UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CV 06 3136**

-----------------------------------------------

JESSE FRIEDMAN,                )

       Petitioner,                )                Index No.

       -against-                )                **AMON, J.**

JOE REHAL, Parole Officer, and
ROBERT DENNISON, Chairman of the                )
New York State Division of Parole,

       Respondents, and                )

THE ATTORNEY GENERAL OF THE                )
STATE OF NEW YORK,

       Additional Respondent.                )

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

JUN 23 2006

BROOKLYN OFFICE

-----------------------------------------------x

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254

Petitioner JESSE FRIEDMAN, by his attorneys Kuby & Perez LLP, submits this Petition

for a Writ of Habeas Corpus as follows:

    1.    The court that entered the judgment of conviction under attack is the County Court,

Nassau County, 262 Old Country Road, Mineola, New York.

    2.    Petitioner entered a plea of guilty on December 20, 1988, and was sentenced to

multiple terms aggregating six to eighteen years on January 24, 1989.

    3.    Petitioner pled guilty to seventeen counts of sodomy in the first degree, one count

of use of a child in a sexual performance, four counts of sexual abuse in the first degree, one count

of attempted sexual abuse in the first degree, and two counts of endangering the welfare of a minor.

    4.    No appeal was filed.

    5.    Petitioner was released to parole supervision in New York County on December 7, 2001. He is currently in the custody of the New York State Division of Parole, reporting in New York County. His parole officer, responsible for day to day supervision, is Respondent Joe Rehal.

    6.    As set forth more fully below, *infra* at pp. 4 – 42, the factual predicates of the claim herein became known to Petitioner commencing in July, 2003, once he was granted access to the original source material obtained by filmmaker Andrew Jarecki. Said materials were unavailable to petitioner prior to that time.

    7.    On or about January 7, 2004, Petitioner filed a motion to vacate his judgment of conviction on the same grounds alleged herein, *viz.*, that despite a court order directing the prosecution to provide all Brady material, the prosecution withheld two broad categories of exculpatory evidence: (1) eyewitness statements exculpating Jesse Friedman of the crimes charged (and, in fact, stating that the crimes never took place), and (2) evidence that investigators used high-pressure, manipulative, and result-oriented interrogation techniques with child witnesses that produced false allegations. Had Jesse Friedman been aware of this and other undisclosed evidence, he would not have pled guilty to crimes of child sexual abuse that he did not commit. Hence, Petitioner is in state custody in violation of his right to due process of law, as set forth in Brady v. Maryland, 373 U.S. 83 (1963), in violation of the Fourteenth Amendment to the Constitution of the United States.

    8.    By Order dated January 6, 2006, and entered on January 19, 2006, the County Court, by the Hon. Richard A. Lapera, J.C.C., denied the motion and all related claims for relief.

2

9.    On February 16, 2006, Petitioner timely applied for a Certificate granting Leave to Appeal to the Appellate Division, Second Department.

10.    By Order dated March 10, 2006, and served on April 10, 2006 with Notice of Entry, the Hon. Howard Miller denied the application.

11.    On May 10, 2006, Petitioner applied to the New York Court of Appeals for a Certificate granting Leave to Appeal.

12.    On May 24, 2006, the New York Court of Appeals dismissed the application.

13.    Calculating the one-year limitations period from July 1, 2006 (when Petitioner began to gain access to the factual predicate for the within claim), 190 days elapsed from discovery of the factual basis to the time of filing for state post-conviction relief. Assuming that the tolling period ended on March 10, 2006,[1] petitioner is within the one-year limitations period.

14.    Pursuant to 28 U.S.C. § 2254(d)(1), it is alleged that the state court decision was contrary to, and an unreasonable application of, clearly established federal law, as set forth by the United States Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Ruiz, 536 U.S. 622 (2002).

15.    Pursuant to 28 U.S.C. § 2254(d)(2), the decision of the state court was based on an unreasonable determination of the facts, as the state court precluded full factual development by denying both an evidentiary hearing and compelling the Prosecution to produce certain relevant discovery.

16.    The extensive background to, and description of, Petitioner's claim is as follows:

---

[1] The Court of Appeals dismissed Petitioner's application on the ground that it lacked jurisdiction to entertain an appeal in the absence of an appeal being granted below.

3

## INTRODUCTION

On December 20, 1988, Jesse Friedman, then nineteen years old, stood before the Nassau County Court accused under three separate indictments charging him with 243 counts of sodomy, sexual abuse, and other crimes against children. It was alleged that his father, Arnold Friedman, a retired teacher who taught after-school computer classes to children in his home, as well as Jesse, who had assisted him in these classes, had sexually abused many students over a number of years. Jesse Friedman was condemned in the press and vilified by a community hungry for retribution based on inflammatory allegations of heinous offenses. If he went to trial and was convicted, Jesse faced the likelihood of consecutive sentences on all of the charges against him – the equivalent of life in prison – from a judge who had made clear her intention to impose such a sentence, before hearing a single piece of trial evidence.

The prosecution of Jesse Friedman came in the thick of an era characterized by many high-profile sex abuse prosecutions that shook the communities in which they arose and the country as a whole. A startling number of these so-called "mass sex abuse" cases – in which the prosecution produced little or no physical evidence – ended in dismissals, acquittals, or post-conviction exonerations of defendants because the prosecution relied on the same suggestive interrogation methods at issue here. But at the time of Jesse Friedman's conviction, these other high-profile cases had not yet unraveled and the atmosphere was still dominated by an imaginary epidemic of mass sexual abuse. By the time of the third indictment, the Prosecution was alleging that the Friedmans led a sex ring, in which numerous adults would violently abuse the children in the computer classes, leading them in bizarre sex games in which all of the children in a class were forced to participate, and continually taking photographs and recording videotapes of the abuse.

4

The only evidence ever relied on to support the claim that Jesse Friedman, who was between fifteen and eighteen years old at the time, was a violent child molester was the statements of the computer students whom the Prosecution claimed he molested. Not one of these children had ever alleged inappropriate conduct in the years during which hundreds were later said to have been molested in the Friedman home. There were no such allegations until after the police launched a sex abuse investigation and began questioning the children. Not one child had ever complained to a parent or teacher, or shown any physical or emotional sign of abuse, despite the fact that parents arrived promptly to pick their children up after each ninety-minute computer class.

There was absolutely no physical evidence of abuse, which police claimed had taken place on a grand and brutal scale, and had been documented extensively in photographs and on videotape, and no such evidence would ever be produced. Finally, the accusations from the children were obtained by police officers who used a panoply of suggestive techniques in conducting their interviews. But since the Prosecution did not, as constitutionally required, disclose any of the evidence in their possession that was favorable to the defense, Jesse Friedman was ignorant of these facts when it came time for him to decide whether to put the Prosecution to their proof at trial.

Confronted by these circumstances, Jesse Friedman decided to plead guilty to crimes he did not commit in exchange for a sentence of six to eighteen years. Affidavit of Jesse Friedman ("Friedman Aff.") ¶ 35. He was incarcerated for thirteen years, and released on parole on December 7, 2001, classified as a "Level 3 Sexually Violent Predator" by the same judge who originally sentenced him.

Toward the end of Jesse's prison term, a documentary filmmaker, Andrew Jarecki, began to discover a large volume of information, never disclosed to the Defense by the Prosecution,

regarding the tactics used by police investigators to obtain accusations of abuse from the fourteen complainants against Jesse Friedman. This new evidence revealed undisclosed statements of child eyewitnesses to police interrogators exculpating Jesse Friedman of any wrongdoing whatsoever. The undisclosed evidence also showed that the investigative method employed by the detectives was a compendium of suggestive and manipulative interview techniques that the police knew, or should have known, would elicit false accusations from children. Jesse Friedman learned about the existence of some of the evidence unearthed by Jarecki when he viewed a rough cut version of the film, "Capturing the Friedmans," in January 2003, and was permitted to view the underlying documents and footage commencing in July 2003. That evidence forms the basis of this Petition.

In the absence of any physical or medical evidence, or prior reports of abuse, the Prosecution relied entirely on allegations made by the computer students after extensive questioning by the police and after the children had entered therapy intended to help deal with the claimed abuse. However, when first questioned by the police, the students stated they had not been abused. They had no recollection of having been abused until after they had been subjected to up to five types of suggestive questioning by the police. Therapists used hypnosis or other so-called "visualization techniques" on at least one child whose complaint was central to the Prosecution's case, eliciting an accusation from a child who, prior to being hypnotized had no memory of sexual abuse. All of these methods have been recognized, in case law and scientific literature, to distort memory and encourage false accusations. The cumulative effect of these tactics fundamentally compromised the competence of all of the child complainants' testimony. That the child complainants (a) at first uniformly denied being abused, and (b) were later subjected to these interrogation methods known to elicit false accusations from children, are two facts that

6

would clearly have been favorable, and in fact crucial, to the defense, therefore requiring disclosure under Brady.

## STATEMENT OF FACTS

### I. The Federal Child Pornography Investigation

The events that led to the filing of child sexual abuse charges against Jesse Friedman were sparked by the investigation of his father Arnold -- a retired school teacher who also taught after-school computer classes in the family's home – for mailing a child pornography magazine to an undercover postal inspector. In July 1984, customs agents at Kennedy Airport intercepted a package from the Netherlands containing a piece of child pornography and addressed to Arnold Friedman. Affidavit of United States Postal Inspector John McDermott in Support of Search Warrant, dated November 3, 1987 ("McDermott Aff."), Exh. 4 (App. 120).[2] They informed Postal Inspector John McDermott.

For the next two years, another postal inspector, posing as a collector of child pornography, wrote letters to Arnold Friedman requesting that Mr. Friedman send him a piece of child pornography, which Mr. Friedman eventually did. McDermott Aff. (App. 121-22). Approximately a year after the mailing of this magazine, on November 3, 1987, Inspector McDermott, posing as a postman, returned the magazine to Mr. Friedman. At that time, McDermott and other agents executed a search of Mr. Friedman's home and found – behind a piano in Mr. Friedman's office – approximately twenty magazines containing "nude photos of pre-adolescent and teenage males," as well as "various pamphlets, booklets and brochures depicting boys in nude and sexual poses." Transcript of Interview with Detective Sergeant Fran Galasso

---

[2] Numbers preceded by "App." indicate the page number in the Appendix of Exhibits, submitted with the instant Petition.

7

("Galasso"), Exh. 5 (App. 131); Transcript of the film, "Capturing the Friedmans,"[3] ("CTF"), Exh. 6 (App. 244-48) (McDermott); Affidavit of Detective William Hatch in Support of Search Warrant, dated November 24, 1987 ("Hatch Aff."), Exh. 7 (App. 371). In addition, the agents found "evidence of a computer class being taught there by Mr. Friedman." CTF (App. 248) (McDermott). They seized "some list of names that we thought could be students." Id. The list turned out to be a list of names and phone numbers of eighty-one of the children who had been students in the computer classes over the prior several years. Galasso (App. 130-32). See Inventory of November 3, 1987 Search, Exh. 7 (App. 377-82).[4]

While the Prosecution would later allege that the Friedmans created hundreds of photographs and videotapes in which they could be seen molesting the children, no such material was found during the federal search or at any other time. Affidavit of Andrew Jarecki ("Jarecki Aff.") ¶ 10 (Onorato) ("In the best case scenario you would like to find videotapes of Mr. Friedman actually sexually abusing the children or at the very least some photographs of some of the children in some sort of compromising sexual positions. We didn't find any of that."); Galasso (App. 188) ("virtually every single one [of the children...] told us they were videotaped"); Alvin E. Bessent, *Dragnet Is Out For Porn Photos In Child-Sex Case*, NEWSDAY, February 8, 1989 (Galasso said, "Just about every class was videotaped. It had to be dozens [of tapes]."), Exh. 9 (App. 384).

---

[3] In instances when the complete transcript of an individual's interview for the film was not available to the Petitioner, citations to the statements are made to the transcript of the film itself, Exhibit 6 to this motion. The name of the speaker is indicated in parentheses. Where the statement appears in footage not included in the film, it is set forth in the Affidavit of Andrew Jarecki and the citation is to that affidavit. A videotape of the film, as well as the videotape of some of the additional footage, referred to in this brief, are provided for the court's convenience.

[4] The record is unclear as to whether and to what extent this list of computer students to be questioned by the police was expanded. One detective, Anthony Sgueglia, said that the police list of possible victims eventually grew to 400. Transcript of Interview with Detective Anthony Sgueglia, Exh. 11 (App. 412).

8

## 2. The State Child Sexual Abuse Investigation

On November 4, 1987, the District Attorney's Detective Squad notified Nassau County Detective William Hatch of the search of the Friedman house the previous day. Hatch Aff. (App. 371). That afternoon Hatch informed Detective Sergeant Fran Galasso, head of the Nassau County Police Department's sex crimes unit, of the search and gave her a copy of the student list that had been found. Hatch Aff. (App. 372); Galasso (App. 130). Galasso immediately started an investigation into possible child abuse. Hatch Aff. (App. 372); Galasso (App. 132). Beginning on November 4, and running into the fall of 1988, Galasso sent out a number of two-detective teams to interview the children who, according to the list, had attended Arnold Friedman's computer classes. Galasso (App. 130-32); Friedman Aff. ¶ 10.

### a. The Computer Classes

Arnold Friedman had conducted these classes since 1982, when he began teaching computer skills to a few Great Neck boys and girls at his home at 17 Piccadilly Road. Friedman Aff. ¶ 4. There were three levels of classes offered (beginner, intermediate, and advanced) at three different times during the school year (starting in September, January, and April). Generally, children in the same class advanced together to the next level. Enrollment in the classes steadily increased over time, and by the time of the investigation Arnold Friedman had taught computer skills to hundreds of boys and girls. He also gave classes for adults that were equally well-attended. Friedman Aff. ¶ 6.

Arnold and Elaine Friedman had three sons – David, the eldest, Seth, the middle child, and Jesse, the youngest. In 1984, Arnold requested that Jesse Friedman begin assisting him in teaching the classes. Friedman Aff. ¶ 4. His responsibilities included preparing the room for the computer class, helping to supervise the children, and assisting his father with the computer instruction.

9

Friedman Aff. ¶ 5. Jesse continued to assist in teaching the classes until June 1987, when he was replaced by another high school student so he could begin college at the State University of New York at Purchase in September 1987. Friedman Aff. ¶ 8.

### b.   Absence Of Complaint And Of Physical Or Medical Evidence

At the time of the federal search – November 3, 1987 – not a single one of the hundreds of computer students who had attended class at the Friedman house over six years had ever complained of any inappropriate treatment.   Parents regularly picked their children up right after class and never noted any negative reaction from any child. One parent, Margalith Georgalis, regularly entered the Friedman house before, during, and after classes, and never saw a hint of any abuse.  Affidavit of Margalith Georgalis ("M. Georgalis Aff.") ¶ 4.  No parent had ever reported any physical or psychological signs that might be associated with their child having been abused. Indeed, Joseph Onorato, the assistant district attorney in charge of the case, does not recall there being any physical evidence to suggest that abuse had occurred.  CTF (App. 273) (Onorato) ("[T]here was a dearth of physical evidence.  I don't even recall whether there was any physical evidence that would have indicated one way or another that these events took place.").  See also Richard Esposito, *Ex-Teacher Focus of Porno Probe*, NEWSDAY, November 13, 1987 ("Police sources said they have not received any complaints about Friedman."), Exh. 10 (App. 386-87).

Detectives, many of whom were transferred into or temporarily assigned to the sex crimes squad, see Transcript of Interview with Detective Anthony Sgueglia ("Sgueglia"), Exh. 11 (App. 390), and untrained in the proper methods for questioning children, fanned out across the town of Great Neck to interview alleged victims.[5]   The teams included, among others, the team of

_____

[5] In addition to common sense, there are specific protocols that should be followed when interviewing children about possible sexual abuse. See, e.g., Dr. Debra Poole, "A Model Child Abuse Protocol - Coordinated Investigative Team Approach," which was developed for the Governor's Task Force on

10

Detectives William Hatch and Wallene Jones and the team of Detectives Anthony Sgueglia and Patty Brimlow.[6] Affidavit of David Kuhn ("Kuhn Aff.") ¶ 5; Sgueglia (App. 393). Detective Sergeant Galasso hoped to gather enough evidence to justify a second search, by state law enforcement. Galasso (App. 139).

That search occurred on November 25, 1987. Inventory of Property Seized in November 25, 1987 Search, Exh. 12 (App. 476–83). Detectives seized all computers and computer-related equipment, all family photographs, home movies, cameras, a home movie projector, and nine "assorted papers with list of boys names and letters." Id. During this search, no child pornography of any kind was found, as substantiated by the detailed search warrant inventory made by the detectives reporting to Detective Sergeant Galasso. Id. Despite this, Detective Sergeant Galasso told filmmaker Jarecki in her interview that the most "overwhelming" thing she recalled from this search was the "enormous amount of child pornography. You would just have to walk into the living room, and it'd be piled around the piano," Galasso (App. 154-155). There were literally foot-high stacks of pornography…in, in plain view, all around the house." Galasso (App. 143).

Arnold and Jesse Friedman were arrested that night. The police then continued to interview computer students at least until shortly before Jesse's guilty plea on December 20, 1988. Friedman Aff. ¶ 10.

---

Children's Justice in Michigan (1993). The protocol outlines an interviewing protocol that police should follow when interviewing children alleged to have been sexually abused.

[6] Other detectives who worked the case included Alex Armstrong, Lloyd Doppman, Larry Merriwether, and Nancy Myers.

11

### c.     Jesse Friedman Was Unaware Of The Tactics Police Used To Manufacture Allegations Against Him And Unaware That Eyewitnesses Had Told Investigators That No Sexual Abuse Occurred

Jesse Friedman was initially unaware of the broad sweep of the investigation targeting him, which included questioning of scores of his father's former computer students. Friedman Aff. ¶ 11. More important, Jesse was unaware then, and for fourteen years after his arrest, of the aggressive tactics used by police to obtain sex abuse accusations from the eight to eleven year-old boys who had attended the classes, and of the critical facts that (a) the children who later became complainants had not recalled being abused until after being subjected to interrogation techniques the police knew, or should have known, would produce false accusations and (b) the children eyewitnesses who did not become complainants (the vast majority of the children the police interviewed) maintained that they had not been abused and that no abuse occurred, even after rigorous police questioning.

Clearly, the methods used by the police were effective at producing sexual abuse charges from children. Between December 1987 and November 1988, Jesse Friedman was charged with child sexual abuse in three separate indictments. In all, the indictments charged 447 counts of sodomy, sexual abuse, endangering the welfare of a child, and other crimes. Two hundred and forty-three of these charges were against Jesse Friedman.[7] The first two indictments named Jesse Friedman's father as his codefendant. In the third, Jesse Friedman's codefendant was another Great Neck teenager named Ross Goldstein.

