# TABLE OF CONTENTS

Table of Cases and Authorities ........................................................................................ iii

Procedural History ............................................................................................................ 1

Summary of Facts Relevant to the Petition ...................................................................... 3

I.      A MAN MAKING A MOVIE ABOUT CLOWNS UNCOVERED
OBVIOUSLY CRITICAL EXCULPATORY EVIDENCE THAT
WAS NEVER DISCLOSED BY THE PROSECUTOR,
VIOLATING JESSE FRIEDMAN'S RIGHT TO DUE PROCESS. .................... 4

        A.     EYEWITNESS STATEMENTS TO THE PROSECUTION
EXCULPATING JESSE FRIEDMAN OF ANY WRONGDOING
WHATSOEVER WERE NEVER DISCLOSED TO THE DEFENSE ..... 4

               1.     The State Court Erred In Identifying These
Statements As Impeachment, Rather Than Exculpatory,
Evidence. The Prosecution Had a Constitutional
Obligation to Disclose Evidence Directly Negating
Jesse Friedman's Guilt ................................................................ 5

               2.     The State Court's Apparent Finding That The
Exculpating Statements Were Immaterial Is An
Unreasonable Application of Clearly Established
Federal Law ................................................................................ 9

        B.     A CRUCIBLE OF SUGGESTION, INTIMIDATION,
AND FALSIFICATION: THE PROSECUTION FAILED
TO DISCLOSE EXCULPATORY EVIDENCE SHOWING
THAT THE POLICE UTILIZED AGGRESSIVELY
SUGGESTIVE AND COERCIVE INTERROGATION
TECHNIQUES THEY KNEW, OR SHOULD HAVE KNOWN,
WOULD YIELD FALSE ACCUSATIONS ........................................... 13

               1.     This Evidence Is Exculpatory ........................................... 18

               2.     This Evidence Was Suppressed ........................................ 20

i

C.     INNOCENT UNTIL HYPNOTIC TRANCE: THE
STATE'S FAILURE TO DISCLOSE THAT CHILDREN
WERE HYPNOTIZED IN ORDER TO MANUFACTURE
ALLEGATIONS AGAINST THE PETITIONER ................................... 24

II.     IF THE STATE HADN'T SUPPRESSED EVIDENCE, JESSE
FRIEDMAN WOULD NOT HAVE PLED GUILTY.  ACCORDINGLY
AN EVIDENTIARY HEARING IS NECESSARY TO ENSURE THAT
THIS INDICTMENT WAS NOT THE PRODUCT OF HYSTERIA AND
PROSECUTORIAL ABUSE. ............................................................................. 27

III.     CONCLUSION ..................................................................................................... 31

# TABLE OF CASES AND AUTHORITIES

## Cases

Atkins v. County of Riverside,
151 Fed. Appx. 501, 2005 U.S. App. LEXIS 19928, (9th Cir. 2005) ............................... 20

Blackledge v. Allison,
431 U.S. 63 (1962) ................................................................................................. 30

Bone v. Mahoney,
66 Fed. Appx. 670, 2003 WL 1793249 (9th Cir. 2003) .................................................... 10

Brady v. Maryland,
373 U.S. 83 (1963) ....................................................... 6-8, 10-12, 18-28, 30, 32

Campbell v. Marshall,
769 F.2d 314 (6th Cir. 1985) ................................................................................... 12, 27

Chang v. United States,
250 F.3d 79 (2d 2001) ............................................................................................ 30

Davis v. Lambert,
388 F.3d 1052 (7th Cir. 2004) ................................................................................. 31

Devereaux v. Abbey, et. al,
263 F.3d 1070 (9th Cir. 2001) ................................................................................. 18

Fambo v. Smith,
433 F.Supp. 590 (W.D.N.Y. 1977) ............................................................................ 12

Ferrara v. United States,
384 F. Supp. 2d 384 (D. Mass. 2005) .......................................... 7-9, 12-13, 19, 26-27, 31

Gregory v. City of Louisville,
444 F.3d 725 (6th Cir. 2006) ..................................................................................... 6

Hakeem v. Goord,
2000 US Dist. LEXIS 14927, (S.D.N.Y. 2000) ............................................................... 6

Hill v. Lockhart,
474 U.S. 52 (1985) ................................................................................................. 10

iii

Keeney v. Tamayo-Reyes,
504 U.S. 1 (1992) ............................................................................. 29, 30

Kercheval v. United States,
274 U.S. 220 (1927) ................................................................................ 10

Kimmelman v. Morrison,
477 U.S. 365 (1986) ................................................................................ 13

Kyles v. Whitley,
514 U.S. 419 (1995) ................................................................ 6, 20, 25, 27-28

Mask v. McGinnis,
233 F.3d 132 (2d Cir. 2000) ...................................................................... 9

Mask v. McGinnis,
28 F. Supp. 2d 122 (S.D.N.Y. 1998) ....................................................... 10, 27

Matheney v. Anderson,
253 F.3d 1025 (7th Cir. 2001), cert. denied, 535 U.S. 1030 (2002) .................... 30

McCann v. Mangialardi,
337 F.3d 782 (7th Cir. 2003) ..................................................................... 19

Miller v. Angliker,
848 F.2d 1312 (2d Cir. 1988), cert denied, 488 U.S. 890 (1988) .............. 7, 10, 12-13, 27

Odem v. Hopkins,
192 F.3d 772 (8th Cir. 1999) ...................................................................... 9

People v. Colavito,
87 N.Y.2d 423 (1996) ............................................................................... 22

Press v. Chemical Inves. Serv. Corp.,
166 F.3d 529 (2d Cir. 1999) ........................................................................ 9

Sanchez v. United States,
50 F.3d 1448 (9th Cir. 1995) .................................................................... 11-13

Schledwitz v. United States,
169 F.3d 1003 (6th Cir. 1999) ..................................................................... 27

Spicer v. Roxbury Correctional Institute,
194 F.3d 547 (4th Cir. 1999) ...................................................................... 28

iv

Strickland v. Washington,
466 U.S. 668 (1984) .......................................................................................................... 13

Strickler v. Greene,
527 U.S. 263 (1990) .......................................................................................................... 28

Townsend v. Sain,
372 U.S. 293 (1963) ..................................................................................................... 29-31

United States v. Avellino,
136 F.3d 249 (2d Cir. 1998) .............................................................................................. 13

United States v. Bagley,
473 U.S. 667 (1985) ................................................................................................. 9, 25, 28

United States v. Kelly,
35 F.3d 929 (4th Cir. 1994) ............................................................................................... 24

United States v. Leroy,
687 F.2d 610 (2d Cir. 1982) .............................................................................................. 23

United States v. Malcolm,
432 F.2d 809 (2d Cir. 1970) .............................................................................................. 12

United States v. Miller,
411 F.2d 825 (2d cir. 1969) ............................................................................................... 26

United States v. Ruiz,
536 U.S. 622 (2002) ............................................................................................... 6-8, 18-20

United States v. Wright,
43 F.3d 491 (10th Cir. 1994) ............................................................................................. 10

Weeks v. Angelone,
176 F.3d 249 (4th Cir. 1999), aff'd on other grounds, 528 U.S. 225 (2000) ................... 28

White v. United States,
858 F.2d 416 (8th Cir. 1988), cert denied, 489 U.S. 1029 (1989) .............................. 12, 27

Williams v. Taylor,
529 U.S. 420 (2000) .......................................................................................................... 30

