```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JESSE FRIEDMAN,

              Petitioner,

       -against-                      MEMORANDUM & ORDER
                                      06-CV-3136(JS)
JOE REHAL, Parole Officer, and
ROBERT DENNISON, Chairman of the
New York State Division of Parole,

              Respondents, and

THE ATTORNEY GENERAL OF THE STATE
OF NEW YORK,

              Additional
              Respondent.
----------------------------------X
APPEARANCES:
For Petitioner:       Ronald L. Kuby, Esq.
                      David Pressman, Esq.
                      Kuby & Perez, LLP
                      119 W. 23rd Street, Suite 900
                      New York, New York 10011

For Respondents:      Judith R. Sternberg, Esq.
                      Nassau County District Attorney's Office
                      262 Old Country Road
                      Mineola, New York 11501

SEYBERT, District Judge:
```

## INTRODUCTION

Petitioner, Jesse Friedman, seeks a writ of habeas corpus challenging the grounds for his 1988 guilty plea on seventeen counts of Sodomy in the First Degree, one count of Use of a Child in a Sexual Performance, four counts of Sexual Abuse in the First Degree, one count of Attempted Sexual Abuse in the First Degree, and two counts of Endangering the Welfare of a Minor. Petitioner proffered three grounds for his writ: (1) the prosecution failed to

disclose eyewitnesses who denied that Petitioner committed any wrongdoing; (2) the police officers investigating the case used overtly suggestive and aggressive interrogation methods with the child witnesses; and (3) the state failed to disclose that at least one child witness underwent hypnosis prior to alleging that Petitioner sexually abused him.  On July 20, 2007, this Court issued an Order dismissing Petitioner's first and second claims as untimely, but reserved decision on the third claim.  On October 3, 2007, the parties held oral argument in open court on the issue of whether Petitioner's argument that the state failed to disclose the use of hypnosis was timely.  For the reasons below, the Court finds that Petitioner's third claim, alleging that the prosecution failed to disclose the use of hypnosis on at least one accuser, is untimely.

## BACKGROUND

The full facts of this case are discussed at length in the Court's July 20, 2007 Order.  Accordingly, the Court will only address the facts relevant to Petitioner's pending claim.  In 1988, Nassau County charged Petitioner, then nineteen years old, with several acts of sodomy, sexual abuse, and crimes against children.  The charges alleged that Petitioner and his father, Arnold Friedman ("Friedman") (collectively, the "Friedmans"), abused young children who attended computer classes taught by Friedman in his Great Neck, New York, home.  Thereafter, the

Friedmans, along with the students and their families, became embroiled in a highly publicized case, which culminated in a guilty plea by both Petitioner and his father.  Petitioner was sentenced to multiple terms aggregating six to eighteen years, and was ultimately released to parole supervision on December 7, 2001. (Pet. ¶ 5).

In the fall of 2000, while Petitioner was still incarcerated, documentary filmmaker Andrew Jarecki ("Jarecki") began investigating the Friedman case for a possible film. (Jarecki Aff. ¶ 2).  Jarecki interviewed members of the Friedman family, many of the former computer class students, as well as prosecutors, law enforcement personnel, and attorneys involved with the case.  (Id. ¶ 4).  After a three-year investigation, Jarecki created *Capturing the Friedmans*, a documentary film depicting the accusations of abuse, the ensuing investigations, and the impact of the case on the Friedman family, the former students, and the Great Neck community.  Petitioner viewed the film in its entirety for the first time on January 10, 2003.  (Id. at ¶ 5; Pet's Aff. ¶ 56;).  Petitioner claims that the film led him to discover that the prosecution had withheld several categories of exculpatory evidence, and argues that he would not have pled guilty if he had been aware of this undisclosed evidence.  After exhausting his state court remedies, Petitioner brought a writ of habeas corpus on June 23, 2006, premised on the allegedly newly-discovered evidence.

As this Court dismissed Petitioner's first two categories of exculpatory evidence as untimely, we need only address the third: that at least one accuser, Gregory Doe, was hypnotized prior to making any accusations against Petitioner.

