1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

JESSE FRIEDMAN,                    :
                                        CV 06 3136
        Plaintiff,                 :

            -against-              :  U.S. Courthouse
                                      Central Islip, N.Y.
REHAL,                             :

                                   :  TRANSCRIPT OF MOTION

        Defendant.
                                      October 3, 2007
- - - - - - - - - - - - - - - X  2:05 p.m.

BEFORE:

        HONORABLE JOANNA SEYBERT, U.S.D.J.


APPEARANCES:

For the Plaintiff:.  RONALD L. KUBY, ESQ.
                     DAVID PRESSMAN, ESQ.
                     118 West 23rd Street
                     New York, New York 10011

For the Defendant:   OFFICE OF NASSAU COUNTY
                     DISTRICT ATTORNEY
                     262 Old Country Road
                     Mineola, New York 11501
                     BY:  JUDITH STERNBERG, ESQ.


Court Reporter:      HARRY RAPAPORT, CSR
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

2

1          THE CLERK:  For oral argument, hearing, Friedman

2    verse Rehal.

3          Please state your appearances for the record.

4          MR. KUBY:  Ronald Kuby, 119 West 23rd Street,

5    New York, New York.

6          MR. PRESSMAN:  David Pressman, from the office

7    of Ronald L. Kuby.

8          Good afternoon, Judge.

9          THE COURT:  Good afternoon.

10          MS. STERNBERG:  Judith Sternberg from the Nassau

11    count DA's office, representing the defendants.

12          THE COURT:  So I can hear all counsel, I would

13    suggest you come up.  And the oral argument can be cleared

14    up quickly.  And I'm attempting to ascertain as to whether

15    obtaining knowledge of the alleged hypnotizing of the

16    victims was known, or could have been known to the

17    petitioner.

18          So, it is a very small item.  It is not on the

19    merits.  And I think that we can proceed on that basis.

20          I do note that in my earlier memorandum and

21    order, that unfortunately in the first paragraph I

22    indicated petitioner's third claim, however, based upon

23    failure to disclose the use of hypnosis on at least one

24    accuser is timely.  It should have read:  Is possibly

25    timely.

3

1      That's what I'm here to decide.  And I will hear

2  any additional arguments after we make that determination.

3      MS. STERNBERG:  Did you want us to approach?

4      THE COURT:  I don't think it is necessary,

5  unless Harry indicates that it is hard to hear.

6      This is one of the world's worst courtrooms for

7  acoustics.  The sounds bounce off the panelling, and

8  that's why we have the rather hideous panels here to

9  absorb some of the sounds.

10      So, if you can't hear me, or I can't hear you,

11  let me know.

12      Now, can you hear me now that I'm on the

13  microphone?

14      MR. KUBY:  Beautiful.

15      THE COURT:  You heard what I said earlier?

16      MR. KUBY:  Yes.

17      THE COURT:  That we are here for a very limited

18  purpose, which is to make a determination as to whether or

19  not the petitioner knew or could have known the claims

20  that one or more of the accusers was hypnotized.

21      MR. KUBY:  Would you like me to proceed first or

22  the People to proceed first?  It is a little sua generics

23  that we are doing.

24      THE COURT:  I assume the State should go first

25  at this point in time.

4

1    I have received the latest communication from

2 the state.  And I'm not too sure what vehicle you are

3 attempting to use in terms of the Court's decision.

4    MS. STERNBERG:  I'm sorry, Judge?

5    THE COURT:  Why don't you go first and tell me

6 why it is that I should find that the petitioner knew or

7 could have known about the videotaping of the accusers --

8 not the videotaping, rather, the hypnosis.

9    MS. STERNBERG:  Your Honor, the plea in this

10 case took place in 1988, and in January of 2003 the

11 petitioner acknowledges, and the Court found in its

12 previous decision, that he saw the movie, and in that

13 movie there was an allegation by one of the complainants,

14 that he had been hypnotized.

15    On that date the defendant knew the faces of the

16 claimants.  That's clearly the basis of the claim in his

17 petition.

18    THE COURT:  And the video we are talking about

19 is Capturing the Friedmans?

20    MS. STERNBERG:  Yes.

21    THE COURT:  And that was the documentary that

22 was produced I guess in 2002, or something like that?

23    MS. STERNBERG:  I don't know what year it was

24 produced.

