**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

Docket Number(s): _____    Caption [use short title]

Motion for: authorization to file a second habeas petition    Friedman v. Green

_____

_____

Set forth below precise, complete statement of relief sought:

Mr. Friedman seeks authorization under 28 U.S.C. § 2244

to file a second habeas corpus petition, pursuant to

28 U.S.C. § 2254, in the United States District Court

for the Eastern District of New York

_____

_____

MOVING PARTY: Jesse Friedman                OPPOSING PARTY: Nassau County District Attorney's Office

☐ Plaintiff          ☐ Defendant
☑ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: The Law Office of Ronald L. Kuby    OPPOSING ATTORNEY: Tammy Smiley
[name of attorney, with firm, address, phone number and e mail]

Rhidaya Trivedi and Ronald L. Kuby        240 Old Country Road, Mineola, NY 11501

119 West 23rd Street Suite 900, New York, NY 10011   516-571-3386

212-529-0223; rhiyatrivedi@gmail.com     Tammy.Smiley@nassauda.org

Court Judge/Agency appealed from: N/A

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**
Has request for relief been made below?                    ☐ Yes ☐ No
Has this relief been previously sought in this Court?       ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

_____

_____

_____

Is oral argument on motion requested?  ☑ Yes ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No  If yes, enter date: _____

**Signature of Moving Attorney:**
/s Rhidaya Trivedi        Date: November 6, 2020    Service by: ☐ CM/ECF  ☑ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MOTION FOR AN ORDER AUTHORIZING THE DISTRICT COURT
TO CONSIDER A SUCCESSIVE OR SECOND HABEAS CORPUS APPLICATION
PURSUANT to 28 U.S.C. §§ 2244 (b), 2254
BY A PRISONER IN STATE CUSTODY

| | |
|---|---|
| NAME:<br>JESSE FRIEDMAN | |

| | |
|---|---|
| PLACE OF CONFINEMENT:<br>SORA | PRISONER NUMBER:<br>89B0323 |

## Instructions–Read Carefully

(1)    This motion must be legibly handwritten or typewritten and signed by the movant under penalty of perjury.  All documents must be on 8½ x 11 inch paper; the Court will not accept other paper sizes.  Any false statements of a material fact may serve as the basis for prosecution and conviction for perjury.

(2)    All questions must be answered concisely in the proper space on the form.

(3)    Movant seeking leave to file a second or successive petition is required to use this form. In capital cases only, the use of this form is optional.

(4)    Movant may use additional pages only to explain additional grounds for relief and set forth additional facts and documents supporting any alleged grounds.  Separate petitions, motions, briefs, arguments, etc. should not be submitted.

(5)    In capital cases only, the use of this form is optional, and separate petitions, motions, briefs, arguments, may be submitted.

Rev. 1.24.2018

(6)  Movant must show in the motion to the Court of Appeals that the claim to be presented in a second or successive habeas corpus application was not presented in a prior application and that

   (1)  the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

   (2)  (a)  the facts underlying the claim could not have been discovered previously through the exercise of due diligence; and

        (b)  those facts, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.
             28 U.S.C. § 2244 (b)

(7)  Send the completed motion, the original and two copies, to:

        **Clerk of Court**
        **United States Court of Appeals for the Second Circuit**
        **Thurgood Marshall United States Court House**
        **40 Foley Square**
        **New York, New York 10007**

Rev. 1.24.2018

# MOTION

1. (a) Name and location of court which entered the judgment of conviction under attack
   Supreme Court of the State of New York, Nassau County, Mineola, NY

   (b) Case number  67104/1987, 67430/1988, 69783/1988

2. Date of judgment of conviction  December 20, 1988

3. Length of sentence  16 to 18 years imprisonment  Sentencing Judge  Hon. Abby Boklan

4. Nature of offense or offenses for which you were convicted:  Sodomy in the First Degree,
   Sexual Abuse in the First Degree, Attempted Sexual Abuse in the First Degree

5. Have you ever filed a post-conviction petition, application, or motion for collateral relief in any federal court related to this conviction and sentence?
   Yes ☐   No ☐
   If "yes", how many times?  One (1)  (if more than one, complete 6 and 7 below as necessary)
   (a) Name of court  United States District Court for the Eastern District of New York
   (b) Case number  06-cv-03136
   (c) Nature of proceeding  Habeas corpus (28 U.S.C. § 2254)

   (d) Grounds raised (list all grounds; use extra pages if necessary)
   Failure to turn over, pursuant to Brady v. Maryland, evidence that (1) some eyewitnesses had initially
   denied sexual abuse, (2) detectives used interrogation mehtods known for eliciting false accusations, and
   (3) at least one suggestive memory recovery tactic - hypnosis - was used to induce memory recall by
   Gregory Doe before he made an accusation.

   (e) Did you receive an evidentiary hearing on your petition, application, or motion?
   Yes ☐   No ✓
   (f) Result  Dismissed

   (g) Date of result  Order entered January 4, 2008

6. As to any second federal petition, application, or motion, give the same information:
   (a) Name of court _____
   (b) Case number _____

Rev. 1.24.2018

(c)  Nature of proceeding _____
_____
_____
(d) Grounds raised (list all grounds; use extra pages if necessary) _____
_____
_____
_____
_____
_____
_____
(e) Did you receive an evidentiary hearing on your petition, application, or motion?
Yes [ ]   No [ ]
(f) Result_____
_____
(g) Date of result_____

7.      As to any third federal petition, application, or motion, give the same information:
(a) Name of court _____
(b) Case number _____
(c)  Nature of proceeding _____
_____
_____
(d) Grounds raised (list all grounds; use extra pages if necessary)_____
_____
_____
_____
_____
(e) Did you receive an evidentiary hearing on your petition, application, or motion?
Yes [ ]   No [✔]
(f) Result_____
_____
(g) Date of result_____

8.      Did you appeal the result of any action taken on your federal petition, application, or
motion? (Use extra pages to reflect additional petitions if necessary)
(1) First petition, etc. No [ ]   Yes [ ]   Appeal No. 08-0297 _____
(2) Second petition, etc. No [ ]   Yes [ ]   Appeal No. _____
(3) Third petition, etc. No [✔]   Yes [ ]   Appeal No. _____

Page 4                                         Rev. 1.24.2018

9.  If you did not appeal from the adverse action on any petition, application, or motion, explain briefly why you did not: _____

_____

_____

_____

_____

_____

10. State concisely every ground on which you now claim that you are being held unlawfully. Summarize briefly the facts supporting each ground.

A.  Ground one: Petitioner was indicted after perjured, false, and coerced testimony was presented
to the Grand Jury, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Supporting FACTS (tell your story briefly without citing cases or law):
Please see the Factual Background and Procedural History section of Petitioner's Memorandum of Law
for a more complete recitation of the facts. In short, the testimony of the fourteen child witnesses
and Ross Goldstein was coerced — the result of multiple, overlapping coercive interrogation
techniques by law enforcement, including repeated, lengthy interrogations, negative reinforcement
when children denied abuse and positive reinforcement when they alleged it, the authoring of
statements by law enforcement instead of the children themselves, and the selective crediting of
plausible allegations and discrediting of allegations patently fantastical.

Was this claim raised in a prior federal petition, application, or motion?
Yes ☐ No ☑

Does this claim rely on a "new rule of constitutional law?" Yes ☐ No ☑
If "yes," state the new rule of constitutional law (give case name and citation):

_____

_____

Does this claim rely on "newly discovered evidence?" Yes ☑ No ☐
If "yes," briefly describe the newly discovered evidence, attach a copy (if available), state when you obtained it, and why it was not previously available to you.
Petitioner's new claim regarding misconduct at the Grand Jury is based on evidence disclosed
by the Nassau County District Attorney's Office in the course of the Conviction Review Process
(previously directed by this Court) and based upon interviews with witnesses newly willing to come
forward after the Conviction Review Process was announced.

_____

_____

_____

_____

Page 5                                              Rev. 1.24.2018

B.    Ground two: _____
        of the Fourteenth Amendment to the U.S. Constitution
        _____

Supporting FACTS (tell your story briefly without citing cases or law):

Please see the Factual Background and Procedural History section of Petitioner's Memorandum of Law

for a more complete recitation of the facts. In short, the cooperation of Ross Goldstein was

coerced for the purpose of coercing Jesse Friedman to plead guilty; the recantation of Ross Goldstein

proves that not a shred of testimony provided by him to the Grand Jury (or that he intended to present

at trial) was true. Additionally, Judge Boklan improperly threatened Jesse with the imposition

of consecutive sentencing if he were to be convicted after trial.

Was this claim raised in a prior federal petition, application, or motion?
Yes [ ]  No [✓]

Does this claim rely on a "new rule of constitutional law?"  Yes [ ]  No [✓]
If "yes," state the new rule of constitutional law (give case name and citation):
_____
_____
_____

Does this claim rely on "newly discovered evidence?" Yes [✓]  No [ ]
If "yes," briefly describe the newly discovered evidence, attach a copy (if available), state when you obtained it, and why it was not previously available to you

The complete and thorough recantation of Ross Goldstein, provided to the Conviction Review Team

of the Nassau County District Attorney's Office could not have been procured with prior due

diligence - Mr. Goldstein himself was clear that the only reason he came forward after 25 years of

anonymity afforded him by his Youthful Offender Status was because a transparent conviction

review process had been announced.

_____
_____

**[Additional grounds and facts and documents supporting any alleged grounds
may be set forth on extra pages if necessary]**

11.    Do you have any motion or appeal now pending in any court as to the judgment now
      under attack? Yes [ ]  No [✓]
      If yes, Name of court _____ Case number _____

        Rev. 1.24.2018

Wherefore, movant prays that the United States Court of Appeals for the Second Circuit grant an Order Authorizing the District Court to Consider Applicant' s Second or Successive Petition for a Writ of Habeas Corpus under <mark>28 U.S.C. § 2254</mark>.

By: /s/ Rhidaya Trivedi
Rhidaya S. Trivedi
Ronald L. Kuby
Law Office of Ronald L. Kuby
Attorneys for Jesse Friedman

Friedman v. Green
_____
Movant's Signature

I declare under Penalty of Perjury that my answers to all the questions in this motion are true and correct.

Executed on <u>November 4, 2020</u>
           [date]

/s/ Rhidaya Trivedi
Ronald L. Kuby____
Law Office of Ronald L. Kuby
Attorneys for Jesse Friedman_____

**PROOF OF SERVICE**

Movant must send a copy of this motion and all attachments to the attorney general of the state in which applicant was convicted.

I certify that on _____, I mailed a copy of this motion*
           [date]

and all attachments to _____ at the following address:

_____

_____

_____
           Movant' s Signature

_____

\*    Pursuant to FRAP 25(a), "Papers filed by an inmate confined in an institution are timely filed if deposited in the institution's internal mail system on or before the last day of filing. Timely filing of papers by an inmate confined in an institution may be shown by a notarized statement or declaration (in compliance with <mark>28 U.S.C. § 1746</mark>) setting forth the date of deposit and stating that first-class postage has been prepaid."

Rev. 1.24.2018

# No. 20-

In the United States Court of Appeals
for the Second Circuit

––––––––––––––––

**Jesse Friedman,**

*Petitioner-Movant,*

**v.**

**Michael C. Green, Executive Deputy Commissioner, New York State Division of Criminal Justice Services,[1] Letitia James, Attorney General of the State of New York**

*Respondents.*

––––––––––––––––

## MEMORANDUM OF LAW IN SUPPORT OF JESSE FRIEDMAN'S MOTION UNDER 28 U.S.C. § 2244 FOR AUTHORIZATION TO FILE A SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS

RHIDAYA TRIVEDI
RONALD L. KUBY
Law Office of Ronald L. Kuby
119 West 23rd Street Suite 900
New York, NY 10011
(212) 529-0223
rhiyatrivedi@gmail.com

---

[1] The New York State Division of Criminal Justice Services is responsible for maintaining the New York State Sex Offender Registry and is therefore the proper Respondent in this case. *See* https://www.criminaljustice.ny.gov/nsor/ (*last accessed,* October 26, 2020); *see also,* Rumsfeld v. Padilla, 542 U.S. 426, 438 (2004) ("a habeas petitioner who challenges a form of 'custody' other than present physical confinement may name as respondent the entity or person who exercises legal control with respect to the challenged 'custody'").

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................3

APPLICABLE LAW ...................................................................................................3

ARGUMENT ...............................................................................................................4

I.    THE FACTUAL PREDICATE FOR JESSE'S CLAIMS COULD NOT HAVE BEEN DISCOVERED PREVIOUSLY THROUGH THE EXERCISE OF DUE DILIGENCE. ..........4

    A.    The Rice Report directly disclosed new, previously unavailable evidence of the techniques which coerced the Grand Jury testimony of the fourteen child witnesses and Ross Goldstein and disclosed one recantation of an original complaining witness and evidence that undermined the credibility of two more. ...........................................................7

    B.    This Court set in motion a series of events that would draw out previously unavailable, inaccessible witnesses, whose testimony would raze the prosecution's case against Jesse Friedman. ...................................................................................................................10

II.    JESSE HAS MADE A PRIMA FACIE SHOWING THAT, BUT FOR CONSTITUTIONAL ERROR, NO REASONABLE FACTFINDER WOULD HAVE FOUND HIM GUILTY OF THE UNDERLYING OFFENSE. .................................................14

    A.    Jesse Raises Three Constitutional Errors, All of Which Have Been Exhausted and Are Cognizable on Federal Habeas Review. ..............................................................14

        i.    Fourteenth Amendment Due Process Claim ...........................................14

        ii.    Fourteenth Amendment Grand Jury Misconduct Claim..........................16

        iii.    Actual Innocence .....................................................................................20

    B.    But for these constitutional errors, no reasonable factfinder would have found him guilty of the underlying offense............................................................................21

CONCLUSION ..........................................................................................................27

# <u>TABLE OF AUTHORITES</u>

## <u>Cases</u>

Alcorta v. Texas, 355 U.S. 28 (1957)...........................................................18, 19, 21

Bell v. United States, 296 F.3d 127 (2d Cir. 2002)....................................................4

Bennett v. United States, 119 F.3d 468 (7th Cir. 1997)............................................4

Brady v. United States, 397 U.S. 742 (1970)...........................................................16

Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)........................................................23

Cosey v. Lilley, 2020 WL 2539065 (S.D.N.Y., May 19, 2020) .............................22

Daye v. Attorney Gen. of State of N.Y., 696 F.2d 186 (2d Cir. 1982) ...................17

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) ...................................................18

Friedman v. Rehal, 618 F.3d 142 (2d. Cir. 2010) ...............................................1, 15

Giglio v. United States, 405 U.S. 150 (1972) ..........................................................18

Graves v. Schriver, No. 9:98-CV-0532, 2001 WL 1860887 (N.D.N.Y. Jan. 9,
2001) ...................................................................................................................20

Hernandez v. Kuhlmann, 14 F. App'x 90 (2d Cir. 2001) .......................................20

In re Davis, 565 F.3d 810, 824 (11th Cir. 2009) .....................................................22

Jordan v. Dufrain, No. 98 CIV. 4166 (MBM), 2003 WL 1740439 (S.D.N.Y. Apr.
2, 2003) ..............................................................................................................21

Machibroda v. United States, 368 U.S. 487 (1972) ...............................................16

Miller v. Pate, 386 U.S. 1 (1967) ...........................................................................18

Mooney v. Holohan, 294 U.S. 103 (1935) ..............................................................17

Napue v. Illinois, 360 U.S. 264 (1959) ..............................................18, 19, 21, 22

Nordahl v. Rivera, No. 08-CV-5565 KMK LMS, 2013 WL 1187478 (S.D.N.Y.
Mar. 21, 2013)....................................................................................................20

People v. Creasy, 236 N.Y. 205, 221 (N.Y. Ct. App. 1923) ...................................19

People v. Cwikla, 46 N.Y.2d 434 (N.Y. Ct. App. 1979)........................................19

People v. Geaslen, 54 N.Y.2d 510 (N.Y. Ct. App. 1981) ...................................19

People v. Pelchat, 62 N.Y.2d 97 (N.Y. Ct. App. 1984) ......................17, 19, 20, 22

People v. Robertson, 12 N.Y.2d 355 (1963) ............................................19

People v. Savvides, 1 N.Y.2d 554 (N.Y. Ct. App. 1956)........................................19

Picard v. Connor, 404 U.S. 270, 278 (1971) ............................................15

Pyle v. Kansas, 317 U.S. 213 (1942) ............................................18

Quezada v. Smith, 624 F.3d 514 (2d Cir. 2010) ...............................14, 23

U.S. v. Hogan, 712 F.2d 757 (2d. Cir.1983) ............................................21

Ulster County Court v. Allen, 442 U.S. 140 (1979)................................................16

United States v. Agurs, 427 U.S. 97 (1976) ............................................18

United States v. Basurto, 497 F.2d 781 (9th Cir. 1974) ........................................21

Waley v. Johnston, 316 U.S. 101 (1942)................................................16

## Statutes

28 U.S.C. § 2244 ..................................................................2, 4, 5, 22, 28

## Other Authorities

"Victims Say Film on Molesters Distorts Facts",
https://www.nytimes.com/2004/02/24/movies/victims-say-film-on-molesters-
distorts-facts.html (*last accessed,* October 13, 2020).............................................6

# PRELIMINARY STATEMENT

Petitioner Jesse Friedman ("Jesse") seeks authorization from this Court pursuant to 28 U.S.C. § 2244(b)(3) to file a second petition for writ of habeas corpus, in order to assert new claims based on facts not discoverable at the time of his prior petition, that underlie two Fourteenth Amendment Due Process violations, but for which Jesse would not stand convicted. Jesse does so in order to make one final attempt to clear his name of crimes for which he is actually, factually innocent; his is one of the last major convictions of the Satanic Panic era that remains intact despite more than a decade of re-investigation and litigation.

The likelihood of Jesse's innocence and the need for newly discovered evidence in order to vindicate it were acknowledged by this Court, the last time Jesse came before it. See Friedman v. Rehal, 618 F.3d 142 (2d. Cir. 2010) (finding that the case was "unlike other appeals", finding that there was "a reasonable likelihood" that Jesse Friedman was wrongfully convicted, and directing the District Attorney of Nassau County to reinvestigate the case). Subsequently, then-Nassau County District Attorney Kathleen Rice undertook a 2.5-year-long re-investigation of Jesse's conviction that concluded with the issuance of a 181-page affirmance; her Office's refusal to disclose any of the materials reviewed in the course of the re-investigation gave rise to five years of subsequent litigation pursuant to New York State's Freedom of Information Law ("FOIL").

That re-investigation and subsequent litigation has provided the defense with newly discovered, newly available evidence that proves that the indictments returned against Jesse were done so on the sole basis of testimony that was false; coerced; perjurious. These new facts include proof that the Nassau County Police Department Sex Crimes Unit a) employed suggestive questioning when gathering statements from children who would later become witnesses at the Grand Jury; b) authored witness' statements on their behalf in curated summaries of multiple, lengthy, hostile interviews; c) utilized the now discredited and abandoned 'recovered memory' approach to allegations of abuse; and d) coerced the cooperation of Jesse's teenage friend Ross Goldstein — the only complaining witness who can credibly be called anything but a child — in the prosecution against Jesse Friedman. These new facts explain the increasingly incredible, fantastical charges which the Grand Jury returned against Jesse — charges for which the trial court promised him a life sentence were he to exercise his right to go to trial (at which Mr. Goldstein would have testified against him) and to which he thus entered a coerced plea of guilty.

These new facts demonstrate two distinct violations of Jesse's constitutional rights: (1) that Jesse's plea was coerced and (2) that the State relied upon coerced, false testimony in order to acquire the indictment to which he ultimately entered his coerced guilty plea — both, Fourteenth Amendment Due Process violations. Jesse also asserts a claim of actual, factual innocence that is far from freestanding, and is

instead, deeply interrelated to his claims of plea and Grand Jury coercion. But for these constitutional violations, there would have been no indictments; no guilty plea; no conviction after trial.

Based on the newly discovered facts summarized above, and for the reasons set forth in this memorandum, this Court should authorize the district court to consider Jesse's new claims in a successive petition for writ of habeas corpus such that he might finally get that which he has always proved elusive: a full and fair evidentiary hearing; a real day in court.[2]

## APPLICABLE LAW

Under the Antiterrorism and Effective Death Penalty Act of 1996, a second or successive habeas corpus petition may be filed in district court only if an applicant obtains authorization from the appropriate court of appeals. 28 U.S.C. § 2244(b)(3)(A). A second or successive habeas corpus petition may be filed in the district court upon a showing by the applicant that:

> **(B)(i)** the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> **(ii)** the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable

---

[2] For the full factual and procedural background of this case, see the Declaration of Rhidaya Trivedi in Support of Jesse Friedman's Application for Authorization to File a Successive Habeas Petition at ¶¶ 9-53.

factfinder would have found the applicant guilty of the underlying offense.

[28 U.S.C. § 2244(b)(2)(B).]

To obtain authorization from a court of appeals, an applicant must make "a *prima facie* showing that the application satisfies the requirements of [ § 2244(b)]." 28 U.S.C. § 2244(b)(3)(C). A "prima facie showing" of these requirements is "not a particularly high standard. An application need only show a sufficient likelihood of satisfying the strict standards…to 'warrant a fuller exploration by the district court." Bell v. United States, 296 F.3d 127, 128 (2d Cir. 2002) (quoting Bennett v. United States, 119 F.3d 468, 469 (7th Cir. 1997)).

## **ARGUMENT**

### I. **THE FACTUAL PREDICATE FOR JESSE'S CLAIMS COULD NOT HAVE BEEN DISCOVERED PREVIOUSLY THROUGH THE EXERCISE OF DUE DILIGENCE.**

The factual predicate for Jesse's claims — of false and coerced testimony at the grand jury; of the coercion of his plea; of his actual, factual innocence — could not have been discovered previously through the exercise of due diligence. There is perhaps, no better proof of this, than the fact that the overwhelming majority of the evidence discussed *herein* was *not* discovered through the due diligence exercised by the *Capturing the Friedmans* team.

4

Indeed, as the indictments were returned in 1987 and 1988 (prior to which all of Arnold and Jesse's class rosters were seized by law enforcement), and therefore armed only with the names of the fourteen "Doe" witnesses, Arnold and Jesse attempted to reconstruct the make-up of the computer classes in which abuse was alleged. It would be these rough reconstructions upon which the *Capturing the Friedmans* team would rely, in their early 2000's attempts to contact each and every complaining witness, computer class student and parent thereof who could confirm or deny the occurrence of abuse. See "Victims Say Film on Molesters Distorts Facts", https://www.nytimes.com/2004/02/24/movies/victims-say-film-on-molesters-distorts-facts.html (*last accessed,* October 13, 2020) (describing Andrew Jarecki stating that he attempted 500 times to contact 100 former computer class students).

As a result of their efforts — hamstrung by the generic names of the students, the fact that the witnesses could live anywhere on the planet, the reality of the internet being only in its earliest stages, and the requirement that complaining witnesses who wished to recant admit to *perjury* — only the recantations of two complaining witnesses — Dennis Doe and Steven Doe (Brian Tilker) — were acquired, in addition to the exculpatory statements of three non-complainant students — David Zarrin, James Forrest and Ron Georgalis —, of three parents — Richard Tilker (Steven Doe's father), Ralph and Margalith Georgalis —, and of

Jesse's friend Judd Maltin. Dozens of witnesses — complaining and not — outright refused to speak to the team.

Today, an additional three complaining witnesses — Barry Doe, Keith Doe, and Kenneth Doe — have recanted; Ross Goldstein has recanted; nine more students who affirmatively deny the existence of any abuse have come forward; the only parent to take contemporaneous notes during the investigation has been persuaded of Jesse's innocence; the reliability of Gregory Doe and Richard Doe has been questioned by the District Attorney herself; a mountain of evidence of interrogation techniques and investigative methods that explain each and every false allegation at the Grand Jury have become newly available.

Matter cannot be created or destroyed. But truth is not matter; in order for lies to be exposed as such — particularly lies told by fearful children amidst a local and national hysteria — opportunities to discover the truth must be *created*. As argued *herein*, the prior decision of this Court created those very opportunities. But for this Court's direction of the District Attorney to re-investigate the conviction; but for the District Attorney's engaging a review process utterly devoid of transparency and integrity; but for the defense's efforts to secure the underlying, withheld, investigative materials through the Freedom of Information Law; but for the motivation that *Capturing the Friedmans*, the Rice Review, and the prior decision of this Court would together provide to witnesses to come forward and either admit

6

to perjury or tell a story of Jesse's innocence long decried in Nassau County — the evidence upon which Jesse's claims are based simply would not have become available.

### A. The Rice Report directly disclosed new, previously unavailable evidence of the techniques which coerced the Grand Jury testimony of the fourteen child witnesses and Ross Goldstein and disclosed one recantation of an original complaining witness and evidence that undermined the credibility of two more.

Without question, the coercive investigatory techniques described in the Rice Report, Trivedi Decl. at ¶¶ 55-85, including the pattern of repeatedly interviewing children and authoring their statements intermittently and inconsistently, Trivedi Decl, at ¶¶ 86-103, the recantation of complaining witness James Doe, Trivedi Decl. at ¶¶ 102, 120-122, and the District Attorney herself questioning the reliability of Gregory Doe and Richard Doe, Ex. E at 79, 103, could not have been discovered previously through due diligence.

First, the investigatory techniques. Criminal procedure dictates that, had Jesse gone to trial, the defense would have had an opportunity to question law enforcement and complaining witnesses as to the investigative techniques that had been utilized in the course of their interrogation(s). But because of the prosecution's year-long declination to provide Brady material to the defense between 1987 and 1988— to disclose the dozens, if not hundreds, of interviews that yielded no allegations of abuse —, Ex. DDD, the defense's inability to know that complaining witnesses had

7

Case 2:06-cv-03136-JS  Document 372, Filed 01/20/20 Page 20 of 443 PageID #: 3566

been interviewed on at least ten occasions that yielded no written statements, Ex.

XX, Decl. of Grace Gill, at ¶¶ 10-11,[3] and the undisputed fact that the 14

complaining witnesses had to be asked leading questions at the Grand Jury to which

they gave "yes" or "no" answers, Ex. BB, August 18, 2013 Letter from Scott Banks

to Justice F. Dana Winslow, **it remains eminently possible that the defense would**

**never have known which questions to ask; which interrogation techniques had**

**yielded which inculpations of Jesse, and how.**

Of course, in the course of making *Capturing the Friedmans*, individual

members of law enforcement and individual complaining witnesses and their parents

would reference individual interrogation techniques. *See, e.g.,* Ex. II, May 18, 2001

Excerpts of Recorded Interview Statements of Detective Anthony Squeglia

(admitting that when interrogating children, you "don't give them an option,

really…"); *see also,* Ex. FF, February 21, 2001 Interview Statements of Fran

Galasso. **But there was no way to know that these techniques were used in a**

**persistent, unrelenting, and uncompromising pattern, and that without them,**

**the children outright failed to inculpate Jesse.** Only the release of the Rice Report

and the interviews with witnesses it facilitated, *see infra*, would reveal the extent to

---

[3] To be clear, even if Jesse had gone to trial, and the prior statements of testifying complaining witnesses turned over as <u>Rosario</u> material, the defense may not have known, and indeed not told, that nine of the complaining witnesses had been interviewed at least once on an occasion that yielded no written statement. Ex. XX at ¶ 10-11.

8

which each and every inculpatory statement about Jesse elicited at the Grand Jury was tainted by the coercive techniques of law enforcement and the overall lack of integrity of the original investigation.

There is perhaps no greater evidence of this last proposition than the Affidavit of Kenneth Lanning, included *herein* as Ex. Y. Detective Lanning reviewed the Rice Report, and noted the *absence* of multiple best practices, known to ensure integrity, transparency and honesty in child sex crime investigations. Trivedi Decl. at ¶ 104; *see also,* Ex. Y at ¶¶ 12-39. Detective Lanning's observations are only possible because of the release of the Rice Report — the release of a systematic summary of the multi-phase investigation into Jesse Friedman.

The recantations of James Doe could also not have been discovered prior. James Doe, wishing to only recant allegations made against Ross Goldstein, has always refused to speak with the defense. The burial of James Doe's recantation of 60% of his prior allegations, Ex. XX, Decl. of Grace Gill at ¶ 17, in a *single sentence* of the Rice Report is no matter; fundamentally, it became available solely as a result of the Conviction Review Process.

Lastly, the Rice Report's questioning of the reliability of Gregory Doe — described as "unreliable" and "perilous to rely on", and his interview, as "fraught with inconsistencies" — and of Richard Doe — for whom no medical evidence

9

could be found by the District Attorney to corroborate his allegations — constitutes newly discovered evidence. Trivedi Decl. at ¶¶ 125-126; Ex. E at 79, 103.

### B. This Court set in motion a series of events that would draw out previously unavailable, inaccessible witnesses, whose testimony would raze the prosecution's case against Jesse Friedman.

*"The impetus and motivation for coming forward to speak about it now was a direct result of the announcement of a transparent and honest review of the case by an independent panel…."*

– Ross Goldstein's March 8, 2013 Letter to the Conviction Review Team at Ex. H.

Ross Goldstein's 2013 recantation to the Friedman Case Review Panel, Ex. H is perhaps the best example of the mountain of newly discovered evidence made available by way of this Court's direction that the Nassau County District Attorney undertake a thorough, transparent, honest re-investigation of the case against Jesse Friedman.

Mr. Goldstein specifically described not wanting to share his story with *Capturing the Friedmans* but **wanting to share it with a 'transparent and honest…independent panel.'** Ex. H at 8-9. Not only did Mr. Goldstein fully recant any inculpatory statements he made about Jesse prior, but he explained in painstaking detail the coercive techniques employed by law enforcement to elicit his entry into a cooperation agreement. *Id.* at 2-6.

Mr. Goldstein is but one of several witnesses to whom access was gained as a result of the announcement of the Rice Review and events subsequent (Keith Doe, for example, would sit for an interview with the defense for the first time, in 2012, after the Rice Review as announced, offering a total recantation. Ex. U, Nov. 13, 2012 Taped Interview with Keith Doe). 'Events subsequent', however must be emphasized — the newly discovered evidence is as much the result of what the Conviction Review team affirmatively did, as much as it is the result of what they did not do (and what the defense undertook as a result).

Indeed, though a smattering of non-complaining student witnesses appears to have spoken with the Conviction Review Team, the Team made no attempt to systematically reconstruct the class rosters or interview the only people who could corroborate or refute the allegations of abuse. They utterly failed to document those allegations that, by definition could be corroborated — either because they involved other alleged victims or referenced physical evidence. Ex. XX at ¶15. This, despite the fact that the indictments allege acts of abuse occurring in a public environment with a room full of witnesses. Ex. XX at ¶16. Of the fourteen original complaining witnesses, the Rice team spoke only to *five*, and mischaracterized the submissions of individuals with direct knowledge of relevant events like Arline Epstein and Scott Banks. See generally, Ex. E.

11

Ultimately, because of what the prosecution said they *would do* — conduct a transparent, honest re-investigation process — and because of what they *did do* — willfully fail to conduct a re-investigation centered around principles of integrity, honesty and transparency — the defense pursued disclosures through FOIL, in a manner, resuming an investigation that had been dormant since the release of *Capturing the Friedmans*. During the FOIL litigation, the defense was ordered, at the prosecution's request, to serve each and every original complaining witness, Trivedi Decl. at ¶ 46, fn. 6; the FOIL litigation would thus create an opportunity for individuals to come forward and express their discontent with representations made in the Rice Report.

Barry Doe, for example, spoke with the *Capturing the Friedmans* team on May 21, 2012, offering an absolute, unequivocal, and thorough recantation. Ex. P, May 21, 2012 Interview Statements of Barry Doe. Upon submission of Barry Doe's interview statements, the Conviction Review team would elect to interview him (it does not appear that they wished to do so prior to his recantation). Trivedi Decl. at ¶ 120. Barry Doe would offer the final word, through counsel, after being served with Jesse's Article 78 seeking FOIL disclosures of the documents underlying the Rice Report. Ex. Z at 4:1-10 (confirming that Barry Doe's memory supports a total exculpation of Jesse).

Many disclosures followed this utterly unpredictable trajectory whereby, after speaking with the defense, witnesses would then speak with the District Attorney's Office. Michael Epstein, for example, sat for an interview with the *Capturing the Friedmans* team on August 1, 2012, and after, spoke to the DA's office and immediately recanted to his mother. Trivedi Decl. at ¶ 59. As a result of Michael's disclosures, Ms. Epstein then came forward and shared her notes with the defense. She was, and remains, the only parent known to have taken notes contemporaneous to the original investigation into Arnold and Jesse Friedman; she would go on to write directly to Judge Winslow, presiding over Jesse's FOIL litigation, because the Rice Report "ignore[d], discount[ed], and mischaracterize[d] much of [her] evidence." Ex. AA, August 19, 2013 Letter from Arline Epstein to Judge F. Dana Winslow.

Scott Banks would, in order to (in a fashion similar to Arline Epstein) rebut the mischaracterization and misinformation of the Rice Report, write a letter to Judge Winslow making clear his lack of faith in Jesse's Grand Jury process. Ex. BB, August 18, 2013 Letter from Scott Banks to Justice F. Dana Winslow.

Kenneth Doe would come forward with his recantation directly as a result the defense being forced to serve all fourteen complaining witnesses with Jesse's FOIL Article 78. See Ex. I, May 20, 2013 Letter from Kenneth Doe to Friedman Case

Review Panel (describing being served as a "collision" of worlds he had previously kept separate).

Similarly, the nine non-complainant computer class students described at Trivedi Decl. at ¶¶ 131-132 would come forward. At least one of them was enrolled in each class in which abuse was alleged. See Ex. XX at ¶¶ 17-20.

## II. JESSE HAS MADE A PRIMA FACIE SHOWING THAT, BUT FOR CONSTITUTIONAL ERROR, NO REASONABLE FACTFINDER WOULD HAVE FOUND HIM GUILTY OF THE UNDERLYING OFFENSE.

Once newly discovered evidence has been presented, the gate-keeping issues are whether Jesse has identified a constitutional error (exhausted and cognizable), and, if so, whether he has shown by clear and convincing evidence that but for that error no reasonable jury would have found him guilty. See Quezada v. Smith, 624 F.3d 514, 521–22 (2d Cir. 2010).

### A. Jesse Raises Three Constitutional Errors, All of Which Have Been Exhausted and Are Cognizable on Federal Habeas Review.

#### i. Fourteenth Amendment Due Process Claim

In Friedman v. Rehal, the Second Circuit wrote, of Jesse's decision to plead guilty,

> With the number of counts in the indictments, Judge Boklan's threat to impose the highest conceivable sentence for each charge, petitioner faced a virtually certain life sentence if he was convicted at trial. And the likelihood that any jury pool would be tainted seemed to ensure that

14

petitioner would be convicted if he went to trial, regardless of his guilt or innocence. Nor could he have reasonably expected to receive a fair trial from Judge Boklan, the former head of Nassau County District Attorney's Sex Crime Unit, who admitted that she never had any doubt of the defendant's guilt even before she heard any of the evidence or the means by which it was obtained. Even if innocent, petitioner may well have plead guilty.

[Friedman, 618 F.3d at 158.]

Jesse's 2014 motion pursuant to CPL § 440.10 correspondingly sought vacatur of his conviction based upon the argument that his plea had been coerced in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.[4] Ex. A, Notice of Motion dated June 23, 2014 at ¶ 3.

"It is a settled principle of federal constitutional law that a guilty plea violates due process and is therefore invalid if not entered voluntarily and intelligently." Brady v. United States, 397 U.S. 742, 748 (1970). "[T]he agents of the state may not produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant." Id. at 750; see Waley v. Johnston, 316 U.S.

---

[4] The citation to the Sixth Amendment was erroneous. Jesse brought on 440 motion — the denial of which he sought and was denied leave to appeal —a Fourteenth Amendment Due Process claim that his plea was coerced, specifically by the conduct of the trial court. Jesse's claim was adequately 'constitutionalized' for federal habeas purposes; he cited the specific provision of the constitution and presented extensive facts in support of his argument. Ex. A at ¶ 3; Picard v. Connor, 404 U.S. 270, 278 (1971) ("Obviously if the petitioner has cited the state courts to the specific provision of the Constitution relied on in his habeas petition, he will have fairly presented his legal basis to the state courts.") (internal citations omitted). The requirement that the state court have been given a reasonable opportunity to pass on the federal habeas claim is satisfied if the legal basis of the claim made in state court was the "substantial equivalent" of that of the habeas claim. Id.; see also Ulster County Court v. Allen, 442 U.S. 140, 147-48 n. 5 (1979).

101, 104 (1942) (per curiam) (guilty plea coerced by federal law enforcement officer inconsistent with due process). The plea is void if it is "induced by promises or threats which deprive it of the nature of a voluntary act… A plea of guilty differs in purpose and effect from a mere admission or an extrajudicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive." <u>Machibroda v. United States</u>, 368 U.S. 487, 493 (1972). Jesse's coerced plea claim is thus cognizable and has been adequately exhausted such that its presentation to this Court is proper.

### ii. Fourteenth Amendment Grand Jury Misconduct Claim

Jesse additionally brings a claim that the indictments to which he ultimately pleaded guilty were procured with evidence that was knowingly coerced, perjurious, unreliable and untrue, in violation of the Fourteenth Amendment Due Process guarantee.[5] In <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935), the Supreme Court of the United States wrote,

> It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as

---

[5] Below, Jesse not only relied upon <u>People v. Pelchat</u>, 62 N.Y.2d 97 (N.Y. Ct. App. 1984) — itself a case that relied upon the jurisprudence of the Due Process Clause of the Fourteenth Amendment — but clearly stated that the claim was raising more than procedural defect; it was raising "violations of fundamental constitutional rights." Memorandum of Law at 124. In order to satisfy the preservation requirements of federal habeas review, the claim must have been presented in state court in a manner sufficient to alert the court to the claim's federal nature. <u>Daye v. Attorney Gen. of State of N.Y.</u>, 696 F.2d 186, 192 (2d Cir. 1982). Jesse's grand jury coercion claim was thus, adequately preserved.

inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation. And the action of prosecuting officers on behalf of the state, like that of administrative officers in the execution of its laws, may constitute state action within the purview of the Fourteenth Amendment. That amendment governs any action of a state, 'whether through its legislature, through its courts, or through its executive or administrative officers.'

[(internal citations omitted).]

In <u>United States v. Agurs</u>, <mark>427 U.S. 97, 103</mark> (1976), the Supreme Court summarized its <u>Mooney</u> line of cases as "consistently [holding] that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair", citing <u>Pyle v. Kansas</u>, <mark>317 U.S. 213</mark> (1942), <u>Alcorta v. Texas</u>, <mark>355 U.S. 28</mark> (1957), <u>Napue v. Illinois</u>, <mark>360 U.S. 264</mark> (1959) (("it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment), <u>Miller v. Pate</u>, <mark>386 U.S. 1</mark> (1967) ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."); <u>Giglio v. United States</u>, <mark>405 U.S. 150</mark> (1972), and <u>Donnelly v. DeChristoforo</u>, <mark>416 U.S. 637</mark> (1974). The line of cases dealt specifically with a conviction obtained *after trial* through the use of false evidence.

In <u>People v. Pelchat</u>, 62 N.Y.2d 97 (N.Y. Ct. App. 1984) the New York State Court of Appeals specifically addressed whether a prosecutor could rely upon knowingly false or perjured testimony at the grand jury stage, after which a

defendant pleaded guilty. The Court wrote, relying upon the federal jurisprudence

described *supra,*

> It is familiar doctrine that a prosecutor serves a dual role as advocate
> and public officer. He is charged with the duty not only to seek
> convictions but also to see that justice is done. In his position as a public
> officer he owes a duty of fair dealing to the accused and candor to the
> courts, a duty which he violates when he obtains a conviction based
> upon evidence he knows to be false. Such misconduct may impair a
> defendant's due process rights and require a reversal of the conviction
> (see, e.g., <u>People v. Robertson</u>, 12 N.Y.2d 355 (1963); <u>People v.
> Savvides</u>, 1 N.Y.2d 554 (N.Y. Ct. App. 1956); <u>People v. Creasy</u>, 236
> N.Y. 205, 221 (N.Y. Ct. App. 1923); **<u>Napue v. Illinois</u>, 360 U.S. 264
> (1959); <u>Alcorta v. Texas</u>, 355 U.S. 28 (1957).** It goes without saying
> that this duty also rests upon the prosecutor during pretrial proceedings
> (see, e.g., <u>People v. Geaslen</u>, 54 N.Y.2d 510 (N.Y. Ct. App. 1981);
> <u>People v. Cwikla</u>, 46 N.Y.2d 434 (N.Y. Ct. App. 1979) and the
> proceedings relating to indictment both at presentment and afterwards.

[62 N.Y.2d at 106 **(emphasis added)**.]

A <u>Pelchat</u> claim is thus cognizable on federal habeas review as a Fourteenth

Amendment Due Process violation. <u>See</u>, <u>e.g.</u>, <u>Hernandez v. Kuhlmann</u>, 14 F. App'x

90, 91–92 (2d Cir. 2001) (dismissing <u>Pelchat</u> claim not because the claim was not

cognizable on federal habeas review, but instead, because there was no showing that

"the prosecutor acted in bad faith by knowing, but failing to disclose, that false

testimony had been presented to the grand jury."); <u>Nordahl v. Rivera</u>, No. 08-CV-

5565 KMK LMS, 2013 WL 1187478, at *6 (S.D.N.Y. Mar. 21, 2013) (citing <u>Pelchat</u>

as an example of the kind of prosecutorial egregiousness that goes to the "heart of

the process" such that it can survive a guilty plea); <u>Graves v. Schriver</u>, No. 9:98-CV-

0532, 2001 WL 1860887, at *2 (N.D.N.Y. Jan. 9, 2001) ("For example, a party may challenge a conviction based upon a guilty plea to an accusatory instrument which is void because the prosecutor knew that the only evidence to support the charge was false" and citing <u>People v. Pelchat</u>, 62 N.Y.2d 97, 107, 108 (1984) as reversing conviction where "Grand Jury had no evidence before it worthy of belief that defendant had committed a crime"); <u>U.S. v. Hogan</u>, 712 F.2d 757, 759 (2d. Cir.1983) (Due Process considerations prohibit government from obtaining an indictment based on known perjured testimony)"); <u>c.f.</u> <u>Jordan v. Dufrain</u>, No. 98 CIV. 4166 (MBM), 2003 WL 1740439, at *4 (S.D.N.Y. Apr. 2, 2003) (finding that <u>Pelchat</u> "rested on state, not federal grounds" but without reasoning of any kind).

As already noted, the New York State Court of Appeals' decision in <u>Pelchat</u> itself rested in part upon federal constitutional jurisprudence. The Court cited, as support for the proposition that grand jury misconduct may require reversal of the *conviction*, two <u>Mooney</u> progeny cases decided on Fourteenth Amendment grounds: <u>Napue v. Illinois</u>, 360 U.S. 264 (1959) and <u>Alcorta v. Texas</u>, 355 U.S. 28 (1957). For the specific proposition that the indictment may be attacked and dismissed after conviction when a witness's testimony was perjured, the Court of Appeals cited <u>United States v. Basurto</u>, 497 F.2d 781 (9th Cir. 1974). The <u>Pelchat</u> Court then ruled that the conviction before them "must be reversed and the indictment dismissed because the evidence before the Grand Jury failed to meet legal standards and the

prosecutor knew that when he permitted the court to take the defendant's plea to the full indictment." 62 N.Y.2d at 107. The Court reiterated that "just as [the prosecutor] could not sit by and permit a trial jury to decide a criminal action on evidence known to be false, he could not permit a proceeding to continue on an indictment which he knew rested solely upon false, citing, again, Napue v. Illinois, 360 U.S. 264 (1959). Jesse's Grand Jury misconduct claim is thus also, cognizable and exhausted.

### iii. Actual Innocence

Where a petitioner seeks to file a successive habeas petition alleging a claim of actual, factual innocence, the claim of innocence must not be freestanding, and instead, tethered to a cognizable federal constitutional violation. See Cosey v. Lilley, 2020 WL 2539065 at *11 (S.D.N.Y., May 19, 2020) (adopting the Tenth and Eleventh Circuits' reasoning that AEDPA's requirements for successive petitions make clear that Congress intended for actual innocence claims to require constitutional error); see also, In re Davis, 565 F.3d 810, 824 (11th Cir. 2009) ("The statute undeniably requires a petitioner seeking leave to file a second or successive petition to establish actual innocence by clear and convincing evidence *and* another constitutional violation."); Case v. Hatch, 731 F.3d 1015, 1037 (10th Cir. 2013). Here, as demonstrated *infra*, Jesse's actual innocence claim is inextricably linked to his Grand Jury and coerced plea claims.

**B. But for these constitutional errors, no reasonable factfinder would have found him guilty of the underlying offense.**

Jesse's claims meet the second element required to authorize the district court to consider a second habeas corpus petition, because Jesse has made a *prima facie* showing that the facts underlying his claims, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense. See 28 U.S.C § 2244(b)(2)(B)(ii). This Court has defined the "prima facie" standard of section 2244(b)(3)(C) to mean, "as the phrase normally does, that the applicant's allegations are to be accepted as true, for purposes of gate-keeping, unless those allegations are fanciful or otherwise demonstrably implausible." Quezada v. Smith, 624 F.3d 514, 521–22 (2d Cir. 2010).

The question is thus: in the absence of the coercive techniques used to procure the grand jury testimony of the fourteen child witnesses and Ross Goldstein, and in the absence of the coercive threat not only of Ross Goldstein's live inculpatory testimony at trial but consecutive sentencing at the hands of Judge Boklan, whether any reasonable factfinder would have convicted Jesse. Unequivocally, the answer is no.

Not a shred of testimony provided by the fourteen child witnesses at the Grand Jury remains free of the taint of coercion by law enforcement. The District

Attorney's own recitation of the investigation makes clear that children's denials were ignored; they were interrogated in lengthy, hostile, and repeated interrogations replete with positive reinforcement for allegations of abuse and negative consequences when they denied it. See e.g., Ex. E at 87; see also Ex. II at 65; Ex. G. In numerous, lengthy interrogations, law enforcement gaslit children into believing that abuse "could" have happened; ignored fantastical allegations of fictional abusers while selectively crediting the rest, no matter how illogical; asked questions that had already been answered, while children repeatedly "remembered" the most egregious, violent conduct in the latter stages of the investigation. Trivedi Decl. at ¶¶ 54-108. Multiple interviews with primary complaining witnesses were undocumented, Ex. XX at ¶¶ 11-12; those that were, were documented in statements concocted by law enforcement, in the language of adults. Trivedi. Decl. at ¶ 94.

Scott Banks' memory is clear: the children were asked "yes" or "no" questions in order to return the three indictments; their testimony was troublingly devoid of details as to who had abused them, what abuse had occurred, when it occurred, and how it occurred. Ex. BB (describing the answers provided by the child witnesses at the grand jury as "providing absolutely no detail"). Keith Doe recollects being asked not about abuse, but about his life generally. See Ex. U at 8 ("When I went to the Grand Jury, they didn't ask me about any of this stuff… I think my recollection is they asked me how old I was and what favorite activities were. … and I remember

the Mineola courthouse actually being a very intimidating place to go when you're that age."). But for this coercion — this deliberate elicitation of perjury — no such indictments could have been returned; there is perhaps, no better support for this proposition than the fact that law enforcement knew they could not rely upon these witnesses at trial. See Ex. H, discussed *infra*.

It is equally true that but for the coercion of Ross Goldstein, and the threats of Judge Boklan, Jesse Friedman would not have entered a coerced plea of guilty. Ross Goldstein's cooperation was *specifically* elicited out of fear that not a single child witness was fit to testify at trial, and thus, to coerce Jesse into pleading guilty — an outcome he had previously refused. Ex. H ("the prosecutor and the police believed there was a good chance that none of the younger kids would be willing to take the stand at trial.). Judge Boklan's threat that Jesse, if convicted at trial — a certain outcome, once Ross Goldstein's cooperation was secured — would never be a free man, ensured that Jesse had no option but to give up. See Ex. H; Ex. LL at ¶11; Ex. UU; Ex. VV.

But for these constitutional errors, no reasonable factfinder would have rendered a verdict of guilty. The prosecution would have presented a case with no physical evidence — no medical testimony, no photographs, no videos; witness testimony would have come from all, some, or none of the fourteen child witnesses. The defense, armed with the statements of all of the witnesses who denied the

occurrence of abuse, the adult-authored statements of the testifying witnesses, and the testimony of parents troubled by the lengthy, hostile interrogations, would have impeached the credibility of each and every one.

The defense would separately be able to call as witnesses parents who had dropped off and picked up their children, re-enrolling them for session after session without concern, in addition to dozens of non-complaining students who attended the same classes in which abuse was alleged to describe their experience of the classes. There would, at minimum, be reasonable doubt, cast by the dozens of students and parents who saw nothing; remembered nothing; feared nothing, in the Friedman home.

Today, nothing remains of the case against Jesse Friedman; the testimony of each and every complaining witness has been razed. Seven main elements dictate this conclusion: 1) the complainant has completely repudiated the testimony he provided when he was a child, explaining that it was a product of coercion, 2) other eyewitnesses who were in the same classroom as the complainant assert that no abuse took place, 3) the complainant lied in material respects, claiming he witnessed sexual abuse against others that did not take place, 4) the complainant lied in material respects by falsely claiming that other perpetrators sexually abused him, 5) the complainant radically altered his testimony in material respects or cannot remember even basic aspects of his testimony, 6) the complainant made assertions that were so

implausible and contradicted by the physical evidence, or obviously fantastic that they cannot be credited, and 7) the complainant's accounts of sexual abuse dramatically expanded after each round of police interrogation.

Of the fourteen original complainants, five have completely repudiated; one has recanted 60% of his allegations; another six have been undermined by the unambiguous testimony of individuals who were their classmates and peers; the remaining two have been deemed unreliable by the District Attorney herself in part because they remember being abused by fictitious characters. Ross Goldstein has offered a recantation that not only rescinds any allegation that Jesse ever abused anyone but offers a credible narrative as to how and why he entered the cooperation agreement and inculpated his friend. The defense has spoken with a total of twelve students who attended each and every class in which the abuse allegedly occurred, in many cases who were alleged to have been abused by others, all in the plain view of the small classroom. All of these witnesses, one of whom is now a Nassau County Assistant District Attorney, deny they witnessed any abuse. ***One or more of these students was present in each class in which abuse was alleged by others and each states that he did not witness any abuse.*** Exhibit XX, Declaration of Grace Gill at ¶¶ 15-20.[6]

---

[6] Even a cursory examination of the six complaining witnesses with whom neither the defense nor the prosecution have spoken, indicates that nothing remains of the case against Jesse.

---

Daniel Doe: Witness accounts, most of which are newly discovered, conclusively refute Daniel Doe's charges. Keith Doe was also in the class from which his allegations arose, and when asked whether he witnessed any abuse he replied "I don't think so…I'm surprised to see that." Ex. U at 5. So too was Steven Doe (Brian Tilker), who stated "I don't remember any bad experiences except for maybe not liking computers, you know?" He can "state without reservation that nothing untoward ever happened to me and that I never witnessed anything untoward happening to anyone else in the classes that I attended." Ex. OO at 13. David Zarrin, another eyewitness to classes with Daniel Doe, agrees that no abuse ever took place. Ex. JJ at 3. Ross Goldstein's recent recantation echoes both of their sentiments. Ex. H.

Patrick Doe: Patrick Doe's allegations are conclusively refuted by Kenneth Doe, Michael Epstein, Michael Kanefsky, and Barry Doe. Moreover, Michael Epstein's mother, Arline Epstein, can confirm that parents freely entered the classroom without ever seeing any sort of sign of abuse. Ex. J; Ex. W. There is no plausible basis to maintain the charges from Patrick Doe.

Lawrence Doe: Numerous other students in that class are unanimous in their observations that no such conduct like that alleged by Lawrence Doe, solely in the third indictment, ever occurred. Michael Epstein, Kenneth Doe, Barry Doe, and Michael Kanefsky were all in the class with Lawrence Doe, and none ever witnessed anything of the sort. Kenneth Doe specifically denies ever being shown pictures of nude people, within the same class that Lawrence Doe alleges they were displayed. Ex. I. All are sure, they never were sexually abused in that class themselves, and they never witnessed any sort of abuse. And Michael Epstein explains: "I really can't imagine that anything untoward was happening on the other side of the room that I didn't notice." Ex. T at 6. The remaining charges by Lawrence Doe (numbers 3294-3296) are similarly baseless as they relate to Jesse Friedman.

Edward Doe: The first class, which accounts for most of the charges, is the same class in which Daniel Doe alleges he was sodomized multiple times each session, and in which the games "Leap Frog" and "Simon Says" were commonly played. Edward Doe alleges isolated incidents of differing abuse, but nothing like those kinds of allegations. Even his reduced allegations, however, stand in stark contrast to multiple witnesses who saw nothing of the sort. Keith Doe was in this class, and doesn't recall seeing anyone abused. Ex. U at 5. So too was Steven Doe, who "did not witness anything inappropriate in the computer classes at any time." Ex. OO at 12. Ross Goldstein has also been variously accused of being present in this class and is adamant that he never saw any sort of abuse. Ex. H.

The charges of Edward Doe are an excellent example of the sort of internal inconsistencies that fatally plague the indictments. Daniel Doe alleges in this class widespread constant sodomy of every student in the class. Edward Doe also alleges serious crimes, but mostly isolated incidents of bizarre sexual acts or violence. Keith Doe alleged still somewhat less serious acts, and now concedes that those words and acts were manipulations by the investigating officers. In the same vein Steven Doe alleged crimes inconsistent with those alleged by the others, and now admits he only stated those things under tremendous police pressure. Ex. OO.

Because he has satisfied both prongs of the demands of § 2444(b)(2)(B)(ii), this Court should authorize Jesse Friedman to file a successive petition for writ of habeas corpus in District Court.

## CONCLUSION

The question before this Court is whether Jesse Friedman has made a *prima facie* showing of newly discovered evidence of constitutional violations — neither fanciful or demonstrably implausible — but for which no reasonable factfinder

---

Fred Doe: Under repeated, extensive, and well-documented police questioning, Fred Doe's allegations grew from a claim that Arnold Friedman gave him "bad hugs" to assertions that he was anally raped by Arnold and Jesse while three of Jesse's friends held him down. *See supra* at Ex. E at 12-13; Trivedi Decl. at 89-93. He falsely identified one of these "helpers." *Id.* His statement, composed by Detective Merriweather contained the "penis was as hard a rock" language, identical to the language Detective Merriweather used in an unrelated case with a different complainant. Trivedi Decl. at ¶ 93. Fred Doe's claim that he submitted to sexual abuse only because he was told he would never be allowed to come back again to computer class" is fantastical and illogical. Ex. Y at ¶¶ 16-17. Fred Doe's claims are refuted by three eyewitnesses who assert that no sexual abuse took place: Steven Doe, Keith Doe, and Ross Goldstein.

William Doe: Nearly all of William Doe's charges involve multiple students and class-wide sexual games. Yet in the Spring 1986 Gamemaker class William Doe was one of just two complaining witnesses. More damningly, the best information available shows that Rafe Lieber and Gary Meyers were also present in this class among other non-complaining student witnesses. Gary Meyers had this to say: "nothing odd or inappropriate happened at all." Rafe Lieber stated: "nothing ever happened." William Doe is the only complaining witness to bring charges at all in the Fall 1986 Music class, raising immediate doubts about whether the public sexual acts describes could possibly have occurred. Beyond such concerns, he shared the class with Rafe Lieber and Gary Meyers, who, as previously stated, did not corroborate the charges. The earlier, first indictment charges were from the Spring 1985 class. William Doe shared that class with Ron Georgalis, who has been adamant about the lack of abuse, and Dan Aibel, who wonders "what could have gone on there that I should have known about?"…and witnessed no such abuse. Ex. X. Rafe Lieber too was in that class, along with numerous other students who refused to disclose abuse. Can we just remove the "gamemaker" and "music" class qualifiers here. "Music class" sounds like violin lessons, and those labels are really only something that my dad and I understood in regards to the more advanced classes. "The Spring 1986 class" should be sufficient for designating the class.

would have convicted him at trial. Nothing Jesse sets forth *herein* is fanciful or demonstrably implausible; everything is instead, deeply consistent with the Satanic Panic era, and of law enforcement's desperation to convict those they believed to be responsible for allegations that can be described as fantastical and implausible.

This Court has once proclaimed the likelihood of Jesse's innocence; recognized the institutional failures he has suffered time and time again; expressed concern as to the injustice that has gone covered up. In the near decade since, Jesse has only further demonstrated his innocence; suffered numerous additional institutional failures; encountered an intentional effort on the part of the prosecution to obscure and cover up the truth. This Court was the first to truly and sincerely acknowledge the probable injustice of the case against Jesse Friedman; we ask that you be the last.

Dated:         New York, NY
                 November 6, 2020

                                 Respectfully submitted,

                                   _____
                                   RHIDAYA TRIVEDI
                                   Law Office of Ronald. L Kuby
                                   119 West 23rd Street, Suite 900
                                   New York, NY 10011
                                   212-529-0223
                                   rhiyatrivedi@gmail.com

# No. 20-

In the United States Court of Appeals
for the Second Circuit

———————————

**Jesse Friedman,**

*Petitioner-Movant,*

**v.**

**Michael C. Green, Executive Deputy Commissioner, New York State Division
of Criminal Justice Services, Letitia James, Attorney General of the State of
New York**

*Respondent.*

———————————

**DECLARATION OF RHIDAYA S. TRIVEDI IN SUPPORT OF
JESSE FRIEDMAN'S MOTION UNDER 28 U.S.C. § 2244
FOR AUTHORIZATION TO FILE A
SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS**

RHIDAYA S. TRIVEDI, an attorney duly admitted to practice law in the State of New York and the Second Circuit Court of Appeals, declares as follows,

1.      I am an associate at the Law Office of Ronald L. Kuby, attorneys for Petitioner-Movant Jesse Friedman. I submit this Declaration in support of Mr. Friedman's Motion Pursuant to 28 U.S.C. § 2244 for Authorization to File a Successive Petition for Writ of Habeas Corpus. I am fully familiar with the facts and circumstances set out below based on my personal knowledge, my review of files maintained by my law office, and information provided to me by other knowledgeable individuals.

**2.      The purpose of this Declaration is to a) put before the Court true and correct copies of certain documents referred to in Mr. Friedman's motion, b) set forth the procedural history of this case, and c) describe the newly discovered evidence upon which this motion is based.[1]**

**EXHIBITS ATTACHED**

3.      Attached as Exhibits A - D are the following documents, relating to the exhaustion of the claims herein:

| | |
|---|---|
| Exhibit A | June 23, 2014 Notice of Motion to Vacate Pursuant to CPL § 440.10 and June 23, 2014 Memorandum of Law |
| Exhibit B | December 23, 2014 Decision and Order of Judge Corrigan |

---

[1] Balancing the procedural demands of § 2244 with the need to fully set forth the now 20-year-long attempt to vindicate Mr. Friedman's innocence, evidence is discussed that is not newly discovered. It is, however, presented as such.

| Exhibit C | September 12, 2018, Transcript of Proceedings At Which Innocence Claim Was Dismissed |
| --- | --- |
| Exhibit D | August 12, 2019, Decision and Order of the Appellate Division, Second Department, Denying Leave to Appeal |

4.    Attached as Exhibits E - K are the following documents, relating to the

Conviction Review Process:

| Exhibit E | June 24, 2013 Conviction Integrity Report of Jesse Friedman ("Rice Report") |
| --- | --- |
| Exhibit F | Affirmation of Barry C. Scheck, a former member of District Attorney Kathleen Rice's Advisory Panel overseeing the re-investigation of the case, that calls for the trial court to grant a full evidentiary hearing on the merits of Mr. Friedman's claims and to provide full discovery of the documents and materials long denied to him |
| Exhibit G | "Victim Questionnaire" attached to the June 24, 2013 Conviction Integrity Review of Jesse Friedman as Document 21 |
| Exhibit H | March 8, 2013 Letter from Ross Goldstein to the Conviction Review Team |
| Exhibit I | May 20, 2013 Letter from Kenneth Doe to Friedman Case Review Team |
| Exhibit J | Arline Epstein: Interview Statements, January 22, 2013 Prepared Statement for Friedman Conviction Review Panel, August 19, 2013 Letter to Justice F. Dana Winslow, Notes Taken During Friedman Prosecution from 1987-1989; Presentation by Arline Epstein to the Friedman Case Review Team |
| Exhibit K | August 8, 2014 Affidavit of Carol Frank |

5.     Attached as Exhibits L - Y are the following exhibits, related to the defense's re-investigative efforts in conjunction to and after the release of, the Rice Report:

| | |
|---|---|
| Exhibit L | 2012 Recorded Interview with Michael Kanefsky |
| Exhibit M | 2012 Recorded Interview with Margalith Georgalis |
| Exhibit N | 2012 Recorded Interview with Christopher Blaha |
| Exhibit O | 2012 Recorded Interview with Shahar Lushe |
| Exhibit P | May 21, 2012 Interview Statements of Barry Doe |
| Exhibit Q | May 23, 2012 Interview Statements of Gary Meyers |
| Exhibit R | May 24, 2012 Interview Statements of Joan Blaha |
| Exhibit S | June 4, 2012 Interview Statements of Rafe Liber |
| Exhibit T | August 1, 2012 Interview Statements of Michael Epstein |
| Exhibit U | November 13, 2012 Recorded Interview of Keith Doe |
| Exhibit V | May 2013, "Destruction of Innocence, the Friedman Case: How Coerced Testimony and Confessions Harm Children, Families & Communities for Decades After the Wrongful Convictions Occur", Gaven de Becker and Emily Horowitz, National Center for Reason and Justice |
| Exhibit W | June 20, 2013 Affidavit of Jeffrey Leff |
| Exhibit X | June 27, 2013 Affidavit of Dan Aibel |
| Exhibit Y | August 4, 2013 Affidavit of Keith Lanning |

6.     Attached as Exhibits Z - CC are the following exhibits, relating to Jesse's FOIL litigation:

| | |
|---|---|
| Exhibit Z | June 28, 2013 Transcript of Hearing in Friedman v. Rice, Index No. 4015-13 (Sup. Ct. Nassau Cty.) ("FOIL Hearing") |
| Exhibit AA | August 19, 2013 Letter from Arline Epstein to Justice F. Dana Winslow, with attachment |

| Exhibit BB | August 18, 2013 Letter from Scott Banks to Justice F. Dana Winslow, Supreme Court, Nassau County |
| Exhibit CC | August 22, 2013 Transcript of Hearing in Friedman v. Rice, Index No. 4015-13 (Sup. Ct. Nassau Cty.) ("FOIL Hearing II") |

7.     Attached as Exhibits DD - VV are the following exhibits, gathered during the making of *Capturing the Friedmans* and prior to the filing of Jesse's first 440.10 motion:

| Exhibit DD | Transcript of *Capturing the Friedmans* |
| Exhibit EE | 2001 Interview of Judge Abby Boklan |
| Exhibit FF | February 21, 2001 Interview Statements of Fran Galasso |
| Exhibit GG | March 21, 2001 Interview Statements of Scott Banks |
| Exhibit HH | 2001 Interview Statements of Larry Solotoff |
| Exhibit II | May 18, 2001 Excerpts of Recorded Interview Statements of Detective Anthony Squeglia |
| Exhibit JJ | July 27, 2001 Recorded Interview of David Zarrin |
| Exhibit KK | August 6, 2001 Interview Statements of Dennis Doe |
| Exhibit LL | Undated Affidavit of Peter Panaro |
| Exhibit MM | December 9, 2003 Affidavit of Richard Tilker |
| Exhibit NN | December 15, 2003 Affidavit of Judd Maltin |
| Exhibit OO | December 23, 2003 Affidavit of Brian Tilker |
| Exhibit PP | December 29, 2003 Affidavit of James Forrest |
| Exhibit QQ | December 30, 2003 Affidavit of Margalith Georgalis |
| Exhibit RR | December 30, 2003 Affidavit of Ralph Georgalis |
| Exhibit SS | December 30, 2003 Affidavit of Ron Georgalis |
| Exhibit TT | January 6, 2004 Affirmation of David Kuhn Re: March 10, 2001 Interview of Detective Wallene Jones |

| | |
|---|---|
| Exhibit UU | February 23, 2004, "Abuse Experts Assail Movie", Marina Pisano, *San Antonio Express News* |
| Exhibit VV | 2003-2004 Transcripts and Statements of Judge Abby Boklan |

8.　　Attached as Exhibits WW - III are the following exhibits, from the

original Jesse Friedman prosecution

| | |
|---|---|
| Exhibit WW | 1988 Nassau County Indictment Numbers 67104, 67430, 69783 |
| Exhibit XX | Declaration of Grace Gill |
| Exhibit YY | December 1987 Statement of Fred Doe |
| Exhibit ZZ | 1988 Interview of Gary Meyers by Detective William Hatch |
| Exhibit AAA | October 16, 1989 Witness Statement Recorded by Detective Merriweather in the prosecution of Robert Izzo |
| Exhibit BBB | February 15, 1989 Interdepartmental Memo from Barry Grennan to Fran Galasso |
| Exhibit CCC | November 24, 1987 Affidavit of Detective William Hatch |
| Exhibit DDD | 1988 Discovery Demands |
| Exhibit EEE | November 16, 1988 Notes of Meeting at Temple Beth-El by Theodore O'Neill |
| Exhibit FFF | March 26, 1990 Letter from District Attorney Dennis Dillon to Inspector Olsen |
| Exhibit GGG | November 29, 1987, "Parents Seek Therapy for Abuse Victims", Kathy Boccella, *Newsday;* Undated Letter from Parent to Dr. Sandra Kaplan at North Shore University Hospital |
| Exhibit HHH | June 23, 1988, "New Arrest in Child-Sex Case", Bill Van Haintze and Alvin Bessent, *Newsday* |
| Exhibit III | November 24, 1988, "Help for Victims of Sex Abuse Stressed in Temple Program", *Great Neck Record* |

## PROCEDURAL HISTORY

## Factual Background / Introduction

9.      Jesse Friedman ("Jesse") was arrested the day before Thanksgiving, 1987. A few days earlier, his father, Arnold Friedman ("Arnold") had confessed to him and his brothers for the first time that he had possessed child pornography, and that federal agents had searched the house and found it. Jesse assumed that this arrest had to do with the pornography possession. It wasn't until the recitation of the charges against Arnold, at arraignment on Thanksgiving morning, that Jesse realized for the first time that they were both being charged with molesting children. Jesse spent the next two weeks in jail before being granted bail.

10.     After interviewing more than 100 students, the Nassau County District Attorney convened a Grand Jury featuring children who testified that Arnold and Jesse had abused them during popular after-school computer classes conducted in the Friedman's house.[2]

---

[2] Three indictments would ultimately be returned, as a result of a total 14 complaining child witnesses who made formal allegations against Jesse Friedman. In 1988, they were assigned "Doe" names: Barry Doe, Kenneth Doe, William Doe, Daniel Doe, Fred Doe, Edward Doe, Dennis Doe, Richard Doe, Steven Doe, Keith Doe, James Doe, Lawrence Doe, Patrick Doe, and Gregory Doe. The defense was informed of the true identities of these 14 individuals by letter dated November 30, 1988 but has never disclosed them in any public filings.

The Rice Report would not utilize the complaining witness' Doe names, but instead, assigned numerals to them (i.e., "Witness 14"). The prosecution has never turned over to the defense a description of which numeral pseudonym corresponds to which "Doe" pseudonym.

11.     The Grand Jury returned an indictment (#67104) on December 7, 1987 which focused substantially on Arnold, though it also charged Jesse with 10 counts of child sex abuse. Soon after, Jesse was indicted a second time (#67430) on February 1, 1988. This time he was charged with 35 counts of child sexual abuse.

12.     The day before he was arraigned on the second indictment, on February 8, 1988, Arnold pled guilty to the federal child pornography charges. At the Nassau County arraignment, Judge Boklan allowed press and television cameras into the courtroom — a first for Nassau County. Great Neck was now in a frenzy, and Jesse was at its center. With Arnold admitting guilt to some charges, no one had any doubt as to the state charges still pending. Police and the DA's office made outlandish accusations, resulting in headlines such as "100 Kids Linked to Teacher in Sex Attack Case", "Suspect in Child Pornography Called a Damager, Denied Bail", "DA Orders AIDS Test for Dad and Son in Sex-Abuse Case for Deadly Virus", and so on. *See* Ex. K, Affidavit of Carol Frank.

13.     No physical evidence of abuse had been found (nor has it to this day); the indictments had been returned solely on the basis of the testimony of children elicited through "yes or no" questions; no hint of complaint had ever been made before the police began their investigation. Parents picked up their children after

---

The attribution of specific allegations to specific witnesses contained *herein* is thus the result of re-investigation, interpretation, and process of elimination. For a summary of the allegations made by each of the fourteen "Doe" complaining witnesses, *see* Exhibit XX, Declaration of Grace Gill.

class for years, often arriving unannounced, and many children re-enrolled for more advanced classes. It was alleged that the Friedmans had photographed and videotaped hundreds of alleged incidents of abuse, but no photos or videotapes were ever found.

14.     A month later, in March of 1988, Arnold pled guilty to the state charges (including a plea to charges alleging sodomy) and gave a "close-out" statement, which provided ammunition for the police to pressure even more witnesses to make allegations against Jesse and cemented the assumption in the public's mind that the wild accusations were completely true. Then, in June, with Jesse refusing to plead guilty and expressing his intention to go to trial, the police arrested 17-year-old Ross Goldstein ("Mr. Goldstein"), shocking Jesse, who could not fathom how his friend could possibly have become caught up in this. Ex. LL, Affidavit of Peter Panaro at ¶ 5-7.

15.     Peter Panaro ("Mr. Panaro"), Jesse's defense attorney, relayed to Jesse what he had been told by Judge Boklan: that if Jesse were convicted of any of the charges, he would be sentenced for each consecutively. *Id.* With just the 39 charges pending at the time, it would amount to a life sentence.

16.     Attempting to build a defense, Jesse's attorneys made multiple document demands, specifying all evidence available under Brady v. Maryland. Ex. DDD, *Brady* Demands. The prosecution denied the existence of a single piece of

<u>Brady</u> material.[3] The police had interviewed more than 100 students, the vast majority of whom denied being abused or witnessing abuse.

17.     Simultaneously, Jesse kept abreast of the contemporaneous Kelly Michaels prosecution. Ms. Michaels was a teacher in New Jersey; like Jesse, she was accused of bizarre ritualistic sexual abuse of children in her care, including sodomizing them with forks and knives. Like Jesse, there was no physical evidence; no complaints before an innocent comment by a child; and no damage to any child despite the wild accusations. She was convicted after trial and sentenced to a term of 47 years in prison in August of 1988. Jesse could not know that five years later she would be exonerated by the New Jersey Superior Court Appellate Division — a decision upheld by the New Jersey Supreme Court — who would condemn the investigation, noting the "interviews of the children were improper and employed coercive and unduly suggestive methods." <u>State v. Michaels</u>, 136 N.J. 299, 315 (1994).

18.     During that summer of 1988, during which Mr. Goldstein was arrested and Ms. Michaels sentenced, Jesse would also learn that two other friends of Mr. Goldstein had been questioned by the police at the same time. He discovered that police had threatened all three; if they didn't cooperate, others would testify that they

---

[3] Later on appeal, the issue of when Friedman first had a right to <u>Brady</u> material would arise. Regardless of whether it is at this stage or only at pre-trial, ADA Onorato did not assert that Friedman had no *right* to the material, he asserted that none *existed*. <u>See</u> Ex. DDD at ¶34.

were part of the "Friedman child molestation ring." These two would never be prosecuted. Ex. E at iii.

19. Throughout this period the headlines continued. It was 1988; the McMartin pre-school case, and nearly 75 other "multiple-victim multiple-offender" cases would completely unravel within a few years, proven to be the result of mass hysteria. These cases involved dozens of alleged victims and hundreds of charges; *all* of the charges were fabricated by communities twisting in fear and anger over the perceived attacks on its children. *See* <u>People of Territory of Guam v. McGravey</u>, <mark>14 F.3d 1344, 1350</mark> (9th Cir. 1994) (referring to the <u>McMartin</u> and <u>Akiki</u> cases as similar only to the Salem witch trials).

20. Anyone with whom Jesse Friedman spoke assumed he was guilty. His attorney had offered him hope that he had an excellent chance of being released early if he were perceived not as someone who voluntarily committed terrible crimes, but rather as another victim of his father. Jesse was 18 at the time of his arrest, but as young as 15 when these crimes allegedly began.

21. The prosecution exercised tremendous pressure on Mr. Goldstein to plead guilty and testify against Jesse. Eventually, weighing the DA's offer of six months in county jail and Youthful Offender status against the functional life sentence Judge Boklan threatened for Jesse, Mr. Goldstein capitulated, agreeing to provide the testimony sought by the DA upon which a third indictment was returned

(#69783, charging Jesse with 198 counts of child sex abuse). Though no physical evidence linked Mr. Goldstein to the computer classes, and Mr. Goldstein denied involvement for weeks, that third indictment implicated him and charged with him 118 counts of abuse, substantially more than the alleged ringleader, Arnold. 79 of the counts against Mr. Goldstein were sodomy charges — ten times the number leveled against Arnold Friedman.

22.    Facing the possibility that, if the prosecution could have three indictments returned, alleging hundreds of acts of sadistic sex abuse, they could secure a conviction at trial — particularly with the help of Ross Goldstein's testimony — and threatened with the possibility of never again being a free man by Judge Boklan,[4] Jesse Friedman ultimately pled guilty on December 20, 1988.

23.    Jesse was sentenced to 16 to 18 years' imprisonment and judgment entered on December 20, 1988.

24.    Nearly two decades later, after Jesse and Arnold had been imprisoned for years (Arnold died there), and Mr. Goldstein had served a shorter prison term, the case became the subject of the Academy Award-nominated documentary, *Capturing the Friedmans*, released in 2003. The documentary team would

---

[4] Judge Boklan's threat to sentence Jesse consecutively would prove real; at Ross Goldstein's sentencing, Judge Boklan would sentence him to a sentence of imprisonment of two to six years, without Youthful Offender status. The promised sentence had been six months in county jail and Youthful Offender Status. This illegally imposed sentence was later vacated on appeal. See People v. Ross G., 163 A.D.2d 529 (2d. Dep't 1990).

repeatedly attempt to communicate with all 14 original complaining witnesses, among others. *See* "Victims Say Film on Molesters Distorts Facts", https://www.nytimes.com/2004/02/24/movies/victims-say-film-on-molesters-distorts-facts.html (*last accessed,* October 13, 2020) (describing Andrew Jarecki stating that he attempted 500 times to contact 100 former computer class students). Three agreed to be interviewed — Dennis Doe, Steven Doe and Gregory Doe —, while six would outright refuse James Doe, Edward Doe, Fred Doe, Richard Doe, Patrick Doe, and Lawrence Doe. The remaining three — Barry Doe, Kenneth Doe and Keith Doe — would not be reachable until the Conviction Review Process was announced, nearly a decade later. See*, infra* at ¶¶ 119-123.

25.    Jesse was released in 2002 after 13 years in prison and has been a "Level-3 Violent Sexual Predator" under the Sex Offender Registration Act ("SORA") ever since.

### Prior Post-Conviction Proceedings Culminating in This Court's Concern for Jesse's Possible Innocence

26.    Jesse filed his first motion to vacate his conviction pursuant to New York's Criminal Procedure Law § 440.10 in January of 2004 for failure to disclose evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963). The prosecution opposed, and his motion was denied on January 6, 2006 without a hearing. Decision and Order, People v. Friedman, Crim. Term Part IV, Motion Cal. C-11 (Jan. 6, 2006)

(Lapera, J.). After leave to appeal was denied, Jesse then took his case to the United States District Court for the Eastern District of New York, seeking *habeas corpus* relief. Judge Seybert denied relief on January 4, 2008, for timeliness, claiming that Jesse had waited too long after the new evidence (collected by the filmmakers) had been discovered to bring his appeal. Judge Seybert granted a Certificate of Appealability.

27.     Jesse then appealed that decision to this Court, and that case was argued on July 8, 2009. A supplemental motion for an actual innocence petition was filed 12 days later. The Second Circuit affirmed Judge Seybert's ruling but, in its words, refused to "become an accomplice to what may be an injustice." Friedman v. Rehal, 618 F.3d at 161. Despite ruling the claim procedurally barred, the Friedman Court found a "reasonable likelihood that Jesse Friedman was wrongfully convicted" based upon the following findings:

> "The quality of the evidence was extraordinarily suspect."

> "Police, prosecutors, and the judge did everything they could to coerce a guilty plea and avoid a trial."

> "Detectives generally entered an interview with a presumption that a child had been abused and refused to accept denials of abuse."

> "This strategy was designed to force children to agree with the detectives' story."

> "The allegations also grew increasingly bizarre, sadistic, and even logistically implausible."

"Prosecutors had no physical evidence and relied entirely on allegations made by computer students after being questioned by Nassau County detectives. No student had ever complained of abuse, nor had any parent ever observed suspicious behavior prior to the investigation. Indeed, Assistant District Attorney Onorato acknowledged, 'there was a dearth of physical evidence.'"

"Aggressive investigation techniques like those employed in [Friedman's] case can induce false reports"

"The tactics were so aggressive that several former students admit that they responded to them by falsely alleging instances of abuse."

"Prosecutors have an obligation to curb police overzealousness. In this case, instead of acting to neutralize the moral panic, the prosecution allowed itself to get swept up in it."

[Id. at 158, 146-148, and 160.]

The Friedman Court was deeply skeptical of the validity of Jesse Friedman's guilty

plea, noting:

[W]ith the number of counts in the indictments and Judge Boklan's threat to impose the highest conceivable sentence for each charge, petitioner faced a virtually certain life sentence if he was convicted at trial. And the likelihood that any jury pool would be tainted seemed to ensure that petitioner would be convicted if he went to trial, regardless of his guilt or innocence. Nor could he have reasonably expected to receive a fair trial from Judge Boklan, the former head of the Nassau County District Attorney's Sex Crime Unit, who admitted that she never had any doubt of the defendant's guilt even before she heard any of the evidence or the means by which it was obtained. Even if innocent, petitioner may well have pled guilty…

Indeed, passing over all of the pressures described above that were brought to bear on petitioner, the threat Judge Boklan made to petitioner's counsel, Peter Panaro, that "if Jesse were to go to trial, she intended to sentence him to consecutive terms of imprisonment for each

14

count if he is convicted" . . .would be sufficient by itself to sustain a challenge to the plea if Panaro's affidavit is credited.

[Id. at 158-59.]

28.     This Court was also very concerned about the basis of the testimony, noting the "consensus within the social science community" that "suggestive recovery tactics can create false memories" and that "aggressive investigation techniques like those employed in (Friedman's) case can induce false reports." Friedman, 618 F.3d at 160. This Court concluded that the evidence against Friedman was "extraordinarily suspect." Id. at 161.

29.     Lacking a legal basis to act, this Court encouraged the Nassau County District Attorney to do so, noting her obligations under New York Rule of Professional Conduct 3.8. It quoted comment 6B, which states that when a "prosecutor comes to know of new and material evidence creating a reasonable likelihood that a person was wrongly convicted" that prosecutor must "examine the evidence and undertake such further inquiry or investigation as may be necessary to determine whether the conviction was wrongful." Id. at 159-160, citing Professional Rule 3.8, comment 6B.

### The "Re-investigation" and the Rice Report

30.     Following the direction of this Court, Nassau County District Attorney Kathleen Rice undertook re-investigation of Jesse's conviction. There were two relevant groups within the review team, herein referred to as the "Advisory Panel"

and the "Review Team." The Advisory Panel was made up of four experts outside the District Attorney's office, announced by DA Rice, and included Barry Scheck, the Executive Director of the Innocence Project. <u>See</u> Exhibit F, Affidavit of Barry Scheck.

31.     The Review Team, who actually had access to evidence and witnesses, was comprised of assistant district attorneys within Nassau County; put another way, the very institution that originally brought the investigation arrogated to itself the exclusive power to determine the credibility of witnesses. Ex. Z, Transcript of Hearing, <u>Friedman v. Rice</u>, No. 4015-13 (Sup. Ct. Nassau Cty June 28, 2013), 10:19-18:11; <u>see also</u>, Exhibit F, Affidavit of Barry Scheck at ¶ 7 ("such determinations were the exclusive province of the District Attorney").

32.     The "Advisory Panel" did not conduct its own independent review, and the DA withheld from them all the evidence except a small amount. Ex. Z, at 10:19-18:11).

33.     Of the original 14 complaining witnesses, the Conviction Review process involved interviews with only five – Stephen Doe, Gregory Doe, James Doe, Richard Doe, and Barry Doe. These five were responsible for only 29% of the charges brought against Jesse. As described at length, *infra*, four of the five have recanted, partially or completely. The DA has never provided an explanation for why the remaining *nine* complaining witnesses were never interviewed.

16

34.     On June 23, 2013, the Review Team published its "Conviction Integrity Review," (hereinafter the "Rice Report") reaffirming the original conviction. *See,* Ex. E, Rice Report.

35.     At no point in the Conviction Review process were the written statements of complaining witnesses, gathered by law enforcement, disclosed to the defense. The Rice Report, however, curiously and painstakingly detailed the sequence of each investigation, describing instances where interviews were conducted with child witnesses and specifying where those interviews led to children 'providing written statements.' Ex. E at 7-32, *discussed infra* at ¶¶ 86-103.

36.     According to the Rice Report, Nassau County officials began conducting interviews on November 12, 1987, more than a week after Arnold Friedman's arrest, and between November 12, 1987 and November 25, 1987, police spoke with at least 35 children (none of whom made allegations of sodomy against Jesse).

37.     The Report contains dozens of attacks on Jesse's character, employing scores of epithets to describe him as a "psychopath," "pansexual," and "deviant." The Report persistently relied on the contents of documents it refused to disclose, and grossly mischaracterized evidence.[5] The Report, instead of employing the

---

[5] For example, DA Rice was challenged to explain why police in 1988, and again during her Conviction Review, have been unable to get dozens of non-complainant computer students — who had sat alongside the complainants *in the very same classes* in which hundreds of episodes of

original "Doe" names given to complaining witnesses (i.e. "Barry Doe"), utilized numerals for each witness (e.g., "Witness 14"). *Supra* at fn. 2. The report abounded with tautological reasoning. Ex. E. at 108 (including the conclusion that adults who repudiate the statements police coerced from them when they were children are self-serving and unreliable because those statements now "stand in marked contrast" to the original accusations elicited by police).

38.    In addition to withholding from the Advisory Panel virtually all the relevant documents (such as all the original interview notes and police files) the DA also prevented witnesses from having contact with the Advisory Panel, except in a few cases in which witnesses refused to meet otherwise. DA Rice also chose *not* to record or transcribe interviews with witnesses, foreclosing any opportunity to evaluate the accuracy of their briefings to the Advisory Panel, or in the context of the final Report. This policy resulted in the omission and mischaracterization of essential witness statements, as starkly illustrated in the interview of Scott Banks, law secretary to Judge Boklan in 1988.

---

violent sexual abuse were alleged – to corroborate the implausible claims of a handful of students. Her response was that "a reliable [class] roster has never existed", Ex. E at 62, that would allow police or prosecutors to identify which students attended class together, and therefore reconstructing the classes would be too difficult. Id. at 134. In fact, as DA Rice is well aware, such class rosters did exist and they were seized by the Nassau County Police in 1987 and kept secret. In addition, as the Rice Report reveals, a questionnaire police used to interview the children specifically asked them to provide names of other students who attended class alongside them, and the DA is in possession of the interview notes the questionnaires yielded. The defense has thus engaged in its own reconstruction and investigation of non-complainant witnesses to the alleged abuse. *See* Ex. XX at ¶¶ 10-19.

39.     Mr. Banks — one of the only people who reviewed the original grand jury testimony that led to the three indictments — met with the DA's Review Team in person and expressed tremendous doubts about the fairness of the Friedman prosecution. As summarized in a letter he later wrote to Judge Winslow to support Jesse Friedman's FOIL effort to get access to the case documents, Banks described his recollections of the case, as he had to the DA's Review Team when he was interviewed:

> The grand jury testimony of child witnesses, largely elicited with leading questions by the prosecutor, demanding a "yes or no" responses, provided absolutely no detail…I recalled being troubled by the complete lack of medical testimony or medical evidence substantiating the allegations of extreme violent sexual abuse…the prosecution did not disclose witness statements, statements of children who denied being abused by Jesse Friedman, the children were subjected to 'counseling' arranged by law enforcement or the District Attorney's Office during the investigation of Friedman case, and some children may actually have been pressured by police investigators to get statements against Jesse. These questionable tactics, never presented to the court by the District Attorney's Office, are troubling to me, as they were to the Second Circuit, and raise substantial questions regarding the fairness of the proceedings…

> [Ex. BB, August 18, 2013 Letter from Scott Banks to Justice F. Dana Winslow, Supreme Court, Nassau County.]

40.     The substantial doubts volunteered by the Judge's law secretary **appear nowhere in the Rice Report**. In fact, Banks's thorough interview with the DA's Review Team was contorted into the following tiny passage, seeming to endorse the outcome of the case:

"Judge Boklan's own law secretary, Scott Banks, a former public defender, confirmed that nothing in the lead-up to Jesse Friedman's plea bargain offended his sense of fairness."

[Ex. E at 86.]

41.    Similarly, Arline Epstein, the only person known to have taken contemporaneous notes throughout the original Friedman investigation, and who was originally convinced that her son Michael had been molested by the Friedmans, was so offended by the Review Team's mischaracterization of her documents and interview that she composed and submitted to Judge Winslow (the Judge presiding over Jesse's FOIL hearing, described below) a lengthy rebuttal detailing the errors. Here is an excerpt:

> The DA's Report ignores, discounts, and mischaracterizes much of my evidence. In fact, only one-fifth of my notes are included. Many of the missing notes contain information that weakens or undermines the Report's arguments.
>
> [Ex. AA, Aug. 19, 2013 Letter from Arline Epstein to Judge F. Dana Winslow.]

42.    Another shocking and even more relevant illustration of the DA's mischaracterization of evidence in the Rice Report comes from Barry Doe, whose grand jury testimony resulted in 10 charges against Jesse, including some to which he pled guilty. Doe's recantation to the *Capturing the Friedmans* team was definitive:

> As God is my witness, and on my two children's lives, I was never raped or sodomized…I remember the cops coming to my house, and

20

the cops being aggressive, and people wanting you to say almost what they wanted to hear. And, and I, I'll tell you I never said I was sodomized or, you know, I was never raped or, you know, molested. And I can't honestly tell you what other things I might have said….I never saw a kid get sodomized or molested. I was never sodomized or molested. And if I said it, it was not because it happened. It was because someone else put those words in my mouth.

[Ex. P, May 21, 2012 Interview Statements of Barry Doe].

43.     The blanket recantation of a key complainant would have been essential for the Advisory Panel and the public to see, *yet it appears nowhere in the Rice Report*, replaced by the following false statement: "[Complainant Barry Doe] actually believes that Jesse Friedman is guilty." Ex. E at 109. The Rice Report goes on to mislead the reader, attributing 20 charges to "the Friedmans" when in fact only two pertained to Jesse. *Id.*

44.     Fundamentally, despite "reviewing" Jesse's conviction for two and a half years, the prosecution's review was illusory. Friedman's team was denied access to every document in the criminal file; even those documents that would have been provided in normal course had he gone to trial. The actual investigating unit — hand-picked members of the DA's office led by a prosecutor with no experience in criminal defense or conviction review — consistently refused to employ the most basic technique of investigation—interviewing non-complaining witnesses who were present in the classes to determine whether they corroborate or refute the complainants' florid accounts of abuse in plain view of the entire class. Their review

was suspect enough that Barry Scheck, a member of the Advisory Panel, would submit an affidavit in support of Jesse's requests pursuant to New York State's Freedom of Information Law for the underlying investigative materials, explicitly stating that it "would be desirable for the court and the parties…to review materials not available to the Advisory Panel" such that Jesse Friedman's innocence or guilt could "finally" be resolved. Ex. F, Affidavit of Barry Scheck at ¶ 7.

### FOIL Litigation

45.     After the DA's office rebuffed Friedman's efforts to review the materials being reviewed by the prosecution, and two years after the conviction review began but before the Rice Repot was released, Jesse filed a Freedom of Information Law ("FOIL") request for the documents being reviewed. That was denied. Jesse appealed to the appeals officer, who similarly denied the request. Jesse then challenged that determination under Article 78 of the Civil Procedure Law and Rules, New York Civil Rights Law 50b, and Criminal Procedure Law § 190. Justice F. Dana Winslow of the Nassau County Supreme Court requested from the District Attorney the case documents at issue, never before revealed to Friedman or to the Second Circuit.

46.     During the pendency of the FOIL litigation, the defense was ordered to serve a copy of the Article 78 petition on each and every one of the 14 original

complaining witnesses.[6] Service of process would lead to one original complaining witness — Kenneth Doe — coming forward and explicitly recanting his prior inculpation of Jesse Friedman, Ex. I, May 20, 2013 Letter of Kenneth Doe to Conviction Review Panel. Another — Barry Doe — would recant through counsel. *See infra* at ¶ 120-122.

47.     After reviewing the documents and holding multiple hearings on the issue, on August 23, 2013, Justice Winslow conveyed his grave concerns about the exculpatory nature of the materials withheld from Friedman. Ex. Z at 36:21. Specifically, he stated:

> The Court, after reading numerous witnesses' statements, none of which were written by the witness him or herself, all of which were written by someone else, finds that even the people -- and they are people, no longer children -- who took the position that they did not want their name disclosed, had some glaring discrepancies in parts of the statements given. Most particularly what comes to mind is a statement given at one point in time and then -- to one detective and then later given to another detective thereafter. There was a rather substantial difference.

[Ex. Z at 31:17-32:2].

48.     Judge Winslow continued, stating that the lack of physical evidence was reason to "look closer and not further away," and ordered the disclosure of

---

[6] We note that service of process was required all over the world and cost nearly $100,000. Those costs, borne by the defense, shed tremendous light on one category of obstacles the defense has always faced in investigating Jesse's innocence: how to locate and ultimately contact witnesses with generic names who could reside anywhere.

"every piece of paper" with Friedman's name on it, protecting only the names of complaining witnesses who had contacted the court and requested protection of their identities. *Id.*

49.     Before the materials were turned over, however, Judge Winslow's decision was stayed and reversed by the Appellate Division, Second Department. Friedman v. Rice, 134 A.D.3d 826 (2d. Dep't 2015) (holding that FOIL exempted the statements of non-testifying witnesses as confidential informant statements and that Friedman had failed to meet the 'good cause' standard warranting disclosure of grand jury materials). Leave to appeal to the Court of Appeals was sought and granted, culminating in Court of Appeals holding that FOIL's exemption for 'confidential informants' applied only where an agency could establish that an express promise of confidentiality was made to the source, or that circumstances of the particular case are such that the confidentiality can be reasonably inferred. Friedman v. Rice, 30 N.Y.3d 461 (N.Y. Ct. App. 2017). The case was thus reversed and remitted back to Supreme Court for proceedings under the new legal standard.

## Current 440.10 Proceedings

50.     On June 23, 2014, while FOIL litigation was ongoing, Jesse filed his second motion to overturn his conviction and dismiss the charges on three grounds: actual innocence, coerced false testimony before the grand jury, and a coerced plea. The prosecution consented to a hearing on the actual innocence claim, while seeking

24

summary dismissal of the other two claims. Summary dismissal of the grand jury coercion and plea coercion claims was granted on December 23, 2014 by Judge Theresa Corrigan. Ex. B.

51.  In the absence of a final judgment, and with the actual innocence claim pending, no appeal could be sought. Proceedings on the actual innocence claim were eventually stayed, pending a resolution of Friedman's FOIL litigation (described above). For four years, the defense was thus, preparing for the actual innocence hearing, and in this capacity, contacted an *additional* **11** non-complainant students who denied the occurrence of any abuse.[7]

52.  And then, on September 4, 2018, while the FOIL case was back on remand from the Court of Appeals and in light of the then-recent Court of Appeal's decision in People v. Tiger, 2018 Slip Op. 04377 (N.Y. Ct. App. June 14, 2018), holding that an individual who pleads guilty may never raise a claim of actual innocence on CPL §440.10 motion, the actual innocence claim was dismissed, and final judgment entered on Friedman's 440.10 motion.[8]

---

[7] By definition, these witnesses were not included in the 440 filing from which this case emerges, and as such they are not discussed here. We reference them only to flag their existence, and to note that were Jesse granted leave to file his successive habeas granted and an evidentiary hearing ordered, that they would be called to testify.

[8] On the consent of all the parties, after Mr. Friedman's actual innocence claim was dismissed and the previously anticipated evidentiary hearing, canceled, the FOIL proceedings were ultimately dismissed, without prejudice to re-file. Fundamentally, Mr. Friedman seeks an opportunity for discovery — for access to materials long covered up and withheld by the District Attorney's

53.     On August 12, 2019, the Appellate Division, Second Department, denied leave to appeal the trial court's December 23, 2014 denial of Jesse's grand jury coercion and plea coercion claims. Petition for writ of certiorari is permissible, after leave to appeal to the Appellate Division has been denied; thus, Jesse had one year and 90 days from August 12, 2019 to file motion requesting that this Court grant him permission for leave file a successive habeas petition in District Court. This motion is thus, timely.

## NEWLY DISCOVERED EVIDENCE OF COERCION AT THE GRAND JURY

54.     The Rice Report and the defense re-investigation it facilitated demonstrate that, in order to have the Grand Jury return three indictments against Jesse Friedman, charging him with 235 counts of child abuse, law enforcement relied upon a) five coercive interrogation techniques, b) individuals they assumed were sex abuse victims, c) to elicit accusations that Detectives would then craft into witness statements, d) all the while electing to disbelieve any allegation that was unbelievable while e) selectively crediting anything that confirmed their suspicions. The new evidence indicates that the investigation into the Friedmans was conducted in a manner that ignored, contradicted, and ran afoul of known best practices in child

---

Office. If that opportunity comes in the form of a full evidentiary hearing in District Court, the need to resume FOIL proceedings will be moot.

26

sex abuse investigations. None of this evidence could have been discovered were it not for this Court's direction that the Nassau County District Attorney's Office reinvestigate Mr. Friedman's original conviction.

55.     Discrete instances of these techniques abounded in the statements of complaining witnesses, non-complaining witness students and parents, and members of law enforcements given to the *Capturing the Friedmans* team in the early 2000's. The Rice Report and subsequent FOIL litigation made clear that which could not have previously been known: that these techniques constituted the whole of law enforcement's approach to child witnesses, and as such, not a shred of evidence elicited by them was reliable.

### Coercive Questioning

56.     The Rice Report provided evidence of reliance by law enforcement upon five techniques, all of which coerced false testimony at the grand jury: 1) suggestive and aggressive questioning; 2) an insistence that other people had already alleged abuse when in fact they hadn't; 3) affirming inculpations with positive consequences and discouraging exculpations with negative consequences; 4) repeatedly asking questions that the children had already, unambiguously, answered; and 5) inviting speculation.

Coercive Technique #1: Suggestive and Aggressive Questioning

57.    In the Rice Report, the prosecution revealed for the first time that Detective Sergeant Frances Galasso, the head of the 1988 investigation into the Friedmans, compiled a list of questions and distributed it to detectives to assist them in gathering statements. The very title of the document, "Victim Questionnaire," instantly indicates to the interviewer, parents, and the child that every child interviewed is, unambiguously, a "victim":



The following constitutes a sampling of the dozens of suggestive questions offered in Galasso's questionnaire:

- Did Jesse ever take you to the bathroom or come into the bathroom while you were there?

- Did anyone ever see Jesse not fully clothed?

- Have you ever seen anyone else in the class being touched?

- Has anyone read any books to you showing pictures of naked people?

- Ask about the couch in the other room. Is it open a lot like a bed?

[Ex. G, Victim Questionnaire, Rice Report Appendix Doc 21.]

Not only were the questions suggestive, however, but they were asked in a consistently aggressive manner.

58.     Michael Epstein's mother Arline — a Great Neck resident and computer programmer for Chase Bank at the time — believed police and ADA Onorato when they told her that her son had been molested by Jesse and Arnold Friedman. Shocked and saddened by what she was told, she vigorously assisted the police and the prosecution in their investigation, speaking with other parents of alleged victims, and organizing a community response to the terrible crimes she was told had unquestionably occurred. During the course of the investigation, she appears to have been the only person to have taken extensive contemporaneous notes of the progress and findings of the investigation, and she retained them in her personal files. *See* Ex. J, Arline Epstein Submissions and Notes.

59.     In 2013, Ms. Epstein and her husband Joel were on vacation in Asia when their son Michael sent her an email entitled "Attempting closure." In it, Michael told his mother for the first time that he had lied to her decades earlier in order to stop the relentless police pressure. He felt he had to admit to crimes that had never happened. He told her that he had never been abused and that he had never seen any other child being abused. Ex. J at A-34. Michael had recently spoken to the DA's office in the course of their conviction review and felt that he had to tell his mother immediately. She described his coming forward with the truth as a "huge

relief" Id. at A-35. As a result of Michael's disclosures, Ms. Epstein came forward and shared her notes with the defense.

60.　　Ms. Epstein's notes recall that at parent meetings, police stated they were convinced of the abuse and attempted to persuade parents that their children had been abused. *Id.* at A-9. They falsely told parents that they had found a "devastating amount of evidence" of abuse, and that the Friedmans had also photographed their abuse of the students. *Id.* at A-10, A-29. Ms. Epstein wasn't present for the police interviews with her son but remembers that the police were convinced of Jesse Friedman's guilt, and "stressed that it would be so much healthier for the kids if they were able to acknowledge what had happened to them." *Id.*

61.　　Detective Squeglia acknowledged to the *Capturing the Friedmans* team that when he questioned the alleged Friedman victims, he not only suggested the answers, he gave the children no option but to agree with them:

> If you talk to a lot of children, you don't give them an option, really. You just-- you-- you be pretty honest with them. You have to tell them pretty honestly that "We know you went to Jesse's class. We know how many times you've been to the class." We-- we-- you know-- we go through the whole routine. We know that there was a good chance that he touched you or Jesse touched you or somebody in that family touched you in a very inappropriate way.

> [Ex. II at 65.]

30

62.     Chris Blaha's mother, Joan Blaha, remembers vividly the suggestive

questioning and the techniques of "asked and answered" to which the detectives

subjected her son Chris:

> They just went at him and at him about what went on, what was in the
> bathroom, did people stand behind him, and on and on and on and on.
> And I just thought it was so – it was so leading and so strong about it,
> and I thought – at first, Chris would say, "Well I guess something
> happened," but he never did because nothing happened. But I just felt
> like they were pushing him in that direction very, very hard. And I was
> thinking if Chris was not a strong person he could have caved on some
> of this stuff. I really felt that way. And after the whole thing was over,
> I told my friends, my husband, and anybody who would listen, that I no
> longer believed half the stuff that was in the newspaper.

> [Ex. R, Interview with Joan Blaha at 3.]

Detectives would ask him the same question as many as five or ten times. She

characterized it as "totally aggressive", and when her son would say no "they would

just rephrase it and ask him again." Id. See also, Ex. N, Interview with Chris Blaha.

Neither her son Chris, nor her other son Jack ever became complainants in the case.

But their insistence that no such abuse occurred gave detectives no pause in pursuing

classmates' accusations.

63.     Richard Tilker, father of Steven Doe (who has given permission for his

name to be used), described the police's insistence that Brian had been abused.

"They didn't' say 'we believe', they said 'we know.'" Ex. M, December 9, 2003

Affidavit of Richard Tilker at 4. Though he wasn't permitted to be present during

the questioning, he eavesdropped and remembers it clearly:

31

I was shocked by the aggressive manner in which they questioned this young boy. It was clear to me that the detectives had already formed their opinion of what had happened in the computer classes and that they were just trying to get Brian to agree with their story. It got to a point where it wasn't asking him what happened, it was more of telling him what happened, and when they didn't like what he had to say they kept repeating they know what happened and that he should tell.

I recall that the questioning just got to be too much. The police wouldn't take no for an answer. Frustrated Brian finally told them that one time he saw Jesse chase after and hit a child, though he later told us that that was not true and that the only reason he had said that was to end the questioning because they wouldn't leave him alone.

[*Id.* at 5-6.]

64.    Barry Doe confirmed the police "wanting you to say almost what they wanted to hear." Ex. P.

Coercive Technique #2: "Other People"

65.    Admissions made in the Rice Report indicate that Detectives used a technique whereby a child would be told what other children had supposedly already said:

 …neither [Officer Durkin], nor her partner Detective Merriweather, would confront the child with what other witnesses had said—though they might have said something along the lines of, 'Jimmy said Arnold was not nice,' a strategy that in some cases produced results.

[Ex. E at 87.]

It is well established in social science that this creates tremendous bias in how children respond during interviews. Ceci, Stephen J.; Bruck, Maggie. 1995. Jeopardy

in the courtroom: A scientific analysis of children's testimony, Washington, D.C.:

American Psychological Association.

66.     Brian Tilker remembered both the use of "other people" and the

Detective's insistence that abuse had taken place:

> I remember the police questioning me on two occasions. On each occasion, I told them I had never been abused by Arnold Friedman or anyone else, and that I did not witness anything inappropriate in the computer classes at any time. I recall that this did not end their questioning and that I felt that they would be unsatisfied with any response other than my concurring with their view that sex abuse had taken place in the Friedman computer classes.
>
> I remember that they made specific suggestions to me about things that they believed happened in the computer classes, and that they told me repeatedly that other students had already told them that they had been abused, and that they were certain that in fact I had also been abused and that I should tell them so…After many sessions in which the police appeared unsatisfied by my negative responses, I became frustrated at the persistent questioning….I remember finally telling the police officers that I had seen Jesse chase after a kid and hit him. I remember saying that not because it was true, but instead because I thought it would get them off my back.
>
> [Ex. OO, Affidavit of Brian Tilker at ¶ 5.]

67.     The Detectives relied upon the "other people" technique to get Michael

Epstein to corroborate abuse claimed by two other key complainants. Ex. T, August

1, 2012 Interview Statements of Michael Epstein. When that failed, police pressured

him to admit having been abused himself. Though he declined to make charges, he

describes how he later lied both to his mother and therapist about the abuse.

Eventually I just consciously decided to lie and say that I had been abused and repeat these crazy things I had heard from other kids or in the therapy or from the police. You know, the leapfrog, which doesn't even make sense… I just regurgitated everything I'd heard from other people, because that was the only way to make it stop.

[Ex. T at 15.]

68. Indeed, the saga of Michael Epstein shows just how thoroughly police misconduct was able to coerce false statements. He took dozens of classes in the Friedman home and was aggressively interviewed multiple times by police. He confirms their use of leading questions and bullying tactics, including threatening that he "would incline towards homosexuality if he failed to [disclose abuse]." The prosecution, in the Rice Report, confirms that this took place. Ex. E at 127.

69. Although he was able to withstand the direct police pressures, the totality of police misconduct created pressure on others, including his mother, which forced him to make false accusations. In late March 1988, immediately following Arnold Friedman's plea and close-out statement, Detective Galasso called Ms. Epstein and stated that the Sex Crimes Squad is "getting [the] task force back together" because they "want to go back out & re- interview kids *to be sure of [the] case against Jesse."* She also says "[the detectives] want to speak to Mike again... police need their help." Ex. J at A-16.

70. This conversation was contemporaneously documented in Ms. Epstein's notes which reveal that Detective Galasso knowingly lied to Epstein in this

telephone call, telling her that in his close-out statement "[Arnold] *Friedman named hundred[s] of kids."* Galasso similarly lied in *Capturing the Friedmans* when she falsely stated that she had seen "foot high stacks" of child pornography "in plain view." Ex. DD at 36. Galasso repeated that lie to parents with whom she spoke. Ms. Epstein recalls that when she inquired in November of 1987, Det. Sgt. Galasso told her they found "stacks of pornographic materials." At one group meeting, police told an assembled group of concerned parents that they had over 100 names of children who had been abused by the Friedmans, and that one student had made a 10-page statement over five hours of questioning. Ex. J at A-3. At a later parent meeting in January 1988, therapists described having difficulty getting through to the children in this case, since they "have no symptoms" of abuse. *Id.* at A-11-A-12.

71.    Reliance upon Arnold's close-out statement accounted for a subset of the use of the "other people" technique.[9] Ron Georgalis recalls Detective Sergeant Galasso coming to his house, and hearing her tell his parents "authoritatively that [he] had been both sodomized and forced to engage in oral sex with Arnold and that he had admitted in a jailhouse confession that [Ron] was his personal favorite." Ex. SS, December 30, 2003 Affidavit of Ron Georgalis. Similarly, complainant Dennis

---

[9] Again, the statements of the Georgalis family and Dennis Doe with respect to Arnold's close-out statement were known to the defense in the early 2000's. The context — that this was but one sub-type of reliance upon a coercive interrogation technique where witnesses are gaslit and bullied into believing that their peers have made certain kinds of statements — was unknowable to the defense until the release of the Rice Report and events subsequent.

Doe recalled the detectives bringing a "huge book" to his house, labeled "Confession from Arnold Friedman", and insisting that Arnold had spoken about Dennis "in there." Ex. KK, Aug. 6, 2001 recorded interview of Dennis Doe at 17.

72.     Ron Georgalis' parents, Ralph and Margalith, confirm this. Ralph describes the questioning as having been designed with the "clear intent ... to convince us that Ron had been molested and that several other children had already admitted that they, also had been abused." Ex. RR, Dec. 30, 2003 Affidavit of Ralph Georgalis at ¶ 3-4. Margalith was also shown Arnold's "close-out" statement as proof that her son had indeed been molested:

> When Sgt. Galasso and somebody else back a second time. That was after they already had convicted Arnold. And we sat in the kitchen and they told me 'we interviewed Arnold in prison and he told us that Ron was his favorite.' Which was a surprise, but later on I thought of it and I thought they probably told it to other families too. And I felt that they were trying to do it to make us mad- really enrage us against Jesse and try and come up with something against him.

> [Ex. M, Nov. 15, 2012 Transcript of Recorded Interview with Margalith Georgalis; Ex. QQ, Dec. 30, 2003 Affidavit of Margalith Georgalis.]

Coercive Technique #3: Positive and Negative Consequences

73.     Using this technique, the detectives would respond positively to accusations of abuse and negatively to denials. In the Rice Report, the prosecution admitted what it had long denied:

> Police used tactics on children that were "unprofessional, unfair, and cruel."

36

Boys were told that failure to disclose would affect their future sexuality, cause them to be "homosexual," or to become abusers themselves.

Police warned children they would "suffer lasting psychological consequences later in life if they do not disclose abuse."

[Ex. E at 66, 71-72.]

74.     Police also provided "positive consequences" by offering rewards to cooperative students. Detective Squeglia admitted to the Rice Review he would befriend children and even offer to "deputize" them to induce them to make allegations. *Id.* at 66. Student Michael Epstein says he saw complainant Barry Doe at school with "a fake police badge, like junior police or something like that, that the, that the police had given him, or the DA or somebody, as a result of having testified." Ex. T, at 9. The Rice Report concedes the use of this tactic as well, noting:

"Police gave some boys rewards to gain their cooperation, including police badges as rewards for cooperation."

When faced with a child who would "totally ignore you," Detective Squeglia explained that he would appeal to the child's trust in authority ("we'll deputize you and you know— I like cops— do you like cops?"), and leave, asking the child to "think about it."

[Ex. E at 66, 71-72].

75.     Richard Tilker also remembers these "many different approaches in trying to persuade the children to answer their questions in the way they wished them to." Ex. MM at 8. He specifically remembers other parents describing pizza parties and making cooperating witnesses "junior detectives" and giving them badges. *Id.*

Parents pressured him and his wife as well, telling them how important it was for their son to acknowledge the abuse, and that they and he were in denial. *Id*. But he remained skeptical, in part because he was in charge of the carpool to drop off and pick up children at the computer classes, including one who became a major complainant. *Id.* at 11. He "never even once noticed my son or any of the other children disturbed or distressed in any way." *Id.*

76.     Gary Meyers recalls an amplified form of the "positive and negative consequences" technique being used against him. During a long interview (recorded on tape and transcribed by Friedman's lawyer Peter Panaro) with Gary Meyers, who repeatedly insists that he had not been abused, Detective Hatch alternated between abusive and coercive interrogation methods:

> Most [people] who abuse children have been abused themselves. It's a monster created within you, this little monster inside you, this little voice. And every now and then it rears its ugly head unless the victim knows enough about the problem to get himself straightened out.
>
> [Ex. ZZ, Transcript of 1988 interview of Gary Meyers by Detective Hatch.]

The detective's partner added: "You'd have to be an idiot not to see this." *Id.* When the questioning finally ended, the detective called the boy's mother into the room and said, "Gary was a wise guy, and I didn't like his answers." *Id.*

Coercive Technique #4: Asked and Answered

77.     Here, a questioner, over the course of multiple, lengthy interrogations, asks a child the same question repeatedly — one that the child has already unambiguously answered — indicating his previous answers to the question were unacceptable. The intensity of the questioning steadily increased until an acceptable answer was produced.

78.     The newly available notes of Arline Epstein document the fact that Detective Galasso told Ms. Epstein that none of the children had reported any incidents of sodomy, but "you usually have to go back to children and speak to them more than once." Id. at A-4. Based on her experience with her son Michael, and hearing from other parents, she knew that police were sitting with young children for many hours at a time to try to get them to "disclose" having been abused. Id. at A-11-A-12.

79.     Similarly, the mother of complainant Barry Doe told Arline Epstein on or about November 30, 1987 that when Detective Merriweather arrived for an interview with her son, he mentioned a very long interview he had just conducted. The note reads: ***"Merriweather had been w/ a kid 7 hour[s] / [the] kid wouldn't open up."*** Ex. J, A-8. In addition, Epstein's notes state that ***police interviewed complainant Barry Doe for five hours***. Ex. J at A-3. Pages A-17 to A-20 show that police interviewed Barry Doe five times. Id. at A-17-A-20. They planned to return

in order for Barry to identify three alleged friends of Jesse whom police said were also involved in the abuse.

80.    The devastating effects of such relentless police questioning is attested to by Friedman complainant "Kenneth Doe." Doe came forward in 2013 when Friedman's attorneys (at the prosecution's insistence) served him with Friedman's Article 78 petition. He avers that none of the accusations made by him were true. He knew this at the time. But under intense police pressure, he "just folded:"

> I recall clearly that police investigators came to my home repeatedly to question me about what had happened in the computer classes. The police repeatedly told me that they knew something had happened, and they would not leave me alone until I told them. As a result, I guess I just folded so they would leave me alone.
>
> [Ex. I, May 20, 2013 Letter from Kenneth Doe to the Friedman Case Review Panel at 1-2.]

81.    Newly recanting complainant Barry Doe specifically explained how police use of the "Asked and Answered" technique escalated into simply "putting words in [his] mouth."

> I never saw a kid get sodomized or molested. I was never sodomized or molested. And if I said it, it was not because it happened. It was because someone else put those words in my mouth.
>
> [Ex. P, May 21, 2012 Interview Statements of Barry Doe at 6; *see also* Ex. Z at 4:9-10.]

82.    Because of the context provided by the Rice Report's thorough documentation of coercive interrogation techniques, pieces of interviews recorded

during the making of *Capturing the Friedmans* can now be understood. For example,

Wallene Jones told filmmakers in 2004 that the 'asked and answered' technique was

being used:

> Jones described one instance in which it took **fifteen visits** to a child's
> home before he declared that he had been abused. In interview sessions
> that lasted as long as four hours, the boy repeatedly denied being the
> victim of abuse. Jones added, "for a long time he had nothing to say,
> but we knew." On one occasion the boy jumped up and down,
> screaming, 'I have nothing to tell you! Nothing happened!' But by then,
> we already knew," Jones said, "so we kept coming back after that until
> he told us**.**
>
> [Ex. TT, Jan. 6, 2004 Affirmation of David Kuhn at ¶ 9 (**emphasis
> added**).]

Why Detective Jones would subject children to this can be summed up in her

own words: "we assumed all of the children had been sexually abused there." *Id.* at

¶ 5).

Coercive Technique #5: Inviting Speculation

83.     Jesse Aviram, one of nine newly discovered non-complainant

witnesses, described to the DA Rice's Review Team how police invited speculation

about his experiences in the Friedman computer classes. Detectives asked if Arnold

Friedman put his penis on Aviram's back and when he said that Arnold did not, the

officers asked if Jesse might not have been aware of it when it happened." Ex. E at

71. Asking a child if something might have occurred without his knowledge is a

textbook example of "inviting speculation" and cannot have any probative value. By

offering him no choice but to admit that anything a detective asserts or asks *could* have happened, pressure on the child is increased to say what the detectives want him to say.

84.     Though Jesse Aviram is one of many former Friedman computer students who insist that no abuse took place in the Friedman classes, *infra* at ¶ 132 in one way he is absolutely unique. Though the DA refers to Mr. Aviram only as a "Nassau County Employee," what the DA withholds from the reader is that the young man was (and to this day remains) an *Assistant District Attorney in the Nassau County DA's office.* ADA Aviram's statements about "forceful and leading" questions used by the police were not the statements of a civilian unfamiliar with police tactics – they were the statements of a trained prosecutor using terms of art, well aware of the unreliability and impropriety of interrogating children in this manner.

85.     Through the use of these five techniques, Detectives coerced the testimony of the 14 child witnesses who would ultimately testify at the Grand Jury against Jesse. Scott Banks, Judge Boklan's Law Secretary, confirmed this. Ex. BB (expressing concern that questioning at the grand jury "demand[ed] yes or no responses", and answers "lacked specificity regarding the dates and times of alleged offenses, and failed to note the presence of other witnesses…and provided absolutely

no detail from the children concerning the specific acts alleged against Mr. Friedman.").

## **Allegation Authoring**

86.     The Rice Report made clear that the children did not compose their own statements; that every assertion in the case against Jesse emerged from multiple interviews which were then composed into statement-form by detectives. In reviewing original statements attributed to the complainants, the first person outside of the DA's office ever to have done so, Nassau County Supreme Court Judge Winslow confirmed that all of the statements were written by someone other than the children themselves, and that there were an alarming number of discrepancies. Ex. Z at 31:17-32:2. Of course, the defense has never seen these statements, let alone been privy to the extent to which they were authored by members of law enforcement.[10]

87.     The Rice Report describes at least **ten** interviews that were conducted with the 14 original complaining witnesses during or after which no formal statement

---

[10] Prior to the release of the Rice Report and subsequent FOIL litigation, the defense had *extremely* limited awareness of the extent to which law enforcement had authored victim statements. For example, in her 2004 interview with attorney David Kuhn, of the *Capturing the Friedmans* team, Detective Wallene Jones candidly stated that three boys' parents had refused to allow their children to sign the statements she had written for them, calling into question the veracity of all the statements detectives drafted. Ex. TT at ¶ 8; *see also* Ex. E at 68. To know the extent of reliance upon this [coercive] method required the release of the Rice Report and Judge Winslow's findings during the FOIL litigation.

was taken. *See* Ex. XX, Declaration of Grace Gill at ¶ 10. It also makes clear that at least **25** formal statements were taken that the defense has never seen. *Id.*

88.     The statements of Fred Doe ("Witness 17") (the sole victim statement turned over to the defense in 1988 (in redacted form), Ex. YY, Daniel Doe ("Witness 5") and William Doe ("Witness 7"), the circumstances of which are recited in the Rice Report for the first time, are particularly revealing. Fred Doe and William Doe were interviewed at least five times; Daniel Doe was interviewed four times. Ex. XX at ¶ 11. William Doe and Daniel Doe were responsible for the most and second most charges against Jesse Friedman. *Id.*

89.     It is noteworthy that the DA's office **did not interview Fred, Daniel or William**, yet tremendous portions of the report were devoted to the trajectory and nature of their allegations against Jesse. *See* Ex. XX at ¶ 11. The defense has repeatedly attempted to speak with all of them, without success. Standing alone, the trajectory and nature of Fred, Daniel and William Doe's allegations raise more questions than they answer about the integrity of the original investigation.

**FRED DOE**
**Five interviews**
**Three statements,**
**Eight counts of the indictment**

90.     **FIRST INTERVIEW:** First, according to the Rice Report, on November 19, 1987, Fred Doe told Detective Merriweather and Police Officer Durkin Arnold gave him "bad hugs" that hurt, and that Arnold would hug him from

behind and rest his head on his back, and also reported seeing a Polaroid camera in the Friedman home, in a big room with a couch. Ex. E at 12-13.

91. **SECOND INTERVIEW / FIRST STATEMENT:** Then, on December 3, 1987, two weeks later, Fred Doe gave his "first written statement during a second documented interview", in which he described Jesse as i) anally sodomizing Fred Doe and another child; ii) exposing himself; and iii) inviting children to touch his penis. Fred Doe further said that Arnold Friedman i) put his hand down Fred Doe's pants; ii) touched his penis; iii) anally sodomized him twice in class; iv) did the same to other students; and v) showed pornographic magazines and video games to the children. Ex E at 18. Nothing in the Rice Report sought to explain the dramatic escalation in the severity of the allegations, why the first interview was not recorded or documented, or what from the statement had been gleaned at the first interview and what from the second.

92. **FOURTH INTERVIEW/SECOND STATEMENT:** Thereafter, according to the Rice Report, Fred Doe testified before the grand jury. After Jesse refused to plead guilty to the first indictment, police brought Fred Doe forward to make a brand-new series of allegations; indeed, five months after Merriweather drafted Fred Doe's original written statement, on April 29, 1988, Fred Doe, "during his fourth interview with police…gave a second written statement". Ex. E at 24. In this statement, Fred Doe reported seeing Arnold and Jesse Friedman anally sodomize

other children while in class. The Rice Report simply does not state what, if anything, took place at Fred Doe's third interview, or why Fred Doe would fail to mention the most egregious, violent, harmful behavior in his first interviews/statements.

93.     **FIFTH INTERVIEW/THIRD STATEMENT:** And on June 9, 1988, during a fifth interview, Fred Doe gave his third statement to Detectives Merriweather and Squeglia, in which he described, for the first time, the presence of Jesse's three friends, stating that they "would hold him down while Jesse anally sodomized him." Ex. E at 26. He further stated that he was forced, by Jesse, to perform oral sex on him. *Id*. When Fred Doe was later taken to a police line-up, which contained a single suspect (alongside others who had nothing to do with the case), the boy identified *two* young men in the line-up: Ross Goldstein and another boy who inexplicably was never charged. There is no explanation for why Doe's false identification of a second assailant did not undermine the DA's confidence in the boy's identification of Ross Goldstein.[11]

94.     Portions of Fred Doe's statement appear not only to have been drafted by Detective Merriweather, but were conceived by him as well, and were clearly written in his own language. A year after the Friedman prosecution, a similar case

---

[11] None of Fred Doe's classmates, three of whom were complainants who have since recanted, corroborate any of Fred Doe's written allegations. *See,* Ex. XX at ¶ 16.

was investigated by the Friedman detectives, under the direction of the same head of sex crimes, Sergeant Frances Galasso. After that case was resolved with a guilty plea, a civil jury found the defendant, bus driver Robert Izzo, innocent, citing coercive questioning by the same detectives (the witness statements were made available in that case). The wording of statements taken by Detective Merriweather in the Izzo case is strikingly similar to the wording of those he and his partner procured in the Friedman case. Below is a comparison of one such element:

Statement from eight-year-old Fred Doe to Detective Merriweather in Friedman
Case



Statement from seven year old girl to Detective Merriweather and his partner in
Izzo Case



Ex. YY; *see also,* Ex. AAA, Oct. 16, 1989 Witness Statement recorded by Det. Merriweather in Izzo Case.

**Daniel Doe**
**Five interviews**
**Three statements**
**54 counts of the indictment**

47

95.     The statements of Daniel Doe ("Witness 5"), as described in the Rice Report for the first time, are equally telling. All of his charges were first alleged in the *third* indictment against Jesse Friedman, more than a year after questioning began, well after the first rounds of questioning of all the students. Ex. XX at ¶ 8. It appears that Daniel Doe never mentioned a word about Jesse Friedman or any new allegations until at least June of 1988, seven months after he was first questioned. Ex E at 26. In his first statement, November 30 1987, he alleged only that Arnold Friedman had touched his penis to his and other students' backs, a charge that very closely resembles the charges attributed to Keith Doe, which the police arrived to from Keith's actual statement: that the instructors leaned over students to type on the keyboards. *Id.* That was the second time he was questioned by police. *Id.*

96.     In October of 1988, eleven months after the first rounds of questioning, Daniel Doe expanded further. He detailed games called "Leap Frog," "Simon Says," and "Superhero," in which all of the children in the class were ritualistically sodomized in the classroom. *Id.* at 27. He also described another activity called "Extravaganza" in which children watched while adults in the classroom performed sex acts on each other. *Id.* According to Daniel, all of these activities were videotaped and photographed. As noted, none of these alleged photographs and video tapes were ever found, and none of these alleged other perpetrators were ever charged.

48

97.    Ultimately, Daniel Doe alleged that during his 10-week course (Basic I Spring 1986, *see* Ex. XX at ¶ 16) he was violently abused multiple times in each session. Alleging that an average of six crimes were perpetrated against this one boy in each session, implies that a crime was occurring *every 15 minutes.* Yet, in the wake of these alleged attacks, Daniel re-enrolled for the advanced class, where he said he was abused 68 times. On 11 occasions the indictments indicate it was 10-year-old Daniel Doe who anally sodomized Jesse Friedman and Ross Goldstein. Ex. WW, Indictments.

### William Doe
### Five interviews
### Four statements
### 38 counts of the indictments

98.    William Doe ("Witness 7") was also interviewed *five times*. Notably, he only inculpated Jesse during his *third* interview with law enforcement (also the first time he mentioned being sodomized). Ex. E at 17. At least one of his interviews is undocumented in any way. Ex. E at 25 (describing that his "third statement" originated in his fourth interview). It was not until his fifth interview that he identified Jesse as someone who victimized him. Ex. E at 26.

### Accomplices and Allegations Unbelievable and Unbelieved

99.    The Rice Report reveals, for the first time, that the testimony of alleged victims was riddled with allegations **that simply cannot be taken to be true**, with multiple alleged victims claiming an ever-increasing number of different assailants

who participated in, or were present for, the molestation. The Rice Report, commencing on page 28, under the subheading "Police Identify Three Potential Accomplices," notes that after repeated interrogations, four students, in one week, named two additional rapists who participated in the abuse. Ex. E at 28. Various children then allegedly selected these two possible additional attackers from photo arrays, yearbooks, and lineups. *Id.* at 28-30. The Rice Report unhelpfully explains that these individuals were not prosecuted due to "insufficient evidence," *Id.* at 30, and the source document cited in the Appendix is equally non-illuminating. Ex. BBB, Feb. 15, 1989 Interdepartmental Memo from Barry Grennan to Fran Galasso.

100. Many of the alleged accomplices were demonstrably fictional. Complainant Richard Doe, whose testimony resulted in ten charges, including some to which Jesse Friedman pled guilty, disclosed to the police an additional "helper" in the Friedman class who abused children. According to Richard Doe, this person was named "Snake" and was a tattooed, menacing man who also abused children including Michael Epstein. Ex. J at A-17-20. Though police enlisted parents – including Arline Epstein — to canvass the area for him, no such person was ever found. *Ms. Epstein later discovered that a tattooed, menacing man named "Snake," is actually a fictional character played by Kurt Russell in the then-popular movie Escape from New York.* It is telling that the Rice Reports excludes the "Snake" story; it undermines the credibility of complainant Richard Doe (the DA's "Witness 13")

whom the DA cites 18 times in the Report as one of the only three complainants (along with James and Gregory Doe) who "stand by their allegations of abuse", discussed *infra;* Ex. E at x.[12]

101.   As already described, Fred Doe (identified as "Witness 17" in the Rice Report) was interrogated at least five times over five months by Detective Merriweather. It was only in the *fifth* round of questioning that Merriweather elicited a new and important admission: that Fred Doe had neglected to mention, in any of his four prior interviews, the presence of *three additional violent teenage assailants* in the room, (alleged friends of Jesse's), including Ross Goldstein. Ex. E at 26.

102.   Similarly, the Rice Report reveals that James Doe (identified as "Witness 11" in the Report) was untruthful with investigators when questioned in 1988. The DA's report explains that there was "an additional individual he had specifically named as an abuser in 1988." *Id.* at 104. That individual was, allegedly, Ross Goldstein. When speaking to the Review Team today, however, he claimed that he was abused by the Friedmans only and has withdrawn any claims he made about Goldstein. *Id.* While the Report mentions this as a small factual detail, it is actually exceedingly important: it confirms that James Doe either lied to police about the crimes he alleged, or that his interrogator did not accurately record the boy's

---

[12] The Rice Report, however, is the reason the defense is aware of the "Snake" story, inasmuch as Arline Epstein came forward to aid the defense in the summer of 2013 after her son Michael came forward with his recantation.

statements. Either way, it is a major inconsistency that undermines the veracity of one out of only three alleged victims' statements, which are cited in the Rice Report as the three who maintained their belief that they were abused by Jesse Friedman. This inconsistency requires examination, as do the numerous additional witness statements in which child rapists appear to inexplicably pop in and out of existence.

103.   The nature of the evidence against these other accused-but-uncharged rapists — multiple victim accounts elicited after intense and repeated interrogation, without corroboration from physical evidence or other student witnesses — does not appear to differ in any material respect from the nature of the evidence used to indict Friedman and obtain his guilty plea. There must be specific reasons that explain why the accusations against other suspects were discounted and deemed insufficient, yet the same type of allegations made by the same alleged victims against the Friedmans were fully credited—then and now. Jesse has thus sought, but has been repeatedly denied, access to the <u>actual</u> witness statements, which, in their various iterations, could explain this otherwise baffling discounting of the statements of alleged victims.

## **<u>Unreliable Investigative Methods</u>**

104.   Former FBI Special Agent Kenneth Lanning has investigated hundreds of child sex abuse cases and is a leading expert in the field of "child sex rings." He was a special agent with the Federal Bureau of Investigation for more than 30 years

until he retired in 2000. He consulted on or evaluated thousands of cases involving the sexual victimization of children during that time, and for 20 years conducted training, research, and case consultation concerning the sexual victimization of children. He is the 1990 recipient of the Jefferson Award for Research from the University of Virginia, the 1996 recipient of the Outstanding Professional Award from APSAC, the 1997 recipient of the FBI Director's Annual Award for Special Achievement for his career accomplishments in connection with missing and exploited children, and the 2009 recipient of the Lifetime Achievement Award for Outstanding Service from the National Children's Advocacy Center. Ex. Y, Aug. 4, 2013 Affidavit of Kenneth Lanning, at ¶¶ 1-7.

105. The defense contacted Detective Lanning to provide his expert opinion on the integrity of the Conviction Review process and the Rice Report. As a preliminary matter, Detective Lanning found "no indication" that either the original investigation or the Conviction Integrity Review included any input or guidance from experts, like himself, with specialized knowledge and experience with what he referred to as, "acquaintance child sex ring cases." Ex. Y at ¶ 12-13. He went on to identify intentionally misleading references to his own research, made in the Rice Report, *Id.* at ¶ 14-15, an utter absence of curiosity as to the underlying explanation of inconsistencies within and across victim statements, *Id.* at ¶ 17-18, a conscious failure to document and record interactions with victims, *Id.* at ¶ 23, affirmative

proof of overzealous interrogators influencing children's allegations and the phenomenon of contagion in which community members spread and reaffirm unproven stories, *Id.* at ¶ 26, the need, given the lack of physical evidence, to be methodical, intentional, and objective, with respect to alleged victims and their questioning. *Id.* at ¶ 35-39.

106.  He also made specific findings based on the kinds and trajectory of allegations leveled at Jesse and Arnold. When students included in the first two indictments were revisited by police months later, police alleged that they spontaneously recalled *four times as many incidents of abuse and 36 times as many sodomies* as they had months earlier. Furthermore, in the first indictment, Jesse was not charged with any counts of sodomy, and Ross Goldstein was not charged at all. By the time of the third indictment, sodomy counts made up the majority of the charges against both young men. *Id.*

*107.*  Detective Lanning characterized these changes as hallmarks of "false cases" of child abuse. Ex. T, at para. 19. *See* Exhibit XX; *see also,* Ex. WW, Nassau County 1988 Indictment Nos. 67104, 67430, 69783.

108.  Detective Lanning stated, that as a rule, "valid cases tend to get *better* and false cases tend to get *worse* with investigation." *Id*. He becomes "concerned when as an investigation progresses, the number of alleged offenders keeps growing and the allegations get increasingly more bizarre and atypical." *Id.* The prosecution

should have shared this concern; instead, they proceeded without caution, to present this coerced evidence to the Grand Jury, thus securing three indictments against Jesse Friedman.

## NEWLY DISCOVERED EVIDENCE THAT JESSE FRIEDMAN'S GUILTY PLEA WAS COERCED

109.    Prior to securing the cooperation of Ross Goldstein in September 1988, the prosecution's entire case rested upon the testimony of young children who had, at the grand jury, required detailed prompting in order to answer "yes or no" questions to the satisfaction of the prosecution. *See* Ex. BB. At this time, despite the fact that two indictments had been returned, and despite the prosecution's "repeated efforts" to persuade Jesse's lawyer, Peter Panaro, that he should plead guilty, Jesse Friedman was determined to go to trial. Ex. LL, Aff. of Peter Panaro at ¶ 5. The prosecution thus sought to strengthen their case, pursuing a third indictment specifically to pressure Jesse Friedman. *Id.* ("ADA Onorato advised me that if Jesse did not plead guilty, his office would obtain a third indictment, and that this indictment would include many more charges than both previous indictments combined, and that those charges would be much more serious.").

110.    The third indictment, true to ADA Onorato's word, showed an exponential increase and worsening of the charges against Jesse, to 198 counts of child sexual abuse. Ex. XX at ¶ 8. The charges became so bizarre they were nearly

impossible to comprehend. The third indictment alleged that the Friedmans were operating a "sex ring" in which multiple adults violently abused groups of children, not individually or in secret, but *en masse, in plain view of the entire class*, and in a classroom with a large glass sliding door. *See,* Ex. WW; *see also,* Ex. XX at ¶ 3. The same children who had already been interviewed multiple times, were re-interviewed as long as eight months after their initial interviews, and suddenly recalled far more sexual abuse than they had ever recalled before, introducing more brand new teenage abusers they had neglected to mention in any of their prior interviews. The third indictment alleged the Friedmans organized sex abuse "games" in which every child in a class was forced to participate. *Id.*

111.    But the third indictment brought more than just additional wild charges. It brought a set of charges against Mr. Goldstein, a teenage friend of Jesse's, who police said had participated in the alleged abuse and might become the first adult witness against Jesse. If Goldstein – who had never even been an assistant in the Friedman computer classes — could be frightened into pleading guilty and implicating Jesse, it was clear Jesse's case would be unwinnable. Jesse had maintained his innocence for more than 11 months of accusations, but when his lawyer heard from Ross Goldstein's lawyer that Ross had decided to plead guilty in return for a massively reduced sentence, Jesse lost hope. Ross's decision to plead guilty and implicate Jesse would change the game for Jesse, who now realized the

only chance he had at ever leaving prison would be to plead guilty. Ex. LL at ¶¶ 10-12.

112. Ross Goldstein's cooperation was sought specifically to pressure Jesse. Judge Boklan's law secretary, Scott Banks, confirmed this: "[Assistant DA] Joe Onorato's determination to offer a plea of guilty, a plea to Ross Goldstein was, and, was [*sic*] basically done to put some pressure on Jesse. . ." Ex. GG, March 21, 2001 Interview of Scott Banks. It worked; Jesse pled guilty shortly thereafter on December 20, 1988.

113. Mr. Goldstein never spoke publicly about the case until 2013, when he sacrificed the 25 years of anonymity afforded him by his Youthful Offender status and provided the Rice Review team with a nine-page recantation. The recantation included a detailed description of how he was "coached, rehearsed, and directed" by Assistant District Attorney Joseph Onorato and Detective William Hatch to make false statements implicating Jesse Friedman. Then, at the request of the DA, Goldstein appeared for three hours in front of the Review Team and confirmed that he "did not witness Jesse or anyone else commit any crime in the Friedman home with any computer student." His statement included the following declarations:

> I did not witness Jesse or anyone else commit any crimes in the Friedman home with any computer student. My testimony before the grand jury was a result of tremendous and unrelenting pressure and intimidation by the police and district attorneys' office in which I was

eventually coerced to lie about crimes taking place in order to try to save myself and be granted the YO status deal that was being offered to me.

In addition to being ostracized in my personal life, in the legal system I was being made to stand trial as Jesse's co-defendant. Not knowing what he had done or not done made it impossible to feel confident about going to trial with him. I felt very scared that a jury would believe the testimony of the young kids over us.

When [Judge] Boklan promised to televise the trial, this added even more pressure on me to eventually cooperate and say things that the prosecutor and the police wanted me to say to make their case against Jesse Friedman. At a certain point during this process, I became locked into cooperating with the prosecution, and from that point on, I did whatever I had to in order to avoid the possibility of a long jail sentence.

In the weeks leading up to my grand jury appearance, I was coached, rehearsed and directed by the prosecutor and Detective William Hatch for hours on end. I was told that it was my role to confirm what the complainants had said when they testified about had happened to them during the computer classes.

According to them, this was how the police and the prosecutors built up evidence that would 'stick at a trial.' I was going to have to take the stand and testify against Jesse at the trial because the prosecutor and the **police believed there was a good chance that none of the younger kids would be willing to take the stand at trial.**

I could not and would not confirm any allegation or admit doing something or seeing Jesse doing something to any complainant, because I truly had no knowledge or participation or witnessed anything of the sort. The prosecutor would then threaten me by placing the YO status off the table. This happened repeatedly. This was like being tortured and treated like a puppet. Just imagine the trauma of having actual memory stamped out and erased from history, and replaced by new, violent images of incidents that never took place.

[Ex. H, March 8, 2013 Letter from Ross Goldstein to the Review Team (**emphasis added**).[13]]

---

[13] Jesse's coerced plea claim is based substantially, but not solely, upon the newly discovered Ross Goldstein's recantation. The claim is also based upon the long since known threats of Judge Boklan, resultant of her unwavering belief in Jesse's guilt of each and every allegation. Indeed, the affirmation of Peter Panaro, Jesse's former attorney, reveals that prior to the entry of Jesse's guilty plea, Judge Boklan informed him that she would sentence Jesse to consecutive terms on every count if he were convicted after trial. Ex. LL, Affirmation of Peter Panaro at ¶ 11. There has never been an evidentiary hearing on the accuracy of the Panaro Affirmation due to the Nassau County District Attorney consistently and successfully opposing a hearing and discovery from the time Friedman filed his §440.10 motion in 2004, through the Second Circuit's decision in 2010, and since. But there is a more than sufficient basis to conclude that this threat was made. Panaro made his statement under oath at a time when he could be prosecuted for perjury, and is prepared to reiterate it, again under oath, at an evidentiary hearing. Judge Boklan never submitted a sworn statement contradicting Panaro. In the course of the prosecution's review process, they had unfettered access to the now-deceased Judge Boklan, but they too failed to submit any sworn statement by her denying the threat was made.

Moreover, such a judicial threat would be completely consistent with Judge Boklan's behavior, both on and off the record. From the beginning of the proceedings against Friedman until her death in 2013, Judge Boklan had engaged in a persistent pattern of conduct and commentary demonstrating that she had prejudged Friedman's guilt *ab initio*, and nothing adduced in the intervening years had caused her to question her original prejudice. Despite knowing that she would be the Judge to preside over his SORA (Sex Offender Registration Act) hearing when he was released from prison, Judge Boklan agreed to appear in the film *Capturing the Friedmans* and gave a multi-hour interview in which she made numerous prejudicial statements about the case, disparaged Jesse's character, and expressed her personal views about his guilt. As documented in the film, Boklan, who was a sitting judge at the time she was interviewed, states, "There was never a doubt in my mind as to [his] guilt." Ex. VV at 32. On February 23, 2004, she reiterated this position, as quoted in the San Antonio Express-News: "there was never an issue as to whether they were guilty or not." Marina Pisano, "Abuse Experts Assail Movie," San Antonio Express-News, Feb. 23, 2004, Ex. UU. She expressed her confidence in Jesse's guilt despite the fact that there was never a trial, and that more than a year elapsed between Jesse's arrest (when he pled not guilty) and his eventual guilty plea, with three intervening indictments. Like Judge Boklan's close friend Det. Fran Galasso, Judge Boklan used her successful prosecution of the Friedman case as an opportunity to gain attention; she went on a tour of national television shows to discuss Jesse's case, repeatedly volunteering her opinion that he was guilty. Her appearances include: *The Today Show* (Dec. 3, 2003); *Dateline* NBC (January 27, 2004); CNN -- *Now with Paula Zahn* (Feb. 18, 2004); and *Nitebeat,* hosted by Barry Nolan (Feb. 26, 2004). Ex. VV.

On *Now with Paula Zahn*, Judge Boklan cited at length psychiatric reports on Jesse from his childhood. She stated, "When he was in ninth grade, he was incorrigible. He had rages that were uncontrolled and he was placed in a special school. In that special school, he started on drugs. He was stoned every day on marijuana and LSD during the years that this abuse took place."

114.   As discussed *infra* at ¶134 Ross Goldstein's recantation is not only evidence that Jesse was unlawfully coerced into pleading guilty, but also of Jesse's actual, factual innocence.

## NEWLY DISCOVERED EVIDENCE OF JESSE FRIEDMAN'S ACTUAL, FACTUAL INNOCENCE

115.   The Conviction Review Process, the Rice Report and subsequent efforts to secure the underlying documents has yielded newly discovered evidence directly from seven of the 14 original complaining witnesses. Five were interviewed by the DA's Office (Barry Doe, James Doe, Gregory Doe, Richard Doe and Stephen Doe); two spoke directly to the defense (Kenneth Doe and Keith Doe). An eighth — Dennis Doe — previously recanted to the defense but was not re-interviewed in the

---

In January 2004, two anonymous letters from complainants were posted on a website for the activist group "The Leadership Council" (www.leadershipcouncil.org), and a statement from Judge Boklan is included with the letters that states:

> The following E-mail was received by me in January of 2004 from one of the thirteen victims of Jesse Friedman. Although there were more victims, these thirteen were acknowledged by Jessie Friedman in his guilty plea of December 20, 1988. The victim had been working on the E-mail for weeks before he sent it to me. I have his permission to distribute it as I see fit to anyone or any organization including the media as long as his identity is kept confidential and the statement is distributed in its entirety.

Feb. 12, 2004 statement by Hon. Abbey L. Boklan, captured at www.leadershipcouncil.org/1/ctf/vict.html#Doe. Last, Judge Boklan inexplicably decided to make the Friedman case the first in the history of Nassau County in which television cameras were allowed in the courtroom. Any potential jury pool was certainly tainted by massive pre-trial publicity and community hysteria. Judge Boklan first permitted camera media inside the courtroom for pre-trial appearances and granted permission in advance to News 12 LI to cover the trial from inside the courtroom.

Conviction Review Process. The remaining six — Daniel, William, Patrick, Lawrence, Edward and Fred Doe — have never spoken with either the defense or the prosecution.

116. Of the five original complaining witnesses who the Rice team interviewed, four — Barry Doe, James Doe, Gregory Doe, Richard Doe — would bolster the argument for Jesse's innocence: Barry and James would recant in some fashion, and the Rice Report would itself express doubt as to the reliability of Gregory and Richard. And the fifth, Stephen Doe, would offer statements that did not alter, in any way, the integrity of his 2001 recantation.[14]

---

[14] We note also the emergence of Witnesses 18, Witness 22 and Witness 23 — three witnesses who never testified in any formal proceeding but who inculpated Jesse, either during the original investigation or during the conviction review process.

Witness 18, during the original investigation, described being abused by Arnold only, but was "removed…from the case" and never spoke with police again or testified in any formal proceeding. Ex. E at 105. Upon receiving a letter from the Rice Review Team, he said he felt "re-victimized, to the point that he almost collapsed." *Id.* Witness 18 gave an interview to the Review Team, where he remembered inculpating Jesse also, during the original investigation. The Rice Report notes: the "notes [of the original interview] do not mention Jesse Friedman as an abuser, though the detective who recorded the notes also told the Review Team that the detective believed Witness 18 *had* implicated Jesse in the course of the interview." *Id.* (*emphasis in original*). The Rice Report goes on to document various inculpatory statements made by Witness 18, regarding both Jesse and Arnold. *Id.* at 106-107.

Witness 18's father, curiously, spoke with the *Capturing the Friedmans* team in 2001. *See* Ex. HH, 2001 Interview Statements of Larry Solotoff (stating that he didn't believe that his "children were involved in the matter, pre se", questioning the integrity of the "particularly aggressive" investigative methods, and comparing those methods to the Robert Izzo civil acquittal).

Both Witness 22's incredibly violent allegations (that Jesse would cover another student's mouth while Arnold sodomized the child, etc.) and Witness 23's tamer allegations, given to law enforcement in November-December 1987, are detailed in a single paragraph; the Rice Report

117. The Nassau County District Attorney's Office has never explained their failure to interview the remaining nine original complaining witnesses (which include Dennis Doe, who recanted in the early 2000's in *Capturing the Friedmans*, and Fred Doe, who made some of the most egregious allegations against Jesse).

118. Confusingly, despite their recantations/unreliability, Gregory, Richard, and James Doe are the three complaining witnesses the Rice Report repeatedly relies upon as evidence of Jesse's guilt. Ex. E at page x ("three other victims…came forward during this re-investigation to re-affirm the abuse they suffered at the hands of Arnold and Jesse Friedman."). Despite Barry Doe's 2012 recantation and Stephen Doe's 2001 recantation, as demonstrated *herein* at ¶¶ 109-11, 118-119, the Rice Report would go on to characterize interviews with both in a deliberately misleading fashion.

119. <u>Kenneth Doe</u>: On May 20, 2013, Kenneth Doe, after being served with the Article 78 Petition in the FOIL case, submitted a letter to the DA in which he completely repudiated the testimony he gave as a child:

> None of the events allegedly described by or attributed to Kenneth Doe ever took place. Arnold Friedman did not contact my anus with his penis, I was not witness to Jesse Friedman taking any photographs of anything, I engaged in no sexual performances, neither Arnold nor Jesse ever touched my penis…During the time that I was present in computer classes, I did not observe Arnold or Jesse Friedman engage

---

does not explain why they did not testify at the grand jury or detail a single piece of evidence that corroborates the allegations. Ex. E at 19-20.

in anything even remotely akin to sexual conduct, and I have no reason
to believe such events occurred.

[Ex. I.]

Kenneth Doe's account of how those allegations came to be, mirrors myriad other

accounts from the investigations, particularly the use of the "asked and answered"

technique:

> I recall clearly that police investigators came to my home repeatedly to
> question me about what had happened in the computer classes. The
> police repeatedly told me that they knew something had happened, and
> they would not leave until I told them. As a result, I guess I just folded
> so they would leave me alone. I recall being taken somewhere and being
> videotaped while I repeated these untruthful statements. After the film
> *Capturing the Friedmans* came out, I went to see it with my wife…The
> descriptions given about the police tactics used to extract statements
> rang true for me.

[*Id.*]

Kenneth Doe specifically explained his desire to keep his participation in the

Friedman case in his past, while telling the truth specifically to the District

Attorney's Office. *Id.*

120. <u>Barry Doe</u>: In a tape made in May 2012 with the *Capturing the*

*Friedmans* team, Barry Doe was unequivocal in his repudiation:

> As God is my witness, and on my two children's lives, I was never
> raped or sodomized… I remember the cops coming to my house, and
> the cops being aggressive, and people wanting you to say almost what
> they wanted to hear. And, and I, I'll tell you I never said I was
> sodomized or, you know, I was never raped or, you know, molested.
> And I can't honestly tell you what other things I might have said… I
> never saw a kid get sodomized or molested. I was never sodomized or

molested. And if I said it, it was not because it happened. It was because someone else put those words in my mouth.

[Ex. P at 4.]

Barry Doe described the intense police questioning, especially the use of "asked and answered," that coerced his false statements: "I remember the cops coming to my house, and the cops being aggressive, and people wanting you to say almost what they wanted to hear." *Id.*

121.   The Rice Report would speak to Barry Doe subsequently, and stress in their report, in a deliberately misleading fashion, Barry Doe's vague recollection of pornography being "present in the classroom",[15] the fact that his "heart [was] pounding" when he had his historic allegations read back to him, and the fact that he did not tell the District Attorney's Office affirmatively that abuse did not take place. Ex. E at xi.

122.   During the August 22, 2013 hearing on Mr. Friedman's Article 78 petition, Barry Doe was one of only three complainants to file objections to the requested file disclosure. He appeared through counsel, Brian Schoer, to object to disclosure, but ***not*** on the ground that the statements attributed to him as a child were

---

[15] Importantly, numerous witnesses remember the students being the ones to sneak pornographic videogames into the classroom. For example, Chris Blaha remembers the games, but remembers it as something the students were "sneaking." It was, in his words "definitely not a part of the computer class." Ex. N at 2. Keith Doe also recalls such games, but not explicitly as part of the class. Rather, he recalls seeing them later. They may, according to his memory, have been in the class as well, but didn't recognize them as sexual in nature at the time. He recalls difficulty figuring out what the pictures were. Ex. U at 3-5.

correct, or that his repudiation of them was untrue. In fact, to emphasize this, in a colloquy between counsel, Barry Doe's lawyer reiterated Freidman's innocence:

> Mr. Kuby: Barry Doe is not alleging that Jesse Friedman committed a criminal act against him. That is something Mr. Schoer told me on behalf of his client. I put that in papers. I just want to confirm that Mr. Schoer stands by the statement that he made to me informally.

> Mr. Schoer: My client's memory would support that statement.

> [Ex. Z at 4:1-10.]

123. <u>Keith Doe</u>: In his recorded interview with filmmaker Jarecki in 2012, in which Jarecki showed Keith, for the first time ever, the actual indictment charges attributed to him by police, he expressed amazement that his testimony was used to indict Jesse Friedman:

> Jarecki: …This says 'from on about the last, the first day of January '87, to the first day of March, 31st day of March '87, Jesse Friedman subjected Keith Doe, a person less than 11 years old, to sexual contact. The defendant did touch his penis to the victim's back.' Do you remember that happening?

> Keith Doe: … I don't think so. I think they asked me was did he ever come into close contact with me. And I think I probably told them that he did. Because he needs to lean over you to type on the keyboard. So that's probably what I told them.

> [Ex. U, Nov. 13, 2012 taped interview with Keith Doe at 2-3.]

He also now states that he has no recollection of ever seeing Jesse Friedman hit any students, of Jesse Friedman ever exposing his penis, or any sort of sexual abuse. <u>Id</u>. at 4-5.

124.   With respect to <u>James Doe</u>, the Rice Report buried in a single sentence his **complete** recantation as to Ross Goldstein. Ex. E at 104 ("Witness 11 only remembered being abused by the Friedmans, not by an additional individual he had specifically named as an abuser in 1988."). The Rice Report ignored the fact that James Doe's 2012 inculpation of "the Friedmans" was profoundly inconsistent with his original accusations, which never included Arnold Friedman and applied to Jesse only. *See* Ex. XX. As outlined in Exhibit XX, Ross Goldstein was named in 60% of the allegations made by James Doe; the Rice Report is silent as to the applicability of this recantation to the 40% of remaining allegations made solely against Jesse Friedman, which mostly involved videogames. *See* Ex. XX at ¶ 17; *see also,* Ex. NN, December 15, 2003 Affidavit of Judd Maltin (explaining that pornographic videogames were extremely common in Great Neck and describing no wrongdoing in the several classes he observed in his role as Jesse's "constant companion"). The instances of abuse alleged by James Doe are all alleged to have occurred in the classroom, in full view of everyone.

125.   Beyond these four recantations, the reliability of another two of the original complaining witnesses — Gregory Doe and Richard Doe — was newly addressed by the Rice Report.

126.   The Rice Report concluded, after interviewing Gregory Doe ("Witness 2"), that he was "unreliable", "fraught with inconsistencies" and even "perilous to rely on", Ex. E at 79)). Nothing more is said about their interview.[16]

127.   The Conviction Review Team interviewed Richard Doe ("Witness 13"), noting that "no medical evidence exist[ed] to substantiate his memory" of physical injury. Ex. E at 103. Richard Doe is the author of the allegations involving the functional perpetrator "Snake: - a tell-tale sign of false allegations, according to Detective Lanning. *See* Ex. Y at ¶ 19.

128.   Brian Tilker/Stephen Doe was interviewed by the Rice team, who emphasized in their ultimate Report that Mr. Tilker did not proclaim Jesse's innocence, and instead, merely stated that a) police questioning was highly suggestive and b) that he had not witnessed any abuse. Ex. E at 111. The Report went on to summarize a rambling discussion about the importance of the bathroom at the Friedmans. Ex. E at 112.

---

[16] Gregory Doe, was of course, interviewed in *Capturing the Friedmans*, describing having no memory of abuse until he was hypnotized: "I was told I was abused. I didn't remember anything. Then all of a sudden, in a trance, all of a sudden, I started to remember things." Ex. DD, Transcript of *Capturing the Friedmans* at 97. Gregory Doe was known to law enforcement prior to the third indictment, and yet only appears for the first time in the third indictment, responsible for twenty-four counts of sodomy in one ten-week winter class (more than two incidents per session). Gregory Doe then reenrolled in the advanced class that Spring where he alleged, he was sodomized another eleven times. In *Capturing the Friedmans* he made even further allegations, in some places apparently borrowing memories from other students. For example, he now claims to recall games such as "leapfrog" and "Simon says", and makes new claims that Arnold Friedman would ejaculate onto gum, or into orange juice, and force all of the students to eat it. He also claims that Arnold Friedman frequently waved knives at the children, threatening to kill all of their families if they ever revealed the abuse. *Id.*

129.   Ultimately, according to the Rice Report, Brian Tilker ("Witness 1") was excluded from their "tallies of Jesse's victims" because the two charges for which he was responsible were stricken by Judge Boklan for evidentiary insufficiency. Ex. E at 19, fn. 78. One would assume that such a ruling, combined with his a) unambiguous statements to the Panel that he did not witness abuse and that police questioning was suggestive, and b) total recantation to the *Capturing the Friedmans* team in 2003, would bolster Jesse's innocence claim, as opposed to merely being excluded from the case of his guilt. Ex. OO at 12 ("My own recollection of the computer classes was a perfectly pleasant and uneventful one. The classes lasted about 90 minutes and we would be given rudimentary computer programs to create…I can state without reservation that nothing untoward ever happened to me and that I never witnessed anything untoward happening to anyone else in the classes that I attended.").[17]

---

[17] <u>Dennis Doe</u> was a previously recanting complaining witness who was not interviewed by the Rice team. His recantation in 2001 included the following statement;

> What I do remember is the detectives putting on me a lot of pressure to speak up. And at some point, I kind of broke down, I started crying. And when I started to tell them things, I was telling myself that it's not true. Like I was telling myself just say this to them in order to get them off your back.

[Ex. KK at 17.]

Dennis Doe's memory of the classes is, regarding certain lessons, particularly detailed. He recalls precisely that they used Commodore 64 computers, he recalls the process of punching a hole in floppy disks to be able to record data on them, and how that worked, and other parts of the class. <u>Id</u>. at 20. He has, however, no recollection of abuse, none of either being sodomized or witnessing anyone else being sodomized. He only has vague recollections, absolutely intertwined with his

130. The allegations of the six remaining complaining witnesses who were neither interviewed during the Conviction Review process nor have elected to speak with the defense — Daniel Doe, Patrick Doe, Lawrence Doe, Edward Doe, Fred Doe, and William Doe — all involve public acts of abuse that involved other students. **All of these allegations have been refuted by the statements of at least one student with the power to confirm or deny that these acts ever took place.** *See* Ex. XX at ¶¶ 16-17.

131. Indeed, in the original Friedman investigation, despite the use of extensive pressure and improperly coercive techniques, a substantial number of computer students denied that any abuse took place.[18] Because the prosecution

---

extended therapy sessions, and police questioning. He recalls much more firmly the police questioning, attending police lineups, even other students in his class, but not abuse.

[18] For example, at a November 24, 1987 meeting between parents and detectives, the detectives announced that "no child out of 30+ interviewed had been sodomized." Ex. AA. The Detectives did not credit these denials, as they were convinced that, as stated by Sgt. Galasso: any child who "set foot through the door, that child was a victim." Nov. 16, 1988 Notes of Meeting at Temple Beth-El, Theodore O'Neill, Ex. EEE.

> Detective Wallene Jones was similarly insistent that denying children were nonetheless abused:
>> …in [15] interview sessions that lasted as long as four hours, the boy repeatedly denied being the victim of abuse. Jones added, "for a long time he had nothing to say, but we knew." "On one occasion the boy jumped up and down, screaming 'I have nothing to tell you! Nothing happened!' But by then, we already knew," Jones said, "so we kept coming back after that until he told us."

> [Ex. TT at 9.]

Thus, following the therapeutic model they helped to devise, the Detectives assumed that the children who denied being abused were simply in deep denial, and that the more they denied it,

refuses to supply any of the original case materials, it is impossible for the defense to know the actual number of computer students who, despite coercive and repeated interrogation, continued to insist that nothing took place. During the result-driven Rice reinvestigation, the prosecution completely abandoned even the idea of compiling class rosters and interviewing the vast body of former students who made no complaints of sexual abuse and denied that any such abuse took place. The defense has, thus, attempted to contact as many former students as possible, yielding, most recently, new exculpations by nine former students. *Infra* at ¶ 131.[19]

132.   Below is a detailed summary of the statements of each of these former student eyewitnesses — **the first nine are newly discovered;** the last three were identified during the making of *Capturing the Friedmans*.

1. **Dan Aibel** is a Harvard graduate and award-winning playwright. He was editor-in-chief of his school newspaper, varsity team captain, and school valedictorian. His mother was president of the high school PTA. When a friend told him last year about the Friedman Case Review, Aibel voluntarily reached out to the DA's Office. In a telephone conversation, Aibel described

---

the more help they needed to "disclose" it. For its part, the prosecution did not consider this "Brady" material and has never shared it with the defense.

[19] During the making of *Capturing the Friedmans*, filmmaker Andrew Jarecki attempted to contact 100 former computer students, 500 times. "Victims Say Film on Molesters Distorts Facts", https://www.nytimes.com/2004/02/24/movies/victims-say-film-on-molesters-distorts-facts.html (*last accessed,* October 13, 2020) (describing Andrew Jarecki stating that he attempted 500 times to contact 100 former computer class students). Only three came forward — David Zarrin, James Forrest and Ron Georgalis. The remaining nine described herein only came forward, with willingness to speak to the defense and/or the Rice Review team, after the District Attorney publicly announced her intention to reinvestigate and/or after the defense initiated their FOIL litigation. That only three were willing to come forward and corroborate Jesse's claims of innocence, is perhaps, not surprising, given the extremely high-profile nature of the case in Great Neck, *see* Ex. K, Affidavit of Carol Frank at ¶ 11 (describing the case as the "story of the year.").

to Chief Assistant Singas that he was visited repeatedly by detectives at the start of the investigation (before the case had even become public), and subjected (along with his mother) to leading and coercive interview techniques. These statements are important not only because they were exculpatory, but also because like recanting complainant Kenneth Doe, Aibel undermines the DA's foundational argument that police did not employ "aggressive techniques" early in the investigation. Ex. X, June 27, 2013 Affidavit of Dan Aibel at 6-9; 17-20. Of the sexual abuse, Aibel insists: "I don't know of anything that happened. Nothing certainly happened while I was around." *Id.*

2. **Jesse Aviram** is currently an Assistant DA in Nassau County District Attorney's Office, reporting to DA Kathleen Rice. New evidence from the Rice Report indicates that the friend who put Dan Aibel in touch with Chief Assistant Singas was Nassau County ADA Jesse Aviram. According to the Rice Report, he told the Review Team that no abuse occurred, confirmed that police interviews were "forceful and leading," even well before the third indictment. Ex. E at 71. ADA Aviram highlighted the police's use of "speculation" in his questioning, noting that Detectives asked if Arnold Friedman put his penis on Aviram's back. When he said that he did not, the officers asked if he might not have been aware of it when it happened." *Id.* at 90.

3. **Chris Blaha**, U.S. Army, Major (Ret.), a decorated veteran of the United States Army, today recalls no sort of abuse, and "can't even fathom logistically how that would be possible." Ex. N, Interview Statements of Christopher Blaha.

4. **Michael Epstein**, a high-level engineer at a major software company, is emphatic that "I never saw anything abusive…there was nothing inappropriate. There was nothing suggestive. There was nothing sexual about it." Ex. T at 7. He states that the complainants were never abused in his presence despite their claims that such abuse took place in plain view of the rest of the class. He sat alongside non-complainants whom the complainants also falsely named as victims. *Id.*

5. **Michael Kanefsky** stated in a recorded interview that he "took two classes taught by Arnold Friedman. I recall nothing happened. Police came to my house two to four times. I told them I saw nothing, and they kept coming back.

I took two private one on one classes with Arnold Friedman. Nothing happened." Ex. L, 2012 recorded interview transcript of Michael Kanefsky.

6. **Rafe Lieber**, the vice president of a title insurance company, recalled the police as being "very intimidating." Ex. S, June 4, 2012 recorded interview statements of Rafe Lieber at 2. He noted specifically a detective raising his pant leg to make his pistol visible to the young boy. *Id.* Lieber was insistent that nothing happened to him, but in a classic example of the "asked and answered" technique, "that never seemed to be good enough as a response." *Id.* at 3. Lieber states: I was very insistent that nothing ever happened to me. And that never seemed to be good enough as a response. Nothing ever happened to me and I don't have any memories of any of that stuff. To tell you the truth, if you take all the stuff that happened afterwards out of it, I remember the class fondly. *Id.*

7. **Shahar Lushe** stated in a recorded interview: honestly believe that if something happened, you know, if it really stood out as something that I didn't think was right, I would remember it. I'd like to believe that. But you know, I can't think of anything like that. Ex. O, Recorded interview statements of Shahar Lushe at 5.

8. **Gary Meyers**, Chief Financial Officer of a university institute, insists now: "I took years of classes with them. I was always enthusiastic about going back….It was never something that was uncomfortable at all, or, you know, awkward." Ex. Q, Transcript of May 23, 2012 recorded interview of Gary Meyers at 4.

9. **Jeffrey Leff**, Gary Meyers' younger brother, today a schoolteacher in Florida, also refutes all allegations of sexual abuse: I was not sexually abused, molested, or sodomized during the computer classes. I am fully aware that there is no way that any sexual abuse or anything else other than computer lessons could have happened in those classes. Nothing inappropriate ever happened during any of the classes I attended, and I attended many of Arnold Friedman's classes. Ex. W, June 20, 2013 Affidavit of Jeffrey Leff at ¶ 3.

10. **David Zarrin**, an employee at his family's business, says "[f]rom what I remember, there was nothing odd going on at all in the classes." Ex. JJ, July 27, 2001 Transcript of Recorded Interview of David Zarrin at 3.

11. **James Forest**: Jamie Forest avers that "I recall with absolute certainty that, (1) I had a great time in those classes; and (2) Jesse and Mr. Friedman never did anything inappropriate to me or my brother." Ex. PP, Dec. 29, 2003 Affidavit of James Forrest.

12. **Ron Georgalis**," an educator at Florida State University, recalls his experience in the computer classes as "overwhelmingly positive." Ex. SS, Dec. 30, 2003 Affidavit of Ron Georgalis at ¶ 3. He calls the games that the DA alleges occurred in the classroom, such as "leapfrog," "patently ridiculous." He "never witnessed Jesse touching any of the children, inappropriately or otherwise." *Id.* at ¶ 4. He has no recollection of ever meeting or seeing Ross Goldstein. He also "can state without reservation that [he] did not experience any form of abuse, sexual or otherwise, during the Friedman's computer classes, nor did I witness any other children being abused." *Id.* at ¶ 5.

133.    To summarize, 12 students who attended the same computer classes as the original complaining witnesses clearly and unequivocally assert that no sexual abuse took place. Ex. XX at ¶ 16. Many of them, as explained *supra*, only inculpated Jesse back in 1988 as the result of the coercive techniques employed by law enforcement.

134.    The recantation of Ross Goldstein is the last noteworthy piece of newly discovered evidence of Jesse's innocence. Ross was clear — he was coerced into inculpating Jesse because Detectives were fearful that none of the children could credibly take the witness stand at a trial. Ex. H at 6. Given Ross' thorough recantation of any prior inculpation of Jesse; given the 12 non-complainant witnesses who deny the existence or even possibility, of any abuse; given the five explicit recantations of Kenneth, Keith, Barry, Stephen, Dennis and James Doe; given the total impeachment of six other complaining witnesses; and given the

prosecution's own disavowal of Gregory and Richard Doe, nothing can be said to remain of the case against Jesse Friedman.

Dated:          New York, NY
                November 6, 2020

                                    Respectfully submitted,

                                    _____
                                    RHIDAYA TRIVEDI
                                    Law Office of Ronald. L Kuby
                                    119 West 23rd Street, Suite 900
                                    New York, NY 10011
                                    212-529-0223
                                    rhiyatrivedi@gmail.com

# TABLE OF CONTENTS

**Pages**

## VOLUME 1

Exhibit A   June 23, 2014 Notice of Motion to Vacate Pursuant to CPL § 440.10 and June 23, 2014 Memorandum of Law — A-0001

Exhibit B   December 23, 2014 Decision and Order of Judge Corrigan — A-0013

Exhibit C   September 12, 2018, Transcript of Proceedings At Which Innocence Claim Was Dismissed — A-0023

Exhibit D   August 12, 2019, Decision and Order of the Appellate Division, Second Department, Denying Leave to Appeal — A-0027

Exhibit E   June 24, 2013 Conviction Integrity Report of Jesse Friedman ("Rice Report") — A-0028

Exhibit F   Affirmation of Barry C. Scheck, a former member of District Attorney Kathleen Rice's Advisory Panel overseeing the re-investigation of the case, that calls for the trial court to grant a full evidentiary hearing on the merits of Mr. Friedman's claims and to provide full discovery of the documents and materials long denied to him — A-0209

Exhibit G   "Victim Questionnaire" attached to the June 24, 2013 Conviction Integrity Review of Jesse Friedman as Document 21 — A-0212

Exhibit H   March 8, 2013 Letter from Ross Goldstein to the Conviction Review Team — A-0217

i

Exhibit I   May 20, 2013 Letter from Kenneth Doe to           A-0226
            Friedman Case Review Team

COUNTY COURT
NASSAU COUNTY
-----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-                                                    Ind. 67104, 67430, 69783

JESSE FRIEDMAN,
                            Defendant.
-----------------------------------------------------------------x

## NOTICE OF MOTION

To:  District Attorney Kathleen Rice

**PLEASE TAKE NOTICE** that upon the annexed affirmation of Ronald L. Kuby, sworn to on June 23, 2014, the annexed Memorandum of Law, Affidavits, Exhibits, and other documents, defendant Jesse Friedman, by his attorneys, will move this Court at the Courthouse, located at 262 Old Country Road, Mineola, New York, on July 7, 2014 at 9:30 in the forenoon of that day, or as soon thereafter as counsel may be heard, for an Order, pursuant to N.Y.C.P.L. §440.10:

1. Overturning his conviction and dismissing the indictment on the ground that he is actually innocent of the crimes for which he was convicted, and that criminal conviction of the actually innocent violates the Due Process clauses of the New York State and United States Constitutions;

2. Overturning his conviction and dismissing the indictment on the ground that improper, coercive methods were used to obtain false testimony before the

**A-0001**

3. Overturning his conviction on the ground that the trial court impermissibly coerced his plea of guilty, in violation of the Art. I, §§ 1 and 2 of the Constitution of the State of New York, and Sixth and Fourteenth Amendments to the Constitution of the United States.

Dated: New York, New York
        June 23, 2014

                                    The Law Offices of Ronald L. Kuby

                                    By:_____
                                        Ronald L. Kuby
                                    119 W. 23rd Street
                                    New York, New York 10011
                                    (212) 529-0223
                                    *Attorney for Petitioner*

To:     Kathleen Rice
        District Attorney
        262 Old Country Road
        Mineola, New York 11501

**A-0002**

COUNTY COURT
NASSAU COUNTY
--------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,
                  Defendant.
--------------------------------------------------------------------x

### ATTORNEY AFFIRMATION

RONALD L. KUBY, an attorney duly admitted to the practice of law in the Courts

of this state, hereby affirms, under penalty of perjury:

    1.    I am an attorney for Jesse Friedman, Defendant, and I am fully

familiar with the facts of the above-captioned case.  I make this motion pursuant to

CPL § 440.10, asking this Court to set aside Jesse Friedman's conviction on those

crimes set forth in indictment numbers 67104, 67430, and 69783, entered on

December 20, 1988, and to dismiss the charges thereunder.  This motion further

seeks to overturn Defendant's plea of guilty.

    2.    This Affirmation, the accompanying Memorandum of Law, Exhibits,

and other documents are submitted in support of the motion.  I incorporate by

reference into this affirmation those facts, exclusive of legal arguments, set forth in

the Memorandum of Law.  The facts recited in support of the motion are based on

**A-0003**

my personal knowledge, the statements of the defendant Jesse Friedman, other witnesses, and numerous documents.

3.     The accompanying Memorandum of Law sets forth the facts and legal rationale demonstrating that Jesse Friedman is entitled to relief under CPL § 440.10(h).

4.     Attached hereto is the Affirmation of Barry C. Scheck, a former member of District Attorney Kathleen Rice's Advisory Panel overseeing the re-investigation of the case, that calls for this Court to grant a full evidentiary hearing on the merits of Mr. Friedman's claims, and to provide full discovery of documents and materials long denied to him.

5.     Three volumes of Exhibits are annexed hereto and filed herewith. Exhibit A is a true and correct copy of the August 18, 2013 letter from Scott Banks to Justice F. Dana Winslow, Supreme Court, Nassau County.

6.     Annexed hereto as Exhibit B is a true and correct copy of the June 24, 2013 Conviction Integrity Report of Jesse Friedman.

7.     Annexed hereto as Exhibit C is a true and correct copy of the June 28, 2013 Transcript of Hearing in Friedman v. Rice, Index No. 4015-13 (Sup. Ct. Nassau Cnty.).

8.     Annexed hereto as Exhibit D is a true and correct copy of the August 19, 2013 letter from Arline Epstein to Justice F. Dana Winslow, with attachment.

9. Annexed hereto as Exhibit E is a true and correct copy of the May 21, 2012 interview statements of Barry Doe, complainant in this action.

10. Annexed hereto as Exhibit F is a true and correct copy of the June 28, 2013 email from John Byrne.

11. Annexed hereto as Exhibit G is a true and correct copy of the August 22, 2013 Transcript of Hearing in <u>Friedman v. Rice</u>, Index No. 4015-13 (Sup. Ct. Nassau Cnty.).

12. Annexed hereto as Exhibit H is a true and correct copy of the December 23, 2003 Affidavit of Brian Tilker.

13. Annexed hereto as Exhibit I is a true and correct copy of the "Victim Questionnaire" attached to the June 24, 2013 Conviction Integrity Review of Jesse Friedman as Document 21.

14. Annexed hereto as Exhibit J is a true and correct copy of excerpts of the recorded interview statements of Detective Anthony Squeglia.

15. Annexed hereto as Exhibit K is a true and correct copy of excerpts of transcripts of recorded interviews with Michael Epstein.

16. Annexed hereto as Exhibit L is a true and correct copy of the January 6, 2004 Affirmation of David Kuhn.

**A-0005**

17. Annexed hereto as Exhibit M is a true and correct copy of the Confidential May 20, 2013 letter from Kenneth Doe to the Friedman Case Review team.

18. Annexed hereto as Exhibit N is a true and correct copy of the May 2013 paper titled "Destruction of Innocence, the Friedman Case: How Coerced Testimony & Confessions Harm Children, Families, & Communities for Decades After the Wrongful Convictions Occur", written by Gavin de Becker and Emily Horowitz, and published by the National Center for Reason and Justice.

19. Annexed hereto as Exhibit O is a Google Maps depiction of the yard and neighborhood at 17 Piccadilly Road, Great Neck, New York.

20. Annexed hereto as Exhibit P is a true and correct copy of the recorded interview statements of Arline Epstein.

21. Annexed hereto as Exhibit Q is a true and correct copy of the recorded interview statements of Joan Blaha.

22. Annexed hereto as Exhibit R is a true and correct copy of the December 9, 2003 Affidavit of Richard Tilker.

23. Annexed hereto as Exhibit S is a true and correct copy of the 1988 Nassau County Indictment Numbers 67104, 67430, and 69783.

24. Annexed hereto as Exhibit T is a true and correct copy of the August 4, 2013 Affidavit of Kenneth Lanning.

**A-0006**

25. Annexed hereto as Exhibit U is a true and correct copy of the December, 1987 statements of Fred Doe.

26. Annexed hereto as Exhibit V is a true and correct copy of the October 16, 1989 witness statement recorded by Detective Merriweather in the prosecution of Robert Izzo.

27. Annexed hereto as Exhibit W is a true and correct copy of the Presentation by Arline Epstein to the Friedman case Review Team, with accompanying notes recorded by Arline Epstein from 1987 to 1989.

28. Annexed hereto as Exhibit X is a true and correct copy of the February 15, 1989 Interdepartmental Memo from Barry Grennan to Fran Galasso.

29. Annexed hereto as Exhibit Y is a true and correct copy of the November 29, 1987 article "Parents Seek Therapy for Abuse Victims", written by Kathy Boccella and published in Newsday at page 6.

30. Annexed hereto as Exhibit Z is a true and correct copy of the transcript of *Capturing the Friedmans*.

31. Annexed hereto as Exhibit AA is a true and correct copy of the June 23, 1988 article "New Arrest in Child-Sex Case", written by Bill Van Haintze and Alvin Bessent and published in Newsday on page 21.

32.     Annexed hereto as Exhibit BB is a true and correct copy of the November 24, 1988 article "Help for Victims of Sex Abuse Stressed in Temple Program" published in the Great Neck Record.

33.     Annexed hereto as Exhibit CC is a true and correct copy of an excerpt from the August 6, 2001 recorded interview statements of Dennis Doe.

34.     Annexed hereto as Exhibit DD is a true and correct copy of an abstract of a presentation titled "Child Pornography and Extrafamilial Child Sex Abuse" from January, 1990, presented at the American Professional Society on the Abuse of Children Annual Meeting in San Diego, CA.

35.     Annexed hereto as Exhibit EE is a true and correct copy of a partial transcript of the presentation referenced in Exhibit DD.

36.     Annexed hereto as Exhibit FF is a true and correct copy of the November 24, 1987 Affidavit of Detective William Hatch.

37.     Annexed hereto as Exhibit GG is a true and correct copy of the 2001 recorded interview of Larry Solotoff.

38.     Annexed hereto as Exhibit HH is a true and correct copy of the March 26, 1990 Letter from District Attorney Dennis Dillon to Inspector Olsen.

39.     Annexed hereto as Exhibit II is a true and correct copy of an undated letter from a parent to Dr. Sandra Kaplan at North Shore University Hospital.

40.     Annexed hereto as Exhibit JJ is a true and correct copy of excerpts of the March 21, 2001 recorded interview of Scott Banks.

41.     Annexed hereto as Exhibit KK is a true and correct copy of the March 8, 2013 letter from Ross Goldstein to the conviction review team.

42.     Annexed hereto as Exhibit LL is a true and correct copy of the Affirmation of Peter Panaro.

43.     Annexed hereto as Exhibit MM is a true and correct copy of the February 23, 2004 article "Abuse Experts Assail Movie" written by Marina Pisano and published in the San Antonio Express-News.

44.     Annexed hereto as Exhibit NN is a true and correct copy of collected transcripts of television appearances by Judge Abby Boklan from 2003 to 2004.

45.     Annexed hereto as Exhibit OO is a true and correct copy of the February 12, 2004 statement by Judge Abby Boklan captured at www.leadershipcouncil.org/1/ctf/vict.html#/Doe.

46.     Annexed hereto as Exhibit PP is a true and correct copy of the April 11, 1988 Demand for Discovery from Douglas Krieger to Assistant District Attorney Joseph Onorato.

47.     Annexed hereto as Exhibit QQ is a true and correct copy of the April 18, 1988 reply to the Demand for Discovery from ADA Onorato to Douglas Krieger.

48.     Annexed hereto as Exhibit RR is a true and correct copy of the November 16, 1988 Notes of Meeting at Temple Beth-El recorded by Theodore O'Neill.

49.     Annexed hereto as Exhibit SS is a true and correct copy of the June 27, 2013 Affidavit of Dan Aibel.

50.     Annexed hereto as Exhibit TT is a true and correct copy of excerpts of the recorded interview of Christopher Blaha.

51.     Annexed hereto as Exhibit UU is a true and correct copy of excerpts of the February 21, 2001 interview statements of Fran Galasso.

52.     Annexed hereto as Exhibit VV is a true and correct copy of the December 29, 2003 Affidavit of James Forrest.

53.     Annexed hereto as Exhibit WW is a true and correct copy of the December 30, 2003 Affidavit of Ron Georgalis.

54.     Annexed hereto as Exhibit XX is a true and correct copy of the December 30, 2003 Affidavit of Ralph Georgalis.

55.     Annexed hereto as Exhibit YY is a true and correct copy of the December 30, 2003 Affidavit of Margalith Georgalis.

56.     Annexed hereto as Exhibit ZZ is a true and correct copy of the transcript of the 2012 recorded interview of Margalith Georgalis.

57.     Annexed hereto as Exhibit AAA is a true and correct copy of the transcript of the 2012 recorded interview with Michael Kanefsky.

58.     Annexed hereto as Exhibit BBB is a true and correct copy of the June 4, 2012 recorded interview of Rafe Lieber.

59.     Annexed hereto as Exhibit CCC is a true and correct copy of the 2012 recorded interview with Shahar Lushe.

60.     Annexed hereto as Exhibit DDD is a true and correct copy of the transcript of the 1988 interview of Gary Meyers by Detective Hatch.

61.     Annexed hereto as Exhibit EEE is a true and correct copy of the transcript of the May 23, 2012 recorded interview of Gary Meyers.

62.     Annexed hereto as Exhibit FFF is a true and correct copy of the June 20, 2013 Affidavit of Jeffrey Leff.

63.     Annexed hereto as Exhibit GGG is a true and correct copy of the July 27, 2001 recorded interview of David Zarrin.

64.     Annexed hereto as Exhibit HHH is a true and correct copy of the November 13, 2012 recorded interview of Keith Doe.

65.     Annexed hereto as Exhibit III is a true and correct copy of the December 15, 2003 Affidavit of Judd Maltin.

66.     Annexed hereto as Exhibit JJJ is a true and correct copy of an excerpt of the 2001 interview of Judge Abby Boklan.

**A-0011**

Dated:  New York, New York
        June 23, 2014

_____
        Ronald L. Kuby

TO:  Kathleen Rice
     District Attorney
     262 Old Country Road
     Mineola, New York, 11501

SUPREME COURT, NASSAU COUNTY

CRIM. TERM: PART 44

PRESENT:

HON. TERESA K. CORRIGAN, AJSC
_____X
THE PEOPLE OF THE STATE OF NEW YORK,

    - against -

                              Ind No. 67104/87, 67430/88
                              and 69783/88

JESSE FRIEDMAN
_____
                          Defendant.  X

       On June 23, 2014, Defendant Jesse Friedman, by Counsel Ronald L. Kuby, moved this Court to overturn defendant's conviction and dismiss the underlying Indictments on three grounds: (1) actual innocence; (2) the knowing use of false testimony before the Grand Jury; and (3) an impermissibly coerced plea of guilty as a result of bias perpetrated upon the defendant by the now deceased, Judge Abby Boklan. The Nassau County District Attorney's Office (hereinafter, "NCDAO") filed their opposition on September 8, 2014, wherein they consented to allowing the defendant an opportunity to be heard at an "actual innocence" hearing but opposed the granting of the motion or inclusion of defendant's second and third points as part of that hearing. Defense filed a reply on October 10, 2014, requesting that the hearing consented to by the NCDAO include all aspects of his motion. Below is the Court's decision on this matter.

### Procedural History

       The criminal case against Jesse Friedman dates back to 1987 when a search warrant was executed in the Friedman home. Thereafter, three separate grand juries handed up Indictments against Jesse Friedman and others between December 1987 and November 1988. On December 20, 1988, Jessie Friedman pleaded guilty to seventeen (17) counts of sodomy in the first degree, four (4) counts of sexual abuse in the first degree, one (1) count of attempted sexual abuse in the first degree, one (1) count of use of a child in a sexual performance, and two (2) counts of endangering the welfare of a child in satisfaction of all three Indictments. He was subsequently sentenced to concurrent upstate prison terms, the longest of which was six (6) to eighteen (18) years.

       Jesse Friedman was released from incarceration in December 2001. In 2003, a movie entitled "Capturing the Friedmans" was released. Thereafter, in January 2004, defendant filed his first motion to vacate his judgement of conviction, never having done so while incarcerated. He

**A-0013**

argued that the statements of several witnesses against him were obtained by inappropriate means, including suggestive interviews or controversial therapy techniques and that the NCDAO failed to disclose this critical evidence in violation of the mandate set forth by Brady v. Maryland, 373 U.S. 83 (1963). An undated affirmation by Friedman's then attorney, Peter Panaro, was annexed to the motion as support for that position as were excerpts from the documentary noted above. The NCDAO filed their opposition in November 2004, and the motion was denied in January 2006. The Appellate Division, Second Department, denied defendant leave to appeal and his application for leave to appeal to the New York Court of Appeals was likewise dismissed.

Thereafter, Jesse Friedman filed a petition for a writ of habeas corpus, in June 2006, before the United States District Court, Eastern District of New York. That Court dismissed the petition on timeliness grounds; however, the decision was appealed to the Second Circuit Court of Appeals. The Second Circuit Court ruled against the defendant stating, [e]ven if the petition is deemed timely, petitioner's Brady claim fails on the merits." Friedman v. Rehal, 618 F.3d 142, 152 (2nd Cir. 2010). The Second Circuit, relying primarily on the movie "Capturing the Friedmans," encouraged the NCDAO to undertake a review of the defendant's case and evaluate his claims of actual innocence.

Judge Reena Raggi wrote a separate opinion concurring with the majority ruling related to Brady matters. She further stated, "[w]hile the acts alleged are disturbing and may well warrant further inquiry by a responsible prosecutor's office, I cannot predict whether the outcome of any such inquiry will be favorable to petitioner, whose conviction is based on a plea of guilty that he thereafter publicly confirmed." Id. at 161, 162.

The NCDAO began its review in 2010. In September 2012, a Freedom of Information Law ("FOIL") request was filed by defendant, denied by the NCDAO and subsequently heard, via an Article 78 proceeding before the Supreme Court, Nassau County. The ruling of the Supreme Court, which granted defendant's FOIL request, is pending appeal. In June 2013, the NCDAO released a report detailing the results of the investigation into defendant's conviction. In June 2014, the defendant filed a defamation lawsuit against the District Attorney and two others in the NCDAO and also filed this motion pursuant to CPL§440.10 seeking to vacate his judgement of conviction and to dismiss the underlying Indictments.

The Court requested the appearance of all attorneys on July 8, 2014, and a schedule was set for the NCDAO's opposition and defendant's reply. Additionally, a recusal motion was discussed and thereafter filed by defense, opposed by the NCDAO and replied to by defense. The Court denied that motion on October 24, 2014, and now turns its attention to this matter.

### Documents Relied upon by the Court

In deciding this motion, the Court relied upon the submission of both parties, including all attachments provided to the Court **except** the transcript of the movie "Capturing the Friedmans" which is found as Exhibit Z in Defendant's initial submission. This Court has not viewed the

2

**A-0014**

documentary and has not read the transcript of same. It is this Court's belief that this motion should be decided on evidence that is not subject to the editing skills of successful and talented movie producers.

As stated above, on July 8, 2014, this Court asked the attorneys to appear before it to discuss, *inter alia*, the attachments provided by counsel for defendant. The Court noted that certain exhibits were not provided to the Court despite there being an indication that it was attached, while others were missing pages or seemed incomplete (excerpted). Counsel for defense advised the Court that he would review the Court's requests and attempt to provide the requested information. As of this writing, the Court has not received any additional documents from defense. The People, in their response to this motion, did provide some of the requested information.

Because there are thousands of pages related to this motion, the Court will list those documents that provided significant insight to the Court and played a major role in the Court's decision. They are: Defense Exhibit A, Letter of N. Scott Banks, Esq to the Hon. F. Dana Winslow; Defense Exhibit JJ, excerpted interview of Scott Banks; Defense Exhibit KK, Ross Goldstein letter to the Case Review Panel dated March 8, 2013; Defense Exhibit LL, undated affirmation of Peter Panaro, Esq.; Defense Exhibit JJJ, excerpted interview of Judge Boklan; People's Exhibit 1, Affirmation of Joseph Onorato dated August 13, 2004; People's Exhibit 2, transcript of recorded interview between Defendant and Peter Panaro, Esq.; People's Exhibit 4, transcript of Judge' Boklan's complete interview with film makers; Appendix 000603-000616, "Notes from Marc's late November conversation with Ross." The Court likewise relied upon the affirmation of Barry C. Scheck which the Defendant attached to his Notice of Motion in addition to the Conviction Integrity Review Report and its attachments, specifically the section related to Ross Goldstein and the "Statement of the Friedman Advisory Panel" located at the beginning of the Report and signed off on by each member of the case advisory panel, including Barry Scheck, Esq..

## Legal Analysis

Defendant's motion asking the Court to overturn his conviction and dismiss the underlying Indictments is initially based on a claim of "actual innocence." As the NCDAO has consented to a hearing related to same, this Court grants same and notes that the moving papers of defense made "a sufficient showing of possible merit to warrant a fuller exploration." People v. Hamilton, 115 A.D.3d 12, 27 (2nd Dept. 2014), *citing* Goldblum v. Klem, 510 F3d 204,219, *cert denied* 555 U.S. 850, 129 S. Ct. 106, 172 L. Ed. 2d 85, *quoting* Bennett v. United States, 119 F3d 468, 469 [7th Cir]. The burden is now on the defendant to establish his innocence by clear and convincing evidence. Id.

The Court next turns its attention to the claim surrounding the Grand Jury Indictments. New York State's Constitution mandates that "no person shall be held to answer for an infamous crime...unless upon indictment of the Grand Jury." NY Const., Art I; Section 6. That

3

**A-0015**

constitutional mandate is now codified within the Criminal Procedure Law (hereinafter, "CPL") Article 190. The legal standard required for an indictment is stated in CPL§190.65(1) and defined in CPL §70.10(1) which requires legally sufficient evidence of a crime and reasonable cause to believe that the accused committed the crime. *See* People v. Pelchat, 62 NY2d 97 (1984). "The test is whether the evidence before the Grand Jury if unexplained and uncontradicted would warrant conviction by a trial jury." Id. at 105. It is the indictment that gives the court jurisdiction over the matter before it.

Indictments are presumed to be valid and a plea of guilty forecloses review of the sufficiency of the Grand Jury evidence and certain technical defects as long as those defects "do not impair the integrity of the Grand Jury process." Id. at 108. That which is not foreclosed includes: (a) challenges to jurisdiction. *See* People v. Harper, 37 NY2d 96, 99 (1975) ("[a] valid and sufficient accusatory instrument is a nonwaivable jurisdictional prerequisite to a criminal prosecution.") [*quoting* People v. McGuire, 5 NY2d 523,527; People v. Scott, 3 NY2d 148, 152)]; (b) challenges to the constitutionality of a statute. *See* People v. Lee, 58 NY2d 491, 494 (1983) ("a plea of guilty, however, is in no way inconsistent with the contention that, conceding commission of all the acts charged, the provision of statute or ordinance which proscribes the particular conduct as criminal is nonetheless unconstitutional."); (c) challenges to speedy trial. *See* People v. Blakley, 34 NY2d 311, 314 (1974) ( "[t]he improper denial of a motion to dismiss the indictment on the grounds that the defendant has not been afforded a speedy trial survives a plea of guilty on appeal") [*citing* People v. Wallace, 26 NY2d 371; People v. Henderson, 20 NY2d 303, 305; People v. Chirieleison, 3 NY2d 170]; *compare*, People v Friscia, 51 NY2d 845 (1980) (calculation of time is waived by a plea of guilty when no constitutional deprivation is demonstrated); (d) challenges to a person's competency. *See* People v. Francabandera, 33 NY2d 429 (1974) (issues related to voluntariness of a plea based on competency is always appealable); (e) challenges to the motive for convening a grand jury. *See* People v. Tyler, 46 NY2d 251 (1978) (convening a grand jury for the primary purpose of trapping defendant into a perjury charge invalidates the subsequent indictment; a question of fact must be presented to the grand jury); and (f) challenges to the use of knowingly inadmissible or insufficient evidence. *See* People v. Peetz, 7 NY2d 147 (1959) (the prosecutor's concession that evidence before the grand jury was not legally admissible is not cured by a conviction after trial).

That which is foreclosed by a plea of guilty includes: (a) claims of selective and vindictive prosecution. *See* People v. Rodriguez, 55 NY2d 776 (1981); (b) claims of prosecutorial misconduct. *See* People v. DiRaffaele, 55 NY2d 234 (1982); (c) claims that evidence acquired post indictment may have lead to an acquittal. *See* People v. Goetz, 68 NY2d (1986); (d) any challenge in the fact finding process engaged in by the grand jurors. *See* People v. Hansen, 95 NY2d 227 (2000); People v. Sobotker, 61 NY2d 44 (1983) (although a constitutional right may survive a guilty plea, a related statutory right is forfeited if it confers more than the Constitution requires). Courts have consistently held that allowing statutory rights to survive the plea of guilty is inconsistent with plea bargaining when a Constitutional right is not impacted. *See* People v. Dunbar, 53 NY2d 868 (1981).

4

**A-0016**

Defense argues that the underlying Indictments obtained in this case were the result of knowingly unreliable and perjured testimony. Defense places significant weight for its position on the methods used by the police to obtain statements from child witnesses and the statements of Scott Banks, law secretary to Judge Abby Boklan, Ross Goldstein, and other "recanting" witnesses. The Court has carefully reviewed each of the referenced statements and find them lacking in support for defendant's position.

Turning first to Scott Banks. The Court has no reason to doubt the veracity of his letter to Justice F. Dana Winslow or to doubt the excerpted statement provided to the Court that he gave to the film makers of "Capturing the Friedmans." A careful review of those documents shows that Scott Banks found "the testimony elicited in the Grand Jury met the legal standards of sufficiency pursuant to CPL§210.20..." Defense Exhibit A. A review of the court file shows that when counts were not supported by legally sufficient evidence, they were dismissed by the court. Scott Banks' other concerns related to the quality of the evidence presented to the grand jury is not one that rises to the level of a constitutional, due process, concern that survives a guilty plea. Clearly, Scott Banks would not and could not have known if the testimony he reviewed was knowingly false when used or subsequently determined to be false. As such his statements and position lend little support for this particular legal argument.

A review of Ross Goldstein's statements in support of this position fare no better. The Court reviewed Ross Goldstein's first recorded statements related to the Friedman matter. When first contacted by the producers of "Capturing the Friedmans," Goldstein was adamant about not wanting to be a part of the film. Friedman had sent him a letter that implied that the two did not know each other and that Goldstein was not present in the Friedman home. Goldstein stated, "...but the bottom line is that he's just not clear about, or just not choosing to remember a more truthful. I'm not saying that...he's just basically making it sound like he never even really knew me..." Appendix 000603. Moments later, in response to a statement by the interviewer that Friedman "looks at the film as being exonerating to some extent...we have found quite a bit of exonerating stuff," Goldstein replies, "that is total...that is something that I would definitely care to share as something completely untrue...that's why I honestly feel partly that me getting involved in the film is not good...will not help him." Id. He later continued,

> "It's not my place to do that and I really think and have thought
> from the beginning that it's a really kind of ballsy, and I'm not
> sure in such a good way, undertaking to try to make this kind of
> a film that it just seems like you guys are going for black and
> white and there's tons of grey area...it's gonna be grey like its
> not going to add up to something in my opinion that's either
> gonna exonerate him all the way or make the police look bad
> all the way...it's too grey, there's too much stuff that could never
> be captured in the film." Id. at 000604.

At the end of the interview when Goldstein is given the opportunity to state that his

5

**A-0017**

statements regarding his involvement in this matter and his knowledge of Friedman's involvement were not true, he replies, "but that's against my will and that's not my problem." Id. at 000616. Thereafter, on March 8, 2013, Goldstein provided a letter to the Friedman case review panel in which he states that his testimony before the grand jury was a complete fabrication and a "result of tremendous and unrelenting pressure and intimidation by the police and district attorney's office..." Defense Exhibit KK. On March 14, 2013, Ross Goldstein met with the review team and two members of the advisory panel in his attorney's office. At that meeting, Goldstein reiterated his recantation but was unable to explain the marked difference in his position from not recanting to full recantation. As such, the Court can not and will not rely on Ross Goldstein to determine that the prosecution "should have known" that his testimony was false or grant a hearing to determine same. This is a specific legal argument with specific legal criteria that need to be met and defense fails to meet that criteria based on the evidence presented related to Ross Goldstein. Moreover, Goldstein only testified relative to the third Indictment and played no part in the first two.

Regarding additional recantation evidence that the defense relies upon to seek dismissal of the Indictments based on the knowing use of false testimony, the defense again fails to meet its burden. That someone recants at a future time does not necessarily equate itself with the prosecution's knowledge that the original testimony is false and should not be used. Courts have consistently held that recantation evidence is suspect and needs to be carefully evaluated when used to overturn a conviction. *See* People v. Deacon, 96 AD3d 965 (2nd Dept. 2012); People v. McGuire, 44 AD3d 968 (2nd Dept. 2007); People v. Shilitano, 218 NY 161 (1916). The proposed recantation evidence espoused by defense throughout his motion again fails to meet the legal burden to grant his motion or to obtain a hearing.

Counsel's reliance on interviewing techniques and best practices as support for this position is likewise misplaced. Such information, alleged by counsel without affidavits of individuals admitting to using the alleged problematic interview techniques, does not equate with the legal requirement that the defense show that the prosecution placed knowingly false testimony before the grand jury. That interviewing techniques have evolved over the years is not grounds for vacating prior convictions based on the legal standard relied upon in this motion.

Moreover, to argue in reply that all of this evidence will be before the Court anyway in the "actual innocence" hearing is meritless. The hearing that has been consented to will be bound by the parameters of "actual innocence" and this Court will not allow hearings within hearings to determine that which the law allows the Court to decide on papers. Defense failed to meet it's burden to show that the prosecution knew, should have known or later learned that false testimony was used in the grand jury and defendant's motion to dismiss the indictment based on same, or to include same in an "actual innocence" hearing, is denied.

The Court next turns its attention to that part of the motion that seeks dismissal of the Indictments based on a plea of guilty that is alleged to have been obtained via improper coercion from the prior Court. In reply, defense asked that this matter be included as part of the "actual

**A-0018**

innocence" hearing if dismissal is not granted by the Court. The NCDAO objects to both requests.

A guilty plea is valid if it is entered knowingly, intelligently and voluntarily. *See* People v. Fiumefreddo, 82 NY2d 536 (1993). Moreover, a plea is not coerced if it follows a statement by the court advising the defendant of the potential maximum sentence faced if the defendant should be convicted after trial. *See* People v. Bravo, 72 AD3d 697 (2nd Dept. 2010); People v. Allen, 273 AD2d 319 (2nd Dept. 2000); *compare*, People v. Rogers, 114 AD3d 707 (2nd Dept. 2014)(Court's remarks that it would have "no problem" imposing the maximum sentence if the defendant was convicted after trial were impermissibly coercive).

A defendant's contention that a plea was involuntarily entered can always be raised on appeal. *See* People v. Seaberg, 74 NY2d 1 (1989); People v. Santiago, 71 AD3d 703 (2nd Dept. 2010). However, when a plea is entered as part of a plea bargain which includes a waiver of one's right to appeal, "the negotiating process serves little purpose if the terms of a 'carefully orchestrated bargain' can subsequently be challenged." Seaberg at 10 *citing* People v. Prescott, 66 NY2d 216, 220 (1985).

When the allegations of coercion are not part of the record, a hearing should be held to determine same. *See* People v. Glasper, 14 NY2d 893 (1964). At such a hearing, the plea taking judge would be required to testify as a witness. A hearing is not required if there are uncontroverted allegations by defendant purporting the coercion in the form of a detailed affidavit of an attorney or others. *See* People v. Richards, 17 AD3d 136 (1st Dept. 2005).

Where a defendant has an ability to raise a ground or issue as the basis for a motion to set aside a verdict and fails to do so, the Court may deny the motion, without a hearing, for failure to so act. CPL §440.10(3)(c). *See*, People v. Thomas, 147 AD2d 510 (2nd Dept. 1989); People v. Cortez, 158 AD2d 611 (2nd Dept. 1990); People v. Dover, 294 AD2d 594 (2nd Dept. 2002). Significant in this determination is whether the defendant had access to the information alleged in the subsequent motion at the time he filed his initial motion. *See* People v. Lawrence, 38 Misc.3d 1204(A); (Sup. Ct., Bronx Cty. 2012).

This is defendant's second motion to vacate his judgement of conviction pursuant to CPL Article 440. There are no facts presented in the current motion, related to the issue of coercion, that were not known to defense at the time of his first motion in 2004. In fact, affidavits relied upon for the current motion were drafted and utilized in the first motion already decided by the Courts. There being nothing new before this Court related to the factual allegations espoused herein, this Court questions why such arguments were not previously raised by defense especially in light of the fact that Defendant has been represented by counsel of his choosing since his release from incarceration. To now argue that an "actual innocence" hearing, which is granted in this matter, can be used as a gateway to these previously silent arguments is disingenuous and makes a mockery of the criminal justice system that sets forth procedures to maintain an orderly, fair and just resolution of matters before it.

7

**A-0019**

Moreover, uncontroverted facts alleging coercion in the form of a detailed affidavit by the attorney or another is missing in this matter. The evidence before this Court is the exact opposite. N. Scott Banks advised the Hon. F. Dana Winslow that he has "repeatedly maintained Judge Boklan presided over the Friedman matter fairly." Defense Exhibit A. Judge Boklan, in her **complete** transcript to the movie producers of "Capturing the Friedmans" states on numerous occasions her belief in defendant's guilt – based on her reading of the grand jury testimony. She likewise states, "Certainly, at trial, I would not have permitted the media to be present." People's Exhibit 4, Appendix 000646. She continues with her belief that the case changed from trial posture to plea posture after the defense learned that Ross Goldstein had agreed to cooperate. Id. at 000659. She speaks of the "terrible sadness" that she felt towards defendant because of everything she learned he had been through while still believing he was a "menace to society." Id. at 000664-665, 691. She referenced a pre-sentence report and a pre-sentence memorandum that detailed admissions by the defendant. Id. at 000661. She acknowledged that she believed the sentence that defendant received was harsh (Id. at 000693) while appreciating that the victims' families felt it was lenient. Id. at 000730. She spoke on two occasions about the potential exposure after a trial. In one instance she surmised what the defendant's attorney may have said about a sentence of "up to 50 years" (Id. at 000671); later in the interview she explained her practice regarding same stating,

> "Like an attorney will say to me, "if my client goes to trial,
> as opposed to taking this plea, are you gonna punish them
> with a greater sentence?" And I say, "I don't punish him for
> going to a trial. But once I hear– once I hear what really
> happened – or if your client commits perjury – or, anything
> that can happen during the course of -- of a trial, who knows
> what I'm gonna sentence him."" Id. at 000728.

There is not a single reference in this entire transcript that depicts Judge Boklan's desire to have media present during a trial; to give the defendant a certain sentence should he go to trial; to have discussed such a sentence in this matter with the defendant's attorney or her desire for a plea of guilty as opposed to a trial, although she was happy for the children that they did not have to testify and happy for herself that she did not have to "listen to what happened to the children." Id. at 000727.

Peter Panaro's undated affirmation is likewise void of any details related to the issue of coercion from the Court. While the affirmation details the third Indictment's genesis based on defendant's failure to take a plea, those statements were directed at the NCDAO. In fact, the affirmation details fair dealing by Judge Boklan when she refused to revoke the defendant's bail upon the unsealing of the third Indictment. Defense Exhibit LL at para. 5-6. The affirmation details information related to Brady concerns but not judicial coercion. Importantly, the affirmation states that the attorney would not allow the defendant to plead guilty unless he in fact was guilty while later seeming to proclaim defendant's innocence. The Second Circuit points out that "Panaro's insistence on an admission of guilt as a condition to agreeing to representing him in

8

**A-0020**

the guilty plea is difficult to reconcile with these cases." Friedman v. Rehal, 618 F.3d 142 (2010) at footnote 1. This Court has the benefit of the transcript of the taped meeting between Panaro and the defendant two days prior to his entering a guilty plea. It details the evidence that Panaro had in support of a trial, specifically, the "Gary Meyers" interview information, his viewing of the pornographic materials in the case, his personal interviews with Sgt. Galasso and Det. Hatch and his conversations with Ross Goldstein's attorney related to his cooperation. He detailed the numerous meetings the two had to discuss the defense that the children were not abused and none of the allegations actually happened in addition to the defense of coercion from the defendant's father, the defense of "mass hysteria" and the defense of insanity and multiple personalities. It detailed the numerous doctors/ psychologists that the defendant saw at the behest of Panaro and the fact that a meeting occurred between defendant and a "prominent appeals lawyer" to act as a legal advisor on the case. It details defendant's efforts to obtain legal opinions from Barry Slotnick (who refused to take the case) and William Kuntsler (who did not reply) in addition to his interviewing approximately thirty-four (34) attorneys before choosing Panaro to represent him. It speaks of the plea bargain in great detail in addition to stating that "Judge Boklan has indicated that for each one of the charges that you are convicted of, she would **consider some** consecutive time." Emphasis added. Panaro went on to explain that regardless of consecutive time, the maximum sentence the defendant could get was forty (40) years under New York law. He continues by explaining certain aspects of the trial, including the right to remain silent, cross-examination and the People's burden of proof. He talks about the rights that are waived by a plea of guilty and that the plea must be voluntary. Panaro advises the defendant that he must tell the court the truth and states that the defendant would have to say he put his "penis into the anus of little boys" and the defendant corrects him and says that he would have to say that "I put my penis to the anus of little boys." He discusses the fee arrangement for representation and that there would be no increased cost for a trial and the limited appealable issues that still remain post plea and sentence. He detailed the fact that the defendant took a lie detector test at the office of Richard Arthur and that the defendant was told that the test showed that the defendant was not telling the truth. He further details that the defendant discussed pleading guilty with his numerous therapists and his family and the many reasons why the defendant has chosen to plead guilty. Panaro closes the interview with a conversation with defendant's mother and gives both parties a chance to ask questions. *See* People's Exhibit 2.

A careful review of both of these exhibits from Peter Panaro fails to show any evidence of judicial coercion such that the plea of guilty should be set aside. Significant to this Court is that Panaro was fully aware of the issue of coercion as he discussed it as a possible defense. Panaro had ample opportunity in this interview and in his affirmation to state, even once, that the Judge was being harsh, difficult, unfair, unreasonable or even overzealous. He said nothing. This evidence does not provide the legal support needed for the Court to either grant the motion to dismiss or to include same in a hearing.

It is evident that this issue of judicial coercion could have and should have been raised previously when Judge Boklan was alive to be heard, under oath, as to what she said and did. Because there was never an appeal on this matter until after the release of the movie "Capturing

9

the Friedmans," there are no plea or sentence minutes available. As far as this Court is aware, there are no minutes of any of the proceedings. This Court will not second guess that which it is factually impossible to determine as the main witness to this issue is unavailable and the delay to raise same, while the witness was alive, falls at the feet of the defendant. The motion to overturn the conviction based on judicial coercion or to include same in the "actual innocence" hearing is denied.

## CONCLUSION

Based on the above, the Defendant's motion to overturn his convictions and dismiss the underlying Indictments is denied.

Moreover, it is **ORDERED,** that a hearing to determine whether the Defendant is actually innocent is to be commenced on January 5, 2015, or as soon thereafter as the Parties agree.

This constitutes the Decision and Order of the Court.

**SO ORDERED.**

Dated:   December 23, 2014

**ENTER**

_Teresa K. Corrigan_

**TERESA K. CORRIGAN, AJSC**

10

**A-0022**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

                            -against-

JESSE FRIEDMAN,

                          Defendant.
-------------------------------------------------------------x

NOTICE OF ENTRY

Ind. No. 67104-87
Ind. No. 67430-88
Ind. No. 69783-88

PLEASE TAKE NOTICE, that the within is a true copy of an Oral Decision and Order

of the Supreme Court of the State of New York, County of Nassau, dated September 4,

2018, in the above-captioned action, filed in the office of the Clerk of the County Court of

Nassau County, Mineola, New York.

Dated:     Mineola, New York
            September 12, 2018

                              Respectfully submitted,

                              MADELINE SINGAS
                              District Attorney, Nassau County
                              262 Old Country Road
                              Mineola, New York 11501
                              (516) 571-3800

TO:    County Court Clerk

        Law Office of Ronald L. Kuby
        119 West 23rd Street
        Suite 900
        New York, New York 10011

**A-0023**

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 45

3    -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,      :Indictment
4                                              :Nos. 67104-87
             -against-                         :     67430-88
5                                              :     69783-88
     JESSE FRIEDMAN,                           :
6                                              :
                          Defendant.           :Decision
7    -------------------------------------------X

8                                  September 4, 2018

9                                  252 Old Country Road
                                   Mineola, New York
10

11   B E F O R E:

12                   HONORABLE TERENCE P. MURPHY,
                            Acting Supreme Court Justice
13

14
     A P P E A R A N C E S:
15
             HON. MADELINE SINGAS
16           Nassau County District Attorney
             For the People
17           BY:  PAULA CAJDLER, ESQ.,
                            Assistant District Attorney
18                          of Counsel.

19

20               *          *          *

21

22                            WENDY SILAS
                              Senior Court Reporter
23

24

25

**A-0024**

1          THE CLERK:  This is Numbers 1, 2 and 3 on

2     today's motion calendar, People versus Jesse Friedman,

3     Indictment 67104 of '87, 67430 of '88 and 69783 of

4     1988.

5          Counsel, can we have your appearance for the

6     record?

7          MS. CAJDLER:  For the People, Assistant

8     District Attorney Paula Cajdler.

9          THE COURT:  Okay, these matters are inclusive

10    of the defendant's post-judgment motion under Criminal

11    Procedure Law Section 440.10, specifically for an

12    actual innocence hearing that was granted by another

13    judge of this court.

14          Pursuant to People v. Tiger, 2018 Slip

15    Opinion 04377, dated June 14th, 2018, defense

16    counsel -- the Court of Appeals, excuse me, the Court

17    of Appeals has ruled that there is no cause of action

18    for an actual innocence hearing when a defendant has

19    previously pled guilty.

20          Defense counsel, by his letter to the court

21    and copy to ADA Sheryl Anania and Tammy Smiley, dated

22    August 23rd, 2018, agrees that that was the Court of

23    Appeals ruling and acknowledges that this court, the

24    trial court, is therefore required to dismiss the

25    balance of the defendant's petition under 440.

**A-0025**

ws

1          In this Court's mind the matter is fully and

2    finally concluded and there's no further action to be

3    taken by the Court.

4          Defendant's motion is denied in all respects

5    and any granting of an actual innocence hearing is

6    hereby withdrawn by this Court under the principles set

7    forth in the Tiger case.

8                    *    *    *    *

9               It is hereby certified that the
                foregoing is a true and accurate
10              transcript of the proceedings.

11

               WENDY SILAS
12             OFFICIAL COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-0026**

WS

# Supreme Court of the State of New York
## Appellate Division : Second Judicial Department

M265123
SL/

SHERI S. ROMAN, J.

2018-12148

DECISION & ORDER ON APPLICATION

The People, etc., plaintiff,
v Jesse Friedman, defendant.

(Ind. Nos. 67104/87, 67430/88, 69783/88)

Application by the defendant pursuant to CPL 450.15 and 460.15 for a certificate granting leave to appeal to this Court from an order of the Supreme Court, Nassau County, dated October 10, 2018, which has been referred to me for determination.

Upon the papers filed in support of the application and the papers filed in opposition thereto, it is

ORDERED that the application is denied.

_____
SHERI S. ROMAN
Associate Justice

August 12, 2019



# CONVICTION INTEGRITY REVIEW: *PEOPLE V. JESSE FRIEDMAN*

### COMMISSIONED BY:

KATHLEEN M. RICE
NASSAU COUNTY DISTRICT ATTORNEY

### CASE ADVISORY PANEL

MARK F. POMERANTZ, ESQ. (CHAIR)
PATRICK J. HARNETT
SUSAN HERMAN, ESQ.
BARRY SCHECK, ESQ.

### JUNE 2013

# STATEMENT OF THE FRIEDMAN ADVISORY PANEL

We write separately in order to comment on the task that confronted the District Attorney and her Review Team in this matter. We thought it appropriate to express our views on the manner in which they approached that task and the conclusions that they reached. Also, it is important that the limited role of the Advisory Panel be clearly understood.

The Friedman case is old. The facts date back more than twenty-five years. Because it was resolved by the guilty pleas of Arnold and Jesse Friedman in 1988, there was never a public trial, and there remains only an incomplete record of what witnesses told the police, the prosecutor, and the grand jury. The candor, memories, and reliability of the witnesses were not tested by cross-examination when the defendants had the opportunity to challenge the witnesses' testimony, and it is impossible to know the full contours of what the prosecution's case or the defense case might have revealed. Now, decades have passed. The Review Team confronted the predictable inability of investigators (all of whom have retired) to find relevant records or to reconstruct their investigation, and the natural deterioration of human memory. The effort was further complicated by the poor practices of the Nassau County Police Department, which did not document the investigation in a way that would allow the progress or sequence of the investigative steps to be understood after the fact.

Beyond these problems, though, the nature of the case presented some extraordinary challenges. The victims who reported sexual abuse to the police and testified about it in the grand jury were children when the events took place; now, they are adults in their 30s, and many of them have families and careers to protect. They are understandably reluctant to revisit a tumultuous and very emotional chapter of their lives. As detailed in the District Attorney's Report, many of the victims did not respond to repeated requests to speak with the Review Team. This does not mean that they were never abused or that Jesse Friedman was not involved. It simply means that they do not want to speak about their recollections after the passage of twenty-five years. Some victims did come forward now, and they reiterated the previous accusations. Others have made conflicting statements,

i

and some claim to have no present ability to recall anything. None of this surprises us. As the Report makes clear, the witnesses have differing motives and abilities to recall the events, and the circumstances under which they were asked to do so varied widely.

Ultimately, the Review Team made the judgment that it would not seek compulsory process to force victims to cooperate, or to provide testimony under oath. The Advisory Panel agreed with this judgment: forcing witnesses to come to terms with these events yet again would be a painful experience for people who thought that the whole matter was behind them, and there was little assurance that compelled testimony could clarify a disputed issue or yield a substantial amount of credible evidence. Crimes such as those alleged here—involving child witnesses and sexual misconduct—are difficult to investigate even when recollections are fresh; when the memories are decades old it is extremely difficult to develop a factual record that is fully reliable or entirely complete.

What is clear to us is that the Review Team did an excellent job under difficult circumstances. The District Attorney called on some of her most senior and trusted prosecutors to lead the review, and we saw first-hand that they approached their work with no preconceived notions about Jesse Friedman's guilt, and no agenda to preserve his conviction. Indeed, if the evidence had convinced them there was a reasonable probability Jesse Friedman was not guilty, or there was new evidence that met even the most lenient legal standard available for relief, we have no doubt the Review Team was prepared to recommend without reservation that Friedman's conviction be overturned. But that was not how the facts played out for the Review Team. After painstaking efforts and discussions that consumed many hundreds of hours, the Review Team reached the judgments that Jesse Friedman pleaded guilty because in fact he was guilty, and that the circumstances do not warrant relief. The bases for these judgments are set forth in the Review Team's comprehensive report of their reinvestigation. Having watched and reviewed the process as it took place, all of the members of the Advisory Panel are satisfied that the Report represents the considered, good-faith, and careful analysis of experienced prosecutors and investigators who wanted only to reach whatever result was warranted by the facts and the law.

ii

**A-0030**

As the Report makes clear, the primary focus of the Advisory Panel was on "process" issues: Was the Review Team proceeding in good faith? Was it pursuing all reasonable avenues to gather evidence? Was it considering the right questions? Was it considering all viable claims that might undermine the conviction? Was it making reasonable inferences from the evidence? That remained our focus during the entire process. It was not our function to conduct the reinvestigation, to review the entire factual record (some of which was unavailable to us as a matter of law), or to assess the credibility of witnesses. These responsibilities belonged to the District Attorney and the Review Team. However, the members of the Advisory Panel guided the process and provided their experience and expertise regarding victims of crime, police procedure, and conviction integrity review policies and practices. The Panel members also did their best to provide counsel to investigators in terms of the overall progress of the investigation. The Panel had no predetermined views, and the counsel it offered was not the product of a majority vote. While it was not the role of the Advisory Panel to make an ultimate judgment about Jesse Friedman's culpability or make factual findings, we do have an obligation to express a view as to whether we believe the conclusions expressed in the Review Team's Report are reasonable and supported by the evidence it cites. We think they are.

One final aspect of this case deserves special comment. The Second Circuit called for a reinvestigation of this case based, in large part, on information revealed in the movie *Capturing the Friedmans*. *Capturing the Friedmans* was a provocative and entertaining movie, but it was not an exhaustive account of the entire case against Jesse Friedman. The Review Team had to go behind the excerpts and sound bites that the producers used in the film and other "reels" and exhibits the producers have produced over the course of this re-investigation. After several failed attempts to get relevant information from the producers, the Review Team, with the support of the Advisory Panel, entered into an agreement with them regarding disclosure in an effort to get as much evidence as possible, and prevent premature public release of sensitive information about the witnesses and their families.

It is simply a fact, however, that before the re-investigation was complete a public relations campaign was launched attacking the original prosecution. In the context of this campaign the producers approached victims and witnesses to

encourage them to take back their incriminating testimony. These actions presented difficulties for the Review Team when assessing the credibility of witnesses, and in some cases, being able to speak with witnesses at all. Similarly, the protracted discussions and negotiations with the film producers about sharing evidence also delayed the re-investigation.

Of course, it is appropriate that Jesse Friedman's supporters, including the film's producers, gather facts, advocate on Jesse's behalf, and provoke public discussion and debate about the case. But artists and advocates use different methods, make different judgments, and apply different standards than those that public prosecutors must employ. It was the role of the District Attorney and her team to follow the facts, without fear or favor, and to make the best judgment they could under the circumstances presented to them, consistent with the law and the evidence. We believe that is what they did in this case.

Respectfully submitted:

Mark F. Pomerantz, Chairman

Dated: 6-15-13

Susan Herman

Dated: 6-15-13

Patrick J. Harnett

Dated: 6/15/13

Barry Scheck

Dated: 6-15-13

iv

# Table of Contents

Executive Summary ............................................................................................... i

I.  The Investigation And Prosecution Of Arnold And Jesse Friedman ...........................1

    A.  The Friedman Family .................................................................................1

    B.  Arnold Friedman's Computer Classes ..........................................................2

        1.  Classroom Organization...................................................................3

        2.  Sessions and Class Membership .......................................................4

    C.  Arnold Friedman's Abusive History..............................................................4

    D.  Federal Agents Arrest Arnold Friedman for Trading in Child Pornography...........6

    E.  The Nassau County Investigation's First Phase
        (Pre-State Search Warrant: November 3-25, 1987)........................................7

        1.  The NCPD's Investigative Team and Procedures ................................7

        2.  Interview Breakdown, and the Significance of "Negative" Reports ..........9

        3.  Initial Media Coverage ..................................................................11

        4.  Witness Interviews .......................................................................11

    F.  The Nassau County Investigation's Second Phase
        (November 25-December 17, 1987)...........................................................14

        1.  The Search Warrant and Arrests ....................................................14

        2.  Continuing Media Coverage ...........................................................16

        3.  Additional Witness Interviews ........................................................17

        4.  The First and Second Indictments....................................................20

        5.  Notes on the Indictments ..............................................................22

    G.  Arnold Friedman's Guilty Plea and Sentence................................................22

    H.  The Nassau County Investigation's Third Phase (December 17,
        1987, to December 20, 1988).................................................................24

        1.  Final Witness Interviews ...............................................................24

        2.  Summary of Statements Concerning "Sex Games"..............................27

        3.  Police Identify Three Potential Accomplices .....................................28

        4.  Media Coverage Subsequent to the Second Indictment .......................32

    I.  Third Indictment (Nov. 7, 1988)...............................................................33

    J.  Jesse Friedman's Guilty Plea ...................................................................35

        1.  Spring 1988: Jesse Hires Attorney Peter Panaro .......................................36

        2.  Autumn 1988: Panaro Retains Psychologists and Other Experts .............37

        3.  Winter 1988: Jesse Explores His Options.................................................40

        4.  Late Winter 1988-89: Plea and Sentencing .................................................42

|   | H. | 1988–2001: From Jesse Friedman's Guilty Plea to Release | 44 |
|   |   | 1. | Jesse Friedman Reaffirms His Guilt on National Television | 44 |
|   |   | 2. | Goldstein's Guilty Plea | 48 |
|   |   | 3. | Arnold Friedman Considers Trying to Vacate his Guilty Plea | 48 |
|   |   | 4. | Jesse's Prison Term | 49 |

**II.** **Commencement, Scope, And Methods Of Review** ........................................... **51**

|   | A. | *Capturing the Friedmans* | 51 |
|   | B. | Post-Conviction Litigation | 52 |
|   | C. | The District Attorney's Response | 54 |
|   |   | 1. | Record Privacy | 56 |
|   |   | 2. | Witness Outreach Protocols | 57 |
|   | D. | Standard of Review | 58 |
|   |   | 1. | Reasonable Probability | 59 |
|   |   | 2. | Vacatur in the Interests of Justice | 59 |
|   | E. | Evidentiary Limitations | 61 |

**III.** **Findings Of Fact: Jesse Friedman's Principal Claims Do Not Demonstrate a Reasonable Probability That He Was Wrongfully Convicted** ................................... **63**

|   | A. | Claims of Inappropriate Police Questioning Are Exaggerated | 64 |
|   |   | 1. | Detective Anthony Squeglia's Interview | 65 |
|   |   | 2. | Other Police Accounts Demonstrate Appropriate Questioning | 67 |
|   |   | 3. | Some Witnesses Were Interviewed on Multiple Occasions; This Was Not Universal Practice or Necessarily Improper | 68 |
|   |   | 4. | Early Phase I and II Interviews Were Generally Characterized by Open, Non-Leading Questioning | 70 |
|   |   | 5. | The "Meyers Tape" Depicts an Interview Conducted to "Close Out" the Case, Not to Charge Jesse Friedman | 72 |
|   |   | 6. | The Evidence Does Not Support the Allegation that Police Used the Close-Out Statement to Generate Charges Against Jesse Friedman | 73 |
|   |   | 7. | Not All Suspects Were Prosecuted | 75 |
|   |   | 8. | Modern Best Practices | 75 |
|   | B. | The Review Team Found No Credible Evidence that Hypnosis Was Used on Any Complainant | 77 |
|   |   | 1. | Doctors Denied That Hypnosis Elicited Charges | 78 |
|   |   | 2. | The Only Witness Account to Describe Hypnosis Is Not Reliable | 78 |
|   |   | 3. | Nothing Else Suggests That Hypnosis Was Ever Used | 79 |

|   |   | 4. | Evidence Demonstrates That Group Therapy Did Not Begin Until After the Third Indictment | 80 |
|   | C. |   | The Record Does Not Support a Finding of Improper Judicial Coercion | 82 |
|   |   | 1. | No Contemporaneous Source Supports a Finding that the Plea Was Coerced | 82 |
|   |   | 2. | *Capturing the Friedmans* Misrepresents Judge Boklan | 83 |
|   |   | 3. | The Court's Conduct Did Not Amount to Coercion | 86 |
|   |   | 4. | Contrary to Jesse Friedman's Assertions, He Fully Participated in his Defense, and Was Not Forced into a Plea by his Family | 87 |
|   |   | 5. | Panaro Had Ample Material With Which to Prepare a Defense | 89 |
|   | D. |   | This Case is Not Similar to "Moral Panic" Cases | 91 |
| **IV.** |   |   | **Findings of Fact: Newly Discovered Evidence Further Supports Jesse Friedman's Conviction. Unanswerable Questions Raised by His Advocates Provide No Basis For Exoneration** | **94** |
|   | A. |   | Analysis of Witness Accounts, Past and Present | 94 |
|   |   | 1. | The Rapid Pace and Extensive Reach of the Initial Police Investigation Demonstrates Reliability | 95 |
|   |   | 2. | Witness Statements Were Detailed | 96 |
|   |   | 3. | In the Wake of *Capturing the Friedmans* and Years Before Any Judicial or Media Attention, Victims Retained Counsel and Wrote Letters to Protect Their Rights, and to Reassert Jesse Friedman's Guilt | 97 |
|   |   | 4. | In Recent Interviews, Victims Confirmed Abuse at the Hands of Arnold and Jesse Friedman | 102 |
|   |   | 5. | Analysis of Alleged "Recantation" Testimony | 107 |
|   | B. |   | Corroborating Evidence Supports The Conviction | 116 |
|   |   | 1. | Arnold Friedman Confessed His Guilt, and Jesse's, to His Brother Howard Friedman | 116 |
|   |   | 2. | Parents Described Corroborative Details to the Review Team | 118 |
|   |   | 3. | Circumstantial Evidence Further Corroborates Witness Accounts | 121 |
|   | C. |   | The Review Team Was Not Able to Corroborate All Accounts | 123 |
|   |   | 1. | Class Rosters and the "Friday Class" | 123 |
|   |   | 2. | Witness 25, a Non-Complainant, Denied, Then Admitted, and Now Denies Again Experiencing or Seeing Any Abuse | 126 |
|   |   | 3. | The Lack of Physical Evidence | 130 |
|   | D. |   | Reservations Concerning the Third Indictment Do Not Taint the Overall Case | 132 |

1.  New York Substantive and Procedural Law Partially Explain Perceived "Overcharging" in the Third Indictment ...................................132

2.  "Game" Allegations Are Consistent with Known "Grooming" Techniques Used by Pedophiles .........................................................132

3.  Varied Recollections Do Not Necessarily Establish that "Sex Game" Allegations Were Untrue ............................................................134

4.  The Timing and Vagueness of "Sex Game" Charges Is Partially Explainable by Developmental Factors ...................................................134

E.  Ross Goldstein's Recent Recantation Is Not Reliable ........................................135

1.  The Codefendant's Absence from *Capturing the Friedmans* .................136

2.  Early Attempts to Contact Ross Goldstein Were Unsuccessful .............137

3.  Goldstein Agrees to Speak to the Review Team .....................................137

4.  Related and Subsequent Interviews .........................................................139

5.  Analysis of Ross Goldstein's Recantation ...............................................141

F.  Jesse Friedman's Various Accounts of Events Are Self-Serving and Not Credible ................................................................................................143

1.  Jesse's Account of the Case ....................................................................144

2.  Jesse's Evolving Narratives Render His Statements Unreliable..............146

V.  Conclusion ..........................................................................................................152

# Executive Summary

**Introduction**

In 1987 and 1988, Arnold Friedman ("Arnold") and his son Jesse Friedman ("Jesse") were jointly charged with sodomizing, sexually abusing, and endangering the welfare of seventeen boys, the students of an afterschool computer class taught by Arnold at their home in Great Neck, New York. Arnold ultimately pled guilty to these crimes in March 1988, and was sentenced to serve ten-to-thirty years in prison. In December 1988, Jesse too pled guilty, after admitting under oath to a judge in open court that he had, in fact, sodomized and sexually abused his father's students. Jesse received a sentence of six-to-eighteen years in prison. Shortly after his sentence was imposed, Jesse appeared on the nationally-televised *Geraldo Rivera Show* to reiterate his guilt, explaining that he, too, was a victim, and that his father had molested him when he was a child. Arnold Friedman died in prison in 1995. Jesse was paroled from prison in 2001. Upon his release, Jesse was adjudicated a level three sex offender.

After viewing the 2003 film *Capturing the Friedmans*, which sought to question the integrity of the case against Jesse and his father, Jesse filed, for the first time, a motion in state court seeking to vacate his conviction. That motion was denied. After exhausting his appellate options in state court, Jesse filed a petition for a writ of habeas corpus in federal court. The United States Federal District Court, Eastern District of New York dismissed his petition as time-barred, but allowed him to appeal to the Second Circuit Court of Appeals. In 2010, the Second Circuit affirmed the order of the District Court, but recommended that the Nassau County District Attorney ("NCDA") undertake a full investigation to determine whether Jesse was wrongfully convicted.

In the course of that recommendation, the court expressed concern about four specific points of inquiry raised in *Capturing the Friedmans*: (1) that flawed interviewing techniques by the police might have been used, leading to false allegations; (2) that children may have been hypnotized to remember abuse, possibly creating false memories; (3) that moral panic led children to make outrageous allegations of bizarre and ritualistic sexual abuse, and; (4) that pressure from police, prosecutors, and the County Court judge who presided over the case may have rendered Jesse's plea involuntary.

After studying the Second Circuit's decision and recommendation, Nassau County District Attorney Kathleen Rice announced that she would reopen the case and thoroughly investigate the possibility that Jesse Friedman stood wrongfully convicted of the crimes to which he pled guilty. Rice assigned senior prosecutors (the "Review Team"), none of whom were with the District Attorney's Office at the time of Jesse's guilty plea, to lead the examination of the conviction. Those prosecutors, with the assistance of nationally-recognized criminal justice experts (the "Advisory Panel"), conducted an almost three-year investigation into the facts leading up to, and resulting in, Jesse Friedman's conviction. The re-investigation focused on the question of whether there existed a "reasonable probability" that Jesse was wrongfully convicted.

i

After this exhaustive investigation, the District Attorney concludes that Jesse Friedman was not wrongfully convicted. The four principal concerns raised by the Second Circuit are not substantiated by the evidence. Further arguments for exoneration offered by advocates for Jesse lack the merit or weight required to overturn this conviction. In fact, by any impartial analysis, the re-investigation process prompted by Jesse Friedman, his advocates, and the Second Circuit, has only increased confidence in the integrity of Jesse Friedman's guilty plea and adjudication as a sex offender.

### Arnold Friedman's Pedophilia Leads To An Investigation

Jesse Friedman's conviction has its roots in a federal investigation of Jesse's father Arnold, a retired schoolteacher. That investigation began in 1984 when a United States Postal Inspector discovered that Arnold had solicited and traded child pornography through the U.S. mail. The investigation ended three years later when agents arrested him on November 3, 1987, and executed a search warrant to recover child pornography from the Friedman home. In the course of that search, federal agents seized more than thirty items of child pornography from Arnold's office, and also discovered a list of names of local children. These children were the members of an afterschool computer class, taught by Arnold from 1982 until 1987. This computer class met in Arnold's home, in the room adjoining his office. Investigators soon learned that Jesse assisted in these classes from 1984 until he left for college in the fall of 1987.

The discovery that a pedophile instructed young children in small classes, in the privacy of his home, led to a separate investigation by the Nassau County Police Department ("NCPD"). The investigative team was led by Detective Sergeant Frances Galasso of the Sex Crimes Squad, who was assisted by an additional nine detectives and two police officers. Whenever possible, the team worked in pairs.

### The Investigation's First Phase: November 12-25, 1987

The state investigation of the Friedmans can be broken into three distinct phases. The first phase covered the time between the investigation's start on November 12, 1987, and the arrest of Arnold and Jesse on state charges on November 25, 1987. During that initial twelve-day period, at least thirty-five children were interviewed. Twelve boys told the detectives that Arnold Friedman had either engaged in illegal sexual conduct with them or had shown them pornography or sexually explicit videogames. Two of those boys identified Jesse as participating in criminal sexual activity, one of whom stated that Jesse photographed Arnold engaging in acts of sodomy. Sworn statements taken by detectives during this period were extremely detailed, and ranged in length from two to ten handwritten pages. These statements, including those against Jesse, were taken in the immediate days following the start of the state investigation into Arnold Friedman.

### The Investigation's Second Phase: November 25, 1987, to December 17, 1987

During the second phase, from Arnold and Jesse's arrest until December 17, 1987, police obtained sworn statements from eleven victims, who said that Jesse engaged in criminal activity. By the end of the second period, only five weeks after the beginning

of their investigation, NCPD had conducted all interviews necessary to sustain the first and second indictments against Jesse, which were filed on December 7, 1987, and February 1, 1988, respectively. Within the investigation's first five weeks, thirteen boys gave detectives detailed statements outlining Jesse's criminal behavior.

**The Investigation's Third Phase: December 18, 1987, to January 25, 1989**

The third phase of the investigation ran from December 18, 1987, until the case's conclusion more than one year later, when Jesse pled guilty to seventeen counts of sodomy and eight additional counts related to the abuse or exploitation of children, and was thereafter sentenced on January 25, 1989, to serve six-to-eighteen years in prison. This period also encompasses Arnold's March 25, 1988, guilty plea. Following that event, Arnold agreed to sit for a "close-out" interview with NCPD detectives in which he admitted to abusing forty-one children, specifically denied abusing twelve others, and generally denied abusing his former students at Woodmere Academy and Bayside High School. He spoke about the type of children he found attractive, and his method of grooming victims. He explained that younger children could be easily distracted with videogames, giving him free reign to do whatever he pleased with them. In exchange for this detailed post-conviction interview, Arnold received immunity from further prosecution.

Detectives resumed taking statements in April 1988. The majority of these interviews consisted of follow-up meetings with victims who had previously given statements against either Arnold or Jesse. In these accounts, some children substantially expanded Jesse's role in the abuse, in addition to including, for the first time, accounts of sexually explicit group activities, such as sexualized versions of "Leap Frog" and "Simon Says," which they said took place in open view in the classroom. Some victims also named three others who were involved in abusing them. Two of these three were never prosecuted, but a third, Ross Goldstein, a friend and schoolmate of Jesse's, was arrested after being identified by six of the victims. Goldstein and Jesse were ultimately indicted on November 7, 1988. Charges in this third indictment included numerous counts of sodomy and sexual abuse. In four transcribed interviews with his attorney and detectives, Goldstein admitted his own participation in the abuse of Arnold's students, and he agreed to cooperate against Jesse in exchange for a reduced sentence.

By the time the investigation concluded approximately one year after it began, police documented visits to 104 households, and identified sixty-nine children who attended the computer classes. At least twenty-five of those sixty-nine children reported criminal activity against one or both Friedmans. Fourteen students had testified against Jesse in the grand jury. Media and law enforcement claims that there may have been as many as 500 victims were substantially overstated.

**Jesse's Prison Term**

Jesse served thirteen years in prison and was released in 2001. Between 2000 and 2001, he was disciplined for possessing in his cell a torn photograph from Harper's magazine of two pre-pubescent girls, one of whom is naked. He also was punished for

iii

writing and distributing "fictional" stories that described violent and disturbing sexual acts, including incest, bestiality, and child rape.

**The Second Circuit's Concern That Jesse Friedman Was Wrongfully Convicted Was Not Substantiated**

### 1. There Is No Evidence That Improper Police Questioning Materially Tainted the Investigation

The rapid pace and extensive reach of the initial police investigation undermine claims that police unduly influenced the victims. The very first child interviewed by the police alleged that Arnold rubbed him on his buttocks and read a book to him and other computer students containing "pictures of naked men." Over the next two weeks, eleven more boys told the detectives, in essence, that Arnold had engaged in either illegal sexual conduct with them or showed them pornography or sexually explicit videogames. Two of these boys also implicated Jesse in criminal sexual behavior. One boy recounted that Jesse touched his penis over his clothes, and that Arnold and Jesse placed their penises near him and took photographs. Another boy stated that Arnold and Jesse would walk around the class with their penises exposed and ask children to touch them. This same boy told detectives that he touched Jesse's penis. Five weeks into the investigation, a total of thirteen boys described criminal activity by Jesse, which led to, among others, charges of six counts of sodomy and fourteen counts related to sexual abuse.

Given this compressed timeline, it is unlikely that detectives would have been able to repeatedly visit any one household for hours at a time to induce a child to make false accusations. There were twelve law enforcement officials who comprised the investigative team. During the first two weeks, at least thirty-five children were interviewed. No single detective dominated the investigation, and different teams obtained incriminating statements from different victims. The Review Team spoke with many individuals, including complainants, non-complainants, and parent-witnesses, about the style of questioning police used. Those people, who were either interviewed or witnessed interviews conducted during the initial phase of the NCPD investigation, told the Review Team that police were not aggressive, did not engage in leading questioning, and, instead, let witnesses tell their stories. An exception was a complainant who was interviewed early in the original investigation. He wrote a letter in May 2013, claiming that his statements were the product of repeated questioning. This complainant refused to speak to the Review Team.

The Review Team found that some witnesses interviewed during the *third* phase of the investigation were asked pointed questions, and that police pressured them to disclose abuse. It is possible that detectives became more insistent after Arnold pled guilty, after many of the original victims named classmates who also were abused, and after Ross Goldstein cooperated against Jesse. In fact, the parent of Witness 28 recorded an example of one such interview. Her son, however, denied being abused. The Review Team is not aware of any victim interviewed during this time period who now alleges that he made a false statement; thus, the Review Team cannot conclude that such questioning produced any untruthful allegations.

iv

**A-0040**

2.      **The Review Team Found No Credible Evidence that Hypnosis Was Used on Any Complainant**

Allegations that hypnosis, group therapy, or individual therapy affected the Friedman case are unsupported by the record. Only one complainant, Witness 2, claims to have been subjected to hypnosis during this investigation. But, his treating psychologist swore in an affidavit that she had never hypnotized him. In addition, his allegation is fraught with inconsistencies. In an interview with the filmmaker of *Capturing the Friedmans*, given almost fifteen years after Jesse Friedman pled guilty, Witness 2 gave contradictory accounts, saying first that he disclosed abuse "the very first night" he spoke to the police, while later saying in another portion of the same interview, that the first time he recalled molestation was under hypnosis. As part of this investigation, the Review Team interviewed Witness 2. During that interview, Witness 2 suggested that he was not sure if hypnosis pre- or post-dated his interviews with police, and he seemed unclear about what hypnosis actually entailed. Moreover, the Review Team found no credible evidence that hypnosis was used on any victim.

Several children and a therapist remember engaging in group therapy, a treatment in which groups of victims are brought together by a therapist to discuss the abuse they suffered. Although that type of treatment could potentially distort a child's memories, it did not in this case. The evidence revealed that group therapy did not begin until after the third indictment was filed and had no impact on any child's statements to police or the grand jury.

Some witnesses were enrolled in private therapy with their own doctors. Given the speed with which the statements were made in the first two phases of the investigation, there is little possibility that therapy could have been so repeated, prolonged, or suggestive as to influence the children's statements to the police. Some victims continued therapy up through the third indictment; but the Review Team found no evidence that this therapy distorted the victims' memories in advance of their grand jury appearances. Any claim that it did is speculative.

3.      **The Friedman Case Is Distinguishable From "Moral Panic" Cases of the 1980s**

Advocates for Jesse Friedman have attempted to draw a parallel between this case and the unreliable "moral panic" cases of the 1980s, such as the 1984-90 prosecution of Virginia McMartin and her family for abuses that allegedly took place in their California preschool. But the cases are in no way similar. In the McMartin case, for example, more than 200 preschool children described suffering sexual abuse at the hands of their teachers, but only after enduring months of highly suggestive questioning by social workers under contract with state prosecutors. The initial complaint was made by a paranoid schizophrenic who claimed that her child's abusers "flew in the air." From that point, the case ballooned to include implausible allegations of what proved to be non-existent cavernous tunnels below the school, in which teachers would molest children as part of satanic rituals.

v

**A-0041**

In the Friedman case, the victims were more than twice as old as the McMartin preschool accusers at the time they disclosed that they were abused, averaging almost eleven years in age. Many of the children disclosed abuse quickly. The case began with an admitted pedophile, Arnold Friedman, who indisputably collected and traded child pornography, and who admitted in his own words to a history of child sexual molestation stretching from his teens into his late adulthood.

Nor does Jesse fit the profile of the kindly teacher wrongfully accused by the community. Experts retained by his own trial counsel described Jesse, at the time, as a psychopath, a narcissist, and a drug abuser who was unable to tell right from wrong. And Jesse's and Arnold's decisions to plead guilty stand in stark contrast to defendants who, in cases like the McMartin case, ultimately elected trial despite the staggering sentences they faced if found guilty.

### 4.    Jesse Friedman's Plea Was Not a Product of Undue Coercion

Jesse Friedman played a central role in his own defense, received competent and thorough legal advice, and weighed his options intelligently before entering his guilty plea. Primary sources, including letters, audio, and videotapes, show Jesse as a maker of his own destiny. Jesse pled guilty because his own calculations showed it to be the optimal strategy in light of the choices available to him, not because someone else forced him to do so.

In family meetings, Jesse led lively debates about the family's litigation strategy. In one, he urged his family to "try the case in the media." In other conversations, Jesse discussed a variety of strategies, such as subjecting "every" student to cross-examination and exploiting all inconsistencies.

One overriding topic of conversation was the benefit to Jesse of his father's guilty plea. Jesse believed that he could escape a guilty verdict only if he avoided being saddled with his father's acknowledged history with child pornography. He considered in detail which scenario would benefit him the most: having his father plead guilty or sitting next to him, with Arnold Friedman looking "like a guilty old man" proclaiming his innocence. After Arnold pled guilty, Jesse fired his first attorney, saying, "my lawyer believes I am guilty and I am not," and went on to interview at least twenty potential attorneys before hiring Peter Panaro.

In a forty-page transcript prepared on the eve of Jesse's guilty plea, Panaro probed with Jesse the reasons behind his decision to plead guilty, and summarized all the efforts he had made to mount a defense. Significantly absent from that document is Jesse's current claim that judicial or prosecutorial coercion, or even pressure from his family, forced his guilty plea. Panaro told Jesse that Judge Boklan "indicated that for each one of the charges that you are convicted of, she would *consider* some consecutive time." A fair reading of the facts indicates that Judge Boklan likely warned Jesse that a conviction after trial could, depending on the strength of the evidence, result in a harsh sentence involving consecutive periods of incarceration. However, judges are allowed to warn defendants of the maximum sentence they could face if the evidence supports all the charges. Indeed, in

cases of this magnitude, with the number of child victims alleging they were repeatedly sodomized by Jesse, a sentence that included consecutive prison terms would not have been uncommon, let alone excessive.

Panaro's transcript chronicled the wide variety of trial strategies he considered and ultimately rejected—complete innocence, coercion, mass hysteria, insanity and multiple personalities. Panaro arranged for Jesse to take a lie detector test, which demonstrated that he was not truthful. Panaro hired Dr. David Pogge, a prominent psychiatrist with a specialty in the treatment of adolescent sex offenders, to evaluate Jesse. Dr. Pogge's conclusions led him to classify Jesse as a "psychopathic deviant" and "pansexual" who was "self-centered, manipulative, egocentric" and who abused drugs. Dr. Pogge concluded that Jesse's personality was consistent with someone who was capable of committing the crimes with which he was charged.

Non-complainants proved almost entirely unwilling to speak with Panaro or Jesse's family. According to Arnold's lawyer, the defense conducted its own outreach to potential witnesses, hoping "that one or more of the people would say, 'The [prosecution's case] is just not true.' But that just didn't happen."

At the time of his plea, Jesse did in fact possess some information of exculpatory value. He knew the complainants' names, from both his own research and the prosecution's disclosure, and used this knowledge to correctly conclude which students in any given class were complainants and which were not. He was also aware that some complainants had re-enrolled in his father's classes after allegedly having been abused. He was well aware that none of the victims told anyone of the abuse until the police began to interview them. He also knew that one student, Witness 28, had been named a victim by other children, but had denied the abuse, and was willing to testify on his behalf. Further, he knew that some detectives, late in the investigation, engaged in questionable interviewing tactics. He knew that some witnesses had testified before two grand juries, describing the most severe abuse, or mentioning him for the first time, only in the third indictment. He also knew that Witness 26, Arnold's teenage assistant in the fall of 1987 class, when Jesse was away at college, was present when abuse was alleged, and could have been tapped as a defense witness. Despite all of this information, Jesse nonetheless chose to plead guilty.

After his plea and while incarcerated, Jesse appeared on *The Geraldo Rivera Show*, against his attorney's advice, and re-affirmed his guilt and discussed the abuse he and his father perpetrated on the children. Jesse recounted how his father "had made vicious threats to the kids about… burning down their homes… or hunt[ing] down their parents… if they told what was going on," threats that Jesse reinforced. He disclosed that Arnold had begun to molest him at a young age, but that he could not stop it because he was "scared" that if he tried to, he would "lose [his] father, who was the most important thing to [him] for most of his life." "For most of my life," Jesse said, Arnold "was the only person who ever loved me." Asked "[w]hy didn't the kids ever tell?" Jesse replied simply, "the same reason I never told." Jesse claimed, at his sentencing, that he was as much a victim as the children.

vii

**A-0043**

**Additional Evidence Corroborates Jesse Friedman's Guilt**

Moving beyond the Second Circuit's concerns, the re-investigation also revealed further important information. Three additional victims alleged in sworn statements to the police in 1987 and 1988 that Jesse sodomized and sexually abused them. While those three never testified before any grand jury, it raises the total number of Jesse's victims to sixteen.

The Review Team also analyzed notes of police interviews with children who never testified before the grand jury. Those notes revealed that some children said they felt uncomfortable in the class and that Arnold would hug, touch or otherwise let his hands linger over them. One child said that on one occasion Arnold taught the class with his shirt off. Another child said that Jesse took photographs of the class as the students worked. Other students said that they saw magazines with pictures of naked men. Several students were told that they were allowed to borrow pornographic videogames—such as Strip Poker—but were cautioned not to tell their parents about it. Several students described pornographic videogames that were given to them by Arnold Friedman. Others mentioned that Jesse would hit students.

One former student told the Review Team that, when helping a child with computer programming, Arnold would instruct the child to get up from his seat. Arnold would then sit down and tell the student to sit on his lap. The student told his mother, who promptly removed him from the class. Arnold later called to offer her a reduced rate if she would re-enroll her son. She declined. The same witness shared that one day in class, while using the bathroom, he "heard the door open behind [him] and saw a flash of light in the bathroom." The witness saw Jesse standing outside the door and asked him if he had photographed him using the bathroom. Jesse denied it.

The Review Team also spoke to, or read accounts of, many victims' parents. One father explained that he watched police interview his son in December 1987, and that as the police posed open-ended questions, the boy "erupted," and described in explicit detail the sexual abuse he had suffered at the hands of Jesse Friedman. Many other parents affirmed that, in hindsight, their children did, in fact, exhibit signs of abuse. One student started defecating in his clothing. Another wet his bed. A third child lost his hair. There were reports of sleeplessness, nightmares, stuttering, a decline in school performance, separation anxiety and an overwhelming sense of fear. One parent found blood in her son's underwear. One mother told the Review Team that she should have become suspicious when she attempted to enter the Friedman house to pick up her son and his friend but found the door locked. She was motioned by Jesse from the window to wait inside her car. When she questioned her son about what he was learning, he and his friend looked at each other sheepishly and giggled. None of these parents stated that they have any reason today to disbelieve that their sons were victims of the Friedmans.

Additionally, Arnold Friedman's brother Howard Friedman spoke with the Review Team. Howard's words were simple: "Jesse is guilty and you're going to ask me how I know. Because Arnold told me." Howard revealed that, in 1987, Arnold had tearfully confessed that both he and Jesse had "misbehaved" with children in the class.

**A-0044**

Arnold also confessed to him that he sexually molested Jesse, a point later corroborated by Jesse himself on *The Geraldo Rivera* show. Arnold swore Howard to secrecy at the time of the confession, and made him promise to keep this confession secret until he died and Jesse was released from prison. After speaking with the Review Team, Howard felt that "a huge rock has been lifted from my chest." Howard told the Review Team that he lied to the parole board and (initially) to the makers of *Capturing the Friedmans* to paint both his brother and his nephew in a better light.

**Many Of The Victims Stand By Their Allegations Of Abuse**

The release of *Capturing the Friedmans* triggered public debate about whether Jesse Friedman was, in fact, innocent all along. For many complainants this was not a welcome conversation. Two former students—by then young men—sought counseling after the film's release led them to feel traumatized anew. Others sought to protect their legal rights. In 2004, four students who had testified against Jesse retained attorney Sal Marinello to assist them in protecting their privacy should the case again threaten to draw them back into the public spotlight. Marinello would not identify his clients to the Review Team, but verified that at the time of his representation, each of his clients had described to him events consistent with their prior statements to police and prosecutors. This is consistent with Marinello's few public statements on the case: as he has said, his clients "were sexually abused during periods of time and they also indicated the son was involved." "They know what the truth is in this case. And when they see something as biased as this [movie] it has to affect them."

Further, three of Jesse's thirteen victims publicly reaffirmed their testimony in anonymous letters. In 2004, two victims wrote a letter to the Motion Picture Academy upon learning that *Capturing the Friedmans* was nominated for an Academy Award:

> *We were abused, tortured and humiliated by Arnold and Jesse Friedman in computer classes in Arnold's basement. Many of us have physical scars from what was done to us: all of us have psychological scars.*

During this time, another victim, a law student, wrote the following to Judge Boklan:

> *It was under the guise of an educator, that Arnold and Jessie Friedman used computer technology to show young children pornography, to take photographs of young children reacting to that pornography, and to take photographs of sexual acts being performed by young children. I was seven years old when I was in the custody of Arnold and Jessie Friedman. At that time I did not understand the dynamics of human sexuality. I only understood fear. I became afraid of everything beyond my control. My childhood curiosity was replaced with an inherent distrust for adults, authority figures, and every unknown.*

ix

**A-0045**

In addition to these historical affirmations, three other victims, Witnesses 11, 13, and 2, came forward during this re-investigation to re-affirm the abuse they suffered at the hands of Arnold and Jesse Friedman. In addition, another former student, Witness 18, who never testified in the grand jury and who had previously disclosed abuse only against Arnold, shared his story of the abuse he suffered at Jesse's hands as well. Each former student described how the acts perpetrated upon them by the Friedmans had long lasting effects.

Witness 11, now a successful professional, not featured in the movie *Capturing the Friedmans*, told the Review Team that he remembers hiding his clothes after class because "there was stuff on [them]." He remembered being sodomized and he also recalled playing a penis measuring game and a sexualized version of "Leap Frog." According to him, sexual abuse often happened to the side of the class, but all students were aware of what was happening. He explained how until recently he was afraid to leave his own children in the care of a non-family member. Another former student, Witness 18, expressed to the Review Team that he felt "re-victimized" and almost collapsed when he heard that the case would be re-investigated.

Witness 13, also not featured in *Capturing the Friedmans*, suffers from a psychiatric condition, which his treating psychiatrist ascribes to the abuse he suffered at the Friedmans' hands. Witness 13 emotionally and angrily recounted to the Review Team how Jesse and Arnold sodomized and sexually abused him during the computer classes. His treating psychiatrist, a family friend who began treating him eight years ago, knew him while he was attending the Friedman class, and witnessed firsthand his change from a normal but quiet five-year-old into a "drifty," troubled seven-to-nine-year old boy who suffered from bouts of spontaneous diarrhea in the years during the Friedman class. A third victim, Witness 2, who appeared in *Capturing the Friedmans*, also spoke to the Review Team and confirmed the abuse he suffered.

**Proffered Recantation Evidence Is Either Mischaracterized, Misrepresented, Or Unreliable**

Jesse Friedman's advocates, including the filmmaking team responsible for *Capturing the Friedmans*, argue that four of Jesse Friedman's accusers have recanted to them on film. That claim is simply not accurate. While Jesse's advocates have refused to provide the Review Team with all of the information needed to fully assess these claims, the Review Team's investigation has shown that three of the four alleged recantations are not recantations at all. Instead, they are excerpts of larger interviews that, when read in full, demonstrate that the former students have not completely disavowed their original allegations.

The fourth alleged recanter, Witness 14, was contacted in 2012 over the telephone by the filmmaker and questioned about his involvement in the Friedman case. He specifically denied that he was a victim. In fact, Witness 14 went on to say, "As God is my witness, and on my two children's lives, I was never raped or sodomized." This stands in marked contrast to his November 1987 sworn statement to the police where he recounted that Arnold sodomized him and that he touched Jesse's penis. But, Witness 14

contacted the Review Team after speaking to the filmmaker. Significantly, and in contrast to how Witness 14's statements have been publicly portrayed, this witness stressed that he did not remember anything from the Friedman classes, and went on to say that others were abused. In other recent statements to both the filmmakers and the Review Team, he has said that "stuff really did happen" and that pornography may have been present in the classroom. When the Review Team reminded him of his prior statements, he said, "my heart is pounding." He went on to tell the Review Team that he had no specific memory of being abused, but that he was not saying it did not happen. He also balked at participating in an attempt to exonerate Jesse. He was extremely careful to guard his privacy especially in light of the fact that he has never told his wife or children of his involvement in the case.

Jesse Friedman's attorney, Ronald Kuby, also informed the Review Team and Advisory Panel that another former victim of the Friedmans had recanted. To support his claim, Kuby forwarded a letter from Witness 10. That witness was prompted to write to the Review Team after receiving a package from Kuby marked "legal mail" at his place of business. The package was opened by his mailroom, and shown to his superiors, who then researched the Friedman case and confronted him about it.

He then contacted Kuby to discuss his involvement in the Friedman case and insist on his privacy. At Kuby's request, Witness 10 wrote a letter to the Review Team, which he asked Kuby to forward. In his letter, he stated that he was untruthful in his original statements to the police, and that he was not sexually molested by the Friedmans. He stated that he believes that he gave those accounts because of repeated police questioning.

Witness 10 refused to be interviewed by the Review Team, even to verify that he had written the letter. The circumstances surrounding Witness 10's "recantation" are suspect. The Review Team mailed two certified letters, one in 2011 and again in 2012, to Witness 10's home, informing him of the re-investigation and requesting that he contact the Review Team to discuss the case. He never responded. Only when he was placed in an embarrassing situation at work did he offer his recantation. Against this backdrop and given his refusal to speak with anyone involved in this case outside of Jesse's attorney, the Review Team cannot credit the statements recently attributed to this individual.

Nor is the Review Team persuaded by the recent statement of one other witness, Witness 25, who never actually testified in the original case. During the original investigation, Witness 25 denied to the police that he was abused. Only after Jesse Friedman pled guilty and was sentenced did he reveal to both his mother and his therapist, separately, that he was in fact abused. Witness 25 originally spoke to the Review Team in 2011 and stated that he was never abused and never witnessed abuse, despite being a member of a class where abuse was alleged to have taken place in plain sight. He described facing immense pressure from his mother and his therapist to admit that he had been victimized by the Friedmans. He believed that admitting that he had been abused was the only way to bring an end to therapy. At the time, the Review Team asked permission to speak to his mother about his experience in therapy, and in response, Witness 25 admitted that he had never told his mother that he had lied. Two years later,

xi

**A-0047**

Witness 25 confessed to his mother that he had never been abused. Because Witness 25 was not a complainant in this case, his recantation does not directly affect Jesse's guilty plea. Balanced against the other evidence the Review Team uncovered, Witness 25's statements are insufficient to disturb the conviction.

**Other Arguments Do Not Indicate A Wrongful Conviction**

Jesse and his advocates argue that many students in classes where abuse was alleged to have occurred in the open said that they never saw anything of the sort. One significant problem with that argument is that it presupposes that these students were in the same session, in the same class, on the same day that abuse was alleged. The fundamental difficulty in recreating class rosters is that witnesses' memories of their classmates, when pieced together, do not yield a consistent picture. Arnold Friedman did not keep records of his class membership or of attendance, both of which are necessary for a complete record. Moreover, it is clear that make-up sessions were given due to absences, and, as such, some students may not have been present when abuse is alleged to have occurred.

Some complaining witnesses referenced their classmates as victims of sexual abuse. Some of those children either denied abuse or were silent. This raises some concern, but the Review Team cannot assume that a child's failure to disclose abuse necessarily means that he was not abused. There are a host of reasons why a child may choose not to disclose abuse or even deny abuse—fear, guilt, and shame may certainly be significant factors. For example, the son of a close family friend of the Friedmans was molested by Arnold many years before these events occurred. He did not disclose Arnold's molestation of him as a child until fifteen years had passed, and only then, after Arnold was arrested in this case. Arnold thereafter admitted to his own family that he had in fact molested this boy. These matters are both delicate and complex and no conclusion can or should be drawn by a child's denial or silence.

**Ross Goldstein's and Jesse Friedman's Accounts**

The exculpatory accounts put forward by Jesse Friedman himself, and his codefendant Ross Goldstein, are not reliable. As to Ross Goldstein, though he now claims he never committed the crimes of which he was accused, this recantation comes twenty-four years after his own guilty plea, and two years after he repeatedly declined to be interviewed by the Review Team. Goldstein's 2013 claim that he, too, had been pressured into falsely implicating himself and Jesse Friedman is simply not credible. Further, the Review Team interviewed a close friend of his, who confirmed that in 1988 Goldstein had privately confessed that during a night of heavy drug use, Jesse had "seduced" him and performed oral sex on him, and that Jesse claimed to have a video recording of the act. Goldstein told his friend that Jesse blackmailed him into photographing the Friedman class, threatening to show the video to Goldstein's girlfriend, friends, and parents.

Goldstein's belated recantation also conflicts with the description of his involvement in the case that he gave to the producers of *Capturing the Friedmans*. In a conversation with film producer Marc Smerling, subsequently transcribed and obtained

by the Review Team, Goldstein responded to the producer's claim that he had "found quite a bit of exonerating stuff":

> *That is total… that is something that I would definitely care to share as something completely untrue…that's why I honestly feel partly that me getting involved in the film is not good… will not help [Jesse].*

At the time, Goldstein disagreed with Smerling's perspective, and stressed instead that, if he were to cooperate with the film, his story would be a "grey area" that was not "either gonna exonerate him [Jesse] all the way or make the police look bad all the way." In any event, Goldstein's contribution to this case was limited to the third indictment.

Jesse Friedman's account of his and his father's innocence is similarly suspect. That Arnold Friedman was a pedophile who showed pictures of naked men to children while holding them, petting them, or fondling them, and rewarding them with pornographic computer discs, is beyond doubt. That Jesse Friedman was a troubled, angry young man, unable to tell right from wrong, has also been documented. It is against this backdrop that this case evolved. Jesse Friedman admitted once to a judge, under oath, and then again to a national television audience, that his father abused him, victimized him, and turned him into an abuser of young boys. Today, Jesse disavows those statements, and maintains his innocence, and that of his father. Even Jesse Friedman's picture of himself is contradictory. At once he claims the naiveté of a young man struggling in a legal system he did not understand. Simultaneously, he describes how he cleverly and purposefully disseminated false information to garner sympathy. In the end, these and other contradictory statements leave no version entirely worthy of belief.

**Conclusion**

The Review Team acknowledges the difficulty of relying on a witness's ability to accurately recall events that transpired twenty-five years earlier. Memory is fluid and can be affected by the telling and re-telling of the event. It is subjective. It is often shaped by a person's life experiences and may be distorted. Additionally, a person's decision to participate in this review, or to absent himself from it, may be motivated by a variety of reasons. In this context, statements obtained during this investigation were analyzed and examined. Where support for the statements was found, it was documented. Where inconsistencies existed, they were noted. Guided by common sense, the Review Team's collective work experience, and the Advisory Panel, the information was evaluated. Efforts to recreate what transpired in 1987-88 were hampered by the passage of time, fading memories, reconstructed personal histories, and the natural tendency toward self-preservation. Rather than rest solely on recent witness statements, the Review Team also looked to objective material, such as the overall structure of the case, including its rapid early progression, contemporaneous reports of the case in media, police, and defense documents, and, of course, statements made by witnesses and by parents as the original investigation progressed. The result is a comprehensive report that draws from all available sources.

xiii

**A-0049**

The Review Team committed itself to follow the facts wherever they might lead, and found that the whole truth diverged significantly from the edited version of events portrayed in the film. In the final analysis, the integrity of Jesse Friedman's conviction has not been undermined by allegations of an overzealous investigation and prosecution, or by any new information. After a three-year investigation of the facts and circumstances surrounding Jesse Friedman's guilty plea, the District Attorney concludes that Jesse Friedman was not wrongfully convicted.

<u>Conviction Integrity Review: *People v. Jesse Friedman*</u>

In August 2010, Nassau County District Attorney Kathleen M. Rice announced that her office would undertake a formal review of the 1988 conviction of Jesse Friedman for crimes involving child sexual abuse and sodomy. Rice's decision, and the subsequent re-investigation, were prompted by the United States Court of Appeals for the Second Circuit, which, in denying Jesse Friedman's petition for a writ of habeas corpus, stated that there existed a "reasonable likelihood" that Jesse Friedman stood wrongfully convicted of the crimes to which he pled guilty more than two decades earlier.[1]

Rice assigned three senior prosecutors—none of whom had served in the prior administration—to lead the investigation (the "Review Team"). Rice also reached outside the office and appointed four independent experts (the "Advisory Panel") capable of guiding the investigation. This report is the culmination of the nearly three-year investigation that followed, and builds on information and statements obtained from witnesses, investigative files, interview transcripts, film footage, audio and videotapes, personal correspondence, and once-confidential legal and medical reports.

## I.     The Investigation And Prosecution Of Arnold And Jesse Friedman

To the extent possible, the section below reconstructs the events that led to Jesse Friedman's guilty plea, beginning with a background on the Friedman family and a chronology of relevant events. This section primarily reflects conclusions drawn from a review of the case file. It has, where relevant, been updated with information learned from interviews conducted by the Review Team.[2]

### A.     The Friedman Family

In the autumn of 1987, Arnold Friedman lived with his wife, Elaine, at 17 Piccadilly Road in Great Neck, New York, a village on the North Shore of Long Island. As described in interviews, Great Neck was and remains an exclusive, socially competitive neighborhood, inhabited by mostly affluent and well-educated families.

Arnold and Elaine[3] had three adult children, none of whom lived at home at that time. David Friedman, the couple's oldest son, was an aspiring children's performer, two years away from pioneering a clown act that would both make him famous and later draw the attention of filmmakers Andrew Jarecki and Marc Smerling.[4] Seth, the Friedman's middle child, declined to participate in both the popular film about the case, *Capturing*

---

[1] *Friedman v. Rehal*, 618 F.3d 142, 159-160 (2d Cir. 2010). The decision is attached at page A001.

[2] Throughout this report, primary source documents included in the Appendix are cited by the letter "A," followed by a page number. For example, "A001" refers to the first page of the Appendix. Some documents are omitted from the public appendix for brevity and confidentiality.

[3] For the sake of convenience, members of the Friedman family are often referred to by their first names. This editorial decision is not intended to convey any disrespect.

[4] *See* Susan Orlean, *Seriously Silly*, THE NEW YORKER, Jan. 31, 1994, at 42-43.

1

*the Friedmans*,[5] and this investigation.[6] The Friedmans' youngest child, Jesse, was then eighteen years old, and a first-year student at the State University of New York, Purchase College.

The Friedman family extensively documented their lives through photographs, audiotapes, and film. In interviews with the Review Team, witnesses described Arnold as a workaholic who avoided spending time with his family, and suggested that his relationship with Elaine was substantially devoid of any real affection. The couple sought marital counseling around 1987, but Arnold Friedman ultimately declined to continue therapy. Recent interviews, letters, and audiovisual material outline significant tensions pitting the two older boys, David and Seth, against their mother.

Jesse himself was depressed as a child and, by at least one report, was diagnosed as manic depressive.[7] As a child he was prone to fits of anger, and may have suffered from a learning disability that went undiagnosed until the ninth grade. When he was still young, he would skip classes and simply not go to school. Jesse eventually completed his secondary education at a Great Neck alternative high school, the Village School. While in high school, according to some sources, Jesse used drugs heavily, including marijuana and LSD. He had several girlfriends, enjoyed music, was socially active, and remained very close to his brothers. After graduating second in his class from the Village School in 1987, he enrolled at the State University of New York, Purchase College, one hour's drive away from his Great Neck home. Jesse was away at college during the final session of his father's computer class, in 1987.

## B.    Arnold Friedman's Computer Classes

At the time of his arrest, some knew Arnold Friedman as a friendly, highly intelligent, and award-winning local schoolteacher, who inspired loyalty and great affection from his students.[8] Others described him as a quiet, bookish man.

Upon his retirement in 1982, Arnold Friedman began offering private piano lessons and computer classes to area children.[9] Jesse joined him as an assistant in the computer classes in 1984, and remained in this position until he left for college in 1987.[10]

---

[5] Produced by Andrew Jarecki and his business partner Marc Smerling, *Capturing the Friedmans* follows the criminal prosecution of Arnold and Jesse Friedman, and the effects of that case on the Friedman family. *See generally Capturing the Friedmans* (Magnolia Pictures 2003). In the years following the release of the film, advocates for Jesse Friedman have argued that excerpts of interviews compiled for the film actually prove Jesse Friedman's innocence. This report examines the relationship between the film and the legal case in depth.

[6] According to Jesse, he has not spoken with Seth for more than ten years.

[7] *See* A905-16, Alvin E. Bessent, *The Secret Life of Arnold Friedman*, NEWSDAY, May 28, 1989.

[8] *Id.*

[9] *Friedman*, 618 F.3d at 146.

[10] *Id.*

2

**A-0052**

Arnold then hired a second assistant, Witness 26,[11] discussed *infra*. The computer classes ostensibly entailed simple programming lessons and either began or ended with an opportunity for the children to select and play videogames. These games were stored on disks in the class disk library.

Students ranged in ages from seven to thirteen years old, and came from all four local elementary, as well as two nearby middle schools. As a result, some students did not know all of their classmates, or even their names. Several parents who were recently interviewed described membership in Arnold's classes as something of a status symbol. Due to the small size of the classes, placement appeared competitive, with spots presumably going only to those with the talent to succeed. Some children had no interest in computers, but were pressured to attend by their parents, who believed that their children would learn a valuable skill.

### 1.    Classroom Organization

All classes were conducted in the main room on the ground floor of the Friedmans' house, which alternately served as a computer classroom and as a small day care center run by Elaine.[12] Each session typically lasted an hour and a half. Parents were free to observe, but there are few documented accounts in which a parent actually entered the classroom, and those instances appear limited to the beginning or the end of class.[13] The room was not visible from the street, or from much of the house, including the front door, and the door to the classroom was kept closed during some class sessions. The only door from the classroom to the outside world opened to the backyard and had retractable bamboo shades attached.[14]

To pick up their children, parents were asked to wait in their cars outside the Friedmans' house.[15] As part of his class responsibilities, Jesse Friedman, standing just inside the front door, would monitor the arrival of the parents' cars, and alert students when their parents arrived.[16] Arnold Friedman outlined these procedures in a letter to each parent, in which he explained that parents should wait inside their vehicles to relieve

---

[11] This report uses numbers to identify confidential witnesses. The numbers are unique, and bear no relation to any previous identification rubric, such as those used in the original indictments. Throughout this report, the term "complainants" refers to the seventeen children who testified in any of three grand jury presentations against either Arnold or Jesse Friedman, or both.

[12] For a leaflet advertising her service, *see* A411.

[13] A recent "white paper" produced by the National Center for Reason and Justice, and written by several of Jesse Friedman's advocates, asserts that parents were likely to drop in at any moment. *See, e.g.*, Gavin de Becker & Emily Horowitz, *Destruction of Innocence: The Friedman Case: How Coerced Testimony & Confessions Harm Children, Families & Communities for Decades after the Wrongful Convictions Occur*, at 6 (Mar. 4, 2013), *available at* http://ncrj.org/ncrj-white-paper-on-the-jesse-friedman-case.

[14] The same "white paper" contains a diagram of the classroom that depicts a glass sliding door as one exit from the classroom. *See id.* at 7. Assuming the door was used as depicted—unobstructed and open—it did not face the front of the house, and was not visible to anyone approaching the house from the street.

[15] Alvin Bessent's 1989 *Newsday* article on the case reported that parents rarely entered the Friedman home, and this was by design. *See* A908-09. Several witnesses told the Review Team the same thing.

[16] *See* A450, letter from Jesse Friedman to David Friedman, re: "True Confessions" (undated).

3

congestion on Piccadilly Road.[17] The parents of one complainant recalled that they were specifically forbidden from entering the classroom: the house's front door was locked, and this complainant's mother had to knock, and wait in her car, to pick up her son. At least one witness told his mother that, for whatever reason, he did not like waiting for his parents with Jesse Friedman.

2.    Sessions and Class Membership

All classes were small, containing approximately nine children, and took place in three discrete "sessions"—fall, winter, and spring[18]—throughout the school year. Each session involved several classes, which met on different days of the week. At different times, Arnold and Jesse Friedman would each host make-up sessions for individuals or groups of students, suggesting that students would occasionally miss class for holidays, family vacations, illness, or other reasons. If Arnold Friedman kept a complete roster of every computer class he taught, it was not recovered or not retained by police; similarly, he did not keep attendance records.

Arnold exercised complete control over class membership. He recommended students for "advancement" to the next level and, in some cases, removed them from a class. One mother explained to the Review Team that Arnold asked her to remove her younger son, citing disciplinary problems, and then her daughter, because Arnold believed that she was not able to grasp the material. The composition of each class was designed specifically by Arnold.

### C.    Arnold Friedman's Abusive History

Arnold Friedman was a pedophile. Arnold's own admission to this fact is documented in a personal narrative he wrote while in prison, titled "My Story." There, he claimed that the disintegration of his parents' marriage required him to seek out other sources of affection, a need that ultimately manifested in the ongoing sexual abuse of his younger brother, Howard Friedman, and of other boys Howard's age.[19] As Arnold matured, he wrote, he still could not shake a need to relive those first experiences with young boys.[20] Arnold's account went on to justify his interest in child pornography as an outlet for his sexual urges, one that he believed would prevent him from actually attempting to touch a child sexually.[21] He also claimed that his psychiatrist sanctioned collecting child pornography on that basis.[22]

---

[17] This document was described to the Review Team by Arline Epstein, a mother whose child was enrolled in Arnold Friedman's classes, and who was interviewed by the Review Team in 2013. Elaine acknowledged the problem caused by traffic on the street, as did Jesse in his post-conviction affidavit. Affidavit of Jesse Friedman in Support of Motion to Vacate Conviction (Jan. 5, 2005), at ¶ 7.

[18] Some years also included smaller summer classes.

[19] *See* A538-41.

[20] *See id.*

[21] *See id.*

[22] A539.

In one instance, outside the scope of the original investigation, Arnold Friedman admitted that he sexually abused at least two young boys while vacationing at the family's second home in Wading River, New York. One was the child of a close family friend, who did not tell his parents that he was abused until after Arnold's arrest, fifteen years after the abuse. Arnold would later claim that that child actually "seduced" *him*.[23] (See excerpt, below.)



In the "close out" interview conducted after his guilty plea, discussed at Section I.G, *infra*, Arnold also admitted to other acts committed outside of his computer class, such as fondling the buttocks of one of his piano students. This report is corroborated elsewhere: in a letter to David Friedman, Jesse himself notes that one piano student had complained that Arnold made "passes" at him.[24]

Arnold also admitted that he collected child pornography. By his own account, his interest intensified in response to the "burden" of raising children.[25] His growing collection of pornography was, according to some documents, well known to his sons, who each independently discovered his cache of pictures. According to Jesse, before 1987, the Friedman children discussed the discovery among themselves only once,[26] though, according to a later letter, David and Jesse Friedman both understood "how scared [Arnold] was of 'being found out.'"[27]

---

[23] A484, letter from Arnold Friedman to David Friedman (May 1_, 1989) ("As though that one, brief episode (in which [the victim] really seduced me) could have caused all the problems in his life.").

[24] *See* A452.

[25] *See* A539.

[26] *See* A912, at 8 (recounting Jesse's early discovery of the pictures).

[27] A453.

5

As a child, Jesse Friedman said, he even brought some of his father's child pornography with him to school. The material was confiscated, and Jesse says today that he is unaware of any follow-up by the school to his parents, or to the authorities.[28] The presence of child pornography was also known to other adults at the time. In a recent statement, Jesse's codefendant, Ross Goldstein,[29] recalled that Jesse Friedman once showed him a magazine containing child pornography, which Jesse had told him belonged to Arnold Friedman.

### D.  Federal Agents Arrest Arnold Friedman for Trading in Child Pornography

In July 1984, federal postal inspectors intercepted a pornographic magazine addressed to Arnold Friedman at his Great Neck home. They launched an investigation that entailed three years of covert correspondence with him to determine the extent of his illegal activity. In letters to an undercover agent playing the part of a pedophile named "Stan," Friedman offered to, and later did, transmit pornographic material through the United States mail. In one such letter, dated January 9, 1986, Arnold described a book, "Joe (14) and His Uncle," as "rather precious." He later sent it to "Stan" with the caption, "Enjoy!" In October of that year, "Stan" mailed Arnold an offer to join an underground club that traded in child pornography. The offer included a questionnaire asking Arnold to explain what types of pornography he preferred. Arnold responded, and on the questionnaire indicated that he preferred "homemade" child pornography.[30]

This investigation concluded when Arnold Friedman took delivery of a pornographic magazine from the undercover agent. That same day, on November 3, 1987, agents executed a search warrant on the Friedman house. As a courtesy to local law enforcement, federal agents invited Nassau County investigators to participate in the execution of the federal warrant.[31] The search resulted in the discovery of the previously-delivered magazine, advertisements for the purchase of additional magazines, and thirty-one books, magazines, and leaflets of commercialized child pornography found loosely behind the piano in Arnold's office.[32] Examples of magazine titles recovered included:

- Jail Bait

---

[28] Jesse Friedman related this incident to the Review Team during a 2011 interview.

[29] The Review Team was mindful of the fact that Ross Goldstein is not the subject of this report and was afforded Youthful Offender Treatment for conduct he engaged in at the Friedman house. However, in light of the fact that his identity has been widely reported in the media, court documents, a published court opinion, and he has permitted the Review Team to use his name in this report, it appears here where its inclusion was deemed absolutely necessary to avoid distorting critical facts and events, or to provide clarity or context. Where possible, however, efforts have been taken to minimize disclosure of specific unlawful acts attributed to him.

[30] *See* Affidavit of John E. McDermott (Nov. 3, 1987), at ¶ 13.

[31] *See* Affidavit of William Hatch (Nov. 24, 1987), at 1.

[32] One of the original investigators, Nassau County Detective Hatch, lists the number of magazines discovered as near twenty. *See id.* But the federal search warrant return names twenty-six magazines, five books, and an additional unnumbered cache of "misc." child pornography. *See* A271-76.

6

- Young Boys & Fellatio
- Todd's First Time
- Young Boys & Sodomy
- Incest Case Histories
- Sexual Experience Between Men & Boys[33]

The search warrant also uncovered a list of some of the students in Arnold's computer classes. Thereafter, Arnold Friedman was indicted in federal court on three counts involving his use of the United States mail to transmit child pornography. He retained Jerry Bernstein, a former Assistant U.S. Attorney, to represent him. At this point, the federal case against Arnold Friedman diverged from the state case, which would begin to develop.

### E. The Nassau County Investigation's First Phase (Pre-State Search Warrant: November 3-25, 1987)

The discovery that a pedophile was instructing children in small classes prompted an investigation into whether Arnold Friedman had ever acted on his urges by abusing the children entrusted to his care.[34] The Nassau County Police Department proceeded to interview children who attended the classes to determine whether Arnold had inappropriate contact with any of his students. Detective Sergeant Frances Galasso of the Sex Crimes Squad was tasked with leading the investigation, which was initially staffed only by herself and two other detectives.

The state investigation of the Friedmans can be broken into three distinct phases. The first phase covered the time between the investigation's start and the execution of the state search warrant on November 25, 1987. The second phase ran from November 25, 1987 to December 17, 1987. By the end of this second period, police had conducted all interviews necessary to sustain the first and second indictments. The third phase extended from December 18, 1987, until the case concluded approximately a year later, with Jesse Friedman's sentencing on January 24, 1989.

### 1. The NCPD's Investigative Team and Procedures

As detailed below, the investigation quickly uncovered evidence of criminal activity, requiring Detective Sergeant Galasso to expand her team of detectives. Ultimately, her team included at least nine Nassau County detectives: Detectives Patricia Brimlow, Lloyd Doppman, William Hatch, Wallene Jones, Anthony Fiore, Nancy Myers,

---

[33] *See id.*

[34] The conclusion that someone who purchases child pornography may also engage in child sexual abuse is both logical and legally supportable. Numerous courts, and the United States Congress, have concluded that child pornography is often used by pedophiles either as a tool in the seduction process, to induce children into believing that sexual activity is normal, or to whet a pedophile's appetite for the ultimate, criminal act of sexual abuse. *See, e.g., United States v. Poitra*, 648 F.3d 884, 891-92 (8th Cir. 2011) (surveying authorities).

7

Larry Merriweather, Peter Reihing, and Anthony Squeglia. Officers Charles Whiddon and Mary Ann Durkin were also assigned to the investigation. Several of these investigators were selected from the Juvenile Aid Bureau based on their training and experience interviewing child witnesses. Detective Sergeant Galasso chose officers with stable home lives, on the theory that they would better understand children and be equipped to endure an emotionally draining interview process. She also preferred detectives to work in pairs, and for the tandem to include one detective who had experience investigating sex crimes, and one who did not. Detective Sergeant Galasso felt that this would ensure that the case benefited from varied investigative experiences. Detective Sergeant Galasso divided Great Neck into grids, handing out assignments systematically on that basis.[35] Detectives worked collaboratively and shared developments. Early in the investigation, a draft list of probative questions was also compiled, which some but not all detectives remember consulting.[36]

During meetings with prospective witnesses, detectives recorded most reports of criminal conduct by reducing them to handwritten formal statements, prepared and signed contemporaneously by the detective who took the interview. Each statement was also signed by the child himself and, in all but two cases, by the child's parent.[37] Editing marks and initialed changes indicate that statements were read back to the child, who was then given a chance to correct any misstatement. Statements were not intended to be verbatim records of the child's words. While this report excerpts only those elements of statements that disclosed criminal conduct, all statements provided substantial background information and often went into great detail. The average statement was handwritten, and filled at least five pages of single-spaced, 8½ by 11 inch paper. Some statements ran to as much as thirteen pages.[38]

Unless otherwise stated, within the chronology below, each reference to a "statement" identifies a statement written by a detective and signed by a witness and, on most occasions, their parents. Detectives also conducted other types of interviews. Some children signed statements indicating that they had participated in an identification procedure, such as, the viewing of a yearbook, a photographic array, or a lineup. Other children completed a checklist to indicate which pornographic videogames, if any, they had seen during the class. Where these appear in this document, they are distinguished from the substantive statements described above. Other interviews were memorialized only by handwritten notes from detectives.

---

[35] The above information is drawn largely from a re-investigation interview with Detective Sergeant Galasso, and corroborated by interviews with other participating detectives.

[36] *See* A285-89. The significance of this document is discussed on page I.E.1, *infra*.

[37] The Review Team's record contains forty-eight signed statements. Only two substantive statements are not countersigned by either of the witness's parents.

[38] The preceding is drawn from an internal review of witness statements. Because such statements necessarily disclose victim identities, and relate to the commission of a sex crime, they are confidential and may not be disclosed. *See* Section II.C.1, *infra*. Accordingly, this report's Appendix does not include any of these statements. To save space, where information discussed here is drawn from these statements, no citation is made.

8

Inculpatory statements did not automatically translate into indictment counts. Instead, before presenting evidence to the grand jury, the lead prosecutor, Assistant District Attorney ("A.D.A.") Joseph Onorato, personally re-interviewed each witness so that he could make his own, independent judgment of the witness's credibility. According to A.D.A. Onorato, and as discussed in a police newsletter, years prior to this case, he had earned a reputation for refusing to take the results of police investigations at face value.[39] In this case, A.D.A Onorato personally passed on the credibility of each potential witness. He would explain to the children that it was important to be truthful, and that the child could decline to testify. At the grand jury presentment, jurors were able to question witnesses directly. Only once did a child present his testimony by videotape.[40]

## 2.    Interview Breakdown, and the Significance of "Negative" Reports

By the end of the investigation, the police documented visits to a minimum of 104 households. From these households, detectives identified sixty-nine children who had attended the Friedman classes. Though only fourteen students would eventually testify against Jesse Friedman before any grand jury, at least **twenty-five** of these sixty-nine children reported criminal activity by one or both Friedmans.[41] Seventeen of those twenty-five implicated Jesse Friedman. This includes three non-testifying victims who, though they did not testify before the grand jury, signed formal statements on December 4 and 10, 1987, and May 26 and June 15, 1988. All four statements included allegations of sodomy and sexual abuse involving Jesse Friedman; it is not known why they did not testify.[42] Based on information obtained during the course of the re-investigation, police did not contact every household that sent students to Arnold Friedman's classes. Contemporaneous media and law enforcement claims that there may have been as many as 500 victims were substantially overstated.

Though the police took many statements, police record-keeping was extremely inconsistent. Some officers made an effort to document their interactions with prospective witnesses, but others did not. Nor can that information be reconstructed from detectives' memories, which have faded in the intervening twenty-five years. In some cases, where an interview did not produce any inculpatory account, police documented the interview with a handwritten note listing the interviewee's name, characterizing the interview as "negative," and, sometimes, explaining that designation.

Investigators recorded these "negative" reports for a variety of reasons. In some cases, the "negative" report indicated that, at the house visited, the parents had attended

---

[39] The newsletter describes a case in which Onorato reported an NCPD officer to the Official Corruption Bureau for an incident involving an allegedly wrongful arrest. *See* A299-300 (undated).

[40] This practice is permitted in New York state in special cases. *See* N.Y. C.P.L. § 190.32.

[41] "Criminal activity," here, includes sexual acts, or conduct that would constitute the crime of Endangering the Welfare of a Child, such as, showing pornographic images to children.

[42] As children, of course, the decision was not theirs alone to make. Parents could reasonably fear for their child's well-being if they were to become involved in a case that could, ultimately, proceed to a traumatic and long trial. No inference, positive or negative, should be drawn from a decision not to testify.

9

Arnold Friedman's adult education class, but the children had not attended any classes. Other negative reports meant that a child had attended Arnold Friedman's class, but only briefly, or that he was enrolled, but never attended. Other reports represented a home where no one had any contact at all with the Friedmans.

In fact, during one interview described as "negative," a child nevertheless told police about alarming behavior: he said that Arnold and Jesse Friedman would "come out of room with a different boy about every 10 min—arm around boys," that someone "took games home," that there was a "Mag with naked men," and that "Boys and Fried spend time & laugh ignore ███." In this, and in other interview notes, children described behavior that was non-criminal but consistent with "grooming,"[43] or that corroborated other witness statements. Examples include:

- Some said they felt uncomfortable in class, and saw Arnold Friedman hug, touch, or otherwise linger with his students.
- ███ said, on November 16, 1987, that Arnold Friedman taught the class with his shirt off. This student quit the class due to what he described as an aggressive relationship between Arnold and Jesse Friedman.
- On November 18, 1987, ███ reported seeing Jesse Friedman take pictures of the class as students worked.
- A student described seeing a magazine with naked pictures of men in the classroom.
- On December 2, 1987, ███ said that Jesse Friedman would pick up children by the waist.
- Several students were told that they were allowed to borrow pornographic videogames—such as "Strip Poker"—but cautioned not to tell their parents about it.
- Still others talked about Jesse Friedman walking around the class with a camera, and hitting students.

Accordingly, it cannot be said that every child who was visited, but did not give a statement, was one who attended the Friedman class and saw nothing out of place.[44] Nevertheless, for many students, the Friedman computer classes were nothing more than what they were advertised to be.

---

[43] "Grooming" is a term used by law enforcement officials, child safety advocates, and others, to describe common techniques used by pedophiles to sexualize a child, and pervert an initially blameless relationship into an opportunity for child sexual abuse. *See, e.g., United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006) (describing "grooming" in the context of federal statutes that criminalize "grooming" behavior). Here, the term "grooming" carries that meaning, with specific emphasis on the use of pornographic images, games, and other inducements to condition a child into believing that sexual behavior with adults is normal.

[44] In his "white paper," for example, Gavin de Becker states that "[o]f the 480 students who police said were in classes with Jesse Friedman and likely molested, inexplicably only 14 were ever put forth as complainants in the case." *See* De Becker & Horowitz, *supra* note 13, at 4. But those numbers are very far off-target. A more accurate ratio would state, as above, that twenty-five of sixty-nine children who at one time took a class with Arnold Friedman reported *criminal acts* by the Friedmans, and still more reported inappropriate behavior.

10

**A-0060**

3.     Initial Media Coverage

The first news article to report on the Friedman case appeared in *Newsday* on November 13, 1987,[45] ten days after the federal search warrant was executed. A week later, though, a local newspaper, the *Great Neck Record*, published a laudatory article noting that Arnold Friedman had been recognized "as one of the two top computer educators in NY State," and praising him for "work[ing] with local youngsters, teaching them computer programming as an extra-curricula[r] activity."[46] No mention was made of the pending federal investigation: indeed, the article describes Arnold's after-school program favorably. The second mention of the prosecution appeared in the *New York Times* on November 26, 1987.[47] Although *Newsday* acknowledged the existence of an investigation against Arnold Friedman, it carefully noted that NCPD detectives had "not received any complaints about [him]."[48] No further media reports of the investigation appeared until Arnold and Jesse were arrested.[49]

4.     Witness Interviews

Despite Arnold Friedman's November 3, 1987, arrest by federal agents, Nassau County officials did not begin conducting interviews until November 12, 1987. Between November 12, the date of the first verifiable interview, and November 25, 1987, the date of the execution of the state search warrant, police spoke with at least thirty-five children.[50] The first interviewee, Witness 18, immediately disclosed incriminating evidence concerning Arnold Friedman to Detectives Hatch and Jones.[51]

The following section summarizes interviews conducted during this initial time period, drawing from sworn statements and interview notes in which witnesses reported

---

[45] Richard Esposito, *Ex-Teacher Focus of Porno Probe*, NEWSDAY, Nov. 13, 1987, 1987 WLNR 162566.

[46] *Computer Teacher Wins Award*, GREAT NECK RECORD, Nov. 19, 1987.

[47] *Ex-Teacher Charged in Sex Abuse of Boys*, N.Y. TIMES, Nov. 26, 1987.

[48] This column appeared only in the "City Edition" of *Newsday*.

[49] Media reports naming the Friedmans were compiled first by a search of commercial databases, legal and otherwise. The Review Team also made direct requests to *Newsday* and the *Great Neck Record*, the publications that provided the most detailed coverage of the Friedman case, and obtained from them all articles relevant to the Friedman case. Similar requests were made to the *New York Daily News* and the *New York Post*. In the event that an article was neither indexed for electronic searching, nor preserved in a publication's own archives, that article may not have been brought to the Review Team's attention. When discussing the media coverage surrounding the Friedman case, the Review Team's analysis was limited to newspaper accounts, and did not include what were likely corresponding levels of coverage on television.

[50] Case notes disclose a prior interview, dated November 8, 1987, in which another individual incriminated Jesse, but the investigation suggests that this handwritten witness report was dated erroneously, and likely occurred on *December* rather than November 8th. This conclusion is further supported by the absence of any statement from this witness in the affidavit filed in connection with the November 25th search warrant, discussed *infra*, and by a recent interview with the victim's mother, who stated that Arnold and Jesse Friedman were arrested by the time police visited her home.

[51] It is not true, as has been suggested, that "in the first series of interviews, thirty in all, not a single student alleged abuse." De Becker & Horowitz, *supra* note 13, at 12. In fact, this claim misrepresents even the primary source it cites, which states that "no child out of 30+ inter[viewed] had b[ee]n sodomized." A842-45, notes of Nov. 24, 1987, meeting with detectives.

11

experiencing or observing criminal activity. In this and in all subsequent, similar sections, witness statements are the exclusive source of information.[52]

- On **November 12**, Detectives Hatch and Jones interviewed Witness 18,[53] who gave an unsigned statement in which he described Arnold Friedman touching children inappropriately, and engaging in early-phase "grooming" behavior. He said Arnold Friedman would gather a group of children around him, and read from a book that "had a picture of a pyramid on the top," and "pictures of naked men" inside. As Arnold read, he would place his arms around the boys directly next to him. On one such occasion, Arnold rubbed Witness 18's back under his shirt, and touched his "butt" over his pants. Arnold stressed to each of the children that they should not tell their parents about the book, and offered to reward their silence with videogames. On another occasion, Witness 18 said, Arnold took him to the back room to display a computer program with the image of a man, which asked and answered sexual questions ("If I were gay I'd like penises.").[54] Witness 18 did not testify before the grand jury, nor did he seek therapy at the time. However, complainants, non-complainants, and (on one occasion) codefendant Ross Goldstein, would later describe activities resembling those described in Witness 18's statement.

- Also on **November 12**, another child, Witness 30, was interviewed by Detectives Hatch and Jones. That child reported that Arnold Friedman would rub his shoulders, arms, legs, down to the side of his buttocks, while displaying pictures of naked boys. Notes of his interview also suggest that the child said that someone was photographed while leaving the bathroom, and the notes also contain the following words: "Get it Right," "Come and Get It," "Young Boys and Sex," and "miniature rubber."

- On **November 17**, Witness 7 was interviewed for the first time by Detectives Brimlow and Squeglia, and described borrowing two computer disks containing "adult games" from Arnold Friedman, seeing Arnold Friedman walk around in a robe, and viewing pornographic material in class. And, he said, he saw a vibrator, attached to a "leather belt," in an adjoining room. Though he was told not to go into the room, the door to it was always left open.

- On **November 19**, detectives conducted interviews with two children. Witness 4 told Detectives Doppman and Jones that Arnold Friedman touched him and other

---

[52] Bullet points in these sections set out interviews and statements taken by a detective, or team of officers. These bullet points do not reflect every police "contact" with a witness. Additional contacts occurred when witnesses participated in identification procedures, or completed "computer disk checklists" to indicate which, if any, disks they saw used in the Friedman class.

[53] New York law strictly forbids the disclosure of information tending to identify the victim of a sex crime. *See* Civil Rights Law § 50-b. To ensure compliance with this rule, this report does not name any of the victims, and excises any details that could allow the individual's name to be discovered. As a matter of policy, even where not legally required, the same anonymity is extended to former students of Arnold Friedman's computer class who deny having been abused; and to adult fact witnesses. Exception is only made where a non-complaining witness has allowed his name to be used.

[54] For further details, *see* Section IV.A.4(d), *infra*.

12

students "on the legs." Witness 17 stated to Detective Merriweather and Police Officer Durkin that Arnold gave him "bad hugs" that hurt, and that Arnold would hug him from behind and rest his head on his back, and also reported seeing a Polaroid camera in the Friedman home, in a big room with a couch.

- On **November 22**, Witness 6 told Detective Squeglia that Arnold Friedman would rub his penis against his back. According to him, Jesse would walk around the room with a camera around his neck and, when Arnold would leave the room with one child, Jesse would follow with camera in hand. He also described seeing sexual videogames like "Strip Poker" in class, and was allowed to take home disks containing games like "Dirty Movie" and "Stroker."

- On **November 23**, detectives took two additional statements. One was the first account to detail criminal conduct by Jesse Friedman.[55] Witness 10 told Detectives Doppman and Jones that Arnold *and* Jesse Friedman put their hands on his leg and rubbed him; Jesse touched his penis over his clothes; and Arnold and Jesse had the children drop their pants and bend over, while Arnold and Jesse put their penises "near" the students and took photographs. He also stated that Arnold put his penis in his "rear end," causing pain and bleeding. Jesse photographed this. On the same day, Witness 7, in his second interview, provided a first statement to Detective Squeglia, recounting that Arnold Friedman rubbed his penis against his back, did the same to another student, and asked him to retrieve a disk from a location near "dirty magazines" depicting "naked boys."

- On **November 24**, detectives recorded an additional three statements. Witness 14 told Detective Merriweather and Officer Durkin that Arnold Friedman touched his penis under his pants, and would press his exposed penis against students' backs while at their desks. Arnold also tried to put his penis in his rear, Witness 14 said, and it hurt him very much. He also stated that Arnold and Jesse Friedman would walk around the class with their penises exposed, ask children to touch them, and that he did touch Jesse's penis. Witness 12 told Detectives Doppman and Jones that he observed Arnold Friedman playing with his own penis in the bathroom while the door was open, and that he observed several pornographic videogames. Jesse, he said, would photograph the class. Witness 4 provided Detectives Doppman and Jones with a first statement, on his second interview, describing Arnold Friedman putting his hand down Witness 4's pants to touch his penis.

This information establishes that, twelve days into an investigation precipitated by and focused on *Arnold* Friedman's illegal acts, and even though Jesse Friedman was away at college at the onset of the investigation, two students had identified him as an individual who participated in criminal sexual activity.

---

[55] An interview with another individual, discussed *infra*, could instead be the first statement implicating Jesse. However, it is believed that this statement was incorrectly dated, and was actually taken later the next month.

13

**A-0063**

**F.     The Nassau County Investigation's Second Phase (November 25-December 17, 1987)**

Arnold Friedman's last computer class was held on Friday, November 20, 1987. Only a single student came to the class: Witness 2. Witness 26, Arnold's assistant since Jesse's departure for college, also arrived, expecting to carry on as usual. Arnold dismissed them both. The next day, Arnold called Witness 26 and informed him that he was discontinuing the Friday afternoon computer class, citing health reasons; Arnold said that he expected that all his other classes would continue. Witness 26 never heard from Arnold again. Around the same time, Arnold called Arline Epstein, the mother of Witness 25, one of the students enrolled in the Friday afternoon class. (Witness 25 and this "Friday class" are discussed below.) Arnold claimed that his arrest and the police investigation were the results of an overblown feud with a neighbor, and insisted that Epstein's son return to his class.[56]

**1.     The Search Warrant and Arrests**

Meanwhile, the police investigation intensified. In addition to the reports of abuse described above, several other students described having access to pornographic videogames, and some said they borrowed them from the Friedman house. One student provided Detective Squeglia with a copy of a disk containing "Dirty Movie" and "Stroker," and said he had obtained it from Arnold Friedman's class. On the basis of these and all preceding statements, on November 25, 1987, the Nassau County Police Department executed their own warrant on the Friedman home. This came twenty-two days after Arnold Friedman's home was first searched by federal agents. During the execution of this warrant, detectives seized computers, audiovisual material, a "flesh colored artificial penis," and a "sexual aid."[57] Detectives found and removed a vibrator, described at the time as "child-sized," from Arnold Friedman's office.[58]

Because Jesse Friedman did not attack his conviction until 2004, more than fifteen years after his guilty plea, these items of physical evidence were all routinely destroyed pursuant to police procedure. Accordingly, no forensic analyses, such as DNA tests, could be performed on the objects. Police also seized a number of computer disks, later found to contain the following programs, among others:

---

[56] *See* A837-41, notes of conversation between Arline Epstein and Arnold Friedman.

[57] *See* A576.

[58] The description was reported by the media after the case resolved, but does not appear in police documents. *See* A906, at 2. It is also chronicled in contemporaneous notes provided to the Review Team by Arline Epstein (*see* A846-51, notes of conversation with Detective Wallene Jones) and acknowledged by David Friedman in a private journal. *See* A431, excerpt 7 (referring to a "little 3[inch] dildo").

14

| Video Game Title | Police Description[59] |
|---|---|
| **Sex Style Test** | "Ask fifteen (15) sexual related questions. Rates you on life satisfaction, sensuality, eroticism." |
| **Strip Poker** | "Play draw poker with 'Suzi & Melissa.' Removal of clothing part of wager." |
| **Farmer's Daughter** | "Story of traveling salesman coming upon farmer's house and meeting farmer's daughter." |
| **Mad Party Fucker** | "Story of party at mansion (orgy)." |
| **Girls They Want To Have Fun** | "Animation of naked woman masturbating—operate joystick to increase score." |
| **Stroker** | "Animation of hand stroking penis—operate with joystick to control stroking action to increase score and prevent premature ejaculation." |
| **Load Me** | "Program appears with German words—after about 30 seconds letters are erased with 'P's, screen goes blank and animation appears with couple performing sexual intercourse." |
| **Dirty Movie** | "Animation appear[s] of woman who undresses[,] spreads her legs[,] and then masturbates/urinates." |
| **Seasons Greeting** | "Animation of Mickey Mouse, dressed in Santa suit, appears with erection and ejaculating." |

Also recovered during the execution of the warrant were two original photographs of nude children,[60] described alternately in police documents as "2 color photos of boy and girl from the neck to the thighs"[61] and "2 snapshots, 1 boy with pants down, 1 girl naked waist down."[62] Because the heads were torn off, no identification of the children could be made. Other items discovered included "3 sheets advertising homosexuality with boys," movie cameras and Polaroid cameras, and pornographic movie reels.[63] In the course of their search, police also discovered a false wall compartment under the stairs of the Friedman home. Federal investigators had no recollection of this space. In a house where other closets were filled to capacity, state investigators found the compartment empty. In interviews, Jesse expressed surprise that this compartment was empty; it was well-known to him as a storage space for props and accessories used in David's clown and magic acts.

---

[59] All descriptions are drawn from paperwork filed by police explaining why some items—these disks, *inter alia*—would not be returned to the Friedmans at the close of the investigation. *See* A407-10.
[60] Police reported *two* such pictures to a group of concerned parents, including Arline Epstein. *See* A852-57, notes of conversation with Dr. Joyce Parks.
[61] A580.
[62] A481.
[63] See *id*.

15

Simultaneously, police arrested Arnold Friedman on charges involving sodomy, sexual abuse, and endangering the welfare of a child, and Jesse on charges involving sexual abuse. Elaine Friedman was also arrested for attempting to punch Detective Sergeant Galasso.[64] At their arraignment the next day, the court set Arnold's bail at $1 million (or $500,000 cash), and Jesse's at $500,000 (or $300,000 cash).[65]

### 2.    Continuing Media Coverage

Arnold Friedman's arrest drew significant media coverage. The *New York Post* and *Daily News* ran the first articles portraying the investigation as a broad effort, reporting that "Nassau County cops are questioning more than 100 children suspected of being molested by their Great Neck computer teacher."[66] The articles made only passing mention of Jesse Friedman.[67] In another *Newsday* article that ran the day after the Friedmans' arraignments, Arnold's former colleagues expressed their surprise at his arrest.[68] Though Arnold Friedman was apparently suspended from teaching on November 20th, no report of his suspension reached the newspapers until a December 3rd article in the *Nassau Herald*.[69]

Subsequent coverage discussed other case details. One *Newsday* article placed the Friedman arrest in the context of a larger "crackdown" on mail-order child pornography.[70] A November 29 *Newsday* story discussed the psychology of dealing with sex abuse victims, and reported that four of the Friedmans' victims would seek therapy,[71] while a third *Newsday* story reported that the Nassau County District Attorney would seek AIDS tests of both Friedman men.[72] An analysis of media reports identifies less than twenty articles between November 25 and December 17, 1987, discussing the case, spread over four newspapers, and less than ten between December 17 and the date of

---

[64] The Friedmans were arraigned before District Court Judge Richard LaPera. *Metro Dateline*, N.Y. Times, Nov. 27, 1987, *available at* http://www.nytimes.com/1987/11/27/nyregion/metro-dateline.html.

[65] *Id.* A second article noted that the court lowered the bail requirement for Arnold and Jesse Friedman. Robin Topping, *Court Lowers Bail in Sex Abuse Case*, NEWSDAY, Dec. 2, 1987, 1987 WLNR 197789. Arnold was, however, denied bail in the federal case. *See* Pete Bowls & Carolyn Colwell, *Suspect in Child Pornography Called a Danger, Denied Bail*, NEWSDAY, Dec. 12, 1987.

[66] Mike Brennan, *Cops Quiz 100 Kids in Teacher Sex Case*, N.Y. POST, 7, Nov. 27, 1987; *see also* Michael Hanrahan & Gene Mustain, *Sex Abuse Charged*, N.Y. DAILY NEWS, Nov. 26, 1987.

[67] Another *Post* article simply made no mention of Jesse Friedman at all. *See* Robert Weddle *et al.*, *Ex-Teacher Held as Kid Abuser*, N.Y. POST, Nov. 26, 1987.

[68] Dan Fagin *et al.*, *Colleagues Shocked, Say Suspect Was Widely Admired Teacher*, NEWSDAY, Nov. 27, 1987, 1987 WLNR 192713.

[69] *Wdmr Academy Suspends Accused Molester*, NASSAU HERALD, Dec. 3, 1987. The abbreviation for "Woodmere" appears in the original article.

[70] *See* Carolyn Colwell, *U.S. Crackdown on Porn Led to Abuse Suspect*, NEWSDAY, Nov. 28, 1987.

[71] Kathy Boccella, *Parents Seek Therapy for Abuse Victims*, NEWSDAY, Nov. 29, 1987, 1987 WLNR 188022.

[72] *DA to Seek Order for AIDS Test*, NEWSDAY, Nov. 29, 1987, 1987 WLNR 188047; *see also* Robert Weddle, *DA: Test Dad & son in Sex-Abuse Case for Deadly Virus*, N.Y. POST, Nov. 28, 1987. Coverage of this particular aspect of the case continued in December of the same year. *See* Robin Topping, *2 Plead Innocent to Sex Abuse; Teacher Refuses Request to Take AIDS Test*, NEWSDAY, Dec. 10, 1987, 1987 WLNR 171495.

16

Arnold's guilty plea, on March 25, 1988. This includes reports that Arnold Friedman had been released to house arrest.[73]

### 3. Additional Witness Interviews

Between November 25 and December 17, 1987, police investigators met with eleven victims alleging criminal activity who gave sworn statements against Jesse Friedman. (Two of those victims had previously been interviewed, but had not made disclosures against Jesse.) After that point, police took no new substantive witness statements until April 1988.[74] One interview took place in February of 1988, but police documented the interview with only a single word, "negative," on a notecard. Based on handwritten notes from detectives, several undated, non-incriminating witness interviews may also have been conducted during that period, as well.

Denis Dillon, District Attorney at the time, chose to present information drawn from these interviews to two successive grand juries, resulting in two separate indictments. This decision was first reported on January 13, 1988, when prosecutors publicly stated that they expected to file a second accusatory instrument against the Friedmans.[75] The issuance of the second indictment resulted in both Arnold and Jesse being re-arrested, and in both being tested for AIDS.[76]

Relevant reports are summarized below. While reviewing the below statements, it is critical to bear in mind that in 1987, a charge of "sodomy" did not require an act of penetration, and could be committed by the touch of penis to anus or mouth.

- On **November 30**, Detectives Myers and Fiore took a first written statement from Witness 5, at the witness's second meeting with police. The statement indicated that Arnold Friedman rubbed his penis against Witness 5's back, and did the same to other children. Another child, Witness 7, met with police for the third time, and provided a second written statement to Detective Squeglia, in which the child stated that Jesse would engage in sexual activity with Arnold Friedman in clear view, expose his own penis, and touch other children's penises. He also reported that Arnold Friedman would rub students' penises, and anally sodomize them. This is the first time Witness 7 acknowledged criminal behavior by Jesse Friedman.

---

[73] Robin Topping & Kathy Boccella, *Avoid Children, Suspect Ordered; Teacher in Sex Case Is Under House Arrest*, NEWSDAY, Jan. 14, 1988, 1988 WLNR 184384.

[74] Some media reports suggest that police met with new victims between the end of December 1987, and February 1988. *See* Alvin E. Bessent, *New Sex Abuse Charges Expected*, NEWSDAY, Feb. 9, 1988, 1988 WLNR 189869 ("Sources said new charges against Friedman will be based on information from about 10 boys . . . who have come forward since December."). This is not completely accurate.

[75] Robin Topping, *New Accusations in Ex-Teacher's Sex-Abuse Case*, NEWSDAY, Jan. 13, 1988, 1988 WLNR 179640.

[76] *See* Phil Mintz, *House-Arrest Order in Kid-Porn Case*, NEWSDAY, Jan. 12, 1988, 1988 WLNR 175178; Alvin E. Bessent, *2 Charged in Sex Abuse of 8 More Boys*, NEWSDAY, Feb. 10, 1988, 1988 WLNR 158363.

17

- Also on **November 30**, Detective Merriweather and Officer Durkin met with Witness 23, who told them[77] that Arnold Friedman would place children on his lap, rub their legs and shoulders, and make the children uncomfortable. Witness 23's mother had removed him from the Friedmans' class after hearing about this conduct, and declined to re-enroll her son even after Arnold called to offer a reduced rate for future classes. Witness 23 did not testify before a grand jury against either of the Friedmans. In an interview completed during this investigation, the same individual stated that once, while urinating in the bathroom, he heard the door open behind him, saw a flash of light, and when he left, saw Jesse Friedman standing there, possibly in the company of one of his friends. Asked what the flash was, Jesse denied that any such thing had happened.

- On **December 2**, Detectives Doppman and Jones took a statement from Witness 13 who stated that Jesse Friedman engaged in oral sex with Arnold Friedman while in the classroom. The child also said that Jesse had removed Witness 13's pants and touched him on the buttocks, forced him to touch Jesse's penis, and that Jesse had anally sodomized him. Arnold Friedman also fondled the child, twice pulled him into a room to touch his penis, and twice anally sodomized him.

- On **December 3**, Detective Brimlow spoke with Witness 26, the teenager who replaced Jesse as Arnold Friedman's assistant in the computer class between October 8 and November 20, 1987. He was aware that disks for the games "Strip Poker" and "Dirty Movie" were in the class's disk library, and that only the Friday afternoon class (which included a large number of complainants) was allowed to remove games from the premises. He observed that, when Arnold Friedman helped children at their computer desks, he would lean against their backs. He further observed Arnold comfort a child—who was also a complainant—by placing him on his lap, and recalled seeing Arnold lead children to a table, where he would show them magazines and papers. Witness 26 did not observe the contents of these papers.

- Also on **December 3**, in his first written statement, during a second documented interview, Witness 17 described to Detective Merriweather and Police Officer Durkin sexual criminal acts performed by Arnold and Jesse Friedman. Jesse, he said, anally sodomized him and another child, exposed himself, and invited children to touch his penis. The child further said that Arnold Friedman put his hand down Witness 17's pants, touched his penis, and anally sodomized him twice in class. Witness 17 said Arnold Friedman did the same to other students. After one such incident, he saw "sticky white stuff." He also described being shown pornographic magazines and videogames, some of which were pre-loaded on the computers when the children sat down.

- On **December 4**, Witness 19 spoke with Detectives Doppman and Jones, and described sexual conduct by both Arnold and Jesse Friedman. By his account, Jesse Friedman fondled and photographed him and other children with their pants

---

[77] Unlike most witness encounters summarized in this section, this interview was never reduced to a written statement, signed by the witness and a detective. This summary of the event is drawn from handwritten interview notes.

**A-0068**

down, and anally sodomized him twice, ejaculating each time into a tissue. He described similar abuse at the hands of Arnold Friedman, stating that Arnold anally sodomized him at his computer terminal a total of five times, ejaculating each time onto the floor. Eventually, this child stopped attending computer class, but did not tell his parents why, because he was "scared." Witness 19 did not testify before the grand jury.

- Witness 8 gave a written statement dated November 8, 1987 to Detective Merriweather. However, because detectives describe an interview conducted on November 12 as the first interview in the case, it is likely that Witness 8's statement instead occurred on **December 8**, 1987. In that interview, the child stated (*inter alia*) that he witnessed Jesse Friedman anally sodomize another child and both Friedmans rub their penises against children's backs. Jesse also made him, Witness 8, touch Jesse's exposed penis. Witness 8 was also exposed to nude photographs of adults and children, and stated that he saw Arnold Friedman lead a child "upstairs" and that, later, he heard screaming.

- On **December 9**, Witness 1 gave a statement to Detective Brimlow, in which he described observing another child being struck on the arm by Jesse Friedman, but denied witnessing or suffering any sexual abuse himself. Though Witness 1 testified before the grand jury, all charges voted by the grand jury based on his testimony were stricken by Judge Boklan, citing insufficient evidence. He would later recant his statement entirely in an affidavit submitted with Jesse Friedman's habeas petition.[78]

- On **December 10**, Witness 3 told Detective Merriweather that Jesse Friedman threw students around "violently" when he was "upset."[79] Also according to Witness 3, Jesse allegedly also walked around the class with his penis sticking out, asking students to touch it. And, Jesse also made students follow him into the hallway. After they left, Witness 3 indicated he could hear them exclaim "ow." He also stated that Arnold Friedman would leave his penis exposed during class, and that he saw both games of a sexual nature, and magazines of naked men.

- Also on **December 10**, Witness 22 provided a statement to Detectives Doppman and Jones detailing sexual abuse by both Arnold and Jesse Friedman. He stated that Jesse would cover another student's mouth while Arnold anally sodomized the child. He also said that Jesse made him touch Jesse's penis, and forced his mouth into contact with Arnold Friedman's penis. He also recalled being shown child pornography by Arnold Friedman, and later being anally sodomized by Arnold Friedman on three occasions. And, lastly, he saw Arnold and Jesse

---

[78] Affidavit of ██████ (Dec. 23, 2003). This individual is one of several who gave an affidavit to filmmaker Andrew Jarecki, which Jarecki used in his efforts to exonerate Jesse Friedman. Though one of the fourteen witnesses who originally testified against Jesse Friedman, all charges related to Witness 1 were dismissed. Therefore, Witness 1 is not included in tallies of Jesse's victims.

[79] Significantly, this report is partially corroborated by a letter from Jesse Friedman, which he called his "true confessions" letter, most likely written a year later, in which he described lifting up children to control them. *See* A450. Peter Panaro, Jesse's attorney, told the Review Team that Jesse had admitted to being physical with students; and, according to Howard Friedman, Arnold's brother, Jesse admitted that he "may have slapped them," the students, "around a bit."

19

Friedman engage in oral sex acts with each other. Witness 22 did not testify before the grand jury against either Friedman. This date is notable as an example of witnesses offering statements incriminating Jesse Friedman, simultaneously, to different detective teams.

- On **December 11**, Witness 32 was interviewed by Detective Brimlow, and discussed being allowed to take two computer disks home from the computer class. One of them had the game "Strip Poker" on it, and he gave the disk to Detective Brimlow.

- On **December 16**, Witness 15 stated to Detective Merriweather and Police Officer Durkin that Arnold and Jesse Friedman would both leave their penises exposed during class and force students to touch them. Both Friedmans, he said, hit him several times on the arm. He also stated that "every time" a child would leave for the bathroom, either Arnold or Jesse Friedman would follow the child, and the child would return with tears in his eyes. He claimed to have observed Arnold anally sodomizing another child, and that Jesse once held him down while Arnold attempted to anally sodomize him. And, he described the Friedmans threatening to burn down the students' houses and have robbers kill their parents if he, or any other child, disclosed the abuse to parents or police.

- On **December 17**, in an interview with Detectives Squeglia and Brimlow, Witness 16 described Arnold and Jesse removing children from class for significant periods of time. By his account, Arnold and Jesse would take a child to Jesse's room. Shortly thereafter, he would hear banging on the walls and cries for help, and the child would emerge five to ten minutes later crying. He also described Arnold and Jesse threatening children into silence. The threat was that they would come to their houses and take them away never to be seen again. Additionally, he stated that Jesse forced his head down to Jesse's penis while Arnold anally sodomized him, and that Arnold and Jesse made the children stand by their seats with their penises exposed.

### 4. The First and Second Indictments

Based on the testimony of five complainants, as well as others, on December 7, 1987, a grand jury returned Indictment 67104, charging Arnold Friedman with three counts of Sodomy in the First Degree, ten counts of Sexual Abuse in the First Degree,[80] two counts of Attempted Sexual Abuse in the First Degree, and twenty-nine counts of

---

[80] In 1987, Sexual Abuse in the First Degree occurred when the defendant "subjects another person to sexual contact," as relevant here, "[b]y forcible compulsion," or "[w]hen the other person is less than eleven years old." N.Y. PENAL LAW §§ 130.65(1), (3). "Sexual contact" means "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party," and "includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." *Id.* at § 130.00(3).

20

Endangering the Welfare of a Child.[81] The grand jury indicted Jesse Friedman on three counts of Sexual Abuse in the First Degree, five counts of Endangering the Welfare of a Child, and two counts of the Use of a Child in a Sexual Performance. The counts faced by Jesse were based on grand jury testimony given by witnesses first interviewed by Detectives Brimlow, Doppman, Jones, Merriweather, Squeglia, and Officer Durkin. Though some witnesses had signed statements describing acts of sodomy, by the time this indictment issued, those witnesses had not yet testified before the grand jury. As a result, this first indictment charged no sodomy counts against Jesse Friedman. Judge Boklan's review of grand jury minutes, which was later confirmed by this investigation, found each of these surviving charges was supported by grand jury testimony.

Building on the testimony of an additional six complainants who had given statements to detectives before December 17, 1987, and testified thereafter, a different grand jury returned Indictment 67430 on February 1, 1988, expanding the charges against the defendants as follows:[82]

|                                         | Arnold Friedman |             | Jesse Friedman |             |
|-----------------------------------------|-----------------|-------------|----------------|-------------|
|                                         | First Ind.      | Second Ind. | First Ind.     | Second Ind. |
| **Sodomy in the First Degree**          | 3               | 5           | 0              | 6           |
| **Sexual Abuse in the First Degree**    | 10              | 18          | 3              | 10          |
| **Attempted Sexual Abuse in the First Degree** | 2        | 2           | 0              | 1           |
| **Endangering the Welfare of a Child**  | 29              | 38          | 5              | 19          |
| **Use of a Child in a Sexual Performance** | 0            | 0           | 2              | 0           |

At this juncture, the exclusive sources of sodomy charges against Jesse Friedman were two children, both of whom were interviewed by the team of Detective Merriweather and

---

[81] Also in 1987, Endangering the Welfare of a Child required proof that, as relevant here, the defendant "knowingly act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of a male child less than sixteen years old." N.Y. PENAL LAW § 260.10(1).

[82] This second indictment included testimony from children whose statements alleging criminal conduct were taken by December 16. It also included testimony from the child whose interview, the Review Team believes, likely took place on December 8, 1987, rather than the reported date of November 8, 1987.

**A-0071**

Police Officer Durkin. A third student had also told police that Jesse Friedman forced him into acts of oral sodomy, but did not testify until the third grand jury presentment.

By December 17, 1987, just over a month after the Nassau County Police investigation began, police had interviewed at least thirteen children who reported Jesse Friedman engaging in criminal activity in the class. Charges against Jesse in the first two indictments would be sustained by testimony from nine of those children.

### 5.   Notes on the Indictments

During pretrial motion practice, Judge Boklan dismissed several counts from each of the three indictments, citing, for example, insufficient evidence. On July 14, 1988, she dismissed nine total counts from the first two, and on November 29, 1988, she dismissed fourteen counts from the third indictment.[83] Each indictment count to survive dismissal by Judge Boklan was adequately supported by grand jury testimony, based on the Review Team's investigation, with the exception of one misdemeanor count. Because grand jury testimony is confidential, this report cannot reproduce that analysis in any greater detail. Cases involving sexual abuse—and especially the abuse of children—carry with them unique concerns for victim anonymity, and grand jury testimony may not be disclosed absent court order.[84] These concerns do not diminish, and may even intensify, as the victims pass into adulthood.

It is important to understand that one of the charged crimes—sodomy—has different legal and colloquial meanings. The crime of sodomy as defined in 1987 did *not* require proof of forcible anal penetration,[85] but could be sustained by proof of the touch of penis to anus or mouth.[86] And, depending on the age of the victim, a single act of sodomy can be charged twice, on a theory of (1) forcible compulsion and (2) minority.[87] Therefore, an indictment charging, for example, 100 counts of sodomy does not necessarily represent 100 separate acts of violent penetration.

### G.   Arnold Friedman's Guilty Plea and Sentence

Recordings of family discussions demonstrate that the Friedman family extensively (and angrily) debated the question of whether Arnold should plead guilty to

---

[83] *See* A394-405.

[84] *See infra* Section II.C.2.

[85] The modern statute also makes clear that the crime, since renamed "Criminal Sexual Act in the First Degree," may be predicated on "oral sexual conduct" or "anal sexual conduct," and that neither term requires penetration. *See* N.Y. Penal Law § 130.00(2)(a)-(b) ("'Anal sexual conduct' means conduct between persons consisting of contact between the penis and anus.").

[86] *See, e.g., People v. Furman*, 177 A.D.2d 591, 592 (2d Dept. 1991) ("We reject the defendant's contention that penetration is a necessary element of sodomy in the first degree.") *and People v. Francis*, 153 A.D.2d 901, 902 (2d Dept. 1989) ("[T]he People were required to prove that the defendant engaged in 'deviate sexual intercourse' with the victim; that is that there was contact between the penis and the anus, the mouth and the penis or the mouth and the vulva.").

[87] The crime of sodomy by forcible compulsion (N.Y. Penal Law § 130.50[1]) is legally distinct from the crime of sodomizing a child under eleven years old (*id.* at § 130.50[3]).

22

**A-0072**

the state charges. Most of the discussion revolved around the question of whether Arnold's plea would help or hurt Jesse.[88] Most of these conversations were led by Jesse Friedman, who vigorously defended his father. The recordings also shed light on a family dynamic in which the three sons attacked and otherwise blamed their mother, Elaine Friedman, for the family's troubles.

On March 25, 1988, almost two months after the filing of the second indictment, Arnold Friedman pled guilty to a limited set of charges—eight counts of Sodomy in the First Degree, twenty-eight counts of Sexual Abuse in the First Degree, four counts of Attempted Sexual Abuse in the First Degree, and two counts of Endangering the Welfare of a Child—in full satisfaction of both state indictments.[89] On March 29, 1988, he also pled guilty to the federal charges pending against him, and was sentenced by Judge Mark A. Constantino to serve ten years in a federal prison.[90] At the time of his guilty pleas, Arnold Friedman expected to serve his federal and state terms of imprisonment concurrently. This expectation proved accurate when on May 13, 1988, he was sentenced by Judge Boklan to serve a concurrent ten-to-thirty years in state prison. His federal conviction required him to immediately begin serving his sentence at a prison in Wisconsin.

After Arnold Friedman pled guilty, at the NCPD's request, and with the advice of his attorney, he agreed to sit for a "close-out" interview. As agreed to by detectives and Arnold's attorney, and noted in a transcript of the session ("Close-Out Statement"), Arnold's participation in the interview was contingent upon his receiving immunity from further prosecution, and upon the guarantee that the interview would not be used to prosecute Jesse Friedman.

During the interview, Arnold initially maintained his innocence, to the point of denying any of the charges to which he had just pled guilty. After conferring with counsel, Arnold volunteered detailed accounts of the sexual acts he had performed with some of the children entrusted to his care, even describing his victim selection methods, and how he would "distract" prospective victims with computer games. He also spoke about the "type" of children he found attractive, and his method for "grooming" victims. Contrary to his later public presentation of the interview—"I had to lie that I abused *every one* of my students"[91]—during the close-out interview, Arnold volunteered detailed information while admitting specific instances of abuse and denying others. Arnold was not asked about, and did not mention, anything related to "sex games" or other abusers. In all, the interview included Arnold's admission that he molested forty-one children—including one child who, though he was not a complainant, had given a statement

---

[88] *See* Discussion between Arnold, David, Elaine, Jesse, and Seth Friedman, at 20:00 (Mar. 24, 1988).

[89] *Friedman*, 618 F.3d at 149 ("On March 25, 1988, Arnold Friedman pled guilty to forty-two counts of child sexual abuse"). The Second Circuit and others use the colloquial and legal meanings of "sexual abuse" interchangeably.

[90] Leonard Buder, *A Pornographer Given 10 Years by a U.S. Judge*, N.Y. TIMES, Mar. 29, 1988.

[91] A562, Open Letter from Arnold and Jesse Friedman (emphasis in original). This characterization was simply assumed to be true by Jesse's advocates. *See* De Becker & Horowitz, *supra* note 13, at 18.

23

implicating Arnold Friedman in sexual abuse. He also denied any criminal conduct towards twelve children, and insisted that he had not abused any of the students he taught at the Woodmere Academy, and Bayside High School.

### H. The Nassau County Investigation's Third Phase (December 17, 1987, to December 20, 1988)

With the conclusion of these interviews, the police investigation against Jesse Friedman entered its third and, in retrospect, final phase. As of December 17, 1987, police were not actively continuing to investigate. No new documented statements were taken until late April 1988, in the aftermath of Arnold Friedman's March 25, 1988, guilty plea.

#### 1. Final Witness Interviews[92]

Although Arnold Friedman's guilty plea ended the case against him, Jesse Friedman continued to maintain his innocence, and in the spring of 1988, A.D.A. Joseph Onorato directed the police to continue the investigation.[93] NCPD detectives resumed interviewing former students, and took the first statement from this final phase of the investigation on April 29, 1988.[94] Detectives conducted interviews resulting in incriminating written statements from, at most, two new students during this period.[95] The majority of other interviews consisted of follow-up meetings with victims who had previously given statements against either Arnold or Jesse Friedman. Several students' accounts substantially expanded Jesse's role in the case. These accounts also, for the first time, included descriptions of criminal activity perpetrated by three other abusers: Ross Goldstein, Suspect 1, and Suspect 2. Material interviews are summarized below:

- On **April 29**, 1988, during his fourth interview with police, Witness 17 gave a second written statement to Detective Merriweather in which he reported seeing Arnold and Jesse Friedman anally sodomize other children while in class.
- On **May 18**, in his second statement, Witness 16 reported to Detectives Reihing and Myers that Jesse Friedman forced his head down to Jesse's penis, while Arnold anally sodomized him. According to the witness, this act took place in Jesse's room. He also stated that both Friedmans showed him pornography involving men and boys together.

---

[92] Note that, in this section, references to third parties are redacted.

[93] A291-92, memorandum from A.D.A. Joseph Onorato to Detective Sergeant Frances Galasso, Mar. 15, 1988, regarding need for additional investigation.

[94] This delay is interrupted by a single documented contact, which occurred on February 3, 1988, and was memorialized on a single note with the child's name and the word, "negative."

[95] There are two potential instances in which the NCPD *may* have conducted initial interviews after the Close-Out Statement. But neither interviewee is mentioned anywhere in the Close-Out Statement, likely foreclosing any possibility that investigators spoke with either as a direct result of some admission made by Arnold Friedman. Arnold *does* mention a child bearing the same first name as one subsequent interviewee, but the file shows that this child's family was first contacted prior to the Close-Out Statement.

24

**A-0074**

- On **May 19**, Witness 2 provided a written statement to Detectives Merriweather and Squeglia. This statement was likely his second, preceded by an undated statement which can tentatively be placed as having occurred in November of 1987.[96] His first statement described criminal acts performed by both Arnold (anal sodomy) and Jesse Friedman (showing him pictures of men engaged in sexual acts). In his second statement, he expanded on those allegations, detailing anal and oral sodomy performed by both Arnold and Jesse Friedman.

- Also on **May 19**, Detectives Reihing and Myers interviewed Witness 9 for a second time, resulting in that witness's first written statement. In his statement, Witness 9 reported that Jesse Friedman had anally sodomized him, and physically abused both him and other children, for no apparent reason. Jesse, he said, would hold the students and turn them upside down by their stomach. Sometimes he had his pants down while he did it. He also said that Jesse would show them pictures of naked boys, and loaded games like "Strip Poker" onto the computers for Arnold Friedman to show the boys. Jesse had threatened Witness 9 and others into silence.

- On **May 26**, Witness 24 stated to Detectives Reihing and Myers that Arnold and Jesse Friedman would show him pornographic material; Jesse would rub up against the child; and that afterward, Jesse would threaten to take his parents away if he told anyone about the pictures.

- On **June 3**, Witness 7 spoke again with Detectives Merriweather and Squeglia, resulting in his third statement. This interview is notable for resulting in the first description of both (1) ███████████████████████████ (2) "sex games," each described below. He explained "Leap Frog" as a "game" where Jesse Friedman would perform oral sex on one student, who would then do the same to the next child in a row, and so on, down the row. ████████████████████ Witness 7 also described playing "Simon Says," and two variations of a "game" called "Super Hero." In one, two children would lie naked ███████████ ███████████; in another, one child would stand naked ███████████ ███████████████ would play with their penises until "white stuff" came out onto the child's body. On the same date, he ████████████████ provided a statement to that effect.

- On **June 7**, Detectives Merriweather and Squeglia took Witness 15's second statement. Here, he also described ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ that, in one case, Jesse ejaculated onto his shirt, which he tried to wash off. He also observed other children being abused by them. Further, he said that Jesse ███████████ anally

---

[96] This conclusion is based on how the witness described his age. Though the statement cannot be dated conclusively, the child's testimony does not form the basis for any charge until the third indictment.

25

**A-0075**

sodomized him, resulting in bleeding in his underwear. On **June 13**, this child's mother gave a statement in which she described seeing her son come home from computer class with a wet shirt, and seeing bloody underwear in his laundry.

- On **June 8**, Witness 8 gave his second statement in an interview by Detectives Merriweather and Squeglia. Here, too, he mentioned for the first time ████████████. He claimed that ██████████████████ videotaped him as he was forced to perform oral sex on Jesse. He also reported he was made to perform oral sex ██████, as Jesse anally sodomized him. He also said he played a game called "Leap Frog," which involved oral sodomy.

- On **June 9**, Witness 17 gave his third statement to Detectives Merriweather and Squeglia. He also described the presence of Jesse's three friends, stating that they would hold him down while Jesse anally sodomized him. He also stated that Jesse made him perform oral sex on Jesse, and that he was anally sodomized ████████████—as were the other children. Additionally, he stated that ████████████████████████████████████████.

- On **June 14**, Witness 11 spoke to Detectives Reihing and Myers, and provided a first written statement, in which he described seeing Jesse, ███████████████████ sodomizing other children. He also observed Jesse restraining another child so that ████████ could try to anally sodomize him. He also described several sex games. In one, Jesse ████████████ would jump off a couch, and attempt to anally sodomize children standing in front of them. They would publicly measure their penises; play "Nude Limbo"; and play a third "game," where Jesse ████████████████ ran into the room naked, saying they were the "Three Musketeers," made the boys take their pants off, and bend over, after which one abuser rubbed his penis into Witness 11's "butt." Throughout, the child stated that Jesse photographed several such incidents and threatened to distribute the pictures if any of the children reported being abused.

- On **June 15**, Detective Squeglia took a fifth statement from Witness 7, who described multiple incidents of anal and oral sodomy involving Jesse ████████████. He also provided the only description of a "game" called "Hora Bora Alice," in which ████████████ Jesse would perform oral sex with each other on a couch. In most cases the students only watched; sometimes they participated. This child remembered seeing ████████████ Jesse ejaculate, and being ejaculated on after participating in one such "game" ("I remember getting sperm on my body. I went to the bathroom and cleaned myself."). This interview was the first in which this child identified Jesse Friedman as someone who victimized him. In previous statements he had told police that he had watched Jesse abuse other boys.

- Also on **June 15**, Witness 24 gave a second statement, again to Detectives Reihing and Myers, in which he described playing a sexualized version of "Simon Says" with Jesse. He also saw Jesse anally sodomize other children in class, and expose his penis repeatedly.

- On **June 21**, Witness 5 spoke with Detectives Merriweather and Squeglia and provided a second statement. In this interview, the child first described criminal

26

conduct by Jesse Friedman, involving both fondling and anal sodomy. He also described seeing Jesse walk around the class with his penis exposed, forcing children to touch it.

- On **June 22**, Witnesses 7 and 15 separately picked ██████████ out of a police lineup. Another witness failed to identify ██████, while a fourth picked two people from the same lineup, one of which was ██████.

- On **October 13**, Witness 5 spoke again with Detectives Merriweather and Myers, for a fourth documented interview, leading to a third statement. He first described ████████████████████████, in incidents of abuse, which he described as including "games" called "Leap Frog," "Simon Says," and "Super Hero," some of which were videotaped. He further described anal and oral sodomy being performed between the children, ██████████ ████████████. He also picked ██████ out of a photographic array.

- On **October 25**, Witness 15 spoke with Detectives Merriweather and Squeglia, resulting in his third statement. He recalled the identity of ████████████ ████████████████████ by holding children down so they could be sodomized, orally and anally. He also recalled an activity called "Extravaganza," which consisted of children watching while ████ the adults performed sex acts on each other while a friend videotaped.

- On **November 1**, Witness 13 provided a second written statement to Detectives Merriweather and Jones, in which he stated that everyone played "Simon Says," involving such commands as "put your finger in someone's butt," "stick your penis in someone's butt," among other instructions. He also stated that ██████████ ████████████████████ held him down while Arnold Friedman anally sodomized him.

    2.    Summary of Statements Concerning "Sex Games"

As set out above, several witnesses described sexually explicit group activities which were presented as "games" taking place in the classroom, rather than behind closed doors. Such activities were allegedly organized by Arnold and Jesse Friedman, and often included ██████. A follow-up interview conducted on June 3, 1988, by Detectives Merriweather and Squeglia was the first interview to discuss such activities. Thereafter, several other witnesses described similar "games," sometimes varying in detail, and including, in some instances, the participation of other adult offenders.

Only three children described a game called "Leap Frog," in which a first player would leap over a second, and then be sodomized by the second player.[97] Each independently described the other as a participant in the game. (Witness 2, in an

---

[97] Two of these complainants described a version of "Leap Frog" involving oral sodomy by Jesse Friedman. A third said that "leapfrog" involved no "leaping"; rather, participants would perform sex acts on those next to them. A fourth child, a non-testifying victim who spoke to the Review Team, recalled playing "Leap Frog" while clothed, sometimes with other students, and sometimes with just Jesse Friedman.

27

**A-0077**

interview with filmmaker Andrew Jarecki, would also later describe being forced to watch Leap Frog.[98] In 1988, he did not mention witnessing these "games.") Two of those three children also described games called "Simon Says"[99] and "Superhero,"[100] and a third witness also described "Simon Says." During the same time period, several games—"Three Musketeers,"[101] "Extravaganza,"[102] "Nude Limbo,"[103] "Hora Bora Alice,"[104] a fifth game where adults would jump off the couch and sodomize children upon landing, and a sixth game involving measuring penises—were each reported by only one child each. Again, Detectives Merriweather and Squeglia took the majority of statements in which these games were described, although Detectives Reihing and Myers received similar accounts from two different children on June 1 and 15, respectively.

Each student reported that all such games were played in the classroom, rather than behind closed doors, and detectives attempted to verify these accounts by compiling lists of the other students in the class, who would (necessarily) either observed or participated in the games. One student specifically denied seeing anything of the sort; while other interviews were conducted, no statements were taken, leading the Review Team to conclude that these subjects did not disclose similar conduct to the police.

### 3.  Police Identify Three Potential Accomplices

Before June 3, 1988, no witness had ever indicated the presence of more than two abusers—father and son—in Arnold Friedman's computer class. Just one week later, however, four students had signed statements detailing crimes committed by one, two, or three additional abusers. One of these abusers, Goldstein, would later be indicted on charges stemming from these interviews. His case is analyzed below. The other two, though never prosecuted, were both subjected to varying degrees of police examination. This section analyzes the development of the case against these young men.

#### a.  Early Investigation Excluded Other Adult Involvement

Though this phase of the investigation was the first to result in the serious investigation of additional parties, it was not the first time police had considered that

---

[98] *See* Doc 83, transcript of interview with Computer Student 1, tape 135, at 3.

[99] This "game" appears to have followed the traditional rules—a central figure uses the phrase "Simon Says" to preface commands—except that here, each command required a sexual act ("Simon Says, touch your penis.").

[100] "Superhero" was described by one witness as being "played" in one of two ways: either a child would lie down, and an abuser would ejaculate onto the child from a standing position, or an abuser would lie down on the floor, naked, with one or more children on top of him, and another abuser would then lie on top of them.

[101] In "Three Musketeers," Jesse Friedman, ▮▮▮▮▮ and a third individual would run into the room and "rub" their penises on the buttocks of child victims.

[102] This "game" involved Arnold and Jesse Friedman performing sex acts on each other and ▮▮▮▮▮, which other children were made to watch.

[103] "Nude Limbo," as described, involved children using a limbo bar while naked.

[104] This "game" involved two abusers naked and kissing on a couch, and may have included some children as participants.

28

othe adults might have been involved in the case. Investigators became aware early on that a local high school student, Witness 26, had worked as Arnold Friedman's assistant in all class sessions between October 8, 1987, and November 20, 1987. In a December 3, 1987 interview with this individual, he described several details about the Friedman classes: he acknowledged, for example, that the class's computer disk library contained pornographic videogames—"Dirty Movie" and "Strip Poker"—and that only one class, the "Friday" class, could borrow games from that library overnight.

One child described being victimized by Arnold Friedman in the classroom while Witness 26 was present. However, despite his proximity to alleged abuse, Witness 26 was never arrested. So too with David Friedman, who expressed concern that police would indict him and use him against his brother Jesse.[105] But this never came to pass.

Similarly, *Capturing the Friedmans* notes another individual of high school age who spent "a lot of time" with Jesse Friedman at his house, lived in the house for at least several weeks during the relevant period and, by his account, saw nothing untoward take place there.[106] This individual spoke to members of the Review Team in connection with this investigation, and expressed his belief that he too had been a suspect during the initial investigation. He claimed he was advised to flee to the Hamptons over the Fourth of July weekend to avoid being arrested in connection with the case. However, despite his belief that his arrest was imminent, no such arrest occurred, and the police never did interview him.

b.    *Police Focus on Ross Goldstein, and Suspects 1 & 2*

In addition to Goldstein, discussed below, the police seriously investigated only two other individuals. Investigators were led to them by witness reports indicating that three high-school age "friends" of Jesse Friedman had joined him, and acted as accomplices to him and Arnold Friedman.[107] Based on these reports, police presented children with yearbooks from local schools, and photographic arrays including potential suspects.[108]

---

[105] *See* A435, excerpt 9 ("I'm probably not going to be arrested. They know I won't testify against Jesse, and, arresting me would delay the start of the trial") (emphasis in original).

[106] Transcript of *Capturing the Friedmans*, A155; *see also generally* Affidavit of ████ (Dec. 15, 2003).

[107] According to Goldstein, though, police began this investigation when, at an uncertain point before June 10, 1988, the name of a high school student was found on one of Arnold Friedman's disks. When officers went to meet this individual, he was in the company of three friends—including Goldstein. *See* Goldstein Interview 2 (Sept. 21, 1988), at 125-50 (containing one narrative of this meeting); A821, Goldstein Statement, Mar. 8, 2013. No evidence has been found to support this version of events.

[108] Note that this section discusses only identifications made by children who at some point reported criminal activity, and whose identification statements contain an indication of which subject was or was not identified.

29

In this manner, Suspect 1, ███████████ was identified by two different victims, once from a yearbook and once from a photographic array.[109] Thereafter, the suspect was monitored by police, arrested on June 10, 1988, and then asked to submit to questioning by detectives. The individual sat for a polygraph, which registered inconclusive results. A re-examination was "recommended," but never completed.

However, Suspect 1 remained a person of interest, and police included his image in a photographic array that was shown to two other children. Neither child identified him. Suspect 1 was also included in a line-up procedure on November 17, 1988, where he was positively identified by three complainants, including three of the complainants who had previously failed to identify him from an array. At the lineup, four other complainants failed to identify him, and four identified someone else in the lineup. (Notably, of the four complainants who mis-identified Suspect 1, only *one* complainant had actually given a statement indicating that Jesse's friends were present in the class.) Detective Sergeant Galasso and Detective Hatch presented the case to members of the District Attorney's office for indictment in January 1989—after Jesse Friedman's guilty plea—but the chief of the District Attorney's Major Offense Bureau declined to prosecute Suspect 1, citing "insufficient evidence."[110]

Suspect 2, ██████████ was included in a photographic array shown to one victim, on June 16, 1988, but was never identified. He was also later included in a line-up proceeding on November 17, 1988. Out of eleven complainants shown this line-up, eight made no identification, though four of those had never mentioned the presence of any of Jesse Friedman's friends in their statements. Three identified someone else in the same lineup. All of those three had given statements describing Jesse Friedman's friends. Suspect 2 was never charged.

### c.    Ross Goldstein

On June 3, 1988, Witness 7 became the first victim to report that an accomplice had joined Arnold and Jesse Friedman in the classroom, and participated in the abuse of the computer students. That same day, police showed Witness 7 a yearbook containing pictures of Jesse's classmates, from which Witness 7 identified both Ross Goldstein *and* Suspect 1 as accomplices.

Within a week, three others also implicated Jesse's friends in similar acts. One, Witness 17, identified Goldstein by photo array, and another, Witness 15, identified him by name. On the strength of these reports police arrested Goldstein on June 10, 1988. Goldstein would later describe this arrest as particularly brutal: police pulled him from the street, he said, threw him in a van, and drove him around while standing over him and yelling at him. But the specific facts of the arrest cannot be corroborated. Though police

---

[109] Presented with similar means of identification, though, one of these students later failed to identify him a second time.

[110] *See* A293, memorandum from Barry W. Grennan, Major Offense Bureau, NCDA, to Det. Sgt. Galasso, Sex Crimes Squad, NCPD (Feb. 15, 1989).

30

files document the arrest, they say only that he was "released following an investigation related to the reported sodomy," and do not report how long he was detained, or if he was picked up in a vehicle. The record also annexes a *Miranda* waiver, signed and dated by Goldstein.

Eventually, three other witnesses would identify Goldstein as an abuser—Witnesses 5, 11, and 13—and Witness 3 would also identify him as someone who was present in the class, all in statements taken between June and November, 1988. In a line-up conducted on June 22, 1988, Goldstein was identified by two children. Another one made no identification. A fourth, Witness 17, identified *two* individuals from a line-up, one of whom was Goldstein. This child had previously identified him from a photographic array. He did not go on to testify against Goldstein in the grand jury.

In the fall of 1988, Goldstein began to cooperate with police in the case against Jesse Friedman in return for what he thought would be a favorable plea bargain, potentially including six months' jail time, five years of probation, and a Youthful Offender adjudication. With his attorney present, Goldstein sat for four transcribed interviews with investigators—on September 8, September 20, October 5, and October 27, 1988—discussing how he had come to be involved with Jesse Friedman, and what he had done in the class. As summarized in a later opinion by the New York State Appellate Division, Second Department:

> [Goldstein], who was 15 and 16 years old when he committed the crimes, became repulsed by them, and six months before the Friedmans were arrested, the defendant disassociated himself from Jesse Friedman and his activities. Following the defendant's indictment for a number of sex crimes, including Class B violent felonies, the prosecution . . . sought the defendant's assistance in strengthening the case against Jesse Friedman, and in providing information concerning two other individuals suspected of being involved in the crimes.[111]

Goldstein's statements to police during these interviews were sometimes highly detailed, and sometimes vague. He described with specificity, for example, the first time he saw Jesse touch a child inappropriately. The child was playing a computer game, he said, that would prompt the user with sexual questions—"where is your penis?"—and, in response, Jesse touched his own penis, and then the child's.[112] Jesse then instructed Goldstein to do the same.[113] When the game next prompted, "where can you stick your penis?", Jesse

---

[111] *People v. Ross G.*, 163 A.D.2d 529, 530 (2d Dept. 1990).
[112] Goldstein Interview 1 (Sept. 8, 1988), at 29-32.
[113] *Id.* at 31-34.

demonstrated by placing his mouth around the child's penis.[114] According to his statements to police, Goldstein was shocked.[115]

Goldstein was able to give detailed descriptions of other events. Late in the interview process, he admitted that, contrary to his prior statements, he had actually met Jesse early in 1986, but kept this fact to himself because during that time, Jesse had forced him into a homosexual relationship, which Goldstein found intensely embarrassing.[116] When police asked Goldstein specific questions about who he had helped Jesse abuse, when, and what acts had been performed on the victims, Goldstein sometimes could remember specific details. On other occasions he could not, and asked police for prompts, or specific details about the acts being alleged. Police obliged, and would sometimes read portions of statements before Goldstein would admit or deny his involvement. Goldstein attributed his lack of memory in these cases to his drug use, such as acid and marijuana, and to memories he was working through with his therapist.

All told, six victims implicated Goldstein in criminal sexual activity, but only four of those eventually testified against him before a grand jury.[117] Had Jesse Friedman proceeded to trial, the terms of Goldstein's cooperation agreement with police would have obligated him to testify truthfully against Jesse Friedman.

### 4. Media Coverage Subsequent to the Second Indictment

News outlets reported extensively on Arnold's plea bargain[118] and sentencing.[119] *Newsday* also reported that Elaine Friedman was charged with obstruction of justice for attempting to punch Detective Sergeant Galasso during Arnold's earlier arrest.[120] Thereafter, the case largely disappeared from the headlines. Even the arrest of a third adult, Ross Goldstein, on June 23, 1988—discussed above—attracted few news

---

[114] *Id.* at 35-38.

[115] *Id.* at 38-41.

[116] Goldstein Interview 4 (Oct. 27, 1988), at 4-7. His prior interviews with police had only alluded to this relationship. *See, e.g.*, Goldstein Interview 1 (Sept. 8, 1988), at 26-28.

[117] Witnesses 3, 5, 7, 11, 15, and 17. No charges resulted from Witnesses ▮ and ▮

[118] *Newsday* first reported the date that the plea would take place. *Long Island Agenda*, NEWSDAY, Mar. 21, 1988, 1988 WLNR 186596. For reports of the proceeding itself, *see* Robert Weddle, *Molester Teacher Jeered*, N.Y. POST., Mar. 26, 1988; Alvin E. Bessent, *Teacher Guilty of Sex Crimes in Plea Bargain, Admits Sodomizing Boys in Great Neck Home*, NEWSDAY, Mar. 26, 1988, 1988 WLNR 178928; Michael Hanrahan & Alton Slagle, *School Operator Admits His Guilt in Sex Abuse Case*, N.Y. DAILY NEWS, Mar. 28, 1988; Arnold Abrams, *Child-Sex Convict: I'm Sorry, Judge Says No to Treatment Bid*, NEWSDAY, Mar. 29, 1988, 1988 WLNR 150866; .

[119] *Prison Term in Abuse of Boys*, N.Y. TIMES, May 13, 1988; Alvin E. Bessent, *Teacher Sentenced in Sodomy*, NEWSDAY, May 14, 1988, 1988 WLNR 149296; A. Anthony Miller, *Arnold Friedman is Sentenced*, GREAT NECK RECORD, May 17, 1988; *see also* Ruben Rosario, *10-Year Sentence for Child Sex*, N.Y. DAILY NEWS, date unavailable; Philip Messing, *Sex Attack Teacher Gets Prison for Kid Porn Rap*, N.Y. POST, date unavailable.

[120] Alvin E. Bessent, *Sex-Case Figure's Spouse Charged*, NEWSDAY, Mar. 30, 1988, 1988 WLNR 162394; *see also* Alvin E. Bessent, *Probation, Fine for 'Swing' at Cop*, NEWSDAY, Oct. 21, 1988, 1988 WLNR 185547.

32

reports.[121] Only three *Newsday* articles were found discussing the substance of the third indictment itself: two discussing the document,[122] and the other describing Jesse's guilty plea.[123] Though the plea and sentencing proceedings for Goldstein and Jesse Friedman both drew considerable commentary, the case had by that time concluded.[124]

On February 11, 1988, Judge Boklan permitted television cameras in her courtroom to film the proceedings, "for arraignment purposes only."[125] In her order, Judge Boklan stated that "a voir dire of the jury would insure against any prejudice that would result from increased publicity." Judge Boklan also noted further cautionary steps she had taken, including "assurances from news media applicants" that the audience would not be filmed, that "outbursts" from the audience would not be broadcast, and that "nothing lewd or scandalous" would occur during the arraignment proceeding, "other than the nature of the charges alleged."[126]

## I.    Third Indictment (Nov. 7, 1988)

Armed with corroborating testimony from Ross Goldstein, and facts demonstrating additional criminal activity, the prosecution sought, and a grand jury returned, a third indictment. This document excluded Arnold Friedman, but included a substantial number of charges against Goldstein, and reflected the decision to charge crimes based on new evidence uncovered after the issuance of the second indictment. No count of the indictment was sustained by Goldstein's testimony alone. Rather, his testimony served only to corroborate other witness accounts.

---

[121] *See* Bill Van Haintze and Alvin E. Bessent, *New Arrests in Child-Sex Case*, NEWSDAY, June 23, 1988, 1988 WLNR 176418 *and* Alvin E. Bessent, *Teen Faces 37 New Sex Charges*, NEWSDAY, June 24, 1988, 1988 WLNR 195422; *see also* A. Anthony Miller, *More Charges and Defendants in Friedman Case*, GREAT NECK RECORD, June 30, 1988.

[122] Alvin E. Bessent, *Child-Sex Case Expanded, Son of Great Neck Computer Teacher Charged with 198 New Counts*, NEWSDAY, Nov. 16, 1988, 1988 WLNR 166292. Another article on the same day discussed the case only very generally. *Youths Face New Counts in Sex-Abuse Case*, NEWSDAY, Nov. 16, 1988, 1988 WLNR 1319633

[123] Alvin E. Bessent, *Boys' Sex Abuse Admitted, Great Neck Teen to Get 6-18 Years in Plea Bargain*, NEWSDAY, Dec. 21, 1988, 1988 WLNR 158550.

[124] For Ross Goldstein, *see* Alvin E. Bessent, *Teen Admits Guilt in Sodomy Cases*, NEWSDAY, Mar. 23, 1989, 1989 WLNR 232736; Shirley E. Perlman, *Prison Term for Teen in Abuse Case*, NEWSDAY, May 4, 1989, 1989 WLNR 215976. For Jesse Friedman, *see Long Island Agenda*, NEWSDAY, Jan. 23, 1989, 1989 WLNR 178234; Alvin E. Bessent, *Teen Gets 6-18 Years for Child Sex Abuse*, NEWSDAY, Jan. 25, 1989, 1989 WLNR 224571. A fifth article noted that police were still looking for the pornographic pictures Arnold and Jesse were accused of creating. Alvin E. Bessent, *Dragnet Out for Porn Photos: Police Hunt Missing Items in Probe of Friedman Child-Sex Case*, NEWSDAY, Feb. 8, 1989, 1988 WLNR 185547.

[125] *See* A390-91, Order, Feb. 11, 1988. She would issue a similar order prior to the third indictment. A392-93, Order, Nov. 17, 1988.

[126] Chief Judge Lippman of the New York Court of Appeals has recently called for wider media coverage of court proceedings, arguing that the public "have a right to know" about the judicial process. *N.Y. Court Of Appeals Chief Judge Calls For Return Of Cameras To Courts*, CBS NEW YORK, Feb. 16, 2013, http://newyork.cbslocal.com/2013/02/16/n-y-court-of-appeals-chief-judge-calls-for-return-of-cameras-to-courts/.

33

Seven children testified before the grand jury in support of this indictment. Of them, three had previously testified against either Friedman.[127] However, it is believed that none of the remaining four were "new contacts"—all were known to the police by December 17, 1987—and at least two had already provided police with formal statements. The charges against Jesse Friedman break down as follows:

| | First Ind. Dec. 7, 1987 | Second Ind. Feb. 1, 1988 | Third Ind. Nov. 7, 1988 |
|---|---|---|---|
| **Sodomy in the First Degree** | 0 | 6 | 126 |
| **Sodomy in the Second Degree** | 0 | 0 | 1 |
| **Attempted Sexual Abuse in the First Degree** | 0 | 1 | 0 |
| **Sexual Abuse in the First Degree** | 3 | 10 | 9 |
| **Sexual Abuse in the Second Degree** | 0 | 0 | 1 |
| **Endangering the Welfare of a Child** | 5 | 19 | 52 |
| **Use of a Child in a Sexual Performance** | 0 | 0 | 9 |

The third indictment was much broader than the preceding two, and many more distinct acts of sodomy were charged. However, the increase is not as steep or startling as the number of counts might suggest. Each charge of sodomy, for example, does not correspond to an independent act of forcible anal penetration. This is so for several reasons: as explained above,[128] first degree "sodomy" in 1987, or the commission of a "criminal sexual act" today, does not require proof of actual penetration, but only the touch of a penis to the victim's mouth or anus (or vice versa).

Second, some singular criminal acts led to two charges. For example, A.D.A. Joseph Onorato often charged a single act of sodomy twice, on the basis of two separate

---

[127] Those four are ███████ ███████ ███████ ███████ and ███████ Of these, the latter two gave statements before December 17, 1987.
[128] *See* note 85, *supra*.

**A-0084**

theories of the crime's commission (one compulsory, the other statutory, based on the victim being less than eleven years old). The crime of sodomy may be committed in several manners under governing law,[129] such that charging the crime under dual theories violates no constitutional rule, and is, in fact, standard prosecutorial practice.[130]

Additionally, a number of counts are attributable to a theory of accomplice liability. In several cases, for example, Jesse Friedman and Goldstein were charged for helping one another perform an act on a child.[131] In such cases, one person would have been charged for actually sodomizing the victim, and the other for restraining or otherwise abetting the act of sodomy. Therefore, in some of the charges, Jesse Friedman was not the principal actor.

Because sodomy in 1987 required only the touch of penis to anus *or* mouth, it does not follow that each underlying act of sodomy (let alone each charge) necessarily entailed violent anal penetration, or resulted in injury. Rather, some counts may have represented the touch of penis to anus, or mouth, as part of a "game," without actual penetration.[132] For example, though some counts allege that Jesse Friedman or Goldstein committed sodomy by forcing[133] a victim to sodomize *them*, the implication is only that the perpetrator forced the child to *touch* his own penis to the perpetrator's anus, or the child's mouth to the perpetrator's penis.[134] Conduct alleged in the third indictment, therefore, was neither factually impossible, nor necessarily implausible. Even so, the third indictment substantially eclipsed the preceding two in the number of charges, and introduced additional criminal acts, as well as fact patterns that resulted in multiplying charges.

## J.    Jesse Friedman's Guilty Plea

Jesse continued to maintain his innocence. In family discussions, he spoke forcefully about his desire to bring his case to trial and confront each witness in sequence. Family members expressed their belief that a fair trial for Jesse would have been impossible but for Arnold's guilty plea. Both brothers, Seth and David, expressed doubt

---

[129] *See* N.Y. Penal Law § 130.50.

[130] This rule accords with the doctrine of "multiplicity," and with established law permitting conviction on similar counts provided that each conviction requires proof of at least one distinct material point. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932); *see also People v. Kindlon*, 217 A.D.2d 793, 795 (3d Dept. 1995) ("An indictment is not multiplicitous if each count requires proof of an additional fact that the other does not."). In any event, if convicted of committing the same act of sodomy in several different ways, Jesse Friedman could not have received consecutive punishment for those acts. *See* N.Y. PENAL LAW 70.25(2).

[131] *See* N.Y. PENAL LAW § 20.00.

[132] Debbie Nathan, a paid consultant for and participant in *Capturing the Friedmans*, assumed otherwise in the film, and in her published works. *See* Debbie Nathan, *Complex Prosecution*, THE VILLAGE VOICE, May 20, 2003, *available at* http://www.villagevoice.com/2003-05-20/news/complex-persecution.

[133] "Force" here refers to either physical coercion, or verbal threat.

[134] Therefore, the charge need not be read to claim that the victim accosted, and then forcibly penetrated, a "strapping teenager[] twice his age," as one of Friedman's advocates has suggested. De Becker & Horowitz, supra note 13, at 16.

35

that a jury would believe Jesse if he stood trial next to a man, his father, who had traded in child pornography.[135] The family and their attorneys also considered the possibility of an *Alford* plea, but there is no evidence that this option was discussed with either the prosecution or the judge.[136] Arnold would later claim that he pled guilty only to spare Jesse that difficulty, and to give him a fair chance at trial.

David Friedman appeared to question Jesse's innocence for the first time after Arnold's counsel, Jerry Bernstein, told the family that Arnold's admissions in the close-out interview tracked precisely with police accounts of abuse.[137] But, he managed to convince himself anew of his father's innocence.[138] At least one contemporaneous letter also shows that Elaine Friedman believed Jesse should simply plead guilty.[139]

1.   Spring 1988: Jesse Hires Attorney Peter Panaro

David and Jesse remained committed to proving Jesse's innocence.[140] After Jesse came to believe that his lawyer, Douglas Krieger, thought that Jesse was actually guilty, Jesse began to aggressively seek out a new attorney willing to go to trial on a theory of complete innocence.[141] In recent conversations with the Review Team, Jesse claimed to have personally interviewed approximately twenty attorneys. Ultimately, sometime in June 1988, Jesse hired Massapequa criminal defense lawyer Peter Panaro.

Once retained, Panaro inherited an investigation already underway. Panaro told the Review Team that Jesse had already deduced the identities of the "Doe" victims. Deborah M. Broder, an assistant to Arnold Friedman's attorney, had already spoken to one witness who expressed a desire to assist Arnold Friedman. A report of that interview was found in Panaro's files.[142] The Friedman family itself was also actively involved in

---

[135] Audio recorded discussion between Arnold, David, Elaine, Jesse, and Seth Friedman (Mar. 24, 1988), preserved as a transcript of "Tape 6, Disk 8," tracks 1 and 2.

[136] The Second Circuit suggested that Panaro may have been under the misimpression that he could not allow Jesse to plead guilty unless he, Panaro, was actually convinced of Jesse's guilt. *See* A374, transcript of meeting between Peter Panaro and Jesse Friedman (Dec. 20, 1988) ("[Y]ou will not be permitted to plead guilty unless you are, in fact, guilty."). In its opinion, the Second Circuit observed in *dicta* that such an admission of guilt was unnecessary, given Supreme Court precedent permitting defendants to plead guilty without acknowledging their culpability. *Friedman*, 618 F.3d at 150 n.1 (citing *North Carolina v. Alford*, 400 U.S. 25, 37-38 (1970)). While such "*Alford*" pleas (also known in New York as *Serrano* pleas, 15 N.Y.2d 304 (1964)) are legally cognizable, they are uncommon, and it is inconceivable that any district attorney would have offered, and a judge accepted, such a plea in a case of this gravity, especially considering the number and age of Jesse's victims, and the nature of the charges. It is more likely that Panaro believed an *Alford* plea to be unrealistic in this case.

[137] A426-28, David Friedman's Personal Journal, excerpt 6.

[138] *Id.*

[139] A433, at excerpt 8; *see also* A477-78, letter from Elaine Friedman to Peter Panaro (undated). Note that the letter was found and transcribed by Jesse.

[140] A433, at excerpt 8.

[141] A303-04, letter from Jesse Friedman to William Kunstler, Esq. (May 6, 1988) ("My lawyer [Douglas Krieger] believes I am guilty and I am not.").

[142] A305-06, memorandum from Deborah M. Broder to File (Jan. 26, 1988).

36

preparing a defense for Jesse. By his brother David's account, this was no easy task. Non-complainants proved entirely unwilling to speak with the Friedman family:

> *The other kids in class w/ no charges, aren't talking to us. They're yelling at us and not helping us. Also one said that if asked, [he] would say that something happened. This person wasn't approached by the police.*[143]

Panaro's files also contain a document listing witnesses who, the unidentified author believed, might be supportive of Jesse.[144] Records do not show when Panaro received this list, nor do they disclose how it was used, if at all. Notably, though, Arnold's handwritten additions to the document suggest that only one child was willing to speak in his defense, and even then, the child would only defend Arnold from the "serious charges."[145] And, there is no evidence to show whether Jesse Friedman, or Arnold, approached Witness 26 as a potential defense witness, even though Witness 26 presumably observed the class.

During this early phase, in an attempt to gain some background on the case, Panaro visited Arnold in a Wisconsin federal prison. During this meeting, Arnold confessed to abusing children at the family vacation home in Wading River, New York. More disturbing still, Arnold asked to change interview tables because he was "excited" by seeing a nearby father bouncing a child on his lap. (The latter was reported in *Capturing the Friedmans*, and also repeated in interviews with the Review Team.[146])

### 2.    Autumn 1988: Panaro Retains Psychologists and Other Experts

Panaro enlisted expert witnesses to examine Jesse and evaluate his mental state. One such expert was Dr. David Pogge, a psychiatrist and a specialist studying the psychopathology of teenage sex offenders. After Jesse Friedman provided a waiver, Dr. Pogge sat with the Review Team to discuss the steps he took in 1988 to evaluate Jesse Friedman. Today, Dr. Pogge is the Director of Psychology and head of the Psychological Assessment Service at Four Winds Hospital, a provider of in-patient psychiatric treatments for children, adolescents, and adults. At the time of the original case, Dr. Pogge was one of the first to treat sexual abuse offenders, and was recruited by North Shore Hospital in Manhasset, New York, for his expertise in that field. While there, he was not involved in the evaluation or treatment of any of the victims of Arnold or Jesse Friedman.

Based on this expertise, Panaro retained Dr. Pogge to evaluate whether Jesse's personality suggested that he was capable of committing the crimes charged. To guide this assessment, Dr. Pogge drew questions and components from several distinct existing testing regimes to capture relevant information about Jesse Friedman. Ultimately, Dr.

---

[143] A419, at excerpt 4 (emphasis in original).
[144] A301-02, "Potential Witness List."
[145] *Id.*
[146] A226.

37

**A-0087**

Pogge's conclusions resulted from the application of his own judgment and expertise to the results produced by these tests. The doctor did not simply restate the results of any one regime.[147] No one psychological protocol dictated his findings.

Together, these tests led Dr. Pogge to classify Jesse as a "psychopathic deviant" who was "self-centered, manipulative, egocentric, and capable of breaking the law." Dr. Pogge stated that the results showed Jesse to be "narcissistic, antisocial, passive aggressive, badly behaved, not a good citizen, and drug-dependent." Similarly, Jesse provided two "reflection" responses to a Rorschach test, an uncommon result suggesting that Jesse believed "he [was] better than other people," and was extremely "egocentric."[148] According to Panaro's notes, Dr. Pogge further described Jesse as a "psychopath" and a "pansexual," and acknowledged that Jesse was, by his own words, a "very heav[y] drug user."[149] Dr. Pogge also concluded that Jesse's personality was consistent with someone who was capable of committing the crimes with which he was charged. As Panaro's contemporaneous notes of his conversation with Dr. Pogge summarized, "Jesse believes it didn't occur or, that if it did occur, it's not really important," because "there is no victim."[150] Panaro expanded on this assessment in a recent interview with the Review Team. He said that Pogge had told him that Jesse lies all the time, and derives gratification from fooling others. It was almost definite, Panaro said Pogge had told him, that Jesse *had* been involved in deviant sexual behavior with his father, and that Jesse's real problem was his inability to admit that his father was guilty.

Another doctor, listed only as "Dr. Feldman" in Panaro's notes, stated that in his opinion Jesse was "abused by his father," exhibited tendencies towards "sadism," and "has been an exhibitionist."[151] Like Dr. Pogge, Dr. Feldman reported that "Jesse feels he is being persecuted and that if there are sexual acts, there are NO VICTIMS b[ecause] they participated 'voluntarily.'"[152] Jesse himself would later make similar claims, in an exchange recorded in *Capturing the Friedmans*:

> **Seth:** *You a child molester, Jesse?*
> **Jesse:** *Nope.*
> **David:** *Did you ever do it?*

---

[147] Dr. Pogge described this process in conversations with the Review Team. Recently, Ron Kuby wrote a letter to the District Attorney's office in which he attempted to discredit Dr. Pogge's findings, nearly twenty-five years after the fact, by claiming that Pogge used inappropriate testing protocols, and that he should instead have used different, far superior tests. *See* letter from Ronald L. Kuby to Madeline Singas, Chief A.D.A., NCDA (Mar. 5, 2013). But Kuby's preferred test did not exist in 1988. And, Dr. Pogge did not simply apply then-existing testing regimes. Instead, he used the testing regimes as guides for his own, independent analysis.

[148] These notes do not appear in Panaro's original files; rather, they were obtained directly from Dr. Pogge's notes, which he discussed with members of the District Attorney's staff during an interview about the case. This interview was obtained pursuant to Jesse Friedman's express permission.

[149] A330-31, handwritten notes, dated Nov. 3, 1988 (emphasis in original).

[150] *Id.*

[151] A307-27, handwritten notes, dated Nov. 21, 1988.

[152] *Id.* (emphasis in original).

38

**A-0088**

> **Jesse:**  *Never touched a kid.*
> **David:**  *Did you do what they said you did?*
> **Jesse:**  *I never touched a kid. I never saw my father touch a kid.*
> **David:**  *Good.*
> **Seth:**  *Yeah, but still, you must have done it.*
> **David:**  *Yeah, but surely something must have happened. It must, something.*
> **Seth:**  *Because the police say it's true. Okay, you never touched a kid, right?*
> **Jesse:**  *Well, if something happened, it didn't happen while I was there.*
> **Seth:**  *But still, the police tell the truth, right? I mean the police—*
> **Jesse:**  *And it was a minimal incident because the kid didn't say anything about it.*
> **Seth:**  *But the police, how could they be lying?*
> **Jesse:**  *Shut up, Seth.*[153]

Panaro asked Dr. Pogge and Dr. Feldman "<u>NOT</u> to give me [Panaro] a written report" of their findings, "due to the extreme negative result of the psychiatric report."[154] The results dismayed David Friedman: Jesse "did terrible," he wrote, "at a psychological profile by the top guy in the country."[155]

Jesse twice sat for a polygraph examination. The first was conducted at the request of Jesse's attorney Douglas Krieger. The results are unknown. The next was administered at Panaro's request over two days by Dick Arther, a nationally-known polygraph expert.[156] According to Panaro, the result of this test "was that Jesse Friedman was not truthful."[157] David, too, described Jesse as having "failed <u>horribly</u>."[158] According to David, Jesse also sat for and failed "terribly" a penile plethysmograph test,[159] an examination in which an instrument is used to measure the subject's penile response

---

[153] A253-55.

[154] A330-31.

[155] A435-36, excerpt 9.

[156] A342-43, polygraph authorzation forms, dated Oct. 18 and 20, 1988.

[157] A600-01, Letter from Peter Panaro, Esq., to Richard O. Arther (June 28, 2002).

[158] A439, excerpt 10 (emphasis in original). In a handwritten note dated December 18, 1988, David retracted this analysis: "I now think he passed but Panaro told us he failed, to get J[esse] to 'admit' guilt." *Id.* Others have questioned the results of this polygraph: years later, the team responsible for *Capturing the Friedmans* would seek a "second opinion" of Jesse's test results, from an attorney friend who was, according to filmmaker Andrew Jarecki, "familiar with polygraphs." This friend apparently concluded that the test was "inconclusive." The basis for this conclusion is not known.

[159] A435-36, excerpt 9. Though Jesse denies it today, according to David's journal, Jesse actually acknowledged that he took the test, but explained away his failure. *Id.* ("Jesse says that any question about sodomy, etc., got a shocked response so he couldn't be neutral through the whole thing…") (ellipsis in original).

39

**A-0089**

while he is exposed to various visual stimuli.[160] The reliability of these tests has been questioned,[161] and Jesse today denies that he took such a test.

### 3. Winter 1988: Jesse Explores His Options

Panaro ultimately met with a non-complainant, Witness 28, and his mother on November 21, 1988.[162] Witness 28 had previously been identified by David Friedman as a sympathetic witness, though David expressed some doubt about how much he would help the case. Witness 28 was, David wrote in March 1988, an "oddball," and "he wasn't in any classes in which there are charges."[163]

At his meeting with Witness 28, according to Panaro's notes, Witness 28's mother showed Panaro a videotaped recording of Detectives Hatch and Jones interviewing her son (the "Meyers Tape").[164] In the video, according to Panaro's notes, both detectives stated that Arnold Friedman "admitted . . . in open court" to abusing children who, in turn, said that her son had been victimized by Arnold.[165] The detectives impressed upon her son that it was futile to deny that he was abused, since "Arnold was under no obligation to admit" to abuse, but did so anyway; and because Arnold would "not be charged with any other additional charges."[166] Instead, the detectives stated that they were primarily interested in "get[ting] psychological help for the children."[167] According to Panaro's transcript of the tape, when the child denied any abuse, the detectives called him a "wise guy" (possibly in response to comments transcribed as "inaudible"),[168] and dismissed as unbelievable the possibility that "it happened to everyone else but not to you."[169] The detectives did not mention either Jesse Friedman or Goldstein, and the interview concluded without any statement being taken. (The Meyers Tape is discussed in Section III.A.5, *infra*.)

During this time, too, Jesse remained free on bail, and continued shooting family videos. In one such video, Jesse and David Friedman drove to a supermarket minutes away from their home. While shopping, the two wandered the market, and Jesse pretended to "interview" customers by shoving a batch of scallions—a pretend microphone—in each interviewee's face. Among his subjects were several young boys,

---

[160] Jason R. Odeshoo, *Of Penology and Perversity: the Use of Penile Plethysmography on Convicted Child Sex Offenders*, 14 TEMP. POL. & CIV. RTS. L. REV. 1, 8-9 (2004).
[161] *Id.* at 10-14; *see also, e.g., Decker v. Hogan*, 09–CV–0239, 2009 WL 3165830, at *7 (Sept. 28, 2009). Nonetheless, they remain widely in use. *See* Rachel Aviv, *The Science of Sex Abuse*, THE NEW YORKER (Jan. 14, 2013).
[162] *See* A305-06.
[163] A419, excerpt 4.
[164] In his original handwritten notes, Panaro appeared to believe that Detective Sergeant Galasso also was present. *See* A308.
[165] Citation here is to the "transcript" of the tape prepared for litigation. A328.
[166] *Id.*
[167] *Id.*
[168] A329.
[169] A328.

40

each of whom greeted the two Friedmans normally, if shyly. The children were in the presence of their parents, who did not react to the Friedmans' presence. Otherwise the two interacted normally with everyone they met. As they left, Jesse and David mocked the supermarket's shopping cart attendee, who appeared to be mentally challenged.

It is apparent from the video that neither David nor Jesse were recognized by the shoppers. Based on subjects of conversation—several "interviews" mention an upcoming presidential election involving George H. W. Bush—this video can be dated to Fall 1988. If that date is correct, the brothers' interactions with members of the Great Neck community belie Jesse's later claim that, in the run-up to his guilty plea, he was a "prisoner in [his] own home" due to the mass hysteria surrounding the case.

Panaro continued to prepare for trial. He obtained from A.D.A. Joseph Onorato full disclosure of each complainant's true name, though A.D.A. Onorato carefully noted that Panaro had received the information long before,[170] and as Panaro told the Review Team, Jesse had long since figured out the victims' identities. Ultimately though, Jesse's decision about going to trial changed, and rapidly. By November 9, 1988, Panaro openly suggested that a limited guilty plea was Jesse's best option,[171] and Jesse too noted, in a letter to his father, that "at one year apeace, [sic]" a conviction on even a few minor charges "would add up too quickly," and carry serious jail time even if otherwise "the trial goes great."[172] Jesse also worried, he said, about the Judge's promise to impose "harsh consecutive time."[173]

The decision to plead guilty followed Jesse's careful consultation with his attorney. Indeed, Panaro recorded and preserved a forty page transcript of an exhaustive meeting between him, Elaine, and Jesse Friedman, in which Panaro confronted Jesse with his options, and probed the reasons for Jesse's change of heart. In the interview, Panaro stated and Jesse agreed that Panaro had discussed several defense strategies with Jesse and with other lawyers,[174] met with multiple psychiatrists in an attempt to formulate a defense strategy based on Jesse's mental state,[175] and further confirmed that he would try the case for no additional fee.[176] Panaro then elicited the admission that Jesse simply did not want to face his accusers in open court:

> **PP:** *It is because of those reasons plus the fact that there are approximately fourteen children in all who could testify against you at this point, [Goldstein], and there have been allegations that perhaps [un-prosecuted accomplices] may be subpoenaed to*

---

[170] A344-45, letter from A.D.A. Joseph Onorato to Peter Panaro, Esq. (Nov. 30, 1988).
[171] *See* A435-36, excerpt 9.
[172] *See* A442, letter from Jesse Friedman to Arnold Friedman ("11:40 PM").
[173] *Id*.
[174] A360-62.
[175] A362-64.
[176] A375.

41

> *trial, that all of these factors have induced you to plead guilty. Correct?*
>
> **JF:** *Correct.*[177]

Panaro further informed Jesse, at length, about his right to appeal his guilty plea,[178] and he confirmed that Jesse had already met with highly-regarded appellate lawyers for that purpose.[179] Panaro also detailed the extent of his near-daily conversations with Jesse and other members of the Friedman family throughout the case's history.[180] Thereafter, Jesse admitted his guilt to Panaro:[181]

> **PP:** *And are you pleading guilty because you are in fact guilty, and for no other reason[?]*
>
> **JF:** *Yes, Peter. That is correct.*[182]

Jesse's mother Elaine Friedman also stated that she was "in support of Jesse's plea of guilty" because she was truly "convinced of Jesse's guilt."[183] Later, during Jesse's imprisonment, she would change her mind. In a recent interview with the Review Team Elaine stated that she "would stake her life on [Jesse's] innocence."

### 4. Late Winter 1988-89: Plea and Sentencing

On December 20, 1988, in Nassau County Court, Jesse Friedman pled guilty to seventeen counts of sodomy, and eight additional counts related to the abuse or exploitation of children, in full satisfaction of the three indictments.[184] His plea bargain included counts from all three indictments. With the plea done, Jesse thanked Scott Banks, Judge Abbey Boklan's law secretary.[185]

Because Jesse took no direct appeal, his plea allocution was never transcribed from the stenographer's shorthand notes.[186] Based on then-prevailing law and practice, though, Jesse would have been required to acknowledge the details of his crimes, and

---

[177] A380-81.
[178] A386.
[179] A359.
[180] A357-58.
[181] Panaro also recorded Jesse's admission in an affidavit submitted in the course of Jesse's habeas litigation. Affidavit of Peter Panaro in Support of Motion to Vacate Conviction, at ¶ 13; *see also Friedman*, 618 F.3d at 150 (noting the same).
[182] A378.
[183] A387.
[184] *Friedman*, 618 F.3d at 150.
[185] Mr. Banks related this occurrence during an interview with the Review Team.
[186] *Friedman*, 618 F.3d at 150 n.2. The stenographer has also since passed away. No other source was able to provide a copy of the plea minutes, including local news media believed to have filmed, or taken notes on, the plea colloquy.

swear that his plea was entered knowingly, voluntarily, and in the absence of any coercion.[187] With this admission, the investigation against Jesse closed.

Jesse continued to receive counseling and legal advice after his guilty plea. For example, Judge Abbey Boklan required that, before pleading guilty, Jesse speak with a psychiatrist. Assigned to the task, Dr. Daniel Schwartz later recalled to the Review Team that Jesse definitely spoke to him about how he was abused by his father, and how Jesse took an active role in abusing children.

Panaro attempted to cast Jesse as still another of his father's victims, arguing that Jesse was as much a victim as the complainants. He pursued other opportunities for leniency as well. According to a letter written by Panaro after Jesse's guilty plea, "prior to his incarceration," Jesse flew to Wisconsin to visit his father, and to ask him to turn over any pornographic pictures he may have produced of his students,[188] in the apparent hope that some charges would be dropped if he cooperated, or appeared to do so. The effort was unavailing, as Arnold could not produce any of these pictures. However, Panaro reported to the prosecutor, A.D.A. Onorato, that Jesse *could* speak to "the number of photographs that he knows were taken, when they were taken, by whom they were taken, etc.," but not their current whereabouts.[189]

Immediately prior to his sentencing, many victims' families reached out to Judge Boklan, with the majority expressing dissatisfaction with the leniency of the likely sentence range of six to eighteen years. Though the minutes of sentencing were never transcribed, Judge Boklan's personal notes, which she read to the *Capturing the Friedmans* filmmaking team, indicate that she read some such notes into the record:

> *The children you have abused are suffering terribly. They are exhibiting sleeplessness, bedwetting, nightmares, stuttering, hair loss, a decline in school work, separation anxiety, and an overwhelming sense of fear. Several children in fact sleep with weapons, bats, and sticks by their beds*.[190]

---

[187] *See, e.g.*, *Santobello v. New York*, 404 U.S. 257, 261 (1971). In the only reported cases to squarely address the subject, the Second Department has twice sustained the validity of pleas entered before Judge Boklan, finding no defect in her ability to fairly admonish defendants of the importance of entering a plea of guilty truthfully. *See People v. Ochoa*, 179 A.D.2d 689, 689-90 (2d Dept. 1992) (denying motion to withdraw plea of guilty, based on integrity of plea colloquy conducted by Judge Boklan) *and People v. Riginio*, 168 A.D.2d 693, 694 (2d Dept. 1990) (same).

[188] *See* A347-48, letter from Peter Panaro, Esq., to A.D.A. Joseph Onorato (Feb. 27, 1989) (responding to A346). Arnold Friedman independently described the same encounter. A502-03, partial letter from Arnold to Jesse Friedman (Aug. 5, 1991).

[189] *See* A293.

[190] A697.

43

On January 24, 1989, Judge Boklan sentenced Jesse Friedman to six to eighteen years' imprisonment, and recommended to the parole board that he serve the full term.[191] Some video footage remains from this proceeding: in a segment that aired on *Dateline*, Jesse cried while addressing the court, blamed his father for not teaching him the difference between right and wrong, and wished that he could have done something to break the cycle of abuse. Jesse would later claim that he was crying only because Panaro had his hand on his shoulder.[192] Shortly after sentencing, Jesse wrote a letter to his brother that described the sentencing as "exhilarating," proclaiming, "I want a big article tomorrow!" He told his brother that "[his] dream of being a star, of having huge numbers of people listen and think about what [he] [has] to say, has come true."[193]

### H.    1988–2001: From Jesse Friedman's Guilty Plea to Release

#### 1.    Jesse Friedman Reaffirms His Guilt on National Television

Just a month after his sentencing, while in Nassau County jail, Jesse appeared on *The Geraldo Rivera Show* and again admitted his guilt, this time to a national audience.[194] Arnold would later argue that the interview was done against Jesse's will,[195] and Jesse himself claimed that he appeared on the show because his attorney encouraged him to do so.[196] Both accounts are false. Jesse appeared on *Geraldo* of his own volition, and against the express advice of his counsel, Peter Panaro. As Jesse wrote, in a release that Panaro demanded from Jesse before he appeared on the show, Jesse was sitting for the interview "voluntarily," to "get [his] side of the story across to the media at any cost, even death."[197] (See statement, next page.)

---

[191] Alvin E. Bessent, *Little Joy in Victory for Boys' Families*, NEWSDAY, Jan. 25, 1989, 1989 WLNR 219053

[192] A457, letter from Jesse Friedman to David Friedman (Jan. 30, 1989).

[193] A458. He added that it was a good thing that he "did not actually do any of that." *Id.*

[194] A newspaper article from that year listed *Geraldo* as the twelfth-highest rated program out of 111 in syndication. Gail Shister, *Geraldo to Cool Down the Sexual Themes*, HOUSTON CHRONICLE, Dec. 29, 1989.

[195] A562 ("His lawyer urged him to do this interview.").

[196] *See* A499, letter from Jesse Friedman to David Friedman (Jul. 18, 1989) ("What do I say to 'the public' to explain what I said on *Geraldo* and why. Thanks to Panaro's encouragement, I have completely ruined my credibility. How can I explain what I did?").

[197] *See* A463 statement dated Feb. 6, 1989.

44

Feb. 6, 1989

I, Jesse Friedman, do hereby consent, against the Advice of my attorney, Peter Panaro, ESQ. 4216 Merrick Road, Massapequa, NY, 11758, that I will voluntarily Appear on the Hiraldo Rivera show knowing that the National Consequences could result in physical Abuse, or even death, by inmates in prison who see me discussing this issue of child Abuse & child pornography on national TV.

I do this because I want to get my side of the story Across to the media at any cost, even death.

*Jesse Friedman*
JESSE FRIEDMAN

Feb. 6, 1989

45

**A-0095**

As Jesse explained in the interview, "[his] side of the story" was one in which he participated in the abuse of his father's students, but only because Arnold forced him to do so. In the video, Jesse looks directly at Rivera and says:

> *I fondled them. I was... forced to... pose in hundreds of photos for my father in all sorts of sexual positions with the kids. And the kids likewise with myself. Oral sex going both ways. I was forced to pose with my penis against their anus.*[198]

Jesse said that Arnold had begun to molest him at a young age. When Jesse eventually "realized what was going on," and that Arnold's behavior was not normal, he still could not stop it, because he was "scared" that if he tried to, he would "lose [his] father, which was the most important thing to [him] for most of [his] life."[199] In a way, he said, he even liked it, because "it was some signs of affection, some signs of loving or caring in the world."[200] "For most of my life," Jesse said, Arnold "was the only person who ever loved me."[201] Asked "[w]hy didn't the kids ever tell?" Jesse replied simply: "the same reason I never told."[202]

Jesse acknowledged Ross Goldstein's participation, but said that his involvement was similarly involuntary: Goldstein happened to stumble into the class while Jesse was "fondling the kids," who were "naked or half naked and [Arnold] was taking pictures."[203] Describing the course of abuse, Jesse acknowledged that "there were times when we held computer class and there wasn't abuse going on."[204] He also explained that children were photographed, with images developed off-site by friends, "Jack" and "Arthur," who possessed darkrooms.[205] Jesse also vividly described the threats he and his father would use to procure the children's silence:

> *I... I know my... my father had made vicious threats to the kids about... about burning down their homes and things like that and... I... re-established that with the kids that I... I thought it was completely possible that my father would actually burn down their homes or... or... or hunt down their parents or something like if... if they told what was going on.*[206]

---

[198] A510-37, *Geraldo: Busting the Kiddy Porn Underground*, at 5-6 (Paramount television broadcast Feb. 23, 1989).
[199] A512.
[200] A519.
[201] A526.
[202] A514.
[203] A532.
[204] A514.
[205] A520-21.
[206] A515-16.

46

This confession echoes confidential statements made by numerous victims: that Jesse and Arnold would, together, threaten children into silence using violent and specific threats. Jesse's recollection of particular threats of arson tracks a statement made by one major complainant in December 1987, more than a year prior to the *Geraldo* interview, and repeated by a child during a 1989 interview:

> *One 12-year-old boy was interviewed for this story in his own room. . . . "The threats made a pretty good impression," he said, glasses askew and eyes darting. He recalled the incident in which a boy's head was banged against the wall. "'Tell and this will happen to you,'" he quoted the Friedmans as saying. He said they also threatened to kill his parents and burn his house if he told.*[207]

To his brothers, Jesse explained his appearance on the *Geraldo* show as a product of his desire for fame, both in its own right and as a way of convincing the world of his contrition. He also said that Geraldo Rivera had "lied" about the subject of the interview.[208] In a letter to Arnold Friedman, Howard Friedman, Arnold's younger brother, questioned this decision, asking why Jesse would admit his and his family's guilt on live television.[209]

Jesse approached an April 1989 interview with *Newsday* in similar fashion.[210] There, he described being abused by his father, saying that his "father began to visit his bedroom at night and fondle him," a tradition that then "escalated into sodomy."[211] Sitting in a jail cell, he proclaimed that he did not "miss" his "old life,"[212] and deliberately avoided any discussion of his own guilt or innocence.[213] Near simultaneously, Jesse wrote a contradictory "off the record" letter to the same *Newsday* reporter, in which he denied the entire account, saying he was innocent, and that it was not "even remotely true" that he had been sexually abused by Arnold.[214] It is not clear if this letter was ever sent, though it is likely.[215]

---

[207] A913.

[208] A4683, letter from Jesse Friedman to David and Seth Friedman (Feb. 27, 1989).

[209] *See* A471-72, letter from Howard Friedman to Arnold Friedman (Mar. 1, 1989).

[210] *See* A483, letter from Jesse Friedman to Seth Friedman (Apr. 8, 1989).

[211] *See* A912.

[212] A914.

[213] *See* A483 ("Alvin told her how he asked me point blank, 'Did I do any of those things?' and that I completely avoided the question. This is true. I had not decided what I wanted to say at that time, now I have, I will not lie anymore. Peter was wrong.'").

[214] *See* A474-77, letter from Jesse Friedman to Alvin Bissent (Apr. 8, 1989) (emphasis in original).

[215] The handwritten letter was found among Jesse's other correspondence. In another letter, Jesse asked his brother Seth to read it and, if he agreed that the letter should be sent, copy it before transmitting it. A481. An addendum to the same letter thanks Seth for "taking care of" the letter, and provides Bessent's address. The implication seems clear that Seth had agreed to send the letter to Bessent.

47

**A-0097**

### 2.    Goldstein's Guilty Plea

On March 22, 1989, consistent with his cooperation agreement, Goldstein pled guilty in Nassau County Court to three counts of sodomy, and one count of the use of a child in a sexual performance.[216] In satisfaction of the terms of the cooperation agreement, the prosecution recommended that Goldstein receive a six-month term of imprisonment, five years' probation, and Youthful Offender status, the latter requiring that all files related to his prosecution be sealed.

Before he pled guilty, however, Judge Boklan informed Goldstein that she was not inclined to grant Youthful Offender treatment. Nevertheless, despite this warning, Goldstein pled guilty. At his sentencing, Judge Boklan declined to sentence in accordance with the terms of the cooperation agreement. Instead, Judge Boklan sentenced Goldstein to serve two-to-six years in prison without a Youthful Offender adjudication. Goldstein appealed and was eventually adjudicated a Youthful Offender, and afforded a more lenient sentence, despite having already served almost fifteen months in jail, and was ultimately released.[217]

### 3.    Arnold Friedman Considers Trying to Vacate his Guilty Plea

In an "Open Letter" that Arnold Friedman published on or about May 1990,[218] he vigorously challenged any correlation between the *possession* of child pornography and the actual *abuse* of children.[219] Arnold's autobiography, "My Story," written while in prison, similarly expanded on his attraction to child pornography, but presented it as a crutch he used to stave off any inappropriate interest in the boys he raised or taught.[220] According to Arnold, he only wavered once in adulthood, when he molested two children—one, the son of a close family friend—at the Friedmans' vacation house in Wading River,[221] and even then, he crossed the line only because the children "really seduced [him]."[222] However, he acknowledged to his brother, Howard, that he had sexually abused Howard when they were children.[223]

In a letter to Elaine, Arnold wrote that he intended to unwind the case's conclusion and use himself as a test case: he would retract his plea, go to trial, and if he won, convince Jesse to do the same.[224] But the family was not supportive, and no indication exists that any other member of the family considered Arnold's plan a serious one. Arnold's brother Howard actively questioned Arnold's protestations of innocence, and blamed Arnold for putting himself in a situation where, given his tendency towards

---

[216] *Ross G.*, 163 A.D.2d at 529.
[217] *Id.* at 532.
[218] *See* Alvin E. Bessent, *Sex Offenders in Open Letter: We're Innocent*, NEWSDAY, 6, May 4, 1990.
[219] A553-55.
[220] A538-41.
[221] A539.
[222] *See* A484. This is a belief common to pedophiles.
[223] *See* A501, letter from Howard Friedman to Arnold Friedman (April 11, 1990).
[224] *See* A486, letter from Arnold to Elaine Friedman (May 19, 1989).

48

pedophilia, abuse became inevitable.[225] Howard also asked Arnold to explain a previous admission that he had made:

> *I remember it so well—it was about 11:15 PM, and you and I were sitting in the den alone, holding hands, talking, talking, crying. You looked me in the eyes and squeezed my hand and said "Howie, please believe me, that I never molested the kids. I may have been a little free with my hands, I may have set them on my lap, I may have hugged them, I may have shown them pornographic material, but, I never, never, hurt them, screwed them, or anything like that." I remember that conversation like I remember no other in my lifetime. So what the fuck is going on? Are you blocking the memory? Are you lying? Then? Now?*[226]

It is not known if any response to Howard's letter was ever sent. In a later letter, sent to Jesse in 1991, Arnold questioned his own sanity.[227] Arnold died four years later while in prison, of heart failure related to a pre-existing condition. Some suspect that his death was a suicide, caused by a deliberate overdose of medication.[228]

### 4. Jesse's Prison Term

Once Jesse was transferred to prison in upstate New York, he began to deny his guilt. Despite this, neither Arnold nor Jesse Friedman ever filed a post-conviction motion until Jesse's 2004 motion, filed nine years after Arnold Friedman's death, and fifteen years after the start of Jesse's prison term. However, while incarcerated, Jesse did retain private counsel to appeal a decision, and argue that he should receive credit for good behavior while incarcerated. Also while imprisoned, Jesse helped another inmate, a close friend of his, prepare his own appeal.

Jesse started his prison term at Clinton Correctional Facility. He immediately began meeting with psychiatrists as part of mandatory treatment, and by the first documented meeting, Jesse had begun to "den[y] his involvement in the crime."[229] Another therapist concluded that Jesse had established substantial mental defenses, and deployed all of them to convince himself of his own innocence:

---

[225] *See* A501.

[226] *Id.*

[227] *See* A502-03.

[228] Subsequent media coverage has asserted that Arnold's death was a suicide. *See, e.g.*, Sharon Waxman, *Victims Say Film on Molesters Distorts Facts*, N.Y. TIMES, Feb. 24, 2004. However, the Review Team has not been able to conclusively prove this fact, and David Friedman disputed the common assumption, saying that, though his father was afraid of going to state prison, and was indeed suicidal, from the circumstances of his prison cell, it seemed Arnold was not expecting to die.

[229] Interview notes by Stanley R. Berg, Jul. 25, 1989 ("[Jesse] has recognized the amount of time he must serve and he feels that he should not have to do it.").

49

> *Mr. Friedman has for all intents and purposes denied the responsibility for his crime. In his estimation he is an innocent victim of the system. . . . His defenses are very refined and he is able to use his intellect and highly polished social ability to slide by and look as though he is accomplishing something.*[230]

By 1995, Jesse had been transferred to Coxsackie Correctional Facility, where he became involved in a number of disciplinary infractions. In one 2000 incident, Jesse was disciplined[231] for possessing a picture of two prepubescent children, one of whom is nude in the photo. The photograph is the work of Sally Mann, and it appeared in a 1992 issue of *Harper's* Magazine.[232] Jesse admitted that he tore the image from the magazine. Regardless of the academic debate concerning what does or does not constitute child pornography,[233] possession of the image violated the terms of Jesse's incarceration. When asked about this incident during an interview with the Review Team, Jesse was unable to explain it until his attorney Ronald Kuby offered that Jesse's possession of the picture was a political statement being made by a political prisoner. Jesse adopted this explanation.

In July 2000, just a few months later, Jesse again faced disciplinary action for writing and distributing three stories depicting lurid, violent, and disturbing sexual acts, including bestiality (forcing a woman to have sex with a dog), child incest, and rape.[234] All three stories are overlaid with strong overtones of sadism and control, with sexual pleasure secondary to dominance or revenge. In one story, Jesse describes an incestuous

---

[230] Interview notes by William S. Burke, Dec. 1990.

[231] Inmate Misbehavior Report, Mar. 29, 2000. Jesse claims that as a result of this incident, he was subjected to solitary confinement for one year, but this is not correct. Jesse Friedman's inmate disciplinary history reports only that, following this incident, a hearing was held concerning this and a second, unrelated incident, and that as a result of that hearing he was subjected to three *months* in solitary confinement (referred to as "SHU," or, "Special Housing Unit"). Jesse appealed the sentence, and it was modified, but not before Jesse had already served the sentence. *See* Inmate Disciplinary History, Jesse Friedman (#89B0323). Prior to this sentence, Jesse had already served a total of 134 days in SHU for two unrelated disciplinary infractions. The inmate records office confirmed this interpretation with a member of the Review Team.

[232] *See* Sally Mann, *Untitled Photo*, HARPER'S, July 1992, at 28.

[233] Since the definition of child pornography is inherently subjective—a parent's photo of his child bathing may be sentimental, and nonpornographic, but its possession by a third party who does not know the child would raise suspicions—such context matters. *See generally* Amy Adler, *Inverting the First Amendment*, 149 U. PENN. L. REV. 921, 966-69 (2001) ("Although Mann has so far escaped prosecution, her work would appear to fit squarely within the definition of child pornography as courts have developed it.") (arguing further that Mann's work is protected speech) *and* Amy Adler, *The Perverse Law of Child Pornography*, 101 COLUMBIA L. REV 209, 254-55 (2001) ("Whatever the law's success in stamping out the 'low-profile, clandestine industry' of kiddie porn, child pornography law has presided over a period in which the sexualized marketing of children has stepped into the light of day.") (using Mann's work as an example of profitable artistic expression that nonetheless approximates child pornography).

[234] *See* Inmate Misbehavior Report, Jul. 13, 2000.

50

relationship between three children—two girls and one boy—that their father discovers, and then gleefully joins.[235] That story ends with a caveat penned by Jesse:

> *Note: Please DO NOT use this story as a reason to practice incest, or especially incest with minors! It could get you arrested! However, if you have any questions, comments, or suggestions about this entirely fictional story, please write to me.*[236]

After discovering the stories, Coxsackie officials destroyed most copies. Both of these events occurred shortly before Jesse began to formally undergo sex offender rehabilitation therapy.[237]

Jesse was eventually moved back to Clinton Correctional Facility, where his therapists offered positive reports. Jesse had accepted his guilt[238] and described reservations about adjusting to life outside prison.[239] Jesse would later say he feigned acceptance to ensure his early release. Following his December 7, 2011 release, on January 7, 2002, Judge Boklan of the Nassau County Court adjudicated him a level three sex offender.[240]

## II.    Commencement, Scope, And Methods Of Review

The following section tracks the development of this case from Jesse Friedman's final year in prison, through the start of this review.

### A.    *Capturing the Friedmans*

When he first met Jesse Friedman—sometime around March 2001, according to Jesse—Andrew Jarecki was an aspiring filmmaker, planning a film about children's clowns serving upper-class families in New York City. He switched course after one possible subject for the film, Jesse Friedman's brother David, hinted at a secret in his family's past. David introduced Jarecki's team to Jesse and, with Jesse's assistance, they began preparing a different film. Though the project had already changed course, the filmmakers continued to tell many interviewees that the focus of the film remained on Manhattan children's entertainers.[241]

---

[235] *See id.*

[236] *Id.*

[237] *See* sex offender counseling program referral/consent, Jun. 12, 2001.

[238] *See* memorandum re: initial psychological assessment, Dec. 14, 2000.

[239] *See* memorandum re: psychological progress note, Jul. 1, 2001.

[240] *See* A406, Order, Jan. 7, 2002.

[241] *See* A602, leaflet discussing Jarecki's and Smerling's "Children's Entertainment Project." Judge Boklan, for example, informed the Review Team that Jarecki had shown her this leaflet, and told her that her interview would be part of such a film.

51

**A-0101**

Jarecki and his production partner Marc Smerling released their finished product, *Capturing the Friedmans*, in 2003. They presented the film as a documentary exploring the elusiveness of truth—the film's posters carried the inquisitive tagline "who do you believe?"—but the film can be viewed as an argument questioning the process by which Jesse and his father were prosecuted. Interviews in the film seem to show a community seized by a "moral panic," as well as a police force and judicial system that aligned themselves against the Friedmans from the start. Victims are hardly mentioned, save for one, who claims he only "remembered" that he had been abused after being "hypnotized." The film also fails to mention Jesse's codefendant, Ross Goldstein, and Jesse's appearance on *The Geraldo Rivera Show*.

For their parts, Jarecki and Smerling insisted that their film was meant to raise questions, not to answer them.[242] Even as the film received critical acclaim, victims reached out anonymously to fill in their side of the story: "We were abused, tortured, and humiliated by Arnold and Jesse Friedman in computer classes in Arnold's basement," two wrote.[243] Nevertheless, Jesse Friedman came to see the film as a vehicle by which he could assert his innocence.

### B. Post-Conviction Litigation

On January 7, 2004, Jesse Friedman filed a post-conviction motion in Nassau County Court, seeking to vacate his judgment, claiming that "newly discovered evidence"—some of which, he said, should have been disclosed under *Brady v. Maryland*[244]—demonstrated that the case against him was burdened by severe procedural defects. Jesse's arguments incorporated three critical "findings" from the film: (1) the witnesses against him and his father had not "remembered" being abused until they were hypnotized; (2) the trial judge was hopelessly biased against him; and (3) police used suggestive interviewing tactics to elicit false allegations.

On January 6, 2006, Nassau County Supreme Court Justice Richard LaPera denied Jesse Friedman's motion. Citing *United States v. Ruiz*,[245] the Court found that no hearing was necessary as to any issue of fact because the information alleged to have been withheld from the defendant was impeachment material to which he was not entitled prior to the entry of his guilty plea. On March 10, 2006, the New York State Appellate Division, Second Department denied Jesse Friedman's application for leave to appeal. On May 24, 2006, Jesse Friedman's application for leave to appeal to the New York Court of Appeals was dismissed.[246] This denial meant that Jesse Friedman had effectively exhausted his appellate options in state court.

---

[242] Sharon Waxman, *Victims Say Film on Molesters Distorts Facts*, N.Y. TIMES, Feb. 24, 2004.
[243] *See* A597-99, reproduction of letters from victims.
[244] *Brady v. Maryland*, 373 U.S. 83 (1963).
[245] *United States v. Ruiz*, 536 U.S. 622 (2002).
[246] *People v. Friedman*, 6 N.Y.3d 894 (2006).

52

Six months later, on June 23, 2006, Jesse Friedman filed a petition for a writ of habeas corpus in the United States District Court, Eastern District of New York. The writ largely restated the claims Jesse had raised in state court earlier that year. On July 20, 2007, the United States District Court dismissed two of his three claims on the grounds that they were untimely. The Court reserved decision on the other claim, related to alleged hypnosis. On January 4, 2008, following oral arguments concerning the timeliness of that claim, the United States District Court dismissed the petition, in its entirety, as time-barred. It later granted a certificate of appealability on that specific issue, and Friedman appealed.

After an initial round of briefing on the time-bar issue, the United States Court of Appeals for the Second Circuit ordered the parties to submit supplemental papers discussing whether Jesse Friedman had ever argued "actual innocence" and, if so, the merits of such a claim. On July 20, 2009, Jesse Friedman submitted a supplemental brief arguing that he *was* "actually innocent," and that, therefore, the Court should review claims that otherwise would have been time-barred.[247] The District Attorney's office replied, and later, at oral argument, the Second Circuit asked the prosecutor to waive any procedural bars and allow a fuller examination of Jesse Friedman's claims via a hearing, where a federal district judge could hear from witnesses. The District Attorney's office respectfully declined to do so.

On August 8, 2010, the Second Circuit Court of Appeals affirmed the order of the United States District Court, Eastern District, finding that Jesse Friedman's *Brady* claim was time-barred. The court went on to find that Jesse's *Brady* claim was also meritless in light of Supreme Court precedent. However, the court also recommended that the Nassau County District Attorney undertake a full investigation to determine whether Jesse was wrongfully convicted. In crafting its decision, the Second Circuit specifically adopted four theories presented in *Capturing the Friedmans*, and presented them as critical areas for inquiry:

- **Police impropriety:** "flawed interviewing techniques were used to produce a flood of allegations, which the then-District Attorney of Nassau County [Denis Dillon][248] wrung into over two hundred claims of child sexual abuse against petitioner."[249]
- **Use of controversial therapy techniques, i.e., hypnosis:** "suggestive memory recovery tactics can create false memories and . . . aggressive investigation techniques like those employed in petitioner's case can induce false reports."[250]

---

[247] The term "actual innocence" here refers to the rule that, in federal habeas corpus law, if a petitioner shows that it is "more likely than not that no reasonable juror would have convicted him" in light of some new evidence, a reviewing court may look past procedural bars, and examine potentially meritorious, underlying claims to relief based on constitutional error. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

[248] Denis Dillon served as District Attorney of Nassau County from 1974-2005.

[249] *Friedman*, 618 F.3d at 158.

[250] *Id.* at 160.

53

- **Defective, involuntary plea:** "the police, prosecutors, and the judge did everything they could to coerce a guilty plea and avoid a trial."[251]
- **Moral panic:** "[t]he magnitude of the allegations against [Jesse Friedman] must be viewed in the context of the late-1980s and early-1990s, a period in which allegations of outrageously bizarre and often ritualistic child abuse spread like wildfire across the country and garnered world-wide media attention."[252]

Before turning to these issues, and others raised by the film, this report outlines the procedures adopted by the Nassau County District Attorney to conduct that investigation.

### C.    The District Attorney's Response

In response to the Second Circuit's decision, Nassau County District Attorney Kathleen M. Rice decided to re-examine the case and circumstances that led to Jesse Friedman's guilty plea. The stated purpose of the re-investigation was to determine whether, based on the Second Circuit's decision and the totality of available evidence, Jesse Friedman had been wrongfully convicted:

> *This investigation involves a unique set of circumstances, so we designed an equally unique process that we believe will enable the fair and efficient evaluation of the case. Nobody knows whether or not our re-investigation will upend Jesse Friedman's guilty plea or corroborate it, but what we do know is that our review will be completely transparent and thorough and we will ensure that the system has done everything it can to determine the truth.[253]*

To lead the team, D.A. Rice appointed three senior prosecutors, to be assisted by three other assistant district attorneys, a special assistant district attorney with over thirty years of investigative experience in both the public and private sector, and the office's Chief Investigator. All had been hired after Rice's election to the District Attorney's office in 2006, and therefore none had any prior involvement with the case. Additionally, District Attorney Rice convened a group of independent experts (the "Advisory Panel" or "Panel") from relevant fields "to work alongside the District Attorney's office," "enable the fair and efficient evaluation of the case," and ensure the objectivity of the review process.[254] The Panel included the following, and was chaired by Mark F. Pomerantz:

- **Patrick J. Harnett:** a thirty-two-year veteran member of the New York City Police Department, served as (among other leadership positions) commanding officer of the Major Case Squad. Harnett was also the chief of the Hartford Police

---

[251] *Id.* at 158.

[252] *Id.* at 155.

[253] Press release, NCDA, *Rice Announces Appointments To Friedman Case Review Panel* (Nov. 8, 2010), http://www.nassaucountyny.gov/agencies/DA/NewsReleases/2010/110810friedmanpanel htm.

[254] *Id.*

54

**A-0104**

Department from 2004 through 2006, and occupied a number of other command positions throughout his career. Today, Harnett is a law enforcement and public safety consultant, who conducts organizational and operational reviews of public safety agencies.

- **Susan Herman:** currently a professor in the Department of Criminal Justice at Pace University, Herman served as executive director of the National Center for Victims of Crime from 1997 to 2004, in other positions related to victims' services, and is also a member of the New York State Permanent Sentencing Commission.

- **Mark F. Pomerantz:** a recently-retired senior litigation partner, now of counsel at the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP, Pomerantz is also a former prosecutor of the United States Attorney's Office for the Southern District of New York, where he led the Criminal Division from 1997 to 1999. In addition to his career as a litigator, Pomerantz taught classes on advanced criminal procedure at Harvard Law School; classes on appellate advocacy, contracts, and criminal litigation at Columbia Law School; and has guest lectured at Stanford University Law School.

- **Barry Scheck:** a professor of law at Benjamin M. Cardozo School of Law, Scheck is the co-founder and co-director of the Innocence Project, and a leading scholar and advocate in the field of criminal justice policy. His work focuses on the exoneration of the wrongfully convicted. In 1988, Scheck became involved in the use of DNA evidence in the criminal law, and remains an expert in the field. Today he also serves on New York State's Commission on Forensic Science, which regulates all crime and forensic DNA laboratories in the State.

Rice's appointments drew praise from the defense bar, including Jesse Friedman's attorney, who hailed the group as "distinguished," and one that "would not be a rubber stamp for anyone's agenda." The attorney, Ron Kuby, went on to say that, "from the perspective of a defendant looking for justice, it really could not be better."[255] This Advisory Panel was apprised of all interviews conducted, the results of those meetings, and some of the Panel members participated in interviews. The full Panel was present for one interview with Jesse Friedman himself; one Panel member participated in an interview with Witness 25 and his mother, and two members participated in an interview with Ross Goldstein. Additionally, the full Panel met with filmmaker Andrew Jarecki on several occasions, and once with both Jarecki and his production partner Marc Smerling. Jarecki, or his attorneys, also spoke on several occasions with chairman Mark Pomerantz.

Though District Attorney Rice is responsible for the result of this review, she and her team have benefited from the Advisory Panel's input and guidance throughout this investigative process. For example, the Review Team consulted with the Panel on procedures related to witness outreach, the standard of review, and document disclosure.

---

[255] Alfonso A. Castillo, *Panel Set to Review Friedman Case*, NEWSDAY, Nov. 8, 2010.

1. <u>Record Privacy</u>

New York law strictly forbids the disclosure of documents that tend to identify the victims of a sex crime,[256] even where disclosure is made to one who, presumably, already knows the victims' names.[257] Furthermore, government agencies are under no duty to redact files made confidential under this provision to render them disclosable, especially where no level of redaction will completely remove the risk of identification.[258] Nor is it permissible for public officials to disclose grand jury minutes relating to *any* crime, except under court order or in the lawful discharge of their duties.[259]

These limitations are adhered to strictly by all state prosecutors, and apply even in the context of post-conviction review.[260] On the basis of this disclosure limitation, the appendix to this report contains only material from which no affirmative identification of a victim could be made. Throughout this process, the only individuals with complete access to victim identities have been the assistant district attorneys and investigators who worked directly on the review process.

A limited exception was made for the Advisory Panel on the basis of its unique relationship with the District Attorney's office, and the imperative that it fulfill its function as an independent oversight body by reviewing materials that would not otherwise be disclosable to the general public. Even so, the outside experts appointed by the District Attorney were not privy to grand jury testimony or unredacted witness statements. Additionally, each member of the Panel signed a confidentiality agreement, preventing disclosure of information while the re-investigation was underway.[261]

---

[256] *See* N.Y. CIVIL RIGHTS LAW § 50-b(1).

[257] *Fappiano v. N.Y.C. Police Dep't*, 95 N.Y.2d 738, 748 (2001).

[258] *Karlin v. McMahon*, 96 N.Y.2d 842, 843 (2001); *Short v. Board of Managers of the Nassau County Medical Center*, 57 N.Y.2d 399, 404-05 (1982).

[259] N.Y. C.P.L. § 190.25(4); N.Y. Penal Law § 215.70.

[260] They are followed, for example, by the New York County District Attorney's conviction integrity bureau.

[261] The District Attorney also construed the appointment of each member of the Advisory Panel to create a legal relationship within which some limited disclosure is permissible. A district attorney may retain consultants to assist with investigating and prosecuting cases, and may "delegate duties" of her position to assistant prosecutors and advisors. *Schumer v. Holtzman*, 60 N.Y.2d 46, 53 (1983). Additionally, the Court of Appeals has held that the office of the district attorney possesses, in addition to those powers conferred by statute, "such powers as may be deemed necessary to the proper performance of [her] official duties." *People ex rel. Gardenier v. Board of Supervisors, Columbia County*, 134 N.Y. 1, 5 (1892). The District Attorney further enjoys "broad discretion" in exercising those powers. *People v. Di Falco*, 44 N.Y.2d 482, 486 (1978). The employment of advisors to perform specific functions is both a necessary corollary of this authority, and common practice in New York State. Because the Advisory Panel served in such an important independent role, limited disclosure to them was permissible where necessary to that function. Appropriate precautions, including redaction, were still taken when sharing sensitive material.

56

2. <u>Witness Outreach Protocols</u>

In reaching out to victims, the investigative team balanced the victims' right to privacy with their value to the overall investigation. Pursuant to the advice of the Advisory Panel, after assembling data on the location of victims and their families, the District Attorney attempted to contact, by registered letter, each of the children who provided grand jury testimony against the Friedmans and Goldstein, those children named as victims in Arnold Friedman's Close-Out Statement, and others believed to possess relevant case information.[262] These letters were generic, sent in unmarked envelopes, and deliberately addressed to the recipient's home to minimize the potential for professional embarrassment. Most individuals contacted received this communication.

No complainant who testified before the grand jury replied with any offer to participate in the re-investigation. Three complainants replied to state that they had nothing to add or contribute. There are many reasons these now-grown men may have for declining to speak with the Review Team and, therefore, this Report does not attribute any motive to the victims' silence.[263] Several other victims, none of whom testified before the grand jury, responded and offered information.

As the investigation drew to a close, the District Attorney's office sent a second letter to each individual, asking the recipient to contact the District Attorney's office by means of a confidential telephone line. This course of action was recommended by the Advisory Panel in response to news reports suggesting that some complainants had recanted their testimony in off-the-record interviews with the creator of *Capturing the Friedmans*. All such letters were sent in unmarked envelopes to preserve the recipient's privacy. The District Attorney's office received several significant responses to this communication, all discussed below.

After the film was released in 2003, complainants went to great lengths to protect their privacy. Some wrote letters asking that Judge Boklan "protect . . . victims from having [their] privacy further invaded."[264] Some retained counsel to that end. Others sought out psychiatric therapy upon the mere discovery that a movie had been made about the case. Drawing on the Review Team's experiences and the expertise of the Advisory Panel, the District Attorney sought both to avoid harming complainants and non-complainants alike, and to respect the privacy of the individuals involved.

For that reason, and again in consultation with the Advisory Panel, the District Attorney decided against attempting to secure interviews with former complainants through subpoena. This decision was undertaken with great care, and only after extensive

---

[262] *See* A832-36, victim outreach letters.
[263] Jesse Friedman's defense team, in press statements, speculates that a complainant's non-response means they "would not or could not affirm their earlier accusations." Daniel D'Addario, *Uncapturing a Friedman*, SALON, Mar. 13, 2013, http://www.salon.com/2013/03/13/uncapturing_a_friedman/singleton. The Review Team does not believe this to be an appropriate inference.
[264] *See* Section IV.A.3, *infra*.

57

**A-0107**

deliberation. Ultimately, the exercise of subpoena power would have required the District Attorney to compel the testimony of individuals who have expressed a clear desire to be left alone, and in some cases, as described below, felt traumatized by the mere mention of Jesse Friedman. The potential damage entailed by such an intrusion was unlikely to be counterbalanced by any other factors. The significant events in this case occurred more than twenty-five years ago, when the complainants were children, and their current memories of the case are subject to all of the effects of the passage of time, in the course of which even important details may fade, disappear, or merge with other life events. Some memories could even have been affected by discussions in the "group therapy" sessions that followed after the case concluded. Succinctly, there was no guarantee that the exercise of subpoena power, with all the potential for harm it could entail, would yield reliable evidence, and this caveat applies equally to all witnesses.[265] In the end, it was determined that Jesse Friedman's claim that he was wrongfully convicted could be evaluated fairly without unnecessarily re-traumatizing the victims of his crimes.

### D.    Standard of Review

Lastly, the District Attorney selected a legal framework to guide the re-investigation. In its opinion denying Jesse Friedman's petition for a writ of habeas corpus, the Second Circuit cited Comment 6B to Rule 3.8 of the New York Rules of Professional Conduct as an ethical guide setting out when, consistent with best practices, a state prosecutor should review a criminal conviction.

> *[W]hen a prosecutor comes to know of new and material evidence creating a reasonable likelihood that a person was wrongly convicted, the prosecutor should examine the evidence and undertake such further inquiry or investigation as may be necessary to determine whether the conviction was wrongful.*

This "reasonable likelihood" standard therefore describes a gateway that must be passed through before a review *begins*, rather than a guide for the conduct of the review itself. The District Attorney's office proceeded to review Jesse Friedman's conviction based on the Second Circuit's conclusion that his petition itself demonstrated such a reasonable likelihood.

At the time, the Rules of Professional Conduct offered little guidance as to how to balance the evidence once such a review began. Accordingly, the District Attorney

---

[265] A district attorney's power to request subpoenas is generally restricted to live criminal cases. *See People v. Natal*, 75 N.Y.2d 379, 384-85 (1990) (construing relevant statutes to conclude that the subpoena power is available to district attorneys only through a live criminal proceeding). Grand juries may also be convened, and subpoenas then issued, however, to (a) investigate issues "concerning misconduct, nonfeasance or neglect in public office by a public servant as the basis for a recommendation of removal or disciplinary action," (b) to convene an inquiry, at an officer's request, to conclude that that public officer acted properly; (c) and, to consider and issue "recommendations for legislative, executive or administrative action in the public interest." N.Y. C.P.L. § 190.85(1)(c).

58

selected a guiding principle, the "reasonable probability" principle, drawn from the clearly articulated legal rules applicable in other collateral proceedings. Recent amendments to the Rules of Professional Conduct clarify the matter, and state that prosecutors are obligated to take corrective action only if they uncover "clear and convincing evidence" of a defendant's innocence. The amendment articulating this higher standard post-dated the District Attorney's decision to apply the more lenient "reasonable probability" framework.

### 1. Reasonable Probability

The "reasonable probability" standard is well-defined[266] and offers Jesse Friedman the benefit of the standard of review that would have been applied at an evidentiary hearing convened to examine a *Brady* or newly-discovered evidence claim (even though claims regarding "newly discovered evidence" are, as a rule, not cognizable following a guilty plea).[267] The re-investigation, therefore, focused on the question of whether there existed a "reasonable probability" that Jesse Friedman was wrongfully convicted.

The Supreme Court has defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome."[268] In applying this standard, despite the fact that he pled guilty, the District Attorney would recommend setting aside Jesse Friedman's conviction if she were to determine that the evidence uncovered by the Review Team established a reasonable probability that Jesse was wrongfully convicted.

### 2. Vacatur in the Interests of Justice

At the suggestion of the experts serving on the Advisory Panel, the District Attorney also considered applying the factors relevant to the dismissal of an indictment "in furtherance of justice," as provided for in New York's Criminal Procedure Law § 210.40. In deciding such a motion, courts must take into account any "consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon

---

[266] New York state and federal courts alike weigh the probative value of "newly discovered evidence" and most non-disclosed exculpatory material by analyzing whether there is a "reasonable probability" that it would have affected the outcome of the case. N.Y. C.P.L. § 440.10(1)(g) (McKinney 2012) (requiring proof of a "probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant.") *and People v. Salemi*, 309 N.Y. 208, 215-16 (1955) (stating that newly discovered material must be such that it will "probably change the result" on retrial); *see also United States v. Bagley*, 473 U.S. 667, 682 (1985) *and People v. Vilardi*, 76 N.Y.2d 67, 77 (1990).

[267] Review of newly discovered evidence is, under New York law, permitted only following trial. *See* N.Y. C.P.L. § 440.10(g) (permitting review of "new evidence" that "has been discovered since the entry of a judgment based upon a verdict of guilty *after trial*") (emphasis added). Exception is made only for innocence claims predicated on newly-discovered DNA evidence, but even these motions are evaluated carefully, and granted only where the defendant "demonstrate[s] a substantial probability that the defendant was actually innocent of the offense of which he or she was convicted." *Id.* at § 440.10(g-1). A *Brady* claim based on the failure to disclose specifically requested documents is examined in New York under a reasonable possibility standard. *See People v. Fuentes*, 12 N.Y.3d 259, 263 (2009).

[268] *Strickland v. Washington*, 466 U. S. 668, 694 (1984), quoted in *Bagley*, 473 U.S. at 682.

59

such indictment or count would constitute or result in injustice," with specific reference to a list of factors.[269]

Such motions may be brought in a limited time frame—absent cause, no more than forty-five days after arraignment[270]—and never after sentencing.[271] Relief is to be granted "sparingly,"[272] and only in the "unusual case that cries out for fundamental justice beyond the confines of conventional considerations."[273] A motion for dismissal in furtherance of justice was intended not as a defendant's additional check on the system, but to give the judicial system control over the prosecutor's previously unfettered discretion to enter an order of "nolle prosequi," declining to prosecute a case further.[274]

Properly understood, the furtherance of justice remedy derives from a legal context entirely inapplicable to the post-conviction review process. The remedy is applied infrequently by New York courts, and generally for relatively minor crimes. It is not intended as a means to exonerate the innocent. It applies irrespective of guilt, where further prosecution would result in an injustice. A dismissal in furtherance of justice, then, is not a determination of guilt or innocence.[275]

Notwithstanding this rubric's post-judgment inapplicability, analysis under the statutory "in furtherance of justice" factors here was also considered to guide the inquiry. Such an analysis would consider, among other things, "the seriousness and circumstances of the offense" charged, "the extent of harm caused," "the history, character, and condition of the defendant," and "the attitude of the complainant or victim" to the motion.[276] However, none of these factors favor Jesse Friedman, nor do they support mitigating his level three sex offender classification.

---

[269] N.Y. C.P.L. § 210.40.

[270] *Id.* at § 255.20.

[271] *See People v. Weaver*, 112 A.D.2d 782, 782 (4th Dept. 1985); *see also People v. Newton*, 30 Misc.3d 1204(A), at *5 (Sup. Ct. Bronx County 2010) ("Nothing contained in [applicable law] authorizes a court to entertain a pretrial motion once judgment has been entered, or vacate that judgment based upon C.P.L. 210.40(1) considerations.") *and People v. Diaz*, 179 Misc.2d 946, 957 n.3 (Sup. Ct. New York County 1999) ("[R]eview of the case law cited by defense counsel, as well as the wording of N.Y. C.P.L. § 210.40, restricts discretion to dismiss the indictment up to the time sentence has been imposed.").

[272] *People v. Algarin*, 294 A.D.2d 589, 590 (2d Dept. 2002).

[273] *People v. Belge*, 41 N.Y.2d 60, 62-63 (1976) (Fuchsberg, J., concurring); *People v. Keith R.*, 95 A.D.3d 65, 67 (1st Dept. 2012) (reversing unanimously Supreme Court's grant of one such motion, despite the fact that the defendant had already served more than the maximum authorized sentence); *see also People v. Quadrozzi*, 55 A.D.3d 93, 103-04 (2d Dept. 2008) *and People v. O'Neill*, 85 Misc.2d 130, 131 (Sup. Ct. New York County 1975).

[274] *See generally People v. Douglass*, 60 N.Y.2d 194, 201-03 (1983).

[275] *See, e.g., People v. Prunty*, 101 Misc.2d 163, 168 (Crim. Ct. Queen County 1979) (holding that the existence of a plausible defense "merely raises an issue that is to be litigated at trial rather than to be determined by a judge on a pretrial motion. A motion to dismiss in furtherance of justice is, in no way, intended to be a substitute for a trial.").

[276] N.Y. C.P.L. § 210.40(1)(a), (b), (d), (i).

60

## E.    Evidentiary Limitations

During the course of this investigation, the Review Team identified evidentiary gaps that could not be remedied by any amount of research or effort. The investigation relied heavily on old prosecution files, compiled by the District Attorney's office from 1987-88; documents produced to the District Attorney's office by third parties, such as the Nassau County Police Department; and the court's file. Though the NCPD produced their complete files to the Review Team, the information in these files was incomplete. The goal of any conviction review should be to reconstruct the original investigation, but here, that was not entirely possible.

There is no indication that crucial documents were deliberately destroyed to frustrate future attempts at exoneration. Some gaps in the record are the product of nothing more than the passage of time. Physical evidence obtained during the execution of the state search warrant, for example, was destroyed in the ordinary course when the case closed and no appeal was filed. Several key witnesses have passed away. And over the course of a quarter century, witness memories have become hazy and confused with subsequent events, such that it becomes almost impossible to resolve conflicts between a statement a witness gave as a child and his recollection of that statement today. This demonstrates the importance of time limits on appeals: because Jesse filed his post-conviction motion in 2004 rather than in 1989, the Review Team's task became considerably more difficult.[277]

Additionally, some information was simply never created. Few police reports or notes exist to explain why the investigation took the path that it did. There was no timeline that outlined important investigative steps, an absence that hampered an accurate understanding of what happened in the Friedman case. Instead, the Review Team was forced to create a chronology by piecing together isolated notes, witness statements and contemporary interviews. Similarly, if a witness statement was reduced to writing by a detective, there was no way of ascertaining how many times that child was interviewed before that statement was taken.

In other cases, documents were found, but without necessary context. Some "notes" of interviews indicate a child's name, and the word "negative," with no explanation of what that could mean. When a child was interviewed more than once, there was rarely any indication of *why* the police decided to revisit the child. Two cases

---

[277] Last month, the Supreme Court held that "untimeliness, although not an unyielding ground for dismissal of a petition, does bear on the credibility of evidence proffered to show actual innocence." *McQuiggin v. Perkins*, ___ U.S. ___, 133 S.Ct. 1924, 1936 (2013). Consideration of this factor, the Court found, "attends to the State's concern that it will be prejudiced by a prisoner's untoward delay in proffering new evidence," a delay that could allow a prisoner to "'lie in wait and use stale evidence to collaterally attack his conviction . . . when an elderly witness has died and cannot appear at a hearing to rebut new evidence.'" *Id.* (citation omitted). Though the "actual innocence" standard did not guide the Review Team, the timeliness of an applicant's wrongful conviction claim should bear equally on that applicant's credibility for the purpose of a conviction integrity review investigation. The rule in *Perkins* accurately conveys the difficulty the Review Team faced in reconstructing this case.

61

clearly illustrate the problem of missing context. In the first case, the Review Team found a witness statement that referenced a critical document—a computer printout the witness made chronicling which days in the Friedman class were "bad"—but did not attach the printout. In the second, a former student told the Review Team in a recent interview that, as a child, he had torn down a leaflet advertising Elaine Friedman's childcare service, and given it to police. Remarkably, the Review Team's files contained a leaflet matching this witness's description, but no reference that it had come from him.

Other records were surprisingly absent. Some witness interviews were conducted entirely off the record, with no attempt made to reduce to writing what was learned from the visit, or why the visit was made. Even inculpatory witness statements, though highly detailed, omitted some important information. For example, it is difficult to determine from some statements where specific criminal acts occurred—in sight, or out of sight of other students. Because this information was not documented, and cannot be reliably recalled, it cannot be reconstructed. Similarly, at the time of Jesse Friedman's guilty plea, neither the police nor the prosecution had yet compiled a full list of the membership of each of Arnold Friedman's classes. Though the police and prosecution files contain some partial rosters, there is no way of ascertaining whether those were made based on information from the victims themselves, from their parents, or from some other unnamed source. Indeed, to the knowledge of the Review Team, a reliable roster has never existed. Without this, the Review Team was left to reconstruct this information from statements signed by the children, expressing their belief as to what class they attended, and even these statements are sometimes contradictory.

This is a gap that could have been filled with information from the victims' parents. But even though parents were likely interviewed, based on the minority age of their children, and the fact that they signed their children's statements, few written accounts of those interviews exist. The Review Team was therefore not able to consider what every parent told police they observed, or failed to observe, about their children's behavior before, during, and after the Friedman class. Even where parents related anecdotes indicating that children had suffered—at least one parent, for example, discussed finding bloodied underwear among her child's clothes—either no follow-up work was done, or none was documented. Such deficient record-keeping is clearly not consistent with best practices and is, simply put, unacceptable. That said, though these deficiencies made the task of the Review Team and Advisory Panel that much more difficult, they did not prevent the Review Team from reaching the conclusions below with full confidence.

Lastly, the difficulty of the Review Team's task was further compounded by the release of *Capturing the Friedmans*, and the actions of the film's producers. Some witnesses refused to speak to the Review Team for fear of becoming involved in the public debate that attended the film. This problem was exacerbated still more by Jesse Friedman's decision to, with the help of the filmmakers, make his purported innocence

62

**A-0112**

the subject of a public relations campaign.[278] And, filmmakers Jarecki and Smerling were not forthcoming with evidence under their control. Though both told witnesses and the public that they possessed swaths of evidence capable of "proving" Jesse Friedman's innocence, this material was not shared with the Review Team or the Advisory Panel until 2012.[279] Even then, the information that they chose to share was partial, thereby rendering it of poor evidentiary quality. The Review Team cannot, for example, derive or adequately review a "recantation" from a two-minute clip of film purporting to excerpt the words of an unidentified individual, or from a letter written by someone who does not wish to discuss his claims with the Review Team.

*     *     *     *     *

This Report addresses in Section III the question of whether Jesse Friedman was wrongfully convicted, focusing on the issues raised by *Capturing the Friedmans* and the decision of the Second Circuit Court of Appeals. In Section IV, the Report considers Jesse Friedman's guilt more broadly, in the context of the totality of all available information.

## III. Findings Of Fact: Jesse Friedman's Principal Claims Do Not Demonstrate a Reasonable Probability That He Was Wrongfully Convicted

Insufficient evidence exists to support any of the exculpatory arguments advanced by Jesse Friedman and his counselors in his appeal to the Second Circuit. Specifically:

- **There is no evidence that improper police questioning materially tainted the investigation (page 64):** Though several witnesses described "aggressive" police questioning, none of the witnesses with whom the Review Team spoke described—and no evidence establishes—that police suggestion permeated the case and influenced witnesses to incriminate Arnold or Jesse Friedman in criminal sexual conduct.

- **The Review Team found no credible evidence that hypnosis was used on any complainant (page 77):** The only witness to recall being hypnotized was not, in fact, hypnotized. All physicians associated with the case recall that any hypnosis used was performed only after the indictments were filed, on a limited number of non-complainants, and with no effect. Further, though group therapy undoubtedly

---

[278] *See, e.g.*, Janet Upadhye, *Brooklyn Professor Fights for Exoneration of Convicted Sex Offender*, DNAINFO, Mar. 18, 2013, http://www.dnainfo.com/new-york/20130328/brooklyn-heights/brooklyn-professor-fights-for-exoneration-of-convicted-sex-offender.

[279] Until that time in the re-investigation, Jarecki had refused to share *any* of his findings unless the District Attorney's office shared with him the witness statements, and grand jury minutes, from the original case. *See, e.g.*, letter from Andrew Jarecki to NCDA and Friedman Advisory Panel (Mar. 9, 2012), at 1-3. This would have been illegal (*see* Section II.C.1, *supra*), and all such offers were rejected accordingly. *See, e.g.*, Letter from Madeline Singas, Chief Assistant District Attorney, NCDA, to Andrew Jarecki, Mar. 27, 2012; *see also* letter from Andrew Jarecki to Mark Pomerantz (April 18, 2012), at 1 (offering to share some material).

**A-0113**

took place, evidence and interviews prove that it began only after all grand jury testimony concluded.

- **Jesse Friedman's plea was not a product of undue coercion (page 82):** The record amply demonstrates that Jesse played a central role in his own defense, received competent and thorough legal advice, and balanced his options intelligently, before entering his guilty plea. Further, the record does not support the claim that Judge Boklan improperly coerced his guilty plea.

- **The Friedman case is distinguishable from the "moral panic" cases of the 1980s (page 91):** Though the 1980s were spotted with some fantastical, factually impossible claims of sexual abuse, this case does not readily fit that paradigm. Here, the defendants pled guilty; the complainants were of comparatively older ages; the allegations were realistic; the investigation more reliable; and the acts were entirely consistent with those of an admitted pedophile.

The next section focuses squarely on these narrow claims and, in reviewing them, concludes that the concerns identified by the Second Circuit, in reliance on *Capturing the Friedmans*, do not establish a "reasonable probability" that Jesse was wrongfully convicted. Thereafter, Section IV discusses additional information learned during the course of this re-investigation, incorporates arguments made by Jesse Friedman's advocates, and addresses the totality of information.

### A.   Claims of Inappropriate Police Questioning Are Exaggerated

Relying almost exclusively on *Capturing the Friedmans*, the Second Circuit's decision in *Friedman* charged that "flawed interviewing techniques were used to produce a flood of allegations, which the then-District Attorney [Denis Dillon] wrung into over two hundred claims of child sexual abuse against [Jesse Friedman]."[280] To support this claim, Jesse Friedman now relies on little more than the film. However, consideration of that material—specifically, an excerpt of an interview with one of a dozen police investigators, and a dramatic reading of a "transcript" of one police interview—yields no reason to believe that such interviews resulted in unreliable information.

The Review Team conducted numerous interviews with former computer students, parents, and police investigators, to recreate the investigation to the extent possible. The Team ultimately was able to speak to only some of those who police interviewed between 1987 and 1988, and it is difficult to draw any broad generalization from this partial sample. Some had favorable experiences with police, while others believed that police did set out with a definite goal in mind. However, to the extent that pointed questioning did occur, it tended to cluster in later interviews, after the first and second indictments, and in interviews with victims identified by Arnold Friedman in his

---

[280] *Friedman*, 618 F.3d at 158.

64

**A-0114**

Close-Out Statement.[281] And even then, pointed questioning appeared directed at identifying and finding help for the victims.

Investigative techniques have evolved since the late 1980s. Were the Friedman case to occur today, for example, officers would interview students with the assistance of trained experts, and those interviews would be videotaped to control for the possibility of suggestion.[282] But this is hindsight, as this was not general practice at the time. As it stands, there is little evidence that police misconduct negatively affected the investigation.

### 1. Detective Anthony Squeglia's Interview

*Capturing the Friedmans* depicts interviews with just two detectives, out of the twelve law enforcement officials detailed to the investigation. Of those interviews, only one, with Detective Anthony Squeglia, supports the claim that police attempted to "force children to agree with the detectives' story."[283] But even this depiction is misleading.

From a transcript that runs more than fifty pages, *Capturing the Friedmans* excerpts only a single short clip. In that short portion, Detective Squeglia states, in response to a question that is marked "unintelligible" on the transcript:[284]

> *If you talk to a lot of children, you don't give them an option, really. You just, you be pretty honest with them. You have to tell them pretty honestly that . . . . "We know that there was a good chance that he touched you or Jesse touched you or somebody in that family touched you in a very inappropriate way.*[285]

Setting aside any question about the reliability of this interview—conducted almost fifteen years after the investigation concluded, informally, on the detective's front lawn—a review of the remainder of the interview transcript demonstrates that the film highlights an unrepresentative sample of a much larger interview. Elsewhere in the *unedited* transcript, Detective Squeglia explains that "you don't want to re-victimize the victim,"[286] and that he strove to avoid putting words in an interviewee's mouth:

> *Q:* [I]f they were having trouble getting to a sort of confession point—did you find it useful to say to them, you know—you know, "We spoke to Jimmy and he said—"

---

[281] One exception includes Witness 10, who said that coercive police tactics depicted in *Capturing the Friedmans* "rang true." Statement of Witness 10 (May 20, 2013), at 2. For a further discussion of this witness, *see* Section IV.A.5(d), *infra*.

[282] For a discussion of modern best practices, *see* Section III.A.8, *infra*.

[283] *Friedman*, 618 F.3d at 147.

[284] A752, transcript of interview with Detective Anthony Squeglia (ret.), part one.

[285] A234-35.

[286] A798, transcript of interview with Detective Anthony Squeglia (ret.), part two; *see also* A747.

65

> *Det. Squeglia.: No, we— wouldn't use that. No. I wouldn't use that anyway. My— my technique was that they would ask me, "what— what— what do you know about him?" And I'd say, "I know things. But I can't tell you what I know because you know things that I don't know. . . . "So, well do you know what happened to me?" "No, I don't know what happened to you. But I know something happened to you, so I want you to tell me— if you can. If you can't, we'll come back another day."*[287]

Detective Squeglia went on to describe the importance of avoiding suggestion, saying, "you can't put anything into the statement. You can't interject anything into it. It has to be their wording freely. And— usually at that point, they— they want to talk to ya."[288]

Detective Squeglia expanded on this point, saying that interviews were open-ended—children "were told they could get up and leave"—and fluid, spanning several sessions at the child's discretion.[289] Revelations frequently came when, after an unproductive first interview, Detective Squeglia and his partner "were invited back" by the child himself.[290] In one such interview, "the one that [he says] actually broke the case," the child ultimately volunteered information "out of the blue, from just sitting down talking." According to the transcript, the child then handed Detective Squeglia a "boy/boy" magazine along with a pornographic videogame, both of which he said had been given to him by the Friedmans.[291] This was common, Detective Squeglia told his interviewer for C*apturing the Friedmans*—"they actually wanna tell you"[292]—and he attributed such revelatory moments to his success at creating a "very friendly atmosphere" where children could "feel confident."[293]

Detective Squeglia did discuss incentives offered to prospective witnesses— characterized by the Second Circuit as "reward[s]" for "cooperative children"—but explained them as attempts to win the trust of *uncooperative* children.[294] When faced with a child who would "totally ignore you," Detective Squeglia explained that he would appeal to the child's trust for authority ("we'll deputize you and you know— I like cops— do you like cops?"), and leave, asking the child to "think about it."[295] On returning, again at the child's request rather than his own initiative, he would follow his

---

[287] A803-04.

[288] A798.

[289] A748.

[290] A745.

[291] A746.

[292] A748.

[293] A745.

[294] *Compare Friedman*, 618 F.3d at 147 ("The detectives would reward cooperative children with 'pizza parties' and police badges. When children did not admit to experiencing sexual abuse, however, detectives would persist in their questioning, sometimes taunting the children for failing to offer the desired answers") *with* A769.

[295] A769.

66

"feeling."[296] Either the child would feel that he was a friend and open up of his own accord after initial small talk, or he would see that the child would "just never give it up." In such cases, Detective Squeglia would simply leave.[297]

Even analyzing the entire substance of Detective Squeglia's interview, the method of questioning that the detective describes is not consistent with best practices. If the full interview, recorded informally and fifteen years after the fact, accurately represents how Detective Squeglia interviewed his witnesses, the detective was not an ideal investigator for this type of case, as measured by today's standards. But nor was he as one-dimensional as he appears in Jesse's submissions. The portion of Detective Squeglia's interview shown in *Capturing the Friedmans*, and relied upon by the Second Circuit, fails to accurately represent the substance of the larger interview. Instead, the out-of-context excerpt creates an exaggerated sense of police wrongdoing that is not otherwise supported by the record available to the Review Team. It is unsurprising that a producer would edit a larger interview for use in a film. This is the artist's prerogative. But the product of this artistic license cannot be represented as legally reliable.

## 2. Other Police Accounts Demonstrate Appropriate Questioning

Absent from Jesse Friedman's advocacy papers, and from the Second Circuit's decision, is the other interview included in *Capturing the Friedmans*, with Detective Doppman. This detective took statements incriminating the Friedmans from eight students, and obtained the results without, he said, engaging in leading. Indeed, Detective Doppman described leading as a "very, very dangerous type of interview process to use."[298] In the film, Doppman's contrasting account precedes Squeglia's by less than a minute, is included presumably to balance Squeglia's questionable practices, and should not be ignored.[299]

Based on interviews with other officers—including Detectives Merriweather, Reihing, Myers, Galasso and Officer Durkin—Detective Doppman's account more accurately represents the course of the actual investigation. All officers spoken to by the Review Team reject the claim that victims were told what to say. Detective Larry Merriweather was Detective Squeglia's partner for many major interviews and said that he would have noticed, and put a stop to, any interviews characterized by explicit leading. Moreover, he suggested that leading would have been (in his opinion) unnecessary, unproductive, and pointless, given the children's lack of a working sexual vocabulary. Nor, he said, did detectives have time to "linger" with children and coax favorable testimony from them, because the case grew so rapidly, and included so many potential victims. There is also evidence that, where a household contained more than one boy witness, investigators separated the boys before questioning them.[300] This decision

---

[296] A769.
[297] A769-70.
[298] A234.
[299] *Id.*
[300] *See* Affirmation of David Kuhn (Jan. 6, 2004), at ¶ 7.

67

demonstrates that police were aware of the danger of cross-contamination between witnesses.

Police Officer Mary Ann Durkin's recollection of the case is representative of statements made by many other police investigators. She recalled that she interviewed potential victims using a "calm, low-key, empathetic and compassionate" manner. Officer Durkin did not receive specialized training for handling child witnesses before the investigation, but nonetheless, was very conscious of not overstepping what she could say to a child without putting words in his mouth. She viewed this as basic common sense. Detective Reihing, too, stated that he consciously avoided leading questioning in interviews, for fear that the resulting statement would be "useless."

Investigators acknowledged that some victims were visited repeatedly, but for different reasons. Detectives Galasso, Squeglia, and Jones all remembered that, on at least one occasion, they conducted repeat interviews because they were asked back, by the child, or by his parents. Officer Durkin believed that she might have re-visited a child if another interviewee named the child as a victim. In that case, neither she, nor her partner Detective Merriweather, would confront the child with what other witnesses had said—though they might have said something along the lines of, "Jimmy said Arnold was not nice," a strategy that in some cases produced results.

3.    Some Witnesses Were Interviewed on Multiple Occasions; This Was Not Universal Practice or Necessarily Improper

Some witnesses were re-interviewed by detectives, but the extent of these re-interviews and their effect are unclear. The reasons for these re-interviews were not documented, but detectives interviewed by the Review Team were certain that, in a few cases, these visits occurred at the child's request, or because the parents contacted the police. Regardless, there is no basis to conclude that such interviews led to false charges.

One of filmmaker Andrew Jarecki's investigators, David Kuhn, swears that Detective Wallene Jones told him, during an interview at Detective Jones' Atlanta home, that she interviewed one student fifteen times. Kuhn reported that statement, without context, in an affirmation annexed to Jesse Friedman's post-conviction filings.[301] But Detective Jones vigorously contests the accuracy of Kuhn's affirmation, and the practices he used to procure it:

> *According to the Kuhn affirmation, I said that I visited one child's home fifteen times, and conducted interviews that lasted as long as four hours. No child was ever visited fifteen times. The child to whom I here referred was visited more often than was usual, and I may have said that he was visited "fifteen times." That, however, was akin to saying that he was visited "a million times"—it was an*

---

[301] *See id.*, at ¶¶ 9-11.

68

**A-0118**

> *exaggeration, intended to convey that this child was visited repeatedly. Of course, had I known that this interview would be used not for the purpose represented to me, but to attack the propriety of the police investigation, and had I still chosen to participate, I would not have spoken casually and, perhaps, carelessly, as I did, but would have addressed the questions with more precision.*[302]

Indeed, Detective Jones recalled specifically being called back to interview this child by the child's mother, who said "she repeatedly noticed that her son's underwear was missing, and that she later learned that the boy had thrown it away because it was stained."[303] Nor, Detective Jones said, was any child "ever interviewed for four hours at one sitting."[304] In light of this, Kuhn's affirmation alone is not reliable proof that any such abusive repeat interviewing occurred.

As stated above, officers gave several explanations for why children may have been revisited by police. Some police investigators, such as Officer Durkin, said that officers would return to one child if another student gave reason to believe that the first had been abused. Other officers said that when they returned to a child for a second interview, it was because, as above, the child himself, or his parents, had requested that police return for another interview.

Some complainants were subjected to repeat visits, but not all. Some non-complainants were interviewed only once, such as former student ███████, who is now an employee of Nassau County, and another prominent non-complainant, the subject of the Meyers interview discussed *infra*. For each of these, and for many more, when they told police that they were not abused, the officers simply left and never came back, corroborating officers' accounts that they returned only at the request of the child, or his parents.

Even though many children were visited repeatedly—and, in response, complainants disclosed abuse in multiple stages—these accounts are not necessarily unreliable. Research demonstrates that, in sexual abuse cases, "delay of abuse disclosure is very common."[305] One such study puts the issue plainly: "for many children, disclosure of sexual abuse is a process, not an event."[306] Under this theory, a multiphase investigation including an initial phase for introduction and rapport building is both common and preferred,[307] and a single interview model is more likely to leave a child "at

---

[302] *See* Affidavit of Wallene Jones (June 2, 2004), ¶ 6-7.
[303] *See id.* at ¶ 8.
[304] *Id.*
[305] *See, e.g.*, Kamala London & Maggie Bruck *et al.*, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Way Children Tell?*, 11 PSYCH. PUB. POL'Y & L. 194, 220 (2005).
[306] Connie Nicholas Carnes *et al.*, *Extended Forensic Evaluation When Sexual Abuse Is Suspected: a Multisite Field Study*, 6 CHILD MALTREATMENT 230, 230 (2001).
[307] *Id.* at 231.

69

**A-0119**

risk" of nondisclosure, not because the event never happened, but because children are "not prepared or able to describe the abuse in the first interview."[308] Other academics have warned against conflating types of repetition: though repetition of the *same question* may produce false reports, "repeated interviews using open-ended questions may help children overcome the emotional difficulties and stresses often associated with forensic interviews about sexual abuse."[309] One such case study determined that a child's eventual, full report of sexual abuse, ultimately "corroborated by suspect confessions, eyewitness accounts, or medical evidence,"[310] could evolve from open questioning over a period involving (first) a "presubstantive" rapport-building interview,[311] and then a series of follow-up substantive interviews.[312] Therefore, no conclusion can be drawn based only on the fact that detectives may have visited a child more than one time before obtaining a statement.

4.    Early Phase I and II Interviews Were Generally Characterized by Open, Non-Leading Questioning

According to the Second Circuit Court of Appeals, witnesses recalled "with great consistency that detectives employed aggressive and suggestive questioning techniques to gain statements from children who had attended Arnold Friedman's computer classes."[313] This conclusion—supported in the Court's decision by just two witness accounts—does not hold up under a more thorough review.

First, the Review Team spoke with many individuals, including complainants, non-complainants, and parent-witnesses, about the methods police used. Those people, who were either interviewed or witnessed interviews conducted during the initial phase of the investigation (between November 12 and December 17, 1987), told the Review Team that police were not aggressive, did not engage in leading questioning, and instead let witnesses tell their stories. The parent of one non-testifying victim, the father of Witness 19, was present for his son's interview, and described police questioning as "gentle," non-leading, non-aggressive, and composed entirely of open-ended questioning. In another case a parent even said that police seemed uninterested in their work. One non-testifying victim, now an attorney, said that questioning resembled a direct examination, not a cross-examination. Other evidence supports this view: Officer Durkin recalled receiving a "nice letter" from a parent thanking her for the kindness she showed while interviewing her son.

When witnesses described more pointed questioning, or leading, the interview can generally be dated to the spring of 1988 or later, after the second indictment, after Arnold

---

[308] *Id.* at 236.
[309] David La Rooy *et al.*, *Do We Need to Rethink Guidance on Repeated Interviews?*, 16 PSYCH. PUB. POL'Y & L. 373, 385 (2010).
[310] *Id.* at 384.
[311] *Id.* at 379.
[312] *Id.* at 379-80.
[313] *Friedman*, 618 F.3d at 146.

70

**A-0120**

Friedman's guilty plea, *and* after his Close-Out Statement. One exception is Witness 1, who gave his first and only statement in December of 1987, and wrote in a 2003 affidavit that police "made specific suggestions . . . about things that they believed happened in the computer classes."[314] But in the same affidavit, Witness 1 said that he was interviewed more than once.[315] In his interview with the filmmaking team, Witness 1 blunted this claim, saying, "I don't feel like [police] were being very forceful," and, "I'm sure they weren't trying to upset me or anything," statements he confirmed in a 2012 interview with the Review Team. Regardless of how police interviewed him, Witness 1 did not adopt police suggestions, and instead implicated Jesse Friedman only in the physical abuse of another student, leading to a single count that was later dismissed.

Witness 25, who was interviewed at least twice and who figures prominently below, also indicated that he felt pressure from police, possibly during an interview conducted late in the investigation, though he felt vastly more from his mother and his therapist. Other similar accounts of pointed police questioning come from the "Meyers tape," discussed below, and the Nassau County employee, ███████████, named above. In a conversation with the Review Team, that witness said that police were forceful and leading. He said police investigators asked him specifically if Arnold Friedman put his penis on the student's back, and when he said that he did not, the officers asked if he might not have been aware of it when it happened. Based on information provided to the Review Team regarding the timing of this interview, the Review Team can date this interview to after the close of the second phase of the original investigation. Whatever pressure he may have felt made no impact, because he continued to deny being victimized or witnessing the same.

Other witnesses described feeling pressured to acknowledge that they were abused, but even then, they said, they were not told what to say. Witness 33, a former student who provided an affidavit for Jesse's habeas petition, gave such a statement, telling the Review Team that police were "not aggressive in attitude but in approach," in that they returned to his house several times. In another such case, Witness 11 said police "were aggressive but did not tell [him] what to say." He, too, was interviewed only late in the investigation, after the Close-Out Statement. It could be that, once Arnold Friedman pled guilty, once Ross Goldstein began to cooperate, or once children made statements indicating they witnessed other students being abused, police felt justified in adopting a firmer approach. In this, they may have been guided by a belief, based on conversations with specialists at the time, that children will suffer lasting psychological consequences later in life if they do not disclose abuse.[316] Indeed several witnesses, including both Witness 11 and the subject of the "Meyers tape," were told that they should disclose that they were abused to avoid suffering from profound psychological disorders later in life.

---

[314] *Id.* at 147 (quoting ████ Aff ¶ 5).

[315] In the affidavit, Witness 1 states "I remember the police questioning me on two occasions" (████ Aff. ¶ 4), but later describes "many sessions" of questioning. *Id.* at ¶ 8.

[316] At the time, community members were concerned that children who went untreated would suffer for their symptoms later. *See* A858-61 (discussing a presentation by Arthur Greene, in which he emphasized the importance of disclosure for victims).

71

**A-0121**

5.    The "Meyers Tape" Depicts an Interview Conducted to "Close Out" the Case, Not to Charge Jesse Friedman

The Second Circuit's decision explains that a "videotape" of a police interview with one student, Witness 28, "vividly illustrates" forceful questioning by police officers.[317] Regrettably, the tape no longer exists. Ms. Meyers, the mother of Witness 28, has stated that she accidentally discarded the only copy of the tape years ago, long before Jesse filed his first post-conviction motion. The Second Circuit, therefore, never saw the original tape. What the court actually reviewed, instead, was defense counsel's reenactment of a selected portion of notes he took while viewing the original tape.

The tape originated when Ms. Meyers used a video camera to produce a Betamax recording of police interviewing her son. By her own description the sound quality was spotty, and the video, worse. While Jesse Friedman's case was pending, Ms. Meyers was contacted by Jesse's trial attorney at the time, Peter Panaro. At his request, she screened the tape for him, and as he watched it, Panaro took notes of what he saw and heard on the tape.[318] But those notes stretch about twenty pages, with writing generously spaced, from an interview that, according to Ms. Meyers, lasted at least an hour. This incomplete transcription, presumably colored by the defense attorney's impression of what facts would have helped his client most, was then polished, formatted, and substantially trimmed to create the clearer "transcript" annexed to Jesse Friedman's brief for his Second Circuit appeal.[319] Lastly, the production team for *Capturing the Friedmans* recorded Panaro reading this second, shortened "transcript," and included *that* reading in the DVD release of their film. In other words, what the Second Circuit reviewed in the movie was three-times removed from whatever "tape" of the interview initially existed.

Setting aside substantial sourcing problems, the "tape" purports to describe an interview in which, as described above, police pushed Witness 28 to admit that he was victimized. Police officers expressed incredulity, for example, that abuse "happened to everyone else but not to you," and warned the child that if he *was* abused, and failed to share it with authorities, he would, later in life, become gay, and may even become an abuser himself.[320] These statements, at a minimum, are unprofessional, unfair, and cruel. But they did not result in false disclosure here. And, nowhere did the police suggest what may have happened to the victim, nor did they show any interest in charging Arnold Friedman, or even mention Jesse Friedman:

> *We are trying to find out who the other victims are to help the parents and those children. Arnold Friedman will not be charged with any other additional charges. There's no*

---

[317] *Friedman*, 618 F.3d at 160 n.10.
[318] A307-27.
[319] *See* A328-29.
[320] *Id.*.

72

> *axe to grind here. . . . It was all stipulated in open court*
> *that there will be no further charges.*[321]

On the "tape," police state that they were led to Witness 28 by two other witnesses, who said they observed him being victimized by Arnold Friedman; and claim that Arnold had admitted to victimizing these children "in open court."[322] This last statement is telling, as it shows that the "Meyers tape" was filmed in the immediate aftermath of Arnold Friedman's plea and his March 25, 1988 Close-Out Statement. It is relevant that police conducted such a tense interview and still never mentioned Jesse Friedman, supporting the detectives' claim that they were primarily interested in making sure child victims received appropriate help.

On a separate note, Peter Panaro's file notes include a memorandum summarizing a conversation with Ms. Meyers, dated January 1988, stating that her children "liked Mr. [Friedman] more than Jesse," and that when they originally saw the Friedmans on the news, they reacted with shock, saying, "Not Mr. [Friedman], maybe his son, but not Mr. [Friedman]."[323] The memorandum goes on, saying the mother "remember[ed] some things that her kids said about Jesse," but that she "[did] not want to remind them":

> *For instance, once when she was going to be late in picking*
> *them up, one of her kids did not want to go because they*
> *would have to wait with Jesse. She spoke to Mr.*
> *[Friedman] about this, and Mr. [Friedman] told her that*
> *Jesse was not getting along too well with the kids, and [he]*
> *would have to throw Jesse out of the class.*[324]

Though the Friedmans considered Witness 28 and his mother as potential defense witnesses, Witness 28's value at trial may have been limited by these revelations.

6.     The Evidence Does Not Support the Allegation that Police Used the Close-Out Statement to Generate Charges Against Jesse Friedman

The Close-Out Statement is discussed *supra*. Succinctly, it resulted from an interview police conducted with Arnold Friedman in an attempt to close out the case. In the interview, Arnold was asked to name all of the children he had victimized, and was promised immunity for any such confession. The goal of the interview was, ostensibly, not only to close the case against Arnold Friedman, but also to secure a final and reliable

---

[321] A328.
[322] *Id.*
[323] A306.
[324] *Id.*

73

**A-0123**

list of all of his victims, so that they could be located and advised to seek treatment if necessary.[325]

Because the promise of immunity could have incentivized Arnold Friedman to simply "admit" to any crime he was asked about, Jesse Friedman's advocates have questioned the reliability of the Close-Out Statement. They have argued that it must necessarily have been used to turn Arnold's admissions against his son, Jesse. No evidence supports this allegation.

First, though the promise of immunity meant that Arnold could have believed it was in his interest to confess to abusing every student he was asked about,[326] Arnold did not. Instead, after initially maintaining his innocence, Arnold offered detailed accounts of the sexual acts he performed with forty-one children, denied any sexual contact with twelve children, and also denied any such contact with any of his former students from the Woodmere Academy and Bayside High School.[327] Arnold went so far as to detail the course of conduct he would undertake to determine which children might be receptive to sexual activity, and which would not.[328] He even described using computer games to distract his students, so he could touch them.[329] The level of detail provided by Arnold Friedman suggests that the document was not a wholesale invention.

Most importantly, the Close-Out Statement was not used against Jesse Friedman. Instead, police documents show that the investigation was "re-started" in mid-March, shortly *before* Arnold's interview,[330] and police took incriminating statements from, at most, only two "new" witnesses after that point.[331] Moreover, the Close-Out Statement mentions Jesse Friedman only in the beginning, where officers promise Arnold Friedman that the statement would be used only to identify and help victims,[332] not to prosecute his son.[333] If officers intended to use the statement to "check their work"[334] in the continuing investigation against Jesse Friedman, they nonetheless failed in both the Close-Out and Meyers interview to ask any questions specifically about Jesse Friedman.

---

[325] *See* A858-61.

[326] Arnold stated as much in his "Open Letter." *See* A562 ("I had to lie that I abused every one of my students. If I inadvertently left one out, I could be subject to further indictments.").

[327] For example, Arnold Friedman would deny sodomizing some children, but admit to fondling them. *See, e.g.*, Close-Out Statement, at 25:20. Note that the Close-Out Statement is omitted from the public version of the appendix to this report, pursuant to Civil Rights Law § 50-b.

[328] *Id.* at 35:25-37:14. He denied using pornographic books to sexualize children. *Id.* at 47:7-19.

[329] *Id.* at 118:1-5.

[330] *See* A291-92.

[331] *See* note 95, *supra*.

[332] *See* Close-Out Statement, at 24:13-19.

[333] *See id.*, at 14:17-22; 20:11-21:16.

[334] A set of handwritten notes provided to the Review Team by Arline Epstein show that, at some point after the Close-Out Statement was taken, Detective Sergeant Galasso called Epstein to tell her about the results of the interview, and to inform her that she was "getting [the] task force back tog[ether]" to "go back out & re-interview kids to be sure of the case against Jesse." A862. Epstein's handwritten annotations, made with the help of the filmmaker, assume that the Close-Out Statement would be used as a tool in that process.

74

**A-0124**

### 7. Not All Suspects Were Prosecuted

Advocates for Jesse Friedman have argued that the police aggressively deployed the threat of prosecution to neutralize potential adult defense witnesses.[335] Instead, it appears that the police investigated and arrested individuals on the basis of witness statements, and declined to arrest other adults, even those close to the case, where the evidence did not support it.[336]

If the Friedman prosecution followed the traditional "moral panic" paradigm, Elaine Friedman (at least) would have been arrested on abuse charges, based solely on her proximity to her husband's crimes, along with David and Seth Friedman. But none were ever prosecuted. Similarly, Witness 26, a teenager selected by Arnold Friedman to replace Jesse as computer class co-instructor, was also a natural target for police investigation due to his presence in the class. But department files disclose only one meeting between police and Witness 26, in which he seems to have been treated as a witness rather than a suspect. Thereafter, Witness 26 disappears from the case entirely, despite the fact that one complainant indicated that Witness 26 was working in the class while abuse occurred.

It is true that two of Jesse Friedman's friends were subjected to a line-up procedure,[337] and one was questioned extensively. But the District Attorney declined to prosecute both, even when police sought an arrest warrant for one of the two.[338] A third individual, a friend of Jesse Friedman's who was staying at Jesse's home during some part of the relevant time period, was never interviewed or prosecuted. Though he submitted an affidavit in 2003 stating his belief that his arrest was imminent during the spring of 1988, nothing in the record supports this contention.[339] Police investigators never assumed that this case constituted a "sex ring," where every adult was presumed guilty, and the District Attorney's exercise of prosecutorial discretion further shows that such an approach would not have been successful.

### 8. Modern Best Practices

Before leaving this subject, it is important to note that police interviewing techniques *have* evolved since 1988, especially where child sex victims are concerned.

---

[335] *See* De Becker & Horowitz, *supra* note 13, at 3. Journalist and paid consultant Debbie Nathan also repeated a similar claim in an interview included in the DVD release of the film's "Bonus Features." *See* CAPTURING THE FRIEDMANS (Magnolia Pictures 2003), "Bonus Features." To access this material, navigate to "The Case," and select "Additional Suspects."

[336] *Cf.* Debbie Nathan, *Complex Prosecution*, THE VILLAGE VOICE, May 20, 2003, *available at* http://www.villagevoice.com/2003-05-20/news/complex-persecution/ (claiming that the Friedman case fit the mold of a "sex ring" prosecution, in which networks of supposedly connected perpetrators are indicted and prosecuted).

[337] *See* Section I.H.3, *supra*.

[338] *See* A293.

[339] *See* ███ Aff.

Today, specialists are involved directly in the interview process, to ensure that statements are accurate and reliable.

Specifically, today the Nassau County Multidisciplinary Team ("MDT") responds to allegations of sexual and severe physical abuse of children of Nassau County, in adherence to both the Child Advocacy Center model and the standards set by the National Children's Alliance. A collaborative response including all relevant members of the MDT is initiated at the time of the first report, and continues throughout the duration of a case. The Nassau County MDT consists of the District Attorney's Office, the NCPD, the Department of Social Services, the Office of the County Attorney, the Coalition Against Child Abuse and Neglect, and the NuHealth SCAN program. The goals of the MDT in cases of alleged sexual abuse include ensuring the safety of the children, reducing trauma, streamlining the investigative and interview process, promoting the successful prosecution of offenders and ensuring the physical and psychological treatment of abuse victims.

In order to meet these goals, and when the circumstances allow, child victims are interviewed jointly by a team which may include NCPD detectives, members of the District Attorney's office, and members of Nassau County Child Protective Services. Forensic interviews are intended to be neutral, non-leading and fact-finding in nature, and carried out by interviewers who have successfully completed competency-based forensic interview training.

This joint effort is intended to reduce the number of interviews the child is subjected to. Every effort is made, as long as circumstances allow, to have child victims under the age of twelve interviewed at the Child Advocacy Center, where the interview can be video recorded and other members of the MDT can observe from an adjoining room. Information gathered during the forensic interview process is shared with MDT medical staff so that the children seen for medical exams need only be questioned regarding their medical history. Continued medical and mental health services are provided to the children and their families at the Child Advocacy Center with additional resources and support being offered to them through victim advocates.

\*      \*      \*      \*      \*

The reliability of a major police investigation is best reviewed on appeal, close in time to the event itself. Here, the Review Team needed to reconstruct the original investigation from twenty-five year old memories, with all the limitations that entails. As reconstructed, though, the record does not support Jesse Friedman's version of events. It also does not support the impression conveyed in *Capturing the Friedmans*, of systematic, overbearing police coercion. After setting artistic license to one side, and considering the unadorned facts, there is simply no evidence that the police engaged in a widespread, concerted effort that "wrung" false testimony from each and every witness. A fair view of the record suggests that, in the earliest phases of the investigation,

76

**A-0126**

detectives turned up evidence that was barely concealed beneath a veneer of fear and lies. Victims knew they had been hurt, but, because of fear and shame, did not know how or whether to share their experiences.[340]

If some detectives later adopted a more aggressive posture—and there is some evidence that they did—the link between questioning and tainted results is nonetheless lacking. The value of the "Meyers tape" is circumscribed by the simple fact that on the "tape," detectives never so much as mention Jesse Friedman, and it is impossible to assess demeanor from a partial transcript thrice-removed from the actual "tape." Excerpts from Detective Squeglia's interview, fifteen years after the fact, cannot be used as conclusive proof of tactics used by all detectives, by most—or, even, by Detective Squeglia, based on the conflicting accounts offered during the interview. And, though the record shows that some students reported feeling pushed to disclose, only two, Witness 1 and ████████, said that police specifically suggested answers to interview questions. Even then, neither bowed to this pressure and falsely disclosed criminal sexual acts.

In hindsight, the investigation was not ideal, but it was a product of its time. In the intervening twenty-five years, methodologies for interviewing child witnesses have evolved. Today, an investigation against the Friedmans would start and proceed differently. But, it has not been shown that the result of that investigation would be any different, or that Jesse's conviction was "wrongful" as a result.

## B.  The Review Team Found No Credible Evidence that Hypnosis Was Used on Any Complainant

In a brief submitted to the Advisory Panel, Jesse Friedman claims that "at least one of the complainants did not assert that he had been abused until after he was subjected to hypnosis."[341] *Only* one complainant makes such a claim, and there is no reason to credit even this allegation. Rather, the record demonstrates conclusively that no students gave incriminating accounts after being "hypnotized" or subjected to other potentially distorting influences.[342]

---

[340] In fact, the research also establishes that there is an extremely high rate of non-disclosure among children who have been sexually abused. According to one study, "fifty-seven percent of children with a sexually transmitted disease failed to disclose abuse when questioned." Thomas D. Lyon, *The New Wave in Children's Suggestibility Research: A Critique*, 84 CORNELL L. REV 1005, 1047-48 (1998) (citing Louanne Lawson & Mark Chaffin, *False Negatives in Sexual Abuse Disclosure Interviews: Incidence and Influence of Caretaker's Belief in Abuse in Cases of Accidental Abuse Discovery by Diagnosis of STD*, 7 J. INTERPERSONAL VIOLENCE 532, 537 (1992)). Another found that "forty-nine percent of children with medical evidence strongly indicative of sexual abuse failed to disclose abuse." *Id.* (citing David Muram *et al.*, *Genital Abnormalities in Female Siblings and Friends of Child Victims of Sexual Abuse*, 15 CHILD ABUSE & NEGLECT 105, 108 (1991)).

[341] Submission of Jesse Friedman to the Friedman Case Review Panel (Mar. 2, 2012), at 32.

[342] *Cf. Friedman*, 618 F.3d at 151.

77

**A-0127**

1.     Doctors Denied That Hypnosis Elicited Charges

The Review Team found that many complainants were referred to North Shore Hospital for treatment. Whether or not all victims sought treatment is not known. Of the North Shore team, some of the doctors spoke to the Review Team. One, Dr. Sandra Kaplan, has since passed away, preventing inquiry into the role she played[343]—though Dr. Pelcovitz, her former colleague, told the Review Team that they referred patients to Dr. Williams for hypnosis, and did not perform it themselves. Dr. Joyce W. Parks, Ph.D., Witness 2's treating psychologist, also passed away recently, but not before signing an affidavit in 2004 stating that she never hypnotized Witness 2.[344] These are the only treating doctors of whom the Review Team is aware.

In 1987, Dr. David Pelcovitz, Ph.D., was the director of psychology for North Shore University Hospital, in Manhasset, where he specialized in treating victims of sexual abuse. In this capacity, Dr. Pelcovitz played a significant role in treating victims of the Friedmans. Today, he is the Gwendolyn and Joseph Straus Chair in Psychology and Jewish Education at Yeshiva University's Azrieli Graduate School of Jewish Education and Administration.

Dr. Pelcovitz stated categorically that he never used hypnosis in his treatments of the Friedman victims. However, he acknowledged that hypnotherapy was believed to be an effective treatment in the late 1980s. He further recalled that, after the case concluded, he referred three to five children to Dr. Daniel E. Williams, Ph.D., in the hope that Dr. Williams could use hypnosis to help children recall memories of abuse that he believed them to be suppressing. In turn, Dr. Williams recalled that, though he administered hypnotherapy to approximately three non-complainant children on Dr. Pelcovitz's referral, the treatment did not result in the "recovery" of any memories.[345] He knew nothing of the allegations in the case, only that they were sexual in nature, and met only once with any patients referred for hypnosis, and none yielded results.

2.     The Only Witness Account to Describe Hypnosis Is Not Reliable

In an interview conducted for *Capturing the Friedmans*, Witness 2 discusses hypnosis. There, he explains that "the actual first time I actually recalled I was actually molested" was under hypnosis.[346] This statement formed the basis for the Second

---

[343] Dr. Kaplan passed away in July of 2010, before the Second Circuit decided Jesse's case. *See Obituary: Sandra Kaplan*, N.Y. TIMES, Jul. 25, 2010.

[344] *See* Affidavit of Joyce Parks (Apr. 14, 2014).

[345] Though New York law bars the admission of memories "recovered" through hypnosis, a witness who has previously been hypnotized may testify to those events that he recalled before he was hypnotized. *People v. Hughes*, 59 N.Y.2d 523, 541-42, 545 (1983). Thus, even if hypnosis had pre- rather than post-dated the conclusion of the case, New York law would recognize the complainants' pre-hypnosis memories as reliable and admissible in judicial proceedings. *See id.*; *see also People v. Schwing*, 9 A.D.3d 685, 685-86 (3d Dept. 2004) (applying this general rule).

[346] A621, transcript of interview with Gregory Doe.

78

**A-0128**

Circuit's belief that hypnosis somehow affected the case. But, a look at the remainder of the interview, in its unedited form, reveals an account that is dramatically different.

In the same interview, the student says that he "gave [the police] a statement" on the "very first night" he spoke with them.[347] He was only hypnotized, he says, "three weeks later," though his parents put him in therapy "right away."[348] Witness 2 stood by this timeline in a later interview with *Newsday*, in which he also claimed that the film's presentation of his statements was "twisted":

> [Witness 2] said he does not need hypnosis to remind him of what the Friedmans did to him. His family sent him to a private therapist after he provided his statement to police but prior to his appearance before the grand jury. The therapist used hypnosis, he said, to try and get him to the point where he could talk about what had been done to him without throwing up.[349]

In a recent interview with the Review Team, Witness 2 suggested that he was not sure if hypnosis pre- or post-dated his interviews with police, and he seemed unclear when asked about what hypnosis actually entailed. He described it as relaxing and staring at cards.

The film's presentation of Witness 2 omits almost all of the witness's account concerning sexual abuse and hypnosis, and highlights only the brief portion in which he claims he was hypnotized before speaking with the police. For example, one would not know from *Capturing the Friedmans* that Witness 2 described the effect the case had on him in great detail. In the full interview, Witness 2 states that he threw up for three days after he first disclosed the abuse to police, and that he developed an anal fissure after being sodomized by the Friedmans.[350] Regardless, due to the inconsistencies underlying Witness 2's statements, it would be perilous to rely on him to establish any concrete "fact" about whether, or when, hypnosis was used. Instead, it is more sensible to rely on the results of interviews with Drs. Pelcovitz and Williams, and the affidavit of Dr. Parks, Witness 2's treating therapist, to conclude that hypnosis was not used to generate incriminating statements.[351]

### 3. Nothing Else Suggests That Hypnosis Was Ever Used

In communications with the Review Team, Andrew Jarecki and Jesse's attorney, Ron Kuby, suggested that records of an academic conference would prove that

---

[347] A629.

[348] A622.

[349] Victor Manuel Ramos, *Challenging 'Friedmans': Out of the Shadows*, NEWSDAY, A5, Feb. 29, 2004.

[350] A623, 625-26. Witness 2 re-affirmed this medical claim in a recent interview, as did his parents, separately. But neither Witness 2 nor his parents remembered the name of the physician who diagnosed this condition, and as a result, the Review Team has not been able to independently confirm it.

[351] *See* Parks Aff. ¶ 4.

79

psychologists associated with the case used hypnosis to prepare witnesses for their appearances before the grand jury. No evidence supports this claim.

Though doctors associated with the case undeniably made some presentation to the American Academy of Child & Adolescent Psychiatry (AACAP),[352] very few records of the event still exist. Some were lost when, early in the last decade, AACAP produced a set of documents to an unknown attorney.[353] The documents were never returned.[354]

Those documents that do remain on file with AACAP do not support Jarecki's claim. Instead, in one transcribed presentation, treating doctors describe "group therapy" sessions conducted with the parents of victims, not the victims themselves. The transcript terminates immediately before a subsequent presentation by Dr. Dan Williams, and the prospect of hypnosis as a preparatory tool is simply never discussed. Another presentation, transcribed in Arline Epstein's notes, states only that the Friedmans' victims showed some symptoms of disassociation and emphasized the buttocks when asked to draw the human body.[355]

### 4. Evidence Demonstrates That Group Therapy Did Not Begin Until After the Third Indictment

"Group therapy"—another treatment discussed by Jesse Friedman's advocates, in which groups of victims, together and at the same time, discuss their memories—can also be excluded as a potential distorting influence on the investigation. News coverage suggests that large-scale group therapy took place at the close of the Friedman case, but not before.[356] The first press mention of any such organized therapy, for instance, dates to November 3, 1988,[357] a year after the federal investigation began, and states that group therapy would begin two weeks later, on November 16, 1988. Assuming this schedule was adhered to, "group therapy" did not begin until nine days after the third and last indictment issued, and just prior to Jesse Friedman's decision to plead guilty.

Information from eyewitnesses confirms that "group therapy" occurred too late to influence the case against Jesse Friedman. According to Arline Epstein's notes, group therapy did not begin until December 7, 1988, nine months after the second indictment was issued, and a month after the third indictment was handed up by a grand jury.[358] In interviews, Dr. Pelcovitz acknowledged that he led approximately twenty group therapy sessions, but stated that he is certain that they began only after all testimony in the case

---

[352] A617-19, abstract of presentations to AACAP conferences.

[353] Email from Maureen DuBois, Director of Human Resources & Operations, American Academy of Child & Adolescent Psychiatry, to Ames Grawert, Assistant District Attorney, NCDA (June 22, 2012).

[354] *Id.*

[355] *See generally* A884-904.

[356] *See* Alvin E. Bessent, *Little Joy in Victory for Boys' Families*, NEWSDAY, Jan. 25, 1989, 1989 WLNR 219053 (observing that Jesse's victims were, by this point, in organized therapy).

[357] See *Temple Beth El's Meeting on Child Sex Abuse Slated for November 16*, GREAT NECK RECORD, Nov. 3, 1988.

[358] *See* A868-69, notes from Nov. 16, 1988 panel at Temple Beth-El.

80

had been given. In fact, Dr. Pelcovitz remembered being specifically asked by the District Attorney's office and by Detective Sergeant Galasso to postpone such treatment until after the case concluded. Initially, he forcefully disagreed with this decision, because he believed it was contrary to medical ethics to allow a patient to suffer, but says he eventually assented when pressed by his then-superior, Dr. Kaplan.

Although Jesse Friedman's affidavit in support of his habeas petition describes the occurrence of widespread group therapy, his descriptions actually depict something else.[359] Jesse's affidavit describes a school principal inviting students to talk to him if necessary, and a school psychologist asked to "be on the look-out for unusual behavior."[360] Jesse's submission also appears to conflate group *therapy* with community meetings convened by the citizens of Great Neck. The latter undeniably took place between December 1987 and January 1988, but were held to instruct *parents* on how to recognize symptoms of abuse, rather than to coach children through their experiences.[361]

The record strongly suggests that witnesses began seeing therapists on an individual basis early in the prosecution. One article, for example, implies that some children sought therapy shortly after the November 25, 1987 search warrant and arrests.[362] Additionally, a "commendation letter" sent by Detective Sergeant Fran Galasso states that her investigators "cooperated with teams of psychiatrists and psychologists involved in the treatment of victims."[363] The letter was transmitted in May 1988, between the second and third indictments,[364] goes into no further detail, and does not make clear whether testifying victims were exposed to therapy.

*    *    *    *    *

In short, there is no evidence that either hypnosis or "group therapy" materially affected the Friedman case in any way. The extent to which victims began treatment in individual therapy sessions before the case concluded is unknown, but law enforcement officers cannot control a family's private decision to seek treatment for a victimized child. Therapy is a valuable tool that, in many cases, is critical to a victim's recovery. And, based on the compressed timeline of the investigation, nothing suggests that it influenced the case against Jesse Friedman one way or the other.

---

[359] Friedman Aff. ¶ 30.

[360] *Id.*

[361] *See* William S. Dobkin, *Great Neck Community Marshals its Resources to Deal with Child Abuse and Child-Sex Crime*, GREAT NECK RECORD, Feb. 4, 1988.

[362] Kathy Boccella, *Parents Seek Therapy for Abuse Victims*, NEWSDAY, Nov. 29, 1987, 1987 WLNR 188022.

[363] A298, letter from Detective Sergeant Fran Galasso, Commanding Officer, NCPD Sex Crime Squad, to Chairman of Committee of Awards, NCPD (May 2, 1998), at ¶ 13.

[364] A294, at ¶ 1.

81

**A-0131**

### C. The Record Does Not Support a Finding of Improper Judicial Coercion

The evidence similarly fails to support Jesse's claim that Judge Abbey Boklan[365] used the threat of an unfairly harsh sentence to induce his plea. Although Judge Boklan warned Jesse that he faced a substantial sentence, that admonition was self-evident, and never crossed or even strained the bounds of propriety.[366] Nor was Judge Boklan, as Jesse now claims, hopelessly biased against the Friedmans. Denying the prosecution's motion, Judge Boklan declined to set new bail after the Friedmans were arraigned on the second and third indictments.[367] She also dismissed counts from the indictments when, in her opinion, they appeared unsupported by the People's evidence.[368] There is no evidence to support the conclusion that Judge Boklan was biased.

#### 1. No Contemporaneous Source Supports a Finding that the Plea Was Coerced

In a pre-plea, transcribed interview conducted with his client, Panaro told Jesse that Judge Boklan "indicated that for each one of the charges that you are convicted of, she would *consider* some consecutive time," a sentence that he speculated could run into hundreds of years, thus ensuring that Jesse would die in jail.[369] However, Panaro clarified matters in the same conversation, as the lawyer's transcription makes clear:

> **PP:** *However, haven't I indicated to you and told you time and time again, that no matter how many years Judge Boklan gave to you on a sentence, that the most time you could be incarcerated for in the State of New York would be forty years?*
> **JF:** *I'm aware of that.*
> **PP:** *And haven't I told you that on many occasions.*
> **JF:** *Yes, you have.*
> **PP:** *Now, that would mean that if your [sic] were incarcerated now you would come out of jail*

---

[365] Judge Boklan passed away during the pendency of this re-investigation.

[366] *Cf. People v. Stevens*, 298 A.D.2d 267, 268 (1st Dept. 2002) (statement that the court would impose the maximum if defendant was convicted after trial was coercive, as it went beyond mere description of sentencing exposure).

[367] A290, memorandum from A.D.A. Joseph Onorato to File, Feb. 9, 1988. Note that the Friedmans were initially held on high bail, which was reduced on appeal. Robin Topping, *Court Lowers Bail in Sex Abuse Case*, NEWSDAY, Dec. 2, 1987, 1987 WLNR 197789. However, that initial amount was set by District Court Judge Richard LaPera, not Judge Boklan. *Metro Dateline*, N.Y. Times, Nov. 27, 1987, *available at* http://www.nytimes.com/1987/11/27/nyregion/metro-dateline.html.

[368] *See* A394-405.

[369] A366 (emphasis added).

82

> *when you're fifty-nine years old. Do you*
> *understand that?*[370]

In fact, in 1988, the sentence for a Class B violent felony, such as Sodomy in the First Degree, carried a minimum of two to six years' imprisonment, and a maximum of eight-and-a-third to twenty-five years. By statute, had Jesse been convicted of only a few such felonies, a forty-year sentence could have resulted from as few as *two*, not *hundreds*, of consecutive sentences.[371]

     In an affirmation attached to his 2004 post-conviction motion, Peter Panaro stated that Judge Boklan threatened to sentence Jesse Friedman to "consecutive terms of imprisonment for *each* count that he was convicted on."[372] This document, however, was prepared in 2004 for post-conviction litigation, and conflicts with the description that Panaro himself recorded while the case was ongoing. Panaro had no reason to dissemble, or soften such a harsh threat, in a pre-plea interview with Jesse designed to probe the basis of his decision to plead guilty. Nor does any other evidence support a theory of coercion. In *Capturing the Friedmans*, Elaine Friedman remembers Judge Boklan threatening to sentence Jesse to three consecutive terms,[373] a highly specific memory that is unsupported by any other evidence. In a contemporaneous journal entry, David Friedman recorded that Judge Boklan suggested "if [Jesse were] convicted after trial, she would probably run the time consecutively instead of concurre[nt]."[374] One of Jesse's letters expresses his belief that Judge Boklan "seems to despise me," and that "she says she will give me harsh consecutive time."[375]

### 2. *Capturing the Friedmans* Misrepresents Judge Boklan

     Panaro's recorded conversation with Jesse indicates that the judge made a conditional statement, tying the likely sentence to the outcome of trial. An interview conducted by Andrew Jarecki, in preparation for *Capturing the Friedmans*, further undercuts the claim that Judge Boklan threatened Jesse with severe jail time without regard to the evidence. A review of the full, unedited transcript of Jarecki's interview shows that Judge Boklan specifically rejected that idea:

> *[A]n attorney will say to me, "If my client goes to trial, as*
> *opposed to taking this plea, are you gonna punish them*
> *with a greater sentence?" And I say, "I don't punish him*
> *for going to a trial." But once I hear— once I hear what*
> *really happened— or if your client commits perjury— or,*

---

[370] A367.

[371] The maximum sentence Jesse could have faced was fifty years in prison, even if the sentences were run consecutively. *See* N.Y. PENAL LAW § 70.30(1)(a)(ii)-(iii) (McKinney 1986).

[372] *See* Panaro Aff. ¶ 11 (emphasis added).

[373] *See* A240.

[374] *See* A415, excerpt 2.

[375] A442.

83

> *anything that can happen during the course of— of a trial,*
> *who knows what I'm gonna sentence him.*[376]

This excerpt was never aired in the film, and went unmentioned in both Jesse Friedman's post-conviction pleadings, and in the Second Circuit's opinion, which accepted as true Jesse's assertion that Judge Boklan "threat[ened] to impose the highest conceivable sentence for each charge" upon which he was convicted.[377]

To support that claim, Jesse's advocates and the *Capturing the Friedmans* filmmakers point to a different excerpt from Jarecki's 2003 interview with Judge Abbey Boklan, in which the Judge allegedly revealed a strong bias against Jesse Friedman. But that excerpt misrepresents the thrust of the Judge's interview, as shared with the Review Team, and may have been edited to convey a misleading impression. Compare the version of Judge Boklan's interview that aired in *Capturing the Friedmans*, with another statement made by Judge Boklan to Jarecki's interview team:

---

**Judge Boklan, in *Capturing the Friedmans***

"**There was never a doubt in my mind as to their guilt. . . .** And remember, I'd been around for a while. This wasn't, you know, the first sex case that I had ever seen. In fact, my previous law secretary used to tease me that we were the pervert part. And having been, you know, head of the Sex Crimes Unit myself where, you know, I had young boys who were sodomized, in fact, one who killed himself, you know, after the sentence of the abuser. I mean, some horrible experiences. So for me to be so outraged. I mean this was really very, very bad what was going on there. It was like someone's worst nightmare. Who would even think of, of doing these things? And to do them in a group with so many witnesses."[378]

---

This statement may appear, in this sequence, in some interview with Judge Boklan. But it does not appear in any of the interview transcripts that Jarecki provided to the District Attorney's office and the Court during Jesse's post-conviction litigation, nor does it appear in any transcript shared subsequently with the Review Team.

Compare it with the below:

---

**Judge Boklan, transcript of a longer interview with the filmmakers, not aired in *Capturing the Friedmans* (A629-733)**

"**There was never a doubt in my mind as to their guilt.** First of all, I knew that all the children had been interviewed separately. The stories were extremely consistent. I had the opportunity to read the grand jury minutes, where these young children testified, as well as the young codefendant who we've previously discussed, who was testifying— against

---

[376] A728 (emphasis added).
[377] *Friedman*, 618 F.3d at 158.
[378] A170-71.

> them.
>
> The stories were consistent with each other. And consistent with the evidence that was found in the federal search warrant. When the children talked about certain videos they had seen, certain pornographic literature that they had been shown-- and you know, I had all those years of experience as an assistant district attorney, and in the sex crimes unit, when I dealt with young children. And it just rang true.
>
> Then, of course, I have a defendant standing out there, and answering 'Yes, yes, yes. Yes, I did all of those charges.' Maybe there is a temptation to plead guilty to a minor charge with a very light sentence, even if you're not guilty, because you're so afraid of exposure. But . . . . I don't think someone's going to just do that— very lightly, unl— unless they're guilty.
>
> Also— Arnold was a very educated man. This was not some young person who was being intimidated, who didn't know what he was doing, who didn't understand what he was facing. So, as I said, I— I was very comfortable with accepting the pleas that they were guilty. And I was very comfortable with sentencing them to long periods of incarceration."[379]

The excerpts share a single line: "there was never a doubt in my mind as to their guilt."

      Unless Judge Boklan used those precise words in two separate interviews, to the same interviewer, it is highly unlikely that the version presented in *Capturing the Friedmans* accurately represents what Judge Boklan actually said. It seems more likely that *Capturing the Friedmans* edited the interview to convey the impression that Judge Boklan tied her confidence in Jesse's guilt to her own biases, rather than the evidence she saw during pretrial practice. Indeed, in the film, Judge Boklan is never shown speaking the critical line, "there was never a doubt in my mind as to their guilt." Instead, audio of her statement plays over courtroom footage. Only as she begins the next sentence—"and remember, I'd been around for a while"—does the film show Judge Boklan speaking.[380] This portion of the film, offered as evidence of Judge Boklan's alleged bias against Jesse Friedman, results from an interview conducted fifteen years after the fact. But even this is a product of selective editing, and the only other evidence of bias comes from self-serving statements made by Jesse and his attorneys during motion practice.

      As in the case of Jesse Friedman's plea, the minutes of his sentencing were also not available to the Review Team. But in a recent interview with the Review Team before her death, Judge Boklan denied that she ever issued any "threat" to Jesse Friedman. She explained that she advised the Friedmans about the maximum sentence they were facing, and that the maximum sentence was, as in all cases, a possibility, depending on factors that would emerge during trial. She noted that this is standard practice. She also clearly

---

[379] A650-51.
[380] *See* A170-71. In the film, this excerpt begins approximately at timestamp 31:27.

stated that she has never said, and would never say, that a defendant would be penalized simply for exercising his constitutional right to trial, regardless of the proof at that trial. Instead, Judge Boklan remembered sympathizing with Jesse Friedman's plight. She felt that Jesse, as a victim of his father's abuse, "had no chance" for normalcy. Judge Boklan's own law secretary, Scott Banks, a former public defender, confirmed that nothing in the lead-up to Jesse Friedman's plea bargain offended his sense of fairness. Judge Boklan, he said, was known to sentence harshly, but never unfairly.

3.   The Court's Conduct Did Not Amount to Coercion

A fair reading of the facts indicates that Judge Boklan likely warned Jesse Friedman that a trial in which he was found guilty could, depending on the strength of presented testimony, result in a harsh sentence involving consecutive periods of incarceration. While a judge's unconditional threat to impose the maximum sentence on a defendant following trial is sufficiently coercive to warrant overturning a guilty plea,[381] judges are allowed to warn defendants of the maximum sentence they could face if the evidence supports all the charges.[382] Indeed, in cases of this magnitude, a sentence that included consecutive prison terms would not have been uncommon, let alone excessive.

Absent evidence of undue coercion, the criminal justice system and the public are entitled to rely on the integrity of Jesse Friedman's guilty plea, knowingly and voluntarily made in open court. "It is well settled that plea bargaining is 'a vital part of our criminal justice system,'" intended to guarantee the speedy resolution of criminal cases, and afford both the prosecutor and the accused a guarantee of finality.[383] Pleas represent compromises,[384] in which the defendant is "convicted with his own consent" in return for a lighter prison sentence, or the prosecution's promise to drop counts of the indictment.[385] Necessarily, this bargaining process implies a level of "situational coercion."[386] In many cases in which a defendant does not admit guilt, but goes to trial, he will face more substantial charges, the possibility of greater prison time, or both.[387] But this does not cast doubt on the validity of the plea process. In all but the most exceptional cases— which this is not—the guilty plea is "conclusive."[388]

---

[381] *People v. Richards*, 17 A.D.3d 136, 137 (1st Dept. 2005).

[382] *People v. Coleman*, 8 A.D.3d 825, 826 (3d Dept. 2004) ("That defendant may have been apprised of his sentencing exposure cannot be a basis for finding coercion.").

[383] *People v. Bradshaw*, 18 N.Y.3d 257, 264 (2011) (quoting *People v. Seaberg*, 74 N.Y.2d 1, 7 (1989)).

[384] *People v. Taylor*, 65 N.Y.2d 1, 5 (1985).

[385] *People v. Parris*, 4 N.Y.3d 41, 49 (2004).

[386] *People v. Seaberg*, 74 N.Y.2d 1, 8-9 (1989); *see also People v. Buskey*, 62 A.D.3d 1164, 1165 (3d Dept. 2009) (holding that the defendant's "assertion that he felt pressured into entering a plea amounts to 'situational coercion,' which is unavailing") (citations omitted).

[387] *See, e.g.*, *People v. Nixon*, 21 N.Y.2d 338, 350 (1967) (observing, before affirming the lower court's denial of a motion to withdraw a plea, that the defendant's plea to a lesser offense than the murder charged was "quite understandable"); *see also People v. Wolf*, 88 A.D.3d 1266, 1267 (4th Dept. 2011) ("'[t]he fact that the possibility of [additional charges] may have influenced defendant's decision to plead guilty is insufficient to establish that the plea was coerced'") (citation omitted; alterations in original).

[388] *Kercheval v. United States*, 274 U.S. 220, 223 (1927).

86

The law intends that a defendant's decision to plead guilty should be a meaningful act, providing the victims and the public with some confidence that the case has concluded and justice been done. In light of Jesse's other confessions, to his attorney, and to a television audience, there was no reason, until 2003, to believe the case had not concluded properly.

> 4. **Contrary to Jesse Friedman's Assertions, He Fully Participated in his Defense, and Was Not Forced into a Plea by his Family**

The record further shows that Jesse Friedman was not coerced into pleading guilty. Rather, the evidence overwhelmingly demonstrates that Jesse Friedman's guilty plea was entered knowingly, voluntarily, and intelligently, after securing competent advice from an effective attorney who was clearly devoted to advocating for his client's best interests.

A careful review of records from the critical period between March and December of 1988 allows some reconstruction of the path that led from Arnold Friedman's guilty plea, through the third indictment, and to Jesse Friedman's own guilty plea. The picture that emerges is not, as Jesse and his advocates have suggested, one characterized by the domination of external forces. Rather, primary sources show Jesse Friedman, his family, and his counsel as makers of their own destiny. Jesse pled guilty because his own efforts showed it to be the optimal strategy in light of the choices available to him, not because someone else forced him to do so. Throughout his prosecution, Jesse Friedman played an active role in his own defense. In family meetings, Jesse led lively debates about the family's litigation strategy. In one, he urged his family to "try the case in the media."[389] In other conversations, Jesse discussed a variety of strategies, such as subjecting "every" student to cross-examination and exploiting all inconsistencies. One overriding topic of conversation was the benefit to Jesse of his father's guilty plea. Jesse believed that he could escape a guilty verdict only if he avoided being saddled with his father's acknowledged history with child pornography. He considered in detail which scenario would benefit him the most: having his father plead guilty, or sitting next to him, with Arnold Friedman looking "like a guilty old man"[390] proclaiming his innocence.

When Arnold did ultimately plead guilty, Jesse interviewed as many as thirty-four potential attorneys[391] before hiring Peter Panaro. Once Panaro was retained, Jesse and his brother David helped him locate potential witnesses, even going so far as to set up his meeting with Witness 28.[392] For his part, Panaro actively pursued a number of case strategies, but his options to develop a defense were limited by the facts of Jesse's case. Panaro began by seeking witnesses willing to testify in Jesse's defense but, judging from notes made by Arnold Friedman, found himself with only a single prospective witness

---

[389] A223.
[390] Audio recorded discussion between Arnold, David, Elaine, Jesse, and Seth Friedman (Mar. 24, 1988), preserved as a transcript of "Tape 6, Disk 8," track 1.
[391] A364. Jesse told the Review Team that he interviewed at least twenty attorneys.
[392] A359.

87

**A-0137**

(Witness 28) arrayed against the District Attorney's thirteen testifying victims.[393] As recorded in David Friedman's journal, area families, whether complainants or otherwise, simply did not wish to speak with or support the Friedman family in any way:

> *The other kids in class w/ no charges aren't talking to us. They're yelling at us and not helping us. Also one said that <u>if asked</u>, would say that something happened. This person <u>wasn't</u> approached by police. (by [sic] he <u>was</u> by friends in school)*[394]

As explained by Arnold Friedman's attorney in *Capturing the Friedmans*, "the hope was that one or more of these people would say, 'this [sexual abuse] is just not true.' But that just didn't happen."[395]

     Panaro also retained mental health experts to assist in the defense. But the conclusions drawn by his hand-picked experts were discouraging, and Jesse's performance on two different lie detector tests indicated deception.[396] Failing on these fronts, Panaro proceeded to consider and reject a wide variety of trial strategies, which he chronicled in a thorough interview with Jesse Friedman,[397] summarizing every step taken during his representation. In all, Jesse considered the following defenses, as transcribed by Peter Panaro:

- **Complete innocence:** "the defense that the children were never abused and that the allegations of which they complained never happened."
- **Coercion:** "anything that may [have] happen[ed] was the result of your father coersing [sic] you into doing what the children allege you did." Panaro described discussing this defense on "thirty occasions."
- **Moral panic:** "all of the children are reacting hysterically to something that never happened and they are starting to believe that it happened themselves, and that this is nothing more than a witch hunt." Panaro described considering this defense on "approximately twenty-five occasions."
- **Insanity:** apparently considered on at least "fifty occasions," Panaro appeared to suggest that he enlisted the psychiatrists and psychologists referenced above to support this type of defense.
- **Multiple personality:** "the fact that you may truly believe that you did not do these acts as charged, and that you are convinced that you did not do

---

[393] *See supra* note 78.

[394] A419, excerpt 4 (emphasis in original).

[395] A203.

[396] *See* Section I.J.2, *supra*.

[397] This interview also suggests that Panaro believed either that Jesse must acknowledge his guilt before pleading guilty, or that Panaro feared Jesse was capable of saying anything, even that Panaro coerced him into pleading guilty. Indeed, as early as April 1989, Jesse claimed that he pled guilty in part because Panaro simply "refuse[d] to accept the truth" of Jesse's innocence. A474.

88

them, but that it may be a Dr. Jekyll and Mr. Hyde type of personality." Panaro describes considering this, too, extensively, "on approximately thirty occasions."

Throughout, the only exculpatory witness discussed was Witness 28.[398] According to Panaro, even though Arnold wrote repeatedly to offer to serve as a defense witness, Jesse ultimately decided it was not in his best interests. Though Jesse's options were few, it was he, and no-one else, who balanced those options and chose to plead guilty. None of this suggests coercion.

As a final point, it bears noting that, if Jesse believed in 1988 that his plea had been coerced, whether by his attorney, the trial court, or his family, it was well within his power to take steps to vacate his plea at that time. In fact, Jesse's closest friend in prison—an inmate named Charles Fedora, who told the Review Team that Jesse was his "best friend"—had himself successfully withdrawn a guilty plea.[399] Fedora explained to the Review Team that, in his case, he had pled guilty to end threats made by the community against his parents. He told the court this, he said, which then accepted his guilty plea without inquiry. As a result of a deficient plea allocution, the Fourth Department overturned his plea, and allowed him to proceed (unsuccessfully) to trial.[400] Though Jesse helped Fedora prepare an appeal from his conviction following that trial, Jesse never chose to apply the same legal skills to his own case.

### 5.    Panaro Had Ample Material With Which to Prepare a Defense

In an affidavit submitted with Jesse's petition for a writ of habeas corpus, Panaro said he was unable to locate any exculpatory witnesses beyond Witness 28.[401] However, he attributed this failure to (1) the prosecution's refusal to produce exculpatory evidence as required under governing precedent;[402] (2) the punitive revocation of Arnold Friedman's bail in response to his own attempts to locate defense witnesses; and (3) the NCPD's decision to confiscate the only copy of Arnold Friedman's class roster.[403]

Even in Panaro's affidavit, there is nothing to substantiate the claim that Arnold Friedman's bail was revoked in response to his attempts to prepare his own defense. In fact, the opposite occurred. Though the prosecution did seek to impose a new bail requirement on Arnold Friedman in response to the filing of the second indictment, the motion was unsuccessful.[404] Moreover, Panaro's *post hoc* explanation is undermined by

---

[398] A358-59.

[399] *People v. Fedora*, 154 A.D.2d 918, 918 (4th Dept. 1989). After overturning his plea, Fedora went to trial, lost, and was sentenced to prison, where (he says) he met Jesse Friedman in 1990. Thereafter, Fedora appealed again, this time unsuccessfully. *People v. Fedora*, 186 A.D.2d 982, 983 (4th Dept. 1992). Presumably it is this appeal that Jesse helped him prepare.

[400] *See Fedora*, 154 A.D.2d, at 918.

[401] Panaro Aff. ¶ 15.

[402] *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963).

[403] *See* Panaro Aff. ¶ 15.

[404] *See* A290.

89

documents demonstrating that he had ample opportunity to identify and contact defense witnesses. One paper found in Panaro's possession lists, in Arnold Friedman's handwriting, the names and contact information of no less than thirty-five potential witnesses.[405] Panaro also received a list of Jesse Friedman's accusers at least one month prior to the entry of Jesse's guilty plea,[406] which—in addition to Arnold and Jesse Friedman's memories of the class—would have guided any outreach attempt to students who were not complainants, but present during classes in which abuse was alleged to have occurred. Even in *Capturing the Friedmans*, Jesse acknowledged that he was able to build a "database" that allowed him to sort records by "complainant, by time period, by nature of charge," and draw conclusions based on what he found.[407]

The Review Team examined the claim that Jesse and his lawyer were denied information they needed to mount a defense,[408] such as the names of children who, though they were enrolled in classes where abuse was alleged, saw nothing; and, the names of children who were identified by others as victims, but made no complaint. To the extent that such information was not disclosed to Jesse before he pled guilty, it did not violate his Due Process rights. That type of information, if considered *Brady* material, must be disclosed prior to trial to ensure that a defendant receives a fair trial.[409] Disclosure is not required prior to a guilty plea. By pleading guilty, a defendant waives his right to *Brady* material.[410]

Further, on the record available to the Review Team, it is not clear whether any such information would have affected Jesse's decision to plead guilty. Even if Jesse Friedman had known with certainty that witnesses who should have seen something nonetheless claimed that they did not—such as in the case of Witness 25—the effect this would have had on Jesse Friedman's decision to plead guilty is unknowable, and likely minimal. Any information that Jesse lacked was cumulative, and added little to the exculpatory information already in his possession when he pled guilty. From the "Meyers tape," Jesse already knew, for example, that some witnesses had named Witness 28 as a victim, but that Witness 28 himself denied it. From the same source, Jesse also had evidence of questionable interviewing tactics.

---

[405] *See* A301-02.

[406] *See* A344-45.

[407] A231-32.

[408] Though it is discussed in Panaro's affidavit, Jesse did not raise this claim during post-conviction litigation. The claim is considered here as part of the Review Team's mission to examine all possible sources of error.

[409] *See Friedman*, 618 F.3d at 154-55 (denying Jesse's claim, "Even if [allegedly withheld] evidence comes within *Brady*'s broader definition of exculpatory evidence").

[410] *See People v. Day*, 150 A.D.2d 595, 600 (2d Dept. 1989) ("the items not produced by the prosecution . . . go to the issue of factual guilt, which, while appropriate for litigation at a trial, are waived by a plea of guilty"); *see also People v. Phillips*, 30 A.D.3d 621, 621-22 (2d Dept. 2006) ("By pleading guilty, the defendant forfeited his right to seek review of any alleged *Rosario* or *Brady* violation"); *People v. Thompson*, 174 A.D.2d 702, 704 (2d Dept. 1991) ("by pleading guilty, the defendant waived any alleged *Brady* violation resulting from the prosecutor's purported failure to disclose the autopsy report").

90

By the time of his plea, Jesse had conducted his own outreach to potential witnesses, hoping "that one or more of these people would say, 'This [the prosecution's case] is just not true.' But that just didn't happen."[411] He had also learned the names of the prosecution's witnesses, both through his own research[412] and from the prosecution's disclosure, and used this knowledge to conclude correctly that some complainants had re-enrolled in his father's class after having been allegedly abused.[413] By reading the indictments, Jesse would have known that some witnesses had testified before two grand juries, and had described the most severe abuse, or accused him of criminal activity for the first time, only in the third indictment. That information would have provided a potentially valuable line of inquiry on cross-examination.

In addition to the above, Jesse knew that adults—such as Witness 26, Arnold's assistant in the fall of 1987—were present in some classes, and that two adult witnesses (Suspects 1 and 2) had been questioned but released. A careful review of the *Great Neck Record* and *Newsday* would even have shown that several complaining witnesses had begun individual therapy, and that local healthcare facilities were planning to launch "group therapy" sessions. Even knowing all of this, Jesse still chose to plead guilty, and it is unreasonable to believe that the addition of one or more defense witness would have so altered the total mix of information as to change his decision to plead guilty. Regardless, the issue was waived when Jesse pled guilty.

*      *      *      *      *

In the absence of coercion, which has not been shown, Jesse Friedman's 1988 guilty plea should have concluded the case. If Jesse believed that his plea *was* the product of illegal coercion, it was within his power to argue that question at any point between 1988 and 2003. That Jesse did not avail himself of this option until fifteen years after the fact, when evidence and memory had grown stale, does and should weigh heavily against the credibility of his claim.

### D.     This Case is Not Similar to "Moral Panic" Cases

Advocates for Jesse Friedman attempt to draw a parallel between the case against the Friedmans and the unreliable "moral panic" cases of the 1980s, such as the 1984-90 prosecution of Virginia McMartin and her family for abuses that allegedly took place in their California preschool.[414] But the cases are in no way comparable.

In the McMartin case, more than 200 preschool-age children described suffering sexual abuse at the hands of their teachers, but only after enduring months of highly suggestive questioning by social workers under contract with state prosecutors.[415] The

---

[411] A203-03. The quote derives from Arnold Friedman's own defense lawyer, Jerry Bernstein.

[412] A231-32.

[413] *See id.*

[414] The Second Circuit Court of Appeals also adopted this analogy. *Friedman,* 618 F.3d at 157 n.8.

[415] Robert Reinhold, *The Longest Trial*, N.Y. TIMES, Jan. 24, 1990.

91

**A-0141**

prosecution's prime witness ultimately recanted, more than a decade later,[416] but the case should have been questioned from the start. The initial complaint was made by a paranoid schizophrenic, who claimed that her child's abusers "flew in the air." From that point, the case ballooned to include implausible allegations of what proved to be non-existent cavernous tunnels below the school, in which teachers would molest children as part of satanic rituals.[417]

Though the accusations against Arnold and Jesse Friedman are shocking—and to some, at first blush, may seem to stretch the bounds of plausibility—the witnesses' accounts fit behavioral paradigms common to pedophiles.[418] This case is not about "ritualistic" satanic sexual abuse.[419] The case began with an admitted pedophile, Arnold Friedman, who indisputably collected and traded child pornography, and who admitted in his own words to a history of abuse stretching from his teens into his late adulthood.[420] Nor, the Review Team concludes, was the case influenced by any of the "recovered memories" techniques common to moral panic cases.

Jesse Friedman, too, does not fit the profile of the kindly teacher wrongfully accused by his community. Experts retained by his own trial counsel described Jesse, at the time, as a psychopath, narcissist, and drug abuser who was unable to tell right from wrong. And Jesse's decision to plead guilty stands in stark contrast to the defendants in the McMartin case, who ultimately elected trial despite the staggering sentences that they faced if found guilty.

The facts of the Friedman case also exclude one of the key risk factors in the McMartin case, and others like it—the youth of the victims. Following trial, and the acquittal of most defendants, the McMartin case became a *cause célèbre* among social scientists, and the subject of an often-cited study demonstrating that a battery of interviewing techniques, all drawn from the videotaped interviews of the McMartin "victims," tends to produce false complaints of abuse in a large number of cases.[421] But that study drew from a pool of sixty-six children with a "mean age of 4.3 years,"[422] and acknowledged that its conclusions could be limited to that age group.[423] The vast majority of research on "child suggestibility"—the phenomenon whereby children uncritically accept an interviewer's account of events—focuses exclusively on children aged six

---

[416] Margaret Talbot, *The Lives They Lived: Peggy McMartin Buckley, the Devil in the Nursery*, N.Y. TIMES, January 7, 2001, *available at* http://www.nytimes.com/2001/01/07/magazine/lives-they-lived-01-07-01-peggy-mcmartin-buckey-b-1926-devil-nursery html?src=pm.

[417] *Id.*

[418] *See* Section IV.D.2, *infra.*

[419] The Second Circuit's discussion of "moral panic" cases focuses on ritualistic abuse, impossible acts, and recovered memory techniques, the common factors in many such cases. *Friedman*, 618 F.3d at 155-56. These were not present in the Friedman case.

[420] *See* Section I.C, *supra.*

[421] *See* Sena Garven *et al.*, *More than Suggestion: the Effect of Interviewing Techniques from the McMartin Preschool Case*, 38 J. APPLIED PSYCHOL. 347, 347 (1998).

[422] *Id.* at 350.

[423] *Id.* at 355. But, the researchers hypothesized that the results could translate easily to adults. *Id.*

92

years or younger, and most researchers acknowledge that older children are not nearly as suggestible as children under six years old.[424] One representative suggestibility study demonstrates a marked fall-off in induced error rate between three- to five-year-olds, six- to ten-year-olds, and (lastly) children older than eleven years old.[425] In the words of another researcher, summarizing and responding to critiques of preschool age suggestibility studies, "preschool research is of substantial use only in cases involving preschool children."[426] By comparison, the mean age of the accusers in the Friedman case, at the time of the first recorded statement with police, was 10.5 years,[427] placing them squarely outside of the most "suggestible" age range.

Further, suggestibility studies suffer from a number of shortcomings that prevent their easy application as analytical tools in this case. Most suggestibility studies are conducted in an emotionally sterile environment unlikely to be duplicated in the real world.[428] University researchers cannot ethically control for the embarrassment that sex abuse victims may feel,[429] do not always use experiments in which the child is touched,[430] and are especially blind to the effect of threats used by violent abusers to procure a child's silence.[431] Moreover, researchers caution against overestimating the effects of suggestibility, as children more strongly resist "implantation" of memories that are implausible, salient, or particularly painful.[432]

---

[424] Yoojin Chae, *et al.*, *Event Memory and Suggestibility in Abused and Neglected Children*, 110 J. OF EXPERIMENTAL CHILD PSYCHOL. 520, 535 (2011); Amye Warren, *et al.*, *Inducing Resistance to Suggestibility in Children*, 15.3 LAW & HUM. BEHAV. 273, 281-83 (1991) (observing that suggestive interviewing techniques may, in some cases, differentially affect seven- and ten-year-olds); Gail S. Goodman & Rebecca S. Reed, *Age Differences in Eyewitness Testimony*, 10.4 LAW & HUM. BEHAV. 317, 319, 328 (1986). For other studies limiting suggestibility findings to children under the age of six, *see* Lyon, "New Wave," *supra* note 340, at 1030-33; *see also* Thomas D. Lyon, *Applying Suggestibility Research to the Real World: the Case of Repeated Questions*, 65 LAW & CONTEMP. PROBS. 97, 113-14 (2002); Stephen J. Ceci & Richard D. Friedman, *The Suggestibility of Children: Scientific Research and Legal Implications*, 86 CORNELL L. REV. 33, 61-62 (2000).

[425] *See* Chae *et al.*, *supra* note 424, at 532.

[426] Ceci & Friedman, *supra* note 424, at 62.

[427] Out of the children who reported criminal activity by Arnold, by Jesse, or by both, investigators were able to determine the age of all but one. The mean age of these children at the time of their first documented interviews with NCPD detectives was 10.5. The median age of the children at the time of their first interview was 10. Using the same methodology, the mean age of children who implicated Jesse was 9.94, with a median of 10.

[428] *See* Lyon, "New Wave," *supra* note 340, at 1048 ("Emotions like fear, loyalty, and embarrassment are largely absent from the laboratory research documenting high rates of suggestibility, in part because ethical considerations limit what researchers are allowed to inflict upon their subjects.").

[429] *Id.* at 1048-49.

[430] *See* Garven *et al.*, *supra* note 418, at 354, 355 ("Furthermore, although most of the allegations [in the study] involved wrongdoing, only one involved touching.").

[431] *See* Lyon, "New Wave," *supra* note 340, at 1049-51, 1060-61.

[432] Livia L. Gilstrap *et al.*, *Child Witnesses: Common Ground and Controversies in the Scientific Community*, 32 WM. MITCHELL L. REV. 59, 71 (2005). Another study concludes that "[s]uggestibility is not simply a matter of age" and that, although preschool-age children are more suggestible than older children, "it is wrong to conclude that a four-year-old is invariably more suggestible than a forty-year-old." John E.B. Myers, Gail S. Goodman, Karen Saywitz, *Psychological Research on Children as Witnesses:*

93

Here, NCPD detectives dealt with (1) older children who described being (2) sexually abused (3) by a trusted authority, and (4) then being threatened into silence, all factors for which the research on child suggestibility cannot or does not account. Critically, none of the suggestibility studies proffered by any party to this case, and none of the hysteria-induced prosecutions to which Jesse seeks to compare his case, involved an admitted pedophile.

*　　*　　*　　*　　*

The Review Team therefore concludes that the arguments advanced by Jesse Friedman in his initial habeas petition, drawn heavily from *Capturing the Friedmans*, do not bear out upon close inspection. Jesse's post-conviction claims relied primarily on a commercial film. The truth, as the Review Team discovered, is more complex.

## IV. Findings of Fact: Newly Discovered Evidence Further Supports Jesse Friedman's Conviction. Unanswerable Questions Raised by His Advocates Provide No Basis For Exoneration

This Report now considers other evidence uncovered in the aftermath of Jesse Friedman's failed habeas petition. Much of this material is inculpatory. Some evidence raises questions that are difficult or impossible to answer twenty-five years after the fact. Taken together, the totality of the evidence falls well short of establishing a "reasonable probability" that Jesse was wrongfully convicted.

### A. Analysis of Witness Accounts, Past and Present

Reports of abuse given to police in 1987-88 were detailed, and many were procured early in the original investigation, long before any distorting influences materialized. In 2004, after the release of *Capturing the Friedmans*, several victims came forward to protest the film's coverage, to confirm that Jesse Friedman *had* victimized them, and to demand their privacy. Other victims, during the pendency of this re-investigation, contacted the Review Team to do the same. Though Jesse Friedman and the producers of *Capturing the Friedmans* claim to possess credible "recantation" testimony, the evidence available to the Review Team does not support this claim. Similarly, the Review Team is not able to credit a separate recantation statement offered by Jesse's counsel. On this record, the Review Team cannot conclude that Jesse Friedman was wrongfully convicted.

---

*Practical Implications for Forensic Interviews and Courtroom Testimony*, 27 PACIFIC LAW JOURNAL 1, 27-29 (1996). Those researchers advise considering age only in the context of "a host of situational, developmental, and personality factors," all of which affect suggestibility. *Id.* at 29.

**A-0144**

1. <u>The Rapid Pace and Extensive Reach of the Initial Police Investigation Demonstrates Reliability</u>

One reason to credit witness testimony is that, up to the second indictment, the investigation progressed rapidly enough to minimize the risk of any distorting influences. The very first witness interviewed by police described being touched by Arnold Friedman, and seeing Arnold show pornographic magazines to other children.[433] Police investigators—Detectives Doppman and Jones—took the first statement incriminating Jesse Friedman on November 23, 1987, just eleven days after the NCPD investigation against Arnold Friedman began, and while Jesse himself was away at college and not a subject of police suspicion. As of December 17, 1987, the investigation against Jesse Friedman lasted little more than a month, entailed police outreach to more than fifty households, and resulted in statements incriminating Jesse from *thirteen* children,[434] nine of which were taken during first interviews with children.[435] This evidence, obtained in the first weeks of the investigation, supported six counts of sodomy, thirteen counts of sexual abuse in the first degree, and twenty-four counts of endangering the welfare of a child. Conviction on these counts alone, separate from any charges contained in the third indictment, would support Jesse Friedman's sentence, and his level three sex offender adjudication.

Given the breadth of the investigation, and the prompt manner in which evidence emerged, it is highly unlikely that the evidence against Jesse Friedman resulted from repeated, heavy-handed interviews. Similarly, the early investigation's compressed timeline limits the chance that any factor would have distorted the investigation—such as conversations with classmates and parents, and unprofessional, suggestive therapy, even in one-on-one sessions. Two students provided incriminating statements against Jesse within two weeks of the start of the investigation against *Arnold* Friedman. Eleven more offered similar accounts against Jesse between November 25 and December 17 of 1987. In some cases—as on December 10—incriminating statements were taken simultaneously and by different detective teams, mitigating the chance of fabrication by a child or by a rogue detective. This compressed timeline differs markedly from popular impressions of the Friedman case.

Varied teams of detectives, some recruited from outside the Sex Crimes Squad, discovered evidence of similar criminal activity by Jesse Friedman. For example, Detectives Doppman and Jones took the first incriminating statement against Jesse on November 23, and Detective Merriweather and Officer Durkin the second, the very next

---

[433] It is not true that the first thirty interviewees disclosed no wrongdoing by the Friedmans. *See supra* note 44.

[434] This figure includes one witness who ultimately recanted his account of physical abuse, and whose testimony led to only one charge unrelated to sexual acts, which was subsequently dismissed from the indictment. It also includes another witness whose statement was taken during this period, though the child did not testify to the contents of that statement until the third indictment.

[435] These nine statements appear, from the record, to result from first encounters. As described elsewhere, it is possible that police met with these witnesses earlier, but did not make any note of it.

95

**A-0145**

day. (And notably, though she led the investigation, Detective Sergeant Galasso took *no* incriminating statements.) This timeline suggests that proof of the Friedmans' crimes lurked just below the surface, waiting for law enforcement to break a silence enforced by shame and threats.

### 2.    Witness Statements Were Detailed

Though this Report cannot discuss witness statements and testimony in detail without revealing confidential witness information and violating grand jury secrecy, it is vital to note that victims' statements also disclosed abuse in great detail. The average length of a witness statement was five pages of 8½ by 11 inch paper, and some were much longer, reaching thirteen pages.

Some examples of witness statements are included below. To preserve confidentiality, these examples are selections from an unspecified number of statements and should not be attributed to any one individual.

- A child stated that Jesse Friedman used Vaseline to help put his penis in the child's "butt." Thereafter, the child's underwear became bloodied, and stuck to him "like glue."
- Several children remembered abuse occurring on a couch. One former student, unprompted, re-affirmed this very detail in an interview with the Review Team.
- One student said he would see children go into the hallway with Jesse Friedman. He would then hear children expressing cries of pain, like "ow," while they were there. Another child said he observed Arnold and Jesse remove a child from the class. He would then hear banging on the walls, and the child screaming for help.
- One child appeared to be holding back in an early interview with police. Though the child would not say that he was abused, he implied that there was something out of the ordinary about the class. He told his father, who was present at the interview, "Daddy, I *never* went to the bathroom." Eventually, in a later interview, he did tell police that he had been abused in the class. This child's suggestion that there was some special significance to the "bathroom" was corroborated by several other witnesses.
- A student remembered hearing Arnold Friedman call a child's mother to tell her that class was running late, even though it was not. Upon hearing that, the child said that he had wished for a gun so he could shoot the Friedmans, to stop them from hurting this other child. He wondered how someone Jewish could do that to another Jewish person.
- A student recalled that Jesse Friedman smiled every time he helped his father sodomize a child.
- Many children remembered magazines "with naked men."
- One child recalled being pulled into another room by Arnold Friedman, who then instructed him to take off his pants. The child described the

96

**A-0146**

experience in detail, explaining how he struggled to unclasp his own green belt, which was always difficult for him to remove.

- Another child remembered that Jesse walked around with his penis exposed, because this child, and others, would say "XYZ" to each other, which meant, "examine your zipper."

- In an interview with Detective Squeglia, another child described a computer program he had made to document the "bad" days in the class. He printed out his records—essentially, a record of abuse—and gave it to Detective Squeglia. Regrettably, neither the NCPD's files, nor the District Attorney's, currently contain such printout.

The level of detail found in these documents gives further reason to trust the victims in this case. It is highly unlikely that police could have "wrung"[436] compelling, specific testimony from so many victims over the course of the first six weeks of the investigation.

> 3. In the Wake of *Capturing the Friedmans* and Years Before Any Judicial or Media Attention, Victims Retained Counsel and Wrote Letters to Protect Their Rights, and to Reassert Jesse Friedman's Guilt

Many of the victims from the original prosecution stand by their allegations of abuse. The release of *Capturing the Friedmans* triggered public debate about whether Jesse Friedman was, in fact, innocent all along, and for many complainants this was not a welcome conversation. Two former students—by then young men—sought counseling after the film's existence led them to feel traumatized anew. Others sought to protect their legal rights: in 2004, four students who had testified against Jesse retained attorney Sal Marinello to assist them in protecting their privacy should the case again threaten to draw them back into the public spotlight. Marinello would not identify his clients to the Review Team, but verified that at the time of his representation, each of his clients had described to him events consistent with their prior statements to police and prosecutors. This is consistent with Marinello's few public statements on the case: as he has said, his clients "were sexually abused during periods of time and they also indicated the son was involved."[437] "They know what the truth is in this case. And when they see something as biased as this, it has to affect them."[438]

Further, the *New York Times* reported that six of Jesse Friedman's victims, and the mother of one, had publicly reaffirmed their testimony, saying "the film omitted or

---

[436] *Friedman*, 618 F.3d at 158.

[437] *Jesse Friedman, Who Pleaded Guilty 25 Years Ago, Says He's Innocent*, CBS New York, May 2, 2012, *available at* http://newyork.cbslocal.com/2012/05/02/jesse-friedman-found-guilty-of-child-abuse-25-years-ago-says-hes-innocent/.

[438] *CNN Live at Daybreak: Capturing the Friedmans: Case Reexamined* (CNN television broadcast Feb. 23, 2004), *available at* http://transcripts.cnn.com/transcripts/0402/23/lad.01.html.

97

**A-0147**

distorted important information about their cases." [439] Two victims also wrote a letter, published anonymously through Judge Abbey Boklan, who verified that they were indeed victims, imploring the Academy of Motion Picture Arts and Sciences not to recognize *Capturing the Friedmans* with an Academy Award:[440] The letter is reproduced in full:

> The Film Capturing the Friedmans *about a case of child molestation in Great Neck, Long Island has been nominated for an Academy Award. We are two of the victims of Arnold and Jesse Friedman writing to you, asking you to hear our side of the story, writing on behalf of the other victims and ourselves. We were abused, tortured, and humiliated by Arnold and Jesse Friedman in computer classes in Arnold's basement. Many of us have physical scars from what was done to us; all of us have psychological scars. Although it has been 16 years, we live with the knowledge of these crimes every day of our lives. Some of us have had bad dreams, some of us slept with baseball bats under our bed for years for fear of reprisals. Many years ago, we thought we could not tell what was happening to us because we felt too guilty and embarrassed and were constantly threatened. Our parents thought Arnold was calling our houses so often because he was such a concerned teacher. His calls were to make sure we were not telling and to repeat the constant threats.*

> *But we have worked through our suffering in therapy, and we are men now, no longer ashamed, some of us with families of our own, all of us embarking on a new life. And now one of the men who tortured and threatened us, Jesse Friedman, is being paraded like a celebrity while we have been left in the shadows, powerless, and voiceless once again.*

> *Don't take our long journey towards healing away from us. Don't use our story to promote the agenda of a confessed child molester who destroyed our childhood and confessed numerous times.*

> *We don't want the acclaim of this movie to keep other young boys who are being secretly abused silent for fear that their stories won't be believed. We don't want adults who might listen to the[ir] children [to] turn a deaf ear,*

---

[439] Sharon Waxman, *Victims Say Film on Molesters Distorts Facts*, N.Y. TIMES, Feb. 24, 2004.
[440] *See* A597-99. As preserved, these statements are undated. However, each followed closely on the heels of a *Newsday* article dated January 10, 2004, requesting that Jesse Friedman's victims come forward.

98

**A-0148**

*having seen the film and say, "These children are probably lying or exaggerating just like those Friedman victims in the movie." We did not lie. We did not exaggerate. We were never hypnotized to tell our stories. The director twisted the facts in the film to make it appear that way. We told the truth then and are telling the truth now.*

*We don't want the story of our suffering used to silence other victims of crimes. We want our own children to grow up in a world where it is safe for children to talk about abuse they are suffering and to get help quickly.*

*You are making a significant decision regarding which documentary film this year deserves the highest praise the film industry can offer. We are sure many factors go into your decision and don't know whether the feelings of the faceless subjects of this documentary are relevant to your considerations.*

*But we can tell you that if this film does win an Oscar, it will be won at the expense of silencing the plaintive voices of abused children once again, just as our own voices were silenced 16 years ago by the threats and intimidation of our tormentors, Arnold and Jesse Friedman.*[441]

>*Signed,*

>*24-year-old graduate student, abused by Jesse and Arnold Friedman*

>*27-year-old businessman, abused by Jesse and Arnold Friedman*

Another victim, a law student at the time, wrote the following to Judge Boklan:

*I am writing to you because I need your help. I was a victim of sexual abuse as a young child. There were many other children who were also abused by the same perpetrators, Arnold and Jessie Friedman. Arnold Friedman died in jail, but Jessie Friedman is now attempting to appeal his conviction with the help of a wealthy filmmaker, the producer of the film* Capturing the Friedmans. *My concern is that during this appeal my privacy will be invaded. I am asking for you to help all of the victims who were involved in the criminal investigation of Arnold and Jessie*

---

[441] *Id.*

99

**A-0149**

Friedman. We want to protect our privacy from further invasion and it is my position that the State should provide that help.

You may or may not be aware that a motion picture was made about this conviction, and that the director of the motion picture is planning to fund some type of appeal. I have recently become aware of the fact that this film has been nominated for an academy award. I am sure that the cinematography is excellent. I wish the director the best of luck in the pursuit of his award, however, I find his position as a financial supporter and advocate for Jessie Friedman's appeal questionable at best. It seems obvious that ancillary to this appeal is an opportunity for him to advertise himself for the purpose of furthering his professional career. He is biased due to the substantial stake that he has in the outcome of the appeal. The culmination of his life's work is his movie that is now aligned with the legal status of Jessie Friedman. A victory in the courtroom would validate his film as a so called "important work" that carries with it the force to impose its will upon our criminal justice system. What aspiring director would not desire such recognition as a social force to project his or her career into the stratosphere of the film-making industry? This director's cause is wrong and his purpose is self serving at my expense as well as at the expense of the other victims.

Arnold and Jessie Friedman violated my trust for them as educators by sexually abusing my classmates and I at their home where they purported to teach computer skills to young people. As a child I was often placed by my parents into the custody of others whether be it at school, or at an after school care program or at a summer camp. This seemed quite common among my peers and I was comfortable with trusting adults as authority figures.

Arnold and Jessie Friedman portrayed themselves as educators who would teach young children how to operate a computer. Many parents were quite enamored with the idea that their child should be equipped with the advantage of computer literacy as the computer technology boom began in the mid 1980s. It was under the guise of an educator, that Arnold and Jessie Friedman used computer technology to show young children pornography, to take photographs of young children reacting to that pornography, and to take photographs of sexual acts being

100

**A-0150**

*performed by young children. I was ▮▮▮▮ years old when I was in the custody of Arnold and Jessie Friedman. At that time I did not understand the dynamics of human sexuality, I only understood fear. I became afraid of everything beyond my control. My childhood curiosity was replaced with an inherent distrust for adults, authority figures, and every unknown.*

*As a victim of sexual abuse perpetrated by Arnold and Jessie Friedman, I should not be obligated to bear any burden, for the purpose of justifying their conviction ex-post. The criminal justice system is an apparatus that society uses to enforce the standards of conduct necessary to protect individuals and the community. It operates by apprehending, prosecuting, convicting, and sentencing those members of the community who violate the basic rules of group existence. The action taken against lawbreakers is designed to serve three purposes beyond the immediate punitive purpose: 1) as a deterrent, 2) to remove dangerous people from the community, and 3) it gives society an opportunity to attempt to transform lawbreakers into law-abiding citizens. This system is imperfect. It is based in theories of retribution and punishment. Furthermore, the victims are entitled to closure, with no obligation lasting in perpetuity to certify, in whole or in part, the prosecution of the criminal defendant by the State ex-post.*

*I am now a ▮▮▮▮▮▮▮ year-old law student who has confronted my past. It seems absurd to me at this point that I may be subpoenaed by a court once again to authenticate my testimony that I gave to a grand jury as a ▮▮▮ year-old child. It is my position that the State should protect me and all the other victims from having our privacy further invaded. As a victim of sexual abuse, I can tell you first hand how embarrassing it feels, despite having done nothing wrong. The sexual abuse was bad enough, but the process of being a part of an investigation and testifying before a grand jury was also very painful. It would be unjust for the State to abandon us now when our privacy may be threatened once again by Jessie Friedman, a convicted sex offender, and his ally, the director of the film* Capturing the Friedmans.

*We need help to prevent our further exposure. Arnold and Jessie Friedman were found guilty of sexually abusing children. The Court determined there was no reasonable*

101

**A-0151**

*doubt that those defendants had committed those crimes. The victims bore our burden by participating in the investigation and testifying. I, nor any of the other victims, should now be placed in a position to defend the conviction of Arnold and Jessie Friedman ex-post. If there is anything that you can do to help us I would be eternally grateful.*[442]

*Sincerely,*

*John Doe*

At least one student who retained Sal Marinello to protect his identity signed one of these anonymous letters. Depending on how much overlap actually occurred, these letters and the confidential statements given to Marinello therefore represent between four and six additional, recent, and independent confirmations of Jesse Friedman's criminal conduct.

4.   In Recent Interviews, Victims Confirmed Abuse at the Hands of Arnold and Jesse Friedman

Several additional witnesses have come forward during the re-investigation to reaffirm the abuse they suffered at the hands of Arnold and Jesse Friedman. Their recent statements are summarized below.

a.   Witness 13: Complainant, Major Witness

In the original prosecution, statements by Witness 13 formed the predicate for several charges, including sodomy. At the time, Witness 13 described in detail how Jesse Friedman would wrap his leg around Witness 13's leg to keep him off balance, or restrain him during sexual acts. Over the course of several recent interviews, Witness 13 emotionally and angrily recounted his experiences in the Friedman class to the Review Team, experiences that, he claimed, deprived him of his childhood.

He explained that his experiences with Arnold and Jesse Friedman were initially positive. However, Witness 13 recalled a point where this changed completely. Specifically, one day, Jesse pulled him into a "room with a folding door," struck, insulted, and then forcibly anally sodomized him. From there, the Friedmans' abuse progressed rapidly, with Jesse always playing the role of enforcer. Jesse appeared to take sadistic delight in this part, and in forcing Witness 13 to submit to Arnold Friedman. According to Witness 13, Arnold's advances seemed almost reluctant, as if he were surrendering to a desire he hated, but felt powerless to resist.

Witness 13 suffered both mentally and physically from this abuse. He described, for example, suffering from severe stomach pain, a symptom corroborated by those who knew him at the time, as described below. He claimed that, during a colonoscopy

---

[442] *Id.*

102

**A-0152**

conducted more than ten years after the events of th s case, the gastroenterologist noticed and commented on damage that would have been consisten: with sexual abuse. No medical evidenc e exists to substantiate this memor y. Though Witness 13 did undergo a colo1oscopy as a result of continuing stomach problems, the r esults of the colonoscopy sho ed no irregularity. Nor did the gastroenterologist re ember seeing any such dam ige, after re /iewing his records.

Addition illy, Witness 13 was diagnosed with a psychi tric condition, which his treat ng psychia rist ascribes to the abuse he suffered at the Friedmans' hands. With Witness 13's ermission, the Review Team spoke extensively with his treating psyc niatrist. His psychiatrist had been a family friend, and nad a professional (non-treat nent) relati onship with Witness 13's father. Witness 13 s father would visit the doct or to work ith him once a month, and Witness 13 would join and play in the waiting area. Witness 1 's psychiatrist witnessed firsthand his change from a normal but quiet five-year-old int o a "drifty," troubled seven- to nin -year-old child. The psychiatrist also recalled that Witness 13 began to suffer from spontaneous diarr ea in the years during the Friedmans' class, and that he would frequently run to the bath oom at odd intervals and com plain of severe stomach pain.

This psy chiatrist began treating Witness 13 approximately eight years ago, and recalled in retrospect that Witness 13 began to isplay symptoms of his psychiatric condition at a young age, possibly during or after nis experien ce in the Friedman class. Based on his m emories of Witness 13's behavior at the time, and his current medical anal /sis, he doe s not doubt that Witness 13 was abused by Ar nold and Jesse Friedman. Tod y Witness 13 is married and employed, and his conditio n is improving, though it tend i to worsen vhen the subject of the Friedmans is broached.

*b.      Witness 11: Complainant, Victim of "Sex Games"*

As a child, Witness 11 implicated both Friedmans and others in sexual criminal acts, including s odomy. He became one of the com plainants w 10 described "sex games" forced on the children by Arnold and Jesse Friedman.

Witness 11 declined to answer an initial let er sent to him by the Review Team. Afte learning t at the filmmaker behind *Capturing the Friedmans* was claiming that leading witnesses had "recanted," a second letter was sent to all complainants, including Witness 11. Thi letter included news reports discu ssing these alleged recantations. This time, Witness 11 responded to the Review Team's letter by cal ing and agreeing to meet with the team.

In that meeting, Witness 11 was invited to tell his story, uninterrupted by ques ions. He opened by saying, without any pro npting whatsoever, that police were "aggressive," but "never told [him] what to say." When polic visited him, he said, he was terrified: Je sse had promised to "kill his dog" if he reported either of the Friedmans to the police. Also, Witness 11 was aware that J esse attended the alternative Village School, which a so terrified him, because he perceived that students at that school were outside the main stream. Police came several times, he said, and he initially told them that

103

nothing had happened, because "I would have been happy never to have said anything." But it was clear that the police would keep coming. In the last visit, a female detective warned that he would never enjoy a "normal" relationship with a woman if he covered for the Friedmans. This "resonated" with him, and "the floodgates opened." He asked the female detective to leave, and began to tell the male detective what had happened to him.

The result was a seven-page statement implicating the Friedmans and others. By his own detailed recollection, police said he told them things they had not heard before. Although the Review Team did not share the contents of Witness 11's original statement with him during his interview, Witness 11 was able to recall specific instances of abuse described similarly in his statement from almost twenty-five years earlier. He took the class for several years, and was abused more by Arnold than Jesse in the early years, he said. Arnold would sit next to him, put his hand on his leg, and rub it. From there, activity escalated, and Witness 11 felt that he was being "groomed." He was eventually placed in the advanced student class, where sexual abuse escalated even further. "It happened a lot," he told the Review Team.

On one occasion, he came home and hid his clothes because there was "stuff on it" from the sexual abuse. Beyond this, he remembered playing a penis measuring "game," which Arnold and Jesse either joined or observed, and "Leap Frog." He told the Review Team that he had "blocked" much of that experience, but that he knew the "game" was sexual, and he remembered being sodomized as well. Sexual abuse, he said, often happened off to the side of the class—though, according to him, all students were aware of what was happening—and "a lot happened on the couch."

As a teenager, he felt humiliated by his association with the case. Everyone in his high school knew that he had been molested, he said. In college, he dealt with the stress and shame of it by "self-medicating" with drugs. When asked about therapy, he said that he may have seen a therapist once or twice after he disclosed his abuse, but that these were individual sessions, not group therapy. He was never hypnotized, he said.

Witness 11 described becoming very depressed and going into therapy for about two years following the release of *Capturing the Friedmans* (even though he said he did not see the film). Today, Witness 11 still bears the scars of his experience. Even now, he often finds it difficult to complete complex tasks, a problem his therapist attributes to the fact that Arnold and Jesse would interrupt computer lessons with molestation. Witness 11 has shared his experiences with his wife, and explained that his history has affected how he cares for his own children. It took him years before he would trust a non-family member with his children's care. When asked why he came forward now, Witness 11 explained that, when he learned of the alleged recantation testimony, he felt he had to come forward, because he "[doesn't] want Jesse to win." Witness 11 only remembered being abused by the Friedmans, not by an additional individual he had specifically named as an abuser in 1988.

104

**A-0154**

c. *Witness 2: Complainant, Appearing in Capturing the Friedmans*

This report discusses Witness 2 above,[443] and concludes that he was never hypnotized. Apart from this, Witness 2 contacted the District Attorney's office to re-affirm the abuse he suffered at the hands of Arnold and Jesse Friedman.

He recalled being made to drink orange juice containing semen, and being given chewing gum mixed with the same. He believed this "game" might have had some relationship to a award that Arnold Friedman won, and took place at a 3:30 PM make-up session before a 4:00 PM class. As evidence of the abuse he suffered, he also repeated that he continued to suffer from a rectal tear, the result of sodomy, though neither he nor his mother could remember the name of the doctor who diagnosed the condition. (This is not new claim: Witness 2 reported the same condition to Andrew Jarecki during his interview for *Capturing the Friedmans*.) As to the original investigation, he acknowledged that police were aggressive, but stressed that they did not tell him what to say. It is notable that, today, Witness 2 describes course of abuse far more pervasive than that detailed in his original witness statements. In 1987-88, Witness 2 never shared with police that he had been made to participate in "sex games," chew gum, or drink juice. This may be a result of delayed disclosure, or of group therapy, which Witness 2 participated in after the close of the case.

Witness 2 said that he deeply regretted participating in the film. He said that when he later saw how Jarecki distorted his interview, it "made [him] nauseous." For example, Witness 2 said, Jarecki convinced him to recline during the interview. The pose was not his idea, Witness 2 told the Review Team.

d. *Witness 18: Non-Testifying Victim and Early Interviewee*

Another former student described being abused, but did not participate in the original prosecution. Police notes show that he described being fondled by Arnold Friedman and being taken to an adjoining room where Arnold showed him a pornographic magazine. After that interview, his parents removed him from the case, and he never spoke with police again, nor did he speak with a therapist, or other professional, until adulthood. At the beginning of this investigation, the Review Team sent Witness 18 a letter requesting an interview. Upon receiving the letter, he said, he felt "re-victimized," to the point that he almost collapsed.

In a recent interview with the Review Team, Witness 18 remembered much more than what was contained in the original files. He believed, for example, that notes of his original interview would show that he had also implicated Jesse as an abuser. The notes do not mention Jesse Friedman as an abuser, though the detective who recorded the notes also told the Review Team that the detective believed Witness 18 *had* implicated Jesse in the course of the interview. However, Witness 18 did remember deliberately holding

---

[443] *See* Section III.B.2, *supra*.

105

back and not telling the police everything he knew, because, he said, the Friedmans had threatened to kill his parents if he told the police. In that interview, he said, the police asked only a few questions, all of which were open-ended.

He specifically remembered that Arnold Friedman showed him a book with Egyptian pyramids on the cover. The book also contained pictures of naked men and, later in the book, more and more naked people appeared. Arnold read the book to him, he said, as he sat on Arnold's lap in Arnold's office and waited for his parents to pick him up from the class. His parents were often late. Twenty-five years later, Witness 18 still remembered specific details about Arnold's office: the color of the desk, the placement of bookcases, and the window. From that vantage point, Arnold could see the front of the house, and any approaching car.

Witness 18 also said that he had not been sodomized by the Friedmans, but that both Arnold and Jesse had touched him on his legs and his buttocks—a behavior typical of early grooming[444]—and that Arnold and Jesse both put their hands down his pants to fondle his penis. Notably, Witness 18 also remembered playing "Leap Frog," alone with Jesse Friedman and with other students, but did not remember the game being sexual. As a child, too, he remembered seeing a leaflet for Elaine Friedman's childcare service. He tore it down, because he did not want other children to experience what he had experienced at the Friedman household. Witness 18 believed he passed the leaflet on to the police at the time. A leaflet fitting that description does, in fact, exist in the District Attorney's files, but is not linked to any one witness.[445]

Witness 18 also clearly remembered the violent, vivid threats Jesse Friedman used to induce his silence. For example, the Friedmans threatened that, if Witness 18 spoke to the police, the Friedmans would slaughter his family in the middle of the night and leave only him alive. Because of this experience, he was terrified when police came to his house. And years later, even in college, Witness 18 was afraid to sleep alone and would imagine Arnold's and Jesse's faces in open windows. He first entered therapy when he was twenty-seven, still trying to cope with the effects of abuse he suffered at the Friedmans' hands. Witness 18 said that, mere minutes into his first therapy session, before he had an opportunity to discuss his past, the therapist recognized his symptoms and asked, "when were you abused?" Although he never saw *Capturing the Friedmans*, Witness 18 sought the help of a second therapist, a post-traumatic stress specialist, in 2004, shortly after the film's 2003 release. During those therapy sessions, he discussed Jesse Friedman as another abuser. Notably, though Witness 18 did not seek therapy until

---

[444] For a well-known example of similar behavior, *see, e.g.*, Malcolm Gladwell, *In Plain View*, THE NEW YORKER, Sept. 24, 2012. There, Gladwell breaks down the behavior of former coach Jerry Sandusky, and outlines the key steps of the pedophile's tradecraft, beginning with ingratiating oneself into a community, and progressing to subtle touches and play. *Id.*; *see also* Marc Fisher, *The Master*, THE NEW YORKER, Apr. 1, 2013 ("According to the studies, abusers are disproportionately teachers who have won awards for excellence; they groom their targets, often selecting students who are estranged from their parents and unsure of themselves, then inviting them to get extra help in private sessions.").

[445] *See* A411, advertisement for "Childbuilders," naming Elaine Friedman.

106

**A-0156**

he was a young adult, and was entirely removed from the original prosecution, his present-day recollections align with both his initial statement, and other witness accounts, to which he was never privy.

With Witness 18's permission, the Review Team met with his post-traumatic stress specialist, who confirmed that Witness 18 often discussed Jesse Friedman as an abuser, and as the source of his anxiety. This began when, one day shortly after the release of *Capturing the Friedmans*, he expressed his anger that anyone would try to rehabilitate the Friedmans. Then he spoke to her in detail about being abused by both Arnold *and* Jesse Friedman. Based on her experience with other victims, the therapist found his accounts credible, and contrasted him with others who make things up in therapy.

In a separate interview, Witness 18's mother said that her son never told her his full story until after the release of *Capturing the Friedmans*. In retrospect, a number of details stand out to her: she said that after attending the Friedmans' class, for example, her ten-year-old son began to defecate while clothed, a reaction that she now believes may have been brought on by his fear of the Friedmans. She further recalled being contacted by Jesse Friedman, who would call to invite her son to come over and borrow videogames from the class library and participate in extra "play time," or to question why her son did not sign up for another class. And, after his involvement with the Friedmans, Witness 18 did not want to stay home alone in the house at night, even while in college.

### 5. Analysis of Alleged "Recantation" Testimony

In recent months, the filmmakers responsible for *Capturing the Friedmans* have claimed to have spoken with "ten" original complainants, none of whom, the filmmakers say, stand by accusations they made in 1987 and 1988.[446] Of these ten, Jarecki and Smerling claim that four have outright recanted their accusations, one "had no recollection prior to [hypnosis] therapy," and the remaining five "refused or were unable to substantiate accusations."[447] Media outlets have reported these conclusions,[448] and both Jarecki and Smerling have presented them in numerous public meetings, in the form of a PowerPoint presentation or "evidence reel" containing snippets of interviews, brief analysis, and conclusions.

Despite a representation they made to an interviewee on at least one occasion, these interviews were conducted by the filmmakers acting alone, and not in cooperation with the District Attorney's office. And contrary to his public statements, the filmmaker

---

[446] *See, e.g.*, Ann Givens, *Revisiting the Friedmans*, NEWSDAY, July 3, 2012.

[447] These quotes derive from a slide of an October 2012 draft of an "evidence reel" PowerPoint presentation provided to the District Attorney's office by Andrew Jarecki on January 15, 2013.

[448] *See* Daniel D'Addario, *Uncapturing a Friedman*, SALON, Mar. 13, 2013, http://www.salon.com/2013/03/13/uncapturing_a_friedman/singleton/.

107

**A-0157**

has not shared *all* notes and transcripts from these interviews.[449] Furthermore, there is no record of how many times interview subjects were spoken with, or what they were told prior to their interview. Some subjects were never told that their interviews with the filmmakers were being recorded. In any event, for the reasons discussed below, the Review Team does not believe that these claimed "recantations," obtained so many years later and without any of the indications of reliability that normally attend such statements,[450] provide a basis for upsetting Jesse Friedman's conviction.

a.      *"Five refused or were unable to substantiate accusations"*

First, the filmmakers' reference to five students who did not substantiate their accounts is vague and misleading. By this description, the filmmakers may be saying only that these five students refused to speak with them. No substantive conclusions can be reasonably drawn from this refusal, except that the subjects did not wish to speak with the filmmakers. Such responses can hardly be seen as exculpatory.

The investigative team has also had the opportunity to review three letters sent by filmmaker Marc Smerling to victims. Smerling implied that he was in possession of new evidence showing that the police and therapists used improper techniques to elicit accusations against the Friedmans. It is understandable why a victim would not wish to respond to the filmmaker responsible for *Capturing the Friedmans*, and who is now plainly looking for information tending to exculpate Jesse Friedman.

---

[449] *See* Nick Pinto, *Jesse Friedman Spent 13 Years in Prison as a Notorious Child Rapist—He May Soon Get an Apology*, VILLAGE VOICE, May 29, 2013, *available at* http://www.villagevoice.com/2013-05-29/news/jesse-friedman/. In at least one article, Jarecki has vastly overstated the amount of assistance he did provide the Review Team. *See* Andrew Jarecki, *Exonerating the Friedmans*, HUFFINGTON POST, Apr. 26, 2013, http://www.huffingtonpost.com/andrew-jarecki/capturing-the-friedmans_b_3165120.html ("We have provided the DA with over 1,700 pages of materials including full transcripts of dozens of interviews with key witnesses whose testimony was otherwise unavailable."). By the Review Team's calculations, and excluding duplicates, Jarecki supplied only 1,164 unique pages. But even that number includes hundreds of pages of documents that the Review Team clearly already had access to: the original indictments, transcribed interviews and affidavits from prior litigation involving the District Attorney's office, the Second Circuit's opinion on the case, and relevant news articles. Subtracting these, Jarecki gave the Review Team less than 600 unique pages, *including* his 132 "page" PowerPoint presentation. In addition to this number, Jarecki did assist Arline Epstein in preparing the 181 pages of documents that she eventually shared with the Review Team.

[450] New York courts regard recantation testimony with skepticism. *People v. Shilitano*, 218 N.Y. 161, 170 (1916). However, though it is "considered to be the most unreliable form of evidence," courts will credit recantation testimony based on an analysis weighing "(1) the inherent believability of the substance of the recanting testimony; (2) the [recanting] witness's demeanor both at trial and at the evidentiary hearing; (3) the existence of evidence corroborating the trial testimony; (4) the reasons offered for both the trial testimony and the recantation; (5) the importance of facts established at trial as reaffirmed in the recantation; and (6) the relationship between the witness and defendant as related to a motive to lie." *People v. Jenkins*, 84 A.D.3d 1403, 1407 (2d Dept. 2011).

**A-0158**

### b. *"One had no recollection prior to therapy"*

The claim that one complainant, Witness 2, was hypnotized prior to disclosing abuse is analyzed and refuted above in Section III.B.2, on page 78. The filmmakers ignore a sworn statement, prepared for court, from Witness 2's treating therapist, stating that no such hypnosis occurred. They also ignore other portions of their own interview with Witness 2, in which the witness claimed to have disclosed abuse even *before* entering therapy. The decision to ignore these facts, and to reference only those parts of Witness 2's statements that suggest he was hypnotized, resulted in a misrepresentation of Witness 2's information.

### c. *"Four [complainants] recanted"*

The filmmakers' efforts led them to one witness who unequivocally told them that nothing happened to him. However, that witness did not say the same thing when speaking with the Review Team, and he made clear that he actually believes that Jesse Friedman *is* guilty. Analysis of the transcripts of interviews with the remaining three "recanters" makes clear that the filmmakers' representations of them are misleading.

- **Witness 3 ("It's a little disturbing that I'm one of the primary complainants."):** Andrew Jarecki's "new evidence" reel shows Witness 3 explaining that he "never testified" that he had been "abused," in the sense of subjected to "gross" "pedophile activities." In the transcript given to the Review Team, which appears to begin mid-interview, Witness 3 expressed grave concern, saying that he does not wish to speak to the interviewer, and asked how he was found, and why the records were not sealed. He emphasized that he did not want to be known to be associated with the case. He told the interviewer he did not remember what happened in class, mostly because it was so long ago, and partly because he did not want to remember.

  But, Witness 3 confirmed that he "felt uncomfortable" in the Friedmans' class, and that he saw "activity that took place in that computer room that seemed abnormal." Specifically, he remembered several "software programs that were pornographic" and that the Friedmans were "perform[ing] stuff" while "sexually aroused" near the children in the classroom. He also stated his belief that the Friedmans were guilty, saying, "Did they go to prison for the right reason? Yes." After learning of Witness 3's interview, the Review Team sought once more to speak with him. He declined, but expressed anger upon learning that the filmmaker had recorded him and shared his statements.

  This description of Witness 3's involvement is consistent with his original statements to police: he was *not,* in fact, "one of the primary complainants," and he never claimed to police that he was sodomized. He did not deny that Jesse and Arnold endangered the welfare of the children in the classroom by engaging in inappropriate sexual conduct, and showing them sexual videogames. In fact, he confirmed it, saying that the Friedmans "performed stuff" while "aroused" in close proximity to the children.

109

**A-0159**

On April 18, 2013, Jarecki sent the Review Team a letter in which he described conducting a subsequent, in-person interview with Witness 3. He declined to include a transcript of the interview, or the full, unedited recording of it. During the interview, Jarecki said, he informed Witness 3 that his grand jury testimony had produced twenty sexual abuse charges. Witness 3 was surprised, and believed that the only way that so many charges could have resulted was if the prosecution had taken affirmative answers to innocuous questions and translated those to allegations of sexual abuse. From this, Jarecki concluded, mistakenly, that Witness 3 was asked only "yes or no" questions in the grand jury and that he "never had to independently recall or recite the specifics of crimes."

All of these claims are untrue. Witness 3's testimony led to, against both Friedmans, two sexual abuse charges (for Jesse pressing his penis against his back) and eighteen counts of Endangering the Welfare of a Child. These charges are largely consistent with Witness 3's current claim that he was not a primary complainant, but rather, that he only *observed* sexual acts, and pornographic material in class. Further, in the brief portion of Witness 3's interview that the Review Team was able to see, Witness 3's statements were all qualified, couched in uncertainty, and peppered with terms such as, "I think" and "probably." Witness 3 spoke about what "may have" happened or been said, not what did.

- **Witness 15 ("What I do remember is the detectives putting on a lot of pressure to speak up."):** Submissions made to the Review Team in support of Jesse's innocence by Ron Kuby and attorneys associated with the filmmakers quote a third complainant describing his meeting with police investigators:[451]

  > What I do remember is the detectives putting on me a lot of pressure to speak up. Yeah?... And.. And.. And at some point I, kind of broke down, I started crying, yeah? And when I had... and when I started to tell them things, I was telling myself that its [sic] not true. Like I was telling myself, ["]Just say this to them in order to get them off your back.["]

Though the statement's context is not discussed,[452] the reader is left with the impression that this complainant falsely implicated Arnold and Jesse Friedman to end an emotionally charged and aggressive interview. Reviewing the interview, however, Witness 15's account describes nothing of the sort. A few lines later, Witness 15 says, "they're putting so much pressure on me that basically I just spoke up. But from the other side, the things that I was saying [were] accurate."

Furthermore, he describes speaking out *despite* the fact that this abuse was something that he blocked out of his mind. Like many young boys, Witness 15 felt that any discussion of sex, especially of sexual experiences related to

---

[451] Friedman submission, at 25.

[452] *Id.*

110

**A-0160**

homosexuality, was "unbelievably uncomfortable." "It's not simply that you were abused," he says, "but you're sexually abused. And sex is a very touchy subject for everyone, even adults." Especially because the abuse he experienced touched on "homosexuality," he said, "it becomes a very sensitive subject. And all you want to do is tell yourself, 'it didn't really happen to me.'"

Witness 15 went on to reaffirm rather than recant his account of abuse at the hands of Arnold and Jesse Friedman: "[t]he confessions that I made in court were as accurate, as accurate as I could state them," he said. "I was one of those [abused] kids," Witness 15 said. Though he could not remember all the details of the abuse, he attributed his foggy memory to psychological distance, not fabrication: "a reason that I don't remember clearly is simply because I don't want to remember it clearly, you know?" He did, though, remember some details: he said that he believed there was a bathroom near the classroom, and that "kids would go back there with Arnold and Jesse for some reason."

He even described the results of this abuse, saying, "my grades dropped in school" as a result. He also acknowledged that he "remember[ed] maybe a few instances of [the Friedmans] standing there naked, or seeing them naked," and further stated that police "never told [him] what [he was] supposed to be saying," or asked any specific, leading questions:

> [W]hat I do remember is under no circumstances did the police ever tell me, ask me something specific. Understand. They never told me what I'm supposed to be saying, so to speak.

The police tried to make the experience "less traumatic," he said, and they did not repeatedly visit his home. They came back, he said, "but they definitely didn't continue coming back." Far from a recantation, Witness 15 provides much support for the prosecution's original case.

- **Witness 1:** The only count derived from Witness 1's testimony was non-sexual and dismissed by Judge Boklan.[453] Therefore, as a "recanting witness," Witness 1 adds very little to the argument that the final indictments against Arnold and Jesse Friedman were flawed.

  When speaking recently with the Review Team, Witness 1 advised that he regretted his interview with the filmmaker, which he believed had been unfairly distorted in *Capturing the Friedmans*. Witness 1 stated that he could not say for certain, and had not said to the filmmaker, that he believed Jesse Friedman was entirely innocent. His position—as expressed in a four-page affidavit he signed in support of Jesse's habeas petition—was only that police questioning was highly suggestive, and that, if sexual abuse occurred, he had not witnessed it.[454]

---

[453] *See* note 78, *supra*.
[454] *See* ▮▮▮▮ Aff. ¶¶ 5, 12-13.

However, he recalled to the Review Team that students did not want to go to the bathroom at the Friedman house, for reasons he could not remember, and shared a vague recollection of being asked by a fellow classmate a question along the lines of, "did you get to go into Jesse's room?" He is not sure today whether this memory is false and a product of what he later heard about the case, but if true, this memory would be suggestive of some irregularity in the Friedman class.

Additionally, in speaking with the filmmaker, Witness 1 said that police were not very forceful, and interviewed him only for a couple "seconds" at a time. He also told the filmmaker that another adult would "always come around" the classroom, and spend his time "sitting on the couch and hanging out with Jesse . . . [l]aughing." When asked if that person was Ross Goldstein, he said yes, he believed so. During the same interview, he said that he remembered being upset because other students were allowed to use the bathroom, but Witness 1 was not. His father, too, confirmed that Witness 1 had related this to him as a child. The significance of the bathroom, as a location where abuse occurred, was discussed by many complainants, and alluded to in Witness 15's own interview with the filmmaker.

- **Witness 14 ("As God is my witness, and on my two children's lives, I was never raped or sodomized."):** In an edited interview done by the filmmakers, Witness 14 specifically disclaimed acts he once described to police in sworn statements. But, in light of the entire interview, and the witness's subsequent statements to the Review Team, the "recantation" is not credible. For instance, though Witness 14 told the filmmakers that he did not recall being abused by the Friedmans, he went on to state unequivocally that others were abused—"stuff really did happen," he said, and added that pornography was present in the classroom. And Witness 14 also balked at participating in an attempt to exonerate Jesse Friedman: "I'm certainly not, not going to sit there and let Jesse Friedman off the hook for what . . . he did to people that I know about."

After speaking first with the filmmakers, Witness 14 also responded to a letter from the Review Team and, though he declined to meet with the Review Team in person, he agreed to speak over the phone. At the time, the Review Team was not aware of what Witness 14 had told the filmmakers, and the Review Team was therefore not able to question Witness 14 specifically about his statement.

In his telephone interview with the Review Team, Witness 14 stated that he had no recollection of Arnold Friedman's class, positive or negative. Yet, he reacted physically when reminded of his prior statements: "my heart is pounding," he said. Witness 14 stated that he does not remember abuse and that, therefore, it probably did not happen. However, when asked whether he remembered being questioned by A.D.A. Joseph Onorato (an event that unquestionably occurred), Witness 14 could not remember that either. Therefore, though he said he has no specific memory of being abused, he was also "not saying it didn't happen." He was also careful to guard his privacy. He explained that he had not told his wife or his children anything about his involvement in the 1987 case, and that he was

112

**A-0162**

upset to learn that his previous conversation with Andrew Jarecki had been covertly recorded.

In late April, 2013, Witness 14 was informed that Jesse's attorney, Ron Kuby, was seeking a court order requiring disclosure of witness statements to police, and grand jury testimony. In response, Witness 14 hired counsel, and informed the Review Team that he felt "tricked" by Andrew Jarecki, and that he stood by the statement he made to the Review Team.

Lastly, the Review Team also discovered a letter from Witness 14's father, addressed to the police commissioner, in which the father commended the police department for their professional treatment of his son throughout the prosecution:

> *They took the time and expended the energy necessary not to scar our young son's mind. . . . [Detective Sergeant Galasso's] skills as a detective are only surpassed by her skills as a human being. She helped to retrieve [sic] my son's dignity from the gutter and return his self-respect. What more could a parent want?*[455]

It is difficult to conclude, in light of this letter, that Witness 14's statements to police were not truthful.

In sum, the only true recantation to stem from the filmmakers' independent research—Witness 14—is now subject to substantial doubt. When Witness 14 realized that the consequences of his statement could lead to Jesse Friedman's exoneration, he balked and refused to cooperate in that endeavor. Given the length and detail of Witness 14's previous, ten-page sworn statement, his father's assessment of the way police treated his son, and a complete reading of his interview transcript, it is difficult to credit this as a reliable recantation.

### d.    Recantation Statement: Witness 10

Near the end of the re-investigation process, Jesse's counsel Ron Kuby contacted the Review Team and Advisory Panel to inform both that another individual, Witness 10, had come forward to recant his prior accusations against Jesse Friedman.[456] Prior to this date, the Review Team had contacted Witness 10 twice, each time by registered letter to his home address, with no result.

---

[455] A508-09, letter from father of Witness 14 to Commissioner Samuel J. Rozzi, NCPD (Mar. 30, 1988), (praising, too, Detective Merriweather and Officer Durkin).

[456] *See* letter from Ronald L. Kuby to Madeline Singas, Chief A.D.A., NCDA (May 24, 2013), at 1 ("[Witness 10] has not spoken to anyone affiliated with Mr. Friedman's defense prior to supplying this letter."). This letter arose in the context of parallel, civil litigation, in which Jesse Friedman is seeking full disclosure of all witness statements and grand jury testimony related to his original prosecution. The District Attorney has opposed this application.

113

In a three-page statement attached to Kuby's own letter, Witness 10 advised the Review Team and Advisory Panel that, having reviewed "all of the accusations allegedly made" by him, "none of the events allegedly described by or attributed to" him in the original prosecution "ever took place." He specifically disavowed his allegations against Jesse Friedman, which, in the first indictment, sustained two counts of Sexual Abuse in the First Degree and two counts of Endangering the Welfare of a Child. "During the time that I was present in the computer classes," he writes, "I did not observe Arnold or Jesse Friedman engage in anything even remotely akin to sexual conduct."[457]

Witness 10 blames police for inducing him to lie during his interview: "police investigators came to my home repeatedly," and "repeatedly told me that they knew something had happened, and they would not leave until I told them," such that, "[a]s a result, *I guess* I just folded so they would leave me alone."[458] Having made these statements, Witness 10 further advised that "I do not wish to be contacted by you, or anyone else related to this case, except to the limited extent that you need to confirm my identity."[459]

Witness 10 was the first victim to report being sodomized by Arnold Friedman. He was also the first witness to allege any sexual abuse against Jesse Friedman. And, according to files available to the Review Team, Witness 10 was visited by police only once: on November 23, 1987, the day he signed his first and only witness statement.

This statement was given very early in the investigation, a fact that cuts sharply against Witness 10's claim that he was visited "repeatedly" by police. Indeed, it would have been unlikely for a witness to have been visited "repeatedly"—as in, more than once—just eleven days after the investigation began. Over the course of that eleven days, a team of a dozen investigators conducted thirty-five distinct interviews, leaving little time for repeat visits. The Review Team found proof of only three documented *second* visits, and no documented *third* visits, prior to November 30, 1987.

Though Witness 10 claims that undocumented, repeat interviews caused him to falsely accuse the Friedmans, he offers no facts to support the conclusion. Indeed, the witness offers only the equivocal, conclusory statement that tales of police wrongdoing "rang true," and that, as a result, "I guess I just folded so they would leave me alone."[460] Witness 10 is certainly not obligated to provide any more information. But, the Review Team cannot ascertain the reliability and importance of Witness 10's statement without first meeting with and interviewing him. Witness 10 clearly stated that no such interview would take place, and though the Review Team reached out to Witness 10 to discuss the substance of his statements, these efforts were met with silence from Witness 10. Indeed,

---

[457] A829. This is the letter referenced in the *New York Times*' June 16 article on the re-investigation. *See* Peter Applebome, *Reinvestigating the Friedmans*, N.Y. TIMES, Jun. 16, 2013, *available at* http://www.nytimes.com/2013/06/16/nyregion/reinvestigating-the-friedmans.html.
[458] A829-30 (emphasis added).
[459] A830-31.
[460] A829-30.

114

**A-0164**

though Witness 10 offered in his letter to confirm his identity by email, Witness 10 ignored an email sent to that address.

Though his inconsistent statement is troubling, after the passage of so much time, and without a clear indication of Witness 10's motivations, the Review Team cannot simply take his statement at face value. This is especially so in light of the circumstances in which Witness 10 gave his statement. As Witness 10 explains in his letter, he says that Kuby contacted him by sending legal mail to his professional address. The letter was required to be sent as part of ongoing Freedom of Information Law litigation, instituted by Kuby in an attempt to gain access to original witness statements and grand jury testimony. Because the letter was marked "legal mail," he says, it was opened by the mailroom at Witness 10's office and flagged to the attention of his company's Legal Department, leading Witness 10's supervisors to question him about his involvement in the Friedman case.[461] After a "candid" conversation with his supervisors, in which Witness 10 told them he was not abused, he contacted Kuby to "make certain there were no further intrusions into [his] work or family life with this matter." During that conversation, after Kuby "urged [him] to come forward," Witness 10 drafted his recantation statement.[462]

It is difficult to credit a recantation made under these circumstances, especially as it appears that Witness 10 chose to come forward only when his privacy was threatened. Recantation testimony is inherently suspect, and in this case, is further complicated by the fact that the recanter will not meet with the Review Team to discuss his statement. As a result, Witness 10's statement demonstrates none of the indicia of reliability regularly used by courts to assess recantation testimony.[463] Therefore, this unconfirmed recantation does not alter the balance of the evidence, which otherwise inclines towards Jesse Friedman's guilt.

*    *    *    *    *

"There is no form of proof so unreliable as recanting testimony."[464] After so much time has passed, the reasons that a witness *might* recant are innumerable. The witness might, for example, desire to avoid all publicity, and so deny all relevant knowledge; or he might wish to limit the chance that he will be spoken to again, and simply tell each interviewer what the interviewer wants to hear. Some witnesses may truthfully recant, and the Review Team acknowledges that recantation testimony may, under certain circumstances, prove credible. Those circumstances were not found to exist here.

---

[461] A830.

[462] *Id.*

[463] *See People v. Davenport*, 233 A.D.2d 771, 773 (3d Dept. 1996) (recantation not credible where unsworn, and proffered only by defendant's relative) *and People v. Bermudez*, 243 A.D.2d 367, 367 (1st Dept. 1997) (declining to credit a recantation obtained under "highly suspicious circumstances"); *cf. People v. Deacon*, 96 A.D.3d 965, 968-69 (2d Dept. 2012) (recantation credible where consistent with other testimony, and where original, adverse testimony resulted from fear of gang reprisal).

[464] *Shilitano*, 218 N.Y. at 170.

115

**A-0165**

It must be added that, in the case of "recantations" gleaned by the *Capturing the Friedmans* producers, the interviewers compounded the problem of the inherent unreliability of recantation testimony by resorting to manipulative questioning techniques. In interviews, the interviewer represented Jesse Friedman's innocence as a *fait accompli*, and encouraged witnesses to come forward to support their predetermined conclusion. In outreach to some witnesses, *Friedmans* producer Marc Smerling wrote, "I am yet to find one boy who took the computer classes who said that he was victimized as described in his Grand Jury testimony"—a fact Smerling could not possibly know, as grand jury testimony is and remains confidential. He even went on to claim that, though he had "spoken to several complainants," "not one has a clear recollection of the crimes they testified to."

Further, almost all interview transcripts reviewed for this re-investigation were troubling. Some "questions" posed during those interviews were preceded by paragraphs (or even pages) of language insinuating Jesse's innocence. In one case, the interviewer, producer Marc Smerling, actually insinuated that he was working with the District Attorney, saying, "the Nassau County District Attorney has asked us to present a tremendous amount of material." The Review Team cannot credit information of this character, produced through these methods, standing alone. The "recantation" testimony offered in this case does not undermine the integrity of Jesse Friedman's conviction.

## B.     Corroborating Evidence Supports The Conviction

Apart from victim testimony, the Review Team has obtained substantial evidence corroborating Jesse Friedman's involvement in criminal activity. First, and most importantly, Arnold Friedman confessed to his brother Howard that both he and Jesse were guilty. The Friedman classes also substantially affected the lives of several computer students, resulting in circumstantial evidence of abuse that, at the time, evaded detection. Today, that evidence further supports Jesse's involvement in his father's crimes.

### 1.     Arnold Friedman Confessed His Guilt, and Jesse's, to His Brother Howard Friedman

The Review Team spoke with Howard Friedman, Arnold Friedman's younger brother. Howard began an initial telephone conversation succinctly: "Jesse is guilty and you're going to ask me how I know," he said. "Because Arnold told me."

Howard explained that Arnold had confessed to him in a late-night conversation at Arnold's Great Neck home, soon after his arrest. One night, after the rest of the family had gone to sleep, the two brothers were watching a local news report describing pornography found at the Friedman home. Arnold broke down crying, turned off the television, and solemnly admitted: "I want you to know I misbehaved in the basement. I didn't do everything the kids say but I did a lot of things I shouldn't have. I wanted to tell you that." When Howard asked if Jesse was also guilty, Arnold said, "Yes, [Jesse] misbehaved in that class." Arnold also admitted that he had molested Jesse. Howard was sure of this: "I will never forget his words to me."

116

**A-0166**

Howard had alluded to this confession, he said, in a letter to Arnold. The Review Team was already aware of this letter, which reads, in relevant part:

> *You looked me in the eyes and squeezed my hand and said "Howie, please believe me, that I never molested the kids. I may have been a little free with my hands, I may have set them on my lap, I may have hugged them, I may have shown them pornographic material, but, I never, never, hurt them, screwed them, or anything like that."*[465]

Arnold had made Howard promise not to share their conversation until after Arnold's death and Jesse's release from prison. Howard said he kept his word. After speaking with the Review Team, though, he said he felt that "a huge rock has been lifted off [his] chest."

Continuing, Howard said that he was "strongly opposed to [his] nephew's attempt to overturn his conviction." And, he said, "Jesse cannot tell right from wrong." He also described an odd conversation he had with Jesse, just before Jesse began to serve his prison term. Over the phone, Howard had asked Jesse if he was guilty. David Friedman heard the question and told Jesse to be "careful how you answer." In response, Jesse said something to the effect of, "I may have slapped them around a bit."

Howard was also able to confirm that Arnold had been a pedophile for all of Arnold's adult life. As a child, in fact, Howard had been Arnold's first victim.[466] He vividly remembered the first time Arnold, then a teenager, sexually assaulted him. Left alone by their mother, Arnold threatened Howard into cooperating, and then anally sodomized him. Arnold also assaulted and abused him in other public places, such as in a locker room, a changing area, and at a public pool. Thereafter, the brothers' relationship was difficult. But, by the time of Arnold's guilty plea, the brothers had become closer. Howard remained close to the family, and attempted to support them in any way he could. Over the years, Howard provided substantial financial support to his brother's family. Moreover, at Jesse's request, Howard wrote a letter to the parole board asserting his belief in Jesse's innocence.[467] He told the Review Team he did so to help his nephew gain early release, though he has, in fact, always believed that Jesse is guilty.

This last of Arnold's confessions, also implicating Jesse, seems to have been a closely guarded family secret. Shortly after Jesse's release, Howard said, he shared it with both David and Seth Friedman. Seth was unsurprised ("I knew it!" he exclaimed, according to Howard), while David was stunned. Arnold's confession to Howard is also

---

[465] A501.

[466] As Arnold said in his autobiographical "My Story," "[w]hen I reached adolescence I sought out partners for my emerging sexuality. My first partner, when I was 13, was my 8 year old brother. I had overt sexual relations with him over a period of a few years." A538.

[467] A917, letter from Howard Friedman to Richard Wilbur, Parole Officer, Southport Correctional Facility (Sept. 23, 1994).

117

kno wn to the *Capturing the Friedmans* filmmakers. When filmmaker Andrew Jarecki first contacted and interviewed Howard during production of the film, Howard declined to give him "full and honest answers," out of a genuine fear that the film would build Arnold into a "monster" or the story's central villain. In fact, in the film, Howard said he could not remember whether Arnold had molested him,[468] and cried, expressing disbelief that his brother could have engaged in such crimes.[469] Thereafter, at an uncertain date after the film's release but before this investigation began, Howard called the filmmaker and related the full contents of Arnold's confession to him.

Nevertheless, Howard's account has not appeared in any of the filmmaker's public statements concerning this case, and Jarecki never mentioned Howard Friedman to the Review Team, notwithstanding his central importance to Jesse's claim of innocence.

### 2.    Parents Described Corroborative Details to the Review Team

During the course of this re-investigation, the Review Team also spoke with several parents who had been involved in the original prosecution. In two cases, those parents shared information tending to corroborate their sons' abuse.

#### a.    Parents of Witness 8: Complaining Witness

The Review Team was able to speak with the father and mother of Witness 8. According to his parents, Witness 8 is extremely successful in his chosen field. But his family life has suffered as a result of his participation in the Friedman class decades earlier.

Witness 8's mother had forwarded him all letters sent by the Review Team, she said, but it did not surprise her to learn that he had not contacted the Review Team in response. She believes that her son was abused, but she does not know the specifics. She said that her son claims that he no longer remembers anything, but she believes he may just not wish to discuss it.

Witness 8's mother told the Review Team that there were warning signs at the time. For one, she said, parents were not permitted into the Friedman house when picking up their children. She remembers once knocking on the front door, which was locked, and then being instructed through the window by one of the Friedmans to go wait in her car. In addition, she would ask her son and his friend what they were learning in the class, and they would look at each other sheepishly and giggle. She went on to say that Witness 8 was never the same after the Friedman class. He became very sad, and acted like a victim. He never attended group therapy but saw a private psychologist for a number of years. Witness 8 blamed his father for what had happened to him—it was his father's idea that he take the class—and this led Witness 8 to become angry and act out.

---

[468] A195-96.
[469] A176, A218-19.

118

**A-0168**

Witness 8's father told the Review Team that he was "convinced that something very damaging appened in the basement." He remembers his son implying, many years later, that he was not physically molested, but that he "had to visually participate as a third party observer to graphic, predatory pedophilia." He believes Witness 8 is using this as a coping mechanism. He feels that his son's childhood suffered and he was very emotionally affected by what happened at the Friedman hous. It totally changed their relationship, he says. There were a lot of trust and anger isses, which led to conflict with n the family. He said he always carried guilt with him, because he is the one who urged Witness 8 to take the class.

Though neither was present for their son's interview with police, Witness 8's father and mother split on one question: his mother believed that the police were disrespectful, and may even have suggested facts to her son, but bases this only on *her* interactions with police, not her son's. Witness 8's father, though, stressed that police were appropriate and professional, though police di return several times.

### b. Father of Witness 19, a Non-Testifying Victim

The father of one non-testifying victim, Witness 19, also described the far-reaching effects that the Friedman case had on his life. On December 4, 1987, Witness 19 gave an inculpatory account to police investigators, stating that he was anally sodomized by rnold at least five times, and by Jesse at least twice. This statement made the child one of the first to describe experiencing this level of abuse by Jesse. Nevertheless, he never testified before the grand jury, and his statement never translated to indictment counts.

Witness 19's father recalled two detectives—later identified as Detectives Dopman and Jones—interviewing his son. Though the detectives requested to speak with his son alone, he insisted that he and his wife be present at the interview. He described police questioning as "gentle, non-leadin and non-agressive," and composed almost entirely of open-ended questions. As to Witness 1's responses, his father remembered hi denying any abuse at first, leading him to beieve that the police were wasting their tie. Then his son "erupted" and offeed a full, shocking account of abuse. When his son described being abused by Arnold and Jesse Friedman, Witness 19 reacted physically. He felt like he was having a heart attack, and his wife may even have called an ambulance.

Today, Witness 19's father recalls that his son showed early warning signs of abuse. At the time, his son directly asked not to be sent to the Friedman's computer class and, after attending, began "fixating" on a "threat about someoe coming out from under a car and taking him away." This description accords with threats reported by other students, including Witness 18.

### c. Summary of Interviews with Other Parents

Several other parents spoke with the Review Team. Some expressed complete confidence in the police investigation. Witness 13's mother and father believed the police

119

were very professional. Witness 2's mother described them as "wonderful," though her son reported otherwise. Witness 5's mother observed police as they interviewed her son, and said her son's body language suggested that he did not seem bothered. As a result, she trusted the investigation. This mother also stated that her son took a pair of scissors, and cut up his blanket—an act she found both disturbing and uncharacteristic, and believed to be a consequence of his victimization. Witness 16's father did not observe his son's interview, and could not speak to its form. He shared only one thing of note: that his son spoke with police behind closed doors, and that afterwards, his son was extremely upset.

One parent, the father of Witness 18, told Andrew Jarecki that police "were suggesting the answers [to questions] to the kids" during interviews. Contacted by the Review Team, Witness 18's father said he was not, in fact, even present for the police interview with his son. He had no memory of the exchange with Jarecki, though he confirmed that the voice on Jarecki's recording was his own. In any event, he was not now of the opinion expressed in that interview—nor, his wife said, was she—and he believed instead that Jesse Friedman was "part of the evil that lived in that house."

Witness 20's mother remembered observing one police interview. The investigators' questions, she recalled, were all open ended and general in nature, and their manner gentle. Her husband was of the same opinion. Though her son, Witness 20, never reported any criminal activity by either Friedman, she did recall walking in on her son and seeing him playing a videogame that depicted naked women. Asked, Witness 20 said that Arnold Friedman had given it to him. Witness 20's mother then confronted Arnold about the game, and Arnold apologized, saying that it must have been an accident. However, she got the sense that he was aware of the fact that something was very wrong, and that it was not an accident at all. At the end of that session, she believes, she did not re-enroll her son. Another adult, the mother of a non-complainant, attended Arnold Friedman's adult education class, and reported that Arnold showed this class a videogame in which a penis could be made to rise and fall. The description loosely resembles a game described elsewhere as "Stroker," and belies the claim that Arnold was wholly ignorant of pornographic games in his disk library.

Lastly, the Review Team was able to speak with the mother of one of Arnold's victims, a former family friend, who met the Friedmans at their vacation home in Wading River. Speaking recently to the Review Team, the mother explained that her child, Witness 31, told her that Arnold had molested him. But he only told her fifteen years after the abuse occurred, when Witness 31 was twenty-eight, and Arnold had just been arrested. This parent is unique in that, during the course of the original investigation, Arnold himself actually acknowledged that he had abused her son.[470] After Witness 31 told his mother about the abuse, she told Elaine Friedman, who admitted to Witness 31's mother that she had found disturbing "pictures" in Arnold's desk, but never confronted

---

[470] Arnold admitted this crime publicly, in his autobiographical "My Story" (A539), to his sons shortly after his federal arrest, and in a private letter to David Friedman. *See* A484.

**A-0170**

Arnold about them. Arnold, in turn, admitted to his family that he *had* sexually molested Witness 31. Though Witness 31 waited fifteen years to tell his mother about Arnold's abuse, he had previously hinted to the fact. Witness 31's mother invited Arnold to play piano at Witness 31's wedding, and when Witness 31 saw Arnold there, he told his mother that Arnold was a "pervert," but said no more.

### 3. Circumstantial Evidence Further Corroborates Witness Accounts

These accounts suggest that certain of the Friedmans' students did, in fact, show signs of abuse at the time, but these "warning signs" were not recognized. This was a common experience. For example, two parents recalled their sons asking to be pulled out of the Friedmans' class, and regretted ignoring their sons' requests. Both children later reported abuse.

Additionally, at least one parent told police that she found blood in her son's underwear, and remembered seeing his shirt unexpectedly wet. These facts corroborate her son's claim that he was sodomized, and that he soaked his shirt to attempt to wash semen from it. Detective Sergeant Galasso remembered hearing another child's parents state that, at some point, their son began taking off his clothes every time someone visited their house. And, from a third set of parents, Detective Sergeant Galasso learned that another complainant began to lose his hair after enrolling in the Friedmans' class. (A recent interview with a classmate confirmed this detail.) Still another child's mother remembered that, after participating in the Friedmans' computer class, her approximately ten-year-old son began to defecate while clothed. A report in *Newsday* chronicled another parent's memory of the changes her son went through during the Friedmans' class:

> *Soon after enrolling in the class, she said, her son's behavior changed. He began drawing sharks and believed they were swimming in his bedroom floor's blue rug. Once, when she asked her son what he was learning in the class, he and a classmate looked at each other with "sheepish grins on their faces" and giggled.*[471]

The last description was independently verified by the Review Team's interview with the parents of Witness 8. Some parents also said they commonly received calls from Arnold and Jesse Friedman offering free computer time, and reduced rates. These recollections corroborate witness's reports that they received phone calls from the Friedmans, in which the Friedmans feigned friendliness with parents, but when speaking with students, threatened them to guarantee their silence. The above stands in marked contrast to the

---

[471] Victor Manuel Ramos, *Challenging 'Friedmans': Out of the Shadows*, NEWSDAY, A5, Feb. 29, 2004.

121

**A-0171**

claim advanced by all of Jesse Friedman's advocates, that "no parents had discovered or reported any of the behavioral signs of sexual abuse in children."[472]

Other former class participants described the mental anguish they continue to suffer, years after the case's conclusion, and the trauma of re-experiencing this abuse both upon simply hearing about the release of *Capturing the Friedmans*, and while speaking to members of the Review Team. The consensus of social scientists is that molestation by an acquaintance is under-reported, especially among boys,[473] meaning that "most children either maintain the secret or delay reporting for significant periods of time."[474] Many victims did speak out, and those who did not cannot be blamed for their silence.

Furthermore, other children were unquestionably exposed to sexual content. Witness 6 saw sexual videogames in the class, and gave police one disk he had been allowed to borrow from the Friedmans, containing "Stroker," and "Dirty Movie." A non-complainant, Witness 32, reported to police that students were allowed to borrow sexual videogames, and turned a disk containing "Strip Poker" over to police. Arnold even admitted that he did share this content: while preparing his defense, Arnold compiled a list of potential defense witnesses. On that list, he included the name of Witness 33, and acknowledged that he had given this child a copy of "Strip Poker."[475] He wrote that the child had repeatedly asked for a copy of the game, and that he only gave Witness 33 the game after consulting with the child's mother. This admission sharply contradicts the claim that sexualized videogames made their way into the Friedman class only accidentally, if at all: if Witness 33 knew to ask Arnold for the game, it follows that he both knew the game was present in the classroom, and that Arnold controlled access to it.

For his part, Witness 33 acknowledged to the Review Team during a recent interview that he did possess a copy of "Strip Poker" as a child, and that it likely came from the Friedmans. The same witness also told the Review Team that Arnold Friedman would sometimes touch and pat his buttocks, and that the pat would last a little too long—it would linger. Witness 33 thought the contact was weird but innocuous, not worthy of being reported, and did not know if he ever told police about it. Here too, then, a witness self-censored. This witness nonetheless signed an affidavit in support of Jesse's motion to vacate his conviction.

---

[472] De Becker & Horowitz, *supra* note 13, at 14. Jesse's advocates have repeated this claim on many occasions, for example, in Jesse's brief to the Advisory Panel, Jesse's habeas petition, Peter Panaro's affidavit (*see* Panaro Aff. ¶ 15), and Arnold Friedman's Open Letter (*see* A557, 564). An entire section of Jesse's first motion to vacate his conviction, under N.Y. C.P.L. § 440.10, is dedicated to this now-disproven claim.

[473] *See* Mary L. Paine & David J. Hansen, *Factors Influencing Children to Self-Disclose Sexual Abuse*, 22 CLINICAL PSYCHOLOGY REVIEW 271, 274-75 (2002).

[474] *Id.* at 289.

[475] *See* A301-02.

### C. The Review Team Was Not Able to Corroborate All Accounts

Sometimes, no corroboration could be found. In several cases, the Review Team was not able to substantiate criminal acts mentioned by some witnesses. Additionally, some critical evidence was never compiled or reviewed during the original prosecution. These instances may raise unanswered questions—today the questions may be unanswerable—but they do not suggest a "reasonable probability" that Jesse Freidman was wrongly convicted.

#### 1. Class Rosters and the "Friday Class"

One significant problem in assembling corroborating evidence is that, based on the Review Team's efforts, Arnold Friedman did not keep a complete or reliable class roster, or any attendance records whatsoever. These records would be necessary to answer two critical questions: who was in the room while criminal sex acts took place, and what should they have seen? As it stands, this partial record seems to both support and undermine the evidence for Jesse Friedman's guilt, and no unequivocal conclusion may be drawn.

##### a. No Reliable Class Rosters Were Found

The fundamental difficulty in recreating class rosters is that witnesses' memories of their classmates, when pieced together, do not yield a consistent picture. Arnold Friedman did not keep records of his class membership or of attendance, both of which are necessary for a complete record. Additionally, make-up sessions were given, and Arnold removed at least two students mid-session. And, though police compiled partial rosters, officers never recorded how, and on the basis of what evidence, the rosters were compiled. These difficulties preclude an easy determination about who should have seen what.

The makers of *Capturing the Friedmans* claim to have solved this difficulty, and in an "evidence reel" screened to a Great Neck audience in the fall of 2012, asserted that problems of corroboration raise serious issues concerning the case against Jesse Friedman. Referring to three non-complainants, the film asserts, for example, that:

- "[Student #1] ▮▮▮ was unaware [that] his classmate ▮▮▮▮▮▮ alleged any abuse."
- "[Student #2] ▮▮▮▮ attended class alongside multiple Complainants, [but he] remembers [the] class fondly."
- "Non-complainant ▮▮▮▮ never saw 67 acts of sodomy allegedly occurring right next to him."

These statements, and others like them, are misleading. The exchanges that apparently led the production team to conclude what ▮▮, ▮▮, and ▮▮ *must* necessarily have seen all appear to be the product of suggestion. In one representative exchange, the interviewee tells the interviewer that he cannot remember which class he attended. The interviewer responds by *telling* the interviewee what class the filmmaker *believes* his

123

**A-0173**

subject attended. When the interviewee replies confusedly, the interviewer takes his failure to specifically object as apparent agreement, and conducts the rest of the interview as if the subject belonged to that class. Another of the three repeatedly informs his interviewer that nothing untoward was ever alleged about the class he attended. Nonetheless, the production team's final presentation proclaims that the witness should have seen abuse occur, but mysteriously did not.

Another example of this questioning is also representative. In his PowerPoint presentation, Jarecki states: "[Student #1] was unaware his classmate ▮▮▮▮▮▮ alleged any abuse." Yet the interview segment upon which Jarecki relies for that conclusion paints a very different picture.

> Q: Do you remember by any chance when you took the class?
> A: I really don't know how old I was. It must have been… I don't know, mid '80s. Somewhere around there.
> Q: So it could have been like say '86 maybe?
> A: It could have been '86. I don't really remember.

A few lines later, Student #1 states that he cannot remember a set of names:

> Q: And I think that if you just took that one class that everyone took was probably something called 'bas<mark>ic 1.</mark>' And so in that class might have been a boy named ▮▮▮ ▮▮▮▮?
> A: Doesn't ring a bell.
> Q: A ▮▮▮▮▮?
> A: Nope.
> Q: ▮▮▮▮▮▮▮?
> A: ▮▮▮▮▮▮. I don't want to say I remember him, but for some reason that name rings a bell. But I don't remember who he is or anything like that.
> Q: ▮▮▮▮▮.
> A: That name also sounds familiar. But you also have to remember it's a very-Great Neck, you know, is a very Jewish town, and half the people sound the same…
> Q: ▮▮▮▮▮?
> A: No, I don't remember that name.
> Q: ▮▮▮▮▮:
> A: Nope.

By the end of the interview, and without obtaining any other information, Jarecki has placed Student #1 into a class with those very same people:

> Q: Well anyway this one class, where if it was Basic spring 1986 class, it would have been you, ▮▮▮▮▮,
> 

124

From this point on the filmmaker is free to draw whatever conclusions he chooses concerning what abuse Student #1 should have seen based on the class into which the filmmaker placed him. But the Review Team finds these conclusions wholly unreliable.

### b. Case Study: the "Friday" Class

Only two classes may be reconstructed with any precision. One is the Friday session held in November of 1987, which abruptly terminated with Arnold Friedman's arrest. The autumn "Friday class" was composed almost entirely of complainants: six of nine reported experiencing abuse. But, even though many of the members of this class reported being abused at *some point*, such as in prior sessions with other classmates, few reported being abused during this timeframe. Even so, one observer—Witness 26, the class's assistant teacher—described observing unusual details about the class, even though he denied seeing any sexual abuse take place.

Witness 26 was a local high school student, and replaced Jesse Friedman as assistant teacher for this class while Jesse was away at college. Witness 26 worked in Arnold Friedman's class for just over two months, from October 8, 1987, to November 20, 1987. In an interview conducted on December 3, 1987, he discussed a series of details, all of which suggest that something out of the ordinary happened on Fridays in Arnold Friedman's classroom. In his statement, Witness 26 noted that:

- While cleaning up one day, he encountered both "Strip Poker" and "Dirty Movie" in the class videogame library. He also recalled that only members of the "Friday class," and not the Thursday class, were allowed to bring disks home from this class library.
- Witness 26 observed Arnold Friedman lean over the children to assist them with their computers. Similarly, he saw Arnold reading to two children from a set of magazines off to the side of the class. Witness 26 never saw what was in the magazines.
- During the Friday class—but only then—Arnold Friedman would close a "sliding door" to separate the classroom from the hallway and the rest of the house. The door was to be kept closed at all times, even when Witness 26 left the room briefly, such as to go to the bathroom.
- Arnold Friedman's last computer class was held on Friday, November 20, 1987—just a week after the first newspaper report of Arnold Friedman's indictment on federal charges. On that day, Witness 26 arrived, set up the machines as he usually did, and prepared for the class to begin. Only one child, Witness 2, arrived. Arnold Friedman dismissed Witness 26 and Witness 2 after a short period of time. The next day Arnold called Witness 26 and informed him that he would be suspending *only* the Friday class on his doctor's advice, to avoid "over-exerting" himself.

Witness 26 was never prosecuted, and his name drops out of the case record after his only interview with police. Even if he saw nothing more, what he did see supports an inference that something about the Friday class merited both secrecy and special treatment.

125

**A-0175**

2. <u>Witness 25, a Non-Complainant, Denied, Then Admitted, and Now Denies Again Experiencing or Seeing Any Abuse</u>

Witness 25 was part of a group of three children who were often described together by other witness reports. All three attended the Friday class. However, though at least two of the three were interviewed by police—and other students named each as witnesses to, or victims of, sexual abuse—none of the three ever disclosed abuse to police. (In the Close-Out Statement, Arnold Friedman denied abusing Witness 25.)

Of these three, the Review Team was able to speak only to Witness 25.[476] The other two witnesses never responded to the Review Team's outreach attempts. Witness 25 is also the subject of a recent opinion piece by his mother, Arline Epstein. In it, Arline Epstein states that her son:

> [H]eld out through the detectives' questioning, and then through months of group therapy focused on helping children "remember." After group therapy came months of individual therapy—along with my gentle but persistent questioning, at the suggestion of his therapist. Finally, my son talked. He told his therapist, and later me, detailed stories that matched the acts of abuse we'd been told about by detectives. But he refused to make a statement to police or testify to the grand jury.[477]

The article misstates several key facts—chief among them, that one of the Friedman witnesses has "unconditionally recanted his accusations"[478]—and conveys the mistaken impression that Witness 25 had the opportunity to "make a statement to police or testify to the grand jury" after falsely admitting that he was abused.[479] In fact, Witness 25 only "talk[ed]" in 1989, long after the case had ended, and therefore, his "accusation" could not possibly have affected Jesse Friedman's 1988 guilty plea. Nonetheless, Witness 25's story demonstrates several of the difficulties involved in reconstructing this twenty-five year-old case, and raises unanswerable but troubling questions.

a. *Initial Meeting with Witness 25*

Witness 25 spoke with members of the Review Team early in the re-investigation, and re-affirmed that he had never witnessed abuse, and that he was never abused. When

---

[476]According to Detective Sergeant Galasso, one of the two remaining individuals was interviewed and did not disclose any abuse. But his parents believed he was holding back, and asked police to return. According to Witness 25, the same child had admitted to therapists that he was abused. (It is not clear how Witness 25 knew this.) No formal, sworn statements exist from either individual.

[477] Arline Epstein, *A Mom's Journey with the Friedmans*, NEWSDAY, Mar. 28, 2013, *available at* http://www.newsday.com/opinion/oped/epstein-a-mom-s-journey-with-the-friedmans-1.4931383.

[478] *Id.* The recantation is not credible, as explained in Section IV.A.5(c), *supra*.

[479] Epstein, *supra* note 477.

126

asked about therapy, he said that his mother placed him into therapy shortly after police investigators visited their home.

Witness 25 said the he felt pressured by police to disclose: one officer told him he would incline towards homosexuality if he failed to do so. But, he faced considerably more pressure from his mother and his therapist to admit that he had been victimized by the Friedmans. He also acknowledged that in 1989, months after Jesse Friedman's guilty plea, that pressure led him to lie and say that he had been abused because he believed it was the only way he would be permitted to bring an end to therapy. But he never made this "confession" to the police or to the District Attorney.

When asked to go into more detail about the therapy he had received as a child, he could not recall it. At the time, prosecutors asked permission to speak with his mother about his experience in therapy and, in response, Witness 25 admitted that, as of 2010, he had not yet told his mother that he had lied about being abused more than twenty years earlier.

> b. *Subsequent Interview with Witness 25 and His Mother*

Two years after speaking with the Review Team, Witness 25 told his mother, in an email sent to her while she was away on vacation, that he had never actually suffered any abuse. Arline Epstein then went to the press to present her story.[480] Shortly thereafter she reached out to the District Attorney's office and asked to present material she had preserved from the original prosecution. She ultimately came in to be interviewed, and when she arrived, she was accompanied by an employee of Andrew Jarecki's film company.

For her interview, Arline Epstein read a prepared statement, and with the assistance of Jarecki's employee, circulated documents from a large binder. When Jarecki's employee left at the conclusion of her prepared statement, Epstein stated that she had been prepared for her interview by Jarecki, Smerling, Gavin de Becker, and Jesse Friedman himself. Jesse, she said, advised her on how to phrase her comments to the Review Team, while Andrew Jarecki and Marc Smerling helped her prepare her statement. The group was also involved in curating and annotating her prepared documents. Arline Epstein also acknowledged that she was not, in all cases, speaking from her own knowledge. When the Review Team asked how she knew specific facts, she acknowledged that she knew some only because "Andrew [Jarecki] told" her.

At the end of the interview, Epstein offered copies of her binder to the Review Team, but prosecutors noticed that the copied binders were incomplete—Arline Epstein's binder contained documents that had never been circulated to the Review Team, and were not included in the copies. When asked why, she said that she was unsure. She then freely shared the remainder of her notes.

---

[480] *See* Hella Winston, *Re-Capturing the Friedman Story*, THE JEWISH WEEK, Nov. 13, 2012, *available at* http://www.thejewishweek.com/news/new-york-news/re-capturing-friedman-story.

c. *Review of Arline Epstein's Notes*

The complete binder contained detailed notes kept by Arline Epstein during the pendency of the original case, along with her recent annotations. This material adds important background information and supports conclusions drawn elsewhere by this investigation. It shows, for example, that Witness 25 was enrolled in the "Friday class" alongside several complainants, and so would be expected to have seen, or been aware of, any wrongdoing. Witness 25's desk faced the wall, he said, a memory supported by his contemporaneous diagram of the classroom. And his family traveled: he remembered attending make-up sessions, and that he missed class on at least those occasions.

Arline Epstein's notes also confirm that her son, Witness 25, did not disclose until 1989, after Jesse Friedman's guilty plea, and that he never shared this with police, such that he had no effect on the case. The notes also show that Arline was told that Arnold had never actually abused Witness 25, a point that Arnold Friedman himself confirmed in the Close-Out Statement.

Her notes also contain a detailed account of how Witness 25 eventually did disclose abuse. It was not abrupt: Witness 25 first indicated to his mother that he was "ready to remember,"[481] and then told her that he had been abused.[482] According to Arline Epstein's recent explanation of the disclosure, her son disclosed by responding to "yes or no" questions that she formulated, based on "what she had heard from Detective Sergeant Galasso" and from other parents.[483] As proof, she gave prosecutors a page of handwritten text, with words haphazardly splashed across the surface. But the notes are more narrative in form than one would expect of the checklist-style questioning Arline Epstein describes. For example, among other things, she recorded her son saying, or agreeing with her prompts, that:

- The bathroom was used to "wash off back"
- It was "almost as bad to watch."
- There was "moaning in room." It is unclear what room is being described.
- After "Jesse [was] gone" it was "much better"
- "Jesse followed kids in w/ camera in bathroom"[484]

To the back page of his mother's notes, ten-year-old Witness 25 added in his own handwriting that Arnold, Jesse, and Goldstein were "schmucky bitchey fucking asshole

---

[481] A872-75, handwritten notes, dated September 1989.

[482] A876-81, handwritten notes and drawings, dated October 1989.

[483] *Id.*, and accompanying explanatory notes.

[484] *Id.* Another student, a non-complainant, did tell the Review Team that, while urinating in the Friedman's bathroom, he heard the door open behind him, saw a flash of light, and when he left, saw Jesse Friedman standing there, possibly in the company of one of his friends. Asked what the flash was, Jesse denied that any such thing had happened

128

**A-0178**

bastards," and drew a stick-figure diagram of a "vict." and a "perp." physically interacting.[485] (See image, below.)



Witness 25 also drew a map of the Friedman house that showed where children were abused in the classroom, and diagrammed Jesse Friedman's bedroom, including the location of both his bed and his candy and gum supply. The portion of Arline Epstein's notes containing Witness 25's handwritten additions was initially omitted from the binders prepared by the filmmaker and distributed to the Review Team. Another document, an undated page from the binder, might suggest a complex and tense relationship between Witness 25 and his former classmates, in some way related to who had disclosed, and who had not. The page contains the following message:

> BWS
> "IDWTTAI! IDR! IL!"[486]

Witness 25 said that he used this "code" on other occasions when he was a child, though his mother does not remember any other example. Arline Epstein and Witness 25 translate the message as, "I don't want to talk about it! I don't remember! I lied!" and imply that it casts further doubt on Witness 25's initial disclosure of abuse.

But even accepting this interpretation, it is unclear what conclusion can be drawn from it. The page is undated, and by Epstein's own admission, was found out of context, rendering impossible any attempt to date the document. Epstein and de Becker simply *assume* that this "admission" follows, and describes, Witness 25's false disclosure to his

---

[485] *Id.*
[486] A882, handwritten note.

129

**A-0179**

mother.[487] However, Witness 25 acknowledges that the quotation marks and prefatory "BWS" in the document could indicate that Witness 25 himself was not the "speaker" in the note—that it was not him who "lied." Rather, he said that the "B" in "BWS" could refer to one of two individuals whose names begin with a "B," one a complainant and the other a non-complainant, and that the "WS" could expand to either "*will* say" or "*would* say." Depending on who, if anyone, "lied," the meaning of the document changes completely. In brief, this last, extraneous piece of paper can be explained in any number of ways, has no certain interpretation, and therefore has no evidentiary value.

*     *     *     *     *

Witness 25's insistence that nothing out of the ordinary occurred in the Friedman house is potentially helpful to Jesse Friedman's defense, considering the number of children who gave statements indicating that they saw Witness 25 being abused, or believed he was present while others were victimized. But Witness 25's experience does not necessarily cast doubt on Jesse's guilty plea, especially when balanced against the other evidence the Review Team uncovered. In addition, Witness 25 "disclosed" that he was abused in 1989, well after Jesse Friedman's December 1988 guilty plea, and his allegations did not have any effect on Jesse's decision to plead guilty.

Ultimately, Witness 25 is one of several students who are referenced in statements by complaining witnesses as having been victimized by the Friedmans, but who did not report sexual misconduct. Another individual states that he attended only one class session, that he was never abused, and that he never witnessed abuse. This individual too may have been named as a victim by a complainant who gave multiple statements to the police. The indication is vague, however, because the complainant provided only a common first name, which this individual happens to share. But here too, the relation is tenuous. No credible evidence suggests that the two individuals were in the same class, and, when asked, the individual did not recognize the name of the complainant who said he witnessed his abuse, nor did he recognize the names of other students. Though these accounts raise questions, they do not cast significant doubt on the larger case.

### 3.     The Lack of Physical Evidence

Though several students testified to having their pictures taken while in the midst of sexual activity, no proof of these pictures was ever found. State investigators did find "2 color photos of [a] boy and girl from the neck to the thighs," but the heads were torn off of the photographs, and it cannot be determined whether these pictures were homemade pornography created by the Friedmans, or representative of child pornography that Arnold Friedman obtained from other sources.[488] Years before the case broke, Arnold also indicated to an undercover law enforcement officer posing as a pedophile

---

[487] This, in turn, Arline Epstein dates to somewhere between September and October, 1989. The basis for this, and many of her dates, are not entirely clear.

[488] *See* A580.

**A-0180**

that he preferred homemade child pornography, both photographs and videos, making it all the more likely that he would produce and possess images fitting that description.

According to Jesse's attorney at the time, Peter Panaro, as the case drew to a close, Jesse flew to Wisconsin to ask his father about the photographs that were taken of the class.[489] Panaro even stated, in a letter to the assistant district attorney assigned to prosecute the case, that Jesse was "willing to cooperate in regard to these photographs," and could describe "the number of photographs that he knows were taken, when they were taken, [and] by whom they were taken," but not the whereabouts of the photographs themselves.[490] This claim speaks to either the photographs' existence, or Jesse's willingness to lie about case facts to secure a more lenient sentence.

The lack of evidence, too, could have resulted from evidence being deliberately destroyed or hidden. Between execution of the federal and state search warrants, a full three weeks lapsed. During that time, any homemade pornography that remained at the Friedman home could have been moved or destroyed. It is notable, for example, that during the execution of the state search warrant, investigators found a hidden "false wall" compartment that, in an otherwise packed house, was completely empty. Even Jesse found this surprising when informed by the Review Team—he knew it as a compartment that was full of materials used by David Friedman in his entertainment act.

Additionally, the absence of medical evidence indicative of sexual abuse is not dispositive proof that none occurred. The only relevant medical test available at the time was highly invasive, and would not necessarily have shown whether a victim was penetrated. And, it certainly would not conclusively prove whether the child was subjected to penis-to-mouth contact, an act that met the definition of Sodomy in the First Degree at the time of the case.[491] According to Detective Sergeant Galasso, while the parents were informed of the test, all decided to spare their children this invasive procedure. Though the prosecution could, potentially, have benefited from the results of some of these tests, the mere lack of physical evidence does not mandate exoneration.

Some physical evidence *was* found, however. Federal investigators found three sexual aids with batteries, in proximity to Arnold Friedman's piano; a sexual aid described by some as "child-sized"; large amounts of commercialized child pornography; and computer disks containing pornographic videogames.

---

[489] *See* A346-48.

[490] A347-48.

[491] Because penetration was not an element of the crime of sodomy, one would not necessarily expect to find blood or semen, as Debbie Nathan claimed in *Capturing the Friedmans*: "In the Friedman case the basic charges were completely implausible. First of all you'd have to believe that blood is coming out of these children's orifices, that they're screaming, that they're crying, that their clothes are soiled from semen and blood and yet their parents show up, sometimes unannounced [and] everything looks fine." A172-73.

131

**D.      Reservations Concerning the Third Indictment Do Not Taint the Overall Case**

The Review Team retains some concerns related to the third indictment. This document greatly increased the number of charges against Jesse Friedman, while for the first time introducing allegations of "sex games," and of a third abuser. However, while problems of proof, twenty-five years later, may reflect on the quality of the original investigation and the current limits of available evidence, they are not so grave as to suggest these charges were false, or fabricated for the sole purpose of inducing Jesse Friedman's guilty plea.

1.      New York Substantive and Procedural Law Partially Explain Perceived "Overcharging" in the Third Indictment

Though the third indictment raised the total number of sodomy charges from the single to the triple digits,[492] a proper understanding of New York criminal law, both substantive and procedural, suggests that prosecutors had a basis for charging the case as they did. At the outset, as discussed above,[493] where the victim is under eleven years old, a single count of sodomy can legally be charged twice under alternative theories. Second, a review of applicable law makes clear that "sodomy" under New York law in 1987 did not require penetration or violence, but only the touching of one's genitals to another's mouth or anus.[494]

This provides a partial explanation for the increase in charges. In fact, based on the Review Team's analysis, the 127 counts of sodomy charged in the third indictment against Jesse Friedman represent seventy-seven distinct acts alleged by seven children, over the course of thirteen months. To the extent that the number of acts charged vastly increased, they were based on witness statements.

2.      "Game" Allegations Are Consistent with Known "Grooming" Techniques Used by Pedophiles

Some skepticism concerning Jesse Friedman's conviction focuses on charges that Arnold and Jesse Friedman both engineered complicated "games" in which play was used as a cover for sexual activity. Some of the "games" reported by the victims were outlandish. Such "sex games" nonetheless accord with the observed behavioral patterns of pedophiles. Several reported cases document adults using "games" to sexualize children. In a 1990 case in Washington, a child reported that her abuser made her "play funny games," like "nude ring around the rosy," and the "happy birthday" game:

> *[The victim] said that Uncle Bill's favorite game was the happy birthday game. "And that's where he puts his peepee*

---

[492] *See supra* Section I.I.
[493] *See* note 87,-*supra*, and accompanying text.
[494] *See id.*

132

**A-0182**

> *in my mouth and shakes it around, and then he says, 'Here*
> *is your happy birthday present,' and something icky gets in*
> *my mouth." R.T. also said that the [defendants] put candles*
> *and marbles in her "peepee."*[495]

And, experts note that "acquaintance child molesters" typically employ strategies that start from a premise of making children comfortable through play, and then progress to sex acts: specifically, the offender "relies more on techniques involving fun, games, and play to manipulate younger children into sex."[496]

    The Freeh Report, the result of an independent investigation summarizing Pennsylvania State University's knowledge of sexual abuse committed by former assistant football coach Gerald "Jerry" Sandusky, describes similar behavior. Sandusky created seemingly safe scenarios—here, Sandusky's lauded Second Mile charity, with its focus on underprivileged children[497]—to place himself close to his desired victim population. From there, he invented excuses to come into physical contact with the children entrusted to his care. For example, Sandusky play-wrestled with one such victim, and later "bear-hugged" the child while showering next to him.[498] Official case records go into further detail, stating that Sandusky would playfully "crack" one victim's back each night before bedtime, a ritual that would later escalate to oral sex.[499] Sandusky also used "tickling" games to get close to other students.[500]

    Another recent scandal at a selective New York school, Horace Mann School, similarly highlights the use of this behavior.[501] There, several teachers have been implicated in the sexual abuse of their students, each with their own "playful" grooming rituals, from a mid-class "frolic" session where the teacher would embrace his students as

---

[495] *State v. Swan*, 114 Wash. 2d 613, 625 (1990) (*en banc*) (affirming sexual abuse convictions); *see also, e.g.*, *Childers v. A.S.*, 909 S.W.2d 282, 285-86 (Tex. App.—Fort Worth 1995, no writ) (describing, in a case concerning civil liability for child abuse, a game called "doctor/patient," which one victim continued to "play" even after the child's parents asked him to stop).

[496] Kenneth V. Lanning, National Center for Missing & Exploited Children, "Child Molesters: A Behavioral Analysis, For Professionals Investigating the Sexual Exploitation of Children," 27 (5th ed. 2010), *available at* www.missingkids.com/en_US/publications/NC70.pdf.

[497] *See* Freeh Sporkin & Sullivan, LLP, Report of the Special Investigative Counsel Regarding the Actions of the Pennsylvania State University Related to the Child Sexual Abuse Committed by Gerald A. Sandusky, at 41 (Jul. 12, 2012) (describing the victimization of one "Second Mile" participant).

[498] *Id.* at 41-42.

[499] *See generally* Press Release, Pennsylvania Attorney General, *Child Sex Charges Filed Against Jerry Sandusky; Two Top Penn State University Officials Charged With Perjury & Failure To Report Suspected Child Abuse* (Nov. 5 2011), *available at* http://www.attorneygeneral.gov/press.aspx?id=6270; *see also* Thirty-Third Statewide Investigating Grand Jury, First Presentment Regarding Gerald A. Sandusky, at 2-4 (Nov. 5, 2011), *available* at http://www.attorneygeneral.gov/uploadedfiles/press/sandusky-grand-jury-presentment.pdf.

[500] *See* First Grand Jury Presentment, *supra* note 499, at 5-6.

[501] *See generally* Amos Kamil, *Prep-School Predators: The Horace Mann School's Secret History of Sexual Abuse*, N.Y. TIMES, June 6, 2012.

133

they ran around the classroom, to "private parts inspections."[502] These examples leave the inescapable conclusion that sexualized "play" is not the product of overzealous police imagination, but a common tool used by acquaintance molesters.

### 3. Varied Recollections Do Not Necessarily Establish that "Sex Game" Allegations Were Untrue

It is of some concern that inconsistencies exist regarding "sex games": for example, some victims recalled that these "games" were played openly in class, while other students report never having seen such games. The case against the Friedmans—on these specific counts—could have suffered had it proceeded to trial. But it is not possible to evaluate the gravity of these inconsistencies. The difficulty of reconstructing class rosters—to say nothing of the impossibility of compiling class *attendance* records—prevents an accurate determination about when children would have necessarily been in the same room with each other.[503]

Without this information, it cannot be said when a specific crime should have been, but was not, witnessed by another complainant. Tellingly, however, several victims interviewed today *do* remember "Leap Frog" as a fixture in the Friedman class. As noted, two complainants remember the game as explicitly sexual, while another non-testifying victim recalls playing the game, in a non-sexual fashion, sometimes alone with Jesse Friedman.[504]

### 4. The Timing and Vagueness of "Sex Game" Charges Is Partially Explainable by Developmental Factors

Though allegations concerning "sex games" emerged late in the case and, in some cases, appear vague or inconsistent with other accounts, both issues can be partially explained by the facts of the case and the victim population. It is common for children to delay disclosing sexual abuse, or to disclose abuse at first only partially. Second, some "sex game" allegations were said to have occurred over a large time-frame, rather than on a specific date. This construction makes it all the more difficult to establish the presence or lack of corroboration.

It is easy for anyone, especially a young child, to confuse or forget when any specific event of abuse happened, when the event was part of a continuing course of conduct occurring over a span of several years. The law acknowledges this difficulty, and permits acts to be charged over a period of time.[505] In fact, in 1996, the New York Penal

---

[502] *Id.*

[503] *See* Section IV.C.1, *supra.*

[504] *See* Section I.H.2, *supra.*

[505] *See People v. Watt*, 192 A.D.2d 65, 68 (2d Dept. 1993), *aff'd*, 84 N.Y.2d 948 (1994) (five-month period "not unreasonably imprecise under the circumstances of this case"). The period, however, must not be so excessive as to frustrate the accused's ability to defend himself. *People v. Keindl*, 68 N.Y.2d 410, 419-21 (1986) (timeframes for offenses ranging up to ten, twelve, and sixteen month period were, on the facts, "so excessive on their face that they are unreasonable").

134

Law was amended to recognize that sexual abuse may be committed as part of a "course of conduct."[506] Reports annexed to the final bill explain that "course of conduct" crimes are necessary in cases of child sex abuse because:

> [S]tudies of children's cognitive skills show that the ability to reconstruct and serialize an event or events often does not develop until the age of 10 or 11 years. And while children can accurately recall information relating to an event, they often describe the event with far less specificity and detail than would an adult.[507]

The New York Legislature has stated that the limits of child cognition are not a reason to discredit allegations of abuse, especially where particularly reliable evidence clearly establishes that the victim has "been repeatedly sexually abused."[508]

In this case, the indictments recognized the difficulty of pinpointing precisely when an act occurred during a session of Arnold Friedman's computer class by charging, on some occasions, that acts occurred within a span of months, such as "from on or about the 15th day of December, 1986, to on or about the 27th day of March, 1987."[509] Therefore, to the extent that any allegations of abuse in this case defy easy placement in the chronology, or lack specificity, this may simply be a function of child developmental psychology, and the accommodations made by New York law for the same.

The delayed disclosure of "sex game" acts is also explainable by resort to child psychology. It is true that, in this case, some victims disclosed gradually: for example, three children gave statements early on against both Arnold *and* Jesse, but dramatically expanded their accusations against Jesse in the third indictment. However, especially because children struggle to remember details of continuing offenses, piecemeal disclosure is to be expected.[510] Accordingly, without more, it cannot be said that the third indictment was flawed simply because children disclosed abuse late in the process. And it is important to bear in mind that, at the time of Jesse's guilty plea, he and his lawyer were well aware that children had disclosed in piecemeal fashion, and were capable of raising the issue at trial if they believed it to be meritorious.

### E.    Ross Goldstein's Recent Recantation Is Not Reliable

Jesse Friedman's codefendant, Ross Goldstein, has recanted, but the Review Team finds these self-serving statements unreliable. At the inception of this investigation, the Review Team reached out to codefendant Ross Goldstein to discuss his involvement in the case. At the time, through his attorney Steven Kartagener, Goldstein refused to be

---

[506] *See, e.g.*, N.Y. PENAL LAW § 130.75.

[507] Governor's Program Bill #39R, Memorandum in Support, dated 1996, Bill Jacket, L. 1996, ch. 122, at 7.

[508] *Id.*

[509] Third Indictment, A072.

[510] *See* Section III.A.5, *supra*.

interviewed. Consistent with his refusal to speak with the Review Team, Goldstein also previously avoided participating in the making or release of *Capturing the Friedmans*.

Goldstein revisited his decision recently. In an interview with the Review Team, he recanted his 1988 admissions and guilty plea relating to charges in the third indictment. Specifically, Goldstein denied seeing or participating in any sexual acts at the Friedman house, though he acknowledged the presence of child pornography in or near the classroom. Based on the substance of his statement, however, as well as information obtained in follow-up interviews, this recantation is not credible.

### 1. The Codefendant's Absence from *Capturing the Friedmans*

Ross Goldstein was conspicuously absent from *Capturing the Friedmans*, in large part because he refused to be interviewed for the film. Documents disclosed to the Review Team show that prior to the film's 2003 release, the filmmakers and Jesse Friedman made numerous overtures to gain Goldstein's cooperation, but none succeeded. One such document transcribes a conversation between Goldstein and *Capturing the Friedmans* producer Marc Smerling. Throughout that fourteen-page, single-spaced transcript, Goldstein insisted that nothing will convince him to cooperate.[511]

Goldstein went on to describe his discomfort with the filmmakers' characterization of their film as partially "exonerating." In this exchange, Goldstein also referenced a letter he received from Jesse Friedman, in which Jesse asked Goldstein to appear in the film, and seemed to disclaim any previous relationship between the two. This surprised and concerned him:

> *Ross Goldstein: I will just touch upon one or two things in this letter. Just things like, um, let me see where it is; "you however probably had no idea there was even a computer school in my house nor had you ever even met my dad." Well, that's, that's not true and uh, he obviously (I'm choosing to believe that he wrote this letter) but the bottom line is that he's just not clear about, or just choosing not to remember a more truthful [history]. I'm not saying that...he's just basically making it sound like he never even really knew me...and there's no real reference to like how we actually got to know each other or why I would have ever been brought into the case. He makes it sound as if it's just completely 100% out of left field, and that's... disturbing to me... but clearly the letter was suggested by you guys. That he should write it as an attempt to try to get me to cooperate, because the focus of the letter is on that.*

---

[511] A609, transcript of conversation between Ross Goldstein and Marc Smerling. This document was provided to the Review Team by Jesse Friedman, not by the filmmakers. Though undated, this transcript must describe an interview conducted before the 2003 release of *Capturing the Friedmans*.

136

> **Marc Smerling**: *He looks at the film as being exonerating to some extent…we have found quite a bit of exonerating stuff.*
>
> **Ross Goldstein**: *That is total…that is something that I would definitely care to share as something completely untrue…that's why I honestly feel partly that me getting involved in the film is not good . . . will not help him.*[512]

Goldstein went on to state that if he were to cooperate in the film, his story would be a "grey area," in that "[it's] not going to add up to something in my opinion that's either gonna exonerate him all the way or make the police look bad all the way."[513] Later, when asked by the Review Team why he told the filmmakers that he could not help Jesse, Goldstein was unable to explain his statements.

### 2.    Early Attempts to Contact Ross Goldstein Were Unsuccessful

Following the start of this investigation in 2010, the Review Team reached out to Goldstein, through his counsel Steven Kartagener, to request an interview. Throughout 2010 and 2011, Goldstein denied the Review Team's requests.

However, in late spring of 2012, filmmaker Andrew Jarecki reported that he had spoken extensively with Goldstein. Thereafter, in the summer of 2012, the filmmaker notified the Review Team that Goldstein had retained new counsel, Ameer Benno, and expressed confidence that Goldstein would "share his story" with the Review Team once "a few ground rules are set out."[514] This effort failed after several rounds of negotiations.

In March 2013, Goldstein retained Ruth Yang, his third attorney in as many years. Yang, who advised that she had been retained by Goldstein with Jarecki's assistance, informed the Review Team that Goldstein "would like to make a statement to the Panel."[515]

### 3.    Goldstein Agrees to Speak to the Review Team

On March 8, 2013, Ross Goldstein wrote a letter, through his counsel, to the Review Team. He claimed that he had never participated in or observed any sexual acts in the Friedman house. Rather, he said, he was pressured by the police and the prosecutor to "admit" his guilt. He claimed police arrested him on several occasions, and that during his first arrest, in June 1988, officers dragged him into a vehicle and attempted to interrogate him without first informing him of his rights. Goldstein was first arrested on

---

[512] A603.
[513] A604.
[514] Email from Andrew Jarecki to Madeline Singas, Chief Assistant District Attorney, NCDA, July 26, 2012.
[515] Letter from Ruth L. Yang to Madeline Singas, Chief Assistant District Attorney, NCDA, Mar. 1, 2013.

**A-0187**

June 10, 1988, and the report of this first arrest includes a signed *Miranda* waiver, and notes that he was released the same night.[516]

In the letter, Goldstein also stressed that he had never met Jesse Friedman before enrolling as a student at the Village School in November 1986, and that he visited the Friedman home on a few occasions. He further stated that he did not go to the Friedman house at all after February 1987. Goldstein admitted, however, that while visiting Jesse Friedman at his house, Jesse had showed him a child pornography magazine that, Jesse said, belonged to Arnold Friedman. Goldstein also recalled seeing the computer class in session several times, and stated that, on one occasion, he observed a child play a "pixelated" pornographic videogame, but only while the child was unsupervised. Otherwise, Goldstein's statement was wholly exonerating as to both himself, and those counts of the third indictment in which he was alleged to have acted in concert with Jesse Friedman.

The following week, on March 14, 2013, Ross Goldstein met with the Review Team, and two members of the Advisory Panel, in his attorney's office. There, Goldstein stated that he first met Jesse when he enrolled at the Village School in November 1986. Up to that point his life was marked by drug use, particularly marijuana and LSD, poor grades, and depression. He was drawn to Jesse based upon their mutual love of music, specifically the Beatles. He stated that neither his friends nor his then-girlfriend liked Jesse, the former for Jesse's eccentricities and the latter because she believed Jesse was bisexual. Goldstein stated that as he continued at the Village School and made more friends, his relationship with Jesse deteriorated. By February 1987, he said, their friendship had ended.

Asked why, then, he pled guilty to such serious charges, Goldstein stated that he had no choice but to cooperate with the police because the other option, standing trial with Jesse, was unimaginable and would surely mean spending the rest of his life in jail. And, Goldstein added, the promise of a Youthful Offender adjudication and favorable sentence if he cooperated was attractive, considering the risk of decades of jail time if he did not cooperate.

Goldstein confirmed that he was interviewed by police investigators in the presence of his attorney, Michael Cornacchia, on four occasions beginning in September 1988 and concluding in October 1988. According to Goldstein, by that point, the police already had a chosen "narrative," which Goldstein was there to complete by confirming details they presented to him, or by embellishing when necessary. When confronted with the transcript of various portions of his interview in which he responded to open-ended questions with lengthy, detailed, uninterrupted answers, Goldstein repeated that he was simply embellishing the "narrative." In this manner, Goldstein explained away the

---

[516] *See* Section I.H.3(c), *supra*.

138

**A-0188**

several statements, including his detailed description of how he first saw Jesse touch a child's penis during a videogame that he believed to be a "sex education program."[517]

Goldstein was also asked about a therapist who provided a report to the court indicating that Goldstein was troubled, remorseful, had come to grips with the magnitude of his crimes, and would benefit from continued treatment. Goldstein acknowledged confessing to this therapist but said that he was forced to continue the lies if he wanted to be offered a lenient guilty plea.

Goldstein also said that he believed the police somehow manipulated the dates of the charges. Originally, he told the police that he met Jesse when he began to attend the Village School in November 1986. Because that date did not align with police accounts, which implicated Goldstein in criminal activity in Spring 1986, Goldstein said, he felt compelled to change his own narrative. He did so, he said, by lying to police, and explaining that he had actually met Jesse Friedman earlier that year, but was too embarrassed and confused to report those interactions, because it was during that time that he became involved sexually with Jesse.

In addition, the Review Team asked Goldstein why he refused to be interviewed prior to this meeting. He claimed that he had always wanted to meet with the Review Team but that his attorney, Steven Kartagener, never informed him of the Team's offer. Kartagener, he said, was a friend of his parents, and only dealt directly with them. Goldstein agreed to waive the attorney-client privilege between himself and two of his prior attorneys: Kartagener, who represented him on his appeal, and Michael Cornacchia, who represented him through his cooperation with the prosecution and plea of guilty.

The Review Team also questioned Goldstein about his pre-*Capturing the Friedmans* statements to Marc Smerling, in which Goldstein indicated that his version of events included "grey area[s]" that would not totally exonerate Jesse Friedman, nor make the police "look bad all the way." Goldstein was unable to account for those remarks.

### 4. Related and Subsequent Interviews

#### a. Goldstein's Attorneys, Steven Kartagener and Michael Cornacchia, Declined Interview Requests

Though Goldstein signed waivers allowing the Review Team to interview his prior attorneys, both declined to be interviewed regarding their representation of Goldstein, even after being informed of Goldstein's recent statement to the Review Team. Cornacchia acknowledged that he was present during Goldstein's interviews with the police, but refused to say anything more.

Goldstein's first post-conviction attorney, Steven Kartagener, did comment on one matter. He said that Goldstein's claim that he was never informed by Kartagener of

---

[517] Goldstein Interview 1 (Sept. 8, 1988), at 28-38.

**A-0189**

the Review Team's interview requests was false. To the contrary, Kartagener confirmed that he spoke with Goldstein directly—and, separately, with Goldstein's parents—about the Review Team's interview requests on numerous occasions throughout 2010 and 2011. Each time, Goldstein was informed of the request, and specifically declined to speak to the Review Team.

### b. Witness 29, Ross Goldstein's High School Friend

The Review Team met with Witness 29, a friend of Goldstein's who he had met in sixth grade and who remained a close friend throughout high school. Witness 29 confirmed knowing Goldstein well at the time of his arrest, but stated that Goldstein changed when he met Jesse Friedman in November 1986. Jesse and Goldstein became friends thereafter, and Witness 29 and Goldstein visited Jesse's house on at least one occasion. Jesse and Goldstein had many mutual interests, including the Beatles, and spent an increasing amount of time together. They used drugs together, including marijuana and LSD, and Goldstein began wearing "John Lennon glasses." Nevertheless, Witness 29 was shocked when Goldstein was arrested. Everyone at school believed that it was a case of mistaken identity. In fact, Witness 29 was preparing to testify as a character witness on Goldstein's behalf.

Witness 29 lost touch with Goldstein for a short period of time after Witness 29 began college. Witness 29 heard about Goldstein's decision to plead guilty from a mutual friend and immediately called Goldstein to inquire what had transpired. Goldstein said that he needed to explain in person. Witness 29 drove to his house and was met by Goldstein's mother, who uncharacteristically screamed at Goldstein not to say anything.

Regardless, Goldstein insisted on a private discussion with Witness 29, behind his locked bedroom door, and to his mother's obvious discontent. There, while Goldstein's mother continued to insist, shouting through the door, that he say nothing, Goldstein admitted to Witness 29 that during a period of heavy drug use, "while they were tripping," Goldstein "got seduced by Jesse and Jesse went down on him." Jesse told Goldstein he had a videotape of the incident, and threatened to send it to Goldstein's girlfriend, parents, friends, and teachers if Goldstein did not cooperate with Jesse. With this videotape, Goldstein admitted to Witness 29, Jesse blackmailed Goldstein into photographing children in the Friedman classroom. (Witness 29 understood this meant photographing sex acts.) In return, Arnold Friedman paid Goldstein.

In later interactions between Goldstein and Witness 29, Goldstein confirmed that he felt guilty about something, which he did not specify. Beginning with a letter he wrote to Witness 29 from prison, dated December 10, 1989, Goldstein said that he was "battling his demons," and went on to say that "I did stupid and terrible things and I feel much remorse." He concluded by saying that it was "too bad I can't get the help and treatment I need." In a second letter dated December 31, 1989, while still incarcerated, he claimed

140

**A-0190**

that he "made tragic mistakes" and "would tell everything in due time. No lies."[518]
During Goldstein's 1990 appeal, Goldstein said he "disassociated himself from Jesse
Friedman and his activities" because he, Goldstein, "became repulsed" by them.[519]

Years later, when Goldstein was expected to die from a life-threatening illness,
Witness 29 visited him in the hospital to say goodbye. Witness 29 forgave him, and told
him that he "wasn't evil." Goldstein acknowledged Witness 29's presence, but said
nothing. Witness 29 believes Goldstein's feelings of guilt, and references to doing "stupid
and terrible things," could have several meanings, other than that he photographed acts of
molestation. For instance, according to Witness 29, Goldstein may have been referring to
his heavy drug use or to the fact that he was a terrible friend who often lied about his
whereabouts.

After that, except for a brief meeting sometime in 1992-94, Witness 29 did not
speak with Goldstein until March 18, 2013, when Witness 29 telephoned him to inform
him of an upcoming meeting with the Review Team. In that call, for the first time,
Goldstein told Witness 29 that he actually was *not* guilty, that nothing sexual happened
between him and Jesse, and that he was pressured to admit his guilt so that he could get
the deal being offered by the District Attorney. Witness 29 asked Goldstein if he
remembered confessing to Witness 29 on the day of his guilty plea. He said he did not,
but was not surprised, because that would have been consistent with the narrative he felt
forced to adopt.

### c. *Marty Berenberg, Village School Faculty*

Two years before meeting Goldstein, the Review Team spoke with Marty
Berenberg. At the time of the original prosecution, Berenberg was a faculty member at
the Village School, where he acted as Jesse's advisor, and later became his private
therapist. Berenberg's first recollection of Jesse was when he offered to let Jesse manage
the school's recording studio. Jesse, he said, happily accepted.

Berenberg first met Ross Goldstein, too, in the Village School's recording studio,
but before Goldstein began class there in 1986. Jesse Friedman had brought Goldstein to
the Village School, Berenberg said, to show off the recording studio. Goldstein enrolled
shortly thereafter. He was sure of this, because he remembered being greatly impressed
by Goldstein's rendition of the Beatles classic, Let It Be. Berenberg said he remembered
Goldstein because of his musical ability, not because he was, at that time, a student at his
school.

### 5. Analysis of Ross Goldstein's Recantation

Ross Goldstein's credibility is suspect. Today, he is unable to explain why he
came forward in 2013, despite being contacted by the Review Team more than two years

---

[518] Witness 29 allowed the Review Team to read, but not copy, these letters.
[519] *Ross G.*, 163 A.D.2d at 530.

prior. His only explanation, that he always wished to speak to the Review Team, and that his attorney Steven Kartagener never relayed the Review Team's interview requests to him, is completely contradicted by Kartagener himself. Further, Goldstein cannot account for how his story, described to the filmmaker in "shades of grey" eight years ago, has since become so black and white.

First, Goldstein struggled when relating some events to the Review Team, and often blurred the sources of his information. He told the Review Team, for example, that children were able to bring computer disks home from the class. Asked how he knew this, despite his claim that he was not involved in the computer class, he admitted that he only knew this because Andrew Jarecki had told him so.

The totality of the evidence, too, does not support Goldstein's current recantation. His statement does little to explain why six witnesses were able to identify him as an abuser during the original prosecution—and why one witness, during an interview with the *Capturing the Friedmans* team, stated that Goldstein, or someone fitting his description, would "always come around" the class. Goldstein's admissions to police were also highly specific, and unlikely to have been fabricated, either by Goldstein himself or by the police. Though Goldstein admits he invented key parts of the story he told the police—such as, that he and Jesse began a homosexual relationship in 1986—this is a highly embarrassing detail that, as a teenager, Goldstein would have been unlikely to invent, much less repeat to his close friend, Witness 29, just months later.

In 1989 Goldstein's confession to Witness 29, in which he said that he was forced to photograph Arnold Friedman's computer students, and that Arnold Friedman paid him, severely undercuts his 2013 recantation. That Arnold Friedman would pay Goldstein to photograph sexual acts is consistent with the Friedmans' predilection for photographing, videotaping, or otherwise documenting the experiences of their lives. Though Goldstein now says that he confessed to Witness 29 because this, too, was part of the narrative he had to adopt, the confession represents a novel fact pattern that does not appear in Goldstein's interviews, or in his allocution to the Court during his guilty plea. (In one of Goldstein's interviews, he says Jesse "victimized" him, but he does not then link this "victimization" to anything else, or suggest that any money changed hands.)

There is, however, one person who did corroborate Goldstein's account about being paid to photograph the students: Jesse Friedman. In an *unaired* portion of his 1989 interview with Geraldo Rivera, Jesse stated that Arnold "paid [Goldstein] to take pictures," after he "walked in on" the class one day.[520] This admission was never broadcast, and Goldstein and Jesse Friedman both told the Review Team that they did not speak between 1988 and (at least) 2012. This suggests that Goldstein's unsolicited confession to Witness 29 reflects the actual truth of the matter, as opposed to some agreed-upon story. Goldstein claims that his account to Witness 29 was an effort to stick to the narrative required to sustain his guilty plea through sentencing. However,

---

[520] A532-33.

142

**A-0192**

Goldstein was under no obligation to volunteer any narrative to Witness 29. This admission was not a requirement of his plea, nor would the police or prosecutors ever learn of their private conversation. He never chose to disavow it until recently, even to Witness 29, and despite Arnold and Jesse Friedman's claims of innocence. In letters to Witness 29 Goldstein wrote that he had done "stupid and terrible things" and had "made tragic mistakes" while, simultaneously, Arnold and Jesse penned letter after letter declaring their innocence. For all of these reasons, Ross Goldstein's current narrative is unworthy of belief. Even when gravely ill and expected to die, Goldstein was prepared to leave Witness 29 with the impression that he had, in fact, participated in the sexual molestation of children.

Finally, even taking all of Goldstein's recent statements as true—including his assertion that he met Jesse only in November 1986—he directly contradicts Jesse Friedman's initial claim that the two barely knew each other, that there was no child pornography or pornographic videogames near the computer class, and that Goldstein was never present during the computer class. And, since Goldstein was only a witness for the third indictment, his removal from the case would affect only that indictment, leaving the first two indictments undisturbed. But there is no reason to take Goldstein's recantation as true.

*    *    *    *    *

Lastly, it bears mentioning that, as explained elsewhere, "[t]here is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character."[521] Goldstein has every motivation to recast his story to present a superficially plausible claim of innocence, but there is no reason to credit it.

## F. Jesse Friedman's Various Accounts of Events Are Self-Serving and Not Credible

Jesse Friedman cooperated extensively with the re-investigation. He sat for three interviews with the Review Team, a fourth with the Advisory Panel and, after waiving confidentiality and applicable privileges with doctors and lawyers, provided the Review Team with thousands of pages of his personal letters and papers. However, he nonetheless has not been candid, and implausibly tried to explain away some important facts. Jesse's account is that every public statement he made about the case before 2004 was a lie, induced either by the police, by the Court, or by anyone but himself. Only now,

---

[521] *Shilitano*, 218 N.Y. at 170; *see also People v. McGuire*, 44 A.D.3d 968, 968 (2d Dept. 2007) (recantation testimony not credible due to "numerous inconsistencies," and because the witnesses 'failed to provide a credible reason for why they originally named the defendant as a fellow shooter and did not come forward earlier to exculpate the defendant."). Indeed it is the rare case where a long-delayed recantation will have any indicia of reliability. Some factors—all negative here—include the "demeanor of the recanting witness, the existence of corroborating evidence, the reasons offered for the recantation of the previous testimony," and "the relationship between the recanting witness and the defendant." *People v. Deacon*, 96 A.D.3d 965, 969 (2d Dept. 2012).

**A-0193**

he says, is he telling the truth. This disturbing duality has the virtue of explaining away inconvenient facts in the record—like his guilty plea—but several contradictions undermine his claim to innocence.

### 1. Jesse's Account of the Case

The Review Team interviewed Jesse Friedman on three occasions: on February 4, 2011, on February 11, 2011, and on June 14, 2011. Each of those interviews was conducted in Ron Kuby's law office. Jesse Friedman, his wife, and Ron Kuby were present for all interviews. Jesse would later meet with the Review Team and Advisory Panel in 2012, to read a prepared statement. The below information reflects Jesse's contemporary recollection of the case, as shared with the Review Team and the Panel in these interviews.

Jesse described his father as a workaholic, and as an emotionally distant man. His family life was extremely unhappy and his parents were distant and constantly fighting. Jesse would kick holes in his bedroom walls to get his parents to stop fighting, or to acknowledge him. While their home movies may portray the family as loving and playful, it was merely an act for the camera. From age twelve through fifteen, Jesse was "socially isolated," a condition that improved only when the school district removed him from his school and placed him in the alternative Village School where, according to him, he flourished. Jesse admitted that he had used drugs—acid about three to four times, and psychedelic mushrooms once—but said that he never used acid when the case was pending. Confronted with Dr. Pogge's notes, showing that Jesse claimed to have used acid "10-12 times"—as recently as three weeks before his Fall 1988 interview with Dr. Pogge—Jesse said, "I don't know why I said that to him." Similarly, Jesse's letters,[522] and an appointment book entry with only a single word—"Acid!"—dated October 25, 1986, all show that he used drugs during the time in which he was alleged to have committed crimes.[523]

The computer classroom was set up on the ground floor of the house, with three children assigned to a table. Two tables were set-up in front of one another with the children at each table facing each other, with computer terminals between them. There was another table set up separately from those two tables with the three children sitting there facing the wall. Jesse's job was to set up and then deconstruct the space for class. He also would wait at the front door to try and recognize the cars when the parents came to pick up their children. He remembers that he was there to maintain order. Some of the students enjoyed teasing Jesse. The door to his own bedroom was near the classroom, he said, but was always kept closed, such that he believed the students did not even know it was a bedroom. (This detail was contradicted by Witness 25.)

He claims he found out about the federal search warrant from his mother when, driving back to college a week after the search, he complained to his mother that his

---

[522] *See* A449.
[523] *See* A507, calendar entry, Jesse Friedman (Oct. 25, 1986).

144

**A-0194**

room was messy, and asked her to stop rifling through his belongings while he was away. Elaine responded by explaining that the FBI had gone through his room, not she.[524] Jesse said that it was at this point that his father explained to him and his brothers that he had had sex with his brother Howard when they were kids. Arnold told them he was homosexual as a teen, and that as he grew up he found himself attracted to, and fixated on, his young partners. Arnold confessed his interest in child pornography to his sons but (consistent with the tale recounted in "My Story")[525] explained that his therapist said it was fine to look at the pictures as long as he did not act on his urges. Arnold told his sons that he wrote to pedophiles and exchanged magazines with someone who turned out to be a federal agent.

Jesse was arrested the following week and, by his account, he did not know why. He recalled that, on his first night in jail, Arnold told him that he had ordered those magazines because of the stress Jesse had caused him being such a problematic child. He maintained that he never saw Arnold touch his computer students and that his father was innocent. Jesse explicitly linked his own innocence with his perception of Arnold's: he said he was sure his father was innocent, because he knew he was too.

Jesse felt alone during the original investigation and prosecution of himself and his father. Elaine, his mother, wanted Arnold to plead guilty, but Jesse and his brothers felt that Arnold's plea would negatively affect Jesse's case. Because she disbelieved Arnold, Elaine came to doubt Jesse's innocence too.

When Goldstein was arrested, Jesse said, he found it nonsensical and mysterious. Goldstein, he said, had been to the Friedman house at least once, to see Arnold's sitar, and was never at the house during computer class—a fact that Goldstein contradicts. Despite having a common interest in music, he said they were not friends, and they exchanged music at school. Jesse claimed that the "death blow" to his case was the third indictment, not Goldstein, who Jesse believed was just one more witness to discredit. After the third indictment, Jesse said he was certain that he would be found guilty. Panaro stopped preparing for trial, Jesse claimed, when Elaine Friedman said she did not want Jesse to proceed to trial. With that decision made for him, his interest shifted to securing a lenient sentence. Then, Panaro told him he could probably get a sentence closer to five years if he blamed it all on his father. Although Jesse never told Panaro that Arnold had abused him until the time of his pre-plea interview[526] (discussed in Section I.J.3, *supra*), Panaro always assumed that this was the case. Jesse felt that Panaro took too much of an interest in Jesse, and it exceeded a client-based relationship.

---

[524] Jesse gave a different account of this discovery to a *Newsday* reporter in 1989: in that version, Jesse's mother told him about the raid immediately, and Jesse brushed it aside. He then "refused to accept later calls from home, and for the next few weeks tried to forget developments in Great Neck." A910.

[525] *See* Section I.C, *supra*.

[526] Other notes show that Jesse had, in fact, previously told Panaro that Arnold had abused him, and had also likely abused his other brothers.

145

Jesse told the Review Team that the decision to plead guilty was made in November 1988, and that he fabricated the story about his father's abuse later. When asked about his decision to appear on *The Geraldo Rivera Show*, Jesse stated that the interview was Geraldo's idea, which Geraldo took up with Jesse's attorney, Panaro. In the lead-up to the interview, Jesse said, he and Panaro disagreed over whether he should go forward with the interview. Panaro might have disagreed with the decision, and Jesse did not remember if he affirmatively wanted to do it, but he was willing, and few others advised against it. Jesse explained that, in retrospect, he simply did not understand at the time that the interview might not be a good idea. Jesse's wife, though, corrected him, and explained that he sat for the interview so that the parole board and inmates would watch and take pity on him.

Jesse discussed his connection with Jarecki, saying that the relationship had evolved over time. At first, the filmmaker would not disclose what information he had uncovered, and Jesse's counsel at the time, Joel Rudin, asked Jarecki to stop contacting Jesse in jail. Eventually they began to trust each other more and the family signed releases granting Jarecki access to the Friedmans' home movies. Jesse said that, after his release, he sat for hours of one-on-one interviews with Jarecki. In one such filmed interview, Jesse said, Jarecki created an atmosphere to simulate that Jesse was still incarcerated. Jesse also explained that his answers were "not fully formed" by the time of these interviews, and the footage was never utilized.[527] Later, Jesse claims that Jarecki told him that Goldstein was interested in speaking to him but was not interested in being involved in the movie. Jesse believed that he could not speak to Goldstein because it would violate his parole conditions but, nonetheless, attempted to contact him, but without success.

### 2.    Jesse's Evolving Narratives Render His Statements Unreliable

Jesse Friedman's claims cannot be credited. If his current claims are to be believed, the Review Team must necessarily find that he has lied repeatedly, whenever it suited his needs. It would mean that he lied under oath to the court, as well as to his attorney, his therapists, Geraldo Rivera, and the media. His self-serving accounts of innocence have to be considered in that context.

In studying the various statements Jesse has made throughout the years, it seems clear that Jesse became overwhelmingly concerned with how what he said might play to a larger audience. Jesse explained to the Review Team, for example, that his early filmed interviews with the filmmakers—which the Review Team has never seen—were unusable, because, Jesse says, his answers to critical questions were not yet fully formed. He was learning how to speak in "sound bites" to get the most information to an audience. This concern with how his statements would be interpreted by a larger audience was not a new one.

---

[527] Jarecki has not shared this footage with the Review Team.

146

**A-0196**

Indeed, some of Jesse's earliest letters to his brothers demonstrate that his words were carefully planned. For example, when he sat for an interview with a journalist in 1989 shortly after his sentencing, Jesse was asked pointedly about his guilt. In explaining to his brother why he avoided answering the question, he said, "I had not decided what I wanted to say at that time, now I have, I will not lie anymore."[528] Since the journalist was intent on writing the story, Jesse later supplied him with a full recantation, explaining again to his brother that the reporter "might as well write one that will help me, instead of hurt me or be indifferent [sic]."[529] Similarly, when writing to David in July 1989, Jesse claimed (untruthfully) that his appearance on *Geraldo* was planned by his attorney, and then asked for David's advice on how to finesse the resulting, highly damaging interview: "I need your opinion. What do I say to the public to explain what I said on *Geraldo* and why[?]" Truth here seems to have been subordinate to whatever image or story Jesse sought to convey.

This shifting narrative makes it difficult to credit any one version when so many have been proffered, for so many different reasons. Below some key areas of inquiry are studied: statements Jesse made about his father's behavior in the classroom, his own behavior in the classroom, his drug use, his reason for confessing his guilt on national television, and lastly, about the history of his own family.

### a. Arnold Friedman's Behavior in the Classroom

Before his death, Arnold Friedman admitted, in his own words, that he was a pedophile. This was not a secret: indeed, many boys who would *not* testify as victims in this case freely discussed the lingering and uncomfortable touches that Arnold subjected them to, and the pornographic material that was freely distributed and displayed in class.

Despite this, Jesse initially denied to the Review Team that Arnold Friedman engaged in any inappropriate behavior inside the classroom, or beyond the two children he confessed to abusing at Wading River. This is an implausible position that can only be explained by Jesse's need to avoid admitting that the witnesses against him may, in fact, have been telling the truth—at least concerning his father. Here too, Jesse's position has evolved:

- When speaking with the Review Team in **2011**, Jesse initially maintained that his father never so much as touched any of his computer students.
- By **2012**, confronted with other statements, Jesse acknowledged to the Review Team and the Panel that his father may have been "touchy-feely" with his students, and that his father had molested two boys at Wading River. Still, he steadfastly denied that his father ever touched his students inappropriately. He also denied that any children were ever photographed,

---

[528] A483.
[529] *Id.*

and insisted that if pornographic videogames were present in the class, it was by oversight.

- In *Capturing the Friedmans* (**2004**), Jesse acknowledged that his father "was no saint." Specifically, he said: "Yeah, so my father had the magazines. And yes, my father admitted that he was a pedophile and had these fantasies. And yes, my father admitted that he was no saint. And that there were times when he slipped."[530]

- By comparison, in his **1989** interview with Geraldo Rivera, Jesse admitted his absolute complicity in his father's crimes, saying, among other things, "I fondled them," and "I was… forced to… pose in hundreds of photos for my father in all sorts of sexual positions with the kids."[531]

- In a **1989** letter, Jesse's attorney, Peter Panaro, informed the district attorney's office that Jesse could speak to "the number of photographs that he knows were taken, when they were taken, [and] by whom they were taken."[532]

- According to Jesse's attorney Peter Panaro, Jesse had admitted to him in **1988** that his father was a pedophile, had abused him, and had likely abused his older brothers as well.

- When speaking with his brothers, Jesse was more oblique, saying in an undated letter, likely written in **1988** or **1989**, that "Dad used to hug certain children a lot." Arnold, he said, "felt close to his students and believed that the squeeze on the shoulder or a hug was proper reinforcement for good work. Sometimes he would put a kid on his lap."[533]

- In the same letter, Jesse went on, saying, "[d]ad might have let his hands wander more than he should of sometime in the Fall 1987 when I wasn't there,"[534] and even acknowledged that this could have been the reason Witness 3, who would later become a complainant, dropped out of the class.[535]

- Again in the same letter, Jesse reported to his brother that one of Arnold's *piano* students had reported that Arnold "made passes at him."[536] He went on, saying, "we all know how scared [Arnold] was of 'being found out.'"[537]

At a meeting with the Advisory Panel, Jesse acknowledged that his father had confessed to sexually abusing two children at the family's Wading River home. But this too was a cautious acknowledgment. Jesse's unwillingness to accept the strong evidence of his own

---

[530] A230.
[531] A514-15.
[532] A347-48.
[533] A451-52.
[534] A452.
[535] A452-53
[536] A452.
[537] A453.

148

**A-0198**

father's guilt suggests that he believes that he cannot admit that the victims in this case may have been telling the truth about *Arnold*—no matter how obvious Arnold's guilt— for fear that the Review Team or the public would conclude that they were also telling the truth about Jesse.

> b.    *Jesse Friedman's Behavior in the Classroom*

In conversations with the Review Team, Jesse Friedman denied touching the children, sexually or otherwise. But this absolute refusal to acknowledge any contact with the children, or any behavior inconsistent with the simple teaching of a class, contrasts starkly with earlier statements:

- According to his uncle, Howard Friedman, Jesse admitted to him that he was occasionally violent with the computer students.
- In his **1989** interview with Geraldo Rivera, Jesse freely admitted that he "fondled" his father's students. He said he was forced "to pose in hundreds of photos for my father in all sorts of sexual positions with the kids. And the kids likewise with myself."[538]
- In the same interview, Jesse said he would "control" the class, and "keep them in line" if the students "got too riled up."[539] This tracks with later statements, where Jesse claimed to exert disciplinary control over the class.
- Panaro informed the Review Team that Jesse had told him, in **1988**, that he was "rough" with the kids, and would "smack" them, and that this was why the students hated him.
- In his undated "true confessions" letter, likely written in **1988** or **1989**, Jesse explained to his brother David that, on one occasion, a girl in the class "cried out and when he went over to her she was peeing in her pants." Nobody else noticed, he said, and he did not want to touch her, but he nudged her into the bathroom and mopped the floor.[540]
- In the same letter, Jesse wrote that the students "hated the idea of waiting inside for their moms," and that he "would have to keep them in and also keep them from beating each other up." "I found two things out because of those kids," he wrote, "one: I loved lifting kids off the ground. It made me feel strong. Two: it showed the kids I was stronger than them plus it was the only way to hold them still. They would attack me, kick me, tickle me, charge at me, try to hold the door closed on me. It became quite a chore!"[541]

---

[538] A514.
[539] *Id.*
[540] A449-50.
[541] A450.

149

- Other incidents occurred during this waiting period, Jesse said. Once, he wrote, "a kid's sweatpants fell down while I was stopping him from killing another student. He had on underwear, and didn't seem to care."[542]

To the Review Team, though, Jesse steadfastly maintained that he never physically contacted the computer students.

### c. The Geraldo Rivera Show

Jesse first told the Review Team that he appeared on *Geraldo* in the hopes of mitigating his sentence. Reminded that he already had been sentenced, Jesse's wife volunteered that Jesse sat for the interview to curry favor with the parole board, or to communicate to prison officials and inmates that he, too, was a victim. Nothing from the record supports that claim.

- In a **1989** letter to his brother David, Jesse said, "I need your opinion. What do I say to 'the public' to explain what I said on Geraldo and why. Thanks to Panaro's encouragement, I have completely ruined my credibility."[543]
- In an earlier **1989** letter to a reporter for *Newsday*, Jesse said that, "Peter convinced me that I should give the public what they are willing to accept. He did not feel that anyone would believe the truth—so I told a sympathetic story."[544]
- Panaro told the Review Team that, in **1989** conversations with his client, Jesse was strongly in favor of the interview. Jesse went on to sign a **1989** statement expressing his desire to "get [his] side of the story across to the media at any cost, even death."[545]

David remained under the impression that the *Geraldo* interview was Panaro's idea until 2004 when, at a public viewing of *Capturing the Friedmans*, David repeated this claim, only to be corrected by Panaro himself, and by Andrew Jarecki.

### d. Drug Use

Jesse told the Review Team that he used LSD, but only three to four times in high school, and that he had stopped using drugs altogether, even marijuana, by the time of his senior year. This version of events, too, finds little support in the record.

- In a **1989** newspaper article, Jesse was reported to have said that he was "stoned on a daily basis" in high school," and "was using LSD."[546]

---

[542] *Id.*
[543] A499.
[544] A474.
[545] A463.
[546] A912.

150

**A-0200**

- According to notes from a defense expert, Dr. David Pogge, Jesse used acid ten to twelve times, most recently in Fall **1988**. Dr. Pogge classified him as a "very heavy drug user."
- In an undated letter, Jesse explained to his brother David that, during one of the classes, he "must have been 17 and doing a lot of dope."[547]

Given such conflicting accounts, Jesse's credibility even on smaller matters, like this, becomes suspect.

### e. *Federal Search Warrant*

Lastly, Jesse gave different accounts of how he learned about the federal search warrant that launched the investigation of his father's computer classes.

- To the Review Team, in **2011**, Jesse claimed that he was not at home during the execution of the warrant, and that his parents did not tell him about it when it happened. Rather, he said, his mother told him one day while driving him back to college. Jesse had blamed her for making a mess of his room, he said, and Elaine countered, saying it was actually the FBI who ransacked his room.
- In a Spring **1989** interview with *Newsday*, Jesse said his mother called him at college to tell him about the search warrant. Thereafter, "he refused to accept calls from home, and for the next few weeks tried to forget developments in Great Neck."[548]
- In his Winter **1989** interview with Geraldo Rivera, Jesse said that he came home from school and found everything out of place. His father took him aside, told him the police had come, and that his mother had found out "about the magazines and the photos and all."[549]

Even this basic detail, an important event in Jesse's life, is subject to change depending on Jesse's audience.

---

[547] A449.
[548] A910.
[549] A524-25.

151

**A-0201**

*f.     Prison Disciplinary Record*

While imprisoned in 2000, Jesse was punished for writing and distributing "fictional" stories that described violent and disturbing sexual acts, including incest involving a father and his children, sex with a dog, and child rape. Jesse was also disciplined for possessing a photograph of two pre-pubescent girls—at least one of whom is naked—torn from the pages of a magazine. The image was the work of photographer Sally Mann, and it appeared in *Harper's* Magazine in 1992, from which Jesse Friedman removed it. (For the image in question, see right.)



Confronted with the photograph during a recent interview with the Review Team, Jesse initially sat silent, stunned, before reaching for it. Inspecting the image, Jesse struggled to explain why he possessed the photograph.

Instead, Jesse's attorney supplied a justification, proclaiming that Jesse was a "political prisoner" and his possession of the image was nothing more than a "political statement." Satisfied, Jesse adopted his attorney's justification. The reasoning does little to explain why the picture was found in Jesse's cell, in violation of the terms of his sex offender counseling program.

*        *        *        *        *

These competing narratives—some related to small matters, but others concerning important case facts—all severely affect the Review Team's ability to find Jesse Friedman credible. In the final analysis, it is difficult to credit an account today that might change tomorrow.

## V.     Conclusion

In 2010 District Attorney Kathleen Rice directed a full, thorough, and fair review of Jesse Friedman's 1988 guilty plea to criminal charges involving the sexual assault of children. All necessary resources were made available for this effort. District Attorney Rice assigned members of her executive staff to the Review Team. The time of these attorneys was not restricted, and over the course of the review, thousands of hours were devoted to the investigation. With open minds, willing to follow the evidence wherever it led, and with no predetermined views of the original case, the efforts to recreate the case began. Those efforts are well documented in this report.

To further ensure fairness, transparency, and integrity, the District Attorney enlisted the expertise and assistance of four prominent experts. These individuals were fully engaged in this process. They attended meetings, consulted on investigatory steps, were briefed on developments, and guided many of the Review Team's efforts. They remained abreast of information, read earlier drafts of this report, assisted in the editing process, and provided overall guidance. The District Attorney is thankful for each of the

152

**A-0202**

expert's professionalism, dedication, and engagement, and this entire process has benefited from their invaluable guidance and expertise.

Once this endeavor began, the Review Team sought information from any available source. The Team was initially encouraged when the *Capturing the Friedmans* filmmaker offered access to information which, he promised, would greatly impact the re-investigation efforts. However, much of the promised information did not materialize. After two years of negotiations concerning his role in the process, in which Jarecki imposed several unrealistic demands, the filmmaker ultimately gave the Review Team and his audience only parts of recorded interviews. Several key interviews were never shared at all—such as, interviews with Jesse Friedman, members of the Friedman family, and with the codefendant, Ross Goldstein. To be fully relevant to this investigation, the footage and other statements provided by Jarecki should have been turned over in their entirety. To satisfy the legal standard to overturn Jesse's conviction, much more was required.

Ultimately, the Review Team finds that Jesse Friedman was properly convicted, pursuant to his voluntary guilty plea. Several factors inform this conclusion. First, over the course of the original investigation, sixteen children offered detailed, lengthy, and documented accounts of criminal sexual abuse suffered at the hands of Jesse Friedman. The children who offered statements against the Friedmans were not in preschool. Instead, they averaged almost eleven years of age. The investigation into Arnold Friedman by the Nassau County Police Department was fast-paced: it began on November 12, 1987, with the very first child interviewed by the police, that same day, disclosing criminal conduct by Arnold Friedman. At the start of the investigation Jesse Friedman was unknown to police, but within two weeks, by November 24, two children had implicated Jesse Friedman in criminal sex acts. By December 17, 1987, a little more than four weeks into the investigation of Arnold, eleven children had implicated Jesse Friedman in serious sexual criminal behavior. Many more shared information with the original investigators that led them to credit the statements of criminal behavior.

It is not the case that the police systematically used high-pressure interview tactics to generate false accusations. The re-investigation showed that many of the children were visited by the police officers only once before the first two indictments were filed. Different detectives took incriminating statements from this group of children. There is no way to know for sure if preliminary discussions with the police, their parents, or their classmates affected the testimony of these victims. While police contact increased, and questioning intensified in the third phase of the case, the Review Team did not find that those factors influenced the testimony that gave rise to third indictment. The Review Team's interviews with the original detectives, the students of Arnold Friedman, and their parents, support the conclusion that the police did not elicit inculpatory statements using flawed investigative techniques.

There is no evidence that therapy distorted children's memories at the time they testified. "Group" therapy was not offered until December of 1988, a full year after the case began, and weeks after the last of three indictments against Jesse Friedman had already been filed, and therefore could not have affected the case. Many parents sought

individual therapy for their children after their children disclosed abuse to the police, but it is unknown how many children were placed into therapy *prior* to disclosing. Within a little more than four weeks of the investigation's commencement, eleven children reported that Jesse Friedman had sexually abused them. In such a short time period, it is difficult to imagine that therapy would have played a significant role, if any, in influencing the case's early development. Equally unavailing is the theory that hypnosis generated any false allegations. No credible showing was made that any child who gave testimony in any of the three grand jury presentments was hypnotized. The mass-marketed assertion, that the majority of children only gave incriminating statements to the police after many months and many sessions of distortive and suggestive therapy, simply is false.

Jesse's criminal conduct was not limited to the thirteen children who testified against him, and whose charges were sustained after judicial review of the grand jury minutes. Rather, the Review Team discovered signed and sworn statements from three additional boys, who gave detailed accounts of sodomy and sexual abuse committed against them by Jesse Friedman. Before this review, these three additional victims were unknown outside of law enforcement. Similarly, a fourth non-testifying victim came forward to describe to the Review Team previously undisclosed abuse he suffered at the hands of Jesse Friedman, bringing the total number of victims to seventeen.

The Review Team also spoke with three of the victims who testified against Jesse in the grand jury. Each confirmed that he was sexually abused by Jesse Friedman. Each told their separate story, marked by pain and recovery. Each man recounted years of shame and humiliation, suffered because they were male victims abused by other men. Despite the passage of more than twenty years, their recollections were vivid. Three more men wrote anonymously at the time of the release of the movie in 2004. In letters, they affirmed the abuse that Jesse inflicted on them, and expressed their anguish at reliving this horrible chapter in their life. It is clear, then, that many of Jesse Friedman's victims stand by the accounts they gave as boys.

Ross Goldstein, a teenager in 1988, and Jesse's peer, was also accused of crimes. After being consistently identified by complaining witnesses, Goldstein was arrested and, with his attorney present, provided hours of transcribed statements outlining the criminal acts he and Jesse engaged in with the boys at the computer classes. This is no small matter. In addition to the sixteen children who gave written accounts of the abuse Jesse inflicted on them, Goldstein corroborated those statements. For almost twenty-four years Goldstein maintained his silence, unwilling to join the Friedmans in their efforts to upset their convictions. When approached by the filmmakers in the early 2000s, Goldstein told them he could not wholly exonerate Jesse Friedman, nor completely vilify the police. Nonetheless, only recently, he did just that, and disavowed every statement, sworn or otherwise, that he had previously made about some of the charges in the third indictment. This context should raise grave doubts about his candor and the credibility of his recent accounts.

Jesse's current statements, that he and his father are absolutely innocent of all the charges to which they pled guilty, are not credible. Undoubtedly, sometimes defendants

154

**A-0204**

plead guilty when they are not, and their later recantations can be substantiated. Such is not the case here. Jesse pled guilty in court, under oath, to heinous crimes. He pled guilty knowing that his sentence was significant: six to eighteen years in prison. His admissions did not end in court. Instead, he sought out other outlets to explain his actions. Despite his attorney's explicit warning, Jesse reiterated his guilt on national television. In his local newspaper, he was interviewed for an exclusive story where he, once again, described what he did. Far from avoiding these "lies," Jesse reveled in public discussions of his guilt.

Arnold Friedman was a pedophile. By his own admission he molested his younger brother Howard, and two children of close family friends. He chose a profession that would allow him access to young boys. It is well established by those who support Arnold and Jesse, and by those who do not, that Arnold Friedman placed his hands on young boys in inappropriate ways, and showed them pornographic magazines and computer disks. At eighteen, Jesse suffered from significant personality disorders, which were documented by an expert, long before this re-investigation began. That expert noted his psychopathic personality, narcissism, and inability to distinguish right from wrong. These factors cannot be overlooked. These were the men that these children named as their abusers in 1987.

Jesse remained quiet until a movie brought him back into the limelight he craved. Today his numerous statements are contradicted by many others. His explanations for doing the things he did and saying the things he said are tortured and strain credulity. In short, there are few statements that Jesse makes today that can be trusted.

As this review unfolded, the Review Team cast the same discerning eye on the evidence produced by the Friedmans and their supporters, as on the original investigation and prosecution. The Review Team thoroughly analyzed and weighed all amassed information. Special attention was paid to the alleged recantation evidence, which was found to be either overstated, not reliable, or unable to be substantiated.

The District Attorney's ultimate decision did not turn on any one piece of evidence or witness account. Instead, it rested upon a consideration of all of the evidence, past and present. No investigation or prosecution is perfect, and this case is no exception. However, in the final analysis, taking all evidence into consideration, and giving it its due weight, Jesse Friedman was not wrongfully convicted.

# Appendix Table of Contents

Doc 1 *Friedman v. Rehal*, **618 F.3d 142** (2d Cir. 2010)........................................000001-000021

Doc 2 Federal Indictment of Arnold Friedman..................................................000022-000024

Doc 3 Nassau County Indictment (Dec. 7, 1987) ...............................................000025-000039

Doc 4 Nassau County Indictment (Feb. 1, 1988) ...............................................000040-000063

Doc 5 Nassau County Indictment (Nov. 7, 1988) ..............................................000064-000137

Doc 6 Transcript of *Capturing the Friedmans* ...............................................000138-000270

Doc 19 Federal Search Warrant Inventory (Nov. 3, 1987)........................000271-000276

Doc 20 State Search Warrant Inventory (Nov. 25, 1987) ........................000277-000284

Doc 21 Victim Questionnaire ...............................................................................000285-000289

Doc 22 Memo from ADA Joseph R. Onorato to File ........................................ 000290

Doc 23 Memo from ADA Onorato to Det. Sgt. Frances Galasso ..................000291 -000292

Doc 25 Memo from ADA Barry Grennan to Det. Sgt. Galasso ...................... 000293

Doc 26 NCPD Commendation Request..............................................................000294-000298

Doc 27 Fourth Precinct Newsletter re: ADA Onorato.....................................000299-000300

Doc 28 List of Potential Defense Witnesses ......................................................000301-000302

Doc 29 Letter: Jesse Friedman to William Kunstler .......................................000303-000304

Doc 30 Memo from Deborah Broder to File.....................................................000305-000306

Doc 31 Notes of Peter Panaro.............................................................................000307-000327

Doc 32 Meyers Interview Transcript .................................................................000328-000329

Doc 33 Notes of Peter Panaro re: Dr. Feldman .............................................000330-000341

Doc 35 Polygraph Authorization .......................................................................000342-000343

Doc 36 Letter: ADA Onorato to Panaro re: Victim Names ...........................000344-000345

Doc 37 Letter: ADA Onorato to Panaro re: Pictures ...................................... 000346

Doc 38 Letter: Panaro to ADA Onorato re: Pictures .....................................000347-000348

Doc 39 Transcript of Panaro and Friedmans Discussing Plea.......................000349-000389

Doc 41 Trial Orders re: Media Access ...............................................................000390-000393

Doc 42 Trial Orders re: Dismissals ....................................................................000394-000405

Doc 44 Trial Order Designating Jesse Friedman a Level 3 Sex Offender ................... 000406

Doc 45 Trial Order re: Property Return .............................................................000407-000410

Doc 46 Leaflet Advertising Elaine Friedman's "Childbuilders" Sevice ...................... 000411

Doc 47 Excerpts from David Friedman's Journal ............................................ 000412-000440

Doc 48 Letter: Jesse Friedman to Arnold Friedman ..................................... 000441-000446

Doc 49 Letter: Jesse Friedman to Panaro ..................................................... 000447-000448

Doc 50 Letter: Jesse Friedman re: "True Confession" ................................. 000449-000454

Doc 51 Letter: Jesse Friedman to David Friedman ...................................... 000455-000462

Doc 52 Jesse Friedman's Consent to Appear on Geraldo Against Panaro's Advice ................. 000463

Doc 53 Letter: Jesse Friedman to David Friedman ...................................... 00464-00469

Doc 54 Letter: Jesse Friedman to David Friedman ...................................... 000470

Doc 55 Letter: Howard Friedman to Arnold Friedman ................................. 000471-000473

Doc 56 Letter: Jesse Friedman to Alvin Bessent ......................................... 000474-000477

Doc 57 Letter: Jesse Friedman to Seth Friedman ........................................ 000478-000483

Doc 58 Letter: Arnold Friedman to David Friedman .................................... 000484-000485

Doc 59 Letter: Arnold Friedman to Elaine Friedman ................................... 000486-000488

Doc 60 Letter: Jesse Friedman to David Friedman ...................................... 000489-000494

Doc 61 Letter: Jesse Friedman to David Friedman ...................................... 000495-000500

Doc 62 Letter: Howard Friedman to Arnold Friedman ................................. 000501

Doc 63 Letter Excerpt: Arnold Friedman to Jesse Friedman re: Photos ..................... 000502-000503

Doc 64 Excerpt: Jesse Friedman's Pocket Calendar .................................... 000504-000507

Doc 65 Victim Parent's Commendation Letter to NCPD ............................. 000508-000509

Doc 66 Transcript: *The Geraldo Rivera Show* ............................................. 000510-000537

Doc 67 Arnold Friedman: "My Story" .......................................................... 000538-000552

Doc 68 Open Letter from Arnold Friedman .................................................. 000553-000568

Doc 69 Property Disposition Documentation ................................................ 000569-000596

Doc 70 2004 Letters from Victims to Judge Boklan ..................................... 000597-000599

Doc 79 Releases of Liability for Panaro and Polygraph Administrator ................. 000600-000601

Doc 80 Description of Jarecki/Smerling "Children's Entertainer Project" ............ 000602

Doc 81 Transcript: M. Smerling Interview with J. Friedman ....................... 000603-000616

Doc 82 AACAP: Abstracts of Presentation .................................................. 000617-000619

Doc 83 Transcript: Jarecki Interview with Gregory Doe .............................. 000620-000629

Doc 84 Transcript: Filmmaker Interview with Abbey Boklan ...................... 000630-000733

Doc 85 Transcript: Filmmaker Interview with Anthony Squeglia (Part 1) ........... 000734-000782

Doc 86 Transcript: Filmmaker Interview with Anthony Squeglia (Part 2) ........... 000783-000819

Doc 97 Letter: Ross Goldstein to Friedman Case Review Panel .................... 000820-000829

**Doc 99 Letter: Kenneth Doe to Friedman Case Review Panel** ........................................000829-000831

**Doc 101(1) Letter: ADA Madeline Singas to Victims (Feb 4, 2011)** ..............................000832-000833

**Doc 101(2) Letter: ADA Singas to Victims (July 26, 2012)** ..........................................000834

**Doc 101(3) Letter: ADA Singas to Victims (April 26, 2013)** ...........................................000835-000836

**Doc 102 (A3) Notes of Call (Nov. 20, 1987)** ........................................................000837-000841

**Doc 103 (A4) Notes of Meeting (Nov. 24, 1987)** ..................................................000842-000845

**Doc 104 (A7) Notes of Call (approx. Nov., 1987)** ................................................000846-000851

**Doc 105 (A9) Notes of Meeting with Doctors (Dec. 1987)** ................................000852-000857

**Doc 106 (A12) Notes of Meeting** ........................................................................000858-000861

**Doc 107 (A16) Notes of Call with Det. Sgt. Galasso (Mar. 1988)** ....................000862-000867

**Doc 108 (A26) Notes of Meeting (Nov. 16, 1988)** ...............................................000868-000869

**Doc 109 (A32) Hand-Drawn Map of Friedman Home** ......................................000870-000871

**Doc 110 (A33) Handwritten Notes** ......................................................................000872-000875

**Doc 111 (A34) Handwritten Notes** ......................................................................000876-000881

**Doc 112 (A35) Handwritten Note** ........................................................................000882-000883

**Doc 113 (A37) "Group Therapy With Victims of Extrafamilial Abuse"** ........................000884-000904

**Doc 114 Alvin Bessent,** *The Secret Life of Arnold Friedman*, NEWSDAY ........................000905-000916

**Doc 115 Letter: Howard Friedman to Parole Officer Richard Wilbur** ......................................000917

STATE OF NEW YORK
COUNTY OF NASSAU

```
-------------------------------------------------------------- )
                                                               )
In the Matter of the Re-Investigation of the                   )
                                                               )
Case of Jesse Friedman                                         )
                                                               )
-------------------------------------------------------------- )
```

## AFFIRMATION

**BARRY C. SCHECK**, an attorney duly admitted to practice as such in the Courts of the

State of New York, hereby affirms, under the pains and penalties of perjury, as follows:

1. I was a member of the Advisory Panel to District Attorney Kathleen Rice and her

    Review Team who performed a conviction review of the Jesse Friedman case. The

    opinions I express in this affirmation are solely my own.

2. I express these views from the standpoint of someone who is concerned about

    "Conviction Integrity" process issues and not as someone who has reached a

    substantive judgment about facts or credibility in this matter – that was not, is not,

    and never has been my role in this matter.

3. When a substantial question has been raised post-conviction about due process or

    innocence claims, and a prosecutor's office decides to undertake a serious and

    conscientious Conviction Integrity review, there are three possible outcomes:

    a) The parties agree there is a due process or innocence claim that merits a

conviction be vacated, or here, withdrawal of a guilty plea;

    b) The parties agree there is no ground for relief; or

    c) The parties agree to disagree and leave it up to a court to resolve, but with a

much better factual record than would have been available without a Conviction Integrity

**A-0209**

review.

4. Ordinarily, following best practices in a Conviction Integrity Review it is desirable to have substantial disclosure of the prosecution's file, grand jury minutes, and police reports to the defense and materials from the petitioner provided to the prosecutor pursuant to non-disclosure agreements. For reasons we discussed in the Advisory Panel Statement, given the nature of this case, the District Attorney made the decision not to release such materials to the defense.

5. Members of the Advisory Panel did not interview witnesses, except, under limited circumstances, Ross Goldstein and Jesse Friedman, nor did we personally review grand jury minutes, original copies of police reports, or the District Attorney's file. The Advisory Panel did not make credibility determinations. Such determinations were the exclusive province of the District Attorney.

6. I have now read the post-conviction application submitted by counsel for Jesse Friedman, and have had the opportunity to review some of the evidence on which those claims are based. The defense raises very specific claims that there are a number of serious substantive errors in the Rice Report. The parties to this litigation have drawn starkly different conclusions about the credibility of witnesses who did come forward.

7. I believe it would be desirable for the court and the parties, utilizing whatever procedural mechanisms the court deems suitable, to review materials not available to the Advisory Panel, such as grand jury minutes, the original case file, and the results of the re-investigation to aid in finally resolving, to the extent it is possible, the issue of Jesse Friedman's guilt or innocence.

**A-0210**

8.  I believe public confidence in the fair resolution of this matter would be greatly
    enhanced if the court could find a way to resolve these issues, including crucial issues
    of witness credibility, using appropriate safeguards. Accordingly, I urge the court to
    accord Mr. Friedman a full evidentiary hearing on the merits of his claims.

Dated: New York, New York
      June _____ 2 0 _____, 2014

                                                      BARRY C. SCHECK

3

**A-0211**

# Victim Questionaire

DID ANYONE EVER GET ANY GIFTS TO TAKE HOME to KEEP, SOFTWARE, etc. PICTURES, CANDY ETC.

DID ANYONE EVER SEE OTHER KIDS WITHOUT CLOTHES, OR PARTIALLY CLOTHED IN MR. FRIEDMAN HOUSE.

DID ANYONE EVER HEAR ANY DESCRIPTIVE LANGUAGE, DESCRIBING PARTS OF THE BODY ~~ABOUT~~ BY MR. FRIEDMAN OR ANYONE ELSE IN THE HOUSE.

DID ANYONE EVER GO INTO JESSE'S ROOM WITH ANYONE ELSE, OTHER KIDS, OR MR. FRIEDMAN

DID ANYONE EVER FEEL UNCOMFORTABLE ABOUT ANYTHING SAID OR DONE AT MR. FRIEDMAN'S

How DID you Become AWARE OF MR. FRIEDMAN

WHO ELSE GOES TO THE CLASS — ANY FRIENDS YOU KNOW OF THAT GO.

WAS MRS. FRIEDMAN AT THE CLASS OR A0448JS000255_ AT CLASS.

**A-0212**

Have you, been on any trips with
Mr. Friedman.

Have you ever seen Mr. Friedman
take pictures or videotapes of yourself
or any other children,

Have you ever seen Mr. Friedman take
any of the children to the bathroom

Did Mr. Friedman ever take you to
the bathroom ~ or come into the
bathroom while you were there.

DID MR. FRIEDMAN HAVE ANY FAVORITES IN
CLASS OR ANYONE HE GOT TO DO ERRANDS
IN THE CLASS

DID ANYONE EVER GO TO MR FRIEDMANS' CAR
TO GET ANY MATERIALS OR ANYTHING

DID ANYONE EVER GO TO ANY OTHER PART OF
THE FRIEDMAN HOUSE, WITH OR WITHOUT MR.
FRIEDMAN FOR ANY REASON

DID ANYONE EVER SEE MR. FRIEDMAN NOT
FULLY CLOTHED.

Appendix 000268

**A-0213**

Have you ever seen any books
with pictures of naked people

Have you ever been touched by anyone
Good touch    Bad touch

Have you seen any pornographic softwea.
or computer games

Have you ever seen anyone else in
the class being touched.

Has anyone read any books to you
showing pictures of naked people.

Have you ever been asked to remain
after class for any reason,

Have you ever seen anyone go into
Mr. Friedman's office with him,

Appendix 000287

DID You eveR See the TAIKING MAN on the
COMPUTER - WHAT DID He SAy - WHAT DID
MR. FRIEDMAN ASK IT TO SAY.

DID MR FRIEDMAN EVER ADMISTER ANY KIND OF PUNISHMENT FOR
BAD BEHAVIOR AND IF So WHAT TYPE.

Appendix 000288

**A-0215**

1. TOUCHING EACH OTHER / PHOTOGRAPHING THEM

2. ASK ABOUT COUCH IN THE OTHER ROOM.
   IS IT OPEN A LOT LIKE A BED
   IS JESSE IN THAT ROOM A LOT

3. IS THE BATHROOM THROUGH THE ROOM WITH THE COUCH

4. DID MR FRIEDMAN OR JESSE EVER SPANK ANYONE

Appendix 000289

**A-0216**

# ROSS GOLDSTEIN

March 8, 2013

Dear Members of the Friedman Case Review Panel,

I am writing this letter because I understand that the Panel will accept my written statement at this time.

It is my hope that this letter will serve as a way to address some fundamental problems with the investigation and prosecution – specifically my role in it. While I have always wanted to personally address the Panel, over the last six or eight months, the District Attorney's Office repeatedly rejected reasonable requests made by my previous attorney which would have created a respectful and safe haven for me to come forward to talk with the Panel about this case, which had such an enormous impact on me and nearly ended my life.

I want to emphasize that one of the main reasons that I am writing this letter to the Panel is that I do not want my choice to not appear in person or make myself available for any questioning to be seen in any way as an affirmation that my testimony in the grand jury in 1988 was truthful or voluntary; it was not truthful and it was not voluntary.

With respect to the facts, I want to clarify one important point: I am not a pedophile. I am sickened and horrified by the very idea of these kinds of crimes being done to anybody - especially children. What I need to emphasize is that I was never an assistant to Arnold or Jesse Friedman in their computer classes and I did not commit any crimes there. I did not witness Jesse or anyone else commit any crimes in the Friedman home with any computer student. My testimony before the grand jury was a result of tremendous and unrelenting pressure and intimidation by the police and district attorney's office - in which I was eventually coerced to lie about the crimes taking place in order to try to save myself and be granted the Y/O status deal that was being offered to me. It was the ONLY way I had to avoid the possibility of spending my entire adult life in jail if convicted by a jury.

For many months after I was arrested, I maintained my innocence and refused to cooperate with the investigation, until the pressure became so heavy that I felt like I had no other option but to cooperate with the police - even though I was innocent. They did a good job of destroying my identity and sense of self by forming a new image of me in the media as a guilty evil monster.

I remember my first interaction with the Nassau County Police Department Sex Crimes Unit (SCU). It was in the late spring of 1988, I was at my friend ▆▆ house. I was

---

[1] I am using the first names of my friends ▆▆ ▆▆ to protect their privacy. If the Panel is unclear as to their identities, please contact my attorney and she will supply them to the Panel



**A-0217**

Friedman Case Review Panel
March 8, 2013
Page 2

17 years old at the time. He noticed that for several days a brown car seemed to be following him. It turned out that the brown car was an unmarked police car. I believe that ▮▮▮▮ was the person who gave my name and the names of my friends to the police. I believe he also told them that we were hanging around the computer classes. ▮▮▮ lived with the Friedmans during the period that the sexual abuse allegations took place. I believe that he was the first person that the police questioned as a possible accomplice of Jesse and that they pressured him to cooperate with them. I was told sometime later that he left town in early July of 1988 for fear of being arrested as well.

One afternoon, that same brown car pulled into ▮s driveway and two police officers came to the house to question him. They said that ▮'s name appeared on a list of students from the Freidman computer classes ▮ denied being a student. They said that they wanted to ask him a few simple questions and, since we were there too (▮▮▮▮▮▮ and we all happened to also know Jesse Friedman, they were going ask us a few questions too. Soon it became clear to the police that I knew Jesse the best out of all of us. In actuality, however, I only knew Jesse for a short time, from November 1986 through June 1987, when I met him as a student after I was transferred to the Village School.

The police asked us a lot of questions. We were gathered together in the living room and ▮'s mother was present at the time. Among the questions that the police asked was if I ever saw any abuse of the kids or any drugs being used there or given to the kids. I said "NO".

I explained to them how I first met Jesse. I also explained the nature of our relationship: how Jesse and I had made a few recordings at the Village School together at the school's sound studio and that was basically what I was doing with him. I made it 100% clear at this point – in front of my three friends and ▮'s mother, that I had absolutely no involvement in the Friedman computer classes and that the few times that I saw any students at his house, I never saw any abuse of any kind.

I remember mentioning that I once saw a syringe in Jesse's drawer in his room but I remember being very clear in telling them that I never saw him use it or talk about using it. I mentioned that Jesse showed me one of his dad's pedophile magazines and that that was the weirdest most awful thing that I ever saw at his house.

The police asked ▮ and ▮ if they knew Jesse or went to the class with him and they both answered "no". One of them, and I am not sure which one, said "we'd see him only when Ross was hanging out with him".

The police said "thank you all very much for letting us talk with you - we really do appreciate it" and then they left. I remember that we all felt a sense of relief when they left. I don't think any of us thought twice that the police might need to talk with any of us ever again.



**A-0218**

Case 2:06-cv-03136-JS Document 372, Filed 01/20/2098 Page 336 of 443 Page ID #: 3882

Friedman Case Review Panel
March 8, 2013
Page 3

A few weeks later, my second interaction with them was dramatically different and clearly marked the beginning of the end of my life as I knew it. It was the day after my high school prom[2]. I was with ▮ and we were on our way to ▮'s house when a white van pulled up out of nowhere and screeched to a halt right in front of ▮'s house. The police jumped out of the white van and yelled, "Are you Ross Goldstein?" I did not understand what was happening, especially because I recognized them as the same two police officers who had spoken with us a few weeks before at ▮'s house.

Then the police announced, "You are being charged with molesting the students at the Friedman computer classes!" Then they grabbed me and pushed me up against the side of the van and handcuffed me; they put the handcuffs on too tight. Then they threw me into the back of the van.

Inside the van, there were five or six police officers. There were no seats in the back of the van - only a garden patio type chair which was not secured to the van in any way. The police shoved me into it. I remember sitting there handcuffed, surrounded by them and being scared out of my mind and feeling utterly helpless. They were all yelling at me and at the same time they seemed to be laughing at me and taunting me as they tried to scare and intimidate me. Because we were inside the back of a van, the police had to stand hunched over. This created a frightening sense of being kidnapped. I could feel their open hostility and aggression towards me. They were relentless. They said things like:

"What are you going to do Mr. Big Shot?"

"How does it feel to be the worst person in the entire town of Great Neck?"

"How does it feel to know you're gonna hang for what you did?"

"You are going to go to jail and you're going to get raped yourself repeatedly..."

"You're going to die of AIDS in Attica!"

"How does it feel to know that you have been caught and that you are going to pay forever for the damage you have done?"

I went into total shock and I felt a deep and overwhelming sense of panic. Here I was alone, only 17 years old at the time, handcuffed in the back of an unmarked van, being threatened and having horrible accusations thrown at me. I began to cry uncontrollably and I broke down. I suffered an anxiety attack. Despite my fear, I tried my best to defend myself and explain to the police they had it all wrong. I remember that I

---

[2] Someone later told me that the limo driver that drove me and my date on the night of my prom was really an undercover police officer.



**A-0219**

Friedman Case Review Panel
March 8, 2013
Page 4

kept trying to say "NO WAY! You have got the wrong guy! I did not hurt anyone at
Jesse's house!"

I tried to refer them back to the conversation we had a few weeks earlier at 
house. I tried to remind them what I had told them and that I had been open and truthful
to their questions. I remember that I had tears streaming down my face, "Why are you
doing this to me?" The response I got was "because we KNOW you are guilty – 100%
without any doubt – so you better SHUT THE FUCK UP and ADMIT IT in order to HELP
YOURSELF KID!" No matter what I said to them, the police would just repeat, "We
know you are guilty already!" To this day, I don't know what the police were referring to
as the source of their confidence in my guilt. I don't know how long I was in the van, but
the police were relentless and their tactics continued for what seemed like an eternity.

The police then took me to the police station and they interrogated me for many
hours. At the police station, I learned that they had also picked up ████ and had threatened
to charge him with being an accomplice of Arnold and Jesse Friedman too. I remember
at one point, we were both in different rooms at the SCU station house both being
interrogated and essentially pressured to admit that we did things in connection with the
Friedmans.

I was never read my Miranda rights.

Different cops kept coming into the interrogation room. Some would talk sweetly
and calmly to me while others would try to scare me and create a sense of fear and
danger. It was classic "good cop bad cop". The police said that they wanted me to agree
and admit that things had happened at the Friedman house. For example, they said
things like:

"Ross, you know you are guilty..."

"It's ok to admit you're gay and that you like to suck dicks."

"We already know from too many of these kids that you made them suck yours."

"Until you admit and help us we are NOT going to drop it!"

Then another officer would come in and say, "I understand Ross - you're not the
one who is to blame - why not help us and the kids and we'll give you complete
IMMUNITY."

At some point my mom came to the police station. I later learned that ████ had let
her know that I had been taken by the police. She came into the station in hysterics and
demanding to know what was going on. The police told her "Your son is a MONSTER."
She had a breakdown right then and there and so she did not have the immediate
clarity to call a lawyer right away. I remained at the station a few more hours into the

**A-0220**

late evening as the police continued to question me. Later that evening, the police decided not to officially charge me and they finally let me go home. One of the final things they said to me was "we'll be back - *expect* us" and that "we need your help in this ... *do the right thing for the community*."

I did not hear from the police again until the day of my arrest, which was literally a few hours before high school graduation. The ill timing was clearly intentional, given the fact that my parents had hired a lawyer after the last incident with the police. My attorney telephoned SCU to let them know that if they wanted to speak to me or arrest me, they should call him to let him know and that he would arrange for me surrender; the police agreed. I am told that this is common practice.

So, clearly when the 8 to 12 police -- some with guns drawn -- came to my home that morning mere hours before my high school graduation and surrounded my house, it was a conscious decision to completely disregard their agreement with my attorney. Only my Grandmother and I were home at the time. They rang the doorbell. I opened the door and they showed me what they said was an arrest warrant and the officer ordered, "You must come with us!"

The police then told my Grandmother "Your grandson is a monster and needs to be locked up!"

I was handcuffed and driven to the police station in a generic police car. Before we reached the end of the block that I lived on, we happened to drive pass by my mother who walking home from work to attend my high school graduation. She saw me in the police car and she immediately rushed over to the police car.

"What are you doing?" she said. She visibly upset and on the verge of hysteria. "It's his graduation day! The ceremony is in 30 minutes! Why are you doing this to him?" One of police officers rolled down the window of the police car and threw the arrest warrant at my mother's face and said, "Here you go lady!" Then they drove off laughing as the light turned green.

When I got to the police station, I learned that there were hundreds of criminal charges against me. The criminal charges were all listed on paper. This was the first time I ever heard of things like "leap frog" and "naked limbo". I remember feeling sick and like losing my mind because the things they accused me of were so vile and disgusting.

When my lawyer showed up and looked at the paper containing the list of criminal charges, I could see that his mind was reeling. He said, "If you did this stuff kid, you are the worst sex offender maybe of all time." I maintained that this was I innocent and that this was "completely insane - and that I only knew Jesse for a little while and had no knowledge of what went on during the commuter classes". But my lawyer basically told me that it didn't matter because I was now in "DEEP SHIT!"



Friedman Case Review Panel
March 8, 2013
Page 6


The police put me in a few line ups. I was not identified in the first line up. However I was subsequently identified in a second one. That was when the police formally brought me in to be booked and held overnight. Apparently, the police had arranged with Newsday ahead of time that I was going to be brought in that day (this courtesy they did not extend to my attorney) for its photo-op of the latest "monster" in the Friedman case. In fact, they were able to help the Newsday photographer get a scary looking picture of me after police officer called out to me and I turned to look at him. The picture appeared in the next day's edition of Newsday. (In a video clip in Andrew Jarecki's film you can see the that police woman who is bringing me into the station is wearing lots of make up and jewelry - making the whole thing seem somehow glamorous and incongruous.)

At this juncture, I was totally unwilling to cooperate with the police and the District Attorney's office.

The day after I was arrested, I lost my life. I lost all my friends and hardly anyone would talk to me. This was in large part due to the hysteria that had surrounded this case and other child abuse cases that had attracted worldwide media attention.

In addition being ostracized in my personal life, in the legal system I was being made to stand trial as Jesse's codefendant. Not knowing what he had done or not done made it impossible to feel confident about going to trial with him.

I felt very scared that a jury would believe the testimony of the young kids over us. And when Judge Boklan promised to televise the trial, this added even more pressure to on me to eventually cooperate and say the things that the prosecutor and police wanted me to say to make their case against Jesse Friedman. At a certain point during this process, I became locked into cooperating with the prosecution - and from that point on I said whatever I had to in order to avoid the possibility of a long jail sentence.

In the weeks leading up to my grand jury appearance, I was coached, rehearsed and directed by the prosecutor and Detective William Hatch for hours on end. I was told that it was my role to confirm what the complainants had said when they testified about what happened to them during the computer classes. According to them, this was how the police and the prosecutor built up evidence that would "stick" at a trial. I was going to have to take the stand and testify against Jesse at a trial because the prosecutor and police believed that there was a good chance that none of the younger kids would be willing to take the stand at a trial.

During these weeks of preparation, I could not and would not confirm any allegation or admit to doing something or seeing Jesse doing something to any complainant because I truly had no knowledge or participation or witnessed anything of the sort. The prosecutor would then threaten me by placing the Y/O status deal off the table. This happened repeatedly. This was like being tortured and treated like a puppet.



**A-0222**

Friedman Case Review Panel
March 8, 2013
Page 7

Just imagine the trauma of having actual memories stamped out and erased from history and replaced with new violent images of incidents that never took place. It was truly like being trapped in a nightmare that I could not wake up from.

Other times the prosecutor would threaten to revoke the Y/O deal – he would announce that ▮ would soon be arrested as the next defendant in the case – and then ▮ would be offered the Y/O status instead of me (at which point he claimed that he would get ▮ to testify against me and Jesse at trial). This happened 2 or 3 times after I refused to testify about something that I never saw or did.

Amazingly, later on the prosecutor and police at one point even offered to the drop charges against me if I was able to help them find a picture or video which had been made at the Friedman house by Arnold or Jesse. I am told that no evidence of this kind was ever found.

The police and prosecutor's idea that two of my high school friends and I would go over together to Jesse's house and use the computer class context to commit crimes against the kids is 100% UNTRUE. I never recruited anyone to take part in anything going on at Jesse's house - and Jesse never recruited me to help him with the computer classes. The two friends who the police said were involved had no actual involvement whatsoever in the classes. I believe that the police were hoping to arrest them both and convict them too. As a result, the prosecutor put as much pressure as he could on me to testify against them as part of my cooperation in trying to secure the Y/O deal. This was a heartbreaking experience because these other guys were my close friends who I had been playing music with on and off in bands since the 7th grade. This case unfortunately ended our friendships

In actuality, as I explained earlier, I was friendly with Jesse for only a small window of time between November 1986 (when I first transferred to the Village School) and February 1987. We would work on music recordings together in the recording studio that was set up at the school. Sometimes we would meet up after school and listen to cassette mixes of what we had worked on together. It was during a few of these times spent listening to music in his room that I happened to hear or see kids arriving at his house for the computer class. When this happened Arnold would come down and knock on Jesse's door and expect him to stop what we were doing and help him teach the computeWhen this happened, I would leave his house and go home (I lived just up the street from him at 51 Piccadilly Road) It's possible that during one or two of these times - as I was leaving - Jesse introduced me to some of the kids in the computer classes. I want to note that in order to exit the house from Jesse's bedroom, I had to go through the computer class area.

When I was first interrogated by the police the dates of the alleged crimes were said to have occurred in the Spring of 1986 – which was clearly impossible because this time period was before I knew or had ever met Jesse. When the police learned this they somehow were able to move the dates on the charges to the Fall and Winter of 1986



Friedman Case Review Panel
March 8, 2013
Page 8

through 1987 - placing them in the window of time when Jesse and I were friends.

At my sentencing the Judge surprised me by revoking the Y/O deal and sentencing me to 2 to 6 years. She also read parts of my grand jury testimony into the record. I later had to appeal my sentence in order to get the Y/O that was promised to me.

Again I would like to make it very clear: every single thing found in my grand jury testimony that the Judge read into the record at the date of my sentencing was untrue and was said by me at the time to avoid a trial, to secure my Y/O status and avoid to a long jail sentence. This is a tragic irony. For example, in my grand jury testimony I stated that I was involved in the computer classes until June of 1987. This is untrue. Jesse and I stopped being friendly around February of 1987 after I met a few other Village School students who were musicians and I joined a band with them. As such, I know that I never went over to his house again after February 1987. This is a good example of a seemingly small detail in my testimony that the used prosecutor to make the other evidence "stick" in their case.

In addition to the tremendous amount of preparation by the prosecution, parts of my testimony incorporated specific actual instances that I had observed at Jesse's house. For example, once I saw some of the kids playing highly pixelated pornographic computer games and Arnold was not in the room at the time. I was there for only a minute or two. As a result of telling this to the prosecutor, he was able to include or add other more serious incidents against Jesse. The prosecutor essentially had me adding scenarios onto the actual memories that I had from the handful of times I was at Jesse's house to listen to music. In this way, they could take a real event and embellish it or meld it in order to fit into their theory of violence and draconian abuse at the Friedman house. The police actually believed that this abuse was happening in a ritualistic manner-- week after week, year after year and that Jesse and I were conducting an open homosexual relationship in front of the class and that we also had our "favorites" among the students to abuse at our pleasure. This is simply untrue.

Please understand that I am writing because I believe that this information should be included as part of the official record in relation to the Panel's review of this case and its subsequent recommendation.

My decision to keep this part of my life story private and not to share it publicly (or in the film Capturing the Friedmans) comes from my wish to move on in life and to preserve my privacy. It's hard sometimes to live with the damage it has caused others, not to mention me and my name. I prefer to focus on ways of exploring the healing process and working on creating love and compassion in my life.

The impetus and motivation for coming forward to speak about it now was a direct result of the announcement of a transparent and honest review of the case by an independent panel. This meant not only a review of the defendants but a review of the



**A-0224**

Friedman Case Review Panel
March 8, 2013
Page 9

entire case - which MUST take into account all that was improperly and perhaps illegally done by the police, the prosecution and Judge Boklan in both their independent and collective handling of the investigation and prosecution.

Thank you for taking the time to read this over. I hope you will consider my earnestness and the importance of these details when you are forming your recommendation.

Ross Goldstein

**A-0225**

**CONFIDENTIAL**

Craig Altshuler
Craig_altshuler@yahoo.com

May 20, 2013

Re: My Statements in the Case of Arnold and Jesse Friedman

Dear Friedman Case Review Panel:

My name is Craig Altshuler. I grew up and attended school in Great Neck, Long Island, went on to graduate from an Ivy League college, pursued a career in finance, and am currently vice president at a reputable investment firm in Manhattan.

In 1987, I attended computer classes taught by Arnold Friedman. On May 7th of this year I reviewed, for the first time, indictment #67104 (the first of a series of indictments against Arnold and Jesse Friedman). I was informed by attorney Ronald L. Kuby that I am identified in that indictment using the pseudonym "Kenneth Doe." I reviewed all of the accusations allegedly made by Kenneth Doe.

I write to inform you that none of the events allegedly described by or attributed to Kenneth Doe ever took place. Arnold Friedman did not contact my anus with his penis, I was not witness to Jesse Friedman taking any photographs of anything, I engaged in no sexual performances, neither Arnold nor Jesse ever touched my penis, Arnold did not show me magazines containing pictures of naked people, and I never showed my penis to Arnold or Jesse Friedman. During the time that I was present in computer classes, I did not observe Arnold or Jesse Freidman engage in anything even remotely akin to sexual conduct, and I have no reason to believe such events occurred.

I recall clearly that police investigators came to my home repeatedly to question me about what had happened in the computer classes. The police repeatedly told me that they knew something had happened, and they would not leave until I told them. As I result, I guess

1

**A-0226**

I just folded so they would leave me alone. I recall being taken somewhere and being videotaped while I repeated these untruthful statements. After the film *Capturing the Friedmans* came out, I went to see it with my wife, who is a psychotherapist. The descriptions given about the police tactics used to extract statements rang true for me.

Over the past twenty-five years, I have occasionally thought about the Friedman case, but it was simply a blip on my radar screen. I had feelings about what happened, but it was not a priority for me. I did not know what role, if any, I played in the case, but I knew that I never went to Court and provided live testimony.

I have always maintained my world of work and family separate from what happened in the Friedman case, although I have discussed it over the years with my wife. These two worlds came into collision earlier this month, when someone delivered to my place of work a copy of certain documents that were filed in Nassau County Court. Because these were legal papers, they were opened by my firm's Legal Department, which reviewed them and notified my supervisors, who began to Google the case details.

I had nothing to hide and nothing to be shy about, so I had a candid conversation with my employers about what had transpired, and they left the matter. However, because I wanted to make certain that there were no further intrusions into my work or family life with this matter, I contacted attorney Ronald L. Kuby with this request. In the course of the conversation, I informed Mr. Kuby of the facts that I have relayed here, and he urged me to come forward in whatever fashion I felt comfortable, and explain what had happened to the Case Review Panel.

Mr. Kuby assured me that my name would not appear in any public report or in any publicly accessible document. I am relying on that assurance. Moreover, because my legal status is still that of a victim of "sexual abuse," although this is factually not correct, I rely on the provisions of Civil Rights Law §50-b(2) to the extent that it prevents you from disclosing my identity publicly. Obviously, this provision does not extend to Mr. Kuby, and you are free to discuss this letter, and the process leading up to it, with him. I do not wish to be contacted by you, or anyone else related to this case, except to the limited extent that you

2

**A-0227**

need to confirm my identity. In such case, you may use the email address above.

I am providing this statement in reliance on the understanding that my name will not be used in any public way whatsoever, though the material in this letter may be used without inclusion of my name or identifying elements, and without personal attribution to me.

Sincerely,

Craig Altshuler

3

**A-0228**

# VOLUME 2

| | | |
|---|---|---|
| Exhibit J | Arline Epstein: Interview Statements, January 22, 2013 Prepared Statement for Friedman Conviction Review Panel, August 19, 2013 Letter to Justice F. Dana Winslow, Notes Taken During Friedman Prosecution from 1987-1989; Presentation by Arline Epstein to the Friedman Case Review Team | A-0229 |
| Exhibit K | August 8, 2014 Affidavit of Carol Frank | A-0421 |
| Exhibit L | 2012 Recorded Interview with Michael Kanefsky | A-0425 |
| Exhibit M | 2012 Recorded Interview with Margalith Georgalis | A-0426 |
| Exhibit N | 2012 Recorded Interview with Christopher Blaha | A-0439 |
| Exhibit O | 2012 Recorded Interview with Shahar Lushe | A-0447 |
| Exhibit P | May 21, 2012 Interview Statements of Barry Doe | A-0463 |
| Exhibit Q | May 23, 2012 Interview Statements of Gary Meyers | A-0476 |
| Exhibit R | May 24, 2012 Interview Statements of Joan Blaha | A-0487 |
| Exhibit S | June 4, 2012 Interview Statements of Rafe Liber | A-0497 |

COUNTY COURT
NASSAU COUNTY

-----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

                Defendant.

-----------------------------------------------------------------x

## AFFIDAVIT OF ARLINE B. EPSTEIN

ARINE B. EPSTEIN, having been duly sworn, hereby declares:

1. I am a resident of Greenwich, Connecticut, and a former resident of Great Neck, New York.

2. I am the mother of Michael Epstein, a student in the Friedman computer classes.

3. Attached to this petition as an exhibit is a true an accurate copy of a letter I wrote on August 19, 2013 to the Honorable F. Dana Winslow, of the Supreme Court Nassau County.

4. Attached to this petition as an exhibit is a true and accurate copy of my prepared statement to the Friedman conviction review panel dated January 22, 2013.

5. Attached to this petition as exhibits are true and accurate excerpts of transcripts of conversations I had regarding the events surrounding the Friedman prosecution.

6. Attached to this petition as an exhibit are true and accurate copies of notes I took of various meetings and events during the Friedman prosecution from 1987 to 1989.

Dated:      June 17, 2014

                                            Arline B. Epstein

## JURAT WITH AFFIANT STATEMENT

State of _Connecticut_  }  ss.
County of _Fairfield_

☐ See Attached Document (Notary to cross out lines 1–7 below)
☐ See Statement Below (Lines 1–7 to be completed only by document signer[s], *not* Notary)

1
2
3
4
5
6
7

_____
Signature of Document Signer No. 1

_____
Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or affirmed) before me

this _17th_ day of _June_ , _2014_ , by
   Date       Month     Year

_Arlene B. Epstein_
Name of Signer No. 1

_____
Name of Signer No. 2 (if any)

_____
Signature of Notary Public

```
ILA WILLIAMS
Notary Public
Connecticut
My Commission Expires Oct 31, 2016
```
Place Notary Seal/Stamp Above

_____
Any Other Required Information
(Residence, Expiration Date, etc.)

———————————— OPTIONAL ————————————

*This section is required for notarizations performed in Arizona but is optional in other states. Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _Affidavit_

Document Date: _6/17/2014_                Number of Pages: _1_

Signer(s) Other Than Named Above: _____

© 2013 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)  Item #25924

**A-0230**

COUNTY COURT
NASSAU COUNTY

------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

          Defendant.

------------------------------------------------------------------x

## AFFIDAVIT

ANDREW JARECKI, having been duly sworn, hereby declares that the following is a true and accurate copy of excerpts of the transcript of my conversation with Arline Epstein on November 8, 2012.

                                 Andrew Jarecki

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0231**

2ok

Jesse Friedman Case
Arline Epstein

(nothing on Part One)

BEGINNING OF PART TWO

Q: So your name?

A: Arline Epstein

Q: And what is your relationship to the Friedman case?

A: I was one of many parents whose, my, our son had taken computer classes at Arnold Friedman's house in the spring of '87, summer of '87, and the fall of '87.

Q: And when did you move to Great Neck?

A: Oh gosh, we moved to Great Neck, I was I guess seven or eight months pregnant with our son. And that was in 1978. It was a community that had wonderful parks and recreation. It was a good commute to New York City. My husband, at that time, was commuting downtown. It was also one community over from Manhasset where my inlaws lived, so we felt it would be great to have, to be close to them and to allow the grandparents and child and, of course, us to be together a lot. 0:52.00

Q: And so Great Neck seemed at that time to be sort of the perfect place to raise a child.

A: It was a very good place. And we felt that the schools are particularly good. So it seemed like a good, a good place to live.

Q: Did Mike enjoy it?

A: I think so. I think he engaged, it seemed to me that he did. He had a wonderful nursery school experience. Actually pre-nursery school experience, and then the nursery school experience at the Community Nursery School, or I think it's called Community School of Great Neck. And he participated in many other activities – Cub Scouts and baseball, the leagues for the young kids. Fully engaged in school activities. And making friends and enjoying the park.

Q: What kind of child was Mike? 2:14.00

A: Um, Mike was always very interested in learning new things. He was

A-0232

Arline Epstein - 1

an only child. He was precocious in reading and doing math, and just very interested in, in new skills. Very creative. He, we lived, we lived overseas in Hong Kong for two years when he was three to five years old. And I remember when we came back, he was very much interested in – it looked to me like an Americanization plan. You know he, he was learning about the Yankees and statistics, and even watching American TV. So he would kind of be literate.

And it wasn't like an, an agenda we set for him. It's just something he did. He was very self-motivated, throughout his life. From being a little kid – very little kid – to, through into adulthood.

Q: (adjustments)…. Okay, so how did you hear about the Friedman computer classes? Arnold's computer classes? | 3:40.00

A: I believe it was through another mother – like the mother of a friend of Mike's. And it seemed like a perfect idea. Mike had, on our way back from living in Hong Kong, we had taken the QEII, and that was in 1984. And they had a computer room onboard. And pretty much that's where he spent the voyage, when he wasn't sleeping or eating. And it was his first exposure, I believe, to computers. And it was just a natural step from then.

And he persuaded us to buy an Apple IIc, and from then on it was just, you know he kind of was our technology guru, starting at age five and a half or six. And it continues to this day.

Q: So, and how did you hear about Arnold's classes?

A: Well through this mother, I guess I just heard the name, and she said, 'I'm going to enroll my son', and she said, 'I wonder if, I wonder if Michael's interested?' So, you know, I just, I guess I must have called up and expressed an interest. | 4:33.00

Q: So Michael initially went to classes with friends that he knew from school?

A: Definitely. Yes.

Q: So it's like a group of sort of – for lack of a better word – 'nerdy' kids who wanted to learn about…?

A: Wonderful nerdy kids. Yeah. And we carpooled, I remember. It was Friday afternoons and I would pick them up every – I think there were three, three kids in the carpool, and I picked them up every third time, probably. And, yeah, but he definitely went with friends.

Arline Epstein - 2

**A-0233**

Q: When I ask a question, if you can give me a little of the question back, only because I'm going to be cut out of it.

A: Got it.

Q: So if I'm like, 'Hey, what color is your house?' You'd say, 'My house is blue'. Instead of just saying, 'Blue'.

A: Okay. Okay sure.

Q: So you shared the carpooling responsibilities with the other mothers? | 5:27.00

A: Yes. Yes. I, um, I was working fulltime at the time. But it was in Lake Success, so I was able to participate in the carpooling responsibilities, I guess probably with two other mothers.

Q: So Michael and his friends go to this class. Did you notice any hesitation by them to take the class? Or when you were taking them to the class? Did they seem intimidated by going to the class?

A: Not at all. They were very excited to be going.

Q: rephrase.

A: Oh. Sorry. I never felt that they were intimidated in any regard. They were very excited to be going to the computer classes. And I, I do remember when I would pick them up, they were really like over the top excited, and um, a little nutty and crazy. But I always figured, 'Well, they had a great time, and there's probably candy there as well.' | 5:57.00

Q: Right. Did Michael ever express his desire not to go to the computer classes?

A: Oh, not, no... he never expressed any desire not to go. It was, it was clear from the beginning that he was learning, and enjoying himself. I remember that he, one Christmas – must have been '87 actually – he asked us for a Commodore computer, which I believe was what was used at the Freidman computer classes. And since we already had an Apple computer, we were very resistant. But eventually I saw that that was something that really meant a lot to him. So we did break down and buy the Commodore.

Q: What happened to Commodore? They really screwed it up, right? (chuckle) Mike was up for the Commodore over the Apple. Now what?

A: I think actually he wanted to master both, knowing Mike.

**A-0234**

Arline Epstein - 3

Q: How many classes did Mike take in all, do you think?

A: I, I, I'm pretty sure he took one in the spring. I'm pretty sure – let's see, he took one computer class in the spring, one shorter class in the summer, and then I know definitely he was in the class in the fall of '87. In fact I have the registration form, the invoice, which is really amazing. Yeah.

7:47.00

Q: Did the other boys do you think, I don't know how you feel about naming names, but I think it's important that, you know, because some of these boys had been complainants, you know, that we, that it was fairly clear that the boys, even those boys, looked forward to going to the class.

A: In my experience, it is definitely true that all the children that I witnessed going to the classes were very positive about going. And that many of them were going for the second or third course.

Q: Did you ever go into the computer classes?

A: You know I went in before Mike enrolled. And I remember this cramped space in the, it was actually the entry level, it wasn't the basement, it was the entry level of the house. Um, on Piccadilly. And it just looked like kind of a house where lots of things were going on, and there was a piano and there were, the computers were lined up. And I met Arnold Freidman. And we had a short discussion about the protocol for the class. And I probably wrote a check or something like that.

8:43.00

Q: What was your impression of Arnold?

A: He seemed like a …kind of nebishy, middle-aged good guy.

Q: (rephrase)

A: I'm sorry. Yeah. Should I say that again?

Q: Yes.

A: My impression of Arnold Friedman was a, a nebishy type of middle age guy. Who had a lot of interests and talents. He clearly played the piano because the piano ws there in the, n the area near the computer room. And I knew of course that he taught computer classes. And I believe at that time I knew that he had been a teacher at Bayside High School. So he was – I had a positive impression.

9:44.00

Q: Did you meet Jesse at that time?

**A-0235**

A: I did not meet Jesse then. In fact, I don't know that I ever actually met Jesse Friedman in those years. I know one time – and I believe it was for the summer class – Jesse called me, and I believe he probably called all the parents who were either thinking of enrolling their sons or, or had enrolled, just to kind of outline the, probably dates and times and things like that. That was my only contact with Jesse.

Q: Did Mike talk about Arnold and Jesse?

A: Did, I don't remember Mike talking about Arnold or Jesse. Other than Arnold – and I…no, I don't remember. Like he might say something about the teacher, or 'We did this…', but not, he didn't talk that much about it, about them.

Q: So at this time he's going to one of these classes a week.

10:45.00

A: Yes, he was, Mike was attending a class once a week on Friday afternoons.

Q: And he, and he re-enrolled for another class. Was that also a Friday afternoon class?

A: You know, I know the last one was Friday. I'm pretty sure the first one, and first one was Friday. In the summer I have no way of remembering. It didn't matter to me what day of the week it was.

Q: How was Mike at the time that he was attending the classes? Was he acting out? Was there any sort of unusual behavior that was uncharacteristic for him entering this period of time?

A: I don't recall any uncharacteristic behavior. There were, Mike has a little bit of a strong, strong streak to him. And a little edginess – usually in a good way. In a humorous or, uh, sort of just a expression of personality. And, and if he expressed any strong wishes or discontent or anything it was kind of, it was in character. And he really, I never remember any, anything that was directly related to the computer classes.

Q: How do you think, how did Mike portray the computer classes to you? He comes home, he has dinner with you and your husband. And you say, 'Hey, how was your day? How was Arnold's class? How was….?' What would he say about it?

12:20.00

A: Let's see – what would Mike say about it? Um, hmmm. I don't think he gave us that much detail. You know, like 'How was your day?' 'Fine' sort of thing. And we would ask 'What are you doing in the class?', 'Oh, we're doing a little, learning some programs', or 'Running this, this

program' or 'Playing this game'. It wasn't too specific, I think. But it seemed like he was enjoying it.

Q: So there's no indication to you that anything was wrong?

A: Absolutely no indication that I had. I never felt that anything was going wrong there, no.

Q: And Mike never was absent from a whole bunch of classes in a row, or absent...?

A: No, no. He went to every single one that he, he possibly could go to. You know, unless he was ill or we were out of town. I don't, don't recall. But I'm sure he was there. If, if he could be.                          12:57.00

Q: So what was the first thing, when was the first time that you heard something nefarious might have been happening?

A: It's kind of unforgettable. Although, you know, the details can fade over time. But the first I remember hearing anything about something nefarious was I received a phone call one evening from the mother of one of Mike's friends. And she...I believe she said the detectives had come to her house - a pair of detectives had come to talk to her son. And they, that this was this shocking news that Arnold Freidman's house had been searched by the U.S. Postal Authorities, and they found child pornography. And they also seized a list of the computer students. So they were ...and I don't know if all this detail was in that first phone call, but that was the, the general information.

    And that the detectives had spoken to ▮▮▮▮, and ....

Q: Well, we should talk about that. I mean...

A: Sorry. Yeah. I don't know.                          14:40.00

END OF PART TWO

---

BEGINNING OF PART THREE

Q: So you were going to tell me how you first heard about something happening at the Friedman house.

A: Yes. I received a call from the mother of a friend of my son, who was probably my most direct contact, both in finding Friedman after school computer classes, and throughout the later unfolding. And I was just shocked to hear what she had to say – that um, this major explosion, as it

were, happened. That Arnold had been found with, arrested for having child pornography. He was a pedophile. That the police were now coming to the homes of the computer students that, whose names they found, the police found on a list in the house.

And that they had spoken to her son, ▮▮▮. And that they would be coming to our house very soon. It was Detective Merriweather and probably Detective Durkin, I believe. The partner.

1:12.00

Q: Did she say whether her son at that point had said anything happened in the class?

A: Yes, she did. Um, she said that, um, she said that ▮▮▮ had told the police – this is according to my memory, which is human – she told me that ▮▮▮ had talked about things that had happened in the computer class. And I believe that she said that the detectives had been there for several hours, and that ▮▮▮ made a statement.

Q: What was your thought?

A: I was just shocked. It was out of – it was like an explosion. It was like my life or my senses or my experience were just turned upside down. It was, it was that sort of shock in that dreadful sense of your life's not going to be the same anymore – our life is, our lives as a family or as a community. I didn't necessarily think about the community at that time, but I certainly just thought 'Wow, this is just unbelievable, and how can this be? And yet the detectives are coming to my house.'

Q: Does it seem, some people would say 'I thought right away that my son might have been molested'. You didn't seem to have that thought.

2:41.00

A: That was not my first thought, my first thought was not that Mike had been molested, although there was a process that I went through over the next few days, weeks, months, to, that was highly convincing that he was molested – to the point where I was sure at the end of all this maybe two-year process, maybe year-and-a-half process, I was sure he was.

But in the beginning, it was just that short of shock and some kind of denial process, I suppose.

Q: I'm going to take a pause...(adjustments)...

3:40.00

END OF PART THREE

---

BEGINNING OF PART FOUR

Arline Epstein - 7

**A-0238**

| | |
|---|---|
| Q: You didn't really – let's go back to that moment, though. You had no reference at that time to think that, because of Michael's behavior or because you had …in the classroom and something happened. But at that point, you didn't have any, your mind didn't go directly to Michael. | |
| A: When I heard that the detectives were coming to my house, I had no, no point of reference that 'Oh, yeah. Something was funny.' If that's what you mean? Like it was absolutely out of the clear blue to me. There was no context in which I could put it. | |
| Q: How quickly did the police come? | |
| A: I don't remember. I thought, I think it was within the next hour. Hour or hour and a half or two hours perhaps. I don't have a clear memory, but they definitely came. It was Detective Merriweather and I believe, as I said, his, I believe his partner was Detective Durkin. | 0:39.00 |
| Q: And tell me about that. | |
| A: I don't have very strong memory about when the detectives actually came. I mean they came. We said 'hello'. They explained why they were there. And they asked to, they spoke to I think my husband was home, I'm not sure. So they spoke to us. And then asked to speak to Michael. And I consented. I really don't have a strong memory of the details. | |
| Q: But they wanted to speak to Michael alone? | |
| A: Yes. They did. They wanted to speak to Michael alone. | |
| Q: Did that seem appropriate to you? | |
| A: I think it felt …I don't know that I even thought about whether it was appropriate, to be honest. A lapse of motherhood or whatever. No. It feels like a, it feels like a moment of, um, of maybe not exercising discerning judgment. But I, I was, I consented to them speaking to Mike alone. | 1:52.00 |
| Q: And how long did they speak to him? | |
| A: I don't recall how long they spoke to Mike. I would say an hour – between an hour and two hours. But I don't, I'm not clear on that amount of time they spent with him. | |
| Q: How did that conversation affect Michael? | |
| A: After the conversation, again, you know, it's, it's kind of amazing that I | |

Arline Epstein - 8

don't remember that clearly – how it affected him. He, he did not want to talk about it. He didn't want to talk about it with us. And I, I let him kind of have his space. I obviously asked how, how it went, or how did he feel about it. But he seemed … not wanting to talk about it. And I'd say upset, in a kind of quiet way.

Q: At what point did it become known to you that he was a victim of Arnold's crime? …    3:31.00

A: It was a, it, it was a process by which I became aware that he was a victim. A very long and convoluted process. We can jump forward to when Arnold made his closeout statement in early 1988. So several months after the detectives came to our door and the investigation began, which was, as I recall, the, the week of Thanksgiving in 1987.

When Arnold made his closeout statement, he named lots of names of children, because I guess that was the process through which he, um, was setting himself up for not being, having other accusations. So closing out the case. And I believe it was Sgt. Gallasso that told me, or I learned from Sgt. Gallasso but via another person, either a therapist or another mother - I cannot remember if it was direct or not, that Arnold said that Mike was not one of his favorites, and, and that was a strange feeling. Like he's naming my son. And he's saying that he did things to my son. But that he was not one of his favorites.

It's just very bizarre. There's something about that. Okay, so back up to 1987, Thanksgiving – there was a, a snowballing process, I would call it, of information giving and receiving that made it more and more convincing that our son had been sexually abused at the Friedmans. And I think that very much of that came from information that Det. Sgt. Gallasso gave us, and other people from the Nassau County Police, gave parents along the way, of 'We found…'    5:32.00

They would say, for example, 'We…' They would repeat the detail of the federal child pornography case. They would talk about how, when the search of the Friedman home was made, they found stacks of pornographic materials. They found photographs of naked children. And it seemed that it was a, they were very sure that something must have happened, other than outside of the child pornography coming in through the mail.

I would say the police were convinced, and they were very convincing. So that was the beginning of my thinking 'Well, if it happened like that, and if it happened to so many kids' – although it, at a time of a, one particular meeting of parents that I recall, it was a, it was a private meeting. It wasn't in a school or, it was called for a group of parents, and I was included, of children who had been questioned by the police. And I    7:48.00

**A-0240**

remember that we were told that there was devastating evidence. And we were also told that, at that point, thirty children had been – this was, we were told by the police, that thirty children had been interrogated. And of all those children, none had said that any sodomy had occurred. But that you usually have to go back to children and speak to them more than once.

And that, and by this time there were children who had made statements. So maybe it was on the, for a few it might have been during the first interview. Not in that group of thirty. Or they, or within that group of thirty, I gather that those children might not have named sodomy as one of the, one of the acts. But, so it was, it was a gathering of momentum, a gathering of evidence, of evidence. | 8:49.00

And also from, there were very early meetings in the community. There was a meeting, I believe it was mid-December. It was like a, almost like a public service. Like the, I believe, Det. Sgt. Gallasso was there. Joe Onorato, the ADA. And from the very beginning there would be psychologists and psychiatrists and experts on child sexual abuse who were invited to speak.

And I remember that – oh, and there was another meeting a month later in January, mid-January of '88, with a similar line up. It was, that was at either Saddle Rock School or Ian Baker School. So there would be psychologists, and psychiatrists, and representatives from the police – usually Det. Sgt. Gallasso. And then maybe other outside experts in the field of, of child psychology and sexual abuse. | 10:15.00

And in, from the beginning, the emphasis by a therapist was universally one of 'It's common for children not to talk about what happened to them. We want to help these children. We want to allow them to heal, and the way to heal is to come to a place where they can disclose what happened to them. It's much harder on them if they do not discuss it.'

So looking back, it seems that there was a tremendous momentum. And I believe that the therapists were convinced that something did happen. I have no sense that the therapist, under any circumstances, tried to create something that wasn't there. Or make assumptions. Or leap to conclusions. I believe we were all led along to this belief – I mean not 'all'. Clearly there were parents, from what I know at the time, who did not believe anything happened. Or if it did, I don't want to have anything to do with the police. And so forth.

But those who did accept and believe that something happened, it seemed that much of the information both that the parents received and that the therapists received came from the police. And when, when the

therapists later – this is jumping ahead a little bit, but when the therapists did initiate group therapy for some of the child victims, and for parents of those children, they were going on the basis of Arnold Friedman's guilty plea. And the closeout statement that disclosed a lot of child sexual abuse.

Q: Your son was very clear, from the time the police came…

A: He was very, my son was very clear that, he told us nothing happened. And um, so I was hoping nothing happened. And gradually, a this outside information came storming in, it became more and more convincing. There were more and more messages from psychologists that they will be in denial. That, you know, and there was more and more sense of something did happen. And we need to address it.

   That I gradually came to believe that something happened.      13:36.00

Q: And that your son was…

A: And that he was not – not so much, I didn't assume he was in denial. I assumed he didn't want to talk about it. I assumed it was very painful to talk about it.

Q: And when you tried to open him up to the idea of talking about it, what was his response?

A: His response was 'I don't want to talk about it.' And really uncomfortable and short and just…not, I mean not like nasty or anything. Just 'I don't want to talk about it.' And so I didn't try to talk about it that much with him, but I did enter into a process whereby he would go to, eventually go to group therapy. Which started in the very end of 1988. I think.

   So it, it wasn't that I was, I think that it wasn't that I was not …well I guess it was that I wasn't believing him, or that I wasn't believing that it was possible that nothing happened by this time. It was, there was just this momentum, this snowballing, or this powerful sense that it must have happened.

   And what also happened along the way to convince me that something happened was that gradually children would make statements in front of the grand jury that would not just talk about what happened to them, but they would talk about what happened to other children in the same computer class. I believe it was at that point where someone would name, 'Oh, and Michael was there.' And 'Oh, they did it to Michael', or 'Oh, I saw them do it to him.' Or 'Everyone was involved without exception.'      15:27.00

**A-0242**

That got to be a place where I felt I would be in crazy denial not to think that something happened. In retrospect, of course, I can see that that wasn't necessarily the wisest and most convincing decision on my part. But it was just, it just felt clear, and it felt like, almost like taking to heart the psychologist's advice of like take it in, deal with it, get on with it. And it will be better for your son if you do that.

Q: I had a lot of questions about these meetings with the psychologists, but just to go back for a second. Was your point where your son went from 'It didn't happen, I didn't see anything happen', to 'I don't recall it happening.' In the beginning you said yes, he said it didn't happen. But then very quickly you start saying, 'Well he just didn't want to talk about it.'

A: I, I'm not sure that I really remember clearly when he went from 'It didn't happen', to 'I don't want to talk about it.' And it might have been concurrent, which was a little, you know, little hard to parse that. I'm not clear about when that happened.

16:58.00

Q: Did you feel – and think about this for a second – did you feel sort of a communal pressure? I'm not talking about people saying…'Well you know ….you're in denial.' But more of a communal pressure in the sense that there was so much, like people talk about the momentum. Like the mothers. …               and all these boys who had sort of, at some point – and by the way, in her interview, Gallasso is very clear that nobody said anything happened to the second or third interview. Nobody in the first interview had said… Did you feel pressured from those other mothers to sort of, because those other mothers had children that said your son was a part of this, to believe it?

A: I don't think I felt pressured by them to believe. I think that what they were saying happened to their sons, and what some of their sons were saying happened to Michael, was part of the general context that led me to believe something happened. I don't think, I don't think that any, I don't think I felt pressure from them to believe that. But they were, um, their situation and their beliefs were convincing. So without feeling the pressure that I had to believe that.

And I also knew some of these people before this happened. I didn't know, some of the mothers I met only after the Friedman case started. But I knew a few of the mothers before. And I never had any sense that they were other than very caring, very protective of their children, and out to do the best that they could for their kids.

19:36.00

Q: In retrospect, knowing that       has recanted, fully recanted, and said, you know, what do you think, how do you think his mother ….?

A: I hesitate to project how a person's going to respond to something that is a huge surprise. I, I don't know. I can only hope that my experience, the positive part of my experience... When my son told me – actually Michael wrote us an e-mail, because we were on different continents. We were traveling, and he wanted to get the information to us as soon as he could – that when he told us that as far as he remember, I mean he told us that no abuse happened to him in, at the Friedmans. And as far as he knew it didn't happen to anyone else.

So the shock that I felt when I read that I can only hope that any other parent would receive that with, of course, surprise, but to see in that the hugely positive sides of this. That truth has a momentum of its own. And I'm hopeful that that is something as human beings we all want to respond to. We all want to do the right thing. And yet acknowledging that it's, it's very hard for the human mind.

You know, I think once we are in any situation that's intense and aversive and difficult and horrifying to some degree, that the mind tends to narrow in, and it can shut out things that don't fit in the pattern. So what the consequence of hearing from a child that it didn't happen, and of course trusting that child, is that we have to turn things on our head and see, we really have to look at what happened and, and what the new story is now, what the new reality is now. It's not easy. But it just feels like it's time to get at the truth, and that we are, as a community, as former Great Neck residents or continuing Great Neck residents, it's a very rare opportunity to be able to look at something that happened twenty-five years ago, and perhaps come to a radically different outcome.

21:31.00

END OF PART FOUR

23:23:00

---

BEGINNING OF PART FIVE

Q: How many times did the police come and visit Mike?

A: The police came twice to visit Mike, and it was a different team each time. The first was, the first team was Merriweather and Durkin, and the second was Detective Squalia and I think Detective Brimlo. I have their business cards.

Q: And did you sit down on the second interview with them, or..?

A: I did not. They also spoke to Mike, I did not sit down with the detectives. They spoke with Mike alone.

0:36.00

Q: And how long was that interview?

Arline Epstein - 13

**A-0244**

A: I don't remember.

Q: And after that interview – what was the result of that interview?

A: I don't remember any different results, and I don't remember any result that clearly, but Mike continued to not want to talk about it with us.

Q: Not want to talk about it? Or did he say nothing happened?

A: Um, I don't remember.

Q: Did the other parents sort of tell you how the detectives had treated their children during their interviews?

A: I remember one case the mother said that, I think it was on the second visit of the detectives, that maybe it was Merriweather had come back and that Brian seemed willing to talk. And that afterwards he was doing fine, and he felt relief for – and he slept well. I just remember that. It was a very personal touch. | 1:56.00

Q: Is there any talk about the police tactics at all? In these meetings? Anybody say, 'Wow, the police were really aggressive with my child'? Or 'They're really kind of like leading my child'?

A: You know, I think I heard about the tactics the police used more after the fact, after, after the meetings were over. And after people whom I knew had been, had been questioned. I do remember, though, that right from the beginning it seemed like the police were spending a really long time with many or most of the children. I won't say 'most', because I don't know most. But with the children I heard about, the police were spending a long time. Hours.

Q: When did Jesse come into the conversation?

A: Well, Jesse was of course arrested the day before Thanksgiving with Arnold. So he was like on the front page of the paper. So he was really very much part of the Arnold and Jesse case. I'm not sure where this is going to go. | 3:00.00

Q: Well in your notes you had said that in the beginning Jesse had very few counts. Or there was, you know, there was no sodomy counts or nothing like that…

A: Oh, all right.

Q: And then later got worse.

A: Oh, okay. Right. So I'll just start from the beginning.

Q: Or we can go later through the notes and ….

A: Okay.

END OF PART FIVE                                                4:40.00

---

BEGINNING OF PART SIX

Q: ….a couple of days…with him and he said that he would come see the reel when he got back early next week.

A: Really?

Q: He said that a couple times already.

A: Okay.

Q: And something always comes up. But …Did any of the other mothers tell you that they had heard something from their children or noticed something about their children's behavior that was unusual around the classes before the police came?

A: None of the mothers that I knew said anything unusual happened before the Friedman class or, or after. No. I, I never heard anything like that.

Q: And when did you first hear the specifics about what was alleged, the sort of games and the mess, multi-perpetrators, and the…?                                                0:43.00

A: It seemed like it just, it seemed like the case just got bigger and bigger and bigger and bigger. As time went by. I mean in the, in the beginning, it was, seemed like it was Arnold and his child porn and um, and then Arnold and Jesse were both arrested. I believe in the beginning there were very few charges against Jesse. It seemed like it was an afterthought. He was kind of an afterthought. Because he was assisting with the classes until the Fall of '87, until September when he then went away to college.

But then as the second grand jury took place, or it was convened, the result of that led to many, many more charges against both, against both Arnold and Jesse, I believe. And but then it seemed like Jesse was bouncing out of the, into the foreground as a, as a bigger player. And then towards, after Ross Goldstein was arrested in June of '88, it just felt

**A-0246**                                    Arline Epstein - 15

like the whole thing exploded. Like oh, there wasn't just Ross, there were other so-called 'helpers' at the computer class. That it, you know, this was a whole sex ring, and there were many, many people doing many, many things to a few children in a small room.

It just got bigger and bigger and bigger.      2:27.00

Q: And never gave you pause. You know, you had been to that room.

A: Yes. You know, like I said about the, my feeling is that when the human mind – or at least when my mind – is focused on something that is intense and emotional and difficult, and very hard to accept, that you can act as if you have blinders on. That your gaze, your ability to take things in gets narrower and narrower.

Looking back, it seems entirely preposterous. The charges that eventually came out, especially of Ross and Jesse and so forth. And the sex games that were allegedly played – it just does not seem…I mean, I was a Cub Scout den mother. To organize eight children into doing something together? Now I'm making light of a, of a terribly serious allegation. But it, it seemed very hard to imagine any kind of coordinated activity in a small room, with eight-year-olds, or nine-year-olds or ten-year-olds.

Having said that, we were also told, as parents, that the children were intimidated. That they were physically threatened. That some child was thrown against the wall. And other children were told, 'You see, that'll happen to you if you step out of line or if you tell.' We were told that the children were threatened, that their houses would be burnt down or their pets would be killed or their parents injured. Or that they wouldn't be allowed to register for computer classes again. I mean really strange, if they told their parents.

So there was this, somehow, a suspension of belief, as opposed to a      4:21.00
suspension of disbelief. It was, it just got crazier and crazier, but somehow it was part of this whole process of escalation. Of snowballing.

Q: They, the police told you a lot of things. They told you that there were …what were the words they used, for the amount of evidence?

A: 'Devastating'. The police said there was 'a devastating amount of evidence.' Yes. Quite a strong word. That was pretty early in the case.

Q: They also said there were photographs. That they…

A: Yes.

**A-0247**

Q: ...basically photographed ...sex acts.

A: Exactly. We were told that there were photographs. That the children were photographed in sexual acts with the helpers, with the adults, with each other. And at some point parents would say 'Well, where are these photographs?' And then it got to be a very important issue. At the time, I believe, of Jesse, deciding whether Jesse would go to trial or whether he would plea bargain. It was a bargaining point of, as I recall, that 'We don't want'...some of the parents felt 'We do not want to allow Jesse to plea unless he can produce the photographs', which people – the police, the parents, whoever – assumed were stashed away somewhere.

   And, and that would emerge later on, and be devastating for their children.

Q: In the end, were ever photographs ever found?

A: As far as I know, the only photographs that I believe were found in the initial search were of a couple of naked kids. And I heard that they were Arnold's own children. I don't know if that's true. Other photographs I don't believe were ever found.

Q: What were your thoughts when you heard about games like Leap Frog, Cum Gum?

A: Well I was, when I heard about games like Leap Frog and Cum Gum, which, I'm not even sure I ever heard of that one, but...oh, Simon Says. And a couple of others, I was pretty much befuddled. You know, someone had to actually explain what they meant by that. Well, there's a lot of ways you could figure it out if you're figuring it out on your own. And I believe that I do have, in my notes, I carefully wrote down these, these games. And, you know, with the explanation of what was, what, that, what it meant, what, what was happening.

   It seemed strange, but by this time it seemed like 'Oh, well. What, you know, this, I guess this could happen.' You know?

Q: What do you think you got most of your information from?

A: I am pretty convinced, and I have a copious store of notes from 1987, November '87 through '89. And the reason I wrote notes is that I've always felt I have an untrustworthy memory. So I kind of was a recorder of things that I heard and things that I learned and discussed – whether it was over the phone or at public meetings or, or other sources. Or from talking to Michael.

   So ...sorry, I forgot the question.

| | |
|---|---|
| | 5:05.00 |
| | 6:31.00 |
| | 8:10.00 |

Arline Epstein - 17

**A-0248**

Q: The question was ....where do you think you got most of your information from?

A: Most of my information I believe, it seemed at the time that it was coming from many different sources. It was coming from other parents, especially a group of mothers that I was connected with during and after the Friedman events. It came from public meetings. It came from the psychologists, psychologists. But, as I looked back, it seems that everyone was getting the same information from one primary source, and I believe that was (cellphone ring).......

Q: I'm sorry. Okay, so we were talking about where the information was coming from.

A: My primary sources of information at the time were, were the police – Det. Sgt. Gallasso, the police at the, well, and the Assistant District Attorney. Information that I gleaned from parents who were in touch with Gallasso or the ADA. Or parents who were speaking to psychologists, psychiatrists. Also from those same psychologists and psychiatrists who appeared at public meetings. And from, it seemed at the time that information was coming from many different sources. And part of my effort to track that information included, included writing lots of notes, because I felt that I had a fairly untrustworthy memory, especially for bad news. So I made a, I guess it was just natural that I would write things down.

9:36.00

   Looking over those notes today, however, I noticed that almost everything came from maybe one primary source- from, from Gallasso, and the police. That office. And that they, that the psychologists and psychiatrists received, received information from that source. That the parents received information from that source. That the public meetings included those people from that. So the source was continued and confirmed.

   So it was kind of the same information coming from, almost resonating within an echo chamber.

11:24.00

Q: How many times did you meet with Gallasso. Including the meetings in public meetings.

A: Uh, I would say I met with Det. Sgt. Gallasso probably three or four times during this whole process. One was at an initial meeting. It was a private meeting of parents who were involved and concerned, very, very early. It was actually before the very first arrest. And then there were at least two and maybe three public meetings, where she was present and gave, gave information.

Arline Epstein - 18

**A-0249**

I don't think I ever met with her in any individual meeting . It's very possible – I can, from my notes it looks like I had a discussion with her on the phone. Although it's ambiguous, so I don't want to say that I did meet with her over the phone.

Q: So you had a meeting with her before the first arrest. What was that…what was the context of that meeting?

12:18.00

A: It was a group of parents – I'm going to guess maybe, oh, anywhere from twelve to sixteen parents in a room – and the police did come. Det. Sgt. Gallasso was there. It might have been other detectives, I don't recall. The context was that parents, children had already been questioned by the detectives, and there was a lot of, oh, fury, worry, wonder. Distraught feelings of 'Aren't you going to go and arrest these people?' I mean it's perfectly natural in the context, that 'You've come to my house, you've talked to my son, he said that something happened, and these people are still just going about their everyday business.'

So there was a huge amount of pressure, I believe, looking back at it. Also I believe there was on the police to, to probably defuse the situation, to give parents the facts as they knew them, to tell them that there, they would be trying to build a case and that they would be arresting him. I think to keep the parents from perhaps overreacting, or reacting in a non-official channel.

Q: What was your impression of Fran Gallasso?

13:43.00

A: She seemed to be very in control of the situation. Very strong personality. Very matter of fact. I, I assumed that everyone was working to mitigate an evil, or to prevent harm, any further harm from being done, and to look for justice.

Q: She probably thought she was, too. And how often did you speak to the mothers of the other children?

A: How often? Gosh, I spoke to, um, I spoke to other mothers I would say at least weekly for many months. I was part of a group that met for lunch to discuss the issues, to decide what to do. I was the only member of that lunch group whose son did not go to the grand jury. So it always felt to me like I was an observer more than an actual player in that. But I appreciated being kept informed.

Q: And then you were reading the newspapers, too. How do you think the newspapers handled the case, or the publicity side of the case?

A: The, I did read the newspapers, and I did actually clip most of the

articles. And I feel that they, I didn't feel there was a lot of investigative journalism. I felt they were reporting what they learned from the police, the DA's office. And they did interview parents. They did represent that point of view. And very early on, they interviewed several psychologists. Or experts. And experts in the field of child sexual abuse.

Those ones they interviewed in the early days, had no, they never participated to the, as far as I know, in the counseling of the children. But their expert opinion was requested.                                                 16:12.00

Q: The purpose of the meetings that were brought together soon after Arnold's arrest to inform...there was also a dual purpose, right? It was to offer psychological counseling.

A: Definitely.

Q: Who was calling those meetings?

A: The meetings that were formed, that were offered – I'm thinking in particular of public meeting, one I believe it was mid-December, and I didn't keep notes on that one – but I, I recall, another note referred to that. That yes, and like other meetings later, there was Det. Sgt. Gallasso, Joe Onorato – I believe he was there – and then, and then specialists in child psychology.

So from the very beginning, there was this shared platform, so that yes, these things happened, but we, we know that we, you know, your children will be offered therapeutic process by which to deal with this. And another meeting occurred a month later in January, mid-January. It's a similar line up. Not exactly the same people. And that would, the     17:32.00 auspices, it was under the auspices of the, the Great Neck School District. We met at, um, it was either Saddle Rock School or E. N. Baker.

And again, Gallasso, I believe Onorato was there, and then psychologists. And including Sandra Kaplan. I believe she attended both meetings. And then other people who were outside psychologists.

Q: Do you think that the psychologists were trying to deduce therapy upon the parents, to tell them 'Hey, your child is going to need therapy, and they should be in therapy immediately'?

A: The psychologists were strongly in favor of children having therapy who experienced this kind of child sexual trauma, or, but several times along the way it was, we were told that it wouldn't be appropriate to start therapy until the convictions occurred or the guilty pleas. And I know that the, the group therapy that eventually started happened, oh, it began in late '88, so it was about a year after the initial arrest. Arrests.

**A-0251**

Having said that, the therapists were very strong about 'This is, is, this would be helpful to your children.'

Q: How do you tell a parent whose child, who believes his child has gone through this, to wait. Did parents wait to give their children therapy?

A: Actually, no. In my experience, the parents did not wait to give their children therapy. Many parents sought out individual therapists at the time that this, this occurred, or soon thereafter. So they felt that it doesn't, if group therapy is coming up fine, we'll participate in that. But in the meanwhile we want our children to have the benefits of therapy.

Q: And those therapists that were at these meetings usually were the recommenders of the therapists that would be the individual therapists. Is that true?

A: I don't think I understood the question. Sorry.                    19:43.00

Q: Well basically Sandra Kaplan is telling people where they could find their therapy, and who they should, who they should talk to about therapy?

A: Um, Sandra Kaplan was there, and she did – at both of the meetings I mentioned – and she did, she did talk about that there, North Shore Hospital, the Department of Child Psychiatry that had a specialized child sexual abuse section, that they would be offering therapy to the parents and to the children. That was clear from very early on.

Q: And in your notes I see the names of the people I recognize that I've heard about before – Dan Williams, Arthur Green, other therapists that have sort of rotated through this case. And Williams is a hynotherapist that everybody talks about. And these notes are from these original meetings. So regardless of the fact that, in some oblique way, the police were saying, 'Well, it's not a really great idea to go to therapy before you testify at the trial', the parents were bringing their kids to these sort of therapists who were applying this sort of therapy, this therapy to 'recover memories' that they had buried or are in denial about or dissociated from. Is that what your experience was?

A: My sense is that parents brought their children to therapists. And I do remember that one person was going to see Dr. Green. I remember his name coming up. I don't remember who what was. And there was talk among the parents that I was familiar with about some child having gone for hypnosis therapy, and that the name 'Dr. Williams' was been       21:41.00
mentioned.

I don't have direct experience of any parents whose children did that. But they were, the children were, very many of them I believe, were in therapy. Individual therapy. But I don't know if it's fair to say that they were encouraged to come up with memories that they didn't have, or if dissociation was discussed in those therapies. In many cases, these were children who had already testified. So I don't feel qualified to, to say.

Q: Testified in the original indictment. There are two more indictments yet to come.

A: Yeah.

Q: Let me rephrase that.

A: Okay.

Q: What do you think the goal of these therapies that were being offered, what was the goal for your child? What was the cure that was offered?

A: Okay. I believe that the goal for individual and probably group therapy as well was articulated as follows: It was very common for children not to disclose this kind of abuse. That it would be extremely healthy for the children, since we know that it happened, it would be extremely healthy for them to discuss what happened at the Arnold Friedman home, and to then begin a healing process.

   So it was to help them remember. Not necessarily with hypnosis, but to give them an opportunity to remember, and then to heal.

Q: Because the overarching idea was that these children couldn't remember the abuse that happened. That the majority of the children who were abused did not remember it.

A: The majority of the children who were abused did not remember. Wait a minute. Wait a minute. No. No.

Q: In other words, what I'm trying to get at is, I'm not trying to put words in your mouth, but basically – and you tell me if I'm wrong – how I see it is, you know, your son certainly puts it very clearly. He says there was never talk about these things happening. The talk was always about 'Do you remember that happening?'

A: Oh.

Q: So in that context, the therapy is largely about trying to get to the, to these hidden memories, that, these awful hidden memories had been

| 22:32.00 |

| 23:59.00 |

buried into the minds of these children. And the cure is the memories being coming out, and then telling what really happened, which everybody knows what happened, but they have to, they have to come to terms with it. You know? So you set up this sort of situation where saying things didn't happen is not an option. Because if you say it didn't happen, it's because you don't remember. So I guess what I'm trying to get at is these meetings, which were largely sponsored by the Nassau County District Attorney's Office, to help to engage the parents in a conversation with psychologists, were largely about getting psychologists to retrieve these memories, help their children retrieve these memories that they had buried so deeply, and weren't about getting to the truth of things. Were not about listening to what the child was saying. But almost denying what the child was saying for a larger truth that they had buried. So you were at these meetings. You're a very rare person – we don't have anybody else who was at these meetings. So I'm kind of wondering what, what was being pitched? I mean for a lack of a better word. And in your notes, all over your notes, it's all about dissociation and denial and kids not speaking about it.

A: Yeah, yeah.

Q: And my gut is, from what I've heard from the children, is what was being pitched is 'your child is not remembering the abuse, and that's normal. That happens. And the best cure for them is for them to remember – not to tell the truth they know, but for them to remember. I think you got there. But let's try it again.

25:46.00

A: Yeah, let's try it again. Right.

Q: And, so I guess, to start that question, at these meetings that were called to discuss the psychological options that were available to parents of these students, what was being discussed?

A: The psychologists at these meetings discussed the, the fact that children who don't remember are probably repressing – or I guess they used the word 'dissociating' – so that the memories, the memories need to be brought up, or brought forward. And that therapy would help with this process. And that it was furthermore a very healthy process for a child to discuss what they assumed, the therapists assumed, would, had happened, and to then be able to heal.

Q: And you were at this meeting, and you believe that to be true?

A: I found it convincing that a child who would be able to speak about something horrifying that happened would be able to go through a healing process.

Q: And so you decided to put Michael through this therapy?

27:09.00

A: Yes. I decided to put Michael into the group therapy, and I entered in the adult, the parents' group.

Q: Did you get to sit in on these therapy sessions with Michael?

A: No. The parents were not invited to participate. And I think they were at the same time as the parents' groups

Q: And what were the parents' groups like?

A: Um, there were two different groups. I believe that one group of parents was those parents of children who did not make accusations – formal accusations. And the other group of parents whose children did. I was in the non-complaining, non-complainant group. There was a social worker leading, I believe it was Carol Samut, leading this group. And it was, you know I can't remember specifically what was discussed. We discussed things like talking to your children. Ways that they might be acting out. How best to help them. How…

And of course we talked about our own angst and our guilt and our worry and even doubts and so forth. And general issues within the family. It was very practical, actually. Practical therapy.

28:33.00

Q: How were they suggesting you help your child?

A: Uh, I don't remember that clearly. I'm sure that part of it was to help the children talk about what happened. And obviously to be alert for any adverse reactions or acting out or symptoms that would show distress or worry or, or anything. But I don't remember much more than that.

Q: So Mike at this point is saying things didn't happen that other kids are saying happened. He's been implicated. No one seems to believe what he's saying. He has to go to therapy with other kids that say things happened. And his mother is being indoctrinated into the, into techniques to get him to say things happened in the next room. How did that affect Mike?

A: I believe that during this whole process that, when he was in group therapy and when I was in group therapy, and, I was trying to heed the advice of the psychotherapists, psychologists. And my approach was to lead him as gently as I could into a comfortable situation where he would disclose. I had assumed things had happened to him. I thought it would be healthy if he could talk about that. His reaction was, 'I don't want to talk about it'.

30:28.00

And he continued in that, in that vein. And finally he came to a place where he, he would, he did talk about it. And the way we did that was we went, we kind of cuddled in my bed, and we put pillows between us – I don't remember why – and we turned the lights down, and I just very gently asked him, 'Well I've heard that this happened to you, and is that true? And I heard that that happened to you, and is that true?' And so forth.

And my feeling, the reason I did that, in that, with that technique, was I thought it might be easier to say 'yes' or 'no' than to, for him to say 'yes' or 'no' than for him to actually speak with words what actually happened. So in retrospect I know that he was going along with it, and just figuring, as he did with group therapy, 'Okay, I'm going to just say something happened, and then we'll put it all behind us.' I know that because he told me that, recently.

Q: But there were clues, to some extent. And those clues could be read either way, right? I mean he wrote angrily in your book.

31:43.00

A: Yeah. Mike wrote angrily in this, Mike wrote a quite angry uh list of names, I guess it was, Ross, Ross and Arnold and Jesse and, and with some profanity and stuff in a kind of wild handwriting. A lot of energy around it. So that was a clue like, 'Okay, he's..' Was it a clue that he was finally being able to come out with, to acknowledge what happened to me or, and in the group therapy.

Looking at it from the other point of view was a clue that he was frustrated and pissed off and, and just 'Let's get on with, with life', kind of thing. He also wrote, I also found very recently this, this note that, that was in the same notebook that I used for a little while when I was talking with Mike, and gently – I thought it was gently, he probably thought it was persistent leading him to disclose what happened. And at the time I don't, either didn't see this, this note, or else I, I saw it and did not understand it. But looking back with hindsight, I can see – he wrote like acronyms. Like the initial of each word.

And IDWTTAI and IDR and IT. And instantly, this is like a month ago, I looked at this, I thought, 'Wow! Where did this come from?" And I instantly knew it said, 'I don't want to talk about it.' I don't remember.' 'I lied'. And it's just pretty incredible that this cryptic bit of evidence – he couldn't come out and say it directly 'I lied'. I mean he was saying 'I don't remember', but he wasn't being believed. It just seemed like the, the syndrome of denial. But he was persistent and strong enough to put this down in writing.

33:36.00

Q: And you refrain, because of the background noise, I want to take just the last part of that. …(instructions)… Can you hold it up as if you're

showing it to me, and just IDW…'

A: Okay.

Q: So you found this, this piece of paper.

A: I found this piece of paper, and it was in the same notebook where I had been taking notes of things that Michael was disclosing to me, finally when he was starting to disclose. I, I found it just a month ago. I, at the time I either did not see it at the time, twenty-three, -four, -five years ago, or I saw it and it was just too mysterious. It's this, amazing for a nine year old, it's an amazing thing that he wrote.

    It was, he wrote in, in just using the first letter of each word – IDWTTAI. IDR! IL! With quotation marks. At the time, if I saw it, I had no idea what it meant. And, and a month ago I found this, and I was just dumbfounded. I thought, and instantly I knew what it meant. 'I don't want to talk about it'. 'I don't remember'. 'I lied'.

    And it was just so kind of a combination of shocking and poignant to realize that this nine year old was writing this message to, to me, cryptically, and I never go the message – except in hindsight.

Q: What does that message mean to you?

A: This means to me that he, he knew that he had to – first of all it meant that he knew he had to be cryptic. He couldn't directly really say 'I lied' at that time. It meant that he was the strong and stubborn kid – stubborn in a good way, usually – strong kid that knew his own mind. And that he was not going to be bowled over by all this. He was not going to be taken along. And do what was expected of him.

Q: But the only way he could express that in this world he was living in…

A: Yes, in this world he was living in, it was, it was better to go along with the flow, and to put it all behind him once – he had a sense that, if he, if he told the therapists that something happened, and he told his mother that something happened, that he would, soon enough it would just go away. And sure enough it did. It was, he was wise. And he was right.

    And it was only later that he was able to say 'Nothing happened.' And it was obviously he said it as an adult, so it was very credible, especially in light of all the other evidence that is coming forward.

Q: And who he is.

A: And who he is. Yeah.

34:50.00

36:52.00

Q: Okay, let me catch up. … These public meetings that took place, did anybody ever stand up and raise doubts?

A: Yes. I remember one parent who, who said that there was contradictory evidence, or contradictory information from what the DA said and what children had said. There were, also at the very first unofficial or private parents' meeting, I believe it was the DA who, or, I'm sorry, Det. Sgt. Gallasso, who said that we, they had interviewed thirty children and none had disclosed any sodomies that had occurred. So there were, there were doubts. And there were, certainly I either knew parents who were doubtful, or the parents – especially the mothers who I had a relationship with during the Friedman issue, case – would talk about parents who, who were completely dubious. And I, you know, I guess in some ways they were called the ones in denial. As I recall.

But I just didn't know. I just didn't know. Maybe, maybe I felt that they were in denial. I guess I wasn't investigating very deeply.

38:37.00

Q: So this even sort of cleave, started to cleave the community, and in so many ways. It started chopping the community up. You know? I mean I've heard, besides the awful answering machine messages from the Friedman house – and those are obvious, obvious attacks against the perpetrators….there were parents who were saying that other parents were in denial, and that the fabric of the community was being torn up.

A: There were parents saying other parents were in denial, in no uncertain terms. There were other parents saying – that I knew. I didn't know many of the parents, because this, this involved children from at least three different schools, maybe four – so there were other parents who just kind of didn't want to deal…they, they felt that they dealt with it. In, in one case, a child did go to the grand jury, but the parents did not choose to send the child to the group therapy, for example.

So I realize there was a lot of difference of opinion. And I also, as things went on, when ▮▮▮ – ▮▮▮▮ – was named as a friend of Jesse who might have been implicated, who might have been involved. All the parents I knew were boycotting ▮▮▮▮▮, and I think my son remembered that. It was just like, it was, yeah, it was a cleavage in the community. There was definitely antagonism and, and hurt feelings. And friends who stopped being friends.

40:34.00

Q: And emotions. I mean, the people got extremely emotional about this.

A: There were a lot of emotions involved in this case. Very….

Arline Epstein – 27

**A-0258**

| | |
|---|---|
| Q: Give me an example that you remember of an emotional sort of reaction that seemed to be completely caused by this, this tension that was building in the community.<br><br>A: Um, I remember very early, around the time of this first private meeting and before the first arrest, so it was before Thanksgiving '87, that I was told that one of the fathers went to the Friedman's house to, to do whatever – don't know, to threaten them or something. And that he was arrested by the police. I mean that was, to me that was pretty outrageous. However you felt. I understood the, the horror and the rage, but I did not understand the behavior.<br><br>Q: Do you think there was a, do you think overall, once the community had decided, once the community had pled, and the community decided there was something that happened there, that people, that there was pressure from certain parents on other parents to believe?<br><br>A: I think once Arnold had pled, that there was, there was definitely pressure on, on the part of some parents, that pressure was put on other parents to believe. And I, I was, um, not directly involved with that. I did not directly experience that. But I was present at lunch meetings and so forth among, among the mothers who, some of the mothers who would report what happened with their neighbor, or 'This person just denies it and I said they were in denial and they don't want to talk to me anymore.'<br><br>　Something like that. I don't have really specific examples. But I was very aware that that was happening.<br><br>Q: Incredible. There's notes you have about how the boys started to treat each other in school, out of school. That these boys were all very close in this class, obviously.<br><br>A: Uh huh.<br><br>Q: And these events, the pressure of it, they started to take a toll on them.<br><br>A: Yes. There was a, there was a few episodes where, I remember one where one of the, one of the kids in the class spoke at school to my son regarding this. It was a simple question of 'Did the police come?' or something like that. And I was told by the child's father about this. And, and it was clear that my son reacted negatively because it was not the right context. It wasn't the group therapy. It wasn't private. So. And the father was very understanding. He actually, he really got it, and he understood that Michael would be, feel jeopardized by that.<br><br>　So that was one, one situation. Another that I heard about was that, | 42:02.00<br><br><br><br><br><br><br><br><br><br><br><br>44:03.00 |

um, somebody – oh, gosh, I'm losing my facts here. Sorry. … What was the deal? Who hit whom? ▇▇ got hit, right?

Q: No, ▇▇ hit ▇▇▇▇▇▇▇▇▇.

A: Oh, okay. There was another situation that I heard about where one child hit another one, and it was kind of payback for talking out of turn, or talking in public about the Friedman issue. So it was, you know, emotions were very tense among not just the parents but the children.

Q: And these children were ten, eleven years old at this point.

A: At this point, yes. They were ten or eleven years old.

Q: So now Mike put a finer point on it, is going to therapy. He's being told that he doesn't, that he needs to tell the truth about what happened, he needs to come to terms with what happened. You're gaining therapies through your therapy on what's happened. And he's going to school and his friends, who were his good, good friends in the class, are telling him that he's got to…keep pressuring him in ways that he's got to join the group. It must have been very, very tough.

45:01.00

A: I think it was extremely hard on Michael. I think it was terribly hard on all the kids. Those who had made accusations at the grand jury, those who had not. I think there was just a huge amount of turmoil and pressure on the kids. The group therapy sessions, we did receive very general reports from the therapists that ….I remember one that, where a hitting incident occurred that the therapist said, 'Well we're working on compassion now.'

So it was, it was just, it had to be a horrible and excruciating time for all the kids. No matter what they believed.

Q: So Mike, he went to the group therapy, therapy for a time. Who paid for the group therapy?

A: I think that the group therapy was provided free of charge to the parents. I have no physical evidence of that, but that was definitely my impression – that it was free. (cell phone ringing.)

END OF PART SIX

46:52.00

BEGINNING OF PART SEVEN

Q: And to put a little finer point on the 'when' of the group therapy, you, you remember the group therapy happening after Arnold pled guilty?

| | |
|---|---|
| A: Yes, I remember that the group therapy began quite a while after Arnold pled guilty, which was March of '88. I have in my notes that, at one of the meetings with officials or psychologists, I don't remember which meeting, that the therapy was going to be scheduled to start I believe it was the middle or end of November of '88. In fact, that, another note said it was delayed a bit. So I'm going to guess it started either the very end of November or early December of 1988. | |
| Q: And where was Jesse in all this at that point? Do you remember? | 0:55.00 |
| A: At the time that the group therapy started, Jesse had been arraigned twice. …. | |
| Q: He had had two grand juries. | |
| A: Two grand juries by then. Because there were three. | |
| Q: Am I right, Alex, do you think? | |
| A: The third one was….well hold on. I have the timeline. See this is where I go like 'ohhhhhh'. Okay, hold on. … okay. First indictment, December '87. Second indictment, February of '88. Third indictment, November '88. | |
| Q: So what's that? | |
| A: The group therapy was originally scheduled to start in mid-November of '88. And right then was the third indictment against Jesse and Ross Goldstein, Jesse Friedman and Ross Goldstein. And we were told that the therapy would be postponed, which it was, by maybe a couple weeks. So it looks to me, from that, that the, they were perhaps waiting to start until they could say that there were even more charges, it was even more obvious that the children needed therapy. | 2:08.00 |
| They did not wait until Jesse pled guilty in my recollection. | |
| Q: But you've seen that article from before the third indictment where Gallasso clearly says that new charges had been brought against Jesse, charges that had been discovered by therapists in session with the children. So regardless of when the group therapy started, there was still communication between the therapists and the police or the parents and the police about what kids were saying in therapy happened in the classroom. | |
| A: Yeah. It's clear, looking back, that although the children had not started group therapy until December of either late November or | |

December of '88, that many of the children were in private therapy, and that there was, that the police did find out about information about what children were saying in private therapy. And that in fact that we were told that new charges did arise from what children had told their therapists. So the parents knew that, the police knew that, the therapists knew that.

It seems like this, in retrospect, like a big, open um information pool, or morass, or something.

Q: So what did, what kind of techniques did they use? You told us about your group therapy. What kind of techniques did the doctor say they were using in the therapy with the kids? Did they give you specifics? Or you were sort of kept out of that?

A: I, as I recall the therapists gave us just a general idea of what techniques they were using in the group therapy. As, one was compassion when compassion was called for. When there was some conflict between, or among the boys. One was encouraging the children to talk about the, the group sexual activities that include, that occurred, or allegedly occurred. And the, I remember being told that that was the most difficult thing for the children to talk about.

4:56.00

As far as other techniques, I don't have a clear memory of, of what we were told.

Q: How long did Mike attend group therapy? How many sessions do you think he did?

A: I, I'm not sure how long group therapy went on, but my impression was that it was, oh, over the course of about four months, approximately, and that there were weekly sessions but with lots of breaks for holidays. So I would guess approximately anywhere from eight to twelve sessions.

Q: And he continued going?

A: Yes. He was, he continued therapy – in fact he started individual therapy with one of the therapists during the course of the group therapy. And I, my feeling in doing that was that at least this person would have a history and wouldn't have to sort of start from scratch with a therapist.

6:22.00

Q: And that was who?

A: That was Dr. Pelcovitz. Dr. Pelcovitz. And Mike continued with David Pelcovitz after the group therapy had finished. I think it was about another six months or so. It could have been as much as a year. I don't know.

Q: And all through this, even the group therapy and now the private therapy, what is Mike saying about what happened?

A: (sigh) During the group therapy and the private therapy, the therapist was telling me that Mike was talking about things that happened at the Friedmans. Not every topic, and it was harder for him to talk about certain things with, with us at home. He was not talking until – you know I think it was during the group therapy that we, he and I would have our quiet discussions, and I would, as gently as possible, give him the opportunity to disclose what happened.

    So he was clearly reluctant, and clearly, after our discussions were over, he didn't want to talk about it at all. It was kind of closing it, like shut.

Q: And at what point did his sessions with Pelcovitz end?

A: The sessions with Dr. Pelcovitz ended, oh, maybe six months to a year after the group therapy ended. And I believe that the doctor and we agreed that he was going to be fine, and it was just an appropriate time to end the therapy. It just...

Q: Was there a reason? I mean if he was still staying nothing happened, or he was saying something happened.

A: He was telling the therapist that things happened.

Q: Yeah. Did Dr. Pelcovitz ever offer hypnotism?

A: I personally wasn't aware that Dr. Pelcovitz offered hypnotism. Although he may have mentioned it in passing to us once. But he never seemed like insisting or saying it was the only way to go or important to do.

Q: Do you think Dr. Pelcovitz ever considered the idea that, that Mike was being honest when he said nothing happened?

A: It's hard for me to say if Dr. Pelkovitz entertained that opinion that Mike was...

Q: What did he tell you?

A: By the time Mike was seeing Dr. Pelcovitz privately, Mike had already spoken in the group of things happening, or concurred. That's, that's my memory of that. So it wasn't like I wanted to continue, have Mike continue therapy so that someone could beat it out of him. It was more like, 'Oh, oh, okay, so he's acknowledged that something happened, and,

| | |
|---|---|
| | 7:36.00 |
| | 8:57.00 |

**A-0263**

and this individual therapy might be a good addition to the, to the, a good support for Mike, in addition to the group therapy.'

Q: In retrospect, do you think Mike had any choice but to admit that something happened?

A: In retrospect, I feel Mike had absolutely no choice – or I feel that Mike felt he had no choice. Than, other than to acknowledge that stuff happened at the Friedmans and happened to him. I think there was just so much relentless pressure on him, from his friends, from the whole …therapeutic community who were taking their cues from what the police told them, and what Arnold Friedman confessed to, of course.

   I think everyone was taking that on face value – was taking what Arnold confessed to on face value. And I think that Mike had no choice but to, uh, to go along with it, and, and he did.

Q: Um, Mike said that after he started lying about what happened, saying that he was molested and all these terrible things happened, that his life was allowed to go back to normal. Was that your perception?

A: My perception is that um, that after he did acknowledge what happened – and then of course the group therapy ended, and he did continue with Dr. Pelcovitz and that came to an end, and I guess he, he had seemed to be on a healthy trajectory, that it looks, you know, it would look to him, I'm sure, as a, as a little kid that, 'Hey, that worked'. You know? 'And now it's all behind me.'

Q: And how do you think it affected your family? I mean, after this was all done, and Mike has been victimized, the community's been victimized, and friendships have been vanquished – how did it affect your relationship, his relationship with is father? His relationship with you? How did it affect your family?

A: I think the affect of the family was, um, hard to quantify or hard to put a finger on. But it was, there was an uneasiness, I think, that – not that this happened to him so much, but that how could this happen, or I personally always had a very sad and deep regret that I did not protect my son from what happened to him. We, we told very few people who didn't already know. Told my husband's parents. I believe my husband told a few very close friends. I told very few people . I did, on a case-by-case basis, as seemed necessary or advisable.

   We were very private about this. With the other parents, there was an ongoing discussion and, of course, we learned you know what was happening with the parole board, with Jesse and so forth. But as far as within the family, there was this sense of holding this big secret thing.

10:30.00

12:05.00

And that I think quite naturally when things would happen to your child, or he would act out – when Mike would act out – or, or do something that, as a parent I couldn't help thinking, 'Well, did that have anything to do with what happened to him?'

On the other hand, there was a, there was a sense of normalcy that came back to the family with all it's, it's quirks. And every family is different with its own particular quirks. It seemed like we were functioning pretty well, going forward.

14:20.00

Q: And then all time passes by and certainly mitigates, softens these events. But then twenty-five years later you're on vacation and …life reaches out.

A: It's the most amazing experience. Yeah. Almost, almost exactly twenty-five years later, there we are, my husband and I on vacation. And even though we were soon to be with Mike on that vacation, we were, we were in Asia and he was in New York, and he felt with the, uh, rapidity with which things were developing in, in gathering new evidence, and he had come out to the, to speak to the D.A., and he had spoken to a journalist and so forth, and presented himself, come forward to, to talk.

He felt he needed to tell us immediately, and he sent an email that was – the subject line was 'Attempting Closure'. And I read it, and he said nothing happened to him. He was not abused in the Friedman class. That all they did was do computer activities. And to the best of his knowledge, no one else was abused.

It was, it was like having the world kind of put on its head. In, in a shocking and good way, as you might imagine. And as I wrote back to him, immediately. Uh, my jaw dropped and I just sat down at my computer and just wrote a very long email. Like 'Wow. I mean where to begin? There so much to say.' And, and I started saying what I had to say, in just kind of a memory dump.

16:04.00

But I said, you know, towards the end, I said, 'You know,. for twenty-five years I've had this very sad and deep regret that I did not protect you from what happened at the Friedmans. And so naturally this is a huge relief. (chuckle) However now I have a regret that I did not protect you from what did not happen at the Friedmans.' And I really feel that – that in being convinced, and my being convinced that something happened, that I did him a, a big disservice, and I, I regret that. And I'm looking very candidly at how that could happen. And I'm also feeling tremendous pride that he has come forward and, and I have taken the lead from him, that it's time to come forward, and however uncomfortable it may be to be very public about it, and however painful and how difficult it might feel, it's just time for the truth to kind of lick its war wounds and come out from

| | |
|---|---|
| hiding. | |
| Q: And what about the community of Great Neck? How long did you live there after these things happened? | 17:44.00 |
| A: We lived in Great Neck for ten years after these events started, so we left in 1987 (sic). Mike was in college. We moved to Connecticut. | |
| Q: 1997. | |
| A: Sorry. | |
| Q: That's okay. Start again. | |
| A: Okay. Um, we lived in Great Neck for ten years after these events started. So in 1997, we moved to Connecticut, and we have lived there ever since. | |
| Q: What was life in Great Neck like after this happened? | |
| A: Well, life in Great Neck – it's very hard to generalize. Because I always feel like I just have a little, little snapshot of any experience of a community. But for one thing, there was, I was in communication with this, a group of mothers who had been very active during the Friedman issues, and it tapered off, but I did, I did meet with them for lunch or dinner for most of the, most of those ten years, until I left. And even once or twice after I had moved away. | 18:25.00 |
| And so I would get a little sense of what their perspective was. Sometimes it was about the case, sometimes it was about the community. We still have friends that we see every now and then. Our across the street neighbors we see. But they don't, they really, their children were older. They really had no, or very little, awareness of what was happening, or a very general awareness of what happened with the Arnold Friedman and Jesse Friedman case. | |
| Q: But there are still people living in Great Neck who believe these events took place, and are still living with the sort of weight of that. What would you say to them, having this weight lifted for all intents and purposes? | |
| A: I would say to those who are still in Great Neck, and those who went through this and may have moved to other places, that the experience of having this tremendous weight lifted from my son's history, my, our life as a family, our experience of, of Great Neck, has been, it's been a relief. And to not know that, to know that your son was not molested, was not abused is, is, it's hard to underestimate how important that is. It's hard to | 19:43.00 |

**A-0266**

overestimate – oops. I think we've got to start again. I'm very tongue-tied.

Q: Yeah. (adjustments and instructions)….. Do you have the email that, that…I don't know if you want to read the whole thing, but you could maybe read excerpts from Mike's email.

A: Sure.

Q: That would be great. Okay, so my question was what would you say to mothers, the Great Neck mothers that used to meet on a regular basis who had gone through this trauma, now that you've discovered now that this weight's been lifted from your shoulders, and your son has been honest with you?

A: I feel an immense relief that Mike came forward and has been honest with us and has also basically forgiven us, which is very generous, for anything that's happened. And I have expressed my deep regret that, for anything that, any harm that I may have caused him. I would say the relief of getting at the truth is so immense that nothing can compare to it. Even discomfort at being public, discomfort of having been wrong, as I certainly feel for myself of having been misguided or misled.

21:45.00

I, I have great compassion for all of us. The children, the mothers, the community members who weren't involved but, but felt they were part of the community. For Jesse. For Ross. I have a huge amount of compassion. And at no time did I feel that the mothers and fathers of the children that Arnold and Jesse and Ross allegedly harmed, at no time did they feel they were anything but deeply caring, responsible, courageous parents.

And I think that that continues, that we all need to act in a way that is, that is able to get at the truth, both for ourselves, for our families, for our children, for the community. And just, just for truth in general. It's just time.

Q: That's great. We talked about this over lunch the other day, where does your husband stand in all this? You don't have to answer that question if you don't want. It's really my own curiosity …

23:27.00

A: I, I'm at the stage where like 'Joel, I have to tell you…?' He travels all the time. I mean, 'So I have to tell you what's going on. I'm going tonight for an interview. Mike already did one. You know, it's real exciting. It's fascinating. I want to really take time and brief you, and I want you to go to this program on Sunday.' But he's kind of….he's taking it in his own way.

Q: Do you think he'll be there on Sunday?

A: I'm going to really make it important. I don't know.

Q: Okay. Well I can always bring it by the house. I told you that before.

A: That's true, and I, yeah. That's a good point. And I, I just feel part of the responsibility is, I just haven't brought him up to speed. I mean I just haven't felt the right opportunity to say 'Okay, this is happening, this...' I mean there's so much. It's been going on so fast. That...but that's, that's definitely important.

24:14.00

Q: On the agenda?

A: Absolutely. The very near...

Q: Oh, I forgot this. Mike had said that Pelcovitz had asked you to testify. Did Pelcovitz talk to you about Michael testifying?

A: I don't recall Dr. Pelcovitz talking to us about Michael testifying. He may have, but I, I don't recall that. I don't recall any pressure. And, and you know I reached a place where I was relieved that Mike was disclosing what happened to him, supposedly, in therapy. But I was also quite comfortable, I must say, with him not testifying. I didn't know why he didn't want to. I could imagine that would be pretty frightening. But I had no idea that he just had drawn the line. Like 'I'm not going to lie to the grand jury.'

25:05.00

Q: Did some of, any of the other parents ever pressure you to have your child testify?

A: I don't recall any pressure. Um, I recall parents, I don't recall any pressure to have Mike testify. I do recall parents saying, 'Well, it's really getting down to the wire. They have two children who have gone to the grand jury. They really need more to make a case.' This was one of the, I think that was the first grand jury. I never felt pressure.

Q: Okay. Okay. I think that's.... it. In this list here. Nikita? Anybody? Any questions I missed? Before we get into the materials? Okay. Let's read those emails first. I think that would be the best.

26:06.00

END OF PART SEVEN

BEGINNING OF PART EIGHT

A: Read the whole thing?

**A-0268**

Q: …get this thing out…

A: Do you want me to like make pauses so you can cut or something?

Q: Read it in a natural way …probably just a hair slower than you think you should.

A: Okay. So first read Mike's?

Q: Yeah.

A: This is the email that my husband and I received from Mike. On September 23rd. 'Something I've been meaning to say for a while. No abuse ever happened at the Friedman's that I was aware of. All that happened was learning about computers. I was not abused….' | 0:24.00

Q: Just a second. Don't look at the camera….

A: Oh, sorry. Okay.

Q: Let's start again.

A: Start again? This is the email that Mike sent to my husband and myself on September 23rd. The title, subject line was 'Attempting Closure'. 'Something I've been meaning to say for a long while – no abuse ever happened at the Friedman's that I was aware of. All that happened was learning about computers. I was not abused, and I never witnessed any abuse of other kids. | 0:50.00

  'Arnold was a kind, avuncular teacher, and Jesse was a goofy kid. I was not happy to be seeing Dr. Pelcovitz for what seemed like an eternity. And to be talking it over with mom endlessly. And it was clear that everyone believed, very strongly, that I, and others, must have been abused. So at some point, I resolved to start lying and saying that I had been abused. And just as I expected, that allowed us to pretty much put this behind us. And I was able to stop seeing Dr. Pelcovitz and stop rehashing the Friedman case over and over.

  'I very consciously declined to testify because I knew I was lying. It seemed like the only out. I'm sorry I lied. But I didn't think I had any other practical choice. I want to be very clear that I don't resent either of you for anything you did or didn't do at the time. Great Neck was caught up in what, in retrospect, looks like a witch hunt, and it would have been nearly impossible not to assume that the Friedmans were guilty, even though there was no physical evidence. Kids kept re-enrolling in the classes. Parents showed up early to pick their kids up and didn't see

anything, et cetera.

'I have very vivid memories, for example, of it suddenly becoming, being very clear that no one was to eat at █████████████ anymore, just because the ████████ son was one of Jesse Friedman's friends.     3:02.00

'Jesse Friedman is now appealing his sex offender status, and the Nassau DA is looking at it, which is why this has come up again now. I've told the DA's Office the truth. And also told the filmmaker who made 'Capturing the Friedmans' - if you haven't seen it, you should – and who is still involved with the case. The filmmaker is pretty much convinced that there was no malpractice....' that, I'm sorry. 'The filmmaker was, is pretty much convinced that there was malpractice by the police....

Q: Let's pull it back to ...there was  huge horn out....

A: Oh, okay. Do you want me to read the 'filmmaker is convinced that..'?

Q: Yeah.

A: So the two paragraphs would be, after 'I had no other choice', would be 'I want to be very clear'. Start there?

Q: Yeah. That would be great.

A: He continues...'I want to be very clear that I don't resent either of you for anything you did or didn't do at the time. Great Neck was caught up in what, in retrospect, looks like a witch hunt, and it would have been nearly impossible not to assume that the Friedmans were guilty, even though there was no physical evidence. Kids kept re-enrolling in the classes. Parents showed up early to pick up their kids and didn't see anything, et cetera.

'I have very vivid memories, for example, of it suddenly being very clear that no one was to eat at Scotto's Pizzeria anymore, just because the Scotto's son was one of Jesse Friedman's friends.     4:24.00

'Jesse Friedman is now appealing his sex offender status, and the Nassau DA is looking at it, which is why this has come up again now. I've told the DA's Office the truth. And also told the filmmaker who made 'Capturing the Friedmans' - if you haven't seen it, you should – and who is still involved with the case. The filmmaker is pretty much convinced that there was malpractice by the police, the DA and Pelcovitz, and they have put together a very convincing case for that.

'Based on my experience, I'm inclined to agree. In addition, many of the kids who accused the Friedmans have now recanted, and said that

Arline Epstein  - 39

either they consciously lied, or the police twisted their words. It's possible that some kids were actually abused, but I think it very unlikely.

'I was waiting until I saw you two in Hong Kong to tell you, but it seems like things are moving forward regarding Jesse's case and possible, possible news coverage. In particular there's one reporter who's written about Dr. Pelcovitz in the past and his sordid history of suppressing credible accusations of abuse, and perhaps inventing false accusations of abuse. She wants me to be a source. I'm not sure I want to be named, and she's not sure she can do the article if I'm not named. I don't know what will happen with that.

'I'm hoping you can help me reconstruct the timeline of office visits and group sessions. And I'd like to see any notes you may have kept, especially if you have any medical records from Pelcovitz or North Shore. I'm also interested in your recollections from the period, particularly around the issue of hypnosis. I remember that Pelcovitz wanted me to be hypnotized. I remember resisting, because I thought it was total B.S. But I don't remember whether he or perhaps Sandra Kaplan ever actually did it or tried to to me. Do you remember?

6:05.00

'Also, do you remember how you decided how you decided to send me to Dr. Pelcovitz in the first place? Was it a referral from the police? DA? Did they pay for some of the sessions? Please forgive me for dropping this on you by email. But I feel it's suddenly progressed to a point where I can't be silent anymore. And it's not really practical to call you wherever you might be in China. Let's take some time in Hong Kong, or sooner if you want, to talk it over. Love, Mike'.

7:10.00

Q: Incredible. And what did you write back?

A: When I read Mike's email, I was, we were in the process of checking into a new room in I believe it was Chungdu in China. And I remember just like the jaw dropping. And this riveting email that I had just read. And so I immediately sat down with my laptop and wrote this.

'Dear Mike. Wow, this is huge. I'm stunned. In a good way, mostly. So much to talk about. I'm very grateful to have this old history cracking open and that we can talk about and shed some light on what happened and what did not happen.

'Of course I will share any files, memories, et cetera that I have. I'm very glad that you are taking action in whatever form that takes. We were flying from Shanghai to Chungdu when you wrote, so we just read your email when we got to, got back to wifi here at the hotel. It's hard to know where to begin. And yes, let's do talk in Hong Kong. But I'm going to put a few things down now, and then revisit this as my thoughts get

8:05.00

collected.

'I was convinced that you and many others had been abused. I guess this is obvious. That means that clearly there was a huge a tragic community-wide hysteria surrounding Arnold, Jesse and Ross Goldstein. I did see 'Capturing the Friedmans', which, of course, if one is 90-95% convinced that things *did* happen, one would interpret in a very different way from a person who knew things did not happen.

'A month ago, I Googled Jesse Friedman, and came across a YouTube of Jesse and his new lawyer and their campaign for his appeal. So I was aware that the case was coming to the fore to some degree, though I didn't know what was going on with the review of the police and DA's action, and had no idea that Pelcovitz's role was being looked at.

9:32.00

'I am so deeply, painfully sorry for all the stress and distress and confusion and angst, and many other emotions that you went through, at that time and in the aftermath. I am also, I also terribly regret anything that I may have done to hurt you in any way. Ironically, for the past twenty-five years, one of the greatest regrets of my life was that I didn't somehow protect you from the Friedmans. So I guess I'd have, I guess I'd have to say this comes as a relief.

'Still, I didn't not protect you from the craziness around what didn't happen. Thank you for saying that you don't resent us. That means a lot. One of the most important things to realize is that once the police and DA were convinced that children were abused by the Friedmans, they, and especially the psychologists, stressed that it would be so much healthier for the kids if they were able to acknowledge what had happened to, what had happened to them. That obviously set up an insidious situation of applying persuasion and pressure on the children to have them speak about it. So the whole thing took on a life of its own.

'And kids who did make accusations always included the names of other kids who were molested. At least that's what we were told. And that your name was mentioned more than once. So as much as I wanted to think that nothing happened to you, because of all this information, I came to accept that it probably did, and eventually that it must have happened. And I saw my role as helping you to talk about it in as gentle a way as I could. Yikes, that must have been hellish for you.

11:20.00

'Regarding Pelcovitz, he and Sandra Kaplan and possibly another psychologist, psychiatrist or two, I don't know, were at North Shore Hospital. Kaplan was the head of Child Psychiatry Unit there, I think. As I recall their expertise in helping child abuse victims was mentioned at meeting, at a meeting of parents of allegedly-involved children, where we were told that their services were being offered to the community. Was it

based on an arrangement with the DA's Office? I couldn't say. In some sense it must have been at least a referral and setting the ball rolling. How else would the psychologists have made the connection with so many?

'I remember that many of the children went for group therapy at North Shore. I think there were two, maybe three, groups based on age and whether the kid had acknowledged or not. They also had group sessions for the parents, and probably two groups – parents of kids who were accusers, and parents of those who were not, which I attended. All of those sessions were on, went on for several months. Three or four, I guess. I don't recall whether they started very late in 1987, or early the next year – most likely 1988.' I was wrong on the dates there.

12:12.00

'Then several parents, including us, arranged for private sessions with one or another of the therapists, which I think started for you during the time that the group therapy was going on, and continued after it ended. This may have been recommended by the therapist or by other parents, most likely both . I don't think we ever had any records or documents from the group therapy sessions. God, that sounds really off to me now.

'I somehow don't think we were charged a fee. We had bills from Pelcovitz for the private sessions, and I'll look and see if I kept them. I will also check to see if I have any old calendars going back that far, but I don't think so.

'I'm sure you were never hypnotized. I'm sure that would have been, that would have required parental permission. I remember begin told by other parents that at least one or maybe two of the victim/accusers had been hypnotized. But he or they had gone to a specialist for that. I'm sure I'll have more to say, but I'll send this now. Still digesting all this. Much love to you. Mom'

13:36.00

Q: Okay. ...Do you have a copy of what I have *Yes.* If you sit off camera here just in case.....(directions to techs)....

14:12.00

END OF PART EIGHT

BEGINNING OF PART NINE

Q: I kind of cut it up by, you know, as I said by subject, which I think might be easier. At least we'd be talking about one subject matter at a time rather than jumping all over the place. ... This first subject I have is discussions with other parents. And the note here that says 'Visit last night Merriweather has been with kids seven hours. Wouldn't open up. Kid said he dreamt some incidents two hours with ▮▮▮. Some

Arline Epstein - 42

**A-0273**

additional questions. ▮▮▮▮ felt comfortable and he wanted to talk to him . Slept well afterwards. Acting normally. Seems all right. Asked Merriweather about it. No attorney for the defense. ...just enough evidence that someone committed crime. Five kids to the grand jury.'

This is pretty early.

A: That's very early. Yes. That is very early.

Q: And that we've already talked about how kids, how the police talked to kids for a very, for elongated periods of time. Your experience with nine year olds, I mean seven hours is....?

A: That's endless. Seven hours is endless.

1:03.00

Q: Okay.... what is this?

A: This is so weird. This just reminds me that I was working full time at Chase in the, as a computer programmer during this whole thing. And, and I think someone must have called me, one of the mothers called me and that's the only scrap at hand I had. It's a computer card. Yeah, when the old, in the old days.

Q: ▮▮▮▮ in 6. A girl ...' So he's....'Detective'...this is ....'Notes on conversation with mother. Nov. '87. Detective wants by Monday, going to grand jury. She has to go as a witness. One other kid. Maybe others.'.... I'm sure I'm missing a lot. You might actually be the better one to run this... *I'm following along with you, if you just name the document.* 'Bail reduced.'...I'm just trying to find something – anybody speak up if you think I'm missing something. '...pledge house but no jobs ...bank loan. Gallasso – devastating evidence.' Ah, this is the Gallasso 'devastating evidence' ...you read that?

A: Yeah. Hope I can read my own handwriting. Okay. 'Bail reduced to $250,000 cash.' This would be the the, um, the state, the state bail. That would be for Arnold. 'Would have to pledge house but no job, so no bank loan.' In other words, at this point it seemed like it would be hard for Arnold to make bail. 'Gallasso said 'Devastating evidence in two other kids' testimony' – which I take to mean are going to talk to the grand jury – 'There is a picture'...this is again from Gallasso, what she said...'There is a picture of one of kids of Jesse and one kid uh, Arnold photo.' And then down below more about the bail.

2:26.00

But I think that whole phrase, that phrase of 'devastating evidence'. That was just typical of what we kept hearing.

Q: Right. And who do you think that phone call was, or those notes

| | |
|---|---|
| came…was that a conversation with Gallasso, do you think? | |
| A: I don't think so. I think this was – I didn't speak to Gallasso myself very often, so I usually got my information second-hand. So it was one of the mothers. Yeah. | 3:22.00 |
| Q: Let's go to the next one. It's probably better if you…. | |
| A: Okay. …Ah. Yeah. This one is actually dated wrong. We figured out, this is about 'Ross Goldstein for prosecution. Close but not quite enough. Two other people.' Again it's a grand jury, the grand jury is coming up. We need enough children to testify. But this actually was in the third grand jury. It had to be. Because it was about Ross. | |
| Q: Right. | |
| A: Yeah. 'No question that Mike, and Mike, was in class with Ross and two others.' I can't read the next word. 'Ross can..' Maybe you figured that out? | |
| Q: I didn't. | |
| A: Okay. 'Ross can name some of the kids he recalls. No doubt. Ross and two others.' | 4:14.00 |
| Q: You know Mike says he has no memory of any other adults in the class …. | |
| A: Certainly makes sense to me. | |
| Q: Where did this come from? | |
| A: This? Um, I'm almost positive, again it was my mother network. Yeah. | |
| Q: So a mother is calling you on the telephone and telling you that Ross has testified to – or at least made a statement to the effect that Mike was one of his victims. | |
| A: Yes, that is correct. That he is calling, that the, yes. the… | |
| Q: Tell me that from the beginning, like I told you. | |
| A: Oh, yeah. Okay. So from this note, I can see that, this is a, this is phone notes. I can tell by the messy handwriting. That I'm on the phone. It's phone notes from a mother. Another mother. And it's around the time of the third grand jury. 'Ross Goldstein for prosecution. Close but | 5:06.00 |

**A-0275**

not quite enough. Two other people'…in other words, they need two other people to testify, I believe. 'No question that M' – or Michael – 'was in class with Ross, and two others. Ross can name some of the kids he recalls. No doubt. Ross and two others.' So I guess that was Ross and two of the, two other helpers.

Q: What do you think that information came to that mother from? That's really insider information when you, when you're hearing through this woman that, what basically Ross is saying in his utterances before …to the grand jury, but it's probably pre-grand jury. Probably just statements he made to the police.

A: Yes. Um, it, it could have come from court, but it does sound like it was before any court appearance. So it had to come either from Gallasso. I doubt if any of the parents were talking directly to other police at that point. Or Joe Onorato. Or another parent. Now the only, those are the only possible sources I can think of.

Q: I've got a question. Like the language of 'close but not quite enough' and 'no question, no doubt'. Like whose language is that? Is that …    6:30.00

A: I'm, as a note taker, I'm, you probably noticed, I mean I wasn't expressing much opinion. I was kind of registering stuff. So I would be very, feel very comfortable in saying that I was just reporting what I was told as opposed to interpreting what I was told. So that it was from the …probably the filter of the mother who I, who was telling me.

Q: What did you think the mother meant by those statements? Read the statements….

A: The statements say 'close but not quite enough'. 'Two other people'. So I, I think I can interpret that two ways. One is we need two other kids to go testify. But now I think it may, may have meant 'We're close but not quite enough charges, and there were two other people who were, who are being investigated by the police.' So I think the note is ambiguous.

And then below, 'No question that Mike was in class with Ross and two others', so there is the two others. 'The helpers', they were called. The lingo became they were 'the helpers'. And several names were named as to who those people were.    7:52.00

This note is notes I took in a phone call with a mother. And I think we might be missing a page. But anyway, and she reported on her discussion with Sandra Kaplan, the psych, psychol, psychiatrist, who was head of the group therapy. And…so Sandra Kaplan was talking about her meeting with Dr. Shine, who was the superintendent of the Great Neck Public Schools. And expressing her disdain for him, and the fact

that she wasn't getting where she wanted to get with him.

And in fact this mother reported that Sandra Kaplan called him a 'maniac' or 'he's crazy'. Obviously this is a very frank discussion that the two of them have. And this person was reporting on that. And also calling Thomas Fenniger, who was I believe his position in the Great Neck schools was, um, I don't have the title handy, but in charge of pupil affairs. Student affairs. Or student welfare. And there are pretty amazing frank assessment of...

9:25.00

Q: What was Dr. Kaplan looking for?

A: Dr. Kaplan, I think, wanted the parents – active parents – to um go to the school, to the maybe Dr. Shine, maybe Fenniger – to put pressure on them. To, to do more for the community. To come forward and really be more activist. In, in the community. The parents felt that there was a huge danger in the community because these sexual predators were here. And you can appreciate that, if they were convinced of that, that they felt they were doing a very important public service.

Q: Oh, I agree with that... This, in this note that Sandra Kaplan is the one who keeps putting the fire under the parents.

A: Yes. Yes. Sandra Kaplan is, I'd say putting the fire under the parents, and maybe using the parents so that her relationship with the school would be altered in some positive way for her. That's, that's also my impression.

10:37.00

Q: Let's go to the next one. *If you wanted to say the name that's on top of the page, you could scroll. It's alphabetical. I*

A: Oh, okay. Okay. So ██████████. 2.8.88' ...

Q: Okay.

A: Um, there's not so much in this note, that, it's just a report from the mother. 'Friedman pleaded guilty today to two counts, second count' ? 'of federal charges out of three.' I don't- oh, yes, I believe there were three federal charges for child pornography. So he pled guilty to one, and that was the second count. 'The judge said he would not sentence him until after he's had a three-week psychological evaluation in Springfield, Illinois. Sentencing scheduled for March 25th. Important to write letters.' That is the key line there. That many, many parents did write letters to I believe it was Judge Mark Constantino of the Federal Court, to make sure they take into account the parents' feelings, that he should be, that, that Friedman should be put away for a long time.

Q: Right. And that was also to Judge Boklan when...the state case, I'm sure.

A: Oh definitely. Do we have, we have documents that, that instruct the parents to write to Judge Boklan. No question. Yes.

Q: What is this question again? What did ▮▮▮▮▮▮▮ advise? Why were ...charges dismissed? Did she ever answer that?

A: Where's, where are we?

Q: At the bottom of that. I guess it says...Oh, that's your question.... That's sort of a good question that ▮▮▮ just brought up. Why were ▮▮▮, some of ▮▮▮ charges dismissed?

A: You know I was, I never, I was never privy to what charges ▮▮▮ made or whether some were dismissed and some not....                          12:36.00

Q: Okay, what's the next one? ... What's on the top of the next one?

A: Next one. 'AE notes on conversation with other mother' And the first word is 'Onorato'. ...

Q: Yes. ... *I did not get to....Oh, is there a transcription there?*

A: Yeah, there is. Uh, transcription – 'Onorato, March 7th. Um, with specific name' – in parentheses – '(With specific names can go to families) Negotiating. Presenting to Friedman. Guilty, one felony. Arnold, sodomy. Acknowledge other charges in return, uh, for Arnold getting 8 1/3 to 25 years. Jesse getting 5 to 15. Want them to sign a closure statement that committed crimes against thirteen kids.' Let's see. 'There are', un, then, 'If don't – I don't know what that means. There are other kids to grand jury.'

Q: It's hard to read.

A: It's hard to read. In other words, this is a briefing from a mother who had either spoken to Onorato or was present when he spoke. Discussing the disposition of the case at this point. The guilty pleas. The guilty plea   14:25.00
of Arnold.

Q: Okay, we should go through these, because these are, I'm just looking through them now. Trying to find one – can you suggest one? *...I think I have ...she actually answered a lot of those questions from those documents. Did you talk about the closeout statement? Was that note about that? Did the police ever present you with the closeout statement or inform you or mention....?*

Arline Epstein – 47

A: The police did mention a closeout statement, and I think more than once. And uh, uh not in a methodical way. But I remember being told by the, by Gallasso at some meeting I believe, or via the mother informant, that I think one of the details that I remember was that um, uh here – one of the notes said, 'Disclosure statement – talked to Fran Gallasso after Friedman pled guilty, said it all.' And, in addition this is allegedly something that Arnold said in his closeout statement. 'As far as the Friday computer class, Mike Epstein, Arnold Friedman said was not a favorite. 'I didn't, at most a hug really. I didn't patted backside. Many other more appealing boys'.' And then Gallasso's message to me or the parent was 'Arnold may have held back. Some of the parents feel that way as well.'

16:18.00

'Arnold's word contradicts what four or five boys said.' So we're receiving piecemeal information about the closeout statement. I'm receiving information that it might have contradicted what some of the children testified about. But I don't know, I did not at that time know any of the specifics, other than what I said.

Q: And that's you're receiving that information from…?

A: From a mother. Yeah.

Q: And from Det. Gallasso.

A: And from Det. – yeah. In these notes, it's not clear whether it was directly from Gallasso. And it is possible that she called, or from a mother who spoke to Gallasso.

16:54.00

Q: ….(adjustments)….. Let's not spend time on….

A: Do you want to look at that one from that early parents' meeting where the thirty plus kids interviewed, and no one….?

Q: Yes.

A: Okay, I know exactly where that is. I don't know where it is in your book, but it's …I have that …. It might be 'Note From Parents' Meeting' or and it's a notebook page. Kind of faint.

Q: What's the first line?

A: First line is, um, 'Exchange in '84 with decoy. Federal Postal Authorities. Custom… blahblahblah.' This was like the first briefing.

18:11.00

Q: Can I see it?

A: Of course. That's the copy, and that's just notebook paper.

Q: I don't know if I've got this one.

A: You know it's possible. I had to, I asked Hella about it, because I didn't find it. I think that's the one I asked her about. It's possible it just got lost. Yeah. So I'll get you a copy.

Q: Why don't you go through it with us?

A: Okay. So this, this, I took extensive notes, this very early meeting, private meeting of parents and with Det. Sgt. Gallasso and I believe there was, one of the parents was a lawyer so he was, he was might even have been in his law office. I don't recall. Anyway. There were fifteen to, I don't know, twelve to sixteen parents there. Anyway. So we were being briefed by the case as it stood at that moment. And this was the day before Arnold and Jesse and Elaine were arrested at their home. For the first time.

    So it was November 20....23rd. 20...24th, that the meeting took place. Okay. Um, and there's a briefing about the federal case and the postal authorities and so forth. And then something really significant she said. 'A list of 81 names of, of computer students was confiscated. Prior to yesterday, 11/23, had no child out of thirty plus interviewed that had been sodomized. Most said nothing happened. Two kids said Friedman had shared porn. And had, and had been rubbed. Parents refused to allow...' sorry... can't read it – but 'the parents refused to allow....to continue.'

    Make, oh, sorry. 'Parents refuse to allow the children to make statements because it happened three years ago.' So further, 'She felt that Friedman may have called parents of kids most at risk. Parents must sign complaint to build a case against him. Children will not have to be in court except possibly the grand jury. Must have written statements. They are within twenty-four hours of arrest. Stay away from Friedman.'

    So state... Okay, 'Statements and grand jury involvement would be independent and separate as of last night.' So I, I'm, I guess that is the Jesse vs. Arnold case. 'As of last night had three to four signed statements. Some of acts were performed in front of other kids. Need corroborating statements.' So this is before any arrests. Before a grand jury.

    'Now the police have 100 names. One child made a ten-page statement. Five hours there.' The detectives were there for five hours.

18:56.00

20:23.00

| | |
|---|---|
| Q: Is there any other ones that pop to your mind? | |
| A: Let me just see. …. | 21:55.00 |
| Q: …I have one here. January '88…the year, …that's after…1/14…January. | |
| A: That's like, yeah, that's sort of early. | |
| Q: ….This is interesting. 'AE Notes on PTA Meeting. 1.14.88' | |
| A: Oh, yeah. ….Oh, great. Yeah. Terrific. Yeah, there's two pages. Did you get both pages of the notes? …Yeah, you do. | |
| Q: Do you want to start with the first page? ….This is, well explain what this is. | |
| A: Yes. There was a meeting, a joint PTA meeting on January 14, 1988. So roughly a month and a half after the first arrest. And the featured speakers included Arthur Greene, psychiatrist. And I believe Sandra Kaplan was there. Det. Sgt. Gallasso and others. Okay. So I took notes about 'Arthur Greene said 'Response of families, response of institutions. Situation of child to begin with.' So these are important criteria to consider. 'Many of kids, of the kids in this case have no symptoms. Surprise to parents – surprising to parents. Why?' | 22:57.00 |
| 'Friedman conned them, knew them, tricked them. The group functioned as a family. Instilled the fear of betrayal and sense of guilt, because all participants …because they were all participants. Exploited, the Friedmans exploited their own feelings of guilt. Kids don't like to discuss sexual matters, especially with parents. Also there's pleasure, curiosity, getting a sexual education. Fantasies. Makes kids feel very guilty. Very repressive about sexuality.' | |
| 'Homosexuality – very taboo and fighting, and frightening. Harder for boys to talk about homosexual sexual abuse. Afraid of retaliation. They're angry, enraged. Afraid they will be punished in proportion to their own anger. The biggest problem – a kid who says nothing. A kid who says nothing happened. No sadness. Anxiety. What to do? No symptoms. Denial phase. Natural way of adapting. Serves a purpose now, but not a good adaptive defense in the long run. Should be evaluated by a competent professional who should talk to parents about how.;..' how parents should talk about it, I suppose. | 25:13.00 |
| 'Kids need to re-experience, as painful as it is. More devastating …' this is Greene continuing…'more devastating to not talk about it. Best to talk now, in a controlled therapeutic session. Address their guilt, fears, | |

Arline Epstein - 50

Case 2:06-cv-03136-JS Document 372, Filed 01/20/2009 Page 400 of 443 Page ID #: 3946

worries about future.  Probably not very long-term treatment.  Short-term for most.  Some...some will be seen, evaluated, best treatment selected for a kid.  Testifying is a very positive experience.  Grand jury.  Change passive horrifying event into something active.  Group treatment may help them talk and open up in conjunction with individual intervention.'

It's the party line, kind of.  Like 'We know this happened.  Therefore we want to help your kids.'  And I, I think there was an earnest and sincere desire to help our children.

Q:  But it's more than that.  The party line is 'Your kid doesn't remember what happened.'

A:  What had happened.  Right.  And it's very common not to disclose, and, or to either not remember or not want to talk about it.  Right.  Very forceful.  And then Sandra Kaplan spoke.  Briefly.  'All kids, victims or witnesses, should have an evaluation by a sexual abuse specialized person or team.  Then probably a brief intervention.  Maybe six sessions.  Should parents try to discuss even when child is in treatment?  Discuss it with the professionals.'

26:30.00

Q:  I've seen the rest of it, and it's kind of the same story.

A:  Yeah.

27:52.00

Q:  I'm just reading this one....... 'AE Notes 5.3.89'...

A:  I think that was right after what I was reading before.

Q:  'AE Notes 5.3.89'.

A:  Yeah, I think it was right after that January.  .... Um, ....

Q:  What is this?.....

A:  This is phone notes from a conversation with another mother who was reporting that um, 'Judge Boklan said about Ross from grand jury minutes..'  I'm not sure how we had access to what Judge Boklan said about Ross and grand jury minutes, but anyway 'reportedly Judge Boklan said that Ross said, 'Hey, that's cool', as he watched Jesse sodomize a kid.  That Ross recruited ███████ and ███████ himself.'  This must be all of the things that Ross acknowledged in court, or to the grand jury obviously.

'That Ross stopped going regularly to the Friedmans in June of '87.  That he sodomized and threatened kids, both when Arnold and Jesse were not there and when they were there.  Both of which facts

| | |
|---|---|
| demonstrate he was not just forced to do what he did by the Friedmans but did it on his own initiative. He took photos of Arnold and Jesse sodomizing kids, et cetera. He received money for photo taking from Arnold. He held kids down while Jesse sodomized them and vice versa. He asked a kid 'Do you want to suck my dick?' And when the kid said, 'No', seized the kid around the neck and forced his penis into the kid's mouth. | 29:42.00 |

'Invented sick games and forced kids to participate, including Mood Limbo'…

Q: Nude Limbo

A: Oh, sorry. 'Nude Limbo'. I misheard that. (chuckle) Thanks for correcting my …. Sexual game knowledge.

Q: …that these are, these are grand jury minutes that are sealed.

A: Uh, pretty incredible. I have no, at the time I was just taking it down. There's a little more to this actually, that 'Ross applied force to a kid's neck on pressure points as a punishment. Ejaculated into hand and measured out …' sorry, 'measured amount with Arnold. Ejaculated into chewing gum and forced kid to chew it. Threatened kids. Said would burn down house, et cetera. Kill parents.'

| | |
|---|---|
| Yeah, I, yeah. How do we have access to this? It, it does boggle the mind. And at the time, there I was, just like, I don't know, recording it. So. | 30:46.00 |

Q: When you were writing this stuff down, did you ever think 'That sounds extreme'?

A: Certainly! This sounded outrageously extreme. Like 'Oh! Oh, they've got Ross doing all these horrible …' It just got, it sounded extreme, and yet there was this power of discernment that somehow had gotten put on hold. I can't explain it other than a kid of mob mentality. Or even I, the quiet historian taking notes. And the reason we have these notes – it's rather humorous – I have always thought I have this terrible memory, and so I need to write things down. And especially bad memory about bad things. You know? Things I don't want to hear.

So I started writing from the early days, and I just kept doing it. And a lot of things I did not record, but, but a surprising number I did. And I did not remember keeping the notes. So six weeks ago I went back and found this, this file folder called 'Friedman', which has accompanied me on three different moves, and I looked in it, and I knew I had clippings, but I didn't know I had notes. It's kind of amazing.

**A-0283**



Q: ...the next...

A: Should be the notarator – moderator. ....(adjustments) ....

Q: Who's [redacted]?

A: [redacted]. Okay. So S[redacted] doesn't really play a role in this case at all, except that she had been Michael's private therapist way before the Friedman thing broke. And I went to her – he was no longer seeing her. It was a short intervention maybe in second or third grade, I don't, maybe third grade. So I, I just, when this broke, I, I thought, 'Well she knows him. I'm just going to kind of call up and see if she has any thoughts.' She's in the community. What, you know, just for general help.

Q: Flipping through here.... (undecipherable).... 6.9.89. so this is the summer of '89. *What's the name?* AE Notes of Kaplan 6.9.89. I find this interesting....

33:34.00

A: Okay, will do. Yeah, like I said I didn't bring – I only brought about the first third, so......(papers rustling)...

Q: ...Kaplan...AIDS, about AIDS...Two plus year later. An immediate concern to us all as parents of victims, ...the next two years at least for our kids. She said she'd be glad to arrange a test to let kids know...more sure.

A: Right.

Q: Tell me what this is. The date is important.

A: Yes. The date of the note is 6.9.89. Sandra Kaplan. She ...all right, it's about AIDS. Um, there was a, so there's new information about testing for AIDS, I believe. So that there was an article that there's a three plus year latency period. So that, um, is an immediate – I wrote that – 'is of immediate concern to us as parents of victims.' Arnold and Jesse were tested very early on, and came out negative. But this is, um, a year and a half or more later, when the parents again, or someone again is raising issue – whether it's Kaplan or she's responding to parents raising the issue.

So 'Testing for the next two years, at least, for our kids', which is what some parents were requesting. And she, Kaplan said she'd be glad to arrange it, and that we wouldn't have to let our kids – oh. That would mean testing our kids, not testing Arnold or Jesse.

35:36.00

Q: Yeah.

A: Okay! Different story. Right. Right. So yeah, so she can arrange for testing of our children for AIDS. And they don't have to know about it. Wow. Yeah, I remember that. Okay.

Q: That must have been hard.

A: That was pretty, like 'All this and that, too.'

Q: ...

A: I'm sorry?

Q: They were....

A: Oh, yeah. ....Oh, yeah. Well I think parents were legitimately concerned. And the psychologist and psychiatrists were responding to that. And who knows who was fanning what flames. It doesn't take...

36:17.00

Q: It does seem like police documents that Kaplan was engaged in a strategy of some sort. I mean she seems to be in conflict with the school system, trying to politicize that... could get something she ...

A: It does look that way. Of course, at the time it wasn't clear. To me anyway. So then ...yeah, and here the parents wanting Kaplan, 'parents wanting to galvanize the community. Idea to have her' – Kaplan – 'make a statement in Great Neck Record about AIDS testing. Received... recommended for victims of Friedman, especially in view of fact that two of teen, of the teenagers weren't tested at all.' ... 'She said she'd bring up awareness issue at weekly pediatrics admitting physicians meeting.'

Oh, then there's a bit you can't read too well here. 'I mentioned story of one local pediatrician who'...and I believe the note says 'did not'..or was skeptical about that there was abuse. A local pediatrician who was skeptical that there was abuse. Yeah. Which I had heard from a mother. And he was one of the most prominent pediatricians in town.

37:57.00

Q: And what happened?

A: Um, I don't know what happened. I think.... I don't know.

Q: It's interesting. On the next, on the bottom of the next page of this note, where it says, 'I also mentioned how close the boys had become.'

A: Yeah. Yeah. So I guess I mentioned, or she mentioned – I mentioned. I don't know who mentioned. Either she mentioned or I mentioned – how close the boys had become. That would be in the

group therapy. Or as a result of the group therapy.

Q: But the date here is ….6.9.89. Does that make sense with what we know?

A: No. That doesn't make sense. So I assume, yeah, I just assumed that. So maybe – oh, jeez. Wait a minute.

Q: 'Be happy to have them meet in….a few months.'

A: 'Meet in a few months, or from time to time, yearly to talk…' Oh, no. So this is, this is, this does make sense. Because group therapy started the very end of '88.

Q: Right.

A: Most likely finished before this conversation took place.

Q: Right.

A: Yes, I was disoriented in time. Okay so that makes sense. So I think I volunteered to the other mothers to call Kaplan and to touch base with her. And there had been some talk about a follow-up gathering for the boys, because they were, apparently close to each other. And so I said I would be happy to – she said she would be happy to have them meet in a few months- or from time to time on a yearly basis – to talk and evaluate it. And I think it was volunteering, maybe not in the notes, to help organize that. Crazy me. | 39:09.00

Q: Civil suit…

A: She also in this note mentioned a negative opinion about the Great Neck Schools again.

Q: Yeah. She wanted in.

A: Yeah. Definitely wanted in.

Q: I'm continuing my search. *With Kaplan, although the therapy started the end of '88, Kaplan was a presence throughout, right? But where did you see her? Only in the public meetings? …*

A: I saw her in the public meetings….

Q: Use her name.

A: Oh, I'm sorry. I saw Dr. Kaplan in the public meetings. So that would | 40:15.00

**A-0286**

be in December of '87 and January of '88. (fire trucks)

Q: ......Okay, go ahead.

A: Uh, I saw Dr. Kaplan at first only in public meetings. That would be
December of '88 and January of '89. Sorry. Wrong. ... I first saw Dr.
Kaplan at the public meetings that were organized in the community.
The first one was December '87, and the second January '88. And then
I'm sure I met with her before the group therapy started, or as part of the
organizing meeting. I don't recall ever meeting with her privately other
than that. I did have some phone discussions with her. I know the one in
the middle of '89, after group therapy had finished. I don't recall if there
were any others.

40:42.00

Q: ... ▮▮▮▮▮ conversations September '89. Page two....*What's
the name?* ▮▮▮▮▮ Conversations September '89'.

A: Some day we're all going to have our, all have everything collated the
same way...You did a quite heroic job, though. I'm doing the chronology,
because it seems to matter to me somehow.

Q: It's usually.

A: But both. I mean you can cross-reference this way. I mean I think
this is brilliant, too.

Q: Yeah, no. The chronology is better. *Say the name again?*

A: ▮▮▮▮▮ . Oh, '2.8' yeah, I remember that one. I mean I don't
remember it very well.

Q: *What was the full name?* ▮▮▮▮▮ 2' – uh, 'conversations
September '89'.

A: Oh, September '89.

Q: ...This is the one where she mentioned the hypnotist.

42:35.00

A: Who? Oh, oh.

Q: 'Late October...appeal. ▮▮▮▮ will get us copies papers...Pelcovitz
screening hypnotism expert Gallasso, late October, for shrinks only. Tell
the kids closer to the ...know anything about it. Said to remind Kaplan
We want it or it probably won't happen.'

A: Right.

Arline Epstein - 56

**A-0287**

Q: ....███████ ....'

END OF PART NINE                                                    43:13.00

BEGINNING OF PART TEN

(PARTS TEN AND ELEVEN ARE BLANK)

BEGINNING OF PART 12

Q: ....This is hard because it's all over the place, so your interpretation is kind of important. It seems like a more scattered note than your usual narrative. ...

A: (reading)... Okay...

Q: This is four months...

A: Okay, first page...

Q: Three or four months before group.

A: Yeah, this is – yeah. Yes. This is before the group started. It looks like a kind of a recap conversation. So it mentions an Atlantic interview, so an interview in Atlantic Magazine, I think. And I have, I don't think anyone ever tracked that down. And I don't know what the interview was about. There's a note, it looks like reminders to myself – 'Kaplan. Dr. Kaplan. Should Mike know?' about something. 'Closing interviews for group.' Oh, sorry. This is, so this is um, this is after the group had ended.                   0:48.00

    The group, I think, ended in the spring or, of '89. So there was talk at the end of the group therapy...

Q: This is fall already.

A: Yeah.

Q: So this would be before the group.

A: No, it started in '88. Late '88. I think we better start over. It's going to be quite confusing. So this note, um, is, it looks like kind of a check off, c checklist to myself at the top there, something about an interview in Atlantic Monthly, a question – 'Dr. Kaplan, should Mike know...'

**A-0288**

Arline Epstein - 57

something. 'Closing interviews for group?' Dr. Kaplan and I think David Pelkovitz had said it might be nice to have a group therapy reunion meeting with the children. So that was supposedly this fall.

'Paper being presented – where?' So we had heard that Dr. Kaplan and I think also David Pelkovitz and maybe other therapists involved in our case had used the materials that they learned in this situation to present a scholarly paper.

2:06.00

'Ben – okay.' 'Future – question' 'Books re: adolescent psychological sexual development – what to watch out for.' So what, what should the parents be alert for. And then, down below, I'm reporting about my talk with Michael, but his, our disclosure talks, or his disclosure talk to me.

That's really hard to read.

Q: Yeah.

A: Uh, it's very hard to read.

Q: Go to the next page.

A: Next page. Okay. So this note is to myself that this mother will give us, get us copies of the papers that Pelkovitz, Pelkovitz and Green must have given. 'Hypnotism expert'…these are just kind of bullet points, I guess. 'Hypnotism expert Williams' – conceivably some follow up information. 'Gallasso'. I don't know what … oh, these are follow up possibilities.

Q: It's kind of crazy, because they denied that hypnotism was ever used.

A: Well, um, I think that hypnotism may not have been used. Like, this is speculation. I believe that any child who was hypnotized, and I did hear that one or two were, um, and I don't have any factual knowledge about that, direct knowledge, but that they were sent out to a hypnotist specialist, hypnotism specialist would….

3:57.00

Q: Daniel Williams.

A: Probably Daniel Williams. Right. And this, I was just, as usual, just gleaning information and writing it down without really knowing much about it.

Q: Yeah, I get it. But you wrote down contemporaneously that there's a hypnotism expert making a paper basically about his experience with the treatment boys. Which says …hypnotism expert, and presumably he would have applied his expertise.

**A-0289**

A: Yeah, it's possible that he participated in the paper. Yeah. I, I don't know from the ...it does look that way. You're right. Okay. So then just a question about whether there would be a closing, closing interviews for the group. The group therapy children. 'He doesn't know anything about it'. 'He said to remind' or 'somebody said to remind Kaplan if we want to do it or it probably won't happen.' This is probably a mother speaking.

Over here, on the side, there's a note. 'David Roll' or something. Can't read the name. David somebody. And then 'behavior modification'. Maybe, yeah, it's just too hard to read. ....yeah, I'm not 100% clear who's telling whom what on this. So it's a little shaky. I don't think it's our strongest...

5:14.00

Q: I've already moved on.

A: Good. Moving right along.

Q: I have a question. How did you get these scans of the yearbook?

A: Um, when all this talk of the extra – Ross Goldstein and the extra helpers and Jesse's friends and Ross's friends – was coming to a high pitch, people would, the mothers in my circle, speculated on who a helper might have been or how they were related to someone. Or did anyone know somebody called 'Snake' for example, because one of the children mentioned someone called 'Snake' as being a helper at the Friedman classes.

So I went to the yearbook, sort of self-delegated – er, to the library – self-delegating, and took down some of the Great Neck North High School yearbooks, and looked through. And I found pictures of... and I don't know what purpose this was supposed to serve, but I did. Pictures of some of the helpers. This, um, woman, young woman, called, nicknamed 'Snake'. Picture of Jesse. A picture of Ross. This really was never put to any practical use.

6:32.00

Q: It's a curiosity.

A: It was an exercise in extreme involvement, I think.

Q: You were trying to have some kind of power in a very, and feeling very powerless.

A: Yeah.

Q: I need your help....

| | |
|---|---|
| A: There's a, there's a letter. I don't know if you want to… | 8:08.00 |
| Q: Go ahead. | |
| A: There's a letter - 'Dear Parents'. Urging people to write to Judge Boklan. I don't know if that's of interest. | |
| Q: You want to read that for us? | |
| A: Yes. | |
| Q: So what is it first? | |
| A: This letter was drafted by a group of parents. And the intent, and the date was most likely January 1989. And the intent was to inform and to rally support and to have letters directed to Judge Boklan to advocate harsh sentencing for Jesse Friedman. | |
| 'Dear Parents, As you remember, it was a little more than a year ago when we discovered that Arnold Friedman, a member of our community, violated the trust and respect our children had for members of the teaching profession. Arnold Friedman pled, pleaded guilty in federal court to sending child pornography through the mails. Due in part to our successful letter-writing campaign, which the judge mentioned in the courtroom, Friedman was sentenced to ten years in federal prison and fined $250,000. | |
| 'In addition he pleaded guilty and disclosed the fact that he had sexually abused hundreds of his computer school students. As a result, he is serving a concurrent ten to thirty year state sentence for those crimes. Since Arnold Friedman's sentencing, our community has been further horrified by the additional knowledge that Arnold Friedman, his son Jesse, Jesse's friend Ross Goldstein and several other teenagers brutally abused the children attending classes at 17 Piccadilly Road. | |
| 'We must again take the opportunity to express our outrage to Judge Boklan, either by signing the attached letter, or by writing in our own words the hope that the judge will impose the stiffest possible punishment. We must let Judge Boklan know that we will not be satisfied until these child abusers are in jail and have criminal records which reflect the severity of their criminal activity – actions. Please understand, since these abusers are the children of our neighbors, the youth of Great Neck are in grave danger. | |
| 'Please send your letters directly to the judge. They must be received before January 24th, the date of Jesse Friedman's sentencing. Thank you.' | 10:39.00 |

Q: Okay. Let's go to the map….

A: Oh, yeah.

END OF PART 12

---

BEGINNING OF PART 13

Q: …I didn't see this….

A: I have it.

Q: Take it out of the thing here.

A: Sure. ….. Yes, I'm looking at a diagram that Mike drew of Arnold Friedman's basement. It is, it shows Office, Washer/Dryer, Printer, various and sundry, the Child Care Chairs for Elaine's Child Playgroup, Jesse's Room, et cetera. And it shows work stations for, and some of them are labeled with children's names. And then Mike drew a couple of stars. And those indicate places where something happened. So this was, this map or diagram emerged during the time that he was, I was encouraging him to disclose things that happened.

   So here's what he did in a concrete way to say…okay, so at one place it was, 'Holding Brian …' maybe somebody else. I can't read it. And then another star – 'Non holding'. And that's all. That's all the stars that are on the map.

Q: What did you, how did you figure out to ask him to draw a map?

A: I had remembered that they had been asked to draw maps in group therapy. That that was part of the process of helping them recall.

Q: …. There's one thing I want to find, but…..Do you have that piece of paper that has all the things that he admitted to eventually? …like a lot of writing on it.l..

A: Oh, Mike? Oh, I don't have that with me. Yeah, that's just crazy… I don't…

Q: …Mike told me when he finally started talking to me about what happened.

A: Yeah, yeah.

1:01.00

2:40.00

**A-0292**

Q: Note re: Mike's memories. Notes to self based on notes of what Mike remembered. AJ with penis out and/or pants down/off. Does not really remember. *There were a few other papers in this binder….* Yes. *I think it might be in there.* Okay.

A: It's not that one. No.

Q: Here it is.

A: This is fun. This is completely crazy. And um, this, this page has tiny scribble based on things Mike was disclosing to me. With a big asterisk that I was asking him the leading questions. And he would say 'yes' or 'no'. Or 'usually' or 'never' or 'not sure'. And so I just wrote as fast as I could. And there's a line here that says 'Ten times every session per kid'. 'Child's penis against back of adult.' 'A and J – that would be Arnold and Jesse – 'penis something, rubbing something.' It's just, and it's like numbered so that there are …

    Oh, '15 separate sex acts described' and some say 10 to 15 times per class. It's, it's just mind-boggling. 'Doesn't recall    or    ' – those are two of the alleged helpers. 'Last session, Fall '87, Jesse gone. Much better' since Jesse was gone. So this is …Oh, 'Jesse followed kids in with camera in bathroom. No lock.' And he names a couple kids involved in that.

    'Why does…question, why does ▌ think M, Mike, is trying to remember?…'

Q: Brian?

A: Uh, okay. 'Arnold gave orders most of the time and did most of the threatening. Jesse did some. Ross not much.' I then translated these notes, loyally and carefully, into a better, more readable form. But this is, I guess I asked for disclosure and I got disclosure.

Q: Right.

A: Um, 'Games. In line one by one or individual? All in plain view. Almost as bad to watch. Remembers moaning in the room. Semen on the floor. Pants off in the middle of sessions.' So the only reason I knew to ask leading questions about what happened was that we were told what happened. Otherwise I'd, I mean there's no way I would have thought to ask any of these - or maybe a few of them, but …

Q: …where's the…? The description of the games. Who described these games for you?

3:52.00

5:14.00

Arline Epstein - 62

**A-0293**

| | |
|---|---|
| A: Uh, yeah. Description of games. Okay, so this is in my neat handwriting. I must have… I don't remember who described the games to me. I don't remember whether it came from one source or from many. I don't remember if it was psychologists or mothers or district attorney. I, I don't. But I wrote in some detail what they thought the game consisted of. | 6:29.00 |
| Q: ….You know what we need to do? We probably need … | |
| END OF PART 13 | 6:58.00 |

BEGINNING OF PART 14

Q: …. In between each … put them on the ground there……..How many are there and how long? *It's about three to-five minutes per person.* Thirty-five minutes….? *Three to five.* Okay.

A: 'Per person', meaning? Oh, per, per….personality. Okay. Okay. …. Okay, so wait, I'm supposed to compare…what I knew at the time. Okay.

Voice: 'We couldn't do it immediately. We had to wait. We had many meetings with them where we, we explained, 'Look. You know, we understand your feelings, but you can't go marching over there.' That was their plan. They wanted to go marching over, break down the door themselves, and accost this guy. 'What have you been doing? What have you been involved in?' And you, you can understand it. I mean they were, they were absolutely destroyed over this. But you had to keep working with them and telling them, 'Look we want to do this the right way so that when we make these arrests and we go in and we do the search warrant we're going to have good evidence, we're going to have good statements. We want to get a conviction on this case. We want these people to go away for a long, long period of time.'

|   |   |
|---|---|
| 'There were literally uh…. | 1:11.00 |

Q: That one I know…

Voice: …'high stacks of pornography. In, in plain view all around the house. She claimed that she didn't see anything like that.

Q: Okay. Let's keep going. *Okay.* Just want to make sure we cover them all.

Voice: 'They would ..they were, they were encouraged to perform acts of oral sodomy with each other. And all the while that this was going on, they were taped. They were videotaped. Unfortunately we were not able

to recover those videotapes. I believe that they were removed between the first and the second search warrant, and we were not, we were never able to find out what happened to them.

'And it was just the enormous amount – I think the most overwhelming thing was the enormous amount of child pornography.'

'Q: And where was that? Where did you, was that something, if I went in the house, would I have had to search for two hours to find that?'

Voice: No, you would just have to walk into the living room and it would be piled around the piano, which was, you know, just as if you were in my house here, you would see it piled up. And if you, if you just looked at it you'd see the pictures on the front. You'd realize, 'Gee, I don't subscribe to this. You know? It's kind of an odd, odd thing to subscribe to. Wanted to make sure, well we, we were lucky in that we were able to re, recover so much physical evidence. And so much of the evidence matched what the kids had. We had that. We had the pornography that was there.                                                                                         2:35.00

'We had the kids detailing to us, and basically telling us, 'Look, I was in Tuesday afternoon's class. We met from 3:00 to 4:00. Also in my class was ▮▮▮ and ▮▮▮ and ▮▮▮ and this one and that one. And here's what happened to each of them.' We had that recorded in statements. That little boy, he was, he was one of the youngest kids. He was seven years old. And he was forced into anal sodomy. So he had blood in his, in his underwear. He was afraid to tell his mother and father, so he took the underwear – he told us he hid it. Well he couldn't remember where he put it. And whether he put it in the garbage. It was never found. His mother, I don't think found it. (dog barking)

'And he told his dog, he told his dog, Hershey, what was, what was happening. Because that was the only one he could talk to. All the          3:34.00 children, virtually every single one that...'

Q: ...

A: We didn't have a dog.

Q: Who did?

A: ▮▮▮, I think.

Q: ▮▮▮?

A: I think. Hershey just rings a bell.

| | |
|---|---|
| Q: Yeah. | |
| A: I don't know of any other – I'm not 100% sure. | |
| Q: Who's he? He was seven. | |
| A: See, I don't know, I didn't really know who was what age. So that's interesting. | |
| Q: I mean you see how she sort of like… it was all this photography and videotape – we never found that. There was bloody underwear, but that, the kid threw that out – we never found that.' You know? I mean she sort of conjures up – 'Oh, the pornography was everywhere.' | 4:03.00 |
| A: Everywhere. | |
| Q: Well that's not true, either. | |
| A: Right. And, and like in your living, it was in the living room. And the piano, there was a… | |
| Q: It wasn't in the living room.. | |
| A: It was no living room. It was kind of a little back, a little back, tiny place where the piano was, where he gave piano lessons. | |
| Q: Yeah. At one point she says that 'pornography was interspersed between the computer books in the classroom…' We did this interview, we came out of this interview and we were …kind of shell shocked, you know? …. (technical interruption) | 4:53.00 |
| END OF PART 14 | |
| | |
| BEGINNING OF PART 15 | |
| A: But I mean what she's saying is just what I heard her say, I think what I heard her say originally. I don't see any conflicts with that. | 0:02.00 |
| Voice: '…told us they were videotaped. To a child. So you know, at the beginning you're either thinking, 'Well there's nothing in the camera, and it's just another way of frightening the children'. But these are valuable to pedophiles. These are very valuable tapes. So it didn't make sense that there wouldn't be anything, in a, in a videotape recorder. And then of course later Jesse admitted that there were tapes, and the other person that we arrested – Ross Goldstein – told us about, about them. | |

'So there was a great, there were a great many witnesses telling us about the videotapes. And what was videotaped was what was ever going on in that particular day. That's basically what it was.'

'Q: But none were ever found.'

Voice: 'None were ever found. None were ever found.'

'Q: Do you have a theory on that?'

| | |
|---|---|
| Voice: 'Oh, yeah. I think they were removed, not found in the first search, who knows? They may have been in the back of a closet somewhere. Stored behind a, a fake wall. I don't know. So I wanted very much to make that a part of the plea bargaining agreement – that he had to come up with those tapes. But I think what happened was he just sort of made a lukewarm attempt, at any, to retrieve some of these things. We never really got any information about who might have gotten them. | 0:59.00 |
| 'I, I believe to this day that he knows, that Jesse knows. Normally you don't have physical evidence. We didn't have physical evidence in terms of the children – damage to the actually physique of the child, organs of the child. But you normally don't walk into a case like this with piles of pornography, with the videos, with witnesses who have witnessed these events. They're normally done in great privacy. It wasn't the case here. We know that large groups of children were, were brought there for weekends. | 1:22.00 |

'Well we don't, we know that they were shown films. We have a lot of information that they were shown films. We don't know the content of, of those films.'

Q: One accusation un…

A: Unsubstantiated. Yeah. And it was, I mean, everyone talked about videos, if they did, because they were asked leading questions about, 'Surely someone was there taking, was that… Someone was there, right?'

Q: That sort of circulates around.

A: Of course.

Q: The kids start to go, they hear each other in group. And whatever it is.

| | |
|---|---|
| A: Whatever. Yeah. Well they're just…it might not even take group. It | 2:25.00 |

**A-0297**

might just take the same detective going from house to house. You know? Like Typhoid Mary.

Q: Right.

A: Yeah. We've got videos tonight. Let's sell videos. This is not recording, right?

Q: No.

A: Good.

Q: Is there anything else that is worthwhile? *Um, I don't know....* I think it's interesting if it were...some of it you've seen from the presentation.
...

'Q: Was there any physical evidence in the case that was relevant or that was really what the case based on at the time...?'

Voice: 'It was more testimony. It was, there was a dearth of physical evidence...'

Q: This is honest.

Voice: 'I don't recall whether there was any physical evidence that would have indicated one way or the other that these events took place.

3:20.00

'Well I recall in the front part of the room – I don't know if they would call them a 'Florida room' in Great Neck, but there was a, a sofa where we moved the sofa aside, and there was some books I recall of child pornography. We found some pictures – I remember a picture of half of a naked female, I believe. A child. But the top part of the child's torso was cut off, so we couldn't identify who the child was. But by and large, not the type of pornography that I had hoped to find when we executed the search warrant.

'I don't know if there was a location that was secret, we couldn't find it, or whether between the time of the federal activity and the time the Nassau County Police got involved and we executed the warrant, whether Mr. Friedman may have moved it to a different location.'

'Q: And if, given what ultimately you knew you had to do in prosecuting the case, what are the kinds of things that would have been...good evidence, or evidence that would have been conclusive for you to use in that kind of a trial, versus ....'

Voice: 'Well the best case scenario, you would like to find videotapes of

**SEALED A-0229 THROUGH A-0429**

| | |
|---|---|
| A: I don't remember if that was, if that was before the arrest. I have no idea. I can't remember when it was. | |
| Q: Okay. And then the police came - who came? | |
| A: Sgt. Gallasso and a guy called Hatch. | |
| Q: And what was your impression of them, and what happened? | 0:05:30.8 |
| A: Well I'm sorry to say I was gullible and I believed everything they said. Even though they talked to me, they talked to Ron, neither one of us had any idea what they were talking about. No evidence that anything happened. Hatch took Ron to the computer, showed him something on the computer. Said, 'Have you seen that before?' 'Nope.' | |
| Q: And that was, what did he show on the computer? | |
| A: I don't know. One of those so-called pornographic things that Arnold was accused of showing them or giving them or whatever. | |
| Q: And they questioned Ron for how long? | |
| A: I don't, I really don't remember. They were sitting in the kitchen. | |
| Q: And what was, how would you describe the questioning that they were asking, how they were asking? | |
| A: I really don't remember. They were not too aggressive. I'm sure. | |
| Q: Were they open to the idea - do you think they were open to the idea that nothing happened? Because Ron obviously said that nothing happened that he saw. | 0:06:34.7 |
| A: Possibly. Possibly. | |
| Q: And what did they ask you? Because you had been - did you tell them you were in the class…you know, you'd drop off disks? | |
| A: I just said that I had absolutely no reason to believe that anything had happened. And they were interested in names of other kids. And I gave them a lot of names, because Ron was in Boy Scouts also with some of the kids. I had written lists. So they were very happy to take all these names. | |
| Q: Do you remember anything else about it? Any of the questions they might have asked Ron? | |

| | |
|---|---|
| A: No. I remember one of the things I said, that as a little kid I was still wiping his tushy sometimes, and I did not see any evidence that anything happened to him. | |
| Q: That's interesting. And then they just went away? But they came back? | |
| A: They came back a long time after. Jesse was indicted or whatever it was. And when they came back, they said, 'We spoke to Arnold in prison. We interviewed him. And he told us that Ron was his favorite.' | 0:07:40.2 |
| Q: What did you think of that? | |
| A: I said, 'Wow'. I said, 'What exactly happened?' And they sort of explained the mechanics of it, but I don't really remember what they said. Because I couldn't imagine raping little children. You know? So they said he was his favorite. And I remember telling Ron, you know, later on. 'He said you were his favorite'. Ron was a little worried. Said, 'Did he say I liked it?' <br><br> I said, 'No. I don't think so.' But then I started suspecting that they told other families that 'your son was his favorite'. And I think they did it so we'd get really angry, and do something to put Jesse away. | |
| Q: What made you suspect that? | |
| A: That's after I started becoming suspicious about the whole thing. | 0:08:51.4 |
| Q: What caused that? Do you remember? | |
| A: No. I really don't. But... | |
| Q: Well let me ask this: Do you remember hearing about these charges? They explained to you what they thought had happened. Do you remember hearing about the games that were supposed to have been played? | |
| A: The games I don't think I heard about, only the disks that were not appropriate for little children. | |
| Q: Right. And what else did you hear was going at the Friedman's? | |
| A: Nothing. All I heard was they were sexually abused. What I learned about is from the movie. | |
| Q: Right. But before the movie you started to have your doubts. | 0:09:36.8 |

6/28/2014 Margolith Georgalis - 5

**A-0431**

A: Yeah. Definitely.

Q: Was that because you believed your son?

A: Yeah. I believed my son, but I also, as I told you, well...I also told him, if something did happen to him - I didn't take him to a psychologist. I didn't see any reason - I told him, 'If something did happen to you, and somebody did something to you that you didn't like, okay. Done. You cannot change it. Not, you know, you have your eyes, your ears, your legs. Nothing physical happened. Go on. Forget about it. It's not the end of the world.'

Q: Did you really think that something happened?                                    0:10:16.4

A: No, no. But I said, 'Just in case, there is some kind of a memory buried in there and it will come out. Okay. It happened. It's all right.' You know?

Q: Where did you get the idea that memories were buried?

A: Because I heard that they were taken them to psychologists. Giving them hypnosis.

Q: Who said? Let's start there.

A: I don't know. Somewhere along the line, I heard that parents were taking the kids to therapists and to hypnosis, to bring out this buried memory, that all these threats that they supposedly had against them. 'If you tell anybody, we'll kill you. We'll do this, we'll do that.' So I said, 'Okay, maybe there's something buried in there that I don't know.' So I told him, 'If there is, if it happened, it happened. Can't change it. If you can live with it, forget about it, go on.'

   And I think at some point he realized that nothing really happened, but    0:12:15.4
if it did happen, it's not the end of the world.

Q: There's a tipping point, right? In these sort of things, where you get to a point where you hear just enough to start to think 'Well that sounds a little too crazy. Things are getting out of hand.'

A: Yes. At some point I thought that it was a witch hunt. And I know that at that time there were other cases in the country. So there was some mass hysteria about child abuse - not that there isn't real child abuse. But that was just a period of hysteria.

Q: And how was your relationship with the other mothers who were, you know, ...

6/28/2014 Margolith Georgalis - 6

**A-0432**

A: We didn't talk about it.

Q: The mothers didn't talk about it?

A: The mothers didn't talk about it. And Arnold's letter said specifically 'Parents, talk to each other.' Nobody talked. I don't know why. I think everybody thought, 'If something happened to my child, maybe not your child, and I don't want you to know about it.'

0:12:04.2

Q: Right. And did you know which kids ended up testifying in front of the grand jury?

A: No, I actually never knew for sure. I knew about the one kid who left town. After the case. And I said, 'That's odd.' Maybe they moved for another reason. Maybe they moved because of this case.

Q: ….(technical)…

A: Start all over again?

Q: No.

A: I was really going to take them off…. It's strange when you have…You're not recording this instant, right?

Q: No.

A: So weird. When you know you're recorded, you're blah blah blah. You don't talk normally.

0:13:23.1

Q: You're doing very well. …

A: I'm twirling this thing like a nervous wreck.

Q: No.

A: I should have taken the glasses off in the first place.

Q: Did Ron talk at all about the kids talking about these events in school?

A: I don't remember if Ron ever talked about them talking in school. I really don't remember.

Q: Did you see any lasting effect on Ron? From talking to the police? From these…?

A: No. There was no lasting effect of this.

Q: How would you describe Ron as a nine year old?

A: He was a good student. He loved cars. He enjoyed the computer games. He was, he had a few good friends. He was perfectly normal.

0:14:10.5

Q: Did any of his friends testify, or did they talk about it? Or you wouldn't know?

A: I don't know that they talked among themselves. I don't know.

Q: Okay. Let me go through my list right here.... When you had an adult class, Jesse didn't participate in those? I guess he didn't need an assistant because adults don't run around...

A: In the adult class we only had four - or three - people.

Q: And Arnold was always there in the class, right?

A: Arnold was there from the beginning to the end. I have a little story about that. I don't know if you want it now.

0:15:12.3

Q: Sure.

A: At one time Arnold had this game, 'Donald Duck's Playground'. Which was a very cute game. You build a playground, and then you play in it. And Valerie Spitz and I asked him to copy it. And he said, 'This is really too good and you should really go buy it. It's not right that I should give it to you.'

We said, 'If you don't give it to us, we're not buying it. So nobody's going to lose anything. Give it to us.' So he finally said, 'Okay, I'm going to end up in jail.' He said, 'Will you visit me?' We said, 'Oh, yeah, yeah. Sure. We'll come visit you.' 'Will you bring me fruitcake?' We said, 'You like fruitcake?' He said, 'Yeah!' We said, 'Okay, we'll bring you fruitcake.'

And to this day, I'm so sorry that I did no send him fruitcake. But how he predicted the future.

0:16:10.5

Q: Yeah, not for copying that disk though, unfortunately. That would have been a gift. When you first heard these allegations, you just immediately assumed that they were right? Or was your immediate assumption like 'That's crazy'?

A: Um, well I figured something may have happened, because he did get

a child pornography magazine in the mail. That was a fact. So he had an interest in child pornography. That was a fact. But I didn't see any reason to believe that he did anything to any of these kids. He had been a teacher for years at Bayside. No complaints, obviously. All this time in Great Neck teaching computer, teacher piano.

0:17:18.1

I could not imagine that he did anything. But maybe he did a little something. Possibly. Not to my child, but maybe to somebody else. If it had not been for that magazine - which was a fact - maybe I would never would have swallowed any of that.

Q: That's a very good point. So none of the mothers were talking about this? It's funny, because there seemed to be a group of mothers - which is the Mary Ross, Epstein, Cohen... I can't remember her name...Yaskowitz. That were chatting about this all the time. They became sort of the core group of mothers that were sort of storming the DA's Office, and you know really working the psychologists over. And actually working the school superintendent over, trying to do more. But then there seems to be another set of mothers that like Jason Seid's mother and, who didn't really participate in that. Just kind of wanted it to be gone.

A: Yeah. I heard that there were people demonstrating in front of his house and hollering. I wasn't going to join any kind of group like that.

0:18:33.2

Q: Yeah. It got pretty crazy in Great Neck at that time. Can you describe some of that?

A: I really did not see it with my own eyes. I read it in the papers.

Q: It was all over the papers.

A: Yeah.

Q: Almost a daily...

A: I cut out the papers. I have a pile this thick.

Q: Was there like an article every day?

A: No. Not ever day, but often enough. Sometimes even on the news. When he was first arrested I think was on the, on the networks.

0:19:13.7

Q: And they, it just got bigger and bigger as it went on. The second indictment, third indictment and the, you know, testing for AIDS. And it just seemed to get...

A: Testing for AIDS? I didn't even hear about that.

Q: It was in one of the newspaper articles. Did you ever go to any of the public meetings about it?

A: I think I may have gone to one.

Q: Do you remember what that was like?

A: No. They said the usual things. You know, 'Take your child to a psychologist, and investigate what happened.'    0:19:41.0

Q: Because the kids have repressed memories.

A: Pardon?

Q: Because the kids have repressed their memories?

A: Yes, yes. Of course. Either repressed, or they threatened them. They hit their heads against the walls and they threatened them that if they tell anybody they'd kill them.

Q: That must have been the tipping point for you.

A: Yes. Ron said, 'You think that if something like this happened to me I would go back there and I wouldn't tell you?'    0:20:17.4

Q: It's a good point. Were there any other people that you know in the community who were what you would call a 'doubter'? Someone from the very beginning who was sort of standing up for Arnold?

A: As I didn't speak to anybody much about this... I mean the one who sent the police here, you know, we both said 'We don't know that anything happened.' Maybe on occasion I talked to somebody, but not in any major way.

Q: What did you think of, what did you think when you saw 'Capturing the Friedmans'?

A: I was very moved. It was really a family tragedy. And I really loved Arnold Friedman, and I, you know, whatever we're doing now doesn't bring him back. That's such a shame.

Q: You were at the Great Neck screening, right?

A: Yes

| | |
|---|---|
| Q: What was that like? | 0:21:20.3 |
| A: Well after that it was kind of wild. | |
| Q: Tell me. | |
| A: Well some people stood up and said how wonderful these people were and nothing happened and 'how dare you', and the judge was sitting right behind me, and people were hollering at her. That reporter, Nathan...there was such exchange with her. So it was interesting. | |
| Q: Do you think it was, I noticed Ron has got this incredible memory, and he really seemed to feel good about talking to us. He was one of the few boys who was just right from the beginning like... | |
| A: Yeah, he has a strong sense of justice. 'And this is the truth and this is what I'm telling you. And it should be told.' | 0:22:07.1 |
| Q: That's good. He's got good parents. I can't think of anything else. Can you think of anything else? I'm afraid I'm missing something.... What would you like to see happen now? | |
| A: I want Jesse to be cleared so he can live near children and have children and be a free person. Can't take away what he's suffered, but he's still young enough to have a long, happy life. | |
| Q: ...just sit for a second. I want to see something. | |
| A: You're going to cut a lot of it out, I hope. | |
| Q: I might as you to answer that question one more time - the one about when they came back, just one more time. Because you did a little better of an answer when you did it on the telephone, and I wanted to use that. Can you tell me the story about when they came back the second time. Do you remember...? | 0:23:14.0 |
| A: Yes. Yeah. When the Sgt. Gallasso and somebody else came back a second time, that was after they already convicted Arnold. And we sat in the kitchen, and they told me 'We interviewed Arnold in prison, and he told us that Ron was his favorite', which was a surprise. But later on I thought of it, and I thought they probably told it to other families, too. And I felt that they were trying to do it to make us mad, really enrage us against Jesse and try and come up with something against him. Which we didn't have anything to say against him. | |
| Q: What do you say to Gallasso when she said this? | |

| | |
|---|---|
| A: Well Gallasso said that, that's when I asked, 'What exactly happened, like physically?' And honestly I don't remember the answer. But you know she implied that he definitely was molested in one way or another, because he was his favorite. So I kind of wanted to know what exactly did they do to him. | 0:24:19.9 |
| Q: And did they ask, talk to Ron a second time? | |
| A: I don't know. Ron was standing by these louvered doors, which were closed, and listening - which he mentions in the movie. I don't know if they talked to him a second time. | |
| Q: Or maybe did you allow them to talk...because you have to... | |
| A: No, I didn't not allow. I mean, 'You want to talk to him, talk to him.' But I don't remember that they talked a second time. Maybe he should remember better. | 0:25.01.7 |
| Q: Yeah, yeah. Ann had a different experience with them. They were much more aggressive with Ann. It seemed. Do you remember talking to her after they came to see her kids? | |
| A: No. We were not friends too much at that time. We got, we became friends later on. And then she told me that she had taped the interview. | |
| Q: Amazing. | |
| A: That was just sticking a video camera through the air vent or something interesting like that. It's too bad it's lost. But she has the transcript. Right? Somebody copied it. So. | |
| Q: Yeah. She's going to read it for us today. Okay. That's great. Thank you. That wasn't so bad, right? | |
| A: No, that's not bad. But if I see it, I'll probably... | 0:26:01.7 |
| END OF INTERVIEW | |

COUNTY COURT
NASSAU COUNTY

--------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

                Defendant.

--------------------------------------------------------------------x

**AFFIDAVIT**

MARC SMERLING, having been duly sworn, hereby declares that the
following is a true and accurate copy of excerpts of the transcript of my
conversation with Chris Blaha in 2012.

                                        Marc Smerling

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

Chris Blaha

| PART 1 | |
|---|---|
| A: Hello. | 00:07.00 |
| Q: Hey Chris? | |
| A: Yeah. | |
| Q: It's Mark Smerling, how are you? | |
| A: Good. | |
| Q: Good. I talked to your mom the other day, and I hope you don't mind me calling you. I ah, I just want to ask you a few questions, and I'll make it as painless as possible. | |
| A: All right. | |
| Q: Listen, you know, your mom gave me a pretty good rundown of your experience talking to Nassau County detectives on the Friedman matter. And I just wanted to get just a quick recollection from you about, about what that felt like. You know, you were what, eleven years old. And then just a, maybe a little recollection of the classes. So I guess... | |
| A: Now, I could tell you that ah, I mean honestly I ... actually where she got all involved with this. I didn't even get the demographics right of the cops that came. So I don't have much of a recollection of ... I just remember them and being in the house, and that's it. | 00:45.00. |
| Q: Right. | |
| A: I don't remember what they asked or anything. | |
| Q: You don't remember feeling any pressure or anything like that. You just stuck to your guns and ... | |
| A: No. And at this point, at this point my memory started to get tainted by my mother saying that they asked, you know, the same question repetitively. But I don't remember. | |
| Q: Do you remember being in Arnold and Jesse's classes? Do you remember that experience? | 1:20.00 |

**A-0440**

A: I remember being in the class, that's what I can tell you. I mean, I would remember if there was some naked ... going on. I find that nearly un-plausible if they're saying that I was there in the class, that I was participating in.

Q: You're actually in a ...

A: I'm a loud kid. I'm pretty sure that there's nothing that they would have said ... I don't remember any fear. You know, the only way they could have stop kids from talking, I would imagine, would be some kind of intimidation. And that's definitely not a memory that I have.

Q: Do you remember seeing any pornography? Do you remember seeing the computer games that they talked about? Those pornographic computer games?

A: The only thing that I have a slight ... I don't think I ever saw anything. I think that people knew that they were there, but I don't remember us like ... I remember like, if anybody did it, it was them trying to be sneaky.

Q: Right. Well, a lot of kids have told me that those games - everybody had those games. I had those games personally when I ...

A: Are you are we talking about Leisure Suit Larry?

Q: Yeah, stuff like that. Exactly.

A: Yeah, I mean that kind of rings a bell, but I definitely wasn't part of the computer class.

Q: Right. I mean, you kept signing up so you must've liked the class, and your brother was in it, too.

A: And so was my father – who, by the way, never turned on a computer again after that class, so I don't know how good teachers they were, but that's another story I guess.

Q: Yeah. So you have no memory of any sort of weirdness in that class, or any of Jesse or Arnold touching anybody - or anything like that?

A: No.

Q: Yeah. And you took how many ...

A: The, the, the, only story that I remember that ... The only thing I remember that, that was like remotely involving them being weird was ...

| | |
|---|---|
| | 1:21.00 |
| | 2:20.00 |
| | 3:02.00 |

| | |
|---|---|
| Now I am digging back deep here. But there was something about like the bathroom was supposed to have cameras. I'm not sure if that was like after like, you know, the whole scandal came out - or if that's while I was there. I don't remember. | 3:03.00 |

Q: Yeah, that's the problem is ... I mean, I've never heard that before actually. But the problem is, that there's so many rumors going around afterwards, and there's so much talk going around. But I mean, your personal experience is the most important thing, you know.

A: There's gotta be ... We were little kids. There would be incredible physical evidence at the time. Am I missing out on that? I mean ...

Q: No, there was no physical evidence that anything ever took place.

A: If, if, if, if kids were really being like sodomized like that movie portrayed, wouldn't there be, I mean, blood?

Q: Yeah, you would think so. You would think so. I mean, there was no physical evidence. The entire case was built around the testimony of fourteen kids. And we've contacted quite a few, and they've either recanted fully, or say they have no memory of these things ever occurring. And they don't really understand, I mean as adults, what they were responsible for in the indictments.

| | |
|---|---|
| When you tell them, 'Hey, you know, you actually are responsible for two counts of sodomy, and forty counts of sexual abuse.' And they're like, 'I never said that in the Grand Jury.' And you're like, 'Well, that's what it says you said.' And they're like, 'Well, I don't have that memory.' The only kid who says something happened so far is a kid who says, 'I remember it after being hypnotized.' | 4:11.00 |

Did any of your friends tell you about their experiences with the police, or do you remember talking about this with your friends at school?

A: I do not. Now ... As a matter of fact ... I mean, I don't remember if there was a reaction at school.

Q: Right. Right.

A: I, I, I, I can only think of one kid who I still might ever - every now and then run into, you know, that was involved.

Q: Yeah, who's that?

| | |
|---|---|
| A: Mom said Larry Predo(?) was in my class. | 5:04.00 |

Q: Yeah, he's a good guy. Yeah.

5:05.00

A: Without looking at a class, without looking at a class roster, I wouldn't be able to tell you.

Q: Right. He was a non-complainant like you were. He was not somebody who ah, who ah, who testified. Let me get my class roster and see if ...

A: And he's another one who I think would have said something. I mean, first of all we were, we were buddies as little kids. I mean, his father was an EMT. I mean, there would have been something physical. You know, we both had normal relationships with our parents. I don't think ... Something would have been said.

Q: Yeah. Well, that's what we hear a lot of. You know, I mean, it's not just your mom. We have three or four mothers who were like, 'You know, I used to walk in and out of the class all the time, and I think my child would have said something if something, you know, was happening.' You were in a class with a kid named Blake Feldman. Do you remember him?

A: No. I don't recognize that name.

5:53.00

Q: Yeah. Larry Predo a non-complainant. Michael Heller, Matthew Katz.

A: I, I, I recognize that name. Yeah, I mean I dated Matt Katz's sister.

Q: Michael Heller was a non-complainant. Matthew Katz was a fairly serious complainant. Jonathan Ross ... Go ahead.

A: (stutter) I guess I could understand why that was never brought up. But I mean that was never brought up in my relationships with that family. I wasn't close to the parents, but I was close to her. I still talk with her every now and then.

Q: Right. Do you remember a boy named Jonathan Ross?

A: Yes.

Q: He is a major, major complainant. Do you have any memory of him?

A: Ummm. I think I have a memory of him from high school, not from that class.

6:41.00

Chris Blaha - 4

| | |
|---|---|
| Q: Right. Right. Bryant Tillker(?), who is one of the kids that was in your class, who has since recanted. Alan Yaskowitz, we have not been able to find, and then there was a kid named David Zarin, who we talked to who is a noncompliant in the same class you were, who said he was in that class and said nothing ever happened. And then the police came and they were really, really aggressive, and they kept asking the same questions over, and over, and over again. Like they ... He says, basically he says, you know, it was like they had this story in their head, and he just wanted to hear it for themselves. | 6:42.00 |

A: Yeah. I mean ... It would be interesting to be a fly on the wall now. I don't remember what they did. And thankfully my mom was there. I would actually like to see their notes, because apparently they did talk to me before she was there. But maybe they were professional enough not to ask them questions, I don't know.

| | |
|---|---|
| Q: Well, I think you were a strong kid. To be honest, I mean, if you look at the class list and you see, you know, that the kids who stuck by their guns - they usually, you know, they went away after a couple of visits, you know. | 7:31.00 |

A: Yeah.

Q: And the ones who kind of like, you know, I mean I'm hearing from a lot of people that Jonathan Ross was a, was a troubled child, and had a, you know, sort of a lot of issues. You know and they seem to ... You know like all these situations, when there's a lot of pressure put on, the ones who have other issues tend to ...

A: And the parents are looking for an excuse for the kid to be a little bit of a loser.

Q: Right. Well, it abdicates parenting in some ways right? It's not my fault, it's this thing. Okay, well I just, you know, so you had a good time in those classes? That's what your mom said; that you were pretty excited about them.

A: (laugh) I'll take her word. Yeah, I mean especially what I looked forward to if there was some traumatic event going on ... You would at least find kids would make some excuse not to go 'I feel sick', or, or that kind of thing.

Q: Yeah. What do you think was happening back then?

| | |
|---|---|
| A: I mean, I don't know. I can't even, I can't even fathom like logistically how that would be possible. As kids are going to show up a few minutes | 8:41.00 |

Case 2:06-cv-03136-JS Document 372, Filed 12/07/2098 Page 433 of 443 Page ID #: 3979

late, kids ... I mean, I don't know how long the class was; let's just say an hour. So you gotta figure some kids are going to show up 15 minutes late. This is great ... Parents are going to show up 15 minutes early. That gives a 30 minutes window to get like ten kids naked, and have them all stay quiet about it. I mean that, that makes no sense at all. But ... I don't have any memory - good, bad, or indifferent - about the joint. I'm pretty sure that ... I was old enough that if there was some sort of traumatic event I would remember it, you know.

Q: Yeah. Yeah. Do you remember, I was trying to see, do you remember a kid named Darrone Nissimi? He was very ...

9:08.00

A: What did you say his first name was?

Q: Darrone.

A: No. I mean Nassimi is a common Great Neck name, but I don't recognize the kid's first name.

Q: Yeah. And Kamal Marchoudi? Those were two kids who were in the class with you with Danny Kadddash (?). A lot of non-complainants. Jamie Forrest, Ron Georgialis, who we've spoken to who is, 'I was in that class'. I mean it's helpful Chris, because, you know, your memories are important because they're saying you were in a class where all this craziness was going on. And, you know, kids from that class were telling us that this was not happening. You know, not in front of them it wasn't happening.

A: I'm trying to remember ... I'm sure there's pictures of it somewhere in - I'm trying to remember the layout of like how the place was constructed. It was all in one room right? I mean there's no way that this could have been happening in ... The class wasn't segregated in any physical matter. Am I right?

9:51.00

Q: Yeah, you're right. It was all in one room. He....

A: So I also find it impossible to believe that out of, how, is it twenty names? - that all these kids would shut up about it when they went home? This is Great Neck. You got a bunch of spoiled kids here. I'm not sure if you're going to intimidate them very well, you know.

Q: Yeah, I agree. Well, there's also the, the fact that you signed up for classes, most of these kids, too. Even the major complainants would sign up for class after class. I mean, what's really a testament to, to I think Arnold, is that the kids seemed to really enjoy it. I mean, you see a lot of kids go through Basic-1, Basic-2 , Basic-3. Then they do the Game

10:44.00

Chris Blaha - 6

**A-0445**

| | |
|---|---|
| Maker class, and they do the Music class ... | |
| A: ... Yeah you are playing games on a computer... You are playing video games. | 10:48.00 |
| Q: Yeah. Emotionally that's interesting. I've never asked of this, but you bring it up. What would you do during the classes all day? | |
| A: I, I, I, I think there were like educational games. But I'll be damned if I remember correctly. | |
| Q: Right. All right, well I appreciate your time. | |
| A: I, I, I mean I was a little kid. I'm sure it was nothing very advanced, because I wasn't a computer guru. I still type like shit so ... | |
| Q: Yeah. Well I appreciate your time, I really do. | |
| A: All right, no problem. | |
| Q: Your mom's a champ. I love her, she's great. All right, take it easy. | |
| END OF INTERVIEW | 11:25.00 |

COUNTY COURT
NASSAU COUNTY

------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

                    Defendant.

------------------------------------------------------------x

**AFFIDAVIT**

ANDREW JARECKI, having been duly sworn, hereby declares that the
following is a true and accurate copy of excerpts of the transcript of my
conversation with Shahar Lushe.

Andrew Jarecki

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0447**

Shahar Lushe and His Mother

| | |
|---|---|
| PART 1 | |
| Q: Hello. | 00:24.00 |
| S: Yes, hi. | |
| Q: Yeah, that's better. | |
| S: Is that better? | |
| Q: Yeah, much better. So, I was just saying that ... Let me just give you just a couple of minutes of background on sort of how we came to this story, and why we were interested in talking to you. | |
| S: Okay. | |
| Q: We started making a documentary film about the Friedman case, and sort of the Friedman family. And one way or another...originally we started about a year and a half ago, working on a film about, that included a guy in New York City called David Friedman, who is a professional clown and children's entertainer. Now, we didn't know this more elaborate story about the family until later. And then, as we started to get more into his story, we discovered that there was a lot more of this history about the family, and the trouble that his father and his brother got into. | |
| And so, we, we refocused the film about a year ago, or something like that - maybe six or eight months ago, actually I guess. We refocused the film on ... to focus on this issue of the case, and how it developed in Great Neck at that time. And so mainly I've been interested, you know, I didn't have a real clear perspective on it coming in. I've done a lot of work on it but, you know, I think it's really important to talk to people who had even some experience with the Friedman's - even if it's not, you know, something where you remember it very, very clearly. | 1:19.00 |
| S: Right, right. | |
| Q: You know, I think it's important to ... Just trying to get people's recollections, and see what, you know, what you do remember from it because, you know, whatever - thirteen years ago or more. And a lot of people that were involved were pretty young. But, you know, I was mainly just curious to hear what you or your mother did recall about that time ... | 2:16.00 |

**A-0448**

| | |
|---|---|
| S: Okay. Mom, you're on the line right? | 2:16.00 |
| M: Yeah, I'm here. Hi Andrew. | |
| Q: All right, nice to meet you. My name is Andrew. Wait, you already know that. | |
| M: Well, he was taking computer class with him. And what happened is that he got the chickenpox, and he was going to miss at least two classes. So I went to him and I said, 'You know, ... | |
| And I think he only gave one class. So it was right at the beginning, and I figured maybe it's not a good time. I think the whole - it was supposed to be like six or more seven sessions I'm not sure. So I went to him and I said, 'You know, he's going to miss two or three classes. Why don't we cancel for now and reschedule him for the next session?' And he said, 'You know something? Don't even worry about it. Your son is very, very smart. And what I'm willing to do for him is just bring him in half an hour before everyone else comes in. When he does come in, and I'll go over it with him. | |
| Q: All right. | 3:28.00 |
| M: And that's what I did. I think I did it once only. And everything, I mean class was done, was finished, and that was it. And then the next thing we heard about them was the fact that they were arrested. Also his wife was running childcare in her house, a kind of a play group. And my little one was two at the time, and I went to observe them with the kids to see if it would be a good place for my daughter. And I didn't like it. | |
| Q: Why not? | |
| M: I didn't like her. I didn't like the woman. The mother. They all had to do a lot with kids, everybody in the family. I know that the father, years ago even before we came into this country, taught my nieces piano. And so I know that for years they did have a lot to do with kids. When the story broke we ... My husband and I were very, very concerned, and we asked my son if anything happened. And he felt very threatened at the time, and he started crying, and being on the defensive. Said, 'No, nothing happened to me.' | 4:18.00 |
| And he insisted that nothing, nothing ever happened. And I don't think it came up much after that. Maybe we discussed it a few times, and every time I pass by the house I think about them, but that's about it. I don't even know what's the story with them now. | 5:39.00 |

Shahar Lushe and His Mother - 2

| | |
|---|---|
| Q: Well, Arnold the father, the father died in prison. | 5:40.00 |
| M: Oh really? | |
| Q: Yeah, he died about, about five years ago. And he, and the son Jesse is still in prison, and he's been in prison for about thirteen years. | |
| M: The mother? | |
| Q: The mother is, she sort of remarried. And she sort of got a new life. she's old, she's about seventy now. And so, you know, the brother - the one that I was, originally was included in my film that I was making before, is, you know, he works with kids, obviously. | |
| M: He was the older brother right? | |
| Q: Yeah. There were two older brothers actually. There were three boys in the family altogether. And he basically spends, you know, he's a children's entertainer. I don't think there's any, you know, my personal opinion is that he is a legitimate children's entertainer and, you know, works hard, and I don't think he's a child molester. But, I think that, you know, there was so much controversy about this story at the time, and obviously a lot of very strong emotions in Great Neck - and this is obviously a case that upset a lot of people. | 6:27.00 |
| M: Right. So how many kids did actually come forward? | |
| Q: Well, in the end there were fourteen kids that, that testified in some way. But it's unclear exactly ... You know, some of them testified that there was real sexual abuse, and then other people just testified that maybe they saw a computer disc in the class that had some sexual content on it, or something like that. | |
| M: Shahar, do you remember anything like that? | 7:29.00 |
| S: No, can't say I did. | |
| Q: Shahar, do you have any recollection of the class? | |
| S: You know what? I can barely remember, you know, the setting - the way that computers were set up and ... I remember where the bathroom was there. I remember having to go to the bathroom once. That was always a problem for me as a little kid in a strange place. Where do you go to the bathroom? For some reason, I remember his son showing me where the bathroom is. That's about it. I don't remember the teacher's face, or anything like that. What did I have? I probably went to about | 8:07.00 |

Shahar Lushe and His Mother - 3

**A-0450**

| | |
|---|---|
| four classes in total would you say? | 8:07.00 |

M: Ummm.

S: About five?

M: Yeah. I remember wanting to go in, and they didn't give me a chance to do that. They kind of blocked the door. And I'm the type of mother that would walk her child in, and stay for a few minutes - and then, a few minutes early and just observe him. And they never allowed that.

Q: And did they say why?

M: No, and it seemed like a natural kind of thing. Maybe ... I can't swear that that's what they say, but it might have been that, you know, they didn't want too many people going into the house or something. The son would usually walk the kids out, as the parents came in to pick them up. So what I would do is just sit outside and wait for him. But never actually ... I think the only time I went in was the time that I went to register him.

And then in the different place in the house, I went to watch his wife with the kids. She was a tough woman. She was, she was definitely pretending when I was there.　　　　　　　　　　　　　9:18.00

Q: Why do you say that?

M: Because, you know, that's the way it felt. She wasn't being herself. She was being over nice. And the interaction between her and her aid didn't seem right. And I guess the way she spoke to the kids. It wasn't the place where I was going to leave my child. I didn't like it. It didn't feel like a warm, comforting place. So that was it. I wish I knew more about it, as far as exactly what he did to those kids.

Q: Well you know, I think there's a ... It's sort of unclear because, to some extent, you know, it became a very passionate event, and everybody became very upset about it. And it's sort of hard to know, even at this point, exactly what happened. But I think ... You know, it's interesting that this sort of general sense that you got is kind of interesting, because I've spoken to some people who have said, 'Well, I had no trouble, they would always let me in, and I felt it was an open door policy.' And then I had other people who said, 'Well, in general that Jesse the son would bring the kids in and out, and I didn't feel like I was being welcomed in.'

M: Uh huh.

Shahar Lushe and His Mother - 4

**A-0451**

Q: Yeah. That's interesting.

S: I do think I remember doing computer work, though. I mean, we definitely worked on the computers. I don't know if there's any question of that. But ...

M: No, I think, I think you did a good job on the computer too. We're talking about thirteen years ago.

S: I don't think we had a computer at home.

M: We did not. It was just the beginning and you were very excited about it. You did nice work. I mean, it definitely gave you the introduction that we were looking for.

S: It was new to me either way, so I don't know. I didn't know what to expect.

Q: Yeah, but for example, do you remember anything about ... I mean even as it relates. for example, to the bathroom. There were some kids who said, 'Oh yeah, well I went to the bathroom, you know, in this room.' And then other kids who said, 'Oh the bathroom. That was where I was abused.' I mean obviously from what you're saying, do you have any recollection of anything in the bathroom that was in inappropriate?

S: No, I don't honestly. You know, I always thought, you know, I could maybe try and remember things, but I don't remember a lot of things from when I was that age. So, I mean, I honestly believe that if something happened, you know, if it really stood out as something that I didn't think were right, I would remember it. I'd like to believe that. But you know, I can't think of anything like that.

   I thought about it. I remember we talked about it when I was younger, and that's why, when I got the letter, I didn't remember the name Friedman. But for some reason I had a feeling it could be part - something to do with that.

Q: Right.

S: Because my mom had, you know, drilled in my head - she wanted to know if anything happened. So she would ask me, you know. But I don't think anything like that did happen with me at least.

Q: Do you remember, there was some thought that they sometimes had somebody else in the classroom? Do you remember whether there more

| | |
|---|---|
| than just two people there?<br>S: No, I honestly don't. I think I remember, but I don't know if it's from people talking, that the son would carry a camera around. But I think that's just something that I've, I've heard over time. I don't know if I actually remember seeing it or not. | 13:29.00 |

M: I think at the time, you said that he did have a camera. And I think I remember the second child there as well.

Q: You remember another, somebody else was part of the classes?

M: Yeah, I think the older child. There were two boys. As far as I remember, there were two boys. I didn't even realize there was a third, but I remember seeing two boys.

Q: What you mean two boys?

M: Him, and his two sons. Mostly the younger one.

Q: Jesse.

M: Was he like sixteen at the time?

Q: Probably, yeah.

M: And um, his older was like two, two years older?

Q: Yeah, about that.

M: Is that David?

Q: No, David would be, he'd be the older still. Probably another - he's about six years older than Jesse I think.

M: Okay. So I remember seeing the two boys. Maybe, maybe, in the very first time. How big was the class Shahar?

S: I don't know.

M: Five, six kids the most. Right? They didn't have that many computers.

S: I don't remember. I think I remember working with somebody else coming late or something, and sitting with somebody else for a few minutes or something. We were sitting *(cough)* excuse me - together. Two people on one computer, if I'm not mistaken.

14:34.00 appears aligned with "Was he like sixteen at the time?" area.

| | 15:35.00 |
|---|---|
| Q: And do you remember ever, there being any ... You know there was this question of whether there were any computer games that were shown to the kids, that were sexual computer games, or like - there was a computer game called Strip Poker, things like that? | 15:36.00 |

S: That I don't remember. I can honestly, I mean, I wouldn't have known what strip poker is at that age. I was, I didn't know what poker was until middle school, I don't think. But umm, I don't remember anything like that. You know, we might have played games, but I don't remember them.

Q: Right.

S: I remember when I got my computer at home, I was still very amazed by it. At school, we had Apple IIe's. And my dad went out about the same thing, because that's what we were learning on. And I remember that ... I mean everything was, like new to me. I think when he was teaching us, he was teaching us on IBMs. So it was a little bit different.

Q: There was some discussion that there might have been another young man who was not one of the Friedman family. A guy called Ross Goldstein. Do you have any recollection of that?

S: No, I don't. I haven't heard anything about that. I don't, I, I, I don't remember if other people were around, if I would have even noticed it, you know. It could've been other parents, or whatever.      16:51.00

M: How old were the kids that were abused?

Q: Somewhere, I guess there were, you know, sort of, they were eight, nine, ten, or eleven - in that range.

S: Were there any from my class in particular? Do you know?

Q: I haven't been able, I think you were in a class called Basic One. That probably would have been the class that you would have started with.

M: How did you get his name?

Q: Well, I think - we actually have sort of been digging around for, you know, whatever information we can get. So we've been sort of getting various documents. And then, this probably, I don't have the exact source - but I'm guessing it's probably from something like Arnold Friedman - when he was in prison, he wrote some notes.

**A-0454**

| | 17:56.00 |
|---|---|
| M: Yeah, he did write us a letter. | 17:57.00 |
| S: To apologize? | |
| M: To explain. | |
| S: What was he explaining exactly? | |
| M: Now, I have the letter someplace. I saved it, but ... | |
| S: Was it a personal letter, where he wrote it to everyone? | |
| M: I think he wrote it to everyone in his class. He was claiming that he never did anything wrong. Did you ever get a hold of one of those letters? | |
| Q: Yes. | |
| M: Okay, so you what's written in it. | |
| Q: Yeah. No, he was very ... | |
| M: Two long pages or something? | |
| Q: Yeah, it was, it was pretty long. One of them came from Jesse, and one of them came from Arnold. The Arnold letter was actually about sixteen pages. | |
| M: Oh, really. | |
| Q: You. I'm not sure. And the Jesse one was, was, like two pages. | 18:50.00 |
| M: I don't remember. I can try and look for it but ... | |
| S: So how many students did they think he had overall? | |
| M: Few hundred I would say. | |
| Q: Well, he actually had about ... It's not entirely clear, but he certainly had more than a hundred students altogether. The number of students ... You know, there are a lot of classes were you had one child who said, 'Oh yes, I was abused.' And then five other children said, 'Nothing happened.' | |
| S: It could very possibly be that he chose the ones he ... Or maybe just | |

Shahar Lushe and His Mother - 8

**A-0455**