in the bathroom, if you happened to go to the bathroom or something like that.

19:45.00

M: You tend to believe that it was not true?

Q: You know, I've been keeping a very open mind about it, because I've spoken to people who believe it, and other people that don't believe it.

19:47.00

M: Uh huh

Q: You know, I certainly, you know, I'm certainly concerned for people that have a recollection of having that happened, but it also seems like there are a lot of people who were in the same classes don't recall it. You know. So I'm just sort of, you know, I'm trying to keep a totally open-mind about it.

S: I find it hard for kids to be able to make up something like this, but I know that the way parents - I mean this is just my personal opinion, I don't know if it helps you at all - but I know that if a parent is so worried about something, then the kid is going to be worried about it, too. He's gonna get scared, and it might cause them to see things. I know that, that can happen. In my case, I mean, I wouldn't say anything that I don't remember. The answer I'm trying to give you is, you know, I honestly don't remember anything.

Q: Sure.

S: But then again, you know, you can never know. Kids are very scared, and it could work the opposite. It could be that they, they're afraid to say what happened, you know. And, I don't know. I guess it's very difficult. I'm sure you know that already.

20:50.00

M: Did you get a chance to speak to Jesse?

Q: Yeah, I visited Jesse actually in prison.

M: What does he say?

Q: Well you know, he says he's innocent. And he says that, you know, that he thinks it was a big witch hunt, and that police were bullying the kids, and so on. Did the police ever visit you?

M: No.

Q: Did they ever try to get in contact with you?

Shahar Lushe and His Mother - 9

**A-0456**

| | |
|---|---|
| M: Yeah. They contacted us, and let us know that that's what happened. | |
| Q: Yeah. | 21:32.00 |
| M: That's how we found out. | 21:33.00 |
| Q: And did they at any point want to get you to have a discussion with them? | |
| M: They said if you need to, you can come. If there's a reason for you to come, then, then yes. And over the years I was thinking that maybe we should have, even though Shahar said that nothing really happened. But at the time I think it's a very scary thing for a parent to think that, you know, that they left their child some place that wasn't safe. I got one phone call I think, and that was it. | |
| Q: Yeah. Well I think, you know, I don't think there's any reason ... I mean it seems to me like, you know, you have pretty good relationship with your son, and obviously you have pretty good intuition about, about, you know, his recollection. And he seems quite clear, you know, in terms of his recollection. So, I always think that's a good sign when you have somebody who, you know, who really has a personal recollection about it. | |
| Now, when he was originally - when you confronted him with it - why do you think he became so upset. Do you feel like you were influencing that? How did you explain that later when you are thinking about it? | |
| M: I don't know. It was really puzzling. It was an odd reaction, because I don't think we were pushing him too hard. I think we were pretty gentle. But I remember clearly where it happened, and how we told him first what we have heard. And we asked him, 'Is there something you think you might want to tell the police? Or is there something that you might want to tell us? Did he hurt you in any way?' He said a few times, 'No.' And then he started crying saying, 'No.' | 22:58.00 |
| S: I don't know, probably just scared. | |
| M: Of what? | |
| Q: Can you say that ... I'm having trouble hearing you. | |
| M: Shahar said he probably was scared. | |
| S: I don't remember, I don't remember what happened. I don't remember them asking me. But the only reason I remember is, I mean they told me about it before - afterwards. But, I mean I don't know why | |

**A-0457**

I reacted like that. Could be that, you know, I didn't know what they were getting at. I didn't know what they wanted from me. I might've been scared by the fact that something like this happened - that I knew somebody like this. I don't know.

24:19.00

Q: Yeah. Well, sometimes also the parent, you know, can communicate their nervousness to the child.

S: Yeah. They were very scared. They didn't know what I was going to say, so ...

Q: Yeah. Yeah, that's interesting.

S: But I was sensitive. I was ... I don't know if I was a crybaby, but ... Was I ma?

M: No. It's easy for you to cry.

S: So, it didn't take much to upset me. We were also, you know, I wasn't one hundred percent with the English language. I had lived in Israel for a few years, and that was my first year back here. And I didn't feel a hundred percent around the kids yet. I was, you know, it was my first year back in school here. First grade I was in Israel. And before we came back here, I was in tutoring trying to learn English again, and things like this. So I didn't feel a hundred percent confident like most kids that age. So I don't know if that had anything to do with anything but ... Just another side note.

Q: Yeah, that's interesting. Well I think, you know, I think you have to trust your own instincts generally though.

S: Yeah, I do. I have no doubts about it.

25:48.00

Q: So, generally just a summary of your experiences. Nothing out of the ordinary?

S: Yeah. I would say so. I mean, I don't even remember - was it a basement that, where we were being taught? Or is it just the first floor ...

Q: It's a first floor, but the house is like a - it's a house that has a ... You can go up to the ... You can either go up, or you go straight in, and there are two entrances.

S: Where is it mom? It's on umm ...

M: It's past ... house.

S: Yeah.  Where that gas station is?

26:31.00

M: Exactly.

26:32.00

S: Yeah, I remember the street.

M: And the house was very dark.

Q: Did you have any other friends that went to the classes?

S: Not that I know of.  Did I mom?  Did I know anyone there?

M: No.  No.

Q: I'm trying to think of other people that were, that were ... Somebody that you might have known, did you know the Nassimi family?

S: Nassimi sounds like Persian.

M: What's the first name of that Nassimi?

Q: Darrone.

S: Darrone Nassimi?

Q: Yeah.

S: I never heard of him but the way...

M: Are they on Betsy Court?

Q: No, I was just thinking they're Persian, they spent time in Israel.

27:09.00

S: Yeah, there's a lot of ... in Great Neck.  But we're on the South side. We're all the way ...

M: We're in Lake Success.

S: So umm, I went to the South High School, and then there was North. So that's one way people were split up in town.  And I didn't know too many people from the north side of town.

M: Were they abused ... kids?

Q: I'm not sure.  I am in the process, I've spoken ... I was speaking to the

Shahar Lushe and His Mother - 12

**A-0459**

mother. I'm trying to get in touch with the son.

M: We got a letter here, and my daughter in Colorado got a letter. How did you get to her?

Q: That's Interesting.

27:46.00
27:52.00

S: Probably from the last name.

Q: Yeah. What's your daughter's name?

M: Tal.

Q: You know ... was it the same letter?

S: Yeah, same letter. Looking for me. And it's her, she goes to college there, you know, she's renting an apartment in her name.

Q: Oh, I know. Is her last name Gryn?

M: No.

S: No, she has the same last name as me – Lushe.

Q: That's interesting.

S: But she says the letter came addressed to me at her house, which is very weird because, you know, I don't live there.

Q: Yeah, that's weird. Her name is Tal? T A L ?

M: Yeah.

28:35.00

Q: I wonder. I'm looking at this and I don't see why that would have happened, but it's possible because we, you know, we have a lot of people on our list, and we were trying to reach them. Sometimes we have multiple addresses.

M: Tell her that you are on an important phone call, and then to come back. 'I'm on the phone now Ronnie. I can't get off, it's important.'

Q: And, how did you first find out about the classes?

M: I'm trying to think. Maybe even the ... Did he advertise in the Penny Saver or something?

Q: Not sure. It's possible. It's possible. I know he did some advertising,

| | |
|---|---|
| but I don't know.<br>M: Must be advertising. Because I don't remember anyone else that I know that went to the class. After my son took the class, my sister mentioned that he taught her daughters piano. But he would go to their house. I'm almost sure. | 29:32.00 |

Q: And where they happy with the piano lessons?

M: (*Laugh*) One of them is taking piano again, so I don't know. And she's thirty years old. Yeah, I think she said he was a good teacher. He was a teacher otherwise, right?

Q: Yeah, he was a teacher of various kinds. Yes. It's true. Well, I think this was helpful. I mean, this was very good background for me, and I hope, you know, if I have more questions - maybe I can follow up with you.

M: Sure.

Q: But, this is, this is good background though.

M: Okay, good luck. So when is this movie coming out?

Q: Well, it's gonna be, we're going to finish shooting this summer, and then it takes a while to edit. So it's probably not going to be out for about a year or something.

M: Uh huh.

Q: But feel free ... also you have my number. So if you think of anything, feel free to call me.

M: Okay, good luck.

Q: Okay, I really appreciate it

S: Thank you for contacting us.

Q: All right, thank you Shahar.

END OF INTERVIEW.

| | |
|---|---|
| | 31:14.00 |

**A-0462**

COUNTY COURT
NASSAU COUNTY

--------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

                Defendant.

--------------------------------------------------------------------x

## AFFIDAVIT

MARC SMERLING, having been duly sworn, hereby declares that the
following is a true and accurate copy of excerpts of the transcript of my
conversation with Barry Doe on May 21, 2012.

                              Marc Smerling

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0463**

Jesse Friedman Case
Friedman Call 10 -- MS-Brian Cohen Recant

| | |
|---|---|
| Q: Hello? | |
| A: Hello, this is Dr. Brian Cohen returning your call. | |
| Q: Hey, how are you? | |
| A: Good, thank you. | |
| Q: Good. Listen, Brian, I'm Mark Smerling. I made the movie 'Capturing the Friedmans'. | |
| A: Okay. | |
| Q: And I'm calling because I don't know if you've been reading what's happening out in Nassau County, but Jesse has gone through a process of trying to get himself exonerated. And the Nassau County District Attorney has asked us to present a tremendous amount of material from interviews with the kids that we did back then, stuff that's sort of come forward since then. And, and just in the sort of hope of being as thorough as possible, I've been reaching out again to kids who were in Arnold Friedman's class, and trying to get their recollections and their, you know, their sort of experience.<br><br> And I'm sorry to call you. I know this is not a pleasant subject, and I know it's a difficult subject to go back to. But it seems that, if we're going through with this and it's going to happen, I would like to be 100% sure in my mind that I'm doing the right thing, and that... | 0:53.00 |
| A: What exactly do they want you to do? | |
| Q: Well they're asking for all the outtakes from all the interviews with the kids that we did, which were, you know, we interviewed about four or five of the complainants. And then they asked for all the interviews with Judge Bachman. Had you seen the movie, by any chance? | |
| A: I did not see the movie. | |
| Q: Okay. I should send you a copy. I think you'd find it interesting. | |
| A: You can definitely – I'd, I'd be very interested to see it. I'm not quite sure how I never saw it. You know I, I have clear recollection – just between you and me – clear recollections of going in their house and, | 1:45.00 |

Friedman Call 10 – Brian Cohen Recant - 1

**A-0464**

and being, and being in the class. And, and I vividly remember going. I mean I'll, I'll be totally honest with you – there is, I was not one of those kids that, you know, was sexually assaulted. So, the last thing I would ever want...but I know some of the people that were. And I would never want them to be put through any more hell than they already went through.

Q: Yeah, I know. I understand. I mean that's why I try to do this in a delicate way, and I mean, can I tell you that, according to the – did you, did you testify to the grand jury? Do you remember that?

A: When I was seven or eight?

Q: Yeah.

A: I very well might have. I, I think that I did. I remember the police coming to my house when I was seven or eight years old, or nine years old, and, and being totally, you know, freaked out by the whole experience, as you could be at eight or nine years old. But I think I was a pretty mature kid even then, and I, you know, but I, I think I did testify at the grand jury. I can't remember what I said. It's been, you know, however, it's been twenty-five years.

Q: Of course. I understand. That's one of the, memory is such an elastic thing, you know. I mean, the, I mean you are in the indictment. Your name is in the indictment. And you are one of the kids that they, you know, the charges were sort of evolved from. You know.

A: Right.

Q: So you spoke in the – but you know, what I'm finding a lot, Brian, is that I call kids who are in the indictment who have, you know, charges from sodomy to ...I mean crazy stuff that was, I mean when you see the film, crazy stuff that was, you know, mass, multiple perpetrator, kids in the, sex rings, pornography – none of which was ever found. Photographs...

A: Which of the, which of the kids did you interview for the movie?

Q: Which were the names?

A: Yeah.

Q: Uh, I want to tell you....

A: Or were they not in, were they not, was that not disclosed in the movie?

| | 2:30.00 |
| | 3:32.00 |

Friedman Call 10 – Brian Cohen Recant - 2

**A-0465**

Q: It's not disclosed in the movie.

A: Sorry, I didn't see it, so...

Q: But I do want to tell you...

A: Wait, Mark. Hold on just one second. Hold on one second.

Q: Sure............

A: I'm sorry, Mark.

Q: That's okay. But I found this many times where I call a kid who's got, you know, five charges of endangering, three charges of sodomy, and they're like, 'Yeah, but I'm not one of the kids who actually was molested.' You know? And I'm like, 'Yeah, but you're, you're, the grand jury says that you were one of the kids who were molested.' And it's a little, this is sort of what is the spiraling sort of troubling part of this whole thing – is other than one or two kids who I've spoken to are, have these fantastic, fantastic recollections, that are like just mind boggling, most of the kids who were, you know there were fourteen complainants, most of the fourteen complainants, out of two that I've talked to – I've talked to almost probably ten of them – only two of them have said something happened, and their stories are extraordinary . Everything from 'I watched Arnold Friedman, you know, jerk off in orange juice and feed it to the class.' 'I watched Arnold Friedman, we played 'duck, duck, goose', where we all had to take own our pants, and Arnold Friedman would go from one boy to the next.'     4:33.00

   I mean just impossible to, to understand in a class where parents were coming to pick up their kids, kids were being dropped off, and it was going on and kids were re-upping every, every, you know, for a new class the next level. It just seemed beyond control. And now I come to find out these kids, one – every one of these kids are like, 'I was hypnotized'. You know. 'I was, I went to North Shore Medical Center, and I was hypnotized. And of course I blocked all those horrible memories out, and when I was hypnotized, I was like in a trance. And it was in my mind.

   And it's, it's so disturbing. And then the kids who were smart, who seemed to have good parents and, you know, who came, you know, have jobs today and are doing well by themselves are kind of, like you, They're kind of like, 'You know, I remember it. I remember being very young. I don't remember exactly what I said, but I remember I was in the grand jury. And they were, you know, the police were really aggressive, and they were very, very, they seemed to know exactly what was going on. And, and I said....     5:33.00

A: I'll tell you that's what I remember.

Q: I know.

A: I'll tell you, it's scary. It's scary to think back about that, because I remember being eight years old and thinking to my, you know, my, if, I don't remember, what year was it? I don't remember how, was it 1980 what?

Q: It was '86. 1986.

A: 1986. I'm thirty-four. I just had my birthday in April. So in 1986, I was eight years old.

Q: Right.

A: I remember, you know, where I was the day my sister was born and I was not even four. So there's not a lot of things I don't remember about my life, and you know it's I remember minutia. I mean I'm a plastic surgeon. I mean, I'm not a, you know, ....    6:34.00

Q: I looked at your resume on line. You're a smart guy.

A: Yeah, no. I'm not a stupid guy. And it's like I, I remember, you know, where I, when I wiped my ass last week. You know, so it's, it's, I remember the cops coming to my house, and the cops being aggressive, and people wanting you to say almost what they wanted to hear. And, and I, I'll tell you I never said I was sodomized or, you know, I was never raped or, you know, molested. And I can't honestly tell you what other things I might have said. At that time. And it's a little scary. I mean it's a little scary to think about what exactly happened in 1986, because I can't tell you, because I can tell you, as God is my witness, and on my two children's lives, I was never raped or sodomized.

Q: I'm sure you're right.

A: And, and ...    7:32.00

Q: And I don't believe it. Honestly, Brian, I don't think anybody was raped or sodomized. Not...

A: I don't know what exactly went on with these other kids, where things that happened. But I can tell you, from what I understand, stuff really did happen. And some people that I know really did suffer.

Q: Yeah.

A: And to this day, to this day, my mother still has lunch – some of her closest friends are people that she met because of that horrible situation back in 1986. So I mean there's still a group of them, they're still very close. And my mother might very well know what's going on. She's still over, I mean I live in Nassau County. I live in Jericho.

Q: Right.

A: So I, I haven't heard a damn thing about this. And she might very well know all about this, and intentionally have kept it from me, because she's a, you know, a good Jewish protective mother. Not because she's trying to protect me or, or they forced me to say things that I shouldn't have said. I honestly, I'd be delighted to go back and read the grand jury testimony. I, I'd be, I don't even know, you know, what I said. I was eight years old. I was eight years old.

8:43.00

Q: Well, you know what?...

A: I want to help you, Mark. I don't know what I can do to help you.

Q: Well I think you can.

A: Are we trying to exonerate Jesse Freidman? Or are we trying to make him into the animal that apparently he was?

Q: Well, I guess, you know, I don't know. I think what we're going, we're trying to do is contact complainants and non-complainants. And get honest memories of what they recall. Like do you recall seeing anybody sodomized? Do you recall seeing anything weird?

A: No. No.

Q: You know? If you...

A: There might have, there might have been pornography on the computer. I don't remember.

9:14.00

Q: Yeah, there was.

A: That's the only thing...

Q: That's been well-established.

A: ... I can tell you. That's the only thing I can tell you, that maybe there was, I saw inappropriate magazines or pictures, or things like that around.

Q: Right.

A: That's the only thing I can tell you that I think maybe I saw. But, and there are plenty of things I can tell you I did not see or did not experience. I never saw a kid get sodomized or molested. I was never sodomized or molested. And if I said it, it was not because it happened. It was because someone else put those words in my mouth. And I do not remember. And I do not, I don't, it pains me to sit here and even think that I could have been manipulated at eight years old. I don't know if I was. I don't remember. I don't remember if my grand jury – is my grand jury testimony sealed? I have no idea.

10:01.00

Q: Yeah, it's sealed. It's all sealed.

A: Right. So it's sealed. I mean how, you'd have to unseal testimony. There is no way in hell some of these people are going to let that grand jury testimony get unsealed.

Q: Yeah. I know. I mean it's, it's a real, it's a real...

A: I mean it would take an act of God for that to happen.

Q: What's that?

A: It would take an act of God for that to happen. I mean let me tell you.

Q: Well let me tell you what's happened, just so you can, bring you a little up to date, and I can even send you ....

A: I really appreciate your phone call. Thank you for letting me know.

Q: I appreciate you calling back.

A: Well I didn't know who it was. My secretary sent me an e-mail, I was in a, I was operating and then I had a board meeting, and I get this e-mail, and I'm like, 'Mark Smerling called. It's a personal matter.' And I'm thinking 'Who the hell is calling me. This could be like someone trying to sell me another goddamn electronic medical record or some other bullshit.' And let me tell you, when you got on the phone and told me you made the movie, I'm thinking, 'This is not the phone call I was expecting.'

10:45.00

Q: (chuckle)

A: So it's okay.

Q: Yeah. What happened was, after the film came out – you know the

film is, is, we've been accused of being ambiguous in the film. And what I'd like to say is that we're not ambiguous. We collected the information and we put it together in the most honest way that we could. You know? And since, at the time of making the film, we talked to three complainants and I think two or three non-complainants who were in the same class. There was real questions about what happened. Because the non-complainants were in the same class, and they were saying, 'We didn't see anything.' And the complainants were having these incredible things happen to them. I mean it wasn't just like 'Arnold took me into the next room, and he fondled me' or 'he did something to me.' The charges were extraordinary, along the lines of the McMartin Case, which was, you know, a lot of – not 'satanism', but a lot of like group molestation.

They got Ross Goldstein, they got other boys involved. Gino Scatto. Other boys who were friends of Jesse were apparently part of it. The ones, one was, another one was arrested. It just, it started to get out of control. There's no doubt about that.                                                                    11:50.00

Q: I remember going for another class that was much smaller, like two or three kids. It might have even been on a weekend over the summer or something. I don't even think Arnold was there. I think it was just with Jesse. And I remember him like waking up in his underwear, you know, with his girlfriend there or some craziness like that. That, that...but nothing – yet again, not uh, you know, maybe that was strange to see at eight years old, but you know, whatever.

A: Well there's no doubt the Friedmans did inappropriate things. I mean Arnold was a pedophile. You know, he was, he ordered magazine through the mail. The other, you know, the fact that, you know, Frank Gallasso the head of the sex crimes unit in Nassau County, said 'Oh, there were foot high stacks of pornography all over the house.' That is not true. You know, we have the pictures from the search. There was one stack. Most of it was normal pornography, and he had ordered a couple magazines – there was like three or four magazines that were definitely kiddie porn magazines.

And so he was inappropriate in so many ways. And he was inappropriate in high school, too. You know? Elaine told me this story, his wife, told me a story about how, you know, his, his students in his chemistry class had brought in this jar that said, it said it was like a cookie jar. Instead of cookies, it said 'marijuana' on it. And then he kind of laughed about it. She was like, 'Yeah, but you're a school teacher. It doesn't seem quite right.' But he was like, 'Eh, my kids are great.' And the next time he came back to school, there was dirt in the jar. And he was like, 'Hah, there's dirt in the jar.' And then like a week later, a little proud was coming up.

Friedman Call 10 – Brian Cohen Recant - 7

**A-0470**

And his wife was like, 'I think you need to remove that jar from the school.' You know, he was just an inappropriate, he was like a big child. You know? He did things like, he smoked pot with his kids. I don't know, I got kids. I don't smoke pot with my kids. It's just not a...

A: I don't smoke pot with my kids, that's for sure.

Q: I mean it's just not a thing to do. You know, I mean there's...

A: I didn't smoke pot until I was twenty-five years old. My mother told me, my mother begged me to in college. She said, 'You need to lighten up.'                                                    13:51.00

Q: (laughter)

A: God is my witness.

Q: He was just an inappropriate, and the fact that he sort of passed on a certain amount of inappropriateness to his sons is not, you know, is pretty, pretty normal, considering the household they lived in. And the fact that you saw, you know, Jesse wake up in his underwear, because his room was right next to the room where they had the class, and his girlfriend does not, does not surprise me. For most people that would be – that was the frigging problem. The problem was those, Judd Maltin. Do you remember Judd Maltin? He's a friend of Jesse's.

A: I remember Judd Lowell?

Q: Maltin, his name was.

A: Yeah, I remember Judd Mole. Judd Mole was friends with Jesse Friedman? Judd Mole was my age.

Q: No, no. Judd Maltin. M-A-L-T-I-N.

A: Oh, oh, okay, no. I don't know who that is.

Q: He's another one. It's another guy, he was a friend of Jesse's who, you know, at some point Arnold was so cheap he wanted to get the disks, because you know those old Commodores have no hard drives, so they run off the disk. He wanted to get some empty disks, you know,. blank disks. They were going through them like crazy. There was more than eight hundred disks from, taken from the house during the search.                                    14:40.00

And Judd says in an interview with us, he goes, 'Those pornography games? Those sort of sex games? Those were mine. They were on, they were on a stack of disks I gave, I thought Arnold would erase them

**A-0471**

before he gave them to the kids.' But apparently the kids were passing them around and things got inappropriate. The place was a free-for-all. It was not exactly what we called the most structured environment for a classroom. You know? And I think things got out of control. You know? And whether Arnold did something physically or not, I can, I, after ten years of looking at this, I can assure I don't, I just, it just boggles the mind that people....

So many kids went to this class – we're talking about 100+ kids over the course of the class, and none of them ever complained. None of them said anything. None of them went home said, 'I don't want to take that class anymore.' None of, there was no medical or physical evidence that anything ever happened until the police went around and said it happened. Now did Arnold rub up against a child? Possibly. He was a weird guy. But did Jesse do anything? I can't find any proof that Jesse did anything, except for these two boys.

15:39.00

And both these boys are very clear in their interviews – I would love to show you this. I have both the interviews on film. But both the boys are very clear that they were hypnotized – you know, they didn't remember anything. They, they were like very upset. Their families were very upset. And then they went to North Shore and they went into therapy, and when they were hypnotized, it just was all in their head.

And there's another case that happened with this bus driver, like four years after Jesse and Arnold's case, where the kids were treated in Norht Shore as well, and it came into their heads. And some of the recollections are identical. Some of the crazy stuff are identical. It, I mean it just boggles the mind how these things could have happened. So. I mean it's...

A: It really does. It's unbelievable.

16:45.00

Q: Well it just sort of tips the hat. You know it's like, Arnold was inappropriate. It's very Shakespearean. He had hubris. He did things that were inappropriate. He did, and his son has paid a tremendous toll for it. So are we trying to exonerate Jesse? I'm not going to make that decision. Nassau County is going to make that decision. Because what happened was Jesse, after we made the film, we did give him everything we had, and he got a lawyer. Ron Kubi, he's a very famous lawyer, who looked at all this stuff. And he said, 'Look, I think you're, I think you there's a good chance that you were wrongly convicted. I'm willing to take this on.'

And they did a 440 Motion, which is a motion to have your conviction vacated. And unfortunately, due to timeliness, because he was in prison for thirteen years, Jesse. He was seventeen when he was arrested.

**A-0472**

A: Right. Right.

Q: He was in prison for thirteen years. You got ten years to do your 440 Motion. And you know Ron did a valiant job through the Nassau County courts up to the New York State level courts, to the federal courts, of trying to convince the courts that 'You should look at this. It's interesting to look at. You should consider this.' But they wouldn't even consider it because it was time barred.

But then, when he got to the 2nd Circuit, which is right below the Supreme Court, they looked at it. They said it was time barred. But they said, they did a landmark opinion which sent it back to Nassau County basically. And it said, after reading all the evidence – and I'm telling you, the 440 Motion, I can show it to you, it's a thousand pages – after reading all the evidence, we believe there's a very good chance that Jesse Friedman was wrongly convicted. That the science back then, the way the children – you were experienced that – the way the children were interviewed was suggestive, coercive. They whey they were psychotherapized through group therapy, through hypnotism, was, was very...

A: I remember. I remember going to those group therapy sessions. I remember the cops coming to my house.

Q: Yeah. How were those group therapy sessions?

A: Very vague. I just remember going. I don't remember what we did. There was a lot of activity. You know, nothing, god, I remember going to that building on Community Drive. I mean I grew up in Great Neck. I grew up five minutes from the hospital. I, I don't remember totally what they were like.

Q: Yeah. I mean that's, that's also a big problem, is I get, I talk to a lot of kids, you know, and a lot of them, you're not a kid anymore, they're not kids anymore, and they're just saying exactly what you're saying. Is, 'You know, I know this, I never saw this, and I was never touched. But I don't remember what that was like, and I don't remember what this was like.' And I think that's just part and parcel to being, at that age, being under such stress. You know?

And, and the kids remember it. They remember it in such a way that you're kind of like - I want to show you this. One of the boys is Jason Pravda. Do you remember Jason Pravda?

A: I don't know him, but I remember the name.

17:58.00

19:24.00

Q: Yeah. I want to show you his interview. If you have some time. I'm not far from you. I'm on 64th Street and Madison Avenue. But if you want to have a cup of coffee or lunch and want to see a little bit of stuff, and I can send you the 2nd Circuit's opinion, and you can read it. And I can send you a copy of the film….

A: I, you know what I'd like to do is try to find some time to maybe meet next week or the week after.

Q: That would be fantastic.

A: And sit down and talk face-to-face. I mean I'm not quite sure what my role can be here. I certainly don't want to go through this. I don't know what to say.                                           20:15.00

Q: Yeah.

A: I'm, I'm curious to hear the information that you have, but I'm certainly not, not going to sit there and let Jesse Friedman off the hook for what things that he did to people that I know about.

Q: Yeah, well let's take it…

A: I, I don't, I don't think you're saying, suggesting that.

Q: No, I'm not suggesting that. I think what, the best thing that could happen in the perfect world is that we find out what happened. You know? And that the only way to do that is to talk to the primary people. Because the sort of hysteria and the rumor mill in Nassau County has gotten, it was just a little out of control. You know? But why don't we just take it a step at a time. Why don't I send you the film, and I'll e-mail you the 440 Motion. If you have some time, you can give it a read. And then we can….

A: Why don't you give me a call next week, and we'll see if we can, when we can find some time.

Q: Okay, great. You want to give me an address to send the film to?

A: Um, yeah. Why don't you send it to my office. I think that's the best thing. I, you know, try to protect my wife and my kids from some of this, some of this stuff.

Q: Of course.

A: So if you don't mind just sending it to my office. Or you can just drop it off at my office if you want in a sealed envelope.

Q: I will do that.

A: The address ...it's on my website. It's 121 A as in 'apple'. East 83rd Street.

Q: Okay, great.

A: And the zip's 10028.

Q: Great. It was good talking to you, Brian. Thank you for calling me back.

A: Yep. Thanks, Mark.

END OF INTERVIEW

21:48.00

Friedman Call 10 – Brian Cohen Recant - 12

**A-0475**

COUNTY COURT
NASSAU COUNTY

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-


JESSE FRIEDMAN,

                 Defendant.

-------------------------------------------------------------------x

**AFFIDAVIT**

MARC SMERLING, having been duly sworn, hereby declares that the following is a true and accurate copy of excerpts of the transcript of my conversation with Gary Meyers on May 23, 2012.

Marc Smerling

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0476**

Jesse Friedman Case
Friedman Call 13 – Gary Meyers Returning MS Call 52312

---

Q: Hello?

A: Mark? Gary Leff returning your call.

Q: How are you?

A: I'm okay.

Q: I'm sorry to bring this back into your life. I can imagine that it's not the call you want to hear. And I hate to be the person, you know, constantly bringing this up.

A: No, no. Yeah.

Q: Listen. I don't know if, can I bring you up to date?

A: Yeah. I hadn't heard anything about anything in a long time.                    0:23.00

Q: Okay. So after 'Capturing the Friedmans' came out, a couple other kids came out. Most, some non-complainants. No real full recantations. Not right after the film. But a lot of people came out. It was surprising. We had the, I don't know if you saw the extras in the film. We had the screening in Great Neck. People got up and really lambasted the judge, and were really angry. You know? And the tide felt like it was sort of turning.

     And I, as you know, because I know you were interviewed by a private detective hired by either Ron Kubie or maybe his, Jessie's Deborah Broder? I have notes. Do you remember her?

A: It's funny, you know. I mean obviously it's so many years ago that I remember having two different conversations.

Q: Yeah, yeah.

A: And I think one of them was with a private investigator who was working for the Friedmans.

Q: Right.

A: And I think one of them was a conversation with someone working for the prosecutors.

---

Q: Oh, interesting. That must have been recently.

A: No, no. This was, this was at the time.

Q: Okay. Gotcha.

A: And so I mean I haven't had any conversations with anybody about it since before the, before – since this all happened.

Q: All right. So. What happened was you know Jesse did his 4:40 Motion, which took a while. And it was time barred. At the, we were never, he was never going to get any relief in Nassau County, I don't think. I mean institutional bias is pretty strong there, and there's a lot of angry people. And the DAs are still working there, and the judge was still sitting there. And Fran Gallasso's husband is a judge. And it was just not going to happen.                                                                                          1:49.00

So he went up through the courts, and he got to just below the Supreme Court, which is called 'the Second Circuit'. And because of, because he was in jail he had no money. And the 4:40 Motion didn't really happen until after, because Ron Kubie took it on as a sort of pro bono, until after the movie came out. He was beyond the statute of limitations on doing a 4:40 Motion. And the Second Circuit time barred it.

But then they wrote a landmark decision, which was basically ten pages saying that there's a very high likelihood that Jesse Friedman was wrongly convicted. That the, the methods used with, to, and this went on and one. But it's been proven through McMartin and a lot of these cases of the methodology used by the psychologist and the police on, on getting testimony from the kids is seriously flawed. And from what they see, Nassau County ought to reopen the case and reinvestigate.

So Kathleen Rice, the current DA in Nassau County, has impaneled four, five experts who are like the Barry Schecht types. The people who are, you know, sort of high liberal experts on one end of the panel. And then there's a couple of cops on the other end of the panel, and she has sent a DA out and a couple of investigators to reinvestigate. Unfortunately, and we were really excited by that. Unfortunately they went through a whole process of trying to reinvestigate, and it kept going on and on and on. And it because very clear that Nassau County was really, they were just trying to get everybody back on board. You know?                                                                              3:00.00

They, the people they were interviewing, they were kid of bullying around a bit, and you know it didn't seem like anybody, and we weren't getting any information. They weren't, there was no discovery, and Ron was getting frustrated. So Andrew and I are going to do a presentation

for this panel. And we're going to do it in a week or two. And you know
for our sort of security and our ability to sort of be as clear as possible,
I'm back into the world of Jesse Friedman to some extent.

   And I've been calling people to get their recollections. And most
importantly to hear my own, with my own ears, what happened. I've read
the notes from your, from your interviews. I've read your mother, you
know, Peter Panero's transcription of what your mother recounted of the
interview they did with you. Which was I guess you recorded on
videotape.

A: Which is actually something I don't remember, and I never, and you
have some advantage over me because I have no, given my age at the
time, I probably wasn't even aware of what was recounted about it.
Yeah, so...

Q: I'll say Gary, given your age, you were a strong little guy. You were        4:42.00
very tough, and I think you were very clear thinking. And I think that in a
lot of ways, you know, you sticking – there's a few guys like you in Great
Neck who sort of stuck to their guns. And I'm just amazed because
there's so many, I mean it's so difficult. You were what? Nine, ten,
eleven years old? It's, and there's a bunch of mothers who stuck to their
guns. Like Chris Blaha's mother. I don't know if you remember him.

A: No, I don't.

Q: You know, there's a couple, there's a couple of mothers that have
been lie, you know, 'That was wrong.' And those are the people who sort
of got up in Great Neck when we screened the movie and were like, 'That
was always wrong.' You know? But anyway, to make a long story short,
I just wanted to kind of go through this, these notes of the conversation
you had with Deborah, and just, you know, just bring you back a little bit
and just talk about it. I don't want to keep you on the phone too long.

A: Sure.

Q: I guess the most, the most – you don't remember the police
interviewing you?

A: I mean I have, you know, my, my recollections of the conversations at        5:43.00
the time are very, you know, are sketchy at best. Right. I mean, I have a
vague recollection that I was interviewed by somebody who was looking
to get me to say something did happen. And I have a, and I have a
recollection of traveling to an office that I believe was a private
investigator's office. You know, it was working for the Friedman's. and
that is probably the extent of my recollection of, you know, from, of
actually being talked to.

And so I, I remember being talked to by two different people at different times. And that's, you know, really all that I remember of actually being interviewed. I don't actually, I don't remember anything really beyond that. I….

Q: And we talk a little bit about what you remember from the class?

A: Yeah. I mean you know, I, I, you know, took years, I took years of classes with them. I was always enthusiastic about going back. And I would, say you know I was doing this class and that class, and I wanted to do this, and, I, you know, was always, it was always something I wanted to do. It was never something that was uncomfortable at all, or, you know, awkward.

And I, I always assumed that if something was going on in the classes that I would have had some sense of it. And I, and I didn't. I do remember, you know, because I was pressed and pressed, 'Was there any time you were ever uncomfortable?', that I probably shared in an interview that, or 'Were you ever alone with them?' Yes. There was one time that I was alone with Jesse. Nothing, you know, untoward happened, for a long time.

I, I had Apple computers at home, and you know they did not. But he always said, 'Oh, you know, we've got some stuff on Apple computers', and you know, manuals and this and that. And he promised to give them to me. And that never happened, never happened, never happened. And I would pester him pester him pester him. And I do remember one time walking I think upstairs in the house, into an office, during class. It was a time the doors were open, he searched through a bunch of drawers, didn't find anything.

7:52.00

And I remember it was sort of weird because I remember I'm standing here while he's searching through drawers and not finding anything. It was the only time I was ever, right, alone with any of them. And, you know, he never like even got close to me. At least that's, that's how I recall it twenty-five years later.

Q: Yeah. And a lot of kids – can I tell you what I hear a lot of? We hear two things. And that, by the way, we do have complainants who have recanted. And we have complainants who – you hear two things. You hear, you know, one complainant say 'I know I said these things in the grand jury, but I did that because they told me to say them'. Which was very powerful. And you have a, you have a couple of complainants who were like, 'I was not part of the abuse. I know that I said some things in the grand jury, but I didn't talk about abuse.'

And then you look at the charges that they're responsible for in the indictment, and there's sodomy and there's all types of crazy stuff. So that's another example of what happens.

And then the third is you have people who are like 'I have no memory of it. I know I must have blocked it out.' Which is, which has been proven of the years people don't block things out that are seriously traumatic. If anything they remember more than they do the things that obviously are trivial. You know?

And then there was one boy – I don't know if you know this boy Jason Pravda.                                              9:31.00

A: No.

Q: He, he says that he never remembered anything until he was hypnotized, which you know opens up a whole can of worms. You know?

A: Okay. I, I remember you know one of, one of my friends who I had been through several classes with, I'm blanking on his last name, Aaron was his first name. And I remember even…

Q: Aaron…

A: Yeah. And he at the time was sort of, you know, wishy-washy over anything. I remember confronting him in school one day, saying like 'Oh, I, I mean I never saw any of this stuff. You know, you were there with me.' He says, 'Well…' And I remember he wouldn't, he was very non-committal . Like he acknowledged it, but he was getting a lot of pressure. I don't know what he ever said to anyone. But it was something that, you know, people who were in class with me, you know, always felt like they weren't allowed to say that nothing happened.

Now you know I obviously, I always took the position of like, 'Look, I only know what I saw. I obviously don't know what supposedly happened in other rooms that I didn't see.' But I was like I always figured I would, I would have at least had some sense of something going on.                          10:46.00

Q: I mean Jacob Borne, who was in one of your classes – one of your first classes and a later class – is a major complainant. And in your statement to Deborah, I was surprised to see that you talked to Jacob, and he had said nothing happened, but he was feeling a lot of pressure from the police. You know? And that's pretty much standard fare.

