Dr. Richard Gardner, clinical professor of child psychiatry at Columbia University, wrote in 1994 about children "subjected to interrogations by police, 'validators,' lawyers, prosecutors, judges, juries, psychiatrists, psychologists, social workers, and self-styled 'therapists' — who may develop a wide variety of symptoms derived from this trauma… I refer to this as *legal process trauma*, because for these people the trauma is not sexual but the legal process" (Gardner, 1994).

In 2005, years after the McMartin case, Debbie Nathan interviewed one of the accusers, Kyle Zirpolo. He told Nathan he isn't sure why he lied about being a victim of sexual abuse, but theorized that he did it to please his parents and the therapists. "Anytime I would give them an answer that they didn't like, they would ask again and encourage me to give them the answer they were looking for. It was really obvious what they wanted. I know the types of language they used on me: things like I was smart, or I could help the other kids who were scared" (Nathan D. , 2005). Zirpolo contacted Debbie Nathan after seeing the film *Capturing the Friedmans,* explaining that he felt ashamed seeing the impact of false accusations on a family. He told Nathan he wanted to apologize to the McMartins. Children who falsely accused John Stoll did have the chance to apologize to him. Like the McMartin defendants, Stoll doesn't blame them, and sees them as victims of panic-fueled adults.

Kristin Erickson falsely accused her preschool teachers of sexual abuse after undergoing hypnosis. Six years after she graduated from preschool, her teacher James Toward and the school's office manager, Brenda Williams, pled guilty to mass child sex abuse in order to avoid life sentences. After their arrest, panic ensued in the community, and psychologists warned parents at public meetings that any child who had ever entered the school was a possible victim and needed help (the same notion that was advanced by police in the Friedman case). When Erickson was 12, she was administered hypnosis to help her remember the abuse that supposedly took place. "After a few intense sessions," she told stories of abuse. Soon after, a therapist not associated with the case opposed hypnosis and suggested it would be better to wait until the memories "come up naturally" when the child becomes an adult. Erickson then tried to forget about the incident and it became a "dark secret" in her life. As Erikson matured, she "demonized" her abusers, and "blamed my possible preschool abuse for bouts of sadness, anger, and unsuccessful relationships." The abuse that had never occurred was a harmful ghost throughout her life.

After watching *Capturing the Friedmans*, Erickson contacted several people who believed her preschool teachers to be innocent. Erickson learned there was no evidence in the case beyond the statements of the children. Erickson, now a composer, wrote the 2008 opera *Recantata* about the injustices suffered by the teachers as the result of statements elicited from children.

Erickson has attempted to deal creatively with the trauma she suffered as a false accuser and a victim of "therapy." Through her statements and her art, she makes clear that falsely accusing others is traumatic and has lifelong psychological effects (Erickson, 2009).

As an adult, Friedman student Michael Epstein has described the years of therapy he had with Dr. David Pelcovitz, who worked closely with detectives. Epstein found that Dr. Pelcovitz "was totally convinced" he had been abused, and saw his job as "trying to get me to remember and/or admit that these things had happened".[65]

---

[65] Michael Epstein interview, 8/5/12.

A-0626

Though he eventually capitulated and agreed to say he was abused (repeating details he'd heard from others[66]), Epstein reports that when "they asked me if I wanted to testify, I said 'No, I don't.' Because I knew I was lying."

Epstein only recently told his mother that he lied about being abused by the Friedmans, and that he was never a victim of any sexual molestation. A 2012 email from mother to son contains Arline Epstein's first response (partly excerpted here):

> Dear Mike, Wow this is huge. I'm stunned. In a good way mostly. So much to talk about. I'm very grateful to have this old history cracking open, and that we can talk about and shed some light on what happened and what did not happen. … Thank you for saying that you don't resent us. That means a lot. One of the most important things to realize is that once the police and DA were convinced that children were abused by the Friedmans, they, and especially the psychologists, stressed that it would be so much healthier for the kids if they were able to acknowledge what had happened to them. That obviously set up an insidious situation of applying persuasion and pressure on the children to have them speak about it. … I saw my role as helping you to talk about it in as gentle a way as I could. Yikes, that must have been hellish for you. I am so deeply, painfully sorry for all the stress and distress and confusion and angst, and many other emotions that you went through at that time and in the aftermath. I also terribly regret anything that I may have done to hurt you in any way. Ironically, for the past twenty-five years, one of the greatest regrets of my life was that I didn't somehow protect you from the Friedmans. So I guess I'd have to say this comes as a relief. Still, I did not protect you from the craziness around what didn't happen.

Arline Epstein's email eloquently conveys truths that have led to profound healing in her family – the same healing that could become available to hundreds of other families who were told by police that their children had been molested. She realizes now that her son had no choice but to lie, given pressure from the police, therapists, and even her own efforts to get him to disclose the alleged abuse. She retained a cryptic note written by her then-9-year old son:

> "IDWTTAI!"
> "IDR!"
> "IL !"

25 years later, after revisiting these events with her son, she understands (and he confirms) what he was trying to communicate:

> "I don't want to talk about it!"
> "I don't remember!"
> "I lied!" [67]

---

[66] Michael Epstein interview, 8/5/12.
[67] Arline Epstein notes, 1989.

34

**A-0627**

## VI)    Conclusions

We now know so many things that were unknown to Jesse Friedman and his defense counsel at the time of the case. A few examples:

- No child ever made any allegation or complaint against Jesse until *after* the police launched their investigation;
- The first 30 children questioned said they had not been abused;
- All charges against Jesse arose from statements of child witnesses – and all were based on statements made after the application of suggestive questioning methods;
- Children who attended classes alongside every one of the 14 complainants saw no abuse in those classes;
- There was *no physical or medical evidence* of abuse;
- Police never found pornographic pictures or videos that they alleged existed;
- All of the above and more was known by prosecutors and illegally withheld from Jesse's defense lawyer, and
- There was clear misconduct on the part of police, prosecutors, and the judge.

Most other mass sex abuse convictions of the time have now been overturned and corrected (to the degree that is possible), but the case of Jesse Friedman is ongoing. It is not resolved, and accordingly, there remains a profound opportunity to begin healing for the many victims of the case. First, there are the people who were compelled as children to testify falsely, children who were persuaded they were victims of sexual abuse, and who were certainly victims of the criminal justice system. There are Jesse Friedman and Ross Goldstein who as teenagers, were forced to plead guilty and go to prison. There are the many families that built their lives on the foundation that their sons had been sodomized. There are police officers and prosecutors who likely now believe their case was profoundly flawed. Even they have a chance to heal. As poet Leonard Cohen writes, "There is a crack in everything – that's how the light gets in."

The Appeals Court judges who reviewed the conviction ruled that there is, in effect, a crack in the Jesse Friedman case – and in the processes that led to it. As of this writing, the Nassau County District Attorney has not completed her review of the case. She has the opportunity to be guided by the light that is now shining on her community – and she is in the best position to heal so many people.

The US Court of Appeals described the "ethical obligation of the District Attorney to seek justice," and they made a pointedly personal comment when they referred to her as "the current Nassau County District Attorney, *who was not responsible for the investigation and prosecution of Jesse Friedman.*"

The Court of Appeals ruling makes clear that this review is meant to be about *"the means by which his conviction was procured."*

That includes assessing the "quality of the evidence," which the Court found to be *"extraordinarily suspect."* A fair review will assess the merits of the actual, specific charges brought against Jesse Friedman – and not rest on the notion that "Something Must Have Happened."

35

**A-0628**

Unlike most students of social science, the authors here do not know the outcome of the case that has been central to this study. It is possible, despite the mountain of exculpatory evidence that has emerged in the years since the case was adjudicated, that the current District Attorney will say she found no problems with the case, and will re-affirm the conviction of Jesse Friedman.

More hopefully, she will conclude that the investigation, prosecution, and conviction were flawed, and she will take purposeful steps to correct what happened. Hopefully, she will acknowledge that advances in social science invalidate the old testimony, just as other prosecutors have corrected so many judicial errors by applying the science of DNA.

Jesse Friedman poses no risk to children – but the *idea* of Jesse Friedman as a violent and sadistic sexual offender is *currently* hurting many people, people who listened to and believed what those in authority told them to believe, way back when.

The sorrowful legacy of the Friedman case endures: Jesse Friedman lives with the stigma of being designated a Level III Violent Sexual Predator. Ross Goldstein lives with some of the same challenges. Hundreds of children grew up with the stigma of being sexual abuse victims. While Jesse spent 13 years in prison, these hundreds of children and their families spent those same years (and more) in another kind of prison. They were sent there by the actions and inactions of police officers, therapists, a judge, and a district attorney.

Today, another district attorney can set them free.

36

Works Cited

American Psychological Association, W. G. (1998). Final conclusions of the American Psychological Association Working Group on Investigation of Memories of Child Abuse. *Psychology, Public Policy, and Law*, *4* (4), 933-940.

Association, A. P. (2000). *Position Statement on Therapies Focused on Memories of Childhood Physical and Sexual Abuse.* American Psychiatric Association.

Bandes, S. (2007). The Lessons of Capturing the Friedmans: Moral Panic, Institutional Denial and Due Process. *Law, Culture and the Humanities*, *3*, 293-319.

Best, J. (1990). *Threatened Children: Rhetoric and Concern about Child-Victims.* Chicago: The University of Chicago Press.

Bradley, A., & Wood, J. (1996). How do children tell? The disclosure process in child sexual abuse. *Child Abuse & Neglect*, *20*, 881-91.

Bruck, M. a. (1995). Amicus Brief for the Case of the State of New Jersey v. Michaels Presented by Committee of Concerned Social Scientists. *Psychology, Public Policy, and Law*, *1* (2), 272-322.

Cahill, M. E. (1977). *Sexually Abused Children - Fact, Not Fiction - Hearings Before the House Subcommittee on Crime.* 95th Congress, 1st Session, May 23, 25, June 10 and September 20.

Ceci, S. J., & Friedman, R. D. (2000). The Suggestability of Children: Scientific Research and Legal Implications. *Cornell Law Review*, *86* (33).

Cohen, S. (2002). *Folk Devils and Moral Panics.* Abingdon, Oxon, UK: Routledge.

De Becker, G. (2000). *Protecting the Gift.* NY, NY: Dell.

De Becker, G. (1999). *The Gift of Fear.* New York, NY: Random House.

Erickson, K. G. (2009, January). *Musical Theater - An Investigation: Thesis submitted in partial fulfillment of the requirements for the MFA Degree, Mills College.* Retrieved November 10, 2012, from http://www.kevyb.com/portfolio/wp-content/uploads/2009/10/RecantataPaper.pdf

Friedman v. Rehal, Dennison, and Cuomo, 08-0297 (U.S. Court of Appeals for the Second Circut August Term 2008).

Gardner, R. (1994). *The Sex-Abuse Time-Line Diagrams.* Retrieved February 23, 2013, from IPT-Forensics: http://www.ipt-forensics.com/journal/volume6/j6_3_5.htm

Greenhoot, A., & Bunnell, S. (2009). Trauma and Memory. In J. Mongetta, J. Salerno, C. Najdowski, B. Bottoms, & G. Goodman, *Children as Victims, Witnesses, and Offenders* (pp. 36-56). NY: Guilford.

Grossman, S. (2011). Hot Crimes: A Study in Excess. *Creighton Law Review*, *45*, 33-86.

Hardy, D., Nachman, D., Penn, S. (Producers), Hardy, D., & Nachman, D. (Directors). (2008). *Witch Hunt* [Motion Picture].

**A-0630**

Harris, S. (2010). NIJ Journal No. 267, NCJ 233282. *267*.

Hershkowitz, I. H. (2005). Trends in children's disclosure of abuse in Israel: A national study. *Child Abuse & Neglect , 29*, 1203-1214.

Jenkins, P. (1998). *Moral Panic: Changing Concepts of the Child Molester in Modern America.*

Jones, M. (2004, September 19). Who Was Abused? *The New York Times* .

Kuehnle, K. a. (2010). Child Sexual Abuse Suspicions: Treatment Considerations during Investigation. *Journal of Child Sexual Abuse , 19*, 554-571.

Layton, B. (Director). (2012). *The Imposter* [Motion Picture].

Loftus, E. (1996). Memory Distortion and False Memory Creation. *Bulletin of the American Academy of Psychiatry , 24* (3).

Loftus, E. (2003). Our changable memories: legal and practical implications. *Nature* , 231-233.

London, K. B. (2005). Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways Children Tell? *Psychology, Public Policy, and the Law , 11* (1), 194-226.

Lyon, T. (1995). False Allegations and False Denials in Child Sexual Abuse. *Psychology, Public Policy, and the Law , 1* (2), 429-437.

Maran, M. (2012, September 20). *"My Lie": Why I falsely accused my father.* Retrieved November 11, 2012, from Salon: http://www.salon.com/2010/09/20/meredith_maran_my_lie_interview/

McMurtrie, J. (2005). The Role of the Social Sciences in Preventing Wrongful Convictions. *American Criminal Law Review , 42* (1271).

Memorandum of Law in Support of Motion to Vacade Defendant's Conviction Pursuant to N.Y. Crim. Proc. Law 440.10, 6710, 67430, 69783 (County Court of the State of NY, County of Nassau January 7, 2004).

Nathan, D. (2003, May 20). Complex Persecution A Long Island Family's Nightmare Struggle With Porn, Pedophilia, and Public Hysteria. *The Village Voice* .

Nathan, D. (2005, October 30). I'm Sorry A long-delayed apology from one of the accusers in the notorious McMartin Pre-School molestation case. *Los Angeles Times* .

Nathan, D., & Snedeker, M. (1995). *Satan's Silence: Ritual Abuse and the Making of a Modern American Witch Hunt.* New York: Basic Books.

Newsday. (1988, June 23). New Arrest in Child-Sex Case. *Newsday* .

Olafson, E. (2012). A Call for Field-Relevant Research about Child Forensic Interviewing for Child Protection. *Journal of Child Sexual Abuse , 21* (1), 109-129.

**A-0631**

Case 2:06-cv-03105 Document 372-11 Filed 02/07/20 Page 7 of 236 Page ID #: 4167

Orbach, Y. H. (2000). Assessing the Value of Structured Protocols for Forensic Interviewing of Alleged Child Abuse Victims. *Child Abuse & Neglect*, *24* (6), 733-752.

Pope, H. G. (1998). Recovered memories of childhood sexual abuse: The Royal College of Psychiatrists issues important precautions. *BMJ*, *316* (488).

Rabinowitz, D. (2003). *No Crueler Tyrannies: Accusation, False Witness, and Other Terrors of Our Times*. New York: Wall Street Journal Books.

Sacks, O. (2013, February 21). Speak, Memory. *The New York Review of Books* .

Scientific Status of Refreshing Recollection by the Use of Hypnosis. (1985). *JAMA*, *253* (13), 1918-1923.

Summit, R. (1983). The Child Sexual Abuse Accomodation Syndrome. *Child Abuse & Neglect*, *7*, 177-193.

Summit, R., & Kryso, J. (1978). Sexual Abuse of Children: A Clinical Spectrum. *American Journal of Orthopsychiatry*, *48* (2).

Transcript, A. P. (1990). Health Science Response to Child Maltreatment Conference., *January*. San Diego, CA.

University of Michigan Law School and Northwestern Law School. (2013). *The National Registry of Exonerations*. Retrieved from http://www.law.umich.edu/special/exoneration/Pages/about.aspx

Van de Kamp, A. G. (September 1996). *Report on the Kern County Child Sex Abuse Investigation*.

Wood, J., Nathan, D., & Nezworski, M. T. (2009). Child Sexual Abuse Investigations: Lessons Learned from the McMartin and Other Daycare Cases. In B. L. Bottoms, C. J. Najdowski, & G. S. Goodman, *Children as Victims, Witnesses, and Offenders: Psychological Science and the Law* (pp. 81-101). New York: The Guilford Press.

A-0632

FRIEDMAN CASE REVIEW PANEL
NASSAU COUNTY, NEW YORK
---------------------------------------------------------x
In the Matter of an Inquiry into

The Criminal Conviction of

Jesse Friedman
---------------------------------------------------------x
                    _FLORIDA_
STATE OF NEW YORK)
                              ss:
NEW YORK COUNTY)
        _PALM BEACH_

I, Jeffrey Leff, being duly sworn, hereby deposes and says:

1. I am currently 37 years old.  I currently live at 2340 NW 29th Rd. Boca Raton, Florida, 33431.  I make this Affidavit to provide the Friedman Case Review Panel with relevant information.

2. I remember taking computer classes taught by Arnold Friedman and assisted by Jesse Friedman in their home in Great Neck, NY when I was a child.

3. I was not sexually abused, molested, or sodomized during the computer classes. I am fully aware that there is no way that any sexual abuse or anything else other than computer lessons could have happened in those classes. Nothing inappropriate ever happened during any of the classes I attended, and I attended many of Arnold Friedman's classes.

4. Students did not go off into side rooms.  There was never any yelling or calling for help.  Parents would drop in at any time to pick up their kids.

5. Kids showed up at different times, some were early.  Kids that came early were able to play computer games. I never saw any sexual games. We played games like "Donald Duck's Playground".

6. I do not recall any grownups other than Arnold Friedman and his son Jesse Friedman being present during the computer classes.

7. I remember attending classes with Ron Georgalis, and Eric Alexander.  My brother older brother Gary, and also my half-sister Cindy each were enrolled in the Friedman computer classes as well.

**A-0634**

8. While my recollections and memories are not vivid or exact -- as I was very young and these events took place over 25 years ago -- I am confident in my assertion that if there were any children in the computer classes with me who were being sexually abused I would have been aware of it at the time, and would remember such an event still to this day.

_[signature] Jeffrey Leff_

Sworn before me this

20TH day of June 2013

State of _FLORIDA_
County of _PALM BEACH_
On this _20TH_ day of _JUNE – 2013_
before me personally appeared
_Jeffrey Leff_
to me known to be the person who executed the
foregoing instrument, and acknowledged that he
executed the same as his free act and deed.
SEAL (signed) _[signature]_
                    Notary Public

Notary Public State of Florida
Rolande M Renaud
My Commission EE027522
Expires 10/05/2014

**A-0635**

# STATE OF NEW YORK

## *Kings County (Brooklyn* Borough)

Daniel Aibel, being duly sworn, hereby deposes and says:

1. I attended at least three separate computer classes at the Friedman home during the period in which it is my impression that the police allege abuse took place.

2. On January 10, 2011, a person I know in the Nassau County District Attorney's office suggested he could give my name to Madeline Singas of the team reviewing the Jesse Friedman conviction if I was open to speaking with her. This person knew I had attended computer classes in the Friedman home during the period in question, because after the release of CAPTURING THE FRIEDMANS we had discussed the fact that I had attended computer classes in the Friedman home.

3. On January 13, 2011, I was contacted by Madeline Singas by email. She advised she was interested in speaking with me about my experiences in the Friedman computer class.

4. On or about January 14th, I connected with Madeline Singas and we had a conversation about the case. My recollection is that I asked Madeline Singas how the DA's office would get complainants to talk; whether they would subpoena people; and what their process would be. My recollection is that she advised that they hadn't figured out how they would be approaching complainants and that they hadn't figured out their process.

5. My recollection is that our conversation consisted primarily of me sharing my experiences and observations about the computer classes I attended at the Friedman home.

6. To the best of my recollection, this is the substance of what I reported to Madeline Singas during our discussion:

7. I was never abused or mistreated in any way at the Friedman home. I never witnessed any abuse or mistreatment of any kind. Police visited my home during what seemed to be the very start of the Friedman case (before it was public).

8. The police asked questions that were leading as I understand the term (e.g. questions about whether Arnold Friedman walked around with his bathrobe open, or stood behind me and rubbed up against me).

9. I advised Madeline Singas my mother was available and likely willing to speak to the DA's office.

10. After this conversation, with Madeline Singas, I emailed my mother and advised I'd just had "a longish talk with" Singas and "she'd like to hear what you have to say."

11. My mother tells me that she has no recollection that a conversation with Madeline Singas or anyone else from the Nassau County District Attorney's office ever occurred.

12. After many months passed without my being contacted, I emailed Madeline Singas on August 31, 2011. I reminded her that we had spoken earlier in the year and asked where the process was at that time.

13. On September 9, 2011 she replied that the investigation was continuing. She advised that a report would eventually be made public.

14. In May 2013, having not heard from the District Attorney's office for almost two years, I emailed Madeline Singas again to ask for an update. She replied and advised she would email me when the report was disseminated.

15. When the public report was released several days ago, I was surprised I'd never been contacted again after the initial discussion given that my observations seem to be at variance with the DA's conclusion.

16. Below is some of what the review team would have learned had they continued to seek information by speaking further with me or my mother. Based on my reading of the report, some of this information appears to run counter to what the DA's report presents:

17. Police visited my home three times, the first visit being right at what seemed to be the start of their investigation, before the case was public knowledge. On the first visit, my then teenage sister was alone at home. It is my understanding that two detectives asked to be admitted to our home to wait for me and were allowed in. It is my understanding that my sister was uncomfortable and waited outside for my mother to return. When my mother and I got home, my mother advises that the police told her they wanted to speak with me alone but would not reveal the subject of their inquiry. She declined to allow them to speak to me alone but agreed to let them question me in her presence. Questions asked of me were "leading" as I understand the term (e.g. questions about whether Arnold Friedman walked around with his bathrobe open or stood behind me and rubbed up against me.).

**A-0637**

18. The second time detectives visited our home, my mother advises they pressured her to get me to disclose that abuse had occurred, warning that if I did not I would have sexual problems and emotional problems later on. "They preyed upon my guilt," she has said, saying things like: "Unless you get him to disclose, he will be scarred for life." "Your son is not telling the truth." "Things happened to your son." "Get him to open up about this." My mother reports that she told the police that she visited the Friedman home many times and entered the class, and that she always found the door open. She reported that she herself had attended adult computer classes at the home.

19. The third time detectives visited our home, it is my understanding that they asked to speak with me again. I am told that my mother asked if they had something new to share or something new to ask. It is my understanding that the police advised that they had just spoken to another student who had told them something to effect of "if anybody would know what happened, Daniel would know." My mother reports that she said something like, "You've been here twice. If you don't have anything to add, there is no reason to talk to my son again. He's told you what he observed."

20. My mother attended computer classes with several friends prior to my enrolling. In that class, it is my understanding that Arnold Friedman showed rudimentary computer games which my mother considered silly and funny, not alarming. It is my understanding that these may be some of the same computer games and graphics described in the report as sinister.

21. I enrolled in Friedman classes at least three times, having enjoyed each class, and I would have continued even further had my soccer practice not been scheduled for the same day as the next computer class I was eligible to attend.

22. In the at least three computer classes I attended, it is my recollection that I had a view of the room from at least two different locations. My recollection is that I had seats facing the sliding glass doors, and at another time a seat facing away from the sliding glass doors.

23. My mother advises that she did enter the class to pick me up at times, and found the door open. While some parents picked up their kids from outside, my recollection is that some entered the classroom early to pick up their kids. My recollection is that one child's mother in particular would almost always, if not always, come into the class before the end. My recollection is that I found it frustrating that she chatted with Arnold Friedman, thus detracting from the remaining time for the class.

24. I have no recollection that the front door was ever locked. My recollection is that it was always or almost always open, with only a screen door closed.

25. My recollection is that Arnold Friedman often had trouble controlling the class – kids would act out and my recollection is that he did not strike me as an imposing or intimidating figure; it often seemed that he had an insufficiently commanding presence to keep the kids in line and maintain control of class.

6-27-13

MILAGROS PEREZ
Notary Public, State of New York
No. 01PE6196919
Qualified in Kings County
Commission Expires 11-17-2016

Kenneth V. Lanning
CAC Consultants
4121 Plank Road #115
Fredericksburg, VA 22407

August 4, 2013

**Comments Concerning
Conviction Integrity Review:
People vs. Jesse Friedman
Nassau County, NY District Attorney
June 2013**

1. My name is Kenneth V. Lanning. I am currently a consultant in the area of crimes against children. Before retiring in 2000, I was a Special Agent with the FBI for more than 30 years.

2. I was assigned to the FBI Behavioral Science Unit (BSU) at the FBI Academy in Quantico, Virginia for 20 years (1981-2000). My work in this Unit involved conducting training, research, and case consultation concerning the sexual victimization of children.

3. During this time, I was able to consult on and evaluate thousands of cases involving the sexual victimization of children. Since my retirement from the FBI, I have continued to consult on such cases in much the same way.

4. I have testified on seven occasions before the U.S. Congress and many times as an expert witness in state and Federal court. I have authored more than 30 articles, monographs, and book chapters setting forth what I have learned about understanding the behavior of sex offenders and their child victims and analyzing criminal cases.

5. I am the 1990 recipient of the Jefferson Award for Research from the University of Virginia, the 1996 recipient of the Outstanding Professional Award from APSAC, the 1997 recipient of the FBI Director's Annual Award for Special Achievement for his career accomplishments in connection with missing and exploited children, and the 2009 recipient of the Lifetime Achievement Award for Outstanding Service from the National Children's Advocacy Center.

6. While assigned to the FBI BSU, I was regularly contacted by law enforcement and prosecutors for guidance in cases involving the sexual victimization of multiple child victims. In most of these cases the offenders were not family members but acquaintances (i.e., teacher, coach, priest, scout leader, babysitter, etc.) well known to the child victims. I referred to such cases involving acquaintance offenders with multiple child victims as *child sex rings*.

7. In 1989, the National Center for Missing & Exploited Children published and then distributed thousands of copies of a monograph I wrote titled *Child Sex Rings: A Behavioral Analysis*. In addition to my analysis of these cases and investigative recommendations, this monograph also contains two response protocols for organizing such an investigation. The monograph was updated in a 2nd edition in 1992. The U.S. Department of Justice published in 1992 a monograph I wrote titled "Investigator's Guide to Allegations of 'Ritual' Abuse." This monograph was distributed at no cost by the FBI and has been posted by numerous groups on the Internet.

8. Many people have extreme and stereotypical ideas of what a child sex ring is. As I use the term, however, a *child sex ring* is simply defined as one or more offenders simultaneously involved sexually with several child victims.

9. Cases in which multiple children are sexually exploited by acquaintances involve different dynamics and require different investigative responses than typical or more common intrafamilial abuse cases.

10. Many experts on the sexual abuse of children have little or no experience with acquaintance-exploitation cases especially those involving multiple victims. Almost all their experience is with stranger or intrafamilial-incest cases. The investigation of acquaintance-exploitation cases requires specialized knowledge and techniques. The protocols, policies, and procedures for addressing one-on-one, intrafamilial, child sexual abuse have only limited application when addressing multiple-victim, extrafamilial, child sexual exploitation cases.

11. I have read the June 2013 Report of the Nassau County, NY District Attorney titled "Conviction Integrity Review: People vs. Jesse Friedman" and have opinions, concerns, and questions about its methodology and parts of the basis for its conclusion.

12. Regardless of the term chosen to label it, the Friedman case is clearly one involving allegations that multiple acquaintance offenders repeatedly sexually victimized multiple children over an extended period of time. I would refer to such a case as a *child sex ring*.

13. There are basic best practice policies and procedures applicable to all investigations and prosecutions. As a less common and more complex acquaintance *child sex ring* case, however, both the original investigation and the current Conviction Integrity Review should have included at least some input and guidance from experts with specialized knowledge and experience with this specific type of case. From the Report, I could see no indication that anyone involved, including the impressive Advisory Panel, had such specialized expertise. In the review conducted or the preparation of the Report, the District Attorney did not consult with me.

14. On pp. 132-133, the Report discusses the skepticism concerning Jesse Friedman's conviction based on charges that Arnold and Jesse Friedman both engineered complicated "games" in which play was used as a cover for sexual activity and that some of the "games" reported by the victims were outlandish. To address this concern, the Report states, "experts note that 'acquaintance child molesters' typically employ strategies that start from a premise of making children comfortable through play, and then progress to sex acts." It then quotes from one of my publications stating specifically that the offender "relies more on techniques involving fun, games, and play to manipulate younger children into sex."

15. The concept in the Report that certain pedophiles use fun, games, and play as a premise to make children comfortable before progressing to sex acts was accurately taken from one of my publications, but was used to imply as typical something that is not. The specific "complicated" or "outlandish" games victims described in the Friedman case as a cover for violent sexual activity do not appear to be consistent with the fun and common games I was describing in my

2

publication as part of grooming techniques to lower inhibitions. In my experience, such games are usually part of non-violent manipulation and not violent sexual acts.

16. One primary purpose of the grooming process as used by child molesters is to control child victims without the need for threats and violence, which typically increase the likelihood of discovery and disclosure. Grooming and violence tend to be incompatible. Violence, threats of violence, and blackmail if used are more likely applied by acquaintance offenders when pushing a victim out or attempting to hold onto a still-desirable victim who wants to leave. The Report describes alleged behavior patterns that are somewhat inconsistent by the same offender.

17. If a child victim describes his or her victimization as involving what clearly sound like the behavior patterns of a nonviolent sex offender using grooming, then the fact the alleged offender fits that pattern is corroborative. If a victim describes a violent, aggressive assault, then the fact the offender does not fit that pattern is an inconsistency that needs to be addressed.

18. In the Friedman case, many victim allegations include both elements of grooming with attention, affection and kindness **and** violence with threats, intimidation, and force. This contrast needs to be carefully evaluated and reconciled. The inconsistency could be because the alleged *what* is inaccurate *(e.g.,* distorted account from victim, insufficient details), the suspected *who* has been misevaluated *(e.g.,* incomplete background, erroneous assessment), or the alleged *who* is innocent *(e.g.,* suspect did not commit alleged crime). I saw no indication in the Report of any attempt to evaluate or reconcile these apparent victim control inconsistencies.

19. As a general principle valid cases tend to get *better* and false cases tend to get *worse* with investigation. I get concerned when as an investigation progresses, the number of alleged offenders keeps growing and the allegations get increasingly more bizarre and atypical. The Report seems to support the fact that such progressions did take place over time in the Friedman case investigation but it sets forth no detailed or plausible explanations of their significance.

20. One of the most important victim patterns of behavior investigators need to identify and document is the disclosure process. Investigators should verify, through active investigation, the exact nature and content of each disclosure, outcry, or statement made by the victim. Secondhand information about disclosure is not good enough. To whatever extent humanly possible, the investigator should determine exactly when, where, to whom, in precisely what words, and why the victim disclosed. Efforts to determine answers to these questions are not limited to and sometimes do not even involve asking the child.

21. At one end of the victim disclosure continuum are children whose sexual victimization is only suspected. These may be the most difficult, complex, and sensitive investigative interviews. The investigator must weigh a child's understandable reluctance to talk about sexual victimization against the possibility that the child was not victimized. The need to protect the child must be balanced with concern about damaging the reputation of an innocent suspect and leading or suggestive questioning. This is often the situation in acquaintance-exploitation cases.

22. There is the complex question of whether and what type of an investigation can be conducted to identify victims when there are no disclosing victims or only vague, non-specific

3

complaints. The indication that the behavior of someone with access to children seemingly fits some suspicious pattern would justify what amount of investigation? Does the mere collection (not production) of child pornography justify an investigation into the possibility the identified collector has molested children? Do you interview both intrafamilial and extrafamilial potential victims? How many interviews can you conduct? What other type of investigation is justified? The answers to these questions are not as simple as many think. Such issues should be discussed with supervisors and legal advisors. In the Report, I did not find a clear and detailed discussion of the issues raised by such questions and their possible impact on the original investigation and the current review.

23. It is the job of the professional investigator to nonjudgmentally listen to all victims, objectively assess and evaluate the relevant information, and conduct an appropriate proficient investigation. Investigative interviews should always be conducted with an open mind and the assumption there are multiple hypotheses or explanations for what is being described, alleged, or suspected. Investigative interviews should emphasize open-ended, age-appropriate questions that are hoped to elicit narrative accounts of events. A child's credibility is jeopardized when and if the information was contaminated, obtained through repetitive or leading questioning, and turns out to be exaggerated, unsubstantiated, or false. Whether by audio/video recording and/or detailed notes/reports, all investigative interaction with victims must be carefully and thoroughly documented. As much as possible, such records should reflect the exact terminology used by the victims. The Report openly admits a deficiency in the existence of such documentation.

24. A child's account of victimization might be affected by suggestions, assumptions, and misinterpretations of overzealous interveners. Overzealous interveners can include parents, family members, foster parents, doctors, therapists, social workers, law enforcement officers, prosecutors, and any combination thereof. Victims have been subtly as well as overtly rewarded and bribed by usually well-meaning interveners for furnishing further details. Some "details" of a child's allegation might even have originated as a result of interveners making assumptions about or misinterpreting what the victim actually said. The interveners then repeat, and possibly embellish, these assumptions and misinterpretations, and eventually the victims are "forced" to agree with or come to accept this "official" version of what happened. This possibility needs to be evaluated in any case review.

25. The importance and difficulty of establishing communication with parents in multi-victim extrafamilial cases cannot be overemphasized. Parents must be told that in the absence of some extraordinary circumstance investigators need to interview their children outside of their presence. In some cases departmental policy or the law may give parents the right to be present during the interview of their minor children. If that is the situation, every effort should be made to get parental and/or departmental permission to waive that right. If parents are present during the interviews, any information so obtained must be carefully assessed and evaluated with the understanding of the parents' potentially significant influence on their children's statements. Compromises involving one-way mirrors, video cameras, and out-of-eye contact sitting positions may be possible. Parents should not be given the details of the disclosures of any other victims. Parents should be told of the importance of keeping the details of their child's disclosures confidential, especially from the media and other parents. It appears in the Friedman case

4

parents were frequently present during the interviews of their children and the potential affect of this was not evaluated or considered.

26. Simply the fact that children's disclosures of alleged sexual victimization contain details is not proof that they actually occurred. Cases like the Friedman case where sexual victimization of children by multiple offenders over an extended period of time is alleged are among the most complex and difficult cases to investigate. After much study and research, I discovered that apparent victims often alleged crimes and provided details of activity that did not necessarily happen. Causes include overzealous interveners influencing children's allegations and the phenomenon of contagion in which community members spread and reaffirm each other's stories.

27. Documenting existing contagion and eliminating additional contagion is crucial to the successful investigation and prosecution of *child sex ring* cases. There is no way, however, to erase or undo contagion or contamination. The best you can hope for is to identify and evaluate it and attempt to explain it.

28. In *child sex ring* cases, it is extremely important that investigators evaluate all possible contagion. Consistent statements obtained from different interviews and multiple victims are powerful pieces of corroborative evidence – that is as long as those statements were not "contaminated." Investigation must evaluate both pre- and post-disclosure contagion and both victim and intervener contagion carefully. Are the different victim statements consistent because they describe common experiences/events or reflect contamination or shared cultural mythology?

