Case 2:06-cv-03136-JS Document 37-31 Filed 02/07/2003 Page 1 of 303 Page ID #: 4397

thing for Jesse to have to overcome.

(MUSIC)

PETER PANARO:

I always believed Jesse. How could this possibly
go on for four years? Children repeatedly
sodomized and sexually abused, with brutality if
you believe the police. And then their parents
come to pick them up right after computer class
and not one kid is crying. Not one kid tells his
mother or father what happened in class. Not one
kid says <u>anything</u>? I find that so incredible
that Jesse's story that nothing happened -- to me
-- was more believable then the police version of
these horrific acts.

Jesse and I went, we flew in August of 1988 all
the way to Madison, Wisconsin where we rented a
car and drove 90 miles to some town that I
couldn't possibly give you the name of, to a

Case 2:06-cv-03136-JS Document 37-311 Filed 02/07/2003 Page 2 of 303 Page ID #: 4398

federal prison. Who knew more about this case then Arnold Friedman? He knew more about it then Jesse. I had to wait 40 minutes because Arnie was either playing tennis or golf, I don't remember what it was. I was outraged.

It was a visiting room. Jesse was out in the waiting room at this point. And this man had this little boy in there who was his son or his stepson, I don't know. But the child was about four or five years old. And they were in the table right next to us. And I was interviewing Arnie, and all of a sudden he leaned over and asked me if I could ask the corrections officer -- or whoever was in charge in the room -- if we could get another table. And I asked him why, and he said, "That little boy over there bouncing on his father's lap is getting me very excited."

**A-0862**

It took me about 15 minutes to regain my composure. I remember that like it was yesterday. I was shocked. 'Cause even though I was involved in the case now for two months, and even though I had studied pedophilia and I knew what these men did to little boys, I had never heard somebody actually <u>say</u> it. And I was absolutely disgusted.

We did change our table and I spoke to Arnie. I interviewed him for a very long time. He was telling me that the only reason he pled guilty and went to jail was because he wanted to save his son, Jesse. He told me that he had, that he was a pedophile. He told me that he had had activity with boys. But not in Great Neck.

He told me that he had a house in Wading River, a beach resort. And that the family enjoyed

vacations there.  And he told me that there were
certain boys he took liberties with, and I don't
want to go into it, while he was in that area.

DEBBIE NATHAN:

(reading)

"In my early '40s, during the summer, I did go
quote, 'over the line,' and did have sexually
arousing contact with two boys, short of sodomy.
One of the boys was the son of a close friend and
I feared exposure and loss of this friendship.
The boy might have told his parents but they said
nothing.  So I assumed that he really had not
told them."

DAVID:

That's what?  It's one sentence, what does that
mean?  What, do you fucking know what that
sentence means?  I don't even fucking know what
that sentence means.  I "sexually aroused?"  What
the fuck is he talking about?  Maybe he put his

arm around the kid. Maybe he was, took him in a sailboat. And he found that sexually arousing. Maybe he was leaning against a tree. That's called sexually arousing contact, if you're sexually aroused while you lean against a tree. I don't know what that means. I don't know what that sentence means.

ELAINE:

When Arnold was first arrested, he said, "I'm arrested because of this magazine. I sent one magazine in the mail and that's why I'm arrested, and it's nothing. It's just nothing, it doesn't count, it doesn't matter, it's nothing." And you know, you, you live as husband and wife, you share certain intimacies. I said to him, "Tell me the truth. What happened?" He says, "That's it. That's the truth."

So it came out that he had, in fact, molested a

young man. And we were sitting in the
therapist's office. And he said, "Oh, I just
molested two boys." And I said, "Two? Two?" I
said, "I thought you told me only one." "Well,
you know" and he "it didn't matter, and it's
nothing," you know. And then I went berserk.
And I felt betrayed.

                    JESSE:

Yeah, so my father had the magazines. And yes,
my father admitted that he was a pedophile and
had these fantasies. And yes, my father admitted
that he was no saint. And that there were times
that he slipped. But I was arrested, too. And
I'm not a child molester. And I don't think it's
appropriate for me to have to answer for the sins
of my father.

(MUSIC)

                    DAVID:

This is what I walk around with. It's just,

Case 2:06-cv-03136-JS Document 87-31 Filed 12/07/20 Page 7 of 303 Page ID #: 4403

every day. It's just ridiculous. All I think about is the case and my career. And they're completely -- it's like oil and water. With the case it's a question of research. My brother's been in the law library researching his current plan. And I'm supposed to go out and make people laugh. It's unbelievably difficult to deal with the case and then go out and entertain people.

DAVID (as a clown):

Hey! Hi, everyone!

PETER PANARO:

We carefully investigated this case for trial. Really get into the case, examine, investigate. And try to build a defense.


JESSE:

While I was out on bail, I put all the charges into a database. So that they could be sorted by complainant, by time period, by nature of charge.

Case 2:06-cv-03136-JS Document 37-31 Filed 02/07/2013 Page 8 of 303 PageID #: 4404

For example, there was one complainant, ten-year-old boy. Says he came to class in the spring of 1986. And during this ten-week session where he was only over my house for an hour and a half once a week, he says that there were 31 instances of sexual contact. That's three times a week, every single week, for ten straight weeks. And then the course ends. In the fall, he re-enrolled for the advanced course and says that he was subjected to 41 more instances of anal and oral sodomy in the next ten-week session. And nobody said anything. Week after week, month after month, year after year. Until _after_ the police came knocking on doors and asking questions.

FATHER OF COMPUTER STUDENT:
I went to the doorbell. There were two Nassau County detectives and they said they'd like to speak to our son with regard to the Friedman

matter. They came in and said "We know something happened to him." They didn't say "We believe." They said, "We know." And they wanted to speak to him.

RON GEORGALIS:

Yeah, I remember it was actually kind of a frightening experience because I remember they're talking to my parents about this. Within earshot of me. I remember actually eavesdropping on what they said. And what they said made my heart race. Because they were saying that actually quite a few horrible things had happened to a lot of children. And I was one of them.

And quite honestly, I didn't believe it, and I was very confused and very angry about this. Thinking, well, why are these people going around telling my parents that all kinds of things have happened when I have simply no recollection of

Case 2:06-cv-03136-JS, Document 37-23, Filed 02/07/2023, Page 10 of 303, PageID #: 4406

anything.

### LLYOD DOPPMAN:

Children want to please very often. They want to give you the answers that you want. Adults do that as well. So you have to be very mindful of the fact that when you're interviewing a child, if the child starts to answer questions, your responses should be somewhat in the framework of, "And then what happened?" Or, "What happened next?" Or, "What do you remember then?" As opposed to, "He did this to you, didn't he?" Or "She did this to you, didn't she?" That's a very, very dangerous type of interview process to use.

### ANTHONY SGUEGLIA:

If you talk to a lot of children, you don't give them an option, really. You just, you be pretty honest with them. You have to tell them pretty

honestly that "We know you went to Mr. Friedman's class. We know how many times you've been to the class." We, we, you know, we go through the whole routine. "We know that there was a good chance that he touched you or Jesse touched you or somebody in that family touched you in a very inappropriate way."

FATHER OF COMPUTER STUDENT:

And I listened to them talking to him and it got to a point where it wasn't asking him what happened. It was more of them telling him what happened. And that when they didn't like what he said, they kept repeating to him that they know what happened. And that he should tell.

FORMER COMPUTER STUDENT #3:

I believe that I remember saying that I saw Jesse like chase after a kid or hit a kid or something like that. And that's what I testified to, to the grand jury. And I remember saying that

because I felt, and I feel like when I said that, that ended the questioning. And so that might have meant that, you could infer maybe that they were asking me a lot of questions. Trying to get something. And I just wanted to give them something. I mean I don't want to be, say I'm a perjurer or anything. But I did not observe anything like that happening.

FORMER COMPUTER STUDENT #4:

(on telephone)

What I do remember is the detectives putting me under a lot of pressure to speak up. And at some point, I, I kind of broke down. I started crying. And when I started to tell them things, I was telling myself that it's not true. I was telling myself "just say this to them in order to get them off your back."

TEXT:

This student's testimony led to 16 counts of sodomy.

DEBBIE NATHAN:

I came across a document regarding a group of children from the Friedman case who were in therapy. And it stated that many of them had absolutely no recollection of the abuse. And there was some discussion about whether hypnosis would be a good idea now. Exactly what you're not supposed to do. It was the kind of therapy that had a really good chance of messing up kids' memories and implanting false memories.

FORMER COMPUTER STUDENT #1:

My parents put me in therapy right away. They put me in hypnosis and tried to recall facts that I had buried. And that's how I first came out, started talking about it. Just through, being hypnotized and everything. I recalled things

that I would bury. I was able to talk about them.

        ANDREW (OC):

For example, what would be something that you recall?

        FORMER COMPUTER STUDENT #1:

The actual first time I actually recalled that I was actually molested. Wow, I was actually molested, I can deal with it now. That was the first time.

        ANDREW (OC):

And you recalled through hypnosis the first episode?

        FORMER COMPUTER STUDENT #1:

Yes.

        ANDREW (OC):

So tell me about that, if you remember.

        FORMER COMPUTER STUDENT #1:

I don't remember much about it. It was just, it

was so long ago. I just remember that I went

through hypnosis, came out, and it was in my

mind.

TEXT:

This student's testimony led to 35 counts of

sodomy.

MALE REPORTER:

(news footage)

19-year-old Jesse Friedman was arraigned on more

than 198 additional counts of child sexual abuse.

This brings the total number of sexual abuse

charges to 245.

DEBBIE NATHAN:

Jesse was grossly overcharged. And you're

basically terrorizing the defendant. You're

telling the defendant "Look, if you plead guilty,

you know, we'll give you a good deal. And, on

you know, two charges. But if you insist on
going to trial, we're going to put 1,003 charges
on you. And if you're convicted of all those
charges, you're gonna rot in jail the rest of
your life."

ELAINE:

I was told that if he went to trial, the judge
would give three consecutive sentences. Instead
of concurrent, the sentencing would be
consecutive. I said, "Oh, my God."

JESSE:

She just kept telling me over and over: "The
only thing to do is to plead guilty and to get
the best deal you can. You can't go to trial.
It doesn't matter if you're guilty or innocent.
You can't go to trial because if you go to trial,
you're gonna go to prison for the rest of your
life." I said, "But Ma, I didn't do it." She
said, "That doesn't matter, you have to plead

guilty."


PETER PANARO:

You have to understand, this is a 19-year-old kid
and he is now facing the most heinous charge
known to man.  And everyone in the world slowly
but surely was turning against him.


DAVID:

(home video footage)

I don't care about my parents.  I wish it was
just my brothers.  Oh, fuck.  I don't care about
my mother, that's for sure.  If my brothers were
okay, then my mother could go to fucking hell.
My father is not going to survive if my brother
gets incarcerated.  So, so when the guilty
verdict comes in on Jesse, my father's gonna kill
himself.  Jesse's gonna go to jail for the rest of
his life.  Seth is gonna move west. Fuck… fuck.

PETER PANARO:

I received a telephone call from Jesse asking to see me. And Jesse told me that he wanted to plead guilty.

JESSE:

In 1988, there was no way that a jury in Nassau county who had been reading the newspaper headlines in Newsday for over a year, those people were never going to listen to anything the defense had to say. And I was absolutely terrified of going to prison for 100 years.

PETER PANARO:

Jesse had always maintained his innocence. I don't work out deals for people who are innocent. And my first reaction was, "I'm not gonna do it. You're not guilty, you're not pleading guilty." And at that point, he told me that "I have something to tell you." And with tears rolling

down his eyes, literally, he told me that he was
abused by his father growing up. And that while
he never enjoyed the sexual part of that, he did
enjoy the attention his father gave him and being
with his father. And that not everything he had
said about nothing happened was true.

JESSE:

Peter Panaro was personally convinced that my
father had sexually abused me. And nothing I
could say could dissuade Peter from this notion.

PETER PANARO:

Jesse felt that if Judge Boklan knew that he also
was a victim of his father, that she might
consider the plea negotiations in a more
favorable way.

JESSE:

He came up with this strategy. It was Peter
Panaro's fictionalized story that he fed to me.
And said, "If you say this, it's gonna look good

for you."

PETER PANARO:

I told him, I wouldn't do it. I told him, "Jesse, when you plead guilty in open court, you're gonna have to admit to this type of anal sodomy, 14 times. And I'm not gonna let you do that unless you can admit it." He looked me right in the eye, always liked to call me by my name before he made a statement, and said, "Peter, I can admit it."

JESSE:

The only concern that Peter Panaro had was that ethically as a lawyer, he couldn't let his client go into court and say something happened that he knew his client had told him was a lie.

(MUSIC)

The private investigator wasn't coming up with anything helpful. There was not gonna be any defense witnesses. There wasn't any money to

hire experts. Mom was insistent upon there not being a trial. Peter Panaro wasn't believing me, no matter how many times I told him nothing happened. I just ran out of options.

ELAINE:

Jesse was a very good baby. I remember when we brought him home from the hospital and Arnie looked at that baby and he said, "That child is marvelous. He's wonderful." And he was so thrilled. And David was the big brother and he used to take care of Jesse. We used to let David watch him, and he was very protective of his baby brother.

DAVID:

(home video footage)

It's amazing. Six months from now … I already don't have a father or a mother. Six months from now I'm not gonna have my brother. If I ever watch this, I don't know when it's gonna be. I

don't know where I'm gonna be. I don't know

what's gonna happen to my family. I'm so scared.


INTERCARD:

It's the night before Jesse is to enter his

guilty plea.


        SETH:

        (home video footage)

We're trying to help Jesse pack. His last night

of freedom, and I wish you would help.

        ELAINE:

        (home video footage)

I don't want to have to spend the next eight

hours screaming with my sons and fighting with

them.

        JESSE:

        (home video footage)

Then shut up.

                ELAINE:

                  (home video footage)

I want them out of this house tomorrow morning.

                DAVID:

                  (home video footage)

Mom, we're here for Jesse.

                ELAINE:

                  (home video footage)

I don't give a shit.  I want you out of this

house tomorrow--

                DAVID:

                  (home video footage)

You may not give a shit about Jesse but we are

here for Jesse.

                JESSE:

                  (home video footage)

What are you talking about?  What are you all

talking about here?

DAVID:

(home video footage)

Can't you put your anger aside for one minute?

ELAINE:

(home video footage)

I cannot put my anger aside about you.  You have

been nothing but hateful, hostile, and angry,

ever since this began.

DAVID:

(home video footage)

Okay, Jess, we're on.

JESSE:

(home video footage)

Ta da. I feel like shit.

DAVID:

(home video footage)

What's today's date?

      JESSE:

      (home video footage)

Today's the day before I went to jail.

      DAVID:

      (home video footage)

"Went" to jail?

      JESSE:

      (home video footage)

I'm going to jail--

      DAVID:

      (home video footage)

Because we're watching it.

      JESSE:

      (home video footage)

Yeah, went. We're gonna be watching this after I'm already out of jail. After four, four-and-a-half years, because the case gets reopened.

At this point in time my life is as good as over.
It is terminated at this point only to resume at
a later day.

This one'll go, this one'll shatter.

                    DAVID:

The night before Jesse's plea we stayed up all
night. Maybe I shot the videotape so that I
wouldn't have to remember it myself. It's a
possibility. Because I don't really remember it
outside of the tape. Like when your parents take
pictures of you, do you remember being there, or
do you remember just the photograph hanging on
the wall?

                    JESSE:

                 (home video footage)

Even if I'm facing the worst scenario possible
tomorrow, and for every day following it, I have

to think tonight that it's not gonna be that bad.
Goodness knows, I don't want to look like my
father. Goodness knows, I want to separate
myself from Arnold Friedman as much as possible.
And I'm not throwing chairs tomorrow.


SETH:

(home video footage)

Good.

JESSE:

(home video footage)

That's for sure.


And if this trial were postponed for three years
-- in three years, I would win. But here,
today, at this point, trying to start a trial in
two weeks, I would lose this trial. We feel this
way and that is what would happen.

TEXT:

The next morning.

         DAVID:

           (home video footage)

So what are you thinking, Jess?

         JESSE:

           (home video footage)

Uh… I'm not.

         DAVID:

           (home video footage)

You're, you're, avoiding?

         JESSE:

           (home video footage)

Uh… well, I gotta eat something.

I'm proud to say I've managed to leave barely any

gas in the car.

DAVID:

(home video footage)

Just our luck, we'll be trapped at the house.

We'll run out of gas at the house.


TEXT:

Driving to the courthouse


SETH:

(home video footage)

You a child molester, Jess?

JESSE:

(home video footage)

Nope.

DAVID:

(home video footage)

Did you ever do it?

JESSE:

(home video footage)

Never touched a kid.

   DAVID:

    (home video footage)

Did you do what they said you did?

   JESSE:

    (home video footage)

I never touched a kid.  I never saw my father

touch a kid.


   DAVID:

    (home video footage)

Good.

   SETH:

    (home video footage)

Yeah, but still, you must have done it.

   DAVID:

    (home video footage)

Yeah, but surely something has happened.

It must, something.

SETH:

Because the police say it's true.  Okay, you
never touched a kid, right?

JESSE:

(home video footage)

Well, if something happened, it didn't happen
while I was there.

(OVERTALK)

SETH:

(home video footage)

But still, the police tell the truth, right?
I mean the police--

JESSE:

(home video footage)

And it was a minimal incident because the kid
didn't say anything about it.

SETH:

(home video footage)

But the police, how could they be lying?

                    JESSE:

                    (home video footage)

Shut up, Seth.


                    PETER PANARO:

                    (news footage)

The children, the 14 children in this case are

clearly victims.  No one could ever argue that.

The real culprit here is Arnold Friedman.  The

man is a monster.  He abused him and he molested

him.  This can't be overlooked.  I can't believe

we live in such a cold society that no one could

look at this man and understand that.

                    JESSE:

                    (news footage)

My father raised me confused about what was right

and what was wrong.  And I realize now how

terribly wrong it all was.  I, I wish I could
have done something to stop it sooner.  I wish
there was something I could have done.  I'm very,
I'm, I'm just so sorry it happened.

PETER PANARO:

Judge Boklan sternly looked down and said that
she recommended to the parole board that he serve
the maximum period of time permitted by law.  A
statement which I felt was harsh and unnecessary
to a 19-year-old under these circumstances.

FRAN GALASSO:

Jesse was a victim.  There's no question, Jesse
was a victim.  But even when he was caught, Jesse
never expressed any kind of sympathy for these
kids. And as a matter of fact, on the day that
the plea was taken, Jesse was dancing and singing
on the courthouse steps while being videotaped by
his two brothers.

JESSE:

(home video footage)

My brain hurts! It'll have to come out. My

brain, but I'm using it!

DAVID:

(home video footage)

(LAUGHTER) But I'm using it.

JESSE:

(home video footage)

Nurse! Nurse!

JOSEPH ONORATO:

They were taking pictures. I remember someone

brought that to my attention. We looked out the

window. Because I'm saying, I'm saying to

myself, "This is very bizarre." I mean he's about

to go to jail for the next six to 18 years and

he's out on the courtroom steps in some sort of

theatrical performance.

JESSE:

(home video footage)

That is so funny when they're all…

DAVID:

I think it was about distracting ourselves. Not
necessarily distracting Jesse. Jesse was, I
think he was the most comfortable about the whole
situation. He, you know, I don't know how he has
always been the most comfortable about it, but he
has.

JESSE:

(home video footage)

Okay, right about now, we've been waiting for a
good two hours or so now because evidently the
parents stormed Denis Dillon's office this
morning when they received the news last night
that I was to plead guilty. And they were not
aware of this fact. They were not even aware of
the fact that negotiations were underway. And

they did not want me to have less than 10 to 30.

And there are a lot of people probably making all sorts of angry statements at this point in time. I can't imagine what they're discussing. The meeting must have looked just like our family.

TEXT:

Parents of computer students

DAVID:

(home video footage)

Well, there wasn't much of them anyway. But that means the meeting's over.

JESSE:

(home video footage)

That means the meeting's over.

DAVID:

(home video footage)

Go ask them, Jess.

JESSE:

(home video footage)

You hold it, I'm not holding it.

DAVID:

Should I do it Jess?

MALE VOICE:

(home video footage)

Heads up!

MALE PARENT:

(home video footage)

You son of a bitch! You raped my son! You raped my son!

DAVID:

(home video footage)

Save me! Oh my God. Get them away from me. They're animals. Oh my God, I don't believe it. Wow. Oooh.

(MUSIC)

TEXT:

Clinton Correctional Facility

Dannemora, New York

ELAINE:

After Jesse went to jail, I know my friends said

to me, "Don't you feel like terrible being alone

in such a big house?"  I said, "No, I feel calm."

That's when I really started becoming a person

and started to live.

HOWARD FRIEDMAN:

Elaine divorced him while he was in prison.  He

settled into life there.  And he, you can't say

it was good in prison but it was as good as it

could get for him.  But of course the torment

continued and got worse because of Jesse.  My

brother never got over the guilt. He had talked

about taking his life because he had this

insurance policy he had taken out. I think it

was $250,000, a quarter of a million.


And Jesse was the beneficiary. He said, "This is

the only thing I have left to give Jesse. So he

has money when he gets out and he can make some

kind of life for himself, because I've screwed it

up otherwise for him." By that time, that clause

in the insurance policy where suicide was

payable, had come into effect.

DEBBIE NATHAN:

And this is the coroner's report. It describes

the cause of death as doxepin intoxication.

Which basically means that Arnold took a massive

overdose of antidepressants.


HOWARD FRIEDMAN:

I took a deep breath and I said, "It's over, David. He's out of his misery. It's over." I thought it was a blessing. Because the guilt he was carrying, he was so unhappy. It was, he was out of his misery. The rest of the family wasn't, but he was. I found it a blessing.

DAVID:

(SINGING) "Let me entertain you, let me make you smile."

It's unbelievably difficult. I have to read these horrible letters about my brother being almost killed in prison. My friends call me, I'm crying. "Why are you crying?" I can't tell them. None of the people that do what I do know about this story. Just the intimation of something like this can ruin someone's career. And I'm always afraid that's going to happen.

(SINGING) "So let me entertain you. And we'll
have a real good time."

HOWARD FRIEDMAN:

I feel I will never really know the truth.

JACK FALLIN:

But the one truthful thing or the honest thing we
know -- Howard loved his brother. Howard loved
his family. Loves his family.

HOWARD FRIEDMAN:

And I believed him when he said he didn't do
those terrible things. I believed him.

ELAINE:

Arnold had a need to confess. And he had a need
to go to jail. And the sad thing is that he took
his son with him.


(MUSIC)


TEXT:

Epilogue

HOWARD FRIEDMAN:

What's the term about families -- dysfunctional?

Numero uno. (LAUGHTER)


EPILOGUE TEXT #1:

Howard & Jack live on the coast of Oregon

EPILOGUE TEXT #2:

with their dachshund, Mona.


EPILOGUE TEXT #3:

Seth Friedman did not wish to be interviewed for

this film.


DAVID:

It was not the way it was supposed to end.

People were supposed to realize that all of this

was nonsense and we'd try to go back to living

our normal lives.

DAVID:

Hey, hi everyone!

EPILOGUE TEXT #4:

David Friedman is New York's #1 birthday clown.

ELAINE:

I would have to stare at Arnold across the dinner table and it was just the two of us.  There was really nothing between us except these children that we yelled at.

EPILOGUE TEXT #5:

Elaine Friedman remarried in 1998.

EPILOGUE TEXT #6:

She and her husband recently moved to the Berkshires.

ELAINE:

We named the cottage "Peaceful Pond Cottage"

because we were looking for a place of healing

and peace.

         JESSE:

         (home video footage)

Any comment on your personal life, sir?

         ARNOLD:

         (home video footage)

Yes.  It's personal.


EPILOGUE TEXT #7:

Arnold Friedman is buried on Long Island.

EPILOGUE TEXT #8

Jesse received $250,000 from his father's life

insurance.


EPILOGUE TEXT #9:

After serving 13 years of his sentence, Jesse

Friedman was released from prison.

EPILOGUE TEXT #10


**A-0904**

David is there to meet him.

DAVID:

Oh, my God. Hey, how you doing? Oh, my God. Holy Christ.

JESSE:

Finally.

EPILOGUE TEXT #11:

Elaine waits to see Jesse for the first time since his release.

ELAINE:

Is that him?

PETER:

That could be he.

ELAINE:

Oh, shit. Oh my God. (LAUGHTER)

JESSE (OC):

Room service.

ELAINE:

Oh, God.

JESSE:

You order a son?  You looking for me?

ELAINE:

Oh. (CRYING)

JESSE:

Surprise.  Hi, look at me. Look.


END CREDITS

COUNTY COURT
NASSAU COUNTY

----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

                Defendant.

----------------------------------------------------------------------x

## AFFIDAVIT

ANDREW JARECKI, having been duly sworn, hereby declares that the following is a true and accurate copy of the transcript of my conversation with Judge Abby Boklan.

                        Andrew Jarecki

Sworn to Before Me this
27th day of August, 2014

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMANS"

INTERVIEW WITH ABBEY BOKLAN

CORRESPONDENT: NOT IDENTIFIED

PRODUCER: NOT IDENTIFIED

TAPE #111 CR# 47-50

(OFF-MIKE CONVERSATION)

QUESTION:

Well, that's a lot of times the best way to do it
is you don't, you know, you don't have any fear
going in.  And they say, "Well, there's only one
candidate that we saw that was completely
fearless and relaxed.  And, you know, she seems
like she's the best person--"

ABBEY BOKLAN:

Well, I wasn't relaxed once the-- the real
campaign started.  First of all, I took my
children's college money a-- as the money-- a lot
of the money that we were expending during the--
especially the contested primaries, you know.  I
mean, I-- was just crazy.  But I found a red
rabbit's foot on the courthouse steps-- red is my

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 49 of 303 PageID #: 4445
Case 2:06-cv-03136-JS, Document 37-2, 11/30/2020, 2983379, Page593 of 1960

favorite color-- the day the call came from the

governor.  So in my strange head, I figured, I

(LAUGHTER) couldn't lose.

        QUESTION:

Great.

        ABBEY BOKLAN:

Yeah, maybe I was just really a wild--

        QUESTION:

Tell me about the--

        (OFF-MIKE CONVERSATION)

        QUESTION:

Just give me some background-- you were saying

that one of the things you do is you prosecuted

murder cases.

        ABBEY BOKLAN:

Yes, I--

        QUESTION:

Because I'm curious about that, 'cause this case,

obviously, was a-- this was a tough case in a lot

of ways, so I'm curious about that experience

that you had with murder cases, and that kind of-

- you know, you weren't a shrinking violet at



that point--

ABBEY BOKLAN:

No, well even before the murder cases, I was head

of the sex crimes unit of the-- district

attorney's office here in Nassau County.  And I

was the one who started the use of the rape kit,

the start of the use of the-- sex crimes dolls.

I don't know if you're familiar with them.  It's

Raggedy Ann and Andy with genitalia, type things.


And from there, I became the deputy chief of the

trial bureau of county court, training other

people to try cases.  And-- then I became a

member of the Major Offense Bureau.  No, I think

it was reverse.  (UNINTEL) that-- I-- that came

after the Major Offense Bureau.  So in the Major

Offense Bureau is when I tried the murder cases.


And I was the first woman in Nassau County to

ever successfully try a murder case.  So-- no.  I

really-- I was not intimidated by-- by this case,

if that's what you're asking.  Because that was

CONFIDENTIAL

my background.  Practically all of my

professional career had been working-- working in

criminal law, and with criminal law cases.  So.

QUESTION:

This case.  How did this case-- first come to

your attention?  Do you remember-- what was the

first thing you remember about this case?

ABBEY BOKLAN:

The first-- (UNINTEL) thing I remember-- is when

the case came for arraignment on indictment.  It

was an indictment that came from the grand jury

of-- you know, Jesse Friedman.  And Arnold

Friedman.  And arraigning them.


And the-- the media frenzy that first time was

the first time that I ever dealt with that as a

judge.  In fact, I think this was the first time

in Nassau County the media was ever permitted

into the courtroom for that arraignment.  And

that was how the case came.


I may have read previously in the newspapers

Abbey Boklan Complete Transcript (111-113).doc



about-- a search warrant being executed. But I
don't remember whether I did or not. Or if it
was even in there.

      QUESTION:

And when this-- arraignment came, what was your--
what's your first recollection of that, or what
your feeling was when you first saw it?

      ABBEY BOKLAN:

My first recollection is, I hated those type of
cases. It was very difficult when I was the head
of the sex crimes unit dealing with young
children who had been abused sexually. I mean, I
was a mother. I had two young children of my
own.


So I think that was my first reaction when I saw
the number of counts. Heard about the number of
children that were involved, the-- this is really
terrible. My second recollection, as I said, was
the media frenzy out there. And there were an
awful lot of parents of the young children, and
family members, and community members who were

CONFIDENTIAL

A-0912

Case 2:06-cv-03073-JS, Document 37-23 1 Filed 02/07/2003 Page 53 of 303 PageID #: 4449

very interested.  So it was a very full

courtroom-- the day of that arraignment.

QUESTION:

And what do you remember about the-- the

Friedmans when they came in?  What was your--

perception of them?

ABBEY BOKLAN:

I didn't have much of a perception.  They-- the

att-- the attorneys do most of the talking-- at

arraignment.  They really didn't speak.  Jesse

was young.  He looked young.


And-- and that was kind of sad.  To see such a

young boy in this situation.  But they were very

quiet.  Both of them were quiet.  And that was

all that I recall about that.

QUESTION:

And after this arraignment (COUGHING)-- what was

the next step that you remember?

ABBEY BOKLAN:

Then we began the conferences, as to whether this

case would be resolved by a plea, or would go to

**CONFIDENTIAL**

trial. Fairly early on, it became evident that--
the father, Arnold Friedman, was looking to
plead. My sentencing commitments, if he pled,
were-- was very, very high. It was 10 to 30
years. The district attorney had indicated that
that-- would not be offensive to the-- to the
families were-- that were involved.

And we went through the set of negotiations. And
he finally determined that he was going to plead
guilty. Jesse, at that time, the son, was still
indicating that he was not guilty. That he was
innocent of the charges. So additional
indictments came down. Additionally-- more
children were found to be involved. And-- and
that is my next recollection of that stage.

QUESTION:

Was there subsequent indictments (COUGHING)?

ABBEY BOKLAN:

The subsequent indictments that came down on
Jesse and another-- another co-defendant as well,
a y-- another young boy.

CONFIDENTIAL

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 55 of 303 PageID #: 4451
Case 2:06-cv-03136-JS Document 37-2 Filed 11/30/2020 2963579, Page999 of 1560

QUESTION:

And we can't talk about him because--

ABBEY BOKLAN:

Well, we can talk about him, but we can't talk by name.

QUESTION:

Because he was c-- granted--

ABBEY BOKLAN:

He actually was given youthful addender (PH) adjudication. That was not my choice. My sentence was a stricter one than-- the district attorney had negotiated with the defendant. But I was not a party to those negotiations.

