| | |
|---|---|
| extreme to begin with ... | 14:49.00 |
| *Static interference on both audio tracks.* | |
| ... more horribly molested. It says that they had some inappropriate experiences with Mr. Friedman. And I found that interesting because, you could argue that it was one of the early stories that led to a much more elaborate set of charges. | 14:59.00 |
| A: Who's your employer? | |
| Q: I'm self-employed. | |
| A: Who pays your fees? | |
| Q: I don't take a fee on this. I'm just making the film at my own expense. | |
| A: Who is your financial backing? | |
| Q: I am. | |
| A: Do your own financial backing? | |
| Q: I am my own financial backing. | |
| A: Well, there's nothing further that I want to say to you. I told you what I want, and what I would like to protect. There's nothing further for me to speak. | 15:34.00 |
| Q: All right. Well, I guess what I'm saying is that it helps me, it encourages me not to use more about you, to the extent that I can at least learn more from you, without having to be specific to you. You know what I'm saying? | |
| A: My concern is that you don't mention our names, and our children's names. | |
| Q: Well let me leave you with this, with this thought if you wouldn't mind. I'm in Rome, I'm far away and I can give you some more background on me. The reason is that I'm ... Basically I was in business for fifteen years. I ran a company called Moviefone, which I started in 1988 or so. I sold it to America Online about three years ago. Before that I was a filmmaker, and since that time I've been - I'm an independent filmmaker, so I'm making this film on my own, and I can afford to make it on my own, and it happens to be a very unusual case which I spent a lot of time on. | 16:38.00 |

**A-1163**

| | |
|---|---|
| A: This is a documentary or a movie? | 16:39.00 |
| Q: No, it's a documentary. And I've interviewed almost everybody involved in the case, and gotten tremendous cooperation from, you know, Judge Bachman who was the judge who was involved in the adjudication of the case. All the members of the Police Department. | |
| A: How is it that none of that was sealed? | |
| Q: Well a lot of it, a lot of it was, or in effective it was. But you know, you work on something for years ... | 17:02.00 |
| *Static interference on both audio tracks.* | |
| So just by way of background, you know, I'm experienced in this, and I also have had the resources to work on this for the last couple of years, or the last year and a half. So this is at the very tail end of it, and that's really why I wrote you again because I was sort of saying, 'Look I'm getting close to the end of this thing.' I'm sure these guys at least, you know, I'd like to them and see what their concerns are. Because I wasn't sure if you were going to call me and say, 'Look, you know, my kids didn't have these experiences, and I'm happy to say that to you - off the record, or on the record, or whatever.' At least I would learn that, and that would perhaps discourage me from using somebody else ... | 17:32.00 |
| A: They didn't have the experiences that anyone claims they had at Friedman. | |
| Q: You're saying they didn't? | |
| A: Correct. | |
| Q: So you feel that ... | |
| A: I don't know who told you what. The fact of the matter is that, as to whether investigators were here or not - there were investigators here. | 18:21.00 |
| Q: I can ... | |
| A: I never saw their report. | |
| Q: Do you want me to read you a few lines? | |
| A: You can read me whatever lines you want, it doesn't matter.... Our children were not involved. | 18:49.00 |

**A-1164**

| | |
|---|---|
| _Static interference is now throughout both audio tracks until 22:33_.00. | |
| Q: If you don't mind, I'll read you a few lines and see if you have a reaction. | 18:50.00 |
| A: Well my reaction is, I don't want to extend myself on this for any further, because you're acting more like a reporter and I don't want to be quoted. So quite frankly .... I will send you a letter to that effect. You see yourself forewarned, or foretold, as the case may be. | |
| Q: I appreciate that, and I am sensitive to the issue. Let me leave you with this final thought which is - one of the ways that this sometimes works, as you know, it's my job to try to get as much information as I can. Currently I have people who are describing events that have to do with your family. Obviously that's something that's nothing you want, I understand that's nothing you want, and I'm sensitive to that. | |
| At the same time, I would like to try to get an understanding, at least for myself, of the history of at least what your recollection is. And it may be two minutes, you know. It maybe that you, that I read you something and you say, 'You know, I had a conversation with my kids about this. It didn't happen.' Or you might say, 'I remember one thing in particular.' Something like that. | 19:44.00 |
| A: Well, let me put it to you this way. Comments made by the investigators, if they were in fact told to you without our authority, we would probably engage in some sort of litigation to enjoin and restrain the use of our family's names in any film whatsoever. | |
| Q: I hear that. So my just suggestions the following. Think about the possibility ... | |
| A: And it was intended to be confidential. And if anything going forward, and if that was released in any way without our family's permission, then we consider that a violation of their rights. | |
| Q: I understand that. | |
| A: Any damages that flow therefrom, as far as we're concerned, we will pursue. | |
| Q: I understand that. So my suggestion is the following. At least I will leave you with this thought which is - I would be happy to send you a letter saying that I will not use your family name in any way. And that I will, you know, guarantee that it will not be included in any way in the film, or any reference in any specific way to you, or your kids. And in return | 21:06.00 |

| | |
|---|---|
| for that, I would like it if you would consider having a phone conversation with me. | 21:06.00 |
| A: I can't go into details on anything at all. So what would be the purpose of the phone call, unless you wanted to talk about the election between Bush and Gore? | |
| Q: Well, only because you, because you obviously do have some recollection of it ... That I as a filmmaker trying to understand, you know, what happened. And if we had that conversation after you thought about it, I would also send you a letter, saying I'm not going to use any of this in any specific way relative to you, or your kids. | |
| A: I think you have to send a letter no matter what, and I'm not going to make a promise of performing, or participating in any way. So I'm not going to do that. You have to be the judge as to what is prudent for you. | |
| Q: Well obviously I have to make that decision as I go, but in general ... All I'm saying to you is there's a guaranteed way to make sure that ... | |
| A: No. The guarantee is a quid pro quo, and I'm not interested in the quid pro quo. | 22:00.00 |
| Q: All right. Well it is a way for you to be sure that, without any question of the legality of it, you're helping me to make an honest film. | |
| A: I think you understand what the way is. Without a quid pro quo. I'm not interested in participating. I really wasn't in even calling you.... | 22:19.00 |
| For whatever I sent to you for whatever, you know, in whatever salt or grain you wish. But then try to protect my family. | 22:33.00 |
| Q: Well I'm certainly offering you a way to guarantee that ... | |
| A: I don't need a way to guarantee anything. | |
| Q: All right. Well, I understand that. Anyway, you know how to reach me. Obviously I'm well advised on it, you're well advised on it. I'm not trying to cause a problem for you. I'm trying to make a film that's accurate, and the best way for me to do it, is to an anonymous source ... | |
| A: I think you can find ways to do whatever you have to without treading on our toes. | |
| Q: Well, I have to make a film about something that involved ... | 23:07.00 |

**A-1166**

| | |
|---|---|
| A: You may have plenty of other material you could use, without specifically naming names. | 23:08.00 |
| Q: I may. I'm just telling you that I have material that includes you, and I'm trying to make a suggestion for a way that I get information without revealing anything about you, and without compromising you. And in fact, give up something that is otherwise, you know, an opportunity to describe what happened - without, you know ... So anyway, it's a suggestion. I may make a suggestion to you and a ... | |
| A: You understand my caution to you? | 23:38.00 |
| Q: Believe me, I'm making a film about a sex case. I'm familiar with all the rules. So I understand what my freedom is, and I understand who's, you know, what liabilities are. And I understand you're concerned about it, and I also understand that I don't want to invade your privacy - and that's why I'm suggesting a way for you to at least inform me or give me a little memory of your feelings which, by the way, is something, it's not such a bad thing to do. Because if you feel that the police ... I mean I'm looking at a report that summarizes the police's alleged experience with your kids. You know, it's not a bad thing to set the record straight - especially if you don't have to do it in a way that's ... And I'm just looking for the truth about what happened with this case. And that's why I'm saying this might be a way to do it. | |
| It's tough for me to get real information on the case. I mean it is. There aren't a hundred people coming forward saying, you know, these are victims, and this is what happened. | |
| A: I didn't say my children were victims, and quite frankly I'm going to tell you that, I'm seriously considering that may be under the circumstances, and given what you've told me - I might have to go to court in any event. | 24:28.00 |
| Q: Well. | |
| A: Do you want to do ... I don't want to do that if I don't have to. You can send me a letter that assures me that my family's names will not be mentioned. That will not be portrayed or mentioned in the film. And that will be the assurance that will guide us. | |
| Q: Well my issue is ... Number one, I'm certainly not concerned about, you know, about getting sued. You know, it happens in life. | |
| A: It happens I mean, but I'm trying to protect my family so ... | |
| Q: I totally understand that. | 25:08.00 |

| | 25:09.00 |
|---|---|
| A: And I'm being civil. I'm not yelling, shouting, or screaming.<br><br>Q: I understand that. And also, I don't think you think that I'm, you know, setting out to try to make a film that's going to say something about your kids that's not true, or anything like that. But I do have to talk about the victims, or the alleged victims, in the case, and there aren't a lot of opportunities to do that. Which is why I'm saying, you know, a way to do this is for me to guarantee you of that. And for you to share with me whatever recollections you have.<br><br>A: That's the third time he repeated that.<br><br>Q: Well, I think it's a very painless way of telling the truth about something. Which, you know, while you certainly haven't misrepresented it - it may be that it was misrepresented. And it's important. As a filmmaker it's important for me to represent it correctly, because the whole point of the film is to try to make an accurate representation of what happened. And I'm not, you know ... I'm suggesting that scenario ... There's no scenario under which I'm going to reveal anything that you don't want. And I can give you that in writing, which I think adds something to your comfort level - without, you know, worrying about, you know, what everybody's legal rights are. It's something that may be a three or four minute conversation ...<br><br>A: You want to send me the letter, that's up to you. I will decide when I get the letter. | 26:15.00 |
| Q: Okay.<br><br>A: There's nothing further to say.<br><br>Q: I tell you what I'm going to do probably then. I'm probably not going to send you the letter. But I will leave the offer on the table because I don't want to create an opportunity for litigation. If you weren't a lawyer, I probably would send you the letter. But I guess I'll just tell you something I'm willing to do, and if you said to me five days from now, 'You know, I thought about it. Yeah, I'll have a ten minute conversation with you. My wife and I discussed it, we don't mind setting the record straight if our names are not included at all.' Then, you know, then that's an opportunity that's available to you. And at that point, you know, I can send you something saying something in accord with our conversation, this is ...<br><br>A: It's my position that I don't want the family involved. I will talk to my wife about what we discussed. | 27:01.00 |

Lawrence Solotoff - 11

**A-1168**

| | |
|---|---|
| Q: Okay. I appreciate it. And I will let you know how to reach us. Or, you know, if I'm not available for ... or if I'm out of the country will call you within a week and reconnect. | 27:01.00 |
| A: And my advice still stands. | |
| Q: I understand. | |
| A: Got it. | |
| Q: Okay. Bye. Thanks. | |
| END OF INTERVIEW | 27:37.00 |

**A-1169**

COUNTY COURT
NASSAU COUNTY

--------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

           Defendant.

--------------------------------------------------------------------x

**AFFIDAVIT**

ANDREW JARECKI, having been duly sworn, hereby declares that the
following is a true and accurate copy of excerpts of the transcript of my
conversation with Detective Anthony Squeglia on May 18, 2001.

                                            Andrew Jarecki

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-1170**

HIT THE GROUND RUNNING FILMS

"ANTHONY SQUEGLIA"

INTERVIEW WITH ANTHONY SQUEGLIA

CORRESPONDENT: (NOT IDENTIFIED)

PRODUCER: ROGEN

TAPE #125

QUESTION:

Just give me a little-- tell me your name and
your background-- you know-- what you're--
(UNINTEL) for.

ANTHONY SQUEGLIA:

Okay, my name's Anthony Squeglia, everybody calls
me Tony. I work for the Nassau County Police
Department. You know, I started in April of
1969. And I just recently retired in May. And--
I was a precinct clerk for four years in the
first precinct of Baldwin. And-- subsequently
from there, I became a detective in 1974. I went
to the juvenile A bureau and I worked-- various
precincts in juvenile. I did a total of 19 years
and six months in that unit.

Tony Squeglia Tape 125

**A-1171**

TAPE #125                                                      PG. 2-        TAPE

During that period of time I would be taken out
to do various-- you know-- functions for
different units. Interviews with children-- you
know, court-- special court assignments and
things like this. Some of the sex offenders and
things like that.

So they would draw from my unit because we had a
repertoire (SIC) with children. We could sit
down and talk to them, get on their level. And
then I guess-- in the last five and a half years
I got assigned to the sex crimes unit which is
now called the special victim squad. And-- I
maintain my-- status there until I retired.

QUESTION:

And-- this-- Friedman case, what was your-- well
first recollection of (UNINTEL) intention
(UNINTEL).

ANTHONY SQUEGLIA:

What do you mean? When-- originally? In 1987

QUESTION:

Yes, yes.

**A-1172**

PG. 3

## ANTHONY SQUEGLIA:

Well, they brought us over and said they were
forming some sort of a task force-- I don't know--
- you know-- and they needed some special people
to work on this case.  And we would be attached
for the duration of the investigation.  And then
they filled us in on what had happened with the--
the government.  You know, they had done a search
of the house and came up with the mailings and
stuff.

And-- I was assigned to sex crimes and my boss--
immediate boss at that time was Fran Galasso.
And she-- she set us up in teams.  Male-- female
teams.  And-- we-- got a list-- of-- alleged
victims-- and-- we took-- lists and we were told
what to do.  In other words, go out and
interview-- whatever time it took.  If it was
daytime, or nighttime or evening, whatever.  You
know, and we actually gave up vacation time and--
it was a special-- thing.

**A-1173**

PG. 1        TAPE

I mean it sort of bothered me, only because I'd

been dealing with children for a lot of years.

And I saw the horrors that go on in some of these

children's families. And-- let's not forget the

aspect that we were all children at one time.

So.

QUESTION:

Now the-- the idea-- you know-- you got into a

little bit of a pattern of how you-- could best

address these families. Obviously they were--

some of them were surprised, some of them were

upset-- all these different reactions.

ANTHONY SQUEGLIA:

Yeah.

QUESTION:

What do you remember about how-- how you found

way to get in and start talking.

ANTHONY SQUEGLIA:

Okay, well, the list was comprised of a lot of

names and families. And-- in the-- one of the

first things we did was-- to see-- establish how

long a child had been in Mr. Friedman's class

**A-1174**

TAPE #125

PG. 5

That would give us an advantage because the
longer in the class, the more we would focus on
that child.  Because we felt, if anything did
happen, that would be-- most likely person.  We
figured out his routine before we did anything.
We figured out that classes went from Monday till
Saturday, Monday being-- new recruit type thing.
And then if-- if he sort of-- got caught on you--
as a child, you would advance to Tuesday and
Wednesday and Thursday.

This would be over a period of time.  And then--
he would focus in on-- possible victim.  And
would escalate it up to a Friday or a Saturday
class which was a special class.  So we focused
in on Friday and Saturday classes because we felt
that's when most of these things occurred.  Down
to-- minimal-- and student-- you know-- activity
in those days.

And then once we approached the-- the homes, it--
you know-- the first thing you do is you have to

**A-1175**

TAPE #125                                                                    PG.        TAPE #1

get the confidence of the parents.  Because

without the parents, you're not gonna go

anywhere.  So-- we introduced ourselves.  We--

pretty much in plain clothes.  Sometimes-- we

originally went out in suits and ties.  And then

it regressed to plain clothes because it was more

familiar-- you know-- we didn't wanna traumatize

the children.


So-- so with the parents, my partner-- Detective

Brinlow (PH) and I-- as soon as we went into the

house, were usually approached by the mothers.

And we'd explain what-- why we're there, what

we're doing there, and we'd really like to talk

to their children, preferably alone.  And that

usually gets a very distinctive reaction.  Some

mothers would automatically get the father and

then we'd have to repeat ourselves.


And then we'd-- we'd get a feel for how we're

going with this, if they're gonna actually let us

talk to the child.  So after a lengthy talk, with

**A-1176**

TAPE #125

the parents, some would say can you come back
tomorrow. Meaning that they wanna discuss this
with their children because they possibly didn't
believe what we were saying. Some would
immediately say-- you can speak to my son. And
then we'd ask them-- we'd like to speak to your
son alone.

Preferably alone. And that was another mixed
bag. Some parents-- like to be there. And we'd
explain to them that sometimes children in
speaking will not divulge anything vital if the
parent is there. Because they never wanna--
children always wanna please adults. That's a--
that's a fact. So-- you could ask a child
something-- and sometimes they'd look at their
parents to get approval.

And that's not what we wanted to do. Another
thing we'd ask the parents-- was-- when your
child is lying-- or not telling the truth, what
kind of reaction do you get from him? You know,

TAPE #125                                                PG. :    TAPE #

some children-- act out-- some children-- you
know-- they just-- out and out liars-- you know--
to the parents.  So the parents have a feel,
because they live with the child.  And we would
ask little questions like that.  So we know if--
if the child is-- pretty much on the line with
us, you know?  We get a feel for it.  And then--
then we had to make a decision.  Who was gonna
talk to the child.

You know, and we'd talk to the child together and
you'd fin out the child would either favor myself
or my partner.  And that's who would take the
investigation.  We-- the opposite person would
sort of-- stay with the parents and go over-- you
know-- details that they were interested in.  And
the other person would be-- in-- in a room, the
child's room, you know, where they lived and
stuff.  Pretty much-- how it worked.

QUESTION:

When you first broke the subject to parents, it's
a very sensitive issue obviously, do you remember

**A-1178**

what-- what kinds of-- words you used or-- how
you-- described that? To the parents?

ANTHONY SQUEGLIA:

Well, you have to remember, most of the parents
already had an idea of what was going on. So
they-- some knew we were coming. Some even
called to make appointments so it wasn't a
startling effect. If they didn't know, it was
very rare. I mean we had one-- father who-- who
knew-- absolutely refused to let us talk to his
son. Even though his son-- had admitted to the
parents that something did happen.

And these are people of statute (SIC). These
are-- you know-- cardiologists, people up there
in standing. And-- they were annoyed, some of
them, that we even came to their house. Because
nothing would ever happen because their child
would have told them so. Very interesting.

QUESTION:

Now-- you know-- you don't (UNINTEL) you know--
but for example-- how did they-- how did they

TAPE #125                                                    PG. 12    TAPE

know before you got in there what you were there
about?

ANTHONY SQUEGLIA:

Well, from-- they had their own network--
apparently everybody that-- had computer class in
Great Neck that went to Mr. Friedman's class was-
- if you wanted to be something in the community
and you wanted computer lessons, Arnold Friedman
was the place to go.  So there was a nucleus of
people, a group that knew each other.  And that
would actually confide in each other.

I don't recall any-- shocked parents, so to
speak.  They were shocked maybe because their son
was there and they were kind of shocked that
their son's name showed up on the list.  Even
though they might have spoken to their son about
it.  And their son totally denied anything.  They
just wanted the opportunity to find out if
anything was-- you know-- had gone on with the
child.

TAPE #125

PG, 11

Because-- you know-- the psychological
ramifications. But-- some parents-- are-- not
all there either. You know, as far as-- their
upbringings and-- we've even had parents-- you
have to remember something-- we went to houses
and we would go back four and five times, okay?
And we got to be pretty friendly with the parents
on a-- like-- "Hi Tony, hi Pat, have coffee," you
know, some would offer dinner.

So those people appreciated us to come in there
because they really wanted to get to the bottom
of this thing and get the proper help for their
children.

QUESTION:

So-- you were-- sometimes you would go back a
number of times-- explain that.

ANTHONY SQUEGLIA:

Yes.

QUESTION:

What was the biggest-- what was the-- what was
the average and then what was the most number of

A-1181

TAPE #125

times you had to go back?

.ANTHONY SQUEGLIA:

I would say the one that actually broke the case,

I would say about four times. When I say broke

the case, it was the first interview that the

child actually-- gave us some vital info. You

know, evidence, so to speak. What had happened

is once the initial interview was done and we

were invited back, we would sort of dress down.

And I say dress down, is pretty much like this.

You know, depending on the weather.


And we'd actually go into the room. And it was

very friendly atmosphere. Because once a child

knows-- knows you, they feel confident with you.

I mean you haven't done anything, really, at this

point. And you're laying the groundwork. So

what happens is you go up to the room, you

actually sit on the floor with these kids. Or

you play with the computer and they were all

computer literate.

**A-1182**

And then eventually on this one particular child,

he went in— finally-- out of-- out of the blue,

from just sitting down talking, just turned

around, opened his computer, brought up a screen,

and it had an apple tree on it. Had a tree with

apples. And each apple had a number in it. And-

- I don't recall the numbers but I think it was

like eight-- up to eight.


And each number represented a date and an

incident that something took place. Then he

proceeded to give me-- magazine that he had

brought home, was allowed to take home. Then he

gave me the disk that he had taken home. So that

was pretty much it.

QUESTION:

What kind of magazine?

ANTHONY SQUEGLIA:

It was a-- it was a boy/boy magazine. Little

boys. You know, it was-- secreted in his room.

So-- it sort of made sense. It was a very--

tough interview.

Case 2:06-cv-02136-JS Document 37-1 Filed 12/07/20 Page 22 of 218 PageID #: 4721
Case 20-3795, Document 37-2, 11/30/2020, 2983376, Page 175 of 1966

QUESTION:

And-- (UNINTEL) as a game or something?

ANTHONY SQUEGLIA:

Yeah, it was a game. I think it was called--
there were so many games. Stroker or-- something
about masturbation. I don't know, something like
that. He was allowed to bring it home.

QUESTION:

And how old was that boy?

ANTHONY SQUEGLIA:

I think he was about eight, seven or eight.

QUESTION:

And how did he describe to you that these
incidents (UNINTEL).

ANTHONY SQUEGLIA:

Pretty much-- first of all, you have to realize
that-- it was tough to get him to admit anybody
touching him other than his parents. You know,
they asked him things like that. He found it
pretty much without telling me, but it seemed
like it was very offensive to him. He would
touch him on the shoulder and then he'd go--

his chest and then into his pants.

He would yell to stop or-- call out his Dad's
name or something like that. He was told to shut
up. And then-- he would describe games that were
not even mentioned in the article. There was a
game there that was called leap frog. And-- this
one really-- got to me. It was-- they would play
leapfrog in the class. They actually had their
clothes off.

And you-- you associate leap frog, like you did
when you were a kid. One guy jumping over
another guy. But the fact is, it means
everybody's butt's up in the air. So to speak.
And then-- they were made to eat-- they-- they
didn't describe it but we described it-- very
offensive-- we called it "come gum." They used
to ejaculate into gum and they used to give it to
the kids to chew.

We found this personally offensive. You know,

PG. ?

TAPE #

there was more than just one child telling us
this. So-- you know-- children that age don't
sit down and talk about these things. You know.
They don't want the title of homosexuality, even
though they don't know what it means, or what that
word means, associated or attached to them. I
find this to be (UNINTEL) behavior. So

QUESTION:

Now-- obviously these people are embarrassed and
they're (UNINTEL), I've heard that-- you know--
it was very hard to get (UNINTEL). Tell me about
what was that (UNINTEL).

ANTHONY SQUEGLIA:

First experience, you had to get a feel for it.
In talking with the child and armed with the
information of the parents of lying, or not
telling the truth, you sort of-- I mean you do
things for a lot of years. And-- you sort of
get a gut feeling. And what you don't want to
is very important to keep focused on this. You
don't want to revictimize the victim. That's
really relevant to a successful investigation

A-1186

TAPE #125

So the best thing that we can do is to make
friends with them. To be on their level, so to
speak.

I know all the books say you don't go down to
their level but at some point you have to get
down. Depending on what they said to you and how
you answered them, I think made a big difference.
The fact that you were friendly with the parents.
They would go to the bathroom, I mean if they had
to go to the bathroom they didn't ask permission.
They were told they could get up and leave. So
if the child went down to the kitchen or the
living room or the dining room, saw his parents
having coffee with your partner, it was like
their family, so to speak.

Let's not forget, we're dealing with little
children here. So we're not the bad guy, and
we're not touching them, and-- after a while,
they get your confidence and they wanna tell you.
They actually wanna tell you. Because they're

TAPE #125

PG. 18          TAPE #

gonna feel better.

QUESTION:

Now-- tell me about the-- (UNINTEL) that they

didn't say anything.  Tell me about the--

(UNINTEL) by the not saying part.  Because that's

the part that scares the parents, that-- kids

could-- you know-- you visit them and visit them

and you know-- (UNINTEL) you know.

ANTHONY SQUEGLIA:

That something went on.

QUESTION:

Yeah.

ANTHONY SQUEGLIA:

Them not saying?  It depends on-- I'll give you

one good example.  There was a-- a child that

had gone to see with Pat.  And it was up in the

northern end, it was a very exclusive, very nice

house.  And-- it had a maid and a butler type

thing.  And when we went to the house, one of the

boys from a previous investigation said some--

so was also touched on that date.

A-1188

TAPE #125

So that gives you another lead into another child. But his name was on the list. We didn't get in-- focus on him right away, but now we did. So when I went to the house with Pat, the mother was there. But the husband was on vacation in Europe. The mother was going on vacation to Florida, and the child was left with the nanny, you know.

And it was like yeah, you can talk to him and I'll see you. The disconcern (SIC) sort of bothers you, too. Like-- I don't know where that came from-- because-- I would never do that. So we sat with the child in his room. And he had a bunk bed. He slept on top. And-- we talked and talked and he wouldn't say anything. And-- Pat and I went outside and we were like-- this-- this kid was-- violated but he's not saying anything. We sort of-- we spoke to him for quite a while. And then we figured out, and this was a-- was a flukey thing.

APP      0406

TAPE #125

PG. 2

TAPE #12

We figured out that-- he wouldn't talk to us

because-- he couldn't associate with us. So I

got-- Detective Washington-- the nanny was-- a

female, she was Hispanic. And Detective Jones,

or Washington, whatever name you have, she was on

another-- you know-- other cases. And her and I

went back.


And after he saw me and recognized me as very

familiar, he started to talk to her. And I could

only associate that to be-- she was the same

color as the nanny. And he always spoke to the

nanny. And from that point on, he would tell me

he had blood in his underwear. But he would

throw the underwear away. He would hide them

the-- I mean-- this is a little kid.


He would hide them and get rid of him. I thought

that was pretty-- pretty tough decision for a

child to make. But he associated with a

different person. So we did whatever it took

To come across.

TAPE #125

lk to us
us. So
ly was--
:ive Jones
', she was
d her an

as very
And I co
ie same
ke to th
ld tell
would
de them

I thoug
for thi

took.

QUESTION:

Now how are you-- a lot of parents (UNINTEL)
about-- you know-- how they-- (UNINTEL) kid or
whatever. When the kid's saying nothing
happened. How do you-- make the transition in
such a way that-- you get them (UNINTEL)?

ANTHONY SQUEGLIA:

Well, if you talk to a lot of children, you don't
give them an option, really. You just-- be
pretty honest with them. You-- you have to tell
them pretty honestly that we know you went to Mr.
Friedman's class, we know how many times you've
been to the class. You know, we-- we go through
the whole routine. We know that there was a good
chance that he touched you or Jessie (PH) touched
you or somebody in that family touched you in a
very inappropriate way.

Now-- have you ever been touched and felt
uncomfortable? Now there's-- as adult as that
might sound, good touch bad touch is pretty much
in schools. And yes, we do know. And you can--

**A-1191**

you can pick up-- like-- have you ever been
touched? Good or bad? You know, like your Daddy
touches you on the shoulder or your Mommy washes
you in the bathtub and touches your private
parts.

Anybody ever touch you where you feel
uncomfortable? And you get mixed emotions. Some
kids would start crying. So you don't really
give them too much of an edge to say, what we're
here to find out about. We already know about
it. We want to hear what you have to say about
it. And we know he probably didn't touch you, he
probably touched somebody else, you see. And
then once they realize that other people have
come forward, it's not easy, but it does work.

QUESTION:

Now you-- now you know that-- (UNINTEL) Jones
said that (UNINTEL). How do you express that to
a child? You can (UNINTEL) them to (UNINTEL)?

ANTHONY SQUEGLIA:

Well, we try to find out-- what-- made them keep

it in so long. And usually he would say-- one
boy said-- I was told if I ever told my parents--
one night, and the specific night wasn't
mentioned, I'd come out of my house and someone
would grab me from under a car and drag me away.
The variations were, I'll burn our house down,
I'll kill your parents.

I mean-- would-- whatever it took, whatever--
whatever threat from the adult-- was meant for
that child, depending on how he acted when he was
touched. If he was aggressive and demanded,
don't touch me, I'm sure they would have said
we'll kill both your parents. Or something to
that effect. You know.

        QUESTION:

Now-- did you-- you have a (UNINTEL).

        (BREAK IN TAPE)

        QUESTION:

You were saying one mother?

        ANTHONY SQUEGLIA:

One mother, up until about three years ago-- was-

TAPE #125

PG. 24   TAPE #1

- was adamant-- we had gone back to her house
about three times. And she led us in the first
time. She heard the allegations. She said I'll
talk to my son, you can come back. So we came
back the next night. She said, I spoke to my
son, nothing happened.

