Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1519 of 1566

6.

same thing to me as his father did in this session too.
Jesse had told me if I didn't take my pants down that I
would never be allowed to come back again to computer
class. I said fine, I won't tell and then I pulled my
pants down to my knees and I was held tight around my waist
so I could not move and I had to hold onto one of the
chairs in the room, bent over and Jesse tried to push his
penis which was hard like his father's was, into my behind,
Jesse hurt me very much and I screamed out but he covered
up my mouth and kept on trying and pushing his penis into
my behind. After a while he stopped and I stopped  and
pulled up my pants up and went back to my computer to work.
I can also remember that when Mr. Friedman did things with
his penis to me and the other boys he would whisper to us
something like, "[Y]ou won't come back," and also he would
say "[D]on't tell your mom or you won't be able to come
back." I can also remember in the first session that Mr.
Friedman pulled his pants and came over to me and told me
his penis was out and it was hard and he pulled my pants
down and he took his penis and rubbed it agains my penis.
He did this for about a minute or so and then he stopped.
Jesse was there too but he was just screaming at everyone.
This hurt me and I cried but he didn't stopp rubbing his
penis against my penis.  I can remember that everyone in
the class had to touch both Mr. Friedman and Jesse's penis,

**A-1525**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1520 of 1566

7.

they would come around to the computer with their pants
down when we had to touch their penises.  I want to talk to
[the detectives] about the session in Mr. Friedman's com-
puter class.  This session was started in January 1987 and
it was on _____ at about 4:30 p.m.  The same boys were in
my class as were in the first session.  I can remember,
that Jesse and Mr. Friedman did some of the same things to
me and the other boys as they did in the first session.
The second session was also run for 10 weeks like the first
one did.  I remember that it was in the beginning of the
session when Mr. Friedman came over to my computer and he
told me take my pants down.  _____ was next to me didn't
say anything because he didn't want to get into any trou-
ble.  Jesse was in the room too, anyway I stood up and I
didn't want to get hit very hard so I did it.  Mr. Friedman
made me bend over and hold onto the back of the computer
class and he took his hard penis and pushed it into by be-
hind and it hurt me a little and I cried to myself because
it hurt and Mr. Friedman held me around my shoulders and
Jesse was sitting on the couch just relaxing and watching
what his father was doing to me.  The other boys were just
watching and I was saying to myself to tell Mr. Friedman to
get off of me.  Mr. Friedman stopped after a while and then
I pulled my pants and went back to my computer.  One other
thing that I remember that happened during the first

**A-1526**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1521 of 1566

8.

session was that Jesse had gotten some of the sticky stuff
from his penis on my shoulder.  This was during the same
time when Jesse had been pushing his penis into my behind.
I come home and wiped it off my clothes.  Now I want to
talk abut my second session again and about what Jesse did
to me.  Jesse came over to me and he told me to stand up
and pull your pants down, this was on a different day in
the beginning of the class but not the same day when his
father did it to me.  Anyway I stood up and Jesse pulled
them down, my pants.  Jesse said this to me, to pull my
pants down and I said no.  Jesse had his zipper undone and
his penis was out, it was very hairy and gross looking.
Jesse's penis was as hard as a rock.  Jesse told me to bend
over on one of the chairs in front if my computer.  My
hands were on the on the chair and Jesse put his hands on
top of mine and then be tried to push his hard penis into
my behind.  The only way I can explain . . . was that is
was like a popcycle trying to go into my behind.  Jesse
could not get it to work, get it into the hole in my be-
hind.  But the hole in my behind was too small.  I also
remember that after Jesse tried to do this to me, he
stopped after a while and I don't remember crying out or
anything.  I just went back to my computer.  I can also
remember that Jesse and his father used to fight with each
other, because Jesse used to scream at everyone and his

**A-1527**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1522 of 1566

9.

father use to yell at him and then Jesse would do the same
thing back to the father. I also remember in the first
session that Mr. Friedman had tried to put his penis into
_____ rear and also Jesse did this to him too and _____
screamed out and Jesse would cover his mouth. He had to do
the same thing that I did by bending over the chairs too
and holding on to the back of the chairs. I also remember
that _____ was hit a lot by Mr. Friedman and Jesse and
one time I remember on two times that Jesse pulled _____
pants down around his legs and he hit him in the behind.
_____ cried out and he was told to be quiet and _____ would
stop. I remember that _____ also had to touch both Mr.
Friedman and Jesse's penises two times like everyone else
did. I also remember _____, he had to pull his pants
down to his knees and Mr. Friedman and Jesse spanked him at
the same time and I also remember that Mr. Friedman tried
on one day to put his penis into _____ behind, but
_____ penis would not come down, so the could not get
his pants down and Mr. Friedman, put his own penis back
into his pants. Also one time I remember that _____ had
to pull his pants down for Mr. Friedman and Mr. Friedman
tried to put his penis into _____ behind. _____ screamed
out Mom and Daddy and Mr. Friedman told him to shut up and
be quiet. My mother, father and [the detectives] are here
with me. Detective Merriweather is writing my story about

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1523 of 1566

10.

Mr. Friedman and Jesse and the computer classes.  I swear
this is the truth and all I can remember at this time.

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1524 of 1566

## Gary Meyers Interviewed by Detective Hatch and Detective Jones

**Hatch:** We've had kids who stated that they saw you and that you're involved, OK?

**Jones**: We want to go through this with you. Don't deny it yet. If you question twelve kids, you'll get 12 different answers. Take Arnie Friedman's own words. But he admitted this.

**Gary**: I didn't see it. I didn't hear it.

**Jones**: Arnold was under no obligation to admit, but he did. Why would Arnold Friedman admit to something that wasn't true. The kids know that he did it. Take Arnold's own words... I know it's impossible to speak to him now but he's openly admitted to this in an open courtroom. He said "I did it."

> [Ann Meyers enters room and she is asked to leave]

**Hatch:** ▮▮▮▮▮▮ and M. E. both say that they saw Gary engaged in it... Arnold Friedman did not have to admit this. No one put him in a dark room. He said it in open court with an attorney. He sodomized them. What I say to you as an intelligent human being is what did you say to that. He admitted he sodomized a lot of children

**Gary**: inaudible

**Hatch:** Arnold Friedman says in a courtroom in front of a judge... I'm not going to tell you, you tell us. What we're trying to determine is... Arnold Friedman in court says that he sodomized children ... The judge said that there are other children and exactly what he did.

> [Inaudible discussion]

**Hatch:** We are trying to find out who the other victims are to help the parents and those children. Arnold Friedman will not be charged with any other additional charges. There's no axe to grind here. There's no axe to grind here. It was all stipulated in open court that there would be no further charges. One judge and the DA says no further charges will be made. Once the stipulation was made with the judge, no further charges will be made. What we want to do is to let the parents know if there are other children that we aren't aware of so that they can get psychological help for the children. We also learn how to deal with pedophiles and how they operate, how they operate and their method of seduction... Not one child came forward. Why? They were blackmailed. Sexual perversions if a person is sexually abused and wanted to keep your mouth shut and took photos and took notes and told you if you said anything to anyone you would be in worse trouble because they would show the picture -- what if the person was seven or eight years old... Could you imagine a copy to our mother, a copy to a smut magazine with the name and address to show that you were a pervert?

**Gary**: inaudible

**Hatch:** Did you know that much five years ago? I'm 43 years old and when I was seven I didn't know as much as I do now.

**Gary**: inaudible

**Hatch:** [angrily] I think you're very funny... No evidence to speculate anything happened... You're reasonably intelligent I wouldn't say you're a genius but you are reasonably intelligent. Arnold Friedman stipulated in court that he sodomized a large number of children.

**Gary:** No he never touched me.

**Hatch:** Oh, it happened to everyone else but not to you. How many sessions did you have at Friedman's.

**Gary**: 8 to 12.

**Hatch:** Arnold Friedman had a certain age group. Pre-adolescent males. He wouldn't be interested in a guy like you? You were nine years old and nothing happened? An eight year old, you don't know as much as you do at 13 years old. I'm saying to you, you went through a physical change. You look different at 13 than you did at 8. Because of that difference, Arnold Friedman no longer wanted you. Pedophiles are very selective. Like heterosexuals. Some like blondes some like brunettes. Arnold

**A-1530**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1525 of 1566

Friedman liked eight-year-olds. You'll find out as you get older that certain things are true, certain things are lies. You denying this doesn't mean it didn't happen. Arnold Friedman admitted it and it's true. When young, impressionable children are running around....

**Gary**: inaudible question

**Jones:** Why don't you ask your sister if something happened? A lot of boys seem to have concerns about their own sexuality.

[Inaudible conversation between Meyers and Jones]

**Hatch:** What about a homosexual act over a period of years? Formative years? Would you consider that having an affect on a person's sexuality? Do you think that determines if you are a homosexual? If a person was involved in a homosexual act during preadolescent years after they are forced out of it do you think they would like it? What about a man who takes unfair advantage of children? If you are going to be a homosexual, you'll be a homosexual.

**Gary**: inaudible

**Hatch:** Well guess what? You are absolutely wrong. Most children who abuse children have been abused themselves. It's a monster created with in you. This little monster inside you. This little voice and every now and then it rears its ugly head. Unless the victim knows enough about the problem to get himself straightened out. If suppressed, it's a two-fold problem. One is anger and frustration. And the other is acting itself out. It's a no-win situation unless the person goes and gets help and admits that he was victimized. If something bad happens even though its not the kid's fault the child blames himself and feels tremendous guilt. We find, with help that they can see it's not their fault. And then the place the blame on the person who created the situation and then they are a lot better off. Don't over intimidate women. Don't over intimidate women. You're a super-smart intelligent individual. You'd have to be an idiot not to see this. To a child, you don't need a knife, guy or machete. The seduction in force can be very subtle. If Arnold Friedman took a small boy and put a very big guy over him, what do you think the little guy will do? There are children who would defy but a very small percentage. 90% would submit. Most kids would be intimidated. If a pedophile wants to get his goal accomplished, I'll have 10 or 12 kids in my class. I know the kids. I know those who I can intimidate and those I cannot. And I'll cut out those that I can't intimidate. Then I go to the next stage in the process and I might cut out even a few more. You might go so far, and then that's that. If you don't want to do something you won't. That's another stage. It's a process of elimination and psychology plays a big part. And then there are other methods other than intimidation. There's carrots and rewards. You are having so much fun and you're getting rewards. If you do something right, you get a reward. A candy bar, a pat on the back.

Do you remember games of a sexual nature? Stroker? Strip Poker? [checks notes] Exploding fists?

