# EXHIBIT 1

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

-against-

JESSE FRIEDMAN,

                                    Defendant.

AFFIRMATION IN OPPOSITION
TO DEFENDANT'S MOTION TO
VACATE HIS JUDGMENT OF
CONVICTION

Ind. Nos. 67104, 67430, and 69783
Motion No. C-004
Hon. Teresa K. Corrigan

-----------------------------------------------------------------x

AMES C. GRAWERT, an attorney admitted to practice in the State of New York, and an

Assistant District Attorney of counsel to the Honorable Kathleen M. Rice, District Attorney of

Nassau County, affirms under penalty of perjury the factual allegations set forth below:

1.      The following is based upon information and belief, the source of said

information and the basis for said belief being defendant's motion papers, and the records of the

Office of the District Attorney, including the conviction integrity report concerning defendant

released by the District Attorney on June 24, 2013.

2.      This affirmation is submitted in opposition to defendant's motion to vacate his

judgment of conviction. The motion is returnable on September 8, 2014.

3.      Defendant's motion arises out of his conviction, on his plea of guilty, of

seventeen counts of first-degree sodomy (Penal Law § 130.50),[1] four counts of first-degree

sexual abuse (Penal Law § 130.65), one count of attempted first-degree sexual abuse (Penal Law

§§ 110.00/130.65), two counts of endangering the welfare of a child (Penal Law § 260.10), and

---

[1]      The crime of sodomy has since been renamed criminal sexual act. See L. 2003, Ch. 264,
§§ 18-20.

one count of the use of a child in a sexual performance (Penal Law § 263.05). Following his conviction, defendant was sentenced, on January 24, 1989, to an aggregate, indeterminate term of six to eighteen years' imprisonment (Boklan, J., at plea and sentence).

4.    Defendant now claims that his conviction should be vacated for three distinct reasons: (1) he is actually innocent of the crimes with which he was charged (see People v. Hamilton, 115 A.D.3d 12 [2d Dept. 2014]); (2) the prosecutor knowingly presented false testimony in the grand jury (see People v. Pelchat, 62 N.Y.2d 97 [1984]); and (3) the judge presiding over his case was biased against him, and coerced his guilty plea.

5.    For the reasons set forth in this affirmation and the accompanying memorandum of law, the People consent to a hearing on defendant's actual innocence claim. Defendant's other claims, however, should be denied summarily. The facts underlying his claim of judicial coercion were fully known to him when he filed a previous motion to vacate judgment in 2004, and he unjustifiably failed to raise that claim then. This alone is a basis for denying his claim. See C.P.L. § 440.10(3)(c). In any event, defendant has utterly failed to substantiate his claims of judicial coercion, and his separate contention that the prosecutor knowingly presented false testimony to the grand jury.

6.    As discussed in paragraphs 57-60, infra, in 2013, the District Attorney's office released a conviction integrity report ("report" or "Rice Report"), which was the culmination of a three-year re-investigation into defendant's arrest and conviction. A redacted copy of the report is annexed to defendant's motion as Exhibit B. Released with the report was a 900-page appendix. Both the report and the appendix can be accessed online at http://goo.gl/IBbmjb.[2]

---

[2]    The index to the appendix can be found at the end of the report. An unredacted copy of the report and appendix will be provided to the Court upon request.

Rather than repeat what is already contained in the report, the People will cite to and incorporate by reference relevant sections, and restate and summarize some facts as necessary.

I.   The 1987-88 Investigation

    A.   Defendant And His Father Teach Computer Lessons To Neighborhood Children.

7.   Defendant's father, Arnold Friedman, was a pedophile.  It is likely that defendant knew or at least suspected this about his father (see Rice Report at 4-5).

8.   In 1982, Arnold began to teach piano and computer classes to neighborhood children out of his home.

9.   Arnold's computer classes met in a room on the ground floor of his home.  The classroom adjoined a bathroom, defendant's bedroom, and was on the same level as Arnold's office.  Though some parents report that they were able to visit the class (see Def. Mem. at 38), others were not welcome to do so, or even to enter the Friedman home when picking up their children (see Rice Report at 3-4 & nn.15-17).  According to one parent, though she "want[ed] to go in" to the home when picking up her child, "they didn't give [her] a chance to do that.  They kind of blocked the door" (Def. Ex. CCC [Lushe interview] at 4).

10.   The computer classes coincided with the school year, running in "fall," "winter," and "spring" sessions of ten classes each.  Classes met once per week on their assigned day and usually included eight or nine individual students.  In some years, smaller summer sessions were offered.  Arnold often taught multiple classes per season, distinguished by the day of the week on which they met (e.g., the "Tuesday" or "Friday" spring class).

11.   Neither Arnold nor defendant kept records of which students were enrolled in which class sessions.  When police later attempted to recreate this information through interviews, they met with mixed success, and were hampered by the incomplete or contradictory

accounts provided by complainants and parents.  Consequently, no reliable set of class rosters was ever found or created.  Though defendant appears to believe one existed at some point (see Def. Mem. at 16), no complete and reliable list was found during the review process.  Therefore, any attempt to recreate rosters or lists of each session necessarily depends upon imperfect information and cold memory (see Rice Report at 4, 62, 123-25 [acknowledging the problems posed by the absence of this critical information]).  Defendant appears to acknowledge this fact, noting in his motion, albeit inconsistently, that his own discussions of class membership are based upon the "best information available" (see, e.g., Def. Mem. at 109-10).  However, defendant fails to recognize that as a result, his attempt to analyze and contrast witness accounts based on which class they attended amounts to little more than informed guesswork.

12.     Between 1984 and 1987, defendant assisted his father in teaching the classes.  In late 1987, a local high school student took over the assistant role (Rice Report at 2).

B.     Classes End After Investigators Search Arnold Friedman's House.

13.     In July 1984, federal officials seized a magazine entitled "Boy Love" as it passed through customs in transit to the Friedman home.[3]  As a result of this discovery, authorities commenced an investigation into Arnold's involvement with child pornography.

14.     That investigation concluded on November 3, 1987, when Arnold accepted the delivery of another child pornography magazine from an undercover federal postal investigator.  Federal agents then executed a search warrant on Arnold's home, leading to the recovery of the magazine, along with at least thirty other articles of child pornography.  Many of these items

---

[3]     Defendant's characterization of the magazine as one "depicting underage teenagers" (Def. Mem. at 2) is just one of his many attempts to distort basic facts.  The magazine, as its title suggests, contained child pornography.

4

were found in Arnold's office, stacked behind a piano. The Nassau County Police Department ("NCPD") also participated in this search (id. at 6-7).

15.     During the search, investigators also found a list of the students enrolled in Arnold's computer classes. In response, the NCPD set out to determine whether Arnold had abused any of his students, or otherwise subjected them to his interest in child pornography.

16.     On November 20, 1987, only two people appeared for Arnold's scheduled Friday computer class, one of whom was Arnold's assistant. Arnold instructed both to go home. The next day, Arnold told his assistant that he was discontinuing the Friday classes, but expected to continue with his other class sessions (id. at 14, 125). The classes never met again.

C.     Police Discover Defendant's Involvement While Investigating His Father.

17.     On November 12, 1987, NCPD detectives began interviewing former students of Arnold's computer classes. The very first child interviewed disclosed incriminating conduct, reporting that Arnold had fondled him, and taken him to another room to show him pornographic computer programs. On the basis of this information, police continued investigating (id. at 12).

18.     The first news report on the investigation appeared the next day, on November 13, 1987, and described Arnold as its exclusive target (id. at 11 & n.45). For his part, defendant was far from police scrutiny, as he had just begun college and was not living continuously at home.[4] Nevertheless, on November 23, 1987, during his first interview with the police, a computer student reported that he had been abused by both Arnold and defendant (id. at 13).

---

[4]     Defendant may not even have known of the investigation at this point, though his accounts on the matter differ (compare Rice Report at 144-45 & n.524 [noting two distinct accounts of how he learned of the search] with Def. Mem. at 69-70 [describing still a third]).

5

19.     Following other reports, one of which also implicated defendant, defendant and Arnold were both arrested on November 25, 1987, on charges involving child sexual abuse. Simultaneously, NCPD investigators executed their own search warrant on the Friedman home. In the process, they discovered sexual aids, sexual videos, cameras, two color photos of a nude boy and girl, and disks containing pornographic video games (id. at 14-15).

20.     Over the next three weeks, police continued to interview prospective witnesses. Of the children interviewed, some had not attended the computer classes at all; others had but witnessed nothing out of the ordinary; and still others described being subjected to behavior that for whatever reason did not rise to the level of criminality, but left them uncomfortable, indicated some irregularity,[5] or was consistent with "grooming" (see, e.g., id. at 10).

21.     By December 17, 1987, thirteen children had told police that defendant had engaged in criminal activity in the computer classes (id. at 22). Between November 1987 and January 1988, nine of these thirteen testified against defendant before Nassau County grand juries. Prior to presenting the witnesses, the lead prosecutor, A.D.A. Joseph Onorato, personally interviewed each of the children, to assess their credibility to his own satisfaction (id. at 9).

22.     On the basis of this testimony, the grand juries returned two indictments against defendant: Indictment No. 67104 in December 1987, and Indictment No. 67430 in February 1988. Together, the two indictments charged defendant with six counts of first-degree sodomy (Penal Law § 130.50), thirteen counts of first-degree sexual abuse (Penal Law § 130.65), one count of attempted first-degree sexual abuse (Penal Law §§ 110.00/130.65), twenty-four counts

---

[5]     Defendant's exhibits contain a recent example of one such account. Non-complainant Rafe Leiber, in an interview with a Capturing the Friedmans producer, told his interviewer that he recalled that some children in his class were separated from the class and brought to a "private room." He did not recall why (see Def. Ex. BBB at 3).

6

of endangering the welfare of a child (Penal Law § 260.10), and two counts of use of a child in a sexual performance (Penal Law § 263.05) (see Rice Report at 20-21).

23.    As defendant's own evidence demonstrates, the testimony underlying these indictments, as well as the "third" indictment that would follow in November 1988, was legally sufficient (see Def. Ex. A [N. Scott Banks letter] at 1), except as to twenty-three counts Judge Boklan dismissed after reviewing the evidence (see Rice Report at 22 [noting such dismissals]).

24.    Additionally, though defendant would have the Court believe otherwise (see Def. Mem. at 3, 5, 24, 71, 74, 95), the witnesses' allegations were not bolts from a blue sky. Nor were they bare allegations bereft of context. Instead, police interviews provided important, corroborating background information. One complainant, for example, shared with police an electronic diary he had kept of "bad days" in the Friedman class (Rice Report at 62, 97). Another complainant—in his first statement, early in the investigation—vividly described being sodomized by Arnold, and told police both how he struggled to avoid "bad touches" from Arnold and defendant, and how he had confided this in his dog, but not in his parents (see Def. Ex. U [statement of Fred Doe] at 5). Some complainants' parents recalled that their children began exhibiting disturbing behavior, or physical symptoms of severe stress, during and after enrolling in the computer classes (see Rice Report at 120-21). Other parents reported that their children had in fact asked to be removed from the classes (id. at 121). Investigators did not uncover mere allegations; they uncovered detailed accounts of abuse that were, at this early phase, worthy of belief (see id. at 2-20 [summarizing witness statements in this period]; see also Def. Ex. U).

25.    On March 15, 1988, the lead prosecutor asked police to prepare the cases for trial by seeking out new witnesses, and re-interviewing prior witnesses (Rice Report at 24 & n.93).

26.     On March 25, 1988, defendant's father Arnold pleaded guilty to forty-two of the more than one-hundred counts leveled against him, in full satisfaction of the state indictments. Days later, he pleaded guilty in federal court to child pornography charges. After his state court guilty plea, on his attorney's advice and in his presence, Arnold gave a "close-out" statement to police, in which he admitted abusing some students, but denied abusing many others, in exchange for immunity from future prosecution (see id. at 23-24).[6]

D.     Additional Witness Interviews Lead To Additional Charges.

27.     In June of 1988, several students told police that they had also been abused by another individual, eventually identified as Ross Goldstein, a friend of defendant.[7]

28.     Goldstein was arrested, and eventually agreed to cooperate with police. Towards that end he sat for four sworn interviews with police. His attorney was present for each. During these interviews, Goldstein was asked to testify truthfully concerning his knowledge of and involvement with defendant. In exchange for his truthful responses, and his cooperation during the remainder of the case, Goldstein was told that prosecutors would recommend a favorable plea-bargain including youthful offender treatment.

---

[6]     Defendant's assertion that this interview was a precondition of Arnold's guilty plea (see Def. Mem. at 72-73) is unsupported.

[7]     Though defendant now concedes that Goldstein was his "friend" (Def. Mem. at 77), for years defendant instead claimed that he barely knew Goldstein (see Rice Report at 145), an assertion that puzzled even Goldstein himself (see id. at 136-37). Some witnesses also indicated that others, in addition to Goldstein, had been present for and participated in sexual abuse in the computer classes. But no reliable identification was ever made of these individuals, and prosecutors declined to pursue charges (id. at 28-30).

8

29.    In response, Goldstein discussed in detail how and why he came to be involved with defendant, and with defendant's actions.  Though speaking with clarity on these and other subjects, Goldstein could not, at times, remember other details (id. at 31-32).

30.    On November 7, 1988, a Nassau County grand jury returned Indictment No. 69783: the "third" indictment as to defendant, but the first and only to name co-defendant Goldstein.  By this instrument, defendant was charged with more than one hundred counts of sodomy, and more than fifty counts of endangering the welfare of a child.  The sodomy charges in the indictment were based on approximately seventy-seven distinct acts (id. at 132) occurring over several class sessions between March 1986 (see, e.g., Def. Ex. S [Indictment Nos. 67104, 67430, 69783]; Ind. No. 69783 at Count 49) and July 1987 (see, e.g., id. at Count 180).

31.    Though Goldstein's testimony served to corroborate some counts, no corroboration was legally required, and no counts of this indictment were sustained by his testimony alone (see Rice Report at 33).

E.    Defendant Voluntarily Pleads Guilty.

32.    In June 1988, months before the third indictment was handed down, defendant hired attorney Peter Panaro to represent him.

33.    Panaro sought out expert witnesses, but none could help provide a defense for defendant.  He also received a list matching the complainant aliases used in the indictments— e.g., "Edward Doe"—with their true names.

34.    Panaro attempted to find former students who would testify in support of defendant at trial.  Very few former students offered to do so.  Though Panaro later claimed that his efforts to find supportive non-complainants were stymied by the prosecution (see Def. Ex. LL [Panaro Aff.] ¶ 15), that is simply not the case (see Rice Report at 87-90).

35.     One former student, Gary Meyers, a non-complainant, did offer to testify on defendant's behalf.  Through speaking with his family, Panaro learned that Meyers's mother had surreptitiously recorded her son's interview with police investigators.  No one besides Panaro and Meyers are known to have seen the resulting videotape (id. at 72-73), and the "transcript" of that tape, upon which defendant relies (see Def. Ex. DDD), is nothing more than a typed version of Panaro's handwritten notes from his first and only viewing of the tape.  The transcript contains no mention whatsoever of defendant, either by police or by Meyers himself (Rice Report at 72-73).  Regardless, in an affirmation Panaro signed for defendant's 2004 motion to vacate judgment (discussed at paragraphs 48-51, infra), he claims he took news of this discovery, and his concerns about inappropriate and aggressive interviewing techniques, directly to the prosecution, and demanded disclosure of any similar revelations about the nature of police questioning (Def. Ex. LL ¶ 18).  But the only other party to this conversation, A.D.A. Joseph Onorato, insisted in his own affirmation that it never happened (see Affirmation of Joseph R. Onorato [annexed hereto as Exhibit 1] ¶¶ 5-6 ["Peter Panaro never suggested to me that police officers were using inappropriate interviewing techniques"]).  Nor, Onorato states, was he ever aware of "any specific treatment or therapy (including hypnosis and visualization) used by any doctor in the treatment of any complainant" (id. at ¶ 7).[8]

36.     Ultimately, in approximately November 1988, Panaro advised defendant to plead guilty.  Defendant, too, wrote to his father that he was considering a guilty plea, as conviction on even a few minor charges would (in his words) "add up too quickly" (Rice Report at 41).

37.     On December 18, 1988, defendant took the extraordinary step of sitting for a tape recorded interview with Panaro.  In that interview, defendant and Panaro discussed the full extent

---

[8]     This affirmation was first annexed to the People's response to defendant's 2004 motion.

of their pre-trial preparations to date. Panaro described in great detail how he had attempted to retain psychiatrists who would support defendant, sought the advice of expert lawyers, and also confirmed to defendant that he would try the case for no additional fee. A transcript of this interview was included in the appendix to the Rice Report, and is attached hereto as Exhibit 2.

38. Panaro also carefully explained to defendant what sentence he might face if convicted at trial. Specifically, Panaro reminded defendant that Judge Abbey Boklan, the judge assigned to the case, had said that if defendant was found guilty, "she would consider" sentencing him to "some consecutive time." But Panaro clarified that "the most time [defendant] could be incarcerated for" was forty years (Ex. 2 at 18-19). Defendant's claim that he feared a sentence of "three hundred years" (Def. Mem. at 74) is dramatic but untrue.

39. Nor is it true, as defendant frequently contends, that Judge Boklan pre-judged defendant's guilt or threatened him with consecutive sentences if he did not plead guilty. As discussed at length in the Rice Report, at pages 82-86, Judge Boklan advised defendant of the maximum possible sentences he could face if convicted after trial. She never indicated that she would impose consecutive sentences, or how many she might impose. Panaro's recorded statement with defendant bears that out. Defendant's very first exhibit in support of his motion—a letter from N. Scott Banks, Judge Boklan's former law secretary—further contradicts his claim: "Judge Boklan presided over the matter fairly," he writes (Def. Ex. A).

40. Lastly, Panaro told defendant that at trial he would face testimony by the complainants, and by Ross Goldstein. In response, defendant confirmed that it was his desire to plead guilty, and that he wished to do so because he was, in fact, guilty (Ex. 2 at 25-26, 30; see also Rice Report at 41-42).

41.     Two days later, on December 20, 1988, defendant pleaded guilty before Judge Boklan in Nassau County Court.  Judge Boklan's law secretary, N. Scott Banks, would later express his confidence that nothing about the plea bargain offended his sense of fairness (Ex. A at 1; see also Rice Report at 86).[9]

42.     Afterwards, defendant visited his father, then serving his federal sentence at a correctional facility in Wisconsin, and asked him to share the location of any exploitative pictures or videos he still possessed of his former computer students.  Arnold was unwilling or unable to do so.  Defendant also participated in mandatory counseling, where he acknowledged his guilt to his psychiatrist, and explained that he had been victimized by his father (see Rice Report at 43).

43.     On January 24, 1989, defendant was sentenced to an aggregate, indeterminate term of six to eighteen years' imprisonment.  Defendant would later describe the sentencing proceeding—during which he cried, blamed his father, and expressed contrition for his failure to break the cycle of abuse—as "exhilarating," saying that his "dream of being a star, of having huge numbers of people listen and think about" his words, had "come true" (id. at 44).

44.     Just after sentencing, defendant filmed an interview with Geraldo Rivera to be broadcast on the national television program, The Geraldo Rivera Show.  A transcript of the interview is annexed as Exhibit 3.  In the course of that interview, which aired the next month, defendant again tearfully confessed his guilt.  Defendant has attempted many times since to square this appearance with his current protestations of innocence.  He has claimed that his lawyer told him to do the interview (but a statement in defendant's own handwriting proves

---

[9]     Because defendant did not pursue a direct appeal from his conviction, the minutes of his guilty plea were never transcribed, and the court reporter's stenographic notes of the plea are no longer available.  Friedman v. Rehal, 618 F.3d 142, 150 n.2 (2d Cir. 2010).

otherwise); that he was misled about the subject of the interview (but the same statement, again, suggests otherwise); that he was hoping to curry sympathy with state corrections officers, and with his future fellow inmates; and lastly, that he did it for the sake of fame. Whatever the reason, it is clear that defendant took this step of his own volition (Rice Report at 44-47).

45.     While incarcerated, defendant never appealed from his conviction, nor did he file a post-conviction motion. After again embracing his guilt and entering a sex offender counseling program, defendant was released from prison on December 7, 2001. On January 7, 2002, defendant was adjudicated a Level III sex offender, "on the consent of the parties."

## II.     Subsequent Procedural History

### A.     Defendant Seeks Post-Conviction Relief.

46.     Shortly before defendant's release from custody, filmmakers Andrew Jarecki and Marc Smerling became aware of defendant's case, and began to produce a film based on the prosecution of defendant and his father. Towards that end, the filmmakers interviewed some of the key players from the underlying criminal prosecution, including Judge Boklan, two detectives, and defendant himself.[10] The resulting film, Capturing the Friedmans, built upon carefully edited excerpts of these interviews, and suggested that defendant had been wrongfully convicted (see Rice Report at 51-52). Jarecki's interviews with defendant were recorded, but never utilized, and despite several requests, were never shared with the Review Team.

---

[10]     Co-defendant Ross Goldstein refused to participate in the film, saying in a transcribed interview with producer Smerling that his memory of events would not exonerate defendant. Instead, he said, his memory would show that there was considerable "grey area" between the People's case and defendant's (Rice Report at 136-37).

Defendant has cryptically explained that the interviews would show that, at the time, his answers to critical questions were not "fully formed" (see id. at 146).

47.     Several victims recoiled from the film, seeing it as offensive (see, e.g., id. at 97-102, 106-07). Four hired an attorney to ensure that their privacy was protected. Two even wrote anonymous letters restating defendant's guilt and asking viewers not to brush aside their experiences based on a feature film (id. at 97-102). Judge Boklan confirmed that these letters were written by actual victims, an event that defendant argues somehow demonstrates the judge's continuing bias against him (see Def. Mem. at 65-66).

48.     On January 7, 2004, just over fifteen years after his guilty plea, defendant filed a motion to vacate his judgment of conviction, pursuant to C.P.L. § 440.10(h). In that motion,[11] defendant argued that the statements of witnesses against him were secured through suggestive interviews or controversial therapy techniques such as hypnosis, and that the prosecution's failure to disclose this critical evidence violated the rule announced in Brady v. Maryland, 373 U.S. 83 (1963). Defendant's motion relied in large part upon information uncovered during the creation of Capturing the Friedmans.

49.     The motion incorporated excerpts from Capturing the Friedmans in which Judge Boklan, in a post-conviction interview, expressed her certainty of defendant's guilt (see Def. 2004 Mem. at 21; see also id. at 23 [discussing other alleged evidence of bias]).[12] Boklan gave this interview to the filmmakers more than a decade after defendant, his father, and Goldstein all

---

[11]    Defendant's seventy-eight-page memorandum of law ("Def. 2004 Mem."), dated January 7, 2004, is part of the Court's file. An additional copy of this document will be provided to the Court upon request.

[12]    Defendant's Exhibit JJJ contains excerpts of the filmmaker's interview. A full transcript of that interview with Judge Boklan is annexed hereto as Exhibit 4.

pleaded guilty, and after defendant admitted his guilt again on the Geraldo Rivera show. The motion also annexed an undated affirmation by defendant's trial attorney, Peter Panaro, in which Panaro alleged that Judge Boklan had told him during an off-the-record conference that she "intended to sentence [defendant] to consecutive terms of imprisonment for each count that he was convicted on." That same affirmation is annexed to defendant's current motion as Exhibit LL. Judge Boklan died in 2012 but when speaking with members of the District Attorney's office, during defendant's conviction integrity review, the judge denied making such a statement to Panaro (see Rice Report at 82-85).

50.    In opposing defendant's 2004 motion, the People submitted supporting documentation, including an affidavit by Wallene Jones, one of the investigating detectives, which tended to show that defendant's allegations of police misconduct were exaggerated or relied upon misrepresentations. The People also submitted an affidavit from a complainant's treating psychologist, in which she denied that she had used hypnosis when treating the complainant identified in Capturing the Friedmans.

51.    On January 6, 2006, the Supreme Court, Nassau County (La Pera, J.), denied defendant's motion without a hearing, holding that defendant's Brady claims were waived by his guilty plea, and that the claims were baseless. The Appellate Division, Second Department denied leave to appeal on March 10, 2006. Defendant also sought leave to appeal to the Court of Appeals, but that Court dismissed the application on May 24, 2006.

52.    Next, defendant filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York, where he argued again that the People had wrongfully withheld Brady material from him. Defendant faulted the prosecution for failing to disclose that: (1) some former students had reported no abuse; (2) police had used coercive and

15

suggestive interviewing techniques; and (3) witnesses only disclosed abuse after being "hypnotized." Following oral argument, the court dismissed the entire petition as time-barred, but granted a certificate of appealability as to the timeliness of defendant's claim that inculpatory witness statements were induced by hypnosis.

53.     Defendant then appealed to the United States Court of Appeals for the Second Circuit. After oral argument, the court ordered the parties to submit supplemental briefs addressing the question of whether defendant had presented a claim of "actual innocence," which might excuse the petition's untimeliness.

54.     On August 16, 2010, the Second Circuit denied defendant's petition, holding that his claims were time-barred. Friedman v. Rehal, 618 F.3d 142, 152 (2d Cir. 2010). The court did not address defendant's claim of actual innocence as a way around the statute of limitations, because it found his Brady claims meritless. Even so, relying largely on Capturing the Friedmans, the Court recommended that the District Attorney review defendant's case, paying specific attention to his claims of (1) judicial coercion, (2) moral panic and suggestive police interviewing techniques, and (3) the use of hypnosis on witnesses. Id. at 155-60.[13]

55.     The People, per District Attorney Kathleen M. Rice, readily agreed to conduct a review of defendant's case. Towards that end, in 2010, the District Attorney convened a team of senior prosecutors (the "Review Team") to conduct a full review of defendant's conviction, to be advised by a panel of outside experts (the "Panel"). During the investigation, the Panel helped

---

[13]     Judge Raggi observed that, in making this recommendation, the majority appeared to "assume the truth of" defendant's allegations, despite the fact that no hearing had been held on them. Friedman, 618 F.3d at 161-62 (Raggi, J., concurring) (noting further that she could not "predict whether the outcome of any such inquiry will be favorable to petitioner, whose conviction is based on a plea of guilty that he thereafter publicly confirmed").

make critical decisions affecting the scope of the review, and was kept informed of the developing record (see Rice Report at 154-58).[14]

B.   The People Release A Report Examining Defendant's Conviction.

56.   Prior to the release of the report on the re-investigation, defendant sought disclosure of records from the original prosecution, pursuant to the Freedom of Information Law ("FOIL"). Defendant's request was denied. In April 2013, defendant commenced a proceeding, under Article 78 of the C.P.L.R., to compel the People to release the requested documentation; he also sought an order granting him access to grand jury testimony.

