# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

                                 Respondent,

-against-

JESSE FRIEDMAN,

                        Defendant-Appellant.

-------------------------------------------------------------------x

AFFIRMATION AND
MEMORANDUM OF
LAW IN OPPOSITION
TO DEFENDANT'S
MOTION FOR LEAVE
TO APPEAL

A.D. No. 2018-12148
Ind. Nos. 67104/1987
           67430/1988
           69783/1988

W. THOMAS HUGHES, an attorney admitted to practice in the State of New York, and an Assistant District Attorney of counsel to the Honorable Madeline Singas, District Attorney of Nassau County, affirms under penalty of perjury the factual allegations below:

1.    This affirmation and accompanying memorandum of law is submitted in opposition to defendant's motion, returnable November 12, 2018, requesting a certificate granting leave to appeal, pursuant to Criminal Procedure Law section 460.15, from the denial of his Criminal Procedure Law section 440.10 motion. The statements contained herein are made upon information and belief, the source of which is the records of the Nassau County District Attorney's Office.

2.    The procedural history of this case is extensive and detailed in the People's opposition to defendant's underlying C.P.L. § 440.10 Motion, annexed as Exhibit 1. *See,*

*e.g.*, People's Aff. in Opp. to Def.'s 2d C.P.L. § 440.10 Mot., Sept. 8, 2014. Accordingly, it is repeated here only in brief.

3. In 1982, codefendant Arnold Friedman, defendant's father, began to provide piano and computer classes to neighborhood children. Those classes were given inside Arnold Friedman's home in Great Neck, New York. Defendant aided his father in teaching the computer classes between 1984 and 1987. In 1987, defendant was replaced by a friend who lived nearby.

4. In July 1984, federal officials seized a magazine of child pornography, entitled "Boy Love," as it passed through customs en route to Arnold Friedman. This seizure prompted a federal investigation into Arnold Friedman's possession of child pornography. This investigation concluded on November 3, 1987, when Arnold Friedman accepted delivery of another child pornography magazine from an undercover federal postal investigator. A federal search warrant executed on the Friedman home led to the seizure of more than a dozen magazines depicting child pornography, two books of child pornography, and other individual articles of child pornography. While executing this search warrant, investigators also found a list of students enrolled in Arnold Friedman's computer classes. They shared this information with the Nassau County Police Department ("NCPD"), which began its own investigation to determine whether any of the children had been abused or used by Arnold Friedman to create his own child pornography.

5. On November 12, 1987, NCPD detectives began to interview former students in Arnold Friedman's class. The first child to be interviewed told police that Arnold Friedman had fondled him and showed him pornographic computer games. At that time, defendant was not a suspect and did not become one until November 23, 1987, when a student told police that he had been abused by both Arnold Friedman and defendant. Both men were arrested on November 25, 1987, on child sexual abuse charges. The NCPD executed a new, state-court-issued search warrant during that arrest. During the execution of that search, the police discovered two color photos of a naked boy and girl, computer disks containing pornography, and sexual aids, including a small, imitation penis.

6. The investigation continued and, by December 17, 1987, thirteen children had told police that defendant had engaged in conduct ranging from inappropriate touching and groping to penile contact with the children's mouths or anuses. Nine of these children testified in a grand jury presentment, which resulted in two indictments against both defendant and Arnold Friedman: 67104 of 1987 and 67430 of 1988.

7. On March 25, 1988, Arnold Friedman pleaded guilty to forty-two of the indicted charges, in full satisfaction of both state indictments against him. He subsequently pleaded guilty in federal court to possession of child pornography. Following his state court plea, Arnold Friedman, on his attorney's advice and in his presence, was interviewed by police for a "close-out statement," wherein he admitted

to abusing numerous students, denied abusing others, explained his abuse in detail, and described what sort of victims he had favored and how he groomed them.

8.      In June 1988, several victims alleged that friends of defendant's, including R.G.,[1] had, on occasion, participated in the sexual abuse of several of the victims. R.G. was arrested and ultimately agreed to cooperate with the prosecution in exchange for a favorable plea-bargain that would include youthful offender treatment. Accordingly, he participated in sworn interviews by various members of the police. During those interviews, he explained his relationship to defendant and Arnold Friedman, as well as the abuse he witnessed and participated in. Although the police investigated two of defendant's other friends, they were not criminally charged.[2]

9.      On November 7, 1988, the grand jury returned Indictment 69783, which named R.G. as a codefendant. Defendant was included in this indictment, and charged

---

[1] R.G. was ultimately adjudicated, following a successful appeal, a youthful offender and his case has been sealed. In accordance with C.P.L. § 720.25(20), he will be referred to in this motion solely by his initials.

[2] Because they were investigated but not charged with any criminal activity, they are not named in this motion in order to protect their privacy rights.

with over a hundred counts of sodomy and more than fifty counts of endangering the welfare of a child.[3]

10.     Defendant's retained counsel, Peter Panaro, Esq., performed a thorough investigation of the prosecution's case and the potential witnesses for the defense. Around November 1988, defendant decided to plead guilty. On December 18, 1988, Mr. Panaro took the extraordinary step of tape-recording an interview with defendant.[4] In that interview, defendant and his attorney discussed the history of defendant's case, including the motion practice that occurred before Attorney Panaro was retained and the extensive pretrial preparations that had been undertaken. Defendant acknowledged that Mr. Panaro had viewed the evidence against him, spoken with the detectives who had investigated the case, and spoke with the mother of one of Arnold Friedman's students, who showed him a video tape of the police interview with her child.[5]

---

[3] At the time of the indictment, sodomy was defined as "deviate sexual intercourse." That crime no longer exists. The factual allegations in the indictment are that defendant and codefendants "did contact the victim's anus with [their] penis." Such an act today would constitute sexual abuse. *See* Penal Law § 130.65 (first-degree sexual abuse); Penal Law § 130.00(2) (defining "anal sexual conduct" as "contact between the penis and anus"). Defendant has used the large number of charges to support his theory that all of the charges against him were the product of hysteria, arguing that the number of charges demonstrated an impossible amount of individual forcible sexual acts (*See* Def.'s Leave App. at 25, 28). This argument is inapposite for two reasons: first, the charged crimes required only contact, not penetration, and therefore many of the acts charged could have happened very quickly and without physical injury to the children. Second, each individual act of sodomy gave rise to two or more charges of sodomy on different legal theories. Indeed, because defendant was charged as an accomplice to R.G.'s acts, some of the charges reflect R.G. as the principal to acts for which defendant was accused of helping or abetting the sodomy.

[4] A copy of the transcript of that interview was attached to the People's opposition to defendant's C.P.L. second § 440.10 motion as Exhibit 2.

[5] The student in question was not a complaining witness, and Arnold Friedman denied abusing him in his close-out statement to the police. The child never gave any statement to the police, but one of the complaining witnesses told police that he saw defendant and R.G. abuse him.

11.    Mr. Panaro detailed the potential defenses that he and defendant had discussed— denying that any abuse happened at all, arguing that the children were acting under the influence of community mass hysteria, arguing that defendant was coerced into committing the crimes in question, or pleading not guilty by reason of mental disease or defect. He and defendant discussed the plea bargain being offered and what an indeterminate sentence meant, the possibility that defendant might be acquitted at trial and serve no time, and the maximum sentence exposure defendant faced if found guilty— 40 years' incarceration— and Mr. Panaro's commitment that, should defendant wish to proceed to trial, Mr. Panaro would require no further fees.

12.    Defendant told Panaro that he understood, and that he was voluntarily pleading guilty. Indeed, defendant stated it was his "strong" wish to accept the prosecution's offer. He also acknowledged that he would be required to tell the truth at the plea proceeding and could only plead guilty if the allegations against him were true. He told Attorney Panaro that he knew that he would have to admit to sodomizing his victims, and that such an admission would be truthful. Defendant also understood that, by pleading guilty, his arguments on appeal would be strictly limited, whereas if he went to trial, there could be many more appealable issues, including the judge's ultimate sentence and decision, if she chose to do so, to sentence defendant to consecutive terms of imprisonment.

13.     Defendant chose to accept the plea bargain offered: an indeterminate term of six to eighteen years' imprisonment. He pleaded guilty on December 20, 1988, and was sentenced as promised on January 24, 1989. He did not file an appeal.

14.     Shortly after his sentencing, defendant agreed to be interviewed by Geraldo Rivera. That interview, conducted in the prison where defendant was incarcerated, was recorded, and defendant understood it was to be broadcast on the nationally syndicated program, *The Geraldo Rivera Show*. He agreed to the interview against the advice of counsel and executed a written waiver that stated specifically that Attorney Panaro had advised defendant not to speak with Geraldo Rivera. Nevertheless, defendant participated in the interview, which was broadcast the following month. In the interview, defendant again confessed his guilt, blaming his father and the sexual abuse he had suffered at his father's hands for his criminal actions.[6]

15.     Defendant served just under thirteen years of his sentence and was released to parole on December 7, 2001. On January 7, 2002, defendant apparently consented to being adjudicated a Level III sex offender, in lieu of contesting the matter at a hearing pursuant to the Sex Offender Registration Act.

16.     Shortly before defendant's release, two filmmakers became aware of defendant's case and began working on a film which ultimately became *Capturing the Friedmans*. The People have always strongly contested the film's major thesis—that

---

[6] A copy of the transcript of that interview was attached to the People's opposition to defendant's second C.P.L. § 440.10 motion as Exhibit 3.

improper police and judicial pressure forced defendant to plead guilty and that the child victims had been coerced or even hypnotized into accusing defendant of abuse that the filmmakers imply never happened. It was, and remains, the People's contention that the film was highly edited to make it appear as favorable to defendant as possible, and that statements made by interviewees were taken out of context to be misleading. In addition, the film was flawed because the interviewees spoke about events that occurred more than a decade in the past and were not warned that the filmmakers intended to "prove" defendant's innocence. Notably, Arnold Friedman is barely more than a footnote in the movie, despite the overwhelming proof of his abuse of numerous children and his acknowledgement, numerous times over the course of his incarceration, that he was a pedophile.

17.   Several victims found the film offensive. Four hired a lawyer to protect their own privacy. Two wrote anonymous letters to the judge who had presided over defendant's case, restating that defendant was guilty and asking those who saw the movie not to brush aside the abuse they suffered at the hands of defendant and his father.

18.   Nevertheless, in January of 2004, fifteen years after pleading guilty and relying largely on *Capturing the Friedmans*, defendant filed a C.P.L. § 440.10(h) motion alleging that the statements of the witnesses against him were secured through suggestive interviews or controversial therapy techniques such as hypnosis, and that the prosecution's failure to disclose this prior to his guilty plea violated the strictures in

*Brady v. Maryland*, 373 U.S. 83 (1963). Attached to that motion was an affirmation from Peter Panaro, describing what he believed to be the plea court's coercion, although defendant did not, in his motion, argue that the court's behavior had coerced him into pleading guilty.

19.     The prosecution opposed defendant's motion, and included in its opposition an affidavit by one of the investigating detectives that stated that defendant's claim of coercion was exaggerated and relied upon misrepresentations. Similarly, the prosecution attached an affidavit from the treating psychologist of a complainant identified in *Capturing the Friedmans*, who had told the filmmakers that he had not remembered the abuse until he had been hypnotized. The psychologist, in her affidavit, denied that she had ever used hypnosis when treating the complainant. Defendant's motion was denied on January 6, 2006 (La Pera, J.). In its decision, the court noted that defendant's *Brady* claims were waived by his guilty plea and that all of his claims were meritless. This Court denied leave to appeal from the denial of defendant's C.P.L. article 440 motion on March 10, 2006.

20.     Defendant subsequently filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. Following the prosecution's motion to dismiss and oral argument upon that motion, defendant's petition was dismissed as time-barred. The court granted a certificate of appealability as to the timeliness of defendant's specific claim that inculpatory witness statements were induced by hypnosis. Defendant appealed to the Second Circuit Court of Appeals. The

Second Circuit denied defendant's petition, again finding it time-barred, and additionally finding that his *Brady* claim was meritless. However, relying largely on *Capturing the Friedmans*, the majority recommended that the District Attorney's office review defendant's case to determine whether defendant was actually innocent. Notably, the concurring judge disapproved of the majority court's decision which "assume[d] the truth" of defendant's allegations. *Friedman v. Rehal*, 618 F.3d 142, 161 (2d Cir. 2010) (Raggi, J., concurring). While the concurrence acknowledged that defendant's allegations "[we]re disturbing and may well warrant further inquiry . . . [it] cannot predict whether the outcome of any such inquiry w[ould] be favorable to petitioner, whose conviction [wa]s based on a plea of guilty that he thereafter publicly confirmed." *Id.* at 161-62.

21.     Then-District Attorney Kathleen Rice agreed to conduct a review of defendant's case. In 2010, the District Attorney convened a team of senior prosecutors to conduct a full review of defendant's conviction with the aid of a panel of outside attorneys, all nationally recognized criminal justice experts.[7] That expert panel was chaired by Mark Pomerantz, Esq., and also included Susan Herman, Esq., Patrick Harnett, Esq., and Barry Scheck, Esq.

22.     While the review was on-going, defendant filed a Freedom of Information Law ("FOIL") request. That request was denied, and defendant subsequently filed a

---

[7] Among the senior prosecutors who participated was current District Attorney Madeline Singas.

petition for a writ of mandamus, pursuant to C.P.L.R. Article 78, to compel the release of certain documents.[8]

23.    On June 24, 2013, after approximately three years of exhaustive review, District Attorney Rice released a report that analyzed each of the areas of concern identified by the Second Circuit, as well as the evidence provided to the review team by defendant's legal counsel and the producers of *Capturing the Friedmans*. The team found that hypnosis had never been used on any of the victims, and that other therapy techniques allegedly used to influence witness memories, such as group therapy, only occurred, at the earliest, two weeks after the third indictment had been issued. While agreeing that the investigation had not been perfect and would have been conducted differently had it occurred today— with the benefit of three decades of advances in science and investigative techniques— and that some, but by no means all, of defendant's allegations raised legitimate questions as to the confidence of defendant's guilt, the team ultimately concluded that the evidence against defendant had been overwhelming and there was no merit to defendant's claim of actual innocence. At bottom, the review team:

> cast the same discerning eye on the evidence produced by the Friedmans and their supporters, as on the original investigation and prosecution. The Review Team thoroughly analyzed and weighed all amassed information.

---

[8] This Article 78 proceeding ultimately came before the Court of Appeals, and the documents that defendant requested expanded from specific items to the entire file, which currently consists of over 40 boxes. A thorough review of the file began in November 2017 and was completed in October 2018.

> Special attention was paid to the alleged recantation evidence, which was found to be either overstated, not reliable, or unable to be substantiated.
>
> The District Attorney's ultimate decision did not turn on any one piece of evidence or witness account. Instead, it rested upon a consideration of all of the evidence, past and present. No investigation or prosecution is perfect, and this case is no exception. However, in the final analysis, taking all evidence into consideration, and giving it its due weight, Jesse Friedman was not wrongfully convicted.

*Jesse Friedman Conviction Integrity Report*, at 155.[9]

24.      The Advisory Panel added that "the Review Team did an excellent job under difficult circumstances. The District Attorney called on some of her most senior and trusted prosecutors to lead the review, and [the Advisory Panel] saw first-hand that they approached their work with no preconceived notions about Jesse Friedman's guilt, and no agenda to preserve his conviction." *Jesse Friedman Conviction Integrity Report*, at ii. "Having watched and reviewed the process as it took place, all of the members of the Advisory Panel are satisfied that the Report represented the considered, good-faith, and careful analysis of experienced prosecutors and investigators who wanted only to reach whatever result was warranted by the facts and the law." *Id.*

25.      On June 23, 2014, defendant filed a second C.P.L. § 440.10(1)(h) motion (hereinafter Defendant's C.P.L. § 440.10 motion), alleging that he was actually innocent

---

[9] A redacted copy of the report was annexed to defendant's second C.P.L. § 440.10 motion as Exhibit B, and the People's papers in opposition included a link to an online copy to the report. That link is no longer valid. A copy of the report will be forwarded to the Court upon request.

of the crimes to which he pleaded guilty, that the prosecutor knowingly admitted false testimony to the grand jury, and that the trial court impermissibly coerced his guilty plea.

26.     The People responded on September 9, 2014 (annexed as Exhibit 1). They did not oppose defendant's request for an "actual innocence" hearing, based on this Court's decision in *People v. Hamilton*, 115 A.D.3d 12 (2d Dept. 2014). *Hamilton* required only a "sufficient showing of possible merit" to entitle defendant to a hearing to prove his innocence. *Id.* at 27. Based on this extremely low bar, the People believed that defendant's factual allegations met the minimal threshold required to have an "actual innocence" hearing.

