- involved the literature.  Both-- in-- on the
computer-- and-- in the written word.  So it-- it
would have been evidence.  It certainly would
come in.  Jessie was a co-defendant to-- all of
that evidence applied to him-- to him as well.

QUESTION:

Did you ever have a sense of whether-- (BEEPING)
you know I said-- at one point Arnold says in one
of his letters, "All I wanted to do was help my
son.  And they told me that if I would plead
guilty, I would get out of the way.  Me and all
of my sickness and my pedophilia would be out of
the picture."

And then-- you know did you ever have a sense
that Arnold was really concerned for saving
Jessie?  Doing what was required to-- to try to
help Jessie get a lower sentence or something?

ABBEY BOKLAN:

He pled guilty knowing at that point that Jessie
was intending to go to trial and say he was a--
he was not guilty.  So I don't understand how his

CONFIDENTIAL

TAPE #111 CR# 47-50                                          PG. 79

pleading guilty was gonna help Jessie.  Did he

love his son?  I don't know.  I really-- I really

don't know.  I think Arnold Friedman was looking

out for Arnold Friedman when he took that plea.

But that's, you know, just an educated guess.

QUESTION:

Yeah, I-- you know I mean it-- Joe Anorando (PH)

says that at one point, you know, if he had

wanted to help his son, there were a number of

ways he could have done that.  He could have

offered to make a deal contingent on his son

getting some kind of leniency or something.  But

he didn't do those things.

ABBEY BOKLAN:

Yeah.  He was looking for-- out for himself I

think.

QUESTION:

Any thoughts about-- you know we know that his--

the family was destroyed by this.  Probably the

family was destroyed already.  But let's say the

family was destroyed by this.

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

TAPE #111 CR# 47-50                                                PG. 80

You know Elaine goes off and, you know, divorces
him. Jessie goes to jail. Arnold goes to jail.
David moves-- lives in Manhattan and-- and goes
on about his career and then the other brother--
goes to San Francisco. Disappears sort of.

You know everybody was sort of dealing in their
own way, I guess, with this kind of a situation
in the family. It-- and does-- you know any--
any thoughts about David Friedman or whether--
'cause he obviously-- (SLAPPING) well one of the
things that-- you know David blows up at one
point at the end, I guess when his father was
sentenced.

He shouts at some of the parents. "You're gonna-
- you-- you're-- you and your kids are gonna have
to live with this for the rest of your lives."
And of course there were various interpretations
immediately. The parents thought what he was
saying-- he was gloating over the fact that the
children were abused. They're gonna have to live

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

TAPE #111 CR# 47-50

with the abuse for the rest of their lives.

And then of course later he says, "No, I was saying you stole my father for these, you know, (UNINTEL) charges. My father was a saint. And so you're gonna have to have this on your head or whatever."

But David had a pretty emotional reaction to it. And I'm wondering if you have any-- any thoughts about his role or the position of the-- or his role. Brother. The oldest son in that family. The father's first born son.

ABBEY BOKLAN:

You're asking about the-- the first born son and any-- thing I feel about it. I really-- except for the very short reference to the other children in a probationary court, I really had no dealings at all with David or the other brother. And was not privy-- to anything that went on with them.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

So I-- I really have absolutely not comment-- on
at all.  Except, you know, from the reports I
read, it was a household devoid of love.  It
certain was not a normal household.  But other
than that, I really could not comment on-- on the
other brothers at all.

QUESTION:

Is it possible that-- that somebody that's in
Jessie's position now, without necessarily even
focusing on Jessie, there's obviously this civil
commitment issue.  That people can be-- in some
states (UNINTEL) people are considered committed
after their maximum prison term because, you
know, they're either-- either-- 'cause I think
two psychiatrists have to say that they're
unstable and that they're likely to commit the
same offenses again.

And there's a Supreme Court discussion about
whether you also have to add the criteria, as is
key in this case, about whether they were unable
to control their own behavior.  Is-- do you think

CONFIDENTIAL

there's any possibility that the-- what do you think about the civil commitment-- legislation? What-- and if that passes in New York state, somebody like Jessie could be locked up for a lot longer.  It's possible.

ABBEY BOKLAN:

I haven't really studied that issue.  I don't-- I'd really rather not--

QUESTION:

Yeah.  That's--

ABBEY BOKLAN:

-- not comment on it.  I mean I-- I am aware that it exists in some states, but I-- I hadn't thought about it.  And I couldn't give you an educated opinion at this time.

(OFF-MIC CONVERSATION)

QUESTION:

Did the-- did the other defendant, the other youth who'll-- the one who got the youthful offender's test (PH), did he have to do an allocution?  Did he have to plead guilty in a formal way?

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

ABBEY BOKLAN:

Oh, certainly.

QUESTION:

And what-- what do you rec-- remember about that
allocution? What that as convincing and-- as the
others?

ABBEY BOKLAN:

I remember very little about it. But I'm sure
the District Attorney must have done questions
and answers from him. Or maybe not, because he
testified in the grand jury as well.. So-- his--
he was locked into what he had testified to in
the grand jury. I don't have much of an
independent recollection of that plea at all.

QUESTION:

I think the-- you know one of the things that's
really unique about this situation also is that
there was really no discovery because, you know
there were-- the was a grand-- there was a grand
jur-- there were a series of grand jury hearings.
There were confessions.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

There were-- but there was no discovery. So for example, Peter Pinero had almost nothing to go on. I think he was given one statement that was redacted. And that was one of him-- that-- you know that Don Arrono (PH) had given him and said, "Look, this is the kind of thing we're getting." But one-- in a case like this, at what point would discovery have begun?

