# EXHIBIT 5

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, --against— JESSE FRIEDMAN, Defendant. | NOTICE OF MOTION TO VACATE CONVICTION PURSUANT TO CPL § 440.10 Indictment Nos. 67104, 67430, 69783 |

PLEASE TAKE NOTICE, that upon the annexed affirmation of MARK GIMPEL, counsel for defendant, JESSE FRIEDMAN, the annexed affidavits, the accompanying exhibits, and the defendant's Memorandum of Law, the defendant will move this Court, at 262 Old County Road, Mineola, New York, 11501, on January 23, 2004, at 9:30 a.m., or as soon thereafter as counsel may be heard, for an order, pursuant to Criminal Procedure Law § 440.10, vacating the defendant's conviction, or ordering an evidentiary hearing to determine this motion, on the grounds of violation of the defendant's right to disclosure of exculpatory evidence within the meaning of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), and the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Art. I, § 6 of the New York State Constitution.

Respectfully submitted,

MARK GIMPEL
870 United Nations Plaza
New York, New York 10017
(212) 308-3430

Attorney for Defendant Jesse Friedman

RECEIVED JAN -9 PM 3:03 NASSAU COUNTY

Dated: New York, New York
January 8, 2004

Gimple Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---

THE PEOPLE OF THE STATE OF NEW YORK, :

-- against -- :

JESSE FRIEDMAN, :

Defendant. :

---

AFFIRMATION OF MARK GIMPEL

Indictment Nos. 67104, 67430, 69783

MARK GIMPEL, ESQ., an attorney duly admitted to practice in the courts of the State of New York, hereby affirms, under penalties of perjury, that the following is true and correct:

1. I am the attorney for the defendant in the above-captioned case, Jesse Friedman, for the purpose of bringing the instant motion to vacate his conviction for first degree sodomy and related charges, pursuant to N.Y. Crim. Proc. Law § 440.10 (1) (h), based upon newly discovered evidence that the People wrongfully withheld evidence favorable to the defense and material to the outcome of the case. I submit this affidavit, upon information and belief, in support of Mr. Friedman's motion.

2. The procedural history and factual record of this case, taken from official court records and transcripts, is set forth in the accompanying Memorandum of Law in support of defendant's motion, which I incorporate by reference into this affirmation. Defendant pled guilty before Judge Amy Boklan (retired) on December 20, 1988. Defendant contends, as set forth in his Memorandum, that his state and federal right to due process was violated by the People's conduct in failing to disclose evidence favorable to the defense, or Brady material.

3.      Forty-one exhibits accompany the instant motion, as follows:

| | |
|---|---|
| Exhibit 1 | Indictment 67104 |
| Exhibit 2 | Indictment 67430 |
| Exhibit 3 | Indictment 69783 |
| Exhibit 4 | Affidavit of United States Postal Inspector John McDermott in Support of Search Warrant, dated November 3, 1987 |
| Exhibit 5 | Transcript of Interview with Detective Sergeant Fran Galasso (in two parts) |
| Exhibit 6 | Transcript of the film, "Capturing the Friedmans" |
| Exhibit 7 | Affidavit of Detective William Hatch, in Support of Search Warrant, dated November 24, 1987 |
| Exhibit 8 | Inventory of November 3, 1987 Search |
| Exhibit 9 | Alvin E. Bessent, *Dragnet Is Out For Porn Photos In Child-Sex Case*, NEWSDAY, February 8, 1989 |
| Exhibit 10 | Richard Esposito, *Ex-Teacher Focus of Porno Probe*, NEWSDAY, November 13, 1987 |
| Exhibit 11 | Transcript of Interview with Detective Anthony Sgueglia (in two parts) |
| Exhibit 12 | Inventory of Property Seized in November 25, 1987 Search |
| Exhibit 13 | Shirley E. Perlman, *Teen Told: Stay Away From Kids*, NEWSDAY August 9, 1990 |
| Exhibit 14 | Blueprint of Lower Level of Friedman House |
| Exhibit 15 | Douglas J. Besharov, *Lessons from the McMartin Case*, THE CHRISTIAN SCIENCE MONITOR, February 9, 1990 |
| Exhibit 16 | Transcript of Federal Sentencing of Arnold Friedman, March 28, 1988 |
| Exhibit 17 | Demand for Discovery, April 11, 1988 |

| | |
|---|---|
| Exhibit 18 | Letter from Assistant District Attorney Joseph Onorato, dated April 18, 1988 |
| Exhibit 19 | Omnibus Motion, April 15, 1988 |
| Exhibit 20 | People's Affirmation in Opposition to Defendant's Omnibus Motion, May 10, 1988 |
| Exhibit 21 | Decision on Omnibus Motion, July 14, 1988 |
| Exhibit 22 | Minutes of Arraignment and Proceedings on Indictment 69783, November 15, 1988 |
| Exhibit 23 | Order to Show Cause, April 15, 1988 |
| Exhibit 24 | Mike Brennan, *100 Kids Linked to Teacher in Sex-Attack Case*, NEW YORK POST, November 27, 1987 |
| Exhibit 25 | Michael Hanrahan and Richard Sisk, *AIDS Tests Sought: L.I. Prosecutor Asks Check of Teacher & Son in Abuse Case,* NEW YORK DAILY NEWS, November 28, 1987 |
| Exhibit 26 | Alvin E. Bessent, *The Secret Life of Arnold Friedman*, NEWSDAY, May 28, 1989 |
| Exhibit 27 | Transcript of Interview with Gregory Doe (in three parts) |
| Exhibit 28 | Taped Interview of Gary Meyers |
| Exhibit 29 | Bill Van Haintze and Alvin E. Bessent, *New Arrest in Child Sex Case*, NEWSDAY, June 23, 1988 |
| Exhibit 30 | Alvin E. Bessent, *Teen Faces 37 New Sex Charges*, NEWSDAY, June 24, 1988 |
| Exhibit 31 | William S. Dobkin, *Great Neck Community Marshals its Resources to Deal With Child Abuse and Child-Sex Crime*, GREAT NECK RECORD, February 4, 1988 |
| Exhibit 32 | Temple Beth-El of Great Neck Panelists of Sexual Abuse of Children Program, November 16, 1988 |
| Exhibit 33 | Letter from District Attorney Dennis Dillon and Barry W. Grennan, March 26, 1990, to Inspector Robert Olsen |

| | |
|---|---|
| Exhibit 34 | Presentation Summary for "Child Pornography and Extrafamilial Child Sex Abuse" |
| Exhibit 35 | Debbie Nathan, *The Ritual Sex Abuse Hoax*, THE VILLAGE VOICE, January 12, 1990 |
| Exhibit 36 | Henry G. Miller, *Learning to Love: The Trial Lawyer's 14 Challenges*, NYSBA JOURNAL, September 2001 |
| Exhibit 37 | Izzo Deposition Excerpts (Detective Wallene Jones and Detective Nancy Myers) |
| Exhibit 38 | Letter from parent to Dr. Sandra Kaplan |
| Exhibit 39 | E-mail from NoleDreamer24@aol.com |
| Exhibit 40 | VHS tape of "Capturing the Friedmans" |
| Exhibit 41 | VHS tape of additional DVD material from "Capturing the Friedmans" |

4. Two of the affidavits annexed hereto, the Affidavit of David Kuhn, Esq., and the Affidavit of Andrew Jarecki, contain facsimile signature pages. We will provide the original signature page upon receipt.

5. Defendant has not previously moved for relief pursuant to Art. 440.

WHEREFORE, for the foregoing reasons and for the reasons set forth in Mr. Friedman's motion papers and Memorandum of Law, Mr. Friedman requests that his motion be granted or, at the very least, that an evidentiary hearing be held.

MARK GIMPEL
870 United Nations Plaza
New York, New York 10017
(212) 308-3430

Attorney for Defendant Jesse Friedman

Dated: New York, New York
January 6, 2003

Friedman Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant.

---------------------------------------------------------------x

AFFIDAVIT OF JESSE FRIEDMAN

Indictment Nos. 67104, 67430, 69783

JESSE FRIEDMAN, hereby declares under penalty of perjury that the following is true and correct:

1. I am the defendant in the above-captioned case. This affidavit is submitted in support of the accompanying motion to vacate my conviction pursuant to CPL 440.10 (h). I make the affidavit based upon personal knowledge and upon information and belief.

2. I grew up in Great Neck N.Y. with my parents, Elaine and Arnold, and my older brothers, David and Seth. We lived at 17 Piccadilly Road.

3. During the day, my mother ran a "playgroup" daycare center for toddlers in our home for toddlers. My father conducted computer classes after school for local children ranging in age from 8 to 11.

4. My father began conducting these after-school computer classes in our home around 1982. In September 1984, when the high school student who had been assisting my father with the classes left for college, I began working as an assistant to my father. I was fifteen years-old, and in tenth grade at the Village School in Great Neck.

5. My responsibilities as an assistant to my father consisted largely of preparing the room for the computer class, and cleaning up the room when the class was over. I would come home from school, put away the toddler toys from my mother's playgroup, and then set up for the computer class. I would set up the tables, computers, monitors, printers, and chairs. I would also run all the extension cords and set up the blackboard. When the class was over, I would take everything down, put all the computer equipment back in the closet, and leave the room ready for my mother to use in the morning for her playgroup. During the classes I helped supervise the children, and maintain order. For example, I would make sure that they did not run around, trip over wires, get into fights, or throw things at each other. I would also generally help out with the computer instruction.

6. The computer classes usually had eight or nine students, as we had space for nine computers – one computer per student. There would be two or three classes per week throughout the entire school year. Courses were offered in three sessions during the school year (starting in September, January, and April) at different levels (beginner, intermediate, and advanced). Once a group was formed, the children would progress through to the advanced course-level, and would tend to re-enroll as a group. Enrollment steadily increased over time. My father also gave classes for adults that were equally well-attended.

7. Our neighbors often expressed annoyance at the constant stream of children entering and leaving our house. During the day, the neighbors weren't happy about the noise from the toddler playgroup in the backyard. After school,

they weren't happy that computer students would congregate in front of the house talking before and after class, and that people would arrive to pick them up, often honking their horns or parking and talking to each other while waiting for their children. To avoid disturbing our neighbors, we always asked the parents not to honk. One of my jobs was to look out for parents arriving to pick up their children, and to help the children quickly to their parent's car so their parent would not honk or loiter.

8. When I left for college at SUNY Purchase in September 1987, my father, on the recommendation of a high school computer teacher in Great Neck, hired Michael Shapiro, a Great Neck high school student, to take over my job as his assistant in the classes.

9. On November 3, 1987, a postal inspector, John McDermott, dressed as a letter carrier got my father to accept a "controlled delivery" of a child pornography magazine. Another postal inspector had posed as a devotee of child pornography and had been corresponding with my father ever since July 1984, when agents of the United States Customs Service had intercepted a magazine at Kennedy Airport containing child pornography sent from the Netherlands and addressed to my father. Our house was searched, and federal agents seized items including approximately twenty magazines containing child pornography. They also found out that my father was conducting computer classes in the home, and a list of names and phone numbers of eighty-one students in the computer classes.

10. On November 4, 1987, Sergeant Fran Galasso, head of the Nassau County Police Department's sex crime unit, was given the list of names seized the

day before in the search. At this point, Galasso started an investigation into possible child sexual abuse. She sent out two-detective teams to interview the children who, according to the list, had attended the classes. We were unaware that the children on the list were being interviewed about child sexual abuse. This interview process would continue for the next twelve months.

11. On November 25, 1987, I was arrested, as was my father, on a felony complaint alleging child sexual abuse. My bail was originally set at $500,000, and my father's at $1,000,000. On December 2, 1987, the Appellate Division Second Department ordered that my bail be reduced to $100,000. I posted bond shortly thereafter. At this point, my father and I realized that detectives were interviewing children who attended the computer classes about possible allegations of child sexual abuse.

12. On December 9, 1987, my father and I were arraigned on indictment number 67430, a 54-count indictment charging sexual abuse of five children. The charges included sodomy in the first degree, sexual abuse in the first degree, using a child in a sexual performance, and endangering the welfare of a child. Ten of the counts in the indictment pertained to me. Both my father and I entered pleas of not guilty before Judge Abbey Boklan.

13. On January 13, 1988 my father posted bond and was released to house-arrest. On February 8, 1988 my father pled guilty in federal court to one count of sending a child pornography magazine through the U.S. mail.

14. On February 9, 1988 my father and I were arraigned on indictment number 67104, a 91-count indictment based on the complaints of eight children,

charging sodomy, sexual abuse, and endangering the welfare of a child. Thirty-five counts of the indictment pertained to me.

15. The case resulted in massive media coverage. Still photographers and a television camera from News 12 (Long Island) photographed and filmed the arraignment. Even though the charges were of an explosive nature, Judge Boklan made no effort to restrict media coverage. Prior to the arraignment, Judge Boklan had approved an application for media coverage of the proceeding. Judge Boklan continued to grant media requests to cover the proceedings, and she ultimately granted permission for all media applications.

16. On March 25, 1988 my father pled guilty before Judge Boklan to charges of sodomy in the first degree (8 counts); sexual abuse in the first degree (28 counts); attempted sexual abuse in the first degree (4 counts); and endangering the welfare of a child (2 counts) in full satisfaction of both indictments, in exchange for a sentence of ten to thirty years in prison. My father believed that being present as a codefendant at my trial – especially having been convicted of sending child pornography through the mail -- would ruin any chance for me to be acquitted.

17. After my father's guilty plea, on the evening of March 25, 1988, he gave the police what his attorney, Jerry Bernstein, described to us a "close-out" statement. My whole family waited at the police station while my father made this statement to the police. The purpose of the statement, we were told, was to enable the police to "close-out" their files on the case. My father provided a lengthy Q&A to the Nassau County sex-crimes detectives. He was asked to

confirm that he had molested each of the children on the police list of students. The police explained to him that if he did not confess to these other acts of sexual abuse he could be re-arrested and charged with such acts. Jerry Bernstein told us that my father would be granted immunity to any such acts that he confessed to – accordingly, he confessed to misconduct with regard to every child the police named. Bernstein told my father that any child whom he declined to admit molesting could be the source of further charges against him. The police later used this statement when they continued questioning other children about me.

18. My father's guilty plea proceeding was also filmed by the television press. On April 15, 1988 I made a motion for a change of venue, which was denied by Judge Boklan.

19. On May 13, 1988, my father was sentenced by Judge Boklan to an indeterminate sentence of ten to thirty years, in accordance with his plea agreement.

20. On June 22, 1988, Ross Goldstein, an acquaintance of mine from the Great Neck Village School, was arrested on a felony complaint and charged as my co-defendant. Goldstein was a year behind me in school, and we had met in September of 1986. We were both charged with crimes that allegedly took place before we had ever met one another. Sixty-eight of the charges against Goldstein in Ind. # 69783 took place prior to our meeting. Ross Goldstein was not a close friend of mine, and had visited my house no more than three times.

21. On June 23, 1988 I surrendered to Nassau County police for arrest on new charges.

22. On June 24, 1988 I was arraigned on 37 new charges of child sexual abuse that allegedly took place during the computer classes. I was also charged with photographing students while they were being sexually abused by others, including Ross Goldstein (Ind. #69783 counts 201, 202, 203, 204, 194, 195) and also photographing students during sexual games such as "Simon Says", "Leap Frog", and "Super Hero" (Ind. #69783 counts 191, 192, 193). I was also charged with photographing students while they engage in sexual acts with my father (Ind. #67104 counts 4, 5).

23. In the days immediately following his arrest, Ross Goldstein was offered a sentence of 2-6 years in exchange for testifying against me. He declined the offer. He was then offered a 1-3 years sentence and again declined the offer. The police attempted to intimidate two of Ross Goldstein's friends into testifying against both Ross Goldstein and myself. When they were unable to arrest either of them, the D.A. went back to Goldstein and offered him six months in the county jail, five years probation, and a youthful offender adjudication in exchange for his testimony as states witnesses against me. Ross Goldstein accepted this offer.

24. On September 8, 1988 Ross Goldstein entered into an agreement with prosecution to cooperate in exchange for a promise that the District Attorney's Office would recommend that his sentence include six months of jail time, five years probation, and a youthful offender adjudication.

25. On November 15, 1988 I was arraigned on indictment No. 69783, a 302-count indictment charging me and Ross Goldstein with sodomy, sexual

abuse, and endangering the welfare of a minor against six children. One hundred and ninety-eight of the counts were against me. My bail conditions remained unchanged.

26. I began to give serious consideration to the option of pleading guilty to the charges. Under the circumstances it began to look like the only sensible course to follow. I was convinced that I would lose a trial, and that I would be in prison for the rest of his life. I was subjected to pressure from my attorney, Peter Panaro, who informed me that I could never win a trial, and that Judge Boklan would sentence me consecutively on every count after a conviction at trial. Panaro told me that he obtained this information directly from Judge Boklan during a conference with her. Judge Boklan was the former head of the Nassau County District Attorney's Office Sex Crimes Unit, and had a reputation as a tough judge, especially when it came to sex crimes.

27. I was only 19 years old, and my father had already pled guilty and been sent to prison. My mother placed tremendous pressure on me to plea bargain rather than fight the accusations at a jury trial. I knew that I was not guilty of the charges, and I also believed on one level that I should go to trial, but I was terrified and exhausted by the stress of the disintegration of my family. I believed my mother when she said that if I were to be convicted in a jury trial I would be incarcerated for the rest of my life. I knew that if I pled guilty I would eventually be released from prison.

28. Judge Boklan had permitted media news cameras to be present in the courtroom during my hearings and appearances; virtually every media

application submitted to her was approved. The media in Nassau County had been completely unfavorable, and her acceptance of all the applications further persuaded me that she was not an impartial Judge and that I would not have a fair or balanced trial.

29. The media was not sympathetic to my case, and the coverage was mainly about how to detect child sexual abuse and how to help victims of sexual abuse. There were no stories that question whether or not the children were actually abused or suggested that I or my father might be innocent. Thus, I was convinced that no one in Nassau County would ever find me innocent of the charges. In June 1988, *Newsday* published a story that discussed how my father "identified about 80 boys he had sexually abused". This was a reference to the close-out statement that had been shared by the police with the media. (Source: NEWSDAY, June 24, 1988)

30. The community of Great Neck had reached a moment of hysteria about the case. The P.T.A. in Great Neck organized letter-writing campaigns, community meetings, and car-pooling arrangements to get community members to attend court appearances. The newspapers in Great Neck published numerous stories about the case, describing community meetings and saying that every student who ever attended a computer class should seek therapy to help prevent future problems. In December, 1987, the *Great Neck News* reported that Detective Galasso advised parents to seek professional counseling for their children who were involved in any way, and the Great Neck North Middle School Principal Ira Gordon announced over the school's loud speaker that if any students wanted to

talk, staff was ready and willing. Dr. Edward Brandon, the school psychologist, asked teachers to be on the look-out for unusual behavior and comments, and to report to him if there were any problems. Meetings were held in December 1987, and January 1988 in Great Neck about the case. Detective Galasso attended these meetings, as did Dr. Sandra Kaplan, the therapist treating many of the alleged victims of sexual abuse. (Source: *Great Neck Record* February 4, 1988) In November 1988 a local synagogue, Temple Beth El in Great Neck, held a community meeting focusing on the subject of "Child Abuse One Year Later", and a discussion on how to prevent child sexual abuse. Dr. Kaplan was joined at the meeting by Detective Galasso and talked about sexual abuse, warning signs in children, and about the abuse alleged in the computer classes. In November 1988, the *Great New News* reported that Dr. Kaplan and Detective Galasso believed that any child who had contact with Arnold Friedman, no matter how minimal, should be considered a victim.

31. My father, a co-defendant, had already pleaded guilty. We were indicted on numerous counts on a theory of aiding and abetting. It was frightening to think that a jury would know all about his confession (due to the pervasive media coverage of the case) and that my attorney would be asking these jurors to find me not guilty on the very same counts.

32. There were also other factors that influenced my decision to plead guilty. Ross Goldstein had agreed to the offer of six months county jail time, five years probation, and a youthful offender adjudication – and was going to testify against me as a State Witness. There was a chance that a jury would take into account that Goldstein's cooperation had been induced by the promise of a six month

sentence, instead of the decades of imprisonment he would otherwise have faced. However, I knew how detrimental his testimony as an adult witness would likely be at my trail. I was told by my lawyer that Detective Galasso said she was investigating my brothers and that if I insisted upon a trial one or both of my brothers would be arrested. Two additional suspects were named, indicted under pseudonyms but never arrested, and many of my high school friends were being pursued for questioning by the police. I took the threats by Detective Galasso against my brothers and my friends seriously, as Ross Goldstein had already been arrested and charged.

33. I was also finding it impossible to find any supportive defense witnesses. I couldn't find any students who were in the classes, and who told the police that nothing happened and didn't press charges, who would agree to come to court and testify on my behalf. Further, my father's close-out statement was shared by Nassau County detectives with the families of computer students – specifically the non-complainants. After reading the close-out statement, where my father described sexually abusing the computer students, they were unwilling to publicly support me.

34. I was traumatized by the entire experience. I was only nineteen years old. I was financially unable to pay for clinical psychiatrist and other expensive legal expert witnesses whom I knew would be important to a trial defense.

35. On December 20, 1988, I made the painful decision to plead guilty to the charges against me. This was a desperate decision that I reached only after realizing that there was no way I could win a trial. In my view, if I lost a trial I

would go to prison for life for something I did not do. At least if I pled guilty, I would eventually get out of prison and at a relatively young age and I would have at least some chance of eventually living a normal and happy life.

36. I told Panaro that my father sexually abused me and that I grew up thinking that this was normal and acceptable behavior. I told him that I sexually abused the students in the computer classes, and that I was guilty of the charges against me. I told him this because Panaro insisted that I confess to him before he would allow me to plead guilty in court. Panaro told this story during his plea negotiations with Judge Boklan hoping to overcome an impasse in negotiations and persuade the judge who had to approve any pea deal with the prosecutor, to approve a reasonable term of imprisonment.

37. I entered into a plea bargain agreement with the District Attorney's office for indictments numbers 67430, 67104, and 69783. I pled guilty to sodomy, first degree (17 counts); sexual abuse, first degree (4 counts); attempted sexual abuse, first degree (1 count); use of a child in a sexual performance (1 count); and endangering the welfare of a minor (2 counts) in exchange for a promised indeterminate sentence of six to eighteen years. After my plea, I was taken into custody of the Nassau County Sheriff's Department.

38. On January 24, 1989, I appeared before Judge Boklan and received a sentence of 6 to 18 years imprisonment. I told the Judge that I was guilty, but that she should have sympathy for me because my father sexually abused me and I did not understand that sexual abuse was wrong. I knew there would be television cameras in the courtroom filming my sentencing. I believed that saying

I was a victim of my father would somehow influence the parole board, and that Judge Boklan would ask the parole board for leniency. My false confession did not have the desired result, and Judge Boklan asked the parole board – in a proceeding before the televised cameras and press – to consider me a dangerous criminal and to hold me for the full eighteen years of my sentence. Once I had decided to plead guilty in exchange for a lighter sentence I could no longer say I was the victim of a witch-hunt. The best thing I could see to do was to say I had done the crimes, but that there was a mitigating circumstance behind my actions.

39. On May 3, 1989, Judge Boklan sentenced Ross Goldstein to an indeterminate sentence of two to six years in prison, in direct contradiction of the District Attorney's bargain with him, which called for a six month sentence and youthful offender status in exchange for his testimony. I read in a NEWSDAY article from May 4, 1989, that in his plea for youthful offender status Goldstein's attorney, in court, quoted Det. Galasso as saying, "[Goldstein] was not a pedophile and is not a risk to the community." On July 21, 1990, the Appellate Division overturned Judge Boklan and ordered that Goldstein's promised sentence be imposed. Goldstein was released from prison after thirteen months.

40. On February 6, 1989, only a few weeks after I entered prison, I agreed to be interviewed for the Geraldo television show. My attorney warned me against doing this, and made me sign a letter stating that I understood the risks and wanted to do it anyway. I was nineteen years old, in solitary confinement, at the very start of my prison sentence, traumatized and depressed. I went on the

show in what I believed to be a last-ditch effort to obtain public sympathy and explain myself in some way.

41. In my interview for the Geraldo show, I talked about being molested by my father and sexually abusing children in the computer classes with my father. Less than three weeks earlier I had been sentenced in court to these very charges, I had told this same story about being molested by my father, and I saw no reason not to continue with the false story. My mother participated in the show and so did my lawyer – even though he advised me against participating. I was in a fragile state and am ashamed about going on the Geraldo show. I did this for the same reasons that I told Judge Boklan that I was sexually abused. I was facing a long sentence and had pled guilty to having sexually abused numbers of young and helpless boys.

42. I was rationally terrified about being attacked and abused in prison by other inmates and corrections officers, and I believed that they might see the show and have sympathy for me. I was aware that child molesters were not treated well in prison, and I hoped that if they believed I was a victim myself I might be treated differently. When I had been in the Nassau County jail prior to posting bond, I had been assaulted by security staff on more than one occasion. Urine was thrown on me. My mother was a member of a group in Nassau County called "Prison Families Anonymous", and I had attended a number of these meetings and had heard only frightening things about being a child molester in prison. Before I went to prison, I had met with a counselor at the Fortune Society in New York City, and he shared with me a realistic and horrific picture of what

prison would be like for a convicted young, white, homosexual-child-molester. I felt that my only hope for survival in prison was to claim that I too had been a victim of my father and pray for sympathy and compassion.

43. I continued to present this version of events, in statements to the media, until several months after my conviction, when I entered the general prison population and was instructed by other inmates that this story would be of no avail. I learned that no series of mitigating circumstances would persuade the Parole Board to release me. While in prison I was denied parole four times because my instant offense demonstrated a propensity for extreme violence, and due to my failure to complete a sex-offender therapy program.

44. On August 23, 2000, the Time Allowance Committee at Coxsackie Correctional Facility denied me release and withheld a year of good-time credits because I failed to successfully participate in a sex-offender therapy treatment program.

45. In December 2000, my brother David told me that he would be featured in a documentary about children's entertainers directed by Andrew Jarecki. He was excited because he felt this would enhance his status as the number one children's birthday party clown in New York City.

46. In January 2001, my brother David was devastated, and told me that Jarecki has "discovered" the secret about me and my father, and that the film would include information about my arrest and conviction. I, too, became distraught because I didn't want to be involved in what I am was told by David would be a film that would destroy his career and perhaps hurt my chances for a

future of a normal life even more. We retained an attorney in an effort to force Jarecki not to make his film.

47. On March 6, 2001, I received my first letter from Jarecki. He introduced himself, explained his plans to make a film featuring my family. He wanted to travel to the prison to visit me and interview me on camera for his movie.

48. On April 4, 2001 Andrew Jarecki and Marc Smerling, one of the films producers, visited me in prison against the wishes and demand of my attorney. He made it clear that he was going to make his movie, and that he had the financial resources to do so with or without my cooperation.

49. After months of negotiation and conflict, my brother David and I agreed to participate in the film. We realized that our participation was our only hope to have our story told in a sympathetic way, as we knew the film would be made with or without our cooperation.

50. Andrew Jarecki made his film, *Capturing the Friedmans*, without any Friedman family members having any input on creative matters or content. We eventually shared our family documents (including video tapes, letters, tape recordings, etc.) with him because we became convinced that he wanted to make a fair and objective film about what happened to our family.

51. Until he finished making the film, Jarecki did not share information with me about his investigation into the case.

52. On December 7, 2001, I was released from Clinton Correctional Facility, in Dannemora, New York, after serving thirteen years of my sentence. I

was released to "Intensive Parole Supervision" including a 7:00 pm nightly curfew, an electronic ankle bracelet, and mandatory three-times-a-week sex offender therapy.

53. On January 1, 2, and 3, 2002, I sat for a lengthy on-camera interview with Jarecki.

54. On January 7, 2002, Judge Abbey Boklan held a sex offender registration classification hearing. Her determination was to classify me a level three "violent sexual predator."

55. On March 16, 2002, I sat for a second on-camera interview with Jarecki.

56. On January 10, 2003, I saw a rough cut of *Capturing the Friedmans* for the first time during a private screening for family members. This gave me some hope that I might be able to overturn my conviction.

57. Beginning in February, 2003, I made repeated unsuccessful efforts to obtain copies of the transcripts from my guilty plea and sentencing from the Nassau County Court.

58. On June 1, 2003, I met Ron Georgalis for the first time while at the Angelika Film Center after screening of *Capturing the Friedmans*. He told me that he was in the classes and nothing happened – and that he is willing to help in any way that he could. On, June 4, 2003, I received an e-mail from Jamie Forrest, another student in the classes, who also told me that nothing happened – and that he too was willing to help me in any way that he could help.

59. On June 28, 2003 I received an e-mail from NoleDreamer24@aol.com from Florida saying how he was one of my father's students in the computer classes, that he never saw my father do anything to any student, and that he believed I was 100% innocent. I subsequently learned from Ron Georgalis that NoleDreamer24@aol.com is Jeffery Leff (formerly Meyers).

60. On July 7, 2003, I meet with Andrew Jarecki; Earl Nemser, Esq.; Joel B. Rudin, Esq., and my brother David to discuss legal options of filing a post-conviction motion. At this meeting Jarecki promised that he would allow me access to any of the materials he had regarding my case to use in challenging my conviction. At this point, I realized that it might be possible to clear my name and to explain what happened and why I pled guilty 14 years ago.

JESSE FRIEDMAN
305 East 105th Street
New York, New York 10029

Dated: January 5, 2004

Sworn before me this 5th
Day of January ____, 2004

JUDITH M. ABRAHAM
Notary Public, State of New York
No. 31-4715173
Qualified in New York County
Commission Expires March 30, 2006

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

---------------------------------------------------------------x

AFFIDAVIT OF
ANDREW JARECKI

Indictment Nos.
67104, 67430, 69783

ANDREW JARECKI hereby swears, under penalties of perjury, that the following is true and correct:

1. I am a documentary filmmaker living in New York City.

2. In fall 2000, I had decided to make a film about children's birthday party entertainers in New York City. One possible subject of the film was David Friedman, an older brother of Jesse Friedman, the defendant in the above-captioned case, who had become one of the most popular of these performers.

3. While doing research, I became aware that David's father and brother had been the defendants in a notorious child sex abuse case in Long Island. Over time, as I became more and more interested in that story, my film evolved into an examination of the Friedman case.

