down his eyes, literally, he told me that he was
abused by his father growing up. And that while
he never enjoyed the sexual part of that, he did
enjoy the attention his father gave him and being
with his father. And that not everything he had
said about nothing happened was true.

JESSE:

Peter Panaro was personally convinced that my
father had sexually abused me. And nothing I
could say could dissuade Peter from this notion.

PETER PANARO:

Jesse felt that if Judge Boklan knew that he also
was a victim of his father, that she might
consider the plea negotiations in a more
favorable way.

JESSE:

He came up with this strategy. It was Peter
Panaro's fictionalized story that he fed to me.
And said, "If you say this, it's gonna look good

for you."

PETER PANARO:

I told him, I wouldn't do it.  I told him,
"Jesse, when you plead guilty in open court,
you're gonna have to admit to this type of anal
sodomy, 14 times.  And I'm not gonna let you do
that unless you can admit it."  He looked me
right in the eye, always liked to call me by my
name before he made a statement, and said,
"Peter, I can admit it."

JESSE:

The only concern that Peter Panaro had was that
ethically as a lawyer, he couldn't let his client
go into court and say something happened that he
knew his client had told him was a lie.

(MUSIC)

The private investigator wasn't coming up with
anything helpful.  There was not gonna be any
defense witnesses.  There wasn't any money to

hire experts.   Mom was insistent upon there not

being a trial.   Peter Panaro wasn't believing me,

no matter how many times I told him nothing

happened.   I just ran out of options.

### ELAINE:

Jesse was a very good baby.   I remember when we

brought him home from the hospital and Arnie

looked at that baby and he said, "That child is

marvelous. He's wonderful."   And he was so

thrilled.   And David was the big brother and he

used to take care of Jesse.   We used to let David

watch him, and he was very protective of his baby

brother.

### DAVID:

(home video footage)

It's amazing.   Six months from now … I already

don't have a father or a mother.   Six months from

now I'm not gonna have my brother.   If I ever

watch this, I don't know when it's gonna be.   I

don't know where I'm gonna be. I don't know

what's gonna happen to my family. I'm so scared.

INTERCARD:

It's the night before Jesse is to enter his

guilty plea.

SETH:

(home video footage)

We're trying to help Jesse pack. His last night

of freedom, and I wish you would help.

ELAINE:

(home video footage)

I don't want to have to spend the next eight

hours screaming with my sons and fighting with

them.

JESSE:

(home video footage)

Then shut up.

ELAINE:

(home video footage)

I want them out of this house tomorrow morning.

DAVID:

(home video footage)

Mom, we're here for Jesse.

ELAINE:

(home video footage)

I don't give a shit.  I want you out of this

house tomorrow--

DAVID:

(home video footage)

You may not give a shit about Jesse but we are

here for Jesse.

JESSE:

(home video footage)

What are you talking about?  What are you all

talking about here?

DAVID:

(home video footage)

Can't you put your anger aside for one minute?

ELAINE:

(home video footage)

I cannot put my anger aside about you.  You have

been nothing but hateful, hostile, and angry,

ever since this began.

DAVID:

(home video footage)

Okay, Jess, we're on.

JESSE:

(home video footage)

Ta da. I feel like shit.

DAVID:

(home video footage)

PG. 112

What's today's date?

JESSE:

(home video footage)

Today's the day before I went to jail.

DAVID:

(home video footage)

"Went" to jail?

JESSE:

(home video footage)

I'm going to jail--

DAVID:

(home video footage)

Because we're watching it.

JESSE:

(home video footage)

Yeah, went. We're gonna be watching this after

I'm already out of jail.  After four, four-and-a-

half years, because the case gets reopened.

At this point in time my life is as good as over.
It is terminated at this point only to resume at
a later day.


This one'll go, this one'll shatter.

### DAVID:

The night before Jesse's plea we stayed up all
night. Maybe I shot the videotape so that I
wouldn't have to remember it myself. It's a
possibility. Because I don't really remember it
outside of the tape. Like when your parents take
pictures of you, do you remember being there, or
do you remember just the photograph hanging on
the wall?


### JESSE:

(home video footage)

Even if I'm facing the worst scenario possible
tomorrow, and for every day following it, I have

to think tonight that it's not gonna be that bad.
Goodness knows, I don't want to look like my
father.  Goodness knows, I want to separate
myself from Arnold Friedman as much as possible.
And I'm not throwing chairs tomorrow.


SETH:

(home video footage)

Good.

JESSE:

(home video footage)

That's for sure.


And if this trial were postponed for three years
--  in three years, I would win.  But here,
today, at this point, trying to start a trial in
two weeks, I would lose this trial.  We feel this
way and that is what would happen.

TEXT:

The next morning.

          DAVID:

          (home video footage)

So what are you thinking, Jess?

          JESSE:

          (home video footage)

Uh… I'm not.

          DAVID:

          (home video footage)

You're, you're, avoiding?

          JESSE:

          (home video footage)

Uh… well, I gotta eat something.

I'm proud to say I've managed to leave barely any gas in the car.

DAVID:

(home video footage)

Just our luck, we'll be trapped at the house.

We'll run out of gas at the house.


TEXT:

Driving to the courthouse


SETH:

(home video footage)

You a child molester, Jess?

JESSE:

(home video footage)

Nope.

DAVID:

(home video footage)

Did you ever do it?

JESSE:

(home video footage)

Never touched a kid.

DAVID:

(home video footage)

Did you do what they said you did?

JESSE:

(home video footage)

I never touched a kid.  I never saw my father

touch a kid.


DAVID:

(home video footage)

Good.

SETH:

(home video footage)

Yeah, but still, you must have done it.

DAVID:

(home video footage)

Yeah, but surely something has happened.

It must, something.

SETH:

Because the police say it's true.  Okay, you

never touched a kid, right?

JESSE:

(home video footage)

Well, if something happened, it didn't happen

while I was there.

(OVERTALK)

SETH:

(home video footage)

But still, the police tell the truth, right?

I mean the police--

JESSE:

(home video footage)

And it was a minimal incident because the kid

didn't say anything about it.

SETH:

(home video footage)

But the police, how could they be lying?

JESSE:

(home video footage)

Shut up, Seth.


PETER PANARO:

(news footage)

The children, the 14 children in this case are clearly victims.  No one could ever argue that. The real culprit here is Arnold Friedman.  The man is a monster.  He abused him and he molested him.  This can't be overlooked.  I can't believe we live in such a cold society that no one could look at this man and understand that.

JESSE:

(news footage)

My father raised me confused about what was right and what was wrong.  And I realize now how

terribly wrong it all was.  I, I wish I could
have done something to stop it sooner.  I wish
there was something I could have done.  I'm very,
I'm, I'm just so sorry it happened.

PETER PANARO:

Judge Boklan sternly looked down and said that
she recommended to the parole board that he serve
the maximum period of time permitted by law.  A
statement which I felt was harsh and unnecessary
to a 19-year-old under these circumstances.

FRAN GALASSO:

Jesse was a victim.  There's no question, Jesse
was a victim.  But even when he was caught, Jesse
never expressed any kind of sympathy for these
kids. And as a matter of fact, on the day that
the plea was taken, Jesse was dancing and singing
on the courthouse steps while being videotaped by
his two brothers.

JESSE:

(home video footage)

My brain hurts!  It'll have to come out. My

brain, but I'm using it!

DAVID:

(home video footage)

(LAUGHTER) But I'm using it.

JESSE:

(home video footage)

Nurse!  Nurse!

JOSEPH ONORATO:

They were taking pictures. I remember someone

brought that to my attention.  We looked out the

window.  Because I'm saying, I'm saying to

myself, "This is very bizarre." I mean he's about

to go to jail for the next six to 18 years and

he's out on the courtroom steps in some sort of

theatrical performance.

JESSE:

(home video footage)

That is so funny when they're all…

DAVID:

I think it was about distracting ourselves.  Not

necessarily distracting Jesse.  Jesse was, I

think he was the most comfortable about the whole

situation.  He, you know, I don't know how he has

always been the most comfortable about it, but he

has.

JESSE:

(home video footage)

Okay, right about now, we've been waiting for a

good two hours or so now because evidently the

parents stormed Denis Dillon's office this

morning when they received the news last night

that I was to plead guilty.  And they were not

aware of this fact.  They were not even aware of

the fact that negotiations were underway.  And

they did not want me to have less than 10 to 30.

And there are a lot of people probably making all
sorts of angry statements at this point in time.
I can't imagine what they're discussing.  The
meeting must have looked just like our family.


TEXT:
Parents of computer students


                    DAVID:

                (home video footage)
Well, there wasn't much of them anyway. But that
means the meeting's over.


                    JESSE:

                (home video footage)
That means the meeting's over.

                    DAVID:

(home video footage)

Go ask them, Jess.

JESSE:

(home video footage)

You hold it, I'm not holding it.

DAVID:

Should I do it Jess?

MALE VOICE:

(home video footage)

Heads up!

MALE PARENT:

(home video footage)

You son of a bitch! You raped my son!  You raped

my son!

DAVID:

(home video footage)

Save me! Oh my God. Get them away from me.

They're animals.  Oh my God, I don't believe it.

Wow.  Oooh.

(MUSIC)

TEXT:

Clinton Correctional Facility

Dannemora, New York

ELAINE:

After Jesse went to jail, I know my friends said
to me, "Don't you feel like terrible being alone
in such a big house?"  I said, "No, I feel calm."
That's when I really started becoming a person
and started to live.

HOWARD FRIEDMAN:

Elaine divorced him while he was in prison.  He
settled into life there.  And he, you can't say
it was good in prison but it was as good as it
could get for him.  But of course the torment
continued and got worse because of Jesse.  My

brother never got over the guilt.  He had talked
about taking his life because he had this
insurance policy he had taken out.  I think it
was $250,000, a quarter of a million.


And Jesse was the beneficiary. He said, "This is
the only thing I have left to give Jesse.  So he
has money when he gets out and he can make some
kind of life for himself, because I've screwed it
up otherwise for him."  By that time, that clause
in the insurance policy where suicide was
payable, had come into effect.

DEBBIE NATHAN:

And this is the coroner's report. It describes
the cause of death as doxepin intoxication.
Which basically means that Arnold took a massive
overdose of antidepressants.


HOWARD FRIEDMAN:

I took a deep breath and I said, "It's over,
David. He's out of his misery.  It's over."  I
thought it was a blessing. Because the guilt he
was carrying, he was so unhappy.  It was, he was
out of his misery.  The rest of the family
wasn't, but he was.  I found it a blessing.

DAVID:

(SINGING) "Let me entertain you, let me make you
smile."

It's unbelievably difficult.  I have to read
these horrible letters about my brother being
almost killed in prison.  My friends call me, I'm
crying.  "Why are you crying?"  I can't tell
them.  None of the people that do what I do know
about this story.  Just the intimation of
something like this can ruin someone's career.
And I'm always afraid that's going to happen.

(SINGING) "So let me entertain you.  And we'll have a real good time."

HOWARD FRIEDMAN:

I feel I will never really know the truth.

JACK FALLIN:

But the one truthful thing or the honest thing we know -- Howard loved his brother.  Howard loved his family. Loves his family.

HOWARD FRIEDMAN:

And I believed him when he said he didn't do those terrible things.  I believed him.

ELAINE:

Arnold had a need to confess.  And he had a need to go to jail.  And the sad thing is that he took his son with him.


(MUSIC)


TEXT:

Epilogue

HOWARD FRIEDMAN:

What's the term about families -- dysfunctional?

Numero uno. (LAUGHTER)


EPILOGUE TEXT #1:

Howard & Jack live on the coast of Oregon

EPILOGUE TEXT #2:

with their dachshund, Mona.


EPILOGUE TEXT #3:

Seth Friedman did not wish to be interviewed for

this film.


DAVID:

It was not the way it was supposed to end.

People were supposed to realize that all of this

was nonsense and we'd try to go back to living

our normal lives.

DAVID:

Hey, hi everyone!


EPILOGUE TEXT #4:

David Friedman is New York's #1 birthday clown.


ELAINE:

I would have to stare at Arnold across the dinner
table and it was just the two of us.   There was
really nothing between us except these children
that we yelled at.


EPILOGUE TEXT #5:

Elaine Friedman remarried in 1998.

EPILOGUE TEXT #6:

She and her husband recently moved to the
Berkshires.


ELAINE:

We named the cottage "Peaceful Pond Cottage"
because we were looking for a place of healing
and peace.

          JESSE:

          (home video footage)

Any comment on your personal life, sir?

          ARNOLD:

          (home video footage)

Yes.  It's personal.


EPILOGUE TEXT #7:

Arnold Friedman is buried on Long Island.

EPILOGUE TEXT #8

Jesse received $250,000 from his father's life
insurance.


EPILOGUE TEXT #9:

After serving 13 years of his sentence, Jesse
Friedman was released from prison.

EPILOGUE TEXT #10

David is there to meet him.

DAVID:

Oh, my God.  Hey, how you doing?  Oh, my God. Holy Christ.

JESSE:

Finally.

EPILOGUE TEXT #11:

Elaine waits to see Jesse for the first time since his release.

ELAINE:

Is that him?

PETER:

That could be he.

ELAINE:

Oh, shit.  Oh my God.  (LAUGHTER)

JESSE (OC):

PG. 133

Room service.

ELAINE:

Oh, God.

JESSE:

You order a son?  You looking for me?

ELAINE:

Oh. (CRYING)

JESSE:

Surprise.  Hi, look at me. Look.


END CREDITS

**7**

HON. HERBERT LIPP
NASSAU COUNTY COURT JUDGE,
SITTING AS A LOCAL CRIMINAL COURT
- - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of

        WILLIAM HATCH          AFFIDAVIT

A detective of the Nassau County Police
Department, Shield No. 402, assigned to
the Sex Crimes Squad.

- - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK )
              : ss.:
COUNTY OF NASSAU )

     I, WILLIAM HATCH, being duly sworn, depose and
say:

     That I am a detective in the Nassau County Police
Department, Shield No. 402, presently assigned to the Sex
Crimes Squad. I have been a member of the Nassau County
Police Department for approximately nineteen (19) years.
I investigate numerous cases involving sexual assualts of
a myriad variety.

     On the morning of November 4, 1987 I was notified
by Detective Sgt. Socher of the District Attorney's Squad
that his squad had assisted the United States Postal Inspectors
in the execution of a United States District Court (Eastern
District) search warrant of the residence of ARNOLD and ELAINE
FRIEDMAN, located at 17 Picadilly Road, Great Neck, New York.
I was advised that Postal Inspector John McDermott was in
charge of the case. The search warrant ordered the seizure
of all photographs, magazines, books, video tapes and other
unusual depictions of children engaging in sexually explicit

conduct, along with letters, envelopes, files, correspondence, personal computer discs, etc., relating to the distribution and receipt of child pornography.

I was in contact with Postal Inspector McDermott and he stated that approximately twenty (20) magazines illustrating nude photos of pre-adolescent and teenage males in various sexual poses were found in the FRIEDMAN house. Along with the magazines were discovered various pamphlets, booklets and brochures depicting boys in nude and sexual poses.

It was further discovered during the search that the FRIEDMAN's had one floor of their home set up like a nursery school with small tables, chairs, toys, and games. Photographs of this room were provided to me by Inspector McDermott along with photographs of the booklets and magazines. (See attached photos.) Lists of names and phone numbers were also present and confiscated.

