DCS 371-87

**POLICE DEPARTMENT**
**COUNTY OF NASSAU**

DATE November 25 1987

ARREST CUSTODIAL NO. _____

TAKEN FROM DEFENDANT ~~PRISONER~~ ARNOLD FRIEDMAN

(name)

OF 17 Picadilly Rd. Great Neck, N.Y.

(address)

THE FOLLOWING ~~STOLEN~~ PROPERTY:

| Quan. | Item / Brand Name | Model / Serial No. | Location |
|---|---|---|---|
| 1. | 9 Reels of Tape | | Bottom |
| 2. | Metal Box Containing | | Closet inside play |
| 3. | Misc Reels of Film + Misc Papers Card Board Box Containing | | 1' 4' 1' |
| 4. | Misc. Films Card Board Box Containing | | 1' '' '' |
| 5. | Commodore Computer | LD4016 SU 63004970 | Crawl Space/Det. |
| 6. | Commodore Pet Computer | ND 2001 SU 0029720 | 1' 1' 1' |
| 7. 6 | OF Naked People Blk + Wht Pictures | | of Jesse's Room (1 Bottom Drawer Der. |
| 8. 6 | Magazines Papers of Sexual Nature Girlie Books + Ass. | | Closet in Jesses |
| 9. 2 | Magazines Unknown Named Girlie | | Desk Dresser in Je Bottom Drawer (r |
| 10. | Hypodermic Needle | | Desk Dresser in Jes Middle Drawer of |
| 11. 2 | Rolls Kodak 35mm Film | | Desk Dresser Jesses Top Left Drawer (Der as) |
| 12. | Theme Notebook | | Besk Dresser Jess |
| 13. 2 | Cassette Tapes for Answering Machine | | In Answering Machin Outop of Desk in C |
| 14. | | | |
| 15. | | | |
| 16. | | | |
| 17. | | | |
| 18. | | | |
| 19. | | | |
| 20. | | | |

Der G. Burnen          149          SCS
(rank)          (name)          (Sh.No.)          (Command)

13

# 5-Year Probation

**PROBATION** from Page 25

Great Neck home. Jesse Friedman, then 19, pleaded guilty in 1988 to 25 counts of sexual abuse and is serving a 6- to 18-year sentence. Arnold Friedman, then 58, pleaded guilty in 1988 to 42 counts of child sexual abuse and federal charges of distributing child pornography through the mail. He is serving 10-30 years.

Goldstein was arrested in June, 1988, and charged with 118 counts of sexual abuse. On the basis of the plea bargain agreement, he pleaded guilty to three counts of first-degree sodomy and one count of using a child in a sexual performance. Boklan rejected the agreement and imposed the harsher sentence despite objections from both the defense and the prosecution.

Attorney Steven Kartagener, who won the Goldstein appeal, declined to comment yesterday, noting that the youthful-offender status requires that the record be sealed.

Boklan told Goldstein that he must get therapy, that he may not work with young children "either on a voluntary basis or paid basis" without the prior consent of the county probation department, and that he was barred from any form of communication or contact with "any complainants in the case."

Boklan denied a request by Assistant District Attorney Joseph Onorato for orders of protection for children who testified before the grand jury.

Noting that the appellate division "has severely limited what I can and cannot do," Boklan said she did not have the power to issue the orders.

But she warned Goldstein that contact with victims or their families would be a violation of probation, carrying "a very heavy price to pay."

Goldstein stood silently as the judge read the conditions. He was escorted to court by his parents.

Later, a parent of one of the abused children said she was "very pleased with the conditions of the probation." Nonetheless, she said she hasn't told her children that Goldstein has been freed from jail.

"I just don't believe I can make them understand that the court system worked for them and this was just one of those things," she said.

*Alvin E. Bessent contributed to this story.*

# Surf and Turf Battle

**SURF** from ...

# Teen Told: Stay Away From Kids

## 5-year probation for released sex offender

**By Shirley E. Perlman**

Ross Goldstein, a Great Neck teenager who had been jailed for sexually abusing children at a neighbor's home, yesterday was ordered to stay away from the victims who testified against him, to have no contact with minors, and to undergo psychotherapy.

The orders were part of the terms and conditions of a 5-year probation imposed yesterday by County Court Judge Abbey L. Boklan in Mineola.

Last year, Boklan sentenced Goldstein to 2-6 years in prison. But Goldstein, 19, was released last month from jail after an appeals court reduced the sentence to 6 months in jail, 5 years' probation and youthful-offender status on the grounds that the sentence violated a plea agreement he made in return for cooperating with the Nassau district attorney's office.



Newsday/W. Richard Haro
Goldstein in 1988

Goldstein was released from the Collins Correctional Facility in Helmuth, N.Y., three days after the Appellate Division of the State Supreme Court in Brooklyn reduced Boklan's prison sentence. The court ruled that the reduced sentence was "in the interest of justice" and what Goldstein bargained for when he agreed to cooperate with the district attorney's office by giving grand jury testimony against his friend Jesse Friedman, who subsequently pleaded guilty to 25 counts of sexual abuse.

Friedman and his father, Arnold Friedman, were arrested Nov. 26, 1987, and ultimately were charged with more than 400 counts of sexually abusing boys age 7-11 during computer classes in the Friedmans'

Please see **PROBATION** on Page 28

**14**

Front of house

Blueprint of lower level of Friedman house

15





UNIVERSITY OF MARYLAND ❀ SCHOOL OF PUBLIC AFFAIRS

# WELFARE REFORM ACADEMY


go

▶ **About Us**

▶ **Publications**
  CHILD CARE
  CHILD DEVELOPMENT &
    HEADSTART
  CHILD WELFARE &
    CHILD ABUSE
  EDUCATION
  ELDERLY
  FAMILY POLICY,
    MARRIAGE & DIVORCE
  FOOD ASSISTANCE,
    FOOD STAMPS & WIC
  TEEN SEX &
    NON-MARITAL BIRTHS
  WELFARE REFORM

▶ **Distance Learning/**
  **Videoconferences**

▶ **Mailing List**

▶ **Contact Us**

☑ E-mail us
🏠 Tell a Colleague

**Publications**

# Lessons from the McMartin Case

By Douglas J. Besharov

*This article originally appeared in The Christian Science Monitor, February 9, 1990.*

RAYMOND BUCKEY and his 63-year-old mother were acquitted of sexually abusing the children in the McMartin Preschool because the jury could not tell whether the children had actually gone through the horrible things they described - or imagined them following the unintentional prompting of adult investigators and therapists.

The Buckey's actual guilt or innocence will long be debated, but even now, the case offers important lessons which might prevent a replay of this tragedy.

1.Parents and other adults must be alert to the possibility of child abuse, but the threat should not be exaggerated. The sexual abuse of children is a serious national problem. But the danger needs to be kept in perspective. According to a study conducted for the US National Center on Child Abuse and Neglect, children are much less likely to be abused in day care than by their own parents.

2.Children must be encouraged to tell about being sexually abused, but inappropriate interviewing techniques can undermine the credibility of their statements. In cases of sexual abuse, where there are often no witnesses and only ambiguous physical indicators, the child's statements may be the only evidence. A child's description of being abused should be pursued vigorously - but with an open mind.

It is not true, as some experts assert, that "children never lie." As the McMartin case demonstrates, for young children the basic issue is whether an interviewer has used suggestive techniques to implant a distorted or untrue idea in the child's mind.

3.Horrifying tales of widespread sexual abuse and satanic rituals should make us skeptical, even if they make titillating reading. Initial reports about McMartin highlighted disgusting tales of animal murder and bizarre behavior which, for months, were reported as

APP.        0486

true, not only by the supermarket tabloids, but by our most
respected news organizations. One child, for example, testified in
the preliminary hearing that he was taken to a cemetery, where he
was forced to help dig up a coffin and watch as the body was cut up
with knives. Even when the investigation failed to corroborate the
children's most grizzly allegations, few asked whether the
assumptions underlying the entire case should be re-examined.

4.The McMartin acquittals do not mean that we have to abandon due
process of law and the presumption of innocence in order to protect
children. As a former prosecutor in the New York City Family Court,
I know how excruciatingly hard it can be to prove child sexual
abuse. The real need, however, is not legal shortcuts but, rather,
well-handled investigations and trials. The McMartin case serves as
a primer of how not to investigate child abuse.

The legal case was compromised at the onset - when the police,
after receiving the first report of possible abuse at the preschool,
sent a letter to the families of 200 current and former students that
read: "Please question your child to see if he or she has been a
witness to any crime or if he or she has been a victim.

The letter went on to say that sexual abuse may have taken place
under "the pretense of 'taking the child's temperature.'" It also
implied that Ray Buckey was the perpetrator.

5.The American jury is our best protection against overzealous law
enforcement. It is hard to imagine a case in which untried
defendants were more unequivocally convicted by the media and the
public. A "lynch-mob syndrome" is what the Los Angeles Times
called it.

Our jury system has recently been much criticized for being old-
fashioned and inefficient. But in watching juries decide controversial
cases like McMartin, one cannot help being impressed by their ability
to avoid passions of the day and to weigh evidence fairly.

6.There must be greater accountability for abuses of prosecutorial
discretion. In order to insure that prosecutors exercise their
discretion free from fear of lawsuits, they have absolute legal
immunity for their decisions. Yet, Peggy Buckey spent two years in
jail; her son nearly five years. And there have been suggestions that
electoral politics played a role in the DA's decisions. Whatever
happened in this particular case, these days prosecutors are too
easily tempted to overreach when a case may make the evening
news. State attorneys general, appellate courts, and bar
associations should be more receptive to citizen complaints of bad
faith prosecution.

Protecting children from sexual abuse requires more than good
intentions. It requires skilled professional intervention, attention to
due process, and common sense. For the sake of all, let's hope that
lesson has been learned.

APP.      0487

Back to top

**HOME - PUBLICATIONS - CONFERENCES - ABOUT US - CONTACT US**

APP.        0488

16

1

1          UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2

3     - - - - - - - - - - -    X

4    UNITED STATES OF AMERICA,  :      CR 87 0742

5         Plaintiff,            :

6          -against-            :
                                       United States Courthouse
7                                      Brooklyn, New York
     ARNOLD FRIEDMAN,           :
8                                      March 28, 1988
          Defendant.            :      10:00 o'clock a.m.
9
     - - - - - - - - - - -    X
10

11                    TRANSCRIPT OF SENTENCE
                BEFORE THE HONORABLE MARK A. COSTANTINO
12               UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:          ANDREW J. MALONEY
                                  United States Attorney
15                                BY: KEVIN O'REGAN
                                  Assistant United States Attorney
16                                225 Cadman Plaza East
                                  Brooklyn, New York
17
     For the Defendant:           JERRY BERNSTEIN, ESQ.
18

19

20   Court Reporter:             Joseph Barbella
                                  225 Cadman Plaza East
21                                Brooklyn, New York
                                  718-330-7687
22

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer-aided transcription.

25

2

1              THE CLERK:   Criminal cause for sentencing, U.S.A.

2     versus Arnold Friedman.

3              MR. BERNSTEIN:   Your Honor, may we approach?

4              (At the sidebar.)

5              MR. BERNSTEIN:   Your Honor, on last Friday Mr.

6     Friedman pled guilty to virtually the entire indictment in

7     Nassau County with the exception of some misdemeanor counts.

8     Judge Bocklin stated that she would sentence him, Mr. Friedman,

9     to a 10 to 30-year period of incarceration.

10             Following that, the Court proceeding, at the

11    suggestion of the Nassau County Police Department, the Nassau

12    prosecutor, Mr. Friedman was invited to go to the offices of

13    Nassau County Police Department to give a closed out statement

14    under the terms where -- in which he would discuss other

15    criminal acts that he may have committed in an effort to aid

16    the Nassau County Police Department in its pending

17    investigation of matters which Mr. Friedman was involved in.

18             Can you wait one moment because the Nassau County

19    Detective is coming up.

20             This is Sergeant Gallasso.  G a l l a s s o.  And this

21    is Joseph Onorato, O n o r a t o, the state prosecutor.

22             As I was telling Judge Costantino, there was a plea

23    and after the plea there was your invitation and Mr. Friedman

24    went to the offices of the police department where he was to

25    give a closed out statement.

3

1          I just explain what that --

2          MR. O'REGAN: Your Honor, may I interrupt? I don't

3    know how -- this is something that should be in open court. I

4    don't know if there is a specific reason for this.

5          THE COURT: I don't know why it's at the sidebar.

6          MR. BERNSTEIN: Because we are talking about the

7    cooperation of the defendant. I think that is --

8          THE COURT: Who is it going to effect the most? Some

9    other children I suppose.

10          MR. O'REGAN: There is no federal cooperation or even

11    state that requires this. I request we do this in open court.

12          MR. BERNSTEIN: I think we are talking about

13    cooperation of a defendant who's going to be incarcerated. I

14    think it's a good idea to do it at sidebar. That's why I

15    suggested -- I am just saying that the matter is still

16    continuing in the state. And even though he has taken a plea

17    the matter is continuing and there may be other matters that

18    may have to come before the Court.

19          MR. O'REGAN: That is not the fact. If these are

20    matters of mitigation of sentence, that should be done in open

21    court.

22          THE COURT: Sure. This is not in mitigation of

23    sentence. I can't take it because it is not before me, number

24    one.

25          The only thing I have before me is the count to which

4

1    he pled guilty.  But in taking into consideration matters of

2    that count I also have to take into consideration all the other

3    factors that are involved in his personal life and the fact

4    that it may involve criminality now that he has pled guilty.

5    And there is no -- or that I am bound by cooperation that might

6    take place.

