## SUPPRESSION OF PHYSICAL EVIDENCE AND LIVE TESTIMONY

## RESULTING FROM ILLEGAL SEARCH & SEIZURE

40.   On November 3, 1987, a warrant issued by a Federal Magistrate was executed at the Friedman home authorizing search and seizure of the following items:

> photographs, magazines, books, videotapes and other unusual depictions of children engaging in sexually explicit conduct and letters, envelopes, files, correspondence, notes, personal computer disks, and the personal computer needed to read the computer disks relating to the distribution and receipt of child pornography through the U.S. Mail, all of which are being used in connection with and are evidence of violations of Title 18, U.S. Code, § 1461 and 2252.   [emphasis added]

41.   The warrant was an anticipatory warrant issued upon the affidavit of Postal Inspector JOHN MCDERMOTT. MCDERMOTT asserted that a "controlled delivery" of a pornographic magazine would be made to the Friedman home on November 3, 1987.

42.   Members of the District Attorney's Squad fully participated with the Federal Postal Inspectors in the execution of the warrant.

43.   In the course of the execution of the warrant, lists of names and phone numbers of the students in the Friedmans' computer classes were seized.

15

44.  As a direct result of this seizure the Nassau
County Sex Crimes Squad initiated its investigation which
resulted in the instant indictments.  Upon information and
belief, each of the complainants in these indictments and
witnesses whom the District Attorney intends to call at
trial were identified from the seized lists, and approached
by the Nassau police within days after the execution of the
federal warrant.

45.  As a direct result of the seizure of the lists,
and the interviews of children identified on the lists, the
Nassau County Police obtained a search warrant from Hon.
HERBERT LIPP authorizing a search and seizure at the
Friedman home of the following items:

> sexual devices, photographs, magazines,
> books, film, audio tapes, video tapes
> and other unusual depictions of children
> engaging in sexually explicit conduct
> and letters, envelopes, files,
> correspondence, notes, lists of
> students, lists of pornographic
> distributors, personal computer disks
> and the personal computers needed to
> read the computer disks relating to
> pornography all of which are being used
> in connection with and are evidence of
> violations of Articles 235, 263 and 260
> of Penal Law of the State of New York.

46.  All evidence seized as a result of the State
warrant, and the live testimony of all complainants and
witnesses approached as a result of the seizure of lists
during execution of the Federal warrant, must be suppressed.

16

47. Insofar as no exigent circumstances were presented justifying the issuance of an anticipatory warrant, the federal warrant was unlawful as a matter of federal constitutional law. Pornographic material, unlike narcotics is not immediately consumed or distributed. Hence the rationale for issuance of an anticipatory warrant does not apply to child pornography cases.

48. Moreover, even assuming that the federal warrant was validly issued, the police strayed beyond its limits in seizing the lists of the Friedmans' computer students. The warrant neither specifically nor categorically justified a seizure of student lists.

49. The seizure furthermore cannot be justified under the "plain view" exception to the warrant requirement. Because the list did not constitute contraband per se, and the police did not have probable cause to believe that it was evidence of a crime, the "plain view" exception is inapplicable.

50. Nor may the People rely upon the "good faith" exception to the warrant requirement endorsed by the United States Supreme Court, to salvage the search under the federal warrant and the seizure of the list.

17

51.   To begin, the search must be measured against both New York State constitutional standards as well as federal Insofar as the Nassau County Police fully participated in the execution of the federal warrant, it must also be deemed a state warrant.   Pursuant to New York State constitutional principles, there is no "good faith" exception to the warrant requirement.

52.   Moreover, the "good faith" exception in any event would not excuse the seizure of the list.   While the federal "good faith" exception will save a technically defective warrant relied upon in good faith by the executing officers, it is of no value in justifying an unlawful seizure of items not specified in the warrant.

## RESERVATION OF MOTIONS

53.   Subject to the resolution of the above motions, the defendant reserves the right to make such other pertinent motions as may be permitted by statute.

DATED:   Great Neck, New York

April 15, 1988

DOUGLAS H. KRIEGER

18

0575

APP.

[illegible]

=== NOTICE OF ENTRY ===

Sir:-Please take notice that the within is a *(certified)* true copy of a
duly entered in the office of the clerk of the within named court on                    19

Dated,

Yours, etc.,
**DOUGLAS H. KRIEGER**

*Attorney for*

*Office and Post Office Address*
98 Cutter Mill Road
GREAT NECK, NEW YORK 11021

To

Attorney(s) for

=== NOTICE OF SETTLEMENT ===

Sir:-Please take notice that an order

of which the within is a true copy will be presented for settlement to the Hon.

one of the judges of the within named Court, at

on                                          19
at                    M.
Dated,

Yours, etc.,
**DOUGLAS H. KRIEGER**

*Attorney for*

*Office and Post Office Address*
98 Cutter Mill Road
GREAT NECK, NEW YORK 11021

To

Attorney(s) for

---

Indictment Nos. 67104
                 and 67430
Index No.                         Year 19

COUNTY COURT : COUNTY OF NASSAU

═══════════════════════════════════

THE PEOPLE OF THE STATE OF
                NEW YORK

            -against-

JESSE FRIEDMAN, et al.,

            Defendant.

═══════════════════════════════════

NOTICE OF OMNIBUS MOTION
and Supporting Papers

═══════════════════════════════════

DOUGLAS H. KRIEGER

*Attorney for* Defendant

*Office and Post Office Address, Telephone*
98 Cutter Mill Road
GREAT NECK, NEW YORK 11021
(516) 466-2663      (718) 746-1900

═══════════════════════════════════

To

Attorney(s) for

═══════════════════════════════════

Service of a copy of the within

                          is hereby admitted.

Dated,

.................................................................

Attorney(s) for

20

COUNTY COURT  :  COUNTY OF NASSAU

- - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK

       - against -              AFFIRMATION IN OPPOSITION

JESSE FRIEDMAN,                 Indictment No. 67104 &
                                          67430

                Defendant.

- - - - - - - - - - - - - - - - - - -X

      I, JOSEPH R. ONORATO, being an Assistant District
Attorney of Nassau County, do hereby affirm the statements
herein to be true under the penalties of perjury, except such
as are made upon information and belief, which matter I
believe to be true.

      This affirmation is submitted in opposition to
Defense Counsels Motion on behalf of defendant JESSE
FRIEDMAN, dated April 15, 1988.

      1.  That as to the application by the defendant
pursuant to Article 210 of the Criminal Procedure Law,
alleging the insufficiency of the Grand Jury minutes, to
merit the returning of the instant indictment, seeking the
inspection of such Grand Jury minutes and/or the dismissal of
the indictment against the defendant, it is submitted by the
People that pursuant to Section 210.45 (5 a, b) the
defendant's instant application in this regard should be
denied.  There are no proper grounds expressed in the instant
application sufficient to merit the consideration of this
Motion under Article 210 of the Criminal Procedure Law.

Further, the instant application is defective in that "the moving papers do not contain sworn allegations supporting all the essential facts" (CPL Section 210.45 (5)). Therefore, it is submitted by the People that defendant's instant application should be denied. Disclosure of such minutes to the defendant is not permissable (PROSKIN V. COUNTY COURT OF ALBANY COUNTY, 30 N.Y. 2d 15).

In the alternative, it is submitted by the People that, should the Court find that the minutes already provided to the Court for its perusal are insufficient to sustain the true bill returned by the Grand Jury herein, leave is requested by the People to permit the District Attorney to represent the matter to either the same or another Grand Jury, within a reasonable period, pursuant to Section 210.20 (4) of the Criminal Procedure Law.

2. As to the allegations made by the defendant seeking the dismissal of Counts 4, 5, 8, 15 and 16 of Indictment #67104 and Counts 1 through 4 and Counts 7, 8, 21, 23, 24, 27, and 28 of Indictment #67430, for lack of specificity please see the attached supplemental bill of particulars that have been served on Counsel for the defendant. As the Court can see the People have significantly narrowed down the time period within which the defendant perpetrated the acts charged in the indictment. Consequently, the time period set out in the indictment as further delineated in the Bill of Particulars is not so inadequate to justify dismissal under

CPL Section 200.50 (6). Based upon the filing of the supplemental Bill of Particulars there can be no showing or allegation of bad faith on the part of the People in particularizing the time period in which the crimes occurred. Furthermore, the defendant has been provided with reasonable and adequate notice of the nature and cause of the accusations guaranteed by the Federal and State Constitutions and is not prevented from preparing a defense including an alibi defense. PEOPLE V. MORRIS 61 N.Y. 2d 290 (1984), PEOPLE V. BENJAMIN R. 103 AD2d 663 (1984), PEOPLE V. COVENEY 134 Misc 2d 894 (1987).

3, 4. As to the allegations made by the defendant that the Court inspect the Grand Jury minutes and dismiss any duplicitis and/or multiplicitis counts of the indictment the People consent to the inspection of the Grand Jury minutes only. The People submit that upon inspection of said minutes the Court will find that none of the counts charged against this defendant are duplicitis or multiplicitis.

5. As to the allegations that the indictment should be dismissed based upon the fact that fewer than twelve (12) grand jurors voted to indict the defendant, the People submit that upon inspection of the Grand Jury minutes and upon paperwork already forwarded to the Court, namely, attendance records and quorum records of the Grand Jury that indicted this defendant, the Court will ascertain that the defendant was properly indicted.

6. As to the allegations made by the defendant that the indictment should be dismissed on the ground of inadequate voir dire of the sworn witnesses, the People submit that upon inspection of the Grand Jury minutes the Court will note that each witness that testified before the Grand Jury was extensively and adequately voir dired as to his capacity to understand and appreciate the nature of an oath pursuant to CPL Section 60.20 (2).

7. As to the allegations made by the defendant that the indictment should be dismissed for the failure of the prosecutor to properly instruct the Grand Jury on the Law pursuant to the applicable sections of the Criminal Procedures Law, the People submit that the Grand Jury was properly instructed as to all relevant matters of Law concerning this case.

8 As to the allegations made by the defendant that the indictment should be dismissed for failure to follow statutory procedures in the use of video tape examinations in the Grand Jury the People submit that upon a reading of the Grand Jury minutes all statutory safeguards in the use of the video tape examination of the one witness that did testify on video tape before the Grand Jury was adequately preserved.

9.  As to the defense allegation seeking to dismiss
the indictments for failure of the People to provide adequate
discovery pursuant to CPL Section 200.95 and 240.40 the
defendant fails to articulate in his Motion, the grounds upon
which he seeks said relief.  Defendant's moving papers do not
contain any sworn allegations supporting the essential facts
contained in this request.  Suffice it to say that the People
have responded to each and every request made by the
defendant for discovery in this matter.  This includes, but
is not limited to, an extensive Demand to Produce that
Counsel for the defendant served upon the Office of the
Nassau County District Attorney on April 11, 1988, and
responded to by the People on April 18, 1988.  As the Court
is well aware there were numerous times during the
conferencing of the facts and circumstances of this case that
the People voluntarily provided information to the defendant
without the necessity of formal written motions.

10, and 11.  As to the allegations by the defendant
that all evidence seized from the defendants home and any
live testimony of all complainants as witnesses referred to
in the indictments should be dismissed based upon the grounds
of unlawful search and seizure and the tainted fruits
therefrom.  The defendant contends that the Federal search
warrant issued with reference to this case is invalid

because it was an anticipatory warrant. Defendant further asserts that the list seized pursuant to the warrant fell outside the scope of the warrant. Furthermore, the defendant asks this Court to apply New York State search and seizure law with reference to the execution of the Federal warrant based upon the assertion that Nassau County Police Deparmtment officials participated in the search.

Assuming, without conceding, that New York State law is applicable to the facts and circumstances of this case, the Federal warrant based upon an affidavit submitted by postal inspector John McDermott establishing the requisite probable cause, was clearly valid. Anticipatory warrants have consistently been held valid in this state. PEOPLE V. GLEN 30 N.Y.(2d) 252 (1972) cert. denied 409 U.S. 849 See also PEOPLE V. WYATT 46 N.Y.(2d) 926, and PEOPLE V. GIAMMAIANO 42nd N.Y.(2d) 1090. There is no probable cause defect in Anticipation Warrants as long as the evidence creates substantial probability that the seizable property will be on the premises when searched. Clearly the affidavit of Postal Inspector McDermott demonstrates that the evidence to be seized would be on the premises when searched. The defendants attempt to hold the Federal search warrant invalid based upon exigent circumstances as it relates to anticipatory warrants is clearly misplaced. Even assuming

without conceding, that exigency is a necessary element in the issuance of a anticipatory warrant, it is clear upon a reading of the affidavit of Postal Inspector McDermott, that Arnold Friedman was involved in the exchange of child pornography with other pedifiles.  See UNITED STATES V. HALE, 784 Federal 2nd 1465 (9th Circuit, 1986) wherein an anticipatory warrant for child pornography was held to be valid.

The defendant further contends that assuming that the anticipatory warrant was valid that the seizure of student lists constituted an unlawful abuse of the limit of the Federal warrant.  Here the defendant makes an unsubstantiated allegation that "student lists" were seized by law enforcement authorities during the execution of the Federal warrant.  In fact no "student lists" were seized by law enforcement officials during the execution of the Federal warrant on November 3, 1987.  What was seized by these officials was approximately two pieces of paper containing names and telephone numbers.  The pieces of paper did not contain any references to the fact that the names and telephone numbers related to children and/or students in the Friedman computer class.  The Police had to perform an exhaustive investigation in order to ascertain the identities, whereabouts, and relevance of the names listed on the paper.  Consequently, a reading of the Federal search

warrant wherein the police were authorized to seize photographs, magagzines, books, and other unusual pictures of children engaged in sexually explicit conduct and letters, envelopes, files, correspondence, notes (emphasis supplied), personal computer discs, and the personal computer needed to read the computer discs relating to the distribution and receipt of child pornography through the United States mail, clearly demonstrates that the papers containing names and telephone numbers was properly seized as potential evidence in connection with violations of Title 18 U.S.C. Section 1461 and Section 2252.

The defendant further contends that even assuming the Federal search warrant was valid and that the lists seized pursuant thereto fell under the parameters of said warrant the testimony of all complainants and witnesses identified as a result of the seized list must be suppressed. In support of this position the defendant relies on the case of UNITED STATES V. CECCOLINI 435 US 268 (1978). The facts that the defendant applies to the principles enunciated in CECCOLINI are inaccurate, speculative, and subjective. The evidence seized pursuant to the search warrant issued by Judge Herbert Lipp as well as the identities of the defendant's victims should not be suppressed. See UNITED STATES V. CECCOLINI 435 U.S. 268 (1978), PEOPLE V. McGRATH 46 N.Y. 2d 12 (1978) cert denied 440 US 972. The Courts of this state have routinely denied

suppression of evidence including the testimony of witnesses where as in this case a clear attenuation exists. PEOPLE V. DENTINE 21 NY 2d 700 (1967), cert denied 393 US 967 (During an unlawful search of defendant's apartment police questioned a man who led them to a woman who had an abortion performed by a defendant. It was held that the woman was properly permitted to testify against the defendant. PEOPLE V. MENDEZ 28 NY 2d 94 (1971) cert denied 404 US 911 (albeit a witness was discovered through an illegal wire tap, the evidence voluntarily supplied by that witness was permissable). PEOPLE V. LaROCCA 37 NY 2d 927 (1975) (while defendant's confession was properly excluded at trial for failure to give warnings, testimony of witnesses whose names defendant gave in his confession was properly admitted). PEOPLE V. GRAHAM 39NY2d 775 (1976) (testimony of a witness is not necessarily excludable because the identity of the witness had been ascertained by a legal search and seizure).

12.  The People consent to the consolidation of indictment #67104 and 67430.

WHEREFORE, it is respectfully requested that an order be entered consistent with the foregoing.

Joseph R. Onorato
Assistant District Attorn

Dated: Mineola, New York
       May 10, 1988

Sir:

PLEASE TAKE NOTICE, that the within is a true copy of

...........................................................

...........................................................

...........................................................

in the within entitled action this day filed and entered herein in the office of the Clerk of the County of Nassau, at Mineola, Nassau County, New York.

Dated, Mineola, N.Y.,

............................................., 19.......

Yours etc.
DENIS DILLON
District Attorney
Nassau County
Mineola, New York

To

.......................................................Esq.

Attorney for

NASSAU COUNTY
## Indictment No. 67104 & 67430

The People of the State of New York

against

**JESSE FRIEDMAN,**

**Defendant**

## AFFIRMATION IN OPPOSITION

DENIS DILLON
District Attorney
Mineola, New York

Due and timely service of a copy of the within

............................................................

............................................................
is hereby admitted.

Dated .....................................,19..........

Attorney for

DA-48. 3/67
DA-1339A. 12/71
Rev. 1/75

0585

APP.

Crim. Term: Part __V__

Motion Cal. #..C-269........

Present: ..........

Hon...ABBEY..L.:..BOKLAN......................................
                                              *County Judge*

Indictment #S...67104..& 67430

---

PEOPLE OF THE STATE OF NEW YORK

     —against—

    JESSE FRIEDMAN,

<br>

                                 *Defendant*

HONORABLE DENIS DILLON
District Attorney
Nassau County
Mineola, New York

  By:   Joseph R. Onorato, Esq.

