it-- from what I learned, the person that
pissed off the most had to deal with the
semen.

20:25:54:09                  You know they'd get 'em aroused, get 'em
going, stop, get 'em aroused, get 'em going,
stop, get 'em aroused, get 'em going, stop.
The person that--

20:25:59:26                              (OFF-MIC CONVERSATION)

                                   * * *END OF SIDE A* * *

                                   * * *SIDE B BLANK* * *

                                 * * *END OF TRANSCRIPT* * *

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMANS"

INTERVIEW WITH GREGORY DOE

CORRESPONDENT:  ANDREW JARECKI

PRODUCER:  NOT IDENTIFIED

TAPE #135

\*\*TRANSCRIBER'S NOTE: QUESTIONER COMPLETELY OFF MIC.  BEST EFFORT

FOLLOWS.\*\*

| | |
|---|---|
| 20:00:00:21 | (OFF-MIC CONVERSATION) |
| 20:00:06:13 | (QUESTIONER INAUDIBLE) |
| | GREGORY DOE: |

20:00:09:01    No, just-- just how-- how the other people
               been just, you know, recalling their
               instant-- their-- their experiences and
               everything.  'Cause I knew each person
               experienced it differently.  'Cause-- I
               don't know if being-- I'm not one of the-- I
               don't know-- did you ever hear of one of the
               favorites.

20:00:29:05    Did you ever hear that-- have you heard that
               terminology?  One of the favorites.  Not

135

being one of them, I don't know if I was
less molested, more molested. But I think
because I wasn't one of the favorites, I got
away cleaner than-- more or less damage than
the other people. And-- I don't know.

ANDREW JARECKI:

20:00:46:11    So what's an example of something that would
happen to somebody that wasn't a favorite?

GREGORY DOE:

20:00:51:16    Level of molestation. They'd get gang raped
I think more. There'd be more-- sodomized
more. You know more time. Instead of just
jerking, he'd have to take the semen,
everything, and just be a vi-- be abused
more in a given timeframe than another
person.

20:01:09:16    Like I only have to deal with Jesse fondling
me one day. The other guy-- if they have--
deal with Jessie getting his dick up his
ass. So--

TAPE #135                                                    PG.6

                         GREGORY DOE:

20:03:13:27             I was raped-- I'd say a good 30, 40 times.
                        I-- that's-- that's just a ballpark figure,
                        average.  I sucked the man's penis I'd have
                        to say about 20, 25 times.  Felt his hand
                        down my pants 40, 50 times.

20:03:28:21             Just-- it was something that just was a
                        routine thing you just deal with.  And it
                        would be like go to computer class, have
                        this done.  Leave.  Next week.  Go to
                        computer class.  Have this done.

20:03:40:26             Between January and June, you're looking at
                        four weeks.  January, February, March,
                        April, May, June.  What, six months?  24
                        times.  Amount of times.  Sometimes you'll
                        get (SLAPPING) doubles.  Sometimes you'd be
                        go in at 4:30, (SLAPPING) get raped.  Come
                        back at 5:15, (SLAPPING) have it again.
                        (SLAPPING) Sometimes a double whammy within
                        one time.  It depends, as I said, on their

mood, their experience, how much they wanted
this and that.

20:04:01:19                     (OFF-MIC CONVERSATION)

                                ANDREW JARECKI:

20:04:19:24     You know, was there ever a time during the
                year and a half where you were just like,
                "I've had it.  I'm not going back."  Or did
                you ever kind of break out and say, "Okay,
                this time I'm gonna skip the class or
                something."

                                GREGORY DOE:

20:04:31:25     I did at one point become very rebellious--
                in the middle of fifth grade.  My mother
                said, "You're fucking going back to that
                class, 'cause my prestige is on the line.
                And because of that, I am going to fucking
                make you go to this class.  I paid all this
                money.  Your father works hard for a living.
                Go."  That was-- my rebellion (SLAPPING) was
                to my parents, not to Arnold.

20:04:53:05     I could not be rebellious to Arnold because

Case 2:06-cv-03136-JS  Document 41-12  Filed 01/28/21  Page 6 of 158 PageID #: 6590

he, in my mind, could kill my parents.
Being rebellious to him would not be good.
Being rebellious to my parents, stopping
payment, would have prevented me from going.
And thus I'd be able to save myself and my
parents.  But it would-- it inevitably-- it
did not happen.

ANDREW JARECKI:

20:05:13:24          Now-- you know and I understand you have
like a lot of conflicting feelings about
this because it's natural, I think.  But,
you said that sometimes that Arnold was, you
know, somebody that you kind of hated and
feared.  But then other times you've said
that you would sort of-- he would-- became a
little bit of a father figure to you.

GREGORY DOE:

20:05:33:21          Uh-huh (AFFIRM).

ANDREW JARECKI:

20:05:34:28          If you could describe that?  The two-- the
two--

TAPE #135                                                          PG.9

GREGORY DOE:

20:05:36:12          The t-- it was because Arnold would be like,
                     "I'm sorry.  I have to do this.  But you
                     deserve it."  And then he'd be like very
                     caring afterwards.  "Oh, are you okay with
                     this?  Are you doing this with this?" You
                     know, he became-- in my mind, because he
                     would be like, "Okay, I have to punish you.
                     But yet I'll comfort you at the same time.
                     I'll hate and love you at the same time."

20:05:58:20          And that became kind of in my mind, a fucked
                     up view, saying, "Wow, Arnold cares about
                     me.  I-- I don't wanna make Arnold mad, so
                     if I don't make Arnold mad, he'll molest me
                     less.  And then he'll be good to me, so
                     he'll kind of be like my father.  But if I
                     make Arnold mad, then Jesse will molest me.
                     And thus they became mad."

20:06:15:12          So it was always trying to make Arnold and
                     Jesse happy.  And we'd make them happy by

them letting molest us (SIC).

ANDREW JARECKI:

20:06:23:12 Now-- was there a-- anyone else-- or that's
is-- was anyone else involved in classes in
any (UNINTEL)?

GREGORY DOE:

20:06:29:17 Outside the two of them?

ANDREW JARECKI:

20:06:31:02 Yeah.

GREGORY DOE:

20:06:32:04 Ross Goldstein, that I remember for a fact,
that should have died.  Hopefully the
cancer-- cancer should have gotten you Ross,
but it didn't.  Oh, hope you die anyway you
piece of shit.

20:06:42:10 But-- it was to the point that he would come
in, be Jesse's friend.  He'd fondle me.  He
wasn't-- he didn't rape me so much.  But he-
- he had a part-- a part in it.  That is
kind of cloudy, but I do remember him being
there.

                                    ANDREW JARECKI:

20:07:00:15                         And what do you remember-- like what did he

                                    do when the classes were going on?

                                    GREGORY DOE:

20:07:03:25                         He'd be there, hanging out. "Hey, what's

                                    going on.  How're you doing?"  Jesse would

                                    be like, "Hey, guys, what's going on?"  He'd

                                    caress-- he'd brush my pants, brush my this,

                                    brush that.


20:07:12:24                         And just-- you know, just fondle to a

                                    degree.  Be in it but not be in it.  Be on

                                    the surface but yet pull out at the same

                                    time.

                                    ANDREW JARECKI:

20:07:22:09                         And what was the relationship between Jesse

                                    and Ross?

                                    GREGORY DOE:

20:07:24:16                         They were best friends.  They were high

                                    school buddies.

                                    ANDREW JARECKI:

20:07:27:07                         Saying that Jesse and--

TAPE #135                                                        PG.12

GREGORY DOE:

20:07:27:29          Jesse and Ross were high school buddies that

                     basically-- he probably was molested by--

                     Ross was probably molested by Arnold.

                     Thought it was okay.  So they-- were in it

                     together.

ANDREW JARECKI:

20:07:43:01          Did you ever see them around the town?

GREGORY DOE:

20:07:44:18          I never saw Ross around town, no.  Ross

                     lived about seven houses down from Jesse.

                     Came over every Friday.  "Hey, what's going

                     on?  How are you doing?"  Dah, dah, dah.

                     And that'd be it.


20:07:56:09          So that was the extent of Ross.  I mean Ross

                     had a part but didn't have a part.  I was

                     raped by Ross once, I'd have to say, in my

                     whole two year-- year and a half experience.

ANDREW JARECKI:

20:08:08:12          Did he seem like he knew what he was doing?

                     Like that was something that he'd done--

GREGORY DOE:

20:08:11:05                    Ross didn't--

ANDREW JARECKI:

20:08:11:06                    --before?

GREGORY DOE:

20:08:11:17                    --enjoy it, but-- yet he was doing it

because he was probably friends with Jesse.

He probably programmed to be, "Oh, I need to

molest by-- "'cause Arnold did it so much.

And because of that-- he was probably

programmed because of it.

ANDREW JARECKI:

20:08:25:04                    Now-- were there any other, you know,

teenagers or anybody else that you knew, you

know, was-- was ever in the class?

GREGORY DOE:

20:08:34:19                    Molesters or-- or victims?

ANDREW JARECKI:

20:08:37:26                    Oh, let's say molesters?

GREGORY DOE:

20:08:39:02                    No. That's all that I can recall. I do not

remember any other people that were a part

                              of it.  Jesse, Ross and Arnold, I remember

                              were the three people that abused me.  I do

                              not remember any other people that were--

                              that got to me.

                                        ANDREW JARECKI:

20:08:53:24                   And how frequently was Ross in the class?

                                        GREGORY DOE:

20:08:56:26                   Ross, I'd have to say, about once every

                              three, four weeks.  He was Uncle Ross.

                              "Hey, Uncle Ross, how you doing?"  You know.

                              Just come out and hang out.  Say, "Hey, how

                              you doing," and everything.  You know.

                                        ANDREW JARECKI:

20:09:08:08                   Did they ever have a reason why he was

                              there?

                                        GREGORY DOE:

20:09:09:29                   No.  Never specific.  Just wanted to hang

                              out, have a good time.  His good time was

                              molesting people, which is sick.

                                        ANDREW JARECKI:

20:09:17:28                   Just to change the subject for a second,

                              that-- there were these-- computer games--

that were discussed in-- during the course
of the case.  There were, you know lots--
there were tons of computer games going
around at the time, obviously.  But these
were sexual computer games or--

GREGORY DOE:

20:09:34:10          Is that--

ANDREW JARECKI:

20:09:35:06          What do you remember about that?

GREGORY DOE:

20:09:35:11          The sexual computer games were defin-- were
confined to the class.  There was two-- disk
things.  Home games.  School games.  School
games were the naked girls and everything.

20:09:50:13          'Cause Arnold had a system where, "Oh, no."
If I were to take it home, Mommy and Daddy
would see, "Oh, I got this from the computer
class."  Then they'd think something.

20:09:57:01          But you brought home normal games as a front
to basically hide his operation.  We'd

basically do the games where there would be naked girls and everything-- in the computer class.

20:10:11:28        But I remember on time I slipped on the games out.  I brought it home and everything.  And I copied it and Arnold found out.  Because of that, I was raped by him and Jesse at the same time as punishment to that.

20:10:22:07        I never did it again.  He made me format it. I formatted it.  I had to bring my computer and show him that I haven't brought it home. So he was absolutely positive, 100 percent, that it was not touched at all any way, form, shape, whatsoever.

                   ANDREW JARECKI:

20:10:35:18        And how did he know that you brought it home?

                   GREGORY DOE:

20:10:40:03        'Cause the-- he accounted for all of the

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 15 of 158 PageID #: 6599

disks that were there.  And since he flipped through and was like, "Who the fuck took this?  Tell me now or I'm gonna kill you all."  And he had a knife and he was waving a knife around.  I was like, "I did it.  I did it.  I did it."

ANDREW JARECKI:

20:10:53:28    And so your-- it wasn't because your parents had found it?

GREGORY DOE:

20:10:55:26    No-- my pare-- I-- I was hoping maybe my parents would find it the hell would have ended.  But it didn't.

ANDREW JARECKI:

20:11:03:24    What?  You could have shown it to them.  Do something like that?

GREGORY DOE:

20:11:06:20    I was too afraid.

20:11:09:21                    (OFF-MIC CONVERSATION)

ANDREW JARECKI:

20:11:20:15    We were talking about the computer games.  So we-- we covered the-- what are the

                              computer games you were allowed to bring

                              home.  And those were like, you know,

                              whatever the traditional computer games that

                              most people were using.  What about the was

                              ones that were strictly for--

                                        GREGORY DOE:

20:11:36:07                   Strict--

                                        ANDREW JARECKI:

20:11:36:15                   --the class?

                                        GREGORY DOE:

20:11:37:12                   --were strictly for class were of naked

                              women.  I remember one time you were in an

                              airplane.  If you scored, you'd get to see a

                              woman's clothes fall off.  Strip poker.


20:11:48:25                   A guy getting his dick rammed up a girl's

                              ass.  Uncle Harry and Sons was a game.

                              There was just a lot of games that were

                              inappropriate for 10-years-old that a parent

                              saw.  (YAWNS) The flip (PH).

                                        ANDREW JARECKI:

20:12:05:02                   And-- now how were the games presented to

you or how did you get access to the games
that were (UNINTEL).

GREGORY DOE:

20:12:12:02          There was-- there was a file.  There was a
disk thing that computers games and regular
games.  It was computer games.  "Oh, yeah.
Okay, game time."  Everybody would pull out
a game and start playing it.

20:12:21:13          You know that was like to calm us down.  To
make sure that we weren't un-- unnormal in
front of our parents to the point where,
"Oh, no.  They got molested."  No, it was
the normal time.

20:12:36:25          The games calmed us down.  It would be like,
"Okay, now the-- the rape session's over.
It's gonna happen next week."  The games
calmed us down.

20:12:44:11          Then-- that'd be like about 5:30, 5:40.
Then we'd actually learn something for 20

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 18 of 158 PageID #: 6602

minutes and go home.  So my parents were

paying for me to learn 20 minutes of

computer class, hour and 40 minutes of

molestation.  So (MAKES NOISE) it was a good

deal they were getting.

ANDREW JARECKI:

20:12:59:06          Yeah, it was (UNINTEL PHRASE).  Now the--

how did the computer-- how did those dirty

computer games, how did those get-- shown?

Were you just allowed to put those in

yourself?  I mean would you just do that?

GREGORY DOE:

20:13:13:19          Yeah, it was basically pick and choose.

What you wanted.  Well, there was a

breakdown: (SLAPPING) women, molestation.

Some people (SLAPPING) have to do

molestation.  Some people have to do women.

But just as long as we picked an even

number, they really didn't care.  There was

no specific set way on what happened.

ANDREW JARECKI:

20:13:29:11          Now what is it-- when you say some people

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 19 of 158 PageID #: 6603

were gonna have to-- (UNINTEL PHRASE)?

GREGORY DOE:

20:13:32:16        There were games that were-- showed boys

getting molested-- the object would be like

to get boys molested by guys.  And then

there would be just some girls that would

just be like, you know, "Show your titties

(SIC).  Show your pussy."  Through-- you

know, strip poker, (SLAP) aiming a water

gun, you shoot this, they lose that.  Stuff

like that.

ANDREW JARECKI:

20:13:51:27        And then there were some games that were

specifically molestations?

GREGORY DOE:

20:13:54:29        Yes.

ANDREW JARECKI:

20:13:55:28        Tell me about that.

GREGORY DOE:

20:13:56:19        Those games were-- geared towards like if

you had 'em-- less molestation session you

had to watch those to reinforce the value

that you were still being molested, that you
were still subjected to our control. It
would be like-- a big guy and a little boy
and you'd have to like shoot the dart.
"Show us your penis."

20:14:23:05                  You'd have to answer questions and if you
got-- you answered the questions it would
show in the end this guy getting raped by
this guy. A boy getting raped by this man.

ANDREW JARECKI:

20:14:32:27                  Do you remember the name of that game?

GREGORY DOE:

20:14:34:06                  No.

ANDREW JARECKI:

20:14:35:24                  Do you remember the names of any of the
molestation kind of games as opposed to-- ?

GREGORY DOE:

20:14:38:20                  I remember Uncle Harry and Sons was a game--
was a name that-- came out and I remembered.
It was just a game that, you know, I think I
frequently used a lot. That-- that name

sticks out in my mind.  I don't know what it

remembers or anything but that name does

stick out in my mind.

ANDREW JARECKI:

20:14:55:07            So, there were two kinds of games?

GREGORY DOE:

20:14:58:07            Regular games, classroom games.  And in the

classroom games was the molestation games,

regular girl games.  Girl games were people

that got raped and everything.  They'd just

be like, "Oh, yeah, we show our titties,

whatever."


20:15:12:05            Molestation games were the people that got

the less of.  So, in any way you were

getting visually or you were getting it

physically.  You were getting molested

mentally or physically all the time

consistently.  Bombarded.  So, they covered

all aspects.

ANDREW JARECKI:

20:15:25:01            Now, when you say that molestation games

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 22 of 158 PageID #: 6606

were people that got the less of tell me
what you mean by that?

GREGORY DOE:

20:15:30:08          You got fondled.  You got a blow job.  You
didn't get gang raped.  You didn't get it in
the ass that time.  You were-- on their sick
level you were not molested to the full
potential so they have to visually reinforce
it.  That's the-- the molestation games were
about.

ANDREW JARECKI:

20:15:49:21          And when you talk about gang rape what--
what constitutes a gang rape as opposed to a
regular rape?

GREGORY DOE:

20:15:54:18          Getting it in the ass and the mouth the same
time.  The-- getting gang raped is defined
is getting it in the ass and the mouth at
the same time rather than just the ass.  And
getting gang raped was a penalty for not
showing up, for misbehaving, for being a
smart ass, you know?  That was their way of

punishing you.

ANDREW JARECKI:

20:16:11:25           And did that happen to you many times?

GREGORY DOE:

20:16:13:12           That happened to me about two, three times.
And I hated it so I fell in line. And I
became rebellious to my parents, not to them
anymore 'cause I knew that they had control
and power over me.

ANDREW JARECKI:

20:16:25:23           Now, the-- let's go back to the laundry
basket for a second. The-- what was that
signal or how did you figure it out-- over
time?

GREGORY DOE:

20:16:34:21           What-- over time was I realized that as the-
- laundry basket came in-- she'd come with a
bag full of laundry. The door would close,
shades would come down, we'd start to get
molested. And then I realized when she came
back the shades would come back and the
molestation would stop and everything would

go back to normal.

20:16:54:17          And-- and I figured-- and-- being okay-- if

this event happens then this happened.  I

realized that she would be doing the laundry

basket and then she would-- and that would

be a signal that we would be getting

molested.  So, evidently she knew what was

going on and she was a part of it because if

she wouldn't have shown up a laundry basket

none of the molestation would start to

happen.

ANDREW JARECKI:

20:17:19:03          So, that-- what-- what was your feeling

about that?  What did that mean to you?

GREGORY DOE:

20:17:21:00          The feeling that she knew what was going on.

She was married and yet she was approving of

it but she wasn't in it.  So, that made me

even angrier because she wasn't a part of it

and she wasn't doing anything to stop it.

And that she was a mother and she had kids

Case 2:06-cv-03136-JS  Document 41-12  Filed 01/28/21  Page 25 of 158 PageID #: 6609

and her kids were doing this.  Her own flesh

and blood was molesting other children.

ANDREW JARECKI:

20:17:46:18        So, the fact that she was okay with it--

GREGORY DOE:

20:17:47:24        She was okay-- she approved of it in her own

way.

ANDREW JARECKI:

20:17:56:01        Now-- is there anything else that-- that you

remember about her role-- how she--

GREGORY DOE:

20:18:04:18        She was just basically just there to make

sure that the parents weren't there and

everything.  She'd come in, give the okay to

be molested, give the okay to stop and that

was-- that was their link to the outside

world.  'Cause they were too fucked up in

the head and they were gang raping us to

know what was going on.  And that was their

lifeline back to reality.

ANDREW JARECKI:

20:18:20:08        What was-- in terms of their threatening,

you know, you mentioned at one time Arnold
had knives or that they had said a lot of
things that were pretty scary.  What was
their best way of enforcing their fear?

GREGORY DOE:

20:18:32:09          The gang rape.  The raping-- the gang rape,
getting molested up the ass, getting
molested in the mouth, being told that
you're nothing.  A lot of verbal screaming.
That was their best way.  To know that we
hated getting gang-- I hated getting gang
raped they used it to reinforce that they
are all powerful and there is nothing I can
do against them.

ANDREW JARECKI:

20:18:50:08          Did they ever use any kind of implements?
You know, did they ever threaten you with
anything physically?

GREGORY DOE:

20:18:55:17          Well, one time I was rebellious they threw
me down and they raped me.  That was their
forcing that we know who you are, we know

where you live and if you say anything we're
gonna kill you.

                    ANDREW JARECKI:

20:19:06:29          Did they ever have any-- did they ever have
a gun or--

                    GREGORY DOE:

20:19:08:00          No.  No.

20:19:10:26                    (OVERTALK)

                    GREGORY DOE:

20:19:11:00          They never had any gun or any machete.  They
just-- he had a regular knife once that he
waved around and everything.  I felt like
taking that knife and lunging him the throat
with it.  I was so tempted to do it.  I
wanted to kill him.  I wanted to so badly.


20:19:22:03          But that fear of my parents being dead, that
they would run and retaliate on my parents
was enough for me to stop.  They operated on
fear and they thrived on fear and it worked.


20:19:36:09          'Cause when you fear-- you-- knowledge if

                                power and if fear is one of the most

                                powerful emotions.  And if you fear

                                something you have control.  It's when the

                                fear stopped and somebody spoke up they lost

                                the control.

                                              ANDREW JARECKI:

20:19:52:23                     I want to ask you--

20:19:55:04                              (OFF MIC CONVERSATION)

                                              ANDREW JARECKI:

20:19:56:08                     I want to ask you about three or four

                                specific computer games that might have gone

                                under the heading of-- the-- you know,

                                pornographic of molestation.  Did you ever

                                hear of a computer game called Joe and His

                                Uncle?

                                              GREGORY DOE:

20:20:14:05                     No, I did not.

                                              ANDREW JARECKI:

20:20:18:26                     Did you ever-- hear of a computer game

                                called Uncle Bob's Game Parlor?

                                            GREGORY DOE:

20:20:26:02                     No.

