CONTINUED FROM PAGE 12

We equivocated. In our opening, we told the jury we were here to defend the Harran Transportation Company. Even if Izzo did abuse the children, the bus company did no wrong. This was also the position taken by the Hicksville School District.

The defense that Izzo didn't do it was carried by his counsel, Pat Crowe, who made a riveting opening. He promised to prove that Izzo's plea of guilty was a lie. And he would explain why Izzo pled guilty when in fact he was not guilty.

The testimony began. The children would testify as to these horrific events. The jurors would be sympathetic. Maybe no questions should be asked of the children by the defense counsel.

Harran was the first-named defendant. That meant I was first to cross-examine. I could say "no questions" when the children testified. But something wouldn't let me do that. I now firmly believed the abuse had not occurred. It would have been dishonest to just sit there. Therefore, I had to:

**5. Learning to Love the Cross-Examination You Dread.**

Yes, even when little children are the witnesses.

I confronted the children with their inconsistencies. Gently, of course. The children had spoken on many occasions. They had given statements to the police as well as to therapists and even to the defense psychiatrist. They testified in pre-trial proceedings. There were many contradictions and virtual impossibilities. Understandably, much was to be forgiven. They were only five years old when they rode with Izzo, six at the grand jury, eight or nine when deposed, 12 at the time of trial. Even adults don't remember perfectly. However, no child ever told the same story twice. And many testified in a mechanical fashion. They had no picture in their brain. They seemed to have no visual memory. This ran counter to the experience of those who have suffered from genuine traumatic experience. They can't get it out of their minds. Three of the 14 children couldn't remember anything at all even after reading their so-called statements of abuse to the police. There was something that did not ring true.

As a result of witnesses not being able to remember being abused by Izzo, two of the cases were severed in the middle of the trial. This gave them a chance at a later trial to prove repressed memory. The defense objected, arguing those two cases should have been dismissed.

***The Motivation*** So, a doubt was building. Perhaps the children were not abused. But why would the parents embrace the claim with such zeal? Just for money? Maybe, but not likely. They were believers. Even before Izzo pled guilty, they were believers. What motivated them? We thought we knew. But first we had to meet the challenge of:

**6. Learning to Love the Unlikely When It Comes to Human Beings.**

The parents were in the grip of mass hysteria. It has happened before. Hysteria is a human ailment. It is something that has always been with us. Salem was not something that happened in the ancient world. It was only 300 years ago. Young women were burned as witches. People cheered. In World War II, we interned loyal Americans of Japanese descent. In the 1930s, people believed the Martians had landed, surprising even Orson Wells. Hysteria is a part of the human tradition.

One mother cried "hysterically" when she first learned that Izzo had been arrested for abusing an older boy. This was before any claim was made that her daughter had been touched. This we learned from the diary of a mother who made 70 phone calls in two hours after hearing of the arrest. There were parent meetings in which the emotions ran so high that Miss Carly, the kindergarten teacher, a lovely young woman who exhibited the greatest affection for her students, "her babies," was reduced to tears by the hysteria.

The parents admitted that no child had come forward during the kindergarten year to describe abuse. Not one. Some of the parents were originally incredulous when the police arrived. One mother said, "If you think my child has been abused, you need therapy. I am the mother and I'd have been the first to know." Indeed, wouldn't she have been?

The children said they did not speak out about the abuse because Bob threatened to kill their Mommies and Daddies if they did. But the children never got off the bus appearing fearful. The children were fond of Bob. Many parents had given Bob gifts. One invited him to lunch. Another shared a beer. There was no atmosphere of fear. It was hysteria that changed them.

But what set the accusation in motion? If he didn't do it, where did the damning evidence come from?

***The Police*** But to criticize the police, let alone attack them, in Nassau County might be suicidal. The police are respected in that affluent county. They are seen, rightly, as protectors, not oppressors. The Nassau County Police enjoy deservedly a reputation for decency and competence. But that doesn't mean they are infallible. It doesn't mean they are immune to hysteria. And claims of sex abuse against children tend to bring about a suspension of critical faculties in all too many people. Thus, we had to meet the challenge of:

**7. Learning to Love the Unpopular, or 50 Million Frenchmen Can Be Wrong.**

The police in Nassau were popular. But they appeared wrong to us. Therefore, damn the unpopular, full speed ahead.

CONTINUED ON PAGE 16

CONTINUED FROM PAGE 14

The Nassau County Police first arrested Izzo for abusing an older boy. They believed that Izzo was a pedophile. They became judge and jury.

The police came to the houses of the children not at the request of any parent, but of their own volition. They were relentless. They did not take "no" for an answer. They visited some homes two to five times. They interviewed some children two to five hours. The parents were not present during the interviews. Usually two detectives interviewed a child. Sometimes they stayed after midnight even though it was summertime and the six-year-old children would have been home during the day.

All the psychological experts, even those called by the plaintiffs, agreed that little children are immensely suggestible, particularly when questioned by adult authority figures such as the police. The police eventually got statements of abuse. Conveniently, not one interview was videotaped. The statements had much in them that was inherently ludicrous. "Bob put his penis into the backside of seven boys at a red light." "We had a garbage pail on the bus in which we all had to pee." "Bob put his penis in my butt in the schoolyard during lunch." The teacher said, "That's cool." There was never any corroboration of these fantastic claims.

As the children and the parents began to meet more in groups, the stories began to grow and borrow from each other. Tales of perpetrators besides "Mr. Bob" began to sprout. Tales of "Fat Billy" and "Bald Mike." One child even claimed that months later at the 1989 Christmas assembly she saw a man named Johnny who was part of the group that had abused her. Izzo had been in jail for a half year at that time. Another child told of a black man who raped her on the bus. Many children talked of an abandoned house that was vacant and boarded up where there were homeless people and bums. There were black men with black suits with knives and white men with white suits. There were Chinese men. Women sometimes. Amazingly, none of these perpetrators was ever found. Not one. That didn't seem to bother the police or distract the district attorney's office, which pushed on with the case against Izzo. Our abuse expert testified that a claim of multiple perpetrators is one of the hallmarks of a false claim of sex abuse.

No one was ever found to corroborate even one location where abuse allegedly took place. Some children claimed that they were taken to an upper floor in a bank building to a computer room at lunchtime with people all over the place. Yet no one in the bank ever saw them. There was a claim of a "junkyard" that no one could even find.

The most common situs complained of was Sears, a shopping center with a large parking lot. At lunch, Sears is very busy. We asked the children, "Didn't someone see you at Sears?" One child said he saw an adult once outside the bus moving his lips saying, "Oh my God." That person was never found. Some kids said Izzo put curtains on the windows so no one could see in. Curtains were never found.

Late in the trial, Izzo's attorney, Pat Crowe, called the security director for Sears. He described the surveillance cameras in the Sears parking lot, none of which ever detected any abuse. The police as well as Sears security patrolled the area. No one ever saw a busload of children being abused.

When Bob went to Florida at the end of April 1989, he was replaced by a man we'll call Sam. (Not his real name.) The children didn't like Sam as much as they liked Bob. When pressed by police for tales of sex abuse, the children told stories of abuse by Sam. They gave statements. It was then learned by the police that Sam was a former police officer. The police quickly got recantations from the children about Sam abusing them. The police only took statements about Bob abusing the kids.

Pursuing the case against Bob, but not against Sam. Was this police manipulation? Were the police soft on former police officer Sam and vigorous only against Bob? If the claims against Sam were ludicrous, were not the claims against Bob ludicrous? Particularly when child after child kept saying how much they liked Bob?

Many of the children had nightmares. They wanted the door locked so that their parents would be safe. Maybe Bob did threaten them. The most damaging revelation comes here. Parent after parent admitted that the nightmares began after the police interviews. The terror began after the police, not before.

One mother described her son as being a "beast" after the police interview. These children endured traumatic episodes. Those episodes were the police interviews.

Conveniently, the police took no videotapes or audiotapes of any interviews. There were few police notes of the interviews. What did the police say to these impressionable six-year-olds during these interviews to get those statements? Did they suggest answers? Did they ask leading questions? Why would a child want to lock the doors to protect mommy and daddy? Why did they start to have nightmares? Were they told that if this bad man wasn't put away, he could hurt mommy and daddy? Our imaginations soar. What harm would there have been in videotaping these interviews? We would then know for sure what happened behind the closed doors without the comforting presence of the parents.

But it was not enough to discredit the police tactics. We had to produce a coherent explanation. How could

CONTINUED ON PAGE 18

CONTINUED FROM PAGE 16

so many people be wrong about Izzo? We needed medical testimony. We needed insight into the human mind. We had to face the formidable challenge of:

**8. Learning to Love a Psychiatrist Even if He Talks Like Sigmund Freud.**

And this may be the hardest love of all. They have strange ideas. You talk about your mother. They talk about Oedipus. You talk about children. They talk about that little bit of pedophile in all of us. You see tunnels and towers. They see female and male anatomy. Somebody once said, "Who would ever be a psychiatrist unless they were a little troubled themselves?"

But the human mind is a dark and largely undiscovered labyrinth. These psychiatrists are trying to relieve the suffering of those formerly considered incurable. Respect must be paid for that effort.

We reached out to one of the most eminent. This was no case to have anyone of less than top stature. We retained one of the foremost child psychiatrists and forensic debunkers of false sex abuse claims in the country. Richard Gardner, M.D., had superb credentials. He was associated with Columbia Presbyterian, one of the foremost medical centers.

Gardner argued that America was in the grip of hysteria over sex abuse. One of his books is *Salem Revisited*. Once we burned witches. Now we put people in jail on fantastic evidence: The McMartins in California; Kelly Michaels in New Jersey; the Amiraults in Massachusetts. A minister in Washington. A pastor in the Bronx. Gardner was passionate. None of these children were abused.

He gave us the phrase:

***Retrospective Reinterpretation*** The parents noticed nothing unusual during the school year. After the police, they blamed everything on sex abuse. "Now it is clear to me." "It all fell together." A child who was a bed wetter was now a worse bed wetter because of abuse. A child who had nightmares because she once suffered a bee sting attack was now having those very same nightmares because she was abused. Children pretending to lick like a cat did so because they were abused.

