UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
JESSE FRIEDMAN,

                Petitioner,

      -against-                 MEMORANDUM & ORDER
                                 06-CV-3136 (JS)

JOE REHAL,

                Respondent.
---------------------------------X
APPEARANCES

For Petitioner:     Rhidaya Trivedi, Esq.
                    Ronald L. Kuby, Esq.
                    Law Office of Ronald L. Kuby
                    119 West 23rd Street, Suite 900
                    New York, New York 10011

For Defendant:     Tammy J. Smiley, Esq.
                    Autumn S. Hughes, Esq.
                    Monica M.C. Leiter, Esq.
                    Nassau County District Attorney's Office
                    262 Old Country Road
                    Mineola, New York 11501

SEYBERT, District Judge:

      Upon the approval of the Second Circuit (see Mandate, ECF No. 35), Petitioner Jesse Freidman ("Petitioner") moves this Court a second time for habeas relief pursuant to 28 U.S.C. § 2254 (hereafter, the Petition"). (See ECF No. 37.) Respondent opposes the Petition. (See Opp'n, ECF No. 40.) For the reasons that follow, the Petition is DISMISSED.

BACKGROUND

While the Court presumes the parties' familiarity with the facts and procedural history of the cases leading up to the current Petition, for the convenience of the reader, it provides the follow background as accurately stated by other courts that have addressed various issues raised by Petitioner.

> The criminal case against [Petitioner] dates back to 1987 when a search warrant was executed in the Friedman home. Thereafter, three separate grand juries handed up Indictments against [Petitioner] and others between December 1987 and November 1988. On December 20, 1988, [Petitioner] pleaded guilty to seventeen (17) counts of sodomy in the first degree, four (4) counts of sexual abuse in the first degree, one (1) count of attempted sexual abuse in the first degree, one (1) count of use of a child in sexual performance, and two (2) counts of endangering the welfare of a child in satisfaction of all three Indictments. He was subsequently sentenced to concurrent upstate prison terms, the longest of which was six (6) to eighteen (18) years.
> [Petitioner] was released from incarceration in December 2001.

People v. Friedman, Indictment Nos. 67104/87, 67430/88, and 69783, slip op. at 1 (N.Y. Crim. Term, Sup. Ct., Nassau Cty. Dec. 23, 2014) (hereafter the "2014 Section 440 Decision").[1] His release was to parole supervision, from which he was discharged on December

---

[1] The 2014 Section 440 Decision is: docketed in this case as ECF No. 37 at 130-39; identified as Ex. B; and, attached to the Petition.

9, 2006. (See Leiter Opp'n Aff., ECF No. 40 (hereafter, "Opp'n Aff."), ¶21.) "On January 7, 2002, [P]etitioner was adjudicated a Level III sex offender. He consented to that classification." (Id. (citations omitted); see also Trivedi Supp. Decl.,[2] at 12, ¶25 (stating that after being released from prison, Petitioner "has been a 'Level-3 Violent Sexual Predator' under the Sex Offender Registration Act ('SORA') ever since").)

> In 2003, a movie entitled "Capturing the Friedmans" was released [(hereafter, the "Movie")]. Thereafter, in January 2004, [Petitioner] filed his first motion to vacate his judgment of conviction [(hereafter, the "First 440 Motion")], never having done so while incarcerated. He argue[d] that the statements of several witnesses against him were obtained by inappropriate means, including suggestive interviews or controversial therapy techniques and that the NCDAO[3] failed to disclose this critical evidence in violation of the mandate set forth by Brady v. Maryland, 373 U.S. 83 (1963). An undated affirmation by [Petitioner]'s then attorney, Peter Panaro, was annexed to the motion as support for that position[,] as were excerpts from the [Movie]. The NCDAO filed their [sic] opposition in November 2004, and the [First 440 M]otion was denied in January 2006. The Appellate Division, Second Department, denied [P]etitioner leave to appeal and his application for leave to appeal

---

[2]   Attorney Trivedi's Declaration in Support of Petition is docketed in this case as ECF No. 37 at 41–115 and is attached to the Petition. Hereafter, the Court will cite to the Trivedi Declaration using its internal pagination.

[3]  "NCDAO" is an acronym for the Nassau County District Attorney's Office, the Office through which the State prosecuted Petitioner on the underlying criminal conduct.

to the New York Court of Appeals was likewise dismissed.

Thereafter, [Petitioner] filed a petition for writ of habeas corpus, in June 2006, before the United States District Court, Eastern District of New York. That Court dismissed the petition on timeliness grounds[, see Freidman v. Rehal, No. 06-CV-3136, 2008 WL 89625 (E.D.N.Y. Jan. 4, 2008)[4]]; however, the decision was appealed to the Second Circuit Court of Appeal. The Second Circuit Court ruled against [Petitioner] stating ["e]ven if the petition is deemed timely, [P]etitioner's Brady claim fails on the merits." Friedman v. Rehal, 618 F.3d 142, 152 (2nd [sic] Cir. 2010). The Second Circuit, relying primarily on the [M]ovie . . . , encouraged the NCDAO to undertake a review of the [Petitioner]'s case and evaluate his claims of actual innocence.

Judge Reena Raggi wrote a separate opinion concurring with the majority ruling related to Brady matters. She further stated, "[w]hile the acts alleged are disturbing and may well warrant further inquiry by a responsible prosecutor's office, I cannot predict whether the outcome of any such inquiry will be favorable to [P]etitioner, whose conviction is based on a plea of guilty that he thereafter publicly confirmed." Id. at 161, 162.

2014 Section 440 Decision at 1-2. "In 2009, between this Court's denial of [Petitioner's initial] habeas corpus petition and the issuance of the Second Circuit decision, [P]etitioner moved from Queens, New York[,] to Bridgeport, Connecticut," where Petitioner registered as a sex offender with the Sex Offender Registry Unit of the Connecticut Department of Public Safety. (Opp'n Aff. ¶40.)

---

[4]   This Court's January 4, 2008 Memorandum and Order denying Petitioner's first habeas petition is docketed in this case as ECF No. 24.

His "offense classification was 'foreign jurisdiction,' requiring lifetime registration," as well as mailing in address verification forms every 90 days and advising "in writing" of any address changes. (Id.)

> Thereafter, [P]etitioner appears to have submitted yearly address verification forms to the New York State Sex Offender Registry Unit by mail. The forms required [P]etitioner to list his addresses, employment information, whether he was attending classes, vehicle information, driver license information, internet service provider information, internet screen name, and email addresses. Since his move to Connecticut, [P]etitioner does not appear to have had to notify the New York State Offender [R]egistry of address changes except as part of the annual verification.