_____

[7] The first indictment, handed down on December 7, 1987, charged Arnold Friedman and Jesse Friedman with fifty-four counts of child sexual abuse. Ten of these charges were against Jesse Friedman. The second indictment, dated February 1, 1988, charged Arnold and Jesse Friedman with ninety-one counts of child sexual abuse, with thirty-five of these charges pertaining to Jesse. The third indictment, issued on November 7, 1988, charged Jesse Friedman and another teenager name Ross Goldstein with 302 counts of child sexual abuse. Of those, 198 charges were against Jesse Friedman. The specific charges in the three indictments included sodomy, sexual abuse of a child, use of a child in a sexual performance, and endangering the welfare of a child. See Indictments 67104, 67430, and 69783, Exh. 1, 2, & 3 (App. 1-117).

12

**d. Additional Suspects**

Some time in the first half of 1988, the police came to believe that there was a so-called "sex ring" operating out of the Friedman house, and that many teenagers, besides Jesse Friedman, had also participated in the molestation that allegedly took place. See Bill Van Haintze and Alvin E. Bessent, *New Arrest in Child Sex Case*, NEWSDAY, June 23, 1988, Exh. 29 (App. 806) ("'These were additional friends of Jesse who were invited to the Friedman home to participate in these sexual performances,' Galasso said."). Jesse met Ross Goldstein in September 1986, when Goldstein enrolled in the Village School, the high school Jesse attended in Great Neck. Friedman Aff. ¶ 20. Goldstein was a year behind Jesse, who had been attending the Village School for two years before Goldstein's enrollment, and they were casual acquaintances. Id.; Affidavit of Judd Maltin ("Maltin Aff.") ¶ 7. On June 22, 1988, Goldstein was arrested pursuant to a felony complaint alleging eighteen acts of child sexual abuse. Friedman Aff. ¶ 20. The next day, Jesse Friedman was arrested on allegations of thirty-seven acts of child sexual abuse. Friedman Aff. ¶ 21.

In June 1988, Detective Sergeant Galasso told *Newsday* that the new arrests were the result of revelations from "previously identified victims during sessions with their therapists." Haintze and Bessent, supra (App. 806). Detectives continued contacting families, and after "numerous sessions with children brought out information that has led to the latest arrests." Alvin E. Bessent, *Teen Faces 37 New Sex Charges*, NEWSDAY, June 24, 1988, Exh. 30 (App. 807). Galasso stated that, "[o]n further questioning, we began to hear that the friends [of Jesse Friedman] were involved." Id.

The assistant district attorney began negotiating with Ross Goldstein for the purpose of persuading him to cooperate and testify against Jesse Friedman. Friedman Aff. ¶ 23. During the

13

summer of 1988, as it appeared increasingly likely that Jesse Friedman would go to trial, the
Prosecution was preparing its case based solely on the testimony of small children, without the
benefit of any physical evidence or adult witnesses to the alleged crimes. By August 1988, when it
appeared most likely that Jesse Friedman would proceed to trial, the district attorney's office made
Ross Goldstein an offer of six months in jail, five years probation, and treatment as a "youthful
offender," in return for testifying against Jesse Friedman. After repeatedly denying the charges
against him, and three months of plea discussions with prosecutors, Goldstein accepted this offer
on September 8, 1988 and signed a sealed cooperation agreement. People v. Ross G., 163 A.D.2d
529, 531 (2d Dept. 1990). In fact, no evidence was ever put forward to corroborate the claim that
Ross Goldstein had any role in the computer classes or had spent any significant amount of time at
the Friedman house. See Maltin Aff. ¶ 7.

Around the end of October 1988, Ross Goldstein appeared before a Nassau County grand
jury and testified that Jesse Friedman was involved in sexually abusing numerous children. See
Ross G, 163 A.D.2d at 531. Goldstein further testified that he, as well as two other Great Neck
teenagers, had participated in the conduct. See id. at 530-531. On March 22, 1989, Goldstein pled
guilty to three counts of sodomy in the first degree and one count of use of a child in a sexual
performance. Id. at 529. Despite the assistant district attorney's promise that Goldstein would be
treated as a youthful offender and receive a six month jail term, on May 3, 1989, Judge Abbey
Boklan sentenced him to four concurrent terms of imprisonment of two to six years. Id. On
appeal, the Second Department reduced his sentence to the six months he had bargained for. Id. at
533. See Shirley E. Perlman, *Teen Told: Stay Away From Kids*, NEWSDAY, August 9, 1990, Exh.
13 (App. 484).

14

The two additional teenagers whom Ross Goldstein implicated, were pulled into the case in the fall of 1988. John Roe[8] and Wayne Roe – approximately eighteen at the time – were arrested and questioned by police. John Roe has described a high pressure interrogation in which he was browbeaten for "hours and hours" and prohibited from calling his parents or an attorney. Jarecki Aff. ¶ 11 (John Roe). The police suggested that the purported participants included "many more" adults in addition to the Friedmans, Goldstein, and the two other boys arrested. Galasso (App. 182) ("Many more, we believe were involved, but did not get arrested because they were not able to be identified . . . ."). Thus, detectives theorized the existence of a pedophiliac sex ring, with at least five adults at a time brutalizing an entire class of ten boys in a small room with barely enough room to accommodate the boys and their computers.[9] It was also alleged that girls were molested, though none became complainants. John Roe also described one evening on which he and Wayne Roe spotted Ross Goldstein, and caught up with him in their car to ask him why he lied and implicated them. Goldstein explicitly acknowledged that he had lied about them. John Roe explains:

> I was wondering how I was pulled into this situation. At one point, the detectives alluded to the fact that Ross Goldstein decided to implicate me. I can't quite imagine what was going through his mind except for intense pressure from the police to come up with anything that seemed like cooperation, however, he implicated two of his friends that he knew had nothing to do with this. He admitted that on another occasion. He was driving around in his car, alone, as he sometimes did. We noticed his car and decided to follow him and ask him whether or not he was aware that he lied flat out about us. And he had no answer as to why, but he did admit that he lied.

Jarecki Aff. ¶ 12 (John Roe).

---

[8] In the indictment, the child complainants were referred to by "Doe" names. The two teenage suspects were referred to by their "Roe" names by the District Attorney's Office. In this petition, we use those pseudonyms, except in the one case in which a complainant has voluntarily revealed his identity by submitting an affidavit in support of the motion.

[9] See Blueprint of Lower Level of Friedman House, Exh. 14 (App. 485).

15

Once Goldstein agreed to testify against Jesse Friedman, the police and prosecution took no further action against John Roe, Wayne Roe, or any other of the claimed adult participants.

### e.    The Nature Of The Charges Against the Friedmans

The indictments depicted a pattern of rampant pedophilia in Arnold Friedman's classes that was astonishing in its magnitude and bizarre, sadistic, and violent in its particulars.  They alleged hundreds of separate instances of abuse, including scores of instances of oral and anal sodomy. The children's statements to detectives, which formed the basis for the indictments, included accusations that Jesse Friedman, a young man with no history of violence, would slap children, pull their hair, and twist their arms.  Galasso (App. 150).

It was also alleged that the children were induced to participate en masse in sex games such as "leap frog."  Indictment 69783, count 192, 222, 223, 224, 240, 241, and 242, Exh. 3 (App. 88-101) (complainant William Doe).  In this game, Arnold and Jesse would supposedly sodomize an entire class of naked boys by "leaping" from one boy to the next.  See Transcript of Interview with Gregory Doe ("Gregory Doe"), Exh. 27 (App. 737) ("Arnold and Jesse would leap one person to another sticking their dick each in their ass."[10]); CTF (App. 268) (Sgueglia) ("There was a game...called 'leapfrog'...one guy jumping over another guy.  But the fact is, it means everybody's butt's up in the air.").  The bizarre nature of this allegation is reminiscent of other late-80's "sex-ring" cases, such as the McMartin case.  In that notorious prosecution, which lasted six years and cost the State of California fifteen million dollars without obtaining a single conviction, children made outrageous allegations that turned out to be totally untrue.  For example, one child in the McMartin case "testified in the preliminary hearing that he was taken to a

---

[10] The indictments did not include a "leapfrog" claim with Gregory Doe as the complainant.  However, by the time of his interview for "Capturing the Friedmans," Gregory Doe "recalled" the game and described it in detail.

cemetery, where he was forced to help dig up a coffin and watch as the body was cut up with knives." Douglas J. Besharov, *Lessons from the McMartin Case*, THE CHRISTIAN SCIENCE MONITOR, February 9, 1990, Exh. 15 (App. 487).

The implausibility of the charges against the Friedmans is illustrated by the charges made by one boy who was the complainant in 104 counts of oral and anal sodomy in the first degree against Jesse Friedman and Ross Goldstein in the third indictment. Indictment 69783, counts 49– 153, Exh. 3 (App. 56-80). These counts represent seventy-two separate alleged incidents of sodomy.[11] As Jesse Friedman has observed,

> There was one complainant, ten year old boy, says he came to [the] class in the spring of 1986, and during this ten week session, where he was only over my house for an hour and a half, once a week, he says that there were thirty-one instances of sexual contact. That's three times a week, every single week, for ten straight weeks. And then the course ends. In the fall, he re-enrolled for the advanced course and says that he was subjected to forty-one more instances of anal and oral sodomy in the next ten week session.

CTF (App. 332) (Jesse Friedman).

Notably, this complainant alleged only eight counts of sexual abuse, against Arnold Friedman, in the second indictment. Yet by the time of his grand jury testimony for the third indictment, he "recalled" conduct giving rise to more than one hundred additional counts of sodomy. This example is representative of the dramatic expansion of the charges from indictment to indictment as the police, trying to establish the existence of a sex ring, carried forward their aggressive and, as demonstrated below, unconstitutionally suggestive investigation they knew, or should have known, would elicit false accusations. The final indictment added three new complainants – and more than *three hundred* new charges.

---

[11] Thirty-two of the seventy-two alleged incidents were charged under two different theories: sodomy by forcible compulsion (N.Y. Penal Law § 130.50 (1)) and sodomy with a person less than eleven years old (N.Y. Penal Law § 130.50 (3).

17

A further example of the implausible and haphazard nature of the charges, is the fact that sixty-eight of the 118 counts against Ross Goldstein were alleged to have taken place between March 1 and July 1, 1986 – before Goldstein first met Jesse Friedman in September 1986. See Indictment 69783, counts 1-4, 38-39, 41-42, 104-128, 196-200, 206, 221, 240-253, 279-291, and 298, Exh. 3, (App. 43-113); Friedman Aff. ¶ 20;  Maltin Aff. ¶ 7.

      **f.**     **The Prosecution's Theory Of Why The Computer Students Never Complained**

The Prosecution's theory about why none of these boys, ranging in age from eight to eleven, complained to their parents about the routine brutality they allegedly suffered at the hands of the Friedmans was that they were viciously threatened that something horrible would happen if they told anyone about the abuse.  See, e.g., Indictment 67104, count 48, Exh. 1 (App. 12-13) (charging that Arnold Friedman "did slam" the head of a child against wall and threatened the class that the same would happen to them if they revealed what they had witnessed in the classes). According to Galasso, these included threats to "kidnap your baby sister," "kill your parents," and send the alleged pornographic videotapes of the children "to Channel 12 News" in the event that "I get arrested."  Galasso (App. 148).  See also Transcript of Federal Sentencing of Arnold Friedman, March 28, 1988, Exh. 16 (App. 524) (Assistant U.S. Attorney tells district court that Arnold Friedman threatened that he would bang children's heads against the wall, kill their parents or other relatives, or set fire to their houses if they told anyone about the molestation).

No account of the conduct of the police can adequately convey the tenor of the investigation without taking notice of the willingness of police, both at the time and in retrospect, to misrepresent the facts of the case.  For example, the press reported shortly after Jesse Friedman's conviction, based on conversations with police that child pornography was found

"interspersed on shelves along with legitimate classroom materials." Alvin E. Bessent, *The Secret Life of Arnold Friedman*, NEWSDAY, May 28, 1989, Exh. 26 (App. 632). See Jarecki Aff. ¶ 9.

This implied that the viewing of pornographic materials was somehow integrated into the computer classes, when in fact the magazines were all found behind the piano in Arnold Friedman's private office, not within reach of any of the computer students. Clearly, the inaccurate police version was a damning allegation, put forward by the police, who knew at the time that it was untrue, since they had themselves conducted the search. Years later, in an interview with filmmaker Jarecki, Galasso would tell the camera that, "the most overwhelming thing" she recalled from the search of the house was the "foot-high stacks" of child pornography found "all around the house," when in fact, she was present for the search and reviewed the inventory lists, which clearly show that pornography was found only in Arnold Friedman's private office. Galasso (App. 143, 154-55). Comments like these were used to stoke the hysteria surrounding the case.

Perhaps most troubling is the evidence that police constructed a bogus photograph at the "crime scene," combining several items that were innocuous in themselves into a tableau suggestive of perversion and abuse. This photograph included several cameras, a number of heterosexual soft pornography magazines, a number of computer floppy disks, and a hypodermic needle. As other photographs demonstrate, none of these items were found together during the actual search. Jarecki Aff. ¶ 15.

19

## 3.   **Discovery**

In a demand for discovery, dated April 11, 1988, Jesse Friedman's attorney, Douglas H.

Krieger,[12] asked the District Attorney's Office to provide both a bill of particulars and discovery

with respect to Indictments 67104 and 67430.  Demand for Discovery, April 11, 1988, ("Demand

for Discovery"), Exh. 17 (App. 536-47).  Specifically citing the prosecution's obligations under

Brady v. Maryland, the defense made two demands of particular relevance here:

> 16.      Any and all written or oral statements or utterances – formal or informal – made to
> the prosecution, its agents and representatives by any person whom the prosecution intends
> to call as a witness at trial, which statements are in any way contrary to the testimony or
> expected testimony of that person or any other person whom the prosecution intends to call
> as a witness at trial or which otherwise reflect upon the credibility, competency, bias or
> motive of any prosecution witness.  Included in this request, for example, are the names of
> any individuals who were students of the defendant's during the time period of the charges
> in the indictment, who stated that they had not witnessed the alleged crimes.

. . . .

> 34.      In addition to the information and material requested above, any documents, books,
> papers, photographs, scientific tests or experiments, tangible objects, written or recorded
> statements of anyone, grand jury transcripts and oral statements of anyone, reports,
> memoranda, names and addresses of persons, or other evidence or information which either
> tends to exculpate the defendant or tends to be favorable or useful to the defense as to
> either guilt or punishment or tends to affect the weight or credibility of the evidence to be
> presented against the defendant or which will lead to evidence favorable to or exculpatory
> of the defendant which is within the possession, custody, or control of the prosecution the
> existence of which is known or by the exercise of due diligence may become known to the
> Government.

Demand for Discovery (App. 542, 545).

The letter concluded with an emphatic reminder that "each request and each paragraph of

this letter is specifically sought under the rule of Brady v. Maryland, supra, and this Brady material

must be made available to the accused as soon as it should be evident to the prosecution that

---

[12] Jesse Friedman had two different attorneys before Douglas Krieger, each of whom represented him at one
court appearance.  Krieger represented Jesse from December 4, 1987 until June 3, 1988, when he was
replaced by Peter Panaro.  Panaro continued to represent Jesse through his sentencing.

information or material in its possession falls within the **ambit** of the rule." Demand for Discovery

(App. 546).

A week later the Prosecution responded to the demand to produce. In response to

paragraph 16 of the defense's discovery request, the Prosecution stated:

> 16. The defendant is not entitled to any statements made by the People's witnesses until the proper time, namely after the jury is selected. See People v. Rosario. With reference to the names of students of the defendant, the defendant himself is in the best position to know their identity.

Letter from Assistant District Attorney Joseph Onorato, dated April 18, 1988, Exh. 18 (App. 550).

This response demonstrated that the prosecution had either willfully or inadvertently

misconstrued the defense's request. Paragraph 16 of the defense's discovery request was not a

narrow demand for Rosario material – statements of prosecution witnesses that, indeed, need not

be turned over until immediately before cross-examination of a witness. See People v. Poole, 48

N.Y.2d 144 (1979). Paragraph 16 was essentially a Brady request. It asked for evidence of

inconsistent statements, statements suggesting a lack of credibility, and statements reflecting

witness bias. Significantly, it demanded "the names of any individuals who were students of the

defendant's" – a group clearly not limited to prosecution witnesses – "who stated that they had not

witnessed the alleged crimes." Demand for Discovery (App. 542).

The Prosecution responded to paragraph 34 of the demand for discovery by asserting that

they possessed no Brady material at all:

> As to evidence tending to be exculpatory to the defendant such is not now known upon information and belief gained from the files of the District Attorney's Office to be in existence. Should such evidence become available, it will be furnished to the defendant pursuant to Brady v. Maryland.

Letter from Assistant District Attorney Joseph Onorato, dated April 18, 1988, Exh. 18 (App. 552).

21

The defense filed an omnibus motion on April 15, 1988. The motion included a request that the indictments be dismissed "for failure of the People to provide adequate discovery pursuant to [N.Y. Crim. Proc. Law] § 200.95 and § 240.40."[13] Omnibus Motion, April 15, 1988, ¶ 9, Exh. 19 (App. 555). The Prosecution did not produce any Brady material in response to this request. See People's Affirmation in Opposition to Defendant's Omnibus Motion, May 10, 1988, ¶ 9, Exh. 20 (App. 580). In a decision dated July 14, 1988, Judge Boklan denied defendant's motion to dismiss the first two indictments for failure of the Prosecution to provide adequate discovery. Decision on Omnibus Motion, July 14, 1988, Exh. 21 (App. 590).

A third indictment was issued on November 7, 1988. By that time, Peter Panaro had taken over as Jesse's lawyer. Immediately after arraignment on this indictment, both parties agreed that rather than commence motion practice again, a stipulation in lieu of motions and voluntary disclosure would suffice. This stipulation, dated November 17, 1988, and so ordered by Judge Boklan, directed the prosecution to "deliver to the defendant all evidence favorable to him under the authority of Brady v. Maryland." Affidavit of Peter Panaro ("Panaro Aff.") ¶ 7.

Some time before the third indictment was handed down, Panaro viewed a videotape of a police interview with one of the computer students, Gary Meyers, that had been recorded by Gary's mother. See Taped Interview of Gary Meyers ("Meyers Interview"), Exh. 28 (App. 804-805); Panaro Aff. ¶ 8. Gary Meyers' mother secretly taped the interview, in or about Summer 1988, because the detectives would not allow her to be present and she wanted to know what they were discussing with her son. Jarecki Aff. ¶ 6. Detectives Jones and Hatch conducted the interview. Later Gary Meyers' mother allowed Peter Panaro, Jesse Friedman's attorney, to view

---

[13] CPL § 240.40 requires that, upon a defendant's motion, a court "must order discovery as to any material not disclosed upon demand pursuant to § 240.20, if it finds that the prosecutor's refusal to disclose such material is not justified." CPL § 240.40(1)(a). CPL § 240.20(1)(h) provided the statutory basis for the defendant's Brady request here.

the tape in her presence, and transcribe it, although she would not provide Panaro with a copy of the tape. The picture on this Betamax tape was of very poor quality. Panaro Aff. ¶ 8.