## <u>Authorities</u>

American Psychiatric Association Board of Trustees,
The American Psychiatric Association Board Statement
on Memories of Sexual Abuse (1993) .............................................................................. 17

Antiterrorism and Effective Death Penalty Act of 1996,
P.L. No. 104-132, 110 Stat 1214 ...................................................................... 6, 21, 29-30

28 U.S.C. § 2254(d)(1) ............................................................................................... 6, 13

28 U.S.C. § 2254(d)(2) .......................................................................................... 6, 21, 26

28 U.S.C. § 2254(e)(2) ................................................................................................... 30

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JESSE FRIEDMAN,                                    )

            Petitioner,                              )

      -against-                                   )

JOE REHAL, Parole Officer, and
ROBERT DENNISON, Chairman of the                   )
New York State Division of Parole,
                                                   )
         Respondents, and
                                                   )
THE ATTORNEY GENERAL OF THE                        )
STATE OF NEW YORK,                                 )

         Additional Respondent.                    )

-------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. §2254

      Petitioner Jesse Friedman, by his attorneys, Kuby & Perez LLP, respectfully

submits this Memorandum of Law in support of his Petition for a Writ of Habeas Corpus

by a Person in State Custody Pursuant to 28 U.S.C § 2254.

## PROCEDURAL HISTORY

      Petitioner Jesse Friedman entered a plea of guilty on December 20, 1988, and was

sentenced to multiple terms aggregating six to eighteen years on January 25, 1989.

      Petitioner pled guilty to seventeen counts of sodomy in the first degree, one count

of use of a child in a sexual performance, four counts of sexual abuse in the first degree,

1

one count of attempted sexual abuse in the first degree, and two counts of endangering the welfare of a minor.

No appeal was filed.

Petitioner was released to parole supervision in New York County on December 7, 2001.

On or about January 7, 2004, Petitioner filed a motion to vacate his judgment of conviction on the same grounds alleged herein.

By Order dated January 6, 2006, and entered on January 19, 2006, the County Court, by Hon. Richard A. Lapera, J.C.C., denied the motion and all related claims for relief.

On February 16, 2006, Petitioner timely applied for a Certificate Granting Leave to Appeal to the Appellate Division.

By Order dated March 10, 2006, and served on April 10, 2006 with Notice of Entry, the Hon. Howard Miller denied the application.

On May 10, 2006, Petitioner applied to the New York Court of Appeals for a Certificate Granting Leave to Appeal.

On May 24, 2006, the New York Court of Appeals dismissed the application.

## SUMMARY OF FACTS RELEVANT TO THE PETITION

On December 20, 1988, Jesse Friedman, a nineteen year-old boy, stood accused of facilitating a non-stop, three-year, pedophiliac orgy in his childhood home during computer classes led by his father. He was condemned in the press and vilified by a community hungry for retribution.[1]

If Jesse Friedman went to trial and was convicted, he faced the likelihood of consecutive sentences on all of the charges against him—the equivalent of life in prison. Jesse Friedman decided to plead guilty to crimes he did not commit in exchange for a sentence of six to eighteen years. Affidavit of Jesse Friedman ("Friedman Aff.") ¶ 35.

In the fall of 2000, toward the end of Friedman's prison term, a documentary filmmaker, Andrew Jarecki, set out to make a movie about clowns, including Jesse Friedman's brother, David Friedman. As he researched David Friedman, Jarecki became intrigued by Jesse Friedman's story and began an exhaustive three-year investigation into the circumstances of this notorious child sex abuse case.

A full statement of relevant facts is laid out in the attached Petition for a Writ of Habeas Corpus.

---

[1] The hysteria surrounding this case included repeated threats of violence against Jesse Friedman and his family. On one occasion, while the police searched Friedman's home, a neighbor came running down the street with a rope in his hand, wanting to strangle Jesse's father. Transcript of Interview with Anthony Sgueglia ("Sgueglia"), Exh. 11 (App. 462).

**ARGUMENT**

I.    **A MAN MAKING A MOVIE ABOUT CLOWNS UNCOVERED OBVIOUSLY CRITICAL EXCULPATORY EVIDENCE THAT WAS NEVER DISCLOSED BY THE PROSECUTOR, VIOLATING JESSE FRIEDMAN'S RIGHT TO DUE PROCESS.**

    A.    **EYEWITNESS STATEMENTS TO THE PROSECUTION EXCULPATING JESSE FRIEDMAN OF ANY WRONGDOING WHATSOEVER WERE NEVER DISCLOSED TO THE DEFENSE**

*"I told them that nothing happened to me...I can state without reservation that I did not experience any form of abuse, sexual or otherwise, during the Friedman's computer classes...nor did I witness any other children being abused."*

                                                     -- Ron Georgalis[2]

*"We told them [the police] that nothing inappropriate happened."*

                                                     -- James Forrest[3]

       During a three-year investigation, filmmaker Andrew Jarecki discovered critical evidence never disclosed to the defense. This evidence included students—present during the alleged abuse—who had unequivocally told investigators that Jesse Friedman was innocent and there was no such abuse.[4] See Affidavit of Ron Georgalis ("Ron Georgalis Aff.") ¶ 5; Affidavit of James Forrest ("Forrest Aff.") ¶ 4.

       The discovery of evidence that eyewitnesses to the alleged panoply of pedophiliac sex categorically denied any abuse having ever taken place is exculpatory evidence in the extreme. This is particularly true given there was not one iota of physical evidence of

---

[2] Affidavit of Ron Georgalis ¶¶ 5, 7
[3] Affidavit of Forrest ¶ 4.
[4] Jarecki also identified students, not interviewed by the police, who insisted on Jesse Friedman's innocence. Hal Bienstock, a student who was not interviewed by the police, states that he never saw anything happening in the classes ("I never noticed anything inappropriate happening in any of the classes."). Affidavit of Hal Bienstock ¶ 3. See also CTF (App. 267-268) (Former computer student # 2) ("I think as someone who took the classes it was just hard to picture even that going on because I did have a good experience. And I didn't . . . see anything . . . remotely like . . . child molestation or child abuse or any, child-anything going on."); See also NoleDreamer24 e-mail (App. 900).

abuse; the only evidence to support the indictment against Jesse Friedman were the statements of child computer students whom the Prosecution claimed he molested.

There simply isn't a category of exculpatory evidence that is more telling, more persuasive, or more important to a defendant. These witnesses were present at the place of the alleged mass abuse. They directly negated Jesse Friedman's guilt. There is no more potent or powerful incarnation of <u>Brady</u> material. These statements were never disclosed to the defense.

Where there is smoke, there is (at least a reasonable probability of) fire. The discovery of these suppressed eyewitness statements to members of the prosecutorial team, suggests more than a mere conflagration. Instead, it suggests that sitting on the District Attorney's desk is evidence—that to this day the DA will neither confirm nor deny—of other eyewitnesses exculpating Jesse Friedman. The fact that at least two eyewitnesses proclaimed Friedman's innocence to the Prosecution's investigators is enough to establish a "reasonable probability" that Jesse Friedman would have had hope—in the face of the much-publicized mass-hysteria characterizing his indictment— that his innocence would be recognized by a jury of his peers. Jesse Friedman would not have pled guilty. And if he did plead, armed with eyewitness exculpating evidence, his plea would have looked much different than it did.