DISCUSSION

I. The AEDPA Statute Of Limitations

The AEDPA places a one year period of limitation on all applications for a writ of habeas corpus. See 28 U.S.C. § 2244(d)(1). The statute lists several events which trigger the start of the limitations period. The dispute in the instant case involves an interpretation of § 2244(d)(1)(D), which starts the one-year period on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Id.

Petitioner invokes this factual predicate provision to make his hypnosis claim timely. However, the parties dispute the date on which Petitioner discovered the factual predicate of his claim. Respondent argues that Petitioner knew the facts on January 10, 2003, when Petitioner watched the film and saw one of the former students allege that he had been hypnotized. If Petitioner knew, or could have known through the exercise of due diligence, of the facts after watching the film, the one-year limitations period would have began on January 10, 2003. On January 7, 2004, 362 days after watching the film, Petitioner filed a post-judgment motion in

state court pursuant to New York Criminal Procedure Law §440.10. After the state court denied his motion, Petitioner sought permission to appeal, which the Appellate Division denied on March 10, 2006. Because the limitations period tolls while a state post-conviction motion is pending, Petitioner's clock started running again on March 10, 2006. According to Respondent's calculation, Petitioner had three days remaining on his limitations period, and therefore had to file his application for a writ of habeas corpus by March 13, 2006, making his June 23, 2006 application untimely.

Petitioner argues that his time began running in July of 2003, when he first gained access to the original materials Jarecki used for his film (hereinafter the "Jarecki materials"). Petitioner claims that he did not have any actual facts after watching the film because it merely portrayed an anonymous "person whose face [was] cloaked in shadows" and about whom there was no identifying information. Transcript of Oct. Hearing at 7, 06-CV-3136 (No. 23) (hereinafter "Hearing"). According to Petitioner, a motion would have been futile at that time because he did not know for a fact that the shadowed man was a complainant and had any relevance to his action. In July of 2003, Petitioner gained access to the Jarecki materials, which included transcripts of the interviews, and discovered that the cloaked man was Gregory Doe, a former student and complainant at Petitioner's Grand Jury Hearing. If the clock started running in July of 2003, Petitioner's current

5

application would be timely.  The discussion therefore turns on whether Petitioner knew, or could have known through the exercise of due diligence, that the prosecution may have withheld information regarding the use of hypnosis on former complainants in January of 2003, when Petitioner watched *Capturing the Friedmans* for the first time.

## II. The Factual Predicate Exception

The date on which the limitations clock begins to tick for the factual predicate exception is a fact-specific question which is appropriately answered by the district court.  See Wims v. United States, 225 F.3d 186, 191 (2d Cir. 2000).  "The proper task in a case such as this one is to determine when a duly diligent person in petitioner's circumstances would have discovered" the basis for his petition.  Id. at 190.  Moreover, if it "plainly appears from the face of . . . [the] petition and supporting papers" that a petitioner unreasonably delayed in filing the petition, then the Court may bar the petition.  Id. at 191.

Petitioner claims that *Capturing the Friedmans* did not provide notice of possible Brady materials related to the hypnosis of at least one complainant.  The film depicts at least two scenes that are relevant to Petitioner's hypnosis claim.  In the first, the viewer sees Debbie Nathan, a writer who corresponded with Friedman during his incarceration, state:

> I came across a document regarding a group of
> children from the Friedman case who were in

6

therapy. And it stated that many of them had no recollection of the abuse. And there was some discussion about whether hypnosis would be a good idea now. Exactly what you're not supposed to do. It was the kind of therapy that had a really good chance of messing up kids' memories and implanting false memories.

CAPTURING THE FRIEDMANS (HBO Video 2004). Shortly thereafter, the film cuts to an unidentifiable man lying in a shaded room, who has the following conversation with Jarecki:

> Former
> Student: My parents put me in therapy right away. They put me in hypnosis and tried to recall facts that I had buried. And that's how I first came out, started talking about it. Just through, being hypnotized and everything. I recalled things that I would bury. I was able to talk about them.
>
> Jarecki: For example, what would be something that you recall?
>
> Former
> Student: The actual first time I actually recalled that I was actually molested. Wow, I was actually molested, I can deal with it now. That was the first time.
>
> Jarecki: And you recalled through hypnosis the first episode?
>
> Former
> Student: Yes.
>
> Jarecki: So tell me about that, if you remember.
>
> Former

7

>       Student: I don't remember much about it. It was just, it was so long ago. I just remember that I went through hypnosis, came out, and it was in my mind.