25    I know that the petitioner claims he saw the



5

1    movie on January 10th, 2003, and the People have no reason

2    to dispute that date.

3         Obviously, on that date he knew this allegation

4    of hypnosis.  And, therefore, on that date, the one year

5    statute of limitations as prescribed began to run.

6         362 days later he filed his post-judgment motion

7    in the state court, thereby tolling the one year statute.

8         He had then three days left within which he

9    could file his petition.

10        The Appellate Division denied him permission to

11   appeal from the denial of the post judgment motion on

12   March 10th, 2006.  His three days ran on March 13th.

13        THE COURT:  Okay.  Straightforward in your mind.

14        MS. STERNBERG:  I would like to also address

15   that I believe it is the petitioner's position that he did

16   not have the factual basis of this claim when he saw the

17   movie; he did not have the factual basis of this claim

18   until the producer of the movie chose to give him the

19   identity of the young man who said in the movie that he

20   had been hypnotized.

21        The law is very clear, and your Honor discussed

22   it in her earlier decision, that your time is -- your time

23   doesn't begin to run when you gather all, or begin to

24   gather your evidence.  Your time begins to run when you

25   know the factual predicate.

6

1        And the fact of the hypnosis is the factual

2   predicate, and that's obvious from the defendant's papers.

3   Regardless of the complainant's identity -- his papers

4   don't make any reference to the complainant's identity.

5   They don't depend on his identity.  They depend solely on

6   his claim, which the People dispute.  But nonetheless,

7   that is the claim, that he was hypnotized.

8            THE COURT:  That the accuser was hypnotized?

9            MS. STERNBERG:  Pardon me?

10           THE COURT:  The accuser was hypnotized?

11           MS. STERNBERG:  Yes, the young man's

12   testimony -- not his testimony, but the statement in the

13   movie.  And that happened on January 10th, 2003.  On that

14   date the complainant knew that claim.

15           THE COURT:  Thank you.

16           Mr. Kuby.

17           MR. KUBY:  Thank you, Judge.

18           Good afternoon.

19           The People allege that it was indeed January

20   10th, 2003, Jesse Friedman sees the film Capturing the

21   Friedmans, and that's when the factual predicate of the

22   claim was discovered.

23           In fact, and I will attempt to demonstrate in

24   argument that it was in fact July 2003, the time that

25   Jesse Friedman obtained access to the director's materials

7

1  that he knew the factual predicate that would support the

2  claim.

3        Now, in order to sort of break that down, on

4  January 10th, 2003, he sees the film.

5        What does he have?  He sees a person on the

6  screen, a person whose face is cloaked in shadows, an

7  undisclosed location, who is both anonymous and presented

8  anonymously, about whom there is no identifying

9  information.  It is a person who states not under oath

10  that he was one of the people who testified in the

11  Friedman case, and he remembered nothing about his

12  molestation until he was hypnotized.

13        Now, Jesse Friedman did not recognize him.  He

14  didn't know his identity.  He didn't even know if in fact

15  he was a complainant. Most important here, he had no way

16  of finding out until he obtained access to the Jarecki

17  material.

18        No degree of due diligence would have led Jesse

19  Friedman to the facts underlying his claim until he got

20  access to the director's material.

21        What is clear is Jesse Friedman didn't have the

22  designation Gregory Doe, until he obtained access to the

23  director's material.

24        He is not named, obviously, by his real name nor

25  the Gregory Doe designation.

8

1        So the Court understands this, the significance

2   of the Gregory Doe designation is this:  The complainants

3   were named in the original paper turned over to Jesse

4   Friedman's defense counsel in the pretrial hearing as

5   Richard Doe, Gregory Doe, and Samuel Doe, and generally

6   identified as to where the alleged molestation took place

7   and other details.

8        But without the Gregory Doe designation, Jesse

9   Friedman had absolutely nothing.  He was able to learn

10  that the mystery man was indeed Gregory Doe when he got

11  access to the Jarecki materials.

12        He was able to obtain a transcript of the actual

13  interview.  He was able to obtain identifying information.

14  And it was there and at that point that the due diligence

15  clock began to run.

16        To try to illustrate this in a different way,

17  assume a continuum.  Someone makes an anonymous phone call

18  to Friedman in a phone call, and says I testified in the

19  Friedman case, and I had my testimony hypnotically

20  refreshed.  I remember nothing before I was hypnotized.