I mean I think what happened, by in large, there are fourteen complaints against Jesse. And I think  what happened by in large was

the ones that, you know, that were not strong – I mean they were kids, you know. Broke down fairly quickly under the pressure. I mean some, I mean this one boy who recanted who's now a plastic surgeon in New York who's you know a very smart guy – went to school at Columbia University.

   As soon as I called him on the telephone, he was like, 'Those things never happened.' He was like very brave and very smart. And he was like, 'Look, I don't want to tell my wife about this or my kids about this. I just want to put this behind me. But I'm going to tell you those things never happened that I said had happened.'                                                                                                                          11:45.00

   And what he said to me is that, you know, he was nine years old. You know? And he was, and he said 'The pressure they put on me was so extreme, that I just finally just told them what they wanted to hear.' It's very upsetting.

   In some of the classes, you were with – can I go through a couple of students? Because I just want, I have a class list, and I just want to….

A: Sure, sure.

Q: You were with, also with Dan Frank, who's a major complainant. Did you ever speak to him, do you remember?

A: I don't even remember the name.

Q: Okay. Haley Spizz.

A: I remember Haley. I don't remember ever having a conversation with her about, about it.

Q: Do you remember having a conversation with any other students about it?

A: Well the only, the only name that immediately comes to mind – because I can actually see myself in class, you know, turning around. I mean I'm in front, like I'm in front of him, you know, the desk in front of him, turning around, talking to Aaron about this. But I mean it wasn't otherwise the kind of thing that you really did a lot of conversation about. You know? Because it was, you know, 'Ah, what's going on? What are we in the middle of?'                                                                                                                          12:26.00

   And so at least I didn't have, I didn't talk about it a lot with a lot of people.

Q: Right. I'm trying to think – you were in a lot of classes. You were in

| | |
|---|---|
| Basic I 85, Basic II 85. | |
| A: It, well I mean I kept going back. Right? I mean, and this wasn't like me being forced to go. Or me like trying to avoid it. I mean I was like, 'Can I please go?' Because I was getting a lot out of it. | 13:02.00 |
| Q: Right. And when the police spoke to you, you don't remember how they portrayed the class? Did it seem like they knew already what had happened, and were just trying to get you to confirm it? | |
| A: Yeah. Oh, yeah. | |
| Q: Can you give me a little detail on that? | |
| A: Well it was, um, I can't like give you quotes. I, I remember having a conversation where I was sitting on the edge of my bed. I had a conversation in my room. With someone, I don't remember who. And that's how, because I remember having the conversation I shared with you about where I revealed while I do remember being alone with him, you know, apart from the class one time. Because they were really fishing for, you know, 'Surely….' You know, there were times where they would try to take you away. You know, 'We know that happened.'<br><br>And so you know I recognized, I acknowledged 'Yes there was one time I was not in the room with everyone else. And here's what that, you know, here's what that story was.' But you know … but I never, at least that I can recall, suggested that I ever thought that something happened to anyone. | |
| Q: Do you remember the ….the big thing which really kicked this off in a bad way was these pornographic computer games, which I've seen and which are extremely rudimentary and almost comical. But they seemed to be something that the police grabbed onto as 'Well, you know, this is how Arnold and Jesse trained these kids to be part of their, you know, sort of sex ring.' And Judd Malton, who was one of Jesse's friends at the time, said, "Well, I'm sorry, but those came from me and the other kids in the class. That they didn't come from Jesse.' | 14:38.00 |
| A: I, I mean I remember getting a, getting a game from Evan Schlessinger. Roughly contemporaneously. And it was mostly like young kids, and there's some…it's like when kids, you know, kids would pass around a Playboy, 'Oh, here, you know, the computer age. Here's something.' Oh, there was Strip Poker. You know? And there was, there's one other. And it's like, you know, 'Tee hee hee. Isn't this funny?' | 15:40.00 |
| But I, but I do remember getting one I think from Evan Schlessinger. | |

Q: Yeah, I mean what the kids by in large tell us is that these games were everywhere. They were sort of like the big joke and everybody had them. You know?

A: Yeah. And I mean they were big jokes. I remember going away to summer camp, and it had a computer lab. And I had, you know, disks of my stuff, right? And one of them with me. And everyone would gather around and snicker because I had one of these, you know, Strip Poker games.

Q: Yeah. Great. Okay. And then the last thing, I want to read you the Panero's – it's not very long – Panero's transcription of the videotape that your mother took. This is going to be kind of interesting for you, I think. There are two cops who come to see you. It's Hatch and Jones. And they, it starts with Hatch saying, 'We've had kids who stated that they saw you and that you're involved. Okay?' And Jones says, 'We want to go through this with you. Don't deny it yet. If you question twelve kids, you'll get twelve different answers. Take Arnie Friedman's own words. But he admitted this.'

16:36.00

You say, 'I didn't see it. I didn't hear it.' 'Arnold was under no obligation to admit it. Why would Arnold Friedman admit to something that wasn't true?' 'The kids know that he did it. Take Arnold's own words. I know it's impossible to speak to him now, but he's only admitted to this in open court. He said, 'I did it.'' Your mother enters the room, and she's asked to leave. And Hatch says, there's two names here. That are redacted. Two kids. 'Both say that they saw Gary engaged in it. Arnold Friedman did not have to admit it. No one put him in a dark room. He said it in open court with an attorney. He sodomized them. What I say to you as an intelligent human being is what did you say to that? He admitted he sodomized a lot of children.'

You're inaudible. 'Arnold Friedman says in a courtroom in front of a judge. I'm not going to tell you. You tell us. What we're trying to determine is Arnold Friedman in court says he sodomized children. The judge said that there are other children exactly', this is not …hold on one second… oh yeah, this is it. Okay. 'Exactly what he did.'

Inaudible discussion. Hatch: 'We are trying to find out who the other victims are to help the parents and those children. Arnold Friedman will not be charged with any other additional charges. There is no ax to grind here. There's no ax to grind here. It was all stipulated in open court that there would be no further charges.'

17:50.00

You're inaudible again. I mean this is mostly you being in audible. 'It happened to everyone else but not to you. How many session did you

| | |
|---|---|
| have at the Friedman's?  You say eight to twelve.'… I'm trying to see which,.… Then it goes here, 'Do you remember'… this is kind of classic… 'Do you remember games of a sexual nature?  Stroke or strip poker?  Exploding Fists?'  And you say, 'Exploding Fists was a karate game.' | |
| 'Did you ever see a porn magazine?'  You say 'no'.  'Did you ever go to any other room in the house?'  'Yes.'  'What room?'  'Jesse's bedroom to play with the Commodore computer.  Nothing happened.'  'Did Jesse help with the classes?'  No answer.  'Did Gary Meyers ever take special SAT class?  Who was in the class, Gary?'  And there's a bunch of names.  'Did you ever see a magazine called 'Gallery Magazine'?  'No.'  'Gary was a wise guy.  I didn't like his answers.'  That's what Hatch says at the end.  'Gary was a wise guy.  I didn't like his answers.' | 18:50.00 |
| Kind of amazing, huh?  How old were you? | |
| Q: What year was this?  I don't even know. | |
| A: 1986. | 19:04.00 |
| Q: Right, so, you know, I, I was born in September '74. | |
| Q: Right.  Wow.  Well Gary can I call you back if I have any questions? | |
| A: Yeah.  I mean obviously… | |
| Q: I won't bother you.  Don't worry.  I won't be calling you ever day. | |
| A: You know, I'm not looking to dredge all, you know, to get, if you do any subsequent filming, I don't want to be on film. | |
| Q: No.  We're not making any more movies.  About this subject.  We're making a lot of movies. | |
| A: Just entirely at random and only tangentially related, there's a current discussion in, on a lot of blogs about Milton Friedman and what his work meant in current economic policy.  And so folks that are trying to sort of revise, you know, do revisionist history on it.  And the meme is referenced a 'Recapturing the Friedmans'. | 19:38.00 |
| Q: (ha ha).  Gotcha.  So you're an economics major? | |
| A: Yeah. | |
| Q: Yeah, so was I. | |
| A: So anyway.  It was sort of funny.  It was over the last few weeks, | |

actually.

Q: What did you think of the film? Did you see the film?

A: I did. You know, I thought it was really well-done. I, you know, I watched it. I was sad after. And …

Q: Yeah. It sort of destroyed Great Neck for a while. I mean it was amazing. It sort of fell right in the middle of this, this sort of bucolic community and just tore it apart, you know? It's an amazing story.

A: Yeah.

Q: All right, Gary. I thank you for talking to me.

A: Anyway. Yep. Very good. Bye.                                         20:51.00

END OF INTERVIEW

A-0486

COUNTY COURT
NASSAU COUNTY

--------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

                Defendant.

--------------------------------------------------------------------x

## AFFIDAVIT

MARC SMERLING, having been duly sworn, hereby declares that the
following is a true and accurate copy of excerpts of the transcript of my
conversation with Joan Blaha on May 24, 2012.

                                               Marc Smerling

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0487**

Cookie Blaha

| | |
|---|---|
| Q: So what's your name? | |
| A: My name is Joan Blaha, but everybody calls me 'Cookie'. And they always have. | |
| Q: And you're the mother of? | |
| A: I'm the mother three boys: Jack, who's forty years old now; Chris, who's thirty-four; and Patrick, who's thirty-one. | |
| Q: And how many of your sons took the computer classes at the Friedman house? | |
| A: Two of my sons, and my ex-husband, all went to Friedman's house for computer lessons. | 0:00:20:7 |
| Q: And I guess the son who took the classes that was questioned by the police, who was questioned by the police, was…? | |
| A: Chris. Chris… Do you want to know the whole story? | |
| Q: Well, let's start with how many computer classes did Chris take? | |
| A: Oh. I don't know. He went a few times. He went a few times, and Jack went a few times. And there's, and Jack is five years older than Chris, so it kind of, one went for a couple of years and sort of stopped, and then Chris started. So it was pretty continuous for quite a bit of time. | |
| Q: And this was in '86, '87? | |
| A: Yeah, something like that. | 0:01:00.5 |
| Q: Okay. Did they ever complain about the classes? | |
| A: Oh, no. | |
| Q: Did they enjoy the classes? | |
| A: Yeah. I mean every now and then they would complain that, you know, and you know the normal kid complaints. It wasn't any, anything – I mean they kept going. They didn't object. They liked them. | |

**A-0488**

| | |
|---|---|
| Q: (adjustments)......And did you go and drop your kids off and pick them up, right? | |
| A: Yes. Jack, I carpooled with Jack. Jack had a friend that went, and we picked up another kid from Saddle Rock. And I carpooled. But when Chrissie went, I didn't carpool because he had something, and I can't remember if it was religion or hockey, but whatever it was, I had to pick him up a little early from class, at least one of the classes. And take him to wherever the next event was. | 0:01:57.2 |
| So I would go into Friedman's house and pick him up. | |
| Q: Did you ever call Friedman beforehand and say 'I'm coming early to pick my son up', or you just showed up? | |
| A: No, I just showed up. And he knew I was going to do it, because I told him in the beginning. In the Village of Great Neck, there's a lot of ordinances. And if you run something out of your house, you can get in all kinds of trouble in the neighbors complain. | |
| So I always assumed that the reason he didn't want people coming in was because if they all parked on the street and picked up their kids, then the Village would get on his case. So most people just drove up, picked up the kids, when they came out, and htat was fine. | 0:02:34.1 |
| But because I had to leave early, I always went in. And I would go in and say, you know the usual, 'What did you learn today?' And that was the end of it. | |
| Q: So you didn't see anything unforward or strange? | |
| A: Absolutely not. I didn't see anything. | |
| Q: What did you see? | |
| A: I just saw the kids and the computers and, you know, kids milling around. I just didn't see anything noteworthy. | |
| Q: So when did you first hear that something nefarious might have been happening at the Friedman house? | |
| A: You know what? I don't remember. I really, I mean we were all shocked. But I don't remember exactly when it was. And to be perfectly honest, I really didn't think it had much to do with me, because it's, my kids didn't have any complaints. And I didn't see any problem. | 0:03:12.0 |

A-0489

Q: Your kids didn't come home saying 'Jesse hit me', or 'Jesse did this'? Did they talk about the class at all?

A: No, they, sometimes I think Jesse was the one who told the kids they had to sit down and be quiet, or sit at the computer and not horse around. So I don't think they loved Jesse. But there was no problems. None.

Q: Did they ever talk about seeing sexual computer games or anything like that?

A: No. My husband, when he went, said that there was some kind of game on the computer, but he went into it, it was an adult class, and this was a lot of years ago, and there wasn't much to talk about.

0:04:00.0

Q: And they didn't say, no one said they ever saw any pornography or anything like that?

A: No.

Q: Okay. So now you're going to tell me the story I think about when the police came.

A: Okay. I was out. It was a rainy day, kind of like today. And I went to the supermarket. And I left Chris home with Patrick, because he was old enough to watch Patrick. It was fine. They were watching TV.

And I came home, and there were two people in my living room. And it was the police. It was a woman and a man. And I was like, 'Wow'. So I said, you know, 'What's going on?' And they said, 'Well we're here to question your son about the Friedman thing.'

0:04:44.0

And they assured me that they didn't ask any questions until I came. And I, so I said, 'Okay'. And then they said, 'Well you can stay as long as you don't interrupt. You really have to be quiet, otherwise you're going to have leave.'

So I stayed, and I let them ask Chrissie all these questions. And they kept at it and at it and at it. And they kept rephrasing the questions and asking the same questions over and over again in different ways. And he kept answering, and he really held his ground. And he said, 'Look, you no...' He was a little kid, but he said, 'No, nothing happened.'

And they just were so persistent that after it was all over and I, you know, and I was under the impression that, because I went in early, that had left his class sort of unscathed. So I just didn't know what to think after that. After I heard this questioning, I always said, I said to my

0:05:39.2

friends, I said to my husband, I said to everybody, 'I wanted to confess.'

I mean he hammered this kid. And it just seemed like a less strong child would say something that maybe didn't happen. So I never really believed anything after that. That's just the way I felt.

Q: Do you remember the policeman's name?

A: No.

Q: Okay. Give me an example of what they would ask and how they would ask.

A: Well, they would ask, they kept asking about the bathroom. They would ask, you know, 'Did you see anything in the bathroom?' 'No.' 'Are you sure? Did you see….?' In other words, then they would say 'Did you see any magazines?' Or 'Did you see books?' Or 'Did anybody go in the bathroom with you?'      0:06:17.0

Or 'When you were at the computer, did somebody lean over you?' But they would rephrase it and ask it again, and again, and again. And then when it was all over, and I explained how I would go into the class, for all these years after that I just assumed - wrongly, obviously - that that class hadn't been touched. And then something did happen, it must have happened in a different class. And that's, that's the way I left it.

Q: Did they ever suggest, do you think that they ever used suggestive techniques? Like did they, did they….?

A: Yes. I do. I thought it was very suggestive. And I often wondered why they never asked my other son if anything happened. They obviously didn't care about that class. But I thought it was very suggestive. I mean I told everybody afterwards I wanted to confess to something, because I thought it was very suggestive.      0:7:17.1

Q: They did ask you to leave the room at some point? Or they did not…?

A: No. They didn't.

Q: Did you say 'Enough' at some point?

A: No. I think they just finished. They were not not nice. They were …

Q: Was your son Chris clear about what he saw in the class and what he experienced in the class?

| | |
|---|---|
| A: Yes. He was very clear. | 0:07:59.9 |
| Q: Why would you think, once he was clear once, that they would just keep going and going? | |
| A: I think that they were really trying to, I don't know what they were trying to do. I mean I don't know if they were consciously trying to get him to say something happened that didn't happen, or if they were trying to just break through some armor that he might have put up. I was giving them credit for trying to do the right thing. But I don't know. I don't know. | 0:08:29.2 |
| Q: Your sons. Have you ever known your sons to block out bad memories? | |
| A: Not with… Well, maybe. But I'm telling you it didn't happen here. | |
| Q: So your son didn't seem like he was hiding something from the police that would make the police…? | |
| A: No, I never heard from them again. So obviously they didn't think so either. That was the end of it. We never heard one work ever about anything. | |
| Q: I thought they came back once. | |
| A: No. | |
| Q: Okay. Just going through my notes. | |
| A: No, that was it. | |
| Q: Did they mention to you that Arnold had confessed to any crimes, or had spoken of…did they talk about Arnold in particular? | 0:09:13.1 |
| A: No. They didn't…no. | |
| Q: How did they portray Arnold to your son? | |
| A: They didn't. They didn't really. You know what? It's been many, many years, and I don't really remember it all that well. I can only tell you what I do know, and that was what I just explained. There wasn't, they didn't talk, I don't remember them talking about Arnold specifically. | |
| Q: And they didn't say to your son that he might not remember it because of a trauma? They didn't use that technique? | |

A: No.

Q: They never threatened your boys?

A: Oh god no.                                                    0:09:52.5

Q: After this was over, you spoke to other people in the community about it, what was happening in Great Neck?

A: Oh, it was crazy. I mean people were going wild, and carrying on. And you know, listen. If you thought your kid was abused, you'd be carrying on, too. I mean people just really jumped on the bandwagon fast. But I just figured it didn't happen to us, and it didn't happen to his class. So, you know, it was unfortunate.

Q: And then you started to hear I'm sure through other people of other children that it happened to.

A: Right. And I often wondered about some of those kids. I don't like to say bad things about anybody's kids, but you know maybe some kids are just easier to sway than others. But after the questioning of Chris, when I heard that So-and-So's kids had said they were abused, I often thought, 'Eh maybe yes, maybe no.'

Q: Did you ever hear a parent of a child say that his or her child was abused?

A: Yes.                                                          0:11:01.4

Q: And what was your impression of that?

A: I didn't say anything, because, because I, I just didn't, I just didn't want to make a judgment call. It's just not fair. I, you know, maybe some of these kids were abused. I don't know. But I can only tell you what happened in my presence. And with my kids.

Q: I'm sorry to reach beyond that. I was wondering how people portrayed the abuse?

A: No, nothing was ever, I never talked to anybody specifically about what happened.

Q: Did you read about the articles in Newsday and all these very sensational articles about HIV tests and...?

**A-0493**

| | |
|---|---|
| A: No, I didn't even know about that. | 0:11:37.7 |
| Q: Okay. Did you know that there was no physical evidence in the case? | |
| A: No. I didn't. I knew that after the movie, but I didn't know that before. I just always had my doubts, after that police thing. | |
| Q: Did you know the children were put through group therapy, hypnotized? That there were psychotherapists brought in? | |
| A: I didn't know…I'd heard…nobody ever told me about it. But I didn't know there was any hypnosis. I did, I'd vaguely heard about some group therapy thing, but I didn't know anything specific. Nobody ever called me. Nobody ever told me. | |
| Q: But there's, I'd heard that there's a group of mothers in town, a group of parents in town that still to this day meet and have lunch once in a while to talk about the abuse their sons … Had you heard that? | |
| A: No. No. I know people still think it happened, though. I, I, because I have friends whose kids weren't involved, but have, but know some of these kids. And they still think something happened. | 0:12:34.4 |
| Q: And why do you think they think that? | |
| A: Because I guess they trust, they trust the judgment of their friends. And I guess maybe they think some of these kids were damaged by that. But maybe … I don't know. But they think it. I can tell you right now. We talked about it at lunch today. | |
| Q: Let's just go back …that's all the questions I have, but I'm really interested, if you can just think back for a second - maybe this isn't possible - but the specific language used by the police. | |
| A: It's impossible. It's really impossible. I really, it's just a long time ago. It's such a, but it was such an impression that they pushed him to say something. And after that I just didn't believe anything. | 0:13:33.2 |
| Q: That's pretty wise. All right. Thank you very much. | |
| Man: Was Chris friends with other kids in the class before him? | |
| A: He was friends with kids in the class that had not claimed abuse. The ones in his class that he was friendly with, they're on the list, they didn't have any claims | |

**A-0494**

Man: Was he friends with them after this happened?

A: They were acquaintances. Two of the kids that he was sort of friendly with were a year older. So it wasn't like they were that friendly. But the ones that claimed abuse, I don't think he was friendly with them anyway.

Q: They must have been talking about it at school. Did he ever relate stories to you about what was happening at school? It must have been kind of crazy. One kid told me a story about how he sat behind one of the boys that you know. And at the beginning, he was with him he was saying, 'Nothing ever happened, nothing ever happened.' And within a month, he was, he wouldn't talk to him anymore. The boy. | 0:14:21.1

A: I told Chris one time, they were doing some psychoanalysis - this has nothing, this is just a funny thing - they were doing something in school with some psychological testing or whatever, and they were supposed to do something with Mr. Potatohead. And they were laughing about it. And they said, 'Well, you could say that it was Mr. Friedman'. And I'm sure the psychologist, all the bells would go off. They thought that was pretty funny.

But I don't remember anything going on in school at the time.

Q: Do you remember meeting Jesse?

A: I, I met Jesse only when I went in to pick Chrissie up. So I never really had any interaction with Jesse. And Jesse's friend. I mean I saw them. That was it. I went in - I'm telling you right now, I didn't see anything. I didn't see anybody cowering in the corners. It just looked like a regular class. And, and my oldest son liked going. I just didn't see any, I just, it didn't happen to us. | 0:15:20.8

Man: If they came to you and they said 'Do you want to go back', ...

A: Yeah, yeah. What? I mean they liked it. They said, 'It's fine. Let's ..' They had no problem going. 'Til Jack got too old, and then Chrissie went. And frankly, if this hadn't happened, I'm sure Patrick would have gone. He was, he was going to be like in the next year's class. So.

Man: Did you ever meet Arnold?

A: Oh, sure. He used to call me on the phone. He always called on the phone to set up the classes. I always thought he was...I always thought he was ... yeah, I'm sorry. Arnold was, he was friendly. I thought he was kind of nebbishy. And he used to call himself 'Arnie', which I always | 0:16:15.1

**A-0495**

thought was a little strange, because I would call him 'Dr. Friedman', and he would call himself 'Arnie'. But there's no law against being a nebbish. I, that's just the way I thought of him.

Q: Well, he was certainly nerdy.

A: He was totally nerdy. But I didn't think of him as being a predator. You know? Or anything. Would I have sent my kids there? Obviously not.

Q: Can you think of anything else?

Man: No...

Q: Any more Colin? Okay.

Man: Oh! Wait. Yes. Can you tell us what Chris does now?    0:17:04.7

A: Oh, right now? Chris is a Major in the United States Army, and he's stationed in Honolulu. And he just got married. And Jack, who went to Arnold, went to West Point, and he did his five years in the Army and now he lives in Texas and he has three kids. So that's what's going on. I don't see any long-lasting psychological trauma here.

Man: Did they ever...go to therapy?

A: No.

Q: Okay. Thank you.

END OF INTERVIEW    0:17:47.6

**A-0496**

COUNTY COURT
NASSAU COUNTY

--------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,
                            Defendant.

--------------------------------------------------------X

## AFFIDAVIT

MARC SMERLING, having been duly sworn, hereby declares that the following is
a true and accurate copy of excerpts of the transcript of my conversation with Rafe
Lieber on June 4, 2012.

                                                    _____
                                                    Marc Smerling

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0497**

Jesse Friedman Case
Friedman Call 16 MS Rafe Lieber 060412

| | |
|---|---|
| (dial tone) | |
| Q: Hello? | |
| A: Hello. | |
| Q: Is this Rafe? | |
| A: Yes. | |
| Q: Rafe, it's Mark Schmerling. I'm a producer of the movie 'Capturing the Friedmans'. I don't know if you saw it, but it was about…. | 0:06.00 |
| A: I'm, yes, of course, I'm familiar with it. | |
| Q: Oh, good. Good. | |
| A: And now, and now I know why you're calling. | |
| Q: Yeah. You know they reopened the case. I guess they kind of reopened the case in Nassau County, and they've asked me to bring up all my film and show them all the stuff. And, you know, I just, I've been calling around just, because when I made the film there was no internet or anything like that, so it was very hard to find people. But I've been calling since then just to get some recollections. I've gotten I think six of the boys who were, you know, in the class who were not complainants, and I've gotten six of the boys who were in the class who were complainants. | |
| And all I've been asking, because I don't really, I don't know – if you saw the film, you see the film is, is a little ambiguous, because I was a little ambiguous. And you know I was part of the world where there was smoke, there might have been some fire. Certainly I didn't think it was as much as the police had said back then, but you know I'm starting to feel like I'm in a moral conundrum here because the boys I've been speaking to have been – I haven't gotten one of them to say these things happened. I've had a couple complainants who had multiple counts of, of things like sodomy and these sex games and all this craziness, and they've said, 'Well, you know, I remember talking in front of the grand jury, and I remember saying things, but the only reason I said it is because I was told to say it, and I had, I felt like I was under a tremendous amount of pressure.' | 1:09.00 |

And these kids were like, what? 8, 7, 10, 11. How old were you? You were probably 11.

A: I mean, I was not a complainant by the way. I'm sure, you ...the list. So yeah, I must have been 11, I guess. I don't know. What year did this supposed, did it allegedly happen, and I can tell you how old I was.

Q: '86. Let's see – I have the class list.                                    2:07.00

A: I was born in '75. So.

Q: So it was Winter of '85.

A: So I would have been 10.

Q: And then you took Basic, that was Basic I, Basic II.

A: I don't even remember.

Q: I mean that's sort of, but, you know I'm only calling to ask one question, and it's just for me. And that is, you know, do you remember seeing anything that you thought was bizarre or...?

A: You know, I've thought – it's funny, I've…. Is this on the record or are we off the record? What....?

Q: Well it's on, I would say it's on, on my record. I would like to know. I'm not making another film about it. I can tell you that much. I've had my fill. I just, for my…if I'm going to go testify or whatever they want to call it in front of a panel, I felt like I should do a little more due diligence.

A: I mean I've, this is something that, that I've thought about over the          2:55.00
years. And, and I have some memories. They're, they're going to be
about 27 years old, these memories at this point. Um, you know, I
certainly remember being in, uh, the police visiting my home. You know,
my, where I, my parents, where I lived. In Great Neck at the time. You
know, and I can remember them being very intimidating. And you know
like to the point where like one of the cops was sitting on my parent's
couch, and like his pant leg was up, and I could see his gun. I guess
that's a kind of a memory that sticks with you.

Q: Especially if you're 11.

A: Yeah.

Q: You remember Chris Blaha? He's a great kid. He was…

A: It sounds familiar.

Q: Yeah. He was in the class. One of the classes....

A: I probably, I would probably ...I would probably, if you, if you shot off a couple of names, there might be some that I remember and some that I don't.

Q: I will. But he was saying much the same thing. He was saying it was almost like they were trying to tell me what happened.

A: Right . They were very ...I was very, and I do remember that, because I was very insistent that nothing ever happened to me, and it was, you know, that never seemed to be good enough as a response. So I do remember that. There are some weird things that I remember, remember from the class.    4:23.00

Q: Go ahead.

A: I remember...I mean some of these details probably don't matter, but I remember Jesse, the son, was constantly walking around with a camera around his neck. And there was um, I think I remember some kids being kind of taken into a private room. But I couldn't tell you who the kids were or certainly what happened. Or notice any reaction or hear anything or observe anything.

   I do remember there being a ...this is kind of embarrassing to talk about....

Q: The video games, no doubt.

A: One of the video games. Yeah.

Q: I mean every kid had them. I had those – I'm about your age as well.    5:24.00
I mean kids had those all over my school. They traded them. They were kind of really rudimentary and ....

A: Never, it was never anything that I – I actually, to tell you the truth, if you take all the, if you take all the stuff that happened afterwards out of it, I have, I remember the class fondly. It's almost impossible for me to remember it fondly now, just because of all the stuff that has gone, that has happened. I mean I saw the movie. I know that ... the Arnie Friedman I think killed himself in jail.

Q: Yeah. Did you ever see that letter he wrote to the community?

A: I, I , I don't recall. It was ....but I know that my parents were very, um, like, it did not, I know that there were a group of parents that were like lead, kind of leading what I would consider to be a witch hunt. I wouldn't say consider to be a witch hunt, but I guess I would use tat term now. And my parents wanted on part of it because I was so insistent that nothing had happened to me.

Q: Your parents were stronger than most. I mean they're...                    6:45.00

A: Yeah.

Q: Actually I take that back, because they talked – the police talked to eighty-one families with eight-one boys. And out of those, they were able to get fourteen boys to go in front of the grand jury, three of which....

A: Yeah, I never even, I never saw the court or anything. I was never ...probably because of the fact that I didn't have anything to give.

Q: And your parents were supportive.

A: Yeah, definitely. They would have believed me, and you know I don't think I had any behavioral changes or anything like that. So there was no, they never questioned me, in the sense – I mean I think they probably asked me once if something happened. And when I said, 'No', they never like pushed me and said, 'You sure? You sure? You sure? Blah        7:28.00
blah blah', or anything like that.

    So other than, you know, the videogames, and not all of them. Some of them were just regular videogames. Some of that...that's kind of al li got.

Q: Yeah. The videogames were like sort of, what I'm understanding, because you know, I don't know if you remember Judd Molton. He was one of Jesse's friends. And ...

A: It doesn't sound familiar.

Q: And a couple of the other boys told me that Arnold used to basically ask kids to bring in old computers and old disks, because he was too cheap to go out and buy them. And there was, at one point there were 800 disks in the room. And ...

A: I, I don't remember bringing my own computer. No way.

Q: It was the older boys. The boys like,

A: Oh, okay.

Q: Judd told me that he got, he got in trouble for not doing his homework. He was spending all his time on his computer, so his parents were like, 'That's enough.' So he took his computer and his disks to the class....

A: Oh, and there was some stuff on there.

Q: Yeah. He said, I said, he said, 'All those games, I had those games.' You know?

A: Right,

Q: 'And I didn't really think about it when I gave, because I had like 300 disks, because I was really into it. And I gave them to Arnold as sort of a...'

A: Yeah, I had hundreds, maybe even thousands of games when I was a kid. Very different than it, than the way gaming is now. I even see it with my son. I mean you know the whole bunch of games on a disk, and you trade them and load 'em up, and I guess upload – I don't even know if they were called, if it was called uploading and downloading then. I don't, I don't remember.

8:49.00

But I had tons of games. And it was for like the Commodore 64. I think was the, something like that, was the computer that we would use. But I, as far as the meat of the, you know, your questions I guess and the meat of what you're looking for, I'm not, I'm not a great source, unless you're trying to confirm that, you know, it's more likely that nothing happened, because I don't have any memory, nothing ever happened to me, and I don't 'have any memories of ....

Q: Well you're not alone.

A: ... of any of that stuff.

Q: I'm starting to think very strongly – even in the beginning, I've always thought that Jesse got a bum rap. And Jesse, many boys have told me that, you know, Jesse was the one who had to be sort of the tough one. He was the one who said, 'Hey kids, sit in the seat', because Arnold was not around and not that present.

9:48.00

But I always thought maybe something happened with Arnold, because he was obviously a pedophile. He had ordered that pornography through the mail. And it's really hard to judge ...

A: By the way, I, well I guess that was in the, in the movie, but like I saw

| | |
|---|---|
| the movie once, and it's not something I ever really, I didn't watch it again, because it, and like I said, it's not, it's a part, it's not a thing. I guess everybody who was a part of that, whether if something did happen or not, still kind of lives with that to this day, that that happened.<br><br>I've, that story has come up in the past, and I said 'Oh, by the way, I was in that class.' You know. Things like that. I'm not ashamed. | |
| Q: Of course not. | |
| A: You know, ever to admit it, because, like I said, nothing, nothing ever happened. But, and I don't know any, I don't, like I said you might read off some names and I might remember. | 10:42.00 |
| Q: Yeah. Let me try. There was a kid in your class Jacob Borne? | |
| A: As in – I mean that name only means something to me because of 'The Bourne Identity'. | |
| Q: He's not the same guy. Aaron Goldbird. | |
| A: That's, that sounds familiar. Yeah. | |
| Q: He was a complainant. Not very many counts. | |
| A: Was he a blonde? | |
| Q: I don't know. | 11:12.00 |
| A: That name sounds familiar. Yeah. | |
| Q: Dan Abel. | |
| A: Yes. Definitely. And I, I knew him. I think it's actually pronounced A-bell. And I knew his father. Yeah, definitely. | |
| Q: He was a complainant, which was surprising. Because I've spoken to him since. He's, he told me.... | |
| A: Let me ask you a question. Let me ask, one kid, do you have a name Seth Crostich by any chance? | |
| Q: Yes. | |
| A: Was he a complainant? | |
| Q: No. | 11:38.00 |

A: He wasn't a complainant?

Q: No.

A: Okay. Interesting.

Q: And from what I hear, he's a smart young guy like you. And like Chris Blaha. I mean I've just talked to so many guys who are non-complainants and they're like, 'Look, I'm not ashamed', like you are. 'I'm just, I didn't see anything, I didn't hear anything. And I told that to the police...'

A: It wasn't just boys either.

Q: No. There was Haley Spiz.

A: Haley Spiz. Yeah. That actually that was the name I was going to say. I remember her. She was in the class.

Q: The one other boy we spoke to who was so smart – Gary Meyers. Do you remember Gay Meyers?                    12:05.00

A: No. Doesn't sound familiar.

Q: And Dan Frank.

A: No. Doesn't sound familiar.

Q: Let me see. Then you were in Basic II. That same group. And that was another thing. Is these kids...

A: They went back, right?

Q: Oh, over and over and Gamemaker I, Gamemaker II.

A: Gary, Gary Kitchen's Gamemaker.

Q: Yeah. I mean it was just like, if they were being – by the way, they're not, there's no accusations in the grand jury indictments of 'Hey, Arnold took me into another room.' It's all happening in the class. You know? In a public...

A: In plain sight?

Q: In plain sight.

A: Oh, that's ridiculous.

Q: And they actually say that. It's ridiculous.                                    12:47.00

A: Okay. That's ridiculous, unless we….(chuckle)…I mean I'm sure we were glued to our computers, but, I mean, you know… we weren't, at eleven you have some sense of awareness – 10 or 11 years old – you have some sense of awareness of what's going on around you, I think. So. That I didn't know either.

Q: Yeah. Yeah, Seth Crostich took Basic III with you.

A: Okay. I remember, I remember Seth. I don't know why, but I just, I happen to remember him.

Q: And then you know it's the same boys, and Haley, in that class is the Basic I and Basic II. And I was wondering if you were in the Extended – yeah, you were in the Extended 86. So that, that had Danny Griffo in it. That was another boy. But other than that, it's the same boys. Dan Abel was in a lot of these. A-bell.                                    13:31.00

A: A-bell. Yeah. It was A-bell.

Q: And you were in Gamemaker, Spring – I mean you went back a lot. So did these boys.

A: Yeah, I, like I said, um, if you can take all this stuff out, I have, I remember the class as being something I enjoyed. So the problem is is that when you add all this stuff, the memory kind of gets cluttered a little bit. It doesn't really become a good memory.

Q: Can you imagine if you were a complainant? Some of these boys, yeah, I don't remember if you remember the boy from the film whose, you know, the only people who said this has happened, I've talked to a lot, is that one boy. Jason Pravda. Who says, he basically says, you know, 'I was hypnotized, and it was like in my mind.' And you know, and then you're like, 'Well explain that to me. Tell me what happened.'                                    14:15.00

'Well, you know, when the police came to my house, and within three weeks, I was taken, doing therapy at a, at North Shore University Hospital. And I was put into a trance. And it was just like all in my mind, right then.' And he describes the most absurd stuff. You know, like 'Arnold would come down, and he'd have a', he would, he won the Teacher of the Year Award, 'and he would jerk off into the, like a punchbowl full of orange juice, and we'd all have to drink it.'

A: That's ridiculous.

Friedman Call 16 MS Rafe Lieber - 060412 - 8

**A-0505**

Q: Or 'He would come on gum and he would make us chew it.'

A: That's ridiculous. That's ridiculous.

Q: Yeah. Yeah. Well, he's damaged. And I think...

A: Of course.

Q: Some of these boys are as much victims as the, as Jesse was.

A: Right.

15:09.00

Q: I mean they were, I mean I can't imagine – I have boys who are that age, and one's, they're now 13 and 18 - but I can't imagine allowing somebody to hypnotize my child in this situation. You know? But it happened, unfortunately. Well I appreciate your time. I really do.

A: Yeah, yeah. I mean anything, you know, anything I can do further. Because, you know, like I said, it's not, I would imagine for most of the kids who were in that class, you know, that's something that from time to time they still think about.

Q: Yeah.

A: I spent a lot of time, I lived in Great Neck until I was about ...thirty-four. I'll be thirty-seven this month, so probably until I was about thirty-four. And so, and any time I would pass Piccadilly Road, I would think about it. You know, and that was a lot. That would be on a weekly basis, I passed Piccadilly Road, and I was like, 'Oh, that's where it happened.'

  And so, um....

Q: Yeah, it was a devastating thing to that ....

A: And so it's like for everybody who was in that class, like that's something that, you know....

Q: It's horrible. I mean there are, there have been a couple of non-complainants who were like, 'I don't want to even think about this.' You know? And I think they feel that way because there's been such an investment in the community to these events taking place....