29. The sources of potential contagion are widespread. Contamination can occur quickly even before any or after only a few victim interviews. Victims can communicate with each other both prior to and after their disclosures. Interveners can communicate with each other and the victims. The team or cell investigation concepts are attempts to address potential investigator contagion in multivictim cases. The same investigators do not interview all the victims, and interviewers do not necessarily share all information directly with each other. The goal of this team or cell concept is defeated if there is too much interaction between the members of different teams or cells. Although teams of investigators were used for the interviews in the Friedman case, from the Report it appears there may have been some investigative cross contamination whose significance was not thoroughly evaluated.

30. Are victims describing events and activities that are consistent with law-enforcement-documented criminal behavior and prior cases, or are they more consistent with distorted media accounts, stereotypical beliefs about child molesters, and erroneous public perceptions of criminal behavior? Investigators should apply the "template of probability." Accounts of child sexual victimization that are more like books, television, news accounts, movies, or the exaggerated fear-mongering of zealots and less like documented cases should be viewed with skepticism, but thoroughly investigated.

31. Unreliable information and false victim denials can be obtained from perfect interviews and reliable information and valid disclosures can be obtained even from highly imperfect

5

interviews. This possibility in no way denies the fact that repetitive, suggestive, or leading interviews are real problems and can produce false or inaccurate information.

32. The judgment of interveners may be affected by their zeal to "believe the children" and to uncover child sexual abuse, pornography, cult activity, or conspiracies. However well intentioned, overzealous interveners must accept varying degrees of responsibility for damaging the prosecutive potential of those cases where criminal abuse did occur and destroying the lives of innocent people where criminal abuse did not occur. Some false claims of threats and force are caused by shame and embarrassment over what actually happened and the children's desire to tell interviewers the socially acceptable version they sense the interviewers may prefer to hear.

33. Investigators should not just accept something sexual happened to a child and ignore the context details that are necessary if it is to be proven in a court of law. If a child makes a disclosure, investigators must attempt to determine not just *what* is alleged but also the details of the context in which that disclosure took place. When the only evidence offered is the word of a child against the word of an adult, child sexual victimization can be difficult to prove in a court of law.

34. It is not the job of law-enforcement officers to believe a child or any other victim or witness. The child victim should be carefully *interviewed*. The information obtained should be *assessed and evaluated*. Appropriate investigation should be conducted to *corroborate* any and all aspects of a victim's statement. The investigator should always be an objective fact-finder considering all possibilities and attempting to determine what happened with an open mind.

35. Although it provides few specific details, the Report clearly indicates that to varying degrees the investigators in the Friedman case misunderstood behavioral inconsistencies; engaged in repetitive, leading, and suggestive questioning; provided rewards and incentives to alleged victims; and indicated a bias toward validating victimization. The Reports suggests this had little significant impact on the case. Without the details of the interviews, however, it is impossible to evaluate this claim with any degree of certainty. The information in the Report provides minimal insight into the details of original interviews.

36. For example, as part of the justification for its conclusions, the Report on pp. 103-104 states that witness 11 was interviewed during the review and, uninterrupted by questions, told them that: the police were aggressive, but never told him what to say; he was terrified when the police came because Jesse had promised to kill his dog if he reported to the police; he was aware that Jesse attended the alternative Village School, which also terrified him, because he perceived that students at that school were outside the mainstream; the police came several times and he initially told them that nothing had happened; it was clear that the police would keep coming; a female detective warned that he would never enjoy a "normal" relationship with a woman if he covered for the Friedmans; he took the class for several years, and was abused more by Arnold than Jesse in the early years such as when Arnold would sit next to him, put his hand on his leg, and rub it; that from there the activity escalated; and he felt that he was being groomed.

37. Some issues raised by this one interview include: Exactly what does it mean for the police to be aggressive? Why did the police keep coming back if he had said nothing had happened?

6

How many times? Why was it clear the police would keep coming? Why would he have sexual problems with women if he did not tell something happened? Is it appropriate or leading for the police to suggest this? Are they implying he would become gay? Why didn't he report Arnold's activity during all those years if Arnold had not threatened violence or gone to a non-traditional school? Why did he keep returning to class? Is it consistent for offenders to both groom and use threats of violence? Did the review team consider these questions? Did these statements raise concerns about the reliability and validity of the witness's original allegations? If not, why not?

38. I recognize that the original Friedman investigation was conducted more than 25 years ago. Investigative procedures have changed and improved, memories fail, and old records are hard to find and follow. However, there is no way to evaluate the past investigation and conviction with confidence without understanding the dynamics of this specific type of case and having access to all relevant material.

39. The criminal-justice system must use fair and objective criteria for evaluating the accuracy of allegations of child sexual victimization and filing charges against the accused. The lack of corroborative evidence is significant when there should be corroborative evidence. Blindly believing everything in spite of a lack of logical evidence or simply ignoring the impossible or improbable and accepting the possible is **not** good enough. If some of what the victim describes is accurate, some misperceived, some distorted, and some contaminated, what is the court supposed to believe? Until we come up with better answers, the court should be asked to believe what a thorough investigation can corroborate, understanding that physical evidence is **only one form of corroboration**. In those cases in which there simply is no corroborative evidence, the court may have to make its decision based on carefully assessed and evaluated victim interviews/testimony and the elimination of alternative explanations.

40. Any attempt to review Jesse's conviction should include competent and objective professionals documenting the disclosure process, evaluating potential contamination, and assessing interview procedures with access to and analysis of the most detailed and contemporaneous notes, reports, statements, records, transcripts, documentation, and evidence available.

Kenneth V. Lanning
CAC Consultants
Fredericksburg, VA

Subscribed and Sworn before the undersigned Notary Public
On the 4th day of August, 2013

my commission expires 2/28/17

Sara B. Faye
County of Spotsylvania
Notary Public, State of Virginia

7

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU:  TRIAL TERM:  PART 3
 2   -------------------------------------------X
     In the Matter of
 3   JESSE FRIEDMAN,

 4             Petitioner,
                              INDEX NUMBER:
 5                               4015-13

             - against -
 6
     KATHLEEN M. RICE, in her official
 7   Capacity as the
     NASSAU COUNTY DISTRICT ATTORNEY,
 8
             Respondent.
 9   -------------------------------------------X
                              Mineola, N.Y.  11501
10                            June 28, 2013
                              APPLICATION
11
     BEFORE:
12
                  HONORABLE F. DANA WINSLOW, JUSTICE
13
     APPEARANCES:
14

15       LAW OFFICE OF RONALD KUBY
             Attorney for Petitioner
16           BY: RONALD L. KUBY, ESQ.
             BY: LEAH BUSBY, ESQ.
17

18       NASSAU COUNTY DISTRICT ATTORNEY
             Attorney for Respondent
19           BY: ROBERT A. SCHWARTZ, ADA
             BY: JUDITH R. STEINBERG, ADA
20

21

22

23

24

25                       CHERYL D. CHESTER, CSR RPR
                          Official Court Reporter
```

```
 1                THE COURT:  For the record, the first matter before
 2     we begin is in the form of an announcement, and
 3     congratulations as well.  Our esteemed court reporter's son
 4     has just been hired to start work in September by the
 5     District Attorney's office.  Does that present a problem for
 6     the petitioner?
 7                MR. KUBY:  Only in a general idealogical sense, not
 8     in terms of this case.
 9                THE COURT:  Was that a yes or a no?
10                MR. KUBY:  It was a no, Judge.
11                THE COURT:  I thank you so very much.
12                And with equal concern to the District Attorney's
13     office, do you have an objection or a comment with respect
14     to that particular issue?
15                MR. SCHWARTZ:  Certainly not, your Honor.
16                THE COURT:  The next item on the agenda is one that
17     is going to be, in large part, conducted by Mr. Bagnuola.
18     Mr. Bagnuola has received several applications.  He's the
19     one who knows, because everyone is referred to him if they
20     ever tried to contact the Office of the Press.  And I
21     understand that there have been some applications produced.
22                At this point, Mr. Bagnuola, would you kindly read
23     off and then present to me the applications, and then I will
24     get the positions of each of the parties.
25                MR. BAGNUOLA:  Both media outlets that presented
```

1 these agreed to pool if anyone asked for that.  They're

2 filming or, excuse my vernacular, shooting with a still

3 camera.

4   Mr. Drew Scott made an application to have a

5 camera.  Uli Seit, from the New York Times, still

6 photographer, make a request to take still photographs in

7 the courtroom.

8   THE COURT:  We will start off with those two.

9 Petitioner, any objections?

10   MR. KUBY:  None.

11   MR. SCHWARTZ:  No objection, your Honor.

12   THE COURT:  Thank you.  Without objection, we will

13 go through the process of setting it up.  Mr. Bagnuola, do

14 you have any other applications?

15   MR. BAGNUOLA:  If you could give me five minutes to

16 have them set up in the jury box.

17   THE COURT: Any other applications at all from

18 anyone?  That is the extent of the applications?

19   MR. BAGNUOLA:  That is the extent.

20   THE COURT: Anybody else in this courtroom have any

21 recording equipment or visual equipment, taking pictures,

22 cameras, anything that they wish to use?  The Court does

23 have to be aware of the presence, and certain rules will

24 exist about how to proceed with the press.  Anybody?

25   All-right.  At this point I see cameras come

1    through the door.  This is the News?

2            MR. BAGNUOLA: Correct.

3            VOICE FROM THE AUDIENCE:  Correct.

4            THE COURT:  You need about five minutes?

5            MR. BAGNUOLA:  Five minutes, please.

6            THE COURT:  If you would kindly start your setup.

7    I won't ask either the petitioner or the respondent to

8    provide us with entertainment for the next five minutes.  I

9    think that thoughtful introspection may, in fact, be helpful

10   if you want to take advantage of it.  Thank you.

11           I want to inform everybody here that someone from

12   the Daily News has appeared as well to take photographs

13   only.  Any objections?

14           MR. KUBY:  None.

15           MR. SCHWARTZ:  None, your Honor.

16           MR. BAGNUOLA:  There is only one other person.

17   Rather than exclude her I will bring her in.

18           VOICE FROM THE AUDIENCE:  I am from the Associated

19   Press.  I want to make sure we will have access to pooled

20   photography.

21           VOICE FROM THE AUDIENCE: I am with the Great Neck

22   Record.  I am wondering if I can use a smart pen?

23           THE COURT:  You may use a smart pen or a

24   not-so-smart pen, anything you would like to do to record,

25   except electronically.  Then I would have to circumscribe,

1   or may have to circumscribe, because we have a court

2   reporter who is fully capable of recording every single

3   word.

4         MR. KUBY: Judge, since I am old I think didn't

5   know what a smart pen is. Is a smart pen actually a video

6   recording device?

7         THE COURT: It is a recording device. We use smart

8   pens here as well for other things but recording.

9         So you are intending to record; is that correct,

10  ma'am?

11        VOICE FROM THE AUDIENCE: Yes, sir. I was hoping

12  to.

13        THE COURT: All-right. You recognize that there

14  will be a recording available to you through the feeds that

15  are being established at this point?

16        VOICE FROM THE AUDIENCE: Yes, sir. And when, your

17  Honor, would those be available?

18        THE COURT: Pardon me?

19        VOICE FROM THE AUDIENCE: When would those be

20  available.

21        THE COURT: Mr. Bagnuola?

22        VOICE FROM THE AUDIENCE: After we are finished

23  here.

24        MR. BAGNUOLA: At the conclusion.

25        (A discussion was held off the record.)

Case 2:06-cv-03136-JS Document 37-2 Filed 02/07/2008 Page 27 of 236 PageID #: 4187

1        THE COURT:  You are satisfied with receiving the

2    feed that would be available.  And I think, though you have

3    the smartest per. in the world, that you're going to find

4    proper recordation done as it has been set up by Mr.

5    Bagnuola.

6        There is something else, Mr. Bagnuola?

7        MR. BAGNUOLA:  I was under the impression that we

8    were going to pool the still photography.  The photographers

9    have to check with their editors first.

10       THE COURT:  If you have, and this is the only

11   exception, so that is acceptable to you?

12       VOICE FROM THE AUDIENCE:  I guess my question is,

13   is there a fee attached to this?

14       THE COURT:  I'm not in charge of fees.

15       VOICE FROM THE AUDIENCE:  As far as I know --

16       THE COURT:  In fact, the Court can order that there

17   be no fee attached.

18       VOICE FROM THE AUDIENCE:  Thank you, your Honor.

19       THE COURT:  You are more than welcome, ma'am.

20       (A discussion was held off the record.)

21       THE COURT: The Associated Press, because of the

22   pooling requirement, maybe others as well, has withdrawn its

23   application to share the photographs and will not be using

24   them.  But that doesn't mean they don't have access to

25   anything and everything else that is produced in the course

1     of this proceeding.

2             All-right.  I think that the briefest overview

3     would be appropriate before we begin.  I am not going to go

4     back to the mid '80's, '85, '86, '87, '88 and so on, except

5     to say that the Friedmans, both Arnold and Jesse, among

6     others, were in fact convicted and sentenced.  In one case

7     in 1987 in the federal prison system, and then in 1988, in

8     December, with Jesse Friedman.

9             Thereafter, Jesse Friedman, who is the petitioner

10    in this case, served a sentence until 2001.  Then he was

11    released.  In 2003, thereabouts, a movie was made.  And

12    then, thereafter, an application in the nature of a habeas

13    corpus proceeding was commenced in the United States

14    District Court for the Eastern District of New York.  And

15    then that determination was in turn appealed, resulting in a

16    20-10 determination by the United States Circuit Court of

17    Appeals for the Second Circuit, which denied the application

18    for habeas corpus relief but did provoke certain reactions

19    from the public and from Mr. Friedman, as I understand it.

20    That, in turn, led to the district attorney at that time

21    establishing an integrity review panel, and the dates are

22    not exactly clear, and a case advisory panel.  The Court

23    wasn't aware of the case advisory panel until recently.

24            The petitioner did make an application before this

25    Court commencing in December, approximately, going through

1    to April and the appeals.  It was based upon a refusal by

2    the appeals board to permit a FOIL, Freedom of Information

3    Law review of the full records maintained in connection with

4    the Jesse Friedman case.  Two letters were sent by counsel

5    for Mr. Friedman.  And then, thereafter, when there was a

6    continual denial because of a exhaustion of remedies at the

7    time that the second letter was denied by the appropriate

8    board in Nassau County, the matter was brought to this

9    Court's attention.

10        And the Court's earliest view of this particular

11   case was in April of this year.  It was in the nature of an

12   Article 81 proceeding to reverse and require -- reverse the

13   determination of the district attorney's office and the

14   police department, if there was overlap, and to have a

15   withdrawal of the plea that was entered by Mr. Friedman, as

16   an end result, being frustrated at that point in time

17   because there was insufficient information according to

18   petitioner.

19        The first time that this Court had the opportunity

20   to have a conference on the record with everyone was June

21   4th, at which time the Court was informed by Mr. Schwartz

22   that there would be available the report that was started in

23   2010.  It would be a report made available by June 28th,

24   today.  I asked for and received the report.  I asked for it

25   at that time, and received the report on Monday, June 24th

1    of this year.

2            Since that time a great deal else has happened.

3    There has been communication to assure that there has been

4    adequate, appropriate communication between the petitioner

5    and the respondent with respect to timing, production of

6    documents, and other administrative matters.  And there has

7    in fact been a call -- there had been two calls, one visit

8    by Mr. Schwartz of the district attorney's office to bring,

9    to make available certain documents.  The documents that

10   were initially provided to the Court were provided

11   electronically and were taken directly off the Nassau County

12   District Attorney's website.  However, the Court reached a

13   bit of an impasse when it saw that there would be close to

14   1,000 pages in the appendix, and did make the request that

15   might be overburdensome, could the district attorney work

16   out a more effective way?  And Mr. Schwartz assisted, and I

17   thank Mr. Schwartz for his assistance in this matter and his

18   capable and rapid response.

19           So, from time to time the following were received

20   during this week.  First, the electronic report that was

21   just mentioned.  Second, was an un-redacted duplicate, hard

22   copy, excuse me a redacted hard copy of that report.  And

23   that was by the following day.  And that is, please don't

24   stand up and hold it up because it would put a strain on the

25   strongest of people, and I certainly put you in that

Case 2:06-cv-03679-JS, Document 37-2, Filed 02/07/2008, Page 31 of 236, PageID #: 4191

1    category but don't want to test your strength at this time.

2    We did receive, then, the appendix in redacted form.

3         Having looked at both the advisory panel report and

4    the report denominated as the executive summary by Miss

5    Rice, and the appendix that we received in multiple volumes,

6    the Court came to the conclusion there was very little that

7    it could do without an un-redacted portion of this report.

8    So it made its request. And, once again, the district

9    attorney's office complied immediately, and within a day did

10   provide a redacted portion, which except when actually used

11   by this Court has remained under lock and key.

12        Something else happened during this period of time

13   as well. It is going to be confined to a characterization

14   rather than a more explicit description. The Court received

15   three unsolicited letters from different people who may have

16   been involved in one fashion or another in this case. The

17   Court has temporarily placed that, as well, under seal and

18   has kept it under lock and key.

19        As of today the Court is extremely interested in

20   finding out certain issues, and is going to do it in reverse

21   fashion. Mr. Kuby, you're not going to have the first word

22   in this case. Mr. Schwartz, I would ask if, in fact, there

23   is a difference in the information that was supplied to the

24   integrity panel and the information supplied to the advisory

25   panel, could you enlighten us what that difference was?

1         MR. SCHWARTZ:  Thank you, your Honor.

2         THE COURT: Thank you.

3         MR. SCHWARTZ:  Before I answer that question

4    directly, I would just also like to add that we supplied the

5    Court, upon request, with un-redacted copies of all of the

6    witness statements in this case.

7         THE COURT:  You did.  And if it wasn't clear when I

8    said un-redacted appendix, these were witnesses who were

9    described with a number, number 2, 8, 12, 26, 25, whatever

10   it is, absolutely supplied, and the Court looked at it as

11   part of the appendices.

12        MR. SCHWARTZ:  You assured the district attorney's

13   office that those too would absolutely remain under seal and

14   be kept confidential.

15        THE COURT:  And they will be and are right now.

16        MR. SCHWARTZ:  Okay.

17        With respect to your question of whether all the

18   materials that were seen by the advisory panel, that was a

19   subset of the records that were available and seen by the

20   review team.  The review team, being the executives in the

21   district attorneys office that conducted the actual

22   investigation.  They, of course, had access to the entire

23   Jesse Friedman file.

24        THE COURT:  I have that reputation, I'm afraid well

25   deserved, of breaking in from time to time just for

**A-0657**

1    clarification.  I want to be sure that I understand what you

2    are saying.  Are you saying that there is a difference

3    between the review panel and another panel that the district

4    attorney's office had, and they reviewed different

5    documents?

6         MR. SCHWARTZ:  We like to refer to the members of

7    the district attorney's office that actually conducted the

8    investigation as the review team.  I think it's easier to

9    remember it that way.  The four independent experts that

10   guided the investigation, oversaw the investigation, gave

11   advice and counsel to the investigation, that is the

12   advisory panel.

13        THE COURT:  Yes.  So is this a question of

14   terminology?  There were two or there were three separate

15   entities?

16        MR. SCHWARTZ:  Two.  One team, one advisory panel.

17        THE COURT:  All-right.  I didn't understand it

18   quite that way a minute ago but fine.  Please continue.

19        MR. SCHWARTZ:  Okay.  The review team, which

20   consisted of members of the district attorney's office, had

21   access and saw more documents than the advisory panel did.

22   For example, there were literally several thousand pages of

23   letters that we received that Jesse Friedman had written.

24   Those were supplied to the review team, the district

25   attorney's office.  They culled through all of these

1   letters.  The vast majority of those letters did not contain

2   any information relevant to the re-investigation, and so

3   they were not shared with the panel.  Some letters that were

4   relevant were, of course, shared with the panel, and they

5   were seen by the panel.

6           There are historical documents.  There are legal

7   papers.

8           THE COURT:  Historical documents?  I am not quite

9   so sure --

10          MR. SCHWARTZ:  I will explain, your Honor.  There

11  are legal papers that have been filed in connection with the

12  original Article 440 motion in state court, things of that

13  nature.  I don't know that the advisory panel has seen all

14  of those legal papers.  I think they saw the bulk of them.

15  Surely everything that is referenced in the report and

16  everything that is in the appendix -- just to be clear, the

17  report refers to more documents than are in the appendix.

18          THE COURT:  The Court noted that, and that was

19  going to be a question, because there was a seeming gap in

20  the numbering in a couple of places.

21          MR. SCHWARTZ:  There was what we found to be a

22  logical reason for that.  The appendix was just getting too

23  large.  Documents that -- there were legal documents.  The

24  original Article 440 papers that were filed, those were kept

25  out.  Some of it was kept out for just the sake of keeping

1    the appendix within reasonable size.  There were other

2    documents that were kept out because we felt that they would

3    be unduly salacious, your Honor.  We didn't want to make

4    them available to the world.

5            THE COURT:  Unduly salacious?

6            MR. SCHWARTZ:  Yes.  I am specifically referring to

7    a story that Mr. Friedman possessed and/or wrote while he

8    was in prison.

9            THE COURT:  That was kept from them because?

10           MR. SCHWARTZ:  Excuse me, your Honor, it wasn't kept

11   from the panel, it was kept out of the appendix.

12           THE COURT:  But the panel saw it?

13           MR. SCHWARTZ:  Yes.  It's referenced in the report.

14   Everything referenced in the report the panel saw.  That is

15   important, your Honor.  Everything referenced in the report,

16   whether or not it's in the appendix, the panel saw.

17           THE COURT:  Including witness statements and

18   affidavits in which the witnesses received numbers rather

19   than a name?

20           MR. SCHWARTZ:  They saw redacted copies of the

21   witness statements.

22           THE COURT:  All-right.  And could you please just

23   inform us what you mean by redacted.  Redacted in what way?

24           MR. SCHWARTZ:  The identity of the victims was

25   blacked out.

**A-0660**

1          THE COURT:  Nothing else was blacked out except the

2     identity of the victim, as you have characterized it, right?

3          MR. SCHWARTZ:  Do you have information, Mr. Kuby?

4          MR. KUBY:  It's not my turn.

5          THE COURT:  Exactly.  I thank you very much for

6     helping me out, but please don't help me.

7          MR. SCHWARTZ:  I don't believe Mr. Kuby would have

8     any idea what was redacted from those reports.  The best I

9     can tell, your Honor, is that nothing of substance was

10    redacted from the reports.  There may have been some other

11    information that would reveal the identity of the victim,

12    something other than their actual name.  I have people here

13    in the courtroom that I could consult with and I could be

14    more explicit, but that is all I know standing before you

15    now.

16         THE COURT:  Who made the determination of

17    substance?

18         MR. SCHWARTZ:  That would have been the review

19    team.

20         THE COURT:  Okay.  And the review team consists of

21    senior district attorneys, ADAs?

22         MR. SCHWARTZ:  Members of the district attorney's

23    executive staff, your Honor.  All are very seasoned, very

24    experienced prosecutors.

25         THE COURT:  And they were all prosecutors, or was

**A-0661**

1      there at least one or more special investigators?

2              MR. SCHWARTZ:  I believe the review team had

3      available to it investigators who work for the office to

4      help with various tasks.  But they certainly didn't make any

5      substantive decisions about what the advisory panel would

6      see or what would be redacted from documents.

7              THE COURT:  Who made that decision is where I

8      started the question.  Who made that decision?

9              MR. SCHWARTZ:  That would have been the members of

10     the review team.  Most decisions were made jointly by all or

11     some of the members of the review team.

12             THE COURT:  Okay.  But not including the

13     investigators and others who were actually members of the

14     team as well, at least as the Court understood it, there was

15     one special investigator who was a member of the team who

16     was not an assistant district attorney.  I just want

17     clarity, that is all.

18             MR. SCHWARTZ:  My understanding, I don't want to

19     play a game of semantics, is that the review team consisted

20     of executive assistant district attorneys.  They had the

21     resources of the whole office.  That does include, of

22     course, non-ADAs.  But certainly, Judge, no ADA or

23     non-executive made substantive decisions about what should

24     or should not be redacted from the report.

25             THE COURT:  Either collectively or individually?

1    Collectively meaning with everybody else, or individually?

2              MR. SCHWARTZ:  That is my understanding.

3              THE COURT:  All-right, next.  Go ahead.

4              MR. SCHWARTZ:  I forgot the question now, your

5    Honor.

6              THE COURT:  All-right.  I wanted to be sure that

7    the record is very clear, and I'm clear, as to the

8    difference, if any, and I think we've seen some differences,

9    of the information that was provided to the review team and

10   the information that was provided to the advisory group, the

11   four members of the advisory group.  What was the difference

12   in what they got?  Because, quite frankly, and I'm sure that

13   you recognize that an advisory group, like any expert, and

14   you've seen that enough I know, Mr. Schwartz, is only as

15   good as the information that they have and are utilizing in

16   reaching determinations and opinions.

17             MR. SCHWARTZ:  I want to reiterate that the

18   advisory panel's function was, had more to do with the

19   process, the standard of review that would be applied to

20   make sure that the investigation was moving in the right

21   direction, to offer suggestions about other areas of inquiry

22   too.  I wasn't part of the review team, your Honor.  I don't

23   know, frankly, but that is my understanding, to give

24   guidance, to give suggestions, to make sure that the

25   investigation was being conducted fairly.  You can read from

1       their letter that --

2               THE COURT: I have.

3               MR. SCHWARTZ: -- that is what they did.  The core

4       investigation, the fact finding, was done by the review

5       team.  And they, of course, had access to the entire file.

6       Whether they utilized it all, I don't know.

7               THE COURT: Let me be sure that I understand that.

8       Are you saying that the advisory panel had access to all --

9               MR. SCHWARTZ: No, your Honor.  In fact, the one

10      thing that they did not have access to was grand jury

11      minutes.

12              THE COURT: Anything else?

13              MR. SCHWARTZ: The review team did.

14              I would like to make a point, Judge, before we

15      continue down this line.

16              THE COURT: Certainly.

17              MR. SCHWARTZ: I think that this is an important

18      issue that is getting missed here.  This is an Article 81

19      proceeding, to review the determination made by the district

20      attorney's office that we would not turn over the records

21      sought by Mr. Kuby pursuant to the Freedom of Information

22      Law, as we know it FOIL.  That request from Mr. Kuby was for

23      records that were shown to the review panel.  And that is

24      important, your Honor.  I think that has gotten lost here.

25              That is all that was in that FOIL request, copies

1    of records that were shown to the review view panel.  In

2    essence, Mr. Kuby wanted to be on the same footing as the

3    review panel.  He wanted to see or have access to everything

4    that the review panel was seeing.  He never asked for the

5    entire case file.

6         MR. KUBY:  Excuse me, Judge, this is just

7    categorically wrong.

8         THE COURT:  Thank you, Mr. Kuby.  And I will say

9    that the application that I've seen from Mr. Kuby does seem

10   to go beyond what you say.

11        MR. SCHWARTZ:  Yes, it does, your Honor.  That is

12   an important part of this proceeding.  He's asking for

13   things now that he never asked for in his FOIL request.

14        THE COURT:  That you may blame on this Court to the

15   following degree.  This Court felt that it was extremely

16   important to have the review panel's report in hand so that

17   it could be used as a basis for the district attorney's

18   office, and for Mr. Kuby to proceed further if they are

19   going to.

20        It may, in and of itself have been sufficient, and

21   it may not be sufficient.  I haven't heard from Mr. Kuby

22   yet.  But I know that there is a question, one way or the

23   other, insufficient or not.  But until we have it, there is

24   no way that we could ever know.  So, I did ask, and on

25   consent everybody agreed.  We're not going to pursue some of

1    the particularity requested by Mr. Kuby until I get that, so

2    long -- until I get the report, so long as it doesn't exceed

3    June 28th. And I am commending you for making it earlier.

4    Thank you.

5         MR. SCHWARTZ: I have no issue with that, your

6    Honor. Where I am concerned we're getting far afield, is

7    that we're focusing on documents and records that were seen

8    by the review team. Those are documents that are being

9    requested now, but were not requested under FOIL.

10   Therefore, one of our arguments, among many, is that request

11   was never instituted and it's not properly before the Court.

12   Now, we haven't submitted a formal response yet.

13        THE COURT: And you have every right to, and I will

14   not ever consider a final determination in this case with

15   respect to the Article 78 issues until you have presented

16   your response.

17        MR. SCHWARTZ: I think it's until we submit our

18   response, and the Court can consider these issues, that

19   requesting additional disclosures is premature.

20        THE COURT: I will differ with you, and haven't

21   differed greatly so far, on this particular point. Because

22   in order for this Court, I'm assuming that Mr. Kuby will say

23   the same thing but he doesn't have to. This Court did need

24   to have as much information as it could that would lead to a

25   proper education, and therefore, a proper determination.

1   And that is why if we are to consider the advisory panel of

2   value, and their finding, then it's necessary to know what

3   it was that the advisory panel was looking at, and how they

4   reached their conclusion.  And that is why we've spent the

5   time that we have, just trying to be sure that there isn't a

6   disconnect.

7           MR. SCHWARTZ:  But, your Honor, the wisdom of the

8   underlying conviction here is not before this Court.

9           THE COURT:  Absolutely correct.

10          MR. SCHWARTZ:  The findings of the review team,

11  supported by the advisory panel, are not before this Court.

12  In an Article 81, brought after a FOIL denial, the issue is

13  whether, and it's solely whether we properly applied the

14  exceptions.  That is the issue here.

15          THE COURT:  You think it's a 78 issue entirely?

16          MR. SCHWARTZ:  Article 78, that is the issue now.