The young man involved agreed to testify in the grand jury, and at later trial, against-- Jesse Friedman, in return for this offer made by the district attorney. Since I was not a party to it, I was not bound by it, I felt. And I gave him an upstate sentence, that was later reduced by an appellate court. (UNINTEL) they granted youthful offender adjudication, and gave a split

CONFIDENTIAL

A-0915

Case 2:06-cv-03136-JS   Document 37-3   Filed 12/07/20   Page 56 of 303 PageID #: 4452
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page908 of 1566

sentence, a six months, as a special condition of
five years probation.  W-- the initial offer by
the district attorney's office, because they felt
that even though the judge (myself) was not a
party to it, that the boy had relied on their
promise when he testified at the grand jury.  So.

QUESTION:

Is it typical that you would be involved in-- in
other cases where the DA makes a deal.  How do
they bring the judge in, so that they do know
that the judge is committed?

ABBEY BOKLAN:

Yes.  We-- well it was supposed to be a-- a
confidence, and then they're supposed to ask the
judge, "Can you go along with this" before any
promises are made.  Because they know-- except in
a very strange case like this, that until the
judge commits to a certain sentence, there really
is-- no plea that has been worked out.  And in
this case, that sentence was not negotiated for
and agreed to by me.

CONFIDENTIAL

TAPE #111 CR# 47-50

QUESTION:

Do you have a sense of why-- of why it was-- it
was handled differently?  Was it-- maybe the
pressure of the case, or the intensity of the
negotiation or something, that prevented the
assistant district attorney from including you in
that?

ABBEY BOKLAN:

I think the assistant district attorney thought
that they had left the ultimate decision in my
hands, and only after the appellate division
reversed did everyone realize, or did the
appellate division decide, that-- the-- the boy
had relied on it, and was entitled to it.  Even
though all the rest of us had thought it would
be-- left to me at time of sentence, and after
reading probation reports, and everything else,
to determine what the appropriate sentence was.

QUESTION:

Is there a-- is there any-- do you have any sense
of why-- I think that young man took a long time
to get to the point where he agreed to turn and--

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

and-- testify against his friend, Jesse.  How
does that usually work?  Why would it take a long
time for him to do that?  And what were they
trying to work out?

          ABBEY BOKLAN:

It could very well have been that the-- defense
attorney was trying to get as good a deal as
possible.  Also, it could have been because the
families were enraged.  The victims' families.
That he was getting such a great deal.  That I
can't answer you.  That you'll have to ask the
district attorney's office, because I was not
privy-- to those negotiations.

          QUESTION:

So now, from the standpoint of-- let's just go
back to Arnold for a second.  Arnold ultimately
did plead guilty.

          ABBEY BOKLAN:

Yes.

          QUESTION:

What's your recollection of that?

CONFIDENTIAL

TAPE #111 CR# 47-50                                    PG. 12

### ABBEY BOKLAN:

My recollection is-- a full courtroom.  The
media.  The TV.  And my greatest concern was that
in no way should the children's names be
revealed, should anyone find out who the real
children were.  Because they had to still live in
the community of Great Neck.  They were in
school.

So that-- I asked most of the questions during
the sentence.  It wa-- it was some things like,
"On such-and-such day, did you do X-- crime?"
And he would answer, "Yes.  Yes.  Yes.  Yes."  So
it wasn't a very long-- it was long, because
there were so many counts being pled to.

But it wasn't a rambling, open narrative, where
the children's names could possibly-- leak out.
I also remember that I was very, very concerned
that there be no photographs taken of the
families, because the young children could be
identified-- through those photographs as well.

Abbey Boklan Complete Transcript (111-113).doc



**A-0920**

TAPE #111 CR# 47-50                                                    PG. 13

And the tremendous horror if any of this got on--

on television, and they saw their names, or their

families on television, that they were the

victims of the-- these horrendous acts.

QUESTION:

Now, obviously, you felt strongly that there was

a benefit to having the cameras there as well,

because otherwise you would have just kicked them

out. What was your-- what was-- what was going

through your mind? Because they-- they had to

apply to you, I guess--

(OFF-MIKE CONVERSATION)

QUESTION:

So I was asking about the-- the decision-- it was

the first time that cameras were allowed in the

courtroom, I guess, in Long Island or in--

ABBEY BOKLAN:

In Nassau County, I--

QUESTION:

Right. And what was-- what-- what was the-- what

was that decision process?

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

A-0921

### ABBEY BOKLAN:

Well, I listened to the defense attorneys, who
were opposed, as I recall.  The district attorney
was not opposed.  And of course it's his job to
protect the children.  It was-- something the
community was very interested in.  The media was
very interested in.  and-- and I-- I believe in
open courtrooms.  And as long as the names of the
children, and the children could be protected, I
saw no harm in it.

I wasn't that concerned about protecting the
defendants.  Their pictures, their names, were
all over the-- the newspapers.  S-- so (LAUGHTER)
their reputation at that point was not too good.
It was mainly, as I said, the protection of the
children.  I was assured by the-- the camera
personnel, by the media, that they would take no
pictures of the families.  That they would en--
ensure that they would block out the names of the
children.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

QUESTION:

If they were used.

ABBEY BOKLAN:

If they were used.  And they would-- take all
measures to protect them.  And-- and they did.
And they were very responsible in their coverage,
as far as that went.

QUESTION:

The-- I mean, obviously somebody-- sex offenders
will say-- and I've even heard some prosecutors
say, as soon as you're on television, and it says
"sex offender," you never will get a fair trial.
You know.  What do you think about that?

ABBEY BOKLAN:

I think they'll get a fair trial.  First of all,
you have the opportunity to-- during voir dire to
speak to the jurors, to make sure they haven't
seen any of the coverage.  Or if they have, that
it won't affect them.

In general, I've been amazed how little the
jurors have read or recall of even some of these



CONFIDENTIAL

high-profile-- murder cases.  Of course, during a

plea, you don't have to worry about that, because

you know-- they're not going to trial.


I think, perhaps, the greater danger to a

defendant is, if they are going to be

incarcerated.  Because in all the jails,

everybody watches TV as well.  They are

certainly-- fair game to a lot of other

defendants, who consider them the lowest of the

low.  A sexual predator.  Especially one

involving a younger child.


So-- that, I think, is a-- is a true danger.

Sometimes you require protective custody-- of the

defendant, who's been convicted of a sex case.

Especially a young one, such as Jesse Friedman.

                    QUESTION:

Why do you think that Arnold pled guilty?

                    ABBEY BOKLAN:

It certainly wasn't because of the mercy of the

sentence.  Ten years to 30 years is a very long

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

time. He was guilty, in my opinion. He told me
he was guilty. And I think, with the amount of
the evidence, he was very concerned that, if he
were convicted after trial, he would get 50
years. And he would never see the light of day.

As it turned out, since he passed away, he died
when he was in prison-- perhaps he should have
gambled and gone to trial. Certainly, at trial,
I would not have permitted the media to be
present. You know, with the young children
testifying. That's a whole-- since we're
discussing media, that's a whole different story
from a plea, a sentence, an arraignment.

QUESTION:

What is that like? Have you-- have you been
involved in a case where you had to have kids
testifying in open court like that?

ABBEY BOKLAN:

Yes, I've been a prosecutor on those cases as
well. Involving very young children.

CONFIDENTIAL

Case 2:06-cv-03136-JS   Document 37-3   Filed 12/07/20   Page 66 of 303 PageID #: 4462
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page916 of 1566

QUESTION:

And what's that like?  How is that different from
a regular case?  What are the challenges of-- of
dealing with a case like that?

ABBEY BOKLAN:

Tremendous challenges.  First of all, you don't
know until that child is in the witness box,
whether they're gonna talk.  I remember I used to
take some of the very young children down to the
courtroom, and we'd actually play there.  You
know, I'd put them in the witness box, I'd
pretend to ask them questions.


I let them sit in the judge's chair.  I let them-
- sit all over the courtroom, so they became a
little more comfortable.  But when they got into
that witness box, and they faced the person who
abused them-- you can never really be sure that
they're going to not refuse-- refuse to talk.


And then of course they have to go through cross-
examination as well.  It's a horrendous

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

experience for a young child.  Absolutely
horrendous.  I used to say to some of them,
"Don't worry, you don't have to look at him or
her.  You can j-- look at me.  Always look at
me."

It-- it was a very tough case.  I found being
head of the sex crimes unit of the district
attorney's office much more difficult.  And
trying those cases, far more difficult than
trying murder cases.  As a judge, I'd much prefer
to try a murder case than any kind of sex abuse
case involving a young child.

              QUESTION:
Just because of the discomfort of-- of putting a
child through that, and things like that?  Or
also just 'cause of the volatility of the case?

              ABBEY BOKLAN:
Both.  But my main concern is the child.  It--
it's a horrendous experience to put a child
through.  I had one case that was tried here
where a young girl testi-- (UNINTEL) fied against

CONFIDENTIAL

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 68 of 303 PageID #: 4464
Case 20-3795, Document 37-2, 11/30/2020, 2983379, Page918 of 1966

her father.  Actually he was acquitted.


You wonder what kind of lingering-- problems that
young girl is going to have.  It's bad enough to
have to stay-- say your-- tell your story.  But
can you imagine if you're not believed?  How you
have to live with that?  And in this case-- some
of the acts that went on in that classroom were
so obscene, and so horrendous, that-- if it were
on a TV program, you would say, "People are
exaggerating.  We don't-- we don't believe it."
So I could imagine what w-- would have gone on,
if we had an actual trial in this case.

                    QUESTION:

There are, I mean, obviously, you know, Arnold
writes you and says, you know, "None of this
happened."  And he writes his open letter and all
that stuff.  Obviously there were some people in
the Friedman camp who said, you know, "It's so
extreme."  You know, "Maybe Arnold Friedman did
something, but banging the kid's head against the
wall, and all these repeated sodomies, and all

CONFIDENTIAL

**A-0928**

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 69 of 303 PageID #: 4465
Case 20-3795, Document 37-2, 11/30/2020, 2983379, Page979 of 1900

this public activity with multiple adults in the

room. It's implausible." And what was your

sense of that? 'Cause you were sitting through

the guilty plea, and all that kind of stuff.

ABBEY BOKLAN:

There was never a doubt in my mind as to their

guilt. First of all, I knew that all the

children had been interviewed separately. The

stories were extremely consistent. I had the

opportunity to read the grand jury minutes, where

these young children testified, as well as the

young co-defendant who we've previously

discussed, who was testifying-- against them.


The stories were consistent with each other. And

consistent with the evidence that was found in

the federal search warrant. When the children

talked about certain videos they had seen,

certain pornographic literature that they had

been shown-- and you know, I had all those years

of experience as an assistant district attorney,

and in the sex crimes unit, when I dealt with



young children.  And it just rang true.

Then, of course, I have a defendant standing out
there, and answering, "Yes, yes, yes.  Yes, I did
all of those charges."  Maybe there is a
temptation to plead guilty to a minor charge with
a very light sentence, even if you're not guilty,
because you're so afraid of exposure.  But when
you're talking about a sentence, and Arnold's
sentence, as I said, was 10 to 30 years, where
you could spend 30 years in jail.  And you're
admitting to a tremendous number of horrendous
acts.

I don't think someone's going to just do that--
very lightly, unl-- unless they're guilty.  Also-
- Arnold was a very educated man.  This was not
some young person who was being intimidated, who
didn't know what he was doing, who didn't
understand what he was facing.  So, as I said, I-
- I was very comfortable with accepting the pleas
that they were guilty.  And I was very



comfortable with sentencing them to long periods
of incarceration.

QUESTION:

When you were-- we talked about what a-- your
impression of Arnold and Jesse a little bit,
although they didn't do as much talking. Did you
have any impression of other family members? I
know that they-- sometimes they would come to
court. David came to court, or, you know--
Elaine (PH) came to court.

And I know there were a couple of altercations
between them, and some of the-- you know, even
some of the parents in the courtroom. What was
their beha-- what was the family's behavior like?
Given this kind of experience that they were
undergoing?

ABBEY BOKLAN:

I have no recollection of what the other members
of the family, and there were never any
altercations in the courtroom when I was in
there. So, that-- everyone sat very quietly.

Abbey Boklan Complete Transcript (111-113).doc


CONFIDENTIAL

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 72 of 393 PageID #: 4468
Case 20-3795, Document 37-2, 11/30/2020, 2983379, Page922 of 1960

Because I told them in the very beginning, any
interruptions, any-- disturbances, you're out of
here. So I remember very q-- you know, quiet--
well-behaved group, on both sides.

There was a tremendous undercurrent of rage and
horror on the part of the victims' families, but
I don't remember misbehavior. I mean, we're
talking about a lot of years ago. But I think I
would have recalled if there was in the courtr--
anything in the courtroom.

QUESTION:

Now, I think that the-- the parents of the
victims in this case came to court very
frequently. At pretty much any time there was
something that was-- gonna be discussed in the
courtroom, where they were permitted, they would
show up. Where-- they weren't absentee.

Do you have any recollection of what kinds of
people they were? Or what-- or the-- were they
very passionate about being there? And-- it

Abbey Boklan Complete Transcript (111-113).doc



A-0932

seemed like there was a real support network that
developed.

ABBEY BOKLAN:

Yes, I re-- I remember a lot of the families.  A
lot of them sent me private letters.  Which is
completely appropriate, prior to sentencing, to--
let a judge know the feeling of the victims, and
of the victims' families.  I remember they were
well-behaved.  They were very well-dressed.


And there was a lot of pain.  The-- you-- you
could see it as they sat there.  I mean, these
were young, innocent children.  You're talking
about very young children here who-- who were
involved.

(OFF-MIKE CONVERSATION)

(BREAK IN TAPE)

(OFF-MIKE CONVERSATION)

QUESTION:

It is a small community.  I'm-- I'm-- I was
interested when I found out-- I guess, you've--
you've known-- well, everybody's known everybody



Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 74 of 303 PageID #: 4470
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page924 of 1566

in this community. But you've known Joe Amarato
(PH), and Peter Pennero (PH), and Fran-- how--
tell me a little about that--

(OFF-MIKE CONVERSATION)

ABBEY BOKLAN:

Tell you a little about-- I'm sorry--

QUESTION:

Just about the relationships between the people.
Because this is-- in this little four-block
radius, there's a lot of drama that goes on here.
A lot of people that have to rely on each other--
what were those relationships like?


Because everybody was a lot younger together.
And then developed, and obviously they all see
you as like-- you made good at the highest level.
And they are all sort of, you know, in their own
fields-- you know, developing and-- and becoming
more successful, and--

ABBEY BOKLAN:

Well, I was older than they were too. Because
remember, I had stopped for 11 years, you know,



to raise my family.  But-- in this community, an
awful lot of the assistant district attorneys go
out into private practice, become defense
attorneys.  So that everybody, at least who works
here in Nassau County, kind of knows each other.

It doesn't affect the cases.  They'll fight as
hard as they can.  Fact, when I was-- first a
judge, one of the-- legal aid attorneys, by the
name of Scott Banks, was assigned to my part for
legal aid in defense.  He later became one of my
law secretaries.  So they come from both sides.

And you know, we're-- professionals doing a job.
And I-- I don't think that the fact that you know
each other from before-- impacts at all on what
happens with a case.  I really don't--

            QUESTION:

Well, it seems like that's true.  Because you--
obviously, you were on-- you know, you had Peter
Pennero-- you know, passionately trying to
definite Jesse.  And then you were also-- you

Abbey Boklan Complete Transcript (111-113).doc



**A-0935**

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 76 of 303 PageID #: 4472
Case 20-3795, Document 37-2, 11/30/2020, 2983379, Page928 of 1000

know, you obviously had-- a p-- prior

relationship with Peter, and you knew him from

work, or whenever.


But tell me a little bit about-- I'm-- I think

it's interesting to sh-- that aspect of it is

that everybody did kind of grow up together in

the system.  And maybe you could comment on those

people who were all so involved in the case.  Or

just what your recollections were.

                ABBEY BOKLAN:

In what respect--

                QUESTION:

(UNINTEL) Amarato, or Pennero, or kind of how

they all-- because even Fran Galosso (PH) ended

up becoming head of the sex crimes division in

the police department.  And it seems like you--

you know, you've all had some kind of-- you know,

in a way, common purpose.  That, you know, you

were on different sides of the equation.  But you

all knew each other. (UNINTEL)--

CONFIDENTIAL

**A-0936**

ABBEY BOKLAN:

I don't think it-- I don't think it really
impacted at all, except that perhaps the fact
that we knew each other, trusted each other, and
knew that we would have further dealings.  You
can usua-- you can depend upon the word-- of
someone you're dealing with like that.  You-- you
can trust them to act as a professional.


And I think that's what's good about so many of
the attorneys knowing each other.  And knowing
that, after this case, there'll be another one,
and another one, and another one.  So, you don't
play games with each other.

QUESTION:

The-- if we go back to Jesse's-- well, we know
that Arnold-- we talked about why Arnold pled
guilty.  And-- I guess I'm curious about-- what
do you-- what was Jesse's situation at that
moment?  Now, Arnold's pled guilty.  His father's
pled guilty.

CONFIDENTIAL

TAPE #111 CR# 47-50

### ABBEY BOKLAN:

He says he-- at that point, he was saying he's
innocent, and he wanted to go to trial.  Joe
Amarato then indicted for more counts.  Because
they had only indicted on some of the charges
against some of the children.  He then brought-0-
further indictments, involving a lot more
children.

So that really you (LAUGHTER) can add up a lot of
consecutive sentences.  And of course, the
evidence becomes greater, the more people you
have willing to testify-- as to what occurred.
And that's when I think, if I recall correctly,
and it's-- it's a lot of years ago.  But the--
the co-defendant, the young one, I think-- when--
Jesse Friedman and his attorneys found out that
the-- the-- the young man had agreed to testify
against him, I think at that point, is when he
started to very seriously think about pleading
guilty.

CONFIDENTIAL

TAPE #111 CR# 47-50                                     PG. 31

QUESTION:

Did you ever have a thought in your mind that,
while there are different gradations of this, did
you ever have a thought as you were learning more
about the case, maybe Arnold did it and maybe
Jesse didn't participate?  Is it possible-- did
you ever think, at any stage, that Jesse might
not have done it, because he was a whole
different person at 17 years old, or something,
when it took place.  Arnold, you can imagine, he
was already a pedophile when he was 56.  But
making-- it seems like, at a certain point, maybe
it wasn't as clear that Jesse was involved.

ABBEY BOKLAN:

I don't think so.  Because, you know, when I was
reading my grand jury minutes, or learning the
story, the two of them were working as a team
with certain friends of Jesse.  So it was never
that Arnold was alone doing things and Jesse
wasn't there.


And of course, once he pled guilty, he not only


CONFIDENTIAL

A-0939

pled guilty and told me that he had done it. But
during the course of his conversations with the
probation department, you know, I get a probation
report-- prior to sentencing. He made tremendous
amounts of admissions to them-- and tried to
justify and explain why he was a participant.

Also, his own attorneys submitted to me, after
plea and prior to sentence, a pre-sentence
memorandum, asking for mercy, not on the grounds
he didn't do it, but on the basis of the
tremendous abuse that he himself had suffered at
the hands of his father. And that he wouldn't
have turned out the way he did if not what
happened to him when he was young.

So-- very quickly, it became not an issue of
whodunit, but what was the appropriate punishment
for what had occurred and happened at that point.

QUESTION:

Do you have the-- I have-- just so you know, I
happen to have it as well, Peter Pennero's pre-

CONFIDENTIAL

A-0940

sentence memorandum.

            ABBEY BOKLAN:

Yes.

            QUESTION:

But I'd be curious if you had it-- pa-- hu-- each
document that I have, I need to bring into the
film in some way, and I think that's a valuable
document.  If you have it, maybe you could read
us a line or two from it, so you know, it makes
the connection.

            ABBEY BOKLAN:

You do have it?  It was given to you by Peter?

            QUESTION:

It was given to me (UNINTEL)--

            ABBEY BOKLAN:

Oh, okay.  Unde-- under that condition.  Let me
just-- (PAPERS)

            QUESTION:

(UNINTEL) included all of those (UNINTEL) that
you had (UNINTEL) so many psychiatrists, and he--
(UNINTEL) five different psychiatrists.  A number
of whom he quotes in that.  You know, talking



about Jesse's-- being abused, and (UNINTEL)
personality (UNINTEL).

      ABBEY BOKLAN:

Well, it's interesting, because I've always
highlighted, you know, I have a little yellow
highlighter where everything that's sent to me,
and I read these and my old highlights back from
those days.  And one of the things that, of
course, I was told, was about the constant abuse
on both a sexual and psychological level by his
father.  And it-- causing Jesse to have suicidal
thoughts.

And then he puts, of course, "severe and frequent
sexual abluse (SIC), including sodomy by the
defendant's own father."  (PAPERS)  There's a
whole section on the drug abuse.  Where Jesse
describes a life where he was stoned on a daily
basis, at ages 16 and 17-- I said-- you know, it-
- it goes on.  But-- but-- but that really is the
bottom line.

CONFIDENTIAL

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 83 of 303 PageID #: 4479
Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 83 of 303 PageID #: 4479

Then there were various psychiatric (NOISE)--
reports that I don't-- I would not feel
comfortable quoting from, even though, as you
indicated, he had turned them over to you--
involving what he told the psychiatrists, et
cetera. But-- but the most important thing is,
obviously, he was very, very disturbed. Very
disturbed individual.

I-- I-- here he-- he loves his father. There's--
there was no doubt about it. And what he thought
of-- as affection from his father, m-- most of us
consider devious and disgusting acts.

So I-- I think we had-- a young man who was
extremely, extremely confused. I don't know--
you have no-- the sentencing minutes-- as well--
of some of the things that I said during the
course of the sentencing-- I'm not much on
speeches. But there were a lot of things that I
said during the course of it-- explaining both
the-- the-- the terrible sadness that I felt, of

CONFIDENTIAL

**A-0943**

what he had gone through.

But at the same time, s-- saying that I thought
he was such a menace to society, because of what
he had been turned into by his father-- that I
felt the parole board should keep him for as long
as they could.  Because there's some times when
you weigh-- different reasons-- for why someone
should go to jail, one of the things that you
really have to consider, as well as the why of
the defendant did it, is to, what kind of danger
he was-- be to society?  And on that point, at
least-- I felt that he was a menace.  Even though
he was very young.

                    QUESTION:

Yeah.  Fran Galoss-- (TAPE SKIPS) who was the guy
started out on his subject on, followed by Jesse
today, because Jesse's in prison today.  You
know, and he's still alive, and (UNINTEL)--

                    ABBEY BOKLAN:

Is he going to talk too?  Is he willing?

CONFIDENTIAL

A-0944

TAPE #111 CR# 47-50                                      PG. 37

QUESTION:

I-- I think-- you know, he's very nervous about--
being paroled. And he is-- I think, like
anybody, he's hopeful that he can tell his side
of things. But I think he's very reticent about
doing that-- before he gets to see how he's
treated the next round, or-- because, you know,
he's been in now-- you know, he's-- he's been up
for parole a number of times, and obviously
hasn't been-- hasn't been paroled.

ABBEY BOKLAN:

Doesn't he max out quite soon?

QUESTION:

He doesn't max out for five more years.

ABBEY BOKLAN:

Oh really.

QUESTION:

So he's-- but his CR date would have been last
year. Around the time they brought him up to see
you.

ABBEY BOKLAN:

Right. And that was a mistake. They shouldn't

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL



have brought him down then.

QUESTION:

Yeah. I was going to say, you know, Fran's said-
-.

ABBEY BOKLAN:

Are we back on film again now?

QUESTION:

Yeah. Yeah--

ABBEY BOKLAN:

Okay.

(OFF-MIKE CONVERSATION)

QUESTION:

Fran said to me at one point that she feels that
he-- knowing what she knows about Jesse, she
feels strongly that if he's let out of prison,
that he will-- commit some other bad act. And
obviously, you felt that at the time, which is
why--

ABBEY BOKLAN:

Well, at the time of sentence. Of course I-- had
not had the opportunity, really, to-- to see how
he's managed up at prison. Whether he's been

Abbey Boklan Complete Transcript (111-113).doc



**A-0946**

remorseful. Whether he's turned his life around.

Because, you know, I have to make a determination now, when he does get out, under Megan's Law (PH), of how dangerous he is. So I-- I don't know what's happened in the interim. And I still have an open mind on that. At the point I sentenced him, I felt strongly enough that he was a danger to society that I included in my sentence a recommendation that the parole board not release him early.

      QUESTION:

And-- I-- I don't want to press that issue, 'cause I know he's going to see you, so--

      ABBEY BOKLAN:

Right.

      QUESTION:

(UNINTEL) talk about that. The-- there was, at one point in the case-- a request for a change of venue. And-- obviously the lawyer said, "Well, we can't get a fair trial." I guess they always do that. What was your reaction to that, and--

Abbey Boklan Complete Transcript (111-113).doc



and-- by the way, also, they can't hear me
usually, so you-- so if I ask you about change of
venue, you might say, "Oh, at one point they
asked for a change of venue." Just so that we
complete the thought.

        (OFF-MIKE CONVERSATION)

        ABBEY BOKLAN:

All right. I felt, in most cases that are high
publicity, if you voir dire the jury very
carefully, you-- you can find a jury that has no
bias, no prejudice, (LAUGHTER) is not even
familiar with the case. And I felt that's the
way it could be handled. I mean, we've had many
high publicity-- cases that were tried here.


Of course, this came after the Friedmans. But
just for an example, you have like the Ferguson
case, which didn't require change of venue.
There are enough jurors in our-- our pool in
Nassau County who can sit fairly impartially.
And you can handle that.



CONFIDENTIAL

**A-0948**

If, during the course of voir dire, you find that
you cannot find a-- an unbiased, unprejudiced
jury that haven't been tainted, well then you can
always move it out.  But thi-- this-- there was
no reason to move it out of county.  At that
point.

QUESTION:

Right.  So now, Jesse comes around to-- to-- it's
time for Jesse's plea, or let's say, now we know
that Arnold's pled, then the other young man has
also pled.  Or effectively, made a deal.  So now,
the two people in the world other than Jesse who
were ostensibly involved, have both pointed the
finger at Jesse in one way or another.


How do you think that affected Jesse's desire to-
- you know, s-- to go to trial, or whatever?  How
does that process-- how did that process go?
'Cause it seems like he had a big pretty big
change of-- of heart.

ABBEY BOKLAN:

He also changed attorneys in midstream.  I don't

CONFIDENTIAL

remember exactly at what point the attorneys
changed. But I'm sure the defense attorney-- sat
him down, and said, "Look. You have so much
against you, and your exposure-- of sentence is
up to 50 years, that it would be very wise to
take, you know, a deal-- as opposed to going to
trial.

"You're still a young man, that you'll-- you'll
get out of jail when you're still a young man,
while you-- otherwise you could spend the rest of
your life sitting behind bars." Of course, I
wasn't privy to those conversations. But that
would be realistically what I would think would
have occurred.

             QUESTION:
And-- so let's-- however that played out, then
eventually-- Jesse comes before you again. And
this time, I guess, he's there to plead.

             ABBEY BOKLAN:
Right, yes. Then he pleads.

CONFIDENTIAL

TAPE #111 CR# 47-50                                          PG. 43

QUESTION:

So tell me about that.  Your recollection of
that.

ABBEY BOKLAN:

Very similar to Arnold's.  Also media was there.
The families were there.  I tried to make the
allocutions (PH) as painless as possible.  Almost
in an antithetic type way, you know, "On such-
and-such date in Nassau County, did you put your
penis on-- on so-and-so's anus?"  And he would
say, "Yes."  Or whatever the charge, the sodomy
charges that he was-- pleading guilty to.


And-- it went very smoothly.  Very quietly.  Very
smoothly.  Pleas, in some ways, are-- easier to
do than the sentences.  The sentences are where
the emotions come out.  The attorneys are
pleading on behalf of their clients.  The
district attorney may-- make a statement.  The
defendant may be pleading for mercy.  The-- so,
that's c-- in-- in some ways, far more emotional
than the actual plea.

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

**A-0951**

QUESTION:

And then eventually, Jesse does come before you
for sentencing.

ABBEY BOKLAN:

Right.

QUESTION:

So tell me about that, at the next-- am I right,
that's the next-- that was sort of the next move-
-

ABBEY BOKLAN:

It really was, once they plead, it-- and it moves
to sentence.  You know, the probation department
had the opportunity to report first-- which-- I
get-- prior to the day of sentence--

* * *END OF TRANSCRIPT* * *

CONFIDENTIAL

TAPE #111 CR# 47-50                                                    PG. 45

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMANS"

INTERVIEW WITH ABBEY BOKLAN

CORRESPONDENT:  NOT IDENTIFIED

PRODUCER:  NOT IDENTIFIED

TAPE #112 CR #51-54

**TRANSCRIBER'S NOTE: QUESTIONER OFF MIC.  BEST EFFORT FOLLOWS.**

(OFF-MIC CONVERSATION)

QUESTION:

We were talking-- oh, we were talking about other
cases.  Well, obviously since that time, we knew-
- we know that there-- there were a lot of other
cases where, you know, in the end the argument
was that the police were overzealous.  That, you
know, the reason that the stories were similar
between the kids is because the police were
teaching the kids what to say.

And so of course they're similar.  They all came
from a similar source.  What was the thing that
made you know that this case was different.  And
when you saw those cases come out, you know, you

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

A-0953

obviously had second thoughts about this case.
You must have had a sense of confidence that this
was case was handled differently. And how did
you know that?

ABBEY BOKLAN:

Well, first of all the case only came to
attention of the police department because of the
search that was done-- by the federal government-
- where they found all of things going on on the
computer and the Internet. And they went in and
they got all of this pornographic material.

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

So knew this wasn't some question of some
hysterical mother who came in and started a mass
hysteria. And only after the federal government
called it to the attention of the Nassau county
authorities and they started investigating and
started to go independently to these various
homes and speaking to the children separately did
they discover what was going on.

CONFIDENTIAL

TAPE #111 CR# 47-50                                                    PG. 47

So I don't think these young children even had a
chance to get together and make up stories.  I
think-- I don't think the police knew what they
were looking for when they started investigating.
So I didn't think there was any issue of brain-
washing.

And as I mentioned previously, we had children
showing tremendous signs of abuse.  Independent
signs.  The nightmares.  The falling school work.
All of those things corroborated what the
children were saying.

And-- and things that parents couldn't explain.
Even things that couldn't be explained as far as
Jessie with the suicide attempts.  With the drug
use.  All of that came before these charges.
There was something festering in that household
long before the federal authorities ever went in.

We-- you also are dealing with an age group of
children-- although they're young, they don't

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

fantasize as much.  And it's very embarrassing

and very-- this is from my own experience in the

sex crimes unit.  Very embarrassing for a young

boy to talk about just-- these type of sex acts.

(ROARING)  It's not something that-- that they're

proud of.


So I think the-- it was my understanding that the

detectives had a very tough time even getting the

information out of these young children.  And the

parents had a very tough time believing that

these things initially were-- occurred, because

Arnold Friedman had this wonderful reputation.


This was after school, extracurricular work for

children who were bright, intelligent.  Wanted to

learn.  Wanted to be involved with computers.  I

mean parents were paying large amounts of money,

you know, from something like this.  I never had

a doubt.  Never had a doubt.

QUESTION:

The-- obviously the person on the other side of

CONFIDENTIAL

A-0956

the equation who was doing most of the-- of the
digging and talking with kids and stuff was Fran
Galaso (PH). What was your relationship with
Fran? How did you guys know each other from
before? What your--

ABBEY BOKLAN:

Fran's husband was an assistant District
Attorney-- in the-- District Attorney's office--
I think even before I was there. So I knew him.
When I was head of the sex crimes unit, I don't
think Fran Galaso was the one who was in the sex
crimes unit of the police department.