So-- during the investigation of the other
children, the name kept popping up. So we went
back a third time and we said listen, we-- we
have a little more, we'd really like to speak to
your son. She said, I told you. I spoke to my
son, nothing happened. I don't want you coming
on my property any more. If I have to go to
court to get a restraining order to do so.
Ironically, this woman-- I won't mention her
name, used to call once a year to speak to me.
Just to-- see how things were going.

And I really-- I could associate with her, but I
was kind of annoyed because the guilt was coming
out in her and I felt bad for her son who was

TAPE #125

to her house

is in the fi...

She said ...

So we ca...

I spoke to my...


the other

up.  So we w...

sten, we-- w...

like to spea...

I spoke to...

want you co...

ave to go to...

to do so.

mention her...

o speak to ...

ing.


with her, ...

guilt was ...

r son who ...

now-- I don't know-- 17, 18, 20, I don't know.
And-- was a victim.  And she-- she's on a guilt
trip.  So-- and then that stopped, abruptly, it
just stopped.  Pretty wild.

QUESTION:

Now-- (UNINTEL) when-- (UNINTEL) try to recollect
things-- or-- not recollect-- you know-- I guess
one question is how did they say to you, "I don't
remember."  Or I don't know, or that didn't
happen.

ANTHONY SQUEGLIA:

Depending on how they say it, you would know.  If
they don't wanna remember.  You know, I mean you
say-- you have small children.  So you know if
they remember.  Let me tell you, there was-- I
think there were like-- almost 400 names to be
dealt with.  And-- I know for a fact a lot of
interviews never got past 20 minutes.  We felt
were-- really-- good cases.


But-- can't fight city hall.  When they say
you're out, we're out.  You know, I guess some

TAPE #125                                                           PG. 26     TAPE #1

people felt that we would alienate their
children. Sad, it was sad.

QUESTION:

Now-- what were the kids-- the kids who were
saying they couldn't remember or-- what would
they say to you-- at first-- when they would say
that?

ANTHONY SQUEGLIA:

Nothing ever happened. We did computers. We
learned-- how to do games and Mr. Friedman was
very nice, he used to help us. You know, it was
sort of-- in the back of your mind, you're saying
to yourself, geez, we've done, I don't know,
maybe-- 30, 40 interviews. Little things are
coming up and they're saying-- geez, I don't
think we're on a witch hunt here. I didn't think
we were on a witch hunt.


I felt-- if it happened, we were gonna find out
it happened. It was just a matter of time before
you start linking things together. You know,
there were kids that would see him in a

Case 2:06-cv-03136-JS Document 37-41 Filed 02/07/2013 Page 35 of 218 PageID #: 4734

supermarket and would run for cover. Parents would call us. I want you to-- I want you to come and interview my child. And nothing would happen. You know, they couldn't give you anything. They didn't pick on everybody. You gotta remember that.

Some kids are so involved-- when children are involved in things, they're not focusing on what's going on around them. They might see something and not see it at all. You know, they're into computers-- you know-- a computer kid today, I have a grandson. He gets on the computer, you could talk to him, he'll yes you to death.

Two minutes later, you shut the computer-- he doesn't know what word you said. Not even focusing, paying attention to you. So-- what's to say that these kids did the same thing.

QUESTION:

Now-- it also must be that there were different

TAPE #125

PC TAPE #1

levels of youths in the class. And (UNINTEL)
kids were playing leap frog in one class and
other kids would remember that.

ANTHONY SQUEGLIA:

Yeah, there were kids that remembered the leap
frog and the come gum. So they-- you know--
came out with-- the bathroom was always
available. There's a bathroom right next to
thing there. And-- very interesting-- running
through the list, there were no females. There
were a few females in the classes but never
it to Friday or Saturday.

Some of them never made it past three weeks,
weeks at school. And a lot of things we pick
up were-- Arnold Friedman would not allow the
parents to come into the house to pick up their
children. His excuse was always-- the neigh
have complaints-- there were no complaints.
There were absolutely no complaints.

They would say-- you can drop them of at th

Case 2:06-cv-03136-JS Document 37-1 Filed 12/07/20 Page 37 of 218 PageID #: 4736
Case 20-3793, Document 37-2, 11/30/2020, 2983378, Page 1190 of 1360

PG. 29

TAPE #125

door. And-- I think-- Jessie used to bring them

out sometimes. I'm sure they got there-- from

the classroom to the car, in that little

corridor, they got the threat, or they got,

"don't forget, don't tell anybody." You know,

that-- that type of thing. And then I think it

even got more bizarre when more names started to

pop up. You know, Ross, and the other-- how he

was shut down-- like-- immediately. Because of

the family name.

           QUESTION:

(UNINTEL) other guy.

           ANTHONY SQUEGLIA:

Yeah.

           QUESTION:

Just so you know, those guys are-- in the movie.

You know-- Scott (UNINTEL).

           ANTHONY SQUEGLIA:

Oh, they are. Okay.

           QUESTION:

And they're (UNINTEL). But-- the-- what was your

recollection of the Ross factor? Like-- how did

TAPE #125

TAPE #

you (UNINTEL) in public?

ANTHONY SQUEGLIA:

Well, Ross, when we established that Ross, he
had a band. They used to practice, Jessie and
his band. And it was established that Ross was
one of the players. We had gone to speak to him.
And I remember it vividly. It was-- we couldn't
get in the house. I mean it was a fiasco. He
surrounded the house, the grandmother was home,
the kid was running from window to door. We
don't know if he was trying to get out of the
back of the door and take off.

We didn't know-- we didn't know what he was
doing. All I remember was it was a fiasco. We
had to get the parents there and physically
remove him. And I think he-- he might have
turned a little state's evidence. I'm not too
sure, I don't recall about him. And he got
minimal time, I think. Two years.

QUESTION:

He got YO status.

ANTHONY SQUEGLIA:

Okay, did he?

QUESTION:

(UNINTEL) let him out.

ANTHONY SQUEGLIA:

They let him out, okay.

QUESTION:

(UNINTEL) decided that-- Onorado (PH) made a deal with him but he didn't tell (UNINTEL).

ANTHONY SQUEGLIA:

Yeah, Onorado-- you interviewed him?

QUESTION:

Yeah.

ANTHONY SQUEGLIA:

Okay, I've had a lot of dealings with him and it's-- I don't know if he was the right guy for the case.  But--

QUESTION:

Well, you said-- I heard-- some people have said that-- they felt like he was crazy about it-- or-- was there something about it that made him (UNINTEL) prosecute or--

## ANTHONY SQUEGLIA:

It was one of the biggest cases in the county.
Maybe the state, I don't know.  I know we had
gone to New Jersey because they had a big case in
Jersey.  Just how to go about the proceedings and
the charges.  And I think-- I think it was-- a
big to do, it would have been easy just to-- to
run the case out for a plea.  On-- on the DA's
behalf.  I don't know.


I mean you know, I deal with these people all the
time.  He's had a lot of cases-- in my field of
sex offenses.  He-- a nice guy, but not one of my
favorite-- I felt the parents were shorted.  If
you can get what I'm saying.  I think we should
have gone all the way with this.  I think we had
100 and something-- federal-- charges against
him.  I know we stayed up all night typing up the
paperwork for the-- 6:00 Hit in the morning.  And
we went right-- I think it was close to
Thanksgiving, if I'm not mistaken, I had like 20
people come in here or.  I don't know.  I guess

TAPE #125

PG. 33

deal was made.

I guess-- in-- instead of dragging-- and another
aspect, maybe if it was dragged out in court
maybe it would traumatize the children.  Putting
them on the stand and cross examining them.
That's not a good thing either.

QUESTION:

Ultimately, there's some-- I'm confused about the
other guy.  The guy (UNINTEL) and they were--
they were picked up.  What kept you from being
able to prosecute those guys or what were you
trying to get?  Was it that the kids didn't
recognize them?  Or what--

ANTHONY SQUEGLIA:

Yeah, the kids didn't know who they were.  There
were other kids in the room.  Identification,
tough.  You know, just by association is not good
enough.  You know, they had a band, they had a
group, doesn't mean anything.  The fact that you
went to talk to them and shut down, they all had
attorneys.  Tells you something.  You know, yeah,

TAPE #125                                                          PG. 34

they were there, they were friends of Jessie's,
sure. But you're not gonna talk to my client.
And the fact that the children couldn't put a
name to a fact or-- can't do a line up. You
know, I think-- that would really traumatize a
child.

QUESTION:

Now how did you know that Ross and the other guys
were involved to begin with?

ANTHONY SQUEGLIA:

Through associations in school. Who you hang
around with. Previous-- I think-- I think--
Jessie was-- he liked to drink a lot and there
were-- juvenile cards on him and-- those cards
have associates on the back. It's a preliminary
thing. In other words, if I had your name, and
we're looking for you and then we wanna know who
your associates are and you've been in trouble
with us, we'd go through a-- legal file.

And on the back, it would say who you were
arrested with, who you were brought in with.

**A-1204**

TAPE #125

PG. 35

Even though nothing ever happened to you, you
would be on the back. So that would determine
who we're going out and speak to. Then you go to
schools, guidance counselors are great. You
know, because when they got a problem they need
your help and-- when you have a problem they--
you know-- we take care of each other. So they
tell you who's who, what's, and that gives you a
focus.

QUESTION:

Now in this case-- this is like-- you know that
Arnold and Jessie were both-- you know-- in the
computer classes and leading the computer
classes. But it's not necessarily an intuitive
jump to say well, there were other like teenaged
kids in there. So what-- do you remember what
made you-- what made you know-- okay-- well, Ross
was part of that. Or-- he was (UNINTEL) system
or something.

ANTHONY SQUEGLIA:

Well, if I'm not mistaken I think Jessie gave
that up. You know-- if I'm not mistaken. I'm

A-1205

TAPE #125

PG. 3  TAPE

not too sure on that one. You have to
understand, it's been a long time. And-- I
wasn't-- part of-- I was part of Arnold
Friedman's lineup. We had a-- you know-- I was
part of him-- in other words-- we gave him, we
got him pizza, we-- you know-- we'd feed them.
And some guys would say-- why are you feeding
this guy? Why don't you let him die, you know
this-- this is the feeling.


There are certain men or detectives-- female as
well, that when they get a sex case-- and it
happened up until I retired-- they wouldn't take
it. Couldn't deal with it. Call up and say
Tony, do me a favor. I got this case, it's
it's a rape, it's the mother's boyfriend, it's
13 year old girl. I-- I can't deal with this.
Can you do me a favor and take the case.
Absolutely.


And then they say how do you do this stuff, you
know? Well, I had a boss tell me one time

**A-1206**

TAPE #125

never seen a guy go after-- rapists like you two guys, me and my partner. And I said-- just something about them. You know, they take away people's lives, really. And we-- we've made some good cases and we've-- put a lot of people away. I don't know if that's good or bad but-- it wasn't just a slap on the wrist. You-- we did the homework, you did the time. You know.

(OFF-MIKE CONVERSATION)

SLATE 4

QUESTION:

The-- oh, I was gonna ask you if the-- did the kids ever get upset-- like emotional between the time that they would say-- nothing happened. And then the time that they would-- come up and--

ANTHONY SQUEGLIA:

Say something.

QUESTION:

Yeah, what is that progression like. Tell me like from the beginning, what's that arc like?

ANTHONY SQUEGLIA:

You would-- you would find some children, this one particular kid, we went to four or five

**A-1207**

Case 2:06-cv-03136-JS Document 37-4 Filed 12/07/20 Page 46 of 218 PageID #: 4745
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1199 of 1566

times. He was very cool. Didn't say anything,

nothing happened. Sit down on the floor, plays

games. Totally ignore you-- that you were even

there. After an hour or two you helped him with

his toy, you did this, you did that. And then

you were friendly.

And then-- from that point, you'd say-- you have

enough tonight, and why don't you think about it.

And you know-- we'll come back tomorrow. And you

know-- we'll deputize (PH) you and you know--

like cops-- do you like cops? I like-- yeah,

they-- my Mommy says they help us. That kind of

stuff.

You come back the next night, it's a whole new

ball of wax. It's like the kid is no longer a

stranger to you, sitting in a room and all of a

sudden-- you find the kid is a little hyper. You

feel like-- you get that feeling he wants to talk

to you and you better do it right before he

doesn't wanna talk to you at all. And you still

**A-1208**

PG. 39

asking about his friends and you-- you go really off the subject. And you-- really into it and then you just say something that triggers it and then all of a sudden the kid's gotta go to the bathroom.

And from a kid that didn't go to the bathroom for two hours the day before, he's running to the bathroom three or four times in an hour. Good indicator-- because-- you know-- his bladder isn't that bad. And-- when he comes back, you know, he's upset. And-- I'll tell you, it's just a feeling you get from-- from doing it a lot. I can't really explain it but-- when you have children of your own, you'll see what I mean. It's a tough thing.

You have that gut feeling and yet-- it only happens where some of them come across and some of them just never give it. They just never give it up. And your heart goes out to them because you know something did happen, maybe not as

TAPE #125                                                         PG. 46        TAPE

extensive as did to another one but-- he might
have been in the cultivating stage. You know--
coming up with-- he was going on Wednesdays all
the time. Wednesdays.

Close to Friday, close to Friday. You have to
keep that focus all the time, you know? The one
we really focused on were the-- Friday and
Saturday. Saturday mostly. No school, parents
away. Families-- two different places in the
country. Child depends on a nanny.

QUESTION:

Well, one of the things now that Elaine says--
well-- how is it possible-- you know-- that the
kids were-- you know-- one kid got his head
banged against the wall, another kid (UNINTEL)
blah blah blah, and then an hour and a half
later, parent comes to pick them up and-- they
take them home and--

ANTHONY SQUEGLIA:

Well, you know-- maybe they dramatize too much.
Banged against a wall? You can bang a kid

**A-1210**

TAPE #125

PG. 41

against a wall-- I believe it had paneling on his
wall, brown paneling, make a lot of noise, but
really do no damage, but get the point across?
You follow what I'm saying. Yeah, it can be
done, can be done.

I mean I could bang my head against the wall and
kick it with my foot and you'd think my head went
through the wall. You gotta remember, these
people that do these things, they're focused on--
touching little kids. They're focused on you
know--

QUESTION:

(UNINTEL) feel like-- you know-- how do these--
it's-- (UNINTEL) saying wow, you know-- I know my
husband-- you know-- might have some problems
but-- you know, he-- didn't engage in this level
of abuse where there were kids naked (UNINTEL)
all that stuff.

QUESTION:

Well, how would she know because every time he
ran a class during the weekend, she'd be gone.

TAPE #125

TAPE #)

She would absolutely-- leave the house. So it's
like sticking your head in the sand. I-- you
know-- I can't explain what she's thinking but
she had to have known.

I mean Jessie-- prancing around the house,
punching holes in the wall, these are-- there's
family with no love in it. That's the way I saw
it. I just saw a bunch of strangers living in the
house. It's-- it was sick. You know, I was
brought up with a family-- tough. Come up in the
city. You come out here, these kids think--
they're tough out here.

They have no idea what the city's like. So you
know, I guess-- you know-- I'm being a little
street wise fitting into this profile over here.
But why would she leave the house every time I
had them there?

QUESTION:

(UNINTEL) talk to me about-- (UNINTEL) back
there, said that-- I said you know-- it's

**A-1212**

possible that Elaine didn't know anything. And

he said, well, the first thing that she did when

she came in the house was you know, she said--

she got home after. And she said I wanna talk to

my husband alone.

                    ANTHONY SQUEGLIA:

Yeah, right.

                    QUESTION:

(UNINTEL) take him right into the office.

                    ANTHONY SQUEGLIA:

Right.  They wouldn't let her go, right?

                    QUESTION:

Yeah.  Because later on, they found out that--

(UNINTEL) well, why did she wanna go straight to

the office.

                    ANTHONY SQUEGLIA:

That's where I was, I was in the office at that

point.  I found the suicide letter.

                    QUESTION:

All right, yeah, well let's go back to the-- to

the raid (PH) now-- on-- you weren't-- on the--

you weren't on the November 3rd-- the (UNINTEL)

PG.

TAPE #:

raid.

ANTHONY SQUEGLIA:

No, no.

QUESTION:

But then November 25th came around.

ANTHONY SQUEGLIA:

Right.

QUESTION:

Tell me about that. What was the preparation

that and--

ANTHONY SQUEGLIA:

Well, we stayed up the whole-- we knew we were

gonna hit the house in the morning. I believe

was like six o'clock, if I'm not mistaken. We

all-- I mean we all stayed in-- 320 Old Country

Road (PH), Minneola. With-- Onorado decided

the charges were. I believe they were 95 felon

counts. And we typed our butts off that night

We got all the paperwork signed. And-- I calle

the wife and said-- I won't be home till three

four in the morning.

PG. 45

Then we're out at five again. You know, she's
saying I got 25 people for dinner and stuff like
this. And I said-- there's nothing I can do
about it. So you got the home front you gotta
worry about-- but-- we organized-- we went to--
17 Piccadilly Lane (PH).

Parked the cars, rang the doorbell, knocked on
the door, said we were the police and then banged
on the door, went in. We just punched the door
down. And they isolated the family. Took them--
the mother wasn't home, I don't think the mother
was home. Put everybody up-- upstairs on the
first floor and we were each in charge of a
section of the house.

Some guys had the bedroom, some guys had the
attic, I had the first floor, the office. I was
there when-- the clown came in. He was ranting
and raving. We had words and-- I was going
through the folders, so we told him to take a
hike. You know, he wanted his-- to talk to his.

Case 2:06-cv-03136-JS   Document 37-4   Filed 12/07/20   Page 54 of 218 PageID #: 4753
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1207 of 1566

PG. 5₄   TAPE

parents. He wasn't-- once you're in the house,
if you're in the confines of the search, you can
remain where they tell you to remain. That was
the living room upstairs.

If you're an outsider, you're not getting into
the search area, okay. And-- he was ready to
duke it out. He was ready to go to battle. And-
- I could-- I could understand that. And then
the wife came, she was ready to do battle as
well. Because she threw a punch at Fran Galasso
(PH) and she got a-- I think she got arrested, if
I'm not mistaken, right?

But-- Larry Meriwether (PH) and I were in the
office and he had a stand up piano. I remember
looking in the piano. I found-- I found a mini
dildo. I found-- we found tissues in the basket
- later turned out to have semen in them, stains
in the garbage pails outside. And I-- I remember
saying I can't imagine-- this guy getting raided
x amount of days ago and we're still finding shit

in his house.

You know? And then we went through his-- his files, because you never know, because they hide everything, they're very possessive. And I found a suicide note. And I said this guy's gotta be kidding. This is like an afterthought, you know, to myself. I-- (CLEARS THROAT)-- I didn't know how to take that.

But you know-- I did give it to the boss. I said-- we're gonna have to keep an eye on him because that's what it requires. I mean somebody that leaves a note-- I don't know if he left it for us to find or-- I just happened to be too nosy, I don't know.

QUESTION:

Was it in the trash or was it on the desk?

ANTHONY SQUEGLIA:

No, it was on his desk and he had like a-- folder-- files-- all different stuff in it. I was just going through everything to make sure,

Case 2:06-cv-03136-JS Document 37-4 Filed 12/07/20 Page 56 of 218 PageID #: 4755
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1209 of 1566

you know.

QUESTION:

Do you remember what it said? I mean generally

ANTHONY SQUEGLIA:

No, not really. No. I started to chuckle and
said look at this. You know, I stopped-- I
remember standing back and saying wow, this guy
serious. You know? I mean this could really
destroy a family, you know? And I didn't do
laughingly, I did it-- laughingly-- like in
shock. Like wow, you know?


And then-- would you do it if you were in this
situation? I don't know. But would you leave
note? Leave a note and then do yourself. Of
course the other-- raid was prior. Sad

QUESTION:

Seems like he was stuck, almost. Like he did
have the--

ANTHONY SQUEGLIA:

He didn't wanna give it up, I guess. They don
wanna give anything way. This is-- this

typical.

### QUESTION:

Now-- now when you went in the-- in the house, what did you-- what did you find in the piano?

### ANTHONY SQUEGLIA:

Found a-- miniature dildo. Like a rubber dildo. Excuse me-- some-- some more magazines. And that's when I said to the guys, you better check the garbage cans out. So that's when they came up with the tissues with semen on them. It wasn't much but-- why was it still here? I'm talking miniature stuff, like for little boys. Really disgusting stuff.

### QUESTION:

You know, later, he said-- those were mine. That's-- you know-- (UNINTEL) to enjoy that--

### ANTHONY SQUEGLIA:

Those were his. Yeah. Well, I wasn't privy to that. I would have said-- I would have commented on that. (LAUGHTER)

### QUESTION:

He-- now-- here's-- one of the things that Elaine

Case 2:06-cv-03136-JS Document 37-4 Filed 12/07/20 Page 58 of 218 PageID #: 4757
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1211 of 1566

says, was that he was emotional about the
the losing-- materials-- about the book-- I
think--

ANTHONY SQUEGLIA:

Yeah, I think he was-- I think he was more
concerned about his paraphernalia than he was
about his family. That-- that thing really
stuck in my mind because-- when he had his
attorney there, it seemed to be the focus of
the whole thing. Like they're gonna keep all
stuff. What about your family? You just
destroyed your family.

I mean it was-- I don't know-- but-- I could say
- I had a-- I had a double homicide one night
where-- two girls got killed in a car with four
kids, they stole a car in (UNINTEL) they killed
these two girls, pushed them. And I remember
had to go make notification to the parents.
That-- your daughter is dead, okay? And the
first-- I'll never get over this-- the first
reaction-- from one of the fathers was-- you

know, I just put a new battery in that car. Do
you think I can get the battery out of that car?
So this is how I associated this.

(OFF-MIKE CONVERSATION)

(BREAK IN TAPE)

ANTHONY SQUEGLIA:

So those people appreciated us to come in there
because they really wanted to get to the bottom
of this thing and get proper help for their
children. And we found it to be-- they came
forward. They (UNINTEL).

(OFF-MIKE CONVERSATION)

***END OF SIDE A***

***SIDE B BLANK***

***END OF TRANSCRIPT***

HIT THE GROUND RUNNING FILMS

"FRAN GALASSO/ANTHONY SQUEGLIA"

INTERVIEW WITH ANTHONY SQUEGLIA

PRODUCER: ROGEN

TAPE #126

**TRANSCRIBER'S NOTE** QUESTIONS OFF-MIC.  BEST EFFORT MADE.**

QUESTION:

(IN PROGRESS) --you were saying.  So-- and-- and
the-- so when you had to inform the father that
his--

ANTHONY SQUEGLIZ:

Yeah, what-- what had happened is-- the two girls
were pronounced dead at the scene.  I remember
being at the scene.  And-- I went to a h-- had to
go with homicide to the house to make
notification, and that's a tough thing to do.  I
had never done it before.  So I'd gone with this
detective, Al Martino (PH), we went to the house.

(CLEARS THROAT) And the first father we spoke to,
we said, "We got some bad news.  Your daughter

Anthony Squeglia Tape 126

Case 2:06-cv-03136-JS  Document 37-4  Filed 12/07/20  Page 61 of 218 PageID #: 4760
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1214 of 1566

was in an accident," da-da-da-da and the whole
nine yards. And what-- you know, "Your-- your
daughter is deceased. She-- died in the
collision." And the f-- and just staring at us.
And-- and it's like-- I could still see this
guy's face today. And he said, "You know, I just
put a new battery in that car. Do you think I
can get that battery back?" And I said to
myself, "Where is this guy goin' with this?
daughter is dead, you know? (CLEARS THROAT)


So I just associated this was Mano (PH)
Freidman's statement of, "You're gonna take
my stuff?" you know. So I said, "You know,
people get into this mode, they don't really
or know what they're saying. I don't know
don't know. And it wasn't the only case
that happen. It happened-- and that's--
that other particular case, I worked on it
own time because I didn't have a witness.
found a guy that was in shock that actually
the collision but never said anything.

TAPE #126

know, it's weird.

QUESTION:

Back for a second to the-- (SNIFF) just to the
family members. What was your impression, you
know you-- you had some experience with Friedman
on-- not just at the raid of the house, but also
after. Maybe starting with the night of the
raid, how did they behave as a family?

ANTHONY SQUEGLIZ:

Very distant. Very distant. It seemed like--
everybody's from a different family, you know?
(COUGH) The wife was disassociating herself from
the husband. (COUGH) Excuse me. The husband was
very, very-- quiet into himself. I guess his
mind was working internally, I don't know. The--
the s-- the older son-- who's the-- clown is--
ranting and raving through the house, being told
to leave. (COUGH) Excuse me. Jesse is-- in
another world. You know, he was away at school I
believe. I got somethin' stuck in my throat.
(COUGH) Okay. I'm good.

TAPE #126

TAPE #12

QUESTION:

Now I guess--

ANTHONY SQUEGLIZ:

(CLEARS THROAT) Thanks.

QUESTION:

Yeah.  I guess-- Jesse comes back at some point

ANTHONY SQUEGLIZ:

(COUGH) Yeah.

QUESTION:

Jesse comes back I guess while the house is

(SNIFF) searched.

ANTHONY SQUEGLIZ:

He-- he was called I believe.  I think-- Fran

Galasso spoke to him or something.  I-- I'm not

too sure, I don't recall.

QUESTION:

And-- and then I-- I think that-- I guess up

until this point he wouldn't have realized that

he was gonna be involved in the case.  He thought

this was more about his dad.

ANTHONY SQUEGLIZ:

(CLEARS THROAT) Yeah.  'Cause his dad-- he take

**A-1225**

TAPE #126

a statement that, "My dad ruined my life," or

something. "He's ruining our lives," or "my

family."

QUESTION:

And-- do you remember anything about him as a

person?

ANTHONY SQUEGLIZ:

Jesse?

QUESTION:

Yes.

ANTHONY SQUEGLIZ:

(SNIFF) I thought he was a little strange. My

first (CLEARS THROAT) opinion of his room was--

not a normal teenager. A little mo-- excessive.

The-- I thi-- I believe there were quite a few

holes in the wall. That's a sign of someone

acting out or-- I mean, how-- how would the

family let him get away with this if-- this was a

close family. If-- if one of my sons put a hole

in the wall, I mean we-- you know, it-- there'd

be some ramifications here. (CLEARS THROAT)

TAPE #126                                                     PG.    TAPE #1.

I saw a lot of destruction in that house.

Family-wise, human-wise.  I would never allow

child to do what he did in his room.  I mean,

there was stuff in his room was unbelievable.

What they show in the papers is nothing.  I me

QUESTION:

(UNINTEL PHRASE)

ANTHONY SQUEGLIZ:

I thought he was kind of strange.  I thought

had-- after-- after hearing all the-- pros an

cons in this case, I sort of felt sorry for hi

Because I felt that-- I really felt that know

about pedophilia, and I gave lectures on it

felt that the-- there's two other brothers if

not mistaken, right?  (CLEARS THROAT) He

father might not have been as bad in the

beginning and maybe had tried something

other b-- sons and never progressed.


But Jesse was the most vulnerable because

stage (CLEARS THROAT) the mother's into

the father's into his own thing.  This kid

**A-1227**

TAPE #126

nuthin'.  He has no love in the family, nobody patting him on the shoulder, nobody guiding him. So I'm sure he was into drugs and drinking. (COUGH) He was kind of strange. . Excuse me. (COUGH) Must be the pollen.

QUESTION:

When we spoke the last time, you mentioned that-- you remembered that Elai-- you-- you said Elaine had this relationship (CLEARS THROAT) or figured out that Elaine had a relationship with--

ANTHONY SQUEGLIZ:

They said they had found it.  And they said-- I never saw it.  But they said they had found her diary during the search.  And word-- the word was that she was having an affair with her therapist. I never actually saw that-- diary.  I know they found a book, I don't know if it was a diary or not.  And-- that-- that's what was going around. Now whether it was true or not, I don't know. (CLEARS THROAT)

QUESTION:

Did you notice anything about the relationship

Case 2:06-cv-03136-JS Document 37-4 Filed 12/07/20 Page 67 of 218 PageID #: 4766
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1220 of 1566

between the husband and the wife that struck

ANTHONY SQUEGLIZ:

I felt that she was more dominating than he.

was like-- very quiet. Was pretty quiet. He

seemed like a smart guy, and that's-- that's one

of the signs. Very intelligent person-- always

wants to be around children, schools. Just got

awards. I can't imagine why he won. (CLEARS

THROAT) It's compulsive. I mean, he-- he had

recently received awards from Queens or something

with the mayor and stuff like that, and he was

well recognized in the local schools. And this

guy blows it. I mean, this is-- this is-- a

sickness.

And I know on lectures-- I've gone up to

Connecticut on lectures for the county. And

I've spoken to Dr. Susan Sacroy (PH). She's an

authority on pedophilia, I don't know if you've

s-- read her book. (SNIFF) And she used to tell

us the-- the only cure for that is the constant

threat of incarceration. (CLEARS THROAT) There's

is no cure. So I take that as gospel, being
she's been around longer than I have.