**Gary:** Exploding fists was a Karate Game.

**Hatch:** Did you ever see any porn magazines?

**Gary:** No

**Hatch:** Did you ever go to any other room in the house?

**Gary**: Yes.

**Hatch:** What room?

**Gary:** Jesse's bedroom to play with the Commodore computer and nothing happened.

**Hatch:** Did Jesse help with the classes?

**Gary**: no answer

**Hatch:** Did Gary Meyers ever take a special SAT class? Who was in the class? ████████
████████████████████████████████████████?

**Hatch**: Did you ever see a magazine called Gallery Magazine?

**Gary**: No

**Hatch**: [calls Ann Meyers back into the room] Gary was a wise guy and I didn't like his answer.

**End**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1526 of 1566

Page 1

10-16-89

Statement of Jennifer Rosen

My name is Jennifer Rosen. I am 7 seven years old. My birthday is February 15th. I live at 24 Clover Fox Hollsville with my mom dad, grandma and grandpa. I am in the second grade at the York Lane School and last year I was in 1st grade and my teacher's name was Miss Shirk.

I remember last year when I was in first grade Mr. Bob was my bus driver. Some of the boys and girls on my bus were Melinda, Jimmy Tobe Micah Guarden, Jill & Keith Connell, Chris Carston, Abbey & Marissa, David & Daniel Kane, Chris Schaffer, Cara Bauer, Steven Pipitone, and Tara Nancy Lisa, John Cosmos, Linda & Douglass and Yee Yee Lu.

A few weeks after school started I saw Mr. Bob touch 2 two other kids private parts. I saw him first touch Marissa's private parts. Mr. Bob had candy day and he would

at W. Hefr. & a. of6

A-1532

X Jennifer Rosen
David P. Rosen
Father

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1527 of 1566

page 2

make all of us line up on the bus as
he gave us candy. He gave us lollipops
candy canes, mints and gum. Mr. Bob
would <s>Mr.</s> pick us me & Selena in the
morning and he also drove us home un
less my mom drove me from dancing
class. One day I was sitting in
the 5th seat on the bus. Mr. Bob
was driving and he pulled the bus over
to the side of the road in front of
someones house. Mr. Bob walked back
to where I was sitting and Melinda was
sitting next to me. Mr. Bob put his hand
down the front of my pants and touched
my private parts (prints & vagina). Melin
saw what Mr. Bob did to me. One day
around the middle of the school year
Mr. Bob walked to the back of the bus
to where I was sitting on the bus. Mr. Bob
told me to stand up and I did. He pulled
my pants and underpants down. He touched my
hiney first and he told me to bend over
He put his pee-pee in my hiney. Another
time, Mr. Bob told me to lay on the floor
of the bus on my back. He put his penis

Det. W. Wefra Sh. 446

jennifer russem
Shad P. Ressen  Tessler.

A-1533

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1528 of 1566

page 3

in my mouth. It tasted yuckey. It was
poos and it smelled of pee-pee. It
was hard as a rock and you
couldn't bite it. A few times M.
Bob would bring me home late from
school because he would go to carvel
first and buy us ice cream. I
never told anyone what M. Bob did
because I was scared. M. Bob told
me he would kill my parents if I
said anything. One day I went to
my teacher and her name was Miss Schell
and I told her that there were funny
things happening on my bus but she
didn't do anything about it. I also
told my daddy that M. Bob had put stink
bombs on my bus. He saw them in the
door and he had abbey step on them.
    I am giving this story to Detective
Nufrio who is writing it for me. I know the
difference between telling the truth and a lie. I
said you have to tell the police the truth. I
am told Detective Nufrio the truth about M.
Bob my bus driver. Detective Nufrio has read this
story to me with my parents and I have signed my name.

Det. N. Nufrio #4846        ᴘ-Jennifer Tilson

A-1534     ᴘᴀᴛᴛᴇ  Richard P. Rosen     ᴘᴏᴛᴛᴏ

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1529 of 1566

## COUNTY OF NASSAU

## Inter-Departmental Memo

To:     Sgt. Galasso, Sex Crimes Squad
        Nassau County Police Department

From:   Barry W. Grennan, Chief
        Major Offense Bureau

Date:   February 15, 1989

Subject: ███████████████

Be advised I have reviewed the above-captioned case as requested for possible presentation to a Grand Jury. It is my opinion that there is insufficient evidence at this time to present the case to a Grand Jury.

Should further evidence develop, feel free to re-submit the case.

BWG:sw

Ntfd. 1620hrs 2/21/89 - Left Message Not there.
████████████ called and I gave
her details regarding ███████████ She
said she was calling for Barry Grennan.





**A-1535**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1530 of 1566

HON. HERBERT LIPP
NASSAU COUNTY COURT JUDGE,
SITTING AS A LOCAL CRIMINAL COURT - - - - - - X

In the Matter of the Application of

WILLIAM HATCH

A detective of the Nassau County Police
Department, Shield No. 402, assigned to
the Sex Crimes Squad.

- - - - - - - - - - - - - - - - - X

AFFIDAVIT

STATE OF NEW YORK  )
                   : ss.:
COUNTY OF NASSAU   )

       I, WILLIAM HATCH, being duly sworn, depose and say:

       That I am a detective in the Nassau County Police Department, Shield No. 402, presently assigned to the Sex Crimes Squad. I have been a member of the Nassau County Police Department for approximately nineteen (19) years. I investigate numerous cases involving sexual assualts of a myriad variety.

       On the morning of November 4, 1987 I was notified by Detective Sgt. Socher of the District Attorney's Squad that his squad had assisted the United States Postal Inspectors in the execution of a United States District Court (Eastern District) search warrant of the residence of ARNOLD and ELAINE FRIEDMAN, located at 17 Picadilly Road, Great Neck, New York. I was advised that Postal Inspector John McDermott was in charge of the case. The search warrant ordered the seizure of all photographs, magazines, books, video tapes and other unusual depictions of children engaging in sexually explicit

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1531 of 1566

conduct, along with letters, envelopes, files, correspondence, personal computer discs, etc., relating to the distribution and receipt of child pornography.

I was in contact with Postal Inspector McDermott and he stated that approximately twenty (20) magazines illustrating nude photos of pre-adolescent and teenage males in various sexual poses were found in the FRIEDMAN house. Along with the magazines were discovered various pamphlets, booklets and brochures depicting boys in nude and sexual poses.

It was further discovered during the search that the FRIEDMAN's had one floor of their home set up like a nursery school with small tables, chairs, toys, and games. Photographs of this room were provided to me by Inspector McDermott along with photographs of the booklets and magazines. (See attached photos.) Lists of names and phone numbers were also present and confiscated.

I was advised by Postal Inspector McDermott that the postal authorities have been investigating Mr. FRIEDMAN since July, 1984 when they were notified by the United States Custom Service that he was receiving "kiddie porn" through the mail. I was further advised that an undercover operation was launched by the postal authorities and "kiddie porn" was exchanged between ARNOLD FRIEDMAN and the postal inspectors.

On the afternoon of November 4, 1987 I notified Sgt. Galasso of these facts and an investigation was begun by the Sex Crimes Squad. It was noted from the lists confiscated that most of the students listed were boys.

- 2 -

**A-1537**

On the evening of November ███████ Detective Wallene

Jones, Shield No. 494 and myself were present at the home

of Mr. and Mrs. ███████ who resided in Great Neck

Estates. Mr. and Mrs. ███████ have three sons: ██████

14 years old ██████ 12 years old; and ██████ 10 years

old. I interviewed all three boys and found that both █████

and ████ had been abused. Both boys stated that they were

shown books and pictures of nude males and were read stories

from these books by Mr. FRIEDMAN. Both boys stated that

Mr. FRIEDMAN would fondle their buttocks while they looked

on or he read them these books.

I was also advised by ██████ that he was photograp

by Mr. FRIEDMAN while he was in the upstairs bathroom with

a younger boy of the class. The younger boy was "sitting

on the commode with his pants down holding his balls" and

██████ was coming out of the bathroom when the photo was

taken.

██████ stated that Mr. FRIEDMAN had fondled his

buttocks and had also taken him into a room, off the classro

where there was a big desk with a computer terminal on top.

██████ stated that Mr. FRIEDMAN took a "small like cable

box" and plugged it into the computer. The figure of a man

came on the computer screen. The figure was first of a man

showing only from the neck to the head. Mr. FRIEDMAN typed

questions into the computer and the man would answer. Mr.

FRIEDMAN would type in "do you like penises?" The man woul

answer audibly "If I were gay, I'd like penises." Mr. FRIE

would then roll a switch on the cable box and then the man

- 3 -

**A-1538**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1532 of 1566

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1533 of 1566

would be shown from the waist to the head. ▉▉▉▉▉ described the man has having on a shirt that was unbuttoned down the front. He said the man didn't wear an undershirt and had a hairy chest.

Darryn further stated that Mr. FRIEDMAN would say to the boys, "You guys mustn't tell anyone about these books". At the end of the class he would give the boys computer games to take home as a reward for keeping quiet.

I also interviewed ▉▉▉▉▉ who indicated to me that he observed copies of "Playgirl Magazine" in Mr. FRIEDMAN's office.

All three of the aforementioned boys attended Mr. FRIEDMAN's computer school. They would attend there after their regular school day during the week.

On the afternoon of November 13, 1987 I informed Sgt. Galasso that the list of names that Det. Wallene Jones had compiled totaled approxiately eighty-one (81).

Furthermore, I have had conversations with Det. Alex Armstrong, Shield No. 8, assigned to the District Attorne Squad and also Det. Anthony Sgueglia, Shield No. 334, presentl assigned to the Sex Crimes Squad, concerning this case. Det. Armstrong has advised me of what observations he made during the course of the issuance of a federal search warrant at Mr. FRIEDMAN's home. (See Det. Armstrong's affidavit attached hereto.) Det. Sgueglia has further advised me of the conversations he had with two students at Mr. FRIEDMAN's school, namely ▉▉▉▉▉ and ▉▉▉▉▉ (See Det. Sguegl:

- 4 -

**A-1539**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1534 of 1566

Based upon information and belief both ARNOLD FRIEDMAN
and his wife are presently continuing to teach young boys
computer training at their home located at 17 Picadilly Road,
Great Neck, New York.

Based upon my experience, the property sought by
this search warrant may be easily and quickly destroyed or
disposed of. During my training as a Nassau County Police
Officer I have been involved in the quick magnetic erasure
of various tapes and discs. These tapes and discs may be
immediately erased on a computer at the touch of a button.
I anticipate that if the FRIEDMANS are aware of our presence
and purpose they will destroy the evidence sought to be obtaine
by this warrant. Based upon conversations with some of the
students' parents it appears that Mr. FRIEDMAN is aware of
our investigation and is attempting to obstruct it.