57.   On June 24, 2013, District Attorney Rice released a report that analyzed each of the areas of concern identified by the Second Circuit. The report also analyzed evidence submitted during the course of the review by defendant's legal team, and by the producers of Capturing the Friedmans. In the report, the Review Team specifically considered and rejected defendant's claims, finding that "hypnosis" was not used on victims at all, and that other techniques, such as "group therapy," appeared only late in the case and affected neither grand jury testimony nor witness statements (see Rice Report at 77-81). The Review Team and Panel reviewed and carefully considered the recantation evidence presented by defendant, as well as the statements of men who attended the computer classes as children and said they witnessed nothing improper.

---

[14]   Defendant's summary of the review process misrepresents both the scope of the review and the degree to which the Panel participated. In his memorandum of law, defendant states that the district attorney "withheld from [the Panel] all the evidence except a small amount that the prosecution selected" (Def. Mem. at 15). But this conclusion lacks support even in defendant's source. That document states only that Panel members were provided with neither unredacted witness statements, nor with grand jury testimony (see Kuby Aff. Ex. C [Minutes of Article 78 Proceeding, June 28, 2013] at 14:17-15:15, 18:9-11). This much is true (see Rice Report at 56 & n.261). But the large majority of the case file was available to the Panel.

58.    Some "recantation" evidence proffered by defendant was nothing of the sort, and actually supported the case against defendant. Other such evidence raised legitimate questions, but given the statements of others who reaffirmed that abuse occurred, and the unreliability of recantations generally and as presented here, the Review Team concluded that the evidence of defendant's guilt was not cast into doubt. (see id. at 94-116).

59.    As to defendant's claim that his plea bargain was the product of coercion, the report further found no support for Panaro's contention that Judge Boklan threatened to impose consecutive terms on every count on which defendant was convicted at trial. Instead, the report documented numerous conflicting accounts of the judge's statement, and concluded that the trial court's conduct fell within the bounds of propriety. Nor, the report explained, did the evidence show that Judge Boklan was biased against defendant (id. at 82-94).

60.    The report noted that police conduct during witness interviews was not, in some cases, consistent with modern best practices. Even so, it determined that defendant had exaggerated the existence and effect of aggressive and/or repeated interviews, and that police questioning could not be reliably linked to any false allegations of sexual abuse (see id. at 63-77, 103).

61.    In August 2013, the Supreme Court, Nassau County, ordered the People to release to defendant the information he had sought in his FOIL request, including unredacted witness statements and grand jury testimony. An appeal from that order is pending before the Appellate Division, Second Department.

62.    In June 2014, defendant commenced a civil action against District Attorney Rice and two members of her staff, alleging that statements made by them in and in connection with the report amounted to defamation. That matter is also pending.

18

C.    Defendant's Current Claims

63.    Now, in his second C.P.L. § 440.10 motion, defendant raises three claims: (1) that he is actually innocent of all charges from the underlying prosecution, (2) that the indictments against him were the product of testimony that the prosecutor knew to be false, and (3) that his guilty plea was coerced by the trial judge.

64.    Defendant's motion papers are replete with falsehoods, half-truths, and misrepresentations regarding his prosecution, the evidence of his guilt, the conviction integrity review, and the evidence that he claims exonerates him. For example, he asserts that witness statements were withheld from the Advisory Panel (Def. Mem. at 41), a fact that he knows to be false. The victims' names were redacted from the statements, but statements were made available to all Panel members. Some Panel members more than others reviewed this material, but all were additionally given detailed synopses of the statements, including when and how the statements were obtained. Moreover, defendant counts as recantations statements by witnesses who actually confirm that abuse occurred in the Friedman house, without even acknowledging these incriminating statements. Specifically, defendant claims that "Keith Doe has completely repudiated his testimony" (Def. Mem. at 99), and that "Dennis Doe has no recollection that any abuse took place" (id. at 106), but his accounts of their "recantations" omit their statements signifying that abuse in fact occurred, including Dennis Doe's statements to Andrew Jarecki that he remembered a few instances of the Friedmans standing in the classroom naked, and of Arnold dropping his pants (see Rice Report at 109-11).[15] Defendant also asserts as fact that certain non-

---

[15]    Because defendant refers to the complaining witnesses by their "Doe" names, and the conviction integrity report refers to them by a designated number, the People will provide the Court, under separate cover, with a list identifying each witness by their number, "Doe" name, and true name. The People request that this list be kept under seal and not be provided to

(Continued . . .)

19

complainants who witnessed no abuse were enrolled alongside complainants who testified that they were victimized in the same class. Those assertions are largely unsubstantiated, and the evidence concerning which students were in classes together is far from conclusive (see id. at 123-25).

65.     Notwithstanding defendant's misrepresentations concerning the evidence of his actual innocence, the statements of victims who maintain that they were abused, and defendant's many admissions of guilt, the People do not oppose his request for an actual innocence hearing. The Appellate Division, Second Department, has only recently recognized a free-standing claim of actual innocence. See Hamilton, 115 A.D.3d at 26. To prevail on such a claim, a defendant bears the heavy burden of establishing his factual innocence by clear and convincing evidence (id. at 27). But, the standard for obtaining a hearing is relatively low, and requires only "a sufficient showing of possible merit to warrant a further exploration by the court." Id.

66.     It was not until recently that defendant submitted evidence sufficient even to clear the low bar set by Hamilton for an evidentiary hearing. For example, it was not until May 2013, during the Article 78 proceeding concerning defendant's FOIL request, that defendant obtained and provided to the People a letter from Kenneth Doe claiming that he was neither a victim of, nor a witness to, abuse by the Friedmans (see Rice Report at 113-15). It was also during the Article 78 proceeding, in August 2013, that an attorney for Barry Doe advised the court that his client had no recollection of being abused by defendant. Prior to that time, Barry Doe's recollection of past events had been far more equivocal (see id. at 112-13).

---

defendant, as it identifies victims of a sex offense. See Civil Rights Law § 50-b; People v. Fappiano, 95 N.Y.2d 738, 747 (2001) (confidentiality provisions of Civil Rights Law § 50-b apply to a defendant previously convicted of a crime).

67.    More importantly, and contrary to defendant's oft-repeated assertion, the District
Attorney has never shied away from an honest examination of defendant's claims, provided it is
done in accordance with the law.  Sharing grand jury and other confidential information about
child sex abuse victims with their convicted abuser, or with other members of the public, is not
legally permitted or responsible, and the People have resisted such unwarranted disclosures.
Instead, the district attorney devoted enormous time and resources towards conducting a
conviction integrity review.  She assigned her best prosecutors to conduct the review; she
impaneled a group of renowned experts to assist in the investigation and make sure it was
conducted fairly and properly; and she looked not only at whether defendant was actually
innocent, but whether he was wrongfully convicted – a standard not requiring factual innocence.
Finally, although not required to do so, she issued a 155-page report detailing her findings,
including those details that were at odds with her conclusions.

68.    Therefore, consistent with these recent developments, the District Attorney's
commitment to a just resolution of defendant's claims, and the Second Department's holding in
Hamilton, the People do not oppose defendant's request for a hearing on his claim of actual
innocence, where he will have the burden of proving by clear and convincing evidence that he is
factually innocent of the charges brought against him.

69.    However, the Court should summarily deny relief on defendant's remaining
points.  Turning to defendant's claim that the trial judge in his case, the late Abbey Boklan, was
biased against him and coerced him into pleading guilty, defendant has delayed beyond all
reason in bringing this claim to the court's attention.  At the time of his first C.P.L. § 440.10
motion, in 2004, defendant was aware of all of the factual predicates underlying this claim, and
even set them out in affidavits and in his memorandum of law.  Defendant had the Panaro

affirmation (Def. Ex. LL), and possessed the full transcript of the <u>Capturing the Friedmans</u> interview with Judge Boklan (<u>see</u> Ex. 4). Nevertheless, defendant failed to claim at the time that this evidence demonstrated that his plea was unlawfully coerced. Because defendant was "in a position adequately to raise the ground" in a prior motion, and yet failed to do so, the Court should find the matter procedurally barred, and decline to review it. C.P.L. § 440.10(3)(c). Applying the procedural bar is especially warranted here because the key witness to this claim, Judge Abbey Boklan, has passed away, and is therefore unavailable to rebut the claim. While defendant easily could have raised this claim in his 2004 motion, when Judge Boklan was alive, he chose not to do so. Allowing defendant to proceed on this claim now, when the People would be deprived of Judge Boklan's testimony, would reward defendant for his delay and greatly prejudice the People.

70.   Alternatively, even if this Court chooses not to apply this procedural bar, it should still summarily deny the claim pursuant to C.P.L. § 440.30(4)(b) and (d), because defendant's allegations are undermined by all of the evidence in the record, including statements by defendant's trial attorney and the Judge's former law secretary, N. Scott Banks, who despite reservations on other aspects of the case confirms that the judge presided over it fairly.

71.   Equally devoid of merit is defendant's claim that the indictments against him relied solely on evidence that the prosecution knew, prior to his plea, to be false (<u>see</u> Def. Mem. at 128-31, <u>citing</u> <u>Pelchat,</u> 62 N.Y.2d at 106-08). Defendant's claim rests on facts that, even assumed to be true and stretched to their limit, fall short of establishing that the prosecutor knowingly relied on false testimony to sustain defendant's indictments. Because defendant has failed to put forth facts substantiating that claim, it should be denied without a hearing.

WHEREFORE, the People consent to an evidentiary hearing on defendant's actual innocence claim; but for the reasons stated above and those expressed in the attached memorandum of law, defendant's remaining claims should be summarily denied.

Dated:    Mineola, New York
          September 8, 2014


AMES C. GRAWERT

23

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

                      -against-

JESSE FRIEDMAN,

                             Defendant.

------------------------------------------------------------------x

Ind. Nos. 67104, 67430, and 69783
Motion No. C-004
Hon. Teresa K. Corrigan

## MEMORANDUM OF LAW

Respectfully submitted,

KATHLEEN M. RICE
District Attorney, Nassau County
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Robert A. Schwartz
Ames C. Grawert
  Assistant District Attorneys
   *of Counsel*

## INTRODUCTION AND STATEMENT OF FACTS

This memorandum of law is submitted to accompany respondent's affirmation in opposition to defendant's motion to vacate his judgment of conviction. Facts relevant to the determination of defendant's claims are set forth in detail in that affirmation, and in the conviction integrity report on defendant's case released by the District Attorney on June 24, 2013 (see generally Def. Ex. B [Rice Report]).

Defendant's motion raises three distinct claims: (1) that he is "actually innocent" of the offenses charged; (2) that the trial judge coerced him into pleading guilty; and (3) that the prosecutor allowed defendant to plead guilty to indictments that the prosecutor knew were premised on false testimony. For the reasons set forth in the accompanying affirmation, the People agree to an evidentiary hearing on defendant's actual innocence claim. The remaining claims, however, should be summarily denied.

ARGUMENT

DEFENDANT'S JUDICIAL COERCION AND <u>PELCHAT</u> CLAIMS SHOULD BE
SUMMARILY DENIED.

In 1988, defendant pled guilty to sexually abusing children during computer classes held in his home. Despite the passage of more than a quarter century, and despite the benefit of a popular film critical of the investigation and prosecution, defendant remains unable to establish any significant wrongdoing by any of the various parties he chooses to blame for his conviction. Though the People have consented to a hearing to resolve defendant's actual innocence claim (<u>see</u> Aff. ¶¶ 64-68), his remaining claims should be dismissed at the threshold as procedurally barred in part, and wholly unsubstantiated.

First, defendant's claim that coercion and bias rendered his guilty plea involuntary is procedurally barred by his failure to advance the argument in a prior motion, filed in 2004. Defendant has been aware of the factual basis of this claim since at least 2004, and fails to justify his decision to raise the claim only now, after a critical witness, the trial judge herself, has passed away. Should the Court choose to reach the merits of defendant's claim despite his unjustified delay, it should still reject the claim as it lacks any credible foundation. Indeed, defendant's allegations are undermined even by his own sources. Defendant's remaining claim, that the People knowingly presented false testimony to the grand juries, is similarly meritless. Defendant has made no showing that all the evidence supporting the indictments was false, or that the prosecutor had knowledge that it was. The Court should summarily deny relief on these claims, as defendant fails to put forth facts substantiating them.

3

I.  Defendant's Coercion Claim Is Procedurally Barred By His Failure To Advance It In His
    Prior Motion.      Separately, The Claim Lacks Merit, As It Is Contradicted And
    Undermined By Even His Own Evidence.

Defendant contends that trial judge Abbey Boklan coerced him into pleading guilty by

threatening to sentence him to "consecutive terms on every count" if he was convicted after trial

(Def. Mem. at 63, 64-68, 132-36).   In making this argument, though, defendant's motion relies

on facts and details that he knew in 2004, at the time of his first motion to vacate judgment.

Because defendant could have raised this claim in his first motion but failed to do so, the motion

should be denied.  See C.P.L. § 440.10(3)(c).  Even if this Court were to reach the merits of this

claim, however, it should deny it summarily, as defendant's allegations of bias and coercion are

contradicted by all other documentary evidence.

A.  Because Defendant Could Have Raised This Claim In 2004, Long Before Judge
    Boklan's Death, The Court Should Decline To Consider It Now.

Defendant's judicial coercion claim relies principally on an affirmation by Peter Panaro,

defendant's trial counsel during the months leading up to his guilty plea (see Def. Mem. at 63-

64; Def. Ex. LL).  Defendant relied upon the very same affirmation in his prior motion to vacate

judgment, for which it was originally prepared (see Def. 2004 Mem. at 20-21, 25-26, 71).[1]  In

that proceeding, in the course alleging various Brady violations, defendant cited Panaro's

affirmation, which said that defendant faced an unreasonably harsh sentence if he chose to

proceed to trial (Def. 2004 Mem. at 21).  Throughout his 2004 memorandum of law, defendant

also made reference to indications of Judge Boklan's alleged bias, such as her decision to grant

media access requests while denying defendant's motion for a change of venue (id. at 22-23),

---

[1]      A copy of defendant's 2004 motion to vacate judgment and memorandum of law is
already in the court file, and not annexed here.

and her handling of co-defendant Ross Goldstein's sentencing (id. at 12-13). Similarly, defendant's motion incorporated an interview with Judge Boklan, recorded for use in Capturing the Friedmans, which he claimed constituted proof of the judge's pervasive bias against him (see id. at 21, 71). All of these facts appear materially unchanged in defendant's current motion (see Def. Mem. at 64-67), and though they were also available to defendant in 2004, he chose not to claim as a basis for relief that Judge Boklan's allegedly coercive conduct rendered his guilty plea involuntary. That contention, as a separate basis for relief, is raised for the first time here.

Defendant should not be permitted to split his claim in this manner. The Criminal Procedure Law strongly disfavors successive Article 440 motions where all claims could have been presented in the first instance, and a court may deny a successive motion on that basis alone. See C.P.L. § 440.10(3)(c) (providing that the court may deny relief where, "[u]pon a previous motion . . . the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so"); see also C.P.L. § 440.30(1)(a) ("a defendant who is in a position adequately to raise more than one ground should raise every such ground"). Relying on that provision, the Second Department has affirmed the summary denials of motions where there was no justification for the defendant's failure to raise the claim in a previous motion. See, e.g., People v. Dover, 294 A.D.2d 594, 596 (2d Dept. 2002); People v. Thomas, 147 A.D.2d 510, 512 (2d Dept. 1989); People v. Cortez, 158 A.D.2d 611, 611 (2d Dept. 1990).

That same result should follow here. It is notable, for one, that defendant chose not to present his coercion argument as an independent legal claim while Judge Boklan was still alive and able to defend herself against defendant's allegations.[2] Defendant has been represented by

---

[2]    Though defendant argues that the People should have secured Judge Boklan's response anyway (see Def. Mem. at 64), this does not justify or excuse his default. Until defendant raised
(Continued . . .)

retained counsel of his choosing since his arrest. If he believed this claim was meritorious, no barrier prevented him from raising it in the prior motion, if not before. That he instead waited to raise the claim until Judge Boklan passed away strongly indicates that he did not believe he could prevail on it while Judge Boklan was alive. See People v. Lawrence, 38 Misc. 3d 1204(A), 2012 WL 6720773, at *3 (Sup. Ct. Bronx County 2012) (denying motion under C.P.L. § 440.10[3][c] where the defendant "offer[ed] no explanation" for presenting his claim in a successive motion, and his delay in doing so "indicate[d] he had little, if any expectation of success in this regard"). Nor is defendant's claim saved by his reference to other facts, such as various television interviews, that he claims lend credence to the notion that Judge Boklan "prejudged [his] guilt ab initio" (see Def. Mem. at 64-67). These interviews were all available to defendant before he made his final submissions in support of his prior motion. Defendant makes no effort to explain or justify his failure to raise this claim earlier, making denial under C.P.L. § 440.10(3)(c) even more appropriate.

Portions of defendant's memorandum can be read to suggest that the Court should ignore this procedural bar because "'the right to challenge . . . the voluntariness of a plea is never waived.'" (Def. Mem. at 134, quoting People v. Ross, 182 A.D.2d 1022, 1023 [3d Dept. 1992]). Here, defendant misses the point. The People are not suggesting, as in Ross, that defendant's valid waiver of appeal renders his claim unreviewable. Defendant defaulted on the claim because when given a chance to raise it he chose not to do so.[3] Now, only after a key witness

this issue as a basis for relief, the People had no reason to seek a sworn statement from Judge Boklan. And regardless, an affirmation from Judge Boklan would be a poor substitute for her live testimony at a hearing.

[3] This is not the first time defendant has defaulted on a claim. He also defaulted on his Brady claim before the federal courts because he delayed beyond the statute of limitations. (Continued . . .)

6

has died, does he wish to take full advantage of the situation and resurrect his defaulted claim. Defendant can cite no authority for the proposition that an involuntary plea claim is exempt from the restrictions placed by the legislature on relief under C.P.L. Article 440. For the reasons set forth above, the Court should exercise its discretion and deny relief. See C.P.L. § 440.10(3)(c).

      B.    Defendant Was Not Coerced Into Pleading Guilty.

Even if this Court were to overlook the procedural bar, summary denial would still be warranted because defendant's allegations of bias and coercion are uniformly undermined by his own submissions. After taking into account all such information, what remains of defendant's claim indicates that his plea bargain was voluntary, and tainted by neither bias nor coercion.

Where the trial court's "hostility and bias" towards a defendant combines with improper remarks "concerning [the court's] sentencing intentions in the event that the defendant proceeded to trial and [was] convicted," the resulting "coercive environment" renders a defendant's guilty plea involuntary, and the ensuing conviction subject to vacatur. People v. Santiago, 71 A.D.3d 703, 703 (2d Dept. 2010), citing People v. Flinn, 60 A.D.3d 1304, 1305 (4th Dept. 2009) (holding that the court's conduct was coercive where it "stated that it would treat defendant 'very differently as far as the sentence is concerned' if he exercised his right to a trial"). In this case, however, neither the trial court's remarks nor its alleged bias justify vacatur.

---

Friedman v. Rehal, 618 F. 3d 142, 152 (2d Cir. 2010). The court found the Brady claim meritless in any event. Id.

1.    The Court Did Not Improperly Burden Defendant's Right to Trial.

Defendant's only direct evidence of coercive conduct is the Panaro affirmation, prepared in connection with the 2004 motion, in which Panaro recalls being told by Judge Boklan that she would sentence defendant to the maximum possible prison term if he were convicted after trial (Def. Ex. LL ¶ 11). This, defendant contends, represents coercion (see Def. Mem. at 63-64, 132). The Court should not take Panaro's affirmation at face value.

Other evidence submitted by defendant undercuts Panaro's account. In a letter from N. Scott Banks, Judge Boklan's law secretary at the time of the plea, Banks affirmed that notwithstanding his reservations concerning other aspects of the case, he had "repeatedly maintained [that] Judge Boklan presided over the Friedman matter fairly" (Def. Ex. A [Banks letter] at 1).[4] And, in a 2001 interview with the Capturing the Friedmans team, Judge Boklan herself denied, unprompted, that she would "punish" any defendant who chooses to go to trial "with a greater sentence."[5] Continuing, she said, "I don't punish [defendants] for going to a trial. But once I hear– once I hear what really happened– or if your client commits perjury– or, anything that can happen during the course of– of a trial, who knows what [sic] I'm gonna sentence him" (Ex. 4 at 99). In 2011, Judge Boklan spoke similarly to members of the District Attorney's office, saying that, though she did not threaten defendant, she did advise him about the maximum sentence he was facing upon conviction, the imposition of which would depend on the course of trial (Rice Report at 85). All of these accounts resonate with each other, but they

---

[4]    During a 2011 interview, Banks told the Review Team that Judge Boklan was known to sentence harshly, but always fairly (Rice Report at 86).

[5]    This interview was originally provided to the Court only in excerpt (see Def. Ex. JJJ). During a July 8, 2014, court appearance, defendant's counsel agreed to provide the Court with the full transcript (see Minutes of Proceedings [July 8, 2014] at 10:8-13). The full interview transcript is included in the appendix to the Rice Report, and also attached here as Exhibit 3.

are sharply dissonant with Panaro's decade-later claim that Boklan committed herself to imposing consecutive terms, no matter the evidence, if defendant chose to exercise his trial rights.

More strikingly, Panaro's affirmation is undermined even by his own prior statements on the matter. During a 1988 pre-plea interview with defendant, which Panaro took the curious precaution of recording, Panaro and defendant discussed at length the latter's motivations for pleading guilty. During that conversation, though Panaro told defendant about the sentence he might face if he was convicted after trial, he made no mention of any inappropriate threat by the judge. Instead, Panaro told defendant only that the judge had said that "she would consider" sentencing defendant to "some consecutive time" upon conviction (Ex. 2 at 18; see Rice Report at 82-83). Panaro's affirmation, prepared for imminent litigation more than a decade after the event it described, must be considered in light of this contradictory account, given instead at a time when Panaro had no reason to dissemble with his client.

Based on the preceding accounts, it is possible that Judge Boklan informed Panaro about the sentence that defendant might face if he was convicted after trial, including the risk that consecutive time might be imposed. Conduct of that nature, constituting a discussion of possible outcomes, does not amount to coercion. Instead, the Second Department has repeatedly contrasted an unequivocal threat to impose a maximum term (see, e.g., People v. Rogers, 114 A.D.3d at 707 [court informed the defendant it would have "'no problem' imposing the maximum" after trial]), which is coercive, with truthful information about what that maximum sentence might entail, which is not. See People v. Bravo, 72 A.D.3d 697, 698 (2d Dept. 2010) ("The County Court did not threaten to sentence the defendant to the maximum term upon a conviction after trial, but only informed him of his sentence exposure in that event."); People v.

9

Allen, 273 A.D.2d 319, 319 (2d Dept. 2000) ("The County Court acted properly in advising [the defendant] of the authorized maximum sentence which could have been imposed had he been convicted after trial"); People v. Stephens, 188 A.D.2d 345, 345-46 (2d Dept. 1992) ("It is not coercive for a court to inform a defendant as to the possible sentence available under the indictment."). Other departments of the Appellate Division have gone farther. In People v. Cornelio, the First Department found no inappropriate coercion where "the court advised the defendant that he faced a possible 100 years in prison, which, based on the facts known to it, it would not hesitate to impose." Cornelio, 227 A.D.2d 248, 248 (1996); cf. People v. Stevens, 298 A.D.2d 267, 268 (1st Dept. 2002) (distinguishing Cornelio where the court "unequivocally stated that upon a conviction, the maximum sentence would be imposed" [emphasis added]). Under any rubric, if Judge Boklan's discussion of defendant's sentencing exposure took the form described by Panaro in 1988, by N. Scott Banks, and by the judge herself, the court's statements constituted permissible commentary summarizing the "possible sentence available under the indictment," not coercion. Stephens, 188 A.D.2d at 346.[6]

2.     Defendant's Own Evidence Also Undercuts His Claims Of Bias.

Similarly, nothing submitted by defendant supports the charge that "Judge Boklan exhibited bias against [defendant] from the start of the case" (Def. Mem. at 63).  Though Capturing the Friedmans does depict Judge Boklan saying the phrase, "[t]here was never a doubt

---

[6]     Defendant may also believe that the simple disparity between the plea offer and the possible sentence under the indictments left him no choice but to plead guilty.  Any plea offer, which usually comes with the promise of a lesser sentence, is "bound to have the concomitant effect of discouraging a defendant's assertion of his trial rights." People v. Pena, 50 N.Y.2d 400, 411-12 (1980).  But "[n]othing requires a defendant to seek a plea bargain and there is nothing coercive in leaving with the defendant the option to accept or reject a bargain." People v. Seaberg, 74 N.Y.2d 1, 8-9 (1989).  A favorable plea offer is not on its own coercive.

in my mind as to [defendant's] guilt" (id. at 64, quoting Def. Ex. Z at 23), the Rice Report demonstrates at length how the film and defendant both take this quote out of context and imbue it with undue significance. In brief, though the film attempts to link Judge Boklan's certainty to her own personal biases, the full, unedited transcript of Judge Boklan's interview shows that she based her opinion of defendant's guilt on a review of the evidence, and on her experience with defendant himself (see Rice Report at 83-86; see also Ex. 4 at 20-22). Judge Boklan may have never seen "a single piece of trial evidence" (Def. Mem. at 67), but she had reviewed the complainants' grand jury testimony, which she found to be "extremely consistent," as well as pages of witness statements (Ex. 4 at 21-22), which her own law secretary later described in Capturing the Friedmans as "pretty vivid in their recollections" of abuse (Def. Ex. Z at 33). Most importantly, Judge Boklan heard defendant plead guilty in open court, and read the "tremendous amounts of admissions" he made later to the probation officers tasked with preparing his presentence report (Ex. 4 at 32). If Judge Boklan was confident of defendant's guilt, she had ample reason to be. Moreover, there is no merit to defendant's statement that the judge "engaged in a damaging pattern of disparaging [defendant]," or that this disparagement affected his decision to plead guilty (Def. Mem. at 67). Judge Boklan's public statements regarding defendant's guilt were made in response to questions from television and film interviewers many years after defendant pleaded guilty, not before.