27.     However, the People opposed defendant's remaining two claims. With regard to defendant's judicial misconduct argument, the People noted, first, that it was based on facts known to defendant when he filed his original C.P.L. § 440.10 motion in 2004, and was, therefore subject to a discretionary procedural bar. *See* C.P.L. § 440.10(3)(c). Indeed, defendant relied primarily on an affirmation that had been annexed to his original C.P.L. § 440.10 motion. Moreover, defendant had chosen to raise this claim only after Judge Boklan had died and the plea minutes had been lost, thereby significantly impacting the ability to counter his arguments. The People further argued that defendant failed to substantiate either of his remaining two claims through sworn allegations and, therefore, failed to meet his burden to be granted a hearing. Defendant's own submissions undermined his arguments; the sworn allegations largely

13

confirmed that Judge Boklan had presided fairly over defendant's case. Defendant failed completely to show that all of the evidence before the grand jury was false and that such alleged falsehood was known to the prosecutor prior to defendant's plea.

28.     Defendant replied on October 10, 2014. The Court issued a decision on December 23, 2014, and, relying on *Hamilton*, granted a hearing to examine defendant's claim of actual innocence. Decision, Dec. 23, 2014, Corrigan, J., at 3 (Def.'s Ex. B). It limited that hearing, however, to the narrow issue of actual innocence. *Id.* at 6. Defendant, the court found, had failed to meet his burden of production for his remaining claims (*id.* at 6, 8). Regarding the claim of false grand jury testimony, the court found that defendant's submissions did not support his arguments. Particularly, it found the three submissions from R.G. ambivalent at best (*id.* at 5-6), and noted that the complaints about investigative techniques amounted to nothing more than the evolution of investigation over the many years since defendant's guilty plea (*id.* at 6). Regarding the judicial misconduct claim, the court found defendant's allegations again belied by his own submissions (*id.* at 8). The court was especially troubled by defendant's unjustifiable failure to raise his coercion argument in his first C.P.L. § 440.10 motion, before Judge Boklan had died and the plea minutes lost (*id.* at 7). Accordingly, the Court denied the remainder of defendant's motion. *Id.* at 10.

29.     Extensive motion practice followed, including motions for Justice Corrigan to recuse herself, which Justice Corrigan ultimately granted, notwithstanding her continued belief that she could preside over the hearing impartially, on the basis

14

that the successive recusal motions were unnecessarily delaying the hearing, and that a former assistant district attorney, current Justice Robert Schwartz, who had been heavily involved with the opposition to defendant's C.P.L. § 440.10 motion, had become a judge. Justice Corrigan believed that defendant might argue that she would feel beholden to support the opposition to his motion as a result of Justice Schwartz's new position and the fact that she herself had been a judge for only two years. Defendant also filed a motion to compel discovery, which the hearing court denied with leave to renew.

30.     On June 14, 2018, the Court of Appeals decided *People v. Tiger*, __ N.Y.3d ___, 2018 Slip Op. 04377. In that decision, the Court held that C.P.L. § 440.10(1)(h) does not allow for a freestanding, post-plea claim of actual innocence. Accordingly, the People's prior consent to such a hearing under this statute was rendered a nullity. The People filed a motion to renew on July 27, 2018, noting that the Court of Appeals' decision was a change in the law requiring the lower court to reverse that part of its decision granting defendant an "actual innocence" hearing. On August 23, 2018, defendant, through counsel, sent a letter to the court agreeing that such a hearing was no longer authorized by law.

31.     On September 4, 2018, the hearing court issued an oral decision granting the People's motion to renew and reversing that portion of its original C.P.L. § 440.10 decision that granted defendant an "actual innocence" hearing (Def.'s Ex. A).

32.    On October 5, 2018, defendant filed the instant application for a certificate of leave to appeal from the lower court's denial of those branches of his second C.P.L. § 440.10 motion alleging that R.G.'s grand jury testimony was knowingly false and that the plea court impermissibly coerced defendant into pleading guilty (Def.'s Mot. at 58, 65). He does not challenge the lower court's dismissal of his request for an "actual innocence" hearing.

33.    As discussed more completely in the attached memorandum of law, the lower court's decisions were sound exercises of discretion. The court properly gave the allegations before it the weight they deserved, based on their equivocal and unsworn nature. Moreover, one of defendant's claim was subject to a procedural bar properly applied. The lower court's decision was a sound exercise of discretion. It did not raise any issues requiring clarification, but rather rested on well-settled law applied to a unique set of facts. Accordingly, defendant has failed to show that his case is entitled to this Court's attention.

34.    Finally, a review of defendant's papers indicates that there are no questions of law or fact which ought to be reviewed by this Court. *See* C.P.L. § 460.15(1).

WHEREFORE, and for the reasons set forth in the attached memorandum of law, defendant's motion should be denied in its entirety.

Dated:  Mineola, New York
         November 9, 2018

_____
W. Thomas Hughes

16

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

                                            A.D. No. 2018-12148
                                            Ind. Nos. 67104/1987
              -against-                      67430/1988
                                            69783/1988

JESSE FRIEDMAN,

                            Defendant-Appellant.

------------------------------------------------------------------------x


MEMORANDUM OF LAW


                                        Respectfully submitted,

                                        MADELINE SINGAS
                                        District Attorney, Nassau County
                                        *Attorney for Respondent*
                                        262 Old Country Road
                                        Mineola, New York 11501
                                        (516) 571-3660

Sheryl Anania
Tammy J. Smiley
Daniel Bresnahan
W. Thomas Hughes
  Assistant District Attorneys
    Of Counsel

## INTRODUCTION

This memorandum of law supports the People's affirmation in opposition to defendant's motion for a certificate granting leave to appeal. The facts relevant to this motion are summarized in the attached affirmation and in the People's response to defendant's second C.P.L. § 440.10 motion, annexed as Exhibit 1.

Defendant pleaded guilty in 1988, after assuring his attorney and the plea court that he was, in fact, guilty, and then consenting to an interview broadcast on national television in which he confirmed his guilt. He then let his conviction lay fallow for over a decade until a filmmaker released a highly edited documentary that elided the evidence of his guilt in favor of sensational, and unsubstantiated, claims of misconduct and coercion. Since then, after fully completing his original sentence, defendant has tried multiple collateral attacks on his guilty plea. When the latest of those failed, he filed the instant application seeking leave to appeal to this Court. However, defendant failed to substantiate his claims with sworn allegations sufficient to warrant even a hearing, and his belatedly-raised judicial misconduct claim was procedurally barred. Accordingly, defendant has failed to show that the lower court abused its discretion in denying his second C.P.L. § 440.10 motion. Moreover, because the denial of his motion was premised on the correct application of well-settled law to the facts of this case, and is fully supported by the record, it presents no issue warranting this Court's attention.

<u>POINT I</u>

Defendant's Claim That The Prosecutor Knowingly Used "Insufficient" Information To Secure An Indictment Was Not Sufficiently Supported To Warrant A Hearing.

Three separate grand juries heard evidence against defendant from fourteen complainants. Those grand jury minutes were reviewed by a judge thirty years ago, who found that the vast majority of the charges in all three indictments were supported by legally sufficient evidence and dismissed the few that were not. Defendant now contends not only that the evidence was legally insufficient, but that the prosecutor in 1988 knew this but allowed defendant to plead guilty nonetheless. Defendant's reliance on *People v. Pelchat*, 62 N.Y.2d 97 (1984) is misplaced— a *Pelchat* error requires proof both that the indictment rested *solely* upon false evidence and that the prosecutor knew this at the time of plea. Defendant failed, in his motion, to make out either prong and, accordingly, the lower court was correct in denying this claim without a hearing.

Defendant's *Pelchat* claim rests primarily on R.G.'s recantation, twenty-five years after his grand jury testimony (Def.'s C.P.L. § 440.10 Mot. at 129-30; Def.'s Leave App. at 43-45, 58-63). At the outset, that ambiguous, self-serving recantation is not sworn (Def.'s C.P.L. § 440.10 Mot. at Ex. KK). Indeed, defendant offers no sworn testimony from R.G. at all. *See* C.P.L. § 440.30(4)(b) (permitting denial of a C.P.L. § 440.10 motion where "the moving papers do not contain *sworn* allegations substantiating or tending to substantiate all the essential facts" supporting the motion; emphasis added). When coupled with the marked contrast between R.G.'s sworn grand jury testimony, his

refusal to recant when presented with that opportunity by the filmmakers of *Capturing the Friedmans*, and his recantation letter, the lower court was correct to examine that recantation with suspicion (Decision, Dec. 23, 2014, Corrigan, J., at 5-6). Furthermore, even if credited, at best R.G.'s recantation merely removed his collaborative testimony from the grand jury, which would not have undermined the third indictment— which could stand on the complainants' testimony alone— and have no effect whatsoever on the first two indictments, which were handed down before R.G. testified (*Id.* at 6).

Of course, *Pelchat* requires more than an allegation that a single grand jury witness was unreliable; it requires that *all* of the material evidence before the grand jury be false. *Pelchat*, 62 N.Y.2d at 107. Here, defendant utterly failed to substantiate any of his allegations; rather he offered only conclusory allegations and supposition, insufficient to warrant even a hearing (Def.'s § 440.10 Mot. at 130-31). Defendant's arguments "alleged . . . without affidavits of individuals admitted to using the alleged problematic interview techniques, does not equate with the legal requirement that the defense show that the prosecution placed knowingly false testimony before the grand jury." (Decision, Dec. 23, 2014, Corrigan, J., at 6). *See Pelchat*, 62 N.Y.2d at 107 (no error where evidence before grand jury was legally sufficient but "may lose its force" at trial due to, for example, "the witness's uncertainty" or other "latent weaknesses in the Grand Jury evidence unknown to the prosecutor").

At bottom, defendant's arguments, based largely on unsworn allegations, amount to no more than a claim that the prosecutor in 1988 should have known that the

complainants' testimony was false— notably without proof that such testimony was false— and a preview of potential weaknesses that defendant, armed with two and a half decades of investigative advancements and the inevitable deterioration of memory, might have raised in the trial that he forewent when he elected to plead guilty. Accordingly, the lower court correctly denied defendant's motion because he failed to substantiate his claims. Therefore, and for the reasons laid out in the People's original opposition to defendant's motion, *see* Ex. 1, this Court should deny defendant's request for a certificate granting leave. *See* 22 N.Y.C.R.R. § 670.12(3).

<u>POINT II</u>

Defendant's Claim Of Judicial Misconduct Was Properly Denied Pursuant To A Discretionary Procedural Bar.

All of the allegations upon which defendant relied to support his claim that the plea court unfairly coerced him into pleading guilty were known to him in advance of his original C.P.L. § 440.10 motion, filed in 2004— and, in fact, were known to him when he pleaded guilty. Nevertheless, defendant did not raise that claim in his first motion, or at any time before Judge Boklan, the person in the best position to confirm or deny defendant's allegations, had died. He has never offered any reason to explain this unjustified failure; rather, he conflates the procedural barrier at issue here with the doctrine of waiver and argues that, because an appellate waiver would not have barred this claim, it is immune to all procedural defects. He then takes out of context statements made by Judge Boklan in order to paint her as hostile to defendant. Defendant's own sworn submissions contradict this argument.

The discretionary procedural bar, alone, warranted denial of this claim. *See* C.P.L. § 440.10(3)(c) ("[T]he court may deny a motion to vacate a judgment when . . . [u]pon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so."). In support of his motion, defendant relied solely on facts known to him when he filed his first C.P.L. § 440.10 motion in 2004, particularly an affirmation by his trial attorney, Peter Panaro, that was annexed to the first motion (Def.'s § 440.10 Mot. at

63-64; Def's § 440.10 Mem. at Ex. LL). Because "a defendant who is in a position adequately to raise more than one ground should raise every such ground," the lower court was correct to deny this claim as procedurally barred. C.P.L. § 440.30(1)(a).

Defendant now attempts to explain this away by stating that "he simply cannot waive a challenge to the voluntariness of his plea" (Def.'s Leave App. at 69-70). This is a red herring; the lower court did not deny this branch of defendant's motion on the ground that the argument was waived, but rather because it was procedurally barred (Decision, Dec. 23, 2014, Corrigan, J., at 7-8). "Waiver connotes the intentional relinquishment or abandonment of a known right," and requires some affirmative act on behalf of the party waiving the right at issue. *People v. Armstrong*, 138 A.D.3d 877, 878-79 (2d Dept. 2016). A procedural bar, by contrast, requires no such affirmative act, but rather is an impediment to raising a claim as a matter of law. *See People v. Jones*, 81 A.D.2d 22, 29 (2d Dept. 1981) (a "procedural default," as opposed to a waiver of right, is "the failure to raise a timely claim of error— whether the omission be intentional or inadvertent— " which "consigns the objection to permanent repose" by operation of law). While a defendant cannot waive a claim that his plea was involuntary, it can be subject to other bars that permit denial without reaching the merits. *See, e.g.*, *People v. Peque*, 22 N.Y.3d 168, 183 (2013) (failure to properly preserve claim that plea was involuntary rendered claim unreviewable); *People v. Cooks*, 67 N.Y.2d 100, 104 (1986) (defendant's claim that plea colloquy was insufficient not reviewable in C.P.L. § 440.10 motion because such claim was reviewable on direct appeal, and therefore subject to

the mandatory bar under C.P.L. § 440.10[2][b]); *People v. Kerley*, 161 A.D.3d 1458, 1460 (3d Dept. 2018) (defendant's claim that plea was involuntary was not reviewable in a C.P.L. § 440.10 motion because it was subject to mandatory bar under C.P.L. § 440.10[2][b]); *People v. Weston*, 145 A.D.3d 746, 747 (2d Dept. 2016) (defendant's claim that guilty plea was coerced by lower court's conduct survived waiver of appeal, but unreviewable because defendant failed to preserve claim). Here, defendant did not waive his claim— and neither the People nor the lower court suggested so. Rather, by failing to raise this claim in his first motion, he defaulted on it, and thereby rendered it subject to a procedural bar.

Whether to deny a subsequent C.P.L. § 440.10 motion for failure to raise a claim in a previous motion despite having opportunity to do so is entrusted to the discretion of the lower court. *People v. Cortez*, 158 A.D.2d 611, 611 (2d Dept. 1990) (no abuse of discretion where article 440 court denied, without a hearing, defendant's constitutional ineffective assistance of counsel claim for failure to raise in a previous C.P.L. § 440.10 motion). The lower court soundly exercised its discretion; defendant had the opportunity to raise his claim in his original C.P.L. § 440.10 claim— indeed, he relied on the same factual allegations attached to his first motion in his second motion (Decision, Dec. 23, 2014, Corrigan, J., at 7). The court was right to deny this branch of defendant's motion in light of his unjustified failure to raise it before the plea minutes had become lost and before Judge Boklan's death, instead of when she "was alive to be heard, under oath, as to what she said and did" (*Id.* at 9). *See People v. Friedgood*, 58 N.Y.2d

467, 470-71 (2004) (motion to vacate judgment denied in part because defendant waited more than three years to make the application); *People v. Baksh*, 75 A.D.3d 846, 847 (2d Dept. 2010) (defendant's over one-year delay in filing motion to vacate judgment, premised on information of which he was allegedly aware at the time of his plea, not excused); *People v. Degondea*, 3 A.D.3d 148, 160-61 (1st Dept. 2003) (denying defendant's C.P.L. § 440.10 motion, in "significant" part, because of defendant's six-year delay in raising claims; *People v. Melio*, 304 A.D.2d 247, 247 (2d Dept. 2003); *People v. Hanley*, 255 A.D.2d 837, 837 (3d Dept. 1998) (allegations in defendant's motion to vacate judgment undermined by defendant's long delay in filing his claim).

Defendant argues that the lower court "offered no authority, or even a basis, to distinguish this case from the plain rule stated in *Ross*" (Def.'s Leave App. at 70). At the outset, while the lower court's decision did not include a citation to *People v. Ross*, 182 A.D.2d 1022 (3d Dept. 1992), the court did cite *People v. Seaberg*, 74 N.Y.2d 1 (1989), and *People v. Santiago*, 71 A.D.3d 703 (2d Dept. 2010), both of which stand for the proposition that a claim "that a plea was involuntarily entered can always be raised on appeal" (Decision, Dec. 23, 2014, Corrigan, J., at 7). Accordingly, defendant's claim that the lower court ignored *Ross*— a Third Department case— is disingenuous. The court appropriately identified the argument that defendant was advancing as inapposite.

The difference between *Ross* and the instant case is obvious and immediate: *Ross* was a direct appeal and the only procedural impediment was defendant's waiver of appeal. *People v. Ross*, 182 A.D.2d 1022, 1023 (3d Dept. 1992). While the defendant in

8

*Ross* also filed a C.P.L. § 440.10 motion, that served only to preserve his coercion claim for direct appeal. *See Weston*, 145 A.D.3d at 747 (a C.P.L. § 440.10 motion suffices to preserve an involuntary plea claim for appeal). Here, defendant advanced a second C.P.L. § 440.10 motion, which carries with it several procedural bars that do not exist in a direct appeal, without having appropriately raised his claim in his original C.P.L. § 440.10 motion. In short, defendant's waiver of his appellate rights is not what prevents him from judicial review of his claim now; his unjustified failure to bring that claim in his original C.P.L. § 440.10 motion, while the primary witness was still alive, is. C.P.L. § 440.30(1)(a).