ABBEY BOKLAN:

Well, if it looks like there's not going to be a plea, there's a conference and stipulations done very shortly after indictment. Usually within a few weeks. And at that point discovery starts.

Certain things have to be handed over. Statements of victims do not have to be handed over until they have to testify. For example, if they would only be testifying to a trial, they're just handed over after the jury's selected and before opening statements.

The-- so that type of discovery would not be

CONFIDENTIAL

TAPE #111 CR# 47-50                                         PG. 86

given out early.  Brady material.  I don't know
if you're familiar with that.  It's-- that's
material that would be favorable to the defense.

For example, there was a young child,
hypothetically, who said, "Oh, no.  None of this
occurred.  We all agreed to make up the story."
That would have to be handed over immediately.
Immediately upon reaching the hands of the
District Attorney's office.

So discovery in New York, it depends upon the
stage and what you're looking to discover.  But
certainly there was a lot of open discussions--
with the District Attorney's office during the
course of conferencing as to, you know, what was
occurring there.  And they would have been able
to get copies of the search warrants.

They would have known what was taken from the
house.  I mean that-- that's-- they-- they would
have been given receipts, in fact, for what was

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

taken from the house on that.   So if you're just

talking about the witnesses' statements, what the

young children were saying--

(OFF-MIC CONVERSATION)

ABBEY BOKLAN:

-- that would not have come until immediately

before the trial.

QUESTION:

And I-- and those kids were never-- so in front

of a grand jury, the process, knowing what you

know about sex crimes in general, the process of-

- a child testifying in front of a grand jury, is

that very different-- we know that there's no

cross-examination, but how is it different from

a-- a child testifying in trial.

ABBEY BOKLAN:

Well, there's no judge.   There's no cross-

examination.   That-- you mentioned is very, very

different in a grand jury proceeding, 'cause the

child doesn't have to go through it.

There's no defendant sitting there looking at

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

them while they're testifying.  They're sitting
up in the witness box.  They have a very
sympathetic assistant District Attorney standing
next to them.

But they do have usually-- between 19 and 23
people approximately sitting there listening to
them.  And that's very hard.  Having all of those
strange listen to, you know, what occurred.
District Attorney asks questions.  Court
reporter-- trans-- writes down everything that's
being said.

You know and they answer-- the de-- grand jurors
have the opportunity to ask questions as well if
they so desire.  District Attorney rules on
whether those questions are admissible or not.
If the defendant wants to testify he-- he can.
But he has to waive immunity.  That's a whole
different process.  And you know can go in there
with his attorney and the District Attorney can
cross-examine the defendant.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

This didn't happen in this case.  The defendants
did not-- did not testify.  Grand jury is a much
easier proceeding for an assistant District
Attorney.  It's much faster.  It's much shorter.


But in a case like that, you still have these
children (UNINTEL) in there.  Being sworn, if
they're found to understand the nature of an
oath.  You have to go through that first if
they're under a certain age.  And they've gotta
tell this story to all of those strangers sitting
there.  A very embarrassing and upsetting story.

QUESTION:

And-- would it be possible in the third
indictment that maybe on-- that the only person
that would be required to testify would be the--
the young man that got youthful offender status
or would they have needed the kids in that-- for
an indictment?

ABBEY BOKLAN:

Oh, they add a lot more children.  There're a lot

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

Case 2:06-cv-03136-JS   Document 41-3   Filed 01/28/21   Page 13 of 47 PageID #: 5646

more counts and a lot more children were added.
I've forgotten how many.  I might even have a--
(ROARING) little note about that someplace.
That's number one, two-- it-- that's number
three.  I think the-- I-- I've forgotten.  I
didn't write down how many more children.  But
there were a lot more children that they brought
in.

In other words, they weren't redoing the same
thing over and over again.  They were bringing in
more children who were not part of the original
ones.  I think the last one-- there was something
like 126 counts of sodomy first degree.  And
there was sexual abuse.

Use of a child in sexual performance 'cause if
you recall-- they were videotaping what was going
on in the classroom.  Those were never found, by
the way.  And then of course there were 52 counts
of endangering the welfare of a child.

CONFIDENTIAL

So-- they started out-- against Jessie, if I
recall, there were three indictments.  It started
out with one small group of children.  Then added
more.  And then added more again.  So--

QUESTION:

And why did they have to add the additional
indictments?

ABBEY BOKLAN:

Because they thought they were going to trial.
They thought they were going to trial against
Jessie.  Because all we were hearing was, "He's
not pleading.  He's not pleading.  He says he's
not guilty.  He's not pleading."


So when an assistant District Attorney hears
that, they've gotta get together the case as
strong as they can.  I think he was hoping to
spare a lot of the children.  Plus some of might
have a-- been reluctant witnesses or their
parents reluctant to have them testify.


But when it looked like there was gonna be a

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

TAPE #111 CR# 47-50

PG. 92

trial, then it was no holds barred.  They were

brining in all of the children.  All of the

children.

QUESTION:

Did you-- you know the doctor.  Did he-- after he

pled in front of you, Jessie, a couple weeks

later, went on Geraldo with his mother.  I don't

know if you remember that.

ABBEY BOKLAN:

I had heard about it.  I hadn't actually seen the

program.

QUESTION:

Yeah.  They were very-- and do you have any

thought about that?  When you-- when you found

out that they went on the television?