4. During a three-year investigation, I sought to interview as many of the children involved in the case as possible, including the alleged child victims. I was able to obtain verbal or filmed interviews with approximately twenty-five of the students, now in their mid to late twenties, who had attended the computer classes. These included approximately five who had become complainants in the indictments, and about twenty non-complainants, many of whom had attended classes alongside those who had claimed to have

been violently abused. I also spoke to prosecutors and law enforcement personnel connected to the case, as well as attorneys, relatives, and others.[1]

5. Jesse Friedman sat for two interviews with me for "Capturing the Friedmans". In accordance with my desire to make an objective and impartial film, I did not share with him the evidence we discovered in making the film. He was not part of the film making team, and he did not see any of the footage from the film until he viewed the film in full in January 2003. He was not compensated in any way for his participation, nor were any other members of the Friedman family.

6. During work on the film, I learned that Ann Meyers, the mother of one of the computer students, had made a secret tape of the police interview with her son (using a video camera, though only the audio portion was recorded), conducted by Detectives Hatch and Jones, because they would not allow her to be present when they were questioning her son. I was informed of this by Peter Panaro, Jesse's attorney, who told me that while Anne Meyers did not provide him with a copy of the tape, she allowed him to view and listen to it, and he transcribed the interview verbatim. Panaro allowed me to

[1] Most of the statements cited in the memorandum of law in support of Jesse Friedman's motion to vacate his conviction are contained either in the transcript of the film itself, or transcripts of several of the full interviews conducted in making the film. These transcripts are included as exhibits to the motion. Several of the other statements cited, not included in film, were part of the full length interview tapes made for the movie, and have neither been transcribed nor, because they are voluminous, provided to the court. Cites to these statements in this affidavit include their location on these tapes. These tapes will be made available at the court's request. Still other statements were made at filmed public forums regarding the film that have not been transcribed, in which police officers, former students in the Friedmans' computer classes, and others involved in the case participated. These statements appear in the videotape – "Capturing the Friedmans: DVD Extra Material" ("CTF-Extra") – that was submitted to the court with defendant's motic... The location of statements that appear on this tape is indicated parenthetically in this affidavit. In addition, this affidavit sets forth a telephone message left on the Friedmans' answering machine in 1988.

type his handwritten transcription, which I did. The typed version is an exhibit to this motion.

7. In making the film, I interviewed Judge Abbey Boklan, who presided over the case. At one point, Judge Boklan described the nature of Brady material to me:

> Brady material, I don't know if you're familiar with that. That's material that would be favorable to the defense. For example, [i]f there was a young child, hypothetically, who said oh no, none of this occurred . . . . That would have to be handed over immediately, immediately upon reaching the hands of the district attorney's office. (Tape 51 at 33 minutes).

9. Judge Boklan described the atmosphere surrounding the case as a "media frenzy", and she also told me that the Friedman case was the first case in the history of Nassau County in which, with her permission, cameras were allowed in the courtroom. She described her decision to allow cameras in the courtroom:

> Well, I listened to the defense attorneys, who were opposed as I recall. The district attorney was not opposed. And of course it's his job to protect the children. It was something the community was very interested in, the media was very interested in, and I believe in open courtrooms and as long as the names of the children and the children could be protected I saw no harm in it. I wasn't that concerned about protecting the defendants. Their pictures their names were all over the newspapers, so their reputation at that point was not too good. (Tape 47 at 10 minutes).

10. I also interviewed Joseph Onorato, the assistant district attorney in charge of the Friedman case. He told me during his interview that no photographs or videotapes of Jesse Friedman or Arnold molesting the children were ever found, during the federal search or at any other time: "In the best case scenario you would like to find videotapes of Mr. Friedman actually sexually abusing the children or at the very least some photographs of some of the children in some sort of compromising sexual positions. We didn't find any of that." (CTF-Extra "The Investigation"). Detective Galasso also told me that the Friedmans

had made pornography using the computer students, but that "nothing ever materialized." (CTF-Extra "The Investigation")

11. I also spoke to "John Roe", one of the two teenagers who was arrested in the case but never charged. John Roe described to me the night he was arrested:

> I was stopped by an unmarked police car and told to get in the vehicle and wasn't ever told why, where I was going or what I had done wrong. Every time that I inquired, all I was told is, "you'll see when we get there." And they took me to, right near Old Country Road in Mineola, where there was a police station. And in Mineola I was placed into an interrogation room. I believe what they did was illegal in that I was there for quite some time. It was hours upon hours, I would estimate ten hours without being able to call anybody, like my parents. I figured my next best shot was to call an attorney and they did not allow me to contact anybody. They basically tried to use intimidation to scare me and threaten into some sort of admission. Some of the things they said were, "We know you were there! We know you had something to do with this, so if you want to make this easier on yourself, you'd better just admit it now." You're gonna be indicted, you're gonna go to jail for this." They had me believing that I would be locked up in jail for something I never did. (CTF-Extra "Additional Suspects")

12. John Roe also told me that Ross Goldstein had implicated him in the case, and that Goldstein had later admitted that he had lied.

> I was wondering how I was pulled into this situation. At one point, the detectives alluded to the fact that Ross Goldstein decided to implicate me. I can't quite imagine what was going through his mind except for intense pressure from the police to come up with anything that seemed like cooperation, however, he implicated two of his friends that he knew had nothing to do with this. He admitted that on another occasion. He was driving around in his car, alone, as he sometimes did. We noticed his car and decided to follow him and ask him whether or not he was aware that he lied flat out about us. And he had no answer as to why, but he did admit that he lied. (CTF-Extra "Additional Suspects")

13.    Detective Lloyd Doppman attended a public screening of "Capturing the Friedmans." During a question and answer period following the screening, Detective Doppman got up to speak. Among other comments, he described the attitude of police when they went to interview alleged child victims in their homes: "We knew going in certain things had happened. We knew that." (CTF-Extra "An Altercation at the New York Premiere")

14.    During the investigation of the Friedmans, the family received numerous threatening phone calls, some of which were recorded on their home answering machine. During the making of "Capturing the Friedmans," Jesse Friedman shared some of these tapes with me. In one of the calls, not included in the film, the caller stated, "You better get out of that house 'cause we're burnin' it down tonight."

15.    The police constructed a bogus photograph at the "crime scene," combining a number of items that included several cameras, photographs removed from heterosexual magazines such as "Playboy," a number of computer floppy disks, and a hypodermic needle. Earlier photographs in the same series show that these innocuous items were each found separately in various places in the Friedman house, and that the police officers who combined them into one sinister-looking photograph, did so to create the impression that they were found together and somehow related; For example, to give the impression that the photographs from the magazine had been taken by the Friedman cameras, or that the computer discs were in some way related to the pornography.

These photographs are shown in the attached in CTF-Extra "The Investigation".

ANDREW JARECKI

Dated:  January 7, 2004

Sworn before this 7th
Day of January. 2004

STANLEY A. LEFKOWITZ
NOTARY PUBLIC, State of New York
No. 01LE4668571
Qualified in New York County
Commission Expires June 30, 2006

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
---------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

---------------------------------------------------------------x

AFFIRMATION OF
PETER PANARO, ESQ.

Indictment Nos.
67104, 67430, 69783

PETER PANARO, ESQ., hereby affirms under penalty of perjury that the following is true and correct:

1. I am an attorney duly admitted to practice law in the State of New York. I am also admitted to practice law in the United States Supreme Court, the United States District Courts for the Eastern and Southern Districts of New York, as well as other courts.

2. I represented Jesse Friedman, the defendant in the above-captioned case, from June 1988 through his sentencing in January 1989. Mr. Friedman was charged in three indictments with more than two hundred offenses involving the sexual abuse of children.

3. I make this affirmation based on personal knowledge and upon information and belief. In preparing this affirmation, I reviewed my entire legal file on this case.

4. Jesse Friedman was indicted on December 7, 1987, together with his father, Arnold Friedman, as a codefendant, for offenses involving the sexual abuse of children. A second indictment charging Arnold and Jesse Friedman with sexual abuse

was issued on February 1, 1988. When my representation of Jesse Friedman began, Arnold Friedman had already pled guilty under these two indictments and had been sentenced both in Federal court and State court. This left Jesse Friedman's charges pending trial.

5.      Notwithstanding repeated efforts by the district attorney's office to persuade me that Jesse should enter a guilty plea, my client and I were intent on going to trial. Assistant District Attorney Onorato advised me that if Jesse did not plead guilty, his office would obtain a third indictment, and that this indictment would include many more charges than both previous indictments combined, and that those charges would be much more serious. Further, Mr. Onorato stated that if this were necessary he would seek to revoke Jesse's bail and have him incarcerated pending trial.

6.      True to his word, when Jesse did not plead guilty, Onorato obtained a third indictment (No. 69783), in which Jesse was charged together with Ross Goldstein, another Great Neck teenager, as a codefendant. This 302-count indictment included 198 counts against Jesse, including more than 100 of them charging sodomy in the first degree. Additionally, Mr. Onorato did seek to have Jesse's bail revoked, an application that was denied by the then presiding judge, Judge Boklan.

7.      Immediately after arraignment on this indictment, counsel for both parties agreed that rather than commence motion practice again, a stipulation in lieu of motions and voluntary disclosure would suffice. This stipulation, dated November 17, 1988, and so ordered by Judge Boklan, directed the prosecution to "deliver to the defendant all evidence favorable to him under the authority of Brady v. Maryland."

8. Before the third indictment was handed down, I had learned from either Jesse or Arnold Friedman that Ann Meyers, the mother of one of the computer students, had secretly made a videotape of an interview with her son, conducted by Detectives Hatch and Jones. I went to Ann Meyers's house and she allowed me to watch the tape in her presence. The picture on this Betamax tape was of very poor quality, but the audio was very clear. As I watched the tape, I transcribed the interview. I later allowed Andrew Jarecki, the director of "Capturing the Friedmans", to type up my handwritten transcription, which he did accurately.

9. After Ross Goldstein was charged, Mr. Michael Connacchia telephoned my office and identified himself as an attorney who was retained to represent the co-defendant, Ross Goldstein. Mr. Conacchia told me that his client had no idea why he was involved or being charged with these crimes since he had never even been inside the computer room at the Friedman home, and never met any of these complainants. I met with Mr. Conacchia and shared my thoughts with him and the two of us began preparing for trial over the course of the next few months, meeting several times and discussing the case. At all times it was always the defendant Ross Goldstein's position that nothing ever happened and that these crimes were never committed by him.

10. On or about September 21, 1988, I telephoned Mr. Conacchia to arrange for a meeting and for the first time, Mr. Conacchia informed me that his client "had changed his mind" and would be saying that the incidents charged in the indictment did in fact take place. After pressing Mr. Conacchia for some time, Mr. Conacchia finally admitted that his client would be cooperating with the District Attorney's Office.

11.    In or about November 1988, during a conference in Judge Boklan's chambers, Judge Boklan told me that if Jesse were to go to trial she intended to sentence him to consecutive terms of imprisonment for each count that he was convicted on.

12.    Notwithstanding his protestations of innocence, Jesse informed me, on or about December 12, 1988, that he wanted to plead guilty because he believed that if he went to trial he would be found guilty and would spend almost the remainder of his life in jail. He was 19 years old at the time. Jesse told me if he pleaded guilty he would probably get out of jail by the time he was 30 years old. I told Jesse that I would not represent him on a guilty plea unless he was guilty and that I could not ethically allow him to plead guilty if he was maintaining his innocence to me.

13.    Jesse told me that he had committed the charged offenses. He also told me that not only had he had been a victim of sexual abuse by his father for many years but that his father had coerced him into participating in the molestation of the computer students.

14.    At a conference, I told the court that Jesse had informed me that he had been a victim of sexual abuse by his father for many years and that this should be considered by the court in mitigation of sentence. I reiterated this request at the sentencing of my client.

15.    Jesse and I had been extremely frustrated in our preparation for trial since no Brady material had been provided to us by the prosecution. In the absence of any physical evidence, medical evidence, or prior complaints by any computer student, the prosecution was relying entirely on new statements allegedly made by the computer students after the police questioning had begun. Accordingly, the only way for us to

refute the prosecution's case would have been to produce evidence showing that the testimony of the computer students was incorrect or not reliable. The Friedmans had been unable to contact the computer students directly for two reasons: First, upon information and belief, when Arnold Friedman had initially tried to contact some of the students, the prosecution had retaliated by revoking his bail. This was a clear warning to Jesse that he should not try to contact them himself. Second, the police had confiscated the list of computer students and their contact information, and refused to return it to the Friedmans. So our only hope was that we could get access to any Brady material that might support the position that Jesse was innocent of the charges. When we were repeatedly denied any Brady material, we realized that it would be difficult to mount a meaningful defense.

16.     While it has always bothered me that we were never provided with this Brady material, it was not until 14 years later, when I saw Andrew Jarecki's film, that I realized the enormous extent and import of the material to which we were refused access. After seeing the film, and some additional information collected by Jarecki, I now realize that the children interviewed as part of the prosecution of Jesse Friedman were subjected to numerous suggestive questioning techniques. In particular, I have learned that the interviews were characterized by leading questions, expressions of the interviewer's beliefs that Jesse Friedman was guilty, manipulation such as befriending and rewarding children to produce sex abuse claims, intimidating or threatening them when such claims were not forthcoming, and repeated interviews when children denied abuse. I also note from the film that one of the most significant complainants in the case had no recollection

of, and made no allegations of any sexual abuse until after he was hypnotized, a technique widely shown to cause false memories.

17. Subsequent to viewing the film, it became apparent to me that the children interviewed as part of the prosecution of Jesse Friedman (other than Gary Meyers, whose interview I was already familiar with) were subjected to numerous suggestive questioning techniques. In particular, I have learned that the interviews were characterized by leading questions, expressions of the interviewer's beliefs that Jesse Friedman was guilty, manipulation such as befriending and rewarding children to produce sex abuse claims, intimidating or threatening them when such claims were not forthcoming, and repeatedly interviews when children denied abuse. I have also since been advised that at least one of the children made no allegations of sexual abuse until after hypnosis.

18. The recording of the interview with Gary Meyers showed that the detectives who conducted the interview used suggestive and harassing questioning. Immediately after viewing the Gary Meyers tape, I informed assistant district attorney Joe Onorato about the interview. I made it clear to him that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable to the defense that the defense had a right to be informed of. I never received any Brady material indicating that such suggestive methods were used with any of the children interviewed by the police.

19. Had I been aware at the time of this extensive body of impeachment evidence, I would have seen the prospect of a guilty plea in a completely different light. I already found it quite incredible that sexual abuse of the scope and severity alleged could have taken place without a single child complaining or showing other signs of

abuse. I also believed that the hysteria surrounding the case could well be responsible for the ever growing number of charges, but as an attorney I had virtually no affirmative evidence with which to oppose the allegations. My common sense and logic told me that scores of children, including the 14 children who were complainants against Jesse, could not be repeatedly sodomized and sexually abused hundreds of times, over a period of four years, day in and day out, and say nothing. After all these were not 3 and 4 year old boys. They were between 8 and 11 years old. I felt that the idea that no one would have said a word, and that in fact some of the most significant complainants would sign up for multiple classes after having been violently abused in the prior classes, was ridiculous. But logic and common sense cannot substitute Brady material – real evidence that would tend to exculpate my client.

20.     In addition, Jesse's situation at the time was made even more dire by the destruction of his family support structure (with the arrest of his father and mother who was briefly arrested, and accusations threatened against his two brothers -- later shown to be totally without merit), the absence of funds required for experts who would have been necessary to prepare a meaningful defense, and the ever increasing number of charges against him (and the attendant publicity accompanying each new set of charges).

21.     It is clear to me that proper disclosure of Brady evidence could have thoroughly altered Jesse's view of his chances of prevailing at trial. If the defense had been privy to that information I believe that Jesse Friedman would certainly have opted to fight the charges against him at trial.

PETER PANARO

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

---x

AFFIRMATION OF DAVID KUHN, ESQ.

Indictment Nos. 67104, 67430, 69783

DAVID KUHN, ESQ., hereby swears, under penalties of perjury, that the following is true and correct:

1. I am an attorney duly admitted to practice law in the state of New York. I was admitted in March 1994 in the First Department. In or about early 2001, I worked as a legal advisor for the documentary film, "Capturing the Friedmans."

2. In or about March 2001, Andrew Jarecki, the director of the film, asked me to interview one of the individuals who had worked as a detective on the Friedman case – Wallene Jones. The interview was to be used in making the film.

3. Mr. Jarecki had located Detective Jones, who now lives in Atlanta, Georgia, and he had spoken to her on the phone. I called her and arranged to visit her in person so I could take down her recollections of her experience in the Friedman case. On March 10, 2001, I met with former detective Jones at her place of business, "Gems of Africa," in Atlanta, Georgia. We spoke for about an hour and a half.

4. I took careful notes when speaking to Ms. Jones. Quotations attributed to Ms. Jones in this affirmation are in her exact words.

5. Ms. Jones told me that she and her partner, William Hatch, were the lead

investigators on the Friedman case and worked from a list of former Friedman computer students provided to her by Fran Galasso. She and her partner conducted numerous interviews. They would arrive in plain clothes at the children's homes. She told me "we assumed all the kids [on the list] were involved." She stated that the detectives knew certain information about what happened, and that it was in their minds when they conducted the interviews.

6.     Jones told me that she thought she had taken notes on the interviews with children when possible.

7.     In the first home they visited, Jones and Hatch spoke to three brothers – ages eleven, twelve, and thirteen – each of whom had been a student in Arnold Friedman's computer classes. Jones recalled separating the boys from each other and from their parents for questioning. She told me that this had been done because "kids will never admit bad things in front of or to their parents." Further, she said that she thought she took notes on the interview she conducted, but could not be positive. "If I did they'd be in the file," she said. "I did not keep any of that stuff myself."

8.     She told me that the boys indicated in general terms that "something bad" had happened to them, but not with much specific detail. She told me that it was common to establish a "very good rapport" with the children, and that this was done with the three boys. However, the parents refused to have their sons sign the statements prepared by the detectives after the interview.

9.     Jones described one instance in which it took fifteen visits to a child's home before he declared that he had been abused. In interview sessions that lasted as long as four hours, the boy repeatedly denied being the victim of abuse. The boy "would

let us sit with him in his bedroom for hours, and he'd bring up every topic except sexual abuse. We played games with him, he showed us his computer, he'd do anything to avoid the subject." Jones added, "for a long time he had nothing to say, but we knew." On one occasion the boy jumped up and down, screaming, 'I have nothing to tell you! Nothing happened!' "[B]ut by then we already knew," Jones said, "so we kept coming back after that until he told us."

10. On the fifteenth visit, the detectives spoke with the boy in his room, after his mother promised to stay completely away from the boy's bedroom and not come in at all during the interview. They explained to her that they were going to stay "as long as it takes, that we were not going to leave until he told us. We were prepared to stay all night if need be."

11. The boy finally stated that he had been abused. Asked why it took the child fifteen interviews to make the accusation, Jones told me that this boy had suffered tremendous trauma and had "kept it deep inside." "I drew it out again," she said. She stated that the detectives did not return after that visit.

12. I asked Ms. Jones if there were any physical signs of abuse of the boy. She replied that she could not remember any. She remembered that on one visit, the boy shouted that "I have nothing to tell you" and that "nothing happened," but she and her partner still returned to question the boy, because they "already knew, so we kept coming back after that until he told us."

13. When I asked her about the media in the case, she told me that there had been a frenzy surrounding it, which died down after a while. She said that when another

child sexual abuse case arose, against a school bus driver named Robert Izzo, the intense attention sparked up again, as crazy as it ever was.

14. I affirm as an officer of the court to the truth of the matters asserted herein in the above document.

Dated: Nantucket, MA
January 6, 2004

1/6/04
David Kuhn, Esq.

Ron Georgalis
Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

--------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

FRIEDMAN

-- against --

JESSE FRIEDMAN,

Defendant,

AFFIDAVIT OF
RON GEORGALIS

Indictment Nos.
67104, 67430, 69783

--------------------------------------------------------------x

RON GEORGALIS hereby swears, under penalties of perjury, that the following is true and correct:

1. I am twenty-seven years old. I am currently a third-year student of anthropology at Florida State University in Tallahassee, Florida. I am now working on my master's thesis and expect to have completed my Master of Arts degree by the end of Spring 2004 semester.

2. I grew up at 16 North Road in Great Neck, NY. During the years 1985 and 1986, when I was nine years old, I was enrolled in the computer classes taught in the Friedman home at 17 Piccadilly Road. I was enrolled in the course for one term of approximately ten classroom sessions and then re-enrolled of my own volition and without hesitation for another such term. I fondly remember those Wednesday afternoon classes as both an opportunity to see my friends, Jeffrey Leff (then Meyers) and Eric Alexander. When my mother asked me if I would like to re-enroll for a third term, I declined because I felt that I was not a serious enough computer student for the classes, while a pleasant escape from the tedium of schoolwork, to have remained worthwhile.

My mother also attended adult education computing classes in the Friedman home, which she thoroughly enjoyed.

3. My memories of the computer classes themselves are overwhelmingly positive. Classes typically began with playing computer games for fun. To my knowledge, games with pornographic content, such as the game "Stroker" which was depicted in "Capturing the Friedmans," were at no time present in the classroom setting. The only game in which I recall any type of group involvement was "Eliza," a game where the computer essentially provided psychological counseling in response to one's input. Allegations of sexual group activities, such as the game "Leap Frog", also mentioned in the film, are patently ridiculous. Arnold Friedman conducted the classes, teaching the BASIC computer language and the fundamentals of designing simple programs. Jesse Friedman was there to provide assistance and presumably to also learn computer skills from his father.

4. I never witnessed Jesse touching any of the children, inappropriately or otherwise. I do not remember ever meeting either of the other Friedman sons or Jesse's friend, Ross Goldstein. The only other student not already mentioned whom I recall being in any of my classes was [redacted], who seemed to be something of a prodigy in computing.

5. During the investigation of Arnold and Jesse Friedman, the Nassau County Police Sex Crimes Unit visited our home twice. To the best of my recollection, it was during the first of these visits that both Detective Galasso and Detective Hatch questioned me in the dining alcove of our kitchen about my experiences in the classes. I told them that nothing happened to me. I remember vividly being taken into our

computer room alone with Detective Hatch, where he showed me the computer program, "Jerky Mouse," confiscated from the Friedman home. The program, which he told me had been confiscated from the Friedman home, consisted of a cartoon mouse masturbating. I told him that I had not ever seen it before. The detectives seemed to give up and leave. The second visit was made by Galasso alone. I remember extremely well that she spoke to my parents in the kitchen with the louver doors closed to keep me from hearing them. I eavesdropped through the doors and recall her telling my parents authoritatively that I had been both sodomized and forced to engage in oral sex with Arnold and that he had admitted in a jailhouse confession that I "was his personal favorite." I do not remember being given any opportunity to counter this charge and deny that anything of the sort had taken place.

6. I can also confirm that the identity of the individual with the e-mail account and screen name "NoleDreamer24@aol.com" is Jeffrey Leff (formerly Jeffrey Meyers.)

7. In conclusion, I can state without reservation that I did not experience any form of abuse, sexual or otherwise, during the Friedmans' computer classes at 17 Piccadilly Road, nor did I witness any other children being abused.

RON GEORGALIS

Sworn before me this 30th day
of December 2003.

Notary Public

My Commission Expires Feb. 2?, 20??

Ralph Georgalis
Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

---------------------------------------------------------------x

AFFIDAVIT OF RALPH GEORGALIS

RALPH GEORGALIS, hereby declares under penalty of perjury that the following is true and correct:

1. I am submitting this affidavit because my son, Ron, was, approximately 15 years ago, one of the children in Arnold Friedman's after-school computer classes. I experienced the Friedman phenomenon firsthand. I hope that one of my clear recollections of the time will be of some use to the court in the case before it.

2. I was not present the first time that Det. Galasso and Det. Hatch came to our home to interview Ron in their investigation of Arnold Friedman.

3. I was present, with my wife, when Det. Galasso returned some months later for a second questioning of Ron. In both instances Ron was questioned in a separate room, outside the hearing of our family. By the second visit Arnold Friedman was in prison, after his confession. Galasso's second visit was obviously to gather evidence against Jesse Friedman. At this time Det. Galasso stated to my wife and me that Friedman had been interviewed in prison, and Galasso quoted him as saying, "Ron was my favorite."

4. On both visits the clear intent of the detectives was to convince us that Ron had been molested and that several other children had already admitted that they, also, had been abused. The first visit was to attempt to gain statements implicating Arnold Friedman. The second visit was an attempt to gain statements implicating Jesse Friedman in the abuse.

Ralph Georgalis

RALPH GEORGALIS

Sworn before me this 30th day of December 2003.

DORINA A. MARTAKIS
Notary Public, State of New York
No. ...998172
Qualified in Queens County
Commission Expires June 22, 2006

Notary Public

Dorina A. Martakis

M. Georgalis
Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant.

AFFIDAVIT OF MARGALITH GEORGALIS

Indictment Nos. 67104, 67430, 69783

---------------------------------------------------------------x

MARGALITH GEORGALIS hereby swears, under penalties of perjury, that the following is true and correct:

1. I am 64 years old. I live in Great Neck, New York

2. In the mid 1980s I enrolled in an introductory computer class in the adult education program in Great Neck, which was taught by Arnold Friedman. I was so impressed by his teaching ability that when I heard he was giving computer classes to children I immediately enrolled my son Ron.

3. Ron attended either 2 or 3 sessions (consisting of 10 classes each) and I enrolled in another class for adults given on the same evening as Ron's class. After every class Ron would bring home a printout of a little program that was taught that day. I even saved all those printouts all these years.

4. At that time we purchased our own computer and Arnold was kind enough to lend us disks and a lot of advice. That meant that I was always walking into the house at the beginning or end of class. Never did I see anything other than children sitting in front of computers, and Arnold and Jesse walking around and answering questions.

5. I was totally shocked when the police showed up at our home with the accusation of child molestation. Ron was unable to supply them with any information. After Arnold was sent to prison the police came again. This time they told us that they had interviewed Arnold in prison and that he had told them that Ron had been his favorite. Even this did not bring back any memories to my son even though the police told us that they already knew Ron had been abused.

6. Over the years I had dozens of long heart to heart talks with my son. I had told him that if someone had done something to him that he did not want done it is not the end of the world and it would be good to remember it and then put it aside but he could never remember anything. I finally concluded that nothing had happened to him.

7. I now believe that nothing inappropriate ever happened to anybody at that house. It is inconceivable that not one child in that class ever complained or refused to go back to those classes if even a small portion of what the police said were true.

8. Some of the other children who I remember Ron was in the same classes with were [redacted] and [redacted]

Margalith Georgalis
MARGALITH GEORGALIS

Sworn before me this 30th
day of December ___, 2003

Notary Public
DORINA A. MARTAKIS
Notary Public, State of New York
No. 01MA4998172
Qualified in Queens County
Commission Expires June 22, 2006
Dorina A. Martakis

Forrest Aff

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

AFFIDAVIT OF
JAMES FORREST

Indictment Nos.
67104, 67430, 69783

JAMES FORREST hereby swears, under penalties of perjury, that the following is true and correct:

1. I am 27 years old. I currently live in Brooklyn, NY and work as an Audio Engineer for a DVD Production Company.

2. I grew up in Great Neck, New York. When I was about eight years old, I attended the computer classes taught by Arnold and Jesse Friedman. My brother took classes there as well.

3. Although I was quite young at the time, I recall with absolute certainty that, (1) I had a great time in those classes; and (2) Jesse and Mr. Friedman never did anything inappropriate to me or my brother.

4. During the investigation of Jesse and Mr. Friedman, the Nassau County Police visited our house, unannounced, and questioned me and my brother regarding the classes and regarding the Friedmans. We told them that nothing inappropriate happened.

5. I remember other parents of students who were allegedly abused telling my parents that my brother and I were in denial and pressuring them to give us therapy or hypnosis.

6. I can state without reservation that nothing untoward ever happened to me or anyone else in the classes I attended.

JAMES FORREST
464 5th Street
Brooklyn, NY, 11215

Dated: December 29, 2003

Sworn before me this 29 day of December, 29, 2003

Notary Public
Deborah L. Johnson

DEBORAH L. JOHNSON
Commission # 1415834
Notary Public - California
Marin County
My Comm. Expires May 5, 2007

Maltin Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

AFFIDAVIT OF
JUDD MALTIN

Indictment Nos.
67104, 67430, 69783

----------------------------------------------------------------x

Judd Maltin hereby swears, under penalties of perjury, that the following is true and correct:

1. I am 32 years old. I currently live at [redacted] Brooklyn, NY 11201. I work at SIAC, the "Securities Industry Automation Corporation" at Two Metrotech Plaza, Brooklyn NY.

2. I first met Jesse Friedman in 1985 during my freshman year of high school. We soon became close friends and spent most afternoons socializing. I was often at the Friedman home. I spent a great deal of time at their house after school and on the weekends.

3. I never experienced anything untoward. I never witnessed anything resembling pedophilia at their house. I saw no pornography in any form.

4. I had nearly expert knowledge in the computers of the day, and assisted the Friedmans in caring for the computers they used in the classes they taught.

5. I recall at least one occasion where Jesse was unavailable to assist his father. There was a special computer birthday party. One of Arnold Friedman's students, [redacted] asked to have his birthday party at the Friedman house, where all his

friends could play computer games, and open presents, etcetera. I was asked to assist because Jesse had a driver's education class. The children behaved as normal children would at a birthday party, and there was nothing sexual of any kind shown to them or performed.

6. My family moved to a smaller home in the winter of 1987. By that time I had lost interest in personal computers, and I decided to give Arnold Friedman my entire collection of software. This included some pornographic video games, which were in common circulation among the community of Great Neck youth who used personal computers and with whom I had traded software. I hadn't thought to remove these videos from the collection when I gave it to Arnold Friedman. I am certain that the pornographic video games that were discovered by the police were part of the large software collection I had given Arnold Friedman. I never heard Arnold or Jesse Friedman make mention of any of this software, and I think it is highly likely that he never used any of the software that I gave him.

7. Ross Goldstein transferred to the Village School in September 1986. He traveled in much different social circles than me and Jesse, and had never socialized with me or Jesse before. After he transferred to the Village School, he certainly never socialized with me or Jesse. As far as I remember they ever meet after school. I would have known if they were socializing, because Jesse and I were nearly constant companions.

JUDD MALTIN

Dated: December 15th, 2003
Sworn before me this 15th
day of December , 2003

B. Tilker Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

AFFIDAVIT OF BRIAN TILKER

Indictment Nos. 67104, 67430, 69783

-------------------------------------------------------------x

Brian Tilker hereby swears under penalty of perjury, that the following is true and correct:

1. I am 24 years old. I currently live in Astoria, New York and am attending law school at St. John's University School of Law.