I was advised by Postal Inspector McDermott that the postal authorities have been investigating Mr. FRIEDMAN since July, 1984 when they were notified by the United States Custom Service that he was receiving "kiddie porn" through the mail. I was further advised that an undercover operation was launched by the postal authorities and "kiddie porn" was exchanged between ARNOLD FRIEDMAN and the postal inspectors.

On the afternoon of November 4, 1987 I notified Sgt. Galasso of these facts and an investigation was begun by the Sex Crimes Squad. It was noted from the lists confiscated that most of the students listed were boys.

- 2 -

On the evening of November 12, 1987 Detective Wallene
Jones, Shield No. 494 and myself were present at the home
of Mr. and Mrs.              who resided in

          Mr. and Mrs.

          I interviewed               and found that
          had been abused.            stated that they were
shown books and pictures of nude males and were read stories
from these books by Mr. FRIEDMAN.            stated that
Mr. FRIEDMAN would fondle their buttocks while they looked
on or he read them these books.

          I was also advised by       that he was photographed
by Mr. FRIEDMAN while he was in the upstairs bathroom with
a younger boy of the class. The younger boy was "sitting
on the commode with his pants down holding his balls" and
          was coming out of the bathroom when the photo was
taken.

          stated that Mr. FRIEDMAN had fondled his
buttocks and had also taken him into a room, off the classroom,
where there was a big desk with a computer terminal on top.

          . stated that Mr. FRIEDMAN took a "small like cable
box" and plugged it into the computer. The figure of a man
came on the computer screen. The figure was first of a man
showing only from the neck to the head. Mr. FRIEDMAN typed
questions into the computer and the man would answer.  Mr.
FRIEDMAN would type in "do you like penises?" The man would
answer audibly "If I were gay, I'd like penises."  Mr. FRIEDMAN
would then roll a switch on the cable box and then the man

                              - 3 -

would be shown from the waist to the head.          described
the man has having on a shirt that was unbuttoned down the front.
He said the man didn't wear an undershirt and had a hairy
chest.

further stated that Mr. FRIEDMAN would say
to the boys, "You guys mustn't tell anyone about these books".
At the end of the class he would give the boys computer games
to take home as a reward for keeping quiet.

I also interviewed          who indicated to me that
he observed copies of "Playgirl Magazine" in Mr. FRIEDMAN's
office.

of the aforementioned boys attended Mr.
FRIEDMAN's computer school.  They would attend there after
their regular school day during the week.

On the afternoon of November 13, 1987 I informed
Sgt. Galasso that the list of names that Det. Wallene Jones
had compiled totaled approxiately eighty-one (81).

Furthermore, I have had conversations with Det.
Alex Armstrong, Shield No. 8, assigned to the District Attorney'
Squad and also Det. Anthony Sgueglia, Shield No. 334, presently
assigned to the Sex Crimes Squad, concerning this case.
Det. Armstrong has advised me of what observations he made
during the course of the issuance of a federal search warrant
at Mr. FRIEDMAN's home.  (See Det. Armstrong's affidavit
attached hereto.)  Det. Sgueglia has further advised me of
the conversations he had with two students at Mr. FRIEDMAN's
school, namely          . and          .  (See Det. Sgueglia'

- 4 -

affidavit attached hereto.)

Based upon information and belief both ARNOLD FRIEDMAN and his wife are presently continuing to teach young boys computer training at their home located at 17 Picadilly Road, Great Neck, New York.

Based upon my experience, the property sought by this search warrant may be easily and quickly destroyed or disposed of. During my training as a Nassau County Police Officer I have been involved in the quick magnetic erasure of various tapes and discs. These tapes and discs may be immediately erased on a computer at the touch of a button. I anticipate that if the FRIEDMANS are aware of our presence and purpose they will destroy the evidence sought to be obtained by this warrant. Based upon conversations with some of the students' parents it appears that Mr. FRIEDMAN is aware of our investigation and is attempting to obstruct it.

WHEREFORE, your affiant respectfully requests that a search warrant be issued authorizing your affiant or any other police officer of the Nassau County Police Department to enter the premises known and described as the single family, detached dwelling, located at 17 Picadilly Road, Great Neck, New York, and therein search for and seize any sexual devices, photographs, magazines, books, film, audio tapes, video tapes and other unusual depictions of children engaging in sexually explicit conduct and letters, envelopes, files, correspondence, notes, lists of students, lists of pornographic distributors, personal computer discs, and the personal computers needed to read the computer discs relating to pornography all of

- 5 -

which are being used in connection with and are evidence
of violations of Article 235, 263 and 260 of the Penal Law
of the State of New York.

_____

WILLIAM HATCH

Sworn to before me this 24th
day of Nevember, 1987

_____

HON. HERBERT LIPP

- 6 -

8

AO 93 (Rev. 5/85)   Search Warrant

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| 11/3/87 | 11/3/87   3.05 pm | MR. ARNOLD FRIEDMAN |

INVENTORY MADE IN THE PRESENCE OF

Inspectors   Pirone & Stock

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

See ATTACHED Inventory Sheets

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on warrant.

Jane E. Mixxxx

Subscribed, sworn to, and returned before me this date:

_Aellyn Gns_   11/9/87

U.S. Judge or Magistrate   Date

APP.   0377

# SEARCH WARRANT INVENTORY

Position/Box: _____

Subject Name: _Arnold Friedman_   Date: _11-5-87_

Subject Address: _17 Piccadilly Rd_   Floor/Room No: _2nd_

Inspector(s): _C. R. Nethercott_   Case No: _____

Safe: _____ Cabinet: _____ Credenza: _____ Desk: _____ Drawer: _____

Other: _Chest of Drawers_ Shelf: _____ Table: _____ Wall: _____

_Adjacent to bathroom_

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | magazine entitled Joe & His Uncle |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

DISTRIBUTION OF COPIES: White - U.S. Magistrate (Return with Warrant)
Yellow - Inspector (Attach to PS 714)
Pink - Subject Searched

Page _____ of _____ pages

## SEARCH WARRANT INVENTORY

Position/Box:

| | |
|---|---|
| Subject Name: ARNOLD FRIEDMAN | Date: 11-03-87 |
| Subject Address: 17 PICADILLY ROAD | Floor/Room No: OFFICE |
| Inspector(s): J.A. PRICE | Case No: |

| Safe: | Cabinet: | Credenza: | Desk: | Drawer: |
|---|---|---|---|---|
| Other: BEHIND PIANO | Shelf: | Table: | Wall: |
| PICTURES | | | |

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | BEST OF ONIX  MAGAZINE |
| 1 | BOYS A MASTERBATION   " |
| 1 | JAIL BAIT   " |
| 1 | YOUNG BOYS ' FELLATIO   " |
| 1 | TODD'S FIRST TIME   " |
| 1 | HOW THE WEST WAS WON   " |
| 1 | ORAL FUN - GAY SEX, GAY FUN " |
| 1 | BIG MAN ON CAMPUS   " |
| 1 | HARD UP   " |
| 1 | IN THE GROOVE   " |
| 1 | YOUNG BOYS A SCOUTY   " |
| 1 | INCEST CASE HISTORIES   " |
| 1 | UP OVER & DOWN UNDER   " |
| 1 | STUDIES IN DANISH MALE HOMOSEXUAL PORNOGRAPHY - VOL 1  BOOK |
| 1 | SEXUAL EXPERIENCE BETWEEN MEN & BOYS   BOOK |
| 1 | SHOW ME   BOOK |
| 1 | CHICKEN PICKENS  MAGAZINE |
| | |
| | |
| | |
| | |

DISTRIBUTION OF COPIES: White - U.S. Magistrate (Return with Warrant)
Yellow - Inspector (Attach to PS 714)
Pink - Subject Searched

Page 1 of 1 pages

# SEARCH WARRANT INVENTORY

Position/Box.: _____

Subject Name: ARNOLD FRiedMAN          Date: 11-3-87

Subject Address: 17 Picadilly Rd. GReat Neck NY 11023 Floor/Room No.: Floor 1 OFFice

Inspector(s): J. STOCK          Case No. _____

Safe: _____ Cabinet: _____ Credenza: _____ Desk: ✓ Drawer: ✓

Other: _____ Shelf: _____ Table: _____ Wall: _____

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| | Misc. child Porn From Left Desk Drawer |

DISTRIBUTION OF COPIES: White - U.S. Magistrate (Return with Warrant)
Yellow - Inspector (Attach to PS 714)
Pink - Subject Searched
Green - Evidence Control Officer (Attach to PS 714)

Page 1 of p.

# SEARCH WARRANT INVENTORY

Position/Box.: _____ /

Subject Name: Arnold Friedman          Date: 11/3/87

Subject Address: 17 Picadilly Rd          Floor/Room No.: _____

Inspector(s): J. McDamott          Case No. _____

Safe: _____ Cabinet: _____ Credenza: _____ Desk: _____ Drawer: _____

Other: [crossed out]          Shelf: _____ Table: _____ Wall: _____

behind Piano

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | Magazine - " Come and Get it " |
| 1 | " Confessions of a Pool Boy |
| 1 | " COD Boys " |
| 1 | " Boys & Masturbation |
| 1 | " Bare Cubs " |
| 1 | " Young Boyso and Sex Rei |
| 1 | " Beginners " |
| 1 | " Teenage Playthings " |
| 1 | " Hot Rods " |
| 1 | " Piece Parlor " |
| 1 | " Hard Sell " |
| 1 | " Young Boys & Fellati |
| 1 | Hardcover Book - " The Boy " |
| 1 | Book " The Child Ser Kar |
| | |
| | |
| | |
| | |
| | |

DISTRIBUTION OF COPIES: White - U.S. Magistrate (Return with Warrant)
Yellow - Inspector (Attach to PS 714)
Pink - Subject Searched
Green - Evidence Control Officer (Attach to PS 714)

Page ___ of ___ pa

# SEARCH WARRANT INVENTORY

Position/Box.: _____ / __

Subject Name: _ARNOLD FREDMAN_  Date: _11/3/87_

Subject Address: _17 PICADILLY RD, GREAT NECK_ Floor/Room No.: _BASEMENT_

Inspector(s): _____  Case No. _____

DRESSER

Safe: _____ Cabinet: _____ Credenza: _____ Desk: _____ Drawer: X

Other: _____ Shelf: _____ Table: _____ Wall: ___

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | WOODEN BOX, MARKED "JACKS / ADAPTEES FUSES" |
| 1 | PLASTIC bag, CONTAINING MARIJUANA SEEDS & STEMS |
| 1 | SMALL BOTTLE CONTAINING PILLS. |
| * | SEVERAL MARIJUANA PIPES AND ROLLING PAPER. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

DISTRIBUTION OF COPIES: White · U.S. Magistrate (Return with Warrant)
Yellow · Inspector (Attach to PS 714)
Pink · Subject Searched

Page ___ of ___ page

APP. 0383

9

# Dragnet Is Out For Porn Photos In Child-Sex Case

### By Alvin E. Bessent

Police are searching for pornographic photos and videotapes that could be key evidence in their continuing investigation of a Great Neck child sex-abuse case.

Many victims told police they were photographed performing sexual acts in the home of computer teacher Arnold Friedman, who has pleaded guilty to sex abuse. And many parents, who fear the material is circulating in child pornography circles, say they were angered because plea bargain negotiations by authorities with Friedman's son Jesse, 18, did not lead police to the material.

A teenage neighbor of the Friedman's has been indicted in the investigation, but two other men that the victims and he said were also involved haven't been charged. The missing pornographic materials could provide needed evidence against the two suspects, officials said.

"Virtually every child who gave a statement said they were extensively photographed and videotaped during these sexual acts," said Det. Sgt. Frances Galasso, chief of the Nassau police sex crimes unit. "Just about every class was videotaped. It had to be dozens [of tapes]," she said.

Jesse Friedman's defense attorney, Peter Panaro, said a video camera and a 35mm still camera were regularly positioned on tripods in the ground floor classroom where Arnold Friedman conducted computer classes. But Panaro

maintained that his client doesn't know what became of the photos and tapes, or whether they still exist. "Jesse says he's never seen a picture ever," Panaro said. "Arnold had 100 percent control over pictures." Arnold Friedman's attorney, Jerry Bernstein, declined to comment.

None of the pictures or tapes were found during two searches in late 1987 of the Friedman house at 17 Picadilly Rd. Nassau police have traveled around the region to view child pornography seized in other jurisdictions, Galasso said. And federal postal inspectors said they, too, are on the lookout for homemade pornography tied to those involved in the case. Authorities said they have no firm leads to the whereabouts of the materials.

Parents of many of the victims say they fear that the materials featuring their children will be distributed in the child pornography netherworld. That was one of the threats Arnold Friedman used to keep the children quiet about what was going on during his classes, parents and police have said.

Because of those concerns, and the parents' desire that the two additional suspects described by victims be charged in the case, questions about the missing photos and tapes almost derailed the negotiations that resulted in Jesse Friedman's Dec. 20 guilty plea to 25 counts of sexual abuse in the case.

According to parents of the victims,

Please see **ABUSE** on Page 31



Newsday / Thomas R. Koeniges

## Fire Hits Apartment Building

An unidentified firefighter is taken to the hospital after battling a fire at the Windsor Village apartment complex in Hauppauge yesterday. Seven other firefighters were taken to the hospital for minor injuries and smoke inhalation. One of them was admitted overnight. No residents were hurt in the fire, which started about 2:15 p.m. Fire officials said eight of the 16 apartments in the building were destroyed by the fire, which probably was electrical in nature.

NEWSDAY, WEDNESDAY, FEBRUARY 8, 1989

0384
APP

# Dragnet Out for Photos in Child-Sex Case

**ABUSE** from Page 6

Jesse Friedman often had a camera around his neck when he greeted their children outside his home before computer classes. When he entered his guilty plea, he admitted taking photos of at least one boy in a sexual scene. In an interview, one victim said he was afraid the pictures and tapes could ruin lives, but took solace in the hope that the pornography will not surface for years. "People change so much as they grow older . . . If these things surface 20 years later, they won't be recognizable," he said.

The mother of a victim said, "The kids are afraid Jesse has those pictures and when he comes out of jail he's going to be real angry and use those pictures to hurt them. It's a very powerful hold to have on someone, to have those pictures."

The Friedmans were arrested Nov. 26, 1987, and charged with counts of child sexual abuse. Charges were later filed against a third defendant, Ross Goldstein, bringing the total number of counts to 465.

Questions about the tapes and photos were not raised during negotiations with Arnold Friedman that

resulted in his guilty plea to 42 felony child sexual abuse charges in exchange for a 10- to 30-year prison sentence. The children had not told police about being photographed or the presence of additional adults during the classes before March 25 when Arnold Friedman's plea was accepted, officials said. Arnold Friedman is serving his state sentence concurrently with 10 to 30 years imposed on the federal charge of distributing child pornography through the mail.

Goldstein, who was indicted last November on 118 counts of sexual abuse, confirmed in grand jury testimony that, in addition to the Friedmans, two additional men participated in the abuse of the victims. But that account from a co-defendant such as Goldstein must be independently corroborated to be of use during a trial, said Assistant District Attorney Joseph Onorato. Goldstein has pleaded not guilty to the charges and is free on $25,000 bail. Goldstein's attorney Michael Cornacchia declined comment.