7         I make that very, very sincerely in knowing my

8    position as a federal judge.  I am not going to get involved in

9    this case.  I have been around too many years to get my shoes

10   laced in the wrong direction.  That means around my neck.

11        Okay.

12        MR. BERNSTEIN:  Judge --

13        THE COURT:  I mean that sincerely.

14        MR. BERNSTEIN:  I haven't made my request.  Could your

15   Honor just hear me?

16        THE COURT:  Sure.  But I am not going to do anything

17   about it.

18        MR. BERNSTEIN:  This is the point.  There was an hour

19   statement given by Mr. Friedman, and I think the county police

20   department would agree was very helpful to them in terms of the

21   investigation that they have been undertaking.

22        We are dealing with a person, as your Honor knows,

23   with mental problem, which is why your Honor has said you are

24   going to send him to Springfield, Missouri for evaluation and

25   study.

JOSEPH BARBELLA    OFFICIAL COURT REPORTER

5

1        THE COURT:  I said I might do that.  I didn't mak  ny

2   determination as yet.

3        MR. BERNSTEIN:  You stated in the record the last

4   time --

5        THE COURT:  Yes.

6        ' MR. BERNSTEIN:  '  t you would send him there before

7   sentencing.

         THE COURT:  Yes.

9        MR. BERNSTEIN:  That s what I understood.

10       THE COURT:  Bu  vou also have a psychiatric report

11   that you failed to serve to t   Court.

12       MR. BERNSTEIN:  I am sorry?

13       THE COURT:  I say, _ u have a psychiatric report that

14   you shoul  ave filed with the Court.  You are not willing to

15   do it, bu  I will take whatever I think is necessary to be

16   done.  But I am going to hear what the arguments are.  I don't

17   make up my mind until I find out what is going on in this

18   court.  I can't speculate about these things.

19       All   ght.

20       (End of sidebar.)

21       THE COURT:  Any just cause or re  on why the defendant

22   should not be sentenced by this Court?

23       MR. BERNSTEIN:  No, your Honor.

24       THE COURT:  Do you take issue with any of the

25   statements in the probation report?  If so, as to which

6

1    statement you take issue.

2         MR. BERNSTEIN:  Your Honor, our view is this.  The

3    last time we were before your Honor for the plea in this case,

4    your Honor stated that quote, and this is on page 3 of the

5    transcript, I will not pass sentence upon him, referring to Mr.

6    Friedman, unless I have that type of a report which, referring

7    to observation and study, to be done in Springfield, Missour.

8         Your Honor, I --

9         THE COURT:  I think at that time didn't you advise the

10   Court that he was under a private psychiatrist's care?

11        MR. BERNSTEIN:  I am sorry?

12        THE COURT:  Didn't you advise the Court likewise at

13   the time that he was under private psychiatr : care?

14        MR. BERNSTEIN:  That's correct.

15        THE COURT:  And generally in criminal cases when there

16   is an individual in private psychiatric care they submit to the

17   Court what the opinion and the diagnosis, or prognosis, or the

18   opinion of the psychiatrist might be so that the Court will

19   have what you call an interested and disinterested psychiatric

20   report to base its determination on.

21        MR. BERNSTEIN:  Your Honor, there's been no report

22   prepared.

23        THE COURT:  I didn't say that there was a report.  But

24   generally one is filed with the Court.  It's unusual where a

25   person has psychiatric treatment with their own personal

JOSEPH PARRELLA     OFFICIAL COURT REPORTER

APP.     0494

1   psychiatrist, and given permission to attend that psychiatrist

2   for the purpose of receiving that treatment or these

3   consultations where it isn't given to the Court, whether it

4   been in camera, no camera, whatever you want to call it, so

5   that the Court will have something to base whatever the opinion

6   may be of the psychiatrist's consultation in the Court's

7   opinion could have reasonable -- some reasonable basis for the

8   statement you might make as to his mental attitude or his

9   mental deficiency.

10   That's what -- if you are going to ask me to look at

11   him as a person with mental problems don't you think it would

12   be proper under the circumstances for you to file -- that you

13   make it available as to the reason why he committed whatever

14   acts to which he has now pled guilty to?

15   MR. BERNSTEIN: First of all, the plea didn't take

16   take place until after 5:00 Friday afternoon. Your Honor had

17   previously stated that your Honor was going to send Mr.

18   Friedman to -- there was no hesitation in your Honor's ruling

19   that you would send -- you said you would not pass sentence

20   upon Mr. Friedman until --

21   THE COURT: I was under the assumption we were going

22   to receive a psychiatric report. When you have a personal

23   psychiatrist who's been treating him for the various -- I

24   suppose mental improprieties that he may have, or mental abuse

25   that he may have, or mental conditions that he may have -- I

8

1   know my psychology very well. I sat in Kings County for seven

2   years as a judge in the State Supreme Court. So none of this

3   is new to me. None of this is new to me. I have all that

4   experience.

5         But I assumed that I would get from the defendant

6   something to give to this Court to rest upon in order to send

7   the matter to a psychological federal institution.

8         MR. BERNSTEIN: Your Honor, I never gave --

9         THE COURT: I don't have to tell you how to practice

10   law. I will tell you that right now. You will be in trouble.

11   Don't place that on me.

12         MR. BERNSTEIN: Certainly I will not.

13         THE COURT: I gave you what I thought was the opinion

14   of the Court. And don't place it on me as to what you thought,

15   because lawyers show should know. I will not accept it from

16   lawyers. It makes it look like it's the judge. I know what I

17   am doing. I don't have any problem with it. None whatsoever.

18         MR. BERNSTEIN: Your Honor, I relied on --

19         THE COURT: Do you wish to submit a psychiatrist

20   report from your own psychiatrist?

21         MR. BERNSTEIN: If it would make a difference in terms

22   of --

23         THE COURT: I don't know that. How can I take --

24         MR. BERNSTEIN: In that case I would.

25         THE COURT: It's like reading a book that hasn't been

9

1  written.

2      MR. BERNSTEIN: I would like that opportunity. And if

3  there is any doubt in the Court's mind as to whether Mr.

4  Friedman should be sent to Springfield, we rely upon the --

5      THE COURT: I didn't say I had a doubt. What I said

6  is that the psychiatrist at the institution should have a right

7  likewise myself to review what type of constitution he has,

8  what type of -- what he has said so they could make a fair and

9  accurate statement as to being incompetent, or schizophrenic or

10  paranoid, or whatever it might be.

11      MR. BERNSTEIN: We are not suggesting he is

12  incompetent.

13      THE COURT: I know you are not. I am sorry I used

14  that word.

15      MR. BERNSTEIN: We would be happy to ask the

16  psychiatrist or psychologist who has seen Mr. Friedman to

17  prepare a written report and forward that report to the

18  psychologist or psychiatrist in Springfield, and to send that

19  to the Court as well, if that would assist the Court.

20      THE COURT: I am not going to adjourn the sentence.

21      Do you have an objection?

22      MR. O'REGAN: I do, your Honor. I have an objection

23  to adjourning this sentence.

24      THE COURT: I am not going to adjourn it.

25      MR. BERNSTEIN: We are not asking that it be

10

1  adjourned.

2  THE COURT: No, I am not going to do that. The

3  defendant is going to be sentenced. If the defense wants to

4  submit some psychological report after sentencing --

5  MR. O'REGAN: Perhaps in context of a Rule 35 motion,

6  of course I have no objection.

7  THE COURT: I am thinking of submitting a -- what I

8  will do here and either after the end of the -- whatever is

9  done this morning as to the sentence that they be permitted to

10  submit it to the Court. And if I send him for study, submit it

11  to the Court and I will send it to the institution where he is

12  going to be sentenced to. But the sentence will not be

13  adjourned.

14  MR. O'REGAN: Thank you.

15  THE COURT: First I must hear what he has to say about

16  sentence.

17  MR. BERNSTEIN: I take it, then, your Honor's previous

18  statement when we were in court wherein you said you would not

19  pass on sentence until the evaluation and study, is your Honor

20  saying something different?

21  THE COURT: I want to hear your allocution. I am not

22  going to -- first I want to hear your allocution to what you

23  say should happen to Mr. Friedman. What you think about

24  sending him to an institution for the purpose of psychiatric

25  evaluation is --

JOSEPH BARBELLA      OFFICIAL COURT REPORTER

11

1        MR. BERNSTEIN:  This is our view of sentencing.  We

2   believe that in light of the state sentence Mr. Friedman is

3   expected to receive that it would be beneficial to Mr.

4   Friedman's therapeutic care, since there are federal facilities

5   which are better equipped to deal with the kind of problems

6   that Mr. Friedman has, that Mr. Friedman be sentenced, and as

7   the prosecutor has already requested, but for different reasons

8   than the prosecutor requested, to be a ten-year jail sentence.

9        So we do not in that sense oppose the government's

10   request in that regard.

11        THE COURT:  Well, one of the reasons that I am asking

12   you to send in your personal psychiatrist report is that the

13   Court has received numerous letters, well over three or four

14   hundred, maybe five hundred letter as to what they expect of

15   Mr. Friedman as far as sentence is concerned.

16        I have receive also some letters which have been sent

17   in his behalf from other students that were in high school,

18   that he taught them in high school, and I received some letters

19   from other persons.  But nowhere in the volume that were sent

20   by private citizen  as to what they feel the sentence should be

21   with reference to Mr. Friedman.

22        But I will not base my sentence on letters that I

23   receive.  I base the sentence on what you say, as far as your

24   understanding of the defendant and what you feel are mitigating

25   factors in his behalf.  And that must be done now.

12

1           MR. BERNSTEIN:  The mitigating circumstances are as

2   follows.  Mr. Friedman faced with an enormity of charges in

3   Nassau County chose of his own volition this past Friday

4   afternoon to enter a plea of guilty to each and every felony

5   count, some 40 odd counts.

6           THE COURT:  When you say chose of his own volition,

7   you are not telling me that he just decided he is going to

8   plead guilty to such charges and that he did so not because he

9   is guilty, but just because he is going to help the public?

10          MR. BERNSTEIN:  I said of his own volition.

11          THE COURT:  I know.

12          MR. BERNSTEIN:  It was his decision.

13          THE COURT:  What you're saying -- what I would like to

14   know is that he pled guilty because he was guilty.

15          MR. BERNSTEIN:  Of course, that is --

16          THE COURT:  That's what I want to know.

17          MR. BERNSTEIN:  That's the only way a defendant can

18   plead.  Unless it's a plea under North Carolina and that's not

19   the case here.

20          THE COURT:  All right.  I wasn't there.

21          MR. BERNSTEIN:  He allocuted to the --

22          THE COURT:  Remember, counsel, I was not in the state

23   court when he took the plea, nor when the court --

24          MR. BERNSTEIN:  He pled.  It was the standard.  It was

25   not a North Carolina --

13

1       THE COURT: One other thing. When he gave the
2  allocution as to his admission of the 49 counts that he pleaded
3  guilty to, because I read a synopsis of it somewhere, the 49
4  counts --

5       MR. BERNSTEIN: It was in that range, in that area.
6       THE COURT: Okay.

7       MR. BERNSTEIN: Following the plea Mr. Friedman went
8  voluntarily to the Nassau County Police Department where he
9  made a lengthy statement.

10      THE COURT: What I would like to know and what I would
11 like to get out of you are any mitigating circumstances to be
12 considered, as is the defendant's right to have something said
13 about him that sort of increases his right to have a lesser
14 sentence than he would ordinarily get.

15      That's what we are talking about in mitigating
16 circumstances. I would like to know that.

17      I was not in the state court. I cannot hear his
18 plea. I don't even know what the indictment charges, except
19 what I read in the newspaper now and then. That's all I know.
20 And I would never take issue with that in this court nor was it
21 to be made a statement in this court.

22      MR. BERNSTEIN: I know it sounds strange, but
23 mitigating in terms of Mr. Friedman in the federal case would
24 not be reflected by your Honor reducing the sentence.

25      THE COURT: Any acts that he had committed in

JOSEPH BARBELLA        OFFICIAL COURT REPORTER

14

1   violation of law are no different than the acts that are placed

2   in the probation report as to his -- as to crimes he

3   committed.  Even acquitals, they would still stay as crimes he

4   committed for the Court to determine as to what would be a

5   proper sentence under the circumstances.

6        MR. BERNSTEIN:  Your Honor, as I stated earlier in

7   light of his expected sentence, we would concur with the

8   government's recommendation.

9        THE COURT:  The government can't tell me how to

10  sentence.  They gave me a letter saying they wanted ten years.

11  That's admissible.  I will take that.  That doesn't mean that

12  he is going to -- I still have the control over sentence.  I am

13  not under the guidelines in this case.  They haven't taken my

14  discretion away from me yet.

15       MR. BERNSTEIN:  Your Honor, the mitigating --

16       THE COURT:  They will as soon as they get all the

17  guidelines.  They are going to send them down to Congress.

18       MR. BERNSTEIN:  Mitigation in this case --

19       THE COURT:  Okay.

20       MR. BERNSTEIN:  In our view mitigation in this case

21  would be Mr. Friedman being placed, as I said earlier, in a

22  federal institution where he could receive therapeutic

23  assistance.  That's our view in order to better -- that there

24  are better facilities and that we would ask the Court to

25  sentence Mr. Friedman to the maximum ten-year jail sentence in

15

1    this case, and to do designate Mr. Friedman to a facility such

2    as Springfield where Mr. Friedman could be evaluated, and then

3    later sent to federal facility where he could best serve his

4    jail sentence.

5         So in that sense the government and I or Mr. Friedman

6    agree on the jail sentence.  And if your Honor is looking for

7    the reason for that, it would be Mr. Friedman has, as I started

8    to say after the --

9         THE COURT:  I don't see any difficulty with you

10   agreeing to a ten-year sentence under the circumstance,

11   agreeing to a concurrent sentence in the state.