PETER PANARO, ESQ.
Attorney for Defendant
4216 Merrick Road
Massapequa, NY  11758

---

On April 15, 1988, defendant moved for an Order:

1.   Granting an inspection of the stenographic transcript of the Grand Jury proceedings upon which these indictments were based, and upon such inspection, for a dismissal of both indictments pursuant to Article 210 of the Criminal Procedure Law;

2.   Dismissing counts 4, 5, 8, 15, and 16 of Indictment No. 67104; and counts 1-4 and Counts 7, 8, 21, 23, 24, 27, and 28 of Indictment No. 67430 for lack of specificity of the allegations, pursuant to C.P.L. §200.50(6);

3.   Dismissing any counts of the indictments which charge more than one instance of Sodomy, Sexual Abuse, or Attempted Sexual Abuse, as duplicitous, pursuant to C.P.L. §200.30(1);

4.   Dismissing any counts of the indictments which are multiplicitous;

5.   Dismissing the indictments in that fewer than twelve grand jurors voting to indict had heard all the essential and critical evidence, resulting in fatally defective proceedings, pursuant to C.P.L. §210.35(5);

6.    Dismissing the indictments on the grounds of inadequate voir dire of sworn witnesses as to capacity to understand an oath pursuant to C.P.L. 60.20(2);

7.    Dismissing the indictments for failure of the prosecutor to properly instruct the Grand Jury on the law pursuant to C.P.L. §210.35(5), §190.50(6);

8.    Dismissing the indictments pursuant to C.P.L. §190.32(5) for failure to follow statutory procedures in the use of videotaped examinations in the grand jury;

9.    Dismissing the indictments for failure of the People to provide adequate discovery pursuant to C.P.L. §200.95 and §240.40;

10.   Suppressing all evidence seized from defendant's home pursuant to C.P.L. §710.20(1)(4) on the grounds of unlawful search and seizure;

11.   Suppressing the live testimony of all complainants and witnesses referred to in the indictments as the tainted fruit of an illegal search and seizure;

12.   Consolidating Indictments 67104 and 67430 pursuant to C.P.L. §200.20(4)(5) and treating them as a single indictment for trial purposes.

13.   Granting the defendant the right to make other pertinent motions as may be permitted by statute.

## INSPECTION AND DISMISSAL

1.    Upon his motion to inspect and dismiss, the defendant alleges that the evidence before the Grand Jury was not legally sufficient to establish the commission of the offenses charged or any lesser included offenses.   C.P.L. 210.20(1)(b); C.P.L. 210.30.

The Court has inspected the Grand Jury minutes in camera. Upon that inspection, this Court has determined that there is no need

to authorize the release of any portion of the minutes to the parties or to defer decision on the motion seeking a dismissal of the indictments until after the parties have been heard further. The Court finds that the evidence before the Grand Jury was legally sufficient to support the crimes charged or any lesser included offenses as to both Indictments, with the following exceptions:

With respect to Indictment No. 67104, the Court finds that the evidence presented to the Grand Jury is insufficient to support the charges alleged under Count 8 (Sexual Abuse in the First Degree) and Count 49 (Endangering the Welfare of a Child). Accordingly, those charges are dismissed with leave for the People to represent those charges to another Grand Jury.

With respect to Indictment No. 67430, the Court finds that the evidence presented to the Grand Jury was insufficient to support the charges alleged in Count 28 (Sexual Abuse in the First Degree); Count 44 (Endangering the Welfare of a Child); Count 54 (Endangering the Welfare of a Child); Count 57 (Endangering the Welfare of a Child); Count 67 (Endangering the Welfare of a Child); Count 84 (Endangering the Welfare of a Child); and Count 85 (Endangering the Welfare of a Child). Accordingly, these charges are dismissed with leave for the People to represent to another Grand Jury.

2. With respect to defendant's motion to dismiss Counts' 4, 5, 8, 15, and 16 of Indictment No. 67104 and Counts' 1, 2, 3, 4, 7, 8, 21, 23, 24, 27, and 28 of Indictment No. 67430 for lack of specificity, that motion is denied.

C.P.L. §200.50(6) does not require an exact date and time, but only a statement that the crime or crimes occurred "on or about a designated date or during a designated period of time." See People v. Morris, 61 NY2d 290 (1984).

⁴ Where, as here, when the time or date is not an essential

element of the charged offenses, a claim of inadequate specificity is determined "on an ad hoc basis by considering all relevant circumstances." People v. Morris, supra at 295. Among the factors to be weighed are "the span of time set forth and the knowledge the People have or should have of the exact date or dates of the crime(s)," "the age and intelligence of the victim and other witnesses," and "the nature of the offenses, including whether it is likely to occur at a specific time or is likely to be discovered immediately." People v. Morris, supra.

Upon consideration of these factors, this Court finds that the time periods designated under each count of Indictment No. 67104 and Indictment No. 67430, and as further delineated in the Bill of Particulars provided by the People, are not so inadequate or unreasonable as to justify dismissal. Defendant has been informed of the nature of the offenses alleged and the dates and time of these offenses within a reasonably designated time period.

3.    Denied.  This Court finds that there are no duplicitous counts of Sodomy, Sexual Abuse or Attempted Sexual Abuse in either Indictment.

4.    Denied.    This   Court   finds   that   there   are   no multiplicitous counts in either indictment.

5.  Denied.  The Court is satisfied that the statutory quorum requirements for voting in the Grand Jury were met.   The Court's examination of the Grand Jury attendance records disclosed that a quorum of grand jurors was present on every day that evidence was presented with respect to both Indictments, and that at least twelve of those who voted to indict heard all of the "critical and essential" evidence against the defendant.  Furthermore, the Grand Jury minutes indicate that the Assistant District Attorney properly instructed the Grand Jury on the requirements for voting.

6.    Denied.    The Court finds that each of the child-witness' that testified before the Grand Jury was extensively and adequately voir dired as to his capacity to understand and appreciate the nature of an oath pursuant to C.P.L §60.20(2).

7.    Denied.    Proper legal advice and adequate legal instructions were given by the District Attorney.    C.P.L. §§210.35; 190.25(6).

8.    Denied.    The Court finds that the Assistant District Attorney adhered to the statutory procedures for the use of a videotaped examination of a child-witness in the Grand Jury.

9.    Defendant's motion to dismiss both indictments for failure of the People to provide adequate discovery pursuant to C.P.L. §200.95 and 240.40 is denied.

## CONTROVERSION OF THE SEARCH WARRANT AND SUPPRESSION OF PHYSICAL EVIDENCE

10.    Defendant seeks to controvert the Federal search warrant which permitted the search and seizure of certain items at 17 Picadilly Road, Great Neck, New York, the residence of the defendant, and to suppress any and all evidence seized pursuant to the warrant.

Defendant contends that under State or Federal constitutional standards, the search warrant must fail as an illegal "anticipatory warrant."    He specifically contends that since no "exigent circumstances" were presented to the issuing Magistrate, that the pornographic materials sought in the warrant were likely to be destroyed or otherwise disposed of prior to seizure, that the issuance of the "anticipatory" search warrant was improper.    The People oppose defendant's motion to suppress.

With respect to defendant's motion to suppress, this Court agrees with the defendant that the validity of the Federal search

warrant should be governed by New York State Law.    See People v. Griminger, _____ NY2d _____ (1988); N.Y.L.J. May 9, 1988, p. 18, Col. 1.

Neither the State Constitution nor relevant sections of the Criminal Procedure Law forbid the issuance of a search warrant in advance of the imminent or scheduled receipt of seizable property by the person or at the premises designated in the warrant.    People v. Glen, 30 NY2d 252, 254 (1972). Furthermore, the Court of Appeals has held that anticipatory warrants are proper without any indication of any "exigent circumstances" requirement prior to issuance.    Indeed, as long as the evidence presented to the issuing judge creates "substantial probability" that the seizable property will be on the premises when searched, an anticipatory warrant may be issued.    People v. Glen, supra at 259.    This Court has reviewed the warrant in question and the affidavit of Postal Inspector McDermott and finds no compelling reason on the face of the documents to disturb the probable cause determination of the Federal Magistrate.    Accordingly, the defendant's motion to controvert the search warrant and to suppress any evidence seized pursuant to that warrant is denied.

## MOTION TO SUPPRESS "STUDENT LISTS"

11.    Defendant contends that even if the Federal warrant is valid, that the seizure of "student lists" was an abuse of the limits of that warrant.    Accordingly, the defendant moves to suppress the testimony of any complainant and/or witness who was interviewed by law enforcement officials as the direct result of the seizure of these lists.    Additionally, defendant seeks to suppress the state warrant and all evidence seized pursuant to that warrant, as the "tainted fruit" of the unlawful seizure of the "student lists".    Alternatively, defendant seeks a pre-trial hearing to determine precisely what the seized "lists" consisted of.

, The People oppose defendant's motion to suppress.    The People

specifically contend that no "student lists" were seized from the defendant's residence when the Federal warrant was executed.

Defendant's motion is denied.    The Federal search warrant authorized the seizure of "correspondence" and "notes" relating to the distribution and receipt of child pornography.    The affidavit in support of the warrant described in general the course of correspondence among pediphiles and their inclinations to (a) save such correspondence, and (b) maintain lists of names, addresses, and phone numbers (affidavit pgs. 8-9).

The Court has inspected the lists referred to in defendant's motion in camera, and finds that there is no need to hold a pre-trial hearing to determine the contents of the disputed "lists".    Indeed, the seized lists are not captioned as "student lists", rather, they are just names and telephone numbers as described in the Postal Inspector's affidavit. $\sqrt{}$ They were, in short, precisely what the Federal Magistrate intended should be seized.    Therefore, there was probable cause for those executing the warrant to seize the lists as evidence of a crime.$\rangle$

Accordingly, having been properly seized, the lists may properly be used as evidence at trial, and, as support for obtaining the State search warrant.

12.    Defendant's motion to consolidate Indictments 67104 and 67430 pursuant to C.P.L. § 200.20(4)(5) is granted upon consent of the parties.

13.    Defendant's request for leave to make additional motions is denied, with leave to renew upon a showing by the defendant that the interests of justice will be served by the determination of such additional motions, as well as good cause for the failure to make a timely application.    C.P.L. 255.20(3).

Therefore, it is

ORDERED, that the defendant's motions are denied except as specifically set forth herein.

E N T E R

GRANTED

JUL 18 1988

HAROLD W. McCONNELL
CLERK

S/ Abbey L. Boklan
Abbey L. Boklan, J.C.C.

DATED: July 14, 1988

COUNTY COURT : NASSAU COUNTY

      PART V

- - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK  :

         -against-              :  IND. # 69783
                                      Sodomy 1

JESSE FRIEDMAN,                :

               Defendant.    :

- - - - - - - - - - - - - - - - - - - X
                         262 Old Country Road
                         Mineola, New York
                         November 15, 1988


B e f o r e:

               HON. ABBEY L. BOKLAN,
                       County Court Judge

Appearances:

               HON. DENIS DILLON,
               Nassau County District Attorney
               BY:   JOSEPH ONORATO, ESQ.
                    Assistant District Attorney
                         For the People


               PETER PANARO, ESQ.
                       For the Defendant


                   -     -     -

        MINUTES OF ARRAIGNMENT AND PROCEEDINGS

                   -     -     -


                       Ellen Sesskin Smith, CSR
                       Official Court Reporter

```
 1                                                      2

 2                    (The following occurred in chambers:)

 3                    THE COURT:  People vs. Jesse Friedman.

 4                    This is being held in chambers.  We will put

 5               everyone's appearance on the record.

 6                    We have Mr. Onorato representing the People,

 7               Mr. Peter Panaro representing the defendant Mr.

 8               Jesse Friedman.

 9                    Mr. Richard Kraus who has filed an

10               application on behalf of Newsday to use still

11               photography at the proceeding.  And?

12                    MR. MILLER:  Anthony Miller, Long Island

13               Community Newspapers, 132 East Second Street,

14               Mineola, 11501.

15                    THE COURT:  All right, I will now hear from

16               all of the parties as to whether there is any

17               opposition to these applications.

18                    Mr. Onorato?

19                    MR. ONORATO:  The People take no position.

20                    THE CLERK:  Mr. Panaro?

21                    MR. PANARO:  Your Honor, I'm going to object.

22               I would object for several reasons.

23                    Insofar as Newsday is concerned, Newsday is a

24               widespread and a wide range newspaper in Nassau

25               and Suffolk County.  Long Island Community
```

3

2    Newspapers, I am assuming, although I do not have

3    any knowledge whatsoever of that publication --

4    I'm assuming that the Great Neck Record is part of

5    their distribution.

6        MR. MILLER:  Yes, that's correct.

7        MR. PANARO:  I will inform this Court that my

8    client and his family have been the subject of

9    several attacks in the last couple of months in

10   the Great Neck area on their property, and just

11   several instances -- any client's car has been

12   egged, my client's mother's car had the wires torn

13   out of it, so they informed me.

14       My client's mother has been harassed on the

15   street.  My client is screamed at while, if he

16   goes into a supermarket, cursed at, et cetera, et

17   cetera.

18       This is probably one of the most instantly

19   recognizable faces in the Great Neck area at this

20   moment.  There is really no need to feed that type

21   of mentality any more than it has already been

22   fed.

23       I'm very afraid for Jesse's safety.  I feel

24   that further publicity with pictures from cameras

25   will only enhance that type of violence.

4

Secondly, there is a point in this case where
there will be a trial.  Jesse will be found either
guilty or not guilty.  If Jesse is found guilty, I
am assuming that there will be a period of
incarceration.

That will also enhance his instant
recognition in prison, should that time come.  And
with a charge of this sensitivity, and this
nature, I think that would endanger his life.

I feel the less publicity that Jesse is faced
with, the better.  And I request that there be no
still photography, of at least Jesse, on those
grounds.

THE COURT:  Mr. Kraus, would you like to be
heard?

MR. KRAUS:  Your Honor, I can only add that
we have photographed Jesse on previous occasions.
The Court has allowed us to take pictures at
previous Court appearances.  This is part of the
People's right to know.  And beyond that, I have
nothing else to add.

THE COURT:  Mr. Miller, would you like to be
heard at all, sir?

MR. MILLER:  Yes.  We have previously

5

2      offered, through prior counsel, to give Mr.

3      Friedman equal space in terms of any statements

4      that he wishes to make.  He has contacted the

5      paper, and we have tried to present a balanced

6      view of the entire situation, trying to avoid any

7      type of judgment.

8           The community is completely aware of the

9      case, and has received extensive publicity, both

10     in the daily papers, and on television, radio.

11     And to turn off coverage at this point, would, I

12     think, present a very onesided, or probably

13     prejudicial to Jesse situation of what is actually

14     going on.  This is an ongoing story.  And it has

15     apparently been widening from what I'm told this

16     morning.  And it would be inappropriate, at least,

17     to stop coverage at this point.

18          THE COURT:  All right, Mr. Kraus and Mr.

19     Miller are of course correct.  I have been

20     permitting photography in the courtroom.  I see no

21     difference today.  There are no children who will

22     be here, as far as I know.

23          There will be one restriction on whichever of

24     you gentlemen will be taking the photographs.  You

25     may not photograph the audience.

6

2          The reason I say that, is that someone, if

3          there is a parent in the audience, that might

4          cause recognition of a young child who is involved

5          here.  But other than that, you are welcome to

6          photograph the proceedings, including Mr.

7          Friedman, and of course the Court.

8          MR. MILLER:  Your Honor, a question if I may.

9          I presume what you are saying here refers to

10          inside the courtroom itself, not outside of the

11          building or in the halls?

12          THE COURT:  I have only control within my

13          courtroom.  From then on it's between you and

14          whomever you are photographing.

15          MR. MILLER:  For the record, I renew my

16          statement to counsel.  We will continue, if you

17          have anything you want to say, or anything you

18          want us to consider.  This is not a onesided

19          presentation of the news.  We would like to hear

20          both sides of it.

21          THE COURT:  All right, Mr. Kraus and Mr.

22          Miller, I leave it to the two of you to work out

23          the photography.

24          MR. MILLER:  We can, your Honor, thank you.

25          MR. ONORATO:  Your Honor, Mr. Kraus and Mr.

7

2    Miller may want to be advised of the fact that the

3    co-defendant Ross Goldstein's arraiganment is

4    going to be done at a different time, at

5    approximately 11:30, just in case you didn't know

6    that.  We don't want you to leave and come back.

7         MR. KRAUS:  Will that be in your courtroom?

8         THE COURT:  It will, but that is a separate

9    application.

10        MR. ONORATO:  I wasn't tying to suggest that

11   we do it now, Judge.

12        THE COURT:  When you decide who is doing it,

13   and where you are taking photographs from, I would

14   just like a court officer to come get me to make

15   sure the spot is all right.  In the past, you

16   recall, you have been taking the photographs from

17   my right side up front.  And if that is still good

18   for you, I have no objection.

19        MR. KRAUS:  Your Honor, I have not

20   photographed in your courtroom.  The courts in

21   this courthouse are extremely dimly lit.  It would

22   help, if for the sake of the pictures, if we could

23   work so that the windows are behind us.  In other

24   words --

25        THE COURT:  Well why don't you take a moment,

8

1

2          we can all go inside.  I will show you where they

3          have been shooting from in the past.  And if that

4          is convenient to you -- I just don't want any

5          photographing from straight on in front of me, in

6          other words.  So we'll just go over that inside.