ANDREW JARECKI:

20:20:27:24             One called Kid Talk?

                                          GREGORY DOE:

20:20:28:22             No.

                                          ANDREW JARECKI:

20:20:30:13             One called Boy Sex Bingo?

                                          GREGORY DOE:

20:20:33:24             No.

                                          ANDREW JARECKI:

20:20:45:04             Did-- you ever hear about one called

                        Stroker?

                                          GREGORY DOE:

20:20:47:16             Yes.

                                          ANDREW JARECKI:

20:20:49:20             What do remember about that?

                                          GREGORY DOE:

20:20:50:02             It was just-- the-- point of the game was

                        the man had to get the boy's clothes off to

                        get to get the penis stroked, kind of like

                        the name of it is what I remember.  And that

                        man-- the boy was standing here, the man was

                        standing here and you had to do certain

objects-- answer certain questions.  Words

start rubbing the guy's penis like this and

the man would start molesting it and if the

boy was bad he'd have to turn around and

he'd take it in the ass.

                    ANDREW JARECKI:

20:21:22:26         And what about-- Strip Poker?

                    GREGORY DOE:

20:21:24:10         That was girls.

                    ANDREW JARECKI:

20:21:29:12         Now, you do you remember any specific

                    episode of seeing-- you know, you don't have

                    to say who but-- do you remember something

                    specific where you thought something

                    happened to someone else and you were like

                    really freaked out by it or--

                    GREGORY DOE:

20:21:41:29         The first time that I saw somebody else come

                    out of the bathroom being molested-- I was

                    like, "Oh, no."  And then I went in for my

                    first session.  And then I was like, "Oh,

                    no.  What happened."  And this is what

happened.

                  ANDREW JARECKI:

20:21:55:13           And the first time you saw them coming out

you-- knew?

                  GREGORY DOE:

20:21:57:13           I-- turned pale white and I knew that I was-

- in fucking trouble in my mind.  And I got

raped and-- I was like, "Oh, shit."  And I

knew that it was something that was gonna

live with me for the rest of my life.  And

I've had to deal with that every time--

20:22:20:12                    (OFF MIC CONVERSATION)

                  ANDREW JARECKI:

20:22:47:12           What was the-- just for layout what was the-

- the bathroom was next to Jesse's room?

                  GREGORY DOE:

20:22:55:13           The computer room, you walk in you have a

table here, a computer, table of computers,

table of computers.  Table over here kind of

like a little nursery over here 'cause his

mother ran a nursery during the day.

Jesse's room here, bathroom there, back door

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 32 of 158 PageID #: 6616

over there.

ANDREW JARECKI:

20:23:14:01    And how-- when you went in the bathroom how

big was the bathroom?

GREGORY DOE:

20:23:15:19    The bathroom was kind of like on a angle.

You walk in, shower, toilet, sink, door

close. Rape would happen in that corner.

ANDREW JARECKI:

20:23:26:24    And was it tight to have, you know--

GREGORY DOE:

20:23:28:09    Yes, very, very, very tight, very close

proximity. That's the way they liked it.

They wanted it tight, fast, boom, in and

out, done. They wanted to get-- molest as

many children as possible. And that's what

happened.

ANDREW JARECKI:

20:23:39:21    And did you have the feeling that they

wanted to molest as many children as

possible for-- sexual reasons or--

20:23:45:24                    (OVERTALK)

GREGORY DOE:

20:23:45:24

I don't know the reasons that possessed them to do it and I will never know the reasons. And I hope I don't know the reasons why they do it. I just know that they did it, they were sick and they all should drop dead. And I hope some day somebody kills them.

20:23:58:25

Ross and Jesse, I hope somebody marks your bullet because you deserve it. The one thing that-- lives with me is that when you get raped constantly in and out no protection there's a tear in the skin in the ass and it's called a fissure.

20:24:20:24

A fissure-- I've had since 11-- being raped at ten. I can't take suppositories 'cause I'm too afraid of getting things shoved up my ass. There's a constant rip that when I go to the bathroom there's always blood in my stool. And when you go to the bathroom for two or three days there's blood in your

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 34 of 158 PageID #: 6618

stool.

20:24:39:00                    And that's a constant reminder that I'm
                               gonna have to live for the rest of my life
                               that I was molested.  And it's a constant
                               reminder knowing that if I-- when I have
                               blood I know that I was molested and this
                               happened.  And that's always a constant
                               reminder that I see two, three times a week.

20:24:55:18                    And I've learned to live with it and I
                               adjust my life to it.  But I always know
                               that if anybody ever doubts it I have
                               evidence right there that I know I was-- you
                               can't get this through natural means.

                                         ANDREW JARECKI:

20:25:11:12                    Do you remember being photographed or any
                               videotape?

                                         GREGORY DOE:

20:25:16:21                    I don't-- I do not recall that.

                                         ANDREW JARECKI:

20:25:19:22                    We-- had one person tell us that when we

Case 2:06-cv-03136-JS  Document 41-12  Filed 01/28/21  Page 35 of 158 PageID #: 6619

went to Jesse's room there was-- a camera
set up with like naked pictures on the wall
of women.  That it was really low and it
looked like a little photo studio.

GREGORY DOE:

20:25:30:04          I don't remember that.  I don't remember
that.  All I remember is I walk in, Jesse's
bed was right there.  My-- more memories are
of the bathroom, not Jesse's room.  Jesse's
room was very off limits.  It was for
special people.  That was the special,
favorite people.  I wasn't one of those.  My
Molestation happened in the bathroom.

ANDREW JARECKI:

20:25:47:08          Did you know any of those people?

GREGORY DOE:

20:25:49:25          The special?

ANDREW JARECKI:

20:25:49:29          Uh-huh (AFFIRM).

GREGORY DOE:

20:25:51:00          Yes.

ANDREW JARECKI:

20:25:51:12              Do you remember their names by chance?

                                    GREGORY DOE:

20:25:53:08              No, I don't want to say their names but I do

                         know that-- I know one of them.  He was a

                         very instrumental in making sure that Arnold

                         went to jail.  And I remember that he went

                         to not the school I went to and he got

                         really messed up because of it.


20:26:08:02              And one of the other favorites had to wind

                         up moving away 'cause his parents were so--

                         flabbergasted on what happened, they faced

                         so much public humiliation, they just got up

                         and left.

                                    ANDREW JARECKI:

20:26:21:10              One of the kids I think-- that was very--

                         you know the kid-- we won't say his whole

                         name-- but Dan was one of the ones that was

                         very active I think in talking to police

                         (UNINTEL).

GREGORY DOE:

20:26:29:21                Yes.  And-- and he wound up-- he wound up

                           also moving away.

                                                ANDREW JARECKI:

20:26:36:22                Right.  And then-- one of the kids I know--

                           another kid that was pretty active-- in

                           trying-- I guess one of the (UNINTEL) was

                           pretty active in talking to the police?

                                                GREGORY DOE:

20:26:53:13                Yes.

                                                ANDREW JARECKI:

20:26:56:00                I don't remember which one.

                                                GREGORY DOE:

20:26:56:20                I don't want to say on camera.

                                                ANDREW JARECKI:

20:27:01:11                The-- there was some discussion about there

                           being a couple of other guys who were

                           involved-- you know, this one guy-- Juno

                           and-- one by the name of Danny.

                                                GREGORY DOE:

20:27:15:22                There were two that-- in the-- were brought

                           in for a line up.  In sixth grade we were

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 38 of 158 PageID #: 6622

recalled-- about-- one, two-- about seven of
us were recalled that were instrumental in
the grand jury testifying before the court
and trying to take Arnold.  But they plea
bargained before the grand jury on what
happened that-- basically what happened was
that (UNINTEL) in Nassau County-- Courthouse
and we weren't able to-- we were not able--
we were not able to positively identify all
of them.  So, that's why they were let go.

ANDREW JARECKI:

20:27:50:01          And did you-- did you have any recognition
of those-- ?

GREGORY DOE:

20:27:51:25          No, I did not have any recognition.  I knew
there were two others but I never physically
came in contact with them.  Ross, Jesse and
Arnold were the-- three main ones for me.

ANDREW JARECKI:

20:28:02:09          And did you get the sense that other kids
had seen these other two guys?

GREGORY DOE:

20:28:04:09            Other people had-- I've heard of the other

                       two special.  But not enough-- they were

                       never there enough to participate and they

                       were never connected to it at all.

ANDREW JARECKI:

20:28:15:29            If you saw-- if you saw either of those

                       people--

GREGORY DOE:

20:28:16:23            I would not recognize them today.

ANDREW JARECKI:

20:28:22:22            Was it now-- I'm not sure-- I thought you

                       mentioned to me somebody on the phone named

                       Leonard.

GREGORY DOE:

20:28:30:07            I thought that was one of the names of the

                       other two people.  But I was mistaken.

ANDREW JARECKI:

20:28:38:27            And-- now how did you find out about Ross

                       having-- cancer?

GREGORY DOE:

20:28:42:18            Through the grapevine.  Through the gossip

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 40 of 158 PageID #: 6624

in my town.

ANDREW JARECKI:

20:28:48:18          Was there a lot of gossip about this-- ?

GREGORY DOE:

20:28:50:00          There was a lot of gossip by also remember
                     it was very-- it was-- the case was buried.
                     The-- the names were buried, it was sealed--
                     it was done-- within a year the case was
                     done, nobody wanted to be part-- when you're
                     a Jewish community you don't want this
                     brought up.


20:29:06:11          People were-- basically they-- turned it and
                     they shut it down as quickly as possible.
                     None of the victims were ever talked about
                     or anything.  It was like something that we
                     knew who you were, we knew who we were.
                     There was kind of a little code of silence
                     that we all made that we like-- we're gonna
                     talk about this but we're not.


20:29:26:01          And seeing them on the street I knew who

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 41 of 158 PageID #: 6625

they were, they know who I am.  It's a
common-- we're all victims of the same
person.  We went through it together.  It's
over.  Let's end it.  It's a-- it's a past
that we don't want to bring up.

ANDREW JARECKI:

20:29:44:29      There were some-- I've heard a couple of
other stories about (UNINTEL)-- there's one-
- of the detectives told me that there was a
game called Leap Frog.  Did you ever hear
about this?

GREGORY DOE:

20:29:55:13      Yeah, Leap Frog.  I remember about that.  It
was kind of like Twister where we would have
to sit down-- our asses would be in the air,
Arnold and Jesse would leap one person to
another sticking their dick each in their
ass.  And just going from game to game to
game to game.  Thank God I was never part of
it but I had to witness it.

ANDREW JARECKI:

20:30:21:06      So, you were-- sitting out during that?

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 42 of 158 PageID #: 6626

GREGORY DOE:

20:30:22:29          I was sitting out watching it.  Those were
                     the favorites-- their favorite activity.
                     Asses up in the air, penises jumping in and
                     out.  Guys scrunching little balls like this
                     down with their asses sticking up, anuses
                     spread in and out.

ANDREW JARECKI:

20:30:39:13          That's a pretty remarkable game.  (UNINTEL)
                     when the detective told me about that I was
                     pretty-- I was-- even I was surprised.

GREGORY DOE:

20:30:46:29          This-- what I recall is it-- it's sick.

ANDREW JARECKI:

20:30:55:07          There was this-- was there also a game that
                     I heard from the same detective about this
                     cum gum.  Was there also a game that had to
                     do with M & M's or something?

GREGORY DOE:

20:31:04:02          No, nothing I recall about M & M's.  All I
                     remember was the cum on the-- on the gum.

ANDREW JARECKI:

20:31:09:28        And were-- were kids ever actually hurt in

                   front of you.  Needless to say that the--

                   sodomy was-- you know, that's a painful and

                   (UNINTEL) but in terms of--

GREGORY DOE:

20:31:18:25        Not physically because you have to remember

                   if there was any physical evidence they'd

                   say, "Oh, wow.  How did my kid get hurt?"

                   That brings suspicion.  It was more mental

                   abuse.

20:31:29:06        And-- and when I was thrown down I was

                   thrown down on rugs so I didn't injure

                   myself.  They always made sure-- they always

                   checked us for bruising and scarring

                   afterwards to make sure there was no

                   evidence.  Since there was no evidence they

                   couldn't prove anything in a court of law.

                   They controlled the fear.

ANDREW JARECKI:

20:31:41:10        And when did they check you?

TAPE #135                                                                    PG.46

GREGORY DOE:

20:31:43:20          About a half an hour before we'd leave after

                     the molestation (UNINTEL).  Any scars, any

                     bruises.  You know, this, that, this, that.

                     Make sure it was all done.  And that was it.

ANDREW JARECKI:

20:31:58:03          Now, just to move over for a second to the--

                     well, (UNINTEL) had asked this question

                     about photos and videotape.  The police at

                     one point got very-- wound up about the idea

                     that-- the Friedman's had taken videotapes

                     or photographs of kids in compromising

                     positions.  Did you ever-- ?

GREGORY DOE:

20:32:14:24          I was never a part of that.  I had heard

                     stories that they had shipped it-- part of a

                     molestation ring.  I don't know if you ever

                     heard about that-- that-- that they were

                     part-- I never-- I never was privy to that

                     information that they were part of some

                     porno-- porno ring in Long Island.

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 45 of 158 PageID #: 6629

20:32:30:10                The molestation-- you know, pictures on the

                           Internet and stuff like that.  I didn't hear

                           anything about that but I was never taken--

                           my photo was never taken that I can recall

                           but I know from what I've heard from other

                           people that they were.  So--

                                    ANDREW JARECKI:

20:32:46:26                So, in the classes you were in there were

                           never any--

                                    GREGORY DOE:

20:32:48:16                I didn't see any pictures taken.  No.

                                    ANDREW JARECKI:

20:32:53:20                Now, how did you first learn about the--

                           that-- of the discovery of the problem in

                           the computer classes?  You had-- you had

                           sort of decided, "No, I'm not talking to

                           anybody."  But-- at a certain point you

                           found out that somebody else-- had found out

                           about it?

                                    GREGORY DOE:

20:33:07:16                I went to the last computer class and--

                           there was nobody there.  And I was like,

"Oh, shit.  Mom, pick me up."  And Arnold--
they claimed Arnold was having heart
problems.  And-- when my dad was called--
they're like, "Oh, yeah, Arnold.  Yeah, I'm
having heart problems.  You know, do
whatever."

20:33:25:21                     Next-- that was on a Wednesday-- Wednesday
                                night.  Thursday night the Nassau County
                                Police showed up at my door.  No uniform.
                                This is-- knock, knock, knock.  "Mr. and
                                Mrs. Doe?"  "Yes."  "This is the Nassau
                                County Police Department.  Can we please
                                come in?"  "Yeah."  "Gregory, come
                                downstairs.  We need-- "

20:33:50:10                             (OFF MIC CONVERSATION)

                                    FEGREGORY DOE:

20:34:00:01                     Okay, what happened-- the way the case broke
                                was that on a Wednesday night I-- had come--
                                Arnold wasn't there.  I called my parents--
                                you know, "Oh, I have heart problems.
                                Whatever."  Thursday about six o'clock

TAPE #135                                                                      PG.49

                                    knock, knock, knock, knock on the door. My
                                    parents came to the door.

20:34:15:13                         "It's the Nassau County Police Department.
                                    We need to talk to you. Can you please send
                                    your son downstairs-- upstairs. We need to
                                    inform you that your son has been molested
                                    for the past year and Jesse and Arnold
                                    Friedman have been arrested."

20:34:34:05                         It was a shock among shocks. My-- I
                                    remember my father broke down and cried. I
                                    never heard him. And my mother freaked. It
                                    hit the news that night that you were being
                                    arrested. And they came, they arrested and
                                    my parents went nuts.

20:34:50:29                         They said, "How can this happen? How didn't
                                    we see it?" They said they were very good
                                    at what they were doing. The police took my
                                    statement, I went down to the courthouse for
                                    the next three days, couldn't eat, couldn't

sleep, I was throwing everything up.  I was
physically ill.

20:35:04:21                          Next thing my parents did was like, "We need
                                     to get him to psychiatric help."  And
                                     through psychiatric help I started-- I was
                                     able to start talking about it and
                                     recognizing it.  And finally it wasn't my
                                     fault, there were people like it.

20:35:16:27                          And that's why I was able to talk about it
                                     as freely as I am today due to the fact that
                                     my parents were-- realized that I needed
                                     help.  And I was able to get it out.  I was
                                     able to talk about it, deal with it,
                                     recognize it and not bury it to the point
                                     where some other people have.  And I know
                                     that they've suffered for it because of
                                     today.

20:35:38:25                          There were times when I was going through
                                     therapy in six and seventh grade.  I thought

I was gay. I would have that faggety (SIC) walk. You know, use my hands, you know, talk like this. And through therapy I realized no. And I realized I'm straight, I love girls and I love to sex with girls and I love to have sex with lots of girls. You know, it's just-- you do that, you're a male, you like to do that.

20:36:00:06          So, and I realized through therapy that I was like okay. But the consequences hindered me from sixth to ninth grade. I was shattered. I was like-- I was a recluse. I gained weight. I was fat, overweight, just-- because of this. Because of the lingering emotional consequences that through therapy and putting my life back together and changing my whole attitude and image helped me out.

20:36:21:11          And I was able to put my life back together. It took about five, seven years. But I put

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 50 of 158 PageID #: 6634

my life back together.

ANDREW JARECKI:

20:36:28:09            Now, going back to that night when the

police came-- came over your house.  The

police came in and then they-- basically

told your parents what?

GREGORY DOE:

20:36:38:02            They told them flat out, "Your son was

molested."  And my mother is like, "No, this

cannot happen to my child."  And I still

remember the-- they turned around and said,

"It's that attitude that probably caused

your son to be molested in the first place."

I still remember that attitude.


20:36:53:04            My mother broke down.  And then she finally

came to the realization that Jewish people

are not immune-- having money doesn't make

you immune to anything.  And-- my mother--

and through therapy I realized that I tried

to tell my mother and she didn't realize it.

And for that I'll always hate her.

20:37:12:29                    I know it's something that you're supposed
                               to get over.  Time heals-- time doesn't heal
                               wounds.  'Cause afterwards my mother blamed
                               me for every fault in her social gathering
                               because I let myself be molested.  And
                               finally at 18 I gave up and I said, "Fuck
                               you" and I walked out.

20:37:31:18                    And I realized that my mother is set in her
                               ways.  And she'll never change it.  It was
                               more-- after the fact that her son got
                               molested-- it was more a social demeanor
                               than of actually my own mental stability
                               that she cared about.  She cared about it in
                               the sense that, "Oh, I need to get my son
                               help.  It's the proper thing to do."  She
                               didn't care-- she cared more in the sense
                               how is this gonna talk people behind my back
                               in a social setting.

20:37:59:02                    And that I will never, ever, ever be able to

Case 2:06-cv-03136-JS  Document 41-12  Filed 01/28/21  Page 52 of 158 PageID #: 6636

forgive her for.  My father came to the

realization that he's my son.  I don't give

a fuck.  It happened.  But I don't-- I will

never talk-- I-- my mother and I do not get

along to this day.  We have a very surface

relationship.  She's my mother, she gave

birth to me.  Okay, that's the end of it.

                    ANDREW JARECKI:

20:38:18:23      Now, were you present when the police came

                 in the first and told--

                    GREGORY DOE:

20:38:21:00      Yes, I was.

                    ANDREW JARECKI:

20:38:23:14      So, tell me about that?  The door opened--

                    GREGORY DOE:

20:38:25:06      The door opened, flashed their badge,

                 "Nassau County Police Department.  We need

                 to talk to you-- you and your son."  My

                 mother is like, "What's going on here?"

                 "Your son has been mole-- we need to talk to

                 you."  "Please come in."

20:38:35:21                  Close the door.  Came upstairs.  "We're

                             sorry to bother you."  Went downstairs.

                             "Mr.-- we need you to sit down.  Your son

                             has been molested.  We need to take a

                             statement from him."

                                        ANDREW JARECKI:

20:38:47:23                  So, who was sitting around then?

                                        GREGORY DOE:

20:38:50:26                  My mother, my father and the two detectives.

                                        ANDREW JARECKI:

20:38:53:22                  And--

                                        GREGORY DOE:

20:38:55:20                  Me.

                                        ANDREW JARECKI:

20:38:57:25                  So-- so, now the five of you are in the

                             living room.

                                        GREGORY DOE:

20:38:59:03                  In the kitchen.  Then what happened was we

                             broke off.  I went down with one-- one of

                             the detectives.  The other detective went

                             and talked to my parents.  And I started to

                             make a statement.

TAPE #135                                                              PG.56


20:39:11:09                     I started to lie at first to protect them.

                                And they said, "If you protect them we can't

                                do anything."  And I realized alright. And I

                                just spilled my guts.  I spilled it and I

                                spilled it and they took pages on pages of

                                information on what I've talked about today

                                but in more detail 'cause it was so fresh 13

                                years ago.  I'm just recalling drips and

                                drabs back on what I can remember.  But--

                                        ANDREW JARECKI:

20:39:37:08                     So, you gave them a statement that very

                                first night?

                                        GREGORY DOE:

20:39:39:19                     I gave them a statement that night.

                                        ANDREW JARECKI:

20:39:43:18                     And-- now that-- do-- do you remember which

                                detectives visited you?  Now, do you

                                remember--

                                        GREGORY DOE:

20:39:50:18                     Sergeant Fran Lasso (PH).

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 55 of 158 PageID #: 6639

ANDREW JARECKI:

20:39:54:06          She visited--

GREGORY DOE:

20:39:54:06          She visited me.  Tony Gusero (PH)-- name
                     ring a bell?  Tony--

ANDREW JARECKI:

20:39:59:16          Squalia (PH)?

GREGORY DOE:

20:39:59:16          Squalia, yeah.  That was it.  Those are the
                     ones that really had contaact with me
                     throughout the whole case.  And-- was there
                     anything that you had that you showed them
                     or gave them or was anything like-- did you
                     have anything on your computer or anything
                     that you could hand them and say--

GREGORY DOE:

20:40:19:21          I gave them disks.  I gave them disks that I
                     had taken without Arnold's permission.  But
                     that I never told them about because I
                     didn't feel like getting gang raped.  And I
                     gave them-- I took the special games that
                     were supposed to be at home-- computer games

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 56 of 158 PageID #: 6640

that were supposed to be in class I took

home and they took those from me. They took

all my games.