Gardner called it "Retrospective Reinterpretation." What seemed normal at the time was later seen as pathological.

***The Main Witness*** Experts are wonderful but the jury wants to see the main witness. They want to see the man who pled guilty to sexually abusing kindergarten children. You can't finesse it. You can't alibi a failure to call him. He has been sitting there. They have been studying him. They want to hear him. Why did you plead guilty if you didn't do it?

What a challenge:

**9. Learning to Love the Witness for Whom There Is No Hope.**

Izzo was serving a sentence of 20 to 60 years. Throughout the trial, he entered the courtroom in handcuffs and was unshackled before the jury entered. Two guards sat behind him. Those who plead guilty in a criminal trial can always at a subsequent civil trial explain why they pled guilty.

Plaintiffs threatened to call Izzo as a witness but didn't. Somehow Izzo as he sat there didn't come across as a monster. He seemed an unthreatening man who sat quietly through months of testimony. But we worried that he would make a poor witness. Some felt that Izzo could so poison the atmosphere by his testimony that the school district and the bus company would not get a fair trial. Yet Izzo's lawyers, and it was their decision, felt they had no choice but to put him on. The jury would feel cheated if he didn't testify. He had to go on.

Pat Crowe was enormously busy preparing for the questioning of the assistant district attorney and the chief detective whom he was going to call as part of his case. He wanted to show that Izzo was not treated fairly by the police and the district attorney's office. He felt he needed help, so he called upon the senior partner of his firm, Emmet Agoglia, a trial lawyer of immense ability, to conduct the examination of Izzo.

It was a wise choice. Somehow, Agoglia was able to rouse Izzo from the defeatism that had gripped him during his years in jail.

Plaintiffs brought in the highly regarded criminal lawyer, Steve Scarring, an expert on sex abuse cases, to cross-examine Izzo. Many felt Izzo, a convicted abuser, would be destroyed.

Extraordinarily, it didn't come out that way. No fault of Scarring. He performed with his usual commanding competence. What was unexpected was that Robert Izzo was full of fire and credibility. He made a startlingly good witness. He proclaimed that he never abused the bus children. He also claimed that he was wrongfully convicted of abusing the Boy Scouts.

He explained why he pled guilty. He had lost all confidence in the justice system after his conviction on the Boy Scout charge. His father would have had to mortgage his house and lose his only possession to come up with $150,000 to pay for the defense of his second trial dealing with the kindergarten children. It had cost his family $100,000 for the first trial and wiped out their savings. If he pled guilty, he was promised a sweetheart deal. He would not get one day extra punishment for pleading guilty to abusing the kindergarten children over and above what his sentence would be for his conviction in the Boy Scout case. He already faced 55 to 167 years on the conviction. When the guilty verdict was read in the Boy Scout case, all he heard was his mother

crying. He still hears her cries. (Izzo's lawyer says Izzo is convinced that his conviction killed his mother. His mother died less than two years after his conviction.) Izzo did not want to subject his mother, his wife, his two sons and father to a further ordeal when there was nothing to gain. He already lost his life, his family, his job, his freedom and his father's savings. He would not subject them to further harm. That's why he pled guilty.

He was persuasive when none thought it was possible. Incredibly, his testimony was even touching. My co-counsel, Lynn Rosenthal, who used to prosecute sex offenders, confessed to being moved. So was I. So were others.

And there was a bit of evidence that substantiated Izzo's claim that his plea was fake. A report from the Department of Mental Health. A psychiatrist interviewed Izzo after he pled guilty. Izzo stated how hard it was to plead guilty to crimes he did not commit.

Izzo's criminal attorney was prepared to try the kindergarten case first. But at the last minute, the Criminal Court ordered the Boy Scout case to go first. The defense only had a couple of weeks to prepare. The switch seemed likely to aid the prosecution. Regardless of whether he was guilty, it seemed to us that Izzo had not been treated too fairly by the criminal justice system.

But Izzo's strong showing raised a question about the district attorney's office. Did the prosecution rush to judgment?

Can everybody be wrong? We criticized the police. Should we now also criticize the district attorney's office, a respected institution in the County of Nassau? Would that be too bold? Another challenge:

**10. Learning to Love Boldness, or Faint Hearts Fair Cases Never Win.**

That's right. Timid trial lawyers never win a damn thing. Go for it. We did.

The assistant district attorney, Maureen Reardon, took the stand toward the end of the civil trial only when called as a witness by the defense.

She was a first cousin once removed of Dennis Dillon, the elected district attorney of Nassau County. She received the assignment to prosecute this very newsworthy case although she had only been admitted three years. Following Izzo's plea of guilty, she joined the law firm that had represented Izzo. She testified that meetings about joining the firm only took place after Izzo's sentencing. Later, she rejoined the district attorney's office. She was married to an uncle of one of the kindergarten children who was suing. Thus, she was an aunt by marriage to one of the plaintiffs. However, she met her husband-to-be after the Izzo criminal case was over.

We made more of the relationship of Charles Brennan, plaintiffs' trial lawyer, and District Attorney Dennis Dillon. On October 4, 1989, Mr. Brennan wrote a letter to Maureen Reardon saying he wanted to work

*Valuing a Business*—The classic valuation text is now in its fourth edition.

Willamette Management Associates is pleased to announce that the best-selling valuation book ever has been updated and expanded to 924 pages! Authors Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweihs have once again created an indispensable valuation reference for all professionals who prepare or review business valuations.

New Edition Includes:

- New data sources, including empirical market data sources.
- Greatly expanded discussion of court case decisions related to specific valuation issues.
- Expanded coverage of valuation discounts and premiums, including the latest empirical studies.
- Valuing stock options.
- Arbitration and mediation.
- International glossary of business valuation terms.

For information on ordering this book or for more information on the services of Willamette Management Associates, please visit our web site at www.willamette.com or call 503-243-7509.

Published by McGraw-Hill, copyright 2000
8½" x 11" hardcover, 924 pages

closely with her. A letter dated the next day appointed Mr. Brennan treasurer of the Dennis Dillon Re-Election Committee. We said there was nothing wrong in this, and there wasn't, but perhaps it explained the relationship. The degree of cooperation given by the district attorney's office to plaintiffs' counsel was highly unusual. Maureen Reardon signed an affidavit, which Brennan prepared and notarized, to delay the children's pre-trial testimony in the civil case. We had the impression that Brennan and Reardon wanted a result in the criminal case before the children testified in the civil case. This testimony, if forgetful and inconsistent, would have weakened the prosecution.

Reardon further admitted that Izzo's criminal counsel claimed that one of the children recanted her claim of sex abuse. (Reardon did not videotape any of her interviews with the children.) Another child told her mother and father it never happened. "We made it all up to get Mr. Bob in trouble." When the child's father wouldn't believe her denial, the child became so upset she wanted her mother to divorce her father. Was the criminal case falling apart before the plea of guilty?

And some of the pleas of guilty seemed ridiculous on their face. Izzo pled to having committed seven rapes at four locations on January 20, 1989, despite the fact he attended a birthday party for the kindergarten teacher in the classroom on that very day. All their abuse took place on a 24-minute bus run and the bus was not late. In addition, some of the abuse to which he pled guilty took place on a Sunday when neither the children nor the driver were present. Another plea involved a child who was vacationing in Florida at the time of the abuse. Who could believe such a plea?

The district attorney's office is required under the *Brady* Rule to give the defense counsel in a criminal case all exculpatory material that tends to prove the defendant not guilty. But the district attorney's office never told Izzo's lawyer that many children were claiming that Sam, the replacement bus driver, also abused them. Top lawyers in the district attorney's office debated the issue and decided against disclosure. Also, Izzo's criminal defense lawyer was never informed that many of the kids originally denied abuse.

We argued that the whole purpose of the Brennan-Reardon effort was to get a plea of guilty. The plea would then probably be admissible in the civil case.

Then an amazing piece of luck fell to the defense. The parents kept diaries. One of the fathers wrote "Charlie planning plea." This was our very theory. Charles Brennan, the plaintiff's attorney, was working with the district attorney's office to get a plea. And they got it. For Izzo, the plea was a wise decision. He did not want to submit his family to the expense and ordeal of a further trial because he had absolutely nothing to gain since he would get no additional prison time. Everybody wins and nobody loses, except maybe the deep pockets in the civil case.

How were the jurors reacting to all this? After all, they were the ones who would decide the case.

And that takes us to the oldest challenge and hardest love of all:

**11. Learning to Love the Juror Who Hates You.**

We were trying to tell the truth. But truth comes at a price. All the talk of sexually invading little children took its toll. We felt (of course, trial lawyers are paranoid by definition) that one juror didn't like defense counsel. Lawyers are constantly fooled by smiles and frowns. But these facial grimaces seemed hostile. How to deal with it?

We couldn't remove the juror for cause. We had to live with that juror. We could not let it affect our performance. We had other jurors to worry about. I for one tried to think of all the reasons why we once loved and selected that juror.

Years ago, my office had an important client that everybody hated. A disagreeable fellow. He never praised. He only found fault. He rarely smiled. We hit on a device. We decided to love him. When he called we would say, "Oh, it's you. How good to hear from you." He was overwhelmed. In all his sour life, no one ever spoke to him with affection. Once we even got him to smile.

So we tried to play the same mind trick. We decided to love that juror. We soldiered on. Did it work? Probably not. Who knows? It was one of the alternates who never voted. It might have been our best juror. We'll never know.

## The Summations

The supreme challenge:

**12. Learning to Love the Truth.**

What is advocacy but putting the truth in the light most favorable to your client? Accept the truth we must. We're not short story writers free to invent our own facts. Temptations abound, but character remains the first attribute of an advocate.

In our case, however, the truth was hard to sell; it was unlikely. But truth has an inherent consistency that the most clever fabricator can never design. We told the truth.

We sum up in reverse order. Crowe goes first. Next, Orzechowski for the school district. Then me. Then Brennan.

Crowe was a lawyer with no where to go but up. He represented Izzo, a man convicted of sex abuse. A lawyer's opportunity of a lifetime. He could afford to take chances. And chances he took.