(Id. at ¶41 (emphasis added).)

> [In 2010, a]fter the Second Circuit issued its decision, then-Nassau County District Attorney Kathleen M. Rice announced she would reopen the case and convene a "Friedman Case Review Panel" to oversee the reinvestigation. Senior prosecutors in the Nassau County District Attorney's Office, who were not involved in the original case nor part of the prior administration that prosecuted petitioner, worked alongside an "Advisory Panel" of criminal justice and wrongful conviction experts. The reinvestigation was conducted by the "Review Team" of prosecutors, which had access to the District Attorney's entire case file as well as the grand jury minutes. The Advisory Panel advised the Review Team on "process issues," counseling the prosecutors on how best to conduct a reinvestigation and generally auditing whether the Review Team was operating in good faith. The Advisory Panel did not itself conduct the reinvestigation or weigh

the credibility of witnesses, and it had
access only to those documents, some redacted,
provided to it by the District Attorney's
Office.

In the Review Team's final report[, dated
June 24, 2013 (hereafter, the "Rice Report")],
it concluded that [P]etitioner "was not
wrongfully convicted" and that none of the
Second Circuit's principal concerns were
substantiated by the evidence. It
distinguished the case from the moral panic
cases of the 1980s and 1990s on the grounds
that the allegations in the Friedman
prosecution were plausible, the children
involved were older, and [P]etitioner had
pleaded guilty. The Advisory Panel prefaced
the report with its own statement that "the
conclusions expressed in the Review Team's
[Rice] Report are reasonable and supported by
the evidence it cites."

Matter of Friedman v Rice, 30 N.Y.3d 461, 470-71, 2017 WL 5574476

(N.Y. 2017) (emphasis added); see also Rice Report,[5] at 152-55

(Conclusion), and i-iv (Advisory Panel Statement). Of

significance, in concluding its preamble Statement, the Advisory

Panel stated:

One final aspect of this case deserves
special comment. The Second Circuit called
for a reinvestigation of this case based, in
large part, on information revealed in the
[M]ovie . . . . [The Movie] was . . .
provocative and entertaining . . . , but it
was not an exhaustive account of the entire
case against [Petitioner]. The Review Team
had to go behind the excerpts and sound bites

---

[5] The Rice Report is: docketed in this case as ECF No. 37 at 145-
325; identified as Ex. E; and, attached to the Petition.
Hereafter, the Court will cite to the Rice Report using its
internal pagination.

that the producers used in the film and other "reels" and exhibits the producers have produced over the course of this re-investigation. After several failed attempts to get relevant information from the producers, the Review Team, with the support of the Advisory Panel, entered into an agreement with them regarding disclosure in an effort to get as much evidence as possible, and prevent premature public release of sensitive information about the witnesses and their families.

It is simply a fact, however, that before the re-investigation was complete a public relations campaign was launched attacking the original prosecution. In the context of this campaign[,] the producers approached victims and witnesses to encourage them to take back their incriminating testimony. These actions presented difficulties for the Review Team when assessing the credibility of witnesses, and in some cases, being able to speak with witnesses at all. Similarly, the protracted discussions and negotiations with the film producers about sharing evidence also delayed the re-investigation.

Of course, it is appropriate that [Petitioner]'s supporters, including the film's producers, gather facts, advocate on [Petitioner]'s behalf, and provoke public discussion and debate about the case. But artists and advocates use different methods, make different judgments, and apply different standards than those that public prosecutors must employ. It was the role of the District Attorney and her team to follow the facts, without fear or favor, and to make the best judgment they could under the circumstances presented to them, consistent with the law and the evidence. We believe that is what they did in this case.

Rice Report at iii-iv (emphasis added). Moreover, in explaining the District Attorney's ultimate conclusion, the Review Team stated, inter alia:

It is not the case that the police
systematically used high-pressure interview
tactics to generate false accusations. The
re-investigation showed that many of the
children were visited by the police officers
only once before the first two indictments
were filed. Different detectives took
incriminating statements from this group of
children. There is no way to know for sure if
preliminary discussions with the police, their
parents, or their classmates affected the
testimony of these victims. While police
contact increased, and questioning
intensified in the third phase of the case,
the Review Team did not find that those
factors influenced the testimony that gave
rise to third indictment. The Review Team's
interviews with the original detectives, the
students of Arnold Friedman, and their
parents, support the conclusion that the
police did not elicit inculpatory statements
using flawed investigative techniques.

*  *  *

. . . . Equally unavailing is the theory that
hypnosis generated any false allegations. No
credible showing was made that any child who
gave testimony in any of the three grand jury
presentments was hypnotized. The mass-
marketed assertion, that the majority of
children only gave incriminating statements to
the police after many months and many sessions
of distortive and suggestive therapy, simply
is false.

Id. at 153 (emphasis added). And, in concluding, the Review Team

wrote, among other things:

[Petitioner] remained quiet until a movie
brought him back into the limelight he craved.
Today his numerous statements are contradicted
by many others. His explanations for doing
the things he did and saying the things he
said are tortured and strain credulity. In

8

short, there are few statements that
[Petitioner] makes today that can be trusted.
        As this review unfolded, the Review Team
cast the same discerning eye on the evidence
produced by the Friedmans and their
supporters, as on the original investigation
and prosecution. <u>The Review Team thoroughly
analyzed and weighed all amassed information.
Special attention was paid to the alleged
recantation evidence, which was found to be
either overstated, not reliable, or unable to
be substantiated.</u>
        **The District Attorney's ultimate
decision** did not turn on any one piece of
evidence or witness account. Instead, it
**rested upon a consideration of all of the
evidence, past and present**. No investigation
or prosecution is perfect, and this case is no
exception. However, in the final analysis,
**taking all evidence into consideration, and
giving it its due weight, [Petitioner] was not
wrongfully convicted**.

<u>Id.</u> at 155 (emphases added).

        On June 23, 2014, Petitioner moved a second time to have
his conviction overturned and the indictments against him
dismissed[6] claiming: actual innocence; false testimony, obtained
by coercion, had been used before the grand jury; and, he had been
improperly coerced by the trial court into pleading guilty. <u>See</u>
2014 Section 440 Decision at 1; (<u>see also</u> Ex. A, ECF No. 37 at
118-29, <u>attached to</u> Petition (hereafter, the "Second 440
Motion")). Supporting his Second 440 Motion, Petitioner attached,
among other things, the Rice Report and a transcript of the Movie.