As described in greater detail below, the recording of the interview with Gary Meyers showed that the detectives used manipulative, aggressive, and even humiliating interrogation methods designed to produce accusations. Immediately after viewing the Gary Meyers tape, Panaro informed District Attorney Joseph Onorato about the interview. Panaro made it clear to Onorato that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable to the defense that the defense had a right to be informed of. Panaro never received any <u>Brady</u> material indicating that such suggestive methods were used with any of the children interviewed by the police. Parano Aff. ¶ 18.

**4.     Jesse Friedman's Plea**

In late 1988, Jesse Friedman confronted the horrible choice between pleading guilty in return for a sentence of six to eighteen years and going to trial.

If convicted at trial, it was a virtual certainty that Jesse Friedman would spend the rest of his life in prison. Judge Boklan, herself the former head of the Nassau County District Attorney's Sex Crimes Unit, had a reputation as a tough judge, especially when it came to sex crimes. Friedman Aff. ¶ 26. Friedman's attorney, Peter Panaro, had told him that he had been expressly informed by Judge Boklan that she intended to sentence Friedman consecutively on every count – even though she had not yet seen any of the defense's evidence. Friedman Aff. ¶ 26; Panaro Aff. ¶ 11. <u>See also</u> CTF (App. 270) (Boklan) ("There was never a doubt in my mind as to their guilt."). With 167 felony counts against Jesse Friedman, this was a penalty sure to far exceed his lifetime.

Without the benefit of the exculpatory evidence raised by this Petition, Jesse Friedman decided to plead guilty in return for a six to eighteen year sentence. Attorney Panaro demanded

that Friedman admit his guilt in order for Panaro to pursue a guilty plea. Panaro Aff. ¶ 12. In telling Panaro that he was guilty, Friedman offered an explanation for his conduct, telling his attorney that he himself had been a victim of sexual abuse by his father for many years and that his father had coerced him into participating in the sexual abuse of the computer students. Friedman Aff. ¶ 38.

Panaro told Jesse Friedman's story to Judge Boklan during plea negotiations. Panaro Aff. ¶ 14. Friedman presented it to the court again on December 20, 1988, when he pled guilty to sodomy in the first degree (seventeen counts), sexual abuse in the first degree (four counts), attempted sexual abuse in the first degree, use of a child in a sexual performance, and endangering the welfare of a child (two counts), in return for a sentence of six to eighteen years. Friedman Aff. ¶ 37.

Jesse Friedman told this story because he hoped that portraying himself as a victim, and not just a perpetrator, might benefit him in three ways. Friedman Aff. ¶ 38. First, he hoped that this explanation for his conduct would encourage Judge Boklan, who had to approve any plea deal with the prosecutor, to approve a lesser term of imprisonment. Friedman Aff. ¶ 38.

Second, Friedman was hopeful that portraying himself in this way would increase the chances of being granted parole after he completed his minimum sentence of six years. Friedman Aff. ¶ 38. He was aware that Judge Boklan had the power to make a recommendation regarding his parole and he hoped this more sympathetic account would avoid a recommendation against early parole. He also thought that this version of events could be considered a mitigating circumstance by the parole board itself. Friedman Aff. ¶ 38.

Third, Friedman was also aware of the horrendous and often violent treatment of child molesters in prison, having already experienced this when he was held in detention in Nassau

24

County, where he had been attacked a number of times, had urine thrown at him, and was subjected to death threats when fellow prisoners learned of the nature of the crimes of which he was being accused. Friedman Aff. ¶ 38. He hoped that portraying himself as a victim rather than a willing participant in the alleged crimes would reduce the chances that he would be targeted by other inmates and corrections officers. Friedman Aff. ¶ 42. Jesse would continue to present this version of events, in statements to the media, until several months after his conviction, when he entered the general prison population and was instructed by other inmates that this story would not help him to win early release.[14]  Friedman Aff. ¶ 43.

In accordance with his plea agreement, Jesse was sentenced on January 24, 1989, to a term of imprisonment of six to eighteen years.

## 5.    The Discovery Of Exculpatory Evidence

The uncovering of the exculpatory evidence that underlies this Petition was accidental.  In fall 2000, a documentary filmmaker, Andrew Jarecki, had decided to make a film about children's birthday party entertainers in New York City.  One possible subject of the film was David Friedman, Jesse Friedman's older brother, who had become one of the most popular of these performers.  While doing background research, Jarecki became aware that David Friedman's father and brother had been the defendants in a notorious child sex abuse case in Long Island.

---

[14] Jesse repeated this story to Alvin Bessent, a reporter for Newsday (Alvin Bessent, *The Secret Life of Arnold Friedman*, NEWSDAY, May 28, 1989) and Geraldo Rivera, who devoted an entire program to the Friedman case, including a taped interview with Jesse in prison. At the time of the interview, Jesse had spent the first two months of his incarceration in solitary confinement. He still believed that adopting this story could enhance his chances of early parole and shelter him from violence. Geraldo Rivera told him that he would provide him with an opportunity to tell this story – which Jesse thought, rightly or wrongly, was the most sympathetic one available to him – to a large audience, and so Jesse appeared on the program. It was only after a few more weeks had passed, that, having lived in prison and talked to prisoners, he became convinced that this story would not improve his chances for early release, and ceased telling it and never did so again. Friedman Aff. ¶ 43.

Over time, as Jarecki became more interested in that story, his film evolved into an examination of the Friedman case.[15]

During a three-year investigation, Jarecki sought to interview as many of the children involved in the case as possible, including the alleged child victims. He was able to obtain verbal or filmed interviews with approximately twenty-five of the students, now in their mid to late twenties, who had attended the computer classes. These included approximately five who had become complainants in the indictments and about twenty non-complainants, many of whom had attended classes alongside those who had claimed to have been violently abused. Jarecki also spoke to many of the key law enforcement personnel and prosecutors connected to the case, as well as attorneys, relatives, and others. Jarecki Aff. ¶¶ 4, 9, 10, 11.

      a.      **Police Used Five Categories Of Highly Suggestive, Result-Oriented Questioning Designed To Produce Accusations From The Children.**

The statements of the detectives themselves reveal that after initially being unable to procure incriminating statements from the children, they utilized a high-pressure, manipulative, and result-oriented approach to their questioning that was not disclosed to the Defense in discovery. The interviews of children were usually conducted out of the presence of parents, Sgueglia (App. 394-95); Kuhn Aff. ¶ 7, with the interviewing detective taking notes, Sgueglia (App. 452-55, 458); Kuhn Aff. ¶ 6; Affidavit of Richard Tilker ("R. Tilker Aff.") ¶ 7; Affidavit of Brian Tilker ("B. Tilker Aff.") ¶¶ 7, 9. Questioning was characterized by a series of interview techniques that the police knew, or should have known, would elicit false accusations of sexual abuse from children. The suggestive methods used by police fall into the five categories of conduct described below, which are recognized as improperly suggestive in common sense, case

---

[15] Jesse Friedman gave two filmed interviews for "Capturing the Friedmans". He was not privy to information that was obtained from other sources. See Friedman Aff. ¶ 60.

law, and scientific literature.  Certain aspects of police conduct may fall into more than one of
these categories.  Police employed all five types of improper conduct in this case.  In most of the
interviews, several of the techniques were used in combination.

### i. Persistent Questioning In The Face of Denials Of Abuse And The Prosecution's Failure To Produce, As Brady Material, Witness Statements That The Abuse Did Not Take Place.

Wallene Jones and her partner, William Hatch, were key investigators on the Friedman
case, and handled many of the interviews.  Kuhn Aff. ¶ 5.  In March 2001, Jones discussed the
case with David Kuhn, a lawyer and legal advisor on "Capturing the Friedmans," who interviewed
Jones for the film.[16]  Jones told Kuhn that when the detectives were unable to procure
incriminating statements from a student at first, they visited the child many times – in one case on
fifteen separate occasions – until the child provided such statements.  Kuhn Aff. ¶ 9, 10.  In
interview sessions that lasted as long as four hours, this particular boy repeatedly denied being the
victim of abuse, on one occasion jumping up and down and shouting that nothing had happened.
Kuhn Aff. ¶ 9, 12.  But the detectives kept returning to the house because they "already knew" that
the boy was a victim.  Kuhn Aff. ¶ 9.  On the fifteenth visit, the detectives spoke with the boy
alone in his bedroom, explaining to his mother that they were going to stay "as long as it takes."
Kuhn Aff. ¶ 10.  The boy finally stated that he had been abused.  Asked why it took fifteen
interviews for the child to make the accusation, Jones told Kuhn that this boy had suffered
tremendous trauma and had "kept it deep inside."  Kuhn Aff. ¶ 11.  "I drew it out again," she said.
Id.

---

[16] Kuhn took contemporaneous notes.  The quotations of Jones in his notes were taken down verbatim.
Kuhn Aff. ¶ 4.

This sort of relentless questioning was not the exception, but the rule. Ron Georgalis was a student in the classes when he was nine and ten years old. On their initial visit to his home, detectives Hatch and Galasso questioned Ron and he told them that nothing inappropriate had happened to him. Affidavit of Ron Georgalis ("Ron Georgalis Aff.") ¶ 5. Still, Galasso returned for a second interview. When Galasso spoke to his parents in the kitchen, Ron eavesdropped on the conversation and heard Galasso tell his parents that he had been sodomized both anally and orally and that Arnold Friedman had referred to him as "his favorite." Ron Georgalis Aff. ¶ 5. See also Affidavit of Ralph Georgalis ("Ralph Georgalis Aff.") ¶ 3 ("Det. Galasso stated to my wife and me that [Arnold] Friedman had been interviewed in prison, and Galasso quoted him as saying, 'Ron was my favorite.'"). Ron Georgalis insisted then, and insists now, that he never witnessed or experienced any abuse whatsoever. Ron Georgalis Aff. ¶¶ 4, 5, 7.

Student complainant Brian Tilker told a similar story:

> I remember the police questioning me on two occasions. On each occasion, I told them I had never been abused by Arnold or Jesse Friedman or anyone else, and that I did not witness anything inappropriate in the computer classes at any time. I recall that this did not end their questioning and that I felt that they would be unsatisfied with any response other than my concurring with their view that sex abuse had taken place in the Friedman computer classes.

B. Tilker Aff. ¶ 4.

Similarly, James Forrest, another of the students, has stated that "the Nassau County Police visited our house, unannounced, and questioned me and my brother regarding the classes and regarding the Friedmans. We told them nothing inappropriate happened." Affidavit of James Forrest ("Forrest Aff.") ¶ 4.[17]

---

[17] Hal Bienstock, a student who was not interviewed by the police, also states that he never saw anything happening in the classes. Affidavit of Hal Bienstock ¶ 3 ("I never noticed anything inappropriate happening

Gregory Doe, the complainant who has acknowledged that he only made claims against the Friedmans after being subjected to hypnosis, see infra at 40-42, is yet another child who failed to implicate the Friedmans upon initial inquiry.

Perhaps the most unifying theme of the interviews, reflected in the statements of both the detectives and their subjects, is the detectives' practice of returning again and again to question the same children, in one case fifteen times. The police were virtually evangelical in their belief that the children they spoke to had been abused, and treated denials of abuse as anything but the truth. It was typical for police to go back four or five times to a home in which the child had denied that sexual abuse had taken place. Sgueglia (App. 399). See also Sgueglia (App. 413) (numerous children, who Sgueglia believed had been abused said "[n]othing ever happened. We did computers."). The children in the Friedman case were interviewed in their own homes by the detectives. As the Michigan Protocol on the correct methods for interviewing children clearly states, ideally, children should not be interviewed about allegations of sexual abuse in their own home.[18]

As one parent described, "[t]he police wouldn't take no for an answer." R. Tilker Aff. ¶ 6. Detective Sgueglia described the approach: "[Y]ou don't give them an option, really . . . w[]e know that there was a good chance that he touched you or Jesse touched you or somebody in that family touched you in a very inappropriate way." Sgueglia (App. 408).

The apparent premise underlying this unrelenting approach is that child sexual abuse victims tend to deny the abuse at first but will divulge the truth after repeated questioning. This

---

in any of the classes."). See also CTF (App. 267-268) (Former computer student # 2) ("I think as someone who took the classes it was just hard to picture even that going on because I did have a good experience. And I didn't . . . see anything . . . remotely like . . . child molestation or child abuse or any, child-anything going on."); See also NoleDreamer24 e-mail, Exh. 39, (App. 900).

18 Dr. Debra Poole, *State of Michigan Governor's Task Force on Children's Justice and Family Independence Agency Protocol*, GOVERNOR'S TASK FORCE ON CHILDREN'S JUSTICE, 12 (1993).

theory, known as the "child sexual abuse accommodation syndrome" (CSAAS), is thoroughly discredited as a basis for a criminal investigation, and was the foundation for many strikingly similar child sexual abuse cases of the 1980's and 1990's.[19]   Roland Summit, the leading proponent of the theory, argued, counter-intuitively, that "if there is evidence of sex abuse and a child denies it, this is only further proof that it happened and a therapist should use any means to help the child talk."[20]   Dr. Maggie Bruck explains that the CSAAS theory operates on the premise that "abused children must be relentlessly pursued or they will never disclose their abuse; one should not readily accept children's denials or recantations because these responses are typical among sexually abused children."[21]   Further, Bruck observes, "sometimes interviewers assure themselves of the safety of actively pursuing children until they assent to abuse by stating that children cannot be influenced to 'lie' about sexual abuse."[22]

Numerous studies challenge and undermine the Summit theory that children are initially silent about abuse, next deny abuse, and finally, after repeated questioning, will disclose the incidents of abuse.  For example, a study by Bradley and Wood found that among 234 validated

---

[19] In the "Little Rascals" case, in Edenton, North Carolina, a multiple-victim, multiple-offender child sex abuse case that started in 1988, many of the children were repeatedly interviewed until they alleged sexual abuse ("All that is known for sure is that although the children initially denied the abuse, they eventually admitted to it--usually after many months and intervening interviews"). See Stephen J. Ceci and Maggie Bruck, Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony (American Psychological Association 1995).

In the Bobby Fijnje case (jury trial, no published opinion) (in Miami, Florida, in 1991, 14-year old Bobby Fijnje was acquitted at trial in a multiple victim sex abuse where evidence showed that suggestive questioning was used to elicit false accusations of sexual abuse.  In a letter to State Attorney Janet Reno, on May 9, 1991, immediately following the acquittal, the jurors in the case wrote that their decision was partially based upon, "The clearly leading and suggestive questioning on the part of both child psychologists while interviewing the two children involved."). Letter from "The Jurors, State of Florida v. Bobby Fijnje" to Janet Reno, State Attorney (May 9, 1991)(available at
http://www.pbs.org/wgbh/pages/frontline/shows/terror/cases/fijnjeletter.html)

[20] Debbie Nathan, *The Ritual Sex Abuse Hoax*, THE VILLAGE VOICE, January 12, 1990, Exh. 35, (App. 835).

[21] Affidavit of Dr. Maggie Bruck, Fuster-Escalona v. Singletary, Case No. 97-1369 (S.D.Fla 1997) ¶ 23 *available at* http://www.oranous.com/innocence/FrankFuster/MaggieBruck.htm.

[22] Id.

30

cases of child sexual abuse, only 5% of the children denied the abuse when first questioned about it.[23] Other important studies have found that when children are asked over and over about events that did not take place, children will increasingly claim that that the events in fact took place (even when interviewed by a different interviewer); that is, during a third or fourth interview a child is more likely to say that a false event happened than during a first or second interview. This evidence confirms common sense and contradicts the detectives' unfounded premise that children need to be interviewed multiple times in order for the truth to emerge. Rather, the first interview with a child is the most accurate, and subsequent interviews are more likely to result in the false reporting of events. [24]

The American Psychiatric Association has also advised against the use of repeated questioning as a method of eliciting memories of sexual abuse, and its STATEMENT ON MEMORIES OF SEXUAL ABUSE notes that,

> Memories can be significantly influenced by questioning, especially in young children. Memories can also be significantly influenced by a trusted person...who suggests abuse as an explanation for symptoms/problems, despite initial lack of memory of such abuse. It has also been shown that repeated questioning may lead individuals to report 'memories' of events that never occurred.[25]

The belief that instances of trauma, including sexual abuse, are forgotten and repressed is controversial at best. Dr. Elizabeth Loftus, a noted memory researcher, opposes absolutely the hypothesis that repeated instances of trauma can be repressed – "It flies in the face of everything

---

[23] A. Bradley & J. Wood, *How do children tell? The disclosure process in child sexual abuse*, 20 CHILD ABUSE & NEGLECT, 881-91 (1996).

[24] See M. Bruck, S. J. Ceci, E. Francoer & R.J. Barr, "*I hardly cried when I got my shot!": Influencing children's reports about a visit to their pediatrician*, 66 CHILD DEVELOPMENT 193-208 (1995)

[25] American Psychiatric Association Board of Trustees, The American Psychiatric Association Board Statement on memories of sexual abuse (1993), *available at* http://www.psych.org/edu/other_res/lib_archives/archives/199303.pdf.

we know about memory."[26] Nevertheless, detectives (**Sgueglia**, Galasso, and Jones) and therapists

(such as Dr. Sandra Kaplan) involved in the Friedman case unreasonably presumed that robust

repression of major, repeated traumatic incidents could occur literally hundreds of times in this

case.[27]

      This is in accord with the detectives' recollections of widespread denials when the

children were first approached. See Sgueglia (App. 398, **406,** 411, 413).

      For example:

- On one occasion it required fifteen visits to get the desired result. Before the final visit, the detectives assured the boy's mother that they were going to stay "as long as it takes." They did. Asked about the incident thirteen years later, Detective Jones stated that the barrage of visits was necessary because the child had been traumatized and "kept it deep inside." Kuhn Aff. ¶¶ 9, 10, 11.

- Detective Sgueglia recalled conducting multiple interviews with a computer student, who would not say anything happened in the classes, "this one particular kid, we went to four or five times. He was very cool. Didn't say anything, nothing happened. Sit down on the floor, plays games. Totally ignore you-- That you were even there. After an hour or two you helped him with his toy, you did this, you did that. And then you were friendly…. You come back the next night, it's a whole new ball of wax. It's like the kid is no longer a stranger to you, sitting in a room and all of a sudden-- you find the kid is a little hyper. You feel like – you get that feeling he wants to talk to you and you better do it right before he doesn't wanna talk to you at all." Sgueglia (App. 424-25**).**

- James Forrest, one of the computer students states that "[t]he Nassau County Police visited our house, unannounced, and questioned me and my brother regarding the classes and regarding the Friedmans. We told them nothing inappropriate happened." Forrest Aff. ¶ 4.

- Another student, Ron Georgalis, has stated that he told detectives on their first visit that he had not been abused: "Nassau County Police Sex Crimes Unit visited our

---

[26] Leon Jaroff, *Lies of the Mind*, TIME MAGAZINE, November 29, 1993, at 56.