> **1.     The State Court Erred In Identifying These Statements As Impeachment, Rather Than Exculpatory, Evidence. The Prosecution Had a Constitutional Obligation to Disclose Evidence Directly Negating Jesse Friedman's Guilt**

The state court looked at the eyewitness statements to investigators proclaiming Jesse Friedman's innocence and saw merely *impeachment* material. <u>People v. Friedman</u>,

Indictment Nos. 67104, 67430, 69783 at 3 (Nassau County Ct. Jan. 6, 2006)(order denying motion to vacate judgment)("Defendant has provided no examples of information that would be considered as evidence that would have established defendant's 'factual innocence' but rather is in [sic] the nature of impeachment information") [hereinafter "Friedman State Court"]. The state court got it dead wrong.

The determination of whether evidence possesses exculpatory or mere impeachment value is a mixed question of law and fact.[5] Under the Antiterrorism and Effective Death Penalty Act of 1996, P.L. No. 104-132, 110 Stat 1214 (AEDPA), a federal court must defer to state court determinations of mixed questions of law and fact unless the "decision...involved an unreasonable application of [] clearly established Federal law." 28 U.S.C. § 2254(d)(1). See Hakeem v. Goord, 2000 US Dist. LEXIS 14927, at *51 (S.D.N.Y. 2000)(applying the "unreasonable application" clause of § 2254(d)(1) to mixed questions of law and fact).

---

[5]    Petitioner has been unable to identify any clear post-Ruiz authority on the proper standard of review of a state court determination of whether alleged Brady material is exculpatory or merely impeachment evidence.
    Evidence is deemed exculpatory if it goes directly to guilt or innocence, and works to undermine confidence in the verdict. See United States v. Ruiz, 536 U.S. 622, 628 (2002)("exculpatory evidence is evidence the suppression of which would 'undermine confidence in the verdict'") quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995). Since the exculpating nature of evidence is determined with reference to the evidence's potential to negate an essential element of the offense charged, id., the determination of whether evidence is exculpatory is a mixed question of law and fact. Often courts conflate the determination of whether evidence is exculpatory with the analysis of the evidence's materiality, as regularly the same considerations are at play. See Gregory v. City of Louisville, 444 F.3d 725, 743-4 (6th Cir. 2006)("Exculpatory evidence is evidence which is material to either guilt or punishment, and materiality under Brady is a mixed question of law and fact for the jury")(internal citations omitted). Accordingly, like the materiality analysis, the determination of whether Brady evidence is exculpatory or merely impeachment evidence is best analyzed under 28 U.S.C. § 2254(d)(1). However, Petitioner maintains that the state court's failure to identify this evidence as exculpatory is also an "unreasonable determination of the facts in light of the evidence presented" in satisfaction of the standard under 28 U.S.C. § 2254(d)(2).

Statements made to the Prosecution by, not one but two computer students that no abuse occurred in the computer class go straight to the issue of guilt or innocence. These statements are not "impeachment" material, they are exculpatory evidence the defense was entitled to. See Brady v. Maryland, 373 U.S. 83 (1963); Ferrara v. United States, 384 F. Supp. 2d 384, 409 (D. Mass. 2005) (statement that negates guilt is exculpatory, not merely a prior inconsistent statement).

Brady v. Maryland's central tenant is that "the suppression by the prosecution of evidence favorable to an accused….violates due process where the evidence is material either to guilt or to punishment…." 373 U.S. at 87. See Miller v. Angliker, 848 F.2d 1312, 1320 (2d Cir. 1988), cert denied, 488 U.S. 890 (1988). While the Supreme Court in Ruiz held that the Prosecution does not have to "disclose material *impeachment* evidence prior to entering a plea agreement with a criminal defendant," 536 U.S. 622, 633 (2002), the Court, once again, made clear that the Prosecution is still required to hand over any information establishing the "factual innocence" of the defendant. Id. at 631. The Ruiz Court based its decision, to limit pre-trial disclosure of *impeachment* material, on the assuredness that "evidence of factual innocence" is still required to be disclosed, even pre-trial. Id. The state court's determination that statements from eyewitnesses exculpating Jesse Friedman are merely impeachment material is an "unreasonable application of [] clearly established Federal law" as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

Like the matter before this Court, in Ferrara v. United States the prosecution suppressed evidence that one of their key witnesses had told a police officer that the defendant did not commit the crime for which he was indicted. 384 F. Supp. 2d 384.

The defendant, put in the "untenable position" of feeling "compelled to plead guilty to...murder charges or face a real risk of...a wrongful conviction resulting in a life sentence," decided to plead guilty. Ferrara, 384 F. Supp. 2d at 388. Eleven years later, the witness' exculpatory statement was discovered and the defendant filed a habeas petition. Id.

Arguing against the granting of habeas, the prosecution relied on many of the same arguments conjured by the Prosecution in Friedman's case. The Ferrara prosecution claimed that the defendant's "guilty plea deprive[d] him of any right to relief," id, and that the witness' recantation "represented only impeaching information that the government was not required to disclose pursuant to the Supreme Court's decision in Ruiz v. Untied States." Id. at 408. The court vehemently disagreed. Citing Brady v. United States, 397 U.S. 742, 757 (1970), the court held that "[a] guilty plea does not deprive a defendant of his right to relief" where the government's failure to disclose exculpatory evidence "undermines the court's confidence in the outcome." Ferrara, 284 F. Supp. 2d at 389. The court went on to find that a witness' statement that the defendant did not commit the crime "was not a prior inconsistent statement that merely impeached his trial testimony" concerning the murders, rather it was exculpatory evidence as the statement "directly negated" the defendant's guilt. Id. at 409.

There are no statements more exculpatory than the testimony of students that—in the very computer classes it is alleged that mass pedophiliac orgies were occurring— Jesse Friedman never engaged in any of the conduct the Prosecution charged him with.

**2.    The State Court's Apparent Finding That The Exculpating Statements Were Immaterial Is An Unreasonable Application of Clearly Established Federal Law**

The state court, in a cursory three sentences, off-handedly dismissed the materiality of these exculpating statements. It appears that, in the state court's opinion, since none of the exculpatory statements were made by complainants, "it is improbable that [the] defendant would not have entered pleas of guilty if he had that information." Friedman State Court at 4.

Determinations of the materiality of evidence are mixed questions of law and fact. See Press v. Chemical Inves. Serv. Corp., 166 F.3d 529, 538 (2d Cir. 1999); Odem v. Hopkins, 192 F.3d 772, 774 (8th Cir. 1999). The state court's decision on the materiality of the exculpating statements is not only an "unreasonable application" of federal law, it is erroneous and bizarre.

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

If the prosecutor had told the defendant that eyewitnesses—present at the same time, and in the same place, as the mass-child-sex enterprise Friedman stood accused of participating in—were steadfastly denying any wrongdoing, nineteen year old Jesse Friedman would not have pled guilty. Even if Friedman decided to plead guilty, he certainly would have been able to negotiate better terms for his plea agreement.