Id. After the anonymous person relays this information, the film displays text that reads, "This student's testimony led to 35 counts of sodomy." At this point, a reasonable viewer would have logically inferred that the anonymous speaker was an actual complainant, and would have been on notice that hypnosis may have been used on the children. Even if Petitioner was still unsure and wanted to connect the anonymous speaker to an actual complainant, Petitioner need only have referred to his Indictment to locate the complainant who accused Petitioner of thirty-five counts of sodomy.

Petitioner argues that he was not on notice because the man was "not under oath" and Petitioner did not know "if in fact he was a complainant." (Hearing at 7). However, the limitations period begins on the date on which petitioner was "on notice of the facts which would support a claim, not from the date on which the petitioner has in his possession evidence to support his claim." Clancy v. Phillips, No. 04-CV-4343, 2005 U.S. Dist. LEXIS 13179, at *14-15 (S.D.N.Y. June 30, 2005). The Jarecki materials did not alert Petitioner to a new claim; it merely confirmed that a former Complainant was hypnotized, and linked the Anonymous Complainant to a named Complainant, Gregory Doe. This evidence only strengthened a claim that Petitioner should have been on notice of after

8

watching the film, and was not newly-discovered evidence for 2244(d)(1) purposes. See Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (holding that petitioner's recently obtained affidavit verifying that his trial counsel may not have informed Petitioner of his rights prior to trial was not newly-discovered evidence and "neither change[d] the character of [Petitioner's] pleaded due process claim nor provide[d] any new ground for [Petitioner's] federal habeas petition.); Youngblood v. Greiner, No. 97-CV-3289, 1998 U.S. Dist. LEXIS 16037, at *4, n.4 (S.D.N.Y. Oct. 8, 1998) (the limitations period for the factual predicate exception began when petitioner became aware of his claim of an illegal search and witness tampering, not from the moment petitioner received documentation affirming the witness tampering). Petitioner was on notice of his hypnosis claim from the moment he saw the film; he merely used the extra time to ascertain the actual identity of the man portrayed in the film, and to determine that the man was "in fact" a complainant.

Petitioner argues that the limitations time started to run when he first gained access to the evidence in support of his Petition, and cites to Pacheco v. Artuz, 193 F. Supp. 2d 756 (S.D.N.Y. 2002), to support this preposition. In Pachecho, a key witness wrote to the petitioner stating that he had lied during the petitioner's trial and was now willing to recant his perjured testimony. The prosecution argued that this evidence was newly-

9

available, and not newly-discovered, and the fact that the witness perjured himself could have been discovered earlier through the exercise of due diligence. The court rejected this argument, reasoning that the "petitioner had no way of knowing whether the testimony was perjured or merely mistaken." Id. at 761. Because "liars are hard to detect", petitioner could not have been on notice of the perjury until the witness actually admitted to it. Id. Petitioner mistakenly interprets the limitations period in Pacheco as starting when the Pacheco petitioner first gained "access to the witness" with the exculpatory evidence. (Hearing at 11). The court in Pacheco did not hold that the clock started when the petitioner gained access to the witness; rather, it held that the petitioner did not have *notice of his claim* until the witness contacted him. See also Clancy v. Phillips, No. 04-CV-4343, 2005 U.S. Dist. LEXIS 13179, at *14-15 (S.D.N.Y. June 30, 2005) (holding that petitioner was on notice of the factual predicate of his claim when he became aware of the existence of an eyewitness with potentially exculpatory evidence, not when petitioner's private investigator actually contacted the eyewitness). Pacheco does not salvage Petitioner's late claim, and does not support starting the limitations period on the day that Petitioner gained access to the Jarecki materials.[1]

---

[1] Petitioner's cites to several other cases that similarly do not support his position. For instance, in Lucidore v. New York State Div. of Parole, No. 99-CV-2936, 1999 U.S. Dist. LEXIS