21  Click.

22        No one could argue under those circumstances

23  that the clock would begin to run.  No one could argue

24  that the due diligence clock could begin to run there

25  because there was no place to go with this phone call.

9

1          At the other end of the continuum, someone walks

2    in and says, hi, my name is X, I'm better known as Gregory

3    Doe.  I testified at the grand jury to the charges to

4    which you pled guilty, and I didn't know anything until I

5    attended the hypnosis sessions, and I'm more than willing

6    to testify for you.

7          Clearly there the due diligence clock begins to

8    run.

9          For Jesse Friedman's case, this was not an

10   anonymous phone call.  But it was an anonymous depiction

11   in a film.

12         It is not as though Jesse Friedman saw that and

13   did nothing.

14         Again, I'm not entirely clear on what we are

15   doing besides arguing, but I want to bring the Court's

16   attention to two letters we were unable to uncover.  And

17   let me give copies to the People.  And I will submit them

18   to the Court in the nature of an offer of proof, and

19   obviously they can be authenticated at a later time if

20   necessary.

21         THE COURT:  Sure.

22         (Handed to the Court.)

23         MR. KUBY:  I will not read them all to the

24   Court.  But I will note that on April 3rd, 2003, and

25   that's the one-page document, and that's an E-mail from an

10

1    attorney Sammy Israel, who was retained by Jesse Friedman.

2    And it is an E-mail to Jarecki, and Jarecki's response.

3           Israel says I want to start a time log with

4    certain of the individuals you contacted in the film.

5           Jarecki puts him off.  And he says, I'm not

6    going to give you access now.  Wait.  Wait for the press

7    to build up a little more, let's meet on April 18th.

8           We don't know the result of that meeting, but we

9    know the consequence.  Because on May 9th Sam Israel sends

10   the letter to Jarecki, claiming that Jarecki has

11   effectively prevented Jesse from having counsel, and

12   states, and I quote the small portion, denied me his

13   lawyer access to materials that might help Jesse in

14   launching a collateral challenge to his conviction.  Close

15   quotes.

16          So, again, as of May 9th, Jesse still doesn't

17   have access.

18          If the Court examines the case law, and I know

19   you have because you cited much of it, what is key here is

20   actually access to the facts, not some sort of belief that

21   facts may exist.

22          In Pacheco versus Artuz (ph), we cite in our

23   papers, habeas action, the star eye witness submits an

24   affidavit saying he perjures himself, and in fact, the

25   defendant didn't do the shooting.

1    The prosecution says, hey, Mr. Defendant, you

2  are way out of time.  You knew all along you didn't do the

3  shooting.  You could have gotten this at any point prior

4  to now.  This is years too late.

5    The Artuz court said, no.

6    He didn't actually discover the facts necessary

7  until the witness wrote to him and said, I testified

8  against you.  I lied, and I'm willing to come forward now

9  and tell the truth.

10    Once he had that type of access to the witness,

11  the one year clock began to run.

12    This is true in Hector versus Greiner,

13  G-R-E-I-N-E-R, where the Court noted the petitioner had

14  access to the transcript.  He had access to the book.  So,

15  of course, he was on notice of the facts.

16    It is true in the Ludicore, L-U-D-I-C-O-R-E

17  case, where the one year clock began once the defendant's

18  attorney received the clerk's police report.

19    Now, he didn't receive all the evidence to make

20  this claim.  But once he made -- had actual access to the

21  police report, that's when the one-year time began.  It

22  didn't happen when he felt there may be a Clarkstown (ph)

23  police report, or even if there was evidence that there

24  was a Clarkstown police report somewhere.  It began when

25  he had access to the facts.

1          So, let's see if we can agree on something.

2          How do we characterize the Gregory Doe comments

3     in the movies in terms of their factual significance?

4          And I have a thought, and the thought is this:

5     It might be fair to characterize them as a commercial

6     film, containing snippets of interviews, cut and spliced

7     and taken out of context, all unsworn, is reliable

8     evidence of nothing.

9          And I think it follows that that description

10    cannot possibly provide access to the factual predicate

11    necessary to support a claim.

12         So, this is my characterization, but it is not

13    mine alone.  This is Ms. Sternberg's characterization of

14    the film and the depictions and the tape, which she made

15    as recently as August 21st, 2007, and as long ago as

16    November 4th, 2004.

17         Reliable evidence of nothing.

18         To look at it in one more way.  Let's assume

19    that Jesse Friedman sees this film on January 10th, and

20    forgetting about exhaustion requirements and other claims,

21    files his habeas petition the next day and says, look, I

22    have these facts.