A: Right. And from time to time stories – not that often, but from time to time - you know, there will be a story. Certainly when the movie came out. And I think when Jesse was released from jail. You know, there were, there were stories in the newspaper about it and things like that.

16:41.00

| | |
|---|---|
| But … | |
| Q: You know what's happening now – Jesse took his appeal, his 4:40 Motion, which is a motion to exonerate, to the Second Circuit, which is the, you know… | |
| A: That's right before the Supreme Court. | |
| Q: That's right. And it was time barred, because he didn't have the money before the movie came out. We gave him a little bit of cash to help him legally. | |
| A: Okay. | |
| Q: And it was time barred, so they basically wrote a landmark decision saying, 'Look, this is time barred, but this thing stinks to high heaven. And Nassau County needs to take another look at this. | 17:19.00 |
| A: And, and so wait. What is Nassau County looking at now? | |
| Q: Kathleen Rice, the new D.A.. Remember it was Dennis Dillon. | |
| A: Oh, yeah. I know, I know Kathleen very well. | |
| Q: Yeah. She, she impaneled like Barry Scheck, the guy from the Innocence Project. Mark Pommerantz. | |
| A: This is an attempt, this is an attempt to …? | |
| Q: To look at the case again. | |
| A: Oh, wow. Jesus. | |
| Q: So they're, they… | 17:44.00 |
| A: I, I … | |
| Q: ….with an eye towards exonerating Jesse. | |
| A: Right. That's going to be a shit show. If that's the case. If that, if that – I didn't know that, and I don't know if that's public. | |
| Q: No, it is. I can send you the article. Let me get your e-mail. I'll send you some stuff that that I think you'll find interesting. | |
| A: Okay. Because I can see parents who are still around. You know, who were around then, freaking out about that. | |

Q: …I know. But you know he's been out of jail. He served his time.

A: No, I know. For a long time.

Q: Yeah. And he also, you know, the thing is he got married. He'd like to have children. He lives under, you know, Megan's Law. As a Violent Sexual Offender.

A: Oh my god! So he can't live near a school. He's got all those restrictions. And everything.

Q: It's awful. He lives in Bridgeport like in the worst neighborhood. And you know he, he's been able to create a business online. He sells books online. You know? And he makes money at it. And his wife's a psychologist. And she's very nice. And regardless of, you know, I just, I can't find anybody to tell me who me, who's like you, or like Chris Blaha, or like Dan Abel, you know, who I did speak to, who says 'Nothing happened now.' You know?

   Or like, I mean I've spoken to who else? I've spoken to Haley. Gary Meyers, I told you. Ron Georgalis, who's not in the classes with you. Other than Jason Pravda, I've not been able to --- the only other boy is Darone Nassimmi. Who basically says, 'These things must have happened, but I, I, my psychologist has told me I blocked them out. I had no memory of them.'

18:36.00

A: Okay. Wow. I didn't even see – I did later on, …for completely other reasons, but I never uh, like after that, like after that whole thing, my parents never felt the need to put me into that.

Q: Yeah.

A: Because I did later, but that was from, like I said, for other things.

Q: Well that was probably a smart move by them.

A: But I never even needed to do that. So.

Q: Yeah. I mean here's a question for you: Do you remember other kids from those classes telling, anyone telling you these things happened?

19:41.00

A: No.

Q: Right. And you're presumably still friends with these kids in school and you'd see them around.

A: Yeah. I mean we were split up between two schools – North, you know Great Neck has two school, uh, you're either in North or South. So not everybody was, I would see every day. But um, yeah. I mean I guess, I don't remember.

Q: I'll tell you a story that Gary Meyers told me – that Jacob Bourne, who's a major complainant, he said that he saw, Gary saw him...and at this time nobody knew who was a complainant and who was who ....Gary saw him in school, and he was like, you know, 'The police came to my house and they were really aggressive'. And his mother recorded a police interview, by the way.                                              20:29.00

A: Okay.

Q: It's kind of amazing. Calling him, you know, 'If you don't get this fixed, you're going to end up a pedophile or a homosexual.' I mean, really aggressive tactics.

A: Right.

Q: And he said to Jacob Bourne, he said, 'Did this happen? Did you see anything?' And Jacob was like, 'No, I didn't see anything.' And Jacob is somebody I've been trying to talk to, and I just can't, he won't talk about it. You know, mainly because I think some of these boys, they're, like he's a big time financial guy. I think they feel like they have some sort of liability, which they don't. I mean, Jesse doesn't care.                                              21:05.00

A: Right.

Q: He just wants, he wants the truth. That's another thing that really bothered me from the beginning, just between you and I, is when we started interviewing people in the beginning, I had no idea - we were doing making a movie about birthday party clowns. We ran into David Friedman. He's a big time birthday party clown in the city. He's sort of like a comedy, the movie.

And then, you know, we ended up finding out what his past was, and we met Jesse in prison. From the very beginning, when I met Jesse, he said to me, 'I want you to talk to everybody. I don't want you to skip over...here's the list from the school that my father gave me. So here's the kids' names, and anybody you can reach, you know, I'd like you to try to talk to them. And if you need me to sign, you know, waivers, I'll sign waivers.'

Like we got him to sign waivers for his lawyers, so his lawyer could talk to us. His psychologist so his psychologist....he was so forthcoming. And everything he told us ended up being true.                                              21:50.00

Then we were talking to Fran Gallasso, who's head of the Sex Crimes Unit. And we go through this whole interview. And I had done some research by then, and I'm like, I'm like, 'Wow, that was a bizarre interview.' And we go back, and I start checking the interview against the facts from the search warrant returns, from the, you know from the court testimony that we had. From, you know, other accounts that are in the newspaper, and she lies to us constantly.

And I was just like 'Wow, there's something seriously wrong here. Seriously wrong. Sort of a shame.

Here, give me your, I'll send you the Second Circuit Opinion. I think you'll find it interesting. What's your e-mail?

A: Rafe. R-A-F as in Frank- E. dot. Lieber. L-I-E-B as in Boy-E-R @ gmail.com

Q: Okay. I'll send you some stuff. But I really appreciate your time. You're honesty and your bravery. Your courage.

A: It's my pleasure.

Q: All right. I'll speak to you soon, Rafe.

A: Okay, great.

Q: Bye-bye.

END OF INTERVIEW

| | |
|---|---|
| | 22:32.00 |
| | |
| | 22:57.00 |

# VOLUME 3

| | | |
|---|---|---|
| Exhibit T | August 1, 2012 Interview Statements of Michael Epstein | A-0511 |
| Exhibit U | November 13, 2012 Recorded Interview of Keith Doe | A-0572 |
| Exhibit V | May 2013, "Destruction of Innocence, the Friedman Case: How Coerced Testimony and Confessions Harm Children, Families & Communities for Decades After the Wrongful Convictions Occur", Gaven de Becker and Emily Horowitz, National Center for Reason and Justice | A-0591 |
| Exhibit W | June 20, 2013 Affidavit of Jeffrey Leff | A-0634 |
| Exhibit X | June 27, 2013 Affidavit of Dan Aibel | A-0636 |
| Exhibit Y | August 4, 2013 Affidavit of Keith Lanning | A-0640 |
| Exhibit Z | June 28, 2013 Transcript of Hearing in Friedman v. Rice, Index No. 4015-13 (Sup. Ct. Nassau Cty.) ("FOIL Hearing") | A-0647 |
| Exhibit AA | August 19, 2013 Letter from Arline Epstein to Justice F. Dana Winslow, with attachment | A-0695 |
| Exhibit BB | August 18, 2013 Letter from Scott Banks to Justice F. Dana Winslow, Supreme Court, Nassau County | A-0733 |
| Exhibit CC | August 22, 2013 Transcript of Hearing in Friedman v. Rice, Index No. 4015-13 (Sup. Ct. Nassau Cty.) ("FOIL Hearing II") | A-0735 |

COUNTY COURT
NASSAU COUNTY

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-


JESSE FRIEDMAN,
                      Defendant.
-------------------------------------------------------------------x

## **AFFIDAVIT**

JAY SALPETER, having been duly sworn, hereby declares that the following is a
true and accurate copy of excerpts of the transcript of my conversation with
Michael Epstein on August 1, 2012.

Jay Salpeter


RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0511**

Jesse Friedman Case
MICHAEL EPSTEIN

Q: Today is August 1st, 2012. The time is now 10:10 am. Sitting alongside of Michael Epstein at 230 Ashland Place, in Brooklyn, New York. And Michael, for identification purposes, can you state your name and date of birth?

A: Hi. Michael Epstein. 10/25/78.

Q: Okay, Michael. You gave me permission to record this conversation?

A: Yes.

Q: And we spoke about two days ago over the phone. Is that correct?

A: Yes.

Q: Okay. Now I'm here regarding the investigation and the reinvestigation of the conviction of Jesse Friedman. And you're in…, you realize and you know who Jesse Friedman is.

0:35.00

A: Yes, I do.

Q: Could you give me a little background – how you know Jesse and his father?

A: Sure. I grew up in Great Neck. And I took computer enrichment courses at their house. Which was also in Great Neck. I took a few sessions of, of those courses. I would say maybe three or four sessions. Each session was ….I think they were once a week. And I was also, you know, I was a pretty bright computer kid at the time, and I'm currently employed in that field. I'm a programmer.

1:27.00

And so I saw it as a chance to, you know, get access to, you know, more computer hardware and software, learn more about how to program. It was also sort of a fun after-school activity with, you know, some of my friends were in the classes, too. And you know there were always, I think in the classes there were always two or three kids I knew well, and a few that I didn't know as well.

Q: Would you recall the names now of the people that you knew in that class?

A: Sure. I mean there were a lot of them. There were Brian Cohen was a very close – I would say he's my best friend in elementary school.

**A-0512**

| | |
|---|---|
| Benjamin Handler – Benjie. Allan Yaskowitz was in, was in one of the classes. You know there were others – I took several sessions, so I don't remember who was in which of the classes, and I think there were other friends I had who were in, in some of them.<br><br>You know, I could name some of my other friends, but I don't know if that…. | |
| Q: Okay, so basically, as we know, we know what happened to Jesse and his father. Correct? | |
| A: Yeah. | |
| Q: And there were allegations of sexual misconduct by the district attorney's office against Jesse and his father. Right? You were aware of that? | |
| A: Yes, yes. | 2:48.00 |
| Q: Okay, now while you were in class, do you recall what year it was possibly? | |
| A: I don't, I don't really. I was young. I would say it was probably …. I don't know. '88, '89, 1990. Something like that. | |
| Q: Okay. Were you in high school at the time? | |
| A: No, no. I was in elementary school. | |
| Q: You were in elementary school. | |
| A: I'd say probably 3rd, 4th, 5th Grade, something like that. | |
| Q: Okay. How did you, while… | |
| A: …Could be 2nd. | |
| Q: Okay. While being present at the house, at the Friedman house, during the classes, did you ever see any mis – you know misconduct by Jesse or his father? | |
| A: No, I never did. | |
| Q: You never did? | |
| A: No. I remember Arnold – his father- as a very, you know he was an older man. He was very kind. He was, he had the sort of bearing of a teacher. He really enjoyed teaching kids. And he also had music | 3:29.00 |

classes in addition to computer classes – or music tutoring or something.

Jesse was sort of, he was a little bit of a rambunctious kid.  He was helpful in the classes, but he was not I think as knowledgeable as his father in general.

Q:  Right.

A:  But he was, he was sort of in the classes as a helper.  You know, he could help you with some things, but Arnold was more knowledgeable about the subject-matter.

4:12.00

Q:  Okay.  Now when did you hear about the arrests?

A:  Well the police came to my house one day. In the evening.  And I remember the doorbell ring and I remember seeing two cops outside.

Q:  Were they in uniform?

A:  In uniform, yeah.

Q:  Right.

A:  There may be others who were not in uniform, but I remember some uniforms.  And my parents answered the door, and they, the police went to speak with my parents without me for a little while.  And then they brought me in.  And you know I think we spoke to them on at least two occasions, and I was, I don't remember specific details of what they asked or what they said, but it was very clear that they were bringing up the subject of, you know, inappropriate activities that they, you know, were sort of strongly hinting had been happening at the Friedman's house.

And of course after that it was all over the news.

5:17.00

Q:  So when they came to speak to you, the Friedmans had already been arrested, or....?

A:  I don't remember.

Q:  You don't remember.  Okay, now when they spoke to you, do you recall what they were asking you?

A:  You know, I, I don't remember specific questions.  But I remember the general tone was 'Other kids have been saying that things have happened.  Do you remember anything?  Can you tell us anything?' That, that's my memory of the tenor of the conversation.

Michael Epstein - 3

Q: All right. And how did you answer them?

A: I said 'No'. I said, 'I don't think anything happened.'

Q: Okay. And then, so that was the last time you ever saw the police. Right? Maybe on one or two occasions?

A: Yeah, I think so. I don't really remember.

Q: Right. Okay. It's fine. It's been years ago. That's understandable.

A: I must have been eight years old or so. Nine.

6:18.00

Q: Do you recall if they ever tried to lead you, you know, with an answer?

A: I don't remember.

Q: Okay.

A: I mean I think just the fact that they were bringing up these statements and saying that other kids had said that they were true had the effect of, you know, I think I'm a little bit stubborn in a lot of ways, and I think if I weren't quite so stubborn and, and confident that nothing had happened I could see acknowledging what they wanted me to say. But I just didn't think it was true.

Q: Okay. Thank you. I'll tell you I would use the word 'you stuck by your convictions'.

A: Yeah, that's a nicer way to say it.

Q: It's a nice way to say you're stubborn. You know? Okay, now. I'm going to sound like an attorney for a second. Did there come a time when you went for psychological treatment or to see, to see a doctor?

7:15.00

A: Yeah, yeah, we've, my parents took me to see I think his name is Dr. Pelkavitz. I don't remember if he was the only one. And I may be getting the name wrong. There was a guy. He had … there may have been two, actually. There was one with an office in Great Neck. At his house. And then there was one with an office at L&J Hospital. I don't remember for sure whether it was the same doctor.

Q: But do you recall the name of Pelkavitz?

A: Yes.

Q: Okay. And how long…

A: He was the primary one.

Q: He was the primary.

A: Yeah.

Q: How did your parents know to go to him?                                    8:00.00

A: I, I got the impression that a lot of kids were going to him. I suspect that the police recommended him but, or referred him, but I don't know.

Q: Right. And for how long did you see Dr. Pelkovitz?

A: Years. Three, four years probably.

Q: Three, four years.

A: At least. Maybe, maybe five.

Q: And during those three, four or five years, you know, whatever it is, basically could you get into what happened in those classes? Were you telling him the same thing that nothing happened, as you told the police?

A: Yeah, for the first several years, I insisted that nothing happened. And I didn't think he believed me. And I think he looked at it more as trying to get me to remember. Because I think he was, I thought he was totally convinced, and trying to get me to remember and, or admit about these things that happened. And you know there was a lot of talk about specific activities that kids had said may have happened.

   I think there was also a lot of just sort of general psychological practice     9:06.00
that was not related. You know, like, what was I doing? What did I think
about? Who were my friends? What was my mood? You know, just
normal stuff that you expect a psychologist to ask. But there was always
the, it was always clear that the reason I was there was because of the
allegations against the Friedmans, and because I had not said that
anything happened.

   And I also had long conversations with my mom at home. Along
similar lines, like talking about going, you know, rehashing the stuff. And
I told her also that nothing had happened, that I never saw anything
inappropriate. You know, they were computer classes.

Q: What's your mother's name?

A: Marlene.

**A-0516**

| | |
|---|---|
| Q: Marlene. Now did, did it ever come up – because, like I said, we spoke a couple of days ago – did it ever come up about the leap frog incident? I mean… | |
| A: I, I'd heard that, that term and some sort of sketchy description of – I mean I think it supposedly referred to some sort of game where a boy or an adult or both would like be naked and jump over the other one's back or something like that? And it always struck me as a little bit farfetched. Like it didn't seem like the sort of activity – and as I matured and became an adult, it never seemed like the sort of activity that an adult would find sexually fulfilling. It seemed like the sort of thing that a kid might have imagined. And I never saw anything of that sort. | 10:22.00 |
| Q: You never saw anything? | |
| A: I never saw anyone take their clothes off. I never saw any – you know, there was a little bit of horseplay, just, but just kids being kids. I mean if you get ten kids in a room in a, in a basement, you're going to get a little bit of running around now and then. But there was nothing inappropriate about it. | |
| Q: Was it Dr. Pelkovitz who brought up the leap frog? Or…that might have come from another source? | |
| A: I think he did. I think it may have come from the police. It may have come from other kids talking about it. I don't remember. | |
| Q: But it could have came from Pelkovitz or the police? | |
| A: It could have been. | |
| Q: Okay. | |
| A: And I think there were other, you know, things that they talked about in that vein that I don't specifically remember. | |
| Q: Do you recall if you were ever asked to be hypnotized? | |
| A: He, he, Pelkovitz definitely talked about it, as something that he felt would be helpful. And I was skeptical. And I don't remember, I mean I've never believed that it probably even works in general. But I don't remember whether he actually tried or not. | 11:29.00 |
| Q: But would it be fair to say, and I guess this has just got to be a 'yes' or 'no' answer, would it be fair to say that he did ask you to take it and you declined? Or … | |
| A: Uh, yes. He certainly asked me to do it. I certainly resisted. I don't | |

**A-0517**

remember whether I eventually agreed.

Q: Okay. Now, you also mentioned to me, and I'm only saying what you mentioned to me - I don't want to put words in your mouth - that eventually there came a time that, because of the constant sessions you had with him, and the impossible aggressiveness or the repetitiveness, you lied to him. Is that correct?

A: Yes. Yeah, that's true.

Q: Would you explain that to me?

A: Yeah. Not so much him. I mean not him at first. But ...

Q: Right.

A: ....after a few years of these sessions, it became clear to me that his goal – and I think also my parent's goal – was to get me to remember or get me to say that abuse had happened. And I just, I didn't want to keep rehashing this, these memories forever. You know? He didn't, the pleasant memories that I have of the class, you know, you hear all these things, and you start to think that, you know, 'Well maybe something did happen.' Or 'Maybe it happened to other kids and not to me.'

13:11.00

And just hearing that, you know, it made me a little bit...it made the memories into things that, by association with all this talking it over, talking it over, talking it over wearied us both. And I wanted to not spend so much time of my life discussing this. So eventually I decided – I think I first told my mother that I remembered it. I made up some stories, as little as I could get away with, about what the Friedmans had done. I think I mentioned the leap frog and maybe some other things.

Q: Do you recall the other things?

A: No, I mean I think just sexual contact of some sort. I don't remember.

Q: Right. So it's leap frog and sexual contact, which you first told your mother. Is that right?

A: Yeah, I think so. And then, and then told Dr. Pelkovitz.

Q: And when you told Dr. Peklovitz, what was his reaction? You know that, did he feel euphoria that he finally had you confess, or....?

A: I can't say what he felt. He may have, he may have felt that. He didn't, I mean he didn't, you know, ...

Q: Did they ask you to testify?

| | |
|---|---|
| A: He asked me if I would be willing to testify. But he didn't make it sound like it mattered that much. I think at that point there were already so many kids who were willing to testify -- or maybe at that point they were already sentenced. I don't remember the timeline. But …. | 14:23.00 |
| Q: Right. | |
| A: I mean I think there were, I think it, Arnold was sentenced pretty quickly, but then Jesse's case hung around for a year or two. So I don't remember which came first. | |
| Q: Right. Okay, now when I just got here, before we went on tape, you informed me that you received a letter from the DA's Office about a year ago, and then you called them. Could you talk about that? | |
| A: Yeah. It may have been less than a year. It may have been, you know, I'd say between six months and a year ago, I got a letter from the Nassau DA -- maybe a year and a half, something like that -- saying that they were re, re-investigating the case, and inviting me to call them if I wanted to talk about it. | |
| And I did. I called the number. And I think we set up another time to talk, and then we talked for, you know, maybe, at least a half hour, maybe a little longer. | 15:34.00 |
| Q: And do you recall what you told them? | |
| A: Yeah, I told them pretty much the same as what I'm telling you. I told them that I don't remember any inappropriate activity at the Freidman's house. I told them that I, you know, felt a little bit pressured by the police and, and Dr. Pelkovitz. And by my parents, frankly. | |
| Q: And did you eventually tell them that you lied just to get them off your back? | |
| A: Uh, I think so. I don't remember specifically. | |
| Q: Okay. I mean is there anything else that I had left out during our conversation that you might want to add? | |
| A: …. Um, I think it's worth noting that I and several of my other friends continue, you know we would take a, a class, which would be, you know, a session of ten or twelve classes, and then we would re-enroll for another one. | 16:32.00 |
| Q: Right. | |

Michael Epstein - 8

**A-0519**

A: Or two or three. And I certainly did that. And I don't know if the kids who alleged abuse also did that. But if they did, it was, I mean I have trouble reconciling that,

Q: Right.

A: ...that fact unless they had....

Q: Did any child in the classes, any of your friends, ever mention anything happened to them?

A: Oh, well, afterwards, after the police came to see us all, I remember some of my friends, specifically Brian and Allen were, had definitely said that something happened, and I was confused by this, because I had been at the classes when they said there was, there were inappropriate activities.

Q: And did you, did you confront them with that?                                    17:57.00

A: I wouldn't say 'confront'. I would say, you know, we probably discussed it a little bit. But it was, it was not the sort of thing that, that people really talked about that much.

Q: Right.

A: There, I remember very clearly on the playground at my elementary school, Brian had, Brian Cohen, had a, like a little badge, like a fake police badge. Like Junior Police, or something like that, that the police had given him, or the DA or somebody. As a result of having testified.

Q: Right.

A: Or, you know, admitted or told the police.

Q: You also told your mother that you lied, correct?

A: I never told her that I lied.                                                          18:39.00

Q: Oh, you never told her?

A: No.

Q: Do you have a relationship with your mother?

A: Yes. I just never, I thought about it a few times. I think about it now. And you know I'm sort of felt like letting sleeping dogs lie, but I feel like maybe this is the time. And you know she conceivably could ....say what she remembers, and she would probably remember more clearly the

**A-0520**

| | |
|---|---|
| questioning, just because she was an adult at the time. | 19:12.00 |
| Q: Would you mind if, you know, if you would ask her if I could speak to her? You know, if not, no problem. But if it were possible. Is she still in Great Neck? | |
| A: Not….(audio break) … | |
| Q: Okay, we went off the air for a second. I hit the wrong button. We were asking your mother possibly, or if you can….if you can, call me. If not, I'm not going to bother your mother without your permission. You know, or if you want to discuss it with her. That's up to you. So you have my number. So, all right. I'm going to conclude the tape now. We've covered about everything, right? | |
| A: Yeah. | |
| Q: So it's 10:30 am, and I want to thank you very much. | 20:00.00 |
| END OF INTERVIEW | |

Michael Epstein - 10

**A-0521**

COUNTY COURT
NASSAU COUNTY

---------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

               Defendant.

---------------------------------------------------------------x

**AFFIDAVIT**

ANDREW JARECKI, having been duly sworn, hereby declares that the following is a true and accurate copy of excerpts of the transcript of my conversation with Michael Epstein on November 1, 2012.

                                             Andrew Jarecki

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0522**

Jesse Friedman Case
Michael Epstein

| | |
|---|---|
| Q: ....Thank you for sitting down with us. I know, as I was saying, it's been a really gratifying thing just to see ...just the way, you know, the way that your mom's reacted to this stuff. And more and more I think that's what's happening out there, is that people are realizing that, it might be, maybe it's okay for them to imagine a world where these things wouldn't happen. It's really, I think it will lead to a lot of healing. And for me it becomes a lot less just about Jesse Friedman or, you know, it's much more about the cumulative effect on all the people who were involved in this. ....But it's, it's a very interesting to see just how people are starting to be freed a little bit by the whole thing. So I just want to ask you a bunch of general questions, stuff that you've talked about in the past. And ....curious about...understanding of this. ....(instructions)....<br><br>     Tell me your name. | 1:57.00 |
| A: Mike Epstein. | |
| Q: rephrase. | |
| A: My name is Mike Epstein. I was a computer student at the Friedman's house the year or so before they were arrested. | 3:28.00 |
| Q: And how old are you now? | |
| A: I'm thirty-four. No, yes. Sorry – I just had a birthday, so... It's now thirty-four, Yeah. | |
| Q: So how old are you now? | |
| A: I'm thirty-four. | |
| Q: And what kind of work do you do now? | |
| A: I'm a computer programmer. | |
| Q: And was your first introduction to computers back in the Friedman days? | |
| A: My first introduction? No. I, I, actually had a lot of introductions to computer programming. I, there were some at school. There was the classes with the Friedmans. I had some on my own. I had some friends who were also into programming. It was kind of a thing that was just becoming, just beginning to become available to kids who had an | |

**A-0523**

aptitude or interest at the time.

Q: I remember. I had a Radio Shack TRS AD with the cassette tape as the memory. I don't know if you remember this. It was just a regular old Radio Shack cassette player as the...

A: Yeah, that was like two years before my time, I think.

Q: But it was, and I guess the Friedmans, they used the Commodore 64?

A: Yeah, they mostly at the Friedmans had the Commodore 64s. There were some old Pets. I don't think anyone used them anymore. I think there were a couple of Apples here and there.     4:37.00

Q: Why do you think they, why were they ahead of the curve? I mean they seemed to have more computers in their house than anyone in Great Neck for sure.

A: Um, that's a good question. I don't know why they were kind of out in front of things. They may have noticed that it was sort of a new market, and been good capitalists. I never really had much insight into that.

Q: But going there, did you feel like, 'Eh, this is old hat. I already know all this stuff', or did you feel like, 'Eh, this is a good thing for me. This is my next step in the learning process.'?

A: I don't really remember in good detail what kinds of topics the classes covered. I don't remember being bored. They were certainly self-paced in a sense, so that if you knew something already, you could work on a more advanced version of it, or you could help other kids with it.

Q: And at the time, I mean leaving aside the topics, but what was it that you were, what was it that you could learn? You know, because most of the time, when kids use computers, they play games or they do stuff that, you know, because kids aren't doing their balancing their checkbook. They're not doing a spreadsheet or something like that. What were the kind of exercises that you could learn from?     5:41.00

A: Well I think the appeal was that it was a chance to do programming that was, you know, goal-driven and problem-solving oriented. And there weren't really classes in elementary school. There were, there were in middle school, but in elementary school the computer room was just sort of like an enrichment thing where maybe you would play Oregon Trail or something. And this was more of a problem-solving experience.

Q: And so the year, when you said the year before they were arrested –

they were arrested in '88.

A: '87? I think?

6:43.00

Q: Yeah. So you went to the classes in…?

A: Yes, so I was probably there – I think I took two classes. I don't, I'm not totally sure. Some of the things like the logistical details are hazy to me, because in retrospect when you're a kid, you know, a lot of timelines seem elongated. Things seem like they go on forever, even if today they would seem like they went by in a flash. I think it was probably two sessions – two classes, two courses. Each course was about ten sessions.

Q: And do you remember how long the classes were?

A: I don't know. I would say the classes were a couple of hours? In the afternoon?

Q: And do you remember how you first heard about the classes by any chance? Or was it something your parents had heard of, or…?

7:20.00

A: I don't remember how I heard. There were a lot of kids going – there were some friends and acquaintances of mine. I don't know what the ordering was, of who heard about it first.

Q: And when, when you had friends in the classes, or was it a kind of thing like you do little league with, with your friends that you went together, or did you go to classes independently? Or…?

A: You mean in terms of physically getting there?

Q: Yeah, or just, you know, somebody signing up for, you know, Basic I or something like that. Would it be you and some friends that were all going to the class at the same time?

A: Yeah, I did it with a couple of friends at, in the same classes at the same time.

8:00.00

Q: And you guys moved from one class to another, to the next?

A: Yeah, there was, there were various levels of class. You would advance from one to the other. And we did that at least, at least once.

Q: And do you remember – you may not remember, but do you remember what time the classes started? Was it an after-school thing? Or…?

**A-0525**

A: Yeah, the classes were after school in the afternoons.

Q: And if you remember, just take us through anything that you remember about the typical class that you... Did you arrive and plug in the computer? Or was it already set up? Or you know, that kind of just, what you recall.

A: Sure. So a typical class, you would arrive at their house, walk in the – I don't know if it was the front door or the basement door. But I think it was the front door. And then you would go down a couple of steps. Instead of going up to the main house. The first thing you would see is Arnold's desk, where he would do like attendance records and registration records and take payments and so on. Then go to the left, and there would be a music room. Which was not in use for the computer classes. And maybe another room.

   8:45.00

   And then to the right from there, towards the back of the house, there was a pretty big room with about maybe ten computers or so. They were set up on long tables, and they were sort of, towards the front of the house there was an aisle with computers on both sides, and then behind that there was an aisle with computers only on the side towards the front of the house, I think. And there were a couple of others in various places.

   It was a bit of a mess. There were disks everywhere. There were you know printouts and computer magazines. And you know it sort of had the atmosphere of a pleasant chaos – pleasant for me because I sort of, my living space has always been a little bit chaotic, too. But there were, there were some printers here and there. And at the beginning of the class, I don't really remember how they were organized. I think there may have been, there was a table over on the other side of the room where I think there were some little talks and explanations of how things would happen, and then we would go and go to the computers and you know try to make our programs work. Try and put them together according to the lesson for that day.

   9:43.00

Q: And what was a typical goal? You know, just, like what was the kind of thing that you would be able to make 'x' happen. You would be able to add two numbers together? You would be able to make things turn into a Christmas tree? Or...?

A: I don't really remember the assignments in detail. I think there would be things like, you know, 'Do some sort of graphics program that would make some sort of shape on the screen, or let you have a program where you would enter something and it would do something else, depending on what you entered. I don't remember details.

**A-0526**

Q: And the classes were….let's say at the end of the hour, at the end of the class, parents would come pick up the kids. How would the sort of pick ups and drop offs work, if you remember?

A: Uh, I think, I mean I think my mom generally dropped me off and picked me up afterwards. It was fairly close to our house, but not really walking distance, except in a pinch. So I would be dropped off at the beginning and picked off, picked up at the end.

Q: And were the classes fun? Did you sort of look forward to going to them?

11:42.00

A: Yeah, I looked forwards to them. I would go back. You know, I registered for another session. I never had any problem going to them week after week. You know each session built on the previous one, so when you went to all of them, you would not have sort of gaps in your knowledge and understanding.

Q: Did you, do you remember missing any large number of classes, or do you feel like you kind of went consistently?

A: I don't remember missing any large number. We may have traveled or something, but I don't, I don't remember missing them.

Q: And just in terms of the layout of the classroom, you said the computers were set up on long tables. How close would you sit typically to another boy that was on the same table? Or…?

A: Um, the kids were fairly close together. You, there was a lot of working together, or if you got stuck, you'd be able to ask someone next to you how they did it or, you know, what they were doing to solve a problem. I'd say they were maybe a food apart, I don't know. If that.

Q: And in terms of who was teaching the classes, was it always Arnold and Jesse? Was there, was there, was it every just Arnold or just Jesse or something like that?

A: Arnold taught the classes. He, he actually knew about computers. I got the impression that Jesse was mostly kind of a logistical helper. I, I don't know if he even knew that much about programming. He was usually around, not always. He would, you know, bring kids in, send them out. He would, you know, if, if there were printouts or disks going around, he might help distribute them or pick them up.

13:16.00

I think he would sometimes probably help, but I don't really remember. Arnold was much more of a presence in the room than Jesse.

**A-0527**

Mike Epstein - 5

Q: And was there anybody else that assisted in the classes that you remember?

A: I don't remember any other adults, helpers there.

Q: And any other teenagers or any other middle aged – you know any other people that were on the administrative or the teaching side?

A: I don't remember seeing anyone else, any, any other people involved with the classes, besides Arnold and Jesse.

Q: Now some of these questions are going to sound silly, but some of the charges are kind of silly. But it's, just to get, just to try to understand it in light of the charges, as you probably know, many of the, of the, of the charges in the case consisted of allegations that people were being sodomized or sexually abused in proximity to other people. That these events were happening uh, you know, not out in the car, but that they were happening right in the computer classes.

14:16.00

And I guess my question is, given the close quarters of the classes, do you think it's, is it possible that these kinds of acts could be taking place next to you, or in the class, while you were taking class and something you wouldn't notice it, or it wouldn't be obvious to you?

A: I mean it's theoretically possible that all the way on the other side of the room there could have been sexual activity happening that I didn't notice, but I can't imagine that that could ever have happened. I mean during the classes, kids were walking around. They were, the computers had these shared disk drives. You would have to go over to the, to the disk drive sometimes to put in the disk you wanted to use, and then set it up to be on the computer that you were using.

There were, the printer was on one side of the room, so you would be going over to the printer at various times. I really can't imagine that anything untoward was happening on the other side of the room that I didn't notice.

Q: And did you ever see anything unusual happen in the class that had to do with any kind of abuse or any kind of mistreatment of the kids?

16:07.00

A: No, I never saw anything abusive. Arnold was very nice. He was avuncular. He was, you know, it was clear that he liked to teach. He really enjoyed teaching kids. And he was very helpful and patient. And you know he was a little bit overwhelmed, sometimes, with the sheer, with, you know, having ten or so kids all with questions, but he would go around the room and get to people and help them, sometimes two at a

time. Sometimes one at a time.

Jesse was kind of, you know, a little more of a goofball. A little less serious. But completely appropriate in every way. Not, not, you know, inappropriate.

Q: And do you remember when you first heard, you know, through the grapevine or in any way, that, that there were these allegations that something nefarious was happening in the computer classes?

A: Well I first heard when the police came to my house. I was at the door first. And so I saw two police outside. In uniform, I think. And they came in and my parents sort of shooed me away for a bit and talked about it, and then brought me back and I talked to the police. And you know they were asking if anything inappropriate or sexual happened at the Friedmans, and I was shocked that they were suggesting that because, because nothing ever happened. Because there was nothing inappropriate. There was nothing suggestive. There was nothing sexual about it.

17:25.00

You know, I, I had felt in the house that they have that it was a kind of weird house, with a lot of rooms. And there were rooms that we weren't supposed to go into as computer class members. But, but I think that's to be expected when you open your house to ten kids running around. You want them in a certain place and not in a certain other place. But no, nothing like what they had suggested had ever happened. And I told them that.

18:11.00

Q: And so how old were you around that time – '87?

A: Uh, I would have just turned nine when they were accused.

Q: And when they were talking to you, do you remember – did you speak to the police while your parents were present? Or was there some time when they spoke to you without your parents there? Do you remember?

A: I think my parents were there. I think I only spoke to the police about two times. I don't think my parents really wanted me to keep talking with them over and over again. And I didn't want to talk to them over and over again either.

Q: And do you remember anything about the nature of those conversations, or the demeanor, and what that felt like for you at nine to be, to be talking to these uniformed police officers?

A: I don't remember much of the conversations with the police. I remember feeling kind of intimidated. I remember feeling that their

| | |
|---|---|
| demeanor and what they said was that 'This happened, and you should tell us, and here's why you should tell us. That you should get it off your chest, or you, you know, if you don't tell us, then it will be harder for you down the road. If you, I think there was some mention that, you know, sort of talking about things like, 'You know, if you are abused and you don't tell anyone, you may grow up to be an abuser. It might turn you gay.' Things like that. | 19:17.00 |

Q: That seemed to be sort of a popular technique. It's truly disturbing also. I mean just the assumption going into that that, like that, I mean nowadays, I think that there's still some theory that there's like a conflict or some relationship between, between being gay and being an abuser or something like that. At the time, though, they didn't seem to be shy about …whereas today the police might insinuate it, but they might not say it. You know? Now the, the conversations, you know, if you remember – I know this is a long time ago – but what was the sort of vibe between you, your parents, the police and when the police would leave… Did you get the sense you parents were trying to feel you out? Trying to understand things from your perspective? Or they were sort of accepting your statement that nothing happened, and then how did that change, if it did?

| | |
|---|---|
| A: I don't really remember how my parents reacted right at the beginning when the police first came. Certainly later my mother especially was certain that I had been abused. And we talked about it at great length. And I kept saying that nothing had happened and I was not abused and the classes were just classes where we used computers. | 21:00.00 |

   And there was this sort of pervasive climate in Great Neck about how this must have happened and they were monsters. And the parents were banding together, and the kids, a lot of the kids, including a very close friend of mine and some other friends of mine, had said that things had happened. And apparently they had also said that things had happened to me that they saw. And I didn't know how that could be.

   And you know, I, I thought maybe other kids had been abused. Maybe other classes had had abuse. But I was certain that nothing had happened in the ones I went to, that I saw. That I experienced.

Q: Around this time, did you feel that you could talk to the other kids that you knew? That that was a topic of conversation? Or when you saw them at school or you saw them on a play date or something, it didn't come up?

| | |
|---|---|
| A: Um, it was not a frequent topic of conversation with the other kids. It was, occasionally there would be like oblique, maybe round about references to it. I remember one of my friends who testified, he showed | 22:23.00 |

me on the playground at school like a police badge that he had received of, or a grand jury badge or a DA badge or something for testifying. Like a 'Junior Police Officer' or something. You know, it was the sort of thing where everybody was kind of confused and maybe ashamed, and didn't want it to be publicly known that they were 'victims'. That they were students of this class that had been busted. So you wouldn't speak about it openly at school. You might, if you were alone, kind of say, 'So what's going on? What have you heard?'