17          THE COURT:  Article 78 and the 78 exceptions

18  therein.

19          MR. SCHWARTZ:  That is the sole issue, whether we

20  properly applied the exceptions.  I understand Mr. Kuby has,

21  separate and apart from that, two other applications.  One

22  is an application before this Court saying, under Civil

23  Rights Law 50-B, where I'm not entitled to see the identity

24  of sex crime victims, I can make a proper showing.  And I'm

25  asking the Court to make an exception and allow me access to

Friedman vs. Rice                                    22

1    these materials.  That is separate and apart from the file.

2          In fact, what we do submit in our papers, it's an

3    oral motion, this is not even the proper court for that

4    application.  It should be heard in County Court where the

5    criminal proceeding was heard.

6          The other application by Mr. Kuby is for grand jury

7    materials.

8          THE COURT:  I am sorry.  Has the jurisdiction of

9    this Court been appealed in some fashion that I'm unaware

10   of?

11         MR. SCHWARTZ:  When we submit our papers we are

12   making an issue of the jurisdiction, not with respect to

13   Article 78 as it applies to the FOIL determination, but we

14   are saying the 50-B determination, and the grand jury issue,

15   should be heard across the street because that is what the

16   statute says.

17         THE COURT:  I also many have to spend a great deal

18   of time on what appears to be semantics.  This Court is

19   faced with, as the district attorney has herself said,

20   integrity, integrity of the process, the integrity of the

21   process, as demonstrated by the investigation of the panel,

22   as demonstrated by the advisory panel's seeming agreement

23   with the panel itself, with the review team itself.  Those

24   are the things that this Court is supposed to examine.  This

25   is part of the Article 78, not just yes or no, and then let

**A-0668**

1    the Appellate Division decide. No. This is something that

2    this Court is undertaking, as it understood from everybody

3    from the very beginning, to determine whether or not there

4    is a basis to have disclosure of certain documents made to

5    Mr. Friedman.

6            MR. SCHWARTZ: Ultimately that is the issue

7    regarding the 50-B and the grand jury. But the reason why I

8    say it's better to be heard in County Court, is because that

9    is the Court where Mr. Kuby, Mr. Friedman's new 440 motion

10   will be brought. The motion to vacate the conviction, which

11   he has assured us is forthcoming, will be heard over there,

12   not before your Honor.

13           You look perplexed, your Honor.

14           THE COURT: The reason why I look perplexed is I

15   am. The reason why I am perplexed, is because this Court

16   has got to determine the Article 78 before the petitioner

17   proceeds further. Either they're going to get additional

18   information, which they hope is going to be supportive of

19   their contentions, or they're not going to get that

20   information.

21           MR. SCHWARTZ: What, in essence, you seem to be

22   doing is making a determination in deciding whether or not

23   you're going to turn over these documents. You seem to be

24   making a determination whether you believe the conviction

25   was sound or not sound. And, respectfully, I would submit

**A-0669**

1    that is not the issue that is before this Court.  An Article

2    81 on FOIL is to determine whether we correctly denied --

3         THE COURT:  Mr. Schwartz, and then we can end this

4    and go on to another topic altogether.  This doesn't sound

5    greatly different than the issue presented to the Second

6    Circuit Court of Appeals in which it made the determination

7    that the statute of limitations had run by 64 or 65 days,

8    and it would not allow for the withdrawal of the plea.  And

9    went on from there to say it has serious questions about the

10   nature of the conviction.  And it was the district attorney,

11   after receipt of that decision, who decided to establish

12   this very same review time, review process, including the

13   advisory panel.  So that is why I am not deviating from what

14   has been presented to me in any fashion.

15        All-right, sir.  Is there anything else that you

16   think should be clarified with respect to the documentation

17   that has been provided to this Court, redacted and

18   un-redacted?

19        MR. SCHWARTZ:  I would like to reserve my right if

20   anything else comes to mind, but I think that is it for now,

21   your Honor.

22        THE COURT:  Absolutely.  You certainly have those

23   rights.  You certainly have the opportunity, in your

24   response, in writing, to demonstrate what your position is

25   in the fashion you believe to be most effective.

**A-0670**

1          Mr. Kuby, sir?

2          MR. KUBY:  Thank you, Judge.  Well, it was a long

3     and fascinating colloquy.  I would like to go back to the

4     question, at least the question that I heard you asking,

5     which materials were presented to the -- I am going to call

6     them the outsiders versus the DA's office, if I may do that.

7     Which materials did the DA's office review that were not

8     provided to the outsiders?

9          From what I heard Mr. Schwartz saying, I think that

10     is absolutely correct, from what I know of the process and

11     after the process ended.  I do have access to the outsiders.

12     I do know a bit about what happened out there.  Mr. Schwartz

13     has stated, quite honestly, that the initial determination

14     of what the panel should see was made by the district

15     attorney's office.  So you already had this very substantial

16     filter put in place, that whatever gets shown to the panel,

17     we're going look at it first and make a decision as to

18     whether or not the panel really needs to see this.

19          Mr. Schwartz said well, a lot of this is just

20     because there are so many pieces of papers and these folks

21     are really busy.  To a certain extent that is true.  What he

22     did not tell you is that the district attorney's office

23     invoked its rights, both under the grand jury section of the

24     CPL not to reveal the grand jury minutes, as well as their

25     50-B rights to not reveal to the panel anything that would

1    tend to identify sex abuse victims.

2          So the same screen that they're applying to me is

3    the screen they applied to the outsiders.  There was no

4    court order ever sought to show good cause as to why the

5    outsiders should see this material.  Although I did

6    specifically ask that the chief assistant district attorney

7    go to court and get an order so you can show it to the panel

8    and you can show it to us.  If you come in and say there's

9    good cause, and we agree there's good cause, I can't imagine

10   that any judge is going to say no, I'm not convinced of

11   that.  I think that in most cases the court would defer to

12   the parties on that determination, provided that there were

13   proper safeguards in place for no further disclosure.  The

14   DA's office refused to do that.

15         The DA's office uses 50-B as a shield, has

16   consistently been used not just against our desire to have

17   some information, but also in determining what they think

18   the outsiders should see.  I don't believe the Court used

19   the phrase garbage in garbage out, but certainly that

20   principle.  A determination is only as good as the evidence

21   on which it's made, is certainly relevant here.  If you look

22   at the advisory committee statement, they acknowledge that

23   they did not review the evidence.  In fact, I think until

24   you got it, Judge, you are the first person in 25 years who

25   doesn't get a pay check from them who has ever taken a look

1    at it.

2          They're dancing around the question.  But I suggest

3    a simple way of proceeding to the Court.  They take

4    everything that was given to the review panel and they hand

5    it over with a little index.  Then they take everything that

6    the DA's office reviewed, that is one pile.  It is what the

7    outsiders saw.  The other pile is what the insiders saw.

8    And I know that the insider pile will be substantially

9    larger and contain substantially more information of

10   precisely the type that will help us establish good cause.

11   The Court can then review that body of documents that the

12   DA's office decided they weren't going to bother the pretty

13   little heads of their advisors with.  Because while I can't

14   know the details of what they fail to provide because, of

15   course, it's all opaque, I do know that many, if not most,

16   of the original police reports were not provided to the

17   members of the outside team.  So that is one way to proceed.

18         Now, the DA's office made a shockingly disturbing

19   statement to the Court that in many ways, I think,

20   characterizes, better than I can, the flaws in this process

21   and, frankly, some of the disingenuousness.  The DA's office

22   took the position that they were not going to include the

23   so-called salacious material.  If the Court reads the

24   papers, even if the Court doesn't, the salacious material

25   they are referring to were eight pages of incest and

1    bestiality and child porn that they supplied to members of

2    the press this week in response to the press making a FOIL

3    request.  So they weren't going to offend their tender

4    sensibilities, but as soon as the press say hey, we would

5    like bestiality and incest porn, they handed it right over.

6    So they're not sparing everybody's sensitivities here.

7    They're more than willing to hand it over.

8          The real reason they didn't include this has

9    nothing to do with the content of these documents.  Because

10   we actually got these documents last night, after the New

11   York Post ran a huge story about Jesse Friedman writing

12   incest and child porn in prison based on the FOIL documents

13   they got.  If the DA's office -- that was the fastest

14   turnaround for FOIL.  We haven't gotten a single piece of

15   paper from them in two years.  But the press said, please

16   send us some bestiality and torture porn, it's online within

17   48 hours.  Amazing what they can do when they try.

18         What they did not include is the fact that they

19   left out the word "not" in their submission.  That is to

20   say, we can now establish Jesse Friedman did not write that

21   pornography.  The reason we know that is through a fairly

22   brief search, admittedly a somewhat unpleasant one, online.

23   We were able to determine this pornography exists online.

24   It is credited to a person with another biline, and has

25   nothing to do with Jesse Friedman's authorship.  Moreover,

1    if you look at the document, I don't know if you have, they

2    wanted to spare your tender sensibilities, it was clearly

3    written on a fairly decent word-processing device.  And

4    Jesse Friedman, in prison until 2000, had a crummy little

5    Smith Corona.  So, accordingly, he didn't write it.  The

6    DA's office could have figured it out if they cared to, as

7    could the outsiders.

8         Jesse Friedman did not possess it.  The reason we

9    know Jesse Friedman did not possess it, is we have the

10   actual inmate misbehavior report that charged him with

11   possessing this material.  And the disposition says "not

12   guilty".  Here is a copy for the Court.  Here's a copy for

13   the DA's office.  That actually says not guilty in two

14   different places.  Admittedly, Judge, this was done, the

15   original document was done on that triplicate thermal paper

16   of a generation ago or two generations ago.

17        It's not that easy to assume the Court has done

18   78's before on prisoner possessions.  Jesse Friedman was

19   charged with possession of this pornography.  He was also

20   charged with unlawful possession of inmate legal material,

21   and offering legal assistance in exchange for money or

22   favors.  He was charged on July 13, 2000.  He had a hearing

23   commenced on July 26, 2000 and July 27, 2000, and he was

24   found not guilty.  The last page, which is the computer

25   printout of the DOC's inmate report, indicates that

1     adjudication.  It shows he was, in fact, found guilty of two

2     charges relating to possession of another prisoner's legal

3     material, but makes no mention of pornographic bestiality,

4     incest pornography, because he was found not guilty of it.

5     He didn't possess it.

6            THE COURT:  Hold it.  You are saying that the

7     absence of a determination is equal to a negative

8     determination; is that right?

9            MR. KUBY:  No, although I could because I think --

10           THE COURT:  I am sure you could.

11           MR. KUBY:  My Latin isn't good, but I think

12    inclusio -- by including this you exclude it.

13           THE COURT:  I would suggest you stay away from

14    Latin.

15           MR. KUBY:  What I will say is, if you actually

16    look, and admittedly it's difficult to see -- maybe the DA's

17    office in their investigative efforts may be able to get

18    another copy of the specific handwritten adjudication, which

19    contains the three charges, unauthorized assistance,

20    unauthorized possession of legal material of another

21    prisoner, which is the third one, and literature, which is

22    the charge referred to on 7-13.

23           There are handwritten notations from the hearing

24    officer.  Guilty of the first count, which is unauthorized

25    assistance.  Number three, guilty of giving another

**A-0676**

1    prisoner, possessing his legal materials.  As to the

2    literature, which is referenced in the 7-13 report, it is

3    written not guilty.  In fact, the not guilty is written

4    twice.  Now, when it goes to the computer system it doesn't

5    list all of the charges for which you were acquitted.  The

6    computer disciplinary record just illustrates what the

7    primary document shows.  This was just a complete and utter

8    and total falsehood that served no purpose whatsoever in

9    terms of what we are actually trying to find out here.

10            THE COURT:  Why don't we then go to what we are

11   trying to find out?

12            MR. KUBY:  Moving on to what we are actually going

13   to find out, our obligation is to show good cause as to why

14   we should have these documents under 50-B (2)(b).

15            THE COURT:  Before you begin, under Civil Rights

16   Law 50-B, who is the victim?  Who is a victim?  Is a victim

17   a person who made a statement at one time or another to law

18   enforcement, recanted thereafter, and is willing to come

19   forward?  Is that person a victim?

20            MR. KUBY:  I think in the issues of the law,

21   although this doesn't help my position --

22            THE COURT:  Go right ahead, because I have looked

23   at various cases and I haven't seen, in the eyes of the law,

24   the question.  Go ahead.

25            MR. KUBY:  I think that there are two arguments.

**A-0677**

1  One is, I am sure the DA's office will make it, unless and

2  until the conviction is overturned by a court of competent

3  jurisdiction that person remains a victim.

4  Then there is the common sense interpretation,

5  which is somebody who allegedly made statements when he was

6  eight-years-old in response to improperly, admittedly

7  improper techniques used by the police at that time, and has

8  now come forward, as did Kenneth Doe, who fully recanted as

9  a grown man and says you know, I have always felt bad about

10  this. I didn't like what happened. But let me tell you

11  these things never happened, they never happened.

12  THE COURT: And is that person a victim on a common

13  sense basis?

14  MR. KUBY: Of course not on a common sense basis.

15  THE COURT: A legal basis you think he might be?

16  MR. KUBY: I think, you know, the prosecution can

17  make an argument certainly, and it's not incredible or

18  disingenuous, that you retain your status, your legal

19  status, unless and until the conviction is overturned, since

20  it was the conviction -- why should I argue against myself?

21  Ask them.

22  THE COURT: Because -- hold it.

23  MR. KUBY: Yes, sir.

24  THE COURT: Thank you very much. I'll do the

25  questioning. Thank you.

**A-0678**

1          MR. KUBY:  Okay.

2          THE COURT:  The issue of the Alford or the modified

3     Alford plea was something that I probably spent more time on

4     than I had to but considered seriously.  And it is the case

5     that I am interested in determining if there were, let's

6     say, 20 are 30 people who were questioned, is it the

7     questioning, is it the interrogation, is it the testimony

8     before the grand jury, is it something else from your

9     perspective?  I can ask, I know that I will receive an

10    answer from the district attorney's office.

11         MR. KUBY:  Let me both directly answer your

12    question, try to be as intellectually honest as I can to be

13    subject --

14         THE COURT:  Please underline that, ma'am, as honest

15    as he can be.  Okay?

16         MR. KUBY:  If I'm going to take the position, which

17    I think is legally acceptable and supportable, you remain a

18    sex crime victim by virtue of the adjudication of guilt of

19    the offender.  That is, if Jesse Friedman still stands

20    convicted of 13 counts involving 13 victims, I think that it

21    would certainly be consistent to say that what makes those

22    people victims is not what they've said subsequently or

23    whatever is said at other times, what makes them victims is

24    the fact there are criminal convictions against Jesse

25    Friedman.

1          Similarly, and by the same token, the fact that

2     many other, or some other people may have come forward, the

3     DA's office sort of opaquely refers to and says, me too.  It

4     was terrible and awful.  There were all these things going

5     on.  Those things in issue are not victims.  The total

6     number of victims that we are dealing with here are actually

7     16 people, because one of the charges was withdrawn.

8          THE COURT:  That would mean 17 minus 1 is 16, or 14

9     minus 1 is 13, or some other figure altogether?

10         MR. KUBY:  I think that their chance -- the

11    prosecution, when we had our very first conference and they

12    sort of oddly insisted that the people who they're trying to

13    protect the identities of, people they are trying to

14    protect, that we're not supposed to know.  They insisted

15    that we have to serve all of those people which, of course,

16    completely undercuts the notion that we don't know their

17    identities.  It's sort of an odd thing to insist in the

18    Article 78 proceeding brought to obtain these documents.

19         THE COURT:  The Court rules, so the record is

20    clear, there is nothing in the 50-B that requires either

21    side, they just have to be served and notified.  And that

22    was the ruling, correct?

23         MR. KUBY:  That's exactly right, Judge.  I said

24    they should do it.  They said we should do it.  I believe

25    the Court said Mr. Kuby, you brought this thing.  So why

1    don't you serve the people you can serve.  If there are any

2    people you can't serve, take it up with the DA's office.

3         We served everyone by name.  We know their names,

4    addresses, where they work.  The People are protecting

5    nothing at this point except the statements and other things

6    which are not protected under 50-B, except to the extent

7    they're there to protect the identities.  Once we know the

8    identities, then they're really protecting nothing.

9         We went ahead and served those people, because we

10   all agreed at that conference the total size of the

11   community and universe.  This was the first question the

12   Court asked, what is the size of the universe of people who

13   need to be given notice here?  The prosecution said 14 is

14   the universe.  When went back through the indictment we

15   realized there were another three people that testified

16   against Arnold Friedman, and those resulted in convictions.

17   We added those.  You asked that.  Three months ago you

18   answered it.

19        They cannot -- they can do whatever they want.

20   They should not be allowed to come back and say oh, there is

21   a whole bunch more other people that we have to spent

22   another like three or four months giving notice to.  We will

23   delay further and maybe we will run out of Judge Winslow

24   before the hearing is over.

25        THE COURT:  I am interested in hearing what you

 1    think should transpire here, after knowing full well that

 2    the district attorney's office has a right to respond to

 3    your Article 78 request.

 4           MR. KUBY:  Thank you, Judge.  First thing I would

 5    like to do is just submit to the Court, and a copy for the

 6    prosecution, a letter dated today.  I actually finished

 7    writing it much earlier today.  I will give you the original

 8    which briefly makes the, recapitulates the good cause

 9    argument, tying it to the Second Circuit's decision, because

10    that is where the good cause comes from.  I understand the

11    prosecution doesn't like what the Second Circuit said.  They

12    want a rejoinder.  Fine.  It doesn't change what the Second

13    Circuit said.  So this is for the Court.

14           (A document was handed.)

15           THE COURT:  Thank you, sir.

16           MR. KUBY:  There are some original documents in

17    there.  That is not an exhaustive treatise.  Out of

18    abundance of --

19           THE COURT:  Caution?

20           MR. KUBY:  -- caution, I make reference in this

21    submission to the November 30, 1988 letter, which

22    specifically states who the complaining, then complaining

23    witnesses were.  And it lists them by the doe name.  And

24    next to the doe name is the real name.  We've had this since

25    November 1988.  We never revealed these names, not because

1    we are not required to, but because there is no mandate

2    against us.  It seemed like the decent thing to do.  So to

3    the extent there is any question as to who and for how long

4    we have actually known the identities, the only thing that

5    they are allowed to protect, that letter illustrates that.

6    And so I think that the prosecution probably wants that copy

7    placed with the other un-redacted documents.

8         THE COURT:  Speaking of redaction, the record will

9    reflect that this is a letter from the district attorney's

10   office dated November 30, 1988 to Mr. Peter Panero, which

11   the Court recognizes as counsel for Jesse Friedman on that

12   date, and thereabout that time.  I don't have the second

13   page to it.  I don't know whether or not there is something

14   more or less.

15        MR. KUBY:  I don't either.  I assume the DA's

16   office has it in their files.  I assume it won't give it to

17   me because it will tell me the names of the people on the

18   front page that I have.  But that -- it serves as further

19   confirmation.  I promised the Court last time I would supply

20   the list of the affidavits of service.

21        THE COURT:  Thank you.

22        MR. KUBY:  Everybody who has been referenced by

23   name has been noticed.  I do have a copy for the district

24   attorney's office.

25             (A document was handed.)

1          MR. KUBY: In terms of documents, the last one I

2     would like to submit is the un-redacted Kenneth Doe letter.

3     That has Kenneth Doe's actual name, Kenneth Doe's e-mail

4     address.  The objection that I made was to the way Chief

5     Assistant District Attorney Singas dealt with Kenneth Doe,

6     the way that Mr. Doe perceived he was being intimidated.

7     The prosecution has this.  I sent it to them on May 24th.  I

8     would like the Court to have the un-redacted copy as well.

9          THE COURT:  Are you talking about a contemporaneous

10    communication between Kenneth Doe and Miss Singas?

11         MR. KUBY:  He is listening to Miss Singas' voice on

12    his office answering machine, then he responded to it

13    contemporaneously.

14         .    THE COURT:  Contemporaneous today, within the last

15    few months, years?

16         MR. KUBY:  I'm sorry, Judge, I didn't understand

17    what you were saying.  Mr. Doe submitted his -- well when

18    the Court, when we had agreed on the procedure to serve the

19    common interest --

20         THE COURT:  This was a pretty easy question I

21    thought.  Can you give me some kind of a time frame?

22         MR. KUBY:  May 20, 2013 he submitted this letter to

23    the conviction integrity team.  A day later, in specific

24    violation of his specific request to not be contacted at

25    work, or at all except or through one e-mail address, Miss

**A-0684**

1    Singas violated that specific request and called him at his

2    office and left a detailed message, within which she

3    explained that she needed to explain to him, more or less,

4    the consequences of his decision, not the consequences, the

5    implications of his decision to recant.

6              I would be happy to submit that to the Court under

7    separate cover.  But this is my letter to Miss Singas, and

8    the original Kenneth Doe statement to the panel.  The one I

9    submitted to the Court and the one that I've given to other

10   people has substantial redactions because they do tend to

11   identify him.

12             THE COURT: How do we proceed from here?

13             MR. KUBY:  The People have had this since the

14   beginning of April.  I know they were hoping the day would

15   come when they didn't have to answer.  And I have been a

16   lawyer long enough to know I never want to do anything

17   before I have to.  Presumably they had a good running start.

18   They, again, rephrased this jurisdictional argument, and

19   they want to tell a State Supreme Court Justice that he has

20   no jurisdiction here.  I mean fine.  It's not an argument

21   that I've ever felt particularly comfortable making,

22   particularly since I am making it to the person deciding it.

23             They have been talking about this for three months.

24   I think they should be given two weeks, maybe three weeks to

25   submit anything and everything they wish to submit to the

1    Court in response to our petition, and we be given a couple

2    of weeks after that to reply.  And then the matter is sub

3    judice before you.

4         THE COURT:  Submitted at least, is that what you

5    are saying, sir?

6         MR. SCHWARTZ:  Your Honor, I feel compelled to

7    respond to some of the statements that Mr. Kuby made.

8         THE COURT:  I knew you would.

9         MR. SCHWARTZ:  He stood before your Honor and

10   insisted Mr. Jesse Friedman did not write and/or possess the

11   statement that was seized from him by correction officials.

12   And he indicates on a form that is illegible that he was

13   found not guilty of that offense.  Whether or not he was

14   adjudicated not guilty, we have strong evidence supporting

15   our assertion that he did write and/or possess that

16   statement.  And I would like to quote from a letter that Mr.

17   Friedman wrote to his uncle Howard:

18        "I wrote what turned out to be a short story.  I

19   did not set out to write it as such.  I was bored.  I was

20   lonely.  (I was horny.)  I had an intriguing dream.  Wanted

21   to put it on paper mostly because I could not get the idea

22   out of my mind and the only way to eject an idea is to put

23   it on paper.  Then I forgot about it.  Unfortunately, I

24   can't share what I wrote with anyone.  In all honesty it is

25   pornographic, very pornographic.  Hey, I was bored.  I know

**A-0686**

 1    there are a lot of writers who can earn the dollars to eat
 2    by selling pornography.  And it gives them the freedom for
 3    other writing.  But I did not write it to sell.  I wrote it
 4    to get it out of my mind, and because some day I would like
 5    to share it with Charles.  Other than that, I doubt anyone
 6    will ever read it.  But I wrote it.  What else was there to
 7    do Friday with my life?"
 8             MR. KUBY:  I want to respond to that, of course.
 9             THE COURT:  Before we go any further, we're
10    starting to get more and more information as time goes on.
11    Has any of this information, from your perspective, been
12    shared?  Maybe Mr. Kuby didn't share the information with
13    respect to the disposition of the internal disposition of
14    the inmate, but since there was a communication to you or to
15    someone else was that ever shared before this moment?
16             MR. SCHWARTZ:  Shared with Mr. Kuby?
17             THE COURT:  Yes.
18             MR. SCHWARTZ:  I am not aware if it was or wasn't.
19    And I am not aware if this, where this letter came from,
20    whether we got it directly from the uncle or we got it from
21    someone else.  I can get that answer to you if you want to
22    give me a moment.
23             THE COURT:  In terms of giving you a moment, you're
24    going to have some time.  But I think that we have taken the
25    global and made a microscope out of this particular

1    incident.

2           MR. SCHWARTZ:  Your Honor, it was important.

3    Certainly aspersions were cast upon my office alleging that

4    we made allegations that Mr. Friedman possessed and/or wrote

5    this story and, in fact, it wasn't true.  I felt it was

6    important to let the Court know that, in fact, we did have

7    strong, sound reasons for coming to the conclusion that Mr.

8    Friedman did, in fact, write and/or possess that.

9           MR. KUBY:  I'm sorry, Judge.

10          THE COURT:  No.  Thank you very much, Mr. Kuby.  If

11   you would kindly take a seat.

12          Mr. Schwartz, who on the review team, the advisory

13   panel, saw this packet, the actual, purported letter or note

14   written by Mr. Friedman?  And then thereafter the follow-up,

15   which included the determination that was seemingly made by

16   the corrections department.  And then after that the letter

17   that you have in your hand right now.  Did any team or panel

18   ever see any of those documents?

19          MR. SCHWARTZ:  The review team and the panel both

20   had the inmate's behavior report explaining that the story

21   was found in Mr. Friedman's, what they call a contraband

22   locker.  And he was cited for violating directive 4572.

23          THE COURT:  And the disposition, was that also

24   disclosed?

25          MR. SCHWARTZ:  I want to answer it this way, your

1    Honor.

2              MR. KUBY:  The answer is no.

3              THE COURT:  Thank you.

4              MR. SCHWARTZ:  The disposition was included.  The

5    not guilty that Mr. Kuby refers to is not legible.  Mr. Kuby

6    wrote that in.  It may or may not, in fact, be accurate.

7              MR. KUBY:  I'm sorry, Judge.  Why don't you put me

8    under oath.  He just accused me of forging a document.

9    They're the ones to do that, Judge, not us.

10             MR. SCHWARTZ:  I made no such allegation.

11             THE COURT:  Hold it.  Neither one of you are going

12   to shout like this at each other in this courtroom.  That is

13   it.  There will not be outbursts such as this.

14             MR. KUBY:  Apologies.

15             THE COURT:  I thank you for that.

16             Now, it is the case that you have said that Mr.

17   Kuby was the person who wrote not guilty, right?  Did I

18   misunderstand you?

19             MR. SCHWARTZ:  I may have misspoken.  What I meant

20   to say is, it is handwritten in.  I don't know if it was Mr.

21   Kuby, someone from his law office, someone from the Friedman

22   team, but it's handwritten in because it's illegible in the

23   printed form.  For whatever reason, I am not even saying

24   it's not accurate, but it's not legible.  I read the

25   document this morning before coming to court.  I never saw,

**A-0689**

Friedman vs. Rice                    44

1    on my copy, the words "not guilty". The first time I saw it

2    was in a copy that Mr. Kuby handed to me.

3          MR. KUBY: May I just try to clarify what these

4    documents are? I'm not going to go back and forth on this.

5          THE COURT: For one minute. That is something that

6    took place in July, purportedly took place on July 13, 2000?

7          MR. KUBY: This?

8          THE COURT: Correct.

9          MR. KUBY: Correct, July 13th.

10         The inmate misbehavior report, which is the

11   accusation of unlawful or illegal activity in the prison,

12   it's the charge. What they did not show to the outsiders,

13   and have not disclosed, was the adjudication of the charge,

14   which was not guilty. That is found in several places.

15   It's found twice in the actual adjudication report. I know

16   that they don't know much about what goes on inside the

17   prisons they send people to but in 2000 --

18         THE COURT: And you do?

19         MR. KUBY: Unfortunately, I know a bit more than

20   they do.

21         THE COURT: They do from hearing it from others and

22   not from personally participating.

23         MR. KUBY: I have actually spent more than a couple

24   of nights, but let's not go into my youth, please.

25         THE COURT: I would avoid that in all cases, I can

**A-0690**

1    tell you.

2         MR. KUBY:  These forms are thermo triplicate forms;

3    that is to say, it was the step after carbon paper.  And

4    there are three or sometimes four sheets.  And they're

5    filled out by hand by the corrections staff.

6         And these findings are consistent with, in fact do

7    represent the determination of the hearing officer.  I

8    suppose we could know that in a couple of different ways.

9         THE COURT:  Mr. Kuby, I'm going to help both sides

10   out, because in your response, Mr. Schwartz, the Court has

11   an expectation that you're going to address this very issue.

12   And we're going to have a legible form of the disposition or

13   adjudication of the charges made.  And you, because you're

14   going to have an opportunity to reply, will be able to do

15   so.  So we don't have to go any further with surmise and

16   conjecture.

17        Next.  Did you have something else that you needed

18   to say, Mr. Schwartz?

19        MR. SCHWARTZ:  I was going to respond to a number

20   of other statements made by Mr. Kuby, your Honor.

21        THE COURT:  That can't wait until you respond to

22   the Article 78; is that correct?

23        MR. SCHWARTZ:  It can.  I just wanted to make sure

24   that no other orders were going to be issued before that

25   time.  If the next thing on board is for us to submit our

1     response, then I'm fine with sitting down, your Honor.

2          THE COURT:  Now, have you seen any orders that were

3     issued sua sponte or were issued, in this case, in any

4     fashion?  The answer to that is rhetorical because the

5     answer is no.  All-right.

6          MR. SCHWARTZ:  I did receive certain requests to

7     have materials brought by the end of the day.

8          THE COURT:  Oh, yes.

9          MR. SCHWARTZ:  I gave them.

10         THE COURT:  I will say with a certain amount of

11    pride, that when this Court has ran into an impediment, in

12    that it could not make accurate determinations because the

13    information wasn't here, it did reach out with letters,

14    carbon copied to Mr. Kuby, saying please provide it.  I have

15    to have it.  This is the information that you have in one

16    particular form.  And I thanked you for your immediate

17    response.

18         MR. SCHWARTZ:  So, your Honor, if we can have three

19    weeks to submit our response, we will do so.

20         THE COURT:  Two weeks for a reply?

21         MR. KUBY:  Yes.  Unfortunately I don't have my

22    calendar.

23         THE COURT:  We have a calendar over here.

24         MR. KUBY:  Okay.  People's response by Friday, the

25    19th, or Monday the 22nd?

Friedman vs. Rice                                        47