When I first got this case, I didn't even know
Fran Galaso was involved. And when I started
learning about it and starting to read a lot of
the grand jury minutes. So I think the fact that
I knew her, her family, had very little-- to do
with it all. (ROARING) In fact when the case
was finished, I-- if I recall correctly, that's
when I first learned how deeply involved-- she
was in the case.

CONFIDENTIAL

QUESTION:

But you-- you guys had (UNINTEL)-- I don't even
know what the protocol is.  But in general--

(OFF-MIC CONVERSATION)

QUESTION:

The protocol would be during the course of the
case.  You wouldn't discuss it with--

(OVERTALK)

ABBEY BOKLAN:

No communication with-- with any detectives or
police.  Remember if we have to go through
hearings, for example, there's gonna be a real
trial.  You have to go through hearings.

And very often, the police officers become
witnesses.  So a judge has no communication at
all with the police officers during the course of
it.  That's why I think-- and at least until time
of sentence or maybe immediately before sentence-
- I really wasn't even-- aware of her-- how-- how
involved she was in the case.  But it wouldn't
have mattered.  You know I know a lot of police

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

**A-0958**

officers who are on cases that I'm handling all
of the time.

QUESTION:

Did-- when you went into the sex crimes unit to
begin with, what possessed you to take that job
at that moment, 'cause that was probably pretty
unusual. I-- maybe I'm wrong. Maybe it was a--
typically a job that would be held by a woman.
But for some reason, I thought it was a job that
would probably traditionally have been held by a
man.

ABBEY BOKLAN:

In this county, if I recall, we had no sex crimes
unit until Dennis Dylan asked me almost to create
one. And I s-- I-- I really-- I think s--
actually started-- the unit. One of the first
things I discovered becoming the head of it, we
didn't even have a rape collection kit.

Every hospital was going off and doing their own
thing. We were losing evidence. It-- it was--
it was really horrendous.

CONFIDENTIAL

So I don't think we had-- either men or women who were the head of the sex crimes unit-- at that point. But my recollection could possibly be faulty with that. But that-- that's what I remember. I know Joe Annoranno (PH) came in long after. You know I was-- already out of the office into the sex crimes unit.

QUESTION:

I wonder whether that's 'cause there were just more sex crimes? It's sort of sad, but true. But maybe it is. Maybe it just became a much more significant part of the makeup of the crimes?

ABBEY BOKLAN:

And also I think-- at least for Mr. Dylan, he was-- he was concerned about how many sex crimes cases we would lose. And some of the reasons we would lose them is that we-- we didn't collect the evidence properly. So there were a lot of things going on.

CONFIDENTIAL

I mean to have children, very young children,

testify in a grand jury when they can't describe

even the genitalia or don't know how, that was

the start of the-- of the dolls that I had sent

for.  So there really-- there-- there was little

foundation.  It was every DA did their own thing.


They got the case.  They ran with it.  There was

no co-- coordination as-- as I recall until I-- I

became at-- you know that's a lot of years ago

we're talking about.  'Cause I left the DA's

office in '82?  '82.

QUESTION:

And tell me about that, 'cause that's

fascinating.  I was reading-- the Justice

Department has a publication about interrogating

children or, you know, questioning children and

how to do it.  At the time, I don't think even

that had come out yet, 'cause this was pretty

early.  How did you know that there were such

things as these anatomically correct dolls?  And

tell me about that-- that process of

CONFIDENTIAL

interrogating children?

### ABBEY BOKLAN:

I read about them. And I asked-- you know the--
the District Attorney, Dennis Dylan, could I-- we
have the money to send for them.

### (OFF-MIC CONVERSATION)

### ABBEY BOKLAN:

The money to send for the-- the dolls, the sex
crimes dolls-- because I found when I would talk
to children how difficult it was for them to
describe what had happened to them. And if you
start drawing pictures for them, what you're
doing is perhaps giving them an idea they didn't
have before.

But if you hand them-- Raggedy Ann and Raggedy--
Andy with-- with genitalia and you say, "Show me.
Show me." And with the doll, they can show you.
Especially since-- we're talking about very young
children now. You don't use these dolls with the
12-year-old or a 10-year-old.

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

**A-0962**

We're using ones that are really not articulate.
Don't know the right words. And they-- they can
show-- I remember the first time I used them
before we went into grand jury were-- I-- I said,
"Show me what he did." And she took the male
doll and stuck it on top to fight female doll and
was rubbing it (SQUEAKING) you know up and down.
And this is the way she could finally explain,
you know, what had happened and what had been
done to her.

Since that time, I think there's been certain
literature about not using the dolls. Where--
but you know the more we learn, the-- the more
careful we can be about not tainting these
children. You know every day things get a little
easier to do these case. And they most-- they
are the most horrendous cases of all. They
really are.

                    QUESTION:

Well, you have to be intelligent about it,
particularly sensitive to it, because it's tough.

CONFIDENTIAL

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 104 of 303 PageID #: 4500
Case 20-3795, Document 37-2, 11/30/2020, 2983379, Page954 of 1380

You know you sent out a 45-year-old detective to
go sit with a 12-year-old or a 10-year-old or a
nine-year-old. You know it's-- there's no
communication there unless they're someone who's
really thinking about the process. Do you know
what I mean?

            ABBEY BOKLAN:

Well, I-- I-- I am not sexist. And I never try
to be. But it's-- I think sometimes it may be
easier for a female to talk to a female. And I
think someone who's been a mother or a father
who's raised young children can handle them
better. You know how to talk to a child.


So I don't-- I guess it's not sexist, 'cause I'm
not really saying a male or a female detective is
better. It's their way and their sensitivity of
dealing with children.

            QUESTION:

When you went into that-- and I-- I'm not trying
to ask a very personal question. But did you
feel like-- people say sex-- you know sex abuse

CONFIDENTIAL

**A-0964**

happens in almost every family at some level or that, you know, in a-- one out of three families or something like that. Did you ever have a friend or someone in your life when you were growing up who (PHONE RINGS) expressed something to you and you thought-- you know you had a way of listening or a way of communicating with them about sex crimes that made you well suited for that? Or was it-- when you joined the sex crimes division it was a pretty new deal?

ABBEY BOKLAN:

It was pretty new. (CLUNKING)

QUESTION:

At the-- at the sentencing-- we were-- getting back to the sentencing. We talked about-- you-- you had talked about the fact that sometimes the sentencing is the more emotional time. I-- I think that was the case from what I've understood about this. Tell me what you remember about the sentencing hearing and that experience.

ABBEY BOKLAN:

Are you talking about Arnold, Jessie or both?



Case 2:06-cv-03136-JS   Document 37-3   Filed 12/07/20   Page 106 of 303 PageID #: 4502
Case 20-3795, Document 37-2, 11/30/2020, 2983376, Page956 of 1560

QUESTION:

I don't know.  Maybe-- do you remember the Arnold
one?

ABBEY BOKLAN:

The Arnold one the-- it wasn't very emotional.  I
mean they didn't make too many pleas on his
behalf.  The Jessie one-- Jessie Freidman one
was-- was more emotional-- because-- you know
defense counsel worked very hard on his behalf.

And not only with pre-sentence memorandums, but
pleas, because of his youth, and the fact that he
had been so badly abused-- by his own father.
And I think there were even allegations of-- of
very little love-- from the mother.  That he was
an unwanted child.

That I should be merciful.  So I remember that.
And I-- said-- I-- I remember some of the things
that-- that I said, but-- it's funny.  I don't
remember whether Jessie said anything at all.

Abbey Boklan Complete Transcript (111-113).doc



**A-0966**

QUESTION:

I-- I remember that he-- I-- I actually saw some
of the news coverage of this. Peter Pinero (PH)
makes a-- pretty-- elaborate argument that Jessie
was, you know, a terrible victim of his father.

ABBEY BOKLAN:

Right.

MALE VOICE:

That he-- what he needs is help or counseling.
It's the-- prison term or whatever. And then
Jessie cries and says, you know, "I experienced
all of this. My father was-- and these children
were victims and I feel terrible about that. But
I was a victim too."

And so he kind of cries and goes through that.
Do you remember being moved by Jessie's-- by-- by
that story generally, which obviously that was
their position. That-- you know do you remember
believing it, first of all? Did you feel that
Jessie was (UNINTEL)?

CONFIDENTIAL

TAPE #111 CR# 47-50                                           PG. 60

## ABBEY BOKLAN:

Are you asking did I believe that he was--
terribly abused as a child?  Yes.  There was no
doubt in my mind that Arnold Friedman had started
abusing Jessie very young.  And trained him,
almost, in this type of-- pedophilic behavior.

I think once Jessie became older, he became less
desirable as a sexual object for his father.  And
once that happened, I-- I think Jessie didn't
feel he was getting the same amount of love from
his father that he was getting, so he became a
partner and a-- as a partner participant, he
probably could feel the oneness with his father--
again.

So in a certain extent-- since I completely
believed that, I had to be moved by the fact that
he himself had gone through exper-- a tremendous-
- trauma as a child growing up.  I knew from the
papers that were given to me that he had gone
through depressions.  He had-- suicidal desires

Abbey Boklan Complete Transcript (111-113).doc


CONFIDENTIAL

**A-0968**

at certain times. And that he had gotten himself
involved in drug use. So that all made sense.

But on the other hand, at some point he turned
from a victim to a predator himself. And reading
the grand jury minutes and everything else I
learned, he was extremely violent himself to the
children. Not-- not just sexually.

He seemed to enjoy what he was doing. And
remember, he brought his own friends in.
Including the co-defendant who later turned and
participated against him. So from a-- a
reluctant participant, he went to an extremely
active participant who was enjoying it.

You know if you look at people out there who
commit horrendous crimes, you say, "Well, maybe
they had a-- a terrible childhood." And many of
them have. But that doesn't excuse the behavior
down the road. And also-- if someone you feel is
going to be a danger-- to other children, if he's

CONFIDENTIAL

**A-0969**

let loose, that's something that you have to

consider.


So in-- in weighing the sentence so low, I felt

badly for what had been done to him.  At this

point, I think I was most interested in

protecting society from having other children go

through what he put those children through in

that computer school in Great Neck.

QUESTION:

They were obviously asking for some kind of

mercy, vis a vi-- well, they knew they were

getting six to 18 years.  What would that-- and

that-- and then obviously you felt strongly

enough about it that you wanted to ensure that he

was in for a good part of that time.

ABBEY BOKLAN:

Right.

QUESTION:

And so tell me the thinking process of-- when--

when you-- you know you said-- you're sort of--

you generally don't talk a lot in court.  You lay

CONFIDENTIAL

down the law or whatever. But why was it different this time and what did you say that--

ABBEY BOKLAN:

It was different because I felt like I was-- I was talking to different people. I was talking to the general public. We had the media in there. And that's part of having-- a reason for having the media in there is to educate the general public.

I was talking to the victims. And it-- not the children. The-- who weren't in the courtroom. But-- but the family members. I know a lot of them were dissatisfied with this sentence for Jessie. They thought it was too merciful. That I should have-- un-- unlike Arnold's sentence. They thought I what being too light for Jessie.

And I-- I was talking to Jessie too, because, you know, a part of me was hoping that when he does get out, he still will be young enough to have a life. And if he gets appropriate therapy or when

CONFIDENTIAL

he's upstate or whatever, that he can have a
decent life and not hurt anyone else.  And maybe
in a way I was explained to myself too why I was
sentencing what I felt was a harsh sentence to
someone who was so young.  And why I was giving a
harsh sentence to someone who was so young.  So I
did talk.

Now what-- what did I say?  Well, it was kind of
long.  (RUSTLING) I'm not gonna go through very
much of it.  I talked of course about the
probation report.  That-- the letters that I
received-- from the families.  The letters I'd
received on his behalf-- from the-- Great Neck
community, because they weren't all bad letters.
There were people who-- who liked the family.
Felt badly for him.

There were psychologists and psychiatrists that
wrote me on behalf of Jessie.  Talking about him
being more of a victim than a criminal.  And I
had the excellent-- pre-sentence memorandum

CONFIDENTIAL

TAPE #111 CR# 47-50                                    PG. 65

prepared by Mr. Prinero (PH). And I said-- this
is a quote. "According to the--" it's a quote
from my notes, so I-- you know I-- sometimes I
change things as I go along when I'm in-- in
there.

But as best as I can tell you, this is what I
said. "According to the pre-sentence probation
support, you were raised as an unwanted child in
a home devoid of love. Your father started
fondling you sexually at about the age of nine
while reading you bedtime stories." "As you grew
and reached puberty, his abuse of you escalated
to regular acts of sodomy. You submitted,
according to your own words, because it was 'it
was important for me to have the love and support
of my father and to please him. My father was my
only friend.'"

And then I quoted from one of the psychiatric
reports. "Jessie's homosexual submission to his
father was clearly due to his desperate need for



A-0973

love from a parent.   (RUSTLING) His mother's

emotional withdrawal and his father's

psychopathology.  His happiness at his father

shifting his passions to other youngsters

strongly suggests that such an orientation was

not an actual one for Jessie and one that he

should have been able to overcome."


"His participation in his father's seduction of

these other youngsters falls under a not uncommon

psychological defense mechanism known as

identification with the aggressor.  To

subconsciously, and therefore unintentionally,

model yourself after a parent is one way of

repressing any of the anger you might feel

towards that person for what he or she has done

to you."  Of course that's the quote from the

psychiatrist.


And then I go back to my own words.  "Torn between

love and hate, you suffered from depression.  And

at one time were suicidal and unable to function



TAPE #111 CR# 47-50                                    PG. 67

in a regular school."  And I said, "It's very

unfortunate that not the psych-- that none of the

therapists you were sent to realized the reason

for your depression.  Perhaps if they had, your

life today would have been far different."


"In addition, however, to looking you-- at you as

a person, considering your motivizations (SIC),

the reasons you have become what you have and

done what you have done, I as a judge have

another, equally important obligation.  I have to

look at the harm to your victims and the severity

of your crimes, as well as the danger you may be

to society."


"The fact that you too were a victim does not

absolve you of responsibility for the sexual

assaults you perpetrated, nor for the physical

abuse that went beyond anything done by your

father."  Remember I had mentioned to you-- to

you earlier.  "Nor for the perverted and

horrendous games you invented and forced your

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

A-0975

TAPE #111 CR# 47-50                                      PG. 68

victims to play.  Nor for inviting your friends
to join you in these games and assaults.  The
children you have abused are suffering terribly.
They are exhibiting sleeplessness, bedwetting,
nightmares, stuttering, hair loss."

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

But you see you gotta realiz-- you know these are
the things also that to me were tremendous
corroboration as to what was occurring.  I mean
the hair loss.  I--

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

"The children you have abused are suffering
terribly.  They are exhibiting sleeplessness,
bedwetting, nightmares, stuttering, hair loss, a
decline in school work, separation anxiety.  And
an overwhelming sense of fear.  Several children
in fact sleep with weapons.  Bats and sticks by
their beds."

"The extended families of your child victims are

**CONFIDENTIAL**

**A-0976**

suffering much, if not more." And then I end,
"After weighing all of these factors and others
as well--"

(BREAK IN TAPE)

ABBEY BOKLAN:

Programs that didn't work well. I mean you're
talking about something that was like 100-- 100--

(REFERENCE TONE)

SLATE:

There's no audio for the end of this shot.

(REFERENCE TONE)

ABBEY BOKLAN:

"The children you have abused are suffering
terribly. They are exhibiting sleeplessness,
bedwetting, nightmares, stuttering, hair loss, a
decline in school work, separation anxiety, and
an overwhelming sense of fear. Several children,
in fact, sleep with weapons. Bats and sticks by
their beds."

"The extended families of your child victims are
suffering as much, if not more." And then I end

CONFIDENTIAL

it, "After weighing all of these factors and
others as well, I have a concluded that you
deserve the full 18 year sentence for the crimes
that you have already committed. And for the
harm that you have already done." And then I go
on to recommend to the parole board that they
keep you for the actual maximum.

QUESTION:

Ah, which brings us, I think, to-- Jessie today.
In I guess I would say a couple of things. Did
it surprise you that both Jessie and Arnold wrote
these open letters to the Great Neck community
saying that they were not guilty and it was a
miscarriage of justice. Is that something you
see typically or do you-- would you have
predicted that? Or do you think that that was--?

ABBEY BOKLAN:

It was a surprise.

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

When I received the letter from-- from Arnold
Friedman-- in 1991 denying his guilt, as well as

CONFIDENTIAL

**A-0978**

the information and-- I'd received that both
Jessie and Arnold had written to the media and
various families, parents, schools, et cetera,
recanting and alleging that they were not guilty,
I was very surprised.

When I go through a trial and the defendant is
convicted, very often I get letters for years and
years later.  You know, "I'm an innocent man.
I've been railroaded.  The police did it.  The
District Attorney's did it.  The judge did it.  I
didn't do it."

But in a case like this, with a plea to so many
counts, with conferencing for so long, with all
of the knowledge that the attorneys had, all of
the discovery of the evidence the defense
attorneys had and of course-- revealed to their
clients, I never, ever expected those years later
to find them to recant.  If anything, it showed
to me the lack of remorse and how right I was--
to give an extremely long sentence.

CONFIDENTIAL

Because denial is one of the most dangerous things when you let someone out. If they're still in denial, they're not trying to change their ways or remorseful for what they did, they could, you know, be very dangerous.

I never received a letter from Jessie. It was from Arnold that I received the letter. And-- you know I was convinced that if Arnold ever got out-- he was a danger to any young child that he would come in contact with. Jessie was young. I'm still hoping that there's a-- a chance-- that he will turn his life around.

QUESTION:

Somebody like Jessie who-- let's say regardless of what you-- what you find in his story here, he still has a long row to hoe in the future. You know does somebody like that have a hope of having a-- some kind of salvation or having a normal life at the end of this process?

CONFIDENTIAL

ABBEY BOKLAN:

I don't know. The professionals and-- and the
literature say a true pedophile, that I think
Arnold was, probably will never change their
ways. Jessie, there were indications from many
of the reports, was not a true pedophile. So all
you can do is hope. I can't predict the future.

QUESTION:

Right. Peter Pinero obviously was very
passionate about-- re-- I-- I-- about
representing Jessie. And in a way-- you know
Peter said to me at one point, "I thought Jessie
was my son. You know any moment."

It-- so they must have been very close, because
obviously they had to-- they shed some tears
together. And-- and Peter's an emotional guy to
begin with. He's a very soft hearted guy
(UNINTEL PHRASE).

What was-- what was your sense of his position
vis a vie Jessie? And-- and, you know, had they



been preparing to go to trial all along and then

at a certain point they sort of hit the point of

no return.  And they knew they were gonna (TRAIN

HONKING) have to plead?

    ABBEY BOKLAN:

I think it-- at some point-- of course Peter

Pinero could answer better as to when he was

prepared to plead.  I think that at one point he

started to weigh all of the evidence that was

against Jessie.  The tremendous emotional--

    (OFF-MIC CONVERSATION)

    QUESTION:

So obviously-- you were saying-- you were

(UNINTEL) Peter Pinero had--

    ABBEY BOKLAN:

Okay.  It came to a point.  Right.

    QUESTION:

Right.

    ABBEY BOKLAN:

I think there came a point-- you're asking me

when Peter decided to plead.  That he started to

weigh all of the evidence.  There was fairly open

CONFIDENTIAL

disclosure in this case-- of-- what they were

facing. And he knew about the tremendous--

volatility of the case itself. The emotions that

would be in-- that would come out during the

course of a trial. And he just felt that-- it--

he couldn't roll the dice that this young boy

would spend the rest of his life-- in jail.


I think Peter was very happy. I think everyone

was very happy not to try this. It would have

been a true horror. A true horror. To have

those children come in and testify. And-- and

Peter was obligated to cross-examine-- to the

best of his ability. Very difficult to cross-

examine a child without-- getting the-- the jury

very angry. Because they don't like to see a

child attacked. So you have to walk a very thin

line and have to be very, very careful when

you're cross-examining a child.


I think everyone knew-- what they were facing in

this case. I don't think anyone wanted this to

CONFIDENTIAL

A-0983

go to trial. Anyone. As far as the

professionals.

QUESTION:

Had there-- is there any way to know had it gone

to trial what would the possible outcomes have

been? Under a couple of scenarios. I mean

knowing what you know, it could have gone this

way or it could have gone this way?

ABBEY BOKLAN:

You're asking for an educated guess, 'cause

that's all it could be.

QUESTION:

Right.

ABBEY BOKLAN:

I have to tell you that when I'm trying to figure

out what verdict my jury is gonna come in with,

I'm 50 percent right. So (LAUGHTER) you've gotta

take what I say with a grain of salt. But I

think the evidence would reach a point and when

all of the materials that would be brought into

the courtroom that were found during the search,

I think that-- it-- the evidence would have been



Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 125 of 303 PageID #: 4521
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page975 of 1566

overwhelming. And I would be very surprised if a
jury did not convict. But you never know. You
never know. (BEEPING)

QUESTION:

Would it have been fair to bring those materials
into the courtroom in-- in a trial just for
Jessie?

ABBEY BOKLAN:

Well, the-- these children were shown these
programs during the course-- as I recall, during
the course of the class and during the course of
what was going on. They were showing them--

(INAUDIBLE)

ABBEY BOKLAN:

Right. They were showing them-- some of those
computer programs were absolutely horrendous.
And some of the-- the magazines they would force
these children to see. So they are-- are
evidence of what was going on.

In fact, if I recall, some of the-- endangering
the welfare of a minor charge in the indictments-

CONFIDENTIAL

- involved the literature.  Both-- in-- on the computer-- and-- in the written word.  So it-- it would have been evidence.  It certainly would come in.  Jessie was a co-defendant to-- all of that evidence applied to him-- to him as well.

QUESTION:

Did you ever have a sense of whether-- (BEEPING) you know I said-- at one point Arnold says in one of his letters, "All I wanted to do was help my son.  And they told me that if I would plead guilty, I would get out of the way.  Me and all of my sickness and my pedophilia would be out of the picture."

And then-- you know did you ever have a sense that Arnold was really concerned for saving Jessie?  Doing what was required to-- to try to help Jessie get a lower sentence or something?

ABBEY BOKLAN:

He pled guilty knowing at that point that Jessie was intending to go to trial and say he was a-- he was not guilty.  So I don't understand how his

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

pleading guilty was gonna help Jessie. Did he
love his son? I don't know. I really-- I really
don't know. I think Arnold Friedman was looking
out for Arnold Friedman when he took that plea.
But that's, you know, just an educated guess.

QUESTION:

Yeah, I-- you know I mean it-- Joe Anorando (PH)
says that at one point, you know, if he had
wanted to help his son, there were a number of
ways he could have done that. He could have
offered to make a deal contingent on his son
getting some kind of leniency or something. But
he didn't do those things.

ABBEY BOKLAN:

Yeah. He was looking for-- out for himself I
think.

QUESTION:

Any thoughts about-- you know we know that his--
the family was destroyed by this. Probably the
family was destroyed already. But let's say the
family was destroyed by this.



**A-0987**

You know Elaine goes off and, you know, divorces him. Jessie goes to jail. Arnold goes to jail. David moves-- lives in Manhattan and-- and goes on about his career and then the other brother-- goes to San Francisco. Disappears sort of.

You know everybody was sort of dealing in their own way, I guess, with this kind of a situation in the family. It-- and does-- you know any-- any thoughts about David Friedman or whether-- 'cause he obviously-- (SLAPPING) well one of the things that-- you know David blows up at one point at the end, I guess when his father was sentenced.

He shouts at some of the parents. "You're gonna-- you-- you're-- you and your kids are gonna have to live with this for the rest of your lives." And of course there were various interpretations immediately. The parents thought what he was saying-- he was gloating over the fact that the children were abused. They're gonna have to live



with the abuse for the rest of their lives.

And then of course later he says, "No, I was
saying you stole my father for these, you know,
(UNINTEL) charges.  My father was a saint.  And
so you're gonna have to have this on your head or
whatever."

But David had a pretty emotional reaction to it.
And I'm wondering if you have any-- any thoughts
about his role or the position of the-- or his
role.  Brother.  The oldest son in that family.
The father's first born son.

            ABBEY BOKLAN:
You're asking about the-- the first born son and
any-- thing I feel about it.  I really-- except
for the very short reference to the other
children in a probationary court, I really had no
dealings at all with David or the other brother.
And was not privy-- to anything that went on with
them.

CONFIDENTIAL

**A-0989**

So I-- I really have absolutely not comment-- on
at all. Except, you know, from the reports I
read, it was a household devoid of love. It
certain was not a normal household. But other
than that, I really could not comment on-- on the
other brothers at all.

QUESTION:

Is it possible that-- that somebody that's in
Jessie's position now, without necessarily even
focusing on Jessie, there's obviously this civil
commitment issue. That people can be-- in some
states (UNINTEL) people are considered committed
after their maximum prison term because, you
know, they're either-- either-- 'cause I think
two psychiatrists have to say that they're
unstable and that they're likely to commit the
same offenses again.

And there's a Supreme Court discussion about
whether you also have to add the criteria, as is
key in this case, about whether they were unable
to control their own behavior. Is-- do you think

CONFIDENTIAL

there's any possibility that the-- what do you

think about the civil commitment-- legislation?

What-- and if that passes in New York state,

somebody like Jessie could be locked up for a lot

longer. It's possible.

ABBEY BOKLAN:

I haven't really studied that issue. I don't--

I'd really rather not--

QUESTION:

Yeah. That's--

ABBEY BOKLAN:

-- not comment on it. I mean I-- I am aware that

it exists in some states, but I-- I hadn't

thought about it. And I couldn't give you an

educated opinion at this time.

(OFF-MIC CONVERSATION)

QUESTION:

Did the-- did the other defendant, the other

youth who'll-- the one who got the youthful

offender's test (PH), did he have to do an

allocution? Did he have to plead guilty in a

formal way?

Abbey Boklan Complete Transcript (111-113).doc



CONFIDENTIAL

Case 2:06-cv-03136-JS  Document 37-3  Filed 12/07/20  Page 132 of 303 PageID #: 4528
Case 20-3795, Document 37-2, 11/30/2020, 2983379, Page982 of 1980

ABBEY BOKLAN:

Oh, certainly.

QUESTION:

And what-- what do you rec-- remember about that
allocution?  What that as convincing and-- as the
others?

ABBEY BOKLAN:

I remember very little about it.  But I'm sure
the District Attorney must have done questions
and answers from him.  Or maybe not, because he
testified in the grand jury as well..  So-- his--
he was locked into what he had testified to in
the grand jury.  I don't have much of an
independent recollection of that plea at all.

QUESTION:

I think the-- you know one of the things that's
really unique about this situation also is that
there was really no discovery because, you know
there were-- the was a grand-- there was a grand
jur-- there were a series of grand jury hearings.
There were confessions.

CONFIDENTIAL

TAPE #111 CR# 47-50                                         PG. 85

There were-- but there was no discovery.  So for
example, Peter Pinero had almost nothing to go
on.  I think he was given one statement that was
redacted.  And that was one of him-- that-- you
know that Don Arrono (PH) had given him and said,
"Look, this is the kind of thing we're getting."
But one-- in a case like this, at what point
would discovery have begun?

          ABBEY BOKLAN:

Well, if it looks like there's not going to be a
plea, there's a conference and stipulations done
very shortly after indictment.  Usually within a
few weeks.  And at that point discovery starts.


Certain things have to be handed over.
Statements of victims do not have to be handed
over until they have to testify.  For example, if
they would only be testifying to a trial, they're
just handed over after the jury's selected and
before opening statements.


The-- so that type of discovery would not be

CONFIDENTIAL

**A-0993**

given out early. Brady material. I don't know
if you're familiar with that. It's-- that's
material that would be favorable to the defense.

For example, there was a young child,
hypothetically, who said, "Oh, no. None of this
occurred. We all agreed to make up the story."
That would have to be handed over immediately.
Immediately upon reaching the hands of the
District Attorney's office.

So discovery in New York, it depends upon the
stage and what you're looking to discover. But
certainly there was a lot of open discussions--
with the District Attorney's office during the
course of conferencing as to, you know, what was
occurring there. And they would have been able
to get copies of the search warrants.

They would have known what was taken from the
house. I mean that-- that's-- they-- they would
have been given receipts, in fact, for what was

CONFIDENTIAL

taken from the house on that. So if you're just
talking about the witnesses' statements, what the
young children were saying--

> (OFF-MIC CONVERSATION)

> ABBEY BOKLAN:

-- that would not have come until immediately
before the trial.

> QUESTION:

And I-- and those kids were never-- so in front
of a grand jury, the process, knowing what you
know about sex crimes in general, the process of-
- a child testifying in front of a grand jury, is
that very different-- we know that there's no
cross-examination, but how is it different from
a-- a child testifying in trial.

> ABBEY BOKLAN:

Well, there's no judge. There's no cross-
examination. That-- you mentioned is very, very
different in a grand jury proceeding, 'cause the
child doesn't have to go through it.

There's no defendant sitting there looking at

CONFIDENTIAL

**A-0995**

TAPE #111 CR# 47-50                                          PG. 88

them while they're testifying.  They're sitting
up in the witness box.  They have a very
sympathetic assistant District Attorney standing
next to them.

But they do have usually-- between 19 and 23
people approximately sitting there listening to
them.  And that's very hard.  Having all of those
strange listen to, you know, what occurred.
District Attorney asks questions.  Court
reporter-- trans-- writes down everything that's
being said.

You know and they answer-- the de-- grand jurors
have the opportunity to ask questions as well if
they so desire.  District Attorney rules on
whether those questions are admissible or not.
If the defendant wants to testify he-- he can.
But he has to waive immunity.  That's a whole
different process.  And you know can go in there
with his attorney and the District Attorney can
cross-examine the defendant.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

**A-0996**

TAPE #111 CR# 47-50                                    PG. 89


This didn't happen in this case.  The defendants
did not-- did not testify.  Grand jury is a much
easier proceeding for an assistant District
Attorney.  It's much faster.  It's much shorter.


But in a case like that, you still have these
children (UNINTEL) in there.  Being sworn, if
they're found to understand the nature of an
oath.  You have to go through that first if
they're under a certain age.  And they've gotta
tell this story to all of those strangers sitting
there.  A very embarrassing and upsetting story.

QUESTION:

And-- would it be possible in the third
indictment that maybe on-- that the only person
that would be required to testify would be the--
the young man that got youthful offender status
or would they have needed the kids in that-- for
an indictment?

ABBEY BOKLAN:

Oh, they add a lot more children.  There're a lot

CONFIDENTIAL

more counts and a lot more children were added.
I've forgotten how many. I might even have a--
(ROARING) little note about that someplace.
That's number one, two-- it-- that's number
three. I think the-- I-- I've forgotten. I
didn't write down how many more children. But
there were a lot more children that they brought
in.

In other words, they weren't redoing the same
thing over and over again. They were bringing in
more children who were not part of the original
ones. I think the last one-- there was something
like 126 counts of sodomy first degree. And
there was sexual abuse.

Use of a child in sexual performance 'cause if
you recall-- they were videotaping what was going
on in the classroom. Those were never found, by
the way. And then of course there were 52 counts
of endangering the welfare of a child.