QUESTION:

The-- it sounds like a raid-- happened, what you
found. And-- and then that you sort of revealed
more as you kept looking and then you picked out
something (UNINTEL PHRASE)--

ANTHONY SQUEGLIZ:

Yeah. We were in the house for quite a while.
(CLEARS THROAT) And the fact that we had a search
warrant for-- pictures and things, you know
you're allowed to go through-- I mean, you don't-
- you don't go looking for-- stolen tires in a--
in a file cabinet. But in this case we were
looking for photos and things like that.


So I had found his-- his suicide note. And-- and
then the-- at the conclusion of the search, we
were leaving the house. And we hadn't really
found much. And-- I went around the outside of
the house and I was looking around 'cause the
house is set up very-- it's an unusual setup in

TAPE #126

TAPE #126

the house. When you walked in (CLEARS THROAT)
upstairs, the staircase was to the left. (S
And it was-- three or four oak steps going u
big platform, and then steps going up furthe

And underneath those steps was-- was-- was
hollow. I kept banging on 'em. And I was
looking for access because that led up to th
front of the house. And then I went outside
was all brick facade. I went back inside
the only thing I could see going under the
staircase was this closet. It was a long cl
Now, I know the closet had been searched. D
had pulled some stuff out and they went thro
it. And it was-- they didn't find anything

On the way out, I got a hold of Fran Galasso
And I said, "Listen, (CLEARS THROAT) did the
pull everything out of this closet?" And
she said, "Yes they did." And I said-- I sai
"Is there a possibility we could take it out
again?" And I don't-- I don't know-- they s

"Why?" or something to that effect. "We just did this, we gotta get out of here. We've been here too long," or whatever. And I said, "I don't know, there's something about-- there's room under that staircase but I can't for me-- for the life of me figure it out." (CLEARS THROAT) Doing construction work all the time, I-- I found that there's dead space here.

So we p-- most people left the house. We were still there on the search. We took everything out of the closet again. And there was-- like I said, there was no light in the closet. And we went to the back of the closet with this flashlight, and sure enough the back panel of the closet went up. And lo and behold, there were computers in there-- disks, all kinds of-- information.

And I believe they took the pictures-- in the-- in the news clipping is-- it's in the truck. See, that wasn't available (CLEARS THROAT) on the

TAPE #126

PG.   TAPE #126

initial look-see.  But-- that's where he kept

his stuff, most of his stuff.  And that was

brought into police headquarters and that was

looked at by-- people that knew computers in

out.  You know, I guess you can't get rid of

stuff.

QUESTION:

Do you know what they found in the computers?

ANTHONY SQUEGLIZ:

No, I don't.  I don't recall.  You-- you have t

understand something, I was on like an

assignment.  (CLEARS THROAT) Once the whole thi

got rolling, we're back to our regular

assignments, you know.

QUESTION:

Right, right.

ANTHONY SQUEGLIZ:

So we're not privy.  (SNIFF)

QUESTION:

We-- I was gonna ask you one question about

kids.  Was it-- (UNINTEL PHRASE).  On that

search, was there-- did you find pornography

**A-1233**

Case 2:06-cv-03136-JS Document 37-4 Filed 12/07/20 Page 72 of 218 PageID #: 4771
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page 1225 of 1366

that search? Or was-- it was mostly-- other than computer games. I guess you found computer--

ANTHONY SQUEGLIZ:

Computer games, yeah. As far as-- you have to understand something. There were ten or 11 of us in the house. I don't know what they found upstairs, at least I don't recollect what they found upstairs. I'm sure they found stuff, but I don't know exactly what it was.

QUESTION:

And they arrested the-- Arnold and Jesse both, and then Elaine also?

ANTHONY SQUEGLIZ:

Then Elaine, yeah. For as-- attempted assault, or something to that nature.

QUESTION:

Were you there when she did that?

ANTHONY SQUEGLIZ:

Yeah.

QUESTION:

What do you remember about that?

TAPE #126

TAPE

## ANTHONY SQUEGLIZ:

(CLEARS THROAT) She was-- well again, put
yourself in her place.  You come home.  You find
(LAUGH) police cars all over your house, you find
'em rippin' your house apart so to speak.  And
you become violent.  I think I would too if that
was the case, not knowing what's going on, really
knowing what's going on.

And then couple that with the incident that
happened just a short while before that.  So it's
an invasion of your privacy to some ex-- some
great extent.  Would you agree or not?  I mean, I
would.  I'd be pretty pissed.  (CLEARS THROAT)
You know?  Yeah, she-- she was acting out.  And I
don't think the charges stuck.  I think-- they
dropped 'em.  I'm-- I'm not too sure.  (SNIFF)

She took a swing at Fran.  Fran Galasso is not a
person you wanna-- I mean, she had moxie, this
kid.  She-- she was a good boss, yeah.  You know,
some guys go, "How can you work for a woman?"

**A-1235**

Never had a problem. Never had a problem-- you
know? Do the right thing. (SNIFF) So.

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

QUESTION:

Just-- yeah. (AIRPLANE) Do you remember the
process of getting-- did you take statements from
the kids when you were sitting with them?

ANTHONY SQUEGLIZ:

Yeah.

QUESTION:

And how did that work? How did you-- 'cause
that's a pretty formal process for a kid and--

ANTHONY SQUEGLIZ:

Yeah, it's usually-- they call it Q&A, question
and answer type thing. And-- we-- we had a-- a
dialogue that we follow. You know, your name.
Y-- you have to make the child credible first of
all to comprehend what years saying and make sure
that they understand what you're saying. You'd--
you'd ask certain questions. And you down a list
of things. What's your name? Where do you live?

TAPE #126                                                          TAPE

What's your phone number? What's your favorite
color? You establish a lot of-- ground rules.
Who's your teacher at school? What's your
favorite subject? And-- and this is all
documented. Answer, question, answer, question.

And-- when you were at-- in the computer class,
did-- you know, and you go on from there. And
it's usually very lengthly (SIC) because you us
a line between each question and answer. And
get-- you have to remember, you ca-- like I said
be-- earlier, you can't re-victimize the--the
child. And you can't put anything into the
statement. You-- you can't interject anything
into it. It has to be their-- their wording
freely. And-- usually at that point, they-- th
want to talk to ya. They really want to talk t
ya.

QUESTION:

And did-- how did-- did somebody-- did somebody
ask the questions and somebody else was writing
down a statement?

A-1237

ANTHONY SQUEGLIZ:

No, no. It's-- it's a one-on-one. I would--
like I was speaking-- you and I are just
speaking. I would do the total-- total, 'cause I
would have to testify to it.

QUESTION:

And then would you-- how would you-- you'd tape
record it, or would you write it?

ANTHONY SQUEGLIZ:

No. Tape recording, no. We-- we-- it's been
discussed many times in the county. The county
feels that tape recordings are really not--
viable. We've had a lot of problems with 'em
from out of state. You know, time lapses. A lot
of things could be said in those times. We just
don't do it. D.A.'s don't want it. No need for
it.


So you know what? If the defense wants to fight
us, they bring us into court. And-- and we go
right down, right down the list. You know, if
they wanna scrutinize it and-- that's how the

TAPE #126                                                          PG. 4   TAPE #12

system works.

                        QUESTION:

And now these kids had to testify in front of a

grand jury?

                        ANTHONY SQUEGLIZ:

Yes.

                        QUESTION:

What's the process of preparing them to do that?

                        ANTHONY SQUEGLIZ:

(CLEARS THROAT) Well, they're usually very

nervous.  Usually the parents are more nervous

than they are.  Whenever we go to grand jury with

young children, we make sure whether-- whether

the boss gives us overtime or not, we go out of

our way.  In other words, I would go in sometimes

on my days off just to be there.


Because (SNIFF) you'll find-- and I don't want to

single anybody out.  But there are certain

district attorneys (CLEARS THROAT) that will go

in without prepping the child.  And just get rid

of the case.  And that's not the process here.

PG. 19

So we're with them pretty much the whole time--
except going in the room.


And all we tell them is tell the truth.  You
know, just stare at Mr. Onorato (PH)-- look at
him.  You don't have to look at the people
sitting there because I don't know if you've ever
been in a grand jury.  Some of them read the New
York Times.  Some eat oranges and apples.  You
feel that they're really not paying attention to
ya.  This is a fact.  (SNIFF.  And-- you know,
you can-- you can be-- a little skeptical, or
maybe a little relieved, I don't know how you
would look at it.  Because people are frightened
to go before their peers.  But if you focus and
you do your homework in your case prep you know--

                    QUESTION:
Now did you-- did you watch their grand jury
testimony or not?

               ANTHONY SQUEGLIZ:
No, you can't-- we can't.  You're not allowed in
there.  Yeah.  In fact, we don't even know what

**A-1240**

it is. You know, like if I have to review for

trial my own testimony? You only get your

testimony. I mean, I don't know what anybody

else said. N-- I don't wanna know what anybody

else said, you know.

QUESTION:

So you took-- the first process is you take a

written (UNINTEL)-- you write. So you write up

ANTHONY SQUEGLIZ:

You take it orally. First you get an admission

orally, okay? You could always testify orally,

okay? And then-- once you get something orally--

you can really expound on it. Now-- now you go

with your format, you know. You know what

happened. You don't know what happened to that

particular child, but you know a lot of things

happened.


So if they're past that stage, they're gonna tell

you what happened to them. You know. And if

they leave something out that you think might

have been in there? You just bypass it, you

TAPE #126

PG. 21

know. I mean, nobody's here to get any glory. I
mean, you know, I don't know if anybody would do
that, but.

(BREAK IN TAPE)

QUESTION:

The-- oh, did you find it helpful-- at-- at some
points did you find it helpful-- you know, the
kids were probably like eyeing you, trying to
figure out how much you knew, you know, in a way.
I'm not-- not-- not deceptively, but they're--
you know, they're-- if they were having trouble
getting to sort of a confession point-- did you
find it useful to say to them, you know-- you
know, "We spoke to your friend Jimmy and he said-
_"

ANTHONY SQUEGLIZ:

No, we--

QUESTION:

--"this?"

ANTHONY SQUEGLIZ:

--wouldn't use that. No. I wouldn't use that
anyway. My-- my technique was they would ask me,

**A-1242**

TAPE #126                                                    PG. 22                    TAPE

"What-- what-- what do you know about him?" And
I'd say, "I know things. But I can't tell you
what I know because you know things that I don't
know." And whether they understood that or not,
they knew what I was talkin' about.

"So what do you know?" "I know a lot of things."
"So, well do you know what happened to me?" "No,
I don't know what happened to you. But I know
something happened to you, so I want you to tell
me-- if you can. If you can't, we'll come back
another day." (SNIFF) You know. So the--
there's a lot going on in their minds. But the
biggest thing was getting their trust. And you
gotta be honest with kids because they see right
through ya.

                    QUESTION:

Did they ever get adamant, like, "I told-- I told
you nothing happened"?

                    ANTHONY SQUEGLIZ:

If-- I'm sure that happened. And I know from
past experienced, if that really happened chances

Case 2:06-cv-03136-JS Document 37-4 Filed 12/07/20 Page 82 of 218 PageID #: 4781
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1235 of 1566

PG. 23

TAPE #126

are nothing happened. You know, depending on how
it was put to me, depending how much I knew about
the case.

QUESTION:

So there were some ca-- there were some kids
where you knew-- "I know somethin's in here."
And then there were other kids where you said,
"You know, it's possible nothing happened."

ANTHONY SQUEGLIZ:

Well, I mean let's not lose the fact that some
kids are very immature at that age as well. And
they wouldn't recall anything, you know. Even if
you feel-- and the only way you could do anything
like that would be-- medical, you know. I know
we do that with young children. We take 'em to--
these scan units for suspected child abuse or
neglect. They do physicals. And I-- we've done
of them. Yeah, they could show penetration--
watch it di-- digitally or, you know, whatever.

Then-- then you have something tangible, then you
have something to go with, you know. But other

**A-1244**

TAPE #126

TAPE #1

than that, the kid says nothing-- some kid

out of it.

QUESTION:

In this case, was there-- did you have the

opportunity to get medical evidence, or?

ANTHONY SQUEGLIZ:

I know they did medicals on quite a few of

As far as the outcomes, it was so massive, I

don't know.  I don't know.  (SNIFF)

QUESTION:

How did the-- oh, how did-- well, the press

obviously found out about the delay.  How do

think the press-- how did-- how did the press

find out that this had happened?  (THUMP) There

was a ton of press there.

ANTHONY SQUEGLIZ:

Okay.  I honestly believe-- during-- during the

search of the house, one of the fathers came

running down the street.  And he came down with

rope in his hands.  I remember him.  And he

wanted to strangle Arnold.  And I'm surprised

that's not even on tape anywhere because he-- he

**A-1245**

TAPE #126

had to be escorted out of the neighborhood.  They
had to put up roadblocks.

I think the neighbors might have called.  I-- the
word I got from-- (SNIFF) who was I talkin' to?
Andrea Day?  You know her?  Fox Five?

QUESTION:

No.  No, no.

ANTHONY SQUEGLIZ:

(CLEARS THROAT) She used to show up on a lot of
that (WIND) stuff.  The word I got was, and this
is only the word I got, was that one of the
neighbors had called and said, "I can't get-- I
can't get into my street.  What the hell is going
on, or what's going on in my neighborhood?  I
can't get to my house." And it was next door or
something like that.  I think that's how the news
media got it.  And I don't know if you guys are
on the same band or I don't know what's go-- you
know, how that works.

QUESTION:

(UNINTEL PHRASE) Just tell me about Great Neck.

**A-1246**

TAPE #126

What-- what was it like in that community?

ANTHONY SQUEGLIZ:

Nice community. Tight, affluent. Well kept homes. Just-- just, you know-- a nice-- level people, you know. Very concerned. The school was-- the school district was very-- cooperative I mean, we went to libraries. We didn't meet resistance from any of the-- schools or anything like that. I mean, they were there to help.

QUESTION:

Would you say-- did the community really mobilize to kind of--

ANTHONY SQUEGLIZ:

A nucleus did. They ha-- we had a meeting over at a building on-- I-- I don't know if it was Jeropa (PH) Turnpike or not. But-- (SNIFF) they had a whole meeting. They had plenty of meetings. They-- in fact, just being there hit the house, they had a massive-- parent turnout-- at a building in Great Neck. I think it was owned by one of the fathers-- who was a heart cardiologist. And they-- they wanted to

**A-1247**

storm the house.  I mean-- that's what I recall.
I remember a lot of irate people.  Yeah, there
was-- I think 30, 40 people maybe that stuck
together.  And I'm sure everybody knew everybody,
you know.

QUESTION:

Now you were-- when you were-- when you went to
the parents' house, or when you went to the house
to see the kids, did you bring any of the
pornography to kinda--

ANTHONY SQUEGLIZ:

No.  No.  Didn't bring anything.

QUESTION:

Yeah.  'Cause it wasn't-- is that not typical,
that you wouldn't--

ANTHONY SQUEGLIZ:

Would have no reason to bring it.  That's-- sort
of suggestive, I think.

QUESTION:

Right.  Well, it certainly (UNINTEL PHRASE).

ANTHONY SQUEGLIZ:

Yeah, I mean think about it.  You got small kids.

**A-1248**

TAPE #126

I came to your house and said, "This is what's
goin' on. You know, maybe your kid's involved
with this." I mean, (MAKES NOISE) we could ha
some ramifications here.

QUESTION:

You-- how did you-- well, there was an article
about it in the paper.

ANTHONY SQUEGLIZ:

As far as?

QUESTION:

That said that the postal inspectors had come
and-- you know, (UNINTEL). So I guess they
probably found out about it fairly quickly.

ANTHONY SQUEGLIZ:

Yeah. Yeah, it's-- it's news. It's-- yeah
you know there's certain information we have
give out to-- public information. You know
right?

QUESTION:

Yeah.

ANTHONY SQUEGLIZ:

They call the-- PIO and they get information

mean, (CLEARS THROAT) we-- we hit a house in
Bellmore (PH). There was a pedophile that he
was-- doin' kids and stuff. And he-- he did
time. And he got out and he went right back to
his house and he started all over again.

And the mail-- we set up-- we actually had one of
us dress up as a mailman, delivered a package.
He accepted the package. Twenty (LAUGH) minutes
later, we hit the house. And this guy was usin'
all the paraphernalia already. And then-- they
searched the house-- the feds. And they didn't
come up with anything.

(BREAK IN TAPE)

QUESTION:

Oh, you were talking about therapy.

ANTHONY SQUEGLIZ:

During-- during the-- parents meetings we-- we--
recruited a therapist. She got on board. She
was there for all the family meetings and offered
free counseling. And, you know, ta-- just to
talk to.

Case 2:06-cv-03136-JS Document 37-4 Filed 12/07/20 Page 89 of 218 PageID #: 4788
Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1242 of 1566

And-- we found ourselves being counselors. We
find that a lot. When I was working, you'd find
people-- if you really helped them and they
trusted you-- you'd be a sounding board for 'em.
And-- even after all this blew over and things
were sort of quieted down, we-- we'd go out of
our way to go see how they were doin' and stuff,
how the kids are doin'. It-- it was really a--
(HITS MIC) a heart-wrenching case, you know, when
you think about it.

When you're doing it, you don't think about it
too much because it has to be done. But when you
sit down and realize what's going on around you,
then you don't realize how lucky you are, you
know, as a parent.

             QUESTION:

Do you remember whether the therapist was--
Sandra Kaplan?

             ANTHONY SQUEGLIZ:

Yeah, it was. Yeah.

PG. 31

TAPE #126

#### QUESTION:

They can't hear me. So say, "The therapist was"--

#### ANTHONY SQUEGLIZ:

The therapist was-- Sandra Kaplan. Yeah. She was good.

#### QUESTION:

And where-- where did she come from?

#### ANTHONY SQUEGLIZ:

I think she was up from that area, if I'm not mistaken. She-- she popped up quite often. Very-- very vocal, very-- very-- I found her to be very good, you know.

#### QUESTION:

And what was her role as--

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

#### QUESTION:

Oh, yeah. What was Kaplan's-- what was her-- you know, what was her role? What did she feel-- what did she need to do or what was helpful?

**A-1252**

TAPE #126

TAPE #

### ANTHONY SQUEGLIZ:

She-- wha-- I saw her on a couple of-- at a couple of meetings with the parents. I just felt that she was-- very vocal. She made it known very clearly that she was there to help. And at time of the day or night. And-- not having too much to do with, you know, people like that. I was impressed by-- how she handled herself. And she was genuinely concerned. And I thought that was great, you know.

### QUESTION:

Did--

### ANTHONY SQUEGLIZ:

She even offered-- counseling to-- us. Because she felt it would be-- after working on this so long, it would be traumatic, you know. But you know.

### QUESTION:

And then I guess she stayed-- she counseled the kids after the case still?

### ANTHONY SQUEGLIZ:

She counseled some of them, yeah. I don't know

A-1253

PG. 33

TAPE #126

about how many, but I know she was-- well-- well

received in some families and not well received

in others.

QUESTION:

Well, the--

ANTHONY SQUEGLIZ:

There are still people out there that wouldn't

let her in the house. I mean--

QUESTION:

Why do you think?

ANTHONY SQUEGLIZ:

They're in denial. Nothing happened. Or nothing

that bad happened. He was caught just before

something terrible happened. You perceive what

you want to perceive. And I'm sure she reads

into it. And forcing yourself on someone is not

a good thera--. therapeutic value, you know?

QUESTION:

Do you think there-- there are obviously (NOISE)

many, many kids involved in the classes. But

only about 14 in the end I guess that were--

**A-1254**

TAPE #126

PG. TAPE

ANTHONY SQUEGLIZ:

Yeah, they focused I believe on 14. Yeah. You
have understand something. When you have a
community and a list with 400 names on it, and
to-- to make a-- a quick conclusion would be
detrimental to everybody. I mean, if-- you ha
time is of the essence so to speak so you work
with what you have. You know.

QUESTION:

Now-- do you feel that there are-- you know
there-- so that means there are another 300 an
somethin' kids that ultimately either, you kno
weren't a part of the case or didn't come
forward, or?

ANTHONY SQUEGLIZ:

Yeah, I'm sure there's a percentage. And don't
forget the fact that he was doing this for qui
a while. So some of the children are not 20, 2
or 17 at the time. And I could say in the cour
of my career in interviewing runaway 17, 18,
20, 21, they're not about to tell you about the
sexuality or their-- their childhood or their

A-1255

PG. 35

guilt because they bury themselves in the sand so
to speak. And it's something that's past them
and they just don't want to focus on it.

QUESTION:

Some of these kids now are-- well, do you-- do
you feel like there are a lot of kids out there
that are still living with this? Or-- or, you
know--

ANTHONY SQUEGLIZ:

Oh, absolutely. Absolutely. Absolutely.

QUESTION:

'Cause like remember, I can't-- they can't hear
me. They can only hear you, so--

ANTHONY SQUEGLIZ:

Yeah, there are a lot of children out there that
have been-- abused. And-- it's probably very
overwhelming, you know.

QUESTION:

But-- and do you think there are a lot of victims
of Arnold Friedman that didn't come forward that-
-

**A-1256**

TAPE #126

PG.       TAPE :

### ANTHONY SQUEGLIZ:

I'm sure. I'm sure over the years there are

victims that we'll never know about that have t

live with this for the rest of their lives. It

sad. You know.

### QUESTION:

What's the thing that-- that, you know-- is the

any one thing that sort of stays with you this

many years later about this case? Something th

was most impressive to you?

### ANTHONY SQUEGLIZ:

Well-- the magnitude of the case. And the len

of time it was going on that nobody actually

picked up on it always boggled my mind. I tell

but then when you work with-- sex victims, I us

to find dealing with like a 13 or a 14 year old

that's been raped or sodomized by a boyfriend

that in talking to some of the mothers, you get

so friendly with them in conversation, you know

like after the trial. They would say, "You know

when I was a little kid my grandfather used to

sexually abuse me." I mean, 37 year old woman

**A-1257**

PG. 37

and 40 year old women. I'd say, "Why'd you wait
so long?" And they'd say, (SNIFF) "Well, I
thought I was my father's favorite."

And in the interim, one particular case was a 37
year old was sexually abused by her father. The
sister was 40-something was sexually abused by
her father. The two sisters never knew this.
And the brother out-- out west was arrested for--
sexually abusing an eight year old boy. And we
went to check him out, he blew his brains out. I
mean, think about the bad chip in that family,      12
you know? And this all started with a nine year   13
old. It's-- it's-- it's mind boggling.             14

    QUESTION:                   15

Yeah, amazing. Good. Alright, well thank you
very much.                                         16

    (OFF-MIC CONVERSATION)      17

    **END OF SIDE A**           18

    **SIDE B BLANK**

    **END OF TRANSCRIPT**

**A-1258**

HIT THE GROUND RUNNING FILMS

"FRAN GALASSO/ANTHONY SQUEGLIA"

INTERVIEW WITH ANTHONY SQUEGLIA

PRODUCER: ROGEN

TAPE #126


**TRANSCRIBER'S NOTE** QUESTIONS OFF-MIC.  BEST EFFORT MADE.**

QUESTION:

(IN PROGRESS) --you were saying.  So-- and-- and
the-- so when you had to inform the father that
his--

ANTHONY SQUEGLIZ:

Yeah, what-- what had happened is-- the two girls
were pronounced dead at the scene.  I remember
being at the scene.  And-- I went to a h-- had to
go with homicide to the house to make
notification, and that's a tough thing to do.  I
had never done it before.  So I'd gone with this
detective, Al Martino (PH), we went to the house.


(CLEARS THROAT) And the first father we spoke to,
we said, "We got some bad news.  Your daughter

AnthonySquegliaTape126

**A-1259**

was in an accident," da-da-da-da and the whole
nine yards. And what-- you know, "Your-- your
daughter is deceased. She-- died in the
collision." And the f-- and just staring at us.
And-- and it's like-- I could still see this
guy's face today. And he said, "You know, I just
put a new battery in that car. Do you think I
can get that battery back?" And I said to
myself, "Where is this guy goin' with this?" The
daughter is dead, you know? (CLEARS THROAT)

So I just associated this was Mano (PH)
Freidman's statement of, "You're gonna take all
my stuff?" you know. So I said, "You know, when
people get into this mode, they don't really hear
or know what they're saying. I don't know, I
don't know. And it wasn't the only case I had
that happen. It happened-- and that's-- that--
that other particular case, I worked on it on my
own time because I didn't have a witness. And I
found a guy that was in shock that actually saw
the collision but never said anything. S-- you

**A-1260**

know, it's weird.

QUESTION:

Back for a second to the-- (SNIFF) just to the
family members.  What was your impression, you
know you-- you had some experience with Friedman
on-- not just at the raid of the house, but also
after.  Maybe starting with the night of the
raid, how did they behave as a family?

ANTHONY SQUEGLIZ:

Very distant.  Very distant.  It seemed like--
everybody's from a different family, you know?
(COUGH) The wife was disassociating herself from
the husband.  (COUGH) Excuse me.  The husband was
very, very-- quiet into himself.  I guess his
mind was working internally, I don't know.  The--
the s-- the older son-- who's the-- clown is--
ranting and raving through the house, being told
to leave.  (COUGH) Excuse me.  Jesse is-- in
another world.  You know, he was away at school I
believe.  I got somethin' stuck in my throat.
(COUGH) Okay.  I'm good.

QUESTION:

Now I guess--

ANTHONY SQUEGLIZ:

(CLEARS THROAT) Thanks.

QUESTION:

Yeah.  I guess-- Jesse comes back at some point?

ANTHONY SQUEGLIZ:

(COUGH) Yeah.

QUESTION:

Jesse comes back I guess while the house is being

(SNIFF) searched.

ANTHONY SQUEGLIZ:

He-- he was called I believe.  I think-- Fran

Galasso spoke to him or something.  I-- I'm not

too sure, I don't recall.

QUESTION:

And-- and then I-- I think that-- I guess up

until this point he wouldn't have realized that

he was gonna be involved in the case.  He thought

this was more about his dad.

ANTHONY SQUEGLIZ:

(CLEARS THROAT) Yeah.  'Cause his dad-- he makes

**A-1262**

a statement that, "My dad ruined my life," or

something.  "He's ruining our lives," or "my

family."

QUESTION:

And-- do you remember anything about him as a

person?

ANTHONY SQUEGLIZ:

Jesse?

QUESTION:

Yes.

ANTHONY SQUEGLIZ:

(SNIFF) I thought he was a little strange.  My

first (CLEARS THROAT) opinion of his room was--

not a normal teenager.  A little mo-- excessive.

The-- I thi-- I believe there were quite a few

holes in the wall.  That's a sign of someone

acting out or-- I mean, how-- how would the

family let him get away with this if-- this was a

close family.  If-- if one of my sons put a hole

in the wall, I mean we-- you know, it-- there'd

be some ramifications here.  (CLEARS THROAT)

**A-1263**

I saw a lot of destruction in that house.
Family-wise, human-wise. I would never allow my
child to do what he did in his room. I mean,
there was stuff in his room was unbelievable.
What they show in the papers is nothing. I mean.

        QUESTION:

(UNINTEL PHRASE)

        ANTHONY SQUEGLIZ:

I thought he was kind of strange. I thought he
had-- after-- after hearing all the-- pros and
cons in this case, I sort of felt sorry for him.
Because I felt that-- I really felt that knowing
about pedophilia, and I gave lectures on it, I
felt that the-- there's two other brothers if I'm
not mistaken, right? (CLEARS THROAT) He m-- the
father might not have been as bad in the
beginning and maybe had tried something with the
other b-- sons and never progressed.


But Jesse was the most vulnerable because at that
stage (CLEARS THROAT) the mother's into therapy,
the father's into his own thing. This kid's got

nuthin'. He has no love in the family, nobody

patting him on the shoulder, nobody guiding him.

So I'm sure he was into drugs and drinking.

(COUGH) He was kind of strange. Excuse me.

(COUGH) Must be the pollen.

QUESTION:

When we spoke the last time, you mentioned that--

you remembered that Elai-- you-- you said Elaine

had this relationship (CLEARS THROAT) or figured

out that Elaine had a relationship with--

ANTHONY SQUEGLIZ:

They said they had found it. And they said-- I

never saw it. But they said they had found her

diary during the search. And word-- the word was

that she was having an affair with her therapist.

I never actually saw that-- diary. I know they

found a book, I don't know if it was a diary or

not. And-- that-- that's what was going around.

Now whether it was true or not, I don't know.

(CLEARS THROAT)

QUESTION:

Did you notice anything about the relationship

**A-1265**

Case 2:06-cv-03679-S, Document 37-4 Filed 12/07/23 Page 104 of 218 PageID #: 4803

between the husband and the wife that struck you?

ANTHONY SQUEGLIZ:

I felt that she was more dominating than he.  He
was like-- very quiet.  Was pretty quiet.  He
seemed like a smart guy, and that's-- that's one
of the signs.  Very intelligent person-- always
wants to be around children, schools.  Just got
awards.  I can't imagine why he won.  (CLEARS
THROAT) It's compulsive.  I mean, he-- he had
recently received awards from Queens or something
with the mayor and stuff like that, and he was
well recognized in the local schools.  And this
guy blows it.  I mean, this is-- this is-- a
sickness.