WHEREFORE, your affiant respectfully requests that
a search warrant be issued authorizing your affiant or any
other police officer of the Nassau County Police Department
to enter the premises known and described as the single family,
detached dwelling, located at 17 Picadilly Road, Great Neck,
New York, and therein search for and seize any sexual devices,
photographs, magazines, books, film, audio tapes, video tapes
and other unusual depictions of children engaging in sexually
explicit conduct and letters, envelopes, files, correspondence
notes, lists of students, lists of pornographic distributors,
personal computer discs, and the personal computers needed
to read the computer discs relating to pornography all of

- 5 -

**A-1540**

which are being used in connection with the evidence

of violations of Article 235, 263 and 260 of the Penal Law

of the State of New York.

_____

WILLIAM HATCH

Sworn to before me this 24th

day of Nevember, 1987

_____

HON. HERBERT LIPP

- 6 -

**A-1541**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1535 of 1566

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1536 of 1566

(516) 466-2663
(718) 746-1900

# DOUGLAS H. KRIEGER
ATTORNEY AT LAW

98 CUTTER MILL ROAD, GREAT NECK, N.Y. 11021

April 11, 1988

Assistant District Attorney Joseph Onorato
Major Offense Bureau
Nassau County District Attorney's Office
262 Old Country Road
Mineola, NY  11501

> Re:  People v. Jesse Friedman
>      Indictments No. 67104 & 67430

Dear Mr. Onorato:

In order to adequately, properly and effectively make motions and prepare this case for trial I respectfully ask that the information, documents and tangible objects hereinafter requested be provided to me as attorney for Arnold Friedman.  It is my view that the requested information is essential to a proper defense and that without such information the defendant cannot be expected to adequately prepare for or conduct his defense."  Therefore, in accordance with Criminal Procedure Law -- Article 240 and the constitutional requirements set forth in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972) and <u>United States v. Agurs</u>, 427 U.S. 97 (1976), I ask the prosecution to particularize, furnish or permit discovery, inspection and the right to copy the information, documents and tangible objects described herein.

## BILL OF PARTICULARS

The Defendant requests the following bill of particulars:

1.  As to each count of each indictment:

    a)  the precise dates, times, and locations of the alleged criminal acts:

        (i)  as to location, if the act occurred within the Friedman house, specify the room where it occurred;

        (ii)  as to dates and times, insofar as many

**A-1542**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1537 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 2

counts span over a 3 or 4 month period,
specify the month or week in which the
act occurred, if a more precise date
cannot be furnished.

b)  Identify by name and date of birth every
person present in the room where the alleged
act occurred during the commission thereof,
including the "children" "touched" by
defendant in the counts 49 and 53 of the 1987
indictment and the "boys" referred to in
counts 40, 41, 42, 43, 44, 48, 51, 52, 53,
56, 57, 58, 59, 63, 64, 65, 67, 80, 81, 82,
and 83 of the 1988 indictment.

c)  Identify by name and date of birth every
person present in the Friedman house during
the commission of the alleged act.

d)  Specify the dates that the complainants
brought the alleged acts to the attention of
law enforcement officers.

e)  As to each complainant, specify the nature of
the courses or lessons he was taking from at
the Friedman house.

    (i)  specify the date that the complainant
    commenced the course or lessons, and the
    date he terminated the course or
    lessons;

    (ii)  specify, as to each complainant, and
    each course or lesson, whether the
    complainant was studying alone or in a
    group. If in a group, state the number
    of students present.

f)  As to each criminal act alleged, specify the
role played by every person present during
the alleged commission of the act.

g)  Describe the particularity the relationships
between the complainants; between the
witnesses referred to in the indictment; and
between the complainants and those witnesses:

    (i)  set forth any familial relationships;

    (ii)  state what school and grade each
    complainant and witness attended during
    the periods alleged in the indictment.

**A-1543**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1538 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 3

h)   As to each act alleged in the indictment,
state what clothing, if any, the victim was
wearing during the alleged act, and what
clothing, if any, the defendant(s) were
wearing during the alleged act.

2.   As to counts 4 and 5 of the 1987 indictment
describe how the allegations in these counts
differ from each other.

3.   As to counts 15 and 16 of the 1987 indictment
describe how the allegations in these counts
differ from each other.

4.   State whether Daniel Doe attended any courses or
lessons at the Friedman house in the months of
July and August 1986.

5.   As to counts 41, 44 and 67, of the 1987
indictment, state whether the "several boys" were
physically injured in any manner, and describe any
such injuries.

6.   As to count 46 and 52, state whether Edward Doe
was physically injured in any manner, and if so
describe his injuries.

7.   As to counts 41, 44, 46, 52 and 67, describe the
precise manner in which the defendant and/or
Arnold Friedman is alleged to have hit the several
boys, or Edward Doe.

8.   As to each and every count referring to "children"
"boys" or "several boys," state how many children
or boys were the subject of the defendant's
alleged acts.

## DISCOVERY AND INSPECTION

1.   Any written or recorded statements made by the
defendant or copies thereof, within the possession, custody
or control of the prosecution the existence of which is
known or by the exercise of due diligence may become known
to the Government.  This request calls for discovery of
written or recorded statements and recordings of defendant's
conversations by any means of mechanical recordation or
electronic surveillance whether made before or after arrest
and/or indictment and whether or not in response to
interrogation.  The term "statements" includes
"substantially verbatim" as well as "mere summary"
statements and encompasses defendant's statements in
whatever form preserved.  This request also calls for

**A-1544**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1539 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 4

discovery of the time, place and circumstances of such
statements.

2.    The substance of any oral statement made by the
defendant, whether before or after arrest:  (a) during a
conversation with any person who in fact was an agent of law
enforcement or informer or who is now a prosecution witness,
or (b) in response to interrogation by any person then known
to the defendant to be an agent of law enforcement.  This
request is designed to reach those statements by the
defendant which have not been preserved in any writing or
recording.  This request also calls for discovery of the
time, place and circumstances of such statements.

3.    Any recorded testimony of the defendant before a
governmental agency, entity or instrumentality or before any
state or federal grand jury.

4.    The defendant's prior criminal record, if any, as
is within the possession, custody, or control of the
prosecution, the existence of which is known or by the
exercise of due diligence may become known to the
prosecution.

5.    Any books, papers, documents, photographs,
tangible objects, buildings or places, or copies or portions
thereof, which are within the possession, custody, or
control of the prosecution and which are material to the
preparation of the defense.  This request includes, but is
not limited to, any of the above-mentioned which came into
the possession, custody or control of the prosecution by
subpoena, seizure or request directed to:  (a) any person
whom the prosecution intends to call as a witness at trial;
and (b) any corporation, partnership, employee organization,
pension fund, financial institution, enterprise or other
association wherein a person whom the prosecution intends to
call as a witness at trial was an officer, employee, agent,
member, trustee, association, partner or had an interest
therein.  This request also specifically includes, but is
not limited to, any books, records or other documentation
within the possession, custody, or control of the
prosecution having to do with the financial or business
activity or any witness the prosecution intends to call at
trial.

6.    Any books, papers, documents, photographs,
tangible objects, buildings or copies of portions thereof
which are within the possession, custody, or control of the
prosecution and which are intended for use by them as
evidence at trial.

7.    Any books, papers, documents, photographs,

**A-1545**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1540 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 5

tangible objects, copies or portions thereof which are
within the possession, custody or control of the prosecution
and which were obtained from or belong to the defendant, or
a co-defendant or a co-conspirator, or over which it is
claimed that the defendant, co-defendant or a co-conspirator
exercised dominion or control.  This request includes but is
not limited to all photographs and video discs referred to
in the indictment.

8.  Any books, papers, documents, photographs,
tangible objects, buildings or places or copies thereof
which are within the possession, custody, or control of the
prosecution that:  (a) are referred to in the indictment;
(b) related to any statement of fact in the indictment; (c)
constitute the fruits or means of perpetrating any of the
offenses set forth in the indictment; or (d) were presented
to the grand jury in its investigation of the criminal
offense or offenses referred to in the indictment.

Regarding items 5 through 8, state which of the
books, papers, documents, photographs, tangible objects,
etc. in the prosecutions' actual or constructive possession
were seized as a result of:  (a) search warrants, (b) arrest
warrants, or (c) no warrants.  Kindly provide copies of all
such warrants and a fully listing of all items seized.

9.  All results or reports of physical or mental
examinations and of scientific tests or experiments, or
copies thereof, which are within the possession, custody or
control of the prosecution, the existence of which is known
or by the exercise of due diligence ma become known to the
prosecution or agent for the prosecution and which may be
either:  (a) material to the preparation of the defense, or
(b) intended for use by the prosecution as evidence at
trial.

10.  All charts, summaries or calculations reflecting
the contents of complex or columinous writings which may be
either (a) material to the preparation of the defense, or
(b) intended for use by the prosecution as evidence at the
trial.

11.  A written list of the names, addresses and
qualifications of all experts the prosecution intends to
call as witnesses at trial, together with all reports made
by such experts, or if reports have not been made, a brief
description of the opinion and subject matter of the opinion
to while each is to testify.

12.  Any documents reflecting or relating to any wire
communications or oral communications intercepted by the
prosecution to which the defendant was a party or during

**A-1546**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1541 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 6

which the defendant was present, or which were obtained by
interceptions directed against the defendant, or to which
any witness the prosecution intends to call at trial was a
party, whether or not such interceptions were authorized or
lawful. the terms "wire communications," "oral
communication," and "interception" are used here as defined
in 18 U.S.C. § 2510 and Article 700 of the CPL. This
request includes one-party "consent" tapes. The request
includes, without limitation, logs, transcripts and tapes of
the intercepted communications, a list of all communications
to which the defendant has been identified as a party, all
applications to the court and orders of the court with
respect thereto, all inventory orders, inventories and
reports of service thereof, and competent evidence of all
the facts and circumstances concerning the authorization for
the applications to intercept any wire communications
involved in this case.

13. The date, time and place of every occasion on
which any surveillance, mail cover, search and/or seizure,
whether electronic, photographic, mechanical, visual, aural
or any other type was made of defendant, together with all
documents, photographs, recordings, or other materials
resulting from or reflecting or relating to such occasions,
including but not limited to any and all affidavits,
warrants, inventories and returns.

14. State whether the prosecution or any law
enforcement agency attempted any identification of the
defendant by means of a show-up or photographic display. If
so, please state the dates, times and places of such
activities; the means employed; the names of the individual
or individuals conducting the procedure; the results of the
efforts and the name and address of any individual who was
asked to attempt an identification. Where the results of
the procedure were recorded on tape, film or written report,
kindly provide counsel with a copy thereof.