Defendant points to other actions by Judge Boklan that he says demonstrate her bias against him. Here too defendant both overstates his case, and fails to reconcile these allegations with his own sources. Though Judge Boklan did deny defendant's motion for a change of venue,

and did permit local media to film pretrial appearances,[7] defendant presents evidence showing that her decisions were not made out of a "lack of concern for the defendant's right to a fair trial" (Def. Mem. at 133). Instead, as Judge Boklan explained in the Capturing the Friedmans interview, she allowed media to film pretrial appearances (see Ex. 4 at 17) because she "believe[d] in open courtrooms" (id. at 14), and was confident based on personal experience that any potential taint in the jury pool could be avoided through careful voir dire (see id. at 40). The same reasoning, she said, underpinned her decision to deny defendant's application for a change of venue. She expected that Nassau jurors would prove either unfamiliar with the case, or fair despite their familiarity (see id.), and if it proved otherwise, she was prepared to transfer the case at that time (see id. at 41). These are not the statements of a judge who "recklessly contributed to the media and public hysteria" surrounding the case (Def. Mem. at 132), and none of the foregoing suggests that the judge "exhibited bias against" defendant "from the start of the case" (id. at 63). Cf. Santiago, 71 A.D.3d at 703 (granting relief based on the court's creation of a "coercive environment," which included statements concerning the court's "sentencing intentions in the event that the defendant proceeded to trial and was convicted").

Defendant also argues that he had "good cause" to believe Judge Boklan's alleged threat to sentence him to consecutive time because she "reneged" on a promise to afford Ross Goldstein youthful offender status and sentenced him harshly (Def. Mem. at 132). Here, again, defendant misrepresents the facts. Defendant's decision to plead guilty could not possibly have been influenced by Goldstein's sentence because Goldstein was sentenced months after defendant pleaded guilty, not before. Even if all defendant meant to convey by this argument

---

[7]     Contrary to defendant's claim (Def. Mem. at 132-33), Judge Boklan also made clear that she "would not have permitted the media to be present" at trial (Ex. 4 at 17).

was that Boklan proved to be tough at sentencing, the argument is irrelevant. Defendant could not be coerced into pleading guilty by events that had not yet happened.

II.    Defendant's Claim That The Indictments Were Based On False Testimony, And That The Prosecutor Knew It To Be False, Is Baseless.

Defendant further contends that his indictments were defective because they were based solely on false evidence and the prosecutor knew the evidence was false. Defendant relies on People v. Pelchat, 62 N.Y.2d 97 (1984), as the basis for this claim. However, none of defendant's allegations support a Pelchat violation. What defendant ultimately is left with is a claim that the prosecutor should have known that some of the evidence was not reliable. Even if that were true—and it is not—that is not a Pelchat violation; that claim does not survive a guilty plea, and entitles defendant to no relief.

Defendant's conviction rests on three indictments, voted by three separate grand juries, which between them heard testimony from fourteen complainants,[8] and corroborating testimony from one adult co-defendant, Ross Goldstein (see Aff. ¶¶ 21-22, 30-31). The grand jury testimony was reviewed, and the trial court held that each indictment was supported by legally sufficient evidence,[9] a fact that Judge Boklan's law secretary N. Scott Banks acknowledges, despite his evident sympathy for defendant (see Def. Ex. A at 1). Regardless, defendant now claims, relying on People v. Pelchat (62 N.Y.2d 97), that his conviction must be vacated because the People allegedly knew that all of this testimony was false when given. Towards that end, defendant argues that the People (1) suborned the perjured testimony of co-defendant Ross

---

[8]    Three of the seventeen complainants testified only against Arnold Friedman.

[9]    The trial court did dismiss some counts from each indictment, for a total of twenty-three counts (see Rice Report at 22).

Goldstein; (2) ignored warnings about the nature of the police interviews underlying complainant testimony; and (3) overlooked other weaknesses in each witness's account. None of this is true, and none of this amounts to error under the narrow rule in Pelchat.

Critically, Pelchat is not a means for a defendant to attack the factual predicate of his guilty plea. See Pelchat, 62 N.Y.2d at 106 (noting that post-conviction attacks on indictments "lend themselves to abuse"); see also id. at 108 ("By pleading, [a] defendant has elected a trial strategy. He has determined, for whatever reason, that he will not litigate the question of guilt."). Instead, it is a narrow doctrine permitting redress for prosecutorial misconduct so severe that it affects the validity of the indictment underlying the criminal prosecution. See People v. Hansen, 95 N.Y.2d 227, 232 (2000) ("Pelchat hinged substantially on the constitutional function of the Grand Jury to indict, as well as on the prosecutor's duty of fair dealing."). The facts of Pelchat make its limited scope clear: in that case, the prosecution secured an indictment based on the testimony of a police officer. Without that officer's testimony, the grand jury would not have had sufficient evidence before it to support the indictment. Pelchat, 62 N.Y.2d at 106-07. Nevertheless, when that officer later told the prosecutor that his testimony was mistaken, the prosecutor allowed the error to go uncorrected, and allowed the court to take the defendant's guilty plea. Id. at 107. This, the Court of Appeals held, rendered the indictment "fatally defective," because in light of the officer's admission "the Grand Jury had no evidence before it worthy of belief that [the] defendant had committed a crime," and because a prosecutor cannot "permit a proceeding to continue on an indictment which he knew rested solely upon false evidence." Id. Continuing, the Court carefully distinguished cases where grand jury testimony is "sufficient when given but which through changed circumstances . . . at trial may lose its force." Id. Evidence may "subsequently fail its purpose for many reasons but the integrity of the

14

Grand Jury's fact-finding process has not been undermined because of that." Id. Similarly, the Court held that where there is a "latent weakness in the Grand Jury evidence unknown to the prosecutor," no error results, and the "conviction based on [the] defendant's plea may stand." Id. at 107-08. Later decisions have continued to limit Pelchat to those situations where the prosecutor learns prior to conviction that "the only evidence supporting the accusatory instrument was false." Hansen, 95 N.Y.2d at 232.

The allegations in defendant's papers do not rise to this level. First, defendant relies heavily on Ross Goldstein's 2013 recantation statement to establish that the People knew that his grand jury testimony was false when given in 1988 (see Def. Mem. at 129-30). Goldstein's decades-late, self-serving statement establishes nothing. During the conviction integrity review of defendant's case, the Review Team investigated Goldstein's claims at considerable length, and found that his changing accounts, combined with his prior statements and other evidence, made it nearly impossible to credit his belated recantation (see Rice Report at 135-43). Moreover, even if credited, the recantation statement would not prove that the People knowingly presented false testimony. Goldstein says that he "became locked into cooperating with the prosecution," and that his testimony was "coached, rehearsed, and directed by the prosecutor" (see Def. Ex. KK at 2, 6). He does not, however, say that the prosecutor knew that his grand jury testimony would be (or had been) false. This alone defeats defendant's claim. In Pelchat, the witness told the prosecutor in as many words that his testimony had been false. Pelchat, 62 N.Y.2d at 100-01, 107. Here, instead, defendant expects that the prosecutor should have guessed, based on Goldstein's reluctance to inculpate himself, that he was lying simply to guarantee that he could receive a favorable plea bargain (see Def. Ex. KK at 6). But Pelchat

does not speak in terms of constructive knowledge, and allegations about defects unknown to the People do not warrant relief. See Pelchat, 62 N.Y.2d at 107-08.

This branch of defendant's Pelchat argument fails for still other reasons. Goldstein testified only in support of Indictment No. 69783 (the "third" indictment), where he was a corroborating witness. As Goldstein concedes, his role was "to confirm what the complainants had said when they testified about what happened to them" (Def. Ex. KK at 6; see also Rice Report at 33 ["No count of the indictment was sustained by Goldstein's testimony alone."]). It is simply not the case, then, that without Goldstein's testimony the grand jury would have had "no evidence before it worthy of belief." Pelchat, 62 N.Y.2d at 107. To the contrary, without him, the first two indictments would have been unaffected, and the third indictment could have stood on complainant testimony alone. See People v. Goetz, 62 N.Y.2d 96, 116-17 (indictment not defective where allegedly perjured testimony "was not the only evidence before the Grand Jury" establishing the defendant's guilt). Clearly this is not a case where the prosecutor knew that the only evidence supporting the indictment was false. Defendant's allegations concerning Ross Goldstein do not establish otherwise.

Of course, defendant also claims that the prosecutor knew that all other grand jury testimony was equally false (see Def. Mem. at 130-31). These arguments fare no better. Pelchat and its progeny distinguish, even if defendant does not, between grand jury testimony that is false, and testimony that "may lose its force" in light of other evidence. Pelchat, 62 N.Y.2d at 107. Only in the first case, where false grand jury testimony leaves the prosecutor with an "empty indictment," is dismissal justified. Id. at 108. In People v. Goetz, for example, the Court of Appeals held that where new evidence merely "conflicts with part of [a complainant's] testimony," the indictment remains valid. Goetz, 68 N.Y.2d at 116. In other words, it is not

16

enough that grand jury testimony might prove unreliable when contrasted or impeached with other evidence. Questions of that nature, requiring the resolution of competing evidentiary claims, are matters for trial. See People v. Sepulveda, 122 A.D.2d 175, 177 (2d Dept. 1986) (distinguishing between testimony that is false, and testimony that is impeachable, the latter of which "presents questions of witness credibility which are for a petit jury"); People v. Nilsen, 182 A.D.2d 715, 716 (2d Dept. 1992) (discrepancy between statements of grand jury witness did not implicate Pelchat); see also Hansen, 95 N.Y.2d at 232-33 (Pelchat does not entitle a defendant to "a review of the fact-finding process engaged in by the grand jurors").

This distinction dooms defendant's remaining arguments. Defendant points again to the affirmation of his trial counsel, Peter Panaro (see Def. Mem. at 130-31), noting this time Panaro's claim that he told lead prosecutor A.D.A. Joseph Onorato about a videotape showing police using aggressive, suggestive interviewing techniques when speaking with Gary Meyers, a non-complainant who has never claimed he was abused by either defendant or defendant's father (Def. Ex. LL ¶ 18). But this does not establish that all witness testimony was unreliable, let alone false. First, in his own affirmation, Onorato flatly denies that any such conversation ever took place, saying instead that Panaro "never suggested to [him] that police officers were using inappropriate interviewing techniques" (Ex. 1 ¶¶ 5-6). Second, even if the prosecution had been told about the Meyers "tape," that would not constitute Pelchat error. At the very most, the Meyers "tape" raises questions about the way witnesses were interviewed. It does not prove that all witnesses, many of whom were interviewed by other detectives,[10] were treated similarly, and it certainly does not prove that those witnesses fabricated their testimony.

---

[10]     Defendant's Exhibit DDD, which he generously describes as a "transcript" (cf. Aff. ¶ 35; see also Rice Report at 72), names the interviewing officers as Detectives Hatch and Jones.
(Continued . . .)

While the manner in which victims were questioned by police might have been an appropriate issue to explore at trial, the concerns allegedly expressed to A.D.A. Onorato do not demonstrate an impairment of the grand jury's fact-finding process. See Pelchat, 62 N.Y.2d at 107 (distinguishing those cases where "due to the witness's uncertainty at trial," prior grand jury testimony "may lose its force"). Defendant's evidence shows boorish conduct by two detectives, conduct defendant would have been free to exploit at trial, but not an error of constitutional dimension. See id. (distinguishing "situations in which there may be latent weaknesses in the Grand Jury evidence unknown to the prosecutor").

Aside from Panaro's uncorroborated and oblique reference to improper interviewing techniques, there is no other evidence suggesting that the prosecutor knew or believed that any (let alone all) evidence in the grand jury was false or baseless. Defendant argues at length that all witness testimony presented to the grand juries was unreliable (see Def. Mem. at 130-31 [summarizing these arguments]). But he has never seen the grand jury testimony, and those who have, Judge Boklan and her law secretary, found it legally sufficient to support the large majority of the charges (Def. Ex. A at 1). While defendant suggests that some latent defects existed, he makes no attempt to prove that any of them were known to the prosecution at any point prior to his conviction. Again, conclusory allegations of prosecutorial misconduct are not enough (see Pelchat, 62 N.Y.2d at 106-07; see also C.P.L. § 440.30[4][b]), and that is all that defendant offers (see Def. Mem. at 131).

---

These detectives were not the only investigators to meet with witnesses and take statements. The task force investigating defendant's case included eight other detectives and two police officers (see Rice Report at 7-8).

18

What defendant really suggests is that the prosecution should have known that the complainants' testimony was false. For example, he points to the lack of corroborating physical evidence to support the notion that the grand jury testimony was implausible (see id.). Defendant's theory is deeply flawed. As explained above, the mere allegation that the People should have examined their evidence more closely does not afford defendant any relief. Notably, too, the proof before a grand jury needed to support an indictment is far less than what is needed to convict after trial. Grand jury evidence is assessed in the light most favorable to the People, and only prima facie evidence of guilt is needed, not proof beyond a reasonable doubt. See People v. Bello, 92 N.Y.2d 523, 525-26 (1998); see also Pelchat, 62 N.Y.2d at 105 ("The test [for sufficiency] is whether the evidence before the Grand Jury if unexplained and contradicted would warrant conviction by a trial jury."). It should not surprise anyone that grand jury testimony is often concise and spartan. That overwhelming evidence of guilt is not presented to the grand jury is not a sign that the case is weak, and it certainly does not suggest fabrication. Yet, defendant still looks to the lack of corroborating and physical evidence in the grand jury testimony (see Def. Mem. at 131; see also id. at 4-5, citing Def. Ex. A) as proof that the prosecutor should have known that there was no evidence to support the indictments. Questions about the strength and reliability of grand jury testimony, however, fail to prove falsity, and do not warrant relief under Pelchat. See Goetz, 68 N.Y.2d at 116-17.

Ross Goldstein's recent recantation does not retroactively render his indictment invalid. Defendant's reliance on the Meyers "tape," and his attempts to characterize complainant testimony as implausible, coerced, and uncorroborated (see Def. Mem. at 130-31), even if true, do not establish that the "only evidence against [the defendant] before the grand jury was false." Goetz, 68 N.Y.2d at 116. Evidence presented to the grand jury may subsequently "fail its

purpose for many reasons but the integrity of the Grand Jury's fact-finding process has not been undermined because of that." Pelchat, 62 N.Y.2d at 107; see also Hansen, 95 N.Y.2d at 232-33. Because defendant offers no evidence substantiating his claim that the indictments were reliant on false testimony, or that the People were aware of any such defect, his claim should be denied summarily.[11]

\*      \*      \*      \*      \*

While the People consent to a hearing on defendant's actual innocence claim, his remaining claims should be summarily denied. Though defendant was fully aware of the facts underlying his judicial coercion claim in 2004, he chose not to litigate the matter at that time, while the judge herself was still alive to answer his allegations. Defendant's unjustified delay has deprived the People of a witness who would prove pivotal at any hearing on the matter, and this loss should not inure to defendant's benefit.

Defendant's claims also lack any foundation. "A judgment of conviction is presumed valid, and the party challenging its validity (defendant here) has a burden of coming forward with allegations sufficient to create an issue of fact." People v. Session, 34 N.Y.2d 254, 255-56 (1974), see also C.P.L. § 440.30(4)(b). Though defendant submits a single affirmation to support his theory of judicial coercion, that document was prepared for a prior post-conviction motion, is undermined by the affirmant's own prior recollections of the same conversation, and is

---

[11]      Equally groundless is defendant's claim that Indictment No. 69783 was secured for the inappropriate purpose of inducing his guilty plea (see Def. Mem. at 131). Here too, defendant fails to substantiate this serious allegation.  In any event, if defendant believed that the third indictment was defective for that reason, the time to say so was before he pled guilty, not twenty-five years later.  Defendant's claim that his indictment was procured through the improper motives of the prosecutor was forfeited by his guilty plea.  See People v. Rodriguez, 55 N.Y.2d 776 (1981) (selective and vindictive prosecution claim forfeited by guilty plea).

20

contradicted even by information gathered by defendant's own advocates. Under these circumstances, the Court may resolve defendant's claims without a hearing (see People v. Satterfield, 66 N.Y.2d 796, 799 [1985]), and it should do so by summarily denying relief. Documentary evidence does not, on its own, entitle a movant to an evidentiary hearing. Instead, that evidence must bear at least some hallmark of reliability. See People v. Fields, 287 A.D.2d 577, 578 (2d Dept. 2001) (affirming the summary denial of an Article 440 motion, where the defendant's claims were premised upon "nothing more than an unreliable recantation"); People v. Cassels, 260 A.D.2d 392, 393 (2d Dept. 1999) (same). Defendant has come forward with no reliable evidence to support his claim that the trial court either improperly deterred him from exercising his trial rights, or created an environment designed to induce his guilty plea.

Similarly, defendant's second point, that the prosecution knowingly presented false testimony to the grand jury, lacks any support whatsoever in the record. Co-defendant Ross Goldstein was a corroborating witness in the third indictment, and the instrument stands on its own despite his self-serving recantation. And, arguments about the reliability of grand jury witnesses do not establish a jurisdictional defect in any indictment.

## CONCLUSION

POINTS TWO AND THREE OF DEFENDANT'S MOTION TO VACATE
JUDGMENT SHOULD BE DENIED WITHOUT A HEARING.

Dated: Mineola, New York
September 8, 2014

Respectfully submitted,

KATHLEEN M. RICE
District Attorney, Nassau County
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Robert A. Schwartz
Ames C. Grawert
  Assistant District Attorneys
  *of Counsel*

22

# E X H I B I T   1

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

       -against-                                 <u>AFFIRMATION</u>

JESSE FRIEDMAN,

                                         Ind. 67104, 67430, 69783
                        Defendant.

----------------------------------------------------------------X

      JOSEPH R. ONORATO, an attorney duly admitted to practice law in the State of New York, affirms the following under the penalty of perjury:

      1.      I am an Assistant District Attorney, of counsel to Denis Dillon, District Attorney of Nassau County.

      2.      In 1987 and 1988, three indictments were filed, charging defendant and two co-defendants with multiple charges of sodomy, sexual abuse, and related offenses.  I was assigned to prosecute these cases.

      3.      I have read the affirmation submitted by Peter Panaro in support of defendant's motion to vacate the judgment of conviction.

      4.      According to the Panaro affirmation, he viewed a video showing Gary Meyers being interviewed by detectives who "used suggestive and harassing questioning" (Panaro affirmation at para. 18).  The affirmation further states, "Immediately after viewing the Gary Meyers tape, I [Peter Panaro] informed assistant district attorney Joe Onorato about the interview.  I made it clear to him that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable

to the defense that the defense had a right to be informed of" (id.).

5.      Peter Panaro never informed me that there was a video tape of Gary Meyers being interviewed, I have never seen any such tape, and I have no reason to believe that any such tape exists or existed. The first reference I ever heard concerning the Meyers tape was at a viewing of the film "Capturing the Friedmans." In that film, it is claimed that such a tape exists or existed, but no tape is shown.

6.      Peter Panaro never suggested to me that police officers were using inappropriate interviewing techniques or that he considered any police interviewing technique to be "evidence favorable to the defense that the defense had a right to be informed of" (Panaro affirmation at para. 18).

7.      Defendant's motion contends that only under hypnosis did Gregory Doe recall being the victim of sexual abuse. I was never aware of any specific treatment or therapy (including hypnosis and visualization) used by any doctor in the treatment of any complainant in the instant case.

Dated:      Mineola, New York
            August _13_, 2004

                                    Joseph R. Onorato

# E X H I B I T   2

*file*

PP: Today is Sunday, it is in the evening at a quarter to seven.
I am in my office with Jesse Friedman, his mother Elaine, his
brother Seth, and his brother David. David is the only one
that's not here yet. He is arriving at about 7 o'clock and right
now it is a quarter to seven. Is that correct Jesse?

JF: That's correct Peter.

PP: And, what we are going to do now is we are going to discuss
Jesse taking a plea on Tuesday of this week, December 20, 1988,
regarding his criminal charges. Is that correct Jesse?

JF: That's correct. Yes.

PP: Okay. Jesse is charged on indictments number 67104, 67430
and 69783 with approximately 300 counts of sexual abuse charges,
endangering the welfare of a child, and sodomy in the first
degree. Is that correct Jesse?

JF: That's correct Peter.

PP: And, two of these indictments 67104 and 67430, which
involved sodomy in the first degree, 54 counts all together
against Jesse and his father, 10 counts against Jesse, on 67430
it was 91 counts in all, 36 counts were against Jesse, the
remainder of the counts against his father, Arnold Friedman. On
at least those two indictments, Jesse was indicted on both of
those prior to ever meeting me or retaining my services. Is that
correct, Jesse?

JF: That's correct.

-1-

PP:  Now, indictment number 67104, you were indicted on December 7, 1987.  Is that correct, Jesse?

JF:  That's correct.

PP:  And on indictment number 67430, you were indicted on February 1, 1988.  Is that correct, Jesse?

JF:  That's correct.

PP:  Now, you retained my services to represent you many months thereafter.  In fact, you did not retain me until June 3, 1988. Correct?

JF:  Correct.

PP:  And, you were investigated and arrested, although not indicted, you were arrested on these charges in November, 1987. Correct?

JF:  Correct.

PP:  And you were incarcerated in November, 1987 until you made bail.  Correct?

JF:  Correct.

PP:  You had an attorney at that time by the name of Douglas Krieger.  Correct?

JF:  Correct.

PP:  Doug Krieger was your attorney from the day of your arrest in November, 1987, until the date of your discharge of him and my retainer on June 3, 1988.  Correct?

JF:  Correct.

-2-

PP:  After you retained my services, you were indicted again.
Isn't that a fact?

JF:  That is a fact.

PP:  And you were indicted on indictment number 69783, with 191
or 192 counts, or thereabout, of further sexual charges including
sodomy in the first degree.  Correct?

JF:  Correct.

PP:  Now.  On this third indictment, stipulations were signed
regarding motions.  However, motions were made Jesse, on indict-
ment 67104 and 67430, way before your retainer of my services.
Correct.  And those motions were made by who?

JF:  They were written by Gerry Bernstein.

PP:  And who else?

JF:  Doug Krieger.

PP:  And they were submitted on your behalf?

JF:  Correct.

PP:  And those motions all went in at some time.

JF:  They were filed by Doug Krieger.

PP:  And then after that, they were decided.  Correct?

JF:  Correct.

PP:  And I had nothing to do with any of that.  Is that a fact?

JF:  That's correct.

PP:  And there was also a motion for a change of venue.  Correct?

JF:  Correct.

-3-

PP:  And who made that motion?

JF:  Doug Krieger.

PP:  And that was decided also.  Correct?

JF:  Correct.

PP:  And I had nothing to do with any of that.  Isn't that a fact?

JF:  Correct.

PP:  And you retained my services after all of that.

JF:  Correct.

PP:  While you have been under my retainer, you have had that third indictment, 69783, and you were also arrested on one charge in Manhattan, in New York City.  Correct?

JF:  Correct.

PP:  And that charge in Manhattan was a misdemeanor charge of peddling without a license?

JF:  Correct.

PP:  Now.  You are aware of everything that I have done in this case.  Are you not Jesse?

JF:  I believe I am.

PP:  Okay.  Isn't it a fact that I have sent you to a Dr. Roger Feldman, and that you have gone to a Dr. Roger Feldman who is a forensic psychologist.

JF:  Correct.

PP:  And how many times did you see Dr. Feldman>

-4-

JF:  Three, four times.

PP:  And isn't it also a fact that I sent you to another forensic psychologist, Dr. Brodsky?

JF:  That's correct.

PP:  And how many times did you see Dr. Brodsky?

JF:  Just once.

PP:  And isn't it a fact that I also sent you to even another forensic psychologist by the name of Dr. Daniel Schwartz.

JF:  Yes, you did.

PP:  And did you see Dr. Daniel Schwartz?

JF:  Yes, I have.

PP:  And how many times have you seen Dr. Daniel Schwartz?

JF:  So far, once.

PP:  And, when you saw Dr. Daniel Schwartz, did you make arrangements again to see him?

JF:  Yeah.

PP:  And are you going to be seeing him again?

JF:  I believe so.

PP:  When?

JF:  I believe tomorrow morning.

PP:  Which is December

JF:  the 19th

PP:  Okay. Talk a little louder, Jesse.

JF:  Okay.

-5-

PP:  And in addition to all that, I sent you to see a forensic psychiatrist who is a specialist in the field of pedophelia, by the name of Dr. Pogge, who is located at Four Winds Hospital in Katonah, New York.  Correct?

JF:  Correct.

PP:  And how many times did you see Dr. Pogge?

JF:  Three times.

PP:  And in addition to that, you've been under the psychological care of Dr. Marty Berenberg.  Correct?

JF:  Correct.

PP:  How long have you been seeing Dr. Berenberg?

JF:  For a number of years now.

PP:  And you were seeing him before I met you, correct?

JF:  Correct.

PP:  And you've been seeing him after I met you, correct?

JF:  Correct.

PP:  And I had constant conversations with Marty Berenberg.  Correct?

JF:  That's correct.

PP:  I've also spoken with Dr. Daniel Schwartz, Dr. Pogge, Dr. Brodsky and Dr. Feldman on many occasions on the phone while in your presence.  Correct?

JF:  Correct.

PP:  I also sent you to Court Consultation Services, another

-6-

psychological organization in Nassau County which is run by its Director, Sue Andrews.  Remember that?

JF:  Yes.

PP:  And did you call Sue Andrews?

JF:  Yes I did.

PP:  And how many times did you converse with Sue Andrews or someone from her staff?

JF: About twice.

PP:  In addition to that I sent you to a private investigator, didn't I?

JF:  Yes you did.

PP:  And his name is Ted or Theodore O'Neill, correct?

JF:  Yes.

PP:  And his offices are at 123 Grove Avenue (Jesse responded simultaneously with the same address), and where is that?

JF:  Cedarhurst, New York.

PP:  And how many times have you seen Ted O'Neill?

JF:  (E)numerous times.

PP:  More than ten or less?

JF:  I would think more than ten.

PP:  And in addition to that I have told you about a Dr. Gene Able in Atlanta, Georgia, and I told you that I spoke with his offices.  Correct?

JF:  Correct.

-7-

PP:  And that I was willing to set up what is called a
pedophillic profile examination which is a penal profile where
they put electrodes on your penis for the purpose of determining
whether or not you have a stimulation when shown pictures of
little boys.  Do you understand that?

JF:  Yes, I do.