Even if the court had not applied this bar, however, it would still have correctly denied defendant's motion for his failure to substantiate his allegations. As the court pointed out, the vast majority of defendant's exhibits actually support a belief that Judge Boklan presided fairly over defendant's case (Decision, Dec. 23, 2014, Corrigan, J., at 8). "A careful review of both" the Peter Panaro affirmation— originally filed in support of defendant's first C.P.L. § 440.10 motion— and the transcript of Panaro's conversation with defendant, particularly in light of the affirmation of Judge Boklan's law secretary— who "repeatedly maintained Judge Boklan presided over the Friedman matter fairly" (Def.'s C.P.L. § 440.10 Memo. at Ex. A)— and the "*complete* transcript" of Judge Boklan's interview with the producers of *Capturing the Friedmans* (Decision, Dec. 23, 2014, Corrigan, J., at 8; emphasis in original) "fail[ed] to show any evidence of judicial coercion such that the plea of guilty should be set aside" (*Id.* at 8-9).

9

Accordingly, and for the reasons laid out in the People's original opposition to defendant's motion, *see* Ex. 1, this Court should deny defendant's request for a certificate granting leave with regard to his procedurally-barred judicial misconduct claim. *See* 22 N.Y.C.R.R. § 670.12(3).

\*     \*     \*     \*

At bottom, the lower court's decision was thorough and well-reasoned, and gave defendant's allegations the consideration they required and deserved. The court properly denied defendant's motion, and defendant offers no justification for review of that denial now warranting the grant of a certificate for leave to appeal. Finally, several factors militate against granting a certificate for leave to appeal. Defendant had the opportunity to litigate all of his current claims at trial and chose not to do so in order to take an advantageous plea deal. He could have appealed his conviction, but chose not to. Instead, he waited twenty-five years to attack his conviction, attempting "to strategically relitigate culpability – at a time when the prosecution's evidence has grown stale, or may be entirely undeveloped," thereby "undermin[ing] critical notions of fairness, finality, and sanctity of the legal process." *People v. Tiger*, __ N.Y.3d ___, 2018 Slip Op. 04377 (June 14, 2018), at \*8 (Garcia, J., concurring). Moreover, defendant was in the unique position to know, in fact, whether he committed the crimes of which he was accused and, accordingly, whether his accusers were lying. Instead, he told his

attorney that he was willing to plead guilty because he was, in fact, guilty. Accordingly, defendant was in no worse position to challenge the People's evidence thirty years ago when he declined that opportunity to proceed to trial than he is today. Therefore, there is no valid excuse for defendant's failure to have taken advantage of his opportunity to contest the People's evidence at trial thirty years ago. The time has long passed for defendant's case to be put to rest, and to allow the victims— all now adults in their thirties— to move forward with their lives instead of endlessly litigating what happened to them when they were children.

## CONCLUSION

<u>This Court Should Deny Defendant's Motion For A Certificate Granting Leave To Appeal.</u>

Dated:   Mineola, New York
         November 9, 2018


                                        Respectfully submitted,

                                        MADELINE SINGAS
                                        District Attorney, Nassau County
                                        *Attorney for Respondent*
                                        262 Old Country Road
                                        Mineola, New York 11501
                                        (516) 571-3660


Sheryl Anania
Tammy J. Smiley
Daniel Bresnahan
W. Thomas Hughes
  Assistant District Attorneys
   Of Counsel

EXHIBIT 1

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------x

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | AFFIRMATION IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE HIS JUDGMENT OF CONVICTION |
| -against- | |
| JESSE FRIEDMAN, | Ind. Nos. 67104, 67430, and 69783 |
| | Motion No. C-004 |
| Defendant. | Hon. Teresa K. Corrigan |

-------------------------------------------------------------------x

AMES C. GRAWERT, an attorney admitted to practice in the State of New York, and an Assistant District Attorney of counsel to the Honorable Kathleen M. Rice, District Attorney of Nassau County, affirms under penalty of perjury the factual allegations set forth below:

1.      The following is based upon information and belief, the source of said information and the basis for said belief being defendant's motion papers, and the records of the Office of the District Attorney, including the conviction integrity report concerning defendant released by the District Attorney on June 24, 2013.

2.      This affirmation is submitted in opposition to defendant's motion to vacate his judgment of conviction. The motion is returnable on September 8, 2014.

3.      Defendant's motion arises out of his conviction, on his plea of guilty, of seventeen counts of first-degree sodomy (Penal Law § 130.50),[1] four counts of first-degree sexual abuse (Penal Law § 130.65), one count of attempted first-degree sexual abuse (Penal Law §§ 110.00/130.65), two counts of endangering the welfare of a child (Penal Law § 260.10), and

---

[1]      The crime of sodomy has since been renamed criminal sexual act. See L. 2003, Ch. 264, §§ 18-20.

one count of the use of a child in a sexual performance (Penal Law § 263.05). Following his conviction, defendant was sentenced, on January 24, 1989, to an aggregate, indeterminate term of six to eighteen years' imprisonment (Boklan, J., at plea and sentence).

4.      Defendant now claims that his conviction should be vacated for three distinct reasons: (1) he is actually innocent of the crimes with which he was charged (see People v. Hamilton, 115 A.D.3d 12 [2d Dept. 2014]); (2) the prosecutor knowingly presented false testimony in the grand jury (see People v. Pelchat, 62 N.Y.2d 97 [1984]); and (3) the judge presiding over his case was biased against him, and coerced his guilty plea.

5.      For the reasons set forth in this affirmation and the accompanying memorandum of law, the People consent to a hearing on defendant's actual innocence claim. Defendant's other claims, however, should be denied summarily. The facts underlying his claim of judicial coercion were fully known to him when he filed a previous motion to vacate judgment in 2004, and he unjustifiably failed to raise that claim then. This alone is a basis for denying his claim. See C.P.L. § 440.10(3)(c). In any event, defendant has utterly failed to substantiate his claims of judicial coercion, and his separate contention that the prosecutor knowingly presented false testimony to the grand jury.

6.      As discussed in paragraphs 57-60, infra, in 2013, the District Attorney's office released a conviction integrity report ("report" or "Rice Report"), which was the culmination of a three-year re-investigation into defendant's arrest and conviction. A redacted copy of the report is annexed to defendant's motion as Exhibit B. Released with the report was a 900-page appendix. Both the report and the appendix can be accessed online at http://goo.gl/IBbmjb.[2]

---

[2]      The index to the appendix can be found at the end of the report. An unredacted copy of the report and appendix will be provided to the Court upon request.

2

Rather than repeat what is already contained in the report, the People will cite to and incorporate

by reference relevant sections, and restate and summarize some facts as necessary.

I.      The 1987-88 Investigation

     A.      Defendant And His Father Teach Computer Lessons To Neighborhood Children.

     7.      Defendant's father, Arnold Friedman, was a pedophile. It is likely that defendant

knew or at least suspected this about his father (see Rice Report at 4-5).

     8.      In 1982, Arnold began to teach piano and computer classes to neighborhood

children out of his home.

     9.      Arnold's computer classes met in a room on the ground floor of his home. The

classroom adjoined a bathroom, defendant's bedroom, and was on the same level as Arnold's

office. Though some parents report that they were able to visit the class (see Def. Mem. at 38),

others were not welcome to do so, or even to enter the Friedman home when picking up their

children (see Rice Report at 3-4 & nn.15-17). According to one parent, though she "want[ed] to

go in" to the home when picking up her child, "they didn't give [her] a chance to do that. They

kind of blocked the door" (Def. Ex. CCC [Lushe interview] at 4).

     10.      The computer classes coincided with the school year, running in "fall," "winter,"

and "spring" sessions of ten classes each. Classes met once per week on their assigned day and

usually included eight or nine individual students. In some years, smaller summer sessions were

offered. Arnold often taught multiple classes per season, distinguished by the day of the week on

which they met (e.g., the "Tuesday" or "Friday" spring class).

     11.      Neither Arnold nor defendant kept records of which students were enrolled in

which class sessions.   When police later attempted to recreate this information through

interviews, they met with mixed success, and were hampered by the incomplete or contradictory

accounts provided by complainants and parents. Consequently, no reliable set of class rosters was ever found or created. Though defendant appears to believe one existed at some point (see Def. Mem. at 16), no complete and reliable list was found during the review process. Therefore, any attempt to recreate rosters or lists of each session necessarily depends upon imperfect information and cold memory (see Rice Report at 4, 62, 123-25 [acknowledging the problems posed by the absence of this critical information]). Defendant appears to acknowledge this fact, noting in his motion, albeit inconsistently, that his own discussions of class membership are based upon the "best information available" (see, e.g., Def. Mem. at 109-10). However, defendant fails to recognize that as a result, his attempt to analyze and contrast witness accounts based on which class they attended amounts to little more than informed guesswork.

12.     Between 1984 and 1987, defendant assisted his father in teaching the classes. In late 1987, a local high school student took over the assistant role (Rice Report at 2).

B.     Classes End After Investigators Search Arnold Friedman's House.

13.     In July 1984, federal officials seized a magazine entitled "Boy Love" as it passed through customs in transit to the Friedman home.[3] As a result of this discovery, authorities commenced an investigation into Arnold's involvement with child pornography.

14.     That investigation concluded on November 3, 1987, when Arnold accepted the delivery of another child pornography magazine from an undercover federal postal investigator. Federal agents then executed a search warrant on Arnold's home, leading to the recovery of the magazine, along with at least thirty other articles of child pornography. Many of these items

---

[3]     Defendant's characterization of the magazine as one "depicting underage teenagers" (Def. Mem. at 2) is just one of his many attempts to distort basic facts. The magazine, as its title suggests, contained child pornography.

4

were found in Arnold's office, stacked behind a piano. The Nassau County Police Department ("NCPD") also participated in this search (id. at 6-7).

15.     During the search, investigators also found a list of the students enrolled in Arnold's computer classes. In response, the NCPD set out to determine whether Arnold had abused any of his students, or otherwise subjected them to his interest in child pornography.

16.     On November 20, 1987, only two people appeared for Arnold's scheduled Friday computer class, one of whom was Arnold's assistant. Arnold instructed both to go home. The next day, Arnold told his assistant that he was discontinuing the Friday classes, but expected to continue with his other class sessions (id. at 14, 125). The classes never met again.

C.     Police Discover Defendant's Involvement While Investigating His Father.

17.     On November 12, 1987, NCPD detectives began interviewing former students of Arnold's computer classes. The very first child interviewed disclosed incriminating conduct, reporting that Arnold had fondled him, and taken him to another room to show him pornographic computer programs. On the basis of this information, police continued investigating (id. at 12).

18.     The first news report on the investigation appeared the next day, on November 13, 1987, and described Arnold as its exclusive target (id. at 11 & n.45). For his part, defendant was far from police scrutiny, as he had just begun college and was not living continuously at home.[4] Nevertheless, on November 23, 1987, during his first interview with the police, a computer student reported that he had been abused by both Arnold and defendant (id. at 13).

---

[4]     Defendant may not even have known of the investigation at this point, though his accounts on the matter differ (compare Rice Report at 144-45 & n.524 [noting two distinct accounts of how he learned of the search] with Def. Mem. at 69-70 [describing still a third]).

5

19. Following other reports, one of which also implicated defendant, defendant and Arnold were both arrested on November 25, 1987, on charges involving child sexual abuse. Simultaneously, NCPD investigators executed their own search warrant on the Friedman home. In the process, they discovered sexual aids, sexual videos, cameras, two color photos of a nude boy and girl, and disks containing pornographic video games (id. at 14-15).

20. Over the next three weeks, police continued to interview prospective witnesses. Of the children interviewed, some had not attended the computer classes at all; others had but witnessed nothing out of the ordinary; and still others described being subjected to behavior that for whatever reason did not rise to the level of criminality, but left them uncomfortable, indicated some irregularity,[5] or was consistent with "grooming" (see, e.g., id. at 10).

21. By December 17, 1987, thirteen children had told police that defendant had engaged in criminal activity in the computer classes (id. at 22). Between November 1987 and January 1988, nine of these thirteen testified against defendant before Nassau County grand juries. Prior to presenting the witnesses, the lead prosecutor, A.D.A. Joseph Onorato, personally interviewed each of the children, to assess their credibility to his own satisfaction (id. at 9).

22. On the basis of this testimony, the grand juries returned two indictments against defendant: Indictment No. 67104 in December 1987, and Indictment No. 67430 in February 1988. Together, the two indictments charged defendant with six counts of first-degree sodomy (Penal Law § 130.50), thirteen counts of first-degree sexual abuse (Penal Law § 130.65), one count of attempted first-degree sexual abuse (Penal Law §§ 110.00/130.65), twenty-four counts

---

[5] Defendant's exhibits contain a recent example of one such account. Non-complainant Rafe Leiber, in an interview with a Capturing the Friedmans producer, told his interviewer that he recalled that some children in his class were separated from the class and brought to a "private room." He did not recall why (see Def. Ex. BBB at 3).

6

of endangering the welfare of a child (Penal Law § 260.10), and two counts of use of a child in a sexual performance (Penal Law § 263.05) (see Rice Report at 20-21).

23.     As defendant's own evidence demonstrates, the testimony underlying these indictments, as well as the "third" indictment that would follow in November 1988, was legally sufficient (see Def. Ex. A [N. Scott Banks letter] at 1), except as to twenty-three counts Judge Boklan dismissed after reviewing the evidence (see Rice Report at 22 [noting such dismissals]).

24.     Additionally, though defendant would have the Court believe otherwise (see Def. Mem. at 3, 5, 24, 71, 74, 95), the witnesses' allegations were not bolts from a blue sky.  Nor were they bare allegations bereft of context.  Instead, police interviews provided important, corroborating background information.  One complainant, for example, shared with police an electronic diary he had kept of "bad days" in the Friedman class (Rice Report at 62, 97). Another complainant—in his first statement, early in the investigation—vividly described being sodomized by Arnold, and told police both how he struggled to avoid "bad touches" from Arnold and defendant, and how he had confided this in his dog, but not in his parents (see Def. Ex. U [statement of Fred Doe] at 5).  Some complainants' parents recalled that their children began exhibiting disturbing behavior, or physical symptoms of severe stress, during and after enrolling in the computer classes (see Rice Report at 120-21).  Other parents reported that their children had in fact asked to be removed from the classes (id. at 121).  Investigators did not uncover mere allegations; they uncovered detailed accounts of abuse that were, at this early phase, worthy of belief (see id. at 2-20 [summarizing witness statements in this period]; see also Def. Ex. U).

25.     On March 15, 1988, the lead prosecutor asked police to prepare the cases for trial by seeking out new witnesses, and re-interviewing prior witnesses (Rice Report at 24 & n.93).

7

26.     On March 25, 1988, defendant's father Arnold pleaded guilty to forty-two of the more than one-hundred counts leveled against him, in full satisfaction of the state indictments. Days later, he pleaded guilty in federal court to child pornography charges. After his state court guilty plea, on his attorney's advice and in his presence, Arnold gave a "close-out" statement to police, in which he admitted abusing some students, but denied abusing many others, in exchange for immunity from future prosecution (see id. at 23-24).[6]

D.     Additional Witness Interviews Lead To Additional Charges.

27.     In June of 1988, several students told police that they had also been abused by another individual, eventually identified as Ross Goldstein, a friend of defendant.[7]

28.     Goldstein was arrested, and eventually agreed to cooperate with police. Towards that end he sat for four sworn interviews with police. His attorney was present for each. During these interviews, Goldstein was asked to testify truthfully concerning his knowledge of and involvement with defendant. In exchange for his truthful responses, and his cooperation during the remainder of the case, Goldstein was told that prosecutors would recommend a favorable plea-bargain including youthful offender treatment.

---

[6]     Defendant's assertion that this interview was a precondition of Arnold's guilty plea (see Def. Mem. at 72-73) is unsupported.

[7]     Though defendant now concedes that Goldstein was his "friend" (Def. Mem. at 77), for years defendant instead claimed that he barely knew Goldstein (see Rice Report at 145), an assertion that puzzled even Goldstein himself (see id. at 136-37). Some witnesses also indicated that others, in addition to Goldstein, had been present for and participated in sexual abuse in the computer classes. But no reliable identification was ever made of these individuals, and prosecutors declined to pursue charges (id. at 28-30).

8

29. In response, Goldstein discussed in detail how and why he came to be involved with defendant, and with defendant's actions. Though speaking with clarity on these and other subjects, Goldstein could not, at times, remember other details (id. at 31-32).