ABBEY BOKLAN:

I had forgotten that until you started your--

investigation here of this case.  And-- it was

mentioned to me I think by Fran Galaso, who I put

you in touch with.  But I had forgotten that.  I

mean it-- it-- well, look how strange it is to be

videotaping-- what was going on there.

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

TAPE #111 CR# 47-50                                          PG. 93

QUESTION:

Yeah.   The whole thing is very public-- public in

a very unusual way.

ABBEY BOKLAN:

Yeah.

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

QUESTION:

(IN PROGRESS) well suited for that?  Or was it

the new (UNINTEL) sex crimes division that was

pretty new to you?

ABBEY BOKLAN:

It was pretty new.  My children were fairly

young.  At--

(OFF-MIC CONVERSATION)

QUESTION:

It's funny.  You know I was-- (CREAKING)

interesting you said that about these dolls,

because-- (CLUNKING) I mean I was just reading--

I have a-- I was just reading-- oh, here during

trial (CLUNKING) the witnesses were (UNINTEL)

describe use (UNINTEL PHRASE).  I mean here they

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

talk about the dolls.

ABBEY BOKLAN:

Right.  Interesting.  This I won't say on-- on
the record in front of the cameras, but when I
first got the dolls and started the show them
around the DA's office, some of the male DA's
were so embarrassed and go so hysterical with
them that it-- that would have been-- that was a
funny sight.  (LAUGHS) And so I don't know if
they still use them up there-- in the DA's
office.  Kay do you know if they still use them?

KAY:

I have no idea.

ABBEY BOKLAN:

I don't-- I don't know.  Joe might be able to
(CLUNKING) able to answer.  I don't know if
that's--

(OVERTALK)

ABBEY BOKLAN:

-- was (UNINTEL) years--

QUESTION:

They say children are usually less accomplished

CONFIDENTIAL

TAPE #111 CR# 47-50                                   PG. 95

than adults in communicating verbally.  Because
of this you may need to use video or props and
additional language to gather information.  This
allows children to demonstrate as well as say
what they have experienced.  And (UNINTEL) media
can be employed by the most (CLUNKING) useful and
(UNINTEL PHRASE) anatomical dolls, anatomical
drawings and picture drawing.

        ABBEY BOKLAN:

Yeah.  I was kind of ahead of my time at that
point.  You know in fact there were very few.  We
had to send for them.  Now I don't know if they
look more realistic, like a male and a female.
But in-- in those days, they really-- they were
rag dolls.  They were very non-threatening.

        QUESTION:

Right.  Right.

        ABBEY BOKLAN:

Be interesting to see what they use now.

        (INAUDIBLE)

        QUESTION:

I wonder what they do-- I mean I guess there's--

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

TAPE #111 CR# 47-50

PG. 96

you know whatever.  You can criticize every
method of investigation.

ABBEY BOKLAN:

Yeah.  It really.  (CLUNKING)

QUESTION:

And there's always somebody who also (CLUNKING)
uses something 'cause the defendant involved--
there's always somebody who's (UNINTEL) precise
because, you know, to say, "Here, photograph some
sex abuse taking place."  And they said, "Well,
you know, photographs can be manipulated or
whatever."  Yeah.

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

**TRANSCRIBER'S NOTE: TAPE REPEATS HERE.  WILL NOT TRANSCRIBE
DUPLICATE TRANSCRIPTION.**

ABBEY BOKLAN:

Programs that didn't work well.  I mean you're
talking about something that the like 100, 120
dollars.  He won a massive, hundred million
dollar settlement against IBM.  But the-- the
interesting part is he did all of this from his

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

home and his computer in his underwear.

QUESTION:

Oh my god.

ABBEY BOKLAN:

And-- and he was against all of this IBM lawyers,
all of these, and they thought he had this
tremendous staff fighting him.  And they-- they
finally gave up and agreed to this settlement.

QUESTION:

Wow.  That's--

ABBEY BOKLAN:

So I think that--

QUESTION:

-- amazing.

ABBEY BOKLAN:

-- is an amazing story.

(OFF-MIC CONVERSATION)

(REFERENCE TONE)

SLATE:

End of wild sound and end of tape.

(REFERENCE TONE)

* * * END OF AUDIO * * *

Abbey Boklan Complete Transcript (111-113).doc

**CONFIDENTIAL**

TAPE #111 CR# 47-50                                                    PG. 98

* * * END OF TRANSCRIPT * * *

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMANS"

INTERVIEW WITH ABBEY BOKLAN

CORRESPONDENT:  NOT IDENTIFIED

PRODUCER:  NOT IDENTIFIED

TAPE #113 CR #55-56

QUESTION:

(IN PROGRESS) a once in a lifetime, what the hell
was going on?  (NOISE) (UNINTEL) like this?  Or
did you come away from it thinking, did you have
any emotion, or any particular feeling when you
were-- when this case was said and done?  Did you
have to go on vacation for a week?  Or did you--
how-- what was your just (UNINTEL) feeling about
it at the end?

ABBEY BOKLAN:

What was my feeling at the end of the case?  I
was glad it was over.  I hoped I never saw
another one like it.  I was so happy it wasn't a
trial.  On a personal level, I was happy I didn't
have to listen to what happened to the children.

CONFIDENTIAL

Case 2:06-cv-03136-JS   Document 41-3   Filed 01/28/21   Page 22 of 47 PageID #: 5655

It's different reading it, and actually seeing the pain, you know, as the children tell about it.