2. My family resides in Great Neck, New York. When I was about 8 years old, I attended the computer classes taught by Arnold and Jesse Friedman.

3. During the investigation of Jesse and Mr. Friedman, the Nassau County Police visited our house, unannounced, and questioned me regarding the computer classes and in particular any inappropriate behavior of Arnold and Jesse Friedman.

4. I remember the police questioning me on two occasions. On each occasion, I told them I had never been abused by Arnold or Jesse Friedman or anyone else, and that I did not witness anything inappropriate in the computer classes at any time. I recall that this did not end their questioning and that I felt that they would be unsatisfied with any response other than my concurring with their view that sex abuse had taken place in the Friedman computer classes.

5. I remember that they made specific suggestions to me about things that they believed happened in the computer classes, and that they told me repeatedly that other students in my class had already told them that they had been abused, and that they were certain that in fact I had also been abused and that I should tell them so.

6. I remember an African-American detective was alone with me in the kitchen and he asked me specific questions about molestation, including recounting for me certain statements that others had allegedly made.

7. During these interviews I recall that the various police officers who had interviewed me, including the African-American detective, had a notepad and took notes of my statements while I was telling them that I was not abused and had not seen anyone else being abused.

8. After many sessions in which the police appeared unsatisfied by my negative responses, I became frustrated at the persistent questioning. As I stated in my interview with Mr. Jarecki for his film, I remember finally telling the police officers that I had seen Jesse chase after a kid and hit him. I remember saying that not because it was true, but instead because I thought it would get them off my back. This statement was not accurate but at the time – being 8 years old – I felt that saying this would allow me to avoid the unpleasant experience of being questioned repeatedly by the police.

9. After I made this statement to the police, which they also took notes of, they asked my parents if they would allow me to testify before a Grand Jury to having been witness to such an incident, and I did so.

10.     A number of other families with whom my family had been friendly also had children who were involved in the case. I remember hearing from my parents at the time that one set of parents of one of my friends had been very aggressive with my parents and encouraged them to believe that I had been molested by the Friedmans. My parents spoke to me about this and when I told them it had not occurred, they told the other parents. I heard from my parents that the other parents became angry and told my parents that my friend (their son) had already told them that he had seen me being abused in the Friedman class and that my parents were "in denial" about my having been abused. This was not true.

11.     My friend (their son) had also been interviewed by the police and called my house to tell me about it immediately after they had left his house. He expressed great excitement about it, and considered it something of an adventure. I was confused because I had never seen him or anyone else being abused in the computer classes. Later, when I learned that he had become a major complainant in the case, I was not surprised, not because I had ever seen him engaged in anything inappropriate, but because he had been so enthusiastic about participating and helping the police. Some kids appeared to get a lot of excitement out of the attention they were getting from the police. On a number of occasions, I heard from friends that the police had brought pizza over to their houses, and in one case, that the detective had "deputized" the boy, giving him a play badge to wear.

12.     My own recollection of the computer classes was a perfectly pleasant and uneventful one. The classes lasted about 90 minutes and we would be given rudimentary computer programs to create. We also played computer games sometimes, but I was

never offered, never saw, and never played with a computer game of a sexual nature such as those alleged to have been present in the computer classes.

13. I can state without reservation that nothing untoward ever happened to me and that I never witnessed anything untoward happening to anyone else in the classes that I attended.

Brian Tilker

Sworn before me this 23rd
Day of December, 2003

BARBARA DOBLIN TILKER
Notary Public, State of New York
No. 30-4666413
Qualified in Nassau County
Commission Expires November 30, 2006

R. Tilker Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-----------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant,

AFFIDAVIT OF RICHARD TILKER

Indictment Nos. 67104, 67430, 69783

-----------------------------------------------------------x

Richard Tilker hereby swears, under penalty of perjury, that the following is true and correct:

1. I am 54 years old. I currently live in Great Neck, New York and am retired from my work as director of operations, specialty events, for Ferons, a major retailer of tennis apparel.

2. I reside with my family in Great Neck, New York. When my son was about 7 years old, he attended the computer classes taught by Arnold and Jesse Friedman.

3. During the investigation of Jesse and Arnold Friedman, we were visited on at least three different occasions by two-person teams of detectives from the Nassau County Police Department. They wanted to question my son Brian with regard to allegations that children had been sexually abused in the Friedman computer classes.

4. Each time the detectives visited, they told us that they knew "something happened" to our son. They didn't say, "We believe," they said, "We know," and they insisted on speaking to our son alone.

5. On one occasion, my wife and I told them they could question Brian alone, but I remained within earshot, and I was shocked by the aggressive manner in

which they questioned this young boy. It was clear to me that the detectives had already formed their opinion of what had happened in the computer classes and that they were just trying to get Brian to agree with their story. It got to a point where it wasn't asking him what happened, it was more of them telling him what happened, and when they didn't like what he had to say they kept repeating they know what happened and that he should tell.

6.    I recall that the questioning just got to be too much. The police wouldn't take no for an answer. Frustrated, Brian finally told them that one time he saw Jesse chase after and hit a child, though he later told us that that was not true and that the only reason he had said that was to end the questioning because they wouldn't leave him alone.

7.    Throughout the time during which the police had questioned me and my son Brian, the detectives, including one in particular who was an African-American male, were carrying a notepad and took copious notes of all the comments we made, including my son's repeated comments telling them that nothing inappropriate had happened to him and that he had not witnessed any abuse of any other person in his classes.

8.    The police used many different approaches in trying to persuade the children to answer their questions in the way they wished them to. For example, we heard from other parents the police would have pizza parties and give police badges to the children who cooperated, making them "junior detectives" in return for their cooperation.

9.    I remember receiving phone calls from the parents of other students who were allegedly abused. These parents were insistent that my wife and I should cooperate

Bienstock Aff.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN,

Defendant..

---------------------------------------------------------------x

AFFIDAVIT OF
HAL BIENSTOCK

Indictment Nos.
67104, 67430, 69783

HAL BIENSTOCK hereby swears, under penalties of perjury, that the following is true and correct:

1. I am thirty-one years old. I live in New York City.

2. I grew up in Port Washington, Long Island. I was enrolled in the computer classes taught in the Friedman home at 17 Piccadilly Road in Great Neck. To the best of my memory, the classes took place when I was in eighth grade, in 1985 and 1986. My recollection is that I was enrolled in the course for one term of approximately ten classroom sessions and then re-enrolled for another such term.

3. I never noticed anything inappropriate happening in any of the classes. I did not witness any harm being done to any of the other children in the classes. More specifically, I never saw Jesse or Arnold Friedman engage in any of the acts of sexual abuse they were later prosecuted for.

4. I was surprised when I learned of the allegations against Arnold and Jesse Friedman as I had never observed anything out of the ordinary in any of the classes I attended.

5. During the investigation of Arnold and Jesse Friedman, the police never questioned me about my experience in the computer classes, nor did they visit my home

6. In conclusion, I did not experience any form of abuse, sexual or otherwise, during Arnold Friedman's computer classes, nor did I witness any other children being abused.

HAL BIENSTOCK

Sworn before me this 24 day of December 2003.

Notary Public

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN.

Defendant,

---------------------------------------------------------------x

Indictment Nos.
67104, 67430, 69783

RECEIVED
03 JAN 20 PM 3:28
NASSAU COUNTY

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE DEFENDANT'S CONVICTION PURSUANT TO N.Y. CRIM. PROC. LAW § 440.10**

MARK GIMPEL, ESQ.
870 United Nations Plaza
New York, New York 10017
(212) 308-3430

Attorney for Defendant Jesse Friedman

AMENDED COPY

EARL H. NEMSER, ESQ.
Swidler, Berlin, Shereff, Friedman
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

Of Counsel

**TABLE OF CONTENTS**

Table of Authorities ..... i

Preliminary Statement ..... 1

Introduction ..... 2

Statement of Facts ..... 5

1. The Federal Child Pornography Investigation ..... 5
2. The State Child Sexual Abuse Investigation ..... 7
   - The computer classes ..... 8
   - Absence of complaint and of physical or medical evidence ..... 8
   - Jesse Friedman was unaware of the tactics police used to elicit the allegations against him from the computer students ..... 10
   - Additional suspects ..... 11
   - The nature of the charges against the Friedmans ..... 14
   - The People's theory of why the computer students never complained ..... 16
3. Discovery ..... 18
4. Jesse's Plea ..... 21
5. The Present Motion ..... 27
   - a. Police used five categories of suggestive questioning to obtain incriminating statements from the children ..... 28
     - i. Presumption of Guilt by Interviewers ..... 29
     - ii. Repeated Questioning in the Face of Denials of Abuse ..... 31
     - iii. Rewarding or Punishing a Child to Obtain Desired Answers ..... 33
     - iv. Peer Pressure – Reporting that Other Children Have Already Implicated the Suspect . 36
     - v. Interviewers of High Status ..... 37
   - b. Hypnosis, memory recovery, and visualization techniques ..... 38

Argument ..... 40

JESSE FRIEDMAN'S CONVICTION MUST BE VACATED PURSUANT TO N.Y. CRIM. PROC.LAW 440.10 (h) BECAUSE THE PEOPLE VIOLATED THEIR DUTY UNDER BRADY v. MARYLAND BY FAILING TO DISCLOSE TO THE DEFENSE EVIDENCE IN THEIR POSSESSION THAT WOULD HAVE SEVERELY UNDERMINED THE CREDIBILITY OF THE PROSECUTION'S WITNESSES ..... 40

A. Introduction ..... 40

B. The Applicable Legal Standard ..... 43

C. The Prosecution Withheld Brady Evidence That Police and Therapists Used Suggestive Methods to Elicit Accusations of Sexual Abuse From Children – Consistent With Their Pattern in Other Child Sex Abuse Cases ..... 46

1. Evidence that detectives used an array of suggestive interviewing techniques was impeachment evidence that the prosecution was required to turn over to the defense under Brady .......... 46

a. The prosecutions' failure to disclose that the detectives communicated their presumption of Jesse Friedman's guilt to the children violated Brady .......... 48

b. The prosecution's failure to disclose that the detectives persisted in questioning the children even when they insisted that they had not been abused violated Brady .......... 50

c. The prosecution's failure to disclose that the detectives used rewards and punishments to obtain desired answers from children violated Brady .......... 55

d. The prosecution's failure to disclose that the detectives used peer pressure to obtain desired answers from children violated Brady .......... 59

e. The prosecution's failure to disclose that that they exploited their high status to elicit allegations of sexual abuse violated Brady .......... 60

2. The People's failure to disclose that hypnosis was used to elicit allegations of sexual abuse concealed favorable evidence from the defense .......... 61

3. The conclusion that these police officers used suggestive techniques in interviewing all possible child victims is underscored by their conduct in another high-profile mass sex abuse case .......... 65

D. The Suppressed Evidence Was Material .......... 67

E. Entitlement to Hearing .......... 76

F. Justice Demands That Jesse Friedman's Conviction Be Vacated .......... 77

CONCLUSION .......... 78

ADDENDUM: Case Chronology .......... A-1

## TABLE OF AUTHORITIES

### CASES

Brady v. Maryland, 373 U.S. 83 (1963) .......... passim

Brady v. United States, 397 U.S. 757 (1970) .......... 43

Giglio v. United States, 405 U.S. 150 (1972) .......... 43

Idaho v. Wright, 497 U.S. 805 (1990) .......... 46

Kyles v. Whitley, 514 U.S. 419 (1995) .......... 43, 44

Little v. Armontrout, 819 F.2d 1425 (8th Cir. 1987) .......... 65

Maryland v. Craig, 497 U.S. 836 (1990) .......... 47

Miller v. Angliker, 848 F.2d 1312 (2d Cir. 1988) .......... 44

People of the Territory of Guam v. McGravy, 14 F.3d 1344 .......... 41

People v. Adams, 53 N.Y.2d 241 (1981) .......... 64

People v. Armer, 119 A.D.2d 930 (3rd Dept. 1986) .......... 44

People v. Baxley, 84 N.Y.2d 208 (1994) .......... 77

People v. Bernard, 163 Misc.2d 176 (Sup. Ct. N.Y. Co. 1994) .......... 44

People v. Curry, 164 Misc.2d 969 (Sup. Ct. N.Y. Co. 1995) .......... 70

People v. Fein, 18 N.Y.2d 162 (1966) .......... 43

People v. Hughes, 59 N.Y.2d 535 (1983) .......... 64, 69

People v. Hults, 76 N.Y.2d 190 (1990) .......... 68

People v. Janota, 181 A.D.2d 932 (3rd Dept. 1992) .......... 44

People v. Kemp, 251 A.D.2d 1072 (4th Dept. 1998) .......... 69

People v. Michael M., 162 Misc.2d 803 (Sup. Ct. Kings Co. 1994) .......... passim

People v. Ortiz, 127 A.D.2d 305 (3d Dept. 1987) .......... 44

People v. Pelchat, 62 N.Y.2d 97 (1984) .......... 44

People v. Poole, 48 N.Y.2d 144 (1979) .......... 19

People v. Ramos, 201 A.D.2d 78 (1st Dept. 1994) .......... 53, 54

People v. Ross G., 163 A.D.2d 529 (2d Dept. 1990) .......... 12, 25

People v. Sandoval, 34 N.Y.2d 371 (1974) .......... 69

People v. Tunstall, 63 N.Y.2d 1 (1984) .......... 69

People v. Ventimiglia, 52 N.Y.2d 350 (1981) .......... 69

People v. Vilardi, 76 N.Y.2d 67 (1990) .......... 44

People v. Wesley, 83 N.Y.2d 417 (1994) .......... 69

People v. Wright, 86 N.Y.2d 591 (1995) .......... 43

People v. Zwart, 600 N.E.2d 1169 (Ill. 1992) .......... 46

Rock v. Arkansas, 483 U.S. 44 (1987) .......... 61, 64

Snowden v. Singletary, 135 F.3d 732 (11th Cir. 1998) .......... 47

State v. Michaels, 625 A.2d 489 (N.J. Super. Ct. App. Div. 1993) .......... 41, 46

State v. Michaels, 642 A.2d 1372 (N.J. 1994) .......... 41, 48, 73

United States v. Avellino, 136 F.3d 249 (2d Cir. 1998) .......... 43

United States v. Banks, 36 M.J. 150 (C.M.A. 1992 .......... 46

United States v. Miller, 411 F.2d 825 (2d Cir. 1969) .......... 64

United States v. Valdez, 722 F.2d 1196 (5th Cir. 1984) .......... 62

**STATUTES**

N.Y. Crim. Proc. Law § 200.95 .......... 20

N.Y. Crim. Proc. Law § 240.20 .......... 20

N.Y. Crim. Proc. Law § 240.40 .......... 20

N.Y. Crim. Proc. Law § 440.30 .......... 77

N.Y. Penal Law § 130.50 .......... 15

N.Y. Code of Professional Responsibility, DR 7-102 .......... 43

N.Y. Code of Professional Responsibility, DR 7-103 .......... 43

Amendment to Florida Rules of Criminal Procedure Creating Rule 3.853, 807 So.2d 633, 26 Fla. L. Weekly S687, Fla., Oct. 18, 2001 .......... 71

## NEWSPAPERS AND MAGAZINE ARTICLES

Alvin E. Bessent, *Dragnet Is Out For Porn Photos In Child-Sex Case*, NEWSDAY, February 8, 1989 .......... 7

Alvin E. Bessent, *Teen Faces 37 New Sex Charges*, NEWSDAY, June 24, 1988 .......... 12

Alvin E. Bessent, *The Secret Life of Arnold Friedman*, NEWSDAY, May 28, 1989 .......... 17, 27

Bill Van Haintze and Alvin E. Bessent, *New Arrest in Child Sex Case*, NEWSDAY, June 23, 1988 .......... 11, 12, 38

Debbie Nathan, *The Ritual Sex Abuse Hoax*, THE VILLAGE VOICE, January 12, 1990, Exh. 35, (App. 827-40) .......... 51

Douglas J. Besharov, *Lessons from the McMartin Case*, THE CHRISTIAN SCIENCE MONITOR, February 9, 1990 .......... 15

Elizabeth Loftus, *Our changeable memories: legal and practical implications*, 4 NATURE, 231-233 (2003) .......... 53

Leon Jaroff, *Lies of the Mind*, TIME MAGAZINE, November 29, 1993 .......... 52

Michael Hanrahan and Richard Sisk, *AIDS Tests Sought: L.I. Prosecutor Asks Check of Teacher & Son in Abuse Case*, NEW YORK DAILY NEWS, November 28, 1987 .......... 24

Mike Brennan, *100 Kids Linked to Teacher in Sex-Attack Case*, NEW YORK POST, November 27, 1987 .......... 24

Richard Esposito, *Ex-Teacher Focus of Porno Probe*, NEWSDAY, November 13, 1987 .......... 9

Shirley E. Perlman, *Teen Told: Stay Away From Kids*, NEWSDAY, August 9, 1990 .......... 13

William S. Dobkin, *Great Neck Community Marshals its Resources to Deal With Child Abuse and Child-Sex Crime*, GREAT NECK RECORD, February 4, 1988 ........ 38, 63

## SCIENTIFIC STUDIES

A. Bradley & J. Wood, *How do children tell? The disclosure process in child sexual abuse*, 20 CHILD ABUSE & NEGLECT, 881-91 (1996) ........ 51

A. Tobey & G.S. Goodman, *Children's eyewitness memory: Effects of participation and forensic context*, 16 CHILD ABUSE & NEGLECT, 779-796 (1992) ........ 60

Council on Scientific Affairs, ***Scientific status of refreshing recollection by the use of hypnosis.*** **253** JAMA, 1918-1923 (1985) ........ 62

Henry G. Miller, *Learning to Love: The Trial Lawyer's 14 Challenges*, NYSBA JOURNAL, September 2001 ........ 67

K. P. Roberts, *Children's ability to distinguish between memories from multiple sources: Implications for the quality and accuracy of eyewitness statements*, 22 DEVELOPMENTAL REVIEW 403-435 (2002) ........ 49

L. Lawson & M. Chaffin, *False negatives in sexual abuse disclosure interviews: Incidence and influence of caretaker's belief in abuse in cases of accidental abuse discovery by diagnosis of STD*, JOURNAL OF INTERPERSONAL VIOLENCE, 7, 532-542 (1992) ........ 73

M. Bruck, S. J. Ceci, E. Francoer & R.J. Barr, "*I hardly cried when I got my shot!": Influencing children's reports about a visit to their pediatrician*, 66 CHILD DEVELOPMENT 193-208 (1995) ........ 49, 52

M. Bruck, S.J. Ceci, & Hembrooke, *The nature of children's true and false narratives* 22 DEVELOPMENTAL REVIEW 520-554 (2002) ........ 49

M.D. Leichtman and S.J Ceci, *The effects of sterotypes and suggestions on preschoolers reports*, 31 DEVELOPMENTAL PSYCHOLOGY 568-578 (1995) ........ 49

Robert Rosenthal, Suggestibility, Reliability, and the Legal Process, DEVELOPMENTAL REVIEW 22 (2002) 334-369 ........ 60, 62

S. Garven, J.M. Wood & R.S. Malpas, *Allegations of wrongdoing: The effects of reinforcement on children's mundane and fantastic claims*, 85 JOURNAL OF APPLIED PSYCHOLOGY 38-49 (2000) ........ 55

S. Garven, J.M. Wood, J.S. Shaw & R. Malpass, *More than suggestion: Consequences of the interviewing techniques from the McMartin preschool case*. 83 JOURNAL OF APPLIED PSYCHOLOGY 347-59 (1998)........ 55, 59

S. J. Ceci & M. Bruck, M., *The suggestibility of the child witness: A historical review and synthesis*, 113 PSYCHOLOGICAL BULLETIN, 403-439 (1993)........ 60

S.J. Ceci, E. Loftus, M. Leichtman, & M. Bruck *The role of source misattributions in the creation of false beliefs among preschoolers*, 62 INTERNATIONAL JOURNAL OF CLINICAL AND EXPERIMENTAL HYPNOSIS 304-320 (1994)........ 49

## MISCELLANEOUS

Affidavit of Dr. Maggie Bruck in Francisco Fuster-Escalona v. Harry K. Singletary, Case No. 97-1369-Civ-Lenard........ 51

American Psychiatric Association Board of Trustees, THE AMERICAN PSYCHIATRIC ASSOCIATION BOARD STATEMENT ON MEMORIES OF SEXUAL ABUSE (1993)........ 52, 64

Brief Amicus Curiae of Victims Of Child Abuse Laws (VOCAL) National Network In Support Of Respondent Sandra Ann Craig, Maryland v. Craig........ 47

Dr. Debra Poole, *State of Michigan Governor's Task Force on Children's Justice and Family Independence Agency Protocol*, GOVERNOR'S TASK FORCE ON CHILDREN'S JUSTICE, 12 (1993)........ 9,50

Royal College of Psychiatrists, *Reported recovered memories of child sexual abuse*, 21 THE COLLEGE PSYCHIATRIC BULLETIN, 663-665 (1997)........ 63

Sandra Kaplan et al. 1990. Child Pornography and Extrafamilial Sex Abuse........ 39, 63

Temple Beth-El of Great Neck Panelists of Sexual Abuse of Children Program, November 16, 1988........ 38

## BOOKS

E. Gray, UNEQUAL JUSTICE: THE PROSECUTION OF CHILD SEXUAL ABUSE (MacMillan 1993)........ 73

Stephen J. Ceci and Maggie Bruck, JEOPARDY IN THE COURTROOM-A SCIENTIFIC ANALYSIS OF CHILDREN'S TESTIMONY 87-105 (American Psychological Association 1995)........ 48, 51

**PRELIMINARY STATEMENT**

This memorandum of law is respectfully submitted in support of the motion of defendant Jesse Friedman, pursuant to N.Y. Crim. Proc. Law § 440.10 (h), to vacate his conviction, on a guilty plea, of twenty-five counts of sexual abuse of children, under Indictments 67104, 67430, and 69783. Jesse Friedman is entitled to this relief on the ground that the People violated his rights under the Due Process clauses of the New York and United States Constitutions by failing to disclose to the defense information in their possession that would have substantially impeached the testimony of the witnesses the People planned to call at trial. That undisclosed information consisted of evidence, from numerous sources, that the investigation into the allegations against Jesse Friedman was rife with improper suggestive questioning of the alleged child victims by police, that therapists who treated these children used suggestive hypnosis and "memory recovery" techniques, and that the children initially had no recollection of any of the abuse that they later claimed. Had Jesse Friedman been aware of this and other undisclosed evidence, he would not have pled guilty to crimes of child sexual abuse that he did not commit.

On December 20, 1988, with no means of challenging the credibility of the People's child complainants, and facing a sentence, if convicted at trial, that would mean spending the rest of his life in prison, Jesse Friedman pled guilty to sodomy in the first degree (seventeen counts), sexual abuse in the first degree (four counts), attempted sexual abuse in the first degree, use of a child in a sexual performance, and endangering the welfare of a child (two counts).[1] On January 24, 1989, he was sentenced to a term of imprisonment of six to eighteen years. Because Jesse Friedman's guilty plea was the direct product of the People's violation of their constitutional duty, under

[1] Jesse Friedman made repeated unsuccessful efforts to obtain copies of the transcripts from his guilty plea and sentencing from the Nassau County Court. Affidavit of Jesse Friedman ¶ 57. Therefore, in this brief, the Affidavit of Jesse Friedman is cited for any information regarding those proceedings.

Brady v. Maryland, to disclose favorable evidence to the defense, the judgment against him should be vacated or, at the least, an evidentiary hearing should be ordered.

## INTRODUCTION

On December 20, 1988, Jesse Friedman, then nineteen years old, stood before the Nassau County Court accused under three separate indictments charging him with 243 counts of sodomy, sexual abuse, and other crimes against children. It was alleged that his father, Arnold Friedman, a retired teacher who taught after-school computer classes to children in his home, as well as Jesse, who had assisted him in these classes, had sexually abused many students over a number of years. Jesse Friedman was condemned in the press and vilified by a community hungry for retribution based on inflammatory allegations of heinous offenses. The prospects that the court would be able to seat a jury untouched by a year of sensationalized media coverage were remote. If he went to trial and was convicted, Jesse faced the likelihood of consecutive sentences on all of the charges against him – the equivalent of life in prison – from a judge who had made clear her intention to impose such a sentence, before hearing a single piece of trial evidence.

The prosecution of Jesse Friedman came in the thick of an era characterized by many high-profile sex abuse prosecutions, like the McMartin case in California, that shook the communities in which they arose and the country as a whole. As described in the argument below, a startling number of these so-called "mass sex abuse" cases – in which the prosecution produced little or no physical evidence – ended in dismissals, acquittals, or post-conviction exonerations of defendants because the prosecution relied on the same suggestive investigative methods at issue here. But at the time of Jesse Friedman's conviction, these other high-profile cases had not yet unraveled and the atmosphere was still dominated by an imaginary epidemic of mass sexual abuse. By the time

of the third indictment, the prosecution was alleging that the Friedmans led a sex ring, in which numerous adults would violently abuse the children in the computer classes, leading them in bizarre sex games in which all of the children in a class were forced to participate, and continually taking photographs and recording videotapes of the abuse.

The only evidence ever relied on to support the claim that Jesse Friedman, who was between fifteen and eighteen years old at the time, was a violent child molester was the statements of the computer students whom the prosecution claimed he molested. Not one of these children had ever alleged inappropriate conduct in the years during which hundreds were later said to have been molested in the Friedman home. There were no such allegations until after the police launched a sex abuse investigation and began questioning the children. Not one child had ever complained to a parent or teacher, or shown any physical or emotional sign of abuse, despite the fact that parents arrived promptly to pick their children up after each ninety-minute computer class.

There was absolutely no physical evidence of abuse, which police claimed had taken place on a grand and brutal scale, and had been documented extensively in photographs and on videotape, and no such evidence would ever be produced. Finally, the accusations from the children were obtained by police officers who used a panoply of suggestive techniques in conducting their interviews. But since the People did not, as constitutionally required, disclose any of the evidence in their possession that was favorable to the defense, Jesse Friedman was ignorant of these facts when it came time for him to decide whether to put the People to their proof at trial.

Confronted by these circumstances, and with his family support system in tatters,[2] Jesse Friedman decided to plead guilty to crimes he did not commit in exchange for a sentence of six to

---

[2] As attorney Peter Panaro observed: "Jesse's situation at the time was made even more dire by the destruction of his family support structure (with the arrest of his father and mother who was briefly arrested, and accusations threatened against his two brothers – later shown to be totally without merit), and the

eighteen years. Affidavit of Jesse Friedman ("Friedman Aff.") ¶ 35. He was incarcerated for thirteen years, and released on parole on December 7, 2001, classified as a "Level 3 Sexually Violent Predator" by the same judge who originally sentenced him.

Toward the end of Jesse's prison term, a documentary filmmaker, Andrew Jarecki, began to discover a large volume of information, never disclosed to the defense by the prosecution, regarding the tactics used by police investigators to obtain accusations of abuse from the fourteen complainants against Jesse. This new evidence showed that the investigative method employed by the detectives was a compendium of suggestive and manipulative interview techniques proven to encourage false accusations from children. Jesse Friedman learned about the existence of some of the evidence unearthed by Jarecki when he viewed a rough cut version of the film, "Capturing the Friedmans," in January 2003, and was permitted to view the bulk of this material a number of months later. That evidence forms the basis of this motion.

In the absence of any physical or medical evidence, or prior reports of abuse, the People relied entirely on allegations made by the computer students after extensive questioning by the police and after the children had entered therapy intended to help deal with the claimed abuse. However, as we will demonstrate below, when first questioned by the police, the students stated they had not been abused. They had no recollection of having been abused until after they had been subjected to up to five types of suggestive questioning by the police. We will also show that therapists used hypnosis or other so-called "visualization techniques" on at least one of the child complainants most central to the prosecution's case, eliciting an accusation from a child who, prior to being hypnotized had no memory of sexual abuse – and very likely used these techniques on many other such children. All of these methods have been recognized, in case law and scientific

absence of funds required for experts who would have been necessary to prepare a meaningful defense." Parano Aff. ¶ 20.

literature, to distort memory and encourage false accusations. Based on the evidence the defense has been able to obtain on its own, we will examine each of these tactics in a legal and scientific framework and show that the cumulative effect of these tactics fundamentally compromised the reliability of all of the child complainants' testimony. That the child complainants (a) at first uniformly denied being abused, and (b) were later subjected to these questioning methods, are two facts that would clearly have been favorable, and in fact crucial, to the defense, therefore requiring disclosure under Brady. Finally, we will establish that because of the egregiously improper investigative method, the stark implausibility of central aspects of the prosecution's factual narrative, and all the other circumstances of the case, there is far more than a "reasonable possibility" that Jesse Friedman's guilty plea was the product of the People's violation of their constitutional duty of disclosure. Thus, Jesse Friedman's conviction must be vacated.

## STATEMENT OF FACTS

### 1. The Federal Child Pornography Investigation

The events that led to the filing of child sexual abuse charges against Jesse Friedman were sparked by the investigation of his father Arnold – a retired school teacher who also taught after-school computer classes in the family's home – for mailing a child pornography magazine to an undercover postal inspector.[3] In July 1984, customs agents at Kennedy Airport intercepted a package from the Netherlands containing a piece of child pornography and addressed to Arnold Friedman. Affidavit of United States Postal Inspector John McDermott in Support of Search

[3] Emily B. Horowitz, Ph.D., provided research assistance for this Memorandum of Law.

Warrant, dated November 3, 1987 ("McDermott Aff."), Exh. 4 (App. 121-22).[4] They informed Postal Inspector John McDermott.

For the next two years, another postal inspector, posing as a collector of child pornography, wrote letters to Arnold Friedman requesting that Mr. Friedman send him a piece of child pornography, which Mr. Friedman eventually did. McDermott Aff. (App. 121-22). Approximately a year after the mailing of this magazine, on November 3, 1987, Inspector McDermott, posing as a postman, returned the magazine to Mr. Friedman. At that time, McDermott and other agents executed a search of Mr. Friedman's home and found – behind a piano in Mr. Friedman's office – approximately twenty magazines containing "nude photos of pre-adolescent and teenage males," as well as "various pamphlets, booklets and brochures depicting boys in nude and sexual poses." Transcript of Interview with Detective Sergeant Fran Galasso ("Galasso"), Exh. 5 (App. 131); Transcript of the film, "Capturing the Friedmans,"[5] ("CTF"), Exh. 6 (App. 244-48) (McDermott); Affidavit of Detective William Hatch in Support of Search Warrant, dated November 24, 1987 ("Hatch Aff."), Exh. 7 (App. 371). In addition, the agents found "evidence of a computer class being taught there by Mr. Friedman." CTF (App. 248) (McDermott). They seized "some list of names that we thought could be students." Id. The list turned out to be a list of names and phone numbers of eighty-one of the children who had been

---

[4] Numbers preceded by "App." indicate the page number in the Appendix of Exhibits, submitted with the instant motion.