Based on Goldstein's testimony, police said, two suspects were brought in for lineups. But only one of the twelve victims who have been cooperating with the investigation made a positive identification. Two

others said they thought they recognized one of the men, but weren't sure, Onorato said.

That left police with the missing photos and tapes as their best remaining hope for making cases against the two suspects, Galasso said.

Outraged relatives of seven of the victims wanted a 10-to-30 year sentence for Jesse Friedman unless he led police to the pornography. They said Onorato badgered them during Dec. 16 and Dec. 20 meetings in his Mineola office when he advised them to accept a deal for 6-to-18 years.

Onorato denied pressuring the parents. Before accepting the plea, Onorato said, he pushed Jesse Friedman for leads to the photos and tapes. But the defendant maintained he knew nothing about the pornography.

Panaro confirmed that Onorato pressured Jesse Friedman on the subject of the photos and tapes before agreeing to the deal. "They wanted those pictures," Panaro said. "I thought the whole deal was dead."

Police asked anyone with information about the case to call the sex-crimes unit at 535-7816. All calls will be kept confidential, they said.

# *Borg Aide Says Overdose Wasn't Suicide Try*

**BORG** from Page 2

Wimbledon championships, six French Open titles and amassing a fortune estimated in excess of $75 million. Citing the pressures of the international tour and his frustration in not being able to retain his No. 1 ranking, he left the sport about the same time his marriage to former Romanian tennis player Mariana Simonescu ended in divorce.

Borg began seeing Jannike Bjorling, then 17, after they met in a Stockholm disco where he was one of the judges at a beauty pageant in which she was entered. Bjorling did not win the contest, but she soon began living with Borg and they have a son, Robin, 3. They never married, and they separated last year.

A romance between Borg, who was ranked the

world's No. 1 tennis player from the mid-1970s to the early 1980s, and Berte has been one of the favorite topics of Italian gossip magazines since they began appearing in public together last summer.

They have been pictured together constantly, possibly because they make such a contrast. He has classic tall blond Scandinavian looks. The petite Berte, from Calabria in southern Italy, has dark eyes, long dark hair and olive complexion.

The couple had hoped to marry at the end of this month in Milan's San Ambrogio Church, but the Catholic Church blocked the ceremony because Borg is divorced and Berte, 36, is still awaiting the final divorce decree from her husband, industrialist Roberto Berger, whom she married four years ago.

Borg and Berte met for the first time in 1973, when

she was the girlfriend of tennis star Adriano Panatta. Berte's career has been one of the most scandalous in the generally bland Italian pop world. She likes to shock. She has posed nude for magazine pictures and an album cover, and several years ago shocked the nationwide TV audience of Italy's biggest pop song festival, San Remo, by dancing suggestively in a skimpy, black leather costume that included a false pregnant belly.

Borg, who has started his own clothing design firm, was inducted into the International Tennis Hall of Fame in Newport, R.I., last year. In an interview after the ceremonies, he said: "I still love the game . . . I was playing tennis for 11 years as a professional. So far, those are the best years I've had."

*Wire services contributed to this report.*

NEWSDAY, WEDNESDAY, FEBRUARY 8, 1989

0385

APP.

31

**10**

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 47 of 145 PageID #: 6259

# Newsday DocCenter archive

## Printed out for: MAHON, January 25th 2001 at 15:10

1 of 1

| | |
|---|---|
| **ID:** | 184467 |
| **Headline:** | Ex-Teacher Focus Of Porno Probe |
| **Byline:** | Richard Esposito |
| **Pub. Date:** | 11/13/1987 |
| **Pub. Day:** | Friday |
| **Edition:** | CITY |
| **Other edition:** | |
| **Page:** | 18 |
| **Section:** | NEWS |
| **Published photo caption:** | |

**Series:**

**Quote:**

**Cover:**

**Dateline:**
**Notes:**

| | |
|---|---|
| **Length:** | 322 |
| **Record security:** | 3 |
| **CORRECTION:** | @correction |
| **Keywords:** | TEACHER,PORNOGRAPHY,NEW YORK CITY,NASSAU COUNTY,GREAT NECK,DAY CARE |
| **Lead paragraph:** | |

fontheight 12>

A retired city schoolteacher is under investigation by postal
inspectors and Nassau County detectives for violations of the child
pornography law, according to court documents.

A Nov. 3 search of the Long Island home of **Arnold Friedman** of Great
Neck, L.I., found child-pornography magazines purchased through the mail
and also found an unlicensed child-care center, according to the
inventory of the search filed with U.S. District Court in Brooklyn

The U.S. Attorney's Office is seeking to indict Friedman on charges
of sexual exploitation of children by buying pornography,
law-enforcement sources said yesterday.

Friedman, 56, who retired in July, 1986, last taught at Bayside High
School in Queens. In a telephone interview, he denied running a
child-care center of any kind and said he no longer has any interest in
child pornography.

According to an affidavit filed by Postal Inspector John McDermott,
the investigation follows a 1984 U.S. Customs seizure of child
pornography destined for Friedman's home.

The affidavit indicates that a sting operation was immediately set
up and a postal inspector posing as a "boy lover," began a
correspondence with Friedman. Friedman's mail also was monitored, and
deliveries from known sources of pornography were recorded, according to
the court documents.

The Nov. 3 search of Friedman's house uncovered a cache of child
pornography behind a piano in an office abutting the alleged day-care
center, according to court documents.

"There is no such thing as a day-care center," Friedman said in a

- 1 -

telephone interview yesterday. "I was lured into a trap scheme of some
sort. What can I do about it? This is something in my past."

Nassau County detectives were contacting parents of children with
whom Friedman might have come in contact, sources said. Police sources
said they have not received any complaints about Friedman.

-30-

-2-

APP.    0387

11

HIT THE GROUND RUNNING FILMS

"ANTHONY SQUEGLIA"

INTERVIEW WITH ANTHONY SQUEGLIA

CORRESPONDENT: (NOT IDENTIFIED)

PRODUCER: ROGEN

TAPE #125

QUESTION:

Just give me a little-- tell me your name and
your background-- you know-- what you're--
(UNINTEL) for.

ANTHONY SQUEGLIA:

Okay, my name's Anthony Squeglia, everybody calls
me Tony. I work for the Nassau County Police
Department. You know, I started in April of
1969. And I just recently retired in May. And--
I was a precinct clerk for four years in the
first precinct of Baldwin. And-- subsequently
from there, I became a detective in 1974. I went
to the juvenile A bureau and I worked-- various
precincts in juvenile. I did a total of 19 years
and six months in that unit.

Tony Squeglia Tape 125

During that period of time I would be taken out
to do various-- you know-- functions for
different units.  Interviews with children-- you
know, court-- special court assignments and
things like this.  Some of the sex offenders and
things like that.

So they would draw from my unit because we had a
repertoire (SIC) with children.  We could sit
down and talk to them, get on their level.  And
then I guess-- in the last five and a half years
I got assigned to the sex crimes unit which is
now called the special victim squad.  And-- I
maintain my-- status there until I retired.

                    QUESTION:

And-- this-- Friedman case, what was your-- very
first recollection of (UNINTEL) intention
(UNINTEL).

                    ANTHONY SQUEGLIA:

What do you mean?  When-- originally?  In 1987?

                    QUESTION:

Yes, yes.

ANTHONY SQUEGLIA:

Well, they brought us over and said they were
forming some sort of a task force-- I don't know-
- you know-- and they needed some special people
to work on this case.  And we would be attached
for the duration of the investigation.  And then
they filled us in on what had happened with the--
the government.  You know, they had done a search
of the house and came up with the mailings and
stuff.

And-- I was assigned to sex crimes and my boss--
immediate boss at that time was Fran Galasso.
And she-- she set us up in teams.  Male-- female
teams.  And-- we-- got a list-- of-- alleged
victims-- and-- we took-- lists and we were told
what to do.  In other words, go out and
interview-- whatever time it took.  If it was
daytime, or nighttime or evening, whatever.  You
know, and we actually gave up vacation time and--
it was a special-- thing.

Case 2:06-cv-03136-JS  Document 41-9  Filed 01/28/21  Page 53 of 145  PageID #: 6265

I mean it sort of bothered me, only because I'd been dealing with children for a lot of years. And I saw the horrors that go on in some of these children's families. And-- let's not forget the aspect that we were all children at one time. So.

QUESTION:

Now the-- the idea-- you know-- you got into a little bit of a pattern of how you-- could best-- address these families. Obviously they were-- some of them were surprised, some of them were upset-- all these different reactions.

ANTHONY SQUEGLIA:

Yeah.

QUESTION:

What do you remember about how-- how you found a way to get in and start talking.

ANTHONY SQUEGLIA:

Okay, well, the list was comprised of a lot of names and families. And-- in the-- one of the first things we did was-- to see-- establish how long a child had been in Mr. Friedman's class.

That would give us an advantage because the longer in the class, the more we would focus on that child. Because we felt, if anything did happen, that would be-- most likely person. We figured out his routine before we did anything. We figured out that classes went from Monday till Saturday, Monday being-- new recruit type thing. And then if-- if he sort of-- got caught on you-- as a child, you would advance to Tuesday and Wednesday and Thursday.

This would be over a period of time. And then-- he would focus in on-- possible victim. And would escalate it up to a Friday or a Saturday class which was a special class. So we focused in on Friday and Saturday classes because we felt that's when most of these things occurred. Down to-- minimal-- and student-- you know-- activity in those days.

And then once we approached the-- the homes, it-- you know-- the first thing you do is you have to

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 55 of 145 PageID #: 6267

get the confidence of the parents.  Because
without the parents, you're not gonna go
anywhere.  So-- we introduced ourselves.  We--
pretty much in plain clothes.  Sometimes-- we
originally went out in suits and ties.  And then
it regressed to plain clothes because it was more
familiar-- you know-- we didn't wanna traumatize
the children.

So-- so with the parents, my partner-- Detective
Brinlow (PH) and I-- as soon as we went into the
house, were usually approached by the mothers.
And we'd explain what-- why we're there, what
we're doing there, and we'd really like to talk
to their children, preferably alone.  And that
usually gets a very distinctive reaction.  Some
mothers would automatically get the father and
then we'd have to repeat ourselves.

And then we'd-- we'd get a feel for how we're
going with this, if they're gonna actually let us
talk to the child.  So after a lengthy talk, with

the parents, some would say can you come back
tomorrow. Meaning that they wanna discuss this
with their children because they possibly didn't
believe what we were saying. Some would
immediately say-- you can speak to my son. And
then we'd ask them-- we'd like to speak to your
son alone.

Preferably alone. And that was another mixed
bag. Some parents-- like to be there. And we'd
explain to them that sometimes children in
speaking will not divulge anything vital if the
parent is there. Because they never wanna--
children always wanna please adults. That's a--
that's a fact. So-- you could ask a child
something-- and sometimes they'd look at their
parents to get approval.

And that's not what we wanted to do. Another
thing we'd ask the parents-- was-- when your
child is lying-- or not telling the truth, what
kind of reaction do you get from him? You know,

some children-- act out-- some children-- you
know-- they just-- out and out liars-- you know--
to the parents.  So the parents have a feel,
because they live with the child.  And we would
ask little questions like that.  So we know if--
if the child is-- pretty much on the line with
us, you know?  We get a feel for it.  And then--
then we had to make a decision.  Who was gonna
talk to the child.

You know, and we'd talk to the child together and
you'd fin out the child would either favor myself
or my partner.  And that's who would take the
investigation.  We-- the opposite person would
sort of-- stay with the parents and go over-- you
know-- details that they were interested in.  And
the other person would be-- in-- in a room, the
child's room, you know, where they lived and
stuff.  Pretty much-- how it worked.

QUESTION:

When you first broke the subject to parents, it's
a very sensitive issue obviously, do you remember

what-- what kinds of-- words you used or-- how
you-- described that?  To the parents?

ANTHONY SQUEGLIA:

Well, you have to remember, most of the parents
already had an idea of what was going on.  So
they-- some knew we were coming.  Some even
called to make appointments so it wasn't a
startling effect.  If they didn't know, it was
very rare.  I mean we had one-- father who-- who
knew-- absolutely refused to let us talk to his
son.  Even though his son-- had admitted to the
parents that something did happen.


And these are people of statute (SIC).  These
are-- you know-- cardiologists, people up there
in standing.  And-- they were annoyed, some of
them, that we even came to their house.  Because
nothing would ever happen because their child
would have told them so.  Very interesting.

QUESTION:

Now-- you know-- you don't (UNINTEL) you know--
but for example-- how did they-- how did they

Case 2:06-cv-03136-JS  Document 41-9  Filed 01/28/21  Page 59 of 145 PageID #: 6271

know before you got in there what you were there
about?

ANTHONY SQUEGLIA:

Well, from-- they had their own network--
apparently everybody that-- had computer class in
Great Neck that went to Mr. Friedman's class was-
- if you wanted to be something in the community
and you wanted computer lessons, Arnold Friedman
was the place to go.  So there was a nucleus of
people, a group that knew each other.  And that
would actually confide in each other.

I don't recall any-- shocked parents, so to
speak.  They were shocked maybe because their son
was there and they were kind of shocked that
their son's name showed up on the list.  Even
though they might have spoken to their son about
it.  And their son totally denied anything.  We
just wanted the opportunity to find out if
anything was-- you know-- had gone on with the
child.

Because-- you know-- the psychological

ramifications. But-- some parents-- are-- not

all there either. You know, as far as-- their

upbringings and-- we've even had parents-- you

have to remember something-- we went to houses

and we would go back four and five times, okay?

And we got to be pretty friendly with the parents

on a-- like-- "Hi Tony, hi Pat, have coffee," you

know, some would offer dinner.


So those people appreciated us to come in there

because they really wanted to get to the bottom

of this thing and get the proper help for their

children.

QUESTION:

So-- you were-- sometimes you would go back a

number of times-- explain that.

ANTHONY SQUEGLIA:

Yes.

QUESTION:

What was the biggest-- what was the-- what was

the average and then what was the most number of

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 61 of 145 PageID #: 6273

times you had to go back?

ANTHONY SQUEGLIA:

I would say the one that actually broke the case,
I would say about four times.  When I say broke
the case, it was the first interview that the
child actually-- gave us some vital info.  You
know, evidence, so to speak.  What had happened
is once the initial interview was done and we
were invited back, we would sort of dress down.
And I say dress down, is pretty much like this.
You know, depending on the weather.

And we'd actually go into the room.  And it was a
very friendly atmosphere.  Because once a child
knows-- knows you, they feel confident with you.
I mean you haven't done anything, really, at this
point.  And you're laying the groundwork.  So
what happens is you go up to the room, you
actually sit on the floor with these kids.  Or
you play with the computer and they were all
computer literate.

And then eventually on this one particular child,
he went in-- finally-- out of-- out of the blue,
from just sitting down talking, just turned
around, opened his computer, brought up a screen,
and it had an apple tree on it.  Had a tree with
apples.  And each apple had a number in it.  And-
- I don't recall the numbers but I think it was
like eight-- up to eight.

And each number represented a date and an
incident that something took place.  Then he
proceeded to give me-- magazine that he had
brought home, was allowed to take home.  Then he
gave me the disk that he had taken home.  So that
was pretty much it.