12        MR. BERNSTEIN:  That's correct, your Honor.

13        THE COURT:  I know it's correct.

14        MR. BERNSTEIN:  That's what your --

15        THE COURT:  I know what the bottom line to it is.

16        All right.  I am not going to do that.  No one is

17   going to tell me how the sentence should be served and where

18   it's going to be served, anymore than I will tell a state court

19   judge how to sentence and how they are going to serve their

20   sentence.

21        MR. BERNSTEIN:  Our request is that Mr. Friedman

22   following his plea in the state went to the police station

23   where he was debriefed for some period of three hours or more

24   concerning activities in addition to those to which he already

25   pled guilty.

16

1      And I think if your Honor wishes to question the
2  sergeant from the police department who --
3           THE COURT:  No.
4           MR. BERNSTEIN:  Who took Mr. Friedman's statement,
5  which incidentally was recorded by a court reporter.  Her name
6  is Sergeant Frances Gallasso.
7           I think your Honor would hear support for the
8  statement I am making, which simply is that Mr. Friedman
9  provided extremely valuable information to the Nassau County
10  Police Department in connection with their continuing
11  investigation.
12           And that information, your Honor, was information that
13  he gave voluntarily.  He did not have to give it.  It was well
14  beyond any charges that were pending against him.
15           The information he gave was of enormous value,
16  enormous value to the police department, enormous value to the
17  people of Nassau County, and what we are asking your Honor to
18  do in light of the fact that Mr. Friedman is now beginning on
19  the road back in terms of rehabiliation and therapy that your
20  Honor permit Mr. Friedman to have that opportunity.
21           He certainly is going to be incarcerated for an
22  extraordinary long period of time and we ask the Court to use
23  it's good offices in permitting Mr. Friedman to be in the kind
24  of a facility where he could continue that therapeutic
25  process.  And it's a process that I think your Honor has seen

JOSEPH BARBELLA      OFFICIAL COURT REPORTER

1   clearly being commenced last Friday.

2        If your Honor wishes us to submit a further report

3   from a psychiatrist, psychologist in addition to what I am

4   stating the morning we would be pleased to do that.

5        But I think, your Honor, the events of last Friday

6   speak more eloquently about what is happening in this case and

7   I would ask your Honor -- and if your Honor would desire to ask

8   Sergeant Gallasso about what happened on Friday and --

9        THE COURT:  No, I will not ask that.  That is strictly

10  within their own province.  It is a state matter that this

11  court should not be involved in.  I know he has pled to

12  whatever he did.  And what he did after he took the plea should

13  be given to the judge in the state court for mitigating

14  purposes.  That's not for me.

15       MR. BERNSTEIN:  We are asking, your Honor -- we are

16  asking that I document the mitigating factors and that's what I

17  am doing.  I am telling your Honor that Mr. Friedman provided

18  valuable information in the context of an investigation which

19  is most pressing.

20       Now, in terms of the federal case, your Honor, there

21  were efforts early for Mr. Friedman to assist the federal

22  government in its investigation of the distribution and

23  manufacture of child pornography.

24       It is perhaps unfortunate, but fortunate in another

25  regard that Mr. Friedman is not -- and I think the government

JOSEPH BARBELLA      OFFICIAL COURT REPORTER

18

1   has not contested that he is not a manufacturer, is not a
2   distributor.

3           THE COURT:  Outside of his own personal use he did not
4   economically profit from the --

5           MR. BERNSTEIN:  I think that is exactly the kind of
6   defendant that stands in front of the Court at this time, an
7   individual who has a private -- he has a private obsession.  He
8   cannot give the government information about the vast network
9   of manufacturing of child pornography.

10          THE COURT:  But he was found with lots of other
11  pornography books.  He is only charged with one.

12          But I found as I read one of the reports somewhere
13  about a stack of -- about maybe a foot and a half, two, three
14  feet.

15          And this Court is familiar with those pornography
16  books because of the hearings I hold on the ones that are taken
17  by Customs when they come into the United States.  The books
18  run no thicker than a quarter of an inch, maybe a little less.

19          And if you take three feet of pornographic books at
20  less than a quarter of an inch you would have say a minimum of
21  a total of maybe five hundred, maybe 4 hundred, maybe three
22  hundred and fifty.

23          MR. BERNSTEIN:  I think if we could ask the --
24          THE COURT:  Pretty close.  Agent McDermott could tell
25  us how many books were seized.

19

1        MR. O'REGAN:  Your Honor, we are not hearing evidence
2    on the --
3        THE COURT:  I am just telling you I don't want it.  I
4    know he had a stack.
5        MR. O'REGAN:  Your Honor, it was not three feet.  It
6    was about a foot.
7        THE COURT:  About a foot.  Okay.
8        MR. BERNSTEIN:  I don't think it was any more than
9    five hundred pages.  I don't know.  I don't think that is
10   significant.  I think what is significant --
11       THE COURT:  It is only significant from the standpoint
12   of view rather than of my making an assessment as to what I
13   should do with him today.
14       MR. BERNSTEIN:  Your Honor, it is significant in our
15   view as to --
16       THE COURT:  I haven't --
17       MR. BERNSTEIN:  This is a man with private obsession.
18       THE COURT:  May I say something to you?  I am only
19   looking at the point of whether the pornography magazines are
20   the consequence that gave him the incentive to practice the
21   abusiveness they did.
22       MR. BERNSTEIN:  Didn't give him the incentive.
23       THE COURT:  Something.
24       MR. BERNSTEIN:  They were a reflection of what is an
25   emotional problem.

20

1    THE COURT: Reflection as opposed to incentive. You

2    can do that. But being a professional individual I wouldn't

3    say it's reflective. I would say obsessive type. There is a

4    distinction between the two words.

5    MR. BERNSTEIN: Judge, I am --

6    THE COURT: It hate to get grammatical, but I can't

7    help it here.

8    MR. BERNSTEIN: What I am saying is the presence of

9    the magazines was just another indication of Mr. Friedman's

10   problem. That's all. Nothing more than that. But he was not

11   a manufacturer. There's never been any --

12   THE COURT: Definitely.

13   MR. BERNSTEIN: Or that he used any of these children

14   to manufacture.

15   THE COURT: Might have put them on computer.

16   MR. BERNSTEIN: I am sorry?

17   THE COURT: Might have been on the computer that he --

18   didn't he have computer that he dubbed in?

19   MR. O'REGAN: Yes.

20   THE COURT: Some of these abusive materials.

21   MR. O'REGAN: Yes.

22   THE COURT: What do you call that? That's

23   manufacturing. That may not be what you call profiting, but it

24   sure is manufacturing.

25   MR. BERNSTEIN: No, your Honor. If I may interrupt?

21

1          THE COURT:  What do you call it?

2          MR. BERNSTEIN:  It was not that.  He had it in his

3     possession.  He was so charged in Nassau County with having

4     pornographic computer disks.

5          THE COURT:  Yes.  Some of which he put -- he gave the

6     input that he gave that software.  As we call it, input of the

7     abusive material.

8          MR. BERNSTEIN:  No, that is not correct.

9          THE COURT:  That's not true?

10         MR. BERNSTEIN:  I see.  Okay.  If that is in, we --

11         THE COURT:  Didn't he dub it in with some of the

12    material?  Didn't he dub it in as some material that he was

13    teaching with -- as computer software that he was --

14         MR. BERNSTEIN:  No, your Honor, he did not.

15         THE COURT:  Let me hear from Mr. O'Regan.

16         MR. O'REGAN:  There were the statements of the boys

17    that Mr. Friedman abused and sodomized which indicated that

18    when they would go into the classroom to the computer screens,

19    there were occasions when pornographic materials were depicted.

20         THE COURT:  That's what I read.

21         MR. O'REGAN:  On the screen itself.

22         MR. BERNSTEIN:  That's right.  But he didn't

23    manufacture those screens as if you lifted the magazines out.

24    We are not contesting the -- I am saying that he didn't

25    manufacture.  These were disks like the magazines.  There were

JOSEPH BARBELLA     OFFICIAL COURT REPORTER

22

1    very few in number.  We are not contesting that.

2              MR. O'REGAN:  We don't know where those disks came

3    from, whether he bought them or whether he programed them in

4    himself.

5              MR. BERNSTEIN:  Your Honor --

6              THE COURT:  I understand.  A misunderstanding can be

7    had by a judge.  No judge is infallible.  My understanding is

8    that he had dubbed them in through the regular disks.

9              MR. BERNSTEIN:  No.  They are commercially available.

10             THE COURT:  Inbetween the --

11             MR. BERNSTEIN:  Those are commercially available

12   computer disks that one can buy.  So that there is nothing

13   that --

14             THE COURT:  I can be wrong.

15             MR. BERNSTEIN:  There is also not child pornography

16   that --

17             THE COURT:  I might have misread it.  I can be wrong.

18             MR. BERNSTEIN:  They are not computer disks.  The

19   written material was far more offensive, your Honor, than

20   the --

21             THE COURT:  I have been through loads of these.

22             MR. BERNSTEIN:  Much more offensive than the computer

23   which is very crude in nature.  As I said it's commercially

24   available.

25             So the situation then, your Honor, is such that as I

JOSEPH BARBELLA        OFFICIAL COURT REPORTER

23

1    said there is really no cooperation of Mr. Friedman that he

2    could have provided to the federal government.  There was an

3    attempt made early on and he gave small bits of information, as

4    best as he could, as to where he purchased these.

5         And Mr. O'Regan in all candor said that that really

6    was not of any use because the federal government knew about

7    that.

8         Well, that was not Mr. Friedman's fault.  Obviously he

9    can't tell them because he doesn't know any more.  The

10   situation was radically different in Nassau County on Friday, I

11   would submit.  And I submit that your Honor should give credit

12   in terms of mitigation to Mr. Friedman for the efforts that he

13   made.

14        THE COURT:  You just consented to ten years.  Now you

15   want me to give him credit.  How do I do that?

16        MR. BERNSTEIN:  By sentencing him to ten years in a

17   federal facility.  That's what we are --

18        THE COURT:  Concurrent?

19        MR. BERNSTEIN:  Your Honor doesn't have to say

20   anything about concurrent.  Your Honor simply has to sentence

21   him to ten years.

22        MR. O'REGAN:  That can cause the state judge to concur

23   on the --

24        THE COURT:  He will be on there on the state --

25        MR. BERNSTEIN:  I am sorry?

JOSEPH BARSELLA     OFFICIAL COURT REPORTER

24

1          THE COURT:  My sentence can be given to him, then the

2     state gives him concurrent, then we are really in trouble.

3          MR. BERNSTEIN:  You are not in trouble.  That's what

4     the understanding was of what would happen.

5          THE COURT:  But I wasn't there.

6          MR. BERNSTEIN:  I understand.

7          THE COURT:  It's like controlling the --

8          MR. BERNSTEIN:  Judge, we certainly are not trying to

9     control the federal court.

10          THE COURT:  In any event I have my own way of doing

11     this.

12          First of all, Mr. Friedman, do you have anything to

13     say?

14          MR. BERNSTEIN:  There were some other points in the

15     report.

16          THE COURT:  Does he rest on his own statement?

17          MR. BERNSTEIN:  Your Honor, there are some things in

18     the report which we should address.

19          THE COURT:  Which?

20          MR. BERNSTEIN:  Presentence report.

21          THE COURT:  I asked you about that when we started.

22     That's exactly what I asked you.

23          MR. BERNSTEIN:  We are not getting to that, your

24     Honor.  I just wanted to look through it.  Before we leave that

25     subject, your Honor, there is one point.  It's insignificant I

JOSEPH BARBELLA       OFFICIAL COURT REPORTER

25

1    suppose, but in the interest of accuracy it should be

2    corrected.

3              THE COURT:  What is that?

4              MR. BERNSTEIN:  On page 2, the last word on that line

5    says, quoting, I have none to see.  I believe that word should

6    be sell.

7              MR. O'REGAN:  That's correct, your Honor.

8              THE COURT:  I see.  Okay.

9              MR. BERNSTEIN:  Then on page 3, 9 lines from the top

10   of the page, your Honor.  On page 3 there is a reference made

11   to two pornographic photos sent to Mr. Friedman.  The same

12   reference is made on page 4.

13             THE COURT:  Where is that again?

14             MR. BERNSTEIN:  Nine lines from the top of the page.

15             THE COURT:  Nine lines.

16             MR. O'REGAN:  I don't know what the factual

17   inaccuracies are.

18             MR. BERNSTEIN:  I don't believe there were

19   pornographic --

20             MR. O'REGAN:  Yes, they were.

21             MR. BERNSTEIN:  I seen the photos that were --

22             THE COURT:  Don't argue before me the --

23             MR. BERNSTEIN:  Perhaps we could ask Agent McDermott.

24             AGT. MC DERMOTT:  Yes, they were.

25             THE COURT:  All right.

26

1    MR. BERNSTEIN:  Well, those are our objections, your

2    Honor.

3        THE COURT:  Okay.

4        MR. O'REGAN:  I have a correction.

5        THE COURT:  Let me have it.

6        MR. O'REGAN:  In light of what Mr. Bernstein has just

7    said I am surprised he hasn't brought it out before that it is

8    the defendant's version.

9        MR. BERNSTEIN:  I think that should be followed by --

10       THE COURT:  What page?

11       MR. O'REGAN:  Page 6, your Honor.

12       MR. BERNSTEIN:  I was going to get to that.

13       THE COURT:  Second paragraph?

14       MR. O'REGAN:  The defendant indicates that he

15   emphatically denied acting out or being involved in any way in

16   child abuse or with the state charge, and in fact of course he

17   pleaded guilt.