7              MR. MILLER:  For the record, your Honor, I'm

8          perfectly prepared -- Mr. Kraus and I can work

9          this out, and he will do the actual photography

10         inside.

11             THE COURT:  All right, fine.

12             MR. MILLER:  He will, and I will work out my

13         interests.

14             THE COURT:  All right.

15             (Whereupon a recess was taken after which the

16         following occurred in Chambers:)

17             THE COURT:  This is an application for

18         videotaping for later broadcasts by News 12, Ken

19         Grimball, on behalf of the station.

20             MR. GRIMBALL:  Correct.

21             THE COURT:  I will ask, gentlemen -- first,

22         counsel, People?

23             MR. ONORATO:  No position.

24             THE COURT:  Defendant, Mr. Panaro?

25             MR. PANARO:  Judge, I have noted my

9

1

2          objections.  However, for purposes of this

3          application I will note them again, with the

4          Court's permission.

5               THE COURT:  Please, because Mr. Grimball

6          wasn't here before, an I assume he would like to

7          respond.

8               MR. PANARO:  Judge, my client has informed me

9          that both he and his family have been the subject

10         of harassment in the Great Neck community.  They

11         have been targeted with violent acts upon their

12         property, although I have not heard of any violent

13         acts upon their persons.

14              Their car has been egged.  Their family

15         automobile, the wires have been torn out.  Mrs.

16         Friedman informed me, informs me, that people

17         scream at her on the street and in the

18         supermarkets.  Jesse has also informed me of like

19         situations.

20              I can't help but think that the advent of

21         cameras in the courtroom is a major part of that

22         harassment, because their faces have been

23         instantly recognizable in the community.  And what

24         we are doing here is only feeding that.

25              There has been no publicity in this case

```
 1                                                   10
 2            whatsoever, that I know of anyway, since June of
 3            '88, June 24th, which was the date of the last
 4            arraignment.
 5                 A lot has been forgotten.  At least they --
 6            and I don't see any reason to rekindle that.
 7                 I'm concerned for my client's safety.  The
 8            parents show up at every court proceeding.  I'm
 9            concerned that it is not only as concerned
10            parents, but to exercise, and possibly rightly so,
11            their influence upon the prosecution of the case
12            and the administration of justice.
13                 I only feel that cameras in the courtroom is
14            adding to that.  And that is especially true in
15            this case, where you have children, and where you
16            have families, and the most sensitive counts of
17            criminal conduct that I can imagine.
18                 I might also note, Judge, that this
19            arraigment him was set for 9:30.  And again, all
20            that we are doing is delaying the court
21            proceedings, because I was ready to go at 9:30.
22            And I would have preferred having my client
23            arraigned at 9:30.  These applications, I may note
24            for the record, are really seriously hampering
25            very valuable Court time.
```

11

And I note that it is now 10:00 o'clock.

THE COURT:  All right, you will have the opportunity -- this is an experiment.  We all realize that it does take time.  You will have the opportunity as an attorney to fill out a questionnaire for the Office of Court Administration to the general procedures.

There is no doubt that everyone would like to be heard on these applications, and that that does take time.  There is no way of getting around that.

I have granted permission in the past for filming.  I see no change in the circumstances for this arraignment to change that.  I will permit Channel 12 to film in the courtroom, with one restriction, which is the same restriction that I have given previously.  You may not film the parents in the back of the the audience, because I don't want any chance of recognition of who the young children are who are involved in this case.

But as far as the Court, the defendant, you are welcome to film.  So you can set up in there.  We had a place that we were filming before, if that is convenient to you, which is over to one

 1

 2          side.  We'll show you that side.  Otherwise, if

 3          you want to change your location, just tell me,

 4          and we'll work out something.

 5               MR. GRIMBALL:  That is fine, thank you very

 6          much for allowing us.

 7               THE COURT:  You're welcome.

 8               (The following occurred in open court:)

 9               THE CLERK:  For arraignment, Peopole vs.

10          Jesse Friedman.

11               MR. PANARO:  For the defendant.  Peter

12          Panaro, 4216 Merrick Road, Massapequa, New York,

13          for the defendant.

14               THE CLERK:  You are Jesse Friedman?

15               THE DEFENDANT:  Yes, I am.

16               THE CLERK:  You appear here with your

17          attorney?

18               THE DEFENDANT:  Yes, I do.

19               THE CLERK:  On November 7th, 1988, the Grand

20          Jury under Indictment 69783, indicted you for

21          sodomy in the first degree, 126 counts; sodomy in

22          the second degree; sexual abuse in the first

23          degree, nine counts; sexual abuse in the second

24          degree; use of a child in a sexual performance,

25          nine counts; endangering the welfare of a child,

1                                                          13

2          52 counts.

3                 You are advised of your right to counsel

4          through all stages of these proceedings.  And also

5          advised if you have any prior felony convictions,

6          you may be subject to a mandatory term of

7          imprisonment.

8                 How do you plead; guilty or not guilty?

9                 THE DEFENDANT:  Not guilty.

10                THE CLERK:  I have a not guilty plea, your

11         Honor.

12                MR. ONORATO:  Judge, I would like the record

13         to reflect that I have handed to the Clerk of the

14         Court the original of the indictment, as well as

15         the original of the People's voluntary disclosure

16         form, a copy of which has been served on counsel

17         for the defendant.

18         The People are announcing their readiness for

19         trial.

20                MR. PANARO:  The defendant acknowledges the

21         receipt of those documents, your Honor.

22                The defendant enters a plea of not guilty to

23         all counts in the indictment.  The defendant

24         demands a trial by jury on all counts, waives a

25         public reading of the information and the

14

indictment, and would request a court date.

I would like to be heard on the question of bail, with the Court's permission.

THE COURT:  Certainly.

MR. PANARO:  Judge, I have had a conference with the assistant district attorney in this case, and he informs me that he is going to be requesting additional bail.

I will inform the Court, much of which the Court probably already knows, and that is that my client is 19 years old.  Prior to these three indictments -- this is the third -- it is my understanding that the defendant had not been arrested prior to those indictments.

Since this indictment, the defendant had been arrested on one A misdemeanor, which is presently pending in Manhattan for which we have a court date.  And that was for peddling on the street without a license, selling goods.

The defendant informs me, Judge, that he was arrested originally on this charge in November of 1987, at a time when I did not represent him.

However, there was very high bail in that case, which was granted.  And the Appellate

15

Division reduced that bail to 100 thousand

dollars.  My client informs me that he has been

out on 100 thousand dollars bail set by the

Appellate Division Second Department since

November 1987, which is over a year ago.

Moreover, I think we can all agree that if

Jesse Friedman were going to abscond, he would be

long gone by now.  It has been over a year that he

has been out of jail.

Since he has been out of jail, there have

been two further indictments.  He was in essence

released in his own custody on the first of the

second indictments, and there was a felony

complaint before Judge Murray Pudalov, which is

basically the charges, the underlying charge

before you today.

And at that arraignment on June 24th, 1988,

the People firstly did not request additional

bail, but they did, however, reserve their right

to make a bail application at the appropriate

time.

However, based on my representations, very

much similar to what I'm placing on the record

today, Judge Murray Pudalov released, continued

16

the defendant on bail, but in essence released him in his own custody on all of the charges before him.

An that was some five months ago.  So the defendant has known of these pending charges for over five months, as well as the total package of charges here for over a year.  And he has been out all during that time.

I will also note for the Court that my client has graduated high school.  He was attending college at SUNY, but had to drop out because of these charges.  And he has made many, many appearances both before your Honor, the District Court judges, and other judges in the County of Nassau.  He has not missed a court appearance.  And I might notes for the record he is here at nine o'clock sharp almost every time the case is on.

We are approximately six weeks away from trial by jury in this case, a jury trial, which in my estimation, is going to take quite a lengthy time.

My client's freedom at this point is vital to our defense in this case.  It has been vital since

17

1

2          I have been on this case.  And my client has

3          supplied invaluable information in order to help

4          me prepare for this defense.

5               We are now putting all of the loose ends of

6          that defense together.  And if he is incarcerated

7          at this late date, it would only serve so

8          prejudicially to him, that it would hamper his

9          defense.

10               I would ask this Court that since there is a

11          trial date set by your Honor for January 4th,

12          since we are only six weeks away from that, and

13          because he has been out on bail for over one year

14          on these same charges, there is no risk whatsoever

15          of his absconding.  And I would ask that he be

16          continued on that 100 thousand dollars bail.  And

17          that it be clear that that bail is to cover these

18          charges.  And that there be no additional bail

19          requested at this time.

20               THE COURT:  Mr. Onorato, do you wish to be

21          heard?

22               MR. ONORATO:  Yes, Judge.  I'm mindful of the

23          facts and circumstances that Mr. Panaro has

24          discussed, since I have been assigned the

25          prosecution of this case for nearly a year.

1

2          With all due respect to the Appellate

3      Division, when they lowered the bail from 250

4      thousand dollars to a hundred thousand dollars,

5      the case that was provided to them at that time by

6      the People, was obviously only the tip of the

7      iceberg, Judge.

8          Since the time that the Appellate Division

9      has set bail in the amount of 100 thousand

10     dollars, there has now been two additional

11     indictments since that time, totalling in excess

12     of 200 counts pertaining to this defendant.

13         The testimony before the latest Grand Jury in

14     connection with the third indictment has revealed

15     a very horrible story, as far as this defendant is

16     concerned.  Not only acts of sexual abuse, but

17     acts of physical abuse to the children as well.

18         The People feel that Jesse Friedman is a

19     danger, not only to himself, but a danger to

20     society.  We feel that the magnitude of this case

21     cries out for an additional amount of bail.

22         It is obvious from the defendant's

23     involvements in Manhattan with another altercation

24     with the law, that he is not cognizant in any way,

25     shape, or form, that to be a law-abiding citizen

1                                                                19

2              is the proper course of conduct in today's

3              society.

4                   I think he is an aberration, I think he is a

5              misfit.   I think that because of these particular

6              facts of this case, that he has more of a reason

7              to flee now.

8                   Conversations with his counsel and with the

9              Court has revealed that since this third

10             indictment, a person who is about to be arraigned

11             within the next hour, a co-defendant by the name

12             of Ross Goldstein, has provided information

13             concerning Jesse Friedman to us in the course of

14             sworn testimony before the Grand Jury.

15                  He has agreed to testify against Mr. Friedman

16             at the trial.   The People felt that they had a

17             very strong case before that agreement with Mr.

18             Goldstein.   We now think that the case against Mr.

19             Friedman has been enhanced immeasurably due to

20             that cooperation.

21                  And we feel that notwithstanding the fact

22             that he has made prior court appearances, the

23             magnitude of the case which is about to face him

24             in the not too near future, is so overwhelming,

25             that I think that under the circumstances he is a

20

2      risk of flight. And we would be asking for bail

3      to be increased to the amount of 200 thousand

4      dollars.

5          MR. PANARO: I would just answer that request

6      quickly, with the Court's permission, in that;

7      one, I remind this Court that all of the new

8      charges that appear before you today are,

9      allegedly occurred at a period in time prior to

10     the very first set of charges in this case; to

11     wit, November 1987. Nothing has happened,

12     according to this indictment, since November 1987

13     when he was released on a hundred thousand dollars

14     bail.

15          Everything that is alleged to have occurred,

16     occurred before that.

17          Secondly, insofar as the gravity of the

18     charges are concerned, I find that argument to be

19     mitigated, Judge, by the fact that my client was

20     originally facing almost three hundred years on

21     the first two sets of charges. I don't see where

22     this adds anything in the normal course of one's

23     human life, which is usually less than a hundred

24     years.

25          I would ask, Judge, that there is really no

21

2         reason at all, six weeks prior to trial, to

3         incarcerate this man who has been out on bail for

4         over a year.

5         THE COURT:  All right, the hundred thousand

6         dollars previously set on the other two

7         indictments, will cover this indictment as well.

8         MR. PANARO:  Thank you, Judge.

9         THE COURT:  Now we have set a firm trial date

10        for January the 4th.  We will be doing our

11        conference and stipulations -- it is my

12        understanding, Mr. Panaro, you have other court

13        appearances this morning.  Do you want to come

14        back tomorrow to do those conferences and

15        stipulations; is that correct?

16        MR. PANARO:  Or late this afternoon, either

17        one, Judge.  I would prefer to come back right

18        after I finish in Hempstead, I'll come back here.

19        THE COURT:  That will be fine.

20        THE COURT:  Now it is also my understanding

21        that both of you are consenting, if this

22        indictment is not dismissed, to a consolidation of

23        this indictment with the other two, in order to

24        try all three indictments together.  Is that

25        correct?

```
 1                                                    22

 2                  MR. PANARO:  That is correct, your Honor.

 3                  MR. ONORATO:  That is correct.

 4             THE COURT:  All right, the record will

 5        reflect that if the indictment is not dismissed,

 6        this indictment will be consolidated with the

 7        other two for trial purposes.

 8             All right, we have to have a control date now

 9        for Mr. Friedman.

10             Will there be any hearings in the new

11        indictment?

12                  MR. ONORATO:  I don't anticipate any.

13             THE COURT:  No?

14                  MR. ONORATO:  I don't anticipate any.

15                  MR. PANARO:  I'll let the Court know in a few

16        days, Judge.  With all due candor, I have to read

17        -- that is very lengthy indictment.  I have to

18        read through it, and I would have to look at the

19        stipulations that we are going to sign today.

20             THE COURT:  Now it is my understanding from

21        the People, you will have the Grand Jury minutes

22        ready for the Court within the next 48 hours?

23                  MR. ONORATO:  Yes, your Honor.

24             Judge, the record should also reflect that, a

25        certain bit of housekeeping.
```

1

23

2           Present in the courtroom are several members

3       of the Nassau County Police Department Sex Crimes

4       Unit.  At the time the defendant was arrested on

5       felony complaints, which eventually led to the

6       third indictment, the magnitude and the scope of

7       the charges was far less than what the Grand Jury

8       voted as far as an indictment is concerned.

9           They have advised me, that in order to

10      complete the necessary police paperwork, that Mr.

11      Friedman must accompany them in his attorney's

12      presence, if he so desires, to police headquarters

13      for processing on the new charges that the Grand

14      Jury indicted his client for.

15          They also advise me that in order for them to

16      do the paperwork, an arrest warrant or indictment

17      warrant would have to be signed by the Judge.

18          My office has prepared such a warrant, which

19      I'm handing to the Clerk of the Court, asking your

20      Honor to sign that so that the police department

21      can process Mr. Friedman.

22          I spoke with Mr. Panaro about that.  He

23      indicates to me that his client would consent to

24      being processed on all of the charges pertaining

25      to this indictment.

24

1

2             THE COURT:  Mr. Panaro?

3             MR. PANARO:  I discussed this with my client

4      at length, your Honor.  We do consent to my client

5      being processed on these charges.

6             THE COURT:  Do you want to go with him?

7             MR. PANARO:  I have discussed that also with

8      my client.  The police are well aware that counsel

9      is involved in this case, and obviously any

10     questioning or any statements made by my client

11     would be taken into consideration by this Court

12     with a view toward the fact that counsel is

13     obviously known to everyone involved.  And based

14     on that, there is no reason for my appearance.

15            THE COURT:  All right, as to a control date

16     then.  If we have no hearings, the next time this

17     case will be on the calendar is for the decision

18     of the Court.  I think perhaps the best thing is

19     to just admonish Mr. Friedman for the trial at

20     this point.

21            Mr. Onorato, do you have any objection to him

22     not appearing for the passing of papers, and to

23     set the next date for his appearance?  And our

24     date set for trial is January 4th.

25            MR. ONORATO:  I have no objection, your

1                                                              25

2            Honor.

3                 THE COURT:   January 4th for Mr. Friedman.

4                 THE CLERK:   Jesse Friedman, you are advised

5            you have to appear back here on January 4th at

6            9:30.   If you fail to do, bail will be forfeitted,

7            proceedings could go on in your absence, and a

8            warrant will be issued for your arrest.

9                 Do you understand? ?

10                THE DEFENDANT:   Yes, I do.

11                THE CLERK:   January 4th.

12                THE COURT:   We'll need a copy of the

13           indictment as well for when I look at the minutes.

14                THE CLERK:   I have one.

15                MR. ONORATO:   I have provided one to the

16           Clerk, your Honor.

17                MR. PANARO:   Thank you, Judge, good morning.

18                THE COURT:   Good morning.

19                     -        -        -

20
     CERTIFICATION:
21
                 I hereby certify that the foregoing is a true
22           and accurate transcript of my stenographic notes in the
             matter of The People of the State of New York vs. Jesse
23           Friedman.

24

25

At a Term of the Supreme
Court, Appellate
Division, Second
Department held at 45
Monroe Place, Brooklyn,
New York

-------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

                Respondents

        against            ORDER TO SHOW CAUSE

JESSE FRIEDMAN,           Indictment Nos.

                     67104, 67430

        Defendant

-------------------------------------X

ENTER:

        _____

HON._____

       UPON Reading and filing the annexed affidavit of

DOUGLAS H. KRIEGER, Esq., dated April 15, 198, the appended exhibits, the accompanying memorandum of law, and upon all prior pleadings and proceedings herein,

LET the Respondent show cause before the Appellate Division, Second Department at the Courthouse located at 45 Monroe Place, Brooklyn, New York on the $\underline{22}^{m}$ day of April, 1988.