20:40:38:26                And-- and they analyzed them. And they

found some of the women pornograophy on

there. And then I told them about the phone

numbers. They called the phone numbers.

Those were shut down. And subsequently the-

- Arnold's house of cards fell to complete

ending.

ANDREW JARECKI:

20:40:58:25                So, all the computer games and all the--

that all came from Arnold?

GREGORY DOE:

20:41:02:27                Every gamne that I had on my Apple computer

came from Arnold. All the games were

supplied by him. They-- I really didn't

have any games because they were-- you know,

bootlegged. So, Arnold took all of them and

just gave them to me and the cops took 'em

all.

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 57 of 158 PageID #: 6641

20:41:20:02          And that was-- and I lost my computer games.
                     And I was like, "Oh, no.  What am I supposed
                     to do?"  Imagine going to school-- I had to
                     skip school for a week-- I was pulled out of
                     school for a week 'cause I was that messed
                     up.  I couldn't function.

                              ANDREW JARECKI:

20:41:32:03          Yeah, I can imagine that first week had to
                     have been--

                              GREGORY DOE:

20:41:33:24          Complete, utter hell.  Going back-- "Uh,
                     okay."  And I'm thinking, "Okay-- " I looked
                     at the other victims.  "Uh, what do we do
                     now."  Therapy, this, that, this, that.  It
                     was just a mess.


20:41:46:19          I failed school.  I did horribly in school
                     that year.  But it was understandable on
                     what happened.  And I picked my grades up
                     and-- I did better ever since.

20:41:57:26                      And I think looking at it back 13 years

                                 later I've come out alright.  I've been able

                                 to establish normalcy in my life.  I--

                                 hopefully gonna have kids in the next two to

                                 three years.  But I will never-- I know what

                                 to look for and what not to.  And to know

                                 what the signs are.


20:42:19:22                      It's one of the benefits in a twisted,

                                 fucked up way.  That I know what to look for

                                 when being molested because I was a victim

                                 myself.  And I know what it's like and I can

                                 prevent it happening for my children.  And I

                                 know what I don't want to be and I don't use

                                 my parent's philosophy not to be what they

                                 are.

                                         ANDREW JARECKI:

20:42:48:20                      The-- in terms of the police questioning you

                                 what do you remember about how the police

                                 handled that--

                                         GREGORY DOE:

20:42:55:15                      They-- they were very rough.  Tell me-- they

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 59 of 158 PageID #: 6643

were not-- gentle.  How can I state it--
finesse me like Arnold and Jesse did.  They
didn't coax me.  "What the fuck happened?"

ANDREW JARECKI:

20:43:07:05    This was who?  Who are we talking about?

GREGORY DOE:

20:43:08:29    The detectives-- I only remember the one
detective.  "What the fuck happened?  Tell
me.  You were molested.  We know.  Tell me.
I need to make a report."  Done.

ANDREW JARECKI:

20:43:18:02    So, you felt like that was maybe--
indelicate or--

GREGORY DOE:

20:43:20:07    Indelicate.  Indelicate and crude but
looking back at it it was probably the best
thing.  Kicked my-- kicked my ass.  And I
realized-- "Okay, kid, you were fucking
molested.  Deal with it and go on with your
life."  I remember that.  I still-- I'll
always remember that night for the rest of
my life.

ANDREW JARECKI:

20:43:40:18                    Where were you when they were talking to

                               you?

GREGORY DOE:

20:43:41:27                    Downstairs in my living-- downstairs-- I

                               have a-- I was downstairs in my living room

                               till they left sitting on a golden couch

                               listening to the Nassau County Police read

                               my name and show me things on what happened.

ANDREW JARECKI:

20:43:58:09                    And what kinds of things did they show you?

GREGORY DOE:

20:43:58:10                    The games.  The evidence.  The-- Leap Frog.

                               The specific details on what I've told you.

                               The gum.  The fissure in my ass.  The penis,

                               the cum sucking and all that stuff.  They

                               had it all.  They had enough evidence.

ANDREW JARECKI:

20:44:16:06                    Now, before they met with you did they know

                               about a lot of that stuff?

GREGORY DOE:

20:44:20:11                    That I don't know.  I don't know about that.

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 61 of 158 PageID #: 6645

I know the case initially broke by the US Postal Service. That they were getting pornography sent in the mail and that the postal service was scanning it and that's how the case broke if I stand corrected.

ANDREW JARECKI:

20:44:32:29          No. And-- so when they were there you were saying they were showing you the evidence and stuff. What was the stuff that they showed you here?

GREGORY DOE:

20:44:39:14          They showed me the-- magazines, Uncle Harry and Sons, the magazines, the computer games that they had taken from the classroom. The-- just the detailed analysis that they had gathered through their talking to other people.

20:44:58:16                              (OFF MIC CONVERSATION)

                         ***END OF TRANSCRIPT***

HIT THE GROUND RUNNING FILMS

"CAPTURING THE FRIEDMAN'S"

INTERVIEW WITH GREOGRY DOE

CORRESPONDENT: ANDREW JARECKI

PRODUCER: (NOT IDENTIFIED)

TAPE #136

**TRANSCRIBER'S NOTE: QUESTIONS ARE OFF MIC. BEST EFFORT FOLLOWS.**

ANDREW JARECKI:

21:00:06:28          (IN PROGRESS)-- anyway eventually they--

they-- they got him to accept a delivery of

the package that (UNINTEL) and then they

busted him so (UNINTEL PHRASE) the delivery

and the postal inspector shows up (UNINTEL

PHRASE).

GREOGRY DOE:

21:00:26:25          That was the end of Arnold's house of cards.

ANDREW JARECKI:

21:00:30:04          Yeah.  Now-- was it-- was it-- it was on the

news that night also?

GREOGRY DOE:

21:00:38:07          Uh-huh (AFFIRM).

Tape 136

TAPE #136                                                        PG.2

                              ANDREW JARECKI:

21:00:38:28              And did you watch that--

                              GREOGRY DOE:

21:00:39:04              Uh-huh (AFFIRM).

                              ANDREW JARECKI:

21:00:39:04              Tell me what that was like?

                              GREOGRY DOE:

21:00:40:20              My mother's like, "Were you a part-- were

                         you a part of that before the cops showed

                         up?  Were you a part of-- ?"  "No, no, no,

                         no, no.  Only three were found molested,

                         mom.  I wasn't part of that."  "Oh, good,

                         good, good."


21:00:49:04              Twenty minutes later the cops show up knock,

                         knock, knock, knock, knock.  "How could you

                         lie to me?  How could you let this happen to

                         me?  You're-- you're Jewish.  You're not

                         supposed to be part of this.  You're--

                         you're-- come from an elite home.  How could

                         this happen?  How can that happen?  Dah,

                         dah, dah, dah, dah."

21:01:05:29                          (OFF MIC CONVERSATION)

                                     ANDREW JARECKI:

21:01:10:02        So, you saw the-- the stories on the news?

                                     GREOGRY DOE:

21:01:12:00        Uh-huh (AFFIRM).

                                     ANDREW JARECKI:

21:01:13:10        You remember what channel you were watching

                   by any chance?

                                     GREOGRY DOE:

21:01:13:19        NBC.

                                     ANDREW JARECKI:

21:01:16:28        So, it was on NBC?

                                     GREOGRY DOE:

21:01:18:07        Channel Four.  Channel Four, Chuck

                   Scarborough (PH) and all that.  And just--

                                     ANDREW JARECKI:

21:01:23:05        And you just happened to be watching?

                                     GREOGRY DOE:

21:01:24:20        I was watching and I'm like, "Mom, Dad, come

                   in here."  "Great Neck, New York."  "What--

                   Great Neck?  What?  What?  What's on the

                   news.  Arnold Fried-- what?  Oh, my God.  My

son is part of it.  Were you molested?"
"No, Dad, no."  Mom's like, "Were you
molested?  You better not have been.  You
should have told us.  How long?"

21:01:40:26                Twenty minutes later the police show up at
                           my-- knock, knock, knock, knock, knock.
                           "Your son has been molested.  Too bad."
                           Then my father is like, "How could this have
                           happened?  Dah, dah, dah, dah, dah, dah."
                           It's like shit happens.

21:01:56:03                And I think my parents realized from then on
                           in that they were doing-- my father realized
                           he hadn't been there for me and he tried to
                           turn his ways and he turned his ways around.
                           My mother continued to be the bitch she was
                           and today is the bitch she is.

                                    ANDREW JARECKI:

21:02:12:09                Next question?  How did you feel when you
                           saw it on television?  You must have been
                           totally freaked out?

GREOGRY DOE:

21:02:16:21                    Oh, I went and I threw up.  My lunch just

                               came right up.  My dinner came right up.

                               My--

                                            ANDREW JARECKI:

21:02:21:05                    Start from the beginning?

                                            GREOGRY DOE:

21:02:21:05                    When I saw it on TV-- when I saw it on TV I

                               was right in the room-- I ran to the

                               bathroom.  I hit the record button on the

                               VCR and I went and I hurled my brains out.

                               'Cause I realized I was like, "Oh, no.  My

                               parents are gonna be dead."

21:02:32:11                    But then when I saw Arnold and Jessie in

                               custody I realized, "Okay, the police know.

                               There's gotta be something."  Then

                               everything that was started to happen.  And

                               the-- my world fell apart.

21:02:48:06                    Being molested and everything you realize

                               that you're a victim.  And the-- saddest

part to me was that I had to deal with
parents that were more worried about
prestige and status in a community rather
than their own son's well being.

ANDREW JARECKI:

21:03:04:15          Did you hear about-- did you-- had you heard
about it from any of your friends (UNINTEL)
by the police?

GREOGRY DOE:

21:03:08:07          No, I-- I think they did it all-- I think it
was controlled-- it hit the news then the
parents.  I don't know how it worked out.

ANDREW JARECKI:

21:03:19:18          And then right after that-- like as soon as
you knew it had broken did you feel like you
could break the silence with your friends?

GREOGRY DOE:

21:03:25:17          My friends never knew.  It was a topic that
was never talked about because it was
realized that you'd be considered a fag,
gay.  You would be somebody that is not
normal.

21:03:43:00                          And nobody knew for a long time.  But then I
                                     started to tell my friends.  And they
                                     realized what I went through.  Some didn't
                                     accept it.  Some didn't become friends with
                                     me-- like, "Oh, you're a fag."  This and
                                     that.

21:03:54:26                          But my friends-- it's something that just
                                     wasn't talked about.  And then sometimes an
                                     instant will happen and they'll just recall
                                     it.  And I'm like, "Oh, yeah, this
                                     happened."  And they're like, "Wow, how can
                                     you talk about it so casually?'

21:04:06:28                          But there are times at night where I shake
                                     still waking up.  And I was like, "Oh."  And
                                     my girlfriend knows about it.  She
                                     understands it 'cause she needs to know I
                                     have certain views on certain things and
                                     you're a product of your environment and
                                     what you've been through.  And just the

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 69 of 158 PageID #: 6653

people that need to know know.  I don't

broadcast it across the world.

ANDREW JARECKI:

21:04:27:10        What kind of views?  You say you have

certain views?  There are things that are

objectionable to her or you have a harsh

attitude-- ?

GREOGRY DOE:

21:04:31:15        I have a harsh attitude towards rapists.  I

have a harsh attitude towards people that

will not-- will fondle children, will--

touch children in an inappropriate way.

Like I was at the mall one day and this

person was molested-- this kid was

screaming, "This person is molesting me."

Put him through a glass wall.  I was 15 at

the time.  I was still in my little

rebellious youth.

21:04:58:23        It wound up the person did molest the kid.

And the guy went through a glass wall.  Got

arrested and everything.  But, you know, I

didn't care.  It was like-- my girlfriend
was like, "How the hell could you do that?"
Broke up with me.  I was a product of my
environment.

ANDREW JARECKI:

21:05:12:25    So, you just saw the kid in that mall or how
did that happen?

GREOGRY DOE:

21:05:16:07    I saw him being-- he was screaming,
"Molestation. Molestation."  The guy was
like trying to grab her ass.  She was like
five.  She was like, "Daddy, don't touch me
like that."  He's like, "I'm gonna touch you
the way I want to."  Boom, straight through
the glass wall.

ANDREW JARECKI:

21:05:27:05    So, you just went up to this guy?

GREOGRY DOE:

21:05:29:06    Yeah, I just went up to him and I threw him
through a glass wall.  I wasn't thinking.  I
was on auto pilot.

Case 2:06-cv-03136-JS  Document 41-12  Filed 01/28/21  Page 71 of 158 PageID #: 6655

ANDREW JARECKI:

21:05:34:06          He was a stranger?

GREOGRY DOE:

21:05:35:08          Oh, a complete stranger. Blood gushing all
over the place. Glass fell down. The store
was like (MAKES A SCREAMING NOISE). An
alarm going off. It was just a mess.

21:05:43:08          I was arrested. No press-- no charges were
pressed because they realized what I had
been through and-- less than five years ago
and it was still fresh in my mind. I was
probationed-- juvenile court, the whole nine
yards.

21:05:56:11          (YAWNING) (UNINTEL PHRASE) hit the news.
'Cause it was a taboo thing to do something
that's wrong in the community. My mother
made sure it never got to the community.
It's a taboo thing to talk about something
that will discredit them in front of their
social gatherings.

ANDREW JARECKI:

21:06:11:13          So-- that's pretty shocking to see that in a

                     mall.  So, this little girl was being

                     molested by her own father in a mall?

                     GREOGRY DOE:

21:06:15:29          Well, her step father.

                     ANDREW JARECKI:

21:06:19:11          So, she's being molested by her step father?

                     GREOGRY DOE:

21:06:20:00          Well-- well, what I perceived to be

                     molestation wound up being he was just

                     hitting her on the ass because she wasn't

                     behaving well.  But she was screaming,

                     "Molestation."  What I perceived 'cause I

                     was still messed up caused the guy to go

                     through a glass wall.  It was pretty bad.

                     ANDREW JARECKI:

21:06:36:26          So-- and that's something your girlfriend

                     didn't understand obviously?

                     GREOGRY DOE:

21:06:38:19          No, she thought I was a psycho and she left

                     me right there and dumped me the next day.

ANDREW JARECKI:

21:06:44:05              That's not your current girlfriend?

                         GREOGRY DOE:

21:06:46:08              No, my--

                         ANDREW JARECKI:

21:06:47:08              Your current girlfriend (UNINTEL)-- have a

                         more open--

                         GREOGRY DOE:

21:06:49:24              My girlfriend knows.  My girlfriend I've

                         been through things.  We went through some

                         things in the past year that most people

                         wouldn't go through.  We went through a lot

                         of-- she wound up getting-- pregnant.  She

                         didn't-- we decided not to have it.  She

                         had-- abortion and that was-- went through

                         it.

21:07:11:19              She went through a lot of problems at home

                         with her family.  We've been through a lot

                         together and we love each other very much.

                         And we plan on getting married.  So, we've

                         been through the things normally you

wouldn't be dealing with.

21:07:25:26                         (OFF MIC CONVERSATION)

21:07:26:23                         (BREAK IN TAPE)

                                    ANDREW JARECKI:

21:07:34:11             How many times did the police visit you in

                        the end?

                                    GREOGRY DOE:

21:07:38:03             About five times.  Five times the police

                        showed up at my apartment-- my parent's

                        house to-- interview me and deal with

                        certain things over the course of a year and

                        a half from the time the case-- (SNEEZES)--

                        from the time the case (SNEEZES) broke till

                        the initial last time where we went for the

                        screening of the two people that they

                        thought they could pin to the case but they

                        couldn't.

                                    ANDREW JARECKI:

21:08:04:29             And-- so the first time you had told them

                        pretty much so the second time was more

                        clarification?

TAPE #136                                               PG.14

GREOGRY DOE:

21:08:08:10          More clarification, more specifics-- more

                     detailed, more calmness, more rational.

ANDREW JARECKI:

21:08:17:01          Did you ever speak to-- I know you were

                     saying you hadn't revealed it to your

                     friends at first or, you know, (UNINTEL).

                     What about other people that were in the

                     class?  Did you ever-- ?

GREOGRY DOE:

21:08:22:20          We never talked about it.  It-- we talked

                     about it-- we talked-- I never talked about

                     it with other people in the class except

                     when we were at the police station when we

                     talked about it.

ANDREW JARECKI:

21:08:33:04          Tell me about that?

GREOGRY DOE:

21:08:34:21          We were-- we just talked about oh, you know,

                     "We can't believe it happened."  "Yeah, I

                     know."  "Did you-- were you one of the

                     favorites?"  This and that and this and

that. And people realized-- they were like,

"Wow, we were all victims." And we dealt

with it.

ANDREW JARECKI:

21:08:52:12     The-- then eventually you testified before

the grand jury?

GREOGRY DOE:

21:08:58:23     Yes. I was one of the people that did

testify in front of the grand jury?

ANDREW JARECKI:

21:09:01:11     Tell us what that was like?

GREOGRY DOE:

21:09:02:28     It was very reckoning, very earth

shattering-- telling-- I answered questions.

They prepped me and I answered questions

that led to Jessie's indictment on what he

did and how he did it and what the specific

things were. And it was one of the hardest

days of my life. Going before the grand

jury I still remember it. It was something

that I had to do because I needed-- nobody

was gonna do it. And it had to be done to

get the scumbag put away which he is right
now.

ANDREW JARECKI:

21:09:30:18            And do you remember the kinds of things that
                       you told them?

GREOGRY DOE:

21:09:33:03            How-- what I told the grand jury was how I
                       was molested, how leap frog was played, how
                       the gum incident was done, I was gang raped,
                       I was a favorite.  Sometimes the non
                       favorites, the computer games.

21:09:47:16            All the things that they used-- threatening
                       to kill my parents.  Things they used that
                       were instrumental in controlling fear was
                       something that I told-- I told the grand
                       jury.

ANDREW JARECKI:

21:10:02:10            That question-- in their interviews with you
                       did the police ever mention any of the other
                       boys?

GREOGRY DOE:

21:10:07:02                    The police were not specific.  They said,

                               "Oh, this person said this.  This person

                               said that."  But they were never specific

                               'cause they wanted to get-- they wanted to

                               see in the interviews if what we said was

                               maybe false or what they said was actually

                               solid evidence.


21:10:20:24                    They didn't want to say, "Oh, this person

                               said that's"-- kind of like, "Oh, yeah, they

                               said this too."  They wanted to make sure it

                               was all concurrent and making sure that it

                               was okay.

                                        ANDREW JARECKI:

21:10:31:06                    Did you feel like by them telling you that

                               other people had said stuff also that gave

                               you more-- ?

                                         GREOGRY DOE:

21:10:38:07                    That gave me hope that they weren't as

                               fearful as I was and that they'd come out

                               and speak the truth.  And which we did.

TAPE #136                                                         PG.18

                              ANDREW JARECKI:

21:10:46:10                   And-- before you went into the grand jury

                              how much preparation was there?

                              GREOGRY DOE:

21:10:53:14                   About a day or two.  There were-- before I

                              went to the grand jury there was about a day

                              or two of preparation on what to do and what

                              to say and what the questions they were

                              gonna be asking me and things like that.

                              ANDREW JARECKI:

21:11:04:13                   Did you feel like the police were ever like

                              pushing you to say more than-- you know,

                              some people say that when-- when police have

                              a case like this they have to really stick

                              it to the perpetrator because otherwise it

                              could unravel or whatever.  Did you ever

                              feel like the police were almost over the

                              top?

                              GREOGRY DOE:

21:11:17:05                   The police were pretty persistent in what

                              they said and what they were doing.  But

                              they had a case to do.  And you'll-- when

you-- a child molestation is a very pretty
serious thing.  Sick people do it so they
wanted to be sure before they had covered
all their avenues to make sure that-- they
were in the grand jury making sure
everything was set.

ANDREW JARECKI:

21:11:35:24         Did you have any friends or any other people
that you knew from the class who had-- who
had gone in front of the grand jury already?

GREOGRY DOE:

21:11:41:08         I knew people that testified at Arnold's--
did Arnold go to trial?

ANDREW JARECKI:

21:11:46:22         No, there was no trial but there was a grand
jury.

GREOGRY DOE:

21:11:47:25         I know people that testified on Arnold's
grand jury.  And I remember that one of the
father's went-- jumped over the court and
went and strangled Arnold's neck and he had
to be restrained.  I remember that.  I

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 81 of 158 PageID #: 6665

remember hearing about that.  I was like,

"He should have killed the fucker."

ANDREW JARECKI:

21:12:02:18          And-- did you ever talk to any of the kids

that were in the computer class before you

testified?

GREOGRY DOE:

21:12:06:09          No, I did not.  We were-- we were separated

because they wanted to make sure that our

stories were all concurrent.

ANDREW JARECKI:

21:12:28:00          Did you follow the trial then?  Did your

parents follow the trial and--

GREOGRY DOE:

21:12:31:03          We--

ANDREW JARECKI:

21:12:31:03          I don't mean to say the trial-- but the--

follow the-- case?

GREOGRY DOE:

21:12:33:16          We followed the case to the point of me

being testified but we just wanted to put it

behind us and I just wanted to get rid of it

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 82 of 158 PageID #: 6666

and just move on with my life, which I did.
But then we realized that Arnold went to
jail, Ross got cancer, Jessie went to jail,
Arnold died in jail and that was the end of
it.   And-- and we just tend to-- you want to
leave such dramatic things-- it happened,
done, deal with it, go on with your life.

ANDREW JARECKI:

21:12:58:02            Did you find out how-- when did you find out
that Arnold died?

GREOGRY DOE:

21:13:03:03            Actually you told me.

ANDREW JARECKI:

21:13:04:02            You didn't know?

GREOGRY DOE:

21:13:04:02            I didn't know.  And I didn't know that Ross
survived cancer.  I thought he had died.

ANDREW JARECKI:

21:13:08:20            How did you feel about hearing that Arnold
died?

GREOGRY DOE:

21:13:11:20            Good.   One-- good.  It felt good that--

PG.22

knowing that he's dead.

                        ANDREW JARECKI:

21:13:17:27            And where is Jessie now?

                        GREOGRY DOE:

21:13:19:10            In jail.  Jessie Friedman is in jail.  I

                       hope he rots in there.