CONTINUED ON PAGE 22

CONTINUED FROM PAGE 20

Crowe castigated the police for their late-night interviewing of five- and six-year-olds. He blasted the district attorney's office for swearing six-year-old children to indict his client at the grand jury. He questioned all concerned for the last-minute switching of the order of the criminal trials so that Izzo was minimally prepared to try the Boy Scout case. He lambasted the prosecutor for not turning over exculpatory material. He even used the "c" word, calling the prosecutors "corrupt."

Stan Orzechowski, defending the school district, had a problem. He had a lot of knowledge and a lot of knowledge is a dangerous thing for a trial lawyer. It can overwhelm you. He and Brennan had been there from the beginning. They knew more than anyone else about the case.

Orzechowski prepared a time chart. It highlighted when the major events took place. The school district had been, in his view, unfairly frustrated when it tried to get information early in the case. He used his chart to review the entire history. He proved there was little chance to abuse some children. One child was on the bus only three minutes. Orzechowski proved that his time to question the children was postponed until the district attorney's office got that guilty plea. The children's terrors began after the police, not before. A false scenario was created by the investigation itself. A brilliant performance.

I was last for the defense. A rare opportunity. I could be brief. Always an advantage. The others took two or more days. I could do it in a half day. I did not have to review all the evidence. The others had done that. I could seize the headlines and hopefully weave them into a persuasive argument.

I argued that the case was a classic conflict. The evidence favored the defendants but the passions favored the plaintiffs. We had everything against us except the truth. Jurors can vote for whom they want and find reasons later. Who wouldn't have sympathy for the children? Regardless of whether they were sexually abused, they certainly had been traumatized by repeated police and prosecutorial interviews. Physical examinations into their tiny private parts. Attendance at depositions. Therapy. All added stress and revived matters the children wanted to forget.

In fact, in this case there was a question never asked. Was it worth it to the children to subject them to this lawsuit? Mr. Izzo was already in jail and posed no further threat. The lawsuit was only for money. But the defense never asked this delicate question. It might be seen as critical of the parents who in many ways were themselves victims of hysteria.

I went on. Beware of the prejudice. When it comes to sex abuse against children, people tend to rush to judgment. Even my client. When Harran learned that Izzo had been arrested on charges of abusing an older boy, he was immediately suspended without a hearing. Izzo and his father protested and argued for the presumption of innocence. They wanted reinstatement. Our vice president said, "Over my dead body. I have daughters." It was a tough decision to suspend for the owner of the bus company, a thoroughly decent man, who had very good relations with his workers. He supported his vice president. It allowed me to argue that Harran put the well-being of children over everything, even over a concern for the rights of an employee.

When evidence favors but passions oppose, only one argument will do. Appeal to the integrity of the jurors. That wasn't hard. These jurors already demonstrated an extraordinary dedication. They had shown good humor during their long service. They all wore black shirts on Halloween, red on Valentine's Day, green on St. Patrick's and somewhere around the tenth month, a shirt which asked: "Is it three months yet?"

The appeal to them was simple. Follow the evidence no matter where it takes you. You took an oath to do the right thing whether it's popular or not. You didn't give up 11 months of your life to deliver a verdict that violates your conscience. Just follow the evidence. That's the moral thing to do.

Where did the evidence point? No child had been in therapy for five years. No physical evidence of abuse. No witness ever found. Not from the bank, the junkyard, the abandoned house, Sears or any other location. The bus had a two-way radio. The bus was never late. How likely was it that the bus in broad daylight was the site of repeated sexual invasions? No other perpetrator was ever found. No teacher or monitor had the slightest suspicion. No child ever gave the same story twice. No pediatrician who saw these children during the school year ever suspected there was abuse. I saved for later the decisive fact that no parent ever suspected.

The evidence was so strong I feared a change of theory in plaintiff's summation. Old adage: Whoever defines the issue wins the case. I worried plaintiffs would try to argue that Izzo was a pedophile who gradually won the children's confidence and gently fondled them when no one was looking. A more plausible claim than rape early on.

But there was a problem with that approach. That was never the claim. Gentle fondling gradually arrived at was never asserted. Izzo pled guilty to having committed sex abuse during the first month of the school year. Police statements described anal, oral and vaginal sex. And gentle equivocal fondling doesn't produce the kind of major damage claimed here, that is, lives destroyed by hideous invasions. This claim was always much more than gentle fondling.

No matter what plaintiffs' counsel argued, however, some juror still might say—where there's smoke there's fire. We agreed. We said the fire was the police. It was their zeal. They had become judge and jury. They had become believers. And it is wrong, plainly speaking, for those in the sex abuse industry, be it the police, the prosecutors or the therapists to get carried away by fantastic claims that can unjustly destroy innocent lives.

Yes, there was police misconduct. Anything that didn't implicate Izzo was disregarded. One child said "The boy (who accused Bob) is a liar. Bob is a nice man." That was ignored. Two sisters told their mother they had been abused by Sam, the replacement bus driver. The mother told the police. She testified that the police made her feel guilty for starting a rumor about Sam. The police didn't want to hear about abuse from any one but Bob. One detective who persisted in crediting stories of abuse by Sam was challenged by other detectives.

When evidence favors but passions oppose, only one argument will do. Appeal to the integrity of the jurors.

***The Unanswerable*** I saved until last two arguments that I called unanswerable. To my grave I will go believing them unanswerable.

• ***No Opportunity*** The lead detective admitted that there were only five or six minutes for these abuses to have taken place. Every parent admitted there was no pattern of lateness. Izzo was a punctual driver arriving usually at the same time.

How did the bus go to Sears or the bank or a junkyard or an abandoned house and never be late? Can you imagine a bus load of five-year-olds coming off a bus, removing clothing, having sex, putting clothing back on, reboarding the bus and never be late? Common sense says there was no opportunity.

• ***No Outcry*** No child gave a hint for the entire school year. No parent ever suspected anything amiss. Think about it. A five-year-old child has been raped and told that "your Mommy and Daddy will be killed if you tell anyone." Imagine that child getting off the bus. A mother would merely have to say, "What kind of day did you have?" No five-year-old child has the neurological apparatus to conceal it. The child's face would give it away.

There is not a caring parent in the world who wouldn't have gotten it out of the child in two or three minutes. It wouldn't have taken two or three months, two or three weeks, two or three days or even two or three hours. And that is if it happened only to one child once. But in this case there were claims of multiple abuse of each child. How can it be suggested a parent wouldn't pick it up the second or the third time? But we're not talking about one child. Sixteen children on that bus were supposedly abused.

After the verdict, we heard that parents on the jury argued strongly against the claim. They understood intimately the workings of a five-year-old child's mind. There is no way a child could keep that secret from a parent if it happened once, let alone many times, let alone to 16 children. This was and is unanswerable.

***The Plaintiffs' Lawyer*** All during the trial I sat behind Charles Brennan. We got along well. I even met his wife during the trial, a lovely person and a great support to him. His co-counsel at trial was Dominic Sichenzia. They both were knowledgeable and capable. They both gave total dedication to the case. Perhaps, I as one who is usually a plaintiff's lawyer, identified with them more than one might expect. I know the feeling when on paper a case looks unbeatable but in reality is frail. Years of hard work have gone into the case. Much money has been expended for necessary and proper disbursements. All rides on the verdict. One of the cruelest challenges:

**13. Learning to Love the Cross You Never Wanted to Carry.**

You have no choice. Face your problems and remember that's why they're called trials. That's what Charles Brennan did.

His summation lasted three days. He waged a valiant fight. He had lived with the case for seven years. He put his heart and soul into it. A great trial lawyer once said, "If I believe in my case, I can get a jury to believe." Charlie was most certainly a believer. It was a good summation. Some in the courtroom were persuaded by it.

Brennan argued there probably wasn't true penetration. He opined that a pedophile would just rest his private part on that of a child. Frankly, there was no evidence to support that claim. He argued it can take a long time for a youngster to go public with a story of sex abuse. He said he had answered the unanswerable. I looked into the jury's eyes. I did not believe they were persuaded. Plaintiff's attorney asked for $4 million for each child. Thus, he didn't retreat from his claim that there were serious acts of sexual depravity. By asking for a lot of money, he took a risk. It's easier for a jury to give smaller amounts of money. But such was his confidence in his case. He was a believer and these children couldn't have had a more dedicated advocate.

***The Charge*** The judge's charge was remarkably short. It was clear. The jury deliberated conscientiously. They wanted the charge read back and it was. The jury was out for more than a week. The suspense built.

## The Verdict

"We have a verdict." The end of an 11-month trial.

The jurors enter. No smiles. Nothing to foretell their verdict. The foreman clutched 12 thick verdict sheets. One for each of the kindergarten children who claimed sex abuse by their bus driver, Robert Izzo. The first question was pivotal. The "did he or did he not do it" question. The judge seemed as tense as the lawyers. He cautioned against any outburst.

The clerk intoned the usual words:

"Have you reached a verdict?"

"We have."

The bulky verdict sheets were gathered. Silently, the judge perused them. His face was grave: "Take the verdict."

The first question on the sheet:

"Considering all the evidence, did Robert Izzo sexually abuse Ken Alexander?"[1]

"No."

"Is that unanimous?"

"No."

Murmurs in the courtroom.

Before the verdict, the families of the children were supremely confident. Parents had been overheard: "Get your pencil out because each of us will get different money."

Izzo had pled guilty to abusing all but two of these children in the criminal case five years earlier. How could a jury in a civil case say he didn't do it?

Perhaps the first "no" was limited only to that child. Surely the answer would be "yes" to the others.

"Considering all the evidence, did Robert Izzo sexually abuse Mary McDonough?"

Considering all the evidence meant including the plea of guilty.

Once again, "No."

And so it went child after every child. All 12 of them. Sitting at the defense table, I only had eyes for Charlie Brennan. I repeat, we had become friendly. I identified with him. I usually represent people who sue. I saw Charlie's head ever so slightly snap back. The defense lawyers did not smile, did not gloat.

The judge, "Poll the jury."