_____

[6] Petitioner moved pursuant to N.Y. C.P.L. § 440.10.

(See Kuby Supp. Aff.[7] ¶¶ 6, 30.)  In arriving at its decision on
the Second 440 Motion, the court considered the Rice Report and
all of the parties' other submissions, with one exception: the
Movie transcript.  See 2014 Section 440 Decision at 2.  The court
further highlighted it had not viewed the Movie, stating its
"belief that th[e Second 440 M]otion should be decided on evidence
that is not subject to the editing skills of successful and
talented movie producers."  Id. at 3.

        As to Petitioner's actual innocence claim: The court
deferred ruling upon it pending a hearing to which the District
Attorney consented.  See id. at 3.  In doing so, the court noted
it would be Petitioner's burden of establishing his innocence by
clear and convincing evidence.  See id.

        As to Petitioner's claim concerning the grand juries:
The court was unpersuaded by Petitioner's contention that the
underlying indictments were the result of knowingly unreliable and
perjured testimony.  See id. at 5.  It rejected each of Petition's
arguments.  First, it found unpersuasive Petitioner's reliance
upon the statements of Scott Banks, law secretary to Judge Abby
Boklan (the judge who presided over Petitioner's underlying
criminal case), stating it had "no reason to doubt the veracity"

---

[7]  Attorney Kuby's Affidavit filed in support of the Second 440
Motion is: docketed in this case as ECF No. 37 at 120-29;
identified as Ex. A; and, attached to the Petition.

of his statement that he found the grand jury testimony to be
legally sufficient and that any concern he had regarding the
quality of evidence presented to the grand jury did not raise a
constitutional due process concern that survives a guilty plea.
See id. (further stating Banks "would not and could not have known
if the testimony he reviewed was knowingly false when used or
subsequently determined to be false," thereby offering "little
support" to Petitioner's contention that the indictments in the
underlying criminal case were the result of knowingly unreliable
and perjured testimony).  Second, the court declined to rely upon
the proffered March 8, 2013 recantation letter of Ross Goldstein
(hereafter, the "Goldstein Recantation") (see Ex. H, ECF No. 37 at
334-42, attached to Petition) in determining whether the
prosecution should have known that Goldstein's grand jury
testimony was not truthful.  See id. 6.  Doing so, it noted:
Goldstein initially refused to be involved in the Movie, but
subsequently participated in an interview with the Movie team,
during which he rejected the notion that there were materials which
could exonerate Petitioner; then, in 2013, having learned of the
Rice re-investigation into Petitioner's criminal case, Goldstein
submits his Recantation, stating his testimony before the grand
jury was a complete fabrication and the result of pressure from
the police and the District Attorney, but, when thereafter
interviewed by the Review Team, he was unable to "explain the

marked difference in his position from not recanting to full recantation." Id. at 5-6. As such, Petitioner could not overcome the presumption against recantation. See id. at 6. "Moreover, Goldstein only testified relative to the third Indictment and played no part in the first two." Id. Third, the court was equally unpersuaded by Petitioner's reliance on additional recantation evidence, finding he did not meet his burden to use it, explaining "[t]hat someone recants at a future time does not necessarily equate itself with the prosecution's knowledge that the original testimony is false and should not be used." See id. (citations omitted). Finally, in the absence of "affidavits of individuals admitting to using the alleged problematic interview techniques," the court found Petitioner's argument regarding the use of purported problematic interview techniques unavailing in showing "that the prosecution placed knowingly false testimony before the grand jury." See id. (stating "[t]hat interviewing techniques have evolved over the years is not grounds for vacating prior convictions").

        As to Petitioner's claim that the court allegedly coerced him into a guilty plea: After thoroughly discussing the relevant law, the court noted that a significant factor in its determination of this claim was "whether the [Petitioner] had access to the information alleged . . . at the time he filed his initial [Section 440] motion." Id. at 7 (citation omitted). In

rejecting Petitioner's request for a hearing on this claim, the court found:

> There are no facts presented in the current motion, related to the issue of coercion, that were not known to [Petitioner] at the time of his first [§ 440 M]otion in 2004.  In fact, affidavits relied upon for the current [§ 440 M]otion were drafted and utilized in the first [§ 440 M]otion already decided by the Courts. There being nothing new before this Court related to the factual allegations espoused herein, this Court questions why such arguments were not previously raised by [Petitioner] especially in light of the fact that [Petitioner] has been represented by counsel of his choosing since his release from incarceration.  * * *

Id.  Further, the court found the record evidence did not support Petitioner's argument that he was coerced into a guilty plea.  See id. at 8-9 ("[U]ncontroverted facts alleging coercion in the form of a detailed affidavit by the attorney or another is missing in this matter.  The evidence before this Court is the exact opposite.").  The court rigorously discussed why it found the statements of Judge Boklan, who presided over Petitioner's underlying criminal case but who had since passed away, did not evidence coercion,[8] e.g., Judge Boklan's: belief in Petitioner's

---

[8]  The court emphasized that its determination as to the Judge Boklan evidence was based upon its review of the complete transcript of the judge's interview with the Movie's producers. Id. at 8 ("Judge Boklan, in her **complete** transcript to the movie producers of "Capturing the Friedmans" stated on numerous occasions her belief in [Petitioner]'s guilt – based on her reading of the grand jury testimony.") (emphasis in original).

guilt based upon her reading of the grand jury testimony; review of a pre-sentence report and a pre-sentence memorandum that detailed admissions by Petitioner; acknowledgement that she believed Petitioner's sentence was harsh, together with her understanding that the victims' families believed the sentence was lenient; and, explaining her practice regarding sentencing, especially after a defendant proceeds to trial. See id. at 8. The court also highlighted what Judge Boklan did not address in the interview, i.e., there was no reference to: giving Petitioner a certain sentence if he were to go to trial; the judge discussing with Petitioner's then-attorney, Peter Panaro, such a sentence; the judge's desire for Petitioner to plead guilty as opposed to going to trial. See id. Finally, the court found "Peter Panaro's undated affirmation is likewise void of any details related to the issue of coercion from the Court." Id. (further stating "[t]he affirmation details information related to Brady concerns but not judicial coercion"). This finding was based upon the court's in-depth review of the transcript of the meeting between Panaro and Petitioner, which occurred two days before Petitioner's plea and during which Panaro discussed in detail with Petitioner the plea bargain and stated to Petitioner "that 'Judge Boklan has indicated that for each one of the charges that [Petitioner would be] convicted of, she would consider some consecutive time.'" (Id. at 9 (emphasis added by court). In the end, Panaro "detail[ed] that