[27] Once memories are implanted by interviewers using suggestive tactics, they often become as real as actual memories, and thus individuals exposed to these techniques can believe that the suggested memories are real. This explains why at least one of the students who only recalled being sexually abused after entering therapy, Gregory Doe, continues to believe that he was actually molested. See Elizabeth Loftus, *Our changeable memories: legal and practical implications*, 4 NATURE, 231-233 (2003).

> home twice . . . . I told them that nothing happened to me." Still Georgalis
> received another visit. Ron Georgalis Aff. ¶ 5.

- Student complainant Brian Tilker also failed to implicate either of the Friedmans
  upon initial questioning. Eventually he told the detectives about an incident of
  abuse, but remembers "saying that not because it was true, but instead because I
  thought it would get them off my back." B. Tilker Aff. ¶ 8.

Quite apart from the scientific research, it is a matter of simple common sense that the

statement of a witness who was regularly at the scene of the alleged crime, stating that no crime

occurred, is evidence favorable to the defense and must be disclosed.

In her interview for "Capturing the Friedmans," Judge Boklan acknowledged this plainly

true proposition:

> Brady material, I don't know if you're familiar with that. That's material that
> would be favorable to the defense. For example, [i]f there was a young child,
> hypothetically, who said oh no, none of this occurred . . . . That would have to be
> handed over immediately, immediately upon reaching the hands of the district
> attorney's office.

Jarecki Aff. ¶ 7. (Boklan).

Yet this has never been done.

### ii.    Presumption Of Guilt By Interviewers

The recently discovered evidence makes clear that it was part of the detectives'

methodology to communicate to the children that the detectives already knew they had been

victims of abuse, and not to accept denials. As Detective Sgueglia, who conducted many of the

interviews, explained:

> Well, if you talk to a lot of children, you don't give them an option,
> really. You just – be pretty honest with them. You – you have to
> tell them pretty honestly that we know you went to Mr. Friedman's
> class, we know how many times you've been to the class. You know
> – we go through the whole routine. We know there was a good
> chance that he touched you or Jesse touched you or somebody in that
> family touched you in a very inappropriate way.

33

Sgueglia (App. 408). See also Sgueglia (App. 409) ("So you don't really give them too much of

an edge to say, what we're here to find out about. We already know about it. We want to hear

what you have to say about it."). If an interview subject inquired about what the detective knew

about the alleged abuser, Detective Sgueglia would say, "'I know things. But I can't tell you what

I know because you know things that I don't know.' And whether they understood that or not,

they knew what I was talkin' about." Sgueglia (App. 460). In Sgueglia's words, the detectives

"did whatever it took." Sgueglia (App. 407). As Detective Lloyd Doppman said, "We knew going

in certain things had happened. We knew that." Jarecki Aff. ¶ 13 (Doppman).

For example, the police did nothing to hide their belief that the Friedmans were guilty

when they came to speak to Gregory Doe, one of the child complainants. Gregory Doe has

explained,

> Thursday night, about six o'clock knock, knock, knock, knock on the
> door. My parents came to the door. "It's the Nassau County Police
> Department. We need to talk to you. Can you please send your son
> downstairs – upstairs. We need to inform you that your son has been
> molested for the past year and Jesse and Arnold Friedman have been
> arrested."

Gregory Doe (App. 742-743). When the interview began, police asked Gregory Doe, "What the

fuck happened? Tell me. You were molested. We know. Tell me. I need to make a report."

Gregory Doe (App. 755). When Gregory Doe's mother told the police that such a thing could not

have happened to her child, one of the detectives responded, "It's that attitude that probably caused

your son to be molested in the first place." Gregory Doe (App. 746).

As part of their questioning routine, other detectives also expressed their certainty that

there had been sexual abuse in the computer classes. Richard Tilker, the father of one of the

student complainants, Brian Tilker, recalls the police arriving at his home unannounced and saying

they, "knew 'something happened' to [your] son." R. Tilker Aff. ¶ 4. "They didn't say 'We

34

believe,' they said, 'We know,' and they insisted upon speaking to our son alone." Id. Mr. Tilker expressed his belief "that the detectives had already formed their opinion of what had happened in the computer classes and that they were just trying to get Brian to agree with their story. . . . [T]hey kept repeating that they know what happened and that he should tell." R. Tilker Aff. ¶ 5. Brian Tilker "remember[s] that they made specific suggestions to me about things that they believed happened in the computer classes . . . ." B. Tilker Aff. ¶ 5.

The suggestiveness of a police presumption of guilt is dramatically demonstrated in the interview of Gary Meyers. In the interview, the detectives went beyond presuming guilt, to actively vilifying the Friedmans. The detectives told Gary on at least seven separate occasions during the interview that Arnold Friedman had confessed to sodomizing children in the classes. See Meyers Interview (App. 804) ("He admitted he sodomized a lot of children"; "Why would Arnold Friedman admit to something that wasn't true?"; "Arnold Friedman in court said that he sodomized children.").

The tactic of actually telling potential witnesses that Arnold Friedman had already specifically admitted molesting them was clearly not limited to Gary Meyers. As Detective Hatch's references to admissions made "in court" make plain, these assurances of Arnold Friedman's guilt were based on the "closeout" statement he gave right after pleading guilty in the state case, in which he admitted abusing every non-complaining child whose name was raised by the police on pain of facing many additional felony charges. Friedman Aff. ¶ 17. "Presumption" is too weak a word to use to describe this virtual guarantee of guilt that detectives provided to the young boys they interviewed. This guarantee worked to manufacture false accusations from the children.

35

### iii.    Rewarding, Punishing Or Humiliating A Child To Obtain Desired Answers

When police encourage certain responses by linking them in the child's mind with rewards, or discourage other responses by linking them to punishments, children are far more likely to provide responses consistent with the interviewer's beliefs.  These rewards and punishments can be subtle and can take many forms, such as praising, bribing, or befriending a child, on the one hand, or refusing to accept a child's answer, or denigrating a child who doesn't provide the desired responses, on the other.  For example, after failing to elicit claims of abuse from one child, a detective in this case told the child's mother, in the child's presence, that he "was a wise guy, and I didn't like his answers."  Meyers Interview (App. 805).  This type of interview creates an emotional tone in which the motivation to please the interviewer may be elevated above the desire to provide accurate responses.

Mindful that "children always wanna please adults," Detective Sgueglia would "find out the child would either favor myself or my partner.  And that's who would take the investigation." Sgueglia (App. 394-95).  Often, the interviews would take place in the child's room, a "very friendly atmosphere," where detectives could "make friends with them," and gain the children's confidence.  Sgueglia (App. 399, 404).  Sgueglia described another situation in which multiple interviews, establishment of a "friendship" with the child, and other inducements were necessary to bring forth a charge of molestation:

> [Y]ou would find some children, this one particular kid, we went to four or five times. He was very cool.  Didn't say anything, nothing happened. Sit down on the floor, play games. Totally ignore you – that you were even there. After an hour or two you helped him with his toy, you did this, you did that.  And then you were friendly. And then – from that point, you'd say – you know, enough tonight, and why don't you think about it.  And you know – we'll come back tomorrow.  And you know we'll deputize you and you know – I like

36

> cops – do you like cops? I like – yeah, they, my mommy says they
> help us. That kind of stuff.

Sgueglia (App. 424-25). Similarly, Richard Tilker "heard from other parents the police would

have pizza parties and give police badges to the children who cooperated." R. Tilker Aff. ¶ 8; see

also B. Tilker Aff. ¶ 11.

The police resorted to the stick as readily as they did the carrot. The repetitive questioning

by police could be so unpleasant that students would finally agree that abuse occurred in order to

obtain psychological relief:

> After many sessions in which the police appeared unsatisfied by my
> negative responses, I became frustrated at the persistent questioning.
> As I stated in my interview with Mr. Jarecki for his film, I remember
> finally telling the police officers that I had seen Jesse chase a kid and
> hit him. I remember saying that not because it was true, but instead
> because I thought it would get them off my back. This statement was
> not accurate but at the time – being 8 years old – I felt that saying
> this would allow me to avoid the unpleasant experience of being
> questioned repeatedly by the police.

B. Tilker Aff. ¶ 8. This recollection is confirmed by the boy's father. R. Tilker Aff. ¶ 6 ("Brian

finally told them that one time he saw Jesse chase after and hit a child, though he later told us that

that was not true and that the only reason he had said that was to end the questioning.").

One child, responsible for sixty-seven counts, including twenty-nine counts of sodomy,

clearly remembered the stress produced by police questioning:

> What I do remember is the detectives putting me under a lot of
> pressure to speak up, and at some point, I kind of broke down. I
> started crying. And when I started to tell them things, I was telling
> myself it was not true. I was telling myself, "Just say this to them to
> get them off your back."

CTF (App. 336) (Dennis Doe).

This use of negative reinforcement to prompt allegations of abuse is also evident in the

taped interview of Gary Meyers. In that interview, Detective Hatch pressured Gary with the

37

intimation that denying abuse in the face of Arnold Friedman's confessions would be an indictment of the boy's intelligence: "You're reasonably intelligent. I wouldn't say you're a genius but you're reasonably intelligent." Meyers Interview (App. 804). Detective Hatch challenged the child's version of events, taunting him: "Oh, it happened to everyone else but not to you." Id. After declaring that Arnold Friedman "liked" young boys, he reiterated incredulously, "You were nine years old and nothing happened?" Id. The detective continued, "You'll find out as you get older that certain things are true, certain things are lies. You denying this doesn't mean it didn't happen." Id. (App. 804-05).

Moving beyond the tactic of refusing to credit the interviewee's answers, the detectives resorted to the even more shocking tactic of humiliation in communicating to Gary, approximately fourteen years old at the time of the interview, that his obstinacy might increase the chances of his becoming a homosexual or pedophile, and having profound psychological problems in the future. After Detective Jones informed Gary that "a lot of boys seem to have concerns about their own sexuality," Detective Hatch expanded on the theme:

> What about a homosexual act over a period of years? Formative
> years? Would you consider that having an affect on a person's
> sexuality? Do you think that determines if you are a homosexual? If
> a person was involved in a homosexual act during preadolescent
> years after they are forced out of it do you think they would like it?

Id. (App. 805). Hatch then explained that a person's failure to admit being the victim of a pedophile could lead to severe psychological distress in later life or even becoming a pedophile oneself.

> Most children who abuse children have been abused themselves. It's
> a monster created within you. This little monster inside you. This
> little voice and every now and then it rears its ugly head. Unless the
> victim knows enough about the problem to get himself straightened
> out. If suppressed, it's a twofold problem. One is anger and
> frustration. And the other is acting itself out. It's a no-win situation

38

> unless the person goes and gets help and admits that he was
> victimized. If something bad happens even though it's not the kid's
> fault the child blames himself and feels tremendous guilt. We find,
> with the help that they can see it's not their fault. And then they
> place the blame on the person who created the situation and then
> they are a lot better off.

Id. (App. 805).

### iv. Peer Pressure – Reporting That Other Children Have Already Given The "Right Answer" By Implicating The Friedmans

In addition to the other suggestive techniques they used, the detectives also exploited the power of peer pressure by telling children they questioned that other children in their class had already implicated Jesse and Arnold Friedman. This coercive technique, which plays upon a child's reluctance to make statements inconsistent with those of his peers, took two forms. Detectives would tell children either that other children had claimed to have been abused or that other children had stated that they had witnessed the interviewee himself being abused.

Detectives told Gary Meyers that several of the other children had told them that he had been a victim of abuse. Detective Hatch advised Gary, "We've had kids who stated that they saw you and that you're involved, OK?" Meyers Interview (App. 804). "Don't deny it yet," Detective Jones immediately interjected. Id. Gary repeatedly denied that he had been abused or had witnessed the abuse of others, saying, "No he never touched me" and "I didn't see it. I didn't hear it." Id. But the detectives persisted, making it plain that they thought Gary was lying and that they were impatient with or offended by what they viewed as his evasions of the truth.

The same tactic was used in the Georgalis home. According to Ron Georgalis's father, "the clear intent of the detectives was to convince us that Ron had been abused and that several other children had already admitted that they, also, had been molested." Ralph Georgalis Aff. ¶ 4.

Detectives told Brian Tilker "repeatedly that other students in my class had already told them that they had been abused, and that they were certain in fact I had also been abused and I should tell them so." B. Tilker Aff. ¶ 5. One detective "recount[ed] for me certain statements that others had allegedly made." B. Tilker Aff. ¶ 6.

### v. Manipulating Answers Through Exploiting The Interrogator's High Status

To a pre-adolescent child, a police officer conducting an official interview is an authority figure with high status. Inherent in this relationship is the natural tendency of the child to please this authority figure and to provide answers consistent with the beliefs expressed by the officer. While an interviewers' high status is an intrinsic feature of the interview, even where the interviewer strives to maintain neutrality, the suggestive potential of this power relationship is activated when an interviewer communicates his implicit agenda to a child or directly exploits the power of his office. Here, as described above, the interviewing detectives employed a host of manipulative tactics. The pure fact that the interviewer was a police detective was made even more compelling when the detective claimed to have information about the child and what supposedly had happened to them. At least one detective in this case went further, offering the child an opportunity to partake in this high status by becoming a "deputy" to the officer himself, asking the child, "we'll deputize you and you know . . . do you like cops?" Sgueglia (App. 425). Some children considered their interaction with the police "an adventure" and "appeared to get a lot of excitement out of the attention they were getting from the police." B. Tilker Aff. ¶ 11.

### b. Hypnosis, Memory Recovery, And Visualization Techniques

In addition to shedding new light on the manner in which police produced claims of abuse from the children, the investigation performed during the making of "Capturing the Friedmans" also revealed that at least one of the complainants did not assert that he had been abused until after

40

he was subjected to hypnosis. As that complainant has acknowledged, "I just remember that I went through hypnosis, came out, and it was in my mind." Gregory Doe (App. 785). This child was the source for thirty-five separate sodomy counts against Jesse Friedman. But it is likely that this instance of hypnosis is not the only one that occurred in this case. Detective Sergeant Galasso acknowledged at the time that there were additional charges revealed "during sessions with…therapists." Bill Van Haintze and Alvin E. Bessent, *New Arrest in Child Sex Case*, NEWSDAY, June 23, 1988 (App. 806).

Dr. Sandra Kaplan – a therapist who worked closely with the police in this case – was an advocate of hypnosis and other so-called "visualization methods," particularly for alleged victims who had "amnesia" for their abuse. Dr. Kaplan worked with the detectives, and the alleged victims, involved in this case as early as December 1987, long before many of the charges were made, and almost a year before Jesse pled guilty. She attended meetings at Great Neck schools in December 1987, January 1988, and November 1988, together with Galasso and others involved in the case. See William S. Dobkin, *Great Neck Community Marshals its Resources to Deal With Child Abuse and Child-Sex Crime*, GREAT NECK RECORD, February 4, 1988, Exh. 31 (App. 808); Friedman Aff. ¶ 30; Temple Beth-El of Great Neck Panelists of Sexual Abuse of Children Program, November 16, 1988, Exh. 32 (App. 810).

After Jesse pled guilty, Kaplan and Galasso (along with others) presented a lecture entitled "Child Pornography and Extrafamilial Child Sexual Abuse,"[28] and discussed the methods used to treat children in the Friedman case. The presentation summary discusses the techniques used to

---

[28] This lecture was presented under the auspices of the Center for Child Protection of the Children's Hospital and Health Center, in San Diego, California, in January 1990. The full title of the conference was, "Health Science Response to Child Maltreatment, with the American Professional Society for the Abuse Annual Meeting and the California Professional Society on the Abuse of Children Annual Meeting in Cooperation with the Office of Victims of Crime, United States Department of Justice".

treat the Friedman computer students, even after Jesse's **guilty** plea, which included hypnosis.

Exh. 34 (App. 813-25). The presentation describes the **utilization** of memory recovery techniques

in detail:

> Of the 15 children seen in the two groups, **six** children had no
> memories of being victimized even though **other** group members
> witnessed their abuse. A technique that **was useful** in helping these
> children remembering was having all group **members** draw pictures
> of the room where they were victimized and **speak** about their
> memories of the classes using the pictures **as a** visual aid. With the
> help of this technique, two group members **who** had amnesia for the
> abuse, remembered most of the detail of **their victimization**. Two of
> the remaining four have had vague but not **detailed** memories and the
> remaining two continue to not remember **their** abuse. The group was
> also helpful in that those children who **remembered**, who initially
> had dissociated, were able to reassure those **with** amnesia that the
> process of remembering would not be **painful** (the children had been
> told by detectives who questioned them that **when** they remembered
> it would be traumatic).

Exh. 34 (App. 821). Thus, even after the conviction of **both** Friedmans, and all the statements

allegedly volunteered by the students, six of the children **in the** classes could not independently

recall the abuse.

17. **The Need For An Evidentiary Hearing And Request For A Discovery**

**Conference:**

The state trial court denied Petitioner's motion, **pursuant** to § 440.10 of the New York

Criminal Procedure Law, without holding an evidentiary **hearing**, without allowing the Petitioner

to take discovery, and without examining the prosecution **file** in camera to ascertain the nature and

extent to which additional Brady material, hitherto undiscovered by the Defense, reposes.

Throughout the course of this litigation in the state courts, the Prosecution has engaged in a

particularized, often highly speculative attack on Friedman's evidentiary submissions, offering a

potpourri of reasons as to why they should not be credited **or** why the evidence of misconduct with

42

respect to witness "x" should not be construed to prove similar misconduct with respect to witness "y" or "w". The Prosecution invited the state courts to resolve credibility determinations based upon argument or competing affidavits—and the state courts accepted such an invitation.

It is important to note what the Prosecution did not plead or prove, and what they will not plead or prove in response to this Petition. The Prosecution never claimed that they did not withhold <u>Brady</u> material. Nowhere did the Prosecution state, under oath, that no <u>Brady</u> material exists. The Prosecution refused to provide documents to the defense, and made no offer or suggestion that the Court should conduct an <u>in camera</u> review.

18.     Therefore, it is respectfully requested that a discovery conference be scheduled with respect to this matter.

**WHEREFORE,** Petitioner Jesse Friedman prays that the Court grant him the relief to which he is entitled in this proceeding.

Dated: New York, New York
June 23, 2006

RONALD L. KUBY [RK- 1879]
DAVID PRESSMAN[29]
Kuby & Perez LLP
119 W. 23rd Street, Suite 900
New York, New York 10011
(212) 529-0223

For the Petitioner Jesse Friedman

---

[29] David Pressman was admitted in New York State in January 2005, but is not yet admitted to the United States District Court, Eastern District of New York.