The Second Circuit has recognized that a change to a plea agreement is a different result for the purposes of determining whether the information suppressed by the prosecution was material. Mask v. McGinnis, 233 F.3d 132, 142 (2d Cir. 2000); Ferrara,

9

384 F. Supp. 2d at 431; Mask v. McGinnis, 28 F. Supp. 2d 122, 125 (S.D.N.Y. 1998)(more favorable plea agreement is deemed to be a different result in habeas petition alleging ineffective assistance of counsel). See also Bone v. Mahoney, 66 Fed. Appx. 670, 673 2003 WL 1793249, at *8 (9th Cir. 2003)(unpublished)("The inquiry here, in contrast, is whether there is a reasonable probability that had Bone undergone a mental evaluation he would not have pled guilty or he would have entered into a more favorable plea agreement"). Where "there is a reasonable probability that but for the withholding of the information...[the defendant] would not have entered the [guilty] plea," the materiality test of Brady is satisfied. Miller v. Angliker, 848 F.2d at 1322. See Hill v. Lockhart, 474 U.S. 52, 59 (1985)(a reasonable probability of a different result includes going to trial rather than pleading guilty).

In Brady v. United States, the Court wrote that "waivers of constitutional rights [including the right to a trial by pleading,] not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." 397 U.S. at 748. The Supreme Court also recognized that "[o]ften the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted." Id. at 756. The Supreme Court has long been extraordinarily concerned that if prosecutorial misconduct deprives the defendant, his counsel, and the court of material evidence negating guilt, guilty pleas might be offered by, and accepted from, innocent individuals. Id. at 757-58. See Kercheval v. United States, 274 U.S. 220, 224 (1927)(recognizing that "unfairly obtained" guilty pleas ought to be vacated). See also United States v. Wright, 43 F.3d 491, 495-6 (10th Cir.

1994)(collecting cases showing that federal courts have consistently held that "defendants who have pleaded guilty are not barred from raising Brady claims" challenging the suppression of "material evidence" that could call into question the "defendant's decision to plead guilty"). The <u>Brady v. United States</u> Court wrote, "We would have serious doubts about this case if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves." 397 U.S. at 758. The <u>Brady</u> Court's ultimate concern was realized in Jesse Friedman.

The Second Circuit, in <u>Miller</u> further explained:

> As a general matter, a plea is deemed "intelligent" if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way; it is deemed "voluntary" if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally. The <u>Brady v. United States</u> Court made clear, however, that this test suffices only in the "absen[ce of] misrepresentation or other impermissible conduct by state agents." Since a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case and of information that may be available to cast doubt on the fact or degree of his culpability, we conclude that even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution.

848 F.2d at 1320 (internal citations omitted).

Without such a rule, "prosecutors may be tempted to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas." <u>Sanchez v. United States</u>, 50 F.3d 1448, 1453 (9th Cir. 1995).

Where the prosecutor withholds material information that negates guilt, even competent counsel cannot adequately advise a defendant and the court cannot properly conclude that "there is nothing to question the accuracy and reliability of the defendant's

11

admissions." Brady v. United States, 397 U.S. at 758. Because the Prosecution failed to

disclose the exculpatory statements of eyewitnesses, Jesse Friedman and his lawyer

lacked the information necessary to evaluate the relevant circumstances, including the

strength of the Prosecution's case; and, the court lacked "the information necessary to

evaluate whether the offered admission of guilt was reliable, rather than an effort by an

innocent individual to avert the more severe consequences of a potential wrongful

conviction." Ferrara, 384 F. Supp. 2d at 415. The federal appellate bench has been very

clear on this point: suppression of exculpatory Brady material can render guilty pleas

involuntary. See, e.g., United States v. Malcolm, 432 F.2d 809, 811 (2d Cir. 1970)(a

guilty plea which is "the tainted product of ignorance" is void); Fambo v. Smith, 433

F.Supp. 590, 595 (W.D.N.Y. 1977)(same); White v. United States, 858 F.2d 416, 422 (8th

Cir. 1988), cert denied, 489 U.S. 1029 (1989); Miller, 848 F.2d at 1319-20; Campbell v.

Marshall, 769 F.2d 314, 321 (6th Cir. 1985); Sanchez, 50 F.3d at 1453.

      In the last of the state court's three sentence ruling on these eyewitness

statements, the court reveals a profound error in its materiality analysis. After finding it

was "improbable" that Jesse Friedman would have not entered a guilty plea—even armed

with two eyewitness accounts exculpating him—the court notes "that not only did this

defendant admit[] his guilt to these crimes under oath before the Court, he admitted his

commission of these crimes to the probation department and went on national television

and admitted his guilt." Friedman State Court at 4. It appears the state court is evaluating

the materiality of this evidence by subjectively looking at Jesse Friedman's behavior and

asking would *Jesse Friedman* have altered his plea. But, the Second Circuit has made it

extraordinarily clear that the materiality analysis, required under Brady, to determine

whether the defendant would have gone to trial if the prosecution had not withheld exculpatory evidence "is an objective one, depending largely on the likely persuasiveness of the withheld information." Miller, 848 F.2d at 1322-3. See Ferrara, 384 F. Supp. 2d at 422 (the materiality analysis "does not involve an 'individualized inquiry' regarding the impact on a particular attorney or defendant"); United States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998)(assessment of materiality "involves an objective inquiry that asks not what a particular defendant would do but rather what is 'the likely persuasiveness of the withheld information'); Sanchez, 50 F.3d at 1454 (adopting Second Circuit's objective standard). See also Kimmelman v. Morrison, 477 U.S. 365 (1986) (applying analogous objective standard in the context of ineffective assistance of counsel claims); Strickland v. Washington, 466 U.S. 668 (1984)(same). The fact that Jesse Friedman pled guilty in court and on television is irrelevant to the state court's determination of the materiality of these statements. Yet, one-third of the court's discussion of this issue is dedicated to a subjective observation of Jesse Friedman's own particular behavior in relation to his guilty plea. It seems apparent that the state court's determination of the materiality was an "unreasonable application" of clearly established federal law. 28 U.S.C. § 2254(d)(1).

**B.    A CRUCIBLE OF SUGGESTION, INTIMIDATION, AND FALSIFICATION: THE PROSECUTION FAILED TO DISCLOSE EXCULPATORY EVIDENCE SHOWING THAT THE POLICE UTILIZED AGGRESSIVELY SUGGESTIVE AND COERCIVE INTERROGATION TECHNIQUES THEY KNEW, OR SHOULD HAVE KNOWN, WOULD YIELD FALSE ACCUSATIONS**

Not only did Jesse Friedman not know—because the Prosecution wouldn't tell him—that eyewitnesses were proclaiming his innocence. Jesse Friedman didn't know that children who were pointing fingers were doing so under immense, intimidating, and

irresponsible influence of detectives deploying aggressive interrogation techniques designed, not to ferret out the truth, but to hang Jesse Friedman.

> *"What the fuck happened? Tell me. You were molested. We know. Tell me."*
>
> -- Gregory Doe[6]

This is how Gregory Doe's interview with the police investigators began. Transcript of Interview with Gregory Doe ("Gregory Doe"), Exh. 27 (App. 755).[7] As any babysitter could tell you, a police officer shouting this kind of rhetoric at a fourth-grader is likely to elicit whatever the child thinks the police officer wants to hear.