The Court rejects Petitioner's contention that he could not have known the factual predicate of his claim because *Capturing the Friedmans* was merely a "commercial film" that "is reliable evidence of nothing." (Hearing at 12). The clock does not start when Petitioner has reliable evidence, it begins when he has notice of the facts underlying his claim. Although merely providing statements from a film may not have been enough for Petitioner to prevail on his underlying Brady-violation claim, Petitioner had another full year from the date that he first had notice of his claim to gather evidence and bring a habeas petition. See Eiland v. Conway, No. 03-CV-4208, 2004 U.S. Dist. LEXIS 17699, at *8 n.2 (S.D.N.Y. Sept. 1, 2004) ("The limitations provision does not (unfairly) require [petitioner] to file a petition as soon as he becomes aware of the problem; it gives him a year from the time he learned of the grounds to file his petition, and thereby takes into

---

11788 (S.D.N.Y. Aug. 3, 1999), the petitioner brought a habeas petition after receiving a copy of a police report in which the complainant stated that she had not been raped. The court found that his petition was timely because the report was newly-discovered evidence which alerted the petitioner to a possible Brady violation. Petitioner likens the *Lucidore* police report to the Jarecki materials, and argues that the limitations period therefore started when he first received a copy of the Jarecki materials. But Petitioner fails to mention that the petitioner in Lucidore had no inkling *whatsoever* of the possibility that the complainant previously stated that she had not been raped. Unlike here, there was no question in Lucidore of whether the petitioner knew of the possibility that the complainant gave contradictory information to the police prior to receiving a copy of the report.

11

account the need to acquire evidence in support of any such petition); Coleman v. Miller, No. 99-CV-3981, 2000 U.S. Dist. LEXIS 17415, at *15 (S.D.N.Y. Oct. 16, 2000) ("a habeas petitioner cannot confuse his knowledge of the factual predicate of his claim with the time permitted for gathering evidence in support of that claim") (quoting Flanagan v. Johnson, 154 F.3d 196 (5th Cir. 1998); Fermin v. United States, No. 99-CV-4127, 2000 U.S. Dist. LEXIS 413, at *8 (S.D.N.Y. Jan. 6, 2000) ("There is no authority to support the proposition that conducting an investigation to disclose exculpatory evidence stays the running of any limitations period."). Here, after watching the film in January of 2003, Petitioner had a full year, until January of 2004, to link the anonymous complainant to a named complainant and gather evidence in further support of his petition. In fact, Petitioner was able to gather this evidence in July of 2003, well before the expiration of a year, and still had five months remaining to bring his claim.

Moreover, the Court has difficulty believing Petitioner's claim that he was not on notice of the factual predicate of his claim because *Capturing the Friedmans* was a popular film, and consisted of "just a good sound bite." (Hearing at 13). An e-mail correspondence between Petitioner's former attorney, Sam Israel ("Israel"), and Jarecki belies Petitioner's argument that he did not take the film seriously. In an e-mail dated April 3, 2003, Israel informs Jarecki that he "would like to start a dialog with

certain of the individuals [Jarecki] contacted in the film . . . who might be helpful to Jesse for the purposes of obtaining helpful statements and/or affidavits." Jarecki responds later that day, and advises Israel that "the best time for talking to these people is when they have already seen tons of press about the film" and Israel should wait to talk to the "possible recanters after they already know the tide is in their favor." Clearly, at least by April of 2003, Petitioner knew that the film featured real persons who were personally connected to the Friedman case, and not actors fictionalizing their involvement.[2] Moreover, even if Petitioner still questioned the reality of the film, Petitioner could have confirmed with Jarecki that the individuals he interviewed were former complainants and not Hollywood actors. Petitioner had the option of filing a collateral state court action, requesting an evidentiary hearing to verify the statements from the film, and then subpoenaing Jarecki's materials for further evidence. See Reid v. Vaughn, No. 01-CV-2385, 2003 U.S. Dist. LEXIS 3342, at *11 (D. Pa. March 4, 2003) (finding that petitioner appropriately filed a state court motion and requested an evidentiary hearing ten days

---

[2] The petition would still be untimely if the Court were to use April 3, 2003 as the starting date. Petitioner would have had until April 3, 2004 to bring his petition. On January 7, 2004, when Petitioner filed his state court post-conviction motion, Petitioner had 87 days remaining on his limitations period. Since the time began running again on March 10, 2006, the date on which Petitioner's state court motion terminated, Petitioner had until June 5, 2006 to file his petition, making his June 23, 2006 application eighteen days late.