23         What would the People say about that petition

24    that showed the film?

25         We know the answer to that.  We know the answer

13

1    because the People have successfully invoked this phrase,

2    as well as others, time and time again, to say that this

3    film is absolutely worthless.

4           The People's memorandum in opposition to the

5    440, they say that that Jarecki's interviews, quote, may

6    be a provocative sound bite for a movie, but it has no

7    place in a serious consideration of the allegations now

8    before the Court.  They said these snippets are, quote, a

9    textbook example of non-evidence that, quote, fails to

10   establish the factual allegation on which he bases his

11   motion.

12          That claim, had Jesse Friedman brought it at

13   that time, without at least being able to verify that this

14   was a complaining witness, would have been dismissed.

15          So, the same statement state that has repeatedly

16   and successfully argued that this unsworn snippet of this

17   person is entitled to no weight whatsoever; it is just a

18   good sound bite, but has no place for serious issues

19   before the federal court.

20          This same state comes forward and says, it is

21   more than enough to establish the factual basis that

22   supports the claim.

23          And I urge you to reject that.  And I urge you

24   to reject something else.

25          THE COURT:  Aren't they very dissimilar

1   responsibilities and obligations?

2          Think about it.  Your client for the first time

3   learns, according to your argument, that there has been

4   someone that has made a claim that he would not have

5   brought these charges if it hadn't been for this hypnotic

6   incident.

7          MR. KUBY:  Right.

8          THE COURT:  That's very different from what the

9   People's responsibility would be at the time that they are

10  arguing against the 440 motion.  Very different context.

11         MR. KUBY:  Understood.

12         But the tone and quality of the argument as to

13  the value of this evidence, the significance of it, the

14  weight to which it is entitled, and its non-evidentiary

15  character.  I do think that that argument, since they made

16  it so successfully below, it is not the least bit unfair

17  to point out to this Court that this is exactly the same

18  evidence that they repeatedly categorize as non-fact,

19  non-evidence, and utterly meaningless.

20         I don't see how you can take this utterly

21  meaningless, quote-unquote, set of allegations, and then

22  claim that it makes out the factual support necessary.

23         The factual support necessary wasn't obtained by

24  Jesse Friedman until he had actual access.

25         Had Andrew Jarecki chosen to wait a year and a

15

1   half before Jesse Friedman was given access, there was

2   nothing he could have done.  He did his best, and that's

3   all he could do.

4          But I do want to address the issue of the

5   People's timeliness in making these arguments before this

6   Court today.  Because I think that the People have waived

7   the very argument on timeliness grounds that they have

8   advanced here.

9          I'm reminded of the case of Davis versus

10  Johnson, we simply had the, quote, timing works both ways.

11  If the State wants to kill a man because his filings are

12  not on time, it should raise the issue promptly.

13         By order dated July 13th, 2006, the first judge

14  to have this petition, ordered the People to answer the

15  petition within 60 days.  The People chose not to answer.

16  Instead, they filed a motion to dismiss under 12(b)(6),

17  without first securing leave or at any time securing leave

18  to file an answer.  But that's fine, they can make a

19  12(b)(6) motion.  They did so in December of 2006.

20         Point one on the motion is that the petition is

21  untimely and should be dismissed.  And they made a number

22  of timeliness arguments.

23         They did not make the timeliness argument that

24  they make here today, and that they attempted to make back

25  in August.

16

1          Now, it is a basic rule of civil litigation --

2     at least when I was going to law school, and I don't see

3     that anything changed -- that if you are making a motion

4     dismiss on the basis of 12(b)(6) you are required to

5     include all of the grounds available to you at the time

6     you make the motion.  Otherwise you've waived.  At least

7     that's what I remember learning.

8          This is not fancy lawyering, like

9     post-conviction relief when the Court of Appeals has

10    jurisdiction.  This is just basic lawyering 101.

11         They elected not to raise this timeliness claim

12    and proceed on the other claims, which is fine.  Textbook

13    definition of waiver.  This Court ruled in their favor on

14    almost everything, almost.

15         It is a little unexpected that they didn't get

16    everything, and they come in 364 days later and make a

17    brand-new argument that they could have made back on

18    September 11th, 2006, saying, Judge, we got all the time

19    in the world.  Why not?