Or, 'Did you testify? Did you say anything happened? Do you remember anything?' That was the term we would use - 'Do you remember?' Not 'Did it happen?' But 'Do you remember it happening?' Because I think we had been told or convinced that it certainly had happened, and you either remembered it or didn't, which I always thought was, was bullshit. I thought that was total crap – that if I had been abused, I would have remembered it.

**23:34.00**

Q: Yeah, well not all the kids have the same presence of mind. You know? Like my daughter is eight now, and if something like that, you know, somebody said that to her, you know she's so opinionated, she would just be like, 'I told you it didn't'. But then I know there are plenty of friends of hers who are looking to you for the...you know, there's this Jimmy Kimmel episode that we've been looking at. I don't know if you saw it. I'll show it to you later. You know, but where they put like a fake, like a cap on the kid and they tell him it's a lie detector test. And they ask him these questions, and if he doesn't give them the answer they want, they give him like a loud noise. You know. In about two seconds, the kid just says whatever they ask him to say. It's amazing.

But it doesn't work with all kids. Did, you know the police at one point had said that, um, let me ask you, before I ask you that, I want to ask you about the badge thing. The, the boy who's, who had gotten this badge and had shown you the badge on the playground, was that somebody you know believed that it happened? Or started out saying it didn't happen, and then changed his mind? Or what was your sense of that if you had any?

A: I don't remember when he said it happened or whether he had said it hadn't. I don't remember the timeline of that relative to like the group therapy or anything.

**25:14.00**

Q: But when he showed you the badge, what did that say to you?

A: Well the badge was, you know, sort of an indication that he was, well one, that he had gone to the grand jury and come out okay, and had this sort of token to show for it. And two, it kind of felt like...I don't really want to say 'peer pressure', but it felt like a suggestions that if I were to go and

**A-0531**

say the things that happened that, that I would come out okay as well.

Q: That maybe that you would maybe get a reward? Or possibly, or…?

A: I wouldn't care about a badge or reward or something that I had achieved by lying.

Q: And, and, did you remember in any way exploring that with your friend? Saying 'I was in class with you. How do you remember things that I don't remember?' Or did you not push it that far?

26:38.00

A: I remember a conversation or two saying, 'I don't think anything happened. What do you…what do you think?' And they would say that they remembered things happening. And I was confused. Because, you know, this was a friend who I was very, very close to. We were, you know, best friends. Practically inseparable. And I didn't understand how he could be saying things that I didn't think were true.

Q: But you didn't press him any further than that?

A: I don't remember. I don't remember how far I took it.

Q: Was it the kind of thing you know after you saw your friend on the playground or whatever, you went back home and thought about it a lot? Or was it just, you know, '..stuff happens'?

A: Well I was thinking about it a lot, now and then. But I was pretty convinced that nothing had happened, because I didn't remember anything happening. And there's only so far you can take that.

Q: Yeah. … You know, at one point the police have, well police said at one point that they were going to arrest four additional teenagers who were, in the view of Detective Gallasso, who was the head of the Sex Crime Unit, that they believed that there were four additional teenagers who were involved who had participated in sexual games with some… Did you remember hearing that at some point?

A: Oh, yeah. I heard that about the other kids they were going to arrest – the teenagers. I don't remember any of their names at the time. Later I read about them in the paper and heard about them. The main one that I remember specifically is XXXXX, and the only reason I remember that is because his family owned a pizzeria in Great Neck, and suddenly we were told not to go to that pizzeria, to go to the other ones instead. Which was, you know, sort of part of the climate of insider/outsider. You know, like trying to marginalize the kids and the families that were alleged to have participated in, in the abuse.

28:21.00

You know, it's sort of an us, it felt like an 'us against them'. Where you know my parents, my mom especially. You know she was spending a lot of time talking to and, and going out with the other mothers mostly. And they would have these lunches, and they would talk on the phone, and, you know, it was very, it was like a witch hunt atmosphere in Great Neck back then. And everybody thought all the accusations were true, and they felt that everyone who was accused was, was guilty.

Q: Is it conceivable that, I mean I guess one of the things that struck me is, given the size of the classroom, and I've seen the classroom with my own eyes, the idea that there were ten kids and Arnold and Jesse, and all these tables, and all these computers, and then four additional, you know, seventeen, eighteen year old kids who are all in there committing these violent crimes and having enough room to play leapfrog. And the, you know, in the room even so. Does that, does any of that sound...how plausible does any of that sound?

A: Well it's not plausible at all. It was a crowded room. There were aisles but it was a pretty crowded space. And it was messy. Just disks and printouts and stuff. I never thought that those games sounded at all plausible, even as a kid. They just didn't seem logistically possible. They didn't seem like something that someone would want to do. I also never thought it seemed at all plausible that they would have done things that involved every kid in the class. Because even if they had, you know, abused some kids, it would have seemed completely impossible that they would have done something in a group with everyone.    30:22.00

You know, at the time I thought it was totally possible that some kids had been taken aside into some other room and abused there. I knew I hadn't, but I had no idea. You know, I wasn't keeping track of every kid at every time during the class. But the games always sounded completely impossible.

Q: Yeah. Did you ever hear about this, about Ross Goldstein?

A: I heard the name. Of Ross. You know, from, I was reading the papers like anyone else, and hearing the news.    31:40.00

Q: Did you ever recognize him? Or did you ever know, had you ever seen him before, or did, will you recognize him now or then...?

A: No, I never recognized Ross's name, or the pictures of him that were in the paper.

Q: Now rather the charges that then involved Ross were all in the third indictment, which happened, you know, eleven months after the first indictment. It's quite a ways down the road. So I thought it was

Mike Epstein - 11

**A-0533**

remarkable that, you know, they, that suddenly, you know that these same kids who have not remembered being – let's say even the kids who had sort of disclosed some abuse had no recollection of the presence of these four additional violent teenagers for eleven months after they made their first statements to the police. And then eleven months later or nine months later ..when the kids, you know the kids start saying, 'Oh, I remember now. There were these four other kids.'

32:56.00

    But you don't have any recollection of Ross being present in the classes, or being an assistant in the classes, or having any role?

A: I don't remember ever meeting Ross or hearing his name before their ad in the paper.

Q: When these things were, you know, were being alleged, or they were appearing in the Great Neck Record or Newsday or whatever, what do you think the tone was like in the press? Did it say 'allegations', or did it say, there was a general sense that these things had happened and this was just the latest report. Or what was the, what was the tone in the press?

A: I think the press accounts were, you know they would say things like 'alleged' and accusations', but reading between the lines, everyone thought that they were guilty, or at least anyone who didn't was not speaking up. There was this real witch hunt atmosphere in Great Neck, where you know everybody was beating down the doors of the school system and the the, the psychiatrists and the DA to demand justice for their kids who had, who had been abused.

    And nobody was speaking up against that at all. Even people who had doubts.

34:20.00

Q: And did you get the feeling, you know, from, from your mom or your dad that there was pressure on them in the community to, to go along or to accept that this had happened to other people, they should hang back and not, you know, not take …a different view? Or maybe by this time they didn't have a different view?

A: I couldn't say. I think my mom was, was totally convinced that I had been abused, in part because I had friends and there were other people who had allegedly named me as a victim. And I say 'allegedly' because I don't know if they actually did, or if they, the police just sort of said they did. Or the psychiatrists or whatever.

Q: So …..there was some discussion about kids having seen, you know, pornography involving children in the classes. As a matter of fact the Chief Detective told us that the pornography was intentionally placed in,

**A-0534**

| | |
|---|---|
| in view of the kids. That it was put on the shelf. There was a shelf where computer books, and the child pornography was interspersed as a way of grooming the children to be more comfortable with the idea of, you know, sexual contact. Do you remember anything like that? | |
| A: No. That's absurd. There was no pornography around the house that I ever saw. It was certainly not out in the open. | |
| Q: It, it's very interesting that …even the police are repeating things now that they read in the paper, or things that didn't appear in the search warrant, and …that didn't appear in the photographs of the classes. Yet the story becomes like an amalgam of …and then people start to have recollections that aren't actually based on their own …you know, their own memories. | 36:53.00 |
| One of the things that they said was that there were these kind of animated sort of sexual computer games on the, on the computers during the classes. Do you remember those games? Or do you remember them being in classes? Or any of that? | |
| A: Well I mean those animated computer sexual games were floating around. You mean, anywhere there were a sufficient mass of eight year old boys you would get things like that. I don't specifically remember whether they were at the Friedman's house, but I certainly saw them around. You know, friends would copy them around and show them. And you know it was sort of a view into a world that we didn't understand. | |
| But when they say 'animated', I mean you think today of a computer game, and it's life like and realistic and 3-D sort of, or like rendered 3-D. These were unbelievably crude. They would be, you know, dots and dashes and lines. It was almost like a Morse code version of a computer game. It's called ASCII. ASCII Art. Extremely crude. Extremely not titillating but just sort of naughty in a, in a childish way. | 37:35.00 |
| I don't know if those were there. They may well have been. But they seemed to be floating around in wide supply in general. | |
| Q: And one of the kids tells a story about how, you know, the games were kept sort of secret from the parents, and the children could watch the games, but if the kid took home one of the games and the parents could see it, then they would be so upset that Arnold would threaten them with a knife and say he was going to kill them if they didn't bring the games back. What do you think of that? | |
| A: I don't remember any discussion of games like that with Arnold, or Jesse. I don't remember anyone being threatened with anything. I can't imagine Arnold threatening anyone at all. He was very gentle. He never, | 38:53.00 |

I never saw any violent side to him at all, or threatening side.

Q: Detective Gallasso says at one point that one of the reasons that the kids kept silent for five years during which these times, events were taking place, is because Arnold and Jesse had said that they, that they would go to the children's houses and kill their baby sisters, and, and kill their parents. Was that…?

A: Well I don't have a baby sister for them to threaten to kill. I don't remember any threats. I would remember that. There, there were no threats that I witnessed. At all.

Q: But that seems out of character? For Arnie or Jesse to be like involved in that kind of violent….?

A: Oh, it's totally out of character. And I don't know I kids would even believe there were threats. I mean they, they didn't even seem like the kind of people who could beat up your parents. They, I mean they were gentle and not, you know, big and strong. And they didn't have weapons. And they were very nice. And, when I heard things like that, I just thought it was completely absurd.    39:50.00

Q: Now at the time, I guess I'm trying to figure out…in your house, at one point, there was Michael sitting in his room, confident that he had not been harmed. There was your mom sitting in her room, thinking that she had not protected you from harm and that these things must have happened. And yet you obviously have a close relationship. And I think you were a good boy and she was crazy about you. And the relationship was …sort of like a nice, loving relationship. How did that effect the relationship, or how did that manifest itself? Or was it just not something that was addressed? Or…?

A: Well it was very awkward to think that my mom didn't believe me when I said that nothing had happened. But it was, it was pretty compartmentalized. If we were discussing it, we would only be discussing that, and it would usually be at night. And we didn't really talk about the Friedman case all day long. It was just sort of a…you know, it was something that was there and that we, that I thought about. But not, it didn't really get in the way of our relationship at other times.

Q: And did you ever feel like you wanted to just say to her, sitting in the car or something, say 'Hey, let's talk about that thing again. I don't think you believe me. And I want you to believe me.'? Or it was better to just let it kind of be whatever it was?    42:10.00

A: I don't, I don't remember in detail at any given time to what extent I instigated or she instigated discussing it. I know that it went on for a long

time. We talked about it for hours and hours. I said that nothing had happened for hours and hours. Usually in my parent's bed with like a wall of pillows between the two of us so we couldn't see each other, but we could talk. It was like sort of a, you know, now, in retrospect, it sounds like a, like a psychiatrist couch or something where you're facing the other way and your eyes are closed.

But you know I kept saying nothing had happened. At the same time I was seeing a, a, it was, well first seeing a, in this group therapy that they had put together, and then seeing a therapist individually. And I was having similar but less intimate conversations with him where I said basically the same thing, that nothing had happened.

And it seemed to me that this would be going on forever. That I would never escape spending a couple nights a week talking about it with my mom, and spending, I don't know, an hour a week, I guess, talking about it with Dr. Pelkovitz. And I just, I knew nothing had happened. I wanted to be done with it. I was so tired of rehashing it over and over again, and I didn't' think, I kind of gave up hope on ever being able to convince them that nothing had happened because I guess they, they believed in recovered memories. They believed that these other kids had recovered memories. They believed the kids who had said that I'd been abused. I don't know. **43:29.00**

And so eventually I just consciously decided to, to lie, and say that I had been abused, and repeat these crazy things I'd heard from other kids, or in the therapy or from the police. You know, the leap frog, which doesn't even make sense. The, you know, saying that there had been kids raped in the classroom, and kids raped in the bedroom, and kids raped in the bathroom, and kids raped …I don't know, in the backyard. I mean, it's…not the backyard. But all these, every, basically I just regurgitated everything I'd heard from other people. Because that was the only way to make it stop.

And I did that. I told my mom. I told Dr. Pelkovitz. And I guess pretty soon after that it did stop, and we were able to stop rehashing it over and over and over again. And they asked me if I wanted to testify, and I said 'No, I don't.' Because I knew I was lying. And you know at that point it just, it seemed like there was no possible way that they wouldn't go to jail. There were so many kids talking about it, so many charges, that nothing I could possibly do would effect that anyway. **45:10.00**

And you know I feel a little guilty for not speaking out, but no one would have believed me anyway, at the time. And it wouldn't have made any difference.

Q: There were a few kids that sort of spoke out at the time, but you know

then they, but there was no consistency to it after that. You know, so you kind of like the kids at some level, but then you know these kids are like, they were like ten years too young to actually be able to do anything. Nobody's going to take them seriously. So you know it's kind of – it's great to know that at the time you…you know, you were confident that you, you know, that you had the courage of your convictions – even though nobody really would listen to you.

A: Well the argument would have been 'Oh, what a, that poor kid, he was abused. He just doesn't remember it yet.'

46:21.00

Q: Yeah. Yeah. And I guess I'm trying to understand, you know, so, so you have some, you had individual therapy, and you also were in that group therapy.

A: Yeah, I guess the group was first. The group – I just remember it being really awkward. I don't remember much in detail about, about it. I think it was Sandra Kaplan and Dr. Pelkovitz, and I think there were kids in it who remembered and who didn't remember together. Which was really awkward. But the whole focus of the group was getting the kids who didn't remember to remember. It wasn't about finding the truth or about helping the kids. It was about helping them remember, because there was this presupposition that this had happened, and that you would have to remember it or else, if you didn't remember it now, you, the rest of your life would be terrible.

   You, you know, they sort of warned us that if you don't remember it now, it may come flooding back to you when you have your first sexual experience, and wouldn't that be terrible. Things like that. Like really kind of dark things.

Q: Of all the people that you remember, you know, from that period of time, is there any one person that stands out as kind of like the image of it for you? Whether it was a parent or a police officer or, or even just a – any kind of image that stays with you?

A: Yeah. I mean the most vivid images for me – one is seeing the police at the door for the first time. There's one of lying in bed talking to my mom over and over again. There's one of sitting and talking to Dr. Pelkovitz over and over again in the private sessions. There's the one of my friend showing me the badge.

48:33.00

   In a less visual sense, there's another kid who I associate very, very closely with, with that episode, and you know he was one of the loudest abusers. And he I never believed at all, because he was a really, a really damaged kid who had always had a lot of trouble getting along with people, a lot of trouble being social. He was occasionally violent. He

Mike Epstein - 16

**A-0538**

was just very ….very difficult in almost every way you can imagine.

   Really hard to get along with. Not, not well-liked. But in a way that it wasn't just that, you know, he was some poor, misunderstood kid. He was actually really unpleasant.

Q: You said a minute ago that one of the 'loudest abusers'. But I think you meant…

A: Oh, sorry. Accusers.

Q: Accusers.

,A: Yeah. Um, yeah. He, you know, at one point he, I heard that he had hit some other kid who was denying that anything had happened. He was just really…. and also his mother was just completely overbearing and one of the main people in the sort of mother's circle who, you know, they were talking about how they could help bring the Friedmans to justice, and how, and what their kids were saying about what had happened, and you know she was kind of central to that as well.

49:48.00

Q: I don't know, I mean I don't expect to broadcast, you know, in Great Neck or anything, but you know we talk a lot about and we talked to the panel and the District Attorney a lot about the individual kids. So I don't know if you're comfortable talking about the kid, but I want to ask you some questions about, about the kids – either kids that we've spoken to or kids that we're trying to speak to or whatever.

A: Sure. Well the one I just mentioned is XXXXXXX. And I haven't, we're not in touch at all. But we never got along, but I think he never got along with anyone, and I just didn't want to have anything to do with him. He was just mean and unpredictable and, and violent and self-centered and just not, not pleasant.

50:47.00

Q: Yeah, we've had trouble talking to him. I guess he works for his parents still, and he either still lives in Great Neck or works in Great Neck. There are a bunch of the kids that are in that situation. You know, that don't have, weirdly like not untied the apron strings, even this many years later. It's, and you know it's upsetting, I mean, when you have, if you believe as the police said there were 400 kids in the classes, and nobody ever had a complaint for five years. And then all of a sudden you have these rabid accusers who are little kids – like 8 years old, 9 years old.

   You know, it's, you have to believe just statistically that when you start out with a group of 400 people, and the police keep going in there and trying to sniff out who they can get to become an accuser, that somebody

like Alan is, you know, that may turn out to be a valuable kid for them if they're trying to win the case.

A: Sure. So I always kind of discounted what XXXXX said. But when my best friend, XXXXX, also was an accuser and said that things had happened to me and to others, I couldn't dismiss that as easily. Because you know he, we were friends. We were very close friends. We did all sorts of things together all the time. Our families were close. And I found that really weird, and I never really understood it, and I think I tried to ask him once why he was saying these things, and he….didn't let on that they weren't true. Maybe he believed them. Maybe he didn't.

52:43.00

Q: Well you know that he's, that he's talked extensively to us, and he said, you know, in some ways the most vehement recantation, said that you know he swore on the life of his children and that God is his witness that none of these things ever happened. That he was never abused and he never saw anyone abused or sodomized. And that if he said those things to the grand jury, that it's not because they happened, it was because someone else put those words in his mouth.

You know, I wonder what …what was the countervailing pressure ? What was the reason why he would say that? And in our conversations with him, he's been adamant about, you know, 'The reason I don't want to say these things, the reason I haven't said these things in the past is my mother is very committed to this. She really believes these things happened.' Right? Okay. So we don't want to upset the apple cart with the mother, but meanwhile there are three people that went to jail, and one of them got cancer in jail and was almost murdered in the infirmary in the Collins Correctional Facility. Another one committed suicide. Another one is considered now still a violent sexual predator. You know, fifteen years later.

54:07.00

And you knew that kid very well, XXXX. Is there any, any, you know, explanation for that? Or how it could be that he would have such a strong view about not having been abused, and yet still have made these claims, not been open with you about it, not having….

A: Yeah, I never, I never understood why he said that things had happened that I knew weren't true. And I think that's – I think he may have had a really tough time of it. In fact, he – and this I really don't want broadcast or used in any way that he might see it – but he went through a spell, probably a couple years, a year or two after this, still in elementary school, where he was pulling out his own hair a lot. I guess out of stress. And it was never really something we ever talked about. And I think I remember being shushed when I brought it up, why he was losing his hair at the age of eleven or so.

And I kind of wonder now if that was a reaction to the, the stress of having testified and said things that weren't true. I mean I don't want to say that, and I don't want to bring it up, but I kind of wonder that.

Q: It's interesting because I remember talking with Fran Gallasso and having her – without saying it was XXXXX – having her say 'One of the boys was, was puling his own hair out', so in other words she was sort of conflating the, the later event, which happened after the convictions, presumably, with, with, you know, she was basically saying it was evidence of the fact that he had been abused. But if the point is that you start doing crazy things like that if you're holding something back, well he wasn't holding anything back. He had gone and testified, so it didn't make sense to me.

A: Right. He…

Q: But this person had to convert almost any action into a stress reaction to having been abused, just as easily as you could convert it to a stress reaction of having falsely accused somebody.

A: Sure. I mean he had said that things happened pretty early on. And I certainly think the hair pulling was later. I don't remember that happening when we were quite so young – but I'm not sure.

57:00.00

Q: And are you guys still friends?

A: No. We kind of drifted apart in middle school. We never had a fight or anything. We just kind of drifted apart and became different people. We've spoken this year about, about this case and the reexamination. We were never completely out of touch, but it was the sort of thing where, you know, you might write to each other on Facebook every two years or something.

Q: You're going to want to dial into your call at 4:30, which is in four minutes. Should we pause?

END OF PART ONE

57:50.00

---

BEGINNING OF PART TWO

Q: Let's see how far we get.

A: Okay, are you recording again? Okay.

Q: So I was also going to ask you I think about …. XXXXX and about XXXXXXXX. What do you remember about those guys?

A: Well, XXXXX, I knew a XXXX.  But apparently there were two XXX.  So the XXXX I knew is the one who is now at The Philadelphia Inquirer.  And I think there's another XXXXX who was a Friedman student, who I don't know.

Q: And XXXXXX you knew?

A: Yeah.  XXXXXX, we were friends later.  We were friends, I think he had gone to a different elementary school, and then we went to the same middle and high schools.  He, he was a, you know, very smart, very nice, very well-adjusted kid.  We got along.  We weren't very close friends, but you know we were on some of the same activities.  And – or maybe it was the other way around.  We went to elementary school together and then not middle and high school.  I don't remember.

   But you know I knew him fairly well and we got along.  I don't think we ever discussed anything about the Friedmans.

Q: But you knew that he was one of the accusers, or you didn't know?

A: I don't know.

Q: And were there any other boys that you knew?  Like I knew that your mom knew the XXXXX, but I didn't know if you knew XXXXX.

A: Yeah, I knew XXXXX later.  Middle and high school.  I don't think I knew him then.

Q: Any impressions of him?  Just ….

A: Yeah, another nice kid.  More, a little bit of a goofball, but in a good way.  Smart.  Friendly.

Q: It's interesting.  Arnold really, really liked him, and said that he was like one of the best students.  He was completely committed to the class, that he loved it, that he had a birthday party there because he liked it so much.  And then he ends up becoming one of the top three complainants in the case.  It was, it was interesting.

A: Have those two, have you been in touch with those two?

Q: We've reached out to both of them.  And we haven't had luck with either one.  You know, XXXX, I mean you know XXXXX has avoided every possible effort to contact us.  And I guess now he's a plastic surgeon also.

0:49.00

1:50.00

**A-0542**

Mike Epstein  - 20

| | |
|---|---|
| A: Oh, really? Both of them? Also XXXXX. XXXXX is a plastic surgeon. | |
| Q: Yeah. Or maybe – what kind of a doctor is …? | |
| Man: I can't remember, but he's in Las Vegas. And XXXXX, we spoke to him. He was, as you said, very well-spoken. He's a lawyer. Very smart. And just said, 'You know, I understand what you were doing. I read the Second Circuit opinion when it was issued. But I just, I'm just not ready to talk about this.' I mean a lot of these people haven't told their families now. | 2:46.00 |
| A: Yeah. Okay. I should take a break. | |
| END OF PART TWO | 3:10.00 |

---

| | |
|---|---|
| BEGINNING OF PART THREE | |
| Q: … I haven't asked you where you went to school. You went to, like where did you go to like grade school, and then high school, and then college? | 0:20.00 |
| A: Uh, I went to Saddle Arts School for elementary in Great Neck. Great Neck South middle and high. And then Harvard University. | |
| Q: …. | |
| A: That's actually my boyfriend. He went to the Harvard Grad School of Design. | |
| Q: I didn't know that there was such a magazine in school. | |
| A: Yeah. Feel free to look through it if you want. | |
| Q: And what did you study at Harvard? | |
| A: Computer Science. | |
| Q: And did you think about going to graduate school? | |
| A: I thought about grad school a little bit. Mostly in the sense of not wanting to go. I was done with classes I was just sort of feeling tired of school. And in my field, you don't really need to go to grad school in many cases to get a good job. So I got a good job and have not felt like I needed to go back to grad school since then. | 0:51.00 |
| Q: Where did you start working when you got out of school? | |

**A-0543**

A: Uh, I first worked at a start-up in the dot com boom times of 2000, 2001 in Silicon Valley. And it was okay . It was better for the first year and a half than the second year and a half. It was more technically interesting in the beginning, and then it became sales focused. And mostly I just really missed New York. So I moved back here. Worked for a hedge fund for a year and a half, because that's what I could find. And then went to work at Google.

Q: And were you, did you get recruited by Google, or did you go looking for just a programming thing, or did you have a particular project that you wanted to do?

A: Uh, just a general job. I had friends there.                                  2:04.00

Q: That probably is the most fun. That would have been probably –how long have you been there?

A: Eight years now.

Q: Well that would be the right eight years to be there, in terms of like getting involved in cool stuff.

A: It's a good place to work.

Q: So many interesting things, though. Really . kind of cool. And I, I know Sergei a little bit, and I've been on vacation with him and stuff. And we've like had some really good conversations. He's very, you know, like pragmatic in that Israeli way, and there's something kind of refreshing about that. But so many ideas. You know. So much not just about execution, but ....better. It's really cool. So do you, I don't remember if I asked you this or not, but do you remember how it - you know, because this thing about how the therapists got involved with the kids, you know my sense is that the group therapy took place somewhat later. And that the individual therapy was what took place at the beginning. But I'm not sure.

And I know you may not have a timeline totally clear in your head either, but it seemed to me that the initial round of, of talking to the kids was facilitated in a way – you know, the first thirty kids said nothing happened, and then the police kept digging, kept digging, but they had to go back to those first thirty kids and see if they could develop something, and ultimately they, in a lot of cases they seemed to have sent the kids to therapy at the suggestion of the DA or the police. And that Sandra Kaplan got involved very early. But I'm not sure it evolved into the group       3:57.00
therapy until somewhat later on.

Mike Epstein - 22

| | |
|---|---|
| So I guess … (interruption)…. | |
| END OF PART THREE | 4:18.00 |
| | |
| BEGINNING OF PART FOUR | |
| Q: ….. | 0:20.00 |
| A: So you were asking about the therapy. Maybe I'll just tell you what I remember in terms of the timeline. I didn't really remember the timeline very well. A few months ago. I have since seen some notes that my mom took, and it looks like the group sessions came first. Probably after Arnold had pled guilty, but before Jesse did. And then it seems that, having met Dr. Pelkovitz through the sessions, my parents sent me to his private practice in his house. | |
| And that went on for – I mean at the time it seemed like years, but it was probably more like a year. When I was a kid, you know, things seemed to drag on forever. But it was probably a year or so. | |
| Q: And that was you getting dropped off at his house and sitting with him for an hour or something like that? | |
| A: Yeah, it was a, it was a one-on-one therapy. Later on there was some sort of family therapy, but it wasn't directly related to this Friedman thing. | 1:17.00 |
| Q: But also with Pelkovitz? | |
| A: Yeah, also with him. | |
| Q: So he became like the sort of family therapist in some way? | |
| A: Yeah, and of course I never trusted him or liked him or enjoyed seeing him, and so it was always very difficult for me to talk to him, to open up to him about other issues when I knew that he had, you know, brow-beaten me into lying about this one. | |
| Q: And so what do you remember about, about Pelkovitz? What do you remember, just in general terms. Personality-wise. And then specifically about what those sessions were like. | |
| A: Pelkovitz was, um, you know he was fairly…forceful and direct, but, but still listened. It wasn't as if he was – I shouldn't have used the word 'brow beat'. It just seemed like that. He, he always wanted to know how I felt and what I was thinking about, but it was very clear that his goal was | 2:19.00 |

to make me remember, make me say that these things had happened. He was very convinced that they had.

So there was a lot of talk about recovered memories. How that would work. What that was like. He suggested that I be hypnotized, which I thought was probably B.S. as a general concept. I never – you know, as a kid I was kind of, um, you know, scientifically minded. And so I'd read some debunkings of psychics, and you know people who can bend metal by just looking at it. And ….

Q: Yuri Geller?

A: Yeah. Yuri Geller, and hypnosis and things like that. And I thought they were kind of all bunk. So for this guy to want to send me to a hypnotist to recover memory I thought was just complete B.S. And that, that never actually happened for me. I was, I was resistant to it, and I think my parents were also hesitant about that.

And you know there was, there was discussion of what the long-term effects of sexual abuse could be, and what it would be like for me if I didn't talk about it, and then it would all come flooding back someday in the future. And talk of what other kids that had happened, and as I said before at some point I just decided to lie to make it all stop, so I could stop seeing him, stop talking about it all the time.  | 3:45.00

Q: Two things – one is that the hypnosis that, it sounds like you opted not to go into that situation. Was it your sense that other people had been hypnotized, or other people were, had been more responsive?

A: Yeah. Pelkovitz had said that other kids were being hypnotized, and some of them had helped, been helped to remember through that. He, it was really clear that he thought that it would probably work. Work in the sense of making me remember things, or be able to talk about abuse that had happened. It was very clear that he thought that there was some memory to be recovered, and that I I wasn't remembering on my own, that hypnosis might work.

Q: And did you, did you, when he said that other, you know, that there was talk about things other kids had remembered, was he recounting things that, that other kids had said to him, or that he had heard? Or what kind of, how did that become clear to you?

A: Well Pelkovitz certainly didn't say, 'You know, Patient X said this…' Maybe, you know, because if he did, then I wouldn't trust him with my experience. But I remember, it may not have been as direct as people said that this such-and-such game had happened, but, talking about, you know, sort of talking about the things. Like, you know, I don't really have  | 5:15.00

**A-0546**

good memories of that part of the therapy.

I sort of have this sense of him talking about things like 'leapfrog' or you know these other ridiculous sounding games. But I can't really say.

Q: Was there a sense that, by telling you these things, he was hoping to give you comfort that you were not alone, and other people had disclosed? Or what did you think his agenda was?

A: I don't know what his agenda was. I got the impression that he was seeing a lot of kids. I don't know anything about the rest of their interactions.

Q: Did you know anyone else that was going to see him?

A: I don't remember.

Q: There was…. And did you ever have any contact with Sandy Kaplan?

A: Sandra Kaplan was, was at the group sessions. I never saw her privately, as I recall.                                                                                     3:32.00

Q: Was it weird for you to be in the group sessions? What were the group sessions like?

A: Oh, the group sessions were horribly weird. Because it was, you know, the assumption was, was of, as I said before, that some kids remembered and other kids didn't remember, which completely presupposed that all this had taken place. And we were in this environment where we were made to listen to some kids saying what they thought had happened, and you know you couldn't cook up a better example of a, of peer pressure technique than that. Of, you know, being in a room with credible adult supervision. You know? Adults who are accredited by their field, and hearing from these other kids who were saying things that weren't true.

Q: Do you remember any particulars from that, from those sessions? Do you remember seeing a particular kid who stuck with you? Or kid that you had already known or something?

A: No, I don't really remember who was in the sessions with me.

Q: I'm amazed quite frankly at how much you do remember. I mean I, looking back, like you know Mark and I have known each other since we were like eight years old. So we both took karate classes when we were like fifteen. I have some memories of those, but I was twice as old as you were. You know? But it's impressive.                                                               8:26.00

**A-0547**

Mike Epstein - 25

A: Well this was a very memorable experience. And plus I had had to reconstruct and think about what happened shortly thereafter when I was suddenly being asked all the time about what happened. And so I think that is what sort of cements it in your mind. If someone had come to your karate class a year after you had taken karate and asked you about every minute of your karate class, you probably would remember it better today than you do.

Q: That's true. And I don't even remember being sexually abused until now you just mentioned it. I think now that I think about it, I think I was probably sexually karated.

A: Well you should call up Detective Gallasso.                                    9:10.00

Q: That's true. So

A: ...if it was in Nassau County.

Q: Yeah. And do you remember the moment, or was there anything that precipitated your changing your story with Pelkovitz? Or you just thought, 'All right. This is session number blahblahblah', or 'I'm just fed up', or you were sitting in the waiting room or...is there anything you remember being the dividing line? Or just a, at some point it happened?

A: It was just this feeling that I kept on having to talk about the same thing over and over again, both with him and with my mother. And at some point, you know, I asked to stop talking about it. I asked to stop going to the sessions, and, and it didn't work. And so I tried the next thing that I could think of, which was to, to start lying and say I remember, and I felt at the time like I was not really convincing in the way I said it. Like I just claimed to have suddenly remembered it, which I thought didn't even seem plausible. But he would just suddenly, after having talked about something over and over again, to either suddenly remember it or suddenly decide to tell the truth? It just, you know, I didn't, I didn't buy it. But he seemed to. My mom seemed to.                                    10:37.00

   You know, I felt bad, but, but.... It stopped. I was able to go on with my life.

Q: And was your dad, did you ever confide anything in your dad, or did you feel like – because it seems like you and your mom were pretty close. So maybe your dad is, personality-wise, not quite as simpatico.

A: Yeah, he and I didn't really talk much at all about this. He was traveling a lot for work – like away half the time. And we were never quite as close as my mom and I. And I'm sure they discussed it, but

**A-0548**

Mike Epstein - 26

didn't talk much with him about it.

Q: Were there other things that you, you know, that were convenient for you – like when you were talking to your mother – that you felt like 'Oh, I'm just going to tell her I didn't eat that cupcake,' or 'I didn't do that thing.' Or in general did you feel like you had a very honest relationship with your mother, and then there was this?

A: Yeah. I think I had a pretty open relationship with my mother other than this. I mean I didn't tell her everything about everything. No kid does. I had, you know, things I did in secrets and, but nothing major.

11:43.00

Q: Now you remember being – I'm trying to place this – you said at one point you were asked to testify. And I'm guess I'm trying to understand where that fit in the timeline. You know, we don't necessarily have the exact timeline, but I guess I'm trying to figure out, in the course of the therapy, who was at, who did the asking?

A: Oh, Dr. Pelkovitz asked me, after I told him that I remembered these things, asked me if I wanted to testify. And I said 'No'. I said I didn't really want to do it. And I think, at that point, Arnold had already pled guilty and Jesse, there were so many counts against him that nobody needed more counts, so nobody pressed.

Q: Was it strange to you that your therapist asked you if you wanted to take a legal action against the alleged perpetrator?

12:58.00

A: I didn't find that strange that he asked if I wanted to testify. In retrospect maybe it is a little bit, but I don't think – you know, it could have been ambiguous whether that question about whether I wanted to testify, whether it was, 'If you want to testify, I'll put you in touch with my friend, Detective Gallasso.' Or whether it was 'Let's talk about your mental state now that you've remembered these things. Do you think you would want to talk about it in court, and if you did, what would that be like?'

And the former is sort of, you know, inappropriate collusion in a sense, and the latter is just sounds like responsible therapy to me, because it was a criminal matter. And I don't remember which it was.

Q: Yeah. It was interesting, because your whole universe becomes the universe of people with relationships to the case. So it's not like you're being, it's not like he went to a group therapy with fifty therapists, and then there were fifty therapists standing outside who had nothing to do with it, you could take your choice. And you go through a pathway, people feel like something happened. They said, 'This person knows the basics, wanted to work with that person.' But it also becomes kind of a

franchise with people that are involved. You know?

It's like somebody develops a new cure for cancer or something, and suddenly everybody is going to that hospital, and the hospital is getting written up as the most profitable hospital. And they're like 'Isn't this all because people have cancer?' Like it's sort of that intersection between commerce and science or medicine. It's always tricky, you know?

A: Well, in retrospect, it seems like Kaplan and Pelkovitz saw this as kind of a career maker for them. You know, they published papers, and they went to conferences, and they made names for themselves. And you know I really wish I could see his notes from our sessions. I don't think they exist.

Q: Have you asked for them?

A: I called up North Shore, and they said they have nothing left from the '80s at all. My name wasn't in their computer as someone with records there.

Q: And have you asked Pelkovitz if he has his own notes?

A: I have not been in touch with him.

Q: And are you thinking about calling him?

A: I'm thinking about it.

Q: It would be interesting if a) it would be nice to know, you know he's opened the door in a way now to the possibility that these things didn't happen. And I know ..... and you know that tells me he sort of sees it maybe as a pendulum swinging in a way and he doesn't want to be on the wrong side of it. But you know, on the other hand, if he's a frank, honest guy, he may actually have some feeling that you know...and assumed that it happened.

I mean I think his position, so far, has been, you know, 'You guys are asking me why I didn't, you know, why I was part of the, of the party saying 'it happened, it happened, it happened'. But you have to remember the reasons these kids came to me is because the police said 'These events took place.' So I didn't go into it as an investigator. I wasn't asked 'Hey, can you take a psychological view of whether these things happened or no?' I was told, 'These kids were raped, and we need help.' So when I came I, I assumed that they were raped. I assumed that Arnold Friedman had pled guilty. And if Arnold Freidman pled guilty, maybe ....If Jesse Friedman pled guilty.'

15:18.00

16:03.00

So in retrospect, for the first time, I'm understanding how Pelkovitz – I mean I never think people are like bad people. I don't think Pelkovitz was like, 'Hmmm, how much money can I make off of pretending that the Freidmans…; You know, I don't think it happens like that. But I think that, you know, often happens like, you know, people feel like they're doing God's work, that they're on to something important, and you know if they can make a name for themselves in the meantime it's for all the right reasons. But you know then things start to take off and take on a life of their own, and…..