```
1              MR. SCHWARTZ:  I would appreciate the 22nd.

2              MR. KUBY:  I have no objection.

3              THE COURT:  By the 22nd.  And I'm assuming that

4     this is of July; is that correct?

5              MR. KUBY:  Correct.  We will have our reply in on

6     the 5th of August.

7              THE COURT:  How close is that to Labor Day?

8              MR. KUBY:  A few weeks.

9              THE COURT:  Two weeks away from Labor Day.  I don't

10    think --

11             MR. KUBY:  I have my reply in by the 5th of August.

12             THE COURT:  Oh, the 5th of August.  Excuse me.  I

13    stand corrected.  The 5th of August it is.  The 19th for the

14    DA's office, the 5th of August for the reply.

15             Is there anything else that this Court has to

16    address before we adjourn?

17             MR. SCHWARTZ:  I believe you said July 19th and we

18    agreed to the 22nd.

19             THE COURT:  The 22nd.  You are absolutely right.

20    The 22nd.  It was initially the 19th.  And you preferred to

21    have that weekend that you could use to work, and of course

22    you can.

23             MR. SCHWARTZ:  Thank you.

24             THE COURT:  Anything else?

25             MR. KUBY:  Is there some time you would like to see
```

**A-0693**

Friedman vs. Rice                                                    48

1    us all again?

2            THE CCURT:  There may be some time.  If you two, or

3    any combination thereof, wish to have a conference with the

4    Court, the Court would be more than happy to oblige

5    telephonically, electronically, in the courtroom.  Just ask.

6            MR. KUBY:  Fine.  Thank you very much, Judge.

7            THE CCURT: Absolutely.

8            MR. SCHWARTZ:  Thank you, your Honor.

9            THE CCURT:  Thank you all very much.  I thank you.

10   This matter is adjourned at this point.

11           Insofar as anybody speaking to the press, would you

12   kindly do so outside in about two minutes.  Mr. Bagnuola is

13   taking over at this point.

14           (Whereupon, this matter was concluded.)

15                              oOo

16                  C E R T I F I C A T E

17

18       I, Cheryl D. Chester, Official Court Reporter, Supreme

19   Court, Nassau County, N.Y., do hereby certify that the foregoing

20   is a true and correct transcript of the proceedings.

21

22

23

24       _____
         Cheryl D. Chester, CSR, RPR
25       Official Court Reporter

COUNTY COURT
NASSAU COUNTY
-------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

                Defendant.
-------------------------------------------------------------x

### AFFIDAVIT OF ARLINE B. EPSTEIN

ARINE B. EPSTEIN, having been duly sworn, hereby declares:

1. I am a resident of Greenwich, Connecticut, and a former resident of Great Neck, New York.

2. I am the mother of Michael Epstein, a student in the Friedman computer classes.

3. Attached to this petition as an exhibit is a true an accurate copy of a letter I wrote on August 19, 2013 to the Honorable F. Dana Winslow, of the Supreme Court Nassau County.

4. Attached to this petition as an exhibit is a true and accurate copy of my prepared statement to the Friedman conviction review panel dated January 22, 2013.

5. Attached to this petition as exhibits are true and accurate excerpts of transcripts of conversations I had regarding the events surrounding the Friedman prosecution.

6. Attached to this petition as an exhibit are true and accurate copies of notes I took of various meetings and events during the Friedman prosecution from 1987 to 1989.

Dated:     June 17, 2014

                                      Arline B. Epstein

**A-0695**

## JURAT WITH AFFIANT STATEMENT

State of _Connecticut_

County of _Fairfield_          } ss.

☐ See Attached Document (Notary to cross out lines 1–7 below)
☐ See Statement Below (Lines 1–7 to be completed only by document signer[s], *not* Notary)

1

2

3

4

5

6

7 _____

_Signature of Document Signer No. 1_          _Signature of Document Signer No. 2 (if any)_

Subscribed and sworn to (or affirmed) before me

this _17_ day of _June_ , _2014_ , by
      Date          Month          Year

_Arlene B Epstein_
      Name of Signer No. 1

_____
Name of Signer No. 2 (if any)

_____
Signature of Notary Public

**ILA WILLIAMS**
**Notary Public**
**Connecticut**
**My Commission Expires Oct 31, 2016**

_____
*Any Other Required Information*
*(Residence, Expiration Date, etc.)*

──────── OPTIONAL ────────

*This section is required for notarizations performed in Arizona but is optional in other states. Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _Affidavit_

Document Date: _6/17/2014_          Number of Pages: _1_

Signer(s) Other Than Named Above: _____

© 2013 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #25924

**A-0696**

*Arline B. Epstein*
*521 W. Lyon Farm Drive,*
*Greenwich, CT 06831*
*203-209-9338 abepstein@gmail.com*

August 19, 2013

Honorable F. Dana Winslow
Supreme Court, Nassau County
100 Supreme Court Drive
Mineola, NY 11501

Your Honor:

I am the mother of Michael Epstein, referred to as "Witness 25" in the Nassau County District Attorney's "Conviction Integrity Review" of the Jesse Friedman case (the "Report.") My name, statement, and documents are mentioned many times in the Report.

After reading the Report I felt mystified and dismayed. Based on my direct experience with how the Review Team treated me and my evidence, I have to conclude that this is not an impartial, balanced Report.

I am writing this not to quibble about minor details. My intention here comes from my adamant desire to get as close as possible to the truth of what happened in this case.

When our son Mike told my husband and me last fall – to our shock -- that he had *not* been molested by the Friedmans, I immediately immersed myself in the case. I poured over my dozens of contemporaneous notes from 1987-89; spoke to psychologist Dr. David Pelcovitz, who had treated our son during those years; sought out new research done by the filmmakers of "Capturing the Friedmans;" called and wrote to several parents I had known whose children had testified against Arnold or Jesse or both; and met with Jesse Friedman to hear what he had to say. Then, I came forward to present my evidence to the Review Team.

I did not enter into this endeavor casually. When I came forward I was not motivated by personal gain, other than the benefit of supporting our son and of knowing that I was acting responsibly. On the contrary, I realized early on that I would probably lose friendships I had with the other mothers in our former "Friedman lunch group," and that has in fact happened. As a private person, I often felt I was putting myself into a painful, vulnerable position. Suddenly I became "Google-able," and our 25-year-old "family secret" (though now revealed as false) became very public. Despite all this, I was determined do whatever needed to be done, as I will continue to do.

1

**A-0697**

The DA's Report ignores, discounts, and mischaracterizes much of my evidence. In fact, only *one-fifth* of my notes are included. Many of the missing notes contain information that weakens or undermines the Report's arguments.

As an example, I have two notes that show occasions when police interviewed children for many hours in one sitting. In referring to one of these notes, the Report withholds the most important information it contains: that the child in question had been interviewed for *five hours*. Another of my notes from a conversation with the mother of complainant "Barry Doe," after Detective Merriweather had interviewed her son, told of a *seven hour* session with a child that had not produced any accusation. This note was omitted from the Report entirely.

One of the foundational claims of the Report is that children were not subjected to these multi-hour interviews ("Nor, Detective Jones said, was any child 'ever interviewed for four hours at one sitting.'" Page 69).

It is shocking that the DA would choose to entirely exclude these two notes that directly undermine an essential premise of her review.

Further, the DA relies on a recent interview by the Review Team with Detective Merriweather (who is mentioned 27 times in the DA's report as having procured many of the most extreme accounts of abuse), to support the Report's claim that detectives did not subject children to multi-hour interviews:

> Nor, [Merriweather] said, did detectives have time to "linger" with children and coax favorable testimony from them, because the case grew so rapidly, and included so many potential victims. (pg. 67)

It is equally remarkable that the DA would choose to exclude a note that directly contradicts the claim of the Detective on whom she relies to make her argument.

Though the DA repeatedly stresses in the Report that it is a difficult task to reconstruct the events of the case given the passage of 25 years, she overlooks or excludes most of this first hand primary source material that comes from a mother who, with her son, was deeply involved in the case. It is worth noting that at the time I had – like virtually everyone in Great Neck -- been convinced of the Friedmans' guilt, so my contemporaneous notes were not biased by any desire to discredit the police or their techniques. In the flood of accusations and hysteria, I was just writing down what I was told by police and others.

The Report also discredits me as a witness. In particular, it portrays me as a kind of puppet of "the filmmakers," implying that I was manipulated into my views by someone else, ignoring the emotional and intellectual evolution that naturally resulted (before I even met the filmmakers) from *my son's thoughtful disclosure to me that he had not been abused by the Friedmans*.

2

**A-0698**

The DA even implies that my documents were edited or crafted for me by the filmmakers, as if my open dialogue with them as part of my own discovery process is something for which I should be chastised.

I will not here go into the details of how the Report also mischaracterizes my son Michael's statements, discounting his relevance for a catalogue of reasons (because "he did not become a complainant;" because "his allegations did not affect Jesse's decision to plead guilty;" because documents "can be explained in any number of ways," or have "no certain interpretation," or have "no evidentiary value.")

I will say generally that the DA works hard to discredit my son – a high level engineer at a major software company, with an impeccable educational and professional record -- rather than viewing him as a unique resource in this kind of investigation because he:

- took dozens of classes in the Friedman house,
- was aggressively interviewed more than once by police,
- confirms their use of leading questions and bullying tactics including threatening that he "would incline towards homosexuality if he failed to [disclose abuse]" (pg. 127)
- states that he was not abused in any way,
- sat alongside two major Complainants in the very classes in which abuse was alleged,
- states that the Complainants were never abused in his presence despite their claims that such abuse took place in plain view of the rest of the class, directly contradicting many of the most important charges in the case including sodomies,
- was falsely named by those Complainants as a victim of abuse,
- sat alongside other non-complainants whom the two Complainants also falsely named as victims,
- in 1988 made a drawing of his own class, showing the name and seating location of each other student (provided to the DA for her review), allowing the Review Team to compare witness testimony from the very classes in which only some children had alleged abuse.

While I have noticed scores of errors and misrepresentations in the Report, I have focused here on approximately 30 material errors relating specifically to the documents I provided or statements I made. These are outlined in the enclosure.

In closing, I would like to point out that I know Jesse Friedman's lawyer has asked the Court to grant him access to documents the DA has been highly reluctant to share. One of the things I have noticed in my discussions with other mothers and community members about this case is how little is actually known about the statements allegedly made by the children. Some Great Neck mothers to this day have no clear idea what charges were attributed to their children, and how those charges affected the case; they don't have copies of the statements

3

**A-0699**

recorded by detectives, and they don't know how those statements were translated into charges in the case. I believe many of the complainants themselves do not know how they were used in the case.

Complainant Barry Doe, who attended the Friedman classes with my son, and whose parents had until recently been friends of ours for years, said in an interview:

> *I can't honestly tell you what other things I might have said at that time. And it's a little scary. I mean it's a little scary to think about what exactly happened in 1986, because I can tell you, as God is my witness, and on my two children's lives, I was never raped or sodomized.*

The young man's use of the word "scary" illustrates the damaging impact of the continued secrecy in this case. The best hope for clarifying things for these families is for you to lift the veil and allow Jesse Friedman's lawyer to finally and for the first time ever have a chance to test the validity of these statements in the light of day.

My son and I approached the DA in good faith, in the hope that our statements and materials could inform a legitimate process of seeking clarity and justice. I learned first hand from the biased manner in which our participation was handled, that the DA did not undertake a fair conviction review and that her Report is riddled with misinformation. Allowing access to the key documents, so they can be evaluated outside of the confines of the very district attorney's office in which the case was originally prosecuted, is essential to the pursuit of justice.

I am very grateful for this opportunity to express my views to you.

Sincerely yours,

Arline B. Epstein

4

**A-0700**

Arline Epstein Bio

*Arline Boyer Epstein grew up near Chicago and graduated from Smith College. She received a Master's degree in Russian literature and continued her graduate studies at Stanford University. She has worked in the USSR on a US Information Agency cultural exchange, served as disaster relief coordinator for the American Council of Voluntary Agencies for Foreign Service in New York City, taught Russian at the Military Language School in Taiwan, and worked in programming and systems for Chase Manhattan Bank in Hong Kong and New York. Since retiring she has been engaged in a wide range of volunteer work and travel. She and her husband Joel have one son and live in Connecticut.*

**Mischaracterization of Statements and Documents from Arline Epstein**

**A response to the Nassau County District Attorney's
"Conviction Integrity Review: People v. Jesse Friedman"**

**August 20, 2013**

1. **DA inaccurately states Epstein provided a document supporting false claim that parents were prohibited from entering Friedman home**

   **Type/location of error:** Citation Error/Mischaracterization (Pages 3-4)

   *"Arnold outlined these [class pick up and drop off] procedures in a letter to each parent, in which he explained that parents should wait inside their vehicles to relieve congestion on Piccadilly Road."*

   Footnote 17 says, incorrectly: "This document was described to the review team by Arline Epstein..." There is no citation of any document in the footnote.

   **Correction:** To her knowledge, Epstein has never seen such a document.

   **Why this is important:** The DA relies on this to support the sinister idea that parents were prevented from entering the classroom. Even if such a document existed, it would not prove this claim, since Arline Epstein was never prevented from entering the classroom, nor were many other parents whose statements have been provided to the DA, including Joan Blaha, Margalith Georgalis, Ann Meyers, and others.

2. **DA obscures essential information that first 30 children interviewed disclosed no sodomy and most said nothing happened**

   **Type/location of error:** Document Dismissed and Ignored/Missing Document (Page 11)

   Despite the Review Team's focus on the earliest days of the investigation, the DA relegates to Footnote 51 an extraordinarily important note from Epstein's document which describes an "emergency" meeting between parents and detectives (Detective Galasso, along with Detective Sgueglia and maybe others) on the night before the Friedmans' arrest (Doc 103, Notes of a Meeting (November 24, 1987), A842-845).

   Footnote 51 provides an incomplete, rendition of a critical line spoken by case detectives: "no child out of 30+ inter[viewed] had b[ee]n sodomized" but obscures its relevance with a superfluous discussion of a White Paper about the Friedman case.

**A-0702**

**Correction:** This note contains essential information that should not have been ignored.

- Informing parents on progress of investigation, police said:

  *"prior to yest[erday] 11/23 had no child out of 30+ inter[viewed] that had b[ee]n sodomized, most said <u>nothing</u> happened...usually cannot get info on 1st interview from a kid"*

- Police were trying to head off a threatened parents' physical confrontation with Arnold Friedman ("Stay away from Friedman!") -- one father had already gone to the house and "was stopped by police." This supports the statement that mass hysteria was present in the Great Neck community, which the DA seeks to downplay by, among other things, claiming that the case was "in no way similar" to high profile mass-hysteria cases such as McMartin.

- "[police] are within 24 hrs of arrest" and "as of last night [police] had 3-4 signed statements" and police "need corroborating statements" and "parents must sign [a] complaint to build a case to arrest [Arnold];

- "children will not have to be in court exc[ept] poss[ibly] g[ran]d jury" -- either a falsely reassuring or prescient statement.

**Why this is important:** This note confirms that *the first 30 children interviewed did not disclose any sodomy, and most made no charges.* This information freely shared with parents in the case was never disclosed to Jesse Friedman's lawyer who was entitled to, and had specifically requested, such exculpatory information, though it might have given him the confidence to go to trial rather than pleading guilty.

Further, it undermines one of the DA's fundamental claims in the Report: that because charges were made rapidly (also an inaccurate claim), it was less likely false charges emerged prompted by multi-hour and multi-visit interrogations. The Report states:

> *Given this compressed timeline, it is unlikely that detectives would have been able to repeatedly visit any one household for hours at a time to induce a child to make false accusations. (pg. iv.)*

That the first 30 interviews were relatively fruitless, indicates that repeated visits were essential to procuring charges for the indictments, and that the DA's claim is false.

3. <u>DA uses inaccurate citation to support sinister-sounding claim</u>

**Type/location of error:** Citation Error/Misinterpretation (Page 14)

"Detectives found and removed a vibrator, described at the time as 'child-sized,' from Arnold Friedman's office."

Footnote 58 cites: "Arline Epstein (see A846-851) notes of a conversation with Detective Wallene Jones." The note cited is mislabeled and misinterpreted.

2

**A-0703**

**Correction:** Arline Epstein never spoke to Detective Wallene Jones, as is clear from the note and her statement. The note was from a phone conversation between Arline Epstein and the mother of George Doe, who is reporting what Detective Jones told her when Jones interviewed her son in late November 1987. Therefore, the information about the "vibrator" is third-hand.

**Why this is important:** This error falsely substantiate an story about a vibrator that does not figure into the case in the slightest, other than to add an inflammatory detail. Whether or not a device was found during the search of the Friedman home, there is no device commercially known as a "child-size vibrator," and if such a device was ever linked to any of the abuse of children, it would appear in an indictment or in any of the claims excerpted in the DA's Report, which it does not. Therefore the inclusion of this element should be given no additional credence.

4. **DA withholds fact that police worked hand in hand with therapists to procure testimony from child witnesses**

   **Type/location of error:** Citation error/Mischaracterization (Page 15)

   "Also discovered during the execution of the warrant were two original photographs of nude children..." Footnote 60 reads: "Police reported two such pictures to a group of concerned parents, including Arline Epstein. See A852-857, notes of conversation with Dr. Joyce Parks."

   Footnote 60 misleadingly calls Epstein's document: "notes of conversation with Dr. Joyce Parks." Both the note's title here and its different name in the appendix, "Notes of Meeting with Doctors" (see Doc 105, A852-857) ignore and mischaracterize the nature and importance of this meeting.

   Correction: As reported in *Newsday* and documented in Epstein's note, on December 2, 1987 -- just one week after the arrests -- a private meeting was held for parents of about 15 alleged victims with Sex Crimes Squad detectives, and Assistant District Attorney Onorato, who gave a lengthy status report on the case. Psychologist Dr. Joyce Parks of Great Neck Consulting Center also spoke, mentioning that "failure to tell [is] the child's form of denial" and that she was "very much in favor of children testifying." (See further discussion of this meeting and Dr. Parks' speech in the Page 81 entry under #10 below.)

   One major point lost in the Review Team's brief mention of this meeting and other such parents' meetings is that *from the beginning and throughout the case, therapists were directly involved, appearing side by side with representatives of the Nassau County Police Department and the Nassau County District Attorney.*

3

For Epstein and other parents, the lines became blurred between the police and prosecutor on the one hand and the therapists on the other because of the way they always appeared together at community meetings. Ostensibly, all were there to support the parents; but their joint presentations confirmed the therapists were there to endorse the policing aspects of the case, and vice versa.

This co-appearance occurred again on January 14, 1988 (see program listing speakers in Epstein's note A11; see also meeting notes, Doc 106 A858-861), with two psychologists plus two psychiatrists, Arthur Green and Sandra Kaplan -- who with her colleague David Pelcovitz would later lead the therapy groups for Friedman victims at North Shore University Hospital (NSUH) -- joining Detective Galasso on stage.

Again at the November 16, 1988, parents' meeting, held just before the group therapy at NSUH was to begin, Detective Galasso appeared together with five psychologists and psychiatrists (see the program listing speakers in Epstein's note A25; see also meeting notes, Doc 108, A868-869). This affiliation continued at least through the October 1989 AACAP presentation (see Doc 82, A617-618).

**Why this is important:** The Review Report does not pursue the issue of this close affiliation between police and therapists, which was an essential method used by police in encouraging children to make abuse charges.

By focusing exclusively on whether "hypnosis" was used to elicit charges, *the DA selectively narrows the focus of the Second Circuit,* which had in fact identified a much broader set of "memory recovery procedures" that plagued cases like Friedman:

> *[These cases] were largely based on memories that alleged victims "recovered" through suggestive memory recovery tactics, including those petitioner claims were used in this case. Indeed, the dramatic increase in conspiratorial charges of child sexual abuse has been traced to a relatively small group of clinical psychologists who supported the psychoanalytic notion of "repressed memories" and encouraged patients to employ extensive "memory recovery procedures" to "break through the barrier of repression and bring memories into conscious awareness. (U.S. Court of Appeals for the Second Circuit, August 16, 2010 decision in Friedman, pg. 20 and 21)*

The use of therapists to help police elicit testimony from computer students in the Friedman case was so blatant that sex crimes chief Detective Galasso describes it freely in a June 23, 1988 *Newsday* article immediately following Ross Goldstein's arrest:

> *"details of the abuse were revealed by previously identified victims during sessions with their therapists."*

In contravention of the recommendation of the Second Circuit, the Review Team ignores this much broader misconduct.

In fact, Dr. Parks remark ("failure to tell = the child's form of denial") epitomizes the views of what the Second Circuit warned was a "relatively small group of clinical psychologists who supported the psychoanalytic notion of "repressed memories" and

4

**A-0705**

encouraged patients to employ extensive "memory recovery procedures." While the DA avoids this issue, the presence of Parks and her colleagues indicates that their now-discredited theories formed the basis of the therapy they provided to computer students during the pendency of the Friedman case.

It is worth mentioning here that then-sitting District Attorney Denis Dillon recognized the danger of using therapists to help elicit testimony in such cases (one of the principal deficiencies that undermined the McMartin case), and wrote a letter to the Nassau County Police Department warning of the dangers of using such tactics in the sexual abuse case they prosecuted immediately following the Friedman case:

> ...*law enforcement investigations into matters of child sexual abuse must remain free from any appearance that law enforcement officials are utilizing the services of psychological agencies and medical professionals in their criminal investigations. The importance of this independence between agencies in protecting the integrity of a criminal investigation was most recently exhibited by the verdict in the McMartin case in California. All reports and interviews with the jurors concerning the acquittal in that case indicate that the jurors were extremely troubled by the role of the psychologists who conducted the interviews of the children involved in that investigation. It was noted that although psychologists, based upon their training are extremely useful in enabling children to discuss instances of sexual abuse, their lack of training in the legal system and the evidentiary limitations placed upon child interviews by the courts make the use of such professionals in a criminal investigation or association with law enforcement personnel during a pending prosecution, extremely unwise. It is my opinion that in order to protect the integrity of the ...investigation and prosecution, any formal association such as that scheduled between the Nassau County District Attorney's Office and the Nassau County Police Department with North Shore University Hospital...must be avoided. (March 26, 1990 letter from Nassau County DA, Denis Dillon)*

### 5. DA withholds critical information that proves detectives subjected children to multi-hour interviews -- one lasting seven hours -- and did so even before the first indictment

**Type/location of error:** Document ignored/Document missing (Pages 67, 69 in section entitled "Police Accounts Demonstrate Appropriate Questioning")

The Report states:

*"Nor, [Detective Merriweather] said, did detectives have time to 'linger' with children and coax favorable testimony from them" (Page 67).*

*"Nor, Detective Jones said, was any child 'ever interviewed for four hours at one sitting'" (Page 69).*

However the Report fails to cite here two of Arline Epstein's notes -- both part of her statement to the Review Team -- which document inappropriately long police interviews with children (one five hours, the other seven hours) during the first weeks of the investigation.

5

**A-0706**

Correction: Epstein's Doc 103, Notes of Meeting (November 24, 1987) describes one of Barry Doe's interviews, just before the arrests: *"[Barry] made a 10-page statement -- [detectives] 5 hours there."* The second note (Epstein's A8) was entirely omitted from the Report and the appendix.

In this note (Epstein's A8), the mother of Barry Doe, phoned Epstein on or about November 30, 1987, and told her that when Detective Merriweather arrived for an interview with her son, *he mentioned a very long interview he had just conducted. Epstein's note reads: "Merriweather had been w/ a kid 7 hour[s] / [the] kid wouldn't open up."*

**Why this is important:**

- Detective Merriweather's statement in the DA's Report that none of the investigators "lingered" with a child, is proven false by this single document showing that (a) *Merriweather himself interviewed a child for seven hours* in the absence of any disclosure, and (b) he was unabashed about telling it to a parent.

- Merriweather's statement was made in November of 1987, predating even the first indictment, thus disproving the DA's foundational argument that no such misconduct occurred early in the case:

  *...people who were either interviewed or witnessed interviews conducted during the initial phase of the NCPD investigation, told the Review Team that police were not aggressive, did not engage in leading questioning, and, instead, let witnesses tell their stories. (pg. iv)*

The DA admits in the Report that "it is possible detectives became more insistent," but only in the "third phase" of the investigation:

  *The Review Team found that some witnesses interviewed during the third phase of the investigation were asked pointed questions, and that police pressured them to disclose abuse. It is possible that detectives became more insistent after Arnold pled guilty, after many of the original victims named classmates who also were abused, and after Ross Goldstein cooperated against Jesse. (pg. iv)*

By definition, a police officer continuing to interrogate a child for seven hours without any disclosure, is a coercive – even an abusive – tactic. A number of computer students who were interviewed by police early in the case have confirmed these tactics were used. For example, in his written recantation (also provided to the DA in advance of the Report), student Kenneth Doe states:

  *I recall clearly that police investigators came to my home repeatedly to question me about what had happened in the computer classes. My parents, who allowed me to be questioned outside of their presence, kept telling me to tell the police what they wanted to know. The police repeatedly told me that they knew something had happened, and they would not leave until I told them. As I result, I guess I just folded so they would leave me alone. I recall being taken somewhere and being videotaped while I repeated these*

6

*untruthful statements. After the film "Capturing the Friedmans" came out, I went to see it with my wife. The descriptions given about the police tactics used to extract statements rang true for me.*

Merriweather's admission, especially when supported by statements of child witnesses, shows that police used these coercive techniques on children in the case, and did so *even before the first indictment.*

It is disingenuous for the DA to accept uncritically Detective Jones' assertion that no child was "ever interviewed for more than four hours at a sitting" or Detective Merriweather's denial that they would "linger" with the children. It is clear that children throughout the case – and not just in the later stages as the DA alleges – subjected children to abusive, repeated, multi-hour interviews.

6. **DA obscures fact that the "close-out statement" given by Arnold Friedman was in fact used to bolster the case against Jesse, contrary to the DA's assertion in the Report, and that Detective Galasso lied to Epstein about the extent of the close out statement**

**Type/location of error:** Citation Error / Mischaracterization/ Document Discounted (Page 73-74 in the section on the use of Arnold's close-out statement)

The Report states:

*"The goal of the [close-out] interview was, ostensibly, not only to close the case against Arnold Friedman, but also to secure a final and reliable list of all his victims so they could be located and advised to seek treatment if necessary."*

**Correction:** The assertion from the Report is a mischaracterization. Arnold's close-out statement was not used only to locate victims and get them help, it was used to build the case against Jesse. Detective Galasso called Epstein in late March 1988. In this conversation, as reflected in Epstein's phone notes, Detective Galasso immediately says that the Sex Crimes Squad is "getting [the] task force back together" because they "want to go back out & re-interview kids *to be sure of [the] case against Jesse.*" She also says "they [the detectives] want to speak to Mike again... police need their help." (Doc 107 Notes of a Call with Det. Galasso, A862-867).

This important note of Epstein's is relegated to Footnote 334:

*A set of handwritten notes provided to the Review Team by Arline Epstein show that, at some point after the Close-Out Statement was taken, Detective Sergeant Galasso called Epstein to tell her about the results of the interview, and to inform her that she was 'getting [the] task force back tog[ether]' to 'go back out and re-interview kids to be sure of the case against Jesse.' A862. Epstein's handwritten annotations, made with the help of the filmmaker, assume that the Close-Out Statement would be used as a tool in that process.*

7

**A-0708**

The largely ignored document contradicts one of the Report's major arguments about the police investigation, revealing much about the critical juncture when police and prosecutors turned their focus to building the case against Jesse Friedman.

In Footnote 334 the Report claims that "Epstein's handwritten annotations... assume that the Close-Out Statement would be used as a tool in that process [i.e., building 'the case against Jesse']." This is totally untrue.

Epstein's annotation to this note shows that she makes no assumptions at all. She simply writes the obvious facts about the note. It reads in its entirety:

> *"Det Sgt Galasso called Arline Epstein (3/88) soon after Arnold Friedman's close-out statement of 3/25/88 (sheets may be out of order) see transcription." (See again Doc 107 Notes of a Call with Det. Sgt. Galasso, A862-867.)*

The note also reveals that Detective Galasso knowingly lied to Epstein in the call, telling her that Arnold had said in his close-out statement he was not interested in and did not abuse Michael, but that *"Friedman named hundred[s] of kids."* We now know from the DA's Report that this is untrue; Arnold admitted abusing 41 children, and Galasso would have known this fact.

Significantly, she then warns Epstein that "Arnold may have held back [in his close-out statement] -- some of [the] parents feel that way." She further advises Epstein that Mike and one of his friends [also a non-complainant, who is referred to in this Report] "could have had an agreement" not to tell.

Detective Galasso then turns directly to the case against Jesse, mentioning upcoming motions in his case on April 22. She also says that William Doe had implicated Jesse in sexual and physical abuse and she cites graphic examples. The details Galasso chose to share (an inappropriate and leading technique in any case) were carefully chosen, since William Doe in the fall of 1987 was in the same "notorious" Friday class as Mike. In fact, William's name appears in Michael's hand-drawn diagram of the computer room (see Doc 109, Hand-Drawn Map of Friedman House, A870-871). The detective emphasized to Epstein that the Friday class that her son was in had "experienced about the worst there was."

In addition, footnote 325 incorrectly cites A858-861, which is a completely unrelated note of Arline Epstein's from the January 1988 community meeting — several months before Arnold's close-out statement (see Appendix Doc 106, Notes of Meeting). The correct citation is apparently Doc 107, A862-867, Notes of Call with Detective Galasso (March 1988).

8

**Why this is important:**

This illustrates how police used Arnold's close-out statement to build the case against Jesse, which directly undermines an assertion so significant to the Report that it warrants its own section entitled:

> *The Evidence Does Not Support the Allegation that Police Used the Close-Out Statement to Generate Charges Against Jesse Friedman (pg. 73)*

It is obvious from the content and context of this conversation that Detective Galasso's intention was not to "locate" her son as a victim or add him to a "reliable list." Michael was well known to the police, having been interviewed by then. And the detective certainly did not advise that he "seek treatment if necessary." Instead, she specifically said the police need Michael's help, not the other way around.

Epstein felt that the primary reason for this phone call, which referred directly to Arnold's recent close-out statement, was to increase Epstein's suspicion that her son had been molested, to stoke her outrage by informing her about crimes Jesse had allegedly committed in her son's class and possibly against Michael, and to enlist her active support in the case against Jesse by allowing police to re-interview her son.

7. **DA repeatedly mischaracterizes Epstein as a puppet of the filmmakers**

**Type/location of error:** Mischaracterization (various locations throughout the Report, including pages 74, 108, 127)

Footnote 334 mentions "Epstein's handwritten annotations, made with the help of the filmmaker..." Later the Report states that she was prepared for her meeting with the Review Team by the filmmaker, Jesse Friedman, and others. On page 127, they state that Epstein was "unsure" about why certain of her notes were missing, and that she only provided them when asked.

**Correction:** Epstein wrote the annotations to her notes on sticky notes, unassisted by anyone. She prepared her own materials and consulted with the same group of people she has spoken to throughout her process, including her son, the filmmakers, and others with knowledge about the case. She told the Review Team that she prepared her own statement from her own ideas and her own experience, based on her own documentary evidence. Though she highlighted 40 critical documents in her presentation to the Review Team, she freely offered all the documents to the Review Team, and spent time on the phone later with one of the prosecutors answering questions about her documents.

**Why this is important:** The DA's pre-occupation with discrediting Epstein may be a way to justify their withholding of documents that undermine significant conclusions of their Report.

8. **DA withholds evidence showing that "memory recovery techniques" including but not limited to hypnosis were discussed publicly as having been used in the Friedman case**

**Type/location of error:** Document Dismissed / Missing Document (on Page 80 in the section on group therapy, hypnosis and the AACAP presentations)

The Report states:

*"Though doctors associated with the case undeniably made some presentation to the American Association of Child and Adolescent Psychiatry (AACAP), very few records of the event still exist.... In one transcribed presentation... [t]he transcript terminates immediately before a subsequent presentation by Dr. Dan Williams."*

One AACAP presentation, in October 1989, by Drs. Kaplan, Pelcovitz, Green, and hypnotism expert Dr. Williams, et. al., is described in Doc 82, A617-618. This document shows that Detective Galasso participated in at least one of these presentations along with the therapists.

The Report does not pursue the importance of the AACAP presentation or presentations that were significant because they were based on the 15 Friedman students who underwent group therapy with two of the listed presenters, Kaplan and Pelcovitz. The Review Team does not closely examine the AACAP presentation(s) nor does it address the questionable fact that in the version of the presentation provided to Friedman's lawyer, the presentation made by hypnotist Dan Williams was entirely redacted, though other presentations before and after him were not.

Epstein's note A36 from October 1989, which corroborates the list of participants of an October 1989 AACAP presentation on the Friedman case and shows that hypnosis specialist Dr. Williams was well known to parents in the Friedman case, does not appear in the Report or the appendix.

Dr. Williams was a prominent expert on hypnotherapy, and some Friedman students were referred to him by the NSUH therapists. His name, well known to the mothers in Epstein's circle, appears in Epstein's note A36 from October 1989. The note begins;"[Barry Doe's mother] will get copies of [the AACAP] paper." Just below that there is a list of names: "Kaplan, Pelcovitz, Green, hypnotism expert Williams, Galasso" (all of whom are speakers in the AACAP presentation that is described in Doc 82, A617-618). In addition, the program listing in that same document shows that hypnosis is on the agenda: "The presentations will address...the use of hypnosis in the treatment of dissociation in victims."

Mike Epstein has reported, and Arline Epstein also recalls, that Dr. Pelcovitz repeatedly encouraged him to go to be hypnotized because it might help him to remember his abuse.

**Why this is important:** The Report fails to consider the implications of the police and therapists working together to elicit testimony (as described earlier), and appearing jointly at a presentation, and fails to recognize the central role in the presentation and case played by hypnosis expert Dr. Dan Williams, relying instead on a single assertion made by one

therapist, Dr. Joyce Parks, that she did not hypnotize complainant Gregory Doe, who repeatedly has stated that he remembered no abuse until after being hypnotized and subjected to other kinds of memory-recovery techniques.

9. **DA barely references a 20 page paper by Friedman case therapists in which they disclose that just months after police attributed hundreds of abuse charges to them, many students had "amnesia" and were unable to recall abuse**

**Type/location of error:** Mischaracterization / Document Dismissed (page 80 in the section on group therapy, hypnosis and the AACAP presentations)

The Report states:

*"Another presentation transcribed in Arline Epstein's notes, states only that the Friedmans' victims showed some symptoms of dissociation and emphasized the buttocks when asked to draw the human body." Footnote 355 cites A884-904, which is Doc 113, "Group Therapy With Victims of Extrafamilial Abuse."*

**Correction:** This footnote mentioning "dissociation" and "buttocks" trivializes this twenty-page paper written by Friedman case therapists Drs. Kaplan and Pelcovitz describing the memories of the Friedman victims. It dismisses the relevance of the document on the premise that group therapy was not provided to alleged victims in the Friedman case until after Jesse Friedman's guilty plea.

However, this paper, "Group Therapy With Victims of Extrafamilial Abuse," states that after six months of therapy:

*"of the 15 children...six children [40 percent] had no memory of being victimized, even though other group members witnessed their abuse" (emphasis added). Even after six months of this group therapy only two of the six non-rememberers recalled "details of their victimization." Two more had only "vague memories" and the remaining two could still not remember the abuse.*

**Why this is important:** This document shows that even after being subjected to months of "memory recovery therapy" nearly a third of these children who had allegedly made disclosures to police of violent and repeated rape (happening to themselves and others), had only "no memory" or "vague memories" of the alleged abuse. *Whether the group therapy took place before or after Jesse pled guilty is irrelevant to the point of this document: that it shows children who had already testified and/or been named as victims had no memories of abuse.*

10. **The Report excludes evidence showing that therapy had a powerful influence on procuring statements that amplified the pressure for Jesse to plead guilty**

**Type/location of error:** Misrepresentation / Document Ignored / Document Missing (Page 81 in the section on group therapy and the role of therapists)

11

**A-0712**

The Report states:

*"The [community meetings in Great Neck] undeniably took place between December 1987 and January 1988, but were held to instruct parents on how to recognize symptoms, rather than to coach children through their experiences."*

The Report's conclusion -- that the community meetings were not a kind of "group therapy" because they did not play a role in coaching children through their experiences -- minimizes both the pervasive presence of therapists at these meeting and the content of their presentations.

Footnote 361 cites a *Great Neck Record* article, yet Arline Epstein's detailed notes from both of these important meetings were not cited in the Report -- other than a fleeting reference in Footnote 60 to one of the notes and the erroneous citation of the other in Footnote 325. (For the December 2, 1987 meeting, see Doc 105, Notes of Meeting with Doctors (December 1987), A852-857; for the January 14, 1988 meeting, see Doc 106, Notes of a Meeting (January 1988), A858-861.)

The printed program of this January "Joint PTA Meeting" -- Epstein's A11 -- which lists all the speakers, is not included in the Report or appendix.

**Correction:** At each of these meetings, psychologists and psychiatrists were not just "instructing" the parents about their children's symptoms, but also emphasizing explicitly that even if their children were now "in denial" about the abuse, they should be encouraged to take an active role in the case by testifying. This was, in effect, a coaching session to encourage parents to press their children to disclose.

Psychologist Dr. Joyce Parks at the December 1987 meeting told parents (per Epstein's notes) "[failure to tell = the child's form of denial" and that "kids need a chance to be active in [their] own behalf, to do something." She said she was "very much in favor of children testifying" (Doc 105, A852-857).

And at the January 1988 meeting, psychiatrist Dr. Arthur Green of Columbia University instructed parents that the "denial phase is a natural way of adapting, but not a good adaptive defense.... children need to re-experience, as painful as it is.... testifying is a very positive experience (grand jury)" (Doc 106, A858-861).

At these and other parents' meetings, psychotherapists repeatedly explained away a child's silence or his insistence that no abuse took place as "denial" or "dissociation." It became a community-meeting mantra for therapists to praise the benefits of pressing children to testify.

**Why this is important:** *The Report's conclusion that "nothing suggests that [therapy] influenced the case against Jesse Friedman one way or another" is false, and ignores the evidence that the therapy had a powerful influence on procuring statements that added tremendous pressure for Jesse to plead guilty.*

As Epstein stated to the Review Team, the therapists who appeared at these community meeting in the Friedman case played a major role in getting parents to press their children to "admit" abuse. These therapists appeared side by side with the police, pushing the parents to

12

**A-0713**

accept that their children had been abused, and coaching parents on how to help their children disclose and testify.

11. **DA erroneously states that Epstein had the mistaken impression that her son had the opportunity to testify in the case**

**Type and location of error:** Misrepresentation, (in paragraph criticizing Epstein's op-ed article in *Newsday* on page 126)

Quoting a *Newsday* op-ed piece written by Arline Epstein, the Report says she "conveys the mistaken impression that [her son] had the opportunity to 'make a statement to police or testify to the Grand Jury' after falsely admitting he was abused."

**Correction:** Epstein is well aware of the case chronology and knows that no further testimony in the case was made after late 1988. In the piece, she in no way represented that her son was a complainant or that his falsely stating to his therapist and mother that he was abused led to any charges. However it would have been entirely legal for Michael Epstein and his parents even in 1989 to press charges toward a further indictment of Jesse Friedman if they had so desired.

12. **DA excludes Epstein's statements about therapist Pelcovitz using case information to encourage her son to "disclose" abuse, and about a fifth alleged rapist named "Snake" who turned out to be a fictional character from the then-popular movie "Escape from New York"**

**Type/location of error:** Mischaracterization / Citation Error / Missing Document (page 128 in the section entitled "Review of Arline Epstein's Notes")

The Report states:

"Her notes also contain a detailed account of how [her son] did disclose abuse. It was not abrupt: [he] first indicated to his mother that he was "ready to remember, and then told her that he had been abused."

Footnote 481 cites A872-875, and the document cited (Doc 110, Handwritten Note, A872-75), say nothing about Michael being "ready to remember" and Michael never told his mother he was "ready to remember." This was something conveyed to Epstein by Pelcovitz in a note from early May 1989 -- four months before the Doc 110, A872-75 cited by the Report – that was excluded from the Report.

The note may be the first indication that Michael was considering lying about being abused in order to end the seemingly endless questioning by Dr. Pelcovitz and later by his mother, whose collaboration the therapist now sought.

Pelcovitz also tells Arline Epstein that Richard Doe, a child in the same therapy group, has accused yet another older helper in the class, a tattooed accomplice named "Snake," of

13

**A-0714**

abusing Mike. *A tattooed, menacing man named "Snake," Ms. Epstein only recently discovered, is actually a a fictional character played by Kurt Russell in the then-popular movie Escape From New York.* (See Epstein's note A19 for Richard's description of "Snake" as told by his mother.) Although Epstein's statement to the Review team included the "Snake" story, this note was not mentioned in the Report or included in the appendix.) Notes A17 and A18 also discuss "Snake."

**Why is this important:** The DA's exclusion of the fact that Richard Doe testified to the existence of a fictional (and unindicted) "fifth" rapist called "Snake" is remarkable because:

- It undermines the credibility of complainant Richard Doe (the DA's "Witness 13") whom the DA cites 18 times in the Report based on his allegations of abuse including sodomy and multi-perpetrator rape.

- It undermines the DA's contention that the Friedman case was "in no way similar" to the McMartin case, which "ballooned to include implausible allegations."

The note is also significant because it identifies that the therapist recited a long list of crimes to which Ross Goldstein had just pled guilty (May 3, 1989), described various "sex games" and told Arline Epstein that her son was named by some classmates as a participant. He mentions Goldstein and at least one other teenager committing sexual abuse in the class, with Michael being named as a victim.

13. <u>**The Report discredits the statements of Michael Epstein, possibly the only available witness with first-hand knowledge of computer classes in which police alleged 81 incidents of abuse (including sodomy), who has excellent recall of police tactics, and now admits he lied and "disclosed" abuse to end the questioning**</u>

**Type/location of error:** Mischaracterization/Evidence Dismissed (Pages xi., 90, etc.)

The DA's Report works hard to discredit Michael -- a high level engineer at a major software company, with an impeccable educational and professional record – for an assortment of reasons:

- because "he did not become a complainant;"

- because "his allegations did not affect Jesse's decision to plead guilty;"

- because documents "can be explained in any number of ways," have "no certain interpretation," or have "no evidentiary value."

14

**A-0715**

**Correction:** In an impartial review, the DA should have viewed Michael Epstein as a unique resource in this kind of investigation because he:

- took dozens of classes in the Friedman house,
- was aggressively interviewed more than once by police,
- confirms their use of leading questions and bullying tactics including threatening that he "would incline towards homosexuality if he failed to [disclose abuse]" (Report, pg. 127)

- today confirms that he was not abused in any way,
- sat alongside two major complainants in the very classes in which abuse was alleged,
- states that the complainants were never abused in his presence despite their claims that such abuse took place in plain view of the rest of the class, directly contradicting many of the most important charges in the case including sodomies,

- was falsely named by those complainants as a victim of abuse,
- sat alongside other non-complainants whom the two complainants also falsely named as victims,

- was ultimately persuaded by his own therapist and his mother to "lie" and disclose abuse that never occurred just to "end the questioning,"

- in 1988 made a drawing of his own class, showing the name and seating location of other students (provided to the DA for her review), allowing the Review Team to compare witness testimony from the very classes in which only some children had alleged abuse.

**Why this is important:** Understanding Michael's experience provides a unique window into the behavior of police and therapists and the coercive techniques that were used on him and other children. Dismissing a witness because these tactics didn't work on him, is like dismissing an eyewitness to a factory gas explosion because he was not killed in the blast. On the contrary, *an impartial case review would learn much from a witness who experienced but was not taken in by these tactics.*

### Final Note on Process

Arline Epstein offered to meet with the Advisory Panel (Barry Scheck, Mark Pomerantz, Susan Herman, and Patrick Harnett) to share her materials, because she was concerned about institutional bias in a case review being performed in secret by the same prosecutor's office that had initially prosecuted the case. When she approached the DA to make this offer, she was immediately told by prosecutor Sheryl Anania that she would not be permitted to meet with the Advisory Panel, but only with the DA's staff, who would then summarize her materials and statements. Over a 3-week exchange of emails, Anania repeatedly refused, stating that "the Review Panel does not meet with witnesses." The excerpt of those emails below confirms the DA's "procedures":

15

**A-0716**

*Epstein: If you provide a date or two when the panel is next meeting, I can try to accommodate that... I was impressed by that DA Rice elected to appoint an outside review panel to ensure a fair process, and I want to be certain they have the benefit of hearing from me directly.*