CONFIDENTIAL

**A-0998**

TAPE #111 CR# 47-50                                    PG. 91

So-- they started out-- against Jessie, if I
recall, there were three indictments.  It started
out with one small group of children.  Then added
more.  And then added more again.  So--

        QUESTION:

And why did they have to add the additional
indictments?

        ABBEY BOKLAN:

Because they thought they were going to trial.
They thought they were going to trial against
Jessie.  Because all we were hearing was, "He's
not pleading.  He's not pleading.  He says he's
not guilty.  He's not pleading."


So when an assistant District Attorney hears
that, they've gotta get together the case as
strong as they can.  I think he was hoping to
spare a lot of the children.  Plus some of might
have a-- been reluctant witnesses or their
parents reluctant to have them testify.


But when it looked like there was gonna be a


CONFIDENTIAL

**A-0999**

trial, then it was no holds barred.  They were
brining in all of the children.  All of the
children.

QUESTION:

Did you-- you know the doctor.  Did he-- after he
pled in front of you, Jessie, a couple weeks
later, went on Geraldo with his mother.  I don't
know if you remember that.

ABBEY BOKLAN:

I had heard about it.  I hadn't actually seen the
program.

QUESTION:

Yeah.  They were very-- and do you have any
thought about that?  When you-- when you found
out that they went on the television?

ABBEY BOKLAN:

I had forgotten that until you started your--
investigation here of this case.  And-- it was
mentioned to me I think by Fran Galaso, who I put
you in touch with.  But I had forgotten that.  I
mean it-- it-- well, look how strange it is to be
videotaping-- what was going on there.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

QUESTION:

Yeah. The whole thing is very public-- public in a very unusual way.

ABBEY BOKLAN:

Yeah.

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

QUESTION:

(IN PROGRESS) well suited for that? Or was it the new (UNINTEL) sex crimes division that was pretty new to you?

ABBEY BOKLAN:

It was pretty new. My children were fairly young. At--

(OFF-MIC CONVERSATION)

QUESTION:

It's funny. You know I was-- (CREAKING) interesting you said that about these dolls, because-- (CLUNKING) I mean I was just reading-- I have a-- I was just reading-- oh, here during trial (CLUNKING) the witnesses were (UNINTEL) describe use (UNINTEL PHRASE). I mean here they

CONFIDENTIAL

**A-1001**

talk about the dolls.

          ABBEY BOKLAN:

Right.  Interesting.  This I won't say on-- on

the record in front of the cameras, but when I

first got the dolls and started the show them

around the DA's office, some of the male DA's

were so embarrassed and go so hysterical with

them that it-- that would have been-- that was a

funny sight.  (LAUGHS) And so I don't know if

they still use them up there-- in the DA's

office.  Kay do you know if they still use them?

          KAY:

I have no idea.

          ABBEY BOKLAN:

I don't-- I don't know.  Joe might be able to

(CLUNKING) able to answer.  I don't know if

that's--

          (OVERTALK)

          ABBEY BOKLAN:

-- was (UNINTEL) years--

          QUESTION:

They say children are usually less accomplished

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

**A-1002**

than adults in communicating verbally.  Because

of this you may need to use video or props and

additional language to gather information.  This

allows children to demonstrate as well as say

what they have experienced.  And (UNINTEL) media

can be employed by the most (CLUNKING) useful and

(UNINTEL PHRASE) anatomical dolls, anatomical

drawings and picture drawing.

ABBEY BOKLAN:

Yeah.  I was kind of ahead of my time at that

point.  You know in fact there were very few.  We

had to send for them.  Now I don't know if they

look more realistic, like a male and a female.

But in-- in those days, they really-- they were

rag dolls.  They were very non-threatening.

QUESTION:

Right.  Right.

ABBEY BOKLAN:

Be interesting to see what they use now.

(INAUDIBLE)

QUESTION:

I wonder what they do-- I mean I guess there's--

CONFIDENTIAL

you know whatever.  You can criticize every

method of investigation.

        ABBEY BOKLAN:

Yeah.  It really.  (CLUNKING)

        QUESTION:

And there's always somebody who also (CLUNKING)

uses something 'cause the defendant involved--

there's always somebody who's (UNINTEL) precise

because, you know, to say, "Here, photograph some

sex abuse taking place."  And they said, "Well,

you know, photographs can be manipulated or

whatever."  Yeah.

        (OFF-MIC CONVERSATION)

        (BREAK IN TAPE)

**TRANSCRIBER'S NOTE: TAPE REPEATS HERE.  WILL NOT TRANSCRIBE

DUPLICATE TRANSCRIPTION.**

        ABBEY BOKLAN:

Programs that didn't work well.  I mean you're

talking about something that the like 100, 120

dollars.  He won a massive, hundred million

dollar settlement against IBM.  But the-- the

interesting part is he did all of this from his

CONFIDENTIAL

home and his computer in his underwear.

          QUESTION:

Oh my god.

          ABBEY BOKLAN:

And-- and he was against all of this IBM lawyers,

all of these, and they thought he had this

tremendous staff fighting him.  And they-- they

finally gave up and agreed to this settlement.

          QUESTION:

Wow.  That's--

          ABBEY BOKLAN:

So I think that--

          QUESTION:

-- amazing.

          ABBEY BOKLAN:

-- is an amazing story.

          (OFF-MIC CONVERSATION)

          (REFERENCE TONE)

          SLATE:

End of wild sound and end of tape.

          (REFERENCE TONE)

          * * * END OF AUDIO * * *

CONFIDENTIAL

TAPE #111 CR# 47-50                                          PG. 98

* * * END OF TRANSCRIPT * * *

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMANS"

INTERVIEW WITH ABBEY BOKLAN

CORRESPONDENT:  NOT IDENTIFIED

PRODUCER:  NOT IDENTIFIED

TAPE #113 CR #55-56

QUESTION:

(IN PROGRESS) a once in a lifetime, what the hell
was going on?  (NOISE) (UNINTEL) like this?  Or
did you come away from it thinking, did you have
any emotion, or any particular feeling when you
were-- when this case was said and done?  Did you
have to go on vacation for a week?  Or did you--
how-- what was your just (UNINTEL) feeling about
it at the end?

ABBEY BOKLAN:

What was my feeling at the end of the case?  I
was glad it was over.  I hoped I never saw
another one like it.  I was so happy it wasn't a
trial.  On a personal level, I was happy I didn't
have to listen to what happened to the children.

CONFIDENTIAL

**A-1006**

It's different reading it, and actually seeing
the pain, you know, as the children tell about
it.

Like an attorney will say to me, "If my client
goes to trial, as opposed to taking this plea,
are you gonna punish them with a greater
sentence?" And I say, "I don't punish him for
going to a trial. But once I hear-- once I hear
what really happened-- or if your client commits
perjury-- or, anything that can happen during the
course of-- of a trial, who knows what I'm gonna
sentence him." And I-- I think it would have
been a-- a terrible trauma for the children.

I think for the attorneys, who are good men. For
the families, for the jurors, and for me to have
to have listened to what occurred there. On--
and I say that from someone who tried sodomy
cases with children before. This one was just
so-- so horrible that my feeling, the main
feeling I had was one of relief. It was over,

CONFIDENTIAL

the children did not have to testify-- I did not have to go through a trial, and I didn't have to watch the pain in the eyes of parents in those children. I think they had to give a-- kind of a brief summary oh-- of what I felt most when it was over.

QUESTION:

Was there a feeling that-- when the parents were leaving the courtroom, and the sentencing had been done, and both Arnold and Jessie had been-- sentenced and gotten long sentences. Was there a feeling of relief in the community? How did the community respond to that?

ABBEY BOKLAN:

Well, I knew when I sentenced Arnold that, of course, the Friedmans were very unhappy. And the victims and their families were very happy. I knew when I sentenced Jessie, that nobody was happy. The Friedmans and their friends and supporters felt it was a horrible and cruel sentence.

CONFIDENTIAL

Case 2:06-cv-03136-JS, Document 37-2, Filed 12/07/2008, Page 149 of 303, PageID #: 4545

The victim's families felt it was an extremely

lenient and merciful sentence.  So I-- I think I

felt that I made no one happy, but I felt it was

right.  And so I was comfortable.  I never had

any contact again with the families until I was

campaigning in 1992 for reelection.


And I was at a-- a fare, a street fare, in Great

Neck, you know, handing out literature, you know,

going around shaking hands.  And someone came up

to me and introduced themselves.  And-- they were

a family member-- of one of the victims-- the

parents.  And they said to me, "We're voting for

you.  You did a good job."  That was the only--

that was the only other contact, and that-- and

that was nice.  Yeah.

                    (OFF-MIKE CONVERSATION)

                    ABBEY BOKLAN:

I don't know, off the record.

                    QUESTION:

Yeah.

ABBEY BOKLAN:

You know, when he was originally brought up here
I was not optimistic in what I read. And that's
all I can say for what's been going on these
years. That's it.

QUESTION:

Yeah.

ABBEY BOKLAN:

So. But let's hope. We don't know.

(OFF-MIKE CONVERSATION)

ABBEY BOKLAN:

'Cause he was a pretty boy.

QUESTION:

Yeah.

ABBEY BOKLAN:

Prettier than Jessie. If I recall. In some ways
I was less sympathetic to him even though, you
know, I wasn't sending him away forever. I mean
he was getting out more than the (UNINTEL)
division, and more than the DA negotiated with
him for. But not a-- a tremendous amount of
time. Because I was bothered by the fact that he

CONFIDENTIAL

didn't have all of Jessie's excuses.

    QUESTION:

Right--

    (OVERTALK)

    ABBEY BOKLAN:

He had no excuse except that he wanted to join in
these fun and games in hurting all these little
children, and doing these other things to them.
I mean he-- he was an outsider, he could have
walked away with no repercussions at all.  So he
really got a great deal.

    (OVERTALK)

    QUESTION:

I think you said, if I remember what you said,
you know, Jessie, you know, you could argue that
Jessie didn't have a choice because this was the
role that (UNINTEL PHRASE).

    ABBEY BOKLAN:

That's what I said I said--

    (OVERTALK)

    QUESTION:

--family, and it looks like you've got some

CONFIDENTIAL

(UNINTEL) parents and I can't understand why you would do it. You know, and his parents did seem to be very, you know, his parents seemed to be like good people, you know. They seemed like they, you know, they were--

(OVERTALK)

ABBEY BOKLAN:

Yeah. I mean in this rich, educated, you know, community. I mean it's just-- it-- it was just shocking. Shocking. So. Anyway.

(OFF-MIKE CONVERSATION)

* * *END OF SIDE A* * *

* * *SIDE B BLANK* *.*

* * *END OF TRANSCRIPT* * *

CONFIDENTIAL

## **VOLUME 5**

Exhibit FF  February 21, 2001 Interview Statements of Fran Galasso  A-1013

Exhibit GG  March 21, 2001 Interview Statements of Scott Banks  A-1127

Exhibit HH  2001 Interview Statements of Larry Solotoff  A-1157

Exhibit II  May 18, 2001 Excerpts of Recorded Interview Statements of Detective Anthony Squeglia  A-1170

Exhibit JJ  July 27, 2001 Recorded Interview of David Zarrin  A-1296

COUNTY COURT
NASSAU COUNTY

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

               Defendant.

-------------------------------------------------------------------x

## AFFIDAVIT

ANDREW JARECKI, having been duly sworn, hereby declares that the
following is a true and accurate copy of the transcript of my conversation
with Fran Galasso.

                                        Andrew Jarecki

Sworn to Before me
this 22th of August 2014

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940768
Qualified in New York County
Commission Expires March 18, 2015

**A-1013**

HIT THE GROUND RUNNING FILMS

"FRAN GALASSO/ANTHONY SQUEGLIA

INTERVIEW WITH FRAN GALASSO

CORRESPONDENT: UNIDENTIFIED

PRODUCER: ROGEN

TAPE #97

(OFF-MIKE CONVERSATION)

QUESTION:

So anyway, thank you for sitting with us.  I

think it basically-- (SOUND GOES OUT)

QUESTION:

So-- I wanna-- basically, I wanted to talk a

little bit about-- the same stuff we talked about

last time, which is just, you know, generally-

- you have, I think, you know, a pretty good

recollection of the case and what your experience

was with it.  And I would love to know, just from

your perspective, how it-- first came to your

attention, how-- you know, there was a moment

when this case was never a part of your life.

FRAN GALASSO:

Right.  Right.

QUESTION:

And do you remember the day that it-- that it became a part of your life?

FRAN GALASSO:

I do, yeah. I don't remember the date, but-- I remember the incident. We were-- we were just busy, working in the office. Was one of the things that I-- I probably love best about the job. Just when you think-- everything is going to be dull, something gets dropped-- on your lap. You know, and it turns out to be something bigger than you ever-- than you ever thought.

What happened was one of the-- detectives from the vice squad came in to see me on a-- on this particular day. And he had a list. And-- what had happened was the previous day he had been asked to-- accompany the United States postal inspectors-- on a search warrant in a raid and-- and-- and arrest that they were making on-- Arnold Freedman (PH)-- in-- up in-- in-- on Piccadilly-- Road in Great Neck.

**A-1015**

TAPE #97

And when they went in, that was a controlled
delivery-- receipt of child pornography.  Which,
as you know, is against the law.  And the postal
inspector had been communicating-- with Arnold
on and off for a period time.  And they had-- he
had arranged to buy this particular-- or receive-
- I'm not sure if it was for money or not-- piece
of child pornography.

And the postal inspector goes, and he's dressed
as a regular FedEx guy, or postal guy.  And as
soon as you accept that delivery, you're under
arrest.  And they went in that day with a search
warrant.  And when they searched the house-- they
realized that the house-- the bottom half of the
house had been turned into a school.  And it was
a computer school.

And one of the documents that the search warrant
authorized them to pick up was this list-- any-

- any and all lists. And part of the list contained a list of what they thought might be students. They really weren't sure at that particular time.

And they told us about this. And that's how the case started. And we just basically said, "Well, what do we have?" I don't know what we have. I picked two detectives. I said, "Pick a name from the list-- and go out and-- see what you can find out. Let's-- let's talk to this person." Seemed to be-- you know, I don't remember the kid's name. But it seemed like it was a youngster's (STATIC) name, like kind of a nickname.

(OFF-MIKE CONVERSATION)

QUESTION:

I think you were saying that-- you were saying, "So what do we have here?"

FRAN GALASSO:

What do we have here? And I sent two detectives out that-- that same evening to do an interview.

**A-1017**

TAPE #97

Pick a name and do an interview. And when they
came back-- they had really hit pay dirt.


It was almost as if this young man was waiting
for them. He was a little boy about-- as I
remember, about ten or 11 years old. Had two
older brothers who had also been-- students in
the computer school at-- at a prior time. And-
- this little boy was so-- angry about what was
going on. He didn't reveal everything in that
first interview.


But what he had done was-- at that point in time,
Elaine Freedman had been operating a daycare
center-- at the same premises earlier in the
day, before the computer school. And she had
posted-- advertisements-- for that all over
town, in supermarkets and different stores. He
had gone around town ripping down all of these
advertisements, because he didn't want any
children in that house.

**A-1018**

When they went to speak with him, he gave the
detectives those advertisements. And that was-
- that was their introduction-- to the case. And
they were able to talk to him about why.


And he didn't say very much about-- sexual abuse,
other-- we gave them enough hints. He told them
that he had been touched at that point.

(OFF-MIKE CONVERSATION)

QUESTION:

So kids had taken down these--

MALE VOICE:

This little boy had taken down those posters and
advertisements and sheets. He gave them to the
two detectives. And he explained to them-- aside
from the touch-- the inappropriate touching-
- that how it had happened was, when he first
started going to computer school-- Arnold would
sit with him for long periods of time.


And then he'd say something like-- "You know

what? Would you go out to my car? In the
back seat there are some books I want you to
get." And he'd go out, he'd get the books, (DOG
BARK) bring them back. And they'd always be
pornography, some form of pornography.

It started with adult pornography, and it
gradually worked its way up to kiddy porn. Now
all kids are interesting in seeing things like
this. Kids just are at that particular age. But
what that does is that makes them very complicit
in the whole thing. And instead of viewing
themselves as victims, they now see themselves as
doing something wrong.

Because they know they're not supposed to be-
- looking at something like this. They know
if-- if their parents were to find out, maybe
they'd get yelled at or told, "You know, you--
you should know better." So it-- it's a way of
keeping them silent. And it's a way of sort of

initiating them into the whole-- process. That
was an important first step.

And what this little boy was able to do was
to identify, then, other children who were in
not only his computer class, but many other
computer classes. And it was at that point that
we were able to learn that these were classes
that went on, literally, every day of the week,
and Saturday, went on during special sessions,
during-- school vacations in the summers.

And we were able to put together-- a master list-
- of the students and their addresses. And we
went to next day to-- you know, to my boss. I
went to my boss and inspector, sat down with him,
told him what I thought-- we had. And-- probably
were gonna have a big case.

We got some extra people assigned to the squad.
Because basically, it was a small sq-- squad.

**A-1021**

We had-- couple a people come over from-- vice
who were experts in film. And-- vice and
pornography. We had people who were specially
trained come over from Juvenile Aid Bureau to
help us with that. (DOG BARK)

And we drew a big map of the whole village of
Great Neck and King's Point, and the areas where
these-- where these kids lived. Mapped it out,
sectioned it off. Divided everybody into teams,
and started sending-- detectives out to do
interviews. That's how it began.

It started about-- some time in October. And
the arrests were actually made the day before
Thanksgiving-- Thanksgiving Eve.

QUESTION:

Now the-- the-- the federal investigation, when
the postal inspectors went in and they raided the
house, that was in-- f-- that was in November. I
think that was around November third.

FRAN GALASSO:

**A-1022**

Okay.  I was gonna-- I was gonna say either late October, early November, right.  So in that period of time, we did all that work of interviewing.

QUESTION:

And how much time was there between the time that-- you knew of the-- that-- between the time that the f-- the postal inspector raided the house and the time that you went in for the second-- raid?

FRAN GALASSO:

Well, it would have been less than a month, because we did that the day before Thanksgiving.

QUESTION:

And why did it-- why was it on the day before Thanksgiving?

FRAN GALASSO:

Well, I don't think we picked the day before Thanksgiving.  That wasn't a deliberate thing. We had to wait until we had-- basically enough evidence-- both in-- in terms of statements from

children. And it takes-- it takes a while to get
these statements.

First of all-- sometimes you're dealing with very
reluctant parents. They get-- rightly, very
hysterical when they realize what-- what their
child may have been a victim of.

So the first thing you have to do is develop some
sort of a rapport and a trust with the-- with the
parent before you even-- talk to the kid. So
that-- that's the first step. There was other
evidence that had to be-- discovered. Some of
these kids had been given-- pornographic computer
disks by Arnold and Jessie. We were able to
recover that.

So basically, it was a-- it was a period of time
of-- getting statements, getting enough good
witnesses so that we felt we had-- the genesis
for a really good case. And getting enough to

get a search warrant and go in and hit the-- and hou-- hit the house a second time to see what we would find.  And then make the arrest that same day.  That's basically-- what happened.

And also, the-- the parents were becoming-- impatient.  They wanted something done immediately.  We couldn't do it immediately.  We had to wait.

We had many meetings with them where we-- we explain, "Look, you know, we-- we understand your feelings.  But you can't go marching over there." That was their plan.  They wanted to go marching over, break down the door themselves and-- accost this guy.  "What have you been doing?  What have you been involved in?"

And you-- you-- you can understand it.  I mean they were-- they were absolutely destroyed over this.  But-- you had to keep working with them

**A-1025**

and telling them, "Look, we wanna do this the
right way so that when we make these arrests,
when we go in and we do the search warrant, we're
gonna have good evidence, we're gonna have good
statements, we wanna get a conviction on this
case. Want these people to go away for a long--
long period of time."

           QUESTION:

Sure. And that was for their own good,
obviously.

           FRAN GALASSO:

It was for their own good. So basically, we
were ready to do that. I believe we went in
two o'clock in the afternoon the day before
Thanksgiving. That's how it worked.

           QUESTION:

And then tell me what that was like. How did
that-- how did that transpire? The-- going in?

           FRAN GALASSO:

Well, we had-- we had teams-- we had teams of-
- of detectives. I don't recall now exactly how

TAPE #97

many that we had.  We had good-- I'd say we had
eight-- at least eight to 12 detectives going in
that day.


We rang the doorbell.  As soon as he realized
who it was-- he wasn't gonna let us in.  So one
of the detectives broke the door down.  Because
we were-- we had a "no knock" warrant.  We were
afraid of-- destruction of evidence.  And we went
in, and-- we started looking around.

                    (BREAK IN TAPE)

                    (OFF-MIKE CONVERSATION)

                    QUESTION:

So you had a "no knock" warrant.

                    FRAN GALASSO:

We had "no wock (PH)-- knock" search warrant.
And we went into the premises at that point.
Arnold was by himself.  His wife was out--
shopping or whatever she was doing.  None of the
older children were home.  None of the children
were home.

**A-1027**

And we systematically started going through
the house, looking for the items that we were
authorized to look for, pictures, pornography,
that sort of thing-- is-- is basically-- lists
of students, records that might have been kept.
At  some point Elaine did come home-- and was
extremely uncooperative.

As a matter of fact, she tried to-- throw a punch
at me, so she wound up getting arrested-- for an
attempted assault that particular day.  There
were literally-- foot high stacks of pornography-
- in-- in plain view-- all around the house.

She claimed that she didn't see anything like
that.  But they were all around for anybody--
to see.  The computer classes had taken place
on the lower level of the house.  It was a high
ranch kind of a design.  So you'd go down about
three or four steps, and there was a-- a fairly
large-- probably in anybody else's house-- family

TAPE #97

room set up with-- (CLEARS THROAT) maybe-- 14,
16 computer stations. And that's where the kids
were sit.

There were also-- there was also quite a lot of
pornography on that level of the house. We were
able to recover that. We were able to recover--
a lot of manuals. Basically-- they were teaching
manuals, how to seduce-- young boys-- basically.
That's-- that's exactly what they were titled,
How To Seduce Boys, How To-- How To Seduce
Children.

We req-- we recovered some naked pictures of--
boys. But the-- (BACKGROUND NOISE) tops of the
heads were always cut off. So we-- we weren't
able to identify any of those kids. We walked
out with-- all of the confiscated-- all of the
computers, all the equipment.

                    (OFF-MIKE CONVERSATION)

                    FRAN GALASSO:

TAPE #97

What we found-- we found-- we found matching
disks-- and games to the games that Arnold had
given the children.  Okay, basically, they were--
masturbation games, where-- a penis would appear-
- as part of a game, sort of like a Nintendo
game.  And you could masturbate.

The idea was to get a s-- certain number of
points before you reached an orgasm.  These
were the games that were being given to seven,
eight, nine, ten year old kids.  There were also
a number of games and-- computer disks-- that-
- in cartoon form, now, so that it would be more
appealing to kids-- pictured relations between--
homosexuals, or even heterosexuals.

The purpose, if you were to go talk to somebody
who's a real expert in the field of pedophilia,
they would tell you that this, again, is a way
of-- getting the kids accustomed to dealing with
this kind of material, making them complicit so

**A-1030**

that if-- (DOG BARK) anybody finds out, they're
guilty, or they're made to feel very guilty as-
- as part of it. So it makes it less likely that
they'll-- they'll tell anybody.

And this is what the pedophile-- this is what
the abuser tells the kids. (DOG BARK) And--
to a child, this is what they told us. "Well,
Arnold and Jessie would tell us that if we told
somebody-- first of all, our parents (DOG BARK)
wouldn't believe us." Because Arnold Friedman
was an award winning-- (DOG BARK) teacher. He
was-- all over the house also that day were-
- plaques and-- (DOG BARK) newspaper articles
written about him.

He had been-- given an award, "Computer Teacher
of the Year." He also taught piano. He played
in a band. He was-- he was fairly well known in
the-- in the area. It's very hard for people
to accept-- him as a-- as a pedophile at that
particular time. Okay?

So first the kids are told, "They won't believe you. Because people will believe me. But look at what you've done. You're not supposed to be looking at these games. You're not supposed to be playing with things like this. You're not supposed to be doing the same things I'm doing to you, you're doing to your friends." Because he would encourage-- they would encourage, and sometimes-- force the children to abuse one another. (DOG BARK)

They had games that they would play. One of the games was "hide the M&M's." They would hide the M&M's in each other's-- underwear. And then-- be forced to eat it out of the underwear, with the underwear and eat it out. They were forced to-- sometimes either Jessie or his father would give the children bubble gum. And they-- and Jessie or his father would ejaculate into the gar-- into-- bubble gum and the kids would chew on the gum.

They would-- they were-- they were encouraged
to perform acts of-- oral sodomy-- with each
other.  And all the while that this was going
on, they were taped.  They were videotaped.
Unfortunately, we were not able to recover those
videotapes.  I-- (DOG BARK) believe that they
were removed between the first and the second--
search warrant.  And we were not-- we were never
able to find out what happened-- to them.

So another threat was-- "I have you doing all of
this-- on tape.  And if anything happens to me,
if I get arrested, then these tapes are going
to Channel 12 News.  And you're all going to be
on tape.  And all of your friends at school, and
your teachers, and everybody you know is gonna
see you and see what you-- did."

And if that didn't work, for good measure, they
were also told-- "If you tell-- I'll come to your

house in the middle of the night, and I'll kidnap your baby sister, or I'll kill your parents." I mean it-- to-- to kids who were eight and nine and 11 and 12, these are very credible threats. You know, they believe all of this. And why shouldn't they?

I mean here's the-- here are these people have this incredible amount of control over them-- over this long period of time. And-- and many of them felt-- wrongly, but they still felt-- that they couldn't go to their parents. Why? Well-- well, we asked them that.

We said, "Why didn't you, despite all of this-- why did you keep going to computer class every week?" "Well, because my parents made me. They didn't think it was a good idea for me to just start something and quit." Which is something all of us say (CHUCKLE) to our kids, right? "You wanna take piano lessons? That's great. But

TAPE #97

lemme tell you, you are going to do it for six
months until you decide whether you like it. You
can't just do it for two weeks and quit."

So-- they misunderstood the parent's motive
in that. And they-- they truly believed it
meant that they couldn't go to their parents.
And Arnold would use that. "They-- aren't your
parents sending you here every week? That's
because they-- they know I'm a wonderful person
and I'm a good teacher. They'll never believe
you. You'll be in more trouble. You'll be
arrested. You'll be-- ." threat-- that you could
imagine.

We didn't have children telling us that-- that
Arnold had slapped them around. But quite a
number of the kids-- reported incidents of being
slapped and having their hair pulled-- or their
arms twisted by Jessie. He was, by far, the more
violent one.

**A-1035**

TAPE #97

But anyway, to get back to that particular day,
I'm-- just to give you a little background on
it.  At some point in time, David Friedman came.
It was rather-- kind of-- kind of a-- a couple
of hours later.  And he was surprised-- by the
whole-- the whole thing, the whole scene of what
had been going on.  By this time, there were-
- there was just about every news organization
you could-- you could name had-- had arrived on
the scene.  Because, of course, they all listen
to the police radios.  And they-- they (CHUCKLE)
know when something big is going down.  They were
all there.

And he came in.  He had a duffel bag.  And--
he kept trying to come into the house.  And I
kept telling him that he couldn't, that he had
to leave, he wasn't-- wasn't allowed while we
were searching.  And finally he-- he came in for
the last time.  He bent down.  I really thought
he had a weapon in the duffel bag.  Everybody

kind of-- you know, reached for a-- a gun at one
point.

He came out.  And what he came out with was a
pair of Fruit of the Loom underwear.  White Fruit
of the Loom.  And he put it on his head.  And he
started prancing around in front of all of the
television cameras and all of the-- detectives,
flailing his arms in the air, saying, "Look
at me!  Look at me!  I'm an asshole!  I'm an
asshole!"

And at that point, we just told him, "Look,
either leave or you're under arrest."  And he
left, and-- that was the end of him for the day--
pretty much.

But that's-- that's the story of that day.  Of
course Arnold was taken into custody and--
(BACKGROUND NOISE) and arrested.  Jessie-- was
taken into custody-- and arrested.  He came home

TAPE #97

at some point. And-- they were both-- fairly

quiet. It was Elaine that was the boisterous

one. She was taken out and she was arrested. So

basically, the whole family, except for-- David

and-- and-- and one older brother--

> QUESTION:

Seth.

> FRAN GALASSO:

-- Seth, right. They were not arrested.

> QUESTION:

Yeah.

> FRAN GALASSO:

That day. And that-- that was it for that day.

(AIRPLANE IN BACKGROUND)

> QUESTION:

What was your interpretation of--

> (OFF-MIKE CONVERSATION)

> FRAN GALASSO:

Well, it-- the other items that we were looking

for-- obviously, any-- any kind of an item

that had a sexual orientation, any kind of a

**A-1038**

sexual aide-- whatsoever. We also had reason
to believe, from some of the children, that
drugs may have been involved. So we also had
authorization to search for anything drug
related. We were able to find--

> (BREAK IN TAPE)

> (OFF-MIKE CONVERSATION)

> QUESTION:

Oh, so in your sear-- you were saying you-- that
you-- you found some-- drug related--

> FRAN GALASSO:

We found-- we found-- other than the-- the-- the
obvious things that I've talked to you about,
the-- the videos, and the-- videos in terms of
the (DOG BARK) pornographic videos, not the
videos involving the children, the computer games
that were pornographic in nature-- photographs,
but always with the heads cut off. Lists,
obviously, of-- kids who had been enrolled in
these computer classes, right down to-- you know,
money lists, also. How my-- how many had paid,
how many owed.

We were able to find child sized dildos and
sexual aides.  We did find a hypodermic needle.
That wa-- that was there.  That was basically
it for drugs.  We-- we weren't able to recover
any drugs.  But there-- and-- and-- it was
just the enormous amount.  I think the most
overwhelming thing was the enormous amount of
child pornography.

   QUESTION:

And where was that?

   FRAN GALASSO:

That was the biggest thing.

   QUESTION:

Where did you-- where-- was that something-- if I
went in the house, would I have had to search for
two hours to find that?

   FRAN GALASSO:

No.  You would just have to walk into the living
room, and it'd be piled around the piano, which
was-- you know, in there, just as if you were in

my house here, you'd see it piled up.  And-- if
you pi-- if you just-- looked at it, you'd see
the pictures on the front, you'd realize, "Gee-
- I don't subscribe to this.  You know, it's
kind of an odd-- (LAUGHTER) odd thing-- (COUGH)
(CLEARS THROAT) to subscribe to."  (CLEARS
THROAT)

QUESTION:

Yeah.

FRAN GALASSO:

And then of course to-- to be told that-- by
the woman who's the-- who's the-- you know, the
person that lives in the house, the wife of this
fellow, that-- she was unaware of-- of this.
(DOG BARK) And some of it was behind a couch.


But you'd have to be somebody who never moved
the couch, never cleaned.  I mean it was not--
it wasn't hidden behind the couch.  I think they
were running out of space.  You know, so there
was-- (CHUCKLE) it was just piled up.

That she didn't know about it, that she never saw these things-- that she never looked or opened any of these books-- is-- crazy. At some point in time-- of course everybody's allowed their phone call to an attorney. And-- these people were, as well.