And I know on lectures-- I've gone up to
Connecticut on lectures for the county.  And--
I've spoken to Dr. Susan Sacroy (PH).  She's an
authority on pedophilia, I don't know if you ever
s-- read her book.  (SNIFF) And she used to tell
us the-- the only cure for that is the constant
threat of incarceration.  (CLEARS THROAT) There

is no cure.  So I take that as gospel, being

she's been around longer than I have.

                    QUESTION:

The-- it sounds like a raid-- happened, what you

found.  And-- and then that you sort of revealed

more as you kept looking and then you picked out

something (UNINTEL PHRASE)--

                    ANTHONY SQUEGLIZ:

Yeah.  We were in the house for quite a while.

(CLEARS THROAT) And the fact that we had a search

warrant for-- pictures and things, you know

you're allowed to go through-- I mean, you don't-

- you don't go looking for-- stolen tires in a--

in a file cabinet.  But in this case we were

looking for photos and things like that.


So I had found his-- his suicide note.  And-- and

then the-- at the conclusion of the search, we

were leaving the house.  And we hadn't really

found much.  And-- I went around the outside of

the house and I was looking around 'cause the

house is set up very-- it's an unusual setup in

the house.  When you walked in (CLEARS THROAT)

upstairs, the staircase was to the left.  (SNIFF)

And it was-- three or four oak steps going up, a

big platform, and then steps going up further.

And underneath those steps was-- was-- was

hollow.  I kept banging on 'em.  And I was

looking for access because that led up to the

front of the house.  And then I went outside, it

was all brick facade.  I went back inside.  And

the only thing I could see going under the

staircase was this closet.  It was a long closet.

Now, I know the closet had been searched.  They

had pulled some stuff out and they went through

it.  And it was-- they didn't find anything.

On the way out, I got a hold of Fran Galasso.

And I said, "Listen, (CLEARS THROAT) did they

pull everything out of this closet?"  And-- and

she said, "Yes they did."  And I said-- I said,

"Is there a possibility we could take it out

again?"  And I don't-- I don't know-- they said,

"Why?" or something to that effect. "We just did
this, we gotta get out of here. We've been here
too long," or whatever. And I said, "I don't
know, there's something about-- there's room
under that staircase but I can't for me-- for the
life of me figure it out." (CLEARS THROAT) Doing
construction work all the time, I-- I found that
there's dead space here.

So we p-- most people left the house. We were
still there on the search. We took everything
out of the closet again. And there was-- like I
said, there was no light in the closet. And we
went to the back of the closet with this
flashlight, and sure enough the back panel of the
closet went up. And lo and behold, there were
computers in there-- disks, all kinds of--
information.

And I believe they took the pictures-- in the--
in the news clipping is-- it's in the truck.
See, that wasn't available (CLEARS THROAT) on the

**A-1269**

initial look-see. But-- that's where he kept all

his stuff, most of his stuff. And that was

brought into police headquarters and that was

looked at by-- people that knew computers in and

out. You know, I guess you can't get rid of

stuff.

QUESTION:

Do you know what they found in the computers?

ANTHONY SQUEGLIZ:

No, I don't. I don't recall. You-- you have to

understand something, I was on like an

assignment. (CLEARS THROAT) Once the whole thing

got rolling, we're back to our regular

assignments, you know.

QUESTION:

Right, right.

ANTHONY SQUEGLIZ:

So we're not privy. (SNIFF)

QUESTION:

We-- I was gonna ask you one question about the--

kids. Was it-- (UNINTEL PHRASE). On that

search, was there-- did you find pornography on

that search?  Or was-- it was mostly-- other than
computer games.  I guess you found computer--

ANTHONY SQUEGLIZ:

Computer games, yeah.  As far as-- you have to
understand something.  There were ten or 11 of us
in the house.  I don't know what they found
upstairs, at least I don't recollect what they
found upstairs.  I'm sure they found stuff, but I
don't know exactly what it was.

QUESTION:

And they arrested the-- Arnold and Jesse both,
and then Elaine also?

ANTHONY SQUEGLIZ:

Then Elaine, yeah.  For as-- attempted assault,
or something to that nature.

QUESTION:

Were you there when she did that?

ANTHONY SQUEGLIZ:

Yeah.

QUESTION:

What do you remember about that?

ANTHONY SQUEGLIZ:

(CLEARS THROAT) She was-- well again, put
yourself in her place. You come home. You find
(LAUGH) police cars all over your house, you find
'em rippin' your house apart so to speak. And
you become violent. I think I would too if that
was the case, not knowing what's going on, really
knowing what's going on.

And then couple that with the incident that
happened just a short while before that. So it's
an invasion of your privacy to some ex-- some
great extent. Would you agree or not? I mean, I
would. I'd be pretty pissed. (CLEARS THROAT)
You know? Yeah, she-- she was acting out. And I
don't think the charges stuck. I think-- they
dropped 'em. I'm-- I'm not too sure. (SNIFF)

She took a swing at Fran. Fran Galasso is not a
person you wanna-- I mean, she had moxie, this
kid. She-- she was a good boss, yeah. You know,
some guys go, "How can you work for a woman?"

**A-1272**

Never had a problem.  Never had a problem-- you
know?  Do the right thing.  (SNIFF) So.

     (OFF-MIC CONVERSATION)

     (BREAK IN TAPE)

     QUESTION:

Just-- yeah.  (AIRPLANE) Do you remember the
process of getting-- did you take statements from
the kids when you were sitting with them?

     ANTHONY SQUEGLIZ:

Yeah.

     QUESTION:

And how did that work?  How did you-- 'cause
that's a pretty formal process for a kid and--

     ANTHONY SQUEGLIZ:

Yeah, it's usually-- they call it Q&A, question
and answer type thing.  And-- we-- we had a-- a
dialogue that we follow.  You know, your name.
Y-- you have to make the child credible first of
all to comprehend what years saying and make sure
that they understand what you're saying.  You'd--
you'd ask certain questions.  And you down a list
of things.  What's your name?  Where do you live?

What's your phone number? What's your favorite
color? You establish a lot of-- ground rules.
Who's your teacher at school? What's your
favorite subject? And-- and this is all
documented. Answer, question, answer, question.

And-- when you were at-- in the computer class,
did-- you know, and you go on from there. And
it's usually very lengthly (SIC) because you use
a line between each question and answer. And you
get-- you have to remember, you ca-- like I said
be-- earlier, you can't re-victimize the-- the
child. And you can't put anything into the
statement. You-- you can't interject anything
into it. It has to be their-- their wording
freely. And-- usually at that point, they-- they
want to talk to ya. They really want to talk to
ya.

QUESTION:

And did-- how did-- did somebody-- did somebody
ask the questions and somebody else was writing
down a statement?

ANTHONY SQUEGLIZ:

No, no.  It's-- it's a one-on-one.  I would--
like I was speaking-- you and I are just
speaking.  I would do the total-- total, 'cause I
would have to testify to it.

QUESTION:

And then would you-- how would you-- you'd tape
record it, or would you write it?

ANTHONY SQUEGLIZ:

No.  Tape recording, no.  We-- we-- it's been
discussed many times in the county.  The county
feels that tape recordings are really not--
viable.  We've had a lot of problems with 'em
from out of state.  You know, time lapses.  A lot
of things could be said in those times.  We just
don't do it.  D.A.'s don't want it.  No need for
it.

So you know what?  If the defense wants to fight
us, they bring us into court.  And-- and we go
right down, right down the list.  You know, if
they wanna scrutinize it and-- that's how the

system works.

QUESTION:

And now these kids had to testify in front of a
grand jury?

ANTHONY SQUEGLIZ:

Yes.

QUESTION:

What's the process of preparing them to do that?

ANTHONY SQUEGLIZ:

(CLEARS THROAT) Well, they're usually very
nervous. Usually the parents are more nervous
than they are. Whenever we go to grand jury with
young children, we make sure whether-- whether
the boss gives us overtime or not, we go out of
our way. In other words, I would go in sometimes
on my days off just to be there.

Because (SNIFF) you'll find-- and I don't want to
single anybody out. But there are certain
district attorneys (CLEARS THROAT) that will go
in without prepping the child. And just get rid
of the case. And that's not the process here.

**A-1276**

Case 2:06-cv-03035-JS, Document 372-1 Filed 02/07/2008 Page 115 of 288 PageID #: 4814

So we're with them pretty much the whole time--
except going in the room.

And all we tell them is tell the truth. You
know, just stare at Mr. Onorato (PH)-- look at
him. You don't have to look at the people
sitting there because I don't know if you've ever
been in a grand jury. Some of them read the New
York Times. Some eat oranges and apples. You
feel that they're really not paying attention to
ya. This is a fact. (SNIFF. And-- you know,
you can-- you can be-- a little skeptical, or
maybe a little relieved, I don't know how you
would look at it. Because people are frightened
to go before their peers. But if you focus and
you do your homework in your case prep you know--

QUESTION:

Now did you-- did you watch their grand jury
testimony or not?

ANTHONY SQUEGLIZ:

No, you can't-- we can't. You're not allowed in
there. Yeah. In fact, we don't even know what

**A-1277**

Case 2:06-cv-03036-JS, Document 37-4 Filed 02/07/08 Page 116 of 218 PageID #: 4815

it is.  You know, like if I have to review for
trial my own testimony?  You only get your
testimony.  I mean, I don't know what anybody
else said.  N-- I don't wanna know what anybody
else said, you know.

QUESTION:

So you took-- the first process is you take a
written (UNINTEL)-- you write.  So you write up--

ANTHONY SQUEGLIZ:

You take it orally.  First you get an admission
orally, okay?  You could always testify orally,
okay?  And then-- once you get something orally,
you can really expound on it.  Now-- now you go
with your format, you know.  You know what
happened.  You don't know what happened to that
particular child, but you know a lot of things
happened.

So if they're past that stage, they're gonna tell
you what happened to them.  You know.  And if
they leave something out that you think might
have been in there?  You just bypass it, you

**A-1278**

know.  I mean, nobody's here to get any glory.  I
mean, you know, I don't know if anybody would do
that, but.

      (BREAK IN TAPE)

      QUESTION:

The-- oh, did you find it helpful-- at-- at some
points did you find it helpful-- you know, the
kids were probably like eyeing you, trying to
figure out how much you knew, you know, in a way.
I'm not-- not-- not deceptively, but they're--
you know, they're-- if they were having trouble
getting to sort of a confession point-- did you
find it useful to say to them, you know-- you
know, "We spoke to your friend Jimmy and he said-
-"

      ANTHONY SQUEGLIZ:

No, we--

      QUESTION:

--"this?"

      ANTHONY SQUEGLIZ:

--wouldn't use that.  No.  I wouldn't use that
anyway.  My-- my technique was they would ask me,

"What-- what-- what do you know about him?" And
I'd say, "I know things. But I can't tell you
what I know because you know things that I don't
know." And whether they understood that or not,
they knew what I was talkin' about.


"So what do you know?" "I know a lot of things."
"So, well do you know what happened to me?" "No,
I don't know what happened to you. But I know
something happened to you, so I want you to tell
me-- if you can. If you can't, we'll come back
another day." (SNIFF) You know. So the--
there's a lot going on in their minds. But the
biggest thing was getting their trust. And you
gotta be honest with kids because they see right
through ya.

             QUESTION:
Did they ever get adamant, like, "I told-- I told
you nothing happened"?

             ANTHONY SQUEGLIZ:
If-- I'm sure that happened. And I know from
past experienced, if that really happened chances

are nothing happened. You know, depending on how
it was put to me, depending how much I knew about
the case.

QUESTION:

So there were some ca-- there were some kids
where you knew-- "I know somethin's in here."
And then there were other kids where you said,
"You know, it's possible nothing happened."

ANTHONY SQUEGLIZ:

Well, I mean let's not lose the fact that some
kids are very immature at that age as well. And
they wouldn't recall anything, you know. Even if
you feel-- and the only way you could do anything
like that would be-- medical, you know. I know
we do that with young children. We take 'em to--
these scan units for suspected child abuse or
neglect. They do physicals. And I-- we've done
of them. Yeah, they could show penetration--
watch it di-- digitally or, you know, whatever.

Then-- then you have something tangible, then you
have something to go with, you know. But other

**A-1281**

than that, the kid says nothing-- some kids are

out of it.

QUESTION:

In this case, was there-- did you have the

opportunity to get medical evidence, or?

ANTHONY SQUEGLIZ:

I know they did medicals on quite a few of them.

As far as the outcomes, it was so massive-- I

don't know.  I don't know.  (SNIFF)

QUESTION:

How did the-- oh, how did-- well, the press

obviously found out about the delay.  How do you

think the press-- how did-- how did the press

find out that this had happened?  (THUMP) There

was a ton of press there.

ANTHONY SQUEGLIZ:

Okay.  I honestly believe-- during-- during the

search of the house, one of the fathers came

running down the street.  And he came down with a

rope in his hands.  I remember him.  And he

wanted to strangle Arnold.  And I'm surprised

that's not even on tape anywhere because he-- he

**A-1282**

had to be escorted out of the neighborhood. They
had to put up roadblocks.


I think the neighbors might have called. I-- the
word I got from-- (SNIFF) who was I talkin' to?
Andrea Day? You know her? Fox Five?

> QUESTION:

No. No, no.

> ANTHONY SQUEGLIZ:

(CLEARS THROAT) She used to show up on a lot of
that (WIND) stuff. The word I got was, and this
is only the word I got, was that one of the
neighbors had called and said, "I can't get-- I
can't get into my street. What the hell is going
on, or what's going on in my neighborhood? I
can't get to my house." And it was next door or
something like that. I think that's how the news
media got it. And I don't know if you guys are
on the same band or I don't know what's go-- you
know, how that works.

> QUESTION:

(UNINTEL PHRASE) Just tell me about Great Neck.

Case 2:06-cv-03026-JS, Document 37-4 Filed 12/07/2008 Page 122 of 218 PageID #: 4821

What-- what was it like in that community?

ANTHONY SQUEGLIZ:

Nice community. Tight, affluent. Well kept
homes. Just-- just, you know-- a nice-- level of
people, you know. Very concerned. The school
was-- the school district was very-- cooperative.
I mean, we went to libraries. We didn't meet any
resistance from any of the-- schools or anything
like that. I mean, they were there to help.

QUESTION:

Would you say-- did the community really mobilize
to kind of--

ANTHONY SQUEGLIZ:

A nucleus did. They ha-- we had a meeting over
at a building on-- I-- I don't know if it was
Jeropa (PH) Turnpike or not. But-- (SNIFF) they
had a whole meeting. They had plenty of
meetings. They-- in fact, just being the-- we
hit the house, they had a massive-- parent
turnout-- at a building in Great Neck. I think
it was owned by one of the fathers-- who was a
heart cardiologist. And they-- they wanted to go

storm the house. I mean-- that's what I recall.
I remember a lot of irate people. Yeah, there
was-- I think 30, 40 people maybe that stuck
together. And I'm sure everybody knew everybody,
you know.

QUESTION:

Now you were-- when you were-- when you went to
the parents' house, or when you went to the house
to see the kids, did you bring any of the
pornography to kinda--

ANTHONY SQUEGLIZ:

No. No. Didn't bring anything.

QUESTION:

Yeah. 'Cause it wasn't-- is that not typical,
that you wouldn't--

ANTHONY SQUEGLIZ:

Would have no reason to bring it. That's-- sort
of suggestive, I think.

QUESTION:

Right. Well, it certainly (UNINTEL PHRASE).

ANTHONY SQUEGLIZ:

Yeah, I mean think about it. You got small kids.

I came to your house and said, "This is what's
goin' on.  You know, maybe your kid's involved
with this."  I mean, (MAKES NOISE) we could have
some ramifications here.

QUESTION:

You-- how did you-- well, there was an article
about it in the paper.

ANTHONY SQUEGLIZ:

As far as?

QUESTION:

That said that the postal inspectors had come in
and-- you know, (UNINTEL).  So I guess they
probably found out about it fairly quickly.

ANTHONY SQUEGLIZ:

Yeah.  Yeah, it's-- it's news.  It's-- yeah, well
you know there's certain information we have to
give out to-- public information.  You know that,
right?

QUESTION:

Yeah.

ANTHONY SQUEGLIZ:

They call the-- PIO and they get information.  I

mean, (CLEARS THROAT) we-- we hit a house in Bellmore (PH). There was a pedophile that he was-- doin' kids and stuff. And he-- he did time. And he got out and he went right back to his house and he started all over again.

And the mail-- we set up-- we actually had one of us dress up as a mailman, delivered a package. He accepted the package. Twenty (LAUGH) minutes later, we hit the house. And this guy was usin' all the paraphernalia already. And then-- they searched the house-- the feds. And they didn't come up with anything.

(BREAK IN TAPE)

QUESTION:

Oh, you were talking about therapy.

ANTHONY SQUEGLIZ:

During-- during the-- parents meetings we-- we-- recruited a therapist. She got on board. She was there for all the family meetings and offered free counseling. And, you know, ta-- just to talk to.

And-- we found ourselves being counselors. We
find that a lot. When I was working, you'd find
people-- if you really helped them and they
trusted you-- you'd be a sounding board for 'em.
And-- even after all this blew over and things
were sort of quieted down, we-- we'd go out of
our way to go see how they were doin' and stuff,
how the kids are doin'. It-- it was really a--
(HITS MIC) a heart-wrenching case, you know, when
you think about it.

When you're doing it, you don't think about it
too much because it has to be done. But when you
sit down and realize what's going on around you,
then you don't realize how lucky you are, you
know, as a parent.

QUESTION:

Do you remember whether the therapist was--
Sandra Kaplan?

ANTHONY SQUEGLIZ:

Yeah, it was. Yeah.

**A-1288**

QUESTION:

They can't hear me.  So say, "The therapist was"--
-

ANTHONY SQUEGLIZ:

The therapist was-- Sandra Kaplan.  Yeah.  She
was good.

QUESTION:

And where-- where did she come from?

ANTHONY SQUEGLIZ:

I think she was up from that area, if I'm not
mistaken.  She-- she popped up quite often.
Very-- very vocal, very-- very-- I found her to
be very good, you know.

QUESTION:

And what was her role as--

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

QUESTION:

Oh, yeah.  What was Kaplan's-- what was her-- you
know, what was her role?  What did she feel--
what did she need to do or what was helpful?

**A-1289**

ANTHONY SQUEGLIZ:

She-- wha-- I saw her on a couple of-- at a
couple of meetings with the parents.  I just felt
that she was-- very vocal.  She made it known
very clearly that she was there to help.  And any
time of the day or night.  And-- not having too
much to do with, you know, people like that, I--
I was impressed by-- how she handled herself.
And she was genuinely concerned.  And I thought
that was great, you know.

QUESTION:

Did--

ANTHONY SQUEGLIZ:

She even offered-- counseling to-- us.  Because
she felt it would be-- after working on this for
so long, it would be traumatic, you know.  But--
you know.

QUESTION:

And then I guess she stayed-- she counseled the
kids after the case still?

ANTHONY SQUEGLIZ:

She counseled some of them, yeah.  I don't know

about how many, but I know she was-- well-- well
received in some families and not well received
in others.

QUESTION:

Well, the--

ANTHONY SQUEGLIZ:

There are still people out there that wouldn't
let her in the house.  I mean--

QUESTION:

Why do you think?

ANTHONY SQUEGLIZ:

They're in denial.  Nothing happened.  Or nothing
that bad happened.  He was caught just before
something terrible happened.  You perceive what
you want to perceive.  And I'm sure she reads
into it.  And forcing yourself on someone is not
a good thera-- therapeutic value, you know?

QUESTION:

Do you think there-- there are obviously (NOISE)
many, many kids involved in the classes.  But
only about 14 in the end I guess that were--

ANTHONY SQUEGLIZ:

Yeah, they focused I believe on 14. Yeah. You
have understand something. When you have a
community and a list with 400 names on it, and
to-- to make a-- a quick conclusion would be
detrimental to everybody. I mean, if-- you know,
time is of the essence so to speak so you work
with what you have. You know.

QUESTION:

Now-- do you feel that there are-- you know,
there-- so that means there are another 300-and-
somethin' kids that ultimately either, you know,
weren't a part of the case or didn't come
forward, or?

ANTHONY SQUEGLIZ:

Yeah, I'm sure there's a percentage. And don't
forget the fact that he was doing this for quite
a while. So some of the children are now 20, 21,
or 17 at the time. And I could say in the course
of my career in interviewing runaway 17, 18, 19,
20, 21, they're not about to tell you about their
sexuality or their-- their childhood or their

guilt because they bury themselves in the sand so to speak.  And it's something that's past them and they just don't want to focus on it.

QUESTION:

Some of these kids now are-- well, do you-- do you feel like there are a lot of kids out there that are still living with this?  Or-- or, you know--

ANTHONY SQUEGLIZ:

Oh, absolutely.  Absolutely.  Absolutely.

QUESTION:

'Cause like remember, I can't-- they can't hear me.  They can only hear you, so--

ANTHONY SQUEGLIZ:

Yeah, there are a lot of children out there that have been-- abused.  And-- it's probably very overwhelming, you know.

QUESTION:

But-- and do you think there are a lot of victims of Arnold Friedman that didn't come forward that--

**A-1293**

ANTHONY SQUEGLIZ:

I'm sure.  I'm sure over the years there are
victims that we'll never know about that have to
live with this for the rest of their lives.  It's
sad.  You know.

QUESTION:

What's the thing that-- that, you know-- is there
any one thing that sort of stays with you this
many years later about this case?  Something that
was most impressive to you?

ANTHONY SQUEGLIZ:

Well-- the magnitude of the case.  And the length
of time it was going on that nobody actually
picked up on it always boggled my mind.  I mean,
but then when you work with-- sex victims, I used
to find dealing with like a 13 or a 14 year old
that's been raped or sodomized by a boyfriend
that in talking to some of the mothers, you get
so friendly with them in conversation, you know,
like after the trial.  They would say, "You know,
when I was a little kid my grandfather used to
sexually abuse me."  I mean, 37 year old women

and 40 year old women. I'd say, "Why'd you wait
so long?" And they'd say, (SNIFF) "Well, I
thought I was my father's favorite."

And in the interim, one particular case was a 37
year old was sexually abused by her father. The
sister was 40-something was sexually abused by
her father. The two sisters never knew this.
And the brother out-- out west was arrested for--
sexually abusing an eight year old boy. And we
went to check him out, he blew his brains out. I
mean, think about the bad chip in that family,
you know? And this all started with a nine year
old. It's-- it's-- it's mind boggling.

                    QUESTION:
Yeah, amazing. Good. Alright, well thank you
very much.

                    (OFF-MIC CONVERSATION)
                    **END OF SIDE A**
                    **SIDE B BLANK**
                    **END OF TRANSCRIPT**

COUNTY COURT
NASSAU COUNTY

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

            Defendant.

-------------------------------------------------------------------x

**AFFIDAVIT**

ANDREW JARECKI, having been duly sworn, hereby declares that the
following is a true and accurate copy of excerpts of the transcript of my
conversation with David Zarrin on July 27, 2001.

                        Andrew Jarecki

**RONALD L. KUBY**
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-1296**

David Zarin Interview

| | |
|---|---|
| Woman:  David Zarin please. | |
| Woman:  Just a moment.  …. | |
| A:  Hello? | |
| Woman:  David? | |
| A:  Hi. | |
| Woman:  I have Andrew on the line for you. | |
| A:  Okay. | |
| Woman:  Hold on one second… Andrew? | |
| Q:  Hello? | |
| Woman:  David's on the line. | |
| Q:  Hi David. | |
| A:  Hi, Andrew.  How are you? | 0:34.00 |
| Q:  Good.  Thanks for connecting. | |
| A:  No problem. | |
| Q:  So should I just give you a minute or two about how I got into this strange subject? | |
| A:  Sure, I'd love to hear that. | |
| Q:  Yeah.  Well you know I started out making a film about a year and a half ago which had as one of its subjects a children's entertainer in New York City named David Friedman.  And you know I sort of knew that he had some complicated family history, but we weren't talking about it, and it wasn't clear what it was.  And then as he and I started to get to know each other a little better, he and I both sort of learned more about this other part of his life, and ultimately he and I spoke about it at length.  And I realized that there was obviously a much more elaborate story behind what he had been describing, sort of having to do with his family. | |

**A-1297**

A: And ...this is his brother?

Q: Yeah. His older brother.

A: Okay.

1:39.00

Q: So as I spent more time looking into the history of the family, you know I obviously came across tons of information about the case. And you know while I think it was, while I thought it was sort of ironic that David Friedman, after having been the progeny of this family, had decided to be a children's entertainer for a living, at the same time I do think he's a good guy, and I didn't, I didn't, you know, think he was a child molester or anything like that. But I did think, you know, it was certainly an interesting choice. And obviously he's a guy who has sort of been grappling with these issues for many years. Just, you know, whatever happened in the computer classes, obviously, as the oldest son in the family, he's had to deal with a lot.

A: Right.

Q: And so I have a lot of compassion for the guy who I don't think was involved in any legal way, but obviously was involved because it's his family. And so, you know, the film had sort of evolved at that time which was about maybe just under a year ago into a film being very much about the case and about the family.

A: Okay.

2:52.00

Q: And so we sort of changed our focus from the original film to this. Because really it's a fascinating and complicated story. And one that was not ever fully looked into because the, the Friedmans pled guilty, and there was just a bunch of other elements to the case that made it something that wasn't, probably was never going to go to trial. And so really I came to it with a very open mind, is to try to understand what happened in the history of the case, and to try and make sense of some conflicting positions and different views that people had about the history of it.

   And as part of that I've been, you know, talking to something like fifty people who have been in the, who were in the computer classes at any one time. Some of whom ended up being complainants in the case and some of them didn't. And so I think that's how we connected with you, and that means that your name was probably on some ancient list of people that had taken computer classes.

A: Right.

Q: And obviously we, you know, we are doing a sort of anonymous analysis of this, without, you know, we're not using your name or anybody's names or anything. We're just trying to understand the events. And, and, you know, get anyone's recollections of what the classes were like or what their own impressions were of you know when they heard about these charges, and was it, you know, surprising to them and you know what was their personal experience. That kind of thing.

4:13.00

A: Okay. From my, what I remember, there was nothing odd going on at all in the classes. The first I heard about it was, I don't even remember if it was right at the time when Arnold and his son were arrested, but it was right around that time. And it was very surprising. I had no idea. I remember asking my mother like was any of my friends involved with it or anything. Because I know I wasn't. And I didn't think anyone in my class was. Because I just remember being there, and him teaching the class. It was, back in those days you did programming and you had, you know, different lines. Like Line 10, Line 20, Line....remember that?

Q: Yeah.

A: So we learned stuff like that. Just different programming. Making like pictures on the screen with those numbers, with those programs. And having the computer do different things. And it was fun. It was a fun class. I had a couple of friends in the class. My friend Larry Fredo. And I think Gary Haim was in that class. And maybe some others. I can't really remember. It was a long time ago. But, well I also remember hearing about how he took pictures of kids while they went to the bathroom. And I know I went to the bathroom while I was there, and I remembered wondering if he ever took pictures of me. I never knew if he did or if he didn't. But at the time I was upset about that.

6:06.00

Q: Right. And did, meaning that maybe he would have taken pictures in a way that you wouldn't have noticed or something?

A: Right. If, because, I mean I haven't thought about this in a long time.

Q: Sure.

A: So it's difficult to recollect, you know my memory? But I think I remember someone saying that he had some sort of peephole in the bathroom. You walked in the house at the front door, and you walked straight to the back. And in the back there was a room where he had his class with computers. And on the right side of that room there was a bathroom. There's sort of like a little hallway, and I think there were like toys there. And across from the toys there was the bathroom, sort of like a box. But you know walls and everything.

David Zarin - 3

**A-1299**

| | |
|---|---|
| And I think I remember someone saying something after the fact that it was, that he had some sort of a peephole. And I always wondered if he took pictures of me while I was going to the bathroom. But other than that, I don't remember him ever, you know, touching me or doing anything like that. | 7:24.00 |
| Q: Yeah, I mean for what it's worth there was, you know, I don't think they ever identified anything like a peephole or anything in any of the investigations. So that might have been something that kind of came out of…. | |
| A: Conjecture. | |
| Q: Yeah, it's very possible. But you know I think there were a lot of kids who have said that they don't remember anything happening. And so you know it could be that they're hearing that there's something happening and they're not seeing it. And they're just, you know, maybe trying to think of things that could have happened, or something that they might not have seen or… Now, do you remember, a couple things. One is do you remember by any chance when you took the class? | |
| A: I really don't know how old I was. It must have been…I don't know – mid '80s. Somewhere around there. | |
| Q: So it could have been like say '86 maybe? | |
| A: It could have been '86. I don't really remember. I could ask my mother. She's out of town right now, but I could try to get that information for you. | 8:50.00 |
| Q: And do you remember if I, I might, I'm curious about other kids that might have been in your class, because I think it's possible, I'm not sure if I have the class lists exactly right. But one of the, let me just read you a couple names and see whether you remember being in class with any of these guys. … Do you remember just taking one class? Or did you go back and take second classes? | |
| A: I think I just took one class. | |
| Q: Right. And I think that if you just took one class, the first class that everyone took was probably something called 'Basic I'. And so in that class might have been… a boy named Blake Feldman? | |
| A: Doesn't ring a bell. | |
| Q: A Matthew Katz? | |

**A-1300**

A: Nope.