15. State whether any individual stated that he or she
would be unable to identify or describe the defendant or
person whom a law enforcement agency believed to be the
defendant. If such was the case, set forth the name,
address and statement of such individual, either as recorded
or as best recalled by the interviewer. Set forth any
description of the defendant furnished to a law enforcement
agency by any individual who allegedly witnessed the events
in the indictment, which description is in any way contrary
to the defendant's actual appearance.

16. Any and all written or oral statements or
utterances -- formal or informal -- made to the prosecution,
its agents and representatives by any person whom the

**A-1547**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1542 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 7

prosecution intends to call as a witness at trial, which
statements are in any way contrary to the testimony or
expected testimony of that person or any other person whom
the prosecution intends to call as a witness at trial or
which otherwise reflect upon the credibility, competency,
bias or motive of any prosecution witness.  Included in this
request, for example, are the names of any individuals who
were students of the defendant's during the time period of
the charges in the indictment, who stated that they had not
witnessed the alleged crimes.

17.  All statements, trial testimony, grand jury
testimony and handwritten or informal notes or interviews in
the possession, custody or control of the prosecution which
were made by any person who was a witness or is a
prospective witness in this case which was made or given
either:  (a) prior to the time such person was a prospective
witness in this case, or (b) in connection with an
investigation or proceeding other than this case.

18.  It is specifically requested that the prosecution
advise all agents who have participated in the investigation
of this case that any and all handwritten notes made by them
not be destroyed.

19.  Please inform us, either by furnishing the
pertinent documents or otherwise, or any and all evidence of
criminal conduct -- state and federal -- on the part of any
person whom the prosecution intends to call as a witness at
trial of which the prosecution, its agents and
representatives have become aware.

20.  Please inform us, either by furnishing the
pertinent documents or otherwise, of any and all promises,
understandings or agreements, formal or informal, between
the prosecution, its agents and representatives and to
persons (including counsel for such persons) whom the
prosecution intends to call as witnesses at trial, together
with copies of all documentation pertaining thereto.  This
request includes, but is not limited to, such promises,
understandings, or agreements as may have been made in
connection with other cases or investigations.  This request
includes information concerning any payment of moneys or
other valuable consideration to any prospective witness.

21.  Please inform us, either by furnishing the
pertinent documents or otherwise, of any and all evidence
that any person who is a prosecution witness or prospective
prosecution witness in this case is or was suffering from
any physical or mental disability or emotional disturbance,
drug addiction or alcohol addiction or is or was under the
care of a psychiatrist, psychologist, counselor or social

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1543 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 8

worker at any time during the period of the indictment to
the present.

22. Any and all statements -- formal or informal --
oral or written -- by the prosecution, its agents and
representatives to any person (including counsel for such
persons) whom the prosecution intends to call as a witness
at trial pertaining in any government action -- state or
federal, civil or criminal -- or immigration matters against
that witness, or anyone related by blood or marriage to that
witness, or person associated in business with that witness
or any corporation, partnership, joint venture, or other
association employing that witness in which that witness has
an interest.

23. The names and addresses of all persons whom the
prosecution, its agents and representatives believe have
relevant knowledge and/or information with reference to the
charges contained in the indictment and whom the prosecution
does not intend to call as witnesses at trial.

24. Set forth as precisely as possible the date, time
and place of any utterances, statements or actions by any
defendant or co-conspirator upon which the prosecution
intends to rely at trial in order to establish the offense
or offenses charged in the indictment.

25. Identify by name and address all persons said to
have been present at or who claim to have personal knowledge
of the utterances, statements, representations, or actions
of any defendant or co-conspirator upon which the
prosecution intends to rely at trial to establish the
offenses charged in the indictment.

26. Kindly inform us of the names of any witnesses or
prospective witnesses in this case who are or have been in
the Federal Witness Protection Program or any other
comparable protective program or situation, custodial or
otherwise, and furnish all documents pertaining to any
offers by the prosecution to any witness or prospective
witness to enter such program.

27. A list of all documents used or obtained or
written in connection with the investigation preceding the
indictment that the prosecution and its agents destroyed,
for whatever reason, including but not limited to, rough
notes of interviews, reports, notes, memoranda, subpoenaed
documents, and other documents.

28. A written list of the names and addresses of all
prosecution witnesses which the attorney for the prosecution
intends to call in the presentation of its case-in-chief,

**A-1549**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1544 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 9

together with any record of prior convictions of any such
witnesses which is within the possession, custody or control
of the prosecution, the existence of which is known or by
the exercise of the diligence may become known to the
Government.

29. Any statements or documents, including but not
limited to grand jury testimony and federal, state and local
tax returns made or executed by any potential prosecution
witness at the trial of this action which the prosecution
knows, or through reasonable diligence should have reason to
know, is false.

30. Any statements reflecting, relating or referring
to any discussion or conversation in which the prosecution
or any government agent suggested that an individual might
possibly be afforded more favorable treatment in any regard
in the event such individual offered evidence against the
defendant. This request includes a list of the dates, times
and places of each such occurrence and the names of the
persons, including counsel, who were present.

31. A list of all persons, and their counsel, who were
asked by the prosecution or its representatives whether they
or their clients would and/or could implicate the defendant in
any criminal wrongdoing.

32. Please inform us of all judicial proceedings in
any criminal cases involving (as a witness, unindicted
co-conspirator, defendant or respondent) any person who is a
potential prosecution witness at the trial of this action.

33. Any and all actions, promises or efforts -- formal
or informal -- on the part of the prosecution, its agents
and representatives to aid, assist or obtain benefits of any
kind for any person whom the prosecution considers a
potential witness at trial, or a member of the immediate
family of such witness, or for the corporation, partnership,
unincorporated association or business employing such
potential witness in which the witness is an employee,
director, shareholder, trustee, partner, member, agent or
servant. This request includes, but is not limited to:  (a)
letter to anyone informing the recipient of the witness'
cooperation; (b) recommendations concerning federal or state
aid or benefits; (c) recommendations concerning licensing,
certification or registration; (d) promises to take
affirmative action to help the status of a witness in a
profession, business or employment or promises not to
jeopardize such status; (e) aid or efforts in securing or
maintaining the business or employment of a witness; (f) aid
or efforts concerning a new identity for the witness and his
family, together with all other actions incidental thereto;

**A-1550**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1545 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 10

(g) direct payments of money or other valuable consideration
or subsidies to the witness; or (h) any other activities,
efforts or promises similar in kind or related to the items
listed in (a)-(g) above.

34.   In addition to the information and material
requested above, any documents, books, papers, photographs,
scientific tests or experiments, tangible objects, written
or recorded statements of anyone, grand jury transcripts and
oral statements of anyone, reports, memoranda, names and
addresses of persons, or other evidence or information which
either tends to exculpate the defendant or tends to be
favorable or useful to the defense as to either guilt or
punishment or tends to affect the weight or credibility of
the evidence to be presented against the defendant or which
will lead to evidence favorable to or exculpatory of the
defendant which is within the possession, custody, or
control of the prosecution the existence of which is known
or by the exercise of due diligence may become known to the
Government.

35.   All photographs, films, and/or videotapes taken in
connection with this case.

36.   State whether the prosecution intends to introduce
evidence of "similar acts" or judgments or conviction
against the defendant or any co-defendant or co-conspirator.
If such is the prosecution's intent, please provide the
following:  (a) a summary of the act or acts to be
introduced; (b) the name, address and position of the
witness through whom such testimony is to be introduced; (c)
a copy of any and all documents intended to be offered; and
(d) the legal basis that the prosecution contends supports
the introduction of such evidence.

37.   All documents and other information relating,
referring to, containing, reflecting, or suggesting any bias
or hostility by any witness for the prosecution toward any
defendant or co-conspirator or any other factor bearing on
the credibility of any such witness.

38.   All videotapes, recordings, transcripts,
photographs, diagrams, charts or other demonstrative
evidence to be offered by the prosecution in the trial of
this case or which relate to the offenses charged.

39.   A list of the names and addresses of all persons
interviewed by any prosecuting attorney, police officer,
detective, postal inspector, FBI agent, or any other agent
or employee of any law enforcement agency in connection with
the investigation of this case or relating to the offenses
charged, whether before or after the return of the

**A-1551**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1546 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 11

indictment(s) and whether or not such interview was reduced
to a written or recorded report.

40. All notes, transcriptions, or recordings or any
interview or statement of any person made by any government
attorney, postal inspector, FBI or any other agent or
employee of the District Attorney in connection with the
investigation of this case relating to the offenses charged,
whether before or after the return of the indictment(s) and
whether or not reduced to a written or recorded report.

41. All statements, interviews, and reports of any
person, written or oral, made to any prosecuting attorney,
police officer, detective, postal inspector, FBI agent or
any other agent or employee of any law enforcement agency in
connection with the investigation of this case relating to
the offense or offenses charged, whether before or after the
return of the indictment(s).

42. Kindly advise us whether any prosecution witness
or prospective prosecution witness was hypnotized or
subjected to any similar procedure designed to elicit
factual information and, if so, please provide:

(a) A copy of any written, recorded or oral statement
made by such person during such procedure;

(b) Any videotapes made in connection with such
procedure; and

(c) The identities of the person or persons
participating in such procedure either as a
subject or as a witness.

43. Kindly advise us whether any prosecution witness
or prospective prosecution witness was interviewed by law
enforcement agents with the assistance of any psychiatrist,
psychologist, counselor, social worker, "validator," etc. in
connection with the charges in this indictment. If so,
please provide names, dates and circumstances.

Each of the foregoing requests is of a continuing
nature and calls for supplementation of any answer as soon
as the prosecution discovers additional evidence,
information or material. In addition, each request and each
paragraph of this letter is specifically sought under the
rule of Brady v. Maryland, supra, and this Brady material
must be made available to the accused as soon as it should
be evident to the prosecution that information or material
in its possession falls within the ambit of the rule. If
your understanding of the applicable law differs from ours
with respect to this matter and if the prosecution possesses

**A-1552**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1547 of 1566

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 12

or comes into possession or <u>Brady</u> material, it is
respectfully requested that you advise us immediately so
that the matter may be ruled on by the court.

44. Provide copies of all press releases issued in
connection with this case.

It is requested that you respond <u>in writing</u> to
this letter as soon as possible and that you respond to each
paragraph of this letter. Please state whatever
information, documents and materials you are willing to
provide and which types of disclosure you decline to provide
and the reasons for your declination. It is respectfully
requested that you respond within ten days of receipt of
this letter.