PP:  The reason for that, Jesse, is that these charges against
you all involve little boys.  Sodomy and sexual abuse of
children, all boys, between the ages of eight and twelve.  Isn't
that a fact?

JF:  That's correct.

PP:  Louder.  Isn't that a fact?

JF:  That's correct.

PP:  Okay.  On one occasion you and I flew to Wisconsin to see
your father in Oxford.  Isn't that a fact?

JF:  That's correct.

PP:  And I spend a whole day with your father, did I not?

JF:  That's correct.

PP:  And you, your father and myself spoke as threesome for a
long period of time?

JF:  That's correct.

PP:  And there was another period of time where I spoke to your
father outside of your presence.  Isn't that correct.

JF:  That's correct.

-8-

PP:  In addition to that I am receiving almost daily letters from your father.  Are you aware of that?

JF:  Yes, I am.

PP:  And how are your aware of that?

JF:  I have gotten copies of most of the letters.  He sends a copy to me, and you show me the copies of letters as they've arrived.

PP:  In addition to that, has he told you that he's been writing to me on a daily basis?

JF:  Yes, he has told me.

PP:  And, in addition to speaking with your father, have I spoke with your mother in this case?

JF:  Yes, many times.  Certainly more than ten.

PP:  Would it be fair to say I spoke to your mother over fifty times in this case.

JF:  Ah, yes.

PP:  Okay.  In addition to everything I just stated, isn't it also a fact that you and I have met on the average of two times a week from the day of my retainer on June 3, 1988 until this very night Sunday night, of December 18, 1988, that you and I have met on an average of two times per week?

JF:  That's correct.

PP:  And would it not be fair to say that an average meeting would be approximately two hours.

-9-

JF:   That's correct.

PP:   And would it also be fair to state that you and I have had almost daily telephone conversations.

JF:   Yes.

PP:   And in addition to all of that, would it also be fair to state that I have had daily telephone conversations with your mother, usually between the hours of 7:30 in the morning and 8 o'clock in the morning.  Wouldn't that be fair to say.

JF:   Yes.

PP:   And wouldn't that be fair to state that from June 3, 1988 until today.

JF:   Yes.

PP:   In addition to that have I not seen your mother on approximately thirty occasions.

JF:   Yes, you have.

PP:   Now, you are also aware of the fact that I have viewed all of the pornographic disc, the computer disc that are in the possession of the police at this point, that I made an appointment and went down to the sex crimes unit, and I viewed all of the discs that the police have.  Isn't that a fact?

JF:   I am aware of that.

PP:   You're also aware that I had conversations with Sgt. Galasso and Det. Hatch and I've personally been interviewed by both of them and I interviewed both of them as well.

-10-

JF:  That's correct.

PP:  And you are aware that I have had approximately eight telephone conversations and one personal interview at the home of Ann Meyers with Ann Meyers.  Are you aware of that?

JF:  I'm aware of that.

PP:  In fact, you and your brother David set that up for me so that I could go over there.  Correct?

JF:  That's correct.

PP:  And you are aware that I did go over there and speak with Ann Meyers?

JF:  I am aware of that.

PP:  Ann Meyers has a video cassette that she played for me on a Betamax.  Correct?

JF:  Correct.

PP:  And you are aware that I have notes of that Betamax. Correct?

JF:  Correct.

PP:  And she would not give me a copy of the tape. You knew that. Right?

JF:  I am aware of that.

PP:  In addition to everything else I've told you,  I have sent you to see William Donino for purposes of retaining his services as a legal advisor in addition to mine.  He is a prominent appeals lawyer and knows many aspects of criminal law.  Isn't

-11-

that a fact that I sent you to see him?

JF: That is correct.

P.P: And isn't it also a fact that I sat and spoke with Michael
Corrnachia on four occasions.  He is the lawyer for Ross
Goldstein and I sat to speak with him about Ross Goldstein's role
in these matters.  Isn't that a fact.

JF: That's correct.

PP: And you were aware of that?

JF: I'm aware of that.

PP: And each time I was going to see Michael Cornacchia didn't I
tell you that I was going to go see him?

JF: Yes you did.

PP: Each time I spoke with Michael Cornacchia didn't I have you
in my office and tell you the results of those meetings.

JF: Yes you did.

PP: Now, Jesse,

JF: Peter

PP: Weren't there times on at least five occasions, if not more,
that Ted O'Neill, your mother, yourself and myself, sat in my
office and had meetings.

JF: Yes, that is true.

PP: And weren't there occasions at least fifteen in number where
your mother, yourself and myself sat and had meetings.

JF: Yes.

-12-

PP: And wasn't there occasions where Seth and David and yourself and myself sat and had meetings.

JF: That's correct.

PP: How old is David?

JF: Twenty-eight.

PP: And he is what relation to you?

JF: My brother.

PP: And how old is Seth?

JF: Twenty-six.

PP: And what relation is he?

JF: My brother.

PP: And how old is Elaine, if you know?

JF: Fifty-seven.

PP: And what is her relationship to you?

JF: My mother.

PP: In addition to everything else I have outlined to you, didn't we discuss defenses in this case?

JF: Yes, we did.

PP: Did we discuss the defense that the children were never abused and that the allegations of which they complained never happened.

JF: That is correct.

PP: And we discussed that on approximately fifty occasions.

JF: That is correct.

-13-

PP: And did we discuss the defense of coersion that anything that may happen was the result of your father coersing you into doing what the children allege you did. And did we discuss that defense on approximately thirty occasions.

JF: Yes, we did.

PP: And did we discuss the defense of mass hysteria. And did we discuss that defense in that all of the children are reacting hysterically to something that never happened and they are starting to believe that it happened themselves, and that this is nothing more than a witch hunt. Didn't we discuss that possibility of defense on approximately twenty-five occasions.

JF: Yes, we did.

PP: In fact, in addition to you and I discussing that, did I not discuss that defense with Drs. Brodsky, Pogge, Dan Schwartz, and Marty Berenberg.

JF: I believe you discussed all the different defenses with all those men.

PP: And I have done that both in your presence and outside your presence.

JF: That's correct.

PP: And did we not discuss the defense of insanity on at least fifty occasions.

JF: Yes, I believe we did.

PP: And in addition to the defense of insanity, as discussed

-14-

between you and I, isn't it a fact that we discussed that with

Feldman, Brodsky, Pogge, Dan Schwartz and Marty Berenberg.

JF: That's correct.

PP: In addition to those psychologists, isn't it a fact that

you've been seeing other psychologists with your mother as well.

And who else have you been seeing?

JF: Oh, the person?

PP: The person's name.

JF: Connie Kennedy.

PP: And for how long have you been seeing Connie Kennedy?

JF: About four months now.

PP: And you've been seeing Connie Kennedy's and my retainer in

the (inaudible).

JF: That's correct.

PP: Isn't it all (inaudible) Jesse, that we discussed the

defense of multiple personality, the fact that you may truly

believe that you did not do these acts as charged, and that you

are convinced that you did not do them, but that it may be a Dr.

Jekyl and Mr. Hyde type of personality and that (inaudible).

JF: That's correct.

PP: We discussed this defense on approximately thirty occasions,

wouldn't that be fair to say?

JF: That's fair to say.

PP: Would it also be fair to say that I discussed these defenses

-15-

at length with Dr. Schwartz, Dr. (inaudible). In addition to all
that, did you discuss that defense with Connie Kennedy?

JF:   No I don't believe I did.

PP:   And, (inaudible) you never discussed that defense with
Connie Kennedy, you have discussed other defenses with her.
Correct.

JF:   Yes, I have.

PP:   Now, you are aware, are you not.  Before I get into that,
you also can see, (inaudible).   Isn't it a fact you wrote to
both Barry Slotnick and William Kuntsler and the purpose of you
writing to them was you wanted to get legal opinion as to this
case and see if they would take this case as your lawyer.   Is
that correct.

JF:  That is correct.

PP:   Is is also a fact that Slotnick did answer and stated that
he would not take your case.

JF:   That is correct.

PP:   And Kuntzler just ignored you and did not even respond.

JF:.  This is correct.

PP:   Now you have also interviewed approximately thirty-four
attorneys in this case who are prominent lawyers in Nassau
County.   Is that correct?

JF:   That is correct.

PP:   And you interviewed everyone of them.   Correct?

-16-

JF:  Correct.

PP:  And after interviewing everyone of those attorneys, you selected my services.  Correct?

JF:  Correct.

PP:  Now, I have all that down.  I want you to (inaudible). for you to (inaudible) this plea.  Are you aware of the (inaudible) that the District Attorney's office is now offering to permit you to plead guilty to approximately fourteen counts of sodomy in the first in that you plea to sodomy in the first degree as to each victim.

JF:  Correct.

PP:  The fourteen victims, you take fourteen counts of sodomy in the first degree (inaudible) plea the remainder of the charges dismissed in satisfaction or (inaudible).   Do you understand that?

JF:  I do.

PP:   Do you understand that in exchange for your plea, the DA is offering a sentence of six years on the minimum and eighteen years on the maximum.

JF:  Yes.

PP:  Do you understand the terms.  You could do as little as six years and then be released.

JF:  Yes.

PP:  You also understand that it means you could be incarcerated for as much to eighteen before your are released from (inaudible).

JF:  Yes.

PP:  How old are you now.

JF:  Nineteen.

PP:  That means that you could come out of jail as early as 25 years or you could be incarcerated until you're thirty-seven or thirty-eight.  Do you understand that.  All right, Jesse, I just turned the tape over because the other side of the tape ended, so I'm going to repeat what we just said.  Are you aware of the fact that you could be incarcerated therefore till as early as you're twenty-five years old or twenty-six years old, but that you could remain incarcerated until as late as thirty-seven or thirty-eight years old on a sentence of six to eighteen years.

JF:  I'm aware of that.

PP:  Are you also aware of the fact that if you do not plead guilty to this and you go to trial, that you could be acquitted of every charge and spend no time in jail if the jury believed that you did not commit these acts or if the jury found that one of your defenses was viable.

JF:  That's correct.

PP:  Are you also aware of the fact Jesse, that in the event that you are convicted of any of the charges that Judge Boklan has indicated that for each one of the charges that you are convicted of, she would consider some consecutive time.  Are you aware of that?

-18-

JF:  Yes, I'm aware of that.

PP:  And isn't it a fact that we have discussed the possibility that your sentence in this case could run into a couple of hundred years.

JF:  That's correct.

PP:  And that could mean the remainder of your life.

JF:  I'm aware of that.

PP:  However, haven't I indicated to you and told you time and time again, that no matter how many years Judge Boklan gave to you on a sentence, that the most time you could be incarcerated for in the State of New York would be forty years.

JF:  I'm aware of that.

PP:  And haven't I told you that on many occasions.

JF:  Yes, you have.

PP:  Now, that would mean that if your were incarcerated now you would come out of jail when you're fifty-nine years old.  Do you understand that?

JF:  Yes, I do.

PP:  Now, are you also aware of the fact that you have an absolute right to a trial by jury in this case.

JF:  I'm aware of that.

PP:  And haven't I discussed that with you?

JF:  Yes, you have.

PP:  On approximately how many times?

-19.-

JF:  Just about every time I've seen you.

PP:  Would you say over fifty times?

JF:  Yes, I would.

PP:  And isn't it a fact that I have discussed with you on an
equal number of times that you have the right to remain silent
throughout all of these proceedings, and that is called your
right against self-incrimination.

JF:  Yes, I'm aware of that right.

PP:  And haven't I also indicated to you that you have the right
to confrontation.  To have everyone of these children testify in
a court of law, and for me to cross-examine each and every one of
these children as well as the police officers, the sargeants, the
detectives, the expert witnesses, and every other witness against
you.

JF:  I'm aware of that.

PP:  And how many times have we discussed that.

JF:  At least fifty.

PP:  Isn't it a fact that I have also told you that if this case
went to trial that I would fight vigorously for the children not
to testify on video tape, but rather to argue strenuously on your
behalf and to force these children to take the stand in open
court and to request that the judge make them testify in open
court, pursuant to a recent case, within the last year known as
Coe v. Iowa.

-20-

JF:  I'm aware of that.

PP:  And haven't I indicated that to you on many occasions.

JF:  Yes, you have.

PP:  And wouldn't you say I've indicated that to you on at least ten occasions or more.

JF:  Yes.

PP:  And, haven't I also indicated to you that the People have the absolute burden of proof in this case, that you don't have to prove or disprove anything.

JF:  I'm aware of that.

PP:  Haven't we also discussed the fact that the People's burden of proof in this case is that they must prove your guilt beyond a reasonable doubt.

JF:  I'm aware of that.

PP:  Didn't we also indicate, and didn't I also tell you that in addition to proving your guilt beyond a reasonable doubt that the People must prove each and every element of every charge beyond a reasonable doubt in order to get a conviction of each and any charge.

JF:  I'm aware of that.

PP:  And didn't I tell you this.

JF:  Yes you told me.

PP:  And haven't we discussed this on more than fifty occasions.

JF:  Yes we have.

-21-

PP: Further, didn't I discuss with you the fact that you did not have to present any evidence, that you could sit mute and do nothing, but the DA had to prove the case beyond a reasonable doubt even if you did nothing.

JF: Yes, you have informed me of that.

PP: And, in addition to everything else that we have just outlined, didn't I tell you that you have the right to an attorney throughout all the stages of these proceedings.

JF: Yes, you did.

PP: Now, Jesse, you are considering very, very, strongly, in fact, you've told me that you want to take a plea of guilty in this case, with a sentence of six to eighteen, and waive all of the rights that I've just outlined. Correct?

JF: Yes.

PP: That includes the right to a trial by jury. You understand that?

JF: Yes, I do.

PP: You understand that if you plead guilty, that a plea of guilty is the same as if you went to trial and you were convicted after trial. Do you understand that?

JF: Yes, I'm aware of that.

PP: There's no difference. Do you understand that?

JF: Yes.

PP: And haven't I told you that on many occasions?

-22-

JF:  Yes, you have.

PP:  And you understand that a plea of guilty must be voluntary and that no one can force you to plead guilty.  Do you understand that?

JF:  Yes, I do.

PP:  Is this plea of guilty voluntary?

JF:  Yes.

PP:  And is anyone forcing you to plead guilty?

JF:  No.

PP:  Has anyone made you any promises other than, if you plead guilty you will be sentenced to a period of incarceration of no more than fifteen years, eighteen years, I'm sorry, no more than eighteen years and no less than six years.

JF:  That's correct.

PP:  Has anyone made you any other promises?

JF:  No they have not.

PP:  Have I made you any other promises?

JF:  No you have not.

PP:  Has the Judge or the DA or the police, or any of the witnesses made you any promises.

JF:  No they have not.

PP:  Now, Jesse, I have been representing you now for about five months, correct?

JF:  Correct.

-23-

PP: Would you say that I worked hard on this case?

JF: I would say you worked hard on this case.

PP: Would you say that I worked very hard on this case?

JF: I would say you worked hard on this case.

PP: And are you satisfied with my services in this matter?

JF: Yes, I am.

PP: And, would you tell me approximately when you decided to take the plea of guilty, if offered, an opportunity to plead guilty, with a plea bargain.

JF: I think it was about two and a half weeks ago.

PP: And have you requested that I seek a plea offer and plea negotiations from the District Attorney?

JF: Yes.

PP: And did there come a time when I informed you that the offer from the DA's office of five years to fifteen years was withdrawn, and that it was unlikely that I could get that offer back or that I could get any other offer.

JF: That's correct.

PP: And recently in the last couple of days, haven't I told you that I went to the District Attorney's office and that I was successful in getting an offer of six to eighteen years.

JF: Yes.

PP: Jesse, is this what you want to do?

JF: Yes.

-24-

PP: Are you doing this after full consultation with me, with your mother, with your father, with your brothers, and with your therapist.

JF: Yes.

PP: You're doing this knowingly?

JF: Yes.

PP: You're doing this voluntarily.

JF: Yes.

PP: The phone has been ringing. I'm going to answer the phone for one second. All right, we answered the phone and that was your brother David. It is now 7 o'clock and he has arrived at the train station and we just told him to wait. Is that correct?

JF: That's correct Peter.

PP: All right now. Jesse, are you aware of the fact that if you plead guilty in this case, that not only will there be no trial, and not only are you admitting guilt, but you will have to tell the Court that you are guilty and you will have to tell them exactly what you did.

JF: Yes.

PP: And are you aware of the fact that in order to do this it must be truthful. Do you understand that?

JF: Yes.

PP: And therefore, do you understand that if you are telling the Court that you sodomized the children, that you are telling the

-25-

Court that that in fact did happen, that you did put your penis
into the anus of little boys and that you are telling the Court
that this is the truth.

JF:  I am aware that I will have to admit in open Court that I
put my penis to the anus of little boys.

PP:  And are you willing to do that?

JF:  I am willing to do that.

PP:  And is that truthful testimony?

JF:  Yes.

PP:  And now, I can understand where there is difficult for you.
But I want you to be very clear on this record and in Court that
you will not be permitted to plead guilty unless you are, in
fact, guilty.  Do you understand that?

JF:  I am aware that that is the way the Court system works.

PP:  Now, Jesse.

JF:  Peter.

PP:  Lastly, I want to go through with you the discussions that
you and I have been having recently in regard to your
incarceration.  Do you understand that you will be incarcerated
at the time of the plea, which is Tuesday, December 20, 1988.

JF:  I am aware of that.

PP:  Are you also aware that I have absolutely no power what-
soever as to where you are incarcerated, and where you are sent
within the penal system and the criminal system.

-26-

JF:  Yes.

PP:  Do you understand that the Judge, Judge Boklan, has no power whatsoever as to where you are placed in the prison system?

JF:  Yes.

PP:  I've told you time and time again, have I not, that the prison system and the Court system are separate and distinct entities, and that you will be incarcerated where the prison system places you.

JF:  Yes.

PP:  At this time, that is unknown.  Haven't I told you that?

JF:  That's correct.

PP:  Now, knowing everything I have told you, is it still your desire to take a plea of guilty in this case?

JF:  Yes.

PP:  Isn't it a fact that I have told you that I am very willing to try this case in front of a jury regardless of whether it takes one day or whether it takes eight months or a year?

JF:  Yes.

PP:  And haven't I told you that it is my opinion that this case will take about six months to try.

JF:  Yes.

PP:  And haven't I also told you that I will charge you no further money whatsoever to try this case?

JF:  That is correct.

-27-

PP:  That the money you have paid me has been to date, $25,000.00 plus a $15,000.00 bail assignment which I will not get until after the case is over.  Isn't that a fact?

JF:  Yes.

PP:  And isn't it also a fact that that is my fee whether there is a trial, or whether there is no trial?  Isn't that a fact?

JF:  I believe that's what the retainer says.

PP:  Isn't it also a fact that I've told you that I will charge you no more than $40,000.00 in the event that there is a trial regardless of how long that trial took.

JF:  Yes.

PP:  Haven't I also indicated to you that after your sentence in this matter, you have the absolute right to appeal this decision and this sentence, and this conviction, to the Appellate Division, Second Department, located at 45 Monroe Place, Brooklyn, New York, but that your notice of appeal must be filed to that address, to the Clerk of the Court, within thirty days.

JF:  I believe that will be filed the day of my plea.

PP:  But, isn't it a fact that I have advised you that you have the right to appeal.

JF:  Yes, you have advised me of that.

PP:  Haven't I also indicated to you that the actual plea and sentence have really very few Appellate issues.  There are none. The thing that you really will be appealing is the issue of the

-28-

search warrant and the suppression of the search warrant and the
seizure of the materials from your home.  Isn't that a fact.

JF:  That is correct.  I also believe we will be appealing the
denial of change of venue.

PP:  That is correct.

JF:  And the denial of the hearing.

PP:  The denial of the hearing for the suppression and for the
search of the property.  Now, isn't it also a fact that I told
you that in the event that Judge Boklan gave you consecutive time
after a trial by jury, if you were to go to trial, that the
Appellate Division has the power to reduce her consecutive time
and to give you whatever time they felt was in the interest of
justice.

JF:  Yes.

PP:  Now, knowing all this is it still your intention to plead
guilty.

JF:  Yes.

PP:  Are you doing this voluntarily and of your own free will.

JF:  Yes.

PP:  Are you under the influence of alcohol or drugs at this
moment.

JF:  No.

PP:  Are you under the influence of any intoxicant whatsoever
that would inhibit you or prevent you from understanding every-

-29-

thing we are discussing.

JF:  No.

PP:  Do you understand everything that we have discussed?

JF:  Yes.

PP:  Have you ever been confined to a mental institution or to an insanity ward for any reason, or hospital?

JF:  No.

PP:  All right, now.  I'm going to end this tape now Jesse.  Is it your intention to plead guilty on Tuesday, December 20.

JF:  As of this moment, yes.

PP:  And is that your decision and no one else's decision.

JF:  Yes.

PP:  And are you pleading guilty because you are in fact guilty, and for no other reason.

JF:  Yes, Peter.  That is correct.

PP:  Now, Jesse.

JF:  Yes, Peter.

PP:  Isn't it a fact that you went for a lie detector test at Richard Arthur's office at my direction in New York City.

JF:  That is correct.

PP:  And haven't you been told that insofar as the lie detector was concerned, that the lie detector showed that you were not telling the truth?

JF:  That is what I was told.

-30-

PP: And isn't it also a fact that you have discussed this plea of guilty that you are going to be taking with your therapist, Marty Berenberg, and other therapist, Connie, what's her name?

JF: Kennedy.

PP: Kennedy.

JF: Yes, that is correct.

PP: And you are doing this plea of guilty, you are going to take this plea of guilty after full discussion of that plea of guilty with both those therapists.

JF: Yes.

PP: And you discussed this plea of guilty with your father.

JF: Yes.

PP: In fact, on December 17, 1988, which was yesterday, you flew out to Wisconsin and spent the entire day with your father.

JF: Two hours with my father.

PP: Your father is in Federal prison in Wisconsin?

JF: That is correct.

PP: And after you spent the two hours with your father

JF: Two hours

PP: You discussed your eventual plea of guilty with your father. Correct?

JF: Correct.

PP: Now isn't it also fair to say that when you first came to me you indicated that you were going to trial.

-31-

JF:  That is correct.

PP:  However, certain things have changed since June 3, 1988,
which have changed your mind and made you desire to plead guilty.
Would this be a fair statement of facts that since the last, that
since the day you retained my services, that you have been
indicted on a subsequent indictment, on a new indictment, and on
the new indictment you are charged with over 190 counts.

JF:  That  is correct.

PP:  And, your father Arnold Friedman is named in two of these
counts.  Actually, he is named in five of them, but three have
been dismissed.

JF:  That is correct.

PP:  And your father has already plead guilty to everything.

JF:  He indeed has.

PP:  And Ross, who is a co-defendant in this indictment has not
only indicated that he would testify for the state, and against
you, but he has in fact given under oath, a question and answer
to the District Attorney's office, and in that question and
answer, he has told them that everything that you are accused of,
did in fact happen.

JF:  That is what I've been told.

PP:  It is because of those reasons plus the fact that there are
approximately fourteen children in all who could testify against
you at this point, Ross, and there have been allegations that

-32-

perhaps Gino Scotto and/or Danny Ackerman may be subpoenaed to
trial, that all of these factors have induced you to plead
guilty.  Correct?

JF:  Correct.

PP:  Elaine Friedman, you are sitting here.  Correct?

EF:  That is correct.

PP:  State your name for the record please.

EF:  Elaine Friedman.

PP:  And Elaine, you are what relation to Jesse?

EF:  I am Jesse's mother.

PP:  And how old are you, Elaine?

EF:  Twenty-nine plus.

PP:  Okay, I'm going to go on to a new tape.  This tape has
ended.

PP:  Now we are continuing with this tape.  The tape is actually
on side one of this tape, but it is the third side of the
December, 19, I'm sorry, December 18, 1988 tape.  I am sitting
with Jesse, I am sitting with Jesse Friedman and his mother
Elaine Friedman, and we will continue the conversation with
Elaine Friedman.  Elaine, you have been in my office on many,
many occasions since June 3, 1988.  Correct?

EF:  Correct.

PP:  And we have over the course of the last couple of weeks been
discussing the possibility of a plea of guilty.  Correct?

-33-

EF:  That is correct.

PP:  You are well aware of Jesse's rights to a trial by jury, his rights to confront witnesses, to be cross-examined, to cross-examine those witnesses, to put the DA to his test of proof, to make the DA prove his case against Jesse, beyond a reasonable doubt, and have the children testify for me to cross-examine the children, and all the other constitutional rights that Jesse has. Are you not?

EF:  That is correct.

PP:  And we discussed this many times.  Isn't that a fact.

EF:  Yes.

PP:  And, can you please state what you think is in Jesse's best interest, whether he should go to trial or whether he should take this plea offer of six years on a minimum and eighteen years on a maximum.

EF:  It is for Jesse's best interest to take the plea offer and not to go to trial.

PP:  Why do you feel that it is in his best interest to take a plea and not to go to trial.

EF:  If Jesse were to go to trial he would probably get a much more severe sentence.

PP:  And are you convinced that the plea for Jesse of guilty to one count of sodomy as to each of the children with a sentence of six to eighteen years in jail, is the best thing for Jesse to do.

EF: Yes, I'm convinced of that.

PP: And have you given this much thought, Elaine?

EF: I have given this almost a year's thought.

PP: And, have you discussed this with Jesse?

EF: Yes I have.

PP: And does Jesse believe this is in his best interests?

EF: Yes he does.

PP: And have you discussed this plea offer with me in Jesse's presence?

EF: Yes, I have.

PP: And does Jesse express to me that it is in his best interest to take this plea?

EF: Yes it is.

PP: You've known Jesse all his life, haven't you?

EF: I'm his mother.

PP: And do you feel that Jesse knows what he is doing here?

EF: Jesse knows what he's doing.

PP: Do you feel that Jesse is rational?

EF: Yes, he is.

PP: Do you feel that he is taking this plea, voluntarily, and of his own free will?

EF: Yes, he is.

PP: Do you feel that Jesse is doing this knowingly?

EF: Yes, he is.

PP:  Who does Jesse live with?

EF:  He lives with me.

PP:  Is there any evidence that Jesse has been on drugs or alcohol or in any way impaired in such a way that his judgment would be affected.

EF:  No.

PP:  And, Jesse has entered a therapy session with you.  Correct?

EF:  Yes.

PP:  And who do you see in that therapy session?

EF:  Connie Kennedy.

PP:  And how often have you been seeing Connie Kennedy?

EF:  Once a week.