30. On November 7, 1988, a Nassau County grand jury returned Indictment No. 69783: the "third" indictment as to defendant, but the first and only to name co-defendant Goldstein. By this instrument, defendant was charged with more than one hundred counts of sodomy, and more than fifty counts of endangering the welfare of a child. The sodomy charges in the indictment were based on approximately seventy-seven distinct acts (id. at 132) occurring over several class sessions between March 1986 (see, e.g., Def. Ex. S [Indictment Nos. 67104, 67430, 69783]; Ind. No. 69783 at Count 49) and July 1987 (see, e.g., id. at Count 180).

31. Though Goldstein's testimony served to corroborate some counts, no corroboration was legally required, and no counts of this indictment were sustained by his testimony alone (see Rice Report at 33).

E. Defendant Voluntarily Pleads Guilty.

32. In June 1988, months before the third indictment was handed down, defendant hired attorney Peter Panaro to represent him.

33. Panaro sought out expert witnesses, but none could help provide a defense for defendant. He also received a list matching the complainant aliases used in the indictments—e.g., "Edward Doe"—with their true names.

34. Panaro attempted to find former students who would testify in support of defendant at trial. Very few former students offered to do so. Though Panaro later claimed that his efforts to find supportive non-complainants were stymied by the prosecution (see Def. Ex. LL [Panaro Aff.] ¶ 15), that is simply not the case (see Rice Report at 87-90).

9

35. One former student, Gary Meyers, a non-complainant, did offer to testify on defendant's behalf. Through speaking with his family, Panaro learned that Meyers's mother had surreptitiously recorded her son's interview with police investigators. No one besides Panaro and Meyers are known to have seen the resulting videotape (id. at 72-73), and the "transcript" of that tape, upon which defendant relies (see Def. Ex. DDD), is nothing more than a typed version of Panaro's handwritten notes from his first and only viewing of the tape. The transcript contains no mention whatsoever of defendant, either by police or by Meyers himself (Rice Report at 72-73). Regardless, in an affirmation Panaro signed for defendant's 2004 motion to vacate judgment (discussed at paragraphs 48-51, infra), he claims he took news of this discovery, and his concerns about inappropriate and aggressive interviewing techniques, directly to the prosecution, and demanded disclosure of any similar revelations about the nature of police questioning (Def. Ex. LL ¶ 18). But the only other party to this conversation, A.D.A. Joseph Onorato, insisted in his own affirmation that it never happened (see Affirmation of Joseph R. Onorato [annexed hereto as Exhibit 1] ¶¶ 5-6 ["Peter Panaro never suggested to me that police officers were using inappropriate interviewing techniques"]). Nor, Onorato states, was he ever aware of "any specific treatment or therapy (including hypnosis and visualization) used by any doctor in the treatment of any complainant" (id. at ¶ 7).[8]

36. Ultimately, in approximately November 1988, Panaro advised defendant to plead guilty. Defendant, too, wrote to his father that he was considering a guilty plea, as conviction on even a few minor charges would (in his words) "add up too quickly" (Rice Report at 41).

37. On December 18, 1988, defendant took the extraordinary step of sitting for a tape recorded interview with Panaro. In that interview, defendant and Panaro discussed the full extent

---

[8]     This affirmation was first annexed to the People's response to defendant's 2004 motion.

10

of their pre-trial preparations to date. Panaro described in great detail how he had attempted to retain psychiatrists who would support defendant, sought the advice of expert lawyers, and also confirmed to defendant that he would try the case for no additional fee. A transcript of this interview was included in the appendix to the Rice Report, and is attached hereto as Exhibit 2.

38.     Panaro also carefully explained to defendant what sentence he might face if convicted at trial. Specifically, Panaro reminded defendant that Judge Abbey Boklan, the judge assigned to the case, had said that if defendant was found guilty, "she would consider" sentencing him to "some consecutive time." But Panaro clarified that "the most time [defendant] could be incarcerated for" was forty years (Ex. 2 at 18-19). Defendant's claim that he feared a sentence of "three hundred years" (Def. Mem. at 74) is dramatic but untrue.

39.     Nor is it true, as defendant frequently contends, that Judge Boklan pre-judged defendant's guilt or threatened him with consecutive sentences if he did not plead guilty. As discussed at length in the Rice Report, at pages 82-86, Judge Boklan advised defendant of the maximum possible sentences he could face if convicted after trial. She never indicated that she would impose consecutive sentences, or how many she might impose. Panaro's recorded statement with defendant bears that out. Defendant's very first exhibit in support of his motion—a letter from N. Scott Banks, Judge Boklan's former law secretary—further contradicts his claim: "Judge Boklan presided over the matter fairly," he writes (Def. Ex. A).

40.     Lastly, Panaro told defendant that at trial he would face testimony by the complainants, and by Ross Goldstein. In response, defendant confirmed that it was his desire to plead guilty, and that he wished to do so because he was, in fact, guilty (Ex. 2 at 25-26, 30; see also Rice Report at 41-42).

11

41. Two days later, on December 20, 1988, defendant pleaded guilty before Judge Boklan in Nassau County Court. Judge Boklan's law secretary, N. Scott Banks, would later express his confidence that nothing about the plea bargain offended his sense of fairness (Ex. A at 1; see also Rice Report at 86).[9]

42. Afterwards, defendant visited his father, then serving his federal sentence at a correctional facility in Wisconsin, and asked him to share the location of any exploitative pictures or videos he still possessed of his former computer students. Arnold was unwilling or unable to do so. Defendant also participated in mandatory counseling, where he acknowledged his guilt to his psychiatrist, and explained that he had been victimized by his father (see Rice Report at 43).

43. On January 24, 1989, defendant was sentenced to an aggregate, indeterminate term of six to eighteen years' imprisonment. Defendant would later describe the sentencing proceeding—during which he cried, blamed his father, and expressed contrition for his failure to break the cycle of abuse—as "exhilarating," saying that his "dream of being a star, of having huge numbers of people listen and think about" his words, had "come true" (id. at 44).

44. Just after sentencing, defendant filmed an interview with Geraldo Rivera to be broadcast on the national television program, The Geraldo Rivera Show. A transcript of the interview is annexed as Exhibit 3. In the course of that interview, which aired the next month, defendant again tearfully confessed his guilt. Defendant has attempted many times since to square this appearance with his current protestations of innocence. He has claimed that his lawyer told him to do the interview (but a statement in defendant's own handwriting proves

---

[9] Because defendant did not pursue a direct appeal from his conviction, the minutes of his guilty plea were never transcribed, and the court reporter's stenographic notes of the plea are no longer available. Friedman v. Rehal, 618 F.3d 142, 150 n.2 (2d Cir. 2010).

12

otherwise); that he was misled about the subject of the interview (but the same statement, again, suggests otherwise); that he was hoping to curry sympathy with state corrections officers, and with his future fellow inmates; and lastly, that he did it for the sake of fame. Whatever the reason, it is clear that defendant took this step of his own volition (Rice Report at 44-47).

45.     While incarcerated, defendant never appealed from his conviction, nor did he file a post-conviction motion. After again embracing his guilt and entering a sex offender counseling program, defendant was released from prison on December 7, 2001. On January 7, 2002, defendant was adjudicated a Level III sex offender, "on the consent of the parties."

II.     Subsequent Procedural History

    A.     Defendant Seeks Post-Conviction Relief.

46.     Shortly before defendant's release from custody, filmmakers Andrew Jarecki and Marc Smerling became aware of defendant's case, and began to produce a film based on the prosecution of defendant and his father. Towards that end, the filmmakers interviewed some of the key players from the underlying criminal prosecution, including Judge Boklan, two detectives, and defendant himself.[10] The resulting film, Capturing the Friedmans, built upon carefully edited excerpts of these interviews, and suggested that defendant had been wrongfully convicted (see Rice Report at 51-52). Jarecki's interviews with defendant were recorded, but never utilized, and despite several requests, were never shared with the Review Team.

---

[10]     Co-defendant Ross Goldstein refused to participate in the film, saying in a transcribed interview with producer Smerling that his memory of events would not exonerate defendant. Instead, he said, his memory would show that there was considerable "grey area" between the People's case and defendant's (Rice Report at 136-37).

13

Defendant has cryptically explained that the interviews would show that, at the time, his answers to critical questions were not "fully formed" (see id. at 146).

47.    Several victims recoiled from the film, seeing it as offensive (see, e.g., id. at 97-102, 106-07). Four hired an attorney to ensure that their privacy was protected. Two even wrote anonymous letters restating defendant's guilt and asking viewers not to brush aside their experiences based on a feature film (id. at 97-102). Judge Boklan confirmed that these letters were written by actual victims, an event that defendant argues somehow demonstrates the judge's continuing bias against him (see Def. Mem. at 65-66).

48.    On January 7, 2004, just over fifteen years after his guilty plea, defendant filed a motion to vacate his judgment of conviction, pursuant to C.P.L. § 440.10(h). In that motion,[11] defendant argued that the statements of witnesses against him were secured through suggestive interviews or controversial therapy techniques such as hypnosis, and that the prosecution's failure to disclose this critical evidence violated the rule announced in Brady v. Maryland, 373 U.S. 83 (1963). Defendant's motion relied in large part upon information uncovered during the creation of Capturing the Friedmans.

49.    The motion incorporated excerpts from Capturing the Friedmans in which Judge Boklan, in a post-conviction interview, expressed her certainty of defendant's guilt (see Def. 2004 Mem. at 21; see also id. at 23 [discussing other alleged evidence of bias]).[12]  Boklan gave this interview to the filmmakers more than a decade after defendant, his father, and Goldstein all

_____

[11]    Defendant's seventy-eight-page memorandum of law ("Def. 2004 Mem."), dated January 7, 2004, is part of the Court's file. An additional copy of this document will be provided to the Court upon request.

[12]    Defendant's Exhibit JJJ contains excerpts of the filmmaker's interview. A full transcript of that interview with Judge Boklan is annexed hereto as Exhibit 4.

14

pleaded guilty, and after defendant admitted his guilt again on the Geraldo Rivera show. The motion also annexed an undated affirmation by defendant's trial attorney, Peter Panaro, in which Panaro alleged that Judge Boklan had told him during an off-the-record conference that she "intended to sentence [defendant] to consecutive terms of imprisonment for each count that he was convicted on." That same affirmation is annexed to defendant's current motion as Exhibit LL. Judge Boklan died in 2012 but when speaking with members of the District Attorney's office, during defendant's conviction integrity review, the judge denied making such a statement to Panaro (see Rice Report at 82-85).

50. In opposing defendant's 2004 motion, the People submitted supporting documentation, including an affidavit by Wallene Jones, one of the investigating detectives, which tended to show that defendant's allegations of police misconduct were exaggerated or relied upon misrepresentations. The People also submitted an affidavit from a complainant's treating psychologist, in which she denied that she had used hypnosis when treating the complainant identified in Capturing the Friedmans.

51. On January 6, 2006, the Supreme Court, Nassau County (La Pera, J.), denied defendant's motion without a hearing, holding that defendant's Brady claims were waived by his guilty plea, and that the claims were baseless. The Appellate Division, Second Department denied leave to appeal on March 10, 2006. Defendant also sought leave to appeal to the Court of Appeals, but that Court dismissed the application on May 24, 2006.

52. Next, defendant filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York, where he argued again that the People had wrongfully withheld Brady material from him. Defendant faulted the prosecution for failing to disclose that: (1) some former students had reported no abuse; (2) police had used coercive and

15

suggestive interviewing techniques; and (3) witnesses only disclosed abuse after being "hypnotized." Following oral argument, the court dismissed the entire petition as time-barred, but granted a certificate of appealability as to the timeliness of defendant's claim that inculpatory witness statements were induced by hypnosis.

53.    Defendant then appealed to the United States Court of Appeals for the Second Circuit. After oral argument, the court ordered the parties to submit supplemental briefs addressing the question of whether defendant had presented a claim of "actual innocence," which might excuse the petition's untimeliness.

54.    On August 16, 2010, the Second Circuit denied defendant's petition, holding that his claims were time-barred. Friedman v. Rehal, 618 F.3d 142, 152 (2d Cir. 2010). The court did not address defendant's claim of actual innocence as a way around the statute of limitations, because it found his Brady claims meritless. Even so, relying largely on Capturing the Friedmans, the Court recommended that the District Attorney review defendant's case, paying specific attention to his claims of (1) judicial coercion, (2) moral panic and suggestive police interviewing techniques, and (3) the use of hypnosis on witnesses. Id. at 155-60.[13]

55.    The People, per District Attorney Kathleen M. Rice, readily agreed to conduct a review of defendant's case. Towards that end, in 2010, the District Attorney convened a team of senior prosecutors (the "Review Team") to conduct a full review of defendant's conviction, to be advised by a panel of outside experts (the "Panel"). During the investigation, the Panel helped

---

[13]    Judge Raggi observed that, in making this recommendation, the majority appeared to "assume the truth of" defendant's allegations, despite the fact that no hearing had been held on them. Friedman, 618 F.3d at 161-62 (Raggi, J., concurring) (noting further that she could not "predict whether the outcome of any such inquiry will be favorable to petitioner, whose conviction is based on a plea of guilty that he thereafter publicly confirmed").

16

make critical decisions affecting the scope of the review, and was kept informed of the developing record (see Rice Report at 154-58).[14]

B.      The People Release A Report Examining Defendant's Conviction.

56.      Prior to the release of the report on the re-investigation, defendant sought disclosure of records from the original prosecution, pursuant to the Freedom of Information Law ("FOIL"). Defendant's request was denied. In April 2013, defendant commenced a proceeding, under Article 78 of the C.P.L.R., to compel the People to release the requested documentation; he also sought an order granting him access to grand jury testimony.

57.      On June 24, 2013, District Attorney Rice released a report that analyzed each of the areas of concern identified by the Second Circuit. The report also analyzed evidence submitted during the course of the review by defendant's legal team, and by the producers of Capturing the Friedmans. In the report, the Review Team specifically considered and rejected defendant's claims, finding that "hypnosis" was not used on victims at all, and that other techniques, such as "group therapy," appeared only late in the case and affected neither grand jury testimony nor witness statements (see Rice Report at 77-81). The Review Team and Panel reviewed and carefully considered the recantation evidence presented by defendant, as well as the statements of men who attended the computer classes as children and said they witnessed nothing improper.

---

[14]      Defendant's summary of the review process misrepresents both the scope of the review and the degree to which the Panel participated. In his memorandum of law, defendant states that the district attorney "withheld from [the Panel] all the evidence except a small amount that the prosecution selected" (Def. Mem. at 15). But this conclusion lacks support even in defendant's source. That document states only that Panel members were provided with neither unredacted witness statements, nor with grand jury testimony (see Kuby Aff. Ex. C [Minutes of Article 78 Proceeding, June 28, 2013] at 14:17-15:15, 18:9-11). This much is true (see Rice Report at 56 & n.261). But the large majority of the case file was available to the Panel.

58.     Some "recantation" evidence proffered by defendant was nothing of the sort, and actually supported the case against defendant. Other such evidence raised legitimate questions, but given the statements of others who reaffirmed that abuse occurred, and the unreliability of recantations generally and as presented here, the Review Team concluded that the evidence of defendant's guilt was not cast into doubt. (see id. at 94-116).

59.     As to defendant's claim that his plea bargain was the product of coercion, the report further found no support for Panaro's contention that Judge Boklan threatened to impose consecutive terms on every count on which defendant was convicted at trial. Instead, the report documented numerous conflicting accounts of the judge's statement, and concluded that the trial court's conduct fell within the bounds of propriety. Nor, the report explained, did the evidence show that Judge Boklan was biased against defendant (id. at 82-94).

60.     The report noted that police conduct during witness interviews was not, in some cases, consistent with modern best practices. Even so, it determined that defendant had exaggerated the existence and effect of aggressive and/or repeated interviews, and that police questioning could not be reliably linked to any false allegations of sexual abuse (see id. at 63-77, 103).

61.     In August 2013, the Supreme Court, Nassau County, ordered the People to release to defendant the information he had sought in his FOIL request, including unredacted witness statements and grand jury testimony. An appeal from that order is pending before the Appellate Division, Second Department.

62.     In June 2014, defendant commenced a civil action against District Attorney Rice and two members of her staff, alleging that statements made by them in and in connection with the report amounted to defamation. That matter is also pending.

18

C.      Defendant's Current Claims

63.     Now, in his second C.P.L. § 440.10 motion, defendant raises three claims: (1) that

he is actually innocent of all charges from the underlying prosecution, (2) that the indictments

against him were the product of testimony that the prosecutor knew to be false, and (3) that his

guilty plea was coerced by the trial judge.