Like an attorney will say to me, "If my client goes to trial, as opposed to taking this plea, are you gonna punish them with a greater sentence?" And I say, "I don't punish him for going to a trial. But once I hear-- once I hear what really happened-- or if your client commits perjury-- or, anything that can happen during the course of-- of a trial, who knows what I'm gonna sentence him." And I-- I think it would have been a-- a terrible trauma for the children.

I think for the attorneys, who are good men. For the families, for the jurors, and for me to have to have listened to what occurred there. On-- and I say that from someone who tried sodomy cases with children before. This one was just so-- so horrible that my feeling, the main feeling I had was one of relief. It was over,

**CONFIDENTIAL**

the children did not have to testify-- I did not
have to go through a trial, and I didn't have to
watch the pain in the eyes of parents in those
children.  I think they had to give a-- kind of a
brief summary oh-- of what I felt most when it
was over.

### QUESTION:

Was there a feeling that-- when the parents were
leaving the courtroom, and the sentencing had
been done, and both Arnold and Jessie had been--
sentenced and gotten long sentences.  Was there a
feeling of relief in the community?  How did the
community respond to that?

### ABBEY BOKLAN:

Well, I knew when I sentenced Arnold that, of
course, the Friedmans were very unhappy.  And the
victims and their families were very happy.  I
knew when I sentenced Jessie, that nobody was
happy.  The Friedmans and their friends and
supporters felt it was a horrible and cruel
sentence.

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

TAPE #111 CR# 47-50                                                    PG. 101

The victim's families felt it was an extremely

lenient and merciful sentence.  So I-- I think I

felt that I made no one happy, but I felt it was

right.  And so I was comfortable.  I never had

any contact again with the families until I was

campaigning in 1992 for reelection.


And I was at a-- a fare, a street fare, in Great

Neck, you know, handing out literature, you know,

going around shaking hands.  And someone came up

to me and introduced themselves.  And-- they were

a family member-- of one of the victims-- the

parents.  And they said to me, "We're voting for

you.  You did a good job."  That was the only--

that was the only other contact, and that-- and

that was nice.  Yeah.

                    (OFF-MIKE CONVERSATION)

                    ABBEY BOKLAN:

I don't know, off the record.

                    QUESTION:

Yeah.

CONFIDENTIAL

ABBEY BOKLAN:

You know, when he was originally brought up here
I was not optimistic in what I read.  And that's
all I can say for what's been going on these
years.  That's it.

QUESTION:

Yeah.

ABBEY BOKLAN:

So.  But let's hope.  We don't know.

(OFF-MIKE CONVERSATION)

ABBEY BOKLAN:

'Cause he was a pretty boy.

QUESTION:

Yeah.

ABBEY BOKLAN:

Prettier than Jessie.  If I recall.  In some ways
I was less sympathetic to him even though, you
know, I wasn't sending him away forever.  I mean
he was getting out more than the (UNINTEL)
division, and more than the DA negotiated with
him for.  But not a-- a tremendous amount of
time.  Because I was bothered by the fact that he

Abbey Boklan Complete Transcript (111-113).doc

CONFIDENTIAL

didn't have all of Jessie's excuses.

> QUESTION:

Right--

> (OVERTALK)

> ABBEY BOKLAN:

He had no excuse except that he wanted to join in these fun and games in hurting all these little children, and doing these other things to them. I mean he-- he was an outsider, he could have walked away with no repercussions at all.  So he really got a great deal.

> (OVERTALK)

> QUESTION:

I think you said, if I remember what you said, you know, Jessie, you know, you could argue that Jessie didn't have a choice because this was the role that (UNINTEL PHRASE).

> ABBEY BOKLAN:

That's what I said I said--

> (OVERTALK)

> QUESTION:

--family, and it looks like you've got some

**CONFIDENTIAL**

TAPE #111 CR# 47-50                                          PG. 104

(UNINTEL) parents and I can't understand why you
would do it.  You know, and his parents did seem
to be very, you know, his parents seemed to be
like good people, you know.  They seemed like
they, you know, they were--

    (OVERTALK)

    ABBEY BOKLAN:

Yeah.  I mean in this rich, educated, you know,
community.  I mean it's just-- it-- it was just
shocking.  Shocking.  So.  Anyway.

    (OFF-MIKE CONVERSATION)

    * * *END OF SIDE A* * *

    * * *SIDE B BLANK* *.*

    * * *END OF TRANSCRIPT* * *

**CONFIDENTIAL**

Abbey Boklan Complete Transcript (111-113).doc

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

                    -against-

MIGUEL DEFREITAS,

                              Defendant.
-----------------------------------------------------------------------x

AFFIRMATION IN
OPPOSITION TO
DEFENDANT'S C.P.L. §
440.20 MOTION

Indictment No. 77897-1991
Motion C-003

ANDREA M. DiGREGORIO, an attorney duly admitted to practice law before the courts of the State of New York, and an Assistant District Attorney of counsel to the Honorable Madeline Singas, District Attorney of Nassau County, affirms the following under penalty of perjury:

1.      This affirmation is submitted in opposition to defendant's motion to set aside his sentence, made pursuant to C.P.L. § 440.20. The motion is returnable November 16, 2018.

2.      The statements contained herein are made upon information and belief, the source of said information and the basis of said belief being my review of the records and files of the Nassau County District Attorney's Office ("NCDA"), including the trial minutes pertaining to this case.