[5] In instances when the complete transcript of an individual's interview for the film was not available to the defense, citations to the statements are made to the transcript of the film itself, Exhibit 6 to this motion. The name of the speaker is indicated in parentheses. Where the statement appears in footage not included in the film, it is set forth in the Affidavit of Andrew Jarecki and the citation is to that affidavit. A videotape of the film, as well as the videotape of some of the additional footage, referred to in this brief, are provided for the court's convenience.

students in the computer classes over the prior several years. Galasso (App. 130-32). See Inventory of November 3, 1987 Search, Exh. 8 (App. 377-83).[6]

While the People would later allege that the Friedmans created hundreds of photographs and videotapes in which they could be seen molesting the children, no such material was found during the federal search or at any other time. Affidavit of Andrew Jarecki ("Jarecki Aff.") ¶ 10 (Onorato) ("In the best case scenario you would like to find videotapes of Mr. Friedman actually sexually abusing the children or at the very least some photographs of some of the children in some sort of compromising sexual positions. We didn't find any of that."); Galasso (App. 188) ("virtually every single one [of the children] told us they were videotaped"); Alvin E. Bessent, *Dragnet Is Out For Porn Photos In Child-Sex Case*, NEWSDAY, February 8, 1989 (Galasso said, "Just about every class was videotaped. It had to be dozens [of tapes]."), Exh. 9 (App. 384-85).

**2. The State Child Sexual Abuse Investigation**

On November 4, 1987, the District Attorney's Detective Squad notified Nassau County Detective William Hatch of the search of the Friedman house the previous day. Hatch Aff. (App. 371). That afternoon Hatch informed Detective Sergeant Fran Galasso, head of the Nassau County Police Department's sex crimes unit, of the search and gave her a copy of the student list that had been found. Hatch Aff. (App. 372); Galasso (App. 130). Galasso immediately started an investigation into possible child abuse. Hatch Aff. (App. 372); Galasso (App.132). Beginning on November 4, and running into the fall of 1988, Galasso sent out a number of two-detective teams to interview the children who, according to the list, had attended Arnold Friedman's computer classes. Galasso (App.130-32); Friedman Aff. ¶ 10.

[6] The record is unclear as to whether and to what extent this list of computer students to be questioned by the police was expanded. One detective, Anthony Sgueglia, said that the police list of possible victims eventually grew to 400. Transcript of Interview with Detective Anthony Sgueglia (App. 412).

**The computer classes**

Arnold Friedman had conducted these classes since 1982, when he began teaching computer skills to a few Great Neck boys and girls at his home at 17 Piccadilly Road. Friedman Aff. ¶ 4. There were three levels of classes offered (beginner, intermediate, and advanced) at three different times during the school year (starting in September, January, and April). Generally, children in the same class advanced together to the next level. Enrollment in the classes steadily increased over time, and by the time of the investigation Mr. Friedman had taught computer skills to hundreds of boys and girls. He also gave classes for adults that were equally well-attended. Friedman Aff. ¶ 6.

Arnold and Elaine Friedman had three sons – David, the eldest, Seth, the middle child, and Jesse, the youngest. In 1984, Arnold requested that Jesse Friedman begin assisting him in teaching the classes. Friedman Aff. ¶ 4. His responsibilities included preparing the room for the computer class, helping to supervise the children, and assisting his father with the computer instruction. Friedman Aff. ¶ 5. Jesse continued to assist in teaching the classes until June 1987, when he was replaced by another high school student so he could begin college at the State University of New York at Purchase in September 1987. Friedman Aff. ¶ 8.

**Absence of complaint and of physical or medical evidence**

At the time of the federal search – November 3, 1987 – not a single one of the hundreds of computer students who had attended class at the Friedman house over six years had ever complained of any inappropriate treatment. Parents regularly picked their children up right after class and never noted any negative reaction from any child. One parent, Margalith Georgalis, regularly entered the Friedman house before, during, and after classes, and never saw a hint of any abuse. Affidavit of Margalith Georgalis ("M. Georgalis Aff.") ¶ 4. No parent had ever reported

any physical or psychological signs that might be associated with their child having been abused. Indeed, Joseph Onorato, the assistant district attorney in charge of the case, does not recall there being any physical evidence to suggest that abuse had occurred. CTF (App. 273) (Onorato) ("[T]here was a dearth of physical evidence. I don't even recall whether there was any physical evidence that would have indicated one way or another that these events took place."). See also Richard Esposito, *Ex-Teacher Focus of Porno Probe*, NEWSDAY, November 13, 1987 ("Police sources said they have not received any complaints about Friedman."), Exh. 10 (App. 386-87).

Detectives, many of whom were transferred into or temporarily assigned to the sex crimes squad, see Transcript of Interview with Detective Anthony Sgueglia ("Sgueglia"), Exh. 11 (App. 390), and untrained in the proper methods for questioning children, fanned out across the town of Great Neck to interview alleged victims.[7] The teams included, among others, the team of Detectives William Hatch and Wallene Jones and the team of Detectives Anthony Sgueglia and Patty Brimlow.[8] Affidavit of David Kuhn ("Kuhn Aff.") ¶ 5; Sgueglia (App. 393). Detective Sergeant Galasso hoped to gather enough evidence to justify a second search, by state law enforcement. Galasso (App.139).

That search occurred on November 25, 1987. Galasso (App. 141). Detectives seized all computers and computer-related equipment, all family photographs, home movies, cameras, a home movie projector, and nine "assorted papers with list of boys names and letters." Inventory of Property Seized in November 25, 1987 Search, Exh. 12 (App. 476–83); Friedman Aff. ¶ 10.

---

[7] There are specific protocols that should be followed when interviewing children about possible sexual abuse. See, e.g., Dr. Debra Poole, "A Model Child Abuse Protocol - Coordinated Investigative Team Approach," which was developed for the Governor's Task Force on Children's Justice in Michigan (1993). The protocol outlines an interviewing protocol that police should follow when interviewing children alleged to have been sexually abused.

[8] Other detectives who worked the case included Alex Armstrong, Lloyd Doppman, Larry Merriwether, and Nancy Myers.

During this search, no child pornography of any kind was found, as substantiated by the detailed search warrant inventory made by the detectives reporting to Detective Sergeant Galasso. Id. Despite this, Detective Sergeant Galasso told filmmaker Jarecki in her interview that the most "overwhelming" thing she recalled from this search was the "enormous amount of child pornography. You would just have to walk into the living room and it'd be piled around the piano. There were literally foot-high stacks of pornography in, in plain view, all around the house." Galasso (App. 143).

Arnold and Jesse Friedman were arrested that night. The police then continued to interview computer students at least until shortly before Jesse's guilty plea on December 20, 1988. Friedman Aff. ¶ 10.

**Jesse Friedman was unaware of the tactics police used to elicit the allegations against him from the computer students**

Jesse Friedman was initially unaware of the broad sweep of the investigation targeting him, which included questioning of scores of his father's former computer students. Friedman Aff. ¶ 11. More important, Jesse was unaware then, and for fourteen years after his arrest, of the aggressive tactics used by police to obtain sex abuse accusations from the eight to eleven year-old boys who had attended the classes, and of the critical facts that (a) the children who later became complainants had not recalled being abused until after being subjected to suggestive techniques and (b) the children who did not become complainants (the vast majority of the children the police interviewed) maintained that they had not been abused, even after rigorous police questioning.

Clearly, the methods used by the police were effective at eliciting sexual abuse charges. Between December 1987 and November 1988, Jesse Friedman was charged with child sexual abuse in three separate indictments. In all, the indictments charged 447 counts of sodomy, sexual abuse, endangering the welfare of a child, and other crimes. Two hundred and forty-three of these

charges were against Jesse Friedman.[9] The first two indictments named Jesse's father as his codefendant. In the third, Jesse's codefendant was another Great Neck teenager named Ross Goldstein.

**Additional suspects**

Some time in the first half of 1988, the police came to believe that there was a so-called "sex ring" operating out of the Friedman house, and that many teenagers, besides Jesse Friedman, had also participated in the molestation that allegedly took place. See Bill Van Haintze and Alvin E. Bessent, *New Arrest in Child Sex Case*, NEWSDAY, June 23, 1988, Exh. 29 (App. 806) ("'There were additional friends of Jesse who were invited to the Friedman home to participate in these sexual performances,' Galasso said."). Jesse met Ross Goldstein in September 1986, when Goldstein enrolled in the Village School, the high school Jesse attended in Great Neck. Friedman Aff. ¶ 20. Goldstein was a year behind Jesse, who had been attending the Village School for two years before Goldstein's enrollment, and they were casual acquaintances. Friedman Aff. ¶ 20; Affidavit of Judd Maltin ("Maltin Aff.") ¶ 7. On June 22, 1988, Goldstein was arrested pursuant to a felony complaint alleging eighteen acts of child sexual abuse. Friedman Aff. ¶ 20. The next day, Jesse was arrested on allegations of thirty-seven acts of child sexual abuse. Friedman Aff. ¶ 21.

In June 1988, Detective Sergeant Galasso told *Newsday* that the new arrests were the result of revelations from "previously identified victims during sessions with their therapists." Haintze

---

[9] The first indictment, handed down on December 7, 1987, charged Arnold Friedman and Jesse Friedman with fifty-four counts of child sexual abuse. Ten of these charges were against Jesse Friedman. The second indictment, dated February 1, 1988, charged Arnold and Jesse Friedman with ninety-one counts of child sexual abuse, with thirty-five of these charges pertaining to Jesse. The third indictment, issued on November 7, 1988, charged Jesse Friedman and another teenager name Ross Goldstein with 302 counts of child sexual abuse. Of those, 198 charges were against Jesse Friedman. The specific charges in the three indictments included sodomy, sexual abuse of a child, use of a child in a sexual performance, and endangering the welfare of a child. See Indictments 67104, 67430, and 69783. Exhibits 1, 2, and 3.

and Bessent, supra (App. 806). Detectives continued contacting families, and after "numerous sessions with children brought out information that has led to the latest arrests." Alvin E. Bessent, *Teen Faces 37 New Sex Charges*, NEWSDAY, June 24, 1988, Exh. 30 (App. 807). Galasso stated that, "[o]n further questioning, we began to hear that the friends [of Jesse] were involved." Id.

The assistant district attorney began negotiating with Ross Goldstein for the purpose of persuading him to cooperate and testify against Jesse. Friedman Aff. ¶ 23. During the summer of 1988, as it appeared increasingly likely that Jesse Friedman would go to trial, the prosecution was preparing its case based solely on the testimony of small children, without the benefit of any physical evidence or adult witnesses to the alleged crimes. By August 1988, when it appeared most likely that Jesse would proceed to trial, the district attorney's office made Ross Goldstein an offer of six months in jail, five years probation, and treatment as a "youthful offender," in return for testifying against Jesse Friedman. After repeatedly denying the charges against him, and three months of plea discussions with prosecutors, Goldstein accepted this offer on September 8, 1988 and signed a sealed cooperation agreement. People v. Ross G., 163 A.D.2d 529, 531 (2d Dept. 1990). In fact, no evidence was ever put forward to corroborate the claim that Ross Goldstein had any role in the computer classes or had spent any significant amount of time at the Friedman house. See Maltin Aff. ¶ 7.

Around the end of October 1988, Ross Goldstein appeared before a Nassau County grand jury and testified that Jesse Friedman was involved in sexually abusing numerous children. See Ross G, 163 A.D.2d at 531. Goldstein further testified that he, as well as two other Great Neck teenagers, had participated in the conduct. See id. On March 22, 1989, Goldstein pled guilty to three counts of sodomy in the first degree and one count of use of a child in a sexual performance. Id. at 529. Despite the assistant district attorney's promise that Goldstein would be treated as a

youthful offender and receive a six month jail term, on May 3, 1989, Judge Abbey Boklan sentenced him to four concurrent terms of imprisonment of two to six years. Id. On appeal, the Second Department ordered that Judge Boklan resentence him to the six months he had bargained for, id. at 533, which she did on August 8, 1990, see Shirley E. Perlman, *Teen Told: Stay Away From Kids*, NEWSDAY, August 9, 1990, Exh. 13 (App. 484).

The two additional teenagers whom Ross Goldstein implicated, were pulled into the case in the fall of 1988. John Roe[10] and Wayne Roe – approximately eighteen at the time – were arrested and questioned by police. John Roe has described a high pressure interrogation in which he was browbeaten for "hours and hours" and prohibited from calling his parents or an attorney. Jarecki Aff. ¶ 11 (John Roe). The police suggested that the purported participants included "many more" adults in addition to the Friedmans, Goldstein, and the two other boys arrested. Galasso (App. 182) ("many more, we believe were involved, but did not get arrested because they were not able to be identified . . . ."). Thus, detectives theorized the existence of a homosexual sex ring, with at least five adults at a time brutalizing an entire class of ten boys in a small room with barely enough room to accommodate the boys and their computers.[11] It was also alleged that girls were molested, though none became complainants. John Roe also described one evening on which he and Wayne Roe spotted Ross Goldstein, and caught up with him in their car to ask him why he lied and implicated them. Goldstein explicitly acknowledged that he had lied about them. John Roe explains:

> I was wondering how I was pulled into this situation. At one point, the detectives alluded to the fact that Ross Goldstein decided to

[10] In the indictment, the child complainants were referred to by "Doe" names. The two teenage suspects were referred to by their "Roe" names by the District Attorney's Office. In this memorandum, we use those pseudonyms, except in the one case in which a complainant has voluntarily revealed his identity by submitting an affidavit in support of the motion.

[11] See Blueprint of Lower Level of Friedman House, Exh. 14 (App. 485).

> implicate me. I can't quite imagine what was going through his mind except for intense pressure from the police to come up with anything that seemed like cooperation, however, he implicated two of his friends that he knew had nothing to do with this. He admitted that on another occasion. He was driving around in his car, alone, as he sometimes did. We noticed his car and decided to follow him and ask him whether or not he was aware that he lied flat out about us. And he had no answer as to why, but he did admit that he lied.

Jarecki Aff. ¶ 12 (John Roe).

Once Goldstein agreed to testify against Jesse Friedman, the police and prosecution took no further action against John Roe, Wayne Roe, or any other of the claimed adult participants.

**The nature of the charges against the Friedmans**

The indictments depicted a pattern of rampant pedophilia in Arnold Friedman's classes that was astonishing in its magnitude and bizarre, sadistic, and violent in its particulars. They alleged hundreds of separate instances of abuse, including scores of instances of oral and anal sodomy. The children's statements to detectives, which formed the basis for the indictments, included accusations that Jesse Friedman, a young man with no history of violence, would slap children, pull their hair, and twist their arms. Galasso (App. 150).

It was also alleged that the children were induced to participate en masse in sex games such as "leap frog." Indictment 69783, count 192, 222, 223, 224, 240, 241, and 242 (complainant William Doe). In this game, Arnold and Jesse would supposedly sodomize an entire class of naked boys by "leaping" from one boy to the next. See Transcript of Interview with Gregory Doe ("Gregory Doe"), Exh. 27 (App. 737) ("Arnold and Jesse would leap one person to another sticking their dick each in their ass."[12]); CTF (App. 268) (Sgueglia) ("There was a game…called leapfrog…one guy jumping over another guy. But the fact is, it means everybody's butt's up in

[12] The indictments did not include a "leapfrog" claim with Gregory Doe as the complainant. However, by the time of his interview for "Capturing the Friedmans," Gregory Doe "recalled" the game and described it in detail.

the air."). The bizarre nature of this allegation is reminiscent of other late-80's "sex-ring" cases, such as the McMartin case. In that notorious prosecution, which lasted six years and cost the State of California fifteen million dollars without obtaining a single conviction, children made outrageous allegations that turned out to be totally untrue. For example, one child in the McMartin case "testified in the preliminary hearing that he was taken to a cemetery, where he was forced to help dig up a coffin and watch as the body was cut up with knives." Douglas J. Besharov, *Lessons from the McMartin Case*, THE CHRISTIAN SCIENCE MONITOR, February 9, 1990, Exh. 15 (App. 487).

The implausibility of the charges against the Friedmans is illustrated by the charges made by one boy who was the complainant in 104 counts of oral and anal sodomy in the first degree against Jesse Friedman and Ross Goldstein in the third indictment. Indictment 69783, counts 49–153. These counts represent seventy-two separate alleged incidents of sodomy.[13] As Jesse Friedman has observed,

> There was one complainant, ten year old boy, says he came to the class in the spring of 1986, and during this ten week session, where he was only over my house for an hour and a half, once a week, he says that there were thirty-one instances of sexual contact, that's three times a week, every single week, for ten straight weeks. And then the course ends, and in the fall, he re-enrolls for the advanced course and says that he was subjected to forty-one more instances of anal and oral sodomy in the next ten week session.

CTF (App. 331-332) (Jesse Friedman).

Notably, this complainant alleged only eight counts of sexual abuse, against Arnold Friedman, in the second indictment. Yet by the time of his grand jury testimony for the third indictment, he "recalled" conduct giving rise to more than one hundred additional counts of

[13] Thirty-two of the seventy-two alleged incidents were charged under two different theories: sodomy by forcible compulsion (N.Y. Penal Law §/130.50 (1)) and sodomy with a person less than eleven years old (N.Y. Penal Law § 130.50 (3).

sodomy. This example is representative of the dramatic expansion of the charges from indictment to indictment as the police, trying to establish the existence of a sex ring, carried forward their aggressive and, as demonstrated below, unconstitutionally suggestive investigation. The final indictment added three new complainants – and more than ***three hundred*** new charges.

A further example of the implausible and haphazard nature of the charges, is the fact that sixty-eight of the 118 counts against Ross Goldstein were alleged to have taken place between March 1 and July 1, 1986 – before Goldstein first met Jesse Friedman in September 1986. See Indictment 69783, counts 1-4, 38-39, 41-42, 104-128, 196-200, 206, 221, 240-253, 279-291, and 298; Friedman Aff. ¶ 20; Maltin Aff. ¶ 7.

**The People's theory of why the computer students never complained**

The People's theory about why none of these boys, ranging in age from eight to eleven, complained to their parents about the routine brutality they allegedly suffered at the hands of the Friedmans was that they were viciously threatened that something horrible would happen if they told anyone about the abuse. See, e.g., Indictment 67104, count 48, Exh. 1 (App. 12-13) (charging that Arnold Friedman "did slam" the head of a child against wall and threatened the class that the same would happen to them if they revealed what they had witnessed in the classes). According to Galasso, these included threats to "kidnap your baby sister," "kill your parents," and send the alleged pornographic videotapes of the children "to Channel 12 News" in the event that "I get arrested." Galasso (App.148). See also Transcript of Federal Sentencing of Arnold Friedman, March 28, 1988, Exh. 16 (App. 524) (Assistant U.S. Attorney tells district court that Arnold Friedman threatened that he would bang children's heads against the wall, kill their parents or other relatives, or set fire to their houses if they told anyone about the molestation).

No account of the conduct of state police can adequately convey the tenor of the investigation without taking notice of the willingness of police, both at the time and in retrospect, to misrepresent the facts of the case. For example, the press reported shortly after Jesse's conviction, based on conversations with police, Jarecki Aff. ¶ 9, that child pornography was found "interspersed on shelves along with legitimate classroom materials." Alvin E. Bessent, *The Secret Life of Arnold Friedman*, NEWSDAY, May 28, 1989, Exh. 26 (App. 632).

This implied that the viewing of pornographic materials was somehow integrated into the computer classes, when in fact the magazines were all found behind the piano in Arnold Friedman's private office, not within reach of any of the computer students. Clearly, the inaccurate police version was a damning allegation, put forward by the police, who knew at the time that it was untrue, since they had themselves conducted the search. Years later, in an interview with filmmaker Jarecki, Galasso would tell the camera that, "the most overwhelming thing" she recalled from the search of the house was the "foot-high stacks" of child pornography found "all around the house," when in fact, she was present for the search and reviewed the inventory lists, which clearly show that pornography was found only in Arnold Friedman's private office. Galasso (App. 143). Comments like these were used to stoke the hysteria surrounding the case.

Perhaps most troubling is the evidence that police constructed a bogus photograph at the "crime scene," combining several items that were innocuous in themselves into a tableau suggestive of perversion and abuse. This photograph included several cameras, a number of heterosexual soft pornography magazines, a number of computer floppy disks, and a hypodermic needle. As other photographs demonstrate, none of these items were found together during the actual search. Jarecki Aff. ¶ 15.

3. **Discovery**

In a demand for discovery, dated April 11, 1988, Jesse Friedman's attorney, Douglas H. Krieger,[14] asked the District Attorney's Office to provide both a bill of particulars and discovery with respect to Indictments 67104 and 67430. Demand for Discovery, April 11, 1988, ("Demand for Discovery"), Exh. 17 (App. 536-47). Specifically citing the prosecution's obligations under Brady v. Maryland, the defense made two demands of particular relevance here:

> 16. Any and all written or oral statements or utterances – formal or informal – made to the prosecution, its agents and representatives by any person whom the prosecution intends to call as a witness at trial, which statements are in any way contrary to the testimony or expected testimony of that person or any other person whom the prosecution intends to call as a witness at trial or which otherwise reflect upon the credibility, competency, bias or motive of any prosecution witness. Included in this request, for example, are the names of any individuals who were students of the defendant's during the time period of the charges in the indictment, who stated that they had not witnessed the alleged crimes.
>
> . . . .
>
> 34. In addition to the information and material requested above, any documents, books, papers, photographs, scientific tests or experiments, tangible objects, written or recorded statements of anyone, reports, memoranda, names and addresses of persons, or other evidence or information which either tends to exculpate the defendant or tends to be favorable or useful to the defense as to either guilt or punishment or tends to affect the weight or credibility of the evidence to be presented against the defendant or which will lead to evidence favorable to or exculpatory of the defendant which is within the possession, custody, or control of the prosecution the existence of which is known or by the exercise of due diligence may become known to the Government.

The letter concluded with an emphatic reminder that "each request and each paragraph of this letter is specifically sought under the rule of Brady v. Maryland, supra, and this Brady material must be made available to the accused as soon as it should be evident to the prosecution that information or material in its possession falls within the ambit of the rule."

---

[14] Jesse Friedman had two different attorneys before Douglas Krieger, each of whom represented him at one court appearance. Krieger represented Jesse from December 4, 1987 until June 3, 1988, when he was replaced by Peter Panaro. Panaro continued to represent Jesse through his sentencing.

A week later the People responded to the demand to produce. In response to paragraph 16 of the defense's discovery request, the People stated:

> 16. The defendant is not entitled to any statements made by the People's witnesses until the proper time, namely after the jury is selected. See People v. Rosario. With reference to the names of students of the defendant, the defendant himself is in the best position to know their identity.

Letter from Assistant District Attorney Joseph Onorato, dated April 18, 1988, Exh. 18 (App. 548-52).

This response demonstrated that the prosecution had either willfully or inadvertently misconstrued the defense's request. Paragraph 16 of the defense's discovery request was not a narrow demand for Rosario material – statements of prosecution witnesses that, indeed, need not be turned over until immediately before cross-examination of a witness. See People v. Poole, 48 N.Y.2d 144 (1979). Paragraph 16 was essentially a Brady request. It asked for evidence of inconsistent statements, statements suggesting a lack of credibility, and statements reflecting witness bias. Significantly, it demanded "the names of any individuals who were students of the defendant's" – a group clearly not limited to prosecution witnesses – "who stated that they had not witnessed the alleged crimes." Demand for Discovery (App. 542).

The People responded to paragraph 34 of the demand for discovery by asserting that they possessed no Brady material at all:

> As to evidence tending to be exculpatory to the defendant such is not now known upon information and belief gained from the files of the District Attorney's Office to be in existence. Should such evidence become available, it will be furnished to the defendant pursuant to Brady v. Maryland.

Letter from Assistant District Attorney Joseph Onorato, April 18, 1988.

The defense filed an omnibus motion on April 15, 1988. The motion included a request that the indictments be dismissed "for failure of the People to provide adequate discovery pursuant

to N.Y. Crim. Proc. Law § 200.95 and § 240.40."[15] Omnibus Motion, April 15, 1988, ¶ 9, Exh. 19 (App. 555). The People did not produce any Brady material in response to this request. See People's Affirmation in Opposition to Defendant's Omnibus Motion, May 10, 1988, ¶ 9, Exh. 20 (App. 580). In a decision dated July 14, 1988, Judge Boklan denied defendant's motion to dismiss the first two indictments for failure of the People to provide adequate discovery. Decision on Omnibus Motion, July 14, 1988, Exh. 21 (App. 590).

A third indictment was issued on November 7, 1988. By that time, Peter Panaro had taken over as Jesse's lawyer. Immediately after arraignment on this indictment, both parties agreed that rather than commence motion practice again, a stipulation in lieu of motions and voluntary disclosure would suffice. This stipulation, dated November 17, 1988, and so ordered by Judge Boklan, directed the prosecution to "deliver to the defendant all evidence favorable to him under the authority of Brady v. Maryland." Panaro Aff. ¶ 7.

Some time before the third indictment was handed down, Panaro viewed a videotape of a police interview with one of the computer students, Gary Meyers, that had been recorded by Gary's mother, [redacted]. See Taped Interview of Gary Meyers ("Meyers Interview"), Exh. 28 (App. 804-05); Panaro Aff. ¶ 8. [redacted] secretly taped the interview, in or about Summer 1988, because the detectives would not allow her to be present and she wanted to know what they were discussing with her son. Jarecki Aff. ¶ 6. Detectives Jones and Hatch conducted the interview. Later, [redacted] allowed Peter Panaro, Jesse Friedman's attorney, to view the tape in her presence, and transcribe it, although she would not provide Panaro with a copy of the tape. The picture on this Betamax tape was of very poor quality. Panaro Aff. ¶ 8.

---

[15] CPL § 240.40 requires that, upon a defendant's motion, a court "must order discovery as to any material not disclosed upon demand pursuant to § 240.20, if it finds that the prosecutor's refusal to disclose such material is not justified." CPL § 240.40 (1) (a). CPL § 240.20 (1) (h) provided the statutory basis for the defendant's Brady request here.

As described in greater detail below, the recording of the interview with Gary Meyers showed that the detectives used suggestive and harassing questioning. Immediately after viewing the Gary Meyers tape, Panaro informed District Attorney Joseph Onorato about the interview. Panaro made it clear to Onorato that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable to the defense that the defense had a right to be informed of. Panaro never received any Brady material indicating that such suggestive methods were used with any of the children interviewed by the police. Parano Aff. ¶ 18.

4. **Jesse's Plea**

In late 1988, Jesse Friedman confronted the horrible choice between pleading guilty in return for a sentence of six to eighteen years and going to trial, which he was sure would result in what amounted to a life sentence. Under enormous pressure from all sides, he took the guilty plea despite being guilty of no wrongdoing.

It was a virtual certainty that Jesse would spend the rest of his life in prison if he were convicted at trial. Judge Boklan, herself the former head of the Nassau County District Attorney's Sex Crimes Unit, had a reputation as a tough judge, especially when it came to sex crimes. Friedman Aff. ¶ 26. Jesse's attorney, Peter Panaro, had told him that he had been expressly informed by Judge Boklan that she intended to sentence Jesse consecutively on every count – even though she had not yet seen any of the defense's evidence. Friedman Aff. ¶ 26; Panaro Aff. ¶ 11. See also CTF (App. 270) (Boklan) ("**There was never a doubt in my mind as to their guilt.**"). With 167 felony counts against Jesse, this was a penalty sure to far exceed his lifetime.

The chances of winning at trial appeared to be non-existent. Panaro had told Jesse that he thought it would be extremely difficult to win at trial, Friedman Aff. ¶ 26, and all the relevant

circumstances supported that view. Public pressure for punishment was tremendous. From the beginning, hysteria had developed around the case. On the night of the second search, for example, one neighbor came running down the street with a rope in his hand, wanting to strangle Arnold Friedman. Sgueglia (App. 462). Some parents talked of wanting to "storm the house". Sgueglia (App.464-65). People also regularly left threatening messages on the Friedman's answering machine. See, e.g., Jarecki Aff. ¶ 14 ("You better get out of that house 'cause we're burnin' it down tonight."); CTF (App. 276) ("When Arnold gets out of jail, he's a dead motherfucker. . . . When Jesse gets out of jail, he's a dead motherfucker.").

Community groups organized letter-writing campaigns – to the judge in the state case and the judge presiding over Arnold Friedman's federal case. The federal judge, Mark A. Costantino, received "maybe five hundred" letters from members of the community regarding the appropriate sentence for Arnold Friedman. Transcript of Federal Sentencing of Arnold Friedman, March 28, 1988 (App. 524). Parents organized meetings and car-pooling arrangements that would allow as many incensed parents as possible to attend court proceedings. One father received a call from the father of another boy involved in the case, who asked him if he "would be willing to participate in seeing that Arnold Friedman 'had an accident' while he was out taking a walk during the time in which he was home on house arrest." Affidavit of Richard Tilker ("R. Tilker Aff.") ¶ 10. As the assistant district attorney handling the case has noted, the atmosphere fostered a perverse sort of competition among parents as to whose child had suffered the worst abuse. CTF (App. 274) (Onorato) (a parent might say "about … another boy, you know, 'He was sodomized five times, but my son was sodomized six times'").

The frenzied atmosphere was aggravated by the sheer volume and incendiary nature of the press coverage, which had penetrated the boundaries of the courtroom itself. Throughout the case,

Judge Boklan granted virtually every request from the media to photograph and film inside the courtroom. See, e.g., Minutes of Arraignment and Proceedings on Indictment 69783, November 15, 1988, Exh. 22 (App. 598). In fact, Judge Boklan allowed this case – with its extremely sensitive subject matter and volatile atmosphere – to become the first in Nassau County history in which cameras were allowed inside the courtroom. Jarecki Aff. ¶ 9 (Boklan).