QUESTION:

What kind of magazine?

ANTHONY SQUEGLIA:

It was a-- it was a boy/boy magazine.  Little
boys.  You know, it was-- secreted in his room.
So-- it sort of made sense.  It was a very--
tough interview.

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 63 of 145 PageID #: 6275

QUESTION:

And-- (UNINTEL) as a game or something?

ANTHONY SQUEGLIA:

Yeah, it was a game.  I think it was called--
there were so many games.  Stroker or-- something
about masturbation.  I don't know, something like
that.  He was allowed to bring it home.

QUESTION:

And how old was that boy?

ANTHONY SQUEGLIA:

I think he was about eight, seven or eight.

QUESTION:

And how did he describe to you that these
incidents (UNINTEL).

ANTHONY SQUEGLIA:

Pretty much-- first of all, you have to realize
that-- it was tough to get him to admit anybody
touching him other than his parents.  You know,
they asked him things like that.  He found it--
pretty much without telling me, but it seemed
like it was very offensive to him.  He would
touch him on the shoulder and then he'd go down

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 64 of 145 PageID #: 6276

his chest and then into his pants.

He would yell to stop or-- call out his Dad's name or something like that. He was told to shut up. And then-- he would describe games that were not even mentioned in the article. There was a game there that was called leap frog. And-- this one really-- got to me. It was-- they would play leapfrog in the class. They actually had their clothes off.

And you-- you associate leap frog, like you did when you were a kid. One guy jumping over another guy. But the fact is, it means everybody's butt's up in the air. So to speak. And then-- they were made to eat-- they-- they didn't describe it but we described it-- very offensive-- we called it "come gum." They used to ejaculate into gum and they used to give it to the kids to chew.

We found this personally offensive. You know,

there was more than just one child telling us
this.  So-- you know-- children that age don't
sit down and talk about these things.  You know.
They don't want the title of homosexuality, even
though they don't know what it means, or what the
word means, associated or attached to them.  I
find this to be (UNINTEL) behavior.  So.

QUESTION:

Now-- obviously these people are embarrassed or
they're (UNINTEL), I've heard that-- you know--
it was very hard to get (UNINTEL).  Tell me about
what was that (UNINTEL).

ANTHONY SQUEGLIA:

First experience, you had to get a feel for it.
In talking with the child and armed with the
information of the parents of lying, of not
telling the truth, you sort of-- I mean you do
things  for a lot of years.  And-- you sort of
get a gut feeling.  And what you don't wanna do
is very important to keep focused on this.  You
don't want to revictimize the victim.  That's
really relevant to a successful investigation.

So the best thing that we can do is to make
friends with them.  To be on their level, so to
speak.

I know all the books say you don't go down to
their level but at some point you have to get
down.  Depending on what they said to you and how
you answered them, I think made a big difference.
The fact that you were friendly with the parents.
They would go to the bathroom, I mean if they had
to go to the bathroom they didn't ask permission.
They were told they could get up and leave.  So
if the child went down to the kitchen or the
living room or the dining room, saw his parents
having coffee with your partner, it was like
their family, so to speak.

Let's not forget, we're dealing with little
children here.  So we're not the bad guy, and
we're not touching them, and-- after a while,
they get your confidence and they wanna tell you.
They actually wanna tell you.  Because they're

gonna feel better.

QUESTION:

Now-- tell me about the-- (UNINTEL) that they
didn't say anything.  Tell me about the--
(UNINTEL) by the not saying part.  Because that's
the part that scares the parents, that-- kids
could-- you know-- you visit them and visit them
and you know-- (UNINTEL) you know.

ANTHONY SQUEGLIA:

That something went on.

QUESTION:

Yeah.

ANTHONY SQUEGLIA:

Them not saying?  It depends on-- I'll give you
one good example.  There was a-- a child that-- I
had gone to see with Pat.  And it was up in the--
northern end, it was a very exclusive, very nice
house.  And-- it had a maid and a butler type of
thing.  And when we went to the house, one of the
boys from a previous investigation said-- so-and-
so was also touched on that date.

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 68 of 145 PageID #: 6280

So that gives you another lead into another child. But his name was on the list. We didn't get in-- focus on him right away, but now we did. So when I went to the house with Pat, the mother was there. But the husband was on vacation in Europe. The mother was going on vacation to Florida, and the child was left with the nanny, you know.

And it was like yeah, you can talk to him and I'll see you. The disconcern (SIC) sort of bothers you, too. Like-- I don't know where that came from-- because-- I would never do that. So we sat with the child in his room. And he had a bunk bed. He slept on top. And-- we talked and talked and he wouldn't say anything. And-- Pat and I went outside and we were like-- this-- this kid was-- violated but he's not saying anything. We sort of-- we spoke to him for quite a while. And then we figured out, and this was a-- was a flukey thing.

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 69 of 145 PageID #: 6281

TAPE #125                                                              PG. 20

We figured out that-- he wouldn't talk to us
because-- he couldn't associate with us.  So I
got-- Detective Washington-- the nanny was-- a
female, she was Hispanic.  And Detective Jones,
or Washington, whatever name you have, she was on
another-- you know-- other cases.  And her and I
went back.

And after he saw me and recognized me as very
familiar, he started to talk to her.  And I could
only associate that to be-- she was the same
color as the nanny.  And he always spoke to the
nanny.  And from that point on, he would tell us
he had blood in his underwear.  But he would
throw the underwear away.  He would hide them in
the-- I mean-- this is a little kid.

He would hide them and get rid of him. I thought
that was pretty-- pretty tough decision for this
child to make.  But he associated with a
different person.  So we did whatever it took.
To come across.

**APP.      0407**

QUESTION:

Now how are you-- a lot of parents (UNINTEL)
about-- you know-- how they-- (UNINTEL) kid or
whatever.  When the kid's saying nothing
happened.  How do you-- make the transition in
such a way that-- you get them (UNINTEL)?

ANTHONY SQUEGLIA:

Well, if you talk to a lot of children, you don't
give them an option, really.  You just-- be
pretty honest with them.  You-- you have to tell
them pretty honestly that we know you went to Mr.
Friedman's class, we know how many times you've
been to the class.  You know, we-- we go through
the whole routine.  We know that there was a good
chance that he touched you or Jessie (PH) touched
you or somebody in that family touched you in a
very inappropriate way.

Now-- have you ever been touched and felt
uncomfortable?  Now there's-- as adult as that
might sound, good touch bad touch is pretty much
in schools.  And yes, we do know.  And you can--

you can pick up-- like-- have you ever been
touched?  Good or bad?  You know, like your Daddy
touches you on the shoulder or your Mommy washes
you in the bathtub and touches your private
parts.

Anybody ever touch you where you feel
uncomfortable?  And you get mixed emotions.  Some
kids would start crying.  So you don't really
give them too much of an edge to say, what we're
here to find out about.  We already know about
it.  We want to hear what you have to say about
it.  And we know he probably didn't touch you, he
probably touched somebody else, you see.  And
then once they realize that other people have
come forward, it's not easy, but it does work.

QUESTION:

Now you-- now you know that-- (UNINTEL)  Jones
said that (UNINTEL).  How do you express that to
a child?  You can (UNINTEL) them to (UNINTEL)?

ANTHONY SQUEGLIA:

Well, we try to find out-- what-- made them keep

it in so long.  And usually he would say-- one
boy said-- I was told if I ever told my parents--
one night, and the specific night wasn't
mentioned, I'd come out of my house and someone
would grab me from under a car and drag me away.
The variations were, I'll burn our house down,
I'll kill your parents.

I mean-- would-- whatever it took, whatever--
whatever threat from the adult-- was meant for
that child, depending on how he acted when he was
touched.  If he was aggressive and demanded,
don't touch me, I'm sure they would have said
we'll kill both your parents.  Or something to
that effect.  You know.

QUESTION:

Now-- did you-- you have a (UNINTEL).

(BREAK IN TAPE)

QUESTION:

You were saying one mother?

ANTHONY SQUEGLIA:

One mother, up until about three years ago-- was-

- was adamant-- we had gone back to her house
about three times.  And she led us in the first
time.  She heard the allegations.  She said I'll
talk to my son, you can come back.  So we came
back the next night.  She said, I spoke to my
son, nothing happened.

So-- during the investigation of the other
children, the name kept popping up.  So we went
back a third time and we said listen, we-- we
have a little more, we'd really like to speak to
your son.  She said, I told you.  I spoke to my
son, nothing happened.  I don't want you coming
on my property any more.  If I have to go to
court to get a restraining order to do so.
Ironically, this woman-- I won't mention her
name, used to call once a year to speak to me.
Just to-- see how things were going.

And I really-- I could associate with her, but I
was kind of annoyed because the guilt was coming
out in her and I felt bad for her son who was

now-- I don't know-- 17, 18, 20, I don't know.
And-- was a victim.  And she-- she's on a guilt
trip.  So-- and then that stopped, abruptly, it
just stopped.  Pretty wild.

### QUESTION:

Now-- (UNINTEL) when-- (UNINTEL) try to recollect
things-- or-- not recollect-- you know-- I guess
one question is how did they say to you, "I don't
remember."  Or I don't know, or that didn't
happen.

### ANTHONY SQUEGLIA:

Depending on how they say it, you would know.  If
they don't wanna remember.  You know, I mean you
say-- you have small children.  So you know if
they remember.  Let me tell you, there was-- I
think there were like-- almost 400 names to be
dealt with.  And-- I know for a fact a lot of
interviews never got past 20 minutes.  We felt
were-- really-- good cases.

But-- can't fight city hall.  When they say
you're out, we're out.  You know, I guess some

people felt that we would alienate their
children.  Sad, it was sad.

### QUESTION:

Now-- what were the kids-- the kids who were
saying they couldn't remember or-- what would
they say to you-- at first-- when they would say
that?

### ANTHONY SQUEGLIA:

Nothing ever happened.  We did computers.  We
learned-- how to do games and Mr. Friedman was
very nice, he used to help us.  You know, it was
sort of-- in the back of your mind, you're saying
to yourself, geez, we've done, I don't know,
maybe-- 30, 40 interviews.  Little things are
coming up and they're saying-- geez, I don't
think we're on a witch hunt here.  I didn't think
we were on a witch hunt.

I felt-- if it happened, we were gonna find out
it happened.  It was just a matter of time before
you start linking things together.  You know,
there were kids that would see him in a

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 76 of 145 PageID #: 6288

supermarket and would run for cover. Parents
would call us. I want you to-- I want you to
come and interview my child. And nothing would
happen. You know, they couldn't give you
anything. They didn't pick on everybody. You
gotta remember that.

Some kids are so involved-- when children are
involved in things, they're not focusing on
what's going on around them. They might see
something and not see it at all. You know,
they're into computers-- you know-- a computer
kid today, I have a grandson. He gets on the
computer, you could talk to him, he'll yes you to
death.

Two minutes later, you shut the computer-- he
doesn't know what word you said. Not even
focusing, paying attention to you. So-- what's
to say that these kids did the same thing.

QUESTION:

Now-- it also must be that there were different

levels of youths in the class.  And (UNINTEL)

kids were playing leap frog in one class and that

other kids would remember that.

ANTHONY SQUEGLIA:

Yeah, there were kids that remembered the leap

frog and the come gum.  So they-- you know-- they

came out with-- the bathroom was always

available.  There's a bathroom right next to the

thing there.  And-- very interesting-- running

through the list, there were no females.  There

were a few females in the classes but never made

it to Friday or Saturday.


Some of them never made it past three weeks, four

weeks at school.  And a lot of things we picked

up were-- Arnold Friedman would not allow the

parents to come into the house to pick up their

children.  His excuse was always-- the neighbors

have complaints-- there were no complaints.

There were absolutely no complaints.


They would say-- you can drop them of at the

door.   And-- I think-- Jessie used to bring them out sometimes.   I'm sure they got there-- from the classroom to the car, in that little corridor, they got the threat, or they got, "don't forget, don't tell anybody."   You know, that-- that type of thing.   And then I think it even got more bizarre when more names started to pop up.   You know, Ross, and the other-- how he was shut down-- like-- immediately.   Because of the family name.

QUESTION:

(UNINTEL) other guy.

ANTHONY SQUEGLIA:

Yeah.

QUESTION:

Just so you know, those guys are-- in the movie. You know-- Scott (UNINTEL).

ANTHONY SQUEGLIA:

Oh, they are.   Okay.

QUESTION:

And they're (UNINTEL).   But-- the-- what was your recollection of the Ross factor?   Like-- how did

you (UNINTEL) in public?

ANTHONY SQUEGLIA:

Well, Ross, when we established that Ross, they
had a band.  They used to practice, Jessie and
his band.  And it was established that Ross was
one of the players.  We had gone to speak to him.
And I remember it vividly.  It was-- we couldn't
get in the house.  I mean it was a fiasco.  We
surrounded the house, the grandmother was home,
the kid was running from window to door.  We
don't know if he was trying to get out of the
back of the door and take off.

We didn't know-- we didn't know what he was
doing.  All I remember was it was a fiasco.  We
had to get the parents there and physically
remove him.  And I think he-- he might have
turned a little state's evidence.  I'm not too
sure, I don't recall about him.  And he got
minimal time, I think.  Two years.

QUESTION:

He got YO status.

ANTHONY SQUEGLIA:

Okay, did he?

QUESTION:

(UNINTEL) let him out.

ANTHONY SQUEGLIA:

They let him out, okay.

QUESTION:

(UNINTEL) decided that-- Onorado (PH) made a deal
with him but he didn't tell (UNINTEL).

ANTHONY SQUEGLIA:

Yeah, Onorado-- you interviewed him?

QUESTION:

Yeah.

ANTHONY SQUEGLIA:

Okay, I've had a lot of dealings with him and
it's-- I don't know if he was the right guy for
the case.  But--

QUESTION:

Well, you said-- I heard-- some people have said
that-- they felt like he was crazy about it-- or-
- was there something about it that made him
(UNINTEL) prosecute or--

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 81 of 145 PageID #: 6293

## ANTHONY SQUEGLIA:

It was one of the biggest cases in the county.
Maybe the state, I don't know.  I know we had
gone to New Jersey because they had a big case in
Jersey.  Just how to go about the proceedings and
the charges.  And I think-- I think it was-- a
big to do, it would have been easy just to-- to
run the case out for a plea.  On-- on the DA's
behalf.  I don't know.

I mean you know, I deal with these people all the
time.  He's had a lot of cases-- in my field, of
sex offenses.  He-- a nice guy, but not one of my
favorite-- I felt the parents were shorted.  If
you can get what I'm saying.  I think we should
have gone all the way with this.  I think we had
100 and something-- federal-- charges against
him.  I know we stayed up all night typing up the
paperwork for the-- 6:00 Hit in the morning.  And
we went right-- I think it was close to
Thanksgiving, if I'm not mistaken, I had like 20
people come in here or.  I don't know.  I guess a

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 82 of 145 PageID #: 6294

deal was made.

I guess-- in-- instead of dragging-- and another aspect, maybe if it was dragged out in court maybe it would traumatize the children.  Putting them on the stand and cross examining them. That's not a good thing either.