18       MR. BERNSTEIN:  We ask that to be changed.  We ask

19   that it be changed to Mr. Friedman.

20       THE COURT:  Where is that?  I have this page.

21       MR. O'REGAN:  Your Honor, it's the bottom paragraph of

22   page 6.  With regard to the pending Nassau County charges the

23   defendant asserts without equivocation that they are totally

24   untrue.  Of course he was not telling the truth when he said

25   that to the pretrial --

27

1    MR. BERNSTEIN: He didn't say it to pretrial services.

2    THE COURT: This is prior.

3    MR. O'REGAN: The probation officer.

4    THE COURT: That's prior to the plea.

5    MR. BERNSTEIN: He didn't. That's right. So we would

6    ask that that be modified.

7    THE COURT: Prior to the plea.

8    MR. BERNSTEIN: Could we --

9    THE COURT: He pled guilty. This was the statement

10   following his plea of guilty to the probation department

11   prepared by the defendant and his attorney.

12   MR. BERNSTEIN: We ask that that sentence be modified

13   to indicate that Mr. Friedman has admitted his involvement in

14   that Nassau County charge.

15   MR. O'REGAN: I ask only that a new sentence be added

16   that after plea in this state change the defendant now admits

17   them. But I think it's important that it be indicated in that

18   report that he lied to pretrial services.

19   MR. BERNSTEIN: He did not speak to pretrial services.

20   MR. O'REGAN: The probation --

21   MR. BERNSTEIN: That is not correct. He never spoke

22   to pretrial services. These are statements made by counsel

23   based on a not guilty plea.

24   THE COURT: Nassau County believes without

25   equivocation that they are totally untrue.

28

1            MR. BERNSTEIN:  Judge, that was --

2            THE COURT:  I will add totally untrue prior to the

3  plea, now admitted.

4            MR. O'REGAN:  That's fine.

5            THE COURT:  Sure.  Not on your plea.  Prior to the

6  state plea.  Does that --

7            MR. BERNSTEIN:  What is important is this was not Mr.

8  Friedman's statement to anybody in pretrial.  This was my

9  statement to pretrial services based upon Mr. Friedman's plea

10  of not guilty in Nassau County which existed until Friday and

11  there is --

12           THE COURT:  That may be true, but the words themselves

13  are not what you would call legalistic words.  Legalistically

14  is that he pleaded not guilty.

15           MR. O'REGAN:  This was not --

16           MR. BERNSTEIN:  That's my understanding.  It shouldn't

17  be held against Mr. Friedman because it was not his statement.

18  It was my statement.

19           MR. O'REGAN:  I wonder where the phrase in the middle

20  of page 6, the defendant vehemently denies quote acting out

21  unquote, for example, sexually abusing any of the students in

22  his computer class.

23           I can't imagine that if this was a technical assertion

24  that Mr. Bernstein --

25           MR. BERNSTEIN:  When one enters a plea of not guilty

29

1    and asks for jury trial that is vehemently a way of saying, not
2    guilty.  I didn't do it.

3          That's a lawyer's statement.

4          THE COURT:  When he enters a plea of not guilty, what
5    he's saying is, I am presumed innocent under the law and the
6    government will have to prove or the state has to prove it.

7          That's what it is, not vehemently denies.  It's a
8    presumption which he's entitled to under the law as to the
9    presumption of innocence.

10         Even if they are guilty and they are represented by
11   lawyers they try their case.  And if the jury finds them
12   guilty, that's it.  If not, the presumption doesn't change.
13   They're acquitted.  It's not a vehement denial.

14         In my court he can get up and say I really deny any
15   part of this.  He didn't say that.  What he said was, I am not
16   guilty.

17         MR. BERNSTEIN:  So what I am saying, your Honor, is
18   that's my word.

19         THE COURT:  I am not going to get into semantics of
20   words.  I will do it my way.  That the statement is totally
21   untrue prior to state plea, now admitted.

22         MR. O'REGAN:  That's fine.

23         MR. BERNSTEIN:  Could we add also the fact of his last
24   statement to police.

25         THE COURT:  No.  Nothing to do that with.

30

1        MR. BERNSTEIN:  Excuse me?

2        THE COURT:  Nothing to do with that.  Now admitted.

3        MR. BERNSTEIN:  That is a presentence report.

4        THE COURT:  I understand.  This was made prior to

5  coming into my court.  It doesn't make any difference that it

6  was made prior to the state court.  And I will accept it that

7  way.

8        All right.

9        MR. BERNSTEIN:  We would ask again, your Honor, that

10  your Honor make note it is only a sentence to be added in there

11  following the statement, state plea.  Just one sentence

12  following state plea.

13        THE COURT:  I already said prior to the state plea he

14  said they were untrue and now it's admitted.

15        What more do you --

16        MR. BERNSTEIN:  You can say that the --

17        THE COURT:  I like my words.  I always like the words

18  I use.  For some reason they always seem to be upheld by

19  whoever is arguing.

20        I am not playing lawyer here.  I am just playing

21  judge.  As long as you say, as an act, I might as well do that,

22  too.

23        All right.

24        MR. BERNSTEIN:  We are just asking.

25        THE COURT:  Now Mr. Friedman has a right to make a

31

1    statement.  If he doesn't want to, he may rest on your

2    statements that have been made to the Court.

3          THE DEFENDANT:  I request the Court to provide me with

4    some assistance with my problem.

5          THE COURT:  I am sorry?

6          THE DEFENDANT:  I'm asking the Court to assist me, to

7    help me with my problems.  I am sorry for my action.

8          THE COURT:  You realize that you caused a tremendous

9    amount of acrimony in a town known as Great Neck.

10          THE DEFENDANT:  Yes.

11          THE COURT:  You realize that the persons' lives that

12   you have effected are young lives whose mental attitudes are

13   effected.  And to have a professional, an individual who gets

14   in with young people all of your life and to have this type of

15   abuse on children is something that doesn't leave them for many

16   years.

17          As a matter of fact, I am sure you know what the

18   statistics show as to the future of children that have been

19   abused by their parents or by outsiders.  I am sure you know

20   that, too.

21          I don't have to place that into your mind.  You know

22   what I am talking about.

23          Situations become difficult for them whereas

24   ordinarily they would have no difficulty with them.  You know

25   that, don't you, Mr. Friedman?

JOSEPH BARBELLA ·    OFFICIAL COURT REPORTER

**APP.    0519**

32

1          THE DEFENDANT:  Yes.

2          I also humbly request that I be allowed to voluntarily

3    surrender to Springfield.

4          THE COURT:  What?

5          MR. BERNSTEIN:  I humbly request to be allowed to

6    voluntarily surrender to the Springfield facility.

7          THE DEFENDANT:  This week is a holiday week in my

8    religion and we take it all very seriously.

9          THE COURT:  What do you have to say?

10         MR. O'REGAN:  Quite a few things.

11         THE COURT:  All right.  That's why we are here.

12         MR. O'REGAN:  This case cries out for the maximum

13   sentence and the maximum fine.  And the government in its

14   letter now before you respectfully recommends that in that

15   sentence the maximum sentence be imposed.

16         First I want to respond to a couple of things that Mr.

17   Bernstein has said, primarily concerning the production of

18   child pornography and I will preface it by saying the

19   government has no evidence that Mr. Friedman sold child

20   pornography as a distributor.

21         But we do know, your Honor, that he keeps these

22   pornographic computer disks which I previously described to you

23   in the bail hearing and gave these to 8 and 12-year old boys to

24   bring home so that they could use them on their own personal

25   computers.

33

1    So he didn't just viciously violate them in his

2    basement.

3    THE COURT:  Isn't that one of the bases for the --

4    that was one of the things that came out in the --

5    MR. BERNSTEIN:  No, your Honor, that is not the --

6    THE COURT:  No?

7    MR. O'REGAN:  Those are things which came afterwards.

8    In addition, your Honor, when Mr. Friedman and his son

9    took photographs of the boys that they abused and sodomized in

10   the actual process of sodomizing the -- in other words, one of

11   them would be sodomizing a little boy and the other would be

12   shooting pictures of him.

13   Now, in all of this talk about a statement on Friday

14   and that was something that Mr. Friedman continued to

15   vehemently deny and so we have pictures floating out there of

16   little boys being sodomized.  We don't know where.  And Mr.

17   Friedman won't tell us.

18   So we do have a personal production of child

19   pornography and it's something that the investigation of which

20   has been stymied.

21   Now, of course, this is a very serious crime, your

22   Honor, and we know that Arnold Friedman used the children

23   pornography that he received in the mail to seduce and to bring

24   into the fold these young boys.

25   But before we get to those boys we also have the kids

34

1    that are in the child pornography itself, the children that are

2    pictured in the children porography.  And it's those people,

3    those little children that the child pornography laws are

4    enacted to protect.

5              And this is precisely the kind of a case which cries

6    out for the enforcement of those laws which is important to

7    limit the demand for children pornography, and hopefully some

8    day to limit its production and to limit the exploitation of

9    children.

10             But beyond that in this case, of course, we have the

11   use of that child pornography to go after, the actual sexual

12   abuse of the little boys that Mr. Friedman has lured into his

13   trust and affection.

14             And I think that is well documented, your Honor, by

15   the copy of the -- the statement of one of the little boys that

16   I annexed to my sentencing letter.

17             I can think of no more graphic way to explain to your

18   Honor what happened in the basement of that home than to refer

19   you to that statement in which that little boy talks about the

20   computer forms on the screen.  He talks about the child

21   pornography left in the bathroom for the children to read and

22   he talks about the horrible way in which Arnold Friedman

23   attacked, abused and sodomized the boys in his class.

24             So, your Honor, this is a case for you to exercise

25   your broad discretion.  I believe that this is a case for you

35

1   to exercise your wisdom as a judge and to say this is a man

2   that must be punished.

3          Now, Mr. Friedman in an effort to get more hospitable

4   accommodations is willing to agree to the ten-year sentence

5   because that of course will be a minimum sentence under his

6   state plea.  So that if your Honor sentences him to ten years

7   he hopes then to spend it in a federal facility rather than one

8   of our state facilities.

9          But I also think that a fine is very important in this

10  case.  I think that a fine is what will be real punishment here

11  because it will tell Mr. Friedman you can't manipulate the

12  system and serve your sentence wherever you please in a more

13  hospitable federal facility, but we are also going to punish

14  you in the pocketbook.

15         We are going to make this a very meaningful sentence

16  and we are going to punish you and we are going to tell the

17  other child sodomizers, other people who seek to send and

18  receive children pornography in the mail that they will be

19  punished severely if they are caught.

20         So I ask your Honor to impose not only the maximum

21  jail term of ten years, but also the maximum fine of two

22  hundred and fifty thousand dollars.

23         Finally, your Honor, I want to respond to Mr.

24  Friedman's own request that he be permitted to surrender

25  voluntarily.  The government in the most emphatic terms opposes

36

1    that request and urges your Honor to have the defendant

2    committed immediately.

3         The reason for that, your Honor, is that Mr. Friedman

4    is in addition to the sexual violence that he committed upon

5    these little boys, he also threatened them in some horrible

6    way.  It doesn't really come out in the statement that I

7    annexed to my letter because it was not one of the boys in

8    which these threats were quite as emphatic.

9         But the other statements of the other boys, your

10   Honor, indicate that Mr. Friedman banged the head of one of the

11   boys against the wall and then said to the other kids in the

12   room, that's going to happen to you if you talk.

13        He also told them that he would kill their parents or

14   other relatives if they spoke.  And he talked about setting

15   fire to their houses at night so that he could kill their

16   parents.

17        These, of course, are very significant things when

18   said to 8 and 9 and 11-year olds.  And it's a graphic example

19   of that little boy who made that statement that I annexed to

20   the sentencing letter.  I spoke to his father yesterday.  They

21   were having some trouble with the son.  He was getting into

22   arguments with his parents.

23        Finally they sat him down and it came out that the

24   little boy is terrified that Arnold Friedman isn't in jail.

25   And finally the father was able to have the little boy explain

1   that Mr. Friedman told me he was going to kill you and mom.

2          And everything that Arnold Friedman predicted for that
3   little boy has come true so far.

4          Arnold Friedman said that the computer class would end
5   if he got caught or if the kids talk.  He said that little boy
6   would get in trouble.

7          And that little boy thinks he's in trouble because he
8   has had to go to the grand jury.  And obviously he's read a lot
9   of negative things about this.

10         So the things that he's predicted have come true and
11  the kid is terrified that the next thing, that his parents are
12  going to be killed, is going to happen.  And the only way we
13  can stop that and stop the terror and horror that is going on
14  and the hurt in all of these children's hearts that attended
15  Mr. Friedman's computer class is by having him remanded
16  immediately.

17         The statement about religious observation and therapy
18  are ridiculous.  Mr. Friedman does not belong to a temple in
19  Great Neck.  Mr. Friedman has never, at least in the recent
20  past, been religious.

21         And with respect to his therapy, Mr. Friedman will be
22  in for a long term of therapy in prison.  He can start it and
23  continue it there.  But this is merely another opportunity to
24  try to manipulate the system, and in particular this Court, for
25  a little bit more freedom when this is the day when his freedom

38

1     must end.

2          And the government asks that he be committed with the
3     maximum sentence at this time.

4          MR. BERNSTEIN:  May I speak?

5          Your Honor, the government has been taking the
6     position from the early days of December at the time of the
7     pretrial detention hearing that Mr. Friedman should be
8     incarcerated in the Metropolitan Correctional Center.

9          And, indeed, after the Court of Appeals decision and
10    our last appearance before your Honor, your Honor stated that
11    you were going to send Mr. Friedman to Springfield.