WHY an Order should not be entered pursuant to Criminal Procedure Law § 230.20(2)(a) removing the above-entitled action from the County Court of Nassau County to a superior court of another county not including Suffolk County, or in the alternative pursuant to CPL § 230.20(2)(b), for an Order directing that the pool of jurors be expanded to encompass prospective jurors from other counties excluding Suffolk County, and for such other and further relief as this Court deems just, fair, and proper.

Let personal service of this Order and the papers on which it is based be made upon the Office of the District Attorney of Nassau County by delivering a copy thereof to and leaving it with a person of suitable age and discretion to be found therein at his office at 262 Old Country Road on or before April 15, 1988 at $\underline{5:00 \ p.m.}$ which shall be good and sufficient service.

D.A.'S OFF (ED.)

Vincent J. Balletta, Jr.
Justice of The Appellate Division

RECEIVED

Dated: April 15, 1988

2

SUPREME COURT:   APPELLATE DIVISION
SECOND DEPARTMENT
-----------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                         Respondents

        vs.                              AFFIDAVIT

JESSE FRIEDMAN,                          Indictment Nos.
                                         67104, 67430
                    Defendant

-----------------------------------X

STATE OF NEW YORK)

                ) ss.:

COUNTY OF NASSAU )

        DOUGLAS H. KRIEGER, being duly sworn deposes and says:

        1.     I am counsel to the defendant JESSE FRIEDMAN.  I
submit this affidavit in support of Mr. Friedman's motion
pursuant to CPL § 230.20(2)(a) and (2)(b) for a change of
venue from the Nassau County Court, or in the alternative
for an expansion of the jury pool to encompass prospective
jurors from other counties.

        2.     JESSE FRIEDMAN stands indicted under two separate
indictments [67104, and 67430], for multiple counts of
Sodomy 10 [P.L. § 130.50], Sexual Abuse 10 [P.L. § 130.50],
Sexual Abuse 10 [P.L. § 130.65], Attempted Sexual Abuse 10,
Endangering the Welfare of a Child, [P.L. § 260.10], and Use
of a Child in a Sexual Performance.

        3.     The indictments charge in sum and substance that
JESSE FRIEDMAN and his father ARNOLD FRIEDMAN sexually

abused thirteen boys, aged 8 to 11, who were attending
private computer classes in the Friedman home over a period
of two years.  ARNOLD FRIEDMAN has extended a guilty plea
and is awaiting sentence on the state charges, and related
federal charges, in the United States District Court for the
Eastern District.

    4.  The defendant was arraigned on the initial
indictment on December 9, 1987, and on the second indictment
on February 9, 1988.  The publicity surrounding this case as
of the arrests and arraignment has been intense, persistent,
and inflammatory to the point where it will be impossible
for the defendant to receive a fair trial either in Nassau
or Suffolk County.

    5.  Long Island Newsday and Long Island Cablevision
Channel 12, covered the arraignment of these defendants
resulting in live courtroom television coverage and media
coverage throughout the counties of Nassau and Suffolk.

    6.  On the day of the defendant's arrest, Long Island
Newsday covered this story with photographs appearing on the
cover page.  Newsday has covered every court appearance in
this matter, and is present in the courtroom with Court
permission for simple status conferences [see exhibits
hereto].

    7.  The progress of this matter has been the subject
of intense local media coverage in the Great Neck Record and
other publications as reflected in the exhibits appended
hereto.  Additionally, the prosecutor in this case has

2

attended lectures given to parent groups on the subject of child abuse, with specific reference to this case.  The Police Officer in change of this investigation has also attended public meetings and lectures on child abuse, and made specific reference to this case.  The community is thus deeply involved in this matter on a highly personal and emotional level.

8.   The very nature of the charges herein has rendered the media and television coverage highly inflammatory, with focus on the charges that the defendants allegedly betrayed the trust of parents in the community by allegedly abusing their children while under their tutelage.

9.   The parents of the complainants in these indictments were present during the guilty pleas entered by ARNOLD FRIEDMAN in both the State and Federal Court, openly expressing reactions of grief, anger and continuing bitterness against this defendant.  Widespread publicity surrounded the guilty pleas of ARNOLD FRIEDMAN, with articles specifically referring to JESSE FRIEDMAN'S reaction in the courtroom, and his interchanges with the parents. [see exhibits hereto].

10.   Subsequent newspaper articles appeared with reference to JESSE FRIEDMAN's mother, ELAINE FRIEDMAN, was arrested for various obstructing offenses in connection with the charges against her husband and son [see exhibits hereto].

11.   In short, the entire Friedman family has been

3

exposed to persistent media coverage on every aspect of
these charges with the result that the defendant has already
incurred the intense obloquy of the community, before
pre-trial hearings have even been commenced.

12. Thus, it is the defendant's contention that due to
the wide-spread, intense, localized and prejudicial
publicity, jury selection in the County of Nassau will
constitute an exercise of futility. Hence this motion is
not premature.

13. Moreover, although the undersigned is cognizant of
the statutory provision that contiguous counties should be
considered in venue changes, it is respectfully submitted
that Suffolk County should be excluded from consideration.
Long Island Newsday, and Long Island Cablevision Channel 12,
provide the same degree and intensity of publicity in
Suffolk County as in Nassau County. Change of Venue to
Suffolk County would also result in an inability to select a
fair and impartial jury.

14. The time for defendant, JESSE FRIEDMAN, to make
his Omnibus Motion in Nassau County Court has been extended
to April 22, 1988.

15. No previous application for this relief has been
made for any other Judge or Court.

WHEREFORE, for the reasons more fully set forth in the
accompanying memorandum of law, it is respectfully requested
that the venue of this action be changed to another county
other than Suffolk County, or in the alternative, that the

4

jury pool be expanded to encompass additional prospective jurors other than from Suffolk County.

DOUGLAS H. KRIEGER

Great Neck, N.Y.
April 15, 1988

Sworn to before me this 15th day of April, 1988

Notary Public

LINDA DE VINCENZO
NOTARY PUBLIC, State of New York
No. 8565673
Qualified in Suffolk County
Certificate Filed in Nassau County
Commission Expires March 30, 19
May 31, 1988

5

Case 2:06-cv-03136-JS Document 41-11 Filed 01/28/21 Page 61 of 131 PageID #: 6514

# 100 KIDS LINKED TO TEACHER IN SEX-ATTACK CASE

**By MIKE BRENNAN**

NASSAU County cops are questioning more than 100 children suspected of being molested by their Great Neck computer teacher, who was arraigned yesterday on sexual abuse charges.

Arnold Freidman, 56, is accused of molesting five of his male students between the ages of nine and 12 at his home. He is being held on $500,000 bail or a $1 million bond.

His son, Jesse, 18, was jailed on similar charges.

The charges come out of "an extensive investigation involving over 100 children," said Nassau County Asst. District Attorney Joseph Onorato.

Onorato, who said a "multitude of pornographic literature was uncovered in Friedman's home," expects more victims to come forward.

Handcuffed to each other, father and son stood impassively at their arraignment before Judge Richard LaPena. Both were arrested Wednesday, along with the elder Friedman's wife, at their home.

Friedman, a former chemistry teacher at Bayside High School, pleaded innocent to nine counts of sexual abuse and three counts of sodomy.

Friedman, a target of a three-year federal investigation, ran a computer and music school from his two-story ranch home at 17 Picadilly Rd., where he allegedly molested the boys.

Jesse, a freshman at SUNY Purchase, pleaded innocent to two counts of sexual abuse and one count of using a child in a sexual performance.

Friedmans' lawyer, Martin Silberg, told the judge: "The charges are probably worse than a conviction . . . The defendant is a 56-year-old man whose entire reputation is going down the tubes."

Friedman's wife, Elaine, was arrested for allegedly interfering with her husband's arrest and the search of their house.

Mrs. Friedman, who operates a day-care center called "Child Minders" at the house, was not arraigned yesterday.

Cops said there was no evidence that any day-care children were molested.

Lawyer Michael Ross, who claimed to be representing an unspecified number of victims, attempted to get an AIDS test ordered for the Friedmans.

Judge LaPena left the AIDS test decision for a hearing next Friday.



**ARNOLD FRIEDMAN**
*Pleads innocent.*

**Associated Press**

# Tally ho, Jackie O

While the rest of America talked turkey yesterday, Jacqueline Kennedy Onassis enjoyed herself horsing around at the annual Thanksgiving fox hunt in Bedminster, N.J.

# City asks spine tap on Boggs

**By ELLEN TUMPOSKY**
Daily News Staff Writer

The city wants to tap spinal fluids of the first person picked up in Mayor Koch's sweep of the mentally ill homeless to determine whether she has a hereditary disease that can cause severe psychological problems.

Billie Boggs, whose real name is Joyce Brown, has a family history of lupus, which in some forms can cause psychosis and personality changes, according to medical experts.

Arguments in the city's appeal of a judge's ruling to release Boggs were heard yesterday before a full five-judge panel of the Appellate Division of state Supreme Court. The justices are expected to rule in the case soon.

City lawyer Paul Rephen said that because Boggs has a "strong family history" of lupus and a persistent low-grade fever, the city wants to test her for the disease.

Robert Levy of the New

# AIDS tests sought

**By MICHAEL HANRAHAN and RICHARD SISK**
Daily News Staff Writers

Nassau County prosecutors yesterday urged that AIDS tests be ordered for a Long Island teacher and his son who are accused of sexually abusing children at their Great Neck home.

Assistant District Attorney Joseph Onorato made the recommendation to test for acquired immune deficiency syndrome after a hearing at which Nassau District Court Judge John O'Shaughnessy refused to lower bail for Arnold Friedman, 56, and his 18-year-old son, Jesse.

The courts have been reluctant to order AIDS testing, but Onorato said he would make the motion next week. The move is supported by parents of the estimated 100 children, aged 8-12, who took computer and music lessons at the Friedman home.

O'Shaughnessy declined to lower the $1 million bail set

## L.I. prosecutor asks check of teacher & son in abuse case

for Friedman, or the $500,000 set for his son, a freshman at Nassau County Community College.

Their lawyer, Mark Heller, had argued that Friedman has lived in Great Neck for 17 years and had "amassed a most enviable record of distinguished service to the community and his students."

Friedman, who had conducted computer science classes at the Woodmere Academy since September, taught for 20 years at Bayside High School in Queens. In 1986 he was cited as an "Outstanding Teacher" in a proclamation signed by Mayor Koch, Heller said.

The lawyer said Friedman also wrote scripts for instructional videotapes in computers that featured comedian and talk-show host Steve Allen.

The Friedmans were arrested Wednesday, and the father later was charged with nine counts of sexual abuse and three counts of sodomy. His son was charged with two counts of sexual abuse, one count of sodomy, and one count of engaging a child in a sexual performance, which prosecutors said involved taking photographs of his father sexually abusing a boy.

According to prosecutors and court papers, evidence



**Arnold Friedman**

for the arrests was based on a sting run by postal inspectors that went back to 1984 and involved the seizure of a European magazine called "Boy Love" that was being mailed to the United States.

Friedman's address was on a copy of the magazine, and a postal inspector posing as a pedophile contacted Friedman, who expressed interest in exchanging magazines, the court papers unsealed Wednesday said.



**A somber moment**

# Police ID

Case 2:06-cv-03136-JS Document 41-11 Filed 01/28/21 Page 65 of 131 PageID #: 6518

**Newsday.com**

# The Secret Life Of Arnold Friedman

**Friends and parents knew him as a respected teacher. What they didn't know was that he and his son were sexually abusing pre-teen boys. See end of text for sidebar-Possible Telltale Signs**

By ALVIN E. BESSENT
Staff Writer

May 28, 1989



IN THE SPRING of 1986, about 100 people - most of them former students of the guest of honor - crowded a hot, second-floor television studio at Bayside High School in Queens to honor a science teacher named Arnold Friedman.

The ex-students, who had come from places as far away as California, greeted each other over sodas and sandwiches and talked about a man some described as unforgettable and others called the best teacher they'd ever had. One guest credited Friedman with turning his life around.

The occasion was Arnold Friedman's retirement after a 26-year career at Bayside High. Friedman, who had the respect of his peers as well as his students, had taught one of New York City's first high school classes in nuclear physics and the first organic chemistry class ever offered at Bayside. And he and his students had converted classroom 235 into WBAY-TV, a simulated television station where they produced videotapes. In a speech to the group, Lester Speiser, principal of the school during most of Friedman's tenure, talked about the joy that Friedman got from "communicating and teaching and seeing his students succeed."

Afterwards, Friedman's youngest son, Jesse, pumped Speiser's hand. "It was wonderful, the things you said about my father," Speiser remembers Jesse telling him.

"In my whole career I don't remember students ever throwing a party like this for someone," Speiser says. * * *

On the day of Arnold Friedman's retirement party, postal inspectors in New York City were in the middle of an investigation that would shatter the teacher's reputation, tear apart his family and horrify his suburban community.

The investigation had been going on for two years. In July, 1984, U. S. Customs officials at Kennedy airport had plucked a small parcel from the stream of boxes and envelopes culled daily for contraband. They had learned to be suspicious of small parcels in plain brown wrappers like the one sent from Holland to Arnold Friedman, 17 Picadilly Rd., Great Neck, Long Island.

Inside was a magazine called Boy Love. It featured low-budget color photos of nude boys and graphic pictures of men having sex with children.

APP.     0628

Postal authorities were alerted and the investigation was launched. Using an undercover name and address, a postal inspector wrote to Arnold Friedman and asked if he had "boy lover" material to sell. "I have none to sell but am interested in obtaining," Friedman responded three days later. "Do you know of any sources?"

The inspector, who called himself Stan, wrote back but heard nothing from Friedman for more than a year. Then, the day after Christmas, 1985, Friedman renewed the correspondence. "I have a great photo book from Holland that might be copyable. Could you do it?" Other letters followed; the correspondents became "Stan" and "Arnie." "The book is `Joe and his Uncle,' " Arnie wrote. "I think I'd like you to send me something (sort of good faith) and I will forward this rather precious book to you."

Stan sent two photos and on Feb. 8, 1986, Arnie mailed a large envelope with a handwritten note. "Stan - Enjoy! Arnie." Inside was the magazine "Joe and His Uncle" - kiddie-porn from a company in Denmark. It was the breakthrough the postal inspectors had been waiting for. The correspondence built up; Arnie even filled out a questionnaire from Stan for an ostensible porn pen-pal club.

On Nov. 3, 1987, an inspector dressed as a postman returned "Joe and his Uncle" to the house on Picadilly Road where Arnold Friedman gave computer lessons to children. Fifteen minutes later, government officials and Nassau police, armed with a warrant, raided the home. They found a foot-high stack of child pornography secreted behind a piano in the living room. And there were grimmer discoveries - child-sized dildoes in a cabinet just outside a makeshift classroom.

They also found a list of 80 names and phone numbers handwritten in Friedman's tortured, tiny scrawl.

Police realized that they had found something that went far beyond pornographic magazines. They intensified the investigation. Before it was over, the probe would uncover the largest child sex-abuse case ever on Long Island and one of the largest in New York State - both in the number of victims and the number of charges. The investigation would leave the lives of the children and their families in shambles, and underline the difficulty of gathering evidence in cases involving pedophiles - adults who are sexually attracted to children.

And it would leave friends, relatives and colleagues of award-winning teacher Arnold Friedman wondering how such a seemingly nice man could do such horrible things. How it could have happened without anyone knowing it was going on?

"I ask myself, looking back, if there were any clues I could have picked up on and the answer is no," said Robert Sholiton, director of The Adult Program for the Great Neck public schools, where Arnold Friedman taught computer classes from 1981 to 1987. "I keep asking myself, is this the man I knew?"

Along the way, the investigation into what went on in the house on Picadilly Road would lay bare a lifetime of unspeakable secrets, and lead to Friedman and his 19-year-old son, Jesse, being indicted on hundreds of counts of sex abuse and sentenced to jail terms. THEY WERE secrets that would make the brick-and-shingle high-ranch on a proverbial tree-lined, suburban street in upscale Great Neck a chamber of horrors for dozens of children. Police said that 140 children - ranging in age from 7 to 12 - would finally admit what they had been too shamed and afraid to tell their parents. Some of them still wet their beds, take baseball bats to bed with them or are unable to sleep. "If you murder someone, seconds later they're dead," says the father of one of the young victims. "This was like a prolonged torture they subjected the kids to." They were secrets of incest that Arnold Friedman's now 19-year-old son Jesse kept hidden through years of therapy and drug abuse. "I guess it mostly started out with my father trying to love me." Jesse says.

APP.     0629

Case 2:06-cv-03136-JS Document 41-11 Filed 01/28/21 Page 67 of 131 PageID #: 6520

They were also secrets that Arnold Friedman, a pudgy 58-year-old pedophile, had not only managed to hide from colleagues but, according to the woman to whom he had been married for 33 years, even concealed from her. "It hit me like a bolt from the blue," she says.

* * *

Arnold Friedman was born in the Brighton Beach section of Brooklyn, the second of three children. Money was scarce for the family during the Great Depression. Arnold's father hustled a living buying and selling auto parts. According to Arnold Friedman's wife - who insisted that her first name be withheld as a condition for consenting to an interview - her father-in-law was emotionally distant. "Arnie's father was a strange man," Mrs. Friedman said. "He didn't talk. When he walked in he said `Hi.' When he left he said `goodbye.' " But she said there was never any indication that her father-in-law molested his son.