                        ANDREW JARECKI:

21:13:25:05            How do you feel about the prospect of him

                       getting out of jail at some point?

                        GREOGRY DOE:

21:13:29:03            The process of jail is to rehab--

                       rehabilitated and-- reinstitutionalize.

                       Maybe Jessie Friedman will be rehabilitated

                       and reinstitutionalized.  But he has to live

                       with the fact that people know who he is and

                       that we're alive and that I promise you if

                       you're anywhere near me I will make your

                       life a living hell.  That-- I will make it

                       my-- life admission to do because you

                       scarred me, you scarred my friends, you

                       scarred my family.  People did something

                       that was-- irreprehensible.  So, you-- you

Case 2:06-cv-03136-JS Document 41-12 Filed 01/28/21 Page 84 of 158 PageID #: 6668

did something-- you have to live with it.

ANDREW JARECKI:

21:14:09:18      After all the excitement died down, after

Jessie went to jail-- (UNINTEL) all that--

how did you-- how did you and your parents

deal with what happened?

GREOGRY DOE:

21:14:19:29      Went to therapy.  Denial, denial, we will

only talk about this behind closed doors.

Nothing-- can know about this in public.

And that's the end of it.

ANDREW JARECKI:

21:14:29:20      And what was the-- therapy part?  What kind

of-- you know, what kind of therapy did you

have?

GREOGRY DOE:

21:14:36:12      Well-- I went to a psychiatrist for ten--

for almost ten years.

ANDREW JARECKI:

21:14:38:25      Yeah.  And was it mainly about this or did--

21:14:41:11                    (OVERTALK)

GREOGRY DOE:

21:14:41:11          It was this initially and then it led to

                     problems with my parents and just deal with

                     it.  And realized that my mother and I will

                     never, ever, ever, never get along.  So, we

                     just-- that's really the end of it.  Therapy

                     ended 17.  I left my house at 18.  I've

                     been-- living here in this town for the past

                     six years of my life.  I've enjoyed every

                     bit of it.

                                ANDREW JARECKI:

21:15:02:12          And are you-- do you have any counseling

                     now?  Do you ever--

                                GREOGRY DOE:

21:15:04:10          No.

                                ANDREW JARECKI:

21:15:04:10          --go back?

                                GREOGRY DOE:

21:15:06:21          No.

                                ANDREW JARECKI:

21:15:06:21          You don't feel like you need it?

TAPE #136

PG.25

GREOGRY DOE:

21:15:08:12    I feel like I've-- everybody has problems in
               life.  Just the level of degree that you
               deal with it.  You talk to friends, you talk
               to family.  You deal with it.  I feel like
               I've come a long way.

21:15:18:15    I don't need to be told that this still
               affects me.  I know it affects me.  I how to
               deal with it.  And I just go on with my
               life.

                              ANDREW JARECKI:

21:15:25:27    How does it affect you today?

                              GREOGRY DOE:

21:15:28:18    It affects me today sleeping wise sometimes.
               I'm shaking at night.  Knowing that I was a
               victim and just seeing other victims so-- I
               know other people are molested they will
               have a certain walk.  People look at me--
               "Oh, you're a fag."

21:15:43:27    I'm just looking at them like I feel sorry

                                for them.  I want to go up and say, "Look,

                                go tell."  You know, just things like that.

                                            ANDREW JARECKI:

21:15:54:28                     And-- have you ever been to a doctor since

                                then to deal with like the physical trauma?

                                            GREOGRY DOE:

21:16:03:12                     They have to do surgery to repair the rip

                                and I will not do surgery.  They said, "You

                                can live with it."  I will live with it.

                                The surgery is something to deal with the

                                fissure.  I choose not to.  I will live with

                                it for the rest of my life.  I don't feel--

                                I don't need something rammed up my ass.

                                That's something that I don't do.

                                            ANDREW JARECKI:

21:16:22:10                     And why is it something-- is that something

                                normally that would have healed after--

                                            GREOGRY DOE:

21:16:25:09                     Something-- you-- normally that would have

                                healed but when you take a crap and-- it

                                comes out it keeps re-tearing it.  And since

                                it keeps re-tearing it there's nothing you

can really do except surgically repair it.

And I don't feel doing that.

ANDREW JARECKI:

21:16:43:18          And-- you mentioned to me you have different

kinds of therapy.  What other-- what kinds

of therapy--

GREOGRY DOE:

21:16:50:06          Hypnotic, regressive and just talking about

it.

ANDREW JARECKI:

21:16:54:06          Tell me about the-- the regressive or

hypnotic--

21:16:54:29                     (OVERTALK)

GREOGRY DOE:

21:16:54:29          They put me in hypnosis and try to recall

facts that I had buried.  And that's how I

first came out and started talking about it.  .

Just through being hypnotized and everything

I recalled things that I would bury.  And I

was able to talk about them.

ANDREW JARECKI:

21:17:09:12          For example, what would be something that

PG.28

                              you recalled?

                                      GREOGRY DOE:

21:17:12:04                   The actual first time I actually recalled

                              that I was actually molested.  Wow, I was

                              actually molested, I can deal with it now.

                              That was the first time.

                                      ANDREW JARECKI:

21:17:23:03                   And you recalled through hypnosis the first

                              episode?

                                      GREOGRY DOE:

21:17:25:23                   Yes.

                                      ANDREW JARECKI:

21:17:27:07                   So, tell me about that-- what do you

                              remember?

                                      GREOGRY DOE:

21:17:28:01                   I don't remember much about it.  It was

                              just-- it was so long ago.  I just remember

                              that I went through hypnosis, came out and

                              it was in my mind.  And then I started to

                              talk about it.  I know they put me through

                              deep trance and then I went through hypnosis

                              and that was it.

ANDREW JARECKI:

21:17:44:08                        And when did you have the hypnosis?

GREOGRY DOE:

21:17:47:15                        I'd have to say about three weeks after I

went to the police. My parents put me in

therapy right away. The one thing I'll

always thank my parents for was to put me in

therapy. But I don't have to thank 'em

afterwards-- for everything-- all the shit I

have been through.

ANDREW JARECKI:

21:18:01:16                        That's what we do with our parents. We

thank 'em for a little small things and we

hate them for everything else. (COUGHING)

The-- who was the-- not-- not by name but

was the psychiatrist that you went to was

the same person that hypnotized you or you

went to two different specialists?

GREOGRY DOE:

21:18:17:16                        No, I went to the same person that

hypnotized me. But I did not go to the

group therapy that everybody went to at

North shore University Hospital.  I went

somewhere else.  (COUGHING) I went to a

private one that my insurance paid for at

around 100 bucks an hour.  So, it was pretty

expensive.  I went to the best of the best.

ANDREW JARECKI:

21:18:35:08          And why didn't you go to the group one?

GREOGRY DOE:

21:18:38:18          'Cause we didn't want people to know that I

was being-- seeking help.  It was-- it was

a-- social no no to-- be-- told that you

have to go see help.

ANDREW JARECKI:

21:18:50:19          And the-- the other kids that went to that

other therapy did you ever hear anything--

GREOGRY DOE:

21:18:54:04          No.

ANDREW JARECKI:

21:18:54:04          --about how that therapy--

21:18:56:17          (OVERTALK)

GREOGRY DOE:

21:18:56:17          Didn't hear anything.

TAPE #136                                                    PG.31

                                        ANDREW JARECKI:

21:18:58:15                             Do you hear now about other kids and how

                                        they've have been able to--

                                        GREOGRY DOE:

21:18:59:26                             No, I haven't heard any contact.  Not really

                                        much at all.  I haven't heard much contact

                                        at all.

                                        ANDREW JARECKI:

21:19:07:29                             'Cause I've-- you mentioned to me before--

                                        you think that there was some kids you--

21:19:10:24                                     (OVERTALK)

                                        GREOGRY DOE:

21:19:10:24                             I-- I think that the people-- from what I

                                        saw in high school-- that did seek some form

                                        of help turned out okay.  Other people

                                        didn't.  So, I was just wondering how they

                                        are now 13 years later.  My boys.  My boys.

                                        ANDREW JARECKI:

21:19:30:27                             What?

21:19:34:02                                     (OFF MIC CONVERSATION)

                                        ANDREW JARECKI:

21:19:38:22                             And what about the regressive therapy?  What

Case 2:06-cv-03136-JS   Document 41-12   Filed 01/28/21   Page 93 of 158 PageID #: 6677

was that like?

GREOGRY DOE:

21:19:40:21          Same thing as like hypnotic.  Just--

ANDREW JARECKI:

21:19:42:17          What did they do?

GREOGRY DOE:

21:19:44:21          Set me back in time.  You know, this date,

that date, what happened, specific events,

specific objects I had to look at and just

try and get me to recall.  And it worked.

ANDREW JARECKI:

21:19:58:19          Now-- yeah, you had mentioned something that

you had-- had some weird behavior at home

and like--

GREOGRY DOE:

21:20:02:27          I was-- I would run around naked.  I would

just run around naked at ten years old.  My

mother would be like, "Put your clothes on."

I'd just run around naked.

21:20:09:02          I would-- eat a lot.  You know, just be very

quite.  You know, not be-- cry a lot.  My

TAPE #136                                                                          PG.33

                                        mother would be like, "Oh, shut up.  Grow

                                        up.  Be a man."

                                                        ANDREW JARECKI:

21:20:18:07                             Some kids actually do like sexual things.

                                        Did you ever masturbate in public or did you

                                        ever--

                                                        GREOGRY DOE:

21:20:22:16                             No, I didn't masturbate in public.  I

                                        masturbated all over my house.  I ran around

                                        naked all over my house.

                                                        ANDREW JARECKI:

21:20:27:02                             Well, so did we but we (UNINTEL).

                                                        GREOGRY DOE:

21:20:35:00                             I don't think at ten years old you need to

                                        roll one up in the middle of your parents'

                                        bedroom completely butt naked.  They had--

                                        caught me on a Saturday night.

                                                        ANDREW JARECKI:

21:20:56:07                             Do you have any advice for-- for other kids

                                        or parents to help them avoid a situation

                                        like this?

GREOGRY DOE:

21:21:00:07                     Listen to your kids.  If you kids are doing

                                any behaviors that seem out of the ordinary

                                go talk to them.  (COUGHING) If sometimes is

                                too good to be true--

21:21:11:19                              (OFF MIC CONVERSATION)

                                         GREOGRY DOE:

21:21:19:09                     Advice for the future-- listen to your kids.

                                Any odd behavior-- listen to them.  If

                                something is too good to be true it usually

                                is.  And if your kids are acting in a way

                                that I've described pick up the signs and

                                realize that there is something wrong.


21:21:37:04                     Analyze and research something beforehand to

                                make sure that-- you know what it is.  And

                                don't let your social status dictate your

                                kids.  Your kids are your kids.  Who gives a

                                crap where you've been raised.  If people

                                don't like you for what you are then they

                                weren't really your friends.

TAPE #136                                                          PG.35

21:21:56:20                    If-- if you're raised in an affluent

                               community and your kid is molested you

                               didn't do it.  You deal with it and you get

                               help and you go on.  So, if you're scarred

                               for life and you care more about what people

                               think then what your own family thinks

                               that's in itself is an issue that I had to

                               deal with.  Because of that I don't get

                               along--

21:22:16:24                              (OFF MIC CONVERSATION)

                                         ANDREW JARECKI:

21:22:39:19                    You told me you're gonna be in Great Neck in

                               a week or so.  Are you going back to be with

                               your parents?  Are you--

                                         GREOGRY DOE:

21:22:42:06                    I'm just going for a graduation party.

                                         ANDREW JARECKI:

21:22:44:10                    So, you're not gonna go stay with your

                               parents?

                                         GREOGRY DOE:

21:22:46:10                    No, just gonna stay with friends.

                                   ANDREW JARECKI:

21:22:49:00          What's it like to go back to Great Neck?  Do
    '                you have a lot of memories--

21:22:50:27                         (OVERTALK)

                                   GREOGRY DOE:

21:22:50:27          I don't-- I don't deal with the Arnolds.  I
                     go back, do what I gotta do, see friends and
                     just leave.

                                   ANDREW JARECKI:

21:22:58:17          So, you don't think about it?
          .                        GREOGRY DOE:

21:22:59:08          I don't think about it.  I go on with my
                     life.  It's 13 years ago.  It's a past that
                     I don't need to deal with.

                                   ANDREW JARECKI:

21:23:04:23          You mentioned to me that Arnold Friedman
                     wrote a letter and I guess you got a copy of
                     it.

                                   GREOGRY DOE:

21:23:08:02          I got a copy claiming that he didn't do it.
                     "You're my child, how could I do anything
                     wrong to you?  Dah, dah, dah, dah, dah."

Shit like that.

ANDREW JARECKI:

21:23:16:03      And what was your reaction to that?

GREOGRY DOE:

21:23:16:16      I tore it up and I burned it.  I read it, I
analyzed it, we talked about it in therapy
and I burned it.  They said burning it will
release my anger.  Got-- I need to get rid
of my anger.  Built up anger is something
bad.  If you have anger you will be troubled
in life.

ANDREW JARECKI:

21:23:35:05      You know, one of the things that he says--
and I think this is worth reacting to 'cause
it's his words from the grave basically--
just-- you know, he says, "Kids lie to the
police."  What's your reaction to that?

GREOGRY DOE:

21:23:45:22      Kids lie to the police?  Arnold, I'm living
proof.  If you're listening to this in some
way, form, shape from hell why would I lie
about something that affected me 13 years

ago that more than a dozen or so people came
forward and lied that you were caught doing
pornography and I have to live with the fact
that these memories are not made up, they're
not fabricated. How can you fabricate
something at ten years old? You need an
imagination beyond imagination. And you
lack the creative ability not knowing
knowledge.

21:24:18:14            So, kids lie to the police-- the I guess all
25 of us or 30 people who you had to deal
with lied and you were innocent. But you
pleaded guilty. And when 14 people go
before a grand jury and testify about the
same thing and they have concurrent stories
there's something there. And I'm living
proof that it happened. And-- now till the
day I die I will always say it happened.
And it did happen.

                                   ANDREW JARECKI:

21:24:43:23            Wow. So-- some people say that--

21:24:48:11                          (OFF MIC CONVERSATION)

                                     ANDREW JARECKI:

21:24:55:15                          Some people say that Jessie was worse than

                                     Arnold.

                                     GREOGRY DOE:

21:24:57:26                          He was.

                                     ANDREW JARECKI:

21:24:57:26                          True?

                                     GREOGRY DOE:

21:24:59:15                          I think so.  Jessie did more of-- Jessie did

                                     more of the molestation.  He was more of a

                                     glossy, he was more younger.  He was more of

                                     a fag that-- basically took after his own

                                     father.  You know, "I want to be my father

                                     so I'll ram kids up the ass."


21:25:12:13                          He did more of the molestation than Arnold.

                                     Arnold kind of oversaw it but he did it

                                     himself.  So, Jessie was the worst.  Jessie

                                     got a worse sentence than Arnold.  And

                                     Jessie has to live with the fact that he did

                                     this and he'll always be a child molester.

                                And that was something that he will live

                                with for the rest of his life.

                                          ANDREW JARECKI:

21:25:32:21                     Tell me about the-- the-- the Jewish factor.

                                You were telling me that, you know, this is

                                a Jewish community and--

                                          GREOGRY DOE:

21:25:36:01                     It's Jewish.  It's Jew-- Jewish people.

                                Jewish people hold things to certain degrees

                                and that Jewish people are very private and

                                this can't happen to a Jewish community-- a

                                rich Jewish community.  It can't happen.

                                And it did.

                                          ANDREW JARECKI:

21:25:51:14                     And how did the knowledge of this impact the

                                community?

                                          GREOGRY DOE:

21:25:55:12                     It rocked it for a while.  But then being

                                Jewish everything is a false front.  They

                                hid it and went on.  I don't-- I don't think

                                Great Neck has ever-- been ever the same

                                since.

ANDREW JARECKI:

21:26:06:14          Now, you signed up for the classes and then

                     obviously you went back for a second round

                     of the classes but you had started being

                     molested already in the first class?

GREOGRY DOE:

21:26:12:22          Uh-huh (AFFIRM).

ANDREW JARECKI:

21:26:15:10          Why did you start up again?

GREOGRY DOE:

21:26:16:13          For the fear that my parents might--

21:26:18:11                    (OFF MIC CONVERSATION)

GREOGRY DOE:

21:26:19:12          The reason that I signed up for the second

                     thing was that the fear that my parents

                     would be killed.

21:26:25:11                    (OFF MIC CONVERSATION)

GREOGRY DOE:

21:26:27:29          The reason I signed-- the reason I signed up

                     for the second set of the class was that I

                     had a fear that my parents would be killed.

TAPE #136                                                    PG.42

                              ANDREW JARECKI:

21:26:34:00            So, your feeling was that--

                              GREOGRY DOE:

21:26:34:23            By pleasing Arnold I would go back to the

                       class, my parents would live for another six

                       months.  It was every six months-- they'd be

                       reevaluated and so--

                              ANDREW JARECKI:

21:26:46:29            There are a couple of things I just want to

                       clarify.  Or things that you said that were-

                       - things that are just confusing.  You said

                       that-- they were--

21:26:58:14                    (OFF MIC CONVERSATION)

                              ANDREW JARECKI:

21:27:00:18            You said that-- that-- the-- sodomy or the--

                       the raping occurred in the--

                              GREOGRY DOE:

21:27:07:26            Bathroom for me.  The sodomy and the raping

                       happened in the bathroom for myself.  I was

                       one time gang raped at a private session in

                       the computer room because I had missed one

                       session.

Case 2:06-cv-03136-JS  Document 41-12  Filed 01/28/21  Page 104 of 158 PageID #: 6688

ANDREW JARECKI:

21:27:20:20          And I think you said that no kids were raped
                     in the room.  They were all taken in the
                     bathroom?

GREOGRY DOE:

21:27:25:14          From what I saw in my sessions the children-
                     - the kids were raped in Jessie's room or
                     the bathroom.  None were raped out on the
                     floor.

ANDREW JARECKI:

21:27:35:03          But then I was confused 'cause you said
                     some-- that one time I guess the leap frog
                     game--

GREOGRY DOE:

21:27:38:27          The leap frog game which was not molestation
                     was a leap frog game-- not considered
                     molestation was done outside.  But that was-
                     - that was-- a group game.  The actual
                     molestation one on one contact happened in
                     the bathroom.  The game happened out on the
                     floor.

                                ANDREW JARECKI:

21:27:55:20              The-- you were saying that-- the class that

                         you went to where Arnold had heart problems

                         and there was nobody there and you showed

                         up-- you figured you were the only guy.

                         That was on a Wednesday night?

                                GREOGRY DOE:

21:28:08:19              Uh-huh (AFFIRM).

                                ANDREW JARECKI:

21:28:09:21              But then you said that the-- the classes you

                         attended were on Friday?

                                GREOGRY DOE:

21:28:13:18              Yes.

                                ANDREW JARECKI:

21:28:13:20              Tell me (UNINTEL)--

                                GREOGRY DOE:

21:28:14:26              Well, that Wednesday class was to make up

                         for the Friday class because there was

                         Thanksgiving.  He wanted to make sure we got

                         our money's worth so we modified the third--

                         the Monday, Tuesday, Wednesday-- he grouped

                         into Thursday, Friday.  He pushed back that

week.  He modified to make sure everything

was good.

ANDREW JARECKI:

21:28:31:07   And-- you said that the police had showed

you the computer games when they came to

your house and so that was one of the ways

that you knew that they knew, right?

GREOGRY DOE:

21:28:43:12   Uh-huh (AFFIRM).

ANDREW JARECKI:

21:28:44:27   But then you also told me that you had taken

those computer games from--

GREOGRY DOE:

21:28:48:14   The special-- game-- that was part of the

computer games of the classroom.

21:29:00:09                  (OFF MIC CONVERSATION)

ANDREW JARECKI:

21:29:07:22   You were saying that Arnold had-- that

Arnold had given you these games to take

home?

GREOGRY DOE:

21:29:10:08   Uh-huh (AFFIRM).

ANDREW JARECKI:

21:29:10:25          So, you had a bunch of games at home?

GREOGRY DOE:

21:29:12:13          Uh-huh (AFFIRM).

ANDREW JARECKI:

21:29:14:22          But then another time you told me that he

had given you the one-- or you had taken--

GREOGRY DOE:

21:29:17:02          I snuck a game out.  I snuck a game out and

went home but I never told them about it

because I didn't want the penalty because I

liked the porno game.  It was a pornography

game.  So--

21:29:35:29                    (OFF MIC CONVERSATION)

***END OF TRANSCRIPT***

28

## Gary Meyers Interviewed by Detective Hatch and Detective Jones

**Hatch**: We've had kids who stated that they saw you and that you're involved, OK?

**Jones**: We want to go through this with you. Don't deny it yet. If you question twelve kids, you'll get 12 different answers. Take Arnie Friedman's own words. But he admitted this.

**Gary**: I didn't see it. I didn't hear it.

**Jones**: Arnold was under no obligation to admit, but he did. Why would Arnold Friedman admit to something that wasn't true. The kids know that he did it. Take Arnold's own words... I know it's impossible to speak to him now but he's openly admitted to this in an open courtroom. He said "I did it."

[███████ enters room and she is asked to leave]

**Hatch:** ███████ and ███████ both say that they saw Gary engaged in it... Arnold Friedman did not have to admit this. No one put him in a dark room. He said it in open court with an attorney. He sodomized them. What I say to you as an intelligent human being is what did you say to that. He admitted he sodomized a lot of children

**Gary**: inaudible

**Hatch**: Arnold Friedman says in a courtroom in front of a judge... I'm not going to tell you, you tell us. What we're trying to determine is... Arnold Friedman in court says that he sodomized children ... The judge said that there are other children and exactly what he did.

[Inaudible discussion]

**Hatch**: We are trying to find out who the other victims are to help the parents and those children. Arnold Friedman will not be charged with any other additional charges. There's no axe to grind here. There's no axe to grind here. It was all stipulated in open court that there would be no further charges. One judge and the DA says no further charges will be made. Once the stipulation was made with the judge, no further charges will be made. What we want to do is to let the parents know if there are other children that we aren't aware of so that they can get psychological help for the children. We also learn how to deal with pedophiles and how they operate, how they operate and their method of seduction... Not one child came forward. Why? They were blackmailed. Sexual perversions if a person is sexually abused and wanted to keep your mouth shut and took photos and took notes and told you if you said anything to anyone you would be in worse trouble because they would show the picture -- what if the person was seven or eight years old... Could you imagine a copy to our mother, a copy to a smut magazine with the name and address to show that you were a pervert?