All said yes to the question of whether that was their verdict, but number two who said "no." The verdict was five to one. That makes a verdict in a civil case in New York. The 5/6 rule.

One of the children, now 12 years old, left with a sob during the taking of the verdict. Later, the parents hugged each other and their attorney in bewilderment and consolation— even in defeat they had not forgotten the enormity of his effort.

Rarely has a verdict in New York surprised so many within the legal profession.

And that brings us to the final and ultimate challenge confronting every trial lawyer:

**14. Learning to Accept Defeat.**

There is no loving of defeat, only accepting it. The sweet uses of adversity taste very tart indeed. Every trial lawyer knows defeat. If you have truly given it your very best, there is no shame in it. There is only shame in inadequate effort or cowardly refusal to ever take a verdict.

Charles and Dominic behaved well and with grace. Disappointed, yes, but no unseemly reaction.

## The Aftermath

Following the verdict, the six jurors met with the judge. It was reported that the five in the majority were comfortable with their verdict. They felt they had done right. They did not do what was popular. They knew that they had to live with that verdict in the years to come. While I am not exactly unbiased, I believe they absolutely did right. I believed it all along. I believe it now.

***The Other Cases*** Thirty-four other cases remained. Following this startling verdict, they were settled for little more than the cost of the defense. Once again, none of those children ever made an outcry during the period of alleged abuse. The two severed cases have been dismissed.

Motions to set aside the verdict have been denied. Judgment for the defense has been entered and has not been appealed.

The verdict remains a stark rebuke to all those who contributed to the hysteria.

At the present time, Robert Izzo is making further legal efforts to obtain his freedom.

***The Lessons for Society*** What can we learn?

Undoubtedly, sex abuse of children exists, particularly within the family. There, unfortunately, opportunity and temptation sometimes meet. But we are witnessing an epidemic of false sex claims. People have been falsely imprisoned. Based all too often on the fantastic claims of young children. Somehow a myth has arisen that young children don't lie. Of course they lie, innocently, but they lie, "I didn't spill the juice, Mommy." Parents lie, too. "Santa Claus brought the gifts." And children are immensely suggestible.

The police and other investigators must take care. No leading questions. Be neutral. Don't try to get an answer. Videotape the children during the interviews so that jurors and jurists can see that the children were not subjected to suggestive techniques.

Prosecutors, police and therapists must bring the same healthy degree of skepticism that they do to any other claim. Prosecutors must accept their legal responsibility to make exculpatory material available to the de-

fense. Is it a custody dispute? Beware. A parent may be using the claim of abuse for advantage. Is there a lawsuit? Look out, always look out when money is involved. Are the children trying to spite one of the parents? Look out. Even in this case, two of the children admitted they made up a false sex claim against their mother's boyfriend. They had learned quickly what an awesome weapon is a charge of child molestation.

Let us never hesitate to see sex abuse when it's reasonably proven. But let us also never hesitate to subject every claim of abuse to critical scrutiny.

The police, no matter how sincere they are in the belief that they are dealing with a pedophile, must not become judge and jury. They must not prejudge and then do anything and everything to justify the prejudgment.

***The Lesson for Trial Lawyers*** Learning to love the inevitable challenges is the *sine qua non* of advocacy. By now it must be obvious that trial lawyers are in the business of boldly embracing the truth, no matter how unlikely and unpopular. We must dig deep into the minds of our clients to say for them what they cannot say for themselves. We must respect the court so that a civilized forum for the resolution of disputes not only exists but thrives. We need a philosophy that places our work in perspective. The world will continue despite our most humiliating defeat. In short, we need to be humble and wise.

Our life is hard but our reward unique. In a world where many people are burdened with a life of predictable conformity, ours is an exhilarating opportunity. We are permitted to have our say. Our challenges are many but without them there would be no joy.

Our burden as a trial lawyer is heavy but happy are those who bear it well.

1. Names of the children are fictitious.

## *Journal* Editorial Board Welcomes Two New Members

Judge John B. Nesbitt of Lyons and Philip H. Dixon of Albany have been named to the *NYSBA Journal* board of editors.

"We chose Judge Nesbitt and Philip Dixon based on their considerable experience writing and editing in the legal field for many years. They were chosen from a pool of nearly 40 applicants," said NYSBA Immediate Past-President Paul Michael Hassett, of Buffalo, who chaired the search committee.

Dixon earned his undergraduate and law degrees from Cornell University. His primary practice areas include environmental, real property and municipal law. He previously served as a law clerk to Judge Lawrence H. Cooke, chief judge of the Court of Appeals. He has contributed chapters to both the NYSBA's treatise on environmental law and to West Publication's volume on the same subject. Before attending law school, he covered New York state government for five years as a reporter with United Press International.

As a member of the NYSBA, Dixon co-chairs the Environmental Law Section's Committee on Legislation and co-chaired its Water Quality Committee for 14 years.

Nesbitt received his undergraduate degree from St. Lawrence University and earned his law degree from Syracuse University College of Law. He was a partner in Nesbitt & Williams LLP and was an assistant Wayne County District Attorney. He has served as president of the Wayne County Bar Association. He is the author of numerous articles, such as "Climbing Justices: Holmes & Hughes in the Alps," published in XIV *Supreme Court Historical Society Quarterly*. Since 1988, he has written an article on local government law for the *Syracuse Law Review*'s annual Survey of New York Law issue.

As a member of the NYSBA, Nesbitt served on the executive committee of the Real Property Law Section and also served on its Committee on Real Estate Financing. He is also a member of the Municipal, Judicial, and Trusts and Estates Law Sections.

Members of the *Journal*'s board of editors are limited to three consecutive three-year terms. Nesbitt and Dixon will fill the vacancies left by Paul S. Hoffman of Croton-on-Hudson, and Albert M. Rosenblatt, associate judge of the Court of Appeals, both of whom reached their term limits this year. Another member, Eugene E. Peckham of Binghamton, was reappointed. Howard Angione of Queens, was reappointed for his second three-year term as editor-in-chief of the *Journal*.

In addition, Philip C. Weis of Oceanside has been named associate editor of the *Journal* to assist the editor-in-chief. He is the law secretary to Hon. Robert Roberto of Supreme Court Nassau County. A graduate of the State University of New York, he holds a master's degree from Brown University and received his J.D. from Brown University.

Philip H. Dixon John B. Nesbitt

37

DEPOSITION of DETECTIVE WALLENE JONES, a non-party witness, taken by the Plaintiffs and Defendants, pursuant to subpoena, before Gina M. Schulz, a Stenograph Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

BRECHER, FISHMAN, FEIT, HELLER, RUBIN & TANNENBAUM, P.C.
Attorneys for Plaintiff
MONTI
222 Broadway
New York, New York 10038
BY: JEFFREY A. MANHEIMER, ESQ., of Counsel

TALISMAN, RUDIN & ESKENAZI, ESQS.
Attorneys for Plaintiffs
KANI, et al
114 Old Country Road
Mineola, New York 11501
BY: STEVEN DE LORENZ, ESQ., of Counsel

FRANK KILGANNON, ESQ.
Attorney for Plaintiffs
TOICH, et al
1551 Kellum Place
Mineola, New York 11501
BY: FRANK KILGANNON, ESQ.
ANTOINETTE BELLINI, ESQ, of Counsel

DAMASHEK, GODOSKY & GENTILE, ESQS.,
Attorneys for Plaintiff
ZEE
35 Worth Street
New York, New York 10013
BY: PAUL SCHNEIDER, ESQ., of Counsel

MARTIN, CLEARWATER & BELL, ESQS.
Attorneys for Defendant
HARRAN TRANSPORTATION COMPANY
220 East 42nd Street
New York, New York 10017
BY: JOHN L.A. LYDDANE, ESQ., of Counsel
MARGARET JOHNSON, ESQ., of Counsel

(CONTINUED)

A P P E A R A N C E S: (Continued)

KROLL & TRACT, ESQS.
Attorneys for Defendant
HICKSVILLE UNION FREE
SCHOOL DISTRICT
120 Mineola Boulevard
Suite 330
Mineola, New York 11501
BY: STANLEY E. ORZECHOWSKI, ESQ., of Counsel

RICHARD J. INZERILLO, ESQ.
Attorney for Defendant
ROBERT IZZO
811 Jericho Turnpike
Smithtown, New York 11787
BY: GARY A. PAGLIARELLO, ESQ., of Counsel

MULHOLLAND, MINION & ROE, ESQS.
Attorneys for Defendant
ST. IGNATIUS
374 Hillside Avenue
Williston Park, New York 11596
BY: DONNA DE NICOLA, ESQ., of Counsel

CURTIS, ZAKLUKIEWICZ, VASILE,
DEVINE & MC ELHENNY, ESQS.
Attorneys for Defendant
STANLEY J. OLES
2174 Hewlett Avenue
P.O. Box 801
Merrick, New York 11566-0801
BY: MARIJANE MC QUEENEY ESQ., of Counsel

CHARLES F. BRENNAN, ESQ.,
Attorney for Plaintiffs
MUSINSKI, et al
11 Clinton Avenue
Rockville Centre, New York 11570
*NOT PRESENT -- NOTIFIED

(CONTINUED)

A P P E A R A N C E S: (Continued)

LERNER, GORDON & HIRSCH, P.C.
Attorneys for Plaintiff
BERG
One Old Country Road
Mineola, New York 11501
*NOT PRESENT -- NOTIFIED

STOCK, TINARI, PAAR, MATTHEWS,
O'CONNELL & OSBORN, ESQS.
Attorneys for Plaintiff
CONK
88 2nd Street
Mineola, New York 11501
*NOT PRESENT -- NOTIFIED

STEINBERG, FINIO & BURLANT, ESQS.
Attorneys for Plaintiffs
BACHTELER, JOHNSON & KULIER
14 Seward Drive
Woodbury, New York 11797
*NOT PRESENT -- NOTIFIED

basically instead of talk about some kind of sexual thing that has occurred to them, because they feel guilty and a part of what has occurred. So you have to gain their confidence and they begin to tell you what has happened.

Q How do you focus them on what you're interested in rather than allowing them to focus on something that might be more comfortable for them to do?