14

the [Petitioner] discussed pleading guilty with his numerous therapists and his family and the many reasons why the [Petitioner] has chosen to plead guilty." Id. Ultimately, the court found neither Panaro's Affirmation nor his pre-plea interview with Petitioner "show[ed] any evidence of judicial coercion such that the plea of guilty should be set aside." Id. What proved paramount to this determination was that "Panaro was fully aware of the issue of coercion as he discussed it as a possible defense" and "had ample opportunity . . . to state, even once, the Judge was being harsh, difficult, unfair, unreasonable or even overzealous," but "[h]e said nothing." Id. (further stating that the delay in bringing forth the allegation of judicial coercion lay with the Petitioner).

Thus, while setting a hearing on his actual innocence claim, the court denied Petitioner's Second 440 Motion to overturn his convictions and dismiss the underlying Indictments. See id. at 10. However, in a September 4, 2018 oral ruling, based upon the Court of Appeal's June 14, 2018 ruling in People v. Tiger, 2018 Slip Opinion 04377, 32 N.Y.3d 91, "that there is no cause of action for an actual innocence hearing when a defendant has previously pled guilty," the court withdrew its prior granting of an actual innocence hearing, and dismissed the remained of Petitioner's Second 440 Motion. (See Sept. 4, 2018 Ruling Tr., Ex. C, ECF No. 37 at 140-43, attached to Petition.) On August 12,

15

2019, the Appellate Division summarily denied Petitioner's application to appeal the denial of his Second 440 Motion. (See People v. Friedman, No. 2018-12148, Summ. Order (N.Y. App. Div., 2d Dep't Aug. 12, 2019), Ex. D, ECF No. 37 at 144, attached to Petition.)

On November 6, 2020, Petitioner filed a motion with the Second Circuit seeking an order authorizing this Court to consider a second habeas corpus application, pursuant to 28 U.S.C. §§ 2244(b) and 2254, asserting he had newly discovered evidence, including the recantations of several key witnesses. (See Petition.) The State opposed the application, arguing, inter alia, both that Petitioner's claims are time-barred and that the Court lacks subject matter jurisdiction. (See Opp'n Aff. ¶68.) On November 30, 2020, finding Petitioner had made a prima facie showing that the requirements of § 2244(b)(2) were satisfied, the Second Circuit issued an order directing this Court "to address, as a preliminary inquiry under § 2244(b)(4), whether the factual predicate for the Petitioner's claims satisfies the requirements of § 2244(b)(2)(B)." Friedman v. Rehal, No. 20-3795, Mandate (2d Cir. Nov. 30, 2020) (docketed in this Case as ECF No. 35).

DISCUSSION

I.   Legal Standard

        Congress enacted the Antiterrorism and Effective Death
Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996),
to restrict "the power of federal courts to grant writs of habeas
corpus to state prisoners." Williams v. Taylor, 529 U.S. 362, 399
(2000).  A state prisoner seeking habeas corpus relief under §
2254 must show that he is "in custody in violation of the
Constitution or laws or treaties of the United States." 28 U.S.C.
§ 2254(a).  Section 2254, as amended by AEDPA, provides, in part,
that:

>       An application for a writ of habeas corpus on
>       behalf of a person in custody pursuant to the
>       judgment of a State court shall not be granted
>       with respect to any claims that was not
>       adjudicated on the merits in State court
>       proceedings unless the adjudication of the
>       claim—
>
>           (1) resulted in a decision that was
>           contrary to, or involved an
>           unreasonable application of,
>           clearly established Federal law, as
>           determined by the Supreme Court of
>           the United States; or
>           (2) resulted in a decision that was
>           based on an unreasonable
>           determination of the facts in light
>           of the evidence presented in the
>           State court proceeding.

28 U.S.C. § 2254(d)(1)&(2).  The AEDPA established a deferential
standard of relief, seeking to "avoid[ ] unnecessarily 'disturbing
the State's significant interest in repose for concluded

17

litigation, denying society the right to punish some admitted offenders, and intruding on state sovereignty to a degree matched by few exercises of federal judicial authority.'" Virginia v. LeBlanc, 137 S. Ct. 1726, 1729 (2017) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)) (brackets omitted). Accordingly, a habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. Herrara v. Collins, 506 U.S. 390, 401 (1993). Ultimately, "the petitioner bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated," Jones v. Vacco, 126 F. 3d 408, 415 (2d Cir. 1997); see also Hawkins v. Costello, 460 F. 3d 238, 246 (2d Cir. 2006), or "by clear and convincing evidence" that the factual determinations made by the state court were inconsistent with the record evidence. 28 U.S.C. § 2254(e)(1); 28 U.S.C. § 2254(d)(2); see also Rice v. Collins, 546 U.S. 333, 340-41 (2006); White v. LaClair, No. 19-CV-1283, 2021 WL 200857, at *3 (E.D.N.Y. Jan. 19, 2021).

As to a successive § 2254 petition, "[a] district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." 28 U.S.C. § 2244(b)(4). In addition to other requirements, i.e., § 2244(b)(2)(B), successive § 2254 petitions are subject to the threshold requirements of both

a one-year application period and an "in custody" jurisdictional requirement. See 28 U.S.C. § 2244(d)(1) ("A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." (emphasis added)). Indeed, it is well-settled that "[o]nly those 'in custody' at the time a habeas petition is filed may petition for a writ of habeas corpus under 28 U.S.C. § 2254." Chandler v. Vermont, 728 F. App'x 73, 74 (2d Cir. June 26, 2018) (citing Finkelstein v. Spitzer, 455 F.3d 131, 133 (2d Cir. 2006)); see also Maleng v. Cook, 490 U.S. 488, 490-91 (1989) (per curiam) (holding that a habeas petitioner must "be 'in custody' under the conviction or sentence under attack at the time his petition is filed" and that the failure to establish the "in custody" requirement deprives a federal habeas court of subject matter jurisdiction); Nowakowski v. New York, 835 F.3d 210, 215 (2d Cir. 2016) ("In order for a federal court to have jurisdiction over a [§ 2254] petition, the petitioner must be 'in custody pursuant to the judgment of a State court.'"); Sloane v. Anderson, No. 19-CV-4700, 2019 WL 2865293, at *2 (S.D.N.Y. July 3, 2019) ("The United States district courts have jurisdiction to entertain petitions for habeas corpus relief only from persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" (quoting 28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a)); Rules Governing Section 2254 Cases in the United States District

19

Courts, Rule 1(a)(1)&(2) (stating § 2254 habeas relief is available only to persons "in custody under a state-court judgment who seeks a determination that" either "the custody violates the Constitution, laws, or treaties of the United States" or "that future custody under a state-court judgment would violate the Constitution, laws, or treaties of the United States").