STate CoveT

COUNTY COURT, NASSAU COUNTY

CRIM. TERM: PART IV
MOTION CAL. C-11
INDICTMENT NOS. 67104, 67430, 69783

P R E S E N T:

HON. RICHARD A. LAPERA, County Court Judge

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK | : **KATHLEEN M. RICE** |
| | : District Attorney |
| | : Nassau County |
| | : Mineola, New York |
| | : By: Judith R. Sternberg, Esq. |
| -against- | : |
| | : Attorney for the Defendant |
| | : Ronald L. Kuby, Esq. |
| | : 740 Broadway, 5th floor |
| | : New York, NY 10003 |
| JESSE FRIEDMAN, | : |
| Defendant | : |
| | : |

The defendant, JESSE FRIEDMAN, by his attorney, Ronald L. Kuby, Esq., has brought

a motion seeking an Order vacating the defendant's judgment of conviction pursuant to CPL

Section 440.10. The District Attorney, by Judith Sternberg, has opposed this application. The

defendant has submitted a reply to the opposition.

On December 20, 1988 the defendant entered pleas of guilty to seventeen counts of

Sodomy in the First Degree, class B violent felonies, one count of Use of a Child in a Sexual

Performance, a class C felony, four counts of Sexual Abuse in the First Degree, class D violent

felonies, one count of Attempted Sexual Abuse in the First Degree, a class E felony and two

counts of Endangering the Welfare of a Child, class A misdemeanors. This plea was taken in

satisfaction of three indictments which had charged the defendant with124 counts of Sodomy in

the First Degree, one count of Sodomy in the Second Degree, 19 counts of Sexual Abuse in the

First Degree, one count of Sexual Abuse in the Second Degree, one count of Attempted Sexual

Abuse in the First Degree, 6 counts of Use of a Child in **a Sexual** Performance, and 69 counts of Endangering the Welfare of a Child.  The defendant was **sentenced** on January 24, 1989 on each count of Sodomy in the First Degree, to an indeterminate **term** of incarceration with a minimum term of six years and a maximum term of eighteen years; **on** Use of a Child in a Sexual Performance, to an indeterminate term of imprisonment **with a** minimum term of five years and a maximum term of fifteen years; on each count of Sexual **Abuse** in the First Degree, to an indeterminate term of imprisonment with a minimum **term of** two and one-third years to a maximum of seven years; on Attempted Sexual Abuse **in the** First Degree to an indeterminate term of incarceration with a minimum term of one and **one-third** years to a maximum of four years; and on each count of Endangering the Welfare of **a Child** to one year.  These sentences were to run concurrently with each other. (Boklan, J.).  **No appeal** was filed.

Defendant now seeks to vacate these convictions **on the** ground that he was not provided with exculpatory and/or impeachment information prior **to the** entry of his guilty pleas. Specifically, defendant contends that the method of **questioning** utilized by the police during their investigation and interrogation of the minor victims **should** have been provided to him, as well as any statements that were made by any victims **initially** denying any sexual contact by the defendant and his father.

The basis for defendant's argument is the movie "**Capturing** the Friedmans", a copy of which is annexed as an exhibit to defendant's motion **papers, and** information gleaned from various sources during the making of that movie.

## WAIVER OF CLAIM

The People argue that the defendant waived any **claim** regarding any <u>Brady</u> violation when he entered his pleas of guilty. In support of their **position** the People rely on the United

States Supreme Court decision in United States v. Ruiz, **536** U.S. 622 (2002), as well as the New York State Supreme Court, Second Department cases of **People** v. Knickerbocker, 230 AD2d 753 (2d Dept. 1996), People v. Thompson, 174 AD2d **702** (2d Dept. 1991) and People v. Day, 150 AD2d 595 (2d Dept. 1989).

The defendant, however, argues that this Court **should** adopt the rationale of the United States Court of Appeals for the Second Circuit as discussed in United States v. Avellino, 136 F.3d 249 (2d Cir. 1998), Brown v. Berbary, 2004 WL 1570258 (W.D.N.Y. 2004) and United States v. Hudak, 2003 WL 221170606 (S.D.N.Y. 2003), **and** the New York State Supreme Court Third Department cases of People v. Ortiz, 127 AD2d 305 (3rd Dept. 1987) and People v. Armer, 119 AD2d 930 (3rd Dept. 1986).

After a review of the case law submitted by the **parties** and a search for additional law on this subject, it is the opinion of this Court that the defendant is not entitled to have his convictions vacated on the allegation that material impeachment evidence  was not disclosed to him prior to the entry of his pleas. United States v. Ruiz, **supra**; People v. Knickerbocker, supra. Defendant has provided no examples of information that **would** be considered as evidence that would have established defendant's "factual innocence"but **rather** is in the nature of impeachment information. United States v. Ruiz, supra, at **631**.   As Justice Thomas stated in his concurring opinion in United States v. Ruiz, supra, at **634,** "the principle supporting Brady was avoidance of an unfair trial. That concern is not implicated at the plea stage regardless."

## DEFENDANT'S CLAIMS OF BRADY VIOLATIONS

### FAILURE TO ADVISE DEFENDANT REGARDING INTERVIEW TECHNIQUES UTILIZED BY THE POLICE

This Court is of the opinion that the defendant did , **in fact**, have knowledge of the

interview techniques used by the police. Defendant's trial counsel was aware of such method by his own admission in the affirmation annexed to defendant's application. Specifically, counsel discusses a tape of an interview that he had seen prior to the entry of defendant's guilty pleas and his concern regarding the questioning of that young man by the police. The opportunity to litigate that issue was available at that time, but counsel did not pursue the matter.

### FAILURE TO ADVISE DEFENDANT REGARDING HYPNOSIS OF VICTIM

Defendant refers to an interview done by the producer of the movie with "Gregory Doe" who mentioned that he had been hypnotized before he remembered any information about the molestation. However, a review of that entire interview reveals that this victim was quite conversant about the molestation from the first time that the police arrived at his door. Whether he subsequently remembered further details and events after undergoing hypnosis is not at issue here nor relevant to this application. The therapist treating him when this all occurred has submitted an affidavit stating that she did not utilize hypnosis in treating "Gregory Doe".

### FAILURE TO ADVISE DEFENDANT REGARDING VICTIMS' INITIAL CLAIMS OF "NOTHING HAPPENED"

The defendant has offered affidavits from two individuals who claimed that they told the police that nothing happened. However, as none of the charges in the any of the three indictments, following motion practice, pertained to these people, it is improbable that defendant would not have entered pleas of guilty if he had had that information. It should also be noted that not only did this defendant admitted his guilt to these crimes under oath before the Court, he admitted his commission of these crimes to the probation department and went on national televison and admitted his guilt.

Accordingly, based upon the foregoing, the defendant's application is denied. No

hearing is necessary as no question of fact is at issue since the requested relief is unavailable due

to the entry of defendant's pleas of guilty as noted.

This shall constitute the Decision and Order of this Court.

So Ordered

Dated: January 6, 2006

ENTER

HON. RICHARD A. LAPERA, J.C.C.

Supreme Court of the State of New York
Appellate Division : Second Judicial Department

M36981
F/

HOWARD MILLER, J.

2006-01594

DECISION & ORDER ON APPLICATION

The People, etc., plaintiff,
v Jesse Friedman, defendant.

(Ind. No. 67104, 67430, 69783)

Application by the defendant, pursuant to CPL 450.15 and 460.15 for a certificate granting leave to appeal to this court from an order of the County Court, Nassau County, dated January 6, 2006, which has been referred to me for determination.

Upon the papers filed in support of the application and the papers filed in opposition thereto, it is

ORDERED that the application is denied.

HOWARD MILLER
Associate Justice

March *10*, 2006

PEOPLE v FRIEDMAN, JESSE

# State of New York
# Court of Appeals

BEFORE: HON. VICTORIA A. GRAFFEO, Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

                            Respondent,

-against-

JESSE FRIEDMAN,

                            Appellant.

CERTIFICATE

DISMISSING

APPLICATION

Ind. Nos. 67104, 67430,
69783

I, VICTORIA A. GRAFFEO, Associate Judge of the Court of Appeals of the State of New York, certify that the application by the defendant-appellant for a certificate to appeal pursuant to section 460.20 of the Criminal Procedure Law is dismissed because the order* sought to be appealed is not appealable under Criminal Procedure Law, section 450.90(1).

Dated: May 24, 2006
Albany, New York

                                                   

Associate Judge

*Description of Order: Decision and order of County Court, Nassau County, entered January 18, 2006, denying defendant's motion to vacate a judgment of conviction.

FRIEDMAN

AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,     AFFIDAVIT OF
                                           JESSE FRIEDMAN

-- against --

JESSE FRIEDMAN,                              Indictment Nos.
                                      67104, 67430, 69783

            Defendant.

-------------------------------------------------------------------x

      JESSE FRIEDMAN, hereby declares under penalty of perjury that the
following is true and correct:

      1.     I am the defendant in the above-captioned case. This affidavit is
submitted in support of the accompanying motion to vacate my conviction
pursuant to CPL 440.10 (h). I make the affidavit based upon personal knowledge
and upon information and belief.

      2.     I grew up in Great Neck N.Y. with my parents, Elaine and Arnold,
and my older brothers, David and Seth. We lived at 17 Piccadilly Road.

      3.     During the day, my mother ran a "playgroup" daycare center for
toddlers in our home for toddlers. My father conducted computer classes after
school for local children ranging in age from 8 to 11.

      4.     My father began conducting these after-school computer classes in
our home around 1982. In September 1984, when the high school student who
had been assisting my father with the classes left for college, I began working as
an assistant to my father. I was fifteen years-old, and in tenth grade at the
Village School in Great Neck.

1

5.      My responsibilities as an assistant to my father consisted largely of preparing the room for the computer class, and cleaning up the room when the class was over. I would come home from school, put away the toddler toys from my mother's playgroup, and then set up for the computer class. I would set up the tables, computers, monitors, printers, and chairs. I would also run all the extension cords and set up the blackboard. When the class was over, I would take everything down, put all the computer equipment back in the closet, and leave the room ready for my mother to use in the morning for her playgroup. During the classes I helped supervise the children, and maintain order. For example, I would make sure that they did not run around, trip over wires, get into fights, or throw things at each other. I would also generally help out with the computer instruction.

6.      The computer classes usually had eight or nine students, as we had space for nine computers – one computer per student. There would be two or three classes per week throughout the entire school year. Courses were offered in three sessions during the school year (starting in September, January, and April) at different levels (beginner, intermediate, and advanced). Once a group was formed, the children would progress through to the advanced course-level, and would tend to re-enroll as a group. Enrollment steadily increased over time. My father also gave classes for adults that were equally well-attended.

7.      Our neighbors often expressed annoyance at the constant stream of children entering and leaving our house. During the day, the neighbors weren't happy about the noise from the toddler playgroup in the backyard. After school,

2

they weren't happy that computer students would congregate in front of the house talking before and after class, and that people would arrive to pick them up, often honking their horns or parking and talking to each other while waiting for their children. To avoid disturbing our neighbors, we always asked the parents not to honk. One of my jobs was to look out for parents arriving to pick up their children, and to help the children quickly to their parent's car so their parent would not honk or loiter.

8.       When I left for college at SUNY Purchase in September 1987, my father, on the recommendation of a high school computer teacher in Great Neck, hired Michael Shapiro, a Great Neck high school student, to take over my job as his assistant in the classes.

9.       On November 3, 1987, a postal inspector, John McDermott, dressed as a letter carrier got my father to accept a "controlled delivery" of a child pornography magazine. Another postal inspector had posed as a devotee of child pornography and had been corresponding with my father ever since July 1984, when agents of the United States Customs Service had intercepted a magazine at Kennedy Airport containing child pornography sent from the Netherlands and addressed to my father. Our house was searched, and federal agents seized items including approximately twenty magazines containing child pornography. They also found out that my father was conducting computer classes in the home, and a list of names and phone numbers of eighty-one students in the computer classes.

10.      On November 4, 1987, Sergeant Fran Galasso, head of the Nassau County Police Department's sex crime unit, was given the list of names seized the

3

day before in the search. At this point, Galasso started an investigation into possible child sexual abuse. She sent out two-detective teams to interview the children who, according to the list, had attended the classes. We were unaware that the children on the list were being interviewed about child sexual abuse. This interview process would continue for the next twelve months.

11.     On November 25, 1987, I was arrested, as was my father, on a felony complaint alleging child sexual abuse. My bail was originally set at $500,000, and my father's at $1,000,000. On December 2, 1987, the Appellate Division Second Department ordered that my bail be reduced to $100,000. I posted bond shortly thereafter. At this point, my father and I realized that detectives were interviewing children who attended the computer classes about possible allegations of child sexual abuse.

12.     On December 9, 1987, my father and I were arraigned on indictment number 67430, a 54-count indictment charging sexual abuse of five children. The charges included sodomy in the first degree, sexual abuse in the first degree, using a child in a sexual performance, and endangering the welfare of a child. Ten of the counts in the indictment pertained to me. Both my father and I entered pleas of not guilty before Judge Abbey Boklan.

13.     On January 13, 1988 my father posted bond and was released to house-arrest. On February 8, 1988 my father pled guilty in federal court to one count of sending a child pornography magazine through the U.S. mail.

14.     On February 9, 1988 my father and I were arraigned on indictment number 67104, a 91-count indictment based on the complaints of eight children,

4

charging sodomy, sexual abuse, and endangering the welfare of a child. Thirty-five counts of the indictment pertained to me.

15. The case resulted in massive media coverage. Still photographers and a television camera from News 12 (Long Island) photographed and filmed the arraignment. Even though the charges were of an explosive nature, Judge Boklan made no effort to restrict media coverage. Prior to the arraignment, Judge Boklan had approved an application for media coverage of the proceeding. Judge Boklan continued to grant media requests to cover the proceedings, and she ultimately granted permission for all media applications.

16. On March 25, 1988 my father pled guilty before Judge Boklan to charges of sodomy in the first degree (8 counts); sexual abuse in the first degree (28 counts); attempted sexual abuse in the first degree (4 counts); and endangering the welfare of a child (2 counts) in full satisfaction of both indictments, in exchange for a sentence of ten to thirty years in prison. My father believed that being present as a codefendant at my trial – especially having been convicted of sending child pornography through the mail -- would ruin any chance for me to be acquitted.

17. After my father's guilty plea, on the evening of March 25, 1988, he gave the police what his attorney, Jerry Bernstein, described to us a "close-out" statement. My whole family waited at the police station while my father made this statement to the police. The purpose of the statement, we were told, was to enable the police to "close-out" their files on the case. My father provided a lengthy Q&A to the Nassau County sex-crimes detectives. He was asked to

5

confirm that he had molested each of the children on the police list of students. The police explair :d to him that if ne did not confess to these other acts of sexual abuse he could be re-arrested and charged with such acts. Jerry Bernstein told us that my father would be granted immunity to any such acts that he confessed to – accordingly, he confessed to misconduct with regard to every child the police named. Bernstein told my father that any child whom he declined to admit molesting could be the source of further charges against him. The police later used this statement when they continued questioning other children about me.

18.     My father's guilty plea proceeding was also filmed by the television press. On April 15, 1988 I made a motion for a change of venue, which was denied by Judge Boklan.

19.     On May 13, 1988, my father was sentenced by Judge Boklan to an indeterminate sentence of ten to thirty years, in accordance with his plea agreement.

20.     On June 22, 1988, Ross Goldstein, an acquaintance of mine from the Great Neck Village School, was arrested on a felony complaint and charged as my co-defendant. Goldstein was a year behind me in school, and we had met in September of 1986. We were both charged with crimes that allegedly took place before we had ever met one another. Sixty-eight of the charges against Goldstein in Ind. # 69783 took place prior to our meeting. Ross Goldstein was not a close friend of mine, and had visited my house no more than three times.

21.     On June 23, 1988 I surrendered to Nassau County police for arrest on new charges.

6

22. On June 24, 1988 I was arraigned on 37 new charges of child sexual abuse that allegedly took place during the computer classes. I was also charged with photographing students while they were being sexually abused by others, including Ross Goldstein (Ind. #69783 counts 201, 202, 203, 204, 194, 195) and also photographing students during sexual games such as "Simon Says", "Leap Frog", and "Super Hero" (Ind. #69783 counts 191, 192, 193). I was also charged with photographing students while they engage in sexual acts with my father (Ind. #67104 counts 4, 5).

23. In the days immediately following his arrest, Ross Goldstein was offered a sentence of 2-6 years in exchange for testifying against me. He declined the offer. He was then offered a 1-3 years sentence and again declined the offer. The police attempted to intimidate two of Ross Goldstein's friends into testifying against both Ross Goldstein and myself. When they were unable to arrest either of them, the D.A. went back to Goldstein and offered him six months in the county jail, five years probation, and a youthful offender adjudication in exchange for his testimony as states witnesses against me. Ross Goldstein accepted this offer.

24. On September 8, 1988 Ross Goldstein entered into an agreement with prosecution to cooperate in exchange for a promise that the District Attorney's Office would recommend that his sentence include six months of jail time, five years probation, and a youthful offender adjudication.

25. On November 15, 1988 I was arraigned on indictment No. 69783, a 302-count indictment charging me and Ross Goldstein with sodomy, sexual

7

abuse, and endangering the welfare of a minor against six children. One hundred and ninety-eight of the counts were against me. My bail conditions remained unchanged.

26.    I began to give serious consideration to the option of pleading guilty to the charges. Under the circumstances it began to look like the only sensible course to follow. I was convinced that I would lose a trial, and that I would be in prison for the rest of his life. I was subjected to pressure from my attorney, Peter Panaro, who informed me that I could never win a trial, and that Judge Boklan would sentence me consecutively on every count after a conviction at trial. Panaro told me that he obtained this information directly from Judge Boklan during a conference with her. Judge Boklan was the former head of the Nassau County District Attorney's Office Sex Crimes Unit, and had a reputation as a tough judge, especially when it came to sex crimes.

27.    I was only 19 years old, and my father had already pled guilty and been sent to prison. My mother placed tremendous pressure on me to plea bargain rather than fight the accusations at a jury trial. I knew that I was not guilty of the charges, and I also believed on one level that I should go to trial, but I was terrified and exhausted by the stress of the disintegration of my family. I believed my mother when she said that if I were to be convicted in a jury trial I would be incarcerated for the rest of my life. I knew that if I pled guilty I would eventually be released from prison.

28.    Judge Boklan had permitted media news cameras to be present in the courtroom during my hearings and appearances; virtually every media

8

application submitted to her was approved. The media in Nassau County had been completely unfavorable, and her acceptance of all the applications further persuaded me that she was not an impartial Judge and that I would not have a fair or balanced trial.