From the detectives' own statements, it is readily apparent that, after initially being unable to procure incriminating statements from the children, they utilized a high-pressure, manipulative, and result-oriented approach during their interrogations. Evidence of interrogation techniques that the police knew, or should have known, would yield false accusations of sexual abuse from small children was never disclosed to the defense in discovery.[8]

Wallene Jones, one of the lead investigators on the case, has admitted that when detectives were unable to procure incriminating statements from a child at first, they visited the child many times – in one case on fifteen separate occasions – until the child provided such statements. Affidavit of David Kuhn ("Kuhn Aff.") ¶ 9. These interviews were usually conducted out of the presence of parents, Sgueglia (App. 394-95); Kuhn Aff. ¶ 7, with the interviewing detective taking notes, Sgueglia (App. 452-55, 458); Kuhn Aff. ¶ 6. In interview sessions that lasted as long as four hours, one boy repeatedly

---

[6] Transcript of Interview with Gregory Doe ("Gregory Doe"), Exh. 27 (App. 755).
[7] Numbers preceded by "App." indicate the page number in the Appendix of Exhibits, submitted with the instant Petition.
[8] Extensive, although not exhaustive, details of the oppressive techniques utilized by the police are detailed in the petitioner's writ.

denied being the victim of abuse, jumping up and down and shouting that nothing had

happened. Kuhn Aff. ¶ 9, 12. But the detectives kept returning to the house because they

"already knew" that the boy was a victim. Kuhn Aff. ¶ 9. On the fifteenth visit, the

detectives spoke with the boy alone in his bedroom, explaining to his mother that they

were going to stay "as long as it takes." Kuhn Aff. ¶10. The boy finally stated that he

had been abused. This sort of relentless questioning was not the exception, but the rule.

Ron Georgalis was a student in the Friedmans' classes when he was nine and ten

years old. On the police's initial visit to his home, the detectives questioned Ron, and

showed him an explicit computer game. Ron Georgalis Aff. ¶ 5. Ron unequivocally told

the police he had never seen the game and that "nothing happened to me." Id. Having

not heard the right answer, when the police returned for second interview, Ron overheard

the detectives telling his parents that he had been sodomized both anally and orally. Ron

Georgalis Aff. ¶ 5. See also Affidavit of Ralph Georgalis ("Ralph Georgalis Aff.") ¶ 3.

Ron insisted then, and insists now, that nothing improper ever occurred in the Friedmans'

computer classes.

Brian Tilker told a similar story. On each occasion of questioning, Brian told

police that "I had never been abused by Arnold or Jesse Friedman or anyone else, and

that I did not witness anything inappropriate in the computer classes at any time."

Affidavit of Brian Tilker ("B. Tilker Aff.") ¶ 4. "[T]his did not end their questioning,"

and Brian "felt that they would be unsatisfied with any response other than my

concurring with their view that sex abuse had taken place in the Friedman computer

classes." Id.

15

During an interview process that, the detectives themselves characterized as one in which "you don't give them an option, really…" Sgueglia (App. 408), a parent observed that "[t]he police wouldn't take no for an answer." Affidavit of Richard Tilker ("R. Tilker Aff.") ¶ 6. The police not only refused to take "no" for an answer, as Brian Tilker avers, they fed children stories "about things they believed happened in the computer classes…" B. Tilker Aff. ¶ 5.

When the children didn't tell the police what they wanted to hear, the police would punish the child through subtle, and at times not-so-subtle, humiliation. For instance, after failing to elicit claims of abuse from one child, a detective told the child's mother, in the child's presence, that "he was a wise guy, and I didn't like his answers." Taped Interview of Gary Meyers ("Meyers Interview"), Exh. 28 (App. 805).

When children told their interrogators what they wanted to hear, they were given toy police badges, pizza parties, and other rewards. See R. Tilker Aff. ¶ 8; see also B. Tilker Aff. ¶11.

The police knew, or should have known, that these interrogation methods used on small children were likely to get the children to manufacture accusations. See Sgueglia (App. 394-95) ("children always wanna please adults"). And, that is exactly what happened. The aggressive, repetitive questioning by police could be so unpleasant that children would finally agree that abuse occurred in order to obtain psychological relief:

> After many sessions in which the police appeared unsatisfied by my negative responses, I became frustrated at the persistent questioning…I remember finally telling the police officers that I had seen Jesse chase a kid and hit him. I remember saying that not because it was true, but instead because I thought it would get them off my back. **This statement was not accurate but at the time—being 8 years old—I felt that saying this would allow me to avoid the unpleasant experience of being**

16

questioned repeatedly by the police.

B. Tilker Aff. ¶ 8 (emphasis added).  One child, responsible for sixty-seven counts, including twenty-nine counts of sodomy, clearly remembered the stress produced by police questioning:

> What I do remember is the detectives putting me under a lot of pressure to speak up. And at some point, I, I kind of broke down.  I started crying. **And when I started to tell them things, I was telling myself that it's not true.  I was telling myself, "Just say this to them to get them off your back."**

CTF (App. 336)(Dennis Doe)(emphasis added).

The detectives even resorted to telling one boy, at the sensitive age of 14, that his obstinacy might increase the chances of him becoming a homosexual or pedophile. Meyers Interview (App. 805).  This kind of bullying of children is unreasonable, unforgivable, and odious.

The police knew, or should have known, that their relentless interrogation tactics deployed on small children were bound to produce false accusations.  Children are impressionable; when confronted with an authority figure who "[won't] take no for an answer," R. Tilker Aff. ¶ 6, a child will say "yes."  This common sense has subsequently been confirmed by scientific study after study.  See American Psychiatric Association Board of Trustees, The American Psychiatric Association Board Statement on Memories of Sexual Abuse (1993), available at http://www.psych.org/edu/other_res/lib_archives/archives/199303.pdf; Bradley & J. Wood, *How do children tell? The disclosure process in child sexual abuse*, 20 Child Abuse & neglect, 881-91 (1996)(among 234 validated cases of child sexual abuse, only 5% of the children denied the abuse when first questioned about it).

17

### 1.    This Evidence Is Exculpatory

Without reference to the petitioner's specific claims regarding the suppression of evidence of coercive interrogation techniques, the state court appears to determine that this evidence—and all evidence the petitioner has raised—is "impeachment" rather than "exculpatory" evidence.  See Friedman State Court at 3.  This determination of a mixed question of law and fact, made with a citation to the Supreme Court's decision in United States v. Ruiz, 536 U.S. 622, is an "unreasonable application of...clearly established federal law." 28 U.S.C. § 2254(d)(1).

The Prosecution's deliberate fabrication of evidence through the use of "investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information," Devereaux v. Abbey, et. al, 263 F.3d 1070, 1076 (9th Cir. 2001), goes directly to the heart of determining Jesse Friedman's guilt or innocence.

The exculpatory nature of this evidence—and the defendant's clearly established constitutional right to it—is confirmed, not called into question, by Ruiz.[9]  In holding that the Due Process Clause does not require the prosecution to disclose impeachment information prior to entry of a guilty plea, the Ruiz Court reasoned that it was

---

[9] United States v. Ruiz, 536 U.S. 622, does not undercut the core notion of Brady for pre- or post- trial defendants. The Prosecution is still required to hand over any information establishing the "factual innocence" of the defendant, although after Ruiz they may no longer need to hand over mere impeachment material pre-trial. Ruiz, 536 U.S. at 633 (holding that "the constitution does not require the Government to disclose material *impeachment* evidence prior to entering a plea agreement with a criminal defendant")(emphasis added). However, the Ruiz Court bases its decision on the assuredness that "evidence of factual innocence" is still required to be disclosed, even pre-trial. See id. at 625, 631 (discussing that the prosecution is required to disclose material related to "factual innocence").