13

after reading a non-fiction book which alerted the petitioner to a possible Brady violation from his trial).

Even if the Court were to credit Petitioner's contention that the factual predicate of his claim could not have been known until Petitioner verified the reality of the film, the Court does not understand why Petitioner needed to wait for the Jarecki materials to confirm the possibility of hypnosis. Publicly-available information existed in January of 2003, and arguably earlier, which would have alerted a duly diligent person in Petitioner's shoes to the possibility of hypnosis.

For example, Petitioner submitted a 1988 newspaper article in support of his habeas petition, in which officers investigating the Friedman case stated that additional details of abuse "were revealed by previously identified victims during sessions with their therapists." Bill Van Haintze and Alvin E. Bessent, *New Arrest in Child Sex Case*, NEWSDAY, June 23, 1988. Although the article does not specifically mention hypnosis, Petitioner also submitted an excerpt from a lecture on child pornography, which featured Dr. Sandra Kaplan, a psychiatrist who publicized her involvement with the treatment of the computer students,[3] and Detective Sergeant Fran Galasso, one of the

---

[3] Petitioner acknowledges knowing that Dr. Kaplan worked with the police and "attended meetings at Great Neck schools in December 1987, January 1988, and November 1988, together with Galasso and others involved in the case." (Pet. p.41).

14

detectives involved with the Friedman investigation. In the presentation, given in 1990, Dr. Kaplan discusses the methods used in the "individual treatment of [the children in the Friedman case], group therapy of the children and their parents and *use of hypnosis in the treatment of dissociation in victims*." (emphasis added). Another presenter, Dr. David Pelcovitz, discusses the visualization techniques used to assist fifteen children in remembering the abuse. Dr. Pelcovitz mentions that two of the fifteen children "who had amnesia of the abuse" remembered "most of . . . their victimization" after the treatments. (Pet. Ex. 34 App. 821). While the Court will give Petitioner a benefit of the doubt and stop short of stating that he could have discovered the possibility of hypnosis far before watching the film, the Court does hold that there was enough information, apart from the Jarecki materials, available to Petitioner in January of 2003, when Petitioner watched the film, which could have independently verified the possibility of hypnosis. See Hector v. Greiner, No. 99-CV-7863, 2000 U.S. Dist. LEXIS 12679, at * 5 (E.D.N.Y. Aug. 29, 2000) (holding that petitioner's claim was not newly discovered where his evidence consisted of scholarly medical articles published in the 1970s, and a trial transcript from an unrelated 1980 case, because the evidence "was in existence and available" and could have been discovered by counsel's due diligence" earlier); Martino v. Berbary, No. 03-CV-923S, 2005 U.S. Dist. LEXIS

15

6232, at *21-22 (W.D.N.Y. March 30, 2005) (rejecting petitioner's argument that he recently learned that "his trial attorney had a conflict of interest due to his membership on a city council in the county in which petitioner was tried" because "evidence of the alleged conflict of interest had clearly been in existence and could have been discovered by petitioner" earlier). The Court fails to see how the Jarecki materials uniquely verified the film's allegations of hypnosis, as opposed to the wealth of other publicly-available information alluding to the use of hypnosis. The presentation by Dr. Kaplan and the statements from the officers involved with the investigation, coupled with the allegations of hypnosis from the film, should have been sufficient to alert Petitioner of the possibility that the child complainants underwent hypnosis.

Accordingly, the Court finds that the Jarecki materials did not provide Petitioner with any newly-discovered evidence, and Petitioner should have been on notice of the factual predicate of his claim after watching the film, or, at the very least, after Petitioner's e-mail correspondence in April of 2003 with Jarecki discussing the materials used for the film. In either instance, the petition for a writ of habeas corpus is time-barred. Petitioner has not provided the Court with any basis for finding that the Jarecki materials were anything more than evidence in further support of a claim that Petitioner was on notice of far

16

earlier than July of 2003.

## **CONCLUSION**

      For the foregoing reasons, this Court GRANTS Respondents' motion to dismiss the Petition as time-barred.

      SO ORDERED

      /s/ JOANNA SEYBERT
      Joanna Seybert, U.S.D.J.

Dated:    Central Islip, New York
          January 4, 2008