20         Now, when I make a mistake, and I'm three months

21    out of time, the People say the remedy should be, of

22    course, my client is precluded from proceeding further.

23         But when the People are a year late making this

24    argument on timeliness, what happens?

25         Well, I submit that the rules should apply to

17

1    them.  This is waiver.  It is deliberate waiver as that

2    term is construed under the Supreme Court case of Day

3    versus McDonough (ph), and they have waived their right to

4    proceed on this argument.

5              Thank you.

6              THE COURT:  Mr. Kuby, if you could just go back

7    to a moment on your time line.

8              I assume this is so from the initial statement

9    made by the respondents, that on January 10th, 2003 the

10   petitioner saw this film.

11             MR. KUBY:  Correct.

12             THE COURT:  When for the first time did he learn

13   the identity of or have access to the facts, the materials

14   of Gregory Doe?

15             MR. KUBY:  My understanding is he first began to

16   obtain the Jarecki materials at the beginning of July

17   2003.

18             We have been unable to at this point to

19   reconstruct whether he saw the Gregory Doe interview in

20   the first week or the fourth week --

21             THE COURT:  When you say saw the interview?

22             MR. KUBY:  Saw the transcript of the interview;

23   saw the identifying information; saw the Gregory Doe file.

24   Just because of the remoteness in time and the fact that

25   nobody really foresaw this was ever going to be an issue

18

1   at the time, didn't minutely chronicle the box by box,

2   document by document search.  But he first gained access

3   the beginning of July 2003.

4           So, even if he saw it on day one, if the very

5   first thing in the first box he opened was, Gregory Doe,

6   this is it, he still would be within the one-year period.

7           THE COURT:  How many boxes were there

8   approximately?  Give me some idea of the type of material,

9   and also whether it still exists today.

10          MR. KUBY:  Give me a moment on that.

11          (Whereupon, at this time there was a pause in

12  the proceedings.)

13          MR. KUBY:  The first question I can only answer

14  in generalities, thousands of pages, but not hundreds of

15  thousands of pages.

16          The second question as to what still exists?  I

17  would love to know the answer to this myself.

18          I contacted Andrew Jarecki in the course of this

19  litigation, and I asked that I be given access to the

20  file.  I, too, have been put off at various times and in

21  various ways.  And I don't yet have subpoena power to

22  conduct discovery.  So I'm presuming that the corpus of

23  his material is intact.  But as to where it is, how to get

24  it, and as to specifically if he kept, for example, any

25  sort of log as to when Jesse came, when Jesse didn't come,

1    I can't answer those questions now.

2           I can represent that July 1st is the absolute

3    earliest date Jesse received any of these materials, and

4    that's the day we used in the course of this litigation.

5    I know the People dispute the significance of it, but I

6    don't believe they dispute the date.

7           THE COURT:  Ms. Sternberg.

8           MS. STERNBERG:  I haven't seen these letters and

9    these E-mails before.  I don't think it supports the

10   petitioner's position.   That's exactly what I said in my

11   papers.

12          THE COURT:  If you can just speak into the

13   microphone, because I don't believe we can hear you.

14          MS. STERNBERG:  The movie is not evidence of

15   anything.  But it is the factual basis of these claims.

16   And he had that factual basis in January.

17          Petitioner argues just now that he didn't have

18   to do anything.  If the producer Jarecki chose not to give

19   him access for a year, ten years, twenty years, he didn't

20   have to do anything.  But he had the opportunity

21   immediately to file his 440 motion in the county court

22   with his myriad of other claims, and to ask the county

23   court to order Jarecki to give him access to that

24   material.

25          In fact, when the 440 was pending before the



20

1  county court, it ordered Jarecki to allow the People

2  access to the out-takes of interviews that were in the

3  film and represented to the Court as evidence.

4          The defendant -- the petitioner, I'm sorry, in

5  this case, made no effort to do anything to get access,

6  except apparently to wait.

7          These papers that Mr. Kuby has just given me,

8  indicate that he knew as soon as he saw the movie that

9  these claims would be the basis -- that these statements

10  in the movie could be the basis of legal claims.  And he

11  chose to wait until Mr. Jarecki gave him access. That's

12  not due diligence.

13          THE COURT:  What about the fact that he got a

14  lawyer, and the lawyer contacted Jarecki?