A: Yeah, that's totally plausible. I mean my mother, who's, who was looking out for me, was equally convinced that things had happened, and acted more of less the same way. And that wasn't for self-advancement, anyway.                                                                                                 17:36.00

Q: Clearly. I mean that's very good point. I mean your mother's a sweetheart. She's so obviously, you know, I'm sure she's as upset in a way now for having, you know, not supported your version of the events back then as she probably was then that, you know, that somehow she didn't, you know, look after you in whatever way she could.

A: And now that I told her that I lied fifteen years ago, twenty years ago, whatever it was – twenty-five years ago. Wow – she immediately came around in supporting me, and she is now very much dedicated to helping to undo whatever wrongs were done. Which I appreciate.

Q: Yeah. It's very impressive. Because you know if you think about, you think XXXXXX mother's position, based on what XXXX said. You know, he doesn't want to go there because she, because she can't go there.

A: Well I don't know if they've discussed it in the last ten years. I have no idea.

Q: But I guess she's giving him enough of a message every time…

A: Or he remembers it from the past.

Q: Yeah.

A: Yeah, she was very vehement.

Q: She was. Mrs. XXXXXX.

A: Yeah.

Q: Do you remember being present at any of that? Or do you remember hearing that through – how did you, how did you know that?

Mike Epstein - 29

**A-0551**

| | 19:13.00 |
|---|---|

A: Um, I don't know if I did know that for sure, that she was vehement. I think part of it is what I read from – you know, because she and XXXXX mother and my mother were always the ones who I knew who were at this, these lunches and so on that the mothers would have. And because XXXX and XXXX had, were accusers. And I think just generally XXXXX mother's personality – because I, you know, we, I knew her socially. I would go over to their house all the time.

And she just seemed very definite about what she wanted and what she believed.

Q: You know I read that, that XXXX had given a statement, had given a ten-page statement detailing all these acts of sexual abuse. And that he was the first – I mean the police have lied about this many different ways. Fran Gallasso told us that it was actually this family called the XXXXXXX who lived in Great Neck Estates who, they were the first ones. And that they had gone to the house and immediately the boys admitted that they had been abused.

Well we talked to the dad in that house, and he was like, 'I remember that. Those cops showed up. They told me what they wanted us to say, and we, my kids said nothing happened to them.' So we were just like, 'Which is it?' But later I've, I've heard that XXXX was the one who gave this ten-page statement. It's so amazing to me in light of the fact that, I mean I don't think he knows that. So when we talk to him, I don't know if we brought that up yet, but I think we got to, I think we're going to have to say to him, 'Do you remember this ten-page statement?' And either he's going to say 'That's not true', or 'I do remember it. I didn't' ….or I remember just going down some flight of fancy in telling a story and cops are getting excited about it.' It's going to be hard to know.

| | 20:59.00 |
|---|---|

A: I spoke to him on the phone a couple of months ago, and you know he was a little bit cagey, but he seemed to give the impression that like he said things, but that his statement was elaborated from that. Like it wasn't exactly what he said. It was, it was vague.

Q: Well, it will be interesting to see how far he can, he can come, you know? So when you first heard about this, this new review of the case that the DA was going to take another look at the case, how did you hear about that?

A: I got a letter from the Nassau DA in early 2011 – maybe Spring 2011 – saying that they were re-examining the case and asked me to call. And I called right away. I made an appointment to speak to someone there. I don't remember her name.

**A-0552**

| | |
|---|---|
| Q: Was it Madeline Singus? | |
| A: That sounds right. But I'm not sure. | |
| Q: She's the one that sent your e-mails… | 22:47.00 |
| A: Yeah. Well the e-mails were from someone else, and they were arranging a time to talk to someone else. And I basically told, I told them that I'd never…anything that happened, and I just told them the truth. | |
| Q: I …was a little garbled. | |
| A: Oh, I just, I told the DA that, the DA's investigator, that nothing had ever happened in the classes, and that some of my friends had testified and I had spoken to the police and then had spoken to Pelkovitz and, you know, eventually decided to lie, but not to the police or the DA, just to my therapist and my mother. And they thanked me for my time. They asked me some more questions. There was follow up call. I don't remember what they, what they asked on the follow up call. And that, that was all I heard. | |
| Q: Did you have an impression, about what, did you feel like when you were speaking to this woman, did you feel that, did you have any sense of what her goal was, or whether she was, you know, being a good listener, or whether she was taking notes? Did she ask if she could record the conversation? Was there any detail that you remember about that? | |
| A: Um, she seemed very eager to hear what I had to say – whatever it might be. I didn't have any impression about whether they had an agenda. Whether they were trying to find one way or the other. It seemed, in a sense, I mean it seemed legitimate in that they seemed to be legitimately looking into what, if anything, had happened. But you know I couldn't really tell more than just a – I think I talked more than she did, because I was telling my story. | 24:11.00 |
| Q: And did she say that, did she mention having talked to anybody else? Or did she say how their investigation was going? Or didn't say anything about that? | |
| A: I don't remember anything like that. I got the impression that they sent letters to everyone. And I don't even know how they got my current address, but through the DAs, they probably, it's probably easy for them. I have no idea how many others they talked to or, or what. | |
| Q: Do you have the letter still? | |

A: I do have it. I don't know where it might be.

Q: I'd love to see it. I'm curious. But don't look now, but if you can find it...

A: Yeah. I looked briefly, and I, it wasn't where I thought it might be.

Q: You don't have it in your normal stack of letters from the District Attorney asking you to.... So the, and that conversation – how long do you think it lasted with them? Or that and the follow up conversation?

A: I would say a total of over an hour. Between one and two hours, the two calls.

Q: And was there any discussion of meeting in person?

A: Uh, I think I offered to meet them in person, and they were satisfied with the call. But I said that, you know, if they preferred I'd be happy to meet in person.

Q: Did they specifically ask you about the other kids you were in the class with?

A: I don't remember if we discussed any other kids.

Q: Just for, in case I didn't ask you before, did you - of the kids we described you being in class with – did you ever, did you ever see XXXXX... Did you ever see XXXXX being mistreated or sexually abused in any way in the classes?

A: No. I never saw XXXXXXX or any of the kids I knew. I never saw anything inappropriate. I don't actually have clear memories of which of those might have been in the same class as me other than XXX. Or, and which I thought might have been in other classes, but I know they were all, at some point, ...

Q: But you remember, if I'm not mistaken I think you remember being in class with XXXXXX?

A: I don't remember whether we were in the same class or not.

Q: But XXXXX, you remember being in class with?

A: Yeah. I think so. Yeah, I really – it's weird. I, I don't really remember clearly who was there. But I know there were some people I knew and a lot that I didn't. Because a lot of the kids went to different schools. Or were in different grades, or whatever. There were four elementary

| | 25:11.00 |
| | 26:13.00 |
| | 27:36.00 |

schools in Great Neck. So I mostly only knew kids from mine.

Q: And so when you were talking to the, to the ...the assistant DA, you were talking to the DA's office, did they express any curiosity about who else you were in class with or about whether you had seen those kids being abused, or did they just focus on you?

A: I don't remember much of what they asked about. I, I mean I told them that I never saw anyone. At all. Being abused.... (interruption)...

END OF PART FOUR

28:52.00

BEGINNING OF PART FIVE

Q: ...Is it okay if we continue?

A: Yeah. Would you be amenable to being in another room for a minute?

Man: Okay.......

Q: Take your time. We're fine.

A: We're almost done, right?...Okay, thanks. Oh, your computer is here. Do you want it?

Man: No.

A: Okay. Okay.

Q: Over the, did the, if you remember did the DA staff ever ask you for any materials or documents? Or did they ask you if you had the class list, or if you had any written stuff, or if you had any notes from therapy or any of that stuff?

1:00.00

A: I'm not sure if they asked for documents. Because I don't have any. I'm inclined to say that they may have and I probably – I mean my mom has some notes and documents and I may have told them that. But I don't really have anything.

Q: And do you remember talking to them about your mom at all? Did they ask about it? Or did you say anything about it, if you remember?

A: Well I mentioned that I talked to her a lot and had eventually lied to her and Pelkovitz and said that it happened. But not I think in any great detail.

1:55.00

Q: Do you know if they ever reached out to your mom?

A: I don't know.

Q: So when we first started talking, and I guess over the years now – 25 years – have there been a handful of time when the issue has come up with your mother? Or she's, or you said, 'Oh, I'm having a bad day', and you can tell she's said, 'Oh, it must be about the bad things that happened.'? Has it popped up over the years at all? Before or most recently?

A: It's only popped up in directly related times. So for example, one, we were visiting some family friends when Jesse had his interview on Geraldo. And we watched it. And I saw him saying that these things had happened, and that he'd molested the kids. And I was kind of shocked because I was pretty sure he hadn't, but that gave me some doubt that maybe he had and maybe it just wasn't me. Or maybe it just wasn't my class for some reason.

2:33.00

So that was confusing. I think, you know, there were a couple of occasions when my parents got a letter, maybe a letter from Arnold or a letter from Jesse, or a letter from someone, about the case once or twice. And they told me that they had received it, and that if I wanted to read it I could. And I kind of just said, 'Don't really want to', because I just didn't, I wanted to leave it.

But it was never really something that we talked about a lot. Ever. Or really ever, ever. Except for when these events kind of happened that were external. I think she might have mentioned, for example, when Jesse got out of jail. As a, I don't know, a heads up. A warning. 'You might want to know.' Or when Arnold died. Things like that.

Q: And then how did you – oh, I'm curious about did you ever see 'Capturing the Friedmans' when it came out?

4:08.00

A: Yeah. I saw, I saw 'Capturing the Freidmans' – I don't know if it was in theaters, but it was the year it came out. Maybe it was in the theater. I don't know. And I thought it was great. You know, I thought it was really well done, and a really nice documentary in its own right. But also it was really reassuring to me to see that there were other people with doubts, and other sort of evidence of…. You know either wrongdoing, or you know things that were not immediately apparent –however you want to put it – about what the police had done and what the DA had done. And the judge.

And it made some things kind of make more sense for me. That I had

never really known about. Like for example the explanation in the film about why Arnold and Jesse would have chosen to plead guilty – and Ross for that matter. Because, you know, they were just faced…. Arnold I think I understood from the beginning that he was trying to, to help Jesse in a way. But why Jesse or Ross would have done it – you know Ross had the, the pretty good plea bargain, although he didn't really get it. And Jesse, you know, he sort of described going behind the scenes, and the night before he pled guilty was, was kind of enlightening for me. To see the family.

Q: Yeah, it must have been interesting to see the, to see that side of it. You know, from being sort of peripherally involved in the other side of it.

A: Yeah.

Q: And it's interesting. Your mom said something about, you know, that seeing that movie in the mindset that she was in did have a different resonance for her than it might have for you. But you guys seen that movie….

A: Because she was convinced that they were guilty and they were somehow playing games or something? Or..?

Q: Yeah. I guess she just felt like, you know, she would see them, the, the, if there was ambiguity in the movie, that she would assume that that meant we didn't look hard enough. Or you know if we had just worked a little harder we would have discovered what really happened.

A: Uh huh. Whereas I saw it and I saw the self-justifications by the judge and the prosecutor, and I just, you know, I wanted to reach into my screen and, and slap some sense into them. Or talk to them.

Q: You know, I ran into the judge …. I ran into the judge, I was in a hospital waiting room and I ran into the judge who has an illness. And this was in the last year. And I went over to her and I started talking to her. And she's very mad at us, and feels the movie is unfair to her and so on. And but it's funny, her husband was there. And he said, he sort of like called me aside and he said, 'So what do you think really happened?' And I was just thinking, 'Wow, if the judge's husband has still got big question marks in his mind…'

A: Were they married at the time? Or….

Q: Yeah.

A: Yeah.

| | 5:03.00 |
| | 6:50.00 |

Q: You know, so they like withdrew this whole thing…But you know there's an opportunity for some healing in a way. You know?

A: I thought it was interesting that you, that the film was left very ambiguous. That even if you had a strong belief about what the truth was, it wasn't, you didn't come right out and say… You just presented a bunch of evidence and a bunch of behind the scenes footage and let people think about it themselves.

Q: Yeah, I mean, I think, you know, I think that the majority of the people that saw the film felt, there was probably on a spectrum, there were people that felt like, 'I don't know what really happened, because I wasn't there, and nobody could show me immediate evidence of it some way, but just looking at the way that law enforcement process took place, in this innocent-until-proven-guilty world, there's no way that this case should have resulted in these guilty pleas. And the prison term and all that stuff.

That was, I mean I don't, every once in a while I run into somebody who says 'Wow, when I saw that movie I just knew they were just guilty as sin'. And those people I kind of feel like are, you know, you're getting kind of a reactionary kind of a personality there where somebody's just saying, you know, the minute you mention a crime, it's like sedition or, you know, or espionage or something. It's like it's just considered so bad. It's considered really worse than murder. I mean child molesters are treated worse than murderers.                                                    8:39.00

You know, as a father I do, I understand the incredible desire to protect your kids, but you know, to the, to the exclusion of fairness… I'm more worried about what it says about what can happen to a sixteen, seventeen, eighteen year old kid in the justice system than I am about whether Jesse Friedman was going to do something awful to a child.

A: I thought it was very interesting, too, with, you know, the birthday clown brother.

Q: Yeah.

A: And it left me wanting to know, like did this hurt his career. I don't know. Did it?

Q: You know, it, he says both. He says that it has, that it did. And when he's really mad and he's having a bad week, he'll say, you know,. 'Your movie destroyed my career.'. And then other times he'll say, 'Look, I was, eh, what was I going to do? My life was so messed up anyway, and I was living in this weird compartmentalized world. And I was like scared all the time that somebody was going to discover who my father was.    9:47.00

And they were going to think that I was doing those bad things, too.'

But you know then I'm sitting there with Gallasso – Mark and I interviewed Gallasso the very first time – and she says, 'Well we knew David was into some bad stuff, too. We just couldn't catch him.' And she's just the most irresponsible thing she could possibly say. So I think he does recognize that there's a certain ventilation that needed to happen. And I saw him, I had lunch with him about maybe a month, a month and a half ago. And, and it was a good, like, another kind of healing thing. You know? He realizes that what he did was a brave thing ultimately for his brother. And you know maybe we dragged him kicking and screaming a little bit, but he'd ultimately do the right thing.

And he wasn't obliged to give us the home movie. He wasn't obliged to let us have that kind of access. But I think he trusted that we were going to do a fair thing with it. And you know, he's happy with that. And also his life was kind of fucked anyway. I mean he was in such a cul de sac and he was so stuck, you know, because he was living in fear all the time. The bigger his clown career was and the more successful his booking clowns for children's parties was, the more he was constantly afraid someone was going to figure out that 'David K' was the same thing as David Friedman, and David Friedman was the same… and that Silly Billy was the same thing as David Friedman, and that David Friedman was of the Friedmans of Great Neck. And thankfully it was a…'

A: Well he was lucky it's a fairly common name, I guess.                                          11:34.00

Q: Yeah, yeah.

A: In New York, at least. There's actually someone at my office named Jesse Friedman, and who, when I get e-mails, it's like, 'Oh, Jesse Friedman.'

Q: It's really funny. The, how did you inform your mom, and what was your thought process when you first spoke to us, and you know, when you first – Oh, actually maybe even, how did you first hear from us? I guess it was about through Jay probably.

A: I heard from Jay, the investigator. And he asked if you could come over, and I said, 'Sure, I'll talk to whoever.' And you know I sort of felt like I, I'm happy to help Jesse directly, because I think that in all likelihood he never did anything wrong. Other than arguably, you know, pleading guilty and going on Geraldo and saying he was guilty. But I can understand why he would have done that.

He was in a terrible position. So I was happy to tell him my story. And he came over again, and Mark came over and I spoke to Mark. And

| | |
|---|---|
| you know. And it became really clear that I was, I was nine, ten at the time these were happening and my memory is not very detailed. I don't have notes. And my mom has all those notes. And her perspective also would be very interesting. And you know also if, if through telling her she is still in touch with the other mothers, and maybe if she wants to talk to them and tell them that she doesn't think it happened. Maybe that's useful, too. | 12:48.00 |

You know, I felt comfortable approaching XXXX to let him know that I was talking to you guys, too, and see if he wanted to say anything. And I don't think he does, but you never know. So actually I eventually told my parents in an e-mail, because they were overseas at the time. And it seemed like the sort of thing where I didn't really want to wait. And we weren't going to be in the same place for a month. And a month seems like a long time when there's this panel going on and no one knows when they'll be done.

| | |
|---|---|
| Q: That was a very nice reaction, and in a way, you know, it's a very selfless reaction. Because if you were focusing on, if you were making it about you and your mom, you might have handled it differently. But you actually saw the urgency of making it about the matter at hand, which was very good. And I think, did you have trepidation about it? Did you think, like what was the downside of, of that? | 14:14.00 |

A: Well, I'd thought about just coming clean quite a few times over the years, but it never seemed pressing, it never seemed well he couldn't be delayed. And I wasn't totally sure that she'd be supportive. I thought she probably would be, but it didn't seem like it was ever the time to rip off the bandaid until now.

Q: And what was her reaction? Did she respond immediately? Did she wait until she came back?

| | |
|---|---|
| A: It was a day or so until she responded. It was….I was a bit nervous for that day. But she wrote a very nice e-mail that said, 'Oh my god. I had never thought about it that way. When I saw the 'Capturing the Friedmans', I looked at it entirely the other way. And I feel bad for what I put you through', and so on and so on. And she sort of told me what she remembered of the timeline and what had happened and what her mindset was, to some extent. You may know. | 15:39.00 |

And then the next time we saw each other in, at their house, we went for a walk and just sort of discussed how she felt at the time, and how, you know everybody in Great Neck was totally convinced that this thing had happened, and she had no reason to doubt the police and the DA and the therapists and … the whole, the whole culture.

Q: Yeah. Interesting. She also – we had dinner with her, and she said, she said, 'You know, in the beginning I didn't believe it happened, but then when you have police officers telling you 'Actually we know it happened to your son,' you know that was really powerful. And now you're, you know, you're in a world where there are therapists telling you something, it's been corroborated by the police, it's been corroborated in the press. And then it's being corroborated by other parents. At a certain point you gotta say, 'Well you know if three people tell you you're sick, lie down'.' | 16:40.00

A: Yeah. And she said that, she said recently that other kids had named me as a victim they saw abused. And so she's going to believe that, I guess. I think the whole experience has made me really much more skeptical of police and claims of guilt, the claims that criminals are guilty of various things where there isn't direct evidence. And actually I just realize it probably as a 'get out of jury duty free' card if I'm ever on a criminal jury. I don't know. Worth a try.

Q: Or you could say, 'Actually I decided that, as an intelligent person and potentially a skeptic who doesn't necessarily go along with everything else, I would be an excellent juror.'

A: Yeah. But if they ask 'Have you ever been the victim of a crime?', when you're going to jury duty, do I say, I mean…I could say 'Well, it's a long story'. (chuckle)

Q: It's a really good point. Do you feel like there are any sort of lasting issues for you other than intellectually? Do you feel like there's, there's, it'll affect you if you decide to adopt a child, or you decide to have a, you know, some chapter of your life that this resonates in some way? Or that it's still with you in an emotional way? Or do you feel like now that you can see it clearly, you know, you're not a victim of a crime per se…. | 17:57.00

A: Yeah, as I said, it's made me a lot more skeptical about claims of crimes or abuse that don't have evidence. I'm sure it does happen, but there's this example, and there's the, you know, the school bus driver example of, of times when these charges have been completely … created. So there's always that possibility. But you know I don't feel scarred. I think if it had never happened, I'd probably have a somewhat different relationship with my parents than I do, but not in, not really different. We wouldn't have this experience.

But it's not like it drove a wedge between us. It's not like it made us really closer. It just kind of happened, and we got past it. And it sucks that we got past it by me having to lie about it, but it actually kind of worked out okay in that sense for me. I guess.

Mike Epstein - 39

Q: It was probably kind of a self-preservation thing. You know, would you have been better off with another year of therapy?

A: I don't think so.

Q: No. And do you think that knowing this …just between you and your mom, you feel like this was kind of like a healing exercise? For you to be able to talk about this freely?

20:00.00

A: It, it's kind of healing, but at the same time it was scabbed over, and it could have, it could have stayed scabbed over. It's kind of too soon to tell where this will go. But you know I know that she's now very much about healing and amends and making things right. And I feel good about that.

Q: That's nice. Can you think of why – and this is speculative, but you're a, you're a product in some way of that community, or you certainly understand it better than somebody that didn't grow up there – do you think there's, can you, can you, I don't know, do you have any feelings about why, how it could come to pass that kids would, would say these things had happened, that kids would say something like XXXX said, 'No, it didn't happen, but I don't want to come out and say that because my mother is so invested.' That just seems so – it's like this poll that just came out that said, you know, Americans don't trust Romney. But that's not reflected in who you're voting for. You know? Like 60% of Americans say they don't trust Romney, but 49% of Americans want to vote for him. You know?

I mean I guess I'm curious, it just seems so counterintuitive. You knew those kids. And what, why? Why?

A: I mean some of them I kind of understand. Like, you know, the kid who was always just really desperate for attention could be the center of attention by saying that these things happened, and get, you know adult approval based on that. But that only explains that one kid. It doesn't explain the other ones who were very generally really like level-headed and not …I don't know. I was always really confused by the, the kids who I knew who were not damaged, who were just sort of ordinary boys who, who were accusers.

21:41.00

I don't know. I mean I, I have my reasons for why I lied about it. But I was very careful not to go to court, or sign a statement or any of that. Because that just seemed evil to do that. And I'm not calling my friends who did it 'evil'. I, I don't know what was going through their head. I don't know if they were just reacting to this notion that – it could have been as simple as the police or somebody saying, 'We know this happened. All these other kids have said it happened. Didn't it happen?'

And going back over and over it again and talking about it.

And, or it could have been that by talking about something over and over again, they convinced themselves it was true. It could have been that they went for hypnosis and that messed them up somehow. I really don't know. I, I wasn't there. I'm, I wasn't in their heads. I'd love to know. Do you have, have you talked to any of the kids who have recanted about that, who did testify?

Q: Yeah.

A: What are, what do they say?

Q: Um, I think they've, you know, that there's a, there's a huge gap really notable, and in some ways it's the thing that's strongest in my mind about this, there's a huge gap between what they thought they were saying happened and what they ended up saying happened.

A: Well that's what I heard from, from XXXX…that what he had said was not what was in his statement. But, but that raises more questions. You know, the questions that this raises are a) how did no one notice that their statement wasn't what they say, b) what happened when they went to the grand jury? What were they asked? What did they, did they just say, was it really sort of awkwardly hands-off experience of the judge just, or the prosecutor just saying 'Did bad things happen to you at the Friedman's'? And then they say 'Yes', and they go 'I don't know'? Or..

| 24:09.00

And plus like even the things that they said happen, happened were still false. Even if all they said was that Arnold threatened them, or that he rubbed against kids or that they saw porn in the house, or whatever the sort of relatively mild accusations are that aren't full-on sex. Even those were not true. So why would they have even said that?

Q: Well, it's interesting. First of all I believe that people really suspend their judgment at a certain point when you mention certain subjects, and child sex abuse is one of them. I mean I've had people say the weirdest things to me. You know, we were taking the film around in the very beginning. You know, I remember a guy from, worked at HBO, came over to me and he's like 'You know, I'm not a good person to talk to about your film.' And I said, 'Why not?' And he goes, 'Well I just, I just have a personal problem – this is just me – I just have a personal problem with child sex abuse.'

Like, 'Really? You, do you think you have a personal problem? You're, you're not married and you don't have any children and you don't think about these issues very much. I am married, I do have children, and I do think about these issues. And I have a huge problem with child

sex…' everybody has a huge problem with child sex abuse. I mean who doesn't have that? And yet people sort of take ownership of it in a way that, somehow that's an opinion and it's…but they, but the bar is so much higher proving that something didn't happen . Because just the whiff, just the hint – as Gallasso says in the movie – just the accusation is enough to ruin someone's life.

26:02.00

A: Yeah, but that doesn't explain why the kids would have made the statements.

Q: Well, so, so to answer that question, I think that, when you combine this 'hands off, we can't say all the words. Don't say all the words.' And so the, and so the rules of evidence, if you will, are that the standard of care is actually lowered because nobody wants to say the real words of what happened. So everybody's pussy footing around it.

And then the kids are asked questions like, you know, 'Did Arnold Friedman rub up against you?'. Well the classroom is this big, and Arnold Friedman was going back and forth – chances are pretty good everybody rubbed up against each other at some point when they were going back and forth. So if you get a kid to say 'Yes, I think he rubbed up against me,' the kid's not really lying. And to the police, that makes them happy, and the kids feel like they've given them what they needed, and yet they didn't have to compromise or make up a, you know, make up a story.

26:51.00

When you look at that the same way with respect to these computer sex games, again, you and I know what Strip Poker looks like or whatever, these are, these are, they're not only not sexual, they're just, you know, they're just like demonstration of lousy computer graphics. There's nothing about them that's even remotely evocative or emotional. It was at that time just amazing the computer could *do it*, it wasn't that they could do it well. It was just amazing you could put 2 and 2 together and you get 4.

So now you're ask a kid, 'Did you ever see a computer game of a sexual nature?', they can say 'Yes', because like almost all the kids we've talked to, everybody had seen those games, …included. And this is something that they can say without really lying. And yet it makes the police happy. So let's say these kids said there was rubbing up against, there was a video, there was some kind of computer game, and you leave out the part that says, 'Yeah, there was rubbing up against, but it wasn't of a sexual nature', or 'There were computer games, but there was nothing stimulating about them, and by the way I have them at home.'

28:07.00

And all this stuff. But if you add it up, not to overcomplicate my

answer, but if you remember in the film - or maybe this is in the additional disk of the film, which I don't know if you saw – there's a sequence of photographs – one of the few things we actually got from the police when we were doing our Foyle request and stuff. There was a sequence where, in the top of Jesse's closet, you see they took a photograph during the search of the house, and he has a couple of like Pentax cameras, like you have when you were going to, you know, photography class when you were in camp or whatever. So he's got a couple little cheap cameras about his shirts in the closet.

And then second photograph you see the drawer next to his bed is pulled out and there are Playboy, like a series of Playboy Magazines….

A: Oh my god! A seventeen year old boy with Playboys!

Q: And then you have, uh, and then you have separately, like somewhere else upstairs they found a hypodermic needle in the house – I don't know what it was for, but in any event it was some old hypodermic needle that was, maybe somebody needed a shot or whatever it was. But it was sitting there. It wasn't like they found a drawer full of heroin apparatus or something. They found this hypodermic needle. And then the amazing thing was the fourth photo in the series is a, is a construction where somebody has taken the, the Playboy Magazines and opened them up to pages that didn't have any words – there were just images, so they could have been photographs.

29:21.00

They've, they've put them out as if they're like photographs. They put a couple of magazines next to each other of just pictures of naked people. Then they've taken the two cameras and placed them on top of the photographs. And then the hypodermic needle and put that in the corner of the photograph. (click) One photograph. That's all you need. When you see all that stuff in one place, it's just this circumstantial indictment, and it becomes a real…

A: Yeah, but I…

Q : … really potent image. But my point is that the police become good at putting sequences of events together in such a way that, for a child to take the next step, just give him a little bit, they can, they can take that and turn it into a much richer statement.

A: Yeah, I just don't know how you go from that to like leap frog and sodomy charges and…

Q: You said it really well. When we spoke, you said that those, those games and those things that are not particularly sexual in nature sound like a child's fantasy of what could have happened. And I do believe

Mike Epstein - 43

there's, there's kids that were in the class, and as Andrew was saying before if it was 400 kids ....speak to 100.....

A: There's a couple of fabulists.

Q: We've got a couple of really, you know, kids who really want to please. And they start....

A: Yeah.                                                                      31:13.00

Q: What do you think about that?

A: I, I always kind of suspected that the more outlandish things came from the more easily convincible, maybe unstable kids. Leap frog is just not physically possible. It doesn't even make sense. It's like a child's idea of what a sex game could be, but it doesn't even make sense as something that is physically possible.

There's a page from my mother's notes where someone – either me or some friend, I don't know what the timeframe is – but somebody is saying like 'such and such happens this number of times per class and there's this number of kids', and she does the math, and there's um, she works out there would have had to have been 150 to 200, I think, acts of sexual intercourse during a two hour class. It's just not, it's just not possible.                                                                      31:59.00

Q: Yeah.

A: And, and no one thought in those terms at the time, how there could possibly be that many charges and that many counts and that many – you know, if you do the math, what would have had to happen. How leap frog could possibly physically work. Nobody was really....thinking in those terms.

Q: It's funny now, because I get the feeling, you know, now that you know the people would even investigating the case of whatever, they sort of, they'll look at XXXXX, that kid who's sort of reclining in the interview, and, and he'll talk about leap frog, or, and, you know, he's, this is a kid who's really deluded. And, you know, for example, a lot of the things that he's describing having happened to him in the class are things that were never alleged in his charges – in fact they were alleged in other people's charges.

So now, you realize he's been sort of stewing in the juice of police discussions, therapy discussions, group discussions, and he's borrowing all these memories from people who have a whole other set of classes and charges and so on. And, you know, but if I say to him, 'Well I don't                                                                      33:22.00

Mike Epstein - 44

**A-0566**

understand. You said to me before that there was no sexual abuse in the computer class. It only happened, you know, behind closed doors or in Jesse's room. But now you're telling me there was leap frog.' And he'll say, 'Yeah, yeah, yeah. But that wasn't molestation. You know, that was considered just a game.' That anal rape was not considered....?

A: So they discussed the technical classification of each thing in the classroom? That's not plausible.

Q: So it's, so it's, I mean, but to get back to your question, I think the big thing here is that kid after kid said to me, or to Mark, 'That's not what I testified to. I know those things happened, because I heard those things happened. That was not my testimony.' 'Really? What was your testimony?' 'My testimony was that I think I saw Jesse chase after a kid and hit a kid, and I'm not really sure that happened.' XXXXXX says that in the movie and other things like that. But they think that what they were saying was, you know, and by the way the police very often I think were saying to the kids, 'Well look, we just need this little thing from you. You're obviously not a big part of this case.'

34:32.00

And so when I talked with them later, they would say, 'Well look, I really, I don't even know why you're talking to me. I wasn't one of the big guys.' I'm like, 'Forty-seven sodomy charges? Really? I think you're the number three complainant.' And, and they had no idea, because they don't remember what they said. And by the way we can't get access to the grand jury testimony, because grand jury testimony is sacrosanct. And all that stuff. But in a sex case where you think the case is in the process of getting unbuttoned, what the hell is the grand jury testimony secret for anyway? Once the scales tip, once the Second Circuit says 'We think there's a reasonable probability this is a wrongful conviction', doesn't the standard have to flip a little bit so that the person that's accused get access to some element of their accusations?

That's why I said there's a real throwing away the key, that it's worse than murder. Because at least in a murder case you can sort of get access. But through these special rules in sex cases...

A: Plus he pled guilty, so he's sort of giving up the right to cross-examine people.

Q: Yeah. But, in today's world we know a lot of people who plead guilty aren't guilty. You know, that a lot of exonerations at the Innocence Project has been part of, you know, 25% of them involve a false guilty plea. So, you know, and the other prosecutors will say, 'No, lots of people....' I mean, you know, you gotta make a deal.

A: If you're offered ten years versus fifty, you....

Mike Epstein - 45

**A-0567**

| | |
|---|---|
| Q: (interruption).......When was the last time you heard from anybody in the Nassau County DA's Office? | 37:40.00 |
| A: Oh, a year and a half ago. | |
| Q: Can you tell me that in a full sentence? | |
| A: I haven't heard from the Nassau DA in about a year and a half, since we, I had two phone calls with them within a week or two of each other, and that was it. | |
| Q: Did your mom ever figure out, or did you ever figure out, whether you paid for any of the therapy, or it was provided for free? | 38:53.00 |
| A: We think that the group sessions were free, but we paid Pelkovitz for the private sessions. And I have memories or my parents writing a check to him at his house for the sessions. | |
| Q: In the therapy with Pelkovitz, do you remember anything, where there any tools used at all? Was there ever a doll or, you know, some kind of anatomical thing? Or did he ever say 'Did this ever happen to you?' Or, I'm just curious about whether it was just talking or there was also any kind of demonstration. | |
| A: I don't know. I don't remember any props at the therapy, but I can't say there weren't any. | |
| Q: Did you ever, did you know XXXX? | |
| A: No. I never knew XXXXX. | |
| Q: Mark, do you think it's productive just to go through these kids just to, who were...? | |
| A: We've done it before. | |
| Q: But have you don't it in this context? | |
| A: Not on camera. | |
| Q: Well just so, particularly third indictment people. Did you know XXXXX? | 40:38.00 |
| A: No.I | |
| Q: Did you know XXXXXX? | |

A: No.

Q: XXXXX?

A: Uh, not well.

Q: XXXXXX you knew.

A: Yeah, I knew him mostly later. High school.

Q: And XXXXX?

A: Yeah, he and I, XXXX and I were close in elementary school. And then we were in two different middle and high schools.

41:08.00

Q: And do you have any contact with him now?

A: No. It's been a while.

Q: And were you, but you were aware that he took the classes?

A: I guess. I, I can't really remember. Are you in touch with him?

Q: Yeah, I've tried to be. He's at … We're reaching out to him.

A: I'd be happy to send notes to him and XXXXX and XXXXX, if that's useful.

Q: I think it would be. Definitely would be. XXXXXX?

A: No.

Q: Mark, is there anything I didn't ask? I'd asked them all, and XXXXXX, um, the only ones he knows are XXXXXXX, the ones we discussed. And anybody else over the years who's like contacted you or somebody you remembered had some knowledge of the, of the situation back there? Or is it just kind of obsolete?

A: No, I haven't had anything to do with it for a while.

Q: Anything else I forgot to ask you? Or any other feelings you have that you want to express?

42:34.00

A: I mean I think, my perception at the time was that in a lot of ways the mothers were sort of driving events, and they certainly were, it felt like they were driving the DA to demand evidence and to demand harsh

**A-0569**

punishment and indictments. And … I don't know to what extent they drove testimony or convinced their sons to talk about, to say that things had happened, or whether it was later. But there was a lot going on with them.

Q: What would you hope would come from this? You know, if you, if you, you know you've taken time and energy and I really, I think it's great that you've been willing to engage on this. I don't know. We've been working on it for fifteen years. I can't exactly tell you why. It just feels like it's the right thing to do. There's not a dime in it. There's no, you know, it's not about really anything other than just, I can't live with the injustice of it. I can't live with Fran Gallasso having this, you know, website that says that she, you know, she's available to consult on sex cases and how to prosecute them, which is a scary thought.

So I guess my question is what would you hope would come out of this? Like what's driven you to be willing to participate?

44:21.00

A: You know, you can't give back the time that Jesse spent in jail. You can't keep Arnold from having died in prison. But it's increasingly clear to me that an injustice was done to them, and you know at the very least I wouldn't wish being a registered sex offender on anyone who is not guilty. Because, you know, I've heard the stories about how they have to live under bridges, or they get kicked out of apartments, or they, you know, they, they just have these really hard lives. And you know it's one thing if it's a case where somebody is guilty of something, but it's something that seems minor. And it's an overreaction. But in this case I really don't think he's guilty of anything.

You know, the, the simplest possible explanation of all the evidence is that he didn't do anything. And that he was railroaded by this, the justice system that, that failed. And if he can have a more normal life, I think he deserves it.

Q: Did you ever meet Fran Gallasso?

A: I don't think I ever met her or the judge or any of those people.

Q: Well I really appreciate your talking to us. I know Jesse really appreciates you talking to us. You haven't…him at some point. Hopefully you'll meet him… It'll be interesting. He's a very bright, complicated guy, but I think mainly complicated by – I think he's dealt with these things in a really kind of admirable way. You know, being one of those people that's in prison and spends his time in the library trying to understand the law and trying to understand how to, you know, how to help himself. And I know he just really, really appreciates….show your willingness to help.

45:41.00

And more and more we're seeing people do that now. We're seeing people that want to, you know, want to do the right thing. They didn't do the wrong thing back then, but you know, as your situation, you talking to Pelkovitz, that wasn't something that contributed to Jesse's problems. But it's still you can make a big difference now, and you have. So thank you very much.

A: Great.

END OF INTERVIEW

46:46.00

COUNTY COURT
NASSAU COUNTY

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-


JESSE FRIEDMAN,

                Defendant.

-------------------------------------------------------------------x

## AFFIDAVIT

ANDREW JARECKI, having been duly sworn, hereby declares that the following is a true and accurate copy of excerpts of the transcript of my conversation with Keith Doe on November 13, 2012.

                                     Andrew Jarecki


RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-0572**

Jesse Friedman Case
Karmal Marchoudi
11/13/12

---

A: …I agree. To be perfectly honest with you, I really don't want to get involved in this stuff. But I, you know, when we first spoke twelve years ago, I thought that, that um, I was used as a peripheral party to this. You know, I gave a grand jury testimony, and that was it. We left Great Neck before the case broke. The police came to see me once. They came a second time and my parents refused to let them talk to me.

So I'm a little bit surprised to hear that I was actually one of the main claimants. You're alleging, you're suggesting that I'm one of these fourteen people.