*Anania: The review panel does not meet with witnesses. I and my colleagues will meet with your and report our findings to the panel.*

*Epstein: While I appreciate your comment about the panel not generally meeting with witnesses directly, it concerns me. One of the reasons Mike and I have agreed to come forward at this time is because we read about DA Rice's appointment of the review panel as a way to ensure fairness in this process. Given that the Nassau County DA is reviewing its own case, we were encouraged to know that the DA recognized the importance of having outside people not invested in the case review the important evidence. I don't believe this material will work well "in translation," and this is why I feel I should insist that we have members of the panel present for our discussion. The opportunity to hear directly from a mother and son who were deeply involved in the police investigation, therapy sessions, community meetings, parents' discussions, etc., will provide a unique perspective for the panel as well as for your and your group.*

*Anania: We have discussed your request to meet with the panel and they have informed us that they do not wish to depart from the procedures set up to this point and therefore do not wish to meet with you.*

Given the importance of Epstein's materials and statements, learning that the Advisory Panel would not be given first-hand access to most of the important evidence in the case, and that the prosecutors would simply "report their findings" to the Panel, caused her to question the Panel's independence. Ultimately, the Review Team allowed only one member of the Advisory Panel – Susan Herman – to attend Ms. Epstein's presentation.

**Why this is important:** It confirms that the Advisory Panel was not permitted (and perhaps did not seek) to hear directly from the vast majority of witnesses in the case, instead relying on the DA's unsubstantiated assurances that their translation of the evidence was accurate. This substantially undermines the credibility of the Advisory Panel as arbiter of the DA's review. ***Given the bias shown in the DA's treatment of Epstein, her son Michael, and the material they provided, she believes the decision to have the Review Team filter evidence and statements rather than having them seen directly by the Advisory Panel, was a fatal flaw that undermined the fairness and integrity of the process.***

# # #

**A-0717**

### NARRATIVE ABOUT THE FRIEDMAN CASE
through the experience of
Arline Epstein and Michael Epstein
January 22, 2013

Introduction

We're glad to have this opportunity to present what we feel is compelling information to the District Attorney's office and to the members of the Friedman Review Panel.

I am Arline Epstein, and I'm here with my son Michael to present our family's experience during the intense and difficult two years of the Friedman case—from late 1987 through late 1989. I will tell you my story and Mike will tell you his.

Our intention is to bring these events into sharp focus—through the extensive contemporaneous notes that I kept, along with other documents. We will be showing some of these through the presentation, and will leave you with a set of the materials at the end of the talk.

Fall of 1987

In the fall of 1987 my son Michael was in fourth grade at Saddle Rock School. He was an excellent student and loved his teacher, Mrs. Wachter. His passions were all things baseball—especially the Yankees—and computers (he loved using our family's Apple IIc and was lobbying hard for his own Commodore 128). He and his friends Brian Cohen, Ben Handler, and another boy had formed a club called "Computer Wizards."

Computer Wizards card and photo of Mike at Commodore computer

*A-1  Computer Class enrollment form*

Mike and Brian and Ben were enrolled in Arnold Friedman's Friday afternoon "advanced" computer classes, having completed the beginning course the previous spring. We three mothers carpooled to drive the boys from school to 17 Piccadilly Road and home again. I would leave work early to pick them up after class. When Mike, Brian and Benji got into the car, they were happy, energized, bantering back and forth, having a great time. I was pleased that Mike was both learning and having fun. I recall never scheduling a doctor's appointment or other activity for those Friday afternoons because Mike would hate to miss his computer class.

In late November 1987 the Friedman case exploded, affecting the lives of our family and scores of other families—especially, of course, the Friedmans.

One evening I got a call from Audrey Cohen, the mother of Mike's best friend Brian. Her voice was strained and agitated. She told me that Nassau County detectives from the Sex Crimes Squad had just left their house after questioning Brian and that they would be coming to our house to talk to Mike.

A pair of detectives soon arrived— Detectives Sgueglia and Brimlow, as I recall.

1

**A-0718**

They came in, introduced themselves and asked to speak to me first. They told me why they were there. They gave me Det. Sgt. Fran Galasso's business card with their names written on it in block letters because apparently they had just been transferred to the Sex Crimes Squad.

A-2 Detectives' makeshift business cards

They asked to speak with Michael alone. They spent an hour or more with him and then left. I went upstairs to ask Mike what he had said to the police and whether anything had happened to him at the computer class. He said nothing happened. And he didn't want to talk about it.

"I don't want to talk about it!" "I don't remember!"....then "disclosure"

From the beginning of the case in November 1987 and for a full year and a half thereafter, Michael maintained that nothing had happened at the computer classes and that he didn't want to talk about it and—later—that he didn't remember.

However, by the late summer and early fall of 1989 that shifted. After many months of group therapy and then individual therapy—both with Dr. David Pelcovitz, then of North Shore University Hospital—and also after my repeated questioning of Mike (following the advice of Dr. Pelcovitz and other therapists), Mike finally started to say both to me and to his therapist that he had been molested. That he had been abused by Arnold and Jesse Friedman and Ross Goldstein and had seen others being abused. Just as the ADA and the police had said. Just as his therapist had said. Just as some of the other boys in his group therapy had said.

Significantly, Mike's disclosures to me were mostly not in the form of descriptions. Instead, they were answers to my "yes" or "no" questions, which I asked as gently and calmly as possible. Inwardly I cringed because I hated the whole process. I was just hoping I would appear to him as a supportive and kind mother rather than an intimidating interrogator.

Each one of my many questions to Mike was based on the mountain of very specific information about the sex crimes that allegedly occurred, which I had received from many sources—ADA Onorato, Det. Sgt Galasso, Mike's therapist Dr. Pelcovitz, and the other parents.

Although my husband and I were devastated to hear directly from Mike that these things had occurred, we were also relieved that he had remembered and had come to accept it. We soon allowed him to stop going to therapy. Mike never did testify against the Friedmans, despite the pressure that my husband and I felt from the police and other parents to have him do so.

However, we were satisfied that we had done what we could to begin a healing process. Over the next 23 years, Mike and I seldom—and gradually, almost never—spoke of these events.

Of course as a mother, I worried about him, especially in the immediate post-Friedman-case years. Then over the next several years, through high school and college,

through both calmer times and rockier times, I hoped that his well-being and his sense of self-worth and his ability to establish satisfying relationships had not been damaged. It was worry and hope, worry and hope, and guilt too, naturally; my mind was never quite free of the subtle shadow of my son's sexual abuse.

Gradually, I was reassured and delighted and relieved as our son matured into an intelligent, engaged, funny, well-adjusted and relationship-rich young man—successful in both the conventional sense and in a less tangible sense. Michael is a man of strong and shining character.

"Attempting Closure " and Real Disclosure: "I lied"

Four months ago, out of the blue, Mike informed us that he had neither been abused nor seen any abuse at the Friedmans'. I was stunned by his revelation, which he sent in an e-mail to us because my husband and I were traveling and Mike wanted us to know as soon as possible. His e-mail had the subject line "Attempting Closure," and it speaks for itself.

Mike's e-mail (in part):

"Something I've been meaning to say for a while: No abuse ever happened at the Friedmans', that I was aware of. All that happened was learning about computers. I was not abused and I never witnessed any abuse of other kids. Arnold was a kind, avuncular teacher, and Jesse was a goofy kid. I was not happy to be seeing Dr. Pelcovitz for what seemed like an eternity, and to be talking it over with Mom endlessly, and it was clear that everyone believed very strongly that I (and others) must have been abused. So at some point I resolved to start lying and saying that I had been abused; and, just as I expected, that allowed us to pretty much put this behind us, and I was able to stop seeing Dr. Pelcovitz and stop rehashing the Friedman case over and over. I very consciously declined to testify, because I knew I was lying. It seemed like the only out. I'm sorry I lied, but I didn't think I had any other practical choice."

Arline's immediate e-mail response (in part):

"Wow. This is huge. I'm stunned. In a good way... mostly. So much to talk about. I'm very grateful to have this old history cracking open and that we can talk about and shed some light on what happened and what did not happen. Of course I will share any files, memories, etc. that I have. I'm very glad that you are taking action, in whatever form that takes.

It's hard to know where to begin.... I was convinced that you and many others had been abused. (I guess this is obvious.) That means that clearly there was a huge and tragic community-wide hysteria surrounding Arnold, Jesse, and also Ross Goldstein.

I am so deeply, painfully sorry for all the stress and distress and confusion and angst and many other emotions that you went through. At that time and in the aftermath,... I also terribly regret anything that I have done to hurt you in any way. Ironically, for the past 25 years one of the greatest regrets of my life was that I didn't somehow protect you from the Friedmans. So I guess I'd have to say this comes as a relief. Still, I did not protect you from the craziness around what did not happen."

The moment I read what Mike had written, it was as if an old jigsaw puzzle, which had holes where pieces were missing and lumpy seams where pieces didn't quite fit together, was thrown up into the air and came back down to earth will all the pieces

3

**A-0720**

perfectly arranged. Mike's revelation completely changed how I viewed the Friedman case.

Contemplating the truth

It was time to do the right thing, whatever it took. I was absolutely clear about that. I would do everything I could to understand what really happened 25 years ago, however difficult and painful and embarrassing it may be to face the fact that I was deceived and wrong and and also in some way complicit in the awful outcome of this case.

From that day I began this process first by looking into my memories and then at my notes. My motivation—to get at the truth—is what has led me to come forward and to appear today. In this, I am following my son's example. At one point I wrote on a sticky note: "I have been contemplating the nature of truth—so hard to know, so vital to keep trying."

Why the notes?

In my home I found an old file labeled "FRIEDMAN" that I had kept through several moves over the years. This file contained extensive materials from the years 1987-89— printed programs and letters and reports and drawings and detailed contemporaneous notes from my talks and meetings with the police, the Assistant District Attorney, the therapists and other parents; notes from the many community meetings; notes to myself.

Why did I take notes? First I am a habitual note-taker. Second, this was the most important event in my son's childhood. Making notes was a way to keep track of the complex and momentous events that were crashing into our lives.

My notes are mostly neutral recordings, written with little or no obvious emotion. They do not record my hours of confusion and dismay and horror and shame. They do not record the many times I had to pull my car over to the side of the road because I was wracked with sobs and inconsolable weeping.

Chronology of Events — Following the Threads of the Case through the Notes

A-4 Nov 24 urgent parents' meeting - status of case against Arnold Friedman; need statements

On Tuesday, November 24, about a week after the detectives questioned Michael, a group of us parents were called to an urgent meeting with Sex Crime Squad detectives, led by Det. Sgt. Fran Galasso. Still stunned by these events, I listened and took notes on a piece of notebook paper.

I want to give you some detail here because this was an extremely important meeting, both because of its content and because it established a pattern of how and what kind of information came from the police to the parents.

First the police gave us the background and a status report. A detective spoke and I wrote: "Prior to yesterday 11/23 [they] had no child out of 30+ interviewed that had been sodomized - most said nothing happened." We were told police "usually cannot get info on [the] first interview from a kid."

Then Galasso told us "Friedman may have called parents of kids <u>most at risk</u>." Yikes, I thought, I got a call from Arnold last week. in which he begged me to to send Michael back to class. And then he told me to tell the police the truth.

A-3 Notes from Arnold Friedman call

The police said next "Parents must sign complaints to build a case to arrest him. Children will not have to be in court except possibly grand jury. Must have written statements."

We were told: "As of last night, [police] had 3-4 signed statements. Some of [the] acts were performed in front of other kids—need corroborating statements. 10 statements are enough, 5 are enough. Need fewer to arrest; need as many as can for grand jury."

The second page of my notes has Galasso's phone number and then "Now [they] have 100 names. Brian [Cohen] made a 10-page statement —[after detectives spent] 5 hours there." The note continues: "[Friedman] will be arrested as soon as [they] talk to [the] DA. He's being watched."

My notes also have the name of Dr. Fogel, at Schneider Children's Hospital at LIJ, who was mentioned as a physician who gave medical examinations for pediatric sex crimes. I have never heard any reports about whether any of the children in the Friedman case were actually taken to see Dr. Fogel for a sex crime examination.

Newsday clipping of Friedman arrest

The next day, November 25, Arnold Friedman was arrested, along with his son Jesse and Arnold's wife Elaine.

The Investigation Heats Up

As the investigation unfolded and the case grew over the following months, Det. Sgt. Fran Galasso repeatedly informed parents that many Great Neck children ("probably hundreds"—and "500" was an often-used number) had been victims and/or witnesses of repeated sodomies and other sexually crimes, including violent sexual games, perpetrated by Arnold and Jesse Friedman and eventually by Ross Goldstein and even other 'helpers.'

I vividly recall Det. Sgt. Galasso saying at one meeting (on November 16, 1988) in ominous tones: "Tell any parent whose child set foot through that door, that child <u>was</u> a victim!" And indeed, I heard those words ripple through the community, with parents telling other parents exactly that. It caused the end of some friendships.

Meanwhile, with those huge numbers being cited, it was hard to keep in mind that the actual number of children who testified did not climb past 15, out of hundreds of computer students.

I was told by Det. Sgt. Galasso (and also by other parents, who had themselves heard from the same source) the names of children in Michael's Friday afternoon classes who had testified to being molested. Then I was told that they had specifically named Michael as someone they had seen being abused in those same class. I was told details about the sexual

abuse and sex games that Michael was subjected to. (Under that pressure, how long could I stand firm in first my denial, then my skepticism? How long before I accepted that my son was a victim and then tried to persuade him that he must testify?)

Meanwhile, numerous psychologists and psychiatrists at public meetings in Great Neck were telling us parents—repeatedly and, I found, persuasively—that a child's inability to remember or refusal to talk about the abuse was dissociation, a coping mechanism that would harm him profoundly, and that the only way for him to heal would be through his remembering and disclosing the abuse. (Though I am aware this theory has since been discredited, it did influence us and the children's therapists.)

Eager to help our son, in the late fall of 1988 we put him into the group therapy treatment that was being provided for free to Friedman victims and parents at North Shore University Hospital. Psychologist Dr. David Pelcovitz led the younger group, which Michael was in, and psychiatrist Dr. Sandra Kaplan led the older group. In both groups kids who had testified received therapy alongside those who had not testified (including those who did not remember any abuse). The therapy was based on the assumption that they were all victims and that those who did not remember would eventually be helped to remember.

This group therapy at North Shore was announced and promoted in the local newspapers. And it was described and recommended at various public meetings at Great Neck elementary schools and at Temple Beth-El. Both Dr. Kaplan and Det. Sgt Galasso participated in each of these meetings, and ADA Onorato usually appeared as well. It was common to see the therapists and the police/ADA on the stage together as they addressed the "Friedman parents." To the parents, this was an implicit official endorsement and approval of the group therapy.

The Early Weeks - First Grand Jury through Arnold Friedman's Sentencing

A-6 Audrey Cohen call: Brian to talk to detectives about testifying

I got a call from Audrey Cohen a day or two after the Friedmans were arrested, telling me that detectives wanted to talk to Brian on Monday about going to testify to the grand jury, and that she had to go as a witness herself.

A-8 Audrey Cohen call: Brian talks to Merriweather; grand jury testimony.

Then that Monday, November 30, Audrey Cohen called again to describe a "visit last night [from Det.] Merriweather." Merriweather told Audrey that before coming to the Cohens' he "had been with a kid 7 hours/ [but the kid] wouldn't open up." (I recall thinking I wouldn't want my son interviewed for seven hours!) My note ends: "5 kid[s] to GRAND JURY." I guessed that Brian was to be the fifth kid.

A-7 Arline calls Suzanne Krause for her professional opinion

Meanwhile, I called my friend Suzanne Krause, who is the mother of Andrew. She is a Clinical Social Worker, and I wanted her professional take on pedophilia and to find out what she knew about the investigation. Suzanne told me that, in her professional experience, if any child in this case had been physically abused, then he or she "would have had some

anxious reaction or ambivalence, etc. - [but there was] none of that" in these kids.

A-9  December 2 private parent's meeting with ADA/police and therapist

On December 2, 1987, one week after the arrests, there was a private meeting with ADA Joe Onorato, police, psychiatrist Dr. Joyce Parks and about 15 families of alleged victims.

Dr. Parks said she "was very much in favor of children testifying" and that children's "failure to tell [is] the child's form of denial."

Then Bob Cohen, Brian's father, brought up inconsistencies in what the police had told parents about the quantity and quality of the evidence and what evidence there actually was. I wrote down "NO PORN PHOTOS OF ANY KIDS."

ADA Onorato reported that Jesse Friedman had no sodomy charges against him and that there would be a second grand jury if there were any new statements.  He listed to date: 50 interviews; 12 signed statements; 4 [to] grand jury already + 2 Thursday; 2 out of 6 are sodomy in first degree; 4 sexual abuse (touching) and endangering (porn materials)."

A-10  Galasso: "Devastating evidence"

Later, in mid-January, I got a call from one of the other mothers who told me that Galasso had told her that there was "Devastating evidence, 2 other kids' testimony. There is a picture of 1 of [the] kids - of Jesse + kid, Arnold photo."

Galasso shared with the parents specific details of the Friedman family resources and the difficulty they would face in raising the very high bail amount.

A-11 and A-12  Joint PTA Meeting - Panel on child sexual abuse

The next day I attended a community meeting for parents on child sexual abuse. Panelists included therapists Dr. Sandra Kaplan and Dr. Arthur Green, among others, plus Det. Sgt. Fran Galasso and ADA Onorato.

Arthur Green spoke at length about why "many of the kids in this case have no symptoms - [which is ] surprising to parents:"  It is because "Friedman conned them, threatened them, bribed them."  And regarding those many kids with neither symptoms nor memory of the abuse, he said the "biggest problem [is the] kid why says nothing happened - no sadness, no anxiety" and that this "denial phase is a natural way of adapting." And he said further, according to my notes: "Testifying [to the] grand jury is a very positive experience." "Group therapy may help them talk and open up, in conjunction with individual therapy." This was the beginning of a theme that was constantly communicated to us parents, as therapists continued to persuade us that getting our kids to admit or disclose abuse would be to their benefit.

Joe Onorato gave a status report: "5 [kids went to the] original grand jury. 10 additional kids - 4 have testified already to second grand jury." Then he did a mathematical projection, saying that 100-120 kids in Friedmans' classes per year  X  4 years of teaching  = 400-480 potential victims. From that day on, the entire dialogue around the case seemed to shift from the 15 actual complainants to 400-plus assumed victims.

7

A-13  Call about plea negotiations

On March 7, 1988, I learned from another mother that the Friedmans had refused a plea bargain and would go to trial. I wrote that Onorato had "want[ed] them to sign a closure [sic] statement" because "with specific names [police] can go [back] to the families" [for more questioning].

A-14 and A-15  Early parent-initiated plans for group therapy  - Arthur Green's contact info

At a mothers' lunch on March 7, 1988 we discussed arrangements for 5 or 6 of the boys to begin group therapy with Dr. Arthur Green, who had spoken at the January 14 parents' meeting.  The boys were Brian Cohen, Matthew Katz, and maybe Ben Handler, Allan Yoskowitz, Andrew Krause and my son Michael.  Arthur Green's address and phone number was given out.

Michael did not participate, and Andrew Krause did not;  I don't know whether any of the other boys did.  But it is significant that this privately organized group therapy was even being proposed long before Jesse Friedman's conviction.

I'd like to talk for a moment here about the therapy that was going on at this time.

First, we heard from psychologists and psychiatrist at almost every parents' meeting, telling us the great importance of group therapy for our children. These included Dr. Parks on December 2, 1987; Drs. Kaplan and Green on January 14, 1988; Drs Kaplan and Fornari as well as social workers Samit and Spector on November 16, 1988.

Second, I personally knew of two or three boys who started individual therapy very soon after the Friedman arrest.  And an article in the Great Neck Record on November 3, 1988, described the group therapy sessions to be offered at North Shore. It mentioned that these group sessions were intended both for "youngsters who are not currently receiving treatment and, additionally, to augment the treatment of children already receiving private, on-going therapy.

Third, I heard from other mothers about at least one and possibly two of the alleged victims who had hypnosis administered to them to help them remember their abuse.

My son had been seeing a psychologist, Dr. Shumsky, earlier in 1987 for reasons unrelated to the Friedman case.  I called her in January or February of 1988 to tell her about Mike's likely sexual abuse and to ask her advice.  She suggested what I could say to help him talk about the abuse.

I remember reading an article in Newday (from right after Ross Goldstein's arrest in June 1988) quoting Det. Sgt. Galasso that "details of the abuse ] were revealed by previously identified victims during sessions with their therapists."

Therapy was definitely going on, and it had an effect on this case.


The Middle Phase - Building the Case against Jesse and Ross

A-16  Call from Det. Sgt. Galasso - getting the task force back together

At the end of March, after Arnold Friedman's sentencing and closeout statement, what Onorato had said about going back to the families became a reality. I felt very surprised and a bit intimidated to receive a call directly from Galasso, for the first time. Her office was "getting the task force back together" and "want to go back out to re-interview kids to be sure of the case against Jesse." I was directed to tell Mike that the police needed his help.

Galasso said that Friedman's closeout statement "named hundreds of kids," and that Arnold's statement "said it all." She warned me that "the [Friday] class that Michael was in experienced about the worst there was." She told me Dan Frank in that same class had witnessed a sodomy and a violent act by Jesse.

The police wanted to speak to Michael. She said that "Benji Handler, too [was] holding back" and "Michael and Ben could have had an agreement" or they may have been threatened.

I felt that Galasso wanted me to think that terrible, violent things had happened to my son. I felt she wanted to stir up my outrage so that I would persuade him to talk.

A-17, A-18, A-19, A-20  "Tracking the 'Helpers' "

Ross Goldstein was arrested in June 1988, and Det. Sgt. Galasso helped rouse a mentality of near-hysteria among us parents by reporting that "there were even more friends of Jesse's involved," not just Ross. Newsday reported that police expected to arrest as many as four acquaintances of Jesse's.

I was part of a group of 5 or 6 mothers of alleged victims in the Friedman case (I was the only member of the group whose son had not testified). We took on the self-appointed task of figuring out who these 'helpers' might be. I took notes as we discussed our "leads" among the teenagers at Great Neck North High School, none of whom any of us actually knew. I also volunteered to go to the library to copy pages from recent high school yearbooks.

We ended up focusing on someone nicknamed "Snake." Allan Yoskowitz mentioned a man called Snake as having been at the Friedmans. His mother relayed this information to me and I wrote it down. His description was of a 21-year-old man with upper-body tattoos who wore long sleeves and asked "where's my money?" I have since learned that a character from the 1981 film "Escape from New York," is called Snake, has tattoos, and appears repeatedly asking "Where's my money?"

Notwithstanding Snake's fictional origin, this character was taken seriously: in May 1989, Dr. Pelcovitz told me that Snake had been present in the classroom and had "pulled M[ike]'s pants, M[ike] pulled S[nake]'s pants d[ow]n, [per] Allan [Yoskowitz]." (See A-30)

And now I think: here's this poor kid Allan who was being so pressured by the police and others that he had to draw on a character from a movie, and I recognize how many other children were under similar pressure. In Mike's case, he dealt with the pressure

9

**A-0726**

by "remembering" details of events that he knew didn't happen.

This "tracking the helpers" project is not something I am proud of.  It is a cautionary tale about gullibility, and being used; but mainly, it illustrates the ambient hysteria that increasingly surrounded the Friedman case.

A-21  Ross Goldstein for the prosecution

A mother whose son was in Mike's Friday class (probably Audrey Cohen or Myra Frank) reported to me in September 1988 that the police now had "Ross Goldstein for the prosecution," meaning that Ross was about to agree or had just agreed to testify against Jesse Friedman.  I was also told they were closing in on two other computer class 'helpers' to strengthen the case against Jesse.

When the mother said "no question Mike was in class with Ross + 2 others" and that "Ross can name some of the kids he recalls," I interpreted this as a further attempt to dispel my residual doubt that Mike was actually molested and to imply that this was a compelling reason for Mike to finally come forward and testify.

A-22  Call from Audrey Cohen - Brian to be questioned again

Audrey told me that detectives "will try to talk to Brian again."

A-23  Call from Audrey Cohen - Group Therapy is postponed; Brian to identify the 'helpers'

Audrey called on November 7, 1988 to tell me that police had been back twice and were coming back again to question Brian and to have him identify Ross Goldstein and 'helpers' Danny Ackerman and Gino Scotto.

A-24  Call from Audrey Cohen - Horrifying testimony by Ross Goldstein

Audrey called to tell me that "Goldstein said he was in their [Mike's and Brian's] class" and that Ross's testimony and some children's grand jury testimony revealed "horrifying" acts "worse than with Arnold" in which "kids were terrorized and terribly sexually abused."  "Ross held [a victim] down/Jesse sodomized [him]. Girls were raped. The children were threatened: "if [they] tell, would be killed, burn house."

A-25 and A-26  Community meeting at Temple Beth-El about group therapy

On November 16, 1988 at Temple Beth-El, NSUH therapists Sandra Kaplan and Carol Samit and other local therapists appeared along with Det. Sgt. Fran Galasso and Thomas Feniger of the Great Neck Public Schools.  Once again the importance of group therapy for the children's healing was stressed.  The dates for group therapy were announced: November 30 (organizational), December 7, and December 14, 1988.

During her presentation Galasso stressed the magnitude of the case and made the comment that abused children become abusers themselves. She also gave her dire warning: "Tell any parent whose child set foot through that door, that child was a victim!"

A-27  Notes from group therapy organizational meeting

When therapists outlined the group therapy treatment plan and schedule, the parents were coached on how to create a supportive atmosphere that was conducive to the child disclosing the abuse.

A-28 "Dear Parents" letter urging parents to write to Judge Boklan about Jesse's sentence

In mid-January 1989, prior to Jesse Friedman's sentencing on January 24, PTA leaders circulated a "Dear Parents" letter to Great Neck Public School parents, urging them to send the pre-printed letter they provided to Judge Boklan, requesting that she "state, for the record, at the time of Jesse's sentencing, that he is a menace to society and should therefore serve the full eighteen years." I now know that Judge Boklan used practically the same language in her sentencing.


The Late Phase - "Disclosure" of Mike's abuse - and community issues

A-29 Audrey Cohen's reports Judge Boklan reading into the public record portions of Ross Goldstein's grand jury minutes at his sentencing

On May 3, 1989 Audrey Cohen called me to report on what Judge Boklan had read out in court from the grand jury minutes at Ross Goldstein's sentencing that day. It is a long list of horrifying sexual crimes, as I recorded in my notes:

- Said, 'Hey, that's cool' as he watched Jesse sodomize a kid
- Recruited Ackerman and Scotto himself.
- Stopped going [to the classes] regularly in June 1987 (?)
- Sodomized and threatened kids both when Arnold and Jesse were not there, and when they were there; both of which demonstrate he was not just forced to do what he did by the Friedmans.
- Took photos of A[rnold] &J[esse] sodomizing kids, etc.
- Received money for photo taking from Arnold
- Held kids down while Jesse sodomized them, and vice versa
- Asked a kid, 'Do you want to suck my dick?' and when kid said no, seized kid around the neck and forced his penis into the kid's mouth
- Invented sick "games" and forced kids to participate, including "mood [nude] limbo"
- Applied force to a kid's neck (on pressure points) as a punishment
- Ejaculated into hand, and measured amount with Arnold
- Ejaculated into chewing gum, and forced kid to chew it
- Threatened kids - said would burn down house, kill parents, etc.

A-30 Dr. Pelcovitz reports to Arline on the severity of sexual abuse at the Friedmans' and on Michael's therapy "progress"

Later in May, Dr. David Pelcovitz (Mike's group therapist and by now his individual therapist) reported to me on the severity of the sexual abuse that occurred at the Friedmans', based on the new information that had recently come out.

- Mike was in group of 3 kids - chosen to participate in games based upon where sat - got hit more (?) than other
- Series of classes when Ross and Danny came, also Jesse
- Mike part of games - Superhero, Simon Says, Leap Frog [with game descriptions]

- 5 times per 10 weeks
- AF teaching as if [nothing was happening]
- (kids can ejaculate)
- Ross-Jesse "sandwich" - cum on kid, on penis, on backside, or in mouth of kid
- Ross "liked" Mike - mentioned in a couple of statements
- Ross come in Jesse's mouth, Jesse come in Mike's mouth, Jesse in Ross's mouth
- Snake - came up behind Mike - pulled Mike's pants, Mike pulled Snake's pants down (per Allan [Yoskowitz]) (Underlining in original.)

Dr. Pelcovitz also told me he "wants [Mike] to remember" and that Mike is "ready to remember" and that now, instead of saying 'I don't remember,' Mike says 'I'm not sure' or 'It must have happened.' With Mike seemingly on the brink of "remembering," I felt Pelcovitz was trying to encourage me to work with Mike to help him along.

A-31 Description of sex games, from Dr. Pelcovitz or another source

Simon Says - Take off your pants, put your hand on your...
put your hand in next person's...., etcetera.

Leap Frog - Leader sucks kid A, kid A and leader suck kid B, kid A and B and leader suck kid C, etcetera.

Superhero - Make a "sandwich" with Jesse on the floor on his back. Two kids on top of him back to back (?) and Ross on top face down.

A-32 Mike's diagram of Friedman computer room

When I was talking to Mike in the late summer or early fall of 1989, trying to get him to "disclose" the abuse, he drew this diagram of the room where computer classes were held. The boys had drawn maps as a therapeutic tool during their group therapy sessions, the parents were told. A 'star' meant "something happened there." Notably, there are only two of those stars indicated in this diagram.

Also, it is remarkable how close together the boys were at the computer stations: Mike and Benji Handler (neither of whom testified) sat right next to Brian Cohen (who did testify) and therefore would have seen and heard whatever might have been happening to Brian. Given the massive amount and frequency of abuse that was alleged in every class session, it would have been inconceivable that none of it took place right there, in front of the other kids. Also, the diagram shows how crowded and cramped this room was, where sexual games involving up to fifteen people at once were alleged to have taken place.

A-33 My notes summarizing what Mike had "remembered" so far, for a conversation with Audrey Cohen

As Mike began to "disclose" the abuse to me during our one-on-one sessions, I wrote down what Mike had "remembered" so far, as well as a list of the specific things he had not "remembered." This indicates that I was working from a "script" of acts of sexual abuse that I had been told about by someone else.

Mike had gotten worn down by the pressure on him from his therapist and me and he had found a way out of this seemingly interminable situation by finally "remembering,"

12

**A-0729**

in other words, lying about the abuse. He obviously "borrowed" allegations that he had heard from other kids (which were shared in the group therapy setting) and from his therapist and now, even from his own mother.

A-34  Mike's "memories" of his sexual abuse - September/October 1989

Finally, after 6 months of group therapy and 2-3 months of individual therapy and many sessions with me, during which I tried to get him to talk about the details of the sexual abuse, Mike finally said abuse had occurred. Mostly, I had him answer my "yes" or "no" questions, which were based on what I had heard from many sources, including Galasso, Onorato, Pelcovitz, and other mothers. Mike's details were gleaned and borrowed from these same sources, directly or indirectly, with one important addition: what the other kids in his therapy group had been saying. Some sex acts he said had occurred "50-150 times per session," others "10X per session per kid." When I see that today it seems wildly implausible.

A-35  Mike's "cryptic" note - and explanation of the cryptic note - September/October 1989

| "IDWTTAI!" | ("I don't want to talk about it!") |
| "IDR!" | ("I don't remember!") |
| "IL!" | ("I lied!") |

Mike was so frustrated that I wouldn't accept the truth that "nothing happened" that he was compelled to write this cryptic note as a sort of cry for help. When the pressure from the police and the therapy had become so oppressive to him, he couldn't even turn to me for solace because I too had been pressured by those same forces and others.

A-36 and A-37  Reporting to Audrey Cohen about Mike's "progress" - scholarly review of the Friedman case by NSUH therapists

I am quoting from a note of mine: "Our last talk - [Mike was] unwilling to talk - wanted to end it... I told him I realized it was hard to talk about games because it was what he [Mike] probably felt the worst about, because [it was the] boys do[ing] to each other some of what the adults and helpers did to [the] boys. HE AGREED. He promised to let me know or call David [Pelcovitz] if things bother him."

It is so painful for me to read this note now! This was the last talk about the sexual abuse that Mike and I had at the time. It was October 1989. He just wanted it to be over. I just wanted him to be OK. (I'm very sure I wanted it to be over too.). My recitation at the end—about how hard it must be to disclose what the boys did to each other—was a direct quote from one of the therapists; it's not something I would ever have known.

A-38, A-39, A-40  Notes from/about conversations with Dr. Sandra Kaplan about the Robert Izzo case, relations with the Great Neck Public Schools, and the role of the mothers

My notes A-38, A-39 and A-40 record and reflect the complicated and contentious relationship between Dr. Sandra Kaplan and the Great Neck Public Schools as well as between some of the Friedman parents and the school district. Kaplan seems to use the parents to her advantage while the parents use her to get what they want; this is a tightly entangled and boundary-crossing relationship.

In document A-40, there is a fascinating confrontation between Great Neck

13

**A-0730**

Superintendent Dr. Shine and the mothers who had come to talk to him: at one point he apparently yelled at the mothers and asked what made them think they were right [about the abuse that had occurred]? A good question.

Over the last few month I have spend a great deal of time reflecting on what my notes mean now, after this great shift in how I view the Friedman case. One strong theme that has emerged is how used, manipulated and pressured I was from the very first days.

For example, Det. Sgt. Galasso talked about "devastating" evidence that the police had against the Friedmans. At the time it sounded so concrete, so convincing! The "devastating" evidence in one of my notes was reportedly a photo of Jesse and one other kid. However, there was no photo of Jesse with a child from a computer class involved in a sexual act, which is what she was implying to us. Why would she call that devastating evidence?

She also said on more than one occasion that abused children go on to become abusers. "I have never arrested a sex offender who has not been a victim!" What possible good did it do to tell that to the already devastated parents who were convinced their child had been abused, or the confused and worried parents who were unconvinced or not quite convinced?

And most disturbing, Det. Sgt. Galasso told us repeatedly (based on what evidence?) that photographs and films of our children in these sexual acts had been made, which could and likely would be sold and circulated as child porn. My group of mothers felt such despair that we could hardly talk about it—and that is saying a lot in this sexual abuse case! This even became a topic that our little nine- and ten-year-old boys actually discussed in their group therapy sessions—the existence of pornographic photos and films of themselves and how that might affect them when they were grown men! (I learned this from the October 1989 Literature/Review Paper by Kaplan/Pelcovitz; see A-37, p.6.)

All of this is what I would have to call misinformation, and I can say for personal experience that it caused tremendous fear and rage and and panic among the parents.

I know now— from a more careful reading of my notes, from newly obtained information, and from some discerning wisdom that has come with age—that we were being deceived.

The result of this is that the parents became riled up and engaged and active and demanding, such that our energies (our fear, rage, and panic) were used as fuel for this complicated, lengthy, high-profile, high-stakes, increasingly frenzied case.

Today my view is that once deception enters into a criminal case, justice cannot be served.

I am absolutely convinced that a horrible injustice was done to Jesse Friedman. This conclusion is based on many things that I have learned—from reading my son's e-mail revelation, to carefully studying my notes, to weighing all the facts that have emerged. This includes especially the recantations of alleged victims who testified as well as the statements of the many children—now men—who did not testify and were in the very same classes as

14

**A-0731**

the those who did testify, yet witnessed no sodomies, no sex games, no threats, no terror.

Because I have had a unique window into this case, and was close to so many of the alleged victims and their parents, I can tell you that this case was flawed. I can tell you that the hysterical quality of the police reaction, prosecutor's reaction, the judge's reaction, the therapists' reaction, and the community reaction all led to a rush to judgment and a miscarriage of justice. Because of that, someone else's son went to jail. For this reason, I could not just sit quietly and be a party to that.

That is why I've come forward to urge you to overturn this conviction.

I stand as an example and my son Michael stands as an example of the opportunity for healing if we let the truth in. And not just let the truth in, but act on the truth, swiftly and boldly, to correct the mistakes of the past. I know the same healing that Michael and I have begun is available to many other people right now.

Thank you very much for your attention and patience.

15

**A-0732**

N. Scott Banks, Esq.
165 Willets Avenue
West Hempstead, New York 11552
Home: (516) 292-6001
Office: (516) 742-1400

August 18, 2013

Hon. F. Dana Winslow
Justice of the Supreme Court
Nassau County Supreme Court
100 Supreme Court Drive
Mineola, New York 11501

Re: **In the Matter of Jesse Friedman v. Kathleen Rice in her
official capacity as District Attorney of Nassau County
Index No. 13-004015**

Honorable Sir:

I submit this letter in support of Petitioner, Jesse Friedman's, application for release of
the original case materials, including witness statements, police reports and Grand Jury
testimony, maintained by the Nassau County District Attorney's Office in connection with Mr.
Friedman's prosecution twenty-five years ago. I was intimately involved in the Friedman case,
serving as Law Secretary to the Honorable Abbey L. Boklan, who presided over the prosecution
of Jesse Friedman and his father, Arnold Friedman. While I have repeatedly maintained Judge
Boklan presided over the Friedman matter fairly, evidence uncovered during the past twenty-
five years (never provided to the Court), including, but not limited to, recantation of purported
"victims", suggestive police practices, and apparent failure of the prosecutor to turn over
essential exculpatory evidence to Jesse Friedman's counsel, cause me to seriously question
the fairness and viability of the Friedman prosecution, and Jesse Friedman's culpability for the
sexual abuse charges contained in the three Indictments.

As Judge Boklan's Law Secretary, I, with the Court, reviewed the Grand Jury minutes to
determine the sufficiency of the Friedman Indictments. While the testimony elicited in the Grand
Jury met the legal standards of sufficiency pursuant to CPL Section 210.20, I recall my
concerns the testimony of the child witnesses lacked specificity regarding the dates and times
of alleged offenses, and failed to note the presence of other witnesses (including other children
in the Friedman computer class) who allegedly witnessed the offenses at the Friedman home.
The Grand Jury testimony of child witnesses, largely elicited with leading questions by the
prosecutor, demanding "yes or no" responses, provided absolutely no detail from the children
concerning the specific acts alleged against Mr. Friedman.

While the Indictments were legally sufficient, I recall being troubled by the dearth of
detail and specificity of the testimony, and complete lack of medical testimony or medical
evidence substantiating the allegations of extreme violent sexual abuse. I presumed witness
statements and police investigative reports, provided to defense counsel during pretrial
proceedings enabled Jesse Friedman's counsel to determine the strength, or lack thereof, of

**A-0733**

the prosecution's case against Mr. Friedman. I have since learned that is not the case, as the prosecution did not disclose witness statements, statements of children who denied being abused by Jesse Friedman, that children were subjected to "counseling" arranged by law enforcement or the District Attorney's Office during the investigation of Friedman case, and some children may actually have been pressured by police investigators to give statements against Mr. Friedman. These questionable actions and tactics, never presented to the Court by the District Attorney's Office, are troubling to me, as they were to the Second Circuit, and raise substantial questions regarding the fairness of the proceedings resulting in Jesse Friedman's conviction.

While I recognize the legitimate concerns regarding secrecy of Grand Jury proceedings, such concerns are not operative here, since given the passage of time, the release of Grand Jury testimony now (which would have been provided the defense at trial in any event), will neither prejudice the alleged victims (whose identities were revealed years ago), nor impair investigations by law enforcement or prosecutors of related offenses. It is my understanding Jesse Friedman's counsel is seeking access to Grand Jury testimony and original witness statements, purportedly drafted by police. Certainly, the testimony and statements of child witnesses would be most informative to the process which should be designed to seek the truth of the events leading to the prosecution of Mr. Friedman.

I respectfully urge the Court to grant Mr. Friedman's application, and direct the District Attorney to disclose this probative and extremely relevant evidence to his attorneys, and provide a level of transparency very much needed in this matter. Indeed, fairness and the interests of justice requires such result.

Respectfully submitted,

N. Scott Banks

cc: Hon. Kathleen Rice
    Ronald L. Kuby, Esq.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU : TRIAL TERM PART 3
------------------------------------------X

In the Matter of JESSE FRIEDMAN,                    Index No.
                                                      4015/13
                              Petitioner,

        -against-

KATHLEEN M. RICE, in her official Capacity
as the NASSAU COUNTY DISTRICT ATTORNEY,

                              Respondent,
 For a Judgment Pursuant to Article 78
of the Civil Practice Law and Rules.
------------------------------------------X

                                    August 22, 2013
                                    Mineola, New York


B E F O R E : HON. F. DANA WINSLOW,

                              Justice.


A P P E A R A N C E S :


        LAW OFFICE OF RONALD KUBY
        By:  RONALD KUBY, ESQ.
             LEAH BUSBY, ESQ.
             LINDA TVRDY, ESQ.
        For Petitioner


        NASSAU COUNTY DISTRICT ATTORNEY
        By:  ROBERT A. SCHWARTZ, ADA
             JUDITH R. STEINBERG, ADA
        For Respondent

A L S O   P R E S E N T :

        GARY SCHOER, ESQ.
        For Witness Number 14


                              Lisa M. Porteus, RPR
                              Official Court Reporter

**A-0735**

1          THE COURT:  All right.  Let the record reflect

2     that this is a continuation of a hearing commenced at the

3     beginning of 2003 in one fashion or another.  The last

4     time that we were here on June 28th, this was the date at

5     which certain things were scheduled to occur.  I have an

6     outline generally that I wished to follow, but I'm going

7     to deviate from it immediately and probably will

8     consistently throughout the proceedings.

9          First thing is that I do understand that Mr.

10    Schoer is in the courtroom, and Mr. Schoer has forwarded

11    a letter that the Court wishes very much to have further

12    explained, and also to have his notice of appearance

13    noted on the record since he has officially appeared, as

14    the Court sees by his prior communication.

15          Mr. Schoer, sir.

16          MR. SCHOER:  Good morning, your Honor.  Gary

17    Schoer, S-C-H-O-E-R.  6800 Jericho Turnpike, Syosset, New

18    York.

19          THE COURT:  Yes, please.

20          MR. SCHOER:  Judge, I submitted an affirmation

21    in opposition to the petition which --

22          THE COURT:  All right.

23          MR. SCHOER:  -- which your Honor should have

24    received.  I represent the person who's been identified

25    as witness number 14 in the District Attorney's report,

                                                              LMP

1    and my client's position is that he does not wish any of

2    the reports, any of the records that have been requested

3    by the petitioner to be released, that he would like his

4    privacy to be maintained, and that he supports the

5    District Attorney's position not to release any of the

6    police reports or the Grand Jury testimony.

7              THE COURT:  All right.  With respect to him.

8              MR. SCHOER:  With respect to him.

9              THE COURT:  Okay.  You are, I know, very much

10   aware of Brady and its successors and the changes that

11   have taken place over the many years since 1988, and also

12   the recantations -- because that's what they're called --

13   by different parties in this case.  In fact, at one point

14   or another both sides have utilized that term,

15   non-recantation or recantation.  And I do want to be sure

16   that this is a privacy issue that is being asserted in

17   connection with the application that is now being made by

18   you.  Is that correct?

19             MR. SCHOER:  That's correct, your Honor.

20             THE COURT:  All right.

21             Mr. Kuby, you wish to be heard?

22             MR. KUBY:  Yes, thank you, Judge.

23             I've spoken to Mr. Schoer, and I submitted a

24   clarification of something Mr. Schoer said in his

25   affirmation, and the clarification I submitted was that

                                                    LMP

1   his client, witness 14, also known as Barry Doe for

2   purposes of our discussion, as he was named in the

3   original indictment, that Barry Doe is not alleging that

4   Jesse Friedman committed a criminal act against him.

5   That's something Mr. Schoer told me on behalf of his

6   client. I put it in papers. I just want to confirm that

7   Mr. Schoer stands by the statement that he made to me

8   informally.

9          MR. SCHOER: My client's memory would support

10  that statement.

11         MR. KUBY: Thank you.

12         MR. SCHOER: At this time.

13         MR. KUBY: Thank you.

14         The victims of a sex crime, if we're going to

15  apply that term to Barry Doe -- and I've suggested that,

16  notwithstanding his recantation, he probably is a victim

17  in the eyes of the law -- they get to be heard. They

18  don't get a veto on release of documents. But,

19  nonetheless, we are very, very, very cognizant of Barry

20  Doe's desire to make certain that his real name and

21  whatever allegations he actually made beyond those in the

22  indictment, that those do not come to public scrutiny. I

23  understand his situation, I understand his profession, I

24  understand his family situation. I actually understand

25  it really well, because he already spoke to the

LMP

1    filmmakers in this case, gave them extensive interviews

2    where he said, among other interviews, as God is my

3    witness he was never molested or seen anyone molested.

4         We've maintained out of discretion, not out of

5    compulsion, his identity and his anonymity.  We've

6    maintained that privacy even though we're under no

7    constraints whatsoever to do so.  We're not public

8    officials.  50B doesn't apply to us, although it does

9    apply to the DA's office.  I could shout his name from

10   the rooftops.  Wouldn't do it, haven't done it, not going

11   to do it.  So in terms of protecting his privacy, we know

12   who he is.

13        The only issue is what were the specifics of

14   his various statements.  And, of course, the statements

15   -- and this is a theme that perhaps I'll return to.

16   Perhaps you've heard it enough.  But I'll say it this

17   time.  The statements themselves are protected only to

18   the extent that they reveal the identity of the person.

19   That's the -- that is the singular and sole protection

20   provided by the Civil Rights Law.

21        We know the identity.  Mr. Schoer doesn't deny

22   we know the identity.  Certainly his client knows we know

23   his identity, because he sat down with us.  So the only

24   thing that's being protected are the specific contents of

25   his statements, and that's not protectable except to the

LMP

**A-0739**