An attorney-- (CLEARS THROAT) showed up. I happen to know the attorney. I had-- worked with him-- before when he was a-- an assistant D.A.. And he wasn't really-- interesting in this kind of a case. He was there to see that their rights hadn't been violated that day. And-- then he-- he dropped the case. He passed it off to somebody else. It wasn't something he wanted to do.

And-- some months-- after this was all over-- I saw him at a dinner. And-- we talked a little bit. And he said to me-- "When I heard-- Elaine say that-- she didn't know any of this existed," he said, "I thought of my own wife."

He said, "I'm married 35 years. My wife knows every sock that's-- that's in my drawer." (CHUCKLE) He said, "I knew-- what we were dealing with." He-- he was overwhelmed-- by it.

She claimed-- you know, "What-- what are they arrested for? What are they being arrested for?" And we read the charges, one of which was sodomy. And she said, "Sodomy? What's sodomy?" She pretended not to know it. "Is that something you put under your hat?" That was her remark. "Is that something you put under your hat?"

QUESTION:

Now that night, obviously, was-- pretty dramatic for the family. How did you feel-- what did you learn about the family-- seeing how they reacted to that kind of situation? I mean just-- it's obviously a high pressure situation.

FRAN GALASSO:

Right.

QUESTION:

And the family didn't seem to pull together--
very well.

FRAN GALASSO:

No. There was also an additional incident
involving the other son that night, Seth. We
believe that it involved him. We have every
reason to believe. What had happened is he had--
he had-- come home, I believe. He had seen what
was going on. And he left. You know, he was-
- he was the quiet one. He kinda left, unlike
David.

We got a report later on that evening-- from a
store owner-- owner of a-- a fancy woman's shop
in Great Neck. And-- we went to interview her-
- or sent somebody to interview her. And the--
report was-- it was a glass-fronted store.

And-- she identified Seth from a photograph.
And-- said that-- he had come and exposed himself
in the-- in the window of the store-- after

he had left the house that evening.  But she
wouldn't press charges when she found out.  She
realized-- by that time, it was all over the
radio.  And she was very leery about getting
involved or having her name become involved.  So
she backed out of-- pressing charges at that
point.  So I'm telling what her story was.  Okay.

You could see that this wasn't exactly-- Fred
McMurray in "My Three Sons," right?  It's a-- I
was-- struck as this being a very dysfunctional
(CHUCKLE) family, obviously.  And would have to--
you would have to wonder-- wouldn't you?

What kind of a family situation-- you would
have that could produce-- this kind of-- crime--
involving this number of children?  Involving the
kinds of pornography that were found in the house
in full view of everybody?  What-- what might it
be like to grow up in a household like this?  I
don't know.  I can't-- even imagine-- what it
would be.

**A-1045**

But-- as time went on, we got-- we got some hints
about that from-- talking to people who are
experts in that field.  Because the investigation
didn't end at that point.  That really was-- the
arrest-- and the search of the house.


And then we went on.  (CLEARS THROAT) Because we
had litera-- literally at that point, dozens more
interviews to do.  (DOG BARK) And as we went on,
charges were-- were added.  New indictments were
brought.  More children were brought into the
grand jury-- to testify, (DOG BARK) became also
part of the case.  (DOG BARK)

        QUESTION:

And what kinds of things-- did you participate in
a bunch of the interviews yourself?  (DOG BARK)

        FRAN GALASSO:

I in-- I did in some of them.  I-- I-- tried not
to do too many of them, because time-- that's not
really what my job was.  I spent an awful lot

of time dealing with the parents and-- trying to
advise them as best as I could-- about getting
some help for their kids (DOG BARK) and where
they could turn to, and doing a lot of hand
holding with them, a lot of meetings.

They eventually formed little parents' groups.
And they met quite frequently-- after the arrests
were made.  (BACKGROUND NOISE) And then-- I think
they were a great support to one another in terms
of proceeding through the whole criminal justice-
- system.  Did a lot of meeting with school
officials in Great Neck.  (DOG BARK)  That sort
of thing.

QUESTION:

Yeah, that must have been very challenging for
them.  Did-- so the first-- child that was
interviewed (DOG BARK) was interviewed by who?

FRAN GALASSO:

By Detective Hatch and Detective Jones.

QUESTION:

**A-1047**

And-- the-- and-- and-- for you personally,
because obviously, you had to make your own
determination at some point-- at what moment
would you say you knew-- (NOISE) "Alright, this-
- you know, worse than we thought," or, "It's-
- you know, what we-- this is-- you know-- what
we didn't wanna hear," or something like that?
What moment did you know something was really up?
(DOG BARK)

             FRAN GALASSO:

Oh, I knew when those detectives came back and
told me what I related to you. I knew that
this was gonna be more than one kid. You know,
it-- it very much sounded like a whole lot of
the training that we had been put through as
detectives, is that-- what to look for in these
kinds of cases. I remember--

             QUESTION:

Tell me about-- tell me about the training.

             FRAN GALASSO:

Well, we basically went over to New York-- we did

a lot of training at the New York City-- Academy
and John Jay Academy. Also did some training
with-- Roy Hazelwood (PH) was a profiler for the
FBI, and an expert in criminal profiling and--
and this kind of behavior.

Worked with-- (DOG BARK) some of the lead
supervisors and detectives from the New York City
Sex Crimes Squads. We did a lot of the training.
And the training is a continuous kind of thing.
But when you first go into a squad like this,
you-- you go to school for a couple weeks solid--
to give you some sort of an overview.

Because for an awful lot of people-- and I know--
I had a little bit of a background because I came
from the court system, and I came from Juvenile
Aid Bureau. So I was used to seeing sex abuse--
not on this scale-- much more-- an intra-familial
kind of-- abuse, step-fathers, and people living
in (CLEARS THROAT) the house.

TAPE #97

So you get a good grounding in-- in what's
involved with a pedophile. And you get a lot-
- and you get to see a lot of cases of serial
pedophiles. And-- believe me when I tell you
that if you've seen one operate, you pretty much
have seen the-- how they operate. And you-- you
know that they're not going to stop with one
child.

So I knew that we had-- we probably had a-- a
fairly big-- case on our hands. And-- we just
had to do decide how we could proceed. You
always wanna be very careful about how you--
proceed. Because the one thing-- that you worry
about-- I know I worried about it all the time-
- is-- just charging somebody with this kind of a
crime is enough to ruin their lives.

So you wanna make sure-- that you have enough
evidence-- and that you're convinced-- that
you're making a good charge.

        QUESTION:

TAPE #97

Right.  And-- what were the steps that you went
through to satisfy your own standard-- to know
for your own s-- s-- you know, for yourself?

FRAN GALASSO:

We wanted to make sure-- well, we-- we were
lucky in that we were able to re-- recover so
much physical evidence.  And that so much of the
evidence matched what the kids had.  So we had
that.  We had the pornography that was there.

We had the kids detailing to us, and basically
telling us, "Look, I was in Tuesday afternoon's
class.  We met from three to four o'clock.  Also
in my class was-- Johnny and Joey and Adam
and this one and that one.  And here's what--
happened to each of them."  We had that recorded
in statements.

Now when you begin an investigation like this,
you wanna keep your witnesses separate.  Okay?
So in the initial pha--

(BREAK IN TAPE)

**A-1051**

Case 2:06-cv-02036-05, Document 37-3 1 Filed 12/07/23 Page 193 of 303 PageID #: 4589

(OFF-MIKE CONVERSATION)

FRAN GALASSO:

Well certainly after that first night, I wasn't
ready to go out and make an arrest. You wanna
make-- make sure you have more than that. You
wanna see how many victims potentially you have.

As the case progressed, we put these teams
together, we knew we had many. And we did
it-- quickly enough so that we were able to
corroborate. If Johnny told us such and such had
happened to Joey, Joey and Adam and-- A, B, C, D-
- the kids corroborated one another.

QUESTION:

You were saying a minute ago that you-- that one
of the things you wanna do (UNINTEL) not putting
the kids together, or--

FRAN GALASSO:

Keep them apart-- as much as possible. And
amazingly-- although the parents started to talk
to one another-- the kids would not talk to the

**A-1052**

parents. Did not want-- even after they revealed
what they had to reveal to the detectives,
they frequently wouldn't say very much to their
parents, nor would they say very much initially
to their therapists.

They didn't talk to each other about it. I don't
know if they ever really did. Because we'd ask
them that frequently. "Did you talk to so and
so?" "No." "Why?" "I don't know." You know
how kids get. "I don't know." I think it was a
source-- you know, embarrassment, and--

                    (OVERTALK)

          FRAN GALASSO:

-- Awkwardness. And also (BACKGROUND NOISE),
never quite (DOG BARK) being sure, you know, if-
- if Arnold and Jessie would come back and get
them. Because after all, they made bail, they
were out.

          QUESTION:

Right.

          FRAN GALASSO:

TAPE #97

They-- they were around.  They could see them.

QUESTION:

Other rules or instructions that you gave your detectives saying, "You're going out and getting these statements."  You know, were there-- were there procedures that you-- that you were trained in following?  And what-- what were those kinds of--

FRAN GALASSO:

Well, it-- not only are there procedures you-- you're trained in following, which is, A, you don't ask any leading cl-- a question.  You don't give the kid the answer.  You-- you wanna hear the whole story from start to finish from-- from the child.

We decided early on, because the-- the parents were such an important part of this, that we would talk first only to parents.  And we spent a lot of time doing that.

TAPE #97

So that we could win their confidence and-- and make them feel that we were really people-- who had their-- not only because we wanted to make an arrest, but we-- we truly did have their kids' best interest in-- at-- at heart. We-- we really did realize-- the emotional problems that kids like this can have down the road. So we wanted to see if we could work with them in-- in doing that.

So we would work with the parents-- first. Get their par-- permission. Obviously, no child was (DOG BARK) ever interviewed without their parents' permission. And we would-- we would go from there. So all of these interviews were always done in the evening-- which-- which also-- also created a problem for us.

You know, you were going (DOG BARK) after dinner. Get a couple of hours in. Oftentimes, you'd have to go back two, three, four times. Because the

**A-1055**

kids would tell you piece of the story and then
say-- you'd say, "Do you have more?"  "Yes."
"Will you tell me if I come back again?" "Okay."

QUESTION:

Right, so they wanted to do it pieces.  Yeah.

FRAN GALASSO:

They had to do it in piece.  It was almost too
much-- you know, for them.  And again, you just
really let them tell the story.  You don't-- you
know, you might ask, "Well, how 'bout-- Johnny?
He was in your class.  Did you see-- anything
happen to him.  Not-- not, "Isn't it true that
Arnold touched Johnny."  You don't do that.  You
know, you let the kid-- tell the story.


But aside from those safeguards, I mean I had
people looking at me, also.  You know, I had to
report every day to-- my inspector and show him
the statements.  And he had to report every day
to the chief of detectives.  And I frequently
had to report to the chief of detectives, and

frequently, to the commissioner of police.
Because these are-- such high profile cases.  And
everybody wants to be very, very careful.


And of course-- the whole time you also have a-
- the assistant district attorneys-- who, in
effect, acts as another level of supervisor.

QUESTION:

Now-- when you go to the-- when you go to a
parent with this kind of thing-- (BACKGROUND
NOISE) how would you approach the parent--
(BACKGROUND NOISE) to-- to-- you know, in-- in
a way that wouldn't just completely freak the
parent out, but would still--

(OFF-MIKE CONVERSATION)

QUESTION:

When you go to a parent with something like
this, you know-- how did you know?  You needed
to obviously go to a couple of kids first, (DOG
BARK) (UNINTEL) have something to tell the
parents.  Cuz otherwise, you go to the parents

and say, "Well, we suspect this, but we don't
know." How did you deal with the parent side of
it? (DOG BARK)

FRAN GALASSO:

Well, I can't tell you exactly how they dealt-
- how detectives Hatch and Jones dealt with
the first-- parent. They were home. They-
- I believe what they said was that they were
investigating the computer school. And they
weren't quite sure-- what it was about at that
point. Okay?

Parents gave permission. And then they were--
the parents were informed-- what had developed.
With that-- for instance, with that first case-
- (DOG BARK) both parents were attorneys, as I
remember. They shut us down completely. Allowed
no interviews with the-- with the older boys.

I went on the first initial (DOG BARK) interviews
with a couple of my detectives. And-- we

**A-1058**

explained.  We sat down with the parents-- and
told them.  At that point in time, there also had
appeared a couple of small newspaper articles
about the postal delivery-- about the arrest for
the receipt of pornography.

QUESTION:

Right.

FRAN GALASSO:

So that had spread around a little bit.

QUESTION:

Small town.

FRAN GALASSO:

Small town.  People-- lotta people knew about it.
Parents were very upset.  Obviously.  Very upsets
to hear that there was actual abuse going on,
and that their child might be a-- a victim.  And
what we'd say is, "Well, I don't know.  But-- you
know, we'd like to talk to them.  We'd like to
find out.  We'll tell you everything-- that they-
- that they say.  And if there's a problem, you
know, you wanna get them some help."

And we would also tell-- the children.  One
of the biggest things we would do is tell the
children, "We're gonna sit down, you and I,
together now.  And we're gonna-- we're gonna tell
Mom and Dad what happened.  Because Mom and Dad
need to be able to get you some help.  You're not
gonna be in trouble with them.  They're not going
to be angry."

And we-- we would explain this part of it with
the parents, too.  How these kids were seduced.
The fear that was used to keep them-- in this
system.  And that-- that had to be the worst--
part of it.

These kids were under-- enormous-- s-- you know,
just enormous stress living under this, and being
afraid all the time that somebody was going to
find out.  We--

QUESTION:

TAPE #97

What were some of the manifestations of that kind
of stress that the kids were under?        FRAN
GALASSO:

Well, we had one boy who was about-- (SIGH) 11
or 12 years old-- who began to lose all his hair.
And his parents didn't know why. (BACKGROUND
NOISE) You know, they brought him to a doctor.
They-- they (DOG BARK) tested him for everything.
(DOG BARK)  And they couldn't figure out why this
kid (DOG BARK), at 12 years old, was losing his
hair.  (DOG BARK) And he wasn't pulling it out.
His hair was falling out.

We had numerous (DOG BARK) kids who had-- changes
in their grades (DOG BARK) at school, which is a-
- typical symptom, you know, that-- that-- social
workers will tell you to look for.  Kids who
have-- (DOG BARK) were A students, all of sudden
(DOG BARK) their-- their grades are dropping.
(DOG BARK)

**A-1061**

TAPE #97

We had kids who reverted back to soiling their--
their underwear, having bathroom accidents. That
sort of thing.

                QUESTION:

Yeah.

                FRAN GALASSO:

A lot of that.

                QUESTION:

Wasn't there one-- I think there was one kid
who-- reported having-- blood in his underwear,
something like that.

                FRAN GALASSO:

Yes.

                QUESTION:

Tell me about that one.

                FRAN GALASSO:

That little boy-- he was the-- he was one of the
youngest kids. He was seven years old. And he
was forced into anal sodomy. So he had blood in
his-- in his underwear. He was afraid to tell
his mother and father.

So he-- took the underwear-- he told us he hid
it. And we-- he couldn't remember where he put
it, and whether he'd put it in the garbage. (DOG
BARK) It was never found. His-- his mother, I
don't think, found it.

And-- (DOG BARK) he told his dog. He told his
dog, Hershey, (DOG BARK) what was-- what was
happening. Because that was the only one he
could talk to. (DOG BARK) Before he talked to
the-- the detectives in the case.

So these-- you know, you have real-- I mean
you're a parent, I'm a parent. You have to-- put
yourself in-- in the-- shoes of these parents--
to-- to even imagine how you would feel-- knowing
that-- you-- every week are bringing your kid--
voluntarily to this kind of an environment.

And maybe even your kid is one of the ones who
said, "You know what, Dad? I don't wanna come

here."  "Oh no, you can't quit.  You gotta-

- finish it out."  Think of how you would feel

when you find out what was really going on there.

I mean the guilt must be-- just-- you know,

unimaginable.


I mean I-- I just can't tell you how bad you end

up feeling for the parents as well as the kids.

You know.

                    QUESTION:

Did-- the first kid that you went to, the parents

were law-- the-- that kid's parents were lawyers?

How did you get-- penetrate the parents to get

the first statement out of the little kid?

                    FRAN GALASSO:

You would really have to be talking to either

Detective Hatch or Detective Jones.

                    QUESTION:

Yeah.

                    FRAN GALASSO:

I mean I-- I think part of it was that the

parents weren't sure what they were there for.
They weren't-- sure whether this guy had been
involved in some sort of a fraud, where there
was-- there could have been a health violation.
I mean it could have been a-- a number of things.

They allowed the interview.  And then when they
found out what it was, they-- they just felt that
they-- they didn't want their kid testifying in
court.  They didn't want any part of it.

They-- they felt they wanted to deal with it
privately, get a hold of a therapist, and-- deal
with it that-- many parents did that.  They were-
- they weren't the only ones.

QUESTION:
Were there other parents who said, "Well, this
happened, but I don't wanna come forward, or I
don't wanna be a part of it?"

FRAN GALASSO:
Yes.  There was-- there were many that did that.

QUESTION:

**A-1065**

TAPE #97

How-- what do you-- what-- in terms of the scope
of the-- case, you know, how many kids do you
think were involved?  How many parents that-- you
know. (DOG BARK)

        FRAN GALASSO:

Well, we-- we investigated-- (SIGH) only the
kids that were contemporaneous with-- with that
particular time, basically.  So we're ta-- I
don't know how many kids now.  And-- there were
maybe-- anywhere from-- eight to-- (DOG BARK) 14
and (DOOR CREAKS) 15 kids in a class every day of
the week, and Saturday, and vacation.


But some of the kids-- went more than once a
week.  So multiply that out-- and you get a
figure.  We went back maybe the year or two
before that to a couple of classes that we pieced
together.  But basically-- these--

        (OFF-MIKE CONVERSATION)

        (BREAK IN TAPE)

          * *(END OF SIDE A)* * *

          * * *(SIDE B BLANK)* * *

**A-1066**

TAPE #97

* * *(END OF TRANSCRIPT)* * *

HIT THE GROUND RUNNING FILMS

"FRAN GALASSO / ANTHONY SQUEGLIA"

INTERVIEW WITH:  FRAN GALASSO

CORRESPONDENT:  (NOT IDENTIFIED)

PRODUCER:  ROGEN

TAPE #98


**TRANSCRIBER'S NOTE:  DOG BARKING IN BACKGROUND THROUGHOUT MUCH OF
INTERVIEW.  NOTED WHERE IT'S PARTICULARLY LOUD.**

(OFF-MIC CONVERSATION)

QUESTION:

(DOG BARKING)  Maybe-- just-- one thing that we-
- that we didn't cover very clearly is, what
do you think-- what-- how did Jesse (PH) get
involved in what Arnold (PH) was doing based on
your-- recollection?  How did this all kind of
get rolling on (PH) the computer school and how
did Jesse get brought into it?  And what was his
role?

FRAN GALASSO:

Okay.  Well, I'm not sure how it all got-- I

Document1

**A-1068**

TAPE #98

can give you a pretty good guess. From Jesse's
words and from what we can piece together from
knowledge of pedophiles and pedophilia-- what we
believed happened is that Arnold was engaged in
abusing his own children.

He had a preference for pre-adolescent boys.
Doesn't mean that he wouldn't abuse somebody
else. But that was clearly his preference, just
as your preference might be for women with blonde
hair. Doesn't mean you wouldn't go out with a
redhead. But-- that's-- that's just the way that
it operates.

The computer school basically started when Jesse
reached puberty. Jesse became an aide in the
computer classes after school. He wasn't the
only one, by the way. He involved some of his
friends, one of whom also got arrested as a
result of-- of this case. Many more, we believe
were involved, but did not get arrested because

they were not able to be identified and because
of the number of years that had-- had gone on.
The children were able to pick them out-- of
lineups and yearbooks and things of that nature.

And those who were, we did have people who were,
and-- and their parents wouldn't allow them to
proceed. So we weren't able to use them. Or we
probably would've had at least two more arrests
in this case I would say-- at least, I think.

                    QUESTION:
And how-- now how did-- and how did Jesse's role
in the computer school evolve as you-- as you say
(PH).

                    FRAN GALASSO:
He became a-- an aide to his father. So he
became involved in the abuse of these children as
well. And we believe he was well schooled. He'd
been abused himself. And he just continued. The
exception being that he was by far more violent.
He was the one that they all said would do most

**A-1070**

TAPE #98

of the threatening, would do the arm-twisting,
would do the slapping, that sort of thing.

    QUESTION:

And at one I think they even talked about-- kids
being--

    (OFF-MIC CONVERSATION)

    QUESTION:

At one point-- there was a-- a description of-
- one of the kids get-- getting his head smashed
against the wall or something like that.  Do you
remember that?

    FRAN GALASSO:

I remember several of the kids reporting things
of that nature.  So I'm not sure which-- you know
which incident you're referring to.  (BARKING)
Many-- many said that they were pushed or shoved,
or had their arms twisted and hair pulled and you
know those kinds of activities, when they weren't
cooperating, when they held back a little bit.
(BARKING)  There were several children who were
singled out for what we believe was even worse
abuse.

**A-1071**

Case 2:06-cv-02036-05, Document 37-3 1 Filed 02/07/2083 Page 213 of 303 PageID #: 4609

Because they were singled out and brought to
rooms upstairs in the house by Jesse.  And we
think the abuse to them was probably worse.  One
was a little boy that I told you about-- who when
he would describe some of what happened to him
and to-- (BARKING) and to his friends-- would
throw himself against the wall.  Just-- (BARKING)
he'd literally be beating himself up as he--
as he was describing the events.  He was one of
those kids.

QUESTION:

And-- and the-- well how (BARKING) would you
describe-- based on the-- the testimony that you
were able to read or hear, what would you say
happened in a typical class?  What went on that
was inappropriate in a typical class?

FRAN GALASSO:

We'd often ask the kids to describe a typical
class to us.  And they-- and they would almost
always mirror one another.  They'd start out

**A-1072**

doing computer work, taking out some work or whatever it that they (BARKING) were teaching kids on computers in those days. I don't even know what it was-- mostly games, I would susp-- I would suspect.

And then the magazines would be distributed (BARKING) or the pornographic games would be distributed where Arnold or Jesse or both would walk up to various children, would sit down. If you were going to be the first one abused on a pit-- on a particular day, he would pull up a chair and sit next to you.

Maybe it would start with his arm around your shoulder or on your leg, and gradually move it up, touching private parts. Maybe he'd ask you to get up. He'd unzipper. He'd ask for oral sex. We'd (PH) per-- perform oma-- oral sex on the kids. It just-- it was just generally a free for all. Because it was-- everybody could--

could see what was-- what was going on.  And very

often they would participate in these-- these

sort of mass games in-- in the classroom.

        QUESTION:

Yeah.  Next question-- the videotapes-- this was

videotaped-- the kids talked about that.  You

talk about what--

           (OVERTALK)

        FRAN GALASSO:

Jesse did, too.

        QUESTION:

--right.

        FRAN GALASSO:

Jesse talked about it.  (BARKING)

        QUESTION:

Can you talk a little bit about-- about what

happened?  Because they've never found--

        FRAN GALASSO:

You want me to let him-- you want to let him in?

Would that help you?

          (OFF-MIC CONVERSATION)

        QUESTION:

TAPE #98

But can we talk about the videotapes and what you
think happened--

MALE VOICE:

Oh yeah, how did you find out that there were
videotapes happening?  And then-- and then what
efforts-- obviously you know it was hard to find
the videotapes.

FRAN GALASSO:

All the children-- virtually every single one
that-- that (BARKING) detailed any kind of abuse
at all-- told us they were videotaped, two (PH)
a child.  So (BARKING) you know at the beginning
you're either thinking, "Well there's nothing
in the camera and it's just another way of
frightening the children."

But these are valuable to pedophiles.  These are
very valuable tapes.  So it didn't make sense
that there wouldn't be anything in the-- in the-
- in the videotape recorder.  (BARKING)  And then
of course later Jesse admitted that there were
tapes.

**A-1075**

Case 2:06-cv-03036-05, Document 37-3 1 Filed 12/07/2008 Page 217 of 303 PageID #: 4613

And the other person that we arrested, Ross

Goldstein (PH), told us about-- about them.  So

there a great-- there were a great many witnesses

telling us about the videotapes.  And what was

videotape was what was ever going on on that

particular day.  That's basically what it was.

QUESTION:

And none were ever found.

FRAN GALASSO:

None were ever found.  None were ever found.

QUESTION:

Do you have a theory on that?

FRAN GALASSO:

Oh yeah.  I think they were removed-- not found

in the first search.  Who knows, they may have

been in the back of a closet somewhere, stored

behind a-- a fake wall.  I don't know.  And then

later on we were told by-- by people who work in-

- not postal, but-- other federal agents who deal

in child pornography back and forth that-- that a

**A-1076**

TAPE #98

master copy of that sort of abuse might be worth $50,000. One-- one videotape. So, no. We-- we could potentially be talking (LAUGHTER) about hundreds that were made here.

QUESTION:

And did you-- after that case and for the years after that that you were working in the police department, did you continue to look for 'em?

FRAN GALASSO:

I looked all the time. We put notices in police magazines-- teletypes that went out to different agencies. Every time we heard or read about a big case being broken anywhere in the area I would send detectives to view the tapes. I had basically sent out a description of-- of what other investigators could look-- look for-- what the room looked-- looked like, descriptions of the kids, the ages, the kind of paneling that they might find in the room. But nothing ever materialized.

QUESTION:

Case 2:06-cv-03049S, Document 37-3 1 Filed 02/07/2803 Page 219 of 803 PageID #: 4615

At one point there's some discussion that Jesse went-- went-- before Jesse-- pled, he went to visit his father in jail, and-- and supposedly tried to get some of this material or something. I don't know if you're-- if you're-- if you know about that.

FRAN GALASSO:

I don't know whether-- whether he just went to visit him, to get the-- I was very adamant with-- with Jesse's attorney. I did not want-- this plea bargain to-- to take place. I thought that we would be very successful at trial. I was not worried about damaging the children psychologically, bringing them to trial. Because there is a great body of evidence that suggests that it's actually therapeutic for the kids to go to trial, that they-- they finally get to get up there, tell what happened, and point to the people that did it, and say that, "Those are the guys."

TAPE #98

And now they're going to see them get punished
as a result of that. Plus, they were already
in therapy. Many of the parents wanted to go to
trial, and had been very supportive of that. But
it-- it-- it became increasingly apparent that-
- that a plea was going to (BARKING) be taken on
this case.

I at least wanted to recover the tapes, the
master tapes-- not that there wouldn't be other
copies out there, but I wanted to be able to say
to the parents, "Look, we got them. You know
here they are. We're going to destroy them."
And I-- I thought that would've brought them some
measure of-- of comfort. And-- I had it-- also-
- another motive in the back of my mind. I--
I thought that recovering some of these tapes
might bring us to another ring of pedophiles,
the people who would buy or-- or send for these
tapes.

QUESTION:

Right.

**A-1079**

### FRAN GALASSO:

So I wanted very much to make that a part of the plea bargaining agreement, that he had to come up with those tapes. But I think what happened was-- he just sort of made a luke warm attempt, if any, to retrieve some of these things. We never really got any information about who might have gotten them.

I-- I believe to this day that he knows-- that Jesse knows. That he-- he was involved in-- in literally everything that his father did. And I believe that-- there may have been behind the scenes there some sort of a loose video club exchange-- these things. And that he-- he may have known who the members were.

### QUESTION:

(UNINTEL).

### FRAN GALASSO:

They had a post office box. We watched that for awhile. Everything stopped at that point and

**A-1080**

TAPE #98

time. So I think there was enough hints that
there might have been something like that going
on.

QUESTION:

Now-- tell me-- you mentioned Ross Goldstein.
How did Ross get involved? Or how did you find
out about Ross? And then tell me how you fo--
found him and picked him up.

FRAN GALASSO:

Well what happened was, we-- we heard from the
kids that we interviewed that there were other
people involved, that-- Jesse wasn't the only
helper that his father had. There were another
of other peo--

(BREAK IN TAPE)

QUESTION:

(BARKING) We were talking about Ross and how--
you were saying the kids had (CLEARS THROAT) said
there were other people involved. And then how
did you figure out Ross was--

FRAN GALASSO:

**A-1081**

Case 2:06-cv-02036-05, Document 372-3 Filed 02/07/2008 Page 223 of 303 PageID #: 4619

That it was Ross Goldstein? (BARKING) One or
two of the kids knew his name was Ross. They
knew Ross. They knew that name. (BARKING) Now
he hadn't been involved recently. They'd been
going back, let's say a year prior towards (PH)
discovery of the whole case. And how it was that
he had dropped out of the whole thing, (BARKING)
I'm not really sure.

I don't remember now at the time. So what we
did was we got a bunch of-- Great Neck (PH) High
School yearbooks. And we had some of the kids
go through them separately. And (UNINTEL) would
say, "That's him. That's the guy." (BARKING)
So that's how we found about Ross Goldstein and
the other people involved. There were other
people.

QUESTION:

And what was Ross like? What kind of person
was he? And (BARKING) could people sort of say
like, "Oh, he was-- he was-- he was kind of

**A-1082**

TAPE #98

different than they were?  He went to a special
school," or something like that?

　　　　FRAN GALASSO:

I don't recall if he went to a special school.
(BARKING)  Jesse did.  Jesse went to an
alternative school that Great Neck has-- which
I get the feeling is for kids who either have
different learning problems with some emotional-
- mostly emotional problems.  I don't recall if
Ross went there or not.


I-- I really don't remember that.  He lived
really just a few doors away from Jesse.  They
were friends.  They-- were involved in some music
together-- listening to music and-- and that sort
of thing.  And Ross and some of these other kids-
- other-- potential perpetrators-- were involved
in a band as well.


That's how we initially found out about them
also-- linked them together through this band.

**A-1083**

TAPE #98

We brought Ross and a couple of the other people in. And we spoke to them very extensively. (BARKING) Ross's mother came in and spoke to me, and broke down and cried. Ross hadn't admitted anything at that point. But she came in and spoke to me and broke down and cried.

And she said, (BARKING) "I-- I knew there was something going on with my son. I didn't want him involved with Jesse." Of course by now the story (BARKING) had broken. She knew what Jesse was involved in. She-- she kinda secretly feared that-- that he might know something or-- or be involved in some way. And this was in essence confirming it.

They retained counsel for him. And-- (DOOR OPENING) he and his counsel and his parents made a decision-- to cooperate with us, to fill in whatever blanks we had left in the-- in the story about who-- how the whole thing operated.

TAPE #98

And that's what happened. And again, we took
precautions with him. We had by this time of
course had numerous photographs of the children
that we had.

So-- we showed him some-- some of the kids.
He was able to name by name-- first and last
name-- every one of these kids. He was able to
reconstruct the classes that they were in, so
it was obvious that he had-- you know a very
intimate knowledge of-- of what went on.

QUESTION:

The photographs that you showed him were
photographs that were taken later, or
photographs--

FRAN GALASSO:

We took--

QUESTION:

-- that were-- that-- the police took.

FRAN GALASSO:

We took-- or-- or were given to us by the

**A-1085**

parents-- school photographs, that thinking
thing.