Q: Kamal Marchudi?

A: Kamal Marchudi. I don't want to say I remember him, but for some reason that name rings a bell. But I don't remember who he is or anything like that.

Q: Jonathan Ross.

A: That name also sounds familiar. But also you have to remember it's a very – Great Neck, you know, is a very Jewish town, and half the people sound the same. You know? 'Jonathan Ross' and ....

10:23.00

Q: Right.... I've got like there's tons of like Handlers and Epsteins and....

A: Right.

Q: And you know there's a lot of very common Jewish names also. Brian Tilker?

A: No, I don't remember that name.

Q: Alan Yaskowitz?

A: Nope.

Q: And do you have any, any recollection of anyone other than Larry Predo and Garret?

A: They're the only two that I remember. I'm trying to think. Because I remember I think I took this class with a couple of my friends. I think we went into the class, or our mothers, you know, put us in the class together.

Q: Right. Yeah, that happens a lot.

11:24.00

A: Yeah. So, at the time, I was probably pretty good friends with them. I know Larry Predo was one of my best friends growing up, when I was younger.

Q: Right.

A: So.

Q: Do you still stay in touch with him?

David Zarin - 5

**A-1301**

A: No. Not at all.

Q: I don't know any of my friends from back then. I was just curious. And the same thing with Garrett?

A: Uh, Garrett, I may have been friendly with him for a while, and I was always an acquaintance of him, but not, I had him, I wasn't friends with him in high school really. But this was prior to that.

Q: And definitely not now, you don't see him?

A: No, I don't see him at all.

Q: And you live in Manhattan now, right?          12:13.00

A: Yes.

Q: And the, because there's still a lot of, an amazing number of people still live in Great Neck actually.

A: Oh, really?

Q: Yes. Just people who are, I think that might be in that last year of taking advantage of the parents before they go out into the world.

A: Right.

Q: How old are you now?

A: Twenty-five.

Q: Yeah. So in '86…

A: '86 I would have been about 10.

Q: Right. Now any recollection of, just personal recollection of Mr. Friedman or his son, Jesse?

A: I think his son, Jesse, had long hair. Is that right?

Q: Pretty long hair, yeah.

A: Um, his son was always around. I don't, I don't really remember if he      13:04.00
helped in teaching the classes. But he definitely always was there. Mr. Friedman, I remember, Mr. Friedman at the time he looked like a much older man to me. But I don't know how old he really was. Maybe fifty or so. Does that sound right?

David Zarin - 6

**A-1302**

Q: Yeah, something like that.

A: That's it. I really don't remember them too well.

Q: Sure. And do you remember anyone else? Any other people, like older people, being in the class? Other teenagers? Or other people Jesse's age?

A: No. I remember Arnold Friedman's wife was around sometimes.

Q: Right. Elaine is her name.

A: Elaine.

Q: And do you remember what she did?

A: No.                                                                                      14:07.00

Q: You just remember seeing her.

A: Yeah, I just remember seeing her around sometimes. And there were a lot of toys in that room, in the computer room.

Q: Right. Yeah, I think she actually ran a daycare thing in the morning. For kids.

A: Okay.

Q: And do you ever remember, you know just in terms of how the class progressed, do you remember anything about, was it all in sort of that one room? And did anyone ever leave the room?

A: I can't, I just remember always at the, I don't remember ever leaving that room. You know, the bathroom was in that room. Our parents would drop us off, our mothers would drop us off. We would go straight to that room. We would sit down at the computer. The class would start. We would, he would go over, you know, what to type into the computer and making sure everyone was on the same page, and you know helping everyone do what we were supposed to do, you know. Get the programs correct. And that's it. And our parents would pick us up and we would      15:33.00
leave. It was what? About an hour class, I think?

Q: Yeah, something like that. Yeah. And then the parents would pick you up?

A: Parents would pick us up. For some reason I, I heard similar to what

David Zarin - 7

**A-1303**

I heard about these people, I don't know if it's true or not, that the reason no one in our class, or what I was told no one in our class, I don't know if anyone in our class was a victim, but I was told that nobody in our class was a victim, because for some reason our parents always came to pick us up early, just, you know, not knowing about him, they just came early. I don't remember them really coming early  That's what I was told.

Q: Do you remember who told you that?

A: I don't know.  Maybe my mother.

16:24.00

Q: Right.

A: I mean I really haven't discussed this even in years.  You know? Since it happened.  When it happened, it was a whole thing and I was very young at the time.  So you know, when you're young you talk about things and make things up.  And I don't even know what's true and what's not.

Q: Yeah.  Yeah.  Well it's hard to figure out memories.

A: Yeah.

Q: Do you remember any, there was some discussion that there were some kind of sexual computer games in the classes that were sometimes either visible to the kids or brought by the Friedmans or something like that where you'd see….

A: Yeah, come to think of it.  I don't remember if it was there or not, but I remember the, this Leisure Suit Larry or something like that?  Is that it?

Q: I'm not sure.

A: I think a game called 'Leisure Suit Larry'.  And I'm not sure if it was associated with his class, but I remember when I was younger hearing about this game, Leisure Suit Larry.  And really that was my only experience at the time with computers was in that class.  Maybe it was, but I don't want to say for sure.

Q: And do you remember whether that was just some kind of a game, or that was a sexual game, or ..?

A: No, it definitely was a sexual game.

18:12.00

Q: Right.

A: It had, I remember like my friends would talk about it, because it had

David Zarin - 8

**A-1304**

naked ladies in it and we were 10, 11 years old. Naked ladies were a big thing for us.

Q: Right. Yeah, exactly. I remember that. And just thinking about, you know, I think it's possible – and I'm not sure, but I think that at least one of the kids that I think may have been in class with you did make charges that things happened in the class, and there was inappropriate activity in the class.

A: Did he do this at the time, or just recently after talking with you?

Q: No, at the time.

A: Okay.

Q: And so I'm just curious about whether, did you, you know, did you ever have any feeling or did you ever see any other child being abused in any way?

A: Honestly not at all. When it happened, I was, I was shocked. You know. I mean I believed it for no other reason than I was told that it happened. But I, you know, I was just surprised. I didn't see anything out of the ordinary, or no one being touched or anything like that.

Q: Right.

A: He did, right before you got to the room where the computers were were the stairs that went upstairs, and I remember his son going up and down the stairs, you know, throughout the class. And I'm not sure if he went up and down the stairs as much. But I know his son went up and down the stairs a lot.

Q: Right. Do you remember whether he ever had kids with him? Or he just went up and down?

A: That I don't remember. Because I really, you know, I wouldn't think about it.

Q: But you never remember, you don't remember kids like that you were sitting next to coming and going?

A: No, I don't. I really don't.

Q: Because the classes, I think the desks were pretty close together.

A: Yeah, they were. The desks were pretty close together. I mean I wish I could say 'Yes' or 'No', but I really don't remember.

19:41.00

20:41.00

David Zarin - 9

**A-1305**

Q: Yeah, no that's, you know I think that the best recollections are the ones that you remember.

A: Yeah.

Q: Now do you remember being approached at any point by the...well first of all, when do you remember hearing about it? Or what was your reaction? Did you ever talk to your friends about it, or how did you find out about it?

A: I was sort of, I think my mother told me. I never really talked to my friends about it too much, I remember, because I didn't want to say anything if they were victims, and you know have them feel bad or something. But that's it. My mother told me about it. And I spoke about it with other people. But I don't really remember talking about it so much with people in the class.

Q: Yeah, and the people, the other people that you spoke to about it were what kind of people?

A: Just other friends that I went to school with that were not in the class, or not a part of his computer program. And I, you know, through time since then I've told like my college friends 'Oh, yeah. You know, I was in class once and blahblahblah', but you know nothing. Just that. 'Oh, yeah. This guy, I was in class once with a guy who molested a kid. I was never molested, but sick stuff.'

Q: Yeah. Now do you remember, I know that the police went out and talked to just about everybody who was every associated with the classes. Do you remember ever the police ever approaching your parents or you?

A: They may have approached my parents. If they did, my parents never told me about it. I never talked to, I don't remember ever talking to the police.

Q: Yeah. And do you remember your parents ever asking you whether anything happened to you? Because the case was obviously pretty public.

A: Right. I'm sure they must have. You know? But I really don't remember them, I don't remember them asking me. Although I can't imagine that they didn't in some sort of way, you know?

Q: Yeah. No, that would make sense I guess. Now I don't know if you know allegations were, I guess you probably read some of the articles or

21:52.00

23:30.00

something.

A: To tell you the truth I really, I wasn't so up on it. I mean I was young, and I really never went back to research it. Maybe now I will. But you know you've spurred a little interest. But at the time, I was very young, and I knew it happened, but you know I didn't read the newspapers at the time, so I didn't really know the facts at all. And I still don't know the facts. Of what was going on.

Q: I'm just looking at this...you know I think that among other things you know if you're curious the charges in the case were very extreme. It's one of the things that makes it kind of an interesting case. And I believe that...well generally if I understand this class right, I think the class had in it – oh, I didn't ask you about another kid named Chris Blaha.

A: Chris Blaha. Sounds familiar. But I don't remember.

Q: And Michael Heller.                                                                      25:08.00

A: Also sounds familiar.

Q: Well anyway this one class, where if it was Basic spring 1986 class, it would have been you, Larry Preddo, Brian Telker, Alan Yaskowitz, Jonathan Ross, Kamal Marchudi, Matthew Katz, Michael Heller, Blake Feldman, Chris Blaha, and you're saying maybe Garrett Haim was in that also. And the charges that came out of that class all came from one kid who had charges which would include Arnold Friedman touching his penis to his back on four occasions. Jesse Friedman sodomizing him thirteen times. Anally, eight times orally. Forcibly compelling him to have sex with him eight times. There was an endangerment charge. And then another person who was involved.

And a guy named Ross Goldstein who was said to be also involved in that class. And he said that he sodomized this boy six times. And had other kind of sex with him. What did he do? Oh had oral sex with him ten times. Other forcible. Compulsion ten times. So this would mean that in a ten week class, there were about sixty-one times that somebody was being forcibly...          26:34.00

A: In just my class?

Q: Yeah, if we believe that you were in that same class. So it's, but I think, you know, without knowing that for sure, I would say, you know, I guess the question would be, you know, what would your reaction be if I said to you that somebody claimed that they were forcibly sodomized many, many times in the class that you were in?

A: Um, I guess my reaction would be like, you know, 'Wow, what if this happened to me and I suppressed it?' You know?

Q: Yeah.

A: But I really don't remember anything ever happening to me.

Q: Yeah. I mean do you feel like that's the kind of thing you would remember?

A: Sure. I mean I would hope I would remember it.

Q: So this is…

A: But it is pretty ugly stuff. You know?

Q: Sure. Now at that age do you think, you know 10 or 11 years old, do you think you would have sort of known what was, what was up, based on what you know you were like at 10? Would you have seen that and thought, "I have no idea what that is?" Or 'That seems inappropriate to me.'

A: I think I would have known what it is, because I remember, you know, when I went to school when I was very young, I played doctor with, you know, girls and stuff like that. So I definitely knew about something dealing with sexual relations with people. That's it.

28:31.00

Q: Yeah.

A: And I think or I hope I would have known that that was wrong if anyone tried to do that to me. You know? Who knows? Maybe they tested out their victims first. You know? In a way that we wouldn't have been aware that they were testing us out to see which ones they couldn't do it to.

Q: But presumably if this was happening in every class, or in most of them – almost every class that you were in – you would probably have noticed it.

A: What's that?

Q: You would probably have noticed it.

A: If he was doing this to me?

Q: Well if he was doing it in the class, and there were boys present.

A: I don't know, because I really, at the time when it occurred, I thought that it wasn't in my class. I thought that he didn't do it to people in my class. Of course our mothers came to pick us up early, so that's what I was told.

Q: Right.

A: And I don't, I didn't remember, I had no reason to think that he was doing it in our class. I mean it's, it could have happened. He could have. And from what you're saying he did. You know. But.

Q: Well all I'm saying is that that's what one of the kids said. One of the challenges in a case like this is to try to understand whether the charges that the kids are making are accurate. Sometimes that, there are, you know, people have an agenda or the police have an agenda or they want to prove something, and then they encourage the kids to say something.

30:47.00

A: Uh huh.

Q: That has certainly happened in other cases.

A: Sure.

Q: But you know, it's always an interesting question of whether somebody else said something happened in a class that you were in. Is it surprising to you that somebody would have made many charges from the same class that you were in?

A: If you would have asked me, I mean knowing that this occurred, it's not surprising. But if you would have asked me while I was taking the class, I would have said, 'Yes, very surprising.' Because I didn't notice anything wrong in the class. Everything, it seemed like I went to class. I learned about computers. I left. And it seemed like everyone else was doing the same thing that I was doing. Yeah. I really, it was normal. It was very normal to me. The class. Nothing seemed strange at the time.

31:45.00

Q: And what about this, there's this other person who was around Jesse's age named Ross Goldstein. Did you ever hear about him?

A: No. Who's he?

Q: He was another kid that was a, he knew Jesse, and he was eventually brought in on charges relating to the computer classes. And the boy who made these sodomy charges said that this boy Ross also participated and did the same thing.

A: Oh.

David Zarin - 13

**A-1309**

Q: And that that was, you know, I think that that happened in the same class we're talking about. But you don't remember anyone around Jesse's age being in the class or participating?

A: No. I mean that doesn't mean that he wasn't there. I just don't remember.

Q: Yeah. Well this is helpful. I'm curious if your mother comes back from vacation, and she has any other thoughts, I would appreciate it if you would just call me if you have any other further memories or any of that stuff.

A: Sure. Are you speaking with any of the mothers?

Q: Yeah.

A: You are?

Q: Sure, so I'd be happy to speak to her if she's available.

A: All right. What's your phone number?

Q: Sure. It's 212-206-4420. And presumably if you got a letter from me it would have been in the last line of the letter.                                    33:22.00

A: Okay. Yeah, I didn't actually receive any of your letters. My dad told me that he was getting some letters about an Arnold Friedman case from this documentary company about a week or two ago, because you were probably sending them to my work. Or you were sending them to my home, and they were in Great Neck, and they were being forwarded to my work.

Q: I think I have an address for you of 20 Waterside Plaza.

A: Okay. That's my, my father's new wife's old apartment, which they still keep but no one lives there right now.

Q: Got you. I can just send you a copy of the last letter that I sent so at least you have some background. What's, can you give me your current address?

A: Sure. You can mail it to 106 East 17th Street.

Q: 106?

A: Yep. Apartment 5F as in Frank. And that's 10003.

| | |
|---|---|
| Q: And what phone number am I calling you on now? | |
| A: This is my work number. | |
| Q: And do you have a home number? | |
| A: 212-598-5903.  And what's your last name? | |
| Q: Jarecki.  JARECKI. | 34:59.00 |
| A: Okay. | |
| Q: And I'll send you, well I'll send you the last letter that I, or a copy of the last letter that I would have sent to the wrong address.  I'll send it to the right address and I'll include like a little biography, sort of describes me and the background of the film. | |
| A: Okay. | |
| Q: All right?  So, anyway, speak to your mom and see whether she wants to chat with us, and we can reconnect again. | |
| A: Great.  Good luck with it. | |
| Q: Okay, I appreciate it.  Bye. | |
| END OF INTERVIEW | 37:06.00 |

**A-1311**

# VOLUME 6

| Exhibit KK | August 6, 2001 Interview Statements of Dennis Doe | A-1312 |
|---|---|---|
| Exhibit LL | Undated Affidavit of Peter Panaro | A-1354 |
| Exhibit MM | December 9, 2003 Affidavit of Richard Tilker | A-1361 |
| Exhibit NN | December 15, 2003 Affidavit of Judd Maltin | A-1365 |
| Exhibit OO | December 23, 2003 Affidavit of Brian Tilker | A-1367 |
| Exhibit PP | December 29, 2003 Affidavit of James Forrest | A-1371 |
| Exhibit QQ | December 30, 2003 Affidavit of Margalith Georgalis | A-1373 |
| Exhibit RR | December 30, 2003 Affidavit of Ralph Georgalis | A-1375 |
| Exhibit SS | December 30, 2003 Affidavit of Ron Georgalis | A-1377 |
| Exhibit TT | January 6, 2004 Affirmation of David Kuhn Re: March 10, 2001 Interview of Detective Wallene Jones | A-1380 |
| Exhibit UU | February 23, 2004, "Abuse Experts Assail Movie", Marina Pisano, *San Antonio Express News* | A-1384 |
| Exhibit VV | 2003-2004 Transcripts and Statements of Judge Abby Boklan | A-1386 |
| Exhibit WW | 1988 Nassau County Indictment Numbers 67104, 67430, 69783 | |
| | Indictment 67104 | A-1395 |

|  | Indictment 67430 | A-1411 |
|  | Indictment 69783 | A-1430 |
| Exhibit XX | Declaration of Grace Gill | A-1506 |
| Exhibit YY | December 1987 Statement of Fred Doe | A-1520 |
| Exhibit ZZ | 1988 Interview of Gary Meyers by Detective William Hatch | A-1530 |
| Exhibit AAA | October 16, 1989 Witness Statement Recorded by Detective Merriweather in the prosecution of Robert Izzo | A-1532 |
| Exhibit BBB | February 15, 1989 Interdepartmental Memo from Barry Grennan to Fran Galasso | A-1535 |
| Exhibit CCC | November 24, 1987 Affidavit of Detective William Hatch | A-1536 |
| Exhibit DDD | 1988 Discovery Demands | A-1542 |
| Exhibit EEE | November 16, 1988 Notes of Meeting at Temple Beth-El by Theodore O'Neill | A-1559 |
| Exhibit FFF | March 26, 1990 Letter from District Attorney Dennis Dillon to Inspector Olsen | A-1562 |
| Exhibit GGG | November 29, 1987, "Parents Seek Therapy for Abuse Victims", Kathy Boccella, *Newsday;* Undated Letter from Parent to Dr. Sandra Kaplan at North Shore University Hospital | A-1567 |
| Exhibit HHH | June 23, 1988, "New Arrest in Child-Sex Case", Bill Van Haintze and Alvin Bessent, *Newsday* | A-1570 |

Exhibit III   November 24, 1988, "Help for Victims of Sex           A-1571
              Abuse Stressed in Temple Program", *Great
              Neck Record*

COUNTY COURT
NASSAU COUNTY

------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-

JESSE FRIEDMAN,

                Defendant.

------------------------------------------------------------------x

**AFFIDAVIT**

ANDREW JARECKI, having been duly sworn, hereby declares that the
following is a true and accurate copy of excerpts of the transcript of my
conversation with Dennis Doe on August 6, 2001.

                                         Andrew Jarecki

RONALD L. KUBY
Notary Public, State of New York
No. 02KU4940788
Qualified in New York County
Commission Expires March 18, 2015

**A-1312**

Doron Nissimi Interview

| | |
|---|---|
| Q: (phone dialing)…. | |
| A: Hello? | |
| Woman: Doron? | |
| A: Yes? | |
| Woman: Hi, I have Andrew Jarecki calling you from the United States? | |
| A: Who? | |
| Woman: Andrew Jarecki. | |
| A: Who is this? | |
| Woman: This is, my name is Jennifer. Your mother spoke to Andrew, and she told you that he might be calling? Let me put him on so he can… | |
| A: Oh, he's the director? | |
| Woman: Yes. | |
| A: Oh, great. | |
| Woman: Hold on one second. | |
| A: Thanks. | |
| Woman: Andrew? | |
| Q: Yes. | |
| Woman: Doron's on the line. | |
| Q: Doron? | |
| A: Hey Andrew. | 1:05.00 |
| Q: Hi, how are you? | |
| A: How's it going? | |

**A-1313**

Q: Good. Pretty well.

A: Great.

Q: So I spoke to your, I'm hearing your very big screen TV in the background. I think.

A: Very big. It's not that big. It's small. It's a small screen TV. But it's on, yeah.

Q: So.

A: Is it too loud? Are you having, do you have difficulty hearing?

Q: It's about the same volume as your voice, so I'm having a little trouble hearing.

A: Oh, so give me a second. I've got my baby lying on me. One second. You lie down for a moment. I'm going to take this…. One second. I apologize. … Raily, sit here for one moment. I'm going to get …okay? …Laya? Can you come down and deal with Ariel for a second? I got an important phone call. … from the States. There's a movie guy I told you about. I'll pick… … So what do you say? Can you tell me a little bit about what you're doing?

Q: Yeah, I was, you know I spoke to your mom a little bit and I, I told her that I wanted to just describe to you what our project has been about. You know, this is a very, I got to this movie in a very strange way, because….

A: Right. How, how did you get to it?

Q: I started out making a film, completely different film. That included as one of its characters a guy named David Friedman, who is a children's entertainer in New York City. And he's sort of like the number one children's entertainer in New York City. And …

A: Right.

Q: And he, so he sort of figured into this movie. And he and I spent a bunch of time together. And you know as I was spending time with him, it made it, it sort of seemed to me that he had certain things about his personal life that he was not talking about. And everyone in the movie was being pretty open, and he was kind of guarded. And so I, you know, asked him about it. And eventually I did some digging, and I discovered that there was this incredible, complicated story behind him and his

1:50.00

3:26.00

family.

A: Right.

Q: And you know that was something that, that sort of surprised me when I first learned about it. And then I spent some time talking to him about it. And he was fairly open with me about it when I described it to him. And you know we started to get into it, and we started to meet some people who were involved in the case. And you know I met a bunch of the people in the police department. And a prosecutor an a bunch of other people, and they...

A: Yeah, those are the people that actually dealt with the case.

Q: Exactly. And you know I felt that it was a very interesting story. Because you know it's, inside there was the anatomy of this very complicated legal case, but also the families that were involved, and the community of Great Neck. And it just seemed to me to be a very interesting story for a film, for a documentary.

A: Right.

Q: And so at that time, which was about maybe nine months or so, ago, we refocused the whole story and started to focus on this part of the story. And so the film is completely different than when we first went into it. And now                                                                                          4:33.00

A: Wow, that's pretty wild.

Q: Yes. And so now I've been on this other story for nine months, and I've just been learning about it and talking to people who were involved in the case. And all that stuff.

A: So how did you track down the actual people that were there in the flesh? How did you get my name for example?

Q: Well I think that, you know that Arnold Friedman, the father, died in prison a few years ago.                                                                                                                         5:12.00

A: Yeah. I didn't know that. I mean my mother had told me, but I didn't know that before.

Q: Yeah And his brother is still, I mean, sorry, his son is still in jail – Jesse.

A: Right.

Q:  And Arnold was, maybe he was about sixty-two or sixty-three when he died, I think.  And in the years prior to his death, he had been in prison for about ten years.  And before he died, he had done a lot of work to try to, you know, I don't know, get a, maybe get his case reopened or get somebody to look at it or something like that.

A:  To try to get out of jail?  Or for some other reason?

Q:  You know, I would imagine to try to get out of jail.

A:  Right.

Q:  Because I think he knew that he was headed for an even worse jail situation, because he first was in a federal prison facility….

A:  Right.  Because there were, they were going through the post office, so it became federal.

Q:  Right.  So it was a…

A:  …..a bunch of things… Right.

Q:  So after that, he, you know, he was looking forward then to another – so he served ten years in federal prison.  And then he was looking at another twenty years in state prison. And you know for a 62 year old or 63 year old guy to begin a twenty-year state prison term is a pretty depressing concept I would imagine.                                                  6:26.00

A:  Right.

Q:  And so I think he was, you know, probably trying to do whatever he could to get some sympathy or something.

A:  Right.

Q:  So as part of that, he produced a lot of documents and …

A:  Confessions?

Q:  Pardon?

A:  Well, when you say 'documents', you mean…go ahead, you were in the middle of a sentence.

Q:  No, you know, he produced a bunch of information like lists of people who were in the classes, and you know he was trying to figure out whether he could do some kind of an investigation. Or you know he had

a very, I think he had a fantasy about being able to get out of jail if he could get you know…

A: Yeah, if could really comply.

Q: Yeah. So anyway, so.. part of that, I ended up getting a bunch of material. I mean I collected hundreds and hundreds of documents on the case, but one of the things that I got was some information from him about who the complainants were and the non-complainants in the class.

7:41.00

A: …Ariel… Sorry, my wife's going out and my daughter is in a panic. One second, I'm sorry. You have to bear with me for a second. I'll take her. I'm just going to hold you Ariel. ..Ima's going to be back in 5 minutes. (scream)…. You're just going to take…home, Ariel. You don't have to cry. Let's walk around, okay? Bye Ima. See you soon. (scream)… Don't cry, my love. Come, we'll fill you your bottle. Okay, Ima's going to be right back. You don't have to cry. You don't have to cry. … You don't have to cry. Stop. I'm going to prepare your bottle. Okay? So …

Q: You know I can call you back also.

A: Yeah. I'm wondering, I'm wondering…I'm really into this, that's why I'm, that's why I'm not telling you to call me back. But…

8:50.00

Q: What time do you go to bed?

A: Uh, usually, usually pretty late. That's the truth.

Q: So do you want, because it's only three o'clock my time. If you want me to call you back in an hour or two or something like that, I could do that.

A: Yeah, I'm trying, I'm wondering if that's when I'll have time, you know? You know what? Let's pretend, let's see how we manage here. Let's continue.

Q: Okay. So I have two – how old are your kids? Or you just have one?

A: I have one, one she's two years old. That's the one you hear. And the other one, I have another girl, and she is about two and a half months old.

Q: Yeah, I got a four year old. And an eight year old. So my four year old, they're already much easier to deal with, I think.

A: Yeah, yeah. They're already still taking care… taking care of

Doron Nissimi - 5

**A-1317**

| | |
|---|---|
| themselves a little bit. | 9:45.00 |
| Q: Yeah. Exactly. Although you can expect that the 8 year old's going to take care of the 4 year old, but that never happens. | |
| A: No? Not yet at least. It'll happen. | |
| Q: So, so anyway. You know, that's basically how I learned a bunch about who was in the classes was from Friedman before, basically before he died. But I didn't know him before he died, but he produced some letters and things before he died. And so you know I've been trying to do as much work as I can to talk to as many people as I can who were involved in one way or another … | |
| A: Tell me something, the courts and the, and you say the uh, the uh courts and the, and the police department, all these guys, they didn't have any trouble disclosing this information to you? | |
| Q: Well they, see, the police cannot disclose this information, because the police have rules against being able to disclose the names of people in cases like this. | |
| A: Right. | |
| Q: But that's why I had to get it from, from the Friedman documents as a place to get them. | 11:00.00 |
| A: ….I'll tell you what. I'd really like to be a lot more with you. You know? So… | |
| Q: When's a good time for you? Want to do it later today? | |
| A: Yeah, if you could call me back do you think in an hour? | |
| Q: Yeah. I gotta bring my wife to the doctor at 3:30, and then I'll be back here shortly after. So like, I would say like an hour, about an hour fifteen. | |
| A: Great. So maybe when you get back. That'll be great. | |
| Q: Okay, great. | |
| A: All right. I appreciate your calling. | |
| Q: No problem. I'll call you back. | |
| A: All right. Great. Thanks. Bye bye. | 11:35.00 |

**A-1318**

Q: (dialing)…

A: Hello.

Woman: Hi Doron?

A: Hi.

Woman: I have Andrew Jarecki on the line again for you. I'm going to put him through, okay?

A: Thanks.

Woman: Thank you. Andrew?

Q: Yes.

Woman: Doron's on the line.

Q: Hi Doron.                                                    12:17.00

A: Hi Andrew.

Q: Did everybody get to sleep okay?

A: Yeah, everyone's asleep. Great.

Q: So what town are you in? Are you in …

A: I'm in Jerusalem.

Q: I have a good friend that lives in Haifa.

A: Oh, yeah?

Q: Yeah. Who is, he's a guy who the, his family runs, owns the movie theaters in, in, most, many of the movie theaters in Israel. His name is Kliedinger.

A: Kliedinger?

Q: Isray Kliedinger.

A: Must be a big family if they own all the movie theaters.

Q: I think that's right. So how long have you lived over there?