Very truly yours,

Douglas H. Krieger

DHK/kc
cc: Hon. Abbey L. Boklan

[D.A.'S OFFICE]

88 APR 14 P3: 59

RECEIVED

**A-1553**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1548 of 1566

**DENIS DILLON**
DISTRICT ATTORNEY



OFFICE OF THE DISTRICT ATTORNEY

NASSAU COUNTY
262 OLD COUNTRY ROAD
MINEOLA, NEW YORK 11501
TELEPHONE (516) 535-3800

April 18, 1988

Douglas H. Krieger, Esq.
98 Cutter Mill Road
Great Neck, NY 11021

Re:   People v. JESSE FRIEDMAN
      Indictment #67104 - #67430

Dear Mr. Krieger:

Please be advised that I am in receipt of the Demand to Produce that you served upon our Office in connection with the above-mentioned case. In connection therewith, please note the following:

## BILL OF PARTICULARS

la)   As to the precise dates of the criminal acts, please see the indictment. As to the times of the criminal acts, said crimes occurred during the afternoons. As to the locations of the criminal acts, they occurred inside 17 Piccadilly Road, Great Neck, New York. Please note that the Criminal Procedure Law, Section 240.20 subdivision 1(i) merely requires the People to provide the approximate date, time and place of the offense charged.

b)    As to the names and dates of birth of every person present in the room at the time of the commission of the acts the People are under no obligation to disclose to the defense the names of its witnesses. Matter of <u>Vergari v. Kendall</u>, 46 AD 2d 679 (1974).

c)    See paragraph 1b) above.

d)    The dates that the victims brought the acts to the attention of law enforcement officials is not the proper subject of a Demand to Produce. See Criminal Procedure Law Section 240.20.

**A-1554**

APP.

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1549 of 1566

– Page Two –

e) The People are under no obligation to provide defense counsel with such information pursuant to a Demand to Produce. With reference to the nature of the courses or lessons each victim was taking from the defendant, their commencement and their termination, the defendant himself is in the best position to know this information.

f) The defendant is not entitled to the People's theory of proof. People v. Einhom, 75 Misc. 2d 83 (1973).

g) The People are under no obligation to provide defense counsel with the relationship that exists between the victims and witnesses. The school and grade each victim and witness attended is irrelevant and not the proper subject of a Demand to Produce.

h) As to the clothing worn by the defendant and the victim during the course of the criminal acts, such a request is not the proper subject of a Demand to Produce. See Criminal Procedure Law Section 240.20.

2) The counts listed specify separate and distinct times that the crimes occurred.

3) See paragraph 2) above.

4) The material requested is not the proper subject of a Demand to Produce pursuant to Criminal Procedure Law Section 240.20.

5) See paragraph 4) above.

6) See paragraph 4) above.

7) See paragraph 4) above.

8) See paragraph 4) above.

## DISCOVERY AND INSPECTION

1. See People's Voluntary Disclosure Form where said information has already been provided.

2. See paragraph 1. above.

3. See People's Voluntary Disclosure Form where said information has already been provided.

**A-1555**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1550 of 1566

- Page Three -

The People are unaware at this time of any prior criminal record of the defendant.

5. The People oppose this overly broad request as not the proper subject of a Demand to Produce. See Criminal Procedure Law Section 240.20. As previously noted on the People's Voluntary Disclosure Form, the People will provide counsel for the defendant with the opportunity to inspect any photographs made in connection with this case as well as the property seized in connection with the search warrant.

6. See paragraph 5. listed above.

7. See paragraph 5. listed above.

8. See paragraph 5. listed above. A copy of the search warrant as well as a copy of the return on the search warrant has already been provided to counsel for the defendant.

9. No such reports exist at the present time.

10. See paragraph 5. listed above.

11. See paragraph 5. listed above.

12. No such material was prepared in the preparation of this case.

13. Members of the Nassau County Police Department executed a search warrant at the home of the defendant on November 25, 1987 at approximately 2:00 p.m. As previously indicated, counsel will be afforded the opportunity to inspect the items seized pursuant to that warrant.

14. Please see People's Voluntary Disclosure Form, paragraph 9. which has already indicated that no such procedure has taken place.

15. No individual has stated that he or she would be unable to identify or describe the defendant.

16. The defendant is not entitled to any statements made by the People's witnesses until the proper time, namely after the jury is selected. See People v. Rosario. With reference to the names of students of the defendant, the defendant himself is in the best position to know their identity.

17. See paragraph 16. listed above as to the proper time that said statements will be turned over to the defense.

**A-1556**

APP.

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1551 of 1566

- Page Four -

18. The People are mindful of their obligations pursuant to the Criminal Procedure Law and the Constitution of the State of New York and of the United States of America.

19. The People are unaware of any evidence of prior criminal conduct of the child witnesses.  Should any such information become available, it will be provided to the defendant.

20. The People have made no promises, understandings or agreements with anyone with respect to this case.

21. The material requested is not the proper subject of a Demand to Produce, pursuant to Criminal Procedure Law, Section 240.20.

22. See paragraph 21. listed above.

23. The People possess no such information.

24. As previously indicated, the defendant made no statements in connections with this case.

25. See paragraph 24. listed above.

26. Upon information and belief, none of the People's witnesses have been in the Federal Witness Protection Program or any other comparable protective program.

27. Neither the prosecution nor its agents have destroyed any material in connection with this case.

28. As previously stated, the names and addresses of all wit- nesses to the crimes listed in the indictment, is not the proper subject of a Demand to Produce, pursuant to Criminal Procedure Law, Section 240.20.  With reference to a record of prior convictions of any of the People's witnesses, see paragraph 19, listed above.

29. The defendant is not entitled to any statements or documents presented to the Grand Jury in connection with this case. As to tax returns, based upon information and belief, none of the child victims has filed a tax return.

30. No such material exists.

31. Based upon information and belief, no such material exists.

32. See paragraph 31. listed above.

33. See paragraph 31. listed above.

**A-1557**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1552 of 1566

– Page Five –

34. As to evidence tending to be exculpatory to the defendant
such is not now known upon information and belief gained
from the files of the District Attorney's Office to be in
existence. Should such evidence become available, it will
be furnished to the defendant pursuant to Brady v. Maryland.

35. See People's Voluntary Disclosure Form wherein the People
have already agreed to provide the defendant with the oppor-
tunity to examine said material.

36. The prosecution does not intend to introduce evidence of
similar acts or judgments of conviction against the defendant
at this time. Should the People elect to do so, the defen-
dant will be provided with the adequate notice as provided
by law.

37. See paragraph 31. listed above.

38. Said request is not the proper subject of a Demand to Produce,
pursuant to Criminal Procedure Law, Section 240.20.

39. See paragraph 38. listed above.

40. See paragraph 38. listed above.

41. See paragraph 38. listed above.

42. Based upon information and belief, none of the prosecution
witnesses or prospective witnesses was hypnotized or sub-
jected to any similar procedure designed to elicit factual
information.

43. See paragraph 38. listed above.

44. See paragraph 38. listed above.

If you have any questions, please do not hesitate to contact me at
535-3739.

Finally, I take this opportunity to remind you that at the time your
client was arraigned on these indictments, the Office of the
District Attorney served upon your client its own Demand to Produce
which was returnable within 20 days. Accordingly, I look forward to
any cross discovery to the extent that it is applicable in the
instant case.

Very truly yours,

DENIS DILLON
District Attorney

Joseph R. Onorato
Assistant District Attorney
Major Offense Bureau

JRO/sw

**A-1558**                    APP.

# THEODORE W. O'NEILL

PRIVATE INVESTIGATOR

123 Grove Avenue

Suite 107

Cedarhurst, New York 11516-2302

Licensed & Bonded
516 295-0861

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1553 of 1566

I, SE, attended a meeting at Temple Beth-El of
Great Neck, on Wednesday, November 16, 1988.  The
subject matter of this meeting was "Sexual Abuse of
Children".

I arrived at the parking lot of the Temple at
approximately 7:45 p.m.  There was a small, two-door car
parked in the lot, with two (2) males in the front seat.
The car had bumper stickers on the rear bumper.  The two
men in the car seemed to be kissing each other at the
time when I got out of my car.

There were approximately two hundred (200) chairs set up
in the room where the meeting was held; about 40-45
people were present.  Most of the attendees were female.

I turned my tape recorder on inside of my pocketbook
when I overheard someone ask the Rabbi if it was okay if
he taped the meeting.  The Rabbi said it was, so I took
out my recorder and put it on top of the empty seat
beside me in order to get better reception on the tape.

The Rabbi called the meeting to order at about 8:15 p.m.
He explained that Detective Sgt. Frances Galasso,
Commanding Officer of the Nassau County Sex Crimes
Squad, had not yet arrived at the meeting.  He did not
know if she would attend, as she was called out on an
emergency on the South Shore.

The meeting was started and the following panelists were
called up to speak:

                Sandra Kaplan, M.D.

                Victor Fonari, M.D.

                Joan Spector, D.S.W

                Carol Samit, C.S.W.

                Thomas Feniger, Ph.D.

**A-1559**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1554 of 1566

After the above five (5) persons spoke to the audience, the Rabbi again got up to the microphone. He stated that Detective Galasso just arrived at the meeting, and told the audience that there would be no more photographing nor tape recording. There were two (2) uniformed police officers standing at the back of the room, and the cameras and tape recorders were given to them.

I gave one of the officers my recorder, and took notes as Detective Galasso spoke.

The following are some of the remarks of Detective Sgt. Frances Galasso, Commanding Officer, Nassau County Sex Crimes Squad:

Sex abuse is running rampant in this County.

I cannot discuss this case without jeopardizing the rights of plaintiffs and defendants.

This is the largest case in number of defendants and number of plaintiffs.

We have merely scratched the surface.

The "abused" becomes "abuser".

I have NEVER arrested a sex offender who has not been a victim!

Working for one (1) year on this investigation; has eighteen (18) years on the job.

At the moment, working in Uniondale and Freeport on cases.

There are many cooperative/many uncooperative people in the community.

Tell any person whose child set foot through the door, that child WAS a victim!

It is a very complicated case.

Some parents said that they had to speak with their attorneys or psychiatrists first.

She thinks she is going to do well on this case.