PP:  And for how long have you been seeing Connie Kennedy?

EF:  Almost a year.

PP:  And have you been seeing her with Jesse?

EF:  Yes.

PP:  And is this plea discussed openly with Connie Kennedy?

EF:  Yes.

PP:  And does Jesse indicate that it's in his best interests to take this plea.

EF:  Yes.

PP:  And does Connie Kennedy indicate that she agrees that it is in Jesse's best interests to take this plea?

EF:  Absolutely.

-36-

PP:  And have you both told me after speaking with Connie Kennedy that you feel that it would be in Jesse's best interests to take this plea?

EF:  Yes.

PP:  Have I ever done anything at all to force Jesse to take this plea?

EF:  No.

PP:  Have - Isn't it a fact that I have told you that I would try this case by trial by jury to it's conclusion, whether it took six weeks or six months, or six years and that I would never charge you another nickel other than that which you have already paid me.

EF:  Yes, that's true.

PP:  And do you believe that to be true?

EF:  Yes, I believe it to be true.

PP:  And in fact I have charged you $25,000.00 plus a $15,000.00 bail assignment transfer, and I have stated in a retainer, and I have stated orally to you now, that that would be my whole fee whether this matter went to trial or did not go to trial.  Isn't that a fact?

EF:  That's a fact.

PP:  Okay.  Jesse, do you have any questions?

JF:  Yes.  Does that retainer include all my appeals?

PP:  That's the only thing it doesn't include.  If you recall, I

-37-

have a copy of the retainer. The retainer says that if you want
to appeal this case, which you have an absolute right to appeal,
that I would charge you a maximum of $15,000.00 additional money
for an appeal, but the cost of printing of that appeal and the
cost of the transcripts would have to be borne by you. Do you
have any other questions?

JF:  Yes.

PP:  What.

JF:  What's the best way to Manhattan from the South Shore?

PP:  Before we get on to that. Elaine, do you understand that
Jesse has, if he takes a plea here, and after he is sentenced,
has an absolute right to appeal his conviction by filing a Notice
of Appeal with the Appellate Division, Second Department within
thirty days of his sentence, and the Appellate Division, Second
Department is located at 45 Monroe Place, (New York, I'm sorry)
Brooklyn, New York. Do you acknowledge me telling you that Jesse
has these rights and where and how to file a Notice of Appeal?

EF:  Yes, I do.

PP:  Now, I was not the lawyer, Elaine, when Arnie was arrested
and when Arnie was convicted and sentenced. Isn't that correct?

EF:  Correct.

PP:  You have indicated to me and so has his attorneys, and so
does the Court record that Arnie plead guilty and admitted to all
of the acts for which he was accused. Correct? Or for

-38-

EF: Felonies.

PP: The felonies, okay.  So they didn't require him to plead guilty to the misdemeanors but he did plead guilty and admit to all of the felonies.  Correct?

EF: Yes.

PP: And those felonies include sodomy in the first degree?

EF: Yes.

PP: And he admitted that he sodomized children between and little boys between the ages of eight and twelve years old?

EF: Yes.

PP: Isn't it also a fact that Arnie gave a closeout statement that allegedly was some four hours in duration after the plea. How long was it?

EF: It was four hours.

PP: But he gave a closeout statement.  Correct?

EF: Yes, he did.

PP: And in that closeout statement, Elaine, he admitted to other sodomies on other little boys as well as the ones he was charged with.  Correct?

EF: Correct.

PP: And are you now convinced that your husband plead guilty because he was in fact guilty of those sodomies?

EF: Yes.

PP: And are you also in support of Jesse's plea of guilty to all

-39-

of these charges that he is going to be pleading guilty to because you are also convinced of Jesse's guilt to the charges for which he is charged?

EF:  Yes.

PP:  Okay Elaine.  I have no further questions at this time and that will conclude the interview with Jesse and his mother, Elaine, in each other's presence.  And Elaine, were you and Jesse indeed in each other's presence during this interview.

EF:  Yes.

PP:  That is the end of the interview.

PP:  Okay, that is the end of this tape and the end of this interview.  I'm rewinding it.

-40-

STATE OF NEW YORK)
                 )   s.s.:
COUNTY OF NASSAU )

I, JESSE FRIEDMAN, the undersigned, have read the foregoing transcript of conversation of December 18, 1988.

I have read the foregoing, know the contents thereof, and that the same is true of my own knowledge.

JESSE FRIEDMAN

On this 20th day of December, 1988, before me personally came JESSE FRIEDMAN, to me known to be the person described in and who executed the foregoing instrument.  Such person duly swore to such instrument before me and duly acknowledged that he executed the same.

Notary Public

-41-

# E X H I B I T   3

**A0970**

I.N.G./GERALDO RIVERA   TEL No.212-581-8196          Feb 14,89   9:23 No.003 P.01/2

# Media Transcripts, Inc.
**41 West 83rd Street, New York, N.Y. 10024,   (212) 362-1481   FAX 799-3482**

| | |
|---|---|
| **FOR** | THE INVESTIGATIVE NEWS GROUP |
| | 311 West 43rd Street |
| | New York, NY  10036 |

| | | |
|---|---|---|
| **PROGRAM** | GERALDO RIVERA | **STATION** |
| | KIDDY PORN | |
| | TAPE 1. | |

| | |
|---|---|
| **DATE** | **CITY** |

### INTV W/JESSE FRIEDMAN

GERALDO: First part, let's start at the end and we'll work our way back.  Okay.

What was your reaction when the judge passed sentence and then recommended that you spend the maximum time in prison?

JESSE:  Well, I knew the sentence I was getting.  It was ... it was a prearranged deal.  I had a feeling the judge was going to recommend I do the full time.  I was hoping she wouldn't.  I thought that she'd be able to read the report and understand the situation. I understand her position and I understand the feeling of the community at large and I can see that it was ...it was ... it was

Appendix 000510

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 94 of 225 PageID #: 5274

**Media Transcripts,**
PROGRAM                    ING/GERALDO –Kiddy Porn Tape #1.          Page 2

necessary.  She had done the same thing at my
father's sentencing.  So, it wasn't too much
of a surprise to me.

GERALDO:  Do you remember what you said
to the judge prior to the sentence being
handed down?

JESSE:  Yeah.

GERALDO:  Can you repeat it right now?

JESSE:  Ah .... I told her I .. I was
truly sorry in my heart for everything that
happened.  I feel terrible for the children
who were involved and who were victimized.
But that I was a victim also.  Everybody
involved was a victim of my father.  Myself,
the children, certainly the families of the
children and the community.  We are all
victims of my father.  I ... I'm looking
forward to spending my time in jail
productively and getting an understanding of
what happened and how it was wrong and had to
see it and prevent it from happening again.
Basically, the one thing I wish most is that I

Appendix 000511

could have been able to stop it sooner.    T

**Media Transcripts,**
PROGRAM                     ING/GERALDO -Kiddy Porn Tape #1.          Page 3

wish I had the power to have stopped what was
happening.

GERALDO: Why didn't you have the power,
Jesse. why did it take the police and the
Federal authorities to stop this ... this
bizarre and horrifying conduct?

JESSE: I was ... after years and years
and years of ... of a very bad situation
between my father and myself and the whole
family, it ... (SIGHS) ... I was too scared!

Once ... once I realized what was going
on and that it was getting worse the stakes
got worse. As more and more bad things
happened, there was more and more pressure
from my father. There was more and more fear
that grew inside of me, that if anybody ever
fought out, it would be horrible for
everybody. I was scared for myself. I was
scared that I'd lose my father, which ... was
the most important thing to me. for most of my
life. And I was scared that I'd lose my
opportunity to get away from what was

Case 2:06-cv-03136-JS  Document 41  Filed 01/28/21  Page 96 of 225 PageID #: 5276

**Media Transcripts,**
PROGRAM              ING/GERALDO -Kiddy Porn Tape #1.      Page 4

happening and put an end to it the only way I
came to the conclusion I could.

GERALDO:  What is your estimation of the
number of victims?  How many kids?

JESSE:  That's very difficult to say.
There were certain children who were actually
physically abused.  There were certain
children who weren't actually  physically
abused, but were witness to what was going on.
Certainly, I would imagine the friends of the
poor kids who were being abused ...

GERALDO:  How many kids, Jesse, did you
and your father physically abuse in your home?

JESSE:  (LONG PAUSE)  I guess seventeen.

GERALDO:  Seventeen different children.

JESSE:  Seventeen children.

GERALDO:  Ranging in age from what to
what?

JESSE:  Nine to eleven.  Mostly ...
mostly around ten and eleven.

GERALDO:  What did you do to the
children?

Appendix 000513

Case 2:06-cv-03136-JS Document 41 Filed 01/28/21 Page 97 of 225 PageID #: 5277

A0974

**Media Transcripts,**
PROGRAM            ING/GERALDO -Kiddy Porn Tape #1.          Page 5

(PAUSE)  I fondled them.  I was ... forced to
... to pose in hundreds of photos for my
father in all sorts of sexual positions with
the kids.  And the kids likewise with myself.

(CLEARS THROAT)

Oral sex going both ways.

I was forced to pose with my penis
against their anus.  I would control the kids.
I would keep them in line if ... if a class
got too riled up.

(PAUSE)

GERALDO:  Why didn't the kids ever tell?

JESSE:  The same reason I never told.

GERALDO:  Did you threaten them, Jesse?

JESSE:  I sort of felt on the same level
as the children.

GERALDO:  I'm not asking you how you
felt.  I'm asking you if you threatened the
kids and told them that if they told,
something awful would happen to them.

JESSE:  Yeah.

GERALDO:  What did you say?  What did you

Case 2:06-cv-03136-JS Document 41 Filed 01/28/21 Page 98 of 225 PageID #: 5278

I:N.G./GERALDO RIVERA   TEL No.212-581-8196         Feb 14,89  9:23 No.003 P.06/28

**Media Transcripts,**
PROGRAM              ING/GERALDO -Kiddy Porn Tape #1.        Page 6

olds and the eleven year olds?

    JESSE:  I just told them that if they
told anyone what was going on, that it would
    (PAUSE)
    I was too scared.

    GERALDO:  Jesse.  We're not up to that
yet.  What did you tell the children?

    JESSE:  Please stop for a moment?
Please.

    CUT.


    CUE: "ROLLING"

    GERALDO:  I want you to tell me what you
told the kids and then we'll get into your own
victimization.  We'll establish that.  I
promise.  But now we have to establish what
you did.  What did you tell those kids.  What
did you tell those nine year old and ten year
olds and eleven year olds?

    JESSE: I told them...that...if they told
anyone what was going on...that...I...I knew
terrible, terrible things would happen

Appendix 000565

Case 2:06-cv-03136-JS  Document 41  Filed 01/28/21  Page 99 of 225  PageID #: 5278
A0976

**Media Transcripts,**
PROGRAM                  ING/GERALDO -Kiddy Porn Tape #1.          Page 7

would...would hurt them much worse...than he
had been doing already.  I...I know my... my
father had made vicious threats to the kids
about...about burning down their homes and
things like that and...I...re-established
that with the kids that I...I thought it was
completely possible that my father would
actually burn down their homes or...or.... or
hunt down their parents or something like if
...if they told what was going on.

GERALDO: You're in here now...for a long
time.  How do you feel about what you've done.
How do you feel about the threats?  How do you
feel about them, the blackmail...the
intimidation of these little children?

JESSE: It was all horrible.  I mean...

GERALDO: How do you feel about yourself,
Jesse?

JESSE: I feel terrible that...I wasn't
able...I didn't have the strength or...or the
knowledge from...from not having grown up
enough or not having learned enough to have

**Media Transcripts,**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #1.          Page 8

that I could have done something, that I could
have...I could have told the kids...tell your
parents what's going on.

GERALDO: But you were enjoying it weren't
you?

JESSE: Oh no.  Oh I never enjoyed it  I
hated every minute of it.  It...it was...it
was...it was degrading.  It was...it
was...disgusting. It was...it was...mentally
painful to go through. It...

GERALDO: Would this happen ever day of
the week Monday through Friday?

JESSE: Oh no.  No.  Classes were only...
usually two...sometimes we had three...
different classes a week.  The kids came once
a week and there were times when...we held
computer class and...there wasn't abuse going
on. It...it wasn't a...particularly, every
single time...every day of the week with the
kids.

GERALDO: It was a common pattern. I
mean...

Appendix 000517

.N.G./GERALDO RIVERA   TEL No.212-581-8196          Feb 14,89  9:23 No.003 P.09/28

**Media Transcripts,**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #1.          Page 9


definitely a common pattern.

GERALDO: Those kids knew when they were
coming to your place what they they were
coming for.

JESSE: Yes. They knew what could possibly
go on and what would happen.

GERALDO: And the picture taking.

JESSE: Constantly.  Always...that...for
the most part...that was the reason it...it
went on.  My father was avidly interested in
photography...for years and years and years
and...that was...where he dragged me into it.

He wanted...pictures of sex acts with the
kids and he needed someone to...perform sex
acts with the kids and...he...forced me to do
it.

GERALDO: What did he say to you?

JESSE: It wasn't so much what he said to
me it was...what I knew...from growing up with
him what would happen if I said no to..

GERALDO: Were you his first victim?

JESSE: As far as I know.          Appendix 000518

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 102 of 225 PageID #: 5478

**Media Transcripts,**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #1.          Page 10

GERALDO: And what did he do to you? More photography?

JESSE: He did just about everything to me. He...used me for...what's now...been ten years of life, the past ten years of my life he...used me and abused me...basically whenever he felt like it.

GERALDO: In...in sex acts you mean?

JESSE: Yeah. It...it started when I was ...about eight or nine and he'd...he'd fondle me. He'd read me bedtime stories and...and he'd fondle me in bed and he'd shower with me and he'd...he'd play with my penis. And as I hit puberty he...he became ac... actively involved in...in having sex with me.

GERALDO: Didn't you tell your mother?

JESSE: I couldn't tell anyone. At first I didn't say anything because...there were lots of reasons. At first...I like it. It was...it was some signs of affection, some signs of..of...of loving or caring in the world.

Appendix 000519

**Media Transcripts,**
PROGRAM                 ING/GERALDO -Kiddy Porn Tape #1.            Page 11

and...teased me and beat me up as older
brothers do to their younger brothers all the
time and then being so much older than me as
they are...and...being two of them I was...I
never had a relationship with them. My mother
was never much involved in being with me or
caring about me.

GERALDO: Do you really believe your
mother didn't know over ten long years what
your dad and you were doing?

JESSE: She didn't outrightly know.  I
think if she did...she would have done
something.  She might have suspected. She
might have suspected and...and...and...and
buried it, not wanting to face it. But if she
had...if she had actually known she would have
said something.

GERALDO: What'd your father do with these
photographs?

JESSE: He would send them off to friends
of his who...had darkrooms who could develop
them.  We...we don't have a darkroom. He
always just sent them out.  I mean sometimes

Appendix 000520

Case 2:95-cv-03136-JS Document 41 Filed 01/28/21 Page 104 of 225 PageID #: 5284

**Media Transcripts,**
PROGRAM                ING/GERALDO -Kiddy Porn Tape #1.        Page 12

he would give them to friends, mostly he
mailed them.

GERALDO: Do you remember to who he sent
them?

JESSE: It was just friends.  Like...there
was...there was ▆▆▆▆ and there was...there was
▆▆▆▆.  I never met...I never met them.

GERALDO: (OVER) Obviously...people in the
same kiddie porn underground?

JESSE: Yeah, people with the same
interests, the same...perverted desires.  I...
I...I never met any of them and...and...I
never much probed where they went somehow. I
mean he wouldn't tell me anyway.

GERALDO: Did he also take videotapes?

JESSE: Yeah.  Yeah.

GERALDO: Videotapes of you in action with
the children?

JESSE: Yeah.  And the kids naked. Yeah.

GERALDO: How many kids would be in one
episode?

JESSE: Well there was anywhere from...
four to...to eight kids in...in a class.

Case 2:06-cv-03156-JS Document 41 Filed 01/28/21 Page 105 of 225 PageID #: 8395

**Media Transcripts,**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #1.          Page 13

GERALDO: All boys.

JESSE: For the most part. Evidently computers wasn't a very...girl thing to do and I guess my father always discouraged the girls from enrolling.

GERALDO: Because of his particular tastes?

JESSE: Yeah.  He just...he loved boys. Disgusting but true.

GERALDO: Did you sit and screen the videotapes with you dad?

JESSE: No I couldn't watch them. No, I... I don't think I've ever actually even... watched a single one of them.

GERALDO: What about the photographs?

JESSE: I saw some of the photographs. Some of them came back. He had his own personal collection of his favorites. I was never interested in looking at them.  It made me even more sick than I already was.

GERALDO: Did he sell them?

JESSE: I don't think he actually sold them.  I think it was mostly just a... Appendix0082

A0983

Case 2:06-cv-03136-JS  Document 41  Filed 01/28/21  Page 107 of 225 PageID #: 5287

**Media Transcripts,**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #1.          Page 15

GERALDO: Tell me.

JESSE: I wasn't home when the...the

federal officers came. I was at school.  And I

came home. I think it was about a week after

they came and I noticed that...things were all

out of place from the way I'd left them.  And

I also noticed there was something very

peculiar...

                    END OF TAPE 1.

Case 2:06-cv-03130-JS Document 41 Filed 01/28/21 Page 108 of 225 PageID # 5288

L.N.G./GERALDO RIVERA  TEL No.212-581-8196        Feb 14,89  9:23 No.003 P.16/2

**Media Transcripts, Inc.**
PROGRAM              ING/GERALDO -Kiddy Porn Tape #2.        Page 16

START TAPE 2.

GERALDO: Okay, you get home, Jesse,
everything's out of place...

JESSE: Yes.

GERALDO: (OVER) When do you reali... at
what point do you realize that the place has
been raided by the cops and that your worst
nightmare had come true?

JESSE: My father took me aside when I got
home and I went to my father. I said: Look,
what's up?  And...he took me out for a walk
and...he told me what had happened, that the
police had come. That my mother...found out
about the magazines and the photos and all.

She...at that point wasn't talking to
him. She had moved in with my grandmother.
And he told me...that...well he told me he
wanted to kill himself. He told me he wanted
to kill me too and take me down with him. He
was so scared of anybody finding out
about...about what was really going on

Case 2:00-cv-03136-JS  Document 41  Filed 01/28/21  Page 109 of 225 PageID #: 5289

**Media Transcripts, Inc.**

PROGRAM                    ING/GERALDO -Kiddy Porn Tape #2.          Page 17

that...he was really willing to take his life
and my life.

GERALDO: Why didn't he?

JESSE: Well...I left very quickly.  I
told him I wouldn't help.  I told him I'd
...I'd keep it a secret.  I...I told... I...I
...I basically convinced him not to kill
himself.  Just because I loved him so much and
I just...the thought of losing him would have
just...the thought of...the thought of losing
him would have...would have killed me.

GERALDO: Still.

JESSE: What do you mean?

GERALDO: Even after what he had done to
you and to the boys.

JESSE: For most of my life he was the
only person who ever loved me.  He was the
only person who ever...was with me, who would
do things for me, who'd show any sort of
affection...

GERALDO: (OVER) He used you.

JESSE: (OVER)...towards me.          Appendix 000526

Media Transcripts, Inc.
PROGRAM              ING/GERALDO -Kiddy Porn Tape #2.              Page 18

first as a sex object and then as an - actor

in his perverted movies.

JESSE: It took me a long time to realize

that.  It took me until...I guess I was... it

took me til I was seventeen to realize that.

GERALDO: When did you...realize that you

have better tell the truth?

JESSE: Well my mother asked me about what

has gone on and I gave her some silly story

and just went back to school. And...tried to

think about the whole thing.  I debated for

...many days as to what to do. My father would

call and I...I wouldn't take his calls.

My mother would call. I told my room

mates...don't take their calls.  I basically

tried to just...just put it aside and hope

that...that...in some strange way it wouldn't

be pursued. And...

GERALDO: That they wouldn't come after

you.

JESSE: Well that...that it wouldn't go

Case 2:06-cv-03136-JS Document 41 Filed 01/28/21 Page 111 of 225 PageID #: 5291

**Media Transcripts, Inc.**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #2.        Page 19

magazines and all the videotapes and left.

And it seemed like that was it. They just
wanted to confiscate all the stuff and...and
find out my father's contacts and things. And
in some way or another I...I...I don't know if
I was lucky or unlucky but I managed to put
the whole thing off until I came home for
Thanksgiving and...that was...that was the big
shock.

I...I came home and I went out with a
bunch of my friends and went into New York
City for the day...shopping and stuff. I was
planning on staying out the whole day and then
I decided I'd go home for dinner. I called
them up to tell them to expect me for dinner
and someone answers the phone.

I...I said hello...and she goes...who is
this? I say; It's Jesse. Who are you trying
to reach? I was just trying to reach my home.
The voice...you've reached your home; your
mother and father have both been arrested. Are
you coming home? I told them, yeah. Said; Well
you'll be briefed when you get here.

Case 2:06-cv-03136-JS Document 41 Filed 01/28/21 Page 112 of 225 PageID #: 5292

**Media Transcripts, Inc.**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #2.           Page 20

And I...I think it was...it was at that
moment...that...well I...I think I basically
just turned to jelly. I...my friends asked
what was wrong. I...I certainly couldn't tell
them. I just told 'em I had to get home and
they knew there was something very wrong and
they...they took me sort of...very carefully
escorted me, we got on the train, came home
and...I really wasn't sure what to expect when
I got there.

I was..I was..scared out of my wits. I
was...I was almost just too scared to go home.
I was really convinced I would just stay in
New York City and just..not go home. Just
figure something else to do and just not go
home for a long time.

GERALDO: So you got home and...

JESSE: And I found...TV cameras
everywhere. Policeman everywhere. My brother
pulled me aside and he told me what had
happened, that they'd both been arrested and
...police officer came and said they wanted me
to come inside. They want to...

Appendix 000529

A0990

I.N.G/GERALDO RIVERA  TEL No.212-581-8196        Feb 14,89   9:23 No.003 P.21/2

**Media Transcripts, Inc.**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #2.        Page 21

I went in and...police everywhere. They...they
were taking everything. They were going
through every box. They weren't leaving
anything unturned.

I still wasn't sure what was going to
happen. I...I thought they'd just question me
about what had gone on. And I guess I sort of
realized at that point I was going to have to
start telling someone what had gone on. And
they arrested me.  They questioned me for
awhile and then they said: You're under arrest
and they slapped handcuffs on me.

And...they took me out in front of the TV
cameras and...and...threw me in the car and
drove me down to the police station. I wasn't
really sure what was going on.

GERALDO: Jesse, you weren't really sure
or...you were very sure.

JESSE: I was very scared and...I was
quickly realizing that my worst nightmare had
come true.  And I also realized that what I
had feared all along...  I ...

Appendix 000530

**Media Transcripts, Inc.**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #2.        Page 22

GERALDO: If it were my child in your computer class I would probably want to kill you, Jesse.

JESSE: I can understand that. If it... were my child and someone did it to my child I'd want to kill them too.

GERALDO: What you've done is one of the most horrible crimes you could possibly commit.

JESSE: That's true. That's very true. I ...perfectly understand how everybody is so appalled at what had gone on. I realize that now.  Four years ago, I didn't.

GERALDO: Seventeen kids.

JESSE: Yeah.

GERALDO: The state says probably three times that many.

JESSE: Well there were kids who were in the classes who were witness to what was going on who...all for different reasons never were actually physically abused by my father.

GERALDO: Or you.

**Media Transcripts, Inc.**
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #2.        Page 23

GERALDO: And there was a neighbor involved.

JESSE: Yeah.

GERALDO: A buddy of yours.

JESSE: Classmate.

GERALDO: And for how long was he a participant?

JESSE: For...for...

GERALDO: (OVER) And what did you have ...did you have a party over there. you, your buddy and your dad and the kids?

JESSE: Well...he just happened to come in one day. Just to stop in and say hi and he walked in on...on...on...my father taking pictures with me having...I was...guess I was fondling the kid...I mean the...the kids, most of the kids were...naked or half naked and he was talking pictures.

And...the...the only...I...what my father did at that point...was he...he offered him money. Not do much to not say anything but

Appendix 000532

A0993

I.N.G./GERALDO RIVERA  TEL No.212-581-8196        Feb 14,89  9:23 No.003 P.24/28

**Media Transcripts, Inc.**

PROGRAM                    ING/GERALDO -Kiddy Porn Tape #2.        Page 24

with the kids. Cause he...wasn't in as many of

the pictures as he wanted to be.  He wanted

pictures of...of me and him having sex.

GERALDO: With the kids.

JESSE: Well him having sex with me.

GERALDO: Your father wanted pictures of

him having sex with you, his son.

JESSE: Yeah.  Yeah. And...he paid Ross to

take pictures of it.

GERALDO: It's so sick, Jesse.  It's so

perverse.

JESSE: It's...it's worse than that. But

it wasn't as if...it's as...started happening

when my...it gradually...grew into worse and

worse things...and...once it got started it

was very difficult to stop.  It was impossible

to stop.

GERALDO: (OVER) Where would it have ended

up?  Where would it have ended up if you had

not been caught? What would have been next;

snuff films; killing the children and

photographing...

Appendix 000533

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 117 of 225 PageID #: 5297

**A0994**

Media Transcripts, Inc.
PROGRAM          ING/GERALDO -Kiddy Porn Tape #2.          Page 25

GERALDO: (OVER) ...their deaths?

JESSE: I...truly believed...once I got away from my father, once I left for school...that it would stop. I always saw myself as the object of his desires. It was... it was me being there that caused him to start abusing the kids in the first place.

It was...it was...me...saying no to him as I grew up and had the courage to say: No, dad, don't do that. That he started...doing things to the kids.

GERALDO: You said off camera that you were concerned about how your father feels. Well why are you concerned about this... this hateful, disgusting man?

JESSE: He's my father.  He will always be my father.  I...loved him very much for many, many years in...in...(COUGHS)....in the only way I...I knew to love my father.

GERALDO: You know the expression, short

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 118 of 225 PageID #: 5298

**Media Transcripts, Inc.**
PROGRAM              ING/GERALDO -Kiddy Porn Tape #2.          Page 26

abusers, where you're going.  How do you think
the prisoners, the other inmates will treat
you?

JESSE: Horribly. If not worse.  I've ...I
had a taste of it on the outside. I had a
brief taste of it here.  And I guess I can
only expect it to get worse. There really
isn't much I can say to any of them.