64.     Defendant's motion papers are replete with falsehoods, half-truths, and

misrepresentations regarding his prosecution, the evidence of his guilt, the conviction integrity

review, and the evidence that he claims exonerates him.  For example, he asserts that witness

statements were withheld from the Advisory Panel (Def. Mem. at 41), a fact that he knows to be

false.  The victims' names were redacted from the statements, but statements were made

available to all Panel members.  Some Panel members more than others reviewed this material,

but all were additionally given detailed synopses of the statements, including when and how the

statements were obtained.  Moreover, defendant counts as recantations statements by witnesses

who actually confirm that abuse occurred in the Friedman house, without even acknowledging

these incriminating statements.  Specifically, defendant claims that "Keith Doe has completely

repudiated his testimony" (Def. Mem. at 99), and that "Dennis Doe has no recollection that any

abuse took place" (id. at 106), but his accounts of their "recantations" omit their statements

signifying that abuse in fact occurred, including Dennis Doe's statements to Andrew Jarecki that

he remembered a few instances of the Friedmans standing in the classroom naked, and of Arnold

dropping his pants (see Rice Report at 109-11).[15]  Defendant also asserts as fact that certain non-

---

[15]     Because defendant refers to the complaining witnesses by their "Doe" names, and the
conviction integrity report refers to them by a designated number, the People will provide the
Court, under separate cover, with a list identifying each witness by their number, "Doe" name,
and true name.  The People request that this list be kept under seal and not be provided to
(Continued . . .)

19

complainants who witnessed no abuse were enrolled alongside complainants who testified that they were victimized in the same class. Those assertions are largely unsubstantiated, and the evidence concerning which students were in classes together is far from conclusive (see id. at 123-25).

65. Notwithstanding defendant's misrepresentations concerning the evidence of his actual innocence, the statements of victims who maintain that they were abused, and defendant's many admissions of guilt, the People do not oppose his request for an actual innocence hearing. The Appellate Division, Second Department, has only recently recognized a free-standing claim of actual innocence. See Hamilton, 115 A.D.3d at 26. To prevail on such a claim, a defendant bears the heavy burden of establishing his factual innocence by clear and convincing evidence (id. at 27). But, the standard for obtaining a hearing is relatively low, and requires only "a sufficient showing of possible merit to warrant a further exploration by the court." Id.

66. It was not until recently that defendant submitted evidence sufficient even to clear the low bar set by Hamilton for an evidentiary hearing. For example, it was not until May 2013, during the Article 78 proceeding concerning defendant's FOIL request, that defendant obtained and provided to the People a letter from Kenneth Doe claiming that he was neither a victim of, nor a witness to, abuse by the Friedmans (see Rice Report at 113-15). It was also during the Article 78 proceeding, in August 2013, that an attorney for Barry Doe advised the court that his client had no recollection of being abused by defendant. Prior to that time, Barry Doe's recollection of past events had been far more equivocal (see id. at 112-13).

---

defendant, as it identifies victims of a sex offense. See Civil Rights Law § 50-b; People v. Fappiano, 95 N.Y.2d 738, 747 (2001) (confidentiality provisions of Civil Rights Law § 50-b apply to a defendant previously convicted of a crime).

67.     More importantly, and contrary to defendant's oft-repeated assertion, the District

Attorney has never shied away from an honest examination of defendant's claims, provided it is

done in accordance with the law.  Sharing grand jury and other confidential information about

child sex abuse victims with their convicted abuser, or with other members of the public, is not

legally permitted or responsible, and the People have resisted such unwarranted disclosures.

Instead, the district attorney devoted enormous time and resources towards conducting a

conviction integrity review.  She assigned her best prosecutors to conduct the review; she

impaneled a group of renowned experts to assist in the investigation and make sure it was

conducted fairly and properly; and she looked not only at whether defendant was actually

innocent, but whether he was wrongfully convicted – a standard not requiring factual innocence.

Finally, although not required to do so, she issued a 155-page report detailing her findings,

including those details that were at odds with her conclusions.

68.     Therefore, consistent with these recent developments, the District Attorney's

commitment to a just resolution of defendant's claims, and the Second Department's holding in

Hamilton, the People do not oppose defendant's request for a hearing on his claim of actual

innocence, where he will have the burden of proving by clear and convincing evidence that he is

factually innocent of the charges brought against him.

69.     However, the Court should summarily deny relief on defendant's remaining

points.  Turning to defendant's claim that the trial judge in his case, the late Abbey Boklan, was

biased against him and coerced him into pleading guilty, defendant has delayed beyond all

reason in bringing this claim to the court's attention.  At the time of his first C.P.L. § 440.10

motion, in 2004, defendant was aware of all of the factual predicates underlying this claim, and

even set them out in affidavits and in his memorandum of law.  Defendant had the Panaro

21

affirmation (Def. Ex. LL), and possessed the full transcript of the Capturing the Friedmans interview with Judge Boklan (see Ex. 4). Nevertheless, defendant failed to claim at the time that this evidence demonstrated that his plea was unlawfully coerced. Because defendant was "in a position adequately to raise the ground" in a prior motion, and yet failed to do so, the Court should find the matter procedurally barred, and decline to review it. C.P.L. § 440.10(3)(c). Applying the procedural bar is especially warranted here because the key witness to this claim, Judge Abbey Boklan, has passed away, and is therefore unavailable to rebut the claim. While defendant easily could have raised this claim in his 2004 motion, when Judge Boklan was alive, he chose not to do so. Allowing defendant to proceed on this claim now, when the People would be deprived of Judge Boklan's testimony, would reward defendant for his delay and greatly prejudice the People.

70. Alternatively, even if this Court chooses not to apply this procedural bar, it should still summarily deny the claim pursuant to C.P.L. § 440.30(4)(b) and (d), because defendant's allegations are undermined by all of the evidence in the record, including statements by defendant's trial attorney and the Judge's former law secretary, N. Scott Banks, who despite reservations on other aspects of the case confirms that the judge presided over it fairly.

71. Equally devoid of merit is defendant's claim that the indictments against him relied solely on evidence that the prosecution knew, prior to his plea, to be false (see Def. Mem. at 128-31, citing Pelchat, 62 N.Y.2d at 106-08). Defendant's claim rests on facts that, even assumed to be true and stretched to their limit, fall short of establishing that the prosecutor knowingly relied on false testimony to sustain defendant's indictments. Because defendant has failed to put forth facts substantiating that claim, it should be denied without a hearing.

22

WHEREFORE, the People consent to an evidentiary hearing on defendant's actual innocence claim; but for the reasons stated above and those expressed in the attached memorandum of law, defendant's remaining claims should be summarily denied.

Dated:     Mineola, New York
           September 8, 2014

 

 

 

 

                                                 AMES C. GRAWERT

23

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

-against-

JESSE FRIEDMAN,

                              Defendant.

-----------------------------------------------------------------------x

Ind. Nos. 67104, 67430, and 69783

Motion No. C-004

Hon. Teresa K. Corrigan


MEMORANDUM OF LAW


Respectfully submitted,

KATHLEEN M. RICE
District Attorney, Nassau County
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Robert A. Schwartz
Ames C. Grawert
  Assistant District Attorneys
   *of Counsel*

## INTRODUCTION AND STATEMENT OF FACTS

This memorandum of law is submitted to accompany respondent's affirmation in opposition to defendant's motion to vacate his judgment of conviction. Facts relevant to the determination of defendant's claims are set forth in detail in that affirmation, and in the conviction integrity report on defendant's case released by the District Attorney on June 24, 2013 (see generally Def. Ex. B [Rice Report]).

Defendant's motion raises three distinct claims: (1) that he is "actually innocent" of the offenses charged; (2) that the trial judge coerced him into pleading guilty; and (3) that the prosecutor allowed defendant to plead guilty to indictments that the prosecutor knew were premised on false testimony. For the reasons set forth in the accompanying affirmation, the People agree to an evidentiary hearing on defendant's actual innocence claim. The remaining claims, however, should be summarily denied.

2

## ARGUMENT

### DEFENDANT'S JUDICIAL COERCION AND PELCHAT CLAIMS SHOULD BE SUMMARILY DENIED.

In 1988, defendant pled guilty to sexually abusing children during computer classes held in his home. Despite the passage of more than a quarter century, and despite the benefit of a popular film critical of the investigation and prosecution, defendant remains unable to establish any significant wrongdoing by any of the various parties he chooses to blame for his conviction. Though the People have consented to a hearing to resolve defendant's actual innocence claim (see Aff. ¶¶ 64-68), his remaining claims should be dismissed at the threshold as procedurally barred in part, and wholly unsubstantiated.

First, defendant's claim that coercion and bias rendered his guilty plea involuntary is procedurally barred by his failure to advance the argument in a prior motion, filed in 2004. Defendant has been aware of the factual basis of this claim since at least 2004, and fails to justify his decision to raise the claim only now, after a critical witness, the trial judge herself, has passed away. Should the Court choose to reach the merits of defendant's claim despite his unjustified delay, it should still reject the claim as it lacks any credible foundation. Indeed, defendant's allegations are undermined even by his own sources. Defendant's remaining claim, that the People knowingly presented false testimony to the grand juries, is similarly meritless. Defendant has made no showing that all the evidence supporting the indictments was false, or that the prosecutor had knowledge that it was. The Court should summarily deny relief on these claims, as defendant fails to put forth facts substantiating them.

I.  Defendant's Coercion Claim Is Procedurally Barred By His Failure To Advance It In His Prior Motion. Separately, The Claim Lacks Merit, As It Is Contradicted And Undermined By Even His Own Evidence.

Defendant contends that trial judge Abbey Boklan coerced him into pleading guilty by threatening to sentence him to "consecutive terms on every count" if he was convicted after trial (Def. Mem. at 63, 64-68, 132-36). In making this argument, though, defendant's motion relies on facts and details that he knew in 2004, at the time of his first motion to vacate judgment. Because defendant could have raised this claim in his first motion but failed to do so, the motion should be denied. See C.P.L. § 440.10(3)(c). Even if this Court were to reach the merits of this claim, however, it should deny it summarily, as defendant's allegations of bias and coercion are contradicted by all other documentary evidence.

A.  Because Defendant Could Have Raised This Claim In 2004, Long Before Judge Boklan's Death, The Court Should Decline To Consider It Now.

Defendant's judicial coercion claim relies principally on an affirmation by Peter Panaro, defendant's trial counsel during the months leading up to his guilty plea (see Def. Mem. at 63-64; Def. Ex. LL). Defendant relied upon the very same affirmation in his prior motion to vacate judgment, for which it was originally prepared (see Def. 2004 Mem. at 20-21, 25-26, 71).[1] In that proceeding, in the course alleging various Brady violations, defendant cited Panaro's affirmation, which said that defendant faced an unreasonably harsh sentence if he chose to proceed to trial (Def. 2004 Mem. at 21). Throughout his 2004 memorandum of law, defendant also made reference to indications of Judge Boklan's alleged bias, such as her decision to grant media access requests while denying defendant's motion for a change of venue (id. at 22-23),

---

[1]  A copy of defendant's 2004 motion to vacate judgment and memorandum of law is already in the court file, and not annexed here.

4

and her handling of co-defendant Ross Goldstein's sentencing (id. at 12-13). Similarly, defendant's motion incorporated an interview with Judge Boklan, recorded for use in Capturing the Friedmans, which he claimed constituted proof of the judge's pervasive bias against him (see id. at 21, 71). All of these facts appear materially unchanged in defendant's current motion (see Def. Mem. at 64-67), and though they were also available to defendant in 2004, he chose not to claim as a basis for relief that Judge Boklan's allegedly coercive conduct rendered his guilty plea involuntary. That contention, as a separate basis for relief, is raised for the first time here.

Defendant should not be permitted to split his claim in this manner. The Criminal Procedure Law strongly disfavors successive Article 440 motions where all claims could have been presented in the first instance, and a court may deny a successive motion on that basis alone. See C.P.L. § 440.10(3)(c) (providing that the court may deny relief where, "[u]pon a previous motion . . . the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so"); see also C.P.L. § 440.30(1)(a) ("a defendant who is in a position adequately to raise more than one ground should raise every such ground"). Relying on that provision, the Second Department has affirmed the summary denials of motions where there was no justification for the defendant's failure to raise the claim in a previous motion. See, e.g., People v. Dover, 294 A.D.2d 594, 596 (2d Dept. 2002); People v. Thomas, 147 A.D.2d 510, 512 (2d Dept. 1989); People v. Cortez, 158 A.D.2d 611, 611 (2d Dept. 1990).

That same result should follow here. It is notable, for one, that defendant chose not to present his coercion argument as an independent legal claim while Judge Boklan was still alive and able to defend herself against defendant's allegations.[2] Defendant has been represented by

---

[2]     Though defendant argues that the People should have secured Judge Boklan's response anyway (see Def. Mem. at 64), this does not justify or excuse his default. Until defendant raised

(Continued . . .)

retained counsel of his choosing since his arrest. If he believed this claim was meritorious, no barrier prevented him from raising it in the prior motion, if not before. That he instead waited to raise the claim until Judge Boklan passed away strongly indicates that he did not believe he could prevail on it while Judge Boklan was alive. See People v. Lawrence, 38 Misc. 3d 1204(A), 2012 WL 6720773, at *3 (Sup. Ct. Bronx County 2012) (denying motion under C.P.L. § 440.10[3][c] where the defendant "offer[ed] no explanation" for presenting his claim in a successive motion, and his delay in doing so "indicate[d] he had little, if any expectation of success in this regard"). Nor is defendant's claim saved by his reference to other facts, such as various television interviews, that he claims lend credence to the notion that Judge Boklan "prejudged [his] guilt ab initio" (see Def. Mem. at 64-67). These interviews were all available to defendant before he made his final submissions in support of his prior motion. Defendant makes no effort to explain or justify his failure to raise this claim earlier, making denial under C.P.L. § 440.10(3)(c) even more appropriate.

Portions of defendant's memorandum can be read to suggest that the Court should ignore this procedural bar because "'the right to challenge . . . the voluntariness of a plea is never waived.'" (Def. Mem. at 134, quoting People v. Ross, 182 A.D.2d 1022, 1023 [3d Dept. 1992]). Here, defendant misses the point. The People are not suggesting, as in Ross, that defendant's valid waiver of appeal renders his claim unreviewable. Defendant defaulted on the claim because when given a chance to raise it he chose not to do so.[3] Now, only after a key witness

---

this issue as a basis for relief, the People had no reason to seek a sworn statement from Judge Boklan. And regardless, an affirmation from Judge Boklan would be a poor substitute for her live testimony at a hearing.

[3]     This is not the first time defendant has defaulted on a claim. He also defaulted on his Brady claim before the federal courts because he delayed beyond the statute of limitations.
(Continued . . .)

6

has died, does he wish to take full advantage of the situation and resurrect his defaulted claim. Defendant can cite no authority for the proposition that an involuntary plea claim is exempt from the restrictions placed by the legislature on relief under C.P.L. Article 440. For the reasons set forth above, the Court should exercise its discretion and deny relief. See C.P.L. § 440.10(3)(c).

B.    Defendant Was Not Coerced Into Pleading Guilty.

Even if this Court were to overlook the procedural bar, summary denial would still be warranted because defendant's allegations of bias and coercion are uniformly undermined by his own submissions. After taking into account all such information, what remains of defendant's claim indicates that his plea bargain was voluntary, and tainted by neither bias nor coercion.

Where the trial court's "hostility and bias" towards a defendant combines with improper remarks "concerning [the court's] sentencing intentions in the event that the defendant proceeded to trial and [was] convicted," the resulting "coercive environment" renders a defendant's guilty plea involuntary, and the ensuing conviction subject to vacatur. People v. Santiago, 71 A.D.3d 703, 703 (2d Dept. 2010), citing People v. Flinn, 60 A.D.3d 1304, 1305 (4th Dept. 2009) (holding that the court's conduct was coercive where it "stated that it would treat defendant 'very differently as far as the sentence is concerned' if he exercised his right to a trial"). In this case, however, neither the trial court's remarks nor its alleged bias justify vacatur.

---

Friedman v. Rehal, 618 F. 3d 142, 152 (2d Cir. 2010). The court found the Brady claim meritless in any event. Id.

7

1.    The Court Did Not Improperly Burden Defendant's Right to Trial.

Defendant's only direct evidence of coercive conduct is the Panaro affirmation, prepared in connection with the 2004 motion, in which Panaro recalls being told by Judge Boklan that she would sentence defendant to the maximum possible prison term if he were convicted after trial (Def. Ex. LL ¶ 11).  This, defendant contends, represents coercion (see Def. Mem. at 63-64, 132).  The Court should not take Panaro's affirmation at face value.