3.      The conviction underlying defendant's application stemmed from defendant's armed robbery of a jewelry store on March 5, 1991, in Hewlett,

Nassau County, New York.  Defendant entered the store and expressed an interest in purchasing a diamond.  After the storeowner removed some diamonds from a safe and displayed them to defendant, defendant selected one diamond.  When asked for a deposit for the gem, defendant pulled out a semi-automatic pistol, put it against the storeowner's head, and threatened to kill both the storeowner and the storeowner's father (who was a store employee and seated nearby) unless they did as defendant directed.  Defendant forced the two men to lie down in the bathroom, stuck a knife against the storeowner's back, and handcuffed the father and son together. Defendant told them not to move or he would shoot them.  One of the victims managed to press a silent alarm button by tripping the panic switch in the bathroom. Police Officers Eager and Land responded to the alarm and observed defendant inside the store.  While the officers attempted to enter the locked front store door, defendant approached the door and brought the store keys (which he had stolen from the owner) to the door cylinder as if he were going to unlock the door.  But, rather than unlock the door, defendant suddenly pulled out his semi-automatic pistol, clutched the gun with both hands, pointed the gun at Eager's chest, and, from a distance of one or two feet, pulled the trigger twice.  The gun misfired, and the officers broke through the door.  Defendant retreated to the rear of the store and fired a shot at the pursuing policemen.  Defendant grabbed the storeowner and the storeowner's father and, pointing a gun at the storeowner's head and using both hostages as human shields, left the store.  Defendant walked with them about 100

feet, then pushed them aside and ran.  A police officer pursued, but lost sight of defendant.  The other officer pursued in his car, but also lost sight of defendant.  A police sergeant, who had responded to a call for assistance, observed defendant climb a fence into the backyard of a home where the homeowner was working on his car in the driveway.  Following a struggle with the car owner, defendant jumped into the car and drove off, crashing into two cars as he fled.  The sergeant pursued in his car. Defendant led the police on a high-speed chase that ended when defendant crashed the stolen car he was driving into a car stopped at an intersection.  Defendant got out of the car and ran.  The police sergeant chased him, and defendant eventually turned toward the sergeant, threw down a gun clip, and surrendered.  A handgun was found on the front seat of the car defendant had stolen.  The store owner and his father identified defendant as the robber.  A business card from the jewelry store and loose diamonds were found in defendant's pants pocket.  The store owner identified the diamonds.  A car registered to defendant was found parked near the jewelry store, and a key that opened the handcuffs used in the robbery was found in the glove compartment of that car.  An unfired cartridge displaying a "light hit" was found on the floor inside the jewelry store.  That cartridge was matched to the gun found in the stolen car.  A spent bullet found in the ceiling of the jewelry store was also matched to the gun found in the car.  A ballistics expert tested the gun and concluded that it was operable, but would misfire occasionally; the firing pin would strike off the center of the primer.

4.     For his criminal acts, defendant was indicted for attempted murder in the first degree (Penal Law §§ 110.00/125.27), two counts of robbery in the first degree (Penal Law §§ 160.15 [2], 160.15 [4]), criminal possession of a weapon in the second degree (Penal Law § 265.03),[1] criminal possession of a weapon in the third degree (Penal Law § 265.02[4]),[2] and reckless endangerment in the first degree (Penal Law § 120.25).

5.     Defendant was convicted in the County Court, Nassau County, after a jury trial, of all the crimes for which he had been indicted.  On or about June 9, 1992, defendant was sentenced to terms of incarceration of twenty-five years to life for attempted murder, and to lesser terms on the remaining convictions. (Baker, J., at pre-trial hearing, trial, and sentence).

6.     On or about April 5, 1994, defendant, represented by counsel, perfected his appeal and raised the following claims:  (1) the sentence imposed was unduly harsh and excessive; (2) trial counsel was ineffective; (3) the prosecution failed to prove defendant's guilt beyond a reasonable doubt; (4) the indictment was defective in that it failed to provide notice of the acts constituting the crimes charged; and (5) the conviction for criminal possession of a weapon in the third degree should be

---

[1] Now designated § 265.03(1)(b).  *See People v. Konstantinides*, 14 N.Y.3d 1 (2009) and L. 1998, ch. 378 § 4.

[2] Now designated Penal Law § 265.03(3).  *See* L. 1998, ch. 378, § 4.

dismissed as a lesser included concurrent count of criminal possession of a weapon in the second degree. *See* defendant's appellate brief, attached hereto as Exhibit 1.

7.     As part of his excessive-sentence claim, defendant contended that the sentences should run concurrently. *See* defendant's brief page. 44. One of the arguments that he offered in support of that claim was that the crimes should be considered as one event for sentencing purposes because they were factually related.

8.     The NCDA filed a responsive brief and argued that some of the claims were unpreserved and that all the claims were without merit. *See* Exhibit 2 – NCDA appellate brief.   In regard to defendant's claim that the sentences should run concurrently, the NCDA contended, inter alia, that consecutive sentences are permissible for separate crimes that occur in the course of a single, extended transaction, and, the numberous crimes that defendant committed were distinct. *See* NCDA brief, page 41.    Thus, the NCDA argued, consecutive sentences were permissible.

9.     In a decision and order dated August 14, 1995, the Appellate Division, Second Department ("Appellate Division"), unanimously affirmed defendant's judgment of conviction. *See People v. DeFreitas*, 213 A.D.2d 96 (2d Dept. 1995).   In its decision, the court thoroughly discussed and rejected the claim that trial counsel provided ineffective assistance. *See id*. at 97-101.   In addition, the court found that there was "no merit" to defendant's "other contentions."   *Id*. at 102. Defendant's motion for reargument was denied on November 2, 1995.