Indeed, the trial judge herself has described the atmosphere surrounding the case as a "media frenzy." Jarecki Aff. ¶ 9 (Boklan). The intensity and extent of the media coverage only heightened the volatile atmosphere of the proceedings. See Galasso (App. 150). ("By this time just about every news organization that you could name had arrived on the scene."). Judge Boklan's lack of concern for Jesse Friedman's rights is typified by her decision-making process regarding cameras in the courtroom. She opened the courtroom to cameras because the case was something the "community was very interested in." She states that she, "wasn't that concerned about protecting the defendants. Their pictures their names were all over the newspapers, so their reputation at that point was not too good." Jarecki Aff. ¶ 9 (Boklan). Still, Judge Boklan denied Jesse Friedman's April 15, 1988 Motion for Change of Venue. See Friedman Aff. ¶ 18; Order to Show Cause, April 15, 1988, Exh. 23 (App. 619-25).

The detectives involved in the case, including Detective Sergeant Galasso, freely spoke to the press and discussed evidence against Arnold and Jesse Friedman. The media portrayal of the case was of a tabloid nature, and featured sensational stories about the heinous crime of child sexual abuse and the shocking nature of the charges. See, e.g., Mike Brennan, *100 Kids Linked to Teacher in Sex-Attack Case*, NEW YORK POST, November 27, 1987, Exh. 24 (App. 626); Michael Hanrahan and Richard Sisk, *AIDS Tests Sought: L.I. Prosecutor Asks Check of Teacher & Son in Abuse Case*, NEW YORK DAILY NEWS, November 28, 1987, Exh. 25 (App. 627). The ferocity of

the media coverage only further convinced Jesse Friedman that he had no chance of winning a trial by jury because most of Nassau County was already familiar with the case through the damning media coverage it received. Friedman Aff. ¶ 29.

Perhaps most daunting was the fact that Jesse's father had pled guilty to the federal child pornography charges on February 8, 1988, and to the state sexual abuse charges on March 25, 1988. Friedman Aff. ¶ 13. Clearly, Arnold Friedman was guilty of the charges of using the mail to send and receive a piece of child pornography. But his resolve to fight the sex abuse charges was overcome by two main considerations. First, he too faced the prospect of life in prison on the sex abuse charges. He was told that if he pled guilty he would be allowed to serve his state sentence concurrently with his federal sentence. Second, he believed that being present as a codefendant at his son's trial would ruin any chance for Jesse to be acquitted. Friedman Aff. ¶ 16.

But this decision actually did more harm than good for Jesse. Both indictments against Arnold and Jesse alleged that all the charges were part of a "common scheme and plan." Eight counts in the second indictment charged Jesse and Arnold with acting in concert to commit the offense. Indictment 67430, counts 1, 2, 21, 26, 27, 52, 64, and 66. In fact, five of the counts to which Arnold Friedman pled guilty under that indictment (counts 1, 2, 21, 26 and 27) charged that he and Jesse had committed the offenses "aiding and abetting and being aided and abetted by each other." Other counts against Arnold Friedman, while not charging Jesse as an accomplice, still referred specifically to Jesse as a participant. See, e.g., Indictment 67104, count 43. In sum, the charges against Jesse were hopelessly intertwined with those to which his father had pled guilty.

Further, immediately after pleading guilty, Arnold Friedman was taken to the police station, where he gave Detective Sergeant Galasso a detailed "closeout" statement. See Transcript of Sentence (App. 490, 492, 501, 503). The purpose of such a statement is for a defendant to

resolve any outstanding allegations by admitting to them, thus allowing the police to close those investigations. If a defendant does not admit to these uncharged crimes, he runs the risk of being prosecuted for them. In other words, if Arnold Friedman had declined to implicate himself with regard to each and every child whom the police believed he had molested, he would have been vulnerable to prosecution and incarceration far beyond the period he had negotiated for in his plea bargain. In a session that took several hours, Arnold Friedman agreed that he had committed all the crimes of which the police suspected him. Id.; Friedman Aff. ¶ 17.

Assistant District Attorney Onorato understood the pressure put on Jesse Friedman by Arnold Friedman's guilty plea:

> He's a young man, he has his whole life in front of him and now he's confronted with a situation where Long Island knows that his father admitted his guilt and there's a reasonable human expectation of some people that, you know, where there's smoke there's fire and if he did it maybe his son did it. We know he was in the same class and he was helping his father, so I think that was a difficult thing for Jesse to have to overcome.

CTF (App. 324) (Onorato).

The fact that Ross Goldstein would be a witness for the state put further pressure on Jesse. See Ross G., 163 A.D.2d at 530 ("Because of [Goldstein's] cooperation Jesse Friedman pleaded guilty . . . ."). Even though a jury might take into account that Goldstein's cooperation had been induced by the promise of a six month sentence, rather than the decades of imprisonment with which Jesse was being threatened, Jesse knew how detrimental the testimony of this adult witness might be at trial. Friedman Aff. ¶ 32.

In light of all these circumstances, Jesse Friedman decided to plead guilty in return for a six to eighteen year sentence. Attorney Panaro demanded that Jesse admit his guilt in order for Panaro to pursue a guilty plea. Panaro Aff ¶ 12. In telling Panaro that he was guilty, Jesse offered an

explanation for his conduct, telling his attorney that he himself had been a victim of sexual abuse by his father for many years and that his father had coerced him into participating in the sexual abuse of the computer students. Friedman Aff. ¶ 38.

Panaro told Jesse's story to Judge Boklan during plea negotiations. Panaro Aff. ¶ 14. Jesse presented it to the court again on December 20, 1988, when he pled guilty to sodomy in the first degree (seventeen counts), sexual abuse in the first degree (four counts), attempted sexual abuse in the first degree, use of a child in a sexual performance, and endangering the welfare of a child (two counts), in return for a sentence of six to eighteen years. Friedman Aff. ¶ 37.

Jesse told this story because he hoped that portraying himself as a victim, and not just a perpetrator, might benefit him in three ways. Friedman Aff. ¶ 38. First, he hoped that this explanation for his conduct would encourage Judge Boklan, who had to approve any plea deal with the prosecutor, to approve a lesser term of imprisonment. Friedman Aff. ¶ 38.

Second, Jesse was hopeful that portraying himself in this way would increase the chances of being granted parole after he completed his minimum sentence of six years. Friedman Aff. ¶ 38. He was aware that Judge Boklan had the power to make a recommendation regarding his parole and he hoped this more sympathetic account would avoid a recommendation against early parole. He also thought that this version of events could be considered a mitigating circumstance by the parole board itself. Friedman Aff. ¶ 38.

Third, he was also aware of the horrendous and often violent treatment of child molesters in prison, having already experienced this when he was held in detention in Nassau County, where he had been attacked a number of times, had urine thrown at him, and was subjected to death threats when fellow prisoners learned of the nature of the crimes of which he was being accused. Friedman Aff. ¶ 38. He hoped that portraying himself as a victim rather than a willing participant

in the alleged crimes would reduce the chances that he would be targeted by other inmates and corrections officers. Friedman Aff. ¶ 42. Jesse would continue to present this version of events, in statements to the media, until several months after his conviction, when he entered the general prison population and was instructed by other inmates that this story would not help him to win early release.[16] Friedman Aff. ¶ 43.

In accordance with his plea agreement, Jesse was sentenced on January 24, 1989, to a term of imprisonment of six to eighteen years.

## 5. The Present Motion

The uncovering of the exculpatory evidence that underlies this motion was accidental. In fall 2000, a documentary filmmaker, Andrew Jarecki, had decided to make a film about children's birthday party entertainers in New York City. One possible subject of the film was David Friedman, Jesse Friedman's older brother, who had become one of the most popular of these performers. While doing background research, Jarecki became aware that David's father and brother had been the defendants in a notorious child sex abuse case in Long Island. Over time, as Jarecki became more interested in that story, his film evolved into an examination of the Friedman case.[17]

---

[16] Jesse repeated this story to Alvin Bessent, a reporter for Newsday (Alvin Bessent, *The Secret Life of Arnold Friedman*, NEWSDAY, May 28, 1989) and Geraldo Rivera, who devoted an entire program to the Friedman case, including a taped interview with Jesse in prison. At the time of the interview, Jesse had spent the first two months of his incarceration in solitary confinement. He still believed that adopting this story could enhance his chances of early parole and shelter him from violence. Geraldo Rivera told him that he would provide him with an opportunity to tell this story – which Jesse thought, rightly or wrongly, was the most sympathetic one available to him – to a large audience, and so Jesse appeared on the program. It was only after a few more weeks had passed, that, having lived in prison and talked to prisoners, he became convinced that this story would not improve his chances for early release, and ceased telling it and never did so again. Friedman Aff. ¶ 43.

[17] Jesse Friedman gave two filmed interviews for "Capturing the Friedmans". He was not privy to information that was obtained from other sources. See Friedman Aff. ¶ 60.

During a three-year investigation, Jarecki sought to interview as many of the children involved in the case as possible, including the alleged child victims. He was able to obtain verbal or filmed interviews with approximately twenty-five of the students, now in their mid to late twenties, who had attended the computer classes. These included approximately five who had become complainants in the indictments and about twenty non-complainants, many of whom had attended classes alongside those who had claimed to have been violently abused. Jarecki also spoke to many of the key law enforcement personnel and prosecutors connected to the case, as well as attorneys, relatives, and others. Jarecki Aff. ¶¶ 4, 8, 10, 11.

**a. Police used five categories of suggestive questioning to obtain incriminating statements from the children.**

The statements of detectives themselves reveal that after initially being unable to procure incriminating statements from the children, they utilized a high-pressure, manipulative, and result-oriented approach to their questioning that was not disclosed to the defense in discovery. The interviews of children were usually conducted out of the presence of parents. Sgueglia (App. 394-95); Kuhn Aff. ¶ 7, with the interviewing detective taking notes. Sgueglia (App. 452-55, 458); Kuhn Aff. ¶ 6; R. Tilker Aff. ¶ 7; Affidavit of Brian Tilker ("B. Tilker Aff.") ¶¶ 7, 9. Questioning was characterized by a series of interview techniques that are now recognized to encourage false claims of sexual abuse from children. The suggestive methods used by police fall into the five categories of conduct described below, which have been recognized as improperly suggestive in both case law and scientific literature. Certain aspects of police conduct may fall into more than one of these categories. Police employed all five types of improper conduct in this case. In most of the interviews, several of the techniques were used in combination.

i. **Presumption of Guilt by Interviewers**

The recently discovered evidence makes clear that it was part of the detectives' methodology to communicate to the children that the detectives already knew they had been victims of abuse, and not to accept denials. As Detective Sgueglia, who conducted many of the interviews, explained:

> Well, if you talk to a lot of children, you don't give them an option, really. You just – be pretty honest with them. You – you have to tell them pretty honestly that we know you went to Mr. Friedman's class, we know how many times you've been to the class. You know – we go through the whole routine. We know there was a good chance that he touched you or Jesse touched you or somebody in that family touched you in a very inappropriate way.

Sgueglia (App. 408). See also Sgueglia (App. 409) ("So you don't really give them too much of an edge to say, what we're here to find out about. We already know about it. We want to hear what you have to say about it."). If an interview subject inquired about what the detective knew about the alleged abuser, Detective Sgueglia would say, "'I know things. But I can't tell you what I know because you know things that I don't know.' And whether they understood that or not, they knew what I was talkin' about." Sgueglia (App. 409). In Sgueglia's words, the detectives "did whatever it took." Sgueglia (App. 407). As Detective Llyod Doppman said, "We knew going in certain things had happened. We knew that." Jarecki Aff. ¶ 13 (Doppman).

For example, the police did nothing to hide their belief that the Friedmans were guilty when they came to speak to Gregory Doe, one of the child complainants. Gregory Doe has explained,

> Thursday night, about six o'clock knock, knock, knock, knock on the door. My parents came to the door. "It's the Nassau County Police Department. We need to talk to you. Can you please send your son downstairs – upstairs. We need to inform you that your son has been molested for the past year and Jesse and Arnold Friedman have been arrested."

Gregory Doe (App. 742-743). When the interview began, police asked Gregory Doe, "What the fuck happened? Tell me. You were molested. We know. Tell me. I need to make a report." Gregory Doe (App. 755). When Gregory Doe's mother told the police that such a thing could not have happened to her child, one of the detectives responded, "It's that attitude that probably caused your son to be molested in the first place." Gregory Doe (App. 746).

As part of their questioning routine, other detectives also expressed their certainty that there had been sexual abuse in the computer classes. Richard Tilker, the father of one of the student complainants, Brian Tilker, recalls the police arriving at his home unannounced and saying they, "knew 'something happened' to [your] son." "They didn't say 'We believe,' they said, 'We know,' and they insisted upon speaking to our son alone." R. Tilker Aff. ¶ 4. Mr. Tilker expressed his belief "that the detectives had already formed their opinion of what had happened in the computer classes and that they were just trying to get Brian to agree with their story. . . . [T]hey kept repeating that they know what happened and that he should tell." R. Tilker Aff. ¶ 5. Brian Tilker "remember[s] that they made specific suggestions to me about things that they believed happened in the computer classes . . . ." B. Tilker Aff. ¶ 5.

The suggestiveness of a police presumption of guilt is dramatically demonstrated in the interview of Gary Meyers. In the interview, the detectives went beyond presuming guilt, to actively vilifying the Friedmans. The detectives told Gary on at least seven separate occasions during the interview that Arnold Friedman had confessed to sodomizing children in the classes. See Meyers Interview (App. 804) ("He admitted he sodomized a lot of children"; "Why would Arnold admit to something that wasn't true?"; "Arnold Friedman stipulated in court that he sodomized a large number of children.").

The tactic of actually telling potential witnesses that Arnold Friedman had already specifically admitted molesting them was clearly not limited to Gary Meyers. As Detective Hatch's references to admissions made "in court" make plain, these assurances of Arnold Friedman's guilt were based on the "closeout" statement he gave right after pleading guilty in the state case, in which he admitted abusing every non-complaining child whose name was raised by the police on pain of facing many additional felony charges. Friedman Aff. ¶ 17. "Presumption" is too weak a word to use to describe this virtual guarantee of guilt that detectives provided to the young boys they interviewed.

**ii. Repeated Questioning in the Face of Denials of Abuse**

Wallene Jones and her partner, William Hatch, were key investigators on the Friedman case, and handled many of the interviews. Kuhn Aff. ¶ 5. In March 2001, Jones discussed the case with David Kuhn, a lawyer and legal advisor on "Capturing the Friedmans," who interviewed Jones for the film.[18] Jones told Kuhn that when the detectives were unable to procure incriminating statements from a student at first, they visited the child many times – in one case on fifteen separate occasions – until the child provided such statements. Kuhn Aff. ¶ 9. In interview sessions that lasted as long as four hours, this particular boy repeatedly denied being the victim of abuse, on one occasion jumping up and down and shouting that nothing had happened. Kuhn Aff. ¶ 12. But the detectives kept returning to the house because they "already knew" that the boy was a victim. Kuhn Aff. ¶ 9. On the fifteenth visit, the detectives spoke with the boy alone in his bedroom, explaining to his mother that they were going to stay "as long as it takes." Kuhn Aff. ¶ 10. The boy finally stated that he had been abused. Asked why it took fifteen interviews for the

[18] Kuhn took contemporaneous notes. The quotations of Jones in his notes were taken down verbatim. Kuhn Aff. ¶ 4.

child to make the accusation, Jones told Kuhn that this boy had suffered tremendous trauma and had "kept it deep inside." "I drew it out again," she said. Kuhn Aff. ¶ 11.

This sort of relentless questioning was not the exception, but the rule. Ron Georgalis was a student in the classes when he was nine and ten years old. On their initial visit to his home, detectives Hatch and Galasso questioned Ron and he told them that nothing inappropriate had happened to him. Ron Georgalis Aff. ¶ 5. Still, Galasso returned for a second interview. When Galasso spoke to his parents in the kitchen, Ron eavesdropped on the conversation and heard Galasso tell his parents that he had been sodomized both anally and orally and that Arnold Friedman had referred to him as "his favorite." Ron Georgalis Aff. ¶ 5. See also Affidavit of Ralph Georgalis ("Ralph Georgalis Aff.") ¶ 3 ("Det. Galasso stated to my wife and me that [Arnold] Friedman had been interviewed in prison, and Galasso quoted him as saying, 'Ron was my favorite.'").

Student complainant Brian Tilker told a similar story:

> I remember the police questioning me on two occasions. On each occasion, I told them I had never been abused by Arnold or Jesse Friedman or anyone else, and that I did not witness anything inappropriate in the computer classes at any time. I recall that this did not end their questioning and that I felt that they would be unsatisfied with any response other than my concurring with their view that sex abuse had taken place in the Friedman computer classes.

B. Tilker Aff. ¶ 4.

Similarly, James Forrest, another of the students, has stated that "[t]he Nassau County Police visited our house, unannounced, and questioned me and my brother regarding the classes

and regarding the Friedmans. We told them nothing inappropriate happened." Affidavit of James Forrest ("Forrest Aff.") ¶ 4.[19]

Gregory Doe, the complainant who has acknowledged that he only made claims against the Friedmans after being subjected to hypnosis, see infra at 38, is yet another child who failed to implicate the Friedmans upon initial inquiry.

**iii. Rewarding or Punishing a Child to Obtain Desired Answers**

When police encourage certain responses by linking them in the child's mind with rewards, or discourage other responses by linking them to punishments, children are far more likely to provide responses consistent with the interviewer's beliefs. These rewards and punishments can be subtle and can take many forms, such as praising, bribing, or befriending a child, on the one hand, or refusing to accept a child's answer, or denigrating a child who doesn't provide the desired responses, on the other. For example, after failing to elicit claims of abuse from one child, a detective in this case told the child's mother, in the child's presence, that "he was a wise guy, and I didn't like his answers." Meyers Interview (App. 805). This type of interview creates an emotional tone in which the motivation to please the interviewer may be elevated above the desire to provide accurate responses.

Mindful that "children always wanna please adults," Detective Sgueglia would "find out the child would either favor myself or my partner. And that's who would take the investigation." Sgueglia (App. 394-95). Often, the interviews would take place in the child's room, a "very friendly atmosphere," where detectives could "make friends with them," and gain the children's

---

[19] Hal Bienstock, a student who was not interviewed by the police, also states that he never saw anything happening in the classes ("I never noticed anything inappropriate happening in any of the classes."). Affidavit of Hal Bienstock ¶ 3. See also CTF (App. 267-268) (Former computer student # 2) ("I think as someone who took the classes it was just hard to picture even that going on because I did have a good experience. And I didn't . . . see anything . . . remotely like . . . child molestation or child abuse or any, child-anything going on."); E-mail from NoleDreamer, Exh. 39 (App. 900).

confidence. Sgueglia (App. 399, 404). Sgueglia described another situation in which multiple interviews, establishment of a "friendship" with the child, and other inducements were necessary to bring forth a charge of molestation:

> You would . . . find some children, this one particular kid, we went to four or five times. He was very cool. Didn't say anything, nothing happened. Sit down on the floor, play games. Totally ignore you – that you were even there. After an hour or two you helped him with his toy, you did this, you did that. And then you were friendly. And then – from that point, you'd say – you know, enough tonight, and why don't you think about it. And you know – we'll come back tomorrow. And you know we'll deputize you and you know – I like cops – do you like cops? I like – yeah, they, my mommy says they help us. That kind of stuff.

Sgueglia (App. 424-25). Similarly, Richard Tilker "heard from other parents the police would have pizza parties and give police badges to the children who cooperated." R. Tilker Aff. ¶ 8; see also B. Tilker Aff. ¶ 11.

The police resorted to the stick as readily as they did the carrot. The repetitive questioning by police could be so unpleasant that students would finally agree that abuse occurred in order to obtain psychological relief:

> After many sessions in which the police appeared unsatisfied by my negative responses, I became frustrated at the persistent questioning. As I stated in my interview with Mr. Jarecki for his film, I remember finally telling the police officers that I had seen Jesse chase a kid and hit him. I remember saying that not because it was true, but instead because I thought it would get them off my back. This statement was not accurate but at the time – being 8 years old – I felt that saying this would allow me to avoid the unpleasant experience of being questioned repeatedly by the police.

B. Tilker Aff. ¶ 8. This recollection is confirmed by the boy's father. R. Tilker Aff. ¶ 6 ("Brian finally told them that one time he saw Jesse chase after and strike a child, though he later told us that that was not true and that the only reason he had said that was to end the questioning.").

One child, responsible for sixty-seven counts, including twenty-nine counts of sodomy, clearly remembered the stress produced by police questioning:

> What I do remember is the detectives putting me under a lot of pressure to speak up, and at some point, I kind of broke down. I started crying. And when I started to tell them things, I was telling myself it was not true. I was telling myself, "Just say this to them to get them off your back."

CTF (App. 336) (Dennis Doe).

This use of negative reinforcement to prompt allegations of abuse is also evident in the taped interview of Gary Meyers. In that interview, Detective Hatch pressured Gary with the intimation that denying abuse in the face of Arnold Friedman's confessions would be an indictment of the boy's intelligence: "You're reasonably intelligent. I wouldn't say you're a genius but you're reasonably intelligent." Meyers Interview (App. 804). Detective Hatch challenged the child's version of events, taunting him: "Oh, it happened to everyone else but not to you." After declaring that Arnold Friedman "liked" young boys, he reiterated incredulously, "You were nine years old and nothing happened?" The detective continued, "You'll find out as you get older that certain things are true, certain things are lies. You denying this doesn't mean it didn't happen." Id. (App. 804-05).

Moving beyond the tactic of refusing to credit the interviewee's answers, the detectives resorted to the even more shocking tactic of communicating to Gary, approximately fourteen years old at the time of the interview, that his obstinacy might increase the chances of his becoming a homosexual or pedophile, and having profound psychological problems in the future. After Detective Jones informed Gary that "a lot of boys seem to have concerns about their own sexuality," Detective Hatch expanded on the theme:

> What about a homosexual act over a period of years? Formative years? Would you consider that having an affect on a person's

> sexuality? Do you think that determines if you are a homosexual? If a person was involved in a homosexual act during preadolescent years after they are forced out of it do you think they would like it?

Id. (App. 805). Hatch then explained that a person's failure to admit being the victim of a pedophile could lead to severe psychological distress in later life or even becoming a pedophile oneself.

> Most children who abuse children have been abused themselves. It's a monster created within you. This little monster inside you. This little voice and every now and then it rears its ugly head. Unless the victim knows enough about the problem to get himself straightened out. If suppressed, it's a twofold problem. One is anger and frustration. And the other is acting itself out. It's a no-win situation unless the person goes and gets help and admits that he was victimized. If something bad happens even though it's not the kid's fault the child blames himself and feels tremendous guilt. We find, with the help that they can see it's not their fault. And then they place the blame on the person who created the situation and then they are a lot better off.

Id. (App. 805).

**iv. Peer Pressure – Reporting that Other Children Have Already Implicated the Suspect**

In addition to the other suggestive techniques they used, the detectives also exploited the power of peer pressure by telling children they questioned that other children in their class had implicated Jesse and Arnold Friedman. This coercive technique, which plays upon a child's reluctance to make statements inconsistent with those of his peers, took two forms. Detectives would tell children either that other children had claimed to have been abused or that other children had stated that they had witnessed the interviewee himself being abused.

Detectives told Gary Meyers that several of the other children had told them that he had been a victim of abuse. Detective Hatch advised Gary, "We've had kids who stated that they saw you and that you're involved. OK?" "Don't deny it yet," Detective Jones immediately interjected.

Meyers Interview (App. 804). Gary repeatedly denied that he had been abused or had witnessed the abuse of others, saying, "No he never touched me" and "I didn't see it. I didn't hear it." Id. But the detectives persisted, making it plain that they thought Gary was lying and that they were impatient with or offended by what they viewed as his evasions of the truth.

The same tactic was used in the Georgalis home. According to Ron Georgalis's father, "the clear intent of the detectives was to convince us that Ron had been molested and that several other children had already admitted that they, also, had been molested." Ralph Georgalis Aff. ¶ 4.

Detectives told Brian Tilker "repeatedly that other students in my class had already told them that they had been abused, and that they were certain in fact I had also been abused and I should tell them so." B. Tilker Aff. ¶ 5. One detective "recount[ed] for me certain statements that others had allegedly made." B. Tilker Aff. ¶ 6.

**v. Interviewers of High Status**

To a pre-adolescent child, a police officer conducting an official interview is an authority figure with high status. Inherent in this relationship is the natural tendency of the child to please this authority figure and to provide answers consistent with the beliefs expressed by the officer. While an interviewers' high status is an intrinsic feature of the interview, even where the interviewer strives to maintain neutrality, the suggestive potential of this power relationship is activated when an interviewer communicates his implicit agenda to a child or directly exploits the power of his office. Here, as described above, the interviewing detectives employed a host of suggestive tactics. The pure fact that the interviewer was a police detective was made even more compelling when the detective claimed to have information about the child and what supposedly had happened to them. At least one detective in this case went further, offering the child an opportunity to partake in this high status by becoming a "deputy" to the officer himself, asking the

child, "we'll deputize you and you know . . . do you like cops?" Sgueglia (App. 424-25). Some children considered their interaction with the police "an adventure" and "appeared to get a lot of excitement out of the attention they were getting from the police." B. Tilker Aff. ¶ 11.

**b. Hypnosis, memory recovery, and visualization techniques**

In addition to shedding new light on the manner in which police elicited claims of abuse from the children, the investigation performed during the making of "Capturing the Friedmans" also revealed that at least one of the complainants did not assert that he had been abused until after he was subjected to hypnosis. As that complainant has acknowledged, "I just remember that I went through hypnosis, came out, and it was in my mind." Gregory Doe (App. 785). This child was the source for thirty-five separate sodomy counts against Jesse Friedman. But it is likely that this instance of hypnosis is not the only one that occurred in this case. Detective Sergeant Galasso acknowledged at the time that there were "additional charges revealed during therapy sessions." Haintze and Bessent, supra. (App. 806).

Dr. Sandra Kaplan – a therapist who worked closely with the police in this case – was an advocate of hypnosis and other so-called "visualization methods," particularly for alleged victims who had "amnesia" for their abuse. Dr. Kaplan worked with the detectives, and the alleged victims, involved in this case as early as December1987, long before many of the charges were made, and almost a year before Jesse pled guilty. She attended meetings at Great Neck schools in December 1987, January 1988, and November 1988, together with Galasso and others involved in the case. See William S. Dobkin, *Great Neck Community Marshals its Resources to Deal With Child Abuse and Child-Sex Crime*, GREAT NECK RECORD, February 4, 1988, Exh. 31 (App. 808); Friedman Aff. ¶ 30; Temple Beth-El of Great Neck Panelists of Sexual Abuse of Children Program, November 16, 1988, Exh. 32 (App. 810).

After Jesse pled guilty, Kaplan and Galasso (along with others) presented a lecture entitled "Child Pornography and Extrafamilial Child Sexual Abuse,"[20] and discussed the methods used to treat children in the Friedman case. The presentation summary, Exh. 34 (App. 813-25), discusses the techniques used to treat the Friedman computer students, even after Jesse's guilty plea, which included hypnosis. The presentation describes the utilization of memory recovery techniques in detail:

> Of the 15 children seen in the two groups, six children had no memories of being victimized even though members witnessed their abuse. A technique that was useful in helping these children remembering was having all group members draw pictures of the room where they were victimized and speak about their memories of the classes using the pictures as a visual aid. With the help of this technique, two group members who had amnesia for the abuse, remembered most of the detail of their victimization. Two of the remaining four have had vague but not detailed memories and the remaining two continue to not remember their abuse. The group was also helpful in that those children who remembered, who initially had dissociated, were able to reassure those with amnesia that the process of remembering would not be painful (the children had been told by detectives who questioned them that when they remembered it would be traumatic).

App. 821. Thus, even after the conviction of both Friedmans, and all the statements allegedly volunteered by the students, six of the children in the classes could not independently recall the abuse.

---

[20] This lecture was presented under the auspices of the Center for Child Protection of the Children's Hospital and Health Center, in San Diego, California, in January 1990. The full title of the conference was, "Health Science Response to Child Maltreatment, with the American Professional Society for the Abuse Annual Meeting and the California Professional Society on the Abuse of Children Annual Meeting in Cooperation with the Office of Victims of Crime, United States Department of Justice".

## ARGUMENT

**JESSE FRIEDMAN'S CONVICTION MUST BE VACATED PURSUANT TO N.Y. CRIM. PROC. LAW 440.10 (h) BECAUSE THE PEOPLE VIOLATED THEIR DUTY UNDER BRADY v. MARYLAND BY FAILING TO DISCLOSE TO THE DEFENSE EVIDENCE IN THEIR POSSESSION THAT WOULD HAVE SEVERELY UNDERMINED THE CREDIBILITY OF THE PROSECUTION'S WITNESSES**

**A. Introduction**

Fair consideration of the battery of suggestive techniques used by police, in the context of the case as a whole, yields two inescapable conclusions: (1) the undisclosed facts regarding how the interviews were conducted was evidence favorable to the defense; and (2) the undisclosed evidence easily meets the lenient standard of materiality that applies here.

The favorableness of the concealed material to the defense is self-evident. Evidence that witnesses made allegations against a defendant only after subjection to suggestive questioning naturally tends to detract from the credibility of those witnesses. More specifically, it is well established that the use of "suggestive interviewing techniques," in child abuse cases "can shape the child's responses." People v. Michael M., 162 Misc.2d 803, 808-09 (Sup. Ct. Kings Co. 1994).

It is just as clear that the People's compliance with their constitutional duty to disclose would have had a major impact on Jesse Friedman's decision regarding a plea. The sheer volume and magnitude of the impeachment evidence withheld by the People is astounding. In the hands of the defense this evidence would have generated not just a glancing blow against the People's case, but a comprehensive assault on the credibility and integrity of virtually every aspect of the prosecution. It would have enabled defense counsel to cast significant doubt on the reliability of every single complainant, and demonstrate to the jury that many, if not all, of the child complainants had made prior inconsistent statements, changing their stories after first stating that they were not victims of any abuse. In addition, the defense could have shown that fifty or more

children denied witnessing any abuse even though they attended the same classes as the boys who alleged sexual abuse that was flagrant, violent, and astonishingly frequent. Finally, the defense could have provided the jury with good reason to doubt the fairness and honesty of the police, the prosecution, and the investigation as a whole.

The damage inflicted by this evidence would have been all the more profound because of at least two major problems with the People's case. First, even though the prosecution alleged that violent and constant sexual abuse occurred over a period of at least three years, it could not point to a single boy who had ever during this time reported being abused, or shown any sign of it, a circumstance directly at odds with both common sense and scientific knowledge.

Second, the prosecution, which asserted that the Friedmans produced hordes of pornographic photographs and videotapes featuring the children in the classes, did not find a single such photograph or tape, despite the fact that Arnold Friedman had no reason to dispose of these ostensibly treasured items prior to the surprise federal search for pornographic materials.