QUESTION:

Ultimately, there's some-- I'm confused about the other guy.  The guy (UNINTEL) and they were-- they were picked up.  What kept you from being able to prosecute those guys or what were you trying to get?  Was it that the kids didn't recognize them?  Or what--

ANTHONY SQUEGLIA:

Yeah, the kids didn't know who they were.  There were other kids in the room.  Identification, tough.  You know, just by association is not good enough.  You know, they had a band, they had a group, doesn't mean anything.  The fact that you went to talk to them and shut down, they all had attorneys.  Tells you something.  You know, yeah,

they were there, they were friends of Jessie's,
sure.  But you're not gonna talk to my client.
And the fact that the children couldn't put a
name to a fact or-- can't do a line up.  You
know, I think-- that would really traumatize a
child.

QUESTION:

Now how did you know that Ross and the other guys
were involved to begin with?

ANTHONY SQUEGLIA:

Through associations in school.  Who you hang
around with.  Previous-- I think-- I think--
Jessie was-- he liked to drink a lot and there
were-- juvenile cards on him and-- those cards
have associates on the back.  It's a preliminary
thing.  In other words, if I had your name, and
we're looking for you and then we wanna know who
your associates are and you've been in trouble
with us, we'd go through a-- legal file.

And on the back, it would say who you were
arrested with, who you were brought in with.

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 84 of 145 PageID #: 6296

Even though nothing ever happened to you, you
would be on the back.  So that would determine
who we're going out and speak to.  Then you go to
schools, guidance counselors are great.  You
know, because when they got a problem they need
your help and-- when you have a problem they--
you know-- we take care of each other.  So they
tell you who's who, what's, and that gives you a
focus.

### QUESTION:

Now in this case-- this is like-- you know that
Arnold and Jessie were both-- you know-- in the
computer classes and leading the computer
classes.  But it's not necessarily an intuitive
jump to say well, there were other like teenaged
kids in there.  So what-- do you remember what
made you-- what made you know-- okay-- well, Ross
was part of that.  Or-- he was (UNINTEL) system
or something.

### ANTHONY SQUEGLIA:

Well, if I'm not mistaken I think Jessie gave
that up.  You know-- if I'm not mistaken.  I'm

not too sure on that one.  You have to
understand, it's been a long time.  And-- I
wasn't-- part of-- I was part of Arnold
Friedman's lineup.  We had a-- you know-- I was
part of him-- in other words-- we gave him, we
got him pizza, we-- you know-- we'd feed them.
And some guys would say-- why are you feeding
this guy?  Why don't you let him die, you know
this-- this is the feeling.

There are certain men or detectives-- female as
well, that when they get a sex case-- and it
happened up until I retired-- they wouldn't take
it.  Couldn't deal with it.  Call up and say
Tony, do me a favor.  I got this case, it's--
it's a rape, it's the mother's boyfriend, it's a
13 year old girl.  I-- I can't deal with this.
Can you do me a favor and take the case.
Absolutely.

And then they say how do you do this stuff?  You
know?  Well, I had a boss tell me one time, I've

never seen a guy go after-- rapists like you two
guys, me and my partner. And I said-- just
something about them. You know, they take away
people's lives, really. And we-- we've made some
good cases and we've-- put a lot of people away.
I don't know if that's good or bad but-- it
wasn't just a slap on the wrist. You-- we did
the homework, you did the time. You know.

(OFF-MIKE CONVERSATION)

QUESTION:

The-- oh, I was gonna ask you if the-- did the
kids ever get upset-- like emotional between the
time that they would say-- nothing happened. And
then the time that they would-- come up and--

ANTHONY SQUEGLIA:

Say something.

QUESTION:

Yeah, what is that progression like. Tell me
like from the beginning, what's that arc like?

ANTHONY SQUEGLIA:

You would-- you would find some children, this
one particular kid, we went to four or five

Case 2:06-cv-03136-JS  Document 41-9  Filed 01/28/21  Page 87 of 145 PageID #: 6299

times.  He was very cool.  Didn't say anything,
nothing happened.  Sit down on the floor, plays
games.  Totally ignore you-- that you were even
there.  After an hour or two you helped him with
his toy, you did this, you did that.  And then
you were friendly.

And then-- from that point, you'd say-- you know,
enough tonight, and why don't you think about it.
And you know-- we'll come back tomorrow.  And you
know-- we'll deputize (PH) you and you know-- I
like cops-- do you like cops?  I like-- yeah,
they-- my Mommy says they help us.  That kind of
stuff.

You come back the next night, it's a whole new
ball of wax.  It's like the kid is no longer a
stranger to you, sitting in a room and all of a
sudden-- you find the kid is a little hyper.  You
feel like-- you get that feeling he wants to talk
to you and you better do it right before he
doesn't wanna talk to you at all.  And you start

asking about his friends and you-- you go really
off the subject. And you-- really into it and
then you just say something that triggers it and
then all of a sudden the kid's gotta go to the
bathroom.

And from a kid that didn't go to the bathroom for
two hours the day before, he's running to the
bathroom three or four times in an hour. Good
indicator-- because-- you know-- his bladder
isn't that bad. And-- when he comes back, you
know, he's upset. And-- I'll tell you, it's just
a feeling you get from-- from doing it a lot. I
can't really explain it but-- when you have
children of your own, you'll see what I mean.
It's a tough thing.

You have that gut feeling and yet-- it only
happens where some of them come across and some
of them just never give it. They just never give
it up. And your heart goes out to them because
you know something did happen, maybe not as

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 89 of 145 PageID #: 6301

extensive as did to another one but-- he might
have been in the cultivating stage.  You know--
coming up with-- he was going on Wednesdays all
the time.  Wednesdays.


Close to Friday, close to Friday.  You have to
keep that focus all the time, you know?  The ones
we really focused on were the-- Friday and
Saturday.  Saturday mostly.  No school, parents
away.  Families-- two different places in the
country.  Child depends on a nanny.

QUESTION:

Well, one of the things now that Elaine says is--
well-- how is it possible-- you know-- that these
kids were-- you know-- one kid got his head
banged against the wall, another kid (UNINTEL)
blah blah blah, and then an hour and a half
later, parent comes to pick them up and-- they--
take them home and--

ANTHONY SQUEGLIA:

Well, you know-- maybe they dramatize too much.
Banged against a wall?  You can bang a kid's head

against a wall-- I believe it had paneling on his
wall, brown paneling, make a lot of noise, but
really do no damage, but get the point across?
You follow what I'm saying.  Yeah, it can be
done, can be done.

I mean I could bang my head against the wall and
kick it with my foot and you'd think my head went
through the wall.  You gotta remember, these
people that do these things, they're focused on--
touching little kids.  They're focused on you
know--

QUESTION:

(UNINTEL) feel like-- you know-- how do these--
it's-- (UNINTEL) saying wow, you know-- I know my
husband-- you know-- might have some problems
but-- you know, he-- didn't engage in this level
of abuse where there were kids naked (UNINTEL)
all that stuff.

QUESTION:

Well, how would she know because every time he
ran a class during the weekend, she'd be gone.

Case 2:06-cv-03136-JS  Document 41-9  Filed 01/28/21  Page 91 of 145  PageID #: 6303

She would absolutely-- leave the house.  So it's
like sticking your head in the sand.  I-- you
know-- I can't explain what she's thinking but
she had to have known.

I mean Jessie-- prancing around the house,
punching holes in the wall, these are-- there's a
family with no love in it.  That's the way I saw
it.  I just saw a bunch of strangers living in a
house.  It's-- it was sick.  You know, I was
brought up with a family-- tough.  Come up in the
city.  You come out here, these kids think
they're tough out here.

They have no idea what the city's like.  So you
know, I guess-- you know-- I'm being a little
street wise fitting into this profile over here.
But why would she leave the house every time he
had them there?

                    QUESTION:
(UNINTEL) talk to me about-- (UNINTEL) back
there, said that-- I said you know-- it's

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 92 of 145 PageID #: 6304

possible that Elaine didn't know anything.  And

he said, well, the first thing that she did when

she came in the house was you know, she said--

she got home after.  And she said I wanna talk to

my husband alone.

ANTHONY SQUEGLIA:

Yeah, right.

QUESTION:

(UNINTEL) take him right into the office.

ANTHONY SQUEGLIA:

Right.  They wouldn't let her go, right?

QUESTION:

Yeah.  Because later on, they found out that--

(UNINTEL) well, why did she wanna go straight to

the office.

ANTHONY SQUEGLIA:

That's where I was, I was in the office at that

point.  I found the suicide letter.

QUESTION:

All right, yeah, well let's go back to the-- to

the raid (PH) now-- on-- you weren't-- on the--

you weren't on the November 3rd-- the (UNINTEL)

raid.

ANTHONY SQUEGLIA:

No, no.

QUESTION:

But then November 25th came around.

ANTHONY SQUEGLIA:

Right.

QUESTION:

Tell me about that.  What was the preparation fro
that and--

ANTHONY SQUEGLIA:

Well, we stayed up the whole-- we knew we were
gonna hit the house in the morning.  I believe it
was like six o'clock, if I'm not mistaken.  We
all-- I mean we all stayed in-- 320 Old Country
Road (PH), Minneola.  With-- Onorado decided what
the charges were.  I believe they were 95 felony
counts.  And we typed our butts off that night.
We got all the paperwork signed.  And-- I called
the wife and said-- I won't be home till three or
four in the morning.

Then we're out at five again.  You know, she's
saying I got 25 people for dinner and stuff like
this.  And I said-- there's nothing I can do
about it.  So you got the home front you gotta
worry about-- but-- we organized-- we went to--
17 Piccadilly Lane (PH).

Parked the cars, rang the doorbell, knocked on
the door, said we were the police and then banged
on the door, went in.  We just punched the door
down.  And they isolated the family.  Took them--
the mother wasn't home, I don't think the mother
was home.  Put everybody up-- upstairs on the
first floor and we were each in charge of a
section of the house.

Some guys had the bedroom, some guys had the
attic, I had the first floor, the office.  I was
there when-- the clown came in.  He was ranting
and raving.  We had words and-- I was going
through the folders, so we told him to take a
hike.  You know, he wanted his-- to talk to his

parents. He wasn't-- once you're in the house,
if you're in the confines of the search, you can
remain where they tell you to remain. That was
the living room upstairs.

If you're an outsider, you're not getting into
the search area, okay. And-- he was ready to
duke it out. He was ready to go to battle. And-
- I could-- I could understand that. And then
the wife came, she was ready to do battle as
well. Because she threw a punch at Fran Galasso
(PH) and she got a-- I think she got arrested, if
I'm not mistaken, right?

But-- Larry Meriwether (PH) and I were in the
office and he had a stand up piano. I remember
looking in the piano. I found-- I found a mini
dildo. I found-- we found tissues in the basket-
- later turned out to have semen in them, stains,
in the garbage pails outside. And I-- I remember
saying I can't imagine-- this guy getting raided
x amount of days ago and we're still finding shit

in his house.

You know?  And then we went through his-- his
files, because you never know, because they hide
everything, they're very possessive.  And I found
a suicide note.  And I said this guy's gotta be
kidding.  This is like an afterthought, you know,
to myself.  I-- (CLEARS THROAT)-- I didn't know
how to take that.

But you know-- I did give it to the boss.  I
said-- we're gonna have to keep an eye on him
because that's what it requires.  I mean somebody
that leaves a note-- I don't know if he left it
for us to find or-- I just happened to be too
nosy, I don't know.

QUESTION:

Was it in the trash or was it on the desk?

ANTHONY SQUEGLIA:

No, it was on his desk and he had like a--
folder-- files-- all different stuff in it.  I
was just going through everything to make sure,

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 97 of 145 PageID #: 6309

you know.

### QUESTION:

Do you remember what it said?  I mean generally?

### ANTHONY SQUEGLIA:

No, not really.  No.  I started to chuckle and I
said look at this.  You know, I stopped-- I
remember standing back and saying wow, this guy's
serious.  You know?  I mean this could really
destroy a family, you know?  And I didn't do it
laughingly, I did it-- laughingly-- like in
shock.  Like wow, you know?


And then-- would you do it if you were in this
situation?  I don't know.  But would you leave a
note?  Leave a note and then do yourself.  Of
course the other-- raid was prior.  Sad.

### QUESTION:

Seems like he was stuck, almost.  Like he didn't
have the--

### ANTHONY SQUEGLIA:

He didn't wanna give it up, I guess.  They don't
wanna give anything way.  This is-- this is

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 98 of 145 PageID #: 6310

typical.

### QUESTION:

Now-- now when you went in the-- in the house,
what did you-- what did you find in the piano?

### ANTHONY SQUEGLIA:

Found a-- miniature dildo.  Like a rubber dildo.
Excuse me-- some-- some more magazines.  And
that's when I said to the guys, you better check
the garbage cans out.  So that's when they came
up with the tissues with semen on them.  It
wasn't much but-- why was it still here?  I'm
talking miniature stuff, like for little boys.
Really disgusting stuff.

### QUESTION:

You know, later, he said-- those were mine.
That's-- you know-- (UNINTEL) to enjoy that--

### ANTHONY SQUEGLIA:

Those were his.  Yeah.  Well, I wasn't privy to
that.  I would have said-- I would have commented
on that.  (LAUGHTER)

### QUESTION:

He-- now-- here's-- one of the things that Elaine

says, was that he was emotional about the-- about
the losing-- materials-- about the book-- I
think--

ANTHONY SQUEGLIA:

Yeah, I think he was-- I think he was more
concerned about his paraphernalia than he was
about his family.  That-- that thing really--
stuck in my mind because-- when he had his
attorney there, it seemed to be the focus of--
the whole thing.  Like they're gonna keep all my
stuff.  What about your family?  You just
destroyed your family.

I mean it was-- I don't know-- but-- I could say-
- I had a-- I had a double homicide one night
where-- two girls got killed in a car with four
kids, they stole a car in (UNINTEL) they killed
these two girls, pushed them.  And I remember-- I
had to go make notification to the parents.
That-- your daughter is dead, okay?  And the
first-- I'll never get over this-- the first
reaction-- from one of the fathers was-- you

know, I just put a new battery in that car.  Do
you think I can get the battery out of that car?
So this is how I associated this.

(OFF-MIKE CONVERSATION)

(BREAK IN TAPE)

ANTHONY SQUEGLIA:

So those people appreciated us to come in there
because they really wanted to get to the bottom
of this thing and get proper help for their
children.  And we found it to be-- they came
forward.  They (UNINTEL).

(OFF-MIKE CONVERSATION)

***END OF SIDE A***

***SIDE B BLANK***

***END OF TRANSCRIPT***

HIT THE GROUND RUNNING FILMS

"FRAN GALASSO/ANTHONY SQUEGLIA"

INTERVIEW WITH ANTHONY SQUEGLIA

PRODUCER: ROGEN

TAPE #126

\*\*TRANSCRIBER'S NOTE\*\* QUESTIONS OFF-MIC.  BEST EFFORT MADE.\*\*

QUESTION:

(IN PROGRESS) --you were saying.  So-- and-- and
the-- so when you had to inform the father that
his--

ANTHONY SQUEGLIZ:

Yeah, what-- what had happened is-- the two girls
were pronounced dead at the scene.  I remember
being at the scene.  And-- I went to a h-- had to
go with homicide to the house to make
notification, and that's a tough thing to do.  I
had never done it before.  So I'd gone with this
detective, Al Martino (PH), we went to the house.