12          The prosecutor, Miss Nordenbrook, attempted to change
13    the government's position rather than agreeing to continue
14    house arrest until the date of sentencing, asked the Court to
15    send Mr. Friedman immediately to Springfield.

16          And it was in your Honor's wisdom at that time that
17    your Honor chose to continue Mr. Friedman in house arrest that
18    he had been under to-date.  Had the Court not in its wisdom
19    followed the government's request and incarcerated Mr.
20    Friedman, I venture to say that we wouldn't be in the position
21    now where Mr. Friedman had pled guilty in Nassau County at a
22    relative early stage in the proceeding in Nassau, a trial being
23    set there for January 9.

24          So this plea has come very early in the proceedings.
25    And the debriefing which took place after the plea which was

39

1    extraordinary useful to the prosecutor and the People of Nassau

2    County would never have taken place.

3         And it was only through your Honor's wisdom in

4    permitting Mr. Friedman to stay out of the -- but this was

5    really an extremely onerous condition of solitary confinement

6    condition that permitted Mr. Friedman to have consultation with

7    counsel, members of his family, various therapists and experts

8    to reach the point of finally last Friday of entering the plea

9    of guilty and then making the statement that he did to Nassau

10   County.

11        I think if we followed the government's knee-jerk

12   action of incarceration for Mr. Friedman back in December and

13   keeping him there forever and forever we would be facing a

14   lengthy trial trial.

15            THE COURT:  I can tell you --

16            MR. BERNSTEIN:  January 9 was --

17            THE COURT:  His case would be one of the first cases

18   that would have been tried.  He would have been tried in

19   January or February at the latest.

20            MR. O'REGAN:  You set the trial date.

21            MR. FRIEDMAN:  I'm not talking abou the federal case.

22   I am talking about the state case.

23            THE COURT:  I know.

24            MR. BERNSTEIN:  January 9 was the trial date in that

25   case.

40

1    THE COURT: I did not agree with the circuit court.

2   They know I am very outspoken. I never run away from these

3   things. I didn't agree. I remanded the defendant to jail.

4    The case was submitted to me and I felt that he should

5   have been remanded to jail at that time. Not that I was trying

6   to second guess it, because the Court of Appeals said so.

7   Rather than it causes more problems and not the case -- not the

8   posture where it could proceed forward and I did what I thought

9   was necessary under the circumstances.

10    MR. BERNSTEIN: I think that your Honor --

11    THE COURT: I don't say that my action in the first

12   instance was error. They may have, but --

13    MR. BERNSTEIN: Our point is not --

14    THE COURT: They like that when I say that.

15    MR. BERNSTEIN: Our point is that the time your Honor

16   had Mr. Friedman in house arrest between the date that he

17   pleaded guilty and today's date, those seven weeks were

18   extremely important.

19    The statement that Mr. O'Regan is making about threats

20   and so, what is significant is that none of that has taken

21   place during the period that he's been under house arrest.

22    THE COURT: Thank God.

23    MR. BERNSTEIN: I mean that the --

24    THE COURT: If you believe in a God you will have to

25   thank him for that. Because it's His blessings, not mine, not

1   Mr. Friedman's, not yours or anybody else.

2           MR. BERNSTEIN: Your Honor, Mr. O'Regan's point we

3   would submit is of no relevance because what he was talking

4   about long predated the date of Mr. Friedman's arrest.

5           As to the production of child pornography, we submit

6   that never occurred. That, indeed, if there were the

7   distribution as Mr. O'Regan would have you --

8           THE COURT: What do you say the photographs are?

9           MR. BERNSTEIN: There are no photographs. There is no

10  evidence of distribution. We would submit that since the

11  postal inspectors in an undercover --

12          THE COURT: I am only weighing both sides of the

13  arguments that you are giving and I will make my own

14  determination. I have no problem with the sentence because

15  both sides agree to 10 years. I have no problem with that. So

16  there is no need to go further than that.

17          The question is what do I do next. And the next is to

18  take into consideration the posture of the case and the matter

19  of the case itself and the issues that were before the Court

20  and the type of incident that took place, and the effect on

21  individuals that it might effect in the future if not presently

22  doing so.

23          And the terrible situation that it has caused the

24  families, the injuries to the mental attitude of the families,

25  the injury to the mental attitude of the child, the potential

42

1    of the child being disturbed when he gets to be older and

2    reflects on this.  He's the one who reflects.

3         MR. BERNSTEIN:  Your Honor, I would like to say one

4    thing more about that.

5         THE COURT:  Do you mean the child passes it on?

6    That's the --

7         MR. BERNSTEIN:  No.

8         THE COURT:  That's what I am saying.

9         MR. BERNSTEIN:  Mr. Friedman -- we finished up close

10   to 10:00 o'clock on Friday night.

11        THE COURT:  You won't be here that long today.

12        MR. BERNSTEIN:  I am talking about when we were at the

13   police station.  Mr. Friedman is prepared to go back and

14   continue speaking to the Nassau County police.

15        THE COURT:  He can do whatever he wants.  I will

16   sentence him.  If Nassau County wants to do something or talk

17   to him and he wants talk to them, you will have to find a way

18   to get to them.

19        MR. O'REGAN:  We will arrange that at any time.

20        THE COURT:  Those avenues are not for the Court.

21        MR. BERNSTEIN:  Judge, my suggestion is that Mr.

22   Friedman -- it would be most beneficial to the prosecutors and

23   the police to have Mr. Friedman not in a custodial setting at

24   the time they speak to him simply because he will be in a

25   position to speak with them when he is in a free state of mind.

43

1    It is their decision, your Honor. We are not seeking

2    to manipulate the Court in any way whatsoever. It is our

3    suggestion that if they choose and they don't want to avail

4    themselves of that opportunity because they want to see Mr.

5    Friedman remanded now instead of tomorrow or the day after,

6    that's their decision for which they -- obviously they have the

7    responsibility.

8    We are just making that available to the government,

9    the prosecutor, and the police. If they choose not to take

10   advantage of it, that's their decision. We just want the Court

11   to know that Friedman man is prepared to do that.

12   Obviously he's prepared to do that when he is in a

13   custodial setting as well. We are not saying that he's not

14   going to. Simply it might be more beneficial if it's

15   non-custodial.

16   As for the fine, your Honor, two hundred and fifty

17   thousand dollars in this case, this is not a white collar

18   crime, not a business crime. It is not a crime that --

19   THE COURT: White collars crimes are pikers compared

20   to this one. No injury to anyone. No future injuries to

21   anyone.

22   MR. BERNSTEIN: It is not a crime wherein there is a

23   financial --

24   THE COURT: As many as 30 -- I can't say the number

25   because I may be all wrong again. Terrible how I make mistakes

JOSEPH BARBELLA     OFFICIAL COURT REPORTER

44

1    in one day.  I make them.

2         All right.  At least there are 10 or 11.

3         MR. O'REGAN:  Many victims.

4         MR. BERNSTEIN:  It is not a financial crime.  It is

5    not a crime that a fine is --

6         THE COURT:  But notice to the world, not only to

7    people in New York City.  It is notice to the world that this

8    has to stop with children.  Notice to the world that the Court

9    takes cognizance of the disruption of human lives.  It may not

10   be as disasterous at first, but it sure is a disaster when you

11   figure they may be spending their entire lives just on

12   reflecting on something that happened to them and they don't

13   know how to correct it.

14        I think that's the horrible thing.

15        This Court is going to sentence the defendant.  I will

16   sentence him today unless the prison authorities decide to send

17   him to a psychiatrist, which I will ask them to do.  But I am

18   going to sentence him to ten years.  I am going to fine him two

19   hundred and fifty thousand dollars under the circumstances.

20        I don't want that in my court.  I am not here as a

21   person to have accolades or anything else.

22        But I honestly feel that this is a proper sentence

23   under the circumstances with all of the information that I have

24   read, all the statements to the Court, and based on those

25   statements, based on actions of the defendant, based on his

JOSEPH BARBELLA     OFFICIAL COURT REPORTER

1   admission of abusing before another judge, this Court sentences

2   him to ten years and a fine of two hundred fifty thousand

3   dollars.

4          MR. O'REGAN:  The government moves to --

5          THE COURT:  If possible I will do it consecutive to

6   the state system.  It may be because they already said they are

7   going to give him ten to thirty.

8          MR. BERNSTEIN:  Would your Honor as to -- in terms of

9   designating a --

10         THE COURT:  I will --

11         MR. BERNSTEIN:  As to designate a -- will you

12  recommend that he be sent to Springfield?

13         THE COURT:  He is going to be remanded today.

14         MR. BERNSTEIN:  Will you recommend --

15         THE COURT:  I will leave that to the prison

16  authorities.  I never designate where a defendant must go.  I

17  will not.

18         MR. BERNSTEIN:  You will not make a recommendation?

19         THE COURT:  No, I will not.  Absolutely not.

20         MR. BERNSTEIN:  Will your Honor ask the Marshal to

21  instruct the appropriate official at the MCC that Mr. Friedman

22  be placed in protective custody in the MCC for his own and

23  other inmates' protection?

24         THE COURT:  The Marshal knows what to do with

25  prisoners of this type and I am sure the warden at the MCC

46

1    knows.

2              MR. BERNSTEIN:  Perhaps.

3              THE COURT:  Does he make a --

4              DEPUTY MARSHAL:  We will notify the chief.

5              THE COURT:  All right.

6              MR. BERNSTEIN:  I take it, your Honor will simply be

7    sentencing Mr. Friedman without any study and evaluation.

8              THE COURT:  Yes.  That's what I am doing.  I leave it

9    to the prison authorities to send him to a psychiatrist if they

10   desire to.

11             MR. O'REGAN:  There is one other matter.  With respect

12   to the letter that I submitted to your Honor and sent to

13   defense counsel, I would ask that exhibit A of that letter be

14   filed under seal to protect the boys.

15             THE COURT:  Yes.

16             MR. O'REGAN:  Thank you.

17             THE COURT:  All right.

18             MR. BERNSTEIN:  Could your Honor make it clear to the

19   marshal that they will tell the -- immediately tell the MCC to

20   put Mr. Friedman in protective custody.  Your Honor did the

21   last time when your Honor remanded the --

22             THE COURT:  If the warden believes so afterwards that

23   he should be in protective custody you may tell him.

24             MR. BERNSTEIN:  It was in the last --

25             THE COURT:  I leave it to the prison warden.  He is

47

1  sentenced.  The prison warden is the one.  The U.S. Attorney

2  knows that I never recommend what a warden must do in a

3  prison.  That's his province not mine.  I only do things in the

4  courtroom.

5        All right.

6        MR. O'REGAN:  Your Honor, I move to dismiss counts 1

7  and 3.

8        THE COURT:  1 and 3 are dismissed.

9        MR. O'REGAN:  Thank you.

10        (End of proceedings.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

(516) 466-2663
(718) 746-1900

## Douglas H. Krieger

ATTORNEY AT LAW

98 CUTTER MILL ROAD, GREAT NECK, N. Y. 11021

April 11, 1988

Assistant District Attorney Joseph Onorato
Major Offense Bureau
Nassau County District Attorney's Office
262 Old Country Road
Mineola, NY  11501

  Re: People v. Jesse Friedman
    Indictments No. 67104 & 67430

Dear Mr. Onorato:

  In order to adequately, properly and effectively make motions and prepare this case for trial I respectfully ask that the information, documents and tangible objects hereinafter requested be provided to me as attorney for Arnold Friedman.  It is my view that the requested information is essential to a proper defense and that without such information the defendant cannot be expected to adequately prepare for or conduct his defense.  Therefore, in accordance with Criminal Procedure Law -- Article 240 and the constitutional requirements set forth in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972) and <u>United States v. Agurs</u>, 427 U.S. 97 (1976), I ask the prosecution to particularize, furnish or permit discovery, inspection and the right to copy the information, documents and tangible objects described herein.

### BILL OF PARTICULARS

  The Defendant requests the following bill of particulars:

  1. As to each count of each indictment:

    a) the precise dates, times, and locations of the alleged criminal acts:

      (i) as to location, if the act occurred within the Friedman house, specify the room where it occurred;

      (ii) as to dates and times, insofar as many

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 2

counts span over a 3 or 4 month period, specify the month or week in which the act occurred, if a more precise date cannot be furnished.

b)   Identify by name and date of birth every person present in the room where the alleged act occurred during the commission thereof, including the "children" "touched" by defendant in the counts 49 and 53 of the 1987 indictment and the "boys" referred to in counts 40, 41, 42, 43, 44, 48, 51, 52, 53, 56, 57, 58, 59, 63, 64, 65,67, 80, 81, 82, and 83 of the 1988 indictment.

c)   Identify by name and date of birth every person present in the Friedman house during the commission of the alleged act.

d)   Specify the dates that the complainants brought the alleged acts to the attention of law enforcement officers.

e)   As to each complainant, specify the nature of the courses or lessons he was taking from at the Friedman house.

   (i)   specify the date that the complainant commenced the course or lessons, and the date he terminated the course or lessons;

   (ii)  specify, as to each complainant, and each course or lesson, whether the complainant was studying alone or in a group.  If in a group, state the number of students present.

f)   As to each criminal act alleged, specify the role played by every person present during the alleged commission of the act.

g)   Describe the particularity the relationships between the complainants; between the witnesses referred to in the indictment; and between the complainants and those witnesses:

   (i)   set forth any familial relationships;

   (ii)  state what school and grade each complainant and witness attended during the periods alleged in the indictment.

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 3

      h)    As to each act alleged in the indictment,
             state what clothing, if any, the victim was
             wearing during the alleged act, and what
             clothing, if any, the defendant(s) were
             wearing during the alleged act.