When Arnold was about 5 years old, his father left the family, plunging them into even more desperate financial straits. The father kept in touch with his relatives but would never again live with his wife and children. "There was an older sister who died suddenly of what they called at the time blood poisoning. This was a Shirley Temple look-alike. The mother was devastated by this sudden death," Mrs. Friedman said. "The father left . . . They were on welfare as a result."

After he graduated from Lincoln High School in Brighton Beach, Arnold went to Brooklyn College and then Columbia University, where he studied chemical engineering. He worked for a short time as an engineer, his wife said, but quit because he detested the odors.

Instead, Arnold, who played the piano, chose to spend his time working Brooklyn clubs as "Arnito Ray," leader of a six-man rhumba band. "I was very much in love with Arnold's music," said Mrs. Friedman. "He never really spoke too much, but his feelings came out in his music and that's what really attracted me."

The bride-to-be had also grown up in Brooklyn. Her father abandoned his family when she was 18, and her mother, an unemployed bookkeeper, was forced to move with her daughter into the home of relatives. There was no hugging or touching in her family, she said. "They are very loving people. They just don't know how to show their love."

In Arnold she found a man concealed within a similar emotional shroud.

"In fact, when Arnie and I were first going together, he said to me, and probably only once said it, `I love you.' It made me feel uncomfortable."

They married in 1955, and eventually moved to Flushing, where they bought their first house. Mrs. Friedman taught school. Arnold played club dates at night but took education courses and did substitute teaching during the day. In 1960, he relegated the band to weekends and became a full-time science teacher at Bayside High School.

His colleagues saw an imaginative, productive teacher whose humor, even temper and contagious enthusiasm made him respected and well liked. He had a favorite response to suggestions, they said. "Dynamite."

"We never saw him really raise his voice or get angry," said a Great Neck neighbor who also taught with him at Bayside but did not want her name used.

APP.     0630

Arnold displayed what Mark Yohalem, former head of the Bayside High School science department, described as "a relaxed authoritativeness."

"He was always one of my best," said Speiser, who was principal at Bayside from 1972 to 1985. "In all this time he was like a pied piper. He was venerated by the boys and girls." Speiser and his family celebrated at the Friedman house in 1983 when computer instructions written by Arnold were released on reeords and cassette tapes. And Arnold played the piano at the marriage of Speiser's daughter in 1984. "In the years I knew him there was never a scintilla, not a breath of this kind of thing," Speiser said, referring to the abuse case.

Speiser said he teased Friedman for being obsessed with technology. "I would walk in and he'd be doing something technical. I would yell, `Hamlet, Hamlet. Do something with that!' "

In 1981, Friedman was hired by the Great Neck School District to teach personal computers in The Adult Program. By the next year, he was appointed coordinator for the program's 20 or so computer classes, said spokeswoman Ronna Telsey. He always had high enrollments and positive ratings, officials said.

And in October, 1987, less than a month before authorities seized stacks of kiddie-porn from his house, Arnold Friedman was cited by the state Association for Computers and Technologies in Education for innovation and excellence in computer education.

But at home, Friedman seemed a different person - his effervesence disappeared.

He was a workaholic who talked little and demonstrated no affection for either her or their three sons, Mrs. Friedman said. He never hugged the boys. He would stay alone for hours in one of the two cluttered offices he maintained in the Great Neck house and then spend the remainder of the night slumped in front of the television set.

"A sentence that began `I feel' was never in his vocabulary," Mrs. Friedman said. "The only conversations Arnold ever had with the children were about work."

"I had an awfully peculiar family," says Jesse Friedman.

* * *

When word went out in Great Neck that Arnold Friedman was offering private computer classes for children in his home - teaching general know-how and basic programing - there was no shortage of takers.

Police said the classes took place for about eight years, starting around 1979.

Hundreds of largely college-educated, upper-middle-class professionals - doctors, lawyers, business executives and entrepreneurs - enrolled their children. Officials estimate that about 500 youngsters, the great majority of them boys, participated in the classes.

The parents of five of Arnold Friedman's victims have talked at length about the case in recent months. All said they went inside the Friedman house only once - when they dropped their children off for the first day of class. They saw nothing to be suspicious about.

A small room to the right of a short corridor had been converted into a classroom. Kid-size, Formica-

APP.      0631

Case 2:06-cv-03136-JS Document 41-11 Filed 01/28/21 Page 69 of 131 PageID #: 6522

topped tables held personal computers. Tiny orange, yellow and blue molded plastic chairs were scattered about the room, which was cluttered with books, computer manuals, magazines and hundreds of computer discs. On one dark, wood-paneled wall, a printout sign proclaimed: "Computer Class is Great."

"It had a real classroom feeling. A little shabby, a little seedy, but a real classroom," said a woman who enrolled her two sons.

Across the hall was the entry to Arnold Friedman's office. Just beyond the classroom, adjacent to a laundry room and bathroom, was the room where Jesse slept. A sign on the wall called his domain "Paradise 7."

Arnold, his wife and sons stared from a framed photograph in the hall.

The parents left confident that all was as it seemed. An affable Arnold Friedman had explained that there was no need to come into the house when they left and picked up their children. He said neighbors had complained about heavy traffic and parking congestion. The parents could simply pull up out front and his son Jesse would escort the kids into and out of the house.

The children came home with stacks of printouts and talked about what they had learned about computers. But they were too shamed and fearful to talk about everything that took up their after-school hours.

Police have given the following account of what happened in Arnold Friedman's computer class:

What the parents did not see were the pornographic magazines interspersed on shelves along with legitimate classroom materials. Some featured pictures of nude women, others showed men posing with women, men with men and men with young boys. Students sent in search of computer manuals would stumble across the magazines.

Soon the children found that Arnold knew they'd discovered the racy pictures. He told them he understood. Their parents would get uptight about things like that, he said, but they could talk to him about anything.

Next the children were introduced to the pornographic computer discs. Things like "Stroker," in which the player could make a graphic representation of a man masturbate. And "Strip Poker," in which a prone woman figure would shed clothing as the game progressed until she was naked.

Or "Talking Sam" in which a male figure would expose his genitals and ask the kids questions about sex.

Det. Sgt. Frances Galasso, head of the Nassau sex crimes unit, said the Friedmans had the children mimic the actions of the computer figure in "Talking Sam." "The Friedmans would demonstrate that on the kids, touch them on their private parts and have the kids touch them."

As a reward for keeping quiet, children were allowed to take computer discs home to copy. In a few cases, police found such discs in the homes of Friedman's students. None of the parents knew what the discs contained, police said. Experts said this added to the youngsters' feelings of complicity. And the children were warned that if they told anyone what was going on there would be no more computer classes in Great Neck, Arnold Friedman would go to jail and it would be all their fault.

APP.      0632

"I really wanted to take computer so I never told anyone about what was going on except my dog," said one 8-year-old victim in his statement to police.

Inexorably, police said, the Friedmans increased the abuse, touching and fondling and performing sex acts. Boys were eventually told to drop their pants. The Friedmans would sometimes expose themselves, walk around the room and order their young charges to touch them. Children's games were perverted. Nudity and fondling were demanded in "Simon Says."

Refusals to cooperate were punished by Arnold and Jesse.

"I remember once they banged some kid's head against the wall and said this will happen to you," a 12-year-old boy who attended the classes two years ago said in an interview. "Mr. Friedman would sneak up behind me and take his hand and push it down into my pants," said an 8-year-old boy in his statement to police. "Jesse used to sneak up from behind me and he would slide his hands the same way his father did. First he would touch my shoulders then down my chest and into my pants.

"Mr. Friedman pulled my pants half-way down and he made me hold onto one of the computer table chairs . . . I screamed `Dad!' and Mr. Friedman said to me to be quiet. Mr. Friedman put his hands over my mouth. During this time the other kids were screaming and telling Mr. Friedman to get off me. I was scared and the other kids were scared, too."

Then in March, 1986, friends of Jesse joined in what police said escalated into orgies of sexual abuse. Arnold and Jesse Friedman and three teens would sometimes attend classes with five to 10 students. Victims recounted being held down by one attacker and raped by another.

As the abuse escalated so did the threats. Police said the children were extensively videotaped and photographed. No pictures of the children have been recovered. But police said Arnold Friedman told the children he would send pornographic pictures of them to magazines and tell the publishers to print their names if they told what was going on.

He threatened to burn their houses down. He reportedly said he would kill their parents.

"It was brainwashing," the mother of one victim said.

* * *

The Friedmans' wall of secrecy quickly disintegrated after police and postal inspectors turned up the list of names in the Nov. 3 raid.

It was a wall that apparently had even hid Arnold Friedman's activities from his wife. "When the federal officers came, Arnold told me he'd mailed a magazine and that was the totality of his crime," Mrs. Friedman said. "He was almost in tears because they took his books. Not because his family was in jeopardy, but because they took his pictures. The family was distraught and destroyed. We began to bicker a lot and work at cross purposes with each other."

Although Friedman insisted he was guilty only of collecting pornography, she said, he began to talk about suicide.

"He felt desperate," said Mark Yohalem, Friedman's former department chairman. Yohalem talked to him shortly after he was hit with the federal charges. "He saw his life in ruins regardless of how the trial would come out."

APP.      0633

Jesse, then a student at SUNY Purchase, said his mother called and told him about the raid. He refused to accept later calls from home, and for the next few weeks tried to forget developments in Great Neck.

Galasso and her 11-member squad of Nassau detectives and officers were hard at work checking out names. The interviews started when detectives chose a name at random from the handwritten list and visited that family. They found three brothers who had all attended classes with the Friedmans. "Two of the three boys gave indications they'd been sexually abused by Mr. Friedman," Galasso said.

But the parents refused to cooperate with the investigation, a reaction that police came to know well. About two dozen families flatly refused to allow officers to talk to their children. "There were even kids who told their parents they were involved in front of us and the parents didn't believe it," Galasso said.

Working with the list of names, Galasso's squad divided into two-persons teams and knocked on doors all over Great Neck as they followed the list. Files were established for each child. Police officers canceled vacations and switched to night shifts.

It was a week before Thanksgiving when two detectives knocked on the door of a woman who would still look haunted more than a year later as she recounted the scene.

The detectives - a man and woman team - said child pornography had been found in Arnold Friedman's house. They wanted to speak to her son as a precaution.

She said the boy "started out saying nothing happened. Then, `Maybe I saw something.' Then about two hours later, `Well, maybe Arnold did expose himself. Maybe Jesse did expose himself.' " Finally, the boy described being fondled and sodomized.

"At that point I went nuts," the woman said, remembering the fury she felt at Arnold Friedman. "I said if you don't arrest him after what I just heard, I'm going to buy a gun and kill him."

One young boy, who revealed what happened only after numerous visits by detectives, repeatedly pounded his head against a wall while describing the sexual abuse. "He would literally beat himself, he was so guilty about what had happened," Galasso said.

As more and more children confided in police, their parents began to talk with one another. Arnold Friedman had phoned some and sent letters to others saying he was innocent - that police were setting him up. He asked for their support.

Frustrated because no arrests had been made, a group of parents decided to confront the teacher at his home. They met Nov. 24 at an office in Great Neck in preparation for the siege. Police attended the meeting. They headed off the confrontation by convincing the group that arrests were imminent.

The next day, Nov. 25, 1987, 12 Nassau police officers and an assistant district attorney descended on the house and broke in the front door. They took Arnold Friedman into custody.

Mrs. Friedman was out shopping for Thanksgiving dinner. Thirty minutes after police arrived, she got home to find neighbors, reporters and camera crews gathered out front and her husband inside in handcuffs. "It was a horror," said Mrs. Friedman, who frantically tried to stop the police searching her house.

"She pushed me," Galasso said. "She threw a punch at my head."

APP.     0634

Arnold Friedman was arrested on a variety of child-abuse charges, and his wife was arrested for attempted assault.

Jesse Friedman was with friends shopping in the East Village that day. He bought a scarf and some records and then at 5 p.m., he called home. Galasso answered. His father and mother had been arrested, she said. She advised him to come home.

Telling his friends nothing of what was going on, he went to Pennsylvania Station, stumbled onto a Long Island Rail Road train and began the long ride home to arrest and jail.

It was a journey that had begun in his childhood.

* * *

According to the judge who would sentence him to prison for child abuse, Jesse Friedman was "raised an unwanted child in a home devoid of love."

His mother, in tears as the judge spoke, didn't challenge that assessment.

"When I was married and had babies, I couldn't love those babies," she said in an interview. "I asked Jesse, do you remember me hugging you at all? He said no. He was so starved for love, for approval, for acceptance that he would have done anything for this love.

"He came into the family sort of out of step. The family focus was on the two older boys," said the mother, who declined to discuss her older sons, neither of whom was involved in the sex abuse case. "He was always kind of . . . dragged along and felt excluded."

Jesse Friedman was interviewed in March in a prison visiting room. As he slouched on a plastic chair and sipped a cherry cola, Jesse said he is "halfway between loving and hating" the man he holds responsible for landing him in prison. "He let me down as a father."

When he was 8 or 9 years old, Jesse said, he stumbled upon his father's cache of kiddie porn. Later, his father began to visit his bedroom at night and fondle him. The abuse escalated into sodomy.

"In my family, everything got washed under the rug," Jesse said. "I never told about the abuse. I didn't think anyone would understand. Trying to do something about the problems in my family never seemed to get me anywhere." Jesse said his parents fought a great deal. "I used to go to sleep listening to them fighting, screaming at one another . . . I never saw them loving each other. I would cry when they would fight. I would bang on the walls. I've got all these holes in the walls from my banging." Jesse said his parents argued about him and about such mundane issues as the color of a carpet.

When he was 10, Jesse began psychiatric therapy. He insists he never told his therapist about the incest.

Jesse increasingly had trouble in school. By ninth grade he rarely attended classes and failed every subject. His academic record improved when he enrolled in an alternative school in Great Neck.

But his emotional problems continued. At 15, Jesse said, he was diagnosed as manic depressive. "I had no friends and no interests except M&Ms, marshmallows and TV." He was 5 feet, 6 inches tall and he ballooned to 175 pounds. At 16 he began smoking marijuana and using LSD, and before long he was stoned on a daily basis.

APP.    0635

Jesse gave up drugs a year later after meeting his first girlfriend. "I enjoyed friends and women more than smoking pot," he said.

As he sipped the soft drink and talked about his life, Jesse had been glancing about the room. Now his close-set, ice-blue eyes stared straight ahead. "I'm not a pedophile. I hate little kids," he declared without blinking. He tugged an ear and stroked the close-cropped beard grown during his first few weeks in prison. "I'm a perfectly healthy, adjusted heterosexual."

It was during his teenage years that Jesse helped his father teach the computer classes in their home. "Jesse was thrilled to do the computer class with Arnie because it was something, it was an activity that gave him a father," his mother said.

* * *

The crimes of Arnold and Jesse Friedman spread pain in a wide wake. Young victims were left scared and unable to sleep. One boy is deathly afraid of fire. Another's stutter has grown worse. Well-behaved children have become difficult.

One 12-year-old questioned his faith. As the boy waited in a courthouse corridor to be sworn to testify before one of three grand juries convened in the case, a prosecutor asked if he believed in God. The boy's mother remembered her son's reply. "No, because a good God wouldn't let this happen to children."

Another mother had lunch with a friend whose son had also been a computer student. She tried to convince her companion that something horrible had indeed happened in the Friedman house. The woman flew into a huff.

"I thought she was going to throw the food in my face. She said she had such a good relationship with her kid he would talk to her. I said, `What am I - a bad mother?' "

Like other guilt-ridden parents, the woman wondered why she didn't see what was happening. And she wrestled with an equally nagging question: Why didn't my child confide in me?

"In the subculture of adolescent boys, the greatest taboo is being homosexual," said FBI special agent Kenneth Lanning, a veteran of more than 1,000 such cases. "That's a big incentive to keep your mouth shut."

According to the victims, fear was another answer.

Experts say silence in the face of abuse is commmon for childen whose first response to the unthinkable is figuratively to pull the covers over their heads and forget it ever happened. "It's almost like an amnesia," said Dr. Sandra Kaplan, chief of North Shore University Hospital's division of child and adolescent psychology, who is treating some of the Friedman victims.

One 12-year-old boy was interviewed for this story in his own room. The room - crammed with schoolwork, electronic equipment, personal computers and two dogs - bespoke comfort and security. But the boy squirmed as he struggled to come to terms with his silence about what had happened during the computer classes in the Friedman house. "The threats made a pretty good impression," he said, glasses askew and eyes darting. He recalled the incident in which a boy's head was banged against the wall. " `Tell and this will happen to you,' " he quoted the Friedmans as saying. He said they also

APP.    0636

threatened to kill his parents and burn his house if he told.

It was almost two years after his last computer class but the strain of remembering soon showed. A lost calculator, a misplaced page of algebra problems and a screaming bout with a younger brother left the boy on the verge of tears. Then his nose began to bleed. The nosebleeds predated his enrollment in computer classes. But they too were triggered by stress. He's always agitated like that after talking about the Friedmans, his parents said later across their dining-room table.

It has also been difficult for parents to talk about their children's ordeals. "We used to have lunches when we sat around and cried on each other's shoulders. I don't think it will ever end," one mother said.

Eventually, about 14 families banded together and, over countless hours, helped police and prosecutors build cases against the men charged with abusing their kids. Twenty children testified before grand juries that ultimately returned three indictments in the case.