**Gary**: inaudible

**Hatch**: Did you know that much five years ago? I'm 43 years old and when I was seven I didn't know as much as I do now.

**Gary**: inaudible

**Hatch**: [angrily] I think you're very funny... No evidence to speculate anything happened... You're reasonably intelligent I wouldn't say you're a genius but you are reasonably intelligent. Arnold Friedman stipulated in court that he sodomized a large number of children.

**Gary**: No he never touched me.

**Hatch**: Oh, it happened to everyone else but not to you. How many sessions did you have at Friedman's.

**Gary**: 8 to 12.

**Hatch**: Arnold Friedman had a certain age group. Pre-adolescent males. He wouldn't be interested in a guy like you? You were nine years old and nothing happened? An eight year old, you don't know as much as you do at 13 years old. I'm saying to you, you went through a physical change. You look different at 13 than you did at 8. Because of that difference, Arnold Friedman no longer wanted you. Pedophiles are very selective. Like heterosexuals. Some like blondes some like brunettes. Arnold Friedman liked eight-year-olds. You'll find out as you get older that certain things are true, certain

things are lies. You denying this doesn't mean it didn't happen. Arnold Friedman admitted it and it's true. When young, impressionable children are running around....

**Gary**: inaudible question

**Jones**: Why don't you ask your sister if something happened? A lot of boys seem to have concerns about their own sexuality.

[Inaudible conversation between Meyers and Jones]

**Hatch:** What about a homosexual act over a period of years? Formative years? Would you consider that having an affect on a person's sexuality? Do you think that determines if you are a homosexual? If a person was involved in a homosexual act during preadolescent years after they are forced out of it do you think they would like it? What about a man who takes unfair advantage of children? If you are going to be a homosexual, you'll be a homosexual.

**Gary**: inaudible

**Hatch:** Well guess what? You are absolutely wrong. Most children who abuse children have been abused themselves. It's a monster created with in you. This little monster inside you. This little voice and every now and then it rears its ugly head. Unless the victim knows enough about the problem to get himself straightened out. If suppressed, it's a two-fold problem. One is anger and frustration. And the other is acting itself out. It's a no-win situation unless the person goes and gets help and admits that he was victimized. If something bad happens even though its not the kid's fault the child blames himself and feels tremendous guilt. We find, with help that they can see it's not their fault. And then the place the blame on the person who created the situation and then they are a lot better off. Don't over intimidate women. Don't over intimidate women. You're a super-smart intelligent individual. You'd have to be an idiot not to see this. To a child, you don't need a knife, guy or machete. The seduction in force can be very subtle. If Arnold Friedman took a small boy and put a very big guy over him, what do you think the little guy will do? There are children who would defy but a very small percentage. 90% would submit. Most kids would be intimidated. If a pedophile wants to get his goal accomplished, I'll have 10 or 12 kids in my class. I know the kids. I know those who I can intimidate and those I cannot. And I'll cut out those that I can't intimidate. Then I go to the next stage in the process and I might cut out even a few more. You might go so far, and then that's that. If you don't want to do something you won't. That's another stage. It's a process of elimination and psychology plays a big part. And then there are other methods other than intimidation. There's carrots and rewards. You are having so much fun and you're getting rewards. If you do something right, you get a reward. A candy bar, a pat on the back.

Do you remember games of a sexual nature? Stroker? Strip Poker? [checks notes] Exploding fists?

**Gary:** Exploding fists was a Karate Game.

**Hatch:** Did you ever see any porn magazines?

**Gary:** No

**Hatch:** Did you ever go to any other room in the house?

**Gary:** Yes.

**Hatch:** What room?

**Gary:** Jesse's bedroom to play with the Commodore computer and nothing happened.

**Hatch:** Did Jesse help with the classes?

**Gary**: no answer

**Hatch:** Did Gary Meyers ever take a special SAT class? Who was in the class? Gary, ▓▓▓▓ ▓▓▓▓, ▓▓▓ ▓▓▓, ▓▓▓ ▓▓▓, ▓▓▓▓▓▓▓.

**Hatch**: Did you ever see a magazine called Gallery Magazine?

**Gary**: No

**Hatch**: [calls Ann Meyers back into the room] Gary was a wise guy and I didn't like his answers.

**End**

**29**



# LONG ISLAND

# New Arrest in Child-Sex Case

By Bill Van Haintze and Alvin E. Bessent

A Great Neck youth was arrested yesterday and accused of participating in orgies of child sexual abuse arranged by computer teacher Arnold Friedman and his son, in which young boys were sodomized during classes in Friedman's home.

Ross Goldstein, 17, of 51 Picadilly Rd. was taken into custody at his home yesterday about one hour before he was due to graduate from an alternative high school in the North Shore community, police said. He was charged with 14 counts of first-degree sodomy, two counts of first-degree sexual abuse, and two counts of using a child in a sexual performance, police said. The abuse allegedly occurred during orgies arranged by Arnold Friedman and his son Jesse between March 1, 1986, and June 30, 1986, and between Dec. 9, 1986 and March 10, 1987.

Goldstein's attorney could not be reached for comment.

Goldstein's was the first of a number of additional arrests expected soon in connection with the abuse, which involved at least five victims previously unknown. Arnold Friedman had admitted abusing 13 young boys when he pleaded guilty in March to 42 counts of various forms of sexual abuse.

"There will be other arrests, possibly four others," said Det. Sgt. Fran Galasso, head of the Nassau police sex crimes unit. "These were additional friends of Jesse who were invited to the Friedman home to participate in these sexual performances," Galasso said.

Jesse Friedman — previously charged with 54 counts of sodomy, sexual abuse and endangering the welfare of a child — will be rearrested and hit with additional, similar charges, Galasso said. The earlier charges are still pending in Nassau County Court.

The newly cited victims, all boys aged 7 to 11, were sodomized and forced to perform oral sex in full view of other computer students, police said. Additional details of the abuse were revealed by previously identified victims during sessions with their therapists,

Galasso said.

"We suspected initially that something more was involved, that there was information the children were reluctant to release. We know from experience that, normally, pedophiles like to share their interest with other pedophiles," Galasso said.

Goldstein and Jesse Friedman had been friends for

Please see SODOMY on Page 24

## Child-Sex Arrest

SODOMY from Page 21

about two years, police said. The two had been classmates at The Village School in Great Neck, an alternative school for students with emotional or learning disabilities, police said.

Goldstein, who was apprehended at 2:55 p.m., was scheduled to participate in graduation ceremonies at the school at 4:30 p.m., police said. Charles Piemonte, who identified himself as the head of the school, said he was aware that police had arrested the boy. He said the boy had "learning problems," but declined to comment further.

Jesse Friedman, 18, who was a student at the State University at Purchase when charged in November, is currently free on $250,000 bail.

Arnold Friedman, 56, was an award-winning teacher who taught for 20 years at Bayside High School in Queens. He is serving a 10- to 30-year prison sentence. He pleaded guilty in March to sodomizing and otherwise sexually abusing 13 young boys, all of whom were students in computer classes conducted in his home. Arnold Friedman also pleaded guilty in U.S. District Court in Brooklyn to sending child pornography through the mail and was sentenced to 10 years in prison. The sentences will run concurrently.

30

Fri.   June   24th, 1988

0807

APP.

## LONG ISLAND

# Teen Faces 37 New Sex Charges

### By Alvin E. Bessent

A Great Neck teenager already charged with molesting young male students at his father's private computer school was rearrested yesterday on 37 new counts of sodomy and other forms of sexual abuse, Nassau police said.

Jesse Friedman, 18, surrendered to police at about 4 p.m. and was charged with 20 counts of first-degree sodomy, 11 counts of first-degree attempted sodomy, four counts of first-degree sexual abuse and two counts of using a child in a sexual performance, police said.

Police said they expect to arrest as many as four acquaintances of Jesse Friedman in the burgeoning case.

With yesterday's arrest, the case has yielded a total

Friedman

of 200 charges against Arnold Friedman, 56, his son,

Jesse, and a neighbor, Ross Goldstein, 17, who was arrested Wednesday.

Jesse Friedman will plead not guilty on the new charges when arraigned today, said his attorney, Peter Panaro. "Jesse informs me he never committed any of these acts," Panaro said yesterday. "My client is distraught and he's asserting his innocence completely."

The charges stem from alleged abuses during the past eight years of 7- to 11-year-old boys attending weekly computer classes at the Friedman home at 17 Picadilly Rd. And, prosecutor Joseph Onorato said yesterday, "There are allegations that, in the view of these classes, Arnold and Jesse were sodomizing one another."

The investigation into the Friedmans' activities intensified in March after Arnold Friedman pleaded guilty to sexually abusing 13 boys, Onorato said. At the same time, Jesse Friedman rejected a deal that would have brought him about 5 to 15 years in prison, Onorato said. "Jesse's indication [that] he wanted to go to trial forced a greater effort to solidify what we had and to build on what we had," Onorato said.

The investigation got a boost when, as part of a plea

bargain, Arnold Friedman identified about 80 boys he had sexually abused, sources have said. The plea netted Friedman 10 to 30 years in prison.

The eight-member police task force handling the cases then began contacting newly identified victims and their families while continuing interviews in already-surfaced cases. The numerous sessions with the children brought out information that has led to the latest arrests, police said.

"As we went back the second time, we began to hear statements such as, 'You know, sometimes Jesse had his friends there,'." said Det. Sgt. Fran Galasso, head of the sex crimes squad. "On further questioning, we began to hear that the friends were involved."

Arnold Friedman had established the computer school in his home eight years ago. He first acted alone in abusing the students, police said, but his son became involved three or four years ago.

Goldstein, a former schoolmate of Jesse Friedman, was being held yesterday in lieu of $100,000 bail set by District Court Judge Murray Pudalev. He is scheduled to return to court Monday. Jesse Friedman had been free on $250,000 bail until yesterday.

31

# Great Neck Record

## YOUR   COMMUNITY   NEWSPAPER

Covering the Village of Great Neck, Great Neck Estates, Great Neck Plaza, Kensington, Kings Point,
Lake Success, Russell Gardens, Saddle Rock, Thomaston and the unincorporated area.

Vol. 100 No. 1 Great Neck, N.Y. · Thursday, February 4, 1988 - 48 pages 35¢ per copy

©1988 Anton Community Newspapers of Long Island
All Rights Reserved. Central Office phone: 747-8282

# Great Neck Community Marshals its Resources To Deal with Child Abuse and Child-Sex Crime

### By WILLIAM S. DOBKIN

With the Great Neck School system and the Parent/Teachers Association of the Baker and Saddle Rock Schools leading the way, Great has launched its counter-attack to relieve the anguish caused by a major child-sex case in its midst and to take measures to prevent any recurrence.

Besides the school district and the Nassau County Police, at least three nearby institutions have come forward with assistance—the North Shore University Hospital in Manhasset, the Schneider Children's Hospital in New Hyde Park, and the Pride of Judea in Douglaston.

Two community meetings have been held. One on December 14, at the J.F. Kennedy School, called by the school district; and the other, January 14, at the Baker School, sponsored by the P.T.A.

These meetings were planned when two P.T.A. presidents, Bobbie Preiser of the Baker School and Maxine Wolpert of the Saddle Rock School met with school psychologists Dr. Eve Weiner and Linda Goluboff. "We had several meetings," said Mrs. Preiser, "since we wanted to give parents a broad range of advice."

Those attending these meetings, about 50 parents at the first one and more than 300 at the second, heard expert advice from a broad range of experts. The list of speakers included Detective Sergeant Fran Galasso, commanding officer of the Nassau County Sex-Crime Squad; Assistant District Attorney Joe Onorato, the state prosecutor in the Arnold Friedman case, Joyce Cates, ACSW, a pediatric social worker and a member of the Child Protection Team, Schneider Children's Hospital, whose address at the January 14 meeting is printed on the editorial page of this issue; Jean Forman, Executive Director of the Nassau Coalition on Child Abuse and Neglect; Dr. Arthur Green, clinical associate professor at the Columbia University College of Physicians and Surgeons; and Dr. Sandra Kaplan, Chief of Child and Adolescent Psychiatry, and Coordinator of the Family Crisis Program at the North Shore University Hospital, and Associate Professor of Clinical Psychology at the Cornell University Medical School.

#### Interview With Dr. Sandra Kaplan

We asked Dr. Kaplan several questions on the effects of sexual abuse on children, other children in the community, and their parents. Dr. Kaplan spoke of children who suffer flashbacks of a traumatic event, fear of a recurrence and exhibit new fears such as that of darkness or being left alone.

Dr. Kaplan urged that children who are victims should be seen by a mental health expert who can recognize symptoms and help the child deal with them. "We help the child realize that the responsibility is not the child's but the adult offender," is how Dr. Kaplan described one phase of therapy.

"All psychiatric records are kept confidential," is the assurance that Dr. Kaplan gives to parents of patients. She explained that the records of the recent child sex abuse case in Great Neck are kept under lock and key because of the extraordinary and sensitive scope of that case. "No records are released to anyone without written consent from the families involved; we respect all patients' confidentiality," Dr. Kaplan said.

She also described how a "post-traumatic

# Community Resources To Deal with Child Abuse

*continued from page 13*

disorder" can effect a community as well as individuals. A community can help deal with trauma by conducting meetings and workshops so that the problem is freely discussed and emotions are allowed to surface. Dr. Kaplan also said that it would be a good idea to have mental health professionals go into the schools to encourage children to talk about their concerns.

Dr. Kaplan's proposals reflected the view of Mrs. Preiser who said said, "There is much more ground to cover. There is an outcry from parents who would like to see workshops set up to learn more on how to prevent and deal with child-sex abuse."

### Pride of Judea Sponsors a Workshop

A workshop on child abuse, sponsored by the Pride of Judea Mental Health Center, was held on Friday, January 29, at their facilities in Douglaston. The workshop was well attended by educators, health care professionals, police officers, members of the clergy and other interested parties.

Dr. Melvin A. Scharfman, Executive Medical Director, said in his opening remarks that while child abusers are not readily identifiable, there are certain traits which they frequently share. These are lack of self-esteem, having themselves been victims of abuse, having a history of alcoholism, being "single parents", and possessing feelings of helplessness, frustration and isolation. Seventy-five percent of physical abuse perpetrators are women and ninety-five percent of sexual abusers are male.

Dr. Stanley Goldklang, Director of Psychological Services, listed some of the causes of physical abuse. Among these are immature parents who judge the child by unrealistic standards. In other cases, a child may "strike a raw nerve" in the parent by being somehow "defective", different from other siblings, being very active or reminding the parent of an estranged spouse

Dr. Goldklang listed indications of child abuse. These included wearing inappropriate clothing, such as long sleeves in warm weather to cover burns, bruises, etc.; seeming shy, tired or withdrawn; not expecting to be comforted when hurt; seeming overly compliant, not wanting to go home; having poor peer relations and talking about being beaten or enacting beatings in play. Signs of sexual abuse include fear of being alone, crying, bed wetting, washing repeatedly, sexual fantasies in play, increased masturbation and adult-like sexual behavior toward other children.

The third panelist, Dr. Margaret A. Moxness, gave a number of suggestions on dealing with suspected child abusers. She stressed the importance of intervening early, in a nonjudgmental manner, and getting the abuser to agree to therapy. She suggested that all parents be given the number of Parents Anonymous, which has a twenty-four hour "hotline."

According to Dr. Moxnes, educators and others often find themselves in a difficult position because they are afraid of "interfering" between a parent who claims he was merely disciplining the child and the victim himself who will often try to protect his abuser out of fear. The child is usually peculiarly attached to his abuser and feels he has provoked the behavior. He is afraid of being removed from the family or causing harm to loved family members.

In response to questions from the audience, the panel reiterated the need to overcome a reluctance to intervene—for whatever reasons. They acknowledged that there were cultural differences in disciplining children and a fine line between spankings and beatings, punishment and abuse—but the bottom line was the welfare of the child and the need to act before the victim is permanently damaged, either emotionally or physically.

*Helen Stein contributed to this article by writing the Section on the Pride of Judea.*

**32**

## Temple Beth-El of Great Neck

### Panelists of Sexual Abuse of Children Program

November 16, 2988

Thomas Feniger, Ph.D.
Director, Pupil Personnel Services, Great Neck Public Schools
516-773-1731


Victor Fornari, M D.
Physician in Charge Pediatric Consultation/Liaison Service and Assistant
Professor of Psychiatry of Cornell University Medical College
516- 562-3005


Detective Sgt. Frances Galasso
Commanding Officer Nassau County Sex Crimes Squad
516-535-7816


Sandra Kaplan, M.D.
Chief of Child and Adolescent Psychiatry, Associate Professor of Clinical Psychiatry
at Cornell University Medical College, and Chairperson for the Committee on Family
Violence and Sexual Abuse of the American Psychiatric Assoc.
516-562-3005


Carol Samit, C.S.W.
Assistant Coordinator of Family Crisis Program, Division of Child
and Adolescent Psychiatry, and Senior Psychiatric Social Worker, The Division of Child
and Adolescent Psychiatry of North Shore University Hospital
516-562-3005


Joan Spector, D.S.W.
Private Practice in Great Neck
516-482-7755

33

DENIS DILLON
DISTRICT ATTORNEY



OFFICE OF THE DISTRICT ATTORNEY

NASSAU COUNTY
262 OLD COUNTRY ROAD
MINEOLA, NEW YORK 11501
TELEPHONE (516) 535-3800

March 26, 1990

Inspector Ronald Olsen
Commanding Officer, Major Offense Squad
Nassau County Police Department
1490 Franklin Avenue
Mineola, NY 11501

Re:  People v. ROBERT J. IZZO

Dear Inspector Olsen:

On Friday, March 23, 1990 I was informed that Detective Sergeant L.
Gorman of the Nassau County Police Department Sex Crimes Squad is
scheduled to appear as a guest speaker at a Child Sexual Abuse
Seminar conducted by the staff of North Shore University Hospital on
March 30, 1990. In addition to Detective Sergeant Gorman, Dr.
Cathryn J. Fenton, Superintendant of Hicksville schools is also
scheduled to appear.

As the Chief of the Major Offense Bureau assigned to the prosecution
of the ROBERT IZZO matter, the appearance of a Nassau County Police
Department representative and Dr. Fenton at this Seminar causes me
great concern. Since the inception of this case, the Office of the
District Attorney has strived to investigate and prosecute this
matter independent of any psychiatric or therapeutic health
professionals. This has been maintained because law enforcement
investigations into matters of child sexual abuse must remain free
from any appearance that law enforcement officials are utilizing the
services of psychological agencies and medical professionals in
their criminal investigations

The importance of this independence between our agencies in
protecting the integrity of a criminal investigation was most
recently exhibited by the verdict in the McMartin case in
California. All reports and interviews with the jurors concerning

the acquittal in that case indicate that the jurors were extremely
troubled by the role of the psychologists who conducted the inter-
views of the children involved in that investigation.  It was noted
that although psychologists, based upon their training are extremely
useful in enabling children to discuss instances of sexual abuse,
their lack of training in the legal system and the evidentiary
limitations placed upon child interviews by the courts make the use
of such professionals in a criminal investigation or association
with law enforcement personnel during a pending prosecution,
extremely unwise.  It is my opinion that in order to protect the
integrity of the ROBERT IZZO investigation and prosecution, any
formal association such as that scheduled between the Nassau County
District Attorney's Office and the Nassau County Police Department
with North Shore University Hospital, who is responsible for the
counselling of many of the IZZO complainants, must be avoided.

I would appreciate a reconsideration of your Department's decision
to send a representative of the Nassau County Police Department to
the North Shore University Seminar on March 30, 1990.  Your
consideration to this matter is greatly appreciated.

                              Very truly yours,

                              Denis Dillon
                              District Attorney


                              Barry W. Grennan, Chief
                              Major Offense Bureau

BWG:sw

**34**

The Center For Child Protection

# Childrens

Hospital
and Health
Center



# HEALTH SCIENCE RESPONSE TO

# CHILD MALTREATMENT 1990

*With The*
*American Professional Society on the Abuse of Children Annual Meeting*
*And The*
*California Professional Society on the Abuse of Children Annual Meeting*

*In Cooperation With The Office of Victims of Crime*
*United States Department of Justice*

## JANUARY 17, 18, 19, 20, 1990
## U.S. GRANT HOTEL • SAN DIEGO, CALIFORNIA

<u>Child Pornography and Extrafamilial Child Sex Abuse</u>

Sandra Kaplan, M.D.

David Pelcovitz, Ph.D.

Carol Samit, C.S.W.

Division of Child and Adolescent Psychiatry
North Shore University Hospital/
Cornell University Medical College

Detective Sergeant Frances M. Galasso
Nassau County
New York Police Department

CHILD PORNOGRAPHY AND EXTRAFAMILIAL CHILD SEX ABUSE

S. Kaplan, M.D., D. Pelcovitz, Ph.D.,

C. Samit, C.S.W., F. Galasso, Det. Sgt.

Although extrafamilial sexual abuse of children is widely recognized as a major problem there is a paucity of mental health literature in this area. This symposium will provide a review of the existing literature on child pornography and extrafamilial sex abuse with a specific focus on clinical treatment of child victims and their parents as well as legal aspects relevant to child victims and their parents. The presenters have collaborated in the individual and group treatment of victims of one of the largest child pornography and sex abuse cases in the United States. This case which has been recently successfully prosecuted involved hundreds of children in an upper socioeconomic suburban area. The presentations will address the individual treatment of these children, group therapy of the children and their parents and use of hypnosis in the treatment of dissociation in victims. Relevant legal issues including reliability of children as witnesses and the role of clinicians in preparing children for testimony will also be presented. All presentations will address both general clinical and research issues regarding child pronography and extrafamilial sex abuse using specific illustrations from the case described above.

The presentations of this symposium will include: Overview of Child Pornography and Child Sexual Abuse; Group Therapy for Victims of Child Pornography and Extrafamilial Sexual Abuse; Group Treatment of Parents of Child Pornography and Extrafamilial Sexual Abuse Victims; Dissociation and Sexual Abuse in Children and Adolescents; Legal Proceedings of Child Pornography and Extrafamilial Child Sexual Abuse.