A As in the Izzo case, you keep going back to "Did anything happen on the bus?" And they may give you a little of something. And then you keep going back and they tell you a little more and a little more.

And as they're telling you, they want to see what your reaction is. And if you don't have a reaction of being shocked and amazed, they will continue to tell you.

Q Did you give any of the children any information that you had gathered from other sources about what had happened on the bus?

A Not unless I had some information. I may have said that one of the other children told me what happened, but that's basically it. Not anything specific, no.

Q In terms of telling a child that another

child had told you what happened, was that an effort on your part to indicate to the child that it was okay for that child to say something because you already heard it?

A It was okay for the child to talk to me because I had been told what had occurred on the bus, yes.

Q When a child told you something that you felt might be expected to have some effect on you but you wanted to gain the child's confidence in terms of telling you more, did you ever say anything to the child about having known that this had happened or having heard this before?

A I would most likely have said, "And what else happened?" I would not usually give an indication that I knew what the child was telling me, no.

Q During the time of this investigation, did the Nassau County Police Department use a technique of telling the children to imagine what a camera had seen if a camera were on the bus?

A Probably. I think maybe one child said that they had seen a camera or something like that.

Q Did any of the statements that you took from the children include the fact that a camera was on

the bus?

A I don't remember. I don't remember any of the details of the statements. I just know basically what occurred.

Q Did you personally ever use the technique of telling a child to imagine what a camera on the bus would have seen?

A Yes.

Q What's the purpose of that technique?

A Well, there had been mention of a camera, someone taking pictures of the kids on the bus, and just to get them to realize that someone had seen something going on on the bus.

Q Did you tell the children that there were pictures taken on the bus?

A I'm not sure exactly. Except that I knew there had been a camera on the bus and someone had been taking pictures.

Q In the course of your investigation, did you determine who it was that was taking pictures on the bus?

A I don't remember.

Q Did you determine whether there were other adults supposed to be on the bus, other than Mr. Izzo?

A I believe at one point or maybe at several points there was supposed to have been someone else on the bus.

Q Did you ever identify the individual who was on the bus with Mr. Izzo?

A I'm really not sure.

Q Was it one person or more than one person?

A I'm not sure about that either.

Q In the course of your investigation, did you ever determine that the bus was taken to locations where the children were taken off the bus and into another structure?

A Yes.

Q What did you determine in that regard?

A I'm not sure. But I don't believe there was any determination made. But I'm not sure about that.

Q In the course of your interviews with the children, did you ever hear about the children being taken into a bank, for example?

A Into another building. I'm not sure if it was a bank or if it was a building. I'm not sure.

Q You told us about going out and taking photographs with Miss Riordan. Were any of the

of it as well?

A That's correct.

Q Do you know whether the relationship became somewhat personal before, after or during the investigation that we've been discussing?

A I really don't remember.

Q I think you stated in your prior testimony that the ability of the child to remember the details of what was alleged was an indicator to you that the child's voracity was beyond suspicion; is that correct?

A That's correct.

Q Were there any children who initially failed to provide sufficient detail concerning these allegations?

A (No response.)

Q Children who initially were reluctant to speak about what occurred?

A Once they did speak on the subject?

Q What I'd like to know is when you first started taking statements, were there any children who were reluctant to speak about what had occurred?

A Oh, yes, certainly. Sure they were.

Q At that point, did you continue in your questioning with them?

A Usually I would go back and interview them at another time.

Q Were any of these children reluctant to speak about what had occurred on a second visit that you may have made to them?

A That's possible. I'm not positive about that, but that's possible.

Q In the event that the child was reluctant to speak to you about the allegations in any detail, would you, after that second occasion, make a third appointment to see them?

A Yes, I would.

Q In your taking of statements, were there any children who failed to give you sufficient detail on the first two attempts such that a third one was necessary to secure further information?

A That is possible, but I cannot say for sure.

Q Would there be any record to that effect?

A I really can't say on that for sure.

Q Is there anyone that could?

A If I did not make a notation of that, then that would not be in the file.

Q In interviewing these children, did you

SUPREME COURT OF THE STATE OF NEW YORK

custody of [redacted] and [redacted] :

Plaintiffs, :

-against- :Index # 323/90

HICKSVILLE UNION FREE SCHOOL DISTRICT, :
HARAN TRANSPORTATION COMPANY,
ROBERT IZZO, :

Defendants. :

- - - - - - - - - - - - - - - - - - - - - - -X

Mineola, New York
November 22, 1995

B e f o r e:

HON. EDWARD W. McCARTY, III,
Supreme Court Justice

Appearances:

CHARLES F. BRENNAN ESQ.
and
DOMINIC J. SICHENZIA, ESQ.
Attorneys for the Plaintiffs

CLARK, GAGLIARDI & MILLER, P.C.
BY: HENRY G. MILLER, ESQ.,
and
ROBERT FRISENDA, ESQ.
Attorneys for the Defendant. Harran

KROLL & TRACT, ESQS.
BY: STANLEY E. ORZECHOWSKI, ESQ.
and
MICHELE J. MITTLEMAN, ESQ.

AGOGLIA, FASSBERG, MAGEE & CROWE, P.C.
BY: JOCELYNE S. KRISTAL, ESQ.
and
PATRICK CROWE, ESQ.

\- - -

TESTIMONY OF WALLENE JONES

\- - -

Angela M. Porcaro
Official Court Reporter

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

to Mrs. M[redacted] and she signed it.

Q Was K[redacted] present when Bob, when Detective Dunn read the statement to Mrs. M[redacted]?

A I'm not sure but that -- I think it says -- yes.

MR. SICHENZIA: Just one second, your Honor. I have nothing further, your Honor.

THE COURT: You may inquire. Let's have the other document marked.

MR. SICHENZIA: I have.

THE COURT: Thank you very much.

CROSS-EXAMINATION

BY MR. MILLER:

Q Have you previously testified that the interviews with the children generally lasted about two to three hours?

A I'm not sure if that's what I testified to.

Q Is that accurate?

A Some did. Some may have lasted less time. Some may have lasted more time.

Q Did some last as long as five hours?

A That's possible.

Q How long did your interview with [redacted] M[redacted] last?

A I really don't know.

Q And you are not able to tell us how often you were

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

A I don't believe so, no.

Q When did you ask her that subject? When did you ask her about that? When during the interview did that subject come up?

A I really don't recall.

Q Well, it's written on the top of the first page of the notes; is it not?

A That's correct.

Q And it's written at a place where there is also a notation in your entry with regard to the child's words or the terms that she uses for some of the body parts; is it not?

A That's correct.

Q Now, having made that reference or directed your attention to that part of the notes, does that refresh your recollection of the subject of rainbow sherbert or ice cream having been brought up in the early stages of the interview?

A No, that does not.

Q In any event, you did indicate earlier, I believe, that you did go back to give ice cream or sherbert or foods of that nature to the children that you had interviewed; is that correct?

A Some of them, yes.

Q I think you told us last time that you recollected

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

SUPREME COURT OF THE STATE OF NEW YORK

custody of [redacted] and [redacted], :

Plaintiffs, :

-against- :Index # 323/90

HICKSVILLE UNION FREE SCHOOL DISTRICT, :
HARAN TRANSPORTATION COMPANY,
ROBERT IZZO, :

Defendants. :

- - - - - - - - - - - - - - - - - - - - - - -X

Mineola, New York
November 22, 1995

B e f o r e:

HON. EDWARD W. McCARTY, III,
Supreme Court Justice

Appearances:

CHARLES F. BRENNAN ESQ.
and
DOMINIC J. SICHENZIA, ESQ.
Attorneys for the Plaintiffs

CLARK, GAGLIARDI & MILLER, P.C.
BY: HENRY G. MILLER, ESQ.,
and
ROBERT FRISENDA, ESQ.
Attorneys for the Defendant. Harran

KROLL & TRACT, ESQS.
BY: STANLEY E. ORZECHOWSKI, ESQ.
and
MICHELE J. MITTLEMAN, ESQ.

AGOGLIA, FASSBERG, MAGEE & CROWE, P.C.
BY: JOCELYNE S. KRISTAL, ESQ.
and
PATRICK CROWE, ESQ.

- - -

CROSS-EXAMINATION OF WALLENE JONES ONLY

- - -

Angela M. Porcaro
Official Court Reporter

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

child has made a disclosure, to clarify.

Q That's your position, right?

A That's my position, that's correct.

Q Do you have a specific recollection of when you brought the dolls in to the M[redacted] interview?

A No, I do not.

Q Did you make any notes at the M[redacted] interview?

A I'm not sure.

Q I ask you to look at this particular sheet which is marked Exhibit Five and I ask you whether that's in your handwriting?

A Yes, it is.

MR. MILLER: Your Honor, is Exhibit Five in evidence as far as this hearing goes?

THE COURT: Yes.

Q May I see that, please? You may keep the exhibit.

Q When did you take these notes?

A It says August 28th, '89.

Q Does that refresh your recollection that it was August 28th?

A Yes.

Q Does that refresh your recollection as to how long you were there on August 28th?

LASER STOCK FORM B

THE CORBY GROUP 1-800-255-5040

SUPREME COURT OF THE STATE OF NEW YORK

custody of [redacted] and [redacted], :

Plaintiffs, :

-against- :Index # 323/90

HICKSVILLE UNION FREE SCHOOL DISTRICT, :
HARAN TRANSPORTATION COMPANY,
ROBERT IZZO, :

Defendants. :

- - - - - - - - - - - - - - - - - - - - - - -X

Mineola, New York
November 22, 1995

B e f o r e:

HON. EDWARD W. McCARTY, III,
Supreme Court Justice

Appearances:

CHARLES F. BRENNAN ESQ.
and
DOMINIC J. SICHENZIA, ESQ.
Attorneys for the Plaintiffs

CLARK, GAGLIARDI & MILLER, P.C.
BY: HENRY G. MILLER, ESQ.,
and
ROBERT FRISENDA, ESQ.
Attorneys for the Defendant. Harran

KROLL & TRACT, ESQS.
BY: STANLEY E. ORZECHOWSKI, ESQ.
and
MICHELE J. MITTLEMAN, ESQ.