II.  Analysis

    A. The Parties' Positions

        Petitioner raises two grounds for habeas relief in his Petition.  First, he claims that the grand jury testimony of fourteen child witnesses and Goldstein was coerced and elicited via improper interrogation techniques.  (See Petitioner at 5, Ground One).  Second, Petitioner contends both that the Goldstein Recantation proves Goldstein had been coerced to cooperate with the prosecution in order to force Petitioner into pleading guilty and that Judge Boklan improperly threatened Petitioner with the imposition of consecutive sentencing if convicted after a trial. (See id. at 6, Ground Two.)  He did not initially address the threshold custodial jurisdiction requirement.  (See id., in toto.)

        In opposition, in addition to other arguments, Respondent asks this Court "to consider the threshold jurisdictional issues of timeliness and custody."  (Opp'n Aff. ¶72; see also Opp'n at 1, 11-17.)  Respondent asserts "this Court lacks subject matter jurisdiction over [P]etitioner's claims

because he is not in custody pursuant to a state court judgment of conviction," having been "released from incarceration on December 7, 2001, and discharged from parole supervision on December 9, 2006." (Id. at ¶74 ("[P]etitioner has not been in state custody for the purposes of habeas relief for approximately thirteen years."); see also Opp'n at 12.)  And, "[a]lthough [Petitioner] is still subject to sex offender registration requirements, registration is a collateral consequence that does not restrict [his] liberty to the degree necessary to constitute custody." (Opp'n at 12 (first citing Chaidez v. United States, 568 U.S. 342, 349, n.5 (2013) (listing sex offender registration as one example of "effects of conviction commonly viewed as collateral"); then citing Vere v. Haggett, No. 08-CV-10852, 2015 WL 1026310, at *6 (S.D.N.Y. Mar. 9, 2015)(stating that courts in the Second Circuit have determined N.Y. sex offender registration is a collateral consequence of conviction)).)  Respondent further contends that of the circuit courts which have addressed whether sex offender registration satisfies the federal habeas "in custody" requirement, all but one has found it does not.  (See id. at 12 (citing cases from the Fourth, Sixth, Seventh, Ninth, and Tenth Circuits which hold that sex offender registration requirements are not custodial in nature).)  Moreover, while the Second Circuit has yet to address this issue, federal district courts in New York and Connecticut have "found that restrictions under those states'

respective sex offender registration laws do not constitute custody." (Id. at 12-13 (collecting cases finding sex offender registration is neither custodial nor punitive).)

As to "[t]he Third Circuit Court of Appeals' decision to the contrary," Respondent argues it is "an outlier" (id. at 13 (citing Piasecki v. Court of Common Pleas, Bucks County, PA, 917 F.3d 161 (3d Cir. 2019))), highlighting that "Pennsylvania's sex offender registration requirements, which are part of the sentence itself are—unlike those in New York and Connecticut—particularly restrictive." (Id. at 13; see also id. at 14 (outlining examples of the restrictive nature of Pennsylvania's sex offender registration requirements).) Furthermore, "Pennsylvania's sex offender registration, unlike those at issue here, was punitive and not collateral." (Id. at 14 (citations omitted).) In comparison, "[t]he New York and Connecticut sex offender registration statutes are not as restrictive as Pennsylvania's law." (Id.; see also id. at 15-16 (contrasting New York's and Connecticut's respective sex offender registration regulations with those of Pennsylvania).)

In reply, Petitioner purports that he is in custody pursuant to a state court judgment since he was "unambiguously in custody at the time of his first petitioner" and is still subject to New York and Connecticut sex offender registration laws. (See Reply, ECF No. 46, at 11-12 ("The argument that [Petitioner] is

not in custody pursuant to the judgment of the state court for federal habeas purposes because he is no longer incarcerated or under parole supervision is disingenuous, arcane, and wrong."); see also id. at 12-21.)  He notes that this habeas petition "presents the question of whether a petitioner for successive writ of habeas corpus, who was under parole supervision at the time of his first petition and for whom the Second Circuit called for further factfinding, remains in custody for successive habeas purposes" (id. at 12, n.2), and suggests this Court "could . . . find that [he] is currently under a kind of probation that would extend his habeas review."  (Id. (citations omitted; emphasis added).)  In sum, Petitioner asks that this Court "not heed the decades of jurisprudence that declines basic procedural rights to sex offenders but[,] instead, follow Piasecki."  (Id. at 14; see also id. at 12 ("[T]his Court must follow the dictates of Piasecki v. Court of Common Pleas, 917 F.3d 161 (3d. Cir. 2019) and hold that [Petitioner] is in custody pursuant to the judgment of a state court within the meaning of 28 U.S.C. §§ 2241(c)(1), 2254(a).").)

    B. The Jurisdictional Issue

        Before filing the instant Petition, Petitioner's sentence for his 1988 guilty-plea conviction -- which is the conviction he is challenging -- fully expired, i.e., he was no longer incarcerated and his associated term of parole had ended. See White, 2021 WL 200857, at *4 ("A sentence fully expires once

23

the term of incarceration and the associated term of parole or
supervised release, if any, has ended." (citing Maleng, 490 U.S.
at 492)).   Therefore, he is no longer considered "in custody".
See Maleng, 490 U.S. at 492 ("We have never held . . . that a
habeas petitioner may be 'in custody' under a conviction when the
sentence imposed for that conviction has fully expired at the time
his petition is filed.")  Hence, even if, arguendo, this Petition
were timely, because Petitioner is no longer in custody, the Court
is without jurisdiction to consider his habeas Petition.  To the
extent Petition tries to overcome the jurisdictional shortcoming
of no longer being "in custody" by relying upon his being subject
to sex offender registration requirements, that reliance is
unavailing.