29. The media was not sympathetic to my case, and the coverage was mainly about how to detect child sexual abuse and how to help victims of sexual abuse. There were no stories that question whether or not the children were actually abused or suggested that I or my father might be innocent. Thus, I was convinced that no one in Nassau County would ever find me innocent of the charges. In June 1988, *Newsday* published a story that discussed how my father "identified about 80 boys he had sexually abused". This was a reference to the close-out statement that had been shared by the police with the media. (Source: NEWSDAY, June 24, 1988)

30. The community of Great Neck had reached a moment of hysteria about the case. The P.T.A. in Great Neck organized letter-writing campaigns, community meetings, and car-pooling arrangements to get community members to attend court appearances. The newspapers in Great Neck published numerous stories about the case, describing community meetings and saying that every student who ever attended a computer class should seek therapy to help prevent future problems. In December, 1987, the *Great Neck News* reported that Detective Galasso advised parents to seek professional counseling for their children who were involved in any way, and the Great Neck North Middle School Principal Ira Gordon announced over the school's loud speaker that if any students wanted to

9

talk, staff was ready and willing. Dr. Edward Brandon, the school psychologist, asked teachers to be on the look-out for unusual behavior and comments, and to report to him if there were any problems. Meetings were held in December 1987, and January 1988 in Great Neck about the case. Detective Galasso attended these meetings, as did Dr. Sandra Kaplan, the therapist treating many of the alleged victims of sexual abuse. (Source: *Great Neck Record* February 4, 1988) In November 1988 a local synagogue, Temple Beth El in Great Neck, held a community meeting focusing on the subject of "Child Abuse One Year Later", and a discussion on how to prevent child sexual abuse. Dr. Kaplan was joined at the meeting by Detective Galasso and talked about sexual abuse, warning signs in children, and about the abuse alleged in the computer classes. In November 1988, the *Great New News* reported that Dr. Kaplan and Detective Galasso believed that any child who had contact with Arnold Friedman, no matter how minimal, should be considered a victim.

31. My father, a co-defendant, had already pleaded guilty. We were indicted on numerous counts on a theory of aiding and abetting. It was frightening to think that a jury would know all about his confession (due to the pervasive media coverage of the case) and that my attorney would be asking these jurors to find me not guilty on the very same counts.

32. There were also other factors that influenced my decision to plead guilty. Ross Goldstein had agreed to the offer of six months county jail time, five years probation, and a youthful offender adjudication – and was going to testify against me as a State Witness. There was a chance that a jury would take into account that Goldstein's cooperation had been induced by the promise of a six month

10

sentence, instead of the decades of imprisonment he would otherwise have faced. However, I knew how detrimental his testimony as an adult witness would likely be at my trial. I was told by my lawyer that Detective Galasso said she was investigating my brothers and that if I insisted upon a trial one or both of my brothers would be arrested. Two additional suspects were named, indicted under pseudonyms but never arrested, and many of my high school friends were being pursued for questioning by the police. I took the threats by Detective Galasso against my brothers and my friends seriously, as Ross Goldstein had already been arrested and charged.

33. I was also finding it impossible to find any supportive defense witnesses. I couldn't find any students who were in the classes, and who told the police that nothing happened and didn't press charges, who would agree to come to court and testify on my behalf. Further, my father's close-out statement was shared by Nassau County detectives with the families of computer students – specifically the non-complainants. After reading the close-out statement, where my father described sexually abusing the computer students, they were unwilling to publicly support me.

34. I was traumatized by the entire experience. I was only nineteen years old. I was financially unable to pay for clinical psychiatrist and other expensive legal expert witnesses whom I knew would be important to a trial defense.

35. On December 20, 1988, I made the painful decision to plead guilty to the charges against me. This was a desperate decision that I reached only after realizing that there was no way I could win a trial. In my view, if I lost a trial I

11

would go to prison for life for something I did not do. At least if I pled guilty, I would eventually get out of prison and at a relatively young age and I would have at least some chance of eventually living a normal and happy life.

36. I told Panaro that my father sexually abused me and that I grew up thinking that this was normal and acceptable behavior. I told him that I sexually abused the students in the computer classes, and that I was guilty of the charges against me. I told him this because Panaro insisted that I confess to him before he would allow me to plead guilty in court. Panaro told this story during his plea negotiations with Judge Boklan hoping to overcome an impasse in negotiations and persuade the judge who had to approve any plea deal with the prosecutor, to approve a reasonable term of imprisonment.

37. I entered into a plea bargain agreement with the District Attorney's office for indictments numbers 67430, 67104, and 69783. I pled guilty to sodomy, first degree (17 counts); sexual abuse, first degree (4 counts); attempted sexual abuse, first degree (1 count); use of a child in a sexual performance (1 count); and endangering the welfare of a minor (2 counts) in exchange for a promised indeterminate sentence of six to eighteen years. After my plea, I was taken into custody of the Nassau County Sheriff's Department.

38. On January 24, 1989, I appeared before Judge Boklan and received a sentence of 6 to 18 years imprisonment. I told the Judge that I was guilty, but that she should have sympathy for me because my father sexually abused me and I did not understand that sexual abuse was wrong. I knew there would be television cameras in the courtroom filming my sentencing. I believed that saying

12

I was a victim of my father would somehow **influence** the parole board, and that Judge Boklan would ask the parole board for **leniency**. My false confession did not have the desired result, and Judge Boklan **asked** the parole board – in a proceeding before the televised cameras and **press** – to consider me a dangerous criminal and to hold me for the full eighteen **years** of my sentence. Once I had decided to plead guilty in exchange for a **lighter** sentence I could no longer say I was the victim of a witch-hunt. The best thing I could see to do was to say I had done the crimes, but that there was a mitigating circumstance behind my actions.

39.     On May 3, 1989, Judge Boklan **sentenced** Ross Goldstein to an indeterminate sentence of two to six years in **prison**, in direct contradiction of the District Attorney's bargain with him, which **called** for a six month sentence and youthful offender status in exchange for his **testimony**. I read in a NEWSDAY article from May 4, 1989, that in his plea for **youthful** offender status Goldstein's attorney, in court, quoted Det. Galasso as **saying**, "[Goldstein] was not a pedophile and is not a risk to the community." **On** July 21, 1990, the Appellate Division overturned Judge Boklan and ordered **that** Goldstein's promised sentence be imposed. Goldstein was released **from** prison after thirteen months.

40.     On February 6, 1989, only a **few** weeks after I entered prison, I agreed to be interviewed for the Geraldo **television** show. My attorney warned me against doing this, and made me sign a letter stating that I understood the risks and wanted to do it anyway. I was nineteen **years** old, in solitary confinement, at the very start of my prison sentence, traumatized and depressed. I went on the

show in what I believed to be a last-ditch effort to obtain public sympathy and explain myself in some way.

41. In my interview for the Geraldo show, I talked about being molested by my father and sexually abusing children in the computer classes with my father. Less than three weeks earlier I had been sentenced in court to these very charges, I had told this same story about being molested by my father, and I saw no reason not to continue with the false story. My mother participated in the show and so did my lawyer – even though he advised me against participating. I was in a fragile state and am ashamed about going on the Geraldo show. I did this for the same reasons that I told Judge Boklan that I was sexually abused. I was facing a long sentence and had pled guilty to having sexually abused numbers of young and helpless boys.

42. I was rationally terrified about being attacked and abused in prison by other inmates and corrections officers, and I believed that they might see the show and have sympathy for me. I was aware that child molesters were not treated well in prison, and I hoped that if they believed I was a victim myself I might be treated differently. When I had been in the Nassau County jail prior to posting bond, I had been assaulted by security staff on more than one occasion. Urine was thrown on me. My mother was a member of a group in Nassau County called "Prison Families Anonymous", and I had attended a number of these meetings and had heard only frightening things about being a child molester in prison. Before I went to prison, I had met with a counselor at the Fortune Society in New York City, and he shared with me a realistic and horrific picture of what

14

prison would be like for a convicted young, white, homosexual-child-molester. I felt that my only hope for survival in prison was to claim that I too had been a victim of my father and pray for sympathy and compassion.

43.     I continued to present this version of events, in statements to the media, until several months after my conviction, when I entered the general prison population and was instructed by other inmates that this story would be of no avail. I learned that no series of mitigating circumstances would persuade the Parole Board to release me. While in prison I was denied parole four times because my instant offense demonstrated a propensity for extreme violence, and due to my failure to complete a sex-offender therapy program.

44.     On August 23, 2000, the Time Allowance Committee at Coxsackie Correctional Facility denied me release and withheld a year of good-time credits because I failed to successfully participate in a sex-offender therapy treatment program.

45.     In December 2000, my brother David told me that he would be featured in a documentary about children's entertainers directed by Andrew Jarecki. He was excited because he felt this would enhance his status as the number one children's birthday party clown in New York City.

46.     In January 2001, my brother David was devastated, and told me that Jarecki has "discovered" the secret about me and my father, and that the film would include information about my arrest and conviction. I, too, became distraught because I didn't want to be involved in what I am was told by David would be a film that would destroy his career and perhaps hurt my chances for a

15

future of a normal life even more.  We retained an attorney in an effort to force Jarecki not to make his film.

47.     On March 6, 2001, I received my first letter from Jarecki.  He introduced himself, explained his plans to make a film featuring my family.  He wanted to travel to the prison to visit me and interview me on camera for his movie.

48.     On April 4, 2001 Andrew Jarecki and Marc Smerling, one of the films producers, visited me in prison against the wishes and demand of my attorney.  He made it clear that he was going to make his movie, and that he had the financial resources to do so with or without my cooperation.

49.     After months of negotiation and conflict, my brother David and I agreed to participate in the film.  We realized that our participation was our only hope to have our story told in a sympathetic way, as we knew the film would be made with or without our cooperation.

50.     Andrew Jarecki made his film, *Capturing the Friedmans*, without any Friedman family members having any input on creative matters or content. We eventually shared our family documents (including video tapes, letters, tape recordings, etc.) with him because we became convinced that he wanted to make a fair and objective film about what happened to our family.

51.     Until he finished making the film, Jarecki did not share information with me about his investigation into the case.

52.     On December 7, 2001, I was released from Clinton Correctional Facility, in Dannemora, New York, after serving thirteen years of my sentence.  I

16

was released to "Intensive Parole Supervision" including a 7:00 pm nightly curfew, an electronic ankle bracelet, and mandatory three-times-a-week sex offender therapy.

53.     On January 1, 2, and 3, 2002, I sat for a lengthy on-camera interview with Jarecki.

54.     On January 7, 2002, Judge Abbey Boklan held a sex offender registration classification hearing. Her determination was to classify me a level three "violent sexual predator."

55.     On March 16, 2002, I sat for a second on-camera interview with Jarecki.

56.     On January 10, 2003, I saw a rough cut of *Capturing the Friedmans* for the first time during a private screening for family members. This gave me some hope that I might be able to overturn my conviction.

57.     Beginning in February, 2003, I made repeated unsuccessful efforts to obtain copies of the transcripts from my guilty plea and sentencing from the Nassau County Court.

58. On June 1, 2003, I met Ron Georgalis for the first time while at the Angelika Film Center after screening of *Capturing the Friedmans*. He told me that he was in the classes and nothing happened – and that he is willing to help in any way that he could. On, June 4, 2003, I received an e-mail from Jamie Forrest, another student in the classes, who also told me that nothing happened – and that he too was willing to help me in any way that he could help.

17

59.    On June 28, 2003 I received an e-mail from

NoleDreamer          ι from Florida saying how he was one of my father's

students in the computer classes, that he never saw my father do anything to any

student, and that he believed I was 100% innocent. I subsequently learned from

Ron Georgalis that NoleDreamer              is        .

60.    On July 7, 2003, I meet with Andrew Jarecki; Earl Nemser, Esq.;

Joel B. Rudin, Esq., and my brother David to discuss legal options of filing a

post-conviction motion. At this meeting Jarecki promised that he would allow me

access to any of the materials he had regarding my case to use in challenging my

conviction. At this point, I realized that it might be possible to clear my name and

to explain what happened and why I pled guilty 14 years ago.

JESSE FRIEDMAN
305 East 105th Street
New York, New York 10029

Dated: January 5, 2004

Sworn before me this 5<sup>H</sup>
Day of January _____, 2004

JUDITH M. ABRAHAM
Notary Public, State of New York
No. 31-4715173
Qualified in New York County
Commission Expires March 30, 2006

18

JARECKi AFF.

---------------------------------------------------------------

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
--------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,                AFFIDAVIT OF
                                                    ANDREW JARECKI
                    -- against --

JESSE FRIEDMAN,                                     Indictment Nos.
                                                    67104. 67430, 69783
                    Defendant,

--------------------------------------------------------------x

ANDREW JARECKI hereby swears, under penalties of perjury, that the following is true and correct:

1. I am a documentary filmmaker living in New York City.

2. In fall 2000, I had decided to make a film about children's birthday party entertainers in New York City. One possible subject of the film was David Friedman, an older brother of Jesse Friedman. the defendant in the above-captioned case, who had become one of the most popular of these performers.

3. While doing research, I became aware that David's father and brother had been the defendants in a notorious child sex abuse case in Long Island. Over time. as I became more and more interested in that story, my film evolved into an examination of the Friedman case.

4. During a three-year investigation, I sought to interview as many of the children involved in the case as possible, including the alleged child victims. I was able to obtain verbal or filmed interviews with approximately twenty-five of the students, now in their mid to late twenties, who had attended the computer classes. These included approximately five who had become complainants in the indictments, and about twenty non-complainants, many of whom had attended classes alongside those who had claimed to have

been violently abused. I also spoke to prosecutors and law enforcement personnel connected to the case, as well as attorneys, relatives, and others.[1]

5. Jesse Friedman sat for two interviews with me for "Capturing the Friedmans". In accordance with my desire to make an objective and impartial film, I did not share with him the evidence we discovered in making the film. He was not part of the film making team, and he did not see any of the footage from the film until he viewed the film in full in January 2003. He was not compensated in any way for his participation, nor were any other members of the Friedman family.

6. During work on the film, I learned that Ann Meyers, the mother of one of the computer students, had made a secret tape of the police interview with her son (using a video camera, though only the audio portion was recorded), conducted by Detectives Hatch and Jones, because they would not allow her to be present when they were questioning her son. I was informed of this by Peter Panaro, Jesse's attorney, who told me that while Anne Meyers did not provide him with a copy of the tape, she allowed him to view and listen to it, and he transcribed the interview verbatim. Panaro allowed me to

---

[1] Most of the statements cited in the memorandum of law in support of Jesse Friedman's motion to vacate his conviction are contained either in the transcript of the film itself, or transcripts of several of the full interviews conducted in making the film. These transcripts are included as exhibits to the motion. Several of the other statements cited, not included in film, were part of the full length interview tapes made for the movie, and have neither been transcribed nor, because they are voluminous, provided to the court. Cites to these statements in this affidavit include their location on these tapes. These tapes will be made available at the court's request. Still other statements were made at filmed public forums regarding the film that have not been transcribed, in which police officers, former students in the Friedmans' computer classes, and others involved in the case participated. These statements appear in the videotape – "Capturing the Friedmans: DVD Extra Material" ("CTF-Extra") – that was submitted to the court with defendant's motion. The location of statements that appear on this tape is indicated parenthetically in this affidavit. In addition, this affidavit sets forth a telephone message left on the Friedmans' answering machine in 1988.

type his handwritten transcription, which I did. The typed version is an exhibit to this motion.

7.      In making the film, I interviewed Judge Abbey Boklan, who presided over the case. At one point, Judge Boklan described the nature of Brady material to me:

> Brady material, I don't know if you're familiar with that. That's material that would be favorable to the defense. For example, [i]f there was a young child, hypothetically, who said oh no, none of this occurred . . . . That would have to be handed over immediately, immediately upon reaching the hands of the district attorney's office. (Tape 51 at 33 minutes).

9.      Judge Boklan described the atmosphere surrounding the case as a "media frenzy", and she also told me that the Friedman case was the first case in the history of Nassau County in which, with her permission, cameras were allowed in the courtroom. She described her decision to allow cameras in the courtroom:

> Well, I listened to the defense attorneys, who were opposed as I recall. The district attorney was not opposed. And of course it's his job to protect the children. It was something the community was very interested in, the media was very interested in, and I believe in open courtrooms and as long as the names of the children and the children could be protected I saw no harm in it. I wasn't that concerned about protecting the defendants. Their pictures their names were all over the newspapers, so their reputation at that point was not too good. (Tape 47 at 10 minutes).

10.     I also interviewed Joseph Onorato, the assistant district attorney in charge of the Friedman case. He told me during his interview that no photographs or videotapes of Jesse Friedman or Arnold molesting the children were ever found, during the federal search or at any other time: "In the best case scenario you would like to find videotapes of Mr. Friedman actually sexually abusing the children or at the very least some photographs of some of the children in some sort of compromising sexual positions. We didn't find any of that." (CTF-Extra "The Investigation"). Detective Galasso also told me that the Friedmans

had made pornography using the computer students, but that "nothing ever materialized."

(CTF-Extra "The Investigation")

11.    I also spoke to "John Roe", one of the two teenagers who was arrested in

the case but never charged. John Roe described to me the night he was arrested:

> I was stopped by an unmarked police car and told to get in
> the vehicle and wasn't ever told why, where I was going or
> what I had done wrong. Every time that I inquired, all I
> was told is, "you'll see when we get there." And they took
> me to, right near Old Country Road in Mineola, where
> there was a police station. And in Mineola I was placed
> . into an interrogation room. I believe what they did was
> illegal in that I was there for quite some time. It was hours
> upon hours, I would estimate ten hours without being able
> to call anybody, like my parents. I figured my next best
> shot was to call an attorney and they did not allow me to
> contact anybody. They basically tried to use intimidation
> to scare me and threaten into some sort of admission.
> Some of the things they said were, "We know you were
> there! We know you had something to do with this, so if
> you want to make this easier on yourself, you'd better just
> admit it now." You're gonna be indicted, you're gonna go
> to jail for this." They had me believing that I would be
> locked up in jail for something I never did. (CTF-Extra
> "Additional Suspects")

12.    John Roe also told me that Ross Goldstein had implicated

him in the case, and that Goldstein had later admitted that he had lied.

> I was wondering how I was pulled into this situation. At one
> point, the detectives alluded to the fact that Ross Goldstein
> decided to implicate me. I can't quite imagine what was
> going through his mind except for intense pressure from the
> police to come up with anything that seemed like
> cooperation, however, he implicated two of his friends that
> he knew had nothing to do with this. He admitted that on
> another occasion. He was driving around in his car, alone, as
> he sometimes did. We noticed his car and decided to follow
> him and ask him whether or not he was aware that he lied flat
> out about us. And he had no answer as to why, but he did
> admit that he lied. (CTF-Extra "Additional Suspects")

13.    Detective Lloyd Doppman attended a public screening of "Capturing the Friedmans." During a question and answer period following the screening, Detective Doppman got up to speak. Among other comments, he described the attitude of police when they went to interview alleged child victims in their homes: "We knew going in certain things had happened. We knew that." (CTF-Extra "An Altercation at the New York Premiere")

14.    During the investigation of the Friedmans, the family received numerous threatening phone calls, some of which were recorded on their home answering machine. During the making of "Capturing the Friedmans," Jesse Friedman shared some of these tapes with me. In one of the calls, not included in the film, the caller stated, "You better get out of that house 'cause we're burnin' it down tonight."

15. The police constructed a bogus photograph at the "crime scene," combining a number of items that included several cameras, photographs removed from heterosexual magazines such as "Playboy," a number of computer floppy disks, and a hypodermic needle. Earlier photographs in the same series show that these innocuous items were each found separately in various places in the Friedman house, and that the police officers who combined them into one sinister-looking photograph, did so to create the impression that they were found together and somehow related; For example, to give the impression that the photographs from the magazine had been taken by the Friedman cameras, or that the computer discs were in some way related to the pornography.