"particularly difficult to characterize impeachment information *as critical information of which the defendant must always be aware prior to pleading guilty…*" 536 U.S. at 630 (emphasis added). The Court went on to note that "the proposed plea agreement at issue…specifies [ ] the Government will provide 'any information establishing the factual innocence of the defendant,'" id. at 631, and "[t]hat fact, along with other guilty-plea safeguards…diminishes the force of [defendant] Ruiz's concern that, in the absence of impeachment information, innocent individuals, accused of crimes, will plead guilty." Id. Under Ruiz, where the prosecution possesses information going to the fabrication of allegations and factual innocence, this material is exculpatory in nature and the "fail[ure] to disclose such information to a defendant before he enters into a guilty plea" violates the Due Process Clause. McCann v. Mangialardi, 337 F.3d 782, 787-88 (7th Cir. 2003)(reading Ruiz as distinguishing between exculpatory and impeachment evidence; reaffirming that exculpatory evidence is evidence that the defendant must always be aware of prior to pleading guilty and must be disclosed pre-plea).

Under the state court's reasoning, if the police were to hold a gun to someone's head and threaten to kill him unless he accused an unpopular neighbor of a serious crime, evidence of the use of the gun to procure the accusation would constitute mere impeachment material and be immune from the requirements of Brady.

Evidence that the police produced fabricated complaints against Jesse Friedman through an aggressive pattern of brow-beating child complainants—through repeated questioning, rewards, and even humiliation—would not merely impeach the children's trial testimony. Rather, this evidence directly negates Jesse Friedman's guilt. See Brady v. United States, 397 U.S. at 757; Ferrara, 384 F. Supp. 2d at 409, 389 ("A guilty plea

19

does not deprive a defendant of his right to relief where, as here, he demonstrates that misrepresentation or other impermissible conduct by the government deprived him of his ability to decide intelligently whether to plead guilty"); see also Atkins v. County of Riverside, 151 Fed. Appx. 501, 506 n.4, 2005 U.S. App. LEXIS 19928, at *9 n.4 (9th Cir. 2005)(unpublished)(recognizing that the fabrication of inculpatory evidence, if true, can have both exculpatory and impeachment value). It seems particularly difficult to characterize the extraordinary activities of the police in this case as information which a defendant does not need to "be aware prior to pleading guilty." Ruiz, 536 U.S. at 630.

The Supreme Court has long made clear that evidence that goes to the heart of guilt or innocence is exculpatory in nature and must be handed-over to the defense. See Brady v. Maryland, 373 U.S. at 87 (evidence must be disclosed that is "favorable to the accused…where the evidence is material either to guilt or to punishment…"); Ruiz, 536 U.S. at 630 (evidence that is "critical information of which the defendant must always be aware prior to pleading guilty" is not impeachment material and must be disclosed). See also Kyles v. Whitley, 514 U.S. 419, 438 (1995).

### 2. This Evidence Was Suppressed

Jesse Friedman was unaware then, and for fourteen years after his arrest, of the aggressive tactics used by police to obtain sex abuse accusations from the eight to eleven year-old boys who attended his father's computer classes.

The State Court made a factual determination that Friedman's defense counsel did "have knowledge of the interview techniques used by the police" based on the attached

20

affidavit of Friedman's trial lawyer stating that he had seen one tape of a police interview with a child. Friedman State Court at 3-4.

During the summer of 1988, Gary Meyer's mother made a secret videotape of police detectives interviewing her fourteen year old son. She was forced to stealthily record the interview, because the detectives would not allow her to be present and she wanted to know what they were doing. Affidavit of Andrew Jarecki ("Jarecki Aff.") ¶ 6. Later, Gary Meyer's mother allowed Peter Panaro, Jesse Friedman's attorney, to view the tape in her presence, and transcribe it, although she would not provide Panaro with a copy of the tape. The picture on the Betamax tape was of very poor quality. Affidavit of Peter Panaro ("Panaro Aff.") ¶ 8.

The determination of whether Friedman's lawyer knew of the interrogation tactics being utilized is a question of fact. Under AEDPA, a federal court reviews state court determinations of fact to consider if the factual determination is "unreasonable…in light of the evidence presented in the state court proceeding." 28 U.S.C. §2254(d)(2).

The Prosecution denies the very existence of this videotape, Affirmation of Joseph R. Onorato ¶ 5, and yet they rely on its existence to establish their compliance with the mandates of Brady. The Prosecution can't have it both ways. Either the tape exists or it doesn't.

If the state court were to have accepted the Prosecution's version of the facts— there is no Gary Meyers videotape—the defendant never learned of the aggressive interrogation techniques until they were uncovered by a filmmaker fourteen years later.

If the state court were to accept the Defendant's version of the facts—there is a tape, and Panaro did see it—the result is still the same. The videotaped interview raised

enough questions to prompt Panaro to inform the district attorney about the interview and make clear to him that "any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable to the defense that the defense had a right to be informed of." Panaro Aff. ¶ 18.   Furthermore, the prosecution had a clear duty to disclose this evidence under the terms of a voluntary agreement entered into with the Defense. As Attorney Peter Panaro avers, and the Prosecution does not deny, on November 17, 1988, the defense and the prosecution stipulated that the prosecution would "deliver to the defendant all evidence favorable to him under the authority of Brady v. Maryland." "Panaro Aff." ¶ 7. Judge Boklan "so ordered" the stipulation. Id. In entering into this common stipulation and voluntary discovery, the Prosecution agreed to provide all Brady material commencing at the time of the stipulation—well before trial.  Such agreements, common in Nassau County, expedite proceedings by reducing wasteful motion practice and are an important and binding agreement. See People v. Colavito, 87 N.Y.2d 423 (1996)(such stipulations are "sound practice" and a defendant should be able to reasonably rely upon the "People's pretrial representations that they would voluntarily produce evidence [they had promised to produce].").  It was reasonable for Panaro to rely on this agreement.  When the prosecution didn't produce any evidence, Panaro's assumption was that there was nothing to produce.  As it turns out, this was far from the truth.

Panaro is no psychic.  He could not have known that the hostile techniques deployed in the Gary Meyer's interrogation were endemic to all of the interactions between the police investigators and the kids in the case.  But, what he saw raised enough interest for Panaro to do exactly what he was supposed to do: he exercised reasonable

22

diligence to obtain the materials through a formal request to the prosecutor identifying the value he saw in this evidence, that it exculpated his client, and asking that it be handed over immediately.[10]  Panaro Aff. ¶ 18.

The state court seems to fault Panaro for not telepathically knowing that there was more information out there, and further faults him for not gathering it.  See Friedman State Court at 4 ("The opportunity to litigate that issue was available at that time, but counsel did not pursue the matter").  Defense counsel could only know what he saw on the poorly recorded Betamax videotape that was shot via subterfuge by a parent who herself was excluded from observing the police interrogate her child.  In fact, in the same affidavit cited by the state court, Panaro himself avers that it wasn't until fourteen years after the prosecution that he learned of the aggressive interrogation methods utilized and "the enormous extent and import of the material to which we were refused access." Panaro Aff. ¶ 16.

In light of the Prosecution's secrecy in conducting this investigation and their interviews, defense counsel could neither have imagined the extraordinary utility in obtaining nor could they actually obtain information on the interrogation techniques deployed by the Prosecution's investigators through reasonable diligence from any source other than the Prosecution.  See United States v. Leroy, 687 F.2d 610, 619 (2d Cir. 1982)("The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence *only* known to the Government")(emphasis added) cert. denied, 459 U.S. 1174

---

[10] It should be noted that it is the Petitioner's position that Panaro's original Brady request, and subsequent stipulation, should have covered this material even absent a specific request for information on the police interrogations.