15          MS. STERNBERG:  And the lawyer apparently chose

16  to wait.  The lawyer is in his stead.

17          THE COURT:  And you are suggesting at that point

18  in time he should have sought an order directing access in

19  county court?

20          MS. STERNBERG:  Yes.

21          He should have sought legal assistance from the

22  Court in getting access to these materials that he knew

23  from the movie was the factual basis for his claim.

24          THE COURT:  Not relied on counsel representing

25  him on the 440 motion?



1    MS. STERNBERG:  Well, if there is the suggestion

2    that counsel was ineffective, failing to do that --

3    THE COURT:  I don't know.

4    MS. STERNBERG:  -- but he has no constitutional

5    claim concerning effectiveness of counsel in the

6    collateral motion.

7    THE COURT:  Yes.

8    MS. STERNBERG:  His time ran when he knew

9    someone was hypnotized and that was the basis a now Brady

10   claim.

11   THE COURT:  Yes.

12   MR. KUBY:  Again, the issue isn't when he had an

13   inkling.  The issue is when he had access to the factual

14   basis, without knowing that this person actually was one

15   of the people who testified against him resulting in an

16   indictment to which he ultimately pled guilty -- without

17   that fact -- again, the Gregory Doe name was not used, and

18   it was all shrouded in anonymity.  He had no facts, he had

19   allegations.

20   He could have gone into court and said, look, I

21   believe this is an accuser.

22   And the People would have come back and said, we

23   don't know who these people are.  This is a Hollywood

24   movie.  We are not going to go run around and defend a

25   claim against any or every actor made in every movie that

22

1    Hollywood puts out.  This has no business in the federal

2    court.

3              What does Jesse do?  He gets a lawyer, the

4    lawyer asks for materials.

5              The lawyer puts him off.  May 9th he asks again.

6              A couple of months later Jesse gets the

7    material.

8              Should he have filed a 440 and spent a year and

9    a half fighting it, as to whether he will get discovery,

10   fighting a motion to dismiss, because you have not alleged

11   any facts, Mr. Friedman?  You just alleged conjecture

12   based on an unsworn Hollywood film.

13             To give you an example, the DNA cases, Johnson

14   versus United States, 544 US 295.

15             You are on notice for the facts that support

16   your claim when you get the DNA test back with the

17   results.  That's when you are on notice of the facts.

18             Of course, the courts have said, nonetheless,

19   once you have your sample, and you know that there is a

20   sample to compare it with, and the technology exists, then

21   you have to proceed with reasonable promptness.

22             So, to make an analogy here, Jesse knows that

23   there is somebody out there saying these things.  He is

24   trying to find out who this person is.  And he does so

25   with reasonable promptness, within a six-month period of

1    time.  But the facts that underlie his claim don't exist

2    until he knows this in fact was one of the witnesses who

3    testified against him.  And he didn't have that Gregory

4    Doe information until July at the very earliest.

5         THE COURT:  Anything else you would like to

6    respond to, Ms. Sternberg?

7              MS. STERNBERG:  No.  Thank you, your Honor.

8         THE COURT:  I will reserve decision on this.

9         Obviously, the respondents aren't claiming that

10   there is much in dispute here other than the effect of the

11   defendant's -- excuse me, the petitioner's waiting until

12   sometime in July 2003 to actually get these materials.

13   And it is a question of interpretation.

14        I don't think there is any need to have

15   additional testimony at this point in time.  It is pretty

16   much as a matter of law that I can decide these issues,

17   unless you have some case law supporting to the contrary,

18   I will make that determination and I will render a written

19   decision.

20        MR. KUBY:  Thank you, Judge.

21        THE COURT:  As far as the discovery motion, I

22   think at this point in time it is premature, and it is

23   related more to the merits than anything else.

24        MR. KUBY:  I understand.  It is not surprising

25   given the procedural posture of the case.  It does

24

1   illustrate though one of the difficulties, even once one

2   files one's claim, actually using the judicial process to

3   get discovery, as opposed to the more informal process

4   that Mr. Friedman was ultimately able to use which

5   probably gave him the material faster.

6           THE COURT:  Sometimes we have to wait a while to

7   render justice, Mr. Kuby.

8           MR. KUBY:  And I don't have a probable with

9   waiting.

10          THE COURT:  Motion to have discovery is denied.

11

12

13          (End of proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25