Q: Yeah, you are. For sure. I can…(papers shuffling) ….          0:47.00

A: This I remember. …. This came up actually when we moved to Glen Cove. And it was embedded actually in a completely, in some file that I had no idea where it, how it came up, but all of a sudden it just popped up on the computer screen. We had a bunch of kids that were actually in the room at the time. And nobody…

Q: At your house?

A: At the house.

Q: Right.

A: And nobody could figure out what the hell it was, because it was really poor graphics or whatever the hell.

Q: Yeah, yeah.          2:23.00

A: And this kid says, 'I think it's a nose. It looks like a nose'. And it took everybody like a couple of seconds to figure out that it was not a nose. It was actually – so that I remember. The woman that kind of picked off her – because I remember they showed this to me at the, the station house.

Q: The computer games.

A: The computer game. This came up I think before a class one year of something.

Q: What? Dirty Movie?

**A-0573**

A: I think so. I'm assuming that's what that is. Those are actually the two major recollections that I had when you first called me. Twelve years ago, that immediately popped into my memory. And the second on, frankly, I didn't even remember – the only reason why it even popped into my head was because that kid said that, and I just remembered that's really funny, because that is not what it is.

Q: So that sounds like 'Load me'. The first time you saw that was after you moved away?

A: Yes.                                                                3:31.00

Q: And did you have any reason to think that that computer game would have gotten on your computer from the Friedmans?

A: It's possible that, you know, we, they used to give you games and al that stuff. I mean frankly I had very little interest in computer programming. I just went for the computer games. Because they had some good ones. I got dragged into this because this, this kid around the block – Blake somethingorother - …

Q: Feldman?

A: …I don't know. I don't remember – the problem is I don't remember anything. Or anybody that was really there or involved or anything. It's just extremely hazy. There's just little pieces of stuff like that, and that's pretty much it. These are pages and pages of…

Q: Are you surprised that, that you were listed so many times with the..

A: Yeah, sure. Absolutely.                                              4:35.00

Q: I mean this is, this is interesting…

A: Hold on. I'm sorry, what is?

Q: Yeah, you can, I can leave this if you want. But this is the, these are the original indictments. So, for example, this says 'from or about the last, the first day of January '87, to the first day of March, 31st day of March '87, uh, Jesse Friedman subjected Keith Dow, a person less than 11 years old, to sexual contact. The defendant did touch his penis to the victim's back.' Do you remember that happening? Would you remember that happening? Or do you remember saying that to the police?

A: ….Look, I think frankly I don't remember. I don't think so. I think what it, I think what they asked me was did he ever come into close contact with me. And I think I probably told them that he did. Because he needs

| | |
|---|---|
| to lean over you to type on the keyboard. So that's probably what I told them. And you know they may have asked me if he was ever aroused when he did that. And I probably responded, you know, 'Well what does that mean?' | 5:45.00 |
| Q: Well that's a big thing for me, like how do you, how do nine year olds actually deal with the questions? | |
| A: Yeah, these, you know, the, the, I think what was part of the issue is you don't have the vocabulary to even know how to process half this stuff. What I can say is that I ... | |
| Q: Well let me ask you – one of the things that they're obviously trying to do, or trying to say, is not just that you, you know, not just that you, that you were aware of a computer game called 'Load Me' or 'Strip Poker' or something. But rather that that was part of the grooming process that had to do with then preparing to molest you and other kids. | |
| A: Did I allege that? | |
| Q: Well, you, you know, they, they ask you, first of all they say that, 'Defendant showed you a videogame depicting a woman and a man engaged in sexual intercourse'. That's very different than you remember seeing that game on a computer. You know, and a lot of people have said to us that those games were present, and that people, you know, that kids have those games all the time. I had those games. | 7:19.00 |
| A: How they characterize things is, I mean, certainly to the extent that you know you want to take fault with how they characterize stuff, I mean that's your prerogative. But I, I don't know. I have no idea. What I can say is, you know, these games were, I mean that was definitely not made up. But then again... like you said, they're just, they are games. | |
| Q: Yeah. I mean I guess the question is 'Do you, do you remember that being sort of part of the curriculum that, that adults were saying, 'Look at this pornographic game'? Or do you remember that it's ... | |
| A: This game, this game came up after the fact. But... this one, I don't even remember when it was. And frankly it only jogged my memory when I saw it in the courthouse. But I, you know, I can't speak to whether it was part of some sort of preprogramming anything. And I'm not sure that I would even be in a position to, at that age, to be able to know that that was going on. You can only, you can only, you know, speak to either what ...what you actually saw, or what you think, or you know, whatever they manipulated into what you think you saw. Right? | |
| I don't know, you know, if they say that this is part of some...I can't use | 8:54.00 |

the, the intelligence and wisdom of a thirty-five year old to say 'Oh, but that, you know, this is definitely not what was going on.' The only thing that I know for a fact is that this, this happened. The two, the two games.

Q: Now the, that you, that you have a recollection of having seen the games, or you have a recollection of actually being sat down and shown the game?

A: No, no. Having seen them. I mean like I said, this was, this was after, this was, you know, I'm not, and again I, I don't recall the specifics of when it was, but it was certainly after, after it all took place. This I, this I don't remember.

Q: The 'Dirty Movie' one?

A: Yeah, I don't, I have...

Q: What about this guy? 'Defendant Arnold Friedman permitted the victim to see two magazines depicting pictures of naked people'?          9:45.00

A: I think, I think that they, I think that they actually had stacks of magazines in the back of the classroom. And I remember uh, that it might have just been some nude magazines. And they got spilled on on the floor, and I think the father got really pissed off at Jesse for having done that. But that's....this I, I don't know.

Q: This one about the...

A: Yeah, I'm not...

Q: That he touched his penis to your back...

A: Yeah, that sounds, that sounds a little embellished.

Q: Um, ...

A: In any case, is, you know, is there an allegation of sodomy here? Or, or...?          10:29.00

Q: Well I think you've got a, you know, here you've got 'observed'...we don't have any allegation of you being sodomized.

A: Because that did not happen.

Q: Did you, do you remember ever seeing anybody else being abused?

A: I don't, I don't know. I don't think so.

**A-0576**

Q: 'Victim observed the defendant, Arnold Friedman's, penis, Friedman's penis being touched by several boys.

A: Arnold?

Q: Arnold Friedman's penis being touched by several boys.

A: I don't think so.

Q: Defendant Arnold Friedman...

A: Again, I, I don't know. I'm surprised to see that. If you had shown me this, if you had shown me this, this and this....

Q: The computer games.

A: and the magazines, I would have said, 'Yeah, I think, I think that's definitely ...' But the rest of the stuff...

Q: But for example, with the magazines, if it was something that was falling on the floor, that's different than somebody saying, 'Oh, I was, I was being shown this by an adult.'

A: Yeah. I, I don't ... you know, that this was an indoctrination camp to ....I wouldn't have been in a position to say that as a nine year old or a ten year old. I think if they, if they want to infer that, then that's their prerogative. But I certainly, I wouldn't have even known to....you know said that. So.

Q: I mean I don't know how I would have known it at the age of nine. Any of this. I mean, you know. But I certainly, you know, I knew about Strip Poker, but I didn't know about other stuff like that. What about this, this 'Victim observed defendant Jesse Friedman hit several boys.'

A: I don't remember. I couldn't say whether that happened or that didn't happen.

Q: Do you remember being, did you ever have any recollection of being afraid of Jesse Friedman or that he was, that he was beating kids?

A: No, I, I don't know about beating kids. I, you know, through the, through the lens of somebody who, you know, went through this, I mean, I don't know. I don't have a specific...you know, you're ten years old or nine years old, like somebody's older than you are. They're just big. So. Right?

| | 11:25.00 |

| | 12:28.00 |

Q: Yeah. Do you remember the visits by the police?

A: There was only one.

Q: I thought you said they came back again.

A: They came back. My parents sent them away.

Q: And why did your parents send them away?

A: Because they said I had said everything that I needed to say.

Q: And then how – if you remember – how did you get from there, from the one visit, to the grand jury?

A: I don't remember.

Q: But you do remember sitting with, in some kind of a setting, or...?    | 13:25.00

A: Yeah. And a grand jury. I went in there. I sat down. They asked me a few questions, and then I left.

Q: Were your parents – your parents must have been with you.

A: One of them, I think, did come with me. Yes. Yep.

Q: And did it become a big thing, like in your family? Was there crying and was there 'We should have taken care of our son'?

A: Nope. Never came up again.

Q: And you were saying how you first got roped into it was this kid Blake or somebody with...

A: Yeah. Yeah. He wanted to, you know he was taking a computer class. He wanted to do this. I guess that's my vague recollection.

Q: Oh, meaning, meaning he said, 'Oh, why don't we take the computer class?'

A: Yeah. I think so.

Q: I see.

A: But again I don't, I don't remember how I specifically got involved.    | 14:13.00

Q: Yeah.

A: I can see how, you know, …look, I think when you called me before, did I not say this? I'm pretty sure I did.

Q: Say what you're going to say and then I'll tell you if you did.

A: No, it was just that there were a couple of computer games, and I'm pretty sure that there were some magazines. But I was not, I was not a victim of, of explicit, you know, abuse. And that's a little surprising to see…I …

Q: Oh, it can be upsetting also.

A: These, these are, it's not that it's upsetting. These are a lot of counts. You know. And it's a little disturbing that I'm actually one of the primary complainants, because the way that it was framed was that you're not a main party to this. Or at least that's what my recollection was.

Q: And how …                                                            15:33.00

A: So, you know, I went through the last, you know, however many years with the understanding that I was a peripheral, a peripheral element to all this. For me, I never really gave it that much thought after the fact. I know what I saw in terms of the computer games and the magazines. And actually that specific recollection was very, very sharp for the Load Me game. But again, that wasn't in the computer class. That was after, after it happened. So, I don't know if that helps you at all, but that's sort of, that's all I can, that is literally all I can remember.

Q: Do you remember….?

A: I never, you know, obviously confidentially between us, I never sought therapy for this. I never went to see anybody. It never affected me in any way. In any significant way. It did when you called me.

Q: How did you feel when I called you? Why, because I know you were very freaked out when I called you.

A: Well, because, because you sent a letter to work. And I found that to be a, a real violation. To be perfectly honest, um, showing up at my house is kind of, it's fairly extreme.

Q: I apologize.

A: No, that's fine. That's fine.

Q: I agree with you.

| | |
|---|---|
| A: The fact that you, the fact that you came all the way over here, though, pretty much conveyed that, you know, if it weren't of significant importance to whatever it is that you're trying to get accomplished, you certainly wouldn't have come all the way, all this way. Right? So for that purpose, I am going to interrupt my dinner with my wife. Who I have to now go back and explain this by the way. So thanks... | 16:57.00 |
| Q: Does she know anything about this? | |
| A: You know I don't think so. I don't think I ever told her about this. I did tell my girlfriend at the time that I was dating, when you, you called me. Because it was, it was fairly traumatic to have that, to have that dredged up. But frankly now that that happened, it's fine. You have the initial shock of it happening. You know, the first time. | |
| Now, you know, um, you're older, you're a little bit more mature. I, you know, to the extent you show me this I can, you know, fill in the blanks for you to the extent that I can. But you know, in all fairness, this is hazy stuff. It is in the shadows, the depths, the recesses of memory. These are the things that stand out. The rest of this stuff? You know, to the extent that they're saying that I'm a primary complainant alleging that I was sodomized, it doesn't say that here. It says that the guy touched his penis to the victim's back. Well if he's wearing jeans and he's bending over somebody, as he's typing on a keyboard, um, you can see how potentially a police officer could take one and manipulate it into another? | 18:12.00 |
| If what you suggest is the case, with exactly what these, these guys were doing, which is taking relatively innocuous things and potentially twisting them into something far worse. | |
| Q: Well a big, big part of this, I think, is, you know, a lot of people feeling like they were a very minor part of the case. And then, you know, nobody, nobody that I've spoken to said, 'Well I know I was the star witness, and these things happened.' They've all said, 'Well I was really peripheral to it.' | |
| A: And I'll tell you why I felt that. When I went into the grand jury, they didn't ask me about any of this stuff. I don't, I don't think. I mean but sure you have access to the grand jury testimony. | |
| Q: I don't. But, but at some point I may. But right now I don't. But the District Attorney does. So. You know, to the extent that I'm telling them... | 19:27.00 |
| A: I think my recollection is they asked me how old I was and what my favorite activities were. That's all I can remember. And I remember the | |

**A-0580**

| | |
|---|---|
| Mineola Courthouse actually being a very intimidating place to go when you're that age. That's pretty much it. | |
| Q: Yeah. Have you ever heard, have you ever heard this 'Keith Doe' before? This …? | |
| A: No, I haven't. This, this is all new stuff. | |
| Q: But even the word, even the name 'Keith Doe', you never thought, 'Oh, that was my 'Doe' name, and Karmal Marchoudi meant 'Keith Doe' or something like that'? | |
| A: No. No. You're sure this is me? | |
| Q: Oh, yeah. | |
| A: Like I guess this is the actual document then? | 20:16.00 |
| Q: Yeah. These are the actual, these are the indictment – the specific pages from the indictment. | |
| A: Well, I'm not sure if that helps you with whatever you're trying to get across. | |
| Q: I think it does. I mean I'm, uh, maybe I have two more questions. One is … do you remember, um, anybody else that you were in class with? Did you have a friend who sat..? | |
| A: Just that kid Blake. That's it. | |
| Q: And you did class, you were in class with him? | |
| A: Um, I ....don't remember. I think so. …. | 21:12.00 |
| Q: And do you think, well I guess the other question is are you…you know, would you be comfortable doing anything more in terms of me being able to, to ….I don't know, interview you in some, in any other way where I can… I don't think I would be any more thorough, but where… | |
| A: To what end? | |
| Q: Um, to have something that, that I would provide to the, to the DA in Nassau County, confidentially, where they would agree not to use it for anything but their investigation. | |
| A: I don't want to get dragged into this really. I understand what you're doing, and you know I, I think it's noble. I think to the extent that there's | |

| | |
|---|---|
| a miscarriage of justice, that I think, I mean, it's a good pursuit. I mean, there's nothing more I can really tell you other than what I just told you. | 22:27.00 |
| Q: Uh huh. | |
| A: And I'm not sure if it's – I, doesn't sound like it's earth shattering or anything particularly… Well you tell me. | |
| Q: It's important, because you know, it's important just at the level… | |
| A: I don't think it's anything different than what I told you before. | |
| Q: What I remember from the last conversation was mainly you saying – I mean you said a lot. 'I don't want to be a part of this', and you know…. | |
| A: That I recall. | |
| Q: You actually said something else interesting. You said, I remember this. You said, you said, 'I don't want', you said, 'I wouldn't want to be involved in this now. Maybe down the road. Maybe fifteen years from now.' You actually said that to me. | |
| A: Did I? I don't remember that. | |
| Q: And you, 'Maybe fifteen years from now' – you actually said 'When I have my own kids.' I don't know if you have your own kids. | |
| A: I don't. | |
| Q: Have you guys been married for a long time or no? | 23:37.00 |
| A: A couple years. No, look. I mean, when you're twenty-two – I don't know, I guess I must have been, yeah, twenty-two? Twenty-three? But uh you came all this way. | |
| Q: No, I… | |
| A: I'm fairly certain that I, I do recall having no interest in getting involved. I didn't then. And I'm pretty sure that that's still the case now. I think to the extent that there's specific information which I don't think you've provided before.. | |
| Q: No, I didn't. Some of this I didn't have. | |
| A: Yeah, you know. Sort of I'm happy to review, which I've done. I can tell you what my recollections were, which I did. What rings true and actually seems to have some sort of basis in reality, which I did. And | |

| | |
|---|---|
| what seems like it was more than likely an exaggeration that was, you know, perpetrated by the police to suit whatever their ends were. Which I also did. | 24:39.00 |

   And you know I'm not sure what more I can, I can do- other than express surprise and shock that I was somebody who was one of the main complainants. That is probably the, that seems, that seems, it seems strange to me that they built a case off of... I mean, to be honest, I was under the impression, until you just mentioned that, that I testified – or not testified, but rather gave evidence – that these guys had these computer games and they had some dirty magazines. And I remember that. And I'm pretty sure that's what I told them.

   And, you know, the other stuff – but I don't, you know, if you're building a federal case out of, you know, those things, and then using it as a building block to be one of the main complainants, that seems very, very surprising. You know, because you're telling me that there were 400 students. Um, I thought there were 400 claimants.

| | |
|---|---|
| Q: Interesting. | 26:14.00 |

A: But that's not based on any fact. I, I just, my impression was that there were, you know, reams and reams of kids out there that had made claims, and that frankly mine weren't even that important in the scheme of things.

Q: No. I want to just, if you don't mind I'm just going to ask my assistant if he will tell me the names of the other kids that were in your class to...

A: I only know that one, and I don't know his last name.

Q: I think it's Blake Feldman. Let me see. Can you....?

A: I think his mother was English. I remember we went to a Mexican place. And I remember hating....

Q: Just because of that game?

A: Yeah. But I don't remember any of the kids from – even kids that were any, that had any part to this. It was, it was just a long time ago. I mean literally we moved back to, from Great Neck to Glen Cove in 1987. So I would have been ten years old. So it's just hard to remember a lot of this stuff, unless it's really something very... you know, which you held onto for one reason or another.

| | |
|---|---|
| Q: Did you, do you remember the experience of being with the cops? Was it pleasant or not? Or were there two of them or four of them? | 27:50.00 |

A: They came when we were redoing our house. In Goren Cove. So I guess we must have just moved in. Um, yeah. I was, I was crying. I'm pretty sure I was crying. Yeah. Yeah. But again, I, you know, other than – yeah, I, I, yeah it probably was unpleasant, if I was crying. Other than that, I don't remember.

Q: Do you remember how many – was it two cops? One cop? Man? Woman?

A: No. No.

Q: Yeah. Yeah. It's a long time ago. Let me see if Carl got back to me.

A: Well look, I've got to get back to my wife.

Q: Well maybe on the way back, if we walk – I'll never find my way back to my car. So if we walk back together....    28:42.00

A: You rented a car here?

Q: No, I have a driver, but....

A: Oh, okay.

Q: But actually, you know what I did? I used, I used Uber.

A: You did?

Q: Yeah. Do you use Uber?

A: Yeah, I use Uber as well.

Q: It's been great.

A: It just started up here.    28:56.00

Q: Yeah. Well I just used my app from the states, and it was like, 'let me see if I open it', and there it was.

A: Yeah, yeah. No, it's, it's just starting up here. It hasn't really taken, but a friend of mine actually started up their London business.

Q: Oh, yeah?

A: Yeah.

Q: It's a good business. They've got forty-two million dollars in venture capital to start that thing. And...

A: For a car service. Can you believe that?

Q: And, and it's not even a car service. It's like basically it's like a very good version of 1-800-Dentist. You know, it's basically like a referral service.

A: That's all it is. Yeah.

Q: But that's ...in Google as a search engine. It could get big. I mean there are actually – oh, yeah. I'll tell you who was in your class: Jonathan Ross. Do you remember him? Blake Feldman.

A: I'm assuming that that's...yeah.

Q: It's the only Blake that we know. Jonathan Goldbert. Brian Tilker. Alan Yaskowitz. Michael Heller. That's interesting that they're....

A: ...hold on. That's, that's it?

Q: No, there were some more. These are the ones that were, these are probably in one of your two classes. I think you took two classes.     **30:00.00**

A: There must have been twenty kids in my class.

Q: Ten, I think.

A: That's it? Ten?

Q: The room wasn't very big.

A: It seemed really big at the time.

Q: And you don't remember the name of any of the other kids? No. But, uh, yeah, so Uber is... wait a minute. Let me see if I got anybody else. Oh, Matthew Katz. ... Dana Fox... Almost done. Darone Nassimi. ... Chris Blaha.

A: Blaha?

Q: Yeah. ... Jaime Forest. And Larry Prado. Which school did you go to?

A: I went to... Lakeville? Lakeville?     **30:46.00**

Q: That was your, it was like your....?

A: Elementary school.

Q: Elementary school.

A: Yeah.

Q: And then did you go to Great Neck North, or no, by that time they were already...

A: No, I was already gone. I was never, it was after the fourth grade.

Q: Yeah. And did you ever follow, like did you ever hear about the Ross Goldstein part of the case, or any of that stuff?

A: You have to understand, after the police were turned away by my parents, it was over. That was it. It never, I wasn't in the community – you know, the community that you referred to and all the issues, I, that just wasn't...actually now, thankfully, in retrospect, I'm, I'm happy that ... that move probably saved me from a lot of angst and getting involved in stuff. But apparently I was involved in it...more than what I believed. But in any case, that was it.

31:30.00

Q: Shall we walk?

A: Yeah.

Q: (moving).....I do have some stuff on this, including a little recording of evidence, stuff that we've been putting together, which I don't need to, I don't necessarily need to show you it, but if you're interested in it, I could...you know, I could leave it for you or something.

32:32.00

A: No.

Q: That's all right. I'm not insisting. I'm just letting you know.

A: No, no, no. That's fine. That's fine. So you were close to the house?

Q: Yeah.

A: Yeah, okay. ....

Q: So what were you, you went, you were at Goldman Sachs. Not when I talked to you. You were probably at NDR or something. What was it called? The first, you were like a ...When I talked to you, you were at Goldman, right. You were like a junior analyst or something.

**A-0586**

| | |
|---|---|
| A: Yep. Yeah. I actually just left a couple years ago. Long career in the fudge factory. | 33:00.00 |
| Q: What did you think of the whole, just all the Goldman drama? The guy that wrote the letter? He was a, he was a UK guy. | |
| A: I haven't read the book yet. Yeah, he probably would have been on the other side from me, of the floor from where I was sitting here in London. I haven't read the book. That place as been so maligned. And you know what? I think there's some element of having lost its way a little bit. And I think it's probably not a bad thing.. | 33:34.00 |
| Q: To be chastened a little bit? | |
| A: Yeah. But I think...ended up being.... For a lot of people...on balance that is what they, they're very good at what they do. I don't think there's some sort of evil premise to the core of the institution. | |
| Q: Yeah. I mean I think what's unfortunate about it is just that, you know, and I was friendly with Bob Rubin. He was like, he was like my sort of ... | |
| A: Don't get me wrong. There's stuff, you know, at Goldman, like any investment bank. Which, which isn't great. But I think a lot of it is just having taken a commercial interest to the degree that probably didn't necessarily serve the ultimate mission objective of the organization as well as it probably did at the time that, you know, Bob Rubin was running it. I think that, you know, making money above all else, as opposed to serving your clients. Was there that going on? Yeah. That was part of it. So.. | |
| Q: Well, the other thing is, though, that you have these, you know, it's sort of like Mike Tyson. You know. It's like you train these people to fight. You train them to be totally bloodthirsty. They got the wart and they have the most intense competition. And then, you know, and then you're going to have some really macho guys who are saying 'Yeah, I dinged that customer, and I did this, and I did that.' And that's how guys, that's how guys are. That's how they talk. That's how...you know, it's like, and then, and then later you say, 'Well that shows that they were the culture that was completely bankrupt.' And I think neither thing is true, you know? | 35:12.00 |
| A: Actually yeah. It wasn't, ...it's amazing, because I thought the culture was extremely tame from what I heard from other investment firms. | |
| Q: Yeha. | |

A: Not much at all. It was more just the alignment of interests, and the focus on ….

Q: Well it's interesting, because there's a …there's a tendency I think for people to…You know, when Wall Street's going well, everybody's like, 'I want to be like Goldman Sachs.' And then when Wall Street is going not as well, people say 'I got ripped off', or 'They took my money.' I don't know if you ever saw that, there was a guy called Heinrich de Kwuiakowski. He was a big client of Bear Stearns. And he was a huge speculator. Like really big time speculator. He was very wealthy. He owned this house in Conyers Farm in Greenwich that he sold for $100 million.

36:13.00

And so he was like a real, you know, just big time speculator. And he made a bet against the dollar. Or in favor of the dollar. Something like that. He bet a lot of money. And got killed. And he lost like $120 million or something. And he filed suit against Bear Stearns. This is probably a decade ago. He filed suit against Bear Stearns saying that was basically an unsophisticated investor and that they didn't tell him at the time that he was betting on the dollar. That they were coming out with a research report, you know, a month later that was going to say that they thought the dollar was going to go down. As if somebody knows that the dollar is going to go down, and the dollar is going to go up.

And he had this huge lawsuit about it, even though that's exactly the same guy that was, that was buying $100 million house in Greenwich because he was such a sophisticated investor that he knew just what he was doing. And I think, you know, it's tough, because investment banks are the, you know, they're the house in a lot of ways. Nobody says, 'They should have, they should have known I was a babe in the woods.'

But it's also true, probably part of the invisible hand is that, you know, if you're Goldman Sachs, you're going to, you're going to have to be made an example of. And there's going to be somebody in the organization who's going to help it happen. At some level. And it wasn't, you know, it's not fatal to the organization either.

37:40.00

A: This your car?

Q: Uh, I think it is. It might be my Uber. Yeah, it's my Uber. Hey, I really appreciate it. I know this is not your expected activity.

A: Yeah. Yeah.

Q: But you're a man of your word. I told you if I came to …You said, 'If

A-0588

you need to find me, do it at home.' So I did it at home.

A: Yeah. No, I ....remember that was...I appreciate....(too low to hear) ...You've got to realize ...a letter to somebody at their place of business, especially when their place, you're working at a place like Goldman and you're reading, you know, something like what you sent, it's extremely shocking.

38:40.00

Q: Yeah, I realize that now. I think I realize that better now than I did ...plus also when you were fairly new in the, you were like new to the workplace at the time.

A: Exactly. Exactly. So you're kind of looking this way, and you're looking that way. And you're thinking to yourself, 'Is this really happening?' And 'How the hell did...?'

Q: Did they find me?

A: '...they find me? And why are they contacting me if I'm some peripheral guy in this whole thing?' Right? So now I understand exactly why you were interested at the time. But I've, literally, I don't, I don't have any other recollections than what I told you. I hope it's helpful. I don't want to be involved, because I just, I don't see what purpose it would serve at this stage, given, you know, I don't know. Maybe there is some sort of purpose. But in any case, I'm not there. I'm here. And frankly I really don't have an intention of actually going back. And you never know where life takes you.

Q: You like it here.

A: Well, you know, this doesn't make it easy, but...

Q: What? The weather?

39:53.00

A: Yeah. Yeah. You know, I think, I mean I don't know where life is going to take us, but I'm fairly certain, at least for now we're happy here.

Q: Do you mind if I e-mail you? If I need to....tell you anything. I'm not going to, I won't go out of my way to find an opportunity.

A: Um...

Q: But I'd rather have the right e-mail address.

A: Look, I just don't want to, I don't want to have – I don't need to be updated. I don't...

**A-0589**

| | |
|---|---|
| Q: All right. I understand that.<br><br>A: I don't need any of that. But I'll tell you what. If you, if you absolutely, you know, need to reach out to me, you can send me an e-mail. I'll give you my, my personal e-mail. But I just don't have any….<br><br>Q: Yeah, I know. I get it.<br><br>A: And I think you understand that from my previous reaction, kind of where I am now in life and all that stuff. But to the extent, you know, it's helpful to you in what you're doing, which ….I've already done, so I'm happy to…<br><br>Q: Yeah, tell me your e-mail.<br><br>A: It's my first name. Dot my last name. @mac.com.<br><br>Q: All right.<br><br>A: I do not want to receive anything from the District Attorney of Nassau County. No e-mail from my…<br><br>Q: No, I won't share, I will not share, I won't share this with anybody.<br><br>A: So it's for you. You made a big effort to come out here. So. Thanks.<br><br>Q: Okay. Have a good day.<br><br>A: Yeah.<br><br>Q: …Thank you….No problem. I'll leave you my …I will send you an e-mail just telling you my phone number. So. If you need me. Thanks, Kamal.<br><br>END OF INTERVIEW | 40:35.00<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>41:30.00 |

# Destruction of Innocence

**The Friedman Case:  How Coerced Testimony & Confessions Harm
Children, Families & Communities for Decades
After the Wrongful Convictions Occur**

Gavin de Becker
Senior Fellow, UCLA Luskin School of Public Affairs
Author, *The Gift of Fear*

Emily Horowitz, Ph.D.
Associate Professor of Sociology & Criminal Justice, St. Francis College
Director, National Center for Reason and Justice

March 2013

A White Paper of
The National Center for Reason and Justice

www.NCRJ.org

**A-0591**

## Table 1. Friedman Case in Context of Similar Convictions During the Child Sex Abuse Hysteria

| Last Name | First Name | Age | State | Sentence | Convicted | Exonerated | False Confession | Perjury or False Accusation | Official Misconduct |
|---|---|---|---|---|---|---|---|---|---|
| Kniffen | Brenda | 29 | CA | Life | 1984 | 1996 | | Y | |
| Kniffen | Scott | 28 | CA | Life | 1984 | 1996 | | Y | |
| McCuan | Alvin | 28 | CA | Life | 1984 | 1996 | | Y | |
| McCuan | Deborah | 25 | CA | Life | 1984 | 1996 | | Y | |
| Aldridge | Robert | 24 | OH | Life | 1985 | 1997 | | Y | Y |
| Algarin | Albert | 21 | NY | 25-50 years | 1985 | 1990 | | Y | |
| Baran | Bernard | 18 | MA | Life | 1985 | 2009 | | Y | Y |
| Cox | Richard | 47 | CA | Unknown | 1985 | 1991 | | Y | Y |
| Cox | Teresa | 17 | CA | 10 years | 1985 | 2000 | | Y | Y |
| Dill | Grace | 50 | CA | Life | 1985 | 1991 | | Y | Y |
| Dill, Jr. | Wayne | 26 | CA | Life | 1985 | 1991 | | Y | Y |
| Forsythe | Colleen | 26 | CA | Life | 1985 | 1991 | | Y | Y |
| Forsythe | Wayne | 28 | CA | Life | 1985 | 1991 | | Y | Y |
| Grafton | Margorie | | CA | 16 years | 1985 | 1990 | | Y | |
| Hubbard | Donna | 30 | CA | Life | 1985 | 1995 | Y | Y | Y |
| Miller | Gina | | CA | Life | 1985 | 1991 | | Y | Y |
| Palomo | Tim | | CA | 14 years | 1985 | 1990 | | Y | Y |
| Pitts | Marcella | 29 | CA | Life | 1985 | 1991 | | Y | |
| Pitts | Ricky | 31 | CA | Life | 1985 | 1991 | | Y | |
| Ramos | Alberto | 21 | NY | 8-25 years | 1985 | 1994 | | Y | Y |
| Stoll | John | 41 | CA | 40 years | 1985 | 2004 | | Y | |
| Taylor | Ruth | 31 | CA | 6 years | 1985 | 2001 | | Y | Y |
| Weimer | Howard | 57 | CA | 42 years | 1985 | 2005 | | Y | |
| Wilcox | Jennifer | 20 | OH | Life | 1985 | 1997 | | Y | Y |
| Beauchamp | Franklin | 27 | NY | 25-75 years | 1986 | 1989 | | Y | |
| Dove | Gayle | 41 | TX | Life | 1986 | 1989 | | Y | |
| Grady | Nathan | 43 | NY | 45 years | 1986 | 1997 | | Y | |
| Modahl | Jeffrey | 29 | CA | 48 years | 1986 | 1999 | | Y | Y |
| Snowden | Grant | 38 | FL | 50 to Life | 1986 | 1998 | | Y | |
| Torres | Jesus | 29 | NY | 25-40 years | 1986 | 1990 | | Y | |
| Amirault | Violet | 59 | MA | 20 years | 1987 | 1998 | | Y | |
| Craig | Sandra | 37 | MD | 10 years | 1987 | 1991 | | Y | Y |
| Friedman | Jesse | 18 | NY | 6-18 years | 1988 | X | Y | Y | Y |
| Michaels | Kelly | 22 | NJ | 47 years | 1988 | 1994 | | Y | |
| Broam | Jack Ray | 29 | NV | Life | 1990 | 1998 | | Y | |
| Manning | Jay Cee | 28 | NV | Life | 1990 | 1998 | | Y | |
| Kelly | Robert | 40 | NC | Life | 1992 | 1997 | | Y | |
| Wilson | Kathryn | 22 | NC | Life | 1993 | 1997 | | Y | |
| Cunningham | Henry | 46 | WA | 47 years | 1994 | 1999 | Y | Y | |
| Cunningham | Connie | 43 | WA | 46 years | 1994 | 1997 | | Y | |
| Everett | Idella | 41 | WA | 4 years | 1994 | 1998 | Y | Y | |
| Everett | Harold | 65 | WA | 23 years | 1994 | 1998 | | Y | |
| Town | Meredith | 36 | WA | 20 years | 1994 | 2000 | Y | Y | Y |
| Christopher | Dayna | 16 | WA | 21-28 weeks | 1995 | 2000 | Y | | |
| Doggett | Carol | 36 | WA | 10 years | 1995 | 2000 | | Y | Y |
| Doggett | Mark | 35 | WA | 10 years | 1995 | 2000 | | Y | Y |
| Gausvik | Ralph | 39 | WA | 23 years | 1995 | 2000 | | Y | Y |
| Green | Doris | 34 | WA | 23 years | 1995 | 1999 | Y | Y | Y |
| Rodriguez | Manual | 36 | WA | 5 years | 1995 | 2000 | | Y | Y |
| Rose | Michael | 25 | WA | 23 years | 1995 | 2000 | | Y | Y |

*Information for all cases other than Jesse Friedman is drawn from The National Registry of Exonerations, University of Michigan Law School and Northwestern Law School, 2013.*

| Case Characteristics | Table 2: A Sampling of Prosecutions During the Child Sex Abuse Hysteria | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Kern County (CA) | McMartin (CA) | Baran (MA) | Grant Snowden (FL) | Fells Acres (MA) | Bronx 5 (NY) | Michaels / Wee Care (NJ) | Friedman Case (NY) | Bobby Finjie (FL) | Little Rascals (NC) | Dale Akiki (CA) | Wenatchee (WA) |
| Year of First Arrest | 1982 | 1983 | 1984 | 1984 | 1984 | 1984 | 1985 | 1987 | 1989 | 1989 | 1991 | 1995 |
| Year of Conviction | 1984 | X | 1985 | 1986 | 1986 | 1986 | 1988 | 1989 | X | 1991 | X | X |
| Year of Acquittal | 2004 | 1990 | 2009 | 1998 | 1999 | 1996 | 1993 | X | 1991 | 1999 | 1993 | 2000 |
| # Abuse Allegations of PRIOR to Police Investigation | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 |
| # of Counts AFTER Investigation / Therapy | 300+ | 300+ | 10 | 5 | 18 | 100+ | 163 | 300+ | 7 | 100+ | 52 | 29,000+ |
| Suggestive Questioning | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Group Parent Meetings | | | Yes | | Yes | | | Yes | | Yes | Yes | |
| Multiple Adults Charged? | Yes | Yes | No | No | Yes | Yes | No | Yes | No | Yes | Yes | Yes |
| Multiple Child Accusers? | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Outrageous Charges? | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Sex Games? | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Hypnosis? | | Yes | | No | Yes | | | Yes | | | | |
| Recovered Memories? | Yes | Yes | Yes | No | | Yes | | Yes | Yes | Yes | Yes | Yes |
| Medical Evidence? | No | No | No | No | No | No | No | No | No | No | No | No . |
| Physical Evidence? | No | No | No | No | No | Yes | No | No | No | No | No | No |

## I)     Introduction

In the late 1980s, Long Island teacher Arnold Friedman provided after-school computer classes to children at his home.  He was often assisted by his teenage son Jesse, and together they conducted hundreds of classes over a three-year period.  Students enrolled for the classes again and again, their parents visited often, and other parents attended evening courses in the same classroom.

Having sent so many of its children to these popular classes, the community of Great Neck was stunned when in 1988 the Friedmans, along with a 17-year old high school friend of Jesse's named Ross Goldstein, were charged with hundreds of violent sexual crimes against children.

Nearly two decades later, after Jesse and Arnold Friedman had been imprisoned for years (Arnold died there), and Goldstein had served a shorter prison term, the United States Court of Appeals for the Second Circuit conducted an extensive review of the case.  They found "a reasonable likelihood Jesse Friedman was wrongfully convicted," and concluded that his guilty plea had been elicited by a biased judge using strategies that were "impermissibly coercive."

Though barred from imposing a legal remedy, the Court made clear it was unwilling to stand by and do nothing:

> *"An appellate court faced with a record that raises serious issues as to the guilt of the defendant and the means by which his conviction was procured, yet unable to grant relief, is not obligated to become a silent accomplice to what may be an injustice."*

Indeed, the Court was anything but silent, expressing an extraordinary series of unequivocal opinions about the prosecution and conviction of Jesse Friedman:

> *"In this case, the quality of the evidence was extraordinarily suspect."*

> *"The police, prosecutors, and the judge did everything they could to coerce a guilty plea and avoid a trial."*

> *"The allegations also grew increasingly bizarre, sadistic, and even logistically implausible."*

> *"Detectives generally entered an interview with a presumption that a child had been abused and refused to accept denials of abuse."*

> *"This strategy was designed to force children to agree with the detectives' story."*

About such cases of mass child sexual abuse in general, the Court expressed a powerful opinion:

> *"The prevailing view is that the vast majority of traumatic memories that are recovered through the use of suggestive recovery procedures are false, and that almost all —if not all— of the recovered memories of horrific abuse from the late-1980's and early-1990's were false."*

**A-0594**

Between 1984 and 1995, at least seventy-two individuals were convicted in nearly a dozen major prosecutions for mass child sex abuse and satanic ritual abuse. **Almost all the convictions have since been reversed.**

**Table 1** shows Jesse Freidman's case in the context of 50 convictions that occurred during the hysteria of mass child sex abuse cases. Though the methods of prosecution of these cases match in all substantive regards, Jesse's conviction is the only one that has not been overturned. **Table 2** shows a sampling of similar cases with a more detailed view. Here again the methods of prosecution match, and Jesse's conviction remains the only one not overturned.