```
 1        extent that it conveys his identify, which we know
 2        already.
 3                 Now, if the Court wants to actually give Barry
 4        Doe more protection than Barry Doe has now, the Court can
 5        do something, although I'm not wild about the idea, quite
 6        frankly, but your power to condition disclosure upon
 7        conditions appears by the statute to be plenary.  I mean,
 8        probably you couldn't exceed the bounds of the
 9        constitution.  You couldn't say, well, you can't disclose
10        it to anybody of a particular race or religion.  But,
11        short of that, you can impose any condition you want.
12                 And one condition you can impose is that, yes,
13        you will give us the Barry Doe documents, conditioned
14        upon everybody receiving them abides by an order of the
15        Court that Barry Dce's actual name will not be revealed
16        by us without further court order.  And that actually
17        gives Barry Doe a legal protection that he does not have
18        right now.
19                 Again, I would prefer that you trust our
20        discretion because we've proven ourselves to be
21        trustworthy.  But if you elect to trust-verify you can
22        issue that order, and it's punishable by the Court's
23        contempt power.
24                 THE COURT:  All right.
25                 And now, Mr. Schwartz, I'd very much like to
```

LMP

1    hear from you.

2              MR. SCHWARTZ:  With all due respect, your

3    Honor, this was petitioner's application, and I believe

4    that they should be heard first.  I have nothing to say

5    in response to Mr. Schoer's statement, but with respect

6    to the petition, I would ask that petitioner make his

7    application and we would respond to that.

8              MR. KUBY:  I'm sorry, didn't I just speak?  I

9    mean, am I --

10              MR. SCHWARTZ:  Is that the --

11              THE COURT:  Excuse me.  Mr. Schwartz, I think

12    that the position that was taken by the petitioner was

13    one that was articulated maybe even more clearly than

14    usual.  But at least, at least, it was understandable.

15              MR. SCHWARTZ:  Okay, your Honor.  If that was

16    the extent of their argument, then I'm obviously prepared

17    to go forward here.

18              THE COURT:  All right.

19              MR. SCHWARTZ:  I thought it was limited to the

20    statement that Mr. Schoer had made.

21              THE COURT:  The limitation, as I understand it,

22    is that the petitioner would, in fact, consent to the

23    receipt of all of Barry Doe's -- we'll call him Barry

24    Doe -- information but never his -- but not his name.

25    His name will remain sacrosanct or will, more aptly,

LMP

1    remain confidential.  Is that incorrect?

2            MR. KUBY:  Correct.

3            THE COURT:  Mr. Schwartz?

4            MR. SCHWARTZ:  And I would object to that, your

5    Honor.

6            THE COURT:  On what basis?

7            MR. SCHWARTZ:  Well, because you know this

8    proceeding was brought to you because a FOIL request was

9    made, and the people, the DA's office, denied the FOIL

10   request.  And now it seems that petitioner wants to

11   discuss everything but FOIL and everything but the Public

12   Officers Law.  I know in their 34 page reply papers they

13   never once mentioned FOIL or the Public Officers Law, and

14   in our papers we rely heavily on the provisions of the

15   Public Officers Law to oppose disclosure of these

16   records.

17           What Mr. Kuby keeps ignoring, because he knows

18   he can't win if he addresses this issue, is that the 50B

19   is not the only provision that prohibits disclosure of --

20           THE COURT:  You're talking about 2068 of the

21   Public Officers Law, correct?

22           MR. SCHWARTZ:  I'm talking about section 87.2(e).

23           THE COURT:  Excuse me, you're absolutely

24   correct.

25           MR. SCHWARTZ:  2(e)iii, which is one of the law

LMP

1       enforcement exemptions.

2              And, your Honor, Mr. Kuby keeps saying that

3       only the identity of the victim is protected.  But

4       87.2(e)iii protects a confidential source or confidential

5       information relating to a criminal investigation.

6              Now, we cited an abundance of Appellate

7       Division case law discussing that provision.  And all

8       those cases say, very simply, the statements of a

9       nontestifying witness are exempt from disclosure.

10             THE COURT:  I'm sorry, Mr. Schwartz, but that's

11      precisely why I asked Mr. Schoer what the basis of his

12      position was, why was he taking this position on behalf

13      of his client.  And Public Officers Law 87.2(e)iii is

14      confined, confined to something that is actually going on

15      at this point, divulging of a confidential source.  There

16      is no confidential source -- because it has two aspects

17      to it.  There's no confidential source because the name

18      is being withheld.  It is the information that is

19      available through the institution involved, and not, and

20      not, the name that is at this moment -- because of Mr.

21      Kuby's waiver -- at issue.

22             MR. SCHWARTZ:  Your Honor, with all due

23      respect, I think you're incorrect on the law there.  I

24      would point out one case in particular, Esposito v. Rice.

25      It's a case in my papers.  It's a case that went to the

LMP

**A-0743**

1    Second Department.  It was similar to this case.  It was

2    a 20-year-old conviction on a homicide case.  The

3    defendant said, I need this witness statement to prove my

4    innocence.  This was a person that gave a statement to

5    the police and never testified at trial.  We argued

6    87.2(e)iii, and the Court again reiterated, statements of

7    nontestifying witnesses are exempt.  It doesn't matter if

8    there's a pending criminal investigation.  It protects

9    the people that have come forward and have spoken to the

10   police, whether it's last year or 20 years ago or 25

11   years ago.

12              If they want their statement released, that's

13   fine.  But they don't want their statements released.

14              THE COURT:  As I heard, Mr. Schoer, there is no

15   request on your part to withhold statements so long as

16   they don't identify your client; correct?

17              MR. SCHOER:  No, Judge.  I don't think I said

18   that.

19              THE COURT:  All right.

20              MR. SCHOER:  You asked me whether or not the

21   basis of my client's --

22              THE COURT:  Was privacy.

23              MR. SCHOER:  Was privacy.  And I said yes.  But

24   I also said that my client supports the non-release of

25   any documents and supports the position of the District

LMP

**A-0744**

1    Attorney's Office.

2            THE COURT:  All right.  So I then -- I thank

3    you for your clarification.

4            I turn back to you.  87 is Public Officers Law.

5            MR. SCHWARTZ:  Yes.

6            THE COURT:  It has nothing to do with the

7    individual involved that is being represented by Mr.

8    Schoer.  Does it?

9            MR. SCHWARTZ:  It absolutely does.  That's

10   what's protected.  Again, it's a provision in the Public

11   Officers Law.  That's the statute that governs FOIL.

12   That's the statute that says everything gets disclosed

13   unless it falls within one of these categories.  And one

14   of the categories is, if I can paraphrase the Appellate

15   Court decisions, statements made by a witness to law

16   enforcement when the witness hasn't testified.  Of

17   course, if the witness testifies at trial, the

18   confidentiality of that statement is lost, that statement

19   is disclosed, and we can't rely on that.  But it protects

20   statements of witnesses, and it's not just -- I think I

21   cited another case, Johnson v. Heinz.  It says it's not

22   just the identity, it's the content of the statement.

23           THE COURT:  You may have cited cases, Mr.

24   Schwartz.  I will say, however, that the cases are

25   distinguishable in many respects.  So it is your

LMP

**A-0745**

1    position, so that we don't spend the rest of the day on

2    this particular aspect, it is your position that there is

3    nothing that should be released, even though there's an

4    assertion of a privacy right.  That is the nature of the

5    concern in the case of Mr. Schoer.  Correct?

6              MR. SCHWARTZ:  Judge, I'm asserting --

7              THE COURT:  I'm saying it for clarification

8    purposes.

9              MR. SCHWARTZ:  I'm asserting that various

10   records are exempt for various reasons.  Right now we're

11   talking about the statements of witnesses to law

12   enforcement.  And those are exempt.

13             Now, Mr. Schoer talks about privacy, and he's

14   not limiting his privacy right to 87.2(e)iii or 50B, he's

15   saying, my client gave a statement to the police, I don't

16   want it released under any circumstances.  And I'm sure

17   his client would rely on any and all statutes that avail

18   him of that privacy.

19             THE COURT:  The Court does have a number of

20   cases that it has seen in this particular area and, as I

21   said, I wish to proceed on.  But before I do, I want to

22   respond to Mr. Kuby's letter.  This is a little bit out

23   of order, because he asked that the three, the three

24   letters forwarded to the Court be made available to him

25   and, of course, to you.  And I said that will be

LMP

1      addressed at this hearing.

2              The Court is taking the following position with

3      respect to those letters because they fall into certain

4      categories.  We know basically what Mr. Schoer's position

5      is.  As to the other two, those letters were sent to the

6      Court -- no carbon copies were sent anyplace else, as far

7      as the Court is aware -- with the singular request that

8      their name not be disclosed or information be used.

9              Now, that is a question that the Court has to

10     consider in its balancing, the balancing that even

11     District Attorney Rice agrees exists, that we -- that

12     there be a consideration given to the victims, as you

13     have identified them at times, or the complainant, or the

14     complaining witnesses, because they have had multiple

15     identifications.  They have to be protected.  And on the

16     other side, Mr. Friedman has to be protected, depending

17     upon the facts.

18              So this, in effect, is a fact determination

19     that is before this Court.  Is there the disclosure of

20     facts that have been requested under FOIL that would

21     allow the petitioner the opportunity to do a few things?

22              Before I get there, unfortunately I think that

23     one aspect has been neglected in this case for both

24     sides, and it's not in the nature of a criticism or even

25     of an oversight.  It is that there have been two sides,

                                                          LMP

**A-0747**

1    warring sides, 180 degrees apart.  The petitioner did it,

2    the petitioner should be punished.  Other side; the

3    petitioner didn't do it, the complaining witnesses have

4    to be properly protected.

5            But the third side, which hasn't been

6    addressed, is the side that if, if, only if -- and you'll

7    see why I say it in this particular context -- if, in

8    fact, the complaining witnesses were mistaken or

9    misstated a position, gave statements, provided

10   information to the District Attorney, to the Nassau

11   County Police Department, they have also been living for

12   25 years with that knowledge.

13           MR. SCHWARTZ:  May I be heard on that, your

14   Honor?

15           THE COURT:  You certainly may.

16           MR. SCHWARTZ:  I've said this before, and if

17   your Honor disagrees --

18           THE COURT:  Not in this context, sir.

19           MR. SCHWARTZ:  What I'm about to say I've said

20   before.

21           THE COURT:  Okay.

22           MR. SCHWARTZ:  If your Honor disagrees with me,

23   that's --

24           THE COURT:  I will clearly let you know if I

25   do.

LMP

**A-0748**

1            MR. SCHWARTZ:  That's obviously your right.

2      But I feel like I have to emphasize this for the

3      umpteenth time.

4            This is here because of a FOIL request.  We are

5      not here relitigating petitioner's guilt.  That may or

6      may not occur sometime in the future.

7            THE COURT:  I'm going to stop you right there,

8      as I always do both of you, when we come to a point that

9      I need clarified or I would like to clarify myself.

10           Of course I'm aware of that fact.  The problem

11     with taking that position in vacuum or isolation is that

12     there is a great deal of information, and we're becoming

13     more and more aware of it as time progresses, but there's

14     a great deal of information that can be used in a couple

15     of different ways.

16           As I know you are very much aware, not only was

17     Mr. Jesse Friedman pleading in 1988, not only was there a

18     sentence, or, more aptly, a portion of a sentence, a

19     portion of a sentence imposed, it is the plea and the

20     sentence that collectively constitutes a conviction or

21     judgment.  If you plead or you're convicted after trial,

22     until the sentence there is no -- there isn't finality

23     with respect to that particular Court.  That need not

24     even be said in this courtroom, except to those who may

25     not be as conversant as you are, Mr. Schwartz, with the

                                                          LMP

**A-0749**

1      procedures.

2              You also know that in 2002, after Mr. Friedman

3      had been released from prison -- he was released in 2001,

4      December of 2001.  In December of 2002 he was determined

5      to be a Level 3 Sexual Offender.  Is that correct?

6              MR. SCHWARTZ:  Yes.

7              THE COURT:  Now, two things.  First, that was

8      really the first conviction.  I want you to think about

9      it, because in effect his jail sentence didn't end when

10     he left Coxsackie, his jail sentence continued to this

11     very day.  That's not to indicate that for one moment

12     this Court has any sympathy for Mr. Friedman or for

13     anyone in that matter.  And I notice the smile on your

14     face, Mr. Schwartz, and I suggest that you remove it

15     rather quickly, because it is very clearly the case that

16     this Court is going to hold both parties to the highest

17     degree possible.  I have had the fortune, misfortune, of

18     reading thousands of pages of Social Science.  I enjoy it

19     immensely.  But it was an intricate part of your

20     presentation and it was an intricate part of the

21     petitioner's presentation.  In fact, you even used some

22     of the same sources.

23             So I get to the point that I was raising with

24     you, sir, and that is that the Court believes that under

25     that particular provision of the law, the Sexual Offender

LMP

**A-0750**

1    Law, that was part of the conviction process.

2         By the way, never once has another Court

3    decided this in the United States, as far as I know.

4    This would be the first determination anywhere, but I

5    don't want to stop there, because of the implications of

6    that law.

7              MR. SCHWARTZ:  Judge, can I --

8              THE COURT:  No.

9         You understand also under the Sexual Predators

10   Law or offender -- rather, the Sexual Offenders Law, that

11   there is an annual application available to the sexual

12   offender.  So a sexual offender can go from a level 3 to

13   a 2, to a 1, to a zero, not a sexual offender.  It

14   provides a need for this case to look closely at every

15   single aspect that was used in the conviction process.

16        I will show this austere, this august -- maybe

17   austere, too, but august group the reason why there are

18   so many multiples that look at this as necessitating the

19   release of information not formerly.

20             In connection with that, and addressing your

21   letter, Mr. Schwartz, in response to Mr. Kuby's letter

22   that was sent to the Court about the three letters that

23   were sent directly to the Court, this Court wrote a

24   letter that is going to become an exhibit, and will be

25   available to any, in which it will fill in the blanks,

LMP

1    and essentially provides the following:  Do you wish to

2    have any information made available?  I suggest in this

3    letter that the recipient even speak with the therapist

4    or anyone, get any help that he or she may desire.

5           The notation at the bottom of this letter I

6    think is the most important one for our immediate

7    discussion:  Your answers may affect this Court's

8    determination of the release of any information regarding

9    you.

10          That's what I would be telling them, that it

11   may, not that it will.  I have said throughout I have an

12   obligation, I have to look at your -- the case law, I

13   have to look at the facts, I have to balance the two

14   warring interests in this case and come to a conclusion.

15          All right.

16          MR. SCHWARTZ:  May I please respond to just

17   something your Honor said?

18          THE COURT:  You may, certainly.

19          MR. SCHWARTZ:  You commented a moment ago about

20   a smile on my face, and it certainly was not my intent to

21   disrespect this Court in any way.  And if I had a smile,

22   I apologize, your Honor.

23          THE COURT:  You never have.

24          MR. SCHWARTZ:  And I certainly don't take light

25   of the fact that Mr. Friedman has to register as a sex

 1    offender.  That's a tremendous burden.

 2              But what I will say is this.  And you compared

 3    it to being a form of continued incarceration.  Even if

 4    Mr. Friedman were still in prison, as was the petitioner

 5    in Esposito v. Rice, it doesn't change the FOIL issue one

 6    iota.  Because the Court of Appeals has said not once,

 7    not twice, not three times, the status of the person

 8    making a request for records under FOIL is irrelevant.

 9    And it doesn't matter if they're an incarcerated prisoner

10    who says I desperately need the information to prove my

11    innocence.  The status of the person making the request

12    is as a member of the general public.  And it doesn't

13    matter that they know the identity of the persons whose

14    reports they're seeking.

15              THE COURT:  I'm going to stop you, because you

16    had a moment's pause.

17              Does it make any difference that at one point

18    in time the District Attorney's Office, in 1988 -- `87,

19    `88 -- sent a full and complete list of all of the -- by

20    the way, 17 complaining witnesses.  We've been dancing

21    around these figures all along.  But I have 17 affidavits

22    of service which were made on 17 people around the world

23    in order to comply with the provisions of the Civil

24    Rights Law.

25              MR. SCHWARTZ:  I could answer that question

                                                        LMP

**A-0753**

1    very simply, your Honor.

2              THE COURT:  Good.

3              MR. SCHWARTZ:  The answer is no.  And I just

4    want to quote for you one sentence from Fabiano versus

5    New York City Police Department.  That's a Court of

6    Appeals case from 2001.

7              Nor does the fact that petitioners already know

8    the identity of their victims provide a basis for

9    disclosure.  The original goal of Civil Rights Law 50B,

10   which is to protect the privacy of sex crimes victims,

11   cannot be negated by a litigant's assertion that he knows

12   the identity of the victim.

13             That's a Court of Appeals case, your Honor.

14   And it's been repeated over and over again.

15             THE COURT:  No, it has not been repeated over

16   and over again.  Portions of it have been used many times

17   for many purposes.  But it is not something that the

18   Court of -- the Appellate Division has adopted wholesale.

19   It has interpreted and has decided that, I think at long

20   last, that Brady material consists not only of

21   substantive material that may tend to show that the

22   defendant did not commit the crime, but also impeachment.

23             MR. SCHWARTZ:  Your Honor, I don't disagree

24   with that.  But --

25             THE COURT:  Thank you.

                                                            LMP

**A-0754**

1          MR. SCHWARTZ:  But Brady comes up in the

2     context of a criminal trial.  It doesn't come up in the

3     context of a FOIL request.  And that's why the courts say

4     your need for the records, even if you claim it's Brady

5     material, is irrelevant.

6          THE COURT:  Thank you, sir.  Because if, in

7     fact, you're saying there is no criminal aspect to this

8     matter, then there cannot be a finding of sexual offender

9     level 3.  That is a criminal matter, as well.  It is a

10    prohibition against the petitioner having contact, living

11    close to, being in the proximity of children and others,

12    including his own.  He can't have his own.

13          Now, that being the case, it is -- and maybe we

14    should herald back to Tony Soprano.  There is a time when

15    Tony Soprano and Junior and others walk around with

16    bracelets in their house.  They were far freer than Mr.

17    Friedman was, because they had the house, they could make

18    the telephone calls, they could make a call and leave.

19    But they weren't free to -- they weren't free, and

20    neither is Mr. Friedman free, to go where he wished, when

21    he wished, so long as it didn't constitute a criminal

22    act.

23          But what we're looking at is the notice of the

24    petition, and the petition is requesting the records with

25    response to the September 19, 2012 request, all of the

LMP

**A-0755**

```
 1        records, and directing respondent to provide petitioner
 2        with the entire case file of its prior investigation, and
 3        granting the release to petitioner of the records and
 4        minutes of Jesse Friedman.
 5                 Now, since you are there, I am most anxious to
 6        receive from you the Department of Corrections violation
 7        that was the topic for far too long, in my view, in our
 8        last hearing, in which the Court ordered a certified copy
 9        so it knew, was there a violation.  And the Court
10        believed that it -- there may not have been any
11        overriding need other than the Court needing to see that
12        piece of information because, Mr. Schwartz, you
13        considered it so important, Mr. Kuby, you considered it
14        so important, but more particularly, all of the written
15        submissions considered it important, so important.  Every
16        single one of the submissions made, all of the affidavits
17        in opposition, affidavits in support, memorandum or
18        memoranda of law contain references to it.
19                 Do you have that, the official records of a
20        violation that occurred on June 28th, 2013, that the
21        Court requested?
22                 MR. SCHWARTZ:  I don't have any records
23        regarding that beyond what Mr. Kuby provided on the last
24        court appearance.
25                 THE COURT:  Let me just refresh your
```

LMP

**A-0756**

1    recollection, then.  You said that Mr. Kuby wrote in, no,

2    or did something -- maybe it wasn't Mr. Kuby himself, but

3    it was somebody from his office if it wasn't Mr. Kuby.

4    That's what I'm asking.  Remember that part?

5              MR. SCHWARTZ:  Yes, your Honor.  And I did have

6    someone from my office call the Department of Corrections

7    and make inquiry.  They did confirm that he was found not

8    guilty of that charge.

9              MR. KUBY:  Thank you.

10             MR. SCHWARTZ:  But they couldn't provide any

11   additional information regarding the circumstances.

12             THE COURT:  So all of the information contained

13   in the report and the advisory report, with references

14   that would appear to rely on it because it used it, has

15   to be questioned.  Is that right?

16             MR. SCHWARTZ:  Well, I stand by what I just

17   said.  He was found not guilty --

18             THE COURT:  No, Mr. -- no.

19             MR. SCHWARTZ:  But, your Honor --

20             THE COURT:  One of the things that I know that

21   you know, you have to answer my question.  It was a

22   perfect deflection.  I congratulate you for that.  But

23   the congratulations end there.

24             That was an important part of the totality of

25   the submissions, whether it should or should not have

LMP

1   been, because he's a bad guy is the best way to say it.

2   He's a bad guy.  Look at what he did.  And the Department

3   of Corrections -- let the record reflect that the

4   District Attorney's Office is nodding his head, and I

5   assume that it is in agreement, or at least tacit

6   agreement.  Fair enough, sir?

7                   MR. SCHWARTZ:  I don't know that I was nodding

8   my head intentionally, your Honor.  So I can't agree to

9   that statement.

10                  THE COURT:  Do you agree that it was used in

11  some fashion in making determinations in this case?

12                  MR. SCHWARTZ:  It was included in the report,

13  but I think it was actually a very small part of the

14  report.

15                  THE COURT:  Oh, how small?  On a scale of one

16  to ten, was it a one, two, five, six, eight?  Tell me the

17  number if you can.

18                  MR. SCHWARTZ:  In the scheme of the whole 150-

19  something page report, I would say it's probably a one or

20  a two.

21                  THE COURT:  One or two.  I will accept the two,

22  and say to you, then, under those circumstances this

23  Court has the right to remove any two or three pages it

24  wants until it reaches what figure?  90 percent?  95

25  percent?

LMP

**A-0758**

1          We can't, we can't, function in the judicial

2     system in this fashion.  This is a country that at this

3     point has no -- and I emphasize that -- has no feeling of

4     credibility towards its institutions.  That starts with

5     the lowest and goes to the highest.  We don't trust our

6     institutions.  You have to show, you have to prove, and

7     that's what the country is saying.  If it isn't saying it

8     in a loud voice, it's saying it by staying out of the

9     fray.

10         All right.  The material that was provided --

11    this is a real problem, Mr. Schwartz, for the Court -- do

12    you recall that counsel for the petitioner in 1987 and

13    1988 requested Brady material and the ADA said there is

14    none, none at that time?

15         You asked Mr. -- and I will use his name -- Mr.

16    Panaro to trust you, trust that there is no Brady

17    material.  At this point in time I don't believe that

18    you're saying that there is nothing in the 17,365 pages

19    that this Court has received in the form of documents

20    that doesn't have some Brady material, and I'm talking

21    about the unredacted portion, the portion that Mr. Kuby

22    didn't see.  But even in the redacted portion there is

23    some material.

24         MR. SCHWARTZ:  Your Honor, I think this is an

25    important point.

LMP

**A-0759**

1          THE COURT:  Oh, thank you.

2          MR. SCHWARTZ:  Well, what you said was

3     obviously important.  I hope what I'm about to say is

4     important, as well.

5          The issue of Brady has come up time and time

6     again over the years.  It was raised in 2004, in

7     petitioner's motion to vacate his judgment.  And that was

8     heard by a Judge.  And the Judge found there was no --

9          THE COURT:  You know why I'm holding up three

10    fingers?

11         MR. SCHWARTZ:  No, Judge.

12         THE COURT:  I think you do, because what the

13    Court said was, Mr. Friedman, you missed by three months.

14         MR. SCHWARTZ:  No, Judge, that's not -- that's

15    not -- that's not the motion I'm talking about.

16         THE COURT:  Oh, a different motion.  You're

17    talking about not the one that came out of the Court of

18    Appeals in which they said this should bear further

19    scrutiny?

20         MR. SCHWARTZ:  No, Judge, I'm not referring to

21    that at all.  I'm going to get to that, though, if you

22    just give me a chance, please.

23         THE COURT:  Well, chances are for those who are

24    either permitted or taken.  Go ahead.

25         MR. SCHWARTZ:  Judge, before this case went to

LMP

1    Federal Court it started -- the post-conviction

2    litigation started in County Court, Nassau County Court.

3              THE COURT:  Yes, sir.

4              MR. SCHWARTZ:  And they raised the Brady claim.

5              THE COURT:  Yes.

6              MR. SCHWARTZ:  And the Judge reviewed it and

7    rejected it.  Okay.

8              They took that case to Federal Court.  And the

9    Second Circuit, yes, they found the petition untimely.

10   But they also reviewed the Brady claim.  And if you read

11   the Second Circuit decision -- I know you have.  I'd ask

12   you to read it again -- they found the Brady claim

13   meritless because you don't have a right to Brady

14   material if you don't go to trial.

15             THE COURT:  In the Second Circuit.  But not

16   every circuit agreed, and there have been changes with

17   respect to Brady material and when it must be provided.

18             If I had the opportunity at this moment, I

19   would very much like to hear -- but we're not going to do

20   it now -- I would very much like to hear your position as

21   to whether or not in a serious case, at least, pre-plea

22   in response to a demand by the defendant, exculpatory or

23   Brady material should be provided.  The Court does think

24   that some of the circuits are getting it right.

25   Unfortunately, they're closer to the Mississippi than we

LMP

1    are.

2              So at this point, your point, sir?

3              MR. SCHWARTZ:  My point is the issue of Brady

4    has been litigated.  It's been litigated in the County

5    Court, it's been litigated in the Second Circuit.  It has

6    no business in this proceeding, your Honor.

7              And I've said this and I'll say it again.

8    Whether or not Brady material -- whether or not the

9    material requested under FOIL would or could be Brady

10   does not change their entitlement to it.  We're not in a

11   criminal proceeding.  We're not in a criminal trial.

12   This was a FOIL request.  And the nature of the material,

13   the Brady material, is irrelevant.

14             THE COURT:  All right.  At this point in time

15   the Court most respectfully disagrees and does find that

16   under these peculiar circumstances -- they may not be

17   peculiar in the fact that they are -- they have occurred

18   with infrequency, but peculiar in the sense of it being

19   brought to the attention of a Court.

20             The next question the Court asked before, and I

21   did not get a position from you, is regarding Correction

22   Law 18602, any sex offender required to register may

23   petition the sentencing Court to modify the level of

24   notification, and that could be done on an annual basis.

25             Does that, in fact, extend the criminal

                                                      LMP