QUESTION:

Right. And what was his story? Ross said, "Yes,
I was involved"? Or that--

FRAN GALASSO:

Ross basically confirmed-- just about everything
that the-- that the children told us, class by
class. He was involved with Jesse. He was a-
- he was a friend-- a friend of Jesse. They did
some drugs together. That was initially how he
got involved in this. There was some amount
of-- as I recall-- some amount of a homosexual
overtone to the whole thing also.

QUESTION:

One of the things that-- you know I-- I know
that there was this letter, the famous letter
that Arnold Friedman (PH) wrote to the-- the
open letter to the community center-- what really
happened-- which never got published anywhere.
He couldn't get any-- you know any (UNINTEL).

Case 2:06-cv-02036-JS Document 37-8 Filed 12/07/08 Page 228 of 303 PageID #: 4624

One of the things that I-- I'm trying to get a
copy of the letter-- but one of the things that
I-- I understand it said was that he had never
met Ross Goldstein in his life. And even to this
day, he was in prison, he'd still never met him.
What-- what was his-- did Ross Goldstein talk
about Arnold?

FRAN GALASSO:

Yeah. Sure. Ross talked a lot about Arnold.
We-- I don't-- I don't know that we ever talked
to Arnold about Ross, though. Arnold-- we know-
- had an attorney obviously from the beginning-
- never would speak with us, nor to Jesse. Okay,
first time I actually ever heard Jesse speak was
on the Geraldo Rivera interview that he did with
him. We did do an interview with Arnold post
conviction. But I don't recall mentioning-- Ross
Goldstein or his mentioning Ross Goldstein. That
wasn't the purpose of the interview.

QUESTION:

But presumably, he must have met him at--

(OVERTALK)

**A-1087**

FRAN GALASSO:

Oh absolutely he met him. Sure. Absolutely.
They were there together on-- you know-- (COUGHS)
dozens and dozens of occasions.

QUESTION:

The-- getting back to the issue of-- Ross's role-
- in the investigation-- Ross became a pretty
important witness--

FRAN GALASSO:

Right.

QUESTION:

--presumably. Tell me-- tell me a little bit
about that.

FRAN GALASSO:

Well, in essence it's always good. You
know you have to realize at that point I'm
thinking, "Trial." Okay, I'm thinking, "We want
to get everything that we can possibly get if we
go to trial." So Ross becomes a valuable witness
if that becomes the case.

Because-- you know that-- defense attorneys are going to try to do what they can to destroy the children's credibility as much as they can, and the police credibility if they can. So they have this extra person who's actually an adult witness now to it, corroborate not only the children but your whole investigation basically.

He's-- he's also able to say, "Yeah, I would help set up the-- pornographic-- you know give out the pornographic-- games to the kids." He was able to describe all of that. So-- I felt that it just made-- made the case that much stronger. An already strong case-- I thought we had an already very strong case-- made it that much stronger.

QUESTION:

Why do you think the case didn't go to trial?

FRAN GALASSO:

Let's cut this off for second.

QUESTION:

Okay.

FRAN GALASSO:

TAPE #98

Okay?

QUESTION:

Or you know-- or you know what?  Let's leave--

(BREAK IN TAPE)

QUESTION:

So what-- yeah, so what-- what stopped the case
from going to trial?

FRAN GALASSO:

Well, I think-- I think-- basically there was
a disagreement between-- how the-- how the DA
felt this case should proceed, and how the police
department felt the case should-- proceed.  And
the DA felt that he had a conviction in his
pocket.  He had already convicted the father.  He
had a plea on his son.  And the agreement was for
a minimum of six, maximum 18 year sentence.

He felt that, "Well, we'd be sparing the kids
the-- the trauma of testifying ultimately.  That
would be good.  And we'd be sparing ourselves
lots of res-- court re-- resources-- money-- you

**A-1090**

know you j-- you just don't go up there with
the kids and the witnesses. You also bring in
expert testimony from child psychologists, from
people who work in these particular field. It's-
- becomes quite involved."

We felt-- very strongly in the opposite
direction. We thought it would be good for the
kids to testify. We had kids and parents ready,
willing, and able to testify. I think that we
would've gotten a conviction in this case. It
was a very very strong case, unusually strong.
Normally you don't have physical evidence. Like
we didn't have physical evidence in terms of the-
- the children-- damage to actual physique of
the-- of the child-- organs of the child. But
you normally don't walk into a case like this
with piles of pornography, with videos, with
witnesses who've witnesses these events-- are
normally done in great privacy. Right? That
wasn't the case here.

TAPE #98

So we felt that we would be successful with
the case. And that instead of the six to 18-
- we could've gotten for Jesse a minimum of 25
to life, which-- I think all of us who were
involved-- all of the police department people
who worked on this case, and worked very-- let
me tell you very hard on this case-- we all came
away. And this-- this was our basic fear.

We weren't so much worried about Arnold, because
he was older when he even went to prison. And
he wasn't the violent person. Our concern was
with Jesse. And we felt, "You know what? He'll
probably do more than six years." And as you
know he has. He's done what-- 10, 11, 12 years?
Okay-- almost 12 years. But he will come out.
And when he comes out, he's going to be that much
more violent.

And he's always going to know the way he got
caught the first time was that somebody told.

TAPE #98

And we all felt that he's capable-- he could be
very easily capable of murdering a child, that
the next child that's abused may not be so lucky
to live to tell.  And we all know that people
become more violent in-- in jail.


I don't know if he's ever participated in-- in
any kind of rehabilitation or-- psychological
counseling.  The rate of recidivism on these
people is very very high.  Most of these programs
have not been successful.  So--

     (OFF-MIC CONVERSATION)

     QUESTION:

So you were saying, you want to see him put away.

     FRAN GALASSO:

Yeah, we thought we had-- we had an excellent
chance-- as good as it gets-- for sending him
away for pretty much the rest of his life.  And-
- and protecting an awful lot of youngsters-- in
the future.  You know and--

     QUESTION:

**A-1093**

Case 2:06-cv-03136-JS  Document 37-3  Filed 12/07/20  Page 235 of 303 PageID #: 4631

Case 20-3793, Document 37-2, 11/30/2020, 2983379, Page1085 of 1960

Okay. Speaking of-- of which, the-- obviously
there's this on-going relationship with the-
- with David (PH). How did you find out about
David's line of work, for example? How did that
start to-- (PHONE RING)

(OFF-MIC CONVERSATION)

QUESTION:

Yeah, you were-- I'm sorry. You were saying at
some point you learned what-- David did for a
living.

FRAN GALASSO:

We learned that-- David was a clown-- a--
a child's entertainer and went by the name
of "Silly Billy." And-- at that time I believe
he was pretty much headquartered in the South
Street Seaport-- area. And we did conduct a
general investigation.

He had no arrest record. But we did not have-
- reports of his having participated with his
father and Jesse at-- with those children that we

investigated. We didn't have that. We were-- we were suspicious because of his background. We became more suspicious after Jesse admitted about the abuse in his own household, just knowing the kinds of backgrounds of-- of how people become pedophiles. But we didn't have an actual complaint.

QUESTION:

And how did you react when you found out, "Oh this guy is you know, entertaining children for a living"? What was your response to that?

FRAN GALASSO:

Well it was-- not surprising. (NOISE) Given-- given the circumstances it's not surprising. I would suspect that there's a problem in that family. And-- if-- if-- and I can't accuse David of being a pedophile, because I don't know for sure. But if he is, then it would be very logical-- that he would need to have constant access to children. What better way.

QUESTION:

Than?

TAPE #98

FRAN GALASSO:

Than being a child's entertainer and having children around him constantly.

QUESTION:

Yeah. The-- if you were sort of still on the job now, would you feel like this is something I want to keep my eye on? Or--

FRAN GALASSO:

Yes. I'd be keeping my eye on him. Jeff (PH), now you have to realize that pedophiles can go for years before they're caught. Arnold-- I-- I don't recall exactly how old-- he was in his 50s when-- when he got arrested, when we arrested him. Had never been arrested. Had been abusing children since his own adolescence. And he told us that. He was never caught all those years.

QUESTION:

And how did you learn that?

FRAN GALASSO:

He told us.

QUESTION:

In the-- Q-- in the Q & A or something?

TAPE #98

FRAN GALASSO:

He did-- we did a Q & A after everything was
over, just before he went-- to prison.  Our
agreement was we wouldn't charge him any-- with
any further crimes if we discovered any-- if he
would agree to give us a Q & A and detail all
of the children-- as many as he could remember--
that he had abused, so that we could approach the
parents of these children and see about getting
them some help.


So he-- he told us that since he was 13 or 14
years old when he had been abused-- he told us
that he had been abused by an older male at that
age-- and subsequently that-- that sort of fueled
his interest.  And-- and he began abusing younger
children from that point on.

        QUESTION:

And did it on many--

        FRAN GALASSO:

That--

        QUESTION:

**A-1097**

TAPE #98

-- occasions-- whenever he got the chance.

          FRAN GALASSO:

Whenever he got the chance-- not only in the computer school, but-- in people's homes. Because I think I mentioned to you-- gave piano lessons. Sometimes he would to somebody's home, sit next to the kid at the piano. The parent would maybe go to the store to pick something up. And he's sodomize the child while the child was taking a piano lesson.

          QUESTION:

(UNINTEL).

          FRAN GALASSO:

And so he missed no opportunity.

          QUESTION:

I mean everybody's kids go to piano lessons--

          FRAN GALASSO:

Right.

          QUESTION:

--so everybody's--

          (OVERTALK)

          FRAN GALASSO:

TAPE #98

Right.  (LAUGHTER)  Piano lessons--

> QUESTION:

--right--

> FRAN GALASSO:

-- computer schools--

> QUESTION:

I want my kid to be given piano lessons--

> FRAN GALASSO:

Right.

> QUESTION:

--by a crippled old woman.

> FRAN GALASSO:

Right.  (LAUGHTER)  How many tim-- I mean think
about it, I mean I have done that.  I have-
- I've-- I've had from time to time a tutor or
whatever for my child.  And I said, would you
mind if I just run and-- I have to pick up a loaf
of bread or-- or whatever it-- it--

> QUESTION:

Yeah.

> FRAN GALASSO:

TAPE #98

-- might be.  You know we all do these things.
And-- the horrible-- you see the worst part of
this is-- that it makes you realize that your kid
could be a victim.  I mean all of us-- you know
you-- you get this very protected feeling.  And
I-- I think this was a big part of the problem
with the parents in Great Neck.

Basically is a very very affluent community.
Most of these people could give their kids the
best of everything.  And that's not saying that
they didn't love their kids, or they didn't spend
time with their kids.  They did all of the right
things.  And they still couldn't protect their
kids.  No.  And-- and if you work in this field
for a long time, if you're a psychologist or
you're a police officer, and-- and this is all
you see, you begin to realize that-- you know
that also.

I-- I can remember being so frustrated one day

Case 2:06-cv-03136-JS Document 37-3 Filed 12/07/20 Page 242 of 303 PageID #: 4638
Case 2:20-cv-03079, Document 37-3 11/30/2020, 2983589, Page 1 of 303 PageID

coming home. And I-- I said to my son who was
maybe-- oh, he was in high school at the time--
I said to him, "John (PH), you gotta tell me, if
you were one of these kids in Great Neck, would
you come home and tell me? Would you tell me if
this was happening?"

Because I just had to figure out what goes on
in a kid's mind, you know, if they're-- they're
living with you as a parent. You're protecting
them. You're doing everything for them. How is
it anybody else could get in and get in the way
of that relationship in-- in this kind of way?
And you know what he said to me? "Probably not."
(BARKING)

And I said, "Why? Why wouldn't you? Would
you think that I would get you in a lot of
trouble? That I would hate you? That I would
think that you were evil? What-- what is it?"
He said, "Nah," he said, "I don't think that.

TAPE #98

But you know what? I wouldn't want to rat on
my friends. And I-- and I know if I told you
I'd be--" and this-- he knew what the case what
about. He said, "I know it'd become a big thing
and everybody'd be involved." And he said, "And
I'd be ratting on all my friends. Well I guess
maybe that's the-- how kids look at it.

QUESTION:

The-- do you have any thought about sort of
David's motivation in all these stuff? Or how
David-- he dealt with the evening (PH) in a crazy
way obviously, very unusual.

FRAN GALASSO:

Oh yeah.

QUESTION:

And even now he's sort of playing games. You
know he's helping Jesse, tried to prove his
innocence now. But he really hasn't been helping
him much for the last 12 years. I mean what-- do
you have any thoughts about--

FRAN GALASSO:

**A-1102**

Well, Jesse's already admitted to everything.
So it's pretty hard to establish any kind of
innocence at this point. What is going through
David's mi-- what is he-- what is he? Well I
think when you put these people under pressure,
they crack a little bit. Their-- their behavior
is-- is a little bit irrational.

You know they don't act like normal people. You-
- they're-- they're-- suspicious. They're angry.
They're not capable of forming good solid close
relationships with-- with other people. You may
know some of these-- you know these are some of
the things you look-- you look for.

            QUESTION:
Is it a surprise to you for example that David's
not-- doesn't have a relationship, isn't married-
-

            FRAN GALASSO:
No.

            QUESTION:
Tell me--

(OVERTALK)

FRAN GALASSO:

No.

QUESTION:

-- just some-- tell me--

FRAN GALASSO:

Oh, it'd be very hard for somebody like that to
establish-- a close personal relationship I think
with either one man or-- or one woman.  There are
too many secrets here.  There's too much violence
that's gone on in-- in the background.  It's
probably better that-- that that's the way it is.
(BARKING)  You know you have to-- on some level
you have to feel very sorry for somebody like
that, too.  Because it can't ever-- and I won't
ever believe he's a very happy person.

QUESTION:

Yeah.  He must-- that must be-- do you think
that's a big burden for him?

FRAN GALASSO:

I think there must be moments when he has

to admit to himself, you know when he's all
by himself, somewhere in his mind he knows
everything that went on. He was probably a
witness to some of it. He knows what his own
childhood was like. He knows what his brother
has said. He knows what his father has said.
There's-- there aren't any secrets as-- as far as
that goes.

And then on another level, I think you have--
you have this great sense of denial. Because
I think if you-- if you didn't deny it on some
level you would-- you would go crazy. I think
we spoke earlier about you know the kind of-- if
you have to rank criminals, obviously even-- even
criminals rank child abusers as-- (LAUGHTER) at
the very lowest rung.

They even hate those people. So now if you-- and
you think about the things that I've told you-
- what these people have done to little helpless

TAPE #98

children. And now think that your own father
could do this? I mean that would be a very hard
thing I think to-- to accept. Think of how your
own children look at you. Do you think that
you would ever want them to view you in this--
in this light. And I-- I think on-- on another
level, you know when a-- a very conscious level,
that he can't do that.

QUESTION:

Did-- did-- in the Q & A-- (BARKING) tell me
what-- Arnold said about-- about David. And his-
- you know--

FRAN GALASSO:

He didn't say much about his other son. He tried
to keep them out of it. (BARKING)

QUESTION:

But at least he told you--

FRAN GALASSO:

Right. We knew about the abuse. And we knew
that it-- that-- the abuse of the other-- at
least this computer school was started at the-

**A-1106**

TAPE #98

- basically at the beginning of-- of Jesse's-- adolescence. But-- we believe that-- that he was involved. And well we know he was involved in abusing children before that.

And he had-- he had the-- the access to children that he taught (BARKING) at Bayside High School. He had-- he had the music lessons-- that he gave. The family had a-- a house-- which I understand was in a rather secluded-- area out east-- somewhere in the North Fork, I believe, of the Island.

We know that large-- groups of children would-- were brought there for weekends. But we don't-- we know that they were shown films. We had a lot of information that they were shown films. We don't know the-- content of the-- of-- of those films.

QUESTION:

But at some point-- along the lines of, "Why is

**A-1107**

this guy so angry?" At some point Arnold did say
that he had molested his own--

FRAN GALASSO:

Right.

QUESTION:

--of-- of his own kids--

(OVERTALK)

FRAN GALASSO:

I-- I believe--

QUESTION:

-- like-- like--

FRAN GALASSO:

--Jesse said that-- also. And-- didn't he say
that in the--

QUESTION:

No, he said it about himself.

FRAN GALASSO:

Oh, so that-- he didn't mention the brothers?
Didn't he say--

QUESTION:

-- remember all that--

FRAN GALASSO:

**A-1108**

--we bruisers (PH)?  Okay.

QUESTION:

Yeah.

FRAN GALASSO:

Alright.

QUESTION:

But--

FRAN GALASSO:

Right.  Arnold-- Arnold admitted to having-- a-
- a-- abused his-- his own three sons.  (BARKING)
But beyond that he wouldn't implicate them in any
other crimes or-- or-- or say much-- much more
than that.

QUESTION:

In the end, what-- what happened-- you know what
was the-- punishment for-- for Arnold and the--
and for Jesse?

FRAN GALASSO:

Arnold was sentenced to 10 to 30 years on the
federal crime of-- the child pornography crime.
And then he-- pled guilty to the charges that

**A-1109**

were presented by-- Nassau County and was
sentenced concurrently to the same amount of
time. Which basically means you're serving the
two sentences at-- one time. But if he-- if he
had gotten out--

    (BREAK IN TAPE)

    FRAN GALASSO:

(IN PROGRESS)-- described what Peter (PH) told
me. I wasn't there.

    QUESTION:

Yeah. Well Peter-- Peter said that there-- he
was in a pretty fancy pen--

    FRAN GALASSO:

Pretty-- pretty nice place, yeah.

    QUESTION:

Yeah.

    FRAN GALASSO:

Tennis times and tee times for golf. And--

    QUESTION:

And when--

    FRAN GALASSO:

--nice. (LAUGHTER)

Case 2:06-cv-03095, Document 37-3 1 Filed 02/07/2083 Page 252 of 303 PageID #: 4648

QUESTION:

--so Arnold went away to it-- (LAUGHTER) so

Arnold w-- was in prison for-- five or six years

I guess.  And then--

(OVERTALK)

FRAN GALASSO:

I don't know--

QUESTION:

--got--

FRAN GALASSO:

--when it was that he-- that he died.  I-- I

don't know.

QUESTION:

But what happened to him in the end--

FRAN GALASSO:

Well, I mean he went to-- he went to federal

penitentiary-- out in the upper Midwest

somewhere.  I-- I seem to recall Wisconsin.  But

I-- I'm not positive.  I believe it was somewhere

in Wisconsin-- a special prison for sex offen-

- offenders.  Jesse was sent-- upstate.  I'm not

sure-- exactly-- which prison.  I think he might-
- may have been in more than one--

QUESTION:

(UNINTEL) I think--

FRAN GALASSO:

Okay, is it?

QUESTION:

--up at some--

FRAN GALASSO:

And he was at least-- for a time-- because I
was told by an author who was doing a book on-
- Joel Steinberg (PH)-- remember the Steinberg
case?  And this particular author had gone up to
interview Joel Steinberg and his-- cellmate was
Jesse-- Jesse Friedman.

QUESTION:

That's ironic.

FRAN GALASSO:

So they were-- they were (LAUGHTER) together.

QUESTION:

The-- that-- and so-- and so then what-- now--

TAPE #98

now Je-- Arnold pled guilty. And then separately
Jesse I guess held out for awhile. How did that
work? Wouldn't (PH) they both plead the same
time? Or was Jesse holding out for something?
Or did Arnold make a deal for Jesse?

FRAN GALASSO:

Arnold made his deal right away. And-- I guess
that was on advice of counsel. Jesse, of course
had a different attorney. Whether he was holding
out for-- for a better deal-- I think he was.
I mean the absolute minimum was this six-- six
to 18. I don't think the parents ever would've
accepted anything less than this.

And many were not happy with-- with this
particular sentence. Plus we had the-- you know
we had the-- the Ross Goldstein piece of it. So
we were developing that with the thought of going
to trial. So-- I mean we weren't in a-- a-- a
big rush-- to force this to trial. We were-- all
the time gathering more and more evidence about
it.

TAPE #98

QUESTION:

And there was a second set of indictments.  I
guess were there two-- there were two--

FRAN GALASSO:

Right.

QUESTION:

--sets of indictments?

FRAN GALASSO:

Right.  As we developed the newest victims, we
took more-- statements.  And we went back and we
got-- second set of-- of indictments.  I could've
done a third and a fourth and a-- believe me.

QUESTION:

And now tell me, just so we have it sort of in
one place, now you know what-- what happened to
Jesse then?  What was his penalty?  And then
where is he now?

FRAN GALASSO:

Jesse got six to 18.  And I'm not sure what
prison he's in.  He's still in jail.  He should
be eligible for-- for parole shortly.  And then
he'll be out.

TAPE #98

Hopefully he will be covered by Megan's Law and then people will be able to find out where he is. Although I'm not even sure of that. Because when he was convicted it was prior to Megan's Law being enacted. So I'm not sure how that-- how that works. You would have to ask Judge Backlin (PH) about that.

QUESTION:

Right. And I think he's gotta come before Judge Backlin again--

FRAN GALASSO:

Does he?

QUESTION:

Yeah.

FRAN GALASSO:

She always said that-- that if she had anything to do with it, he would serve his full amount of time.

QUESTION:

Yeah. And did you ever feel sorry for Jesse?

TAPE #98

Did you ever feel like Jesse was-- a victim?  And
it was a terrible thing?  And that's why he got
into--

(OVERTALK)

FRAN GALASSO:

Jesse was a victim.  There's no question.  And in
his early childhood Jesse was a-- a victim.  But
I think that-- that Jesse reached a point in life
when he clearly knew what he was doing was wrong-
- that what was happening was wrong.  He could
have tried to get out of it.  He didn't.

Even when he was caught, Jesse never expressed
any kind of sympathy for these kids.  He never
gave any information-- even after his conviction
to the parents where-- other people that might
help these children in any way.  I mean I-- I
didn't see any kind of real remorse on-- I think
he's very sorry he got caught.  But that-- that
was about it.

QUESTION:

**A-1116**

Yeah. The-- tell me about the steps of the courthouse-- or how the family behaved at the videotaping. I remember there was a moment you said that-- that you went outside and--

(OVERTALK)

FRAN GALASSO:

Oh yeah. They tried to videotape the-- the victims as they came into court. Course they were stopped from doing that. At one point, I believe it was in the-- at one point in federal court when the father was sentenced by the federal judge-- Jesse and David made a-- some-- very threatening-- remarks to some of the families that were sitting there.

"You'll get yours. We'll get you." You know that kind of-- that kind of thing-- those remarks. David-- said-- to the parents of the little boy who'd lost the hair-- the boy that I had told you about-- at the sentencing of-- I don't recall whether it was the father or

**A-1117**

the brother now. I-- I tend to think it was the
brother's sentencing.

Walked right up to-- this particular father
and-- and grandfather of this little boy. And
said, "I-- I hope-- I hope your son suffers the
rest of his life. I hope he suffers these ef--
effects the rest of his life."

QUESTION:

There--

FRAN GALASSO:

That was David. Right. And of course you know
the father got up and lunged for him. And the
court officers came-- came over. (BARKING) And
the court room had to be quieted down. And--

QUESTION:

Did-- when you saw them videotaping, did you
think they (BARKING) were kinda making light of
it?

FRAN GALASSO:

I-- I think it was an effort to-- it-- it-- a

**A-1118**

TAPE #98

very misguided and-- and clumsy-- really effort
to try and intimidate people.

QUESTION:

With the video--

FRAN GALASSO:

Yeah, with the-- with the video.  And-- and don't
forget, video video, right?  What are you-- what
are you saying to those kids?  Hmmm?  'Cause this
is going to be on TV.  Maybe somebody else is
videoing and is going to be on TV.  There were--
there were no times when the children appeared in
the court.

You have to realize that-- except for the grand
jury.  (BARKING)  They-- they appeared for the
grand jury.  The Friedmans were not there.  Or
they were there-- (CLEARS THROAT) they were not
there on those occasions.  Just the children were
there.  And they were kept separate from-- from
everybody in a special place.

QUESTION:

I have two-- I have two-- two last questions.

TAPE #98

FRAN GALASSO:

Yeah.

QUESTION:

One is, what would you say if I'm a parent and I'm thinking about hiring this guy for my birthday party and I have no information about any of this stuff. And somebody calls you up and says, "You know I'm thinking about this guy, Silly Billy." How-- how would you respond to that? What would you say?

FRAN GALASSO:

Well I would-- if they were interested I'd tell 'em the story that I told you, and say, "Now do you really want to hire Silly Billy? It's up to you." Or I would have to tell them, "I wouldn't hire Silly Billy. And here are the reasons."

QUESTION:

Just sort of-- one last question about just sort of your-- how-- 'cause you know you chose a-- line of work here which is not easy. This is

**A-1120**

TAPE #98

not like taking you know-- it's not working in a doctor's office. This is not being a college professor. (PHONE RING) This is the real engagement (PH).

FRAN GALASSO:

Right.

QUESTION:

What-- (CLEARS THROAT) was there anything that led you to be interested in this? Anything in your life which made you feel like you know, you were interested in this particular area of the law or law enforcement?

FRAN GALASSO:

No. Just that I had-- prior to this assignment I had been assigned to the Juvenile Aid Bureau (PH). And I acted as a liaison officer between the family court and-- and the police department-- more or less arranging for officers' testimony and working with the-- the county attorneys who were going to trial on some of these matters.

TAPE #98

And it-- it-- it was a real eye opener to me to see how many cases of abuse there were. I would never have dreamed that-- that there was that much abuse. Because prior to that I'd always worked in a regular detective squad where you get a whole variety of-- of cases.

So yes, you'll-- you'll get a case like this. But so-- rare, that-- that you really view it as-- as something-- an anomaly of-- of human nature. Oh-- so there-- there came a time when there was a vacancy in the squad.

QUESTION:

In the se-- (UNINTEL).

FRAN GALASSO:

In the sex crime squad that-- the-- person who had it got promoted to Lieutenant. And I had done about four years in the courts. You know I was tired of it. I wanted a change. And I thought, "Gee, you know what? I-- I think I-- I'd like to do this. I'd like to see what's

TAPE #98

involved here and-- and-- see what we could do to help some of these kids. Let's--"

QUESTION:

Did you ever have any personal experience with people in your family who had been victims? Or anything--

FRAN GALASSO:

No.

QUESTION:

-- like that?

FRAN GALASSO:

Thank God. No.

QUESTION:

Yeah.

FRAN GALASSO:

But you can be--

QUESTION:

Yeah.

FRAN GALASSO:

-- you-- let me tell you, you become very paranoid about it--

QUESTION:

Talk about that a little bit--

FRAN GALASSO:

--oh--

QUESTION:

-- about-- what--

FRAN GALASSO:

--I did--

QUESTION:

--how it left you. And-- I know you retired--

FRAN GALASSO:

I--

QUESTION:

-- what five years after this case? Something
like that?

FRAN GALASSO:

No. S-- a few years after the case. You-- you
do. You become more suspicious of people. You
know I-- I think I once said to somebody I think
I had arrested-- or my squad had arrested, "Every
category of person, with the exception of a nun,"
we had never arrested a nun. (LAUGHTER)

**A-1124**

TAPE #98

But ev-- just about every other category of-- of

person-- religious and non religious-- I mean

from-- from-- youngster-- you know just barely

out of adolescence themselves to-- I think we had

a grandmother who was 83, if you could believe

that. Just the-- this enormous variety. And--

and-- you could--

QUESTION:

All-- all caught-- they were all molesting?

FRAN GALASSO:

With children. Right. So you do a lot of bus

drivers, teachers-- people that your children

interact with every day, okay. So you become

very very cautious. I know I-- I had this little

girl-- my own little girl was at the time about

two years old. And-- then it was time for her to

go to nursery school, and then-- and then pre-

school. And well, I wouldn't put her on a bus,

you know. I still won't put her on a bus.

(OFF-MIC CONVERSATION)

* * *END OF SIDE A* * *

* * *SIDE B BLANK* * *

**A-1125**

TAPE #98

PG. 59

* * *END OF TRANSCRIPT* * *

COUNTY COURT
NASSAU COUNTY

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

               Defendant.

-------------------------------------------------------------------x

**AFFIDAVIT**

ANDREW JARECKI, having been duly sworn, hereby declares that the following is a true and accurate copy of excerpts of the transcript of my conversation with Scott Banks on March 21, 2001.