**A-1319**

| | |
|---|---|
| A: I've been living here, officially living here, since 1997. That's when I made Esolia (?) I became an immigrant. Yeah. That was in February of '97. | 13:10.00 |
| Q: I see. | |
| A: But I was studying here for several years before that. I was flying back and forth and spending most of my time here. | |
| Q: Oh, that's – your mother misses you. I can tell. | |
| A: Yeah. That's good. That's a good sign. | |
| Q: Now and you do computer stuff? | |
| A: Yeah. Ironically I work with computers. | |
| Q: What kind of business is it in? | |
| A: I'm actually, I don't know what you'd call it. I guess I'm an IT expert. Systems administrator. Network administrator. It's basically managing computer networks. Whatever's involved in doing that. | 14:00.00 |
| Q: Yeah.. | |
| A: Providing IT solutions and all that. | |
| Q: You know I had a, do you know a company called Movie Phone? Also called 777 Film? | |
| A: Yeah, yeah, yeah. | |
| Q: That was my business. I started that business in 1989. | |
| A: Did you really? | |
| Q: Yeah. | |
| A: Don't tell me you were that voice. | |
| Q: No, I wasn't, but I hired the guy, I brought in the guy that was the voice. …of the business. He lives in Los Angeles. He's a very funny guy. | |
| A: That guy… I guess he's got a very unique voice. Everyone knows who that, by the guy's voice. | |

Q: Yeah, it was, it became like the voice you love to hate.

A: Yeah, yeah.

Q: Because everybody liked to make fun of it. But you know if we changed it people would say, 'What happened to the voice'.

A: Yeah, yeah. For sure.

Q: But they love to complain about it actually.

A: Yeah, well I think the nature of those, of those On Demand phone …you know, those call routing systems, they basically get very talkative. Especially to get the information that you need. So it kind of just stuck in people's ears. And then you had all the promotions in the beginning – 'Sponsored by K Locker' or whoever the hell was sponsoring it.

Q: Yeah, exactly.

A: That's funny.

Q: You know, I actually, I sold that business to AOL in 1999, and when I did it was the same time they were selling ICQ to aol? And so I got one of those guys, Yosi Varda – I don't know if you know ….     15:12.00

A: Yeah, the guy is here. Sure.

Q: It's actually a very interesting group. They are such smart guys there.

A: Well …that's how, I mean the idea itself was a great idea, but they were selling basically nothing. The …let's not say nothing, they were selling great technology, a technology that was making no money. It was completely free. It was like there was like no way of making money. They were actually riding on a business theory at the time that today, you know, basically went out the window. That basically the more clientele you have, that's what's worth the money. So you just had like millions of users, but they had no way of getting any money out of them.

Q: Yeah. In the end you know AOL was battling AT&T, who also wanted to buy it. And it was just….Yeah, and it was just like a traffic grab, you know? Everybody wants…and of course Yosi, who's very smart, but who is very classic Israeli. You know, he's like, he didn't want any AOL stock because he said, you know, 'Your stock is bullshit American fantasy money. I only want cash.' So of course he …     16:34.00

A: You offered him less.

Q: Yeah. So they pay him $325 million in cash, and within about six months of the deal, the AOL stock prices more than doubled.

A: Wow, so he thought that he, he thought that he lost now big.

Q: Yeah. I mean he did great, but you know it's, it was such a classic thing. I mean I think any other time in history, he would have been right. And I like the conservative Israeli philosophy. I think he was, you know, most of it was very…

A: Today he surely would have been right. Yeah?

Q: Yeah. But I think that year in particular it would have been good to get that AOL stock.

A: Yeah. Well the, the other question is how long would have had to let it vest before he could actually sell it out?

Q: He would have been able to sell it about six months after he got it.

A: So he would have been okay.

Q: Exactly.

A: I think 325 will do, huh?

Q: Yeah. Exactly. Nobody's going to cry over his situation. Anyway, but after I, but I was making films before I started that business. And then I started the business and then I just went back to, I did that for a while, and then I went back to ….    | 17:34.00

A: Yeah, well it's definitely two different approaches, even though they both have to do with film. Yeah, like a business aspect and a more artistic aspect.

Q: Exactly.

I guess the art is always really the more, the more, the greater thing. I, I also play the drums, and play a little bit of guitar and I sing. And I always said if I could make my money in music, I'd go do music in a second, even though, you know, I live for computers. I love it. I love what I'm doing.

Q: Yeah.

A: But there's something about art that's, you know, a person likes to

| | |
|---|---|
| create using his hands.  Like God, you know? | |
| Q:  I used to do music all the time.  I used to do music in high school all the time, and then when I sold my business I had a friend who I did some music with, because now you know you can because there's Pro Tools and all this incredible software.  And so I started …and then I ended up, because I play the drums and I sing.  And my friend is a really good keyboard player and good composer, and so he and I wrote a song right after I sold my business, we wrote a song.  We wrote a lot of songs together, but one song we ended up playing for some people at, in sort of the television world.  And they bought the song to be the theme song on the Warner Bros. Show called 'Felicity'?  I don't know if you have that show. | 18:26.00 |
| A:  Yeah, yeah, yeah.  I've heard of it. | |
| Q:  Yeah, and it's a really good show.  And anyway, so now it's a theme song, so I get to be singing on television … and it's my most, of all the things I've done in my life, it's the one I'm the most proud of in some ways, because you know there's nothing better than art and using your voice and.. | |
| A:  Yeah, yeah, yeah.  Sure.  Absolutely.  That's pretty wild.  … It's almost like a Forest Gump story, you know, 777 Film, I sing the theme song for that.  That's funny. | 19:22.00 |
| Q:  And I was …so people do, 'Oh, so you have a good voice.  But how come you weren't the voice of 777 Film?' | |
| A:  Yeah.  That's wonderful. | |
| Q:  Do you have e-mail, by the way?   Because I might e-mail you my song. | |
| A:  I will have that on .mp3. | |
| Q:  What's your email? | |
| A:  dnissimi | |
| Q:  At? | |
| A:  @hotmail. | |
| Q:  Is it .com or ….? | |
| A:  Com.  Yeah.  .com. | 20:02.00 |

Q: So anyway, back to our favorite subject.

A: Yeah.

Q: You know so I think, I mean I was curious because it's, whatever, it's been thirteen years or something. And I'm, you know, I got a little bit of a sense you know from your mom of what her recollections were of that time, but I was curious to hear, you know, your recollections and....

A: Yeah.

Q: You know, what you remember about it.

A: Look, can I jump one step backwards?

Q: Yeah, yeah.

A: You're definitely my only source of the only continuation of any of this. That means to say my mom called me up like two weeks ago, she told me, she was almost afraid to, she told me she was afraid to ask me. She said that you had contacted her some months ago and all that, and she didn't know exactly what to do, and she spoke to my sister and she spoke to all sorts of different people. You know, she was kind of stuck. She didn't know how I'd take this. | 20:31.00

And when she spoke to me, it was very, it's more interesting for me, you know? Because it's kind of a chapter that I've totally gone beyond, you know? But it's definitely something that I never got all the answers to, either.

Q: Yeah.

A: I don't know how many people you've interviewed or spoken to or however it works out, but when I was going to Cross Hills, I was pretty young. And I don't remember all that much. The confessions that I made in court were as accurate, as accurate as I could state them, but there's something, when a kid...let's say it like this. After I went to, when I was going to therapy, after this whole incident... say after, after the court cases and all that, the therapist explained to me how the human mind is so strong that traumatic incidents like this, the mind blocks out. It's like a, it's like a, she called it a defense mechanism, you know?

Q: Yep.

A: So any recollection of what was going on there I barely have, you know? That's what is so wild about this. And that's what really struck me | 22:07.00

when my mom called up and she told me that you're doing a movie about it, I said, 'There's a movie I'd like to see.' You know? Believe it or not there's some where maybe it's still fresh in their minds or they have a stronger personality or that they, you know, that it's still fresh in their mind, they'd say, 'I'd rather not wake up the dent (?)' You know? For me, for me the first thing I really, that I, that I really said is 'I want to see this.' You know? Because I have a very, very vague memory of what went on there. Either because I was young, or because I simply blocked it out. '

Q: Yep.

A: But it's probably more, because it's been blocked out completely. It's really wild.

Q: Yeah.

A: The other ironic thing is that when I was young, I remember thinking to myself they're running advertising campaigns about kids that, kids that get abused, whether it's sexually or physically or you know, however it is, but these kids should go and tell their parents or tell their teachers or, that kids should speak up. And whenever I saw these commercials, I'd say to myself, 'I bet if that happened to me, I'd have the courage and go talk.' Like that's how much it was blocked out of my mind. To the point where like I was one of those kids but I was saying that, you know, if I was one of those kids I would tell. But in the meantime I actually was. You see what I'm saying?

Q: Yeah.

A: So if we could, if we could take one step back, say, say I'd like to use you to contribute a little bit, you know, about that, about this whole, this whole bit, you know, as much as, as much as I could help you I'd love to.

Q: Yeah.

A: Right?

Q: You know, it's interesting. I mean I'll say one thing just up front, which is that you know this is a very, it's a very controversial case, because a lot of these cases ended up getting examined in a more thorough way, because this case never went to trial.

A: Right.

Q: And you know the police were extremely tough, and they basically, my impression was they really went after guilty pleas from the ...

23:14.00

24:33.00

**A-1325**

A: Right, right. I remember that.

Q: And so as a result you don't have the full history of a trial and all that stuff.

A: Right, the focus.

Q: And so coming into this I should say I don't have a clear – I mean I spoke to your mother a little bit, and also by the way my conversation with you is, is confidential between, vis a vis, you know, your, the things I'm telling you now are things that….

A: Are confidential. And I assume the things I assume the things that I tell you also. My name and all that shouldn't be disclosed.                                  25:16.00

Q: Yeah, and I'll tell you what I should say about that is you know we're having a conversation and I, you know, the, I would say that parts of our conversation I won't use are your name and your identity. You know, something that would let somebody know who you are or something like that. But obviously I'm trying to get background and I'm making a film, so it is, when you tell me something I'm learning from it and I'm, you know, going to use that information. But I think that coming into this, you know, I didn't really know the story.

    And I think that you know a number of these cases, after the police did their work on the case and all that, a bunch of these cases got sort of undone by the court system. And partly the reason that that happened was this was at a time in the late '80s when the police were not that knowledgeable yet about how to interview kids, and there was a lot of thinking after this time that you know sometimes the police were questioning kinds in a manner that caused them to remember things that were more extreme, or either the police knew what they were looking for.   26:42.00

    And on the other side of the coin you have people who say, 'Well this is the most horrible crime in the world, and, you know, and …if it happened….'

A: Right. I understand.

Q: But there's a lot of controversy about it, and partly you know what I hear you saying is you don't have as clear a recollection of it as you would expect to have …

A: Right.

Q: …and all I'm saying is that I came into this with a very open mind.

**A-1326**

Saying, 'I'm going to learn from talking to people, and start with a clean slate.' Forget what the police say. Forget what the original, you know, people said to the grand jury or to the police. And just go back to these people, you know, more than a decade later, and say, 'You know, you've done some thinking about it, and I can tell you some more about the history of the case, and you know let's just take a fresh look at it and try to understand what did happen, as opposed to sorting through the history of it.'

27:41.00

But I think that's an important thing to do in all of it, because you know people get impressions of themselves either as someone who was a victim of abuse or someone who was not a victim of abuse. And then they become, you know, very used to those impressions.

A: Right. For sure.

Q: And that's something that, you know, I know from talking to your mother, I got the sense that she said, 'Well you know this happened to Doron and that was very unfortunate, but luckily we got it out and we got it behind us and now he's able to go on with his life.'

A: Well, I could say surely yeah, …

Q: Just that, you know, I think you should be, as you think about it, you know you should try to use your best, you know, intellectual and emotional memory, and not necessarily go back to the things people told you but really the things that you personally, you know you personally remember, you personally connect with. Because you know I think there…

A: …I'll, really, for sure. Well I'll tell you a sentence, I'll tell you certain things like this for example. Like I was saying before, there are things I remember in the class for example. And I said there would be a continuation to it, yeah? It wouldn't be like the end of a story. You know? But from that point on I don't remember. You understand?

29:09.00

Q: Yeah.

A: This is, things like that. Um, another example would be, like you were saying, when a, the detective comes and he has a certain target to get to, right? So he's going to lead the conversation. That's what he's there for. That's, he's the prosecutor. That's what the prosecutor's job is to do. Yeah? So he's trying to lead the conversation a certain way. I can't say that if I'd just sit there with the detectives and they'd say, 'Go ahead, spit it out. What have you got for me?' that I'd sit there and tell them the whole thing A to Z. You know?

Simply because I really like it was, like it was something that was really blocked out of my mind. But one of the things that really, that really amazed me out of this whole thing is that I would tell the detectives certain things that I'd be telling myself, it was really weird, like you play with yourself at this age, like a person has to understand they're talking about kids that were put into very uncomfortable situations. Unbelievably uncomfortable. That it's not simply that you were abused or whatever it is, but you're sexually abused. And sex is a very touchy subject for everyone, even adults. Yeah? Even like a husband and wife, you know? It's maybe the most difficult thing to discuss with your wife.

30:32.00

I don't know, not you in particular. I'm saying like…

Q: No, I agree.

A: Sex is always touchy. So when you get to kids and kids they know, you know, they know not that much about sex, but they know that it's, you know, it's something like shoo shoo, yeah? And all of a sudden you find out you were sexually abused, right? And, and all these really horrible things. And things that even, that even we go up to homosexuality. Yeah? Because that's what it comes down to in the end. And so it becomes very, very, it becomes a very sensitive subject. And all you want to do is tell yourself 'It didn't really happen to me.' You know?

So while I was talking to the detectives, they were putting – and this is what I remember – it's actually quite funny, because, and my mother called me up and told me that, and told me that, that you called her and asked me if I wanted to discuss this and whatever it may be. So I told her I don't know how much, how many details I can give him about what was going on in the classes. It's a very, very vague. You know? I remember maybe a few, a few instances of, of them standing there naked or seeing them naked. Something to that effect. But nothing really, you know, I don't know if you call 'action'. Right?

31:53.00

But what I was wondering is is – Andrew, yeah?

Q: Yes.

A: Is he doing anything about the, is he covering anything about the entire court case? Obviously you're telling me now that that's kind of what you were trying to get into here, saying that the case never went to trial and it was, and they kind of took a little, they ended up …or it was controversial and all that. But I said I could shed a little bit more light on the trial. On the …

Q: Investigation?

A: On the investigation, yeah. Because what I do remember is the detectives putting on a lot of pressure to speak up. Yeah? And, and at some point I kind of broke down. I started crying, yeah? And when I had, when I started to tell them things, I was telling myself that it's not true. Like I was telling myself, 'Just say this to them in order to get them off your back', kind of. Like so coming from, coming from a, coming from a – how do you say it? A…. what's the word I'm looking for? One who's trying to be a…what's the word I'm looking for? Trying to be critical of the objectives. Yeah? …the objective, are you saying here are a bunch of detectives that are basically, you know, talking to this kid, putting him under a lot of pressure. Young kid. Right? Telling him to speak up.

33:18.00

And here's this kid, and he just cracks to get them off his back, right? But what really amazed me was that when I started to tell them things, and I was convincing myself that it didn't happen to me, right? Because of the sensitivity involved, they, they would say, or they were telling me 'Yeah we know about that. We heard that confession. Like you don't have to be scared. That we heard of this. Other kids told us about this.'

And they even came – I remember later on, say a few months down the road, when they had gone into the investigation further, that they had actually gotten a five or six, I remember they brought this huge book to my house. 'Confession from Arnold Friedman'. That they sat with him for hours in jail. And it was a huge, it was at least 500 or 600 pages. And I said to him, 'Does he speak about me in there?' So they said, 'Yeah, he does.' And they said mostly so, so I was interested to know exactly what he said about me.

So they said mostly what you told us about. That's what he discussed here.

Q: Yeah.

A: So it's pretty weird. If you know what I mean. From one side you don't remember it. And you could even feel from, feel that, like you said, they're putting so much pressure on me that I basically just spoke up. But from the other side, the things that I was saying was accurate. You know? Gave me also a different perspective about the human mind in general, how the mind is so intricate, where out of the, out of way back in my mind, out of the sub, subconscious I could actually throw out these facts.

34:49.00

Q: Right.

A: So that's something that was pretty wild for me. Yeah?… What's that?

**A-1329**

Q: I mean I think that the, you know, this question, it's a very central question, and one of the reasons why I think people are talking to me at this stage is because I think a lot of people have, you know, questions and thoughts about these kinds of issues this many years later, because you know now for many years you've sat with one impression, and then as you think about it, you know, you see a lot of material…you still there?

A: Yeah, yeah.

Q: Oh, sorry. My phone cut off for a second. I think you know you see a lot of material in your mind where you say to yourself, 'Well, okay so the police said it, and there must have been many other kids that said it, and then Arnold Freidman must have confessed to it in prison', and so on and so on and so on. So that becomes something that solidifies the memory.

A: Well, I'll tell you what's the thing. I'll tell you one thing. I understand what you're saying. But I, what I do remember is under no circumstances did the police ever tell me, ask me something specific. Understand. They never told me what I'm supposed to be saying, so to speak. There was always a question mark. And after I'd say something, so I guess in order to make me feel more comfortable, in order to make me feel like I'm not telling them a secret, right? Because that's also a big fear of kids at that age. Look, I had a lot of fears. Yeah?    `36:19.00`

   They were talking about uh Jeff, his bodyguard going around and trying to scare people. You know? Scare the kids not to, not to talk. And phone calls and about phone calls of computer voices calling up phones automatically and, and just trying to scare the kids. That was supposedly some sort of tactic to try to get the kids not to speak up so much. And there as a lot of fear going on behind the case also. So I felt that one of the things that the, one of the, one of the other goals that they, that the detectives were trying to achieve was to also give us a little bit of comfort and protection, so we could say 'Even if I were to tell them something new, maybe they would have been telling me…'Look, you didn't just give away a secret. You know? Don't be scared'.'

   Like I think it was more that type of approach than to actually try to shape my words or to shape my, shape my mind in a way. That's a feeling that I had at least, because there was really a lot of fear behind this thing as well. It's also a little bit scary to hear that now you're involved at this age in trying to bring justice to the, to these type of people, or people who are being tried for these types of charges.    `37:50.00`

   I mean to say there's, it's a very, when you're dealing with kids, this is really what I spoke to my mom about and this is what I'll tell you about, that my first question was, 'Is Andrew going to be dealing with the whole

issue of the investigation and let me say of the courts? Right? Let's say thereafter. Not necessarily what happened in the classroom. Also what happened in the classroom, whatever it is. But is he going to be dealing with how the kids not only were treated in the classroom, but how the kids were treated throughout this whole court case. And you say 'What has gone through their minds'? Right.

Because that was also very weird. Like to come to school late, and for somehow some kids to spread rumors that you were in court. And the grand jury. And for rumors to start going around in school, it's a real shitty feeling. You know? And that's also not the greatest thing, to go to school and to be like the kid that's involved in some sort of investigation. You know? That was also pretty weird. And to go to, I was in two lineups. I was the only one, I was the only one who, I was the only one who identified – I forget his name. Uh, some kid that was a friend of Jesse's that was also coming to the classes.

39:06.00

There were two kids. There was one called Gino Scatto. I remember his name because his parents owned the pizza store called 'Scatto's' and there was another pizza store called 'Gino's'. So I remember his name. And there was another guy though, it's like under, there was, he was the one they were really going after. As an, as a friend of Jesse's. I forget his name. But I was the only one who identified him positively, and at some point they said, 'Do you want to go after him on your own? Because we don't have other kids to join you.' So I said, 'No, I'm not into it.' You know?

But to go to like a police lineup, for example. Like that's, that' scary. You know? That's like you're looking at, through the glass. And you see people. And, look, it's something that maybe today, when I look back at it, or today I would have to do it, so I do it as like, I do it more in the head, in the head space of a responsible adult that's going to, you know, to help bring justice to the world. Or at a young age, I mean a kid doesn't think of it that way. A kid, you know, he gets quite emotional over such things.

40:27.00

Q: Sure.

A: So think a lot of, I mean you probably even know better than I do, being that you're investigating the full situation, and kind of getting into, you know, really getting into it. That part of what the detectives also trying to do is try to make it less, less traumatic, as less, the least traumatic for us while getting the information that they need to put, to put the guys away.

Q: Right.

A: So, I don't know. I guess you could call it controversial, but...

Doron Nissimi - 19

Q: I guess I think…

A: ..but at a certain stage….

Q: Yeah, I say it's controversial because, you know, there are people who are both sides of the equation. So there are people who say, you know, 'Yes, these guys were committing these crimes', and there are other people who say, 'I went to the computer classes and I learned computers and I never saw anything go wrong.'

A: Uh huh. Well that's, that's interesting. Well I'm sure it's possible. You know? I'm not quite sure. That it was some sort of a pedophile factory. I'm don't know what you'd call it. You know? It could very well be that he taught computers. Look, I can think back and I could, I could tell you that, I don't know if I learned anything applicable. I don't know if they contribute – what I learned, I wouldn't say anything I learned there contributed to my computer knowledge today. Or anything like that. But that could be said, I wasn't a student for that long. I don't think.

41:51.00

   I don't quite, I don't know exactly how long I was there for, but, but I do remember being taught computers to a certain level. That is to say I think we were learning Basic. I know we were working on Commodore 64s. We were learning Basic. I remember a few lines of code. And I remember him teaching us how to build a calculator that would ask you, you know, 'please specify if you want to multiply' – no, 'add, multiply, subtract or divide'. And say 'Give us your first number, your second number' and it will give you the answer. Like a little simple program like that in Basic.

   I remember it's not as if you know I definitely wouldn't say that it was a system where, you know, kids would come in to learn computers and they would just become, I don't know, a big mess. You know? But, but I also didn't say that it was kosher. And I surely wouldn't say that, I surely wouldn't say that they, they got it hard, you know? Like I wouldn't say that like that the detectives calls for them to sit more than what they should have. You know?

43:05.00

Q: Right.

A: Not that I, you know, not that I'm happy about, about anybody, that happening to anybody. There's a phrase at the Jewish sages wrote somewhere. It's a saying that says … 'When your enemy falls, don't be happy.'

Q: What is it? 'When an enemy falls, don't be happy'?

happy'.

Q:  Right.

A:  So don't rejoice, don't be happy, don't rejoice.

Q:  Misfortune, right.

A:  Yeah.  Don't judge someone else's misfortune.  So I'm not saying, you know, they deserved every bit of it.  But from one side, you know, a person gets what he deserves.

Q:  Do you remember the, was there any time ever where you had spoken to your parents before this?  Or you began to, to feel that this abuse had taken place only once you were talking to the police was when it came out?  Do you remember when it first came out?    43:54.00

A:  I think, looking backwards, that, let's say like this, there's certain, I don't know, I think it's called, certain um... uh... symptoms that you'll notice in such kids.  Things that the psychologists see.  It's nothing etched in stone here.  Certain symptoms like my grades dropping in school, for example. And things like that.  So I think that when we look back on it, right, we said, I don't know if you call it justified, or we somehow noticed a few of these symptoms fitting into the timetable.  But the first time that I actually spoke about it was only after the police came.

Q:  Right.

A:  And that's why I was saying, too, that it was quite ironic that when I'd see these commercials I'd say to myself, 'Hey, you know, I'd speak up in a second.  What's the big deal?'  You know, like I didn't understand why they'd be advertising such a thing.  You know?  Like any kid would speak up if this were happening to him.  But then on the other hand, you know, like there I was – a kid that's not speaking up.  You know?    45:11.00

Q:  Yeah.  Now do you remember that, when you, do you remember whether you were visited by the police numerous times?  Because in some cases they had to visit people many times.

A:  I think I, the first time they visited me it was right before the Chanukah holiday.  We had a custom in our house to decorate the front window of the house, because at the time there, I mean to say the reason maybe being because it's during the holiday season and people decorate the house for Christmas, so we had a custom also to decorate our front window for Chanukah.  The truth is that the entire theme of the Chanukah holiday is called ....., it means to 'publicize the miracle of Chanukah', so we were actually doing much more than what we thought.  We were

Dennis Doe  - 21

**A-1333**

actually publicizing the miracle.

And I was in, and I was very, I was going to, I was going to a private ….or it was more…there was like later on in the '90s the whole had …of like more, you know, everyone's equal type thing became more acceptable. But in the later '80s, I remember like when our bus would drive through Steamboat Road, for example, the Blacks would look at us funny. You know, things like that. So I was a little bit paranoid about being Jewish.

And here I saw this old, like an old Chevy, I don't know what detective was driving it. I think his name was Larry. I don't remember. But I don't know. But I see this old, this old car pulling up slowly. And I was standing in the front window, putting up all these decorations. And I go 'Yeah, I'm damned proud to be Jewish'. Like talking to this guy. You know? Because I felt that he was looking at me. And then all of a sudden his car stops, and two people get out of the car and walk up to my door. | 47:14.00

I was like 'Oh shit.' You know? Like it was totally weird. So, because of that story, that's how I remember the first time they came. They may have come one time after, and I remember eating breakfast or lunch with them once. Near the, near the District Attorney's Office I think. I don't remember exactly. And that may have been, on, on the day of maybe a grand jury, or I don't remember why we were actually there. They, I think they took a report, they had taken one big report from me the first time, where we, you know, where we wrote down several pages. And I think they came back for a further report. But they definitely didn't continue coming back to me.

Maybe I didn't, maybe I didn't have such useful information for them. I also remember once, once we had to go for a lineup, or we had to be, all the kids had to be together in one place, there was always a fear, there was always a fear that al the time you'd see someone that you knew, or that – not that you knew, rather, than you, that you'd recognize. Because I know he was running several different classes. So you'd see a kid from your class, and all of a sudden it would bring you flashbacks. Or he'd say, 'Well you were also in this..' You know, it was kind of like freaky.

But, but I remember when we were all sitting together, there were kids that were really, were really traumatized from this. There were kids that were hit harder, and they were like, they were I guess the bigger witnesses, you know. The stronger witnesses. They have more of a recollection. Things like that. The police didn't come to, didn't, it wasn't, I wouldn't consider myself someone who's actively involved in it. My parents were definitely cool by that, that they didn't deny it. I had a friend | 49:21.00

that was going to the class, and I told the detectives his name. And when they showed up at his door, his parents basically said, 'You know, see you later. Like you're not coming in to interview my kid. There's something that we don't want to discuss, we don't want to talk about it.' And they sent them away.

Q: And do you remember whether that kid was someone where you sent them there just because they asked for somebody else that was in the class? Or because you also had some concrete recollection of him having some bad experience?

A: Well no. They, no, no. They had asked, they were looking for names. I think at the stage where they got me, they had gotten my name from some other kid. And some other kid that, uh, that remembered me. I think that those earlier stages of the case, because I think I remember when they came to, I don't remember exactly, but I think when they came to me they had told me the story of how they got the 'no knock' search warrant, and they, you know, and they broke into the house. And whatever it was, they told me that it happened several weeks before. So it was really in the early stages of the case that they came to me.

   And I think at that stage, they were looking, they were looking more for just people. They said, 'Tell us, do you remember anyone? If you also, if you remember anything happening to them.' But I had, I had given them this name. Again, not because I had necessarily remembered anything in particular, but because, but because they were asking for the people that I know, and this is some kid that I actually brought him into the class.

   I remember after my first class- he was also into computers, and after I went to my first class, I told him 'I'm going to computer classes', and he also got, and he was also interested in joining us. He was a kid that I was actually in school with, and I think it was actually through him that the news, that the news got out to the classmates, that I was going to court, and the nature of the whole case. He wasn't allowed to discuss it. He wasn't allowed to talk to the detectives because his parents wouldn't let him. So that may have been his way of getting it out, or that may have been his way to make himself feel better. You know?

Q: If I may, I don't want to ask you to mention his name to me, but I, maybe I, I might name a few people for you and ask you whether you remember that being one particular person?

A: All right.

Q: Do you mind? Uh, XXXXXX? XXXXXX? XXXXX? XXXXXX. XXXXXX. XXXXXX. XXXXXX. XXXXXXXX. XXXXXXX. XXXXX.

50:22.00

51:33.00

| | |
|---|---|
| XXXXX. XXXXXXX. XXXXXXX. XXXXXXX. Any of those yet? | |
| A: No. | |
| Q: I'll keep going. I got… | |
| A: Although, although some of the names sound familiar. I can't put any faces on them. | |
| Q: Do you remember the names of any of the other kids that were in your classes? | |
| A: There was a kid by the name of Nicholas. I don't know his family name. I has seen him at a baseball card show about a year after the case, or two years after. And when I told him what had happened, he, he seemed like a little bit, he got a little bit like emotional. You know. Probably started crying, but I probably freaked….out of him. Not because he was in shock. I think because it actually touched something … about him. That kind of weirded him out and he walked away. I don't now his family name. | 52:50.00 |
| Q: Do you want me to, I can keep going. I mean I'll eventually probably hit on your friend, but .. | |
| A: You think? Go for it. | |
| Q: I've done so much work on this crazy case. Um, all right. _____ _____ _____? | |
| A: You hit him. | |
| Q: Oh. Let me guess. XXXXXX. | |
| A: Yeah, you got it. Is that how you got my name? | |
| Q: No. Actually I got your name from one of the original lists. But … | |
| A: The original lists from the detectives? | 55:11.00 |
| Q: No, from…no, the police won't give you anything on this stuff. The, I mean the police are very nice to me and I've had a very good relationship with them and tried to understand this. You know, they know that I'm not coming into it to try to prove that they're bad guys, or try to have a preconceived notion. So I think they're comfortable. I've spoken to not just the police but I've interviewed the judge, I've interviewed the prosecutor, Joe Onorato. I've interviewed all the detectives. I think the detective you might have been talking about might have been Larry | |

**A-1336**

Merriweather.