**A-1560**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1555 of 1566

## Temple Beth-El of Great Neck

### Panelists of Sexual Abuse of Children Program

November 16, 2988

Thomas Feniger, Ph.D.
Director, Pupil Personnel Services, Great Neck Public Schools
516-773-1731

Victor Fornari, M.D.
Physician in Charge Pediatric Consultation/Liaison Service and Assistant
Professor of Psychiatry of Cornell University Medical College
516- 562-3005

Detective Sgt. Frances Galasso
Commanding Officer Nassau County Sex Crimes Squad
516-535-7816

Sandra Kaplan, M.D.
Chief of Child and Adolescent Psychiatry, Associate Professor of Clinical Psychiatry
at Cornell University Medical College, and Chairperson for the Committee on Family
Violence and Sexual Abuse of the American Psychiatric Assoc.
516-562-3005

Carol Samit, C.S.W.
Assistant Coordinator of Family Crisis Program, Division of Child
and Adolescent Psychiatry, and Senior Psychiatric Social Worker, The Division of Child
and Adolescent Psychiatry of North Shore University Hospital
516-562-3005

Joan Spector, D.S.W.
Private Practice in Great Neck
516-482-7755

Over 200 seats
About 40-45

**A-1561**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1556 of 1566

**DENIS DILLON**
DISTRICT ATTORNEY



OFFICE OF THE DISTRICT ATTORNEY

NASSAU COUNTY
262 OLD COUNTRY ROAD
MINEOLA, NEW YORK 11501
TELEPHONE (516) 535-3800

March 26, 1990

Inspector Ronald Olsen
Commanding Officer, Major Offense Squad
Nassau County Police Department
1490 Franklin Avenue
Mineola, NY 11501

Re:  People v. ROBERT J. IZZO

Dear Inspector Olsen:

On Friday, March 23, 1990 I was informed that Detective Sergeant L.
Gorman of the Nassau County Police Department Sex Crimes Squad is
scheduled to appear as a guest speaker at a Child Sexual Abuse
Seminar conducted by the staff of North Shore University Hospital on
March 30, 1990.  In addition to Detective Sergeant Gorman, Dr.
Cathryn J. Fenton, Superintendant of Hicksville schools is also
scheduled to appear.

As the Chief of the Major Offense Bureau assigned to the prosecution
of the ROBERT IZZO matter, the appearance of a Nassau County Police
Department representative and Dr. Fenton at this Seminar causes me
great concern.  Since the inception of this case, the Office of the
District Attorney has strived to investigate and prosecute this
matter independent of any psychiatric or therapeutic health
professionals.  This has been maintained because law enforcement
investigations into matters of child sexual abuse must remain free
from any appearance that law enforcement officials are utilizing the
services of psychological agencies and medical professionals in
their criminal investigations

The importance of this independence between our agencies in
protecting the integrity of a criminal investigation was most
recently exhibited by the verdict in the McMartin case in
California.  All reports and interviews with the jurors concerning

**A-1562**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1557 of 1566

- 2 -

the acquittal in that case indicate that the jurors were extremely troubled by the role of the psychologists who conducted the interviews of the children involved in that investigation. It was noted that although psychologists, based upon their training are extremely useful in enabling children to discuss instances of sexual abuse, their lack of training in the legal system and the evidentiary limitations placed upon child interviews by the courts make the use of such professionals in a criminal investigation or association with law enforcement personnel during a pending prosecution, extremely unwise. It is my opinion that in order to protect the integrity of the ROBERT IZZO investigation and prosecution, any formal association such as that scheduled between the Nassau County District Attorney's Office and the Nassau County Police Department with North Shore University Hospital, who is responsible for the counselling of many of the IZZO complainants, must be avoided.

I would appreciate a reconsideration of your Department's decision to send a representative of the Nassau County Police Department to the North Shore University Seminar on March 30, 1990. Your consideration to this matter is greatly appreciated.

Very truly yours,

Denis Dillon
District Attorney


Barry W. Grennan, Chief
Major Offense Bureau

BWG:sw

**A-1563**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1558 of 1566

 **NORTH SHORE UNIVERSITY HOSPITAL—** 

**CORNELL UNIVERSITY MEDICAL COLLEGE**

DEPARTMENT OF PSYCHIATRY
Division of Child and Adolescent Psychiatry

516-562-3005

## I N V I T A T I O N

You are cordially invited to attend the
Raphell Sims Lakowitz Memorial Conference
"Extrafamilial Child Sexual Abuse and Pornography:
A Community Disaster"
on Friday, March 30, 1990

A Luncheon for Distinguished Guests will be held in the
Ketcham Board Room at 12:15 P.M.
Enclosed is a Conference Flyer for your information.

Please R.S.V.P. to Sandy Valli at 562-3005

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1559 of 1566

RCV  BY:XEROX TELECOPIER 7010 ; 3-23-90   3:21PM ;      516 3656326→                516535;# 2
      B3-23-90 15:14      NSUH CUMC PSYCHIATRY                 001 P02



## NORTH SHORE UNIVERSITY HOSPITAL–

### CORNELL UNIVERSITY MEDICAL COLLEGE

DEPARTMENT OF PSYCHIATRY
Division of Child and Adolescent Psychiatry

516-562-3005

*Joe Onorato*
*See who is*
*to attend*
*BG*
*free*

March 23, 1990

Mr. Barry W. Grennan
Chief Major Offense Bureau
District Attorney's Office
262 Old Country Road
Mineola, Ny 11501

Dear Mr. Grennan:

You and any of your staff are invited to attend this Conference.  You are
also invited to attend the Conference Luncheon for Distinguished Guests
which will be held in the Ketcham Board Room at 12:15 P.M.

Notice of this Conference was sent to your Office by the North Shore
University Hospital Department of Health Education.  However, I want to
personally invite you since you mentioned that you had not seen this
announcement.

Please respond regarding the Conference and Luncheon attendance to Sandy
Valli at 562-3005.

                          Yours truly,

                          *Sandra Kaplan,* M.D.
                          Sandra Kaplan, M.D.
                          Chief, Department of Child and
                          Adolescent Psychiatry
                          North Shore University Hospital
                          Associate Professor of Clinical
                          Psychiatry
                          Cornell University Medical College

SK:sv
Encl.

**A-1565**

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1560 of 1566



The Raphell Sims Lakowitz Memorial Conference

# "EXTRAFAMILIAL CHILD SEXUAL ABUSE AND PORNOGRAPHY, A COMMUNITY DISASTER"

### Friday, March 30, 1990

**Objectives:** To educate the professional community and provide training for the recognition, diagnosis, treatment and prevention of extrafamilial sexual abuse and pornography of children and adolescents. Information will be provided on mental health and legal issues associated with extrafamilial child sexual abuse and pornography.

**Audience:** The conference is designed to meet the needs of all providers of professional services to children, such as psychiatrists, pediatricians, psychologists, attorneys, law enforcement and criminal justice professionals, social workers, educators, health professionals and community agency staff.

**Accreditation:** Cornell University Medical College designates this continuing medical education activity for credit in Category I of the Physician's Recognition Award of the American Medical Association. This program has been reviewed and is acceptable for 5½ prescribed hours by the American Academy of Family Physicians. Certificates of Attendance for professionals will be awarded.

**Where:** The symposium will be held in the Rust Auditorium of North Shore University Hospital-Cornell University Medical College, Manhasset, NY. The hospital is located on Community Drive, easily accessible from the Long Island Expressway (Exit 33) or Northern Boulevard (Route 25A). Train information: Long Island Railroad from Penn Station to Manhasset. **Parking:** Parking is available for symposium participants. Use hospital entrance #3 and follow the signs for "Seminar Parking".

**Fee:** Includes registration, refreshments, lunch and parking.

| | | |
|---|---|---|
| General | $45.00 | |
| Physican/CME | $50.00 | |

**Please make checks payable to:**
N.S.U.H. #10853
Pre-registration required
For information, call (516) 562-3045.

## Program

| | | | | |
|---|---|---|---|---|
| 8:30 A.M. | Registration and Coffee | | 12:15 P.M. | Lunch |
| 9:00 A.M. | **Welcome** | | 1:00 P.M. | **"Legal Issues for Children, Clinicians and Educators: Resolving Conflict Between Prosecution vs. Treatment Needs"** |

**9:00 A.M. Welcome**
Isidore Shapiro, A.C.S.W.
Commissioner
Nassau County Department of
Mental Health, Mental Retardation
and Developmental Disabilities

**Overview: "Extrafamilial Sexual Abuse and Pornography"**
Sandra Kaplan, M.D.
Chief, Division of Child and
Adolescent Psychiatry
North Shore University Hospital-
Cornell University Medical College
Associate Professor of Clincial Psychiatry
Cornell University Medical College

**10:00 A.M. "A Cycle of Abuse: from Victim to Perpertrator"**
Judith Becker, Ph.D.
Director, Sexual Behavior Clinic
New York State Psychiatric Institute
Professor of Clinical Psychology
In Psychiatry
College of Physicians and Surgeons
Columbia University

**10:45 A.M. Break**

**11:00 A.M. "The Effects of Child Sexual Abuse Rings on Children"**
Ann Burgess, R.N., D.N.Sc., F.A.A.N.
Van Amerigen Professor of Psychiatric
Mental Health Nursing
School of Nursing
University of Pennsylvania

**11:45 A.M. Panel: Questions and Answers**

**1:00 P.M. "Legal Issues for Children, Clinicians and Educators: Resolving Conflict Between Prosecution vs. Treatment Needs"**
Howard Davidson, J.D.
Director, American Bar Association
Center on Children and the Law

**1:45 P.M. Panel Presentation: "Sex Abuse Crisis: Issues in Treatment and Management A Community Response"**
Carol Samit, M.S.W.
Senior Psychiatric Social Worker
Family Crisis Center
North Shore University Hospital-
Cornell University Medical College

David Pelcovitz, Ph.D.
Chief Child Psychologist
Division of Child and
Adolescent Psychiatry
North Shore University Hospital-
Cornell University Medical College

Lawrence Gorman
Detective Sergeant
Nassau County Police Department
Sex Crimes Squad

Dr. Catherine J. Fenton
Superintendent of Schools
Hicksville Public Schools

**2:45 P.M. Panel: Questions and Answers**

**3:15 P.M. Conference Summation and Conclusion**
Sandra Kaplan, M.D.

Case 2:06-cv-00335-SD Document 1732-6 1 Filed 02/02/2023 Page 43 of 48 PageID #: 5107

# Parents Seek Therapy for Abuse Victims

**By Kathy Boccella**

While investigators prepare their case against a Great Neck teacher who was arrested last week on charges of sexually molesting four young boys, parents of the boys say they are seeking psychiatric help for their children.

According to those who work with young victims, therapy is the first step toward overcoming the immense emotional trauma of sexual abuse.

"It's probably the most devastating, all-pervasive combination of trauma outside of a Holocaust situation that a kid could go through," said David A. Ackerman, a social worker who leads a sexual abuse treatment team at West Nassau Mental Health Center. "It

affects every aspect of the person's development."

On Wednesday, Arnold Friedman, 56, a retired Bayside High School teacher, and his son, Jesse, 18, were charged with sodomizing and sexually abusing four boys who took computer lessons at Friedman's home. Arnold Friedman also faces federal charges of receiving and sending pornography in the mail. A three-year federal investigation of child pornography led to their arrest; allegations of abuse surfaced after Nassau County police began to interview students.

Both Friedmans have pleaded innocent to the state charges.

Experts say the physical damage to sexually

abused children is often minimal. It is the emotional scars that can last a lifetime.

"The recurrence of the trauma can be triggered off by almost anything: Somebody might start dating, get pregnant, contemplate marriage," said Ackerman.