GERALDO: Or to us.

PHONE RINGS.

JESSE: I guess not.

GERALDO: Eighteen years.

PHONE KEEPS RINGING.

JESSE: Hopefully not. (PAUSE)  I'm not...
I'm not a pedophile.  I don't...enjoy having
sex with kids.  I...was never...interested or
had fantasies about having sex with boys. I'm
not a homosexual.  I never...felt like I...
I...never asked my father to have sex with me.
I...I never...

GERALDO: (OVER) Then...then what are you...

Case 2:05-cv-02195-JS Document 41 Filed 01/28/21 Page 119 of 225 PageID #: 5798

I.N.G./GERALDO RIVERA  TEL.No.212-581-8196          Feb 14,89  9:23 No.003 P.27/28

**Media Transcripts, Inc.**
PROGRAM                 ING/GERALDO -Kiddy Porn Tape #2.          Page 27

JESSE: I'm a victim of a very bad
childhood. My father...

GERALDO: That's what Charlie Manson says.

JESSE: I don't know much about Charlie
Manson. What I do know is that...I relied on
my father...as a child to...

GERALDO: (OVER) You take no
responsibility?

JESSE: No. It's not that...I...I...I
don't deny I have responsibility for what
happened. At times I feel like I...have more
responsibility than anybody else because... of
everybody involved. I should have been the one
to say something to stop it, to do something
about it and I feel awful that I couldn't.

GERALDO: Or didn't..

JESSE: And didn't. I...didn't know as a
sixteen year old that...physical contact of
that sort with your father was...uncommon or
...or wrong.

GERALDO: You didn't know. How could you
not know?

Media Transcripts, Inc.
PROGRAM                    ING/GERALDO -Kiddy Porn Tape #2.          Page 28

knowing.  It was what I grew up with.  It was
all I knew.

OFF CAMERA COMMENTS.

GERALDO: Well I think Peter will make a
...a good case for some kind of compassion in
sentencing but...he ought to...he also better
make a good case to keep you in isolation up
there because that....

JESSE: Yeah.

GERALDO: ...I mean the real...I mean
those...those black and Puerto Rican daddies
up there are not going to...

JESSE: It's not just the blacks and
Puerto Ricans...

GERALDO: (OVER) ...care.

JESSE: ...it's everybody.

GERALDO: I was just talking from a
personal experience, they're just not going
to...they're not going to be your fans.  Okay.
Good luck.

# E X H I B I T   4

BOKLAN INTERVIEW —

WORKING COPY

$\mathfrak{L}$ -

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMANS"

INTERVIEW WITH ABBEY BOKLAN

CORRESPONDENT: NOT IDENTIFIED

PRODUCER: NOT IDENTIFIED

TAPE #111 CR# 47-50

(OFF-MIKE CONVERSATION)

QUESTION:

Well, that's a lot of times the best way to do it
is you don't, you know, you don't have any fear
going in. And they say, "Well, there's only one
candidate that we saw that was completely
fearless and relaxed. And, you know, she seems
like she's the best person--"

ABBEY BOKLAN:

Well, I wasn't relaxed once the-- the real
campaign started. First of all, I took my
children's college money a-- as the money-- a lot
of the money that we were expending during the--
especially the contested primaries, you know. I
mean, I-- was just crazy. But I found a red
rabbit's foot on the courthouse steps-- red is my

**CONFIDENTIAL**

favorite color-- the day the call came from the

governor.  So in my strange head, I figured, I

(LAUGHTER) couldn't lose.

                QUESTION:

Great.

                ABBEY BOKLAN:

Yeah, maybe I was just really a wild--

                QUESTION:

Tell me about the--

                    (OFF-MIKE CONVERSATION)

                QUESTION:

Just give me some background-- you were saying

that one of the things you do is you prosecuted

murder cases.

                ABBEY BOKLAN:

Yes, I--

                QUESTION:

Because I'm curious about that, 'cause this case,

obviously, was a-- this was a tough case in a lot

of ways, so I'm curious about that experience

that you had with murder cases, and that kind of-

- you know, you weren't a shrinking violet at

CONFIDENTIAL

that point--

ABBEY BOKLAN:

No, well even before the murder cases, I was head of the sex crimes unit of the-- district attorney's office here in Nassau County. And I was the one who started the use of the rape kit, the start of the use of the-- sex crimes dolls. I don't know if you're familiar with them. It's Raggedy Ann and Andy with genitalia, type things.

And from there, I became the deputy chief of the trial bureau of county court, training other people to try cases. And-- then I became a member of the Major Offense Bureau. No, I think it was reverse. (UNINTEL) that-- I-- that came after the Major Offense Bureau. So in the Major Offense Bureau is when I tried the murder cases.

And I was the first woman in Nassau County to ever successfully try a murder case. So-- no. I really-- I was not intimidated by-- by this case, if that's what you're asking. Because that was

CONFIDENTIAL

my background.  Practically all of my

professional career had been working-- working in

criminal law, and with criminal law cases.  So.

QUESTION:

This case.  How did this case-- first come to

your attention?  Do you remember-- what was the

first thing you remember about this case?

ABBEY BOKLAN:

The first-- (UNINTEL) thing I remember-- is when

the case came for arraignment on indictment.  It

was an indictment that came from the grand jury

of-- you know, Jesse Friedman.  And Arnold

Friedman.  And arraigning them.


And the-- the media frenzy that first time was

the first time that I ever dealt with that as a

judge.  In fact, I think this was the first time

in Nassau County the media was ever permitted

into the courtroom for that arraignment.  And

that was how the case came.


I may have read previously in the newspapers

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

about-- a search warrant being executed.   But I
don't remember whether I did or not.   Or if it
was even in there.

QUESTION:

And when this-- arraignment came, what was your--
what's your first recollection of that, or what
your feeling was when you first saw it?

ABBEY BOKLAN:

My first recollection is, I hated those type of
cases.   It was very difficult when I was the head
of the sex crimes unit dealing with young
children who had been abused sexually.   I mean, I
was a mother.   I had two young children of my
own.

So I think that was my first reaction when I saw
the number of counts.   Heard about the number of
children that were involved, the-- this is really
terrible.   My second recollection, as I said, was
the media frenzy out there.   And there were an
awful lot of parents of the young children, and
family members, and community members who were

CONFIDENTIAL

very interested.  So it was a very full

courtroom-- the day of that arraignment.

QUESTION:

And what do you remember about the-- the

Friedmans when they came in?  What was your--

perception of them?

ABBEY BOKLAN:

I didn't have much of a perception.  They-- the

att-- the attorneys do most of the talking-- at

arraignment.  They really didn't speak.  Jesse

was young.  He looked young.


And-- and that was kind of sad.  To see such a

young boy in this situation.  But they were very

quiet.  Both of them were quiet.  And that was

all that I recall about that.

QUESTION:

And after this arraignment (COUGHING)-- what was

the next step that you remember?

ABBEY BOKLAN:

Then we began the conferences, as to whether this

case would be resolved by a plea, or would go to

**CONFIDENTIAL**

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 128 of 225 PageID #: 5308

trial.  Fairly early on, it became evident that--
the father, Arnold Friedman, was looking to
plead.  My sentencing commitments, if he pled,
were-- was very, very high.  It was 10 to 30
years.  The district attorney had indicated that
that-- would not be offensive to the-- to the
families were-- that were involved.


And we went through the set of negotiations.  And
he finally determined that he was going to plead
guilty.  Jesse, at that time, the son, was still
indicating that he was not guilty.  That he was
innocent of the charges.  So additional
indictments came down.  Additionally-- more
children were found to be involved.  And-- and
that is my next recollection of that stage.

QUESTION:

Was there subsequent indictments (COUGHING)?

ABBEY BOKLAN:

The subsequent indictments that came down on
Jesse and another-- another co-defendant as well,
a y-- another young boy.

CONFIDENTIAL

QUESTION:

And we can't talk about him because--

ABBEY BOKLAN:

Well, we can talk about him, but we can't talk by name.

QUESTION:

Because he was c-- granted--

ABBEY BOKLAN:

He actually was given youthful addender (PH) adjudication. That was not my choice. My sentence was a stricter one than-- the district attorney had negotiated with the defendant. But I was not a party to those negotiations.

The young man involved agreed to testify in the grand jury, and at later trial, against-- Jesse Friedman, in return for this offer made by the district attorney. Since I was not a party to it, I was not bound by it, I felt. And I gave him an upstate sentence, that was later reduced by an appellate court. (UNINTEL) they granted youthful offender adjudication, and gave a split

CONFIDENTIAL

sentence, a six months, as a special condition of five years probation. W-- the initial offer by the district attorney's office, because they felt that even though the judge (myself) was not a party to it, that the boy had relied on their promise when he testified at the grand jury. So.

QUESTION:

Is it typical that you would be involved in-- in other cases where the DA makes a deal. How do they bring the judge in, so that they do know that the judge is committed?

ABBEY BOKLAN:

Yes. We-- well it was supposed to be a-- a confidence, and then they're supposed to ask the judge, "Can you go along with this" before any promises are made. Because they know-- except in a very strange case like this, that until the judge commits to a certain sentence, there really is-- no plea that has been worked out. And in this case, that sentence was not negotiated for and agreed to by me.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 131 of 225 PageID #: 5311

QUESTION:

Do you have a sense of why-- of why it was-- it
was handled differently?  Was it-- maybe the
pressure of the case, or the intensity of the
negotiation or something, that prevented the
assistant district attorney from including you in
that?

ABBEY BOKLAN:

I think the assistant district attorney thought
that they had left the ultimate decision in my
hands, and only after the appellate division
reversed did everyone realize, or did the
appellate division decide, that-- the-- the boy
had relied on it, and was entitled to it.  Even
though all the rest of us had thought it would
be-- left to me at time of sentence, and after
reading probation reports, and everything else,
to determine what the appropriate sentence was.

QUESTION:

Is there a-- is there any-- do you have any sense
of why-- I think that young man took a long time
to get to the point where he agreed to turn and--

CONFIDENTIAL

and-- testify against his friend, Jesse.  How
does that usually work?  Why would it take a long
time for him to do that?  And what were they
trying to work out?

ABBEY BOKLAN:

It could very well have been that the-- defense
attorney was trying to get as good a deal as
possible.  Also, it could have been because the
families were enraged.  The victims' families.
That he was getting such a great deal.  That I
can't answer you.  That you'll have to ask the
district attorney's office, because I was not
privy-- to those negotiations.

QUESTION:

So now, from the standpoint of-- let's just go
back to Arnold for a second.  Arnold ultimately
did plead guilty.

ABBEY BOKLAN:

Yes.

QUESTION:

What's your recollection of that?

CONFIDENTIAL

ABBEY BOKLAN:

My recollection is-- a full courtroom.  The
media.  The TV.  And my greatest concern was that
in no way should the children's names be
revealed, should anyone find out who the real
children were.  Because they had to still live in
the community of Great Neck.  They were in
school.

So that-- I asked most of the questions during
the sentence.  It wa-- it was some things like,
"On such-and-such day, did you do X-- crime?"
And he would answer, "Yes.  Yes.  Yes.  Yes."  So
it wasn't a very long-- it was long, because
there were so many counts being pled to.

But it wasn't a rambling, open narrative, where
the children's names could possibly-- leak out.
I also remember that I was very, very concerned
that there be no photographs taken of the
families, because the young children could be
identified-- through those photographs as well.

Abbey Boklan Complete Transcript (111-113).doc



Case 2:06-cv-03136-JS Document 41 Filed 01/28/21 Page 134 of 225 PageID #: 5314

And the tremendous horror if any of this got on--
on television, and they saw their names, or their
families on television, that they were the
victims of the-- these horrendous acts.

QUESTION:

Now, obviously, you felt strongly that there was
a benefit to having the cameras there as well,
because otherwise you would have just kicked them
out. What was your-- what was-- what was going
through your mind? Because they-- they had to
apply to you, I guess--

(OFF-MIKE CONVERSATION)

QUESTION:

So I was asking about the-- the decision-- it was
the first time that cameras were allowed in the
courtroom, I guess, in Long Island or in--

ABBEY BOKLAN:

In Nassau County, I--

QUESTION:

Right. And what was-- what-- what was the-- what
was that decision process?

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

### ABBEY BOKLAN:

Well, I listened to the defense attorneys, who
were opposed, as I recall.  The district attorney
was not opposed.  And of course it's his job to
protect the children.  It was-- something the
community was very interested in.  The media was
very interested in.  and-- and I-- I believe in
open courtrooms.  And as long as the names of the
children, and the children could be protected, I
saw no harm in it.

I wasn't that concerned about protecting the
defendants.  Their pictures, their names, were
all over the-- the newspapers.  S-- so (LAUGHTER)
their reputation at that point was not too good.
It was mainly, as I said, the protection of the
children.  I was assured by the-- the camera
personnel, by the media, that they would take no
pictures of the families.  That they would en--
ensure that they would block out the names of the
children.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

QUESTION:

If they were used.

ABBEY BOKLAN:

If they were used.  And they would-- take all
measures to protect them.  And-- and they did.
And they were very responsible in their coverage,
as far as that went.

QUESTION:

The-- I mean, obviously somebody-- sex offenders
will say-- and I've even heard some prosecutors
say, as soon as you're on television, and it says
"sex offender," you never will get a fair trial.
You know.  What do you think about that?

ABBEY BOKLAN:

I think they'll get a fair trial.  First of all,
you have the opportunity to-- during voir dire to
speak to the jurors, to make sure they haven't
seen any of the coverage.  Or if they have, that
it won't affect them.

In general, I've been amazed how little the
jurors have read or recall of even some of these

CONFIDENTIAL

high-profile-- murder cases.  Of course, during a
plea, you don't have to worry about that, because
you know-- they're not going to trial.

I think, perhaps, the greater danger to a
defendant is, if they are going to be
incarcerated.  Because in all the jails,
everybody watches TV as well.  They are
certainly-- fair game to a lot of other
defendants, who consider them the lowest of the
low.  A sexual predator.  Especially one
involving a younger child.

So-- that, I think, is a-- is a true danger.
Sometimes you require protective custody-- of the
defendant, who's been convicted of a sex case.
Especially a young one, such as Jesse Friedman.

QUESTION:

Why do you think that Arnold pled guilty?

ABBEY BOKLAN:

It certainly wasn't because of the mercy of the
sentence.  Ten years to 30 years is a very long

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 138 of 225 PageID #: 5318

time.  He was guilty, in my opinion.  He told me
he was guilty.  And I think, with the amount of
the evidence, he was very concerned that, if he
were convicted after trial, he would get 50
years.  And he would never see the light of day.

As it turned out, since he passed away, he died
when he was in prison-- perhaps he should have
gambled and gone to trial.  Certainly, at trial,
I would not have permitted the media to be
present.  You know, with the young children
testifying.  That's a whole-- since we're
discussing media, that's a whole different story
from a plea, a sentence, an arraignment.

QUESTION:

What is that like?  Have you-- have you been
involved in a case where you had to have kids
testifying in open court like that?

ABBEY BOKLAN:

Yes, I've been a prosecutor on those cases as
well.  Involving very young children.

**CONFIDENTIAL**

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 139 of 225 PageID #: 5319

QUESTION:

And what's that like?  How is that different from

a regular case?  What are the challenges of-- of

dealing with a case like that?

ABBEY BOKLAN:

Tremendous challenges.  First of all, you don't

know until that child is in the witness box,

whether they're gonna talk.  I remember I used to

take some of the very young children down to the

courtroom, and we'd actually play there.  You

know, I'd put them in the witness box, I'd

pretend to ask them questions.


I let them sit in the judge's chair.  I let them-

- sit all over the courtroom, so they became a

little more comfortable.  But when they got into

that witness box, and they faced the person who

abused them-- you can never really be sure that

they're going to not refuse-- refuse to talk.


And then of course they have to go through cross-

examination as well.  It's a horrendous

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

experience for a young child.  Absolutely
horrendous.  I used to say to some of them,
"Don't worry, you don't have to look at him or
her.  You can j-- look at me.  Always look at
me."

It-- it was a very tough case.  I found being
head of the sex crimes unit of the district
attorney's office much more difficult.  And
trying those cases, far more difficult than
trying murder cases.  As a judge, I'd much prefer
to try a murder case than any kind of sex abuse
case involving a young child.

                    QUESTION:

Just because of the discomfort of-- of putting a
child through that, and things like that?  Or
also just 'cause of the volatility of the case?

                    ABBEY BOKLAN:

Both.  But my main concern is the child.  It--
it's a horrendous experience to put a child
through.  I had one case that was tried here
where a young girl testi-- (UNINTEL) fied against

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

her father.  Actually he was acquitted.

You wonder what kind of lingering-- problems that
young girl is going to have.  It's bad enough to
have to stay-- say your-- tell your story.  But
can you imagine if you're not believed?  How you
have to live with that?  And in this case-- some
of the acts that went on in that classroom were
so obscene, and so horrendous, that-- if it were
on a TV program, you would say, "People are
exaggerating.  We don't-- we don't believe it."
So I could imagine what w-- would have gone on,
if we had an actual trial in this case.

                    QUESTION:

There are, I mean, obviously, you know, Arnold
writes you and says, you know, "None of this
happened."  And he writes his open letter and all
that stuff.  Obviously there were some people in
the Friedman camp who said, you know, "It's so
extreme."  You know, "Maybe Arnold Friedman did
something, but banging the kid's head against the
wall, and all these repeated sodomies, and all

CONFIDENTIAL

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 142 of 225 PageID #: 5322

this public activity with multiple adults in the
room.  It's implausible."  And what was your
sense of that?  'Cause you were sitting through
the guilty plea, and all that kind of stuff.

ABBEY BOKLAN:

There was never a doubt in my mind as to their
guilt.  First of all, I knew that all the
children had been interviewed separately.  The
stories were extremely consistent.  I had the
opportunity to read the grand jury minutes, where
these young children testified, as well as the
young co-defendant who we've previously
discussed, who was testifying-- against them.

The stories were consistent with each other.  And
consistent with the evidence that was found in
the federal search warrant.  When the children
talked about certain videos they had seen,
certain pornographic literature that they had
been shown-- and you know, I had all those years
of experience as an assistant district attorney,
and in the sex crimes unit, when I dealt with

CONFIDENTIAL

young children.  And it just rang true.

Then, of course, I have a defendant standing out
there, and answering, "Yes, yes, yes.  Yes, I did
all of those charges."  Maybe there is a
temptation to plead guilty to a minor charge with
a very light sentence, even if you're not guilty,
because you're so afraid of exposure.  But when
you're talking about a sentence, and Arnold's
sentence, as I said, was 10 to 30 years, where
you could spend 30 years in jail.  And you're
admitting to a tremendous number of horrendous
acts.

I don't think someone's going to just do that--
very lightly, unl-- unless they're guilty.  Also-
- Arnold was a very educated man.  This was not
some young person who was being intimidated, who
didn't know what he was doing, who didn't
understand what he was facing.  So, as I said, I-
- I was very comfortable with accepting the pleas
that they were guilty.  And I was very

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

comfortable with sentencing them to long periods
of incarceration.

QUESTION:

When you were-- we talked about what a-- your
impression of Arnold and Jesse a little bit,
although they didn't do as much talking.  Did you
have any impression of other family members?  I
know that they-- sometimes they would come to
court.  David came to court, or, you know--
Elaine (PH) came to court.


And I know there were a couple of altercations
between them, and some of the-- you know, even
some of the parents in the courtroom.  What was
their beha-- what was the family's behavior like?
Given this kind of experience that they were
undergoing?

ABBEY BOKLAN:

I have no recollection of what the other members
of the family, and there were never any
altercations in the courtroom when I was in
there.  So, that-- everyone sat very quietly.

CONFIDENTIAL

Because I told them in the very beginning, any
interruptions, any-- disturbances, you're out of
here. So I remember very q-- you know, quiet--
well-behaved group, on both sides.

There was a tremendous undercurrent of rage and
horror on the part of the victims' families, but
I don't remember misbehavior. I mean, we're
talking about a lot of years ago. But I think I
would have recalled if there was in the courtr--
anything in the courtroom.

QUESTION:

Now, I think that the-- the parents of the
victims in this case came to court very
frequently. At pretty much any time there was
something that was-- gonna be discussed in the
courtroom, where they were permitted, they would
show up. Where-- they weren't absentee.

Do you have any recollection of what kinds of
people they were? Or what-- or the-- were they
very passionate about being there? And-- it

**CONFIDENTIAL**

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 146 of 225 PageID #: 5326

seemed like there was a real support network that developed.

ABBEY BOKLAN:

Yes, I re-- I remember a lot of the families. A lot of them sent me private letters. Which is completely appropriate, prior to sentencing, to-- let a judge know the feeling of the victims, and of the victims' families. I remember they were well-behaved. They were very well-dressed.

And there was a lot of pain. The-- you-- you could see it as they sat there. I mean, these were young, innocent children. You're talking about very young children here who-- who were involved.

(OFF-MIKE CONVERSATION)

(BREAK IN TAPE)

(OFF-MIKE CONVERSATION)

QUESTION:

It is a small community. I'm-- I'm-- I was interested when I found out-- I guess, you've-- you've known-- well, everybody's known everybody

CONFIDENTIAL

Appendix 000654

in this community.  But you've known Joe Amarato
(PH), and Peter Pennero (PH), and Fran-- how--
tell me a little about that--

                    (OFF-MIKE CONVERSATION)

                    ABBEY BOKLAN:

Tell you a little about-- I'm sorry--

                    QUESTION:

Just about the relationships between the people.
Because this is-- in this little four-block
radius, there's a lot of drama that goes on here.
A lot of people that have to rely on each other--
what were those relationships like?


Because everybody was a lot younger together.
And then developed, and obviously they all see
you as like-- you made good at the highest level.
And they are all sort of, you know, in their own
fields-- you know, developing and-- and becoming
more successful, and--

                    ABBEY BOKLAN:

Well, I was older than they were too.  Because
remember, I had stopped for 11 years, you know,

CONFIDENTIAL

to raise my family". But-- in this community, an
awful lot of the assistant district attorneys go
out into private practice, become defense
attorneys. So that everybody, at least who works
here in Nassau County, kind of knows each other.

It doesn't affect the cases. They'll fight as
hard as they can. Fact, when I was-- first a
judge, one of the-- legal aid attorneys, by the
name of Scott Banks, was assigned to my part for
legal aid in defense. He later became one of my
law secretaries. So they come from both sides.

And you know, we're-- professionals doing a job.
And I-- I don't think that the fact that you know
each other from before-- impacts at all on what
happens with a case. I really don't--

                    QUESTION:

Well, it seems like that's true. Because you--
obviously, you were on-- you know, you had Peter
Pennero-- you know, passionately trying to
definite Jesse. And then you were also-- you

**CONFIDENTIAL**

know, you obviously had-- a p-- prior
relationship with Peter, and you knew him from
work, or whenever.

But tell me a little bit about-- I'm-- I think
it's interesting to sh-- that aspect of it is
that everybody did kind of grow up together in
the system.  And maybe you could comment on those
people who were all so involved in the case.  Or
just what your recollections were.

       ABBEY BOKLAN:

In what respect--

       QUESTION:

(UNINTEL) Amarato, or Pennero, or kind of how
they all-- because even Fran Galosso (PH) ended
up becoming head of the sex crimes division in
the police department.  And it seems like you--
you know, you've all had some kind of-- you know,
in a way, common purpose.  That, you know, you
were on different sides of the equation.  But you
all knew each other. (UNINTEL)--

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

ABBEY BOKLAN:

I don't think it-- I don't think it really
impacted at all, except that perhaps the fact
that we knew each other, trusted each other, and
knew that we would have further dealings. You
can usua-- you can depend upon the word-- of
someone you're dealing with like that. You-- you
can trust them to act as a professional.

And I think that's what's good about so many of
the attorneys knowing each other. And knowing
that, after this case, there'll be another one,
and another one, and another one. So, you don't
play games with each other.

QUESTION:

The-- if we go back to Jesse's-- well, we know
that Arnold-- we talked about why Arnold pled
guilty. And-- I guess I'm curious about-- what
do you-- what was Jesse's situation at that
moment? Now, Arnold's pled guilty. His father's
pled guilty.

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

ABBEY BOKLAN:

He says he-- at that point, he was saying he's
innocent, and he wanted to go to trial.  Joe
Amarato then indicted for more counts.  Because
they had only indicted on some of the charges
against some of the children.  He then brought-0-
further indictments, involving a lot more
children.

So that really you (LAUGHTER) can add up a lot of
consecutive sentences.  And of course, the
evidence becomes greater, the more people you
have willing to testify-- as to what occurred.
And that's when I think, if I recall correctly,
and it's-- it's a lot of years ago.  But the--
the co-defendant, the young one, I think-- when--
Jesse Friedman and his attorneys found out that
the-- the-- the young man had agreed to testify
against him, I think at that point, is when he
started to very seriously think about pleading
guilty.

CONFIDENTIAL

QUESTION:

Did you ever have a thought in your mind that,
while there are different gradations of this, did
you ever have a thought as you were learning more
about the case, maybe Arnold did it and maybe
Jesse didn't participate?  Is it possible-- did
you ever think, at any stage, that Jesse might
not have done it, because he was a whole
different person at 17 years old, or something,
when it took place.  Arnold, you can imagine, he
was already a pedophile when he was 56.  But
making-- it seems like, at a certain point, maybe
it wasn't as clear that Jesse was involved.

ABBEY BOKLAN:

I don't think so.  Because, you know, when I was
reading my grand jury minutes, or learning the
story, the two of them were working as a team
with certain friends of Jesse.  So it was never
that Arnold was alone doing things and Jesse
wasn't there.


And of course, once he pled guilty, he not only

CONFIDENTIAL

pled guilty and told me that he had done it. But
during the course of his conversations with the
probation department, you know, I get a probation
report-- prior to sentencing. He made tremendous
amounts of admissions to them-- and tried to
justify and explain why he was a participant.

Also, his own attorneys submitted to me, after
plea and prior to sentence, a pre-sentence
memorandum, asking for mercy, not on the grounds
he didn't do it, but on the basis of the
tremendous abuse that he himself had suffered at
the hands of his father. And that he wouldn't
have turned out the way he did if not what
happened to him when he was young.

So-- very quickly, it became not an issue of
whodunit, but what was the appropriate punishment
for what had occurred and happened at that point.

QUESTION:

Do you have the-- I have-- just so you know, I
happen to have it as well, Peter Pennero's pre-

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

sentence memorandum.

ABBEY BOKLAN:

Yes.