Other evidence submitted by defendant undercuts Panaro's account.  In a letter from N. Scott Banks, Judge Boklan's law secretary at the time of the plea, Banks affirmed that notwithstanding his reservations concerning other aspects of the case, he had "repeatedly maintained [that] Judge Boklan presided over the Friedman matter fairly" (Def. Ex. A [Banks letter] at 1).[4]  And, in a 2001 interview with the Capturing the Friedmans team, Judge Boklan herself denied, unprompted, that she would "punish" any defendant who chooses to go to trial "with a greater sentence." [5]  Continuing, she said, "I don't punish [defendants] for going to a trial.  But once I hear– once I hear what really happened– or if your client commits perjury– or, anything that can happen during the course of– of a trial, who knows what [sic] I'm gonna sentence him" (Ex. 4 at 99).  In 2011, Judge Boklan spoke similarly to members of the District Attorney's office, saying that, though she did not threaten defendant, she did advise him about the maximum sentence he was facing upon conviction, the imposition of which would depend on the course of trial (Rice Report at 85).  All of these accounts resonate with each other, but they

---

[4]    During a 2011 interview, Banks told the Review Team that Judge Boklan was known to sentence harshly, but always fairly (Rice Report at 86).

[5]    This interview was originally provided to the Court only in excerpt (see Def. Ex. JJJ). During a July 8, 2014, court appearance, defendant's counsel agreed to provide the Court with the full transcript (see Minutes of Proceedings [July 8, 2014] at 10:8-13).  The full interview transcript is included in the appendix to the Rice Report, and also attached here as Exhibit 3.

are sharply dissonant with Panaro's decade-later claim that Boklan committed herself to imposing consecutive terms, no matter the evidence, if defendant chose to exercise his trial rights.

More strikingly, Panaro's affirmation is undermined even by his own prior statements on the matter. During a 1988 pre-plea interview with defendant, which Panaro took the curious precaution of recording, Panaro and defendant discussed at length the latter's motivations for pleading guilty. During that conversation, though Panaro told defendant about the sentence he might face if he was convicted after trial, he made no mention of any inappropriate threat by the judge. Instead, Panaro told defendant only that the judge had said that "she would consider" sentencing defendant to "some consecutive time" upon conviction (Ex. 2 at 18; see Rice Report at 82-83). Panaro's affirmation, prepared for imminent litigation more than a decade after the event it described, must be considered in light of this contradictory account, given instead at a time when Panaro had no reason to dissemble with his client.

Based on the preceding accounts, it is possible that Judge Boklan informed Panaro about the sentence that defendant might face if he was convicted after trial, including the risk that consecutive time might be imposed. Conduct of that nature, constituting a discussion of possible outcomes, does not amount to coercion. Instead, the Second Department has repeatedly contrasted an unequivocal threat to impose a maximum term (see, e.g., People v. Rogers, 114 A.D.3d at 707 [court informed the defendant it would have "'no problem' imposing the maximum" after trial]), which is coercive, with truthful information about what that maximum sentence might entail, which is not. See People v. Bravo, 72 A.D.3d 697, 698 (2d Dept. 2010) ("The County Court did not threaten to sentence the defendant to the maximum term upon a conviction after trial, but only informed him of his sentence exposure in that event."); People v.

9

Allen, 273 A.D.2d 319, 319 (2d Dept. 2000) ("The County Court acted properly in advising [the defendant] of the authorized maximum sentence which could have been imposed had he been convicted after trial"); People v. Stephens, 188 A.D.2d 345, 345-46 (2d Dept. 1992) ("It is not coercive for a court to inform a defendant as to the possible sentence available under the indictment."). Other departments of the Appellate Division have gone farther. In People v. Cornelio, the First Department found no inappropriate coercion where "the court advised the defendant that he faced a possible 100 years in prison, which, based on the facts known to it, it would not hesitate to impose." Cornelio, 227 A.D.2d 248, 248 (1996); cf. People v. Stevens, 298 A.D.2d 267, 268 (1st Dept. 2002) (distinguishing Cornelio where the court "unequivocally stated that upon a conviction, the maximum sentence would be imposed" [emphasis added]). Under any rubric, if Judge Boklan's discussion of defendant's sentencing exposure took the form described by Panaro in 1988, by N. Scott Banks, and by the judge herself, the court's statements constituted permissible commentary summarizing the "possible sentence available under the indictment," not coercion. Stephens, 188 A.D.2d at 346.[6]

## 2. Defendant's Own Evidence Also Undercuts His Claims Of Bias.

Similarly, nothing submitted by defendant supports the charge that "Judge Boklan exhibited bias against [defendant] from the start of the case" (Def. Mem. at 63). Though Capturing the Friedmans does depict Judge Boklan saying the phrase,"[t]here was never a doubt

---

[6] Defendant may also believe that the simple disparity between the plea offer and the possible sentence under the indictments left him no choice but to plead guilty. Any plea offer, which usually comes with the promise of a lesser sentence, is "bound to have the concomitant effect of discouraging a defendant's assertion of his trial rights." People v. Pena, 50 N.Y.2d 400, 411-12 (1980). But "[n]othing requires a defendant to seek a plea bargain and there is nothing coercive in leaving with the defendant the option to accept or reject a bargain." People v. Seaberg, 74 N.Y.2d 1, 8-9 (1989). A favorable plea offer is not on its own coercive.

10

in my mind as to [defendant's] guilt" (id. at 64, quoting Def. Ex. Z at 23), the Rice Report demonstrates at length how the film and defendant both take this quote out of context and imbue it with undue significance. In brief, though the film attempts to link Judge Boklan's certainty to her own personal biases, the full, unedited transcript of Judge Boklan's interview shows that she based her opinion of defendant's guilt on a review of the evidence, and on her experience with defendant himself (see Rice Report at 83-86; see also Ex. 4 at 20-22). Judge Boklan may have never seen "a single piece of trial evidence" (Def. Mem. at 67), but she had reviewed the complainants' grand jury testimony, which she found to be "extremely consistent," as well as pages of witness statements (Ex. 4 at 21-22), which her own law secretary later described in Capturing the Friedmans as "pretty vivid in their recollections" of abuse (Def. Ex. Z at 33). Most importantly, Judge Boklan heard defendant plead guilty in open court, and read the "tremendous amounts of admissions" he made later to the probation officers tasked with preparing his presentence report (Ex. 4 at 32). If Judge Boklan was confident of defendant's guilt, she had ample reason to be. Moreover, there is no merit to defendant's statement that the judge "engaged in a damaging pattern of disparaging [defendant]," or that this disparagement affected his decision to plead guilty (Def. Mem. at 67). Judge Boklan's public statements regarding defendant's guilt were made in response to questions from television and film interviewers many years after defendant pleaded guilty, not before.

Defendant points to other actions by Judge Boklan that he says demonstrate her bias against him. Here too defendant both overstates his case, and fails to reconcile these allegations with his own sources. Though Judge Boklan did deny defendant's motion for a change of venue,

11

and did permit local media to film pretrial appearances,[7] defendant presents evidence showing that her decisions were not made out of a "lack of concern for the defendant's right to a fair trial" (Def. Mem. at 133). Instead, as Judge Boklan explained in the Capturing the Friedmans interview, she allowed media to film pretrial appearances (see Ex. 4 at 17) because she "believe[d] in open courtrooms" (id. at 14), and was confident based on personal experience that any potential taint in the jury pool could be avoided through careful voir dire (see id. at 40). The same reasoning, she said, underpinned her decision to deny defendant's application for a change of venue. She expected that Nassau jurors would prove either unfamiliar with the case, or fair despite their familiarity (see id.), and if it proved otherwise, she was prepared to transfer the case at that time (see id. at 41). These are not the statements of a judge who "recklessly contributed to the media and public hysteria" surrounding the case (Def. Mem. at 132), and none of the foregoing suggests that the judge "exhibited bias against" defendant "from the start of the case" (id. at 63). Cf. Santiago, 71 A.D.3d at 703 (granting relief based on the court's creation of a "coercive environment," which included statements concerning the court's "sentencing intentions in the event that the defendant proceeded to trial and was convicted").

Defendant also argues that he had "good cause" to believe Judge Boklan's alleged threat to sentence him to consecutive time because she "reneged" on a promise to afford Ross Goldstein youthful offender status and sentenced him harshly (Def. Mem. at 132). Here, again, defendant misrepresents the facts. Defendant's decision to plead guilty could not possibly have been influenced by Goldstein's sentence because Goldstein was sentenced months after defendant pleaded guilty, not before. Even if all defendant meant to convey by this argument

---

[7]     Contrary to defendant's claim (Def. Mem. at 132-33), Judge Boklan also made clear that she "would not have permitted the media to be present" at trial (Ex. 4 at 17).

was that Boklan proved to be tough at sentencing, the argument is irrelevant. Defendant could not be coerced into pleading guilty by events that had not yet happened.

II.   Defendant's Claim That The Indictments Were Based On False Testimony, And That The Prosecutor Knew It To Be False, Is Baseless.

Defendant further contends that his indictments were defective because they were based solely on false evidence and the prosecutor knew the evidence was false. Defendant relies on People v. Pelchat, 62 N.Y.2d 97 (1984), as the basis for this claim. However, none of defendant's allegations support a Pelchat violation. What defendant ultimately is left with is a claim that the prosecutor should have known that some of the evidence was not reliable. Even if that were true—and it is not—that is not a Pelchat violation; that claim does not survive a guilty plea, and entitles defendant to no relief.

Defendant's conviction rests on three indictments, voted by three separate grand juries, which between them heard testimony from fourteen complainants,[8] and corroborating testimony from one adult co-defendant, Ross Goldstein (see Aff. ¶¶ 21-22, 30-31). The grand jury testimony was reviewed, and the trial court held that each indictment was supported by legally sufficient evidence,[9] a fact that Judge Boklan's law secretary N. Scott Banks acknowledges, despite his evident sympathy for defendant (see Def. Ex. A at 1). Regardless, defendant now claims, relying on People v. Pelchat (62 N.Y.2d 97), that his conviction must be vacated because the People allegedly knew that all of this testimony was false when given. Towards that end, defendant argues that the People (1) suborned the perjured testimony of co-defendant Ross

---

[8]   Three of the seventeen complainants testified only against Arnold Friedman.

[9]   The trial court did dismiss some counts from each indictment, for a total of twenty-three counts (see Rice Report at 22).

13

Goldstein; (2) ignored warnings about the nature of the police interviews underlying complainant testimony; and (3) overlooked other weaknesses in each witness's account. None of this is true, and none of this amounts to error under the narrow rule in Pelchat.

Critically, Pelchat is not a means for a defendant to attack the factual predicate of his guilty plea. See Pelchat, 62 N.Y.2d at 106 (noting that post-conviction attacks on indictments "lend themselves to abuse"); see also id. at 108 ("By pleading, [a] defendant has elected a trial strategy. He has determined, for whatever reason, that he will not litigate the question of guilt."). Instead, it is a narrow doctrine permitting redress for prosecutorial misconduct so severe that it affects the validity of the indictment underlying the criminal prosecution. See People v. Hansen, 95 N.Y.2d 227, 232 (2000) ("Pelchat hinged substantially on the constitutional function of the Grand Jury to indict, as well as on the prosecutor's duty of fair dealing."). The facts of Pelchat make its limited scope clear: in that case, the prosecution secured an indictment based on the testimony of a police officer. Without that officer's testimony, the grand jury would not have had sufficient evidence before it to support the indictment. Pelchat, 62 N.Y.2d at 106-07. Nevertheless, when that officer later told the prosecutor that his testimony was mistaken, the prosecutor allowed the error to go uncorrected, and allowed the court to take the defendant's guilty plea. Id. at 107. This, the Court of Appeals held, rendered the indictment "fatally defective," because in light of the officer's admission "the Grand Jury had no evidence before it worthy of belief that [the] defendant had committed a crime," and because a prosecutor cannot "permit a proceeding to continue on an indictment which he knew rested solely upon false evidence." Id. Continuing, the Court carefully distinguished cases where grand jury testimony is "sufficient when given but which through changed circumstances . . . at trial may lose its force." Id. Evidence may "subsequently fail its purpose for many reasons but the integrity of the

14

Grand Jury's fact-finding process has not been undermined because of that." Id. Similarly, the Court held that where there is a "latent weakness in the Grand Jury evidence unknown to the prosecutor," no error results, and the "conviction based on [the] defendant's plea may stand." Id. at 107-08. Later decisions have continued to limit Pelchat to those situations where the prosecutor learns prior to conviction that "the only evidence supporting the accusatory instrument was false." Hansen, 95 N.Y.2d at 232.

The allegations in defendant's papers do not rise to this level. First, defendant relies heavily on Ross Goldstein's 2013 recantation statement to establish that the People knew that his grand jury testimony was false when given in 1988 (see Def. Mem. at 129-30). Goldstein's decades-late, self-serving statement establishes nothing. During the conviction integrity review of defendant's case, the Review Team investigated Goldstein's claims at considerable length, and found that his changing accounts, combined with his prior statements and other evidence, made it nearly impossible to credit his belated recantation (see Rice Report at 135-43). Moreover, even if credited, the recantation statement would not prove that the People knowingly presented false testimony. Goldstein says that he "became locked into cooperating with the prosecution," and that his testimony was "coached, rehearsed, and directed by the prosecutor" (see Def. Ex. KK at 2, 6). He does not, however, say that the prosecutor knew that his grand jury testimony would be (or had been) false. This alone defeats defendant's claim. In Pelchat, the witness told the prosecutor in as many words that his testimony had been false. Pelchat, 62 N.Y.2d at 100-01, 107. Here, instead, defendant expects that the prosecutor should have guessed, based on Goldstein's reluctance to inculpate himself, that he was lying simply to guarantee that he could receive a favorable plea bargain (see Def. Ex. KK at 6). But Pelchat

15

does not speak in terms of constructive knowledge, and allegations about defects unknown to the People do not warrant relief. See Pelchat, 62 N.Y.2d at 107-08.

This branch of defendant's Pelchat argument fails for still other reasons. Goldstein testified only in support of Indictment No. 69783 (the "third" indictment), where he was a corroborating witness. As Goldstein concedes, his role was "to confirm what the complainants had said when they testified about what happened to them" (Def. Ex. KK at 6; see also Rice Report at 33 ["No count of the indictment was sustained by Goldstein's testimony alone."]). It is simply not the case, then, that without Goldstein's testimony the grand jury would have had "no evidence before it worthy of belief." Pelchat, 62 N.Y.2d at 107. To the contrary, without him, the first two indictments would have been unaffected, and the third indictment could have stood on complainant testimony alone. See People v. Goetz, 62 N.Y.2d 96, 116-17 (indictment not defective where allegedly perjured testimony "was not the only evidence before the Grand Jury" establishing the defendant's guilt). Clearly this is not a case where the prosecutor knew that the only evidence supporting the indictment was false. Defendant's allegations concerning Ross Goldstein do not establish otherwise.

Of course, defendant also claims that the prosecutor knew that all other grand jury testimony was equally false (see Def. Mem. at 130-31). These arguments fare no better. Pelchat and its progeny distinguish, even if defendant does not, between grand jury testimony that is false, and testimony that "may lose its force" in light of other evidence. Pelchat, 62 N.Y.2d at 107. Only in the first case, where false grand jury testimony leaves the prosecutor with an "empty indictment," is dismissal justified. Id. at 108. In People v. Goetz, for example, the Court of Appeals held that where new evidence merely "conflicts with part of [a complainant's] testimony," the indictment remains valid. Goetz, 68 N.Y.2d at 116. In other words, it is not

16

enough that grand jury testimony might prove unreliable when contrasted or impeached with other evidence. Questions of that nature, requiring the resolution of competing evidentiary claims, are matters for trial. See People v. Sepulveda, 122 A.D.2d 175, 177 (2d Dept. 1986) (distinguishing between testimony that is false, and testimony that is impeachable, the latter of which "presents questions of witness credibility which are for a petit jury"); People v. Nilsen, 182 A.D.2d 715, 716 (2d Dept. 1992) (discrepancy between statements of grand jury witness did not implicate Pelchat); see also Hansen, 95 N.Y.2d at 232-33 (Pelchat does not entitle a defendant to "a review of the fact-finding process engaged in by the grand jurors").

This distinction dooms defendant's remaining arguments. Defendant points again to the affirmation of his trial counsel, Peter Panaro (see Def. Mem. at 130-31), noting this time Panaro's claim that he told lead prosecutor A.D.A. Joseph Onorato about a videotape showing police using aggressive, suggestive interviewing techniques when speaking with Gary Meyers, a non-complainant who has never claimed he was abused by either defendant or defendant's father (Def. Ex. LL ¶ 18). But this does not establish that all witness testimony was unreliable, let alone false. First, in his own affirmation, Onorato flatly denies that any such conversation ever took place, saying instead that Panaro "never suggested to [him] that police officers were using inappropriate interviewing techniques" (Ex. 1 ¶¶ 5-6). Second, even if the prosecution had been told about the Meyers "tape," that would not constitute Pelchat error. At the very most, the Meyers "tape" raises questions about the way witnesses were interviewed. It does not prove that all witnesses, many of whom were interviewed by other detectives,[10] were treated similarly, and it certainly does not prove that those witnesses fabricated their testimony.