10.     On October 12, 1995, a judge of the Court of Appeals denied defendant leave to appeal to that Court. *People v. DeFreitas*, 86 N.Y.2d 872 (1995).

11.     In motion papers dated February 26, 1999, defendant, pro se, submitted his first coram nobis petition, contending that he was denied effective assistance of appellate counsel.[3] The NCDA opposed the motion, and the Appellate Division subsequently denied defendant's application, holding that defendant failed to prove that he had received ineffective assistance of counsel. *People v. DeFreitas*, 262 A.D.2d 499, 499 (2d Dept. 1999).

12.     Nearly ten years later, in motion papers dated January 2, 2009, defendant, represented by counsel, brought another writ of error coram nobis, again claiming that he received ineffective assistance of counsel on his direct appeal.[4] The NCDA opposed defendant's motion, and the Appellate Division subsequently denied defendant's second coram nobis application, again holding that defendant failed to prove that he had been provided ineffective assistance of appellate counsel. *People v. DeFreitas*, 60 A.D.3d 1080, 1080 (2d Dept. 2009). A judge of the Court of Appeals

---

[3] Defendant argued that appellate counsel should have raised the following claims: (1) the court improperly permitted amendment of the indictment; (2) the trial court responded improperly to a note from the jury; and (3) the trial court improperly limited trial counsel's cross-examination of one of the victims.

[4] Defendant again argued that appellate counsel should have raised the claim that the trial court did not appropriately respond to a note from the jury. Defendant argued also that the juror-note issue was not subject to preservation rules.

denied defendant's application for leave to appeal.  *People v. DeFreitas*, 12 N.Y.3d 914 (2009).

13.    In motion papers dated October 13, 2010, defendant brought a motion (# C-861) pursuant to C.P.L. § 440.10 to vacate his judgment of conviction.  He raised the following claims:  (1) the trial court responded improperly to a juror note (which prevented defendant from receiving effective assistance of counsel); (2) the trial court "impaired the aura of impartiality" by sustaining its own objections, becoming an unsworn witness, and improperly curtailing cross-examination; (3) the final charge to the jury contained errors; (4) the prosecutor was improperly permitted to "amend" count one of the indictment, and the new charge was not supported by evidence presented to the grand jury; (5) the court's preliminary instructions did not meet the requirements of C.P.L. § 270.40; and (6) the charges in the indictment were improperly joined.

14.    The NCDA opposed defendant's motions and argued, among other things, that all the claims that defendant presented in his memorandum of law were based upon matters of record, and therefore had to be summarily denied pursuant to C.P.L. § 440.10(2)(c).  In addition, the NCDA argued that defendant's claims were without merit.

15.    In a decision dated January 5, 2011, the County Court (Berkowitz, J.) summarily denied defendant's motion (# C-861).  The court found that defendant's

claims were based upon matters of record and, pursuant to C.P.L. § 440.10(2)(c), denied those claims.

16.    Defendant sought leave to appeal the decision and order of the County Court.  In a decision and order dated July 8, 2011, the Appellate Division denied defendant leave to appeal.

17.    In motion papers dated December 1, 2011, defendant brought his third petition for a writ of error coram nobis, again claiming that appellate counsel was ineffective.[5] The NCDA opposed defendant's motion.  In a decision and order dated May 1, 2012, the Appellate Division denied defendant's motion, once again holding that defendant failed to prove that he had been provided ineffective assistance of appellate counsel.  *People v. DeFreitas*, 95 A.D.3d 902, 942 (2d Dept. 2012).  A judge of the Court of Appeals denied defendant leave to appeal, and also denied defendant's application for reconsideration of its denial.  *People v. DeFreitas*, 22 N.Y.3d 1040 (2013); *People v. DeFreitas*, 19 N.Y.3d 1025 (2012).

18.    In a petition dated October 1, 2012, defendant brought a federal habeas corpus petition in the Eastern District of New York. Basically, defendant contended that the state court wrongly denied his C.P.L. § 440.10 motion, and that the Appellate Division wrongly denied his 2011 coram nobis application.   The NCDA opposed

---

[5] Defendant alleged that appellate counsel was ineffective because he did not argue that the trial court "never legally obtained subject matter jurisdiction when the Prosecutor . . . . knowingly used the repealed law of Section 279 of the Code of Criminal Procedure to join the separate offenses into one indictment" (defendant's affidavit in support of his petition, page 2, para. 3).

defendant's petition as being untimely.  In a memorandum and order dated May 1, 2015, the Eastern District of New York (Azrack, J.) dismissed defendant's petition as untimely.

19.    Defendant then brought a fourth petition for a writ of error coram nobis.  His claims regarding appellate counsel centered on allegations that the trial court wrongly charged the jury.  The NCDA opposed defendant's application.  The Appellate Division subsequently denied defendant's application, once more finding that defendant had failed to show that he was denied the effective assistance of appellate counsel. *People v. DeFreitas*, 156 A.D.3d 718 (2d Dept. 2017).  On February 26, 2018, a judge of the Court of Appeals denied defendant leave to appeal. *People v. DeFreitas*, 30 N.Y.3d 1115 (2018).

20.    Now, in motion papers dated August 23, 2018, defendant moves to set aside his sentence alleging that (1) he should have received concurrent, rather than consecutive, sentences, (2) "the imposition of defendant's sentence based solely upon the sentencing judge's observation of trial contained in his personal notes was erroneous," and (3) he was denied due process by the "failure" of the court to provide him with "an opportunity to examine and respond to the information relied on by the sentencing court in imposing sentence."