Jesse Friedman's case does not exist in isolation. It is very much a part of the series of cases set against the child sexual abuse hysteria of the 1980's and early 1990's. Many of those prosecutions resulted in dismissals or acquittals. See the Akiki case (jury trial, no published opinion) (early 1990's acquittal by jury after defendant spent more than two years in jail; allegations, made after interviews with a large number of children, included the ritual slaying inside the preschool of a giraffe and an elephant).[21] In a great number of those cases in which defendants were found guilty, the convictions have been set aside based on the very same infirmities that exist here. See, e.g., State v. Michaels, 642 A.2d 1372 (N.J. 1994), affirming State v. Michaels, 625 A.2d 489 (N.J. Super. Ct. App. Div. 1993) (New Jersey Supreme Court upheld

[21] The Akiki case is discussed in People of the Territory of Guam v. McGravy, 14 F.3d 1344, note 1 (Reinhardt, J. dissenting).

decision of the Appellate Division (1) reversing, on the basis of highly improper interrogations, the conviction of a nursery school teacher convicted of bizarre acts of sexual abuse against many children, and (2) holding that defendant was entitled, on retrial, to hearing to determine whether children's testimony was inadmissible based on suggestive questioning.).

Each of these cases was grounded largely on allegations by children – made only after police questioning began – of acts thought unimaginable.[22] But they were imaginable. And, sparked by understandable fear and horror at the suggestion that children were being abused, as well as investigative tactics calibrated for accusation rather than accuracy, they were vividly imagined by children, adults, and whole communities. The moment in our legal and judicial history represented by these cases is not a proud one. This case too is a product of that moment.

At base, this case is defined by three questions. In the panicked, topsy-turvy atmosphere surrounding child sex abuse cases in the 1980's and early 1990's, they were consistently answered incorrectly. First, "Can it be that copious claims of sex abuse from many different children can have no basis in fact?" The answer, demonstrated in case after case, is that it can be. Second, "Can it be that such severe, violent, and pervasive abuse can go on for years without one complaint from the children and no physical, behavioral, or emotional indications?" The answer, explained more fully below, is that this is a practical impossibility. Finally, "Can it be that an innocent person would confess or plead guilty to heinous crimes that he did not commit?" Although the notion of an innocent person admitting guilt may be counter-intuitive, the phenomenon is not at all rare, as demonstrated by the procession of inmates who pled guilty or otherwise admitted guilt at

---

[22] Many cases, including the McMartin and Michaels cases, were triggered by one questionable report of sexual abuse by one parent about one child. Among the other complainants that emerged in those cases, not one child had claimed any type of abuse until after being suggestively questioned by police and therapists. In this case, there was not even one report of abuse to prompt the investigation. Not one of the complainants against the Friedmans had alleged any abuse before egregiously suggestive tactics by police had poisoned the well.

some point, who have been decisively exonerated in recent years. Here, considering all the circumstances and pressures confronting him, Jesse Friedman's guilty plea is consistent with actual innocence.

**B. The Applicable Legal Standard**

Under Brady v. Maryland, 373 U.S. 83 (1963) the prosecution must provide the defendant with evidence in its possession that is favorable to the defense regarding guilt or punishment. Brady material includes evidence that may be useful for the impeachment of a prosecution witness. Giglio v. United States, 405 U.S. 150 (1972). The responsibility to disclose Brady material is institutional, and exists regardless of an individual prosecutor's good or bad faith. See Kyles v. Whitley, 514 U.S. 419 (1995); People v. Wright, 86 N.Y.2d 591 (1995).[23]

"The government's obligation to make such disclosures is pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government." United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (citation omitted). Avellino based this conclusion on the principle that even a voluntary plea is subject to being vacated where it was obtained through "'impermissible conduct by state agents.'" Id. (quoting Brady v. United States, 397 U.S. 742, 757 (1970)). "Impermissible conduct includes Brady violations." Avellino, 136 F.3d at 255. See also People v. Ortiz, 127 A.D.2d 305, 308 (3rd

[23] New York has long recognized that the prosecution must reveal to the defense precisely the same type of evidence as a matter of New York constitutional law. People v. Fein, 18 N.Y.2d 162 (1966). See also N.Y. Code of Professional Responsibility, DR 7-102 (prohibition against concealing or knowingly failing to disclose "that which the lawyer is required by law to reveal"); DR 7-103 (duty of public prosecutor to disclose evidence tending to "negate the guilt of the accused, mitigate the degree of the offense or reduce the punishment").

Dept. 1987) (claim of violation of Brady rights is not waived by a guilty plea) (citing People v. Pelchat, 62 N.Y.2d 97, 108 (1984)).

To warrant vacatur of a conviction, the suppressed evidence must be "material." Brady v. Maryland, 373 U.S. at 887. Where the prosecution has withheld multiple items of evidence, the items are considered individually but their materiality is evaluated by the cumulative impact of the withholding. Kyles, 514 U.S. at 437.

New York courts apply a dual standard of materiality. Where Brady material is withheld from the defense despite a specific request made by defense counsel, reversal is required if there is a "reasonable possibility" that the prosecution's failure to disclose exculpatory information contributed to the defendant's conviction. People v. Vilardi, 76 N.Y.2d 67, 77 (1990). When only a general request is made, the undisclosed evidence is material only if there is a "reasonable probability" that the undisclosed evidence would have altered the outcome. People v. Janota, 181 A.D.2d 932, 934 (3rd Dept. 1992).

In the context of a guilty plea, the materiality inquiry focuses on "whether . . . the defendant would not have pleaded guilty" if the prosecution had met its Brady obligation. People v. Armer, 119 A.D.2d 930, 932 (3rd Dept. 1986). See also People v. Bernard, 163 Misc.2d 176, 181 (Sup. Ct. N.Y. Co. 1994) (conviction must be reversed if information would have materially affected the decision to plead guilty) (citing Miller v. Angliker, 848 F.2d 1312 (2d Cir. 1988)). When a defendant who pled guilty has made a specific request for the information withheld, New York's dual standard requires that a conviction must be reversed if there is any reasonable possibility that the defendant would have pled not guilty, rather than guilty, if he had known the information that the prosecution did not turn over.

Here, each piece of withheld evidence was the subject of a specific request. In its demand to produce, the defense asked for:

> 16. Any and all written or oral statements or utterances – formal or informal – made to the prosecution, its agents and representatives by any person whom the prosecution intends to call as a witness at trial, which statements are in any way contrary to the testimony or expected testimony of that person or any other person whom the prosecution intends to call as a witness at trial or which otherwise reflect upon the credibility, competency, bias or motive of any prosecution witness. Included in this request, for example, are the names of any individuals who were students of the defendant's during the time period of the charges in the indictment, who stated that they had not witnesses the alleged crimes.
>
> . . . .
>
> 34. In addition to the information and material requested above, any documents, books, papers, photographs, scientific tests or experiments, tangible objects, written or recorded statements of anyone, reports, memoranda, names and addresses of persons, or other evidence or information which either tends to exculpate the defendant or tends to be favorable or useful to the defense as to either guilt or punishment or tends to affect the weight or credibility of the evidence to be presented against the defendant or which will lead to evidence favorable to or exculpatory of the defendant which is within the possession, custody, or control of the prosecution the existence of which is known or by the exercise of due diligence may become known to the Government.

These specific requests were complemented by the ultra-specific request made by Attorney Panaro after he viewed the Gary Meyers interview. Right after seeing the Meyers tape, Panaro "informed District Attorney Joe Onorato about the interview," and "made it clear to him that any evidence that similar tactics were used in interviewing any of the complainants against Jesse Friedman would be evidence favorable to the defense that the defense had a right to be informed of." Panaro Aff. ¶ 18. The evidence suppressed by the prosecution here would have been responsive to these unquestionably specific requests by Jesse Friedman's attorneys.

Based on the arguments below regarding the strongly exculpatory nature of the withheld material, it is clear that the "reasonable possibility" standard is more that met here. Finally, even if the court were to find that some, or even all, of the non-disclosed Brady material was not the subject of a specific request, there is more than a "reasonable probability" that the exculpatory

evidence, relating principally to the credibility of the alleged child victims, would have resulted in a plea of not guilty rather than guilty.

**C. The Prosecution Withheld Brady Evidence That Police and Therapists Used Suggestive Methods to Elicit Accusations of Sexual Abuse From Children – Consistent With Their Pattern in Other Child Sex Abuse Cases.**

**1. Evidence that detectives used an array of suggestive interviewing techniques was impeachment evidence that the prosecution was required to turn over to the defense under Brady.**

The impact of suggestive questioning on children's allegations of sexual abuse is well established both scientifically and in case law. In recent years, numerous convictions of child sexual abuse from the 1980's and early 1990's have been overturned on the basis of repeated suggestive interviews by police, therapists, and parents that undermined the reliability of allegations by children. See, e.g., Idaho v. Wright, 497 U.S. 805, 812-13 (1990) (upholding decision of Supreme Court of Idaho reversing conviction where statements of alleged child sexual assault victim were unreliable due to suggestive questioning by a biased interviewer); State v. Michaels, 625 A.2d 489 (N.J. Super. Ct. App. Div. 1993) (reversal of child sexual assault conviction and remand for pre-trial hearing to determine whether "accuser's testimony is founded upon unreliable perceptions, or memory caused by improper investigative procedures [that may result] in a defendant's right to a fair trial being irretrievably lost"); People v. Zwart, 600 N.E.2d 1169, 1172 (Ill. 1992) (error to admit alleged child sexual assault victim's hearsay statement where it was "the result of suggestive interview techniques"); United States v. Banks, 36 M.J. 150, 169 (C.M.A. 1992) (in child sexual assault case, it was error for trial judge to exclude videotape of child's interview with social worker where defense contended interview techniques were unduly suggestive and "it was essential for the members to see the interview process in order for them to be able to understand and to evaluate the defense theory of the case"); See also Snowden v.

Singletary, 135 F.3d 732 (11th Cir. 1998) (habeas corpus granted on ground that expert witness was allowed to testify that 99.5% of children tell the truth and that the expert had never personally encountered a child who lied about abuse).

In Maryland v. Craig, 497 U.S. 836 (1990) four justices dissenting from the Court's opinion upholding use of closed-circuit television testimony from alleged child sexual assault victims relied on studies that show that

> children are substantially more vulnerable to suggestion than adults, and often unable to separate recollected fantasy (or suggestion) from reality. . . . The injustice their erroneous testimony can produce is evidenced by the tragic Scott County investigations of 1983-1984, which disrupted the lives of many (as far as we know) innocent people in the small town of Jordan, Minnesota (internal citations omitted)

497 U.S. at 868 (Scalia, J. dissenting, joined by Brennan, Marshall, and Stevens, JJ.). See also Brief Amicus Curiae of Victims Of Child Abuse Laws (VOCAL) National Network In Support Of Respondent Sandra Ann Craig, Maryland v. Craig (discussing use of improperly suggestive interviewing techniques in child sexual assault cases).

This spate of reversals followed upon the courts' recognition – based largely on new scientific evidence – that certain types of suggestive questioning can elicit false allegations of sexual abuse from children. This scientific evidence undermined the prevailing belief at the time that children would never lie regarding sexual abuse. The convictions overturned in these cases occurred at a time when popular understanding of the susceptibility of children to such suggestive techniques rested on unfounded premises that would be completely undermined by newer research within a few years. See id. Here, those questioning the children employed the full spectrum of improper techniques condemned in the cases cited above.

The categories of suggestive methods used in child sexual abuse cases have been formulated in many different ways.[24] In this brief, we divide suggestive questioning methods into five categories that encompass virtually all of the techniques recognized in the various organizing frameworks used by courts and social scientists.[25] As in other frameworks, these categories overlap, and multiple types of suggestive questioning techniques are often used within the same interview.

**a. The prosecutions' failure to disclose that the detectives communicated their presumption of Jesse Friedman's guilt to the children violated Brady.**

Studies have found that when an interviewer believes that abuse occurred, children are more likely to provide false reports so that their answers are consistent with the belief of the interviewer.[26] In addition, when children hear information from interviewers across multiple interviews about what might have happened to them, they can eventually incorporate what they hear from the interviewer into a personal experience that actually happened.[27] Children subjected

---

[24] In People v. Michael M, for example, a New York court found that, "factors that influence a child's suggestibility include: (1) whether the interviewer believes in the presumption of guilt; (2) whether the interviewer vilifies or criticizes the suspect; (3) whether the questions asked are leading or non-leading; (4) whether the interviewer is a trusted authority figure." Michael M, 162 Misc.2d at 809 (citing Myers, *The Child Witness: Techniques for Direct Examination, and Impeachment*, 18 PAC L J 801, 889 (1987); Goodman and Hegelson, *Child Sexual Assault: Children's Memory and the Law*, 40 *U Miami L Rev.*, at 195).

Social scientific studies have come to agree on a framework of nine categories of suggestive questioning techniques that tend to elicit false allegations of sexual abuse from children. These nine categories are: (1) interviewer bias; (2) repeated questions; (3) repeating misinformation across interviews; (4) emotional tone of the interview; (5) peer pressure or interactions; (6) being interviewed by adults with high status; (7) stereotype inducement; (8) anatomically correct dolls; (9) source attribution errors. These same categories have been adopted in cases evaluating claims of suggestive questioning. See, e.g., State v. Michaels, 642 A.2d 1372 (N.J. 1994).

[25] The defense is not aware of whether anatomically correct dolls were used in this case.

[26] Stephen J. Ceci and Maggie Bruck, JEOPARDY IN THE COURTROOM-A SCIENTIFIC ANALYSIS OF CHILDREN'S TESTIMONY 87-105 (American Psychological Association 1995).

[27] *Id.* at 87-105.

to such interviewer bias are more likely to provide responses that are inaccurate and false.[28] Studies show that when children are given negative information about a suspect (e.g., he is a bad person or he does bad things), they are more likely to provide false allegations.[29]

Here, the interviewers regularly reminded the alleged victims and their families of the detectives' certainty that Arnold and Jesse Friedman were guilty, consistently telling the child witnesses that the police "already know about it." Sgueglia (App. 409). See also Kuhn Aff. ¶ 5 (Detective Jones "already knew" that the boy was a victim). As Richard Tilker put it, "They didn't say 'We believe' they said 'We know.'" R. Tilker Aff. ¶ 4. For a police officer to tell a child that he already knows the answer to the question he has posed is leading questioning in its most unvarnished form.

A presumption of guilt is raised to a new level of suggestiveness when the interviewer vilifies the suspect in front of the potential witness. There can be no greater vilification of a suspect than telling a prospective child witness that the suspect is guilty of multiple counts of child sexual abuse, and even that he has confessed to these crimes. See Meyers Interview (App. 804) (Detective Hatch states numerous times that Arnold Friedman had already confessed to "sodom[izing] a larger number of children").

---

[28] K. P. Roberts, *Children's ability to distinguish between memories from multiple sources: Implications for the quality and accuracy of eyewitness statements*, 22 DEVELOPMENTAL REVIEW 403-435 (2002); M. Bruck, S. J. Ceci, E. Francoeur & R.J. Barr, *"I hardly cried when I got my shot!": Influencing children's reports about a visit to their pediatrician*, 66 CHILD DEVELOPMENT 193-208 (1995); S.J. Ceci, E. Loftus, M. Leichtman, & M. Bruck *The role of source misattributions in the creation of false beliefs among preschoolers*, 62 INTERNATIONAL JOURNAL OF CLINICAL AND EXPERIMENTAL HYPNOSIS 304-320 (1994); M. Bruck, S.J. Ceci, & Hembrooke, *The nature of children's true and false narratives* 22 DEVELOPMENTAL REVIEW 520-554 (2002).

[29] M.D. Leichtman and S.J Ceci, *The effects of sterotypes and suggestions on preschoolers reports*, 31 DEVELOPMENTAL PSYCHOLOGY 568-578 (1995).

              **b. The prosecution's failure to disclose that the detectives persisted in questioning the children even when they insisted that they had not been abused violated Brady.**

Perhaps the most unifying theme of the interviews, reflected in the statements of both the detectives and their subjects, is the detectives' practice of returning again and again to question the same children, in one case fifteen times. The police were virtually evangelical in their belief that the children they spoke to had been abused, and viewed denials of abuse as products of shame, fear, or repression – anything but the truth. It was typical for police to "go back four or five times" to a home in which the child had denied that sexual abuse had taken place. Sgueglia (App. 389). See also Sgueglia (App. 413) (numerous children, who Sgueglia believed had been abused said "[n]othing ever happened. We did computers."). The children in the Friedman case were interviewed in their own homes by the detectives. As the Michigan Protocol on the correct methods for interviewing children clearly states, ideally, children should not be interviewed about allegations of sexual abuse in their own home.[30]

As one parent described, "[t]he police wouldn't take no for an answer." R. Tilker Aff. ¶ 6. Detective Sgueglia described the approach: "[Y]ou don't give them an option, really . . . we know that there was a good chance that he touched you or Jesse touched you or somebody in that family touched you in a very inappropriate way." Sgueglia (App. 408).

The implicit premise underlying this unrelenting approach is that child sexual abuse victims tend to deny the abuse at first but will divulge the truth after repeated questioning. This theory, known as the "child sexual abuse accommodation syndrome" (CSAAS), has been thoroughly discredited as a basis for a criminal investigation, and was the foundation for many

30 Dr. Debra Poole, *State of Michigan Governor's Task Force on Children's Justice and Family Independence Agency Protocol*, GOVERNOR'S TASK FORCE ON CHILDREN'S JUSTICE, 12 (1993).

strikingly similar child sexual abuse cases of the 1980's and 1990's.[31]   Roland Summit, the

leading proponent of the theory, argued, counter-intuitively, that "if there is evidence of sex abuse

and a child denies it, this is only further proof that it happened and a therapist should use any

means to help the child talk."[32]   Dr. Maggie Bruck explains that the CSAAS theory operates on the

premise that "abused children must be relentlessly pursued or they will never disclose their abuse;

one should not readily accept children's denials or recantations because these responses are typical

among sexually abused children."[33]   Further, Bruck observes, "sometimes interviewers assure

themselves of the safety of actively pursuing children until they assent to abuse by stating that

children cannot be influenced to 'lie' about sexual abuse."  Id.

Numerous studies challenge and undermine the Summit theory that children are initially

silent about abuse, next deny abuse, and finally, after repeated questioning, will disclose the

incidents of abuse.  For example, a 1996 study by Bradley and Wood found that among 234

validated cases of child sexual abuse, only 5% of the children denied the abuse when first

questioned about it.[34]   Other important studies have found that when children are asked over and

---

[31] In the "Little Rascals" case, in Edenton, North Carolina, a multiple-victim, multiple-offender child sex abuse case that started in 1988, many of the children were repeatedly interviewed until they alleged sexual abuse ("All that is known for sure is that although the children initially denied the abuse, they eventually admitted to it--usually after many months and intervening interviews").  See Ceci and Bruck, *supra* note 26.

In the Bobby Fijnje case (jury trial, no published opinion) (in Miami, Florida, in 1991, 14-year old Bobby Fijnje was acquitted at trial in a multiple victim sex abuse where evidence showed that suggestive questioning was used to elicit false accusations of sexual abuse.  In a letter to State Attorney Janet Reno, on May 9, 1991, immediately following the acquittal, the jurors in the case wrote that their decision was partially based upon, "the clearly leading and suggestive questioning on the part of both child psychologists while interviewing the two children involved.")

[32] Debbie Nathan, *The Ritual Sex Abuse Hoax*, THE VILLAGE VOICE, January 12, 1990, Exh. 35, (App. 827-40).

[33] Affidavit of Dr. Maggie Bruck in Francisco Fuster-Escalona v. Harry K. Singletary, Case No. 97-1369-Civ-Lenard.

[34] A. Bradley & J. Wood, *How do children tell? The disclosure process in child sexual abuse*, 20 CHILD ABUSE & NEGLECT, 881-91 (1996).

over about events that did not take place, children will increasingly claim that that the events in fact took place (even when interviewed by a different interviewer); that is, during a third or fourth interview a child is more likely to say that a false event happened than during a first or second interview. This evidence contradicts the detectives' unfounded premise that children need to be interviewed multiple times in order for the truth to emerge. Rather, the first interview with a child is the most accurate, and subsequent interviews are more likely to result in the false reporting of events.[35]

The American Psychiatric Association has also advised against the use of repeated questioning as a method of eliciting memories of sexual abuse, and its STATEMENT ON MEMORIES OF SEXUAL ABUSE notes that,

> memories can be significantly influenced by questioning, especially in young children. Memories can also be significantly influenced by a trusted person who suggests abuse as an explanation for symptoms or problems, despite initial lack of memory of such abuse. It has also been shown that repeated questioning may lead individuals to report 'memories' of events that never occurred.[36]

The belief that instances of trauma, including sexual abuse, are forgotten and repressed is controversial at best. Dr. Elizabeth Loftus, a noted memory researcher, opposes absolutely the hypothesis that repeated instances of trauma can be repressed – "It flies in the face of everything we know about memory."[37] Nevertheless, detectives (Sgueglia, Galasso, and Jones) and therapists (such as Dr. Sandra Kaplan) involved in the Friedman case relied on the premise that robust

---

[35] See Bruck, Ceci, Francoeur & Barr *supra* note 28.

[36] American Psychiatric Association Board of Trustees, THE AMERICAN PSYCHIATRIC ASSOCIATION BOARD STATEMENT ON MEMORIES OF SEXUAL ABUSE (1993), *available at* http:www.psych.org/public_info/MEMORI~1.cfm.

[37] Leon Jaroff, *Lies of the Mind*, TIME MAGAZINE, November 29, 1993, at 56.

repression of major, repeated traumatic incidents could occur literally hundreds of times in this case.[38]

New York courts have specifically held that a denial of abuse by a child alleged to have been abused is Brady material. In People v. Ramos, 201 A.D.2d 78, 84 (1st Dept. 1994), the First Department vacated a child sexual abuse conviction, holding that the People violated their disclosure obligation in failing to turn over two reports prepared by the New York City Human Resources Administration, containing the alleged victim's negative responses when asked if the defendant had molested her. The first report stated that "when the mother first discovered the child's [vaginal] irritation she asked her if anyone had touched her and the child had replied no, [and] that when the child was examined at the hospital she reported that [another child in her day care group] had touched her." Similarly, the second report constituted Brady because it contained information "that at one point when she was asked what defendant had done to her she replied that he had taped her mouth and, when asked what else, she replied, 'Nothing—taped my mouth.'" Id.

Ramos is flatly indistinguishable from the instant case in this regard. In this case, many of those who, as children, were interviewed as part of this investigation recall (without coaching or prompting) that they denied that they had been abused and that those denials were repeatedly treated as false by the police. This is in accord with the detectives' recollections of widespread denials when the children were first approached. See Sgueglia (App. 398, 406, 411, 413).

[38] Once memories are implanted by interviewers using suggestive tactics, they often become as real as actual memories, and thus individuals exposed to these techniques can believe that the suggested memories are real. This explains why at least one of the students who only recalled being sexually abused after entering therapy, Gregory Doe, continues to believe that he was actually molested. See Elizabeth Loftus, *Our changeable memories: legal and practical implications*, 4 NATURE, 231-233 (2003).

For example:

- On one occasion it required fifteen visits to get the desired result. Before the final visit, the detectives assured the boy's mother that they were going to stay "as long as it takes." They did. Asked about the incident thirteen years later, Detective Jones stated that the barrage of visits was necessary because the child had been traumatized and "kept it deep inside." Kuhn Aff. ¶¶ 9, 10, 11.

- Detective Sgueglia recalled conducting multiple interviews with a computer student, who would not say anything happened in the classes, "this one particular kid, we went to four or five times. He was very cool. Didn't say anything, nothing happened. Sit down on the floor, plays games. Totally ignore you-- That you were even there. After an hour or two you helped him with his toy, you did this, you did that. And then you were friendly.... You come back the next night, it's a whole new ball of wax. It's like the kid is no longer a stranger to you, sitting in a room and all of a sudden-- you find the kid is a little hyper. You feel like – you get that feeling he wants to talk to you and you better do it right before he doesn't wanna talk to you at all." Sgueglia (App. 424-25).

- James Forrest, one of the computer students states that "[t]he Nassau County Police visited our house, unannounced, and questioned me and my brother regarding the classes and regarding the Friedmans. We told them nothing inappropriate happened." Forrest Aff. ¶ 4.

- Another student, Ron Georgalis, has stated that he told detectives on their first visit that he had not been abused: "Nassau County Police Sex Crimes Unit visited our home twice . . . . I told them that nothing happened to me." Still Georgalis received another visit. Georgalis Aff. ¶ 5.

- Student complainant Brian Tilker also failed to implicate either of the Friedmans upon initial questioning. Eventually he told the detectives about an incident of abuse, but remembers "saying that not because it was true, but instead because I thought it would get them off my back." B. Tilker Aff. ¶ 8.

Quite apart from the scientific research, it is a matter of simple common sense that the statement of a witness who was regularly at the scene of the alleged crime, stating that no crime occurred, is evidence favorable to the defense. Notably, the conviction in Ramos occurred in 1985, two years before the first allegations arose here. The Ramos court had no hesitation in finding that initial denials of abuse by children are patently favorable to the defense. In her

interview for "Capturing the Friedmans," Judge Boklan acknowledged this plainly true proposition:

> Brady material, I don't know if you're familiar with that. That's material that would be favorable to the defense. For example, [if] there was a young child, hypothetically, who said oh no, none of this occurred . . . . That would have to be handed over immediately, immediately upon reaching the hands of the district attorney's office.

Jarecki Aff. ¶ 8. (Boklan).

The accuracy of this conclusion is clear, just as it is clear that the prosecution did not comply with this well-established constitutional rule in this case. But clearsightedness was not the order of the day in the late eighties, in a suburban town reacting to allegations of mass child abuse. Conviction was, and at almost any cost. Concealment of dozens of statements by children indicating that Jesse Friedman was innocent was one of the prices the prosecution was willing to pay.

**c. The prosecution's failure to disclose that the detectives used rewards and punishments to obtain desired answers from children violated Brady.**

Children are highly sensitive to emotional cues. Studies have found that when children are rewarded for answers that the interviewer suggests (e.g., praising a child or moving to the next question when the desired answer is provided), and punished for others (e.g., repeating the question or refusing to accept the first answer to the question), they are more likely to answer questions in a way that will result in rewards.[39]

---

[39] S. Garven, J.M. Wood, J.S. Shaw & R. Malpass, *More than suggestion: Consequences of the interviewing techniques from the McMartin preschool case*, 83 JOURNAL OF APPLIED PSYCHOLOGY 347-59 (1998); S. Garven, J.M. Wood & R.S. Malpas, *Allegations of wrongdoing: The effects of reinforcement on children's mundane and fantastic claims*, 85 JOURNAL OF APPLIED PSYCHOLOGY 38-49 (2000); Ceci & Bruck *supra* note 28 at 139-146.

This is also true of adults. In one study, Dr. Saul Kassin describes the tactics used to elicit false confessions from innocent adults. Kassin explains that these tactics include feigned sympathy and friendship, falsely claiming that another person has already confessed and implicated the subject, other forms of trickery and deception, and wearing a person down after a long interview session.[40] This study was done on adults later found to be innocent – yet it is clear that children are particularly sensitive to these tactics (for example, a noted study found that children under the age of twelve are significantly more influenced by suggestibility and feedback during interrogation).[41] If innocent adults will confess to crimes that they did not commit when exposed to this type of questioning by police, it is not surprising that child witnesses could easily create false allegations of sexual abuse against others when questioned by a detective using very similar coercive and persistent tactics.

The detectives in this case used many types of rewards and punishments when questioning the children. Their willingness to abandon their role as neutral investigators, in favor of seeking to make the child a friend and ally, is manifest in their statements, as well as those of the children and their parents. Brian Tilker recalls the excitement some of the children expressed about having a policeman visit their house: "Some kids appeared to get a lot of excitement out of the attention they were getting from police." B. Tilker Aff. ¶ 11. His father remembers the detectives trying to make friends with the children involved: "We heard from other parents the police would have pizza parties and give police badges to the children . . . ." R. Tilker Aff. ¶ 8. This practice, of "deputizing" the children, was one of the most insidious and flagrantly suggestive strategies adopted by the police. Detective Sgueglia acknowledged using the practice in his description of

---

[40] Saul Kassin, *The Psychology of Confession Evidence*, 52 AMERICAN PSYCHOLOGIST, 221-233 (1997).

[41] C.H. Gudjonsson, *A new scale of interrogative suggestibility*, 5 PERSONALITY AND INDIVIDUAL DIFFERENCES, 303-314 (1985).

one child who denied he was ever sexually abused. In order to persuade him to talk about the sexual abuse, he said to the child, "we'll deputize you and you know . . . do you like cops?" Sgueglia (App. 425). It is difficult to imagine a greater incentive for a child to ingratiate himself with the police than the prospect that he can become a sort of junior policeman, on the very same side as the detective asking him the questions.

The detectives also made liberal use of negative reinforcement. Denials of abuse were greeted with unpleasant consequences ranging from simple non-acceptance of answers to harsh denigration of the boy. The interview of Gary Meyers, taped by his mother and transcribed by Jesse Friedman's attorney, Panaro Aff. ¶ 8, provides a shocking example. When Gary repeatedly denied suffering abuse, Detectives Hatch and Jones used psychological intimidation to try to get the fourteen year-old to change his story. Hatch insulted the boy's intelligence based on his refusal to implicate the Friedmans ("I wouldn't say you're a genius but you're reasonably intelligent."). Further, the detective insinuated that Gary's continued denials could affect his mental health, and result in homosexuality ("Do you think that [involvement in a homosexual act as a preadolescent] determines if you are a homosexual?"), or even becoming a pedophile himself ("It's a monster created within you . . . and every now and then it rears its ugly head."). Of course, the antidote for these potential calamities was for a boy to "go[] and get[] help and admit[] he was victimized," to "place the blame on the person who created the situation and then [be] a lot better off." Detective Hatch ended the interview by telling Gary's mother, with Gary in the room, that "he was a wise guy, and I didn't like his answers." Meyers Interview (App. 805).

The tactics used in the interview of Gary Meyers are repellant to any right sense of justice. There can be little doubt that these detectives resorted to such repugnant tactics whenever confronted with an unyielding child subject.

The affidavits of Richard Tilker and his son Brian demonstrate that detectives often treated the children more like guilty suspects than potential witnesses, keeping a child in a state of intense anxiety so long as he failed to supply the answers the detectives were seeking. Describing the questioning of his son as an "interrogation," Mr. Tilker stated:

> It got to a point where it wasn't asking him what happened, it was more of them telling him what happened, and when they didn't like what he said they kept repeating they knew what happened, and that he should tell.