(CLEARS THROAT) And the first father we spoke to,
we said, "We got some bad news.  Your daughter

Anthony Squeglia Tape 126

was in an accident," da-da-da-da and the whole
nine yards. And what-- you know, "Your-- your
daughter is deceased. She-- died in the
collision." And the f-- and just staring at us.
And-- and it's like-- I could still see this
guy's face today. And he said, "You know, I just
put a new battery in that car. Do you think I
can get that battery back?" And I said to
myself, "Where is this guy goin' with this?" The
daughter is dead, you know? (CLEARS THROAT)

So I just associated this was Mano (PH)
Freidman's statement of, "You're gonna take all
my stuff?" you know. So I said, "You know, when
people get into this mode, they don't really hear
or know what they're saying. I don't know, I
don't know. And it wasn't the only case I had
that happen. It happened-- and that's-- that--
that other particular case, I worked on it on my
own time because I didn't have a witness. And I
found a guy that was in shock that actually saw
the collision but never said anything. S-- you

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 103 of 145 PageID #: 6315

know, it's weird.

QUESTION:

Back for a second to the-- (SNIFF) just to the family members. What was your impression, you know you-- you had some experience with Friedman on-- not just at the raid of the house, but also after. Maybe starting with the night of the raid, how did they behave as a family?

ANTHONY SQUEGLIZ:

Very distant. Very distant. It seemed like-- everybody's from a different family, you know? (COUGH) The wife was disassociating herself from the husband. (COUGH) Excuse me. The husband was very, very-- quiet into himself. I guess his mind was working internally, I don't know. The-- the s-- the older son-- who's the-- clown is-- ranting and raving through the house, being told to leave. (COUGH) Excuse me. Jesse is-- in another world. You know, he was away at school I believe. I got somethin' stuck in my throat. (COUGH) Okay. I'm good.

QUESTION:

Now I guess--

ANTHONY SQUEGLIZ:

(CLEARS THROAT) Thanks.

QUESTION:

Yeah.  I guess-- Jesse comes back at some point?

ANTHONY SQUEGLIZ:

(COUGH) Yeah.

QUESTION:

Jesse comes back I guess while the house is being

(SNIFF) searched.

ANTHONY SQUEGLIZ:

He-- he was called I believe.  I think-- Fran

Galasso spoke to him or something.  I-- I'm not

too sure, I don't recall.

QUESTION:

And-- and then I-- I think that-- I guess up

until this point he wouldn't have realized that

he was gonna be involved in the case.  He thought

this was more about his dad.

ANTHONY SQUEGLIZ:

(CLEARS THROAT) Yeah.  'Cause his dad-- he makes

a statement that, "My dad ruined my life," or something. "He's ruining our lives," or "my family."

QUESTION:

And-- do you remember anything about him as a person?

ANTHONY SQUEGLIZ:

Jesse?

QUESTION:

Yes.

ANTHONY SQUEGLIZ:

(SNIFF) I thought he was a little strange. My first (CLEARS THROAT) opinion of his room was-- not a normal teenager. A little mo-- excessive. The-- I thi-- I believe there were quite a few holes in the wall. That's a sign of someone acting out or-- I mean, how-- how would the family let him get away with this if-- this was a close family. If-- if one of my sons put a hole in the wall, I mean we-- you know, it-- there'd be some ramifications here. (CLEARS THROAT)

I saw a lot of destruction in that house.
Family-wise, human-wise.  I would never allow my
child to do what he did in his room.  I mean,
there was stuff in his room was unbelievable.
What they show in the papers is nothing.  I mean.

QUESTION:

(UNINTEL PHRASE)

ANTHONY SQUEGLIZ:

I thought he was kind of strange.  I thought he
had-- after-- after hearing all the-- pros and
cons in this case, I sort of felt sorry for him.
Because I felt that-- I really felt that knowing
about pedophilia, and I gave lectures on it, I
felt that the-- there's two other brothers if I'm
not mistaken, right?  (CLEARS THROAT) He m-- the
father might not have been as bad in the
beginning and maybe had tried something with the
other b-- sons and never progressed.

But Jesse was the most vulnerable because at that
stage (CLEARS THROAT) the mother's into therapy,
the father's into his own thing.  This kid's got

nuthin'.  He has no love in the family, nobody

patting him on the shoulder, nobody guiding him.

So I'm sure he was into drugs and drinking.

(COUGH) He was kind of strange.  Excuse me.

(COUGH) Must be the pollen.

### QUESTION:

When we spoke the last time, you mentioned that--

you remembered that Elai-- you-- you said Elaine

had this relationship (CLEARS THROAT) or figured

out that Elaine had a relationship with--

### ANTHONY SQUEGLIZ:

They said they had found it.  And they said-- I

never saw it.  But they said they had found her

diary during the search.  And word-- the word was

that she was having an affair with her therapist.

I never actually saw that-- diary.  I know they

found a book, I don't know if it was a diary or

not.  And-- that-- that's what was going around.

Now whether it was true or not, I don't know.

(CLEARS THROAT)

### QUESTION:

Did you notice anything about the relationship

between the husband and the wife that struck you?

ANTHONY SQUEGLIZ:

I felt that she was more dominating than he.  He
was like-- very quiet.  Was pretty quiet.  He
seemed like a smart guy, and that's-- that's one
of the signs.  Very intelligent person-- always
wants to be around children, schools.  Just got
awards.  I can't imagine why he won.  (CLEARS
THROAT) It's compulsive.  I mean, he-- he had
recently received awards from Queens or something
with the mayor and stuff like that, and he was
well recognized in the local schools.  And this
guy blows it.  I mean, this is-- this is-- a
sickness.

And I know on lectures-- I've gone up to
Connecticut on lectures for the county.  And--
I've spoken to Dr. Susan Sacroy (PH).  She's an
authority on pedophilia, I don't know if you ever
s-- read her book.  (SNIFF) And she used to tell
us the-- the only cure for that is the constant
threat of incarceration.  (CLEARS THROAT) There

is no cure. So I take that as gospel, being
she's been around longer than I have.

QUESTION:

The-- it sounds like a raid-- happened, what you
found. And-- and then that you sort of revealed
more as you kept looking and then you picked out
something (UNINTEL PHRASE)--

ANTHONY SQUEGLIZ:

Yeah. We were in the house for quite a while.
(CLEARS THROAT) And the fact that we had a search
warrant for-- pictures and things, you know
you're allowed to go through-- I mean, you don't-
- you don't go looking for-- stolen tires in a--
in a file cabinet. But in this case we were
looking for photos and things like that.

So I had found his-- his suicide note. And-- and
then the-- at the conclusion of the search, we
were leaving the house. And we hadn't really
found much. And-- I went around the outside of
the house and I was looking around 'cause the
house is set up very-- it's an unusual setup in

the house. When you walked in (CLEARS THROAT)
upstairs, the staircase was to the left. (SNIFF)
And it was-- three or four oak steps going up, a
big platform, and then steps going up further.

And underneath those steps was-- was-- was
hollow. I kept banging on 'em. And I was
looking for access because that led up to the
front of the house. And then I went outside, it
was all brick facade. I went back inside. And
the only thing I could see going under the
staircase was this closet. It was a long closet.
Now, I know the closet had been searched. They
had pulled some stuff out and they went through
it. And it was-- they didn't find anything.

On the way out, I got a hold of Fran Galasso.
And I said, "Listen, (CLEARS THROAT) did they
pull everything out of this closet?" And-- and
she said, "Yes they did." And I said-- I said,
"Is there a possibility we could take it out
again?" And I don't-- I don't know-- they said,

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 111 of 145 PageID #: 6323

"Why?" or something to that effect.  "We just did
this, we gotta get out of here.  We've been here
too long," or whatever.  And I said, "I don't
know, there's something about-- there's room
under that staircase but I can't for me-- for the
life of me figure it out."  (CLEARS THROAT) Doing
construction work all the time, I-- I found that
there's dead space here.

So we p-- most people left the house.  We were
still there on the search.  We took everything
out of the closet again.  And there was-- like I
said, there was no light in the closet.  And we
went to the back of the closet with this
flashlight, and sure enough the back panel of the
closet went up.  And lo and behold, there were
computers in there-- disks, all kinds of--
information.

And I believe they took the pictures-- in the--
in the news clipping is-- it's in the truck.
See, that wasn't available (CLEARS THROAT) on the

initial look-see.  But-- that's where he kept all

his stuff, most of his stuff.  And that was

brought into police headquarters and that was

looked at by-- people that knew computers in and

out.  You know, I guess you can't get rid of

stuff.

QUESTION:

Do you know what they found in the computers?

ANTHONY SQUEGLIZ:

No, I don't.  I don't recall.  You-- you have to

understand something, I was on like an

assignment.  (CLEARS THROAT) Once the whole thing

got rolling, we're back to our regular

assignments, you know.

QUESTION:

Right, right.

ANTHONY SQUEGLIZ:

So we're not privy.  (SNIFF)

QUESTION:

We-- I was gonna ask you one question about the--

kids.  Was it-- (UNINTEL PHRASE).  On that

search, was there-- did you find pornography on

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 113 of 145 PageID #: 6325

that search?  Or was-- it was mostly-- other than
computer games.  I guess you found computer--

ANTHONY SQUEGLIZ:

Computer games, yeah.  As far as-- you have to
understand something.  There were ten or 11 of us
in the house.  I don't know what they found
upstairs, at least I don't recollect what they
found upstairs.  I'm sure they found stuff, but I
don't know exactly what it was.

QUESTION:

And they arrested the-- Arnold and Jesse both,
and then Elaine also?

ANTHONY SQUEGLIZ:

Then Elaine, yeah.  For as-- attempted assault,
or something to that nature.

QUESTION:

Were you there when she did that?

ANTHONY SQUEGLIZ:

Yeah.

QUESTION:

What do you remember about that?

### ANTHONY SQUEGLIZ:

(CLEARS THROAT) She was-- well again, put
yourself in her place. You come home. You find
(LAUGH) police cars all over your house, you find
'em rippin' your house apart so to speak. And
you become violent. I think I would too if that
was the case, not knowing what's going on, really
knowing what's going on.

And then couple that with the incident that
happened just a short while before that. So it's
an invasion of your privacy to some ex-- some
great extent. Would you agree or not? I mean, I
would. I'd be pretty pissed. (CLEARS THROAT)
You know? Yeah, she-- she was acting out. And I
don't think the charges stuck. I think-- they
dropped 'em. I'm-- I'm not too sure. (SNIFF)

She took a swing at Fran. Fran Galasso is not a
person you wanna-- I mean, she had moxie, this
kid. She-- she was a good boss, yeah. You know,
some guys go, "How can you work for a woman?"

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 115 of 145 PageID #: 6327

Never had a problem.  Never had a problem-- you
know?  Do the right thing.  (SNIFF) So.

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

QUESTION:

Just-- yeah.  (AIRPLANE) Do you remember the
process of getting-- did you take statements from
the kids when you were sitting with them?

ANTHONY SQUEGLIZ:

Yeah.

QUESTION:

And how did that work?  How did you-- 'cause
that's a pretty formal process for a kid and--

ANTHONY SQUEGLIZ:

Yeah, it's usually-- they call it Q&A, question
and answer type thing.  And-- we-- we had a-- a
dialogue that we follow.  You know, your name.
Y-- you have to make the child credible first of
all to comprehend what years saying and make sure
that they understand what you're saying.  You'd--
you'd ask certain questions.  And you down a list
of things.  What's your name?  Where do you live?

What's your phone number?  What's your favorite
color?  You establish a lot of-- ground rules.
Who's your teacher at school?  What's your
favorite subject?  And-- and this is all
documented.  Answer, question, answer, question.

And-- when you were at-- in the computer class,
did-- you know, and you go on from there.  And
it's usually very lengthly (SIC) because you use
a line between each question and answer.  And you
get-- you have to remember, you ca-- like I said
be-- earlier, you can't re-victimize the-- the
child.  And you can't put anything into the
statement.  You-- you can't interject anything
into it.  It has to be their-- their wording
freely.  And-- usually at that point, they-- they
want to talk to ya.  They really want to talk to
ya.

                    QUESTION:

And did-- how did-- did somebody-- did somebody
ask the questions and somebody else was writing
down a statement?

ANTHONY SQUEGLIZ:

No, no.  It's-- it's a one-on-one.  I would--
like I was speaking-- you and I are just
speaking.  I would do the total-- total, 'cause I
would have to testify to it.

QUESTION:

And then would you-- how would you-- you'd tape
record it, or would you write it?

ANTHONY SQUEGLIZ:

No.  Tape recording, no.  We-- we-- it's been
discussed many times in the county.  The county
feels that tape recordings are really not--
viable.  We've had a lot of problems with 'em
from out of state.  You know, time lapses.  A lot
of things could be said in those times.  We just
don't do it.  D.A.'s don't want it.  No need for
it.

So you know what?  If the defense wants to fight
us, they bring us into court.  And-- and we go
right down, right down the list.  You know, if
they wanna scrutinize it and-- that's how the

system works.

QUESTION:

And now these kids had to testify in front of a grand jury?

ANTHONY SQUEGLIZ:

Yes.

QUESTION:

What's the process of preparing them to do that?

ANTHONY SQUEGLIZ:

(CLEARS THROAT) Well, they're usually very nervous.  Usually the parents are more nervous than they are.  Whenever we go to grand jury with young children, we make sure whether-- whether the boss gives us overtime or not, we go out of our way.  In other words, I would go in sometimes on my days off just to be there.


Because (SNIFF) you'll find-- and I don't want to single anybody out.  But there are certain district attorneys (CLEARS THROAT) that will go in without prepping the child.  And just get rid of the case.  And that's not the process here.

So we're with them pretty much the whole time--
except going in the room.

And all we tell them is tell the truth. You
know, just stare at Mr. Onorato (PH)-- look at
him. You don't have to look at the people
sitting there because I don't know if you've ever
been in a grand jury. Some of them read the New
York Times. Some eat oranges and apples. You
feel that they're really not paying attention to
ya. This is a fact. (SNIFF. And-- you know,
you can-- you can be-- a little skeptical, or
maybe a little relieved, I don't know how you
would look at it. Because people are frightened
to go before their peers. But if you focus and
you do your homework in your case prep you know--

QUESTION:

Now did you-- did you watch their grand jury
testimony or not?

ANTHONY SQUEGLIZ:

No, you can't-- we can't. You're not allowed in
there. Yeah. In fact, we don't even know what

it is.  You know, like if I have to review for
trial my own testimony?  You only get your
testimony.  I mean, I don't know what anybody
else said.  N-- I don't wanna know what anybody
else said, you know.

                    QUESTION:

So you took-- the first process is you take a
written (UNINTEL)-- you write.  So you write up--

                    ANTHONY SQUEGLIZ:

You take it orally.  First you get an admission
orally, okay?  You could always testify orally,
okay?  And then-- once you get something orally,
you can really expound on it.  Now-- now you go
with your format, you know.  You know what
happened.  You don't know what happened to that
particular child, but you know a lot of things
happened.

So if they're past that stage, they're gonna tell
you what happened to them.  You know.  And if
they leave something out that you think might
have been in there?  You just bypass it, you

know.  I mean, nobody's here to get any glory.  I
mean, you know, I don't know if anybody would do
that, but.