2.    As to counts 4 and 5 of the 1987 indictment
      describe how the allegations in these counts
      differ from each other.

3.    As to counts 15 and 16 of the 1987 indictment
      describe how the allegations in these counts
      differ from each other.

4.    State whether Daniel Doe attended any courses or
      lessons at the Friedman house in the months of
      July and August 1986.

5.    As to counts 41, 44 and 67, of the 1987
      indictment, state whether the "several boys" were
      physically injured in any manner, and describe any
      such injuries.

6.    As to count 46 and 52, state whether Edward Doe
      was physically injured in any manner, and if so
      describe his injuries.

7.    As to counts 41, 44, 46, 52 and 67, describe the
      precise manner in which the defendant and/or
      Arnold Friedman is alleged to have hit the several
      boys, or Edward Doe.

8.    As to each and every count referring to "children"
      "boys" or "several boys," state how many children
      or boys were the subject of the defendant's
      alleged acts.

## DISCOVERY AND INSPECTION

    1.   Any written or recorded statements made by the
defendant or copies thereof, within the possession, custody
or control of the prosecution the existence of which is
known or by the exercise of due diligence may become known
to the Government.  This request calls for discovery of
written or recorded statements and recordings of defendant's
conversations by any means of mechanical recordation or
electronic surveillance whether made before or after arrest
and/or indictment and whether or not in response to
interrogation.  The term "statements" includes
"substantially verbatim" as well as "mere summary"
statements and encompasses defendant's statements in
whatever form preserved.  This request also calls for

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 4

discovery of the time, place and circumstances of such
statements.

2.    The substance of any oral statement made by the
defendant, whether before or after arrest:  (a) during a
conversation with any person who in fact was an agent of law
enforcement or informer or who is now a prosecution witness,
or (b) in response to interrogation by any person then known
to the defendant to be an agent of law enforcement.  This
request is designed to reach those statements by the
defendant which have not been preserved in any writing or
recording.  This request also calls for discovery of the
time, place and circumstances of such statements.

3.    Any recorded testimony of the defendant before a
governmental agency, entity or instrumentality or before any
state or federal grand jury.

4.    The defendant's prior criminal record, if any, as
is within the possession, custody, or control of the
prosecution, the existence of which is known or by the
exercise of due diligence may become known to the
prosecution.

5.    Any books, papers, documents, photographs,
tangible objects, buildings or places, or copies or portions
thereof, which are within the possession, custody, or
control of the prosecution and which are material to the
preparation of the defense.  This request includes, but is
not limited to, any of the above-mentioned which came into
the possession, custody or control of the prosecution by
subpoena, seizure or request directed to:  (a) any person
whom the prosecution intends to call as a witness at trial;
and (b) any corporation, partnership, employee organization,
pension fund, financial institution, enterprise or other
association wherein a person whom the prosecution intends to
call as a witness at trial was an officer, employee, agent,
member, trustee, association, partner or had an interest
therein.  This request also specifically includes, but is
not limited to, any books, records or other documentation
within the possession, custody, or control of the
prosecution having to do with the financial or business
activity or any witness the prosecution intends to call at
trial.

6.    Any books, papers, documents, photographs,
tangible objects, buildings or copies of portions thereof
which are within the possession, custody, or control of the
prosecution and which are intended for use by them as
evidence at trial.

7.    Any books, papers, documents, photographs,

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 5

tangible objects, copies or portions thereof which are
within the possession, custody or control of the prosecution
and which were obtained from or belong to the defendant, or
a co-defendant or a co-conspirator, or over which it is
claimed that the defendant, co-defendant or a co-conspirator
exercised dominion or control.  This request includes but is
not limited to all photographs and video discs referred to
in the indictment.

8.    Any books, papers, documents, photographs,
tangible objects, buildings or places or copies thereof
which are within the possession, custody, or control of the
prosecution that:  (a) are referred to in the indictment;
(b) related to any statement of fact in the indictment; (c)
constitute the fruits or means of perpetrating any of the
offenses set forth in the indictment; or (d) were presented
to the grand jury in its investigation of the criminal
offense or offenses referred to in the indictment.

Regarding items 5 through 8, state which of the
books, papers, documents, photographs, tangible objects,
etc. in the prosecutions' actual or constructive possession
were seized as a result of:  (a) search warrants, (b) arrest
warrants, or (c) no warrants.  Kindly provide copies of all
such warrants and a fully listing of all items seized.

9.    All results or reports of physical or mental
examinations and of scientific tests or experiments, or
copies thereof, which are within the possession, custody or
control of the prosecution, the existence of which is known
or by the exercise of due diligence ma become known to the
prosecution or agent for the prosecution and which may be
either:  (a) material to the preparation of the defense, or
(b) intended for use by the prosecution as evidence at
trial.

10.  All charts, summaries or calculations reflecting
the contents of complex or columinous writings which may be
either (a) material to the preparation of the defense, or
(b) intended for use by the prosecution as evidence at the
trial.

11.  A written list of the names, addresses and
qualifications of all experts the prosecution intends to
call as witnesses at trial, together with all reports made
by such experts, or if reports have not been made, a brief
description of the opinion and subject matter of the opinion
to while each is to testify.

12.  Any documents reflecting or relating to any wire
communications or oral communications intercepted by the
prosecution to which the defendant was a party or during

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 6

which the defendant was present, or which were obtained by
interceptions directed against the defendant, or to which
any witness the prosecution intends to call at trial was a
party, whether or not such interceptions were authorized or
lawful.  the terms "wire communications," "oral
communication," and "interception" are used here as defined
in 18 U.S.C. § 2510 and Article 700 of the CPL.  This
request includes one-party "consent" tapes.  The request
includes, without limitation, logs, transcripts and tapes of
the intercepted communications, a list of all communications
to which the defendant has been identified as a party, all
applications to the court and orders of the court with
respect thereto, all inventory orders, inventories and
reports of service thereof, and competent evidence of all
the facts and circumstances concerning the authorization for
the applications to intercept any wire communications
involved in this case.

    13.  The date, time and place of every occasion on
which any surveillance, mail cover, search and/or seizure,
whether electronic, photographic, mechanical, visual, aural
or any other type was made of defendant, together with all
documents, photographs, recordings, or other materials
resulting from or reflecting or relating to such occasions,
including but not limited to any and all affidavits,
warrants, inventories and returns.

    14.  State whether the prosecution or any law
enforcement agency attempted any identification of the
defendant by means of a show-up or photographic display.  If
so, please state the dates, times and places of such
activities; the means employed; the names of the individual
or individuals conducting the procedure; the results of the
efforts and the name and address of any individual who was
asked to attempt an identification.  Where the results of
the procedure were recorded on tape, film or written report,
kindly provide counsel with a copy thereof.

    15.  State whether any individual stated that he or she
would be unable to identify or describe the defendant or
person whom a law enforcement agency believed to be the
defendant.  If such was the case, set forth the name,
address and statement of such individual, either as recorded
or as best recalled by the interviewer.  Set forth any
description of the defendant furnished to a law enforcement
agency by any individual who allegedly witnessed the events
in the indictment, which description is in any way contrary
to the defendant's actual appearance.

    16.  Any and all written or oral statements or
utterances -- formal or informal -- made to the prosecution,
its agents and representatives by any person whom the

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 7

prosecution intends to call as a witness at trial, which
statements are in any way contrary to the testimony or
expected testimony of that person or any other person whom
the prosecution intends to call as a witness at trial or
which otherwise reflect upon the credibility, competency,
bias or motive of any prosecution witness.  Included in this
request, for example, are the names of any individuals who
were students of the defendant's during the time period of
the charges in the indictment, who stated that they had not
witnessed the alleged crimes.

17.  All statements, trial testimony, grand jury
testimony and handwritten or informal notes or interviews in
the possession, custody or control of the prosecution which
were made by any person who was a witness or is a
prospective witness in this case which was made or given
either:  (a) prior to the time such person was a prospective
witness in this case, or (b) in connection with an
investigation or proceeding other than this case.

18.  It is specifically requested that the prosecution
advise all agents who have participated in the investigation
of this case that any and all handwritten notes made by them
not be destroyed.

19.  Please inform us, either by furnishing the
pertinent documents or otherwise, or any and all evidence of
criminal conduct -- state and federal -- on the part of any
person whom the prosecution intends to call as a witness at
trial of which the prosecution, its agents and
representatives have become aware.

20.  Please inform us, either by furnishing the
pertinent documents or otherwise, of any and all promises,
understandings or agreements, formal or informal, between
the prosecution, its agents and representatives and to
persons (including counsel for such persons) whom the
prosecution intends to call as witnesses at trial, together
with copies of all documentation pertaining thereto.  This
request includes, but is not limited to, such promises,
understandings, or agreements as may have been made in
connection with other cases or investigations.  This request
includes information concerning any payment of moneys or
other valuable consideration to any prospective witness.

21.  Please inform us, either by furnishing the
pertinent documents or otherwise, of any and all evidence
that any person who is a prosecution witness or prospective
prosecution witness in this case is or was suffering from
any physical or mental disability or emotional disturbance,
drug addiction or alcohol addiction or is or was under the
care of a psychiatrist, psychologist, counselor or social

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 8

worker at any time during the period of the indictment to the present.

22.  Any and all statements -- formal or informal -- oral or written -- by the prosecution, its agents and representatives to any person (including counsel for such persons) whom the prosecution intends to call as a witness at trial pertaining in any government action -- state or federal, civil or criminal -- or immigration matters against that witness, or anyone related by blood or marriage to that witness, or person associated in business with that witness or any corporation, partnership, joint venture, or other association employing that witness in which that witness has an interest.

23.  The names and addresses of all persons whom the prosecution, its agents and representatives believe have relevant knowledge and/or information with reference to the charges contained in the indictment and whom the prosecution does not intend to call as witnesses at trial.

24.  Set forth as precisely as possible the date, time and place of any utterances, statements or actions by any defendant or co-conspirator upon which the prosecution intends to rely at trial in order to establish the offense or offenses charged in the indictment.

25.  Identify by name and address all persons said to have been present at or who claim to have personal knowledge of the utterances, statements, representations, or actions of any defendant or co-conspirator upon which the prosecution intends to rely at trial to establish the offenses charged in the indictment.

26.  Kindly inform us of the names of any witnesses or prospective witnesses in this case who are or have been in the Federal Witness Protection Program or any other comparable protective program or situation, custodial or otherwise, and furnish all documents pertaining to any offers by the prosecution to any witness or prospective witness to enter such program.

27.  A list of all documents used or obtained or written in connection with the investigation preceding the indictment that the prosecution and its agents destroyed, for whatever reason, including but not limited to, rough notes of interviews, reports, notes, memoranda, subpoenaed documents, and other documents.

28.  A written list of the names and addresses of all prosecution witnesses which the attorney for the prosecution intends to call in the presentation of its case-in-chief,

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 9

together with any record of prior convictions of any such
witnesses which is within the possession, custody or control
of the prosecution, the existence of which is known or by
the exercise of the diligence may become known to the
Government.

29.  Any statements or documents, including but not
limited to grand jury testimony and federal, state and local
tax returns made or executed by any potential prosecution
witness at the trial of this action which the prosecution
knows, or through reasonable diligence should have reason to
know, is false.

30.  Any statements reflecting, relating or referring
to any discussion or conversation in which the prosecution
or any government agent suggested that an individual might
possibly be afforded more favorable treatment in any regard
in the event such individual offered evidence against the
defendant.  This request includes a list of the dates, times
and places of each such occurrence and the names of the
persons, including counsel, who were present.

31.  A list of all persons, and their counsel, who were
asked by the prosecution or its representatives whether they
or their clients would and/or could implicate the defendant in
any criminal wrongdoing.

32.  Please inform us of all judicial proceedings in
any criminal cases involving (as a witness, unindicted
co-conspirator, defendant or respondent) any person who is a
potential prosecution witness at the trial of this action.

33.  Any and all actions, promises or efforts -- formal
or informal -- on the part of the prosecution, its agents
and representatives to aid, assist or obtain benefits of any
kind for any person whom the prosecution considers a
potential witness at trial, or a member of the immediate
family of such witness, or for the corporation, partnership,
unincorporated association or business employing such
potential witness in which the witness is an employee,
director, shareholder, trustee, partner, member, agent or
servant.  This request includes, but is not limited to:  (a)
letter to anyone informing the recipient of the witness'
cooperation; (b) recommendations concerning federal or state
aid or benefits; (c) recommendations concerning licensing,
certification or registration; (d) promises to take
affirmative action to help the status of a witness in a
profession, business or employment or promises not to
jeopardize such status; (e) aid or efforts in securing or
maintaining the business or employment of a witness; (f) aid
or efforts concerning a new identity for the witness and his
family, together with all other actions incidental thereto;

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 10

(g) direct payments of money or other valuable consideration
or subsidies to the witness; or (h) any other activities,
efforts or promises similar in kind or related to the items
listed in (a)-(g) above.

34.   In addition to the information and material
requested above, any documents, books, papers, photographs,
scientific tests or experiments, tangible objects, written
or recorded statements of anyone, grand jury transcripts and
oral statements of anyone, reports, memoranda, names and
addresses of persons, or other evidence or information which
either tends to exculpate the defendant or tends to be
favorable or useful to the defense as to either guilt or
punishment or tends to affect the weight or credibility of
the evidence to be presented against the defendant or which
will lead to evidence favorable to or exculpatory of the
defendant which is within the possession, custody, or
control of the prosecution the existence of which is known
or by the exercise of due diligence may become known to the
Government.