"It helps them a great deal," Kaplan said, referring generally to victims of child abuse. "This enhances their selfesteem, to see themselves as heroes because they helped stop sex abuse." * * *

On March 29, 1988, Arnold Friedman appeared in Federal Court in Brooklyn and was sentenced to 10 to 30 years in prison for distributing child pornography through the mail. Meanwhile, Arnold, Jesse, and Ross Goldstein, 18, a friend of Jesse's, would be indicted in Nassau County on a total of 464 counts of sodomy, sexual abuse, using a child in a sexual performance and endangering the welfare of a child. Arnold, indicted on 107 counts, would later plead guilty to 42 sex crimes, including eight counts of sodomy and 28 counts of first-degree sexual abuse. Jesse, charged with 239 counts, pleaded guilty to 25 charges, including 17 counts of sodomy and four counts of first-degree sexual abuse.

Both Arnold and Jesse would admit molesting 13 boys. On May 13, 1988, Arnold was sentenced by Nassau County Court Judge Abbey Boklan to a concurrent 10 to 30 years in prison for sodomy, sexual abuse and endangering the welfare of a child. Boklan recommended that he serve the full 30 years. Arnold, who will be eligible for parole in 10 years, is imprisoned in the Federal Correctional Institute in Oxford, Wis. In a letter to Newsday, in which he refused requests for interviews, he referred to his case as "the Great Neck Horror" and said it was the story of a town that "conducted a modern-day witch hunt."

"The fact that my son and I pleaded guilty was not an admission of culpability," Friedman wrote, "but an attempt to salvage whatever little remained of our lives."

On Jan. 24, 1989, Jesse Friedman was sentenced to six to 18 years in prison. At the sentencing, Jesse revealed through his attorney, Peter Panaro, that he had been abused by his father. Despite the attorney's plea for leniency, Boklan again recommended that the defendant serve the full sentence. Jesse is in the Clinton Correctional Facility in Dannemora.

"I don't long to be free," Jesse said in the prison interview. "I don't miss my old life."

Ross Goldstein, who was indicted on 118 counts of various sexual abuses, cooperated with authorities and implicated Jesse Friedman before a grand jury. He pleaded guilty March 22 to three counts of first-degree sodomy and one count of using a child in a sexual performance. He was sentenced May 3 to two to six years in prison.

Mrs. Friedman pleaded guilty to attempted assault, second degree, and obstructing governmental administration. She was sentenced Oct. 20, 1988, to three years probation and a $1,000 fine.

APP.      0637

Case 2:06-cv-03136-JS  Document 41-11  Filed 01/28/21  Page 75 of 131 PageID #: 6528

Two additional suspects - teens referred to by the children and named by Goldstein - remain at large. The children were unable to identify the two positively in police line-ups.

Police said they believe the two suspects were photographed and videotaped with the children. They the children claim to have been extensively photographed. Nassau detectives have viewed pictures seized in other jurisdictions but have not yet turned up anything.

Bitterness resulted among parents of the some of the victims who felt that prosecutors had failed to force Jesse Friedman to lead police to the photos before allowing him to plead guilty. The parents fear the pictures will be circulated among pedophiles and will one day surface and embarrass the children.

Some parents attended a series of tense meetings with Assistant District Attorney Joseph Onorato while he negotiated Jesse Friedman's plea. They said he told them their children would have to testify in open court if the case went to trial. Onorato also raised the spectre of appeals based on defense attempts to suppress the list police used to locate the victims. The parents said they were told that all of the evidence their children provided could be suppressed by an adverse ruling.

Onorato said he just wanted parents to know all the things that could possibly go wrong if they proceeded to trial.

The parents reluctantly accepted the deal that sent Jesse Friedman to prison. "It seemed like Jesse was calling the shots," the mother of one victim said. "Jesse could accept or reject the plea bargain. Jesse could appeal."

Both federal and state prosecutors said as a rule they always prefer to avoid taking child molesters to trial. "We don't want to put these children on the stand if we can avoid it," said Andrew Maloney, U.S. Attorney for the Eastern District of New York.

* * *

Discussing sexual-abuse therapy, Kaplan said that one objective is to help such victims learn to deal with shame and confusion about their sexuality. "A boy who has been sodomized may feel that he's destined to be a homosexual. We help them to understand they're victims. That sex abuse is the fault of the adult perpetrator, not the child."

The children whose parents deny what has happened and force them to suppress it often suffer the most, Kaplan said. "Parents who encourage their children to deny are telling their kids they can't trust them to help."

For some parents and children, the ordeal was exacerbated by accidental meetings with Mrs. Friedman and Jesse, who was free on bail for a long time after his indictment. One woman and her two sons - both victims - saw Mrs. Friedman and Jesse in a local poultry market. The boys ran for cover. "My kids were deathly afraid. They asked for the keys and ran out and locked themselves in the car," the woman said.

Some of the children who testified before the grand juries received threatening telephone calls warning them not to cooperate with police. Now they worry that videotapes will come back to haunt them. They want to forget the lessons in the house on Picadilly Road.

"I've been trying to put it behind me and go on," one 12-year-old victim said of the experience that scarred his childhood. He tries not to think about the respected teacher who lived a secret life.

APP.    0638

By virtue of his own admissions in court, Arnold Friedman is a pedophile. According to Kaplan, he fits much of the classic pattern. Pedophiles, she said, are often intelligent, talented and respected in their communities. They often manage to find jobs such as teachers, police officers, doctors or nurses, or activities like scout leader or coach that bring them into regular contact with children. In many cases, they were abused as children and pick out victims in that age group. They come from all social classes and all walks of life.

It is common for them to live behind facades so respectable that even the parents of their victims are shocked by the disclosures of abuse. It was that way with Arnold Friedman, whose persona was his protection.

"These kind of offenders are the most prolific child molesters known to mankind," says FBI agent Kenneth Lanning. But he adds: "One of the difficulties is the stereotype of the offender as totally bad, the dirty old man in the wrinkled raincoat. Society has a problem when the offender is not totally bad." Possible Telltale Signs EXPERTS say that it is difficult but not impossible for parents to protect children from pedophiles, who often hide behind a cloak of respectability while their victims rarely talk about being attacked and sometimes exhibit no symptoms.

Police and experts on the subject say several of the following symptoms of behavior, while not necessarily proof that sexual abuse is taking place, may become evident:

Many young victims become irritable, depressed, can't sleep, or become afraid of men in general, said Dr. Sandra Kaplan, director of North Shore University Hospital's Division of Child and Adolescent Psychology.

They may also display "hypersexuality," a sudden concern with sex that is inappropriate for their age. Compulsive masturbation and fear of going to a specific place can also occur. Other children display what Kaplan calls a "frozen watchfulness," suspiciously eyeing people around them. Abused children may begin to dress in inappropriately heavy clothes, said Alane Fagin, executive director of Child Abuse Prevention Services of Roslyn. "They're ashamed of their bodies. They think people can see they've been sexually abused." Fagin also said that some victims may want to bathe continually.

But about one in four abused children will show no symptoms at all, Kaplan said. Boys, in particular, are less likely to confide what's happening to them, she said. The bottom line, said postal inspector John McDermott, whose unit conducted the Friedman child pornography investigation, is never trust your child completely to anyone.

When a child is with a babysitter, teacher or anyone, McDermott said, "one of the things you should do is drop in unannounced and uninvited."

*Copyright © 2003, Newsday, Inc.*

APP.     0639

27

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMANS"

INTERVIEW WITH:  GREGORY DOE

INTERVIEWER:  ANDREW JARECKI

PRODUCER:  (NOT IDENTIFIED)

TAPE #134

\*\*TRANSCRIBER'S NOTE:  INTERVIEWER COMPLETELY OFF-MIC.  BEST EFFORT

FOLLOWS.\*\*

19:45:26:16                              (OFF-MIC CONVERSATION)

ANDREW JARECKI:

19:45:28:05          So thank you for having us.  This is Gregory

Doe (PH).  You know mainly what I'm

interested in is just kind of trying to

understand this whole picture of Great Neck

(PH), that world that you lived in and all

that stuff, just understand how this story

is-- emerges.  So to begin with--

background-- basically how old are you?

GREGORY DOE:

19:45:50:02          Twenty-four right now.

Tape 134

                                    ANDREW JARECKI:

19:45:51:25                         And-- where did you grow up?

                                    GREGORY DOE:

19:45:53:12                         Great Neck, New York.

                                    ANDREW JARECKI:

19:45:55:01                         And-- how old were you when you lived in

                                    Great Neck?

                                    GREGORY DOE:

19:45:57:26                         I lived in Great Neck from 1977 when I was

                                    born to roughly 1995 when I came to where my

                                    current position is right now.

                                    ANDREW JARECKI:

19:46:07:10                         And-- what kind of a town is Great Neck?

                                    GREGORY DOE:

19:46:12:18                         Great Neck is your rich suburbian (SIC),

                                    White, Jewish surburbian-- home.  Ninety

                                    percent of it's Jewish.  Very affluent

                                    community.  Diverse with White and-- Persian

                                    background.

                                    ANDREW JARECKI:

19:46:25:09                         See that's an interesting combination.

                                    (OVERTALK)

GREGORY DOE:

19:46:26:21                     It--

ANDREW JARECKI:

19:46:27:06                     --the stories.

GREGORY DOE:

19:46:27:27                     --it def-- definitely is.  It's-- it's got a

very rich heritage basically in Judaism.  It

thrives on-- wealth, prestige-- how much

money you have, what type of car you drive,

what type of clothes you wear, what does

your father do.


19:46:47:13                     Prestige on education-- how far you can do.

Just the right scenario.  There can be no

wrong in Great Neck.  It's not your typical

normal community.

ANDREW JARECKI:

19:46:59:17                     Meaning it's like a special (UNINTEL)-- you

know people look at each other for like how-

- how does your son do?  And what-- what

college is he going to?  Is there a little

competition--

(OVERTALK)

GREGORY DOE:

19:47:07:06                As bit-- the more you go to school, the more

                           bragging rights for the parents when they

                           play Mahjongg or go to Bar Mitzvahs, the

                           weddings, the social gatherings, temple

                           gatherings-- all that stuff.  So how are

                           your kids doing versus oh, how are they

                           doing?

ANDREW JARECKI:

19:47:24:08                So it sounds like they're just out to be--

                           to be nice.  But sometimes it's competitive.

GREGORY DOE:

19:47:27:07                Oh, it's always competitive.  Just to see

                           whose kid does better and who makes more

                           money.

ANDREW JARECKI:

19:47:32:05                Yeah.  Now just-- also when I'm at-- you--

                           you're doing perfectly on this.  But-- but--

                           you are-- kinda already doing this but I

                           forgot to tell you.  They can't hear me

                           because I don't have a mic.  So if I say to

you like-- "So you know what street was the
Friedman house on," you might say instead of
just saying, "Piccadilly," you might say,
"Oh the Friedman house was on Piccadilly
Road."

GREGORY DOE:

19:47:52:16          Okay.

ANDREW JARECKI:

19:47:53:06          Just to kind of give a little bit of the
question--

GREGORY DOE:

19:47:54:20          Okay.

ANDREW JARECKI:

19:47:57:15          And-- how would describe your parents?  Just
in general-- as to what kind of people are
they--

GREGORY DOE:

19:47:59:23          My parents-- my mother was born in Canada.
And my father was raised in Queens.  Both
from a very affluent background-- where
education was h-- hindered (PH) in very
much.  My father was an Orthodox Jew.  Came

down to Conservative Judaism.  My mother was
reform.  And she upgraded herself to
Conservative.  Both raised with-- very
strong values and education in family.

ANDREW JARECKI:

19:48:27:10     And what kind of work did they do?  Were
they professional--

GREGORY DOE:

19:48:29:13     My mother was a legal secretary for awhile.
My father is in the commodities exchange.
So they're both very corporate America, very
clean-cut, nine to five, five days a week.

ANDREW JARECKI:

19:48:43:22     My dad worked on the-- well my dad had
business in the commodities.  (UNINTEL
PHRASE) when I was kid.  That was like my
summer job.  Did-- did you have any
siblings?

GREGORY DOE:

19:48:53:04     I have one sister.  (CLEARS THROAT)

ANDREW JARECKI:

19:48:56:07     Is she similar to age as you?  Or--

GREGORY DOE:

19:48:57:25          She's four years apart. So there's a big

                     age gap, but there's not.

ANDREW JARECKI:

19:49:03:06          Now how did you-- first-- to move to the

                     computer class-- take these computer

                     classes? How did you first-- find out about

                     the--

(OVERTALK)

GREGORY DOE:

19:49:10:22          Okay. The computer class. When I was in

                     fourth grade I was at John F. Kennedy

                     School. And I had a teacher named Dr.

                     Friedner (PH). There was a Commodore 64

                     program-- the computer-- the old-- do you

                     remember the old Commodore 64-- hard drive,

                     laptop disk?


19:49:26:21          And basically what happened was that there

                     was-- I was a computer go-to guy in the

                     class. If there was any problem they'd go

                     to me. And there was this massive printing

error that the printer couldn't work.   And
nobody could figure it out.   But I did.

19:49:39:02                      Dr. Friedner was friends with Arnold
                                 Friedman.   And because she had taken
                                 computer classes with him at night.   So she
                                 wrote my parents a letter saying how good
                                 this was.   And she recommended I get really
                                 verse (PH) computers.   And Dr.-- Arnold
                                 Friedman taught a computer class on his own
                                 time at night.   So that's basically how I
                                 was introduced.   My parents were introduced
                                 to him.   And she recommended him very
                                 highly.

                                 ANDREW JARECKI:

19:50:04:18                      And-- so when your parents signed you up--

                                 GREGORY DOE:

19:50:07:24                      My parents called Arnold Friedman.   And they
                                 heard about his class, through inquiries,
                                 through the Great Neck-- 'cause (PH)
                                 Community College.   "Oh, yeah.   Arnold
                                 Friedman, very reputable, very good guy and

everything."  So he was-- came very highly

recommended to the community.  So my parents

signed me up.

ANDREW JARECKI:

19:50:23:12                And then how often did you-- for-- for how

long did you go?

GREGORY DOE:

19:50:27:01                Year and a half every Friday-- from four to

six.

(OVERTALK)

ANDREW JARECKI:

19:50:29:10                --the question or they won't know what the

hell the answer is.  So say like you know,

"I went to class--

GREGORY DOE:

19:50:32:24                I went to the classroom.  I went to the

class from the middle of my fourth grade to

roughly January of my fourth grade to the

end, took a break.  And basically to the end

of my fifth grade year, which is roughly a

year and a half.  And I-- went every Friday

from about 4 to 6pm.

TAPE #134                                                        PG.10

                                        ANDREW JARECKI:

19:50:58:27          So the classes were like two hours--

                                        GREGORY DOE:

19:51:00:09          Classes were two hours long.

                                        ANDREW JARECKI:

19:51:09:00          So while you were there, did you-- you

                     signed up for more than one class--

                                        (OVERTALK)

                                        GREGORY DOE:

19:51:12:20          Well it was-- it was kind of block sessions.

                     Janu-- it was like you'd sign up for

                     September to January, January to June.  They

                     were blocked class.  And I came in the

                     January block.  And you'd be signed up.

                     You'd-- okay, you'd learn this, this, this,

                     this, this, this, this, play computer games,

                     you know learn some basic programming on the

                     surface.

                                        ANDREW JARECKI:

19:51:31:17          And then-- so you went to one-- one block--

                                        GREGORY DOE:

19:51:34:09          One block-- finished it up, went to summer

school, went to summer day camp, came back,

went to the next block.  Then after the

third block-- in the middle of the third

block-- it's when the case broke.  Actually

it was in about the second block, around

Thanksgiving of 1988, 80-- 88-- was in the

second block.  So it was about-- roughly

about a year and a half that it broke.  Case

broke Thanksgiving.

                    ANDREW JARECKI:

19:52:05:21         And-- when you were going to the classes--

                    do you remember--

19:52:20:10                    (OFF-MIC CONVERSATION)

                    ANDREW JARECKI:

19:52:32:13         Oh, do you remember which day you attended

                    the classes?

                    GREGORY DOE:

19:52:34:25         On Fridays.  I would always attend the class

                    on Fridays.

                    ANDREW JARECKI:

19:52:39:19         And-- generally how many-- well you were in

                    two different classes I guess or two

Case 2:06-cv-03136-JS   Document 41-11   Filed 01/28/21   Page 89 of 131 PageID #: 6542

different sections.

GREGORY DOE:

19:52:44:16          Uh-huh (AFFIRM).

ANDREW JARECKI:

19:52:45:08          Did you stay with the same kids?

GREGORY DOE:

19:52:47:00          It-- it depended up people's schedules.  But

generally there were some kids in one block,

some kids in other.  There were some

classmates that I knew throughout.

ANDREW JARECKI:

19:52:57:04          And how many other kids were in-- were in

each class at--

(OVERTALK)

GREGORY DOE:

19:52:59:26          Hold on.  Let me think here for a second.

The number of kids.  Let's see there's a

computer row this way, a computer row that

way, a computer row-- three, six, nine, 12--

about 14 in the class.  'Cause the computers

were set-- we had a back wall and two tables

and then two tables.

ANDREW JARECKI:

19:53:21:23            And-- did you become friends with other kids

                       that were in the class?