OVERVIEW OF CHILD PORNOGRAPHY AND CHILD SEXUAL ABUSE

PRESENTATION I

SANDRA KAPLAN, M.D.

Although extrafamilial sexual abuse of children is widely recognized as a major problem there is a paucity of mental health literature in this area. This symposium will provide a review of the existing literature on child pornography and extrafamilial sex abuse with a specific focus on clinical treatment of child victims and their parents as well as legal aspects relevant to child psychiatrists. The presenters have collaborated in the indiivdual and group treatment of victims of one of the largest child pornography and sex abuse cases in the United States. This case which has been recently successfully prosecuted involved hundreds of children in an upper socioeconomic suburban area. The presentations will address the individual treatment of these children, group therapy of the children and their parents and use of hypnosis in the treatment of dissociation in victims. Relevant legal issues including reliability of children as witnesses and the role of psychiatrists in preparing children for testimony will also be presented. All presentations will address both general clinical and research issues regarding child pornography and extrafamilial sex abuse using specific illustrations from the case described above.

PRESENTATION I

Child pornography is a multi-faceted, international, multimillion dollar business. More than 260 different varieties of pornographic publications have been produced. (Pierce, 1984). It is estimated that between 300,000 to 600,000 children below the age of sixteen are involved nationwide in child pornography activities, (Pierce, 1984). Depiction of sexual activity between adults and children is thought to account for approximately 7% of the total pornographic industry in the United States (House of Representative Hearing, 1977, cited in Pierce).

The United States is the world's leading consumer of child pornography materials. Customs officials have evidence that approximately 20,000 known Americans (97% of whom are male) are buying child pornography material, either from domestic or foreign (Netherlands, Sweden, Denmark) distributors (Thorton, Washington Post, 1986). Domestic materials are typically produced by amateurs, foreign production is commercially produced in a more sophisticated way. (American Medical Association, 1987).

The typology of child pronography will be presented and the mental health literature will be reviewed. The psychological consequences have been reported by Burgess (1984) in her study of sixty-two children involved in sex rings, that those involved in child pornography as part of the abuse had more negative symptoms than those who were abused but not subject to child pornography.

CHILD PORNOGRAPHY AND EXTRAFAMILIAL SEX ABUSE

Group Therapy and Hypnosis for Victims of Child Pornography

and Extrafamilial Sexual Abuse

PRESENTATION II

David Pelcovitz, Ph.D.

Group treatment for victims of sex abuse is widely thought to be the treatment of choice for this population. Forseth and Brown (1981) report that in their survey of 36 incest-treatment programs, group therapy was most often cited as the preferred treatment modality. The advantages of group treatment include a lessening of the feeling of stigmatization and difference which is one of the most damaging sequelae of sexual abuse, a decrease in feelings of social isolation which is also reported by many victims and the beneficial effects of learning that their experiences were no so "horrible" that they permanently have to be kept secret. In light of the above, it is surprising that the literature on group treatment of victims of sex abuse there is no reference to the unique treatment needs of boys abused by perpetrators outside of their family.

In light of the paucity of data on group therapy for this population, we attempted to empirically measure the effectiveness of groups we offered to these victims.

Fifteen victims of a child pornography and sex abuse ring which victimized children attending an after-school program were seen in once

PRESENTATION II

weekly focused group therapy sessions for six months. The victimization of the children included repeated sodomy, oral sex and numerous sexual games. The abuse was recorded by the perpetrators on videotape, and numerous photographs. All members of the group were administered the Child Behavior Checklist, Youth Self-Report, Area of Change Questionnaire, and a structured interview designed by Pynoos and Eth to assess changes in children's behavior as a result of the trauma. The results of these questionnaires pre and post group interviews are not yet analyzed but will be reported at the time of the symposium.

Short-term focused group therapy sessions were offered on a once a week basis for ten sessions. The focus of the sessions was similar to what is described in the group therapy literature on incest victims but a number of themes emerged which were unique to this type of abuse. Themes consistent with what is reported in the group treatment of incest included: (1) Stigmatization: The children reported feeling permanently damaged and different from their peers as a result of the abuse. Some of the children reported being teased and called "gay" by peers who discovered they were abused. A number of the children expressed a hope that their future wives and children never find out about their victimization; (2) Guilt: A number of the children were embarassed to discuss their feelings about being abused because of fear that the abuse would be viewed as their fault. In spite of repeated assurance by family members and therapists that they were not to blame, these feelings persisted. A major source of guilt was not having told their parents

PRESENTATION II

about the abuse because of their believing the perpetrators' threats. (3)
Trust: Many of the children expressed continuing difficulty trusting
adults outside of their family—particularly teachers. Unlike children in
incest families, there was no evidence that this lack of trust was also
directed towards parents. However, several children expressed concern
regarding their parents failure to protect them from the abuse; (4)
Anger: As is the case with groups of incest victims, perhaps the most
frequently expressed feeling in our groups was that of anger at the
perpetrator. On the evening following the conviction of the man they felt
was the most sadistic perpetrator of abuse, the boys had a party to
celebrate the event. Vivid fantasies of torturing the perpetrators were
often expressed. (5) Powerlessness: This theme emerged repeatedly,
particularly in the dreams reported by these youngsters: One child
reported dreaming repeatedly of being trapped and unable to get help, "I
tried to scream for help but nothing came out"; (6) Sexuality: The
children had considerable difficulty discussing the effects the abuse had
on their sexual functioning. The consensus of most of the children was
that since the abuse was done by men and not women, it was not really sex,
and they were, therefore, still virgins. A group which discussed the
children's knowledge of sexual matters, revealed many misconceptions about
sex, as well as a high level of anxiety about discussing the impact which
their abuse might have on future sexual functioning.

Several issues which emerged in the group were unique to this type of
victimization. Pornography: The children almost universally denied being
upset by the idea that pictures of their victimization are being

PRESENTATION II

circulated. An interesting adaptation to the permanent record of their abuse was a belief that since several years have elapsed since the photographs and videotapes were made, they now look so different that they have a new appearance and identity from that seen on the pornographic material. Dissociation: Of the 15 children seen in the two groups, six children had no memories of being victimized even though other group members witnessed their abuse. A technique that was useful in helping these children remembering was having all group members draw pictures of the room where they were victimized and speak about their memories of the classes using the pictures as visual aid. With the help of this technique, two group members who had amnesia for the abuse, remembered most of the detail of their victimization. Two of the remaining four have had vague but not detailed memories and the remaining two continue to not remember their abuse. The group was also helpful in that those children who remembered, who initially had dissociated, were able to reassure those with amnesia that the process of remembering would not be painful (the children had been told by detectives who questioned them that when they remembered it would be traumatic). Family Issues: Many of the victims harbored anger at their parents for urging them to continue attending classes. Although it was apparent that most parents encouraged their children to discuss the abuse, almost all of the group members reported that they were only comfortable discussing their topic in the safety of the group and not with their parents.

In summary, group treatment for male victims of child pornography and extrafamilial sex abuse appears to be very helpful in providing a forum for discussion of memories and feelings related to the victimization,

PRESENTATION II

lessening feelings of stigmitization and damage, and lessening feelings of isolation and powerlessness. The group also proved to be a helpful modality for helping those children who repressed their memories of the abuse to remember what had happenend to them.

A number of workers in recent years have pointed to a link between physical and sexual abuse in early life and the subsequent development of dissociative disorders. particularly multiple personality disorder (Putnam,1985; Braum & Sachs, 1985). Most of the existing studies on this issue have been based on retrospective studies of adult patients with multiple personality disorder, although the findings of a correlation have been quite consistent and etiologically suggestive. A critical review of this literature will evaluate the empirical evidence and theoretical formulations for the emergence of dissociation as a psychopathologically overdetermined response to physical and sexual abuse during childhood and adolescence.

Supportive evidence for the above includes a recent study by Finer (Ph.D. dissertation), which compared the dissociative propensity of abused children with that of a control group. Finer found higher dissociation scores in the abused group on two independent measures, one of which was a standard measure of hypnotizabilty. The findings and implications of this study will be discussed.

Finally, treatment implications of the above findings will be addressed. This will include a review of the literature on the use of hypnosis with physically and sexually abused children as well as those with dissociative disorders. Our own clinical experience in this area will be reviewed, together with suggested guidelines for further study.

CHILD PORNOGRAPHY AND EXTRAFAMILIAL SEX ABUSE

(Group treatment of parents of child pornography and of

extrafamilial sexual abuse victims.)

PRESENTATION III

Carol Samit, C.S.W.

The majority of the literature on the treatment of child sexual abuse focuses on the treatment of incest. Few articles describe the group treatment of extrafamilial sexual abuse and those are limited to the treatment of child victims. Reference has been made to the need to help parents cope with extrafamilial molestation, but there is nothing written about group treatment for parents whose children are these victims.

In a clinical presentation, we will describe the process and the themes in the group treatment of parents whose latency age children were molested while attending an after-school program.

Like their children, these parents feel victimized, stigmatized and betrayed. The symptomtology of the parents often paralleled their children. Among their symptoms were feelings of sadness, feelings of failure (as a parent), fear that something bad will happen to them in the future and general feelings of depression and anxiety. In addition, feelings of self-blame and guilt and a wish for retribution and need to be validated were expressed. Individual and couple issues emerged as therapy progressed. The boys' own ongoing group process as well as for group sessions, were strongly influenced by community response to the sexual abuse, media coverage and the impacting legal systems.

Countertransferential issues of working with a non-pathological parent group, therapists living in the same community, sharing a similar SES background and common value base will be discussed. The stages of group process will be examined as they apply to other groups of this type.

LEGAL PROCEEDINGS OF CHILD PORNOGRAPHY AND

EXTRAFAMILIAL CHILD SEXUAL ABUSE

PRESENTATION IV

Detective Sergeant Frances M. Galasso,

Nassau County, New York Police Department


Federal and State laws regarding child pornography and extrafamilial child sexual abuse and investigation and prosecution procedures will be presented.    Legal obligations of child and adolescent psychiatrists will be discussed.

Court proceedings and child victims as witnesses will also be reviewed.    The law enforcement and judicial proceedings of the case involving all of the presenters will be utilized to illustrate this presentation.    Child and adolescent psychiatric collaboration with law enforcement in these cases will be emphasized.

The Center For Child Protection

*WELCOMES YOU TO THE*

*HEALTH SCIENCE RESPONSE TO*

*CHILD MALTREATMENT 1990*

WITH THE
AMERICAN PROFESSIONAL SOCIETY ON THE ABUSE OF CHILDREN ANNUAL MEETING

AND THE
ALIFORNIA PROFESSIONAL SOCIETY ON THE ABUSE OF CHILDREN ANNUAL MEETING

IN COOPERATION WITH THE OFFICE FOR VICTIMS OF CRIME
UNITED STATES DEPARTMENT OF JUSTICE

JANUARY
17·18·19·20
1 9 9 0

U.S. GRANT HOTEL
San Diego, California

APP.        0826

**35**

[From *The Village Voice*, January 12, 1990. Reprinted in *Women and Other Aliens: Essays from the U.S.-Mexico Border*, El Paso: Cinco Puntos Press, 1991. Copyright 1990 by Debbie Nathan. Reposted here with explicit permission of Debbie Nathan. Direct reposting requests to mc@ncrj.org.]

# The Ritual Sex Abuse Hoax

## by Debbie Nathan

### After the First McMartin Trial

The eight kids sitting in Geraldo Rivera's New York studio after the first McMartin trial ended could have stepped out of a candy bar commercial on Saturday morning TV. They gleamed with the healthy tans, shopping-mall clothes, and moussed sun-bleached hair of the southern California suburbs; their parents looked equally affluent. But these families were far from cheerful. "We were molested," a strapping blond teenager told the audience solemnly, "and that's an honest-to-God fact." When some of the children – most of them by now adolescents – described suffering flashbacks and night terrors, their mothers quietly dabbed at tears. Other parents seemed angry and driven. "The parents and children standing up here will not stop," said Marymae Cioffi, who since the beginning of the case had been organizing to convince the public and the courts that bizarre sex abuse claims at places like the McMartin preschool should be believed.

As Cioffi spoke, her lips twitched in spasms of anger. The children sat politely. But when a relative of the defendants noted that the investigation had never produced any evidence against them, the eyes of a small, until then subdued 14-year-old boy suddenly turned to slits; his teeth bared and his lips trembled, just like Cioffi's. For even though the jury had completely exonerated Peggy McMartin Buckey while acquitting her son Ray on most counts and deadlocking on the rest, Geraldo's guests insisted their former teachers really were sadistic sex criminals.

Gerald reminded the audience that defendants are innocent until proven guilty. But he also asked whether the acquittals spelled doom for child abuse prosecutions, and titled the program "The McMartin Outrage: What Went Wrong?" Finally, when he patted the children's shoulders and remarked on their "sincere pain," it was clear this show was adding to the pressures that would lead to the current retrial of Ray Buckey on eight counts involving three girls.

What Geraldo neglected to mention was that none of these children had ever taken the stand: since McMartin first hit the media in 1984, his guests' accusations had been so consistently bizarre and illogical that their testimony would only have damaged the case. There was 18-year-old Chris Collins, whose father belongs to a McMartin parents' group that believes the teachers are part of an intergenerational Satanic conspiracy. Collins, who insists that he was molested attending McMartin in the mid-'70s, remembers a room below the school office and "major, major sacrifices" connected with the "Satanic Church." The problem with his claim is that when Collins was at McMartin, Ray Buckey was in high school and, according to his mother, maintained a perfect attendance record – meaning he was never at the preschool when Collins was. Then there was round-faced, 10-year-old Elizabeth Cioffi. According to her father, she has talked about being molested under the school in tunnels lined with flashing lights and pictures of the devil.

APP.      0827

Irrationality pervaded the McMartin case from the beginning. The first allegation came from a woman later diagnosed as a paranoid schizophrenic. After Judy Johnson noticed one day in 1983 that her two-year-old son's bottom was red, she told police he said something about a man named Ray at his nursery school. In the next few weeks, Johnson accused 25-year-old Buckey of donning a mask and sodomizing her child while sticking his head in a toilet; of wearing a cape while taping the boy's mouth, hands, and eyes; and of sticking an air tube in his rectum. She also said Ray made the child ride naked on a horse and molested him while dressed as a cop, fireman, clown, and Santa Claus. Later, she claimed that the McMartin teachers, including Ray's 57-year-old mother, Peggy, jabbed a scissors into the boy's eyes and staples in his ears, nipples, and tongue; that Ray put her son's finger into a goat's anus; and that Peggy killed a baby and made the boy drink the blood. She also told the D.A.'s office than an AWOL marine and three models in a health club had raped her son, and that the family dog was sodomized as well.

Within a few months, Peggy, Ray, his 28-year-old sister, his 77-year-old wheelchair bound grandmother, and three other women teachers would be jailed and charged with hundreds of counts of sex abuse. During the investigation, some parents would claim that hundreds of Los Angeles-area children were brutally molested in several day-care centers, over a 20-year period, by a conspiracy of Satanic child pornographers. Children would talk about playing the "Naked Movie Star" game, about being photographed nude, about sexual assault in hot-air balloons, on faraway farms, on the shoulders of busy highways, in cemeteries, in tunnels under the school yard.

The McMartin School was painstakingly probed for tunnels. None were found. Neither was child pornography, nor witnesses from the traffic-filled freeways, nor any other evidence. Doctors' findings of physical abuse were later debunked by medical researchers. Child protection experts have since criticized the prosecution's social workers for using leading, suggestive interviewing methods that resembled brainwashing. Judy Johnson was hospitalized for psychosis in early 1985 (she later died of an alcoholism-related liver disease.) An assistant D.A., who quit the case and then helped the defense told the press over three years ago that the woman had been mentally ill when she made her first charges – information the McMartin jurors were never allowed to hear.

But none of these revelations seemed to dampen the prosecutors', the media's, or the public's need to believe horrible things had happened at McMartin. For the first two years, the press slavishly trumpeted every illogical accusation, so that when charges against five women defendants were dropped in 1986 – after the Los Angeles D.A. called the evidence "incredibly weak" – polls showed that most people still thought that abuse had occurred at the pre-school. During the subsequent, almost three-year trial, neither the *Los Angeles Times* nor the rest of the metropolitan media bothered to critically dissect the case.

Finally the verdicts were announced, but the fact that they were overwhelmingly not guilty didn't seem to matter much either. In each of the 13 hung decisions, from 7 to 11 jurors decided in Buckey's favor, but this was glossed over by the press. So were the comments of jurors like Darryl Hutchins: he said that during deliberations he decided that Ray Buckey had molested the first child, but that he would have voted differently had the judge allowed testimony about the mother's mental illness – or the defense's contention that while the McMartin defendants were in jail, the little boy was molested by his father.

Refiling counts that most of the jury has rejected is almost unheard of. Immediately after the verdicts, however, McMartin parents began a media campaign to push the D.A. to prosecute

APP.    0828

Ray Buckey a second time. Again, the press dealt uncritically with the pressure. On tabloids like *Geraldo* and *Oprah*, support for a retrial was overt; "responsible" media like *The New York Times* were more subtle, suggesting, for example, that the jurors in the first trial were "stymied" by "the malleable memories of children and the distorting effects of questioning, particularly when a child has been traumatized." Hardly anyone acknowledged that most of the jurors had concluded the children had likely not been abused, except possibly by their own relatives and certainly by the investigation itself.

## A National and International Panic

Clearly, the public had come to believe that something as monstrous–sounding, yet as patently absurd, as McMartin was eminently imaginable. So imaginable in fact that a rash of similar cases surfaced across the country. A month after the McMartin investigation started, a Jordan, Minnesota, garbage collector accused of molesting three girls told authorities several local families were in a child sex ring. The charges against the middle-aged couples met widespread disbelief. But as neighbors stepped forward to support the accused, they, too, were arrested – the children had named them as perpetrators. Stories of ritual and slaughter emerged after the children were removed to foster care and many were interviewed more than 30 times apiece. The murder tales were later deemed fabrications, and some children admitted they lied to get relentless interviewers to leave them in peace. A husband and wife were acquitted, charges against 21 others were dropped, and the garbage collector confessed to inventing the charges in hopes of getting a lighter sentence.

In Chicago, a child told her mother that a day-care janitor had tickled her vagina. During repeated interviews, some 300 other children accused 40 teachers of abusing them during Satanic rituals, complete with baby killing. No physical evidence was produced; the janitor was tried anyway and acquitted. Several other cases surfaced, and by 1985, McMartin parents with media connections were collaborating with ABC's "20/20" on shows claiming that "Satanic" crime and day-care abuse were epidemic. Other journalists ran with the story, disregarding the lack of evidence. Meanwhile, prosecutors, police, and social workers were attending nationwide conferences to "network" with "experts" on Satanic kiddie-porn conspiracies and learn how to root them out of nursery schools. There was a wave of cases that year, among them one in El Paso, Texas, where two women teachers were accused. Investigators were in touch with McMartin child interviewers and with Satanic Conspiracy theorist Ken Wooden, who helped produce the "20/20" series. The preschoolers never testified; instead, parents described their children's "outcries" since the investigation had started, and behavioral changes like masturbating, urinating on walls, and assuming "sexual" postures. The teachers were convicted.

In these and some thirty others covered by the Memphis Tennessee *Commercial Appeal* in a 1988 series, journalists noted striking similarities in what child protection officials dubbed "ritual abuse" cases. Investigations usually began because of vague medical symptoms or after an upper-middle-class child did something that adults thought inappropriately sexual. Then, even though most sexual abuse occurs within the family, investigators immediately directed their inquiries outside the home. Sometimes they even suspected community sex rings, but most often they focused on elite childcare centers. The first allegation sometimes seemed plausible. But in remarkable departures from forensics, police, social workers, doctors, and therapists badgered children to name more victims and perpetrators, ignoring answers that contradicted a ritual abuse scenario. As a result, many men were charged; but women were too, and this was especially shocking, since females have not been thought of

APP.     0829

as child molesters, much less sex torturers.

From 1984 to 1989, some 100 people nationwide were charged with ritual sex abuse; of those, 50 or so were tried and about half convicted, with no evidence except testimony from children, parents, "experts" expounding on how the children acted traumatized, and doctors talking about tiny white lines on anuses or bumps on hymens – "signs of abuse" that later research would show on nonabused children. By 1986, in many states, hastily reformed criminal statutes made it unnecessary for children to come into court; parents could act as hearsay witnesses, or kids could testify on closed-circuit TV, giving juries the automatic impression that defendants had done something to frighten the child. And once a person stood accused, the community often decided that *something* must have happened. Any remaining skeptics were blasted for "condoning child abuse" and some were accused themselves.

As the cases snowballed, many parents were skeptical, but therapists told doubters that unless they believed the allegations, their children would be further traumatized. Anxious, guilt-ridden parents formed organizations with names like Believe the Children, the group begun by the McMartin parents. Besides offering psychological support, these groups helped prosecutors put together cases, did media promotion, and lobbied for laws allowing children to testify outside the courtroom.

Despite the support they received from adults, instead of getting calmer as time passed, many of the children showed increasingly traumatized behavior, such as flashbacks. Their tales of abuse followed a pattern; at first they said they were merely fondled; later in the investigation, they mentioned rape, sodomy, and pornography; then they progressed to increasingly bizarre scenarios. Across the country, the molesters were described as black men, mulattos, deformed people, or clowns; the abuse took place in churches; adults wore masks and costumes; they urinated and defecated on children; they burned, stabbed, cooked, or drowned babies; they sacrificed animals; they molested children in funeral homes and buried Barbie dolls. Extensive investigations have failed to turn up material evidence to support any of those claims.

In a 1987 case in Holland, the authorities decided there were no culprits at all. A four-year-old boy in the town of Oude Pekkela returned home from a play area with a bloody anus. In the next few months, some 100 children told authorities that German pornographers dressed as clowns had kidnapped, molested, and tortured them in Satanic rituals, and as time passed they acted more and more traumatized. But after a massive investigation, officials concluded that the four-year-old had poked himself with twigs while playing with another preschooler; that no German pornographers – or any other molesters – had ever existed. And in suburban Philadelphia, where an investigation began last year into claims that a teacher and her 68-year old aide ritually assaulted three girls with excrement, the Bucks County D.A. dismissed the allegations as hysteria. Still, an unquestioning belief in ritual sex abuse in the U.S., Canada, and other post-industrial countries remains the rule. Here, not only religious fundamentalists and the unschooled, but large numbers of literate, secular people seem ready to accept the idea that scores of people in crowded daycare centers could engage hundreds of children in vicious – not to say extremely messy – assaults, and yet leave neither a scintilla of physical evidence nor an adult material witness. What's going on?