AGOGLIA, FASSBERG, MAGEE & CROWE, P.C.
BY: JOCELYNE S. KRISTAL, ESQ.
and
PATRICK CROWE, ESQ.

- - -

CROSS-EXAMINATION OF WALLENE JONES ONLY

- - -

Angela M. Porcaro
Official Court Reporter

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

A No, it does not.

Q Would you be good enough to read this exhibit which is in evidence for the purposes of this hearing to us, please, so we can go through it together? I may interrupt you from time to time.

A Okay. Bob had his pants --

Q (Interrupting) Start from the top of the page.

A Start from the top. (Reading) August 28th, August 28th, '89. Wednesday, Strawberry/Rainbow sherbert, multi-colored sprinkles.

Q What does that refer to?

A That is apparently the kind of sherbert she likes.

Q Why did you write that?

A Probably because we had planned to bring her sherbert at some time.

Q Why?

A Well, we on occasion did bring the children ice cream or sherbert after the statement was taken or after the interview.

Q Why?

A I don't know.

Q It's a reward for giving the statement; isn't it?

A No, absolutely not.

Q Keep reading, please.

LASER STOCK FORM B THE CORBY GROUP 1-800-255-5040

THE WITNESS: Yes, I talked about the case.

Q And then you said to him, "Well, why are they calling you, Bob? Why are they calling you?" Certainly you said that?

A No, I did not.

Q Didn't you have a little curiosity?

A None at all.

Q Didn't he say, "How is it? How are they? What do I have to watch out for?" Didn't he say that to you?

A No, he did not.

THE COURT: Why don't we take our break now?

(Recess taken.)

Q Detective Jones, is it correct that it's your practice and that of the other detective if I child says to you, "Nothing happened. There was no sex abuse," it's your practice not to take a statement; am I correct?

A That's correct.

Q And the other thing I wanted to ask you, was it part of your practice, if you recall, when you interviewed [redacted] [redacted], in saying to the child, "You know, he may have done bad things to you and you didn't even know it?"

A No.

Q I want to tell you and then ask you a question on it, that Mrs. [redacted] has told the judge that in her diary

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

after the August 25th interview, that C[redacted], the child came out and said about the police, "You know, they're right. They're right," meaning the police, "he was doing bad things and I didn't even know it."

Would that refresh your recollection that that would be something that you would have said on August 25th?

A No.

Q No?

A No.

Q Thank you.

THE COURT: It's a very interesting point of view, prospective question, because in essence that could have been C[redacted]'s words, "They're right," he was doing -- not something that she said

MR. MILLER: I would say respectfully that would be a bit of a stretch of interpretation. It does seem to me that the child was telling the mother, "They, the police, are right. You know, he was doing bad things but I wouldn't even know about it."

THE COURT: I understand your position.

MR. MILLER: You are the trier of this issue and obviously you will draw whatever conclusion

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

Det. Wallene Jones - For Plf. - Cross 46

you want. For me it is just one more element of unreliability.

THE COURT: I understand.

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

APP. 0873

proceedings

AND [redacted],
Plaintiffs

-against- 323-90

HICKSVILLE UNION FREE SCHOOL DISTRICT, HARRAN TRANSPORTATION COMPANY, ROBERT IZZO
Defendant,

- - - - - - - - - - - - - - - - - - - - -X

October 11, 1995
Mineola, New York

B e f o r e,

HON. EDWARD W. MCCARTY III, J.S.C.

A p p e a r a n c e s:

CHARLES F. BRENNAN, ESQ.
DOMINIC J. SICHENZIA, ESQ.
Attorneys for Plaintiffs

HENRY G. MILLER, ESQ.
ROBERT FRISENDA, ESQ.
Attorneys for Defendant Harran

STANELY E. ORZECHOWSKI ESQ.
MICHELE J. MITTLEMAN, ESQ.
Attorneys for Defendant Hicksville

JOCELYNE S. KRISTAL, ESQ.
PATRICK CROWE, ESQ.
Attorneys for Defendant Izzo

Maria Santaly, C.S.R.
Official Court Reporter

W A L L E N E J O N E S, called as a witness on behalf of the Plaintiff, being first duly sworn, testified as follows:

THE CLERK: Please be seated. Please state your name for the record.

THE WITNESS: My name is W-a-l-l-e-n-e, Jones. J-o-n-e-s.

THE CLERK: Rank,.

THE WITNESS: Retired detective.

THE CLERK: Shield.

THE WITNESS: Four nine four.

THE CLERK: Command.

THE WITNESS: Sex crimes squad, Nassau County Police Department.

THE CLERK: Thank you.

THE COURT: Retired detective Jones, it's nice to have you here, just relax, okay answer the questions posed to you by counsel, you may inquire, sir.

DIRECT EXAMINATION

BY MR. SICHENZIA:

Q Good morning, Miss Jones, my name is Dominic Sichenzia, I think we met briefly out in

Q Was there a policy or procedure regarding the presence of parents during the interviewing of children of under eleven years of age?

A Under no circumstances have I ever interviewed a child with a parent present.

THE COURT: What his question, was there a policy for or against it.

THE WITNESS: No policy. It was just basically the detective who was doing the interviewing or the investigation, what they.

Q I think you answered my question. I'll ask it, did you have a personal policy that you followed with regard to parents being present when you interviewed children under the age of eleven?

A Yes, I did.

Q What was that policy?

A No parents ever present.

Q What was the reason for that?

A Well, children if they have not told their parents already, there is some reason why they have not told their parents, and children

Supreme Court
Mineola, New York

July 22, 1994
11:10 a.m.

DEPOSITION of DETECTIVE NANCY MYERS, a non-party witness, pursuant to Article 31 of the Civil Practice Law and Rules of Testimony, and Subpoena, held at the above-mentioned time and place, before Jane E. Duda, a Notary Public of the State of New York.

A P P E A R A N C E S:

B E F O R E:

HON. CHARLES MARCHESE
Judicial Hearing Officer

TALISMAN, RUDIN & ESKENAZI, ESQS.
Attorneys for Plaintiff KANI, GOLDBERG, PIPITONE, RAFIC, GIARDIN, FUSCO, CALABRESE, PALMER, BROWER, BAUM, TOBIN, SCHAEFFER & ROSEN
114 Old Country Road
Mineola, New York 11501
BY: CRAIG SNYDER, ESQ.
WILBUR TALISMAN, ESQ.

FRANK X. KILGANNON, ESQ.
Attorney for Plaintiffs
PUCCI, CROMWELL, TOICH & MCCALLEY
1551 Kellum Place
Mineola, New York 11501
BY: ANTOINETTE BELLINI, ESQ.

DAMASHEK, GODOSKY & GENTILE, ESQS.
Attorneys for Plaintiffs ZEE
233 Broadway
New York, New York 10279-003
BY: RICHARD M. GOLDSTEIN, ESQ.

BRECHER, FISHMAN, FEIT, HELLER, RUBIN & TANNENBAUM, ESQS.
Attorneys for Plaintiffs MONTI
222 Broadway
New York, New York 10038
BY: LONNY LEVITZ, ESQ.

A P P E A R A N C E S (continued):

MARTIN, CLEARWATER & BELL, ESQS.
Attorneys for Defendant
HARRAN TRANSPORTATION COMPANY
220 East 42nd Street
New York, New York 10017
BY: JOHN LYDDANE, ESQ., of Counsel

KROLL & TRACT, ESQS.
Attorneys for Defendant
HICKSVILLE UNION FREE SCHOOL DISTRICT
120 Mineola Boulevard
Mineola, New York 11501
BY: STANLEY E. ORZECHOWSKI, ESQ., of Counsel

RICHARD J. INZERILLO, ESQ.
Attorney for Defendant ROBERT IZZO
811 Jericho Turnpike
Smithtown, New York 11787
BY: SCOTT CACCIABAUDO, ESQ.

MULHOLLAND, MINION & ROE, ESQS.
Attorneys for Defendant ST. IGNATIUS
374 Hillside Avenue
Williston Park, New York 11596
BY: DONNA DeNICOLA, ESQ., of Counsel

CURTIS, ZAKLUKIEWICZ, VASILE, DEVINE.
and MC ELHENNY, ESQS.
Attorneys for Defendant STANLEY J. OLES
2174 Hewlett Avenue P.O. Box 801
Merrick, New York 11566-0801
BY: MARIJANE McQUEENEY, ESQ.

A P P E A R A N C E S (continued) :

NOTIFIED OF DEPOSITION BUT DID NOT APPEAR:

LERNER, GORDON & HIRSCH, ESQS.
Attorneys for Plaintiff BERG.
One Old Country Road
Carle Place, New York 11514

PAUL BURLANT, ESQ.
Attorney for Plaintiffs JOHNSON
1565 Franklin Avenue
Mineola, New York 11501

CHARLES F. BRENNAN, ESQ.
Attorney for Plaintiffs MUSINSKI, MARCIN, CONNOLLY, MC MAHON, MULDER, BROUSSEAU, PFAENDER, VISCONTI, PATRICOLO, DELANEY, RAJAN, SINGLE, and GOODWIN
11 Clinton Avenue
Rockville Centre, New York 11570

STOCK & OSBORN, ESQS.
Attorneys for Plaintiffs CONK
88 Second Street
Mineola, New York 11501

17

A Did I see any? No.

Q Did anybody ever give you any photographs of children that were supposed to represent some injury that a child had gotten?

A I never saw any, no.

Q Did you ever obtain any physical evidence of injury to any of the children involved in the bus cases?

A No.

Q Did you ever obtain any written records reflecting injury to any of the children involved in the bus case?

A I believe the medical reports were negative.

Q When you say the medical reports were negative, are you referring to medical reports of examinations arranged by you after taking statements from children, where the children indicated that they were in some way penetrated?

A Yes.

Q And was it routine police practice that if a child indicated to a police investigator that there had been penetration, that such a medical examination be obtained?

A Yes.

Q Were the medical examinations obtained by medical personnel trained in evaluating children for physical evidence of sexual molestation?

A Yes.