> "[O]nce the sentence imposed for a conviction
> has completely expired, the collateral
> consequences of that conviction are not
> themselves sufficient to render an individual
> 'in custody' for the purposes of a habeas
> attack upon it." Ogunwomoju v. United States,
> 512 F.3d 69, 74 (2d Cir. 2008) (quoting
> Maleng, 490 U.S. at 492, 109 S. Ct. 1923).
> Collateral consequences include the
> "inability to vote, engage in certain
> businesses, hold public office, or serve as a
> juror," as well as the possibility of a
> subsequent conviction being enhanced under
> repeat-offender laws.  Maleng, 490 U.S. at
> 491-92, 109 S. Ct. 1923; see also Nowakowski,
> 835 F.3d at 216 ("Those cases where courts
> have declined to find the petitioners
> sufficiently 'in custody' have typically
> involved the imposition of fines or civil
> disabilities, such as suspension of
> licenses.") (collecting cases).

White, 2021 WL 200857, at *5.

The White case is instructive in this instance.
Petitioner White sought "to be released from the restrictions
imposed under SORA, which he contend[ed] render[ed] him 'in
custody' for habeas purposes." Id. at *1.   In denying White's §
2254 petition, Chief Judge Brodie rejected the contention that
SORA restrictions, and ones similar to them, "render a petitioner
'in custody' because, in principal part, those requirements are
more similar to collateral consequences of conviction than to the
strict requirements of parole and also because the statutes were
not intended to be punitive." Id. at *5 (collecting cases finding
sex offender registration requirements amount to collateral
consequence of conviction).   In doing so, Chief Judge Brodie
distinguished Piasecki, the sole circuit court case to find a
petitioner subject the requirements of a sex offender registration
statute to be "in custody" for § 2254 habeas purposes, and which
involved "a significantly more restrictive sex offender law." Id.
at *6 (citing Piasecki, 917 F.3d at 170-71).   Of import, Chief
Judge Brodie highlighted that "[t]he Third Circuit made clear that
its decision did not read the 'in custody' requirement out of
section 2254, [but] that it merely held 'that the custodial
jurisdiction requirement is satisfied by severe, immediate,
physical, and (according to [Pennsylvania S]tate's own definition)

punitive restraints on liberty that are imposed pursuant to — and included in — the judgment of a state court such as the one'" at issue in Piasecki.  Id. (quoting Piasecki, 917 F.3d at 176); see also Piasecki, at 917 F.3d at 166 ("[F]or the purposes of habeas jurisdiction, a petitioner is 'in custody' if he or she files while subject to significant restraints on liberty that are not otherwise experienced by the general public." (citing Jones v. Cunningham, 371 U.S. 236, 239 (1963); further citations omitted)).  Conversely, petitioner White, who was subject to New York's SORA, could not establish § 2254 "in custody" jurisdiction, because SORA:

> [u]nlike the intentionally punitive statute at issue in Piasecki, 917 F.3d at 174-75, in which registration requirements are imposed as part of the petitioner's sentence, . . . is a remedial statute and the "SORA requirements, unlike post-release supervision, are not part of the punishment imposed by the judge; rather, SORA registration and risk-level determinations are nonpenal consequences that result from the fact of conviction for certain crimes."

Id. at *7 (quoting People v. Gravino, 14 N.Y.3d 546, 556-57 (2010); further citation omitted); see also id. (observing "'[t]he fact that SORA's registration requirement is imposed in a separate proceeding further differentiates the requirement from that in Piasecki, which conditions were imposed at sentencing"[9]); id. at

---

[9]    In New York, the Board of Examiners of Sex Offenders makes a recommendation to the sentencing court sixty days before a sex

*8 ("The Court finds, consistent with other circuit courts and district courts in this circuit, that SORA's requirements are similar to collateral consequences of a conviction rather than to the comprehensive regime of parole.  While SORA imposes some restraints on Petitioner's liberty that are not shared by the general public, including the fact that he must verify his address and employment annually, and must be photographed 'at the law enforcement agency having jurisdiction' every three years, these requirements are insufficient to render Petitioner in custody." (citing N.Y. Corr. Law §§ 168-f(2), 168-f(b-3)).  Hence, the district court found petitioner White was not "in custody" and, therefore, could "not challenge the SORA requirements to his case through the habeas process"; thus, White's § 2254 petition was denied.  Id. at *9, *10.

The White Court's determination that a § 2254 habeas petitioner was not "in custody" thereby depriving the court of §

---

offender's discharge, parole or release to post-release supervision concerning whether the individual should [be] designated as a sex offender and, if so, the nature of the designation, i.e., Level One, Two or Three.  After notice to the defendant, the sentencing court makes the ultimate determination concerning designation as a sex offender.  That decision is subject to appellate review.

Fowler v. Fischer, No. 18-CV-2769, 2019 WL 2551766, at *5 (S.D.N.Y. May 30, 2019) (citing N.Y. Corr. Law §§ 168-l, 168-n), report and recommendation adopted, 2019 WL 2544472 (S.D.N.Y. June 20, 2019).

2254(a) jurisdiction echoes the recent finding of a sister court in the Southern District of New York.  In Fowler v. Fischer, the § 2254 petitioner sought the vacatur of his 2008 conviction for statutory rape.  See Fowler v. Fischer, No. 18-CV-2769, 2019 WL 2551766, at *5 (S.D.N.Y. May 30, 2019) (hereafter, "Fowler R&R") (citing N.Y. Corr. Law § 168-l, § 168-n), report and recommendation adopted by, 2019 WL 2544472 (S.D.N.Y. June 20, 2019).  Respondent moved to dismiss the § 2254 petition, arguing the court lacked subject matter jurisdiction over it because "petitioner's being subject to the registration and reporting requirements of New York's sex offender registration statute[, i.e., SORA,] do[es] not constitute 'custody' for the purpose of bringing a habeas corpus petition."  Fowler R&R at *1.  In recommending the dismissal of Fowler's § 2254 petition, the court observed that while the Second Circuit has yet to address this issue, six circuit courts have uniformly done so, holding that the "registration and related requirements" of sex offender registration statutes do not satisfy the "in custody" requirement of § 2254(a).  Id. at *3 (citing Hautzenroeder v. Dewine, 887 F.3d 737, 744 (6th Cir. 2018); Dickey v. Allbaugh, 664 F. App'x 690, 692-94 (10th Cir. 2016); Calhoun v. Attorney Gen. of Colo., 745 F.3d 1070, 1074 (10th Cir. 2014); Wilson v. Flaherty, 689 F.3d 332, 338 (4th Cir. 2012); Virsnieks v. Smith, 521 F.3d 707, 719-20 (7th Cir. 2008); Leslie v. Randle, 296 F.3d 518, 521-23 (6th Cir. 2002); Zichko v. Idaho, 247 F.3d