These photographs are shown in the attached in CTF-Extra "The Investigation".

**ANDREW JARECKI**

Dated:  January 7, 2004

Sworn before this 7th
Day of January. 2004

STANLEY A. LEFKOWITZ
NOTARY PUBLIC, State of New York
No. 01LE4668571
Qualified in New York County
Commission Expires June 30, 2006

PANARO
AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------- --------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

             -- against --

AFFIRMATION OF
PETER PANARO, ESQ.

JESSE FRIEDMAN,

Indictment Nos.
67104, 67430, 69783

             Defendant,

--------------------------------------------------------------------x

     PETER PANARO, ESQ., hereby affirms under penalty of perjury that the

following is true and correct:

    1.    I am an attorney duly admitted to practice law in the State of New York. I

am also admitted to practice law in the United States Supreme Court, the United States

District Courts for the Eastern and Southern Districts of New York, as well as other

courts.

    2.    I represented Jesse Friedman, the defendant in the above-captioned case,

from June 1988 through his sentencing in January 1989. Mr. Friedman was charged in

three indictments with more than two hundred offenses involving the sexual abuse of

children.

    3.    I make this affirmation based on personal knowledge and upon

information and belief. In preparing this affirmation, I reviewed my entire legal file on

this case.

    4.    Jesse Friedman was indicted on December 7, 1987, together with his

father, Arnold Friedman, as a codefendant, for offenses involving the sexual abuse of

children. A second indictment charging Arnold and Jesse Friedman with sexual abuse

was issued on February 1, 1988. When my representation of Jesse Friedman began, Arnold Friedman had already pled guilty under these two indictments and had been sentenced both in Federal court and State court. This left Jesse Friedman's charges pending trial.

5.      Notwithstanding repeated efforts by the district attorney's office to persuade me that Jesse should enter a guilty plea, my client and I were intent on going to trial. Assistant District Attorney Onorato advised me that if Jesse did not plead guilty, his office would obtain a third indictment, and that this indictment would include many more charges than both previous indictments combined, and that those charges would be much more serious. Further, Mr. Onorato stated that if this were necessary he would seek to revoke Jesse's bail and have him incarcerated pending trial.

6.      True to his word, when Jesse did not plead guilty, Onorato obtained a third indictment (No. 69783), in which Jesse was charged together with Ross Goldstein, another Great Neck teenager, as a codefendant. This 302-count indictment included 198 counts against Jesse, including more than 100 of them charging sodomy in the first degree. Additionally, Mr. Onorato did seek to have Jesse's bail revoked, an application that was denied by the then presiding judge, Judge Boklan.

7.      Immediately after arraignment on this indictment, counsel for both parties agreed that rather than commence motion practice again, a stipulation in lieu of motions and voluntary disclosure would suffice. This stipulation, dated November 17, 1988, and so ordered by Judge Boklan, directed the prosecution to "deliver to the defendant all evidence favorable to him under the authority of Brady v. Maryland."

8.    Before the third indictment was handed down, I had learned from either Jesse or Arnold Friedman that                , the mother of one of the computer students, had secretly made a videotape of an interview with her son, conducted by Detectives Hatch and Jones. I went to                's house and she allowed me to watch the tape in her presence. The picture on this Betamax tape was of very poor quality, but the audio was very clear. As I watched the tape, I transcribed the interview. I later allowed Andrew Jarecki, the director of "Capturing the Friedmans", to type up my handwritten transcription, which he did accurately.

9.    After Ross Goldstein was charged, Mr. Michael Connacchia telephoned my office and identified himself as an attorney who was retained to represent the co-defendant, Ross Goldstein. Mr. Conacchia told me that his client had no idea why he was involved or being charged with these crimes since he had never even been inside the computer room at the Friedman home, and never met any of these complainants. I met with Mr. Conacchia and shared my thoughts with him and the two of us began preparing for trial over the course of the next few months, meeting several times and discussing the case. At all times it was always the defendant Ross Goldstein's position that nothing ever happened and that these crimes were never committed by him.

10.   On or about September 21, 1988, I telephoned Mr. Conacchia to arrange for a meeting and for the first time, Mr. Conacchia informed me that his client "had changed his mind" and would be saying that the incidents charged in the indictment did in fact take place. After pressing Mr. Conacchia for some time, Mr. Conacchia finally admitted that his client would be cooperating with the District Attorney's Office.

11.     In or about November 1988, during a conference in Judge Boklan's chambers, Judge Boklan told me that if Jesse were to go to trial, she intended to sentence him to consecutive terms of imprisonment for each count that he was convicted on.

12.     Notwithstanding his protestations of innocence, Jesse informed me, on or about December 12, 1988, that he wanted to plead guilty because he believed that if he went to trial he would be found guilty and would spend almost the remainder of his life in jail. He was 19 years old at the time. Jesse told me if he pleaded guilty he would probably get out of jail by the time he was 30 years old. I told Jesse that I would not represent him on a guilty plea unless he was guilty and that I could not ethically allow him to plead guilty if he was maintaining his innocence to me.

13.     Jesse told me that he had committed the charged offenses. He also told me that not only had he had been a victim of sexual abuse by his father for many years but that his father had coerced him into participating in the molestation of the computer students.

14.     At a conference, I told the court that Jesse had informed me that he had been a victim of sexual abuse by his father for many years and that this should be considered by the court in mitigation of sentence. I reiterated this request at the sentencing of my client.

15.     Jesse and I had been extremely frustrated in our preparation for trial since no Brady material had been provided to us by the prosecution. In the absence of any physical evidence, medical evidence, or prior complaints by any computer student, the prosecution was relying entirely on new statements allegedly made by the computer students after the police questioning had begun. Accordingly, the only way for us to

refute the prosecution's case would have been to produce evidence showing that the testimony of the computer students was incorrect or not reliable. The Friedmans had been unable to contact the computer students directly for two reasons: First, upon information and belief, when Arnold Friedman had initially tried to contact some of the students, the prosecution had retaliated by revoking his bail. This was a clear warning to Jesse that he should not try to contact them himself. Second, the police had confiscated the list of computer students and their contact information, and refused to return it to the Friedmans. So our only hope was that we could get access to any Brady material that might support the position that Jesse was innocent of the charges. When we were repeatedly denied any Brady material, we realized that it would be difficult to mount a meaningful defense.

16.     While it has always bothered me that we were never provided with this Brady material, it was not until 14 years later, when I saw Andrew Jarecki's film, that I realized the enormous extent and import of the material to which we were refused access. After seeing the film, and some additional information collected by Jarecki, I now realize that the children interviewed as part of the prosecution of Jesse Friedman were subjected to numerous suggestive questioning techniques. In particular, I have learned that the interviews were characterized by leading questions, expressions of the interviewer's beliefs that Jesse Friedman was guilty, manipulation such as befriending and rewarding children to produce sex abuse claims, intimidating or threatening them when such claims were not forthcoming, and repeated interviews when children denied abuse. I also note from the film that one of the most significant complainants in the case had no recollection

of, and made no allegations of any sexual abuse until after he was hypnotized, a technique widely shown to cause false memories.

17. Subsequent to viewing the film, it became apparent to me that the children interviewed as part of the prosecution of Jesse Friedman (other than Gary Meyers, whose interview I was already familiar with) were subjected to numerous suggestive questioning techniques. In particular, I have learned that the interviews were characterized by leading questions, expressions of the interviewer's beliefs that Jesse Friedman was guilty, manipulation such as befriending and rewarding children to produce sex abuse claims, intimidating or threatening them when such claims were not forthcoming, and repeatedly interviews when children denied abuse. I have also since been advised that at least one of the children made no allegations of sexual abuse until after hypnosis.

18. The recording of the interview with Gary Meyers showed that the detectives who conducted the interview used suggestive and harassing questioning. Immediately after viewing the Gary Meyers tape, I informed assistant district attorney Joe Onorato about the interview. I made it clear to him that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable to the defense that the defense had a right to be informed of. I never received any Brady material indicating that such suggestive methods were used with any of the children interviewed by the police.

19. Had I been aware at the time of this extensive body of impeachment evidence, I would have seen the prospect of a guilty plea in a completely different light. I already found it quite incredible that sexual abuse of the scope and severity alleged could have taken place without a single child complaining or showing other signs of

abuse. I also believed that the hysteria surrounding **the** case could well be responsible for the ever growing number of charges, but as an attorney I had virtually no affirmative evidence with which to oppose the allegations. My common sense and logic told me that scores of children, including the 14 children who were complainants against Jesse, could not be repeatedly sodomized and sexually abused hundreds of times, over a period of four years, day in and day out, and say nothing. After all these were not 3 and 4 year old boys. They were between 8 and 11 years old. I felt that the idea that no one would have said a word, and that in fact some of the most significant complainants would sign up for multiple classes after having been violently abused in the prior classes, was ridiculous. But logic and common sense cannot substitute Brady material – real evidence that would tend to exculpate my client.

20.     In addition, Jesse's situation at the time was made even more dire by the destruction of his family support structure (with the arrest of his father and mother who was briefly arrested, and accusations threatened against his two brothers -- later shown to be totally without merit), the absence of funds required for experts who would have been necessary to prepare a meaningful defense, and the ever increasing number of charges against him (and the attendant publicity accompanying each new set of charges).

21.     It is clear to me that proper disclosure of Brady evidence could have thoroughly altered Jesse's view of his chances of prevailing at trial. If the defense had been privy to that information I believe that Jesse Friedman would certainly have opted to fight the charges against him at trial.

PETER PANARO

KUKN
AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,          AFFIRMATION OF
                                              DAVID KUHN, ESQ.
-- against --

JESSE FRIEDMAN,                               Indictment Nos.
                                              67104, 67430, 69783
                    Defendant,

-----------------------------------------------------------------x

DAVID KUHN, ESQ., hereby swears, under penalties of perjury, that the
following is true and correct:

1.      I am an attorney duly admitted to practice law in the state of New York. I
was admitted in March 1994 in the First Department. In or about early 2001, I worked as
a legal advisor for the documentary film, "Capturing the Friedmans."

2.      In or about March 2001, Andrew Jarecki, the director of the film, asked
me to interview one of the individuals who had worked as a detective on the Friedman
case -- Wallene Jones. The interview was to be used in making the film.

3.      Mr. Jarecki had located Detective Jones, who now lives in Atlanta,
Georgia, and he had spoken to her on the phone. I called her and arranged to visit her in
person so I could take down her recollections of her experience in the Friedman case. On
March 10, 2001, I met with former detective Jones at her place of business, "Gems of
Africa," in Atlanta, Georgia. We spoke for about an hour and a half.

4.      I took careful notes when speaking to Ms. Jones. Quotations attributed to
Ms. Jones in this affirmation are in her exact words.

5.      Ms. Jones told me that she and her partner, William Hatch, were the lead

investigators on the Friedman case and worked from a list of former Friedman computer students provided to her by Fran Galasso. She and her partner conducted numerous interviews. They would arrive in plain clothes at the children's homes. She told me "we assumed all the kids [on the list] were involved." She stated that the detectives knew certain information about what happened, and that it was in their minds when they conducted the interviews.

6.    Jones told me that she thought she had taken notes on the interviews with children when possible.

7.    In the first home they visited, Jones and Hatch spoke to three brothers – ages eleven, twelve, and thirteen – each of whom had been a student in Arnold Friedman's computer classes. Jones recalled separating the boys from each other and from their parents for questioning. She told me that this had been done because "kids will never admit bad things in front of or to their parents." Further, she said that she thought she took notes on the interview she conducted, but could not be positive. "If I did they'd be in the file," she said. "I did not keep any of that stuff myself."

8.    She told me that the boys indicated in general terms that "something bad" had happened to them, but not with much specific detail. She told me that it was common to establish a "very good rapport" with the children, and that this was done with the three boys. However, the parents refused to have their sons sign the statements prepared by the detectives after the interview.

9.    Jones described one instance in which it took fifteen visits to a child's home before he declared that he had been abused. In interview sessions that lasted as long as four hours, the boy repeatedly denied being the victim of abuse. The boy "would

let us sit with him in his bedroom for hours, and he'd bring up every topic except sexual abuse. We played games with him, he showed us his computer, he'd do anything to avoid the subject." Jones added, "for a long time he had nothing to say, but we knew." On one occasion the boy jumped up and down, screaming, 'I have nothing to tell you! Nothing happened!' "[B]ut by then we already knew," Jones said, "so we kept coming back after that until he told us."

10.     On the fifteenth visit, the detectives spoke with the boy in his room, after his mother promised to stay completely away from the boy's bedroom and not come in at all during the interview. They explained to her that they were going to stay "as long as it takes, that we were not going to leave until he told us. We were prepared to stay all night if need be."

11.     The boy finally stated that he had been abused. Asked why it took the child fifteen interviews to make the accusation, Jones told me that this boy had suffered tremendous trauma and had "kept it deep inside." "I drew it out again," she said. She stated that the detectives did not return after that visit.

12.     I asked Ms. Jones if there were any physical signs of abuse of the boy. She replied that she could not remember any. She remembered that on one visit, the boy shouted that "I have nothing to tell you" and that "nothing happened," but she and her partner still returned to question the boy, because they "already knew, so we kept coming back after that until he told us."

13.     When I asked her about the media in the case, she told me that there had been a frenzy surrounding it, which died down after a while. She said that when another

child sexual abuse case arose, against a school bus driver named Robert Izzo, the intense attention sparked up again, as crazy as it ever was.

14.    I affirm as an officer of the court to the truth of the matters asserted herein in the above document.

Dated: Nantucket, MA
        January 6, 2004

_____ 1/6/04

David Kuhn, Esq.

RON  GEORGALIS

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,        AFFIDAVIT OF
                                            RON GEORGALIS

FRIEDMAN
        -- against --

JESSE FRIEDMAN,                             Indictment Nos.
                                            67104, 67430, 69783

        Defendant,

----------------------------------------------------------------x

        RON GEORGALIS hereby swears, under penalties of perjury, that the following

is true and correct:

        1.      I am twenty-seven years old.  I am currently a third-year student of

anthropology at Florida State University in Tallahassee, Florida.  I am now working on

my master's thesis and expect to have completed my Master of Arts degree by the end of

Spring 2004 semester.

        2.      I grew up at 16 North Road in Great Neck, NY.  During the years 1985

and 1986, when I was nine years old, I was enrolled in the computer classes taught in the

Friedman home at 17 Piccadilly Road.  I was enrolled in the course for one term of

approximately ten classroom sessions and then re-enrolled of my own volition and

without hesitation for another such term.  I fondly remember those Wednesday afternoon

classes as both an opportunity to see my friends,          ·                    and

        .  When my mother asked me if I would like to re-enroll for a third term, I

declined because I felt that I was not a serious enough computer student for the classes,

while a pleasant escape from the tedium of schoolwork, to have remained worthwhile.

My mother also attended adult education computing **cla**sses in the Friedman home, which she thoroughly enjoyed.

3.      My memories of the computer classes **them**selves are overwhelmingly positive.  Classes typically began with playing **compu**ter games for fun.  To my knowledge, games with pornographic content, such **as the** game "Stroker" which was depicted in "Capturing the Friedmans," were at no **time** present in the classroom setting.  The only game in which I recall any type of group **invol**vement was "Eliza," a game where the computer essentially provided psychologi**cal** counseling in response to one's input.  Allegations of sexual group activities, such **as the** game "Leap Frog", also mentioned in the film, are patently ridiculous.  Arnold **Friedman** conducted the classes, teaching the BASIC computer language and the funda**men**tals of designing simple programs.  Jesse Friedman was there to provide ass**istance** and presumably to also learn computer skills from his father.

4.      I never witnessed Jesse touching any **of the** children, inappropriately or otherwise.  I do not remember ever meeting either of **the** other Friedman sons or Jesse's friend, Ross Goldstein.  The only other student not **already** mentioned whom I recall being in any of my classes was                who **seemed** to be something of a prodigy in computing.

5.      During the investigation of Arnold **and** Jesse Friedman, the Nassau County Police Sex Crimes Unit visited our home **twice**.  To the best of my recollection, it was during the first of these visits that both Detective **Galasso** and Detective Hatch questioned me in the dining alcove of our kitchen **about my** experiences in the classes.  I told them that nothing happened to me.  I remember **vividly** being taken into our

computer room alone with Detective Hatch, where he showed me the computer program,

"Jerky Mouse," confiscated from the Friedman home. The program, which he told me

had been confiscated from the Friedman home, consisted of a cartoon mouse

masturbating. I told him that I had not ever seen it before. The detectives seemed to give

up and leave. The second visit was made by Galasso alone. I remember extremely well

that she spoke to my parents in the kitchen with the louver doors closed to keep me from

hearing them. I eavesdropped through the doors and recall her telling my parents

authoritatively that I had been both sodomized and forced to engage in oral sex with

Arnold and that he had admitted in a jailhouse confession that I "was his personal

favorite." I do not remember being given any opportunity to counter this charge and

deny that anything of the sort had taken place.

6.      I can also confirm that the identity of the individual with the e-mail

account and screen name "NoleDreamer                    is.

,.)

7.      In conclusion, I can state without reservation that I did not experience any

form of abuse, sexual or otherwise, during the Friedmans' computer classes at 17

Piccadilly Road, nor did I witness any other children being abused.

RON GEORGALIS

Sworn before me this _30ᵗʰ_ day
of December 2003.

_____
Notary Public

My Commission Expires Feb. 21, 2011

RALPH   GEORGALIS

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,     AFFIDAVIT OF
                                              RALPH GEORGALIS

-- against --

JESSE FRIEDMAN,

         Defendant,

----------------------------------------------------------------x

RALPH GEORGALIS, hereby declares under penalty of perjury that the
following is true and correct:

1. I am submitting this affidavit because my son, Ron, was, approximately
15 years ago, one of the children in Arnold Friedman's after-school computer classes. I
experienced the Friedman phenomenon firsthand. I hope that one of my clear
recollections of the time will be of some use to the court in the case before it.

2. I was not present the first time that Det. Galasso and Det. Hatch came to
our home to interview Ron in their investigation of Arnold Friedman.

3. I was present, with my wife, when Det. Galasso returned some months
later for a second questioning of Ron. In both instances Ron was questioned in a separate
room, outside the hearing of our family. By the second visit Arnold Friedman was in
prison, after his confession. Galasso's second visit was obviously to gather evidence
against Jesse Friedman. At this time Det. Galasso stated to my wife and me that Friedman
had been interviewed in prison, and Galasso quoted him as saying, "Ron was my
favorite."

4.      On both visits the clear intent of the detectives was to convince us that

Ron had been molested and that several other children had already admitted that they,

also, had been abused. The first visit was to attempt to gain statements implicating

Arnold Friedman. The second visit was an attempt to gain statements implicating Jesse

Friedman in the abuse.

Ralph Georgalis

RALPH GEORGALIS

Sworn before me this $30$ day
of December 2003.