(1983); <u>United States v. Kelly</u>, 35 F.3d 929, 937 (4th Cir. 1994)(where defendant cannot gain access to <u>Brady</u> material through "reasonable diligence," the Government has an obligation to disclose).

The state court's determination that Panaro's prudent request for <u>Brady</u> material somehow defeats Friedman's claim against the Prosecution for failing to produce it is unreasonable and runs contrary to the central tenants of <u>Brady</u>.  <u>See Brady v. Maryland</u>, 373 U.S. at 87 ("[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

### C.   INNOCENT UNTIL HYPNOTIC TRANCE: THE STATE'S FAILURE TO DISCLOSE THAT CHILDREN WERE HYPNOTIZED IN ORDER TO MANUFACTURE ALLEGATIONS AGAINST THE PETITIONER

In addition to aggressive police interrogation techniques designed to concoct and create accusations against Jesse Friedman, the petitioner has also learned that hypnosis was used on, at least one, child complainant who, prior to the hypnosis, did not have any memory of abuse or impropriety whatsoever.  It is our deep suspicion that this child, Gregory Doe, was not the only complainant who remembered being sodomized regularly and repeatedly over a prolonged period of time only after entering a highly manipulative hypnotic trance.

Gregory Doe's testimony was the source thirty-five separate sodomy counts against Jesse Friedman.  His charges are among the most fantastic allegations made against the Friedmans.  Among his allegations is the claim that the Friedmans made an

24

entire class of boys strip naked and then serially sodomized them in a game referred to as "leap frog." Gregory Doe (App. 737).

Gregory Doe stated clearly that the "first time I actually recalled that I was actually molested" was only after going into a hypnotic trance, Gregory Doe (App. 785). It is the petitioner's position that Doe's allegations, and potentially other allegations, were the product of suggestion and manipulation by a therapist with deep ties to the Prosecution. Sgueglia (App. 469).

The use of widely-discredited hypnotic suggestion to manufacture further accusations—like the use of aggressive systems of humiliation, threat, and repetition in interrogations—is evidence that goes directly to the defendant's guilt or innocence. Evidence that helps establish that a perpetrator may not have been a perpetrator is exculpatory by nature. See Brady v. Maryland, 373 U.S. at 87. The nondisclosure of Gregory Doe's hypnosis is violative of due process as there is a reasonable probability that, had the use of hypnosis been disclosed, Jesse Friedman would not have pled guilty to abusing Gregory Doe, and Friedman's lawyer would have demanded more detailed information on the questionable techniques deployed by both the Prosecution and therapists to elicit accusations from the children complainants. The failure to disclose undermines confidence in Friedman's plea with regards to Doe's allegations. See Kyles, 514 U.S. at 434 quoting Bagley, 473 U.S. at 678 ("The question is not whether the defendant would more likely than not have received a different [result] with the evidence, but whether in its absence he received...[a result] worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary

25

suppression 'undermines confidence in the outcome'"). See also Brady v. United States, 397 U.S. at 757; Ferrara, 384 F. Supp. 2d at 389.

The State was required to disclose this Brady material, and the State shirked its responsibility. See Jean v. Rice, 945 F.2d 82, 86-87 (4th Cir. 1991)(where eyewitness identification was crucial to prosecution, state's failure to disclose that eyewitness had been hypnotized was Brady violation); United States v. Miller, 411 F.2d 825, 832 (2d cir. 1969)(failure to disclose pre-trial hypnosis of eyewitness required new trial).

While Doe insists that he was hypnotized and only then remembered Freidman's abuse; Doe's therapists insists that, as far as she knew, he was never hypnotized. The state court's cursory disposal of this issue—in the absence of full disclosure and an evidentiary hearing—by referencing the affidavit of Doe's therapist is an "unreasonable" and uninformed determination of the facts. 28 U.S.C. § 2254(d)(2).

This Court will eventually need to make a determination as to the credibility of Gregory Doe *vis-a-vis* his therapist, but it can only do so after full disclosure and an evidentiary hearing. The state court's impulsive favoring of the therapist has no basis in the record and is "unreasonable" in light of Doe's own statements to the contrary. Id.

Proper discovery will reveal more children who unequivocally stated that there was no impropriety of any kind until being put into a trance by a therapist working in tandem with a prosecution tainted by hysterics.

## II.   IF THE STATE HADN'T SUPPRESSED EVIDENCE, JESSE FRIEDMAN WOULD NOT HAVE PLED GUILTY. ACCORDINGLY AN EVIDENTIARY HEARING IS NECESSARY TO ENSURE THAT THIS INDICTMENT WAS NOT THE PRODUCT OF HYSTERIA AND PROSECUTORIAL ABUSE.

There is a reasonable probability that if the constitutionally required disclosures had been made, Jesse Friedman would not have pled guilty to the 243 charges against him,[11] would not have been convicted of them at trial, and would not have been held responsible for them at sentencing.

As clearly established by Brady v. United States and its progeny, misrepresentations or other misconduct by the prosecution can undermine our confidence in, and the reliability of, a guilty plea and, therefore, provide a basis for granting a petitioner relief in a habeas corpus proceeding. See Brady v. United States, 397 U.S. at 757-58; White, 858 F.2d at 422; Miller, 848 F.2d at 1318-22; Campbell, 769 F.2d at 321. Where prosecutorial misconduct, including the failure to disclose Brady material, creates a reasonable probability that an innocent individual has falsely pled guilty to avert the risk of a wrongful conviction and a much longer sentence, Brady authorizes collateral relief. Brady v. United States, 397 U.S. at 757-58. This is such a case.

While materiality of Brady evidence is considered cumulatively, Kyles, 514 U.S. at 436-37, not item-by-item, each of the suppressed pieces of evidence raised here satisfies the materiality test, individually and collectively. See also Schledwitz v. United States, 169 F.3d 1003, 1012 (6th Cir. 1999)("[I]n determining whether undisclosed

---

[11] Even if Friedman would have still pled guilty, he would have pled to lesser charges and faced significantly less prison time. This satisfies the "reasonable probability" standard. See Mask v. McGinnis, 28 F. Supp. 2d 122, 125 (S.D.N.Y. 1998); Ferrara, 384 F. Supp. 2d at 431 (finding the "reasonable probability" standard satisfied where defendant who pled guilty would have agreed to a lesser sentence if proper disclosures had been made).

27

evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the 'reasonable probability' test is met"). Alone or together, this newly uncovered evidence establishes a "reasonable probability" that, had the Prosecution honored its constitutional obligations under Brady, Jesse Friedman would not have pled guilty, and if he had pled guilty his plea agreement would have been substantially different.[12] See Bagley, 473 U.S. at 682 (suppressed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" ); Strickler v. Greene, 527 U.S. 263, 289-90 (1990); Kyles, 514 U.S. at 434.

The egregious misconduct in producing accusations from impressionable children, followed by the suppression of eyewitness accounts that nothing happened, and the covering up of the use of hypnosis to elicit some of the more lurid allegations certainly "undermines confidence" in Jesse Friedman's guilty plea. See Kyles, 514 U.S. at 434 quoting Bagley, 473 U.S. at 678 ("The question is not whether the defendant would more likely than not have received a different [result] with the evidence, but whether in its absence he received...[a result] worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome'").[13]

---

[12] The "materiality test is not an evaluation of the sufficiency of the non-suppressed evidence, nor does it require the defendant to prove, by a preponderance of the evidence, that he would have been acquitted if the suppressed evidence had been disclosed." Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 559 (4th Cir. 1999).