To be clear, sexual abuse of children does happen, and with alarming frequency. Author de Becker has spent his professional life working to understand and combat the strategies used by child predators. As his books report, one in three girls and one in six boys will have sexual contact with an adult. It is evident that many real offenders exist, and are committing pernicious crimes.

At the same time, false and hysteria-driven prosecutions like those that swept the nation in the 1980s and 1990s rob resources from prosecutions of actual sex crimes, reduce the public's faith in the legitimacy of such prosecutions, and interfere with the protection of children.

Looking at just the Friedman case, observers face a challenging question: How can the justice system produce a case that alleges hundreds of counts of sodomy, gains guilty pleas and sweeping admissions from the defendants, and ends with convictions and prison terms – and then see that same case completely unravel under later scrutiny?

First, since the Friedman case never went to trial, the allegations were never exposed to the light of an objective judicial process. Absent a trial, even preposterous allegations can be credited without being tested or challenged. Absent a trial there is, in effect, no defense mounted. There is only surrender.

Just as the defendants are forced to surrender, so too are the child witnesses and their parents. The impact on wrongly-imprisoned defendants is obvious, however the impact on hundreds of children has rarely been considered.

Initially sure they were *not* sexually abused, and confident in their perceptions of reality, these children are dragged to a place of confusion, mistrust of adults, and uncertainty about themselves and the world. Many children who were persuaded against their will and against their own perception and intelligence to believe they were sodomized never regained a foundation of confidence in their own perceptions. The Friedman case is rare among the others in that today, there is an opportunity to heal the wounds of confusion and deceit.

## II) Background of the Friedman Case

Jesse Friedman was 18 and in his first semester at college when his father Arnold was charged with receiving and sending a pornographic magazine through the mail. After learning of Arnold's arrest in connection with the magazine, and then learning he taught after-school computer classes for children, the Nassau County police launched an investigation to determine if any of the students were victims of sexual abuse.

2

**A-0595**

This was at the height of the sex abuse panic, when many believed that an epidemic of abuse perpetrated in public settings by multiple adults against multiple children en masse (e.g. daycare centers, schools), was sweeping the country. The most famous of these cases, the McMartin Preschool case, started in 1983 and was still being aggressively investigated when Nassau County police began to question students who attended computer classes in the Friedman home. Other highly publicized prosecutions were ongoing or had already resulted in convictions (Kern County, Country Walk, Fells Acres, Bernard Baran, Kelly Michaels, and the Bronx Five).

In the Friedman case, when police visited parents of the computer students and informed them that the teacher had purchased child pornography, panic ensued. Despite the fact that prior to contact with police, no students had ever made complaints of any kind, and despite the lack of any medical or physical evidence, a perfect storm of community hysteria, police, prosecutorial, and judicial misconduct, biased and financially-incentivized mental health professionals, and the use of now-debunked suggestive questioning techniques led to hundreds of false allegations of sexual abuse. In a misguided effort to help Jesse Friedman escape incarceration, his father pled guilty to multiple charges. Soon after, police aggressively coerced Ross Goldstein, a high school friend of Jesse's, to testify against Jesse in exchange for receiving a 6-month jail sentence (a deal on which the judge later reneged, and which an appeals court reinstated after Goldstein had been incarcerated for more than a year, and been diagnosed with cancer). Simultaneously, Judge Boklan improperly threatened that if Jesse refused a plea offer and went to trial, she intended to apply "maximum" incarceration via "consecutive sentences" totaling 50 years -- a technique now found to be impermissibly coercive[1].

Overwhelmed by the idea of going to trial, and facing the probability of a life sentence, 18-year-old Jesse falsely confessed as part of a plea deal. Sentenced to 6-18 years in prison, Jesse served 13 years, and was released on parole in December 2001. To this day, Jesse Friedman remains classified for life as a "Level III Violent Sexual Predator;" a scarlet letter that in practice denies Jesse and his wife Elisabeth the opportunity to have children of their own.

Unlike many of the other people charged with mass sexual abuse during the national hysteria, Jesse's father Arnold actually had ordered pornographic magazines depicting children. Thus, there was some legitimate basis for police to be concerned and to investigate Arnold Friedman. But why Jesse? Why did police and prosecutors commit so much energy to charging Jesse?

The answer is likely a logistical one: Jesse was present at the computer classes in which police allege Arnold abused children out in the open. Since Jesse was present, he must be either a witness or a suspect. If he is a credible witness saying he never saw any sexual abuse, the detectives have no case against Arnold, whom they know bought child porn and taught classes to young children in his home. However, if Jesse is also charged with molesting the children, the case against Arnold is not only intact, but improved. With Jesse as a suspect, neither father nor son could testify to the benefit of the other, and charging Jesse provided leverage that compelled Arnold to plead guilty. In the simplest terms, since Jesse was in the room, he had to be charged.

Renewed public attention to the case came in 2003, when director Andrew Jarecki released the landmark film *Capturing the Friedmans*, an Academy-award nominated documentary that cast

---

[1] Peter Panaro interview, 6/11/12.

3

doubt on the prosecution's case. Research conducted by Jarecki and his producer, Marc Smerling, both before and since the release of the film, uncovered new information, including material the prosecution had illegally withheld from Jesse's defense attorney.

The unprecedented ruling of the US Court of Appeals included direction that the Nassau County District Attorney undertake a review of the case to determine if the conviction should be set aside. Presumably to help offset the institutional bias inherent in having a DA's office review a case it had itself prosecuted, the District Attorney appointed a panel that was allowed to review some material in the case. However, the panel was given no decision-making authority, and did not receive key materials in the case, including grand jury minutes.

Of the 480 students who police said were in classes with Jesse Friedman and likely molested, inexplicably only 14 were ever put forth as complainants in the case. As of this writing, Jarecki and Smerling have spoken with 10 of these 14, with striking results: Three of them have recanted their prior testimony outright, one has no memory of ever being abused, and another admits he had no recollection of abuse until after undergoing now-discredited "memory-recovery" techniques including hypnosis. Five additional students who were allegedly victimized were unable or refused to substantiate accusations attributed to them by police.

The filmmakers interviewed 11 additional students who attended computer classes alongside the complainants: Each of these witnesses categorically states that he saw no abuse, even though according to the police version, their classmates had been violently molested "in plain view[2]" of the rest of the class.

In summary, the statements of these computer students directly contradict the statements of *every one* of the original 14 complainants.

**III)   Moral Panic About Child Sex Abuse**

In order to fully understand the Friedman case, we must view it in the social and historical context of a "moral panic." Sociologist Stanley Cohen (2002), a leading scholar in this arena, includes child sex abuse panic as a classic example of a moral panic (pp. xvi-xix). Legal scholar Steven Grossman (2011) also applies Cohen's moral panic concept to the mass child sex abuse cases of the 1980s/1990s but instead calls them "hot crimes." Grossman argues that the child sex abuse hysteria is a typical "hot crime" – a form of moral panic that emerges when criminal justice problems that have been ignored or underestimated come to the forefront of social consciousness. The crimes suddenly become "hot," causing a surge of public panic.

Child sex abuse was not defined as a social issue until 1977, when the U.S. Congress held its first hearings on the topic. There are two key historical reasons for the emergence of child sex abuse as a major social issue. First, the 1970s saw an increased awareness of all crimes involving women and children, including rape, domestic violence, and child abuse. Second, many more women began entering the work force, a shift that deepened fears about changing cultural values and the role of women in the family.

---

[2] Detective Galasso interview, 2/28/01.

A related social change was the substantial increase in the use of daycare services: Between 1940 and 1989, the percentage of children who needed alternative childcare rose from 8 percent to more than 50 percent (de Becker, 1999). Many parents experienced strong feelings of guilt and even fear about giving their kids over to the care of others -- feelings naturally stimulated by stories of child sexual abuse at the hands of a caretaker.

As Nathan and Snedeker note in their groundbreaking study of the child sex panic, social conservatives like Anita Bryant ran public campaigns accusing gay men of being child molesters, and others claimed that gay men kidnapped children, turned them into homosexuals, and produced massive amounts of male child pornography. These terrifying notions resulted in "sex abuse researchers and law-enforcement officials....promoting the idea of rampant, conspiratorial cabals of men bent on sexually abusing youngsters" (Nathan & Snedeker, 1995, pp. 43-44). Researcher Ann Burgess coined the term "sex rings" for these supposedly massive, cult-like, underground networks of men; in the early 1980s, these mythic groups were taken seriously by law enforcement, despite the absence of real evidence. These senseless myths captured the public imagination and persist today, even though we now know that nearly all perpetrators of child sexual abuse are heterosexual men (de Becker, 1999).

Sociologist Joel Best (1990) studies how child-victims first emerged as a "central, visible theme in debates about social problems" (p. 6). Best notes that when the term "child sexual abuse" replaced incest and child molestation, it prompted the evolution of a cadre of experts who saw themselves as advocates for child-victims of such abuse. Soon, he writes, child sexual abuse began to terrify the American public, accompanied by horrifying and unsubstantiated statistics and fiery rhetoric about the extent of sexual abuse and child pornography. He attributes much of this hysteria to the rise of the fundamentalist Christian agenda, which sought to characterize all those outside the family – such as teachers and daycare workers – as threats to child safety and the family (Best, 1990). Nathan and Snedeker (1995) agree with Best, noting that the growth in demonology and myths about the extent of the problem of missing children, cut-backs in social programs that actually benefitted children, as well as the "frustrations of feminists [and] child-protection workers" (p. 50), were the final straws that allowed the country to fall into a full-fledged irrational panic about child sex abuse.

A public that had never seen child sex abuse anywhere started to see it everywhere. Grossman (2011) notes that "reaction turned into over-reaction and remedial measures became excessive (p. 34)." Soon child sex abuse became a focus of research, scholarship, and an area of expertise in both social work and mental health. The first academic articles appeared in 1977 (in the journal *Victimology*), and that same year the journal *Child Abuse & Neglect* was formed, publishing their first articles on child sex abuse in 1979. The criminal justice system soon followed suit. Prosecutors had theretofore been hesitant to prosecute sex crimes based solely upon accounts from child witnesses, but they soon reversed this approach and, as Grossman (2011) notes, launched investigations "with the premise that children never lied about being sexually abused, and that if a child claimed to be sexually abused, the job of the investigator was to verify that fact" (p. 68). For example, the far-reaching McMartin case was triggered by just one allegation – a bizarre, illogical, and unsubstantiated story of child sexual abuse, told by a schizophrenic parent.

As Grossman (2011) aptly concludes, the child sex panic happened when,

> ...overly eager police with the help of overly eager 'child therapy professionals' feed the results of their efforts to crusading prosecutors who charge criminal defendants based on evidence obtained in a highly suggestive manner and often not supported by physical or other evidence. Evidence that points to any conclusion short of child abuse is either ignored or covered up. The media plays up the cases in ever more horrifying ways, inciting the public and leading to even more questionable prosecutions. From such things, societal excess is born and nurtured (p. 42).

When we hear about a case of mass sexual abuse, meaning one in which many children are victimized at the same time in the same place, *in the open*, by one or more adults, and when we hear descriptions of the unbelievable, often ritualistic, satanic, and sadistic things that are alleged to have happened to the children, there is a good reason we are incredulous: It is because we know intuitively (and experts know empirically) that the cases don't pass the Red Face Test. Child sexual predators do not operate in the ways purported in these cases. The very nature of effective predation is that it requires secrecy, privacy, and a strategy for persuading victims to cooperate.

Every predator able to accomplish sexual assault or rape requires two key advantages: Privacy and Control (over the victim and the environment). Privacy is defined here as isolation or concealment. In the context of child sexual abuse, "a private place is one in which there is little or no chance that a third party will suddenly show up, a place that is out of range of the hearing by people who could detect what is going on" (de Becker, 1999).

The open classroom at the Friedman house meets none of these time-tested criteria. In addition to the fact that the room is full of students, any one of whom might object to mass sodomy and resist it or report it, there is the equally pressing matter of parents who arrive at unpredictable times. Next, there is the fact that there are frequent visitors to the active house, including parents of children attending the computer classes. Finally, there are large windows at ground level that provide a generous view to anyone standing outside or walking past. This situation hardly presents a place that guarantees privacy.

Further, when one places the alleged acts within the four walls of the room, the scenario put forth by police is -- just as the Court of Appeals found -- "logistically implausible." The indictments describe mass sodomy taking place in this room, including a game of naked leapfrog in which three or four adults allegedly "leap" from small boy to small boy, anally penetrating each one – all in full view of other simultaneous victims, all in view of the windows, and all in an unlocked environment likely to be visited at any moment by parents. The scenarios described in the indictments require us to accept a preposterous situation: A group of naked offenders and a full classroom of child victims, also naked – meaning that to avoid being caught in the criminal act when an unexpected visitor arrives through the unlocked door, everyone would have to get dressed, resume their natural demeanor, conceal any upset, retake their chairs, and return the room to apparent normalcy – in an instant. See Figures 1 and 2 for a rendering of the classroom where such magic would have to occur.

6

**A-0599**



Figure 1: Computer classroom in the Friedman home.



Figure 2. View from outside classroom.

Friedman and its many analog cases describe a kind of sexual predator that does not actually exist, one who molests a group of victims simultaneously and en masse, in an open area, in concert with a group of other predators, doing things that sexual predators do not actually do, and taking risks that sexual predators do not take.

7

**A-0600**

Why are descriptions of these cases always so newsworthy, so extraordinary – and so hard to believe? It is because they do not actually happen. If someone with no knowledge of these cases were asked to review the allegations, they might describe them as being so fanciful and unrealistic, it's as if children invented them. In fact, children did partly invent them. The preposterous nature of the charges derives from the tortured way in which they were elicited: A team of adult police officers unsupervised in multi-hour, multi-visit sessions with a pre-pubescent child, and suggesting sexual crimes children have no language to talk about or understand, cajoling the child to re-articulate the scenarios in his own words. What emerges is a twisted language that is a hybrid of pornographic adult imagery and childish fantasy. In the words of Ron Georgalis, one of the alleged Friedman victims, "The very nature of these charges is so absurd. It seems almost like some kind of grotesque fantasy."[3]

The reports that result from these interrogations derive from police detectives who are naturally jaded through their experience with adult criminal behavior, and innocent children, naturally creative and eager to please their inquisitors – authority figures the children have been encouraged by their parents to satisfy.

The images conjured up by this process appear warped to us because we are indeed seeing them through a carnival mirror that bears no relation to reality.

Butting up against their inability to resist or understand, and not having the language to satisfy their adult interrogators, the children often draw upon their limited universe of experience, and upon stories they've heard. For example, after repeated visits and hours of questioning by police and parents, one student in the Friedman case finally "disclosed" a story that satisfied police: He suddenly remembered a series of new adult "accomplices" in the Friedman computer classes, including an intimidating man called "Snake," who had visible tattoos.

The story of Snake was as vivid as a Hollywood movie, and with good reason: The popular film *Escape From New York*, released in 1981, some years before the Friedman case erupted, prominently featured an intimidating man called Snake, who had visible tattoos. The character, played by Kurt Russell, gained a cult following that eventually led to production of action figures and comic books, and a parody on *The Simpsons*.

Notwithstanding Snake's fictional origin, the student's fantastical remark resulted in a futile search for this additional adult perpetrator, who was said to have pulled down the pants of a student. The Snake story opened a new chapter in the Friedman case, even though the student named said no such thing happened to him, and recalled no one named Snake.

In California's Modahl case, recordings found years after the conviction shed light on otherwise secret interview strategies, presented in the documentary film *Witch Hunt* (Hardy & Nachman, 2008) and used in this instance on a 6-year old girl:

> Interviewer: Okay, did that happen before they tied you down, or after, or do you remember?

---

[3] Ron Georgalis interview, 3/16/02.

A-0601

Child: It happened after.

Interviewer: After. After he tied you down. What did they do, get on the bed and just put it right in your mouth?

Child: Uh huh.

Observers (including judges and juries) are often impressed by the remarkable detail attributed to children in reports of police interviews. The kids seem to remember times, dates, and places better than adults do; a passage from this interview shows how such detail is sometimes created:

Interviewer: Now Teresa, the last time it happened was in the summer of 83 at grandma's house in Cottonwood. The time before that, when was it?

Child: I don't remember.

Interviewer: Was it like weeks or days?

2nd Interviewer: When I asked you before you told me that it happened often on and off between the first time it started in 1980 until the summer of 83, you told me. Do you remember how frequently you said it happened? You said not every week, but how often?

Child: About once a month (Hardy & Nachman, 2008).

The tape of this interview was proof of the flawed questioning techniques that led to many wrongful convictions. The California Attorney General's Office sent dozens of investigators to review these prosecutions of mass child sexual abuse, and after months of analysis they issued a report citing substantial problems associated with interview techniques. Attorney General Van de Kamp himself has since said:

In a sense the investigators [are] telling the children what happened, and the children saying Yes and whatever, and sort of being led into statements rather than saying: What happened? Did anything happen? (Van de Kamp, September 1996)

The Friedman case also contains many examples of now-discredited interview strategies, including those used on computer student Gary Meyers. A tape recording made by the boy's mother and later transcribed by Jesse's lawyer Peter Panaro, revealed exactly what was said in this revealing interview.

Two detectives, who directed Gary Meyers' mother to leave the room, pressured the boy to admit he was a victim of sexual abuse. Straying disastrously far from simply asking the boy questions, they tried in numerous ways to persuade Gary Meyers to make admissions. The boy's first statement is clear:

Child: I didn't see it. I didn't hear it.

The detectives then take turns making their most persuasive arguments, beginning with: "We've had kids who stated that they saw you and that you're involved, OK?"[4]

This approach has two desired effects:  First, by telling the child that others have said it, they employ peer pressure, to make the child feel left out if he doesn't agree with the allegations. Second, by letting him know that he is not the only one to disclose abuse, they are diffusing the responsibility, which might allow a weaker-willed boy to give false statements, comforted by the idea that he is just confirming statements already made by others, not making any novel accusations himself.  In both effects, the child is likely unaware the police often lie to elicit a statement, so the children are responding to a false premise.

Next, they told the boy three times that Arnold Friedman confessed in open court, and asked him, debate-style, what he, "as an intelligent human being," would say to that.  They next assured the boy three times that there wouldn't be further charges in any event (another blatant falsehood since the entire purpose of the interview was to elicit further charges), and told him twice "There's no axe to grind here."  Acknowledging that before the investigation, "Not one child came forward" to report abuse, one of the detectives proposed an explanation as to why kids never told anyone: "They were blackmailed."  He explained that if an abuser "took photos and took notes and told you if you said anything to anyone you would be in worse trouble because they would show the picture.  What if the person was seven or eight years old... Could you imagine a copy to your mother, a copy to a smut magazine with the name and address to show that you were a pervert?"

When Gary Meyers wasn't persuaded, one detective became angry.

> Detective: I think you're very funny... you're reasonably intelligent, I wouldn't say you're a genius but you are reasonably intelligent.  Arnold Friedman stipulated in court that he sodomized a large number of children!

> Child: No.  He never touched me.

> Detective: Oh, it happened to everyone else, but not to you?

The detective kept arguing: "You'll find out as you get older that certain things are true, certain things are lies. You denying this doesn't mean it didn't happen."

When one detective added "A lot of boys seem to have concerns about their own sexuality," the other picked up the theme more forcefully:

> What about a homosexual act over a period of years?  Formative years?  Would you consider that having an effect on a person's sexuality?  Do you think that determines if you are a homosexual?  If a person was involved in a homosexual act during preadolescent years after they are forced out of it, do you think they would like it?

---

[4] Gary Meyers interview, 5/23/12.

**A-0603**

When the boy rejected this argument, the detective escalated to an intimidating and accusatory presentation that included dire warnings about what would happen to the boy if he did not admit being victimized:

> Well guess what? You are absolutely wrong. Most children who abuse children have been abused themselves. It's a monster created within you, this little monster inside you, this little voice. And every now and then it rears its ugly head unless the victim knows enough about the problem to get himself straightened out. If suppressed, it's a two-fold problem. One is anger and frustration. And the other is acting itself out. It's a no-win situation unless the person goes and gets help and admits that he was victimized. If something bad happens even though it's not the kid's fault, the child blames himself and feels tremendous guilt. We find with help that they can see it's not their fault. And then they place the blame on the person who created the situation, and then they are a lot better off... You're a super smart intelligent individual. You'd have to be an idiot not to see this.

Eventually, the detectives stopped arguing, and asked a few direct questions. They received direct answers:

> Detective: Did you ever see any porn magazines?
>
> Child: No.
>
> Detective: Did you ever go to any other room in the house?
>
> Child: Yes.
>
> Detective: What room?
>
> Child: Jesse's bedroom to play with the Commodore computer. And nothing happened.
>
> Detective: Did you ever see a magazine called *Gallery Magazine*?
>
> Child: No.

Finally, a detective called the boy's mother back into the room, and provided his candid assessment of the interview: "Gary was a wise guy, and I didn't like his answers[5]."

The twisted creative exercise in cases alleging mass child sexual abuse helps explain why we often see similar themes appear in otherwise far-flung cases. When we hear, for example, about a prosecution alleging that devil-worshipping adults practiced satanic ritual and sexual abuse on children, there is recognition from the cases that preceded it. This leads the public to believe that crimes involving sexual abuse and bizarre rituals are common. Police detectives are not immune from believing the same thing, and when they interview young children, this becomes a slight

---

[5] Gary Meyers interview, 5/23/12.

variant on the self-fulfilling prophecy: the self-created prophesy. In a sense, when children do little more than agree, their statements can actually become true – if one defines the word true to mean that which is "proven" in a court.

Even the most outlandish stories are sometimes believed. The authors reviewed the case of Frédéric Bourdin, a young man who told an FBI agent he had been abducted by high-ranking military officials, flown to another country, had his eye color changed by chemicals, suffered torture including the breaking of bones, and was subjected to satanic ritual and sexual abuse by many men. The FBI agent later said "I had heard of cases like this," and indeed she had – only they weren't any more true than this one. Frédéric Bourdin ultimately admitted he made it all up (Layton, 2012). Like urban legends, which gain credibility solely because of retelling, the persistent conjoining of mass sexual abuse and bizarre ritual found credibility in the 1980s/1990s through the endorsement of police, prosecutors, and judges. And the stories were welcomed and broadly retold by the media.

### IV) The Ten Blind Conspirators

In case after case alleging mass sexual abuse of children, the authors observe ten common factors, like ten blind conspirators that create wrongful convictions, and do profound damage to children and communities. There may be some knowing villains in some of these cases, however most individual participants in the system carry just their own cup of water; each unknowingly contributing to the flood that sweeps away the justice they believed they were working toward.

The Ten Blind Conspirators:

1. Police Misconduct
2. Absence of Physical Evidence
3. Absence of Medical Evidence
4. Outlandish or Impossible Scenarios
5. Prosecutorial Misconduct
6. Judicial Misconduct
7. Coercive Interviews by Police and Therapists
8. Improper Relationship Between Police and Therapists
9. The Use of Now-Discredited Memory-Recovery Techniques and Hypnosis
10. Police & Prosecutors Fuel Community Hysteria

#### 1. Police Misconduct

Police officers were not immune to the child sex panic sweeping the country. Often, they saw themselves as child defenders, using any means necessary to secure convictions of evildoers perceived as unworthy of legal protection. In the Friedman case, the police prompted the panic by notifying parents that someone to whom they had entrusted their children had been found to have purchased child pornography. As in most other cases of the time, police told parents their children might be victims of sexual abuse – *before* conducting any other investigation, and *before* finding any evidence that even one child was actually abused.

12

**A-0605**

In the first series of interviews, 30 in all, not a single student alleged abuse.[6] Nonetheless, police continued to ask other students who attended the very same classes whether they had been abused – dismissing any testimony to the contrary. In fact, the police – who already had an expected outcome in mind – were driven to repeatedly and suggestively interview students precisely because they had no other evidence to substantiate sexual abuse. So complete was their rush to judgment in the Friedman case that lead prosecutor Joseph Onorato stated in a televised interview that it was "The worst case I have ever seen in my 20 years as a prosecutor"[7] without regard for how such a comment would taint the opinion of the public, including a potential jury pool.

In earlier cases, such as the Kern County cases of *Pitts* and *Stoll* in the early 1980s, police collaborated with child services workers and therapists to get as many allegations of abuse as possible. The stories the children told did not match or make sense (e.g. the times and places alleged by some of the children were different than those alleged by others – even though they were supposedly all abused simultaneously and *en masse*). In *Pitts*, the children changed their stories as the questioning continued, and their stories grew more detailed and extreme, eventually including drugs and videos of children. No drugs or videos were ever found.

As in Friedman, when children in Pitts and Stoll denied they were abused, police rejected the denials and kept interviewing them. Eventually children broke down and agreed that abuse had occurred. The more they were interviewed, the more new adult offenders were added. Police in the *Stoll* case publicly said children were photographed performing sex acts; again, no such photographs were ever found.

Similarly, Detective Fran Galasso, head of the sex crimes unit, claimed that the most notable thing about the search of the Friedman home were "foot-high stacks of pornography in plain view literally all around the house."[8] In fact, her account is proven false by statements of the Assistant District Attorney, present at the same search, the written record of search warrant returns recorded by police, and photographs taken during the search.

Hungry for any remotely incriminating physical evidence, police stretched to create images designed to alarm parents and the public, and make the Friedmans appear guilty. For example, a series of photographs collected by the filmmakers, shows various innocuous items found in the Friedman house (e.g. a Playboy Magazine, two 35mm cameras, and an unused plastic syringe). Individually, these items are innocent enough and found in many homes. However, in a later photo in the same series, we see that police have moved the items and arranged them in a manner designed to make them look sinister: the Playboy Magazine is open to photos of nude women, and the cameras (which had been found elsewhere) are laid out on top of the photographs (as if the cameras were used to take the photos in the magazine), with the syringe thrown in for good measure. The alarming tableau created by police conveyed that the Friedmans were vicious molesters who used their cameras to photograph nude boys, while doing something untoward involving a syringe (Motion, 2004).

---

[6] Arline Epstein notes, November 24, 1987.
[7] Joseph Onorato interview with News 12 Long Island, 3/25/88.
[8] Detective Galasso interview, 2/28/01.

13

Police spoke regularly and extensively to the press about details in the Friedman case, inspiring sensationalized media coverage, and creating the presumption of guilt. Police stoked the fire of hysteria by telling parents their children had been photographed performing sex acts.[9]  In fact, Galasso insisted that "to a child" every student had reported having been videotaped or photographed performing sexual acts. Yet to this day, no such videotape or photo has been found – nor did police ever offer any evidence to support this widely publicized claim (Motion, 2004).

### 2.  Absence of Physical Evidence

*There was no physical evidence ever offered in the Friedman case.*

### 3.  Absence of Medical Evidence

*There was no medical evidence ever offered in the Friedman case.*

Scott Banks, the law secretary to the judge overseeing the case, and one of the few people to review the grand jury transcripts, described the "lack of any medical…any medical testimony in the grand jury," and says "it bothered me[10]." (Banks also expressed concern about the fact that the children kept re-registering for the classes year after year, and not one of the complainants ever told their parents they didn't want to go back.)

Prior to contact with police, no parents had discovered or reported any of the behavioral signs of sexual abuse in children:

> Hyperactivity, fear of being alone with certain adults, unusual or exaggerated interest in people's bodies, wearing excessive amounts of clothing, and inappropriate affection toward strangers (de Becker, 1999).

More significantly, no parents or pediatricians had ever reported that any indicators of sodomy were observed in any of the computer students:

> Stomach and digestive problems, difficulty walking or sitting, torn, stained, or bloody underwear, blood in urine or stool, unexplained genital contusions, sexually transmitted disease (de Becker, 1999).

Debbie Nathan, an expert on sex abuse cases, explains that if the Friedman charges were valid, it would be impossible to *not* find medical evidence:

> The allegations were violent sodomy, and sodomizing a child of that age is very traumatic. It'll actually either rip the anus so that you need a surgical repair, or cause a lot of swelling and a lot of pain… And you'd expect to see all kinds of complaints on the part of the child; all kinds of uncomfortableness that the parents would notice.[11]

---

[9] Arline Epstein notes, 1989.

[10] Scott Banks interview, 5/12/12.

[11] Debbie Nathan interview, 3/22/01.

14

In the Friedman case, no children had made special visits to doctors or reported the kinds of injuries and symptoms that would, by the laws of nature, result from the abuse alleged in the indictments. Given the frequency of normal pediatrician visits by children in wealthy suburban areas, it is reasonable to assume that the alleged Friedman victims were examined many times during the years they attended computer classes – and yet, no reports from doctors or parents of any signs of abuse.   One parent, Arline Epstein, took her son, whom police alleged was sexually abused, for regular check ups by his pediatrician, Dr. Eric Gould.  No sign of abuse ever emerged.[12]

Thus, the only medical evidence we have points to no abuse having occurred.  This reality might partly explain one of the most remarkable facts in the case: ***Police provided no evidence that they ever took any children to be examined by doctors***, even though the boys had supposedly been raped.

Though the information appears nowhere in the case, and was never disclosed to Jesse's lawyer by the prosecution, Detective Sgueglia confirms in a recorded interview not only that police would routinely take young children for medical examinations when abuse is suspected but that they did so in the Friedman case: We "did medicals on quite a few of them."

Asked if any medical evidence was obtained during these examinations, this key detective in the case gives a remarkable reply: "I don't know.  I don't know."[13]

Since no medical evidence was ever presented in the case, it is fair to assume that the medical examinations did not reveal evidence of rape or other violence.  On the broader issue, one cannot imagine any other rape case in which detectives would (a) fail to take even one possible victim for medical examination, (b) be unaware of the results of medical examinations, (c) fail to report the results of medical examinations, and (d) fail even to report that any took place.  In Friedman, all these things happened.

### 4.  Outlandish or Impossible Scenarios

To explain why the kids continued to attend the classes again semester after semester, Detective Galasso claims they were threatened and blackmailed, told their families would be harmed if they ever told anyone what was happening to them.  She states in a 2001 interview that the children in the class "were also told, 'If you tell-- I'll come to your house in the middle of the night, and I'll kidnap your baby sister, or I'll kill your parents.'  I mean it-- to-- to kids who were 8 and 9 and 11 and 12, these are very credible threats.  You know, they believe all of this.  And why shouldn't they?"[14]  The police developed a clear narrative, albeit an unlikely one, that conveniently explained why not a single child out of hundreds, in years of classes, ever told his parents about any abuse.

---

[12] Arline Epstein email, 3/1/13.
[13] Detective Sgueglia interview, 5/8/01.
[14] Detective Galasso interview, 2/28/01.

15

**A-0608**

The charges leveled by the police were illogical, unverifiable, implausible, and in some instances, physically impossible. When one child in a class said abuse took place frequently in plain view of others (or even *constantly*, as in the case of Daniel Doe described below), and another child in the same class said he never saw any abuse, *police considered only the testimony of the child who agreed abuse had taken place*. For example, the top five children associated with charges account for 322 counts of sexual abuse, about three fourths of the charges in the case. The charges associated with one student, Daniel Doe, amount to a total of 124 counts, including 56 counts from just one class – which would mean that during the 10-week course, he was violently abused 6 times each session, or *once every 15 minutes*.

Brian Tilker attended this class alongside fellow student Daniel Doe, yet Tilker said in his affidavit that he did not witness any abuse taking place during the class. Daniel Doe, like other complainants, then re-enrolled in the advanced class, where he says he was sexually abused an additional 68 times. Remarkably, according to the indictment, on 11 occasions, it was *eight-year old Daniel Doe who sodomized a pair of teenagers twice his age, Jesse Friedman and Ross Goldstein*.

Another class included two students who made 96 charges of abuse, yet two other students attending the same class confirm they witnessed no abuse. Student Rafe Lieber says: "Nothing ever happened to me and I don't have any memories of that stuff."[15] Gary Meyers attended this same class: "If something was going on in the classes, that I, you know, would have some sense of it and I didn't."[16] James Doe, a complainant in the class whom police associate with some of the 96 abuse charges, not only re-enrolled for the next class but also encouraged his younger brother to begin taking classes at the Friedman home.

Computer student Michael Epstein attended classes alongside students responsible for 81 charges against the Friedmans, including sodomy and sexual abuse in plain view of others, yet he stated as a boy and now as an adult that he never saw anything.[17] Detective Galasso told Michael's mother Arline that other children in Michael's afternoon classes had testified to being molested, specifically naming Michael as someone they witnessed being abused. Galasso also warned her that "the [Friday] class that Michael was in experienced about the worst there was."[18]

Michael Epstein comments in an interview on the allegations of sex games in which naked boys were supposedly sodomized in plain view of others: "Well it's not plausible at all. It was a crowded room. There were aisles, but it was a pretty crowded space. And it was messy, just being disks and printouts and stuff. I never felt that those games sounded at all plausible, even as a kid. It just didn't seem logistically possible. They didn't seem like something that someone would want to do. I also never thought it seemed at all plausible that they would have done things that involved every kid in the class."[19]

---

[15] Rafe Lieber interview, 6/4/12.

[16] Gary Meyers interview, 5/23/12.

[17] Michael Epstein interview, 8/5/12.

[18] Arline Epstien testimony to DA, 1/22/13.

[19] Michael Epstein interview 8/5/12.

16

More outrageous stories about sexual abuse emerged, describing acts that are not documented in known cases of sexual predation. For example, the Friedmans supposedly forced children to measure quantities of semen in their hands, to chew gum covered with semen, and to drink orange juice mixed with semen.[20] Interview strategies that combine the understandably cynical ideas of police detectives with of creative and fanciful ideas of children likely explain the outlandish and unrealistic charges.

A *New York Times* article about the *Stoll* case in Kern County describes implausible stories of sexual abuse:

> Much of the kids' testimony pushed the bounds of plausibility -- and of anatomy. Chris Diuri, four feet tall, testified that he had to sodomize men two feet taller than him. Asked how he did it, he said: 'I stand on my toes.' Jed, who was 6 years old and so small he had to kneel on the chair to reach the microphone at the witness stand, could not remember how many months are in a year or the names of all the months. But he was positive that his father molested him exactly 19 times (Jones, 2004).

Similar outrageous tales emerged in the other mass sex abuse cases. In the McMartin case, there were tales of child sacrifice and animal slaughter, and children being forced to drink blood. Famously, after the McMartin children described a network of tunnels under the preschool, tens of thousands of dollars were spent trying to unearth tunnels. None were found. In the Kelly Michaels case, children accused her of cutting off genitalia. There was no evidence of any of these activities, yet prosecutors moved forward nonetheless – perhaps all the more.

It is no coincidence that bizarre and outlandish charges lead to extensive media attention – a fact not lost on police and prosecutors of mass sex abuse cases.

For her exposés of dubious sexual abuse prosecutions, journalist Dorothy Rabinowitz was nominated for a Pulitzer Prize in 1996, and won the prize in 2001. She then authored *No Crueler Tyrannies: Accusation, False Witness, and Other Terrors of Our Times*. The first prosecution that caught her attention was the case of Kelly Michaels and the Wee Care Nursery School. Michaels, in her 20s, was charged with 299 counts of child sexual abuse involving daycare students, including that she penetrated their rectums and vaginas with knives, forks and other objects (though no injuries were ever reported, and no medical evidence was offered). Police and prosecutors also made public the accusations that Michaels had forced children to eat cakes made from human excrement, made them play sex games, and forced them to drink urine. Rabinowitz writes:

> I thought, How can one woman, one young, lone woman in an absolutely open place like the child care center of the church in New Jersey that she worked for -- how could she have committed these enormous crimes against 20 children, dressed and undressed them and sent -- you know what it is to dress and undress even one child every day without getting their socks lost? -- 20 children in a perfectly public

---

[20] Arline Epstein notes, 1989.

17

place, torture them for two years, frighten and terrorize them, and they never went home and told their parents anything? ... This did seem strange (2003).

But strangeness, alas, became the norm in the mass sex abuse cases of the 1980s and early 1990s, Whereas generally in life, the more fantastical a story, the less believable we find it to be, experts in these cases tried to explain away our skepticism with the novel idea that children made up fantastical stories precisely *because* they had been molested: "The children had been traumatized and tortured and, as a result, had to construct all sorts of fantasies to defend themselves" (Rabinowitz, 2003).

In the Friedman case, outrageous stories such as nude leapfrog and children forced to chew "cum gum" cemented the tenacious idea that *something must have happened*. Looking back on the case, one can say that Jesse Friedman was convicted of *Something Must Have Happened*.

### 5. Prosecutorial Misconduct

Like the police, prosecutors also engaged in misconduct in the Friedman case, with the apparent goal of avoiding an actual trial at any cost.

Most notably, they withheld exculpatory information from Jesse Friedman's lawyer, Peter Panaro, despite being legally bound to provide it. (The law requires that prosecutors turn over to the defense any exculpatory material that comes into their hands.)