```
 1        aspects?  At least arguably, doesn't it extend the
 2        criminal aspects of this case beyond what you
 3        characterized as civil, meaning FOIL?  The Court has a
 4        question as to whether or not FOIL is civil or criminal
 5        or quasi-criminal.  But whatever it turns out to be, that
 6        will be determined in another Court or by a legislature.
 7                 Please.
 8                 MR. SCHWARTZ:  No, Judge, it doesn't extend the
 9        criminal case.  It's no different, as I said before,
10        whether the petitioner was still incarcerated.  It
11        doesn't extend the criminal case.
12                 And the Court of Appeals says it, again
13        frequently, a guilty plea marks the end of a criminal
14        case.  It's not a gateway to further litigation.
15                 THE COURT:  But you know that they didn't mean
16        it in the context that that's the end of the case, you're
17        not going to sentence him, the case is over, you're
18        guilty, you took a plea, good-bye, have a good life.
19                 MR. SCHWARTZ:  The context in which they meant
20        it -- and I didn't finish the quote -- was that the issue
21        of factual guilt is removed from the case.  And that's
22        what we're doing here, we're revisiting the factual
23        guilt.  And that's gone.
24                 THE COURT:  But Ms. Rice wanted to do precisely
25        that.  She said, following the determination made by the
```

                                                              LMP

**A-0763**

1    United States Circuit Court of Appeals for the Second

2    Circuit, I want to get to the bottom of this, too, I want

3    to look at it and I'm using the Brady standard, the Brady

4    standard, as a lower standard to look at the entire case.

5         Now, I think that most of you have gotten a

6    flavor for what has transpired in the past, and it is

7    important now to move on from this Court's perspective to

8    the following.

9         First.  There was a letter sent, received by

10   this Court, which came from the law secretary to Abby

11   Boklan.  That letter effectively requests that the Court

12   allow the petition to proceed.  It was the case that the

13   author of that letter did read -- in fact, he's one of

14   the few people who did read the Grand Jury transcripts.

15   He did voice some concern at one point or another.  The

16   Court was very much concerned that he did not, however,

17   follow that up with any additional action.  But he did

18   send this Court a letter, a copy of which all of you

19   have.  And those of you who don't have it, I don't have

20   to provide a copy because it's on the internet.

21        So at this point we know what the only living

22   person who was involved to the intimate degree that the

23   Judge herself was has to say about the facts and

24   circumstances surrounding the 19 -- December 1988 plea.

25        But the Court is also in receipt of a letter

LMP

1    from Arlene -- from one person who I understand is

2    present, and who may wish to say something one way or

3    another.  And I am not going to inhibit that, certainly.

4    Does the person who wrote the letter, copy of which was

5    sent to the District Attorney and to the petitioner, wish

6    to say something?

7                MR. KUBY:  Judge, Ms. Epstein -- she's

8    consented to the use of her name -- Ms. Epstein is not

9    present.  She said what she had to say in writing and --

10               THE COURT:  All right.  That's what the Court

11   was here to find out, either way.

12               The letter that she sent was to say -- at least

13   a letter that this Court found to be compelling to the

14   degree not that it accepts word for word what was said,

15   but that it creates the -- and supports the argument that

16   there is insufficient information.

17               The Court, after reading numerous witnesses'

18   statements, none of which were written by the witness him

19   or herself, all of which were written by someone else,

20   finds that even the people -- and they are people, no

21   longer children -- who took the position that they did

22   not want their name disclosed, had some glaring

23   discrepancies in parts of the statements given.  Most

24   particularly what comes to mind is a statement given at

25   one point in time and then -- to one detective and then

                                                        LMP

1    later given to another detective thereafter. There was a

2    rather substantial difference.

3        The Court also finds something else. First,

4    what everybody who has been involved with this matter has

5    seen -- but until there is a greater emersion it may not

6    have the same effect -- that there was no physical

7    evidence, no photographs. Yes, I understand that there

8    are reasons why there may not be physical evidence. Yes,

9    I understand that there may be reasons why there are no

10    photographs. But instead of just saying there aren't any

11    and that's enough, it means that we have to look closer

12    and not further away. We have to start using a

13    microscope instead of a telescope to look at the facts in

14    order to see whether or not they truly make sense, the

15    timeline makes sense, the fact that so many of the

16    complaining witnesses say time and again everybody in the

17    classroom was present when certain things happened, and

18    total denial.

19        What the Court has seen also is that there are

20    more recantations than there are affirmations of the

21    statements previously made. If we go on the balancing

22    basis, if we hold hearings with each and every one of the

23    individual complainants, we may not progress any further

24    than we are now. If everything is open as was intended

25    by FOIL, everything is open to the petitioner.

LMP

**A-0766**

1          Now, the Court still maintains that it owes the

2     duty to the three parties that have communicated with it,

3     one who filed an affirmation in opposition.  I have

4     serious reservations, as you know, Mr. Schoer, about the

5     privacy right being invoked on these circumstances, but I

6     will give you the benefit of that doubt for the moment.

7     And I have every intention of sending the letters to the

8     two who sent letters to the Court.

9          In conclusion -- and I am going to ask for a

10    response from both -- because I'm a clock watcher, but I

11    watch the person who works harder than anybody else, our

12    court reporter.  I am giving the conclusion now, subject

13    to something that somebody may say that will change the

14    dynamics as I have outlined them already.

15          It is hereby ordered that the District Attorney

16    of Nassau County provide all documents, records of all

17    kinds including the Grand Jury minutes, redacting only

18    the names of the complaining witnesses that I will, in

19    fact, provide, work out with counsel, who have previously

20    contacted this Court, that's -- those are the only names.

21    We sent out 17, we served 17.  Some were served pursuant

22    to -- and even Mr. Kuby learned something about the CPLR.

23    We served some pursuant to CPLR 308(1), we served some

24    pursuant to the Hague Convention, and we served them all

25    over -- in all different ways to assure that actual

LMP

**A-0767**

1    service was effected.

2            If the District Attorney wishes to appeal this

3    order, I want the District Attorney, who has made an

4    outstanding presentation -- no one can ever doubt that

5    this was done with great fervor.  If they wish to appeal

6    the order, it should be noted that this Court will not

7    stay it.  Any stay that occurs will have to be obtained

8    by the Appellate -- from the Appellate Division by 2:00,

9    August 30th.  That's Monday.  That's only if it chooses

10   to proceed in such a fashion.

11           During such time, no document of any kind may

12   be moved re-filed or in any way handled, touched by

13   anyone in the District Attorney's Office.  This is a

14   stay-away for that.  I want to be sure that there is

15   preservation, just as the District Attorney wanted the

16   same kind of assurance from the Court.  We have locked

17   everything up, we've made sure that all non-redacted or

18   unredacted material is locked up tight.

19           Please be further advised that this Court has

20   requested the original stenographic notes that were taken

21   in the proceeding -- I held this off to the very end --

22   the stenographic notes that were taken of the proceedings

23   regarding the petitioner in 1988 at the plea.  Let me

24   give you the history, just for a moment.

25           Stenographic notes were taken by the Gregg

LMP

1    method or one of the methods of taking stenographic

2    notes.  They were then transcribed and then utilized by

3    the parties.  In this particular case, since on the

4    record -- wherever that record may be -- on the record

5    there is purportedly a waiver of any right to appeal, and

6    that's why I had some of the other concerns that I just

7    didn't voice before.  Since there was no appeal, there

8    was no transcription.  But that doesn't mean destruction,

9    as we keep hearing about.  The stenographic notes were

10   sent to Albany and then maybe Utah and maybe Taiwan.  I

11   have no idea.  They are being tracked at this very

12   moment, and I hope to have and will, of course, share

13   with the parties such stenographic notes or materials as

14   this Court receives.

15           At this point is there anything that you wish

16   to say, Mr. Kuby?

17           MR. KUBY:  Only this, Judge.  That in order to

18   expedite this process, we will conditionally agree to

19   redact the three names of the three people who have

20   requested that redaction, subject to the Court retaining

21   jurisdiction.  And after you send your letter and after

22   they respond, which is going to take a period of time,

23   the Court may change its order and release the names to

24   us.  But in order to get this moving we're happy to agree

25   preliminarily to those redactions, so in the absence of

LMP

1    an appeal we can proceed to inspect these documents on

2    September 1st.  And I'm calendar-challenged.  August 30th

3    is --

4              THE COURT:  August 30th.

5              MR. KUBY:  Is a Monday or a --

6              THE COURT:  A Friday.  It's -- excuse me, then

7    it would be the 2nd, isn't it?  What's Monday?  Today's

8    Thursday.  What's Monday?

9              THE CLERK:  This Monday is the 26th.

10             THE COURT:  The 26th.

11             MR. KUBY:  Thank you, Judge.

12             MR. SCHWARTZ:  Your Honor?

13             THE COURT:  Yes, sir?  Please, Mr. Schwartz.

14             MR. SCHWARTZ:  Just so there's no -- there

15   certainly is some confusion on my part regarding the

16   Court's order.  I would ask that if the Court could put

17   it in writing so that I have it, so there is no miss --

18   there is no confusion on my part as to what exactly

19   you're ordering us to disclose.

20             THE COURT:  If there is a doubt on your part,

21   it is every aspect, every part, every piece of paper that

22   has been generated in the matter of People against Jesse

23   Friedman, the 1987, 1988 case.  Except that there may be

24   redaction of two, and -- a total of three, including Mr.

25   Schoer's client.  And that is on consent.  And the Court

LMP

1   will be pleased to give you the names of the three

2   complaining witnesses for which redaction is appropriate.

3   Otherwise every single document.

4           MR. SCHWARTZ:  I would ask, your Honor, that we

5   get an order in writing so that if we do file a notice of

6   appeal we have a written order from which to appeal from.

7           THE COURT:  All right.  As I know that you are

8   well aware, being such an astute advocate, there is no

9   longer an obligation by the Second Department to have a

10  written order, that the transcript itself is sufficient.

11  And if, in fact, there is a need for a conference call, I

12  think you have all of my telephone numbers, both of you.

13  And, if not, then you can certainly obtain them after

14  this proceeding is concluded.

15          I do want to note for the record that this must

16  be one of Mr. Kuby's most succinct responses in his long

17  history of advocacy.

18          MR. SCHWARTZ:  Your Honor, please, I just have

19  one more request.  In lieu of the fact that you're not

20  giving us a written order, and I need to get the

21  minutes --

22          THE COURT:  Yes.

23          MR. SCHWARTZ:  -- to file a notice of appeal,

24  and you've only given us until Monday, I'm kind of

25  hamstrung here.

LMP

**A-0771**