                               Andrew Jarecki

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-1127**

Scott Banks
Beta 104 and 105

| | |
|---|---|
| PART 1 | |
| Q: So, thank you for sitting with us today. And you know, the last time we get together we basically just talked informally about, you know, your recollections of the case and how it came to you. And maybe we should start first with - how did you first hear about this Friedman case? | 00:38.00 |
| A: Well, I was a law secretary and chief legal advisor to Judge Abbey Boklan in Nassau County Court. And the matter was assigned, actually the father's case, Arnold Friedman's matter was assigned to our Part, I guess in 1989, upon his arrest in Great Neck. First on federal charges of disseminating pornographic materials in the mail. He was arrested in federal court by the fed's Postal Inspectors and then, I guess, the state investigation revealed that there were young boys who had been sexually molested by Arnold Friedman at the time - in a computer school run by the father. | |
| Subsequently, as part of the investigation, they also arrested his son Jesse Friedman. And that's how we got the case. It was assigned to our Part. | 1:45.00 |
| Q: And when it was assigned to you, what was the first thing you had to do with it? | |
| A: Will actually it was interesting. The very first thing happened, well you know, we were faced with two defendants charged with multiple counts of sexual charges. The father actually, in my recollection, is the father first went to - was in federal court and was released on bond. He subsequently pled guilty to a federal indictment - and with a promise of ten years. So the first thing that we got involved in was dealing with the fathers case. | |
| This was a new case for Nassau County. We've never had a multiple child molestation case in the county. Also what was interesting, it was the first time that television cameras were allowed in the courtroom, on a experimental basis of the state. So we were dealing with: 1- How do we deal with the issues of, you know, privacy of children, you know, on these types of cases? There's huge media attention from all the networks and the local cable stations. So we were dealing with those issues too. And Judge Boklan was very protective of, obviously, the rights of the children. Make sure their names aren't disseminated. So what happened is the, | 2:42.00 |
| see we were trying to see if there was a resolution in the case, certainly | 3:31.00 |

**A-1128**

| | |
|---|---|
| with the father, because of ... In light of his plea of guilty in the federal case, his attorney I think wanted to resolve the state case as quickly as possible. So that was our first dealings with the case - was dealing with the fathers case, and how that was going to .... we can resolve that. | 3:31.00 |
| | |
| Obviously, we were concerned in light of what happened in other cases, particularly, you know, I think our conscious was raised with respect to the McMartin case, which had gone on in California for years. And Judge Boklan did not want, nor, want a case to take on that type of, you know, momentum. We were concerned about that. So we wanted to have a hold on the case. If it was going to be litigated, we wanted to make sure that we were prepared to litigate the case in a timely, yet fair fashion. | |
| | |
| Q: This issue of cameras in the courtroom. You know, how did that sort of come about and how did it relate to this case? Why was, you know, was it in the news at that moment? | 4:43.00 |
| | |
| A: Oh yes. This was, I mean, my recollections this was front page news in the local papers - Newsday, which is the main paper here on Long Island. And, you know, once the defendants made their first appearances in court on the indictments - which was, you know, many, many counts - the newspapers and certainly the news media made application to our Part to be allowed to film in the courtroom. And there were other considerations. The families of the victims were also present, just about every court appearance. It was a most interesting thing. | |
| | |
| Usually, in the criminal ... In County Court where this case was, or in any in any criminal court - the victims or their families - don't make any appearances in the court until there's a trial on case. In this particular case, we saw the families in court almost every court appearance, because they were so concerned about what happened to the children and so concerned about what the court, I think, was ultimately going to do. | |
| | |
| So I got to know, maybe not on a first name basis, but I know the families were because they would ask me, 'What's going on? What's going to happen with this case?' You know, because I was the spokesman for the court at that time, trying to insulate the court from the press and such, and also the families involved. So that was very interesting. And so, you know, someone depressed got involved, they had to make applications to the court. And we had to make sure that when we were, that certain, they would, they would abide by certain, you know, privacy issues related to the families, and also that they don't, you know, detract from any of the proceedings that went on. They were | 6:14.00 |
| present, for instance, at the arraignment of defendants. They were also | 7:00.00 |

| | |
|---|---|
| present when Arnold Friedman ultimately pled guilty to the entire indictment on the case. | 7:00.00 |
| Q: What do you remember going through your mind, or the judge's mind, in terms of the decision-making about whether to let the cameras into the courtroom in this case? | |
| A: Well I think that we wanted to make it ... I think we were willing to, the judge was willing, to allow the cameras in the courtroom. But once again, it was how it was going to be done. We certainly wanted to make sure that the names of the victims in this case, or alleged victims of the time - were not revealed in any way shape or form. So even when it came time for, you know, Arnold Friedman to enter his plea of guilty, you know, when normally you would have to identify the victim - because that's part of the plea process - you know, we make sure that there was protection in that regard. | |
| I forget if it was identified as a ... if there was an agreement as to who ... John Doe was one child and stuff like that. But it made sure that that was not revealed on, on, in open court. But the defendant had to acknowledge that I was in some fashion. | 8:00.00 |
| Q: Now, at some moment you had to decide, you know, 'Well, do we want this to be the first case where television cameras were in the courtroom.' What was the thinking process at the moment? | |
| A: Well I think we thought it was an important case and it was certainly important to the media. And I think that when you make that determination, you have to weigh in balance the rights of the public to know what's going on. There was widespread concern about this type of a case, and they had a right to, you know .... And I'm a proponent of cameras in the courtroom. I think it's important, if it's done in a tasteful manner where it doesn't interfere with the serenity of the process, and the seriousness of the process. | |
| That, you know, we just keep, you know ... And once again as an experimental basis, you know, positioning of the cameras - what are they going to be. Make sure they're not intrusive upon, on, on any of the parties involved. That was our concern. Not as much as, whether or not the cameras should be there. One camera, one angle. That was the type of thing we wanted to do. It wasn't going to pan the audience. It wasn't going to pan, you know, you know ... It was more of a stationary type of thing so it wouldn't disrupt the proceedings. | 9:01.00 |
| Q: Was there any downside that you saw personally, in having the cameras in on this case? | |
| | 9:43.00 |

| | |
|---|---|
| A: No, not at all. | 9:44.00 |
| Q: Can you please restart that and please repeat the question a little bit. | |
| A: No, I don't think there was a downside to having the cameras in the courtroom. I think of fact it was a plus. And I think once again, it was the first time it was done. We were, you know, I think mandated by the state to try this experiment. There are some, I mean we could have turned down the application. But, you know ... And the judge considered it thoughtfully and believed that, you know, it would not interfere with the process or the defendant's rights. | |
| And I believe, if I'm not mistaken, that neither Mr. Friedman's defense attorney, nor Jesse Friedman's defense attorney, nor ultimately Ross Goldstein's defense attorney ever objected to having the cameras in the courtroom. And that's a fact we could consider at the time, but I don't know if that would have been dispositive of that. But the main thing is, you know, without objection to the cameras in the courtroom - we weren't going to deny that, you know, that application. | 10:58.00 |
| *Production pause.* | |
| Q: So then, when was when was the first time you saw Arnold Friedman physically? | 11:22.00 |
| A: The first time I saw her old Friedman, was at his arraignment on multiple counts of sexual molestation, sodomy charges. Endangering the welfare of children. Sexual assault. Offhand I don't recollect the number of counts, but it was, you know, I think it was somewhere along eighty counts in the indictment. And also, his son was also brought in on arraignment at the time.. | |
| Q: And what was your impression, just your initial impression looking at them? | |
| A: Well, you know, it's ... Any time you, you know, you see someone in their circumstances, you know, they look ordinary people, you know. I think it raises your consciousness to some extent, that you realize that, you know, people who could be accused of these offenses ... And I had no opinion as to that. My understanding of this case was what I read in newspapers like anybody else. | |
| And so, you know, certainly I had no judgment, put any judgment as to whether or not these accusations were true or not. In fact, I'm | 12:36.00 |

probably more jaded than anybody else, you know. After reading about those other cases like McMartin, like the New Jersey case where the schoolteacher was charged. You know, I'm more, you know, I question sometimes the legitimacy of sometimes of those prosecutions, so ... But I do know that his attorney, Arnold Friedman's attorney, was ... did go into federal court and did enter a plea of guilty to the federal indictment, with an understanding and an agreement that he was going to get ten years imprisonment.

So, my understanding also was that point in time that, Arnold Friedman was probably interested in resolving the state cases as well. His lawyer I think, was very ... Mr. Bernstein I believe was very interested in trying to get a quick resolution of the federal case, of the state cases as well.

Q: Hey Scott, can you pull that back and just start with, I think, your comment about Bernstein saying, 'I could have missed it.'          13:37.00

A: Yeah. I believe that Mr. Bernstein, who was Arnold's attorney, was willing and wanted to get a quick resolution of the state case, in light of the fact that he already led to the federal indictment.

Q: Why do you think, why do you think that was? What was the driving force between wanting to get it done quickly?

A: Well I think the, probably the driving force in, and this is just, you know, my understanding at the time was - on one hand that Arnold would be doing his time in a federal institution, as opposed to a state institution. Federal institutions being maybe a little easier in terms of, you know, for a gentleman of his age. He was in his fifties at that time. Maybe that was one of the concerns that they had.

And if they could get a resolution of the case where the time would          14:31.00
run with each other concurrently or not, or would run after, you know, the time he doesn't federal prison, at least that would be better for his client. So I mean that was the understanding, that was the feeling I got in terms of my discussions with the attorney and the prosecutor during conferences.

Q: Did you have the feeling that Arnold was, that it was a significant concern to Arnold to find a way to, to help Jesse or to create a better opportunity for Jesse? Or was Arnold just focused on Arnold - or did you have any sense of that?

A: I think Arnold was focused on his son to some extent. There was a period of time, where the day that Arnold Friedman pled guilty to the          15:24.00

indictment, there were negotiations going on in the court between his lawyer and the prosecutor and Judge Boklan. And I was involved in those discussions because, you know, we said ... Normally the defendant was meet with his lawyer outside in the hallways and if they .... a plea arrangement and they discussed it there in the hallways. We, I arranged for the Friedman's, for Mr. Friedman and his family to have a - to get a jury room, where they could sit and they could discuss these, the plea options.

And I know that a lot of the discussions consented around his son, you know, because that would come back and forth at the time. But, you know ...

Q: What about his son?                                                      16:19.00

A: Well you know, I think he was concerned about, you know, reducing the matter ... but he would have to make admissions, I'm sorry, make admissions that his son was involved.

Q: Go back to before I'm sorry ...

A: Part of the plea would be that, you know, some of these offenses were done with, in concert with his son. And I think, you know, the concern was, you know, in making those admissions and implicating his son in those offenses. And I don't know, I don't recollect - it's been a while - as to whether or not he actually mentioned the son's name in his pleas but, when he took his plea but, that was a concern, because he was charged with acting in concert with his son. Normally the prosecutor would want a, an admission an to implicate the other person involved. But since he was pleading to the indictment, I don't think they really have much say in that matter. But I don't have an independent recollection right now, to sit here and swear that he actually mentioned his son's being involved in the particular offenses itself.

Q: But you did have a sense ... I'm trying to get a sense a little bit of Arnold Friedman of the man. And the question is, you know ... cold callous, calculating child molester? Or was he a family man also, who was worried that his activities had perhaps, you know, had more of an impact on his son, because he took a guilty plea?                    17:32.00

A: In terms of Arnold Friedman and what he was about, and what his motivations were. At my level it was hard to really get a good feeling as to, you know, whether or not he was a family man, what his attitudes were towards his children. We got, I mean I, I, my knowledge of Arnold Friedman was based upon reading this indictment. Reading the minutes of a grand jury proceeding. Meeting with his attorneys, his attorney.    18:28.00

And sometimes, you know, quickly advising him that his lawyers ... at a court appearance I did speak to him, maybe his wife or, you know, tell him your lawyer's going to be late - whatever it is.  But generally, I did come you know, when you see a person, any person charged with a crime of this magnitude, you know, you don't - I didn't get the impression, one impression that he was, you know, this child molester or anything like that.  You don't get that type of feeling about somebody, you don't get that close to that situation.

Q:  But in the course of the plea negotiation, you would have had a chance to see what was his priority list.  And when he was negotiating and what he was willing to do.  And obviously he, you know, agonized - he seems to have agonized about it.

A:  Agonized a lot.  It's ...                                                        19:13.00

Q:  Maybe you could describe that a little better.  When you met with him, his demeanor being like, or the process ...

A:  Well, I remember when we, we put them into the jury room so they could spend, and it was an entire day of negotiations.  And I mean, you know, the judge made a certain sentencing commitment.  I don't recollect exactly what the time was that she had promised him if he pled guilty.  And I know it was extensive.  I know it was equivalent to frankly a life sentence, you know, when you combine the times.  And, you know, you know, and I was back and forth with his attorney.  You know, finding out because the judge wanted to know what's going on, you know.

And he, you know, there was screaming, crying.  You could hear it in the room.  There was agonizing, you know, certainly an agonizing.  For the family to go through.  So I mean, you can't help but, you know, feel that, you know.  Whether or not ... I think the concern also was part of what he would have to say on the record.  On one hand we wanted to make sure that the names of the victims were not in open court.  On the   20:32.00 other hand, he had to make admissions as to the acts that he did.  And it was very important, since he was pleading to each count in the indictment, that we had to go through each of the acts in the indictment.

And I think that was probably the most difficult part for him I guess.  Because on the one hand ... It's one hand admitting it to yourself that you're guilty.  On the other hand it's admitting in open court in front of your family.  And I think he also was concerned about probably protecting his son, who was also indicted in there.  And I think he probably wanted to, you know, not have to mention Jesse's name as part of being involved in any acts, you know, in the matter.  I'm not sure if Ross Goldstein at

**A-1134**

that point in time, was brought into the equation at the point in time, or if that came later.

Q: I think that was later. When he was in court and had to plead, what were the kinds of things he would have to plead to? Like what kinds of words would he have to say?                    21:32.00

A: Well he would umm, he would have to, he would have to admit that - on or about a certain date and time ... And it was broadly worded in terms of the indictment. It wasn't specific dates because, you know, the children were young and they couldn't exactly remember the particular date that it occurred. But the incidents occurred at his home ...

*Production pause.*

Q: So with respect to the kinds of things that Arnold would have to say in front of the jury, in front of the judge am sorry.                    22:54.00

A: Well ... Any time a defendant is entering a plea of guilty, the judge wants to make sure that each and every element of the offense which he's charged is, is, is established. So, we're talking about a very lengthy indictment. And so Arnold was obligated to plead guilty to each of those counts in the indictment, and pretty much state that on a particular date and a particular time - that he did a certain act to a particular child. And that's what the court went through in each and every count of, of, the indictment. And he had, basically he had to admit that he did that.

And I remember that it was a very, you know watching it, the words didn't come out easy. But that's not unusual in any type of plea. I mean, sometimes defendants tend to, you know, have difficulty in making admissions, you know, on the - in open record. They want to sometimes, you know, create the impression that maybe their less culpable than they were. His ... My recollection is he had more difficulty getting, saying it - not necessarily that he was trying to absolve himself from any liability, but he had to go through each and every count.                    24:01.00

And that was, that was really painful. And you had, you know, you had to realize that the families of the victims are there too. They, they were involved in the process too that day. I mean, they were in the courtroom all day, waiting for something to happen. Because the understanding was something was going to happen that day, because the judge had set up a schedule and said, 'Look, if nothing's going to happen we're going to move this case along.'

So something was going to happen. And you know, so the prosecutor - Mr. Alvarado(?) - was in constant communication with the                    25:07.00

victims families as to what the process going on. I spoke to several members of the victims families, because they wanted to know what was going on with the case. I think as a member ... Family members of the victims are concerned about, you know, what's going to happen. Is there going to be a suitable punishment? Are their children going to go, you know, and testify down the line? Most of them have, have testified in the grand jury, you know. And their concerns, you know, about whether or not they're going to have to go further in the process. So it was a long process. It was a long plea. But he basically had admitted to each of the charges.

Q: I think, if I'm correct in my recollection, the judge allowed him to go to kind of a yes or no answer, where she started to read the charges. Do you remember why she did that?

25:59.00

A: It's, it's, it's ... Well I think the judge permitted a yes or no response. Number one: because it's, you can do it. It's permissible. It was, I think, less, it doesn't involve as much pulling teeth out of a defendant. It was a lengthy allocution, and I think that she felt that at the time that ... As long as the main thing is that he admits to each of the elements, because that was the most crucial part. 'Did you on a certain point in time sexually abuse a certain child?' 'Yes I did.' 'Was it in the County of Nassau?' 'Yes it was.' This way you establish an jurisdictional .... elements of the crime, which is fine and satisfactory to the court.

Some judges don't allow that. Some judges want, you know, admissions as to each one. But then again, we're talking about a multiple, multiple count indictment. So I think the judge felt it would go a lot smoother this way. That was also part and parcel of, of, if I recall, of the types of negotiations that we were going through.

27:03.00

Q: You had talked about the grand jury minutes. Obviously, the grand jury had to hear the testimony from the kids. What's your recollection of, of what you - obviously, you know, naming the kids or whatever - but what was your recollection of what you, what you read there? What kind, how, how it made you, you know, what you thought while you're reading those minutes?

A: It was ... When I read the grand jury minutes you've got a, you got a sense of, of what was really going on in the case. You know, you read old news reports, but when you read first-hand a child's recollection of going to a, you know, Mr. Friedman's home and, and going through, and certain acts being done against them -it really brings things to life.

Yeah, once again you read this with, you know ... Sometimes you

28:17.00

may read it with some skepticism, you know, because, you know, 'Geez, how can this happen?' It never happened in Nassau ... There hadn't been a case like this in Nassau County before. Nothing that I have dealt with before. You sit there and go, 'Jesus, can this really happened?' But it was constant, the number of children testifying about the type of accident when I'm there, you know, and .... You got to ... Your certainly going to feel for, you know, what these children had gone through. And it was, you know, and I, you know ... I read, I read the grand jury minutes, then the judge reached the grand jury minutes for one major reason. The defense has an opportunity to ask the court, 'Are the charges contained in the indictments sufficient? Has the grand jury, you know, legally sufficient evidence been presented to the grand jury to establish the crimes that are alleged?' Not whether anyone is guilty.

So we got to where we're looking at it. Were there proper proceedings in the grand jury? That's what we're looking at. Making sure there was no over bearing by the prosecutor. And we concluded that it was, it was, at least in terms of the grand jury proceedings, it was a proper proceeding. Not necessarily that each and every charge was proved beyond a reasonable doubt. That's up to a jury to determine, you know, not for the grand jury to determine. But we want to make sure the charges were sustainable, at least in terms of, you know, holding up the indictment. And we did.

29:21.00

Q: Do remember anything specifically that stands out from the grand jury minutes we thought, 'That sounds like a real good recollection.' You know that move you in a way that made you start to not just say, 'Well, I saw the case ... and now I'm starting to get to know the case?

A: I guess certain acts ....

Q: If you can be specific because, you know, we talk all about it. We talk about the penis, and the anus, and the this and the that - because it's all in the stuff, you know ...

A: Well, the thing that really I guess, you know, hit me was - I call it, you know, the 'cum gum'. Where, you know, and I don't, you know, I don't recall whether or not the child or someone - who came, physically came in the gum and the child was made to chew it. Or the father ... I mean that was something that was really, you know, kind of revolting to me.

30:20.00

Q: ... the child said that it was a game or something?

A: Yeah, yeah. Where you would, you know, someone would, would physically cum in chewing gum. And then it would be chewed. That, you know, I mean you read that, you know, you have to stop. I remember

| | |
|---|---|
| stop reading and I go, 'This is, this is too gross, you know.' The other stuff, the physical touching ... | |
| One of the things, you sit down there and I know I've, you know, the thing about this ... how could this go on in this home for so long and not being, you know, come out. But, you know, that's a, that's a ... that wasn't my providence. That wasn't what I had to decide, or the judge had to decide, you know, that's up to someone else to decide that. But, you know, the children were, you know ... between the fondling and the a, you know, umm subsidization of the children. I mean, those are the types of things we'd see. And they were pretty, you know, if I recall, you know, the children were pretty, you know, vivid in their recollections as to what Arnold and/or Jesse did it to them. | 31:25.00 |
| Q: Did ... It sounds like though you did, I mean, and I think in a way, you know, anybody who's, you know, later on Arnold Friedman writes this letter to the Great Neck community and says, 'Oh, this was a witch hunt, and none of this happened,' and all that stuff. | |
| But I think, you know, I've said, I would say that all the people that I've spoken to have some question about the extent, you know. People say, 'Well, I know something happened.' I mean, what was your sense about ... Is your personal sense, as you're going through it about, you know ... Was this a case where every charge and there was sustainable and the evidence was clear, or was it more general sense or what? | 32:34.00 |
| A: Well you know, in terms of, you know, whether or not Arnold Friedman's allegations that this was a witch hunt, and that ah overblown by the community, overblown by the media, you know ... I can't, you know, I can only tell you that he pled guilty to each count in the indictment, and he had a right and an opportunity if he wanted to - to litigate the charges. The truth and/or falsity of the allegations. | |
| He elected to plead guilty to the entire indictment. That's a choice that he made after consultation with his lawyer. And there are a lot of reasons why someone might do that. You know, maybe they feel that the cards are stacked against them in terms of evidence. Other times they want to limit their exposure to the system. But the exposure that he was admitting to was significant and whether or not ... | 33:33.00 |
| *Production pause.* | |
| Q: You were saying there were some reasons why somebody could conceivably plead guilty to something. | 34:02.00 |
| A: Yeah. I mean I, I mean I think that there are people, you knows | |

sometimes - and I've raised this argument, you know, before a jury years ago - where I said .... and he denied it on the stand that he ever did it. And I said, you know, people can plead guilty to things that they're innocent, when they're looking at what the possible exposure is, compared to what they would get if they pled guilty and they have no way in balance those things.

I don't think this was the case at all. Whether or not each and every count in the indictment was sustainable by a jury, you know, possibly not. I mean that's, you know, their prosecutor never really had an opportunity to present those types of evidence.

And obviously where, you know, in this type of a case where children are involved and the indictment was so, was in some sense quite broad in terms of time frame and stuff like that. It's possible that, you know, the defense could, you know, be able to attack the substance of the prosecution's case with regard to certain of the allegations. | 34:47.00

But there were multiple, a multitude of ... of charges here. And I think that when you look at it on balance, I think that's, you know, for him to suggest - Mr. Friedman to suggest - that there was a witch hunt here ... You know, certainly the fact that they recovered these child pornographic materials at his home, where he pled guilty to an offense. And then, subsequently after an indictment, he then admits in open court of multiple charges of sodomy, endangering the welfare of certain victims. I mean, to suggest now or for him to suggest that this was a witch hunt in the community, I don't think has any credibility.

Once again, it's not my determination or the court's determination as to what he should plead. He has every right to proceed to trial. And he made that determination, that, you know, for whatever reason, that he would, he would plead guilty.

Q: Do you think he had a good chance if he went to trial?

A: Well, I'm certainly not privy to his independent discussions with his lawyer as to what his possible defenses are. Whether or not he was going to raise alibi defenses. 'I could not have been there at the time'. Or that 'These children …the biggest were coerced'. Or in other words intimidated or, you know, into making allegations – which I understand are the type of defenses in these types of cases – that you know the police and/or psychologists who are involved in questioning the children certainly can influence what a child may say. And that may have been a possible line of defense. | 36:51.00

And sometimes they're credible defenses. You know, we see that in a

lot of these cases which – and ultimately juries, after time, throw out. Once again, we go to McMartin. We go to the case in New Jersey and other cases that we've seen where there's influences, there, you can see the police, or the psycho, of the psychologists that the police employ, or the prosecutors employ, do influence the way children can testify.

I don't know if those issues were going to be raised in this particular case, so I can't really comment onto, as to, but all I do know is that they weren't raised at Mr. Friedman, Arnold Friedman, pled guilty, you know, and he had an opportunity, if he wanted, to litigate those issues.

37:48.00

Q: Let's change course a little bit to … Jesse. What was your impression of Jesse and how he was involved?

A: Jesse Friedman was very young, good looking - I think he was seventeen or eighteen years old when he came before the court. And you couldn't help but thinking about – at least I couldn't help thinking about – after reading the, the grand jury minutes, and reading what Jesse was alleged to have done, to start thinking about, you know, well if he's done this, and his father has done this, then whether or not he was also a victim of his father.

Now I, I looked at Jesse differently than, you know, down the line than his father. Because I felt you know, without, he certainly admitted to doing certain acts. I believe he was guilty of those acts. But I also believe that he was, you know – I don't know how much choice he had. Over time. I think from reading the grand jury minutes, and reading his probation reports down the line, he was a victim of his father for years and years. And I think that, you know, had, you know, I think that limits your choice in where you're going to go.

39:13.00

I mean his, I mean you think about your, your, the figures you admire the most are your parents. You know? And here's this father who's, who's sodomizing him as a boy. You know, what chance does he have? So that was my, that was my recollection of Jesse. I believe he was a pretty bright, intelligent young man. And uh, but obviously troubled.

Q: Did you feel that, I mean obviously the attention at a certain point turned to Jesse…

A: Yes.

Q: …because Arnold was put away.

A: Absolutely.

Q: Talk about that.

A: Yeah. We always believed – after his father pled guilty – Jesse subsequently retained new counsel.

40:19.00

Q: Who was this?

A: Peter Panaro. Peter Panaro became new counsel. I think a Mr. Krieger was his first attorney. And Peter Panaro became his counsel. And Peter was pretty aggressive in terms of moving this matter along. That his client was, was going to, was going to assert his innocence in the case. And uh, and this case was going to be tried. And we geared up. We were gearing up for a rather lengthy trial of this case.

At that point in time, the prosecutors also brought the indictment of Ross Goldstein.

Q: And what was the impact of that?

A: Well I think that became troublesome to the defense of, of Jesse. Because Ross Goldstein was a friend of Jesse who was also a victim of Arnold Friedman, and was brought into this... this case, into the, into the act, got involved in these same acts as Jesse and Arnold were involved in. I think he was a little more sympathetic to the extent he was, you know, he was brought, he came into this. He didn't commit, he wasn't accused of as many of the, of the allegations. He certainly the clear, clearly from the review of grand jury minutes, he was involved. But I think that his lawyers were looking to cut some sort of a deal to, you know, so he wouldn't face the exposure that he was facing. And he was working a deal with the prosecutor.

And I think when he ultimately took a plea and took a deal, that put, clearly, because that brought another witness in, who was a little more articulate, frankly. Because otherwise, you know, you're dealing with young kids, and their recollection. Now you've got a seventeen-year-old person – albeit a co-defendant – but who's corroborating certain aspects of what went on in the home at the time. So I think that put some pressure upon Jesse. But once again that's something that his lawyer can tell you about, as to whether or not that had that same effect.

42:16.00

But you know look. You have a seventeen-year-old – this is Jesse Friedman – who was indicted on multiple, multiple counts of sexual abuse and sodomy charges and endangering the welfare of a child. His father had just gone to prison. Sentenced to prison for many, many years. And he's, he, and this young man is facing, you know, extensive period of time in state prison. You know, a lot of, I'm sure a lot of weight

| | |
|---|---|
| on his mind and his lawyer's mind as to whether or not, you know, what happens if he's convicted? You know, you know you plea bargain a case for reduction in the charges, or for a sentence, or you can take your chance at a trial. | 43:37.00 |

And I think that's what went through his mind, you know? But once again, down the line, he, there was a, plea negotiations were done. I think there was a promised sentence of six years to eighteen. There was no consideration of youthful offender in this case. In light of the violent nature of the acts, because they are considered violent felonies. And he pled guilty. As did Ross Goldstein.

Q: Do you feel that the, I mean I know obviously you respect the judge. You spend a lot of time with the judge, and so do I. I've spent time with the judge. Do you feel that the judge was tough on Jesse? Perhaps too tough?

| | |
|---|---|
| A: You know the sentencing is always the prerogative of the court. You know. And during my two year tenure with Judge Boklan, you know, there were many times we would disagree as to a result. I, I always looked at Jesse, as I said before, as, as partly a victim. And that sometimes the choice that he had was probably very limited. But I think that while Judge Boklan was not, was certainly aware and considered that in her, in her deliberations, I think she also had to look in the audience and see that … (break)…. | 45:15.00 |

END OF PART ONE

BEGINNING OF PART TWO

Q: You were saying that, while you think the judge considered Jesse's youth, she also had to look….

A: Yeah, I think she considered Jesse's youth. I think she, you know, considered the fact that Jesse was certainly a victim of his father. And we wouldn't lose sight of that. But I think in her mind she also had, you know, she's very, very concerned about the victims. And she, you know, he had a choice. He made the wrong choice in her mind. And she was going to make sure that this, that the punishment that she would mete out would be significant enough.

| | |
|---|---|
| I think she had a little more leeway perhaps, and perhaps I, you know, in looking at this case, I probably would have, you know, if I was evaluating it, I probably would have considered something lesser. Because in light of what I felt about the case. But you know I couldn't | 0:59.00 |

criticize her. You know? Because I mean she was looking at, she has to look at, you know, it's a tough job. And she's got to look at things from every perspective. And you know the victims, she couldn't lose sight of the fact of what these victims had gone through. And could go through for many, many years. You know? You know? You know, it's not just an act that occurs. I mean, I think, you know, you know the sexual abuse that went on with these children, you know, can affect children forever.

1:05.00

Q: Peter Panaro wrote a letter in one of his memos to the court, where he says in big block letters, where he says, 'I strongly urge you not to read into the record the statement about how you recommend, you know, you said that he's a threat to society,' and you recommend to a parole board that they keep them in forever. There's a kind of border on, maybe being too hard on Jesse?

A: Well ...

Q: Maybe you describe what happened, if you can remember.

2:35.00

A: Well I do remember that at the time of sentencing the judge, well didn't sentence Jesse Friedman six to eighteen years. The judge did make a statement on the record that recommended that recommended that, that the parole board certainly keep Jesse Friedman in jail for the maximum time allowable under the law. You know, I think the court has a option to do that. You know, at the time, you know, I, I think, you know, retrospect, you know, I think that the decision as to whether or not somebody should be released on parole, should be a decision based upon what the parole board considers in terms of someone's rehabilitation. And certainly when a parole board considers whether or not they gonna release a particular inmate, they gonna, they gonna consider, you know, the persons rehabilitation at the institution. They gonna consider the victims, what their views are. And to some extent, certainly what the court says.

But you know, whether or not that was the judge's recommendations considered, you know, you know, by the parole board to the extent that the parole board will say, 'Well, Judge Boklan said, never release this young man, we gonna well bye-bye that.' I don't know if that's their, their principal determination. I don't know much weight that holds with the parole board.

3:39.00

Q: Do you know that, you know, Jesse's still in jail?

A: Yes I do. I, I'm somewhat surprised that he was still in jail. You know, his, you know, certainly I would suspect that he would not get the minimum of six years, but I think that certainly he would not do the

| | |
|---|---|
| maximum time either. I'm a hundred percent sure why he's still in jail. If it had anything to do with what the judge's recommendations were at the time. Whether or not at his parole hearings whether or not the families at least have responded in kind, you know, to, you know, object to his parole. And with the prosecutor. What role did the prosecutor have in this case? Certainly they have a substantial role in, in, in advising the parole board of what their views are. And probably, most important is what Jesse Friedman is done with his time. You know, has he faced up ... You know they look at this he did remorseful. Has he, has he been involved in programs related to the offenses for which he was, he was convicted of? | 4:19.00 |
| My understanding is, is from speaking his, Peter Panaro that he hasn't. That he in fact has denied any involvement in, in the offenses that he pled guilty to. Which is his right to do. | 5:09.00 |
| Q: Would you say the decision to give Jesse ... I'm trying to understand the phenomenon, the parents, the pressure - all that stuff. Would you say that the decision to read for example, to read that into the record despite Panaro's objection, you know, and all that kind of stuff, knowing that it may mean that this nineteen-year-old, or eighteen-year-old kid was gonna go to jail, essentially for the full time of his life to that date. Is that something you would say that you and the judge disagreed on? | |
| A: Well, you know, I come from a different background than Judge Boklan. And I think one of the reasons why she asked me to be her law secretary was because, she wanted a sounding board. I come from, I'm a criminal defense background, Judge Boklan was a, was a lifelong prosecutor and judge, and has reputation for being, I think, a very intelligent, fair judge. But a very, a tough sentencing judge. And you know, um, and I think that, you know, we would have our disagreements in reviewing a case and we would talk about that. She'd win. And I respect that. When I have, would disagree, I don't recall us discussing the particulars of what she was going to say in the record. | 6:15.00 |
| But one thing I will say about Judge Boklan is that, she's not a person to be, I don't think she was influenced by, you know, the media. Influenced by what the families. I think what you said on the record, was based upon her understanding of this case. She was a former head of the sex crimes unit the District Attorney's Office, so she had certainly, you know, deal with cases, maybe not of this magnitude, but certainly serious sex offense allegations. And I think that she felt that her heart that this was the appropriate sentence, and the response that she gave in terms of her recommendations was appropriate as well. I don't necessarily think that, that it really had to be said, but that's, you know, that's, you know, I wouldn't, you know, I didn't have an opportunity nor would I at | 7:07.00 |
| | 8:07.00 |

**A-1144**

| | |
|---|---|
| that point, you know, disagree with her. I mean she has the right to, you know, to put that on the record. And judges do that occasionally on other cases as well. | |
| Q: In terms of representation, I guess Jesse was represented by Peter Panaro and Arnold was represented by Jerry Bernstein. What was your sense of just the general representation that they got? | 8:19.00 |
| A: You only think in terms of Jerry Bernstein, Jerry came into court with an agenda. I, I think he, I think he was comfortable with the fact that he had to work at the best possible deal for his client. That's why when he went into federal court, and pled guilty to ten years in federal indictment, I think he knew in his heart that he was gonna go to state court, and enter a plea of guilty to these charges. Okay, you just don't, you know, do that without having anticipation that you can resolve the state charges along the way. And I think Jerry didn't know, obviously was unfamiliar with Judge Boklan. I think he had appeared in front of her, and he learned pretty quickly that she's a pretty tough judge in terms of sentencing. But I think he went in there, he knew his case, and he negotiated a deal with the prosecutor the best he could do, and the sentencing, you know ... | |
| I think one of the things that was constantly going through the minds of the court was, you know, to protect the children. The victims. And if we could avoid the children having to testify in a case, you know, then that's something that, you know, we would try to do. And you know, he certainly was interested in some sort of, of a plea, and that was done. Obviously, the judge was not gonna give away the court house either. She felt that Arnold needed sufficient punishment for the acts that he committed against these young children. Likewise, Peter Panaro was an aggressive advocate for his client. I think that he took this case on with, with the feeling that he was going to litigate this case. | 9:39.00 |
| I always thought that this case was gonna be litigated. That was, you know, pleading the case. And I think until Ross Goldstein became involved in the case, that was clear to me. I think Ross Goldstein being involved, I think, changed, changed the whole dynamics of the case. Because now you have not just young children, who may have been influenced by psychologists, police, whatever, prosecutors - in saying what they said that as a possible defense - but now you had an independent witness who could corroborate some of the things. And I think that was something that was, made it more difficult for Jesse Friedman at the time. Likewise, I mean ... | 10:32.00 |
| *Tape change.* | |
| Q: We were talking about how Ross's influence changed the case in | 11:18.00 |

some fundamental way.

| | |
|---|---|
| A: Yeah, I, I, I, Ross Goldstein when he came in the case and he was indicted on multiple counts, brought I think a new dynamic to the prosecution. Because now it's brought in a witness who was old ... Number one is, once a, once a deal was arranged with Ross to testify against Jesse, it brought a, it put a new complexion on the case - to the extent that now you have a, a witness, albeit a person who was accused of committing similar acts. But, you know, somewhat sympathetic young man, to the extent that he was not in the family. He was a victim of the father at the time coming in, and he corroborating a lot of what these young children would testify to. And that puts additional pressure upon, upon Jesse Friedman to make a determination, as to whether or not he proceeds onto trial, or risk the fact that not only does he have the testimony of these young children, which could certainly have a, you know, substantial effect on a jury, but also now seen his co-defendant now saying, 'You know what? These kids are saying it true. It even happened to me.' | 11:24.00 |
| So I, I, you know, without going into the mind of Jesse at the time and why he made certain decisions, I think that, you know, or his lawyer. How that came about, I assume that that was a substantial part of why Jesse ultimately decided to plead guilty. And also, understanding we have, you have a judge who's gotta, who's got a reputation to being a very tough sentencing judge, who's put six to eighteen years on the table on a plea. What would happen if he was found guilty of even one count of this multiple count? If he's found guilty of just one count, he could get up to twenty-five years in prison. You know so, I think the, I think that weighed heavily upon the defense in the case is, you know, not just, you know, what evidence they have stacked against them, but what are the possible repercussions of a, of a conviction after trial. And that has to come into play in any criminal case. | 12:40.00 |
| Q: You said that Ross was also a victim. How did we learn that? | 13:38.00 |
| A: Well, through consultation with, with his attorney said the case. Certainly review of probation report the case. You know, that's pretty much how, you know, I gained the understanding that Ross was, you know, brought in to this, but first had been a victim, a victim of the Friedman's. | |
| Q: And he was gonna argue then, that he was a student of Arnold Friedman's? | |
| A: He was a student and I believe, and this is going back, but I believe that he was helping out also in the class. He was a friend of Jesse. But | |

| | |
|---|---|
| he was also brought into this, these, these, these actions, these deviant actions, deviant actions. | 14:26.00 |

Q: Couple of people in the case said that the judge had given an indication to the lawyers that if Jesse went to trial, she was prepared to be very tough in the sentencing. Is it typical that the judge would telegraph something like that?