A: I think he's a Black, isn't he?

Q: I think he might be.

A: Big guy.

Q: Yeah, I've heard about, I haven't met Merriweather. But ….

A: I think his name was Larry. I don't remember. He was there with some other lady. …she was more the sensitive guy. He was more the one who was trying to get all the facts.

Q: Yeah. So XXXXXXX, you, the police went there but they didn't want to talk to them.

A: Is that how you know that it was him?

Q: Well it sounds, yeah, they, he didn't become a complainant. And it sounds, from what you just said a few minutes ago, like the parents were probably concerned about, you know, about getting involved. Which, you know, it's good to go either way. That either he was involved and the parents are, you know, trying to keep it a secret or don't want him involved, or he wasn't involved and the parents, it didn't matter that the parents didn't want him to talk to the cops. You know?          56:38.00

A: Right. I don't even think that he, I don't even think that he was given a choice. I don't know if it was based on any facts there. They're, they were a traditional Persian family. They are a traditional Persian family. And Persians are kind of into their own world. You know? They created their own atmosphere. Back then, even more so. They weren't really assimilating into the Great Neck atmosphere. And they were very into their own thing. And, and I don't know if they really wanted to get involved in community affairs, if that's what you call it. Really go, you know, they were kind of into their own, you know, their own four walls of their house and just kind of, you know, kind of like living their own life, 'Leave me alone.' You know?

Q: Now you know just in terms of the history of your involvement, you know are there things that you, that you remember, that you feel comfortable that you really do feel is part of your memory versus something that, you know, is kind of vague to you?

A: Um, I don't, I don't, I didn't get the question really.
                                                            57:46.00
Q: Just that…

A: Things that stand out to me?

Q: Yeah, you were saying sometimes it's hard to know, you know, that in retrospect you don't have that clear a memory of what happened in the classes. Necessarily. And you have a clearer memory of your conversations with the police or the investigation afterward.

A: Well....

Q: You know, I'm curious about what you do remember from the classes, if there's anything that is a clear memory for you, that you feel like was something that you carried with you or you remembered. Any images.

A: Well, I told you certain things, certain stories got kind of cut short. For example, once, once they decided they were showing, that in order to join the class, you had to bring with yourself a floppy disk, yeah? A five and a quarter inch disk. In order I guess to save your work to it, whatever it is. So, so the Arnold decided he was going to, that he was going to sell, at that time there was like a little, like on cassettes for example, you have underneath it write protection. Yeah? To say if you pop the little tab you won't be able to write on it anymore?

Q: Right.

A: So, so there are two of them for each side of the tape. Yeah? So you can make a 45 minute tape and now you're going to tape by taping over the write protection for the second side. So floppy disk got to the same date, at the time they could store I think 300 some odd K. And if you punch a hole on the other side, so it will remove the write protection for the other side, you can store twice the data on the disk. So they had offered two options – either to buy this special hole-puncher that, you know, kind of sits on the corner of the disk and punches the hole exactly where it should be, or you could go and get the disks punched for, I don't know, for a dollar a disk. Or to buy this actual hole puncher for, I don't know, $20 or whatever they would charge. I don't remember exactly.

   But I remember going, going there to punch, to get my disks punched again – I didn't want to buy this thing – and, and they, and he had taken me over into the side, into this side, kind of like a closet I think. Where he had this thing. And that's where the story ends. Understand what I'm saying? Like theoretically I should remember more. Right?

Q: Right. And do you remember what...

A: I should remember him punching disks or remember him giving them back. I should remember the continuation of the class. I don't know.

59:09.00

**A-1338**

Like I should, you know, the story should continue. That's not where a story ends. Things like that. Specifically I remember him once I think dropping his pants by the, or being naked by the, by the board. There was a board in the front, in the front of the class that would flip from side to side. I think. Chalk board or marker board, I think. I remember some girl that was in the class, that she used to come in early for some reason, and I couldn't understand why she was coming in early. It could be because her parents had to drop her off early, I don't know why.

60:47.00

But I remember coming in for example and, I don't know, she looked, you know, she looked a little bit like distraught. You know? Things like that. I don't, I wouldn't, I don't specifically remember things like the detectives had mentioned games like playing I think… that they asked me about is games like, like they'd call it Leap Frog. I'm sure you've heard about it. That was one of their big questions to me. I remember they asked me a few times. 'Do you remember them playing a game of Leap Frog?' Right?

And I don't necessarily remember that. There are other, let's say specifically I don't remember all that much. I remember there was a bathroom towards the back of the, towards the back of the classroom that sometimes kids would go, kids would go back there with Arnold or Jesse for some reason. Things like that. It's not, it's not, it's really…it's really something that, it's really vague, let's say. It's something I really, that I really kind of put behind me even before it was behind me, you know?

62:04.00

Q: Yep. You know, you were telling me about that you had had therapy. Did you have, did you go to that North Shore Hospital? Was that part…?

A: I went. There's a place across from Lord & Taylors. Looks like an old mansion or something. I don't know if…it's not, you're not referring to North Shore University, are you?

Q: Yeah, there's the North Shore Hospital. There were some doctors there called Dr. Pelkovitz and Dr. Kaplan? I'm not sure….

A: No, that wasn't me. I was going to, it was some lady. I forget her name. I was going there once a week. I hated to go, but after I'd go, I'd kind of be more relaxed when I came out. You know?

Q: Yeah.

A: It was more of a talking thing. There was nothing really that intensive, you know?

Q: Right.

**A-1339**

A: I went to a few sessions, and the she said once, 'Look, you know, we hang out here. We get to know each other. You know. We'll have a good time together. But at some point we have to also confront the issues of why you're here and things like that.' And she started getting more into, more into details, asking me if I remembered what was going on and things like that. At some point I had told her that, you know, 'I'm kind of hoping like we keep discussing things, things, excuse me, and I keep coming to these classes, to these sessions, and I'm wondering when, like they keep telling me the more you talk about it, like you gotta get it out of your system, the more you talk about it, that's, you know, that's how you'll get over it.'

64:29.00

And I said to her, 'We've spoken so much about it. When's the 'getting over it' time?' You know? Like you know time to move on. That's really my attitude over it all. I'm very, that's my personality. You know? I'm very into like 'If you're not going to change it, if you can't do anything about it, if it's not constructive, just, you know, just go on.' You know? I just lost my job two months ago. I got a new job, thank God, but the company I was working for went out of business. And they didn't, they didn't pay the last two salaries. Here they pay salaries per month.

So two months' salaries. At the end, however it works out, with all the different, with all the different things that they didn't pay, they owe me about $40,000. And there's nowhere, there's no one to go to. Now it's actually pretty wild, because I'm holding like the only asset that they have, which is all their data. I was like, because, you know, I'm the one that does the backups and all that shit. So basically I have four years of, four years of work on like twenty tapes. You know? Sitting at someone's, you know, sitting offsite. And the lawyers are, you know, the lawyers are talking to me now and they want to get the tapes, and I have some sort of contract actually deploying, you know, actually doing this. Taking the tapes off. Because, whatever. It's a big mess.

65:42.00

Nothing to get, nothing to get too into it. But what I noticed about is like a lot of people for example got really like overwhelmed by this. People that they may have owed a fraction of what they owe me. Because I was working there four years, so they owe me a lot of um severance pay and all sorts of shit like that. But there are people that they owe maybe 25% of that amount, you know, or even less. People that they owe $5,000 or $3,000 are so distraught by it, you know? They're like so whacked out. I was like, 'Look, if I can get the money that comes to me, you know, if I can get it...' So I'm going to try as hard as I can to get it, you know? I got the tapes here. I don't mind taking a lawyer and going to court with them, you know? Because I think I'm really going to go for it.

But if it comes to the end and I'm basically, and the court says 'Listen,

take these tapes, give them to the judge and you know you'll get your
money the same time everybody else gets his money, which may be
never.' So I'm not going to go to the side and cry. I'll be like 'All right.
That sucks and who gives a shit?' You know? And that's that. So that's,
that's kind of, I would say I'm more of a, I'm more of a logical thinker than
an emotional thinker, you know?

Q: Yeah.

A: In cases like this, when the psychologist was, you know, was talking
to me more and more, I was like, 'All right. We got the point. We got it.'
You know? 'I appreciate your help. All right? But when is, when do we
say 'Game over' and move on with life? You know?' Because that's kind
of my, that's kind of my, that's what kind of made sense to me. We
helped out the detectives, and these guys got put away. All right? They,
they supposedly got 'punished' for what they did. Right? You can't
really, I can never really make, you know, draw equivalents between a
particular crime or a crime like this and going to jail. Right?                    67:49.00

    But that's maybe because I've never been in jail. I don't know. But
I'm just saying, I don't know what you'd call it, but let's say this, we
helped the system do what society has classified as 'the just thing to do'
to such a person. So like I did mine. You know? I appreciate your help
trying to get out of the system. It was, it was pretty rough, you know? I
did go through, through a pretty rough time talking about it and taking,
trying to really, you know, break down the walls in my mind and to take
myself back. But that's it, you know? Game over. Let's move on.

Q: A couple of things you said I was curious about. One thing is I think
the other boy you mentioned is probably Ross Goldstein?

A: Ross Goldstein?

Q: Yeah. Well there were three boys involved who were mentioned at
one time or another.

A: Ross. Right, right.

Q: There was XXXXXX.                                                               69:30.00

A: Yeah, the other one was Ross, right.

Q: Ross Goldstein. And then another one was a kid named XXXXXX.

A: Ah, no. So the other one I was talking about was XXXXX. I was the
only one who identified XXXXXX. Or, I'm trying to think – I don't
remember. Could it be Ross? The name Ross sounds familiar also. I

don't know.

Q: Yeah. Now it could be…

A: It was, I remember it was the top, it was the top one of the three – that was a real, he was the real suspect out of the three friends.

Q: Right. Because only one of them ended up going to jail, and that was Ross.

A: All right. It could, it could be him. No, I don't think so. I think it was XXXXXXXX. Because I remember I was the only one that identified him, and I didn't, I didn't pursue it, you know?

Q: Right.

A: He didn't go to jail.

Q: Wait. XXXXXX.

A: Right. XXXX didn't, XXXXXX didn't go to jail, so I think it was XXXXXXX that I identified. I may have also positive identified Ross…I remember going to two lineups. I may have positively identified this guy Ross Goldstein. I don't remember. But I think it was XXXXXX that it, that I identified. And I knew it right away. That's what was weird about it. I don't know if, again I don't know if it was because I recognized him from the class or for some other reason, but it took me about two seconds to identify him. I just remember I just went up to the window like, I don't know, I think it was No. 3 or No. 6 or whatever it was. So, 'All right', and that's, you know? I'm almost sure it was XXXXXXXX.

Q: Now do you remember at the time whether at that time you remember feeling like, 'Oh, I remember that this man was definitely in the computer classes?'

A: Again, there's nothing – not nothing, but there's really, I can't really put my finger on anything that's not, anything that's that concrete. You know? I don't know, I don't know why. Again, if you're going to, if one, if one's going to be…objective, so you could say, it was something that was being fabricated, that's really the way… If I would look at myself objectively, I'd say 'This guy isn't necessarily a good or a concrete …I got to, you notice I have a speech impediment … that basically I'm not the most concrete witness. Yeah? But, but looking at it say from a more personal level, or from maybe a psychologist's point of view, someone who's more into the mind and the way the mind works, I, I don't know exactly how to put it.

70:13.00

70:58.00

But I really, let's say I, the psychologist or even this, this therapist that I was speaking to, and my sister is also into therapy, and a friend of mine's mother is also into therapy, and they all had said that, that it's somewhere deep inside of me, and that if I don't try to talk it out, it could bite me back one day, so to speak. You know? Like it could come out or it could come out in different ways. But there is some sort of concept that supposedly, and I think I also learned about it in health class in 11th grade, where the mind will also block things out completely in order for a person not to crack.

And it seems a little bit like, like me to do such a thing. You know what I mean? Knowing myself. It seems a little bit like me to say, 'This is irrelevant. It's not going to be constructive, it'll only cause you harm, it'll only mix up your mind.' And to kind of just block it out in order to keep focused, you know? I'm not the most, I'm not, I don't act on emotion. You know? I try to act on logic. I think it's also good practice. I don't know. It doesn't have to be somewhat emotional, yeah? I'm not, I'm not a stone. But.

73:18.00

Q: Well, I mean I'm listening to you taking care of you daughter. You're walking around. You're taking, you know, you're worried about her. So I'm sure it hasn't screwed up your..

A: No, no. For sure. But I'm saying there are certain things that I say 'This basically will do me nothing.' You know? I thankfully say, you know, 'If it's dead, why wake up the dead?' You know? There are people that are, just keep digging. You know? 'I know it's in your mind somewhere. You're blocking it out. Try to get them out.' People that will go for, go for hypnosis and all sorts of shit. You know? That's not me, you know? It's totally like me to just, to just block it out of my mind. You know? If such a concept exists. And from what I understand, it does. You know?

That's why I wouldn't really call myself like 'Here's the man that brought us all the facts to the table.' You know? Put me through a lie detector, and you know 'He's our prime ...' You know? 'He's our prime guy.' Prime witness. That's not me. You know?

74:48.00

Q: Yeah. It's interesting. You know, I know a bunch about the case, and so I want to be sensitive to, I want to get your impressions of it, but I also, I kind of want to share with you some of the stuff I've learned, because I think it might be interesting for you.

A: Yeah, that's really what, that's really the only thing I expect back from you.

Q: Yeah, well it's really.

**A-1343**

Dennis Doe - 31

A: That's really what interests me.

Q: Yeah, and we may not just want to have, you know we might want to have another conversation, a further conversation also once you've had a chance to digest some things. But you know my reason for wanting to do this is in some ways probably similar to your reason for being willing to talk to me. Which I appreciate. Which is you know I'm interested in trying to understand what happened. You know, I mean you know I sold my business. I got plenty of money. I'm not trying to make a film. If I was going to make a film to make a lot of money, this wouldn't be it. You know, I'd make some Tom Hanks movie or something. Certainly Arnold Friedman is not your best leading man for a Hollywood movie.

A: No.

76:09.00

Q: But you know for me it's kind of become a little bit of a, you know, just an intellectual exploration to try to understand something that was so tremendously emotional and, and powerful in people's lives. And you know I'm very respectful of the people who feel that, you know, bad things happen to them, because it's, you know, to the extent that these crimes took place they're terrible crimes.

A: Right.

Q: But at the same time there are many possible scenarios. It could be that crimes took place but they were not as extreme.

A: Right.

Q: It could be that, you know, very little took place or nothing took place. But the kids, you know, felt pressured by the police or felt that there were expectations...

A: Right. Some sort of conspiracy.

Q: Yeah, and not, I think there's actually two versions of that story, even. One of them is that the police were sitting around saying, 'How can we destroy the Friedman family?', but the more likely scenario in this kind of a case is that the police were completely convinced that Arnold Friedman, who had been legitimately ...found to be using the mail to transport a small amount of child pornography, that, you know, they knew that he was guilty of that, and so there was always a possibility that, you know, the police sort of assume there was more 'Where there's smoke there's fire.'

77:15.00

And then there's this, you know, there are many versions also,

because for example you could believe that Arnold Friedman behaved inappropriately to kids, but that he did it privately, or that he took the kids aside and maybe he didn't rape the kids, but maybe he did less to them. Or he touched them or he fondled them. But not believe that his son was involved.

A: Right.

Q: And that's important, because you know if you believe that Arnold Freidman did something but his son didn't, well maybe they needed to get the son in jail, because.....

A: In order to, in order to make their case against Arnold more stronger.                    78:17.00

Q: Yeah. Because his son was in all the classes. But I tell you, you know my personal feeling is that, having interviewed all these police officers, I don't believe that the police officers were trying to do something bad. You know? I believe the police officers were trying to get the truth. It's possible that they were aggressive in the way that they did it, but I don't have the impression that they were intentionally going out to get bad information, or they were intentionally going out to get testimony that was untrue. But at the same time, I think when you have somebody who's convicted of having child pornography, and you know that, you know, in your mind you know he's a pervert and he likes sexual images of children, and then you find out that in his house he has these classes, you know a lot of..

A: Right, so draw the connection between the two.

Q: Right. A lot of people feel like, then you go out and you get some impressionable kids, and you say, 'Well don't you remember anything?' And you push them a little bit. And they remember a little bit. And then you immediately tell them that what they're recollecting is similar to what they've heard from other kids. And then that way it makes the child open up and feel that he should say more.

A: Right. Is that the overall impression that you've gotten from this? Is that what it is?

Q: Well it's funny I've, I have to say I've gotten it from, I've gotten different impressions. You know? I've spoken to, I spoke to one kid who was one of the very significant complainants. Many, many charges. And I said, 'You know, tell me about it.' 'Well,' he said, 'I didn't remember any    79:46.00
of the abuse that I suffered. Nothing. Until I had therapy. And then once I had therapy I remembered everything.' And I said, 'Well, so you were in many classes and you don't remember anything?' And he said, 'That's right.' And I said, 'Well when did you, when did you have the therapy?'

And he said, 'Well, about four weeks after the arrests.' And I said, 'And that's when you remembered it?' And he said, 'Yeah.' I said, 'What kind of therapy was it.' He said, 'Well I was hypnotized.' And I said, 'Do you..' And 'What do you remember about the hypnosis?' And he said, 'Well the hypnosis brought everything back to me because I spoke to the therapist and eventually, you know, I don't remember exactly what I remembered, but I remembered I went in, I remembered nothing, and then I went, and I was hypnotized and then it was in my mind.'

A: Right. Sounds fishy. Right?

Q: Well it's a very interesting thing. It's like this is a kid who made very, very strong charges and years later says, 'Well at the time I gave my first confession to the police, I didn't remember anything.' And then later says, 'When I was hypnotized I remembered everything,' and has very strong feelings about it. And, but if you ask him about any detailed recollections, he doesn't really remember details. And some of the details if you remember are from the stories about the case – not from things that happen to him. But he remembers them as having happened to him.                                                                                                              81:02.00

   So for example, the Leap Frog game. You know, he told me a very long story about the case, but he never told me about the Leap Frog game. And then at the end I said to him, 'Well tell me about the Leap Frog game.' And he said, 'Oh, yeah, yeah, yeah. That happened, too.' Well as you know from talking to the police, the Leap Frog game was pretty – that's not the kind of thing you'd forget.

A: Right. I actually didn't hear the details of what the game was, but I can imagine by the normal game of leap frog what it was about.

Q: Yeah, well basically that they would, you know, have the kids all bend over and they would sort of jump from one kid to the next, sodomizing them, you know, basically raping them one after the other, in the presence of the other kids.

A: Right.

Q: And I thought that was, you know that's, that's, and you know…

A: Something that would stand out. Yeah.

Q: Now a lot of things that he said to me…                                                                                                              82:25.00

A: Or, or if you're coming from the other side, that's something that a kid would definitely, if it's that's traumatic, something the kid would definitely block out.

**A-1346**

Q: Right. Now another, now I've spoken to another complainant who was one of the people who testified in front of the grand jury, and he said 'I remember', you know, I don't want to sound like the police, because I know they told you 'Oh yeah, what you said is just like what Johnny said.' But at the same time I did speak to another kid who said that I, you know, I spoke to the police and you know I told them that Jesse did this and this and this, and he said, 'But sitting here today, I can tell you that I really feel like what happened was, you know they were asking me a lot of questions and putting a lot of pressure on me, and I think I told them that to get them off my back.'

A: Right. Which is kind of what I was, is kind of what I was telling you, looking at it from an objective point of view. Yeah?

Q: Yeah.

A: And I have no doubt that working with kids, working with kids that age, that went through such a traumatic experience, I think that that's the only way to approach such a case. Because you'll definitely have a situation where the kids won't want to talk about it, either because of fear, or because they're blocking out of their minds, or because it's just a sensitive subject like we said, because we're talking about sexual abuse. Yeah? And it's, I mean to say it could be that the police had to have such an aggressive approach, and that the results of such an aggressive approach was a situation where kids didn't necessarily want to, or didn't necessarily even recall certain facts. But because of the pressure, they did speak up.

83:37.00

Things like that. I think it also, I think part of the big equation is also that at the end they both pleaded guilty, and I saw the six hundred page, or this huge book of really, you know, of just a confession by Arnold Friedman, where he sat in jail for like hours and just, you know, told them things. I don't imagine that a person's going to throw away thirty years of his life to get the police off his back. You know? Like Arnold Friedman definitely wasn't in the same situation that the kids were maybe put under pressure and say, 'You know, I'm going to get these guys off my back. I'll just tell them what they want to hear.' Arnold Friedman wasn't in the same boat. He's not going to go ahead and tell them now, 'Yeah, I'm, you know, the world's biggest pedophile. Just get off my back.' Because he knows he gets jail for thirty years for doing that.

So things like that, I think play part of the big equation. It could surely go both ways. Like you're saying, it is very controversial, and you can surely say 'Yeah, that's the approach of the police, and that's the, the outcome such an approach will be had.' What I mean to say, 'The outcome of such an approach will be that kids may feel that they're, that

| | |
|---|---|
| they're speaking up or that they will actually speak up in order just for the police to leave them alone. Because of the enormous pressure that they're putting on the kids. | |
| Q: Well let me, I want to ask you a question, and I want to tell you something the Arnold Friedman confession. Just, I haven't asked you this simple question, which is as we are talking today, currently at this moment, leaving aside what you remembered, you know, obviously what you said or what the police asked you about or whatever, at this moment, do you remember, in your mind, do you have a concrete recollection of being, of ever being molested by Arnold Friedman or Jesse Friedman or Ross Goldstein? | 85:19.00 |
| A: Not a concrete recollection. No. | |
| Q: And do you have, just to put a finer point on it, because this is, I want to tell you a little bit more about this, do you have a recollection of whether you feel that you were ever, that in any of those classes, that you were raped or you were sodomized? | |
| A: Not any clear recollection. | 86:10.00 |
| Q: And when you think about it, I mean obviously, you know, I speak very comfortably about this because I've been working on it for so long I realize these are very sensitive subjects, but, and we have the comfort of me being in my cozy office in New York, and you being a million miles away in Jerusalem, but I, when you think about, even about this time and the abuse that was discussed and the history of this, looking back on it, do you feel, when you think about it do you think, 'Well something happened and I don't exactly remember what', or do you think, 'Well something happened and I know that one of the things that happened was that I was sodomized'? | |
| A: I think it's more of something happened, and I know, yeah. But I don't know what. You understand? | |
| Q: Yes. | |
| A: Something happened and I know. When you say, when I look at the big picture of things, and me being personal, you know, personally involved in it, and just seeing the, you know, the entire thing. And even the outcome. Not necessarily the outcome to say thirty years and eighteen years however it worked out, I don't remember. But the outcome of the whole thing. You can say, 'Oh, anything ...seeing about them and my own feelings and the question marks that I have and the blackouts that I have and things like that, I kind of know that something happened there. And I really, and I really, I truly believe that a reason | 87:34.00 |

**A-1348**

that I don't remember clearly is simply because I don't want to remember it clearly, you know?

Personally, the truth is that I really want for you to send your final project to me here in Israel. I'd really want to see that. You know? But that's watching a movie. That's not living it, you know?

Q: Right.

A: So. That's kind of what I feel. You know?

Q: Yeah. You know, it's interesting. I'll tell you about the Arnold Friedman confession is very interesting.

A: Can you hold on one second?

Q: Yeah, yeah.

A: My wife is calling me and I'm walking back and forth outside. .....(conversation),…

88:55.00

Q: How are you doing? Is your wife trying to get you off the phone?

A: Yeah, yeah. Because it's like one in the morning here. But yeah, I got about another five minutes. So what were you about to tell me? I'd love to have another conversation with you. This is really, you know…?

Q: Yeah. Well it's very, it is very interesting. I mean it's, you know, I'm glad I'm bringing you a little bit into the fascination of it, because it's…

A: No, it's really fascinating to me. Because look, it's something that I never, something that I always would have liked to research more from the outside like you're doing. Like I would have loved to do what you're doing, you know? I'm just not in a position to do it because I was, you know, because that could like really screw up my mind doing that, you know?

Q: Yep. But one thing that's interesting is that, you know this issue about the 600 page confession from Arnold Friedman, you know I'll tell you the story that I've heard now from Arnold Friedman's lawyer, and from Jesse Friedman, who I've spoken to, and from, well, I'll give you the most complete recollection I have about this is that after Arnold Friedman pled guilty, he was told that, if he made a complete confession in the form of what they call a 'Q&A', where he sits down and he goes through all of the events with the police, then if he, everyone that he admitted to molesting, he could never be reindicted for molesting those people. So even if he went to jail for thirty years, and then they found out that there

90:10.00

were another thousand kids or ten kids or two kids that he molested, they could never come after him again.

A: Right.

Q: So you know now I've spoken to Arnold's wife. And Arnold…

A: I'm not sure if I understood that. You said for each kid that he testifies, …

Q: Yeah, let me see if I, let me try to say it, I'll try to say it more clearly. That, okay, let's say that there are a hundred kids in Great Neck. The police said, 'Look, if any one of these kids comes forward after you go to jail and says that you molested them, then we can take you out of jail, put you in a trial again, and give you more years. However, if you tell us right now everyone that you ever molested, then we will give you clemency basically, or we'll give you a free pass and you won't get any more years. We just want you to tell us everyone that you molested so that we can hel them get help.'

A: Right.

Q: Well, you know then I spoke to Arnold's wife, and Arnold's wife said 'Well the lawyer took this and said to Arnold, 'Well look, you're going to jail anyway, so you might as well confess to everything, whether you did it or not. So you have to basically confess that every single kid you ever met, talked to on the street, or you know met in the supermarket checkout line, that you molested them, because' ….(audio break)… molesting tons and tons and tons of victims. Including his own three children. Well his three children, you know two of whom are pretty well adjusted, have said, 'There's no, you know, there's no possibility in a million years that my father molested me. I guarantee that he never molested me.

'And you know here's why I know. And you know I got a therapist and I think, you know, I'm living with all these issues of what happened to my family but I can tell you for sure my father didn't molest me.' Well there isn't, and then I spoke to a lawyer and the lawyer said, 'Well this does happen, where you know where the accused will sometimes give a statement, and the idea is that then that statement can't really hurt him, so he can say whatever he wants. And so he was very creative and he tried to give the most full statement he could.' However, in this case, that statement could be used against his son.

And so his wife's position is Arnold confessed to a million crimes that he never committed because he was so afraid that he was going to be convicted, or he was going to be brought back for more charges, that his

92:20.00

| | |
|---|---|
| lawyer said, 'What difference does it make? Just confess to everything. Just say you did everything.' And so he confessed to everything in the indictments and many, many, many crimes outside of the indictments. And what I, you know, I asked his lawyer, and I said, 'Is that true?' And the lawyer said, 'Yeah. I told him that he should say, you know, he should be very, very over the top in his confession. He should give, you know, anything anybody could ever potentially, you know, bring up he should mention in this thing.' | 94:12.00 |

   Well nobody said, at that time, I don't think, to Arnold Friedman, that they were going to take this confession and go sit in front of kids and say 'Look what Arnold admitted to doing.'

A: They didn't read any of it to me, that's for sure.

Q: They didn't what?

| | |
|---|---|
| A: They didn't read any of it. They, they had told me that, because they were sitting with him for so long, that there was no real order to the confession. And that to find my, to find what he said about me was very difficult because he jumped, he was jumping from, from one issue to another. He was like, 'Oh, yeah. I remember this. And oh yeah, I remember this.' So it's really scattered. So they never, I know that they never read it out to me. Like they never, they never came to me and said, 'Here's the confession. He's already confessed to it. Now let's hear it from your mouth.' That never happened. | 95:19.00 |

Q: Right. Yeah.

A: You know?

Q: But it sounds like this is around the second round, because I think the first time they came to you they didn't have that yet, probably.

A: No, they didn't have that. Right.

Q: But you know you could see again, if you believe Story B, if you believe that they were, that the police were going after them and that maybe these crimes didn't happen, or didn't happen at the level that were said….

A: For sure, yeah.

Q: …then it's possible that bringing a 600 page book is a way to give a kid confidence that he's not alone, and that the man has already confessed to his guilt, and so that all you're doing is just giving some corroboration ….

A: Either that or he had a real shitty lawyer, yeah?

Q: Right. Right. Yeah. But it's...

A That's a pretty stupid thing to tell someone to do, especially if he's, you know, 100% innocent. Or going to Story B, that this is a whole ploy, you know? So that's pretty stupid advice. You know, if the guy comes to his lawyer and says, 'Look, I'll tell you the truth. I honestly didn't do this.' And the lawyer says, 'Well go ahead and tell them that you did it in order to save your ass.' So.