Despite the agony they experience, children who are sexually abused rarely confide in their parents, experts say.

While adults may find such behavior hard to understand, psychiatrists say keeping mum is part of the dynamic of the abuse situation.

"There are several reasons why chldren do not talk about it," said Dr. Marvin L. Blumberg, a psychiatrist and chairman of the department of pediatrics at Jamaica Hospital. "One is that the youngster feels that the adult [who is abusing the child] is trusted and won't do anything wrong, especially if it's somebody he knows. If he says it's alright, it must be alright.

"Sometimes it's a question of bribery — don't tell anybody, it's our secret, it's fun. For older children, in their teens, after getting started they may feel they'll be blamed. They think, 'It's my fault and so I better keep my mouth shut.' "

Parents are generally more aware when a family member is abusing their child than an outsider, the experts say. When they do find out what has hap-

Please see THERAPY on Page 23

# DA to Seek Order for AIDS Tests

The Nassau County District Attorney's Office will ask a judge to order Arnold and Jesse Friedman to submit to AIDS tests, a spokesman said yesterday.

"We've been in touch with several parents and some have expressed concern," said the spokesman, Ed Grilli.

The parents had requested the test on Thursday, a day after Friedman, 56, a computer and music teacher, was arrested on charges that he sodomized and sexually abused four young boys in his Great Neck home. Arrested with Friedman was his son, Jesse,

18, a student at the State University at Purchase.

Arnold Friedman also faces federal charges of receiving and sending child pornography through the mail. Both Friedmans have pleaded innocent to the state charges.

Grilli said District Attorney Denis Dillon would request the court order sometime this week. He said Friedman has not indicated whether he would voluntarily submit to the test.

Mark Heller, the Friedmans' attorney, was not available for comment.

Case 2:06-cv-0013695SD Document 732-6 1 Filed 01/02/08 03 Page 44 of 48 PageID #: 5108

# Parents Seek Therapy for Abuse Victims

THERAPY from Page 6

pened, they may feel hurt that the child did not confide in them.

"They can't understand why the child was notable to come to them," Ackerman said. "They blame the kid, they blame themselves. Very often they deny what has happened.'

Ackerman said sexual abuse often leaves children with a distorted view of themselves; they may feel tainted, corrupted or unlikeable.

For boys, sexual abuse can lead to homosexuality, especially if the abuse takes place in their teen years when feelings of guilt and shame are stron-

gest. "They may feel they let it happen. That has a prolonged effect and is very often personality-destructive," Blumberg said.

Or they may turn into bullies, trying to prove their masculinity through aggressive behavior. Girls who are sexually abused may turn to prostitution, he said.

A less conspicuous side effect is the loss of the ability to trust because the abuser often is someone who was trusted and liked by both the child and the family.

Other side effects can range from the inability to sleep to bad grades to a shyness that previously did not exist.

experts say. Problems with drugs and alcohol can also develop.

While parents may be attuned to the signs of sexual abuse, it is often difficult to spot the abuser. "There is not a typical offender," Ackerman said. Pedophiles, or people who sexually desire children, come from all walks of life and span socio-economic groups, he said.

But there are some common threads that are found in the personalities of pedophiles. According to Blumberg, they are emotionally immature and weak, and are looking for love and attention. Often they feel they cannot engage in sex with adults, even if they are mar-

ried and have children. Many were themselves sexually abused as children.

As with rape, child sexual abuse cases are difficult to prosecute and traumatic for the victims. Cases often are plea-bargained because parents do not want their children reliving the experience in a courtroom, Ackerman said.

If they do go to trial, defense attorneys often suggest that the child fabricated the offense, he said.

"I would say it is very unusual that a child would make up sexual abuse," Blumberg said. "They're more likely to lie that it doesn't happen than [that] it does."

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1563 of 1566

Mr & Mrs B████████
86 ███████ Ave
Hicksville Ny 11801

North Shore University Hospital
400 Community Drive
Manhasset, NY  11030

Ms. Sandra Kaplan,

 Enclosed please find a copy of a final bill just received also please find a notice received from Susan Rothman, Nassau County D A Office.   This notice states that we receive 6 free sessions from your office.  Mrs. Rothman strongly suggested that we accept these free sessions and urged us to make an appointment, even though J█████ was already under Drs. care..

 We only came to one session  and then decided not to return and use any other free sessions.

 This matter of $300.00 unpaid is being turned over to my attorney Paul Burlant, 1565 Franklin Ave. Mineola, NY 11501 #516 742-0700.  I am also filing a compliant with   Assistant District Attorney Maureen Riordon.

 We should not be held responsible for a supposedly free visit  that we were mistakingly told   would help our criminal case.

Thank You,

A-1569

Case 2:06-cv-03683-SD Document 1732-6 1 Filed 02/02/2003 Page 46 of 48 PageID #: 5110

# LONG ISLAND

# New Arrest in Child-Sex Case

## By Bill Van Haintze and Alvin E. Bessent

A Great Neck youth was arrested yesterday and accused of participating in orgies of child sexual abuse arranged by computer teacher Arnold Friedman and his son, in which young boys were sodomized during classes in Friedman's home.

Ross Goldstein, 17, of 51 Picadilly Rd. was taken into custody at his home yesterday about one hour before he was due to graduate from an alternative high school in the North Shore community, police said. He was charged with 14 counts of first-degree sodomy, two counts of first-degree sexual abuse, and two counts of using a child in a sexual performance, police said. The abuse allegedly occurred during orgies arranged by Arnold Friedman and his son Jesse between March 1, 1986, and June 30, 1986, and between Dec. 9, 1986 and March 10, 1987.

Goldstein's attorney could not be reached for comment.

Goldstein's was the first of a number of additional arrests expected soon in connection with the abuse, which involved at least five victims previously unknown. Arnold Friedman had admitted abusing 13 young boys when he pleaded guilty in March to 42 counts of various forms of sexual abuse.

"There will be other arrests, possibly four others," said Det. Sgt. Fran Galasso, head of the Nassau police sex crimes unit. "These were additional friends of Jesse who were invited to the Friedman home to participate in these sexual performances," Galasso said.

Jesse Friedman — previously charged with 54 counts of sodomy, sexual abuse and endangering the welfare of a child — will be rearrested and hit with additional, similar charges, Galasso said. The earlier charges are still pending in Nassau County Court.

The newly cited victims, all boys aged 7 to 11, were sodomized and forced to perform oral sex in full view of other computer students, police said. Additional details of the abuse were revealed by previously identified victims during sessions with their therapists,

## Child-Sex Arrest

SODOMY from Page 21

about two years, police said. The two had been classmates at The Village School in Great Neck, an alternative school for students with emotional or learning disabilities, police said.

Goldstein, who was apprehended at 2:55 p.m., was scheduled to participate in graduation ceremonies at the school at 4:30 p.m., police said. Charles Piemonte, who identified himself as the head of the school, said he was aware that police had arrested the boy. He said the boy had "learning problems," but declined to comment further.

Jesse Friedman, 18, who was a student at the State University at Purchase when charged in November, is currently free on $250,000 bail.

Arnold Friedman, 56, was an award-winning teacher who taught for 20 years at Bayside High School in Queens. He is serving a 10- to 30-year prison sentence. He pleaded guilty in March to sodomizing and otherwise sexually abusing 13 young boys, all of whom were students in computer classes conducted in his home. Arnold Friedman also pleaded guilty in U.S. District Court in Brooklyn to sending ch... through the mail

Galasso said.

"We suspected initially that something more was involved, that there was information the children were reluctant to release. We know from experience that, normally, pedophiles like to share their interest with other pedophiles," Galasso said.

Goldstein and Jesse Friedman had been friends for

Please see SODOMY on Page 24



9080   APP.

A-1570

Case 20-3795, Document 37-2, 11/30/2020, 2983378, Page1565 of 1566

## Opinion:

# We Are Not Facing A Serious Water Shortage

*Ed. Note: The following opinion piece is in response to a top-ed article by Sonia Sable, a Great Neck resident. In her article, Ms. Sable questioned the policy and timing of imposing water restrictions on residents while granting water permits to commercial developers. In their response, the Water Commissioners of the Manhasset/Lakeville Water District — Brian Jennings, James Sharkey, and Francis Gould — make clear that the water restrictions were too granted while a mo...orium was in effect.*

The Manhasset Lakeville Water District, contrary to what was written in a recent opinion piece, is not facing a "serious water shortage." We are, however, faced with state-mandated water pumpage caps at a time when difficult zoning and land-management decisions are being made by the nine incorporated villages and parts of North Hempstead that we serve.

Manhasset-Lakeville, unlike most of the districts served by Nassau County's 41 public and private water suppliers, remains comparatively undeveloped. The 400-acre Whitney estate in Manhasset is the largest undeveloped tract in Nassau. The village of North Hills home to only hundreds a decade ago, today has a population of more than 5,000. Some our largest customers - businesses and industrial parks - have increased their water consumption commensurate with their expansion in recent years. The Northern Boulevard business district has boomed and developers have sought, and continue to seek, permission to develop tracts that lay empty or underutilized.

Long Island gets all of its water from underground sources. New York State's Department of Environmental Conservation (DEC) determined in the fall of 1986 that the withdrawal of water from Nassau County's underground aquifers now equals or exceeds the amount of water being charged. There are hydrology experts who disagree with the DEC's position and maintain that the rate of recharge remains higher than the discharge rate.

On ... strict was mandated by the DEC that it c ... ot pump more than 2.6 billion gall. ...s average, in any one year, over the next five years. The state's cap quantity was based on our actual pumpage between 1980 and 1984. Considerable development (with attendant water demand) occurred in the interim. Dozens of residential and commercial projects had already been granted building permits or site-plan approvals by a zoning entity along with a letter of water availability granted by the district. The letter entitles a property owner access to water. To compound the issue, we had pumped 2.8 billion gallons of water to our customers in 1986, not knowing that the DEC was about to announce its pumpage caps.

The district imposed a moratorium on the issuance of all new letters of water availability and reviewed applications that were still pending. That moratorium was imposed by us in November, 1986 and was suspended in April of this year. Effective October 4, we reinstated that moratorium based upon adverse pumpage trends which occurred during a dry summer. We have requested a meeting with the DEC to discuss the unique problems that confront the Manhasset-Lakeville Water District and are continuing to review the effectiveness of the existing water conservation programs. We are also considering additional conservation measures.