QUESTION:

But I'd be curious if you had it-- pa-- hu-- each
document that I have, I need to bring into the
film in some way, and I think that's a valuable
document.  If you have it, maybe you could read
us a line or two from it, so you know, it makes
the connection.

ABBEY BOKLAN:

You do have it?  It was given to you by Peter?

QUESTION:

It was given to me (UNINTEL)--

ABBEY BOKLAN:

Oh, okay.  Unde-- under that condition.  Let me
just-- (PAPERS)

QUESTION:

(UNINTEL) included all of those (UNINTEL) that
you had (UNINTEL) so many psychiatrists, and he--
(UNINTEL) five different psychiatrists.  A number
of whom he quotes in that.  You know, talking

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

about Jesse's-- being abused, and (UNINTEL)
personality (UNINTEL).

ABBEY BOKLAN:

Well, it's interesting, because I've always
highlighted, you know, I have a little yellow
highlighter where everything that's sent to me,
and I read these and my old highlights back from
those days.  And one of the things that, of
course, I was told, was about the constant abuse
on both a sexual and psychological level by his
father.  And it-- causing Jesse to have suicidal
thoughts.


And then he puts, of course, "severe and frequent
sexual abluse (SIC), including sodomy by the
defendant's own father."  (PAPERS)  There's a
whole section on the drug abuse.  Where Jesse
describes a life where he was stoned on a daily
basis, at ages 16 and 17-- I said-- you know, it-
- it goes on.  But-- but-- but that really is the
bottom line.

CONFIDENTIAL

TAPE #111 CR# 47-50                                          PG. 35

Then there were various psychiatric (NOISE)--
reports that I don't-- I would not feel
comfortable quoting from, even though, as you
indicated, he had turned them over to you--
involving what he told the psychiatrists, et
cetera.  But-- but the most important thing is,
obviously, he was very, very disturbed.  Very
disturbed individual.

I-- I-- here he-- he loves his father.  There's--
there was no doubt about it.  And what he thought
of-- as affection from his father, m-- most of us
consider devious and disgusting acts.

So I-- I think we had-- a young man who was
extremely, extremely confused.  I don't know--
you have no-- the sentencing minutes-- as well--
of some of the things that I said during the
course of the sentencing-- I'm not much on
speeches.  But there were a lot of things that I
said during the course of it-- explaining both
the-- the-- the terrible sadness that I felt, of

**CONFIDENTIAL**

what he had gone through.

But at the same time, s-- saying that I thought
he was such a menace to society, because of what
he had been turned into by his father-- that I
felt the parole board should keep him for as long
as they could.  Because there's some times when
you weigh-- different reasons-- for why someone
should go to jail, one of the things that you
really have to consider, as well as the why of
the defendant did it, is to, what kind of danger
he was-- be to society?  And on that point, at
least-- I felt that he was a menace.  Even though
he was very young.

QUESTION:

Yeah.  Fran Galoss-- (TAPE SKIPS) who was the guy
started out on his subject on, followed by Jesse
today, because Jesse's in prison today.  You
know, and he's still alive, and (UNINTEL)--

ABBEY BOKLAN:

Is he going to talk too?  Is he willing?

CONFIDENTIAL

QUESTION:

I-- I think-- you know, he's very nervous about--
being paroled. And he is-- I think, like
anybody, he's hopeful that he can tell his side
of things. But I think he's very reticent about
doing that-- before he gets to see how he's
treated the next round, or-- because, you know,
he's been in now-- you know, he's-- he's been up
for parole a number of times, and obviously
hasn't been-- hasn't been paroled.

ABBEY BOKLAN:

Doesn't he max out quite soon?

QUESTION:

He doesn't max out for five more years.

ABBEY BOKLAN:

Oh really.

QUESTION:

So he's-- but his CR date would have been last
year. Around the time they brought him up to see
you.

ABBEY BOKLAN:

Right. And that was a mistake. They shouldn't

CONFIDENTIAL

have brought him down then.

QUESTION:

Yeah.  I was going to say, you know, Fran's said-
-

ABBEY BOKLAN:

Are we back on film again now?

QUESTION:

Yeah.  Yeah--

ABBEY BOKLAN:

Okay.

(OFF-MIKE CONVERSATION)

QUESTION:

Fran said to me at one point that she feels that
he-- knowing what she knows about Jesse, she
feels strongly that if he's let out of prison,
that he will-- commit some other bad act.  And
obviously, you felt that at the time, which is
why--

ABBEY BOKLAN:

Well, at the time of sentence.  Of course I-- had
not had the opportunity, really, to-- to see how
he's managed up at prison.  Whether he's been



remorseful.  Whether he's turned his life around.

Because, you know, I have to make a determination
now, when he does get out, under Megan's Law
(PH), of how dangerous he is.  So I-- I don't
know what's happened in the interim.  And I still
have an open mind on that.  At the point I
sentenced him, I felt strongly enough that he was
a danger to society that I included in my
sentence a recommendation that the parole board
not release him early.

              QUESTION:

And-- I-- I don't want to press that issue,
'cause I know he's going to see you, so--

              ABBEY BOKLAN:

Right.

              QUESTION:

(UNINTEL) talk about that.  The-- there was, at
one point in the case-- a request for a change of
venue.  And-- obviously the lawyer said, "Well,
we can't get a fair trial."  I guess they always
do that.  What was your reaction to that, and--

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

Appendix 000668

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 161 of 225 PageID #: 5341

TAPE #111 CR# 47-50                                              PG. 40


and-- by the way, also, they can't hear me
usually, so you-- so if I ask you about change of
venue, you might say, "Oh, at one point they
asked for a change of venue." Just so that we
complete the thought.

        (OFF-MIKE CONVERSATION)

        ABBEY BOKLAN:

All right. I felt, in most cases that are high
publicity, if you voir dire the jury very
carefully, you-- you can find a jury that has no
bias, no prejudice, (LAUGHTER) is not even
familiar with the case. And I felt that's the
way it could be handled. I mean, we've had many
high publicity-- cases that were tried here.


Of course, this came after the Friedmans. But
just for an example, you have like the Ferguson
case, which didn't require change of venue.
There are enough jurors in our-- our pool in
Nassau County who can sit fairly impartially.
And you can handle that.

CONFIDENTIAL

TAPE #111 CR# 47-50                                          PG. 41

If, during the course of voir dire, you find that
you cannot find a-- an unbiased, unprejudiced
jury that haven't been tainted, well then you can
always move it out. But thi-- this-- there was
no reason to move it out of county. At that
point.

                    QUESTION:

Right. So now, Jesse comes around to-- to-- it's
time for Jesse's plea, or let's say, now we know
that Arnold's pled, then the other young man has
also pled. Or effectively, made a deal. So now,
the two people in the world other than Jesse who
were ostensibly involved, have both pointed the
finger at Jesse in one way or another.


How do you think that affected Jesse's desire to-
- you know, s-- to go to trial, or whatever? How
does that process-- how did that process go?
'Cause it seems like he had a big pretty big
change of-- of heart.

                    ABBEY BOKLAN:

He also changed attorneys in midstream. I don't

**CONFIDENTIAL**

Appendix 000670

remember exactly at what point the attorneys changed. But I'm sure the defense attorney-- sat him down, and said, "Look. You have so much against you, and your exposure-- of sentence is up to 50 years, that it would be very wise to take, you know, a deal-- as opposed to going to trial.

"You're still a young man, that you'll-- you'll get out of jail when you're still a young man, while you-- otherwise you could spend the rest of your life sitting behind bars." Of course, I wasn't privy to those conversations. But that would be realistically what I would think would have occurred.

QUESTION:

And-- so let's-- however that played out, then eventually-- Jesse comes before you again. And this time, I guess, he's there to plead.

ABBEY BOKLAN:

Right, yes. Then he pleads.

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

QUESTION:

So tell me about that.  Your recollection of
that.

ABBEY BOKLAN:

Very similar to Arnold's.  Also media was there.
The families were there.  I tried to make the
allocutions (PH) as painless as possible.  Almost
in an antithetic type way, you know, "On such-
and-such date in Nassau County, did you put your
penis on-- on so-and-so's anus?"  And he would
say, "Yes."  Or whatever the charge, the sodomy
charges that he was-- pleading guilty to.

And-- it went very smoothly.  Very quietly.  Very
smoothly.  Pleas, in some ways, are-- easier to
do than the sentences.  The sentences are where
the emotions come out.  The attorneys are
pleading on behalf of their clients.  The
district attorney may-- make a statement.  The
defendant may be pleading for mercy.  The-- so,
that's c-- in-- in some ways, far more emotional
than the actual plea.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

QUESTION:

And then eventually, Jesse does come before you

for sentencing.

ABBEY BOKLAN:

Right.

QUESTION:

So tell me about that, at the next-- am I right,

that's the next-- that was sort of the next move-

-

ABBEY BOKLAN:

It really was, once they plead, it-- and it moves

to sentence.  You know, the probation department

had the opportunity to report first-- which-- I

get-- prior to the day of sentence--

* * *END OF TRANSCRIPT* * *

CONFIDENTIAL

TAPE #111 CR# 47-50                                              PG. 45

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMANS"

INTERVIEW WITH ABBEY BOKLAN

CORRESPONDENT:  NOT IDENTIFIED

PRODUCER:  NOT IDENTIFIED

TAPE #112 CR #51-54

**TRANSCRIBER'S NOTE: QUESTIONER OFF MIC.  BEST EFFORT FOLLOWS.**

(OFF-MIC CONVERSATION)

QUESTION:

We were talking-- oh, we were talking about other
cases.  Well, obviously since that time, we knew-
- we know that there-- there were a lot of other
cases where, you know, in the end the argument
was that the police were overzealous.  That, you
know, the reason that the stories were similar
between the kids is because the police were
teaching the kids what to say.

And so of course they're similar.  They all came
from a similar source.  What was the thing that
made you know that this case was different. And
when you saw those cases come out, you know, you

CONFIDENTIAL

obviously had second thoughts about this case.
You must have had a sense of confidence that this
was case was handled differently.  And how did
you know that?

ABBEY BOKLAN:

Well, first of all the case only came to
attention of the police department because of the
search that was done-- by the federal government-
- where they found all of things going on on the
computer and the Internet.  And they went in and
they got all of this pornographic material.

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

So knew this wasn't some question of some
hysterical mother who came in and started a mass
hysteria.  And only after the federal government
called it to the attention of the Nassau county
authorities and they started investigating and
started to go independently to these various
homes and speaking to the children separately did
they discover what was going on.

CONFIDENTIAL

So I don't think these young children even had a chance to get together and make up stories. I think-- I don't think the police knew what they were looking for when they started investigating. So I didn't think there was any issue of brain-washing.

And as I mentioned previously, we had children showing tremendous signs of abuse. Independent signs. The nightmares. The falling school work. All of those things corroborated what the children were saying.

And-- and things that parents couldn't explain. Even things that couldn't be explained as far as Jessie with the suicide attempts. With the drug use. All of that came before these charges. There was something festering in that household long before the federal authorities ever went in.

We-- you also are dealing with an age group of children-- although they're young, they don't

CONFIDENTIAL

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 169 of 225 PageID #: 5349

fantasize as much.  And it's very embarrassing and very-- this is from my own experience in the sex crimes unit.  Very embarrassing for a young boy to talk about just-- these type of sex acts. (ROARING)  It's not something that-- that they're proud of.

So I think the-- it was my understanding that the detectives had a very tough time even getting the information out of these young children.  And the parents had a very tough time believing that these things initially were-- occurred, because Arnold Friedman had this wonderful reputation.

This was after school, extracurricular work for children who were bright, intelligent.  Wanted to learn.  Wanted to be involved with computers.  I mean parents were paying large amounts of money, you know, from something like this.  I never had a doubt.  Never had a doubt.

QUESTION:

The-- obviously the person on the other side of

CONFIDENTIAL

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 170 of 225 PageID #: 5350

the equation who was doing most of the-- of the
digging and talking with kids and stuff was Fran
Galaso (PH).  What was your relationship with
Fran?  How did you guys know each other from
before?  What your--

                    ABBEY BOKLAN:

Fran's husband was an assistant District
Attorney-- in the-- District Attorney's office--
I think even before I was there.  So I knew him.
When I was head of the sex crimes unit, I don't
think Fran Galaso was the one who was in the sex
crimes unit of the police department.

When I first got this case, I didn't even know
Fran Galaso was involved.  And when I started
learning about it and starting to read a lot of
the grand jury minutes.  So I think the fact that
I knew her, her family, had very little-- to do
with it all.  (ROARING)  In fact when the case
was finished, I-- if I recall correctly, that's
when I first learned how deeply involved-- she
was in the case.

**CONFIDENTIAL**

QUESTION:

But you-- you guys had (UNINTEL)-- I don't even
know what the protocol is.  But in general--

(OFF-MIC CONVERSATION)

QUESTION:

The protocol would be during the course of the
case.  You wouldn't discuss it with--

(OVERTALK)

ABBEY BOKLAN:

No communication with-- with any detectives or
police.  Remember if we have to go through
hearings, for example, there's gonna be a real
trial.  You have to go through hearings.

And very often, the police officers become
witnesses.  So a judge has no communication at
all with the police officers during the course of
it.  That's why I think-- and at least until time
of sentence or maybe immediately before sentence-
- I really wasn't even-- aware of her-- how-- how
involved she was in the case.  But it wouldn't
have mattered.  You know I know a lot of police

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 172 of 225 PageID #: 5352

officers who are on cases that I'm handling all
of the time.

               QUESTION:

Did-- when you went into the sex crimes unit to
begin with, what possessed you to take that job
at that moment, 'cause that was probably pretty
unusual. I-- maybe I'm wrong. Maybe it was a--
typically a job that would be held by a woman.
But for some reason, I thought it was a job that
would probably traditionally have been held by a
man.

               ABBEY BOKLAN:

In this county, if I recall, we had no sex crimes
unit until Dennis Dylan asked me almost to create
one. And I s-- I-- I really-- I think s--
actually started-- the unit. One of the first
things I discovered becoming the head of it, we
didn't even have a rape collection kit.


Every hospital was going off and doing their own
thing. We were losing evidence. It-- it was--
it was really horrendous.

CONFIDENTIAL

So I don't think we had-- either men or women who were the head of the sex crimes unit-- at that point.  But my recollection could possibly be faulty with that.  But that-- that's what I remember.  I know Joe Annoranno (PH) came in long after.  You know I was-- already out of the office into the sex crimes unit.

QUESTION:

I wonder whether that's 'cause there were just more sex crimes?  It's sort of sad, but true.  But maybe it is.  Maybe it just became a much more significant part of the makeup of the crimes?

ABBEY BOKLAN:

And also I think-- at least for Mr. Dylan, he was-- he was concerned about how many sex crimes cases we would lose.  And some of the reasons we would lose them is that we-- we didn't collect the evidence properly.  So there were a lot of things going on.

CONFIDENTIAL

I mean to have children, very young children,
testify in a grand jury when they can't describe
even the genitalia or don't know how, that was
the start of the-- of the dolls that I had sent
for.  So there really-- there-- there was little
foundation.  It was every DA did their own thing.

They got the case.  They ran with it.  There was
no co-- coordination as-- as I recall until I-- I
became at-- you know that's a lot of years ago
we're talking about.  'Cause I left the DA's
office in '82?  '82.

QUESTION:

And tell me about that, 'cause that's
fascinating.  I was reading-- the Justice
Department has a publication about interrogating
children or, you know, questioning children and
how to do it.  At the time, I don't think even
that had come out yet, 'cause this was pretty
early.  How did you know that there were such
things as these anatomically correct dolls?  And
tell me about that-- that process of

CONFIDENTIAL

interrogating children?

ABBEY BOKLAN:

I read about them.  And I asked-- you know the--
the District Attorney, Dennis Dylan, could I-- we
have the money to send for them.

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

The money to send for the-- the dolls, the sex
crimes dolls-- because I found when I would talk
to children how difficult it was for them to
describe what had happened to them.  And if you
start drawing pictures for them, what you're
doing is perhaps giving them an idea they didn't
have before.


But if you hand them-- Raggedy Ann and Raggedy--
Andy with-- with genitalia and you say, "Show me.
Show me." And with the doll, they can show you.
Especially since-- we're talking about very young
children now.  You don't use these dolls with the
12-year-old or a 10-year-old.

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

Case 2:06-cv-03136-JS Document 41 Filed 01/28/21 Page 176 of 225 PageID #: 5356

We're using ones that are really not articulate.
Don't know the right words.  And they-- they can
show-- I remember the first time I used them
before we went into grand jury were-- I-- I said,
"Show me what he did."  And she took the male
doll and stuck it on top to fight female doll and
was rubbing it (SQUEAKING) you know up and down.
And this is the way she could finally explain,
you know, what had happened and what had been
done to her.

Since that time, I think there's been certain
literature about not using the dolls.  Where--
but you know the more we learn, the-- the more
careful we can be about not tainting these
children.  You know every day things get a little
easier to do these case.  And they most-- they
are the most horrendous cases of all.  They
really are.

                    QUESTION:

Well, you have to be intelligent about it,
particularly sensitive to it, because it's tough.

**CONFIDENTIAL**

You know you sent out a 45-year-old detective to
go sit with a 12-year-old or a 10-year-old or a
nine-year-old.  You know it's-- there's no
communication there unless they're someone who's
really thinking about the process.  Do you know
what I mean?

ABBEY BOKLAN:

Well, I-- I-- I am not sexist.  And I never try
to be.  But it's-- I think sometimes it may be
easier for a female to talk to a female.  And I
think someone who's been a mother or a father
who's raised young children can handle them
better.  You know how to talk to a child.

So I don't-- I guess it's not sexist, 'cause I'm
not really saying a male or a female detective is
better.  It's their way and their sensitivity of
dealing with children.

QUESTION:

When you went into that-- and I-- I'm not trying
to ask a very personal question.  But did you
feel like-- people say sex-- you know sex abuse

**CONFIDENTIAL**

happens in almost every family at some level or
that, you know, in a-- one out of three families
or something like that.  Did you ever have a
friend or someone in your life when you were
growing up who (PHONE RINGS) expressed something
to you and you thought-- you know you had a way
of listening or a way of communicating with them
about sex crimes that made you well suited for
that?  Or was it-- when you joined the sex crimes
division it was a pretty new deal?

ABBEY BOKLAN:

It was pretty new.  (CLUNKING)

QUESTION:

At the-- at the sentencing-- we were-- getting
back to the sentencing.  We talked about-- you--
you had talked about the fact that sometimes the
sentencing is the more emotional time.  I-- I
think that was the case from what I've understood
about this.  Tell me what you remember about the
sentencing hearing and that experience.

ABBEY BOKLAN:

Are you talking about Arnold, Jessie or both?

CONFIDENTIAL

TAPE #111 CR# 47-50                                    PG. 58

QUESTION:

I don't know.  Maybe-- do you remember the Arnold
one?

ABBEY BOKLAN:

The Arnold one the-- it wasn't very emotional.  I
mean they didn't make too many pleas on his
behalf.  The Jessie one-- Jessie Freidman one
was-- was more emotional-- because-- you know
defense counsel worked very hard on his behalf.

And not only with pre-sentence memorandums, but
pleas, because of his youth, and the fact that he
had been so badly abused-- by his own father.
And I think there were even allegations of-- of
very little love-- from the mother.  That he was
an unwanted child.

That I should be merciful.  So I remember that.
And I-- said-- I-- I remember some of the things
that-- that I said, but-- it's funny.  I don't
remember whether Jessie said anything at all.

CONFIDENTIAL

QUESTION:

I-- I remember that he-- I-- I actually saw some
of the news coverage of this.  Peter Pinero (PH)
makes a-- pretty-- elaborate argument that Jessie
was, you know, a terrible victim of his father.

ABBEY BOKLAN:

Right.

MALE VOICE:

That he-- what he needs is help or counseling.
It's the-- prison term or whatever.  And then
Jessie cries and says, you know, "I experienced
all of this.  My father was-- and these children
were victims and I feel terrible about that.  But
I was a victim too."


And so he kind of cries and goes through that.
Do you remember being moved by Jessie's-- by-- by
that story generally, which obviously that was
their position.  That-- you know do you remember
believing it, first of all?  Did you feel that
Jessie was (UNINTEL)?

CONFIDENTIAL

ABBEY BOKLAN:

Are you asking did I believe that he was--
terribly abused as a child? Yes.  There was no
doubt in my mind that Arnold Friedman had started
abusing Jessie very young.  And trained him,
almost, in this type of-- pedophilic behavior.

I think once Jessie became older, he became less
desirable as a sexual object for his father.  And
once that happened, I-- I think Jessie didn't
feel he was getting the same amount of love from
his father that he was getting, so he became a
partner and a-- as a partner participant, he
probably could feel the oneness with his father--
again.

So in a certain extent-- since I completely
believed that, I had to be moved by the fact that
he himself had gone through exper-- a tremendous-
- trauma as a child growing up.  I knew from the
papers that were given to me that he had gone
through depressions.  He had-- suicidal desires

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

at certain times. And that he had gotten himself involved in drug use. So that all made sense.

But on the other hand, at some point he turned from a victim to a predator himself. And reading the grand jury minutes and everything else I learned, he was extremely violent himself to the children. Not-- not just sexually.

He seemed to enjoy what he was doing. And remember, he brought his own friends in. Including the co-defendant who later turned and participated against him. So from a-- a reluctant participant, he went to an extremely active participant who was enjoying it.

You know if you look at people out there who commit horrendous crimes, you say, "Well, maybe they had a-- a terrible childhood." And many of them have. But that doesn't excuse the behavior down the road. And also-- if someone you feel is going to be a danger-- to other children, if he's

CONFIDENTIAL

let loose, that's something that you have to
consider.

So in-- in weighing the sentence so low, I felt
badly for what had been done to him. At this
point, I think I was most interested in
protecting society from having other children go
through what he put those children through in
that computer school in Great Neck.

QUESTION:

They were obviously asking for some kind of
mercy, vis a vi-- well, they knew they were
getting six to 18 years. What would that-- and
that-- and then obviously you felt strongly
enough about it that you wanted to ensure that he
was in for a good part of that time.

ABBEY BOKLAN:

Right.

QUESTION:

And so tell me the thinking process of-- when--
when you-- you know you said-- you're sort of--
you generally don't talk a lot in court. You lay

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

down the law or whatever. But why was it
different this time and what did you say that--

ABBEY BOKLAN:

It was different because I felt like I was-- I
was talking to different people. I was talking
to the general public. We had the media in
there. And that's part of having-- a reason for
having the media in there is to educate the
general public.

I was talking to the victims. And it-- not the
children. The-- who weren't in the courtroom.
But-- but the family members. I know a lot of
them were dissatisfied with this sentence for
Jessie. They thought it was too merciful. That
I should have-- un-- unlike Arnold's sentence.
They thought I what being too light for Jessie.

And I-- I was talking to Jessie too, because, you
know, a part of me was hoping that when he does
get out, he still will be young enough to have a
life. And if he gets appropriate therapy or when

CONFIDENTIAL

he's upstate or whatever, that he can have a
decent life and not hurt anyone else. And maybe
in a way I was explained to myself too why I was
sentencing what I felt was a harsh sentence to
someone who was so young. And why I was giving a
harsh sentence to someone who was so young. So I
did talk.

Now what-- what did I say? Well, it was kind of
long. (RUSTLING) I'm not gonna go through very
much of it. I talked of course about the
probation report. That-- the letters that I
received-- from the families. The letters I'd
received on his behalf-- from the-- Great Neck
community, because they weren't all bad letters.
There were people who-- who liked the family.
Felt badly for him.

There were psychologists and psychiatrists that
wrote me on behalf of Jessie. Talking about him
being more of a victim than a criminal. And I
had the excellent-- pre-sentence memorandum

CONFIDENTIAL

prepared by Mr. Prinero (PH).  And I said-- this
is a quote.  "According to the--" it's a quote
from my notes, so I-- you know I-- sometimes I
change things as I go along when I'm in-- in
there.

But as best as I can tell you, this is what I
said.  "According to the pre-sentence probation
support, you were raised as an unwanted child in
a home devoid of love.  Your father started
fondling you sexually at about the age of nine
while reading you bedtime stories."  "As you grew
and reached puberty, his abuse of you escalated
to regular acts of sodomy.  You submitted,
according to your own words, because it was 'it
was important for me to have the love and support
of my father and to please him.  My father was my
only friend.'"

And then I quoted from one of the psychiatric
reports.  "Jessie's homosexual submission to his
father was clearly due to his desperate need for

CONFIDENTIAL

love from a parent.  (RUSTLING) His mother's
emotional withdrawal and his father's
psychopathology.  His happiness at his father
shifting his passions to other youngsters
strongly suggests that such an orientation was
not an actual one for Jessie and one that he
should have been able to overcome."

"His participation in his father's seduction of
these other youngsters falls under a not uncommon
psychological defense mechanism known as
identification with the aggressor.  To
subconsciously, and therefore unintentionally,
model yourself after a parent is one way of
repressing any of the anger you might feel
towards that person for what he or she has done
to you."  Of course that's the quote from the
psychiatrist.

And then I go back to my own words. "Torn between
love and hate, you suffered from depression.  And
at one time were suicidal and unable to function

Abbey Boklan Complete Transcript (111-113).doc



in a regular school." And I said, "It's very
unfortunate that not the psych-- that none of the
therapists you were sent to realized the reason
for your depression. Perhaps if they had, your
life today would have been far different."

"In addition, however, to looking you-- at you as
a person, considering your motivizations (SIC),
the reasons you have become what you have and
done what you have done, I as a judge have
another, equally important obligation. I have to
look at the harm to your victims and the severity
of your crimes, as well as the danger you may be
to society."

"The fact that you too were a victim does not
absolve you of responsibility for the sexual
assaults you perpetrated, nor for the physical
abuse that went beyond anything done by your
father." Remember I had mentioned to you-- to
you earlier. "Nor for the perverted and
horrendous games you invented and forced your

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

victims to play.  Nor for inviting your friends
to join you in these games and assaults.  The
children you have abused are suffering terribly.
They are exhibiting sleeplessness, bedwetting,
nightmares, stuttering, hair loss."

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

But you see you gotta realiz-- you know these are
the things also that to me were tremendous
corroboration as to what was occurring.  I mean
the hair loss.  I--

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

"The children you have abused are suffering
terribly.  They are exhibiting sleeplessness,
bedwetting, nightmares, stuttering, hair loss, a
decline in school work, separation anxiety.  And
an overwhelming sense of fear.  Several children
in fact sleep with weapons.  Bats and sticks by
their beds."