---

[10]     Defendant's Exhibit DDD, which he generously describes as a "transcript" (cf. Aff. ¶ 35; see also Rice Report at 72), names the interviewing officers as Detectives Hatch and Jones.
                                                                                    (Continued . . .)

17

While the manner in which victims were questioned by police might have been an appropriate issue to explore at trial, the concerns allegedly expressed to A.D.A. Onorato do not demonstrate an impairment of the grand jury's fact-finding process. See Pelchat, 62 N.Y.2d at 107 (distinguishing those cases where "due to the witness's uncertainty at trial," prior grand jury testimony "may lose its force"). Defendant's evidence shows boorish conduct by two detectives, conduct defendant would have been free to exploit at trial, but not an error of constitutional dimension. See id. (distinguishing "situations in which there may be latent weaknesses in the Grand Jury evidence unknown to the prosecutor").

Aside from Panaro's uncorroborated and oblique reference to improper interviewing techniques, there is no other evidence suggesting that the prosecutor knew or believed that any (let alone all) evidence in the grand jury was false or baseless. Defendant argues at length that all witness testimony presented to the grand juries was unreliable (see Def. Mem. at 130-31 [summarizing these arguments]). But he has never seen the grand jury testimony, and those who have, Judge Boklan and her law secretary, found it legally sufficient to support the large majority of the charges (Def. Ex. A at 1). While defendant suggests that some latent defects existed, he makes no attempt to prove that any of them were known to the prosecution at any point prior to his conviction. Again, conclusory allegations of prosecutorial misconduct are not enough (see Pelchat, 62 N.Y.2d at 106-07; see also C.P.L. § 440.30[4][b]), and that is all that defendant offers (see Def. Mem. at 131).

---

These detectives were not the only investigators to meet with witnesses and take statements. The task force investigating defendant's case included eight other detectives and two police officers (see Rice Report at 7-8).

What defendant really suggests is that the prosecution should have known that the complainants' testimony was false. For example, he points to the lack of corroborating physical evidence to support the notion that the grand jury testimony was implausible (see id.). Defendant's theory is deeply flawed. As explained above, the mere allegation that the People should have examined their evidence more closely does not afford defendant any relief. Notably, too, the proof before a grand jury needed to support an indictment is far less than what is needed to convict after trial. Grand jury evidence is assessed in the light most favorable to the People, and only prima facie evidence of guilt is needed, not proof beyond a reasonable doubt. See People v. Bello, 92 N.Y.2d 523, 525-26 (1998); see also Pelchat, 62 N.Y.2d at 105 ("The test [for sufficiency] is whether the evidence before the Grand Jury if unexplained and contradicted would warrant conviction by a trial jury."). It should not surprise anyone that grand jury testimony is often concise and spartan. That overwhelming evidence of guilt is not presented to the grand jury is not a sign that the case is weak, and it certainly does not suggest fabrication. Yet, defendant still looks to the lack of corroborating and physical evidence in the grand jury testimony (see Def. Mem. at 131; see also id. at 4-5, citing Def. Ex. A) as proof that the prosecutor should have known that there was no evidence to support the indictments. Questions about the strength and reliability of grand jury testimony, however, fail to prove falsity, and do not warrant relief under Pelchat. See Goetz, 68 N.Y.2d at 116-17.

Ross Goldstein's recent recantation does not retroactively render his indictment invalid. Defendant's reliance on the Meyers "tape," and his attempts to characterize complainant testimony as implausible, coerced, and uncorroborated (see Def. Mem. at 130-31), even if true, do not establish that the "only evidence against [the defendant] before the grand jury was false." Goetz, 68 N.Y.2d at 116. Evidence presented to the grand jury may subsequently "fail its

19

purpose for many reasons but the integrity of the Grand Jury's fact-finding process has not been undermined because of that." Pelchat, 62 N.Y.2d at 107; see also Hansen, 95 N.Y.2d at 232-33. Because defendant offers no evidence substantiating his claim that the indictments were reliant on false testimony, or that the People were aware of any such defect, his claim should be denied summarily.[11]

\*     \*     \*     \*     \*

While the People consent to a hearing on defendant's actual innocence claim, his remaining claims should be summarily denied. Though defendant was fully aware of the facts underlying his judicial coercion claim in 2004, he chose not to litigate the matter at that time, while the judge herself was still alive to answer his allegations. Defendant's unjustified delay has deprived the People of a witness who would prove pivotal at any hearing on the matter, and this loss should not inure to defendant's benefit.

Defendant's claims also lack any foundation. "A judgment of conviction is presumed valid, and the party challenging its validity (defendant here) has a burden of coming forward with allegations sufficient to create an issue of fact." People v. Session, 34 N.Y.2d 254, 255-56 (1974), see also C.P.L. § 440.30(4)(b). Though defendant submits a single affirmation to support his theory of judicial coercion, that document was prepared for a prior post-conviction motion, is undermined by the affirmant's own prior recollections of the same conversation, and is

---

[11]     Equally groundless is defendant's claim that Indictment No. 69783 was secured for the inappropriate purpose of inducing his guilty plea (see Def. Mem. at 131). Here too, defendant fails to substantiate this serious allegation. In any event, if defendant believed that the third indictment was defective for that reason, the time to say so was before he pled guilty, not twenty-five years later. Defendant's claim that his indictment was procured through the improper motives of the prosecutor was forfeited by his guilty plea. See People v. Rodriguez, 55 N.Y.2d 776 (1981) (selective and vindictive prosecution claim forfeited by guilty plea).

contradicted even by information gathered by defendant's own advocates. Under these circumstances, the Court may resolve defendant's claims without a hearing (see People v. Satterfield, 66 N.Y.2d 796, 799 [1985]), and it should do so by summarily denying relief. Documentary evidence does not, on its own, entitle a movant to an evidentiary hearing. Instead, that evidence must bear at least some hallmark of reliability. See People v. Fields, 287 A.D.2d 577, 578 (2d Dept. 2001) (affirming the summary denial of an Article 440 motion, where the defendant's claims were premised upon "nothing more than an unreliable recantation"); People v. Cassels, 260 A.D.2d 392, 393 (2d Dept. 1999) (same). Defendant has come forward with no reliable evidence to support his claim that the trial court either improperly deterred him from exercising his trial rights, or created an environment designed to induce his guilty plea.

Similarly, defendant's second point, that the prosecution knowingly presented false testimony to the grand jury, lacks any support whatsoever in the record. Co-defendant Ross Goldstein was a corroborating witness in the third indictment, and the instrument stands on its own despite his self-serving recantation. And, arguments about the reliability of grand jury witnesses do not establish a jurisdictional defect in any indictment.

## CONCLUSION

POINTS   TWO   AND   THREE   OF   DEFENDANT'S   MOTION   TO   VACATE
JUDGMENT SHOULD BE DENIED WITHOUT A HEARING.

Dated: Mineola, New York
      September 8, 2014

Respectfully submitted,

KATHLEEN M. RICE
District Attorney, Nassau County
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Robert A. Schwartz
Ames C. Grawert
 Assistant District Attorneys
  *of Counsel*

22

# EXHIBIT 1

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

     -against-                                 <u>AFFIRMATION</u>

JESSE FRIEDMAN,

                                         Ind. 67104, 67430, 69783

                            Defendant.

----------------------------------------------------------------X

      JOSEPH R. ONORATO, an attorney duly admitted to practice law in the State of New York, affirms the following under the penalty of perjury:

      1.      I am an Assistant District Attorney, of counsel to Denis Dillon, District Attorney of Nassau County.

      2.      In 1987 and 1988, three indictments were filed, charging defendant and two co-defendants with multiple charges of sodomy, sexual abuse, and related offenses. I was assigned to prosecute these cases.

      3.      I have read the affirmation submitted by Peter Panaro in support of defendant's motion to vacate the judgment of conviction.

      4.      According to the Panaro affirmation, he viewed a video showing Gary Meyers being interviewed by detectives who "used suggestive and harassing questioning" (Panaro affirmation at para. 18). The affirmation further states, "Immediately after viewing the Gary Meyers tape, I [Peter Panaro] informed assistant district attorney Joe Onorato about the interview. I made it clear to him that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable

to the defense that the defense had a right to be informed of" (id.).

5.      Peter Panaro never informed me that there was a video tape of Gary Meyers being interviewed, I have never seen any such tape, and I have no reason to believe that any such tape exists or existed.  The first reference I ever heard concerning the Meyers tape was at a viewing of the film "Capturing the Friedmans."  In that film, it is claimed that such a tape exists or existed, but no tape is shown.

6.      Peter Panaro never suggested to me that police officers were using inappropriate interviewing techniques or that he considered any police interviewing technique to be "evidence favorable to the defense that the defense had a right to be informed of" (Panaro affirmation at para. 18).

7.      Defendant's motion contends that only under hypnosis did Gregory Doe recall being the victim of sexual abuse.  I was never aware of any specific treatment or therapy (including hypnosis and visualization) used by any doctor in the treatment of any complainant in the instant case.

Dated:      Mineola, New York
            August _13_ , 2004

                                    _Joseph R. Onorato_
                                    Joseph R. Onorato

# E X H I B I T   2

*file*

PP: Today is Sunday, it is in the evening at a quarter to seven.
I am in my office with Jesse Friedman, his mother Elaine, his
brother Seth, and his brother David. David is the only one
that's not here yet. He is arriving at about 7 o'clock and right
now it is a quarter to seven. Is that correct Jesse?

JF: That's correct Peter.

PP: And, what we are going to do now is we are going to discuss
Jesse taking a plea on Tuesday of this week, December 20, 1988,
regarding his criminal charges. Is that correct Jesse?

JF: That's correct. Yes.

PP: Okay. Jesse is charged on indictments number 67104, 67430
and 69783 with approximately 300 counts of sexual abuse charges,
endangering the welfare of a child, and sodomy in the first
degree. Is that correct Jesse?

JF: That's correct Peter.

PP: And, two of these indictments 67104 and 67430, which
involved sodomy in the first degree, 54 counts all together
against Jesse and his father, 10 counts against Jesse, on 67430
it was 91 counts in all, 36 counts were against Jesse, the
remainder of the counts against his father, Arnold Friedman. On
at least those two indictments, Jesse was indicted on both of
those prior to ever meeting me or retaining my services. Is that
correct, Jesse?

JF: That's correct.

-1-

PP:  Now, indictment number 67104, you were indicted on December 7, 1987.  Is that correct, Jesse?

JF:  That's correct.

PP:  And on indictment number 67430, you were indicted on February 1, 1988.  Is that correct, Jesse?

JF:  That's correct.

PP:  Now, you retained my services to represent you many months thereafter.  In fact, you did not retain me until June 3, 1988. Correct?

JF:  Correct.

PP:  And, you were investigated and arrested, although not indicted, you were arrested on these charges in November, 1987. Correct?

JF:  Correct.

PP:  And you were incarcerated in November, 1987 until you made bail.  Correct?

JF:  Correct.

PP:  You had an attorney at that time by the name of Douglas Krieger.  Correct?

JF:  Correct.

PP:  Doug Krieger was your attorney from the day of your arrest in November, 1987, until the date of your discharge of him and my retainer on June 3, 1988.  Correct?

JF:  Correct.

-2-

PP:  After you retained my services, you were indicted again.
Isn't that a fact?

JF:  That is a fact.

PP:  And you were indicted on indictment number 69783, with 191
or 192 counts, or thereabout, of further sexual charges including
sodomy in the first degree.  Correct?

JF:  Correct.

PP:  Now.  On this third indictment, stipulations were signed
regarding motions.  However, motions were made Jesse, on indict-
ment 67104 and 67430, way before your retainer of my services.
Correct.  And those motions were made by who?

JF:  They were written by Gerry Bernstein.

PP:  And who else?

JF:  Doug Krieger.

PP:  And they were submitted on your behalf?

JF:  Correct.

PP:  And those motions all went in at some time.

JF:  They were filed by Doug Krieger.

PP:  And then after that, they were decided.  Correct?

JF:  Correct.

PP:  And I had nothing to do with any of that.  Is that a fact?

JF:  That's correct.

PP:  And there was also a motion for a change of venue.  Correct?

JF:  Correct.

-3-

PP: And who made that motion?

JF: Doug Krieger.

PP: And that was decided also.  Correct?

JF: Correct.

PP: And I had nothing to do with any of that.  Isn't that a fact?

JF: Correct.

PP: And you retained my services after all of that.

JF: Correct.

PP: While you have been under my retainer, you have had that third indictment, 69783, and you were also arrested on one charge in Manhattan, in New York City.  Correct?

JF: Correct.

PP: And that charge in Manhattan was a misdemeanor charge of peddling without a license?

JF: Correct.

PP: Now.  You are aware of everything that I have done in this case.  Are you not Jesse?

JF: I believe I am.

PP: Okay.  Isn't it a fact that I have sent you to a Dr. Roger Feldman, and that you have gone to a Dr. Roger Feldman who is a forensic psychologist.

JF: Correct.

PP: And how many times did you see Dr. Feldman>

-4-

JF:   Three, four times.

PP:   And isn't it also a fact that I sent you to another forensic psychologist, Dr. Brodsky?

JF:   That's correct.

PP:   And how many times did you see Dr. Brodsky?

JF:   Just once.

PP:   And isn't it a fact that I also sent you to even another forensic psychologist by the name of Dr. Daniel Schwartz.

JF:   Yes, you did.

PP:   And did you see Dr. Daniel Schwartz?

JF:   Yes, I have.

PP:   And how many times have you seen Dr. Daniel Schwartz?

JF:   So far, once.

PP:   And, when you saw Dr. Daniel Schwartz, did you make arrangements again to see him?

JF:   Yeah.

PP:   And are you going to be seeing him again?

JF:   I believe so.

PP:   When?

JF:   I believe tomorrow morning.

PP:   Which is December

JF:   the 19th

PP:   Okay. Talk a little louder, Jesse.

JF:   Okay.

-5-

PP:  And in addition to all that, I sent you to see a forensic psychiatrist who is a specialist in the field of pedophelia, by the name of Dr. Pogge, who is located at Four Winds Hospital in Katonah, New York.   Correct?

JF:  Correct.

PP:  And how many times did you see Dr. Pogge?

JF:  Three times.

PP:  And in addition to that, you've been under the psychological care of Dr. Marty Berenberg.   Correct?

JF:  Correct.

PP:  How long have you been seeing Dr. Berenberg?

JF:  For a number of years now.

PP:  And you were seeing him before I met you, correct?

JF:  Correct.

PP:  And you've been seeing him after I met you, correct?

JF:  Correct.

PP:  And I had constant conversations with Marty Berenberg. Correct?

JF:  That's correct.

PP:  I've also spoken with Dr. Daniel Schwartz, Dr. Pogge, Dr. Brodsky and Dr. Feldman on many occasions on the phone while in your presence.   Correct?

JF:  Correct.

PP:  I also sent you to Court Consultation Services, another

-6-

psychological organization in Nassau County which is run by its
Director, Sue Andrews.  Remember that?

JF: Yes.

PP: And did you call Sue Andrews?

JF: Yes I did.

PP: And how many times did you converse with Sue Andrews or
someone from her staff?

JF: About twice.

PP: In addition to that I sent you to a private investigator,
didn't I?

JF: Yes you did.

PP: And his name is Ted or Theodore O'Neill, correct?

JF: Yes.

PP: And his offices are at 123 Grove Avenue (Jesse responded
simultaneously with the same address), and where is that?

JF: Cedarhurst, New York.

PP: And how many times have you seen Ted O'Neill?

JF: (E)numerous times.

PP: More than ten or less?

JF: I would think more than ten.

PP: And in addition to that I have told you about a Dr. Gene
Able in Atlanta, Georgia, and I told you that I spoke with his
offices.  Correct?

JF: Correct.

-7-

PP: And that I was willing to set up what is called a pedophillic profile examination which is a penal profile where they put electrodes on your penis for the purpose of determining whether or not you have a stimulation when shown pictures of little boys. Do you understand that?

JF: Yes, I do.

PP: The reason for that, Jesse, is that these charges against you all involve little boys. Sodomy and sexual abuse of children, all boys, between the ages of eight and twelve. Isn't that a fact?

JF: That's correct.

PP: Louder. Isn't that a fact?

JF: That's correct.

PP: Okay. On one occasion you and I flew to Wisconsin to see your father in Oxford. Isn't that a fact?

JF: That's correct.

PP: And I spend a whole day with your father, did I not?

JF: That's correct.

PP: And you, your father and myself spoke as threesome for a long period of time?

JF: That's correct.

PP: And there was another period of time where I spoke to your father outside of your presence. Isn't that correct.

JF: That's correct.

-8-

PP:  In addition to that I am receiving almost daily letters from your father.  Are you aware of that?

JF:  Yes, I am.

PP:  And how are your aware of that?

JF:  I have gotten copies of most of the letters.  He sends a copy to me, and you show me the copies of letters as they've arrived.