22.    For reasons more fully set forth in the accompanying memorandum of law, defendant's motion should be denied.  His sentence is lawful. Moreover, on direct appeal, the Appellate Division rejected as meritless his claim that his sentences

should have concurrently.  Thus, defendant's claim regarding consecutive sentencing is procedurally barred pursuant to C.P.L. § 440.20(2).  Finally, all of defendant's arguments are meritless.

WHEREFORE, based upon the above and the annexed memorandum of law, defendant's motion to set aside his sentence should be denied.

Dated:   Mineola, New York
         November 9, 2018


_____

ANDREA M. DiGREGORIO

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                       Respondent,

          -against-

MIGUEL DEFREITAS,

                      Defendant.
-------------------------------------------------------------------x

Indictment No. 77897-1991
Motion No. C-003

MEMORANDUM OF LAW

MADELINE SINGAS
District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York  11501
(516) 571-3800

Judith R. Sternberg
Andrea M. DiGregorio
   Assistant District Attorneys
     of Counsel

## STATEMENT OF FACTS

The relevant facts and procedural history of this case are set forth in the preceding affirmation.

ARGUMENT

Defendant's Motion Should Be Summarily Denied Because It Is Procedurally Barred, In Part, And Entirely Meritless (answering defendant's C.P.L. § 440.20 motion).

A sentence may be set aside pursuant to C.P.L. § 440.20 only if it is "unauthorized, illegally imposed or otherwise invalid as a matter of law." C.P.L. § 440.20(1). In support of his baseless contention that his sentence is invalid, defendant contends that (1) he should have received concurrent, rather than consecutive, sentences, (2) "the imposition of defendant's sentence based solely upon the sentencing judge's observation of trial contained in his personal notes was erroneous," and (3) he was denied due process by the "failure" of the court to provide him with "an opportunity to examine and respond to the information relied on by the sentencing court in imposing sentence." This court should reject defendant's arguments. First, defendant's sentence was authorized, legally imposed, and valid. Second, his claim that his sentences should have run concurrently rather than consecutively was raised on rejected on appeal, and thus is procedurally barred pursuant to C.P.L. § 440.20(3). Third, all of defendant's contentions are without merit.

Defendant's Sentence Was Authorized, Legal, And Valid.

The terms of defendant's sentences were within permissible bounds, a fact that defendant does not dispute. That is, following a jury trial, defendant was convicted of attempted murder in the first degree (Penal Law §§ 110.00/125.27; a class A-I felony),

two counts of robbery in the first degree (Penal Law § 160.15[2], [4]; class B armed violent felonies), criminal possession of a weapon in the second degree (Penal Law § 265.03; a class C violent felony), criminal possession of a weapon in the third degree (Penal Law § 265.02[4]; a class D violent felony), and reckless endangerment in the first degree (Penal Law § 120.25, a class D felony).[6]   The terms of sentence he received was twenty-five years to life for the attempted-murder conviction, twelve and one-half to twenty-five years for the robbery convictions, two and one-third to seven years for the reckless-endangerment conviction, five to fifteen years for the second-degree weapon-possession conviction, and two and one-third to seven years for the third-degree weapon-possession conviction.   These sentences were within statutory parameters.  *See* Penal Law §§ 70.00(2)(a), (d), (3)(a)(i),(b); 70.02(2)(a),(c),(3)(a),(b),(4); C.P.L. § 1.20(41).[7]

Moreover, as discussed on page 41 n.* of respondent's appellate brief (Exhibit 2), consecutive sentencing was appropriate.  Indeed, as even defendant acknowledged in his appellate brief (Exhibit 1 [defendant's brief], page 44), consecutive sentences are permissibly for separate crimes that occurred in the course of a single, extended transaction.  *See People v. Salcedo*, 92 N.Y.2d 1019, 1021-22 (1998) (where the crimes are committed through separate and distinct acts, even though part of a single transaction,

---

[6] References are to statutes in effect at the time defendant committed the crimes.

[7] References are to statutes in effect at the time defendant committed the crimes.

consecutive sentences are possible regardless of whether the statutory elements of the offenses overlap); *see also People v. Olds*, 24 A.D.3d 571, 572 (2d Dept. 2005); *People v. Higgins*, 137 A.D.2d 620, 620-21 (2d Dept. 1988); *People v. Telford*, 134 A.D.2d 632, 633 (2d Dept. 1987).[8]

## Defendant's Contention That The Sentences Should All Have Run Concurrently Is Procedurally Barred.

Defendant nonetheless contends that all his sentences should have run concurrently, rather than consecutively, as some of his sentences did. However, this contention cannot establish a basis for C.P.L. § 440.20 relief because it is procedurally barred.

Criminal Procedural Law § 440.20(2) sets forth that a court "*must* deny" a C.P.L. § 440.20 motion when "the ground or issue raised [in the C.P.L. § 440.20 motion] was previously determined on the merits upon an appeal from the judgment or sentence." C.P.L. § 440.20(2)(emphasis added).[9] Here, on direct appeal, defendant raised the claim that his sentences should run concurrently and not consecutively, and the Appellate Division rejected that argument on the merits. *See People v. DeFreitas*, 213 A.D.2d 96, 97-102 (2d Dept. 1995). Thus, the claim is procedurally barred.

---

[8] Defendant's contention in his current motion that the sentences could not run consecutively because they were based on the same criminal transaction (defendant's motion, page 5), ignores well-settled case law to the contrary. *See generally Salcedo*, 92 N.Y.2d at 1021.