R. Tilker Aff. ¶ 5. Eventually his son told the detectives about an incident of abuse that had not taken place.

> I recall that the questioning just got to be too much. The police wouldn't take no for an answer. Frustrated, Brian finally told them that one time he saw Jesse chase after and hit a child, though he later told us that that was not true and that the only reason he had said that was to end the questioning because they wouldn't leave him alone.

R. Tilker Aff. ¶ 6.

Dennis Doe was subjected to the same intimidation tactics:

> What I do remember is the detectives putting me under a lot of pressure to speak up, and at some point, I kind of broke down. I started crying. And when I started to tell them things, I was telling myself it was not true. I was telling myself, "Just say this to them to get them off your back."

CTF (App. 336) (Dennis Doe).

Gregory Doe, the student that underwent hypnosis and recalled incidents of sexual abuse, also remembered the police using aggressive tactics. He recalled his initial interrogation by detectives as "indelicate and crude," and reported that they said to him, "'What the fuck happened? Tell me. You were molested. We know. Tell me. I need to make a report.'" Gregory Doe (App. 755).

**d. The prosecution's failure to disclose that the detectives used peer pressure to obtain desired answers from children violated Brady**

Peer pressure arises when a child is informed that another child has already talked to the interviewer or told the interviewer specific information. Studies have found that peer pressure can influence children to produce reports that are consistent with the information supposedly obtained from the other child.[42]

The detectives told Gary Meyers that several of the other children had told them that Gary had been a victim of abuse: "We've had kids who stated that they saw you and that you're involved, OK?" Detective Jones quickly added, "Don't deny it yet." Meyers Interview (App. 804). Gary repeatedly denied that he had been abused or had witnessed the abuse of others, saying, "No he never touched me" and "I didn't see it. I didn't hear it." Id. But the detectives persisted, making it plain that they thought Gary was lying and that they were impatient with or offended by what they viewed as his evasions of the truth.

The same tactic was used in the Georgalis home. According to Ron Georgalis's father, "the clear intent of the detectives was to convince us that Ron had been molested and that several other children had already admitted that they, also, had been molested." Ralph Georgalis Aff. ¶ 4.

Detectives told Brian Tilker "repeatedly that other students in my class had already told them that they had been abused, and that they were certain in fact I had also been abused and I should tell them so." B. Tilker Aff. ¶ 5. One detective "recount[ed] for me certain statements that others had allegedly made and ask[ed] me if I would concur that these acts had been committed in the computer classes." B. Tilker Aff. ¶ 6. See also Sgueglia (App. 409) ("And then once they realize that other people have come forward, it's not easy, but it does work.").

---

[42] Garven, Wood, Shaw & Malpas *supra* note 39 at 347-59.

e. **The prosecution's failure to disclose that that they exploited their high status to elicit allegations of sexual abuse violated Brady.**

The children in the Friedman case were interviewed by Nassau County detectives. Detectives are intimidating to children and are unquestionably in a position of power and prestige. Studies have determined that adults in positions of status and power can influence the accuracy of statements of children.[43] Robert Rosenthal[44] explains that interviewers of "high status" are a primary feature of suggestive interviews, and can significantly influence the validity of children's reports. He writes,

> Adults with high status include interviewers such as police or parents who, by virtue of their status in society or in the eyes of the child, possess an authority that is difficult for the child to resist. Also included are interviewers who approach the child with the appearance of information concerning the matter about which the child is being questioned. Thus an interviewer who tells the child that he knows what happened and merely wants the child to confirm the interviewer's version of the "facts" is an interviewer of high status. Several studies have shown that children are likely to be impressed by adults and will incorporate adults beliefs into their reports.[45]

The interviewing detectives here went far beyond the impropriety of telling the children what the "right" answer was. The suggestiveness of each of the inappropriate tactics they employed was exacerbated by their high status.

---

[43] S. J. Ceci & M. Bruck, M., *The suggestibility of the child witness: A historical review and synthesis*, 113 PSYCHOLOGICAL BULLETIN, 403-439 (1993); A. Tobey & G.S. Goodman, *Children's eyewitness memory: Effects of participation and forensic context*, 16 CHILD ABUSE & NEGLECT, 779-796 (1992).

[44] Robert Rosenthal is a civil rights attorney who has represented several defendants appealing convictions for mass sexual abuse. He submitted a federal habeas appeal for Grant Snowden, whose conviction was reversed and remanded by the Eleventh Circuit Court of Appeals in 1998. The Snowden case, like the Friedman case, included testimony elicited from children after they were exposed to coercive and suggestive interviewing techniques.

[45] Robert Rosenthal, *Suggestibility, Reliability, and the Legal Process*, DEVELOPMENTAL REVIEW 22 (2002) 334-369.

**2. The People's Failure to Disclose That Hypnosis Was Used to Elicit Allegations of Sexual Abuse Concealed Favorable Evidence From The Defense.**

Jesse Friedman's decision whether to plead guilty would have been cast in a wholly different light had he known that Gregory Doe did not "recall" any instances of abuse until after he was subjected to hypnosis. In Rock v. Arkansas, 483 U.S. 44 (1987), a decision handed down before this prosecution arose, the Supreme Court recognized the suggestiveness of hypnosis and its tendency to foster inaccurate reports.

Gregory Doe, who admitted that his accusations followed upon hypnosis by a therapist, was the source of thirty-five separate counts of sodomy against Jesse Friedman. His charges against Jesse and Arnold Friedman are among the most fantastic allegations made against them. They include the claim that the Friedmans made an entire class of boys strip naked and then serially sodomized them in a game referred to as "leap frog." Gregory Doe (App. 737).

In his interview for "Capturing the Friedmans," Gregory Doe stated unequivocally that he had no memory of sexual abuse until after he underwent hypnosis during therapy. After the Friedmans were arrested, Gregory Doe explained, "my parents put me in therapy right away," and "they put me in hypnosis and tried to recall facts that I had buried. And that's how I first came out and started talking about it. I recalled things I would bury." Gregory Doe (App. 784, 786). "[T]he actual first time I actually recalled that I was actually molested," Gregory Doe stated, was after the therapy, which Gregory Doe described as "regressive" and "hypnotic." Gregory Doe (App. 784-785). "I just remember that I went through hypnosis, came out, and it was in my mind," he said. Gregory Doe (App. 785).

The unreliability of hypnosis as a technique to help individuals "remember" incidents of sexual abuse is well established in the scientific literature and legal precedent. As the Fifth Circuit observed in 1984,

> The scientific consensus is that a subject's reactions while under hypnosis are characterized by eager suggestibility to even slight nuances in the hypnotist's words or manner, a distorting desire to please the hypnotist, and the subject's later inability to distinguish between memories existing before hypnosis and pseudomemories existing on account of hypnosis.

United States v. Valdez, 722 F.2d 1196, 1201 (5th Cir. 1984) (excluding an uncorroborated identification, made only after hypnosis, of a person clearly singled out for suspicion). See also Robert Rosenthal, *Suggestibility, Reliability, and the Legal Process*, DEVELOPMENTAL REVIEW 22 (2002) 334-369 ("testimony that is induced or refreshed by hypnosis is another example of evidence that is traditionally excluded for want of reliability. Several jurisdictions have established a *per se* rule, excluding hypnotically enhanced testimony from trials because it may be the product of – or enhanced by – the hypnotic procedures, rather than a reflection of an actual experience.").

As early as 1985, four years before hypnosis was used to induce accusations in the Friedman case, an article in the Journal of the American Medical Association warned of the danger that hypnosis generates "false memories": "Contrary to what is generally believed by the public, recollections obtained during hypnosis not only fail to be more accurate but actually appear to be generally less reliable than nonhypnotic recall."[46] More recently, in 1997, the Royal College of Psychiatrists in the United Kingdom warned therapists against using hypnosis as a means to assist in the recovery of memory in cases involving child sexual abuse:

> Psychiatrists are advised to avoid engaging in any "memory recovery techniques" which are based upon the expectation of past sexual abuse of which the patient has no memory. Such "memory recovery techniques" may include drug-mediated interviews, hypnosis, regression therapies, guided imagery, "body memories", literal dream interpretation and journaling. There is no evidence that the

---

[46] Council on Scientific Affairs, *Scientific status of refreshing recollection by the use of hypnosis*, 253 JAMA, 1918-1923 (1985).

> use of consciousness-altering techniques, such as drug-mediated interviews or hypnosis, can reveal or accurately elaborate factual information about any past experiences including childhood sexual abuse. Techniques on regression therapy including "age regression" and hypnotic regression are of unproved effectiveness.[47]

There is good reason to believe that other complainants, in addition to Gregory Doe, may have been subjected to hypnosis or other "memory recovery techniques." Dr. Sandra Kaplan was a therapist who worked closely with the detectives involved in the Friedman case. Sgueglia (App. 469). As Detective Sgueglia explained, "we recruited a therapist. She got on board. She was there for all the family meetings and offered free counseling." Sgueglia (App. 467).

Dr. Kaplan adhered to the then-controversial and now thoroughly discredited belief that the children who had no memory of sexual abuse had a form of "amnesia." She and Detective Sergeant Galasso gave a joint presentation detailing their experience in the Friedman case, in which Kaplan explained that with the help of visualization (drawing pictures of the room where the abuse supposedly took place and using the pictures as a "visual aid") children who had no memories of sexual abuse "remembered most of the detail of their victimization."[48] (App. 821). Dr. Kaplan treated children involved in the Friedman case prior to the time that Jesse pled guilty.[49] She discussed treating the children at a meeting with parents in February 1988, in which detectives involved in the case participated. <u>Id.</u>

The suggestiveness of memory recovery techniques such as hypnosis and visualization is further exacerbated where, as here, the administering therapist is not objective or impartial. Dr.

---

[47] Royal College of Psychiatrists, *Reported recovered memories of child sexual abuse*, 21 THE COLLEGE PSYCHIATRIC BULLETIN, 663-665 (1997).

[48] Sandra Kaplan et al. <u>Child Pornography and Extrafamilial Sex Abuse</u> (1990). Exhibit 34.

[49] William S. Dobkin, *Great Neck Community Marshals its Resources to Deal With Child Abuse and Child-Sex Crime*, GREAT NECK RECORD, February 4, 1988. [Exhibit 31 (App. 808)]

Kaplan's relationship with the detectives, prosecutors, and parents compromised her ability to fairly treat children involved in the Friedman case. Because she worked with the same detectives who were trying to develop a case against Jesse Friedman, Dr. Kaplan was absolutely unsuitable for counseling patients and working with them to "remember" sexual abuse. This collaboration with law enforcement directly violated the standards of the AMERICAN PSYCHIATRIC ASSOCIATION STATEMENT ON MEMORIES OF SEXUAL ABUSE, which urges that psychiatrists "should maintain an empathetic, non-judgmental, neutral stance towards reported memories of sexual abuse . . . . A strong belief by the psychiatrist that sexual abuse, or other factors, are or are not the cause of the patient's problems is likely to interfere with appropriate assessment and treatment."[50]

The scientific community's uniform repudiation of hypnosis as a truth-finding device is mirrored in state and federal case law. New York courts have recognized that testimony resulting from hypnosis is an exception to the general rule that "the oath and cross-examination are sufficient tests of reliability to allow admission of the testimony." People v. Michael M, 162 Misc.2d 803, 808 (Sup. Ct. Kings Co. 1994) (citing People v. Hughes, 59 N.Y.2d 523, 535 (1983); People v. Adams, 53 N.Y.2d 241, 249-51 (1981)). See also United States. v. Miller, 411 F.2d 825 (2d Cir. 1969) (failure to disclose use of hypnosis was grounds for reversal).

In Rock v. Arkansas, 483 U.S. 44 (1987), the Supreme Court, while striking down a per se rule against all hypnotically refreshed testimony, recognized the substantial danger that hypnosis can give rise to false testimony, and the absence of any foundation for "[t]he popular belief that hypnosis guarantees the accuracy of memory." Id. at 51.

> Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in

[50] American Psychiatric Association Board of Trustees, *supra* note 36.

> details from the imagination in order to make an answer more coherent and complete; and, the subject experiences 'memory hardening,' which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

Id. at 51. (citing M. Orne et al., *Hypnotically Induced Testimony*, in EYEWITNESS TESTIMONY: PSYCHOLOGICAL PERSPECTIVES 171 (G. Wells & E. Loftus, eds., 1984); Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 CALIF. L. REV. 313, 333-342 (1980)). See also id. at 52 (hypnosis should be performed "only by a psychologist or psychiatrist with special training in its use and who is independent of the investigation"); Little v. Armontrout, 819 F.2d 1425, 1429 (8th Cir. 1987) ("A person in a hypnotic trance is subject to a heightened degree of suggestibility.") (granting habeas petition granted where hypnotically enhanced testimony found to be constitutionally unreliable).

**3. The conclusion that these police officers used suggestive techniques in interviewing all possible child victims is underscored by their conduct in another high-profile mass sex abuse case.**

The large quantity of evidence of suggestiveness now known to the defense is far more than sufficient to make out a violation of Brady. But the conclusion that these methods extended to every part of the investigation is dramatically underscored by the strikingly similar conduct by police during the 1989 investigation Robert Izzo. Izzo was a school bus driver in Hicksville, Long Island, who was convicted, on a guilty plea, of sexually abusing schoolchildren, ranging from five to twelve years old in 1991, but later vindicated in a civil trial in which the jury explicitly found that the charged crimes had never happened. As in this case, the People alleged group molestation with multiple perpetrators, and there was no physical evidence of abuse, no complaints from the children or their parents until after the children were interviewed at great length using suggestive techniques, not one of the interviews with police was videotaped, and the asserted reason for the children's failure to complain was that the perpetrator made threats.

In the civil suits against the school bus company, which began in 1995, evidence emerged that Nassau County Police, including several of the detectives who worked the Friedman case, engaged in suggestive methods nearly identical to those used in the prosecution of Jesse Friedman. These techniques included rewarding children (Detective Wallene Jones stated "[W]e on occasion did bring the children ice cream or sherbet after the statement was taken or after the interview.")[51]; questioning a child multiple times (sometimes on five occasions) if he or she refused to implicate the suspect; conducting lengthy interviews lasting as long as five hours or more; presumption of guilt (in one case, a detective told a child during an interview that Izzo was in jail, and therefore bad or guilty - which is a highly suggestive technique); and telling children that other children had asserted that sexual abuse took place on the bus. Izzo Deposition Excerpts, Exh. 37 (App. 870, 867, 863-64, 884, 890, 884, 866, 871-72, 895, 859-60, 895). The prosecution did not disclose any of this information as required by Brady.

As in this case, the Izzo investigation made use of therapy involving visualization techniques. Children received six free sessions – paid for by the Nassau County District Attorney's Office – with Sandra Kaplan,[52] the same therapist who worked closely with detectives and administered hypnosis and other visualization techniques in the Friedman case.[53] Use of these techniques in the Izzo case was not limited to doctors. Detective Jones described telling a child to

[51] Detective Nancy Myers used "different methods" to help children overcome their reluctance to testify: "I remember being outside the grand jury room and I did let one of the girls wear my earrings." (App. 886)

[52] Letter from parent to Dr. Sandra Kaplan, Exh. 38 (App. 899), requesting that the six free sessions promised her by the Nassau County District Attorney's Office be paid.

[53] The People have never disclosed whether Dr. Kaplan was paid for her work in this case.

imagine what a camera on the bus would have seen "just to get them to realize that someone had seen something going on on the bus."[54] (App. 860-861).

The correspondence between the Izzo case and the case at bar reflects a pattern of conduct followed by the Nassau County District Attorney's Office and the Nassau County Police Department in cases of this nature.[55] It reinforces the already clear conclusion that the investigation in this case was pervaded by suggestiveness and other improprieties.

### D. The Suppressed Evidence Was Material

One cannot consider the mountain of impeachment evidence concealed by the prosecution without recognizing that its proper disclosure would have dramatically altered the circumstances under which Jesse Friedman contemplated whether or not to plead guilty. The requirement that there be a reasonable possibility that disclosure would have changed Jesse's plea is easily met here.

---

[54] In the Izzo case, the District Attorney's Office advised the detectives not to attend meetings with therapists treating the alleged child victims – citing the fact that in the McMartin case, the close relationship between the detectives and the therapists was a reason why the allegations of sexual abuse by the children lacked credibility. Letter from District Attorney Dennis Dillon and Barry W. Grennan, Chief, Major Offense Bureau, to Inspector Robert Olsen, March 26, 1990, Exh. 33 (App. 811-812).

[55] The Izzo case raises some disturbing questions about the length to which prosecutors and police in Nassau County will go to avoid their constitutional duty under Brady. In an article about the case, Henry Miller, attorney for the school bus company in the civil suit, as described how prosecutors separated a second suspect in the case -- a former police officer -- from a joint prosecution with Izzo. Henry G. Miller, *Learning to Love: The Trial Lawyer's 14 Challenges*, NYSBA JOURNAL, September 2001, Exh. 36 (App. 841-853). When Izzo went to Florida in April 1989, he was replaced by a man Miller refers to as "Sam": "When pressed by police for tales of sex abuse, the children told stories of abuse by Sam. They gave statements. It was then learned by the police that Sam was a former police officer. The police quickly got recantations from the children about Sam abusing them. The police only took statements about Bob abusing the kids." Miller (App. 846). Removing Sam from the case provided the District Attorney's Office with a rationale, albeit a defective one, for not informing Izzo of the claims against Sam and the subsequent recantations. "Top lawyers in the District Attorney's office debated the issue and decided against disclosure". Miller (App.849). Clearly, the evidence regarding the accusations against the replacement bus driver, and the recantations, was Brady material. The manipulation by prosecutors, in order to have an excuse to deny this information to Izzo, demonstrates the willingness of the Nassau County District Attorney's Office -- the same office that prosecuted Jesse Friedman -- to wink at their constitutional obligations in order to secure a conviction.

Of course, the linchpin of the People's case at trial would have been the testimony of the alleged child victims. As Jesse Friedman looked ahead to a possible trial, he knew the jury would be sympathetic to the child witnesses and that there was no certainty of discrediting their testimony. In the absence of the Brady violations, though, the defense would have had an arsenal of powerful impeachment evidence at its disposal.

First, the jury would have learned that several, if not many, of the complainants had initially told the police that they were not molested, pointing a finger at Jesse or Arnold Friedman only after repeated leading questioning. Demonstrating to a jury that a witness has made prior inconsistent statements is a potent form of impeachment. See People v. Hults, 76 N.Y.2d 190, 203 (1990) ("[T]he prior statement and the trial testimony are . . . set against each other. The very fact that the witness necessarily erred in making one or the other - - because both cannot be true - - tends to undermine the witnesses credibility."). Further, the jurors would have been made aware that dozens of non-complainant children – who attended the same classes in which these free-for-alls of sexual and physical abuse were supposed to have taken place – also made statements to police exonerating the Friedmans.

As important, the defense would have been able to present to the jury an astounding array of suggestive and pressuring techniques that the detectives used in questioning the children. These techniques, described in detail above, compose a virtual textbook on how to encourage false statements from alleged child sex abuse victims.

Significantly, a properly informed defense could have attacked the evidence generated by suggestive questioning even before it reached a jury. Where a defendant is charged with sexual abuse, the trial court has the power to grant a preliminary hearing to determine whether evidence must be suppressed as the product of a suggestive interview. People v. Michael M, 162 Misc.2d

803, 806-07 (Sup. Ct. Kings Co. 1994). See also People v. Kemp, 251 A.D.2d 1072 (4th Dept. 1998) (acknowledging that such a hearing is called for when there are "nonspeculative allegations of undue suggestion," but affirming the denial of a hearing where such allegations were absent) (citation omitted). The power to grant a preliminary hearing in this context is just one application of the inherent "right of a trial court to determine evidentiary matters at pretrial hearings, despite the lack of specific authorization in the N.Y. Crim. Proc. Law." Michael M., 162 Misc.2d at 807 (citing, inter alia, People v. Wesley, 83 N.Y.2d 417, 424 (1994) (pretrial hearing to determine admissibility of DNA evidence); People v. Tunstall, 63 N.Y.2d 1 (1984) (pretrial hearing to determine admissibility of prehypnotic recollection); People v Hughes, 59 N.Y.2d 523, 542-545 (1983). (same); People v. Ventimiglia, 52 N.Y.2d 350, 362 (1981) (pretrial hearing to determine admissibility of prior uncharged crimes); People v. Sandoval, 34 N.Y.2d 371, 374 (1974) (pretrial hearing to determine prosecutor's use of prior conviction to impeach the defendant)). The opportunity to test the admissibility of the People's evidence before making a final decision about going to trial would have provided further reason for Jesse Friedman not to plead guilty when he did.

Notably, the evidence of suggestiveness compiled above includes only the Brady material that the defense has been able to ferret out on its own. This likely constitutes just a fraction of the impeaching, or otherwise exculpatory evidence that would have emerged had the People met their discovery obligations. Review of the District Attorney's file in this case is sure to reveal additional instances of suggestive questioning of which the defense should have been apprised. It would be naïve at best to suggest that there is no reasonable possibility that this trove of evidence favorable to the defense would have changed the complexion of the case for a jury, or that there is

no reasonable possibility that Jesse Friedman would have decided to go to trial on account of it, as he definitively asserts in his affidavit in support of this motion.

The People cannot plausibly deny that the revelation of Brady material would have fundamentally transformed the evidentiary landscape of this case. Instead, they are likely to argue that Jesse Friedman pled guilty not because of the apparent dearth of evidence in his defense, or because of the other awesome pressures he was facing, but because he was in fact guilty – and that therefore the undisclosed evidence would not have changed his plea. There is absolutely no basis for such a conclusion.

The mere fact of a guilty plea does not establish guilt in this context. If it did Brady would have no application to guilty pleas. The principle that an individual may plead guilty even though he is not is well established.

> Inherent in this approach is perhaps the principle that an innocent man would never plead guilty, and therefore the availability of evidence which appears exculpatory in nature could not in fact have actually influenced the decision as to whether to plead to the crime charged. This belief, while admirable in its noble perception of our judicial system, does not reflect the reality of plea agreements, where numerous factors go into a decision as to whether to plead guilty to a particular charge.

People v. Curry, 164 Misc.2d 969, 972 (Sup. Ct. N.Y. Co. 1995). One vivid proof of the proposition that a guilty plea, or a confession, does not necessarily bespeak actual guilt is the long list of individuals who pled guilty, or falsely confessed, and were then exonerated through DNA evidence.[56] Here, the factors leading Jesse Friedman to plead guilty, described supra at 13-16, included:

---

[56] These individuals include David Vasquez, who pled guilty but was exonerated by DNA evidence in 1989 (discussed at http://www.innocenceproject.org); Jerry Frank Townsend, who pled guilty but was exonerated by DNA evidence in 2001 (discussed in *Amendment to Florida Rules of Criminal Procedure Creating Rule*

- A trial judge who had decided that Jesse was guilty before a single witness was heard and intended to sentence him to the equivalent of a life sentence. Panaro Aff. ¶ 11.

- No Brady material, and therefore an absence of evidence with which to challenge the People's witnesses;

- Media and community hysteria about the case;

- Advice from his own attorney to plea guilty;

- The much-publicized guilty pleas of Arnold Friedman pursuant to a federal indictment and two state indictments under which Jesse was a codefendant; and

- A state's witness (Ross Goldstein) who had testified against him in the grand jury and would do so again at trial.

In addition to the substantial evidence that Jesse's guilty plea was consistent with his innocence, there are at least two other aspects of the case that belie the claim that Jesse's plea reflected actual guilt.

First, it is virtually impossible to reconcile the fact that before police questioning began, not one child had claimed abuse, and not one parent had noticed any sign of abuse, with the events alleged to have occurred in the Friedman house. Arnold Friedman taught these computer classes for approximately five years. The charges in the indictments span three years. Hundreds of children passed through the classes during that period, many of them signing up again and again. Month after month, year after year, they were driven by their parents to and from the classes, behaving like any other boys their age, giving no indication that anything was amiss. Yet the allegations gathered by police included innumerable acts of oral and anal sodomy, and routine physical violence, such as "hitting" one boy or several boys, or "slamming" a child's head into a

---

3.853, 807 So.2d 633, 26 FLA. L. WEEKLY S687, Fla., Oct. 18, 2001; and Eddie Joe Lloyd, who falsely confessed but was exonerated DNA evidence in 2002 (discussed at http://www.innocenceproject.org).

wall. See e.g., Indictment 67430, counts 41, 43; Indictment 67104, count 48. See also Galasso (App. 150) (stating that children claimed that Jesse Friedman slapped them, pulled their hair, and twisted their arms). The idea that not a single child reported the abuse to a parent, bore perceptible signs of physical injury, or presented psychological or behavioral symptoms of the severe sexual, physical, and psychological abuse the children were allegedly suffering boggles the imagination.

The Affidavit of Margalith Georgalis, the mother of computer student Ron Georgalis, underscores the implausibility of the People's case in this regard. Mrs. Georgalis was enrolled in an introductory adult education computer class taught by Arnold Friedman. She was so impressed by his skill as a teacher that she enrolled her son Ron in the class he taught for children. Because Arnold Friedman would generously allow the Georgalis family to borrow computer discs and welcomed their requests for computer advice (and because her son was one of Arnold Friedman's students), Mrs. Georgalis.

> was always walking into the house at the beginning or end of class. Never did I see anything other than children sitting in front of computers, and Arnold and Jesse walking around and answering questions.

M. Georgalis Aff. ¶¶ 2, 4. The account offered by Mrs. Georgalis, who went in and out of the Friedman house at will and observed no impropriety, powerfully belies the People's theory that Arnold and Jesse Friedman steadfastly sealed off their home from adults in order to commit atrocities against children. See Sgueglia (App. 415-16).

Indeed, the very outlandishness of the claims made by the alleged victims underscores the implausibility of the deafening silence that surrounded this alleged rampage of sexual abuse until the police began "questioning" children about it. For example, the student who did not recall any abuse before being hypnotized now claims – although he did not make such allegations at the time – that children who missed a class were "gang raped" at the "make-up" session, that children

would routinely be anally penetrated for as long as ten minutes at a time, and that the Friedmans would ejaculate onto pieces of gum or into cups of orange juice and force the children to consume them. Gregory Doe (App. 662, 677).

The absence of "outcry" or perceptible signs of abuse is a feature shared by virtually all of the multiple abuser/multiple victim child sex abuse cases in which convictions have ultimately been overturned by the courts. In Michaels, for instance, the New Jersey Supreme court found it pertinent that the day care center Ms. Michaels worked at "never received a complaint about her from staff, children, or parents." State v. Michaels, 642 A.2d 1372, 1374 (N.J. 1994).

Under the prosecution's scenario, we would have to believe that there was not one boy whose relationship with his parents was honest and candid enough that he would have told them what was happening in computer class, notwithstanding the alleged threats by the Friedmans; not one boy who failed to understand that his teacher's conduct was inappropriate and therefore revealed it without fear of embarrassment; not one boy whose reaction was to quit the class, and then, removed from physical presence of the Friedmans, to describe what happened to an adult. Rather, the People posited that the Friedmans controlled the children's minds so completely as to turn them into a group of zombies, uniformly immobilized by the Friedmans' alleged threats and completely incapable of deviating from their instructions. This is the stuff of science fiction, not reality.

In fact, an authoritative study[57] found that two-thirds of child victims of sexual abuse who were threatened not to disclose the improper conduct still revealed it. Not one Great Neck parent or child ever once complained. In Great Neck, not one of hundreds of children ever complained.

---

[57] E. Gray, UNEQUAL JUSTICE: THE PROSECUTION OF CHILD SEXUAL ABUSE (MacMillan 1993).

Another study[58] found that 43% of sexually abused children disclosed the abuse in the first interview. This study found that children were much more likely to disclose abuse when there was an extra-familiar abuser (67% of this group disclosed in the first interview) or when they had supportive parents (63% of this group disclosed in the first interview). Arnold Friedman was not related to any of the children in his computer classes. And, in this affluent suburban town, among this group of people who chose to send their kids to an after-school computer class, it is reasonable to believe there were many supportive parents.

Mrs. Georgalis's description of her relationship with her son, Ron, makes this point clearly:

> Over the years I had dozens of long heart to heart talks with my son. I had told him that if someone had done something to him that he did not want done it is not the end of the world and it would be good to remember it and then put it aside but he could never remember anything. I finally concluded that nothing had happened to him.

M. Georgalis Aff. ¶ 6. Surely, Mrs. Georgalis was not the only Great Neck parent to treat this situation with sensitivity, understanding, and acceptance.

The second element of the evidence that cannot be reconciled with the idea that Jesse Friedman was guilty is the failure of police to find a single photograph or videotape to substantiate their theory that the Friedmans produced a large number of images of the boys as they were being sexually abused. See Jarecki Aff. ¶ 10 (Galasso) (The Friedmans made pornography but "nothing ever materialized"). At least fifteen of the counts in the three indictments alleged that the defendants photographed the children in this manner. See, e.g., Indictment 67104, Count 4 ("The defendant [Jesse Friedman] did photograph the victim while Arnold Friedman did contact the

[58] L. Lawson & M. Chaffin, *False negatives in sexual abuse disclosure interviews: Incidence and influence of caretaker's belief in abuse in cases of accidental abuse discovery by diagnosis of STD*, JOURNAL OF INTERPERSONAL VIOLENCE, 7, 532-542 (1992).

victim's anus with his penis."). The police believed that dozens of boys were photographed or videotaped in this manner and that hundreds of these images were produced. See Galasso (App. 188). Yet not a single one was ever found.

The police asserted that Arnold Friedman had disposed of these materials, either hiding or destroying them, before the police could find them. But that explanation simply ignores the facts of the case. Before November 3, 1987, the date of the search by federal agents, Arnold Friedman did not have the slightest inkling that he was the subject of an investigation or that law enforcement agents would soon be rummaging through his possessions. He had no reasons to get rid of the alleged photographs and tapes.

Nor does it make any sense that the images supposedly created regularly in the classes eluded the first search and were disposed of before the state search on November 25, 1987. Child pornography was precisely what the federal agents were looking for on November 3. They were authorized to search, and did search, anywhere such materials might be hidden. If the alleged materials had been in the Friedman house that day, the agents would have found them.

The detectives came looking and hoping for child pornography on a large scale or evidence that child pornography was produced in the home. As the photographs and documents in the record make clear, the federal agents harvested exactly 18 pornography magazines in the Friedman house. Yet, within weeks Detective Sergeant Galasso would be speaking publicly of the masses of pornography, the stacks and stacks, that were "everywhere" to be seen in Arnold Friedman's house. Galasso (App. 143).