(BREAK IN TAPE)

QUESTION:

The-- oh, did you find it helpful-- at-- at some
points did you find it helpful-- you know, the
kids were probably like eyeing you, trying to
figure out how much you knew, you know, in a way.
I'm not-- not-- not deceptively, but they're--
you know, they're-- if they were having trouble
getting to sort of a confession point-- did you
find it useful to say to them, you know-- you
know, "We spoke to your friend Jimmy and he said-
-"

ANTHONY SQUEGLIZ:

No, we--

QUESTION:

--"this?"

ANTHONY SQUEGLIZ:

--wouldn't use that.  No.  I wouldn't use that
anyway.  My-- my technique was they would ask me,

"What-- what-- what do you know about him?"  And
I'd say, "I know things.  But I can't tell you
what I know because you know things that I don't
know."  And whether they understood that or not,
they knew what I was talkin' about.


"So what do you know?"  "I know a lot of things."
"So, well do you know what happened to me?"  "No,
I don't know what happened to you.  But I know
something happened to you, so I want you to tell
me-- if you can.  If you can't, we'll come back
another day."  (SNIFF) You know.  So the--
there's a lot going on in their minds.  But the
biggest thing was getting their trust.  And you
gotta be honest with kids because they see right
through ya.

                    QUESTION:

Did they ever get adamant, like, "I told-- I told
you nothing happened"?

                ANTHONY SQUEGLIZ:

If-- I'm sure that happened.  And I know from
past experienced, if that really happened chances

are nothing happened.  You know, depending on how
it was put to me, depending how much I knew about
the case.

### QUESTION:

So there were some ca-- there were some kids
where you knew-- "I know somethin's in here."
And then there were other kids where you said,
"You know, it's possible nothing happened."

### ANTHONY SQUEGLIZ:

Well, I mean let's not lose the fact that some
kids are very immature at that age as well.  And
they wouldn't recall anything, you know.  Even if
you feel-- and the only way you could do anything
like that would be-- medical, you know.  I know
we do that with young children.  We take 'em to--
these scan units for suspected child abuse or
neglect.  They do physicals.  And I-- we've done
of them.  Yeah, they could show penetration--
watch it di-- digitally or, you know, whatever.

Then-- then you have something tangible, then you
have something to go with, you know.  But other

than that, the kid says nothing-- some kids are out of it.

QUESTION:

In this case, was there-- did you have the opportunity to get medical evidence, or?

ANTHONY SQUEGLIZ:

I know they did medicals on quite a few of them. As far as the outcomes, it was so massive-- I don't know.  I don't know.  (SNIFF)

QUESTION:

How did the-- oh, how did-- well, the press obviously found out about the delay.  How do you think the press-- how did-- how did the press find out that this had happened?  (THUMP) There was a ton of press there.

ANTHONY SQUEGLIZ:

Okay.  I honestly believe-- during-- during the search of the house, one of the fathers came running down the street.  And he came down with a rope in his hands.  I remember him.  And he wanted to strangle Arnold.  And I'm surprised that's not even on tape anywhere because he-- he

had to be escorted out of the neighborhood. They
had to put up roadblocks.

I think the neighbors might have called. I-- the
word I got from-- (SNIFF) who was I talkin' to?
Andrea Day? You know her? Fox Five?

QUESTION:

No. No, no.

ANTHONY SQUEGLIZ:

(CLEARS THROAT) She used to show up on a lot of
that (WIND) stuff. The word I got was, and this
is only the word I got, was that one of the
neighbors had called and said, "I can't get-- I
can't get into my street. What the hell is going
on, or what's going on in my neighborhood? I
can't get to my house." And it was next door or
something like that. I think that's how the news
media got it. And I don't know if you guys are
on the same band or I don't know what's go-- you
know, how that works.

QUESTION:

(UNINTEL PHRASE) Just tell me about Great Neck.

What-- what was it like in that community?

ANTHONY SQUEGLIZ:

Nice community.  Tight, affluent.  Well kept homes.  Just-- just, you know-- a nice-- level of people, you know.  Very concerned.  The school was-- the school district was very-- cooperative. I mean, we went to libraries.  We didn't meet any resistance from any of the-- schools or anything like that.  I mean, they were there to help.

QUESTION:

Would you say-- did the community really mobilize to kind of--

ANTHONY SQUEGLIZ:

A nucleus did.  They ha-- we had a meeting over at a building on-- I-- I don't know if it was Jeropa (PH) Turnpike or not.  But-- (SNIFF) they had a whole meeting.  They had plenty of meetings.  They-- in fact, just being the-- we hit the house, they had a massive-- parent turnout-- at a building in Great Neck.  I think it was owned by one of the fathers-- who was a heart cardiologist.  And they-- they wanted to go

storm the house.  I mean-- that's what I recall.
I remember a lot of irate people.  Yeah, there
was-- I think 30, 40 people maybe that stuck
together.  And I'm sure everybody knew everybody,
you know.

QUESTION:

Now you were-- when you were-- when you went to
the parents' house, or when you went to the house
to see the kids, did you bring any of the
pornography to kinda--

ANTHONY SQUEGLIZ:

No.  No.  Didn't bring anything.

QUESTION:

Yeah.  'Cause it wasn't-- is that not typical,
that you wouldn't--

ANTHONY SQUEGLIZ:

Would have no reason to bring it.  That's-- sort
of suggestive, I think.

QUESTION:

Right.  Well, it certainly (UNINTEL PHRASE).

ANTHONY SQUEGLIZ:

Yeah, I mean think about it.  You got small kids.

I came to your house and said, "This is what's
goin' on.  You know, maybe your kid's involved
with this."  I mean, (MAKES NOISE) we could have
some ramifications here.

QUESTION:

You-- how did you-- well, there was an article
about it in the paper.

ANTHONY SQUEGLIZ:

As far as?

QUESTION:

That said that the postal inspectors had come in
and-- you know, (UNINTEL).  So I guess they
probably found out about it fairly quickly.

ANTHONY SQUEGLIZ:

Yeah.  Yeah, it's-- it's news.  It's-- yeah, well
you know there's certain information we have to
give out to-- public information.  You know that,
right?

QUESTION:

Yeah.

ANTHONY SQUEGLIZ:

They call the-- PIO and they get information.  I

mean, (CLEARS THROAT) we-- we hit a house in Bellmore (PH). There was a pedophile that he was-- doin' kids and stuff. And he-- he did time. And he got out and he went right back to his house and he started all over again.

And the mail-- we set up-- we actually had one of us dress up as a mailman, delivered a package. He accepted the package. Twenty (LAUGH) minutes later, we hit the house. And this guy was usin' all the paraphernalia already. And then-- they searched the house-- the feds. And they didn't come up with anything.

(BREAK IN TAPE)

QUESTION:

Oh, you were talking about therapy.

ANTHONY SQUEGLIZ:

During-- during the-- parents meetings we-- we-- recruited a therapist. She got on board. She was there for all the family meetings and offered free counseling. And, you know, ta-- just to talk to.

And-- we found ourselves being counselors.  We
find that a lot.  When I was working, you'd find
people-- if you really helped them and they
trusted you-- you'd be a sounding board for 'em.
And-- even after all this blew over and things
were sort of quieted down, we-- we'd go out of
our way to go see how they were doin' and stuff,
how the kids are doin'.  It-- it was really a--
(HITS MIC) a heart-wrenching case, you know, when
you think about it.

When you're doing it, you don't think about it
too much because it has to be done.  But when you
sit down and realize what's going on around you,
then you don't realize how lucky you are, you
know, as a parent.

QUESTION:

Do you remember whether the therapist was--
Sandra Kaplan?

ANTHONY SQUEGLIZ:

Yeah, it was.  Yeah.

QUESTION:

They can't hear me.  So say, "The therapist was"--

ANTHONY SQUEGLIZ:

The therapist was-- Sandra Kaplan.  Yeah.  She was good.

QUESTION:

And where-- where did she come from?

ANTHONY SQUEGLIZ:

I think she was up from that area, if I'm not mistaken.  She-- she popped up quite often. Very-- very vocal, very-- very-- I found her to be very good, you know.

QUESTION:

And what was her role as--

(OFF-MIC CONVERSATION)

(BREAK IN TAPE)

QUESTION:

Oh, yeah.  What was Kaplan's-- what was her-- you know, what was her role?  What did she feel-- what did she need to do or what was helpful?

ANTHONY SQUEGLIZ:

She-- wha-- I saw her on a couple of-- at a

couple of meetings with the parents.  I just felt

that she was-- very vocal.  She made it known

very clearly that she was there to help.  And any

time of the day or night.  And-- not having too

much to do with, you know, people like that, I--

I was impressed by-- how she handled herself.

And she was genuinely concerned.  And I thought

that was great, you know.

QUESTION:

Did--

ANTHONY SQUEGLIZ:

She even offered-- counseling to-- us.  Because

she felt it would be-- after working on this for

so long, it would be traumatic, you know.  But--

you know.

QUESTION:

And then I guess she stayed-- she counseled the

kids after the case still?

ANTHONY SQUEGLIZ:

She counseled some of them, yeah.  I don't know

about how many, but I know she was-- well-- well
received in some families and not well received
in others.

### QUESTION:

Well, the--

### ANTHONY SQUEGLIZ:

There are still people out there that wouldn't
let her in the house.  I mean--

### QUESTION:

Why do you think?

### ANTHONY SQUEGLIZ:

They're in denial.  Nothing happened.  Or nothing
that bad happened.  He was caught just before
something terrible happened.  You perceive what
you want to perceive.  And I'm sure she reads
into it.  And forcing yourself on someone is not
a good thera-- therapeutic value, you know?

### QUESTION:

Do you think there-- there are obviously (NOISE)
many, many kids involved in the classes.  But
only about 14 in the end I guess that were--

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 134 of 145 PageID #: 6346

ANTHONY SQUEGLIZ:

Yeah, they focused I believe on 14. Yeah. You have understand something. When you have a community and a list with 400 names on it, and to-- to make a-- a quick conclusion would be detrimental to everybody. I mean, if-- you know, time is of the essence so to speak so you work with what you have. You know.

QUESTION:

Now-- do you feel that there are-- you know, there-- so that means there are another 300-and-somethin' kids that ultimately either, you know, weren't a part of the case or didn't come forward, or?

ANTHONY SQUEGLIZ:

Yeah, I'm sure there's a percentage. And don't forget the fact that he was doing this for quite a while. So some of the children are now 20, 21, or 17 at the time. And I could say in the course of my career in interviewing runaway 17, 18, 19, 20, 21, they're not about to tell you about their sexuality or their-- their childhood or their

guilt because they bury themselves in the sand so to speak. And it's something that's past them and they just don't want to focus on it.

### QUESTION:

Some of these kids now are-- well, do you-- do you feel like there are a lot of kids out there that are still living with this? Or-- or, you know--

### ANTHONY SQUEGLIZ:

Oh, absolutely. Absolutely. Absolutely.

### QUESTION:

'Cause like remember, I can't-- they can't hear me. They can only hear you, so--

### ANTHONY SQUEGLIZ:

Yeah, there are a lot of children out there that have been-- abused. And-- it's probably very overwhelming, you know.

### QUESTION:

But-- and do you think there are a lot of victims of Arnold Friedman that didn't come forward that--

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 136 of 145 PageID #: 6348

ANTHONY SQUEGLIZ:

I'm sure.  I'm sure over the years there are
victims that we'll never know about that have to
live with this for the rest of their lives.  It's
sad.  You know.

QUESTION:

What's the thing that-- that, you know-- is there
any one thing that sort of stays with you this
many years later about this case?  Something that
was most impressive to you?

ANTHONY SQUEGLIZ:

Well-- the magnitude of the case.  And the length
of time it was going on that nobody actually
picked up on it always boggled my mind.  I mean,
but then when you work with-- sex victims, I used
to find dealing with like a 13 or a 14 year old
that's been raped or sodomized by a boyfriend
that in talking to some of the mothers, you get
so friendly with them in conversation, you know,
like after the trial.  They would say, "You know,
when I was a little kid my grandfather used to
sexually abuse me."  I mean, 37 year old women

Case 2:06-cv-03136-JS Document 41-9 Filed 01/28/21 Page 137 of 145 PageID #: 6349

and 40 year old women. I'd say, "Why'd you wait so long?" And they'd say, (SNIFF) "Well, I thought I was my father's favorite."

And in the interim, one particular case was a 37 year old was sexually abused by her father. The sister was 40-something was sexually abused by her father. The two sisters never knew this. And the brother out-- out west was arrested for-- sexually abusing an eight year old boy. And we went to check him out, he blew his brains out. I mean, think about the bad chip in that family, you know? And this all started with a nine year old. It's-- it's-- it's mind boggling.

QUESTION:

Yeah, amazing. Good. Alright, well thank you very much.

(OFF-MIC CONVERSATION)

**END OF SIDE A**

**SIDE B BLANK**

**END OF TRANSCRIPT**

**12**

HON. HERBERT LIPP
NASSAU COUNTY COURT JUDGE
SITTING AS A LOCAL CRIMINAL COURT
- - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of

VILLIAM HATCH,                                    R E T U R N

A Detective in the Nassau County
Police Department, Shield No. 402,
assigned to the Sex Crimes Squad.

- - - - - - - - - - - - - - - - - - - - - -X

STATE OF NEW YORK   )
                    :   ss.:
COUNTY OF NASSAU    )

           WILLIAM HATCH, being duly sworn, deposes and says:

           That 1 am a detective assigned to the Sex Crimes Squad of the

Nassau County Police Department, Shield No. 402.