35.   All photographs, films, and/or videotapes taken in
connection with this case.

36.   State whether the prosecution intends to introduce
evidence of "similar acts" or judgments or conviction
against the defendant or any co-defendant or co-conspirator.
If such is the prosecution's intent, please provide the
following:  (a) a summary of the act or acts to be
introduced; (b) the name, address and position of the
witness through whom such testimony is to be introduced; (c)
a copy of any and all documents intended to be offered; and
(d) the legal basis that the prosecution contends supports
the introduction of such evidence.

37.   All documents and other information relating,
referring to, containing, reflecting, or suggesting any bias
or hostility by any witness for the prosecution toward any
defendant or co-conspirator or any other factor bearing on
the credibility of any such witness.

38.   All videotapes, recordings, transcripts,
photographs, diagrams, charts or other demonstrative
evidence to be offered by the prosecution in the trial of
this case or which relate to the offenses charged.

39.   A list of the names and addresses of all persons
interviewed by any prosecuting attorney, police officer,
detective, postal inspector, FBI agent, or any other agent
or employee of any law enforcement agency in connection with
the investigation of this case or relating to the offenses
charged, whether before or after the return of the

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 11

indictment(s) and whether or not such interview was reduced
to a written or recorded report.

40.   All notes, transcriptions, or recordings or any
interview or statement of any person made by any government
attorney, postal inspector, FBI or any other agent or
employee of the District Attorney in connection with the
investigation of this case relating to the offenses charged,
whether before or after the return of the indictment(s) and
whether or not reduced to a written or recorded report.

41.   All statements, interviews, and reports of any
person, written or oral, made to any prosecuting attorney,
police officer, detective, postal inspector, FBI agent or
any other agent or employee of any law enforcement agency in
connection with the investigation of this case relating to
the offense or offenses charged, whether before or after the
return of the indictment(s).

42.   Kindly advise us whether any prosecution witness
or prospective prosecution witness was hypnotized or
subjected to any similar procedure designed to elicit
factual information and, if so, please provide:

(a)   A copy of any written, recorded or oral statement
      made by such person during such procedure;

(b)   Any videotapes made in connection with such
      procedure; and

(c)   The identities of the person or persons
      participating in such procedure either as a
      subject or as a witness.

43.   Kindly advise us whether any prosecution witness
or prospective prosecution witness was interviewed by law
enforcement agents with the assistance of any psychiatrist,
psychologist, counselor, social worker, "validator," etc. in
connection with the charges in this indictment.   If so,
please provide names, dates and circumstances.

Each of the foregoing requests is of a continuing
nature and calls for supplementation of any answer as soon
as the prosecution discovers additional evidence,
information or material.   In addition, each request and each
paragraph of this letter is specifically sought under the
rule of Brady v. Maryland, supra, and this Brady material
must be made available to the accused as soon as it should
be evident to the prosecution that information or material
in its possession falls within the ambit of the rule.   If
your understanding of the applicable law differs from ours
with respect to this matter and if the prosecution possesses

Joseph Onorato
Assistant District Attorney
April 11, 1988
Page 12

or comes into possession or <u>Brady</u> material, it is
respectfully requested that you advise us immediately so
that the matter may be ruled on by the court.

    44.  Provide copies of all press releases issued in
connection with this case.

    It is requested that you respond <u>in writing</u> to
this letter as soon as possible and that you respond to each
paragraph of this letter.  Please state whatever
information, documents and materials you are willing to
provide and which types of disclosure you decline to provide
and the reasons for your declination.  It is respectfully
requested that you respond within ten days of receipt of
this letter.

                   Very truly yours,

                   Douglas H. Krieger

DHK/kc
cc:  Hon. Abbey L. Boklan

D.A.'S OFF (FED.)

88 APR 14  P3:58

RECEIVED

**18**

**DENIS DILLON**
DISTRICT ATTORNEY



OFFICE OF THE DISTRICT ATTORNEY

NASSAU COUNTY
262 OLD COUNTRY ROAD
MINEOLA, NEW YORK 11501
TELEPHONE (516) 535-3800

April 18, 1988

Douglas H. Krieger, Esq.
98 Cutter Mill Road
Great Neck, NY 11021

Re: People v. JESSE FRIEDMAN
Indictment #67104 - #67430

Dear Mr. Krieger:

Please be advised that I am in receipt of the Demand to Produce that
you served upon our Office in connection with the above-mentioned
case. In connection therewith, please note the following:

## BILL OF PARTICULARS

1a) As to the precise dates of the criminal acts, please see the
indictment. As to the times of the criminal acts, said crimes
occurred during the afternoons. As to the locations of the
criminal acts, they occurred inside 17 Piccadilly Road, Great
Neck, New York. Please note that the Criminal Procedure Law,
Section 240.20 subdivision 1(i) merely requires the People to
provide the approximate date, time and place of the offense
charged.

b) As to the names and dates of birth of every person present
in the room at the time of the commission of the acts the
People are under no obligation to disclose to the defense the
names of its witnesses. Matter of Vergari v. Kendall, 46 AD 2d
679 (1974).

c) See paragraph 1b) above.

d) The dates that the victims brought the acts to the attention
of law enforcement officials is not the proper subject of a
Demand to Produce. See Criminal Procedure Law Section 240.20.

- Page Two -

e)   The People are under no obligation to provide defense counsel
     with such information pursuant to a Demand to Produce.   With
     reference to the nature of the courses or lessons each victim
     was taking from the defendant, their commencement and their
     termination, the defendant himself is in the best position to
     know this information.

f)   The defendant is not entitled to the People's theory of proof.
     People v. Einhorn, 75 Misc. 2d 83 (1973).

g)   The People are under no obligation to provide defense counsel
     with the relationship that exists between the victims and wit-
     nesses.   The school and grade each victim and witness attended
     is irrelevant and not the proper subject of a Demand to
     Produce.

h)   As to the clothing worn by the defendant and the victim during
     the course of the criminal acts, such a request is not the
     proper subject of a Demand to Produce.   See Criminal Procedure
     Law Section 240.20.

2)   The counts listed specify separate and distinct times that the
     crimes occurred.

3)   See paragraph 2) above.

4)   The material requested is not the proper subject of a Demand
     to Produce pursuant to Criminal Procedure Law Section 240.20.

5)   See paragraph 4) above.

6)   See paragraph 4) above.

7)   See paragraph 4) above.

8)   See paragraph 4) above.

## DISCOVERY AND INSPECTION

1.   See People's Voluntary Disclosure Form where said information
     has already been provided.

2.   See paragraph 1. above.

3.   See People's Voluntary Disclosure Form where said information
     has already been provided.

- Page Three -

The People are unaware at this time of any prior criminal record of the defendant.

5. The People oppose this overly broad request as not the proper subject of a Demand to Produce. See Criminal Procedure Law Section 240.20. As previously noted on the People's Voluntary Disclosure Form, the People will provide counsel for the defendant with the opportunity to inspect any photographs made in connection with this case as well as the property seized in connection with the search warrant.

6. See paragraph 5. listed above.

7. See paragraph 5. listed above.

8. See paragraph 5. listed above. A copy of the search warrant as well as a copy of the return on the search warrant has already been provided to counsel for the defendant.

9. No such reports exist at the present time.

10. See paragraph 5. listed above.

11. See paragraph 5. listed above.

12. No such material was prepared in the preparation of this case.

13. Members of the Nassau County Police Department executed a search warrant at the home of the defendant on November 25, 1987 at approximately 2:00 p.m. As previously indicated, counsel will be afforded the opportunity to inspect the items seized pursuant to that warrant.

14. Please see People's Voluntary Disclosure Form, paragraph 9. which has already indicated that no such procedure has taken place.

15. No individual has stated that he or she would be unable to identify or describe the defendant.

16. The defendant is not entitled to any statements made by the People's witnesses until the proper time, namely after the jury is selected. See People v. Rosario. With reference to the names of students of the defendant, the defendant himself is in the best position to know their identity.

17. See paragraph 16. listed above as to the proper time that said statements will be turned over to the defense.

- Page Four -

18.   The People are mindful of their obligations pursuant to the
      Criminal Procedure Law and the Constitution of the State of
      New York and of the United States of America.

19.   The People are unaware of any evidence of prior criminal
      conduct of the child witnesses.  Should any such information
      become available, it will be provided to the defendant.

20.   The People have made no promises, understandings or agreements
      with anyone with respect to this case.

21.   The material requested is not the proper subject of a Demand to
      Produce, pursuant to Criminal Procedure Law, Section 240.20.

22.   See paragraph 21. listed above.

23.   The People possess no such information.

24.   As previously indicated, the defendant made no statements in
      connections with this case.

25.   See paragraph 24. listed above.

26.   Upon information and belief, none of the People's witnesses
      have been in the Federal Witness Protection Program or any
      other comparable protective program.

27.   Neither the prosecution nor its agents have destroyed any
      material in connection with this case.

28.   As previously stated, the names and addresses of all wit-
      nesses to the crimes listed in the indictment, is not the
      proper subject of a Demand to Produce, pursuant to Criminal
      Procedure Law, Section 240.20.  With reference to a record
      of prior convictions of any of the People's witnesses, see
      paragraph 19, listed above.

29.   The defendant is not entitled to any statements or documents
      presented to the Grand Jury in connection with this case.
      As to tax returns, based upon information and belief, none of
      the child victims has filed a tax return.

30.   No such material exists.

31.   Based upon information and belief, no such material exists.

32.   See paragraph 31. listed above.

33.   See paragraph 31. listed above.

- Page Five -

34. As to evidence tending to be exculpatory to the defendant
    such is not now known upon information and belief gained
    from the files of the District Attorney's Office to be in
    existence. Should such evidence become available, it will
    be furnished to the defendant pursuant to Brady v. Maryland.

35. See People's Voluntary Disclosure Form wherein the People
    have already agreed to provide the defendant with the oppor-
    tunity to examine said material.

36. The prosecution does not intend to introduce evidence of
    similar acts or judgments of conviction against the defendant
    at this time. Should the People elect to do so, the defen-
    dant will be provided with the adequate notice as provided
    by law.

37. See paragraph 31. listed above.

38. Said request is not the proper subject of a Demand to Produce,
    pursuant to Criminal Procedure Law, Section 240.20.

39. See paragraph 38. listed above.

40. See paragraph 38. listed above.

41. See paragraph 38. listed above.

42. Based upon information and belief, none of the prosecution
    witnesses or prospective witnesses was hypnotized or sub-
    jected to any similar procedure designed to elicit factual
    information.

43. See paragraph 38. listed above.

44. See paragraph 38. listed above.

If you have any questions, please do not hesitate to contact me at
535-3739.

Finally, I take this opportunity to remind you that at the time your
client was arraigned on these indictments, the Office of the
District Attorney served upon your client its own Demand to Produce
which was returnable within 20 days. Accordingly, I look forward to
any cross discovery to the extent that it is applicable in the
instant case.

                              Very truly yours,

                              DENIS DILLON
                              District Attorney

                              Joseph R. Onorato
                              Assistant District Attorney
JRO/sw                        Major Offense Bureau

**19**

COUNTY COURT  :  COUNTY OF NASSAU
-------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

      -against-

JESSE FRIEDMAN, et al.

          Defendant.

-------------------------------------X

NOTICE OF OMNIBUS MOTION
Indictment No. 67104
Indictment No. 67430

        PLEASE TAKE NOTICE that upon the annexed
affirmation of DOUGLAS H. KRIEGER, ESQ. duly affirmed April
_15_ , 1988, the indictments, and upon all prior pleadings and
proceedings had herein, the undersigned will move this Court
before the HON. ABBEY L. BOKLAN, at the Nassau County
Courthouse located at 262 Old County Road, Mineola, New York
on the 22nd day of April, 1988 for an Order as follows:

      1.    Inspecting the Grand Jury minutes and upon such
inspection dismissing the indictments for legal
insufficiency of the evidence, pursuant to CPL §
210.20(1)(b) and 210.30(1);

      2.    Dismissing counts 4, 5, 8, 15 and 16 of Indictment
No. 67104, and counts 1 through 4 and counts 7, 8, 21, 23,
24, 27 and 28 of Indictment No. 67430, for lack of
specificity of the allegations, pursuant to CPL § 200.50(6);

1

3. Dismissing any counts of the indictment which charge more than one instance of sodomy, Sexual Abuse, or Attempted Sexual Abuse, as duplicitious, pursuant to CPL § 200.30(1);

4. Dismissing any counts of the indictments which are multiplicitous;

5. Dismissing the indictments in that fewer than 12 grand jurors voting to indict had heard all the essential and critical evidence, resulting in fatally defective proceedings, pursuant to CPL § 210.35(5);

6. Dismissing the indictment on the grounds of inadequate voir dire of sworn witnesses as to capacity to understand an oath pursuant to CPL § 60.20(2);

7. Dismissing the indictments for failure of the prosecutor to properly instruct the grand jury on the law, pursuant to CPL § 210.35(5), § 190.5(6);

8. Dismissing the indictments pursuant to CPL § 190.32(5) for failure to follow statutory procedures in the use of videotaped examinations in the grand jury;

2

9. Dismissing the indictments for failure of the People to provide adequate discovery pursuant to CPL § 200.95 and § 240.40;

10. Suppressing all evidence seized from defendant's home pursuant to CPL § 710.20(1)(4) on the grounds of unlawful search seizure;

11. Suppressing the live testimony of all complainants and witnesses referred to in the indictments as the tainted fruit of an illegal search and seizure;

12. Consolidating Indictments 67104 and 67430 pursuant to CPL § 200.20(4)(5) and treating them as a single indictment for trial purposes;

13. Subject to the resolution of the above motions, the defendant reserves the right to make such other pertinent motions as may be permitted by statute.