GREGORY DOE:

19:53:27:17            I became friendly with them.  But-- 'cause--

                       but most of them were kids I knew in the

                       community.  'Cause there were interesting

                       computers that were eight and nine years

                       old.  Like, "Wow, you know we get to learn

                       about Commodore 64, the Apple 2C (PH)-- all

                       that stuff.  So we-- it was very-- really a

                       good time that you know we'd get together,

                       hang out, you know just talk and everything.

ANDREW JARECKI:

19:53:46:23            And-- did you have other friends that

                       attended other classes?  Like there was

                       somebody you knew that went to the Tuesday

                       class or something like that?

GREGORY DOE:

19:53:55:10            Not really.  We were only-- I only got to

                       know people-- the way he did it was-- he

                       only got to know-- he did it in such a way

that he only got to know people in your

class, that you only stayed with people in

your class.

ANDREW JARECKI:

19:54:10:17          How did you get to classes? Did you--

(OVERTALK)

GREGORY DOE:

19:54:12:04          My mother drove me. It's ironic. The first

day she got lost. And she called him. And

she's like, "Oh I don't know how to get to

this place." And then he wound up giving

her directions. It's ironic that she'd have

gotten lost. I didn't want to go initially.

She forced me to go. It's ironic. If I

wouldn't have gone, I wouldn't be here

today.

ANDREW JARECKI:

19:54:31:09          And so-- we did the years. But you were

half way through fourth grade when you

started?

GREGORY DOE:

19:54:35:14          About September, October through fourth

                              grade.  And then the case broke roughly

                              about-- a week and a half (PH)--

                              Thanksgiving of the next year, in fifth

                              grade.

                                        ANDREW JARECKI:

19:54:46:21                   And how-- how old were you in fourth (PH)

                              grade?

                                        GREGORY DOE:

19:54:48:06                   Oh, let's see-- '77-- arrrooom-- 10 and 11.

                              It happened when I was 10 and 11.

                                        ANDREW JARECKI:

19:55:00:04                   And-- (COUGHS) now did you-- did you ever--

                              know the Friedmans before that?

                                        GREGORY DOE:

19:55:14:03                   No.  I never knew the Friedmans beforehand.

                                        ANDREW JARECKI:

19:55:17:02                   And-- after you met them for the first time,

                              did you remember having any like just

                              initial recollection of what-- what your

                              first meeting--

                                        (OVERTALK)

                              GREGORY DOE:

19:55:25:29         First time was like it was a welcome party.

                    "Hey Gregory, he's a new member of the

                    class.  Everybody welcome him.  Hey Gregory,

                    how are you doing?"  That was really

                    nothing--

                              ANDREW JARECKI:

19:55:34:26         Right.

                              GREGORY DOE:

19:55:35:05         --that was really-- nothing ever happened

                    that first time.

                              ANDREW JARECKI:

19:55:41:03         And-- do you remember like your first

                    impression of-- Mr. Friedman-- your first

                    impression--

                              GREGORY DOE:

19:55:45:21         Seemed like a generally good guy.  He had

                    kids.  You know older man, very successful,

                    established within the community.  You know

                    it was-- he had a family.  He had his wife.

                    You know he had this community.  He owned a

                    house and everything.  So--

ANDREW JARECKI:

19:55:58:21          Right.  And do you remember anything-- like

(UNINTEL) when you first met Jesse (PH)?

GREGORY DOE:

19:56:02:04          Glazy eyes.  Very glazy eyes.  Very fruity

type-- you know it seemed like he was on the

fruity side.

ANDREW JARECKI:

19:56:13:19          Who are you talking about?

GREGORY DOE:

19:56:14:21          Jesse.  Jesse was very fruity.  Had to do--

just you know the very kind of feminine type

of man that he was.  That was my first

impression that I got of him.  I'd never met

anybody like that before.  I was like,

"Well, okay."  You know being 10 years old

you're not-- you're-- you're very-- in a

very-- sheltered environment.  You didn't

meet anybody like that.  So it's the first

time I ever met somebody like that.

ANDREW JARECKI:

19:56:37:05          And do you remember how he behaved toward

Case 2:06-cv-03136-JS Document 41-11 Filed 01/28/21 Page 95 of 131 PageID #: 6548

                                   you?  Like did you feel like he was

                                   welcoming--

                                            GREGORY DOE:

19:56:41:15                   He-- Jesse was very-- very touchy-feely,

                                 very overly friendly.  And first time I

                                 remember Arnold's like, "No, no.  Just

                                 welcome him."  He welcomed me and that was

                                 it.

                                     ANDREW JARECKI:

19:56:55:04                   And-- do you remember anyone else who was

                                 around either the first time or other--

                                     (OVERTALK)

                                     GREGORY DOE:

19:57:01:01                   I remember certain specific individuals

                                 (PHONE RING) that-- (PHONE RING)

19:57:07:04                        (OFF-MIC CONVERSATION)

                                     ANDREW JARECKI:

19:57:19:02                   Now do you remember-- just-- just some more

                                 background.  Do you remember any of the

                                 other Friedmans?  Like did you ever meet--

                                     GREGORY DOE:

19:57:23:13                   I met Arnold.  He was older, you know

APP.    0657

Case 2:06-cv-03136-JS Document 41-11 Filed 01/28/21 Page 96 of 131 PageID #: 6549

respectable. He seemed like an okay type of
guy, you know. But you know first
impressions are first impressions. That was
the first impressions I got of Arnold. So
he seemed alright.

19:57:36:25                    His son was kind of fruity fag. So-- you
know-- but looking back on it, I don't-- I
didn't know what-- that type of person was.
'Cause when you lived with your mother, your
father, and your sister in a Jewish
community and you're sheltered from this,
and you-- you're 10 years old, you don't
know what fag is. So that's basically what
happened.

                              ANDREW JARECKI:

19:57:58:03                    And-- do you remember meeting like his wife,
for example?

                              GREGORY DOE:

19:58:01:02                    His wife was the ugliest piece of shit I
ever saw in my life. She was old, derailed
(PH), and everything else. It's like oh

God.  She always used to carry this laundry
basket that I remember was a signal-- to
know if everything was clear.  And that I
learned through trial and error later.  At
the-- Friedman house on when the abuse would
be getting.

ANDREW JARECKI:

19:58:27:28    And how did they do it with this laundry
basket?

GREGORY DOE:

19:58:29:18    Basically what happened was that, the way
the house was downstairs was segregated.
She'd bring the laundry basket in.  And
she'd be like, "Okay, I'm going to go do my
laundry now."  But the laundry machine was
right next to the bathroom that the little
station (PH) happened in.  But she'd turn
around and walk away.  She'd close the door.
Five, 10 minutes later there would be
getting (PH).

ANDREW JARECKI:

19:58:50:20    So in a way you felt like she was

Case 2:06-cv-03136-JS Document 41-11 Filed 01/28/21 Page 98 of 131 PageID #: 6551

facilitating--

(OVERTALK)

GREGORY DOE:

19:58:53:08        She was basically the link to the outside

world.   The back door-- there was a glass.

The shade would come down.  It would close.

People would be playing on the computer.

The-- they would start to put your hands

(PHONE RING) down your pants and everything.

(PHONE RING)

19:59:12:12                    (OFF-MIC CONVERSATION)

19:59:18:25                    (REFERENCE TONE)

SLATE:

19:59:22:15        There appears to be no audio for this take.

Time code on the dat (PH) jumps from 152 to

159.   And this take starts at 154.  The next

slate to take on the data is take number

five.

19:59:37:29                    (REFERENCE TONE)

ANDREW JARECKI:

20:03:50:07        So just-- you know what was it-- now where

were the classes held for the--

(OVERTALK)

GREGORY DOE:

20:03:56:29        Classes-- the house-- the way the
                   construction was at-- it was kind of like a
                   split.  The house was kind of like, there
                   was a door here and a door there.  You'd
                   walk in this way.  And you'd walk through a
                   corridor here.


20:04:07:15        There was a sliding door here.  You'd go on
                   the left.  And that'd be the main computer
                   room where all the computers were.  There'd
                   be a set up over here which was software,
                   which the kids could do during the day.  And
                   then be to the left.  That's where the
                   computer classes were.

                              ANDREW JARECKI:

20:04:22:29        And-- when you went in, what-- what was a
                   typical class like?  Like the first thing
                   you would do, the second thing you would do,
                   and--

GREGORY DOE:

20:04:30:11                Well, there was something called makeup

                           sessions-- that if you missed a class Arnold

                           would encourage you to make up.  That'd be

                           basically-- you'd come a half an hour before

                           the class.  You'd come from 3:30 to 4:00.

                           And during those makeup sessions which

                           happened not periodically, you'd just get

                           gang raped.

20:04:45:29                It was just a raping session.  Because you

                           were penalized because you missed the class

                           before.  That was his penalty to you, that

                           you'd-- since you'd be there you'd get

                           raped, you would miss it.  And there was--

                           always be a few-- when the kids came in for

                           awhile, "I don't have to go through this for

                           like another half an hour."

20:05:04:24                Basically be-- you won't get it for, sit

                           down, do a computer thing, about 4:25 she'd

                           come in, you know do whatever-- 4:25 to

about 5:30ish, 5:35.  Then they'd clean up,

do some computer stuff.  And then-- and then

sometimes they'd invite parents in to show

you what you learned.  And for like 20

minutes, you're like, "Oh yeah, we did this

today.  We did that today."  "Okay, thanks.

Bye."  Send you on your merry way.

                    ANDREW JARECKI:

20:05:32:23         So that was a way-- having parents in there

                    was a way to make it seem like--

                    GREGORY DOE:

20:05:35:17         Uh-huh (AFFIRM).

                    ANDREW JARECKI:

20:05:36:01         --(UNINTEL PHRASE).  Yeah.  (UNINTEL).  Now-

                    - where did Mr. Friedman stand, like during

                    the classes, during the class part of the

                    class?  Was he like teacher, like stands in

                    front of the room?  Or was he always walking

                    around?

                    GREGORY DOE:

20:05:53:27         Mr. Friedman's too good of respect for him.

                    Arnold was-- always kind of like on the

side.   Where-- had to be a table right here-

- always be on the side trying and teach and

stuff just to see what was going on.

ANDREW JARECKI:

20:06:07:08         Was there like a blackboard or something?

GREGORY DOE:

20:06:08:15         Yeah, it was kinda like a-- a whiteboard,

you know like the marker you'd use then

erase?   It'd be that type of a board.

ANDREW JARECKI:

20:06:16:12         And-- you know did you ever-- were you in

ever-- ever in any other part of the house

besides where--

GREGORY DOE:

20:06:25:19         Besides Jesse's room?   The ramming fuck room

and the-- other room?   No.

ANDREW JARECKI:

20:06:32:16         And the ramming room was the bath-- was the

bathroom--

GREGORY DOE:

20:06:34:12         Was the bathroom.   Yes.

Case 2:06-cv-03136-JS   Document 41-11   Filed 01/28/21   Page 103 of 131 PageID #: 6556

ANDREW JARECKI:

20:06:37:28          And-- now when do you first recall knowing--

like your first recollection like,

"Something's not right here"?

GREGORY DOE:

20:06:46:11          Two weeks-- two and a half weeks into it.

Jesse-- basically what happened was-- we're

at a computer one day.  He's like, "I wanna

show you something."  Took his hand, shoved

it right down my pants, playing with my

penis.

20:06:57:15          It's like, "Uh, okay."  And Arnold had

pictures.  He said, "I know where you live.

I know your parents.  I'll kill your parents

if you tell them."  And I'm thinking, "Oh,

no.  Mom and Dad are really not good."  At

that point in my life, I didn't have a good

relationship with my father.

20:07:13:26          It was a very destructive household.  My

parents, which I was living it-- my mother

and my father were constantly fighting all
that time and everything. And Arnold-- by
him molesting me-- kind of became like a
little father figure towards my parents.
Because my father really didn't give two
fucks about my life at that point and that
time.

20:07:31:24

And he really was never there. He was
already working. He'd always get-- it would
always be like-- angry. He'd be angry if
anything I did wrong. So Arnold in a sense
became kind of like a father-- sick fagger--
father figure in my mind. It'd be like,
"Well, he cares for me-- he's caring for me-
- would be like-- he-- by touching me and
everything. I didn't know any other-- I was
dumb. I was 10 years old, didn't know any
difference. It's what happened.

ANDREW JARECKI:

20:07:54:11

And so the first thing you remember was--
had to do with Jesse?

APP.     0666

GREGORY DOE:

20:07:57:23          Had to do with Jesse.  Jesse put his hands

                     down my pants, was playing with my penis.

                                    ANDREW JARECKI:

20:08:02:01          And what was your first reaction to that?

                                    GREGORY DOE:

20:08:03:20          Oh.  Oh-- "Don't."  And I was like, "What

                     are you doing?"  He's like, "Don't.  Calm

                     down.  Be quiet."  And he started caressing

                     my penis, my-- my genitalia and everything.

                     Then I remember-- he had a piece of

                     cinnamon-- cinnamon raisin-- cinnamon gum.


20:08:22:16          There was cum on it.  He put cum on the

                     cinnamon raisin gum.  He said, "Chew it."

                     "What do you mean chew it?"  He put his dick

                     on it, wrapped it.  He said, "Chew it now."

                     I wound up chewing that piece of gum, with

                     the cum-- with his cum on it.


20:08:39:23          It was the most horrifying thing.  I

                     remember I had to chew it and spit it out,

                                    chew it spit it out, you know.  He used to

                                    say, "Now you're part of me."  He said, "Now

            ʿ                       I own you."  That was his thing.

                                         ANDREW JARECKI:

20:08:54:04                         And when he first said that to you, you know

                                    what was your first reaction to that?

                                         GREGORY DOE:

20:08:57:27                         "No, I don't own you."  He's like, "Yes, I

                                    do.  Your parents are never going to find

                                    out.  I'm going to kill you otherwise.  You-

                                    - you've come here to-- you're-- for a

                                    computer class.  We're going to do this.

                                    We're going to do that."


20:09:08:27                         And you know, being 10 years old you're

                                    afraid.  You don't know.  And you know

                                    you're-- you're helpless.  I mean you

                                    couldn't do anything.  Being 10 years old,

                                    you don't know what's right and what's

                                    wrong.  'Cause all you know is go on a hike,

                                    going to school, playing ball with your

                                    friends and everything.

ANDREW JARECKI:

20:09:27:16          Now when this for example-- this episode
                     where you know you were in the computer
                     class-- where your first experience-- where
                     were you sitting in the (UNINTEL)?

GREGORY DOE:

20:09:34:24          I was sitting second chair in.  I always sat
                     like the second chair in usually.  And
                     Jesse's be like, "It's your turn."  And you
                     would just-- caress his hands down my pants
                     and everything.  And-- and it was-- it was--
                     it didn't feel good.  It didn't feel bad.
                     It felt indifferent.


20:09:50:19          Because I didn't know.  Everybody's you
                     know-- you don't know at 10 years old.  Yes,
                     I like girls and everything.  But I never
                     touched a girl, never felt a girl, to know
                     what it was like.  So you know-- you-- you
                     experience these things just like, "Uh,
                     okay."

ANDREW JARECKI:

20:10:06:23

Now where was-- you were in the second chair in. And then somebody sat to your left?

GREGORY DOE:

20:10:12:16

Somebody sat to my left. Somebody sat to my right, behind me, forward, back.

ANDREW JARECKI:

20:10:16:25

Do you remember who was sitting to your (UNINTEL PHRASE)?

GREGORY DOE:

20:10:18:12

Not-- it would vary from time to time. It-- some people would miss. Some people would be there. Some-- it-- it would vary from time to time. But the same group of people within a block would be there. And that's what would happen.

ANDREW JARECKI:

20:10:32:00

And that first class-- so that you started right--

GREGORY DOE:

20:10:35:18

Second-- two-- two, three weeks into it. After they assessed what would be, whether a

good victim, bad victim, you know and

everything-- on with the rape they went.

ANDREW JARECKI:

20:10:46:03        And-- when you-- were sitting there and then

Jesse-- where was Jesse standing when this

was going on-- kind of--

(OVERTALK)

GREGORY DOE:

20:10:53:02        I would be like here.  He would kind of be

like standing to the right of me.  And his

hand would kind of just slip down in your

pants, just kinda-- you know just slowly in

his faggy way, you know just caress his

hands down his pants and everything.  You

know?

20:11:06:28        And he would do that.  It would be like,

"Oh, this is going to feel so good and

everything."  He's 18 at the time.  He's a

senior in high school.  I'm like, "Uh, I

don't know."  You know being 10 years old,

you don't-- you lack that experience.

ANDREW JARECKI:

20:11:18:04 And-- now when this happened the first time,
were there kids on both sides of--

(OVERTALK)

GREGORY DOE:

20:11:22:01 Yeah, there was kids. Everybody-- I'm like,
"What's going on?" "Shh shh." Everybody
was at their computer screen frozen looking
at it. They didn't know anything and he's
just going ahead, just bringing his hands
down and everything.

ANDREW JARECKI:

20:11:34:00 And you're-- you know was there any reaction
at any point during that session?

GREGORY DOE:

20:11:39:20 I'm like, "Stop. No, stop. No." And he
would do it. He'd just keep doing it.