In a sense, nothing new. Moral panics – the Salem witch trials and McCarthyism, for example – have often run rampant through cultures in flux, and "ritual abuse" is today's

APP.     0830

mythic expression of deep-seated worries over sweeping changes in the family. Since the 1970s, the number of working women have risen, and so have the divorce rates and female-headed households. Children are being socialized less by family authority and more by the media and its consumerist focus on the erotic, yet AIDS has imbued eros with a new danger. All these changes spell anxiety. For conservatives, they are literally sinful, and since moral traditionalists hate public day-care, a right-wing impulse to demonize childcare workers is not surprising. But many feminists and progressives have bought into the hysteria, too: ritual abuse panic has become an outlet for women's rage at sexual violence and harassment. While this anger could hardly be more justified, it has increasingly been articulated through an anti-sexual current in the feminist movement, a current that jibes with the views of conservatives who loathe pornography – and who also fear women, their need for day-care, their independence, and their sexuality.

## The Denial — and Redefinition — of Incest

Until recently, generations of silence and denial shrouded the problem of child sexual abuse, especially incest. Academic literature had long described it as a one-in-a-million event, and when women and girls told therapists and child protection authorities they had been molested, their stories were usually dismissed as nasty figments of the female psyche. But by the mid-70s, as feminists were fighting this society's tendency to belittle and disbelieve women's rape reports, theoreticians like Florence Rush began eloquently arguing that children – especially girls – had the same problem when they tried to talk about being sexually abused. Meanwhile, several studies reported that one out of every hundred women remembered having sex with fathers and stepfathers – and that did not even include experiences with other family members like uncles. By 1980, thanks largely to feminist efforts to create and publicize reporting systems, the government tallied almost 43,000 cases of sex abuse annually, up from a few thousand only a few years earlier. Most perpetrators were fathers and other male relatives and most of the victims were girls.

Feminists who analyzed incest defined it as inherently victimizing the daughter; they said her extreme dependence on her family and the men in it meant she could not give meaningful consent to sex. But then they made a dubious leap: they began applying their perspective on incest to non-relatives. Judith Herman, in her 1982 book, *Father-Daughter Incest*, wrote that any sexual relationship between an adult and a child, even if the child is a teenager, "must necessarily take on some of the coercive characteristics of rape." Florence Rush compared children choosing adult sex partners to chickens meeting up with hungry foxes.

Actually, studies show that the realities of transgenerational sex outside the family, where individual adults wield a good deal less power over children, are more ambiguous. Most male pedophilia consists of caressing and fondling. For most children, these experiences appear to be at best confusing, at worst traumatic. But others seem to willingly participate, and some adults recall that while still legally minors they accepted, even welcomed sex with grownups. (Many gay men, for example, say they instigated these encounters, and some suggest that such relationships offer the boys the only real possibility for healthy acculturation into homosexuality.) Nonetheless, the prevailing feminist view of child sexual abuse broadened its meaning to include, without distinctions, any contact between someone below the age of consent with someone older – even if that meant ignoring how the younger partner remembered the incident.

APP.    0831

In the early 1980w, feminist sociologist Diana Russell asked women to remember any unwanted sexual contact before age 18, including with boyfriends of the same age – "sexual contact meaning anything from anal intercourse to glimpsing a flasher to an unwelcome hug." She also asked women to recall "incest," defined as sexual contact between relatives (even distant ones) more than five years apart in age. By Russell's standards, tongue kissing between a 13-year-old and her cousin's 19-year-old husband would be considered incestuous and therefore exploitative, even if the woman remembered enjoying it. Using her extravagantly broad definitions, she found that one in five women were "incest victims" and more than half suffered child sexual abuse. Because the media quoted this and similar studies without explaining how diverse the reported experiences were, it suddenly seemed to the public that little kids were in imminent danger of being raped.

## Cultural Anxiety About Child Safety

But even before feminist anti-sex abuse efforts had begun, a national fear was growing that terrible, previously unheard of perversities were endangering children. It began with rumors of Halloween sadists. In 1970, *The New York Times* reported that the "plump red apple that Junior gets from a kindly old woman down the block … may have a razor blade hidden inside." By 1972, many kids were not allowed to trick-or-treat; three years later *Newsweek* warned that several children were dead and hundreds more injured by viciously doctored Halloween candy. A few years later, kiddie porn was the new threat. In 1977, NBC reported that "as many as two million American youngsters are involved in the fast-growing, multi-million dollar child pornography business…" and "police say the number of boy prostitutes may be as high as half a million" (some 10 percent of all male adolescents in the entire country).

Then, in the early 1980s, following the New York City disappearance of Etan Patz, the kidnapping and slaying of Adam Walsh, and the murders of 28 Atlanta schoolchildren, the missing children's movement emerged. Crusaders began describing a stranger abduction problem of astonishing proportion: U.S. Representative Paul Simon offered House members a "conservative estimate … 50,000 children abducted by strangers annually," and a leading child-search organization said 5000 of these children were murdered each year.

Research by journalists and sociologists has debunked all these claims. In the entire U.S., only one child has ever been killed by Halloween candy – and the poison was put there by his own father. Only 18 injuries were reported nationwide during the 25 years before 1984, the most serious one a wound requiring some stitches. Some of these were hoaxes or fabrications by attention-seeking kids. As for kiddie-porn, it's estimated that even before 1978, when all production and commercial distribution of such material was banned under federal law, only about 5000 and 7000 children were involved worldwide. Since then the commercial market in America, miniscule to begin with, has been virtually wiped out.

Research into claims about mass kidnappings likewise deflates the hype: a recently released Justice Department study finds that almost all missing children are teenage runaways and throwaways. The typical kidnapping is committed by a divorced parent who has lost custody. As for stranger-abductions, the Washington D.C.-based National Center for Missing and Exploited Children currently lists about 240 children missing in the entire country. Still, much of the American public is convinced that molesters, sadists, kidnappers, and pornographers are major threats to our kids.

APP.    0832

# Paranoia about Satanism

This fear has been reinforced by yet another strand of irrationality – the rise of paranoia about Satanism. Religious belief in child-torturing conspiracies of devil worshippers – whether Christian, Jewish, or Satanist – has flowered and withered since the early days of the Church. Lately, the belief has resurged in the U.S. and gained widespread acceptance ′ via tabloid media like *Geraldo*. Things have gotten so far out of hand that last year a Texas school district told students they could no longer wear T-shirts with peace symbols, since self-styled experts on Satanism say the design represents the devil. Another popular belief, that Satanists kidnap blonde virgins for sacrifice, cropped up nationwide in 1997 and 1998, and spawned a wave of what sociologist Jeffrey Victor calls "rumor panics": townspeople from Montana to Maine banned library books, armed themselves into vigilante squads, and raided purported "covens" that often turned out to be nothing more than teen punk-rocker hangouts.

The latest Satan scare has its roots in 1970s fundamentalism. In *The Late Great Planet Earth* and *Satan is Alive and Well on Planet Earth*, both of which sold millions of copies, Christian TV celebrity Hal Lindsey decries the corrupting influence of the "New Age" '60s, yearningly prophesies the end of the world and Armageddon, and warns of the sinister power of rock music, witches and devil worshippers. Meanwhile, many white teenagers shocked their elders by reading popular works about Satanism, scrawling "666"-style graffiti, and listening to the music Cardinal O'Connor, in his recent "exorcism" sermon, called pornography in sound.

During the late '70s, "urban legends," or modern folk rumors, about devil worshippers spread across the U.S. One tale had it that Ray Kroc, former owner of McDonald's, had tithed his hamburger profits to the church of Satan in exchange for prosperous Big Mac sales. Another was that Procter & Gamble's century-old moon-and-stars logo was a secret Satanic symbol. (The rumor got so out-of-control that the company had to change the logo in 1985.)

## "Recovered" Memories and MPD

Another evolution in the popular zeitgeist was signaled by the 1980 release of *Michelle Remembers*, coauthored by Lawrence Pazder, a Catholic psychiatrist from Vancouver, and his wife and former patient, Michelle Smith. The book recounts how Smith, in treatment for depression, underwent months of hypnosis and "remembered" being imprisoned at age five by her mother and a group of Satanists. She said she was locked up, buried with snakes, smeared with human waste, raped with candles and crucifixes, and finally forced to destroy an infant. Smith's therapy consisted of more hypnosis, prayers to the Virgin Mary, and exorcism.

There is no confirmation that anything Smith "remembers" occurred. Psychiatric anthropologist Sherrill Mulhern, who has reviewed tapes of sessions similar to Pazder's and Smith's, says patients retain an unshakable belief in whatever a therapist suggests under hypnosis. Smith's "memories," Mulhern says, were probably constructed piecemeal, with Pazder introducing the Satanic motifs. Still, *Michelle Remembers* became a "non-fiction" bestseller, and the authors appeared on national Christian talk shows. Another self-styled cult survivor had her story published in a tabloid, and by 1983 the FBI was getting calls from women around the country, claiming they too had escaped devil-worshipping cults.

APP.    0833

Their stories hardly varied: the cults were part of a generations-old, international conspiracy including prominent people, and practiced rites like the ones in *Michelle Remembers*; they also kidnapped and sacrificed children, which explained the country's thousands of missing kids.

According to Kenneth Lanning of the FBI, at first the agency took the stories seriously. Perhaps there were a few isolated cults, maybe they could have killed some children. Authorities nationwide began digging up reported burial sites, but found nothing, and Lanning's doubts increased as "survivor" reports mushroomed (the FBI now gets a call a day). "If the cults were real," he says, "they would constitute the greatest conspiracy in history."

Who, then are these "survivors" and what's their connection to ritual abuse accusations? Sherrill Mulhern, who has spent years studying traditional cults and modern groups like Jonestown, began researching the "survivors" and their therapists about five years ago. She soon realized that she was looking not at a real cult, but at people linked by a delusionary belief in one.

Many "survivors," Mulhern says, are former teen runaways who lived on the streets and took up prostitution – behavior typical of incest victims. Many have abused drugs that produce paranoid delusions; many have been treated for schizophrenia and for borderline personality, which is characterized by compulsive lying. More recently, many have been diagnosed by therapists as suffering from multiple personality disorder. And virtually all had fundamentalist Christian parents or later converted. While being "born again," they were often hypnotized by fellow "survivors" of by self-styled Christian spiritual therapists.

The public knows about multiple personality from *The Three Faces of Eve* and *Sybil*. This diagnosis – which was called double consciousness in the 19th century and later fell out of favor – has been officially resurrected during the past 15 years by the American psychiatric profession. A century ago, Freud's term for multiple personality was hysteria, and he first treated hysterical women during the 1880s. When hypnotizing deeply religious Catholic patients, Freud was struck by how many told trance tales of being raped by black-robed Satan worshippers, stories identical to those told by women during earlier witch trials. He speculated that these stories were actually sadomasochistic fantasies overlying memories of real childhood incest but articulated in the language of religion.

A century later, therapists started hearing the same tales again. This time around, they weren't so willing to call them fictions. The new, unqualified belief that all womens' and girls' rape and incest stories were true reflected the reemergence of that strain in feminist thinking that condemned all sexual impulses as merely forms of male domination. In this view, men were inherently predatory, obsessed with penetration and violence – or, as Andrea Dworkin put it, "the stuff of murder, not love." Women, on the other hand, wanted gentle, not-necessarily-even-genital-sex. By analogy, children were just as pure.

Feminists like Diana Russell, Florence Rush, and Dworkin denied that sadomasochistic acts or thoughts could be erotic for women. Russell viewed them as inventions of the patriarch and reflections of women's powerlessness; Rush, in her groundbreaking work on sex abuse, *The Best Kept Secret*, disapprovingly connected the "uncensored erotic imagination" with "the total freedom of the sadist." Besides being theoreticians, these women were also activists in Women Against Pornography, which was lending the right's anti-porn crusade a

APP.      0834

modern "progressive" aura by arguing, despite the lack of evidence, that representations of women being wounded or sexually dominated by men cause sexual violence. At the same time, many therapists who considered themselves feminists adopted the belief that when patients bring up fantasies, dreams, or memories of coerced or brutal sex, they can never be products of the erotic imagination; they must really have happened – and anyone who says otherwise is an apologist for patriarchal violence.

This was the complaint lodged against Freud. During his early career, when female hysterics told him they had been seduced during childhood by their fathers and other adults, Freud believed them; he concluded that such violations were common and led to neurosis. Later, he decided many of the stories were untrue. Freud undoubtedly ended up underestimating the prevalence of abuse, though he never dismissed all his patients' seduction stories. To explain the others as fantasies, he developed the theory of the Oedipus complex.

In recognizing children as intensely sexual beings, the theory was revolutionary. But its assumption that all women envy men their penises helped reinforce sexual stereotypes and encouraged therapists to mindlessly dismiss women's memories of childhood molestation. Not surprisingly, then, Freud's theories of sexuality were later just as simplistically attacked by feminists eager to conflate sexuality with male violence. Their criticisms were most forcefully articulated in 1984, with the publication of Jeffrey Masson's *The Assault on Truth: Freud's Suppression of the Seduction Theory*.

And even as Masson institutionalized Freud-bashing, women and children were telling therapists and police rococo tales about sadomasochistic, diabolical assaults. How could these bizarre stories be true? But then, hadn't we learned that sex abuse was much more common than previously thought?

The stage was set for McMartin hysteria.

## The McMartin "Investigation" and "the child sexual abuse accommodation syndrome"

In 1983, as part of his upcoming, hotly contested reelection campaign, the Los Angeles district attorney commissioned a survey asking voters to name their biggest crime concerns. He was surprised to learn that their main worry wasn't drugs or drunken driving – it was child abuse. At about the same time the pollsters were at work, a mentally ill mother was telling Los Angeles County authorities *Story-of-O* tales about the McMartin preschool. Following her first accusations, police sent 200 letters to parents, listing specific questions to ask their children about whether and how Ray Buckey molested them. Virtually all the children denied being abused. Nevertheless, at the suggestion of the prosecution, panicked families made appointments at the Children's Institute International (CII), a Los Angeles abuse therapy clinic.

There, social workers plied the children with puppets, suggested ritual abuse scenarios, coaxed recalcitrant kids to "pretend," and said that if they didn't tell the "yucky secret" it meant they were stupid. This interviewing method followed from Los Angeles psychiatrist Roland Summit's "child sexual abuse accommodation syndrome," a theory about incest. Summit argues that if there is evidence of sex abuse and a child denies it, this is only further proof that it happened and a therapist should use any means necessary to help the child talk.

APP.    0835

When this technique was applied to criminal investigation, there wasn't supposed to be any problem with false allegations. Research has since suggested that as many as one in twelve sex abuse reports are fabricated, that in divorce custody disputes, the rate may be as high as one in two, and that a disturbingly common source of false allegations is mentally ill mothers who injure their children, even genitally, to get attention. But in 1984, few were thinking about such issues – conventional wisdom was that since children are innocent beings, they never lie about sexual abuse. If they later recant, that means they are under family pressure to protect the father – and their turnabout is further proof of the crime.

So no matter how much coercion was used to get an accusation and no matter if a child later retracted it, once Summit's incest theory was applied, a charge of abuse became irrefutable. Child protection workers ignored the fact that this logic had little to do with day-care. After all, why would children staunchly deny abuse to protect an adult who wasn't part of the family? And if they'd been so brutally attacked at school, why wouldn't they tell their parents?

Therapists and investigators came up with all sorts of rationales. One was that the teachers threatened them by slaughtering animals and warning that the same thing would happen to their parents if they told. Kids who revealed nothing were said to have split off unbearable memories and developed amnesia. Following this line of thinking, it's not surprising that some investigators and psychologists used hypnotic suggestion to get children to "remember" abuse; more typical was endless interrogation, much of it done by parents.

In imposing such techniques, adults no doubt injected their own motifs into allegations. Indeed, there is evidence that the details in ritual abuse charges come more from grown-ups than children. Lawrence Pazder, coauthor of *Michelle Remembers*, told the *San Francisco Examiner* he acted as a consultant to Los Angeles police investigating McMartin and to parents nationwide; McMartin parent Jackie McGaulley has confided she met with him during the early days of the investigation. Around the same time, Ken Wooden, the Satanic conspiracy theorist, mailed information to 3,500 prosecutors describing what to look for in ritual abuse cases. Women claiming to be survivors contacted McMartin investigators and parents; some even joined parents at nationwide child protection conferences to speak about ritual abuse. Meanwhile, prominent psychiatrists like Bennett Braun began appearing at symposia on multiple personality, telling colleagues that a fourth of the women with this diagnosis are escapees from cults organized like the "Communist cell structure." Soon, other therapists would be carrying guns for protection against devil worshippers. And soon, more and more prosecutors would make front-page news by leveling charges of unspeakably sadistic rape, sodomy and terrorism against people whose only previous experience with the law was in traffic court.

Yet Satanism as a motive in ritual abuse cases didn't always wash: Though prosecutors tried to keep it quiet, if the public or jury found out that the accusations included the belief that the defendants danced around in covens, cases tended to become laughingstocks and collapse. (Indeed, the phrase *ritual abuse* was coined by child-protection people worried that *Satanic abuse* would evoke public disbelief.) So prosecution-minded child-protection activists tried to develop sensible-sounding explanations for why ordinary people would suddenly get the urge to stick swords up toddlers.

### The New Psychology of Ritual Abuse

APP.     0836

To do this, common sense had to be reformed. Nobody, not even the most jaded of cops, had ever heard of people with no relationship to enragé politics or cults and with no mental health problems practicing intricate sexual tortures against little children in nursery schools. The situation was akin to the dilemma faced by inquisitors during the witch trials, when one of the biggest issues was how to *physically* identify a consort of Satan. The accused would be stripped and a search would ensue for "devil's privy marks": warts, scars, and skin tags, especially on the genitals. Such blemishes were said to prove the bearer had a compact with the devil. Three hundred years later, bodily flaws wouldn't do. Now what was needed was a new psychology.

Serious research was no help. Most male molesters and pedophiles who commit non-violent offenses score normally on psychological tests, but one would expect a Rorschach to ferret out something remarkable about a person who rubs feces on toddlers and barbecues babies. Nevertheless, batteries of exams given to ritual abuse defendants turned up virtually nothing unusual. This was especially remarkable when it came to women, since the few female child molesters mentioned in earlier medical literature had invariably been diagnosed as mentally retarded or psychotic.

But in the 1980s, rapidly increasing reports of incest included several cases with female perpetrators. Recent studies suggest that these women are unusually emotionally disturbed, abuse drugs, and were themselves incest victims. When molesting their children, they do it nonviolently, by fondling them during diaper changes, for example; and they often feel ashamed and turn themselves in. Others report helping their husbands molest their daughters. These women seem to share many traits with battered wives, and after escaping abusive marriages, some have willingly confessed their former complicity.

As soon as female incest offender studies were published in the mid-1980s, prosecutors of ritual cases rushed to pound the accused into the profiles. In most cases, it takes a huge stretch of the imagination to link ritual abuse defendants with incest offenders. Accused groups have usually contained more women than men, and that doesn't fit the battered or dominated wife profiles. And virtually all the defendants have insisted they are innocent even after generous plea bargaining.

Nevertheless, zealous child protection authorities keep trying to suggest "profiles," even if it means fictionalizing defendants' lives. In several cases, with no supporting evidence, officials have told journalists that the accused were "abused as children." In others, prosecutors have intimated that benign activities, often having something to do with sex, reflect psychopathology. In one case, a middle-aged married woman had an affair (with a man) while she was working at a preschool; one week, when she was considering leaving her husband, she signed the daily attendance sheet with her maiden name. At trial, the prosecutor displayed the signatures and implied the woman was mentally ill.

Another profile gained popularity after the 1985 Meese Commission hearing where critics of adult pornography were joined by spokespeople for the kiddie porn, missing children, and ritual abuse panics. Appearing with a chart supposedly describing confessed and convicted male sex abusers, the FBI's Lanning advised cops to check whether a suspect seemed Regressed ("low self-esteem"); Inadequate ("social misfit"); Morally Indiscriminate ("a user and abuser of people"); Sexually Indiscriminate ("try sexual – willing to try anything"). Though this typology is about as scientific as a horoscope, Lanning, a vocal Satanic-conspiracy-theory skeptic, has cautioned his chart wasn't developed for women or ritual abuse defendants – which hasn't kept prosecutors from using it.

APP.    0837

Even so, the search for a more convincing profile goes on. In response to true believers' urgings, the federal government followed Meese Commission recommendations and funded studies that accept, a priori, the validity of ritual abuse charges. In 1985, the University of California at Los Angeles got $405,000 to monitor into adulthood the "coping" skills of children allegedly molested in local preschools, though authorities later dismissed virtually all their stories as unbelievable.

One researcher for this study is sociologist David Finkelhor, a self-styled sexual progressive and longtime colleague of feminist Diana Russell. Finklehor got a grant to profile day-care sex crimes. Again, most of the cases he researched had so many investigative and evidentiary flaws that they never made it to trial. Except for idle speculations, Finklehor found nothing remarkable in ritual defendants' histories or personalities. But instead of asking if this meant the charges were false, he implied that since the accused are normal, being normal is part of the typology of the ritual offender. With this sleight of hand, the study, titled *Nursery Crimes*, immediately became a bible for child protection fanatics eager to supply incredulous communities and journalists with a "scientific" rationale for their paranoia.

## The Margaret Kelly Michaels Case

The updating of ritual abuse hysteria with pop psychology is vividly illustrated in New Jersey's Margaret Kelly Michaels case – the northeast's version of McMartin. Michaels, a teacher at a suburban Newark day-care center, was accused in 1985 of assaulting preschoolers sexually with peanut butter, swords, bloodied tampons, urine, feces, and terroristic threats. She was said to have committed these crimes against dozens of children daily, for seven months, in a crowded facility, without any adults seeing her and without leaving any physical evidence.