Q Where were those examinations routinely done?

A I believe I sent most of them to Long Island Jewish.

Q And at Long Island Jewish did they have a specific unit within the hospital that took care of that type of investigation?

A Yes.

Q Did the investigation include medical examinations plus certain cultures for infections?

A Yes.

Q With respect to the children in the bus cases who were sent to Long Island Jewish for that type of examination, do you recall how many children there were?

A I believe they all went, but some of them might have gone to the Nassau County Medical Center, but I think that most of them I sent to Long Island Jewish. They have have an excellent doctor there.

Q And in terms of those fears, did you do anything in the course of interrogating the children to allay those fears?

A Yes, that's what I explained to you, I am a police officer and it would be okay. And we were there to protect them.

Q Did you ever tell them in words or substance that Mr. Izzo would not have access to them or their parents?

A I might have told them that.

Q Do you have any specific recollection of what you said in that regard?

A Exactly, to each child, no.

Q Did you ever see any NYSIID sheet on Mr. Izzo, Mr. Oles or Mr. Quintano?

A I might have. I don't recall.

Q In terms of your investigation, did you ever develop any information that any of these individuals had been charged with sex crimes in the past?

A No.

Q In the interviews that you had with the children, was there any standard pattern in terms of the time of day or the length of time that you spent with

the children?

A I think it was all different. Sometimes I went back two or three times to one child. There were some five.

Q In terms of the time of day when you saw the children, was there any specific time of day that you conducted your interviews?

A Sometimes in the day, sometimes in the evening, whatever I was working, whatever tour of duty.

Q In terms of how long you stayed in the course of an individual interview, was there any minimum or maximum amount of time that you would take?

A As long as it would take me.

Q Did most of the interviews fit a particular pattern in terms of length of time?

A No, it's an individual thing.

Q Did you ever indicate to any of the children that there was a camera on the bus that may have recorded things?

A The children told me that Mr. Izzo was taking pictures of them.

I didn't say anything about a camera being on the bus.

Q In the course of your investigation, did

A Yes.

Q To your knowledge, were the dolls in the possession of the Police Department used by any of the detectives in the investigation we have been discussing?

A I wasn't there when other detectives were doing their interview. They might have used them.

Q To your knowledge, they didn't?

A To my knowledge, I don't think anybody did

Q Did you interview a child named J[redacted] [redacted]

A Yes.

Q Did you interview a child named [redacted] [redacted]?

A Yes.

Q Did you use any type of dolls in your interview with J[redacted] R[redacted]?

A I don't believe I did, no.

Q Did you use any type of dolls in your interview with N[redacted] G[redacted]?

A I don't think so, no.

Q Did you interview a child name S[redacted] [redacted]y?

A I'm not sure if I did that interview.

Q Do you recall any of the children telling

A Yes.

Q To your knowledge, were the dolls in the possession of the Police Department used by any of the detectives in the investigation we have been discussing?

A I wasn't there when other detectives were doing their interview. They might have used them.

Q To your knowledge, they didn't?

A To my knowledge, I don't think anybody did

Q Did you interview a child named J[redacted] [redacted]

A Yes.

Q Did you interview a child named [redacted] [redacted]n?

A Yes.

Q Did you use any type of dolls in your interview with J[redacted] R[redacted]?

A I don't believe I did, no.

Q Did you use any type of dolls in your interview with N[redacted] G[redacted]?

A I don't think so, no.

Q Did you interview a child name S[redacted] [redacted]y?

A I'm not sure if I did that interview.

Q Do you recall any of the children telling

you that they were reluctant to testify before the Grand Jury?

A Yes, there were some children that did not want to testify, yes.

Q Do you remember who they were?

A Not specifically, no.

Q Do you remember how you overcame their reluctance, if you did?

A Well, I used different methods. I remember being outside the grand jury room and I did let one of the girls wear my earrings. I had a habit of wearing long dangling earrings, which the kids would like. And I told her she could wear them.

I believe there was a pig, one of the court reporters had a little pink pig, and a few of the children brought that pig inside the Grand Jury with them.

Q Were you present when the children testified before the Grand Jury?

A No, I was not in the Grand Jury room.

Q Were you present when the kids were interviewed by Maureen Reardon before they testified?

A I don't recall which interviews I would have been in on.

A I wasn't aware of any supervision. That happened with Sergeant Gorman.

THE COURT: In the Police Department, you mean?

Q In other words, you were, as a charge detective, in charge of this investigation. The task force was organized and you went about the investigation without any help from above?

A Correct.

Q In terms of liaison with the prosecutor's office, who handled that?

A Well, Sergeant Gorman would have spoken to the district attorney's office.

Q Okay. In the course of the investigation, did you have any contact with the prosecutor's office?

A Oh, yes.

Q At what juncture did you begin to have contact with the prosecutor's office?

A Right before Mr. Izzo was arrested for the first time.

Q What was the nature of your contact?

A I believe it was determined through Lieutenant Daley, who was our supervisor at that time, and assistant district attorney Maureen Reardon, and it

was determined that, yes, we would make the arrest.

Q Okay. And from that point on, how frequently did you have contact with anyone in the prosecutor's office?

A Oh, I spoke to Assistant District Attorney Maureen Reardon quite often, after interviewing the children, after taking statements, she was made aware of everything that was going on in the investigation.

Q Did Mrs. Reardon have any input into the style or scope of the investigation?

A Yes, I think she did.

Q To what extent?

A Well, it was her determination as to reinterviewing the victims. After I took a statement, she was forwarded a copy of the statement. And whatever arrangements she made to speak with these people, I was not present when she did that.

Q Did she in any way direct the scope or style of your efforts to investigate the allegations, apart from what she did herself?

A With myself, no, I would say no.

Q Who determined how much time should be devoted to this investigation?

A That decision was made by Sergeant Gorman.

17

12/1/95

SUPREME COURT OF THE STATE OF NEW YORK

custody of [redacted] and [redacted] :

Plaintiffs, :

-against- :Index # 323/90

HICKSVILLE UNION FREE SCHOOL DISTRICT, :
HARAN TRANSPORTATION COMPANY,
ROBERT IZZO, :

Defendants. :

- - - - - - - - - - - - - - - - - - - - - - -X

Mineola, New York
December 1, 1995

B e f o r e:

HON. EDWARD W. McCARTY, III,
Supreme Court Justice

Appearances:

CHARLES F. BRENNAN ESQ.
and
DOMINIC J. SICHENZIA, ESQ.
Attorneys for the Plaintiffs

CLARK, GAGLIARDI & MILLER, P.C.
BY: HENRY G. MILLER, ESQ.,
and
ROBERT FRISENDA, ESQ.
Attorneys for the Defendant. Harran

KROLL & TRACT, ESQS.
BY: STANLEY E. ORZECHOWSKI, ESQ.
and
MICHELE J. MITTLEMAN, ESQ.

AGOGLIA, FASSBERG, MAGEE & CROWE, P.C.
BY: JOCELYNE S. KRISTAL, ESQ.
and
PATRICK CROWE, ESQ.

- - -

CROSS-EXAMINATION OF SUSAN CONNOLLY AND
DETECTIVE NANCY MEYERS

- - -

Angela M. Porcaro
Official Court Reporter

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

didn't you?

A They were interviewed. I don't recall if I was one of the detectives that actually went to Sears.

Q In any event, nobody could be found who saw children being abused there; is that right?

A In Sears?

Q Yes?

A In Sears, no.

Q Did you always re-interview a child when there was a denial?

A As we developed more information -- if a child told us that there was another child involved with the child we were taking the statement from, yes, we would go back and re-interview that child.

Q Some of the kids told you that Mr. Izzo let other people on the bus to help him do bad things; right?

A Yes.

Q You never found one person, did you?

A No, I didn't.

Q Thanks. The others will have a go with you, also.

THE CORBY GROUP 1-800-255-5040 LASER STOCK FORM B

**STANLEY J. OLES, JR.**

Defendants.

---------------------------------------------------------x

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---------------------------------------------------------x

J[redacted], an infant under the age of 14 years, by his father and natural guardian, **STEPHEN P.** [redacted] and **ST**[redacted], Individually,

Index No: 22760/89

Plaintiffs,

- against -

**HICKSVILLE UNION FREE SCHOOL DISTRICT HARRAN TRANSPORTATION CO., INC., ROBERT IZZO,** and **DIOCESE OF ROCKVILLE CENTRE/ ST. IGNATIUS LOYOLA SCHOOL,**

Defendants.

---------------------------------------------------------x

**MEMORANDUM OF LAW**

Statement of Facts

C[redacted] testified at trial and at her hearing that she had no recollection of being sexually abused by Robert Izzo and that her review of the transcript of her Grand Jury testimony and the police statement of August 28, 1989, did not refresh her recollection.

She had no recollection of what the police said or about what they asked her or what she may have said to them. She had no recollection of signing the written statement and no recollection of the statement being read to her. She did not write and wouldn't have read the statement when she was 5 years old.

She testified she told the police the "truth" but could not say what she told them, nor could she recall how many times she was interviewed. She was unable to verify that the allegations as set forth in the written statement were true at the time of the police interview.

At her deposition in 1992, she denied that Robert Izzo had ever touched her private parts and denied she ever told the police that she kissed Robert Izzo's penis (as alleged on the police statement). At her 50-H hearing in 1991, she denied every seeing Robert Izzo's penis.

Mrs. [redacted] testified that the police interviewed her daughter on three occasions; on July 14, 1989, August 25, 1989, and August 28, 1989. The first interview by Detectives Meyers and Merriweather lasted 30-45 minutes. The second and third interviews by Detective Jones and Dunn each lasted between 2-3 hours.

Renee Krieger, a social worker at North Shore University Hospital, testified that Mrs. [redacted] told her that [redacted] denied any sexual abuse when initially interviewed by the police. She further testified that she questioned the parents as part of a parent's questionnaire and recorded their answers in which Mrs. M[redacted] repeats her daughter's prior denial of sex abuse. The initial denial of sex abuse to the police is also recorded in the history Mrs. Krieger took from Mrs. M[redacted]

Nancy Line (formerly Detective Nancy Meyers) claims she never specifically asked [redacted] if she was sexually abused on her

initial interview, but admitted that no sexual abuse was reported and that one of her purposes in interviewing ( was to see if she was abused. She did not recall arranging any follow up interviews. No notes or statement was taken. She admitted that she generally does not take any notes or statements when a person denies sexual abuse, and no notes of this interview were taken.