1015, 1019 (9th Cir. 2001); McNab v. Kok, 170 F.3d 1246, 1247 (9th Cir. 1999) (per curiam); Williams v. Gregoire, 151 F.3d 1180, 1184 (9th Cir. 1998); and, further collecting district court cases "reaching the same result"). The Fowler court observed that these numerous courts' decisions were based primarily on two factors: (1) "in virtually all of the cases, the registration statute in issue does not limit the offender's movement or employment in any respect," requiring only "notice to state authorities either before or shortly after any change in residence, employment, etc."; and (2) that in "several of the cases" the courts "relied on the fact that the registration requirement was not imposed as part of the sentence," but "as a result of a separate, non-criminal proceeding." Id. at *4 (citing Rodriguez v. Attorney Gen., 10-CV-3868, 2011 WL 519591 at *8 (S.D.N.Y. Feb. 15, 2011), report and recommendation adopted by, 2011 WL 3875328 (S.D.N.Y. Sept. 2, 2011)). Conversely, it found the Third Circuit's Piasecki case to be a "single outlier". Id. at *4. In delineating its reason for that distinction, the Fowler Court observed that the Piasecki Court "held that a Level Three sex offender under Pennsylvania's sex offender registration statute was 'in custody' for the purpose of filing a habeas corpus petition" for three reasons: (1) "the petitioner was placed under sex-offender supervision as part of the sentencing proceeding;" (2) "the petitioner was subject to a substantial number of stringent limitations;" and (3)

"Pennsylvania itself had concluded that the requirements of its sex offender registration statute were punitive in nature and were not merely collateral consequences of a criminal conviction." Fowler R&R, 2019 WL 2551766, at *5 (citing Piasecki, 917 F.3d at 164-65, 175-76).  Petitioner Fowler, a Level Two sex offender, by contrast, was not "in custody", with the facts of his case being "more similar to those in the cases that have held being subject to a sex offender registration statute does not constitute being 'in custody' and [being] materially different from the facts presented in Piasecki."  Id. at *4.  In particular, the court highlighted: (1) "the requirements with which [Fowler] had to comply as a Level Two offender were relatively minor" and "far less rigorous than the restrictions at issue in Piasecki", id. (citing N.Y. Corr. Law § 168-f); (2) "the registration requirement was not part of [Fowler]'s sentencing[, but] the result of a separate proceeding held after the completion of [Fowler]'s sentence of incarceration", id. at *5 (citing N.Y. Corr. Law §§ 168-1, 168-n); and (3) SORA "'is not a penal statute and the registration requirement is not a criminal sentence[;] . . . [it] is a remedial statute intended to prevent future crime.'"  Id. (quoting Gravino, 14 N.Y.3d at 556 (emphasis in original); further citation omitted).  Thus, the court recommended that the outcome of Fowler's petition was "controlled by the vast majority of decisions holding that being subject to a sex offender registration

statute does not constitute being 'in custody'" and that dismissal the § 2254 petition for lack of subject matter jurisdiction was warranted.  Id. at *5; see also id. at *6.

Here, the weight of persuasive authority buttresses the finding that the requisite § 2254(a) custodial jurisdiction is wanting, thereby compelling the dismissal of the Petition.  First, and contrary to the Piasecki case, Petitioner's SORA's requirements where not part of his sentence, but the result of a separate proceeding. (See Opp'n Decl. ¶21.)  See also Gravino, 14 N.Y.3d at 556-57 ("SORA requirements, unlike postrelease supervision, are not part of the punishment imposed by the judge; rather, SORA registration and risk-level determinations are nonpenal consequences that result from the fact of conviction for certain crimes."); Wilson v. State, No. 3:14-CV-1392, 2016 WL 81788, at *2 (D. Conn. Jan. 7, 2016) ("The duty to register as a sex offender is a mandatory condition imposed by Connecticut's Criminal Procedure Statutes, not the reasoned judgment pronounced by the sentencing court." (citation omitted)).  Second, and contrary to the Piasecki case, New York's SORA is a remedial statute intended to prevent future crime; it is nonpenal.  See, e.g., People v Perez, 125 N.Y.S.3d 308, 309 (2020) ("[T]he purpose underlying SORA [is] to protect the public from sex offenders" (quoting People v. Mingo, 12 N.Y.3d 563, 574 (2009)); see also North v. Bd. of Exams. of Sex Offenders of State of N.Y., 8 N.Y.3d

745, 752 (N.Y. 2007) ("SORA is not a penal statute and the registration requirement is not a criminal sentence. Rather than imposing punishment for a past crime, SORA is a remedial statute intended to prevent future crime; its aim is to 'protect[ ] communities by notifying them of the presence of individuals who may present a danger and enhancing law enforcement authorities' ability to fight sex crimes.'" (quoting Doe v. Pataki, 120 F.3d 1263, 1276 (2d Cir. 1997)). The same is true of Connecticut's sex offender registration statute. See Wilson, 2016 WL 81788, at *2 ("The registration statute falls within the Criminal Procedure (Title 54) rather than the Penal Code (Title 53) division of the Connecticut General Statutes. Connecticut's sex-offender-registration requirement functions as a collateral consequence rather than a restraint on liberty."); see also, generally, State v. Waterman, 264 Conn. 484, 492-93 (2003) (rejecting argument that Connecticut sex offender registration law was enacted for punitive purposes); State v. Kelly, 256 Conn. 23, 94-95 (2001) (holding Connecticut's sex offender registration statute "is regulatory and not punitive in nature" and "was enacted to protect the public from sex offenders").