DORINA A. MARTAKIS
Notary Public, State of New York
No. 998172
Qualified in Queens County
Commission Exp. Res June 22, 2006

Dorina O. Martakis

M  GEORGA LISO

AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,      AFFIDAVIT OF
                                                   MARGALITH GEORGALIS

          -- against --

JESSE FRIEDMAN,                         Indictment Nos.
                                     67104, 67430, 69783

            Defendant.

----------------------------------------------------------------x

MARGALITH GEORGALIS hereby swears, under penalties of perjury, that the following is true and correct:

     1.      I am 64 years old.   I live in Great Neck, New York

     2.      In the mid 1980s I enrolled in an introductory computer class in the adult education program in Great Neck, which was taught by Arnold Friedman.  I was so impressed by his teaching ability that when I heard he was giving computer classes to children I immediately enrolled my son Ron.

     3.      Ron attended either 2 or 3 sessions (consisting of 10 classes each) and I enrolled in another class for adults given on the same evening as Ron's class.   After every class Ron would bring home a printout of a little program that was taught that day. I even saved all those printouts all these years.

     4.      At that time we purchased our own computer and Arnold was kind enough to lend us disks and a lot of advice. That meant that I was always walking into the house at the beginning or end of class. Never did I see anything other than children sitting in front of computers, and Arnold and Jesse walking around and answering questions.

5. I was totally shocked when the police showed up at our home with the accusation of child molestation. Ron was unable to supply them with any information. After Arnold was sent to prison the police came again. This time they told us that they had interviewed Arnold in prison and that he had told them that Ron had been his favorite. Even this did not bring back any memories to my son even though the police told us that they already knew Ron had been abused.

6. Over the years I had dozens of long heart to heart talks with my son. I had told him that if someone had done something to him that he did not want done it is not the end of the world and it would be good to remember it and then put it aside but he could never remember anything. I finally concluded that nothing had happened to him.

7. I now believe that nothing inappropriate ever happened to anybody at that house. It is inconceivable that not one child in that class ever complained or refused to go back to those classes if even a small portion of what the police said were true.

8. Some of the other children who I remember Ron was in the same classes with were            and

Margalith Georgalis
MARGALITH GEORGALIS

Sworn before me this 30 it
day of December ___, 2003

_____
Notary Public

DORINA A. MARTAKIS
Notary Public, State of New York
No. 01MA4998172
Qualified in Queens County
Commission Expires June 22, 2006

Dorina A. Martakis

FORREST AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

            -- against --

JESSE FRIEDMAN,

            Defendant,

------------------------------------------------------------------x

AFFIDAVIT OF
JAMES FORREST

Indictment Nos.
67104, 67430, 69783

       JAMES FORREST hereby swears, under penalties of perjury, that the following is true and correct:

       1.     I am 27 years old. I currently live in Brooklyn, NY and work as an Audio Engineer for a DVD Production Company.

       2.     I grew up in Great Neck, New York. When I was about eight years old, I attended the computer classes taught by Arnold and Jesse Friedman. My brother took classes there as well.

       3.     Although I was quite young at the time, I recall with absolute certainty that, (1) I had a great time in those classes; and (2) Jesse and Mr. Friedman never did anything inappropriate to me or my brother.

       4.     During the investigation of Jesse and Mr. Friedman, the Nassau County Police visited our house, unannounced, and questioned me and my brother regarding the classes and regarding the Friedmans. We told them that nothing inappropriate happened.

       5.     I remember other parents of students who were allegedly abused telling my parents that my brother and I were in denial and pressuring them to give us therapy or hypnosis.

6.    I can state without reservation that nothing untoward ever happened to me

or anyone else in the classes I attended.

JAMES FORREST

Brooklyn, NY, 11215

Dated:  December __29__, 2003

Sworn before me this __29__
day of December, __29__, 2003

Notary Public
Deborah L. Johnson

MALTIN AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

-------------------------------------------------------------------x

AFFIDAVIT OF
JUDD MALTIN

Indictment Nos.
67104, 67430, 69783

Judd Maltin hereby swears, under penalties of perjury, that the following is true
and correct:

1.      I am 32 years old. I currently live at 114 Dean St, Brooklyn, NY 11201.
I work at SIAC, the "Securities Industry Automation Corporation" at Two
Metrotech Plaza, Brooklyn NY.

2.      I first met Jesse Friedman in 1985 during my freshman year of high
school. We soon became close friends and spent most afternoons socializing. I was often
at the Friedman home. I spent a great deal of time at their house after school and on the
weekends.

3.      I never experienced anything untoward. I never witnessed anything
resembling pedophilia at their house. I saw no pornography in any form.

4.      I had nearly expert knowledge in the computers of the day, and assisted
the Friedmans in caring for the computers they used in the classes they taught.

5.      I recall at least one occasion where Jesse was unavailable to assist his
father. There was a special computer birthday party. One of Arnold Friedman's
students, Dan Frank, asked to have his birthday party at the Friedman house, where all his

friends could play computer games, and open presents, etcetera. I was asked to assist
because Jesse had a driver's education class. The children behaved as normal children
would at a birthday party, and there was nothing sexual of any kind shown to them or
performed.

6.      My family moved to a smaller home in the winter of 1987. By that time I
had lost interest in personal computers, and I decided to give Arnold Friedman my entire
collection of software. This included some pornographic video games, which were in
common circulation among the community of Great Neck youth who used personal
computers and with whom I had traded software. I hadn't thought to remove these videos
from the collection when I gave it to Arnold Friedman. I am certain that the
pornographic video games that were discovered by the police were part of the large
software collection I had given Arnold Friedman. I never heard Arnold or Jesse
Friedman make mention of any of this software, and I think it is highly likely that he
never used any of the software that I gave him.

7.      Ross Goldstein transferred to the Village School in September 1986. He
traveled in much different social circles than me and Jesse, and had never socialized with
me or Jesse before. After he transferred to the Village School, he certainly never
socialized with me or Jesse. As far as I remember they ever meet after school. I would
have known if they were socializing, because Jesse and I were nearly constant
companions.

JUDD MALTIN

Dated: December _15th_, 2003
Sworn before me this _15th_
day of December , 2003

B. TILKER

AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-----------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,     AFFIDAVIT OF
                                    BRIAN TILKER

-- against --

JESSE FRIEDMAN,                         Indictment Nos.
                                     67104, 67430, 69783

           Defendant,

-----------------------------------------------------------x

Brian Tilker hereby swears under penalty of **perjury**, that the following is true and correct:

1.     I am 24 years old. I currently live in Astoria, New York and am attending law school at St. John's University School of Law.

2.     My family resides in Great Neck, New York. When I was about 8 years old, I attended the computer classes taught by Arnold and Jesse Friedman.

3.     During the investigation of Jesse and Mr. Friedman, the Nassau County Police visited our house, unannounced, and questioned me regarding the computer classes and in particular any inappropriate behavior of Arnold and Jesse Friedman.

4.     I remember the police questioning me on two occasions. On each occasion, I told them I had never been abused by Arnold or Jesse Friedman or anyone else, and that I did not witness anything inappropriate in the computer classes at any time. I recall that this did not end their questioning and that I felt that they would be unsatisfied with any response other than my concurring with their view that sex abuse had taken place in the Friedman computer classes.

5.      I remember that they made specific suggestions to me about things that they believed happened in the computer classes, and that they told me repeatedly that other students in my class had already told them that they had been abused, and that they were certain that in fact I had also been abused and that I should tell them so.

6.      I remember an African-American detective was alone with me in the kitchen and he asked me specific questions about molestation, including recounting for me certain statements that others had allegedly made.

7.      During these interviews I recall that the various police officers who had interviewed me, including the African-American detective, had a notepad and took notes of my statements while I was telling them that I was not abused and had not seen anyone else being abused.

8.      After many sessions in which the police appeared unsatisfied by my negative responses, I became frustrated at the persistent questioning. As I stated in my interview with Mr. Jarecki for his film, I remember finally telling the police officers that I had seen Jesse chase after a kid and hit him. I remember saying that not because it was true, but instead because I thought it would get them off my back. This statement was not accurate but at the time – being 8 years old – I felt that saying this would allow me to avoid the unpleasant experience of being questioned repeatedly by the police.

9.      After I made this statement to the police, which they also took notes of, they asked my parents if they would allow me to testify before a Grand Jury to having been witness to such an incident, and I did so.

10.     A number of other families with whom my family had been friendly also had children who were involved in the case. I remember hearing from my parents at the time that one set of parents of one of my friends had been very aggressive with my parents and encouraged them to believe that I had been molested by the Friedmans. My parents spoke to me about this and when I told them it had not occurred, they told the other parents. I heard from my parents that the other parents became angry and told my parents that my friend (their son) had already told them that he had seen me being abused in the Friedman class and that my parents were "in denial" about my having been abused. This was not true.

11.     My friend (their son) had also been interviewed by the police and called my house to tell me about it immediately after they had left his house. He expressed great excitement about it, and considered it something of an adventure. I was confused because I had never seen him or anyone else being abused in the computer classes. Later, when I learned that he had become a major complainant in the case, I was not surprised, not because I had ever seen him engaged in anything inappropriate, but because he had been so enthusiastic about participating and helping the police. Some kids appeared to get a lot of excitement out of the attention they were getting from the police. On a number of occasions, I heard from friends that the police had brought pizza over to their houses, and in one case, that the detective had "deputized" the boy, giving him a play badge to wear.

12.     My own recollection of the computer classes was a perfectly pleasant and uneventful one. The classes lasted about 90 minutes and we would be given rudimentary computer programs to create. We also played computer games sometimes, but I was

never offered, never saw, and never played with a computer game of a sexual nature such as those alleged to have been present in the computer classes.

13.     I can state without reservation that nothing untoward ever happened to me and that I never witnessed anything untoward happening to anyone else in the classes that I attended.

Brian Tilker

Sworn before me this $23rd$
Day of December, 2003

BARBARA DOBLIN TILKER
Notary Public, State of New York
No. 30-4666413
Qualified in Nassau County
Commission Expires November 30, 2006

R   TILKER

AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,      AFFIDAVIT OF
                                                 RICHARD TILKER

-- against --

JESSE FRIEDMAN,                          Indictment Nos.
                                          67104, 67430, 69783

           Defendant,

-----------------------------------------------------------------x

      Richard Tilker hereby swears, under penalty of perjury, that the following is true and correct:

      1.      I am 54 years old. I currently live in Great Neck, New York and am retired from my work as director of operations, specialty events, for Ferons, a major retailer of tennis apparel.

      2.      I reside with my family in Great Neck, New York. When my son was about 7 years old, he attended the computer classes taught by Arnold and Jesse Friedman.

      3.      During the investigation of Jesse and Arnold Friedman, we were visited on at least three different occasions by two-person teams of detectives from the Nassau County Police Department. They wanted to question my son Brian with regard to allegations that children had been sexually abused in the Friedman computer classes.

      4.      Each time the detectives visited, they told us that they knew "something happened" to our son. They didn't say, "We believe," they said, "We know," and they insisted on speaking to our son alone.

      5.      On one occasion, my wife and I told them they could question Brian alone, but I remained within earshot, and I was shocked by the aggressive manner in

which they questioned this young boy. It was clear to me that the detectives had already formed their opinion of what had happened in the computer classes and that they were just trying to get Brian to agree with their story. It got to a point where it wasn't asking him what happened, it was more of them telling him what happened, and when they didn't like what he had to say they kept repeating they know what happened and that he should tell.

6.     I recall that the questioning just got to be too much. The police wouldn't take no for an answer. Frustrated, Brian finally told them that one time he saw Jesse chase after and hit a child, though he later told us that that was not true and that the only reason he had said that was to end the questioning because they wouldn't leave him alone.

7.     Throughout the time during which the police had questioned me and my son Brian, the detectives, including one in particular who was an African-American male, were carrying a notepad and took copious notes of all the comments we made, including my son's repeated comments telling them that nothing inappropriate had happened to him and that he had not witnessed any abuse of any other person in his classes.

8.     The police used many different approaches in trying to persuade the children to answer their questions in the way they wished them to. For example, we heard from other parents the police would have pizza parties and give police badges to the children who cooperated, making them "junior detectives" in return for their cooperation.

9.     I remember receiving phone calls from the parents of other students who were allegedly abused. These parents were insistent that my wife and I should cooperate

with the police and acknowledge that Brian had been abused. They told us that their son, who had been in class alongside Brian, had already acknowledged that he had been abused, and that he had seen Brian abused. I told them that my wife and I discussed it with Brian, who was a very mature and forthright boy, and he told us that no such thing had occurred. When we told the parents of the other boy, they became very pushy and told us that we were "in denial" and that "it absolutely happened to our son." Not only did we speak to Brian, but we had him speak with a clinical psychologist, who told us that in his view, Brian was being completely truthful and that nothing had happened to him.

10.     Because of the nature of the charges against the Friedmans, I remember the community being in an uproar and that there was a tremendous amount of pressure for children to join the case. The anger at the Friedmans was very strong. In one case, I had even gotten a call from one of the other fathers involved in the case, who asked if I would be willing to participate in seeing that Mr. Friedman "had an accident" while he was out taking a walk during the time in which he was home on house arrest. It was my interpretation that he and some of the other parents were contemplating trying to harm or kill Mr. Friedman. I remember other families of students were who were allegedly abused in the computer classes would meet once a month together to plan strategies for maximizing the punishment of the Friedmans.

11.     Another reason why I felt the charges against the Friedmans were implausible is that I was in charge of the car-pool to drop off and pick up my son and his friends from the computer classes, including the boy whose parents are mentioned above, and who became a major complainant in the case. I never even once noticed my son or

any of the other children disturbed or distressed in any way. If these boys had been violently abused during each computer class, I would have seen some evidence of this in their behavior on any of the many occasions on which I picked my son and his friends up at the classes.

12.     I know one of the children who testified against Jesse Friedman saying he was a victim of sexual abuse during the computer classes because at the time he was friends with my son, and my wife and I were friends with his parents. This child had told a number of lies about my son, our family, and others in the past, and so it was not a surprise to me that he had become one of the main complainants in the Friedman case, and that he was so excited about having a chance to talk to the police and be the center of attention. That was the kind of boy he was.

Richard Tilker

Sworn before me this _____
Day of December, 2003

BARBARA DOBLIN TILKER
Notary Public, State of New York
No. 30-4666413
Qualified in Nassau County
Commission Expires November 30, 2006

BIEN STOCK

AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,                   AFFIDAVIT OF
                                                       HAL BIENSTOCK

       -- against --

JESSE FRIEDMAN,                                        Indictment Nos.
                                                       67104, 67430, 69783

       Defendant..

-------------------------------------------------------------x

HAL BIENSTOCK hereby swears, under penalties of perjury, that the following is true and correct:

1.     I am thirty-one years old. I live in New York City.

2.     I grew up in Port Washington, Long Island. I was enrolled in the computer classes taught in the Friedman home at 17 Piccadilly Road in Great Neck. To the best of my memory, the classes took place when I was in eighth grade, in 1985 and 1986. My recollection is that I was enrolled in the course for one term of approximately ten classroom sessions and then re-enrolled for another such term.

3.     I never noticed anything inappropriate happening in any of the classes. I did not witness any harm being done to any of the other children in the classes. More specifically, I never saw Jesse or Arnold Friedman engage in any of the acts of sexual abuse they were later prosecuted for.

4.     I was surprised when I learned of the allegations against Arnold and Jesse Friedman as I had never observed anything out of the ordinary in any of the classes I attended.

5.    During the investigation of Arnold and Jesse Friedman, the police never

questioned me about my experience in the computer classes, nor did they visit my home

6.    In conclusion, I did not experience any form of abuse, sexual or otherwise,

during Arnold Friedman's computer classes, nor did I witness any other children being

abused.

HAL BIENSTOCK

Sworn before me this $\underline{24}$ day
of December 2003.

_____

Notary Public

ONORATO

AFF.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

      -against-                           AFFIRMATION

JESSE FRIEDMAN,

                                        Ind. 67104, 67430, 69783

                    Defendant.

----------------------------------------------------------------------X

        JOSEPH R. ONORATO, an attorney duly admitted to practice law in the State of New York, affirms the following under the penalty of perjury:

        1.      I am an Assistant District Attorney, of counsel to Denis Dillon, District Attorney of Nassau County.

        2.      In 1987 and 1988, three indictments were filed, charging defendant and two co-defendants with multiple charges of sodomy, sexual abuse, and related offenses. I was assigned to prosecute these cases.

        3.      I have read the affirmation submitted by Peter Panaro in support of defendant's motion to vacate the judgment of conviction.

        4.      According to the Panaro affirmation, he viewed a video showing Gary Meyers being interviewed by detectives who "used suggestive and harassing questioning" (Panaro affirmation at para. 18). The affirmation further states, "Immediately after viewing the Gary Meyers tape, I [Peter Panaro] informed assistant district attorney Joe Onorato about the interview. I made it clear to him that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable

to the defense that the defense had a right to be informed of" (id.).

5.      Peter Panaro never informed me that there was a video tape of Gary Meyers being interviewed, I have never seen any such tape, and I have no reason to believe that any such tape exists or existed. The first reference I ever heard concerning the Meyers tape was at a viewing of the film "Capturing the Friedmans." In that film, it is claimed that such a tape exists or existed, but no tape is shown.

6.      Peter Panaro never suggested to me that police officers were using inappropriate interviewing techniques or that he considered any police interviewing technique to be "evidence favorable to the defense that the defense had a right to be informed of" (Panaro affirmation at para. 18).

7.      Defendant's motion contends that only under hypnosis did Gregory Doe recall being the victim of sexual abuse. I was never aware of any specific treatment or therapy (including hypnosis and visualization) used by any doctor in the treatment of any complainant in the instant case.

Dated:      Mineola, New York
            August 13, 2004

                                        Joseph R. Onorato

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- ---------x

JESSE FRIEDMAN,                                )        Index. No.

        Petitioner,                           )

        -against-                             )

JOE REHAL, Parole Officer, and
ROBERT DENNISON, Chairman of the               )
New York State Division of Parole,
                                               )
        Respondents, and
                                               )
THE ATTORNEY GENERAL OF THE
STATE OF NEW YORK,                             )

        Additional Respondent.                )

---------------------------------------------------------- ---------x

## AFFIRMATION OF SERVICE

RONALD L. KUBY, an attorney duly admitted to practice before the courts of the

State of New York, and a member of the bar of this Court, hereby affirms under the pains

and penalties of perjury that on June 23, 2006, he caused to be served a true copy of the

Petition for a Writ of Habeas Corpus, supporting Memorandum of Law and Exhibits upon

the following:

        Parole Officer Joe Rehal
        New York State Division of Parole
        119 West 31st Street, 4th floor
        New York, NY 10001;

        Robert Dennison, Chairman
        New York State Division of Parole
        119 West 31st Street
        New York, NY; and

Office of the Attorney General of the
State of New York
120 Broadway
New York, NY

by hand.

Dated: New York, New York
June 23, 2006

RONALD L. KUBY