[13] Having found that all of the evidence uncovered by the defendant is mere "impeachment" material and not exculpatory evidence, Friedman State Court at 3, the state court never ruled on the materiality of the Brady material raised here (except, arguably, for the eyewitness statements proclaiming Friedman's innocence). As such, the district court reviews the issue de novo. See, e.g., Weeks v. Angelone, 176 F.3d 249, 258, 263 (4th Cir. 1999), aff'd on other grounds, 528

28

Throughout these proceedings, the Prosecution has scrupulously avoided forthrightly assuring the state court that no further Brady material exists, nor have they offered up the relevant evidentiary materials for an independent judicial determination. Instead, the Prosecution continues to tow the untenable position that the mass of exculpatory material painstakingly assembled by the defense still does not prove Friedman's Brady claim.

In Townsend v. Sain, 372 U.S. 293 (1963), the Supreme Court ruled that district courts always have discretion to hold evidentiary hearings on dispositive factual questions arising in habeas corpus litigation. Id. at 318. The Court further ruled that "the holding of a [federal] hearing is *mandatory*" in six situations, including circumstances in which the state courts previously held a hearing and made factfindings. Id. (emphasis added).[14] Townsend's mandatory hearing standards—and its delegation to district courts of broad discretion to hold evidentiary hearings that are not mandated—govern petitioner's request for an evidentiary hearing.

Townsend's holding governing evidentiary hearing questions was modified by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), in one context: situations in which the failure to present evidence is attributable to either the prisoner or his counsel. Id. at 5-9. In such situations, the failure can constitute a procedural default, eliminating the right to a

---

U.S. 225 (2000) (pre-AEDPA *de novo* standard applies because Supreme Court of Virginia "failed to address [petitioner's claim] on the merits").

[14] Townsend requires a federal evidentiary hearing if: "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. Townsend, 372 U.S. at 313.

29

mandatory federal evidentiary hearing, absent the demonstration of "cause" and
"prejudice" or the demonstration that the denial of a hearing will result in a "fundamental
miscarriage of justice." Id. at 11-12. 28 U.S.C. § 2254(e)(2) essentially codified the
Keeney holding. Because the Prosecution's Brady violations are not attributable to
Friedman or his lawyers and were diligently raised, upon discovery, in the state court,
Townsend governs this Court's determination on granting an evidentiary hearing. See
Williams v. Taylor, 529 U.S. 420, 433-34 (2000)("Contrary to the Commonwealth's
position, however, there is no basis in the test of § 2254(e)(2) to believe
Congress…intended the statute's further, more stringent requirements to control the
availability of an evidentiary hearing in a broader class of cases than were covered by
Keeney's cause and prejudice standard"); Matheney v. Anderson, 253 F.3d 1025, 1039
(7th Cir. 2001), cert. denied, 535 U.S. 1030 (2002)("if the 'failure to develop the factual
basis of a claim in State court proceedings' can not be attributed to something the
petitioner 'did or omitted,' Section 2254(e)(2) does not apply and it is then necessary to
evaluate the request for an evidentiary hearing under pre-AEDPA standards").

Under Townsend and its progeny, federal habeas corpus hearings are required
where: (1) the petition alleges facts that, if proved, entitle the petitioner to relief, 372 U.S.
at 312; (2) the fact-based claims survive summary dismissal because their factual
allegations are not "palpably incredible [or] patently false" – the standard for summary
dismissal in habeas corpus proceedings, Blackledge v. Allison, 431 U.S. 63, 75-76
(1962), see Chang v. United States, 250 F.3d 79, 85 (2d 2001); and, (3) for reasons
beyond the control of the petitioner and his lawyer, the factual claims were not previously

30

the subject of a full and fair hearing in the state courts. Davis v. Lambert, 388 F.3d 1052, 1066 (7th Cir. 2004).

If the statements of eyewitnesses—present when these orgiastic mass-sexual Olympics were said to have occurred—unequivocally negating Jesse Friedman's guilt were handed over to the defense, the result in this case would certainly have been different. If evidence of the police investigator's tactics for manufacturing accusations from children through a series of highly suggestive, coercive, and humiliating interrogation techniques, including guided hypnosis, had been disclosed to defense counsel, the result in this case would certainly have been different.

Jesse Friedman didn't know about the statements of eyewitnesses exculpating him. He didn't know about the horrific techniques designed to elicit accusations that formed the basis of the Prosecution's indictment. How could he? The prosecutor, despite his constitutional obligation, and requests from defense counsel, never disclosed any of this.

Jesse Friedman satisfies the Townsend test and is entitled to an evidentiary hearing.

## III.   CONCLUSION

The Prosecution's unlawful failure to disclose material exculpatory information negating his guilt deprived Jesse Friedman's counsel of the ability to advise him properly, prompted Friedman to plead guilty to avert the risk of a wrongful conviction resulting in a life sentence, and deprived the court of the ability to discern that there was not a factual basis for his plea to the sexual abuse charges. See Ferrara, 384 F. Supp. 2d 384, 408.

It is admittedly difficult for any court to re-open a case that has received as much attention as this one. But, the evidence before this Court is overwhelming and warrants, at the very least, *in camera* review of the Brady material raised to ascertain whether, as we suspect, the prosecution is riddled with disregard for the defendant's right to due process.

Jesse Friedman has spent his young adult life behind bars for crimes he did not commit. Finally, he has a chance to clear his name.

For the foregoing reasons, a writ of habeas corpus should be granted.

Dated: New York, New York
      June 23, 2006

RONALD L. KUBY [RK-1879]
DAVID PRESSMAN[15]
Kuby & Perez, LLP
119 W. 23rd Street, Suite 900
New York, New York 10011

For the Petitioner, Jesse Friedman

---

[15] David Pressman was admitted in New York State in January 2005, but is not yet admitted to the United States District Court, Eastern District of New York.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- ---------x

JESSE FRIEDMAN,                                )        Index. No.

       Petitioner,                      )

      -against-                           )

JOE REHAL, Parole Officer, and
ROBERT DENNISON, Chairman of the    )
New York State Division of Parole,

                           )

      Respondents, and                 )

THE ATTORNEY GENERAL OF THE
STATE OF NEW YORK,                    )

      Additional Respondent.           )

-------------------------------------------------------- ---------x

## AFFIRMATION OF SERVICE

       RONALD L. KUBY, an attorney duly admitted to practice before the courts of the

State of New York, and a member of the bar of this Court, hereby affirms under the pains

and penalties of perjury that on June 23, 2006, he caused to be served a true copy of the

Petition for a Writ of Habeas Corpus, supporting Memorandum of Law and Exhibits upon

the following:

       Parole Officer Joe Rehal
       New York State Division of Parole
       119 West 31st Street, 4th floor
       New York, NY  10001;

       Robert Dennison, Chairman
       New York State Division of Parole
       119 West 31st Street
       New York, NY; and

Office of the Attorney General of the
State of New York
120 Broadway
New York, NY

by hand.

Dated: New York, New York
June 23, 2006

_____
RONALD L. KUBY