Panaro was not told by prosecutors, and did not learn until years later, that some of the children interviewed by police made statements they subsequently recanted. He was not told some students denied anything happened even though other children identified them as victims (Transcript, 1990). Panaro was also not told that most students initially told police nothing happened, and became associated with allegations only after repeated visits by detectives, suggestive questioning, and therapy.[21] Further, prosecutors did not disclose to Panaro that the overwhelming majority of child witnesses told police they never saw any abuse, including those who had attended the very same classes alongside students who alleged abuse. In fact, it was not revealed until 2013 that Detective Galasso told parents that the first 30 students interviewed by police made no accusations of sexual abuse by the Friedmans. Despite their awareness that any of these children could have been impeachment witnesses for the defense, and despite the fact that the law requires prosecutors to inform the defense, the prosecutors knowingly withheld this essential information from Panaro.

Eventually, police and prosecutors came up with 3 indictments against Jesse. After the 2nd indictment, his father Arnold accepted a plea deal, and, in return for a guarantee that he would not be further prosecuted, agreed to sign a so-called "close-out statement" in which he confessed to molesting every single child who had ever attended the computer classes – *including students whom police never alleged were molested.*

Thus, to escape the threat of future prosecution, Arnold confessed to crimes that nobody - not even the police - ever alleged he had committed.

---

[21] Peter Panaro interview, 6/11/12.

18

**A-0611**

The stated purpose of the close-out statement was to inoculate Arnold from future prosecution. Though the prosecutor agreed to keep the statement confidential, it was instead shown by police to child witnesses and their families, and used to elicit more charges against Jesse and Ross Goldstein.

The Friedman case includes three people who were coerced into providing false confessions. The public naturally assumes that only guilty people would ever confess, yet the criminal justice system knows better: In the past 20 years, 142 convictions have been overturned, 142 people exonerated, because courts found that the confessions of the defendants were false (The National Registry of Exonerations, 2013).

The Third Indictment – more rife with inconsistencies and inaccuracies than the prior indictments – includes charges against Ross Goldstein. Most of the charges in this indictment were attributed to students who reportedly made earlier charges – however now, these same children supposedly recalled *four times* as many incidents of abuse, including 36 times as many sodomies.

At this point, Jesse was facing more than 200 charges of child sexual abuse for which Judge Boklan threatened to sentence him to consecutive prison terms. With Ross Goldstein's testimony against him, and a confession from his father and co-defendant, Jesse was left with no option but to plead guilty. (Ross Goldstein has since stated that he never saw Jesse sodomize anyone and that his false testimony was the result of coercive strategies used against him by police and prosecutors).

### 6. Judicial Misconduct

Judge Abbey Boklan, who is now deceased, made it clear in 1988 that she believed Jesse was guilty – an opinion she developed and acted upon despite having seen no evidence at trial. As important, however, was her determination in the years following the case to pursue media opportunities and provide inaccurate information that continues to undermine Jesse Friedman's reputation and legal efforts – all in violation of the rules of judicial conduct.

Instead of maintaining an impartial judicial stance, and instead of waiting to see actual evidence at trial, she stated, "There was never a doubt in my mind as to their guilt."[22] After the release of *Capturing the Friedman*, she told a CNN reporter, "There was never an issue of whether he was guilty or not guilty."[23] She told Matt Lauer of NBC that Jesse's case had nothing to do with false memories, but rather "with sick games".[24] Even after Jesse's release from prison, Judge Boklan continued to voice accusations against Jesse.

The United States Court of Appeals found that "the judge did everything [she] could to coerce a guilty plea and avoid a trial." For example, Judge Boklan told Jesse's defense attorney that if Jesse did not plead guilty, she would sentence him to consecutive prison terms. The Court of Appeals called this threat "impermissibly coercive," and cited it as sufficient to sustain a challenge to Jesse's guilty plea (Appeals, 2008).

---

[22] Judge Boklan interview, 5/14/01.

[23] Judge Boklan interview with CNN, 2/18/04.

[24] Judge Boklan interview with NBC, 12/03.

Even the Judge's own law secretary, Scott Banks, describes his discomfort with the way the case was prosecuted. Banks, one of the few people who read the grand jury minutes, was troubled by the lack of medical evidence, lack of "date specificity," and says that he was "bothered" because the children kept re-enrolling in the class.[25]

### 7. Coercive Interviews by Police and Therapists

Despite, and perhaps *because of* the lack of physical or medical evidence, police put all their resources into interviews, the fertile ground that eventually produced hundreds of allegations. Working with therapists, they used a range of suggestive and oppressive methods that have since been shown to lead to false memories:

1) Presuming that suspects were guilty;
2) Repeatedly questioning and interviewing children who had already denied abuse;
3) Rewarding and/or punishing children to get certain answers;
4) Using police interviewers to intimidate and/or impress children; and,
5) Using memory-recovery techniques such as hypnosis and visualization.

Police assumed from the start that the Friedmans were guilty, and ignored all evidence to the contrary. Student Tilker, and his father, both reported in recorded interviews that police bullied Brian to say that abuse took place. Mr. Tilker said police told him they "knew" his son was abused. Brian Tilker finally told police he was hit during class because, he explained, "I feel like when I said that that ended the questioning."[26]

Another student, Dennis Doe, to whom police attributed more than 50 charges of sodomy and sexual abuse, also says he lied and told police he was a victim in order to stop the questioning: "What I do remember is the detectives putting on me a lot of pressure to speak up....and when I started to tell them things, I was telling myself that it's not true. Like I was telling myself just say this to them in order to get them off your back."[27]

Joan Blaha, a mother of two students in the classes who often arrived early pick up her kids, told police she never saw sexual abuse or anything out of the ordinary taking place during the computer classes. In a recorded interview she explains that police nonetheless "kept at it and at it and at it. And they kept rephrasing the questions and asking the same questions over and over again in different ways."[28]

One of her sons steadfastly refused to provide the answers police were seeking, and his mother points out that "a less strong child would say something that maybe didn't happen."[29]

---

[25] Scott Banks interview, 5/12/12.

[26] Mr. Tilker & Brian Tilker interview, 7/11/01.

[27] Dennis Doe interview, 8/6/01.

[28] Joan Blaha interview, 5/23/12.

[29] Jason Blaha interview, 5/23/12.

20

**A-0613**

Another student, Dan Aibel, attended the same classes in which two other students had reportedly claimed 67 acts of sodomy took place. Aibel says he never saw any abuse during the classes, but he remembers the police "were operating as if everyone had been molested, abused." He reports that police told parents "it was important for parents to confront [the abuse]; the kids would suffer for it later in life if they didn't…deal with it now."[30] Rafe Lieber – who attended a class in which 96 charges were alleged – says, "I remember the class fondly."[31] Another student, David Zarin, was surprised when he learned that his classmate Complainant Dennis Doe had made 50 charges of sexual abuse, because "There was nothing odd going on at all in the classes."[32]

Student Gary Meyers took classes alongside three children to whom police attributed more than 120 charges against the Friedmans; he too never saw any evidence of sexual abuse. In a recorded interview, he says he was always "enthusiastic" about taking the classes, was enrolled for years, and, "if something was going on in the classes, that I, you know, would have had some sense of it. And I didn't."[33] In a 1988 affidavit, Meyers reports that Complainant James Doe told him that the police didn't believe him when he said nothing happened, and that another student, Aaron Golbert, told him police insisted other students were victimized and pressured him to "say that all these things happened to him."[34]

Police also provided rewards to cooperative students. Detective Sguéglia admitted he would make friends with children and even "deputize" them in order to induce them to make allegations (Motion, 2004, p. 34). Student Michael Epstein says he saw another student with "a fake police badge, like junior police or something like that, that the, that the police had given him, or the DA or somebody, as a result of having testified."[35]

Detective Hatch, another investigator in the case, told children they would suffer psychological problems and even become homosexual or pedophiles themselves if they didn't admit abuse (Motion, 2004). The mother of Daniel Aibel said she saw no sign or indication that her son had been abused, yet the police told her that if her son didn't admit it, "he's going to be traumatized for life."[36] In fact, many of the children who did ultimately testify to sexual abuse appear (in the present day) to be traumatized as the result of interview strategies, therapy, being stigmatized as victims, and being compelled to lie.

Student Gary Meyers also says children were pressured to make allegations against the Friedmans, and it "always felt like they weren't allowed to say that nothing happened." When Meyers challenged a friend about the allegations, reminding him he was in the same class and never saw anything, the friend made it clear that he was "getting a lot of pressure."[37]

---

[30] Dan Aibel interview, 7/6/01.
[31] Rafe Lieber interview, 6/4/12.
[32] David Zarin interview, 7/27/12.
[33] Gary Meyers interview, 5/23/12.
[34] P.I. Deborah Broder notes, 1/26/88.
[35] Michael Epstein interview, 8/5/12.
[36] Mrs. Aibel interview, 7/6/01.
[37] Gary Meyers interview, 5/23/12.

21

Another detective, Wallene Jones, acknowledges that she and her partner would not take no for an answer – in one case, visiting a child *fifteen times* before eliciting an accusation of abuse. Jones told an investigator that the reason they had to visit the child so many times was because the boy had suffered trauma and had "kept it deep inside." The police told the mother they wouldn't leave until the boy told them what happened to him, and that they would stay all night if required.[38]

One father, an attorney, declined to have his children press charges because he felt they were questioned improperly, that police "were particularly aggressive," and that police "were suggesting the answers to the kids."[39] The detective who questioned these children states in an affidavit that both children were abused.[40] However, in a recorded interview, the boy's father says: "What we saw here was overzealousness. They suggesting answers…they wanted to talk to the kids without adults present."[41]

Two boys who eventually became complainants reportedly told Detective Sgueglia about the presence of sexual computer games in the class, yet *didn't mention being sexually abused or sodomized until after spending months in therapy.* While the police alleged that the Friedmans provided "pornographic" computer games to students as a way to groom them for sexual abuse, many students have stated that these crudely animated sexually-oriented computer games were commercially available and already in their possession. As Judd Maltin stated in his affidavit, these games "were in common circulation among the community of Great Neck youth." He states that the Friedmans likely received computer games from him – rather than the other way around.[42] Michael Epstein agrees, and said in a recent interview, "Those animated computer sexual games were floating around… anywhere there were a sufficient mass of 8-year-old boys you would get things like that… friends would copy them around and show them."[43] Parent Ann Meyers, mother of computer student Gary Meyers, remembers going to a local computer store where she discovered that the same computer games alleged to have been distributed by the Friedmans were openly sold.[44] Complainant Keith Doe says he never even saw any of the computer games until *after* he moved from Great Neck and stopped attending the computer classes.[45]

Though it is now clear these games were not created or provided by Arnold Friedman, Detective Galasso's public statements float the notion that the games were intentionally in cartoon form to make them more appealing to the children. In a recorded interview, Detective Galasso claims these games served a sinister purpose, in that they were deliberately given to the children by the Friedmans to get kids "accustomed to dealing with this kind of material, making them complicit so that if anybody finds out, they're guilty, or they're made to feel very guilty [as] part of it."[46] The police used everything to support their belief that the Friedmans were guilty, and so even video

---

[38] Wallene Jones interview, 1/6/04.
[39] Larry Solotoff interview, 2001.
[40] William Hatch affidavit, 11/24/87.
[41] Larry Solotoff interview, 2001.
[42] Judd Maltin affidavit, 12/15/03.
[43] Mike Epstein interview, 11/01/12.
[44] Ann Meyers interview, 11/15/12.
[45] Keith Doe interview, 11/13/12.
[46] Detective Galasso interview, 2/28/01.

22

games sold in local stores and traded by the children themselves, watched outside of the computer class, were presented as if part of an elaborate scheme to keep the children from revealing the abuse.

The Friedman case is hardly the only one in which coercive and oppressive interview strategies were used on children, though it is one of the few cases not yet overturned. In a paper called "Suggestive Interviewing in the McMartin Preschool and Kelly Michaels Daycare Abuse Cases: A Case Study," the authors found that interviewers would (a) introduce new suggestive information into the interview, (b) provide praise, promises, and positive reinforcement, (c) express disapproval, disbelief, or disagreement with children, (d) exert conformity pressure, and (e) invite children to pretend or speculate about supposed events" (Schreiber, et al, 2006).
After the California Attorney General's office conducted an extensive review of mass child sexual abuse prosecutions, Attorney General John Van de Kamp said, "At that point everyone believed that what the kids were telling child protective services was true – why would they lie? Children are innocent; if it's being fed to them what to say and so forth, then that's a delicate kind of situation. They had to be treated with sensitivity but at the same time, if they're going to send people away for 10, 20, 30 years, then you have to make sure that they are being corroborated" (Van de Kamp, September 1996).

Alas, the Friedman case included no corroboration for statements attributed to children, statements which arose from flawed and coercive interview strategies.

> ### *Why Police and Therapists No Longer Use Suggestive and Coercive Questioning*

One reason children in these cases were questioned so vigorously was due to a misapplication of a theory known as the "Childhood Sexual Abuse Accommodation Syndrome" or CSAAS. This now-discredited idea postulates that children will not disclose abuse without being pressured. Under this premise, when children deny being sexually abused, the denial is considered a way of coping with the abuse, and they must be questioned repeatedly for police to gain disclosure (Summit R., 1983). This fractured logic inspired some detectives, therapists, and parents to believe that when a child said nothing happened, that very statement meant something did happen. The more assertive the denial, the more deeply the abuse was "buried." Thus, denial itself became a form of proof, and any response – whether a child agreed that abuse occurred or insisted it had not – meant that abuse had occurred. It became a "maxim" among child abuse experts such as Summit (1983) that children "never fabricate the kinds of explicit sexual manipulations they divulge in complaints or interrogations" (p. 16).

While it might appear admirable to always believe what children say, police and therapists in the mass sex abuse cases consistently *declined* to believe children who said nothing happened. So those who claim children "never fabricate" in these cases are left with the conundrum of calling children liars (or deniers) when they say nothing happened.

In stark contrast, more current research shows that children who have been sexually abused are not especially resistant to disclosure, particularly when the perpetrator is a non-family member. One study found that among validated cases of child sexual abuse, only 5% of children denied the abuse when first asked about it (Bradley & Wood, 1996). ***In the Friedman case, 100% of the students initially interviewed denied sexual abuse when first asked about it.***

23

**A-0616**

A summary of the major studies on sexual abuse disclosure found that "the majority of children disclosed abuse when directly asked." Further, "only a minority" went on to recant their allegations of abuse. The studies also found that when interviewed by police or therapists there was no need for suggestive questioning, because in these "formal settings" children were even more likely to disclose abuse. "These same techniques, especially when used by biased interviewers, entail a risk of producing false allegations" (London et al 2005).

In 1995, Maggie Bruck and Stephen Ceci wrote an Amicus Brief about the Kelly Michaels case (another mass sex abuse case that started in 1985) outlining the problems with suggestive interviewing in the case. The Michaels conviction was overturned on the grounds that the children were questioned improperly. In this landmark brief, Bruck and Ceci (1995) present guidelines for reducing the instance of false abuse allegations:

> ➤ Interviewers should use non-leading questions
> ➤ Interviews should be conducted by people who do not have an
>    attachment to the belief that sexual abuse happened
> ➤ Interviewers should not pose the same question more than once;
> ➤ Interviewers should undertake one interview rather than repeated interviews;
> ➤ Interviewers should not give children rewards for confirming
>    sexual abuse happened.

Burce and Ceci (1995) also found that some children are influenced by suggestive questioning in even a single interview, and that unwanted results become "most dramatic" after repeated interviews (p. 309).

According to students in the Friedman classes (whether or not they went on to become complainants), as well as parents and investigators, the techniques used by police and therapists in the case in 1987 and 1988 were the same as those now understood to elicit *false* allegations of abuse. The protocols accepted today for interviewing children were developed in direct response to the rash of false allegations that emerged from the improper methods used in the Friedman and other cases of the time.

Whatever the interview style, there is agreement that *allegations elicited from children should be viewed as only one form of evidence in a much broader investigative process*. When such allegations comprise the only evidence, as in the Friedman case, wrongful conviction is a predictable result.

Research and science aside, it is Detective Sgueglia who gives the clearest look at how police interviewed children in the Friedman case:

> You don't give them an option, really, you tell them that you already know it happened because others already admitted that it happened, so once they realize that other people have come forward – it's not easy, but it does work.[47]

---

[47] Anthony Sgueglia interview, 5/18/01.

24

**A-0617**

## 8. Improper Relationship between Police and Therapists

The police and therapists in these cases had a relationship that focused on their mutual goal of eliciting allegations of abuse. The police urged parents to place children in therapy. In Friedman, for example, almost immediately after Arnold was arrested, police helped arrange for all children in the classes to receive individual therapy, and began suggesting and making plans for group therapy.

Detective Sgueglia reports that police enlisted therapists to be involved with the investigation from the start: "We recruited a therapist. She got on board. She was there for all the family meetings, and offered free counseling."[48] Detective Galasso confirmed to the Long Island newspaper *Newsday* that the majority of charges against Jesse (and the only indictment against Ross Goldstein) originated "during sessions with their therapists" (Newsday, 1988).

Arline Epstein recalls a community meeting in which Dr. Arthur Green, a therapist, told parents that all children should have therapy to help them disclose abuse, and that the "biggest problem [is the] kid who says nothing happened." Dr. Green said the "denial phase is a natural way of adapting."[49] Green also made the claim that testifying before the grand jury about the abuse "is a very positive experience." Epstein says the theme from police and therapists, communicated to all parents, was that every child in every class was a probable victim, and that individual and group therapy were both important to facilitate the all-important disclosure process. Police assumed that every child who took the computer classes had been sexually abused, and Detective Galasso made public that flawed assumption in statements to local newspapers such as the *Great Neck Record*: "Every child that set foot through that door was a victim in one way or another… and it's vitally important that every parent who hasn't does get their child help" (1988).

Detective Galasso admits she told parents "your child might be a victim" and asked "do you want to get them some help?"[50] The result is that children who *might* have been victims received therapy designed to elicit stories of victimization.

In the Friedman case, the therapists told parents they were "very much in favor of children testifying," and that "testifying is a very positive experience" that would bring children "enormous relief." Parent Arline Epstein reports that she perceived Detective Galasso and Dr. Sandra Kaplan as "partners" in an effort to get the children to disclose allegations of abuse. In addition, therapists told parents it was good for them to be angry, because it is "good for them to fight the case."[51]

Since the Friedman case, scholars have established specific guidelines for interviewing children, and more to the point, set forth the actions to avoid (all of which actions were taken in Friedman):

> When the therapists' clinical role bleeds into the role of the forensic interviewer, the therapist's exploration of alleged but unconfirmed abuse increases the risk for the detrimental consequences of interviewer bias, suggestive questioning, and repeated

---

[48] Anthony Sgueglia interview, 5/18/01.
[49] Arline Epstein testimony to DA, 1/22/13.
[50] Detective Galasso, interview, 2/28/01.
[51] Arline Epstein notes, 1989.

25

questioning...   When therapists directly take on an investigative role, asking questions to 'facilitate disclosure," they may interfere in the forensic investigation. Under such circumstances, the risk is that the child's memories and statements become so tainted or inaccurate that a miscarriage of justice results (Kuehnle, p. 557).

### 9.  The Use of Now-Discredited Memory Recovery Techniques and Hypnosis

As in the other sex abuse cases, mental health experts, acting in concert with police, used several suggestive methods to elicit allegations from the children in the Friedman case.  The therapists began with the premise that the children had been abused and were blocking out memories of trauma.  Their job, then, was to "help" the children remember the abuse.

*Every one of the first 30 children interviewed in the Friedman case categorically denied abuse had taken place.*  Many then had assistance from police and therapists in helping them "remember." Many were then able to "remember" the abuse so clearly that they could provide grand jury testimony against Jesse Friedman, having somewhere acquired a vocabulary for describing the terrible events.  As adults, however, many of these same witnesses present a confounding challenge to proponents of recovered memory: *They have forgotten again*.

Witness after witness interviewed as adults report that they vividly remember the Friedmans, the computer classes, what they learned there, where they sat, who else attended, visits to their home by police detectives, the therapists, and the drama surrounding the case – however they state today that *they have no memory of being molested,* and many believe they were not molested.  Consider the conundrum facing proponents of recovered memory.  They claim that children block out traumatic events and need help to recover the memories.  Then children remember.  Then children provide detailed testimony.  And then they lose all memories of the abuse, yet retain memory of other contemporaneous and traumatic events (e.g., exposure to unfamiliar and disturbing descriptions of violent sexual abuse, aggressive police interviews, suggestive and insistent therapy).

These child witnesses and their parents were told that the only path to healing was to recall and deal with the details of their abuse.  And then they did so – and then they had the therapy they were promised would bring them to terms with what happened, and then the therapy that was supposedly their only chance for healthy development and a good life.  And then we are asked to believe that they lost the memories of abuse again?  Why would that happen?  Recovered memory proponents are silent on this question, perhaps because no plausible explanation exists.  In fact, recovered memory proponents are silent in general these days, and any who might still cling to past beliefs would have to rename the theory.  No longer could it be called simply Recovered Memory; it would have to be called *Recovered and Then Un-recovered Memory*.

The children who were compelled to testify about mass sexual abuse have grown up, and many have in fact recovered an accurate view of reality, recovered confidence in their own perceptions, and recovered their own voices.  As such, two key elements that contribute to any effective social research have now been added to the mix: Time and Truth.  One result is that it is no longer acceptable to compel children to say they remember that which they do not remember.

26

**A-0619**

We now know that so-called *Memory Recovery Techniques,* including hypnosis, were employed repeatedly in the Friedman case. Dr. Sandra Kaplan, the psychiatrist who worked with many of the children in the Friedman case gave a presentation in 1990, along with Drs. Pelcovitz and Green, and Detective Galasso, at a conference of the *American Professional Society on the Abuse of Children* (AACAP).[52] The presentation addressed "the individual treatment of these children, group therapy of the children and their parents, and the use of hypnosis in the treatment of dissociation in victims" (Transcript, 1990). The children referred to are children who attended classes at the Friedmans. The abstract further discusses the process of "dissociation" and "amnesia," noting that 6 of 15 children in a therapy group had "no memories of being victimized even though other group members [supposedly] witnessed their abuse" (Transcript, 1990).

Research (and a basic understanding of human emotion) elucidates that suggestive and insistent therapy can be damaging to children, likely part of why complainant Gregory Doe, as an adult, appears to be so profoundly damaged, at times even delusional.[53] In a rare moment of cogency, Gregory Doe describes his very first memory of any sexual abuse at the computer classes: "I went through hypnosis, came out, and it was in my mind. And then I started to talk about it. I know they put me into a deep trance and then I went through hypnosis and that was it."[54]

Detectives in the Friedman case told reporters in 1988 that therapists "brought out" new information about other suspects in the case, again suggesting that the children somehow buried the abuse but were able to remember it after they were pushed and probed (Motion, 2004, p. 12). One child who first alleged 8 counts of sexual abuse, later "recalled" more than 100 further counts of abuse" (Motion, 2004, p. 15).

Student Michael Epstein tells the stark story of how this kind of therapy eventually breaks down a child's resistance:

> Eventually I just consciously decided to lie and say that I had been abused, and repeat these crazy things I had heard from other kids or in the therapy or from the police. You know, the leap frog, which doesn't even make sense... I just regurgitated everything I've heard from other people, because that was the only way to make it stop. I did that. I told my mom. I told Dr. Pelkovitz. And I guess pretty soon after that, it did stop and we were able to stop rehashing it over and over and over again.[55]

---

[52] The authors would like to review this material, however in response to requests for a tape recording of the presentation, AACAP produced only a heavily redacted tape recording from which nearly the entire talks by both Dr. Kaplan and Detective Galasso had been erased. Despite having released this document widely to the public, when asked by Jesse's lawyers, the AACAP refused to release the full tape unless required to do so by subpoena.

[53] Debbie Nathan interview, 3/22/01.

[54] Gregory Doe interview, 6/6/01.

[55] Michael Epstein interview, 8/5/12.

27

> ➢ *Why Memory-Recovery Techniques and Hypnosis Are No Longer Used*

By the mid-1990s, former patients were winning lawsuits against therapists who "helped" them remember ritual abuse (Wood, Nathan, & Nezworski, 2009, p. 84). Back in 1987, however, some therapists likely believed they were doing the right thing by using hypnosis and other techniques to help victims recall memories. In the Friedman case, the therapists were clearly influenced by the police and their insistence that all the children were abused; those who said they weren't abused were perceived as mistaken since others reportedly saw them being abused. It's clear today that this circular logic cannot lead prosecutors to credible information.

Elizabeth Loftus, a leading researcher in the area of repressed memories, refutes the assumption that traumatic memories are repressed because they are too horrible to remember, and that special techniques are required to uncover them: "In point of fact, there is no cogent scientific support for this repression folklore, and there is ample reason to believe that extraordinarily suggestive and prolonged searches for hidden memories can be harmful" (Loftus, 1996).

In particular, Loftus notes that there is no scientific research showing that victims of abuse are totally unaware of what happened to them. She agrees with Freudian scholar Frederick Crews, who says therapists engaging in recovered memory techniques are motivated by ideology rather than science, and they are detrimental to patients because they result in false allegations and can even destroy families (Loftus, 1996, p. 292). An extensive review of the literature on childhood trauma and memory found that "the core of such events tends to be remembered quite well" (Greenhoot & Bunnell, 2009), and that these memories persist even into adulthood, just like memories of other major events.

Dr. Oliver Sacks, esteemed professor of neurology and psychiatry at Columbia University, and now clinical professor of neurology at New York University, has extensively studied the topic of false memories. Sacks recently wrote in the *New York Review of Books*:

> In our present age, descriptions and accusations of childhood abuse have reached almost epidemic proportions. Much is made of so-called recovered memories—memories of experiences so traumatic as to be defensively repressed, and then, with therapy, released from repression. Particularly dark and fantastic forms of this include descriptions of satanic rituals of one sort and another, accompanied often by coercive sexual practices. Lives, and families, have been ruined by such accusations. But it has been shown, in at least some cases, that such descriptions can be insinuated or planted by others. The frequent combination, here, of a suggestible witness (often a child) with an authority figure (perhaps a therapist, a teacher, a social worker, or an investigator) can be particularly powerful (Sacks, 2013).

Of relevance to both the students who were presented as victims in the Friedman case and the young men who were presented as offenders, and ultimately "confessed," Sacks writes:

> From the Inquisition and the Salem witch trials to the Soviet trials of the 1930s and Abu Ghraib, varieties of 'extreme interrogation,' or outright physical and mental torture, have been used to extract political or religious 'confessions.' While such interrogation may be intended to extract information

28

**A-0621**

in the first place, its deeper intentions may be to brainwash, to effect a genuine change of mind, to fill it with implanted, self-inculpatory memories, and in this it may be frighteningly successful (Sacks, 2013).

As early as 1985, the Council of the American Medical Association issued a cautionary statement: "Recollections obtained during hypnosis can involve confabulations and pseudomemories, and not only fail to be more accurate, but actually appear to be less reliable than non-hypnotic recall" (Scientific Status of Refreshing Recollection by the Use of Hypnosis, 1985).

More than a decade later, the UK College of Psychiatrists came out "strongly against persuasive or suggestive psychotherapeutic techniques designed to unearth sexual abuse of which the patient has no memory" (Pope, 1998).

In 1998, the *American Psychological Association* released a report saying: "Most people who were sexually abused as children remember all or part of what happened to them," and that while it is possible for memories that have been forgotten for a long time to be remembered, it is "also possible to construct pseudomemories for events that never occurred." The report emphasizes that hypnosis is "not an appropriate procedure" for the goal of retrieving memories because of the "serious risk that pseudomemories may be created in trance states and of the related risk due to increased confidence in those memories….in those situations in which hypnosis is used, it is necessary to interpret the client's responses in light of parallel measure of suggestibility and proneness to fantasy" (American Psychological Association, 1998). In this same report, the authors warn that psychologists "are not usually in a position to know the truth."

Lief and Fetkewicz (1995) surveyed 100 individuals who alleged sexual abuse after supposedly recovering memories via therapy -- and then later retracted their allegations. The authors found that suggestion from therapists was the key reason the ex-patients first reported abuse. These people who recanted also said they were seeking the approval they gained from therapists when they said they remembered abuse. These former patients reported that they got favorable attention when they reported more frequent or more extreme instances of abuse. As in the Friedman case, group therapy was used to help resistant children say they had been victimized. In fact, in two of the successful lawsuits against therapists, "improper exposure to support groups" was cited as one reason for ruling against the therapists. According to former patients, group therapy can enhance false memories because it functions as a hotbed of pressure and suggestion.

Considering the overwhelming amount of modern research that has led to the spate of acquittals in cases alleging mass sexual abuse, it is little wonder that the United States Court of Appeals made so decisive a pronouncement in their Friedman opinion:

The prevailing view is that the vast majority of traumatic memories that are recovered through the use of suggestive recovery procedures are false, and that almost all —if not all— of the recovered memories of horrific abuse from the late-1980s and early-1990s were false (Appeals, 2008).

### 10. Police & Prosecutors Fuel Community Hysteria

As in many of these cases, police in the Friedman case spread panic through alarming statements made to parents and news media. Seeking always to bring in more defendants and bolster the

29

**A-0622**

theme of a "sex ring," Detective Galasso asked students to look through Great Neck high school yearbooks and to point out anyone they "recognized."[56] According to Detective Galasso, that is how they identified Jesse's high school friend, Ross Goldstein. Soon enough, Goldstein was arrested and placed under intense pressure by police. Indeed, pressure is a required strategy when police have no physical evidence, no medical evidence, and no corroboration for statements elicited from children.

The 17-year old Goldstein named two other friends, who were then arrested and questioned (though never charged). In a telling example of how charges escalate in these cases, Ross Goldstein was accused of 118 counts of abuse, including 79 counts of sodomy – *ten times more than even alleged ring-leader Arnold Friedman*. Though these terrible crimes would carry a 50-year sentence, the DA offered Goldstein a remarkable deal: Just 6 months in the county jail and a sealed record – if he would testify against Jesse Friedman. Ross Goldstein accepted the offer. As Debbie Nathan writes:

> The case had clearly been developed as a gay "sex ring"—a police fantasy rampant during the homophobic Reagan years, when Anita Bryant was denouncing gay men as child molesters, and psychiatric nurse Ann Burgess, author of 1988's *Children Traumatized in Sex Rings*, was publishing her first writings on the topic. Child protection authorities speculated about gay men organizing to move boys around the country in order to molest them and make pornography. The sex ring theory was the precursor of the "satanic" day care cases, such as the McMartin preschool in California, and Kelly Michaels in New Jersey (2003).

According to Wood et al. (2009), "Virtually all early media coverage of these so-called daycare abuse cases was uncritical and sensationalistic, [with] television programs and magazine stories credulously reporting electrifying claims" (Wood, Nathan, & Nezworski, 2009, p. 81). Although the first articles critical of these prosecutions began to appear in 1987, it was not until the McMartin acquittals in 1990 that researchers began to seriously question the validity of these cases. At the time of the Friedman case, however, the Great Neck community had no way of knowing that the other cases emerging around the country were not true and would be debunked in the years to follow. In fact, prosecutions in other states (which were subsequently discredited) further fueled the idea that mass sex abuse of children, and outlandish group and public sex games, constituted a real and growing social problem.

Jesse's friend Judd Maltin remembers that "guilt was everywhere" and "the whole town was against Jesse."[57] Computer student Rafe Lieber says today that "There were a group of parents that were kind of leading what I would consider to be a witch hunt."[58] Joan Blaha, the mother of two computer students, agrees with this assessment, saying, "Oh, it was crazy…I mean people, people just really jumped on the bandwagon fast."[59] Jesse's lawyer Peter Panaro explains that

---

[56] Detective Galasso interview, 2/28/01
[57] Judd Maltin affidavit, 12/15/03.
[58] Rafe Lieber interview, 6/4/12.
[59] Joan Blaha interview, 5/23/12.

"The parents had formed a group…and they made demands. They wanted Jesse and his father prosecuted. They wanted them incarcerated."[60] There was pressure to test Arnold and Jesse Friedman for AIDS. Parents were even more hysterical after Dr. Sandra Kaplan advised them to test their own small children for AIDS, and to continue testing for at least 2 years, because of the disease's "3+ year latency period."[61] These unfounded, alarmist proclamations and the inevitable publicity they engendered, contributed greatly to the atmosphere of hysteria.

Prosecutor Joseph Onorato told filmmakers that the case was a "great topic of conversation in Great Neck," and "one of the biggest things that happened in the Great Neck community in a long time." Onorato said parents became competitive with each other over how many times their children were abused – "sometimes there would be some minor conversation about, you know, another boy. You know, 'he was sodomized five times, but my son was sodomized six times'."[62]

Though it is natural for parents to be distraught when they believe something terrible has happened to their children, in a climate of community hysteria, something far more insidious takes hold, something particularly helpful to prosecutors. As described by Pulitzer prize-winning journalist Dorothy Rabinowitz, parents became "bound by a common passion to see the offenders convicted; they sought one another out; they shared with one another details of comments they had extracted from their children…they found, in a society of others they saw as victims like themselves, a powerful bond – and in the case itself, a dream that utterly absorbed them. They lived their lives with a focus and intensity previously unknown to them" (2003, p. 232).

Community groups in Great Neck organized letter-writing campaigns, and the federal judge presiding over Arnold Friedman's case received "maybe 500" letters from concerned citizens. They organized meetings and carpools so parents could attend court appearances. One parent reported that he was asked to help Arnold Friedman have "an accident" prior to his sentencing (Motion, 2004, p. 22). The hysteria in Great Neck added to the pressure Jesse felt to plead guilty. Despite the fact that the case involved underage victims, and one underage defendant, Judge Boklan made Friedman the first trial in the history of Nassau County in which cameras would be permitted in the courtroom. Though she herself characterized the climate around the case as "media frenzy" (Motion, 2004, p. 23), she expressed indifference about whether television coverage would negatively impact Jesse and the case: "I wasn't that concerned about protecting the defendants. Their pictures, their names were all over the newspapers. So, their reputation at that point was not too good."[63]

Judge Boklan could not have more accurately described the predictable result of a relentless campaign by herself, police, and prosecutors to fuel community hysteria.

### V) Why The Truth Is Important

Children at the center of these cases are often traumatized by the experience of lying about being abused. As adults, most remember the pressure of being forced to lie about the abuse, but don't

---

[60] Peter Panaro interview, 6/15/12.

[61] Arline Epstein notes, 1989.

[62] Joseph Onorato interview, 3/20/01.

[63] Judge Boklan interview, 5/14/01.

remember the allegations they made. Most remember persistent questioning and pressure from people in positions of authority. Nathan and Snedeker note that children who made false allegations of sexual abuse are similar to those who falsely confessed to abusing children: "The authorities use the same methods to evoke false accusations as they do to win false confessions. Accused and accusers become both victims of the investigative process and victimizers of each other" (Nathan & Snedeker, 1995).

As Linda Starr, a former sex crimes prosecutor, explains in a *New York Times* article about the children at the center of the John Stoll case, "Before I met them, I didn't appreciate that these kids, who had not been sexually abused, would have experienced trauma comparable to kids who had been." The article interviews Ed Sempley, a child who falsely accused Stoll of abuse. Sempley tells the journalist that he is tormented by his lies, and is still haunted by his inability to withstand the pressure of the police interviewers. As in the Friedman case, he was told that other boys had already accused Stoll of abuse, and that those boys claimed Sempley was also abused. Finally, Sempley broke down and told the police what they wanted to hear. Sempley can't remember his own testimony, and he wisely points out, "You don't remember the lies. You remember the truth" (Jones, 2004).

John Stoll's conviction was overturned in 2004. During his appeal hearing, Sempley and five other boys who had accused Stoll recanted their original testimony and explained that they lied because they were pressured by police. Another boy who recanted his original testimony against Stoll said he spent years in therapy trying to overcome the trauma of the sexual abuse, until he realized that he had no actual memory of being sexually abused (Jones, 2004).

Gregory Doe, the only one of the Friedman complainants with whom filmmakers have spoken who today states that he was abused, admits that he recalled the abuse only after going through hypnosis. He is clearly damaged by trauma despite years in therapy -- and likely *because* of years of therapy. Loftus argues that once memories are implanted by therapists, they can often no longer be distinguished from actual memories (2003). Gregory Doe's story of abuse contains dozens of contradictions, inconsistencies, and preposterous scenarios.[64] In fact, many of the charges he now alleges, were never part of his testimony but, rather, were "borrowed" from allegations attributed to other computer students.

As early as 1995, Bruck and Ceci warned that encouraging children to make false allegations is itself a trauma. After reading the transcripts of the suggestive interviews in the cases they studied, they say it is "the interviewing techniques which we view as abusive in themselves" (Bruck, 1995). They express disbelief that adults in the case were allowed to discuss sexually explicit issues with children in blatant ways. These cases often expose young children to disturbing sexual concepts from which parents have protected children for thousands of years.

Bruck and Ceci express concern that interviewers "would be allowed to bully and frighten the child witnesses" (Bruck, 1995, p. 309), and worry that children will have long-term effects from believing they were the victims of sexual abuse when the only abuse that occurred was the intimidation of the interviewers.

---

[64] Gregory Doe interview, 6/6/01.

32

**A-0625**