```
 1              THE COURT:  Would you like it at 5:00 instead
 2      of 2?
 3              MR. SCHWARTZ:  I would like an additional week,
 4      if that's possible, your Honor, and it would depend on
 5      how quickly the court reporter can get me the minutes.
 6              THE COURT:  This Court reporter is known for
 7      her accuracy and speed.  She can have those notes
 8      available within minutes of your departure from the
 9      courtroom.
10              MR. SCHWARTZ:  In any event, your Honor, if I
11      could have to August 30th, which was the original date
12      you mentioned.
13              THE COURT:  That was an accident.
14              MR. SCHWARTZ:  I understand, but I would ask
15      for that anyway.  I don't know that there's that much
16      urgency in a few days.
17              THE COURT:  The reason why is because of the
18      nature of this case.  First, it's affecting somebody on a
19      daily basis.  Second, the Second -- the Appellate
20      Division Second Department is clearly short-staffed and
21      is behind.  The sooner we get it there, with the sense of
22      urgency that we wish to have it decided one way or
23      another because of the effect that it might have on other
24      similarly-situated cases, the better for the entire
25      judicial and legal community.
```

LMP

**A-0772**

1              So if you need an extra day I can appreciate

2       that.

3              Mr. Kuby, reaction to the next day?

4              MR. KUBY:  Whatever you say, Judge.

5              THE COURT:  I thank you for that and appreciate

6       the comment.

7              It will be, then -- will the 27th be sufficient

8       for you?

9              MR. SCHWARTZ:  I guess it will have to be, your

10      Honor, but I would request more.

11             THE COURT:  I know, and I do want to say that

12      there have been four instances in which this Court has

13      sent orders to the District Attorney, copies to Mr. Kuby,

14      giving them very short time periods in which to comply

15      with certain requirements imposed by the Court.  They

16      have been able not only to comply, but even

17      embarrassingly early on one occasion.

18             I thank you very much.

19             MR. KUBY:  Thank you, Judge.

20             THE COURT:  Thank you.  We stand adjourned.

21                          *   *   *

22             I hereby certify that the foregoing
        is a true and accurate transcription of my
23      stenographic notes in the captioned matter.

24

25                          _____
                            Lisa M. Porteus, RPR
                            Official Court Reporter

                                                        LMP

**A-0773**

## **VOLUME 4**

Exhibit DD  Transcript of Capturing the Friedmans          A-0774

Exhibit EE  2001 Interview of Judge Abby Boklan            A-0907

HIT THE GROUND RUNNING FILMS PRESENTS

JESSE:

Hi.  Hi.  It's me, Jesse.  Are we-- we there?
Yeah.  Okay.  Good.  We're there.  Well, this
afternoon after a very lousy sketch about yo-
yoing I figure we'll-- for lack of anything
better to do we'll take it towards a more serious
side right about now.  And we're going to conduct
an interview with (SIGHS) Arnold Friedman -- my
father.

JESSE (VO):

I still feel like I knew my father very well.  I
don't think that just because there were things
in his life that were private and secret and
shameful that that means that the father who I
knew and the things I knew about him were in any
way not real.


OPENING CREDITS: "CAPTURING THE FRIEDMANS"

SONG LYRICS:

(MUSIC) *They're gonna put me in the movies.*

**A-0774**

*They're gonna make a big star out of me. We'll*
*make the film about a man that's sad and lonely.*
*And all I gotta do is act naturally.*
*Well I'll bet you are gonna be a big star. Might*
*win an Oscar. You can never tell. The movie's*
*gonna make me a big star 'cause I can play the*
*part so well. Well, I hope you come see me in the*
*movie. Then I know that you will plainly see the*
*biggest fool that's ever hit the big time. And*
*all I gotta do is act naturally.*

      ELAINE:

Arnold liked pictures. I mean, that's-- let's
face it. He liked pictures.

      ARNOLD:

      (home movie footage)

Well, we're here. This is it, the whole family
assembled. Everybody in Great Neck, New York.
(MUSIC)

HOME MOVIE CARDS:

"PECULIAR"

"CAST PICKED AT RANDOM FROM THE FUNNY FARM"

"PHOTOGRAPHY BY ARNOLD FRIEDMAN"

ELAINE:

We had three sons.  David being the oldest had a
lot of responsibility when he was young.  Seth
was an outright rebel.  And somehow Jesse was
just like the-- the one that-- that keeps trying
to catch up and doesn't quite make it (MUSIC
ENDS).

DAVID:

I have very good memories of the-- of-- of my--
well, I have very good memories of my childhood.
(CHILDREN PLAYING IN WATER) I had a great time
growing up.  We had a great-- I had a great time
because of my friends.  And my father was-- was--
was great.  I mean, he may not have been the best
father, but-- but-- but he-- he-- he went to
Columbia University.  And then when he graduated
he went to the Catskills to play in his band.

SONG LYRICS:

(MUSIC) *The Jazzbo Mambo with boogie beat is the
newest dance on 52nd street*.

DAVID:

The band was called Arnito Rey and his Orchestra.

My father's name was Arnold Friedman. This was in the late 40's and early '50s. So he played Latin music and was very big at the time. And so he changed his name to Arnito Ray.

SONG LYRICS:

--*do the Jazzbo Mambo into the beat.*

DAVID:

I don't know. My dad was a cool guy, you know? He was a schoolteacher. And I think that-- the other kids liked him, and he liked kids. But he didn't like spending a lot of time with his wife, so he would teach high school during the day, and then after school he would come home and teach piano lessons and later computer lessons in the house. And that was, of course, more time he didn't have to spend with his wife.

ELAINE:

I'm not that anxious to talk about his father 'cause, you know, we were divorced. And-- but his father-- he would-- but-- I don't really want to talk about it.

PG. 5

ARNOLD:

(home movie footage)

In case anybody didn't know, I'm the father of
this family. Never in the movies. Never seen in
any of the pictures. But I really am the father.
And we're all gathered together while David is
messing up the camera here. No, he's taking a
good movie -- and zooming in and out. When you
see me on this, you're gonna (LAUGHS)-- okay,
shut it.

DAVID:

He died of a surprise heart attack about five
years ago. And it was very, very sad. He was,
you know, selfless and altruistic.

ANDREW (OC):

But in the end, he wasn't-- he wasn't together
with your mom?

DAVID:

He wasn't together with my mom at the end.

ANDREW (OC):

And when did they make the decision not to be
together? Long before he died?

**A-0778**

PG. 6

DAVID:

Couple years before his death. There's a lot of-
- well, whatever. There's some things I don't
want to talk about.

(MUSIC)

DAVID:

(home video footage)

Well, this is-- this is private, so if you don't-
- if you're not me then you really shouldn't be
watching this because this is supposed to be a
private situation between me and me. This is
between me now and me in the future. So turn it
off. Don't watch this. This is private. If
you're the fucking-- oh, god, the cops. If
you're the fucking cops, go fuck yourselves. Go
fuck yourselves because you're full of shit.

JOHN MCDERMOTT:

Back in 1984, US Customs had seized some child
pornography addressed from the Netherlands in the
mail to Arnold Friedman. Now, he never got that
piece of mail, but his name was forwarded on to
us. So what we would do then would be to

**A-0779**

initiate a correspondence with Arnold in the
hopes that we can determine if he is in fact
willing to violate the statute again about
mailing or receiving child pornography.

"Dear Stan, the book is Joe, 14, and his uncle.
I think I'd like you to send me something, sort
of good faith, and then I'll forward this rather
precious book to you. Thanks. Arnie."

    ELAINE:

See, it's very hard to believe that this so-
called "good marriage" was so disturbed. He sent
him these pictures, and he sent them the note
then I remember 'cause the lawyer got the note.
And then he wrote, "Enjoy."

    JOHN MCDERMOTT:

Since he had sent the magazine he was always
asking for it back. So I asked the prosecutors,
"Let's grant him his wish. He wants his magazine
back." I dressed up as a mail carrier, knocked
on his door, asked him if he was Arnold Friedman.
He replied he was. And I said, "I have a package

for you. Sign right here." He did.

About an hour later we went back. Give him some time with the magazine. I'm dressed now, I just put a blue suit jacket over the carrier's uniform. And I told him, "I have a search warrant-- for child pornography." He says, "There's nothin' like that here." And I said, "You don't recognize me?" I'd just been at his door an hour ago. He goes, "No." And I took off my jacket, and I said, "Now do you recognize me?" "Oh, yeah. Oh, okay. The magazine is upstairs."

I went up to his bedroom. In the top dresser door was the open magazine. Well, he thought we would take the magazine and leave. And I said, "No. No, we have a search warrant. We're gonna search the whole house for child pornography." And around that time his wife showed up.

ELAINE:

I thought they were searching like for marijuana or something. I didn't know what they were

searching for to tell you the truth. And I
thought it was a big mistake.

      JOHN MCDERMOTT::

One of the first things we went to was his
office. And I remember just as I was about to
pull out a drawer Mr. Friedman came rushing in
and said, "Wait. I'll get that for you." And it
wa-- and said, "Here. This is-- this is all
that's there." And it was one piece of-- mail
from the Netherlands, but it was child
pornography. And he said, "That's it. That's
all there is." And I said, "Well, that's great,
Mr. Friedman, but we're still gonna search." And
he goes, "I don't-- I don't understand why you
don't believe-- why don't you go when I tell you
that's all there is." And I said, "Well, we
don't believe you."

      ELAINE:

Well, it's not something he sort of left lying
around on the kitchen table. He wasn't proud of
it, and he kept it hidden. He had his office
downstairs. It wasn't like right there. You had

to go downstairs and around the corner to get to his office. And he said-- we used to have someone that cleaned. He says, "Don't let her clean in here. It's okay. I don't want my things disturbed." So I-- I never went in there.

JOHN MCDERMOTT:

Then one of our inspectors moved the piano that was in that office. And that's where his stash of magazines were held, behind the piano.

ELAINE:

And this was Arnold's secret. He liked to look at pictures of boys. And it's not that he acted on these things. He-- he just wanted to-- to look at these pictures and meditate or--

JOHN MCDERMOTT:

And these are listings of the magazines that were found behind the piano. "Young Boys and Sodomy," "Incest Case Histories," something called "Chicken Pickin's Magazine." And in addition to that we found evidence of a computer class being taught there by Mr. Friedman. And we did seize some list of names that we thought could be

**A-0783**

students.  I remember walkin' in there sayin',
"God damn.  We could have a problem here."

      FRAN GALASSO:

Just when you think everything is going to be
dull something gets dropped on your lap, and, you
know, it turns out to be something bigger than
you ever-- than you ever thought.  What happened
was one of the detectives from the vice squad
came in to see me.  And he had a list.  And it
was at that point that we were able to learn that
these were computer classes that went on
literally every day of the week and Saturday.
And we drew a big map of the whole village of
Great Neck, sectioned it off, and started sending
detectives out to do interviews.

      ANTHONY SGUEGLIA:

She set us up in teams - male/female teams.  And-
- we got a list of-- alleged victims.
(BACKGROUND MUSIC) Soon as we went into the house
we were usually approached by the mothers.  And
we explained why we're there, what we're doing
there, and we'd really like to talk to talk to

their children preferably alone.

FRAN GALASSO:

The parents were becoming impatient. They wanted something done immediately. But you always want to be very careful about how you proceed because the one thing that you worry about, I know I worried about it all the time, is -- just charging somebody with this kind of a crime is enough to ruin their lives. So you want to make sure that you have enough evidence and that you're convinced that you're making a good charge.

ANDREW (OC):

And how much time was there between the time that the postal inspector searched the house and the time that you went in for the second search?

FRAN GALASSO:

Well, it would have been less than a month because we did that the day before Thanksgiving.

NEWS ANCHOR:

A prominent middle-aged teacher in a prosperous Long Island town is charged with sodomizing young

boys who were his students.

            FEMALE REPORTER:

Police are charging that sexual abuse went on

behind the doors of 17 Picadilly Road in Great

Neck.

            FRAN GALASSO:

We rang the doorbell.  As soon as he realized who

it was, he wasn't gonna let us in.  So one of the

detectives broke the door down.  And we went into

the premises at this point.  Arnold was by

himself.  His wife was out shopping.

            ELAINE:

I was out to the store to buy a Thanksgiving

turkey.  And I go up the front walk to the house

and there're people all over the house.  And my

husband is sitting, looking very sheepishly in

the dining room -- handcuffed.

            FRAN GALASSO:

By this time just about every news organization

you could name had arrived on the scene.

            DAVID

I went home for Thanksgiving, got to the house,

**A-0786**

and there's cops and news trucks all over the
place. And I got worried, of course.

JOSEPH ONORATO:

When David came to the house, we were able to
ascertain eventually the type of business he was
in. And we heard that he was involved in
children's entertainment in the form of some sort
of clown activities.

ANTHONY SGUEGLIA:

I was there when the clown came in. He was
ranting and raving. We had words. And I was
goin' through the folders. We told him to take a
hike.

FRAN GALASSO:

And he kept trying to come into the house, and I
kept telling him that he couldn't, that he had to
leave. He wasn't, wasn't allowed while we were
searching. And finally he, he came in for the
last time. He bent down. I really thought he
had a weapon in the duffle bag. Everybody kind
of, you know, reached for a-- a gun at one point.
He came out-- what he came out with was a pair of

Fruit of the Loom underwear.  And he started

prancing around, flailing his arms in the air

saying, "Look at me.  Look at me.  I'm an

asshole.  I'm an asshole."

       DAVID:

         (news footage)

They're harassing my father for no reason at all.

       DAVID:

If I had had a, some kind of Arabian sand scarf I

would have wrapped that around my face and been

Lawrence of Arabia, which might-- maybe that

would have been better.  But I took out underwear

and put it on my head because I didn't want to be

on camera.

       FEMALE REPORTER:

The first arrested was Arnold Friedman, a retired

schoolteacher who was charged with sodomizing

boys aged 8 to 11.

       FRAN GALASSO:

         (news footage)

The charges are that while running a computer

school, Arnold Friedman and his son engaged in

various forms of sexual abuse against minor
children.

> DAVID:

Jesse pulls up coming home from school. His
friends dump him out of the car.

> JESSE:

David sort of grabbed me and-- we were sitting a
couple houses down sort of on the sidewalk. And
he was saying something to me. And then the--
one of the TV cameras came over, so we kind of
ran to the backyard. And we went behind the
house. And we were in the backyard of our house.

> DAVID:

And than cops came back, and they said, "What's
going on here?" And I said, "Don't worry about
it. It's just me and Jesse." And they said,
"Well, we want Jesse-- we need Jesse in the house
now." It must be-- we thought it-- you know, we
didn't know why that was.

> JOSEPH ONORATO:

As we conducted more interviews of the children,
Jesse's name started to pop up. And-- and Jesse

was there. And what did Jesse do? And
eventually we were able to ascertain that Jesse's
role was not one of, you know, helping his dad
conduct the computer class but basically abusing
the children himself.

FRAN GALASSO:

We didn't have children telling us that-- that
Arnold had slapped them around. But quite a
number of the kidsreported incidents of being
slapped and having their hair pulled or their
arms twisted by Jesse. He was by far the more
violent one.

JUDD MALTIN:

All the policemen said that Jesse was some kind
of aggressor, that even his father was cowering,
and Jesse was this sexual, molesting tyrant. I
challenge anyone to find anyone who Jesse had
even teased as a child or called a name. Jesse
was not an angry person. He was not an upset
person. So we ended spending a lot of time
together. I was over at his house three days a
week, four days a week. And as far as I know

him, none of this ever happened.  Not on my
watch.

> NEWS REPORTER:

Eighteen-year-old Jesse Friedman also stands
accused of sex abuse and using a child in a
sexual performance.

> JESSE:

The only thought that I just kept having the
whole night was we need to get bailed out and
then home, and we'll figure out what's going on.
And the lawyers will take care of this.  And
they'll straighten this out.  Because it was
still just a matter of, "This is a big
misunderstanding." But when the bail was set at a
million dollars, instead of going out with Mom
and David like we were supposed to, we went back
the other way. And that was the moment when there
was this whole new sense that the problem was
much worse than I originally thought.

> (MUSIC)

> FRAN GALASSO:

The investigation didn't end at that point.  That

really was the arrest and the search of the
house.  And then we went on because we had
literally at that point dozens more interviews to
do.

ELAINE:

Somewhere along the way-- I think it was the
Nassau County cops.  They showed me this
magazine, and they said, "Do you see?  Look at
this magazine."  And they showed me the magazine.
They were embarrassed to show it to me because of
what the pictures were.  And you know, I didn't
see it.  My eyes were in the right direction, but
my brain saw nothing because when it was all over
the lawyer showed me the magazine, and then I saw
it.  For the first time I really saw it.  And I
just-- I couldn't believe what I saw.

I-- I mean, I had no concept that this thing even
exists in the world, that this magazine would
even be in the world.  This is-- I mean, we had a
middle-class home, educated.  I had a good
family, right?  Where did this come from?

                    FAMILY FRIEND:

                        (home movie footage)

Mr. and Mrs. Friedman's house on this most

beautiful Thanksgiving dinner.

                    GRANDMA:

                        (home movie footage)

(IN PROGRESS) For my daughter, for my son-in-law,

and-- and for my three-- grandsons.

                    JESSE (as a child):

                        (home movie footage)

I'm thankful that both my brothers are home

(LAUGHS).

                    ELAINE:

                        (home movie footage)

I'm most thankful to my husband, to Arnie.

                    VOICES:

                        (home movie footage)

Aw.

                    REPORTER (OC):

                        (news footage)

Anything you want to say, Mr. Friedman?  Are you

guilty?  Did you do all they say you did?

ARNOLD:

(news footage)

No comment.

HOWARD FRIEDMAN:

I was the first to visit my brother in prison.
And that was a-- a moment in my life I'll never
forget. He came into the room. I was sitting at
this table. And a lot of tables. And they were
crowded. Just awful surroundings. And didn't
have his glasses on. Without his glasses he was
blind as a bat. They'd taken them off and broken
them, stepped on them. He had a smell of urine.
They were throwing urine at him. They were
threatening to throw him down the stairs. They
knew what he was in there for. The media-- it
was all over the media. (POLICE SIRENS AND
SCANNERS) He was half-blind and hadn't shaved in
two days and shivering and cold and scared out of
his wits. The first words out of his mouth was,
"Howie, they're gonna kill me. They're gonna
kill me. Get me out of here."

                    COURT CLERK:

                        (news footage)

The People versus Arnold Friedman and Jesse
Friedman.  Indictment 67430.  Step up please.

                    FEMALE NEWS REPORTER:

                        (news footage)

So began the very first time cameras were
permitted in a Nassau County courtroom.  Fifty-
six year old Arnold Friedman and his 18-year-old
son, Jesse heard the court clerk read off a 91-
count indictment charging them with sodomy and
sexual abuse.

                    COURT CLERK:

                        (news footage)

Arnold Friedman, how do you plead to this
indictment?  Guilty?  Or not guilty?

                    ARNOLD:

                        (news footage)

Not guilty.

                    COURT CLERK:

                        (news footage)

And Jesse Friedman, how do you plead to this

**A-0795**

indictment?

JESSE:

(news footage)

Not guilty.

COURT CLERK:

(news footage, overlapping)

Guilty?  Or not guilty?

MALE VOICE:

My brother and Jesse kept saying they're

innocent.  This is trumped up charges.  And they

got a McMartin on their hands.  You know, they--

they somehow got one kid to-- to-- they got the

police to be able convince the kids, "Well, all

of your friends said somethin' happened.  Didn't

somethin' happen?  Somethin' must have happened,"

et cetera, et cetera.  And-- they were convinced.

They-- they kept saying they were innocent.  And

I just kept thinking, "I have to believe them."

FRAN GALASSO:

It's very hard for people to accept him as a, as

a pedophile.  Arnold Friedman was an award-

winning teacher.  All over the house were plaques

and newspaper articles written about him. He had
been given an award, Computer Teacher of the
Year. He also taught piano.

ELAINE:

(PIANO MUSIC) David plays beautifully. And his
father taught him how to play the piano.

DAVID:

It was when he died that I realized how much of
an impact he had on my life.

ARNOLD (OC):

(home movie footage)

Take a bow (LAUGHTER).

DAVID:

He-- he was very supportive of my magic-- when I
was a kid.(MUSIC) When I was about six my father
took me to a magic show. And it's probably my
earliest memory.

ELAINE:

You know when your son goes to college and you
say, "Go to college. And-- and what are you
gonna be? Be a doctor. Be a lawyer." I tried to
make him into a doctor or a lawyer (LAUGHS).

PG. 25

DAVID:

You know, my mom would always say, you know, "Get a job. Get a job." But my dad would say to me, "You know, David. I can't tell you what to do because you know what I did when I got out of college." He blew off his chemical engineering degree, which he could have worked for an oil company and made tons of money. Instead, he played in the mountains, which is a total blow off, follow your dream, artistic thing. And I totally love him for that.

FATHER OF COMPUTER STUDENT:

Trust your children to somebody who was a schoolteacher for over 20, 30 years. A member of your community. All you heard were accolades about this person. And now all of a sudden he's a monster. And things that were being said, you know, upset the community because you don't expect that here.

ELAINE:

(MUSIC) Great Neck is a peninsula -- it's a very insulated community. This was a-- a certain kind

of person that lived in Great Neck.

JOSEPH ONORATO:

It's on the north shore of Long Island, which is
usually a predominately wealthy area. These are
wealthy, professional people that have a great
deal of income in their lives. And they live
accordingly.

ANTHONY SGUEGLIA:

Nice community. Tight. Affluent. Well-kept
homes.

DAVID:

They get dressed up to go shopping. They-- they
want to be sure they get seen by the people they
want to see. And cars are important. Clothes
are important.

FATHER OF COMPUTER STUDENT:

There's a lot of competition in Great Neck.
Everybody's kid's a genius and the best. And
everybody's the best in this and that. And you
just want your kid to be happy and get an array
of experiences. And this computer class was one
of those experiences. You though you were doing

usually a predominately wealthy area. These are
wealthy, professional people that have garnered a
great deal of income in their lives. And they
live accordingly.

ANTHONY SGUEGLIA:

Nice community. Tight. Affluent. Well-kept
homes.

DAVID:

They get dressed up to go shopping. They, they
want to be sure they get seen by the people they
want to see. And cars are important. Clothes
are important.

FATHER OF COMPUTER STUDENT:

There's a lot of competition in Great Neck.
Everybody's kid's a genius and the best. And
everybody's the best in this and that. And you
just want your kid to be happy and to get an
array of experiences. And this computer class
was one of those experiences. You thought you
were doing right.

JOSEPH ONORATO:

Most of the children started out explaining how

**A-0800**

Mr. Friedman would try to test them I think, in my opinion, as to whether they'd be receptive to some of his advances. There'd be certain showings on the computer during computer class of certain material that was inappropriate for children.

FRAN GALASSO:

If you were going to be the first one abused on a particular day, he would pull up a chair and sit next to you. Maybe it would start with his arm around your shoulder or on your leg and gradually move it up touching private parts.

JOSEPH ONORATO:

And then over the course of time we developed a situation where we found out that there was not only sexual touching of the genitals, but there were acts of sodomy, oral and anal sodomy, that took place during the course of the class.

ANDREW (OC):

So were the kids abused in the computer room in view of everyone else?

FORMER COMPUTER STUDENT #1:

From what I saw in my sessions none were raped out on the floor. The kids were raped in Jesse's room or the bathroom.

ANDREW (OC):

Just to change the subject for a second, there were these sexual computer games that were discussed during the course of the case.

FORMER COMPUTER STUDENT #1:

We'd basically do the games where there would be naked girls and everything -- in the computer class. But I remember one time I slipped one of the games out, and I brought it home and everything. And I copied it. And Arnold found out. Because of that I was raped by him and Jesse at the same time as punishment to that. I never did it again. He made me format it. I formatted it. I had to bring my computer in and show him that I hadn't brought it home. So he was absolutely positive, 100 percent that it was not touched at all in any way, form, shape whatsoever.

ANDREW (OC):

And how did he know that you brought it home?

FORMER COMPUTER STUDENT #1:

'Cause the, he accounted for all the disks that were there. And since he flipped through, he's like, "Who the fuck took this? Tell me now or I'm gonna kill you all!" And he had a knife, and he was waving a knife around. I was like, "I did it. I did it. I did it."

RON GEORGALIS:

My general recollection of the classes, is basically a positive one, is a pleasant one. The types of behaviors which were described, which were, well, just downright satanic in nature. I mean, they make him sound like some kind of brutal sadist, where as I had just always thought of him as being kind of a, a nebbish.

FORMER COMPUTER STUDENT #2:

(on telephone)

I think as someone who took the classes it was just hard to picture even that going on because I did have a good experience. And I didn't, you

know, see anything, you know, remotely like, you know, like, like child molestation or child abuse or any, child-anything going on.

RON GEORGALIS:

What took place in Arnold's classes was pretty much just straight computer lessons. I mean, as ordinary and as boring as you could possibly imagine it.

FRAN GALASSO:

It was just generally a free-for-all because it was, everybody could, could see what was, what was going on. And very often they would participate in these, these, sort of, mass games in, in the classroom.

ANTHONY SGUEGLIA:

There was a game there that was called "leapfrog." And this one really got to me. It was, they would play leapfrog in the class. They'd actually have their clothes off. And we, we associate leapfrog like you do when you were a kid, one guy jumping over another guy. But the fact is, it means everybody's butt's up in the

air, so to speak.

RON GEORGALIS:

The very nature of these charges is so absurd. It, it seems almost like some kind of grotesque fantasy.

FORMER COMPUTER STUDENT #1:

Yeah. Leapfrog. I remember about that. It's kind of like Twister where we would have to sit down. Our asses would be in the air. Arnold and Jesse would leap from one person to another sticking their dick each in our ass.

ANDREW (OC):

But then I was confused because you said, "No kids were raped in the computer room."

FORMER COMPUTER STUDENT #1:

The leapfrog game, which was not molestation, was a leapfrog game, was not considered molestation, was done outside. But that was, that was a, that was a group game. The actual molestation, one-on-one contact, happened in the bathroom. The game happened out on the floor.

SCOTT BANKS:

One of the things you, you sit down there, and I
know I've, you know, think about this, you know,
"How could this go on in, in this home for so
long and, and not be, you know, come out?" But,
you know, that's, that's a, that's a, that wasn't
my province. That wasn't what I had to decide or
the judge had to decide. You know, that's up to
someone else to decide that.

But if I recall, you know, the children were
pretty vivid in their recollections as to what
Arnold and or Jesse did to them. And Judge
Boklan, you know, she's a pretty strong-willed
judge. And she's pretty unmovable when she makes
her decision.

JUDGE ABBEY BOKLAN:

There was never a doubt in my mind as to their
guilt. And remember, I'd been around for a
while. This wasn't, you know, the first sex case
that I had ever seen. In fact, my previous law
secretary used to tease me that we were the

**A-0806**

pervert part. And having been, you know, head of
the Sex Crimes Unit myself where, you know, I had
young boys who were sodomized, in fact, one who
killed himself, you know, after the sentence of
the abuser. I mean, some horrible experiences.
So for me to be so outraged. I mean this was
really very, very bad what was going on there.
It was like someone's worst nightmare. Who would
even think of, of doing these things? And to do
them in a group and with so many witnesses.

HOWARD FRIEDMAN:

The scenario as posted by the media and the
police was so incredibly way out it was hard for
me to believe that it was true.

LARRY KING:

("Larry King Live" footage)
We now welcome, also in Los Angeles, Debbie
Nathan. Debbie is an investigative freelance
journalist who has been covering the McMartin and
other abuse trials around the country. All these
parents are bizarro, huh? They're all whacked?

DEBBIE NATHAN:

("Larry King Live" footage)

Well, it's not really fair, I don't think, to deal simply with these parents or with this particular case.  You have to understand that all over the country there is a hysteria.  And I don't think that it's a question with most of these kids of lying.  I think that they have been brainwashed if you will.

DEBBIE NATHAN:

I was one of the first writers for the mass media to look at those cases critically and question them.  So as a result of that, having done a lot of that work, I got a lot of letters from people.

DAVID:

And my father wrote to Debbie and said, I don't know, said, "Help me."  And she has been the only person outside the family that said, "I believe you."

DEBBIE NATHAN:

In the Friedman case, the basic charges were completely implausible.  First of all, you'd have

**A-0808**

to believe that blood is coming out of these children's orifices. That they're screaming. That they're crying. That their clothes are soiled from semen and from blood. And yet their parents show up. Sometimes they show up unannounced. Everything looks fine.

ANDREW (OC):

Was there any physical evidence in the case that was relevant? Or it was really, was the case really strictly based on the statements of the kids?

JOSEPH ONORATO:

It was more testimony. It was, there was a dearth of physical evidence. I, I don't even recall whether there was any physical evidence that would have indicated one way or another that these events took place.

DEBBIE NATHAN:

I don't think that they're sitting around with any kind of diabolical or conspiratorial agenda to go out and falsely accuse Arnold Friedman or railroad Jesse Friedman. But nobody's critiquing

them. Nobody's telling them that there's a right way and a wrong was to do this. Nobody's saying that we've got a problem in this culture with hysteria around this issue. And so they're really free to let their fantasies fly.

FRAN GALASSO:

I think the most overwhelming thing was the enormous amount of child pornography. You would just have to walk into the living room and it'd be piled around the piano. There were literally foot-high stacks of pornography in, in plain view, all around the house.

DEBBIE NATHAN:

But photos taken during the search showed nothing of the kind.

JOSEPH ONORATO:

But as far as the families were concerned, I don't want to use the word that they were competitive with each other. I don't know if it's to that extent. You know, sometimes it'd be some idle conversation about, you know, another boy, you know, "He was sodomized five times, but

my son was sodomized six times," you know, as if
that meant something in the overall scheme of
things.

DEBBIE NATHAN:

There's a whole community atmosphere that gets
created in a mass-abuse case like this, where the
families are talking to each other, they're going
to community meetings, or they're calling on the
phone all the time. They're seeing each other in
group therapy. And there is definitely an
element when a community defines itself as a
victimized community that if you're not
victimized, you don't fit into that community.

FATHER OF COMPUTER STUDENT:

The families that had their child molested or
allegedly molested became very involved and it
took a greater part of their life at that point.
I appreciated their call in the beginning telling
me what happened. And then when I told them that
we'd looked into it and my wife and I both felt
that nothing happened to our son. It got to be a
little pushy situation where they told us that we

were in denial and it absolutely happened to our son.

    (MUSIC)

    MALE VOICE ON PHONE:

(BEEP) You fucking bitch. I'm gonna kill you. When Jesse gets out of jail, he's a dead motherfucker. When Arnold gets out of jail, he's a dead motherfucker. Fuck you! And fuck your whole family! (HANGS UP)

    ANDREW (OC):

Is there any one word or phrase that you could use to describe the experience overall?

    ELAINE:

Chaos. Hysteria. It was really crazy.

    HOWARD FRIEDMAN:

Am I dreaming? Is this a nightmare? The, this can't be happening to my family. My brother? And a day doesn't go by that I don't think of it. It destroyed my family. It tore us apart.

    ELAINE:

I don't know. I, I can't say too much about it. They, they were … We were a family.

(MUSIC)

INTERCARD:

After spending 6 weeks in jail, Arnold is allowed home under house arrest to prepare for his trial.

DAVID:

(home video footage)

Mommy believes you did it. And she believes you should go to jail. And she believes that she deserves everything that's left and you shouldn't have any part of it. You have to hire another lawyer!? All this woman does is hire lawyers. I honestly have to tell you, anything that she decides, I can't trust. She, she runs around, "Arnie, they don't trust me." Well, we <u>don't</u> trust her. We lived with her for three, for two months while you were in jail, and we learned not to trust her.

DEBBIE NATHAN:

David had just gotten a video camera when this case broke. And so he just started recording the family falling apart.

JESSE:

(home video footage)

People are telling me, "Look what your father did to you. Look at the mess he got you into." And Mommy believes him, and I don't. I tell them to get lost. And Mommy says, "You're right." And "I've lived with him for all my life. And look at all these horrible things he's done for me over 30 years." Which amounts to nothing -- except this.

JESSE:

At some point David making the videotapes kind of springboarded to my thoughts about audiotape. And I began to make audio recordings of these family arguments.

ELAINE:

(on audiotape)

He's my husband! He doesn't belong to you!

JESSE:

(on audiotape)

He's my father. He doesn't belong to you.

ELAINE:

(on audiotape)

Well, he doesn't belong to anybody now.

JESSE:

(on audiotape)

Why don't you tell me why you're being so
pessimistic and why you're not standing behind
the family and why you don't believe us?

ELAINE:

(on audiotape)

I don't believe your father because you father
has never been honest with me.  And I don't know
where the truth is at this point.

SETH:

(on audiotape)

You're so fucking stupid!

GRANDMA:

(on audiotape)

Don't scream.

(OVERTALK)

SETH:

(on audiotape)

I don't want to talk about this!

Why are we talking about this?

FEMALE VOICE:

(on audiotape)

We're trying to--

(OVERTALK)

SETH:

(on audiotape)

She's stupid! Don't listen to her!

ELAINE:

The family was screaming at each other. And

everybody wanted me to say, "He didn't do it."

Well, I wouldn't do that. I said, "I don't

know." And I didn't, they wanted me just to lie,

you know, and say, "He didn't do it," whether I

believed it or not. And I was so angry at Arnold

and what he'd done that I wouldn't do it. And I

said, "Well, I don't know." And I wanted just to

tell the truth. That is the truth. I didn't

know.

DAVID:

My mother abandoned him, pretty much. Wouldn't
talk to him, fought with him constantly, made him
sleep on the sofa. And after 33 years of
marriage when your wife, when you've been accused
of a crime you didn't commit, you spend six weeks
in pri-- in jail for it, you're trying to build a
defense, and your wife leaves you, essentially,
my father fell apart.

DAVID:

(home video footage)

You yelled and screamed about what, that you
ruined her life. She's brainwashed you. You
didn't do anything. The police have done it to
you. It's not your fault. The police are do,
are, are railroading you.

ARNOLD:

(home video footage)

That we know.

DAVID:

(home video footage)

But it's not your fault.

JESSE:

(home video footage)

Mommy doesn't believe you.

DAVID:

(home video footage)

The police pick-- picked on you, and that's who
they're going after. It's not because you
deserved it.

ARNOLD:

(home video footage)

I'm taking the blame.

DAVID:

(home video footage)

You're taking the blame, and you don't deserve
the blame. She's brainwashing you into thinking
that it's your fault. And it's not your fault.
She thinks he did it. And if he did it, then she
thinks he's going to be convicted of it. And if
he's convicted of it, he's gonna go away.

JESSE:

(home video footage)

Yeah, but if, let's say he goes away for 10

years.

                    DAVID:

                        (home video footage)

And even if she--

                    JESSE:

                        (home video footage)

He's still gonna come out.

                    DAVID:

                        (home video footage)

No.  I'm talking about 50 years.  I'm talking
about 100 years.

                    JESSE:

                        (home video footage)

She doesn't think he's getting 50 years.  I don't
think she thinks that he's gonna get 50 years.

                    DAVID:

                        (home video footage)

Okay.  So what is he gonna get?  Twenty years?
That's, that's 50 years.

                    JESSE:

                        (home video footage)

What's the difference, well--

DAVID:

(home video footage)

If he goes to a state institution on state charges you know he's not coming back.

JOSEPH ONORATO:

In this case, there was consultations between both sides -- the District Attorney's Office, the families, the defense attorneys -- as to what to do with Arnold Friedman.

JESSE:

We were trying to maintain a sense of normalcy in terms of having dinner and paying the bills, but it was almost surreal. I mean just, I don't think any of us had any notion of what was going on, or what we were doing, or where any of this was leading.

JESSE:

(home video footage)

Sir, sir would you like to comment on the

situation?

ARNOLD:

(home video footage)

Yes, I, I think this is a kitchen.

DAVID:

I thought it was only gonna last a year and that
we would look back and laugh about how crazy we
were and how we didn't know what we were doing.
And just sort of laugh.

ARNOLD:

(home video footage)

What do you want my nose, my teeth?

DAVID:

(home video footage)

Wait a minute, there it is-- there's your nose.

ARNOLD:

(home video footage)

Oh that's great. (CHUCKLE) I feel like I'm being
dissected here.

DAVID:

(home video footage)

And here's Mommy and Daddy in a rare moment of

affection.

ARNOLD:

What's the matter?

ELAINE:

(home video footage)

I should have affection for you...why? Why?

ARNOLD:

(home video footage)

Why?  Why not?

ELAINE:

(home video footage)

*Tsuris* is all I ever got from you.

ARNOLD:

(home video footage)

That's not all.  You've gotten other things.

      ELAINE:

    (home video footage)

Lately.

      ARNOLD:

(home video footage)

Lately but not-- but not all.

      (MUSIC)

     SONG LYRICS

*You're the one who's stolen my heart...*

      ELAINE:

I think I was the first woman that he ever really

dated.  And he was very reluctant to get married.

I sort of said, "We've got to do this," you know.

I could be very...  So he says, "Well, alright."

Big mistake (LAUGHTER).

      HOWARD FRIEDMAN:

We were delighted. She was effervescent, pretty.

They seemed to be very much in love. They seemed

to be very compatible. It had been a long time
in coming. My mother (CHUCKLE) "You're my
oldest, get married, I want a grandchild," you
know.

DAVID:

My mother is sexually ignorant. As far as I'm
concerned she had sex, I mean everyone thinks
their parents only had sex three times, you know
for each of their, each of the siblings. But
with my mother I think it was true.

ELAINE:

And it was like, you know you read in a book how
do you have sex. And you start here and then you
do step one, step two, step three. And that's
somewhat like what sex was like with Arnold.
Because I used to say to him, "It's called fore-
play. It's supposed to be play, it's supposed to
be fun." And he treated it like work. Like this
is what you're supposed to do when you do it,

like washing the dishes.

      DAVID:

If he was so much in the closet and not living with her and not attracted, where was she for 30 years? Why didn't she say, "Honey, you're not having sex with me. I think I want a divorce." Where was she? I don't think that's the case. Something, either she's, either they're both crazy -- which is a possibility. Or, or he was perfectly normal based, according to, you know, by her standards.

      (MUSIC ENDS)

      LYRICS

*You're the one for me.*

      HOWARD FRIEDMAN:

It was a difficult marriage because of Elaine. She had her problems, and it took a monumental amount of patience and love and caring to handle it. It wasn't easy for him. It wasn't easy for

the kids.  But they were able to live with it.

She was the best mother she knew how. She loved

her kids and she loved her husband.  She wasn't

the warmest, most outgoing human being in the

world.


                    ELAINE:

When I had the first child, I was just ecstatic.

But I didn't know how to do it.  And I wasn't the

most well balanced person myself.  You know, we

all have hang-ups and...That's my hang-up: Good

things can never happen to me, only bad.

                    ARNOLD:

                    (home video footage)

That's all, that's all the snapshots.

                    DAVID:

                    (home video footage)

I know.

                    ARNOLD:

>                    (home video footage)
>
> This whole thing is all the snapshots.
>
>                    DAVID:
>
>                    (home video footage)
>
> I know. Did they go, and they looked through
>
> each one?
>
>
>                    ARNOLD:
>
>                    (home video footage)
>
> They must have. This is, this is ancient film.
>
>                    JESSE:
>
>                    (home video footage)
>
> What is it Dad?
>
>                    DAVID:
>
>                    (home video footage)
>
> Holy shit.
>
>                    JESSE:
>
>                    (home video footage)
>
> Dad, what is it?

                    DAVID:

                        (home video footage)

Oh my god, it's amazing.  How did you get this?

This is great.

                    ARNOLD:

                        (home video footage)

This is my Dad's--


                    DAVID:

                        (home video footage)

Who took it?


                    ARNOLD:

                        (home video footage)

--my-- father.

                    JESSE:

                        (home video footage)

Dad, what's that a film of?

                    ARNOLD:

(home video footage)

This is a film of my sister.

(MUSIC)

HOWARD FRIEDMAN:

I had a sister. She died a year before I was born. My brother knew her when he was young, of course. And she died of blood poisoning. It was a horrible, terrible, sudden death.

ELAINE:

And it destroyed the family. Arnold's parents divorced. So Arnold's mother had these two boys and they were really on welfare, I don't know, it was, they lived in a basement apartment. Evidently, there was one bedroom and the boys slept in the bedroom with the mother.

HOWARD FRIEDMAN:

We shared, all three of us, not in the same bed, but we all shared the same room, big rooms. And

rather then put a, apparently they, the living room was the living room and then there was the kitchen. So we put all the beds in the one room.

ELAINE:

And that she dated a lot of men and would bring the man, men into the apartment and they would have sex in the bed while Arnold was there listening. And Arnold said that because he saw his mother in bed with a man, that when he was adolescent he was experimenting -- as all children do -- and he had sex with his brother in bed or something like that. And to me, that's not what all children do.

DEBBIE NATHAN:

Arnold sent me this right around when he started writing me and it's called "My Story" and it was written in 1988. And I think it was his attempt to talk about the case, but also talk about the

case in the context of his life.

And it starts out, it says, "This story goes back 50 years to when I was a child." He says, "When I reached adolescence I sought out partners for my emerging sexuality. My first partner, when I was 13 was my eight-year-old brother. I had overt sexual relations with him over a period of a few years."

HOWARD FRIEDMAN:

I know that my brother has said that he messed around with me when I was a kid. And I don't remember any of it. I don't remember anything. I have nothing up here that has me yelling, or screaming or crying, or trying to get away, or unhappy or…I, there's nothing there that, maybe someday a door will open, but it better hurry up, because I'm 65 (CHUCKLE). And at this point in

time, I could care less.

DEBBIE NATHAN:

Then he goes on and says, "My next partners were boys my own age all of which sexual relations probably being within norms for my age. However, the emotional impact of these relations was very pronounced, and lasted through my adult life. A more normal situation, as probably happened with my partners, would have been to outgrow and forget these episodes. However, I literally fell in love with these boys. And the relations were far more significant to me than they were to my partners."

And then he told me that when he got to be an older teenager, like maybe in his late teens, he started worrying that he was still attracted to kids that were the same age as his brother had been when Arnold was 13. And that really started

bothering him. And then after he had his own children he was worried. He started worrying that maybe he would molest his own children.

And at that point he went to therapy. And the therapist told him, "No, don't worry. You've got everything under control."

SONG LYRICS

*The Jazzbo Mambo with the boogie beat is the newest dance on 52nd Street. All the cats come running from both near and far to do the Jazzbo Mambo eight to the bar.*

JESSE(OC)

Come on, Light Fingers… Light Fingers, come on.

SONG LYRICS

*Jazzbo Mambo! Jazzbo Mambo! Jazzbo Mambo, eight to the bar.*

FRAN GALASSO:

A-0833

You could see that this wasn't exactly Fred
McMurray and "My Three Sons" right?  It was, it
struck us as being a very dysfunctional family,
obviously.  And would have to, you would have to
wonder -- wouldn't you -- what kind of a family
situation you would have that could produce this
kind of crime.  What might it be like to grow up
in a household like this?  I don't know. I can't
even imagine.

       DAVID:

       (home movie footage)

Today is September 14, 1975.  We just concluded a
tour of Jungle Safari.

       SETH:

       (home movie footage)

Jungle Habitat.

       DAVID:

       (home movie footage)

Jungle Habitat in West Milford, New Jersey.  Here

are my three brothers.

SETH:

(home movie footage)

Two brothers, you dummy.

DAVID:

(home movie footage)

Two brothers. Alright, there are three children.

ELAINE:

What happened was the three sons were like a

gang. Like "This is our gang. And Mom, Mom,

she's not, she's not part of our gang."

DAVID:

(home video footage)

And we have of course, (CHUCKLE)

JESSE:

A pterodactyl.

DAVID:

A Pteradactyl.

ARNOLD:

(home movie footage)

A Jewish pterodactyl.  Shmuck, shmuck, schmuck.


DAVID:

The four of us got along so well.  We had a very

similar kind of sense of humor.  You know one guy

would say something and then it would, then the

next person would add to the joke.  And my mother

who has no sense of humor, and she just didn't

get that part of us.  And she resented that.

ELAINE:

When this whole thing blew apart, the men got

together and Arnold confided in them. And me? And

I was a loyal wife.  People told me, "Oh why

don't you leave him, he's a horrible person.

Just walk out and leave him."  And I didn't.  I

went all over town. I raised money for bail. I

called every relative I knew. I begged.  And I

did all this for him, right.  He was my husband,

I loved him.  And no one said, "What do you want?" to me.

SCREEN ID:  PASSOVER SEDER, 1988

            JESSE:

               (home video footage)

Toast to Daddy being here next year.  Ma, your toast.

            DAVID:

               (home video footage)

Or even next month.

            ELAINE:

               (home video footage)

That's my toast.  That we have a seder next year.

            DAVID:

Okay.

            JESSE:

(home video footage)

Okay, I think we can eat now.

DAVID:

(home video footage)

So you're saying, so what we have is the people who we thought would testify and say that nothing happened--

GRANDMA:

(home video footage)

The lawyer calls up on a Sunday?

DAVID:

(home video footage)

--that something happened. And we are afraid to put them on the witness stand, even though we know that nothing happened. We think they will say something happened.

JERRY BERNSTEIN:

The Friedmans suggested that we speak to various

people who may have been present at the time.
And some of those people weren't alleged victims
at all. And that the hope was that one or more
of these people would say, "This is just not
true." But that just didn't happen.

DAVID:

(home video footage)

They're not getting favorable and you're getting
negative. The kids who, he said this one kid who
wasn't, he wasn't pressing charges, he wasn't
approached by the police or maybe he was, but he
didn't join up with the police. And he's
claiming that something happened.


As far as I'm concerned he's being, he's, clearly
he's lying because nothing happened. Did
something happen, Dad?


ARNOLD:

(home video footage)

No.




DAVID:

(home video footage)

So then nothing happened.

DAVID:

We begged him to tell us that <u>something</u> happened

to explain how this whole mess could have

happened.  That's the only way to explain how it

could have happened, other then the fact that the

police are out of their minds.  He, we begged

him, he told us nothing happened. That's good

enough for me -- nothing happened.

JESSE:

If my father had the ability to confess to me,

yeah he had done something one time, and that's

how this whole crazy mess got started, it would

make a lot more sense. Not that I wanted that to
be the case. But you have to find a way to
explain the unexplainable.

         DAVID:

         (home video footage)

Oh, my gosh.

         GRANDMA:

         (home video footage)

Oh, look at that.

         GROUP: (singing)

         (home video footage)

"Happy Birthday to you. Happy Birthday to you."

         GRANDMA:

         (home video footage)

Is that a real ice cream?

         ELAINE:

That's what's so odd about it.  They had this
idealized image of this father as being this

saint-like person, this Santa Claus, Messiah, you know. And professionals in the field say that, oh they have this idea that children identify with the abusive parent.

When I was about a year or two, my parents separated. And what did I do? "My father is wonderful. My mother is terrible." The truth is -- my father was a rat, just like David's father. My father walked out. This is not wonderful. This is being a rat. My mother was, my mother was a nag. Well, I mean this is true. But look, she stayed with me, she took care of me. So people's visions are distorted.

DAVID:

I never felt angry at my dad. My dad had nothing to do with this. Someone knocks on the door and accuses you for a crime you didn't commit, you gotta, you gotta attack, attack your attackers

and do what you can.  And that's all it was.  It

had nothing to do with... There was nothing else

that was involved at all.

ELAINE:

(home video footage)

We were talked about honoring and respecting.

DAVID:

(home video footage)

But yeah, talk about honor and r--, do you honor

and respect your husband?  That's why I don't

talk to you.

ELAINE:

(home video footage)

I said I did honor and respect my husband.

DAVID:

(home video footage)

Oh, okay.

ELAINE:

(home video footage)

But you don't like that answer.

DAVID:

(home video footage)

No I don't, I don't believe it, no.

ARNOLD:

Things are getting a little out of hand.

ELAINE:

(home video footage)

Ask your father. Do I honor and respect you?

ARNOLD:

(home video footage)

Yes, you do. Things are deteriorating here.

ELAINE:

(home video footage)

Do you object to my handling, do you have any
objection in my relationship with you?

ARNOLD:

PG. 72

(home video footage)

No.

DAVID:

(home video footage)

Do you like it when she calls you slime?

ARNOLD:

(home video footage)

She doesn't call me slime everyday.

DAVID:

(home video footage)

She did.  Did you like it when she did?

ARNOLD:

(home video footage)

No, not that one time.

DAVID:

Okay.

**A-0845**

ARNOLD:

That was the only time.

DAVID:

(home video footage)

Did you like, do you like it--

DEBBIE NATHAN:

The other cases that I've written about -- those

families have been much stronger. They've, first

of all they've started from a monolithic feeling

of innocence, which didn't exist in this family,

because of Arnold's pedophilia. And they just

buckled down and everybody gets behind the

defendant, the accused family member. People

quit their jobs. And you know people were all

sitting around the kitchen table for the next

three years with staplers and Xerox machines.

And they're working on the defense. And then

when the defendant is convicted, they're working

on the appeal. And all family conflict is

submerged.

ELAINE:

(home video footage)

Why don't you try once to be supportive of me.


DAVID:

(home video footage)

Well, I'll tell you why.  Because we all started

at the beginning of this thing and, and--

ELAINE:

(home video footage)

Well let's start from right now.

DAVID:

(home video footage)

Okay, let's start from right now.

ELAINE:

(home video footage)

Right now.

DAVID:

(home video footage)

Alright, let's start from right now. We'll start

brand new. We're all starting brand new.

We have a decision making process on the table.

SETH:

(home video footage)

Great.

DAVID:

(home video footage)

All the past mistakes, they were mistakes. We're

not gonna hold them against anyone.

SETH:

(home video footage)

Great, great. Now we're starting afresh.

ELAINE:

(home video footage)

All I ask is that --

        SETH:

           (home video footage)

Stop, lower your voice, and talk nicely to your

sons.

        ELAINE:

           (home video footage)

-- I wanted you guys to call me.

        DAVID:

           (home video footage)

Alright, we're gonna do it, starting now.

        GRANDMA:

           (home video footage)

Seth, why don't you call me?

        (OVERTALK)

        (MUSIC)

        JERRY BERNSTEIN:

I think there was a recognition that Arnold's

case was becoming increasingly hopeless because

of the child pornography problem, because of
other people coming out of the woodwork. So the
strategy evolved to, "What can we do to save
Jesse?"

ELAINE:

Jesse's lawyer very eloquently said to us, "If
there's a rowboat and it's sinking, and the
rowboat is tied to a rock, you have to disconnect
the rowboat from the rock and save the rowboat
even though the rock is sinking." Meaning you
had to separate Arnold from Jesse. And Arnold
was going to plead, and Jesse would in some way
benefit.

JESSE:

I was sitting there potentially going to trial
with no pornographic magazines admitted into
evidence. Without an adult pedophile as a co-
defendant. And I understood that sort of
reasoning. But it makes no sense if my father

pleads guilty and then I go to trial and say, "I
didn't do it," when all the jurors have already
read in the newspaper that my father plead
guilty.

And I did not want my father to plead guilty.

SCOTT BANKS:

I arranged for Mr. Friedman and his family to get
a jury room where they could sit and they could
discuss these plea options.  And while I didn't
go inside the room except to knock on the door
and say where we're at in terms of what Mr.
Friedman wanted to do, there was a lot of yelling
and crying, and screaming going on, coming out of
that room.

ELAINE:

When I screamed at Arnold I screamed, "You must
do it because it'll help Jesse.  Do it for
Jesse."

JESSE:

And my brothers were just furious at this notion
that my father would go to court and plead
guilty. And at one point in all of the chaos my
father just started screaming. And there's
uncontrollable tears. He picked up a chair, I
remember he threw a chair. He was just screaming
about how he wasn't gonna plead guilty, he didn't
do anything, he's not gonna plead guilty. And he
was furious at my mother, and he was, he was just
freaking out.

And I remember very clearly sitting down with my
father in the corner. My mother's over there, my
brothers are over here. I'm talking to my father
privately and he asked me what he should do. And
I could have said to my father, "I want you just
to walk out of here and go to trial and not plead
guilty." Instead, I remember very clearly saying
to him I wanted him to make the decision. And I

remember feeling like a really young kid. Kind of

looking up to my Dad and saying, "Dad, I, you

know, I want you to be my Daddy."

And I would have been really, really proud of him

if he just stood up and said, "Elaine, I'm not

pleading guilty. We're going to trial." But

that's not what happened.

MALE REPORTER:

Former New York City schoolteacher Arnold

Friedman had nothing to say when he left the

Nassau County Courthouse in Mineola. But inside

he pleaded guilty to more then 40 counts of

sodomy, sexual abuse and endangering the welfare

of a child.

COURT CLERK:

(news footage)

Attempted sexual abuse in the first degree, an

"E" felony, two counts. And endangering the

welfare of a child, a Class "A" misdemeanor, one count, in full satisfaction of this indictment?

ARNOLD:

(news footage)

Yes.

DAVID:

My mother manipulated him. My mother is crazy, and my mother has control over my father. Some relationships have that, where the woman controls the man. It's called being pussy whipped. My father and my mother are not the only two people in the world who have that relationship. My father and mother had that relationship. My mother and the lawyers said, "Take the plea." They took the plea.

HOWARD FRIEDMAN:

I sat there in disbelief. Is this my brother? My brother? This isn't my brother, he's not a monster. He's a good loving brother, and husband,

and son, and citizen, and teacher.  And this
isn't happening. This is a mistake.  Something as
horrendous as child molestation, you have to live
with yourself.  If you didn't do it, you don't
plead guilty.  I never understood it.


INTERCARD:

It's the night before Arnold is to begin serving
his sentence.

                    (MUSIC)

          JESSE:

          (home video footage)

We have Elaine.


          ELAINE:

Hi.

          JESSE:

We have Teddy, Arnie.

ARNOLD:

(home video footage)

Number 4753206.

ELAINE:

(home video footage)

Don't. Please don't film me. I, David, I told

you I don't want to be on tape.

JESSE:

(home video footage)

Why are you so ...

DAVID:

(home video footage)

She wants no, when we stop talking to her--

JESSE:

(home video footage)

She doesn't want--

(OVERTALK)

DAVID:

(home video footage)

She doesn't want any record, any record at all.

ELAINE:

(home video footage)

Can you believe these kids?  That they have to

persecute me?

ARNOLD:

(home video footage)

David, if your mother doesn't want to be filmed,

don't film her.

DAVID:

(home video footage)

Okay.

ARNOLD:

(home video footage)

Come on.

ELAINE:

When it was all over they said it was all my
fault because I wanted them to do… to take a plea
and … It had been arranged before.  Arnold
wanted, agreed to take a plea.  But they were
very hurt.

ARNOLD:

(home video footage)

I'm still here.  (CHUCKLE) I may not be here very
much longer, but I'm still here.

DAVID:

(home video footage)

That's disturbed.

ARNOLD:

(home video footage)

Yeah.

MALE REPORTER:

The sentence: 10 to 30 years.  The crime:

A-0858

sodomizing young boys. Defendant Arnold Friedman

had pleaded guilty to sexually abusing more then

a dozen youngsters. But this does not end the

Friedman case. There are still numerous sodomy

and sex abuse charges pending against Arnold's

son, Jesse Friedman.

JESSE:

(home video footage)

You know, without Daddy in this case I can't see

any reason why we shouldn't go to the media with

this. I mean we could try this case in the

media. Who's gonna, who's gonna buy that I

sodomized boys?

DAVID:

(home video footage)

Yeah, I agree with you, I agree with you.

JESSE:

(home video footage)

No, I really--

DAVID:

(home video footage)

Well, I don't think we have to. Well all I want
to do, I think we can certainly, we can go to
trial and prove it in the trial.

JOSEPH ONORATO:

We didn't make a deal with Arnold Friedman to
spare his son. So his son is facing a multiple
count indictment, he's facing a considerable
amount of jail time. And now he's confronted
with a situation where Long Island knows that his
father admitted his guilt. And there's a
reasonable human expectation of some people that,
you know, where there's smoke there's fire. And
if he did it, maybe his son did it. He was, we
know he was in the same class and he was helping
his father. So I think that was a difficult