A: I don't remember that independently. You know, I think that any lawyer who practices in, who would practice before Judge Boklan, or frankly most judges, understands that if, if ... During the course of plea negotiations, the judge knows certain things about a case. At a trial, and she can give a plea promise based upon what she knows about the case, and a way to resolve it. But it trial I mean, there are other things that she may learn which really affect her judgment on what's gonna happen.

| | |
|---|---|
| So there are, though, it's, it's, while, you know, I think that what anyone understands going into that process, be it Judge Boklan or any other judge, is that you roll the dice. If the judge hears something, the potential that a defendant will get sentenced to a more substantial amount of time if he's convicted by a jury. You know, that could happen and I don't know if she specifically said, 'Your gonna, you know, if your client doesn't plead guilty to this and take six to eighteen years, he's gonna get, you know, ten to thirty years. I don't think that discussion ever came, came out. I think that she, but I think it's an understanding, and it should be the understanding of any defense lawyer going into that part, that that could happen. | 15:46.00 |

Q: You had said that the McMartin case was weighing heavily on your mind.

| | |
|---|---|
| A: Well, I think the one thing that Judge Boklan was concerned about was, not to have this case become a circus. And, you know, we watched, we considered and talked about in very general sense - we didn't study the McMartin case - but we saw that case went on for years it seems. And you know, we want, one of the things we worked on was, you know, how did these trials go about, you know, are, is videotape testimony of children gonna be used? We had to deal with some legal issues. You know, how do we keep this case, you know, Judge Boklan is very concerned about scheduling. How do we keep this running so it doesn't, so it goes smoothly, it doesn't go for six to eight months. | 16:44.00 |

| | |
|---|---|
| We reserved, I mean we, I've, my recollection we reserved almost two months that we figured that this case would go to trial, would be tried. You know, we didn't know if they would be experts utilized by the prosecution, experts utilized by the defense. So you know, those are the | 17:49.00 |

things that we were concerned about. But you know, I think the case in California, the McMartin case, took on it, it took on a life of its own and we wanted to avoid that. We really did.

Q: In terms of the fact pattern, the facts in this case and the, you know ...

A: And the kids in McMartin were younger too was my understanding.

Q: Did you see as the big difference between this case and theses other cases that later got ...

A: Well, I think the biggest difference between this case and the other cases is that, you know, McMartin, I forget the woman's name - New Jersey was prosecuted.

Q: Kelly Michaels.

A: Thank you. The Michaels case.

Q: I think it was Kelly Michaels.

A: Kelly Michael. Kelly Michaels case in New Jersey ...

Q: Can you start over?

A: I think the difference between the McMartin case and the Kelly Michaels case in New Jersey, was the age of the children. These children, I mean they were young, but they weren't, I think the McMartin case was nursery school. Kelly Michaels case, they were I think a little younger. These children were a little older, a little more articulate. So that was something that, you know, we knew that, you know, where sometimes videotape testimony might be permissible, you know, we probably wouldn't allow that in this particular case. We'd probably have the witnesses testify live. Maybe, you know, closed courtroom so that, you know, but to protect the identity of the victims. But we certainly were not going, you know, we, you know, we have to weigh and balance the rights of the defendant to get, you know, confront his witnesses.

So those are issues that we had to concern ourselves with, but it was, they were, they were a lot, they were articulate young people, you know, young children who testified in the grand jury as to what happened in the case.

Q: Any recollections of David?

A: With respect to David Friedman, I don't have any, you know, I know

17:50.00

18:32.00

19:22.00

| | |
|---|---|
| he was in the court with his family during the course of the, his father's plea, and the negotiations. I, you know, obviously he wasn't accused of anything at the time in this. He wasn't involved in this case. So I don't have really an independent recollection of anything specific about him. You know, I later learned that he's one of the leading children's entertainers in the state of New York, which is, I don't know, I might say surprising. You know, it's sort of interesting. The fact that his father, you know, was involved in these types of acts, and his brother was too. And, you know, and obviously I think, you know, I view this as a very dysfunctional family and, you know, it's interesting that they have evolved. | 20:02.00 |
| Q: You mentioned to me the last time we got together, about your recollections of comments that David might have made in the courtroom, or comes to family members of the victims or something. | |
| A: I don't offhand remember any particular comments. | 21:10.00 |
| Q: What you think was Anarado's agenda as the prosecutor? Did he want the case to go to trial? | |
| A: I think Anarado, Joe Anarado would have loved to seen the case resolve itself in some sort of a plea. I think he was, it would have been a very lengthy prosecution. You know, I think that he was, you know, would, as likewise concerned about his, the victims in the case, and the families in the case. So I think that, I think that he, you know, it would have been a difficult prosecution, even though, you know, it's, it's, a lot of counts. These cases are tough for prosecutors too, because you're dealing with young children. And, you know, and good lawyers on the other side. | |
| So I think that he, you know, I think that he was hoping, anticipating that there be some sort of resolution of the case. I think that's why he offered a plea of guilty, a plea to Ross Goldstein. Because that would, he, I think with the anticipation ... And there was a lot of, there was a lot of opposition from that, from my understanding, from the families. | |
| I think Joe Anarado's determination to offer a plea of guilt, a plea to Ross Goldstein was, was basically done to put some pressure upon Jesse to consider whether or not he wanted to go to trial. And I think, that's a, that's a tact that the prosecution, a prosecutor will use. So I think that, you know, his motivations were to try to resolve the case without a trial if they could. | 22:49.00 |
| Q: Do you think he was in the mood to go to trial on something like this? I mean not just him, but as DA in that situation. It seems like a huge | |

| | |
|---|---|
| amount of work to try this case. | |
| A: Well, I think that the prosecutors may, has to, prosecutor in the case like this, as well as the court, has to look at, you know, what, you know, 'What do I have?' Certainly the prosecutors, 'What kind of difference do I have, what are the concerns of the victims and their parents? ' I think that in a case, especially in a case of this, what would the victims be satisfied with. Will they ever be satisfied? And what, you know, is that, when you look at other prosecutions do you say, 'Well geez, you know, am I better off, you know, trying to work out a deal? Why not put the children through the, through the misery of going through a trial? Do I risk, you know, the fact that it gets some finality in this case? 'Because these other cases end up in after trials, and after convictions, and there's a lengthy appeals. | 23:37.00 |
| So I think that, you know, Joe Anarado and the DA's office have to consider whether or, what, you know, what's in the best interest of the victims first, and whether they wanted to put him through this. You know, but certainly weren't, they were not going to just, you know, give the case away. I mean, I think that Anarado was gonna try this case if he had to try this case. But I certainly think that he was not, in the sixteen to eighteen promise by the court, was something that he could live with. | 24:30.00 |
| Q: During the process of negotiating the plea, what was your role? I'm kind of foggy on that. And how were you the surrogate for Judge Boklan? | |
| A: Well, a lot of, I mean in the actual discussions with respect when a, when a defendant, what kind of plea offer is gonna be made in a case, and what the time commitment would be in terms of sensing, is purely prerogative of the court. And those things generally would occur inside chambers with Judge Boklan. My role at that point was sometimes, in this particular case, was discussing the parameters of what the plea might be. What the prosecutor would be seeking - in terms of the counts they would require a particular defendant to plead guilty to - and putting that together for the court so the judge can make, and also have the factual scenario down, so the judge can make a determination as to what's the appropriate sentence. | 25:31.00 |
| What happened with this particular case, which a little different than the other run-of-the-mill cases, was the defendant - going back to Arnold Friedman - was when he came to court on a particular day when we thought the plea might happen, I mean it was, I was the liaison between the prosecutor, and the defense, and the court in terms of trying to move things along. Trying to, you know, find out what, where the defense is. What kind of a, what kind of things they were looking for. So part of that's | 26:22.00 |

| | |
|---|---|
| what I was involved with. But the judge herself would make the decision. And, you know, you know, basically Bocklan, Judge Boklan would, you know, very rarely consult with me as to what, 'Scott, what do you think I should do?' I mean, she was a pretty strong little judge and she has her views towards ... and she's pretty unmovable when she makes her decision. | 26:57.00 |

But my role was to assist the court in getting enough facts before the court, so she could render the appropriate decision. Also, the legal analysis of what is an appropriate sentence. You know, what are the parameters of the sentence. So those are the things that we were involved in all the time, especially in this case.

Q: You mentioned that in the negotiations between the family and the judge, you were the go-between. Can you elaborate a little bit about the experience of the family being in that room, and who was arguing with who?

| | |
|---|---|
| A: Well not, you know, obviously the, there were discussions on a particular day, when Arnold Friedman was going to decide whether or not to enter a plea of guilty. And as I stated before, I, we allowed them to have a room, a jury room to discuss with their, the attorneys, family members in a room - which was very atypical. You know, those things did not happen. Usually any of those discussions happen in a lawyer's office, or outside, you know, even sometimes, you know, in a jail cell you're talking to your client. But here it happened, we gave them a jury room and they were there throughout the entire day. And I had conversations with Jerry Bernstein back and forth about what the judge would require in terms of a plea allocution, because once again there were discussions as to what the judge would even require. And actually what the prosecutor would want. | 28:07.00 |

| | |
|---|---|
| The prosecutors certainly wanted to make sure that each victim was identified. That, that, that Arnold Friedman would in fact admit to the allegations. And so while I didn't go inside the room, except to knock on the door and say where we were at, you know, in terms of what, what Mister Friedman wanted to do. There was a lot of yelling, and crying, and screaming going on, coming out of that room. It was quite obviously an emotional period of time for that family, you know, to be going through. I mean, you know, his wife was there - I think her name was Elaine Friedman if I'm not mistaken. Jesse was there, even though Jesse was not going to be pleading, you know, in that case. I believe David Friedman was there. Jerry Bernstein, he may even have had another attorney there with Arnold. | 29:04.00 |

| | |
|---|---|
| So there was a, you know, this was, you know, Mister Friedman was | 30:08.00 |

| | |
|---|---|
| going to plead guilty to multiple counts of, you know, in front of on, in front of cameras, in front of a families - victims families - and that was probably going to be an emotional time for him. You know, it's hard to, you know, you know, you put yourself in that position, but it's hard to sometimes defendants have difficulty admitting things. You know, and that was probably part of their negotiations, what he would say. So my recollection is it was a very emotional period of time for the family at that point in time. | 30:08.00 |
| Q: Is it normal for a judge to decide what the plea arrangement would be? I thought they came from the prosecution usually. | |
| A: The role, the role Judge Boklan, or any judge in a criminal case, is not to decide what the plea is going to be. What the offer will be. The prosecutor in the case has total discretion to make an offer in the case based upon its consideration of the case. The judges made prerogative is to discuss with the sentencing would be. | |
| Now judges can reject the pleas if they feel that it's, it's, it's something that they, in their own conscience, can't support. But in this particular case, in Arnold Friedman's particular case, the prosecutor made no offer on the case. Arnold Friedman pled guilty to the indictment, so then it's the judge could not, cannot stop the defendant from pleading to an indictment. He can. So the judge at the point has to decide what the appropriate sentence would be. So Judge Boklan would not interfere with the plea per se of the defendant. Now with Ross Goldstein, there was a problem. Because the prosecutors made a deal with Ross Goldstein, that he would get a belief six months, five year probation sentence. And they were supposed to make a recommendation as to that sentence, to the sentencing court. | 31:15.00 |
| Now the judge judge, I don't believe, was bound by that. I think it was a recommendation. And judge, I don't know if she had given a sentencing commitment on the case, but the prosecutor's ... was supposed to state for the record that they were recommending six months to five years probation. And whether or not the judge was going along with that was her, you know, was her prerogative. My understanding is that at the time of Mr. Goldstein was sentenced the prosecutors did not do that. They did not make that recommendation. And that was subsequently appealed. And in fact the Appellate Division in the Second Department determined that the prosecutors should have made the recommendation. I think Mr. Friedman, Mr. Goldstein was re-sentenced to a six-month, five-year sentence. Five year probation sentence. | 32:27.00 |
| Q: And I think by that time he already served a year. | 32:57.00 |

| | |
|---|---|
| A: Probably so. I don't know. He was out on appeal. But he had served approximately a year then. Okay. | 32:58.00 |
| Q: In plain English, it meant that they made a deal ... | |
| A: Well in plain English, they, they, they made in, in, in consideration of Ross Goldstein testifying against Jesse Friedman. The prosecutors said, they agreed that they would make a sentencing recommendation to the court. Judge Boklan felt that she wasn't bound by the, by the recommendation, and she was going to sentence them to the appropriate sentence that she felt that was Goldstein should have gotten, based upon a review of the evidence and the probation report. But the prosecutors at least, to the extent that they would have an obligation pursuant to their plea negotiations with Mr. Goldstein and his lawyer, to make a recommendation. They had to state that recommendation on the record and they did not do that. | |
| Q: So what happened ultimately to Ross Goldstein's situation? | |
| A: Ross Goldstein appealed his sentence. The Appellate Division review the appeal, and made a determination that the court sentencing of him was improper. That because the prosecutor, and it wasn't really a criticism of the judge to my recollection, it was rather the prosecutor's role in this. That they should have made the affirmative recommendation of a sentence, and they did not do that. And as a result which the Appellate Division said that Ross Goldstein should have gotten the benefit of his bargain. And which was six months, five years probation. My understanding is he probably had done a little bit more time than that, because he was held, he was, he was in jail and had not made a bond pending appeal. So the judge in the court did read first Judge Bocklan's sentencing determination. | 34:00.00 |
| Q: The issue here was not only the sentence, but was he going to be giving youthful offenders ... | |
| A: Right. I think ... There was an issue as to whether or not Ross Goldstein would get Youthful Offender. I am trying to recall whether or not that was also part and parcel of what the prosecutors were going to ... A - would they recommend Youthful Offender, or not oppose the application of ... of Youthful Offender. Judge Boklan, I don't believe, was inclined to give Youthful Offender. But I think once again, as the prosecutors determination, recommendation that they would either not oppose it, or, or, well actually not oppose the application. I think they actually opposed the application for Youthful Offender, which once again was not consistent with their plea negotiations with Mr. Goldstein. | 35:00.00 |
| | 35:46.00 |

| | |
|---|---|
| Q: So to put it into English so the average person can understand. Basically the prosecutor made a deal with Ross Goldstein to get him to testify. The prosecutor never bothered to tell the judge about it, or didn't do what they were supposed to do. In the end, he did get Youthful Offender status and I'm going to ask you what that means. | 35:47.00 |
| A: Well the, the, in this particular case the prosecutor made a deal with the attorney, that they would firmly recommend that Ross would get Youthful Offend, well, well, would get six month, five-year sentence and they would not oppose an application for Youthful Offender. Youthful Offender, just so you know, is that when a defendant is eighteen years or younger and is convicted of a crime, that, that, if, if Youthful Offender is granted - that his conviction is actually vacated and set aside, and substituted for finding that the person is a youthful offender. | |
| You know, in a felony charge it's, it's very important obviously to have that type of, so you don't have ... adjudication so you're not convicted of a felony, or have a ... And actually the, the, the defendant has no criminal conviction at the time. So that was important, certainly for Ross Goldstein and his lawyers. What happened in this particular case is that the prosecutor was obligated to make affirmative recommendation on the record at the time of sentencing as to what, you know, Ross should, type of sentence he should receive. I don't believe the judge was necessarily bound by that ... I don't think the judge gave any commitment at the time. I think basically her position was ... | 36:51.00 |
| Judge Boklan was faced with a situation where she didn't give a sentencing promise. She was gonna rely upon reviewing any documents that was submitted at the time of sentencing. But once again, the role of prosecutor is to play fair, and if they made a deal they at least have to ... And we were, we knew the deal, what the deal was, but they had to firmly make that recommendation on the record, and then the judge could make the determination as to what she was gonna do. In this case Mr. Anarado did not make that recommendation on the record, and that was the reason why the appellate court reversed the sentencing determination of the court. | 37:46.00 |
| Q: So to this day he doesn't have a criminal record.. | |
| A: Yeah, to this, yeah ... Upon the reversal and direction of The Appellate Court, Ross Goldstein was re-sentenced to, as a Youthful Offender, and his conviction was vacated and set aside by the court. And he has no criminal record as a result of the, of the case. | |
| Q: You had to do was when we first met you, that after this case you | 39:04.00 |

**A-1154**

| | |
|---|---|
| retired at the court. Can you a little bit about that? You were kind of burned out. It was a tough case for you. | 39:04.00 |
| A: This was one of the last cases, one of the more difficult cases that, you know, I had to deal with, because of the age of the victims. The emotional ... The emotions that went on with negotiating both pleas of Arnold Friedman and the father. I decided, you know, shortly thereafter that, you know, I, you know, that I would probably go back into actual practice of law after that. I felt, you know, it was a strain. It was, it was, you know, we had, I had disagreements sometimes with, with what went on in the case, or other cases too. | |
| And that's, but I, you know, I certainly always respected judge Bocklan's, you know, prerogative to do certain things. But it was a tough, it was a tough time, and I felt it was time for me to move on, you know, do certain other things in the practice of law. So I went on my own. Took a job in a law firm. | 39:59.00 |
| Q: Is there anything in particular that really got you on this particular case? | |
| A: Well I think when, when it came to do the dealing with Jesse Friedman's sentence, you know, coming from a defense attorney's background, you know, I looked at Jesse, I always looked at Jesse Friedman as, as a victim in this case. And, and I guess if you look at any of the sexual predator cases, you might find that the defendant's in these cases were once victims too. | |
| And the balance is, how do you deal with that? How do you deal with a young person who's been victimized by his father? This is what he knows. This is what he's taught as may be proper, you know, behavior. And I thought that, you know, I always felt that, you know, he should have been given a little more, maybe a little more leniency and that we have to look in terms of rehab. What, what, what's gonna happen to this, this young man's gonna get out of jail sometime, and the hope is, is that, you know, he doesn't continue to behave that he, that it was taught to him by his father - that his father, you know corrupted him. | 41:04.00 |
| So my concern's always, you know, always are, you know, do we concerns with lengthy prison sentences for him, as opposed to well - can we deal with the problem itself? Because I always looked at him as a victim, as I looked at these children as victims. And as I looked at Ross Goldstein as a victim. The father I felt was the, was the, the person who put this all, you know, this, created this pattern of behavior for his son. | |
| So I, you know, I, I, I felt, you know, I have some, you know ... Look, I | 42:14.00 |

| | |
|---|---|
| think he should have been punished. But I have some empathy for, for Ross Goldstein in that regard. I mean for yes, Jesse Freeman. Yes.<br><br>END OF INTERVIEW | 42:22.00 |

**A-1156**

COUNTY COURT
NASSAU COUNTY

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

               Defendant.

-------------------------------------------------------------------x

### AFFIDAVIT

ANDREW JARECKI, having been duly sworn, hereby declares that the
following is a true and accurate copy of excerpts of the transcript of my
conversation with Larry Solotoff in 2001.

                                       Andrew Jarecki

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-1157**

Lawrence Solotoff

| PART 1 | |
|---|---|
| A: Hello. | 01:57.00 |
| Q: High, this is Andrew Jarecki | |
| A: You're calling regarding a film of some sort? | |
| Q: Yes. | |
| A: Okay, I think I left instructions with your assistant, that we really don't want to be involved in the matter. | |
| Q: I think .. | |
| A: I know you're persistent. You send letters and stuff like that. | |
| Q: And that's my job. | |
| A: I know, but I don't want our children's name to be identified, or anything. It's not a matter of public record. | |
| Q: Sure I understand that. Well, I think ... And I know you're a lawyer, and I'm sensitive to, to. More than anything else the personal issue of what, you know, what the story is about, and the case is about. But I think my, you know, my approach has generally been, and the reason I've gotten some cooperation on this subject is because, you know, number one, I'm very sensitive to the issues of confidentiality. The reason why I wanted to connect with you was because I have ... | |
| I probably should give you a minute or two of background on this, because as of this moment - the reason that I'm calling you is because there is ... There are two people in the film now mention you. And I want to try to find a way to at least discuss that with you, and ... something that's not acceptable to you, to try to work out a way to avoid that. | 2:55.00 |
| A: We don't have to be mentioned. Why would we have to be mentioned? | |
| Q: Well, you don't have to be mentioned, other than the fact that obviously I've interviewed, you know, a hundred people for the film, and in the current edits, which is pretty close to finished - this is one, you know, the story that relates to you is mentioned, and is mentioned in | 3:37.00 |

some detail, and therefore I wanted at least talk to you about it, and understand your, you know, your sensitivity to it, because there are people I've spoken to people who say, 'Yes, I have something to say about it.' And other people say, 'I have nothing to say about it.'

In this case it's odd, because we have people who are talking about you. And I want to be sensitive to that, because any time, you know, you mention anybody in conjunction with a case like this, it can be a sensitive issue, whatever the case is.

A: Well, I don't know who would know anything about us, or our children, even if they were to mention it. How would they know? Even if they were investigators, or anything like that. Because there was no one that we spoke to regarding this matter at all. Okay?    4:03.00

Q: Well I think that ... I tell you, I mean, the information that I had has to do with the ... that there was a visit to your house on November 12th in 1987 by Detective Hatch, and another detective called Walling(?) Jones. And they did a thorough report of that visit, and this was in Great Neck Estates, and described their conversations with Justin, and Brandon, and Darren, and their ages, and their experience with Arnold Friedman. So there was a detailed history of that.

A: But that's usually confidential where it concerns minors. And I don't see how even they ... how any investigators have any authority from us to release the documentation. In fact, the way I see it is, if I knew in fact, if I know in fact that that will come out in the film, then we would go into court and seek an injunction, and try to restrain the publication of anything that would be confidential to them, when they were minors.

Q: Sure. And obviously, you know, a couple of things. One is I obviously have had very good advice on the subject. This is not my first time, and I'm familiar with sensitivity to the issues.    5:31.00

A: Yeah, but you have discretion as to whether to use or material or not, and I'm suggesting that you use your discretion not to use that material.

Q: Sure, and that's partly why I'm calling you. A - because I want to know what your sensitivities are specifically. And B – ...

A: Well, I think it's a private matter, and it would cause great injury to our children if this stuff was exposed.

Q: I understand that. And I've been working on this film for a long time, so I'm very familiar with the history of the case also.    6:06.00

Lawrence Solotoff - 2

**A-1159**

| | |
|---|---|
| A: But many people have done films on, on sensitive matters involving matters of this kind. But, you know a) there's fictitious characters for one, and b) there is anonymity for two, you know, and .... | 6:08.00 |
| As far as we're concerned, I mean, there's just - there would be no reason why they aren't entitled to their privacy. In addition, I don't know whether you know that, which kids were involved, and which kids weren't involved, if any. So, I mean, I don't know how ... who would identify that. The investigators themselves are not necessarily accurate at the time. For my point of view, the way the questions were asked by the investigators: they were suggesting the answers to the kids, and you gotta be careful with that. And in fact, I don't know whether that you need that stuff to come out. These guys were, they were so ... In other words, the kids might not say anything that was particularly offensive, but in walks an investigator and says, 'Show me where below your belt you were touched.' The kids never said that. | 6:36.00 |
| So I mean, so what happens is we got problems with everything going forward on this. And I think that, you know, you're treading on thin ice to involve our family. Whatever you have, you have enough to go do with other people. Not with us. | 7:29.00 |
| Q: Well the issue is to some extent, I think it's interesting because ... I'll just tell you, you know, I understand your sensitivity to this. I have two kids and I would feel the same way. | |
| A: Yeah, but if your kids weren't involved, or if even if there was any way shape or form some tangential concern, and it was something that ... I mean obviously we were not involved in the matter in court. They were no affidavits taken, you know, we don't even believe that our children were involved in the matter, per se. I mean, they were students there, but what does that mean? And the fact of the matter is that I have no way of challenging what the investigators put in their reports, so I would insist on seeing anything that would in any way, shape, or form that would, you know, would somehow defame or injure my children. And we were trying to shield our children from the investigation as well. And the investigators know that. | |
| Q: Yeah, and they tell you also, just so you know. This is not a group of investigators, you know, breaking rank and telling me all kinds of stuff. I mean ultimately, you know ... I don't know what kind of lawyer you are but probably, you know ... | 8:49.00 |
| A: I'm a Civil Rights Attorney. That's what I do business in. Okay? That includes rights of privacy, freedom of information, First Amendment and the whole nine yards. | 9:16.00 |

**A-1160**

| | |
|---|---|
| Q: Believe me, I have a very good First Amendment lawyer, and I have tremendous respect for him because ... | 9:17.00 |
| A: No, no. I'm not threatening you. What I'm saying is ... | |
| Q: No, no, no. I don't think you are. | |
| A: I don't think that ... I think it would be a very simple and safe matter - since I got a second letter from you, and you're determined - I'm concerned that my children, and my family's names would be involved in a matter which we do not want our names involved. And I don't want the children's names involved in. And we tried to protect them then, as we ... we're seeking to protect them now. Now they're adults now, but the fact of the matter is, is that they have a right to preserve and protect their privacy. | |
| Q: Well I understand that. And I also, you know, it's not - the film ... It doesn't necessarily help the film to have anyone mentioned in a specific way | |
| A: I think not, because it doesn't matter whether anybody knows who's involved or not. Okay? There's no need to name families, or addresses, or names in any way that you could be connected. | |
| Q: Now I guess the reason that I'm, that I wanted to talk to you is because, you know, you were one of the first ... Well let me say this. I'm trying to gather as much information about the history of it as I can, because, you know, this is not the first time I've heard this story - that the police version of the events is not necessarily as indicated. You know, that often happens in investigations like this, that the police get very excited. Or they think that they're onto something huge, and they end up, you know, creating a very, very large case.  In this case, it was one of the largest cases ever. And I have had some indication that, you know, the police notes on these interviews are not accurate. And so ... | 10:17.00 |
| A: And that's whether we were one of the first people they ever came to or not, I would never know that. And the fact of the matter is - is that they are particularly aggressive. And we had to ... We were familiar with the case that went down on Long Island involving sexual claims against a bus driver who was doing something to school children on the bus. And he was for civil purposes - because he was charged with criminal offenses which he pled guilty to - but for civil purposes the bus company and he were sued. And they were able to prove, even in a civil court, this is not beyond a reasonable doubt, but where there is a preponderance of | 11:43.00 |

Lawrence Solotoff - 4

**A-1161**

| | |
|---|---|
| the evidence, that he didn't sexually harass those children. And that in fact the investigators were overzealous in trying to nail this guy down. And I'm telling you, what we saw here was over-zealousness. They suggesting answers, looking down where they wanted children to point themselves. I mean, they did not, you know, they didn't ... They wanted to talk to the kids without adults present. They stood on both sides of a child who's, you know, at that point in time young, and they know that these are policemen.

I have to tell you that we were deeply concerned about the charges for and against this guy.

Q: I think it was Robert ... the other case?

A: And quite frankly ... Yeah. You know, we certainly tried to protect our children from the police. And if they had other things to go on, let them go in that direction for themselves. | 11:43.00 |
| Q: Yeah. This is helping me a lot, because I guess partly what I'm trying to do is educate myself, and to the extent that what's said in the film by someone else is incorrect, it doesn't help me to use it. It will only hurt the film, not help it.

A: Well, I don't want to be quoted, and I don't want to be ... my name mentioned. So I don't know what that does for you.

Q: Well for example, you know, I can, you know, I can use what you're saying without using your name, and it can help me a lot to understand the, you know, the history of the case. But one thing that would help me, is if I could understand, you know, at least ... You know, even in this context what you're saying is very helpful. Because I tell you why. One of the things that they used in terms of sort of explaining the history of this, is to say that, you know, the case got really, really extreme. | 13:04.00 |
| I don't know if you know, if you followed it at all, but it got to the point where they, you know, were saying that the police were finding hundreds of children that had been viciously molested by the Friedman's. And, you know, their lives destroyed, and they were ... It got to the point where it's one of the most extreme cases of these sort of ritual sex abuse cases, where there were, you know, there were ten kids in the room at the same time - and the adults were committing all kinds of crimes in full view of everybody else in the room. It was very extreme.

And one of the things that interested me about the history of your experience with the investigators is that, you know, have a sort of description of it. And one of the things that struck me is that it's not very | 14:00.00

14:49.00 |