Q: Well I think what the lawyer would have said is, is 'Look, you're already pleading guilty', because he had decided to plead guilty by that time. Because they had, you know, they had a big collection of kids. The police had a lot of statements that were either true or not true depending on what side of the story you believe. And Arnold was guilty on the pornography charge. So once he was guilty on the pornography charge, I think his lawyer may have said to him, 'You know, look. You're going to jail anyway.' And so it's possible at that point that, you know, in this version of the story Arnold was pleading guilty anyway. And so once he pled guilty, his lawyer said, 'Well if you're going to plead guilty anyway, you might as well say you did everything, and that way you won't have to come in again.    96:44.00

A: But that's still pretty crappy legal counsel. I don't know. That's what I think, because I think, because I believe – I don't know. I mean I can guess it doesn't always work out this way, but I believe that the purpose of a court is to bring, is to bring justice, yeah? Justice. It comes from the word 'just'. Or, you know, to be just, to be right. The court's decision should be to come up with the right thing. Now I don't believe that OJ Simpson was innocent. You know? Things like that. So it doesn't always come out that way, that's for sure. But, but I think overall the entire legal system is designed to find out the truth. That's what it's all about. Let's find out the truth of what's going on here, because there will always be two or three or ten sides to a story. So for a lawyer to give such advice to say 'Listen, go ahead and do this', I mean say for it to become more politics than legal, I think is crappy legal counsel. If that's, you know, if that's the case. That's all I'm saying. It's not I mean to say if, if what you're saying is true, and he was simply, simply testifying in order to make it easy on himself, so to speak. So he had a real shitty lawyer. You know?

Q: Yeah.    98:14.00

A: That's what I think.

Q: Yeah.

A: But it may not always be like that. Maybe the point of the, maybe the objective of the law is not necessarily to sort out the truth but to kind of, you know, get the best deal for his customer. You know? I don't know.

Q: Do you remember the, you know, I'm curious to explore this a little bit more, but I also want you to, to go be with your wife. So should we try to schedule another time to talk?

A: I think so. I think so. You're going to send me an e-mail? Yeah?

99:03.00

Q: Yeah, I'll send you an e-mail.

A: So send me an e-mail so at least I'll have some way of getting in contact with you. And I'd like to continue, continue speaking with you. Because it's all interesting, and I'm also open minded, as you said. Yeah? Everything's possible. You know? But, but yeah, I'd surely like to consider discussing it and seeing, you know, and getting really a big picture of this.

Q: Yeah. Good. Well it was very nice to talk to you, and thank you for taking so much time.

A: Wonderful. Yeah, thanks a lot for calling.

Q: And we'll reconnect soon.

A: All right. Great. Thanks a lot. Be well. Good luck.

Q: You, too. Bye bye.

END OF INTERVIEW

100:24.0

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
---------------------------- ------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

           -- against --

JESSE FRIEDMAN,

             Defendant,

---------------------------------------------------------------x

AFFIRMATION OF
PETER PANARO, ESQ.

Indictment Nos.
67104, 67430, 69783

PETER PANARO; ESQ., hereby affirms under penalty of perjury that the following is true and correct:

    1.    I am an attorney duly admitted to practice law in the State of New York. I am also admitted to practice law in the United States Supreme Court, the United States District Courts for the Eastern and Southern Districts of New York, as well as other courts.

    2.    I represented Jesse Friedman, the defendant in the above-captioned case, from June 1988 through his sentencing in January 1989. Mr. Friedman was charged in three indictments with more than two hundred offenses involving the sexual abuse of children.

    3.    I make this affirmation based on personal knowledge and upon information and belief. In preparing this affirmation, I reviewed my entire legal file on this case.

    4.    Jesse Friedman was indicted on December 7, 1987, together with his father, Arnold Friedman, as a codefendant, for offenses involving the sexual abuse of children. A second indictment charging Arnold and Jesse Friedman with sexual abuse

**A-1354**

was issued on February 1, 1988. When my representation of Jesse Friedman began, Arnold Friedman had already pled guilty under these two indictments and had been sentenced both in Federal court and State court. This left Jesse Friedman's charges pending trial.

5.      Notwithstanding repeated efforts by the district attorney's office to persuade me that Jesse should enter a guilty plea, my client and I were intent on going to trial. Assistant District Attorney Onorato advised me that if Jesse did not plead guilty, his office would obtain a third indictment, and that this indictment would include many more charges than both previous indictments combined, and that those charges would be much more serious. Further, Mr. Onorato stated that if this were necessary he would seek to revoke Jesse's bail and have him incarcerated pending trial.

6.      True to his word, when Jesse did not plead guilty, Onorato obtained a third indictment (No. 69783), in which Jesse was charged together with Ross Goldstein, another Great Neck teenager, as a codefendant. This 302-count indictment included 198 counts against Jesse, including more than 100 of them charging sodomy in the first degree. Additionally, Mr. Onorato did seek to have Jesse's bail revoked, an application that was denied by the then presiding judge, Judge Boklan.

7.      Immediately after arraignment on this indictment, counsel for both parties agreed that rather than commence motion practice again, a stipulation in lieu of motions and voluntary disclosure would suffice. This stipulation, dated November 17, 1988, and so ordered by Judge Boklan, directed the prosecution to "deliver to the defendant all evidence favorable to him under the authority of Brady v. Maryland."

**A-1355**

8.    Before the third indictment was handed down, I had learned from either Jesse or Arnold Friedman that _____, the mother of one of the computer students, had secretly made a videotape of an interview with her son, conducted by Detectives Hatch and Jones. I went to _____'s house and she allowed me to watch the tape in her presence. The picture on this Betamax tape was of very poor quality, but the audio was very clear. As I watched the tape, I transcribed the interview. I later allowed Andrew Jarecki, the director of "Capturing the Friedmans", to type up my handwritten transcription, which he did accurately.

9.    After Ross Goldstein was charged, Mr. Michael Connacchia telephoned my office and identified himself as an attorney who was retained to represent the co-defendant, Ross Goldstein. Mr. Connacchia told me that his client had no idea why he was involved or being charged with these crimes since he had never even been inside the computer room at the Friedman home, and never met any of these complainants. I met with Mr. Connacchia and shared my thoughts with him and the two of us began preparing for trial over the course of the next few months, meeting several times and discussing the case. At all times it was always the defendant Ross Goldstein's position that nothing ever happened and that these crimes were never committed by him.

10.    On or about September 21, 1988, I telephoned Mr. Connacchia to arrange for a meeting and for the first time, Mr. Connacchia informed me that his client "had changed his mind" and would be saying that the incidents charged in the indictment did in fact take place. After pressing Mr. Connacchia for some time, Mr. Connacchia finally admitted that his client would be cooperating with the District Attorney's Office.

11.    In or about November 1988, during a conference in Judge Boklan's chambers, Judge Boklan told me that if Jesse were to go to trial, she intended to sentence him to consecutive terms of imprisonment for each count that he was convicted on.

12.    Notwithstanding his protestations of innocence, Jesse informed me, on or about December 12, 1988, that he wanted to plead guilty because he believed that if he went to trial he would be found guilty and would spend almost the remainder of his life in jail. He was 19 years old at the time. Jesse told me if he pleaded guilty he would probably get out of jail by the time he was 30 years old. I told Jesse that I would not represent him on a guilty plea unless he was guilty and that I could not ethically allow him to plead guilty if he was maintaining his innocence to me.

13.    Jesse told me that he had committed the charged offenses. He also told me that not only had he had been a victim of sexual abuse by his father for many years but that his father had coerced him into participating in the molestation of the computer students.

14.    At a conference, I told the court that Jesse had informed me that he had been a victim of sexual abuse by his father for many years and that this should be considered by the court in mitigation of sentence. I reiterated this request at the sentencing of my client.

15.    Jesse and I had been extremely frustrated in our preparation for trial since no Brady material had been provided to us by the prosecution. In the absence of any physical evidence, medical evidence, or prior complaints by any computer student, the prosecution was relying entirely on new statements allegedly made by the computer students after the police questioning had begun. Accordingly, the only way for us to

**A-1357**

refute the prosecution's case would have been to produce evidence showing that the testimony of the computer students was incorrect or not reliable. The Friedmans had been unable to contact the computer students directly for two reasons: First, upon information and belief, when Arnold Friedman had initially tried to contact some of the students, the prosecution had retaliated by revoking his bail. This was a clear warning to Jesse that he should not try to contact them himself. Second, the police had confiscated the list of computer students and their contact information, and refused to return it to the Friedmans. So our only hope was that we could get access to any Brady material that might support the position that Jesse was innocent of the charges. When we were repeatedly denied any Brady material, we realized that it would be difficult to mount a meaningful defense.

16.     While it has always bothered me that we were never provided with this Brady material, it was not until 14 years later, when I saw Andrew Jarecki's film, that I realized the enormous extent and import of the material to which we were refused access. After seeing the film, and some additional information collected by Jarecki, I now realize that the children interviewed as part of the prosecution of Jesse Friedman were subjected to numerous suggestive questioning techniques. In particular, I have learned that the interviews were characterized by leading questions, expressions of the interviewer's beliefs that Jesse Friedman was guilty, manipulation such as befriending and rewarding children to produce sex abuse claims, intimidating or threatening them when such claims were not forthcoming, and repeated interviews when children denied abuse. I also note from the film that one of the most significant complainants in the case had no recollection

of, and made no allegations of any sexual abuse until after he was hypnotized, a technique widely shown to cause false memories.

17.     Subsequent to viewing the film, it became apparent to me that the children interviewed as part of the prosecution of Jesse Friedman (other than Gary Meyers, whose interview I was already familiar with) were subjected to numerous suggestive questioning techniques. In particular, I have learned that the interviews were characterized by leading questions, expressions of the interviewer's beliefs that Jesse Friedman was guilty, manipulation such as befriending and rewarding children to produce sex abuse claims, intimidating or threatening them when such claims were not forthcoming, and repeatedly interviews when children denied abuse. I have also since been advised that at least one of the children made no allegations of sexual abuse until after hypnosis.

18.     The recording of the interview with Gary Meyers showed that the detectives who conducted the interview used suggestive and harassing questioning. Immediately after viewing the Gary Meyers tape, I informed assistant district attorney Joe Onorato about the interview. I made it clear to him that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable to the defense that the defense had a right to be informed of. I never received any Brady material indicating that such suggestive methods were used with any of the children interviewed by the police.

19.     Had I been aware at the time of this extensive body of impeachment evidence, I would have seen the prospect of a guilty plea in a completely different light. I already found it quite incredible that sexual abuse of the scope and severity alleged could have taken place without a single child complaining or showing other signs of

abuse. I also believed that the hysteria surrounding the case could well be responsible for the ever growing number of charges, but as an attorney I had virtually no affirmative evidence with which to oppose the allegations. My common sense and logic told me that scores of children, including the 14 children who were complainants against Jesse, could not be repeatedly sodomized and sexually abused hundreds of times, over a period of four years, day in and day out, and say nothing. After all these were not 3 and 4 year old boys. They were between 8 and 11 years old. I felt that the idea that no one would have said a word, and that in fact some of the most significant complainants would sign up for multiple classes after having been violently abused in the prior classes, was ridiculous. But logic and common sense cannot substitute Brady material – real evidence that would tend to exculpate my client.

20.     In addition, Jesse's situation at the time was made even more dire by the destruction of his family support structure (with the arrest of his father and mother who was briefly arrested, and accusations threatened against his two brothers -- later shown to be totally without merit), the absence of funds required for experts who would have been necessary to prepare a meaningful defense, and the ever increasing number of charges against him (and the attendant publicity accompanying each new set of charges).

21.     It is clear to me that proper disclosure of Brady evidence could have thoroughly altered Jesse's view of his chances of prevailing at trial. If the defense had been privy to that information I believe that Jesse Friedman would certainly have opted to fight the charges against him at trial.

PETER PANARO

**A-1360**

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

--------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,       AFFIDAVIT OF
                                                        RICHARD TILKER
      -- against --

JESSE FRIEDMAN,                                 Indictment Nos.
                                              67104, 67430, 69783

           Defendant,

--------------------------------------------------------------x

       Richard Tilker hereby swears, under penalty of perjury, that the following is true and correct:

       1.     I am 54 years old.  I currently live in Great Neck, New York and am retired from my work as director of operations, specialty events, for Ferons, a major retailer of tennis apparel.

       2.     I reside with my family in Great Neck, New York.  When my son was about 7 years old, he attended the computer classes taught by Arnold and Jesse Friedman.

       3.     During the investigation of Jesse and Arnold Friedman, we were visited on at least three different occasions by two-person teams of detectives from the Nassau County Police Department.   They wanted to question my son Brian with regard to allegations that children had been sexually abused in the Friedman computer classes.

       4.     Each time the detectives visited, they told us that they knew "something happened" to our son.  They didn't say, "We believe," they said, "We know," and they insisted on speaking to our son alone.

       5.     On one occasion, my wife and I told them they could question Brian alone, but I remained within earshot, and I was shocked by the aggressive manner in

**A-1361**

which they questioned this young boy. It was clear to me that the detectives had already formed their opinion of what had happened in the computer classes and that they were just trying to get Brian to agree with their story. It got to a point where it wasn't asking him what happened, it was more of them telling him what happened, and when they didn't like what he had to say they kept repeating they know what happened and that he should tell.

6.     I recall that the questioning just got to be too much. The police wouldn't take no for an answer. Frustrated, Brian finally told them that one time he saw Jesse chase after and hit a child, though he later told us that that was not true and that the only reason he had said that was to end the questioning because they wouldn't leave him alone.

7.     Throughout the time during which the police had questioned me and my son Brian, the detectives, including one in particular who was an African-American male, were carrying a notepad and took copious notes of all the comments we made, including my son's repeated comments telling them that nothing inappropriate had happened to him and that he had not witnessed any abuse of any other person in his classes.

8.     The police used many different approaches in trying to persuade the children to answer their questions in the way they wished them to. For example, we heard from other parents the police would have pizza parties and give police badges to the children who cooperated, making them "junior detectives" in return for their cooperation.

9.     I remember receiving phone calls from the parents of other students who were allegedly abused. These parents were insistent that my wife and I should cooperate

**A-1362**

with the police and acknowledge that Brian had been abused. They told us that their son, who had been in class alongside Brian, had already acknowledged that he had been abused, and that he had seen Brian abused. I told them that my wife and I discussed it with Brian, who was a very mature and forthright boy, and he told us that no such thing had occurred. When we told the parents of the other boy, they became very pushy and told us that we were "in denial" and that "it absolutely happened to our son." Not only did we speak to Brian, but we had him speak with a clinical psychologist, who told us that in his view, Brian was being completely truthful and that nothing had happened to him.

10.    Because of the nature of the charges against the Friedmans, I remember the community being in an uproar and that there was a tremendous amount of pressure for children to join the case. The anger at the Friedmans was very strong. In one case, I had even gotten a call from one of the other fathers involved in the case, who asked if I would be willing to participate in seeing that Mr. Friedman "had an accident" while he was out taking a walk during the time in which he was home on house arrest. It was my interpretation that he and some of the other parents were contemplating trying to harm or kill Mr. Friedman. I remember other families of students were who were allegedly abused in the computer classes would meet once a month together to plan strategies for maximizing the punishment of the Friedmans.

11.    Another reason why I felt the charges against the Friedmans were implausible is that I was in charge of the car-pool to drop off and pick up my son and his friends from the computer classes, including the boy whose parents are mentioned above, and who became a major complainant in the case. I never even once noticed my son or

**A-1363**

any of the other children disturbed or distressed in any way. If these boys had been violently abused during each computer class, I would have seen some evidence of this in their behavior on any of the many occasions on which I picked my son and his friends up at the classes.

12.    I know one of the children who testified against Jesse Friedman saying he was a victim of sexual abuse during the computer classes because at the time he was friends with my son, and my wife and I were friends with his parents. This child had told a number of lies about my son, our family, and others in the past, and so it was not a surprise to me that he had become one of the main complainants in the Friedman case, and that he was so excited about having a chance to talk to the police and be the center of attention. That was the kind of boy he was.

Richard Tilker

Sworn before me this 9th
Day of December, 2003

BARBARA DOBLIN TILKER
Notary Public, State of New York
No. 30-4666413
Qualified in Nassau County
Commission Expires November 30, 2006

**A-1364**

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,                    AFFIDAVIT OF
                                                        JUDD MALTIN
            -- against --

JESSE FRIEDMAN,                                         Indictment Nos.
                                                        67104, 67430, 69783

            Defendant.

------------------------------------------------------------------x

      Judd Maltin hereby swears, under penalties of perjury, that the following is true
and correct:

    1.    I am 32 years old. I currently live at 114 Dean St, Brooklyn, NY 11201.
I work at SIAC, the "Securities Industry Automation Corporation" at Two
Metrotech Plaza, Brooklyn NY.

    2.    I first met Jesse Friedman in 1985, during my freshman year of high
school. We soon became close friends and spent most afternoons socializing. I was often
at the Friedman home. I spent a great deal of time at their house after school and on the
weekends.

    3.    I never experienced anything untoward. I never witnessed anything
resembling pedophilia at their house. I saw no pornography in any form.

    4.    I had nearly expert knowledge in the computers of the day, and assisted
the Friedmans in caring for the computers they used in the classes they taught.

    5.    I recall at least one occasion where Jesse was unavailable to assist his
father. There was a special computer birthday party. One of Arnold Friedman's
students, Dan Frank, asked to have his birthday party at the Friedman house, where all his

**A-1365**

friends could play computer games, and open presents, etcetera. I was asked to assist because Jesse had a driver's education class. The children behaved as normal children would at a birthday party, and there was nothing sexual of any kind shown to them or performed.

6.  My family moved to a smaller home in the winter of 1987. By that time I had lost interest in personal computers, and I decided to give to Arnold Friedman my entire collection of software. The pornographic video games that were discovered by the police were in common circulation among the community of Great Neck youth who used personal computers and with whom I had traded software. I never heard Arnold or Jesse Friedman make mention of any of this software, and I think it is highly likely that he never used any of the software that I gave him.

7.  Ross Goldstein transferred to the Village School in September 1986. He traveled in much different social circles than me and Jesse, and had never socialized with me or Jesse before. After he transferred to the Village School, he certainly never socialized with me or Jesse. As far as I remember they never meet after school. I would have known if they were socializing, because Jesse and I were nearly constant companions.

JUDD MALTIN

Sworn before me this 15th
day of December , 2003

XANTHIA T. HOUGH
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01-HO6062183
QUALIFIED IN QUEENS COUNTY
MY COMMISSION EXPIRES 07-30-20

**A-1366**

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,          AFFIDAVIT OF
                                              BRIAN TILKER
        -- against --

JESSE FRIEDMAN,                               Indictment Nos.
                                              67104, 67430, 69783

        Defendant,

-------------------------------------------------------------------x

Brian Tilker hereby swears under penalty of perjury, that the following is true and correct:

1.      I am 24 years old. I currently live in Astoria, New York and am attending law school at St. John's University School of Law.

2.      My family resides in Great Neck, New York. When I was about 8 years old, I attended the computer classes taught by Arnold and Jesse Friedman.

3.      During the investigation of Jesse and Mr. Friedman, the Nassau County Police visited our house, unannounced, and questioned me regarding the computer classes and in particular any inappropriate behavior of Arnold and Jesse Friedman.

4.      I remember the police questioning me on two occasions. On each occasion, I told them I had never been abused by Arnold or Jesse Friedman or anyone else, and that I did not witness anything inappropriate in the computer classes at any time. I recall that this did not end their questioning and that I felt that they would be unsatisfied with any response other than my concurring with their view that sex abuse had taken place in the Friedman computer classes.

**A-1367**

5.      I remember that they made specific suggestions to me about things that they believed happened in the computer classes, and that they told me repeatedly that other students in my class had already told them that they had been abused, and that they were certain that in fact I had also been abused and that I should tell them so.

6.      I remember an African-American detective was alone with me in the kitchen and he asked me specific questions about molestation, including recounting for me certain statements that others had allegedly made.

7.      During these interviews I recall that the various police officers who had interviewed me, including the African-American detective, had a notepad and took notes of my statements while I was telling them that I was not abused and had not seen anyone else being abused.

8.      After many sessions in which the police appeared unsatisfied by my negative responses, I became frustrated at the persistent questioning. As I stated in my interview with Mr. Jarecki for his film, I remember finally telling the police officers that I had seen Jesse chase after a kid and hit him. I remember saying that not because it was true, but instead because I thought it would get them off my back. This statement was not accurate but at the time – being 8 years old – I felt that saying this would allow me to avoid the unpleasant experience of being questioned repeatedly by the police.

9.      After I made this statement to the police, which they also took notes of, they asked my parents if they would allow me to testify before a Grand Jury to having been witness to such an incident, and I did so.

**A-1368**

10.     A number of other families with whom my family had been friendly also had children who were involved in the case. I remember hearing from my parents at the time that one set of parents of one of my friends had been very aggressive with my parents and encouraged them to believe that I had been molested by the Friedmans. My parents spoke to me about this and when I told them it had not occurred, they told the other parents. I heard from my parents that the other parents became angry and told my parents that my friend (their son) had already told them that he had seen me being abused in the Friedman class and that my parents were "in denial" about my having been abused. This was not true.

11.     My friend (their son) had also been interviewed by the police and called my house to tell me about it immediately after they had left his house. He expressed great excitement about it, and considered it something of an adventure. I was confused because I had never seen him or anyone else being abused in the computer classes. Later, when I learned that he had become a major complainant in the case, I was not surprised, not because I had ever seen him engaged in anything inappropriate, but because he had been so enthusiastic about participating and helping the police. Some kids appeared to get a lot of excitement out of the attention they were getting from the police. On a number of occasions, I heard from friends that the police had brought pizza over to their houses, and in one case, that the detective had "deputized" the boy, giving him a play badge to wear.

12.     My own recollection of the computer classes was a perfectly pleasant and uneventful one. The classes lasted about 90 minutes and we would be given rudimentary computer programs to create. We also played computer games sometimes, but I was

**A-1369**

never offered, never saw, and never played with a computer game of a sexual nature such as those alleged to have been present in the computer classes.

13.     I can state without reservation that nothing untoward ever happened to me and that I never witnessed anything untoward happening to anyone else in the classes that I attended.

Brian Tilker

Sworn before me this 23rd
Day of December, 2003

BARBARA DOBLIN TILKER
Notary Public, State of New York
No. 30-4666413
Qualified in Nassau County
Commission Expires November 30, 2006

**A-1370**

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------x

, THE PEOPLE OF THE STATE OF NEW YORK,   AFFIDAVIT OF
                 JAMES FORREST

    -- against --

JESSE FRIEDMAN,          Indictment Nos.
                 67104, 67430, 69783

    Defendant,

-------------------------------------------------------------------x

   JAMES FORREST hereby swears, under penalties of perjury, that the following

is true and correct:

   1.  I am 27 years old.  I currently live in Brooklyn, NY and work as an Audio

Engineer for a DVD Production Company.

   2.  I grew up in Great Neck, New York.  When I was about eight years old, I

attended the computer classes taught by Arnold and Jesse Friedman.  My brother took

classes there as well.

   3.  Although I was quite young at the time, I recall with absolute certainty

that, (1) I had a great time in those classes; and (2) Jesse and Mr. Friedman never did

anything inappropriate to me or my brother.

   4.  During the investigation of Jesse and Mr. Friedman, the Nassau County

Police visited our house, unannounced, and questioned me and my brother regarding the

classes and regarding the Friedmans.  We told them that nothing inappropriate happened.

   5.  I remember other parents of students who were allegedly abused telling

my parents that my brother and I were in denial and pressuring them to give us therapy or

hypnosis.

**A-1371**

6.  I can state without reservation that nothing untoward ever happened to me

or anyone else in the classes I attended.

_JAMES FORREST_

Brooklyn, NY, 11215

Dated: December 29, 2003

Sworn before me this 29
day of December, 29, 2003

Notary Public
Deborah L. Johnson

DEBORAH L. JOHNSON
Commission # 1415834
Notary Public - California
Marin County
My Comm. Expires May 5, 2007

**A-1372**

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,      AFFIDAVIT OF
                                               MARGALITH GEORGALIS

        -- against --

JESSE FRIEDMAN,                           Indictment Nos.
                                          67104, 67430, 69783

          Defendant.

-------------------------------------------------------------------x

      MARGALITH GEORGALIS hereby swears, under penalties of perjury, that the

following is true and correct:

      1.     I am 64 years old.  I live in Great Neck, New York

      2.     In the mid 1980s I enrolled in an introductory computer class in the adult

education program in Great Neck, which was taught by Arnold Friedman.  I was so

impressed by his teaching ability that when I heard he was giving computer classes to

children I immediately enrolled my son Ron.

      3.     Ron attended either 2 or 3 sessions (consisting of 10 classes each) and I

enrolled in another class for adults given on the same evening as Ron's class.  After

every class Ron would bring home a printout of a little program that was taught that day.

I even saved all those printouts all these years.

      4.     At that time we purchased our own computer and Arnold was kind enough

to lend us disks and a lot of advice.  That meant that I was always walking into the house

at the beginning or end of class.  Never did I see anything other than children sitting in

front of computers, and Arnold and Jesse walking around and answering questions.

**A-1373**

5.     I was totally shocked when the police showed up at our home with the accusation of child molestation. Ron was unable to supply them with any information. After Arnold was sent to prison the police came again. This time they told us that they had interviewed Arnold in prison and that he had told them that Ron had been his favorite. Even this did not bring back any memories to my son even though the police told us that they already knew Ron had been abused.

6.     Over the years I had dozens of long heart to heart talks with my son. I had told him that if someone had done something to him that he did not want done it is not the end of the world and it would be good to remember it and then put it aside but he could never remember anything. I finally concluded that nothing had happened to him.

7.     I now believe that nothing inappropriate ever happened to anybody at that house. It is inconceivable that not one child in that class ever complained or refused to go back to those classes if even a small portion of what the police said were true.

8.     Some of the other children who I remember Ron was in the same classes with were ⌐            ⌐ and

_Margalith Georgalis_
MARGALITH GEORGALIS

Sworn before me this 30ᵗʰ
day of December ___, 2003

DORINA A. MARTAKIS
Notary Public, State of New York
No. 01MA4998172
Qualified in Queens County
Commission Expires June 22, 20 06

_Dorina A. Martakis_

**A-1374**

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,                AFFIDAVIT OF
                                                    RALPH GEORGALIS

        -- against --

    JESSE FRIEDMAN,

             Defendant,

----------------------------------------------------------------x

      RALPH GEORGALIS, hereby declares under penalty of perjury that the
following is true and correct:

      1.    I am submitting this affidavit because my son, Ron, was, approximately
15 years ago, one of the children in Arnold Friedman's after-school computer classes. I
experienced the Friedman phenomenon firsthand. I hope that one of my clear
recollections of the time will be of some use to the court in the case before it.

      2.    I was not present the first time that Det. Galasso and Det. Hatch came to
our home to interview Ron in their investigation of Arnold Friedman.

      3.    I was present, with my wife, when Det. Galasso returned some months
later for a second questioning of Ron. In both instances Ron was questioned in a separate
room, outside the hearing of our family. By the second visit Arnold Friedman was in
prison, after his confession. Galasso's second visit was obviously to gather evidence
against Jesse Friedman. At this time Det. Galasso stated to my wife and me that Friedman
had been interviewed in prison, and Galasso quoted him as saying, "Ron was my
favorite."

**A-1375**

4.    On both visits the clear intent of the detectives was to convince us that

Ron had been molested and that several other children had already admitted that they,

also, had been abused. The first visit was to attempt to gain statements implicating

Arnold Friedman. The second visit was an attempt to gain statements implicating Jesse

Friedman in the abuse.


*Ralph Georgalis*

RALPH GEORGALIS


Sworn before me this *30th* day
of December 2003.


DORINA A. MARTAKIS
Notary Public — State of New York
998172
Qualified — Queens County
Commission Expires June 22, 2006

*Dorina O. Martakis*


**A-1376**

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,      AFFIDAVIT OF
                                                            RON GEORGALIS

FRIEDMAN
              -- against --

JESSE FRIEDMAN,                              Indictment Nos.
                                                  67104, 67430, 69783

              Defendant,

-------------------------------------------------------------------x

       RON GEORGALIS hereby swears, under penalties of perjury, that the following

is true and correct:

       1.     I am twenty-seven years old.  I am currently a third-year student of

anthropology at Florida State University in Tallahassee, Florida.  I am now working on

my master's thesis and expect to have completed my Master of Arts degree by the end of

Spring 2004 semester.

       2.     I grew up at 16 North Road in Great Neck, NY.  During the years 1985

and 1986, when I was nine years old, I was enrolled in the computer classes taught in the

Friedman home at 17 Piccadilly Road.  I was enrolled in the course for one term of

approximately ten classroom sessions and then re-enrolled of my own volition and

without hesitation for another such term.  I fondly remember those Wednesday afternoon

classes as both an opportunity to see my friends,                      and

       .  When my mother asked me if I would like to re-enroll for a third term, I

declined because I felt that I was not a serious enough computer student for the classes,

while a pleasant escape from the tedium of schoolwork, to have remained worthwhile.

**A-1377**