We have implemented some of the strictest water conservation programs in Nassau County to help the district comply with the DEC's water pumpage limits. And we've found that the overwhelming majority of our customers are complying with our policies regarding lawn sprinkling (which is limited to odd and even numbered days, dep ... on your house number) and the fillin ... ols (those with a capacity of more than 200 gallons must obtain water from outside the district.) Large scale water users, like car washes and restaurants, have voluntarily agreed to cut down on their water usage. We are considering a policy whereby the heaviest water users would have to pay a surcharge on the number of gallons consumed beyond a certain point. There are some conservation measures that are out of our jurisdiction. Some letters of water availability that were granted in the pre-cap days of the early 1980's are not being acted upon until the late 1980's. We cannot, in the name of water conservation, rescind these letters without facing a lawsuit that we would surely lose.

Elected officials in Nassau County, such as ourselves, know that preserving our quality of life is of the utmost importance to the people we serve. The answer to the quandry that we are facing lies in responsible zoning decisions, the public acquisition of environmentally sensitive property, when possible; and wise use of our precious water supply. Water is something so many of us take for granted. Our most valued resource is cheap and sufficient for our present needs and those in the forseeable future. We're working hard to keep it that way and, with your help, we will.

Brian R. Jennings
James E. Sharkey
Francis E. Gould
Manhasset-Lakeville Water District
Board of Commissioners

## Jennings to Run Again For Water District

Brian Jennings, a commissioner of the Manhasset-Lakeville Fire-Water District, is running unopposed for another three-year term in his present post. The longtime Manhasset resident has served as a commissioner since November, 1986. Voting will take place on Tuesday, Dec. 21 between 3:00 p.m. and 10:00 p.m. at Manhasset-Lakeville Firehouses Number 1 (on Bayview Avenue in Manhasset), Number 4 (on Northern Boulevard in Great Neck) and Number 5 (on 38th Avenue in New Hyde Park).

"The job has changed significantly over the years," Mr. Jennings said, in a recent interview. "When I first started, we mostly dealt with installing new mains and equipment." Now, he continued, the board is faced with state-mandated water pumpage caps, the need to develop effective conservation programs, and adhere to stricter water quality standards.

**District Cover Fire and Water**

Manhasset-Lakeville's district is one of three in Nassau County whose commissioners oversee both a Fire and Water District. In recent years, the board has upgraded its computer systems, which has made billing customers more efficient. The computer upgrade has also enabled firedispatchers not only to relay information to the district's volunteer firefighters regarding the site of a fire, but also where the nearest hydrant is located, and if any hazardous material is stored on the property. Mr. Jennings, an active member of Firehouse Number Two for more than 15 years, now serves as an auxiliary member. He's hoping that many will respond to the Fire Department's call for additional volunteers. All those that are over the age of 18, and interested in joining the fire department, should contact the firehouse nearest them.

**New Wells Ready to Go**

"We've also negotiated with the owners of large, open spaces and successfully put dosal well-sites at extremely low cost," Commissioner Jennings stated. New wells are almost ready to go on-line along Shelter Rock Road, near the Shelter Rock school, and at the Spruce Pond development in North Hills. Plans are underway for well-construction at the Gracefield and Stone Hill (the former Faley estate) properties. Nine incorporated villages in Manhasset and Great Neck fall within the district's jurisdiction. Unincorporated portions of Manhasset, North New Hyde Park, and Great Neck are also served by Manhasset-Lakeville's 14 wells and five firehouses.

**Conservation Still Necessary**

Commissioner Jennings foresees the need to further water conservation over the next three years at Manhasset-Lakeville, like Nassau County's 41 other public and private water suppliers, works to keep its annual water pumpage within the cap levels set by the state's Department of Environmental Conservation (DEC).

"We recently reinstituted a moratorium that will extend for another 12 to 24 months."

Mr. Jennings said, referring to the moratorium now in place on the issuance of new letters of water availability. "This will give us a chance to assess past conservation measures and examine additional options." The Board of Commissioners have had a moratorium in place for all but six months over the past two years. Commissioner Jennings serves out the board along with James Sharkey and Francis Gould.

Mr. Jennings, his wife, Ann, and their eight children have lived in Manhasset since 1962. The Notre Dame and New York University alumnus is director of New York Telephone's Community Relations Department for Long Island.

## Help For Victims Of Sex Abuse Stressed In Temple Program

**By Paul Lipkowitz**

Every speaker at Temple Beth El's program on "Sexual Abuse of Children" on Nov. 16 stressed the need for help for victims of child sexual abuse. In no uncertain terms, all underscored one point: young victims of sexual abuse could be victims for life, if no support is given.

Referring to the Friedman case in Great Neck, Detective Sgt. Frances Galasso of the Nassau County Sex Crimes Squad warned all parents of victims. "Every child that we lost through that door was a victim in one way or another," she said, and it's vitally important that every parent who hasn't does get their child help.

**Accommodation Syndrome**

How such abuse could have gone on, how it might effect children, and what parents can do now, were some of the questions the speakers tried to answer at the program.

The "Child Sexual Abuse Accommodation Syndrome," identified by Roland Summit at U.C.L.A., illustrates the problems children face in disclosing their sexual abuse. "The syndrome is based on the fact that there is tremendous fear and rejection of those issues in the society at large," said Dr. Victor Fornari, physician in charge of Pediatric Consultation at Cornell University Medical College.

He continued: "Every child faces a secondary trauma in revealing their sexual abuse to the adult world where they are often met with blame, disbelief, and rejection."

These children are abandoned by the very people they need to support them.

"This reinforces their initial feeling of helplessness before the abuse. In the end, these children are made to feel continually helpless," said Dr. Fornari.

**Short and Long-Term Effects**

"The majority of sexual abuse cases do not leave physical signs," said Dr. Sandra Kaplan, Chief of Child and Adolescent Psychiatry at Cornell University Medical College. Short-term effects that were diminished self-esteem, a sense of helplessness, aches and pains which are often associated with anxiety in children, overly compliant behavior, delinquent behavior, and an extraordinary fear of males. Most perpetrators of sex crimes are men, Dr. Kaplan noted.

Every speaker warned that if no intervention on behalf of the child is made, the long-term effects of child sexual abuse can be severe.

Dr. Kaplan said problems that could follow the abused child into adulthood are: feelings of isolation and problems with intimacy, feelings of being branded or stigmatized like "damaged goods," a fear of repeated victimization in rape, and a risk that suicide. Large numbers of suicides, Dr. Kaplan added, were sexually abused as children.

**Advice to Parents**

"It's important for parents to get control of their feelings and try to calm the child," said Carol Sarnit, Assistant Coordinator of the Family Crisis Program at North Shore.

"Try not to show anger or pain. It will not help the child to confide," she added. "And above all, be careful not to give the impression, even the underlying impression, of blaming the child."

According to studies, Dr. Kaplan added, the children who recover most fully from sex abuse are the children who have had the support of a non-offending adult.

Thomas Feriger, Ph.D., Director of Pupil Personnel Services in the Great Neck Public Schools, explained the school's approach. "Our ... tudent ... el," he said. "We try to

Mr. Jennings said, referring to the moratorium now in place on the issuance of new letters of water availability.

serve both as educators and as conduits—we have tried to get children and parents who need help to the experts who can help.

"We are not a treatment agency," he continued. "We would do a disservice to dabble."

**Warning to Parents**

Det. Sgt. Galasso compared her experiences covering Great Neck's sex-abuse with a similar case in Freeport. "There parents put their own feelings of guilt, shame, and embarrassment behind them," she said, "and let us help."

Twenty five percent of girls and nine percent of boys have been sexually abused before they reach the age of 18 according to Dr. Kaplan. Experts maintain, however, that these figures underestimate the problem because most children do not report sex crimes.

## Cost of Catastrophic Coverage Explained At Senior Center Meeting

**By Harry Schatz**

Surprise, anger and concern were expressed by participants who attended a meeting held at the Great Neck Senior Citizen Center, on Nov. 16 on the provisions and costs of the Medicare Catastrophic Coverage Act of 1988. The speakers representing the Grey Panthers, were Alice Martin and Ruth Berlind.

Many in the audience were shocked to learn the method of financing via the costly and controversial supplemental premium or surtax on their Federal Income Tax. Despite the media publicity, a large segment of the audience was unaware of how the benefits were to be paid for what it would cost them. As the supplemental premium was explained by Mrs. Martin with it's 15 percent surtax or $22.50 on every $250 of Federal Income taxes with a maximum of $800 a person or $1600 per couple for 1989 and increase each year up to $900 and $1400 by 1993; many people said that it was unfair and a serious financial burden, Mrs. Martin pointed out that this was in addition to the $4 a month catastrophic increase to the existing Part B monthly premium scheduled at $27.90 (or January 1, 1989 for a total of $31.90. With the rates scheduled to rise to $37.50 for each $150 of taxes owed in 1990 to $39.90 in 1992 and to $42.50 in 1993, there was general agreement that the costs were inordinately excessive.

Dissatisfaction was also expressed with many of the provisions of the law which were felt to be inadequate for the needs of Medicare beneficiaries. Review some of the provisions, Mrs. Berlind said, "When the bill was being discussed in Congress, it sounded like a good idea with the government really concerned to find an answer to the medical problems of the aged. In it's final form, it did not deliver what was promised."

Mrs. Berlind reviewed hospital stays, skilled nursing facility care, prescription drugs, home health care, hospice and respite care and the basic catastrophic change that puts a cap of $1370 in annual out-of-pocket expenses of Medicare-allowed doctor bills. Commenting on the adequacy or insufficiency of each provision, Mrs. Berlind found drawbacks in many of the changes in the law which she felt simply failed to provide the necessary resolution to the problems. She reminded the audience that everything she discussed was explained in the brochure entitled, *Medicare Has Improved*, sent to every Medicare beneficiary. "This pamphlet must be read carefully," she said. "For every beneficiary, so that they understand each provision in the law."

Although Medicare benefits have been enhanced, a warning was issued by Mrs. Martin for beneficiaries not to cancel their Medicare, or other policies that supplemented Medicare, at this time. The law prevents duplication of Medicare benefits by private concerns who are required during the month of January to send a letter to their policy holders explaining what they are offering. It appears that in most cases a supplemental policy would be helpful, but no decision should be made at the present time.

*Ed Note: A comprehensive review of the entire catastrophic law is forthcoming very soon.*

## CERTIFICATE OF SERVICE

I, Rhidaya S. Trivedi, being duly sworn, hereby certify under penalty of perjury that I am an associate at the law firm of the Law Office of Ronald L. Kuby, counsel for Petitioner-Movant Jesse Friedman; I am over 18 years of age; and on November 6, 2020, I caused true and correct copies of Mr. Friedman's motion for authorization to file a second petition for writ of habeas corpus, together with all supporting papers, to be served on counsel for Respondent, by electronic mail, at the following address:

Tammy Smiley
Nassau County District Attorney's Office
E-mail: Tammy.Smiley@nassauda.org

Dated:    New York, NY
          November 6, 2020

RHIDAYA TRIVEDI