"The extended families of your child victims are

CONFIDENTIAL

suffering much, if not more."  And then I end,

"After weighing all of these factors and others

as well--"

(BREAK IN TAPE)

ABBEY BOKLAN:

Programs that didn't work well.  I mean you're

talking about something that was like 100-- 100--

(REFERENCE TONE)

SLATE:

There's no audio for the end of this shot.

(REFERENCE TONE)

ABBEY BOKLAN:

"The children you have abused are suffering

terribly.  They are exhibiting sleeplessness,

bedwetting, nightmares, stuttering, hair loss, a

decline in school work, separation anxiety, and

an overwhelming sense of fear.  Several children,

in fact, sleep with weapons.  Bats and sticks by

their beds."


"The extended families of your child victims are

suffering as much, if not more."  And then I end

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

it, "After weighing all of these factors and

others as well, I have a concluded that you

deserve the full 18 year sentence for the crimes

that you have already committed.  And for the

harm that you have already done."  And then I go

on to recommend to the parole board that they

keep you for the actual maximum.

                QUESTION:

Ah, which brings us, I think, to-- Jessie today.

In I guess I would say a couple of things.  Did

it surprise you that both Jessie and Arnold wrote

these open letters to the Great Neck community

saying that they were not guilty and it was a

miscarriage of justice.  Is that something you

see typically or do you-- would you have

predicted that?  Or do you think that that was--?

                ABBEY BOKLAN:

It was a surprise.

                (OFF-MIC CONVERSATION)

                ABBEY BOKLAN:

When I received the letter from-- from Arnold

Friedman-- in 1991 denying his guilt, as well as

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

the information and-- I'd received that both
Jessie and Arnold had written to the media and
various families, parents, schools, et cetera,
recanting and alleging that they were not guilty,
I was very surprised.

When I go through a trial and the defendant is
convicted, very often I get letters for years and
years later.  You know, "I'm an innocent man.
I've been railroaded.  The police did it.  The
District Attorney's did it.  The judge did it.  I
didn't do it."

But in a case like this, with a plea to so many
counts, with conferencing for so long, with all
of the knowledge that the attorneys had, all of
the discovery of the evidence the defense
attorneys had and of course-- revealed to their
clients, I never, ever expected those years later
to find them to recant.  If anything, it showed
to me the lack of remorse and how right I was--
to give an extremely long sentence.

CONFIDENTIAL

Because denial is one of the most dangerous
things when you let someone out.  If they're
still in denial, they're not trying to change
their ways or remorseful for what they did, they
could, you know, be very dangerous.

I never received a letter from Jessie.  It was
from Arnold that I received the letter.  And--
you know I was convinced that if Arnold ever got
out-- he was a danger to any young child that he
would come in contact with.  Jessie was young.
I'm still hoping that there's a-- a chance-- that
he will turn his life around.

                    QUESTION:

Somebody like Jessie who-- let's say regardless
of what you-- what you find in his story here, he
still has a long row to hoe in the future.  You
know does somebody like that have a hope of
having a-- some kind of salvation or having a
normal life at the end of this process?

**CONFIDENTIAL**

## ABBEY BOKLAN:

I don't know. The professionals and-- and the
literature say a true pedophile, that I think
Arnold was, probably will never change their
ways. Jessie, there were indications from many
of the reports, was not a true pedophile. So all
you can do is hope. I can't predict the future.

### QUESTION:

Right. Peter Pinero obviously was very
passionate about-- re-- I-- I-- about
representing Jessie. And in a way-- you know
Peter said to me at one point, "I thought Jessie
was my son. You know any moment."

It-- so they must have been very close, because
obviously they had to-- they shed some tears
together. And-- and Peter's an emotional guy to
begin with. He's a very soft hearted guy
(UNINTEL PHRASE).

What was-- what was your sense of his position
vis a vie Jessie? And-- and, you know, had they

**CONFIDENTIAL**

been preparing to go to trial all along and then
at a certain point they sort of hit the point of
no return.  And they knew they were gonna (TRAIN
HONKING) have to plead?

ABBEY BOKLAN:

I think it-- at some point-- of course Peter
Pinero could answer better as to when he was
prepared to plead.  I think that at one point he
started to weigh all of the evidence that was
against Jessie.  The tremendous emotional--

(OFF-MIC CONVERSATION)

QUESTION:

So obviously-- you were saying-- you were
(UNINTEL) Peter Pinero had--

ABBEY BOKLAN:

Okay.  It came to a point.  Right.

QUESTION:

Right.

ABBEY BOKLAN:

I think there came a point-- you're asking me
when Peter decided to plead.  That he started to
weigh all of the evidence.  There was fairly open

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

disclosure in this case-- of-- what they were

facing. And he knew about the tremendous--

volatility of the case itself. The emotions that

would be in-- that would come out during the

course of a trial. And he just felt that-- it--

he couldn't roll the dice that this young boy

would spend the rest of his life-- in jail.

I think Peter was very happy. I think everyone

was very happy not to try this. It would have

been a true horror. A true horror. To have

those children come in and testify. And-- and

Peter was obligated to cross-examine-- to the

best of his ability. Very difficult to cross-

examine a child without-- getting the-- the jury

very angry. Because they don't like to see a

child attacked. So you have to walk a very thin

line and have to be very, very careful when

you're cross-examining a child.

I think everyone knew-- what they were facing in

this case. I don't think anyone wanted this to

**CONFIDENTIAL**

go to trial.  Anyone.  As far as the

professionals.

QUESTION:

Had there-- is there any way to know had it gone

to trial what would the possible outcomes have

been?  Under a couple of scenarios.  I mean

knowing what you know, it could have gone this

way or it could have gone this way?

ABBEY BOKLAN:

You're asking for an educated guess, 'cause

that's all it could be.

QUESTION:

Right.

ABBEY BOKLAN:

I have to tell you that when I'm trying to figure

out what verdict my jury is gonna come in with,

I'm 50 percent right.  So (LAUGHTER) you've gotta

take what I say with a grain of salt.  But I

think the evidence would reach a point and when

all of the materials that would be brought into

the courtroom that were found during the search,

I think that-- it-- the evidence would have been



Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 198 of 225 PageID #: 5378

overwhelming.  And I would be very surprised if a
jury did not convict.  But you never know.  You
never know.  (BEEPING)

QUESTION:

Would it have been fair to bring those materials
into the courtroom in-- in a trial just for
Jessie?

ABBEY BOKLAN:

Well, the-- these children were shown these
programs during the course-- as I recall, during
the course of the class and during the course of
what was going on.  They were showing them--

(INAUDIBLE)

ABBEY BOKLAN:

Right. They were showing them-- some of those
computer programs were absolutely horrendous.
And some of the-- the magazines they would force
these children to see.  So they are-- are
evidence of what was going on.

In fact, if I recall, some of the-- endangering
the welfare of a minor charge in the indictments-

Abbey Boklan Complete-Transcript (111-113).doc

CONFIDENTIAL

- involved the literature. Both-- in-- on the
computer-- and-- in the written word. So it-- it
would have been evidence. It certainly would
come in. Jessie was a co-defendant to-- all of
that evidence applied to him-- to him as well.

                    QUESTION:

Did you ever have a sense of whether-- (BEEPING)
you know I said-- at one point Arnold says in one
of his letters, "All I wanted to do was help my
son. And they told me that if I would plead
guilty, I would get out of the way. Me and all
of my sickness and my pedophilia would be out of
the picture."


And then-- you know did you ever have a sense
that Arnold was really concerned for saving
Jessie? Doing what was required to-- to try to
help Jessie get a lower sentence or something?

                   ABBEY BOKLAN:

He pled guilty knowing at that point that Jessie
was intending to go to trial and say he was a--
he was not guilty. So I don't understand how his

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

pleading guilty was gonna help Jessie. Did he love his son? I don't know. I really-- I really don't know. I think Arnold Friedman was looking out for Arnold Friedman when he took that plea. But that's, you know, just an educated guess.

QUESTION:

Yeah, I-- you know I mean it-- Joe Anorando (PH) says that at one point, you know, if he had wanted to help his son, there were a number of ways he could have done that. He could have offered to make a deal contingent on his son getting some kind of leniency or something. But he didn't do those things.

ABBEY BOKLAN:

Yeah. He was looking for-- out for himself I think.

QUESTION:

Any thoughts about-- you know we know that his-- the family was destroyed by this. Probably the family was destroyed already. But let's say the family was destroyed by this.

You know Elaine goes off and, you know, divorces him.  Jessie goes to jail.  Arnold goes to jail. David moves-- lives in Manhattan and-- and goes on about his career and then the other brother-- goes to San Francisco.  Disappears sort of.

You know everybody was sort of dealing in their own way, I guess, with this kind of a situation in the family.  It-- and does-- you know any-- any thoughts about David Friedman or whether-- 'cause he obviously-- (SLAPPING) well one of the things that-- you know David blows up at one point at the end, I guess when his father was sentenced.

He shouts at some of the parents.  "You're gonna-- you-- you're-- you and your kids are gonna have to live with this for the rest of your lives." And of course there were various interpretations immediately.  The parents thought what he was saying-- he was gloating over the fact that the children were abused.  They're gonna have to live

CONFIDENTIAL

with the abuse for the rest of their lives.

And then of course later he says, "No, I was
saying you stole my father for these, you know,
(UNINTEL) charges. My father was a saint. And
so you're gonna have to have this on your head or
whatever."

But David had a pretty emotional reaction to it.
And I'm wondering if you have any-- any thoughts
about his role or the position of the-- or his
role. Brother. The oldest son in that family.
The father's first born son.

                    ABBEY BOKLAN:

You're asking about the-- the first born son and
any-- thing I feel about it. I really-- except
for the very short reference to the other
children in a probationary court, I really had no
dealings at all with David or the other brother.
And was not privy-- to anything that went on with
them.

CONFIDENTIAL

So I-- I really have absolutely not comment-- on at all. Except, you know, from the reports I read, it was a household devoid of love. It certain was not a normal household. But other than that, I really could not comment on-- on the other brothers at all.

QUESTION:

Is it possible that-- that somebody that's in Jessie's position now, without necessarily even focusing on Jessie, there's obviously this civil commitment issue. That people can be-- in some states (UNINTEL) people are considered committed after their maximum prison term because, you know, they're either-- either-- 'cause I think two psychiatrists have to say that they're unstable and that they're likely to commit the same offenses again.

And there's a Supreme Court discussion about whether you also have to add the criteria, as is key in this case, about whether they were unable to control their own behavior. Is-- do you think

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

there's any possibility that the-- what do you
think about the civil commitment-- legislation?
What-- and if that passes in New York state,
somebody like Jessie could be locked up for a lot
longer.  It's possible.

                    ABBEY BOKLAN:

I haven't really studied that issue.  I don't--
I'd really rather not--

                    QUESTION:

Yeah.  That's--

                    ABBEY BOKLAN:

-- not comment on it.  I mean I-- I am aware that
it exists in some states, but I-- I hadn't
thought about it.  And I couldn't give you an
educated opinion at this time.

                (OFF-MIC CONVERSATION)

                    QUESTION:

Did the-- did the other defendant, the other
youth who'll-- the one who got the youthful
offender's test (PH), did he have to do an
allocution?  Did he have to plead guilty in a
formal way?

**CONFIDENTIAL**

ABBEY BOKLAN:

Oh, certainly.

QUESTION:

And what-- what do you rec-- remember about that
allocution? What that as convincing and-- as the
others?

ABBEY BOKLAN:

I remember very little about it. But I'm sure
the District Attorney must have done questions
and answers from him. Or maybe not, because he
testified in the grand jury as well.. So-- his--
he was locked into what he had testified to in
the grand jury. I don't have much of an
independent recollection of that plea at all.

QUESTION:

I think the-- you know one of the things that's
really unique about this situation also is that
there was really no discovery because, you know
there were-- the was a grand-- there was a grand
jur-- there were a series of grand jury hearings.
There were confessions.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

There were-- but there was no discovery.  So for
example, Peter Pinero had almost nothing to go
on.  I think he was given one statement that was
redacted.  And that was one of him-- that-- you
know that Don Arrono (PH) had given him and said,
"Look, this is the kind of thing we're getting."
But one-- in a case like this, at what point
would discovery have begun?

                    ABBEY BOKLAN:

Well, if it looks like there's not going to be a
plea, there's a conference and stipulations done
very shortly after indictment.  Usually within a
few weeks.  And at that point discovery starts.

Certain things have to be handed over.
Statements of victims do not have to be handed
over until they have to testify.  For example, if
they would only be testifying to a trial, they're
just handed over after the jury's selected and
before opening statements.

The-- so that type of discovery would not be

CONFIDENTIAL

given out early. Brady material. I don't know
if you're familiar with that. It's-- that's
material that would be favorable to the defense.

For example, there was a young child,
hypothetically, who said, "Oh, no. None of this
occurred. We all agreed to make up the story."
That would have to be handed over immediately.
Immediately upon reaching the hands of the
District Attorney's office.

So discovery in New York, it depends upon the
stage and what you're looking to discover. But
certainly there was a lot of open discussions--
with the District Attorney's office during the
course of conferencing as to, you know, what was
occurring there. And they would have been able
to get copies of the search warrants.

They would have known what was taken from the
house. I mean that-- that's-- they-- they would
have been given receipts, in fact, for what was

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 208 of 225 PageID #: 5388

taken from the house on that.  So if you're just
talking about the witnesses' statements, what the
young children were saying--

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

-- that would not have come until immediately
before the trial.

QUESTION:

And I-- and those kids were never-- so in front
of a grand jury, the process, knowing what you
know about sex crimes in general, the process of-
- a child testifying in front of a grand jury, is
that very different-- we know that there's no
cross-examination, but how is it different from
a-- a child testifying in trial.

ABBEY BOKLAN:

Well, there's no judge.  There's no cross-
examination.  That-- you mentioned is very, very
different in a grand jury proceeding, 'cause the
child doesn't have to go through it.


There's no defendant sitting there looking at

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

them while they're testifying. They're sitting up in the witness box. They have a very sympathetic assistant District Attorney standing next to them.

But they do have usually-- between 19 and 23 people approximately sitting there listening to them. And that's very hard. Having all of those strange listen to, you know, what occurred. District Attorney asks questions. Court reporter-- trans-- writes down everything that's being said.

You know and they answer-- the de-- grand jurors have the opportunity to ask questions as well if they so desire. District Attorney rules on whether those questions are admissible or not. If the defendant wants to testify he-- he can. But he has to waive immunity. That's a whole different process. And you know can go in there with his attorney and the District Attorney can cross-examine the defendant.

CONFIDENTIAL

This didn't happen in this case.  The defendants
did not-- did not testify.  Grand jury is a much
easier proceeding for an assistant District
Attorney.  It's much faster.  It's much shorter.

But in a case like that, you still have these
children (UNINTEL) in there.  Being sworn, if
they're found to understand the nature of an
oath.  You have to go through that first if
they're under a certain age.  And they've gotta
tell this story to all of those strangers sitting
there.  A very embarrassing and upsetting story.

QUESTION:

And-- would it be possible in the third
indictment that maybe on-- that the only person
that would be required to testify would be the--
the young man that got youthful offender status
or would they have needed the kids in that-- for
an indictment?

ABBEY BOKLAN:

Oh, they add a lot more children.  There're a lot

CONFIDENTIAL

more counts and a lot more children were added.
I've forgotten how many. I might even have a--
(ROARING) little note about that someplace.
That's number one, two-- it-- that's number
three. I think the-- I-- I've forgotten. I
didn't write down how many more children. But
there were a lot more children that they brought
in.

In other words, they weren't redoing the same
thing over and over again. They were bringing in
more children who were not part of the original
ones. I think the last one-- there was something
like 126 counts of sodomy first degree. And
there was sexual abuse.

Use of a child in sexual performance 'cause if
you recall-- they were videotaping what was going
on in the classroom. Those were never found, by
the way. And then of course there were 52 counts
of endangering the welfare of a child.

**CONFIDENTIAL**

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 212 of 225 PageID #: 5392

So-- they started out-- against Jessie, if I
recall, there were three indictments.  It started
out with one small group of children.  Then added
more.  And then added more again.  So--

QUESTION:

And why did they have to add the additional
indictments?

ABBEY BOKLAN:

Because they thought they were going to trial.
They thought they were going to trial against
Jessie.  Because all we were hearing was, "He's
not pleading.  He's not pleading.  He says he's
not guilty.  He's not pleading."

So when an assistant District Attorney hears
that, they've gotta get together the case as
strong as they can.  I think he was hoping to
spare a lot of the children.  Plus some of might
have a-- been reluctant witnesses or their
parents reluctant to have them testify.

But when it looked like there was gonna be a

CONFIDENTIAL

trial, then it was no holds barred. They were

brining in all of the children. All of the

children.

QUESTION:

Did you-- you know the doctor. Did he-- after he

pled in front of you, Jessie, a couple weeks

later, went on Geraldo with his mother. I don't

know if you remember that.

ABBEY BOKLAN:

I had heard about it. I hadn't actually seen the

program.

QUESTION:

Yeah. They were very-- and do you have any

thought about that? When you-- when you found

out that they went on the television?

ABBEY BOKLAN:

I had forgotten that until you started your--

investigation here of this case. And-- it was

mentioned to me I think by Fran Galaso, who I put

you in touch with. But I had forgotten that. I

mean it-- it-- well, look how strange it is to be

videotaping-- what was going on there.

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

QUESTION:

Yeah.  The whole thing is very public-- public in

a very unusual way.

ABBEY BOKLAN:

Yeah.

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

QUESTION:

(IN PROGRESS) well suited for that?  Or was it

the new (UNINTEL) sex crimes division that was

pretty new to you?

ABBEY BOKLAN:

It was pretty new.  My children were fairly

young.  At--

(OFF-MIC CONVERSATION)

QUESTION:

It's funny.  You know I was-- (CREAKING)

interesting you said that about these dolls,

because-- (CLUNKING) I mean I was just reading--

I have a-- I was just reading-- oh, here during

trial (CLUNKING) the witnesses were (UNINTEL)

describe use (UNINTEL PHRASE).  I mean here they

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

talk about the dolls.

ABBEY BOKLAN:

Right. Interesting. This I won't say on-- on
the record in front of the cameras, but when I
first got the dolls and started the show them
around the DA's office, some of the male DA's
were so embarrassed and go so hysterical with
them that it-- that would have been-- that was a
funny sight. (LAUGHS) And so I don't know if
they still use them up there-- in the DA's
office. Kay do you know if they still use them?

KAY:

I have no idea.

ABBEY BOKLAN:

I don't-- I don't know. Joe might be able to
(CLUNKING) able to answer. I don't know if
that's--

(OVERTALK)

ABBEY BOKLAN:

-- was (UNINTEL) years--

QUESTION:

They say children are usually less accomplished

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

Appendix 000723

Case 2:06-cv-03136-JS   Document 41   Filed 01/28/21   Page 216 of 225 PageID #: 5396

than adults in communicating verbally. Because of this you may need to use video or props and additional language to gather information. This allows children to demonstrate as well as say what they have experienced. And (UNINTEL) media can be employed by the most (CLUNKING) useful and (UNINTEL PHRASE) anatomical dolls, anatomical drawings and picture drawing.

ABBEY BOKLAN:

Yeah. I was kind of ahead of my time at that point. You know in fact there were very few. We had to send for them. Now I don't know if they look more realistic, like a male and a female. But in-- in those days, they really-- they were rag dolls. They were very non-threatening.

QUESTION:

Right. Right.

ABBEY BOKLAN:

Be interesting to see what they use now.

(INAUDIBLE)

QUESTION:

I wonder what they do-- I mean I guess there's--

CONFIDENTIAL

you know whatever.  You can criticize every
method of investigation.

ABBEY BOKLAN:

Yeah.  It really.  (CLUNKING)

QUESTION:

And there's always somebody who also (CLUNKING)
uses something 'cause the defendant involved--
there's always somebody who's (UNINTEL) precise
because, you know, to say, "Here, photograph some
sex abuse taking place."  And they said, "Well,
you know, photographs can be manipulated or
whatever."  Yeah.

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

**TRANSCRIBER'S NOTE: TAPE REPEATS HERE.  WILL NOT TRANSCRIBE
DUPLICATE TRANSCRIPTION.**

ABBEY BOKLAN:

Programs that didn't work well.  I mean you're
talking about something that the like 100, 120
dollars.  He won a massive, hundred million
dollar settlement against IBM.  But the-- the
interesting part is he did all of this from his

CONFIDENTIAL

home and his computer in his underwear.

QUESTION:

Oh my god.

ABBEY BOKLAN:

And-- and he was against all of this IBM lawyers,
all of these, and they thought he had this
tremendous staff fighting him.  And they-- they
finally gave up and agreed to this settlement.

QUESTION:

Wow.  That's--

ABBEY BOKLAN:

So I think that--

QUESTION:

-- amazing.

ABBEY BOKLAN:

-- is an amazing story.

(OFF-MIC CONVERSATION)

(REFERENCE TONE)

SLATE:

End of wild sound and end of tape.

(REFERENCE TONE)

* * * END OF AUDIO * * *

**CONFIDENTIAL**

TAPE #111 CR# 47-50                                          PG. 98

                                    * * * END OF TRANSCRIPT * * *

                                    HIT THE GROUND RUNNING FILMS

                                       "CAPTURING THE FRIEDMANS"

                                    INTERVIEW WITH ABBEY BOKLAN

                                CORRESPONDENT:  NOT IDENTIFIED

                                    PRODUCER:  NOT IDENTIFIED

TAPE #113 CR #55-56

                                    QUESTION:

          (IN PROGRESS) a once in a lifetime, what the hell

          was going on?  (NOISE) (UNINTEL) like this?  Or

          did you come away from it thinking, did you have

          any emotion, or any particular feeling when you

          were-- when this case was said and done?  Did you

          have to go on vacation for a week?  Or did you--

          how-- what was your just (UNINTEL) feeling about

          it at the end?

                                    ABBEY BOKLAN:

          What was my feeling at the end of the case?  I

          was glad it was over.  I hoped I never saw

          another one like it.  I was so happy it wasn't a

          trial.  On a personal level, I was happy I didn't

          have to listen to what happened to the children.

**CONFIDENTIAL**

It's different reading it, and actually seeing
the pain, you know, as the children tell about
it.

Like an attorney will say to me, "If my client
goes to trial, as opposed to taking this plea,
are you gonna punish them with a greater
sentence?" And I say, "I don't punish him for
going to a trial. But once I hear-- once I hear
what really happened-- or if your client commits
perjury-- or, anything that can happen during the
course of-- of a trial, who knows what I'm gonna
sentence him." And I-- I think it would have
been a-- a terrible trauma for the children.

I think for the attorneys, who are good men. For
the families, for the jurors, and for me to have
to have listened to what occurred there. On--
and I say that from someone who tried sodomy
cases with children before. This one was just
so-- so horrible that my feeling, the main
feeling I had was one of relief. It was over,

CONFIDENTIAL

the children did not have to testify-- I did not
have to go through a trial, and I didn't have to
watch the pain in the eyes of parents in those
children.  I think they had to give a-- kind of a
brief summary oh-- of what I felt most when it
was over.

QUESTION:

Was there a feeling that-- when the parents were
leaving the courtroom, and the sentencing had
been done, and both Arnold and Jessie had been--
sentenced and gotten long sentences.  Was there a
feeling of relief in the community?  How did the
community respond to that?

ABBEY BOKLAN:

Well, I knew when I sentenced Arnold that, of
course, the Friedmans were very unhappy.  And the
victims and their families were very happy.  I
knew when I sentenced Jessie, that nobody was
happy.  The Friedmans and their friends and
supporters felt it was a horrible and cruel
sentence.

**CONFIDENTIAL**

The victim's families felt it was an extremely lenient and merciful sentence. So I-- I think I felt that I made no one happy, but I felt it was right. And so I was comfortable. I never had any contact again with the families until I was campaigning in 1992 for reelection.

And I was at a-- a fare, a street fare, in Great Neck, you know, handing out literature, you know, going around shaking hands. And someone came up to me and introduced themselves. And-- they were a family member-- of one of the victims-- the parents. And they said to me, "We're voting for you. You did a good job." That was the only-- that was the only other contact, and that-- and that was nice. Yeah.

(OFF-MIKE CONVERSATION)

ABBEY BOKLAN:

I don't know, off the record.

QUESTION:

Yeah.

CONFIDENTIAL

ABBEY BOKLAN:

You know, when he was originally brought up here
I was not optimistic in what I read. And that's
all I can say for what's been going on these
years. That's it.

QUESTION:

Yeah.

ABBEY BOKLAN:

So. But let's hope. We don't know.

(OFF-MIKE CONVERSATION)

ABBEY BOKLAN:

'Cause he was a pretty boy.

QUESTION:

Yeah.

ABBEY BOKLAN:

Prettier than Jessie. If I recall. In some ways
I was less sympathetic to him even though, you
know, I wasn't sending him away forever. I mean
he was getting out more than the (UNINTEL)
division, and more than the DA negotiated with
him for. But not a-- a tremendous amount of
time. Because I was bothered by the fact that he

CONFIDENTIAL

didn't have all of Jessie's excuses.

QUESTION:

Right--

(OVERTALK)

ABBEY BOKLAN:

He had no excuse except that he wanted to join in
these fun and games in hurting all these little
children, and doing these other things to them.
I mean he-- he was an outsider, he could have
walked away with no repercussions at all.  So he
really got a great deal.

(OVERTALK)

QUESTION:

I think you said, if I remember what you said,
you know, Jessie, you know, you could argue that
Jessie didn't have a choice because this was the
role that (UNINTEL PHRASE).

ABBEY BOKLAN:

That's what I said I said--

(OVERTALK)

QUESTION:

--family, and it looks like you've got some

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

(UNINTEL) parents and I can't understand why you would do it. You know, and his parents did seem to be very, you know, his parents seemed to be like good people, you know. They seemed like they, you know, they were--

(OVERTALK)

ABBEY BOKLAN:

Yeah. I mean in this rich, educated, you know, community. I mean it's just-- it-- it was just shocking. Shocking. So. Anyway.

(OFF-MIKE CONVERSATION)

\* \* \*END OF SIDE A\* \* \*

\* \* \*SIDE B BLANK\* \*.\*

\* \* \*END OF TRANSCRIPT\* \* \*

**CONFIDENTIAL**

Abbey Boklan Complete Transcript (111-113).doc