PP:  In addition to that, has he told you that he's been writing to me on a daily basis?

JF:  Yes, he has told me.

PP:  And, in addition to speaking with your father, have I spoke with your mother in this case?

JF:  Yes, many times.  Certainly more than ten.

PP:  Would it be fair to say I spoke to your mother over fifty times in this case.

JF:  Ah, yes.

PP:  Okay.  In addition to everything I just stated, isn't it also a fact that you and I have met on the average of two times a week from the day of my retainer on June 3, 1988 until this very night Sunday night, of December 18, 1988, that you and I have met on an average of two times per week?

JF:  That's correct.

PP:  And would it not be fair to say that an average meeting would be approximately two hours.

-9-

JF:  That's correct.

PP:  And would it also be fair to state that you and I have had almost daily telephone conversations.

JF:  Yes.

PP:  And in addition to all of that, would it also be fair to state that I have had daily telephone conversations with your mother, usually between the hours of 7:30 in the morning and 8 o'clock in the morning.  Wouldn't that be fair to say.

JF:  Yes.

PP:  And wouldn't that be fair to state that from June 3, 1988 until today.

JF:  Yes.

PP:  In addition to that have I not seen your mother on approximately thirty occasions.

JF:  Yes, you have.

PP:  Now, you are also aware of the fact that I have viewed all of the pornographic disc, the computer disc that are in the possession of the police at this point, that I made an appoint- ment and went down to the sex crimes unit, and I viewed all of the discs that the police have.  Isn't that a fact?

JF:  I am aware of that.

PP:  You're also aware that I had conversations with Sgt. Galasso and Det. Hatch and I've personally been interviewed by both of them and I interviewed both of them as well.

-10-

JF:  That's correct.

PP:  And you are aware that I have had approximately eight telephone conversations and one personal interview at the home of Ann Meyers with Ann Meyers.  Are you aware of that?

JF:  I'm aware of that.

PP:  In fact, you and your brother David set that up for me so that I could go over there.  Correct?

JF:  That's correct.

PP:  And you are aware that I did go over there and speak with Ann Meyers?

JF:  I am aware of that.

PP:  Ann Meyers has a video cassette that she played for me on a Betamax.  Correct?

JF:  Correct.

PP:  And you are aware that I have notes of that Betamax. Correct?

JF:  Correct.

PP:  And she would not give me a copy of the tape. You knew that. Right?

JF:  I am aware of that.

PP:  In addition to everything else I've told you,  I have sent you to see William Donino for purposes of retaining his services as a legal advisor in addition to mine.  He is a prominent appeals lawyer and knows many aspects of criminal law.  Isn't

-11-

that a fact that I sent you to see him?

JF:  That is correct.

PP:  And isn't it also a fact that I sat and spoke with Michael Corrnachia on four occasions.  He is the lawyer for Ross Goldstein and I sat to speak with him about Ross Goldstein's role in these matters.  Isn't that a fact.

JF:  That's correct.

PP:  And you were aware of that?

JF:  I'm aware of that.

PP:  And each time I was going to see Michael Cornacchia didn't I tell you that I was going to go see him?

JF:  Yes you did.

PP:  Each time I spoke with Michael Cornacchia didn't I have you in my office and tell you the results of those meetings.

JF:  Yes you did.

PP:  Now, Jesse,

JF:  Peter

PP:  Weren't there times on at least five occasions, if not more, that Ted O'Neill, your mother, yourself and myself, sat in my office and had meetings.

JF:  Yes, that is true.

PP:  And weren't there occasions at least fifteen in number where your mother, yourself and myself sat and had meetings.

JF:  Yes.

-12-

PP:   And wasn't there occasions where Seth and David and yourself
and myself sat and had meetings.

JF:   That's correct.

PP:   How old is David?

JF:   Twenty-eight.

PP:   And he is what relation to you?

JF:   My brother.

PP:   And how old is Seth?

JF:   Twenty-six.

PP:   And what relation is he?

JF:   My brother.

PP:   And how old is Elaine, if you know?

JF:   Fifty-seven.

PP:   And what is her relationship to you?

JF:   My mother.

PP:   In addition to everything else I have outlined to you,
didn't we discuss defenses in this case?

JF:   Yes, we did.

PP:   Did we discuss the defense that the children were never
abused and that the allegations of which they complained never
happened.

JF:   That is correct.

PP:   And we discussed that on approximately fifty occasions.

JF:   That is correct.

-13-

PP:  And did we discuss the defense of coersion that anything
that may happen was the result of your father coersing you into
doing what the children allege you did.  And did we discuss that
defense on approximately thirty occasions.

JF:  Yes, we did.

PP:  And did we discuss the defense of mass hysteria.  And did we
discuss that defense in that all of the children are reacting
hysterically to something that never happened and they are
starting to believe that it happened themselves, and that this is
nothing more than a witch hunt.  Didn't we discuss that
possibility of defense on approximately twenty-five occasions.

JF:  Yes, we did.

PP:  In fact, in addition to you and I discussing that, did I not
discuss that defense with Drs. Brodsky, Pogge, Dan Schwartz, and
Marty Berenberg.

JF:  I believe you discussed all the different  defenses with all
those men.

PP:  And I have done that both in your presence and outside your
presence.

JF:  That's correct.

PP:  And did we not discuss the defense of insanity on at least
fifty occasions.

JF:  Yes, I believe we did.

PP:  And in addition to the defense of insanity, as discussed

-14-

between you and I, isn't it a fact that we discussed that with
Feldman, Brodsky, Pogge, Dan Schwartz and Marty Berenberg.

JF:   That's correct.

PP:   In addition to those psychologists, isn't it a fact that
you've been seeing other psychologists with your mother as well.
And who else have you been seeing?

JF:   Oh, the person?

PP:   The person's name.

JF:   Connie Kennedy.

PP:   And for how long have you been seeing Connie Kennedy?

JF:   About four months now.

PP:   And you've been seeing Connie Kennedy's and my retainer in
the (inaudible).

JF:   That's correct.

PP:   Isn't it all (inaudible) Jesse, that we discussed the
defense of multiple personality, the fact that you may truly
believe that you did not do these acts as charged, and that you
are convinced that you did not do them, but that it may be a Dr.
Jekyl and Mr. Hyde type of personality and that (inaudible).

JF:   That's correct.

PP:   We discussed this defense on approximately thirty occasions,
wouldn't that be fair to say?

JF:   That's fair to say.

PP:   Would it also be fair to say that I discussed these defenses

-15-

at length with Dr. Schwartz, Dr. (inaudible). In addition to all
that, did you discuss that defense with Connie Kennedy?

JF: No I don't believe I did.

PP: And, (inaudible) you never discussed that defense with
Connie Kennedy, you have discussed other defenses with her.
Correct.

JF: Yes, I have.

PP: Now, you are aware, are you not. Before I get into that,
you also can see, (inaudible).   Isn't it a fact you wrote to
both Barry Slotnick and William Kuntsler and the purpose of you
writing to them was you wanted to get legal opinion as to this
case and see if they would take this case as your lawyer.  Is
that correct.

JF: That is correct.

PP: Is is also a fact that Slotnick did answer and stated that
he would not take your case.

JF: That is correct.

PP: And Kuntzler just ignored you and did not even respond.

JF: This is correct.

PP: Now you have also interviewed approximately thirty-four
attorneys in this case who are prominent lawyers in Nassau
County.  Is that correct?

JF: That is correct.

PP: And you interviewed everyone of them.  Correct?

-16-

JF:  Correct.

PP:  And after interviewing everyone of those attorneys, you selected my services.  Correct?

JF:  Correct.

PP:  Now, I have all that down.  I want you to (inaudible). for you to (inaudible) this plea.  Are you aware of the (inaudible) that the District Attorney's office is now offering to permit you to plead guilty to approximately fourteen counts of sodomy in the first in that you plea to sodomy in the first degree as to each victim.

JF:  Correct.

PP:  The fourteen victims, you take fourteen counts of sodomy in the first degree (inaudible) plea the remainder of the charges dismissed in satisfaction or (inaudible).  Do you understand that?

JF:  I do.

PP:  Do you understand that in exchange for your plea, the DA is offering a sentence of six years on the minimum and eighteen years on the maximum.

JF:  Yes.

PP:  Do you understand the terms.  You could do as little as six years and then be released.

JF:  Yes.

PP:  You also understand that it means you could be incarcerated for as much to eighteen before your are released from (inaudible).

JF:  Yes.

PP:  How old are you now.

JF:  Nineteen.

PP:  That means that you could come out of jail as early as 25 years or you could be incarcerated until you're thirty-seven or thirty-eight.  Do you understand that.  All right, Jesse, I just turned the tape over because the other side of the tape ended, so I'm going to repeat what we just said.  Are you aware of the fact that you could be incarcerated therefore till as early as you're twenty-five years old or twenty-six years old, but that you could remain incarcerated until as late as thirty-seven or thirty-eight years old on a sentence of six to eighteen years.

JF:  I'm aware of that.

PP:  Are you also aware of the fact that if you do not plead guilty to this and you go to trial, that you could be acquitted of every charge and spend no time in jail if the jury believed that you did not commit these acts or if the jury found that one of your defenses was viable.

JF:  That's correct.

PP:  Are you also aware of the fact Jesse, that in the event that you are convicted of any of the charges that Judge Boklan has indicated that for each one of the charges that you are convicted of, she would consider some consecutive time. Are you aware of that?

-18-

JF:  Yes, I'm aware of that.

PP:  And isn't it a fact that we have discussed the possibility that your sentence in this case could run into a couple of hundred years.

JF:  That's correct.

PP:  And that could mean the remainder of your life.

JF:  I'm aware of that.

PP:  However, haven't I indicated to you and told you time and time again, that no matter how many years Judge Boklan gave to you on a sentence, that the most time you could be incarcerated for in the State of New York would be forty years.

JF:  I'm aware of that.

PP:  And haven't I told you that on many occasions.

JF:  Yes, you have.

PP:  Now, that would mean that if your were incarcerated now you would come out of jail when you're fifty-nine years old.  Do you understand that?

JF:  Yes, I do.

PP:  Now, are you also aware of the fact that you have an absolute right to a trial by jury in this case.

JF:  I'm aware of that.

PP:  And haven't I discussed that with you?

JF:  Yes, you have.

PP:  On approximately how many times?

-19.-

JF:  Just about every time I've seen you.

PP:  Would you say over fifty times?

JF:  Yes, I would.

PP:  And isn't it a fact that I have discussed with you on an
equal number of times that you have the right to remain silent
throughout all of these proceedings, and that is called your
right against self-incrimination.

JF:  Yes, I'm aware of that right.

PP:  And haven't I also indicated to you that you have the right
to confrontation.  To have everyone of these children testify in
a court of law, and for me to cross-examine each and every one of
these children as well as the police officers, the sargeants, the
detectives, the expert witnesses, and every other witness against
you.

JF:  I'm aware of that.

PP:  And how many times have we discussed that.

JF:  At least fifty.

PP:  Isn't it a fact that I have also told you that if this case
went to trial that I would fight vigorously for the children not
to testify on video tape, but rather to argue strenuously on your
behalf and to force these children to take the stand in open
court and to request that the judge make them testify in open
court, pursuant to a recent case, within the last year known as
Coe v. Iowa.

-20-

JF:  I'm aware of that.

PP:  And haven't I indicated that to you on many occasions.

JF:  Yes, you have.

PP:  And wouldn't you say I've indicated that to you on at least
ten occasions or more.

JF:  Yes.

PP:  And, haven't I also indicated to you that the People have
the absolute burden of proof in this case, that you don't have to
prove or disprove anything.

JF:  I'm aware of that.

PP:  Haven't we also discussed the fact that the People's burden
of proof in this case is that they must prove your guilt beyond a
reasonable doubt.

JF:  I'm aware of that.

PP:  Didn't we also indicate, and didn't I also tell you that in
addition to proving your guilt beyond a reasonable doubt that the
People must prove each and every element of every charge beyond a
reasonable doubt in order to get a conviction of each and any
charge.

JF:  I'm aware of that.

PP:  And didn't I tell you this.

JF:  Yes you told me.

PP:  And haven't we discussed this on more than fifty occasions.

JF:  Yes we have.

-21-

PP:  Further, didn't I discuss with you the fact that you did not have to present any evidence, that you could sit mute and do nothing, but the DA had to prove the case beyond a reasonable doubt even if you did nothing.

JF:  Yes, you have informed me of that.

PP:  And, in addition to everything else that we have just outlined, didn't I tell you that you have the right to an attorney throughout all the stages of these proceedings.

JF:  Yes, you did.

PP:  Now, Jesse, you are considering very, very, strongly, in fact, you've told me that you want to take a plea of guilty in this case, with a sentence of six to eighteen, and waive all of the rights that I've just outlined.  Correct?

JF:  Yes.

PP:  That includes the right to a trial by jury.  You understand that?

JF:  Yes, I do.

PP:  You understand that if you plead guilty, that a plea of guilty is the same as if you went to trial and you were convicted after trial.  Do you understand that?

JF:  Yes, I'm aware of that.

PP:  There's no difference.  Do you understand that?

JF:  Yes.

PP:  And haven't I told you that on many occasions?

JF:  Yes, you have.

PP:  And you understand that a plea of guilty must be voluntary and that no one can force you to plead guilty.  Do you understand that?

JF:  Yes, I do.

PP:  Is this plea of guilty voluntary?

JF:  Yes.

PP:  And is anyone forcing you to plead guilty?

JF:  No.

PP:  Has anyone made you any promises other than, if you plead guilty you will be sentenced to a period of incarceration of no more than fifteen years, eighteen years, I'm sorry, no more than eighteen years and no less than six years.

JF:  That's correct.

PP:  Has anyone made you any other promises?

JF:  No they have not.

PP:  Have I made you any other promises?

JF:  No you have not.

PP:  Has the Judge or the DA or the police, or any of the witnesses made you any promises.

JF:  No they have not.

PP:  Now, Jesse, I have been representing you now for about five months, correct?

JF:  Correct.

PP: Would you say that I worked hard on this case?

JF: I would say you worked hard on this case.

PP: Would you say that I worked very hard on this case?

JF: I would say you worked hard on this case.

PP: And are you satisfied with my services in this matter?

JF: Yes, I am.

PP: And, would you tell me approximately when you decided to take the plea of guilty, if offered, an opportunity to plead guilty, with a plea bargain.

JF: I think it was about two and a half weeks ago.

PP: And have you requested that I seek a plea offer and plea negotiations from the District Attorney?

JF: Yes.

PP: And did there come a time when I informed you that the offer from the DA's office of five years to fifteen years was withdrawn, and that it was unlikely that I could get that offer back or that I could get any other offer.

JF: That's correct.

PP: And recently in the last couple of days, haven't I told you that I went to the District Attorney's office and that I was successful in getting an offer of six to eighteen years.

JF: Yes.

PP: Jesse, is this what you want to do?

JF: Yes.

-24-

PP:   Are you doing this after full consultation with me, with
your mother, with your father, with your brothers, and with your
therapist.

JF:   Yes.

PP:   You're doing this knowingly?

JF:   Yes.

PP:   You're doing this voluntarily.

JF:   Yes.

PP:   The phone has been ringing.  I'm going to answer the phone
for one second.  All right, we answered the phone and that was
your brother David.  It is now 7 o'clock and he has arrived at
the train station and we just told him to wait.  Is that correct?

JF:   That's correct Peter.

PP:   All right now.  Jesse, are you aware of the fact that if you
plead guilty in this case, that not only will there be no trial,
and not only are you admitting guilt, but you will have to tell
the Court that you are guilty and you will have to tell them
exactly what you did.

JF:   Yes.

PP:   And are you aware of the fact that in order to do this it
must be truthful.  Do you understand that?

JF:   Yes.

PP:   And therefore, do you understand that if you are telling the
Court that you sodomized the children, that you are telling the

-25-

Court that that in fact did happen, that you did put your penis into the anus of little boys and that you are telling the Court that this is the truth.

JF:  I am aware that I will have to admit in open Court that I put my penis to the anus of little boys.

PP:  And are you willing to do that?

JF:  I am willing to do that.

PP:  And is that truthful testimony?

JF:  Yes.

PP:  And now, I can understand where there is difficult for you. But I want you to be very clear on this record and in Court that you will not be permitted to plead guilty unless you are, in fact, guilty.  Do you understand that?

JF:  I am aware that that is the way the Court system works.

PP:  Now, Jesse.

JF:  Peter.

PP:  Lastly, I want to go through with you the discussions that you and I have been having recently in regard to your incarceration.  Do you understand that you will be incarcerated at the time of the plea, which is Tuesday, December 20, 1988.

JF:  I am aware of that.

PP:  Are you also aware that I have absolutely no power what-soever as to where you are incarcerated, and where you are sent within the penal system and the criminal system.

—26—