[9] An exception to the mandatory denial of C.P.L. § 440.20(2) occurs if there has been "a retroactively effective change in the law controlling the issue." *Id.* Defendant, however, does not allege -- let alone establish -- that there has been such a retroactive change in the law. Indeed, no such change in the law has occurred. *See generally Salcedo*, 92 N.Y.2d at 1021-22.

More specifically, on direct appeal, defendant argued in his brief that the court should not have imposed consecutive sentences because, inter alia, the crimes were "factually interrelated and should be considered as one event for sentencing purposes." *See* Exhibit 1, page 44.   Respondent opposed that argument, recognizing that the Second Department had "repeatedly held, consecutive sentences are permissibl[e] for separate crimes that occurred in the course of a single, extended transaction," and the numerous crimes defendant committed were distinct.   Exhibit 2, page 41, n.*

In affirming defendant's conviction, the Appellate Division thoroughly discussed and rejected the claim -- raised in defendant's brief -- that trial counsel provided ineffective assistance. *See id.* at 97-101.   In addition, the court found that there was "no merit" to defendant's "other contentions." *Id.* at 102.   Thus, since the consecutive-sentence claim was one of the "other" issues that defendant raised on appeal (apart from his ineffective-counsel claim), the appellate court's finding of "no merit" applied to that sentencing claim.

The Trial Court's Perusal Of His Trial Notes
Did Not Render Defendant's Sentence Unlawful.

Misconstruing the record and the law, defendant contends that he should be re-sentenced because the court relied "solely" on its trial notes when sentencing defendant, and defendant was not provided an opportunity to examine those notes

for accuracy.  *See*  Points I and II of defendant's memorandum of law.   This Court should reject defendant's contentions as meritless.

Defendant cites to no law that prohibits a judge from consulting his or her trial notes prior to making a sentence determination.  Defendant also cites to no law that sets forth that a sentence is invalid if a judge consults trial notes before imposing a sentence.[10]  Defendant's failure is unsurprising.  Case law is long-established that a sentencing court is in an advantageous position to determine an appropriate sentence *because* it had the opportunity to observe the defendant and was familiar, first-hand, with the facts and circumstances underlying the conviction, as adduced through the evidence at trial.  *See People v. Junco*, 43 A.D.2d 266, 268 (1st Dept.), *aff'd*, 35 N.Y.2d 417 (1974); *see also Chilson*, 133 A.D.2d at 934; *People v. Suitte*, 90 A.D.2d 80, 85 (2nd Dept. 1982). Thus, the sentencing judge's review of his trial notes, which, as he stated, "refreshed" his recollection of his impressions at trial (S. 4), was conduct well within the court's discretion and did not render defendant's sentence invalid.[11]  *See Chilson*, 133 A.D.2d at 934 ("assuming, arguendo, that County Court did rely upon its

---

[10] Indeed, a case that defendant cites on page 2 of his memorandum of law to support his contention that the court wrongly referred to its trial notes in determining a sentence -- *People v. Chilson*, 133 A.D.2d 931 (3rd Dept. 1987) -- actually supports a contrary position.  That is, *Chilson* recognized that, in determining a sentence, a court *may* properly rely upon subjective impressions formed during its observations at trial.  *Id.* at 934.

[11] The sentencing minutes are attached hereto as Exhibit 3.  Numbers in parenthesis preceded by "S" refer to the pages of the sentencing minutes.

subjective impressions in determining defendant's sentence, County Court could properly do so in the exercise of its discretion to determine an appropriate sentence").

Defendant's claim that the sentence imposed was *solely* the product of the judge's review of his notes ignores that the sentence was pronounced after the court listening to comments by defense counsel and the prosecutor regarding sentence (S. 2). Also, defendant does not dispute that a pre-sentence report was issued in this case.[12]

Defendant's claim that he was entitled to inspect the judge's notes for accuracy also find no support in the law. Notably, the court stated that it used it notes to *refresh* its recollection and impressions at trial, not that it was considering its notes to be evidence adduced at trial (S. 4).. And, as noted above, a court *may* properly rely on its impressions of evidence at trial in imposing sentence. *See Chilson*, 133 A.D.2d at 934.

Moreover, defendant's suggestion that the notes *might* have been inaccurate is based on nothing more than sheer speculation, which cannot provide a basis for C.P.L. § 440.20 relief. *See generally* C.P.L. § 440.30(1)(a),(4)(b) (motion must contain sworn allegations substantiating or tending to substantiate all essential facts).

* * * *

In sum, defendant's contention that his sentences should have run concurrently rather than consecutively is procedurally barred because the Appellate Division has

---

[12] In his motion, defendant includes a June 7, 2018, letter attributed to his trial counsel, wherein mention is made of the existence of the pre-sentence report.

already rejected that claim on the merits, and there has been no retroactively effective change in the law controlling that issue.  Furthermore, defendant's claim that his sentence is invalid because the judge reviewed his trial notes prior to sentencing defendant, without, sua sponte, giving them to defendant to review for accuracy, finds no support in the law. Indeed, the court's conduct was well within its discretion and did not render defendant's sentence unlawful.

7

CONCLUSION


Defendant's C.P.L. § 440.20 Motion Should Be Denied.



Dated:  Mineola, New York
         November 9, 2018



                              Respectfully submitted,

                              MADELINE SINGAS
                              District Attorney, Nassau County
                              *Attorney for Respondent*
                              262 Old Country Road
                              Mineola, New York  11501







Judith R. Sternberg
Andrea M. DiGregorio
    Assistant District Attorneys
       of Counsel







8