Further, Arnold Friedman was offered the chance to receive a reduced sentence if he turned over to the authorities the pornography he had supposedly created. Yet, according to the prosecution, with nothing to lose and precious years of freedom to gain, he did not produce any

such material. This is at odds with his willingness, in his closeout statement, to admit abusing every child mentioned by the police – an act that prevented further prosecution.

One last disturbing aspect of this case must be considered. Ross Goldstein was charged as severely in the third indictment as Jesse Friedman. The charges against him included 78 counts of first degree sodomy of a child. The penalty: six months and a clean record. Someone in the prosecutor's office, in conjunction with the police, made the judgment that it was sound practice to quickly release into the community an individual whom the authorities ostensibly believed was a predatory pedophile who had already committed violent sexual abuse against numerous children in the town. To call this sound judgment is absurd. The authorities would never have agreed to these terms, unless they knew that the release of Ross Goldstein was not really a threat to children in the community, unless the arrest and prosecution of Ross Goldstein had little or nothing to do with believing that he had committed the appalling crimes charged.

Law enforcement's approach to the allegations that the Friedmans used the computer students to make pornography, is emblematic of the method they applied to virtually every other aspect of this case: Begin with a conclusion, and then work backwards to attempt to justify it. In 1988, in the swirl of outrage and emotion, and in the infancy of our understanding regarding the many dangers that attend investigation of charges of mass child sex abuse, this method was very effective in obtaining indictments. But consideration of the tactics used here by law enforcement, with dispassionate attention to the requirements of law and reason, leads inexorably to the conclusion that Jesse Friedman's conviction cannot be sustained.

**E. Entitlement to Hearing**

Clearly, the allegations in the instant motion, if established, would require vacatur of Jesse Friedman's conviction. Assuming that the People do not concede these allegations, this Court is

required to grant Jesse Friedman an evidentiary hearing pursuant to N.Y. Crim. Proc. Law § 440.30. See People v. Baxley, 84 N.Y.2d 208, 213-14 (1994) (where defendant's allegations were sufficient as a matter of law to make out a Brady violation, he was entitled to an evidentiary hearing).

**F. Justice Demands That Jesse Friedman's Conviction Be Vacated**

In the end, this case, and the constitutional concept of Due Process that governs it, come down to one principle – fundamental fairness. There are cases in which the question of what basic fairness requires is complex and intricate. This is not one of those cases. The investigation that led to the prosecution of Jesse Friedman was as fair as a stacked deck. The inequity is recognizable to anyone who, without passion or prejudice, approaches the case with reason and a willingness to see. It is injustice at first sight. Accordingly, the judgment against Jesse Friedman must be vacated.

## CONCLUSION

Jesse Friedman's motion to vacate his conviction should be granted.

Dated: January 7, 2004
New York, New York

By: ______________________
MARK GIMPEL, ESQ.
870 United Nations Plaza
New York, New York 10017
(212) 308-3420

EARL H. NEMSER, ESQ.
Swidler, Berlin, Shereff, Friedman
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

Addendum

## CASE CHRONOLOGY

*For the Court's convenience, this chronology sets forth many of the most important events in this case.*

| | |
|---|---|
| July 1984 | U.S. Customs agents at JFK Airport seize a child pornography magazine addressed to Arnold Friedman. They inform United States Postal Inspector John McDermott. |
| November 23, 1984 - February 6, 1986 | For a year and a half, an undercover postal inspector, posing as a collector of child pornography, engages in a correspondence with Arnold Friedman, trying to persuade Friedman to send a piece of child pornography by mail. |
| February 8, 1986 | Arnold Friedman sends the undercover a magazine that contains child pornography. |
| November 3, 1987 | After continued correspondence with the undercover, over another year and a half, in which Arnold Friedman repeatedly requests the return of the magazine, Postal Inspector John McDermott, posing as a mailman, returns the magazine to Arnold Friedman at his home in Great Neck in a "controlled delivery."<br><br>McDermott and other federal agents execute a search of the Friedman home, pursuant to a warrant, for "materials related to the manufacturing and distributing of child pornography." They find approximately twenty magazines, alleged to contain child pornography, in Arnold Friedman's private office, but no evidence of self-produced pornography. They also find a list of names of students who had attended Arnold Friedman's after-school computer classes over the prior several years. |
| November 4, 1987 | Informed of the search by federal agents, Detective Sergeant Fran Galasso of the Nassau County Police Department initiates an investigation into possible child sexual abuse in Arnold Friedman's computer classes. There have been no complaints of abuse from children and no parent has reported physical or psychological symptoms of abuse. Two-detective teams begin interviewing students on the list. |

| | |
|---|---|
| November 25, 1987 | Nassau County detectives execute a search of the Friedman house and arrest Arnold and Jesse Friedman on charges of child sexual abuse. |
| December 9, 1987 | Arnold and Jesse Friedman are arraigned on Indictment 67104, which contains fifty-two counts of child sexual abuse against five children. |
| February 8, 1988 | Arnold Friedman pleads guilty in federal court to one count of mailing child pornography. |
| February 9, 1988 | Arnold and Jesse Friedman are arraigned on Indictment 67430, which contains ninety-one counts of sexual abuse against eight children. The arraignment is covered in court by television cameras and photographers. This is the first time a judge has ever permitted cameras inside a Nassau County courtroom. Judge Boklan will continue to routinely grant such requests throughout the proceedings. |
| March 25, 1988 | Arnold Friedman pleads guilty before Judge Boklan to all felony counts in Indictments 67104 and 67430 in exchange for a promised sentence of ten to thirty years, to run concurrently with any sentence imposed in federal court. Faced with the prospect of being re-arrested and prosecuted based on the allegations of other children, he provides a lengthy "closeout" statement to detectives, confessing to acts of molestation against every child whose name is raised by the police. Detectives will use this statement in subsequent visits to children's houses. |
| March 28, 1988 | Arnold Friedman is sentenced to ten years in federal prison. |
| April 11,1988 | Douglas Krieger, Esq., serves a demand for discovery, which includes a specific Brady request. |
| May 13, 1988 | Arnold Friedman is sentenced to ten to thirty years in prison on the state charges. |
| June 22, 1988 | Ross Goldstein is arrested based on a felony complaint alleging 18 counts of child sexual abuse committed in the Friedmans' computer classes. Detective Galasso tells the press and Jesse's attorney, Peter Panaro, that there might be as many as four additional suspects arrested. |

| | |
|---|---|
| June 23, 1988 | Jesse Friedman, who has surrendered at the demand of Nassau County police, is arraigned on a felony complaint charging thirty-seven new counts of sexual abuse. |
| September 8, 1988 | Ross Goldstein signs a plea agreement in which he promises to testify against Jesse Friedman. Goldstein is promised a sentence of six months in the county jail, five years probation, and a youthful offender adjudication. |
| In or about Summer/ Fall 1988 | Attorney Panaro, having viewed and transcribed the tape of the Interview of Gary Meyers, specifically requests Brady evidence of similar suggestive and intimidating questioning of other children by detectives. None is disclosed. |
| November 15, 1988 | Jesse Friedman and Ross Goldstein are arraigned on Indictment 69783, which contains 302 counts of child sexual abuse against seven children. |
| December 20, 1988 | Jesse Friedman pleads guilty before Judge Boklan to twenty-four counts in full satisfaction of the three indictments against him in exchange for a promised sentence of six to eighteen years. |
| January 24, 1989 | Jesse Friedman is sentenced by Judge Boklan to six to eighteen years. |
| March 22, 1989 | Ross Goldstein pleads guilty to three counts of sodomy in the first degree, and one count of use of a child in a sexual performance. |
| May 3, 1989 | Ross Goldstein is sentenced to two to six years by Judge Boklan, contrary to Goldstein's cooperation agreement. Ten weeks later, the Second Department reverses Judge Boklan and orders that she resentence Goldstein to the originally promised term of six months. |
| Fall 2000 | Andrew Jarecki begins production of a documentary about children's birthday party entertainers, which eventually becomes "Capturing the Friedmans." He first contacts Jesse Friedman about the project in March 2001. |
| December 7, 2001 | Jesse Friedman is released from prison after serving thirteen years of his sentence. |

| | |
|---|---|
| January 2002 | Jesse Friedman sits for on-camera interview with Andrew Jarecki for his film. |
| January 2003 | Jesse Friedman sees a rough-cut of "Capturing the Friedmans". |

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-- against --

JESSE FRIEDMAN.

Defendant,

Indictment Nos. 67104, 67430, 69783

----------------------------------------------------------------x

**APPENDIX OF EXHIBITS**

MARK GIMPEL, ESQ.
870 United Nations Plaza
New York, New York 10017
(212) 308-3420

TABLE OF CONTENTS

| | |
|---|---|
| Exhibit 1 | Indictment 67104 |
| Exhibit 2 | Indictment 67430 |
| Exhibit 3 | Indictment 69783 |
| Exhibit 4 | Affidavit of United States Postal Inspector John McDermott in Support of Search Warrant, dated November 3, 1987 |
| Exhibit 5 | Transcript of Interview with Detective Sergeant Fran Galasso (in two parts) |
| Exhibit 6 | Transcript of the film, "Capturing the Friedmans" |
| Exhibit 7 | Affidavit of Detective William Hatch, in Support of Search Warrant, dated November 24, 1987 |
| Exhibit 8 | Inventory of November 3, 1987 Search |
| Exhibit 9 | Alvin E. Bessent, *Dragnet Is Out For Porn Photos In Child-Sex Case*, NEWSDAY, February 8, 1989 |
| Exhibit 10 | Richard Esposito, *Ex-Teacher Focus of Porno Probe*, NEWSDAY, November 13, 1987 |
| Exhibit 11 | Transcript of Interview with Detective Anthony Sgueglia (in two parts) |
| Exhibit 12 | Inventory of Property Seized in November 25, 1987 Search |
| Exhibit 13 | Shirley E. Perlman, *Teen Told: Stay Away From Kids*, NEWSDAY, August 9, 1990 |
| Exhibit 14 | Blueprint of Lower Level of Friedman House |
| Exhibit 15 | Douglas J. Besharov, *Lessons from the McMartin Case*, THE CHRISTIAN SCIENCE MONITOR, February 9, 1990 |
| Exhibit 16 | Transcript of Federal Sentencing of Arnold Friedman, March 28, 1988 |
| Exhibit 17 | Demand for Discovery, April 11, 1988 |

| | |
|---|---|
| Exhibit 18 | Letter from Assistant District Attorney Joseph Onorato, dated April 18, 1988 |
| Exhibit 19 | Omnibus Motion, April 15, 1988 |
| Exhibit 20 | People's Affirmation in Opposition to Defendant's Omnibus Motion, May 10, 1988 |
| Exhibit 21 | Decision on Omnibus Motion, July 14, 1988 |
| Exhibit 22 | Minutes of Arraignment and Proceedings on Indictment 69783, November 15, 1988 |
| Exhibit 23 | Order to Show Cause, April 15, 1988 |
| Exhibit 24 | Mike Brennan, *100 Kids Linked to Teacher in Sex-Attack Case*, NEW YORK POST, November 27, 1987 |
| Exhibit 25 | Michael Hanrahan and Richard Sisk, *AIDS Tests Sought: L.I. Prosecutor Asks Check of Teacher & Son in Abuse Case,* NEW YORK DAILY NEWS, November 28, 1987 |
| Exhibit 26 | Alvin E. Bessent, *The Secret Life of Arnold Friedman*, NEWSDAY, May 28, 1989 |
| Exhibit 27 | Transcript of Interview with Gregory Doe (in three parts) |
| Exhibit 28 | Taped Interview of Gary Meyers |
| Exhibit 29 | Bill Van Haintze and Alvin E. Bessent, *New Arrest in Child Sex Case*, NEWSDAY, June 23, 1988 |
| Exhibit 30 | Alvin E. Bessent, *Teen Faces 37 New Sex Charges*, NEWSDAY, June 24, 1988 |
| Exhibit 31 | William S. Dobkin, *Great Neck Community Marshals its Resources to Deal With Child Abuse and Child-Sex Crime*, GREAT NECK RECORD, February 4, 1988 |
| Exhibit 32 | Temple Beth-El of Great Neck Panelists of Sexual Abuse of Children Program, November 16, 1988 |
| Exhibit 33 | Letter from District Attorney Dennis Dillon and Barry W. Grennan, March 26, 1990, to Inspector Robert Olsen |

| | |
|---|---|
| Exhibit 34 | Presentation Summary for "Child Pornography and Extrafamilial Child Sex Abuse" |
| Exhibit 35 | Debbie Nathan, *The Ritual Sex Abuse Hoax*, THE VILLAGE VOICE, January 12, 1990 |
| Exhibit 36 | Henry G. Miller, *Learning to Love: The Trial Lawyer's 14 Challenges*, NYSBA JOURNAL, September 2001 |
| Exhibit 37 | Izzo Deposition Excerpts (Detective Wallene Jones and Detective Nancy Myers) |
| Exhibit 38 | Letter from parent to Dr. Sandra Kaplan |
| Exhibit 39 | E-mail from NoleDreamer[redacted] |
| Exhibit 40 | VHS tape of "Capturing the Friedmans" |
| Exhibit 41 | VHS tape of additional DVD material from "Capturing the Friedmans" |

1

DA-66 DA 1831 3/73 Rev.1/78

COUNTY COURT : COUNTY OF NASSAU

THE PEOPLE OF THE STATE OF NEW YORK

– against -

ARNOLD FRIEDMAN and JESSE FRIEDMAN,

Defendants.

THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, accuse the defendant

ARNOLD FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE,

committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1987 to on or about the 25th day of November, 1987, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Barry Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Kenneth Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

THIRD COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Kenneth Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

FOURTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of USE OF A CHILD IN A SEXUAL PERFORMANCE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, knowing the character and content thereof he employed, authorized, or induced Kenneth Doe, a child less than sixteen years of age to engage in a sexual performance, to wit: the defendant did photograph the victim while Arnold Friedman did contact the victim's anus with Arnold Friedman's penis.

FIFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of USE OF A CHILD IN A SEXUAL PERFORMANCE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, knowing the character and content thereof he employed, authorized, or induced Kenneth Doe, a child less than sixteen years of age to engage in a sexual performance, to wit: the defendant did photograph the victim while Arnold Friedman did contact the victim's anus with Arnold Friedman's penis.

SIXTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1987 to on or about the 25th day of November, 1987, in the County of Nassau, State of New York, subjected Barry Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

SEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1987 to on or about the 25th day of November, 1987, in the County of Nassau, State of New York, subjected Barry Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

EIGHTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of January, 1987 to on or about the 30th day of April, 1987, in the County of Nassau, State of New York, subjected Barry Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

NINTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, subjected George Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

TENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, subjected George Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

ELEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, subjected George Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

TWELFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987,

in the County of Nassau, State of New York, subjected George Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

THIRTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1985 to on or about the 1st day of January, 1986, in the County of Nassau, State of New York, subjected Joseph Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

FOURTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, subjected Kenneth Doe, a person less than eleven years old, to sexual contact, to wit: the victim did touch the defendant's penis.

FIFTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, subjected a person less than eleven years old, to sexual contact, to wit: Kenneth Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

SIXTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of April, 1987 to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, subjected Kenneth Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

SEVENTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, on or about the 27th day of May, 1985, in the County of Nassau, State of New York, subjected William Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

EIGHTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of October, 1986 to on or about the 30th day of January, 1987, in the County of Nassau, State of New York, subjected William Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

NINETEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of AN ATTEMPT TO COMMIT THE CRIME OF SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1987 to on or about the 25th day of November, 1987, in the County of Nassau, State of New York, attempted to subject Barry Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did attempt to touch the victim's penis.

TWENTIETH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of AN ATTEMPT TO COMMIT THE CRIME OF SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1987 to on or about the 25th day of November, 1987, in the County of Nassau, State of New York, attempted to subject Barry Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did attempt to touch the victim's penis.

TWENTY-FIRST COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of January, 1987 to on or about the 30th day of April, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Barry Doe, a male child, less than sixteen years old, to wit: the defendant did show the victim magazines containing pictures of naked people.

TWENTY-SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of January, 1987 to on or about the 30th day of April, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Barry Doe, a male child, less than sixteen years old, to wit: the defendant did show the victim magazines containing pictures of naked people.

TWENTY-THIRD COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of January, 1987 to on or about the 30th day of April, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Barry Doe, a male child, less than sixteen years old, to wit: the defendant did show the victim the defendant's penis.

TWENTY-FOURTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of January, 1987 to on or about the 25th day of November, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Barry Doe, a male child, less than sixteen years old, to wit: the defendant did show the victim magazines containing pictures of naked people and did show the victim the defendant's penis.

TWENTY-FIFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of January, 1987 to on or about the 30th day of April, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Barry Doe, a male child, less than sixteen years old, to wit: the defendant did show his penis to the victim.

TWENTY-SIXTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of December, 1984 to on or about the 1st day of July, 1985, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Joseph Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see a video disc entitled "Strip Poker" depicting a naked female.

TWENTY-SEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of December, 1984 to on or about the 1st day of July, 1985, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Joseph Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see a video disc entitled "Stroker" depicting a hand masturbating a penis.

TWENTY-EIGHTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of January, 1985 to on or about the 1st day of July, 1985, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Joesph Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see a video disc entitled "Hands on X" depicting naked people.

TWENTY NINTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN of the crime of ENDANGERING THE WELFARE OF A CHILD committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1985 to on or about the 1st day of January 1986, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Joseph Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see a video disc entitled Dirty Movie depicting a naked woman touching her vagina and a video disc entitled Stroker depicting a hand masturbating a penis.

THIRTITH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1985 to on or about the 1st day of January, 1986, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Joseph Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see a video disc entitled Girls They Want to Have Fun depicting a naked woman masturbating.

THIRTY FIRST COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of December, 1984 to on or about the 31st day of January, 1986 in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Joseph Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see the following video discs: 1-Strip Poker, depicting a naked female, 2-Stroker, depicting a hand masturbating a penis, 3-Hands on X, depicting naked people, 4-Dirty Movie, depicting a naked woman touching her vagina and 5-Girls They Want to Have Fun, depicting a naked woman masturbating.

THIRTY SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Kenneth Doe, a male child, less than sixteen years old, to wit: the defendant showed the victim magazines containing pictures of naked people.

THIRTY THIRD COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Kenneth Doe, a male child, less than sixteen years old, to wit: the defendant showed the victim magazines containing pictures of naked people.

THIRTY FOURTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Kenneth Doe, a male child, less than sixteen years old, to wit: the defendant showed the victim magazines containing pictures of naked people.

THIRTY FIFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County of Nassau, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Kenneth Doe, a male child, less than sixteen years old, to wit: the defendant showed the victim magazines containing pictures of naked people.

THIRTY SIXTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Kenneth Doe, a male child, less than sixteen years old, to wit: the defendant made the victim show the defendant his penis.

THIRTY SEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Kenneth Doe, a male child, less than sixteen years old, to wit: the defendant did show his penis to the victim.

THIRTY EIGHTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Kenneth Doe, a male child, less than sixteen years old, to wit: the defendant did show his penis to the victim.

THIRTY NINTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1987, to on or about the 30th day of June, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Kenneth Doe, a male child, less than sixteen years old, to wit: the defendant did show his penis to the victim, the defendant made the victim show the defendant his penis and the defendant did show the victim magazines containing pictures of naked people.

FORTIETH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, on or about the 27th day of May, 1985, in the County of Nassau, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did touch the penis of a child less than sixteen years of age in the victim's presence.

FORTY FIRST COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, on or about the 27th day of May, 1985, in the County of Nassau, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did place his penis between the buttocks of seven boys less than sixteen years of age in the victim's presence.

FORTY SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1985 to on or about the 30th day of April, 1985, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see a video disc entitled Sex Style Test which asked sexually related questions.

FORTY THIRD COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 30th day of January, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did touch the penis of Jesse Friedman in the victim's presence.

FORTH FOURTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 30th day of January, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did touch his penis to the anus of Jesse Friedman in the victim's presence.

FORTY FIFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 30th day of January, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did touch the penis of Arnold Friedman in the victim's presence.

FORTY SIXTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 30th day of January, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did touch his penis to the anus of Arnold Friedman in the victim's presence.

FORTY SEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD, FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 30th day of January, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see a video disc entitled Mad Party Fucker depicting a story of an orgy at a mansion.

FORTY EIGHTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 30th day of January, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did slam the head of a child less than sixteen years of age into a wall and told the class that this is what would happen to people who told what was going on in the victim's presence.

FORTY NINTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 30th day of January, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did touch the penis of a child less than sixteen years of age in the victim's presence.

FIFTIETH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 30th day of January, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did show the victim magazines containing pictures of naked people.

FIFTY FIRST COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1987, to on or about the 25th day of November, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did touch his penis to the anus of a child less than sixteen years of age in the victim's presence.

FIFTY SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1985, to on or about the 25th day of November, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did the following: 1-the defendant did touch the penis of a child less than sixteen years of age in the victim's presence; 2-the defendant did place his penis between the buttocks of seven boys less than sixteen years of age in the victim's presence; 3-the defendant permitted the victim to see a video disc entitled Sex Style Test which asked sexually related questions; 4-the defendant did touch the penis of Jesse Friedman in the victim's presence; 5-the defendant did touch his penis to the anus of Jesse Friedman in the victim's presence; 6-the defendant permitted the victim to see a video disc entitled Mad Party Fucker depicting a story of an orgy at a mansion; 7-the defendant did slam the head of a child less than sixteen years of age into a wall and told the class that this is what would happen to people who told what was going on in the victim's presence; 8-the defendant did show the victim magazines containing pictures of naked people and 9-the defendant did touch his penis to the anus of a child less than sixteen years of age in the victim's presence.

FIFTY THIRD COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of October, 1986, to on or about the 25th day of November, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of William Doe, a male child, less than sixteen years old, to wit: the defendant did the following: 1-the defendant did touch the penis of Arnold Friedman in the victim's presence; 2-the defendant did touch his penis to the anus of Arnold Friedman in the victim's presence and 3-the defendant did touch the penis of a child less than sixteen years of age in the victim's presence.

FIFTY FOURTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1987, to on or about the 25th day of November, 1987, in the County, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Barry Doe, a male child, less than sixteen years old, to wit: the defendant did show the victim magazines containing pictures of naked people.

All of the acts and transactions alleged in each of the several counts in this indictment are connected together and form part of a common scheme and plan.

Dated: December 7, 1987

Denis Dillon JRO

DENIS DILLON
District Attorney

PLEASE TAKE NOTICE that in accordance with the provisions of Section 240.30 of the Criminal Procedure Law, I hereby demand that within twenty days of the date of service of this Demand, you disclose and make available to the District Attorney of Nassau County for inspection, photocopying, or testing any written report or document or portion thereof, concerning a physical or mental examination, or scientific test, experiment, or comparisons, made by or at the request or direction of the defendant.

PLEASE TAKE FURTHER NOTICE that in accordance with the provisions of Section 250.20 of the Criminal Procedure Law I hereby demand from you and each of you that if you intend upon the trial of this indictment to offer, for any purpose whatever, testimony which may tend to establish your presence elsewhere than at the scene of the crime or crimes with which you are charged, at the time of their commission, you must, within eight days from the date of service of this Demand, serve upon the District Attorney of Nassau County, and file with this court, a copy thereof, a "notice of alibi" which shall set forth in detail the place or places where you claim to have been together with the names, post office addresses, residences and places of employment and the addresses thereof of the witnesses upon whom you intend to rely to establish your presence elsewhere than at the scene of the crime or crimes at the time of their commission.

If at the trial of this action the defendant calls such an alibi witness without having served a notice of alibi pursuant to the demand, or, if having served such a notice he calls a witness not specified therein, a motion will be made pursuant to the provisions of Section 250.20 of the Criminal Procedure Law to exclude any testimony of such witness relating to the alibi defense.

PLEASE TAKE FURTHER NOTICE that pursuant to Section 710.30 of the Criminal Procedure Law, the People intend to offer at the trial of this indictment evidence of oral and/or written statement(s) made to a public servant pertaining to the charge set forth in this indictment.

PLEASE TAKE FURTHER NOTICE that pursuant to Section 710.30 of the Criminal Procedure Law, during the trial of this matter, the People expect to introduce testimony identifying the defendant as a person who committed the offenses charged as set forth in this indictment, which testimony will be given by a witness (witnesses) who has (have) previously identified the defendant.

DENIS DILLON
District Attorney
Nassau County, New York

DA-56. 8/70
DA-1187. 9/71 Rev. 1/80

2

DA-65.DA-1831.3/73.Rev.1/75

67430

COUNTY COURT : COUNTY OF NASSAU

THE PEOPLE OF THE STATE OF NEW YORK

—against—

ARNOLD FRIEDMAN and JESSE FRIEDMAN,

Defendants.

THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, accuse the defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE,

committed as follows:

The defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, individually and aiding and abetting and being aided and abetted by each other, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Fred Doe, a person less than eleven years old, to wit: the defendant, ARNOLD FRIEDMAN did contact the victim's anus with the defendant ARNOLD FRIEDMAN'S penis while the defendant JESSE FRIEDMAN covered the victim's mouth.

SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, individually, and aiding and abetting and being aided and abetted by each other, from on or about the 31st day of December, 1986 to on or about the 31st day of March, 1987, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Fred Doe, a person less than eleven years old, to wit: the defendant, ARNOLD FRIEDMAN did contact the victim's anus with the defendant ARNOLD FRIEDMAN'S penis while the defendant JESSE FRIEDMAN was telling the victim to be quiet.

THIRD COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Fred Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

FOURTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, with the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 31st day of December, 1986 to on or about the 31st day of March, 1987, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Fred Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

FIFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, with the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of January, 1986 to on or about the 31st day of March, 1986, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Dennis Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

SIXTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, with the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Dennis Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

SEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of January, 1986 to on or about the 31st day of March,

1986, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Dennis Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

EIGHTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Dennis Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

NINTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SODOMY IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, engaged in deviate sexual intercourse with Richard Doe, a person less than eleven years old, to wit: the defendant did contact the victim's anus with the defendant's penis.

TENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, subjected Daniel Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

ELEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, subjected Daniel Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

TWELFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, subjected Daniel Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

THIRTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, subjected Daniel Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

FOURTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Daniel Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

FIFTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Daniel Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

SIXTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December,

1986, in the County of Nassau, State of New York, subjected Daniel Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

SEVENTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Daniel Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

EIGHTEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Fred Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

NINETEENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Fred Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

TWENTIETH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Fred Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's buttocks.

TWENTY-FIRST COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, individually, and aiding and abetting and being aided and abetted by each other, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Fred Doe, a person less than eleven years old, to sexual contact, to wit: the defendant, ARNOLD FRIEDMAN did touch the victim's buttocks after the defendant, JESSE FRIEDMAN, had pulled the victim's pants down.

TWENTY-SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Fred Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis with the defendant's penis.

TWENTY-THIRD COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Fred Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's buttocks.

TWENTY-FOURTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 31st day of December, 1986 to on or about the 31st day of March, 1987, in the County of Nassau, State of New York, subjected Fred Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

TWENTY-FIFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Edward Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

TWENTY—SIXTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, individually, and aiding and abetting and being aided and abetted by each other, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Edward Doe, a person less than eleven years old, to sexual contact, to wit: the defendant, ARNOLD FRIEDMAN, did touch the victim's penis while the defendant, JESSE FRIEDMAN, held the victim.

TWENTY-SEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendants, ARNOLD FRIEDMAN and JESSE FRIEDMAN, individually, and aiding and abetting and being aided and abetted by each other, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Edward Doe, a person less than eleven years old, to sexual contact, to wit: the defendant, ARNOLD FRIEDMAN, did touch the victim's penis while the defendant, JESSE FRIEDMAN did touch the victim's buttocks with the defendant, JESSE FRIEDMAN'S, penis.

TWENTY-EIGHTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of March, 1987, in the County of Nassau, State of New York, subjected Edward Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

TWENTY-NINTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of January, 1986 to on or about the 31st day of March, 1986, in the County of Nassau, State of New York, subjected Dennis Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

THIRTIETH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, subjected Dennis Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

THIRTY-FIRST COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of January, 1986 to on or about the 31st day of March, 1986, in the County of Nassau, State of New York, subjected Dennis Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

THIRTY-SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, subjected Dennis Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch the victim's penis.

THIRTY-THIRD COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of January, 1987 to on or about the 31st day of March, 1987, in the County of Nassau, State of New York, subjected Keith Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

THIRTY-FOURTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of September, 1986 to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, subjected Keith Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did touch his penis to the victim's back.

THIRTY-FIFTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of AN ATTEMPT TO COMMIT THE CRIME OF SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986, to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, attempted to subject Richard Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did attempt to touch the victim's penis.

THIRTY-SIXTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of AN ATTEMPT TO COMMIT THE CRIME OF SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986, to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, attempted to subject Richard Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did attempt to touch the victim's penis.

THIRTY-SEVENTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, JESSE FRIEDMAN, of the crime of AN ATTEMPT TO COMMIT THE CRIME OF SEXUAL ABUSE IN THE FIRST DEGREE, committed as follows:

The defendant, JESSE FRIEDMAN, from on or about the 1st day of September, 1986, to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, attempted to subject Richard Doe, a person less than eleven years old, to sexual contact, to wit: the defendant did attempt to touch the victim's anus with the defendant's finger.

THIRTY-EIGHTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of April, 1986 to on or about the 30th day of June, 1986, in the County of Nassau, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Daniel Doe, a male child, less than sixteen years old, to wit: the victim observed the defendant touch his penis to a boy's back.

THIRTY-NINTH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986, to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Fred Doe, a male child, less than sixteen years old, to wit: the defendant permitted the victim to see a computer disc depicting naked people.

FORTIETH COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986, to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Fred Doe, a male child, less than sixteen years old, to wit: the victim observed the defendant place his hand down the pants of several boys.

FORTY-FIRST COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986, to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Fred Doe, a male child, less than sixteen years old, to wit: the victim observed the defendant hit several boys.

FORTY-SECOND COUNT

AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuse the defendant, ARNOLD FRIEDMAN, of the crime of ENDANGERING THE WELFARE OF A CHILD, committed as follows:

The defendant, ARNOLD FRIEDMAN, from on or about the 1st day of September, 1986, to on or about the 31st day of December, 1986, in the County of Nassau, State of New York, knowingly acted in a manner likely to be injurious to the physical, mental and moral welfare of Fred Doe, a male child, less than sixteen years old, to wit: the victim observed the defendant's penis being touched by several boys.