           That on Wednesday, November 25, 1987, at approximately 2:00 p.m.

the above-captioned search warrant was executed at 17 Picadilly Road, Great

Neck, New York, and the following is a complete and accurate inventory of the

property seized:

           (See Attached List)

_____
                                                  WILLIAM HATCH

Sworn to before me this
30th day of November, 1987

_____
HON. HERBERT LIPP                         ORDERED THAT THE SEIZED PROPERT
NASSAU COUNTY COURT JUDGE                 BE KEPT IN CUSTODY OF THE
SITTING AS A LOCAL CRIMINAL COURT         NASSAU COUNTY POLICE DEPARTMENT

                                          _____
                                          HON. HERBERT LIPP
                                          NASSAU COUNTY COURT JUDGE
                                          SITTING AS A LOCAL CRIMINAL COU

SCS # 371-67

**POLICE DEPARTMENT**
**COUNTY OF NASSAU**

DATE November 25 19 67

ARREST
CUSTODIAL NO. _____

TAKEN FROM DEFENDANT ARNOLD FRIEDMAN
(name)

OF 17 PICADILLY Rd. GREAT NECK, N.Y.
(address)

THE FOLLOWING PROPERTY:

| | Quan. | Item / Brand Name | Model / Serial No. | Location |
|---|---|---|---|---|
| 1. | 1 | ASSORTED COMP. DISCETTE | | ROOM / DET C.W. |
| 2. | 1 | PLASTIC BOX CONTAINING | NONE | COMPUTER STORAGE |
| 3. | 1 | " " " | " | " " |
| 4. | 1 | " " " | " | " " |
| 5. | 1 | " " " | " | " " |
| 6. | 1 | " " " | " | " " |
| 7. | 1 | VIEWTEX PROJECTOR | MD# V-445/SN 44-12945 | " " |
| 8. | 1 | CONTAINING COMP DISCETTES CLEAR COLORED PLASTIC BOX | NONE | " " " |
| 9. | | CAN OUTSIDE HOUSE ON RIGHTSIDE ASSORTED PAPERS FROM GARBAGE | | HOUSE ON RIGHT SIDE. GARBAGE CAN OUTSID. |
| 10. | 1 | PANASONIC DATA CASSETTE | GE443087 | DET C. COMPUTER STORAGE RM |
| 11. | 1 | CARTRIDGE BAG CONTAINING ASS. COMP. | NONE | " " " |
| 12. | 1 | CARDS PLASTIC BOX W/ ASS. 3x5 | " | " " " |
| 13. | 1 | " " " " | " | " " " |
| 14. | 1 | 15 CASSETTES CARDBOARD BOX CONTAINING | " | " " " |
| 15. | 1 | INTERFACE | NONE | " " " |
| 16. | 7 | BAG OF REFERENCE MANUELS | " | " " " |
| 17. | 1 | MOVIE FILMS AND ASS PAPERS ENVELOPE W/ASS. MIME | | LOWER LEFT HAND DR DEF. OFFICE OF De |
| 18. | 1 | ANNOUNCE ARN. TO REY PROGRAM TENT | | LOWER LEF DEF. " " HAND DRAWER |
| 19. | 3 | IN PLASTIC BAG W/ TYPED SEXUAL AIDS BATTERY | | LOWER CABINET DRA NEXT TO PIANO DEF. OF |
| 20. | 9 | ASS. PAPERS W/ LIST OF BOYS NAMES + LETTERS | | ON DESK IN DEF. OFF |

Det. O. Brownlow
(rank)          (name)          149 (Sh.No.)          S.C.S. (Command)

POLICE DEPARTMENT
COUNTY OF NASSAU

DATE __November 25__ 19 _87_

ARREST
CUSTODIAL NO. _____

TAKEN FROM DEFENDANT ~~PRISONER~~ __Arnold Friedman__
(name)

OF __17 Picadilly Rd, Great Neck, N.Y__
(address)

THE FOLLOWING ~~ARRESTED~~ PROPERTY:

| | Quan. | Item / Brand Name | Model / Serial No. | Location |
|---|---|---|---|---|
| 1. | 1 | CSI Power Switch w/cables | HD# 1208 /SN 2293.2A | Room /Det.C. Computer Storage |
| 2. | 1 | Commodore 1541 Disc Drive | S/N AA1A16384 | " " . Det c |
| 3. | 1 | Commodore Computer | MD# 64 /SN 500010963 | " " ^ " |
| 4. | 1 | " Video Monitor | MD# 1701/SN 07838374 | " " . " . |
| 5. | 1 | Voice Box Speech Syn | No S/N | " " " |
| 6. | 1 | Super X Graphic Equalized Module | S/N 287611 | " " . . |
| 7. | 1 | Princeton Amplifier | No S/N | " " . " . |
| 8. | 1 | Extension Cord | No S/N | " " �width |
| 9. | 1 | Commodore 64 Computer | S/N P2038185 | " " " |
| 10. | 1 | " " " | S/N P01551350 | " " " |
| 11. | 1 | " " " | S/N RP0053535 | " " " |
| 12. | 1 | " " " | S/N P5209888 | " " " |
| 13. | 1 | " " " | S/N P5205933 | " " " |
| 14. | 1 | " " " | S/N P01501525 | " " " |
| 15. | 1 | " " " | S/N P00414468 | " " " |
| 16. | 1 | Commodore Vic 20 | S/N V004639 | " " " |
| 17. | 1 | " " " | S/N P1245860 | " " " |
| 18. | 1 | " " " | S/N B084984 | " " " |
| 19. | 1 | Commodore Disc Drive | HD1541/SN AJ1A857B3 | " " |

_Det O. Brunlow_
(rank)

_____
(name)

_149_
(Sh.No.)

_J.C.S._
(Command)

POLICE DEPARTMENT
COUNTY OF NASSAU

DATE November 25 19 87

ARREST
CUSTODIAL NO. _____

TAKEN FROM DEFENDANT
PRISONERXXX         ARNOLD FRIEDMAN
                              (name)

OF   17   Picadilly Rd, Great Neck, N.Y.
                              (address)

THE FOLLOWING STOLEN PROPERTY:

| 1. Quan. | Item / Brand Name | Model / Serial No. | Location | Det C. |
|---|---|---|---|---|
| 2. 1 | Commodore Computer Monitor | HD # 1702/SNXC118160 | Computer Storage | |
| 3. 1 | Commodore 64 Computer | S/N P0168211 9 | " | " |
| 4. 1 | Sakata Comp. Monitor | HDSC 100/SN16270955 | # " | " |
| 5. 1 | Samsung Comp. Monitor | S/N 3-0+ 50105146 | " | " " |
| 6. 1 | Amdek Comp. Monitor | S/U Y2IO32985 | " | " " |
| 7. 1 | Sakata Comp. Monitor | S/N 14274069 | " | " " |
| 8. 1 | Commodore Printer + cover | HD # VIC 1525/SN 202513 | " " | " " |
| 9. 1 | Commodore Printer | HD VIC 1575/SN 000292 | " | " " |
| 10. 1 | Super Sketch | S/N 010686 | " | " " |
| 11. 1 | Commodore Printer Face Inter. | No S/N | " | " " |
| 12. 1 | Commodore Data Set | S/N 230259 | " | " " |
| 13. 1 | " " " | S/N 092044 | " | " " |
| 14. 1 | " " " | S/N 1054900 | " | " " |
| 15. 1 | " " " | S/N 032854 | " | " " |
| 16. 1 | " " " | S/N 013193 | " | " " |
| 17. 1 | Open Box 5¼" discettes | | " | " " |
| 18. 1 | GAF 8mm Mov.e Camera | Model # SS250KL | " - " " |
| 19. 1 | Assorted Comp Discette Plastic Box Containing | None | " " " |
| 20. 1 | " " " " | None | " " " |

Det. O. Brenton          149          S.C.S.
   (rank)      (name)        (Sh.No.)      (Command)

Case 2:06-cv-03136-JS   Document 41-9   Filed 01/28/21   Page 143 of 145 PageID #: 6355

$\partial c s^4 \Rightarrow 11-87$

**POLICE DEPARTMENT**
**COUNTY OF NASSAU**

DATE _November 25_ 19 _87_

ARREST CUSTODIAL NO. _____

TAKEN FROM DEFENDANT _ARNOLD FRIEDMAN_
(name)

OF _17 Picadilly Rd, Great Neck, N.Y._
(address)

THE FOLLOWING STOLEN PROPERTY:

| | Quan. | Item / Brand Name | Model / Serial No. | Location |
|---|---|---|---|---|
| 1. | | Homosexualty w/Boys Sheets Advertising | | Behind Piano in Def. o |
| 2. | 3 | Discplates of kids in class/check Box ledger, reel of | Box ledger, reel of | Next to Piano in Def. 6, |
| 3. | 1 | Cardboard box containing | Film & other ass. photos | On top of File cabin |
| 4. | 1 | Sony video tape. Plastic box containing | | Of Def. office (bo On Amplifier in c |
| 5. | 4 | Reels of tapes | | Of Def. office (il On Amplifier in c |
| 6. | 1 | Box of kilobytes Computer Discs | | Of Def. office (be On Amplifier in cor |
| 7. | 1 | Box of Lafayette magnetic Recording tape | | Of Def office (bo On Amplifier in cor |
| 8. | 1 | Suicide Letter | | Sn desk in Def. o |
| 9. | 5 | Boxes of video tapes | | In downstairs entran In storage seat b, |
| 10. | 4 | Metal reels of film | | " " " co |
| 11. | 27 | Business cards Assorted | | " " " (def |
| 12. | 1 | Commodore Printer | ND 1526/SN1026035 | Downstairs Hall C |
| 13. | 1 | Nikn 35 mm Camera & Case | | " " " |
| 14. | 3 | Papers w/list of Names of Computer Programs | | On Wall in computer st Bayroom |
| 15. | 1 | Brown colored Polaroid Camha | S/N X630417V2 DX | On Book Shelf indo. |
| 16. | 15 | Assorted Computer Power Packs In Red Box | | (def. c.n Computer storage |
| 17. | 23 | Assorted Computer Joy Sticks In Red Box | | " " (def (def. c.w) |
| 18. | 1 | Commodore Pet computer Projector | MD 4016/SN B302029 | Downstairs Hall c |
| 19. | 1 | Eumig Super8 Movie | None | " " |
| 20. | 3 | Composition Note Pads containing lesson plans of class | | Book Shelf on PlayRod. |

Rev. O. Bromlin
(rank) | (name) 149 | (Sh.No.) | SCS (Command)

#4

**POLICE DEPARTMENT**
**COUNTY OF NASSAU**

DATE __11/25__ , 19 __87__          ARREST          NO. _____
                                   CUSTODIAL

TAKEN FROM DEFENDANT ~~XXXXXXXXX~~ __ARNOLD FRIEDMAN__
                                        (name)

OF __17 PICCADILLY RD. GREAT NECK__
                                        (address)

THE FOLLOWING ~~XXXXXXX~~ PROPERTY:

| | | | | |
|---|---|---|---|---|
| 1. | 1 | VCR AGFA TAPE | CLASP/ROCK VIDEO | 2ND FL GREEN BEDROOM #1 |
| 2. | 1 | List OF NAMES | | 2ND FL GREEN BEDROOM #F |
| 3. | 6 | QINI DIARIES | 1980, 1981, 1982, 1983 1984 | MASTER BEDROOM HIGHCHEST #3 |
| 4. | 2 | SNAPSHOT | 1 BOY WITH PANTS DOWN 1 GIRL NAKED WAIST DOWN | 2ND FL GREEN BEDROOM NWOOD |
| 5. | 279 | COMPUTER TAPES | ASSORTED PROGRAMS | ATTIC    #P/ |
| 6. | 1 | GLASS INE FOLDER CONTAINING VARIOUS LISTS | | MASTER BEDROOM DESKTOP #4 |
| 7. | 1 | STENO BOOK  CHM 1983-R8H | | Master Bedroom Desktop #5 |
| 8. | 5 | 4'x6' READ NOTEBOOKS | 2 ORANGE COVERS 1 RED COVER | MASTER BEDROOM DESKTOP #2 |
| 9. | 1 | WHITE PAD  -BRUMLOW NAME-CAROL FRANK | | MASTER BEDROOM DESKTOP |
| 10. | 2 | GARDEN CITY HOTEL STATIONERY PAGES | | MASTER BEDROOM FLOOR |
| 11. | 1 | CHILDMINDERS PARENT MEETING ANNO | | MASTER BEDROOM FLOOR #4 |
| 12. | 6 | FILE FOLDERS COMPUTER CLASS - ADS OLD -ADS NEW COMPUTERS EDUC. -ADS CURRENT | | MASTER BEDROOM FILE #6 |
| 13. | 10 | SNAPSHOTS | | MASTER BEDROOM FLOOR |
| 14. | 2 | FILE FOLDERS STUDENTS REG 1986 - R&G - 87 | | MASTER BEDROOM FILE #2 |
| 15. | 1 | COMMODORE PET 2001 SERIES Serial# 043806 | | 2ND FL GREEN BEDROOM #A |
| 16. | 1 | APPLE IIe COMPUTER  #DHAOSH3AZS2 | | 2ND FL GREEN BEDROOM  #F |
| 17. | 2 | APPLE DISK DRIVES  # 388227 # A2M8003-97225 | | 2ND FL GREEN BEDROOM #F |
| 18. | 1 | APPLE MONITOR Serial# 831013020 | | 2ND FL GREEN BEDROOM #F |
| 19. | 1 | STAR NP10 PRINTER # 2700611036ZZ | | 2ND FL GREEN BEDROOM #A |
| 20. | | ASSORTED COMPUTER PROGRAM DISKS | | 2ND FL GREEN BEDROOM #F |

P.O.          MARY ANN DURKIN          2428          Sex CRIMES
(rank)              (name)              (Sh.No.)          (Command)

# 6

**POLICE DEPARTMENT**
**COUNTY OF NASSAU**

DATE __11/25__ 19 __87__          ARREST CUSTODIAL NO. __11/25/87__

TAKEN FROM DEFENDANT ~~PRISONER~~ ____ ARNOLD FRIEDMAN ____
(name)

OF ____ 17 PICCADILLY RD. GREAT NECK ____
(address)

THE FOLLOWING ~~PROPERTY~~PROPERTY:

| | Quan. | Item / Brand Name | Model / Serial No. | Location |
|---|---|---|---|---|
| 1. | | STACKS OF | | |
| 2. | 2 | INDEX CARDS W/RUBBERBANDS | | MASTER BEDROOM/FILEBOX on |
| 3. | 35 | ASSORTED VCR TAPES | | LIVING ROOM CABINET w̄z̄ |
| 4. | 21 | ASSORTED VCR TAPES | | LIVING ROOM CABINET |
| 5. | 2 | LEGAL SIZE ENVELOPES &d. of Ed. BAYSIDE HS | | LIVING ROOM CABINET |
| 6. | 13 | ASSORTED LISTS OF VCR TAPES | | LIVING ROOM CABINET |
| 7. | 12 | REELS OF MOVIE FILM | | 2ND PL / DEN w̄z̄ |
| 8. | 1 | BELL + HOWELL FILMOSOUND Serial # CE78912 | | 2ND FL DEN AE |
| 9. | 1 | RED FOLDER WITH CLASS RECORDS | | LIVING ROOM CABINET |
| 10. | 3 | $20 BILLS ON DESK | LEFT IN BEDROOM | MASTER BEDROOM MA m |
| 11. | | 120 IN BILLS IN ENVELOPE | " E - EMERGENCY " | MASTER BEDROOM left n MAR |
| 12. | | 115 IN BILLS IN ENVELOPE | 'GARAGE SALE " | MASTER BEDROOM left EK |
| 13. | | 370 IN BILLS IN ENVELOPE | 'STARLIGHT" | MASTER BEDROOM left us IN |
| 14. | | 85 IN BILLS IN ENVELOPE | GOLDFOUND GARAGE SALE" | MASTER BEDROOM left s |
| 15. | | 70 IN BILLS IN PINK PAPER | | MASTER BEDROOM / left us |
| 16. | | 10 IN BILLS IN SEASONS GREETING ENVELOPE | | MASTER BEDROOM / left us |
| 17. | | 211.09 IN POCKETBOOK | | LIVING ROOM |
| 18. | | 30.25 BILLS + COIN IN BLUE BOX | | KITCHEN AE |
| 19. | | $484 bills IN BOX WITH UNCIRCULATED COINS | | BASEMENT AS + LM |
| 20. | 4 | 20 PIECE ROLLS AT $565 EACH | UNCIRCULATED COINS 2260 | BASEMENT AS + LM |

+ POCKETBOOK AND ALL LISTED MONEY RETURNED TO DAVID FRIEDMAN THIS DAY

__P.O.__ ____ MARY ANN DURKIN ____ __2428__ ____ SexCRIME ____
(rank)        (name)        (Sh.No.)        (Command)