14. Such other and further relief as this Court deems

3

just, fair and proper.

                    Yours, etc.


                    DOUGLAS H. KRIEGER
                    Attorney for Defendant
                    JESSE FRIEDMAN
                    98 Cutter Mill Road
                    Great Neck, New York 11021-3002
                    Tel. No. (516) 466-2663

Dated:   Great Neck, New York
         April 15, 1988

TO:   HON. ABBEY L. BOKLAN

      ASST. DISTRICT ATTORNEY JOSEPH ONORATO

      CLERK OF THE COURT

4

COUNTY COURT  :  COUNTY OF NASSAU
-----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

        -against-               AFFIRMATION
                                    Indictment No. 67104
JESSE FRIEDMAN, et al.         Indictment No. 67430

            Defendant.

-----------------------------------------X

STATE OF NEW YORK)
        :  ss.:
COUNTY OF NASSAU )

    DOUGLAS H. KRIEGER, an attorney-at-law licensed to practice law in the State of New York does hereby affirm to be true under penalty of perjury the following facts, upon information and belief are true;

    1.  I am the attorney for the defendant, am fully familiar with the facts and circumstances of this case and make this affirmation in support of the defendant's Omnibus Motion.

    2.  The sources of affiant's information and belief are the Court records, conversations with the defendant, JESSE FRIEDMAN, and conversations with JERRY D. BERNSTEIN, ESQ., attorney for ARNOLD FRIEDMAN and with the District Attorney's Office.

## THE INDICTMENTS

3.    The defendant JESSE FRIEDMAN stands indicted under Indictment 67104, for the crimes of Use of a Child in a Sexual Performance [2 counts], Sexual Abuse 1° [3 counts], Endangering the Welfare of a Child [5 counts].

4.    Under the second indictment, 67430, JESSE FRIEDMAN and ARNOLD FRIEDMAN are charged with acting in concert in the commission of the crimes of Sodomy 1° [2 counts] and Endangering the Welfare of a Child [3 counts].  JESSE FRIEDMAN is individually charged with Sodomy 1° [4 counts], Sexual Abuse 1° [7 counts], Attempted Sexual Abuse in the 1° [1 count] and Endangering the Welfare of a Child [16 counts].

5.    The first indictment involves five complainants, and the second involves eight complainants.  Other than 11 counts in the first indictment [13, 17, 26-31, 41 and 42], all counts in both indictments allege offenses committed during the 1986, and 1987 school years.*

---

*    Counts 26, 27 and 31 in which ███████ is the complainant, allege Endangering Counts occurring from December, 1984 to July, 1985, and December, 1984 to January, 1986.

2

6. Upon information and belief, all of the
complainants, as well as the "boys" who are referred to in
many of the Endangering counts as victims but not
complainants, were attending computer courses held in the
Friedmans' home during the applicable periods.

THE "SINGLE ACT" OFFENSES CHARGED IN BOTH INDICTMENTS MUST
BE DISMISSED FOR LACK OF SPECIFICITY PURSUANT TO CPL §
200.50(6).

7. The requirements of CPL ¶ 200.50(6) that an
indictment allege the commission of an offense "on or about
a designated date or during a designated period", requires
that the designation be sufficiently specific such that the
defendant is given fair and reasonable opportunity to
prepare an adequate defense.

8. The District Attorney's Office has stated that it
is unable to narrow the time periods alleged in the
indictments, which span 3, 4, 5 and in one count 7 month
periods. All such counts that allege "single act" crimes
must be dismissed for lack of specificity:

3

9. Only one instance of a "single act" offense, such as Sodomy and Sexual Abuse can be alleged in a particular count in an indictment. In order for a defendant to have reasonable notice and ability to prepare a defense to that one alleged act, the indictment or bill or particulars must set forth the designated time with sufficient specificity.

10. Whether a time span is sufficiently specific depends upon the length of the period alleged, the age and intelligence of the victim, the nature of the offense and the surrounding circumstances, and the lapse in time between the alleged commission of the offense and the defendant's arrest.

11. Counts 1 through 20 of Indictment 67104 allege 3 and 4 month periods for Sodomy and Sexual Abuse with the exception of Count 13 which alleges a 5 month period and Count 17 which provides a specific date. The periods set forth in Counts 1, 6, 7, 19 and 20 terminate on November 25, 1987; the date of the defendants' arrests.

The periods set forth in Counts 2 through 5, 9 through 12, and 14 through 16; 16 however, terminate on June 30, 1987, approximately 5 months prior to the defendants' arrests.

4

Count 13, alleging a 5 month span terminates on January, 1986 -- 22 months prior to the defendants' arrests. Count 18 terminates on January, 1987, 10 months prior to the defendants' arrests.

12. Counts 1 through 28 in the second indictment allege single act crimes spanning 3 and 4 month periods with the exception of Count 28 which designates a 7 month period.

The designated periods in these counts terminate 11, 17 and 20 months prior to the defendants' arrests, with the exception of counts 2, 4, 24 and 28 which terminate 8 months prior to the arrests.

13. The complainants in both indictments, upon information and belief were between 8 and 12 years old during the applicable periods. They are all presumably intelligent, high functioning children, attending private computer classes and the Great Neck schools.

14. Given the length of time periods alleged, the level of competence of the complainants, and the lengthy gaps of time between the alleged periods and the arrests, [particularly in the second indictment], the indictments fail to satisfy requirement of CPL §200.50(6). Prejudice to the defense is obvious and grossly unfair. The defendants are expected to prepare a defense to a single act allegedly committed during a 3, 4, 5, or 7 month time period, as long as 5, 10, and 22 months prior to their arrest.

5

Count 13, alleging a 5 month span terminates on January, 1986 -- 22 months prior to the defendants' arrests. Count 18 terminates on January, 1987, 10 months prior to the defendants' arrests.

12.   Counts 1 through 28 in the second indictment allege single act crimes spanning 3 and 4 month periods with the exception of Count 28 which designates a 7 month period.

The designated periods in these counts terminate 11, 17 and 20 months prior to the defendants' arrests, with the exception of counts 2, 4, 24 and 28 which terminate 8 months prior to the arrests.

13.   The complainants in both indictments, upon information and belief were between 8 and 12 years old during the applicable periods.   They are all presumably intelligent, high functioning children, attending private computer classes and the Great Neck schools.

14.   Given the length of time periods alleged, the level of competence of the complainants, and the lengthy gaps of time between the alleged periods and the arrests, [particularly in the second indictment], the indictments fail to satisfy requirement of CPL §200.50(6).   Prejudice to the defense is obvious and grossly unfair.   The defendants are expected to prepare a defense to a single act allegedly committed during a 3, 4, 5, or 7 month time period, as long as 5, 10, and 22 months prior to their arrest.

5

multiplicitous counts should be dismissed.  To assist the
Court, the following lists have been prepared setting forth
these counts of the indictments which contain identical
allegations and hence may be multiplicitous:

A.   Indictment 67104:

- Counts 4, 5

- Counts 6, 7

- Counts, 9, 10, 11, 12

- Counts 14, 15, 16

- Counts 19, 20

- Counts 21, 22

- Counts 23, 25

- Counts 32, 33, 34, 35, 36

- Counts 37, 38

B.   Indictment 67430:

- Counts 10, 11, 12, 13

- Counts 14, 15, 16, 17

- Counts 35, 36

VOIR DIRE OF WITNESS AS TO CAPACITY TO BE SWORN AND
CORROBORATION

19.  Upon information and belief each of the
complainants testified under oath in the Grand Jury.  Any

7

of the complainants under 12 years of age are presumed
incompetent to testify as sworn witnesses, unless adequate
voir dire by the prosecutor on the record demonstrates the
child's capacity to understand an oath.  An adequate voir
dire cannot be replete with leading questions.

20.  The defense requests that the Court ascertain
whether an adequate voir dire was conducted prior to the
swearing of each witness, and whether the record supports
the swearing of all witnesses.  As to any witnesses who
should not have been sworn. their testimony would be
inadequate to support the corresponding charges, unless
sufficient corroboration exists in the Grand Jury evidence.

21.  As to any witnesses who were not adequately voir
dired and improperly sworn, the defense moves to dismiss the
corresponding counts in the indictments unless the witness'
testimony is supported by evidence tending to establish that
a crime was committed and that the defendant committed it.

### USE OF VIDEOTAPED TESTIMONY IN GRAND JURY:

22.  Upon information and belief, with respect to at
least one complainant the prosecution utilized videotaped
testimony in the Grand Jury.

8

23.   As to any videotaped testimony in the Grand Jury,
the defense requests that the court ascertain whether the
requirements of CPL §190.32 were satisfied, to wit:

(a)   that the complainant was either a "child
witness", or was qualified as a "special
witness", pursuant to court orders.   [§
190.32(3)].

(b)   That the videotape commences with a statement
by the prosecutor of the date, time, and
place of the examination, and the that
prosecutor, the operator and all persons
present are identified on the tape.   [§
190.32(5)(a)].

(c)   that the day, hour, minute and second are
accurately reflected on the tape.   [§
190.32(5)(b)].

(d)   that only authorized persons pursuant to §
190.25 and § 190.32(5)(c) are present during
the taping and have taken the requisite
secrecy oath on the record.   [§
190.32(5)(c)].

9

(e)    that the tape contains the following recorded
information, the name of the witness, the
date of birth of the witness if twelve years
old or less, the caption and the Grand Jury
number of the case, and if the witness was
qualified as a "special witness" the date of
the Court Order and the name of the Justice
who issued it.    [§ 190.32(5)(d)].

(f)    that the tape contains the administration of
the oath if the witness was sworn, or a
statement that the testimony is not under
oath if the witness was not sworn.    [§
190.32(5)(e)].

(g)    that the tape(s) contain the commencement,
termination and certification requirements set
forth in § 190.32(f).

(h)    that the tape has been recorded in the Grand
Jury in the same manner as if the witness had
testified in person.    [§ 190.32(6)].

(i)    that custody of the tape has been maintained
in the same manner as custody of Grand Jury
minutes.    [§ 190.32(7)].

10

24.   The defendant moves for dismissal of any counts of the indictment which are premised upon videotaped examination which does not comply with any of these requirements.

## QUORUM REQUIREMENTS

25.   Based upon the length of the indictments, the number of complainants, and the numerous sessions presumably involved in these Grand Jury proceedings, the defendant requests that the court ascertain whether the quorum requirements of CPL § 190.25(1) were satisfied.

26.   Unless twelve grand jurors who were present when all the "essential and critical evidence" was presented, were voted to return the indictments, the proceedings were fatally defective.

27.   Insofar as all the evidence in this case would constitute "essential and critical evidence", it is particularly important to determine whether the quorum requirements were satisfied.  We therefore request that the court juxtapose the attendance records of the grand jurors who voted to indict with each and every jury session.

11

28. Moreover, it is incumbent upon the prosecutor to instruct the Grand Jury that only those grand jurors who were present during the critical and essential testimony are eligible to vote, and to indicate to the panel the names of the eligible voters.

29. The defendant moves to dismiss either or both indictments if these quorum and instructions requirements were not satisfied.

## CONSOLIDATION OF INDICTMENTS

30. The defendant further moves pursuant to CPL § 200.20(4)(5) for consolidation of Indictments 67104 and 67430 for purposes of trial.

31. CPL § 200.20(5) requires mandatory consolidation of indictments where the offenses charged are joinable by reason of being based upon the same act or criminal transaction, unless the People demonstrate good cause not to consolidate.

32. The offenses involved in these to indictments involve the same "criminal transaction" as that term is defined in CPL § 40.10(2)(b), in that they are, . . . "so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture."

33.   Both indictments charge the defendants with the single criminal purpose or objective of, essentially, exploiting the children in the Friedmans' computer classes for the alleged purposes of gratifying ARNOLD FRIEDMAN'S and JESSE FRIEDMAN'S sexual desires.

34.   The vast majority of the 146 counts in the two indictments allege acts occurring during the 1986 and 1987 school year, and concern activities allegedly occurring in the Friedmans' computer classes.   Ninety of the 146 counts are endangering counts which allege the same patterns of criminal activity; either (1) alleged victimization of the complainants by exposing them to sexual materials or to sexual activity committed by or between the defendants, or (2) alleged victimization of the complainants by exposing them to sexual victimization of other boys.

35.   Hence the offenses charged in the two indictments are clearly part of the same "criminal venture" as defined in CPL § 40.10(2)(b).   The indictments must therefore be joined for trial pursuant to CPL § 200.20(5) in the absence of a showing of good cause by the People justifying separate trials.

36.   Alternatively the defendant seeks consolidation pursuant to CPL § 200.20(4) in the discretion of the Court. That provision allows for consolidation when, inter alia,

13

the offenses charged, although based upon different criminal transactions, are defined by the same or similar statutory provisions, and consequently are "the same or similar in law." CPL § 200.20(2)(c).

37.  The two indictments charge the same sequence of sex offences defined in P. L. Article 130, to wit; Sodomy 1° (P.L. § 130.50), Sexual Abuse 1°, [JESSE FRIEDMAN is additionally charged with 2 counts of use of a child in a Sexual Performance]. The remaining 34 counts of indictment 67104, in the remaining 53 counts of Indictment 67430 change Endangering the Welfare of a Child [P.L. § 260.10].

38.  Furthermore, the interests of justice, and of efficient judicial administration militate strongly in favor of consolidation. The defendant should not be forced to undergo the trauma and expense of two trials, when the indictments involve precisely the same type of criminal charges, arising out of a single "criminal venture." Nor should judicial resources be needlessly wasted by separate trials on these indictments.

39.  Finally, it is in the best interests of the community as well as of the defendants to expeditiously resolve these indictments by a single trial.

14