ANDREW JARECKI:

20:11:45:05 And-- what about the other kids? Did they
ever like kinda look at you weird--

GREGORY DOE:

20:11:48:09 Kinda looked at me funny. I looked at them

like, "What's going on?"  They looked

straight.  No reaction.  No nothing.

ANDREW JARECKI:

20:11:54:10     And why do you think that (UNINTEL PHRASE)?

GREGORY DOE:

20:11:55:17     'Cause they knew what was going on, but they

were too afraid of what Jesse said and

Arnold said to basically know what happened.

And that's basically why-- 'cause there's so

much fear for our parents and everything.

Knowing that oh, you'd be tabooed at a

community that was-- such-- we were growing

up-- and Jewish-- da da da da da.  It would

be that.

ANDREW JARECKI:

20:12:21:21     And-- so that was the first time.

GREGORY DOE:

20:12:23:16     Yes.

ANDREW JARECKI:

20:12:24:07     Did the gum episode happen the first time?

GREGORY DOE:

20:12:26:02     Gum episode the first time and more multiple

times after that.

ANDREW JARECKI:

20:12:31:20     And-- how did he-- like did he just have the

gum in his hand? Or did he--

GREGORY DOE:

20:12:36:22     He'd take it out of-- slowly take it out of

the wrapper. And we knew by him doing it

slowly, we knew what was going on. And you

really couldn't do anything about it.

(YAWN) You were helpless 'cause you-- you

were too fear-- you were victimized by fear-

- for a feared (PH). You couldn't do

anything.

ANDREW JARECKI:

20:12:55:04     Now that was the ver-- that was the first

time that you remember.

GREGORY DOE:

20:12:56:13     It was the first time.

ANDREW JARECKI:

20:12:59:03     Do you remember a subsequent time, like when

you started to know, "Oh this is going to

become a regular thing."

GREGORY DOE:

20:13:04:17    After I was put into the bathroom, the first

               time I was raped-- I knew it was going to

               happen-- happen again and again and again.

               Just you knew it would happen after the

               second-- about af-- after a month you'd know

               what was going on.   (COUGHS)

ANDREW JARECKI:

20:13:17:21    If it's the first time, it might have been

               just like-- you know something weird the

               first class--

GREGORY DOE:

20:13:21:00    Right.

ANDREW JARECKI:

20:13:21:00    --so you don't know whether it's going to be

               something regular.

GREGORY DOE:

20:13:23:29    But then after that it became routine for a

               year and a half.

ANDREW JARECKI:

20:13:27:20    And was it-- did it happen in every class?

TAPE #134                                                    PG.37

GREGORY DOE:

20:13:29:10          Yes.  Some degrees more, to some degrees

                     less.  It would happen-- in more in some

                     classes.  It happened less in some class.

                     Depends if they had a new person.  Depends

                     more on the favorites was there.  And that's

                     basically how it progressed.

ANDREW JARECKI:

20:13:42:24          But remember they can't hear me.  So yeah--

GREGORY DOE:

20:13:44:08          So it ha-- it happened a lot.  It happened

                     every-- every time, just the degree--

                     whether you'd have to suck on-- suck Jesse's

                     penis, suck Arnold's penis, take-- their

                     dick in the ass or not-- would all depend on

                     whether the favorite was there-- had you

                     missed a class before, had you done

                     something to piss them off, or everything.

                     It all depended on their mood.  That's how

                     it went.

ANDREW JARECKI:

20:14:09:00          Now-- what was the rel-- the relationship

between Arnold and Jesse like--

GREGORY DOE:

20:14:12:19                      They were father--

ANDREW JARECKI:

20:14:12:27                      --(UNINTEL PHRASE).

GREGORY DOE:

20:14:13:22                      They were father and son.  They were a gang

rape.  Arnold-- I remember one time Arnold

won teacher of the year award.  And he

brought down orange juice.  He took his

penis, dunked cum in the orange juice, and

made us all drink it.

20:14:26:19                      And the more per-- and I remember the person

who drank the most would get molested the

less.  So I wound up drinking the most.

'Cause I hated being molested.  I wanted to

do anything possible to get out of it.  And

that's what happened.

ANDREW JARECKI:

20:14:39:11                      Now-- so after the first episode, the next

time it happened-- how did it-- how did it

escalate coming out-- (UNINTEL PHRASE)?

GREGORY DOE:

20:14:49:27          It would--

ANDREW JARECKI:

20:14:50:13          Oh, I'm sorry.

20:14:52:15                          (OFF-MIC CONVERSATION)

ANDREW JARECKI:

20:15:03:23          Now-- we were saying.  How did it escalate

from the first session?

GREGORY DOE:

20:15:07:12          From the first session-- escalated by-- my

first time was-- I was brought into the

bathroom.  "We're going to show you a little

gift we're going to have for you."  I was--

they dropped my pants, forced to bend over.

Penis was-- it hurt.  It hurt really bad.

And it was-- his penis was put in my ass.

And I remember-- I remember doing that.


20:15:30:14          And he said, "Okay, now you can suck my

penis."  And I wound up sucking his penis.

Gripped me by the head and I was like, "No,

Case 2:06-cv-03136-JS   Document 41-11   Filed 01/28/21   Page 117 of 131 PageID #: 6570

no, no, no."  I had to suck his penis.

ANDREW JARECKI:

20:15:39:01          Which one-- which Friedman was this?

GREGORY DOE:

20:15:40:21          Both-- Jesse and Arnold.  I--

ANDREW JARECKI:

20:15:43:25          And--

GREGORY DOE:

20:15:44:15          --I was more molested by Jesse than I was

Arnold.  But I was also molested by Arnold a

lot.

ANDREW JARECKI:

20:15:52:15          And-- when you went into the-- bathroom, how

did that work?  Like how did-- did one of

them go in there first?  Or how did they

bring you in there?

GREGORY DOE:

20:16:01:06          It-- it would vary.  They'd say, "Okay, this

is your time now," and then basically just

go in.  And we would-- have to deal with it.

They would say, "You know the drill."  Pants

would come down.  You'd bend over.  And--

Case 2:06-cv-03136-JS Document 41-11 Filed 01/28/21 Page 118 of 131 PageID #: 6571

hmmm-- and that wasn't-- wasn't pretty.

ANDREW JARECKI:

20:16:22:06      And where-- which-- what were you-- were

you-- bending over the toilet or bending

over the sink?

GREGORY DOE:

20:16:28:21      Bending over the toilet seat.  And basically

it was like we were having to-- you know we

were being molested.  And be-- there was

like a shower right here.  The toilet was

right here.  We'd have to grip onto the

thing like this.  And just-- we'd have to

deal with it.

20:16:46:03      And you know you're-- you're a victim.  You

don't know.  You're young.  You're-- you're

naive.  And you're stupid.  You didn't know

anything anymore.  So having to deal with

this was hard.  And then especially after

what happened, your parents would be there

15 minutes later.  You act completely

normal.

20:17:06:11                    So that was the hardest part.  But at home I
                               remember I used to run around naked a lot.
                               And I cried when I wanted to le-- I didn't
                               want to go to sleep at camp (PH), 'cause I
                               thought they'd do the same thing to me.
                               Being away from the Friedmans I thought, "Oh
                               no."  They said, "When you go away you can't
                               tell.  We're going to find you.  We-- you
                               know-- we're going to your-- going to this
                               camp, that camp.  And we know that you're
                               going to be there.  And if we want, we'll
                               hunt you down."

20:17:31:20                    And I got a post card twice saying, "Are you
                               doing-- are you misbehaving?  Write back or
                               otherwise I resp-- expect a response."  And
                               I had to write a response back.  They kept
                               tabs on their kids, as they claimed.

                                               ANDREW JARECKI:

20:17:45:28                    Yeah.  That's (UNINTEL PHRASE).  So it
                               didn't just stop at the end of the class or-

—

(OVERTALK)

GREGORY DOE:

20:17:50:20                No, no, no.  They'd-- it was all about

control.  If they lost control, their world

fell apart.  They lost control, their world

did fall apart.  But they held together for

awhile by post cards-- basically-- making

sure you know-- on a weekly basis you can

hold it together, 'cause you know you see

him once, "Oh why'd you do this (UNINTEL)?"

You know you'd block it.


20:18:12:25                You'd block it out of your mind so much that

when it just came you'd just go back to it.

It just became a routine part of life for a

year.  And it's just something you don't

want to do.  You don't want to acknowledge.

"How do feel?"  "Oh yeah, I get molested

every week."  You know you don't-- it's

something you don't talk about.  It's a

taboo thing.

ANDREW JARECKI:

20:18:29:12

Did you ever-- did you ever keep any of

their cards they sent you?

GREGORY DOE:

20:18:32:15

No, I tore them all up out of anger that

they were watching me and everything.  I was

like, "How do I break free?"  I used to cry.

I couldn't do anything.  Pissed me off.

Pissed me off big time, but I couldn't do

anything.  I was 10.

ANDREW JARECKI:

20:18:44:22

Right.

GREGORY DOE:

20:18:44:26

There were times I wanted to kill 'em.

There were times that I just wanted-- there

was this glass-- break through the glass

when we're-- down the block.  But I

couldn't, 'cause I was so emotionally torn

by fear that I couldn't do anything.

ANDREW JARECKI:

20:19:03:27

Now was there ever a time when the

molestation took place in the classroom,

other than the sort of fondling part?  Was

there anything--

ʳ                                      GREGORY DOE:

20:19:12:10          No.  They'd try to keep it to the bathroom.

That's what I can recall.  I don't remember

anybody ever getting raped when there were

other people around.  But when you have that

special session by yourself, yes you were

molested in the computer room.  They didn't

bother to give you the privacy in that room.

That you just went and they just did

whatever they wanted to do for a half an

hour.  That was a free for all.

                    ANDREW JARECKI:

20:19:33:06          Tell me about that.

                    GREGORY DOE:

20:19:35:05          Rape, molestation, sodomy.  I remember one

time I got the ass and the dick at the same

time.  That was probably the worst.  That

was probably the worst experience I ever

had.  And I was crying.  I spit.  And I

remember going to take a swing at him, and

they pushed me down.

20:19:48:17                    They said, "If you ever fucking do that

                               again, we're going to fucking kill you."

                               And I knew that I was powerless.  But when

                               you're 10 years old, you know you throw a

                               wimpy punch at somebody's that's 18 and 45,

                               fooom, right to the ground.  Then they were-

                               - pin me on the ground.  They raped me.  And

                               that hurt the most.

                                            ANDREW JARECKI:

20:20:05:25                    Now just 'cause-- you know-- I think people

                               need to be able to visualize how this

                               happened in the room.  The-- tell about the-

                               - the-- this-- this happened in one of the

                               earlier sessions when he came between 3:30

                               and 4:00-- and--

                                            GREGORY DOE:

20:20:20:10                    Yes.  Their special makeup session.  You'd

                               always be sitting in the back.  So they

                               could always get a view of the room.  I was

                               in a chair.  I was thrown to the floor.

Case 2:06-cv-03136-JS   Document 41-11   Filed 01/28/21   Page 124 of 131 PageID #: 6577

Pants were torn off.  Jesse went in my ass--
Ross (PH) went in my mouth.

20:20:39:06                And they were like saying, "Oh yeah, yeah,
                           yeah, yeah, yeah."  And so basically I was
                           like this.  He was like that.  He was like
                           that.  And I was getting it from both sides.
                           And I couldn't do anything.

                                    ANDREW JARECKI:

20:20:50:24                And where was-- Arnold?

                                    GREGORY DOE:

20:20:52:22                In front.  Jesse was in back.  Then they
                           switched.  And the scariest part was that
                           they were doing this to 10 year old.  No
                           condoms.  No-- you know they coulda had
                           anything.  I was very lucky I walked away
                           disease free, AIDS free.

20:21:12:20                I coulda died.  I was lucky that God was
                           watching over me.  'Cause there were tears.
                           There was blood.  It was just-- there was
                           (SNAP SNAP) contact.  And that's what

                                    happened.

                                    ANDREW JARECKI:

20:21:28:09                         Now your parents brought you to that makeup

                                    session--

                                    GREGORY DOE:

20:21:31:22                         Uh-huh (AFFIRM).

                                    ANDREW JARECKI:

20:21:32:07                         --had to drive you there.  What was that

                                    like?  Well do you remember what you were--

                                    (OVERTALK)

                                    GREGORY DOE:

20:21:35:05                         The drive was hell.  I was be-- I always

                                    used to get very quiet from my mother's

                                    house to (COUGHS)-- to my-- to the house in

                                    which it happened.  Used to always get very

                                    very very quiet.  And you know you deal with

                                    it.


20:21:49:21                         I mean-- but he-- 'cause always in the back

                                    I feared that they'd be-- kill your parents.

                                    And if we kill your parents, you know who

                                    was going to take care of Mom and Dad?  You

know by being silent I was helping them keep
them alive.  That was programming to my
head.  I did it.

ANDREW JARECKI:

20:22:08:11    So when you were in-- in the car with your
mother, did you ever consider saying to your
mother, you know "I'm--

GREGORY DOE:

20:22:16:04    There was one time where I said, "Mommy, I
don't want to go."  She'd be like, "I paid
all this fucking money for you to go.  You
better fucking go so I can show the other
kids what you learned," is what my mother
said exactly.

20:22:27:14    My mother was more concerned about her
prestige in the community than the welfare
of her son.  And because of that, my mother
and I have never gotten along to this day.
My father and I have rebuilt our
relationship.  My mother and I do not talk.
We-- don't talk, because I-- in a sense I

Case 2:06-cv-03136-JS   Document 41-11   Filed 01/28/21   Page 127 of 131 PageID #: 6580

tried to cry out to help in my own way.  And
she ba-- basically was wanting to take the
prestige of the community over-- her own
son.

20:22:53:20          And through many counseling years, the
psychiatrist basically said, "You have to
live with it."  My mom has to live with it.
And she's regretted it to this day.  And I
still hate her for it, 'cause there were
many times where I said, "No."  And she said
if would've known the signs she would've
changed it.

ANDREW JARECKI:

20:23:11:26          Now the-- the-- so a typical-- then you're
saying basically that the molestation
happened just about every class--

(OVERTALK)

GREGORY DOE:

20:23:22:21          Yes--

ANDREW JARECKI:

20:23:22:26          --that.

GREGORY DOE:

20:23:23:14                Some form of molestation-- ass or dick or

                           would I have to jerk them off, but something

                           would happen.  And the degree as I said

                           before, depended on their mood, depended who

                           was there and you know just the whole

                           situation.


20:23:35:11                They would have to judge each situation.

                           Because there could be an absenteeism, the

                           parents might be talking to the mother so

                           she might not come up with the laundry

                           basket ahead of time.  So-- just because of

                           that.

                                    ANDREW JARECKI:

20:23:49:24                So they were a little (UNINTEL)?  So you're

                           saying that all the children were involved

                           in this in some way.

                                    GREGORY DOE:

20:23:54:09                At some level.

                                    ANDREW JARECKI:

20:23:55:00                Did you guys talk about it?

## GREGORY DOE:

20:23:55:29                    No.  We didn't.  Because of the fear that I

said, that our parents would be killed.

Parents would be hurt.  "We know your

parents.  We know where you live.  We have

your phone number and address."  And you

know what?  It was legitimate.


20:24:09:26                    Because you have to have our address to know

what was going on.  So because of that, it

was just-- it was very very very big fear

factor.  And I don't have children.  But if

your children love you and respect you and

do anything, and they think, "Oh no, Mommy

and Daddy are going to get killed," at ten,

what are they going to do?


20:24:28:28                    They're going to try and protect their

parents, 'cause that's all they know.  And

by them taking this abuse, they realize,

"Okay, Mommy and Daddy will be okay.  My

parents will be okay.  The only people that

Case 2:06-cv-03136-JS   Document 41-11   Filed 01/28/21   Page 130 of 131 PageID #: 6583

love-- raise me for 10 years of my life will
be okay."

                         ANDREW JARECKI:

20:24:41:02              Now-- who was your best friend in the class?
                         We won't-- you know we're cutting out all
                         the names of everybody.  So--

                              (OVERTALK)

                         GREGORY DOE:

20:24:46:10              I didn't have any names.  I didn't have any
                         best friends.

                         ANDREW JARECKI:

20:24:49:08              Was there anybody that you were closer--
                         somewhat closer to than the other kids?  Or
                         (UNINTEL PHRASE)?

                         GREGORY DOE:

20:24:53:21              Not really.

                         ANDREW JARECKI:

20:24:57:07              Did you ever see any of the kids on the
                         outside?

                         GREGORY DOE:

20:24:58:21              Yes.  I saw a lot of them on the outside.
                         And we just looked at each other very

strangely and just went on. It was--

working on the outside, we just-- we didn't

talk about it. It was a taboo subject.

We'd be like, "Oh, you're going to the

class." "Yeah." "Okay, I'll see you there.

Bye." That was it.

ANDREW JARECKI:

20:25:16:19      And-- when you-- were taken in the bathroom,

in that-- say in a typical class, would more

than one kid be taken in the bathroom?

GREGORY DOE:

20:25:28:06      It would be turns. Sometimes as a penalty

the other kid would have to watch. You know

one person would be raped, turn around.

Sometimes you'd have to jerk the other boy

off. But we were too young. We couldn't

get-- you know-- and everything.

20:25:40:08      So you would just-- you'd jerk the other guy

off. And then you'd have to watch it and go

on. Arnold would get his pleasure.

"Alright, next!" Turn around and just-- and