After investigators made all the mistakes that characterized McMartin, they still had no evidence that Michaels was in a cult. So they searched for psychopathology. Again, nothing strange in Michaels' background. They pressed on anyway. To fit her into the incest offender profile, prosecutors played up unfounded rumors that her father fondled her during jailhouse visits. At a preliminary hearing, they brought in the FBI's Lanning to "instruct" the judge that women don't have to be psychotic to molest children. Both in court and off the record, the prosecutors plugged Michaels into anything that passed for a profile, even those developed for men. They suggested she was "dissociated" – i.e., a multiple personality – because she did dance exercises at the day-care center while looking "spacey." They implied she was a pedophile – a term never before applied to women – because she took photographs at the playground. And the fact that Michaels adamantly insisted she was innocent was supposed to mean she was "morally indiscriminate." As proof of her cunning, prosecutors told the jury that during one psychological evaluation, Michaels drew a person with one foot turned inward; but another time she drew it pointed out!

With such nonsense offered – and largely accepted – as "motive," it was unavoidable that Michaels would be demonized for any sexual behavior not conforming to the strictest traditional standards. At her women's college, for example, she had experimented with lesbianism. The prosecution insinuated that Michaels' homosexual experiences and the fact that she had not slept with a man until age 25, were proof of "confusion" that would cause her to torture children. Michaels was ultimately convicted on 115 counts of abuse. The case against her, permeated as it was by the testimony of social workers and psychologists,

APP. 0838

exchanged open talk of Satanic conspiracies for a secular, feminist-sounding idiom that nevertheless couches a profound hostility towards women and a loathing for any erotic impulse.

Even children's play with each other is becoming suspect. Abuse-finders now worry that preschoolers who play sexually with their peers may be "perpetrators" or pedophiles-in-the-making. CII, the Los Angeles clinic known for its abominable McMartin interviews, is now treating "offenders" as young as four years old if they have so much as "verbally cajoled" a younger child into sex play that CII deems not "normal." While researchers say most of the "offenders" were themselves sexually abused, the clinic's history of eliciting false allegations makes any such claims suspect. More telling is the CII therapists' disapproval that some of their little girl patients said they acted sexually not out of "love and caring," but simply "to feel good."

While such rhetoric may still be patently laughable, repressing older kids is another story. Teenagers are increasingly victimized by laws denying them access to birth control, confidential abortions, or a sense that sex is anything more than a deadly disease. The trend is now justified via the rhetoric of "child protection"; in Arizona, after a law passed mandating teachers and counselors to report sex abuse victims, officials in the state's largest school district gathered the names of sexually active students and handed them over to the cops.

### Edenton, North Carolina

Meanwhile, in divorce disputes and especially on the day-care front, hysteria continues unabated. Across the country, more and more losers in custody battles are accusing spouses of being Satanic cult sex abusers. And since 1989, the town of Edenton, North Carolina, has been disrupted by charges that five women and two men associated with an elite preschool molested, raped, and filmed sex acts with 70 young children and infants. Earlier in the investigation, officials said they had photographic evidence of the crimes, and the D.A. claims the children have made most of their allegations to therapists. But the only "evidence" to emerge is one Polaroid photo, found in a woman defendant's home, of her having sex with her fiancé (an adult); at least one therapist is giving Satanism and ritual abuse seminars around the state, and some parents of the alleged victims are active in Believe the Children.

The North Carolina kids' stories have unerringly followed the ritual abuse plot, progressing lately to tales of witnessing babies slaughtered. Perhaps not coincidentally, their most bizarre allegations began surfacing this past fall, around the time that 27 million viewers watched *Do You Know the Muffin Man?*, a CBS move that rehashed details from several ritual abuse cases, but included the wholly fictional climax of parents discovering day-care teachers worshipping the devil amidst piles of kiddie porn. Or maybe the North Carolina children saw an earlier Oprah Winfrey show in which a Jewish woman, accompanied by her Jewish therapist, claimed to be a survivor of childhood cult ritual abuse and added that Jewish families had been sacrificing babies since the 1700s.

### The Lasting Damage Done by McMartin

A few months later, during the taping of the *Geraldo* post-trial show, the McMartin children and their parents sat under bright lights and gave their names. Back at a Los Angeles studio

APP.    0839

hookup, a girl sat in a darkened area, anonymous. She told how when she was five she used to spend after-school hours with Ray Buckey helping him clean up classrooms, yet he never molested her. She recalled going to CII during the investigation, and how the therapists kept suggesting the details of ritual sex games before they even started up the tape recorder. Then they turned it on, all the while telling her things she'd never heard of, and insisting she repeat them.

She wouldn't, and now six years later, a boy sitting in the bright lights – one whose parents parade him on national TV and make speeches about Satanist sex abuse networks in Episcopal churches – glared at her silhouette and insisted she was really molested. The girl sat in the shadows, afraid to show her face or give her name. She and her family fear harassment – not for proclaiming she was raped, but for insisting she wasn't.

As for the children who sat in the light, their parents have invested years believing in demonic conspiracies and underground nursery tunnels. (Until recently, the parents were still digging. They came up with Indian artifacts.) They have spoken unremittingly of such things, to the world and to their sons and daughters. They have told their children, over and over again, that they were abused, then rewarded them for acting traumatized. They have put them in therapy with adult fanatics who have done the same, and enrolled them as guinea pigs in the "research" projects of zealots.

The McMartin kids, and hundreds of others in ritual abuse spin-offs across the country, have spent years trapped in clans now extended to include psychologists, social workers and prosecutors — clans whose identity derives from a tent-revival belief in their children's imagined victimization. Right wing devil-mongers may find the subculture to their liking, but the rest of us ought to recognize the harm it is wreaking, not only on civil liberties and the falsely accused, but also on day-care, on women's rights, and especially on children. Because the kids involved in this hysteria have indeed suffered, but not at the hands of their teachers. And the abuse perpetrated against them by the child-protection movement gone mad are every bit as awful as the tyranny of incest.

APP.    0840

███████, ████████, an Infant
under the age of 14 years, by his Mother
and Natural Guardian, ████████,
and ████████ and ████████,

                    Plaintiffs,

          -against-
HARRAN TRANSPORTATION COMPANY, INC.,
HICKSVILLE UNION FREE SCHOOL DISTRICT,
ROBERT IZZO and ANDERS QUINTANO,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - -x
HICKSVILLE UNION FREE SCHOOL DISTRICT,

                    Third-Party Plaintiff,

          -against-
ST. IGNATIUS LOYOLA SCHOOL,

                    Third-Party Defendant,

AND ALL OTHER RELATED FORK LANE ACTIONS.
- - - - - - - - - - - - - - - - - - - - - - - - -x



                    Nassau Supreme Court
                    Mineola, New York


                    May 13, 1994
                    10:20 a.m.



B E F O R E:
          Hon. Charles Marchese
          Judicial Hearing Officer

36

## *A Real Case*

# Learning to Love: The Trial Lawyer's 14 Challenges

By Henry G. Miller

**L**ove is blind, but a trial lawyer must see all. In painting your client's portrait, you must anticipate the warts. If you don't, your opponent will. You ignore the hostile gaze of a juror at your peril. Same for the judge. And what about co-counsel? You've known Tyrone (the Tiresome) for years. You never liked him. He never liked you. Now you have to work together. Worst of all, you don't like your case. The facts are tawdry. The file is thick. No one wants to try the case. In truth, you hate the case. You hate the judge. You hate the jury. You hate your client. You hate the lawyers with whom you have to work.

What do you do? Resign? Run away with Gaugin to Tahiti? Flee to a nunnery or a monastery? Fake a heart attack? Beg a colleague to replace you? Settle at any price? Cry and hope for an early quietus? No. You dig deep and take refuge in an old secret: Love the challenge as you love yourself. And this is a wise secret because it permits us to face every obstacle, no matter how challenging.

Let's take a real case and use it as a summary of all our approaches to the trial of a case. A case that may have been the longest civil case ever tried before a New York jury.

### A Real Case

Forty-eight children claim sex abuse. By one man. Their school bus driver. Hicksville, Long Island, 1987 to 1989. As to 16 of the children, the driver pled guilty. This was after having been convicted by a jury of sexually abusing Boy Scouts following an accusation from the son of a family friend. Then came civil lawsuits. The search for money.

***The Chronology*** Robert Izzo joined Harran Transportation Company, Inc., in September 1986. As a school bus driver in Hicksville, he was popular and well-liked by the children.

But less than three years later, on May 21, 1989, Izzo was arrested for molesting a young man, a charge which eventually included the Boy Scouts. Then in June, the Nassau County Police began an investigation regarding schoolchildren.

Izzo, a Hicksville resident, had been released from custody following his arrest. However, on July 21, 1989,

he was rearrested for allegedly sexually abusing schoolchildren. He has been in jail ever since.

Grand jury testimony was taken in the summer and early fall as to the young man and Boy Scouts. In October, a grand jury heard about the schoolchildren. Izzo was indicted. Two criminal trials were anticipated. One for the young man and the Boy Scouts; another for the schoolchildren.

The school case was to go first. Nineteen months had been spent focusing on that trial. But at the last moment the court switched the order and the Boy Scout case went first. That was in February 1991. Why a switch? Some of the schoolchildren had recanted. Only 20 days to prepare for the trial. After a full trial, Izzo was convicted in the Boy Scout case by a Nassau County jury. Both Izzo and his estranged wife, the mother of his two sons, testified.

Following that conviction, Izzo pled guilty on April 2, 1991, to abusing 16 of the schoolchildren, obviating a need for the second trial.

The first cluster of civil cases on behalf of the schoolchildren came on for trial in September of 1995 in the Supreme Court of Nassau County.

The plea of guilty put the plaintiffs in a powerful position.

***The Plea*** The plea of guilty in the schoolchildren case followed the Boy Scout conviction by less than two months in 1991. The assistant district attorney, Maureen Reardon, offered Mr. Izzo a plea of guilty to 38 counts



Henry G. Miller, a past president of the New York State Bar Association, is the senior member of the White Plains law firm of Clark, Gagliardi & Miller, P.C. He is the author of *Critical Lessons from a History of the New York Law*, published by New York Law Publishing, the trade book division of American Lawyer Media. His play *Lycenses* was performed at the Hamilton Theater and the Westport Country Playhouse. He has graduated *cum laude* from St. John's College and received his LL.B. from St. John's University School of Law.

**APP. 0841**

including rape, sodomy and sexual abuse in the first degree. She made the offer after Izzo had been convicted by a jury of sexually abusing the Boy Scouts. The district attorney's offer was contingent upon Izzo waiving his right to appeal in all cases. His sentences would run concurrently. He would serve no extra time. The offer was accepted. Izzo was not merely asked whether he pled guilty. He was asked specifically what he did. He explained. "My penis entered her vagina." That is, a five-year-old's vagina. He read from notes prepared, he believes, by the prosecutor.

After Izzo pled guilty, the parents had a party. It was very festive. Music, dancing and drink. The prosecutor, Maureen Reardon, as well as Charles Brennan, the lawyer representing the children in the civil cases, and some of the detectives were there. They had a lot to celebrate. A plea of guilty would probably be admissible in the civil case where not only Izzo would be sued, but where his employer, the Harran Transportation Company, and the school district of Hicksville, deep pockets, would also be sued.

Why did he take a plea? After his arrest in May of 1989 for molesting an older boy, an intense police investigation followed. The Nassau County Police Department augmented its sex abuse unit so that at one time at least 10 detectives were on the case. The police, although there were no complaints from the young children or their parents, began to interview them at great length. They obtained incriminating statements from the little children written by the police themselves. The parents were not present when the police interviewed the children. The children could neither read nor write. They were only five or six years old. They printed their names on the bottom of these statements, countersigned by their parents. Some of the statements were graphic. "I saw Bob kiss the boys on the lips. He would also touch the boys' penises with his penis." "He made me sit on his lap when his pants were down. He pulled down my pants and my underpants and he rubbed his penis against my butt and my front private spot. He put his penis where I make pee pee." This from a kindergarten girl. These statements were taken in the summer of 1989.

Robert Izzo drove these children during the school year starting in September 1988. At lunch time, he took the half-day morning class from school to home and the half-day afternoon class from home to school. The last time he drove was in early May 1989. He had gone to Florida for a short visit. Upon his return, he was arrested.

In October, Maureen Reardon swore the children to testify before a grand jury. Swearing six-year-old children is highly unusual. But there was no other corroboration, and legally she needed sworn testimony. Some

children would not testify despite having given statements to the police. Others gave watered-down versions of what the police had written in the statements. The grand jury indicted Izzo.

On the recommendation of the police, the children were sent to North Shore Hospital for extensive psychological therapy, lasting for months, in some cases up to a year. The therapists at North Shore, for the most part, assumed the children were abused. When the children would deny or forget the abuse, the therapists claimed that the children were in denial.

**The Client** How could anyone represent Bob Izzo, a convicted pedophile, in the civil cases? Our first challenge:

**1. Learning to Love Your Client No Matter How Unlovable.**

Enter Pat Crowe, of Agoglia, Fassberg, Holland & Crowe, assisted by Jocelyn Krystal. They undertook the defense of Izzo. There was a temptation to treat Izzo politely and competently but give no passion, no zeal, a cold defense. They resisted that gutless approach. Instead, they got to know their client.

Bob Izzo was an excellent candidate when Harran Transportation Company hired him. He had been in the Navy eight years, serving in Vietnam. He was married and had two sons. He grew up in Hicksville, graduated from its high school and still lived there in the family home owned by his father. To be a school bus driver, the law requires an investigation of one's background. He was fingerprinted. He had no record. Absolutely clean. Clear in drug testing. A very good driving record. On paper, a first-rate candidate.

He was a very popular driver, often requested by the parents. The children liked him. He ran a tight ship. He was quick to complain in writing if some of the kids, particularly the older ones, were unruly. There were two letters of commendation in his file. The dispatchers thought he was the kind of driver on whom they could depend. He would sometimes go to lunch with Dotty Watts, one of the dispatchers. She liked him. In fact, Dotty, who later became a crucial witness, testified that she used him as a photographer, one of his great interests, for her daughter's wedding.

A bond developed between lawyers and client. Some said Crowe's opening was the best they ever heard. Krystal's concern for Izzo was noticeable, bringing him help he couldn't get in jail like lunch and a clean shirt. It was contagious. It was noticed that the court officers, not usually hospitable to pedophiles, had a good relationship with Izzo.

However, there were some problems. It was claimed that Izzo once asked a teenage counselor for a date during a school summer program. But she may have looked as old as 20. However, this was never reported to the

9

bus company. A school clerk admitted that a mother once complained Izzo had touched the sleeve of her child's dress saying she looked pretty. It made her child uncomfortable. However, that mother was never called to testify.

More seriously, a letter from a clerk at St. Ignatius, a school in Hicksville, alleged that some children complained about Izzo. They thought he was weird. He raffled off candy. There was a dirty picture from a magazine on the floor. During the trial, the author of the letter testified that the only reason she put the complaint in writing was because the bus company requested it. She admitted she was asked to make the letter strong so that there would be a basis to change his route. She had no fear for the children's safety. The children had not come into her office to complain about Izzo; it was something that evolved during a conversation. She never wanted the man fired and there were no sexual overtones to the incident. Another judge on an earlier application called the letter sinister only in hindsight.

Izzo wrote a response. The children had been unruly and their complaint was an act of retaliation. Indeed he had filed a written complaint about one of the children from St. Ignatius before the children complained of him.

The Harran safety director investigated the complaint. He immediately searched the bus, found nothing wrong, questioned Izzo, put a report in the file and changed Izzo's route.

The bus company and the school district argued there was nothing in any of these complaints to suggest that Izzo was a child molester.

Three sets of lawyers in general agreement but with variations in their approach. And that's a challenge.

**2. Learning to Love Co-Counsel, Even When You Want to Kill Each Other.**

I, along with my partner, Bob Frisenda, and Lynn Rosenthal of the firm of Clark, Gagliardi & Miller, P.C., undertook the defense of the bus company. Almost all my trials are for plaintiffs, but this case was for old friends at the Greater New York Mutual Insurance Co. which had limited coverage for the bus company. The defense of Izzo went to Crowe and the Agoglia firm.

Stanley Orzechowski, along with Michelle Mittleman of the firm of Kroll & Tract, undertook the defense of the Hicksville School District. Stanley had been with the case from the beginning. My firm came in late, just for the trial.

There were built-in tensions. Crowe took the position that Izzo was railroaded into a plea. We, on behalf of the Deep Pockets, had other defenses. Also, there were differences between the bus company and the school district. And all three sets of attorneys had their own way of doing things, their own individual trial lawyer personalities. But we all had to hang together or assuredly we would all "you know what" separately.

**Strategy**

We, the Deep Pockets, began with the approach that we would gloss over the issue of whether Izzo did or did not do it. We had a strong defense. The bus company did nothing wrong. The abuse, if it did occur, was outside the scope of employment. The plaintiffs would have to prove the bus company and the school district knew or should have known that Izzo had a proclivity to hurt children. But we had a powerful answer to that. Who in their right mind would keep a bus driver if it was even suspected he had the slightest tendency to hurt children? We were not dealing with a person of rare skill such as a great athlete or performer. We were talking about a bus driver whose skills were easily replaceable.

A debate over strategy raged: "Don't go near the issue of whether Izzo did or did not do it. He pled guilty. Who would plead guilty unless he did it? Even if he didn't do everything, he must have done something."

My colleagues, Bob Frisenda, who supervised our preparation, and Lynn Rosenthal, both former assistant district attorneys from the Bronx, tried the case with me and they concurred. Beware of the "did he or did he not" issue. We didn't need it. We had a solid defense. "If the children's parents and teacher didn't know, how could we know?"

*A Troubled File* Being a trial lawyer who comes to a file late in a litigation has its drawbacks. There's much to learn. You have to read and then read and then read a little more. People may become trial lawyers because they like to talk, but they'd better like reading.

In this case, dozens of depositions and hearings had to be digested. Pleadings and motions perused. Precedents had to be analyzed. The investigation had to be revisited. Police statements had to be studied. It was work.

And running under the entire case was a sewer of foul accusations. Major sexual invasions of children of CONTINUED ON PAGE 12

CONTINUED FROM PAGE 10

tender years. Children at their most adorably innocent moment. Life is short. Who wants to be saddled with this kind of a case? And that brings me to the third challenge:

### 3. Learning to Love the Case That Even Good People Despise.

Despite all the tawdriness of the claims, there was an undeniable fascination at work. True or not, these claims drew back the curtain on a human being in a most private moment. There was the voyeuristic thrill one sometimes gets in the theater. We were privy to dark secrets. We were reminded: When it comes to sex, never be surprised.

Yes, it was a hard case to learn, but we were buttressed by Dame Hawthorne's wise dictum: That which is hardest to do is sweetest to have done.

Young lawyers should learn that lesson. The case in the office that no one wants to try is the case to covet. "I'll try it" should be their instinctive and unqualified response. Embrace it. Run to it. Make that case the love of your life. The rewards will be many.

And so it was with this case. It became a mesmerizing adventure.

*Strange Facts* Facts inconsistent with the plea of guilty came to our attention.

There was no physical evidence to corroborate the claims. The children had been taken to Long Island Jewish Hospital. There was no residual evidence of abuse in the vaginal or anal area of any child. The claims of abuse were not of light fondling. The claims included the big three of sex abuse: vaginal, anal and oral rape. Even if one were dealing with the most cautious pedophile who sought to leave no evidence of his vicious intrusions into five-year-old children, wouldn't there have been at least one lustful uncontrolled lunge that would have left an indelible mark? Wouldn't it be virtually impossible not to physically harm such a small delicate child?

None of these 14 kindergarten children had been in therapy for the last five years. If a child had been truly traumatized in such an ugly fashion, wouldn't some of them have needed some kind of continuing treatment?

These events supposedly took place in broad daylight during the lunch hour. In Hicksville, homes and buildings are close together. It is not a rural area where buses can hide. Yet, not one witness to any of these atrocious acts was ever found, despite an intense investigation following enormous publicity.

Maybe we should question whether the abuse took place.

*The Judge* But the trial was ready to begin. Time to decide on the Battle Plan. Time for the final strategy. Time to choose. Time to open. Much depended on the

judge. How strict would he be on the admissibility of evidence? How tight would the ship be run? It would be a long trial. Jurors almost always go with the judge, the most powerful personage in the courtroom. And it's always a challenge.

### 4. Learning to Love the Judge.

In this case, it was easy. People will accuse me of flattery. I don't care. Fair is fair and truth is truth. We had a splendid assignment.

The trial judge, Hon. Edward W. McCarty, III, permitted a relaxed atmosphere. He didn't insist we stand each time he entered the courtroom. But when counsel became too contentious, he stopped it fast. The mood was one of congenial discipline. A colonel in the Army Reserves, he had served in Haiti and would probably have been in Bosnia except for this trial. A former prosecutor himself, he understood the criminal process.

His instinct was to let in as much evidence as he legally could, often over our objections. He wanted the jury to really know this case. In retrospect, a wise decision.

A trial that could have been ugly rarely became ugly. A superb judicial performance.

*The Jury* We went through almost 800 jurors who would be willing to sit for a "three-month" trial to find 10, six jurors and four alternates. Little did we know that it would take more than 11 months of a full-time, continuous trial. The jury was sound. We were in Mineola, Long Island. A cross-section of Nassau County. Who were they?

Juror One. The foreman, a large and friendly man.

Juror Two. Quick to smile, she always responded well to my poor quips during our long trial. Not a parent but a strong family person.

Juror Three. Very understanding, a mother, a solid juror all the way.

Juror Four. Con Ed, a father who rarely betrayed his feelings. Strong. He always listened attentively. From the first, I wanted him on the jury.

Juror Five. Very warm, quick to seize nuance. She smiled a lot. We liked each other. You can tell. Our only black juror, a parent.

Juror Six. An attractive, well-dressed woman, wore something different almost every day. Her attentiveness, particularly during summations, to all four counsel, was extraordinary. It riveted you to her. Her face showing a high degree of intelligence. Divorced. No children.

By the time of the verdict, there was only one alternate left and she did not vote.

### The Trial

What to do in the opening? What to do? You can bluff through jury selection, but not an opening.

CONTINUED ON PAGE 14