Mrs. recalled that she had been told of Robert Izzo's prior arrest for alleged sexual abuse by L n (who would later describe Mrs. as ("crying hysterically on the phone"). She testified that the police described to her what a pedophile is and the characteristics of a pedophile. She also recalled that the police produced two anatomically correct dolls during the interview of ( on August 28, 1989.

Detective Dunn claimed he never discussed Robert Izzo during his critical interview on August 25, 1989, and no statement was then taken. Detective Jones however admitted on cross-examination that she took notes of their August 25, 1989 interview, which clearly demonstrates that was questioned about how Robert Izzo touched her. Her notes report hugs and kisses and tickling, but do not report any act of oral or anal sodomy or rape.

Detective Jones and detective Dunn denied any recollection of whether dolls were used on the interviews of August 25 or August 28, 1989. Detective Jones has previously testified that she does not generally use dolls with interviews of young children since they are inherently suggestive.

Neither Detective Jones nor Detective Dunn had any recollection of what they asked C r on August 25 or August 28, 1989, nor did they have an independent recollection of what she said. While Detective Dunn denied that C verified the truth of the statement, C denied any recollection of having heard the statement being read. Mrs. M r testified was silent and never said anything concerning the statement when it was read.

The notes taken by Detective Jones and the statement written by Detective Dunn contain marked differences. Detective Jones' notes admittedly do not record any allegation that Robert Izzo "rubbed his penis against my butt and my front private part. He put his penis where I make pee pee". It is also significant that a correction was made on the last line of the statement substituting "put" for rubbed, a material change suggesting "rape". This change was not initialed by Mrs or C contrary to police practices when a change or correction is being made by the person giving the statement.

The unreliability of the allegations within the police statement is demonstrated by the following circumstances:

(1) was only 5 years old, a circumstance that Detective Jones agreed would render her vulnerable to suggestion.

(2) She was repeatedly questioned by two police officers for a period of 4 to 6 hours on August 25 - August 28,

1989, Dolls were used on at least one occasion, a circumstance which is highly suggestible.

(3) At her 1992 deposition, [redacted] testified that the police told her what other kids said and that Robert Izzo was in jail, a circumstance that Detective Meyers admitted would contaminate the interview with suggestion.

(4) Detective Jones in earlier testimony admitted it was her practice to tell children that she knew what happened and that other kids had told her what happened and that Bob had a camera on the bus.

(5) Detective Meyers admitted that repetitious questioning on the subject of sex abuse concerning a 5 year old child may produce unreliable allegations.

(6) Despite leading and suggestive questioning by Maureen Riordan, [redacted] did not testify as to virtually all of the allegations written by Detective Dunn inn the August 28, 1989.

There was no testimony before the Grand Jury of oral sodomy, rape or fondling activity.

[redacted] then testified that Robert Izzo put his penis in her but on "Red Day" and that [redacted] was there when this happened.

This testimony is absolutely false since [redacted] was not even in school on "Red Day" (February 10, 1989) as admitted in plaintiffs' bill of particulars and corroborated by the school records.

This Grand Jury testimony demonstrates that the interrogations or interviews of [redacted] were contaminated by the fact that someone told her about Red Day and about [redacted] Co[redacted] (who did testify that she was abused on "Red Day."

[redacted]y was interviewed by Detective Jones and Dunn on August 3, 1989 4 weeks before C[redacted]er was interviewed by Detective Jones and Dunn. [redacted]y was [redacted] best friend at the time.

The circumstantial evidence suggests that [redacted] was repeating what she was told had happened on Red Day when S[redacted] C[redacted], was on the bus. This information was either directly provided to C[redacted] by the police or the district attorney, S[redacted], or the [redacted]. Her testimony demonstrates that this child's recollection" was then very susceptible to suggestions, leading to a complete fabrication of events that occurred when she wasn't even in school.

Significantly, Maureen Riordan clearly attempted to solicit other allegations of sex abuse against Robert Izzo without success, and ended her questioning of the witness by challenging her ability to recall, saying, "Did you have a loss of memory, [redacted]?" [redacted]'s response was "No".

This Grand Jury testimony was given six weeks after the police statement was made. It would be rather incredible for C[redacted] [redacted] to "forget" the allegations contained in the police statement if in fact these events ever occurred. Moreover, this highly impressionable child allegedly "remembered" abuse that

occurred on the bus while she was away in Florida with her family, testifying as to an act of anal intercourse that is not recorded in her police statement.

If her testimony was unreliable when she testified under oath in open court before a Grand Jury, how reliable are the alleged allegations made to the police six weeks earlier under repetitive questioning, with suggestive dolls, in an inherently coercive circumstance (alone, outside the presence of her parents, with two detectives.)

The likelihood of contaminations is further demonstrated by the lack of objectivity of the police officer, Detective Jones had expressed an opinion to one of the parents early in the investigation that Robert Izzo had ________________ all the children on the bus. Detective Dunn was the ______________ detective on the earlier _____________ on the [redacted] case, and was responsible for his ________________. Detective Meyer and Merriweather began their interviews of the parents by describing what a pedophile is and their characteristics <u>before</u> they interviewed each child.

The District Attorney's Office appeared at a PTA meeting on July 25, 1989, to address all the parents a month <u>before</u> Detective Jones and Dunn first interviewed [redacted].

The M[redacted]s attended lawyer meetings in August at the M[redacted] house before their daughter disclosed any sexual abuse.

It is also significant that Mrs. [redacted] wrote to the school principal on July 17, 1989, reporting that the police told her of

"Robert Izzo's background and activities" and of "touching games" engaged in by Robert Izzo, statements that would be likely to contaminate an interview of the child after these allegations are repeated to the parents.

Mrs. [redacted] actually arranged to have her daughter treated and evaluated at North Shore University Hospital on August 22, 1989, prior to any disclosure of sex abuse according to Mr. [redacted]. this circumstance would certainly tend to cause the child to believe she was abused by Robert Izzo, and provided yet another occasion for interrogation as to possible abuse.

Detective Meyers has testified that the majority of children she interviewed denied sex abuse at the critical interviews.

No explanation is offered for the incredible delay of 5 weeks between the first and second police interviews. The lengthy delay would likely increase the risk of contamination as the police spoke to [redacted]'s friends and school mates during these interval and parents ______________________ in frequent conversation with each other.

Mr. [redacted]'s own diary notes reflect lawyer meetings as early as July, 1989, casting doubt as the spontaneity or reliability of the delayed disclosures.

The police statement of August 28, 1989 at best reflects Detective Dunn's alleged recollection of what C[redacted] allegedly said to him.

38

Mr & Mrs B[redacted]
86 [redacted] Ave
Hicksville Ny 11801

North Shore University Hospital
400 Community Drive
Manhasset, NY 11030

Ms. Sandra Kaplan,

Enclosed please find a copy of a final bill just received also please find a notice received from Susan Rothman, Nassau County D A Office. This notice states that we receive 6 free sessions from your office. Mrs. Rothman strongly suggested that we accept these free sessions and urged us to make an appointment, even though J[redacted] was already under Drs. care..

We only came to one session and then decided not to return and use any other free sessions.

This matter of $300.00 unpaid is being turned over to my attorney Paul Burlant, 1565 Franklin Ave, Mineola, NY 11501 #516 742-0700. I am also filing a compliant with Assistant District Attorney Maureen Riordon.

We should not be held responsible for a supposedly free visit that we were mistakingly told would help our criminal case.

Thank You,

39

From: NoleDreamer[redacted]
To: info@freejesse.net
Date: Sat, June 28, 2003 10:06 pm
Subject: A former student

---

Jesse,

I am a former student of Mr. Friedman's computer class. I just saw "Capturing The Friedmans" today. I now live in South Florida and my Great Neck days are way behind me. It is odd how seeing a movie can make you remember things more clearly, and put things into focus.

I want to let you know that I never saw your father do anything to any student. I just wanted to add that I am sorry that you lost him from your life. I lost my father when I was 14.

I came away from the movie with two strong convictions. First off, I believe that while your father may not have been 100% innocent, I think that he got caught up in the media storm and the police did use unethical tactics to build a stronger case against him. I also believe that you are totally innocent. This was quite a revelation to me. Back in late 1987, when the story came out I was just shy of my 12th birthday. I was not yet able to look at the story from any other angle than what was being fed to the community through the media storm. I think that is so unfair that you lost 13 years of your life (not to mention the most important thing, your good name), for things that you never did.

I am so glad that the movie was made because it finally tells the true story and draws no conclusions. Sadly, if you had asked me about Arnold Friedman and yourself before the movie, I would have called both of you evil and deserving of the worst kind of punishment possible. I now see your father as a flawed man yes, but also as someone who was a victim of a campaign to trump up more changes, 90% of which I believe are false. Lastly, I now believe that you were just a kid and you sort of got caught up in something that someone of that age couldn't handle. Once again I believe that you are 100% innocent.

I am so sorry that you had to lose 13 years of your life and your father over these things. May God bless you fully with a long happy life.

Sincerely,
A New Yorker in Fla

Subj: **Re: This is why this film was made!!!!!**
Date: 7/1/2003 12:55:00 PM Eastern Daylight Time
From: rgeorg[redacted]
To: Jesse2255@aol.com
*Sent from the Internet (Details)*

Hey Jesse,

I was thrilled to have gotten your forward because I immediately recognized the sender of that message. He is none other than one of my best friends - that guy I was telling you about. I am so proud of him for doing the conscientious and courageous thing. I had a long conversation with him last night, and he told me explicitly that he is willing, if need be, to come back to New York to testify on your behalf. This is great news indeed. Congrats!

Ron

---

Help STOP SPAM with the new MSN 8 and get 2 months FREE*
http://join.msn.com/?page=features/junkmail