Finally, and contrary to the Piasecki case, the SORA requirements for a Level Three sex offender, to which Petitioner is subjected, are not so rigorous that they subject Petitioner to significant restraints on his liberty that are not otherwise

experienced by the general public.  By way of comparison, in

Piasecki the petitioner:

> was required to register in-person with the
> State Police every three months for the rest
> of his life.  The [Pennsylvania sex offender]
> statute also required him to appear, in-
> person, at a registration site if he were to:
>
> > • Change his name;
> > • Change his residence or become
> > transient;
> > • Begin a new job or lose previous
> > employment;
> > • Matriculate or end enrollment as
> > a student;
> > • Add or change a phone number;
> > • Add, change, or terminate
> > ownership or operatorship of a car
> > or other motor vehicle, and, as part
> > of that visit, provide his license
> > plate number, VIN number, and
> > location where the vehicle will be
> > stored;
> > • Commence or change temporary
> > lodging;
> > • Add, change, or terminate any
> > email address or other online
> > designation; or
> > • Add, change, or terminate any
> > information related to an
> > occupational or professional
> > license.
>
> If Piasecki were to become homeless, he was
> required to appear in person monthly and to be
> photographed.  Prior to any international
> travel, Piasecki had to appear in person at an
> approved registration site no less than 21
> days before his anticipated departure.
> Failure to abide by any of these reporting
> requirements exposed Piasecki to criminal
> prosecution.

<u>Piasecki</u>, 917 F.3d at 164-65 (citations, footnotes, and internal quotation marks omitted; emphasis added). Conversely, neither New York's nor Connecticut's sex offender registration statues are as restrictive. In making this determination, the Court underscores that, as Petitioner concedes, because of his 2009 move to Connecticut, he "is not currently subject to in-person registration requirements in New York, but instead, annual mail-in verification." (Reply at 17, n.5 (citing N.Y. Corr. Law § 168-i).) Thus, to argue that such a requirement is analogous to any of the restrictions in <u>Piasecki</u> or causes a significant restraint on Petitioner's liberty defies credulity.

Then, via notation, Petitioner further purports that:

> [p]ursuant to Connecticut General Statute § 54-251 (2018), [Petitioner] is also subject to annual in-person registration requirements of his residential address, employment, vehicle registration, internet identifiers (e-mail addresses, social media handles, etc.), as well as the taking of a photograph annually. Any changes in his address, employment, vehicle registration, and internet identifiers must also be registered in Connecticut without undue delay.

<u>Id.</u> (citing Conn. Gen. Stat. § 54-251). However, as the Respondent accurately states:

> Connecticut law does not mandate routine in-person registration. [Instead,] "Connecticut General Statute § 54-253, which governs individuals who committed sex offenses in other jurisdictions[:] mandates registration [be] done "in writing[;]" states that the registration forms will be "mailed" to the

> offender's address[;] and requires the
> offender to "submit to the retaking of a
> photographic image upon request." [Moreover,
> a] separate statutory provision explicitly
> states that address verification forms are to
> be returned "by mail" within ten days of being
> mailed to the offender."

(Opp'n at 15 (first citing Conn. Gen. Stat. § 54-257(c); then

citing Wilson v. State, No. 3:14-CV-1392, 2016 WL 81788, at *2 (D.

Conn. Jan. 7, 2016) (noting the lack of in-person registration

requirements in deciding that Connecticut sex offender

registration requirements are non-custodial); finally citing State

v. T.R.D., 286 Conn. 191, 208 (Conn. 2008)(stating address

verification form must be returned by first-class mail)).) See

also Cornelio v. Connecticut, No. 3:19-CV-1249, 2020 WL 7043268,

at *1, n.3 (D. Conn. Nov. 30, 2020) (citing Conn. Gen. State. §

54-253 as the statute which identifies "sex offender registration

requirements applicable to residents of Connecticut who have been

convicted of a sex offense in a jurisdiction outside of Connecticut

and incorporating registration requirements of Conn. Gen. Stat. §

54-251 that apply to an offender convicted for a sex offense

against a minor victim"). Petitioner does not dispute these

contentions. If he had, it would have been unavailing as none of

these requirements are so onerous that they thwart Petitioner from

exercising free movement and autonomy as the general public may

do. See, e.g., Wilson, 2016 WL 81788, at *2 (stating that

Connecticut's sex offender registration statute does not interfere

with petitioner's "ability to come and go as he pleases" and does
not prohibit an offender from "living, working, attending school,
or traveling where he wants").  Indeed, it is spurious to claim
that Connecticut's sex offender registration restrictions to which
Petitioner is subject are comparably severe to those in Piasecki.

        In the end, Petitioner acknowledges "the multitude of
contrary authority in the Federal Circuit Courts of Appeals" and
admits "[l]ittle can be offered by way of a response[, as] to
distinguish the caselaw is to simply disagree with the caselaw."
(Reply at 16, n.3.)  That is so.  Petitioner has offered little
more than his impassioned disagreement with the decades of case
law finding that the requirements of post-judgment sex offender
registration statutes are collateral to underlying sex crimes and
that the imposition of those requirements do not translate into a
state's maintaining custody over the offender such that habeas
custodial jurisdiction is established.  Rather, review of the
record demonstrates: (1) the sex offender registration
requirements to which Petitioner is subject are not "severe,
immediate, physical and . . . punitive restraints on liberty,"
such as those imposed upon petitioner Piasecki; (2) the imposition
upon Petitioner of sex offender registration requirements were not
part of his underlying state court judgment; (3) Petitioner being
subject to the sex offender registration requirements of New York
and Connecticut is a collateral consequence of his 1998 guilty-

plea conviction; and (4) the subject sex offender registration statutes are non-punitive in nature; therefore, Petitioner is not considered to be "in custody" pursuant to § 2254.  As a result, this Court lacks the requisite federal habeas custodial jurisdiction to consider the Petition.

***

CONCLUSION

Accordingly, for the reasons stated herein, **IT IS HEREBY ORDERED** that Petitioner's Petition is DISMISSED.

FURTHER, because Petitioner has not made a substantial showing that he was denied a constitutional right, the Court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); see also Finkelstein v. Spitzer, 455 F.3d 131, 133 (2d Cir. 2006) ("As the district court was informed by [petitioner]'s submissions that [petitioner] was no longer in custody in connection with his fraud convictions at the time he filed his present [§ 2254] petition, he has not made a substantial showing that he was in custody by reason of the denial of a constitutional right.  Accordingly, we deny [petitioner]'s motion for a certificate of appealability."); Pirtle v. Winn, 66 F. Supp. 3d 307, 311 (E.D.N.Y. 2014) (denying certificate of appealability where § 2254 petition dismissed for lack of jurisdiction).  It is

further certified, pursuant to 28 U.S.C. § 1915(a), that any appeal

would not be taken in good faith.  See Coppedge v. United States,

369 U.S. 438, 444-45 (1962).

      The Clerk of the Court is directed to close this case.


**SO ORDERED.**


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: August  20 , 2021
      Central Islip, New York